PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:    MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

_____

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-01010-E |
| | § | |
| Defendants. | § | |
| | § | |

-------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§
§    Adv. Proc. No. 21-3004
§

Plaintiff,

§
§

vs.

§
§    Case No. 3:21-cv-00881-X
§

HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.,

§
§
§
§
§

Defendant.

§
§

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§
§    Adv. Proc. No. 21-3005
§

Plaintiff,

§
§

vs.

§
§    Case No. 3:21-cv-00880-C
§

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§
§
§
§

Defendants.

§
§

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§    Adv. Proc. No. 21-3006
§

Plaintiff,

§
§

vs.

§
§    Case No. 3:21-cv-01378-N
§

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

§
§
§
§

Defendants.

§
§

_____

HIGHLAND CAPITAL MANAGEMENT, L.P.,                    §
                                                     §
                                                     §
                                                     §    Adv. Proc. No. 21-3007
                              Plaintiff,             §
                                                     §
vs.                                                  §
                                                     §
                                                     §    Case No. 3:21-cv-01379-X
HCRE PARTNERS, LLC (n/k/a NexPoint                   §
Real Estate Partners, LLC), JAMES                    §
DONDERO, NANCY DONDERO, AND                          §
THE DUGABOY INVESTMENT TRUST,                        §
                                                     §
                                                     §
                              Defendants.            §
-------------------------------------------------------------------

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ...............................................2

    A.  BACKGROUND ................................................................ 2

        1.  The Bankruptcy Case ............................................... 2

        2.  Procedural History ................................................. 3

            i.  Commencement of the Adversary Proceedings ............................ 3

            ii.  Defendants' Motions to Withdraw the Reference ......................... 4

            iii.  The Adversary Proceedings are Consolidated for Pretrial Purposes ................................................................... 4

            iv.  Plaintiff Files the Amended Complaints ............................... 5

    B.  HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT ........................ 5

        1.  The Demand Notes ................................................. 5

            i.  James Dondero ................................................. 6

            ii.  HCMFA ...................................................... 6

            iii.  HCMS ....................................................... 6

            iv.  HCRE ....................................................... 7

        2.  The Term Notes ................................................... 9

    C.  THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING ........................ 12

        1.  Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet .................................... 13

        2.  In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes ............ 17

        3.  Without Exception, the Notes were Disclosed in Highland's Books and Records Carried as Assets without Discount .................................. 19

        4.  Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections ................................................. 21

    D.  THE OBLIGORS' AFFIRMATIVE DEFENSES ............................... 23

i

1.    The Alleged Agreement Defense ........................................................... 23

        i.      The Allegations Materially Changed Over Time ......................... 24

        ii.     The Final Version of the "Alleged Agreement" Defense ............. 26

        iii.    No Reasonable Trier of Fact Can Find that the Alleged Agreement
                Existed ........................................................................................ 26

    2.    HCMFA's "Mutual Mistake" Defense ................................................... 32

    3.    Waiver and Estoppel [NexPoint, HCMS, HCRE] ................................. 37

    4.    Other Defenses ....................................................................................... 38

III.   ARGUMENT .......................................................................................................38

    A.   Legal Standard ................................................................................................ 38

        1.    Summary Judgment Standard ................................................................. 38

        2.    Summary Judgment Standard for Promissory Notes .............................. 40

    B.   Highland is Entitled to Summary Judgment for Defendants' Breach of the
         Notes ............................................................................................................... 40

    C.   Defendants Fail to Rebut Highland's Prima Facie Case ................................. 43

        1.    No Reasonable Jury Could Find that the "Alleged Agreement"
              Exists ..................................................................................................... 43

        2.    No Reasonable Jury Could Find the HCMFA Note Was a
              "Mistake" ............................................................................................... 46

        3.    No Reasonable Jury Could Find that NexPoint's, HCRE's, and
              HCMS's Defaults under the Notes Were the Result of Highland's
              Negligence .............................................................................................. 48

        4.    No Reasonable Jury Could Find that NexPoint "Prepaid" on the
              NexPoint Note ........................................................................................ 49

CONCLUSION ...............................................................................................................49

EXHIBIT A - Parties, Witnesses, and Definitions

DOCS_NY:44673.9 36027/003

## TABLE OF AUTHORITIES

**CASES**

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
   MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021)................................ 46, 48

*Alton v. Texas A&M University*,
   168 F.3d 196 (5th Cir. 1999) ......................................................................... 39, 40

*Armstrong v. City of Dallas*,
   997 F.2d 62 (5th Cir.1993) ............................................................................... 40

*Crisalli v. ARX Holding Corp.*,
   177 F. App'x 417 (5th Cir. 2006).......................................................................... 46

*FDIC v. Cardinal Oil Well Servicing Co.*,
   837 F.2d 1369 (5th Cir.1988) ............................................................................. 40

*Hall v. Branch Banking*,
   No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014)................................... 39

*Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*,
   CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007)............................. 47

*In re Heritage Org., L.L.C.*,
   354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006)................................................ 45, 46

*In re Magna Cum Latte, Inc.*,
   07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ................. 39, 40, 44

*Latimer v. Smithkline & French Laboratories*,
   919 F.2d 301 (5th Cir.1990) .............................................................................. 39

*Looney v. Irvine Sensors Corp.*,
   CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ................ 40, 43, 46, 48

*Melanson v. Navistar, Inc.*,
   3:13-CV-2018-D, 2014 WL 4375715 (N.D. Tex. Sept. 4, 2014)............................. 45

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
   40 F.3d 698 (5th Cir. 1994) ............................................................................... 39

*Resolution Tr. Corp. v. Starkey*,
   41 F.3d 1018 (5th Cir. 1995) .......................................................................... 40, 43

*Scott v. Wollney*,
   No. 3:20-CV-2825-M-BH, 2021 WL 4202169 (N.D. Tex Aug. 28, 2021)........................... 45

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) .............................................................................. 39

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ............................................................................. 38

iii

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007) ...................................... 46, 47, 48

**RULES**

FED. R. CIV. P. 56(c) ................................................................................................................... 36

iv

### HIGHLAND CAPITAL MANAGEMENT, L.P.'S AMENDED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this amended memorandum of law in support of its *Motion for Partial Summary Judgment* (the "Motion") on its First and Second Causes of Action.[1]  In support of its Motion, Highland states as follows:

### I.    PRELIMINARY STATEMENT[2]

1.    In accordance with its Plan and the clear and unambiguous terms of the Notes, Plaintiff seeks to collect on over $50 million of promissory notes issued by Mr. Dondero and certain entities controlled by him.  The Notes were tendered in exchange for hard dollars at a time when Mr. Dondero controlled both the borrower and the lender.  Now, Mr. Dondero refuses to make good on his promises to repay the money he borrowed.

2.    Plaintiff makes out its prima facie case for summary judgment for Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the Notes are (i) valid, (ii) executed by Defendants and in favor of Highland, and (iii) there is a balance due and owing under the Notes.  Defendants fail to rebut Plaintiff's prima facie case because Defendants fail to create a genuine issue of material fact regarding their breach.   There is a complete absence of evidence to support each of Defendants' affirmative defenses.

3.    Nevertheless, Defendants are certain to contest every single fact and erect countless strawmen regardless of the record in support of their own fabricated stories.  But in the end, there will be no evidence to corroborate the Defendants' contentions other than their own

---

[1] Concurrently herewith, Highland is filing the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Appendix"). Citations to the Appendix are notated as follows: Ex. #, Appx. #

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

self-serving, conclusory, and unsubstantiated assertions.  There will be no documents or written communications that credibly support Defendants' story.  By contrast, Plaintiffs claims are both simple and buttressed by a mountain of undisputed evidence including contemporaneous written communications, audited financial statements, statements to third parties, books and records, and the plain words of the Defendants and their officers.

4.      Plaintiff does not have to prove its case beyond a reasonable doubt or by clear and convincing evidence nor does Plaintiff have the burden of proving that *no* facts are in dispute.  Instead, Plaintiff need only show that there is no "genuine" dispute of material fact.

5.      Viewed fairly, Plaintiff's evidence is so overwhelming, and Defendants' stories are so weak, that the Court must grant the Motion.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

## A.    BACKGROUND[3]

### 1.    The Bankruptcy Case

6.      On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.      On December 4, 2019, the Delaware Court entered an order transferring venue of Highland's bankruptcy case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") [Bankr. Docket No. 186].[4]

---

[3] Attached hereto as **Exhibit A** is a list of *Parties, Witnesses, and Definitions*.

[4] "Bankr. Docket No. __" refers to the docket maintained by the Bankruptcy Court in case no. 19-34054.

DOCS_NY:44673.9 36027/003

8.      On January 22, 2021, Highland filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").

9.      On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order") which confirmed Highland's Plan.[5]

10.     On August 11, 2021, the Plan became Effective (as defined in the Plan), and Highland became the Reorganized Debtor (as defined in the Plan).  *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 2700].

**2.      Procedural History**

**i.      Commencement of the Adversary Proceedings**

11.     On January 22, 2021, Plaintiff commenced the Adversary Proceedings by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Original Complaints") against each of the Defendants.[6]

12.     In its Original Complaints, Plaintiff asserted claims against each Defendant for (i) breach of contract for the Defendant's breach of its respective obligations under the Notes and (ii) turnover by each Defendant for all accrued and unpaid principal and interest due under the

---

[5] The confirmed Plan included certain amendments filed on February 1, 2021.  *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Bankr. Docket No. 1875].

[6] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004 (the "HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action"), Docket No. 1 (the "HCRE Original Complaint").  The forgoing are collectively referred to as the "Original Complaints."

DOCS_NY:44673.9 36027/003

Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

<b>ii.     <u>Defendants' Motions to Withdraw the Reference</u></b>

13.     Between April and June 2021, the Obligors each filed a similar motion to withdraw the reference (the "<u>Motions to Withdraw</u>") in which the Obligors sought to withdraw the Adversary Proceedings from the Bankruptcy Court to the District Court.

14.     In July 2021, the Bankruptcy Court issued Reports and Recommendations (the "<u>R&Rs</u>") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions.

15.     The applicable District Court subsequently adopted the Bankruptcy Court's R&Rs in the NexPoint, HCMS, HCRE, and HCMFA Actions, but the decision on the R&R in the Dondero Action remains pending.

<b>iii.     <u>The Adversary Proceedings are Consolidated for Pretrial Purposes</u></b>

16.     The Parties subsequently agreed to, among other things, consolidate discovery for all purposes and coordinate the timing of the service of pleadings (i.e., Plaintiff's amended complaints adding the New Claims against the Duty Defendants and the Defendants' responses thereto). That agreement was memorialized in a *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding (collectively, the "Discovery Stipulations").

17.     In furtherance of the intent reflected in the Discovery Stipulations, and consistent with the related Orders granting Plaintiff's unopposed motions for leave to amend its pleadings, Plaintiff was "deemed to have served the Amended Complaint on the [applicable]

4

[D]efendant on July 13, 2021," even though the Amended Complaints were not actually filed on the dockets until August 27, 2021.

**iv.**      **Plaintiff Files the Amended Complaints**

18.      On August 27, 2021, Highland filed its Amended Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263).[7] In the Amended Complaints, Highland added the new claims against new defendants. Specifically, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[8]

**B.**      **HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT**

19.      The Obligors are the makers under a series of promissory notes tendered to Highland in exchange for contemporaneous loans and other consideration. These Notes were executed between 2013 and 2019 and are described below.

**1.**      **The Demand Notes**

20.      As the documentary evidence specifically identified below establishes, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans as follows:

---

[7] All of the amendments related to the belated assertion of the Alleged Agreement defense. Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense.

[8] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement.

5

i.      **James Dondero**

- a Demand Note in the original principal amount of $3,825,000, executed on February 2, 2018, in favor of Highland (the "First Dondero Note"); (Klos Dec.[9] ¶ 18 at Ex. D); Ex. 125 at 9, Appx. 2357; Ex. 188, Appx. 3001-3002; Ex. 189, Appx. 3003-3004; Ex. 74, Appx. 1338-1340; Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Ex. 32 ¶ 20, Appx. 664; Ex. 31 ¶ 20, Appx. 647)

- a Demand Note in the original principal amount of $2,500,000, executed on August 1, 2018, favor of Highland (the "Second Dondero Note"); (Klos Dec. ¶ 19 at Ex. E); Ex. 126 at 2, Appx. 2366; Ex. 190, Appx. 3005-3006; Ex. 76, Appx. 1354-1356; Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Ex. 32 ¶ 21, Appx. 664; Ex. 31 ¶ 21, Appx. 647); and

- a Demand Note in the original principal amount of $2,500,000, executed on August 13, 2018, in favor of Highland (the "Third Dondero Note," collectively with the First Dondero Note and the Second Dondero Note, the "Dondero Notes") (Klos Dec. ¶ 20 at Ex. F); Ex. 126 at 2, Appx. 2366; Ex. 77, Appx. 1357-1359; Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Ex. 32 ¶ 22, Appx. 664; Ex. 31 ¶ 22, Appx. 647).

ii.     **HCMFA**

- a Demand Note in the original principal amount of $2,400,000, executed on May 2, 2019, in favor of Highland (the "First HCMFA Note") (Klos Dec. ¶ 21 at Ex. G); Ex. 147 at 7, Appx. 2526; Ex. 54, Appx. 870-873; Ex. 55, Appx. 874-875; Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 53, Appx. 866-869); and

- a Demand Note in the original principal amount of $5,000,000, executed on May 3, 2019, in favor of Highland (the "Second HCMFA Note," together with the First HCMFA Note, the "HCMFA Notes") (Klos Dec. ¶ 22 at Ex. H); Ex. 147 at 7, Appx. 2526; Ex. 56, Appx. 876-877; Ex. 1 (Exhibit 2), Appx. 12-15; Ex. 57, Appx. 878-880).

iii.    **HCMS**

- a Demand Note in the original principal amount of $150,000, executed on March 28, 2018, in favor of Highland (the "First HCMS Demand Note") (Klos Dec. ¶ 23 at Ex. I); Ex. 143, Appx. 2487-2490; Ex. 3 (Exhibit 1), Appx. 117-119);

---

[9] Refers to the *Declaration of David Klos in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, being filed concurrently herewith.

- a Demand Note in the original principal amount of $200,000, executed on June 25, 2018, in favor of Highland (the "Second HCMS Demand Note") (Klos Dec. ¶ 24 at Ex. J); Ex. 144, Appx. 2491-2494; Ex. 3 (Exhibit 2), Appx. 120-122);

- a Demand Note in the original principal amount of $400,000, executed on May 29, 2019, in favor of Highland (the "Third HCMS Demand Note") (Klos Dec. ¶ 25 at Ex. K); Ex. 145 at 11, Appx. 2506; Ex. 3 (Exhibit 3), Appx. 123-125); and

- a Demand Note in the original principal amount of $150,000, executed on June 26, 2019, in favor of Highland (the "Fourth HCMS Demand Note," collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and the Third HCMS Demand Note, the "HCMS Demand Notes") (Klos Dec. ¶ 26 at Ex. L); Ex. 146 at 7, Appx. 2516; Ex. 3 (Exhibit 4), Appx. 126-128).

