including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)     *Legal/Compliance/Risk Analysis*.  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)     *Tax*.  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)     *Management of Clients and Accounts*.  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)     *Valuation*.  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)     *Execution and Documentation*.  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)     *Marketing*.  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)     *Reporting*.  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

APP 108

      (i)    *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

      (j)    *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of <u>Section 2.03</u> hereof;

      (k)    *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

      (l)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

    Section 2.03   <u>Shared Employees</u>.

      (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

APP 109

(b)      Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)      To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" or, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)      Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)      Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)      The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)      The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)      The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)    The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)    The Staff and Services Provider shall require that each Shared Employee:

(i)    certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)    be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)    provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)    to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)    act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)    Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04    Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05    Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06 <u>Authority</u>. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07 <u>Third Parties</u>.

(a) The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b) In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08 <u>Management Company to Cooperate with the Staff and Services Provider</u>. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09 <u>Power of Attorney</u>. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01    Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02    Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03    Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01    Representations. Each of the Parties hereto represents and warrants that:

(a)    It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)    this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)    no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)    neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01    Standard of Care.    Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02 <u>Exculpation</u>. To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages. To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement. The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03 <u>Indemnification by the Management Company</u>. The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04 _Other Sources of Recovery etc_. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to a Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; _provided_ that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

APP 117

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

APP 118

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

15

Section 8.04   Governing Law.

(a)   This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)   The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "Proceedings") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   Severability.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   No Waiver.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   Counterparts.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09   Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)      If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

APP 121

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

NEXPOINT ADVISORS, L.P.

By:  NexPoint Advisors GP, LLC, its
General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

HIGHLAND CAPITAL
MANAGEMENT, L.P.

By:  Strand Advisors, Inc., its General
Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

### DEFENDANT NEXPOINT ADVISORS, L.P.'S
### ANSWER TO AMENDED COMPLAINT

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.     Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.     Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.     Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.     Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.     Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.     Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.     Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.    Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.    Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.    To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.    Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.    Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
_____
Davor Rukavina

```
 1                  WATERHOUSE - 10-19-21

 2           IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 3                    DALLAS DIVISION
        -----------------------------
 4   IN RE:

 5                                Chapter 11
     HIGHLAND CAPITAL
 6   MANAGEMENT, L.P.,           CASE NO.
                                 19-34054-SGI11
 7
             Debtor.
 8   -----------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
             Plaintiff,
10   vs.                             Adversary
                                 Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT     21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15           Defendants.
     -----------------------------
16

17          REMOTE VIDEOTAPED DEPOSITION OF

18                 FRANK WATERHOUSE

19                October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195
```

Exhibit C

1              WATERHOUSE - 10-19-21

2

3

4                    October 19, 2021

5                    9:30 a.m.

6

7

8

9       Remote Deposition of FRANK WATERHOUSE,

10   held before Susan S. Klinger, a Registered

11   Merit Reporter and Certified Realtime Reporter

12   of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WATERHOUSE - 10-19-21

 2   A P P E A R A N C E S :

 3   (All appearances via Zoom.)

 4   Attorneys for the Reorganized Highland Capital

 5   Management:

 6        John Morris, Esq.

 7        Hayley Winograd, Esq.

 8        PACHULSKI STANG ZIEHL & JONES

 9        780 Third Avenue

10        New York, New York  10017

11   Attorneys for the Witness:

12        Debra Dandeneau, Esq.

13        Michelle Hartmann, Esq.

14        BAKER McKENZIE

15        1900 North Pearl Street

16        Dallas, Texas  75201

17   Attorneys for NexPoint Advisors, LP and

18   Highland Capital Management Fund Advisors,

19   L.P.:

20        Davor Rukavina, Esq.

21        An Nguyen, Esq.

22        MUNSCH HARDT KOPF & HARDD

23        500 North Akard Street

24        Dallas, Texas  75201-6659

25
```

Case 21-03005-sgj Doc 36-4 Filed 10/29/21 Entered 10/29/21 05:22:38 Page 4 of 37
Case 3:21-cv-00881-X Document 78-16 Filed 04/20/23 Page 33 of 200 PageID 43977

Page 4

```
 1              WATERHOUSE - 10-19-21

 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3   and HCMS:

 4        Deborah Deitsch-Perez, Esq.

 5        Michael Aigen, Esq.

 6        STINSON

 7        3102 Oak Lawn Avenue

 8        Dallas, Texas  75219

 9

10   Attorneys for Dugaboy Investment Trust:

11        Warren Horn, Esq.

12        HELLER, DRAPER & HORN

13        650 Poydras Street

14        New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18        Deborah Newman, Esq.

19        QUINN EMANUEL URQUHART & SULLIVAN

20        51 Madison Avenue

21        New York, New York  10010

22

23   Also Present:

24        Ms. La Asia Canty

25
```

```
 1                    WATERHOUSE - 10-19-21

 2                         I N D E X

 3

 4    WITNESS                                    PAGE

 5    FRANK WATERHOUSE

 6    EXAMINATION BY MR. MORRIS                    10

 7    EXAMINATION BY MR. RUKAVINA                 256

 8    EXAMINATION BY MS. DEITSCH-PEREZ            352

 9    EXAMINATION BY MR. MORRIS                   377

10    EXAMINATION BY MR. RUKAVINA                 387

11    EXAMINATION BY MS. DEITSCH-PEREZ            393

12

13                     E X H I B I T S

14    No.                                        Page

15    Exhibit 2  NPA et al Amended Complaint     142

16    Exhibit 33 6/3/19 Management                91

17               Representation

18    Exhibit 34 HCMLP Consolidated Financial     94

19               Statements

20    Exhibit 35 HCMFA Incumbency Certificate    151

21    Exhibit 36 Email string re 15(c)           170

22    Exhibit 39 HCMLP Operating Results 2/18    226

23    Exhibit 40 Summary of Assets and           236

24               Liabilities

25    Exhibit 41 12/19 Monthly Operating Report  258
```

Case 21-03005-sgj Doc 44-8 Filed 10/29/21 Entered 10/29/21 05:22:38 Page 6 of 37
Case 3:21-cv-00881-X Document 178-16 Filed 01/09/23 Page 35 of 200 PageID 43979
Page 6

```
 1                    WATERHOUSE - 10-19-21

 2     Exhibit 45 HCMFA Consolidated Financial     135

 3                Statements

 4     Exhibit 46 NexPoint 2019 Audited            218

 5                Financials

 6

 7     Exhibit A1 Emails 11/25                     328

 8     Exhibit A2 Emails 12/31                     338

 9     Exhibit A6 Emails 1/12                      341

10     Exhibit A7 Promissory Notes                 297

11     Exhibit A9 Email, 8/31                      307

12     Exhibit A10 Acknowledgment from HCMLP       302

13     Exhibit A11 HCMLP Schedule 71A              309

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          WATERHOUSE - 10-19-21

 2          P R O C E E D I N G S

 3          VIDEOGRAPHER:  Good morning,

 4     Counselors.  My name is Scott Hatch.  I'm a

 5     certified legal videographer in association

 6     with TSG Reporting, Inc.

 7          Due to the severity of COVID-19 and

 8     following the practice of social

 9     distancing, I will not be in the same room

10     with the witness.  Instead, I will record

11     this videotaped deposition remotely.  The

12     reporter, Susan Klinger, also will not be

13     in the same room and will swear the witness

14     remotely.

15          Do all parties stipulate to the

16     validity of this video recording and remote

17     swearing, and that it will be admissible in

18     the courtroom as if it had been taken

19     following Rule 30 of the Federal Rules of

20     Civil Procedures and the state's rules

21     where this case is pending?

22          MR. HORN:  Yes.

23          MS. DANDENEAU:  Yes.

24          MR. MORRIS:  Yes.  John Morris.  I

25     would just try to do a negative notice
```

Case 21-03005-sgj Doc 448-8 Filed 10/29/21 Entered 10/29/21 05:22:38 Page 8 of 37
Case 3:21-cv-00881-X Document 178-16 Filed 04/09/23 Page 37 of 200 PageID 43981

Page 8

 1           WATERHOUSE - 10-19-21

 2    here, as we did yesterday.  If anybody has

 3    a problem with what was just stated, can

 4    you state your objection now?

 5          Okay.  No response, so everybody

 6    accepts the stipulation and the instruction

 7    that was just given.

 8          VIDEOGRAPHER:  Thank you.  This is

 9    the start of media labeled Number 1 of the

10    video recorded deposition of Frank

11    Waterhouse In Re: Highland Capital

12    Management, L.P., in the United States

13    Bankruptcy Court for the Northern District

14    of Texas, Dallas Division, Case Number

15    21-03000-SGI.

16          This deposition is being held via

17    video conference with participants

18    appearing remotely due to COVID-19

19    restrictions on Tuesday, October 19th, 2021

20    at approximately 9:32 a.m.  My name is

21    Scott Hatch, legal video specialist with

22    TSG Reporting, Inc. headquartered at 228

23    East 45th Street, New York, New York.  The

24    court reporter is Susan Klinger in

25    association with TSG Reporting.

```
 1              WATERHOUSE - 10-19-21

 2         Counsel, please introduce

 3    yourselves.

 4         MR. MORRIS:  John Morris, Pachulski

 5    Stang Ziehl & Jones for the reorganized

 6    Highland Capital Management, L.P., the

 7    plaintiff in these actions.

 8         MS. DANDENEAU:  Deborah Dandeneau

 9    from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12         MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16         MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19         MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24         MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties
```

Case 21-03005-sgj Doc 4 Filed 10/20/21 Entered 10/20/21 22:38:13 Page 10 of 897
Case 3:21-cv-00881-X Document 176-16 Filed 04/09/23 Page 39 of 200 PageID 43983

Page 10

1           WATERHOUSE - 10-19-21

2           as Deborah Deitsch-Perez.

3                   MS. NEWMAN:  This is Deborah Newman

4           from Quinn Emanuel.  We represent the

5           litigation -- Marc Kirschner as the trustee

6           for the litigation SunTrust.

7                   MR. MORRIS:  I think that is

8           everybody.

9                   VIDEOGRAPHER:  Thank you.  Will the

10          court reporter please swear in the witness.

11                       FRANK WATERHOUSE,

12      having been first duly sworn, testified as

13      follows:

14                       EXAMINATION

15      BY MR. MORRIS:

16          Q.      Please state your name for the

17      record.

18          A.      My name is Frank Waterhouse.

19          Q.      Good morning, Mr. Waterhouse.  I'm

20      John Morris, as you know, from Pachulski Stang

21      Ziehl & Jones.  You understand that my firm and

22      I represent Highland Capital Management, L.P.;

23      is that right?

24          A.      Yes.

25          Q.      Okay.  And do you understand that

1                    WATERHOUSE - 10-19-21

2      we're here today for your deposition in your

3      individual capacity?

4           A.    Yes.

5           Q.    Did you review and -- did you

6      receive and review a subpoena that Highland

7      Capital Management, L.P., served upon you?

8           A.    Yes.

9           Q.    You have been deposed before; right?

10          A.    Yes.

11          Q.    How many times have you been

12     deposed?

13          A.    About three or four times.

14          Q.    Okay.  And I defended you in one

15     deposition; isn't that right?

16          A.    That is correct.

17          Q.    So the general ground rules for this

18     deposition are largely the same as the

19     depositions you have given before.  And that is

20     I will ask you a series of questions, and it is

21     important that you allow me to finish my

22     question before you begin your answer; is that

23     fair?

24          A.    Yes.

25          Q.    And it is important that I allow you

1                    WATERHOUSE - 10-19-21

2    to finish your answers before I begin a

3    question, but if I fail to do that, will you

4    let me know?

5         A.    I can certainly do that.

6         Q.    Okay.  Do you understand that this

7    deposition is being videotaped?

8         A.    Yes.

9         Q.    You understand that I may seek to

10   use portions of the videotape in a court of

11   law?

12        A.    I did not know that, until you just

13   said that.

14        Q.    Okay.  And you are aware of that now

15   before the deposition begins substantively; is

16   that right?

17        A.    Yes.

18        Q.    So unlike I think the other

19   depositions that you have given, this one is

20   being given remotely.  So that presents some

21   unique challenges, at least as compared to a

22   deposition that is taken in-person.

23             From time to time we're going to put

24   documents up on the screen, Mr. Waterhouse.

25   And it is important that I give you the

```
 1              WATERHOUSE - 10-19-21

 2    opportunity to review any portion of the

 3    document that you think you need in order to

 4    fully and completely answer the question.

 5              So I would ask you to let me know if

 6    there is a portion of a document that you need

 7    to see in order to fully and completely answer

 8    the question.  Can you do that for me?

 9        A.    Yes.

10              MS. DANDENEAU:  Mr. Morris, I would

11              just note that we do have hard copies of

12              the documents that you sent, so if you can

13              just refer to the exhibit number as

14              reflected in the documents that you sent,

15              Mr. Waterhouse will be able to look at the

16              hard copies of those documents.

17              MR. MORRIS:  I appreciate that,

18              and -- and I will encourage him to do so.

19              There will be other documents that we did

20              not send to you that we'll be using today

21              though.

22        Q.    Okay.  With that as background, if

23    there is anything that I ask you, sir, that you

24    don't understand, will you let me know?

25        A.    Yes.
```

Case 1:20-cv-00536-SJD Doc #: 114-3 Filed: 10/20/21 Page: 10/20/21 Entered: 10/20/21 05:23:38 Page 14 of 897
Case 3:21-cv-00881-X   Document 176-16   Filed 05/20/23   Page 43 of 200   PageID 43987

Page 14

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Okay.  Are you currently employed?

 3         A.    Yes.

 4         Q.    By whom?

 5         A.    The Skyview Group.

 6         Q.    When did you become employed by the

 7    Skyview Group?

 8         A.    I believe March 1st of 2021.

 9         Q.    Do you have a title at Skyview?

10         A.    Yes.

11         Q.    What is your title?

12         A.    My title is chief financial officer.

13         Q.    Do you report to anybody in your

14    role as CFO?

15         A.    I don't, no.

16         Q.    No.  Is there a president or a CEO

17    of Skyview?

18         A.    Yes.

19         Q.    Who is that?

20         A.    That is Scott Ellington.

21         Q.    But you don't report to

22    Mr. Ellington; is that right?

23         A.    I don't think so.

24         Q.    Does Skyview Group --

25               MS. DANDENEAU:  Excuse me, we --
```

```
 1                 WATERHOUSE - 10-19-21

 2        A.    I -- I -- I might.  I just -- I

 3   don't recall.

 4        Q.    Okay.  Does Skyview Group provide

 5   any services to any entity directly or

 6   indirectly owned or controlled by Jim Dondero?

 7        A.    Yes.

 8        Q.    Can you name -- is that pursuant to

 9   written contracts?

10        A.    Yes.

11        Q.    And do you know how many contracts

12   exist?

13        A.    Approximately six or so.

14        Q.    And is the Skyview Group made up of

15   individuals who were formerly employees of

16   Highland Capital Management, L.P.?

17        A.    No.

18        Q.    Do you know how many -- how many --

19   how many employees does Skyview have?

20        A.    Approximately 35.

21        Q.    And can you tell me how many of

22   those 35 are former officers, directors, or

23   employees of Highland Capital Management, L.P.?

24        A.    I don't know the exact number.

25        Q.    Is it more than 20?
```

Case 21-30000 Dyjsjc Doc 4148-3 10/20/20/05/22 red 10/20/2011/05/22 38:19 43 16 of 897
Case 3:21-cv-00881-X Document 178-16 Page 05/09/399 Page 45 of 200 PageID 43989

Page 16

1                    WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    Is it more than 30?

4          A.    I don't know.

5          Q.    Can you tell me what portion of

6    Skyview -- Skyview's revenue is derived from

7    entities that are directly or indirectly owned

8    or controlled by Jim Dondero?

9               MS. DANDENEAU:  Mr. Morris, I mean,

10          you called Mr. Waterhouse here individually

11          for purposes of his testimony in connection

12          with the noticed litigation.  I have given

13          you some leeway to ask him some background

14          information about Skyview Group, but this

15          is not a substitute for a deposition in

16          connection with any other pending disputes

17          that exist.  And -- and we agreed to accept

18          the subpoena on the basis of he -- this is

19          testimony that he is giving in connection

20          with the noticed litigation.

21               I really think that you are now

22          going a little bit far afield from the

23          purpose of this deposition.

24               MR. MORRIS:  Okay.  It is -- I'm not

25          intending to use these -- the answers to

```
 1                    WATERHOUSE - 10-19-21

 2          these questions for any purpose other than

 3          this litigation.  I think you understand

 4          fully why I'm asking the questions, and I

 5          just have a couple more, if you will bear

 6          with me.

 7                    MS. DANDENEAU:  Okay.

 8                    MS. DEITSCH-PEREZ:  Can we have an

 9          agreement that an objection by one is an

10          objection for any other party here?

11                    MR. MORRIS:  Sure.  I would -- I

12          would encourage that, sure.

13                    MS. DEITSCH-PEREZ:  Thank you.

14                    MR. MORRIS:  It can't be sustained

15          or overruled more than one time, so...

16          Q.    Mr. Waterhouse, can you answer my

17     question, please.

18                    MS. DANDENEAU:  Do you want to

19          repeat it, Mr. Morris, for his benefit?

20                    MR. MORRIS:  Sure.

21          Q.    Can you -- can you tell me the

22     approximate portion of Skyview's revenue that

23     is derived from entities that are directly or

24     indirectly owned or controlled by Mr. Dondero?

25          A.    I don't know the exact number.
```

Case 21-30605 Document 00416 Filed 10/20/21 Entered 10/20/21 22:38: Page 18 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 05/09/23 Page 47 of 200 PageID 43991

Page 18

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Is it more than 75 percent?

 3        A.    Yes.

 4        Q.    Is it more than 90 percent?

 5        A.    I don't know.

 6        Q.    Okay.  Can I refer to Highland

 7   Capital Management, L.P., as Highland?

 8        A.    Yes.

 9        Q.    All right.  And you previously

10   served as Highland's CFO; correct?

11        A.    Yes.

12        Q.    When did you join Highland?

13        A.    I don't recall the exact date.

14        Q.    Can you tell me what year?

15        A.    2006.

16        Q.    When did you -- in what year did you

17   become Highland's CFO?

18        A.    I don't recall the exact date.

19        Q.    I'm not asking you for the exact

20   date.  I'm asking you if you recall the year in

21   which you were appointed CFO.

22        A.    I don't recall the exact year.

23        Q.    Can you tell me which years it is

24   possible that you were appointed to CFO of

25   Highland?
```

1              WATERHOUSE - 10-19-21

2         A.    2011 or 2012.

3         Q.    Did you serve as Highland's CFO on a

4    continuous basis from in or around 2011 or 2012

5    until early 2021?

6         A.    Yes.

7         Q.    During that entire time you reported

8    directly to Jim Dondero; correct?

9         A.    I -- I don't know.

10        Q.    Is there anybody else you reported

11   to -- withdrawn.

12              Did you report to Mr. Dondero for

13   some portion of the time that you served as

14   CFO?

15        A.    Yes.

16        Q.    Is there a portion of time that you

17   don't recall who you reported to?

18        A.    Yes.

19        Q.    What portion of time do you have in

20   your mind when you can't recall who you

21   reported to?

22        A.    From the 2011 to -- for

23   approximately a year or two.

24        Q.    Okay.  So is it fair to say that you

25   reported to Mr. Dondero in your capacity as CFO

1                   WATERHOUSE - 10-19-21

2    from at least 2014 until the time you left

3    Highland?

4                   MS. DANDENEAU:  Objection to form.

5         A.    I don't want to speculate the exact

6    or what year that changed or -- so I would like

7    to stick with my testimony.

8         Q.    Can you recall when you began

9    reporting to Mr. Dondero?

10        A.    I don't recall.

11        Q.    Can you -- can you give me an

12   estimate of what year you think you might have

13   began reporting to Mr. Dondero?

14        A.    I will go back to my prior

15   testimony.

16        Q.    Okay.  There is no -- you have no

17   ability to tell me when you began reporting to

18   Mr. Dondero.

19             Do I have that right?

20             MS. DANDENEAU:  Objection to form.

21        A.    I don't recall.

22        Q.    Okay.  Do you recall who you might

23   have reported to before you began reporting to

24   Mr. Dondero?

25        A.    Yes.

