1           WATERHOUSE - 10-19-21

2      Q.     And then do you see that

3   Ms. Thedford includes you on the email string

4   on Tuesday, October 6th, at 5:52?

5      A.     Yes.

6      Q.     And she asks you and Dave Klos and

7   Kristin Hendrix for advice on that particular

8   Request No. 2 that I have just read; right?

9      A.     Yes.

10      Q.     Okay.  Can you tell me who

11   Ms. Thedford is?

12      A.     She was an attorney that was in the

13   legal group.

14      Q.     At Highland Capital Management,

15   L.P.?

16      A.     I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19      Q.     Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22      A.     Yes.

23      Q.     And -- okay.

24           Do you know whether Ms. Thedford

25   held any positions in relation to the retail

```
 1                  WATERHOUSE - 10-19-21

 2    funds as we defined that term?

 3         A.    Yes.

 4         Q.    What is your understanding of the

 5    positions that Ms. Thedford held at the retail

 6    funds?

 7         A.    I -- I recall her being an officer.

 8    I don't recall her title.

 9         Q.    Okay.  Is she still an officer at

10    any of the retail funds today?

11         A.    No.

12         Q.    Do you know when she ceased to be an

13    officer of the retail funds?

14         A.    Approximately.

15         Q.    And when did she approximately cease

16    to be an officer of the retail funds?

17         A.    It was in -- it was in early of

18    2021.

19         Q.    Okay.  Do you know when she became

20    an officer of the retail funds?

21         A.    I don't recall.

22         Q.    To the best of your recollection,

23    was she an officer of the retail funds in

24    October of 2020?

25         A.    I believe so.
```

```
                    WATERHOUSE - 10-19-21
 1

 2       Q.    Okay.  Do you know what title she

 3  held in her capacity as an officer, if any?

 4       A.    I told you I don't remember.

 5       Q.    Okay.  So she sends this email to

 6  you at 5:52 p.m. on October 6th.

 7             And if we can scroll up to the

 8  response, you responded a minute later with a

 9  one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13  response to the retail board's Question No. 2,

14  right, whether there are any material

15  outstanding amounts currently payable or due in

16  the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19       see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21  few minutes later and she asks whether you

22  could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you
```

1                   WATERHOUSE - 10-19-21

2    refer her to the balance sheet that was

3    provided to the board as part of the 15(c)

4    materials.

5               Do you see that?

6         A.    Yes.

7         Q.    And -- and did the advisors provide

8    to the board certain balance sheets in 2020 in

9    connection with the 15(c) review?

10        A.    Yes, they did.

11        Q.    Okay.  And were the amounts that

12   were outstanding or that were to be due in the

13   future by the advisors to Highland included in

14   the liability section of the balance sheet that

15   was given to the retail board?

16        A.    Yes.  Notes would be reflected as

17   liabilities.

18        Q.    Okay.  And --

19        A.    If I'm understanding your question

20   correctly.

21        Q.    You are.  And -- and -- and those

22   liabilities you -- you were -- you believed

23   were responsive to the retail board's question;

24   correct?

25        A.    Yes.

WATERHOUSE - 10-19-21

1

2     Q.    Okay.  And then if we can scroll up,

3  you see Ms. Thedford responds to you

4  nine minutes later with a draft response.

5          Do you see that?

6     A.    Yes.

7     Q.    And she says that she is taking from

8  the 6/30 financials certain information about

9  amounts that were due to HCMLP and affiliates

10  as of June 30th, 2020.

11          Do you see that?

12     A.    I do.

13     Q.    Okay.  And did you believe, as the

14  treasurer of NexPoint and HCMFA and as the CFO

15  of Highland, that the information that

16  Ms. Thedford obtained from the 6/30 financials

17  was accurate and responsive in relation to the

18  retail fund board's question?

19     A.    I just want to make sure I

20  understand the question.

21          Are you saying that the financial

22  information provided to the retail board as

23  part of the 15(c) process, which included

24  financial statements as of June 30th of 2021,

25  did I feel like those were responsive to their

Case 3:21-cv-00881-X   Document 86-4 Filed 10/29/21   Entered 01/20/22 18:18:37   Desc
Case 3:21-cv-00881-X   Document 178-17   Filed 01/09/24   Page 6 of 200   PageID 44150

Page 177

```
 1                  WATERHOUSE - 10-19-21

 2      questions?

 3           Q.    Yes.

 4           A.    Yes.

 5           Q.    Thank you.

 6                 MS. DEITSCH-PEREZ:  John, it is not

 7           in the chat yet.  Can you just make sure it

 8           gets put in there.

 9                 MR. MORRIS:  Sure.

10                 MS. CANTY:  I put it in there.  I

11           think maybe I just sent it directly, so let

12           me make sure it says to everyone.  But I

13           did put it in there.  I will try again.

14                 MR. MORRIS:  Thank you, La Asia.

15                 MS. DANDENEAU:  What number is it.

16                 MR. MORRIS:  What, the Bates number?

17                 MS. DEITSCH-PEREZ:  No, the --

18           this -- yeah, 36 is not in the chat.

19                 MR. MORRIS:  Okay.  We'll get it.

20                 MS. DANDENEAU:  I think that

21           Ms. Canty just sent it to me originally.

22           Sorry.

23                 MR. MORRIS:  Okay.  We will get it

24           there.

25                 MS. CANTY:  Okay.  It is there now
```

```
 1                    WATERHOUSE - 10-19-21

 2          for everyone.

 3               MS. DEITSCH-PEREZ:  Got it.  Thank

 4          you.

 5          Q.    Do you recall if the proposed

 6     response that Ms. Thedford crafted was

 7     delivered to the retail board with the -- with

 8     the yellow dates having been completed?

 9          A.    I don't know.

10               MR. MORRIS:  Davor, I'm going to ask

11          that the advisors and -- the advisors of

12          both HCMFA and NexPoint produce to me any

13          report that was given to the retail board

14          concerning the promissory notes at issue,

15          including the obligations under the notes.

16          Q.    Do you know -- do you know if

17     ultimately NexPoint informed the retail board

18     in response to its question that NexPoint owed

19     Highland approximately 23 or $24 million?

20               MS. DANDENEAU:  Objection to the

21          form.

22          A.    Sorry, are you asking, did NexPoint

23     tell the retail board that it owed Highland?

24          Q.    Let me ask a better question,

25     Mr. Waterhouse.
```

                        WATERHOUSE - 10-19-21

1

2              Did -- do you know if anybody ever

3  answered the retail board's question that was

4  Number 2?

5       A.    I don't -- I can't say for sure.

6       Q.    Okay.  Do you recall -- I think you

7  testified earlier that you walked through the

8  advisors' financials with the retail board;

9  correct?

10      A.    Yes.

11      Q.    And as part of that process, did you

12 disclose to the retail board the obligations

13 that NexPoint and HCMFA had to Highland under

14 promissory notes?

15      A.    The retail board, as I stated

16 earlier, receives financial information,

17 balance sheet, income statement information

18 from the advisors.  That information is

19 provided to the retail board in connection with

20 the 15(c) process.

21              So any notes between the advisors

22 and the Highland would be -- anything would be

23 detailed in those financial statements.

24      Q.    Do you recall in 2020 ever speaking

25 with the retail board about the advisors'

                    WATERHOUSE - 10-19-21

2    obligations under the notes to Highland?

3              MS. DANDENEAU:  Objection to form.

4              MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    I don't recall specifically.

7        Q.    Do you have any general recollection

8    of discussing with the retail board the

9    advisors' obligations to Highland under the

10   notes that they issued?

11             MS. DANDENEAU:  Object to the form.

12             MS. DEITSCH-PEREZ:  Object to the

13       form.

14       A.    I just recall generally just -- it

15   is just -- I present the financial statements,

16   and if they have questions, I answer their

17   questions and walk them through.

18             I don't recall what they asked.  I

19   don't recall where the discussion went.  I

20   don't recall anything of that nature.

21       Q.    Okay.  Do you know if anybody on

22   behalf of HCMF -- HCMFA ever told the retail

23   board that HCMFA had no obligations under the

24   two 2019 notes that you signed?  Withdrawn.

25             Do you know whether anybody on

1                    WATERHOUSE - 10-19-21

2     behalf of HCMFA ever told the retail boards

3     that you weren't authorized to sign either of

4     the two 2019 notes?

5                    MS. DANDENEAU:  Objection to form.

6          A.    I'm not aware.

7          Q.    Are you aware of anybody on behalf

8     of HCMFA ever telling the retail boards that

9     your execution of the two 2019 notes was a

10    mistake?

11                   MS. DANDENEAU:  Objection to form.

12         A.    I'm not aware.

13         Q.    Are you aware of anybody on behalf

14    of HCMFA ever telling the retail boards that

15    HCMFA did not have to pay the amounts reflected

16    in the two notes that you signed in 2019?

17         A.    I'm not aware.

18         Q.    Do you know whether anybody ever

19    told the retail boards -- withdrawn.

20                   Do you know whether anybody ever

21    told the retail boards that Highland has

22    commenced a lawsuit to recover on the two notes

23    that you signed in 2019?

24         A.    I'm not aware.

25         Q.    Are you aware of anybody informing

WATERHOUSE - 10-19-21

1
2    the retail boards that Highland has sued to

3    recover on the NexPoint note?

4        A.    I'm not aware.

5        Q.    Do you know whether anybody ever

6    told the retail board that Highland had

7    declared a default with respect to the two

8    HCMFA notes that you signed in 2019?

9        A.    I'm not aware.

10       Q.    Are you aware of anybody ever

11   informing the retail boards that Highland had

12   declared a default under the NexPoint note?

13       A.    I'm not aware.

14       Q.    Are you aware of anybody telling the

15   retail board that Highland made a demand for

16   payment under the 2019 notes that you signed on

17   behalf of HCMFA?

18       A.    I'm not aware.

19       Q.    Let's -- let's see if there is a

20   response to Ms. Thedford's email, if we can

21   scroll up.

22            Do you see you responded to

23   Ms. Thedford five minutes after she provided

24   the draft response to you?

25       A.    Yes.

```
1              WATERHOUSE - 10-19-21

2       Q.    Okay.  And do you see that Dustin

3   Norris is copied on this email?

4       A.    Yes, he is.

5       Q.    Great.  Do you know whether

6   Mr. Norris held any positions at either of the

7   advisors as of October 6, 2020?

8       A.    I will go back to -- I'm not the

9   legal expert of what appoints you or how or

10  why, but you did see Dustin's name on the

11  incumbency certificate that you produced

12  earlier.

13      Q.    Do you know what his title was in

14  October of 2020?

15            MS. DANDENEAU:  Objection to form.

16      A.    I don't -- I don't recall.

17      Q.    Was he -- did he have a title with

18  each of the advisors, to the best of your

19  recollection?

20      A.    I don't recall.

21      Q.    Do you know why he is included on

22  this email string?

23      A.    I didn't add Dustin.  It looks like

24  Lauren did.  I don't know why she added him or

25  not.  You would have to ask her.
```

1      WATERHOUSE - 10-19-21

2      Q.   Does Mr. Norris play a role in

3  formulating the advisors' responses to the

4  questions asked by the retail board in

5  connection with the 15(c) annual review?

6           MS. DANDENEAU:  Objection to form.

7      A.   He -- Dustin Norris is there in the

8  board meetings.  But -- so he has a role, yes.

9      Q.   Okay.  And does Mr. Norris hold any

10  positions, to the best of your knowledge, in

11  relation to any of the retail funds?

12      A.   I don't -- I don't believe he does.

13      Q.   How about Mr. Post, do you know

14  whether Mr. Post holds any position in either

15  of the advisors?

16      A.   I mean, he -- he -- yes.

17      Q.   What is your understanding of the

18  positions that Mr. Post holds in relation to

19  the advisors?

20           MS. DANDENEAU:  Objection to form.

21      A.   He is an employee of NexPoint

22  Advisors.  He is also the chief compliance

23  officer for -- for NexPoint.

24      Q.   Who is the chief compliance officer

25  for HCMFA, if you know?

1                WATERHOUSE - 10-19-21

2                MS. DANDENEAU:  Objection to form.

3        A.    That would be Jason as well.

4        Q.    Okay.  Now, looking at your

5  response, you noted initially that nothing was

6  owed under shared services.  Do I have that

7  right in substance?

8        A.    Yeah.  I think I'm being responsive

9  to Lauren's question here, whether any of the

10 shared service invoices are outstanding.

11       Q.    Right.

12       A.    Yes.

13       Q.    And that is because -- and that is

14 because the retail the retail board has asked

15 for the disclosure of all material obligations

16 that were owed to HCMLP either then or in the

17 future; isn't that right?

18                MS. DANDENEAU:  Objection to form.

19       Q.    We can go back down and look.

20       A.    Look, I don't know if that's a

21 material item, I mean, again, but sure.

22       Q.    Okay.  But there were no shared

23 services outstanding; correct?

24                MS. DANDENEAU:  Objection to form.

25       A.    That is what this email seems to

1                    WATERHOUSE - 10-19-21

2     indicate.

3          Q.    And you wouldn't have written it if

4     you didn't believe it to be true at the time;

5     correct?

6          A.    Correct.

7          Q.    And when you referred to shared

8     services outstanding, what you meant there was

9     that neither NexPoint nor HCMFA owed Highland

10    any money under the shared services agreements

11    that they had with Highland as of October 6th,

12    2020; right?

13         A.    I don't know if it is as of October

14    6, 2020 or if it was from -- like through the

15    financials -- through the date of the

16    financials as of June 30.

17         Q.    Okay.  And then you noted that

18    HCMA -- the HCMFA note is a demand note; right?

19         A.    Yes.

20         Q.    And then you referred Ms. Thedford

21    to Kristin Hendrix for the term of the NexPoint

22    note.  Do I have that right?

23         A.    Yes.

24         Q.    And then you refer to that agreement

25    that is referenced in the 2018 audited

1          WATERHOUSE - 10-19-21

2     financials about Highland's agreement not to

3     make demand upon HCMFA until May 2021; correct?

4          A.    Correct.

5          Q.    And then -- and then the next thing

6     you write is that the attorneys think that BK

7     doesn't change that, but don't know for sure at

8     the end of the day.

9               Do you see that sentence?

10         A.    Yes.

11         Q.    Which attorneys were you referring

12    to?

13         A.    I don't remember.

14         Q.    Did you have a conversation with

15    attorneys concerning whether the bankruptcy

16    would change or alter in any way the agreement

17    not to make a demand under the HCMFA note?

18         A.    Look, yeah, I mean, I don't

19    specifically remember, but generally, I mean,

20    it is in this email.  I don't -- I don't -- I

21    don't -- I don't remember who I talked to or,

22    you know, was it inside counsel, outside

23    counsel, but obviously I talked to somebody.

24         Q.    Do you have any recollection --

25         A.    Well, I don't even know if it's --

1       WATERHOUSE - 10-19-21

2   actually, it may not even have been me.  I say

3   the attorneys in, you know, a lot of -- like I

4   talked about the team.

5           It could have been someone on the

6   team, like, hey, we need to run this down, and

7   maybe they talked to attorneys again and

8   relayed that information to me.

9           So I really don't know if I spoke or

10  someone else did or -- or, I mean, and maybe it

11  wasn't even from corporate accounting.  Maybe

12  it was, you know, other -- I'm kind of

13  summarizing, you know, again, so I don't really

14  know -- I can't really say for sure.  I don't

15  remember how I came about of this knowledge.

16      Q.    I appreciate your efforts,

17  Mr. Waterhouse, but I will just tell you that

18  if I ask a question and you don't know the

19  answer or you don't recall, I'm happy to accept

20  that.  I don't -- I don't want you to

21  speculate, so I want to be clear about that.

22  So I appreciate it.

23          Let me just ask you simply:  Do you

24  know what attorneys -- can you identify any of

25  the attorneys who thought that the bankruptcy

```
 1                 WATERHOUSE - 10-19-21

 2    process didn't change the agreement?

 3         A.    I don't recall.

 4         Q.    Okay.  Perfect.

 5               And then let's look at the last

 6    sentence.  It says, quote:  The response should

 7    include, as I covered in the board meeting,

 8    that both entities have the full faith and

 9    backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11               Do you see that?

12         A.    Yes.

13         Q.    Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.    Yes.

18         Q.    Do you remember in the context in

19    which you told the retail board that?

20         A.    I mean, generally, yes.

21         Q.    Tell me what you recall.

22         A.    So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show
```

Case 3:21-cv-00881-X Document 184-10 Filed 01/09/24 Entire Document Page 319 of 397
Case 3:21-cv-00881-X Document 1678-17 Filed 02/09/99 Page 19 of 200 PageID 44163
Page 190

```
1                WATERHOUSE - 10-19-21

2    they have liabilities on them that exceed

3    assets.

4                So the retail board has asked, okay,

5    you know, how -- you know, if -- if these

6    liabilities come due or they're payable, you

7    know, how does that come about?

8                And, you know, the response is,

9    well, the advisors have the -- the full faith

10   and backing from -- from Jim Dondero.

11        Q.    And how did you know that the

12   advisors had the full faith and backing from

13   Jim Dondero?  What was the basis for that

14   statement that you made to the retail board?

15        A.    I talked to Jim about it at some

16   point in the past.

17        Q.    And did you tell Mr. Dondero that

18   you were going to inform the retail board that

19   the advisors had his full faith and backing

20   before you actually told that to the retail

21   board?

22        A.    I don't recall having that

23   conversation.

24        Q.    Do you recall if you ever informed

25   Mr. Dondero that you had disclosed or told the
```

1                    WATERHOUSE - 10-19-21

2    retail board that the advisors had the full

3    faith and backing of Mr. -- Mr. Dondero?

4                    MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall discussing that with

7    him at the time.

8         Q.    When you told this to the board, was

9    Mr. Dondero participating in the discussion?

10        A.    Not that I recall.

11        Q.    Withdrawn.  Was it not -- withdrawn.

12                Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17        A.    I believe I was at home.

18        Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22                MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't recall everyone on the call.

25        Q.    Can you identify anybody who was on

```
1                WATERHOUSE - 10-19-21

2    the call?

3         A.    Other than the board members?

4         Q.    Yes.

5         A.    Lauren Thedford.  I mean, there

6    are -- there are many -- my section is just one

7    of many sections that are just -- you know, as

8    you can appreciate, this is a long board

9    meeting.

10             I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.    I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.    I think you asked me this already,

18   John.

19        Q.    Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.    I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.
```

1      WATERHOUSE - 10-19-21

2      Q.    Okay.  Do you know if either of them

3   have a position with the retail board -- with

4   the retail funds?

5      A.    I don't believe Mr. Norris has a

6   position with the retail funds.

7      Q.    All right.  What about Mr. Post?

8      A.    Mr. Post is the CCO of the advisors.

9      Q.    Okay.  Does he hold any position --

10     A.    I don't believe so.

11     Q.    -- with the retail funds?

12     A.    I don't believe so.

13     Q.    Okay.

14     A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18     Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21            MS. DANDENEAU:  Objection to form.

22     A.    It is -- it is -- it is what has

23   been discussed with them prior.

24     Q.    And were you -- were you trying to

25   give them comfort that even though the

```
 1                    WATERHOUSE - 10-19-21

 2    liabilities exceeded the assets that the

 3    advisors would still be able to meet their

 4    obligations as they become due?

 5              MS. DANDENEAU:  Objection to form.

 6              MS. DEITSCH-PEREZ:  Object form.

 7         A.    I -- I can't -- I don't remember

 8    specifically the conversation, but generally --

 9    you know, generally, yes.  And that is why --

10    but, you know, again, in this email saying, you

11    know, I am sure I qualified it with the retail

12    board, you know, as I said I like -- you know,

13    to my knowledge, that hasn't changed.  But,

14    again, generally -- generally that is what I

15    remember.

16         Q.    Okay.  Do you recall if in the

17    advisors' response to the retail board's

18    question if the response included any statement

19    concerning Mr. Dondero and -- and the full

20    faith and backing that he was giving to the

21    advisors?

22              MS. DEITSCH-PEREZ:  Object to the

23         form.

24         A.    I don't -- I don't remember

25    specifically what was provided.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.

 3        A.    And I don't really -- I don't really

 4   remember generally either.

 5        Q.    Okay.

 6              MR. MORRIS:  So -- so, again, I'm

 7        just going to ask Mr. Rukavina if your

 8        clients can produce as soon as possible the

 9        15(c) response, the written response that

10        the advisors made, if any, to the board's

11        Question No. 2.

12              I'm not looking for the whole

13        response, but I certainly want the response

14        to Question No. 2.

15        Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17              Did -- did the assets of --

18   withdrawn.

19              Did the liabilities of HCMFA exceed

20   its assets in 2020?

21              MS. DANDENEAU:  Objection to form.

22              MS. DEITSCH-PEREZ:  Objection, form.

23        A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.
```

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  And did the liabilities of

 3    NexPoint exceed its assets in 2020?

 4              MS. DEITSCH-PEREZ:  Objection to

 5         form.

 6        A.    I don't believe so.

 7        Q.    Okay.  So -- so it was only one of

 8    the two advisors who had liabilities that

 9    exceeded the value of the assets.

10              Do I have that right?

11              MS. DEITSCH-PEREZ:  Objection to

12         form.

13              MS. DANDENEAU:  Form.

14        A.    Yes.

15        Q.    And do you know, ballpark, the

16    amount by which the value of HCMFA's

17    liabilities exceeded their assets in 2020?

18              MS. DANDENEAU:  Objection to form.

19        A.    I don't -- I don't recall.

20              MR. MORRIS:  I had specifically

21         requested in discovery the audited

22         financial reports for both advisors and

23         NexPoint.  I think I may have gotten one

24         for NexPoint but I'm still waiting for the

25         balance.  And I'm going to renew my request
```

```
 1                 WATERHOUSE - 10-19-21

 2          for those documents too.

 3          Q.    Let's go to the next exhibit, which

 4     is Number 10.  So I think it is in your stack,

 5     Mr. Waterhouse.

 6                 MR. MORRIS:  And we can take the one

 7            down from the screen and put up Number 10

 8            for everybody.

 9                 (Exhibit 10 marked.)

10          Q.    And I don't know if you have ever

11     seen this before, but I'm really putting it up

12     on the screen for purposes of turning to the

13     very last page of the document.