### iv.   **HCRE**

- a Demand Note in the original principal amount of $100,000, executed on November 27, 2013, in favor of Highland (the "First HCRE Demand Note") (Klos Dec. ¶ 27 at Ex. M); Ex. 148, Appx. 2533-2536; Ex. 4 (Exhibit 1), Appx. 201-203);

- a Demand Note in the original principal amount of $2,500,000, executed on October 12, 2017, in favor of Highland (the "Second HCRE Demand Note") (Klos Dec. ¶ 28 at Ex. N); Ex. 154 at 7, Appx. 2575; Ex. 4 (Exhibit 2), Appx. 204-206);

- a Demand Note in the original principal amount of $750,000, executed on October 15, 2018, in favor of Highland (the "Third HCRE Demand Note") (Klos Dec. ¶ 29 at Ex. O); (Ex. 155 at 5, Appx. 2585; Ex. 4 (Exhibit 3), Appx. 207-209); and

- a Demand Note in the original principal amount of $900,000, executed on September 25, 2019, in favor of Highland (the "Fourth HCRE Demand Note," collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and the Third HCRE Demand Note, the "HCRE Demand Notes") (Klos Dec. ¶ 30 at Ex. P); Ex. 156 at 6, Appx. 2596; Ex. 4 (Exhibit 4), Appx. 210-212).

21.    Except for the date, the amount, the maker, and the interest rate, each of the

Demand Notes is identical and includes the following provisions, among others:

DOCS_NY:44673.9 36027/003

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be ***due and payable on demand of the Payee***.

     5.    <u>Acceleration Upon Default</u>.  ***Failure to pay this Note or any installment hereunder as it becomes due shall***, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.***  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     6.    <u>Waiver</u>.  Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     7.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Ex. 74, Appx. 1338-1340; Ex. 76, Appx. 1354-1356; Ex. 77, Appx. 1357-1359; Ex. 1 (Exhibits 1-2), Appx. 9-15; Ex. 3 (Exhibits 1-4), Appx. 117-128; and Ex. 4 (Exhibits 1-4), Appx. 201-212 (emphases added).

     22.    On December 3, 2020, Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The Demand Letters also included a demand for all costs of collection, including attorneys' fees, as provided in the Notes.  Ex. 79, Appx. 1370-1373; Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216 (collectively, the "<u>Demand Letters</u>").

23.     Neither Mr. Dondero, nor HCMFA, nor HCMS, nor HCRE made any payments to Highland on account of Notes or otherwise responded to the Demand Letters prior to the commencement of the Adversary Proceedings.

24.     Consequently, Mr. Dondero, HCMFA, HCMS, and HCRE breached Section 2 of each Demand Note, and each such Obligor is in default.

25.     As of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

26.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Demand Notes was $7,874,436.09. (Klos Dec. ¶ 40).

27.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. (Klos Dec. ¶ 45).

28.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. (Klos Dec. ¶ 50).

    **2.**     **The Term Notes**

29.     As the documentary evidence specifically identified below establishes, on May 31, 2017, Mr. Dondero executed a 30-year term note on behalf of NexPoint (the "NexPoint Term Note"), HCMS (the "HCMS Term Note"), and HCRE (the "HCRE Term Note"),

respectively, each as a maker, in favor of Highland (collectively, the "Term Notes"). (Klos Dec.
¶¶ 27-29).

30.    Each of the Term Notes "rolled up" the respective maker's obligations
under certain then-outstanding demand notes that were identified as the "Prior Notes" in each Term
Note.[10]

31.    The following Term Notes are at issue:

- a Term Note signed on NexPoint's behalf in the original principal
  amount of $30,746,812.23 (the "NexPoint Term Note") (Klos Dec. ¶ 31
  at Ex. A); Ex. 2 (Exhibit 1), Appx. 41-44; Ex. 2 ¶ 21, Appx. 28; Ex. 15
  ¶ 21, Appx. 428);

- a Term Note signed on HCMS's behalf in the original principal amount
  of $20,247,628.02 (the "HCMS Term Note" and together with the
  HCMS Demand Notes, the "HCMS Notes") (Klos Dec. ¶ 32 at Ex. R);
  Ex. 3 (Exhibit 6), Appx. 133-136); and

- a Term Note signed on HCRE's behalf in the original principal amount
  of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE
  Demand Notes, the "HCRE Notes") (Klos Dec. ¶ 33 at Ex. S); Ex. 4
  (Exhibit 6), Appx. 217-220).

32.    According to Mr. Waterhouse, Highland loaned money to NexPoint,
HCMS, and HCRE to enable those entities to make investments. Ex. 105 at 126:21-129:3, Appx.
2081.[11]

---

[10] Proof of the loans underlying the Prior Notes (as defined in each Term Note) can be found at Exs. 127-141, Appx.
2368-2481 (HCMS); Exs. 149-153, Appx. 2537-2567 (HCRE); Exs. 157-161, Appx. 2599-2636 (NexPoint (the July
22, 2015 Prior Note appears to have been backdated because the underlying loans were effectuated between July 2015
and May 2017 (see Ex. 161))).

[11] Highland sought to inquire as to the use of the loan proceeds by NexPoint, HCMS, and HCRE (Exs. 47-49, Appx.
842-859 (Rule 30(b)(6) Topic 3(e))), but (a) those Obligors objected on relevance grounds (Ex. 191, Appx. 3007-
3012; Ex. 98 at 348:18-20, Appx. 1758), and (b) Mr. Dondero claimed to have no personal knowledge of the purpose
of the loans or the borrowers' use of the loan proceeds.  Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779,
448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

33.     Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Note), each of the Term Notes is identical and includes the following provisions, among others:

> 2.1     Annual Payment Dates.   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full. ***Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

> 4.     Acceleration Upon Default.   *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof***. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

> 5.     Waiver.   Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

> 6.     Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

34.     NexPoint, HCMS, and HCRE each failed to make the Annual Installment payment due on December 31, 2020.

35.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and (b) December 17, 2021, the unpaid

principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[12] (Klos Dec. ¶ 51).

36.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.[13] (Klos Dec. ¶ 52).

37.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[14] (Klos Dec. ¶ 53).

## C.    THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING

38.    As described in more detail below, the existence, validity, and enforceability of the Notes is corroborated by the following undisputed facts:

- Plaintiff's audited financial statements (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse) showed that each of the Notes (including the HCMFA Notes) (a) was carried as an asset on Plaintiff's balance sheet, (b) had a value equal to the unpaid principal and interest then due, and (c) was disclosed without reference to the Alleged Agreement, HCMFA's Mistake Defense, or any other defense;

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 that they were obligated to pay Highland the amounts due under the HCMFA Notes and the NexPoint Notes, respectively, each without any setoff or reservation;

---

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[13] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[14] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

12

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff;

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the Petition Date through January 9, 2020, when Mr. Dondero solely controlled Plaintiff), Plaintiff's bankruptcy filings (most of which were prepared or signed by Mr. Waterhouse) reported the Notes (including the HCMFA Notes) as being assets of the Debtor's estate, each without any setoff or reservation;

- The Notes (including the HCMFA Notes) were identified as substantial assets and sources of recovery under Plaintiff's proposed Plan, yet none of the Obligors informed the Court, Plaintiff, or any creditors of any of their purported defenses even though (a) each of them filed a Plan Objection, and (b) the Adversary Proceedings had already been commenced when the confirmation hearing on the Plaintiff's Plan was conducted.

1. **Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet**

39.    The undisputed evidence cited below establishes, among other things, that (a) all of the Notes executed through early May 2019 were provided to PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[15] and (c) neither Highland nor Mr. Dondero disclosed the Alleged Agreement, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principals ("GAAP").

---

[15] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Ex. 34 at 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were **not** included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its *own* 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its *own* balance sheet. Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

40.    PwC's audit process was extensive and took months to complete.  Ex. 94 at 9:24-12:14, Appx. 1554-1555.

41.    As part of the process, Highland was responsible for drafting the financial statements and accompanying notes and "management" provided the information that PwC needed to conduct its audits.  *Id*. at 14:8-15:14, Appx. 1556; *see also id*. at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse, and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Ex. 105 at 87:25-89:10, Appx. 2071.

42.    Before signing off on its audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness.").

43.    For at least the fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Ex. 33, Appx. 729-740, Ex. 86, Appx. 1420-1431, Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

44.    On June 3, 2019, in connection with PwC's audit of Highland's financial statements for the period ending December 31, 2018, Mr. Dondero and Mr. Waterhouse made the following representations to PwC:

14

- The Affiliated Party Notes represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019 (Ex. 33 ¶11, Appx. 732; Ex. 94 at 24:6-25:5, Appx. 1558);[16]

- If there were any errors in Highland's financial statements, they were not "material" (Ex. 33 ¶32, Appx. 735; Ex. 94 at 25:6-26:13, Appx. 1558-1559);

- There were no "material" transactions or agreements that were not recorded in the financial statements (Ex. 33 ¶34, Appx. 735; Ex. 94 at 26:14-27:11, Appx. 1559);

- All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements (Ex. 33 ¶35(d), Appx. 735; Ex. 94 at 27:12-28:11, Appx. 1559);

- All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed (Ex. 33 ¶36, Appx. 736; Ex. 94 at 28:12-29:5, Appx. 1559); and

- All subsequent events were disclosed (Ex. 33 (signature page), Appx. 738; Ex. 94 at 29:6-30:2, Appx. 1559-1560).

45.     Under GAAP, Highland was required to disclose to PwC (a) all "material" related party transactions and (b) any circumstances that would call into question the collectability of any of the Notes.  Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570.[17]

46.     Neither Mr. Dondero nor Highland ever disclosed to PwC (a) the existence or terms of the Alleged Agreement; (b) the existence of any oral or written amendment to any of the Affiliate Notes listed in PwC's 2018 work papers; or (c) that any of the Notes might be

---

[16] "Affiliated Party Notes" is the term used by PwC to refer to notes tendered to Highland by officers, employees, or affiliates of Highland.  *See generally* Ex. 33, Appx. 729-740; Ex. 94, Appx. 1551-1585.

[17] For purposes of the 2017 audit, the "materiality" threshold was $2 million.  Ex. 86 at 1, Appx. 1421.  For purposes of the 2018 audit, the "materiality" threshold was $1.7 million or more.  Ex. 33 at 1, Appx. 730; Ex. 94 at 22:11-23:3, Appx. 1558.  *See also* Ex. 105 at 91:14-93:6, Appx. 2072.

15

forgiven.  Ex. 24 (Responses to RFAs 1-2), Appx. 521; Ex. 94 at 67:16-70:19, Appx. 1569-1570,

71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Ex. 105 at 102:2-5, Appx. 2075.

47.     If PwC had learned before June 3, 2019, that any of the Notes (a) might not

be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based

on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed.

Ex. 94 at 74:19-76:12, Appx. 1571.

48.     For purposes of PwC's audit, "affiliate notes" were considered receivables

of Highland and were carried as assets on Highland's balance sheet under "Notes and other

amounts due from affiliates."  Ex. 34 at 2, Appx. 745; Ex. 72 at 2, Appx. 1291; Ex. 94 at 23:10-

22, Appx. 1558, 31:11-33:20, Appx. 1560; Ex. 105 at 106:20-109:12, Appx. 2076.

49.     For the 2017 fiscal year, Highland valued "Notes and other amounts due

from affiliates" in the aggregate amount of approximately $163.4 million, which then constituted

more than 10% of Highland's total assets; for the 2018 fiscal year, Highland valued "Notes and

other amounts due from affiliates" in the aggregate amount of approximately $173.4 million,

which then constituted more than 15% of Highland's total assets.  Ex. 72 at 2, Appx. 1291; Ex. 34

at 2, Appx. 745; Ex. 94 at 33:21-34:2, Appx. 1560-1561, 51:2-16, Appx. 1565.

50.     The notes to the financial statements described the "Affiliate Notes" that

were carried on Highland's balance sheet; management calculated the amounts due and owing to

Highland from each Affiliate.  Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 34:17-36:25; 51:17-

53:12, Appx. 1565; Ex. 105 at 110:22-112:21, Appx. 2077.

51.     The "fair value" of the Affiliate Notes was "equal to the principal and

interest due under the notes."  Ex. 72 at 30-31, Appx. 1319-1320; Ex. 34 at 28-29, Appx. 771-772;

Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565.

52.    At the time PwC completed its 2017 and 2018 audits, PwC had no reason to discount the value of any of the Affiliate Notes.  Ex. 94 at 39:17-21, Appx. 1562; 54:2-8, Appx. 1566.

53.    Moreover, as reflected in PwC's work papers, and based on the information provided by Highland and PwC's own independent analysis, PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Ex. 92, Appx. 1514-1530; Ex. 93, Appx. 1531-1550; Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

54.    Note 15 to Highland's 2018 audited financial statements disclosed as a "subsequent event" (*i.e.*, an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit) the following:

> Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million.  The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39, Appx. 782.  *See also* Ex. 94 at 54:9-55:7, Appx. 1566.

55.    There will be no evidence that HCMFA issued any notes to Highland in 2019 other than the HCMFA Notes.

## 2.    In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes

56.    The Advisors have contracts to manage certain funds (the "Fund Agreements").  The Fund Agreements are among the most important contracts the Advisors have; HCMFA's Rule 30(b)(6) witness acknowledged that its contracts with the Funds are largely the reason for HCMFA's existence.  Ex. 192 at 66:3-67:6, Appx. 3031.

17

57.    The Funds are purportedly managed by a board (the "Retail Board").  In the fall of each year, the Retail Board must determine whether to renew the Fund Agreements with the Advisors, a process referred to as a "15(c) Review."  As part of the 15(c) Review process, the Retail Board requests information from the Advisors.  Ex. 99 at 129:17-130:3, Appx. 1844-1845, Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092.

58.    Mr. Waterhouse, the Advisors' Treasurer, and Mr. Norris, HCMFA's Executive Vice President, participated in the annual 15(c) Review process with the Retail Board.  Ex. 192 at 67:7-68:19, Appx. 3031; Ex. 105 at 168:13-169:8, Appx. 2091.

59.    In October 2020, as part of its 15(c) Review, the Retail Board asked the Advisors to provide certain information including the following:

> Are there any outstanding amounts currently payable or due in the future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provides services to the Funds?

Ex. 36 at 3, Appx. 793.

60.    Ms. Thedford, the Secretary of the Advisors and an employee of Highland, followed up on this particular question, and Mr. Waterhouse directed her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review.  *Id.* at 2, Appx. 792.

61.    As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer).  Ex. 35, Appx. 788-789; Ex. 37, Appx. 795-796.

62.    Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA."  Ex. 36 at 1, Appx. 791.

63.     This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information.  Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029; Ex. 194 at 117:16-122:15, Appx. 3156-3157; Ex. 195 at 120:23-122:13, Appx. 3211-3212.

64.     On October 23, 2020, the Advisors provided their final, formal responses to the questions posed by the Retail Board.  As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, the Advisors reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA.  The Note between HCMLP and NexPoint comes due on December 31, 2047.  The earliest the Note between HCMLP and HCMFA could come due is in May 2021.  All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter.  The Advisor notes that both entities have the full faith and support of James Dondero.

Ex. 59 at 2, Appx. 885.

65.     Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the NexPoint Note the HCMFA Notes.

**3.     Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount**

66.     In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the Notes as valid debts due and owing by each of the Obligors to Plaintiff.

19

67.    For example, in the Debtor's February 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the transfer to Mr. Dondero on February 2, 2018 was contemporaneously identified as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. *See also* Ex. 78 at 2, Appx. 1362 (in the Debtor's August 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan.").