```
 1                WATERHOUSE - 10-19-21

 2        Q.     Who might you have reported to in

 3   your capacity as CFO before you started

 4   reporting to Mr. Dondero?

 5        A.     That would have been Patrick Boyce.

 6        Q.     Are you aware that Highland filed

 7   for bankruptcy on October 19th, 2019?

 8        A.     Yes.

 9        Q.     And we refer to that as the petition

10   date?

11        A.     Yes.

12        Q.     Okay.  Do you hold any professional

13   licenses, sir?

14        A.     Yes.

15        Q.     Can you tell me what professional

16   licenses you hold?

17        A.     I'm a certified public accountant.

18        Q.     Okay.  Anything else?

19        A.     No.

20        Q.     Do you have any other professional

21   licenses or certificates?

22        A.     When you say "professional license,"

23   that is not education?

24        Q.     Tell me -- sure.  Anything other

25   than a driver's license.
```

Case 21-03005-sgj Doc 64 Filed 10/20/21 Entered 10/20/21 12:38:48 Page 22 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 06/09/23 Page 51 of 200 PageID 43995

Page 22

                          WATERHOUSE - 10-19-21

1
2               Do you have any other license or
3    certificate or certification?
4        A.    Are you asking, like, where I went
5    to school and the --
6        Q.    I am not.  I am not.  I didn't say
7    education.  I didn't ask about degrees.
8               Do you know what a license is?
9        A.    Well, yeah, I mean, a license is
10   something you get after you receive a certain
11   level of proficiency.
12       Q.    Do you have any licenses or
13   certifications other than your CPA?
14              MS. DANDENEAU:  Objection, form.
15              I assume you mean professional
16        licenses, Mr. Morris; correct?
17       Q.    Can you answer my question, sir?
18       A.    Mr. Morris, I'm thinking.  I
19   don't -- I don't think I have any others.
20       Q.    Are you familiar with an entity
21   called Highland Capital Management Fund
22   Advisors?
23       A.    Yes.
24       Q.    Were you ever -- can we refer to
25   that entity as HCMFA?

```
 1                    WATERHOUSE - 10-19-21

 2          A.    Yes.

 3          Q.    Were you ever employed by HCMFA?

 4          A.    Not that I recall.

 5          Q.    Were you ever -- did you ever hold

 6   the title of an officer or director of HCMFA?

 7          A.    Yes.

 8          Q.    What title did you hold?

 9          A.    Treasurer.

10          Q.    When did you become the treasurer of

11   HCMFA?

12          A.    I don't recall.

13          Q.    Can you tell me the year?

14          A.    I don't -- I don't know the year.

15          Q.    Can you approximate the year in

16   which you became the treasurer of HCMFA?

17          A.    I don't know.

18          Q.    Can you tell me if it was before or

19   after 2016?

20          A.    I don't recall.

21          Q.    Are you still the -- do you know if

22   you're still the treasurer of HCMFA today?

23          A.    Today, I am the acting treasurer for

24   HCMFA.

25          Q.    Is there a distinction between
```

WATERHOUSE - 10-19-21

1
2    treasurer and acting treasurer?

3         A.    I said "acting treasurer" as I am an

4    employee of Skyview, as you previously

5    stated -- or asked.

6         Q.    But you are the treasurer of HCMFA

7    today; correct?

8         A.    I am -- I am the acting treasurer

9    for HCMFA.

10        Q.    How did you become the treasurer of

11   HCMFA?

12        A.    Are you asking how I became the

13   treasurer of HCMFA today?

14        Q.    How did you become appointed to

15   serve as the treasurer of HCMFA?

16        A.    Well, in -- in -- in what time

17   capacity?

18        Q.    The first time that you were

19   appointed.

20        A.    First time.  I believe I was asked

21   to serve as treasurer for HCMFA the first time.

22        Q.    By who?  Who asked you to do that?

23        A.    I don't recall.

24        Q.    Is there anything that would refresh

25   your recollection as to who appointed you as

WATERHOUSE - 10-19-21

1

2      the treasurer of CF- -- HCMFA for the first

3      time?

4          A.    I don't -- I mean, there would be

5      some documents, some legal documents.  I don't

6      know where those are.

7          Q.    How many times have you been

8      appointed the treasurer of HCMFA?

9          A.    I don't know.

10         Q.    Was it more than once?

11         A.    I don't know.

12         Q.    Can you tell me any period of time

13     since 2016 that you did not hold the title of

14     treasurer of HCMFA?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't recall.

17         Q.    What are your duties and

18     responsibilities as the treasurer of HCMFA?

19         A.    My duties are to do the best job

20     that I can as the -- as an accountant and

21     finance guy.

22         Q.    What specific duties and

23     responsibilities do you have as the treasurer

24     of HCMFA?

25         A.    My duties are to do the best job

```
 1              WATERHOUSE - 10-19-21

 2    that I can as the accounting and finance person

 3    for HCMFA.

 4         Q.    As the accounting and finance person

 5    for HCMFA, do you have any particular areas of

 6    responsibility?

 7         A.    Yeah, it is to manage the accounting

 8    and finance function for HCMFA.

 9         Q.    Would that include -- do you have

10    responsibility for overseeing HCMFA's annual

11    audit?

12         A.    Can I please elaborate on my prior

13    question?

14         Q.    Of course.  You -- you are giving

15    answers.  I'm asking questions.

16         A.    Okay.  Yes, so the -- it -- like I

17    said, it is to manage the accounting finance

18    aspect, but I am, as we discussed, the

19    treasurer.  That is -- being treasurer is what

20    gives me that -- that management function.

21         Q.    Does anybody report to you in your

22    capacity as treasurer of HCMFA?

23         A.    I don't believe so.

24         Q.    Does HCMFA have a chief financial

25    officer?
```

Case 21-30005-sgj Doc 3641-3 Filed 10/20/21 Entered 10/20/21 23:18:48 Page 2 of 897
Case 3:21-cv-00881-X Document 186 Filed 05/09/23 Page 56 of 200 PageID 44000

Page 27

1                    WATERHOUSE - 10-19-21

2        A.    I don't -- I don't know.

3        Q.    You don't know?

4              You're the treasurer of HCMFA but

5    you don't know if HCMFA has a chief financial

6    officer.

7              Do I have that right?

8        A.    That's right.

9        Q.    Okay.  Have you heard of a company

10   called NexPoint Advisors?

11       A.    Yes.

12       Q.    We will refer to that as NexPoint.

13   Okay?

14       A.    Okay.

15       Q.    Were you ever employed by NexPoint?

16       A.    I don't recall.

17       Q.    Did you ever hold any title with

18   respect to the entity known as NexPoint?

19       A.    Yes.

20       Q.    What titles have you held in

21   relation to NexPoint?

22       A.    Treasurer.  I think it was only

23   treasurer.

24       Q.    Can you tell me the approximate year

25   you became the treasurer of NexPoint?

Case 21-30005 jgc Doc 414-3 1720/201/05/22 red Ent020/2011/05/22 388:Page 28 of 897
Case 3:21-cv-00881-X Document 16 Filed 06/09/39 Page 57 of 200 PageID 44001

Page 28

```
1                    WATERHOUSE - 10-19-21

2         A.    I don't know.

3         Q.    Are you still the treasurer of

4    NexPoint today?

5         A.    I am the acting treasurer for

6    NexPoint.

7         Q.    When did your title change from

8    treasurer to acting treasurer?

9         A.    I don't know.

10        Q.    Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13        A.    I don't -- I don't believe so.

14        Q.    Why did --

15        A.    I still manage the finance and

16   accounting function for NexPoint.

17        Q.    Why did your title change from

18   treasurer to acting treasurer?

19        A.    I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23        Q.    Okay.

24        A.    And we -- we provide officer

25   services.
```

Case 21-03005-sgj Doc 84-13 Filed 10/20/21 Entered 10/20/21 05:23:38 Page 29 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 05/09/23 Page 58 of 200 PageID 44002

Page 29

```
 1                    WATERHOUSE - 10-19-21

 2        Q.     And you serve as an officer of

 3    HCMFA; correct?

 4        A.     I think we went over that with my

 5    testimony.  Yes, I'm the acting treasurer for

 6    HCMFA.

 7        Q.     And you are an officer of NexPoint;

 8    correct?

 9        A.     I think -- I am the acting treasurer

10    for NexPoint Advisors.

11        Q.     And -- and who appointed you acting

12    treasurer of NexPoint Advisors?

13        A.     I don't recall specifically.

14        Q.     Do you have any recollection of who

15    might have appointed you the treasurer of

16    NexPoint?

17        A.     I mean, it -- it -- I don't recall

18    exactly who it was.

19        Q.     Who were the possibilities?

20               MS. DEITSCH-PEREZ:  Object to the

21         form.

22        Q.     You can answer.

23        A.     Someone in the legal group for

24    NexPoint.  The other officers as well.

25        Q.     Have you heard of a company called
```

Case 21-03005-sgj Doc 184-3 Filed 10/20/21 Entered 10/20/21 22:38:13 Page 30 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 01/09/23 Page 59 of 200 PageID 44003

Page 30

WATERHOUSE - 10-19-21

1

2     Highland Capital Management Services, Inc.?

3          A.     Yes.

4          Q.     We will refer to that as HCMS.

5     Okay?

6          A.     HCMS.  Okay.

7          Q.     Were you ever employed by HCMS?

8          A.     No.

9          Q.     Have you ever held any titles in

10    relation to HCMF -- I apologize -- HCMS?

11         A.     Yes.

12         Q.     What titles have you held in

13    relation to HCMS?

14         A.     Treasurer and acting treasurer.

15         Q.     When did you first become treasurer

16    or acting treasurer of HCMS?

17         A.     I don't recall the exact dates.

18         Q.     Can you recall -- can you

19    approximate the year that you became the

20    treasurer of HCMS?

21         A.     I don't -- I don't know.

22         Q.     Are you still the treasurer of HCMS

23    today?

24         A.     I am the acting treasurer for HCMS.

25         Q.     And are your duties and

```
 1                  WATERHOUSE - 10-19-21

 2    responsibilities as the acting treasurer for

 3    HCMS and the acting treasurer for NexPoint the

 4    same as your duties and responsibilities in

 5    your role as the acting treasurer of HCMFA?

 6         A.    More or less.

 7         Q.    Have you ever heard of a company

 8    called HCRE Partners, LLC?

 9         A.    Yes.

10         Q.    And do you understand that that

11    entity is now known today as NexPoint Real

12    Estate Partners?

13         A.    I did not know that.

14         Q.    All right.  Can we refer to HCRE

15    Partners as HCRE?

16              MS. DANDENEAU:  Objection to form.

17              Did you mean NexPoint Real Estate

18         Partners, Mr. Morris?

19              MR. MORRIS:  No.

20              MS. DANDENEAU:  Oh.

21              MR. MORRIS:  He said he wasn't

22         familiar that it was succeeded by that

23         entity.  So --

24              MS. DANDENEAU:  Okay.

25              MR. MORRIS:  -- let's go with what
```

Case 21-30005 Doc 4143-3 07/20/21 Entered 07/20/21 22:38:48 Page 32 of 897
Case 3:21-cv-00881-X   Document 18-16   Filed 01/09/23   Page 61 of 200   PageID 44005

Page 32

1                    WATERHOUSE - 10-19-21

2          the witness knows.

3          Q.    You're familiar with an entity

4    called HCRE Partners, LLC; correct?

5          A.    Yes.

6          Q.    Okay.  So that is the entity that we

7    will refer to as HCRE.  If you're aware of any

8    successor, that is great.  If not, let's just

9    define it as such.

10              Have you ever been employed by HCRE

11   or any entity that you know to have succeeded

12   HCRE?

13         A.    No.

14         Q.    Did you ever serve as an officer or

15   director of HCRE or any successor?

16         A.    Not that I recall.

17         Q.    Okay.  Can we refer to NexPoint and

18   HCMFA as the advisors?

19         A.    Yes.

20         Q.    In general, the advisors provided

21   investment advisory services to certain retail

22   funds; correct?

23         A.    Yes.

24         Q.    And we will refer to the retail

25   funds that are served by the advisors

1                    WATERHOUSE - 10-19-21

2    collectively as the retail funds; is that okay?

3         A.    Okay.

4         Q.    Each of the retail funds is governed

5    by a board; correct?

6         A.    Yes.

7         Q.    And do you know the people who serve

8    on the boards of the retail funds?

9              MS. DANDENEAU:  Objection to form.

10        A.    I don't know all of them.

11        Q.    Do you know whether the same people

12   serve on the board of each of the retail funds

13   as we've defined that term?

14        A.    Which -- so when you say "retail

15   funds" -- again, I want to be -- what retail

16   funds are you referring to, because there are

17   -- there are several distinctions?

18             What retail funds are you using when

19   you refer to them?

20        Q.    That is why -- that is why I tried

21   to define the terms.  So let me do it again.

22             Retail funds for the purposes of

23   this deposition means any retail fund to which

24   either of the advisors provides advisory

25   services.  Okay?

Case 21-30085 Doc 414-3 Filed 10/20/21 Entered 10/20/21 23:18 Page 34 of 897
Case 3:21-cv-00881-X   Document 678-16   Filed 01/09/23   Page 63 of 200   PageID 44007

Page 34

1                    WATERHOUSE - 10-19-21

2         A.    Okay.

3         Q.    Okay.  So do you know whether the

4    same people serve on the board of each of the

5    retail funds?

6         A.    I don't know.

7         Q.    Were you ever employed by any of the

8    retail funds?

9         A.    No.

10        Q.    No?

11        A.    No.

12        Q.    Okay.  Do you have any title with

13   respect to any of the retail funds?

14        A.    Yes.

15        Q.    What titles do you hold --

16   withdrawn.

17              Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20              MS. DANDENEAU:  Objection to form.

21        Q.    Withdrawn.

22              Do you have the same title with

23   respect to each of the retail funds?

24        A.    No.

25        Q.    Tell me which title you have with

Case 21-30605 Document 00514-163 1070/201/05/22 Entered 10/20/201/05/22 3:18: Page 35 of 897
Case 3:21-cv-00881-X   Document 178-16   Filed 07/30/23   Page 64 of 200   PageID 44008

Page 35

                    WATERHOUSE - 10-19-21

1    respect to each retail fund.

2              Actually, let's do it a different

3    way.  I withdraw the question.

4              Can you give me one title you have

5    in relation to any retail fund?

6         A.    Yes.

7         Q.    What title -- what title can you

8    give me?

9         A.    Principal executive officer.

10        Q.    Do you serve as principal executive

11   officer for each of the retail funds?

12        A.    No.

13        Q.    Can you identify for me the retail

14   funds in which you serve as the principal

15   executive officer?

16        A.    Yes.  Highland Funds 1, Highland

17   Funds 2, Highland Income Fund, Highland Global

18   Allocation Fund.

19        Q.    I'm sorry, you said "Global

20   Allocation Fund"?

21        A.    Yes.

22              VIDEOGRAPHER:  Excuse me,

23        Mr. Morris.  This is the videographer.  I'm

24        concerned about the lighting in the

Case 21-30305 Document 00514146310 Date Filed 10/10/2011 Page 36 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 07/00/2399 Page 65 of 200 PageID 44009

Page 36

                      WATERHOUSE - 10-19-21

1      witness' camera.

2              Do you want to go off the record and

3      make some adjustments?

4              MR. MORRIS:  Sure, but just for this

5      purpose.  I don't want to take a break.  We

6      just started.

7              MS. DANDENEAU:  Yeah, that is fine.

8      That is fine.  We're going to put you on

9      mute.

10             MR. MORRIS:  All right.

11             MS. DANDENEAU:  I'm going to try to

12     open up some of the shades.

13             VIDEOGRAPHER:  We're going off the

14     record at 10:08 a.m.

15     (Recess taken 10:08 a.m. to 10:11 a.m.)

16             VIDEOGRAPHER:  We are back on the

17     record at 10:11 a.m.

18     Q.    Mr. Waterhouse, when did you become

19  the principal executive officer of the four

20  retail funds that you just identified?

21     A.    I don't recall.

22     Q.    Do you recall the approximate year

23  that you became the principal executive officer

24  of the four funds?

Case 21-30805 Document 00416378116 Page 0750/2399 Page 66 of 200 PageID 44010
Case 3:21-cv-00881-X Document 178-3 10/20/21 05/22 Entered 10/20/21 05:22:38 Page 3 of 897

Page 37

```
 1                   WATERHOUSE - 10-19-21

 2        A.    2021.

 3        Q.    Did you ever hold any title with

 4   respect to any of the four funds you have just

 5   identified other than principal executive

 6   officer?

 7        A.    I don't recall.

 8        Q.    Is it possible that you held a

 9   position or a title with the four funds you

10   just identified prior to 2021?

11        A.    Yes.

12        Q.    But you don't recall if you did or

13   not; do I have that right?

14        A.    No.  You -- I thought you asked, did

15   I hold other titles.

16        Q.    Did you hold any title at the four

17   retail funds for which you now serve as

18   principal executive officer at any time prior

19   to 2021?

20        A.    Yes.

21        Q.    What titles did you hold?

22        A.    I don't recall all the titles.

23        Q.    Do you recall any of the titles?

24        A.    Yes.

25        Q.    What titles do you recall holding at
```

```
 1                    WATERHOUSE - 10-19-21

 2    those four retail funds before 2021?

 3          A.    Principal executive officer.

 4          Q.    Were you the principal executive

 5    officer of the four retail funds that you have

 6    identified?

 7          A.    Sorry, could you repeat the

 8    question?

 9          Q.    Were you the principal executive

10    officer for each of the four retail funds that

11    you have identified?

12          A.    Yes.

13          Q.    When did you become the principal

14    executive -- withdrawn.

15                Can you give me the approximate year

16    that you became the principal executive officer

17    for each of the four retail funds you've

18    identified?

19          A.    I don't recall.

20          Q.    What are your duties and

21    responsibilities as the principal executive

22    officer of these four retail funds?

23          A.    It is to manage the finance and

24    accounting positions.

25          Q.    So at the same time you serve as the
```

Case 21-30509, Doc 4748, 10/20/21, Entered 10/20/21 08:18 Page 39 of 897
Case 3:21-cv-00881-X   Document 78-16   Filed 01/09/23   Page 68 of 200   PageID 44012

Page 39

WATERHOUSE - 10-19-21

1

2    treasurer of the advisors, you also serve as

3    the principal executive officer of these four

4    retail funds; correct?

5         A.    Yes.

6         Q.    Did you ever hold any title with

7    respect to any other retail fund?

8         A.    Not that I recall.

9         Q.    During the period that you served as

10   Highland's CFO, from time to time Highland

11   loaned money to certain of its officers and

12   employees; correct?

13        A.    Yes.

14        Q.    During the period that you served as

15   Highland's CFO, from time to time Highland

16   loaned money to certain --

17        A.    Let me -- let me retract that,

18   sorry, that -- you asked during the time I was

19   CFO, Highland loaned moneys to employees.  I

20   don't -- I don't recall that during my tenure

21   of CFO.

22        Q.    You have no recollection during the

23   time that you were the CFO of Highland of

24   Highland ever loaning any money to any officer

25   or director of Highland?

```
1                    WATERHOUSE - 10-19-21

2          A.    I don't recall during my tenure of

3     Highland or my -- as CFO of Highland -- yeah,

4     if there are any loans as CFO of Highland.

5          Q.    I'm just talking about officers and

6     employees right now.  You have no recollection

7     of Highland ever making a loan to any of its

8     officers or employees during the time that you

9     served as CFO.  Do I have that right?

10               MS. DANDENEAU:  Objection to form.

11         A.    So I thought you were saying

12    officers and employees as CFO, right, so there

13    were -- I mean, okay, yes.

14         Q.    I would ask you to listen carefully

15    to my question.  If I -- if I'm not clear, let

16    me know, but I'm really trying to be as clear

17    as I can.

18         A.    I'm listening as carefully as I can,

19    and you are asking very specific questions in a

20    timeline.  And I'm trying to answer your

21    questions as specifically as I can, and I

22    apologize if -- if I'm going back.  I am -- you

23    are asking very specific questions.  Thank you.