14                 So this is a document that we have

15     been -- that we premarked as Exhibit 10.  And

16     we're turning to the last page of the document,

17     which is a document that was filed in the

18     adversary proceeding 21-3004.  And -- no, I

19     apologize, I think we -- right there.  Perfect.

20                 And it is page 31 of 31.

21                 MR. MORRIS:  I think there may have

22            been some something erroneously stapled to

23            the hard copy that I gave you folks, but

24            I'm looking for page 31 of 31 in the

25            document that begins with the first page of
```

```
 1                WATERHOUSE - 10-19-21

 2         Exhibit 10.

 3         Q.    Do you have that, Mr. Waterhouse?

 4         A.    I don't have it yet.  I'm looking.

 5         Q.    All right.  If you look at the top

 6    right-hand corner, you will see it says page

 7    hopefully something of 31?

 8         A.    Yes, I've got it now.

 9         Q.    Okay.  You have got 31 of 31.  You

10    can take a moment to read that, if you would

11    like.

12         A.    (Reviewing document.)  Okay.

13         Q.    Have you ever seen this before?

14         A.    I don't know if I have seen this

15    specific document, but, you know, I've --

16    I'm -- I'm aware of it.

17         Q.    And is this the document that you

18    had in mind when you sent that email to

19    Ms. Thedford that we just looked at where you

20    said that Highland had agreed not to make a

21    demand upon HCMFA until May 2021?

22         A.    Honestly, I don't -- it wasn't this

23    document.  I mean, it's something like this,

24    yes.  I mean, yes.

25         Q.    Well --
```

1          WATERHOUSE - 10-19-21

2     A.    It is something like this, but I

3  don't think it was this specific document.

4     Q.    Well, but this document does say in

5  the last sentence that Highland agreed not to

6  seek -- not to demand payment from HCMFA prior

7  to May 31, 2021; right?

8     A.    Yes.

9     Q.    And are you aware of any other

10 document that was ever created pursuant to

11 which Highland agreed not to demand payment on

12 amounts owed by HCMFA before May 31, 2021?

13    A.    Hold on.  Are you asking, am I aware

14 of a document that by HCMFA that basically says

15 otherwise?

16    Q.    No.  Let me try again.

17          Are you aware of any other document

18 pursuant to which -- pursuant to which Highland

19 agreed not to make a demand on HCMFA until May

20 31st, 2021?

21    A.    I'm -- I think there was something

22 in connection with -- with the -- with the

23 audit that basically says the same thing.

24    Q.    Okay.  And do you think that the

25 audit is referring to this particular document?

1                    WATERHOUSE - 10-19-21

2          A.    I don't know.

3          Q.    All right.  This document is dated

4     April 15, 2019.  Do you see that?

5          A.    I do.

6          Q.    And do you remember that the audit

7     was completed on June 3rd, 2019?

8          A.    Yes.

9          Q.    And do you recall that the audited

10    financials -- and I'm happy to pull them up if

11    you would like, but do you recall that the

12    audited financials included a reference to the

13    agreement pursuant to which Highland agreed not

14    to make a demand until May 31st, 2021?

15         A.    Yes, I remember.

16         Q.    And as part of the process, would

17    you have expected the corporate accounting team

18    to have provided a copy of this document to

19    PwC?

20              MS. DANDENEAU:  Objection to form.

21         A.    Yes, I would have expected something

22    like this, or again, you know, some document

23    that basically states -- states the deferral

24    till May 31 of 2020.

25         Q.    Okay.

WATERHOUSE - 10-19-21

1

2    A.    May 31 of 2021, excuse me.

3    Q.    And this document states the

4  deferral that you just described; correct?

5    A.    It does.

6    Q.    And this document states the

7  deferral that was described in the audited

8  financial statements that we looked at before;

9  correct?

10    A.    It does.

11          MR. MORRIS:  Okay.  Can we scroll

12        down just a little bit to see who signed on

13        behalf of the acknowledgment there.

14    Q.    Okay.  So Mr. Dondero signed this

15  document on behalf of both HCMFA and Highland;

16  do you see that?

17    A.    I do.

18    Q.    Okay.  Did you discuss this document

19  or the -- withdrawn.

20          Did you discuss the concept of the

21  deferral with Mr. Dondero in the spring of

22  2019?

23    A.    I think I testified I don't recall.

24    Q.    Okay.  Do you know whose idea it was

25  to issue the acknowledgment in this form?

1                    WATERHOUSE - 10-19-21

2       A.    I don't recall.

3            MR. MORRIS:  Can we scroll back up

4       to the document, please.

5       Q.    Do you see in the beginning it says,

6  reference is made to certain outstanding

7  amounts loaned from Highland to HCMFA for

8  funding ongoing operations.

9            Do you see that?

10      A.    Yes.

11      Q.    And were you aware as the CFO of

12  Highland and as the treasurer of HCMFA that as

13  of April 15, 2019, Highland had made certain

14  loans to HCMFA to fund HCMFA's ongoing

15  operations?

16      A.    Yes.

17      Q.    And were you aware that those loans

18  were payable on demand and remained outstanding

19  as of December 31st, 2018?

20      A.    Yes.

21      Q.    And were you aware that those

22  amounts were payable on demand, and they

23  remained outstanding as of April 15, 2019?

24            MS. DEITSCH-PEREZ:  Object to the

25      form.

```
 1                   WATERHOUSE - 10-19-21

 2        A.    Well, this -- this document dated

 3   April 15, 2019 says they have been deferred to

 4   May 31, 2021.

 5        Q.    Right.  But I'm just sticking to the

 6   first paragraph where they refer to the

 7   outstanding amounts.  And in the end it says

 8   the -- it remained outstanding on December

 9   31st, 2018, and I think you told me that you

10   understood that, and then I'm just trying to

11   capture the last piece of it.

12             Did you understand that there were

13   amounts outstanding from the loan that Highland

14   made to HCMFA to fund ongoing operations as of

15   April 15th, 2019?

16        A.    Yes.

17        Q.    Thank you.  Let's look at the next

18   sentence.  HCMFA expects that it may be unable

19   to repay such amounts should they become due

20   for the period commencing today and continuing

21   through May 31st, 2021.

22             Do you see that?

23             MS. DANDENEAU:  Objection to form.

24        A.    I do.

25        Q.    As the CFO -- withdrawn.
```

WATERHOUSE - 10-19-21

1
2          As the treasurer of HCMFA, did you

3    believe that -- do you believe that statement

4    was true and accurate at the time it was

5    rendered?

6        A.    I mean, it -- it -- the answer to

7    that is I really didn't have any -- I didn't

8    have an opinion really.

9        Q.    Did you do anything to educate

10   yourself in April of 2019 on the issue of

11   whether HCMFA could repay the amounts that it

12   owed to Highland should they become due?

13       A.    I don't believe so.

14       Q.    Did you at any time form any

15   opinions as to HCMFA's ability to repay all

16   amounts due to Highland should they become due?

17       A.    Not really.  I guess I don't...

18       Q.    Well, you told the retail board that

19   HCMFA's liabilities exceeded their assets in

20   2020; correct?

21       A.    Yes.

22       Q.    Based on the work that you did to

23   prepare for the retail board, did you form any

24   view as to whether HCMFA would be unable to

25   repay the amounts that it owed to Highland

                    WATERHOUSE - 10-19-21

1    should they become due?

2            MS. DANDENEAU:  Objection to form.

3    A.    I mean, I -- when you look at that,

4    to answer you, completely, you know, again,

5    if -- the response I gave the retail board was,

6    you know, the -- the advice -- HCMFA advisors

7    have the -- have the full faith and backing of

8    Jim Dondero.  So I didn't form an opinion of

9    whether the advisor could pay it or not.

10   Q.    Did you form any view as to whether

11   the advisors could repay the amounts that it

12   owed to Highland should they become due without

13   the full faith and backing of Mr. Dondero?

14           MS. DANDENEAU:  Objection to form.

15           MS. DEITSCH-PEREZ:  Form.

16   A.    I mean, if you -- if you -- if you

17   take that last statement out, I mean, it would

18   be difficult for HCMFA to pay back demand notes

19   at that time.

20   Q.    And it was precisely for that reason

21   that you told the retail board that -- that the

22   retail -- that the advisors had the full faith

23   and backing of Mr. Dondero; correct?

24           MS. DANDENEAU:  Objection to form.

1                 WATERHOUSE - 10-19-21

2      A.    I mean, yes, as the mouthpiece, I

3 was relaying information.

4      Q.    Okay. And you relayed that

5 information with the knowledge and approval of

6 Mr. Dondero; correct?

7           MS. DEITSCH-PEREZ: Object to the

8      form.

9      A.    As I stated in the email, I don't

10 believe, and I think I testified I don't

11 believe I had conversations with Mr. Dondero at

12 the time of that board meeting.

13      Q.    Did you tell the retail board that

14 the advisors had the full faith and backing of

15 Mr. Dondero without Mr. Dondero's prior

16 approval?

17      A.    Yeah, I -- I -- yes, I'm -- like I

18 said, I think I testified earlier, I'm sure I

19 qualified it as well.

20      Q.    What do you mean by that?

21           MS. DANDENEAU: Objection to form.

22      A.    Again -- again, like I said in the

23 email, it has the full faith and backing of Jim

24 Dondero unless that has changed.

25      Q.    Actually that is not what you said,

```
 1                  WATERHOUSE - 10-19-21

 2   so let's put the email back up.

 3        A.    It is -- it is -- it is in the

 4   email.

 5        Q.    Let's put the email back up.  You

 6   didn't say unless it has changed.  You said you

 7   believe it hasn't changed; right?

 8        A.    Okay.  And to my knowledge that

 9   hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19              We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24              So I am relaying, as I'm telling you

25   now, what is in the email.  And unless
```

```
1              WATERHOUSE - 10-19-21

2    something has changed -- to my knowledge, it

3    hasn't changed, but it could have changed.

4         Q.    When you say that the advisors have

5    the full faith and backing from Mr. Dondero,

6    did you intend to convey that, to the extent

7    the advisors were unable to satisfy their

8    obligations as they become due, Mr. Dondero

9    would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12         form.

13              And, John, we have given you a lot

14         of leeway here but this does not seem

15         relevant to this case.  You seem sort of

16         taking a complete sort of diversion into

17         the allegations and the complaint just

18         filed on Friday, and so I would ask you to

19         move on because --

20              MR. MORRIS:  And I will tell you --

21         I will tell you that I have never read that

22         complaint cover-to-cover.  I have nothing

23         to do with the prosecution of those claims.

24         And this issue that we're talking about

25         right now is related solely to the
```

Case 3:21-cv-00881-X Document 179-4 Filed 10/20/23 Page 39 of 397 PageID 20905
Case 3:21-cv-00881-X Document 177 Filed 04/09/23 Page 38 of 200 PageID 44182

Page 209

1          WATERHOUSE - 10-19-21

2      promissory notes that your clients refuse

3      to pay.

4          So I'm going to continue to ask my

5      questions, and I would ask the court

6      reporter to read back my last question.

7                    (Record read.)

8          MS. DEITSCH-PEREZ:  And then I

9      believe there were objections to form.

10     Q.    You can answer the question.

11     A.    Yes.

12     Q.    Thank you very much, sir.

13         MR. MORRIS:  Can we go back to the

14     other document, please?

15     Q.    Mr. Waterhouse, do you know if this

16  document was ever shared with the retail board?

17     A.    I don't recall.

18     Q.    Did you ever share it with the

19  retail board?

20     A.    I don't recall.

21     Q.    Did you ever tell the retail board

22  about the substance of this document?

23     A.    I don't recall.

24     Q.    Did you ever tell the retail board

25  that Highland had agreed not to make a demand

1                    WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3        A.    I don't recall.

4        Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9        A.    I don't recall.

10       Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13       A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17       Q.    Uh-huh.

18       A.    Yeah, I don't -- I don't recall.

19       Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24            MS. DANDENEAU:  Objection to form.

25       A.    I don't recall.

1                    WATERHOUSE - 10-19-21

2        Q.      Did you ever inform PwC that HCMFA's

3    liabilities exceeded its assets?

4                MS. DANDENEAU:  Object to the form.

5        A.      I don't -- I don't think I told

6    them.  I mean, they -- they audited the

7    financial statements.

8        Q.      Did -- do you know if anybody on

9    behalf of Highland ever informed

10   PricewaterhouseCoopers that HCMFA may be unable

11   to repay amounts owing to Highland, should they

12   become due?

13               MS. DANDENEAU:  Objection to form.

14       A.      Yes.  Again, I think I testified

15   earlier that -- that this was communicated to

16   the auditors.

17       Q.      Ideally --

18       A.      I don't know who exactly did that.

19   I don't recall doing it, but, yeah, it was --

20   it was communicated.  And that is why -- I

21   mean, there is a disclosure in the financial

22   statements; right?

23       Q.      There is, and that disclosure

24   relates to the last sentence of this document;

25   correct?

1      WATERHOUSE - 10-19-21

2      A.    Yes.

3      Q.    Do you recall looking in the

4  document and seeing anything that was disclosed

5  with respect to the sentence above that?

6      A.    No.

7      Q.    Do you know whether anybody on

8  behalf of Highland ever informed

9  PricewaterhouseCoopers that HCMFA expects that

10 it may be unable to repay amounts due and owing

11 to Highland should they become due?

12          MS. DEITSCH-PEREZ:  Object to the

13     form.  I think that is the third time.

14     A.    I don't recall.  Again, as I said,

15 we -- all of this was given to the auditors.

16     Q.    Do you know if Highland received

17 anything of value in exchange for its agreement

18 not to demand payment on amounts owed by HCMFA

19 prior to May 31st, 2021?

20          MS. DEITSCH-PEREZ:  Object to the

21     form.  That is the second time.

22          MS. DANDENEAU:  Object to the form.

23     A.    I have answered this question.

24          MR. RUKAVINA:  Hold on.  Object to

25     legal conclusion.  Go ahead.

1          WATERHOUSE - 10-19-21

2      A.     I have answered this question

3  before.

4      Q.     And the answer was no?

5      A.     I'm not aware.

6      Q.     Now, this acknowledgment can't

7  possibly apply to the two notes that you signed

8  on behalf of HCMFA because those notes were

9  signed on May 2nd and May 3rd, 2019; is that

10 right?

11          MS. DANDENEAU:  Objection to form.

12     A.     Unless there is a drafting error.

13     Q.     Okay.  Are you aware of a drafting

14 error?

15     A.     I'm not aware.  I didn't -- I wasn't

16 part of -- I didn't sign this note or this

17 acknowledgment.  I didn't draft it.

18     Q.     But you do see it is dated April 15,

19 2019; right?

20     A.     Yes.

21     Q.     And this was a document that was

22 actually included by the advisors in a pleading

23 they filed with the Court; right?

24          MR. RUKAVINA:  Well, I don't know

25          that so I object to form.

1          WATERHOUSE - 10-19-21

2     Q.    Okay.  Let's go to the first page of

3   the document and just confirm that.

4          MR. AIGEN:  Mr. Morris, I just note

5     that you already said there was some error

6     with the document that is listed as

7     exhibit --

8          MR. MORRIS:  No.  No, no, no.

9          MS. DEITSCH-PEREZ:  Oh, okay.

10         MR. MORRIS:  What I said is that

11    there is a few pages that were mistakenly

12    stapled to the end of the document.

13         MS. DEITSCH-PEREZ:  Okay.

14         MR. MORRIS:  There is no problem

15    with this document.

16         MS. DEITSCH-PEREZ:  And just so

17    we're clear that the document -- the pages

18    that start with defendant's amended answer

19    are not intended to be part of this

20    document?

21         MR. MORRIS:  That's correct.

22         MS. DEITSCH-PEREZ:  And that the --

23    but it is your representation that the rest

24    of the document is -- is -- is correct

25    because we don't -- we don't have any way

```
 1              WATERHOUSE - 10-19-21

 2      of verifying that, we're just --

 3              MR. MORRIS:  You do, actually.  You

 4      could just go to Docket No. 21-3004.

 5              MS. DEITSCH-PEREZ:  If you want to

 6      stop this deposition so we can go and pull

 7      that document up, we're happy to do it.  So

 8      I am just asking you for your

 9      representation.

10              MR. MORRIS:  Sure.  I gave that.

11              MS. DEITSCH-PEREZ:  Okay.

12      Q.    So do you see that this is a

13  document that was actually filed with the Court

14  by Highland Capital Management Fund Advisors?

15      A.    No.  I get with the first page in

16  the section.  Maybe I'm looking at the wrong

17  thing.  It says, Highland Capital Management.

18      Q.    Don't worry about it.  Don't worry

19  about it.

20      A.    Maybe I went back -- okay.

21              MR. MORRIS:  All right.  Can we put

22      up on the screen Exhibit 2.

23              (Exhibit 2 marked.)

24              MR. MORRIS:  I think it is

25      Exhibit 1.
```

WATERHOUSE - 10-19-21

1

2          MS. DANDENEAU:  I'm sorry, John, did

3     you say Exhibit 2 or Exhibit 1?

4          MR. MORRIS:  It is Exhibit 2 in the

5     binders so it is premarked Exhibit 2.  And

6     now I'm asking -- right there -- going to

7     Exhibit 1 to the document that was marked

8     as Exhibit 2.

9          MS. DANDENEAU:  Got it.  In the

10     binder there is no --

11          MS. DEITSCH-PEREZ:  There is no

12     Exhibit 1.

13          MR. MORRIS:  All right.  So look at

14     the one on the screen.

15     Q.    Do you see, Mr. Waterhouse, that

16     this is a promissory note dated May 31st, 2017,

17     in the approximate amount of $30.7 million?

18     A.    Yes.

19     Q.    And do you see that the maker of the

20     note is NexPoint?

21     A.    Yes.

22     Q.    And that Highland is the payee; is

23     that right?

24     A.    Yes.

25     Q.    Okay.  And do you see in Paragraph 2

                    WATERHOUSE - 10-19-21

1    this is an annual installment note?

2         A.    Can you scroll down.

3         Q.    Sure.

4              MR. MORRIS:  Can we scroll down --

5         yeah, there you go.

6         A.    Right there, yeah.  Yes.

7              MR. MORRIS:  And can we scroll down

8         to the signature line.

9         Q.    And do you recognize that as

10   Mr. Dondero's signature?

11        A.    Yes.

12        Q.    And is this the promissory note that

13   we talked about earlier where NexPoint had made

14   certain payments in the aggregate amount of

15   about 6 to $7 million against principal and

16   interest?

17        A.    I don't recall discussing the

18   aggregate principal amounts of 6 to $7 million,

19   but -- so I don't -- I don't recall that prior

20   discussion with those amounts.

21        Q.    All right.  Let's take a look.

22   NexPoint always included this promissory note

23   as a liability on its audited financial

24   statements; right?

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And NexPoint had its financial

 4   statements audited; isn't that correct?

 5        A.    Yes.

 6        Q.    And was the process of NexPoint's

 7   audit similar to the process you described

 8   earlier for Highland and HCMFA?

 9        A.    Yes, it is similar.

10        Q.    Okay.

11              MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15              MS. CANTY:  It is going to be

16        Exhibit 46.

17              (Exhibit 46 marked.)

18        Q.    And do you see, sir, that we've put

19   up NexPoint Advisors' consolidated financial

20   statements and supplemental information for the

21   period ending December 31st, 2019?

22        A.    Yes.

23        Q.    Did you participate in the process

24   whereby these audited financial statements were

25   issued?
```

1                    WATERHOUSE - 10-19-21

2          A.     I didn't participate directly, as

3     I've described before, about the -- the team

4     performing the audit.

5          Q.     Do you recall when the audit of

6     NexPoint's financial statements for the period

7     ending December 31st, 2019 was completed?

8          A.     Yes.

9          Q.     And when do you recall it being

10    completed?

11         A.     In January of 2021.

12         Q.     Do you know why the 2019 audit

13    report wasn't completed until January of 2021?

14         A.     Yes.

15         Q.     Why was the NexPoint audit report

16    for the period ending 12/31/19 not completed

17    until January 2021?

18         A.     Because we had to deal with working

19    from home from -- with COVID, and on top of all

20    of our daily responsibilities and job duties

21    at -- at providing -- at Highland providing

22    services to NexPoint, we had to do all of this

23    extra work for a bankruptcy that was filed in

24    October of 2019.

25                    MR. MORRIS:  Can we go to the

1              WATERHOUSE - 10-19-21

2        balance sheet on page 3?  Okay.  Stop right

3        there.

4        Q.    Do you see under the liabilities

5    section, the last item is note payable to

6    affiliate?

7        A.    Yes.

8        Q.    And is that the note that we just

9    looked at?

10            MS. DANDENEAU:  Objection to form.

11       Q.    Withdrawn.

12            Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15            MS. DANDENEAU:  Objection to form.

16       A.    I believe no.

17       Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21       A.    I don't recall.

22       Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25            MS. DEITSCH-PEREZ:  Object to the

1                   WATERHOUSE - 10-19-21

2          form.

3          A.     Approximately.

4          Q.     And does that refresh your

5    recollection that between the time the note was

6    executed and the end of 2019, that NexPoint had

7    paid down approximately $7 million?

8          A.     Yes.  If we are just doing the math,

9    yes.

10         Q.     Okay.  Did NexPoint complete its

11   audit from 2020?

12         A.     Sorry, you kind of broke up.  Do

13   NexPoint complete?

14         Q.     The audit of its financial

15   statements for the period ending December 31st,

16   2020?

17         A.     No.

18         Q.     No, it's not complete?

19         A.     No, it is not complete.

20         Q.     Did HCMFA complete its audit for the

21   year ending December 31st, 2020?

22         A.     No.

23                MR. MORRIS:  Can we go to page 15,

24         please, the paragraph at the bottom.

25         Q.     Do you see that NexPoint has

1        WATERHOUSE - 10-19-21

2    included under notes payable to Highland a

3    reference to the amounts that were outstanding

4    as of the year-end 2019 under the note that we

5    looked at just a moment ago?

6        A.    Yes.  Are you talking about the

7    second paragraph?

8        Q.    I'm actually talking about first

9    paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13              MS. DANDENEAU:  Objection to form.

14       John, do you mean the first paragraph of

15       that page?