68.    After the Petition Date, but while Mr. Dondero was still in control of Highland, the Debtor filed its *Schedules of Assets and Liabilities* [Bankr. Docket No. 247] (the "Debtor's Schedules").  The Debtor's Schedules included the Notes among the Debtor's assets. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

69.    In every one of the Debtor's *Monthly Operating Reports* (the "MORs") filed with the Court (while Mr. Dondero was in control of Highland and after), the Debtor included as assets of the estate amounts "Due from affiliates" that included the Notes. *See, e.g.,* Ex. 41, Appx. 816-825; Ex. 42, Appx. 826-835; Ex. 88, Appx. 1475-1486; Ex. 89, Appx. 1487-1496.[18]

70.    Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued

---

[18] *See also* Bankr. Docket No. 405 (October 2019); Bankr. Docket No. 289 (November 2019); Bankr. Docket No. 418 (December 2019); Bankr. Docket No. 497 (January 2020); Bankr. Docket No. 558 (February 2020); Bankr. Docket No. 634 (March 2020); Bankr. Docket No. 686 (April 2020); Bankr. Docket No. 800 (May 2020), as amended in Bankr. Docket No. 905; Bankr. Docket No. 913 (June 2020); Bankr. Docket No. 1014 (July 2020); Bankr. Docket No. 1115 (August 2020); Bankr. Docket No. 1329 (September 2020); Bankr. Docket No. 1493 (October 2020); Bankr. Docket No. 1710 (November 2020); Bankr. Docket No. 1949 (December 2020); and Bankr. Docket No. 2030 (January 2021).

interest. *See, e.g.,* Exs. 196-198, Appx. 3239-3244 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

71.    Relatedly, Highland's accounting group has a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").  The Loan Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger. *See* Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

72.    The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business. For example, Ex. 199, Appx. 3246 ties exactly into Ex. 198, Appx. 3243-3244, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Bankr. Docket No. 2020.  Klos Dec. ¶¶15-16.[19]

### 4.    Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections

73.    On November 24, 2020, Highland filed its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 1473].  Included therein were the Debtor's Liquidation Analysis/Financial Projections (the

---

[19] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Bankr. Docket No. 2030 (balance sheet). Ex. 198, Appx. 3243-3244 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, Appx. 3245-3246, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  *See* Klos Dec. ¶¶15-16.

"Projections"). Ex. 90, Appx. 1497-1505. Among the assumptions supporting the Projections was that "[a]ll demand notes are collected in the year 2021." *Id.* at 173 of 178, Appx. 1500 (Assumption C).

74.    Thus, even though Highland had not yet called the Demand Notes, the Obligors and all parties in interest were put on notice on November 24, 2020, that the Debtor's Projections assumed all Demand Notes would be collected the following year.

75.    By early February 2021, Highland had already commenced the Adversary Proceedings to collect on all of the Notes.  Consequently, it amended the Projections [Bankr. Docket No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021."  Ex. 91 at 2, Appx. 1508 (Assumption C) (the "Assumption").

76.    Thus, as of February 1, 2021, on the eve of confirmation, the Obligors and all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due under the Notes would be collected as part of the Plan.

77.    At the confirmation hearing, James P. Seery, Jr., Highland's Chief Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and (b) how the commencement of the Adversary Proceedings impacted the Projections. Mr. Dondero's counsel asked limited questions on cross-examination concerning the Notes. Ex. 206 at 123:23-124:23, Appx. 4305-4306, 128:23-129:21, Appx. 4310-4311, 185:8-15, Appx. 4367.

78.    In his closing argument, Mr. Dondero's counsel discussed the Notes and (a) vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term

Notes are due and payable and (b) observed that the Notes were not discounted for "collectability issues," but made no mention of the Alleged Agreement, HCMFA's Mutual Mistake defense, or any other defense:

> First, there's the notes; and second, there's the assets. The notes are either long-term or demand notes. Those long-term notes, Mr. Seery will tell you some have been validly accelerated and therefore are now due and payable. I think there's arguments to the contrary. But those long-term notes probably have some both time value of money and collection costs. And then, of course, you have to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not provided any data or analysis as to what discounts were applied to those notes. And, therefore, I don't think that this Court can make any determination that the best interests of the creditors have been met.

Ex. 207 at 223:22-224:14, Appx. 4701-4702.

## D.    THE OBLIGORS' AFFIRMATIVE DEFENSES

79.    The Obligors have asserted various defenses to Plaintiff's claims concerning Counts One and Two and those are addressed below.

### 1.    The Alleged Agreement Defense

80.    Over the course of several months, Mr. Dondero cobbled together an affirmative defense premised on an alleged oral agreement pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent" or if certain assets were sold by a third party. After Mr. Dondero settled on that defense, all of the Obligors (except HCMFA) amended their pleadings to adopt the same affirmative defense.

###### i.    The Allegations Materially Changed Over Time

81.    In due course, each of the Defendants filed its respective Original Answer.[20] In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes."  Ex. 80 ¶40, Appx. 1380 (the "Alleged Agreement").  None of the Corporate Obligors asserted the Alleged Agreement or any similar defense in its respective Original Answer.

82.    In late March, Highland asked Mr. Dondero to admit, among other things, that he did not pay taxes on the amounts loaned to him but that Plaintiff allegedly agreed not to collect.  Ex. 81 (Responses to RFAs 4, 8, and 12), Appx. 1387-1388.  Having been alerted to a fatal flaw in his defense, Mr. Dondero modified his affirmative defense based on the Alleged Agreement to state that: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes *upon fulfillment of conditions subsequent*."   Ex. 83 ("Amended Answer") ¶40, Appx. 1403.

83.    On April 15, 2021, about ten days after serving his Amended Answer, Mr. Dondero served his *Rule 26 Initial Disclosures.*  Ex. 184, Appx. 2982-2990 (the "Rule 26 Disclosures").   In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," but his sister, Ms. Dondero, was not among them.  *Id.* at 2-5, Appx. 2984-2987.

84.    On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories*.  Ex. 82, Appx. 1390-1396.

---

[20] Dondero Action, Docket No. 6 (the "Dondero Original Answer"); HCFMA Action, Docket No. 6 (the "HCMFA Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6 (the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

85.     In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of the Debtor *by James Dondero* subsequent to the time each note was executed." *Id*. at 4, Appx. 1394 (Answer to Interrogatory No. 1) (emphasis added).

86.     In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but – like the Rule 26 Disclosures – Mr. Dondero's sister was not among them. *Id.*, Appx. 1394 (Answer to Interrogatory No. 2).

87.     It was not until later in discovery that Mr. Dondero identified his sister – someone he failed to include as a person likely to have discoverable information or someone he believed had actual knowledge of each Alleged Agreement – as the person who allegedly bound Plaintiff to the Alleged Agreement, rather than himself.[21]

88.     In the weeks that followed, each of the Obligors (except for HCMFA) sought leave from the Court to amend its respective answer to adopt Mr. Dondero's Alleged Agreement defense, contending that it is not liable under any of the Notes because Plaintiff (bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into an oral agreement pursuant to which it promised not to collect on the Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[22]

---

[21] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner interests in Highland. *See* Ex. 31 ¶82, Appx. 655.

[22] *See* Ex. 11, Appx. 384-393 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended Answer) ¶42, Appx. 421-422; Ex. 8, Appx. 292-312 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First Amended Answer) ¶56, Appx. 402; Ex. 9 (HCRE's Motion for Leave to Amend), Appx. 313-333; Ex. 17 (HCRE's Amended Answer) ¶99, Appx. 468.

25

ii.    **The Final Version of the "Alleged Agreement" Defense**

89.    After months of maneuvering, Mr. Dondero, HCMS, HCRE, and NexPoint

finally settled on the following affirmative defense based on the Alleged Agreement:

> Plaintiff's claims are barred … because prior to the demands for
> payment Plaintiff agreed that it would not collect the Notes upon
> fulfillment of conditions subsequent.    Specifically, sometime
> between December of the year in which each note was made and
> February of the following year, [] Nancy Dondero, as representative
> for a majority of the Class A shareholders of Plaintiff agreed that
> Plaintiff would forgive the Notes if certain portfolio companies were
> sold for greater than cost or on a basis outside of James Dondero's
> control.    The purpose of this agreement was to provide
> compensation to Defendant James Dondero, who was otherwise
> underpaid compared to reasonable compensation levels in the
> industry, through the use of forgivable loans, a practice that was
> standard at HCMLP and in the industry.    This agreement setting
> forth the conditions subsequent to demands for payment on the
> Notes was an oral agreement; however, Defendant [ ] believes there
> may be testimony or email correspondence that discusses the
> existence of this agreement that may be uncovered through
> discovery in this Adversary Proceeding.

Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer").[23]

iii.    **No Reasonable Trier of Fact Can Find that the Alleged Agreement
Existed**

90.    For the reasons set forth below, no reasonable trier of fact can find that the

Alleged Agreement ever existed.

91.    Mr. Dondero could not identify a material term of the Alleged Agreements.

Mr. Dondero could not describe a material terms of the Alleged Agreements without relying on a

document prepared by counsel.    Specifically, without a list prepared by counsel, Mr. Dondero

could not identify any of the Notes subject to the Alleged Agreements nor could he recall (i) the

number of Notes subject to each Alleged Agreement, (ii) the maker of each Note subject to each

---

[23] *See also* Ex. 15 ¶83, Appx. 435-436 ("NexPoint's Answer"); Ex. 16 ¶97, Appx. 451-452 ("HCMS's Answer"); and
Ex. 17 ¶99, Appx. 468 ("HCRE's Answer").

26

Alleged Agreement, (iii) the date of each Note subject to each Alleged Agreement, or (iv) the principal amount of any Note subject to the Alleged Agreements.  Ex. 99 at 13:4-28:22, Appx. 1815-1819.

92.    Mr. Dondero's inability to identify the notes subject to the Alleged Agreement is significant because he and HCMFA had other notes outstanding at the same time. *See, e.g.,* Ex. 43, Appx. 836-838 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26, 2014 note executed by HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26, 2016 note executed by HCMFA in the principal amount of $2.3 million).

93.    Mr. and Ms. Dondero dispute a key aspect of the Alleged Agreements.  Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope.  Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement.  Mr. Dondero, on the other hand, disagrees.  *Compare* Ex. 100 at 180:8-183:20, Appx. 1919-1920 *with* Ex. 99 at 79:6-81:23, Appx. 1832.

94.    Mr. Dondero personally caused MGM stock to be sold in November 2019 and failed to declare the Notes forgiven.  According to Mr. and Ms. Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies -- Trussway, Cornerstone, or MGM -- above cost.  *See* Ex. 31 ¶82, Appx. 655.

95.    In November 2019, Mr. Dondero caused the sale of a substantial interest in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the Alleged Agreement altogether.  *See* Ex. 201 ¶29-30, Appx. 3270-3271; Ex. 202 ¶14, Appx. 4135; Ex. 203 ¶1, Appx. 4143; Ex. 204 at 5 n. 5, Appx. 4156.

96.    <u>Ms. Dondero was not competent to enter into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not competent to enter into the Alleged Agreements, and she made no effort to educate herself before purportedly binding Highland.  Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry" (Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928);[24]

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id*. at 61:25-63:13, Appx. 1889-1890);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (*Id*. at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id*. at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id*. 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900);

---

[24] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Ex. 100 at 51:11-22, Appx. 1887.  This information was false.  Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909).

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit4), Appx. 57-93.

97.    Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions.  Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland.  Ex. 101 at 12:3-73:17, Appx. 1961-1976.

98.    The Alleged Agreements were kept secret and were never disclosed.  The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero:

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement.  Ex. 100 at 190:16-191:17, Appx. 1922;

- Ms. Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (2) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court.  Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); and

- Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada, or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms

of the Alleged Agreement to the Bankruptcy Court.  Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17, Appx. 521-524).[25]

99.    No Document Exists that Reflects the Existence or Terms of the Alleged Agreements.  No document was created prior to the Petition Date that memorializes or reflects the existence or terms of the Alleged Agreement:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreement; or (b) is otherwise aware of anything in writing that identifies the promissory notes that are the subject of each Alleged Agreement.  Ex. 100 at 178:25-180:7, 180:24-181:6, Appx. 1919.

- The terms of the Alleged Agreement were never reduced to writing. Ex. 25 (Responses to RFAs 7-8, Appx. 539, Responses to Interrogatories 3-4, Appx. 542); Ex. 26 (Responses to RFAs 7-8, Appx. 555, Responses to Interrogatories 3-4, Appx. 558); Ex. 100 at 217:2-17, Appx. 1928.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreement; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements.  Ex. 24, Appx. 522 (Response to RFA 7); Ex. 99 at 28:24-29:12, Appx. 1819.

100.    Even if the Alleged Agreements existed, they are unenforceable for lack of consideration.  Mr. Dondero is the founder of Highland and Highland was the platform he used to support his other businesses, including the Advisors, HCRE, and HCMS.  No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the three

---

[25] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement. Ex. 24, Appx. 521 (Responses to RFAs 3 and 4).  But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only knows that it was subject to "milestones" that he cannot identify.  Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party.

Yet, according to Ms. Dondero, "motivating" Mr. Dondero is all Highland received. *See, e.g.,*

Ex. 100 at 221:2-225:7, Appx. 1929-1930.

101.    Indeed, Ms. Dondero admitted that she did not know, and had no reason to

expect, that Highland would benefit from the sale of the portfolio companies by a third party. She

also acknowledged that (a) Highland would not benefit from the Alleged Agreements if a third

party sold the portfolio companies at less than cost and (b) the Notes would all be forgiven even if

a third party sold the portfolio companies at a price "substantially below cost." Ex. 100 at 201:24-

203:11, Appx. 1924-1925; 227:17-229:14, Appx. 1931.

102.    <u>Mr. Dondero fixed the terms of the Alleged Agreements without</u>

<u>negotiation</u>.  No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero

made no counterproposal of any kind.  Indeed, the undisputed facts show that Ms. Dondero never

(i) made a counterproposal; (ii) negotiated any aspect of the Alleged Agreements; (iii) asked Mr.

Dondero how he selected the portfolio companies; (iv) inquired as to whether Mr. Dondero already

had a duty to maximize value; (v) rejected any aspect of Mr. Dondero's proposal; or (vi) rejected

or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the

portfolio companies were sold by a third party. Ex. 100 at 194:16-19, Appx. 1923, 195:14-199:15,

Appx. 1923-1924.

103.    <u>There is No History of Loans Being Forgiven at Highland</u>.  Mr. Dondero,

NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was

standard at Highland." *See, e.g.,* Ex. 31 ¶82, Appx. 655.  This is demonstrably false.

104.    Mr. Dondero has admitted that Highland disclosed to its auditors all loans

of a material amount that Highland ever forgave. Ex. 98 at 426:8-427:15, Appx. 1777.  During his

31

deposition, Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778.

## 2. HCMFA's "Mutual Mistake" Defense

105.    HCMFA's primary affirmative defense is that the HCMFA Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from Defendant to Waterhouse to executive the same for Defendant."  Ex. 13 ¶ 47, Appx. 412.

106.    In support of its defense, HCMFA asserts that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45, Appx. 412.

107.    HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

> The Defendant accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21,
> 2019. In turn, the Plaintiff accepted responsibility to the Defendant
> for having caused the NAV Error, and the Plaintiff ultimately,
> whether through insurance or its own funds, compensated the
> Defendant for the above payments by paying, or causing to be paid,
> approximately $7.5 million to the Defendant directly or indirectly to
> HGAF and its investors.