24         Q.    During the period that you served as

25    Highland's CFO, from time to time Highland
```

Page 41

1              WATERHOUSE - 10-19-21

2    loaned money to certain corporate affiliates;

3    correct?

4              MS. DANDENEAU:  Objection to form.

5       A.    What are corporate affiliates?

6       Q.    How about the ones that are in

7    Highland's audited financial statements under

8    the section entitled Loans to Affiliates.  Why

9    don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12             MS. DANDENEAU:  Objection to form.

13      A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16      Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20      A.    Is that a -- it depends on the

21   context.

22      Q.    How about the context of making

23   loans?

24             MS. DANDENEAU:  Objection to form.

25      A.    I didn't make the determination of

Case 21-03005-sgj Doc 44-3 Filed 10/20/21 Entered 10/20/21 05:22:38 Page 42 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 08/09/23 Page 71 of 200 PageID 44015

Page 42

```
 1                   WATERHOUSE - 10-19-21

 2    who an affiliate was or is at the time those --

 3    I didn't -- that wasn't my job to make a

 4    determination of who an affiliate is.

 5         Q.    All right.  So as the CFO of

 6    Highland, do you have any ability right now to

 7    tell me which companies that were directly or

 8    indirectly owned and/or controlled by

 9    Mr. Dondero in whole or in part received loans

10    from Highland Capital Management, L.P.?

11               MS. DANDENEAU:  Objection to form.

12               MS. DEITSCH-PEREZ:  Objection, form.

13         A.    Yes.

14         Q.    Okay.  Identify every entity that

15    you can think of that was directly or

16    indirectly owned and/or controlled by

17    Mr. Dondero in whole or in part that received a

18    loan from Highland Capital Management, L.P.

19               MR. RUKAVINA:  Objection, legal

20         conclusion.

21         A.    NexPoint Advisors, Highland Capital

22    Management Fund Advisors, HCM Services,

23    Dugaboy.  Sorry, I don't think -- Dugaboy

24    doesn't fit that definition.  You said owned

25    and controlled.  I don't think that that
```

Case 21-30005 Doc 41-3 10/20/21 Entered 10/20/21 23:38 Page 43 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 08/09/23 Page 72 of 200 PageID 44016

Page 43

                    WATERHOUSE - 10-19-21

1    definition --

2         Q.    I said owned and/or controlled.

3         A.    I don't -- again, I'm not -- I'm not

4    the legal expert.  I don't think it controls --

5    he controls Dugaboy, so again, I'm not the

6    legal person.

7         Q.    I'm not asking you for a legal

8    conclusion, sir.  I'm asking you for your

9    knowledge, okay, as the CFO -- the former CFO

10   of Highland Capital Management, other than

11   NexPoint, HCMFA, and HCMF -- HCMS, can you

12   think of any other entities that were owned

13   and/or controlled directly or indirectly in

14   whole or in part by Jim Dondero who received a

15   loan from Highland Capital Management, L.P.?

16              MS. DANDENEAU:  Objection to form.

17        A.    HCRE.

18        Q.    Any others?

19        A.    That is -- that is all I can think

20   of.

21        Q.    And you're aware that from time to

22   time while you were the CFO, Highland loaned

23   money to Jim Dondero; correct?

24        A.    Yes.

Case 21-03005-sgj Doc 44-6 Filed 10/20/21 Entered 10/20/21 22:38:48 Page 44 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 01/09/23 Page 73 of 200 PageID 44017
Page 44

1              WATERHOUSE - 10-19-21

2         Q.    Okay.  Can we refer to the four

3    entities that you just named and Mr. Dondero as

4    the affiliates?

5         A.    So that would be Jim Dondero,

6    NexPoint Advisors, Highland Capital Management

7    Fund Advisors, and HCRE.

8         Q.    And HCMS?

9         A.    And HCMS, okay.

10        Q.    And can we refer to the loans that

11   were given to each of those affiliates as the

12   affiliate loans?

13        A.    Yes.

14        Q.    And is it fair to say that each of

15   the affiliates were the borrowers under the

16   affiliate loans as we're defining the term?

17             MR. RUKAVINA:  Objection, legal

18        conclusion.

19        A.    The borrowers are whoever were on

20   the notes.  I don't -- I don't know.  I'm not

21   the legal person.

22        Q.    But you --

23        A.    I don't know.

24        Q.    You do know, as Highland's former

25   CFO, that each of the affiliates that you have

Case 21-03006-sgj Doc 414-3 Filed 10/20/21 Entered 10/20/21 05/22:88 Page 45 of 897
Case 3:21-cv-00881-X Document 178-16 Appendix Filed 08/30/2399 Page 74 of 200 PageID 44018

Page 45

1                    WATERHOUSE - 10-19-21

2    identified tendered notes to Highland; correct?

3              MR. RUKAVINA:  Hey, John, will you

4         just give me a running objection to legal

5         conclusion to HCM --

6              MR. MORRIS:  No.  No, if you want to

7         object --

8              MR. RUKAVINA:  I will object every

9         time.  Object to legal conclusion.

10             MR. MORRIS:  That is fine.

11    A.    Sorry, can you repeat the question?

12    Q.    Are you aware that each of the --

13    that each of the affiliates, as we have defined

14    the term, gave to Highland a promissory note in

15    exchange for the loans?

16             MR. RUKAVINA:  Objection to the

17        extent that calls for a legal conclusion.

18    A.    I don't.

19    Q.    No, you don't know that?

20    A.    No, they didn't -- you said they

21    exchanged a promissory note for a loan.  I

22    don't -- I don't understand that question, so I

23    said no.

24    Q.    At the time of the bankruptcy

25    filing, did Highland have in its possession

1                    WATERHOUSE - 10-19-21

2     promissory notes that were signed by each of

3     the affiliates?

4          A.    Yes.

5          Q.    To the best of your knowledge,

6     during the time that you served as Highland's

7     CFO, did Highland disclose to its outside

8     auditors all of the loans that were made to

9     affiliates?

10              MR. RUKAVINA:  Objection, that calls

11         for a legal conclusion.

12              MS. DEITSCH-PEREZ:  I also couldn't

13         hear you, John, because there was some

14         garbling on -- on the -- on the call.

15              MR. MORRIS:  Folks, I've got to tell

16         you this is not going well, and I'm

17         reserving my right --

18              MS. DANDENEAU:  John, it was just

19         the end of that question.  It was just the

20         end of that question.  I couldn't hear it

21         either.  Sorry, if you could repeat it,

22         please.

23              MR. MORRIS:  That is less than an

24         hour into this, but folks are trying to run

25         out the clock, and so I'm just going to

1         WATERHOUSE - 10-19-21

2        state that now.

3              MS. DANDENEAU:  You know, and,

4        Mr. Morris, I really object to that.  I

5        mean --

6              MR. MORRIS:  Okay.

7              MS. DANDENEAU:  -- Mr. Waterhouse

8        just told you he's trying to listen to your

9        questions and answer them carefully, and

10       you have no basis for saying that.

11             MR. MORRIS:  Okay.

12             MS. DANDENEAU:  This does not --

13       this is not an experienced witness, so he's

14       trying to do the best he can.

15       Q.    Mr. Waterhouse, during the time that

16   you served as Highland's CFO, did Highland

17   disclose to its outside auditors all of the

18   loans that it made to each of the affiliates

19   that you have identified?

20             MR. RUKAVINA:  Objection, legal

21       conclusion.

22       A.    Yes.

23       Q.    To the best of your knowledge, while

24   you were Highland's CFO, were all of the

25   affiliate loans described in Highland's audited

```
 1                    WATERHOUSE - 10-19-21

 2    financial statements?

 3                 MR. RUKAVINA:  Objection, legal

 4         conclusion.

 5         A.    When an audit was performed, any

 6    loans that were made by Highland to the

 7    affiliates were disclosed to auditors.

 8         Q.    Are you aware of any loan that was

 9    made to any affiliate that was not disclosed to

10    the auditors?

11         A.    I'm not aware.

12         Q.    To the best of your knowledge, did

13    each of the affiliates who were --

14    (inaudible) -- loaned from Highland execute a

15    promissory note in connection with that loan?

16                 MR. RUKAVINA:  Objection, legal

17         conclusion.

18         A.    Sorry, you -- halfway through the

19    question it got muffled.

20                 Can you repeat that again?

21         Q.    To the best of your knowledge, did

22    every affiliate execute a promissory note in

23    connection with each loan that it obtained from

24    Highland?

25                 MR. RUKAVINA:  Objection, legal
```

Case 21-30085 Document 00514148103 Page 78 of 200 Page 49 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 08/09/23 Page 78 of 200 PageID 44022

Page 49

```
 1                    WATERHOUSE - 10-19-21

 2         conclusion.

 3         A.     Yes.

 4         Q.     You are not aware of any loan that

 5   any affiliate ever obtained from Highland where

 6   the affiliate did not give a promissory note in

 7   return; is that fair?

 8         A.     Yes, I'm not aware.

 9         Q.     And to the best of your knowledge,

10   did Highland loan to each affiliate an amount

11   of money equal to the principal amount of each

12   promissory note?

13                MR. RUKAVINA:  Objection, legal

14         conclusion.

15         A.     Yes.

16         Q.     During the time that you served as

17   CFO, did Highland ever loan money to

18   Mark Okada?

19         A.     I -- I don't recall.

20         Q.     Did you ever see any promissory

21   notes executed by Mark Okada?

22         A.     I don't recall.

23         Q.     Do you know if Highland ever forgave

24   any loan that it ever made to Mr. Okada?

25         A.     I don't recall.
```

1          WATERHOUSE - 10-19-21

2     Q.    Do you recall if Mr. Okada paid back

3  all principal and interest due and owing under

4  any loan he obtained from Highland?

5          MS. DEITSCH-PEREZ:  Objection to

6     form.

7          MS. DANDENEAU:  Objection to form.

8     A.    I don't recall.

9     Q.    Do you recall whether -- during your

10  time as CFO, whether Highland ever loaned money

11  to Jim Dondero?

12    A.    Yes.

13    Q.    To the best of your knowledge, did

14  Mr. Dondero sign and deliver to Highland a

15  promissory note in connection with each loan

16  that he obtained from Highland?

17    A.    If you are referring to the

18  promissory notes that, you know, part of

19  Highland's records, yes.

20    Q.    Okay.  You're not aware of any loan

21  that Mr. Dondero took from Highland that wasn't

22  backed up by -- by a promissory note with a

23  face -- with a principal amount equal to the

24  amount of the loan; correct?

25    A.    Am I aware that Jim Dondero took a

```
                    WATERHOUSE - 10-19-21
```

1    loan?

2         Q.    Without giving a -- let me ask a

3    better question.  I'm sorry, Mr. Waterhouse.

4         Are you aware of any loan that

5    Mr. Dondero obtained from Highland where he

6    didn't give a promissory note in return?

7         A.    I'm not aware.

8         Q.    During the time that you served as

9    Highland's CFO, did Highland ever forgive any

10   loans, in whole or in part, that it made to

11   Mr. Dondero?

12        A.    Not that I'm aware.

13        Q.    At the time that you served as

14   Highland's CFO, did Highland ever forgive any

15   loan, in whole or in part, that it made to any

16   affiliate as we've defined the term today?

17        A.    Not that I'm aware.

18        Q.    During the time that you served as

19   Highland's CFO, did Highland ever forgive, in

20   whole or in part, any loan that it ever made to

21   any officer or employee?

22        A.    Highland forgave loans to officers

23   and employees.  It may not have been at the

24   time when my title was CFO.

Case 21-30000-sgj Doc 414-3 Filed 10/20/21 Entered 10/20/21 23:18:43 Page 52 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 01/09/23 Page 81 of 200 PageID 44025

Page 52

```
1                     WATERHOUSE - 10-19-21

2         Q.    Okay.  And so I appreciate the

3    distinction.

4              Is it fair to say that, to the best

5    of your knowledge, Highland did not forgive a

6    loan that it made to an officer or employee

7    after 2013?

8              MS. DANDENEAU:  Objection to form.

9         A.    I don't recall.

10        Q.    To the best of your knowledge, did

11   Highland disclose to its auditors every

12   instance where it forgave, in whole or in part,

13   a loan that it had made to one of its officers

14   or employees?

15        A.    No.

16        Q.    Can you think of -- can you -- can

17   you identify any loan to an officer or employee

18   that was forgiven by Highland, in whole or in

19   part, that was not disclosed to Highland's

20   outside auditors?

21        A.    Look, I don't recall all of the

22   loans and the loan forgiveness.  I just know as

23   part of the audit process there is a

24   materiality concept.

25              So if there were loans to employees
```

Page 53

1                    WATERHOUSE - 10-19-21

2    that were of -- you know, that were deemed

3    immaterial, those items may not have been

4    disclosed by the team to the auditors.

5         Q.    I appreciate that.

6              Do you have an understanding as to

7    what the level of materiality was?

8         A.    I don't recall.

9         Q.    As the CFO of Highland, to the best

10   of your knowledge, did Highland disclose to its

11   outside auditors every loan that was forgiven,

12   in whole or in part, that was material as that

13   term was defined by the outside auditors?

14        A.    Yes.

15        Q.    And do you recall where -- do you

16   recall where the definition of materiality can

17   be found for -- for this particular purpose?

18              MS. DANDENEAU:  Objection to form.

19        A.    No.  You -- I don't determine

20   materiality.

21        Q.    Okay.  I'm just asking you if you

22   can help me understand where it is, but I think

23   we will find it in a few minutes.

24              You are aware that Highland has

25   commenced lawsuits against each of the

1                    WATERHOUSE - 10-19-21

2    affiliates, as we've defined the term, to

3    collect under certain promissory notes; is that

4    right?

5         A.    Yes.

6         Q.    And are you familiar with the notes

7    that are issue -- at issue in the lawsuits?

8              MS. DANDENEAU:  Objection to form.

9         A.    Generally familiar.

10        Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13        A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15        Q.    And Mr. Dondero?

16        A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19        Q.    I just --

20        A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23        Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and

Case 21-03005-sjpc Doc 64-3 Filed 10/28/21 Entered 10/28/21 13:48:55 Desc
Case 3:21-cv-00881-X Document 61-6 Filed 09/30/22 Page 84 of 200 PageID 44028

Page 55

                    WATERHOUSE - 10-19-21

1

2    Mr. Dondero we will call Mr. Dondero.  Okay?

3        A.    Okay.  Thank you.  As you can see,

4    Mr. Morris, there is a lot of entities -- a lot

5    here.  I just want to be clear.

6        Q.    Okay.  Now, the affiliates of

7    Mr. Dondero signed promissory notes that are

8    not subject to the lawsuit.

9              Do you understand that?

10             MS. DANDENEAU:  Objection to form.

11       A.    The affiliates and Mr. Dondero

12   signed --

13       Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15             From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20             MR. RUKAVINA:  Objection to the

21        extent that calls for a legal conclusion.

22       A.    Yes.

23       Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that

1                    WATERHOUSE - 10-19-21

2    were given by the affiliates and Mr. Dondero?

3         A.    Yes.

4         Q.    Can you describe the process for me?

5         A.    The process, payment should be

6    applied as laid out in the -- in the promissory

7    note.

8         Q.    From time to time were payments made

9    that were not required under the promissory

10   notes?

11              MS. DANDENEAU:  Objection to form.

12        A.    Yes.

13        Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17        A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19        Q.    Yes.

20        A.    I don't know.

21        Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25              MS. DANDENEAU:  Objection to form.

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A. Did I approve the payments? I |

approve -- I approve -- if there was cash -- if

there was cash being repaid on a note payment,

yes, I approved in the general sense of being

made aware of the payment and the amount.

Q. And are you the person who

authorized Highland's employees to effectuate

those payments?

A. Yes.

Q. When you gave the instruction to

effectuate the payment, did you obtain

Mr. Dondero's prior approval?

A. I mean, it -- I mean, it -- it

depends.

Q. Can you think of any instance where

you directed Highland's employees to make a

payment of principal or interest against any

note that was tendered by an affiliate or

Mr. Dondero that Mr. Dondero did not approve of

in advance?

A. I can't recall specifically.

Q. Can you identify -- withdrawn.

Did Mr. Dondero ever tell you that a

payment that was made against principal and

Case 21-30006gsjgc Doc 414-3 10/20/01/05/22red 10/20/01/05/23 38:43 58 Dof897
Case 3:21-cv-00881-X Document 678-16 Page 09/00/2399 Page 87 of 200 PageID 44031

Page 58

1                     WATERHOUSE - 10-19-21

2     interest due under one of the notes that was

3     tendered by an affiliate or himself should not

4     have been made?

5          A.     Yes.

6          Q.     Can you identify the payment for me?

7          A.     It would be for -- for NexPoint

8     Advisors.

9          Q.     Okay.  And when did Mr. Dondero tell

10    you that a payment that you had initiated on

11    behalf of NexPoint should not have been made?

12         A.     I wasn't initiating payment.  It was

13    in the context of the -- I think you used this

14    term, "the advisors," so NexPoint Advisors and

15    Highland Capital Management Fund Advisors had

16    overpaid on certain agreements with Highland

17    Capital Management, L.P.  And as a part of that

18    process, the advisors -- what I was told at the

19    time were in talks and negotiations and

20    discussions with Highland Capital Management,

21    L.P., on offsets in relation to those

22    overpayments.

23         Q.     When did this conversation take

24    place?

25                MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj Doc 414-3 Filed 10/20/21 Entered 10/20/21 22:18:43 Page 59 of 897
Case 3:21-cv-00881-X Document 178-16 Filed 09/09/23 Page 88 of 200 PageID 44032

Page 59

WATERHOUSE - 10-19-21

1

2     A.     I don't recall specifically.

3     Q.     Do you recall what year it was?

4     A.     Yes.

5     Q.     What year did the conversation with

6 Mr. Dondero take place that you just described?

7     A.     2020.

8     Q.     Okay.  Do you remember if it was

9 December 2020?

10     A.     It -- it -- I don't -- I don't

11 recall what month specifically, but it would

12 have been November or December.

13     Q.     And we're talking here about a

14 payment of principal and/or interest that was

15 due -- withdrawn.

16            We're talking here about a payment

17 of principal and interest that was applied

18 against NexPoint's note; correct?

19            MS. DANDENEAU:  Objection to form.

20     A.     I don't recall what that payment

21 consisted of.

22     Q.     Is it possible that the payment you

23 have in mind related to the shared services

24 agreement?

25            MS. DANDENEAU:  Objection to form.

```
 1                  WATERHOUSE - 10-19-21

 2       A.    No.

 3       Q.    Are you certain that the payment --

 4  that the payment that you have in mind related

 5  to the promissory note that NexPoint issued in

 6  favor of Highland?

 7             MS. DANDENEAU:  Objection to form.

 8       A.    Yes.

 9       Q.    Okay.  Other than that one payment,

10  can you identify any other instance where

11  Mr. Dondero told you that a payment should not

12  have been applied against principal and

13  interest under any promissory note tendered by

14  any affiliate or Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Objection to

17        form.