16              MR. MORRIS:  No, the first paragraph

17       under notes payable to Highland.

18       A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in

Case 3:10-cv-00065-Doc 866-4 Filed 10/29/011 Entered 10/29/01 03/22 18:Page 323 of 397
Case 3:21-cv-00881-X   Document 178-17   Appendix   Filed 06/09/399   Page 52 of 200   PageID 44196

Page 223

1                    WATERHOUSE - 10-19-21

2    perfectly together.

3         Q.    Okay.  But you're not aware of any

4    note that was outstanding at the end of 2019

5    from NexPoint to Highland other than whatever

6    principal was still due and owing under the

7    $30 million note issued in 2017; correct?

8         A.    Well, it -- I don't -- there is

9    reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12        Q.    Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20             Do you see that?

21        A.    Oh, I do, yes.

22        Q.    So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original

1          WATERHOUSE - 10-19-21

2   $30 million 2017 note that we looked at a

3   moment ago?

4       A.    Well, we're at the bottom of the

5   page.  Is there anything on page 16?

6       Q.    That is a fair question, sure.  That

7   is it.

8       A.    Okay.  So it appears that that is

9   the only note that is detailed in the notes in

10  the financial statement.

11      Q.    And you don't have any memory of any

12  other note other than the 2017 note, right,

13  being outstanding as of the end of the year?

14      A.    I deal with thousands of

15  transactions every year.  I don't really have a

16  very specific memory for what exactly was

17  outstanding.

18          MR. MORRIS:  Why don't we take a

19      break now.  We've been going for a little

20      while.  It's 3:26.  Let's come back at

21      3:40.

22          VIDEOGRAPHER:  We're going off the

23      record at 3:26 p.m.

24      (Recess taken 3:26 p.m. to 3:39 p.m.)

25          VIDEOGRAPHER:  We are going back on

WATERHOUSE - 10-19-21

1 the record at 3:39 p.m.

2

3 Q. All right.  Mr. Waterhouse, we -- I

4 don't think we have a lot more here.

5   To the best of your knowledge and

6 recollection, were all affiliate loans and all

7 loans made to Mr. Dondero recorded on

8 Highland's books and records as assets of

9 Highland?

10   MS. DANDENEAU:  Object to the form,

11  asked and answered.

12 A. To my knowledge, yes.

13 Q. Okay.  Can you recall any loan to

14 any affiliate or Mr. Dondero that was not

15 recorded on Highland's books and records as an

16 asset?

17 A. Like during my time as CFO?  I don't

18 recall.

19 Q. How about after the time that you

20 were CFO?  Did you recall that there was a loan

21 by Highland to an affiliate or to Mr. Dondero

22 that hadn't been previously recorded on

23 Highland's books as an asset?

24   MS. DANDENEAU:  Objection to form.

25 A. I guess I don't understand the

1              WATERHOUSE - 10-19-21

2    question.  I left Highland as of -- I'm not

3    aware of -- I left Highland in February --

4    probably the last day of February of 2021.

5         Q.    Okay.

6         A.    I'm not -- I'm not aware of any --

7    I'm not aware of anything past that date.

8         Q.    Okay.  While you were the CFO at

9    Highland, did Highland prepare in the ordinary

10   course of business a document that reported

11   operating results on a monthly basis?

12        A.    Yes.

13        Q.    And are you generally familiar with

14   the monthly operating reports?

15        A.    Yeah.  You are referring to the

16   reports that we filed to the Court every month?

17        Q.    I apologize, I'm not.  I'm taking

18   you back to the pre-petition period.  There was

19   a report that I have seen that I'm going to

20   show you, but I'm just asking for your

21   knowledge.

22              MR. MORRIS:  Let's put it up on the

23        screen, Exhibit 39.

24              (Exhibit 39 marked.)

25        Q.    Do you see this is a document that

```
 1                  WATERHOUSE - 10-19-21

 2   is called operating results?

 3        A.    Yeah, that's the title of it.

 4        Q.    Okay.  And was a report of operating

 5   results prepared by Highland on a monthly basis

 6   during the time that you served as CFO?

 7        A.    No.

 8        Q.    Are you familiar with a document of

 9   this type?  And we can certainly look at the

10   next page or two to refresh your recollection.

11        A.    I'm just looking at the title.  I

12   don't really -- again, as I discussed before, I

13   don't have any records or documents or emails

14   or appointments or anything that I was able to

15   use prior to -- prior to this deposition, so

16   I'm doing the best I can.

17        Q.    Okay.  You don't need to apologize.

18   I'm just asking you if you are familiar with

19   the document called Operating Results that was

20   prepared on a monthly basis at Highland?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        Q.    If you're not, you're not.

24        A.    I don't believe this was prepared on

25   a monthly basis.
```

Case 3:23-cv-00050-S Doc 86-4 Filed 10/29/2011 Entered 10/29/2011 03:23:18 Page 322 of 397
Case 3:21-cv-00881-X   Document 167-17   Appendix 7   Filed 06/09/2399 Page 57 of 200   PageID 44201

Page 228

WATERHOUSE - 10-19-21

1

2       Q.    Okay.  Do you see that this one

3    is -- is dated February 2018?

4       A.    Yes.

5       Q.    Do you have -- do you believe --

6    have you ever seen a document that was

7    purporting to report operating results for

8    Highland?

9             MS. DANDENEAU:  Objection to form.

10      A.    Yes.

11      Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15      A.    I believe it was -- it was prepared

16   on an annual basis.

17      Q.    Okay.

18            MR. MORRIS:  Can we look at the next

19       page.

20      Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23            And it is dated February 2018.

24      A.    Yes.

25      Q.    Do you recall that there was a

1           WATERHOUSE - 10-19-21

2    report that Highland prepared that identified

3    significant items impacting the balance sheet?

4        A.    A report that was prepared.

5        Q.    Let me ask a better question:  Did

6    Highland prepare reports to the best of your

7    recollection that identified significant items

8    that impacted its balance sheet?

9        A.    Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17       Q.    Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21            Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24            MS. DANDENEAU:  Objection to form.

25       A.    Yes.

1                    WATERHOUSE - 10-19-21

2          Q.     And did the monthly close package

3     that Highland prepared include information

4     concerning significant items that impacted

5     Highland's balance sheet?

6          A.     Yes, it had a page like that is --

7     that is on the screen that detailed items

8     like -- of that nature.

9          Q.     And do you know who -- was there

10    anybody at Highland who was responsible for

11    overseeing the preparation of the monthly

12    reporting package?

13         A.     That would have been -- again, it

14    varies over time during my tenure as CFO.

15    It -- it varied over -- over time, but -- but

16    typically a -- a corporate accounting manager.

17         Q.     And who were the corporate

18    accounting managers during your tenure as CFO?

19         A.     It would have been Dave Klos and

20    Kristin Hendrix.

21         Q.     And did the corporate accounting

22    manager deliver to you drafts of the monthly

23    close package before it was finalized?

24         A.     Sometimes.

25         Q.     Was that the practice even if there

1          WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.    The practice meaning that they

4    sometimes lured them to me?

5         Q.    That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8              MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17             Do I have that right?

18             MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.

WATERHOUSE - 10-19-21

1

2      A.    And, quite frankly, I don't even

3   know if these were -- these were sent to me

4   even in any capacity.

5      Q.    What was the purpose of preparing

6   the monthly reporting package -- withdrawn.

7            What was the purpose of preparing

8   the monthly close package?

9            MS. DEITSCH-PEREZ:  Object to the

10      form.

11      A.    The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14      Q.    Who was included in the idea of

15   senior management?

16      A.    You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19      Q.    Were monthly reporting -- withdrawn.

20            Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23      A.    To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I

```
 1              WATERHOUSE - 10-19-21

 2   don't know because, again, I wasn't reviewing

 3   them.  I hadn't reviewed a close package for --

 4   for a long time.  But I believe the standard

 5   practice that was still being carried out.

 6        Q.   Did you ever have any discussions

 7   with the debtor's independent board concerning

 8   any promissory notes that were issued by any of

 9   the affiliates or Mr. Dondero?

10        A.   I can't -- I can't -- I can't recall

11   specifically.

12        Q.   Did you speak with the independent

13   board from time to time?

14        A.   Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19        Q.   Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25        A.   I don't recall any conversations
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 02:23:18 Page 230 of 397
Case 3:21-cv-00881-X Document 178-17 Filed 07/09/23 Page 63 of 200 PageID 44207

Page 234

```
 1                    WATERHOUSE - 10-19-21

 2   specifically.

 3        Q.    Do you know if the topic was ever

 4   discussed, even if you don't remember it

 5   specifically?

 6             MS. DANDENEAU:  Objection to form.

 7        A.    It -- it -- it may have.  I don't

 8   know.  I don't recall.

 9        Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12        A.    I don't -- I don't recall

13   specifically.

14        Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18        A.    Nothing -- nothing is really jumping

19   out at me.

20        Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24        A.    I don't recall having that

25   conversation.
```

1                    WATERHOUSE - 10-19-21

2         Q.      Did you ever tell Mr. Seery that you

3    had any reason to believe that the amounts

4    reflected in the notes issued by the affiliates

5    and Mr. Dondero were invalid for any reason?

6         A.      I don't -- I don't recall.

7         Q.      Did you tell Mr. Dondero -- did you

8    tell Mr. Seery that you thought the promissory

9    notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12        A.      I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19        Q.      Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23              MS. DANDENEAU:  Objection to form.

24        A.      Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery

Case 3:23-cv-00065-S Doc 86-4 Filed 10/29/01/05/22 Entered 10/20/01 17:02:23 18:22:43 23 Desc 397
Case 3:21-cv-00881-X   Document 178-7   Appendix   Filed 07/08/23 09   Page 65 of 200   PageID 44209

Page 236

1              WATERHOUSE - 10-19-21

2    anything that -- that said I have concerns over

3    these notes?

4         Q.    No.  Let me try again.  Maybe it was

5    my question.

6              Did you ever give Mr. Seery any

7    information concerning any of the notes that

8    were issued by any of the affiliates or

9    Mr. Dondero?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15             MR. MORRIS:  Can we put up the

16        document that has been premarked as Exhibit

17        39?

18             MS. DANDENEAU:  John, that is this

19        document, isn't it?

20             MR. MORRIS:  Oh, yeah, it might be,

21        as a matter of fact.  Let's go to Number

22        40.

23             (Exhibit 40 marked.)

24        Q.    During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that

Case 3:23-cv-00909-j-Doc 86-4 Filed 10/29/01/05/22 Entered 10/29/01/05/22 18:23:23 Desc
Case 3:21-cv-00881-X Document 178-17 Filed 07/00/23 Page 66 of 200 PageID 44210

Page 237

                          WATERHOUSE - 10-19-21

1

2    were filed with the bankruptcy court?

3         A.    I didn't -- I didn't prepare them

4    personally.

5         Q.    Did people prepare them under your

6    direction?

7         A.    Yes.  There were members of the team

8    that prepared them, and they worked in -- you

9    know, there were members of DSI that were

10   involved in the process as well.

11        Q.    To the best of your knowledge, did

12   DSI rely on the employees of Highland for the

13   information that they used to prepare the

14   bankruptcy filings?

15        A.    Yes.  The books and records were

16   with the Highland personnel.

17        Q.    Okay.  And do you see on the screen

18   here, there is a document that we have marked

19   as Exhibit 40 that is -- that is titled Summary

20   of Assets and Liabilities?

21        A.    Uh-huh.

22        Q.    Okay.  And do you recall reviewing

23   any summary of assets and liabilities before it

24   was filed with the bankruptcy court?

25        A.    Yes, I recall reviewing this at a

```
 1                    WATERHOUSE - 10-19-21

 2   high level.

 3        Q.    And did you believe that it was

 4   accurate at the time it was filed?

 5        A.    I didn't have any other reason to

 6   believe otherwise.

 7        Q.    Okay.  Do you see that the total

 8   value of all properties listed in Part 1 is

 9   approximately $410 million?

10             MS. DEITSCH-PEREZ:  Objection to

11        form.

12        A.    Yes, it is in 1c.

13        Q.    Yes.

14        A.    Yes, I see that.

15        Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22             Do you see that?

23        A.    I do.

24        Q.    And that was a reference to the

25   notes receivable from the affiliates and
```

```
 1                  WATERHOUSE - 10-19-21

 2   Mr. Dondero, among others; is that right?

 3            MS. DANDENEAU:  Objection to form.

 4       A.    Yes.  The affiliate notes and the

 5   Dondero notes were in this amount, but they

 6   weren't -- again, like you said, and among

 7   others.

 8       Q.    Okay.  We will look at the

 9   specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14            MS. DANDENEAU:  Objection to form.

15       A.    I -- I -- I believe so.

16       Q.    Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20            MS. DEITSCH-PEREZ:  Object to the

21       form.

22            MS. DANDENEAU:  Object to the form.

23       A.    Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.
```

```
 1                   WATERHOUSE - 10-19-21

 2         Q.    Okay.

 3         A.    You know, but as of the time of this

 4   filing, that is what was put in this filing,

 5   right, but, you know, I mean, numbers --

 6   numbers change, facts and circumstances change.

 7         Q.    But as the CFO of Highland, the

 8   debtor in bankruptcy, did you believe that this

 9   number accurately reflected the total amount

10   due under the notes receivable?

11         A.    That is what we had in our books and

12   records.

13         Q.    Okay.  And did you believe as the

14   CFO that the books and records accurately

15   reported the then value of the debtor's assets?

16               MS. DANDENEAU:  Objection to form.

17         A.    We didn't -- as part of this filing,

18   there was no fair value measurement or

19   anything.  These were just accounting entries

20   for the promissory notes.  There is no analysis

21   for impairment or fair market value adjustments

22   or anything of that nature.  This is purely

23   taking numbers and putting them in our form.

24         Q.    Did you do any impairment analysis

25   at any time while you were employed by
```

```
 1                WATERHOUSE - 10-19-21

 2   Highland?

 3        A.    Yes, we did do impairment analysis

 4   on -- on assets.

 5        Q.    Okay.  Did you ever do an impairment

 6   analysis on any of the promissory notes that

 7   were given to Highland by any of the affiliates

 8   or Mr. Dondero?

 9        A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19              As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?
```

WATERHOUSE - 10-19-21

1

2        A.     The audited financials -- yes,

3   audited financial statements are prepared in

4   accordance with GAAP.

5        Q.     Do you recall whether any of

6   Highland or HCMFA or NexPoint ever made a fair

7   market value adjustment to any of the notes

8   issued by any of the affiliates or Mr. Dondero

9   to Highland?

10       A.     I do not recall that happening, but

11  the -- it is because under -- under GAAP,

12  the -- the treatment of liabilities is

13  different than assets.

14       Q.     Okay.  So then let's just focus on

15  Highland's audited financial statements.

16             The last audited financial

17  statements were for the period ending December

18  31st, 2018; correct?

19       A.     That is my understanding.

20       Q.     And you had -- you had an obligation

21  to disclose anything to PricewaterhouseCoopers

22  concerning any subsequent events between the

23  end of 2018 and June 3rd, 2019; correct?

24             MS. DANDENEAU:  Objection to form.

25             MS. DEITSCH-PEREZ:  Form.

1              WATERHOUSE - 10-19-21

2     A.    Correct.

3     Q.    Okay.  To the best of your

4  knowledge, as Highland's CFO, did Highland ever

5  make any fair market value adjustments to any

6  of the promissory notes that were carried on

7  its balance sheet and that were issued by any

8  of the affiliates or Mr. Dondero?

9     A.    I think I answered that question

10  earlier.  I don't recall doing that for any of

11  the -- those -- those notes.  So it would have

12  included the audit for the -- for the 2018

13  period.

14     Q.    Okay.

15     MR. MORRIS:  Can we go to the next

16    page.

17     Q.    Do you see this is a note a list of

18  notes receivable?  Do you see that?

19     A.    Yes, I do.

20     Q.    And do you see that this ties into

21  the page that we were just looking?

22     A.    I'm sorry, can we go back to the

23  prior page?  I mean, it was at 150,331,222.  It

24  was on the prior page.  Next page.  Yes, it

25  agrees.

1          WATERHOUSE - 10-19-21

2          Q.    Okay.  So now let's look at that

3     schedule.  So this was the face amount of all

4     of the promissory notes that Highland held at

5     the time this document was filed with the

6     bankruptcy court; right?

7          A.    Yes.

8          Q.    There is a footnote there that says,

9     doubtful or uncollectible accounts are

10    evaluated at year-end.

11              Do you see that?

12         A.    I do.

13         Q.    Okay.  And is it fair to say that as

14    of the year-end 2018, the year before this,

15    that to the extent any of these notes were

16    outstanding at that time, they weren't deemed

17    to be doubtful or uncollectible?

18         A.    Yeah.  For the 2018 audit, there

19    weren't any -- there weren't any adjustments to

20    fair value.

21         Q.    Okay.  And during the bankruptcy, do

22    you recall that Highland subsequently reserved

23    for the Hunter Mountain Investment Trust note?

24         A.    Yes.

25         Q.    Why did Highland -- were you

Case 3:03-05059-jpc Doc 864-148 310/29/011/05/22ed Entered 10/29/01/03/22 18:Page 324 of 39...
Case 3:21-cv-00881-X   Document 178-17   Appendix 7   Page 74 of 200   PageID 44218
Page 245

```
                        WATERHOUSE - 10-19-21
```

1                        WATERHOUSE - 10-19-21

2    involved in the decision to reserve the Hunter

3    Mountain Investment Trust note?

4         A.    I was not.

5         Q.    Do you know why Highland decided to

6    reserve for the Hunter Mountain Investment

7    Trust note?

8         A.    I don't know yet decision was made.

9    I believe it was made by someone at DSI.

10        Q.    Okay.  I'm just asking if you know

11   why.

12               Did you ever ask anyone why they

13   reserved for that particular note?

14        A.    I don't recall.

15        Q.    Do you know whether the debtor

16   reserved for any other note on this list during

17   the bankruptcy?

18        A.    Again, I don't recall.  I wasn't

19   part of any process of -- again, like any fair

20   value adjustments or anything to that degree.

21   Like I said, a lot of that was done by DSI and

22   it was kind of out of our court.

23        Q.    Okay.  Do you know if any note

24   receivable on this list was ever deemed by the

25   debtor to be doubtful or uncollectible?

WATERHOUSE - 10-19-21

1

2      A.    I don't -- I don't have a

3  recollection of every filing, so I don't know.

4      Q.    Did you ever have a discussion with

5  anybody at any time about whether any of the

6  notes receivable on this list should be deemed

7  to be doubtful or uncollectible?

8      A.    No.  As I previously stated, we were

9  told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13          MR. MORRIS:  I move to strike.

14      Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19          MS. DANDENEAU:  Objection to form.

20      A.    I don't recall.

21      Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25          MS. DANDENEAU:  Objection to form.

Case 3:21-cv-00881-X   Document 187-4   Filed 01/09/24   Page 324 of 397
Case 3:21-cv-00881-X   Document 178-17   Page 08509/399   Page 76 of 200   PageID 44220

Page 247

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall.  I mean, it may have

3   happened, you know, again, when we initially

4   getting DSI up to speed and going through

5   financials, it may have happened, but I don't

6   recall specifically.

7        Q.    While you were the CFO of Highland

8   during the time that the company was in

9   bankruptcy, did you have any reason to believe

10  that any of the notes receivable on this list

11  other than Hunter Mountain Investment Trust

12  should have been characterized as doubtful or

13  uncollectible?

14             MS. DANDENEAU:  Objection to form.

15             MS. DEITSCH-PEREZ:  Form.

16       A.    I didn't know.  I didn't form an

17  opinion.  Bankruptcy was new to me.  It still

18  is new to me, even after going through this.

19  So I really didn't know what to expect nor

20  really -- you know, I didn't know.

21             MR. MORRIS:  I move to strike.

22       Q.    During the period of Highland's

23  bankruptcy when you were serving as CFO, did

24  you have any reason to believe any of the notes

25  on this list were doubtful or uncollectible?

```
 1                    WATERHOUSE - 10-19-21
 2            MS. DEITSCH-PEREZ:  This is like the
 3       fifth time you've asked it.  Object to the
 4       form.
 5            MR. MORRIS:  I'm moving to strike,
 6       if you haven't noticed, because he's not
 7       answering the question.
 8            MS. DEITSCH-PEREZ:  He was answering
 9       the question, you just didn't like it, like
10       the answer.
11            MR. MORRIS:  Good Lord.
12       Q.    Go ahead, Mr. Waterhouse.
13       A.    Again, I don't -- we brought up a
14  myriad of issues at the start of the bankruptcy
15  case.  I don't recall if this was one of them,
16  but, again, there are a lot of things we
17  couldn't change.  Even, you know, I was told
18  status quo, blah, blah, blah, right, there is a
19  stay, you can't -- you know, I don't recall
20  specifically, but that doesn't mean it didn't
21  happen.
22            MR. MORRIS:  I move to strike.
23       Q.    During the time that Highland was in
24  bankruptcy and you served as CFO, did you have
25  any reason to believe that any of the notes
```

1              WATERHOUSE - 10-19-21

2     receivable on this list were doubtful or

3     uncollectible?

4              MS. DEITSCH-PEREZ:  Object to the

5          form.

6          A.    Potentially.

7          Q.    Did you ever tell anybody that?

8          A.    As I just stated like five times,

9     yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15         Q.    I don't want to know -- I don't want

16    to know what was --

17             MS. DEITSCH-PEREZ:  Wait, wait.

18         Excuse me.  Mr. Morris, you did not let him

19         finish his answer.

20         A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not

```
1                WATERHOUSE - 10-19-21

2    once, twice, three, four times with -- you

3    know, I mean, we -- I don't -- I don't remember

4    the sum culmination of all these discussions.

5    They all kind of blend together.

6               MR. MORRIS:  Okay.  I move to strike

7        and I will try one more time.

8        Q.    Did you ever tell anybody at DSI

9    that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11              MS. DANDENEAU:  Object to form.

12       A.    Potentially.

13       Q.    Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16       A.    Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19       Q.    Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22              MS. DANDENEAU:  Objection to form.

23       A.    I've gone through that.  I don't

24   recall specifically.