Ex. 13 ¶¶ 41-42, Appx. 411.

108.    On May 28, 2019, HCMFA sent a memorandum to the Board of Trustees

of HGAF to describe the "Resolution of the Fund's" NAV Error, HCMFA did not mention

Highland but reported:

> The Adviser and Houlihan Lokey, an independent third party expert
> valuation consultant approved by the Board, initially determined
> that the March Transactions were "non-orderly" and should be given
> "zero weighting" for purposes of determining fair value.  As
> reflected in the consultation, the Adviser ultimately determined that
> both March Transactions should be classified as "orderly."  The fair
> valuation methodology adopted, as addressed in the consultation,
> weights inputs and does not reflect last sales transaction pricing
> exclusively in determining fair value.  The "orderly determination
> and adoption of the weighted fair valuation methodology resulted in
> NAV errors in the Fund (the "NAV Error").

Ex. 182, Appx. 2978-2980.

109.    HCMFA will not offer into evidence any document to establish that (a) it

ever told Securities and Exchange Commission that Highland, and not HCMFA, was responsible

for the NAV Error; (b) it ever told the HGAF Board that anyone other than HCMFA and Houlihan

Lokey were responsible for the NAV Error; or that (c) Highland ever agreed to "compensate"

HCMFA for any mistake it may have made with respect to the NAV error.  *See* Ex. 192 at 140:7-

11, Appx. 3049.[26]

---

[26] While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million
as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make
that payment on behalf of Highland.  *Id.* Ex. 192 at 138:15-19, Appx. 3049.

110.   <u>HCMFA Recovers Approximately $5 million Through Insurance to</u>
<u>Compensate HGAF for the NAV Error</u>.  HCMFA reported to the HGAF Board that the "Estimated
Net Loss" from the NAV Error was $7,442,123.  Ex. 182 at 2, Appx. 2980.  HCMFA admits that
it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay
approximately $2.4 million out-of-pocket to fully cover the estimated loss.[27]  Despite having
received approximately $5 million in insurance proceeds (representing more than two-third of the
total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was
"compensation" for its negligence and (b) HCMFA was entitled to receive **both** and $5 million in
insurance proceeds $7.4 million in "compensation" from Highland even though the total loss was
only $7.4 million.  HCMFA never told its insurance carrier that Highland was at fault or that
Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered.
Ex. 192 at 133:14-150:22, Appx. 3047-3052.

111.   After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4
million from Highland in connection with the Notes. Ex. 192 at 146:20-25, Appx. 3051.

112.   Thus, according to HCMFA, "it received $7.4 million from Highland as
compensation, and approximately $5 million from the insurance carrier as compensation for the
total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11, Appx.
3051.

113.   HCMFA is not aware of (a) anyone on behalf of HCMFA ever informing
ICI mutual that it received $7.4 million from Highland on account of the NAV Error, Ex. 192 at
150:3-6, Appx. 3052, or (b) anyone on behalf of HCMFA ever informing ICI Mutual that HCMFA

---

[27] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of
$246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of
$2,398,842 to fully fund the loss.  Ex. 182 at 2, Appx. 2980.

34

believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22, Appx. 3052.  In other

words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA "whole" or

otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV

Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

114.    <u>Mr. Waterhouse Knew the HCMFA Notes Were Treated as Intercompany</u>

<u>Loans</u>.  Highland maintained an e-mail group called "Corporate Accounting" that included Mr.

Waterhouse, among others.  *See, e.g.,* Ex. 194 at 111:6-112:7, Appx. 3154.

115.    On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the

Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA.  This is a
> new interco loan.  Kristin, can you or Hayley please prep a note for
> execution.  I'll have further instructions later today, but please
> process this payment as soon as possible.

Ex. 54, Appx. 870-873.

116.    Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP was

transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee were

asked to prepare a promissory note.

117.    The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate

Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a
> new loan ($4.4M should be coming in from Jim soon).

> Hayley, please add this to your loan tracker.  I will paper the loan.

Ex. 56, Appx. 876-877.

118.    Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was

going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was

going to "paper the loan."  And that's exactly what happened.

119.    <u>HCMFA Represented to Third Parties that the HCMFA Notes Were</u> <u>Liabilities</u>.  As discussed above, HCMFA represented to the Retail Board in October 2020 as part of the 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of HCMFA.  *See* Ex. 59 at 2, Appx. 885.  Before filing its Original Answer, HCMFA never told anyone that was there was an error in the letter to the Retail Board.  Ex. 192 at 125:18-127:2, Appx. 3045-3046.

120.    <u>The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet</u> <u>and Included in its Audited Financial Statements</u>.  HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its balance sheet.  Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.

121.    <u>Nothing in HCMFA's Books and Records Corroborates HCMFA's Mistake</u> <u>Defense</u>.  There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Ex. 192 at 59:8-63:20, Appx. 3029-3030.

122.    <u>Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake</u> <u>Defense</u>.  As discussed *supra*, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the HCMFA Notes as valid debts due and owing by each of the Obligors to Plaintiff.  Thus, regardless of what HCMFA may think, there is no evidence that any purported mistake is "mutual."  Moreover, if Mr. Waterhouse "made a mistake" in preparing and executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he (i) signed off on Highland's and HCMFA's audited financial statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings.

3.      **Waiver and Estoppel [NexPoint, HCMS, HCRE]**

123.    There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020.  Ex. 98 at 462:16-463:9, Appx. 1786; Ex. 105 at 381:21-382:16, Appx. 2144-2145.  Nevertheless, NexPoint, HCMS, and HCRE assert that any default under the Notes was the "result of Plaintiff's own negligence, misconduct, breach of contract" under the Shared Services Agreement. Ex. 15 ¶ 80, Appx. 435; Ex. 12 ¶¶ 54-55, Appx. 402; Ex. 17 ¶¶ 97-98, Appx. 467.

124.    NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA").  Ex. 205, Appx. 4162-4181.

125.    Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.  In fact, Article II of the SSA expressly provided that "for the avoidance of doubt   . . . [Highland] shall *not* provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  Ex. 205 at § 2.02, Appx. 4165-4167 (emphasis added).

126.    To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 Authority.  [Highland's] scope of assistance and advice
> hereunder is *limited to the services specifically provided for in this
> Agreement.  [Highland] shall not assume or be deemed to assume
> any rights or obligations of [NexPoint] under any other document
> or agreement to which NexPoint is a party*. . . . [Highland] shall not

37

have any duties or obligations to [NexPoint] unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which [NexPoint] is a party.

*Id.* § 2.06, Appx. 4170 (emphasis added).

### 4.      Other Defenses

127.      Mr. Dondero could not identify any facts to support his affirmative defenses of waiver, estoppel, or lack of consideration. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

128.      NexPoint and HCMS assert that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid." Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.  The facts relevant to this defense are described above and in the Klos Declaration. (Klos Dec. ¶¶ 3-14).  Further, while NexPoint and HCMS now contend that they "pre-paid," both chose to pay Highland in January 2021 after receiving notice of default (in a transparent but futile attempt to "cure," for which they had no right rather than assert the "prepayment" defense.  *See* Ex. 2 (Exhibit 3), Appx. 49-56.

## III.      ARGUMENT

### A.      Legal Standard

#### 1.      Summary Judgment Standard

129.      "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)).  "A dispute about a material fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999). The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact.").

130.    "If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted).

131.    Thus, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming

that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n 12 (5th Cir.1993) ("We no longer ask whether literally little evidence, *i.e.*, a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

### 2. Summary Judgment Standard for Promissory Notes

132.    "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment.").  To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

### B. Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes

133.    Highland has made its *prima facie* case that it is entitled to summary judgment on Defendants' breach of the Notes.

134.    The Dondero Demand Notes are: (i) valid, (ii) signed by Mr. Dondero, and in Highland's favor, (Klos Dec. ¶¶ 18-20, Exs. D, E, F), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was

$9,004,013.07, and as of (b) December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

135.    The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

136.    The HCMS Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 23-26, Exs. I, J, K, L), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81, (Klos Dec. ¶ 45).

137.    The HCRE Demand Notes are: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶¶ 27-30, Exs. M, N, O, P), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23, (Klos Dec. ¶ 50).

138.    The NexPoint Term Note is: (i) valid, (ii) signed by NexPoint, and in Highland's favor, (Klos Dec. ¶ 31, Ex. A), and (iii) as (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b)

December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27,[28] (Klos Dec. ¶ 51).

139.    The HCMS Term Note is: (i) valid, (ii) signed by HCMS, and in Highland's favor, (Klos Dec. ¶ 32, Ex. R), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31,[29] (Klos Dec. ¶ 52).

140.    The HCRE Term Note is: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶ 33, Ex. S), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[30] (Klos Dec. ¶ 53).

141.    Each of the Obligors under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand.

142.    Each of the Obligors under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[28] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[29] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[30] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

143.    Highland has been damaged by the Obligors' breaches in amounts that are set forth above but which (a) continued to increase daily, and (b) which do not include a calculation of collection costs and attorneys' fees.[31]

144.    Accordingly, Highland has made out its prima facie case for summary judgment that Defendants have breached the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").[32]

## C.    Defendants Fail to Rebut Highland's Prima Facie Case

145.    Defendants fail cannot rebut Highland's prima facie case for breach of the Notes because there is no substantive or credible evidence to support any of their affirmative defenses and there is substantial evidence to contradict them.

### 1.    No Reasonable Jury Could Find that the "Alleged Agreement" Exists

146.    Mr. Dondero, NexPoint, HCRE, and HCMS fail to show there is any genuine issue of material fact to support their "Alleged Agreement" defense. There is a complete absence of evidence in support of this defense and there is substantial evidence to contradict them.

---

[31] Plaintiff seeks to add to its damages accrued and unpaid interest, and Plaintiff's costs of collection, including reasonable attorney's fees. Ex. 162-180, Appx. 2637-2945. Plaintiff respectfully requests an opportunity to conduct a final damage calculation if the Court fully grants the Motion.

[32] In the event the Motion is granted, Highland requests that the Court hold a hearing on damages, as interest under the Notes and attorney's fees continue to accrue.

147.    As discussed above, (i) Mr. Dondero cannot identify materials terms of the Alleged Agreement, such as (a) which Notes are subject to the Alleged Agreement, (b) the number of Notes subject to the Alleged Agreement, (c) the maker of each Note subject to the Alleged Agreement; (d) the date of each Note subject to the Alleged Agreement, or (e) the principal amount of any Note subject to the Alleged Agreement, (*see supra* ¶¶ 91-92); (ii) Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each Alleged Agreement, (*see supra* ¶¶ 93); (iii) Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the Alleged Agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the Alleged Agreement, (*see supra* ¶¶ 94-95); (iv) Ms. Dondero, the counter-party to the Alleged Agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not competent to enter into the Alleged Agreements (*see supra* ¶¶ 96); (v) the existence or terms of the Alleged Agreement was never disclosed by Mr. Dondero or Ms. Dondero to anyone, including PwC, Mr. Waterhouse, Mr. Okada or the Bankruptcy Court, (*see supra* ¶¶ 98); (vi) no document exists memorializing or otherwise reflecting the existence of terms of the Alleged Agreement, (*see supra* ¶ 99); and (vii) there is no history of loans being forgiven at Highland, (*see supra* ¶¶ 103-104).  Accordingly, there is an absence of evidence showing the Alleged Agreement exists.  *See Magna*, 2007 WL 3231633, at *16 (granting summary judgment with respect to breach of promissory note where defendants assert that they are discharged from debt obligations after terms of lease were altered, finding "[t]here is no evidence that any agreement was altered. At best, the summary judgment evidence supports a theory that the terms of the leases were not what the [] Defendants expected them to be.")

148.    The Alleged Agreement would also be unenforceable as a matter of law for lack of (a) consideration, (b) definiteness, and (c) a meeting of the minds.  In order to be legally

enforceable, a contract "must address all of its essential and material terms with a reasonable

degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL

4202169, at * 7 (N.D. Tex Aug. 28, 2021); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32

(Bankr. N.D. Tex. 2006) (in order to prove existence of a valid and binding

subsequent oral agreement binding upon parties, party must prove that there was "(1) a meeting of

the minds" and "(2) consideration to support such a subsequent oral agreement.")  "Whether a

contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal

quotations omitted).  "A contract must also be based on valid consideration." *Id.* "In determining

the existence of an oral contract, courts look at the communications between the parties and the

acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV-

2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014).

       149.    Based on the evidence cited above, no reasonable trier of fact could find

that there was a meeting of the minds between Ms. Dondero and Mr. Dondero regarding the

material terms of the oral Alleged Agreement or that such oral Agreement was exchanged for

consideration. *See Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D.

Tex. Sept. 4, 2014) (finding that a reasonable trier of fact could not find that based on the oral

conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a

meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021

WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make

it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not

find an enforceable contract,'" finding that party "has not identified evidence of record that would

allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the

minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x

417, 419 (5th Cir. 2006)) (citation omitted); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent

oral amendment" defense fails where the summary judgment record does not support the existence

of a subsequent agreement").

151.   150.   Accordingly, there is no genuine issue of material fact regarding the Alleged

Agreement defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's,

NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### 2.   No Reasonable Jury Could Find the HCMFA Note Was a "Mistake"

151.   HCMFA's Mistake Defense also fails as a matter of law because there is no

evidence to show that HCMFA and Highland were acting under a shared factual mistake when

executing the HCMFA Notes.

152.   "For mutual mistake to nullify a promissory note, the evidence must show

that both parties were acting under the same misunderstanding of the same material fact." *Looney*,

2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law).  "[A] party must show

that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects

the agreed upon exchange. *Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*, No. H-06-

1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27. 2007) (citing Texas law).  In other words,

"[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but

the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.*

(internal quotations omitted).  "In determining the intent of the parties to a written contract, a court

may consider the conduct of the parties and the information available to them at the time of signing

in addition to the written agreement itself." *Id.*  "When mutual mistake is alleged, the party seeking

relief must show what the parties' true agreement was and that the instrument incorrectly reflects

that agreement because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co.,

Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations

omitted).  "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7.

153.    Here, the HCMFA Notes were apparently hiding in plain sight for almost two years.  The undisputed documentary and testimonial evidence overwhelmingly establishes that both HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr. Waterhouse, HCMFA's treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan" (*supra*, ¶¶ 114-118); (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets (*supra* ¶ 120); (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, (see supra ¶ 122), and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times, (*supra*, ¶¶ 119).

154.    There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into this agreement.  The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) ICI Mutual. (*See supra*, ¶¶ 110-115; 119).  The purported "mistake" is also not reflected in HCMFA's books and records or audited financials. (*See supra*, ¶¶ 120).

155.    HCMFA's Mistake Defense, therefore, fails as a matter of law.  *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that

47

[defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.) (emphasis in original); *Whitney*, 2007 WL 3145798, at *6 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

156.    Accordingly, there is no genuine issue of material fact regarding HCMFA's Mistake Defense, and Highland is entitled to summary judgment for HCMFA's breach of the HCMFA Demand Notes.