18       A.    Not that I recall.

19       Q.    Thank you very much.

20             Do you know if Mr. Dondero approved

21  in advance of each loan made to each affiliate

22  and himself during the time that you were the

23  CFO?

24             MS. DEITSCH-PEREZ:  Object to the

25        form.
```

Case 21-30360-sgj Doc 414-3 Filed 10/20/21 Entered 10/20/21 23:38:42 Page 6 of 897
Case 3:21-cv-00881-X Document 176-16 Filed 01/09/23 Page 90 of 200 PageID 44034
Page 61

                    WATERHOUSE - 10-19-21

1

2        A.    Yes, generally.

3        Q.    Can you identify any loan that was

4    ever made to an affiliate or to Mr. Dondero

5    that Mr. Dondero did not approve of in advance?

6        A.    Other than the ones that are in

7    dispute, I'm not aware.

8        Q.    Do you believe that Mr. Dondero did

9    not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12            MS. DANDENEAU:  Objection to form.

13       A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16       Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19            Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23       A.    Was I aware of every loan, yes.

24       Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans

Case 21-30005 Doc 414-3 10/20/21 Entered 10/20/21 23:38:38 Page 62 of 897
Case 3:21-cv-00881-X   Document 186   Appendix   Filed 00/00/399 Page 91 of 200   PageID 44035

Page 62

1                     WATERHOUSE - 10-19-21

2      that were made to one of the affiliates or

3      Mr. Dondero during the time that you were the

4      CFO was made without Mr. Dondero's prior

5      knowledge and approval?

6          A.    Not that I recall.

7          Q.    Thank you.  In fact, do you -- as

8      the CFO, would you have allowed Highland to

9      loan money to an affiliate or to Mr. Dondero

10     without obtaining Mr. Dondero's prior approval?

11              MS. DANDENEAU:  Objection to form.

12         A.    I can't -- there was so many times

13     over the years, I can't speak for every single

14     one, but generally, yes, I -- I spoke to him.

15         Q.    You -- you never -- you never --

16     withdrawn.  I will just take that.

17              Can you recall any payment that was

18     ever made against principal and interest on a

19     note that was issued in favor of Highland by an

20     affiliate or Mr. Dondero that you personally

21     did not know about in advance?

22         A.    There are so many through the years,

23     I don't -- I don't -- I don't recall every

24     single one.

25         Q.    Okay.  Can you identify any payment

Case 21-03005-sgj Doc 414-3 Filed 10/20/21 Entered 10/20/21 05:23:18 Page 63 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 01/09/23 Page 92 of 200 PageID 44036
Page 63

                          WATERHOUSE - 10-19-21

1

2    that was made against principal and interest on

3    any note tendered by any affiliate or

4    Mr. Dondero that you didn't know about in

5    advance?

6         A.    I don't recall.

7         Q.    Other than Mr. Dondero -- withdrawn.

8               Did anybody at Highland have the

9    authority to make a payment against principal

10   and interest due under a loan given to the

11   affiliates and Mr. Dondero without your

12   knowledge and approval?

13              MS. DANDENEAU:  Objection to form.

14        A.    Sorry, there was -- to make a

15   payment on an affiliate loan, what you are

16   saying would it require my knowledge and

17   approval, yes.

18        Q.    Okay.  I appreciate that.  Thank

19   you.

20              Did anybody at Highland have the

21   authority, to the best of your knowledge, to

22   effectuate a loan to an affiliate without

23   Mr. Dondero's prior knowledge and approval?

24              MS. DANDENEAU:  Objection to form.

25        A.    I can't speak for all, but

WATERHOUSE - 10-19-21

1 generally, yes.

2 Q. Did you personally communicate with

3 Mr. Dondero to let him know each time a payment

4 of principal or interest was being made against

5 any note that was tendered by an affiliate or

6 Mr. Dondero to Highland?

7 A. I don't -- are you saying, did I let

8 Mr. Dondero know if a payment was made on any

9 affiliate or loan to Mr. Dondero? I mean,

10 not -- not every -- no.

11 Q. Let me ask it this way: Did you

12 have a practice of informing Mr. Dondero when

13 payments were made against principal and

14 interest on any note that was tendered by an

15 affiliate or Mr. Dondero?

16 MS. DEITSCH-PEREZ: Objection to

17 form.

18 MS. DANDENEAU: Objection to form.

19 A. No, I did not.

20 Q. Did Mr. Dondero ever tell you that a

21 payment of principal or interest had been made

22 against a note that was tendered by an

23 affiliate or himself that he had been unaware

24 of?

```
 1                    WATERHOUSE - 10-19-21

 2        A.     Not that I recall.

 3        Q.     Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5               Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12               MS. DANDENEAU:  Objection to form.

13        A.     I didn't -- I didn't -- I didn't

14   know that it was all notes.

15        Q.     Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19               MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.     Yes.

22        Q.     Do you have any understanding as to

23   the terms of that agreement?

24        A.     Yes.

25        Q.     What is your understanding of the
```

1                    WATERHOUSE - 10-19-21

2    terms of the agreement?

3        A.    That there were certain milestones

4    that had to be reached.

5        Q.    Do you have any understanding of the

6    terms of the agreement between Mr. Dondero and

7    Nancy Dondero concerning any of the notes

8    issued by the affiliates or Mr. Dondero other

9    than that there have to be milestones reached?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12        A.    There are milestones, I found out

13   yesterday, or there was some --

14              MS. DANDENEAU:  Okay.  I'm just

15         going to object to the extent that you

16         learned anything in conversations with

17         counsel, please don't reveal -- that is

18         privileged, and don't reveal any privileged

19         communications.

20              THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23   were?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't.

Case 21-30085 Doc 04-148 3 10/20/21 05/22 Entered 10/20/21 05/22 38:38 Page 6 Des897
Case 3:21-cv-00881-X Document 178-16 Filed 05/09/23 Page 96 of 200 PageID 44040

Page 67

                    WATERHOUSE - 10-19-21

1

2      Q.    Do you know anything about -- do you

3  know what promissory notes the agreement

4  covered?

5      A.    I don't.

6      Q.    Do you know if -- if Jim and Nancy

7  Dondero entered into one agreement or more than

8  one agreement?

9            MS. DEITSCH-PEREZ:  Object to the

10      form.

11      A.    I don't know.

12      Q.    Do you know if the agreement is in

13  writing?

14      A.    I don't know.

15      Q.    How did you learn of the existence

16  of the agreement?

17            MS. DANDENEAU:  Objection to form.

18      Again --

19      A.    I don't -- I don't recall who told

20  me.

21      Q.    You have no recollection of who told

22  you about this agreement between Jim and Nancy

23  Dondero?

24            MS. DEITSCH-PEREZ:  Object to the

25      form.

WATERHOUSE - 10-19-21

1

2      A.     I don't recall.

3      Q.     Do you recall how you learned of the

4  agreement?

5             Was it in a meeting?  Was it in a

6  phone call?  Was it in an email?

7      A.     I don't recall.

8      Q.     Do you recall when you learned of

9  the agreement?

10     A.     Not specifically.

11     Q.     Do you recall what year you learned

12 of the agreement?

13     A.     In -- look, I mean, there are so

14 many notes.  I may be getting -- I believe it

15 was 2020.

16     Q.     All right.  I'm not asking about

17 notes, sir.  I'm asking about the agreement

18 that you testified you knew about between Jim

19 and Don- -- Nancy Dondero.  Okay.

20            Do you understand my question now?

21 Should I ask my question again?

22     A.     Yeah, sure.  Go ahead.

23     Q.     I'm going to use the word

24 "agreement" to refer to the agreement that

25 Mr. Dondero and Nancy Dondero entered into

```
 1                WATERHOUSE - 10-19-21

 2  where you understood that certain milestones

 3  had to be reached.  Okay?

 4       A.    Uh-huh.

 5             MS. DANDENEAU:  Objection.

 6             MS. DEITSCH-PEREZ:  Object to the

 7       form.

 8             MR. MORRIS:  Just defining a term,

 9       what is the objection.

10             MS. DEITSCH-PEREZ:  The objection --

11             MR. MORRIS:  I will move on.  I will

12       move on.

13             MS. DEITSCH-PEREZ:  John --

14       Q.    Sir, are you okay with that

15  definition of agreement?

16       A.    Okay.

17       Q.    Okay.  So you don't recall who --

18  who informed you of the existence of the

19  agreement; is that right?

20       A.    I don't recall.

21       Q.    You don't recall who told you the

22  terms of the agreement.

23             Do I have that right?

24       A.    Correct.

25       Q.    And you don't recall if you learned
```

```
1                  WATERHOUSE - 10-19-21

2     about the agreement in a meeting, through an

3     email, or through a phone call.

4               Do I have that right?

5         A.    I don't recall.

6         Q.    Can you tell me when you learned of

7     the agreement?

8         A.    I don't -- I don't -- I don't

9     remember specifically.

10        Q.    Can you tell me if you learned of

11    the agreement before or after the petition

12    date?

13        A.    It would have been -- it would have

14    been after.

15        Q.    Can you tell me if you learned of

16    the agreement before or after January 9th,

17    2020?

18        A.    It would have been after.

19        Q.    Can you tell me if you learned of

20    the agreement before or after you left Highland

21    Capital Management in February of 2021?

22        A.    I don't -- I don't -- I don't know.

23        Q.    It is possible that you learned of

24    it while you were a Highland employee.

25               Do I have that right?
```

1            WATERHOUSE - 10-19-21

2        A.    I don't remember the -- I mean, it

3    was sometime in 2021.  I don't remember when.

4        Q.    All right.  So to the best of your

5    recollection, it was in 2021 but you don't

6    recall if it was before or after you ceased to

7    be a Highland employee.

8              Do I have that right?

9        A.    Yeah, I mean, it was -- it was

10   likely after I was -- after I left Highland

11   because, if I put myself back into the last

12   days of -- of 2021, it was -- you know, the

13   communications with Mr. Dondero were -- were --

14   were -- there weren't as many communications

15   because of the circumstances.

16       Q.    And so based on that you believe

17   that it is most likely that you learned of this

18   agreement sometime after you left Highland

19   employment?

20       A.    I wouldn't use the term "most

21   likely."  I don't recall specifically.  I don't

22   recall.

23       Q.    Do you recall ever telling Jim Seery

24   about this agreement?

25       A.    No, I don't -- I didn't tell

Page 72

1                WATERHOUSE - 10-19-21

2    Jim Seery.

3         Q.    Did you tell anybody at DSI about

4    this agreement?

5         A.    No.

6         Q.    Did you tell any of Highland's

7    independent directors about this agreement?

8         A.    No.

9         Q.    Did you tell anybody at Pachulski

10   Stang Ziehl & Jones about this agreement?

11        A.    No.

12        Q.    Did you tell any employee of

13   Highland about this agreement?

14        A.    No.

15             MS. DANDENEAU:  Mr. Morris, it has

16        been an hour and a half.  Is this a good

17        time for a break?

18             MR. MORRIS:  Sure.

19        Q.    Mr. Waterhouse, I will just remind

20   you that during the break please don't speak

21   with anybody about the deposition, the

22   substance of your testimony or anything else

23   concerning the deposition.  Okay?

24        A.    Yes.

25             MR. MORRIS:  So it is 11:02.  We're

Case 1:20-cv-06485-JSR Doc #: 414-3 Filed 10/20/21 Entered 10/20/21 Page 73 of 897
Case 3:21-cv-00881-X   Document 78-16   Filed 01/09/23   Page 102 of 200   PageID 44046

Page 73

                        WATERHOUSE - 10-19-21

1

2       at 11:02 your time.  Let's come back, I

3       guess, at 15 -- at 11:15 your time.

4               VIDEOGRAPHER:  We're going off the

5       record at 11:02 a.m.

6       (Recess taken 11:02 a.m. to 11:20 a.m.)

7               VIDEOGRAPHER:  We are back on the

8       record at 11:20 a.m.

9       Q.    Mr. Waterhouse, did you speak with

10   anybody during the break about this deposition?

11      A.    No.

12              MS. DANDENEAU:  Other than -- other

13      than his counsel.

14      Q.    Did you speak to your counsel about

15   the substance of your deposition today?

16      A.    No, I didn't bring it up.

17      Q.    I didn't ask you if you brought it

18   up.  I asked you if you had any conversation

19   with your lawyer about the substance of your

20   deposition.

21              MS. DANDENEAU:  Yes, he did.

22      Q.    Can you tell me what the -- you

23   discussed?

24              MS. DANDENEAU:  No, I object to

25      that.  He's not going to answer.  That is a

1          WATERHOUSE - 10-19-21

2    privileged conversation.

3          MR. MORRIS:  So I just want to make

4    sure that I understand.  During the break

5    you spoke with your client about the

6    substance of this deposition; is that

7    right?

8          MS. DANDENEAU:  Yes, John.

9          MR. MORRIS:  And you refuse -- you

10   refuse to let your client tell me what was

11   discussed; is that right?

12         MS. DANDENEAU:  That's correct.

13         MR. MORRIS:  You know, I had given

14   the instruction prior to the break not to

15   speak with counsel.  I would have

16   appreciated --

17         MS. DANDENEAU:  No, you didn't --

18   actually, that is not true, Mr. Morris.

19   You said not to speak with anyone.  We

20   never have interpreted that to mean

21   conversations with counsel.  That's never

22   been -- I have never, ever heard that

23   instruction.

24         MR. MORRIS:  Okay.  We will -- we

25   will -- we will deal with it when and if we

Case 21-30604, Doc 414-3, 10/20/21, Entered 10/20/21 22:38, Page 75 of 897
Case 3:21-cv-00881-X  Document 78-16  Filed 01/09/24  Page 104 of 200  PageID 44048

Page 75

1                  WATERHOUSE - 10-19-21

2         have to.

3         Q.    Mr. Waterhouse, after learning about

4    the agreement, did you ask anybody if the

5    agreement was reflected in a writing?

6              MS. DANDENEAU:  Objection to form.

7         A.    No.

8         Q.    Did you ask anybody if the terms of

9    the agreement were memorialized anywhere?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  What is the --

12        A.    No.

13             MS. DANDENEAU:  Well, because you

14             keep talking about this agreement and I --

15             I -- I think, Mr. Morris, that is really

16             not clear what you mean by "the agreement."

17             And maybe you can just go back and restate

18             what that is.

19             MR. MORRIS:  Okay.  Your client has

20             agreed with me twice on the definition, but

21             I will try one more time.

22        Q.    Mr. Waterhouse, do you understand

23    that when I use the term "agreement," I'm

24    referring to the agreement between Jim and

25    Nancy Dondero concerning certain promissory

Case 21-30566 Document 00416247830 Page 76 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 01/09/23 Page 105 of 200 PageID 44049

Page 76

```
 1                WATERHOUSE - 10-19-21

 2    notes where you learned that one of the terms

 3    of the agreement was milestones reached?

 4         A.    Okay.

 5         Q.    And did you understand that that was

 6    the -- the agreement that we were referring to

 7    every time we used the word "agreement" in this

 8    deposition?

 9         A.    I don't know anything about this

10    agreement.  So, look, I do -- it -- I don't

11    know whether --

12         Q.    Let's -- let's try this again.

13         A.    Yeah.  Look, I don't know what this

14    agreement relates.

15              MS. DEITSCH-PEREZ:  John, John --

16         Q.    Let me try --

17              MS. DEITSCH-PEREZ:  John, please let

18         the witness finish.

19              MR. MORRIS:  Please stop.  Please

20         stop.  Please stop talking.

21              MS. DEITSCH-PEREZ:  No, you stop.

22         Let the witness --

23              MR. MORRIS:  Stop talking.

24              MS. DEITSCH-PEREZ:  -- finish -- you

25         interrupted him.
```

1              WATERHOUSE - 10-19-21

2          MR. MORRIS:  You know what, you

3      guys, this is really wrong.  It is really,

4      really wrong.  Okay?

5          I had the witness agree not once,

6      but twice to the definition of agreement.

7      Okay?  I'm going to try and do it a third

8      time.

9          MS. DANDENEAU:  No, but, please,

10     John, really --

11         MR. MORRIS:  No, please stop

12     talking.  Please.  It is my deposition.

13     Object to questions.

14         MS. DANDENEAU:  No, but also you

15     instructed him that -- that if you were

16     going -- if you were interrupting him, that

17     he should remind you that you're

18     interrupting him and -- and --

19         MR. MORRIS:  Let him do that.  Let

20     him do that.

21         MS. DANDENEAU:  Okay.  Well, you --

22         MR. MORRIS:  Please stop talking.

23     A.    Okay.  I don't know any of the

24  details of these agreements.  I don't know

25  anything about them.  I heard -- someone -- I

```
1                    WATERHOUSE - 10-19-21

2      don't know who, I don't know when, as you

3      asked, sometime in '21, someone told me about

4      this -- or I don't honestly know -- I don't

5      even recall exactly how I was made aware of

6      this, but I was.  I don't know -- I don't know

7      any of these details, and I'm getting -- again,

8      there is, you know, I -- I -- I had a passing

9      conversation with -- with Jim at some point

10     on -- on some -- on the executive comp, and I'm

11     getting confused of what is what, because

12     again, I don't know any of these details.

13          Q.    Okay.  Let me try again,

14     Mr. Waterhouse, and I apologize.

15               Are you aware of any agreement

16     between Jim Dondero and Nancy Dondero

17     concerning any promissory note that was given

18     to Highland by any affiliate or Mr. Dondero?

19               MS. DEITSCH-PEREZ:  Object to the

20          form.

21          A.    I've heard of an agreement.  That

22     is -- that is -- I mean, if you are using aware

23     as heard, sure.

24          Q.    And you understand that one of the

25     terms of the agreement is that it was based on
```

```
 1                    WATERHOUSE - 10-19-21

 2   milestones that had to be reached; is that

 3   right?

 4              MS. DANDENEAU:  Objection to form.

 5       A.    That was one of the words that was

 6   used when I heard about it, yes.

 7       Q.    And when you heard about this

 8   agreement that had a term in it concerning

 9   milestones reached, did you ask the person who

10   was telling you about the agreement whether or

11   not it was in writing?

12       A.    I did not.

13       Q.    Did you ask any questions at all?

14              MS. DANDENEAU:  Objection to form.

15       A.    Not that I recall.

16       Q.    But do you understand that going

17   forward, we're going to refer to the agreement

18   as the agreement that you just described that

19   you were --

20              MS. DANDENEAU:  Object to the form.

21       A.    Yes.

22       Q.    Okay.  You don't have any personal

23   knowledge concerning the terms of the

24   agreement; correct?

25              MS. DEITSCH-PEREZ:  Object to the
```

Case 21-30505 Document 00416110720 Filed 05/22 Entered 05/22 18:38 Page 80 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 01/09/24 Page 109 of 200 PageID 44053

Page 80

WATERHOUSE - 10-19-21

1    form.

2        Q.    You can answer.

3        A.    I don't -- I heard about the

4    agreement.  I don't know anything -- I heard

5    there was an agreement.  That is -- again, as I

6    testified before -- I said before, heard about

7    it, don't know the details.  I believe it was

8    sometime this year.

9        Q.    Do you have any personal knowledge

10   about the terms of the agreement, sir?

11           MS. DANDENEAU:  Objection to form.

12       A.    Other than what I have previously

13   discussed, I don't -- I don't know.

14       Q.    Did -- did Mr. Dondero tell you

15   about the existence of the agreement?

16       A.    I don't recall.

17       Q.    Do you recall the source of your

18   information when you learned about the

19   agreement?

20       A.    No, I don't -- I don't recall.  I

21   don't remember.  I just -- I heard about it

22   generally.  I don't remember -- I don't

23   remember who, how, if, how.  I don't remember.

24       Q.    You know, Mr. Waterhouse, I just

WATERHOUSE - 10-19-21

1

2    want to be clear that I never would have asked

3    you to appear at this deposition if your name

4    hadn't been included in responses to discovery

5    as to somebody with knowledge about the -- who

6    was told about the existence of the agreement.

7                    That is what prompted me do this,

8    and I really do feel compelled to tell you that

9    I otherwise would never have called you as a

10   witness.  So I regret that you're being put

11   through this today.  I had no intention of

12   burdening you or taking your time, but that is

13   the reason that we issued the subpoena is

14   because certain of the defendants identified

15   you as somebody --

16                    MS. DEITSCH-PEREZ:  Mr. Morris, you

17        are here to ask questions, not to have --

18                    MR. MORRIS:  I feel badly for the

19        guy.  I really do.

20                    MS. DEITSCH-PEREZ:  I'm sure you do.

21                    MR. MORRIS:  I do.  Stop.

22                    MS. DEITSCH-PEREZ:  You stop.

23                    MR. MORRIS:  I'm allowed.

24                    MS. DEITSCH-PEREZ:  No, you're not

25        allowed to have a chat with the witness.

Case 21-30605 Document 00416070422 Page 82 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 02/09/23 Page 111 of 200 PageID 44055

Page 82

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Well, I hope that you

 3   appreciate what I'm saying here,

 4   Mr. Waterhouse.

 5             MS. DANDENEAU:  All right.  Let's go

 6        ahead and ask questions, and again, you're

 7        entitled to probe his -- his knowledge

 8        of -- whatever knowledge he has about

 9        this -- this agreement and --

10             MR. MORRIS:  That is what I'm doing.

11             MS. DANDENEAU:  -- he will answer

12        the questions to the best that he can.

13             MR. MORRIS:  That is what I'm doing.

14        Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18        A.    Yes, I don't -- I don't know.

19        Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24             MS. DANDENEAU:  Objection to form.

25        A.    I don't know.
```

Page 83

WATERHOUSE - 10-19-21

1

2      Q.    Did you ever make --

3      A.    I don't know anything about these

4  agreements.

5      Q.    Did you ever make any effort to

6  determine which promissory notes are subject to

7  this agreement?

8      A.    No.

9      Q.    Did you ever ask anybody which

10  promissory notes are subject to this agreement?

11      A.    No.

12      Q.    Do you know if there is a list

13  anywhere of the promissory notes that are

14  subject to this agreement?