25       Q.    So you should just -- I don't want
```

1           WATERHOUSE - 10-19-21

2    to tell what you to do.  Do you have --

3              MS. DANDENEAU:  Good.

4        Q.   Other than -- other than telling

5    them that they should look at the values, do

6    you have any recollection whatsoever of ever

7    having told anybody at DSI that any of the

8    notes receivable on this page were doubtful or

9    uncollectible?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12             MS. DANDENEAU:  Objection.

13       A.   I recall having general discussions

14   about everything on our balance sheet which

15   would have included these -- these notes

16   receivable.

17       Q.   Okay.

18       A.   I don't recall specifically where

19   those discussions delved into.

20       Q.   Do you recall any discussion at all

21   on the topic of whether any of these notes on

22   this list were doubtful or uncollectible?

23             MR. AIGEN:  Mr. Morris, how on earth

24        is that question different from the

25        question that you just asked for the last

1                 WATERHOUSE - 10-19-21

2     five times?  I mean, really I thought you

3     were -- (overspeak.)

4          MR. MORRIS:  Because he never

5     answered it.

6          MS. DEITSCH-PEREZ:  Are you

7     listening to him?

8          MR. MORRIS:  You know --

9          MS. DEITSCH-PEREZ:  He basically

10    said that he had a conversation with DSI

11    that went over all of this stuff and that

12    conversation could have included the notes

13    but he doesn't recall specifically.

14          What more do you want him -- to ask

15    of him?

16          MR. MORRIS:  I want him -- I would

17    love him to say -- I would like him to

18    testify to the truth, and that is he has no

19    recollection.

20          MS. DEITSCH-PEREZ:  Well, the truth

21    as you would like to see it, but -- but he

22    is testifying truthfully.  And I -- and, by

23    the way, I move to strike that comment --

24          MR. MORRIS:  Okay.

25          MS. DEITSCH-PEREZ:  -- because it

```
 1                  WATERHOUSE - 10-19-21

 2         suggests that he has not testified

 3         truthfully.

 4              MR. MORRIS:  I will ask my question

 5         again.  And if at any time you want to

 6         direct him not to answer, that is your

 7         prerogative.

 8         Q.    Mr. Waterhouse, do you have any

 9    recollection at all of ever telling anybody

10    from DSI that any of these notes were doubtful

11    or uncollectible?

12              MS. DANDENEAU:  Object to form.

13         A.    I don't remember specifically.

14         Q.    Do you remember generally that

15    specific topic?

16         A.    We generally talked about assets,

17    values.  If -- we had discussions of that and

18    collectability in nature.  I mean, of Highland,

19    the funds, the CLOs, the entire complex.  We

20    had discussions like that, which is, you know,

21    as you look at a billion dollar consolidated

22    balance sheet.

23              So I generally remember -- this is

24    billions of dollars, including these assets --

25    having discussions of this -- of this type.
```

1          WATERHOUSE - 10-19-21

2      Q.    Do you believe that an affiliate

3  loan on this list was doubtful or

4  uncollectible?  Would you have told that to

5  DSI?

6           MS. DANDENEAU:  Objection to form.

7           MS. DEITSCH-PEREZ:  Object to form.

8      A.    If we had, like -- again, if we --

9  if -- if we weren't preparing financial

10  statements in accordance with GAAP, and -- you

11  know, if DSI at that point -- they were --

12  again, I was new to bankruptcy.

13           The CRO is -- we are delegating

14  everything to the CRO.  All the decisionmaking.

15  Remember -- remember when you and I went into

16  Delaware Court and we were saying DSI basically

17  does everything, remember this, Mr. Morris?

18           You were my counsel at the time, and

19  basically we're running everything through DSI.

20  That was what this was like in the early part.

21           Everything was communicated through

22  DSI.  So DSI says this.  DSI says that.  That

23  is what we're doing, and we're pointing out

24  things to them.

25           Now, they decide what direction this

1                   WATERHOUSE - 10-19-21

2    goes.

3         Q.    Did you point out that any of

4    these --

5         A.    I don't recall specifically.

6         Q.    Okay.  At any time that you served

7    as Highland's CFO, did you ever point out to

8    DSI that any of these loans were doubtful or

9    uncollectible?

10               MS. DEITSCH-PEREZ:  Object to the

11          form.

12               MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17        Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21   didn't you?

22               MS. DEITSCH-PEREZ:  Objection to

23          form.

24        A.    I didn't personally prepare them,

25   the team did with DSI.

1                    WATERHOUSE - 10-19-21

2          Q.    But you signed them; correct?

3          A.    My signature is on the MORs.

4          Q.    And you signed them as the preparer

5     of the document; correct?

6          A.    Yes, I did this pursuant to DSI's

7     instructions.

8          Q.    Okay.  You wouldn't have signed the

9     document if you didn't believe it to be

10    accurate; correct?

11         A.    If I had reason to believe it

12    wasn't, presumably I wouldn't have signed it.

13         Q.    Okay.  And do you have any reason to

14    believe right now that any monthly operating

15    report that has your signature on it was

16    inaccurate in any way?

17              MS. DEITSCH-PEREZ:  Object to the

18         form.

19         A.    My understanding of the monthly

20    operating reports is we were filing them in

21    accordance with the standards set by the Court.

22    It wasn't -- you know, again, I don't -- you

23    know, it wasn't GAAP.  It wasn't these other

24    standards, so I testified I didn't have

25    experience in this.  The CRO was running the

```
1                    WATERHOUSE - 10-19-21

2     show.  I followed their advice.

3          Q.    But you assured yourself that

4     everything in the report was accurate before

5     you signed them; correct?

6                MS. DANDENEAU:  Objection to form.

7          A.    I trusted the guidance from the CRO

8     and their team and their experience and their

9     guidance for doing this for many, many, many

10    years to -- to -- to categorize and put things

11    in ways on the form.

12               You know, my team had -- had not

13    filled out these forms before and needed all of

14    this guidance.  I'm not an expert in this.  I

15    have oversight of it.  I signed the form.  DSI

16    told me to.

17         Q.    And you and your team are the source

18    of the information that DSI used to create the

19    reports; correct?

20               MS. DANDENEAU:  Objection to form.

21         A.    The books and records reside with

22    the -- with -- with the corporate accounting

23    team.

24         Q.    Okay.  And the corporate accounting

25    team was the corporate accounting team that was
```

1                    WATERHOUSE - 10-19-21

2    under your direction; correct?

3         A.    Yes.

4         Q.    So -- so your team was responsible

5    for maintaining Highland's books and records;

6    correct?

7         A.    I'm sorry, my team was responsible?

8         Q.    Correct.

9         A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13        Q.    The corporate accounting group

14   reported to you; correct?

15        A.    Yes.

16             MR. MORRIS:  Can we put up 41,

17        please.

18             (Exhibit 41 marked.)

19        Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22             Do you see that?

23        A.    I do.

24        Q.    And you signed this report in your

25   capacity as the chief financial officer of

1                    WATERHOUSE - 10-19-21

2     Highland; correct?

3          A.     Yes.

4          Q.     And you're the preparer -- you're

5     identified as the preparer of the report;

6     correct?

7          A.     That is correct.

8          Q.     Do you recall participating in the

9     preparation of monthly operating reports?

10         A.     As I testified earlier, it was put

11    together, you know, with the team.  The team

12    worked with DSI to put these monthly operating

13    reports together.  We had no experience at this

14    time of the monthly operating reports or things

15    of this nature.

16               MR. MORRIS:  Can you turn to the

17          next page, please.

18         Q.     Do you see a line item under assets

19    due from affiliates?

20         A.     Yes, I do.

21         Q.     Okay.  And to the best of your

22    knowledge and understanding, as the person who

23    is identified as the preparer of this report,

24    does that line item include the affiliate loans

25    that we've been talking about?

1    WATERHOUSE - 10-19-21

2        A.    Again, I would have to see, just

3    like we did with the financial statements of

4    Highland and NexPoint, I would have to see a

5    detailed build, but, you know, if you look at

6    the other line items, you know, the only other

7    place it could be would be in -- in other

8    assets.

9        Q.    Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14           MS. DANDENEAU:  Objection to form.

15       A.    I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18       Q.    All right.  No problem.

19       A.    -- these are millions of dollars.

20       Q.    Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23       A.    Yes, I see that in Footnote 1.

24       Q.    Okay.  And that's the reserve that

25   was taken against that note?

1      WATERHOUSE - 10-19-21

2  A.  Yes, that is what this indicates.

3  Q.  Okay.  And were you aware that the

4 reserve was being taken on that it was?

5  A.  I was -- I was aware, yeah, at some

6 point, yes.

7  Q.  Okay.  And are you aware of any

8 reserve being taken with respect to any other

9 note that was issued in favor of Highland?

10  A.  Again, as I testified, we didn't go

11 through an analysis on -- on -- on the other

12 notes.

13  Q.  Can we turn --

14  A.  I believe -- I believe it says that

15 in Footnote 1, fair value has not been

16 determined with respect to any of the notes.

17    So this footnote -- footnotes, look,

18 there has been no determination.

19  Q.  Okay.  The determination was made in

20 the audited financial statements just six

21 months earlier; right?  We saw that earlier?

22  A.  That was as of 12/31/18.  I mean,

23 things -- circumstances -- there's a bank --

24 circumstances change, things change -- things

25 change over time, you know, facts and

1          WATERHOUSE - 10-19-21

2   circumstances change.  Again, you have to do an

3   analysis.

4          Q.    Okay.  And you do recall that in

5   Highland's 2018 financial statement, all of the

6   notes issued by affiliates and Mr. Dondero that

7   were due at year-end had a fair value equal to

8   the carrying value; correct?  We looked at

9   that?

10         A.    Yes.  That was in the -- in the

11  disclosure for the -- for the affiliate notes,

12  yes.

13         Q.    And -- and you were obligated to

14  share with PwC any subsequent events between

15  the end of 2018 and the date that you signed

16  your management representation letter on June

17  3rd, 2019; correct?

18              MS. DEITSCH-PEREZ:  Object to the

19         form.

20         A.    Yes.  I -- I -- I signed the

21  management, you know, my signature is in the

22  management representation letter -- I hope I'm

23  answering your question -- that is dated in

24  June with the representations made in that

25  management representation letter.

WATERHOUSE - 10-19-21

1

2      Q.    Okay.  And there was nothing that

3    caused PricewaterhouseCoopers to include in

4    subsequent events any adjustment to the

5    conclusion that the fair value of the affiliate

6    notes and the notes issued by Mr. Dondero

7    equaled the carrying value; correct?

8            MS. DANDENEAU:  Objection to the

9        form.

10     A.    That is correct.  That is what was

11   in the -- in the -- in the footnotes.

12     Q.    Okay.  So are you aware of anything

13   that occurred between June 3rd, 2019 and

14   December 31st, 2019 that would have caused the

15   fair value of the notes to differ from the

16   carrying value?

17     A.    Yeah.  Highland filed for

18   bankruptcy, things changed -- I mean, there was

19   a bankruptcy filed in October of -- of -- of

20   2019, right, the petition date that we've

21   described earlier.

22            I mean, I had a -- I guess looking

23   back naively, I thought we were going to get an

24   audit from PwC for year-ended 2019, and when we

25   had discussions with PwC, they were like, are

```
1                    WATERHOUSE - 10-19-21

2    you crazy, we're not auditing this.  Values

3    change, all these things change, bankruptcy

4    changes the entire scenario.  I mean -- and

5    they're like, we're not -- we're not touching

6    this.

7                    And so, you know, I was like, okay,

8    sorry, I get it, okay, no an audit.

9                    I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12                   Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18       Q.    Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21       A.    No.

22       Q.    So --

23       A.    That's right.

24       Q.    So can you identify any fact that

25   would cause the fair value to deviate from the
```

1                  WATERHOUSE - 10-19-21

2    carrying value during the seven-month period

3    between June 3rd and the end of the year, 2019?

4                  MS. DANDENEAU:  Objection to form.

5         A.    No.  I mean, I'm putting myself back

6    at that time, right.  Hindsight is 2020, but we

7    didn't do an analysis, but we would have done a

8    fulsome analysis and looked at all of the facts

9    and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13                There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19        Q.    Okay.  You didn't do an analysis.

20              Do I have that right?

21        A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23              MR. MORRIS:  Okay.  I'm going to

24        take a break.  I may be done, so the time

25        now is -- is 4:30 your time.  Let's just

1          WATERHOUSE - 10-19-21

2          take a short break until 4:40 your time.

3               MS. DANDENEAU:  Okay.

4               VIDEOGRAPHER:  We're going off the

5          record, 4:31 p.m.

6          (Recess taken 4:31 p.m. to 4:43 p.m.)

7               VIDEOGRAPHER:  We are back on the

8          record at 4:43 p.m.

9               MR. MORRIS:  I have no further

10         questions.

11              MR. RUKAVINA:  Okay.

12         Mr. Waterhouse, I will go next.

13                    EXAMINATION

14    BY MR. RUKAVINA:

15         Q.   Sir, my name is Davor Rukavina.  I'm

16    the lawyer for --

17              MR. MORRIS:  Hey, Davor, just before

18         you begin, I just want to put on the record

19         Highland's objection to documents that were

20         produced to me 10 minutes before the

21         deposition began.

22              MR. RUKAVINA:  What the basis of

23         your objection?

24              MR. MORRIS:  That they were due

25         quite some time ago, and the fact that you

Page 267

1               WATERHOUSE - 10-19-21

2          had -- I just think it's appropriate to --

3          to dump documents on somebody 10 minutes

4          before the deposition.  I just think

5          that's --

6               MR. RUKAVINA:  Well, these are

7          documents Highland produced.  I'm not aware

8          of any rule I have to give you advance

9          documents when I know for the record that

10         other than the exhibits that you sent to us

11         last week, most of the exhibits you used

12         today you did not provide to me prior to

13         this deposition.

14              MR. MORRIS:  No, but the documents

15         were produced by me in -- in litigation,

16         right?

17              MR. RUKAVINA:  I'm going to use

18         primarily, John, the documents that you

19         produced to me today, but you may.

20              MR. MORRIS:  Primarily.  I've got --

21         I've got my objection.  You have got your

22         response.  Proceed.

23         Q.    Mr. Waterhouse, again, I represent

24    the advisors, HCMFA and NexPoint Advisors.

25              Do you understand that?

```
 1                WATERHOUSE - 10-19-21

 2      A.    Yes.

 3      Q.    You and I have never met or talked

 4  before today, have we?

 5      A.    No, I have -- I have heard your

 6  voice on calls before.

 7      Q.    Okay.

 8            MR. RUKAVINA:  Madam Court Reporter,

 9      I will use a few exhibits today.  My

10      associate, Mr. Nguyen, will find some way

11      to get them to you.  I don't know how to do

12      that, but it looks like you guys do.

13            I am going to use numbers as well.

14      But to differentiate them from Mr. Morris

15      we're going to mark mine with the prefix A

16      for advisors.

17            Do you understand?

18            COURT REPORTER:  Yes.

19            MR. RUKAVINA:  Okay.  Perfect.

20      Q.    Okay.  So, Mr. Waterhouse, let's

21  start with those two HCMFA notes that you were

22  asked about, one for 5 million and one for

23  2.4 million.

24            Do you recall those notes?

25      A.    Yes.
```

```
1                    WATERHOUSE - 10-19-21

2         Q.    Were you ever the CFO of HCMFA?

3         A.    I don't recall.

4         Q.    So to the best of your recollection,

5    you were still an officer of HCMFA in 2019,

6    just that your title was treasurer?

7              MR. MORRIS:  Object to the form of

8         the question.  There is no leading here.

9         He works for your client.

10              MS. DANDENEAU:  That is not -- that

11        is not true.

12              MR. MORRIS:  He's the treasurer --

13        he is the treasurer of your client.  I

14        don't -- I'm going to object every time you

15        try to lead, so...

16              MR. RUKAVINA:  Totally fine to

17        object.

18              MR. MORRIS:  Okay.

19        Q.    Please answer my question,

20   Mr. Waterhouse.

21        A.    I'm sorry, could you repeat?  There

22   was...

23        Q.    Yes.  You were -- you testified

24   earlier that in 2019 you were an officer of

25   HCMFA; correct?
```

1          WATERHOUSE - 10-19-21

2          A.    Yes, I testified that I was the

3   treasurer and I didn't know if that incumbency

4   certificate, you know, was one that appointed

5   me as a treasurer, but yes.

6          Q.    I'm just trying to confirm that

7   sitting here today, to the best of your

8   recollection, at that time you were -- your

9   title was treasurer.  It was not chief

10  financial officer.

11         A.    I don't recall that being my title.

12         Q.    Okay.  And in May of 2019, however,

13  I think you testified you were the chief

14  financial officer of the debtor; correct?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes, I was -- yes.

18         Q.    Okay.  As such, in May of 2019, did

19  you have the authority, to your understanding,

20  to unilaterally loan $5 million or $2.4 million

21  to anyone on behalf of the debtor?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Sorry, can you repeat that?

25         Q.    Yes.  So in your capacity as the

1          WATERHOUSE - 10-19-21

2    chief financial officer of the debtor, Highland

3    Capital Management, L.P., in May of 2019, did

4    you believe that you unilaterally, just Frank

5    Waterhouse, had the authority to loan on behalf

6    of the debtor to anyone $5 million and

7    $2.4 million?

8               MR. MORRIS:  Objection to the form

9          of the question.

10   A.     No.

11   Q.     Is it because loans of that amount

12   would have had to be approved by someone else?

13   A.     Yes.

14   Q.     Who in '20 -- in May of 2019, if

15   Highland wanted to loan 5 million or

16   $2.4 million to someone, what would have been

17   the internal approval procedure?

18               MR. MORRIS:  Objection to the form

19          of the question.

20   A.     If -- if we had loans of that nature

21   that needed to be made due to their size, we

22   would have gotten approval from the -- the

23   president of Highland.

24   Q.     And who that was individual?

25   A.     It was James Dondero.

Case 3:23-cv-00995-Spc-3cpc 86-4 F46c310/29/2011/H5122ed E0f/20/0117032f2318:Pag2127Desf397
Case 3:21-cv-00881-X   Document 287-17   Appendix   Filed 01/09/2899   Page 101 of 200   PageID 44245

Page 272

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  Now, I'm going to ask you a

3     similar question but for a different entity.

4                In May of 2019, as the treasurer of

5     HCMFA, did you believe that you unilaterally

6     had the ability to cause HCMFA to become the

7     borrower of a $5 million loan and a

8     $2.4 million loan?

9                MR. MORRIS:  Objection to the form

10         of the question.

11         A.    No.

12         Q.    What would -- what would the

13    approval have taken place -- strike that.

14                What would the approval process have

15    been like in May of 2019 at HCMFA for HCMFA to

16    take out a $7.4 million loan?

17                MR. MORRIS:  Objection to the form

18         of the question.

19         A.    The process would have been similar

20    to what we just discussed on -- for Highland to

21    make a loan to others.  So, again, you know,

22    we -- we would have -- either myself or someone

23    on the team would have discussed this with

24    the -- the president and owner of -- of HCMFA.

25         Q.    And who was that individual?

1          WATERHOUSE - 10-19-21

2     A.     That was James -- Jim Dondero.

3     Q.     So do I understand that in May of

4  2019, on behalf of both the lender, Highland,

5  and the borrower, HCMFA, Mr. Dondero would have

6  had to approve $7.4 million in loans?

7          MR. MORRIS:  Objection to the form

8     of the question.

9     A.     Yes.

10    Q.     You mentioned when Mr. Morris was

11  asking you the NAV error, N-A-V error, with

12  respect to TerreStar, without writing us a

13  novel, unless you feel like you have to, can

14  you summarize what that NAV error was?  What

15  happened?

16    A.     There was a -- in the Highland

17  Global Allocation Fund, it owned at the time an

18  equity interest in a company called TerreStar.

19  And TerreStar is -- at the time was a private

20  company, and it may still be today.  Again, I'm

21  putting myself back then as a private company.

22          We had -- sorry, I don't mean we --

23  the fund and the advisor used Houlihan Lokey

24  to -- to value that investment.  And during

25  that time there was some trades that were

```
 1              WATERHOUSE - 10-19-21

 2   executed at market levels that were much lower

 3   than the Houlihan Lokey model.

 4              And based on information and

 5   discussions with the portfolio managers and,

 6   you know, principals that were very familiar

 7   with TerreStar, it was determined that those

 8   trades were non-orderly and they were not

 9   considered in the valuation as consulted with

10   Houlihan Lokey and PricewaterhouseCoopers at

11   the time.

12              Subsequent to a -- I can't remember

13   the exact circumstances of why the SEC got

14   involved.  I think it was due to this -- this

15   investment became a material position in the

16   fund.  It triggered an SEC, kind of, inquiry.