**3.    No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence**

157.    No reasonable jury could find that NexPoint's default under its Note was the result of Highland's negligence under the SSA.[33]    As discussed above, the SSA, by its clear

---

[33] Highland did not enter into shared services agreements with HCRE and HCMS so those Obligors' affirmative defenses fail as a matter of law.

terms, does not impose a duty on Highland to make payments under the Term Notes, on behalf of

NexPoint, HCRE, and HCMS, without the express authorization of those entities or an agent of

those entities.  *See supra* ¶¶ 120-125.   It is undisputed that Highland was never directed to make

the payments under the Term Notes. *See supra* ¶ 123.

158.    Accordingly, there is no genuine issue of material fact regarding

NexPoint's, HCRE's, and HCMS's breach under the Term Notes, and Highland is entitled to

summary judgment on its claims for breach of the Term Notes.

**4.**    **No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note**

159.    NexPoint's and HCMS's assertion that they did not default by failing to

make the December 31, 2020 Annual Installment payment because they "prepaid" is contradicted

by undisputed documentary evidence.  (*See* Klos Dec. ¶¶ 3-14).

160.    Accordingly, there can be no genuine dispute of material fact regarding

NexPoint's and HCMS's failure to pay amounts due and owing under the NexPoint and HCMS

Term Notes.

**CONCLUSION**

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold

Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes,

including the costs of collection and reasonable attorneys' fees in an amount to be determined and

(iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:  December 20, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
           ZAnnable@HaywardFirm.com


*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

DOCS_NY:44673.9 36027/003

## PARTIES, WITNESSES, AND DEFINITIONS

1.      "Advisors" refers to HCMFA and NexPoint, together.  The Advisors provide investment advisors services to certain retail funds and are effectively owned or controlled by Mr. Dondero.  Ex. 96 at 228:11-19; Ex. 105 at 32:17-23.[34]

2.      "Corporate Obligors" refers to HCMFA, NexPoint, HCMS, and HCRE in their capacities as makers under their respective Notes.

3.      "Dugaboy" refers to The Dugaboy Investment Trust, a trust formed in 2010 to purportedly provide for the living maintenance, education, health, and lifestyle of its beneficiaries. Mr. Dondero is the sole beneficiary of Dugaboy during his lifetime; his children and subsequent generations shall become the beneficiaries following his demise.

4.      "HCMFA" refers to Highland Capital Management Advisors, L.P.  HCMFA is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:11-15.

5.      "NexPoint" refers to NexPoint Advisors, L.P.  NexPoint is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23.  HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:16-19.

6.      "HCRE" refers to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and is an entity that is directly or indirectly owned by Mr. Dondero. Ex. 96 at 228:20-23.

7.      "HCMS" refers to Highland Capital Management Services, Inc., and is an entity that is directly or indirectly owned or controlled by Mr. Dondero. Ex. 96 at 228:24-229:4.

---

[34] All citations herein to "Appx." refer to the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*.

8.      "Klos Dec." refers to the *Declaration of David Klos In Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, filed simultaneously with the Motion.

9.      "Mr. Dondero" refers to an individual named James Dondero.  Mr. Dondero is the founder and former president and Chief Executive Officer of Highland.  Ex. 96 at 248:3-6.  Mr. Dondero served as Highland's president from 1994 until January 9, 2020. Ex. 98 at 291:6-292:16. At all relevant times, Mr. Dondero also served as President of HCMFA and directly or indirectly owned or controlled each of the Corporate Obligors.  Ex. 37; Ex. 96 at 228:6-229.

10.      "Ms. Dondero" refers to an individual named Nancy Dondero.  Ms. Dondero is Mr. Dondero's sister.  At Mr. Dondero's request, Ms. Dondero became the sole Trustee of Dugaboy in October 2015 and has served in that capacity since that time.  Ex. 96 at 174:21-25; Ex. 100 at 166:19-169:5.

11.      "Mr. Norris" refers to an individual named Dustin Norris.  Mr. Norris has been an officer of HCMFA since 2012, and currently serves as the Executive Vice President of HCMFA. Ex. 35; Ex. 192 at 18:11-25.

12.      "Mr. Post" refers to an individual named Jason Post. Mr. Post was employed by Highland in 2018 and 2019, and then became an employee of HCMFA and served as the Chief Compliance Officer for each of the Advisors.  Ex. 105 at 184:13-185:3; Ex. 192 at 32:6-33:25.

13.      "Mr. Sauter" refers to an individual named Dennis C. Sauter.  Mr. Sauter served as Highland's general counsel of real estate from approximately February 2020 until April 2021, and has served as the general counsel of NexPoint from April 2021 to the present. Ex. 193 at: 7:16-9:12.

14.      "Ms. Thedford" refers to an individual named Lauren Thedford.  Ms. Thedford is an attorney who was previously employed by Highland while simultaneously serving as an officer

of HCMFA and NexPoint, holding the title of Secretary.  Ms. Thedford also served as an officer

of the retail funds managed by the Advisors until early 2021.  Ex. 35; Ex. 37; Ex. 105 at 172:10-

173:25.

       15.     "Mr. Waterhouse" refers to an individual named Frank Waterhouse.  Mr.

Waterhouse is a Certified Public Accountant who joined Highland Capital Management, L.P. in

2006 and served as Highland's Chief Financial Officer ("CFO") on a continuous basis from

approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse

simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of

Treasurer and (2) Principal Executive Officer of certain retail funds managed by the Advisors.  As

Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for

managing the Advisor's accounting and finance functions.  Ex. 35; Ex. 37; Ex. 105 at 18:6-15,

18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-

39:5.

       16.     "Notes" refers to the Demand Notes and the Term Notes, as those terms are defined

below.

       17.     "Obligors" refers to Mr. Dondero and the Corporate Obligors in their capacities as

makers under the Notes.

       18.     "PwC" refers to Pricewaterhouse Coopers, firm that served as Highland's outside

auditors from 2003 through at least June 3, 2019.  Ex. 34; Exs. 63-66; Exs. 69-72; Ex. 87 at 9 (Item

26b.1).

3



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed December 21, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | |
|---|---|---|
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § | 21-03007-sgj |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | |
| Defendants. | § | |

### ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

This matter having come before the Court on the (a) *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 86] (the "NexPoint Motion") filed by NexPoint Advisors, L.P. ("NexPoint"); (b) *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 91] (the "HCMS Motion") filed by Highland Capital Management Services, Inc. ("HCMS"); and (c) *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3007, Docket No. 86] (the "HCRE Motion," and collectively with the NexPoint Motion and the HCMS Motion, the "Motions") filed by HCRE Partners, LLC ("HCRE," and collectively with NexPoint and HCMS, "Defendants"); and this Court having considered (i) the Motions; (ii) *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 104; Adv. Proc. 21-3006, Docket No. 109; Adv. Proc. 21-3007, Docket No. 104] (the "Objection") filed by Highland Capital Management, L.P. ("Highland"); (iii) the (a) *Reply of*

*Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 115] (the "NexPoint Reply") filed by NexPoint; and (b) *Highland Capital Management Services, Inc. and HCRE partners, LLC's Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 120, and Adv. Proc. 21-3007, Docket No. 115] (the "HCRE and HCMS Replies," and together with the NexPoint Reply, the "Replies") filed by HCRE and HCMS; and (iv) the arguments made during the hearing held on December 13, 2021 (the "Hearing"); and this Court having found that Defendants have not established "good cause" under Rule 16(b) of the Federal Rules of Civil Procedure for the relief requested in the Motions; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motions in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court, and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth during the Hearing on these Motions, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motions are **DENIED**.

2.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**### END OF ORDER ###**

DOCS_NY:44447.8 36027/003

Davor Rukavina
Julian P. Vasek
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

Attorneys for NexPoint Advisors, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. No. 21-03005-sgj |
| | § | |
| vs. | § | Civ. Act. No. 3:21-cv-00880-C |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**NOTICE OF OBJECTION OF NEXPOINT ADVISORS, L.P. TO ORDER DENYING
MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

PLEASE TAKE NOTICE that, on January 5, 2022, NexPoint Advisors, L.P. ("NexPoint")

filed the following documents in the District Court under Civ. Act. No. 3:21-cv-00880-C, copies

of which are attached hereto:

- *Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert
  Disclosure and Discovery Deadlines* (Dist. Ct. Dkt. 21);

- *Brief in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions
  to Extend Expert Disclosure and Discovery Deadlines* (Dist. Ct. Dkt. 22); and

- *Appendix* in Support of *Objection* of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines (Dist. Ct. Dkt. 23).

RESPECTFULLY SUBMITTED this the 5th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant The Dugaboy Investment Trust
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

Davor Rukavina on behalf of Defendant NexPoint Advisors, L.P.
drukavina@munsch.com

Julian Preston Vasek on behalf of Defendant NexPoint Advisors, L.P.
jvasek@munsch.com

                    /s/ Davor Rukavina
                    Davor Rukavina

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. No. 21-03005-sgj |
| | § | |
| vs. | § | Civ. Act. No. 3:21-cv-00880-C |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**OBJECTION OF NEXPOINT ADVISORS, L.P. TO ORDER DENYING MOTIONS
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Objection to Order Denying Motions to Extend Expert

Disclosure and Discovery Deadlines* (the "Objection"), respectfully stating as follows:

Pursuant to Rules 54(b), 72(a) and Local Civil Rule 72.1, NexPoint seeks the District

Court's review of the Bankruptcy Court's *Order Denying Motions to Extend Expert Disclosure

and Discovery Deadlines* (the "Order").   For the reasons set forth in its brief, filed

contemporaneously with this Objection and incorporated herein by reference, NexPoint submits

that, in denying NexPoint leave to extend the expert disclosure and discovery deadlines, the Order

is clearly erroneous and contrary to law and should, therefore, be reconsidered and reversed by the

District Court.

      RESPECTFULLY SUBMITTED this the 5th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina
     State Bar No. 24030781
     Julian P. Vasek.
     State Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     Email:  drukavina@munsch.com
     Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Case Admin Sup    txnb_appeals@txnb.uscourts.gov

Bryan Christopher Assink    bryan.assink@bondsellis.com

Clay M Taylor    clay.taylor@bondsellis.com

Daniel P Elms    elmsd@gtlaw.com, guerrak@gtlaw.com

Davor Rukavina    drukavina@munsch.com

Deborah Rose Deitsch-Perez    deborah.deitsch-perez@stinson.com, kinga.mccoy@stinson.com, patricia.tomasky@stinson.com

Douglas Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com, gbrouphy@hellerdraper.com, vgamble@hellerdraper.com

Gregory V Demo    gdemo@pszjlaw.com, hwinograd@pszjlaw.com, jfried@pszjlaw.com, lsc@pszjlaw.com

Jeffrey N Pomerantz    jpomerantz@pszjlaw.com

John A Morris    jmorris@pszjlaw.com, hwinograd@pszjlaw.com, lsc@pszjlaw.com

Julian Preston Vasek    jvasek@munsch.com

Leslie A Collins    lcollins@hellerdraper.com, dhepting@hellerdraper.com

Michael P Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com

Stacey G Jernigan    sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

Zachery Z. Annable    zannable@haywardfirm.com, zannable@franklinhayward.com

/s/ Davor Rukavina

Davor Rukavina

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. No. 21-03005-sgj |
| | § | |
| vs. | § | Civ. Act. No. 3:21-cv-00880-C |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**BRIEF IN SUPPORT OF OBJECTION OF NEXPOINT
ADVISORS, L.P. TO ORDER DENYING MOTIONS TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

I.      RELIEF REQUESTED ...................................................................................1

II.     BACKGROUND ...........................................................................................1

        A.    THE ADVERSARY PROCEEDING ...................................................................1

        B.    NEXPOINT'S AFFIRMATIVE DEFENSE.........................................................2

        C.    THE EXPERT WITNESS DEADLINES ............................................................4

        D.    THE MOTION AND THE ORDER ..................................................................5

        E.    NEXPOINT'S RETENTION OF STEVE PULLY AND HIS EXPERT REPORT .....................5

III.    ARGUMENTS AND AUTHORITIES.................................................................6

        A.    RECONSIDERATION OF ORDER AS ORDER OF MAGISTRATE JUDGE ..........................6

        B.    STANDARD APPLICABLE TO THE MOTION ...................................................7

             1.    Explanation for Failure to Timely Designate Expert...................................7

             2.    The Importance of the Expert ..................................................................10

             3.    No Potential Prejudice to the Debtor ........................................................12

             4.    Availability of Continuance to Avoid Prejudice.......................................13

        C.    THE BANKRUPTCY COURT CLEARLY ERRED IN ENTERING THE ORDER .................13

IV.   CONCLUSION..........................................................................................16

CERTIFICATE OF SERVICE .................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 (E.D. Tex. 2021) ...............................13

*Baylor Health Care Sys. v. Equitable Plan Servs.*, 955 F. Supp. 2 678 (N.D. Tex. 2013).............7

*Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir. 1990) .............................................................10

*Guzman v. Hacienda Records & Recording Studio Inc.*, 808 F.3d 1031 (5th Cir. 2015)............ 6-7

*In re Geert Duizenstraal*, 1997 U.S. Dist. LEXIS 16506 (N.D. Tex. 1997) ..................................6

*In re Schooler*, 725 F.3d 498 (5th Cir. 2013).................................................................................8

*Marathon Fin. Ins. Inc. RRG v. Ford Motor Co.*, 591 F.3d 458 (5th Cir. 2009)............................7

*Quijano v. United States*, 325 F.3d 564 (5th Cir. 2003) ..........................................................10, 15

*S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533 (5th Cir. 2003) .........................................7

*Streber v. Hunter*, 221 F.3d 701 (5th Cir. 2000)....................................................................10, 15

## Other

Fed. R. Civ. P. 16....................................................................................................................7

Fed. R. Civ. P. 54................................................................................................................6, 13

Fed. R. Civ. P. 72...........................................................................................................1, 6, 14

Local Civ. R. 72.1 ....................................................................................................................1

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Brief* (the "Brief") in support of its *Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* (the "Objection"), respectfully stating as follows:

## I.      RELIEF REQUESTED

1.      By the Objection, and pursuant to Federal Rule of Civil Procedure 72(a) and Local Civil Rule 72.1, NexPoint seeks the District Court's review of the Bankruptcy Court's *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* (the "Order").  NexPoint submits that, in denying NexPoint leave to extend the expert disclosure and discovery deadlines, the Order is clearly erroneous and contrary to law and should, therefore, be reconsidered and reversed by the District Court.

## II.      BACKGROUND

A.      THE ADVERSARY PROCEEDING

2.      The Debtor was a debtor and is now a reorganized debtor in a Chapter 11 case pending before the Bankruptcy Court.

3.      The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

4.      By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note").  APP 008 ¶ 21.[1]  The Note is a 30-year note and provides for an

---

[1]      "APP" refers to the *Appendix in Support of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, which is being filed contemporaneously herewith.

annual payment of principal and interest.  APP 008 ¶ 22.  After prior payments, the Debtor asserts

that $23,071,195.03 remains due and owing on the Note.  APP 010 ¶ 31.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report

and recommendation and ordering that the reference for this Adversary Proceeding will be

withdrawn once the Bankruptcy Court certifies this Adversary Proceeding as being trial ready.

APP 002.  As part of the same, the District Court necessarily agreed and ordered that NexPoint

has a right to a trial by jury of this Adversary Proceeding.

6.      Although not clear, it appears that the Bankruptcy Court is acting in the capacity of

a magistrate judge, as the Bankruptcy Court itself appears to have concluded, although there is no

order so specifying.  APP 775 n.1; APP 776 n.5  Accordingly, in order not to waive its rights,

NexPoint filed the Objection.