15      A.    I'm not aware.

16      Q.    Have you ever seen the terms of the

17  agreement written down anywhere?

18      A.    No.

19      Q.    Have you ever asked anybody whether

20  the terms of the agreement were written down

21  anywhere?

22      A.    I have not.

23      Q.    Did learning about the agreement

24  cause you to do anything in response?

25            MS. DANDENEAU:  Objection to form.

WATERHOUSE - 10-19-21

1

2      A.    No.

3      Q.    Did anybody ever describe to you the

4  nature of the milestones that you referred to

5  earlier?

6      A.    No, I don't -- I don't have any

7  details of this.

8      Q.    That is fine.

9            PricewaterhouseCoopers served as

10  Highland's outside auditors prior to the

11  petition date; correct?

12      A.    Yes.

13      Q.    You refer to PricewaterhouseCoopers

14  as PwC?

15      A.    Yes.

16      Q.    PricewaterhouseCoopers audited

17  Highland's financial statements on an annual

18  basis; correct?

19      A.    During my -- during my time as -- as

20  CFO, yes, PricewaterhouseCoopers was the

21  auditor.

22      Q.    Do you know why Highland had its

23  annual financial statements audited each year?

24      A.    Generally.

25      Q.    Tell me your general understanding

Case 21-30005 Doc 4148-3 Filed 10/20/21 Entered 10/20/21 05:22:38 Page 85 of 897
Case 3:21-cv-00881-X   Document 78-16   Filed 02/09/24   Page 114 of 200   PageID 44058

Page 85

1              WATERHOUSE - 10-19-21

2    as to the reason why Highland had its annual

3    financial statements audited each year.

4         A.    From -- from time to time, they were

5    used -- or asked for, as part of diligence or

6    transactions or -- or things of that nature.

7         Q.    And were they given to third parties

8    for purposes of diligence or transactions from

9    time to time?

10        A.    As far as I'm aware, yes.

11        Q.    And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15             MS. DANDENEAU:  Objection to form.

16        A.    I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21        Q.    And --

22        A.    You would have to ask them.

23        Q.    Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?

Case 21-30085 Doc 414-3 10/20/21 Entered 10/20/21 Page 86 of 897
Case 3:21-cv-00881-X Document 78-16 Filed 02/09/23 Page 115 of 200 PageID 44059

Page 86

                     WATERHOUSE - 10-19-21

 1

 2          MS. DANDENEAU:  Objection to form.

 3     A.     During my tenure as CFO, I played a

 4   very minimal role.

 5     Q.     What was the minimal role that you

 6   played?

 7     A.     You know, again, it was -- it was to

 8   check in with the team, to make sure that, you

 9   know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18          Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21     Q.     Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25     A.     Yeah.  I mean, there was -- there

1          WATERHOUSE - 10-19-21

2    was a -- there was a point -- it varies.  It

3    varies by year, in function, in time and, you

4    know, depending on the request, but yes, I

5    mean, there is -- there is -- there is

6    generally a point person of communication.

7          Q.    And who was the point person from

8    2016 until the time you left Highland?

9          A.    I don't -- I don't know

10   specifically, but it would have been, you

11   know -- you know, someone on the corporate

12   accounting team.

13         Q.    And was there a head of the

14   corporate accounting team?

15         A.    Yes, so -- yes.

16         Q.    Who was the head of corporate

17   accounting for the five years prior to the time

18   you left Highland?

19         A.    I don't -- if you're asking from

20   2016 on, I don't -- it was Dave Klos, but,

21   again, there was -- there was changes to the

22   team and the reporting structure.  I don't

23   remember exactly when that happened during --

24   you know, over the last -- since 2016.

25         Q.    Did the folks who participated and

                      WATERHOUSE - 10-19-21

1

2    ran the audit all report to you, directly or

3    indirectly?

4         A.    Yes.

5         Q.    And did you have any responsibility

6    for making sure that the audit report was

7    accurate before it was finalized?

8         A.    Yeah.  I mean, you know, that --

9    that is -- my responsibility to the auditors

10   was -- again, is -- and the CFO is to -- we are

11   providing accurate financial statements; right?

12            And -- and -- and as part of any

13   audit, we disclose all relevant information as

14   part of any audit.

15        Q.    Okay.  And as the CFO, did you take

16   steps to make sure that the audit report was

17   accurate?

18        A.    I mean, I would say in a general

19   sense, yes.  But, again, I mean, I had a

20   very -- I had a very capable and competent

21   team.  I wasn't managing them.

22            You know, part of what I do is I let

23   the team -- I want managers to grow.  I want

24   managers to have rope.  And that is -- you

25   know, I'm not a stand-behind-you type of guy.

                    WATERHOUSE - 10-19-21

1    If you -- if you talk to my team members, I'm

2    not micromanaging people.  I want people to

3    learn and grow in their function so they can go

4    on and do bigger and better things with their

5    careers.

6              And so, yes, generally I was

7    responsible for it, but I wanted the team to

8    learn and grow and be responsible for the bulk

9    of the audit.

10       Q.    Did you personally review each audit

11   report before it was finalized to satisfy

12   yourself that it was accurate?

13       A.    I don't -- I don't recall, you know,

14   for every single -- we're talking 2016, there

15   would have been three years, 2016 to '17, '18.

16   I don't -- we're -- we're going back

17   five years-plus.  I don't -- you know, I don't

18   recall.

19       Q.    Did you have a practice that you

20   employed to make sure that you were satisfied

21   that Highland's audit reports were true and

22   accurate to the best of your knowledge?

23       A.    I mean, our -- the practice was set

24   up with our -- the -- the practice to put

1              WATERHOUSE - 10-19-21

2   together accurate audited or accurate financial

3   statements is to your control environment.

4              So, you know, the -- so the practice

5   was to maintain a stable control environment

6   which then the output is -- is accurate

7   financial statements.

8              So -- so, you know, if I was

9   comfortable that the control environment was

10  operating, then, you know, that would dictate

11  how I would -- you know, what I might or might

12  not do in a given year.

13       Q.    Okay.  Do you recall ever being

14  uncomfortable with the control environment

15  during the period that you served as CFO?

16       A.    Yeah.  I mean, look, yes, there are

17  times -- you know, nothing is perfect.  So

18  there were -- there were times when, yes, you

19  know -- there are times I learned I was

20  uncomfortable with the control environment, and

21  that is part of the management of the process

22  and having, you know -- and -- and working

23  through whatever obstacles present themselves.

24       Q.    Okay.  Were you ever uncomfortable

25  with the control process as it related to

 1                  WATERHOUSE - 10-19-21

 2     reporting and disclosures of loans to

 3     affiliates and Mr. Dondero?

 4             MS. DANDENEAU:  Objection to form.

 5       A.    I don't -- I don't recall --

 6       Q.    So you don't recall --

 7       A.    -- the --

 8             MS. DANDENEAU:  Mr. Morris --

 9       A.    I don't recall being uncomfortable.

10     But, again, we're going back several years.  I

11     don't -- you know, the practice in an audit is

12     to disclose all information to the auditors.

13     And I don't -- I don't recall.

14       Q.    As part of the process of the audit,

15     did you sign what is sometimes referred to as a

16     management representation letter?

17       A.    Yes.

18             MR. MORRIS:  Can we put up on the

19         screen a document that we have premarked as

20         Exhibit 33.

21             (Exhibit 33 marked.)

22             MS. DANDENEAU:  Mr. Morris, that is

23         not in the binder; correct?

24             MR. MORRIS:  Correct.

25       Q.    So you will see, Mr. Waterhouse,

WATERHOUSE - 10-19-21

1   this is a letter dated June 3rd.  And if we

2   could go to the signature page.

3             And do you see that you and

4   Mr. Dondero signed this document?

5       A.    Yes.

6       Q.    That is your signature; right?

7       A.    Yes.

8             MR. MORRIS:  Okay.  Can you go back

9       to the top.

10            MS. DANDENEAU:  Mr. Morris, can you

11      have somebody post this in the chat so that

12      we have can have a copy of this, please.

13            MR. MORRIS:  Yeah, sure.  Asia, can

14      you do that, please.

15      Q.    Okay.  Do you see at the bottom of

16   the second paragraph there is a reference to

17   materiality?

18      A.    Yes.

19      Q.    Okay.  It says, Materiality used for

20   purposes of these representations is

21   $1.7 million.

22            Do you see that?

23      A.    I do.

24      Q.    And did PwC set that level of

Case 21-30005 Doc 414-3 10/20/01/05/22 Entered 10/20/01/05/22 38:38 Page 93 of 897
Case 3:21-cv-00881-X Document 278-16 Filed 02/09/2899 Page 122 of 200 PageID 44066

Page 93

```
 1                WATERHOUSE - 10-19-21

 2   materiality?

 3        A.    Yes.

 4        Q.    And for purposes of the audit, did

 5   PwC set the level of materiality each year?

 6        A.    Yes.

 7        Q.    Did that number change over time?

 8        A.    I'm not aware of what materiality is

 9   every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20             If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of
```

```
 1                  WATERHOUSE - 10-19-21

 2   materiality that PwC established?

 3               MS. DANDENEAU:  Objection to form.

 4        A.    So, again, during my tenure as CFO,

 5   and -- Highland -- it was -- it is required to

 6   disclose any affiliate loans that are in excess

 7   of materiality.

 8               Now, the forgiveness of those loans

 9   may or may not -- I mean, since materiality

10   fluctuates every year, a -- you know, if a loan

11   was forgiven, it may or may not, you know --

12   and, look, I would want to consult the guidance

13   around this.

14               It is not something we do -- you

15   know, it is not -- you know, GAAP can be and

16   disclosures can be very specialized so, again,

17   we want to consult the guidance.  But we would

18   see if and what would need to be disclosed if

19   it were deemed immaterial.

20        Q.    Did you and Mr. Dondero sign

21   management representation letters of this type

22   in each year in which you served as Highland's

23   CFO?

24        A.    I -- I -- I will speak for myself.

25   I signed them.  There may have been others that
```

Case 21-03005-sgj Doc 14 Filed 10/20/21 Entered 10/20/21 15:23:38 Page 95 of 897
Case 3:21-cv-00881-X   Document 78-16   Filed 03/09/23   Page 124 of 200   PageID 44068

Page 95

                    WATERHOUSE - 10-19-21

1

2    signed as well.  I don't -- I don't recall.

3         Q.    But to the best of your knowledge,

4    you, personally, signed a management

5    representation letter in connection with

6    Highland's audit each year that you served as

7    the CFO; correct?

8         A.    I would say generally speaking,

9    Mr. Morris.  I don't recall for every single

10   year, you know, generally, but I would want to

11   refer to all the rep letters and see who signed

12   them.

13        Q.    Do you recall Highland having its

14   financial statements audited in any year during

15   the period that you were a CFO where you didn't

16   sign the management representation letter?

17        A.    I don't recall.  But, John, we're

18   going back five, six, seven, eight, nine,

19   decade.  I don't -- I don't remember.

20        Q.    I don't want to go back that many

21   decades, but I'm just asking you if you recall

22   that there was you didn't sign it?

23        A.    I -- I -- I don't, but my memory

24   is -- again, I -- I -- I can't tell you what I

25   did in 2012.  I mean, I think generally, yes,

```
 1                    WATERHOUSE - 10-19-21

 2   but I don't -- I don't know for sure, and I

 3   would want to rely on the document.

 4        Q.    Let me ask the question a little bit

 5   differently then.

 6              Do you have any reason to believe

 7   that Highland had its annual financial audit

 8   and you did not sign a management

 9   representation letter in connection with that

10   audit?

11              MS. DANDENEAU:  Objection to form.

12        A.    I don't believe it would, but,

13   again, I would want to -- I don't recall and I

14   would want to confirm it to -- to make, you

15   know, an affirmative -- to give an affirmative

16   answer.

17        Q.    Do you know whether PwC required

18   management to sign management representation

19   letters?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes.  I mean, it -- management

22   representation letters are signed by

23   management.

24        Q.    Okay.  And do you know -- do you

25   have any understanding as to why PwC requires
```

1                    WATERHOUSE - 10-19-21

2    management to sign management representation

3    letters?

4                MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    I don't know why PwC's -- what PwC's

7    specific practice is.  I know generally what

8    management representation letters are.

9        Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14       A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17       Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20       A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23       Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?

WATERHOUSE - 10-19-21

1

2    A.    That is -- that is -- other than

3  what I said, it is -- it is -- it is required

4  so -- to ensure that the -- you know, there

5  is -- there is completeness in what is being

6  audited.

7    Q.    Did you -- did you have a practice

8  whereby you and Mr. Dondero conferred about the

9  management representation letters before you

10 signed them?

11   A.    No.

12   Q.    Did you have a practice --

13 withdrawn.

14         Do you see just the next sentence

15 after the materiality, there is a sentence that

16 states:  We confirm, to the best of our

17 knowledge and belief, as of June 3rd, 2019, the

18 date of your report, the following

19 representations made to you during your audit.

20         Do you see that sentence?

21   A.    Yes.

22   Q.    Okay.  Did you understand when you

23 signed this letter that you were confirming the

24 representations that followed?

25   A.    When I signed this management

1              WATERHOUSE - 10-19-21

2    letter -- representation letter, yes.

3         Q.     Okay.  Did you discuss this letter

4    with Mr. Dondero before you signed it?

5         A.     I don't recall.

6         Q.     Do you recall if Mr. Dondero asked

7    you any questions before he signed the letter?

8         A.     I don't recall.

9         Q.     Do you recall if you asked

10   Mr. Dondero any questions before you signed

11   this letter?

12        A.     I don't recall.

13        Q.     Is it fair to say that Mr. Dondero

14   did not disclose to you the existence of the

15   agreement that we have -- as we've defined that

16   term prior to the time you signed this letter?

17             MS. DANDENEAU:  Objection to form.

18        A.     I don't think I understand the

19   question.  So, again, you are saying, did

20   Mr. Dondero not disclose to me the existence of

21   this letter?

22        Q.     No, I apologize.

23             Did Mr. Dondero disclose to you the

24   existence of the agreement prior to the time

25   you signed this letter on June 3rd, 2019?

Case 3:21-cv-00881-X  Document 84  Filed 10/29/21  Entered 10/29/21 03:28:18  Page 310 of 397
Case 3:21-cv-00881-X  Document 216  Filed 02/09/24  Page 129 of 200  PageID 44073

Page 100

1                    WATERHOUSE - 10-19-21

2          A.      The agreement -- the agreement that

3     we talked about earlier?

4          Q.      Correct.

5          A.      Look, as I said earlier, the first

6     time I heard of this agreement was sometime

7     this year.

8          Q.      Okay.  Can we turn -- let's just

9     look at a couple of items on the list.  If we

10    can go to page 33416.  Do you see in Number 35

11    it talks about the proper recording or

12    disclosure in the financial statements of ND

13    relationships and transactions with related

14    parties.

15               Do you see that?

16         A.      I do.

17         Q.      As the CFO, do you have any

18    understanding as to whether Dugaboy is a

19    related party?

20         A.      I don't recall.

21         Q.      Do you know whether any of the

22    affiliates are related parties?

23         A.      If -- if it was NexPoint, HCMFA,

24    HCMS, HCRE, yeah, if -- if that is the

25    affiliate definition, and there.  In ASC 850 --

1    WATERHOUSE - 10-19-21

2    again, I mean, I haven't looked at ASC 850 in

3    quite some time, but, you know, if -- if there

4    is a control language, you know, ASC 850, would

5    that -- that section in GAAP would -- would

6    pick up and define what are related parties.

7             So, you know, like I said, if -- one

8    of the four entities I just described, if -- if

9    they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11       Q.   Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15       A.   I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17       Q.   Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20       A.   Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.

1                    WATERHOUSE - 10-19-21

2          Q.    To the best of your knowledge, was

3    the existence of the agreement ever disclosed

4    to PwC?

5          A.    I'm not -- I'm not aware.

6          Q.    Do you recall if the agreement was

7    ever disclosed in Highland's audited financial

8    statements?

9          A.    I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15         Q.    That is all I'm asking for.

16         A.    I'm not aware.

17         Q.    Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23               Do you see that?

24         A.    Yes.

25         Q.    To the best of your knowledge, as of

1               WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6        A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11       Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15       A.    Yes.

16       Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19       A.    Yes.

20       Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24       A.    It is -- it is -- it is just -- it

25   is a typical audit request.

1                    WATERHOUSE - 10-19-21

2          Q.    And do you understand -- do you have

3    an understanding that PwC wanted to know that

4    as of the date of the audit whether any

5    material changes had occurred since the end of

6    the fiscal year, using the definition of

7    materiality that is in this particular

8    management representation letter?

9          A.    It -- it is -- it is -- it is a --

10   it is as described.  It is just a poorly worded

11   question, so it is hard for me to say yes.

12         Q.    If I asked you this, I apologize,

13   but did you ever learn when the agreement was

14   entered into?

15         A.    I don't -- I don't -- like I said

16   before, I don't know or have any details of the

17   agreement.

18         Q.    Okay.  Did you ever ask anybody when

19   the agreement was entered into?

20         A.    I did not.

21         Q.    Let's look at the audited financial

22   statements.  We will put up on the screen a

23   document that has been premarked as Exhibit 34.

24               (Exhibit 34 marked.)

25               MS. DANDENEAU:  And again, if Ms. La

                        WATERHOUSE - 10-19-21

1

2          Canty could please put that in the chat

3          room, that would be great.

4               MR. MORRIS:  I will assure you we

5          will put every document in the chat room.

6          Q.    Now, I'm just going to ask you

7     questions that are related to the provisions of

8     this report that concern the affiliate loans,

9     but again, Mr. Waterhouse, if there is any part

10    of the document that you need to see or that

11    you think you might need to see in order to

12    refresh your recollection to answer any of my

13    questions, will you let me know that?

14         A.    Yes.

15         Q.    Because this is a pretty lengthy

16    document, but do you see that the cover page

17    here is the Highland consolidated financial

18    statements for the period ending December 31st,

19    2018?

20         A.    Yes.

21         Q.    If we can go to -- I think it is the

22    next one, looking for PwC's signature line.

23              MS. CANTY:  I'm sorry, John, did you

24    say something?

25              MR. MORRIS:  Yes, can we turn the

```
 1                    WATERHOUSE - 10-19-21

 2          page.  I think it is 215.  Yes, stop right

 3          there, just above -- I'm sorry, I want to

 4          see just the date of the report.

 5          Q.    Okay.  Do you see at the bottom of

 6   that page there, Mr. Waterhouse,

 7   PricewaterhouseCoopers has signed this audit

 8   report?

 9          A.    Yes, I see their signature.

10          Q.    Okay.  And it is the dated same day

11   as your management representation letter; is

12   that right?

13          A.    It is -- yes, it is the same day.

14          Q.    Was that the practice to sign the

15   management representation letter on the same

16   day that the audit report was signed?

17          A.    Yes, that is typical in every audit.

18          Q.    Can we just scroll down to the

19   balance sheet on the next page.

20                Do you see that there is a line

21   there that says, Notes and Other Amounts Due

22   from Affiliates?

23          A.    Yes.

24          Q.    Does that line, to the best of your

25   knowledge, include the amounts that were due
```

Case 3:21-cv-00881-X   Document 186-4   Filed 01/09/24   Entered 01/09/24 18:14:31   Desc
Case 3:21-cv-00881-X   Document 78-16   Filed 04/09/24   Page 136 of 200   PageID 44080

Page 107

1          WATERHOUSE - 10-19-21

2    under the affiliate under the notes signed by

3    the affiliates and Mr. Dondero?

4          MR. RUKAVINA:  Objection to the

5      extent that calls for a legal conclusion.

6      A.    I mean, I would want to see the

7    detail and the build to this $173,398,000, but,

8    yes, I mean, if -- if -- given what we

9    discussed before, you know, it -- it should

10   capture that.

11     Q.    And -- and while you were the CFO of

12   Highland, were all notes held by Highland that

13   were issued by an affiliate or Mr. Dondero

14   carried as assets on Highland's balance sheets?

15          MS. DANDENEAU:  Objection to form.

16          MS. DEITSCH-PEREZ:  Object to form.

17     A.    I don't -- I don't know how else

18   they would be carried.

19     Q.    Okay.  Can you think of any -- are

20   you aware of any promissory note issued by an

21   affiliate or Mr. Dondero that was not carried

22   on Highland's audited financial balance sheets?