17   And as part of that inquiry, they questioned

18   the valuation methodology.  "They" meaning the

19   SEC.

20              And at the culmination of that

21   process -- this is all summarized -- the value

22   that was -- that ultimately had to be used in

23   the fund's NAV was different than -- materially

24   different than what the original valuation at

25   Houlihan Lokey provided.
```

1                    WATERHOUSE - 10-19-21

2                    And given that there was this fund

3    was, as we discussed -- I don't know if we

4    discussed it, but it was an open-ended fund

5    that was going -- that was converting to a

6    close-end fund.

7                    Due to the fact that it was an

8    open-ended fund, you had to recalculate NAV and

9    see what the impact was on people -- on

10   investors coming in and out of the fund and if

11   there is a detrimental impact and to calculate

12   what that -- what that impact was and if there

13   was any amounts owed to the fund pursuant to

14   the error.

15       Q.    Were you personally involved

16   internally at either Highland or HCMFA with

17   these investigations and discussions with the

18   SEC?

19       A.    I was.

20       Q.    Which other key people or senior

21   people at Highland were involved, to your

22   recollection?

23       A.    Myself, Thomas Surgent, David Klos,

24   Lauren Thedford, Jason Post.

25       Q.    Mr. Dondero, was he --

Case 3:21-cv-00881-X Document 864 Filed 10/29/21 Entered 01/03/23 18:27:27 Desc
Case 3:21-cv-00881-X Document 187 Filed 01/09/23 Page 105 of 200 PageID 44249

Page 276

1                    WATERHOUSE - 10-19-21

2        A.     I believe Cliff Stoops.  I'm trying

3    to think.  And maybe that is -- that is -- that

4    is -- that is all kind I can recall at the

5    moment.

6        Q.     Do you recall whether it was

7    determined that the fund suffered losses as a

8    result of this error?

9        A.     The -- the fund -- the -- the --

10   because the open-ended nature of the fund,

11   there were losses that were attributable to

12   investors.  Meaning they -- they would have

13   redeemed and got a less money or -- or they

14   subscribed in and maybe because they didn't get

15   enough shares and then they later sold and then

16   they were harmed in that fashion.

17                And there is -- there is -- there

18   were very -- there were very detailed

19   calculations and, you know, all these different

20   scenarios that we had to -- I'm sorry, I keep

21   saying "we" -- that the individuals involved

22   had to calculate and quantify.

23       Q.     Well, do you recall whether HCMFA

24   admitted certain fault and liability for this

25   error?

Case 3:21-cv-00881-X   Document 187-4   Filed 01/09/24   Page 327 of 397
Case 3:21-cv-00881-X   Document 177-17   Filed 01/09/24   Page 106 of 200   PageID 44250

Page 277

1                     WATERHOUSE - 10-19-21

2          A.      I don't recall specifically.

3          Q.      Do you recall whether HCMFA caused

4    any funds to be paid to the investors and the

5    fund the subject of the NAV error?

6          A.      Yes.

7          Q.      Do you recall the approximate amount

8    of funds, moneys paid to the investors and the

9    fund?

10         A.      It was -- it was approximately

11   $7 million.

12         Q.      If I was to suggest 7.8 million,

13   would that ring more true or are you sticking

14   with your original answer?

15         A.      It was -- it was approximately 7 --

16   7 to $8 million.  Again, I don't remember the

17   exact number, but it was in that ballpark.

18         Q.      So regardless of whether HCMFA

19   accepted fault or liability, it caused some

20   $7 million or more to be paid out to affected

21   investors in the fund?

22                 MR. MORRIS:  Objection to the form

23         of the question.

24         A.      And I want to make sure I'm

25   understanding your question because there is a

1                     WATERHOUSE - 10-19-21

2     lot of different entities that are going on to

3     my head.

4                     I think what you are saying is based

5     on this error, shareholders were harmed by this

6     approximately $7.8 million -- by approximately

7     $7.8 million.  Is that what you are asking?

8          Q.    Yes, sir.

9          A.    Yes, that was -- again, I don't have

10    the exact numbers.  If I take -- it was -- it

11    was in that ballpark, and there is a detail

12    calculation and write-up that could, that --

13    that exists someplace.

14         Q.    Now, at that time, at the time that

15    the NAV error occurred, was there a contract in

16    place between HCMFA and the debtor pursuant to

17    which the debtor was providing services to

18    HCMFA?

19                    MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Was that contract generally called a

23    shared services agreement?

24         A.    It was generally called that, but

25    there were -- there were -- I mean, it -- it --

```
1                    WATERHOUSE - 10-19-21

2     it depends on who you talk to, but yes,

3     generally, there were -- there are multiple

4     agreements.

5          Q.    Pursuant to one or more of those

6     agreements, was the debtor providing certain

7     services to HCMFA?

8                 MR. MORRIS:  Objection to the form

9          of the question.

10         A.    Yes.

11         Q.    And can you at a very high level

12    summarize in 2018 and 2019 what those services

13    were?

14         A.    Yes, there was a -- yes.

15         Q.    Okay.  Please -- please go -- go

16    through a short summary.

17         A.    There was a -- a cost reimbursement

18    agreement between Highland Capital Management

19    Fund Advisors and Highland Capital Management,

20    L.P.  That agreement was for what we referred

21    to as front office services, so investment

22    management, things of that nature.

23                There was I think what most people

24    refer to as the shared services agreement that

25    was -- that agreement was between Highland
```

1          WATERHOUSE - 10-19-21

2     Capital Management Fund Advisors and Highland

3     Capital Management for back office services.

4          Q.     And can you summarize what you mean

5     by back office services?

6          A.     Those services were for accounting,

7     finance, tax, valuation, HR, IT, you know,

8     legal compliance, things of -- things of those

9     nature -- or things of that nature, excuse me.

10         Q.     So in the spring of 2019, do you

11    recall whether HCMFA took the position that it

12    was actually Highland that caused the NAV error

13    to occur pursuant to the valuation services

14    that Highland was providing?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.     I do not recall.

18         Q.     Did you ever have any discussions

19    with anyone, Jim Dondero or anyone in the first

20    half of 2019 as to whether Highland, the

21    debtor, that is, had any liability to HCMFA

22    related to the NAV error?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.     I do not recall.

Case 3:21-cv-00881-X Document 186-4 Filed 10/29/21 Filed 06/20/17 Page 28 of 397
Case 3:21-cv-00881-X Document 17 Appendix Filed 04/09/23 Page 110 of 200 PageID 44254
Page 281

WATERHOUSE - 10-19-21

1

2      Q.      And then you mentioned that the fund

3   was being closed and some compensation related

4   to that.  Can you -- can you elaborate?  What

5   were you referring to?

6      A.      Right.  So the advisor, pursuant to

7   board approval, put a proposal in front of the

8   shareholders of the Highland Global Allocation

9   Fund to convert it from an open-ended fund to a

10  closed-end fund.

11          So an open-ended fund, when

12  shareholders subscribe to the fund or redeem

13  into the fund, they do it at NAV.

14          When it is -- when you have a

15  closed-end fund, closed-end funds are -- are

16  publicly-traded, like on the New York Stock

17  Exchange, exchanges like that, and -- and

18  shareholders or investors, they're not --

19  they're -- they're not subscribing and

20  redeeming with the fund.  They are like shares

21  of Apple.

22          Those shares of the Highland Global

23  Allocation Fund trade on an exchange, and that

24  is how you, you know, that is how, you know,

25  you become an equity owner in the fund or you

1            WATERHOUSE - 10-19-21

2    sell your shares and you are no longer an

3    equity owner.

4            As part of that proposal, the

5    advisor told shareholders if you -- if you vote

6    for this proposal to -- to convert it from an

7    open-ended fund to a closed-end fund, we will

8    pay you some amounts of money.  I forgot -- a

9    certain number of points.  I think it was

10   like -- it was like two to three points or

11   something -- something like that.

12       Q.    Okay.  You mentioned when Mr. Morris

13   was asking you, going back to those two

14   promissory notes, you will recall the 5 million

15   and 2.4 million, you mentioned something to the

16   effect that Mr. Dondero told -- told you to pay

17   some moneys out of Highland.  Do you remember

18   that discussion with Mr. Morris?

19       A.    I do.

20       Q.    So, to the best of your

21   recollection, did you have a discussion with

22   Mr. Dondero about making some payments in May

23   of 2019 out of Highland?

24       A.    I recall, as I testified earlier,

25   that I had a conversation with Mr. Dondero

```
 1                    WATERHOUSE - 10-19-21

 2    for -- for these amounts attributable to -- it

 3    was either the error -- you know, the error,

 4    and in that conversation he said, go get the

 5    money from Highland.  I believe that is what I

 6    testified earlier, and that -- that is my

 7    recollection.

 8         Q.    Do you recall if that was an

 9    in-person meeting or some other mode for the

10    meeting?

11         A.    I -- I -- I recall that being

12    in-person.

13         Q.    Do you recall if anyone else was

14    present, or was it just you and Mr. Dondero?

15         A.    I recall just he and I.

16         Q.    And the moneys that he told you to

17    find from -- or get from Highland, was that in

18    the amount of $5 million and $2.4 million?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    I believe so, but I would have to go

22    back and look and see when those moneys were

23    actually paid into the -- into the fund and,

24    you know, when those transfers were done.  If

25    they were all done around that same time, then
```

                        WATERHOUSE - 10-19-21

1

2   yes, I would say it was -- it was all related

3   to that.

4       Q.    Did Mr. Dondero tell you that those

5   funds would be a loan from Highland to HCMFA?

6       A.    I don't recall.

7             MR. MORRIS:  Objection to the form

8       of the question.

9       Q.    Now, and forgive me, I'm probably

10  the only non-American born here, but I speak

11  reasonably well in English.  I don't recall,

12  does that mean you don't remember or does that

13  mean it didn't happen?

14            MR. MORRIS:  Objection to the form

15      of the question.

16      A.    It -- it means I don't -- I don't

17  remember.

18      Q.    Did Mr. Dondero tell you to have

19  those two promissory notes prepared?

20      A.    I don't recall.

21      Q.    When you -- again, when you say, I

22  don't recall today, that means that sitting

23  here today, you just don't remember one way or

24  the other.  Is that accurate?

25      A.    Yes.

WATERHOUSE - 10-19-21

1

2      Q.    Is it possible that you, having

3  heard what Mr. Dondero said and seeing funds

4  being transferred, assumed that that would be a

5  loan without him actually telling you that

6  would be a loan?

7           MR. MORRIS:  Objection to the form

8      of the question.

9      A.    Sorry, I want to make sure -- did I

10  ask the amounts that were transferred that I --

11  that -- that I assumed that that was a loan?

12      Q.    Well, let me -- let me take -- let

13  me try again.

14           So you have established already that

15  there were quite a number of promissory notes

16  back and forth -- I'm sorry, quite a number of

17  promissory notes with affiliated companies and

18  individuals owing Highland money; right?

19      A.    Yes.

20      Q.    And you have established that there

21  were many transactions and transfers going back

22  and forth over the years; right?

23           MS. DANDENEAU:  Objection to form.

24      A.    In -- yes, in my capacity as CFO and

25  my employment, yes, that is -- yes.

1          WATERHOUSE - 10-19-21

2     Q.    And that's part of the reason why

3  you just can't remember some of the details

4  today because this -- this happened years ago,

5  and there were a number of transactions.  Is

6  that accurate?

7          MS. DANDENEAU:  Objection to the

8     form.

9          MR. MORRIS:  Objection to the form

10     of the question.

11     A.    I mean, I deal with thousands of --

12  of -- of -- of transactions, you know, whether

13  it has -- the processing of transactions, you

14  know, if it has got, you know, more -- more

15  zeros, you know, behind it than others.

16          When you look at thousands of

17  transactions over the years for funds and

18  advisors and -- and, you know, financial

19  statements, I mean, it is -- it is very hard

20  going back in -- in -- in my -- you know,

21  14-ish year career at -- at Highland to

22  remember a lot of those details, especially

23  when I don't have any records or books or

24  anything like that, and -- and going back many

25  years.

                    WATERHOUSE - 10-19-21

1

2          Q.     And that is fine.   That -- that --

3     that is why I asked the question.

4                 Is it possible in May of 2019 when

5     Mr. Dondero told you to transfer the funds from

6     Highland, you just assumed on your own that

7     those would be loans without him actually

8     telling you that those would be loans?

9                 MR. MORRIS:  Objection to the form

10         of the question.

11         A.     I don't know.

12         Q.     I'm sorry, you --

13         A.     I said I don't know.

14         Q.     Okay.  Well, as the -- as the CFO

15    for Highland, if you saw $7.4 million going

16    out, you would feel some responsibility to

17    account for that, wouldn't you?

18                MR. MORRIS:  Objection to the form

19         of the question.

20         A.     Yes.

21         Q.     Is it fair to say that those would

22    be in the range large enough to rise up to your

23    level?

24                MR. MORRIS:  Objection to the form

25         of the question.

1           WATERHOUSE - 10-19-21

2       A.    If -- I don't know if I understand

3   your question.  Those amounts would arise to my

4   level where I would be involved or...

5       Q.    You would want to know what a

6   transfer for that amount, $7.4 million, was all

7   about, as the CFO of Highland, wouldn't you?

8           MR. MORRIS:  Objection to the form

9       of the question.

10      A.    Yes, I make it -- I mean, I -- I

11  review all sorts of payments, I mean, even

12  smaller dollar payments on a periodic basis,

13  you know, to -- to -- to understand and to make

14  sure that we are paying things in a -- you

15  know, in -- in -- in an informed way.  And, you

16  know -- and we're -- and we're paying things

17  pursuant to vendor contracts and things like

18  that.

19      Q.    So as part of that, is it possible

20  that seeing $7.4 million go out you would have

21  promissory notes made in order to keep a paper

22  trail, assuming that those were loans, when

23  perhaps they were never intended to be loans by

24  Mr. Dondero?

25          MR. MORRIS:  Objection to the form

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    I don't know.  As I testified

 4   earlier, I had conversations with Mr. Dondero

 5   about -- about the -- the -- the moneys that

 6   were needed for the NAV error.  And I recall

 7   him saying go get it from Highland -- or get it

 8   from Highland.

 9        Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12             MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18             I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I
```

Case 3:21-cv-00881-X Document 186-4 Filed 10/20/23 Page 329 of 397
Case 3:21-cv-00881-X Document 177-17 Filed 01/09/23 Page 119 of 200 PageID 44263

Page 290

                    WATERHOUSE - 10-19-21

1

2    don't -- I don't recall generally.  I don't --

3    I don't recall.

4        Q.    So -- but to the best of your

5    recollection, it was on your initiative,

6    following your discussion with Mr. Dondero,

7    that you had someone draft those two promissory

8    notes; is that correct?

9             MR. MORRIS:  Objection to the form

10       of the question.

11       A.    Yes, we would have -- the team, as I

12   stated earlier, we don't draft promissory

13   notes.  "The team" meaning the accounting and

14   finance team.

15            So the team would have worked with

16   the legal group at Highland to draft any notes.

17       Q.    Do you believe or do you have any

18   recollection as to whether you would have done

19   that pursuant to an email or telephone call or

20   in-person meeting?

21            MR. MORRIS:  Objection to the form

22       of the question.

23       A.    Are you asking if I would have -- if

24   those notes would have been drafted pursuant to

25   an email or phone call?

```
 1                   WATERHOUSE - 10-19-21

 2       Q.    Strike that.

 3             Do you recall whether you sent an

 4  email to anyone asking them to draft those two

 5  promissory notes?

 6       A.    I don't recall because, again,

 7  once -- I would have instructed -- likely

 8  instructed the team to -- to work with the

 9  legal group to draft these documents.

10             I -- I -- I -- yeah, I didn't -- I

11  mean, that is more an operational-type

12  procedure.  So, you know, a manager or a

13  controller or working with legal.  You know,

14  they -- they can certainly handle that task to

15  get that -- you know, to request that from

16  legal.

17       Q.    And who on your team do you think

18  you would have asked to do that?

19             MR. MORRIS:  Objection --

20       Q.    Who would have been the logical

21  person or people, if you don't remember their

22  name today?

23             MR. MORRIS:  Objection to the form

24       of the question.

25       A.    It -- it -- there is only two
```

 1                    WATERHOUSE - 10-19-21

 2    managers of the group.  That would have been

 3    Dave Klos or Kristin Hendrix.

 4            Dave was the -- one of his duties

 5    was managing the valuation team, and so he was

 6    intimately involved with this process.  So, you

 7    know...

 8        Q.    Okay.

 9        A.    I don't recall specifically but, I

10    mean, my general -- you know, I -- I -- I

11    likely would have talked to Dave first about it

12    versus someone like Kristin who hadn't been

13    intimately involved.

14        Q.    And -- and do you have a view as to

15    whether it is most likely that you would have

16    done that by email or in-person or how would

17    you believe you would have communicated that to

18    Mr. Klos?

19            MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I likely would have done that in

22    person.  Again, if things of this nature

23    that -- again, you have to put ourselves back

24    to, we have been working on this very stressful

25    project for many, many months.  And once the

WATERHOUSE - 10-19-21

1
2    go-ahead was to -- you know, we see the light

3    at the end of the tunnel with wrapping this up

4    and making shareholders whole -- sorry to say

5    "we" -- you know, the -- so the folks that are

6    involved in it.

7              I like to talk to people

8    face-to-face and -- and -- and go to -- and go

9    to their desk, because that shows if I'm going

10   to their desk that -- that is something that I

11   want done, you know.

12        Q.    And do you remember, Mr. Waterhouse,

13   getting those two promissory notes in paper

14   format or by email before they were executed?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall.

18        Q.    For whatever was the ordinary course

19   back then in May 2019, would you expect to have

20   received them only on paper or would you have

21   expected to have received them in Word document

22   or PDF document by email?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I -- I didn't sign -- I signed very

Case 3:21-cv-00881-X Document 864 Filed 10/29/21 Entered 10/29/21 08:23:18 Page 29 of 397
Case 3:21-cv-00881-X Document 287-17 Filed 04/29/24 Page 123 of 200 PageID 44267

Page 294

```
 1                 WATERHOUSE - 10-19-21

 2    few documents via email.  I can't say that it

 3    never happened, but people either stopped by my

 4    office and physically walked in documents for

 5    signature that we discussed face-to-face.

 6                 Or documents were -- if -- if --

 7    if -- if -- let's say I wasn't there or I

 8    wasn't available, documents were dropped off.

 9    I had -- I had some in- and outboxes in front

10    of my -- my office there at the Crescent.

11                 Documents would be dropped off for

12    signature.  There would be a cover sheet that

13    would be -- have been applied to those

14    documents detailing, you know, who dropped it

15    off, the purpose, why, what time.

16                 And then, you know, as I stated, I

17    don't draft documents and I always go to the

18    legal group and the compliance group to make

19    sure that they're in the loop.  And there is

20    a -- a box or section that says, Has legal

21    reviewed or approved, or something to that

22    nature.

23                 Again, I don't -- I don't have

24    access to that cover sheet anymore, but it

25    was -- it was something to that effect.
```

Page 295

1                    WATERHOUSE - 10-19-21

2                    And my assistant, you know, if she

3    was there, she would review that -- you know,

4    whatever was being dropped off.  And if that

5    has legal, you know, reviewed or -- reviewed or

6    approved it, if that wasn't -- if that stuff

7    hadn't been done, it was like she would just

8    tell them like, go -- go -- go to the legal

9    group, because --

10        Q.    Let me -- let me pause --

11              MS. DANDENEAU:  Let him finish.

12              MR. MORRIS:  Thank you.  Go ahead.

13        A.    I take -- go to the legal group

14   because that -- that was my -- you know, I

15   didn't -- I didn't review anything that -- that

16   they weren't -- you know, or there wasn't some

17   representation made to me that they had

18   reviewed, approved in some capacity.

19                    Again, my -- my -- my goal, as CFO,

20   is to provide transparency and make sure that

21   groups like compliance and other things -- and

22   the other group in legal are -- are in -- you

23   know, their -- they're made aware of

24   transactions of -- you know, that are crossing

25   my desk.

Case 3:21-cv-00881-X  Document 864  Filed 10/29/21  Entered 10/29/21 08:23:18  Page 329 of 397
Case 3:21-cv-00881-X  Document 17ac  Appendix  Filed 01/09/24  Page 125 of 200  PageID 44269

Page 296

1                WATERHOUSE - 10-19-21

2                Because I'm not in every

3    conversation.  They're not in every

4    conversation -- meaning legal compliance -- and

5    I just want to make sure that -- that everyone

6    is in sync to, you know, to -- to the extent

7    possible.

8         Q.    So if we summarize, you don't

9    specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13               MR. MORRIS:  Objection to the form

14        of the question.

15        A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19        Q.    I understand.  Understand.

20               When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24        A.    No, I -- I -- I use a -- an -- an

25   ink pen.

Case 3:21-cv-00881-X   Document 177   Filed 03/22/18   Page 29 of 397
Case 3:21-cv-00881-X   Document 177   Filed 04/569/2899   Page 126 of 200   PageID 44270

Page 297

1                    WATERHOUSE - 10-19-21

2        Q.    Do you know -- was there a file at

3    Highland kept anywhere with ink-signed

4    originals of a promissory notes in general or

5    these two promissory notes specifically?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    Sorry, I just want to make sure I

9    understand your question.  Are you saying is

10   there a file somewhere that has ink-signed

11   originals of these two promissory notes?

12       Q.    Yes.

13       A.    I would -- I would assume they're

14   some place.  I mean --

15       Q.    Well, was there a -- was there a

16   place where Highland generally kept originals

17   of promissory notes owed to it?

18       A.    I wouldn't -- no.

19             MR. RUKAVINA:  Mr. Nguyen, would you

20   please pull up my A7, alpha 7.

21       Q.    These are the two promissory notes,

22   Mr. Waterhouse.

23             (Exhibit A7 marked.)

24       Q.    And please -- Mr. Waterhouse, please

25   command my associate to scroll down as you need

WATERHOUSE - 10-19-21

1
2  to, but I want you to take a very close look at
3  your two signatures here and tell me whether
4  you believe, in fact, that you ink signed them
5  or whether you --
6          MS. DANDENEAU:  Mr. Rukavina,
7      Mr. Waterhouse has the copies.
8          MR. RUKAVINA:  Perfect.  Then you
9      can take this down, Mr. Nguyen.
10     A.    These -- these -- these signatures
11 are identical, now that I stare at them, and I
12 mean, they are so close -- I mean, they're
13 identical that, I mean, even with my chicken
14 scratch signature, I don't know if I can -- you
15 know, I do this 100 times, could I do that
16 as -- as precisely as I see between the two
17 notes.
18     Q.    Well, that is why I ask.
19 Mr. Waterhouse, now that you have examined
20 them, does it seem like it is more likely that
21 you actually electronically signed these?
22          MR. MORRIS:  Objection to the form
23      of the question.
24     A.    Is -- I don't -- I don't recall
25 specifically.  As I said before, my assistant

1                    WATERHOUSE - 10-19-21

2      did have a -- an electronic signature, and that

3      was used from time to time.  It wasn't as

4      common practice back in 2019.  It definitely

5      was more common practice when we had to work

6      from home and remotely for COVID because it

7      that made it almost impossible to, right,

8      provide wet signatures since we're all working

9      from home remotely.

10          Q.    Well, going just for these two

11     promissory notes, Mr. Waterhouse, in light of

12     your inability to remember any details, are you

13     sure you actually signed either or both of

14     those notes?

15               MS. DANDENEAU:  Objection to form.

16          A.    I don't recall specifically

17     signing -- actually physically signing these

18     notes.  As I said before, I don't recall doing

19     that.  This -- this looks like my signature,

20     but yet these two signatures are identical.

21          Q.    So you don't recall physically

22     signing them, and I take it you don't recall

23     electronically signing them either?