**B.      NEXPOINT'S AFFIRMATIVE DEFENSE**

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal

and interest on December 31, 2020, and that NexPoint failed to make this payment.  APP 009 ¶ 26.

Thus, in January 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor

demanded full and immediate payment.  APP 009 ¶ 27.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that

certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement")

between the Debtor and NexPoint dated January 1, 2018.  APP 086 ¶ 80; APP 105.  The Shared

Services Agreement was in place as of December 31, 2020, although the Debtor terminated it later,

in 2021.  APP 462 at 2–9.  Under the Shared Services Agreement, the Debtor provided various

services to NexPoint, including so-called "back office" services, including treasury, accounting,

and payables services.  APP 462 at 13–APP 464 at 9.  NexPoint has alleged that, pursuant to the

Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  APP 473 at 22–APP 474 at 8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place, unaccelerated.  NexPoint has always asserted this as an affirmative defense.  *See* Defendant's Original Answer, <mark>Docket No. 6</mark>.  NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.  In other words, until NexPoint deposed Mr. Waterhouse, NexPoint believed that the Debtor simply forgot to facilitate the December 31, 2020 payment of the Note as it had done in the past and as NexPoint was relying on the Debtor to do again (using NexPoint's funds of course).

10.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  APP 155 at 3–6; APP 463 at 3–8; APP 549 ¶ 25.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement.  Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint

to pay any more funds to the Debtor, including, expressly on the Note.  APP 526 at 4–APP 528 at 17.

11.     This changed the potential facts as NexPoint understood them from a situation where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

## C.     THE EXPERT WITNESS DEADLINES

12.     NexPoint did not know that Waterhouse would provide this testimony.  APP 791 ¶ 12.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

15.     On September 6, 2021, the Bankruptcy Court entered a scheduling order that provided for a deadline of October 29, 2021 for the parties to designate experts and provide expert disclosures.

**D.     THE MOTION AND THE ORDER**

16.     On October 29, 2021, NexPoint filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion").  APP 089.  The Debtor objected, APP 534, and NexPoint filed a reply brief.  APP 786.

17.     The Bankruptcy Court held a hearing on the Motion on December 13, 2021.  At the conclusion of the hearing, the Bankruptcy Court orally denied the Motion and stated its reasons for such denial on the record.  APP 889–891.

18.     The Bankruptcy Court entered the Order on December 21, 2021.  APP 894.

**E.     NEXPOINT'S RETENTION OF STEVE PULLY AND HIS EXPERT REPORT**

19.     NexPoint filed its Motion as soon as it could after learning of Waterhouse's testimony, and it filed its Motion before the deadline to designate an expert expired.  However, NexPoint's expert was not able to prepare his report before that deadline expired.  Nevertheless, to demonstrate NexPoint's speed and that there would be no delays to this Adversary Proceeding, NexPoint filed on the docket of this Adversary Proceeding its designation of Steve Pully as its

expert, together with Mr. Pully's completed expert report, on December 10, 2021.  APP 830.  Thus,

by the time of the hearing on the Motion, NexPoint's expert had already completed his report.

## III.    ARGUMENTS AND AUTHORITIES

### A.    RECONSIDERATION OF ORDER AS ORDER OF MAGISTRATE JUDGE

20.      The Bankruptcy Court is not a magistrate judge.  The District Court's order on

NexPoint's motion for the withdrawal of the reference provides that the Bankruptcy Court shall

consider all pretrial matters, but does not state that the Bankruptcy Court shall do so as a magistrate

subject to the rules applicable to magistrate judges.  NexPoint therefore submits that the District

Court may reconsider, modify, or reverse the Order and grant the Motion *de novo* as it could do

with respect to any of its own pretrial orders under Rule 54(b), and NexPoint hereby seeks such

review and reconsideration.

21.      However, because the issue is uncertain, and because the Bankruptcy Court appears

to understand that it is acting in the capacity of a magistrate judge, NexPoint also seeks the District

Court's review of the Order under Rule 72(a).  In this respect, the Federal Rules of Bankruptcy

Procedure do not incorporate Rule 72, even though they incorporate most of the Federal Rules of

Civil Procedure into an adversary proceeding such as this one.  If Rule 72(a) applies, then the

standard for reconsidering the Order is that the Order is "clearly erroneous or is contrary to law."

FED. R. CIV. P. 72(a).

22.      Because the Order is not dispositive, the "clearly erroneous" standard applies.  *See,

e.g., In re Geert Duizenstraal,* 1997 U.S. Dist. LEXIS 16506 a *3-*4 (N.D. Tex. 1997).  Under

this standard, an order is clearly erroneous "when although there is evidence to support it, the

reviewing court on the entire evidence is left with the definite and firm conviction that a mistake

has been committed."  *Guzman v. Hacienda Records & Recording Studio Inc.*, 808 F.3d 1031,

1036 (5th Cir. 2015).  *Accord Baylor Health Care Sys. v. Equitable Plan Servs.*, 955 F. Supp. 2
678, 689 (N.D. Tex. 2013).

### B.    STANDARD APPLICABLE TO THE MOTION

23.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for
good cause," although there is some uncertainty as to whether this standard applies only after a
deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.
Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure
16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

24.     When the issue concerns an "untimely submission of expert reports," the Fifth
Circuit has specified the following four factors as guiding the decision: "(1) the explanation for
the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential
prejudice in allowing the amendment; and (4) the availability of a continuance to cure such
prejudice."  *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003).  Again,
this test applies to a deadline which has already expired.  Logically, therefore, a lesser standard
should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

#### 1.    Explanation for Failure to Timely Designate Expert

25.     The explanation for the requested extension of the expert deadlines was simply that
the parties deposed Waterhouse on October 19, 2021, and it was not until that deposition that
NexPoint knew or could reasonably have known that Waterhouse would testify that he was
affirmatively instructed not to make the December 31, 2020 payment on the Note.  APP 092 ¶ 12;
APP 791 ¶ 11.  This testimony directly contradicted Dondero's recollection that he made no such
instruction.  Since NexPoint relied on Dondero's recollection and had no reasonable grounds to
believe that Waterhouse would testify differently, there was no reason for NexPoint to retain an

expert prior to the October 19, 2021 deposition of Waterhouse.  In this respect, discovery worked as it should have and NexPoint should not be penalized for the natural evolution of this lawsuit.

26.     Prior to this deposition, NexPoint believed that the Debtor had utterly failed to discharge its duties under the Shared Services Agreement by not facilitating the payment on the Note.  This did not call for an expert.  But, once Waterhouse testified that Dondero instructed him not to make the payment, the issue fundamentally changed.  This important distinction has been aptly explained by the Fifth Circuit in a case where the issue was whether a trustee breached his duties:

> Finders of fact are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.  Accordingly, we have explained that, as a general rule, expert testimony is not needed in many if not most cases. Moreover, although expert testimony may be necessary in a professional negligence case to establish the standard of care for the industry, an exception applies in instances of negligence that are a matter of common knowledge comprehensible to laymen.

> Although Liberty Mutual contends that expert testimony was required in this case, Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and in the face of repeated warnings and inquiries by a concerned creditor, a layperson could discern that the standard of care was not met in this case.

> We agree with Lamesa that, under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken *some* form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013) (internal citations and quotations omitted)

27.     Thus, it was only after the Waterhouse deposition that NexPoint learned that, if the jury believes Waterhouse, the issue of the Debtor's standard of care under the Shared Services Agreement becomes much more complicated, thereby necessitating an expert on that standard of

care.  Nor is the Debtor free of blame with respect to the timing of when NexPoint learned of

Waterhouse's testimony.   On May 11, 2021, the Debtor served its amended responses to

NexPoint's discovery.  APP 813.  In those, the Debtor answered the following interrogatory:

> **INTERROGATORY NO. 2:**
>
> If the Debtor contends that it was not responsible for causing payments to be made
> under the Note on NexPoint's behalf pursuant to the Shared Services Agreement,
> explain the legal and factual basis for such contention.
>
> **RESPONSE TO INTERROGATORY NO. 2:**
>
> The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal
> conclusion or legal analysis. Subject to its objection, the Shared Services
> Agreement did not provide that the Debtor was responsible for causing payments
> to be made under the Note. The Debtor further states that after the Debtor sent
> NexPoint the Default Letters, NexPoint did not contend that the Debtor was
> required to make payments under the Note on NexPoint's behalf. The Debtor's
> personnel caused the January Payment to be processed upon instruction from
> NexPoint.

APP 819.

28.    Even though NexPoint asked the Debtor to explain, factually, why the Debtor was

not responsible for causing payments to be made, rather than including in its answer that Dondero

gave Waterhouse the alleged instruction, the Debtor merely answered that the contract did not

impose this responsibility on the Debtor.  Yet, the Debtor's answer to the following request for

production strongly suggests that the Debtor knew of the alleged instruction, which it did not

include it in the interrogatory answer:

> **REQUEST FOR PRODUCTION NO. 1**:
>
> All Communications pursuant to which any director, officer, or employee of the
> Debtor was advised or instructed not to make the December Payment or to cause
> the December Payment to be made.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. <u>Any Communications responsive to Request for Production No. 1 were verbal</u>.

APP 822 (emphasis added).

29.     The Debtor could and should have stated what these verbal communications were in May, 2021.  Instead, NexPoint was forced to wait until Waterhouse's deposition to learn of the alleged verbal communication.  Alternatively, the Debtor too did not know ahead of time how Mr. Waterhouse would answer, but then it can hardly accuse NexPoint of any delay.

**2.      The Importance of the Expert**

30.     This is a jury trial where the issues concern the Debtor's standard of care under the Shared Services Agreement.  "Expert testimony is generally <u>required</u> to prove the applicable standard of care." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (emphasis added); *Streber v. Hunter*, 221 F.3d 701, 724 (5th Cir. 2000) ("Breach of the standard of care must generally be proven by expert testimony").  [E]xpert testimony is <u>necessary</u> to establish the standard of care . . . Similarly, breach of a fiduciary duty or a conflict of interest <u>requires</u> proof of expert testimony." *Geiserman v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (internal quotations removed) (emphasis added).

31.     The Shared Services Agreement, in place during November and December, 2020 (when Dondero allegedly gave Waterhouse the instruction), provides as follows:

Section 6.01.  <u>Standard of Care</u>.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies, and procedures in performing its duties hereunder.

APP 115.

32.     "Covered Person" includes the "Staff and Services Provider," *i.e.* the Debtor, and

its managers, directors, officers, and shareholders.   APP 106.   There can be no dispute that

section 6.01 applied to the Debtor itself, and to Waterhouse.

33.     The Shared Services Agreement identifies at least three services that the Debtor

was required to provide that are directly on point:

> (a)     *Back- and Middle Office*.  Assistance and advice with respect to back- and
> middle-office functions including, but not limited to . . . finance and accounting,
> payments, operation, book keeping, cash management . . . accounts payable . . .
>
> (k)     *Ancillary Services*.   Assistance and advice on all things ancillary or
> incidental to the foregoing.
>
> (l)     *Other*.   Assistance and advice relating to such other back- and middle-office
> services in connection with the day-to-day business of [NexPoint] as [NexPoint]
> and [the Debtor] may from time to time agree.

APP 107–109 (emphasis added).

34.     The Shared Services Agreement also sets forth the standard of care that the Debtor

was to provide to NexPoint in discharging the Debtor's duties under the Shared Services

Agreement:

> the care, skill, prudence and diligence under the circumstances then prevailing that
> a prudent person acting in a like capacity and familiar with such matters would use
> in the conduct of an enterprise of a like character and with like aims.

APP 115 § 6.01

35.     Assistance and advice—again, *advice*—with respect to "payments" is expressly

included.  And, should there be any doubt, the Debtor's own Chief Financial Officer at the time

confirmed that it was "reasonable for NexPoint to rely on the debtors' employees to inform

NexPoint of an upcoming payment due on the $30 million promissory note."  APP 473 at 22–

APP 474 at 8.  The question therefore is, assuming that Dondero instructed Waterhouse not to

make the payment on the Note, whether Waterhouse thereafter doing nothing to clarify and ensure that he correctly understood Dondero, or to advise Dondero of the potential consequences of non-payment, or to seek to dissuade Dondero from his instruction, comported with "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

36.     This is appropriate for an expert to review because a lay juror is not likely to resolve these questions from personal experience or common sense.  Thus, extending the expert discovery deadline is important for NexPoint to fully present its defense and for the jury to be able to discharge its duties in resolving the defense.

### 3.     No Potential Prejudice to the Debtor

37.     Granting the Motion would not work any prejudice on the Debtor.  NexPoint filed its expert report on December 10, 2021, and only a short additional time would be needed for the Debtor to depose that expert and potentially retain a rebuttal expert.  Trial of this Adversary Proceeding is not set and, on December 17, 2021, the Debtor filed its motion for summary judgment, the hearing on which will not be until March 8, 2022.  The Bankruptcy Court will then provide a report and recommendation on that motion, subject to *de novo* review by the District Court, which will likely take weeks if not months to resolve.  Thus, granting the Motion would not have delayed the ultimate trial of this Adversary Proceeding at all.

38.     With respect to the Debtor's argument that it will be prejudiced by potentially having to expend funds to retain a rebuttal expert, NexPoint's first response is that, if the Debtor prevails on its claims under the Note, it will seek to recover its fees and costs from NexPoint. Second, and perhaps more importantly, having to incur costs for an expert in a $24 million lawsuit,

where the Debtor has always known of NexPoint's affirmative defense and very likely knew of

Waterhouse's testimony before (as there were two other employees, David Klos and Kristin

Hendrix, who are still employees of the Debtor, who testified at deposition that Waterhouse told

them of Dondero's alleged instruction at approximately the same time the instruction was allegedly

given), is not legally cognizable prejudice any more than it would be in any case:

> any additional costs incurred from an extension would not be unreasonable. Here,
> Plaintiffs seek an extension so they can offer an expert witness for their products
> liability claims.  Defendants have been aware of these claims since this case's
> inception.  Because expert witnesses are crucial for Plaintiffs' prima facie case,
> Defendants have known they would need to prepare rebuttal evidence since this
> case began on October 14, 2019.  These facts do not present an instance in which a
> party adds an additional claim, or introduces an eleventh-hour witness, to foist
> additional litigation costs without warning.

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 at *12 (E.D. Tex. 2021).

### 4.    <u>Availability of Continuance to Avoid Prejudice</u>

39.    As this Adversary Proceeding is not set for trial, as it will not be set for trial until it

is certified as trial ready by the Bankruptcy Court, and as it will not be certified as trial ready until

after the Debtor's motion for summary judgment is adjudicated, there is no need for a continuance

and this factor is not relevant to the ultimate issue.  As discussed above, granting the Motion would

not cause any delay in the ultimate adjudication of this Adversary Proceeding.

### C.    <u>THE BANKRUPTCY COURT CLEARLY ERRED IN ENTERING THE ORDER</u>

40.    As noted, NexPoint submits that the District Court can and should review the

Motion and Order under Rule 54(b) *de novo* by considering the underlying evidence, arguments,

and opposition.  This is especially the case because the District Court will try this Adversary

Proceeding to a jury, and the District Court should control what evidence is presented to the jury.

41.      If, however, the District Court applies Rule 72(a), then NexPoint submits that the

District Court should reconsider the Order and grant the Motion because the Bankruptcy Court's

denial of the Motion was clearly erroneous.