23     A.    I'm -- I'm -- I'm not aware.

24     Q.    Okay.  Are you aware of any category

25   of asset on Highland's balance sheet in which

Case 3:21-cv-00881-X Document 186-4 Filed 10/20/21 Entered 10/20/21 18:12:38 Page 310 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 04/09/24 Page 137 of 200 PageID 44081
Page 108

1                    WATERHOUSE - 10-19-21

2    any of the promissory notes issued by an

3    affiliate or Mr. Dondero would have been

4    included?

5                MS. DANDENEAU:  Objection to form.

6        A.    Sorry, am I aware of any asset of an

7    affiliate being included --

8        Q.    That -- let me -- let me try again.

9                Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12       A.    Yes.

13       Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16       A.    Yes.

17       Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21       A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.

WATERHOUSE - 10-19-21

1                    Now, does that mean absolute?  I

2    don't know.

3        Q.    Do you have any reason to believe

4    that the promissory notes would have been

5    carried on the balance sheet in a category

6    other than Notes and Other Amounts Due from

7    Affiliates?

8        A.    If they were deemed -- no.  If they

9    were deemed an affiliate, you know, under GAAP,

10   they should be carried in that line.

11   Otherwise, it would go into another line.

12       Q.    Okay.  And do you see the total

13   asset base as of December 31st, 2018, was

14   approximately $1.04 billion?

15       A.    Yes.

16       Q.    Is my math correct that the Notes

17   and Other Amounts Due from Affiliates

18   constituted approximately 17 percent of

19   Highland's assets as of the end of 2018?

20       A.    Well, so how are you defining

21   Highland?

22       Q.    Highland Capital Management, L.P.,

23   the entity that this audit is subject to -- or

24   the subject of.

25

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:18:43 Page 11 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 04/09/23 Page 139 of 200 PageID 44083

Page 110

```
 1                    WATERHOUSE - 10-19-21

 2        A.     On a consolidated or unconsolidated

 3   basis?

 4        Q.     I'm looking at the balance sheet.

 5   It is a consolidated balance sheet.  Okay?

 6               Does the Notes and Other Amounts Due

 7   from Affiliates constitute approximately

 8   17 percent of the total assets of Highland

 9   Capital Management, L.P., on a consolidated

10   basis?

11               MS. DANDENEAU:  Objection to form.

12        A.     I don't have a calculator in front

13   of me but I will take your math, if you are

14   taking the 173 divided by the billion.

15        Q.     Okay.

16        A.     If that is accurate, yes.  But,

17   again, on a consolidated basis.

18        Q.     And on an unconsolidated basis the

19   percentage would be higher; correct?

20        A.     I -- no.  I don't know.

21        Q.     Well, okay.  That is fair.

22               MR. MORRIS:  Can we turn to

23        page 241, please.

24        Q.     Do you see that this is a section of

25   the audit report that is entitled Notes and
```

1          WATERHOUSE - 10-19-21

2    Other Amounts Due from Affiliates?

3          A.    Sorry, I can't see the -- the --

4          Q.    It is at the top.

5          A.    Notes and Other Amounts Due from

6    Affiliates, yes, I see that.  I don't -- I

7    don't have a page number, but I'm on a page

8    that says at the top:  Notes and Other Amounts

9    Due from Affiliates.

10         Q.    Okay.  And that is the same title of

11   the line item on the balance sheet that we just

12   looked at; right?  Notes and Other Amounts Due

13   from Affiliates?

14         A.    Yes.

15         Q.    And is it your understanding, based

16   on your experience and knowledge as the CFO,

17   that this is the section of the narrative that

18   ties into the line item that we just looked at?

19         A.    Yes.

20         Q.    And is this section of the audit

21   report intended to describe and disclose all of

22   the material facts concerning the Notes and

23   Other Amounts Due from Affiliates?

24              MS. DANDENEAU:  Objection, form.

25         A.    This -- these notes -- these notes

```
 1                    WATERHOUSE - 10-19-21

 2   of the financial statements are -- the purpose

 3   is to disclose any material items in relation

 4   to that balance sheet line item.

 5        Q.    Okay.  And all of the information,

 6   to the best of your knowledge, that is set

 7   forth in this section of the audit report was

 8   provided by Highland; correct?

 9        A.    Yes, it would have been provided by

10   the corporate accounting team.

11        Q.    Okay.  And the corporate accounting

12   team, did that team report to you in the

13   organizational structure?

14        A.    Yes.

15        Q.    And did you have any concerns about

16   the controls that were in place to make sure

17   that the information provided with respect to

18   Notes and Other Amounts Due from Affiliates was

19   accurate and complete?

20             MS. DANDENEAU:  Objection to form.

21        A.    Not that I recall.

22        Q.    Okay.  Do you recall ever being

23   concerned that any portion of the Notes and

24   Other Amounts Due from Affiliates in any audit

25   report was inaccurate, incomplete, or not
```

Case 3:21-cv-00881-X Document 166-4 Filed 10/20/21 Entered 10/20/21 07:22:18 Page 113 of 397
Case 3:21-cv-00881-X Document 178-16 Filed 01/09/24 Page 142 of 200 PageID 44086

Page 113

                    WATERHOUSE - 10-19-21

1      reliable?

2         A.    I didn't -- I had concerns about,

3   you know, like I talked about before, of there

4   were -- there were potentially issues in the

5   control environment.  But as far as it relates

6   to the audited financial statements, any -- the

7   team would work with the auditors to disclose

8   all -- all notes in Highland's possession.

9              And any -- any notes that were

10  deemed material by the auditor, right, these

11  were disclosed in these -- in this section, you

12  know, in -- in the notes to the consolidated

13  financial statements as you presented.

14        Q.    Do you recall ever having a

15  conversation with anybody at any time

16  concerning the accuracy of the section of audit

17  reports that relates to Notes and Other Amounts

18  Due from Affiliates?

19             MS. DANDENEAU:  Objection to form.

20        A.    You know, as -- as -- I didn't have

21  direct conversations with

22  PricewaterhouseCoopers as I had, you know --

23  I -- I had the team that managed this.

24             Again, I wasn't anywhere chose to

                        WATERHOUSE - 10-19-21

1

2    being the point person of this audit.  And I

3    can't recall, you know, when -- you know, I

4    don't even know if I was ever the point person

5    during my tenure as CFO.

6              I don't know if PwC had any concerns

7    when they were performing those audit

8    procedures.  They may have and they may have --

9    and it may not have been communicated to me.  I

10   don't know.

11             MR. MORRIS:  All right.  I move to

12        strike.

13        Q.   And I'm going to ask you to listen

14   carefully to my question.

15             Did you -- do you recall ever having

16   a conversation with anybody at any time

17   concerning the accuracy of the reporting

18   provided in the audited financial statement on

19   the topic of Notes and Other Amounts Due?

20             MS. DANDENEAU:  Objection to form.

21        A.   I don't recall for this, but that

22   doesn't mean that it didn't exist.

23        Q.   Okay.  But you have no reason to

24   believe, as you sit here right now, that you

25   ever discussed with anybody concerns over the

Case 3:21-cv-00881-X Document 86-4 Filed 10/29/21 Entered 01/20/01 17:22:18 Page 11 Desc 397
Case 3:21-cv-00881-X Document 78-16 Filed 05/09/2899 Page 144 of 200 PageID 44088

Page 115

```
 1                  WATERHOUSE - 10-19-21

 2     accuracy of the section of the audit reports

 3     called Notes and Other Amounts Due from

 4     Affiliates; correct?

 5                  MS. DANDENEAU:  Object to the form.

 6                  MS. DEITSCH-PEREZ:  Objection to

 7          form.

 8          A.    I don't recall having any

 9     conversations.  But, again, I mean, this is --

10     this is two years ago.

11          Q.    I'm just asking for your

12     recollection, sir.

13          A.    Yes.

14          Q.    If you don't recall, this will --

15          A.    Yeah.

16          Q.    (Overspeak) -- if you don't

17     recall --

18          A.    Yeah, I don't -- I don't recall.

19          Q.    Do you know who was responsible for

20     drafting the audit report?

21          A.    Are you asking the actual Highland

22     employee responsible?  I mean, it was

23     Highland's responsibility, so, I mean, that

24     is --

25          Q.    Right.
```

                    WATERHOUSE - 10-19-21

1

2       A.      -- Highland's responsibility.

3   Highland's responsibility.

4       Q.      Who, at Highland, was responsible

5   for drafting this section of the audit report?

6       A.      I -- I don't know the answer to

7   that.  Again, there was a team who worked on

8   this.  And I don't know, you know, whether it

9   was the staff or the manager.

10              Again, this is where I let the teams

11  manage.  And, you know, there may be a

12  corporate accountant who worked on this.  I

13  just -- you know, I wasn't part of that process

14  to give that person experience.  I don't know.

15      Q.      Do you recall having any

16  communications with anybody at any time

17  concerning this section of the report?

18      A.      Yeah, I don't recall.

19      Q.      Do you recall whether you ever told

20  anybody at any time that any aspect of this

21  section of the report was inaccurate or

22  incomplete?

23      A.      I don't recall.

24      Q.      As you sit here today, do you have

25  any reason to believe that this section of the

1                    WATERHOUSE - 10-19-21

2    audit report is incomplete or inaccurate in any

3    way?

4                    And I'm happy to give you a moment

5    to -- to look at it, if you would like.

6                    MS. DANDENEAU:  Objection to form.

7                    MS. DEITSCH-PEREZ:  Same.

8        A.    I mean, I would have to look at -- I

9    would have to look at the bill to the note

10   schedule to make sure I know you presented me

11   with materiality, but again, there might be a

12   note as of 12/31/18 that somehow was -- was

13   under materiality not disclosed.  I don't -- I

14   don't know.  I would need more information.

15       Q.    Okay.  But without more information,

16   you have no reason to believe anything this

17   section is inaccurate; correct?

18                    MS. DANDENEAU:  Objection to form.

19       A.    I don't.  I mean, you know, this was

20   part of the audit.

21       Q.    Thank you.  Now, you will see if we

22   could scroll just a little bit more that each

23   of the first five paragraphs concerns

24   specifically the four affiliates that we've

25   been discussing and Mr. Dondero.

1                    WATERHOUSE - 10-19-21

2                    MR. MORRIS:  If we could go the

3          other way, La Asia.  We don't need Okada.

4          We're going to have to thread the needle.

5          Okay.  Good, perfect.

6          Q.    Do you see those five paragraphs

7     certain the four affiliates and Mr. Dondero as

8     we've been referring to today?

9          A.    Yes.

10         Q.    Okay.  And do you see at the end of

11    every paragraph it states, quote:  A fair value

12    of a partnership's outstanding notes receivable

13    approximates the carrying value of the notes

14    receivable?

15         A.    Yes, I see that.

16         Q.    Do you have an understanding of what

17    that means?

18         A.    Yes.

19         Q.    What is your understanding of that

20    sentence?

21         A.    It is the -- again, the -- the fair

22    value, right, which is -- which is what the --

23    what Highland could sell that asset for.  This

24    statement is comparing the fair value of the

25    notes to the carrying value, so the carrying

```
 1                   WATERHOUSE - 10-19-21

 2   value is the line item that you showed me

 3   earlier that is in Notes and Other Amounts Due

 4   from Affiliates.

 5        Q.    Okay.  Is another way to say this is

 6   that the fair market value of the notes equals

 7   the principal amount and -- withdrawn.

 8             Is the fair way to interpret this

 9   that the fair market value of the notes equals

10   all remaining unpaid principal and interest due

11   under the notes?

12             MS. DANDENEAU:  Object to the form.

13             MS. DEITSCH-PEREZ:  Objection, form.

14        A.    I don't know the answer to that,

15   because I don't recall where -- where any --

16   where -- in what line item was the interest

17   component reported.

18        Q.    All right.  Well, if we look in this

19   audit report, you will see in the middle of the

20   first paragraph, for example, it states that as

21   of December 31st, 2018, total interest and

22   principal due on outstanding promissory notes

23   was approximately $5.3 million.

24             Do you see that?

25        A.    I do.
```

Case 3:21-cv-00881-X   Document 180-4   Filed 10/20/23   Page 312 of 397
Case 3:21-cv-00881-X   Document 78-16   Filed 05/09/23   Page 149 of 200   PageID 44093
Page 120

1              WATERHOUSE - 10-19-21

2         Q.    Is that the carrying value or the

3    fair value?

4         A.    That would be the carrying value --

5         Q.    And is the last --

6         A.    -- in my opinion.

7         Q.    Okay.  And it is in your opinion as

8    the chief financial officer of Highland during

9    the period of time that you described; right?

10   It is an educated opinion?

11        A.    I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13        Q.    Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16              MS. DANDENEAU:  Objection to form.

17              MS. DEITSCH-PEREZ:  Objection, form.

18        A.    Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21        Q.    Correct.

22        A.    If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,

Case 3:21-cv-00881-X Document 864 Filed 10/20/01 Entered 10/20/01 03:28:48 Page 12 Desc 397
Case 3:21-cv-00881-X Document 884-16 Filed 12/09/2899 Page 150 of 200 PageID 44094

Page 121

WATERHOUSE - 10-19-21

1

2  look, I mean, if you -- I mean, if you are

3  saying the 5.3 million is in the notes and

4  other amounts due from affiliates, then the

5  last statement is saying the fair value

6  approximates 5.3 million.  That is what that

7  last sentence is saying.

8       Q.    Do you see in the middle of the

9  first paragraph -- not in the middle, the next

10  to last sentence there is a statement that the

11  partnership will not demand payment on amounts

12  that exceed HCMFA's excess cash availability

13  prior to May 31st, 2021.

14            Do you see that?

15       A.    I do.

16       Q.    Do you know when Highland agreed not

17  to demand payment as described in that

18  sentence?

19       A.    I don't know specifically.

20       Q.    Do you know why Highland agreed not

21  to demand payment on HCMFA's notes until May

22  2021?

23       A.    Yes.

24       Q.    Why was that decision made?

25       A.    You know, well, it -- it -- that

Case 3:21-cv-00881-X Document 186-4 Filed 01/20/23 Page 312 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 02/09/22 Page 151 of 200 PageID 44095
Page 122

WATERHOUSE - 10-19-21

1    decision was made as to not put HCMFA into a

2    position where it didn't have sufficient assets

3    to pay for the demand note.

4        Q.    And at the time the agreement was

5    entered into, pursuant to which the partnership

6    wouldn't demand payment, did HCMFA have

7    insufficient assets to satisfy the notes if a

8    demand had been made?

9            MS. DANDENEAU:  Objection to form.

10       A.    I don't have HCMFA's financial

11   statements in front of me as of 12/31/18.

12       Q.    Was there a concern that HCMFA would

13   be unable to satisfy its demands under the

14   notes if demand was made?

15           MS. DANDENEAU:  Objection to form.

16       A.    Well, there is -- I don't recall --

17   I mean, there is something, right, in place to

18   basically not demand payment until May 31, 2021

19   as detailed here.

20       Q.    And who made the decision to enter

21   into -- who made the decision on behalf of

22   Highland not to demand payment until May 31st,

23   2021?

24       A.    I'm trying to remember.  I don't

1          WATERHOUSE - 10-19-21

2    remember exactly -- I don't remember if it was

3    myself or -- or Jim Dondero who -- who -- there

4    was -- there was something signed, from what I

5    recall, that -- that -- that backed up this

6    line item in the -- in the notes I'm -- look,

7    I'm, I'm --

8         Q.    We will get to that.

9         A.    You --

10        Q.    I'm just --

11        A.    You have -- I mean --

12        Q.    We're going to give that to you.

13   I'm going to give that to you.

14        A.    You -- you -- you have all the

15   documents.  I don't have the documents, and

16   that is what makes it so hard.  I don't have

17   any documents to prepare for this deposition;

18   right?  You have all -- I don't -- I don't -- I

19   don't remember, but, you know, again, it would

20   probably be myself or Jim.

21        Q.    Do you know if Highland received

22   anything in return for its agreement not to

23   make a demand for two years?

24        A.    I don't -- I don't think it referred

25   anything.

```
 1                WATERHOUSE - 10-19-21

 2        Q.    And did you and Mr. Dondero discuss

 3   HCMFA's ability to satisfy the notes if a

 4   demand was made at the time this agreement was

 5   entered into?

 6             MS. DANDENEAU:  Objection to form.

 7        A.    I don't -- I don't -- I don't recall

 8   having a specific conversation, if I did, or --

 9   or David Klos.

10        Q.    Okay.  I'm just asking if you recall

11   any conversations that you had.

12        A.    I don't recall.

13        Q.    Okay.  Do you know why Highland

14   loaned the money to HCMFA that is the subject

15   of the notes described in this paragraph?

16        A.    I don't remember specifically why

17   5.3 million was loaned.  I mean, I -- it would

18   have to be put in the context.

19        Q.    Do you have any recollection at all

20   as to why Highland ever loaned any money to

21   HCMFA?

22        A.    Yes.

23             MS. DANDENEAU:  Objection to form.

24        Q.    What do you remember about that?

25        A.    There was a Highland Global
```

```
 1                 WATERHOUSE - 10-19-21

 2   Allocation Fund, which was a -- a fund managed

 3   by Highland Capital Management Fund Advisors.

 4   There was a -- we -- I'm just telling you,

 5   there was -- there was -- there was a -- a

 6   ultimately a NAV error found in this fund while

 7   it was an open-ended fund and, you know, there

 8   were amounts owed by the advisor in -- in

 9   relation to that NAV error.

10                There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16       Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19       A.    These started back -- I think, I

20   mean --

21       Q.    I apologize.

22       A.    -- that -- I mean, the answer to

23   that is no.

24       Q.    I apologize, the loans that were

25   made in connection with the events that you're
```

Case 3:21-cv-00881-X   Document 180-4   Filed 10/29/21   Entered 10/29/21 17:02:18   Page 312 of 397
Case 3:21-cv-00881-X   Document 78-16   Filed 02/09/23   Page 155 of 200   PageID 44099

Page 126

1              WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3              MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5         A.    I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8         Q.    Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13        A.    This is for NexPoint Advisors?

14        Q.    Yes.

15        A.    I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18        Q.    Do you know why?

19        A.    But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21        Q.    Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24        A.    Yes.

25        Q.    Why did High -- why do you recall --

```
 1                  WATERHOUSE - 10-19-21
 2    what is the reason you recall Highland lending
 3    money to NexPoint?
 4         A.    I mean, I was just -- I just -- I
 5    just recall.  I mean, I just -- I don't
 6    remember why.
 7         Q.    I understand.  And I'm asking you if
 8    you recall --
 9         A.    Oh, why -- I thought you say --
10    NexPoint Advisors was launching a fund which
11    is -- I believe that the legal name is NexPoint
12    Capital, Inc.  And it -- it provided a
13    co-invest into that fund.
14              And, from what I remember, the --
15    the -- that NexPoint borrowed money from
16    Highland at the time to make that co-invest.
17         Q.    So this was an investment that
18    NexPoint was required to make; is that right?
19              MS. DANDENEAU:  Objection to form.
20         A.    I don't know if it was required to
21    make, I don't recall that, or if it just made
22    it.
23         Q.    Okay.  But your recollection is that
24    NexPoint made an investment and they borrowed
25    money from Highland to finance the investment.
```

1              WATERHOUSE - 10-19-21

2              Do I have that right?

3      A.     Yes.

4      Q.     How about HCRE?  Do you know why

5   HCRE borrowed money from Highland?

6      A.     I don't remember specifically.

7      Q.     Do you remember generally?

8      A.     Generally, yeah -- I mean, yes.

9      Q.     Can you tell me your general

10  recollection as to why Highland loaned money to

11  HCRE?

12     A.     For -- for -- for investment

13  purposes.

14     Q.     So HCRE made the investment and it

15  obtained a loan, or loans, from Highland in

16  order to finance that investment or those

17  investments.

18             Do I have that right?

19     A.     I mean, I -- you know, generally.

20     Q.     Okay.  How about Highland Management

21  Services, Inc.?

22             Do you have any recollection as to

23  why HCMS borrowed money from Highland?

24     A.     Generally.

25     Q.     What is your general recollection as

Case 3:21-cv-00881-X Document 186-4 Filed 01/29/21 Entered 01/29/21 Page 312 of 397
Case 3:21-cv-00881-X Document 286-16 Filed 02/09/23 Page 158 of 200 PageID 44102
Page 129

WATERHOUSE - 10-19-21

1

2   to why HCMS borrowed money from Highland?