24          A.    I don't recall.  You know, Highland

25     has all my emails.  If that occurred, you know,

1                    WATERHOUSE - 10-19-21

2    you know, I don't have any of these records is

3    what I'm saying.  I don't have any of those

4    records.

5         Q.    That is why I'm asking you these

6    questions in great detail because I don't have

7    those emails.  I'm trying to -- I'm hoping that

8    you will give me some names or some details so

9    I can go look for more emails, but again, you

10   don't remember any -- any individual, other

11   than Mr. Dondero that we've discussed, you

12   don't remember any individual with whom you

13   discussed these promissory notes prior to their

14   execution?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall discussing it with

18   anybody else.

19        Q.    Okay.

20        A.    I mean, prior --

21        Q.    I understand.

22        A.    You know, there was no one else --

23   there was no one else in that meeting that I

24   recall with Mr. Dondero.

25        Q.    Now, when you established that by

Case 21-03005-sgj Doc 86-4 Filed 10/20/21 Entered 10/20/21 17:22:18 Page 30 of 397
Case 3:21-cv-00881-X Document 177 Appendix Filed 01/09/23 Page 130 of 200 PageID 44274
Page 301

1              WATERHOUSE - 10-19-21

2     May of 2019 --

3          A.    And -- and from what I recall, and

4     the reason why I was by myself is -- is, you

5     know, I don't -- I don't want to speculate, I'm

6     sorry.

7          Q.    Okay.  We have established that by

8     May of 2019, in your view, the liabilities of

9     HCMFA exceeded its assets; correct?

10         A.    Yeah.  I mean, again, I don't have

11    financial statements in front of me, but I

12    think, if I recall, we'd have to go through the

13    testimony with Mr. Morris, I believe that was

14    the case.

15         Q.    In fact, you will recall that in

16    April of 2019, Mr. Dondero signed a document

17    that extended the demand feature of two prior

18    notes to May 31, 2019.  Do you recall that?

19              MS. DEITSCH-PEREZ:  I think you

20         might -- maybe have the court reporter read

21         that back.  You might have misspoke.

22              (Record read.)

23              MR. RUKAVINA:  And I did misspeak.

24         Q.    I meant to say to May 31, 2021.  Do

25    you recall that, sir?

1           WATERHOUSE - 10-19-21

2           MR. MORRIS:  Objection to the form

3      of the question.

4      A.    Yes.

5           MR. RUKAVINA:  And, Mr. Nguyen, just

6   so that the record is clear, will you please

7   pull up my Exhibit Alpha 10, A10.

8           (Exhibit A10 marked.)

9      Q.    You don't have this one in front of

10  you, Mr. Waterhouse?  This is the one that

11  Mr. Morris used earlier.  Do you see that

12  document, sir?

13     A.    Yes, I do.

14     Q.    And this is what you were testifying

15  about before when Mr. Morris was asking you.

16  Do you remember that?

17     A.    Yes.

18     Q.    So here is my question for you,

19  Mr. Waterhouse:  As the chief financial officer

20  of Highland, was it prudent for Highland less

21  than three weeks later to be lending

22  $7.2 million to an insolvent entity that

23  couldn't even then pay its debts back to

24  Highland?

25           MS. DANDENEAU:  Objection to form.

1          WATERHOUSE - 10-19-21

2          MR. MORRIS:  Objection to the form

3     of the question.

4     A.    Sorry, I just want to make sure --

5  are you asking me, did you say, was it prudent

6  for Highland to loan $7.4 million to HCMFA a

7  few weeks after this document was executed?

8     Q.    Yes, and at a time when HCMFA's

9  liabilities exceeded its assets.

10         MR. MORRIS:  Objection to the form

11    of the question.

12    A.    I don't -- it is odd.  I don't know.

13         MR. RUKAVINA:  You can take this

14  exhibit down, Mr. Nguyen.

15    Q.    Do you recall asking anyone,

16  Mr. Dondero or -- or anyone outside as to

17  whether Highland ought to be lending

18  $7.4 million to HCMF regarding HCMF's

19  creditworthiness?

20         MR. MORRIS:  Objection to the form

21    of the question.

22    A.    I don't recall.

23    Q.    Did you receive personally any of

24  that $7.4 million?

25    A.    No.

```
 1                    WATERHOUSE - 10-19-21

 2          Q.    Did you even --

 3               MR. MORRIS:  I didn't hear that

 4          question, sir.

 5               MR. RUKAVINA:  The one that he

 6          answered, John, or my new one?

 7               MR. MORRIS:  No, no, your question,

 8          Davor.

 9               MR. RUKAVINA:  I had asked him

10          whether he received any of the

11          $7.4 million.  He said no.

12               MR. MORRIS:  Yeah.  I thought there

13          was a question after that.  Maybe I was

14          mistaken.  I apologize.

15               MR. RUKAVINA:  I had started a new

16          question, so here, let me start the new

17          question again.

18          Q.    Did you personally receive any

19     direct benefit from those two notes for

20     $7.4 million?

21          A.    No.

22          Q.    Did you ever personally consider

23     yourself obligated to repay either or both of

24     those notes?

25          A.    No.
```

Case 3:23-cv-00769-X Doc 86-4 Filed 10/28/24 Entered 10/28/24 18:34:30 Desc
Case 3:21-cv-00881-X Document 177 Filed 04/09/24 Page 134 of 200 PageID 44278

Page 305

                        WATERHOUSE - 10-19-21

1

2              MR. RUKAVINA:  Pull up those notes

3    again, Mr. Nguyen.

4         Q.    You can have them in front of you,

5    Exhibit 7, Mr. Waterhouse, whatever is easier

6    for you.  If you go to your signature page, my

7    question to you is, why did you not include

8    your title as treasurer by your name, Frank

9    Waterhouse?

10             MS. DANDENEAU:  Objection to form.

11        A.    I didn't -- I didn't draft this

12   document.

13        Q.    So you relied on whoever drafted it

14   to draft it correctly?

15        A.    Yes.

16        Q.    Okay.  But back then when you signed

17   this, did it ever cross your mind that you were

18   the maker on these notes?

19        A.    No.

20        Q.    Back then when you signed this

21   document, did it ever cross your mind that you

22   could be a co-obligor on these notes?

23        A.    No.  I didn't receive $7.4 million,

24   I mean...

25        Q.    But can you say that HCMFA received

1          WATERHOUSE - 10-19-21

2    $7.4 million?

3          A.    I would have to go back and look and

4    check in, you know, the -- the financial

5    records and the bank statements.

6               MR. RUKAVINA:  You can take this

7    exhibit down, Mr. Nguyen.

8          Q.    Mr. Waterhouse, I'm not trying to be

9    a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17         A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19         Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.

Case 3:21-cv-00881-X Document 180-4 Filed 10/20/23 Entered 10/20/23 18:43:30 Desc397
Case 3:21-cv-00881-X Document 78-17 Filed 04/05/23 Page 136 of 200 PageID 44280

Page 307

```
 1                    WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to the

 3       form.

 4       A.    Yes.

 5       Q.    So do you agree with me that it's

 6   odd -- I think that is the word you used --

 7   that Highland would be loaning $7.4 million a

 8   few weeks after that extension to an entity

 9   whose liabilities exceeded its assets, and you

10   would agree with me that it was never your

11   intention to be in any way liable for these two

12   promissory notes; correct?

13              MR. MORRIS:  Objection to the form

14       of the question.

15       A.    Sorry, you -- you asked a lot there.

16              MR. RUKAVINA:  I will strike it and

17   I will move on.

18              Let's go to -- pull up Exhibit 9,

19   please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20   9, A9.

21              (Exhibit A9 marked.)

22       Q.    Sir, take a moment to look at this,

23   but this is an email, and you will see attached

24   July 31, 2020 affiliate notes.

25              Do you see that attachment?
```

Case 3:21-cv-00881-X  Document 86-4  Filed 10/20/21  Entered 10/20/21 03:22:18  Page 330 of 397
Case 3:21-cv-00881-X  Document 177  Filed 04/09/24  Page 137 of 200  PageID 44281

Page 308

```
1                  WATERHOUSE - 10-19-21

2        A.     Yes.

3        Q.     Okay.  And do you see an entry for

4    Highland Capital Management Fund Advisors?

5               MR. MORRIS:  I'm sorry, hold on.

6        Where are you looking?

7               MR. RUKAVINA:  Last page, John.

8               MR. MORRIS:  Is it the page on the

9        screen?

10              MR. RUKAVINA:  Oh, I'm sorry.

11       Mr. Nguyen just did it.  Yes, the last page

12       there.

13              MR. MORRIS:  Thank you.

14       Q.     Do you see an entry there for HCMFA?

15       A.     Yes.

16       Q.     About $10.5 million.

17              Do you see that?

18       A.     I do.

19       Q.     And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23       A.     I don't know.  Okay.

24              MR. RUKAVINA:  Close this one and

25       pull up, Mr. Nguyen, the schedules,
```

Case 3:21-cv-00881-X Document 88-4 Filed 10/20/21 Entered 10/20/21 23:18:43 Page 309 of 397
Case 3:21-cv-00881-X Document 78-17 Filed 04/09/2899 Page 138 of 200 PageID 44282

Page 309

1                    WATERHOUSE - 10-19-21

2          schedule of assets.  What exhibit is this

3          of ours, Mr. Nguyen?

4                    MR. NGUYEN:  This is A11.

5                    MR. RUKAVINA:  Oh, this will be A11.

6                    (Exhibit A11 marked.)

7          Q.    You don't have this in front of you,

8    Mr. Waterhouse?

9          A.    Okay.

10         Q.    This is what Mr. Morris used

11   earlier.  Do you remember looking at this with

12   Mr. Morris?

13         A.    Yes.

14                   MR. RUKAVINA:  You might have to

15         zoom in a little.  Okay.

16         Q.    Now, I see Affiliate Note A, B, and

17   C.

18                   Do you have any recollection as to

19   why the names of the affiliates are omitted?

20         A.    I don't.  I testified earlier that,

21   you know, the team worked with DSI in providing

22   these.  I -- I don't -- I don't know.

23         Q.    Can we deduce -- is it logical to

24   deduce that Affiliate Note A would be NexPoint

25   given its size of $24.5 million?

WATERHOUSE - 10-19-21

```
 1              MR. MORRIS:  Objection to the form

 2       of the question.

 3       A.    I mean, it -- it is a -- it is -- it

 4  is approximate.

 5       Q.    Well, can we -- can we deduce -- or,

 6  I'm sorry, strike that.

 7              Can you, sitting here today,

 8  logically conclude that Affiliate Note B or C

 9  represents HCMFA?

10              MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I don't know.  I don't know.  I

13  can't.

14       Q.    Okay.  As of the petition date, we

15  have established that HCMFA, under promissory

16  notes, owed $7.4 million and $5.3 million to

17  the debtor; correct?

18              MR. MORRIS:  Objection to the form

19       of the question.

20       A.    Yes.

21       Q.    Okay.  And by my reckoning, that

22  would be somewhere approaching $13 million.

23              MR. MORRIS:  Objection to the form

24       of the question.
```


                    WATERHOUSE - 10-19-21

1

2        Q.     It would be $12.7 million.  Is that

3   generally correct?

4        A.     Sorry, the amounts were 7.4, 5.3.

5        Q.     Yes.

6        A.     Okay.  Yeah, that -- that -- I can

7   do that math, yes.

8        Q.     Do you have any explanation or any

9   understanding of why there is no similar entry

10  listed here on the schedule of assets filed

11  with the bankruptcy court?

12              MR. MORRIS:  Objection to the form

13       of the question.

14       A.     I don't know.  We have to look at

15  the supporting schedules, like I talked about

16  other -- presumably there is -- there is a

17  build to the schedule that would provide the

18  detail.

19       Q.     Well, that was going to be my next

20  question.  You anticipated it.

21              MR. RUKAVINA:  You can -- you can

22       take this down, Mr. Nguyen.

23       Q.     Do you believe that whenever you and

24  your team provided the underlying data to the

25  financial advisor that the actual names of the

Case 3:21-cv-00881-X   Document 284   Filed 01/05/22   Entered 01/03/22 18:34:31   Desc
Case 3:21-cv-00881-X   Document 287-17   Filed 05/09/24   Page 141 of 200   PageID 44285

Page 312

1                    WATERHOUSE - 10-19-21

2    affiliates for Affiliate Note A, B, and C would

3    have been listed there?

4          A.    Are you asking we provided the names

5    to the financial advisor?  I don't -- I don't

6    understand who the financial advisor is.

7          Q.    I'm sorry, DSI.

8                Let me ask the question this way,

9    Mr. Waterhouse.

10               Whenever you provided information

11   about the affiliate notes to DSI, do you

12   believe that you would have included the actual

13   names of the affiliates, you or your team, or

14   that you would have done the Affiliate Note A,

15   Note B, Note C?

16               MR. MORRIS:  Objection to the form

17         of the question.

18               MS. DANDENEAU:  Objection to the

19         form.

20         A.    We -- like I testified earlier, when

21   we were -- we gave everything to -- to DSI.  We

22   were giving all of our records, all of our

23   files, everything to DSI.  We weren't redacting

24   information or saying, hey, here is a note,

25   here is Affiliate Note A or B.

1          WATERHOUSE - 10-19-21

2              I mean, it was -- our job and our

3    focus -- and I testified in court back in 2019;

4    right -- was -- was to be transparent and, you

5    know, get DSI up to speed on -- on the matters

6    at Highland.  So I can't see us redacting at

7    that point.

8              MR. RUKAVINA:  Mr. Nguyen, will you

9         please pull up Mr. Morris' Exhibit 36.

10        Just the very first page, the very top

11        email.  You might zoom in a little bit.

12        Q.    Now, you recall being asked about

13   this by Mr. Morris?

14        A.    Yes, I do.

15        Q.    And you wrote:  The HCMFA note is a

16   demand note.

17              You wrote that; right?

18        A.    Yes.

19        Q.    And, in fact, weren't there by that

20   point in time several notes?

21        A.    Yes, there were.  Again, I don't --

22   I don't remember everything specifically.  I

23   mean --

24        Q.    I understand.  I understand.

25              So this is an example where -- where

Case 3:21-cv-00881-X Document 86-4 Filed 10/20/21 Entered 10/20/21 18:43:31 Page 312 of 397
Case 3:21-cv-00881-X Document 177 Appendix Filed 05/29/23 Page 143 of 200 PageID 44287

Page 314

1                    WATERHOUSE - 10-19-21

2    you might have made a mistake by referring to a

3    singular instead of a plural; right?

4         A.    Yes.

5         Q.    Okay.  And you -- you wrote -- a

6    couple of sentences later, you wrote:  There

7    was an agreement between HCMLP and HCMFA the

8    earliest they could demand is May 2021.

9              You wrote that; right?

10        A.    Yes.

11        Q.    But I think you -- you agreed with

12   Mr. Morris that that can't possibly apply to

13   the May 2019 notes, can it?

14             MR. MORRIS:  Objection to the form

15        of the question.  That is not what he

16        testified to.

17        Q.    Let me ask -- let me ask a different

18   question.

19             Sitting here today -- or if you can

20   answer me from your memory on October 6,

21   2020 -- did the April acknowledgment that

22   extended the maturity date apply to the

23   May 2019 notes also?

24        A.    I don't recall specifically.

25        Q.    Well, you recall that the notes that

Case 3:21-cv-00881-X Document 864 Filed 10/29/21 Entered 10/29/21 18:13:31 Desc
Case 3:21-cv-00881-X Document 177 Filed 05/09/23 Page 144 of 200 PageID 44288

Page 315

                        WATERHOUSE - 10-19-21

1      you signed were demand notes; right?

2      A.    Yes.

3      Q.    Do you find it logical, based on

4      your experience, that had they intended to have

5      a different or a set maturity date, you would

6      have instructed that that set maturity date be

7      included instead of a demand feature?

8               MR. MORRIS:  Objection to the form

9               of the question.

10     A.    Sorry, just want to make sure I

11     understand.  You are saying that -- that the

12     $5 million note, the $2.4 million note, if

13     those were supposed to be a term note, that I

14     would have made sure that those were a term

15     note?

16     Q.    I'm saying -- I'm saying,

17     Mr. Waterhouse, that on May the 2nd and May the

18     3rd, 2019, if you intended that those two

19     promissory notes could not be called until May

20     2021, would you have included such language in

21     those two promissory notes?

22              MR. MORRIS:  Objection to the form

23              of the question.

24     A.    I guess -- I'm sorry, I don't recall

```
 1                  WATERHOUSE - 10-19-21

 2    putting language in those May notes.  I don't

 3    remember what language you are referring to.

 4         Q.    Well, let's read this again.

 5               There was an agreement between HCMLP

 6    and HCMFA the earliest they could demand is May

 7    2021.

 8               Do you recall that agreement?

 9         A.    Yes, that was the agreement we

10    looked at earlier; correct?

11         Q.    Okay.  Yes.

12               Do you -- do you understand now that

13    that agreement that we looked at earlier also

14    applied to the May 2019 notes that you signed?

15         A.    I don't -- I don't know.

16         Q.    But as of October 6, 2020, you're

17    writing that there is one demand note and

18    you're categorizing that demand note as not

19    being demandable on May 2021; correct?

20         A.    Yes.

21         Q.    And you know now that you made at

22    least one mistake in this email; correct?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    Yes.
```

1          WATERHOUSE - 10-19-21

2          MR. RUKAVINA:  You can pull this

3     down, Mr. Nguyen.

4     Q.    So, Mr. Waterhouse, you don't

5  remember Mr. Dondero telling you to make these

6  loans or not.  HCMLP was loaning $7.4 million

7  to someone that their assets were less than

8  their liabilities.

9          We don't see on the July list of

10  notes, where there is $12.7 million of notes,

11  we don't see that on the bankruptcy schedules,

12  and we have this Exhibit 36 where you are

13  confused.

14          Are you prepared to tell me, sir,

15  today that you might have made a mistake in

16  executing those two promissory notes?

17          MR. MORRIS:  Objection to the form

18     of the question.

19     A.    I -- I don't know.

20     Q.    And if it turns out that you're

21  personally liable for those promissory notes,

22  it would certainly be a mistake, wouldn't it?

23          MS. DANDENEAU:  Objection to the

24     form.

25          MR. MORRIS:  Join.

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    If Mr. Dondero testifies that he

 4   never told you to make these loans, would you

 5   disagree with his testimony?

 6              MR. MORRIS:  Objection to the form

 7        of the question.

 8        A.    Like I testified earlier with my

 9   conversation with Mr. Dondero, all I recall is

10   he said, get the money from Highland.

11        Q.    And if Mr. Dondero testifies that

12   he, in consultation with other senior personnel

13   at Highland, decided that Highland needed to

14   pay HCMFA $7.4 million as compensation for the

15   NAV error and not a loan, would you have any

16   reason to disagree with Mr. Dondero?

17              MR. MORRIS:  Objection to the form

18        of the question.

19        A.    If that was -- if that was his

20   intent, yes, it would -- I would --

21        Q.    Do you have any reason to disagree

22   with him?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    If that was his intent, I don't
```

1                    WATERHOUSE - 10-19-21

2     know.  I don't know how I disagree with that.

3          Q.     And just to confirm, you don't

4     remember ever asking Mr. Dondero whether you

5     should have two promissory notes prepared?

6          A.     No.

7          Q.     And you don't remember discussing

8     with Mr. Dondero what the terms of those two

9     promissory notes should be?

10         A.     I don't recall -- I testified all I

11    recall is he said, get the money from Highland.

12    I don't -- the -- the terms of the note, I

13    don't recall ever having a discussion around

14    the terms of the note, but since I don't draft

15    the notes, that -- there could have been a

16    conversation with other people later.

17         Q.     Do you have any memory of whether

18    after the notes were drafted, but before you

19    signed them, that you communicated with

20    Mr. Dondero in any way to just confirm or -- or

21    get his blessing or ratification to signing

22    those notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.     I don't recall.

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Again, the only thing you remember,

 3   sitting here today, was Mr. Dondero said, get

 4   the money from Highland, and that is it, that

 5   is all you remember?

 6              MR. MORRIS:  Objection to the form

 7       of the question.

 8       A.    I testified to that several times.

 9   This was over two years ago.  A lot has

10   happened.  That is all I recall.

11       Q.    And help me here.  I'm not very

12   technologically astute.  When you -- and I -- I

13   recognize that you do it rarely, but when you

14   sign a document electronically, do you believe

15   that there is an electronic record of you

16   having authorized or signed a document

17   electronically?

18              MR. MORRIS:  Objection to the form

19       of the question.

20       A.    I -- I don't know the tech answer to

21   that, but, you know, since I don't have -- I

22   don't ever attach my signature block

23   electronically, my assistant would have done

24   that, and if that is done over email like we

25   did several times -- you know, multiple,
```

WATERHOUSE - 10-19-21

1

2    multiple times over COVID, she would attach my

3    signature block and then email it out to

4    whatever party.

5        Q.    What was your assistant's name in

6    May 2019?

7        A.    It was Naomi Chisum.

8        Q.    Is she the only one?  I'm sorry, was

9    she your only assistant that would have maybe

10   facilitated logistically something like you

11   just described?

12       A.    You know, she was out on maternity

13   leave at some point.  I don't -- I don't recall

14   those dates where she was out for maternity

15   leave.  There was -- there were folks backing

16   her up.  I don't recall specifically who

17   those -- who those, you know, administrative

18   assistants were, and I don't recall

19   specifically if she was out during this time on

20   maternity leave.

21            I do know that that she was out for

22   a period of time, or who knows, or she could

23   have been on vacation that day or, you know, I

24   don't know.

25       Q.    Switching gears now, the two

Case 3:21-cv-00881-X Document 88 Filed 10/29/21 Entered 10/29/21 18:32:43 Page 332 of 397
Case 3:21-cv-00881-X Document 180-17 Filed 06/09/23 Page 151 of 200 PageID 44295
Page 322

1                    WATERHOUSE - 10-19-21

2      complaints that have been filed that is against

3      HCMFA and NexPoint, did you see any drafts of

4      those complaints before they were filed?