42.      In this respect, the Bankruptcy Court concluded that, because NexPoint had always

asserted its affirmative defense that the Debtor caused the alleged default:

> I do not think the sudden statement of Frank Waterhouse suddenly is a game-
> changer that creates some new need for an expert. So, therefore, looking at the
> factors, I don't think the explanation here to extend the deadlines has merit.

APP 890 at 19–23.

43.      This was clearly erroneous.  The only evidence submitted was that NexPoint did

not learn of Waterhouse's testimony until he was deposed, and that NexPoint did not have a

reasonable ability to learn of that testimony beforehand.  No evidence to the contrary was

presented.  And, the Bankruptcy Court failed to take into account the Debtor's failure to fully

answer NexPoint's interrogatory, which asked for any facts as to why the Debtor did not facilitate

or make the payment on the Note.

44.      The Bankruptcy Court also concluded that there was no importance to the amended

schedule:

> And I do not think an expert can testify about contractual duties and attempt to
> interpret its provisions. That is the job of the Court, and I think it is improper subject
> matter for an expert.
>
> I don't buy into any notion that this is terribly unique territory or exotic. I mean, it
> was a contract. Shared services agreements are not all that unique, shall we say?
> It's not a device that is used solely in the investment advisor fund world.  It's in the
> corporate world generally.  Courts see these in all kinds of cases.  So, again, I don't
> think contract interpretation needs an expert here or should have an expert here.
>
> And just because experts are sometimes -- often, I should say -- appropriate in legal
> malpractice or medical malpractice or other kinds of tort cases where duties might
> be needing of elaboration, here, the contract spells out the duties, and I just don't
> think any of those cases argued are applicable.

APP 891 at 3–19.

45.    Here, the Bankruptcy Court not only clearly erred; it erred as a matter of law.
NexPoint's expert was not being asked to interpret the contract or tell the jury what the contract
says.  Rather, he was only being asked to opine on whether the Debtor's failure comported with
the standard of care actually set forth in the contract:

> the care, skill, prudence and diligence under the circumstances then prevailing that
> a prudent person acting in a like capacity and familiar with such matters would use
> in the conduct of an enterprise of a like character and with like aims.

APP 115 § 6.01.

46.    Opining on whether the Debtor acted with the care, skill, prudence, and diligence
under the circumstances as a prudent person in a like situation would have is a question of fact.  It
is not a legal interpretation of a contract.  Again, the Fifth Circuit holds that "[e]xpert testimony is
generally required to prove the applicable standard of care."  *Quijano*, 325 F.3d at 567) (emphasis
added); *Streber*, 221 F.3d at 724 ("Breach of the standard of care must generally be proven by
expert testimony").  Clearly, therefore, as expert testimony on this issue is potentially required, it
cannot invade the province of the Court to determine what the applicable standard of care is.

47.    The Bankruptcy Court also found prejudice in denying the Motion:

> Prejudice, I do think there is potential prejudice in allowing an extension of this
> deadline. It will be costly, add a layer of expense and delay to this litigation, when
> I don't think it would be admissible at trial ultimately.

APP 891 at 20–23.

48.    This finding is likewise clearly erroneous and erroneous as a matter of law.  The
Bankruptcy Court based its finding of prejudice on its view that the expert testimony may not be
admissible.  As noted above, this is wrong: *Dabuert* issues aside, expert testimony on whether a
standard of care has been complied with is absolutely admissible and may be required.  The
Bankruptcy Court's overall finding of prejudice cannot be separated from this wrong sub-finding.

And, on the issue of cost, as noted above the Debtor will have a claim for any increased fees and expenses if it prevails at trial and such increased fees and expenses—ordinary incidents of high-stakes litigation—are not by themselves legally cognizable prejudice any more than they are in any case.

## IV.   <u>CONCLUSION</u>

49.   The District Court will conduct the jury trial in this case, and the District Court should control what evidence the jury will weigh.  In the end, the trial here will be about the truth, the facts, and the equities.  A scheduling order should not be used to prevent that result.  Here, the delay is not the fault of NexPoint, since NexPoint did not know what Waterhouse would say until he was deposed.  Any delay is the fault of the Debtor in not fully answering NexPoint's discovery. The expert is important because, if the jury believes Waterhouse, then NexPoint should have the ability to demonstrate that the Debtor nevertheless breached its duties to NexPoint in causing the alleged default on the Note; something on which expert testimony is certainly appropriate, if not required.  And, there is no real prejudice to the Debtor, certainly not by way of any delay in the ultimate adjudication of this case.  In the end, while schedules and scheduling orders are important, they should not be used to prejudice an otherwise viable issue or tactically benefit a litigant. NexPoint therefore prays that the District Court reverse the Order and grant the Motion.

RESPECTFULLY SUBMITTED this the 5th day of January, 2022.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Case Admin Sup    txnb_appeals@txnb.uscourts.gov

Bryan Christopher Assink    bryan.assink@bondsellis.com

Clay M Taylor    clay.taylor@bondsellis.com

Daniel P Elms    elmsd@gtlaw.com, guerrak@gtlaw.com

Davor Rukavina    drukavina@munsch.com

Deborah Rose Deitsch-Perez    deborah.deitsch-perez@stinson.com, kinga.mccoy@stinson.com, patricia.tomasky@stinson.com

Douglas Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com, gbrouphy@hellerdraper.com, vgamble@hellerdraper.com

Gregory V Demo    gdemo@pszjlaw.com, hwinograd@pszjlaw.com, jfried@pszjlaw.com, lsc@pszjlaw.com

Jeffrey N Pomerantz    jpomerantz@pszjlaw.com

John A Morris    jmorris@pszjlaw.com, hwinograd@pszjlaw.com, lsc@pszjlaw.com

Julian Preston Vasek    jvasek@munsch.com

Leslie A Collins    lcollins@hellerdraper.com, dhepting@hellerdraper.com

Michael P Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com

Stacey G Jernigan    sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

Zachery Z. Annable    zannable@haywardfirm.com, zannable@franklinhayward.com

/s/ Davor Rukavina
Davor Rukavina

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. No. 21-03005-sgj |
| | § | |
| vs. | § | Civ. Act. No. 3:21-cv-00880-C |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF OBJECTION OF NEXPOINT
ADVISORS, L.P. TO ORDER DENYING MOTIONS TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

**APPENDIX**

| Docket No. | Document | App. Page |
|---|---|---|
| CA 10 | District Court Order (adopting Bankruptcy Court's report and recommendation) | 001 |
| AP 63 | Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty | 003 |
| AP 64 | Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint | 076 |
| AP 86 | Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 089 |
| AP 104 | Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 534 |
| AP 105 | Highland's Memorandum of Law in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 538 |
| AP 106 | Declaration of John A. Morris in Support of Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 561 |
| AP 109 | Memorandum Opinion and Order Denying Arbitration Request and Related Relief | 774 |
| AP 115 | Reply of Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines | 786 |
| AP 120 | Notice of Expert Report of Steven J. Pully | 830 |
| AP 124 | Transcript of Hearing Held on December 13, 2021 | 856 |
| AP 138 | Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines | 894 |

U.S. Bankruptcy Court, Adversary Proceeding No. 21-03005 ("**AP**")
U.S. District Court, Civil Action No. 3:21-cv-0880-C ("**CA**")

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-34054-SGJ-11 |
| | ) | |
| Debtor(s). | ) | |

* * *

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | |
| | ) | Adversary No. 21-03005-SGJ |
| | ) | |
| NEXPOINT ADVISORS, L.P., | ) | |
| | ) | |
| Defendant(s). | ) | Civil Action No. 3:21-CV-0880-C |

## ORDER

CAME BEFORE THIS COURT FOR CONSIDERATION the Report and

Recommendation, signed by the Honorable Stacey G. C. Jernigan, United States Bankruptcy

Judge, therein recommending that the District Court: (1) grant Defendant's Motion to Withdraw

the Reference at such time as the Bankruptcy Court certifies that litigation is trial-ready; and

(2) defer to the Bankruptcy Court the handling of all pretrial matters.[1]

After due consideration and having conducted a *de novo* review, the Court finds that

Defendant's limited objections should be **OVERRULED**.  Furthermore, after reviewing the

thorough and well-reasoned Report and Recommendation, the Court is of the opinion that the

---

[1] On July 22, 2021, Defendant Nexpoint Advisors, L.P. filed limited objections to the Report and
Recommendation.

Report and Recommendation entered by the Bankruptcy Court should be **ADOPTED** as the findings and conclusions of this Court.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Withdraw Reference shall be granted, but only at such time as the Bankruptcy Court certifies to this Court that the litigation is trial-ready.

**IT IS FURTHER ORDERED** that the Bankruptcy Court shall handle all pretrial matters, including discovery and the filing of reports and recommendations on dispositive motions, which shall in turn be considered by the undersigned Senior United States District Judge.

**IT IS FURTHER ORDERED** that this civil action be **STAYED** pending further Order of the Court.[2]

SO ORDERED.

Dated July 28, 2021.

SAM R. CUMMINGS
SENIOR UNITED STATES DISTRICT JUDGE

---

[2] The stay imposed in this civil action shall be lifted upon the filing of a subsequent report and recommendation or at such time as the Bankruptcy Court certifies to this Court that the litigation is trial-ready.

2

APP 002

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §  Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | §  Adversary Proceeding No. |
| | § |
| vs. | §  21-03005 |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES | § |
| DONDERO, NANCY DONDERO, AND THE | § |
| DUGABOY INVESTMENT TRUST, | § |
| | § |
| Defendants. | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding") by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants NexPoint Advisors, L.P. ("NPA"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with NPA, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.       The Debtor brings this action against Defendants in connection with NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33, and payable in annual installments.  NPA has failed to pay amounts when due under the Note (as defined below), the Note is in default, and the amounts due under the Note have been accelerated pursuant to the terms of the Note.

2.       In paragraph 42 of NPA's *First Amended Answer* [Docket No. 34-3], NPA contends that the Debtor orally agreed to relieve it of the obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  NPA further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of NPA, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr.

2

Dondero entered into the Alleged Agreement on behalf of NPA, he controlled both NPA and the Debtor and was the lifetime beneficiary of Dugaboy.

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note.

4.      Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against NPA for breach of its obligations under the Note and for turnover, the Debtor adds alternative claims (a) against NPA for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note), for NPA's breach of its obligations under the Note, (b) turnover by NPA to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, NPA pursuant to the Note; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

3

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas, and organized under the laws of the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled NPA; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14. Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15. On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16. On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members: (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17. On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18. On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

APP 007

## STATEMENT OF FACTS

**A.**    **The NPA Note**

      20.     NPA is the maker under a promissory note in favor of the Debtor.

      21.     Specifically, on May 31, 2017, NPA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $30,746, 812.33 (the "<u>Note</u>"). A true and correct copy of the Note is attached hereto as **<u>Exhibit 1</u>**.

      22.     Section 2 of the Note provides: "**<u>Payment of Principal and Interest</u>**.

Principal and interest under this Note shall be due and payable as follows:

      **2.1**    **<u>Annual Payment Dates</u>.** During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**<u>Annual Installment</u>**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

      **2.2**    **<u>Final Payment Date</u>**. The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**<u>Maturity Date</u>**").

      23.     Section 3 of the Note provides:

**<u>Prepayment Allowed: Renegotiation Discretionary</u>**. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      24.     Section 4 of the Note provides:

**<u>Acceleration Upon Default</u>**. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

APP 008

25.     Section 6 of the Note provides:

> **Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     NPA's Default Under the Note**

26.     NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

27.     By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.  The Demand Letter provides:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.
>
> **The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

28.     On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

29.     The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

> [T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due immediately**.

7

> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

30.    Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

31.    As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

32.    Pursuant to Section 4 of the Note, the Note is in default, and is currently due and payable.

**C.    The Debtor Files the Original Complaint**

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for NPA's breach of its obligations under the Note and (ii) turnover by NPA for the outstanding amounts under the Note, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.    NPA's Affirmative Defenses**

34.    On March 1, 2021, NPA filed *Defendant's Original Answer* [Docket No. 6] (the "Original Answer").  In its Original Answer, NPA asserted three affirmative defenses: (i) the claims are barred because the Plaintiff caused NPA to default, (ii) the claims are barred because the Plaintiff caused NPA to delay in making payment, and (iii) waiver and estoppel. *See id.* ¶¶39-41.

35.    On June 9, 2021, NPA filed *Defendant's First Amended Answer* [Docket No. 35-3] (the "Amended Answer"), that asserted a new affirmative defense; namely, that the

8

Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶42.

36.     According to NPA, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

37.     According to NPA, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

38.     Mr. Dondero controlled both NPA and the Debtor at the time he entered into the Alleged Agreement on behalf of NPA.

39.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.     Dugaboy Lacked Authority to Act on Behalf of the Debtor**

40.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 4**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

41.     Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 4**, § 4.2(b).

42.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

9

43. Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor

## FIRST CLAIM FOR RELIEF
**(Against NPA)**

**(For Breach of Contract)**

44. The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

45. The Note is a binding and enforceable contract.

46. NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

47. Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

48. As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03, as of January 15, 2021, plus an amount equal to all accrued buy unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
**(Against NPA)**
**(Turnover by NPA Pursuant to 11 U.S.C. § 542(b))**

49. The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

50. NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of

10

Case 21-03005-sgj Doc 63-4 Filed 07/01/22 Entered 07/01/22 13:18:43 Page 11 of 18
Case 3:21-cv-00881-X   Document 178-15   Filed 01/09/24   Page 106 of 200   PageID 43850
Appendix

payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

51.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

52.     NPA has not paid the amount due under the Note to the Debtor.

53.     The Debtor has made demand for the turnover of the amount due under the Note.

54.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

55.     The Debtor is entitled to the amount due under the Note.

### THIRD CLAIM FOR RELIEF
### (Against NPA)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Debtor made the transfer pursuant to the Alleged Agreement within two years of the Petition Date.

58.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

11

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

59.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt NPA incurred under the Note demonstrates a scheme of fraud.

60.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfer made pursuant to the Alleged Agreement from NPA.

61.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Note.

<u>FOURTH CLAIM FOR RELIEF</u>
(Against NPA)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

64.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

12

(h) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

65.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from NPA.

66.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Notes.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

68.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

13

69.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

70.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (Breach of Fiduciary Duty)

71.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

72.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

14

73.    If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

74.    Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

76.    James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

77.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

78.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

79.    Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages

WHEREFORE, the Debtor prays for judgment as follows:

(i)    On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to

15

the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged

16

Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages and

(iii)     Such other and further relief as this Court deems just and proper.

APP 019

Dated:  As of July 13, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:       jpomerantz@pszjlaw.com
              ikharasch@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

18

# EXHIBIT 1

# PROMISSORY NOTE

**$30,746,812.33**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.    The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    <u>Final Payment Date</u>.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.  Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.  Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.  Prior Notes. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
|  | $27,675,000 |  | $30,746,812.33 |

3

# EXHIBIT 2

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

       Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due underline immediately.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

## Appendix A

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 3

APP 029

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 15, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Partial Payment on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, ("Maker"), entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").  A copy of the Note is attached hereto as **Appendix A**.

On January 7, 2021, Payee notified you that because of Maker's failure to make the payment due on December 31, 2020 (the "Default"), the Note was in default and that all principal, interest, and any other amounts due on the Note were immediately due and payable.  The amount due and payable on the Note as of January 8, 2021, was $24,471,804.98; however, interest continues to accrue under the Note.