3        A.     For -- for investment purposes.

4        Q.     So it is the same thing, HCMS wanted

5   to make investments and it borrowed money from

6   Highland in order to finance those investments;

7   is that right?

8        A.     I mean, yes, generally.  I mean, I

9   can't -- I don't -- on the services, there --

10  there are several loans in these schedules.

11  You know, I can't remember why every single one

12  of these were made, but I would say, yeah, I

13  mean, generally.

14       Q.     Okay.  I appreciate that.

15            MR. MORRIS:  Let's go to the page

16       with Bates No. 251.  La Asia, are you

17       there?

18            MS. CANTY:  Sorry, John.  It went

19       out for a minute.  Can you say that again.

20       I don't know what is going on.

21            MR. MORRIS:  The page with Bates

22       No. 251, can we go to that.

23            MS. CANTY:  Yes, sorry.

24            MR. MORRIS:  Keep going to the

25       bottom.  Yeah, there you go.

Case 3:21-cv-00881-X Document 86-4 Filed 10/29/01/05/22 Entered 10/29/01 17:02:28 Page 13 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 02/09/899 Page 159 of 200 PageID 44103
Page 130

1                    WATERHOUSE - 10-19-21

2          Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5          A.    I do.

6          Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11         A.    I mean, it relates to it, but not in

12   its entirety.

13         Q.    Okay.

14               MR. MORRIS:  If we can scroll up to

15         capture the entirety of this section right

16         here.

17         Q.    And what do you mean by that, sir?

18               MR. MORRIS:  Yeah, right there.

19         Perfect.

20         A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25         Q.    Okay.  And -- and would the type of

Case 3:21-cv-00881-X Document 864 Filed 01/29/01/05/22 Entered 01/29/01/05/22 18:13:18 Desc
Case 3:21-cv-00881-X Document 78-16 Filed 06/09/2899 Page 160 of 200 PageID 44104

Page 131

```
                    WATERHOUSE - 10-19-21
 1
 2  subsequent event relating to affiliate loans be
 3  captured in this section if they were -- if
 4  they were made after the end of the fiscal year
 5  and prior to the issuance of the audit report?
 6      A.    Yes, if they were deemed material or
 7  disclosable.
 8      Q.    Okay.  I appreciate that.
 9            Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14      A.    Yes.
15      Q.    And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19      A.    I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22      Q.    Yes.
23      A.    I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically
```

1            WATERHOUSE - 10-19-21

2    if -- you know, what -- if that 7.4 million was

3    solely attributable to the NAV error.

4        Q.    Okay.  But there is no question that

5    Highland told PricewaterhouseCoopers that over

6    the course of 2019 HCMFA issued promissory

7    notes to the partnership in the aggregate

8    amount of $7.4 million; correct?

9        A.    In the course of the audit, we would

10   have produced all promissory notes in our

11   possession, including the ones that are

12   detailed here.

13       Q.    Do you recall that you signed the

14   two promissory notes that are referenced in

15   that provision?

16            MS. DANDENEAU:  Objection to form.

17       A.    I didn't recall initially but I've

18   been reminded.

19       Q.    Okay.  And -- and do you recall that

20   those notes are dated May 2nd and May 3rd,

21   2019?

22       A.    Yes.

23       Q.    So that was just a month before the

24   audit was completed; correct?

25       A.    Yes.  I think we had a June 3rd

Case 3:21-cv-00881-X   Document 88   Filed 10/20/11/2022   Page 133 of 397
Case 3:21-cv-00881-X   Document 78-16   Filed 07/09/24   Page 162 of 200   PageID 44106

Page 133

WATERHOUSE - 10-19-21

1

2  date, right, if -- if my memory serves me

3  right.

4       Q.    Yes, I will represent to you that

5  your memory is accurate in that regard.

6             Did anybody ever instruct you as the

7  CFO to correct this statement that we're

8  looking at in subsequent events?

9       A.    So let me understand.  You're saying

10  when I was CFO at Highland Capital did anyone

11  ever ask me to correct the -- over the course

12  of 2019 through the report date HCMFA issued

13  promissory notes, this statement?

14      Q.    Right.

15      A.    Not that I'm aware.

16      Q.    While you were the CFO of Highland,

17  did anybody ever tell you that that sentence

18  was wrong?

19      A.    Not that I'm aware.

20      Q.    Highland -- withdrawn.

21            HCMFA disclosed these notes in its

22  own audited financial statements; right?

23            MR. RUKAVINA:  Objection, form.

24      A.    I assume that these would be

25  material -- if these are material financial

1          WATERHOUSE - 10-19-21

2    statements, yes, they -- they -- they should be

3    and they were likely disclosed.

4          Q.    Now, there is no statement

5    concerning the 2019 notes about the forbearance

6    that we looked at in the affiliated note

7    section of the report; right?

8              MS. DANDENEAU:  Objection to form.

9          Q.    I'll withdraw.  That was bad.

10             Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15         A.    Yes.

16         Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18         A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21         Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25         A.    Right.  But this is through

```
 1                  WATERHOUSE - 10-19-21

 2    June 3rd.  It could have been done on June 4th.

 3    I don't -- I don't -- I don't recall.

 4         Q.    Okay.

 5              MR. MORRIS:  Can we put up on the

 6         screen the HCMFA audit report.  And while

 7         we're --

 8              MS. DANDENEAU:  What exhibit is

 9         this?

10              MR. MORRIS:  La Asia, what number is

11         that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17         in the chat.

18              MS. DANDENEAU:  Thank you.

19         Q.    Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.    Yes.

23         Q.    As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that
```

                        WATERHOUSE - 10-19-21

1       we looked at earlier for Highland?

2            A.     I would imagine I would have been

3       asked to.  I don't recall if I did.

4            Q.     Do you recall ever being asked by an

5       auditor to sign a management representation

6       letter and then not doing it?

7            A.     No.

8                   MR. MORRIS:  Can we just scroll down

9            again.  I just want to see the date of the

10           document.

11           A.     I mean, let me -- you know, there

12      are different versions to management

13      representation letters I will qualify.

14                  Yes, there are certain -- from time

15      to time auditors can make representations

16      that -- in the rep letter that is being

17      proposed that are inaccurate or out of scope or

18      things like that and they've asked for

19      signature.

20                  In that context, yes.  I mean, you

21      know -- I mean, if I have been asked to sign

22      and make those representations and those

23      representations are invalid, yes, I would not,

24      I mean, I -- I wouldn't sign that.

                        WATERHOUSE - 10-19-21

1

2          Q.     Okay.  PricewaterhouseCoopers served

3     as HCMFA's outside auditors as well; correct?

4          A.     Yes.

5          Q.     Do you see that this audit report is

6     signed on June 3rd, 2019, just like the

7     Highland audit report?

8          A.     That is correct.

9          Q.     And did the process of -- of

10    preparing HCMFA's audit report, was that the

11    same process that Highland followed when it did

12    its audit report at this time?

13         A.     I mean, it is a different entity.

14    There are different assets.  You know, it --

15    it -- it is -- as you saw, Highland's

16    financials are on a consolidated basis.  This

17    is different, so it is under the same control

18    environment and team.

19         Q.     Okay.  I appreciate that.  So the

20    same control environment and team participated

21    in the preparation of the audit for Highland

22    and for HCMFA at around the same time; correct?

23         A.     Yes.

24                MR. MORRIS:  Can we go to page 17 of

25         the report.  I don't have the Bates number.

                    WATERHOUSE - 10-19-21

1

2          Q.     Okay.  Do you see that just like

3    Highland's audited financial report, HCMFA's

4    audited financial report also has a section

5    related to subsequent events?

6          A.     Yes.

7          Q.     And am I reading this correctly that

8    just as Highland had done, HCMFA disclosed in

9    its audited financial report a subsequent event

10   that related to the issuance of promissory

11   notes to Highland in the aggregate amount of

12   $7.4 million in 2019?

13         A.     That is what I see in the report.

14         Q.     And you were the treasurer of HCMFA

15   at the time; right?

16         A.     Yes, to the best of my knowledge.

17         Q.     And did anybody ever tell you prior

18   to the time of the issuance of this audit

19   report that that sentence relating to HCMFA's

20   2019 notes was inaccurate or wrong in any way?

21         A.     Not that I recall.

22         Q.     As you sit here right now, has

23   anybody ever told you that that sentence is

24   inaccurate or wrong in any way?

25         A.     Not that I recall.

WATERHOUSE - 10-19-21

1

2      Q.     I apologize if I asked you this

3   already, but has anybody ever told you at any

4   time that you are not authorized to sign the

5   promissory notes that are the subject of the

6   sentence we're looking at?

7      A.     Not that I recall.

8      Q.     Did anybody ever tell you at any

9   time that you had made a mistake when you

10  signed the promissory notes that are the

11  subject of this sentence?

12     A.     Say that again.  Did anyone ever say

13  that I made a mistake?

14     Q.     Let me ask the question again.

15            Did anybody ever tell you at any

16  time that you made a mistake when you signed

17  the two promissory notes in Highland's favor on

18  behalf of HCMFA in 2019?

19     A.     Not that I recall.

20            MR. MORRIS:  Let's just look at the

21         promissory notes quickly.  Can we please

22         put up Document Number 1, and so this is in

23         the pile that y'all have.  We'll just go

24         for a few more minutes and we can take our

25         lunch break.

1                    WATERHOUSE - 10-19-21

2        Q.    All right.  So I don't know if you

3    have seen this before, sir.  Do you see that

4    this is a complaint against HCMFA?

5        A.    Yes, I am looking at it on the

6    screen.

7        Q.    Okay.  And have you ever seen this

8    document before?

9        A.    I went through some of these

10   documents with my counsel here yesterday.

11            MR. MORRIS:  All right.  Can we go

12        to Exhibit 1 of this document.

13       Q.    Do you see Exhibit 1 is a

14   $2.4 million promissory note back in 2019?

15       A.    Yeah, I found it in the book.  Yes,

16   I have it here in front of me.

17       Q.    And this is a demand note, right, if

18   you look at Paragraph 2?

19       A.    Yes.

20       Q.    And this is a note where the maker

21   is HCMFA, and Highland is the payee; right?

22       A.    Yes.

23            MR. MORRIS:  And if we can scroll

24        down, can we just see Mr. Waterhouse's

25        signature.

1                    WATERHOUSE - 10-19-21

2        Q.     Is that your signature, sir?

3        A.     Yes, it is.

4        Q.     And did you sign this document on or

5    around May 2nd, 2019?

6        A.     I don't recall specifically signing

7    this, but this is my signature.

8        Q.     Okay.  And do you recall that

9    Highland transferred $2.4 million to HCMFA at

10   or around the time you signed this document?

11       A.     I don't recall specifically.  I

12   would want to, as I sit here today, go back and

13   confirm that, but again, presumably that --

14   that -- that did happen.

15       Q.     You wouldn't have signed this

16   document if you didn't believe that HCMFA

17   either received or was going to receive

18   $2.4 million from Highland; is that fair?

19       A.     I mean, it -- if -- if -- if there

20   wasn't a transfer of value, yeah, I mean, you

21   know, I would have no reason to -- to sign a

22   note.

23       Q.     And -- and Highland wouldn't have

24   given this note to PricewaterhouseCoopers if --

25   withdrawn.

Page 142

1              WATERHOUSE - 10-19-21

2              HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6              MR. RUKAVINA:  Objection, legal

7         conclusion, speculation and form.

8         A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14             MR. MORRIS:  Okay.  Can we go to

15        Exhibit 2.

16             (Exhibit 2 marked.)

17        Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20        A.    Yes.

21        Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23        A.    Yes.

24        Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And if we go to the bottom, can we

4   just confirm that that is your signature?

5        A.    Yes.

6        Q.    And together these notes are the

7   notes that are referred to both in Highland and

8   HCMFA's audited financial reports in the

9   subsequent event sections; correct?

10             MS. DANDENEAU:  Objection to form.

11       A.    They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13       Q.    Okay.  And you were authorized to

14   sign these two notes; correct?

15             MR. RUKAVINA:  Objection, legal

16       conclusion.

17       A.    Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22       Q.    And you believed you were authorized

23   to sign the notes; is that fair?

24       A.    I signed a lot of documents in my

25   capacity, just because it is operational in

1               WATERHOUSE - 10-19-21

2 nature. So, you know, to me this was just

3 another document, to be perfectly honest.

4      Q.     Sir, would you have signed

5 promissory notes with the principal amount of

6 $7.4 million if you didn't believe you were

7 authorized to do so?

8            MS. DANDENEAU: Objection to form.

9      Q.     Are you frozen?

10      A.     No. I'm just -- you know, it is --

11 you know, again, I typically don't sign

12 promissory notes, and I don't recall why I

13 signed these, but -- you know, but I did.

14      Q.     All right. So listen carefully to

15 my question. Would you have ever signed

16 promissory notes with a face amount of

17 $7.4 million without believing that you were

18 authorized to do so?

19      A.     No. I mean, I'm -- I'm putting my

20 signature on there, so no.

21      Q.     Okay. And would you have signed two

22 promissory notes obligating HCMFA to pay

23 Highland $7.4 million without Mr. Dondero's

24 prior knowledge and approval?

25            MS. DEITSCH-PEREZ: Object to the

```
1                    WATERHOUSE - 10-19-21

2        form.

3        A.    You know, from -- from what I recall

4   around these notes, you know, I don't recall

5   specifically Mr. -- Mr. Dondero saying to -- to

6   make this a loan.

7              So my conversation with Mr. Dondero

8   around the culmination of the NAV error as

9   related to TerreStar which was a -- a -- I

10  think it was a year and a half process.  I

11  don't know, it was a multi-month process, very

12  laborious, very difficult.

13             When we got to the end, I had a

14  conversation with Mr. Dondero on where to, you

15  know, basically get the funds to reimburse the

16  fund, and I recall him saying, get the money

17  from Highland.

18       Q.    And so he told you to get the money

19  from Highland; is that right?

20       A.    That is what I recall -- in my

21  conversation with him, that is -- that is what

22  I can recall.

23       Q.    Do you know who drafted these notes?

24       A.    I don't.

25       Q.    Did you ask somebody to draft the
```

Case 3:21-cv-00881-X Document 186 Filed 01/29/11 Entered 01/29/11 03:22:18 Page 314 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 02/09/24 Page 175 of 200 PageID 44119

Page 146

1                    WATERHOUSE - 10-19-21

2    notes?

3        A.    I didn't ask -- I don't specifically

4    ask people to draft notes really.  I mean,

5    again, you know, the legal group at Highland is

6    responsible and has always been responsible for

7    drafting promissory notes.

8        Q.    So based on your -- based on the

9    practice, you believe that somebody from the

10   Highland's legal department would have drafted

11   these notes.  Do I have that right?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.  John, I also asked you for the Word

14        versions of these notes so we could look at

15        the properties, and you have not provided

16        them.  Are you intending to?

17             MR. MORRIS:  No.

18       Q.    Can you answer my question, sir?

19       A.    Again, I --

20             MS. DANDENEAU:  Do you want him to

21        repeat it?

22       A.    Yeah, why don't you repeat it?

23       Q.    Sure.  Mr. Waterhouse, based on the

24   practice that you have described in your

25   understanding, do you believe that these notes

1         WATERHOUSE - 10-19-21

2    would have been drafted by somebody in the

3    legal department?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6    A.    Yes.

7    Q.    Okay.  And do you know who would

8    have instructed -- do you have any knowledge as

9    to who would have instructed the legal

10   department to draft these notes?

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13   A.    It was whoever was working -- I

14   mean, it was likely someone on the team.  I

15   mean, I don't remember exactly on every note or

16   every document, but, again, a lot of these

17   things of this nature -- they're operational in

18   nature -- were handled by the team.

19             The team knows to -- I mean, we

20   don't draft documents.  We're not lawyers.

21   We're not attorneys.  It is not what I do or

22   accountants do.

23             So they are always instructed to go

24   and -- and go to the legal team to get

25   documents like this drafted.  Also, when you go

1          WATERHOUSE - 10-19-21

2    to the legal team, the -- you know, we always

3    loop in compliance.  And compliance -- when you

4    go to the legal team, compliance is part of

5    legal team.  They're made aware of -- of -- of

6    these types of transactions.

7          Q.    And do you believe that you had

8    the -- withdrawn.

9              Did you ever tell Mr. Dondero --

10   (inaudible) -- did you see those?

11         A.    Sorry.

12             MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14         Q.    Did you ever tell Mr. Dondero that

15   you signed these two notes?

16         A.    I don't recall ever -- no, I don't

17   recall having a conversation with him.

18         Q.    Did you ever discuss these two notes

19   with him at any time?

20         A.    The conversation, I recall, was what

21   I described earlier.  And that is the only time

22   I recall ever discussing this.

23         Q.    Okay.  But the corporate accounting

24   group had a copy of this -- of these two notes.

25   And pursuant to the audit process, the

1                 WATERHOUSE - 10-19-21

2 corporate accounting group gave the two notes

3 to PricewaterhouseCoopers in connection with

4 the audit; correct?

5           MS. DANDENEAU: Objection to form.

6      A.     Yes. I mean, that is -- yeah, I

7 mean, they -- unless the legal team can also

8 retain copies of items like this. I mean, I

9 don't know everything that they would retain as

10 well.

11          The legal team would also, if they

12 had documents as part of audits, turn that over

13 to the auditors as well. So it could have been

14 the corporate accounting team. It could be

15 someone on the legal team.

16      Q.     All right. So you didn't -- you

17 didn't draft this note; right?

18      A.     I -- I -- I did not.

19      Q.     But somebody at Highland did; is

20 that fair?

21           MS. DEITSCH-PEREZ: Object to the

22       form.

23      A.     I don't know. I mean, we can go to

24 the legal team. I don't -- I'm not sitting

25 behind someone in legal. Maybe they went to

```
                       WATERHOUSE - 10-19-21
 1
 2    outside counsel.  I have no idea.

 3        Q.    Did you have any reason to believe

 4    you weren't authorized to sign this note,

 5    either of these two notes?

 6        A.    I think I have already answered that

 7    question.

 8        Q.    Okay.  You didn't give these notes

 9    to PricewaterhouseCoopers; correct?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12    PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14    described, somebody in the corporate accounting

15    group would have given these two notes to

16    PricewaterhouseCoopers; correct?

17             MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19    either the corporate accounting team or maybe

20    the legal team.

21             MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23             VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Case 3:21-cv-00881-X Document 786-4 Filed 10/29/21 Entered 10/29/21 08:22:18 Page 315 of 397
Case 3:21-cv-00881-X Document 780-16 Filed 12/09/24 Page 180 of 200 PageID 44124

Page 151

                     WATERHOUSE - 10-19-21

 1

 2                   VIDEOGRAPHER:  We are back on the

 3       record at 1:49 p.m.

 4       Q.     Mr. Waterhouse, did you speak with

 5   anybody during the break about the substance of

 6   this deposition?

 7       A.     I spoke to -- to Deb and Michelle.

 8       Q.     About the substance of the

 9   deposition?

10       A.     Yes.

11       Q.     Can you tell me what you talked

12   about?

13                   MS. DANDENEAU:  No.  We object on

14       the basis of privilege.

15       Q.     Okay.  You are going to follow your

16   counsel's objection here?

17       A.     Yes.

18       Q.     Okay.

19                   MR. MORRIS:  Can we put up on the

20       screen Exhibit 35.

21                   (Exhibit 35 marked.)

22       Q.     Are you able to see that document,

23   sir?

24       A.     Yes.

25       Q.     Have you ever seen an incumbency

1              WATERHOUSE - 10-19-21

2    certificate before?

3         A.    I have.

4         Q.    Do you have a general understanding

5    of what an incumbency certificate is?

6         A.    I have a general understanding.

7         Q.    What is your general understanding?

8         A.    You know, those -- my general

9    understanding is that the incumbency

10   certificate basically lists folks that can --

11   are like authorized signers.

12        Q.    Okay.  And do you see that this is

13   an incumbency certificate for Highland Capital

14   Management Fund Advisors, L.P.?

15        A.    Yes.

16        Q.    Okay.  And if we could scroll down

17   just a little bit, do you see that it's dated

18   effective as of April 11th, 2019?

19        A.    Yes, I see that.

20        Q.    Okay.  And is that your signature in

21   the middle of the signature block?

22        A.    Yes, it is.

23        Q.    And by signing it, did you accept

24   appointment as the treasurer of HCMFA effective

25   as of April 11th, 2019?