5                    MR. MORRIS:  Objection to the form

6           of the question, and to the extent that you

7           had any communications with counsel or you

8           were shown drafts of the complaints by

9           counsel while you were employed by

10          Highland, I direct you not to answer.

11     A.     I -- I reviewed documents yesterday

12     with counsel here.  I believe that is the first

13     time I have ever seen those.

14     Q.     Okay.  Did you ever discuss with

15     Mr. Seery these two lawsuits before or after

16     they were filed?

17     A.     I don't recall.

18     Q.     Were you ever interviewed by legal

19     counsel, to your knowledge, about these

20     promissory notes before the complaints were

21     filed?  Without going into what was said, were

22     you ever interviewed by legal counsel?

23                    MR. MORRIS:  Objection to the form

24          of the question.

25     A.     I don't recall.

Case 3:21-cv-00881-X Document 864 Filed 10/29/01 Entered 01/29/01 03:38:18 Page 332 of 397
Case 3:21-cv-00881-X Document 187 Filed 06/09/23 Page 152 of 200 PageID 44296

Page 323

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Obviously with COVID, it changed,

 3   but -- but before COVID, did you used to meet

 4   with Mr. Seery from time to time in-person?

 5         A.    Yeah, I mean, so before COVID -- so

 6   we're talking kind of late March, early April,

 7   right, there was about -- I don't remember the

 8   specific date when the board for Highland was

 9   appointed.  I believe it was around February of

10   2020, so maybe there was a month-and-a-half,

11   two-month window where we were meeting

12   in-person or, you know, like we were actually

13   in the office, excuse me, we were in the

14   office.

15              And, you know, when they were first

16   appointed, the board members and Mr. Seery

17   were -- were definitely down here more

18   in-person.

19         Q.    Did you ever see Mr. Seery taking

20   written notes of -- of his meetings with you or

21   others?

22         A.    I don't recall.

23         Q.    Do you recall on any Zoom or video

24   conference with Mr. Seery, seeing him take

25   notes, written notes?
```

Case 3:23-cv-00505-jc Doc 86-4 Filed 10/28/2011/05/22 Entered 01/28/2017 03:23:18 Page 320 of 397
Case 3:21-cv-00881-X   Document 287-17   Appendix   Filed 04/29/22   Page 153 of 200   PageID 44297

Page 324

1                   WATERHOUSE - 10-19-21

2          A.    The Zoom calls we had, I don't

3    recall having seen video or, you know, or if it

4    was on Zoom, I just remember it being -- well,

5    no, you know what, there were some -- you know,

6    I take that back.

7                   So there were -- there were some

8    times that I did remember seeing Mr. Seery

9    on -- on some of the Zoom calls.

10         Q.    Well, let me --

11         A.    I don't -- sorry, I'm thinking.  I'm

12   thinking -- I'm going back.  I'm trying to

13   process this.

14         Q.    I can make it much quicker,

15   Mr. Waterhouse.  I have heard -- I have heard

16   that Mr. Seery is a copious note taker.

17                   Do you have any knowledge about

18   that?

19         A.    No.

20         Q.    Okay.  Switching gears yet again,

21   and this will be last theme.  Do you need a

22   restroom break, or are you good to go for

23   another half an hour?

24                   MS. DEITSCH-PEREZ:  I need a

25         restroom break.

Case 21-03005-sgj Doc 864 Filed 10/20/21 Entered 10/20/21 17:22:18 Page 332 of 397
Case 3:21-cv-00881-X Document 177 Appendix Filed 01/09/23 Page 154 of 200 PageID 44298

Page 325

WATERHOUSE - 10-19-21

1

2          MR. RUKAVINA:  Can we make it five

3      minutes?

4          THE WITNESS:  Five minutes would be

5      great.

6          VIDEOGRAPHER:  We're going off the

7      record at 5:53 p.m.

8      (Recess taken 5:53 p.m. to 5:59 p.m.)

9          VIDEOGRAPHER:  We are back on the

10     record at 5:59 p.m.

11     Q.    Mr. Waterhouse, I had asked you

12 earlier about contracts between HCMFA and the

13 debtor, and now I'm going to talk about

14 contracts between the debtor and NexPoint

15 Advisors.  Okay?

16     A.    Okay.

17     Q.    Now, were there contracts similar to

18 the ones with HCMFA that NexPoint had in the

19 nature of employee reimbursement and shared

20 services?

21     A.    Yes, they -- NexPoint Advisors and

22 Highland Capital Management Fund Advisors had

23 cost reimbursement and shared services

24 agreements with Highland Capital Management,

25 L.P.

1          WATERHOUSE - 10-19-21

2      Q.    And was that shared services

3  agreement, to the best of your understanding,

4  in place as of December 31, 2020?

5      A.    It was -- it was terminated at some

6  point, and I remember the contracts had

7  different termination dates, but I think the --

8  the date of termination was January 31st of

9  2021, after the termination was put in.

10          So yeah, it would be in place at the

11  end of the year of December -- it would be in

12  place at December 31st, 2020.

13      Q.    And pursuant to that agreement as of

14  December 31st, 2020, was the debtor providing

15  what you would describe as back office services

16  to NexPoint?

17      A.    Yes.

18      Q.    Would those have included accounting

19  services?

20      A.    Yes.

21      Q.    And as part of those accounting

22  services, would the debtor have assisted

23  NexPoint with paying its bills?

24          MR. MORRIS:  Objection to the form

25      of the question.

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Yes.

 3         Q.    So let's break that up.  You were a

 4    treasurer of NexPoint as well in December of

 5    2020?

 6               MR. MORRIS:  Objection to the form

 7         of the question.

 8         A.    Yes.

 9         Q.    Okay.  And in December of 2020, did

10    NexPoint have its own bank accounts?

11         A.    Yes.

12         Q.    And did it use those bank accounts

13    to pay various of its obligations?

14         A.    Yes.

15         Q.    Did employees of the debtor have the

16    ability to cause transfers to be made from

17    those bank accounts on behalf of NexPoint?

18         A.    Yes.

19         Q.    And is that one of services that the

20    debtor provided NexPoint, basically ensuring

21    that accounts payable and other obligations

22    would be paid?

23         A.    Yes.

24               MR. MORRIS:  Objection to the form

25         of the question.
```

Page 328

1                    WATERHOUSE - 10-19-21

2          Q.    You answered yes?

3          A.    Yes.

4          Q.    And the payments, though, whose

5    funds would they be made from?

6          A.    From the bank account of NexPoint

7    Advisors.  If they were NexPoint advisor

8    obligations, it would be made from NexPoint

9    Advisors' bank account.

10         Q.    So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13                (Exhibit A1 marked.)

14         Q.    So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18                Do you see that, sir?

19         A.    I do.

20         Q.    And do you see where Ms. Hendrix

21   writes:  NPA.

22                Do you know what NPA stood for?

23         A.    Yes.

24         Q.    And what does it stand for?

25         A.    NexPoint Advisors.

Case 3:21-cv-00881-X  Document 78-17  Filed 01/05/22  Entered 01/05/22 23:18:32  Page 329 of 397
Case 3:21-cv-00881-X  Document 217  Filed 04/09/24  Page 158 of 200  PageID 44302
Page 329

```
 1                WATERHOUSE - 10-19-21
 2        Q.    And was that how you-all internally
 3   at Highland refer to NexPoint Advisors, L.P.?
 4        A.    I mean, yes, amongst other things.
 5        Q.    And she writes at the bottom of her
 6   email:  Okay to release?
 7              Do you see that?
 8        A.    Yes, I do.
 9        Q.    So what --
10              MR. MORRIS:  Hold on one second.
11              Okay.  Go ahead.
12              MR. RUKAVINA:  Yeah.
13        Q.    So what is -- what is Ms. Hendrix
14   here on November 25 asking of you?
15        A.    She is asking me -- so she -- these
16   are -- these are payments -- typically we would
17   do an accounts payable run every week at the
18   end of every Friday.  But looking at this date,
19   it is Wednesday, November 25th, which means, to
20   me, it is likely Thanksgiving weekend.
21              So this is the day before
22   Thanksgiving, so this is the last kind of --
23   kind of day before the holidays and vacation
24   and things of that nature.  So it is
25   effectively the Friday of that week.
```

1    WATERHOUSE - 10-19-21

2         So she is -- she is putting in all

3    the payments for the week because we batch

4    payments weekly.  And these are the payments

5    that go out that week, and she is informing me

6    of the payments and -- you know, again, at the

7    bottom of the email, she is asking for my okay

8    to -- to release these payments in the wire

9    system.

10        Q.    So these would be accounts payable

11   of NexPoint?

12        A.    I mean, it would be accounts payable

13   for all of these entities listed on this email.

14        Q.    And who was Ms. Hendrix employed by

15   in November and December of 2020?

16        A.    Highland Capital Management.

17        Q.    Okay.  So -- so part of the services

18   that NexPoint had contracted with was for

19   Highland to ensure that NexPoint timely paid

20   its accounts payable; is that accurate?

21             MR. MORRIS:  Objection to the form

22        of the question.  You have got to be

23        kidding me.

24        Q.    Is that accurate?

25        A.    Yes.

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 18:43:33 Desc
Case 3:21-cv-00881-X Document 78-17 Filed 06/09/23 Page 160 of 200 PageID 44304

Page 331

1                    WATERHOUSE - 10-19-21

2        Q.    And did NexPoint rely on employees

3    of the debtor to ensure that NexPoint's

4    accounts payable were timely paid?

5             MR. MORRIS:  Objection to the form

6        of the question.

7        A.    Yes.

8             MR. RUKAVINA:  Let's flip to the

9        next page, Mr. Nguyen, if you will please

10        scroll to the next page.

11        Q.    So this is an email similar to the

12    prior one, November 30th.

13             Do you see where it says, NPA HCMFA,

14    USD $325,000 one-day loan?

15             Do you see that, sir?

16        A.    I do.

17        Q.    Do you have any memory of what that

18    was?

19        A.    I don't recall what that -- what

20    that payment was for.

21        Q.    Did it sometimes occur that one

22    advisor would, on very short-terms, make loans

23    to another advisor?

24        A.    Yes.  This -- this -- this occurred

25    from -- from -- from time to time.  It actually

```
 1                  WATERHOUSE - 10-19-21

 2   looking at -- I'm -- I'm looking at the date of

 3   this email.  It is November 30th.  It is the

 4   last day of the month.

 5              HCMFA has obligations it needs to

 6   pay to its broker-dealer, which is HCFD.  And

 7   it likely was short funds to make those

 8   obligations under that -- under its agreement,

 9   and so it provided a one-day loan because on

10   the next business day on 12/1 -- or the next

11   business day in December, it would receive

12   management fees from the underlying funds that

13   it managed and it would be able to pay back

14   that loan to NexPoint Advisors.

15        Q.    So -- so here Ms. Hendrix was

16   seeking your approval to transfer $325,000 from

17   NexPoint to HCMFA for a one-day loan; is that

18   correct?

19        A.    That is correct.

20        Q.    Let's flip to the next page, sir.

21              MR. RUKAVINA:  And, Mr. Nguyen, if

22        you will please scroll down.

23        Q.    Now we have as an entry for

24   $325,000, 11/30 loan payment.

25              Do you see that, sir?
```

                    WATERHOUSE - 10-19-21

1
2       A.    Yes.

3       Q.    And that is probably the loan that
4  was approved on the prior page?

5       A.    Yes, most likely.

6       Q.    So is it also true, sir, that in
7  addition to accounts payable debtor employees
8  would be assisting NexPoint with respect to
9  paying back its debt?

10            MR. MORRIS:  Objection to the form
11      of the question.

12      A.    I mean, yes, for loans of this
13  nature, yes.

14      Q.    Well, what about long term loans?
15  Was it reasonable for NexPoint to expect debtor
16  employees to ensure that NexPoint timely paid
17  its obligations under long-term notes?

18            MR. MORRIS:  Objection to the form
19      of the question.

20            MS. DANDENEAU:  Objection to form.

21      A.    I mean, that is one of the things
22  that the Highland personnel did provide to the
23  advisors.  Yes, we would -- we would -- over
24  the years, yes, we -- we -- we -- we did do
25  that generally.  Again, I don't remember

1                    WATERHOUSE - 10-19-21

2    specifically but, yes, generally we -- you

3    know, we did do that.

4         Q.    So do you recall -- and we can pull

5    it up, if need be -- that under the NexPoint

6    note that Mr. Morris asked you about earlier,

7    the one for more than $30 million, that

8    NexPoint was obligated to make an annual

9    payment of principal and interest?

10               MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yes, it was -- yes, it -- it was an

13   amortizing note.  It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.  So -- but are --

16   are you asking me --

17        Q.    I'm just asking you, sir, if you

18   recall the note.

19        A.    Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21        Q.    And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24        A.    I do.

25        Q.    And do you believe that employees of

1                      WATERHOUSE - 10-19-21

2    the debtor would have played any role in

3    NexPoint having made those prior payments?

4              MR. MORRIS:  Objection to the form

5       of the question.

6    A.    Yes.

7    Q.    And what role in years prior to 2020

8    would employees of the debtor have had with

9    respect to NexPoint making that annual payment?

10    A.    We -- we -- we would have -- I keep

11    saying "we."  The team would have calculated

12    any amounts due under that loan and other

13    loans, as -- as standard course.

14              We would -- since we provided

15    treasury services to the advisors, we would

16    inform the -- the -- the -- we informed

17    Mr. Dondero of any cash obligations that are

18    forthcoming, whether we do cash projections.

19              If, you know, any of these payments

20    would have -- or, you know, the sum total of

21    all of these payments, including any note

22    payments, if there were any cash shortfalls, we

23    would have informed Mr. Dondero of any cash

24    shortfalls.  We could adequately plan, you

25    know, in instances like that.

Case 3:21-cv-00881-X Document 267 Filed 04/09/22 Page 333 of 397
Case 3:21-cv-00881-X Document 207-17 Filed 04/09/22 Page 165 of 200 PageID 44309
Page 336

WATERHOUSE - 10-19-21

1

2          Or, sorry, we -- I say "we" -- I

3    keep saying "we" -- I keep wearing my -- again,

4    my -- my treasurer hat.

5          But, yes, it is to -- it is to

6    inform Mr. Dondero of the obligations of the

7    advisors in terms of cash and obligations that

8    are -- are upcoming and that -- and that are --

9    are scheduled to be paid.

10     Q.    And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14          MS. DANDENEAU:  Objection to form.

15          MS. DEITSCH-PEREZ:  Davor, I think

16     you misspoke.  You might want to just

17     repeat the question.

18     Q.    Okay.  Let me repeat the question,

19   sir.

20          Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24     A.    Yes.

25     Q.    So someone at the debtor in treasury

                    WATERHOUSE - 10-19-21

1    or accounting would have sent some schedule or

2    a reminder that a payment would be coming due

3    in the future.  Is that generally the practice?

4        A.    Yes, we would -- you know, again, I

5    didn't -- I didn't micromanage the teams, but

6    we had a -- a corporate accounting calendar

7    that we use as kind of a tickler file to keep

8    track of payments.

9               I actually, you know, don't know how

10   actively they're using that in -- in prior to

11   2020, but it was actively used at some point.

12              We did look at NexPoint cash

13   periodically and cash for the other advisors as

14   well and payments.  You know, we -- payments

15   like this would have appeared in our cash

16   projections, in the advisor's cash projections.

17              And, again, as like I said earlier,

18   they would have appeared there, so there would

19   be time to plan for making any of these

20   payments.

21       Q.    And based on your experience, would

22   it have been reasonable for NexPoint to rely on

23   the debtors' employees to inform NexPoint of an

24   upcoming payment due on the $30 million

Case 23-03035-sgj Doc 86-4 Filed 10/29/01/05/22 Entered 10/29/01 03/22 18:Page 333 of 397
Case 3:21-cv-00881-X Document 188-17 Appendix Filed 04/09/22 899 Page 167 of 200 PageID 44311

Page 338

                    WATERHOUSE - 10-19-21

2   promissory note?

3              MR. MORRIS:  Objection to form of

4        the question.

5              MS. DANDENEAU:  Objection to form.

6        A.    Yes.  Yes, they did.  I mean, but I

7   mean, but I don't think these -- these notes

8   were any secret to anybody.

9        Q.    I understand, and I'm not suggesting

10  otherwise.

11             MR. RUKAVINA:  Please pull up Alpha

12  2, Mr. Nguyen.

13             (Exhibit A2 marked.)

14        Q.    Now, this document is similar to the

15  ones we've seen before as of December 31, 2020,

16  and I don't see under NTA anything there for

17  paying the promissory note to Highland.

18             Do you see anything like that?

19        A.    I do not.

20             MR. RUKAVINA:  You can pull that --

21  that exhibit down, Mr. Nguyen.

22        Q.    You are aware, of course, by now

23  that, in fact, NexPoint failed to make the

24  payment due December 31, 2020, are you not?

25        A.    I am aware, and yes, I do understand

1          WATERHOUSE - 10-19-21

2    it.

3          Q.    Were you aware that Highland

4    accelerated that $30 million promissory note?

5          A.    I am aware.

6          Q.    Were you aware of that acceleration

7    at the time that it occurred?

8          A.    I don't remember specifically.

9          Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13         A.    Did anyone ask me what Highland

14   should do about the missed payment?

15         Q.    Yes, before acceleration.

16               MR. MORRIS:  Objection to the form

17         of the question.

18         A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20               MS. DANDENEAU:  Why don't you just

21         repeat the question, Mr. Rukavina.

22         Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24               I am saying you're the CFO of

25   someone, in this case, Highland, and the

Case 3:21-cv-00881-X Document 184-4 Filed 10/20/23 Page 334 of 397
Case 3:21-cv-00881-X Document 17 Filed 01/09/23 Page 169 of 200 PageID 44313

Page 340

                    WATERHOUSE - 10-19-21

1

2    borrower failed to make the required payment.

3    Are you with me so far?

4         A.    I am.

5         Q.    Did anyone then ask you, what should

6    we do with respect to our rights against the

7    borrower that missed the payment?

8         A.    Not that I recall.

9         Q.    Did you play a role in the decision

10   to accelerate that $30 million promissory note?

11        A.    I did not.

12        Q.    Do you recall whether Mr. Seery ever

13   asked you before the acceleration as to whether

14   he should accelerate the note?

15        A.    I don't recall.

16        Q.    And you don't recall when you

17   learned of the acceleration itself?

18             MR. MORRIS:  Objection to the form

19        of that question.

20        A.    It was -- it was sometime in

21   early -- in early 2021.  I don't remember

22   specifically.

23        Q.    But do you recall whether it was

24   after the acceleration had already been

25   transmitted?

Case 3:21-cv-00881-X  Document 177  Filed 01/09/24  Page 334 of 397
Case 3:21-cv-00881-X  Document 177  Appendix  Filed 01/09/24  Page 170 of 200  PageID 44314
Page 341

WATERHOUSE - 10-19-21

1

2              MS. DANDENEAU:  Objection to the

3        form of the question.

4        A.    I don't recall.

5        Q.    Do you recall in early to mid

6   January of 2021, after the default, discussing

7   the default with Mr. Dondero?

8        A.    I do recall discussing with

9   Mr. Dondero after December 31, 2020?

10       Q.    Yes, the fact of the default.

11       A.    I don't recall.

12              MR. RUKAVINA:  Let's pull up my

13   Exhibit 6, Alpha 6.

14              (Exhibit A6 marked.)

15              MR. RUKAVINA:  And, Mr. Nguyen, if

16        you will please scroll down.

17       Q.    This email chain begins with you

18   writing to Ms. Hendrix on January the 12th:

19   NexPoint note to HCMLP.

20              Do you see that, sir?

21       A.    I do.

22       Q.    Were you discussing this same

23   $30 million note we're talking about right now

24   with Ms. Hendrix?

25       A.    Yes.

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you recall what prompted

 3   you to send that email to her?

 4        A.    Yes, I had -- I had a conversation

 5   with Jim.

 6        Q.    Okay.  And what -- what did you

 7   discuss with Jim that led to this email chain?

 8        A.    He -- he called me and he said he

 9   wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13        Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18        A.    No, it was -- it was that morning.

19        Q.    And do you recall how you had that

20   conversation with him?

21              MR. MORRIS:  Objection to the form

22        of the question.

23        Q.    By telephone, by email, in-person?

24        A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in
```

```
1              WATERHOUSE - 10-19-21

2    December of 2020.  He called me from home.  He

3    said he was in court.  He wanted to -- he asked

4    about, you know, making payment on the note and

5    the amount, and so I didn't have those numbers

6    in front of me, so I said I would get back to

7    him.  I wanted all the details, so here is

8    this -- so I reached out to Kristin.

9         Q.    And then she gave you that

10   $1,406,000 figure?

11             MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25             When you conveyed the number to
```

1          WATERHOUSE - 10-19-21

2    Mr. Dondero, was -- was it also on January

3    12th?

4          A.    Sorry, when I conveyed the

5    $1.4 million number?

6          Q.    Yes.

7          A.    Yes, yes, it was that -- it was --

8          Q.    So you had --

9          A.    It was that point.

10         Q.    Well, to the best of your

11   recollection, you had a conference with

12   Mr. Dondero by the telephone in the morning,

13   and then another conference with him by

14   telephone after 11:40 a.m. that morning?

15         A.    Yeah, I can't remember -- yeah, it

16   was either that morning or it could have been,

17   you know, early afternoon, but again, I

18   remember calling him back, relaying this

19   information to him, and he said, okay, pay --

20   you know, make -- make this payment.

21         Q.    And during either of those two

22   calls, did you tell Mr. Dondero anything to the

23   effect that making those -- I'm sorry, making

24   that payment would not de-accelerate the

25   promissory note?

```
 1                   WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did you tell him anything to the

 4   effect that making that payment would not cure

 5   the default?

 6        A.    No.

 7        Q.    Did you discuss that in any way with

 8   him?

 9        A.    No, I did not.

10        Q.    Did he say why he wanted to have

11   that $1.4 million payment made?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    He -- he -- he didn't go into

15   specifics.

16        Q.    Did he say anything to you to the

17   effect that if NexPoint makes that payment,

18   then the note will be de-accelerated?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I don't recall.

22              MR. RUKAVINA:  You can put this one

23        down, Mr. Nguyen.