On January 14, 2021, Payee received a wire from Maker in the amount of $1,406,111.92 (the "Partial Payment").  To reiterate, the amount due under the Note as of January 8, 2021, was $24,471,804.98.  The Partial Payment will be applied as payment against the amounts due under the Note pursuant to Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due <u>immediately.</u>**

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).  Payment of such amount is due immediately.  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved, including the right to recover Payee's expenses incurred in collecting the Note.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter
        A.  Lee Hogewood III

# Appendix A

## PROMISSORY NOTE

**$30,746,812.33**                                                **May 31, 2017**

        THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

        1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

        2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

        2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

        2.2    <u>Final Payment Date</u>.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

        3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

        4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

APP 034

EXHIBIT A

PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

**Appendix B**

ABA #:              322070381
Bank Name:      East West Bank
Account Name:  Highland Capital Management, LP
Account #:         5500014686

# EXHIBIT 4

# FOURTH AMENDED AND RESTATED

## AGREEMENT OF LIMITED PARTNERSHIP

### OF

## HIGHLAND CAPITAL MANAGEMENT, L.P.

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP
AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR
UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE
ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS
PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL
SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE
PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

# FOURTH AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND CAPITAL MANAGEMENT, L.P.

## TABLE OF CONTENTS

ARTICLE 1    GENERAL ...............................................................................................................1
   1.1.    Continuation ...................................................................................................1
   1.2.    Name ..............................................................................................................1
   1.3.    Purpose ...........................................................................................................1
   1.4.    Term. ..............................................................................................................1
   1.5.    Partnership Offices; Addresses of Partners. ..................................................1

ARTICLE 2    DEFINITIONS .........................................................................................................2
   2.1.    Definitions ......................................................................................................2
   2.2.    Other Definitions ...........................................................................................6

ARTICLE 3    FINANCIAL MATTERS ..........................................................................................6
   3.1.    Capital Contributions ....................................................................................6
   3.2.    Allocations of Profits and Losses .................................................................8
   3.3.    Allocations on Transfers ...............................................................................9
   3.4.    Special Allocations ........................................................................................9
   3.5.    Curative Allocations ....................................................................................10
   3.6.    Code Section 704(c) Allocations .................................................................10
   3.7.    Capital Accounts ..........................................................................................11
   3.8.    Distributive Share for Tax Purpose .............................................................12
   3.9.    Distributions. ...............................................................................................12
   3.10.   Compensation and Reimbursement of General Partner ...............................14
   3.11.   Books, Records, Accounting, and Reports ..................................................14
   3.12.   Tax Matters ..................................................................................................14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS ..............................................15
   4.1.    Rights and Obligations of the General Partner ............................................15
   4.2.    Rights and Obligations of Limited Partners ................................................19
   4.3.    Transfer of Partnership Interests .................................................................19
   4.4.    Issuances of Partnership Interests to New and Existing Partners.................21
   4.5.    Withdrawal of General Partner ....................................................................21
   4.6.    Admission of Substitute Limited Partners and Successor General Partner.....21

ARTICLE 5    DISSOLUTION AND WINDING UP ....................................................................22
   5.1.    Dissolution ...................................................................................................22
   5.2.    Continuation of the Partnership ...................................................................23
   5.3.    Liquidation ...................................................................................................23
   5.4.    Distribution in Kind .....................................................................................24
   5.5.    Cancellation of Certificate of Limited Partnership .....................................24
   5.6.    Return of Capital ..........................................................................................24
   5.7.    Waiver of Partition.......................................................................................24

ARTICLE 6    GENERAL PROVISIONS ......................................................................................24
   6.1.    Amendments to Agreement ..........................................................................24

APP 039

| 6.2. | Addresses and Notices | 25 |
|------|----------------------|----|
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

ii

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation *("Strand"),* as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in <u>Article 2</u>.

## ARTICLE 1

## GENERAL

**1.1.** **Continuation**. Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act. Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.** **Name.** The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P. The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.** **Purpose.** The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act. Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.** **Term.** The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.** **Partnership Offices; Addresses of Partners**.

(a) <u>Partnership Offices</u>. The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate. The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b) <u>Addresses of Partners</u>. The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201. The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership. Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

2.1.    **Definitions.**    The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect to any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

APP 042

*"Class B Limited Partner"* means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

*"Class B Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

*"Class B NAV Ratio Trigger Period"* means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

*"Class C Limited Partner"* means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

*"Class C Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

*"Class C NAV Ratio Trigger Period"* means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

*"Code"* means the Internal Revenue Code of 1986, as amended and in effect from time to time.

*"Contribution Note"* means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

*"Default Loan"* has the meaning set forth in Section 3.1(c)(i).

*"Defaulting Partner"* has the meaning set forth in Section 3.1(c).

*"Delaware Act"* means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

**"Effective Date"** means the date first recited above.

*"Fiscal Year"* has the meaning set forth in Section 3.11(b).

3

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* **Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

4

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

APP 045

"**Record Date**" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"**Second Amended Buy-Sell and Redemption Agreement**" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"**Securities**" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended, and any successor to such statute.

"**Substitute Limited Partner**" has the meaning set forth in Section 4.6(a).

"**Transfer**" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"**Treasury Regulations**" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.** **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

**3.1.** **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

(i)       The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)      Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)      Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)       Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

    (ii) <u>Reduction of Percentage Interest</u>. If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

    The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

   **3.2.** **Allocations of Profits and Losses**.

    (a) <u>Allocations of Profits</u>. Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

    (i) <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

    (ii) <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

    (iii) <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

    (b) <u>Allocations of Losses</u>. Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

    (i) <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

    (ii) <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however*, losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

    (iii) <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

APP 048

(c)    <u>Limitation on Loss Allocations</u>. If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.    **Allocations on Transfers**. Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.    **Special Allocations.** If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    <u>Partnership Minimum Gain Chargeback</u>**.** Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g). This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>**.** Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g). This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    <u>Qualified Income Offset</u>**.** If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)    <u>Gross Income Allocation</u>. If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

APP 049

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

      (e)    **Nonrecourse Deductions.** Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

      (f)    **Partner Nonrecourse Deductions.** Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

      (g)    **Section 754 Adjustments.** To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

      (h)    **Section 481 Adjustments.** Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.** The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4. Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.** In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property. Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

APP 050

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7.    Capital Accounts.

(a)    Maintenance of Capital Accounts.  The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    Negative Capital Accounts.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    Interest.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    No Withdrawal.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e)    Loans From Partners.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    Revaluations.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

APP 051

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited.  Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

APP 052

(iii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)     No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)     Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "Tax Distribution").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)     Payments Not Deemed Distributions.     Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)     Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)     Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)     Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

**3.10.   Compensation and Reimbursement of General Partner.**

(a)   Compensation.   The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)   Reimbursement for Expenses.   In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

**3.11.   Books, Records, Accounting, and Reports.**

(a)   Records and Accounting.   The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose. The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)   Fiscal Year.   The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)   Other Information.   The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)   Distribution Reporting to Class B Limited Partner and Class C Limited Partner. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

**3.12.   Tax Matters.**

(a)   Tax Returns.   The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes. The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1. The classification, realization, and recognition of income, gain, loss, deduction, credit and

APP 054

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

        (b)    <u>Tax Elections</u>. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

        (c)    <u>Tax Controversies</u>. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

        (d)    <u>Taxation as a Partnership</u>. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

    **4.1.**    **Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

        (a)    <u>Management</u>. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to <u>Section 3.10</u>; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

APP 055

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

        (b)      Certificate of Limited Partnership. The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

        (c)      Reliance by Third Parties. Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially. Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing. In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence. In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

        (d)      Partnership Funds. The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner. The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership. The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

APP 056

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

        (e)      Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

        (i)      The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

        (ii)      The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

        (iii)      The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

        (f)      Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

        (g)      Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

        (h)      Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

the "*GP Party*"*)*, against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

        (i)     Liability of General Partner.

        (i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

        (ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

        (j)     Reliance by General Partner.

        (i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

        (ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

        (k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

APP 058

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

4.2.     **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)     Limitation of Liability. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)     Management of Business. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)     Return of Capital. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)     Second Amended Buy-Sell and Redemption Agreement. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)     Default on Priority Distributions. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under Section 3.9(b) and this Section 4.2(e). In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this Section 4.2(e).

4.3.     **Transfer of Partnership Interests**.

(a)     Transfer. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

APP 059

(b)     *Transfers by General Partner.* The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner. Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement. If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)     *Transfers by Limited Partners.* The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)     *Distributions and Allocations in Respect of Transferred Partnership Interests.* If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4. All distributions declared on or before the date of that Transfer shall be made to the transferor. Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest. Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)     *Forfeiture of Partnership Interests Pursuant to the Contribution Note.* In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners. The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)     *Transfers of Partnership Interests Pursuant to the Purchase Notes.* Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4. Issuances of Partnership Interests to New and Existing Partners.

(a)    Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)    Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5. Withdrawal of General Partner.

(a)    Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "**Departing Partner**") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)    Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6. Admission of Substitute Limited Partners and Successor General Partner.

(a)    Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "**Substitute Limited Partner**"),

21

APP 061

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding: (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

APP 062

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.** **Continuation of the Partnership**. Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event. If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs. If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a) Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b) The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c) The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d) All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.** **Liquidation**. Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator. The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest. The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest. Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein. Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein. The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.     Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.     Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.     Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.     Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

**ARTICLE 6**

**GENERAL PROVISIONS**

**6.1.     Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2. Addresses and Notices.** Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3. Titles and Captions.** All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement. All Exhibits hereto are incorporated herein by reference.

**6.4. Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5. Further Action.** The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7. Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8. Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9. Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10. Counterparts.** This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11. Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12. Invalidity of Provisions.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

   **6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

   **6.14.    Mandatory Arbitration.**  In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award.  The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

APP 066

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

APP 067

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
    James D. Dondero,
    President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
      James D. Dondero,
      President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its   Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

**MARK K. OKADA**

_____
Mark K. Okada

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Homs
Its:    President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

APP 070

## EXHIBIT A

| | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | By Class | Effective % |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

## EXHIBIT B

### ADDENDUM
### TO THE
### FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
### OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

### RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

### AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C. (for NexPoint); Stinson LLP (for Nancy Dondero); Heller, Draper, & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☑ 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☑ 13-Recovery of money/property - §548 fraudulent transfer
- ☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

Other Relief Sought    Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | | |
|---|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | | |
| PLAINTIFF | DEFENDANT | | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | | |
| DATE<br>August 27, 2021 | | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Case 21-03005-sgj Doc 64 Filed 09/04/21 Entered 09/04/21 15:23:18 Page 1 of 13
Case 3:21-cv-00881-X    Document 178-15    Filed 07/08/23    Page 169 of 200    PageID 43913
Appendix 790/3899

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

Case 21-03005-sgj Doc 64-48 9 Filed 09/04/21 Entered 09/04/21 15:23:08 Page 7 of 13
Case 3:21-cv-00881-X Document 178-15 Filed 08/09/23 Page 175 of 200 PageID 43919
Appendix

it is denied. To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.    Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.    Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.    Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.    Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.    Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.    Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.    Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.    Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.    Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

    The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

    /s/ Davor Rukavina
    Davor Rukavina

Davor Rukavina
Julian P. Vasek
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

Attorneys for NexPoint Advisors, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
## EXPERT DISCLOSURE AND DISCOVERY DEADLINES

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery*

*Deadlines* (the "Motion"), respectfully stating as follows:

---

## I.     RELIEF REQUESTED

1.      By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "Scheduling Order"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.     PROCEDURAL BACKGROUND

2.      The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.      By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.      NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

---

MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND
DISCOVERY DEADLINES—Page 2

5. On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready. As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

## III.    FACTS

6. This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7. The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8. One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018. The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021. Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note." *See* Declaration at Exhibit C, 337:22-338:8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged

default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would

remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* <mark>Docket No. 6</mark>.

NexPoint's defense, however, was based on its belief that the Debtor and its employees, including

Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision

not to make the payment.

10.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as

did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief

financial officer in December, 2020, and either the treasurer or chief financial officer (either way

an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee,

although he provided services to NexPoint as well pursuant to the Shared Services Agreement.

Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James

Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor,

instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including,

expressly on the Note.

11.      This changed the potential facts as NexPoint understood them to be from ones

where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where

the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the

payment.  Assuming the Dondero instruction to be true, this raises the question of whether the

Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.      NexPoint did not know that Waterhouse would provide this testimony.  NexPoint

understood that Dondero instructed Waterhouse to make no further payments on the Shared

Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

Case 21-03005-sgj Doc 88-4 Filed 10/29/21 Entered 10/29/21 15:22:18 Page 5 of 10
Case 3:21-cv-00881-X   Document 78-15   Filed 05/06/23   Page 186 of 200   PageID 43930
Appendix

on the Shared Services Agreement.  But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.  After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims."  Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement.  This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained. Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.     ARGUMENT AND AUTHORITIES

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

---

*Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.     When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003). Again, this test applies to a deadline which has already expired. Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.     Applying these or any factors:

(i)     this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)    if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)   the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)    NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)     the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)    there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)     a continuance is easily available to avoid any prejudice to the Debtor—indeed, there
is no need for a continuance even as the Adversary Proceeding has yet to be
certified as trial ready and it is likely that the District Court will not schedule the
Adversary Proceeding for trial for some time.

22.     NexPoint submits that this Motion cannot come as a surprise to the Debtor.

NexPoint has asserted its affirmative defense since the beginning.  The only difference now is that,

instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved

to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction

from Dondero.  As it can be presumed that Waterhouse previously informed the Debtor or its

counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the

Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that

testimony.  It is reasonable to conclude that the Debtor knew or should have known that the

"standard of care" under the Shared Services Agreement would then become a material issue.

23.     Accordingly, "good cause" to amend the Scheduling Order exists, if that higher

standard even applies, and approving such amendment will not prejudice the Debtor and will

instead serve the interests of justice.

## V.     **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court

enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline

to designate experts and serve expert reports through December 13, 2021; (iii) modifying the

Scheduling Order accordingly for the potential designation of rebuttal experts and service of

rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and

further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

    /s/ Davor Rukavina
    Davor Rukavina

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

1.    My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

2.    I am an attorney duly licensed to practice law in the State of Texas.  I am a shareholder at Munsch Hardt Kopf & Harr, P.C.  I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

3.    At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

DECLARATION OF DAVOR RUKAVINA—Page 1

APP 099

4.     Highland Capital Management, L.P. (the "<u>Debtor</u>") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5.     The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline.  The following is the reason why.

6.     One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "<u>Agreement</u>") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A."  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7.     The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8.     On October 19, 2021, the Debtor deposed Frank Waterhouse ("<u>Waterhouse</u>"), as did I, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial

DECLARATION OF DAVOR RUKAVINA—Page 2

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9. Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10. This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11. Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.    In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.    Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero. In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.    I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement. Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true). I do not have a copy of Mr. Seer's deposition yet.

15.    With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

DECLARATION OF DAVOR RUKAVINA—Page 4

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.     On October 22, 2021, I began searching for a potential expert. On October 26, 2021, I contacted Steven J. Pully about the potential engagement. After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021. The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time. I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.     Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021. Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents. Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.     NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DECLARATION OF DAVOR RUKAVINA—Page 5

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

### ARTICLE I

### DEFINITIONS

Section 1.01   Certain Defined Terms.   As used in this Agreement, the following terms shall have the following meanings:


Exhibit A

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

2

APP 106

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office:* Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3