```
1              WATERHOUSE - 10-19-21

2        A.     Again, I'm not the legal -- I don't

3   know if this makes me the treasurer or the

4   appointment.  I don't know -- I don't know

5   that, so I don't -- I don't know if that

6   document -- again, I think -- again, I'm not

7   the legal expert.  I think isn't there --

8   aren't there other legal documents that detail

9   who the officers are that could be incorporated

10  or things like that?  Again, I don't want to

11  play armchair attorney here.

12       Q.     I'm not asking you for a legal

13  conclusion.  I'm asking you for your knowledge

14  and understanding.  When you signed this

15  document, did you understand that you were

16  accepting an appointment as the treasurer of

17  HCMFA?

18              MS. DANDENEAU:  Objection to form.

19              MS. DEITSCH-PEREZ:  Objection, form.

20       A.     Again, I don't think this -- that

21  wasn't my understanding.  I don't think this

22  makes -- this document makes me the treasurer.

23       Q.     What do you think this document --

24  why did you sign this document?

25              MS. DEITSCH-PEREZ:  Objection to
```

1         WATERHOUSE - 10-19-21

2    form.

3              MR. MORRIS:  You're objecting to the

4         form of the question when I asked him why

5         did you sign the document?  What is the

6         basis for the objection?

7              MS. DEITSCH-PEREZ:  Because, John, I

8         think that it does call for a legal

9         conclusion other than -- with him saying

10        because somebody told me to sign this

11        document.  But if you want to go there,

12        that is fine.

13             MR. MORRIS:  Okay.

14             MS. DANDENEAU:  I don't think --

15        he's already said he's not a lawyer.

16             MR. MORRIS:  I'll allow the witness

17        to answer this question.

18   Q.    Why did you sign this document, sir?

19   A.    I mean, our -- our legal group would

20   bring by these incumbency certificates from

21   time to time.  I have no idea why they're being

22   updated, and I was asked to sign.

23   Q.    Did you ask anybody, what is this

24   document?

25   A.    No.

Case 3:21-cv-00881-X Document 86-4 Filed 10/29/21 Entered 10/29/21 18:31:15 Desc
Case 3:21-cv-00881-X Document 78-16 Filed 09/30/22 Page 184 of 200 PageID 44128

Page 155

1                    WATERHOUSE - 10-19-21

2          Q.     Did anybody tell you why they needed

3     you to sign the document?

4          A.     Not that I can recall.

5          Q.     You testified earlier that you

6     understood that you served as the acting

7     treasurer for HCMFA; correct?

8          A.     Yes.

9          Q.     How did you become the acting

10    treasurer of HCMFA?

11               MS. DANDENEAU:  Objection to form.

12         A.     I don't -- I don't know the legal --

13    I don't know the legal mechanic of how I became

14    the acting treasurer.

15         Q.     I'm not asking for the legal

16    mechanic.  I'm asking you as the person who

17    is --

18               MS. DANDENEAU:  John, you said --

19               MR. MORRIS:  Stop.

20               MS. DANDENEAU:  -- how did you

21         become the treasurer.  That is --

22               MR. MORRIS:  Please stop.

23               MS. DANDENEAU:  That is a legal

24         question.

25               MR. MORRIS:  I am not asking any

1                    WATERHOUSE - 10-19-21

2          legal questions, to be clear.  I'm asking

3          for this witness' understanding as to how

4          he became the acting treasurer of HCMFA.

5          If he doesn't know, he can say he doesn't

6          know, but this legal stuff is nonsense, and

7          I really object to it.

8          Q.    Sir, I'm asking you a very simple

9    question.

10                 MS. DANDENEAU:  Argumentative.

11         Q.    You testified -- you testified that

12   you became the acting treasurer of HCM --

13   HCMFA; correct?

14         A.    Yes.

15         Q.    How did that happen?

16                 MS. DANDENEAU:  Again, object to

17         form.

18                 MR. MORRIS:  I can't wait to do this

19         in a courtroom.  Good God.

20         Q.    Go ahead, sir.

21         A.    I don't know the exact process of

22   how that happened.

23         Q.    Do you have any idea whether signing

24   this document was part of the process?

25                 MR. MORRIS:  You know what --

Case 3:21-cv-00881-X  Document 186 Filed 10/19/22  Page 315 of 397
Case 3:21-cv-00881-X  Document 16  Filed 01/06/23  Page 186 of 200  PageID 44130

Page 157

1          WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection.

3          MR. MORRIS:  -- withdrawn.  You guys

4   want to do this, I can't wait.  I can't

5   wait.  This is the craziest stuff ever.

6          MS. DANDENEAU:  John, he said he's

7   not a lawyer, and you are asking him for a

8   legal conclusion, and he says he doesn't

9   know, and you persist.

10          MR. MORRIS:  Okay.

11          MS. DANDENEAU:  So you can ask these

12   questions --

13          MR. MORRIS:  Did anyone -- please

14   stop talking.

15          MS. DANDENEAU:  -- at another

16   point -- no, no, no, I'm entitled to talk,

17   too; right?  If you're going to make these

18   accusations as if we're trying to stonewall

19   you, this is not the witness to ask that

20   question.

21          MR. MORRIS:  I can't -- I can't

22   wait -- I can't wait to do this in a

23   courtroom.  I will just leave it at that.

24          MS. DANDENEAU:  That's right, I'm

25   sure you can't.

```
1               WATERHOUSE - 10-19-21

2          Q.    Did anyone ever tell you, sir, that

3     even though you were the acting treasurer of

4     HCMFA, that you were not authorized to sign the

5     two promissory notes that we looked at before

6     lunch?

7          A.    I'm not sure I understand the

8     question.  I wasn't -- I mean, I'm -- I'm the

9     current acting treasurer.

10         Q.    Did anybody ever tell you at any

11    time that even though you were the acting

12    treasurer of HCMFA, that you were not

13    authorized to sign the two promissory notes

14    that we looked at before lunch?

15              MS. DANDENEAU:  Objection to form.

16         A.    Not that I recall.

17         Q.    Did anybody ever tell you at any

18    time that you were not authorized to sign the

19    two promissory notes that we looked at before

20    lunch?

21         A.    Not that I recall.

22         Q.    Did anybody ever tell you at any

23    time that you should not have signed the two

24    promissory notes that we looked at before

25    lunch?
```

Case 3:21-cv-00881-X Document 184-4 Filed 01/09/24 Entered 01/09/24 18:45:15 Desc 397
Case 3:21-cv-00881-X Document 780-16 Filed 09/09/23 Page 188 of 200 PageID 44132

Page 159

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Did you ever tell anybody at any

 4  time that you weren't authorized to sign the

 5  two promissory notes that we looked at before

 6  lunch?

 7        A.    Not that I recall.

 8        Q.    Did you ever tell anybody at any

 9  time that you made a mistake when you signed

10  the two promissory notes that we looked at

11  before lunch?

12        A.    Not that I recall.

13        Q.    As you sit here right now, do you

14  have any reason to believe that you were not

15  authorized to sign the two documents that we

16  looked at before lunch?

17              MS. DANDENEAU:  Objection to form.

18        A.    If -- if this is the -- the valid

19  incumbency certificate, I mean, this does --

20  this does detail who the signers are.

21        Q.    Okay.  And looking at that document,

22  does that give you comfort that you were

23  authorized to sign the two promissory notes

24  that we looked at before lunch?

25              MS. DEITSCH-PEREZ:  Object to the
```

                    WATERHOUSE - 10-19-21

1     form.

2              MS. DANDENEAU:  Objection, form.

3     A.    Yes.

4     Q.    As of October 20th -- withdrawn.

5              I'm trying to take your mind back to

6     a year ago, October 2020.  Do you recall at

7     that time that the boards of the retail funds

8     were making inquiries about obligations that

9     were owed by the advisors to Highland in

10    connection with their 15(c) review?

11             MS. DANDENEAU:  Objection to form.

12    A.    I don't -- I don't recall.

13    Q.    As of October 2020, you had no

14    reason to believe you weren't authorized to

15    sign the two promissory notes that we just

16    looked at; correct?

17             MS. DANDENEAU:  Objection, form.

18             MS. DEITSCH-PEREZ:  Objection to

19       form.

20    A.    I didn't think about it in October

21    of 2020, but I mean --

22    Q.    Did you have any reason to believe

23    at that time that you weren't authorized to

24    sign the two notes that we just looked at?

Case 3:21-cv-00881-X  Document 286-4  Filed 10/29/21  Entered 10/29/21 03:23:18  Page 16 of 397
Case 3:21-cv-00881-X  Document 78-16  Filed 09/09/22  Page 190 of 200  PageID 44134

Page 161

```
 1                 WATERHOUSE - 10-19-21

 2        A.     Not that I'm aware, no.

 3        Q.     Did you have any reason to believe a

 4   year ago that you made a mistake when you

 5   signed those two notes?

 6        A.     Not that I'm aware.

 7        Q.     A year ago you believed that HCMFA

 8   owed Highland the unpaid principal amounts that

 9   were due under those two notes; correct?

10        A.     They're -- they're promissory notes

11   that were -- as you presented, that were --

12   that were executed.  Whether they're valid or

13   if there's other reasons, I didn't -- I don't

14   know.

15        Q.     I'm not asking you whether they're

16   valid or not.  I'm asking you for your state of

17   mind.  A year ago you believed that HCMFA

18   was -- was obligated to pay the unpaid

19   principal amount under the two notes that you

20   signed; correct?

21        A.     Yeah, I'm -- I'm -- yes.

22        Q.     Thank you.  Are you aware -- you're

23   aware that -- that in 2017, NexPoint issued a

24   note in favor of Highland in the approximate

25   amount of $30 million; correct?
```

Page 162

1                 WATERHOUSE - 10-19-21

2      A.    I'm -- I'm -- I'm generally aware.

3      Q.    Okay.  And are you generally aware

4  that from time to time, after the note was

5  issued by NexPoint, that moneys were applied to

6  principal and interest that were due under the

7  NexPoint note?

8      A.    Yes, I'm generally aware.

9      Q.    Okay.  And did anybody ever tell you

10  that the payments that were made against the

11  NexPoint notes were made by mistake?

12      A.    Yes.

13      Q.    And is it the one payment that we

14  talked about earlier today?

15      A.    We talked about a lot of things

16  today.  What payment are we talking about?

17      Q.    Okay.  Who told you that any payment

18  made against the NexPoint note was made by

19  mistake?

20      A.    D.C. Sauter.

21      Q.    When did Mr. Sauter tell you that?

22      A.    I don't -- I don't remember

23  specifically.

24      Q.    Do you remember what payments --

25      A.    Sometime -- sometime this year.

Case 23-03005-sgj Doc 86-4 Filed 10/29/01 Entered 10/29/01 08/22/18 Page 16 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 03/09/2899 Page 192 of 200 PageID 44136

Page 163

                    WATERHOUSE - 10-19-21

1

2        Q.      Sometime in 2021?

3        A.      Yes.

4        Q.      Do you remember what payment he was

5   referring to?

6        A.      It was the -- the payment made in

7   January of 2021 or -- yeah, January of -- of

8   this -- January of 2021.

9        Q.      Okay.  So did anybody ever tell you

10  at any time that any payment that was made

11  against principal --

12       A.      And -- and -- and -- hold on, and it

13  may have been other -- again, it may have been

14  that payment or -- or there may have been what

15  he was explaining, a misapplication of prior

16  payments as well.

17       Q.      Can you -- can you give me any

18  specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20  everything that Mr. Sauter told you about --

21  about errors in relation to payments made

22  against principal and interest due under the

23  NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.

Case 21-03005-sgj Doc 864 Filed 10/29/21 Entered 10/29/21 18:13:16 Desc
Case 3:21-cv-00881-X Document 78-16 Filed 02/09/24 Page 193 of 200 PageID 44137

Page 164

1                    WATERHOUSE - 10-19-21

2        I'm going to object here, and I'm going to

3        instruct the witness not to answer

4        depending on the discussion that you had --

5        Mr. Waterhouse, I'm the lawyer for

6        NexPoint, and as everyone here knows, D.C.

7        Sauter is in-house counsel.

8             So if you and Mr. Sauter were having

9        a factual discussion and him preparing his

10       affidavit, et cetera, then go ahead and

11       answer that.  But if you were having a

12       discussion as to our legal strategy in this

13       lawsuit, or anything having to do with

14       that, then do not answer that.

15            And if you need to talk to either

16       your counsel or me about that, then we need

17       to have that discussion now.

18       A.    Okay.  Yeah, I don't -- I don't

19  really know how to make that distinction, so

20  maybe I need to talk to counsel before I

21  answer, or if I can answer.

22       Q.    Let me just ask you this question:

23  Did -- did you have any conversation with

24  Mr. Sauter about any payment of principal and

25  interest prior to the time that you left

Case 3:21-cv-00881-X Document 86-4 Filed 10/29/21 Entered 01/01/05/22 Page 316 of 397
Case 3:21-cv-00881-X Document 78-16 Filed 03/09/2899 Page 194 of 200 PageID 44138

Page 165

```
1                    WATERHOUSE - 10-19-21

2    Highland's employment, or did it happen after

3    you left Highland's employment?

4         A.    I don't -- I don't recall if -- I

5    don't recall.  I mean, it was sometime in 2021.

6    I don't remember if it was before or after I

7    was let go from Highland.

8         Q.    Okay.  So -- so nobody told you

9    prior to 2021 that any error or mistake was

10   made in the application of payments against

11   principal and interest due on the NexPoint

12   note.  Do I have that right?

13        A.    Yeah, I don't -- I don't recall this

14   being in 2020.

15        Q.    Okay.  And it didn't happen in 2019;

16   correct?

17        A.    I don't recall that happened.

18        Q.    And it didn't happen in 2018;

19   correct?

20        A.    I don't -- I don't recall that

21   happening.

22        Q.    And it didn't happen in 2017;

23   correct?

24        A.    I don't recall.

25        Q.    But -- but you believe the
```

Case 3:23-cv-00385-S Doc 86-4 Filed 10/29/01 Entered 10/29/01 03:23:18 Page 16 of 397
Case 3:21-cv-00881-X   Document 286-16   Filed 10/09/23   Page 195 of 200   PageID 44139

Page 166

```
 1                WATERHOUSE - 10-19-21

 2   conversation took place in 2021.  You just

 3   don't remember if it was before or after you

 4   left Highland's employment.  Do I have that

 5   right?

 6        A.    It was sometime this year.  I

 7   don't -- I don't remember.

 8        Q.    Okay.  Did you report this

 9   conversation to Mr. Seery at any point?

10        A.    I don't believe so.

11        Q.    Did you report this conversation to

12   anybody at DSI at any time?

13        A.    I don't recall.

14        Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16        A.    Yeah, that's right.  I don't recall

17   doing that.

18        Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21        A.    No, I don't -- I don't recall.

22        Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25        A.    I don't recall.
```

Case 3:21-cv-00881-X Document 88-4 Filed 10/28/21 Entered 10/28/21 18:16:16 Desc
Case 3:21-cv-00881-X Document 176 Filed 03/09/23 Page 196 of 200 PageID 44140

Page 167

1                    WATERHOUSE - 10-19-21

2          Q.    Did you tell any of the employees at

3    Highland before you left Highland's employment

4    about this call that you had with Mr. Sauter?

5               MS. DANDENEAU:  Objection to form.

6          A.    No, I don't -- no, I don't recall.

7          Q.    NexPoint -- to the best of your

8    knowledge, did NexPoint ever file a proof of

9    claim against Highland to try to recover moneys

10   that were mistakenly paid against the principal

11   and interest due under the note?

12         A.    Okay.  Hold on.  You are saying did

13   NexPoint Advisors file a proof of claim to

14   Highland for errors related to payments under

15   the NexPoint note to Highland?

16         Q.    Correct.

17         A.    I'm -- I'm -- I'm not -- I'm not

18   aware.

19         Q.    Are you aware --

20         A.    I'm not the legal person here, I

21   don't know.

22         Q.    I'm just asking for your knowledge,

23   sir.

24         A.    Yeah, I don't know.  I'm not aware.

25         Q.    Are you aware of any claim of any

Case 3:21-cv-00881-X   Document 786-4   Filed 10/29/01   Page 310 of 397
Case 3:21-cv-00881-X   Document 786-16   Filed 01/09/24   Page 197 of 200   PageID 44141

Page 168

1                    WATERHOUSE - 10-19-21

2     kind that NexPoint has ever made to try to

3     recover the amounts that it contends were -- or

4     that Mr. Sauter contend were mistakenly applied

5     against principal and interest due under the

6     NexPoint note?

7          A.    I'm not aware.

8                MS. DANDENEAU:  Objection to form.

9          Q.    Okay.  The advisors' agreements with

10    the retail funds are subject to annual renewal;

11    correct?

12         A.    Yes.

13         Q.    And do you participate in the

14    renewal process each year?

15         A.    Yes.

16         Q.    What role do you play in the renewal

17    process?

18         A.    I'm -- I'm asked by the retail board

19    to walk-through the advisors financials.

20         Q.    And do you do that in the context of

21    a board meeting?

22         A.    Yes, it is -- yes, it is typically

23    done in a board meeting.

24         Q.    And do you recall the time --

25    does -- does the renewal process happen around

Case 3:21-cv-00881-X   Document 304   Filed 10/29/21   Entered 10/29/21 23:18:31   Page 169 of 397
Case 3:21-cv-00881-X   Document 78-16   Filed 01/09/24   Page 198 of 200   PageID 44142

Page 169

 1                    WATERHOUSE - 10-19-21

 2    the same time each year?

 3         A.    Yes, it is -- it is around the same

 4    time every year.

 5         Q.    And what -- what time period of the

 6    year does the renewal process occur?

 7         A.    Approximately the September

 8    timeframe.

 9         Q.    During that process, in your

10    experience, does the board typically conduct

11    its own diligence and ask for information?

12         A.    Does the board ask for lots of -- I

13    mean, just -- I mean, lots of information as a

14    part of that -- that -- as part of that board

15    meeting and that process.

16         Q.    Okay.  And do you recall that the

17    process in 2020 spilled into October?

18         A.    Yes.  Yes.

19         Q.    Okay.  And as part of the process in

20    2020, the retail board asked -- asked what are

21    referred to as 15(c) questions; right?

22         A.    I guess I don't want to be -- they

23    asked 15(c) -- are you saying they asked 15(c)

24    questions and this is why it went into October

25    or --

WATERHOUSE - 10-19-21

1

2          Q.    No, I apologize.

3                Do you have an understanding of

4   what -- of what 15(c) refers to in the context

5   of the annual renewal process?

6          A.    Yes, generally.

7          Q.    All right.  What is your general

8   understanding of the term "15(c)" in the

9   context of the annual renewal process?

10         A.    I -- I think 15(c) is the section

11  that -- that -- you know, that -- that the

12  board has to evaluate every year, the retail

13  board.  They have to, you know, go through,

14  evaluate, and go through that approval process

15  on a yearly basis.

16         Q.    Okay.

17               MR. MORRIS:  Can we put up on the

18         screen Exhibit 36, please.

19               (Exhibit 36 marked.)

20               MR. MORRIS:  I guess let's just

21         start at the bottom so Mr. Waterhouse can

22         see what is here.

23         Q.    You see this begins with an email

24  from Blank Rome to a number of people.

25               MR. MORRIS:  And if we can scroll

                    WATERHOUSE - 10-19-21

1       up -- keep going just a little bit.

2       Q.    You will see that there is an email

3   from Lauren Thedford to Thomas Surgent and

4   others where she reports that she was attaching

5   and reproducing below additional 15(c)

6   follow-up questions from the board.

7              Do you see that?

8       A.    Yes.

9       Q.    And do you see Question No. 2 asks

10  whether there are any material outstanding

11  amounts currently payable or due in the future

12  (e.g., notes) to HCMLP by HCMFA or NexPoint

13  Advisors or any other affiliate that provides

14  services to the funds?

15             Do you see that?

16      A.    Yes.

17      Q.    And -- and did you -- do you recall

18  that in -- in October of 2020 the retail boards

19  were asking for that information?

20      A.    I don't recall it, but there --

21  they're obviously asking in this email.

22      Q.    Okay.

23             MR. MORRIS:  Can we scroll up a

24             little bit, please.