24        Q.    And, again, when you say you don't

25   recall, you mean you don't remember right now
```

Case 3:21-cv-00881-X   Document 263-4   Filed 10/29/21   Entered 01/17/23 18:43:34   Desc
Case 3:21-cv-00881-X   Document 263-17   Filed 03/09/23   Page 175 of 200   PageID 44319

Page 346

                        WATERHOUSE - 10-19-21

1    either way; correct?

2

3        A.    Yeah, I don't remember.  I don't

4    remember us discussing that.

5        Q.    Now -- and we're almost done, I

6    promise.  I'm just going to -- I don't know how

7    to ask this question, so I'm just going to try

8    to do my best.

9              Prior to the default on December 31,

10   2020, did Mr. Seery ever tell you any words to

11   the effect that you or someone at Highland

12   should ensure that NexPoint doesn't make its

13   payment?

14       A.    No.

15       Q.    Did you have any hint or any belief

16   that anyone at NexPoint -- I'm sorry, strike

17   that.

18             Did you have any reason to believe

19   that anyone with Highland was actively trying

20   to get NexPoint to make that default by not

21   paying on December 31?

22             MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Are you asking, did any Highland

25   employees actively work to make -- to

1                WATERHOUSE - 10-19-21

2    somehow --

3        Q.    Yes.  Let me take a step back.  Let

4    me take a step back.

5             So you are aware now that as a

6    result of that default, what was still some

7    25-year note was accelerated and became

8    immediately due.  You are aware of that now;

9    right?

10       A.    Yes.

11       Q.    And can you see how someone at

12   Highland might actually have been pleased with

13   that development?

14            MR. MORRIS:  Objection to the form.

15       Q.    Not that they were --- not that they

16   were pleased, but you can see how someone at

17   Highland might have been pleased with that

18   development?

19            MR. MORRIS:  Objection to the form

20       of the question.

21            MS. DANDENEAU:  Object to form.

22       A.    I don't know how they would have

23   reacted to that.

24       Q.    Okay.  But you're not -- you're not

25   aware of any instructions or any actions being

```
1                   WATERHOUSE - 10-19-21

2      given or taken at Highland by Mr. Seery, the

3      independent board, DSI, that -- that would have

4      basically led Highland to ensure that NexPoint

5      would fail to make that payment?

6           A.    I'm not aware.

7           Q.    In other words, there wasn't a trick

8      or a settlement; right?

9                 MS. DEITSCH-PEREZ:  Objection to

10          form.

11                MS. DANDENEAU:  Object to form.

12                MR. MORRIS:  Object to form.

13          A.    I'm not aware.

14                Look, I'm not aware.  I'm not in

15     every conversation.  I mean, and I'm just --

16     again, I'm sitting at home.  It is the end of

17     the year.  Again, I'm not aware.

18          Q.    That is a perfectly legitimate

19     answer.  I don't know why -- why you think

20     otherwise.

21                Okay.  Just give me one second to

22     compose my thoughts.

23                MS. DEITSCH-PEREZ:  While you're

24          taking your one second, why don't we take

25          three minutes.  I will be right back.
```

Case 3:21-cv-00881-X  Document 8-4  Filed 10/29/01/05/22  Entered 01/29/01/0 22:18:43  Page 349 of 397
Case 3:21-cv-00881-X  Document 287-17  Filed 04/09/2899  Page 178 of 200  PageID 44322

Page 349

```
 1                WATERHOUSE - 10-19-21

 2          VIDEOGRAPHER:  Do we want to go off

 3     the record?

 4          MR. RUKAVINA:  Yes.

 5          VIDEOGRAPHER:  All right.  We're

 6     going off the record at 6:27 p.m.

 7     (Recess taken 6:27 p.m. to 6:30 p.m.)

 8          VIDEOGRAPHER:  We are back on the

 9     record at 6:30 p.m.

10          MR. HORN:  Is Deb back?

11          MS. DANDENEAU:  Are you asking about

12     me?  I'm here.

13          MR. HORN:  Oh, okay.  I don't see

14     you, sorry.

15     Q.    Actually, yeah, Mr. Waterhouse, so

16   when you had --

17          MS. DANDENEAU:  Are you asking about

18     Deb Dandeneau or Deborah?  I mean, there

19     are a lot -- as we talked about, a lot of

20     Debs.  I'm here.

21          MS. DEITSCH-PEREZ:  I'm here.

22          MR. HORN:  Yes, I was asking about

23     DDP.

24          MS. DEITSCH-PEREZ:  Oh, DDP is here.

25          MR. HORN:  Okay.  Here we go.  I'm
```

Case 3:21-cv-00881-X Document 77-4 Filed 10/20/22 Page 335 of 397
Case 3:21-cv-00881-X Document 77 Appendix Filed 01/09/23 Page 179 of 200 PageID 44323

Page 350

1        WATERHOUSE - 10-19-21

2    going back on mute.

3        MS. DANDENEAU:  Get the right

4    nomenclature.

5        Q.    Mr. Waterhouse, on January 12th,

6    2021, when you had those talks with Mr. Dondero

7    about the $1.4 million payment, did you have a

8    communication or a conversation with Mr. Seery

9    about that payment after January 12th, 2021?

10       A.    I don't recall.

11       Q.    Well, in response to Mr. Dondero

12   reaching out to you, do you recall on that day,

13   January 12th, talking to Mr. Seery or anyone at

14   Highland other than the email chain we just saw

15   about Mr. Dondero's call with you?

16       A.    Did I talk to -- I spoke with

17   Kristin -- I don't know if I spoke to her.  I

18   likely spoke to Kristin Hendrix because we had

19   to get the wire on NexPoint's behalf to make

20   the payment to Highland.

21       Q.    So it is true, then, that -- that

22   employees of the debtor did actually cause that

23   payment to be made when it was made after

24   January 12th?

25       A.    Yes, I mean, we -- we -- as I

Case 3:21-cv-00881-X Document 864 Filed 10/29/01 Entered 10/29/01 17:22:18 Page 35 of 397
Case 3:21-cv-00881-X Document 317 Filed 01/09/28 Page 180 of 200 PageID 44324

Page 351

1              WATERHOUSE - 10-19-21

2    testified earlier, we provided that accounting

3    finance treasury function as -- under the

4    shared services agreement.  And so once I

5    got the -- I talked to Jim, got the approval to

6    make this payment, we have to then make the

7    payment, or the team does, and so the payment

8    was made.

9        Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15        MR. MORRIS:  Objection to the form

16      of the question.

17    A.    I don't -- I don't recall.

18    Q.    And does that include legal counsel?

19        Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24    A.    I don't recall.

25    Q.    Okay.  Thank you, sir, for your

```
 1                WATERHOUSE - 10-19-21

 2     time.

 3               MR. RUKAVINA:  Pass the witness.

 4               MR. MORRIS:  I just have a few

 5     questions, if I may.

 6               MS. DEITSCH-PEREZ:  Don't you go at

 7     the end?

 8               MR. MORRIS:  Oh, I apologize.  He is

 9     your witness.  I'm surprised you want to

10     ask him questions, but go right ahead.

11               MS. DEITSCH-PEREZ:  Just have a

12     couple of things.

13               MR. RUKAVINA:  And I will just

14     object to that, that he's our witness.

15     That's not --

16               MR. MORRIS:  I'm not talking to you.

17     I'm not talking to you.

18               MS. DANDENEAU:  Also, Mr. Morris, it

19     is -- it is --

20               MS. DEITSCH-PEREZ:  He is not my

21     witness.  He's been subpoenaed by you.

22     Okay?

23               That is no offense, Mr. Waterhouse,

24     I'm -- I'm not -- okay.  Anyway.

25                         EXAMINATION
```

```
 1                WATERHOUSE - 10-19-21

 2   BY MS. DEITSCH-PEREZ:

 3        Q.    Good evening.  I'm very sorry to be

 4   going last and I know you have had a long and

 5   taxing day, so I thank you for indulging me.

 6             The kinds of services that you

 7   describe that the -- that Highland provided for

 8   NexPoint, did Highland also provide similar

 9   services to that to HCRE and HCMS?

10        A.    Yes.

11             MR. MORRIS:  Objection to the form

12        of the question.

13        Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16        of the question.

17             MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19             MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.    Let's take them one at a time.
```

```
1                    WATERHOUSE - 10-19-21

2                    What kinds of services did Highland

3    provide to HCRE?

4                    MR. MORRIS:  Objection to the form

5         of the question.

6         A.    HCMS, Highland employees provided

7    accounting services, treasury management

8    services, potentially legal services.  I

9    don't -- but I wouldn't have been directly

10   involved in that.  But as far as the teams that

11   I manage, it was accounting, treasury, things

12   of that nature.

13        Q.    Okay.  And that was for HCM, LLP --

14        A.    And -- and, sorry, it would also be

15   any asset valuation if needed as well.

16        Q.    Okay.  We went back and forth on

17   each other and I apologize, so just to clarify.

18                    You were talking about the services

19   that Highland Capital Management provided to

20   HCMS; is that right?

21        A.    HCMS.  So, again, yes.  And

22   accounting, treasury, valuation, and also tax

23   services too.

24        Q.    Okay.

25        A.    Tax services.  Look, I'm expanding
```

```
 1                  WATERHOUSE - 10-19-21

 2   this, their HR services as well.

 3        Q.    Okay.  And did that include bill

 4   paying?

 5             MR. MORRIS:  Objection to the form

 6        of the question.

 7        Q.    Did the services that HCM provided

 8   to HCMS include bill paying?

 9             MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did
```

```
 1                  WATERHOUSE - 10-19-21

 2    HCMLP cause HCMS to pay its bills?

 3              MR. MORRIS:  Objection to the form

 4         of the question.

 5         A.    I mean, it -- it -- it depend -- it

 6    depended on the nature of the payment and the

 7    vendor, but, you know, if there were -- if

 8    there were larger scheduled payments, you know,

 9    I would like to give at least 30 days notice.

10              And that is -- that is kind of my

11    rule of thumb so no one is surprised.

12         Q.    Okay.  And was it generally HCMLP's

13    practice to timely pay HCMS' bills?

14              MR. MORRIS:  Objection to the form

15         of the question.

16         A.    It -- it -- it -- that depended on

17    the nature of the payment.

18         Q.    Okay.  And can you explain what you

19    mean by that?

20         A.    Yeah, I mean if -- if it was -- I

21    mean -- if there was some professional fees

22    that weren't -- you know, they were due but

23    they weren't urgent, those fees may not be paid

24    as timely as others that have a due date or --

25    or things like that.
```

1          WATERHOUSE - 10-19-21

2          Q.    Okay.  Are loan payments the kinds

3    of thing that HCMLP would pay on time because

4    of potential consequences of not paying on

5    time?

6               MR. MORRIS:  Objection to the form

7          of the question.

8          A.    Yes.  As I testified earlier, we

9    would want to give, you know, notice on -- on

10   -- on larger payments and -- and things of that

11   nature so we didn't miss due dates.

12         Q.    Okay.  And over the course of time,

13   did HCMLP generally pay HCMS' loan payments in

14   a timely fashion?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I can't remember specifically, but

18   generally, yes.

19         Q.    Okay.  Now, did HCMLP provide

20   similar services to HCRE that you have

21   described it provided to HCMS?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Yes, but I don't think it -- it

25   provided -- I don't think it provided HR

Case 3:21-cv-00881-X Document 86-4 Filed 10/29/21 Entered 10/29/21 18:13:35 Page 335 of 397
Case 3:21-cv-00881-X Document 177 Filed 01/09/24 Page 187 of 200 PageID 44331

Page 358

1          WATERHOUSE - 10-19-21

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

WATERHOUSE - 10-19-21

1    loan payment that was due from HCMS to HCMLP in

2

3    December of 2020?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I don't believe that payment --

7    payment was made.

8         Q.    Okay.  And when HCMLP caused HCMS in

9    the past to make loan payments, whose money did

10   it use to make those payments?

11             MR. MORRIS:  Objection to the form

12        of the question.

13        A.    It was the -- the money in HCMS's

14   operating account would be made to that --

15   those moneys would be used to make payment to

16   Highland Capital Management.

17        Q.    Okay.  And Highland -- is it correct

18   that Highland Capital Management personnel had

19   the access to HCMS's accounts to be able to

20   cause such payments to be made?

21        A.    Yes, Highland personnel had access

22   to those accounts.

23        Q.    Okay.  And so now for HCRE, whose

24   money was used when HCMLP caused HCRE

25   payments -- loan payments to Highland to be

Page 360

```
 1                   WATERHOUSE - 10-19-21

 2   made?

 3               MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    It was -- it was cash in HCRE's bank

 6   account that would be used to make payments to

 7   Highland Capital Management.

 8        Q.    Okay.  And so did Highland Capital

 9   Management have access to HCRE's funds in order

10   to be able to make such payments?

11               MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25               MR. MORRIS:  Objection to the form
```

1                    WATERHOUSE - 10-19-21

2           of the question.

3           A.    I -- I don't recall.

4           Q.    Do you have any reason to believe

5    that either HCRE or HCMS simply didn't have the

6    funds on hand to make the December 2020

7    payments?

8           A.    I don't know.

9           Q.    I guess I'm asking, do you have any

10   reason to believe that they didn't have the

11   funds?

12          A.    We managed cash for so many

13   different entities and funds, and I don't

14   recall, you know, where the cash position was

15   for HCRE and HCMS at 12/31/2020.

16          Q.    Okay.

17          A.    I just don't recall, and I don't --

18   and I don't remember what the loan payment

19   obligations were from HCRE to Highland, and

20   from HCMS to Highland.  I don't recall.  I

21   don't recall, I mean...

22          Q.    Let me come at it a different way.

23   Were the -- were the payments that would

24   otherwise have been due in December of 2020

25   made in January of 2021 for HCMS and HCRE?

Case 3:23-cv-00603-S Doc 86-4 Filed 10/29/01 Entered 10/29/01 Page 36 of 397
Case 3:21-cv-00881-X Document 287 Filed 05/09/2899 Page 191 of 200 PageID 44335

Page 362

WATERHOUSE - 10-19-21

1

2      A.     I believe the HCRE payment was made

3   in January of 2021.  I don't recall any

4   payments being made from HCMS to Highland.

5      Q.     If it -- how is it the HCRE payment

6   came to be made?  Why did you make it -- why

7   did HCM make the payment in January of 2021?

8      A.     Jim -- Jim called me and instructed

9   me to -- to make the payment on behalf of HCRE,

10  Jim Dondero -- Jim Dondero.

11     Q.     Did he seem upset that -- that the

12  payment had not been made?

13     A.     Yeah.  On the note that was, you

14  know, that was the term note, yes, he -- he was

15  displeased that the -- that the payment had not

16  been made by year-end.

17     Q.     Okay.  And did you make the -- cause

18  the payment to be made as -- as requested?

19     A.     Yes.

20     Q.     And did anyone else from HCM

21  participate with you in causing the payment to

22  be made to -- on the HCRE loan?

23     A.     Yes.  It would have been Kristin

24  Hendrix.  I -- again, I don't -- as I testified

25  earlier, I'm not an officer of HCRE.  I don't

WATERHOUSE - 10-19-21

1    believe I'm an authorized signer.  So I

2    can't -- other personnel have to make payment

3    from HCRE to -- to -- to -- to Highland.

4        Q.    Okay.  And in the conversation

5    that -- that you had with Mr. Dondero when he

6    requested the payment to be made, did you say

7    to him words to the effect, Jim, this loan is

8    going to stay in default, what are you making

9    the payment for, anything like that?

10       A.    No.

11       Q.    In fact, did you have the impression

12   from him that he thought that the loan would

13   be -- the default would be cured by making the

14   payment?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    Did I get the impression from Jim

18   Dondero that the loan would be cured if the

19   payment from HCRE --

20       Q.    Yeah, if that is what he thought.

21            MR. MORRIS:  Objection to the form

22       of the question.

23       A.    I didn't get any impression from him

24   on that at the time.

Page 364

1                    WATERHOUSE - 10-19-21

2         Q.    Do you know whether there was an

3    HCMS term loan that had a payment due in

4    December of 2020?

5         A.    I don't recall.

6         Q.    Okay.  And so the reason you don't

7    recall whether or not there was a payment in

8    January of 2021 is because you just don't

9    remember whether there was such a loan at all?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22             MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in

Case 3:23-cv-00595-jpc Doc 86-4 Filed 10/29/01/05/22ed Entered 01/17/03/22 18:P36:36Desc 397
Case 3:21-cv-00881-X   Document 287-17   Filed 05/09/22   Page 194 of 200   PageID 44338

Page 365

1              WATERHOUSE - 10-19-21

2   January of 2021, do you think it was part of

3   the same conversation where Jim Dondero said,

4   hey, why didn't that get paid, please make

5   that -- get that payment done?

6              MR. MORRIS:  I object to the form of

7        the question.

8        A.    Yes.  Likely it would have been -- I

9   mean, again, I don't recall a payment being

10  made, but, you know, again, I don't remember

11  everything.

12       Q.    Okay.  Did -- at the time you were

13  communicating with Kristin Hendrix about the

14  payment being made, whichever payments were

15  made in January, did she say anything to you

16  about the payments not curing the loan

17  defaults?

18       A.    No.

19       Q.    Okay.  All right.  So I'm going to

20  take you back to very early in the deposition

21  when Mr. Morris was asking you about the --

22  the -- the -- the agreement with respect to

23  the -- the forgiveness element of the loans, so

24  that is just to orient you.

25              Do you remember that there was a

WATERHOUSE - 10-19-21

1
2    time that you and Mr. Dondero were

3    communicating about potential means of

4    resolving the Highland bankruptcy by what was

5    colloquially referred to as a pot plan?

6         A.    Yes.

7         Q.    Okay.  And can you tell me generally

8    when that was?

9         A.    Like mid -- mid 2020, sometime in

10   2020, mid 2020.

11        Q.    Okay.  And did the process of trying

12   to figure out what the numbers should be

13   involve looking at what one should pay for the

14   Highland assets?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    Okay.  And did there come a time

19   when you were proposing some potential numbers

20   and Mr. Dondero said something to you like,

21   well, why are you including payment for the

22   related party notes, those, you know, were

23   likely to be forgiven as part of my deferred

24   executive compensation?

25             MR. MORRIS:  Objection to the form

```
 1                    WATERHOUSE - 10-19-21

 2         of the question.

 3         A.    Yes, we did have that conversation.

 4         Q.    Okay.  Was that conversation in

 5   connection with trying to figure out the right

 6   numbers for a pot plan?

 7         A.    Yeah.  I mean, it was -- it was -- I

 8   mean, Jim -- Jim would ask for, you know,

 9   most -- most recent asset values, you know, for

10   Highland, and -- and myself and the team

11   provided those to him, so it was in that

12   context.

13         Q.    Okay.  And does that refresh your

14   recollection that these communications were in

15   2020 rather than 2021?

16              MR. MORRIS:  Objection to the form

17         of the question.

18         A.    The -- the -- the executive

19   compensation discussions were definitely in

20   2020.

21         Q.    Okay.  Now, did you ever make

22   proposals that took into account Jim's comment

23   that the notes were likely to end up forgiven

24   as part of his compensation?

25              MR. MORRIS:  Objection to the form
```

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we -- the team and myself put

 4   together, you know, asset summaries of Highland

 5   at various times for all the assets of

 6   Highland, and not including the notes.

 7        Q.    Okay.  And were those presentations

 8   communicated to -- to Mr. Seery?

 9        A.    No.  Well, look, I didn't tell -- I

10   didn't tell Mr. Seery.  I don't know what

11   Mr. Dondero did with the information.

12        Q.    Okay.

13        A.    I did not have conversations with

14   Mr. Seery.

15        Q.    Okay.  Do you know who saw the

16   presentations that you put together that didn't

17   include the value of the related party notes?

18        A.    We're talking presentations -- these

19   are -- these are Excel spreadsheets?

20        Q.    Uh-huh.

21        A.    I don't know who -- these were given

22   to -- to Jim Dondero.  I don't know what was

23   done with them after that.

24        Q.    Okay.  You also mentioned earlier

25   that sometime during your tenure at Highland
```

WATERHOUSE - 10-19-21

1

2   you knew of the practice of giving forgivable

3   loans to executives.

4           MR. MORRIS:  Objection to the form

5       of the question.

6       Q.   Can you -- can you tell me what you

7   recall about that practice?

8           MR. MORRIS:  Objection to the form

9       of the question.

10      A.   Yes, so there were -- there were --

11  during my tenure at Highland, there were loans

12  or -- given to employees that were later

13  forgiven at a future date and time.

14      Q.   Okay.  And when the loans were

15  given, did the notes, to your recollection, say

16  anything about the potential forgiveness term?

17          MR. MORRIS:  Objection to the form

18      of the question.

19      A.   When you say "did the notes," did

20  the promissory notes detail the forgiveness?

21      Q.   Yes.

22      A.   Not that I recall.

23      Q.   And until such time as whatever was

24  to trigger the forgiveness occurred, were the

25  notes bona fide notes as far as you were

1                  WATERHOUSE - 10-19-21

2    concerned?

3                  MR. MORRIS:  Objection to the form

4         of the question.

5         A.    Yes, similar to -- yes.

6         Q.    Okay.  You were going to say similar

7    to what?

8         A.    Mr. Morris earlier today showed

9    notes of the financial statements about various

10   affiliate loans.  I -- I -- I do recall these

11   notes because I -- at that time personally

12   worked on the -- the financial statements of

13   Highland.  That was, you know, in my role as a

14   corporate accountant.

15                And there were -- those loans

16   were -- to the partners were detailed in the

17   notes to the financial statements, similar to

18   what we went through earlier today in the prior

19   testimony about what we saw with Highland

20   and -- and -- and the -- and HCMFA.

21        Q.    Is it fair to say that on Highland's

22   balance sheet there were any number of assets

23   that the value of which could be affected by

24   subsequent events?

25                MR. MORRIS:  Objection to the form

```
1                   WATERHOUSE - 10-19-21

2         of the question.

3         A.    Yes.  I mean, yes, that -- there

4    are.  And that is -- yes.

5         Q.    Okay.  And is it typical accounting

6    practice that until there is some certainty

7    about those potential future events, that asset

8    value listed on -- on the books doesn't take

9    into account those potential future events?

10              MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25              MR. MORRIS:  Objection to the form
```