1          WATERHOUSE - 10-19-21

2      of the question.

3      A.    The accounting standard is you have

4  to estimate to the best -- you know, to -- to

5  the best of your ability, the fair value of an

6  asset as of the balance sheet date under --

7  under GAAP.

8      Q.    Did -- strike that.

9          Okay.  Give me a minute.  I'm

10  close -- I'm close to done.  Let me just go off

11  and look at my notes for a second.  So take two

12  minutes.

13          VIDEOGRAPHER:  We're going off the

14      record at 7:02 p.m.

15      (Recess taken 7:02 p.m. to 7:03 p.m.)

16          VIDEOGRAPHER:  We are back on the

17      record at 7:03 p.m.

18      Q.    Mr. Waterhouse, is it generally your

19  understanding that people you work with now

20  have been asking the debtor for full and

21  unfettered access to their own former files?

22          MR. MORRIS:  Objection to the form

23      of the question.

24      A.    Yes, I am -- I am generally aware.

25      Q.    Okay.  And do you think you could

1                    WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4              MR. MORRIS:  Objection to the form

5        of the question.

6        A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10             You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15       Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17       A.    Yes.

18       Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20             MR. MORRIS:  Objection to the form

21       of the question.

22       A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

Case 3:10-cv-00865-jsjc 86d 4148d10f29/011/05/22ed E0f28/01170222318:Pal337ecf397
Case 3:21-cv-00881-X Document 170-18 Appendix 18 Page 01205/249 Page 3 of 200 PageID 44347

Page 374

```
 1              WATERHOUSE - 10-19-21

 2              Is that -- I don't know the

 3    relationship.  So, again, I'm not the lawyers.

 4    I've said many times.  But my understanding is

 5    the litigation trust is suing me.  I could be

 6    wrong there.  I don't know.

 7         Q.    Okay.  I understand.

 8              Someone with some connection to the

 9    Highland debtor has brought a claim against

10    you; is that fair?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.    Yes.

14         Q.    Okay.  And is there also some motion

15    practice in the bankruptcy where the debtor or

16    someone associated with the debtor is

17    attempting to undo something that was

18    previously resolved with you?

19         A.    Yes.

20         Q.    And so in one action somebody is

21    associated with the debtors trying to --

22    threatening you with trying to take money from

23    you, and then in the other -- and trying to --

24    and in the other they are threatening not to

25    pay you things that had previously been agreed;
```

WATERHOUSE - 10-19-21

1

2    is that correct?

3              MR. MORRIS:  Objection to the form

4        of the question.

5        A.    I want to be -- yes, I -- there

6    is -- I'm being sued, again, on -- on something

7    that was agreed to with Mr. Seery and myself.

8    I don't -- I don't -- I don't own that claim.

9        Q.    Okay.

10        A.    To be transparent, I don't own that

11    claim.  So it is not my personal property.

12        Q.    Okay.

13        A.    And -- and being the nonlawyer, I

14    don't know how I can get sued for something

15    that I don't owe or, like, I don't own

16    anything.  I'm not the lawyer.  But, I mean, if

17    that is -- if I'm understanding the facts

18    correctly.

19        Q.    Okay.  And the lawsuit that was

20    filed that names you, that was just filed

21    this -- this past week; is that right?

22              MS. DANDENEAU:  Ms. Deitsch-Perez, I

23        do want to interrupt at this point because

24        just as I told Mr. Morris, that this is a

25        deposition about the noticed litigation.

```
1                  WATERHOUSE - 10-19-21

2             I really don't want to go -- go

3        afield --

4             MS. DEITSCH-PEREZ:  Yeah.

5             MS. DANDENEAU:  -- and open up a

6        whole new line of inquiry about the lawsuit

7        or the -- the motion and the bankruptcy

8        court.  We will be here all night.

9             MS. DEITSCH-PEREZ:  And I

10       understand.

11       Q.    My -- my point is:  Do you feel

12  like -- like there is some effort by these

13  parties related to the debtor to intimidate

14  you -- not that you -- I'm not saying you are

15  or you aren't.

16            But do you feel like there is some

17  effort to intimidate you and maybe an effort to

18  deter you from being as prepared as you might

19  be in this deposition?

20            MR. MORRIS:  Objection to the form

21       of the question.

22       A.    I was -- I was surprised by the

23  lawsuit, by me being named, because, again, I

24  don't own the asset and things like that.

25  Yeah, I just -- I want to move forward with my
```

```
 1              WATERHOUSE - 10-19-21

 2    life at Skyview.

 3              MS. DEITSCH-PEREZ:  Thank you.

 4              THE WITNESS:  Thank you.

 5                  FURTHER EXAMINATION

 6    BY MR. MORRIS:

 7       Q.    If I may, I just have a few

 8    questions.

 9              Mr. Waterhouse, we saw a number of

10    documents that Mr. Rukavina put up on the

11    screen where Ms. Hendrix would send you a

12    schedule of payments that were due on behalf of

13    certain Highland affiliates.

14              Do you remember that?

15       A.    Yes.

16       Q.    And in each instance she asked for

17    your approval to make the payments; is that

18    right?

19       A.    Yes, she did.

20       Q.    And was that the -- was that the

21    practice in the second half of 2020 whereby

22    Ms. Hendrix would prepare a list of payments

23    that were due on behalf of Highland associates

24    and ask for approval?

25       A.    Yes.
```

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    And I think you said that there was

 3   a -- a --

 4        A.    It was -- I think I testified to

 5   this earlier when we talked about procedures

 6   and policy, you know, again, I want to be

 7   informed of -- of -- of -- of -- of any

 8   payments that are going out.  I want to be made

 9   aware of these payments, and that was just a

10   general policy, not just for 2020.

11        Q.    Okay.  So it went beyond 2020?

12        A.    Yes.

13        Q.    Is that right?

14        A.    Yes.

15        Q.    Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20        A.    I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet
```

1                    WATERHOUSE - 10-19-21

2      deadlines.

3                    I don't know how, as I testified

4      earlier, how much they were using that

5      calendar.

6           Q.    Okay.  But -- but you did get notice

7      and a request to approve the payments that were

8      coming due on behalf of Highland's affiliates.

9      Do I have that right?

10                   MS. DANDENEAU:  Objection to form.

11          A.    I mean, generally, yes.  I mean, you

12     know, as we saw with these emails, generally, I

13     mean, did that encompass everything, no.

14          Q.    Okay.  Do you know why the

15     payment -- do you know why there was no payment

16     made by NexPoint at the end of 2020?

17          A.    Yes.  There was -- there was -- we

18     talked about these agreements between the

19     advisors and Highland, the shared services and

20     the cost reimbursement agreement.

21                   And in late 2020, there were

22     overpayments, large overpayments that had been

23     made over the years on these agreements, and it

24     was my understanding that the advisors were --

25     were talking with -- like Jim Seery and others

```
 1                  WATERHOUSE - 10-19-21

 2    to offset any obligations that the advisors

 3    owed to Highland as offset to the overpayments

 4    on these agreements.

 5        Q.    Okay.  Did you participate in any of

 6    those conversations?

 7        A.    I did not.

 8        Q.    Okay.  Do you know -- do you recall

 9    that the -- at the end of November, the debtor

10    did notice to the advisors of their intent to

11    terminate the shared services agreements?

12        A.    Like I testified earlier, there

13    was -- the agreements weren't identical, from

14    what I recall, and there is one that had a

15    longer notice period, which I think had a

16    60-day notice period.  I don't recall which one

17    that was, so not all of them were -- notice

18    hadn't been given as of November 30th, for all

19    of the agreements.

20        Q.    Upon the receipt of the -- the

21    termination notices that you recall, do you

22    know if the advisors decided at that point not

23    to make any further payments of any kind to

24    Highland?

25              MR. RUKAVINA:  Objection, form.
```

WATERHOUSE - 10-19-21

1
2    A.     No.   The advisors -- the advisors

3    had stopped making payments prior to that

4    notice.

5    Q.     Okay.  And how do you know that the

6    advisors stopped making -- making payments

7    prior to the notice?

8    A.     I had -- I had a conversation

9    with -- with Jim Dondero.

10   Q.     And did Mr. Dondero tell you that

11   the advisors would no longer make payments to

12   Highland?

13          MS. DEITSCH-PEREZ:  Object to the

14   form.

15   A.     Yes, he -- he -- again, he said

16   they -- they -- the advisors have overpaid on

17   these agreements, to not make any future

18   payments, and that there needs to be offsets,

19   and they're working on getting offsets to these

20   overpayment.

21   Q.     Do you know if anybody ever

22   instructed Highland's employees to make the

23   payment that was due by NexPoint at the end of

24   the year?

25   A.     Did anyone instruct Highland's

```
 1                  WATERHOUSE - 10-19-21

 2   employees to make that payment?

 3        Q.    Correct.

 4        A.    Anyone -- not that I'm aware.

 5        Q.    Were any of Highland's employees

 6   authorized to make the payments on behalf of

 7   its affiliates -- withdrawn.

 8              Was any of Highland's employees

 9   authorized to effectuate the payment on behalf

10   of NexPoint that was due at the end of the year

11   without getting approval from either you or

12   Mr. Dondero?

13        A.    They had the -- they had the ability

14   to make the payment, but they didn't -- you

15   know, that -- that payment needed to be

16   approved.

17        Q.    Okay.  And it needed to be approved

18   by you or Mr. Dondero; is that right?

19        A.    I mean, I'm not going to make the

20   unilateral decision.

21        Q.    Is that a decision that you

22   understood had to be made by Mr. Dondero?

23        A.    Yes.  Sitting back in December of

24   2020, the -- that -- there was this off --

25   offset negotiation that -- that was happening,
```

```
 1                    WATERHOUSE - 10-19-21
 2   so I mean, until those negotiations were
 3   resolved, you know, there wasn't any
 4   payments -- there weren't any payments.
 5        Q.   And -- and there were no payments
 6   until the negotiations were resolved because
 7   that was the directive that you received from
 8   Mr. Dondero; correct?
 9        A.   I don't think he said -- I mean, I
10   think -- yeah, I mean -- I'm trying to recall
11   the conversation.  It was -- you know, there
12   is -- there is these negotiations.  There's --
13   there needs to be these offsets.  They're
14   talking with the debtor.  So, you know, until
15   this is resolved, right, I mean, depending on
16   how, whatever that resolution was, were we to
17   take any action.
18        Q.   Okay.  How about with respect to
19   HCMS, did HCMS have a term payment due at the
20   end of the year?
21        A.   Again, I don't -- I don't recall.
22        Q.   Okay.  You discussed briefly two
23   payments that were made in January of 2021, one
24   on behalf of NexPoint, and one on behalf of
25   HCMS.  Do I have that right?
```

WATERHOUSE - 10-19-21

1

2          A.      No.   The two payments I recall were

3     NexPoint and HCRE.

4          Q.      Okay.  And those two payments --

5     thank you for the correction.  And those two

6     payments were made because Mr. Dondero

7     authorized those payments to be made; correct?

8          A.      Yes.

9          Q.      And they hadn't been made before

10    that because Mr. Dondero had not authorized

11    them to be made?

12               MS. DEITSCH-PEREZ:  Object to the

13          form.

14         A.      Yes, because of these negotiations.

15         Q.      Okay.  Just a couple of more

16    questions.

17               Did anybody, to the best of your

18    knowledge, on behalf of HCMFA, ever tell the

19    SEC that HCMLP was responsible for the mistakes

20    that were made on the TerreStar valuation?

21         A.      Did anyone from Highland on HCMFA's

22    behalf tell the SEC that Highland -- that

23    Highland was responsible for there -- I just

24    want to make sure --

25         Q.      It was a little bit different, so

                    WATERHOUSE - 10-19-21

1    let me try again.

2         A.    These are very long questions, John.

3    I'm not trying to be --

4         Q.    That is good.  Do you know whether

5    anybody -- do you know whether anybody on

6    behalf of HCMS -- HCMFA ever told the SEC that

7    Highland was the responsible party for the

8    TerreStar valuation error?

9         A.    Not that I'm aware.

10        Q.    Okay.  Did anybody on behalf of

11   the -- on behalf of HCMFA ever tell the retail

12   board that Highland was responsible for the

13   TerreStar valuation error?

14        A.    Not that I'm aware.

15        Q.    Do you know if HCMFA made an

16   insurance claim with respect to the damages

17   that were incurred in relation to the TerreStar

18   valuation error?

19        A.    Yes.

20        Q.    And do you know why they made that

21   insurance claim?

22        A.    Because there was an error.  I

23   mean --

24        Q.    Was the insured's claim made -- was

WATERHOUSE - 10-19-21

1

2    the insurance claim made under HCMFA's policy?

3        A.    Yes.

4        Q.    Did HCMFA at any time prior to the

5    petition date -- withdrawn.

6              You were asked a couple of questions

7    where -- where you said that Mr. Dondero told

8    you that he was ascribing zero value to the

9    notes as part of a pot plan because he believed

10   that the notes were part of executive

11   compensation.

12             Do I have that right?

13             MS. DEITSCH-PEREZ:  Object to the

14        form.

15       A.    Yes.

16       Q.    Okay.  Have you ever heard that

17   before the time that Mr. Dondero told you that

18   in the conversation about the pot plan?

19       A.    Had I heard that prior to my

20   conversation with Mr. Dondero?

21       Q.    Yes.

22       A.    No, I had not heard that prior.

23       Q.    Okay.  And that was in the context

24   of his formulation of the settlement proposal;

25   is that right?

Case 3:21-cv-00881-X Document 188 Filed 01/09/24 Page 338 of 397
Case 3:21-cv-00881-X Document 178-18 Filed 02/09/24 Page 16 of 200 PageID 44360

Page 387

```
 1                 WATERHOUSE - 10-19-21

 2         A.    I mean, generally, yes.  You know,

 3   we were asked to provide asset values, right,

 4   and he was having settlement discussions.

 5   Again, I don't know who those went to

 6   ultimately.  I don't recall.

 7               MR. MORRIS:  I have no further

 8         questions.  Thank you very much for your

 9         patience.  I apologize for the late hour.

10               MS. DEITSCH-PEREZ:  John, you stay

11         on about your email when --

12               MR. RUKAVINA:  Hold on, I'm not

13         done.

14               MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15         still has questions.  Sorry.  I was going

16         to say both John and Davor, could you stay

17         on afterwards just to talk about the

18         requests.

19                    FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21         Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25               Do you remember that testimony?
```

```
 1                WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Okay.  And was that late November or

 4  early December of 2020?

 5       A.    It was, I would say, first or second

 6  week of November.

 7       Q.    Okay.  Do you recall whether --

 8  whenever you had that discussion, whether

 9  Mr. Dondero had already been fired by the

10  debtor?

11       A.    Yes, I -- I believe he was not an

12  employee of the debtor anymore at that time.

13       Q.    And when you were discussing this

14  with Mr. Dondero and he said no more payments,

15  you were discussing the two shared services

16  agreements and employee reimbursement

17  agreements we testified -- you testified about

18  before; is that correct?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    That is correct.

22       Q.    And had your office or you -- and we

23  will talk at a future deposition about the

24  administrative claim.

25            But had -- by that time that you
```

```
 1                WATERHOUSE - 10-19-21

 2    talked to Mr. Dondero, had your office or you

 3    done any estimate of what the alleged

 4    overpayments were?

 5                MR. MORRIS:  Objection to the form

 6         of the question.

 7         A.    Yes, we had -- there was a -- there

 8    was a detailed analysis that was put together

 9    by David Klos at the time.

10         Q.    And do you recall just generally

11    what the total amount for both advisors of the

12    overpayments was?

13         A.    It was in excess of $10 million.

14         Q.    Was it in excess of $14 million?

15                MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I -- I remember it was an

18    eight-figure number.  I don't remember

19    specifically.

20         Q.    Okay.  And did you convey that

21    number to Mr. Dondero when you had that

22    conversation?

23         A.    Yes.

24         Q.    What was his reaction?

25         A.    I mean, he wasn't happy.
```

WATERHOUSE - 10-19-21

1

2    Q.    Is it fair to say he was upset?

3    A.    Yes.

4    Q.    Did Mr. Dondero ever expressly tell

5  you to not have NexPoint make the required

6  December 31, 2020, payment?

7    A.    Yes, I recall him saying don't make

8  the payment because it was being negotiated, as

9  I discussed with Mr. Morris, this offset

10  concept.  So there were obligations due by the

11  advisors to Highland, they should be offset

12  that -- you know, those obligations should be

13  offset by this -- by this overpayment.

14    Q.    And when did he tell you that?

15    A.    I would say -- I would say around --

16  probably December -- December-ish.

17    Q.    Early December, late December?

18    A.    I don't recall with as much

19  specificity as -- as -- as -- as stopping the

20  shared services payments, because we had

21  actually made one shared services payment in

22  November.  So that is why I need to remember

23  that one more clearly.  I don't remember where

24  exactly in December that conversation occurred.

25    Q.    Did Mr. Dondero expressly use the

```
 1                WATERHOUSE - 10-19-21

 2   word "NexPoint" when he was saying don't make

 3   these payments?

 4           MR. MORRIS:  Objection to the form

 5       of the question, asked and answered.

 6       A.    Yeah, we were -- we were discussing

 7   advisor obligations.  So it was -- you know, it

 8   was just obligations from the advisors.

 9           And -- and he specifically talked

10   about the NexPoint payment as well.

11       Q.    Okay.  And it is your testimony that

12   he expressly told you not to make that NexPoint

13   December 31 payment?

14           MR. MORRIS:  Objection, asked and

15       answered twice.

16       A.    Yes, he -- he did, during that

17   conversation.

18       Q.    And did you ever follow up with him

19   after that about whether NexPoint should or

20   shouldn't make that payment?

21       A.    I did not.

22       Q.    Did you ever, on or about

23   December 31, 2020, remind him and say, hey,

24   this payment is due, what shall I -- what

25   should I do?
```

1               WATERHOUSE - 10-19-21

2       A.    I did not.

3       Q.    So sitting here today, you -- you

4  remember distinctly that Dondero in December of

5  2020 expressly told you not to have NexPoint

6  make that payment?

7            MR. MORRIS:  Objection, asked and

8       answered three times.

9       A.    Yes.

10      Q.    Can you say categorically it wasn't

11  just some general discussion where he told you

12  not to make payments?

13            MR. MORRIS:  Objection, asked and

14       answer four times.

15            MR. HORN:  Four times now.  Go for

16       five.

17      A.    Yes.

18      Q.    Did you tell Mr. Seery that?

19      A.    I don't believe I did.  I don't

20  recall.

21      Q.    And was this an in-person discussion

22  or telephone or email?  Do you remember?

23      A.    This was a phone -- a phone

24  conversation.

25      Q.    Okay.  Would you have a record of --

Case 3:21-cv-00865-X Doc 364 Filed 10/29/01 Entered 10/29/01 03:22:18 Page 339 of 397
Case 3:21-cv-00881-X   Document 178-18   Page 53 of 399   Page 22 of 200   PageID 44366
Page 393

```
 1                    WATERHOUSE - 10-19-21

 2    on your cell phone of when that conversation

 3    might have taken place?

 4              I'm sorry, strike that.

 5              Was that by cell phone?

 6       A.    I believe -- yes, because we -- I

 7    was at home.  I mean, I don't have a landline.

 8    All I have is my cell phone.

 9       Q.    Do you know whether your cell phone

10    still has records of conversations from

11    December 2020 on it?

12       A.    My call log doesn't go back that

13    far.

14       Q.    Okay.  Thank you.

15              MR. RUKAVINA:  I will pass the

16    witness.

17              MS. DEITSCH-PEREZ:  Just a couple

18       quick questions.

19                   FURTHER EXAMINATION

20    BY MS. DEITSCH-PEREZ:

21       Q.    With respect to HCRE and HCMS, am I

22    correct there was -- there was no direction not

23    to pay those loan payments?

24              MR. MORRIS:  Objection to the form

25       of the question.
```

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes, I don't recall having

 3   conversations about, you know, those -- those

 4   entities.

 5        Q.    And, in fact, what was the tone that

 6   Mr. Dondero had when he talked to you about the

 7   fact that HCRE and HCMS payments hadn't been

 8   made when he found out that they hadn't been

 9   paid?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  Objection to form.

12        Q.    What was the tone he took with you?

13        A.    Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16        Q.    Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Okay.  Thank you.

23             MR. MORRIS:  I have nothing further.

24        Thank you so much, Mr. Waterhouse.

25             MR. HORN:  I have no questions.
```

```
 1                WATERHOUSE - 10-19-21

 2        Thank you, Mr. Waterhouse.  We appreciate

 3        your time.  I am logging off the discussion

 4        and I will talk to y'all tomorrow.

 5             MR. MORRIS:  Super.

 6             VIDEOGRAPHER:  If there are no

 7        further questions, this ends the

 8        deposition -- excuse me.  This ends the

 9        deposition, and we are going off the record

10        at 7:30 p.m.

11        (Deposition concluded at 7:30 p.m.)

12

13             _____

14                FRANK WATERHOUSE

15

16   Subscribed and sworn to before me

17   this      day of             2021.

18

19   ---------------------------------

20

21

22

23

24

25
```

```
 1              WATERHOUSE - 10-19-21

 2            C E R T I F I C A T E

 3

 4        I, SUSAN S. KLINGER, a certified shorthand

 5    reporter within and for the State of Texas, do

 6    hereby certify:

 7        That FRANK WATERHOUSE, the witness whose

 8    deposition is hereinbefore set forth, was duly

 9    sworn by me and that such deposition is a true

10    record of the testimony given by such witness.

11        I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage; and that I am in no way interested in

14    the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16    hand this 19th of October, 2021.

17

18        _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25
```

```
 1                  WATERHOUSE - 10-19-21

 2   NAME OF CASE:  In re:  Highland Capital

 3   DATE OF DEPOSITION:  October 19, 2021

 4   NAME OF WITNESS:  Frank Waterhouse

 5   Reason Codes:

 6         1.  To clarify the record.

 7         2.  To conform to the facts.

 8         3.  To correct transcription errors.

 9   Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25
```

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| Plaintiff, | § Adversary Proceeding No. |
| vs. | § 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| Plaintiff, | § Adversary Proceeding No. |
| vs. | § 21-03006-sgj |

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § |
| Plaintiff, | § § Adversary Proceeding No. |
| vs. | § § 21-03007-sgj |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |
| Defendants. | § |

## HIGHLAND'S OBJECTION TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings. Highland fully incorporates by reference its contemporaneously filed brief (the "Brief")[3] in opposition to the Motions and would show unto the Court as follows:

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] Capitalized terms used but not defined herein shall take on the meaning scribed thereto in the Brief.

APP 535

## RELIEF REQUESTED

1.      By this Objection, Highland respectfully requests that the Court enter an order denying the Motions seeking to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order.

2.      Pursuant to Rules 7.1(d) and (h) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), the Brief is being filed contemporaneously with this Objection and is incorporated by reference.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Highland respectfully requests that the Court enter an order (i) denying in whole the relief requested in the Motions, and (ii) granting Highland such further and additional relief as the Court deems just and proper.

APP 536

Dated:  December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:       jpomerantz@pszjlaw.com
                   jmorris@pszjlaw.com
                   gdemo@pszjlaw.com
                   hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:      MHayward@HaywardFirm.com
                   ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

4

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § |
| Plaintiff, | § § Adversary Proceeding No. |
| vs. | § § 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § § § § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § |
| Plaintiff, | § § Adversary Proceeding No. |
| vs. | § § 21-03006-sgj |
| | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

APP 539

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF FACTS ................................................................................... 4

  A.  The Note ............................................................................................... 4

  B.  NexPoint Defaults under the Note and Highland Sues to Collect ....................................... 5

  C.  NexPoint Blames Highland for Its Default............................................................. 6

  D.  The Court Enters the Scheduling Order ............................................................... 6

  E.  Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any Payments to Highland ........................................................................................... 7

  F.  Highland's Obligations under the Shared Services Agreement Were Limited to Those "Specifically" Identified Therein ......................................................................... 8

  G.  The Instant Motion ..................................................................................... 9

III.  ARGUMENT........................................................................................... 9

  A.  NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law ................... 9

  B.  NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling Order........................................................................................... 10

    1.  NexPoint's Explanation for Failing to Timely Designate an Expert Is Deficient ........................................................................................... 12

    2.  NexPoint's Suggested "Expert" Testimony Is Irrelevant ......................................... 13

    3.  Allowing the Testimony Would Prejudice Highland ................................................. 15

  C.  HCRE's and HCMS's Joinders Have Even Less Merit than the Motion and Should Be Denied ........................................................................................... 17

CONCLUSION............................................................................................. 17

i

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Askanase v. Fatjo*,
    130 F.3d 657 (5th Cir. 1997) .................................................. 10

*Binh Hoa Le v. Exeter Fin. Corp.*,
    3:15-CV-3839-L, 2019 WL 1436375 (N.D. Tex. Mar. 31, 2019) ........................ 12, 13, 17, 18

*Charalambopoulos v. Grammer*,
    3:14-CV-2424-D, 2017 WL 930819 (N.D. Tex. Mar. 8, 2017) .............................. 14

*Flax v. Quitman County Hosp.,
    LLC*, 2:09-CV-101-M-D, 2011 WL 3585870 (N.D. Miss. Aug. 16, 2011)........................... 10

*Geiserman v. MacDonald*,
    893 F.2d 787 (5th Cir.1990) .................................................. passim

*Grand Time Corp. v. Watch Factory, Inc.*,
    3:08-CV-1770-K, 2009 WL 10678210 (N.D. Tex. Nov. 18, 2009) .................................. 11, 12

*Hanspard v. Otis Elevator Co.*,
    CIV.A. 05-1292, 2007 WL 839994 (W.D. La. Jan. 12, 2007) ................................ 10

*Henderson v. Atmos Energy*,
    496 F. Supp. 3d 1011 (E.D. La. 2020)....................................... 16

*Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*,
    CV 12-1026, 2014 WL 12721924 (E.D. La. Nov. 7, 2014) ..................................... 15

*Panhandle Advert., LLC v. United Rentals Realty,
    LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901 (N.D. Tex. Feb. 12, 2021).......................... 9, 10

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) .................................................. 14

*Reliance Ins. Co. v. Louisiana Land & Expl. Co.*,
    110 F.3d 253 (5th Cir. 1997) .................................................. 12, 13, 17

*Rolls-Royce Corp. v. Heros, Inc.*,
    CIV.A. 307-CV-0739-D, 2010 WL 184313 (N.D. Tex. Jan. 14, 2010).................................. 15

*S&W Enters., L.L.C. v. SouthTrust Bank of Alabama, NA*,
    315 F.3d 533 (5th Cir. 2003) .................................................. 12, 17

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*,
    438 F. Supp. 2d 696 (E.D. Tex. 2006)..................................... 10

**Rules**

Fed. R. Civ. P. 16(b)(4)............................................................................................................... 11

iii

**HIGHLAND'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings.[3] In support of its Objection, Highland respectfully states as follows:

## I.    PRELIMINARY STATEMENT[4]

1.     NexPoint's Motion to modify the Scheduling Order is without merit and should be denied.

2.     This Adversary Proceeding arises from NexPoint's default under its Note in the original principal amount of $30.7 million. The Note required NexPoint to make Annual Installment payments to Highland on December 31 of each year.

3.     NexPoint blames Highland for its failure to timely make the Annual Installment payment. Initially, NexPoint contended that Highland breached its obligations by negligently failing to make the payment on NexPoint's behalf. Then, Frank Waterhouse, an officer of NexPoint, a current employee of Skyview (the entity that services numerous of Mr. Dondero's

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] *See Motion of Highland Capital Management Services, Inc. to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 91 in Adversary Proceeding 21-03006 ("HCMS's Joinder") (incorporating NexPoint's Motion), and *Motion of HCRE Partners, LLC to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 86 in Adversary Proceeding 21-03007 ("HCRE's Joinder", and together with HCMS's Joinder, the "Joinders," and collectively with the Motion, the "Motions") (incorporating NexPoint's Motion).

[4] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed thereto below.

businesses), and Highland's former Chief Financial Officer, testified in his deposition that NexPoint failed to make the Annual Installment payment because Mr. Dondero instructed him in December 2020 not to make *any* payments to Highland from *any* of the entities that Mr. Dondero controlled.

4.      NexPoint contends that, in light of this testimony, an expert is necessary to testify regarding whether Highland violated an "affirmative duty or obligation" it owed to NexPoint under Section 6.01 of the Shared Services Agreement to effectuate the payment on behalf of NexPoint, despite Mr. Dondero's instructions to the contrary.   According to NexPoint:

> [T]he question becomes whether Waterhouse or the Debtor 'put their head in the sand' in violation of any affirmative duty or obligation they may have had regarding the matter, such as; to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint or the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.

Motion ¶ 13.

5.      NexPoint's Motion to extend the expert disclosure and discovery deadlines in order to retain a testifying expert on Highland's duties of care under the Shared Services Agreement is without merit.

6.      NexPoint's suggested expert testimony is improper because it concerns "the standards and duties of care under the parties' Shared Services Agreement" and otherwise seeks to interpret that Agreement for the Court.  It is black-letter law that the determination of the existence and scope of contractual and other legal duties are improper subjects of expert opinion because they constitute legal conclusions that fall within the exclusive province of the Court.

7.      Even if that were not the case (and it is), NexPoint fails to satisfy its burden of demonstrating "good cause" to modify the Scheduling Order under Rule 16(b) for three independent reasons.  *First*, as set forth below, the Motion is untimely.  *Second*, the suggested expert testimony is irrelevant because it would not assist a factfinder in determining any technical

2

or complex issues in this case. By its plain terms, the Shared Services Agreement does not impose an affirmative duty on—or even authorize—Highland to effectuate payments on behalf of NexPoint without authorization from a NexPoint Representative. NexPoint's reliance on Section 6.01 as the source of Highland's alleged duties is thus misguided, as that provision applies only to duties specifically set forth under the Agreement.[5] ***Finally***, allowance of the expert testimony at this late juncture would substantially prejudice Highland, with such prejudice being exacerbated (and not cured) by a continuance. If the Motion is granted, Highland will be forced to expend significant resources addressing NexPoint's latest theories of its defense, including through additional discovery and motion practice. It will also cause a further delay of the trial on the merits, thereby impeding Highland's ultimate recovery under the Note, all at the expense of Highland's creditors.

8.      Separately, as ill-conceived as the Motion is, the Joinders raise considerable questions of good faith, because neither Highland Management Services, Inc. ("HCMS") nor HCRE Partners, LLC ("HCRE") even alleges that it is a party to a shared services agreement (let alone the Shared Services Agreement submitted with the Motion), nor can it. The Motion seeks to "designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement," but the Joinders offer no explanation for why such expert testimony would have any relevance to them since they are not parties to ***any*** shared services agreement.

9.      For the reasons set forth herein, Highland respectfully requests that the Court deny the Motion in all respects.

---

[5] NexPoint offers no explanation for why Highland's alleged obligations under the Shared Services Agreement supersede Mr. Waterhouse's fiduciary duties to NexPoint. If anyone had a duty to ask Mr. Dondero "Are you sure?" or "Do you know what you're doing" (an absurd concept on its own), it was surely Mr. Waterhouse—not in his capacity as a Highland employee—but in his capacity as an officer of, and a fiduciary to, NexPoint.

APP 545

## II.     STATEMENT OF FACTS

**A.     The Note**

10.     On May 31, 2017, James Dondero ("Mr. Dondero") signed a 30-year term note on behalf of NexPoint and in favor of Highland (the "Note"). Morris Dec.[6] Exhibit 1.

11.     The Note consolidated NexPoint's obligations under five Prior Notes (as that term is defined in the Note) and was for an original principal amount of $30,746,812.33. *See* Morris Dec. Exhibit 1, Ex. A. Highland received no consideration for consolidating the five demand notes into a single 30-year term note.

12.     NexPoint and Mr. Dondero knew that NexPoint was required to pay Highland in Annual Installments, because it was spelled out plainly in the Note:

> 2.1     Annual Payment Dates. During the term of this Note, [NexPoint] shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each payment) in thirty (30) equal annual payments (the "Annual Installments") until the Note is paid in full. ***[NexPoint] shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

Morris Dec. Exhibit 1 § 2.1 (emphasis added).

13.     NexPoint and Mr. Dondero also knew the consequences of failing to timely make the required Annual Installment payments, because they were also spelled out plainly in the Note:

> 4.     Acceleration Upon Default. ***Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof [i.e., Highland]***, without notice, demand presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable*** and subject to those remedies of the holder hereof [i.e., Highland].

*Id*. § 4 (emphases added).

---

[6] References to "Morris Dec. __" are to the *Declaration of John Morris in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* being filed concurrently herewith.

4

14. Finally, Mr. Dondero expressly agreed on behalf of NexPoint to waive any notice of default or acceleration:

> 5. <u>Waiver</u>. [NexPoint] hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and all other notices of any kind hereunder.

*Id*. § 5.

15. Thus, based on the plain terms of the Note executed by Mr. Dondero on NexPoint's behalf at a time when Mr. Dondero indisputably controlled both entities, NexPoint agreed (a) to make Annual Installment payments to Highland on December 31 of each year; (b) that Highland would have the unilateral right upon a default to accelerate all unpaid principal and interest due under the Note without notice or demand; and (c) to waive, among other things, a grace period, notice of nonpayment, notice of intent to accelerate, and "all other notices of any kind hereunder."

## B. NexPoint Defaults under the Note and Highland Sues to Collect

16. NexPoint does not dispute that it failed to make the Annual Installment payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

17. By letter dated January 7, 2021, in an exercise of its unambiguous and unconditional rights under the Note, Highland demanded that NexPoint immediately pay all unpaid principal and interest then due under the Note (the "<u>Demand Letter</u>"). Morris Dec. Exhibit 2. The Demand Letter stated:

> Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.
>
> The Note is in default, and payment is due immediately.

*Id*.

APP 547

18.     On January 22, 2021, after NexPoint failed to meet its obligations under the Note, Highland commenced this Adversary Proceeding.  [AP Docket No. 1].

**C.     NexPoint Blames Highland for Its Default**

19.     On March 1, 2021, NexPoint filed its *Original Answer* asserting, among other things, that "[p]ursuant to that certain Shared Services Agreement, [Highland] was responsible for making payments on behalf of [NexPoint] under the note" such that any "alleged default" was caused by Highland's own negligence and breach of contract (the "Original Defense"). *Defendant's Original Answer* [AP Docket No. 6] (the "Original Answer") ¶¶ 39-41.

20.     On August 9, 2021, NexPoint filed its *First Amended Answer*, which did not substantively alter its Original Defense.  [AP Docket No. 50] (the "Amended Answer") ¶¶ 39-41.

21.     On September 1, 2021, after Highland amended its Complaint, NexPoint filed its *Answer to Amended Complaint* [AP Docket No. 64] (the "Final Answer").  The Final Answer did not substantively alter NexPoint's Original Defense.  *See id.* ¶¶ 80-82.

22.     Thus, at all times prior to filing the Motion, NexPoint contended that its failure to timely make the Annual Installment due on December 31, 2020 was caused by Highland's own alleged negligence and breach of the Shared Services Agreement.

**D.     The Court Enters the Scheduling Order**

23.     On September 6, 2021, the Court entered the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [AP Docket No. 70] (the "Scheduling Order").

24.     The Scheduling Order provides, in pertinent part, that "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021."  Scheduling Order ¶ 3.

6

### E. Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any Payments to Highland

25.     In December 2020, Frank Waterhouse ("Mr. Waterhouse") wore multiple hats that Mr. Dondero gave to him, including: (a) Chief Financial Officer of Highland; (b) Treasurer of NexPoint; (c) Treasurer of HCMS; (d) Treasurer of Highland Capital Management Fund Advisors, L.P. ("HCMFA", and together with NexPoint, the "Advisors"); and (e) Principal Executive Officer of certain funds managed by the Advisors.  *See* Morris Dec. Exhibit 3 at 24:2-25; 35:8-22; 120:7-12; 327:3-8.

26.     At a recent deposition, Mr. Waterhouse testified that NexPoint did not make the Annual Installment payment due on December 31, 2020 because Mr. Dondero had instructed him in December 2020 not to cause any payments to be made to Highland.  Mr. Waterhouse also testified that he never followed up with Mr. Dondero or reminded him that the payment was coming due at the end of the month.  *See* Morris Dec. Exhibit 3 at 390:4-392:17.

27.     Mr. Dondero testified that he was unaware of anyone ever instructing or authorizing Highland to make the Annual Installment payment due under the Note on NexPoint's behalf. Morris Dec. Exhibit 4 at 462:16-463:9.  Mr. Waterhouse concurred and confirmed that Highland's employees were not authorized to make the Annual Installment payment due at the end of the year without prior approval:

> Q:  Do you know if anybody ever instructed Highland's employees to make the payment that was due by NexPoint at the end of the year?
>
> A:  Did anyone instruct Highland's employees to make that payment?
>
> Q:  Correct.
>
> A:  Anyone – not that I'm aware.
>
> Q:  . . . [Were] any of Highland's employees authorized to effectuate the payment on behalf of NexPoint that was due at the end of the year without getting approval from either you or Mr. Dondero?

APP 549

A: They had the – they had the ability to make the payment, but they didn't – you know, that – that payment needed to be approved.

Morris Dec. Exhibit 3 at 381:21-382:16.

**F.  Highland's Obligations under the Shared Services Agreement Were Limited to Those "Specifically" Identified Therein**

28. NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA").  Rukavina Dec., Exhibit A.[7]

29. Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  Highland is unaware of any provision in the SSA—and NexPoint cites to none—that authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.

30. In fact, Article II of the SSA expressly provided that "for the avoidance of doubt . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  SSA at § 2.02 (emphasis added).

31. To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06  Authority.  [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement.  [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which NexPoint is a party***. . . .  [Highland] shall not have any duties or obligations to [NexPoint] unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which [NexPoint] is a party.

---

[7] References to "Rukavina Dec. __" are to the *Declaration of Davor Rukavina* [AP Docket No. 86-1] attached to the Motion.

APP 550

*Id.* § 2.06 (emphasis added).

32.     There can be no credible dispute that (a) the Note is a "document or agreement to which NexPoint is a party," and that (b) the making of the Annual Installment payments were "obligations of" NexPoint under the Note.

**G.     The Instant Motion**

33.     Apparently stunned by Mr. Waterhouse's testimony, NexPoint now seeks to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order so it can obtain expert testimony regarding Highland's legal duties under Section 6.01 of the Shared Services Agreement.  Specifically, NexPoint proposes to retain an expert to testify "on the standards and duties of care under the parties' Shared Services Agreement . . . with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment." Motion ¶ 1.

### III.     ARGUMENT

**A.     NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law**

34.     NexPoint's suggested expert testimony is improper as a matter of law because it amounts to a legal conclusion.

35.     A party may not offer an expert opinion on the scope of a party's "legal duty" because such testimony amounts to a legal conclusion.  *See Panhandle Adver., LLC v. United Rentals Realty, LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901, at *5 (N.D. Tex. Feb. 12, 2021); *Flax v. Quitman County Hosp., LLC*, 2:09-CV-101-M-D, 2011 WL 3585870, at *5 (N.D. Miss. Aug. 16, 2011).

36.     NexPoint's suggested expert testimony relates to Highland's "duties of care under the parties' [SSA]" and, specifically, whether "Highland was responsible" under the SSA for

APP 551

"ensuring that NexPoint made" its Annual Installment payment under its Note. Motion ¶¶ 1, 18. This is precisely the type of expert testimony that courts preclude because it constitutes a legal conclusion. *See Panhandle*, 2021 WL 1112901 at *5 (granting plaintiff's motion to exclude expert testimony "as to his opinions regarding the legal duties Defendant owed Plaintiff under the lease at issue" because "opinions on the duties owed by the defendants and whether they fulfilled those duties were legal conclusions and not the proper subject for expert testimony"); *Flax*, 2011 WL 3585870 at *5 (prohibiting expert testimony "on the issue of *law* of whether a duty of care was owed") (emphasis in original); *Hanspard v. Otis Elevator Co.*, CIV.A. 05-1292, 2007 WL 839994, at *2 (W.D. La. Jan. 12, 2007) (granting plaintiff's motion *in limine* to exclude expert testimony where "an opinion as to the scope of [party's] contractual duties" constitutes a legal conclusion); *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 706 (E.D. Tex. 2006) (finding expert testimony improper where it "opines as to the duties" owed by parties because "they amount to conclusions of law").

37.     The question of whether Highland owed or breached any legal duties is an issue for the trier of fact to decide. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (affirming lower court's preclusion of expert testimony regarding whether officers and directors "fulfilled their fiduciary duties to the Company … is a legal opinion and inadmissible. Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. It is not for [the expert] to tell the trier of fact what to decide").

38.     Accordingly, NexPoint's suggested expert testimony on Highland's duties under the SSA is improper as a matter of law, and the Motion should be denied on this basis alone.

**B.     NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling Order**

39.     NexPoint fails to satisfy its burden of demonstrating good cause to modify the Scheduling Order.

40.     Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order may be modified only for "good cause." Fᴇᴅ. R. Cɪᴠ. P. 16(b)(4). Courts consider four factors in determining whether "good cause" is shown: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir.1990). These are the same four factors used to determine whether to exclude expert testimony under Rule 37(c)(1) of the Federal Rules of Civil Procedure. *See Grand Time Corp. v. Watch Factory, Inc.*, 3:08-CV-1770-K, 2009 WL 10678210, at *2 (N.D. Tex. Nov. 18, 2009). Ultimately, "the good cause standard requires the 'party seeking relief to show that the deadlines [could not] reasonably [have been] met despite the diligence of the party needing the extension.'" *Binh Hoa Le v. Exeter Fin. Corp.*, 3:15-CV-3839-L, 2019 WL 1436375, at *14 (N.D. Tex. Mar. 31, 2019) (quoting *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)).

41.     "Under Rule 16(b), the movant has the burden of showing good cause to modify a scheduling order." *Grand Time*, 2009 WL 10678210 at *3. Whether to modify a scheduling order is within the court's broad discretion. *See Geiserman*, 893 F.2d at 790 ("[O]ur court gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order") (internal quotations omitted); *Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997). Moreover, "a trial court's decision to exclude evidence as a means of enforcing a pretrial order must not be disturbed absent a clear abuse of discretion." *Geiserman*, 893 F.2d at 790.

42.     Each of the four factors weighs in favor of denying modification of the Scheduling Order.

11

1. **NexPoint's Explanation for Failing to Timely Designate an Expert Is Deficient**

43.     NexPoint's explanation for its failure to timely designate an expert is disingenuous. NexPoint contends that, *inter alia*, its failure to previously designate an expert was "due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony," and that expert testimony is now "necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint Motion." Motion ¶ 21. NexPoint seeks to modify the Scheduling Order simply because the deposition of one of its witnesses did not go well. This is plainly improper under Rule 16(b). *See Reliance*, 110 F.3d at 257 (affirming lower court's denial of party's request to supplement expert report where "[movant] asked for an opportunity to avoid the deadline for its expert report merely because the deposition of its expert witness did not go well," noting that "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case").

44.     Moreover, NexPoint filed its Original Answer nine (9) months ago and its Original Defense was expressly based on the SSA. [AP Docket No. 6 ¶¶ 39-41]. Given the testimony of Mr. Dondero (which could not have been unexpected) and Mr. Waterhouse that NexPoint never authorized or instructed Highland to make the Annual Installment payment due on December 31, 2020, *see* Section II.E, *supra*, NexPoint has always had the burden of proving that Highland owed a duty under the SSA, yet it never offered expert opinions on the topic. If NexPoint wanted to offer "expert testimony" concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that. *See Geiserman*, 893 F.2d at 792 (finding party failed to provide a "valid reason that would justify excusing him from the deadlines imposed by the lower court," noting "[t]he claimed importance of expert testimony underscores the need for [party] to have timely designated his expert witness," and "[t]he importance of such proposed testimony cannot singularly override the enforcement of local rules

12

and scheduling orders"). NexPoint's conclusory statements regarding the need for expert testimony are insufficient under Rule 16(b). *See Binh Hoa*, <mark>2019 WL 1436375</mark> at \*20 (finding "vague and conclusory statements regarding the need for additional information or facts do not adequately explain [party's] failure to meet the expert deadline in the Scheduling Order").

45. Accordingly, the first factor strongly favors denial of the Motion.

## 2. NexPoint's Suggested "Expert" Testimony Is Irrelevant

46. The second factor—the importance of the suggested expert testimony— weighs heavily in favor of denying modification of the Scheduling Order.

47. In addition to being improper, the suggested expert testimony is also irrelevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Charalambopoulos v. Grammer*, 3:14-CV-2424-D, <mark>2017 WL 930819</mark>, at \*9 (N.D. Tex. Mar. 8, 2017) (quoting *Pipitone v. Biomatrix, Inc.*, <mark>288 F.3d 239, 245</mark> (5th Cir. 2002)).

48. NexPoint contends that its suggested expert testimony is "important because the duties of care as specified in the [SSA] are terms of art necessitating an expert analysis." Motion ¶ 21. NexPoint's reliance on Section 6.01 in support of its Motion is misplaced.

49. By its express terms, Section 6.01 does not impose a duty on Highland to make or effectuate Annual Installment payments on NexPoint's behalf without authorization from a representative of NexPoint. Rather, Section 6.01 sets forth a "standard of care" that applies *only* with respect to the discharge of "duties under this Agreement."[8] In fact, to remove all doubt, the

---

[8] Notably, and notwithstanding the "standard of care" set forth in Section 6.01, the SSA provides Highland with considerable exculpation and indemnification protections that alone defeat NexPoint's Original Defense. For example, NexPoint agreed not to hold Highland liable for any acts or omissions unless it is determined by a court of competent jurisdiction to "be the result of gross negligence or to constitute fraud or willful misconduct." Rukavina Dec., Exhibit A § 6.02. NexPoint also agreed to indemnify Highland "from and against any and all claims and causes of action" for, among other things, "negligence." *Id.* § 6.03.

13

SSA emphasizes multiple times that Highland had **no** duties or obligations except with respect to those "specifically" identified therein. *See* Rukavina Dec., Exhibit A §§ 2.02, 2.06. NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative. *See* Original Answer ¶¶ 39-41 (no SSA provision cited); Amended Answer ¶¶ 39-41 (no SSA provision cited); Final Answer ¶¶ 80-82 (no SSA provision cited); Motion, generally (citing only to Section 6.01).

50. Thus, based on the plain terms of the SSA and NexPoint's own pleadings, expert testimony regarding Highland's alleged "duties" is irrelevant. *See Geiserman*, 893 F.2d at 791 (affirming lower court's refusal to modify scheduling order, noting that expert testimony "is not critical" if the issue at hand is "obvious to a layperson or established as a matter of law"); *Rolls-Royce Corp. v. Heros, Inc.*, CIV.A. 307-CV-0739-D, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant [] when an expert offers a conclusion based on assumptions unsupported by the facts of the case").

51. Moreover, the suggested expert testimony will not help the factfinder understand a complex fact in issue. Contrary to NexPoint's representations, this Adversary Proceeding does not involve complicated or technical issues. The issues in this Adversary proceeding are whether NexPoint defaulted on its Note and whether NexPoint can prove that Highland's alleged "negligence" or "breach of contract" caused such default. Final Answer ¶¶ 80-82. These issues are well within a fact-finder's understanding and are not the type which would necessitate an expert. *See Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*, CV 12-1026, 2014 WL 12721924, at *10 (E.D. La. Nov. 7, 2014), *on reconsideration,* CIV.A. 12-1026, 2014 WL 6090584 (E.D. La. Nov. 13, 2014) (excluding expert testimony where, "[d]espite Plaintiffs' arguments to the contrary, this case is not about the complicated inner workings of the insurance industry. It is about whether

14

an insurance agent misrepresented the type of coverage that Plaintiffs believed they were purchasing, and whether Defendants owed a heightened duty of care to Plaintiffs. Nothing in [expert's] report or proposed testimony will help the jury to understand a fact in issue that is not within the common understanding of a lay juror"); *Henderson v. Atmos Energy*, 496 F. Supp. 3d 1011, 1017 (E.D. La. 2020) (excluding expert testimony as irrelevant and unnecessary where "it is one based in common sense").

52.     At all relevant times, Mr. Waterhouse was an officer and a fiduciary of NexPoint, serving as its Treasurer.  If anyone had an obligation to ask Mr. Dondero if he wanted to reconsider his instructions, it was Mr. Waterhouse in the first instance—not in his capacity as an employee of Highland, but as an officer and fiduciary of the obligor, NexPoint.  Whether Mr. Dondero or Mr. Waterhouse is telling the truth is an interesting issue, but the Court need not resolve their dispute because it would only be relevant if the SSA imposed a duty on Highland to effectuate the Annual Installment payment without ever receiving any direction or instruction from a duly authorized representative of NexPoint.  And, as Mr. Waterhouse testified, the SSA imposes no such duty.

53.     Accordingly, the suggested expert testimony is irrelevant, and the Motion should be denied on this basis.

### 3.     Allowing the Testimony Would Prejudice Highland

54.     The third and fourth factors also weigh in favor of denying the Motion.

55.     Allowing the suggested expert testimony would prejudice Highland because Highland would need to expend additional resources responding to NexPoint's latest theory of its defense by way of: (i) retaining a rebuttal expert; (ii) deposing NexPoint's expert; or (iii) moving to strike the expert testimony.  *See Geiserman*, 893 F.2d at 791 (affirming lower court's striking of untimely witness designation and preclusion of expert testimony where delay of "a couple

15

weeks in designating the expert witness" would have "disrupted the court's discovery scheduling
and the opponent's preparation," and resulted in "expense that would result from an extended
discovery schedule for [movant's] failure to adhere to deadlines," noting that "the trial court has
latitude to control discovery abuses and cure prejudice by excluding improperly designated
evidence"); *Binh Hoa*, 2019 WL 1436375 at *20 ("It would [] be patently unfair to allow Plaintiff
to supplement and amend his expert report this late in the case without: (1) allowing Defendants
to amend their expert designations and provide an expert report to address the matters in Plaintiff's
amended and supplemental expert reports, (2) giving Defendants an opportunity to depose
Plaintiff's expert regarding his most recent opinion . . .").

56. A continuance would not cure this prejudice because the trial on the merits of the
underlying action would be unnecessarily delayed. This would ultimately delay Highland's
potential recovery under the Note and distributions to creditors under Highland's Plan. *See S&W
Enters.*, 315 F.3d at 537 (affirming lower court's denial of untimely submission of expert report
where defendant would be forced to conduct additional discovery in response to movant's new
materials, noting that "while a continuance could be granted for additional discovery . . . a
continuance would unnecessarily delay the trial"); *Reliance*, 110 F.3d at 257-58 (affirming lower
court's denial to modify scheduling order to add expert testimony where court found "[t]o allow
plaintiff to add more material now and create essentially a new report would prejudice the
defendants, who would then have to get an expert to address these last-minute conclusions, and
thus disrupt the trial date in this case") (internal quotations omitted); *Geiserman*, 893 F.2d at 791
(finding that while attorney "could have conducted new discovery and redeposed witnesses under
a continuance in response to the untimely designation, this would have resulted in additional delay
and increased the expense of defending the lawsuit"); *Binh Hoa*, 2019 WL 1436375 at *20
("Ordering another continuance would only serve to reward Plaintiff for his dilatory conduct and

16

failure to comply with court-ordered deadlines and this district's Local Civil Rules and result in

additional delay and expense. Regardless, it is not incumbent on the court to award litigants for

failing to develop their cases"). A simple collection action like the Adversary Proceeding should

not be continually extended simply because the defendant is unsatisfied with its defenses and the

evidence adduced in discovery.

57.    For these additional reasons, NexPoint fails to demonstrate good cause to excuse it

from the deadlines set forth in the Scheduling Order. Accordingly, the Motion should be denied.

**C.    HCRE's and HCMS's Joinders Have Even Less Merit than the
Motion and Should Be Denied**

58.    The Joinders are even more frivolous than the Motion. In addition to the reasons

set forth above, neither HCMS nor HCRE was ever a party to any shared services agreement with

Highland, let alone the SSA that is the foundation of the Motion. Accordingly, the Joinders are

without merit and should be summarily denied by the Court.

## CONCLUSION

For the foregoing reasons, Highland respectfully requests that the Court (i) deny the

Motions and (ii) grant such other and further relief as the Court deems just and proper.

17

Dated:  December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
                 jmorris@pszjlaw.com
                 gdemo@pszjlaw.com
                 hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:      MHayward@HaywardFirm.com
                 ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| | § |
| | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03006-sgj |
| | § |

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| HIGHLAND CAPITAL MANAGEMENT | § | |
|---|---|---|
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF JOHN A. MORRIS IN SUPPORT OF HIGHLAND'S OBJECTION TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a) and under penalty of perjury, declare as follows:

1.    I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Reorganized Debtor, and I submit this Declaration in support of *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* (the "Objection") being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.    Attached as **Exhibit 1** is a true and correct copy of a 30-year term note on behalf of NexPoint Advisors, L.P. and in favor of Highland Capital Management, L.P. for an original principal amount of $30,746,812.33, dated May 31, 2017.

3.      Attached as **Exhibit 2** is a true and correct copy of a Demand Letter dated January

7, 2021.

4.      Attached as **Exhibit 3** is a true and correct copy of the October 19, 2021 deposition

transcript of Frank Waterhouse.

5.       Attached as **Exhibit 4** is a true and correct copy of the October 29, 2021 deposition

transcript of James Dondero.


Dated: December 1, 2021.                         */s/ John A. Morris*
                                                 John A. Morris

# EXHIBIT 1

APP 564

## PROMISSORY NOTE

$30,746,812.33                                                      May 31, 2017

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.   Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.   Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.   Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.   Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.   Prior Notes. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

APP 566

# EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

# EXHIBIT 2

APP 568

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

   Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due underline immediately.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

APP 570

**Appendix A**

ABA #: 322070381
Bank Name: East West Bank
Account Name: Highland Capital Management, LP
Account #: 5500014686

# EXHIBIT 3

```
 1            WATERHOUSE - 10-19-21

 2       IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
 3              DALLAS DIVISION
     -------------------------------
 4    IN RE:

 5                       Chapter 11
     HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,        CASE NO.
                     19-34054-SGI11
 7

          Debtor.
 8    -------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
          Plaintiff,
10    vs.                    Adversary
                         Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT     21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15          Defendants.
     -------------------------------
16

17       REMOTE VIDEOTAPED DEPOSITION OF

18          FRANK WATERHOUSE

19          October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

Page 2

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | |
| 3 | |
| 4 | October 19, 2021 |
| 5 | 9:30 a.m. |
| 6 | |
| 7 | |
| 8 | |
| 9 | Remote Deposition of FRANK WATERHOUSE, |
| 10 | held before Susan S. Klinger, a Registered |
| 11 | Merit Reporter and Certified Realtime Reporter |
| 12 | of the State of Texas. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 3

1 WATERHOUSE - 10-19-21
2 A P P E A R A N C E S :
3 (All appearances via Zoom.)
4 Attorneys for the Reorganized Highland Capital
5 Management:
6 John Morris, Esq.
7 Hayley Winograd, Esq.
8 PACHULSKI STANG ZIEHL & JONES
9 780 Third Avenue
10 New York, New York 10017
11 Attorneys for the Witness:
12 Debra Dandeneau, Esq.
13 Michelle Hartmann, Esq.
14 BAKER McKENZIE
15 1900 North Pearl Street
16 Dallas, Texas 75201
17 Attorneys for NexPoint Advisors, LP and
18 Highland Capital Management Fund Advisors,
19 L.P.:
20 Davor Rukavina, Esq.
21 An Nguyen, Esq.
22 MUNSCH HARDT KOPF & HARDD
23 500 North Akard Street
24 Dallas, Texas 75201-6659
25

Page 4

1 WATERHOUSE - 10-19-21
2 Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3 and HCMS:
4 Deborah Deitsch-Perez, Esq.
5 Michael Aigen, Esq.
6 STINSON
7 3102 Oak Lawn Avenue
8 Dallas, Texas 75219
9
10 Attorneys for Dugaboy Investment Trust:
11 Warren Horn, Esq.
12 HELLER, DRAPER & HORN
13 650 Poydras Street
14 New Orleans, Louisiana 70130
15
16 Attorneys for Marc Kirschner as the trustee for
17 the litigation SunTrust:
18 Deborah Newman, Esq.
19 QUINN EMANUEL URQUHART & SULLIVAN
20 51 Madison Avenue
21 New York, New York 10010
22
23 Also Present:
24 Ms. La Asia Canty
25

Page 5

1 WATERHOUSE - 10-19-21
2 I N D E X
3
4 WITNESS                          PAGE
5 FRANK WATERHOUSE
6 EXAMINATION BY MR. MORRIS            10
7 EXAMINATION BY MR. RUKAVINA          256
8 EXAMINATION BY MS. DEITSCH-PEREZ     352
9 EXAMINATION BY MR. MORRIS            377
10 EXAMINATION BY MR. RUKAVINA          387
11 EXAMINATION BY MS. DEITSCH-PEREZ     393
12
13        E X H I B I T S
14 No.                          Page
15 Exhibit 2 NPA et al Amended Complaint     142
16 Exhibit 33 6/3/19 Management         91
17         Representation
18 Exhibit 34 HCMLP Consolidated Financial    94
19         Statements
20 Exhibit 35 HCMFA Incumbency Certificate   151
21 Exhibit 36 Email string re 15(c)          170
22 Exhibit 39 HCMLP Operating Results 2/18   226
23 Exhibit 40 Summary of Assets and         236
24         Liabilities
25 Exhibit 41 12/19 Monthly Operating Report  258

Page 6

1      WATERHOUSE - 10-19-21
2   Exhibit 45 HCMFA Consolidated Financial     135
3         Statements
4   Exhibit 46 NexPoint 2019 Audited          218
5         Financials
6
7   Exhibit A1 Emails 11/25              328
8   Exhibit A2 Emails 12/31              338
9   Exhibit A6 Emails 1/12              341
10  Exhibit A7 Promissory Notes          297
11  Exhibit A9 Email, 8/31              307
12  Exhibit A10 Acknowledgment from HCMLP     302
13  Exhibit A11 HCMLP Schedule 71A          309
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1      WATERHOUSE - 10-19-21
2      P R O C E E D I N G S
3      VIDEOGRAPHER:  Good morning,
4   Counselors.  My name is Scott Hatch.  I'm a
5   certified legal videographer in association
6   with TSG Reporting, Inc.
7      Due to the severity of COVID-19 and
8   following the practice of social
9   distancing, I will not be in the same room
10  with the witness.  Instead, I will record
11  this videotaped deposition remotely.  The
12  reporter, Susan Klinger, also will not be
13  in the same room and will swear the witness
14  remotely.
15     Do all parties stipulate to the
16  validity of this video recording and remote
17  swearing, and that it will be admissible in
18  the courtroom as if it had been taken
19  following Rule 30 of the Federal Rules of
20  Civil Procedures and the state's rules
21  where this case is pending?
22     MR. HORN:  Yes.
23     MS. DANDENEAU:  Yes.
24     MR. MORRIS:  Yes.  John Morris.  I
25  would just try to do a negative notice

Page 8

1      WATERHOUSE - 10-19-21
2   here, as we did yesterday.  If anybody has
3   a problem with what was just stated, can
4   you state your objection now?
5      Okay.  No response, so everybody
6   accepts the stipulation and the instruction
7   that was just given.
8      VIDEOGRAPHER:  Thank you.  This is
9   the start of media labeled Number 1 of the
10  video recorded deposition of Frank
11  Waterhouse In Re: Highland Capital
12  Management, L.P., in the United States
13  Bankruptcy Court for the Northern District
14  of Texas, Dallas Division, Case Number
15  21-03000-SGI.
16     This deposition is being held via
17  video conference with participants
18  appearing remotely due to COVID-19
19  restrictions on Tuesday, October 19th, 2021
20  at approximately 9:32 a.m.  My name is
21  Scott Hatch, legal video specialist with
22  TSG Reporting, Inc. headquartered at 228
23  East 45th Street, New York, New York.  The
24  court reporter is Susan Klinger in
25  association with TSG Reporting.

Page 9

1      WATERHOUSE - 10-19-21
2      Counsel, please introduce
3   yourselves.
4      MR. MORRIS:  John Morris, Pachulski
5   Stang Ziehl & Jones for the reorganized
6   Highland Capital Management, L.P., the
7   plaintiff in these actions.
8      MS. DANDENEAU:  Deborah Dandeneau
9   from Baker McKenzie.  My partner, Michelle
10  Hartmann, is also in the room with me,
11  representing Frank Waterhouse individually.
12     MS. DEITSCH-PEREZ:  Deborah
13  Deitsch-Perez from Stinson, LLP,
14  representing Jim Dondero, Nancy Dondero,
15  HCRA, and HCMS.
16     MR. HORN:  Warren Horn with Heller,
17  Draper & Horn in New Orleans representing
18  Dugaboy Investment Trust.
19     MR. RUKAVINA:  Davor Rukavina with
20  Munsch Hardt Kopf & Harr in Dallas
21  representing NexPoint Advisors, LP and
22  Highland Capital Management Fund Advisors,
23  L.P.
24     MR. AIGEN:  Michael Aigen from
25  Stinson, and I represent the same parties

Page 10

WATERHOUSE - 10-19-21

1 as Deborah Deitsch-Perez.
2     MS. NEWMAN:  This is Deborah Newman
3 from Quinn Emanuel.  We represent the
4 litigation -- Marc Kirschner as the trustee
5 for the litigation SunTrust.
6     MR. MORRIS:  I think that is
7 everybody.
8     VIDEOGRAPHER:  Thank you.  Will the
9 court reporter please swear in the witness.
10     FRANK WATERHOUSE,
11 having been first duly sworn, testified as
12 follows:
13     EXAMINATION
14 BY MR. MORRIS:
15     Q.   Please state your name for the
16 record.
17     A.   My name is Frank Waterhouse.
18     Q.   Good morning, Mr. Waterhouse.  I'm
19 John Morris, as you know, from Pachulski Stang
20 Ziehl & Jones.  You understand that my firm and
21 I represent Highland Capital Management, L.P.;
22 is that right?
23     A.   Yes.
24     Q.   Okay.  And do you understand that

Page 11

WATERHOUSE - 10-19-21

1 we're here today for your deposition in your
2 individual capacity?
3     A.   Yes.
4     Q.   Did you review and -- did you
5 receive and review a subpoena that Highland
6 Capital Management, L.P., served upon you?
7     A.   Yes.
8     Q.   You have been deposed before; right?
9     A.   Yes.
10     Q.   How many times have you been
11 deposed?
12     A.   About three or four times.
13     Q.   Okay.  And I defended you in one
14 deposition; isn't that right?
15     A.   That is correct.
16     Q.   So the general ground rules for this
17 deposition are largely the same as the
18 depositions you have given before.  And that is
19 I will ask you a series of questions, and it is
20 important that you allow me to finish my
21 question before you begin your answer; is that
22 fair?
23     A.   Yes.
24     Q.   And it is important that I allow you

Page 12

WATERHOUSE - 10-19-21

1 to finish your answers before I begin a
2 question, but if I fail to do that, will you
3 let me know?
4     A.   I can certainly do that.
5     Q.   Okay.  Do you understand that this
6 deposition is being videotaped?
7     A.   Yes.
8     Q.   You understand that I may seek to
9 use portions of the videotape in a court of
10 law?
11     A.   I did not know that, until you just
12 said that.
13     Q.   Okay.  And you are aware of that now
14 before the deposition begins substantively; is
15 that right?
16     A.   Yes.
17     Q.   So unlike I think the other
18 depositions that you have given, this one is
19 being given remotely.  So that presents some
20 unique challenges, at least as compared to a
21 deposition that is taken in-person.
22     From time to time we're going to put
23 documents up on the screen, Mr. Waterhouse.
24 And it is important that I give you the

Page 13

WATERHOUSE - 10-19-21

1 opportunity to review any portion of the
2 document that you think you need in order to
3 fully and completely answer the question.
4     So I would ask you to let me know if
5 there is a portion of a document that you need
6 to see in order to fully and completely answer
7 the question.  Can you do that for me?
8     A.   Yes.
9     MS. DANDENEAU:  Mr. Morris, I would
10 just note that we do have hard copies of
11 the documents that you sent, so if you can
12 just refer to the exhibit number as
13 reflected in the documents that you sent,
14 Mr. Waterhouse will be able to look at the
15 hard copies of those documents.
16     MR. MORRIS:  I appreciate that,
17 and -- and I will encourage him to do so.
18 There will be other documents that we did
19 not send to you that we'll be using today
20 though.
21     Q.   Okay.  With that as background, if
22 there is anything that I ask you, sir, that you
23 don't understand, will you let me know?
24     A.   Yes.

Page 14

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  Are you currently employed?
3  A.  Yes.
4  Q.  By whom?
5  A.  The Skyview Group.
6  Q.  When did you become employed by the
7  Skyview Group?
8  A.  I believe March 1st of 2021.
9  Q.  Do you have a title at Skyview?
10  A.  Yes.
11  Q.  What is your title?
12  A.  My title is chief financial officer.
13  Q.  Do you report to anybody in your
14  role as CFO?
15  A.  I don't, no.
16  Q.  No.  Is there a president or a CEO
17  of Skyview?
18  A.  Yes.
19  Q.  Who is that?
20  A.  That is Scott Ellington.
21  Q.  But you don't report to
22  Mr. Ellington; is that right?
23  A.  I don't think so.
24  Q.  Does Skyview Group --
25       MS. DANDENEAU:  Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

1
2  A.  I -- I -- I might.  I just -- I
3  don't recall.
4  Q.  Okay.  Does Skyview Group provide
5  any services to any entity directly or
6  indirectly owned or controlled by Jim Dondero?
7  A.  Yes.
8  Q.  Can you name -- is that pursuant to
9  written contracts?
10  A.  Yes.
11  Q.  And do you know how many contracts
12  exist?
13  A.  Approximately six or so.
14  Q.  And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17  A.  No.
18  Q.  Do you know how many -- how many --
19  how many employees does Skyview have?
20  A.  Approximately 35.
21  Q.  And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24  A.  I don't know the exact number.
25  Q.  Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  Is it more than 30?
4  A.  I don't know.
5  Q.  Can you tell me what portion of
6  Skyview -- Skyview's revenue is derived from
7  entities that are directly or indirectly owned
8  or controlled by Jim Dondero?
9       MS. DANDENEAU:  Mr. Morris, I mean,
10  you called Mr. Waterhouse here individually
11  for purposes of his testimony in connection
12  with the noticed litigation.  I have given
13  you some leeway to ask him some background
14  information about Skyview Group, but this
15  is not a substitute for a deposition in
16  connection with any other pending disputes
17  that exist.  And -- and we agreed to accept
18  the subpoena on the basis of he -- this is
19  testimony that he is giving in connection
20  with the noticed litigation.
21       I really think that you are now
22  going a little bit far afield from the
23  purpose of this deposition.
24       MR. MORRIS:  Okay.  It is -- I'm not
25  intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

1
2  these questions for any purpose other than
3  this litigation.  I think you understand
4  fully why I'm asking the questions, and I
5  just have a couple more, if you will bear
6  with me.
7       MS. DANDENEAU:  Okay.
8       MS. DEITSCH-PEREZ:  Can we have an
9  agreement that an objection by one is an
10  objection for any other party here?
11       MR. MORRIS:  Sure.  I would -- I
12  would encourage that, sure.
13       MS. DEITSCH-PEREZ:  Thank you.
14       MR. MORRIS:  It can't be sustained
15  or overruled more than one time, so...
16  Q.  Mr. Waterhouse, can you answer my
17  question, please.
18       MS. DANDENEAU:  Do you want to
19  repeat it, Mr. Morris, for his benefit?
20       MR. MORRIS:  Sure.
21  Q.  Can you -- can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25  A.  I don't know the exact number.

Page 18

WATERHOUSE - 10-19-21

1
2  Q.  Is it more than 75 percent?
3  A.  Yes.
4  Q.  Is it more than 90 percent?
5  A.  I don't know.
6  Q.  Okay.  Can I refer to Highland
7  Capital Management, L.P., as Highland?
8  A.  Yes.
9  Q.  All right.  And you previously
10  served as Highland's CFO; correct?
11  A.  Yes.
12  Q.  When did you join Highland?
13  A.  I don't recall the exact date.
14  Q.  Can you tell me what year?
15  A.  2006.
16  Q.  When did you -- in what year did you
17  become Highland's CFO?
18  A.  I don't recall the exact date.
19  Q.  I'm not asking you for the exact
20  date.  I'm asking you if you recall the year in
21  which you were appointed CFO.
22  A.  I don't recall the exact year.
23  Q.  Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?

Page 19

WATERHOUSE - 10-19-21

1
2  A.  2011 or 2012.
3  Q.  Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6  A.  Yes.
7  Q.  During that entire time you reported
8  directly to Jim Dondero; correct?
9  A.  I -- I don't know.
10  Q.  Is there anybody else you reported
11  to -- withdrawn.
12  Did you report to Mr. Dondero for
13  some portion of the time that you served as
14  CFO?
15  A.  Yes.
16  Q.  Is there a portion of time that you
17  don't recall who you reported to?
18  A.  Yes.
19  Q.  What portion of time do you have in
20  your mind when you can't recall who you
21  reported to?
22  A.  From the 2011 to -- for
23  approximately a year or two.
24  Q.  Okay.  So is it fair to say that you
25  reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21

1
2  from at least 2014 until the time you left
3  Highland?
4  MS. DANDENEAU:  Objection to form.
5  A.  I don't want to speculate the exact
6  or what year that changed or -- so I would like
7  to stick with my testimony.
8  Q.  Can you recall when you began
9  reporting to Mr. Dondero?
10  A.  I don't recall.
11  Q.  Can you -- can you give me an
12  estimate of what year you think you might have
13  began reporting to Mr. Dondero?
14  A.  I will go back to my prior
15  testimony.
16  Q.  Okay.  There is no -- you have no
17  ability to tell me when you began reporting to
18  Mr. Dondero.
19  Do I have that right?
20  MS. DANDENEAU:  Objection to form.
21  A.  I don't recall.
22  Q.  Okay.  Do you recall who you might
23  have reported to before you began reporting to
24  Mr. Dondero?
25  A.  Yes.

Page 21

WATERHOUSE - 10-19-21

1
2  Q.  Who might you have reported to in
3  your capacity as CFO before you started
4  reporting to Mr. Dondero?
5  A.  That would have been Patrick Boyce.
6  Q.  Are you aware that Highland filed
7  for bankruptcy on October 19th, 2019?
8  A.  Yes.
9  Q.  And we refer to that as the petition
10  date?
11  A.  Yes.
12  Q.  Okay.  Do you hold any professional
13  licenses, sir?
14  A.  Yes.
15  Q.  Can you tell me what professional
16  licenses you hold?
17  A.  I'm a certified public accountant.
18  Q.  Okay.  Anything else?
19  A.  No.
20  Q.  Do you have any other professional
21  licenses or certificates?
22  A.  When you say "professional license,"
23  that is not education?
24  Q.  Tell me -- sure.  Anything other
25  than a driver's license.

Page 22

WATERHOUSE - 10-19-21

1
2       Do you have any other license or
3   certificate or certification?
4       A.   Are you asking, like, where I went
5   to school and the --
6       Q.   I am not.  I am not.  I didn't say
7   education.  I didn't ask about degrees.
8       Do you know what a license is?
9       A.   Well, yeah, I mean, a license is
10  something you get after you receive a certain
11  level of proficiency.
12      Q.   Do you have any licenses or
13  certifications other than your CPA?
14      MS. DANDENEAU:  Objection, form.
15      I assume you mean professional
16  licenses, Mr. Morris; correct?
17      Q.   Can you answer my question, sir?
18      A.   Mr. Morris, I'm thinking.  I
19  don't -- I don't think I have any others.
20      Q.   Are you familiar with an entity
21  called Highland Capital Management Fund
22  Advisors?
23      A.   Yes.
24      Q.   Were you ever -- can we refer to
25  that entity as HCMFA?

Page 23

WATERHOUSE - 10-19-21

1
2       A.   Yes.
3       Q.   Were you ever employed by HCMFA?
4       A.   Not that I recall.
5       Q.   Were you ever -- did you ever hold
6   the title of an officer or director of HCMFA?
7       A.   Yes.
8       Q.   What title did you hold?
9       A.   Treasurer.
10      Q.   When did you become the treasurer of
11  HCMFA?
12      A.   I don't recall.
13      Q.   Can you tell me the year?
14      A.   I don't -- I don't know the year.
15      Q.   Can you approximate the year in
16  which you became the treasurer of HCMFA?
17      A.   I don't know.
18      Q.   Can you tell me if it was before or
19  after 2016?
20      A.   I don't recall.
21      Q.   Are you still the -- do you know if
22  you're still the treasurer of HCMFA today?
23      A.   Today, I am the acting treasurer for
24  HCMFA.
25      Q.   Is there a distinction between

Page 24

WATERHOUSE - 10-19-21

1
2   treasurer and acting treasurer?
3       A.   I said "acting treasurer" as I am an
4   employee of Skyview, as you previously
5   stated -- or asked.
6       Q.   But you are the treasurer of HCMFA
7   today; correct?
8       A.   I am -- I am the acting treasurer
9   for HCMFA.
10      Q.   How did you become the treasurer of
11  HCMFA?
12      A.   Are you asking how I became the
13  treasurer of HCMFA today?
14      Q.   How did you become appointed to
15  serve as the treasurer of HCMFA?
16      A.   Well, in -- in -- in what time
17  capacity?
18      Q.   The first time that you were
19  appointed.
20      A.   First time.  I believe I was asked
21  to serve as treasurer for HCMFA the first time.
22      Q.   By who?  Who asked you to do that?
23      A.   I don't recall.
24      Q.   Is there anything that would refresh
25  your recollection as to who appointed you as

Page 25

WATERHOUSE - 10-19-21

1
2   the treasurer of CF- -- HCMFA for the first
3   time?
4       A.   I don't -- I mean, there would be
5   some documents, some legal documents.  I don't
6   know where those are.
7       Q.   How many times have you been
8   appointed the treasurer of HCMFA?
9       A.   I don't know.
10      Q.   Was it more than once?
11      A.   I don't know.
12      Q.   Can you tell me any period of time
13  since 2016 that you did not hold the title of
14  treasurer of HCMFA?
15      MS. DANDENEAU:  Objection to form.
16      A.   I don't recall.
17      Q.   What are your duties and
18  responsibilities as the treasurer of HCMFA?
19      A.   My duties are to do the best job
20  that I can as the -- as an accountant and
21  finance guy.
22      Q.   What specific duties and
23  responsibilities do you have as the treasurer
24  of HCMFA?
25      A.   My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1  that I can as the accounting and finance person
2  for HCMFA.
3     Q.   As the accounting and finance person
4  for HCMFA, do you have any particular areas of
5  responsibility?
6     A.   Yeah, it is to manage the accounting
7  and finance function for HCMFA.
8     Q.   Would that include -- do you have
9  responsibility for overseeing HCMFA's annual
10  audit?
11     A.   Can I please elaborate on my prior
12  question?
13     Q.   Of course. You -- you are giving
14  answers. I'm asking questions.
15     A.   Okay. Yes, so the -- it -- like I
16  said, it is to manage the accounting finance
17  aspect, but I am, as we discussed, the
18  treasurer. That is -- being treasurer is what
19  gives me that -- that management function.
20     Q.   Does anybody report to you in your
21  capacity as treasurer of HCMFA?
22     A.   I don't believe so.
23     Q.   Does HCMFA have a chief financial
24  officer?

Page 27

WATERHOUSE - 10-19-21

1     A.   I don't -- I don't know.
2     Q.   You don't know?
3       You're the treasurer of HCMFA but
4  you don't know if HCMFA has a chief financial
5  officer.
6       Do I have that right?
7     A.   That's right.
8     Q.   Okay. Have you heard of a company
9  called NexPoint Advisors?
10     A.   Yes.
11     Q.   We will refer to that as NexPoint.
12  Okay?
13     A.   Okay.
14     Q.   Were you ever employed by NexPoint?
15     A.   I don't recall.
16     Q.   Did you ever hold any title with
17  respect to the entity known as NexPoint?
18     A.   Yes.
19     Q.   What titles have you held in
20  relation to NexPoint?
21     A.   Treasurer. I think it was only
22  treasurer.
23     Q.   Can you tell me the approximate year
24  you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

1     A.   I don't know.
2     Q.   Are you still the treasurer of
3  NexPoint today?
4     A.   I am the acting treasurer for
5  NexPoint.
6     Q.   When did your title change from
7  treasurer to acting treasurer?
8     A.   I don't know.
9     Q.   Did your duties and responsibilities
10  change at all when your title was changed from
11  treasurer to acting treasurer?
12     A.   I don't -- I don't believe so.
13     Q.   Why did --
14     A.   I still manage the finance and
15  accounting function for NexPoint.
16     Q.   Why did your title change from
17  treasurer to acting treasurer?
18     A.   I don't -- I'm using the term
19  "acting treasurer" as I'm a Skyview employee.
20  I don't -- I don't know -- again, I am a -- as
21  I am the Skyview employee.
22     Q.   Okay.
23     A.   And we -- we provide officer
24  services.

Page 29

WATERHOUSE - 10-19-21

1     Q.   And you serve as an officer of
2  HCMFA; correct?
3     A.   I think we went over that with my
4  testimony. Yes, I'm the acting treasurer for
5  HCMFA.
6     Q.   And you are an officer of NexPoint;
7  correct?
8     A.   I think -- I am the acting treasurer
9  for NexPoint Advisors.
10     Q.   And -- and who appointed you acting
11  treasurer of NexPoint Advisors?
12     A.   I don't recall specifically.
13     Q.   Do you have any recollection of who
14  might have appointed you the treasurer of
15  NexPoint?
16     A.   I mean, it -- it -- I don't recall
17  exactly who it was.
18     Q.   Who were the possibilities?
19     MS. DEITSCH-PEREZ: Object to the
20  form.
21     Q.   You can answer.
22     A.   Someone in the legal group for
23  NexPoint. The other officers as well.
24     Q.   Have you heard of a company called

Page 30

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   Highland Capital Management Services, Inc.?
3   A.   Yes.
4   Q.   We will refer to that as HCMS.
5   Okay?
6   A.   HCMS.  Okay.
7   Q.   Were you ever employed by HCMS?
8   A.   No.
9   Q.   Have you ever held any titles in
10  relation to HCMF -- I apologize -- HCMS?
11  A.   Yes.
12  Q.   What titles have you held in
13  relation to HCMS?
14  A.   Treasurer and acting treasurer.
15  Q.   When did you first become treasurer
16  or acting treasurer of HCMS?
17  A.   I don't recall the exact dates.
18  Q.   Can you recall -- can you
19  approximate the year that you became the
20  treasurer of HCMS?
21  A.   I don't -- I don't know.
22  Q.   Are you still the treasurer of HCMS
23  today?
24  A.   I am the acting treasurer for HCMS.
25  Q.   And are your duties and

Page 31

1   WATERHOUSE - 10-19-21
2   responsibilities as the acting treasurer for
3   HCMS and the acting treasurer for NexPoint the
4   same as your duties and responsibilities in
5   your role as the acting treasurer of HCMFA?
6   A.   More or less.
7   Q.   Have you ever heard of a company
8   called HCRE Partners, LLC?
9   A.   Yes.
10  Q.   And do you understand that that
11  entity is now known today as NexPoint Real
12  Estate Partners?
13  A.   I did not know that.
14  Q.   All right.  Can we refer to HCRE
15  Partners as HCRE?
16  MS. DANDENEAU:  Objection to form.
17  Did you mean NexPoint Real Estate
18  Partners, Mr. Morris?
19  MR. MORRIS:  No.
20  MS. DANDENEAU:  Oh.
21  MR. MORRIS:  He said he wasn't
22  familiar that it was succeeded by that
23  entity.  So --
24  MS. DANDENEAU:  Okay.
25  MR. MORRIS:  -- let's go with what

Page 32

1   WATERHOUSE - 10-19-21
2   the witness knows.
3   Q.   You're familiar with an entity
4   called HCRE Partners, LLC; correct?
5   A.   Yes.
6   Q.   Okay.  So that is the entity that we
7   will refer to as HCRE.  If you're aware of any
8   successor, that is great.  If not, let's just
9   define it as such.
10  Have you ever been employed by HCRE
11  or any entity that you know to have succeeded
12  HCRE?
13  A.   No.
14  Q.   Did you ever serve as an officer or
15  director of HCRE or any successor?
16  A.   Not that I recall.
17  Q.   Okay.  Can we refer to NexPoint and
18  HCMFA as the advisors?
19  A.   Yes.
20  Q.   In general, the advisors provided
21  investment advisory services to certain retail
22  funds; correct?
23  A.   Yes.
24  Q.   And we will refer to the retail
25  funds that are served by the advisors

Page 33

1   WATERHOUSE - 10-19-21
2   collectively as the retail funds; is that okay?
3   A.   Okay.
4   Q.   Each of the retail funds is governed
5   by a board; correct?
6   A.   Yes.
7   Q.   And do you know the people who serve
8   on the boards of the retail funds?
9   MS. DANDENEAU:  Objection to form.
10  A.   I don't know all of them.
11  Q.   Do you know whether the same people
12  serve on the board of each of the retail funds
13  as we've defined that term?
14  A.   Which -- so when you say "retail
15  funds" -- again, I want to be -- what retail
16  funds are you referring to, because there are
17  -- there are several distinctions?
18  What retail funds are you using when
19  you refer to them?
20  Q.   That is why -- that is why I tried
21  to define the terms.  So let me do it again.
22  Retail funds for the purposes of
23  this deposition means any retail fund to which
24  either of the advisors provides advisory
25  services.  Okay?

Page 34

WATERHOUSE - 10-19-21

1   A.   Okay.
2   Q.   Okay.  So do you know whether the
3   same people serve on the board of each of the
4   retail funds?
5   A.   I don't know.
6   Q.   Were you ever employed by any of the
7   retail funds?
8   A.   No.
9   Q.   No?
10  A.   No.
11  Q.   Okay.  Do you have any title with
12  respect to any of the retail funds?
13  A.   Yes.
14  Q.   What titles do you hold --
15  withdrawn.
16      Do you have the same titles with
17  respect to all of the retail funds or do
18  they -- or just something else?
19  MS. DANDENEAU:  Objection to form.
20  Q.   Withdrawn.
21      Do you have the same title with
22  respect to each of the retail funds?
23  A.   No.
24  Q.   Tell me which title you have with

Page 35

WATERHOUSE - 10-19-21

1   respect to each retail fund.
2       Actually, let's do it a different
3   way.  I withdraw the question.
4       Can you give me one title you have
5   in relation to any retail fund?
6   A.   Yes.
7   Q.   What title -- what title can you
8   give me?
9   A.   Principal executive officer.
10  Q.   Do you serve as principal executive
11  officer for each of the retail funds?
12  A.   No.
13  Q.   Can you identify for me the retail
14  funds in which you serve as the principal
15  executive officer?
16  A.   Yes.  Highland Funds 1, Highland
17  Funds 2, Highland Income Fund, Highland Global
18  Allocation Fund.
19  Q.   I'm sorry, you said "Global
20  Allocation Fund"?
21  A.   Yes.
22      VIDEOGRAPHER:  Excuse me,
23  Mr. Morris.  This is the videographer.  I'm
24  concerned about the lighting in the

Page 36

WATERHOUSE - 10-19-21

1   witness' camera.
2       Do you want to go off the record and
3   make some adjustments?
4   MR. MORRIS:  Sure, but just for this
5   purpose.  I don't want to take a break.  We
6   just started.
7   MS. DANDENEAU:  Yeah, that is fine.
8   That is fine.  We're going to put you on
9   mute.
10  MR. MORRIS:  All right.
11  MS. DANDENEAU:  I'm going to try to
12  open up some of the shades.
13  VIDEOGRAPHER:  We're going off the
14  record at 10:08 a.m.
15  (Recess taken 10:08 a.m. to 10:11 a.m.)
16  VIDEOGRAPHER:  We are back on the
17  record at 10:11 a.m.
18  Q.   Mr. Waterhouse, when did you become
19  the principal executive officer of the four
20  retail funds that you just identified?
21  A.   I don't recall.
22  Q.   Do you recall the approximate year
23  that you became the principal executive officer
24  of the four funds?

Page 37

WATERHOUSE - 10-19-21

1   A.   2021.
2   Q.   Did you ever hold any title with
3   respect to any of the four funds you have just
4   identified other than principal executive
5   officer?
6   A.   I don't recall.
7   Q.   Is it possible that you held a
8   position or a title with the four funds you
9   just identified prior to 2021?
10  A.   Yes.
11  Q.   But you don't recall if you did or
12  not; do I have that right?
13  A.   No.  You -- I thought you asked, did
14  I hold other titles.
15  Q.   Did you hold any title at the four
16  retail funds for which you now serve as
17  principal executive officer at any time prior
18  to 2021?
19  A.   Yes.
20  Q.   What titles did you hold?
21  A.   I don't recall all the titles.
22  Q.   Do you recall any of the titles?
23  A.   Yes.
24  Q.   What titles do you recall holding at

Page 38

WATERHOUSE - 10-19-21

1 those four retail funds before 2021?
2    A.    Principal executive officer.
3    Q.    Were you the principal executive
4 officer of the four retail funds that you have
5 identified?
6    A.    Sorry, could you repeat the
7 question?
8    Q.    Were you the principal executive
9 officer for each of the four retail funds that
10 you have identified?
11    A.    Yes.
12    Q.    When did you become the principal
13 executive – withdrawn.
14        Can you give me the approximate year
15 that you became the principal executive officer
16 for each of the four retail funds you've
17 identified?
18    A.    I don't recall.
19    Q.    What are your duties and
20 responsibilities as the principal executive
21 officer of these four retail funds?
22    A.    It is to manage the finance and
23 accounting positions.
24    Q.    So at the same time you serve as the

Page 39

WATERHOUSE - 10-19-21

1 treasurer of the advisors, you also serve as
2 the principal executive officer of these four
3 retail funds; correct?
4    A.    Yes.
5    Q.    Did you ever hold any title with
6 respect to any other retail fund?
7    A.    Not that I recall.
8    Q.    During the period that you served as
9 Highland's CFO, from time to time Highland
10 loaned money to certain of its officers and
11 employees; correct?
12    A.    Yes.
13    Q.    During the period that you served as
14 Highland's CFO, from time to time Highland
15 loaned money to certain –
16    A.    Let me – let me retract that,
17 sorry, that – you asked during the time I was
18 CFO, Highland loaned moneys to employees. I
19 don't – I don't recall that during my tenure
20 of CFO.
21    Q.    You have no recollection during the
22 time that you were the CFO of Highland of
23 Highland ever loaning any money to any officer
24 or director of Highland?

Page 40

WATERHOUSE - 10-19-21

1    A.    I don't recall during my tenure of
2 Highland or my – as CFO of Highland – yeah,
3 if there are any loans as CFO of Highland.
4    Q.    I'm just talking about officers and
5 employees right now. You have no recollection
6 of Highland ever making a loan to any of its
7 officers or employees during the time that you
8 served as CFO. Do I have that right?
9        MS. DANDENEAU: Objection to form.
10    A.    So I thought you were saying
11 officers and employees as CFO, right, so there
12 were – I mean, okay, yes.
13    Q.    I would ask you to listen carefully
14 to my question. If I – if I'm not clear, let
15 me know, but I'm really trying to be as clear
16 as I can.
17    A.    I'm listening as carefully as I can,
18 and you are asking very specific questions in a
19 timeline. And I'm trying to answer your
20 questions as specifically as I can, and I
21 apologize if – if I'm going back. I am – you
22 are asking very specific questions. Thank you.
23    Q.    During the period that you served as
24 Highland's CFO, from time to time Highland

Page 41

WATERHOUSE - 10-19-21

1 loaned money to certain corporate affiliates;
2 correct?
3        MS. DANDENEAU: Objection to form.
4    A.    What are corporate affiliates?
5    Q.    How about the ones that are in
6 Highland's audited financial statements under
7 the section entitled Loans to Affiliates. Why
8 don't we start with those. Do you have any
9 understanding of what the phrase "affiliates"
10 means?
11        MS. DANDENEAU: Objection to form.
12    A.    I understand what affiliates are,
13 yet affiliates can have different meanings in
14 different contexts, so...
15    Q.    Why don't you – why don't you tell
16 me what your understanding of the term
17 "affiliate" is in relation to Highland Capital
18 Management, L.P.
19    A.    Is that a – it depends on the
20 context.
21    Q.    How about the context of making
22 loans?
23        MS. DANDENEAU: Objection to form.
24    A.    I didn't make the determination of

Page 42

WATERHOUSE - 10-19-21

1 who an affiliate was or is at the time those --
2 I didn't -- that wasn't my job to make a
3 determination of who an affiliate is.
4   Q.   All right.  So as the CFO of
5 Highland, do you have any ability right now to
6 tell me which companies that were directly or
7 indirectly owned and/or controlled by
8 Mr. Dondero in whole or in part received loans
9 from Highland Capital Management, L.P.?
10      MS. DANDENEAU:  Objection to form.
11      MS. DEITSCH-PEREZ:  Objection, form.
12   A.   Yes.
13   Q.   Okay.  Identify every entity that
14 you can think of that was directly or
15 indirectly owned and/or controlled by
16 Mr. Dondero in whole or in part that received a
17 loan from Highland Capital Management, L.P.
18      MR. RUKAVINA:  Objection, legal
19      conclusion.
20   A.   NexPoint Advisors, Highland Capital
21 Management Fund Advisors, HCM Services,
22 Dugaboy.  Sorry, I don't think -- Dugaboy
23 doesn't fit that definition.  You said owned
24 and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1 definition --
2   Q.   I said owned and/or controlled.
3   A.   I don't -- again, I'm not -- I'm not
4 the legal expert.  I don't think it controls --
5 he controls Dugaboy, so again, I'm not the
6 legal person.
7   Q.   I'm not asking you for a legal
8 conclusion, sir.  I'm asking you for your
9 knowledge, okay, as the CFO -- the former CFO
10 of Highland Capital Management, other than
11 NexPoint, HCMFA, and HCMF -- HCMS, can you
12 think of any other entities that were owned
13 and/or controlled directly or indirectly in
14 whole or in part by Jim Dondero who received a
15 loan from Highland Capital Management, L.P.?
16      MS. DANDENEAU:  Objection to form.
17   A.   HCRE.
18   Q.   Any others?
19   A.   That is -- that is all I can think
20 of.
21   Q.   And you're aware that from time to
22 time while you were the CFO, Highland loaned
23 money to Jim Dondero; correct?
24   A.   Yes.

Page 44

WATERHOUSE - 10-19-21

1   Q.   Okay.  Can we refer to the four
2 entities that you just named and Mr. Dondero as
3 the affiliates?
4   A.   So that would be Jim Dondero,
5 NexPoint Advisors, Highland Capital Management
6 Fund Advisors, and HCRE.
7   Q.   And HCMS?
8   A.   And HCMS, okay.
9   Q.   And can we refer to the loans that
10 were given to each of those affiliates as the
11 affiliate loans?
12   A.   Yes.
13   Q.   And is it fair to say that each of
14 the affiliates were the borrowers under the
15 affiliate loans as we're defining the term?
16      MR. RUKAVINA:  Objection, legal
17      conclusion.
18   A.   The borrowers are whoever were on
19 the notes.  I don't -- I don't know.  I'm not
20 the legal person.
21   Q.   But you --
22   A.   I don't know.
23   Q.   You do know, as Highland's former
24 CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1 identified tendered notes to Highland; correct?
2      MR. RUKAVINA:  Hey, John, will you
3      just give me a running objection to legal
4      conclusion to HCM --
5      MR. MORRIS:  No.  No, if you want to
6      object --
7      MR. RUKAVINA:  I will object every
8      time.  Object to legal conclusion.
9      MR. MORRIS:  That is fine.
10   A.   Sorry, can you repeat the question?
11   Q.   Are you aware that each of the --
12 that each of the affiliates, as we have defined
13 the term, gave to Highland a promissory note in
14 exchange for the loans?
15      MR. RUKAVINA:  Objection to the
16      extent that calls for a legal conclusion.
17   A.   I don't.
18   Q.   No, you don't know that?
19   A.   No, they didn't -- you said they
20 exchanged a promissory note for a loan.  I
21 don't -- I don't understand that question, so I
22 said no.
23   Q.   At the time of the bankruptcy
24 filing, did Highland have in its possession

Page 46

WATERHOUSE - 10-19-21

1 promissory notes that were signed by each of
2 the affiliates?
3 A. Yes.
4 Q. To the best of your knowledge,
5 during the time that you served as Highland's
6 CFO, did Highland disclose to its outside
7 auditors all of the loans that were made to
8 affiliates?
9 MR. RUKAVINA: Objection, that calls
10 for a legal conclusion.
11 MS. DEITSCH-PEREZ: I also couldn't
12 hear you, John, because there was some
13 garbling on -- on the -- on the call.
14 MR. MORRIS: Folks, I've got to tell
15 you this is not going well, and I'm
16 reserving my right --
17 MS. DANDENEAU: John, it was just
18 the end of that question. It was just the
19 end of that question. I couldn't hear it
20 either. Sorry, if you could repeat it,
21 please.
22 MR. MORRIS: That is less than an
23 hour into this, but folks are trying to run
24 out the clock, and so I'm just going to
25

Page 47

WATERHOUSE - 10-19-21

1 state that now.
2 MS. DANDENEAU: You know, and,
3 Mr. Morris, I really object to that. I
4 mean --
5 MR. MORRIS: Okay.
6 MS. DANDENEAU: -- Mr. Waterhouse
7 just told you he's trying to listen to your
8 questions and answer them carefully, and
9 you have no basis for saying that.
10 MR. MORRIS: Okay.
11 MS. DANDENEAU: This does not --
12 this is not an experienced witness, so he's
13 trying to do the best he can.
14 Q. Mr. Waterhouse, during the time that
15 you served as Highland's CFO, did Highland
16 disclose to its outside auditors all of the
17 loans that it made to each of the affiliates
18 that you have identified?
19 MR. RUKAVINA: Objection, legal
20 conclusion.
21 A. Yes.
22 Q. To the best of your knowledge, while
23 you were Highland's CFO, were all of the
24 affiliate loans described in Highland's audited
25

Page 48

WATERHOUSE - 10-19-21

1 financial statements?
2 MR. RUKAVINA: Objection, legal
3 conclusion.
4 A. When an audit was performed, any
5 loans that were made by Highland to the
6 affiliates were disclosed to auditors.
7 Q. Are you aware of any loan that was
8 made to any affiliate that was not disclosed to
9 the auditors?
10 A. I'm not aware.
11 Q. To the best of your knowledge, did
12 each of the affiliates who were --
13 (inaudible) -- loaned from Highland execute a
14 promissory note in connection with that loan?
15 MR. RUKAVINA: Objection, legal
16 conclusion.
17 A. Sorry, you -- halfway through the
18 question it got muffled.
19 Can you repeat that again?
20 Q. To the best of your knowledge, did
21 every affiliate execute a promissory note in
22 connection with each loan that it obtained from
23 Highland?
24 MR. RUKAVINA: Objection, legal
25

Page 49

WATERHOUSE - 10-19-21

1 conclusion.
2 A. Yes.
3 Q. You are not aware of any loan that
4 any affiliate ever obtained from Highland where
5 the affiliate did not give a promissory note in
6 return; is that fair?
7 A. Yes, I'm not aware.
8 Q. And to the best of your knowledge,
9 did Highland loan to each affiliate an amount
10 of money equal to the principal amount of each
11 promissory note?
12 MR. RUKAVINA: Objection, legal
13 conclusion.
14 A. Yes.
15 Q. During the time that you served as
16 CFO, did Highland ever loan money to
17 Mark Okada?
18 A. I -- I don't recall.
19 Q. Did you ever see any promissory
20 notes executed by Mark Okada?
21 A. I don't recall.
22 Q. Do you know if Highland ever forgave
23 any loan that it ever made to Mr. Okada?
24 A. I don't recall.
25

Page 50

WATERHOUSE - 10-19-21

1
2    Q.   Do you recall if Mr. Okada paid back
3    all principal and interest due and owing under
4    any loan he obtained from Highland?
5         MS. DEITSCH-PEREZ:  Objection to
6    form.
7         MS. DANDENEAU:  Objection to form.
8    A.   I don't recall.
9    Q.   Do you recall whether -- during your
10   time as CFO, whether Highland ever loaned money
11   to Jim Dondero?
12   A.   Yes.
13   Q.   To the best of your knowledge, did
14   Mr. Dondero sign and deliver to Highland a
15   promissory note in connection with each loan
16   that he obtained from Highland?
17   A.   If you are referring to the
18   promissory notes that, you know, part of
19   Highland's records, yes.
20   Q.   Okay.  You're not aware of any loan
21   that Mr. Dondero took from Highland that wasn't
22   backed up by -- by a promissory note with a
23   face -- with a principal amount equal to the
24   amount of the loan; correct?
25   A.   Am I aware that Jim Dondero took a

Page 51

WATERHOUSE - 10-19-21

1    loan?
2    Q.   Without giving a -- let me ask a
3    better question.  I'm sorry, Mr. Waterhouse.
4         Are you aware of any loan that
5    Mr. Dondero obtained from Highland where he
6    didn't give a promissory note in return?
7    A.   I'm not aware.
8    Q.   During the time that you served as
9    Highland's CFO, did Highland ever forgive any
10   loans, in whole or in part, that it made to
11   Mr. Dondero?
12   A.   Not that I'm aware.
13   Q.   At the time that you served as
14   Highland's CFO, did Highland ever forgive any
15   loan, in whole or in part, that it made to any
16   affiliate as we've defined the term today?
17   A.   Not that I'm aware.
18   Q.   During the time that you served as
19   Highland's CFO, did Highland ever forgive, in
20   whole or in part, any loan that it ever made to
21   any officer or employee?
22   A.   Highland forgave loans to officers
23   and employees.  It may not have been at the
24   time when my title was CFO.

Page 52

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  And so I appreciate the
3    distinction.
4         Is it fair to say that, to the best
5    of your knowledge, Highland did not forgive a
6    loan that it made to an officer or employee
7    after 2013?
8         MS. DANDENEAU:  Objection to form.
9    A.   I don't recall.
10   Q.   To the best of your knowledge, did
11   Highland disclose to its auditors every
12   instance where it forgave, in whole or in part,
13   a loan that it had made to one of its officers
14   or employees?
15   A.   No.
16   Q.   Can you think of -- can you -- can
17   you identify any loan to an officer or employee
18   that was forgiven by Highland, in whole or in
19   part, that was not disclosed to Highland's
20   outside auditors?
21   A.   Look, I don't recall all of the
22   loans and the loan forgiveness.  I just know as
23   part of the audit process there is a
24   materiality concept.
25        So if there were loans to employees

Page 53

WATERHOUSE - 10-19-21

1
2    that were of -- you know, that were deemed
3    immaterial, those items may not have been
4    disclosed by the team to the auditors.
5    Q.   I appreciate that.
6         Do you have an understanding as to
7    what the level of materiality was?
8    A.   I don't recall.
9    Q.   As the CFO of Highland, to the best
10   of your knowledge, did Highland disclose to its
11   outside auditors every loan that was forgiven,
12   in whole or in part, that was material as that
13   term was defined by the outside auditors?
14   A.   Yes.
15   Q.   And do you recall where -- do you
16   recall where the definition of materiality can
17   be found for -- for this particular purpose?
18        MS. DANDENEAU:  Objection to form.
19   A.   No.  You -- I don't determine
20   materiality.
21   Q.   Okay.  I'm just asking you if you
22   can help me understand where it is, but I think
23   we will find it in a few minutes.
24        You are aware that Highland has
25   commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  affiliates, as we've defined the term, to
3  collect under certain promissory notes; is that
4  right?
5     A.  Yes.
6     Q.  And are you familiar with the notes
7  that are issue -- at issue in the lawsuits?
8        MS. DANDENEAU:  Objection to form.
9     A.  Generally familiar.
10    Q.  Can we refer to the lawsuits that
11  Highland has commenced against the affiliates
12  collectively as the lawsuits?
13    A.  Yes.  And, again, the affiliates are
14  NexPoint, HCMFA, HCMS, and HCRE.
15    Q.  And Mr. Dondero?
16    A.  Okay.  See, that is a new -- and now
17  Mr. Dondero is included in your affiliate
18  definition.
19    Q.  I just --
20    A.  I thought affiliates -- I thought
21  affiliates were just the four prior entities,
22  so I just want to be clear.
23    Q.  I appreciate that.  So let's --
24  let's keep them separate and let's refer to the
25  four corporate entities as the affiliates, and

Page 55

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  Mr. Dondero we will call Mr. Dondero.  Okay?
3    A.  Okay.  Thank you.  As you can see,
4  Mr. Morris, there is a lot of entities -- a lot
5  here.  I just want to be clear.
6    Q.  Okay.  Now, the affiliates of
7  Mr. Dondero signed promissory notes that are
8  not subject to the lawsuit.
9        Do you understand that?
10       MS. DANDENEAU:  Objection to form.
11    A.  The affiliates and Mr. Dondero
12  signed --
13    Q.  You know what?  I will skip it.
14  That is okay.  Okay.
15       From time to time while you were
16  Highland's CFO, payments were applied against
17  principal and interests that were due under the
18  notes that were tendered by the affiliates and
19  Mr. Dondero; correct?
20       MR. RUKAVINA:  Objection to the
21     extent that calls for a legal conclusion.
22    A.  Yes.
23    Q.  Did Highland have a process where --
24  whereby payments would be applied against
25  principal and interest against the notes that

Page 56

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  were given by the affiliates and Mr. Dondero?
3    A.  Yes.
4    Q.  Can you describe the process for me?
5    A.  The process, payment should be
6  applied as laid out in the -- in the promissory
7  note.
8    Q.  From time to time were payments made
9  that were not required under the promissory
10  notes?
11       MS. DANDENEAU:  Objection to form.
12    A.  Yes.
13    Q.  Who was responsible for deciding
14  when and how much the payments would be made
15  with respect to each of the notes that were
16  issued by the affiliates and Mr. Dondero?
17    A.  Who was responsible for deciding how
18  much was paid prior to the due date?
19    Q.  Yes.
20    A.  I don't know.
21    Q.  Did you approve of each payment that
22  was made against principal and interest on the
23  notes that were given by the affiliates and
24  Mr. Dondero?
25       MS. DANDENEAU:  Objection to form.

Page 57

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2    A.  Did I approve the payments?  I
3  approve -- I approve -- if there was cash -- if
4  there was cash being repaid on a note payment,
5  yes, I approved in the general sense of being
6  made aware of the payment and the amount.
7    Q.  And are you the person who
8  authorized Highland's employees to effectuate
9  those payments?
10    A.  Yes.
11    Q.  When you gave the instruction to
12  effectuate the payment, did you obtain
13  Mr. Dondero's prior approval?
14    A.  I mean, it -- I mean, it -- it
15  depends.
16    Q.  Can you think of any instance where
17  you directed Highland's employees to make a
18  payment of principal or interest against any
19  note that was tendered by an affiliate or
20  Mr. Dondero that Mr. Dondero did not approve of
21  in advance?
22    A.  I can't recall specifically.
23    Q.  Can you identify -- withdrawn.
24       Did Mr. Dondero ever tell you that a
25  payment that was made against principal and

WATERHOUSE - 10-19-21

1 interest due under one of the notes that was
2 tendered by an affiliate or himself should not
3 have been made?
4     A.   Yes.
5     Q.   Can you identify the payment for me?
6     A.   It would be for -- for NexPoint
7 Advisors.
8     Q.   Okay.  And when did Mr. Dondero tell
9 you that a payment that you had initiated on
10 behalf of NexPoint should not have been made?
11     A.   I wasn't initiating payment.  It was
12 in the context of the -- I think you used this
13 term, "the advisors," so NexPoint Advisors and
14 Highland Capital Management Fund Advisors had
15 overpaid on certain agreements with Highland
16 Capital Management, L.P. and as a part of that
17 process, the advisors -- what I was told at the
18 time were in talks and negotiations and
19 discussions with Highland Capital Management,
20 L.P., on offsets in relation to those
21 overpayments.
22     Q.   When did this conversation take
23 place?
24         MS. DANDENEAU:  Objection to form.

WATERHOUSE - 10-19-21

1     A.   I don't recall specifically.
2     Q.   Do you recall what year it was?
3     A.   Yes.
4     Q.   What year did the conversation with
5 Mr. Dondero take place that you just described?
6     A.   2020.
7     Q.   Okay.  Do you remember if it was
8 December 2020?
9     A.   It -- it -- I don't -- I don't
10 recall what month specifically, but it would
11 have been November or December.
12     Q.   And we're talking here about a
13 payment of principal and/or interest that was
14 due -- withdrawn.
15         We're talking here about a payment
16 of principal and interest that was applied
17 against NexPoint's note; correct?
18     MS. DANDENEAU:  Objection to form.
19     A.   I don't recall what that payment
20 consisted of.
21     Q.   Is it possible that the payment you
22 have in mind related to the shared services
23 agreement?
24     MS. DANDENEAU:  Objection to form.

WATERHOUSE - 10-19-21

1     A.   No.
2     Q.   Are you certain that the payment --
3 that the payment that you have in mind related
4 to the promissory note that NexPoint issued in
5 favor of Highland?
6         MS. DANDENEAU:  Objection to form.
7     A.   Yes.
8     Q.   Okay.  Other than that one payment,
9 can you identify any other instance where
10 Mr. Dondero told you that a payment should not
11 have been applied against principal and
12 interest under any promissory note tendered by
13 any affiliate or Mr. Dondero?
14         MS. DANDENEAU:  Objection to form.
15         MS. DEITSCH-PEREZ:  Objection to
16 form.
17     A.   Not that I recall.
18     Q.   Thank you very much.
19         Do you know if Mr. Dondero approved
20 in advance of each loan made to each affiliate
21 and himself during the time that you were the
22 CFO?
23         MS. DEITSCH-PEREZ:  Object to the
24 form.

WATERHOUSE - 10-19-21

1     A.   Yes, generally.
2     Q.   Can you identify any loan that was
3 ever made to an affiliate or to Mr. Dondero
4 that Mr. Dondero did not approve of in advance?
5     A.   Other than the ones that are in
6 dispute, I'm not aware.
7     Q.   Do you believe that Mr. Dondero did
8 not approve of each of the loans that are in
9 dispute in advance of the time that the loan
10 was made?
11         MS. DANDENEAU:  Objection to form.
12     A.   Given what is in the dispute, you
13 know, and -- and -- and the way things might --
14 yeah, I mean...
15     Q.   I am not asking about the dispute,
16 and it was probably my mistake to follow you
17 there.
18         Were you aware of every loan made by
19 Highland to each of its affiliates and
20 Mr. Dondero while you were the CFO at the time
21 each loan was made?
22     A.   Was I aware of every loan, yes.
23     Q.   Okay.  And if you put yourself back
24 in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  that were made to one of the affiliates or
3  Mr. Dondero during the time that you were the
4  CFO was made without Mr. Dondero's prior
5  knowledge and approval?
6      A.   Not that I recall.
7      Q.   Thank you.  In fact, do you -- as
8  the CFO, would you have allowed Highland to
9  loan money to an affiliate or to Mr. Dondero
10 without obtaining Mr. Dondero's prior approval?
11     MS. DANDENEAU:  Objection to form.
12     A.   I can't -- there was so many times
13 over the years, I can't speak for every single
14 one, but generally, yes, I -- I spoke to him.
15     Q.   You -- you never -- you never --
16 withdrawn.  I will just take that.
17          Can you recall any payment that was
18 ever made against principal and interest on a
19 note that was issued in favor of Highland by an
20 affiliate or Mr. Dondero that you personally
21 did not know about in advance?
22     A.   There are so many through the years,
23 I don't -- I don't -- I don't recall every
24 single one.
25     Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  that was made against principal and interest on
3  any note tendered by any affiliate or
4  Mr. Dondero that you didn't know about in
5  advance?
6      A.   I don't recall.
7      Q.   Other than Mr. Dondero -- withdrawn.
8          Did anybody at Highland have the
9  authority to make a payment against principal
10 and interest due under a loan given to the
11 affiliates and Mr. Dondero without your
12 knowledge and approval?
13     MS. DANDENEAU:  Objection to form.
14     A.   Sorry, there was -- to make a
15 payment on an affiliate loan, what you are
16 saying would it require my knowledge and
17 approval, yes.
18     Q.   Okay.  I appreciate that.  Thank
19 you.
20          Did anybody at Highland have the
21 authority, to the best of your knowledge, to
22 effectuate a loan to an affiliate without
23 Mr. Dondero's prior knowledge and approval?
24     MS. DANDENEAU:  Objection to form.
25     A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  generally, yes.
3      Q.   Did you personally communicate with
4  Mr. Dondero to let him know each time a payment
5  of principal or interest was being made against
6  any note that was tendered by an affiliate or
7  Mr. Dondero to Highland?
8      A.   I don't -- are you saying, did I let
9  Mr. Dondero know if a payment was made on any
10 affiliate or loan to Mr. Dondero?  I mean,
11 not -- not every -- no.
12     Q.   Let me ask it this way:  Did you
13 have a practice of informing Mr. Dondero when
14 payments were made against principal and
15 interest on any note that was tendered by an
16 affiliate or Mr. Dondero?
17     MS. DEITSCH-PEREZ:  Objection to
18 form.
19     MS. DANDENEAU:  Objection to form.
20     A.   No, I did not.
21     Q.   Did Mr. Dondero ever tell you that a
22 payment of principal or interest had been made
23 against a note that was tendered by an
24 affiliate or himself that he had been unaware
25 of?

Page 65

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2      A.   Not that I recall.
3      Q.   Are you aware that Mr. Dondero and
4  the affiliates -- withdrawn.
5          Are you aware that Mr. Dondero
6  NexPoint, HCRE, and HCMS all contend that they
7  do not have to pay on any of the notes they
8  issued because they are subject to an oral
9  agreement between Mr. Dondero and Nancy
10 Dondero, in her capacity as the trustee of the
11 Dugaboy Investment Trust?
12     MS. DANDENEAU:  Objection to form.
13     A.   I didn't -- I didn't -- I didn't
14 know that it was all notes.
15     Q.   Okay.  Are you -- did you ever learn
16 that there was an oral agreement between Jim
17 Dondero and Nancy Dondero pertaining to any
18 notes issued by any affiliate or Mr. Dondero?
19     MS. DEITSCH-PEREZ:  Object to the
20 form.
21     A.   Yes.
22     Q.   Do you have any understanding as to
23 the terms of that agreement?
24     A.   Yes.
25     Q.   What is your understanding of the

Page 66

WATERHOUSE - 10-19-21

1
2   terms of the agreement?
3       A.   That there were certain milestones
4   that had to be reached.
5       Q.   Do you have any understanding of the
6   terms of the agreement between Mr. Dondero and
7   Nancy Dondero concerning any of the notes
8   issued by the affiliates or Mr. Dondero other
9   than that there have to be milestones reached?
10      MS. DEITSCH-PEREZ:  Object to the
11      form.
12      A.   There are milestones, I found out
13  yesterday, or there was some --
14      MS. DANDENEAU:  Okay.  I'm just
15      going to object to the extent that you
16      learned anything in conversations with
17      counsel, please don't reveal -- that is
18      privileged, and don't reveal any privileged
19      communications.
20      THE WITNESS:  Okay.
21      A.   So I'm not aware of anything else.
22      Q.   Do you know what the milestones
23  were?
24      MS. DANDENEAU:  Objection to form.
25      A.   I don't.

Page 67

WATERHOUSE - 10-19-21

1
2       Q.   Do you know anything about -- do you
3   know what promissory notes the agreement
4   covered?
5       A.   I don't.
6       Q.   Do you know if -- if Jim and Nancy
7   Dondero entered into one agreement or more than
8   one agreement?
9       MS. DEITSCH-PEREZ:  Object to the
10      form.
11      A.   I don't know.
12      Q.   Do you know if the agreement is in
13  writing?
14      A.   I don't know.
15      Q.   How did you learn of the existence
16  of the agreement?
17      MS. DANDENEAU:  Objection to form.
18      Again --
19      A.   I don't -- I don't recall who told
20  me.
21      Q.   You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24      MS. DEITSCH-PEREZ:  Object to the
25      form.

Page 68

WATERHOUSE - 10-19-21

1
2       A.   I don't recall.
3       Q.   Do you recall how you learned of the
4   agreement?
5       Was it in a meeting?  Was it in a
6   phone call?  Was it in an email?
7       A.   I don't recall.
8       Q.   Do you recall when you learned of
9   the agreement?
10      A.   Not specifically.
11      Q.   Do you recall what year you learned
12  of the agreement?
13      A.   In -- look, I mean, there are so
14  many notes.  I may be getting -- I believe it
15  was 2020.
16      Q.   All right.  I'm not asking about
17  notes, sir.  I'm asking about the agreement
18  that you testified you knew about between Jim
19  and Don- -- Nancy Dondero.  Okay.
20      Do you understand my question now?
21  Should I ask my question again?
22      A.   Yeah, sure.  Go ahead.
23      Q.   I'm going to use the word
24  "agreement" to refer to the agreement that
25  Mr. Dondero and Nancy Dondero entered into

Page 69

WATERHOUSE - 10-19-21

1
2   where you understood that certain milestones
3   had to be reached.  Okay?
4       A.   Uh-huh.
5       MS. DANDENEAU:  Objection.
6       MS. DEITSCH-PEREZ:  Object to the
7       form.
8       MR. MORRIS:  Just defining a term,
9       what is the objection.
10      MS. DEITSCH-PEREZ:  The objection --
11      MR. MORRIS:  I will move on.  I will
12      move on.
13      MS. DEITSCH-PEREZ:  John --
14      Q.   Sir, are you okay with that
15  definition of agreement?
16      A.   Okay.
17      Q.   Okay.  So you don't recall who --
18  who informed you of the existence of the
19  agreement; is that right?
20      A.   I don't recall.
21      Q.   You don't recall who told you the
22  terms of the agreement.
23      Do I have that right?
24      A.   Correct.
25      Q.   And you don't recall if you learned

Page 70

WATERHOUSE - 10-19-21

1  about the agreement in a meeting, through an
2  email, or through a phone call.
3       Do I have that right?
4    A.  I don't recall.
5    Q.  Can you tell me when you learned of
6  the agreement?
7    A.  I don't -- I don't -- I don't
8  remember specifically.
9    Q.  Can you tell me if you learned of
10  the agreement before or after the petition
11  date?
12    A.  It would have been -- it would have
13  been after.
14    Q.  Can you tell me if you learned of
15  the agreement before or after January 9th,
16  2020?
17    A.  It would have been after.
18    Q.  Can you tell me if you learned of
19  the agreement before or after you left Highland
20  Capital Management in February of 2021?
21    A.  I don't -- I don't -- I don't know.
22    Q.  It is possible that you learned of
23  it while you were a Highland employee.
24       Do I have that right?

Page 71

WATERHOUSE - 10-19-21

1    A.  I don't remember the -- I mean, it
2  was sometime in 2021.  I don't remember when.
3    Q.  All right.  So to the best of your
4  recollection, it was in 2021 but you don't
5  recall if it was before or after you ceased to
6  be a Highland employee.
7       Do I have that right?
8    A.  Yeah, I mean, it was -- it was
9  likely after I was -- after I left Highland
10  because, if I put myself back into the last
11  days of -- of 2021, it was -- you know, the
12  communications with Mr. Dondero were -- were --
13  were -- there weren't as many communications
14  because of the circumstances.
15    Q.  And so based on that you believe
16  that it is most likely that you learned of this
17  agreement sometime after you left Highland
18  employment?
19    A.  I wouldn't use the term "most
20  likely."  I don't recall specifically.  I don't
21  recall.
22    Q.  Do you recall ever telling Jim Seery
23  about this agreement?
24    A.  No, I don't -- I didn't tell

Page 72

WATERHOUSE - 10-19-21

1       Jim Seery.
2    Q.  Did you tell anybody at DSI about
3  this agreement?
4    A.  No.
5    Q.  Did you tell any of Highland's
6  independent directors about this agreement?
7    A.  No.
8    Q.  Did you tell anybody at Pachulski
9  Stang Ziehl & Jones about this agreement?
10    A.  No.
11    Q.  Did you tell any employee of
12  Highland about this agreement?
13    A.  No.
14       MS. DANDENEAU:  Mr. Morris, it has
15    been an hour and a half.  Is this a good
16    time for a break?
17       MR. MORRIS:  Sure.
18    Q.  Mr. Waterhouse, I will just remind
19  you that during the break please don't speak
20  with anybody about the deposition, the
21  substance of your testimony or anything else
22  concerning the deposition.  Okay?
23    A.  Yes.
24       MR. MORRIS:  So it is 11:02.  We're

Page 73

WATERHOUSE - 10-19-21

1  at 11:02 your time.  Let's come back, I
2  guess, at 15 -- at 11:15 your time.
3       VIDEOGRAPHER:  We're going off the
4    record at 11:02 a.m.
5    (Recess taken 11:02 a.m. to 11:20 a.m.)
6       VIDEOGRAPHER:  We are back on the
7    record at 11:20 a.m.
8    Q.  Mr. Waterhouse, did you speak with
9  anybody during the break about this deposition?
10    A.  No.
11       MS. DANDENEAU:  Other than -- other
12    than his counsel.
13    Q.  Did you speak to your counsel about
14  the substance of your deposition today?
15    A.  No, I didn't bring it up.
16    Q.  I didn't ask you if you brought it
17  up.  I asked you if you had any conversation
18  with your lawyer about the substance of your
19  deposition.
20       MS. DANDENEAU:  Yes, he did.
21    Q.  Can you tell me what the -- you
22  discussed?
23       MS. DANDENEAU:  No, I object to
24    that.  He's not going to answer.  That is a

Page 74

WATERHOUSE - 10-19-21

1    privileged conversation.
2
3        MR. MORRIS: So I just want to make
4    sure that I understand. During the break
5    you spoke with your client about the
6    substance of this deposition; is that
7    right?
8        MS. DANDENEAU: Yes, John.
9        MR. MORRIS: And you refuse -- you
10   refuse to let your client tell me what was
11   discussed; is that right?
12       MS. DANDENEAU: That's correct.
13       MR. MORRIS: You know, I had given
14   the instruction prior to the break not to
15   speak with counsel. I would have
16   appreciated --
17       MS. DANDENEAU: No, you didn't --
18   actually, that is not true, Mr. Morris.
19   You said not to speak with anyone. We
20   never have interpreted that to mean
21   conversations with counsel. That's never
22   been -- I have never, ever heard that
23   instruction.
24       MR. MORRIS: Okay. We will -- we
25   will -- we will deal with it when and if we

Page 75

WATERHOUSE - 10-19-21

1    have to.
2
3        Q.   Mr. Waterhouse, after learning about
4    the agreement, did you ask anybody if the
5    agreement was reflected in a writing?
6        MS. DANDENEAU: Objection to form.
7        A.   No.
8        Q.   Did you ask anybody if the terms of
9    the agreement were memorialized anywhere?
10       MS. DANDENEAU: Objection to form.
11       MR. MORRIS: What is the --
12       A.   No.
13       MS. DANDENEAU: Well, because you
14   keep talking about this agreement and I --
15   I -- I think, Mr. Morris, that is really
16   not clear what you mean by "the agreement."
17   And maybe you can just go back and restate
18   what that is.
19       MR. MORRIS: Okay. Your client has
20   agreed with me twice on the definition, but
21   I will try one more time.
22       Q.   Mr. Waterhouse, do you understand
23   that when I use the term "agreement," I'm
24   referring to the agreement between Jim and
25   Nancy Dondero concerning certain promissory

Page 76

WATERHOUSE - 10-19-21

1    notes where you learned that one of the terms
2    of the agreement was milestones reached?
3
4        A.   Okay.
5        Q.   And did you understand that that was
6    the -- the agreement that we were referring to
7    every time we used the word "agreement" in this
8    deposition?
9        A.   I don't know anything about this
10   agreement. So, look, I do -- it -- I don't
11   know whether --
12       Q.   Let's -- let's try this again.
13       A.   Yeah. Look, I don't know what this
14   agreement relates.
15       MS. DEITSCH-PEREZ: John, John --
16       Q.   Let me try --
17       MS. DEITSCH-PEREZ: John, please let
18   the witness finish.
19       MR. MORRIS: Please stop. Please
20   stop. Please stop talking.
21       MS. DEITSCH-PEREZ: No, you stop.
22   Let the witness --
23       MR. MORRIS: Stop talking.
24       MS. DEITSCH-PEREZ: -- finish -- you
25   interrupted him.

Page 77

WATERHOUSE - 10-19-21

1        MR. MORRIS: You know what, you
2    guys, this is really wrong. It is really,
3    really wrong. Okay?
4        I had the witness agree not once,
5    but twice to the definition of agreement.
6    Okay? I'm going to try and do it a third
7    time.
8        MS. DANDENEAU: No, but, please,
9    John, really --
10       MR. MORRIS: No, please stop
11   talking. Please. It is my deposition.
12   Object to questions.
13       MS. DANDENEAU: No, but also you
14   instructed him that -- that if you were
15   going -- if you were interrupting him, that
16   he should remind you that you're
17   interrupting him and -- and --
18       MR. MORRIS: Let him do that. Let
19   him do that.
20       MS. DANDENEAU: Okay. Well, you --
21       MR. MORRIS: Please stop talking.
22       A.   Okay. I don't know any of the
23   details of these agreements. I don't know
24   anything about them. I heard -- someone -- I

Page 78

WATERHOUSE - 10-19-21

1   don't know who, I don't know when, as you
2   asked, sometime in '21, someone told me about
3   this -- or I don't honestly know -- I don't
4   even recall exactly how I was made aware of
5   this, but I was. I don't know -- I don't know
6   any of these details, and I'm getting -- again,
7   there is, you know, I -- I -- I had a passing
8   conversation with -- with Jim at some point
9   on -- on some -- on the executive comp, and I'm
10  getting confused of what is what, because
11  again, I don't know any of these details.
12      Q.   Okay. Let me try again,
13  Mr. Waterhouse, and I apologize.
14          Are you aware of any agreement
15  between Jim Dondero and Nancy Dondero
16  concerning any promissory note that was given
17  to Highland by any affiliate or Mr. Dondero?
18          MS. DEITSCH-PEREZ: Object to the
19      form.
20      A.   I've heard of an agreement. That
21  is -- that is -- I mean, if you are using aware
22  as heard, sure.
23      Q.   And you understand that one of the
24  terms of the agreement is that it was based on

Page 79

WATERHOUSE - 10-19-21

1   milestones that had to be reached; is that
2   right?
3          MS. DANDENEAU: Objection to form.
4      A.   That was one of the words that was
5   used when I heard about it, yes.
6      Q.   And when you heard about this
7   agreement that had a term in it concerning
8   milestones reached, did you ask the person who
9   was telling you about the agreement whether or
10  not it was in writing?
11     A.   I did not.
12     Q.   Did you ask any questions at all?
13         MS. DANDENEAU: Objection to form.
14     A.   Not that I recall.
15     Q.   But do you understand that going
16  forward, we're going to refer to the agreement
17  as the agreement that you just described that
18  you were --
19         MS. DANDENEAU: Object to the form.
20     A.   Yes.
21     Q.   Okay. You don't have any personal
22  knowledge concerning the terms of the
23  agreement; correct?
24         MS. DEITSCH-PEREZ: Object to the

Page 80

WATERHOUSE - 10-19-21

1   form.
2      Q.   You can answer.
3      A.   I don't -- I heard about the
4   agreement. I don't know anything -- I heard
5   there was an agreement. That is -- again, as I
6   testified before -- I said before, heard about
7   it, don't know the details. I believe it was
8   sometime this year.
9      Q.   Do you have any personal knowledge
10  about the terms of the agreement, sir?
11         MS. DANDENEAU: Objection to form.
12     A.   Other than what I have previously
13  discussed, I don't -- I don't know.
14     Q.   Did -- did Mr. Dondero tell you
15  about the existence of the agreement?
16     A.   I don't recall.
17     Q.   Do you recall the source of your
18  information when you learned about the
19  agreement?
20     A.   No, I don't -- I don't recall. I
21  don't remember. I just -- I heard about it
22  generally. I don't remember -- I don't
23  remember who, how, if, how. I don't remember.
24     Q.   You know, Mr. Waterhouse, I just

Page 81

WATERHOUSE - 10-19-21

1   want to be clear that I never would have asked
2   you to appear at this deposition if your name
3   hadn't been included in responses to discovery
4   as to somebody with knowledge about the -- who
5   was told about the existence of the agreement.
6          That is what prompted me do this,
7   and I really do feel compelled to tell you that
8   I otherwise would never have called you as a
9   witness. So I regret that you're being put
10  through this today. I had no intention of
11  burdening you or taking your time, but that is
12  the reason that we issued the subpoena is
13  because certain of the defendants identified
14  you as somebody --
15         MS. DEITSCH-PEREZ: Mr. Morris, you
16     are here to ask questions, not to have --
17         MR. MORRIS: I feel badly for the
18     guy. I really do.
19         MS. DEITSCH-PEREZ: I'm sure you do.
20         MR. MORRIS: I do. Stop.
21         MS. DEITSCH-PEREZ: You stop.
22         MR. MORRIS: I'm allowed.
23         MS. DEITSCH-PEREZ: No, you're not
24     allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1   Q.   Okay.  Well, I hope that you
2
3   appreciate what I'm saying here,
4   Mr. Waterhouse.
5        MS. DANDENEAU:  All right.  Let's go
6   ahead and ask questions, and again, you're
7   entitled to probe his -- his knowledge
8   of -- whatever knowledge he has about
9   this -- this agreement and --
10       MR. MORRIS:  That is what I'm doing.
11       MS. DANDENEAU:  -- he will answer
12   the questions to the best that he can.
13       MR. MORRIS:  That is what I'm doing.
14   Q.   Mr. Waterhouse, I take it you do not
15   know which promissory notes issued by which
16   affiliates or Mr. Dondero are the subject of
17   this agreement; do I have that right?
18   A.   Yes, I don't -- I don't know.
19   Q.   Do you know of any way to determine
20   which promissory notes issued by the affiliates
21   and Mr. Dondero are the subject of this
22   agreement other than asking Jim or Nancy
23   Dondero?
24       MS. DANDENEAU:  Objection to form.
25   A.   I don't know.

Page 83

WATERHOUSE - 10-19-21

1   Q.   Did you ever make --
2
3   A.   I don't know anything about these
4   agreements.
5   Q.   Did you ever make any effort to
6   determine which promissory notes are subject to
7   this agreement?
8   A.   No.
9   Q.   Did you ever ask anybody which
10   promissory notes are subject to this agreement?
11   A.   No.
12   Q.   Do you know if there is a list
13   anywhere of the promissory notes that are
14   subject to this agreement?
15   A.   I'm not aware.
16   Q.   Have you ever seen the terms of the
17   agreement written down anywhere?
18   A.   No.
19   Q.   Have you ever asked anybody whether
20   the terms of the agreement were written down
21   anywhere?
22   A.   I have not.
23   Q.   Did learning about the agreement
24   cause you to do anything in response?
25       MS. DANDENEAU:  Objection to form.

Page 84

WATERHOUSE - 10-19-21

1   A.   No.
2
3   Q.   Did anybody ever describe to you the
4   nature of the milestones that you referred to
5   earlier?
6   A.   No, I don't -- I don't have any
7   details of this.
8   Q.   That is fine.
9        PricewaterhouseCoopers served as
10   Highland's outside auditors prior to the
11   petition date; correct?
12   A.   Yes.
13   Q.   You refer to PricewaterhouseCoopers
14   as PwC?
15   A.   Yes.
16   Q.   PricewaterhouseCoopers audited
17   Highland's financial statements on an annual
18   basis; correct?
19   A.   During my -- during my time as -- as
20   CFO, yes, PricewaterhouseCoopers was the
21   auditor.
22   Q.   Do you know why Highland had its
23   annual financial statements audited each year?
24   A.   Generally.
25   Q.   Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1   as to the reason why Highland had its annual
2   financial statements audited each year.
3   A.   From -- from time to time, they were
4   used -- or asked for, as part of diligence or
5   transactions or -- or things of that nature.
6   Q.   And were they given to third parties
7   for purposes of diligence or transactions from
8   time to time?
9   A.   As far as I'm aware, yes.
10   Q.   And was it your understanding as the
11   CFO that the third parties who received the
12   financial statements in diligence or
13   transactions was going to rely on those?
14       MS. DANDENEAU:  Objection to form.
15   A.   I don't know -- I don't know gen --
16   I don't know specifically what they were going
17   to rely on.  You know, we would get requests
18   for audited financial statements.  I don't know
19   what they were relying on.
20   Q.   And --
21   A.   You would have to ask them.
22   Q.   Did you personally play a role in
23   PwC's annual audit and the conduct of the
24   audit?

Page 86

WATERHOUSE - 10-19-21

1   MS. DANDENEAU: Objection to form.
2   A.   During my tenure as CFO, I played a
3   very minimal role.
4   Q.   What was the minimal role that you
5   played?
6   A.   You know, again, it was -- it was to
7   check in with the team, to make sure that, you
8   know, audit -- the deadlines were being hit,
9   information was being presented to the auditors
10  in a -- in a timely fashion, but, you know,
11  other than that, it was a very capable team
12  that are still current employees of Highland
13  and, you know, they -- they conducted 99
14  percent of -- look, I don't want to give
15  percentages.  I mean, this is -- but I -- I --
16  I played a minimal role towards the end.
17         Before during my earlier years as
18  CFO, I did more, and then as time went on, I
19  did less in it.
20  Q.   Okay.  Was there a person at
21  Highland who was responsible for overseeing
22  Highland's participation in PwC's audit during
23  the time that you were the CFO?
24  A.   Yeah.  I mean, there was -- there

Page 87

WATERHOUSE - 10-19-21

1   was a -- there was a point -- it varies.  It
2   varies by year, in function, in time and, you
3   know, depending on the request, but yes, I
4   mean, there is -- there is -- there is
5   generally a point person of communication.
6   Q.   And who was the point person from
7   2016 until the time you left Highland?
8   A.   I don't -- I don't know
9   specifically, but it would have been, you
10  know -- you know, someone on the corporate
11  accounting team.
12  Q.   And was there a head of the
13  corporate accounting team?
14  A.   Yes, so -- yes.
15  Q.   Who was the head of corporate
16  accounting for the five years prior to the time
17  you left Highland?
18  A.   I don't -- if you're asking from
19  2016 on, I don't -- it was Dave Klos, but,
20  again, there was -- there was changes to the
21  team and the reporting structure.  I don't
22  remember exactly when that happened during --
23  you know, over the last -- since 2016.
24  Q.   Did the folks who participated and

Page 88

WATERHOUSE - 10-19-21

1   ran the audit all report to you, directly or
2   indirectly?
3   A.   Yes.
4   Q.   And did you have any responsibility
5   for making sure that the audit report was
6   accurate before it was finalized?
7   A.   Yeah.  I mean, you know, that --
8   that is -- my responsibility to the auditors
9   was -- again, is -- and the CFO is to -- we are
10  providing accurate financial statements; right?
11         And -- and -- and as part of any
12  audit, we disclose all relevant information as
13  part of any audit.
14  Q.   Okay.  And as the CFO, did you take
15  steps to make sure that the audit report was
16  accurate?
17  A.   I mean, I would say in a general
18  sense, yes.  But, again, I mean, I had a
19  very -- I had a very capable and competent
20  team.  I wasn't managing them.
21         You know, part of what I do is I let
22  the team -- I want managers to grow.  I want
23  managers to have rope.  And that is -- you
24  know, I'm not a stand-behind-you type of guy.

Page 89

WATERHOUSE - 10-19-21

1   If you -- if you talk to my team members, I'm
2   not micromanaging people.  I want people to
3   learn and grow in their function so they can go
4   on and do bigger and better things with their
5   careers.
6         And so, yes, generally I was
7   responsible for it, but I wanted the team to
8   learn and grow and be responsible for the bulk
9   of the audit.
10  Q.   Did you personally review each audit
11  report before it was finalized to satisfy
12  yourself that it was accurate?
13  A.   I don't -- I don't recall, you know,
14  for every single -- we're talking 2016, there
15  would have been three years, 2016 to '17, '18.
16  I don't -- we're -- we're going back
17  five years-plus.  I don't -- you know, I don't
18  recall.
19  Q.   Did you have a practice that you
20  employed to make sure that you were satisfied
21  that Highland's audit reports were true and
22  accurate to the best of your knowledge?
23  A.   I mean, our -- the practice was set
24  up with our -- the -- the practice to put

Page 90

WATERHOUSE - 10-19-21

1
2  together accurate audited or accurate financial
3  statements is to your control environment.
4       So, you know, the -- so the practice
5  was to maintain a stable control environment
6  which then the output is -- is accurate
7  financial statements.
8       So -- so, you know, if I was
9  comfortable that the control environment was
10 operating, then, you know, that would dictate
11 how I would -- you know, what I might or might
12 not do in a given year.
13     Q.   Okay. Do you recall ever being
14 uncomfortable with the control environment
15 during the period that you served as CFO?
16     A.   Yeah. I mean, look, yes, there are
17 times -- you know, nothing is perfect. So
18 there were -- there were times when, yes, you
19 know -- there are times I learned I was
20 uncomfortable with the control environment, and
21 that is part of the management of the process
22 and having, you know -- and -- and working
23 through whatever obstacles present themselves.
24     Q.   Okay. Were you ever uncomfortable
25 with the control process as it related to

Page 91

WATERHOUSE - 10-19-21

1
2  reporting and disclosures of loans to
3  affiliates and Mr. Dondero?
4       MS. DANDENEAU:  Objection to form.
5     A.   I don't -- I don't recall --
6     Q.   So you don't recall --
7     A.   -- the --
8       MS. DANDENEAU:  Mr. Morris --
9     A.   I don't recall being uncomfortable.
10 But, again, we're going back several years. I
11 don't -- you know, the practice in an audit is
12 to disclose all information to the auditors.
13 And I don't -- I don't recall.
14     Q.   As part of the process of the audit,
15 did you sign what is sometimes referred to as a
16 management representation letter?
17     A.   Yes.
18       MR. MORRIS:  Can we put up on the
19 screen a document that we have premarked as
20 Exhibit 33.
21       (Exhibit 33 marked.)
22       MS. DANDENEAU:  Mr. Morris, that is
23 not in the binder; correct?
24       MR. MORRIS:  Correct.
25     Q.   So you will see, Mr. Waterhouse,

Page 92

WATERHOUSE - 10-19-21

1
2  this is a letter dated June 3rd. And if we
3  could go to the signature page.
4       And do you see that you and
5  Mr. Dondero signed this document?
6     A.   Yes.
7     Q.   That is your signature; right?
8     A.   Yes.
9       MR. MORRIS:  Okay. Can you go back
10 to the top.
11       MS. DANDENEAU:  Mr. Morris, can you
12 have somebody post this in the chat so that
13 we have can have a copy of this, please.
14       MR. MORRIS:  Yeah, sure. Asia, can
15 you do that, please.
16     Q.   Okay. Do you see at the bottom of
17 the second paragraph there is a reference to
18 materiality?
19     A.   Yes.
20     Q.   Okay. It says, Materiality used for
21 purposes of these representations is
22 $1.7 million.
23       Do you see that?
24     A.   I do.
25     Q.   And did PwC set that level of

Page 93

WATERHOUSE - 10-19-21

1
2  materiality?
3     A.   Yes.
4     Q.   And for purposes of the audit, did
5  PwC set the level of materiality each year?
6     A.   Yes.
7     Q.   Did that number change over time?
8     A.   I'm not aware of what materiality is
9  every single year, so -- but, you know, this
10 number would likely fluctuate.
11     Q.   Okay. I'm going to go back to a
12 question I asked you earlier today. And that
13 is in connection -- this letter is issued in
14 connection with the audit for the period ending
15 12/31/2018; correct?
16     A.   Yes.
17     Q.   Okay. And is it fair to say that if
18 any -- actually, withdrawn. I'm going to take
19 it outside of this.
20       If Highland ever forgave the loan to
21 any affiliate or any of its officers or
22 employees, in whole or in part, to the best of
23 your knowledge, would that forgiveness have
24 been disclosed in the audited financial
25 statements if it exceeded the level of

Page 94

WATERHOUSE - 10-19-21

1   materiality that PwC established?
2       MS. DANDENEAU: Objection to form.
3       A.  So, again, during my tenure as CFO,
4   and -- Highland -- it was -- it is required to
5   disclose any affiliate loans that are in excess
6   of materiality.
7       Now, the forgiveness of those loans
8   may or may not -- I mean, since materiality
9   fluctuates every year, a -- you know, if a loan
10  was forgiven, it may or may not, you know --
11  and, look, I would want to consult the guidance
12  around this.
13      It is not something we do -- you
14  know, it is not -- you know, GAAP can be and
15  disclosures can be very specialized so, again,
16  we want to consult the guidance.  But we would
17  see if and what would need to be disclosed if
18  it were deemed immaterial.
19      Q.  Did you and Mr. Dondero sign
20  management representation letters of this type
21  in each year in which you served as Highland's
22  CFO?
23      A.  I -- I -- I will speak for myself.
24  I signed them.  There may have been others that
25

Page 95

WATERHOUSE - 10-19-21

1   signed as well.  I don't -- I don't recall.
2       Q.  But to the best of your knowledge,
3   you, personally, signed a management
4   representation letter in connection with
5   Highland's audit each year that you served as
6   the CFO; correct?
7       A.  I would say generally speaking,
8   Mr. Morris.  I don't recall for every single
9   year, you know, generally, but I would want to
10  refer to all the rep letters and see who signed
11  them.
12      Q.  Do you recall Highland having its
13  financial statements audited in any year during
14  the period that you were a CFO where you didn't
15  sign the management representation letter?
16      A.  I don't recall.  But, John, we're
17  going back five, six, seven, eight, nine,
18  decade.  I don't -- I don't remember.
19      Q.  I don't want to go back that many
20  decades, but I'm just asking you if you recall
21  that there was you didn't sign it?
22      A.  I -- I -- I don't, but my memory
23  is -- again, I -- I -- I can't tell you what I
24  did in 2012.  I mean, I think generally, yes,
25

Page 96

WATERHOUSE - 10-19-21

1   but I don't -- I don't know for sure, and I
2   would want to rely on the document.
3       Q.  Let me ask the question a little bit
4   differently then.
5       Do you have any reason to believe
6   that Highland had its annual financial audit
7   and you did not sign a management
8   representation letter in connection with that
9   audit?
10      MS. DANDENEAU: Objection to form.
11      A.  I don't believe it would, but,
12  again, I would want to -- I don't recall and I
13  would want to confirm it to -- to make, you
14  know, an affirmative -- to give an affirmative
15  answer.
16      Q.  Do you know whether PwC required
17  management to sign management representation
18  letters?
19      MS. DANDENEAU: Objection to form.
20      A.  Yes.  I mean, it -- management
21  representation letters are signed by
22  management.
23      Q.  Okay.  And do you know -- do you
24  have any understanding as to why PwC requires
25

Page 97

WATERHOUSE - 10-19-21

1   management to sign management representation
2   letters?
3       MS. DEITSCH-PEREZ: Object to the
4   form.
5       A.  I don't know why PwC's -- what PwC's
6   specific practice is.  I know generally what
7   management representation letters are.
8       Q.  Okay.  Do you personally -- I'm not
9   asking about PwC.  I'm asking for you -- I'm
10  asking about you, do you have an understanding
11  as to why the auditor asks for management
12  representation letters?
13      A.  Okay.  So you're asking me in my
14  personal capacity, yes, I have a general
15  understanding of why.
16      Q.  Can you give me the general
17  understanding that you have as to why
18  management representation letters are required?
19      A.  They are -- they are required to --
20  they are -- they are one of the items required
21  in an audit to help verify completeness.
22      Q.  Do you have any -- any other
23  understanding as to why management
24  representation letters are required?
25

Page 98

WATERHOUSE - 10-19-21

1    A.    That is -- that is -- other than
2 what I said, it is -- it is -- it is required
3 so -- to ensure that the -- you know, there
4 is -- there is completeness in what is being
5 audited.
6    Q.    Did you -- did you have a practice
7 whereby you and Mr. Dondero conferred about the
8 management representation letters before you
9 signed them?
10    A.    No.
11    Q.    Did you have a practice --
12 withdrawn.
13        Do you see just the next sentence
14 after the materiality, there is a sentence that
15 states:  We confirm, to the best of our
16 knowledge and belief, as of June 3rd, 2019, the
17 date of your report, the following
18 representations made to you during your audit.
19        Do you see that sentence?
20    A.    Yes.
21    Q.    Okay.  Did you understand when you
22 signed this letter that you were confirming the
23 representations that followed?
24    A.    When I signed this management

Page 99

WATERHOUSE - 10-19-21

1 letter -- representation letter, yes.
2    Q.    Okay.  Did you discuss this letter
3 with Mr. Dondero before you signed it?
4    A.    I don't recall.
5    Q.    Do you recall if Mr. Dondero asked
6 you any questions before he signed the letter?
7    A.    I don't recall.
8    Q.    Do you recall if you asked
9 Mr. Dondero any questions before you signed
10 this letter?
11    A.    I don't recall.
12    Q.    Is it fair to say that Mr. Dondero
13 did not disclose to you the existence of the
14 agreement that we have -- as we've defined that
15 term prior to the time you signed this letter?
16        MS. DANDENEAU:  Objection to form.
17    A.    I don't think I understand the
18 question.  So, again, you are saying, did
19 Mr. Dondero not disclose to me the existence of
20 this letter?
21    Q.    No, I apologize.
22        Did Mr. Dondero disclose to you the
23 existence of the agreement prior to the time
24 you signed this letter on June 3rd, 2019?

Page 100

WATERHOUSE - 10-19-21

1    A.    The agreement -- the agreement that
2 we talked about earlier?
3    Q.    Correct.
4    A.    Look, as I said earlier, the first
5 time I heard of this agreement was sometime
6 this year.
7    Q.    Okay.  Can we turn -- let's just
8 look at a couple of items on the list.  If we
9 can go to page 33416.  Do you see in Number 35
10 it talks about the proper recording or
11 disclosure in the financial statements of ND
12 relationships and transactions with related
13 parties.
14        Do you see that?
15    A.    I do.
16    Q.    As the CFO, do you have any
17 understanding as to whether Dugaboy is a
18 related party?
19    A.    I don't recall.
20    Q.    Do you know whether any of the
21 affiliates are related parties?
22    A.    If -- if it was NexPoint, HCMFA,
23 HCMS, HCRE, yeah, if -- if that is the
24 affiliate definition, and there.  In ASC 850 --

Page 101

WATERHOUSE - 10-19-21

1 again, I mean, I haven't looked at ASC 850 in
2 quite some time, but, you know, if -- if there
3 is a control language, you know, ASC 850, would
4 that -- that section in GAAP would -- would
5 pick up and define what are related parties.
6        So, you know, like I said, if -- one
7 of the four entities I just described, if -- if
8 they are in that control definition of ASC 850,
9 they would be picked up in 35D.
10    Q.    Do you -- do you have any reason to
11 believe that they would be picked up in that
12 definition, based on your knowledge and
13 experience?
14    A.    I -- I believe that entities
15 controlled under GAAP are -- are affiliates.
16    Q.    Okay.  Would Mr. Dondero also
17 qualify as a related party for purposes of
18 Section 35D, to the best of your knowledge?
19    A.    Yeah, I don't -- I don't know.  I
20 would think -- I would have to read the code
21 section to see if someone personally -- is it
22 talking about related parties.  So, look, if
23 your own in control, yeah, I mean, I would have
24 to read the section.

Page 102

WATERHOUSE - 10-19-21

1    Q.    To the best of your knowledge, was
3  the existence of the agreement ever disclosed
4  to PwC?
5    A.    I'm not – I'm not aware.
6    Q.    Do you recall if the agreement was
7  ever disclosed in Highland's audited financial
8  statements?
9    A.    I don't – I don't remember if it
10  was in every Highland's audited financial
11  statements during my tenure. We would have to
12  read the financial statements to see what was
13  disclosed, but I'm not – I mean, as I sit here
14  today, I'm not aware.
15    Q.    That is all I'm asking for.
16    A.    I'm not aware.
17    Q.    Can we go to the next page, please,
18  and look at 36. 36 says, we have disclosed to
19  you the identity of the partnership's related
20  party relationships and all the related party
21  relationships and transactions of which we are
22  aware.
23       Do you see that?
24    A.    Yes.
25    Q.    To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

1    June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6    A.    I mean, I can speak for myself as
7  signer of this representation letter. I
8  disclosed what – what, you know, what –
9  what – what I knew. Sorry, look, yes, so I –
10  I disclosed what I knew.
11    Q.    Okay. Can we go to page 419. Do
12  you see at the end there is a reference to
13  events that occurred since the end of the
14  fiscal year and the date of the letter?
15    A.    Yes.
16    Q.    And were you aware of that – of
17  that provision of the management representation
18  letter before you signed the document?
19    A.    Yes.
20    Q.    Do you have an understanding as to
21  why PwC asked for that confirmation of that
22  particular part of the management
23  representation letter?
24    A.    It is – it is – it is just – it
25  is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

1    Q.    And do you understand – do you have
3  an understanding that PwC wanted to know that
4  as of the date of the audit whether any
5  material changes had occurred since the end of
6  the fiscal year, using the definition of
7  materiality that is in this particular
8  management representation letter?
9    A.    It – it is – it is – it is a –
10  it is as described. It is just a poorly worded
11  question, so it is hard for me to say yes.
12    Q.    If I asked you this, I apologize,
13  but did you ever learn when the agreement was
14  entered into?
15    A.    I don't – I don't – like I said
16  before, I don't know or have any details of the
17  agreement.
18    Q.    Okay. Did you ever ask anybody when
19  the agreement was entered into?
20    A.    I did not.
21    Q.    Let's look at the audited financial
22  statements. We will put up on the screen a
23  document that has been premarked as Exhibit 34.
24       (Exhibit 34 marked.)
25       MS. DANDENEAU: And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

1    Canty could please put that in the chat
3  room, that would be great.
4       MR. MORRIS: I will assure you we
5  will put every document in the chat room.
6    Q.    Now, I'm just going to ask you
7  questions that are related to the provisions of
8  this report that concern the affiliate loans,
9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14    A.    Yes.
15    Q.    Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20    A.    Yes.
21    Q.    If we can go to – I think it is the
22  next one, looking for PwC's signature line.
23       MS. CANTY: I'm sorry, John, did you
24  say something?
25       MR. MORRIS: Yes, can we turn the

Page 106

WATERHOUSE - 10-19-21

1    page. I think it is 215. Yes, stop right
2    there, just above -- I'm sorry, I want to
3    see just the date of the report.
4        Q.   Okay. Do you see at the bottom of
5    that page there, Mr. Waterhouse,
6    PricewaterhouseCoopers has signed this audit
7    report?
8        A.   Yes, I see their signature.
9        Q.   Okay. And it is the dated same day
10   as your management representation letter; is
11   that right?
12       A.   It is -- yes, it is the same day.
13       Q.   Was that the practice to sign the
14   management representation letter on the same
15   day that the audit report was signed?
16       A.   Yes, that is typical in every audit.
17       Q.   Can we just scroll down to the
18   balance sheet on the next page.
19            Do you see that there is a line
20   there that says, Notes and Other Amounts Due
21   from Affiliates?
22       A.   Yes.
23       Q.   Does that line, to the best of your
24   knowledge, include the amounts that were due

Page 107

WATERHOUSE - 10-19-21

1    under the affiliate under the notes signed by
2    the affiliates and Mr. Dondero?
3        MR. RUKAVINA:  Objection to the
4        extent that calls for a legal conclusion.
5        A.   I mean, I would want to see the
6    detail and the build to this $173,398,000, but,
7    yes, I mean, if -- if -- given what we
8    discussed before, you know, it -- it should
9    capture that.
10       Q.   And -- and while you were the CFO of
11   Highland, were all notes held by Highland that
12   were issued by an affiliate or Mr. Dondero
13   carried as assets on Highland's balance sheets?
14       MS. DANDENEAU:  Objection to form.
15       MS. DEITSCH-PEREZ:  Object to form.
16       A.   I don't -- I don't know how else
17   they would be carried.
18       Q.   Okay. Can you think of any -- are
19   you aware of any promissory note issued by an
20   affiliate or Mr. Dondero that was not carried
21   on Highland's audited financial balance sheets?
22       A.   I'm -- I'm -- I'm not aware.
23       Q.   Okay. Are you aware of any category
24   of asset on Highland's balance sheet in which

Page 108

WATERHOUSE - 10-19-21

1    any of the promissory notes issued by an
2    affiliate or Mr. Dondero would have been
3    included?
4        MS. DANDENEAU:  Objection to form.
5        A.   Sorry, am I aware of any asset of an
6    affiliate being included --
7        Q.   That -- let me -- let me try again.
8            Do you see there is a number of
9    different assets that are described on this
10   balance sheet?
11       A.   Yes.
12       Q.   One of the assets that is described
13   is Notes and Other Amounts Due from Affiliates;
14   right?
15       A.   Yes.
16       Q.   And it is reasonable to conclude
17   that the notes from the affiliates and
18   Mr. Dondero are included in that line item;
19   right?
20       A.   Yes, based on this description.
21   Again, I would want to see a build of this to
22   100 percent confirm, but based on the
23   description, the asset description, it is -- it
24   is likely.

Page 109

WATERHOUSE - 10-19-21

1            Now, does that mean absolute? I
2    don't know.
3        Q.   Do you have any reason to believe
4    that the promissory notes would have been
5    carried on the balance sheet in a category
6    other than Notes and Other Amounts Due from
7    Affiliates?
8        A.   If they were deemed -- no. If they
9    were deemed an affiliate, you know, under GAAP,
10   they should be carried in that line.
11   Otherwise, it would go into another line.
12       Q.   Okay. And do you see the total
13   asset base as of December 31st, 2018, was
14   approximately $1.04 billion?
15       A.   Yes.
16       Q.   Is my math correct that the Notes
17   and Other Amounts Due from Affiliates
18   constituted approximately 17 percent of
19   Highland's assets as of the end of 2018?
20       A.   Well, so how are you defining
21   Highland?
22       Q.   Highland Capital Management, L.P.,
23   the entity that this audit is subject to -- or
24   the subject of.

Page 110

WATERHOUSE - 10-19-21

1    A.    On a consolidated or unconsolidated
2  basis?
3    Q.    I'm looking at the balance sheet.
4  It is a consolidated balance sheet.  Okay?
5        Does the Notes and Other Amounts Due
6  from Affiliates constitute approximately
7  17 percent of the total assets of Highland
8  Capital Management, L.P., on a consolidated
9  basis?
10       MS. DANDENEAU:  Objection to form.
11   A.    I don't have a calculator in front
12  of me but I will take your math, if you are
13  taking the 173 divided by the billion.
14   Q.    Okay.
15   A.    If that is accurate, yes.  But,
16  again, on a consolidated basis.
17   Q.    And on an unconsolidated basis the
18  percentage would be higher; correct?
19   A.    I -- no.  I don't know.
20   Q.    Well, okay.  That is fair.
21       MR. MORRIS:  Can we turn to
22  page 241, please.
23   Q.    Do you see that this is a section of
24  the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

1  Other Amounts Due from Affiliates?
2    A.    Sorry, I can't see the -- the --
3    Q.    It is at the top.
4    A.    Notes and Other Amounts Due from
5  Affiliates, yes, I see that.  I don't -- I
6  don't have a page number, but I'm on a page
7  that says at the top:  Notes and Other Amounts
8  Due from Affiliates.
9    Q.    Okay.  And that is the same title of
10  the line item on the balance sheet that we just
11  looked at; right?  Notes and Other Amounts Due
12  from Affiliates?
13   A.    Yes.
14   Q.    And is it your understanding, based
15  on your experience and knowledge as the CFO,
16  that this is the section of the narrative that
17  ties into the line item that we just looked at?
18   A.    Yes.
19   Q.    And is this section of the audit
20  report intended to describe and disclose all of
21  the material facts concerning the Notes and
22  Other Amounts Due from Affiliates?
23       MS. DANDENEAU:  Objection, form.
24   A.    This -- these notes -- these notes

Page 112

WATERHOUSE - 10-19-21

1  of the financial statements are -- the purpose
2  is to disclose any material items in relation
3  to that balance sheet line item.
4    Q.    Okay.  And all of the information,
5  to the best of your knowledge, that is set
6  forth in this section of the audit report was
7  provided by Highland; correct?
8    A.    Yes, it would have been provided by
9  the corporate accounting team.
10   Q.    Okay.  And the corporate accounting
11  team, did that team report to you in the
12  organizational structure?
13   A.    Yes.
14   Q.    And did you have any concerns about
15  the controls that were in place to make sure
16  that the information provided with respect to
17  Notes and Other Amounts Due from Affiliates was
18  accurate and complete?
19       MS. DANDENEAU:  Objection to form.
20   A.    Not that I recall.
21   Q.    Okay.  Do you recall ever being
22  concerned that any portion of the Notes and
23  Other Amounts Due from Affiliates in any audit
24  report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

1  reliable?
2    A.    I didn't -- I had concerns about,
3  you know, like I talked about before, of there
4  were -- there were potentially issues in the
5  control environment.  But as far as it relates
6  to the audited financial statements, any -- the
7  team would work with the auditors to disclose
8  all -- all notes in Highland's possession.
9        And any -- any notes that were
10  deemed material by the auditor, right, these
11  were disclosed in these -- in this section, you
12  know, in -- in the notes to the consolidated
13  financial statements as you presented.
14   Q.    Do you recall ever having a
15  conversation with anybody at any time
16  concerning the accuracy of the section of audit
17  reports that relates to Notes and Other Amounts
18  Due from Affiliates?
19       MS. DANDENEAU:  Objection to form.
20   A.    You know, as -- as -- I didn't have
21  direct conversations with
22  PricewaterhouseCoopers as I had, you know --
23  I -- I had the team that managed this.
24       Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1 being the point person of this audit. And I
2 can't recall, you know, when -- you know, I
3 don't even know if I was ever the point person
4 during my tenure as CFO.
5     I don't know if PwC had any concerns
6 when they were performing those audit
7 procedures. They may have and they may have --
8 and it may not have been communicated to me. I
9 don't know.
10    MR. MORRIS: All right. I move to
11 strike.
12    Q. And I'm going to ask you to listen
13 carefully to my question.
14    Did you -- do you recall ever having
15 a conversation with anybody at any time
16 concerning the accuracy of the reporting
17 provided in the audited financial statement on
18 the topic of Notes and Other Amounts Due?
19    MS. DANDENEAU: Objection to form.
20    A. I don't recall for this, but that
21 doesn't mean that it didn't exist.
22    Q. Okay. But you have no reason to
23 believe, as you sit here right now, that you
24 ever discussed with anybody concerns over the
25

Page 115

WATERHOUSE - 10-19-21

1 accuracy of the section of the audit reports
2 called Notes and Other Amounts Due from
3 Affiliates; correct?
4     MS. DANDENEAU: Object to the form.
5     MS. DEITSCH-PEREZ: Objection to
6 form.
7     A. I don't recall having any
8 conversations. But, again, I mean, this is --
9 this is two years ago.
10    Q. I'm just asking for your
11 recollection, sir.
12    A. Yes.
13    Q. If you don't recall, this will --
14    A. Yeah.
15    Q. (Overspeak) -- if you don't
16 recall --
17    A. Yeah, I don't -- I don't recall.
18    Q. Do you know who was responsible for
19 drafting the audit report?
20    A. Are you asking the actual Highland
21 employee responsible? I mean, it was
22 Highland's responsibility, so, I mean, that
23 is --
24    Q. Right.
25

Page 116

WATERHOUSE - 10-19-21

1     A. -- Highland's responsibility.
2 Highland's responsibility.
3     Q. Who, at Highland, was responsible
4 for drafting this section of the audit report?
5     A. I -- I don't know the answer to
6 that. Again, there was a team who worked on
7 this. And I don't know, you know, whether it
8 was the staff or the manager.
9     Again, this is where I let the teams
10 manage. And, you know, there may be a
11 corporate accountant who worked on this. I
12 just -- you know, I wasn't part of that process
13 to give that person experience. I don't know.
14    Q. Do you recall having any
15 communications with anybody at any time
16 concerning this section of the report?
17    A. Yeah, I don't recall.
18    Q. Do you recall whether you ever told
19 anybody at any time that any aspect of this
20 section of the report was inaccurate or
21 incomplete?
22    A. I don't recall.
23    Q. As you sit here today, do you have
24 any reason to believe that this section of the
25

Page 117

WATERHOUSE - 10-19-21

1 audit report is incomplete or inaccurate in any
2 way?
3     And I'm happy to give you a moment
4 to -- to look at it, if you would like.
5     MS. DANDENEAU: Objection to form.
6     MS. DEITSCH-PEREZ: Same.
7     A. I mean, I would have to look at -- I
8 would have to look at the bill to the note
9 schedule to make sure I know you presented me
10 with materiality, but again, there might be a
11 note as of 12/31/18 that somehow was -- was
12 under materiality not disclosed. I don't -- I
13 don't know. I would need more information.
14    Q. Okay. But without more information,
15 you have no reason to believe anything this
16 section is inaccurate; correct?
17    MS. DANDENEAU: Objection to form.
18    A. I don't. I mean, you know, this was
19 part of the audit.
20    Q. Thank you. Now, you will see if we
21 could scroll just a little bit more that each
22 of the first five paragraphs concerns
23 specifically the four affiliates that we've
24 been discussing and Mr. Dondero.
25

Page 118

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        MR. MORRIS:  If we could go the
3    other way, La Asia.  We don't need Okada.
4    We're going to have to thread the needle.
5    Okay.  Good, perfect.
6        Q.    Do you see those five paragraphs
7    certain the four affiliates and Mr. Dondero as
8    we've been referring to today?
9        A.    Yes.
10       Q.    Okay.  And do you see at the end of
11   every paragraph it states, quote:  A fair value
12   of a partnership's outstanding notes receivable
13   approximates the carrying value of the notes
14   receivable?
15       A.    Yes, I see that.
16       Q.    Do you have an understanding of what
17   that means?
18       A.    Yes.
19       Q.    What is your understanding of that
20   sentence?
21       A.    It is the -- again, the -- the fair
22   value, right, which is -- which is what the --
23   what Highland could sell that asset for.  This
24   statement is comparing the fair value of the
25   notes to the carrying value, so the carrying

Page 119

1    value is the line item that you showed me
2    earlier that is in Notes and Other Amounts Due
3    from Affiliates.
4        Q.    Okay.  Is another way to say this is
5    that the fair market value of the notes equals
6    the principal amount and -- withdrawn.
7        Is the fair way to interpret this
8    that the fair market value of the notes equals
9    all remaining unpaid principal and interest due
10   under the notes?
11       MS. DANDENEAU:  Object to the form.
12       MS. DEITSCH-PEREZ:  Objection, form.
13       A.    I don't know the answer to that,
14   because I don't recall where -- where any --
15   where -- in what line item was the interest
16   component reported.
17       Q.    All right.  Well, if we look in this
18   audit report, you will see in the middle of the
19   first paragraph, for example, it states that as
20   of December 31st, 2018, total interest and
21   principal due on outstanding promissory notes
22   was approximately $5.3 million.
23       Do you see that?
24       A.    I do.

Page 120

1    WATERHOUSE - 10-19-21
2        Q.    Is that the carrying value or the
3    fair value?
4        A.    That would be the carrying value --
5        Q.    And is the last --
6        A.    -- in my opinion.
7        Q.    Okay.  And it is in your opinion as
8    the chief financial officer of Highland during
9    the period of time that you described; right?
10   It is an educated opinion?
11       A.    I'm reading this at face value.  I'm
12   taking that as that is carrying value.
13       Q.    Okay.  And does the last sentence
14   say that the carrying value is roughly
15   approximate to the fair market value?
16       MS. DANDENEAU:  Objection to form.
17       MS. DEITSCH-PEREZ:  Objection, form.
18       A.    Again, this note to the financial
19   statement is specific to notes and other
20   amounts due from affiliates.
21       Q.    Correct.
22       A.    If the interest component is
23   reported elsewhere on the balance sheet, you
24   know, it -- it could be off.  Again, I
25   don't have the detail.  I don't know, but yes,

Page 121

1    WATERHOUSE - 10-19-21
2    look, I mean, if you -- I mean, if you are
3    saying the 5.3 million is in the notes and
4    other amounts due from affiliates, then the
5    last statement is saying the fair value
6    approximates 5.3 million.  That is what that
7    last sentence is saying.
8        Q.    Do you see in the middle of the
9    first paragraph -- not in the middle, the next
10   to last sentence there is a statement that the
11   partnership will not demand payment on amounts
12   that exceed HCMFA's excess cash availability
13   prior to May 31st, 2021.
14       Do you see that?
15       A.    I do.
16       Q.    Do you know when Highland agreed not
17   to demand payment as described in that
18   sentence?
19       A.    I don't know specifically.
20       Q.    Do you know why Highland agreed not
21   to demand payment on HCMFA's notes until May
22   2021?
23       A.    Yes.
24       Q.    Why was that decision made?
25       A.    You know, well, it -- it -- that

Page 122

WATERHOUSE - 10-19-21

1              WATERHOUSE - 10-19-21
2  decision was made as to not put HCMFA into a
3  position where it didn't have sufficient assets
4  to pay for the demand note.
5      Q.  And at the time the agreement was
6  entered into, pursuant to which the partnership
7  wouldn't demand payment, did HCMFA have
8  insufficient assets to satisfy the notes if a
9  demand had been made?
10     MS. DANDENEAU: Objection to form.
11     A.  I don't have HCMFA's financial
12  statements in front of me as of 12/31/18.
13     Q.  Was there a concern that HCMFA would
14  be unable to satisfy its demands under the
15  notes if demand was made?
16     MS. DANDENEAU: Objection to form.
17     A.  Well, there is -- I don't recall --
18  I mean, there is something, right, in place to
19  basically not demand payment until May 31, 2021
20  as detailed here.
21     Q.  And who made the decision to enter
22  into -- who made the decision on behalf of
23  Highland not to demand payment until May 31st,
24  2021?
25     A.  I'm trying to remember.  I don't

Page 123

WATERHOUSE - 10-19-21

1  remember exactly -- I don't remember if it was
2  myself or -- or Jim Dondero who -- who -- there
3  was -- there was something signed, from what I
4  recall, that -- that -- that backed up this
5  line item in the -- in the notes I'm -- look,
6  I'm, I'm --
7     Q.  We will get to that.
8     A.  You --
9     Q.  I'm just --
10     A.  You have -- I mean --
11     Q.  We're going to give that to you.
12  I'm going to give that to you.
13     A.  You -- you -- you have all the
14  documents.  I don't have the documents, and
15  that is what makes it so hard.  I don't have
16  any documents to prepare for this deposition;
17  right?  You have all -- I don't -- I don't -- I
18  don't remember, but, you know, again, it would
19  probably be myself or Jim.
20     Q.  Do you know if Highland received
21  anything in return for its agreement not to
22  make a demand for two years?
23     A.  I don't -- I don't think it referred
24  anything.

Page 124

WATERHOUSE - 10-19-21

1     Q.  And did you and Mr. Dondero discuss
2  HCMFA's ability to satisfy the notes if a
3  demand was made at the time this agreement was
4  entered into?
5     MS. DANDENEAU: Objection to form.
6     A.  I don't -- I don't -- I don't recall
7  having a specific conversation, if I did, or --
8  or David Klos.
9     Q.  Okay.  I'm just asking if you recall
10  any conversations that you had.
11     A.  I don't recall.
12     Q.  Okay.  Do you know why Highland
13  loaned the money to HCMFA that is the subject
14  of the notes described in this paragraph?
15     A.  I don't remember specifically why
16  5.3 million was loaned.  I mean, I -- it would
17  have to be put in the context.
18     Q.  Do you have any recollection at all
19  as to why Highland ever loaned any money to
20  HCMFA?
21     A.  Yes.
22     MS. DANDENEAU: Objection to form.
23     Q.  What do you remember about that?
24     A.  There was a Highland Global

Page 125

WATERHOUSE - 10-19-21

1  Allocation Fund, which was a -- a fund managed
2  by Highland Capital Management Fund Advisors.
3  There was a -- we -- I'm just telling you,
4  there was -- there was -- there was a -- a
5  ultimately a NAV error found in this fund while
6  it was an open-ended fund and, you know, there
7  were amounts owed by the advisor in -- in
8  relation to that NAV error.
9     There were also, for the same fund,
10  that same fund was ongoing an
11  open-end-to-close-end conversion, and as part
12  of that proposal, shareholders who voted for
13  the conversion received compensation from the
14  advisor.
15     Q.  All right.  Now, the events that
16  you're describing occurred in the spring of
17  2019; right?
18     A.  These started back -- I think, I
19  mean --
20     Q.  I apologize.
21     A.  -- that -- I mean, the answer to
22  that is no.
23     Q.  I apologize, the loans that were
24  made in connection with the events that you're

Page 126

WATERHOUSE - 10-19-21

1  describing occurred in May 2019; right?
2  MR. RUKAVINA:  Objection to the
3  extent that calls for a legal conclusion.
4  A.  I don't recall specifically what
5  amounts of money were moved when, for what
6  purpose.
7  Q.  Okay.  Fair enough.  Going to the
8  next paragraph, do you recall that NexPoint
9  Advisors had obtained a number of loans from
10  Highland, and they rolled up those loans into
11  one note in approximately 2017?
12  A.  This is for NexPoint Advisors?
13  Q.  Yes.
14  A.  I – I mean, I don't – I don't
15  recall the NexPoint Advisors loan being a
16  roll-up loan, but –
17  Q.  Do you know why?
18  A.  But, look, if you have documents
19  that show – I mean, look, I just don't recall.
20  Q.  Okay.  That is fair.  Do you know
21  why – do you have any recollection as to why
22  Highland loaned money to NexPoint?
23  A.  Yes.
24  Q.  Why did High – why do you recall –

Page 127

WATERHOUSE - 10-19-21

1  what is the reason you recall Highland lending
2  money to NexPoint?
3  A.  I mean, I was just – I just – I
4  just recall.  I mean, I just – I don't
5  remember why.
6  Q.  I understand.  And I'm asking you if
7  you recall –
8  A.  Oh, why – I thought you say –
9  NexPoint Advisors was launching a fund which
10  is – I believe that the legal name is NexPoint
11  Capital, Inc.  And it – it provided a
12  co-invest into that fund.
13  And, from what I remember, the –
14  the – that NexPoint borrowed money from
15  Highland at the time to make that co-invest.
16  Q.  So this was an investment that
17  NexPoint was required to make; is that right?
18  MS. DANDENEAU:  Objection to form.
19  A.  I don't know if it was required to
20  make, I don't recall that, or if it just made
21  it.
22  Q.  Okay.  But your recollection is that
23  NexPoint made an investment and they borrowed
24  money from Highland to finance the investment.

Page 128

WATERHOUSE - 10-19-21

1  Do I have that right?
2  A.  Yes.
3  Q.  How about HCRE?  Do you know why
4  HCRE borrowed money from Highland?
5  A.  I don't remember specifically.
6  Q.  Do you remember generally?
7  A.  Generally, yeah – I mean, yes.
8  Q.  Can you tell me your general
9  recollection as to why Highland loaned money to
10  HCRE?
11  A.  For – for – for investment
12  purposes.
13  Q.  So HCRE made the investment and it
14  obtained a loan, or loans, from Highland in
15  order to finance that investment or those
16  investments.
17  Do I have that right?
18  A.  I mean, I – you know, generally.
19  Q.  Okay.  How about Highland Management
20  Services, Inc.?
21  Do you have any recollection as to
22  why HCMS borrowed money from Highland?
23  A.  Generally.
24  Q.  What is your general recollection as

Page 129

WATERHOUSE - 10-19-21

1  to why HCMS borrowed money from Highland?
2  A.  For – for investment purposes.
3  Q.  So it is the same thing, HCMS wanted
4  to make investments and it borrowed money from
5  Highland in order to finance those investments;
6  is that right?
7  A.  I mean, yes, generally.  I mean, I
8  can't – I don't – on the services, there –
9  there are several loans in these schedules.
10  You know, I can't remember why every single one
11  of these were made, but I would say, yeah, I
12  mean, generally.
13  Q.  Okay.  I appreciate that.
14  MR. MORRIS:  Let's go to the page
15  with Bates No. 251.  La Asia, are you
16  there?
17  MS. CANTY:  Sorry, John.  It went
18  out for a minute.  Can you say that again.
19  I don't know what is going on.
20  MR. MORRIS:  The page with Bates
21  No. 251, can we go to that.
22  MS. CANTY:  Yes, sorry.
23  MR. MORRIS:  Keep going to the
24  bottom.  Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1  
2  Q.  Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5  A.  I do.
6  Q.  And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10 that you disclosed subsequent events?
11 A.  I mean, it relates to it, but not in
12 its entirety.
13 Q.  Okay.
14 MR. MORRIS:  If we can scroll up to
15 capture the entirety of this section right
16 here.
17 Q.  And what do you mean by that, sir?
18 MR. MORRIS:  Yeah, right there.
19 Perfect.
20 A.  There are – there are different
21 subsequent events in – under GAAP.  So there
22 are – and – and – so what we see in the
23 notes to the financial statements are one type
24 of subevent.
25 Q.  Okay.  And – and would the type of

Page 131

WATERHOUSE - 10-19-21

1  
2  subsequent event relating to affiliate loans be
3  captured in this section if they were – if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6  A.  Yes, if they were deemed material or
7  disclosable.
8  Q.  Okay.  I appreciate that.
9  Do you see the next to the last
10 entry there?  It says, Over the course of 2019
11 through the report date, HCMFA issued
12 promissory notes to the partnership in the
13 aggregate amount of $7.4 million?
14 A.  Yes.
15 Q.  And does that refresh your
16 recollection that those are the notes that
17 related to the NAV error that you mentioned
18 earlier?
19 A.  I don't – I don't remember the
20 exact.  Again, there are – I mentioned two
21 line items; right?
22 Q.  Yes.
23 A.  I mean, it was the GAAP conversion
24 process plus the – the NAV error.  I don't
25 have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1  
2  if – you know, what – if that 7.4 million was
3  solely attributable to the NAV error.
4  Q.  Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9  A.  In the course of the audit, we would
10 have produced all promissory notes in our
11 possession, including the ones that are
12 detailed here.
13 Q.  Do you recall that you signed the
14 two promissory notes that are referenced in
15 that provision?
16 MS. DANDENEAU:  Objection to form.
17 A.  I didn't recall initially but I've
18 been reminded.
19 Q.  Okay.  And – and do you recall that
20 those notes are dated May 2nd and May 3rd,
21 2019?
22 A.  Yes.
23 Q.  So that was just a month before the
24 audit was completed; correct?
25 A.  Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1  
2  date, right, if – if my memory serves me
3  right.
4  Q.  Yes, I will represent to you that
5  your memory is accurate in that regard.
6  Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9  A.  So let me understand.  You're saying
10 when I was CFO at Highland Capital did anyone
11 ever ask me to correct the – over the course
12 of 2019 through the report date HCMFA issued
13 promissory notes, this statement?
14 Q.  Right.
15 A.  Not that I'm aware.
16 Q.  While you were the CFO of Highland,
17 did anybody ever tell you that sentence
18 was wrong?
19 A.  Not that I'm aware.
20 Q.  Highland – withdrawn.
21 HCMFA disclosed these notes in its
22 own audited financial statements; right?
23 MR. RUKAVINA:  Objection, form.
24 A.  I assume that these would be
25 material – if these are material financial

Page 134

WATERHOUSE - 10-19-21

1    statements, yes, they -- they -- they should be
2    and they were likely disclosed.
3
4        Q.    Now, there is no statement
5    concerning the 2019 notes about the forbearance
6    that we looked at in the affiliated note
7    section of the report; right?
8            MS. DANDENEAU:  Objection to form.
9        Q.    I'll withdraw.  That was bad.
10           Do you recall when we were looking
11   at the paragraph concerning HCMFA earlier it
12   had that disclosure about the agreement whereby
13   Highland wouldn't ask for demand on the -- on
14   the HCMFA notes?
15       A.    Yes.
16       Q.    That forbearance disclosure is not
17   made with respect to the 2019 notes; right?
18       A.    Not -- look, not that I can recall,
19   unless -- unless it was done at a subsequent
20   day.
21       Q.    Right.  And it is not in the
22   subsequent event section that we're looking at
23   right now where the 2019 notes are described;
24   right?
25       A.    Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1    June 3rd.  It could have been done on June 4th.
2    I don't -- I don't -- I don't recall.
3
4        Q.    Okay.
5            MR. MORRIS:  Can we put up on the
6    screen the HCMFA audit report.  And while
7    we're --
8            MS. DANDENEAU:  What exhibit is
9    this?
10           MR. MORRIS:  La Asia, what number is
11   that?
12           MS. CANTY:  45.
13           MR. MORRIS:  So this will be marked
14   as Exhibit 45.
15           (Exhibit 45 marked.)
16           MS. CANTY:  Yeah, and I will put it
17   in the chat.
18           MS. DANDENEAU:  Thank you.
19       Q.    Okay.  All right.  Do you see that
20   this is the consolidated financial statements
21   for HCMFA for the period ending 12/31/18?
22       A.    Yes.
23       Q.    As the treasurer of HCMFA at the
24   time, did you have to sign a management
25   representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1    we looked at earlier for Highland?
2        A.    I would imagine I would have been
3    asked to.  I don't recall if I did.
4        Q.    Do you recall ever being asked by an
5    auditor to sign a management representation
6    letter and then not doing it?
7        A.    No.
8            MR. MORRIS:  Can we just scroll down
9    again.  I just want to see the date of the
10   document.
11       A.    I mean, let me -- you know, there
12   are different versions to management
13   representation letters I will qualify.
14           Yes, there are certain -- from time
15   to time auditors can make representations
16   that -- in the rep letter that is being
17   proposed that are inaccurate or out of scope or
18   things like that and they've asked for
19   signature.
20           In that context, yes.  I mean, you
21   know -- I mean, if I have been asked to sign
22   and make those representations and those
23   representations are invalid, yes, I would not,
24   I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1        Q.    Okay.  PricewaterhouseCoopers served
2    as HCMFA's outside auditors as well; correct?
3        A.    Yes.
4        Q.    Do you see that this audit report is
5    signed on June 3rd, 2019, just like the
6    Highland audit report?
7        A.    That is correct.
8        Q.    And did the process of -- of
9    preparing HCMFA's audit report, was that the
10   same process that Highland followed when it did
11   its audit report at this time?
12       A.    I mean, it is a different entity.
13   There are different assets.  You know, it --
14   it -- it is -- as you saw, Highland's
15   financials are on a consolidated basis.  This
16   is different, so it is under the same control
17   environment and team.
18       Q.    Okay.  I appreciate that.  So the
19   same control environment and team participated
20   in the preparation of the audit for Highland
21   and for HCMFA at around the same time; correct?
22       A.    Yes.
23           MR. MORRIS:  Can we go to page 17 of
24   the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

1   Q.   Okay.  Do you see that just like
2   Highland's audited financial report, HCMFA's
3   audited financial report also has a section
4   related to subsequent events?
5   A.   Yes.
6   Q.   And am I reading this correctly that
7   just as Highland had done, HCMFA disclosed in
8   its audited financial report a subsequent event
9   that related to the issuance of promissory
10  notes to Highland in the aggregate amount of
11  $7.4 million in 2019?
12  A.   That is what I see in the report.
13  Q.   And you were the treasurer of HCMFA
14  at the time; right?
15  A.   Yes, to the best of my knowledge.
16  Q.   And did anybody ever tell you prior
17  to the time of the issuance of this audit
18  report that that sentence relating to HCMFA's
19  2019 notes was inaccurate or wrong in any way?
20  A.   Not that I recall.
21  Q.   As you sit here right now, has
22  anybody ever told you that that sentence is
23  inaccurate or wrong in any way?
24  A.   Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1   Q.   I apologize if I asked you this
2   already, but has anybody ever told you at any
3   time that you are not authorized to sign the
4   promissory notes that are the subject of the
5   sentence we're looking at?
6   A.   Not that I recall.
7   Q.   Did anybody ever tell you at any
8   time that you had made a mistake when you
9   signed the promissory notes that are the
10  subject of this sentence?
11  A.   Say that again.  Did anyone ever say
12  that I made a mistake?
13  Q.   Let me ask the question again.
14  Did anybody ever tell you at any
15  time that you made a mistake when you signed
16  the two promissory notes in Highland's favor on
17  behalf of HCMFA in 2019?
18  A.   Not that I recall.
19  MR. MORRIS:  Let's just look at the
20  promissory notes quickly.  Can we please
21  put up Document Number 1, and so this is in
22  the pile that y'all have.  We'll just go
23  for a few more minutes and we can take our
24  lunch break.

Page 140

WATERHOUSE - 10-19-21

1   Q.   All right.  So I don't know if you
2   have seen this before, sir.  Do you see that
3   this is a complaint against HCMFA?
4   A.   Yes, I am looking at it on the
5   screen.
6   Q.   Okay.  And have you ever seen this
7   document before?
8   A.   I went through some of these
9   documents with my counsel here yesterday.
10  MR. MORRIS:  All right.  Can we go
11  to Exhibit 1 of this document.
12  Q.   Do you see Exhibit 1 is a
13  $2.4 million promissory note back in 2019?
14  A.   Yeah, I found it in the book.  Yes,
15  I have it here in front of me.
16  Q.   And this is a demand note, right, if
17  you look at Paragraph 2?
18  A.   Yes.
19  Q.   And this is a note where the maker
20  is HCMFA, and Highland is the payee; right?
21  A.   Yes.
22  MR. MORRIS:  And if we can scroll
23  down, can we just see Mr. Waterhouse's
24  signature.

Page 141

WATERHOUSE - 10-19-21

1   Q.   Is that your signature, sir?
2   A.   Yes, it is.
3   Q.   And did you sign this document on or
4   around May 2nd, 2019?
5   A.   I don't recall specifically signing
6   this, but this is my signature.
7   Q.   Okay.  And do you recall that
8   Highland transferred $2.4 million to HCMFA at
9   or around the time you signed this document?
10  A.   I don't recall specifically.  I
11  would want to, as I sit here today, go back and
12  confirm that, but again, presumably that –
13  that – that did happen.
14  Q.   You wouldn't have signed this
15  document if you didn't believe that HCMFA
16  either received or was going to receive
17  $2.4 million from Highland; is that fair?
18  A.   I mean, it – if – if – if there
19  wasn't a transfer of value, yeah, I mean, you
20  know, I would have no reason to – to sign a
21  note.
22  Q.   And – and Highland wouldn't have
23  given this note to PricewaterhouseCoopers if –
24  withdrawn.

Page 142

WATERHOUSE - 10-19-21

1
2    HCMFA wouldn't have given this note
3    to PricewaterhouseCoopers if it hadn't received
4    the principal value of -- of the note in the
5    form of a loan; correct?
6        MR. RUKAVINA:  Objection, legal
7        conclusion, speculation and form.
8    A.    Again, we -- what we provided to PwC
9    were, as part of the audit, any promissory
10   notes executed and outstanding.  You know, as a
11   part of the audit, they, you know, they -- they
12   have copies of all the bank statements,
13   things -- things of that sort.
14       MR. MORRIS:  Okay.  Can we go to
15       Exhibit 2.
16       (Exhibit 2 marked.)
17   Q.    Do you see that this is a promissory
18   note dated May 3rd, 2019 in the amount of
19   $5 million?
20   A.    Yes.
21   Q.    Do you believe this is also a demand
22   note if you look at Paragraph 2?
23   A.    Yes.
24   Q.    And do you see that HCMFA is the
25   maker, and Highland is the payee?

Page 143

WATERHOUSE - 10-19-21

1
2    A.    Yes.
3    Q.    And if we go to the bottom, can we
4    just confirm that that is your signature?
5    A.    Yes.
6    Q.    And together these notes are the
7    notes that are referred to both in Highland and
8    HCMFA's audited financial reports in the
9    subsequent event sections; correct?
10       MS. DANDENEAU:  Objection to form.
11   A.    They -- they -- they totaled
12   $7.4 million, so presumably, yes.
13   Q.    Okay.  And you were authorized to
14   sign these two notes; correct?
15       MR. RUKAVINA:  Objection, legal
16       conclusion.
17   A.    Yeah.  I mean, I'm -- I was the
18   officer of -- of HCMFA.  You know, I -- I'm not
19   the legal expert on -- on what that -- what
20   that confers to me or what it doesn't.  I mean,
21   that is my signature on the notes.
22   Q.    And you believed you were authorized
23   to sign the notes; is that fair?
24   A.    I signed a lot of documents in my
25   capacity, just because it is operational in

Page 144

WATERHOUSE - 10-19-21

1    nature.  So, you know, to me this was just
2    another document, to be perfectly honest.
3    Q.    Sir, would you have signed
4    promissory notes with the principal amount of
5    $7.4 million if you didn't believe you were
6    authorized to do so?
7        MS. DANDENEAU:  Objection to form.
8    Q.    Are you frozen?
9    A.    No.  I'm just -- you know, it is --
10   you know, again, I typically don't sign
11   promissory notes, and I don't recall why I
12   signed these, but -- you know, but I did.
13   Q.    All right.  So listen carefully to
14   my question.  Would you have signed
15   promissory notes with a face amount of
16   $7.4 million without believing that you were
17   authorized to do so?
18   A.    No.  I mean, I'm -- I'm putting my
19   signature on there, so no.
20   Q.    Okay.  And would you have signed two
21   promissory notes obligating HCMFA to pay
22   Highland $7.4 million without Mr. Dondero's
23   prior knowledge and approval?
24       MS. DEITSCH-PEREZ:  Object to the

Page 145

WATERHOUSE - 10-19-21

1
2    form.
3    A.    You know, from -- from what I recall
4    around these notes, you know, I don't recall
5    specifically Mr. -- Mr. Dondero saying to -- to
6    make this a loan.
7        So my conversation with Mr. Dondero
8    around the culmination of the NAV error as
9    related to TerreStar which was a -- a -- I
10   think it was a year and a half process.  I
11   don't know, it was a multi-month process, very
12   laborious, very difficult.
13       When we got to the end, I had a
14   conversation with Mr. Dondero on where to, you
15   know, basically get the funds to reimburse the
16   fund, and I recall him saying, get the money
17   from Highland.
18   Q.    And so he told you to get the money
19   from Highland; is that right?
20   A.    That is what I recall -- in my
21   conversation with him, that is -- that is what
22   I can recall.
23   Q.    Do you know who drafted these notes?
24   A.    I don't.
25   Q.    Did you ask somebody to draft the

Page 146

WATERHOUSE - 10-19-21

2 notes?

3     A.   I didn't ask -- I don't specifically

4 ask people to draft notes really. I mean,

5 again, you know, the legal group at Highland is

6 responsible and has always been responsible for

7 drafting promissory notes.

8     Q.   So based on your -- based on the

9 practice, you believe that somebody from the

10 Highland's legal department would have drafted

11 these notes. Do I have that right?

12     MS. DEITSCH-PEREZ: Object to the

13     form. John, I also asked you for the Word

14     versions of these notes so we could look at

15     the properties, and you have not provided

16     them. Are you intending to?

17     MR. MORRIS: No.

18     Q.   Can you answer my question, sir?

19     A.   Again, I --

20     MS. DANDENEAU: Do you want him to

21     repeat it?

22     A.   Yeah, why don't you repeat it?

23     Q.   Sure. Mr. Waterhouse, based on the

24 practice that you have described in your

25 understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

2 would have been drafted by somebody in the

3 legal department?

4     MS. DEITSCH-PEREZ: Object to the

5     form.

6     A.   Yes.

7     Q.   Okay. And do you know who would

8 have instructed -- do you have any knowledge as

9 to who would have instructed the legal

10 department to draft these notes?

11     MS. DEITSCH-PEREZ: Object to the

12     form.

13     A.   It was whoever was working -- I

14 mean, it was likely someone on the team. I

15 mean, I don't remember exactly on every note or

16 every document, but, again, a lot of these

17 things of this nature -- they're operational in

18 nature -- were handled by the team.

19     The team knows to -- I mean, we

20 don't draft documents. We're not lawyers.

21 We're not attorneys. It is not what I do or

22 accountants do.

23     So they are always instructed to go

24 and -- and go to the legal team to get

25 documents like this drafted. Also, when you go

Page 148

WATERHOUSE - 10-19-21

2 to the legal team, the -- you know, we always

3 loop in compliance. And compliance -- when you

4 go to the legal team, compliance is part of

5 legal team. They're made aware of -- of -- of

6 these types of transactions.

7     Q.   And do you believe that you had

8 the -- withdrawn.

9     Did you ever tell Mr. Dondero --

10 (inaudible) -- did you see those?

11     A.   Sorry.

12     MS. DEITSCH-PEREZ: I did not hear

13     the end of that question.

14     Q.   Did you ever tell Mr. Dondero that

15 you signed these two notes?

16     A.   I don't recall ever -- no, I don't

17 recall having a conversation with him.

18     Q.   Did you ever discuss these two notes

19 with him at any time?

20     A.   The conversation, I recall, was what

21 I described earlier. And that is the only time

22 I recall ever discussing this.

23     Q.   Okay. But the corporate accounting

24 group had a copy of this -- of these two notes.

25 And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

2 corporate accounting group gave the two notes

3 to PricewaterhouseCoopers in connection with

4 the audit; correct?

5     MS. DANDENEAU: Objection to form.

6     A.   Yes. I mean, that is -- yeah, I

7 mean, they -- unless the legal team can also

8 retain copies of items like this. I mean, I

9 don't know everything that they would retain as

10 well.

11     The legal team would also, if they

12 had documents as part of audits, turn that over

13 to the auditors as well. So it could have been

14 the corporate accounting team. It could be

15 someone on the legal team.

16     Q.   All right. So you didn't -- you

17 didn't draft this note; right?

18     A.   I -- I -- I did not.

19     Q.   But somebody at Highland did; is

20 that fair?

21     MS. DEITSCH-PEREZ: Object to the

22     form.

23     A.   I don't know. I mean, we can go to

24 the legal team. I don't -- I'm not sitting

25 behind someone in legal. Maybe they went to

Page 150

WATERHOUSE - 10-19-21

1 outside counsel. I have no idea.

2 Q. Did you have any reason to believe

3 you weren't authorized to sign this note,

4 either of these two notes?

5 A. I think I have already answered that

6 question.

7 Q. Okay. You didn't give these notes

8 to PricewaterhouseCoopers; correct?

9 MS. DANDENEAU: Objection to form.

10 A. I don't recall giving these to

11 PricewaterhouseCoopers.

12 Q. And in the practice that you have

13 described, somebody in the corporate accounting

14 group would have given these two notes to

15 PricewaterhouseCoopers; correct?

16 MS. DANDENEAU: Objection to form.

17 A. I think I've answered that. I said

18 either the corporate accounting team or maybe

19 the legal team.

20 MR. MORRIS: Okay. Why don't we

21 take our lunch break here.

22 VIDEOGRAPHER: We're going off the

23 record at 1:04 p.m.

24 (Recess taken 1:04 p.m. to 1:49 p.m.)

Page 151

WATERHOUSE - 10-19-21

1 VIDEOGRAPHER: We are back on the

2 record at 1:49 p.m.

3 Q. Mr. Waterhouse, did you speak with

4 anybody during the break about the substance of

5 this deposition?

6 A. I spoke to -- to Deb and Michelle.

7 Q. About the substance of the

8 deposition?

9 A. Yes.

10 Q. Can you tell me what you talked

11 about?

12 MS. DANDENEAU: No. We object on

13 the basis of privilege.

14 Q. Okay. You are going to follow your

15 counsel's objection here?

16 A. Yes.

17 Q. Okay.

18 MR. MORRIS: Can we put up on the

19 screen Exhibit 35.

20 (Exhibit 35 marked.)

21 Q. Are you able to see that document,

22 sir?

23 A. Yes.

24 Q. Have you ever seen an incumbency

Page 152

WATERHOUSE - 10-19-21

1 certificate before?

2 A. I have.

3 Q. Do you have a general understanding

4 of what an incumbency certificate is?

5 A. I have a general understanding.

6 Q. What is your general understanding?

7 A. You know, those -- my general

8 understanding is that the incumbency

9 certificate basically lists folks that can --

10 are like authorized signers.

11 Q. Okay. And do you see that this is

12 an incumbency certificate for Highland Capital

13 Management Fund Advisors, L.P.?

14 A. Yes.

15 Q. Okay. And if we could scroll down

16 just a little bit, do you see that it's dated

17 effective as of April 11th, 2019?

18 A. Yes, I see that.

19 Q. Okay. And is that your signature in

20 the middle of the signature block?

21 A. Yes, it is.

22 Q. And by signing it, did you accept

23 appointment as the treasurer of HCMFA effective

24 as of April 11th, 2019?

Page 153

WATERHOUSE - 10-19-21

1 A. Again, I'm not the legal -- I don't

2 know if this makes me the treasurer or the

3 appointment. I don't know -- I don't know

4 that, so I don't -- I don't know if that

5 document -- again, I think -- again, I'm not

6 the legal expert. I think isn't there --

7 aren't there other legal documents that detail

8 who the officers are that could be incorporated

9 or things like that? Again, I don't want to

10 play armchair attorney here.

11 Q. I'm not asking you for a legal

12 conclusion. I'm asking you for your knowledge

13 and understanding. When you signed this

14 document, did you understand that you were

15 accepting an appointment as the treasurer of

16 HCMFA?

17 MS. DANDENEAU: Objection to form.

18 MS. DEITSCH-PEREZ: Objection, form.

19 A. Again, I don't think this -- that

20 wasn't my understanding. I don't think this

21 makes -- this document makes me the treasurer.

22 Q. What do you think this document --

23 why did you sign this document?

24 MS. DEITSCH-PEREZ: Objection to

Page 154

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    form.
3        MR. MORRIS:  You're objecting to the
4    form of the question when I asked him why
5    did you sign the document?  What is the
6    basis for the objection?
7        MS. DEITSCH-PEREZ:  Because, John, I
8    think that it does call for a legal
9    conclusion other than -- with him saying
10   because somebody told me to sign this
11   document.  But if you want to go there,
12   that is fine.
13       MR. MORRIS:  Okay.
14       MS. DANDENEAU:  I don't think --
15   he's already said he's not a lawyer.
16       MR. MORRIS:  I'll allow the witness
17   to answer this question.
18   Q.   Why did you sign this document, sir?
19   A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time.  I have no idea why they're being
22   updated, and I was asked to sign.
23   Q.   Did you ask anybody, what is this
24   document?
25   A.   No.

Page 155

1    WATERHOUSE - 10-19-21
2    Q.   Did anybody tell you why they needed
3    you to sign the document?
4    A.   Not that I can recall.
5    Q.   You testified earlier that you
6    understood that you served as the acting
7    treasurer for HCMFA; correct?
8    A.   Yes.
9    Q.   How did you become the acting
10   treasurer of HCMFA?
11       MS. DANDENEAU:  Objection to form.
12   A.   I don't -- I don't know the legal --
13   I don't know the legal mechanic of how I became
14   the acting treasurer.
15   Q.   I'm not asking for the legal
16   mechanic.  I'm asking you as the person who
17   is --
18       MS. DANDENEAU:  John, you said --
19       MR. MORRIS:  Stop.
20       MS. DANDENEAU:  -- how did you
21   become the treasurer.  That is --
22       MR. MORRIS:  Please stop.
23       MS. DANDENEAU:  That is a legal
24   question.
25       MR. MORRIS:  I am not asking any

Page 156

1    WATERHOUSE - 10-19-21
2    legal questions, to be clear.  I'm asking
3    for this witness' understanding as to how
4    he became the acting treasurer of HCMFA.
5    If he doesn't know, he can say he doesn't
6    know, but this legal stuff is nonsense, and
7    I really object to it.
8    Q.   Sir, I'm asking you a very simple
9    question.
10       MS. DANDENEAU:  Argumentative.
11   Q.   You testified -- you testified that
12   you became the acting treasurer of HCM --
13   HCMFA; correct?
14   A.   Yes.
15   Q.   How did that happen?
16       MS. DANDENEAU:  Again, object to
17   form.
18       MR. MORRIS:  I can't wait to do this
19   in a courtroom.  Good God.
20   Q.   Go ahead, sir.
21   A.   I don't know the exact process of
22   how that happened.
23   Q.   Do you have any idea whether signing
24   this document was part of the process?
25       MR. MORRIS:  You know what --

Page 157

1    WATERHOUSE - 10-19-21
2        MS. DANDENEAU:  Objection.
3        MR. MORRIS:  -- withdrawn.  You guys
4    want to do this, I can't wait.  I can't
5    wait.  This is the craziest stuff ever.
6        MS. DANDENEAU:  John, he said he's
7    not a lawyer, and you are asking him for a
8    legal conclusion, and he says he doesn't
9    know, and you persist.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  So you can ask these
12   questions --
13       MR. MORRIS:  Did anyone -- please
14   stop talking.
15       MS. DANDENEAU:  -- at another
16   point -- no, no, no, I'm entitled to talk,
17   too; right?  If you're going to make these
18   accusations as if we're trying to stonewall
19   you, this is not the witness to ask that
20   question.
21       MR. MORRIS:  I can't -- I can't
22   wait -- I can't wait to do this in a
23   courtroom.  I will just leave it at that.
24       MS. DANDENEAU:  That's right, I'm
25   sure you can't.

| Page 158 | Page 159 |
|---|---|
| WATERHOUSE - 10-19-21 | WATERHOUSE - 10-19-21 |

Page 158

1    WATERHOUSE - 10-19-21
2       Q.   Did anyone ever tell you, sir, that
3    even though you were the acting treasurer of
4    HCMFA, that you were not authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7       A.   I'm not sure I understand the
8    question.  I wasn't -- I mean, I'm -- I'm the
9    current acting treasurer.
10      Q.   Did anybody ever tell you at any
11   time that even though you were the acting
12   treasurer of HCMFA, that you were not
13   authorized to sign the two promissory notes
14   that we looked at before lunch?
15      MS. DANDENEAU:  Objection to form.
16      A.   Not that I recall.
17      Q.   Did anybody ever tell you at any
18   time that you were not authorized to sign the
19   two promissory notes that we looked at before
20   lunch?
21      A.   Not that I recall.
22      Q.   Did anybody ever tell you at any
23   time that you should not have signed the two
24   promissory notes that we looked at before
25   lunch?

Page 159

1    WATERHOUSE - 10-19-21
2       A.   Not that I recall.
3       Q.   Did you ever tell anybody at any
4    time that you weren't authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7       A.   Not that I recall.
8       Q.   Did you ever tell anybody at any
9    time that you made a mistake when you signed
10   the two promissory notes that we looked at
11   before lunch?
12      A.   Not that I recall.
13      Q.   As you sit here right now, do you
14   have any reason to believe that you were not
15   authorized to sign the two documents that we
16   looked at before lunch?
17      MS. DANDENEAU:  Objection to form.
18      A.   If -- if this is the -- the valid
19   incumbency certificate, I mean, this does --
20   this does detail who the signers are.
21      Q.   Okay.  And looking at that document,
22   does that give you comfort that you were
23   authorized to sign the two promissory notes
24   that we looked at before lunch?
25      MS. DEITSCH-PEREZ:  Object to the

Page 160

1    WATERHOUSE - 10-19-21
2    form.
3       MS. DANDENEAU:  Objection, form.
4       A.   Yes.
5       Q.   As of October 20th -- withdrawn.
6       I'm trying to take your mind back to
7    a year ago, October 2020.  Do you recall at
8    that time that the boards of the retail funds
9    were making inquiries about obligations that
10   were owed by the advisors to Highland in
11   connection with their 15(c) review?
12      MS. DANDENEAU:  Objection to form.
13      A.   I don't -- I don't recall.
14      Q.   As of October 2020, you had no
15   reason to believe you weren't authorized to
16   sign the two promissory notes that we just
17   looked at; correct?
18      MS. DANDENEAU:  Objection, form.
19      MS. DEITSCH-PEREZ:  Objection to
20   form.
21      A.   I didn't think about it in October
22   of 2020, but I mean --
23      Q.   Did you have any reason to believe
24   at that time that you weren't authorized to
25   sign the two notes that we just looked at?

Page 161

1    WATERHOUSE - 10-19-21
2       A.   Not that I'm aware, no.
3       Q.   Did you have any reason to believe a
4    year ago that you made a mistake when you
5    signed those two notes?
6       A.   Not that I'm aware.
7       Q.   A year ago you believed that HCMFA
8    owed Highland the unpaid principal amounts that
9    were due under those two notes; correct?
10      A.   They're -- they're promissory notes
11   that were -- as you presented, that were --
12   that were executed.  Whether they're valid or
13   if there's other reasons, I didn't -- I don't
14   know.
15      Q.   I'm not asking you whether they're
16   valid or not.  I'm asking you for your state of
17   mind.  A year ago you believed that HCMFA
18   was -- was obligated to pay the unpaid
19   principal amount under the two notes that you
20   signed; correct?
21      A.   Yeah, I'm -- I'm -- yes.
22      Q.   Thank you.  Are you aware -- you're
23   aware that -- that in 2017, NexPoint issued a
24   note in favor of Highland in the approximate
25   amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

2   A.   I'm – I'm – I'm generally aware.

3   Q.   Okay.  And are you generally aware

4  that from time to time, after the note was

5  issued by NexPoint, that moneys were applied to

6  principal and interest that were due under the

7  NexPoint note?

8   A.   Yes, I'm generally aware.

9   Q.   Okay.  And did anybody ever tell you

10  that the payments that were made against the

11  NexPoint notes were made by mistake?

12   A.   Yes.

13   Q.   And is it the one payment that we

14  talked about earlier today?

15   A.   We talked about a lot of things

16  today.  What payment are we talking about?

17   Q.   Okay.  Who told you that any payment

18  made against the NexPoint note was made by

19  mistake?

20   A.   D.C. Sauter.

21   Q.   When did Mr. Sauter tell you that?

22   A.   I don't – I don't remember

23  specifically.

24   Q.   Do you remember what payments –

25   A.   Sometime – sometime this year.

Page 163

WATERHOUSE - 10-19-21

2   Q.   Sometime in 2021?

3   A.   Yes.

4   Q.   Do you remember what payment he was

5  referring to?

6   A.   It was the – the payment made in

7  January of 2021 or – yeah, January of – of

8  this – January of 2021.

9   Q.   Okay.  So did anybody ever tell you

10  at any time that any payment that was made

11  against principal –

12   A.   And – and – and – hold on, and it

13  may have been other – again, it may have been

14  that payment or – or there may have been what

15  he was explaining, a misapplication of prior

16  payments as well.

17   Q.   Can you – can you give me any

18  specificity – withdrawn.

19       Withdrawn.  Can you tell me

20  everything that Mr. Sauter told you about –

21  about errors in relation to payments made

22  against principal and interest due under the

23  NexPoint note?

24       MS. DANDENEAU:  Can I just –

25       MR. RUKAVINA:  Hold on.  Hold on.

Page 164

WATERHOUSE - 10-19-21

2  I'm going to object here, and I'm going to

3  instruct the witness not to answer

4  depending on the discussion that you had –

5  Mr. Waterhouse, I'm the lawyer for

6  NexPoint, and as everyone here knows, D.C.

7  Sauter is in-house counsel.

8       So if you and Mr. Sauter were having

9  a factual discussion and him preparing his

10  affidavit, et cetera, then go ahead and

11  answer that.  But if you were having a

12  discussion as to our legal strategy in this

13  lawsuit, or anything having to do with

14  that, then do not answer that.

15       And if you need to talk to either

16  your counsel or me about that, then we need

17  to have that discussion now.

18   A.   Okay.  Yeah, I don't – I don't

19  really know how to make that distinction, so

20  maybe I need to talk to counsel before I

21  answer, or if I can answer.

22   Q.   Let me just ask you this question:

23  Did – did you have any conversation with

24  Mr. Sauter about any payment of principal and

25  interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

2  Highland's employment, or did it happen after

3  you left Highland's employment?

4   A.   I don't – I don't recall if – I

5  don't recall.  I mean, it was sometime in 2021.

6  I don't remember if it was before or after I

7  was let go from Highland.

8   Q.   Okay.  So – so nobody told you

9  prior to 2021 that any error or mistake was

10  made in the application of payments against

11  principal and interest due on the NexPoint

12  note.  Do I have that right?

13   A.   Yeah, I don't – I don't recall this

14  being in 2020.

15   Q.   Okay.  And it didn't happen in 2019;

16  correct?

17   A.   I don't recall that happened.

18   Q.   And it didn't happen in 2018;

19  correct?

20   A.   I don't – I don't recall that

21  happening.

22   Q.   And it didn't happen in 2017;

23  correct?

24   A.   I don't recall.

25   Q.   But – but you believe the

Page 166

WATERHOUSE - 10-19-21

1 conversation took place in 2021. You just
2 don't remember if it was before or after you
3 left Highland's employment. Do I have that
4 right?
5    A.   It was sometime this year. I
6 don't -- I don't remember.
7    Q.   Okay. Did you report this
8 conversation to Mr. Seery at any point?
9    A.   I don't believe so.
10    Q.   Did you report this conversation to
11 anybody at DSI at any time?
12    A.   I don't recall.
13    Q.   Do you have -- you don't have a
14 recollection of ever doing that; correct?
15    A.   Yeah, that's right. I don't recall
16 doing that.
17    Q.   Do you recall telling anybody at
18 Pachulski Stang about the conversation you
19 recall with Mr. Sauter?
20    A.   No, I don't -- I don't recall.
21    Q.   Did you tell any of the independent
22 board members about your conversation with
23 Mr. Sauter?
24    A.   I don't recall.

Page 167

WATERHOUSE - 10-19-21

1    Q.   Did you tell any of the employees at
2 Highland before you left Highland's employment
3 about this call that you had with Mr. Sauter?
4    MS. DANDENEAU:   Objection to form.
5    A.   No, I don't -- no, I don't recall.
6    Q.   NexPoint -- to the best of your
7 knowledge, did NexPoint ever file a proof of
8 claim against Highland to try to recover moneys
9 that were mistakenly paid against the principal
10 and interest due under the note?
11    A.   Okay. Hold on. You are saying did
12 NexPoint Advisors file a proof of claim to
13 Highland for errors related to payments under
14 the NexPoint note to Highland?
15    Q.   Correct.
16    A.   I'm -- I'm -- I'm not -- I'm not
17 aware.
18    Q.   Are you aware --
19    A.   I'm not the legal person here, I
20 don't know.
21    Q.   I'm just asking for your knowledge,
22 sir.
23    A.   Yeah, I don't know. I'm not aware.
24    Q.   Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1 kind that NexPoint has ever made to try to
2 recover the amounts that it contends were -- or
3 that Mr. Sauter contend were mistakenly applied
4 against principal and interest due under the
5 NexPoint note?
6    A.   I'm not aware.
7    MS. DANDENEAU:   Objection to form.
8    Q.   Okay. The advisors' agreements with
9 the retail funds are subject to annual renewal;
10 correct?
11    A.   Yes.
12    Q.   And do you participate in the
13 renewal process each year?
14    A.   Yes.
15    Q.   What role do you play in the renewal
16 process?
17    A.   I'm -- I'm asked by the retail board
18 to walk-through the advisors financials.
19    Q.   And do you do that in the context of
20 a board meeting?
21    A.   Yes, it is -- yes, it is typically
22 done in a board meeting.
23    Q.   And do you recall the time --
24 does -- does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1 the same time each year?
2    A.   Yes, it is -- it is around the same
3 time every year.
4    Q.   And what -- what time period of the
5 year does the renewal process occur?
6    A.   Approximately the September
7 timeframe.
8    Q.   During that process, in your
9 experience, does the board typically conduct
10 its own diligence and ask for information?
11    A.   Does the board ask for lots of -- I
12 mean, just -- I mean, lots of information as a
13 part of that -- that -- as part of that board
14 meeting and that process.
15    Q.   Okay. And do you recall that the
16 process in 2020 spilled into October?
17    A.   Yes. Yes.
18    Q.   Okay. And as part of the process in
19 2020, the retail board asked -- asked what are
20 referred to as 15(c) questions; right?
21    A.   I guess I don't want to be -- they
22 asked 15(c) -- are you saying they asked 15(c)
23 questions and this is why it went into October
24 or --

Page 170

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21

2    Q.   No, I apologize.

3       Do you have an understanding of

4  what -- of what 15(c) refers to in the context

5  of the annual renewal process?

6    A.   Yes, generally.

7    Q.   All right.  What is your general

8  understanding of the term "15(c)" in the

9  context of the annual renewal process?

10    A.   I -- I think 15(c) is the section

11  that -- that -- you know, that -- that the

12  board has to evaluate every year, the retail

13  board.  They have to, you know, go through,

14  evaluate, and go through that approval process

15  on a yearly basis.

16    Q.   Okay.

17       MR. MORRIS:  Can we put up on the

18  screen Exhibit 36, please.

19       (Exhibit 36 marked.)

20       MR. MORRIS:  I guess let's just

21  start at the bottom so Mr. Waterhouse can

22  see what is here.

23    Q.   You see this begins with an email

24  from Blank Rome to a number of people.

25       MR. MORRIS:  And if we can scroll

Page 171

WATERHOUSE - 10-19-21

1  up -- keep going just a little bit.

2    Q.   You will see that there is an email

3  from Lauren Thedford to Thomas Surgent and

4  others where she reports that she was attaching

5  and reproducing below additional 15(c)

6  follow-up questions from the board.

7       Do you see that?

8    A.   Yes.

9    Q.   And do you see Question No. 2 asks

10  whether there are any material outstanding

11  amounts currently payable or due in the future

12  (e.g., notes) to HCMLP by HCMFA or NexPoint

13  Advisors or any other affiliate that provides

14  services to the funds?

15       Do you see that?

16    A.   Yes.

17    Q.   And -- and did you -- do you recall

18  that in -- in October of 2020 the retail boards

19  were asking for that information?

20    A.   I don't recall it, but there --

21  they're obviously asking in this email.

22    Q.   Okay.

23       MR. MORRIS:  Can we scroll up a

24  little bit, please.

Page 172

WATERHOUSE - 10-19-21

1    Q.   And then do you see that

2  Ms. Thedford includes you on the email string

3  on Tuesday, October 6th, at 5:52?

4    A.   Yes.

5    Q.   And she asks you and Dave Klos and

6  Kristin Hendrix for advice on that particular

7  Request No. 2 that I have just read; right?

8    A.   Yes.

9    Q.   Okay.  Can you tell me who

10  Ms. Thedford is?

11    A.   She was an attorney that was in the

12  legal group.

13    Q.   At Highland Capital Management,

14  L.P.?

15    A.   I'm -- I'm -- I'm -- I don't

16  remember if she was an employee of Highland or

17  any of the advisors.

18    Q.   Do you know if she served as

19  the corporate secretary for both HCMFA and

20  NexPoint?

21    A.   Yes.

22    Q.   And -- okay.

23       Do you know whether Ms. Thedford

24  held any positions in relation to the retail

Page 173

WATERHOUSE - 10-19-21

1  funds as we defined that term?

2    A.   Yes.

3    Q.   What is your understanding of the

4  positions that Ms. Thedford held at the retail

5  funds?

6    A.   I -- I recall her being an officer.

7  I don't recall her title.

8    Q.   Okay.  Is still an officer at

9  any of the retail funds today?

10    A.   No.

11    Q.   Do you know when she ceased to be an

12  officer of the retail funds?

13    A.   Approximately.

14    Q.   And when did she approximately cease

15  to be an officer of the retail funds?

16    A.   It was in -- it was in early of

17  2021.

18    Q.   Okay.  Do you know when she became

19  an officer of the retail funds?

20    A.   I don't recall.

21    Q.   To the best of your recollection,

22  was she an officer of the retail funds in

23  October of 2020?

24    A.   I believe so.

Page 174

WATERHOUSE - 10-19-21

2  Q.  Okay.  Do you know what title she
3  held in her capacity as an officer, if any?
4  A.  I told you I don't remember.
5  Q.  Okay.  So she sends this email to
6  you at 5:52 p.m. on October 6th.
7  And if we can scroll up to the
8  response, you responded a minute later with a
9  one-word answer:  Yes.
10  Do you see that?
11  A.  Yes.
12  Q.  And -- and yes is -- yes was in
13  response to the retail board's Question No. 2,
14  right, whether there are any material
15  outstanding amounts currently payable or due in
16  the future?
17  A.  Yes.
18  MR. MORRIS:  And can we scroll up to
19  see what happened next.
20  Q.  So Ms. Thedford writes back to you a
21  few minutes later and she asks whether you
22  could provide the amounts.
23  Do you see that?
24  A.  Yes.
25  Q.  And then you respond further and you

Page 175

WATERHOUSE - 10-19-21

2  refer her to the balance sheet that was
3  provided to the board as part of the 15(c)
4  materials.
5  Do you see that?
6  A.  Yes.
7  Q.  And -- and did the advisors provide
8  to the board certain balance sheets in 2020 in
9  connection with the 15(c) review?
10  A.  Yes, they did.
11  Q.  Okay.  And were the amounts that
12  were outstanding or that were to be due in the
13  future by the advisors to Highland included in
14  the liability section of the balance sheet that
15  was given to the retail board?
16  A.  Yes.  Notes would be reflected as
17  liabilities.
18  Q.  Okay.  And --
19  A.  If I'm understanding your question
20  correctly.
21  Q.  You are.  And -- and -- and those
22  liabilities you -- you were -- you believed
23  were responsive to the retail board's question;
24  correct?
25  A.  Yes.

Page 176

WATERHOUSE - 10-19-21

2  Q.  Okay.  And then if we can scroll up,
3  you see Ms. Thedford responds to you
4  nine minutes later with a draft response.
5  Do you see that?
6  A.  Yes.
7  Q.  And she says that she is taking from
8  the 6/30 financials certain information about
9  amounts that were due to HCMLP and affiliates
10  as of June 30th, 2020.
11  Do you see that?
12  A.  I do.
13  Q.  Okay.  And did you believe, as the
14  treasurer of NexPoint and HCMFA and as the CFO
15  of Highland, that the information that
16  Ms. Thedford obtained from the 6/30 financials
17  was accurate and responsive in relation to the
18  retail fund board's question?
19  A.  I just want to make sure I
20  understand the question.
21  Are you saying that the financial
22  information provided to the retail board as
23  part of the 15(c) process, which included
24  financial statements as of June 30th of 2021,
25  did I feel like those were responsive to their

Page 177

WATERHOUSE - 10-19-21

2  questions?
3  Q.  Yes.
4  A.  Yes.
5  Q.  Thank you.
6  MS. DEITSCH-PEREZ:  John, it is not
7  in the chat yet.  Can you just make sure it
8  gets put in there.
9  MR. MORRIS:  Sure.
10  MS. CANTY:  I put it in there.  I
11  think maybe I just sent it directly, so let
12  me make sure it says to everyone.  But I
13  did put it in there.  I will try again.
14  MR. MORRIS:  Thank you, La Asia.
15  MS. DANDENEAU:  What number is it?
16  MR. MORRIS:  What, the Bates number?
17  MS. DEITSCH-PEREZ:  No, the --
18  this -- yeah, 36 is not in the chat.
19  MR. MORRIS:  Okay.  We'll get it.
20  MS. DANDENEAU:  I think that
21  Ms. Canty just sent it to me originally.
22  Sorry.
23  MR. MORRIS:  Okay.  We will get it
24  there.
25  MS. CANTY:  Okay.  It is there now

Page 178

WATERHOUSE - 10-19-21

1    for everyone.
2        MS. DEITSCH-PEREZ:  Got it.  Thank
3    you.
4        Q.   Do you recall if the proposed
5    response that Ms. Thedford crafted was
6    delivered to the retail board with the -- with
7    the yellow dates having been completed?
8        A.   I don't know.
9        MR. MORRIS:  Davor, I'm going to ask
10       that the advisors and -- the advisors of
11       both HCMFA and NexPoint produce to me any
12       report that was given to the retail board
13       concerning the promissory notes at issue,
14       including the obligations under the notes.
15       Q.   Do you know -- do you know if
16   ultimately NexPoint informed the retail board
17   in response to its question that NexPoint owed
18   Highland approximately 23 or $24 million?
19       MS. DANDENEAU:  Objection to the
20       form.
21       A.   Sorry, are you asking, did NexPoint
22   tell the retail board that it owed Highland?
23       Q.   Let me ask a better question,
24   Mr. Waterhouse.

Page 179

WATERHOUSE - 10-19-21

1        Did -- do you know if anybody ever
2    answered the retail board's question that was
3    Number 2?
4        A.   I don't -- I can't say for sure.
5        Q.   Okay.  Do you recall -- I think you
6    testified earlier that you walked through the
7    advisors' financials with the retail board;
8    correct?
9        A.   Yes.
10       Q.   And as part of that process, did you
11   disclose to the retail board the obligations
12   that NexPoint and HCMFA had to Highland under
13   promissory notes?
14       A.   The retail board, as I stated
15   earlier, receives financial information,
16   balance sheet, income statement information
17   from the advisors.  That information is
18   provided to the retail board in connection with
19   the 15(c) process.
20       So any notes between the advisors
21   and the Highland would be -- anything would be
22   detailed in those financial statements.
23       Q.   Do you recall in 2020 ever speaking
24   with the retail board about the advisors'

Page 180

WATERHOUSE - 10-19-21

1    obligations under the notes to Highland?
2        MS. DANDENEAU:  Objection to form.
3        MS. DEITSCH-PEREZ:  Object to the
4    form.
5        A.   I don't recall specifically.
6        Q.   Do you have any general recollection
7    of discussing with the retail board the
8    advisors' obligations to Highland under the
9    notes that they issued?
10       MS. DANDENEAU:  Object to the form.
11       MS. DEITSCH-PEREZ:  Object to the
12       form.
13       A.   I just recall generally just -- it
14   is just -- I present the financial statements,
15   and if they have questions, I answer their
16   questions and walk them through.
17       I don't recall what they asked.  I
18   don't recall where the discussion went.  I
19   don't recall anything of that nature.
20       Q.   Okay.  Do you know if anybody on
21   behalf of HCMF -- HCMFA ever told the retail
22   board that HCMFA had no obligations under the
23   two 2019 notes that you signed?  Withdrawn.
24       Do you know whether anybody on

Page 181

WATERHOUSE - 10-19-21

1    behalf of HCMFA ever told the retail boards
2    that you weren't authorized to sign either of
3    the two 2019 notes?
4        MS. DANDENEAU:  Objection to form.
5        A.   I'm not aware.
6        Q.   Are you aware of anybody on behalf
7    of HCMFA ever telling the retail boards that
8    your execution of the two 2019 notes was a
9    mistake?
10       MS. DANDENEAU:  Objection to form.
11       A.   I'm not aware.
12       Q.   Are you aware of anybody on behalf
13   of HCMFA ever telling the retail boards that
14   HCMFA did not have to pay the amounts reflected
15   in the two notes that you signed in 2019?
16       A.   I'm not aware.
17       Q.   Do you know whether anybody ever
18   told the retail boards -- withdrawn.
19       Do you know whether anybody ever
20   told the retail boards that Highland has
21   commenced a lawsuit to recover on the two notes
22   that you signed in 2019?
23       A.   I'm not aware.
24       Q.   Are you aware of anybody informing

Page 182

WATERHOUSE - 10-19-21

1 the retail boards that Highland has sued to
2 recover on the NexPoint note?
3
4 A. I'm not aware.
5 Q. Do you know whether anybody ever
6 told the retail board that Highland had
7 declared a default with respect to the two
8 HCMFA notes that you signed in 2019?
9 A. I'm not aware.
10 Q. Are you aware of anybody ever
11 informing the retail boards that Highland had
12 declared a default under the NexPoint note?
13 A. I'm not aware.
14 Q. Are you aware of anybody telling the
15 retail board that Highland made a demand for
16 payment under the 2019 notes that you signed on
17 behalf of HCMFA?
18 A. I'm not aware.
19 Q. Let's -- let's see if there is a
20 response to Ms. Thedford's email, if we can
21 scroll up.
22 Do you see you responded to
23 Ms. Thedford five minutes after she provided
24 the draft response to you?
25 A. Yes.

Page 183

WATERHOUSE - 10-19-21

1
2 Q. Okay. And do you see that Dustin
3 Norris is copied on this email?
4 A. Yes, he is.
5 Q. Great. Do you know whether
6 Mr. Norris held any positions at either of the
7 advisors as of October 6, 2020?
8 A. I will go back to -- I'm not the
9 legal expert of what appoints you or how or
10 why, but you did see Dustin's name on the
11 incumbency certificate that you produced
12 earlier.
13 Q. Do you know what his title was in
14 October of 2020?
15 MS. DANDENEAU: Objection to form.
16 A. I don't -- I don't recall.
17 Q. Was he -- did he have a title with
18 each of the advisors, to the best of your
19 recollection?
20 A. I don't recall.
21 Q. Do you know why he is included on
22 this email string?
23 A. I didn't add Dustin. It looks like
24 Lauren did. I don't know why she added him or
25 not. You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

1
2 Q. Does Mr. Norris play a role in
3 formulating the advisors' responses to the
4 questions asked by the retail board in
5 connection with the 15(c) annual review?
6 MS. DANDENEAU: Objection to form.
7 A. He -- Dustin Norris is there in the
8 board meetings. But -- so he has a role, yes.
9 Q. Okay. And does Mr. Norris hold any
10 positions, to the best of your knowledge, in
11 relation to any of the retail funds?
12 A. I don't -- I don't believe he does.
13 Q. How about Mr. Post, do you know
14 whether Mr. Post holds any position in either
15 of the advisors?
16 A. I mean, he -- he -- yes.
17 Q. What is your understanding of the
18 positions that Mr. Post holds in relation to
19 the advisors?
20 MS. DANDENEAU: Objection to form.
21 A. He is an employee of NexPoint
22 Advisors. He is also the chief compliance
23 officer for -- for NexPoint.
24 Q. Who is the chief compliance officer
25 for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

1
2 MS. DANDENEAU: Objection to form.
3 A. That would be Jason as well.
4 Q. Okay. Now, looking at your
5 response, you noted initially that nothing was
6 owed under shared services. Do I have that
7 right in substance?
8 A. Yeah. I think I'm being responsive
9 to Lauren's question here, whether any of the
10 shared service invoices are outstanding.
11 Q. Right.
12 A. Yes.
13 Q. And that is because -- and that is
14 because the retail the retail board has asked
15 for the disclosure of all material obligations
16 that were owed to HCMLP either then or in the
17 future; isn't that right?
18 MS. DANDENEAU: Objection to form.
19 A. We can go back down and look.
20 A. Look, I don't know if that's a
21 material item, I mean, again, but sure.
22 Q. Okay. But there were no shared
23 services outstanding; correct?
24 MS. DANDENEAU: Objection to form.
25 A. That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1    indicate.
2    Q.    And you wouldn't have written it if
3    you didn't believe it to be true at the time;
4    correct?
5    A.    Correct.
6    Q.    And when you referred to shared
7    services outstanding, what you meant there was
8    that neither NexPoint nor HCMFA owed Highland
9    any money under the shared services agreements
10   that they had with Highland as of October 6th,
11   2020; right?
12   A.    I don't know if it is as of October
13   6, 2020 or if it was from -- like through the
14   financials -- through the date of the
15   financials as of June 30.
16   Q.    Okay.  And then you noted that
17   HCMA -- the HCMFA note is a demand note; right?
18   A.    Yes.
19   Q.    And then you referred Ms. Thedford
20   to Kristin Hendrix for the term of the NexPoint
21   note.  Do I have that right?
22   A.    Yes.
23   Q.    And then you refer to that agreement
24   that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1    financials about Highland's agreement not to
2    make demand upon HCMFA until May 2021; correct?
3    A.    Correct.
4    Q.    And then -- and then the next thing
5    you write is that the attorneys think that BK
6    doesn't change that, but don't know for sure at
7    the end of the day.
8    Do you see that sentence?
9    A.    Yes.
10   Q.    Which attorneys were you referring
11   to?
12   A.    I don't remember.
13   Q.    Did you have a conversation with
14   attorneys concerning whether the bankruptcy
15   would change or alter in any way the agreement
16   not to make a demand under the HCMFA note?
17   A.    Look, yeah, I mean, I don't
18   specifically remember, but generally, I mean,
19   it is in this email.  I don't -- I don't -- I
20   don't -- I don't remember who I talked to or,
21   you know, was it inside counsel, outside
22   counsel, but obviously I talked to somebody.
23   Q.    Do you have any recollection --
24   A.    Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1    actually, it may not even have been me.  I say
2    the attorneys in you, know, a lot of -- like I
3    talked about the team.
4    It could have been someone on the
5    team, like, hey, we need to run this down, and
6    maybe they talked to attorneys again and
7    relayed that information to me.
8    So I really don't know if I spoke or
9    someone else did or -- or, I mean, and maybe it
10   wasn't even from corporate accounting.  Maybe
11   it was, you know, other -- I'm kind of
12   summarizing, you know, again, so I don't really
13   know -- I can't really say for sure.  I don't
14   remember how I came about of this knowledge.
15   Q.    I appreciate your efforts,
16   Mr. Waterhouse, but I will just tell you that
17   if I ask a question and you don't know the
18   answer or you don't recall, I'm happy to accept
19   that.  I don't -- I don't want you to
20   speculate, so I want to be clear about that.
21   So I appreciate it.
22   Let me just ask you simply:  Do you
23   know what attorneys -- can you identify any of
24   the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1    process didn't change the agreement?
2    A.    I don't recall.
3    Q.    Okay.  Perfect.
4    And then let's look at the last
5    sentence.  It says, quote:  The response should
6    include, as I covered in the board meeting,
7    that both entities have the full faith and
8    backing from Jim Dondero, and to my knowledge
9    that hasn't changed.
10   Do you see that?
11   A.    Yes.
12   Q.    Okay.  Prior to October 6th, 2020,
13   had you told the retail board that HCMFA and
14   NexPoint have the full faith and backing from
15   Jim Dondero?
16   A.    Yes.
17   Q.    Do you remember in the context in
18   which you told the retail board that?
19   A.    I mean, generally, yes.
20   Q.    Tell me what you recall.
21   A.    So we were walking through the
22   financials from the advisors; right?  So as I
23   described to you, you have got HCMFA and NPA.
24   And these -- the financials, you know, show

Page 190

WATERHOUSE - 10-19-21

1 they have liabilities on them that exceed
2 assets.
3     So the retail board has asked, okay,
4 you know, how -- you know, if -- if these
5 liabilities come due or they're payable, you
6 know, how does that come about?
7     And, you know, the response is,
8 well, the advisors have the -- the full faith
9 and backing from -- from Jim Dondero.
10     Q.    And how did you know that the
11 advisors had the full faith and backing from
12 Jim Dondero?  What was the basis for that
13 statement that you made to the retail board?
14     A.    I talked to Jim about it at some
15 point in the past.
16     Q.    And did you tell Mr. Dondero that
17 you were going to inform the retail board that
18 the advisors had his full faith and backing
19 before you actually told that to the retail
20 board?
21     A.    I don't recall having that
22 conversation.
23     Q.    Do you recall if you ever informed
24 Mr. Dondero that you had disclosed or told the

Page 191

WATERHOUSE - 10-19-21

1 retail board that the advisors had the full
2 faith and backing of Mr. -- Mr. Dondero?
3     MS. DEITSCH-PEREZ:  Object to the
4 form.
5     A.    I don't recall discussing that with
6 him at the time.
7     Q.    When you told this to the board, was
8 Mr. Dondero participating in the discussion?
9     A.    Not that I recall.
10     Q.    Withdrawn.  Was it not -- withdrawn.
11     Do you recall whether -- when you
12 covered this issue with the board, was that in
13 a -- a Zoom call or a Webex call?  Was it a
14 telephone call?  Was it in-person?  Like where
15 were you physically in relation to the board?
16     A.    I believe I was at home.
17     Q.    Okay.  Can you identify every person
18 that you recall who was present for this
19 disclosure other than -- other than the board
20 members themselves?
21     MS. DEITSCH-PEREZ:  Object to the
22 form.
23     A.    I don't recall everyone on the call.
24     Q.    Can you identify anybody who was on

Page 192

WATERHOUSE - 10-19-21

1 the call?
2     A.    Other than the board members?
3     Q.    Yes.
4     A.    Lauren Thedford.  I mean, there
5 are -- there are many -- my section is just one
6 of many sections that are just -- you know, as
7 you can appreciate, this is a long board
8 meeting.
9     I can't recall specifically, really
10 even generally, or who was on when this was
11 discussed.  But Lauren was typically on for the
12 entire time.
13     Q.    I apologize if I asked you this, but
14 do either of Mr. Norris or Mr. Post hold any
15 positions relative to the retail funds?
16     A.    I think you asked me this already,
17 John.
18     Q.    Okay.  I just don't recall.  Can you
19 just refresh my recollection if I did, in fact,
20 ask you the question?
21     A.    I don't believe -- if we can go
22 back.  I don't believe Mr. Norris has a title
23 at the retail funds.  Mr. -- and Mr. Post is
24 the CCO of the advisor, the advisors.

Page 193

WATERHOUSE - 10-19-21

1     Q.    Okay.  Do you know if either of them
2 have a position with the retail board -- with
3 the retail funds?
4     A.    I don't believe Mr. Norris has a
5 position with the retail funds.
6     Q.    All right.  What about Mr. Post?
7     A.    Mr. Post is the CCO of the advisors.
8     Q.    Okay.  Does he hold any position --
9     A.    I don't believe so.
10     Q.    -- with the retail funds?
11     A.    I don't believe so.
12     Q.    Okay.
13     A.    I don't know if being the CCO for
14 the advisor conveys something for the retail
15 funds.  Again, I am not -- that is the legal
16 compliance part of it.  I don't know.
17     Q.    Why did you tell the retail board
18 that the advisors have the full faith and
19 backing from Mr. Dondero?
20     MS. DANDENEAU:  Objection to form.
21     A.    It is -- it is -- it is what has
22 been discussed with them prior.
23     Q.    And were you -- were you trying to
24 give them comfort that even though the

Page 194

WATERHOUSE - 10-19-21

1  liabilities exceeded the assets that the
2  advisors would still be able to meet their
3  obligations as they become due?
4      MS. DANDENEAU: Objection to form.
5      MS. DEITSCH-PEREZ: Object form.
6  A. I -- I can't -- I don't remember
7  specifically the conversation, but generally --
8  you know, generally, yes. That is why --
9  but, you know, again, in this email saying, you
10 know, I am sure I qualified it with the retail
11 board, you know, as I said I like -- you know,
12 to my knowledge, that hasn't changed. But,
13 again, generally -- generally that is what I
14 remember.
15     Q. Okay. Do you recall if in the
16 advisors' response to the retail board's
17 question if the response included any statement
18 concerning Mr. Dondero and -- and the full
19 faith and backing that he was giving to the
20 advisors?
21     MS. DEITSCH-PEREZ: Object to the
22 form.
23 A. I don't -- I don't remember
24 specifically what was provided.
25

Page 195

WATERHOUSE - 10-19-21

1  Q. Okay.
2  A. And I don't really -- I don't really
3  remember generally either.
4      Q. Okay.
5      MR. MORRIS: So -- so, again, I'm
6  just going to ask Mr. Rukavina if your
7  clients can produce as soon as possible the
8  15(c) response, the written response that
9  the advisors made, if any, to the board's
10 Question No. 2.
11     I'm not looking for the whole
12 response, but I certainly want the response
13 to Question No. 2.
14     Q. Do you have a general understanding
15 as to the amount by which -- withdrawn.
16     Did -- did the assets of --
17 withdrawn.
18     Did the liabilities of HCMFA exceed
19 its assets in 2020?
20     MS. DANDENEAU: Objection to form.
21     MS. DEITSCH-PEREZ: Objection, form.
22 A. I believe I have already answered
23 that question earlier, I think. I believe I
24 said yes.
25

Page 196

WATERHOUSE - 10-19-21

1  Q. Okay. And did the liabilities of
2  NexPoint exceed its assets in 2020?
3      MS. DEITSCH-PEREZ: Objection to
4  form.
5  A. I don't believe so.
6      Q. Okay. So -- so it was only one of
7  the two advisors who had liabilities that
8  exceeded the value of the assets.
9      Do I have that right?
10     MS. DEITSCH-PEREZ: Objection to
11 form.
12     MS. DANDENEAU: Form.
13 A. Yes.
14     Q. And do you know, ballpark, the
15 amount by which the value of HCMFA's
16 liabilities exceeded their assets in 2020?
17     MS. DANDENEAU: Objection to form.
18 A. I don't -- I don't recall.
19     MR. MORRIS: I had specifically
20 requested in discovery the audited
21 financial reports for both advisors and
22 NexPoint. I think I may have gotten one
23 for NexPoint but I'm still waiting for the
24 balance. And I'm going to renew my request
25

Page 197

WATERHOUSE - 10-19-21

1  for those documents too.
2      Q. Let's go to the next exhibit, which
3  is Number 10. So I think it is in your stack,
4  Mr. Waterhouse.
5      MR. MORRIS: And we can take the one
6  down from the screen and put up Number 10
7  for everybody.
8      (Exhibit 10 marked.)
9      Q. And I don't know if you have ever
10 seen this before, but I'm really putting it up
11 on the screen for purposes of turning to the
12 very last page of the document.
13     So this is a document that we have
14 been -- that we premarked as Exhibit 10. And
15 we're turning to the last page of the document,
16 which is a document that was filed in the
17 adversary proceeding 21-3004. And -- no, I
18 apologize, I think we -- right there. Perfect.
19     And it is page 31 of 31.
20     MR. MORRIS: I think there may have
21 been some something erroneously stapled to
22 the hard copy that I gave you folks, but
23 I'm looking for page 31 of 31 in the
24 document that begins with the first page of
25

Page 198

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | Exhibit 10. |
| 3 | Q. Do you have that, Mr. Waterhouse? |
| 4 | A. I don't have it yet. I'm looking. |
| 5 | Q. All right. If you look at the top |
| 6 | right-hand corner, you will see it says page |
| 7 | hopefully something of 31? |
| 8 | A. Yes, I've got it now. |
| 9 | Q. Okay. You have got 31 of 31. You |
| 10 | can take a moment to read that, if you would |
| 11 | like. |
| 12 | A. (Reviewing document.) Okay. |
| 13 | Q. Have you ever seen this before? |
| 14 | A. I don't know if I have seen this |
| 15 | specific document, but, you know, I've -- |
| 16 | I'm -- I'm aware of it. |
| 17 | Q. And is this the document that you |
| 18 | had in mind when you sent that email to |
| 19 | Ms. Thedford that we just looked at where you |
| 20 | said that Highland had agreed not to make a |
| 21 | demand upon HCMFA until May 2021? |
| 22 | A. Honestly, I don't -- it wasn't this |
| 23 | document. I mean, it's something like this, |
| 24 | yes. I mean, yes. |
| 25 | Q. Well -- |

Page 199

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A. It is something like this, but I |
| 3 | don't think it was this specific document. |
| 4 | Q. Well, but this document does say in |
| 5 | the last sentence that Highland agreed not to |
| 6 | seek -- to demand payment from HCMFA prior |
| 7 | to May 31, 2021; right? |
| 8 | A. Yes. |
| 9 | Q. And are you aware of any other |
| 10 | document that was ever created pursuant to |
| 11 | which Highland agreed not to demand payment on |
| 12 | amounts owed by HCMFA before May 31, 2021? |
| 13 | A. Hold on. Are you asking, am I aware |
| 14 | of a document that by HCMFA that basically says |
| 15 | otherwise? |
| 16 | Q. No. Let me try again. |
| 17 | Are you aware of any other document |
| 18 | pursuant to which -- pursuant to which Highland |
| 19 | agreed not to make a demand on HCMFA until May |
| 20 | 31st, 2021? |
| 21 | A. I'm -- I think there was something |
| 22 | in connection with -- with the -- with the |
| 23 | audit that basically says the same thing. |
| 24 | Q. Okay. And do you think that the |
| 25 | audit is referring to this particular document? |

Page 200

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A. I don't know. |
| 3 | Q. All right. This document is dated |
| 4 | April 15, 2019. Do you see that? |
| 5 | A. I do. |
| 6 | Q. And do you remember that the audit |
| 7 | was completed on June 3rd, 2019? |
| 8 | A. Yes. |
| 9 | Q. And do you recall that the audited |
| 10 | financials -- and I'm happy to pull them up if |
| 11 | you would like, but do you recall that the |
| 12 | audited financials included a reference to the |
| 13 | agreement pursuant to which Highland agreed not |
| 14 | to make a demand until May 31st, 2021? |
| 15 | A. Yes, I remember. |
| 16 | Q. And as part of the process, would |
| 17 | you have expected the corporate accounting team |
| 18 | to have provided a copy of this document to |
| 19 | PwC? |
| 20 | MS. DANDENEAU: Objection to form. |
| 21 | A. Yes, I would have expected something |
| 22 | like this, or again, you know, some document |
| 23 | that basically states -- states the deferral |
| 24 | till May 31 of 2020. |
| 25 | Q. Okay. |

Page 201

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A. May 31 of 2021, excuse me. |
| 3 | Q. And this document states the |
| 4 | deferral that you just described; correct? |
| 5 | A. It does. |
| 6 | Q. And this document states the |
| 7 | deferral that was described in the audited |
| 8 | financial statements that we looked at before; |
| 9 | correct? |
| 10 | A. It does. |
| 11 | MR. MORRIS: Okay. Can we scroll |
| 12 | down just a little bit to see who signed on |
| 13 | behalf of the acknowledgment there. |
| 14 | Q. Okay. So Mr. Dondero signed this |
| 15 | document on behalf of both HCMFA and Highland; |
| 16 | do you see that? |
| 17 | A. I do. |
| 18 | Q. Okay. Did you discuss this document |
| 19 | or the -- withdrawn. |
| 20 | Did you discuss the concept of the |
| 21 | deferral with Mr. Dondero in the spring of |
| 22 | 2019? |
| 23 | A. I think I testified I don't recall. |
| 24 | Q. Okay. Do you know whose idea it was |
| 25 | to issue the acknowledgment in this form? |

Page 202

WATERHOUSE - 10-19-21

1    A. I don't recall.
2    MR. MORRIS: Can we scroll back up
3 to the document, please.
4    Q. Do you see in the beginning it says,
5 reference is made to certain outstanding
6 amounts loaned from Highland to HCMFA for
7 funding ongoing operations.
8    Do you see that?
9    A. Yes.
10    Q. And were you aware as the CFO of
11 Highland and as the treasurer of HCMFA that as
12 of April 15, 2019, Highland had made certain
13 loans to HCMFA to fund HCMFA's ongoing
14 operations?
15    A. Yes.
16    Q. And were you aware that those loans
17 were payable on demand and remained outstanding
18 as of December 31st, 2018?
19    A. Yes.
20    Q. And were you aware that those
21 amounts were payable on demand, and they
22 remained outstanding as of April 15, 2019?
23    MS. DEITSCH-PEREZ: Object to the
24 form.

Page 203

WATERHOUSE - 10-19-21

1    A. Well, this -- this document dated
2 April 15, 2019 says they have been deferred to
3 May 31, 2021.
4    Q. Right. But I'm just sticking to the
5 first paragraph where they refer to the
6 outstanding amounts. And in the end it says
7 the -- it remained outstanding on December
8 31st, 2018, and I think you told me that you
9 understood that, and then I'm just trying to
10 capture the last piece of it.
11    Did you understand that there were
12 amounts outstanding from the loan that Highland
13 made to HCMFA to fund ongoing operations as of
14 April 15th, 2019?
15    A. Yes.
16    Q. Thank you. Let's look at the next
17 sentence. HCMFA expects that it may be unable
18 to repay such amounts should they become due
19 for the period commencing today and continuing
20 through May 31st, 2021.
21    Do you see that?
22    MS. DANDENEAU: Objection to form.
23    A. I do.
24    Q. As the CFO -- withdrawn.

Page 204

WATERHOUSE - 10-19-21

1    As the treasurer of HCMFA, did you
2 believe that -- do you believe that statement
3 was true and accurate at the time it was
4 rendered?
5    A. I mean, it -- it -- the answer to
6 that is I really didn't have any -- I didn't
7 have an opinion really.
8    Q. Did you do anything to educate
9 yourself in April of 2019 on the issue of
10 whether HCMFA could repay the amounts that it
11 owed to Highland should they become due?
12    A. I don't believe so.
13    Q. Did you at any time form any
14 opinions as to HCMFA's ability to repay all
15 amounts due to Highland should they become due?
16    A. Not really. I guess I don't...
17    Q. Well, you told the retail board that
18 HCMFA's liabilities exceeded their assets in
19 2020; correct?
20    A. Yes.
21    Q. Based on the work that you did to
22 prepare for the retail board, did you form any
23 view as to whether HCMFA would be unable to
24 repay the amounts that it owed to Highland

Page 205

WATERHOUSE - 10-19-21

1 should they become due?
2    MS. DANDENEAU: Objection to form.
3    A. I mean, I -- when you look at that,
4 to answer you, completely, you know, again,
5 if -- the response I gave the retail board was,
6 you know, the -- the advice -- HCMFA advisors
7 have the -- have the full faith and backing of
8 Jim Dondero. So I didn't form an opinion of
9 whether the advisor could pay it or not.
10    Q. Did you form any view as to whether
11 the advisors could repay the amounts that it
12 owed to Highland should they become due without
13 the full faith and backing of Mr. Dondero?
14    MS. DANDENEAU: Objection to form.
15    MS. DEITSCH-PEREZ: Form.
16    A. I mean, if you -- if you -- if you
17 take that last statement out, I mean, it would
18 be difficult for HCMFA to pay back demand notes
19 at that time.
20    Q. And it was precisely for that reason
21 that you told the retail board that -- that the
22 retail -- that the advisors had the full faith
23 and backing of Mr. Dondero; correct?
24    MS. DANDENEAU: Objection to form.

Page 206

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.   I mean, yes, as the mouthpiece, I
3  was relaying information.
4     Q.   Okay.  And you relayed that
5  information with the knowledge and approval of
6  Mr. Dondero; correct?
7          MS. DEITSCH-PEREZ:  Object to the
8  form.
9     A.   As I stated in the email, I don't
10 believe, and I think I testified I don't
11 believe I had conversations with Mr. Dondero at
12 the time of that board meeting.
13    Q.   Did you tell the retail board that
14 the advisors had the full faith and backing of
15 Mr. Dondero without Mr. Dondero's prior
16 approval?
17    A.   Yeah, I -- I -- yes, I'm -- like I
18 said, I think I testified earlier, I'm sure I
19 qualified it as well.
20    Q.   What do you mean by that?
21         MS. DANDENEAU:  Objection to form.
22    A.   Again -- again, like I said in the
23 email, it has the full faith and backing of Jim
24 Dondero unless that has changed.
25    Q.   Actually that is not what you said,

Page 207

1          WATERHOUSE - 10-19-21
2  so let's put the email back up.
3     A.   It is -- it is -- it is in the
4  email.
5     Q.   Let's put the email back up.  You
6  didn't say unless it has changed.  You said you
7  believe it hasn't changed; right?
8     A.   Okay.  And to my knowledge that
9  hasn't changed, that is what it says.
10    Q.   That's right.
11    A.   But, again, I mean, that is -- I
12 don't know everything.  And I'm not in every
13 conversation.  I'm not -- to presume that I am,
14 is -- and you have to put myself -- as you
15 started this out, Mr. Morris, I was at home in
16 October of 2020 with COVID -- or, you know,
17 under these COVID times that we described is
18 very difficult.
19         We have all been working at home for
20 really the first time ever, undergoing
21 processes, procedures, control environments
22 that have been untested, and there is poor
23 communication.
24         So I am relaying, as I'm telling you
25 now, what is in the email.  And unless

Page 208

1          WATERHOUSE - 10-19-21
2  something has changed -- to my knowledge, it
3  hasn't changed, but it could have changed.
4     Q.   When you say that the advisors have
5  the full faith and backing from Mr. Dondero,
6  did you intend to convey that, to the extent
7  the advisors were unable to satisfy their
8  obligations as they become due, Mr. Dondero
9  would do it for them?
10         MS. DANDENEAU:  Object to the form.
11         MS. DEITSCH-PEREZ:  Object to the
12 form.
13         And, John, we have given you a lot
14 of leeway here but this does not seem
15 relevant to this case.  You seem sort of
16 taking a complete sort of diversion into
17 the allegations and the complaint just
18 filed on Friday, and so I would ask you to
19 move on because --
20         MR. MORRIS:  And I will tell you --
21 I will tell you that I have never read that
22 complaint cover-to-cover.  I have nothing
23 to do with the prosecution of those claims.
24 And this issue that we're talking about
25 right now is related solely to the

Page 209

1          WATERHOUSE - 10-19-21
2  promissory notes that your clients refuse
3  to pay.
4         So I'm going to continue to ask my
5  questions, and I would ask the court
6  reporter to read back my last question.
7         (Record read.)
8         MS. DEITSCH-PEREZ:  And then I
9  believe there were objections to form.
10    Q.   You can answer the question.
11    A.   Yes.
12    Q.   Thank you very much, sir.
13         MR. MORRIS:  Can we go back to the
14 other document, please?
15    Q.   Mr. Waterhouse, do you know if this
16 document was ever shared with the retail board?
17    A.   I don't recall.
18    Q.   Did you ever share it with the
19 retail board?
20    A.   I don't recall.
21    Q.   Did you ever tell the retail board
22 about the substance of this document?
23    A.   I don't recall.
24    Q.   Did you ever tell the retail board
25 that Highland had agreed not to make a demand

Page 210

WATERHOUSE - 10-19-21

1    against HCMFA until May 2021?
2        Q.   Do you know whether anybody on
3        A.   I don't recall.
4        Q.   Do you know whether anybody on
5    behalf of the advisors ever informed the retail
6    board that Highland had agreed on April 15,
7    2019, not to make a demand against HCMFA under
8    the promissory notes?
9        A.   I don't recall.
10       Q.   Did you instruct Ms. Thedford or
11   anybody else responding to the retail board's
12   15(c) inquiry to disclose this document?
13       A.   Did I instruct Ms. Thedford or
14   anyone else to -- to -- to produce this, to
15   disclose this document?  Is that what you -- I
16   just want to make sure.
17       Q.   Uh-huh.
18       A.   Yeah, I don't -- I don't recall.
19       Q.   Did you instruct anybody to inform
20   the retail board, in response to their question
21   as part of the 15(c) process, to -- to tell the
22   retail board about Highland's agreement not to
23   make a demand until 2021?
24           MS. DANDENEAU:  Objection to form.
25       A.   I don't recall.

Page 211

WATERHOUSE - 10-19-21

1        Q.   Did you ever inform PwC that HCMFA's
2    liabilities exceeded its assets?
3           MS. DANDENEAU:  Object to the form.
4        A.   I don't -- I don't think I told
5    them.  I mean, they -- they audited the
6    financial statements.
7        Q.   Did -- do you know if anybody on
8    behalf of Highland ever informed
9    PricewaterhouseCoopers that HCMFA may be unable
10   to repay amounts owing to Highland, should they
11   become due?
12           MS. DANDENEAU:  Objection to form.
13       A.   Yes.  Again, I think I testified
14   earlier that -- that this was communicated to
15   the auditors.
16       Q.   Ideally --
17       A.   I don't know who exactly did that.
18   I don't recall doing it, but, yeah, it was --
19   it was communicated.  And that is why -- I
20   mean, there is a disclosure in the financial
21   statements; right?
22       Q.   There is, and that disclosure
23   relates to the last sentence of this document;
24   correct?

Page 212

WATERHOUSE - 10-19-21

1        A.   Yes.
2        Q.   Do you recall looking in the
3    document and seeing anything that was disclosed
4    with respect to the sentence above that?
5        A.   No.
6        Q.   Do you know whether anybody on
7    behalf of Highland ever informed
8    PricewaterhouseCoopers that HCMFA expects that
9    it may be unable to repay amounts due and owing
10   to Highland should they become due?
11           MS. DEITSCH-PEREZ:  Object to the
12   form.  I think that is the third time.
13       A.   I don't recall.  Again, as I said,
14   we -- all of this was given to the auditors.
15       Q.   Do you know if Highland received
16   anything of value in exchange for its agreement
17   not to demand payment on amounts owed by HCMFA
18   prior to May 31st, 2021?
19           MS. DEITSCH-PEREZ:  Object to
20   form.  That is the second time.
21           MS. DANDENEAU:  Object to the form.
22       A.   I have answered this question.
23           MR. RUKAVINA:  Hold on.  Object to
24   legal conclusion.  Go ahead.

Page 213

WATERHOUSE - 10-19-21

1        A.   I have answered this question
2    before.
3        Q.   And the answer was no?
4        A.   I'm not aware.
5        Q.   Now, this acknowledgment can't
6    possibly apply to the two notes that you signed
7    on behalf of HCMFA because those notes were
8    signed on May 2nd and May 3rd, 2019; is that
9    right?
10           MS. DANDENEAU:  Objection to form.
11       A.   Unless there is a drafting error.
12       Q.   Okay.  Are you aware of a drafting
13   error?
14       A.   I'm not aware.  I didn't -- I wasn't
15   part of -- I didn't sign this note or this
16   acknowledgment.  I didn't draft it.
17       Q.   But you do see it is dated April 15,
18   2019; right?
19       A.   Yes.
20       Q.   And this was a document that was
21   actually included by the advisors in a pleading
22   they filed with the Court; right?
23           MR. RUKAVINA:  Well, I don't know
24   that so I object to form.

Page 214

WATERHOUSE - 10-19-21

1
2    Q.    Okay.  Let's go to the first page of
3    the document and just confirm that.
4        MR. AIGEN:  Mr. Morris, I just note
5    that you already said there was some error
6    with the document that is listed as
7    exhibit –
8        MR. MORRIS:  No.  No, no, no.
9        MS. DEITSCH-PEREZ:  Oh, okay.
10       MR. MORRIS:  What I said is that
11   there is a few pages that were mistakenly
12   stapled to the end of the document.
13       MS. DEITSCH-PEREZ:  Okay.
14       MR. MORRIS:  There is no problem
15   with this document.
16       MS. DEITSCH-PEREZ:  And just so
17   we're clear that the document – the pages
18   that start with defendant's amended answer
19   are not intended to be part of this
20   document?
21       MR. MORRIS:  That's correct.
22       MS. DEITSCH-PEREZ:  And that the –
23   but it is your representation that the rest
24   of the document is – is – is correct
25   because we don't – we don't have any way

Page 215

WATERHOUSE - 10-19-21

1
2    of verifying that, we're just –
3        MR. MORRIS:  You do, actually.  You
4    could just go to Docket No. 21-3004.
5        MS. DEITSCH-PEREZ:  If you want to
6    stop this deposition so we can go and pull
7    that document up, we're happy to do it.  So
8    I am just asking you for your
9    representation.
10       MR. MORRIS:  Sure.  I gave that.
11       MS. DEITSCH-PEREZ:  Okay.
12   Q.    So do you see that this is a
13   document that was actually filed with the Court
14   by Highland Capital Management Fund Advisors?
15   A.    No.  I get with the first page in
16   the section.  Maybe I'm looking at the wrong
17   thing.  It says, Highland Capital Management.
18   Q.    Don't worry about it.  Don't worry
19   about it.
20   A.    Maybe I went back – okay.
21       MR. MORRIS:  All right.  Can we put
22   up on the screen Exhibit 2.
23       (Exhibit 2 marked.)
24       MR. MORRIS:  I think it is
25   Exhibit 1.

Page 216

WATERHOUSE - 10-19-21

1
2        MS. DANDENEAU:  I'm sorry, John, did
3    you say Exhibit 2 or Exhibit 1?
4        MR. MORRIS:  It is Exhibit 2 in the
5    binders so it is premarked Exhibit 2.  And
6    now I'm asking – right there – going to
7    Exhibit 1 to the document that was marked
8    as Exhibit 2.
9        MS. DANDENEAU:  Got it.  In the
10   binder there is no –
11       MS. DEITSCH-PEREZ:  There is no
12   Exhibit 1.
13       MR. MORRIS:  All right.  So look at
14   the one on the screen.
15   Q.    Do you see, Mr. Waterhouse, that
16   this is a promissory note dated May 31st, 2017,
17   in the approximate amount of $30.7 million?
18   A.    Yes.
19   Q.    And do you see that the maker of the
20   note is NexPoint?
21   A.    Yes.
22   Q.    And that Highland is the payee; is
23   that right?
24   A.    Yes.
25   Q.    Okay.  And do you see in Paragraph 2

Page 217

WATERHOUSE - 10-19-21

1
2    this is an annual installment note?
3    A.    Can you scroll down.
4    Q.    Sure.
5        MR. MORRIS:  Can we scroll down –
6    yeah, there you go.
7    A.    Right there, yeah.  Yes.
8        MR. MORRIS:  And can we scroll down
9    to the signature line.
10   Q.    And do you recognize that as
11   Mr. Dondero's signature?
12   A.    Yes.
13   Q.    And is this the promissory note that
14   we talked about earlier where NexPoint had made
15   certain payments in the aggregate amount of
16   about 6 to $7 million against principal and
17   interest?
18   A.    I don't recall discussing the
19   aggregate principal amounts of 6 to $7 million,
20   but – so I don't – I don't recall that prior
21   discussion with those amounts.
22   Q.    All right.  Let's take a look.
23   NexPoint always included this promissory note
24   as a liability on its audited financial
25   statements; right?

Page 218

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   And NexPoint had its financial
4    statements audited; isn't that correct?
5    A.   Yes.
6    Q.   And was the process of NexPoint's
7    audit similar to the process you described
8    earlier for Highland and HCMFA?
9    A.   Yes, it is similar.
10   Q.   Okay.
11       MR. MORRIS:  Can we put up
12   NexPoint's audited financials and let
13   everybody know what exhibit number it is,
14   La Asia?
15       MS. CANTY:  It is going to be
16   Exhibit 46.
17       (Exhibit 46 marked.)
18   Q.   And do you see, sir, that we've put
19   up NexPoint Advisors' consolidated financial
20   statements and supplemental information for the
21   period ending December 31st, 2019?
22   A.   Yes.
23   Q.   Did you participate in the process
24   whereby these audited financial statements were
25   issued?

Page 219

WATERHOUSE - 10-19-21

1
2    A.   I didn't participate directly, as
3    I've described before, about the -- the team
4    performing the audit.
5    Q.   Do you recall when the audit of
6    NexPoint's financial statements for the period
7    ending December 31st, 2019 was completed?
8    A.   Yes.
9    Q.   And when do you recall it being
10   completed?
11   A.   In January of 2021.
12   Q.   Do you know why the 2019 audit
13   report wasn't completed until January of 2021?
14   A.   Yes.
15   Q.   Why was the NexPoint audit report
16   for the period ending 12/31/19 not completed
17   until January 2021?
18   A.   Because we had to deal with working
19   from home from -- with COVID, and on top of all
20   of our daily responsibilities and job duties
21   at -- at providing -- at Highland providing
22   services to NexPoint, we had to do all of this
23   extra work for a bankruptcy that was filed in
24   October of 2019.
25       MR. MORRIS:  Can we go to the

Page 220

WATERHOUSE - 10-19-21

1
2    balance sheet on page 3?  Okay.  Stop right
3    there.
4    Q.   Do you see under the liabilities
5    section, the last item is note payable to
6    affiliate?
7    A.   Yes.
8    Q.   And is that the note that we just
9    looked at?
10       MS. DANDENEAU:  Objection to form.
11   Q.   Withdrawn.
12       Is that the approximately
13   $30 million note that we just looked at that
14   was dated from 2017?
15       MS. DANDENEAU:  Objection to form.
16   A.   I believe no.
17   Q.   Okay.  You're not aware of any other
18   note that was outstanding from NexPoint to
19   Highland as of the end of the year 2019, other
20   than that one $30 million note; right?
21   A.   I don't recall.
22   Q.   And as of the end of 2019, the
23   principal amount that was due on the note was
24   approximately $23 million; right?
25       MS. DEITSCH-PEREZ:  Object to the

Page 221

WATERHOUSE - 10-19-21

1
2    form.
3    A.   Approximately.
4    Q.   And does that refresh your
5    recollection that between the time the note was
6    executed and the end of 2019, that NexPoint had
7    paid down approximately $7 million?
8    A.   Yes.  If we are just doing the math,
9    yes.
10   Q.   Okay.  Did NexPoint complete its
11   audit from 2020?
12   A.   Sorry, you kind of broke up.  Do
13   NexPoint complete?
14   Q.   The audit of its financial
15   statements for the period ending December 31st,
16   2020?
17   A.   No.
18   Q.   No, it's not complete?
19   A.   No, it is not complete.
20   Q.   Did HCMFA complete its audit for the
21   year ending December 31st, 2020?
22   A.   No.
23       MR. MORRIS:  Can we go to page 15,
24   please, the paragraph at the bottom.
25   Q.   Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1 included under notes payable to Highland a
2 reference to the amounts that were outstanding
3 as of the year-end 2019 under the note that we
4 looked at just a moment ago?
5    A.   Yes.  Are you talking about the
6 second paragraph?
7    Q.   I'm actually talking about first
8 paragraph.  Do you understand that the first
9 paragraph is a reference to the 2017 note, and
10 the amounts that were -- the principal amount
11 that was outstanding as of the end of 2019?
12       MS. DANDENEAU:  Objection to form.
13 John, do you mean the first paragraph of
14 that page?
15       MR. MORRIS:  No, the first paragraph
16 under notes payable to Highland.
17    A.   Yeah, I see the paragraph, and
18 again, this is what I answered earlier.  I
19 believe so, just because I don't -- again, this
20 is a number in a balance sheet, and without
21 matching it up and seeing the detail with the
22 schedule like I kind of talked about for
23 Highland's financial statements, it is a little
24 bit more difficult to tie everything in

Page 223

WATERHOUSE - 10-19-21

1 perfectly together.
2    Q.   Okay.  But you're not aware of any
3 note that was outstanding at the end of 2019
4 from NexPoint to Highland other than whatever
5 principal was still due and owing under the
6 $30 million note issued in 2017; correct?
7    A.   Well, it -- I don't -- there is
8 reference in the second paragraph.  I don't --
9 I don't -- I don't recall what that is
10 referring to, so I don't -- I don't know.
11    Q.   Well, if you listen carefully to my
12 question, right, I'm asking about notes that
13 were outstanding at the end of 2019, and if we
14 look at the paragraph you just referred to, it
15 says that during the year there were new notes
16 issued totaling $1.5 million, but by the end of
17 the year, no principal or interest was
18 outstanding on the notes.
19       Do you see that?
20    A.   Oh, I do, yes.
21    Q.   So does that refresh your
22 recollection that there were no notes
23 outstanding from NexPoint to Highland other
24 than the principal remaining under the original

Page 224

WATERHOUSE - 10-19-21

1 $30 million 2017 note that we looked at a
2 moment ago?
3    A.   Well, we're at the bottom of the
4 page.  Is there anything on page 16?
5    Q.   That is a fair question, sure.  That
6 is it.
7    A.   Okay.  So it appears that that is
8 the only note that is detailed in the notes in
9 the financial statement.
10    Q.   And you don't have any memory of any
11 other note other than the 2017 note, right,
12 being outstanding as of the end of the year?
13    A.   I deal with thousands of
14 transactions every year.  I don't really have a
15 very specific memory for what exactly was
16 outstanding.
17       MR. MORRIS:  Why don't we take a
18 break now.  We've been going for a little
19 while.  It's 3:26.  Let's come back at
20 3:40.
21       VIDEOGRAPHER:  We're going off the
22 record at 3:26 p.m.
23 (Recess taken 3:26 p.m. to 3:39 p.m.)
24       VIDEOGRAPHER:  We are going back on

Page 225

WATERHOUSE - 10-19-21

1 the record at 3:39 p.m.
2    Q.   All right.  Mr. Waterhouse, we -- I
3 don't think we have a lot more here.
4       To the best of your knowledge and
5 recollection, were all affiliate loans and all
6 loans made to Mr. Dondero recorded on
7 Highland's books and records as assets of
8 Highland?
9       MS. DANDENEAU:  Object to the form,
10 asked and answered.
11    A.   To my knowledge, yes.
12    Q.   Okay.  Can you recall any loan to
13 any affiliate or Mr. Dondero that was not
14 recorded on Highland's books and records as an
15 asset?
16    A.   Like during my time as CFO?  I don't
17 recall.
18    Q.   How about after the time that you
19 were CFO?  Did you recall that there was a loan
20 by Highland to an affiliate or to Mr. Dondero
21 that hadn't been previously recorded on
22 Highland's books as an asset?
23       MS. DANDENEAU:  Objection to form.
24    A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1 question. I left Highland as of -- I'm not
2 aware of -- I left Highland in February --
3 probably the last day of February of 2021.
4 Q. Okay.
5 A. I'm not -- I'm not aware of any --
6 I'm not aware of anything past that date.
7 Q. Okay. While you were the CFO at
8 Highland, did Highland prepare in the ordinary
9 course of business a document that reported
10 operating results on a monthly basis?
11 A. Yes.
12 Q. And are you generally familiar with
13 the monthly operating reports?
14 A. Yeah. You are referring to the
15 reports that we filed to the Court every month?
16 Q. I apologize, I'm not. I'm taking
17 you back to the pre-petition period. There was
18 a report that I have seen that I'm going to
19 show you, but I'm just asking for your
20 knowledge.
21 MR. MORRIS: Let's put it up on the
22 screen, Exhibit 39.
23 (Exhibit 39 marked.)
24 Q. Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1 is called operating results?
2 A. Yeah, that's the title of it.
3 Q. Okay. And was a report of operating
4 results prepared by Highland on a monthly basis
5 during the time that you served as CFO?
6 A. No.
7 Q. Are you familiar with a document of
8 this type? And we can certainly look at the
9 next page or two to refresh your recollection.
10 A. I'm just looking at the title. I
11 don't really -- again, as I discussed before, I
12 don't have any records or documents or emails
13 or appointments or anything that I was able to
14 use prior to -- prior to this deposition, so
15 I'm doing the best I can.
16 Q. Okay. You don't need to apologize.
17 I'm just asking you if you are familiar with
18 the document called Operating Results that was
19 prepared on a monthly basis at Highland?
20 MS. DEITSCH-PEREZ: Object to the
21 form.
22 Q. If you're not, you're not.
23 A. I don't believe this was prepared on
24 a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1 Q. Okay. Do you see that this one
2 is -- is dated February 2018?
3 A. Yes.
4 Q. Do you have -- do you believe --
5 have you ever seen a document that was
6 purporting to report operating results for
7 Highland?
8 MS. DANDENEAU: Objection to form.
9 A. Yes.
10 Q. Okay. And when you say that you
11 don't believe it was produced on a monthly
12 basis, was it produced on any periodic bases to
13 the best of your recollection?
14 A. I believe it was -- it was prepared
15 on an annual basis.
16 Q. Okay.
17 MR. MORRIS: Can we look at the next
18 page.
19 Q. Do you see that there is a statement
20 here called: Significant items impacting
21 HCMLP's balance sheet?
22 And it is dated February 2018.
23 A. Yes.
24 Q. Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1 report that Highland prepared that identified
2 significant items impacting the balance sheet?
3 A. A report that was prepared.
4 Q. Let me ask a better question: Did
5 Highland prepare reports to the best of your
6 recollection that identified significant items
7 that impacted its balance sheet?
8 A. Well, so Highland prepared a -- a
9 monthly close package. And maybe I'm
10 getting -- and -- and maybe change names at one
11 time or maybe I'm just -- again, just
12 misremembering -- but in that, yes, there is a
13 page that would detail just changes in -- you
14 know, just changes month over month on the
15 balance sheet.
16 Q. Okay. And maybe it is my fault.
17 Maybe I didn't know the proper name for it.
18 But let's use the phrase "monthly close
19 package."
20 Did Highland prepare a monthly close
21 package in the ordinary course of business
22 during the time that you served as CFO?
23 MS. DANDENEAU: Objection to form.
24 A. Yes.

Page 230

WATERHOUSE - 10-19-21

1
2    Q.   And did the monthly close package
3  that Highland prepared include information
4  concerning significant items that impacted
5  Highland's balance sheet?
6    A.   Yes, it had a page like that is --
7  that is on the screen that detailed items
8  like -- of that nature.
9    Q.   And do you know who -- was there
10  anybody at Highland who was responsible for
11  overseeing the preparation of the monthly
12  reporting package?
13    A.   That would have been -- again, it
14  varies over time during my tenure as CFO.
15  It -- it varied over -- over time, but -- but
16  typically a -- a corporate accounting manager.
17    Q.   And who were the corporate
18  accounting managers during your tenure as CFO?
19    A.   It would have been Dave Klos and
20  Kristin Hendrix.
21    Q.   And did the corporate accounting
22  manager deliver to you drafts of the monthly
23  close package before it was finalized?
24    A.   Sometimes.
25    Q.   Was that the practice even if there

Page 231

WATERHOUSE - 10-19-21

1  were exceptions to the practice?
2    A.   The practice meaning that they
3  sometimes lured them to me?
4    Q.   That that was the expectation even
5  if circumstances prevented that from happening
6  from time to time.
7       MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   I -- I would say it started out that
10  way but over the years it -- it was not
11  enforced.
12    Q.   Okay.  So you were -- you reviewed
13  and approved monthly -- monthly reporting
14  packages for a certain period of time and then
15  over time you stopped doing that.
16    Do I have that right?
17       MS. DANDENEAU:  Objection to form.
18    A.   Yes, I mean, if you're talking about
19  a formal meeting where we sit down and go
20  through and approve it.  I would say that was
21  standard practice a decade -- you know, early
22  on.  And as time went on that -- that -- that
23  practice wasn't followed.
24    Q.   Okay.

Page 232

WATERHOUSE - 10-19-21

1
2    A.   And, quite frankly, I don't even
3  know if these were -- these were sent to me
4  even in any capacity.
5    Q.   What was the purpose of preparing
6  the monthly reporting package -- withdrawn.
7       What was the purpose of preparing
8  the monthly close package?
9       MS. DEITSCH-PEREZ:  Object to the
10    form.
11    A.   The -- the original purpose was so
12  that it would just -- it would be a report that
13  was reviewed monthly with senior management.
14    Q.   Who was included in the idea of
15  senior management?
16    A.   You know, I think originally when
17  this was conceived that would have been like
18  Jim Dondero and Mark Okada.
19    Q.   Were monthly reporting -- withdrawn.
20       Were monthly close packages prepared
21  to the best of your knowledge until the time
22  you left Highland?
23    A.   To my knowledge -- I don't know,
24  actually.  I mean, to my knowledge, I believe
25  it was being -- that was still being done.  I

Page 233

WATERHOUSE - 10-19-21

1  don't know because, again, I wasn't reviewing
2  them.  I hadn't reviewed a close package for --
3  for a long time.  But I believe the standard
4  practice that was still being carried out.
5    Q.   Did you ever have any discussions
6  with the debtor's independent board concerning
7  any promissory notes that were issued by any of
8  the affiliates or Mr. Dondero?
9    A.   I can't -- I can't -- I can't recall
10  specifically.
11    Q.   Did you speak with the independent
12  board from time to time?
13    A.   Yes, from -- from -- from time to
14  time I had discussions with the independent
15  board members, you know, either -- either, you
16  know, by themselves or wholly, you know, as --
17  as a -- as a combined work.
18    Q.   Okay.  Before we talk about
19  Mr. Seery, do you recall ever having a
20  conversation with Mr. Nelms or Mr. Dubel
21  concerning any promissory note that was
22  rendered by one of the affiliates or
23  Mr. Dondero to Highland?
24    A.   I don't recall any conversations

| Page 234 | Page 235 |
|---|---|

WATERHOUSE - 10-19-21

Page 234

1   specifically.
2   Q.   Do you know if the topic was ever
3   discussed, even if you don't remember it
4   specifically?
5       MS. DANDENEAU:   Objection to form.
6   A.   It -- it -- it may have.  I don't
7   know.  I don't recall.
8   Q.   Do you recall ever discussing any
9   promissory note issued by any of the affiliates
10  or Mr. Dondero with James Seery?
11  A.   I don't -- I don't recall
12  specifically.
13  Q.   Do you recall generally ever
14  discussing the topic of promissory notes issued
15  by any of the affiliates or Mr. Dondero to
16  Highland with Mr. Seery?
17  A.   Nothing -- nothing is really jumping
18  out at me.
19  Q.   Do you recall if you ever told
20  Mr. Seery that any of the affiliates or
21  Mr. Dondero didn't have an obligation to pay
22  all amounts due and owing under their notes?
23  A.   I don't recall having that
24  conversation.

WATERHOUSE - 10-19-21

Page 235

1   Q.   Did you ever tell Mr. Seery that you
2   had any reason to believe that the amounts
3   reflected in the notes issued by the affiliates
4   and Mr. Dondero were invalid for any reason?
5   A.   I don't -- I don't recall.
6   Q.   Did you tell Mr. Dondero -- did you
7   tell Mr. Seery that you thought the promissory
8   notes issued by the advisors and Mr. Dondero
9   that were outstanding as of the petition date
10  were assets of the estate?
11  A.   I don't recall having a specific
12  conversation about those -- you know, those
13  notes outstanding as -- as of the petition date
14  being assets on the estate.  I mean, we put
15  together -- you know, they're in the books and
16  records of the financial statements.  I don't
17  recall having a specific conversation.
18  Q.   Did you ever prepare any documents
19  that were delivered to Mr. Seery that concerned
20  the promissory notes issued by any of the
21  affiliates or Mr. Dondero?
22      MS. DANDENEAU:   Objection to form.
23  A.   Did I produce any that concerned --
24  you mean did I just -- did I give Mr. Seery

WATERHOUSE - 10-19-21

Page 236

1   anything that -- that said I have concerns over
2   these notes?
3   Q.   No.  Let me try again.  Maybe it was
4   my question.
5       Did you ever give Mr. Seery any
6   information concerning any of the notes that
7   were issued by any of the affiliates or
8   Mr. Dondero?
9       MS. DANDENEAU:   Objection to form.
10  A.   I don't recall if I did or not.  I
11  don't -- I don't remember.  I mean, you have my
12  emails.  You may have asked.  Again, I don't --
13  I don't know.
14      MR. MORRIS:   Can we put up the
15  document that has been premarked as Exhibit
16  39?
17      MS. DANDENEAU:   John, that is this
18  document, isn't it?
19      MR. MORRIS:   Oh, yeah, it might be,
20  as a matter of fact.  Let's go to Number
21  40.
22      (Exhibit 40 marked.)
23  Q.   During the bankruptcy,
24  Mr. Waterhouse, did you prepare documents that

WATERHOUSE - 10-19-21

Page 237

1   were filed with the bankruptcy court?
2   A.   I didn't -- I didn't prepare them
3   personally.
4   Q.   Did people prepare them under your
5   direction?
6   A.   Yes.  There were members of the team
7   that prepared them, and they worked in -- you
8   know, there were members of DSI that were
9   involved in the process as well.
10  Q.   To the best of your knowledge, did
11  DSI rely on the employees of Highland for the
12  information that they used to prepare the
13  bankruptcy filings?
14  A.   Yes.  The books and records were
15  with the Highland personnel.
16  Q.   Okay.  And do you see on the screen
17  here, there is a document that we have marked
18  as Exhibit 40 that is -- that is titled Summary
19  of Assets and Liabilities?
20  A.   Uh-huh.
21  Q.   Okay.  And do you recall reviewing
22  any summary of assets and liabilities before it
23  was filed with the bankruptcy court?
24  A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1  high level.
2
3      Q.    And did you believe that it was
4  accurate at the time it was filed?
5      A.    I didn't have any other reason to
6  believe otherwise.
7      Q.    Okay.  Do you see that the total
8  value of all properties listed in Part 1 is
9  approximately $410 million?
10          MS. DEITSCH-PEREZ:  Objection to
11     form.
12     A.    Yes, it is in 1c.
13     Q.    Yes.
14     A.    Yes, I see that.
15     Q.    Okay.  If we go to the second page,
16  now I think I may just have excerpts here, just
17  so everybody is clear, but if we scroll down to
18  the second page, you will see that there is
19  a – a little further.  There you go.  You will
20  see there is a reference to Item 71, notes
21  receivable.
22          Do you see that?
23     A.    I do.
24     Q.    And that was a reference to the
25  notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1
2  Mr. Dondero, among others; is that right?
3          MS. DANDENEAU:  Objection to form.
4      A.    Yes.  The affiliate notes and the
5  Dondero notes were in this amount, but they
6  weren't – again, like you said, and among
7  others.
8      Q.    Okay.  We will look at the
9  specificity because I'm not playing gaming
10  here, but do you know if the $150 million of
11  notes receivable was included within the
12  $410 million of total value of the debtor's
13  assets?
14          MS. DANDENEAU:  Objection to form.
15     A.    I – I – I believe so.
16     Q.    Right.  And so is it fair to say
17  that as of the date this document was prepared,
18  the notes receivable were more than one-third
19  of the value of the debtor's assets?
20          MS. DEITSCH-PEREZ:  Object to the
21     form.
22          MS. DANDENEAU:  Object to the form.
23     A.    Again, if you are just taking the
24  math, 150 divided by whatever the $400 million
25  number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1
2      Q.    Okay.
3      A.    You know, but as of the time of this
4  filing, that is what was put in this filing,
5  right, but, you know, I mean, numbers –
6  numbers change, facts and circumstances change.
7      Q.    But as the CFO of Highland, the
8  debtor in bankruptcy, did you believe that this
9  number accurately reflected the total amount
10  due under the notes receivable?
11     A.    That is what we had in our books and
12  records.
13     Q.    Okay.  And did you believe as the
14  CFO that the books and records accurately
15  reported the then value of the debtor's assets?
16          MS. DANDENEAU:  Objection to form.
17     A.    We didn't – as part of this filing,
18  there was no fair value measurement or
19  anything.  These were just accounting entries
20  for the promissory notes.  There is no analysis
21  for impairment or fair market value adjustments
22  or anything of that nature.  This is purely
23  taking numbers and putting them in our form.
24     Q.    Did you do any impairment analysis
25  at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1
2  Highland?
3      A.    Yes, we did do impairment analysis
4  on – on assets.
5      Q.    Okay.  Did you ever do an impairment
6  analysis on any of the promissory notes that
7  were given to Highland by any of the affiliates
8  or Mr. Dondero?
9      A.    Not that I recall.
10     Q.    Under what circumstances do you
11  prepare impairment analyses?
12     A.    As – as – if you're preparing
13  financials in accordance with GAAP, generally
14  accepted accounting principles, if you're
15  preparing full GAAP financials, you should be
16  preparing – you should be undergoing on a
17  periodic basis any fair market value
18  adjustments to assets.
19          As I was instructed at the time of
20  the petition date, we weren't producing GAAP
21  financials.  So this wasn't something I was
22  worried about nor concerned about.
23     Q.    Okay.  Were NexPoint and HCMFA and
24  Highland's audited financial statements
25  prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1
2     A.   The audited financials -- yes,
3  audited financial statements are prepared in
4  accordance with GAAP.
5     Q.   Do you recall whether any of
6  Highland or HCMFA or NexPoint ever made a fair
7  market value adjustment to any of the notes
8  issued by any of the affiliates or Mr. Dondero
9  to Highland?
10     A.   I do not recall that happening, but
11  the -- it is because under -- under GAAP,
12  the -- the treatment of liabilities is
13  different than assets.
14     Q.   Okay.  So then let's just focus on
15  Highland's audited financial statements.
16          The last audited financial
17  statements were for the period ending December
18  31st, 2018; correct?
19     A.   That is my understanding.
20     Q.   And you had -- you had an obligation
21  to disclose anything to PricewaterhouseCoopers
22  concerning any subsequent events between the
23  end of 2018 and June 3rd, 2019; correct?
24          MS. DANDENEAU:  Objection to form.
25          MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1
2     A.   Correct.
3     Q.   Okay.  To the best of your
4  knowledge, as Highland's CFO, did Highland ever
5  make any fair market value adjustments to any
6  of the promissory notes that were carried on
7  its balance sheet and that were issued by any
8  of the affiliates or Mr. Dondero?
9     A.   I think I answered that question
10  earlier.  I don't recall doing that for any of
11  the -- those -- those notes.  So it would have
12  included the audit for the -- for the 2018
13  period.
14     Q.   Okay.
15          MR. MORRIS:  Can we go to the next
16  page.
17     Q.   Do you see this is a note a list of
18  notes receivable?  Do you see that?
19     A.   Yes, I do.
20     Q.   And do you see that this ties into
21  the page that we were just looking?
22     A.   I'm sorry, can we go back to the
23  prior page?  I mean, it was at 150,331,222.  It
24  was on the prior page.  Next page.  Yes, it
25  agrees.

Page 244

WATERHOUSE - 10-19-21

1
2     Q.   Okay.  So now let's look at that
3  schedule.  So this was the face amount of all
4  of the promissory notes that Highland held at
5  the time this document was filed with the
6  bankruptcy court; right?
7     A.   Yes.
8     Q.   There is a footnote there that says,
9  doubtful or uncollectible accounts are
10  evaluated at year-end.
11          Do you see that?
12     A.   I do.
13     Q.   Okay.  And is it fair to say that as
14  of the year-end 2018, the year before this,
15  that to the extent any of these notes were
16  outstanding at that time, they weren't deemed
17  to be doubtful or uncollectible?
18     A.   Yeah.  For the 2018 audit, there
19  weren't any -- there weren't any adjustments to
20  fair value.
21     Q.   Okay.  And during the bankruptcy, do
22  you recall that Highland subsequently reserved
23  for the Hunter Mountain Investment Trust note?
24     A.   Yes.
25     Q.   Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1
2  involved in the decision to reserve the Hunter
3  Mountain Investment Trust note?
4     A.   I was not.
5     Q.   Do you know why Highland decided to
6  reserve for the Hunter Mountain Investment
7  Trust note?
8     A.   I don't know yet decision was made.
9  I believe it was made by someone at DSI.
10     Q.   Okay.  I'm just asking if you know
11  why.
12          Did you ever ask anyone why they
13  reserved for that particular note?
14     A.   I don't recall.
15     Q.   Do you know whether the debtor
16  reserved for any other note on this list during
17  the bankruptcy?
18     A.   Again, I don't recall.  I wasn't
19  part of any process of -- again, like any fair
20  value adjustments or anything to that degree.
21  Like I said, a lot of that was done by DSI and
22  it was kind of out of our court.
23     Q.   Okay.  Do you know if any note
24  receivable on this list was ever deemed by the
25  debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1
2    A.   I don't -- I don't have a
3  recollection of every filing, so I don't know.
4    Q.   Did you ever have a discussion with
5  anybody at any time about whether any of the
6  notes receivable on this list should be deemed
7  to be doubtful or uncollectible?
8    A.   No.   As I previously stated, we were
9  told we didn't have to keep GAAP financials.
10  We weren't having -- you know, there is no
11  underlying audits being performed, so I mean,
12  it wasn't something I worried about.
13    MR. MORRIS:   I move to strike.
14    Q.   Did you ever have a conversation
15  with anybody about any of the notes receivable
16  and whether they should be deemed to be
17  doubtful or uncollectible?   Did you have the
18  conversation, yes or no?
19    MS. DANDENEAU:   Objection to form.
20    A.   I don't recall.
21    Q.   Do you recall ever telling anybody
22  that you believed any of the notes receivable
23  on this list should be doubtful -- should be
24  deemed to be doubtful or uncollectible?
25    MS. DANDENEAU:   Objection to form.

Page 247

WATERHOUSE - 10-19-21

1
2    A.   I don't recall.   I mean, it may have
3  happened, you know, again, when we initially
4  getting DSI up to speed and going through
5  financials, it may have happened, but I don't
6  recall specifically.
7    Q.   While you were the CFO of Highland
8  during the time that the company was in
9  bankruptcy, did you have any reason to believe
10  that any of the notes receivable on this list
11  other than Hunter Mountain Investment Trust
12  should have been characterized as doubtful or
13  uncollectible?
14    MS. DANDENEAU:   Objection to form.
15    MS. DEITSCH-PEREZ:   Form.
16    A.   I didn't know.   I didn't form an
17  opinion.   Bankruptcy was new to me.   It still
18  is new to me, even after going through this.
19  So I really didn't know what to expect nor
20  really -- you know, I didn't know.
21    MR. MORRIS:   I move to strike.
22    Q.   During the period of Highland's
23  bankruptcy when you were serving as CFO, did
24  you have any reason to believe any of the notes
25  on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1
2    MS. DEITSCH-PEREZ:   This is like the
3  fifth time you've asked it.   Object to the
4  form.
5    MR. MORRIS:   I'm moving to strike,
6  if you haven't noticed, because he's not
7  answering the question.
8    MS. DEITSCH-PEREZ:   He was answering
9  the question, you just didn't like it, like
10  the answer.
11    MR. MORRIS:   Good Lord.
12    Q.   Go ahead, Mr. Waterhouse.
13    A.   Again, I don't -- we brought up a
14  myriad of issues at the start of the bankruptcy
15  case.   I don't recall if this was one of them,
16  but, again, there are a lot of things we
17  couldn't change.   Even, you know, I was told
18  status quo, blah, blah, blah, right, there is a
19  stay, you can't -- you know, I don't recall
20  specifically, but that doesn't mean it didn't
21  happen.
22    MR. MORRIS:   I move to strike.
23    Q.   During the time that Highland was in
24  bankruptcy and you served as CFO, did you have
25  any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1
2  receivable on this list were doubtful or
3  uncollectible?
4    MS. DEITSCH-PEREZ:   Object to the
5  form.
6    A.   Potentially.
7    Q.   Did you ever tell anybody that?
8    A.   As I just stated like five times,
9  yes, we -- at the beginning after filing and we
10  were getting DSI and others up to speed, you
11  know, we had a myriad of discussions of a lot
12  of things and this was likely one of them.   I
13  don't -- but I don't recall specifically we
14  talked --
15    Q.   I don't want to know -- I don't want
16  to know what was --
17    MS. DEITSCH-PEREZ:   Wait, wait.
18  Excuse me.   Mr. Morris, you did not let him
19  finish his answer.
20    A.   I spoke -- we had -- we were
21  bringing Fred Karesa and Brad Sharp (phonetic)
22  up to speed on all of these items, contracts,
23  and investments and going through -- we had
24  hours and hours and hours of discussion.   And
25  then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1    once, twice, three, four times with -- you
2    know, I mean, we -- I don't -- I don't remember
3    the sum culmination of all these discussions.
4    They all kind of blend together.
5         MR. MORRIS:  Okay.  I move to strike
6    and I will try one more time.
7    Q.   Did you ever tell anybody at DSI
8    that you believed any of the notes receivable
9    on this list were doubtful or uncollectible?
10        MS. DANDENEAU:  Object to form.
11   A.   Potentially.
12   Q.   Potentially you told them or
13   potentially they were doubtful or
14   uncollectible?
15   A.   Potentially I told them that we
16   needed to look at the value of these -- of
17   these assets.
18   Q.   Okay.  Did you -- okay.  It is
19   potential that you told them and it is
20   potentially that you didn't; right?
21        MS. DANDENEAU:  Objection to form.
22   A.   I've gone through that.  I don't
23   recall specifically.
24   Q.   So you should just -- I don't want

Page 251

WATERHOUSE - 10-19-21

1    to tell what you to do.  Do you have --
2         MS. DANDENEAU:  Good.
3    Q.   Other than -- other than telling
4    them that they should look at the values, do
5    you have any recollection whatsoever of ever
6    having told anybody at DSI that any of the
7    notes receivable on this page were doubtful or
8    uncollectible?
9         MS. DEITSCH-PEREZ:  Object to the
10   form.
11        MS. DANDENEAU:  Objection.
12   A.   I recall having general discussions
13   about everything on our balance sheet which
14   would have included these -- these notes
15   receivable.
16   Q.   Okay.
17   A.   I don't recall specifically where
18   those discussions delved into.
19   Q.   Do you recall any discussion at all
20   on the topic of whether any of these notes on
21   this list were doubtful or uncollectible?
22        MR. AIGEN:  Mr. Morris, how on earth
23   is that question different from the
24   question that you just asked for the last

Page 252

WATERHOUSE - 10-19-21

1    five times?  I mean, really I thought you
2    were -- (overspeak.)
3         MR. MORRIS:  Because he never
4    answered it.
5         MS. DEITSCH-PEREZ:  Are you
6    listening to him?
7         MR. MORRIS:  You know --
8         MS. DEITSCH-PEREZ:  He basically
9    said that he had a conversation with DSI
10   that went over all of this stuff and that
11   conversation could have included the notes
12   but he doesn't recall specifically.
13        What more do you want him -- to ask
14   of him?
15        MR. MORRIS:  I want him -- I would
16   love him to say -- I would like him to
17   testify to the truth, and that is he has no
18   recollection.
19        MS. DEITSCH-PEREZ:  Well, the truth
20   as you would like to see it, but -- but he
21   is testifying truthfully.  And I -- and, by
22   the way, I move to strike that comment --
23        MR. MORRIS:  Okay.
24        MS. DEITSCH-PEREZ:  -- because it

Page 253

WATERHOUSE - 10-19-21

1    suggests that he has not testified
2    truthfully.
3         MR. MORRIS:  I will ask my question
4    again.  And if at any time you want to
5    direct him not to answer, that is your
6    prerogative.
7    Q.   Mr. Waterhouse, do you have any
8    recollection at all of ever telling anybody
9    from DSI that any of these notes were doubtful
10   or uncollectible?
11        MS. DANDENEAU:  Object to form.
12   A.   I don't remember specifically.
13   Q.   Do you remember generally that
14   specific topic?
15   A.   We generally talked about assets,
16   values.  If -- we had discussions of that and
17   collectability in nature.  I mean, of Highland,
18   the funds, the CLOs, the entire complex.  We
19   had discussions like that, which is, you know,
20   as you look at a billion dollar consolidated
21   balance sheet.
22        So I generally remember -- this is
23   billions of dollars, including these assets --
24   having discussions of this -- of this type.

Page 254

WATERHOUSE - 10-19-21

1
2  Q.  Do you believe that an affiliate
3  loan on this list was doubtful or
4  uncollectible?  Would you have told that to
5  DSI?
6      MS. DANDENEAU:  Objection to form.
7      MS. DEITSCH-PEREZ:  Object to form.
8  A.  If we had, like -- again, if we --
9  if -- if we weren't preparing financial
10  statements in accordance with GAAP, and -- you
11  know, if DSI at that point -- they were --
12  again, I was new to bankruptcy.
13      The CRO is -- we are delegating
14  everything to the CRO.  All the decisionmaking.
15  Remember -- remember when you and I went into
16  Delaware Court and we were saying DSI basically
17  does everything, remember this, Mr. Morris?
18      You were my counsel at the time, and
19  basically we're running everything through DSI.
20  That was what this was like in the early part.
21      Everything was communicated through
22  DSI.  So DSI says this.  DSI says that.  That
23  is what we're doing, and we're pointing out
24  things to them.
25      Now, they decide what direction this

Page 255

WATERHOUSE - 10-19-21

1
2  goes.
3      Q.  Did you point out that any of
4  these --
5      A.  I don't recall specifically.
6      Q.  Okay.  At any time that you served
7  as Highland's CFO, did you ever point out to
8  DSI that any of these loans were doubtful or
9  uncollectible?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      MS. DANDENEAU:  Objection.
13      A.  If you're asking me if I had a
14  conversation with DSI, if any of these loans
15  were doubtful or uncollectible, I don't recall
16  specifically.
17      Q.  Do you recall that the debtor filed
18  on the docket monthly operating reports?
19      A.  Yes.
20      Q.  You prepared those personally,
21  didn't you?
22      MS. DEITSCH-PEREZ:  Objection to
23  form.
24      A.  I didn't personally prepare them,
25  the team did with DSI.

Page 256

WATERHOUSE - 10-19-21

1
2      Q.  But you signed them; correct?
3      A.  My signature is on the MORs.
4      Q.  And you signed them as the preparer
5  of the document; correct?
6      A.  Yes, I did this pursuant to DSI's
7  instructions.
8      Q.  Okay.  You wouldn't have signed the
9  document if you didn't believe it to be
10  accurate; correct?
11      A.  If I had reason to believe it
12  wasn't, presumably I wouldn't have signed it.
13      Q.  Okay.  And do you have any reason to
14  believe right now that any monthly operating
15  report that has your signature on it was
16  inaccurate in any way?
17      MS. DEITSCH-PEREZ:  Object to the
18  form.
19      A.  My understanding of the monthly
20  operating reports is we were filing them in
21  accordance with the standards set by the Court.
22  It wasn't -- you know, again, I don't -- you
23  know, it wasn't GAAP.  It wasn't these other
24  standards, so I testified I didn't have
25  experience in this.  The CRO was running the

Page 257

WATERHOUSE - 10-19-21

1
2  show.  I followed their advice.
3      Q.  But you assured yourself that
4  everything in the report was accurate before
5  you signed them; correct?
6      MS. DANDENEAU:  Objection to form.
7      A.  I trusted the guidance from the CRO
8  and their team and their experience and their
9  guidance for doing this for many, many, many
10  years to -- to -- to categorize and put things
11  in ways on the form.
12      You know, my team had -- had not
13  filled out these forms before and needed all of
14  this guidance.  I'm not an expert in this.  I
15  have oversight of it.  I signed the form.  DSI
16  told me to.
17      Q.  And you and your team are the source
18  of the information that DSI used to create the
19  reports; correct?
20      MS. DANDENEAU:  Objection to form.
21      A.  The books and records reside with
22  the -- with -- with the corporate accounting
23  team.
24      Q.  Okay.  And the corporate accounting
25  team was the corporate accounting team that was

Page 258

WATERHOUSE - 10-19-21

1 under your direction; correct?
2 A. Yes.
3 Q. So -- so your team was responsible
4 for maintaining Highland's books and records;
5 correct?
6 A. I'm sorry, my team was responsible?
7 Q. Correct.
8 A. Yes. They -- they -- they were
9 the -- the -- the general ledger of Highland,
10 that responsibility was with the corporate
11 accounting team.
12 Q. The corporate accounting group
13 reported to you; correct?
14 A. Yes.
15 MR. MORRIS: Can we put up 41,
16 please.
17 (Exhibit 41 marked.)
18 Q. All right. You will see that this
19 is a report that is dated January 31st, 2020,
20 but it is for the month ending December 2019.
21 Do you see that?
22 A. I do.
23 Q. And you signed this report in your
24 capacity as the chief financial officer of

Page 259

WATERHOUSE - 10-19-21

1 Highland; correct?
2 A. Yes.
3 Q. And you're the preparer -- you're
4 identified as the preparer of the report;
5 correct?
6 A. That is correct.
7 Q. Do you recall participating in the
8 preparation of monthly operating reports?
9 A. As I testified earlier, it was put
10 together, you know, with the team. The team
11 worked with DSI to put these monthly operating
12 reports together. We had no experience at this
13 time of the monthly operating reports or things
14 of this nature.
15 MR. MORRIS: Can you turn to the
16 next page, please.
17 Q. Do you see a line item under assets
18 due from affiliates?
19 A. Yes, I do.
20 Q. Okay. And to the best of your
21 knowledge and understanding, as the person who
22 is identified as the preparer of this report,
23 does that line item include the affiliate loans
24 that we've been talking about?

Page 260

WATERHOUSE - 10-19-21

1 A. Again, I would have to see, just
2 like we did with the financial statements of
3 Highland and NexPoint, I would have to see a
4 detailed build, but, you know, if you look at
5 the other line items, you know, the only other
6 place it could be would be in -- in other
7 assets.
8 Q. Okay. And as a matter of
9 arithmetic, is it fair to say that is the value
10 of the assets due from affiliates was more than
11 25 percent of the value of Highland's total
12 assets as of 12/31/2019?
13 MS. DANDENEAU: Objection to form.
14 A. I'm really not doing the mental math
15 right now, so I've been going at this depo for
16 hours, so I'm really not -- you know --
17 Q. All right. No problem.
18 A. -- these are millions of dollars.
19 Q. Let's look at the Footnote 1,
20 please. Do you see there is a reference to the
21 Hunter Mountain note?
22 A. Yes, I see that in Footnote 1.
23 Q. Okay. And that's the reserve that
24 was taken against that note?

Page 261

WATERHOUSE - 10-19-21

1 A. Yes, that is what this indicates.
2 Q. Okay. And were you aware that the
3 reserve was being taken on that it was?
4 A. I was -- I was aware, yeah, at some
5 point, yes.
6 Q. Okay. And are you aware of any
7 reserve being taken with respect to any other
8 note that was issued in favor of Highland?
9 A. Again, as I testified, we didn't go
10 through an analysis on -- on -- on the other
11 notes.
12 Q. Can we turn --
13 A. I believe -- I believe it says that
14 in Footnote 1, fair value has not been
15 determined with respect to any of the notes.
16 So this footnote -- footnotes, look,
17 there has been no determination.
18 Q. Okay. The determination was made in
19 the audited financial statements just six
20 months earlier; right? We saw that earlier?
21 A. That was as of 12/31/18. I mean,
22 things -- circumstances -- there's a bank --
23 circumstances change, things change -- things
24 change over time, you know, facts and

Page 262

WATERHOUSE - 10-19-21

1 circumstances change. Again, you have to do an
2 analysis.
3    Q.   Okay. And you do recall that in
4 Highland's 2018 financial statement, all of the
5 notes issued by affiliates and Mr. Dondero that
6 were due at year-end had a fair value equal to
7 the carrying value; correct? We looked at
8 that?
9    A.   Yes. That was in the -- in the
10 disclosure for the -- for the affiliate notes,
11 yes.
12    Q.   And -- and you were obligated to
13 share with PwC any subsequent events between
14 the end of 2018 and the date that you signed
15 your management representation letter on June
16 3rd, 2019; correct?
17       MS. DEITSCH-PEREZ: Object to the
18    form.
19    A.   Yes. I -- I -- I signed the
20 management, you know, my signature is in the
21 management representation letter -- I hope I'm
22 answering your question -- that is dated in
23 June with the representations made in that
24 management representation letter.

Page 263

WATERHOUSE - 10-19-21

1    Q.   Okay. And there was nothing that
2 caused PricewaterhouseCoopers to include in
3 subsequent events any adjustment to the
4 conclusion that the fair value of the affiliate
5 notes and the notes issued by Mr. Dondero
6 equaled the carrying value; correct?
7       MS. DANDENEAU: Objection to the
8    form.
9    A.   That is correct. That is what was
10 in the -- in the -- in the footnotes.
11    Q.   Okay. So are you aware of anything
12 that occurred between June 3rd, 2019 and
13 December 31st, 2019 that would have caused the
14 fair value of the notes to differ from the
15 carrying value?
16    A.   Yeah. Highland filed for
17 bankruptcy, things changed -- I mean, there was
18 a bankruptcy filed in October of -- of -- of
19 2019, right, the petition date that we've
20 described earlier.
21       I mean, I had a -- I guess looking
22 back naively, I thought we were going to get an
23 audit from PwC for year-ended 2019, and when we
24 had discussions with PwC, they were like, are

Page 264

WATERHOUSE - 10-19-21

1 you crazy, we're not auditing this. Values
2 change, all these things change, bankruptcy
3 changes the entire scenario. I mean -- and
4 they're like, we're not -- we're not touching
5 this.
6       And so, you know, I was like, okay,
7 sorry, I get it, okay, no an audit.
8       I mean, it is -- you know, and --
9 you know, and we weren't preparing GAAP
10 financial statements.
11       Again, I didn't know what we were
12 doing in relation to our financial statements,
13 but these were the discussions I was having at
14 the time. And yeah, I mean, filing bankruptcy
15 from what I got from outside auditors and
16 others involved changed things dramatically.
17    Q.   Okay. Highland wasn't the obligor
18 under any of the notes that we're talking
19 about; correct?
20    A.   No.
21    Q.   So --
22    A.   That's right.
23    Q.   So can you identify any fact that
24 would cause the fair value to deviate from the

Page 265

WATERHOUSE - 10-19-21

1 carrying value during the seven-month period
2 between June 3rd and the end of the year, 2019?
3       MS. DANDENEAU: Objection to form.
4    A.   No. I mean, I'm putting myself back
5 at that time, right. Hindsight is 2020, but we
6 didn't do an analysis, but we would have done a
7 fulsome analysis and looked at all of the facts
8 and circumstances at the time, but asset values
9 change. You know, there could have been a
10 market crash in hindsight in 2020, which --
11 which affected entities' abilities.
12       There could have been all of these
13 things, right, that -- that happen. It is --
14 it is easy to look back in hindsight, but when
15 you are looking at this in -- in realtime, the
16 analysis is different, and again, we didn't do
17 an analysis.
18    Q.   Okay. You didn't do an analysis.
19    Do I have that right?
20    A.   I don't -- I don't recall doing one
21 or maybe -- you know, I don't recall doing one.
22       MR. MORRIS: Okay. I'm going to
23 take a break. I may be done, so the time
24 now is -- is 4:30 your time. Let's just

Page 266

WATERHOUSE - 10-19-21

1  take a short break until 4:40 your time.
2
3      MS. DANDENEAU:  Okay.
4      VIDEOGRAPHER:  We're going off the
5  record, 4:31 p.m.
6  (Recess taken 4:31 p.m. to 4:43 p.m.)
7      VIDEOGRAPHER:  We are back on the
8  record at 4:43 p.m.
9      MR. MORRIS:  I have no further
10  questions.
11      MR. RUKAVINA:  Okay.
12  Mr. Waterhouse, I will go next.
13          EXAMINATION
14  BY MR. RUKAVINA:
15  Q.   Sir, my name is Davor Rukavina.  I'm
16  the lawyer for --
17      MR. MORRIS:  Hey, Davor, just before
18  you begin, I just want to put on the record
19  Highland's objection to documents that were
20  produced to me 10 minutes before the
21  deposition began.
22      MR. RUKAVINA:  What the basis of
23  your objection?
24      MR. MORRIS:  That they were due
25  quite some time ago, and the fact that you

Page 267

WATERHOUSE - 10-19-21

1  had -- I just think it's appropriate to --
2  to dump documents on somebody 10 minutes
3  before the deposition.  I just think
4  that's --
5      MR. RUKAVINA:  Well, these are
6  documents Highland produced.  I'm not aware
7  of any rule I have to give you advance
8  documents when I know for the record that
9  other than the exhibits that you sent to us
10  last week, most of the exhibits you used
11  today you did not provide to me prior to
12  this deposition.
13      MR. MORRIS:  No, but the documents
14  were produced by me in -- in litigation,
15  right?
16      MR. RUKAVINA:  I'm going to use
17  primarily, John, the documents that you
18  produced to me today, but you may.
19      MR. MORRIS:  Primarily.  I've got --
20  I've got my objection.  You have got your
21  response.  Proceed.
22  Q.   Mr. Waterhouse, again, I represent
23  the advisors, HCMFA and NexPoint Advisors.
24      Do you understand that?
25

Page 268

WATERHOUSE - 10-19-21

1  A.   Yes.
2  Q.   You and I have never met or talked
3  before today, have we?
4  A.   No, I have -- I have heard your
5  voice on calls before.
6  Q.   Okay.
7      MR. RUKAVINA:  Madam Court Reporter,
8  I will use a few exhibits today.  My
9  associate, Mr. Nguyen, will find some way
10  to get them to you.  I don't know how to do
11  that, but it looks like you guys do.
12      I am going to use numbers as well.
13  But to differentiate them from Mr. Morris
14  we're going to mark mine with the prefix A
15  for advisors.
16      Do you understand?
17      COURT REPORTER:  Yes.
18      MR. RUKAVINA:  Okay.  Perfect.
19  Q.   Okay.  So, Mr. Waterhouse, let's
20  start with those two HCMFA notes that you were
21  asked about, one for 5 million and one for
22  2.4 million.
23      Do you recall those notes?
24  A.   Yes.

Page 269

WATERHOUSE - 10-19-21

1  Q.   Were you ever the CFO of HCMFA?
2  A.   I don't recall.
3  Q.   So to the best of your recollection,
4  you were still an officer of HCMFA in 2019,
5  just that your title was treasurer?
6      MR. MORRIS:  Object to the form of
7  the question.  There is no leading here.
8  He works for your client.
9      MS. DANDENEAU:  That is not -- that
10  is not true.
11      MR. MORRIS:  He's the treasurer --
12  he is the treasurer of your client.  I
13  don't -- I'm going to object every time you
14  try to lead, so...
15      MR. RUKAVINA:  Totally fine to
16  object.
17      MR. MORRIS:  Okay.
18  Q.   Please answer my question,
19  Mr. Waterhouse.
20  A.   I'm sorry, could you repeat?  There
21  was...
22  Q.   Yes.  You were -- you testified
23  earlier that in 2019 you were an officer of
24  HCMFA; correct?
25

Page 270

```
1          WATERHOUSE - 10-19-21
2     A.   Yes, I testified that I was the
3   treasurer and I didn't know if that incumbency
4   certificate, you know, was one that appointed
5   me as a treasurer, but yes.
6     Q.   I'm just trying to confirm that
7   sitting here today, to the best of your
8   recollection, at that time you were -- your
9   title was treasurer.  It was not chief
10  financial officer.
11    A.   I don't recall that being my title.
12    Q.   Okay.  And in May of 2019, however,
13  I think you testified you were the chief
14  financial officer of the debtor; correct?
15         MR. MORRIS:  Objection to the form
16    of the question.
17    A.   Yes, I was -- yes.
18    Q.   Okay.  As such, in May of 2019, did
19  you have the authority, to your understanding,
20  to unilaterally loan $5 million or $2.4 million
21  to anyone on behalf of the debtor?
22         MR. MORRIS:  Objection to the form
23    of the question.
24    A.   Sorry, can you repeat that?
25    Q.   Yes.  So in your capacity as the
```

Page 271

```
1          WATERHOUSE - 10-19-21
2   chief financial officer of the debtor, Highland
3   Capital Management, L.P., in May of 2019, did
4   you believe that you unilaterally, just Frank
5   Waterhouse, had the authority to loan on behalf
6   of the debtor to anyone $5 million and
7   $2.4 million?
8          MR. MORRIS:  Objection to the form
9     of the question.
10    A.   No.
11    Q.   Is it because loans of that amount
12  would have had to be approved by someone else?
13    A.   Yes.
14    Q.   Who in '20 -- in May of 2019, if
15  Highland wanted to loan 5 million or
16  $2.4 million to someone, what would have been
17  the internal approval procedure?
18         MR. MORRIS:  Objection to the form
19    of the question.
20    A.   If -- if we had loans of that nature
21  that needed to be made due to their size, we
22  would have gotten approval from the -- the
23  president of Highland.
24    Q.   And who that was individual?
25    A.   It was James Dondero.
```

Page 272

```
1          WATERHOUSE - 10-19-21
2     Q.   Okay.  Now, I'm going to ask you a
3   similar question but for a different entity.
4          In May of 2019, as the treasurer of
5   HCMFA, did you believe that you unilaterally
6   had the ability to cause HCMFA to become the
7   borrower of a $5 million loan and a
8   $2.4 million loan?
9          MR. MORRIS:  Objection to the form
10    of the question.
11    A.   No.
12    Q.   What would -- what would the
13  approval have taken place -- strike that.
14         What would the approval process have
15  been like in May of 2019 at HCMFA for HCMFA to
16  take out a $7.4 million loan?
17         MR. MORRIS:  Objection to the form
18    of the question.
19    A.   The process would have been similar
20  to what we just discussed on -- for Highland to
21  make a loan to others.  So, again, you know,
22  we -- we would have -- either myself or someone
23  on the team would have discussed this with
24  the -- the president and owner of -- of HCMFA.
25    Q.   And who was that individual?
```

Page 273

```
1          WATERHOUSE - 10-19-21
2     A.   That was James -- Jim Dondero.
3     Q.   So do I understand that in May of
4   2019, on behalf of both the lender, Highland,
5   and the borrower, HCMFA, Mr. Dondero would have
6   had to approve $7.4 million in loans?
7          MR. MORRIS:  Objection to the form
8     of the question.
9     A.   Yes.
10    Q.   You mentioned when Mr. Morris was
11  asking you the NAV error, N-A-V error, with
12  respect to TerreStar, without writing us a
13  novel, unless you feel like you have to, can
14  you summarize what that NAV error was?  What
15  happened?
16    A.   There was a -- in the Highland
17  Global Allocation Fund, it owned at the time an
18  equity interest in a company called TerreStar.
19  And TerreStar is -- at the time was a private
20  company, and it may still be today.  Again, I'm
21  putting myself back then as a private company.
22         We had -- sorry, I don't mean we --
23  the fund and the advisor used Houlihan Lokey
24  to -- to value that investment.  And during
25  that time there was some trades that were
```

Page 274

WATERHOUSE - 10-19-21

1
2 executed at market levels that were much lower
3 than the Houlihan Lokey model.
4          And based on information and
5 discussions with the portfolio managers and,
6 you know, principals that were very familiar
7 with TerreStar, it was determined that those
8 trades were non-orderly and they were not
9 considered in the valuation as consulted with
10 Houlihan Lokey and PricewaterhouseCoopers at
11 the time.
12          Subsequent to a -- I can't remember
13 the exact circumstances of why the SEC got
14 involved. I think it was due to this -- this
15 investment became a material position in the
16 fund. It triggered an SEC, kind of, inquiry.
17 And as part of that inquiry, they questioned
18 the valuation methodology. "They" meaning the
19 SEC.
20          And at the culmination of that
21 process -- this is all summarized -- the value
22 that was -- that ultimately had to be used in
23 the fund's NAV was different than -- materially
24 different than what the original valuation at
25 Houlihan Lokey provided.

Page 275

WATERHOUSE - 10-19-21

1
2          And given that there was this fund
3 was, as we discussed -- I don't know if we
4 discussed it, but it was an open-ended fund
5 that was going -- that was converting to a
6 close-end fund.
7          Due to the fact that it was an
8 open-ended fund, you had to recalculate NAV and
9 see what the impact was on people -- on
10 investors coming in and out of the fund and if
11 there is a detrimental impact and to calculate
12 what that -- what that impact was and if there
13 was any amounts owed to the fund pursuant to
14 the error.
15     Q.    Were you personally involved
16 internally at either Highland or HCMFA with
17 these investigations and discussions with the
18 SEC?
19     A.    I was.
20     Q.    Which other key people or senior
21 people at Highland were involved, to your
22 recollection?
23     A.    Myself, Thomas Surgent, David Klos,
24 Lauren Thedford, Jason Post.
25     Q.    Mr. Dondero, was he --

Page 276

WATERHOUSE - 10-19-21

1
2     A.    I believe Cliff Stoops. I'm trying
3 to think. And maybe that is -- that is -- that
4 is -- that is all kind I can recall at the
5 moment.
6     Q.    Do you recall whether it was
7 determined that the fund suffered losses as a
8 result of this error?
9     A.    The -- the fund -- the -- the --
10 because the open-ended nature of the fund,
11 there were losses that were attributable to
12 investors. Meaning they -- they would have
13 redeemed and got a less money or -- or they
14 subscribed in and maybe because they didn't get
15 enough shares and then they later sold and then
16 they were harmed in that fashion.
17          And there is -- there is -- there
18 were very -- there were very detailed
19 calculations and, you know, all these different
20 scenarios that we had to -- I'm sorry, I keep
21 saying "we" -- that the individuals involved
22 had to calculate and quantify.
23     Q.    Well, do you recall whether HCMFA
24 admitted certain fault and liability for this
25 error?

Page 277

WATERHOUSE - 10-19-21

1
2     A.    I don't recall specifically.
3     Q.    Do you recall whether HCMFA caused
4 any funds to be paid to the investors and the
5 fund the subject of the NAV error?
6     A.    Yes.
7     Q.    Do you recall the approximate amount
8 of funds, moneys paid to the investors and the
9 fund?
10     A.    It was -- it was approximately
11 $7 million.
12     Q.    If I was to suggest 7.8 million,
13 would that ring more true or are you sticking
14 with your original answer?
15     A.    It was -- it was approximately 7 --
16 7 to $8 million. Again, I don't remember the
17 exact number, but it was in that ballpark.
18     Q.    So regardless of whether HCMFA
19 accepted fault or liability, it caused some
20 $7 million or more to be paid out to affected
21 investors in the fund?
22          MR. MORRIS: Objection to the form
23 of the question.
24     A.    And I want to make sure I'm
25 understanding your question because there is a

Page 278

WATERHOUSE - 10-19-21

1 lot of different entities that are going on to
2 my head.
3       I think what you are saying is based
4 on this error, shareholders were harmed by this
5 approximately $7.8 million -- by approximately
6 $7.8 million. Is that what you are asking?
7    Q.   Yes, sir.
8    A.   Yes, that was -- again, I don't have
9 the exact numbers. If I take -- it was -- it
10 was in that ballpark, and there is a detail
11 calculation and write-up that could, that --
12 that exists someplace.
13    Q.   Now, at that time, at the time that
14 the NAV error occurred, was there a contract in
15 place between HCMFA and the debtor pursuant to
16 which the debtor was providing services to
17 HCMFA?
18       MR. MORRIS: Objection to the form
19 of the question.
20    A.   Yes.
21    Q.   Was that contract generally called a
22 shared services agreement?
23    A.   It was generally called that, but
24 there were -- there were -- I mean, it -- it --

Page 279

WATERHOUSE - 10-19-21

1 it depends on who you talk to, but yes,
2 generally, there were -- there were multiple
3 agreements.
4    Q.   Pursuant to one or more of those
5 agreements, was the debtor providing certain
6 services to HCMFA?
7       MR. MORRIS: Objection to the form
8 of the question.
9    A.   Yes.
10    Q.   And can you at a very high level
11 summarize in 2018 and 2019 what those services
12 were?
13    A.   Yes, there was a -- yes.
14    Q.   Okay. Please -- please go -- go
15 through a short summary.
16    A.   There was a -- a cost reimbursement
17 agreement between Highland Capital Management
18 Fund Advisors and Highland Capital Management,
19 L.P. That agreement was for what we referred
20 to as front office services, so investment
21 management, things of that nature.
22       There was I think what most people
23 refer to as the shared services agreement that
24 was -- that agreement was between Highland

Page 280

WATERHOUSE - 10-19-21

1 Capital Management Fund Advisors and Highland
2 Capital Management for back office services.
3    Q.   And can you summarize what you mean
4 by back office services?
5    A.   Those services were for accounting,
6 finance, tax, valuation, HR, IT, you know,
7 legal compliance, things of -- things of those
8 nature -- or things of that nature, excuse me.
9    Q.   So in the spring of 2019, do you
10 recall whether HCMFA took the position that it
11 was actually Highland that caused the NAV error
12 to occur pursuant to the valuation services
13 that Highland was providing?
14       MR. MORRIS: Objection to the form
15 of the question.
16    A.   I do not recall.
17    Q.   Did you ever have any discussions
18 with anyone, Jim Dondero or anyone in the first
19 half of 2019 as to whether Highland, the
20 debtor, that is, had any liability to HCMFA
21 related to the NAV error?
22       MR. MORRIS: Objection to the form
23 of the question.
24    A.   I do not recall.

Page 281

WATERHOUSE - 10-19-21

1    Q.   And then you mentioned that the fund
2 was being closed and some compensation related
3 to that. Can you -- can you elaborate? What
4 were you referring to?
5    A.   Right. So the advisor, pursuant to
6 board approval, put a proposal in front of the
7 shareholders of the Highland Global Allocation
8 Fund to convert it from an open-ended fund to a
9 closed-end fund.
10       As an open-ended fund, when
11 shareholders subscribe to the fund or redeem
12 into the fund, they do it at NAV.
13       When it is -- when you have a
14 closed-end fund, closed-end funds are -- are
15 publicly-traded, like on the New York Stock
16 Exchange, exchanges like that, and -- and
17 shareholders or investors, they're not --
18 they're -- they're not subscribing and
19 redeeming the fund. They are like shares
20 of Apple.
21       Those shares of the Highland Global
22 Allocation Fund trade on an exchange, and that
23 is how you, you know, that is how you, you know,
24 you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1  sell your shares and you are no longer an
2  equity owner.
3        As part of that proposal, the
4  advisor told shareholders if you -- if you vote
5  for this proposal to -- to convert it from an
6  open-ended fund to a closed-end fund, we will
7  pay you some amounts of money. I forgot -- a
8  certain number of points. I think it was
9  like -- it was like two to three points or
10  something -- something like that.
11     Q. Okay. You mentioned when Mr. Morris
12  was asking you, going back to those two
13  promissory notes, you will recall the 5 million
14  and 2.4 million, you mentioned something to the
15  effect that Mr. Dondero told -- told you to pay
16  some moneys out of Highland. Do you remember
17  that discussion with Mr. Morris?
18     A. I do.
19     Q. So, to the best of your
20  recollection, did you have a discussion with
21  Mr. Dondero about making some payments in May
22  of 2019 out of Highland?
23     A. I recall, as I testified earlier,
24  that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1  for -- for these amounts attributable to -- it
2  was either the error -- you know, the error,
3  and in that conversation he said, go get the
4  money from Highland. I believe that is what I
5  testified earlier, and that -- that is my
6  recollection.
7     Q. Do you recall if that was an
8  in-person meeting or some other mode for the
9  meeting?
10    A. I -- I -- I recall that being
11  in-person.
12    Q. Do you recall if anyone else was
13  present, or was it just you and Mr. Dondero?
14    A. I recall just he and I.
15    Q. And the moneys that he told you to
16  find from -- or get from Highland, was that in
17  the amount of $5 million and $2.4 million?
18        MR. MORRIS: Objection to the form
19    of the question.
20    A. I believe so, but I would have to go
21  back and look and see when those moneys were
22  actually paid into the -- into the fund and,
23  you know, when those transfers were done. If
24  they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1  yes, I would say it was -- it was all related
2  to that.
3     Q. Did Mr. Dondero tell you that those
4  funds would be a loan from Highland to HCMFA?
5     A. I don't recall.
6        MR. MORRIS: Objection to the form
7    of the question.
8     Q. Now, and forgive me, I'm probably
9  the only non-American born here, but I speak
10  reasonably well in English. I don't recall,
11  does that mean you don't remember or does that
12  mean it didn't happen?
13       MR. MORRIS: Objection to the form
14    of the question.
15    A. It -- it means I don't -- I don't
16  remember.
17    Q. Did Mr. Dondero tell you to have
18  those two promissory notes prepared?
19    A. I don't recall.
20    Q. When you -- again, when you say, I
21  don't recall today, that means that sitting
22  here today, you just don't remember one way or
23  the other. Is that accurate?
24    A. Yes.

Page 285

WATERHOUSE - 10-19-21

1     Q. Is it possible that you, having
2  heard what Mr. Dondero said and seeing funds
3  being transferred, assumed that that would be a
4  loan without him actually telling you that
5  would be a loan?
6        MR. MORRIS: Objection to the form
7    of the question.
8     A. Sorry, I want to make sure -- did I
9  ask the amounts that were transferred that I --
10  that I assumed that that was a loan?
11    Q. Well, let me -- let me take -- let
12  me try again.
13        So you have established already that
14  there were quite a number of promissory notes
15  back and forth -- I'm sorry, quite a number of
16  promissory notes with affiliated companies and
17  individuals owing Highland money; right?
18    A. Yes.
19    Q. And you have established that there
20  were many transactions and transfers going back
21  and forth over the years; right?
22        MS. DANDENEAU: Objection to form.
23    A. In -- yes, in my capacity as CFO and
24  my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

1
2    Q.   And that's part of the reason why
3  you just can't remember some of the details
4  today because this -- this happened years ago,
5  and there were a number of transactions. Is
6  that accurate?
7        MS. DANDENEAU: Objection to the
8  form.
9        MR. MORRIS: Objection to the form
10  of the question.
11     A.   I mean, I deal with thousands of --
12  of -- of -- of transactions, you know, whether
13  it has -- the processing of transactions, you
14  know, if it has got, you know, more -- more
15  zeros, you know, behind it than others.
16        When you look at thousands of
17  transactions over the years for funds and
18  advisors and -- and, you know, financial
19  statements, I mean, it is -- it is very hard
20  going back in -- in -- in my -- you know,
21  14-ish year career at -- at Highland to
22  remember a lot of those details, especially
23  when I don't have any records or books or
24  anything like that, and -- and going back many
25  years.

Page 287

WATERHOUSE - 10-19-21

1
2    Q.   And that is fine. That -- that --
3  that is why I asked the question.
4        Is possible in May of 2019 when
5  Mr. Dondero told you to transfer the funds from
6  Highland, you just assumed on your own that
7  those would be loans without him actually
8  telling you that those would be loans?
9        MR. MORRIS: Objection to the form
10  of the question.
11     A.   I don't know.
12     Q.   I'm sorry, you --
13     A.   I said I don't know.
14     Q.   Okay. Well, as the -- as the CFO
15  for Highland, if you saw $7.4 million going
16  out, you would feel some responsibility to
17  account for that, wouldn't you?
18        MR. MORRIS: Objection to the form
19  of the question.
20     A.   Yes.
21     Q.   Is it fair to say that those would
22  be in the range large enough to rise up to your
23  level?
24        MR. MORRIS: Objection to the form
25  of the question.

Page 288

WATERHOUSE - 10-19-21

1
2    A.   If -- I don't know if I understand
3  your question. Those amounts would arise to my
4  level where I would be involved or...
5    Q.   You would want to know what a
6  transfer for that amount, $7.4 million, was all
7  about, as the CFO of Highland, wouldn't you?
8        MR. MORRIS: Objection to the form
9  of the question.
10     A.   Yes, I make it -- I mean, I -- I
11  review all sorts of payments, I mean, even
12  smaller dollar payments on a periodic basis,
13  you know, to -- to -- to understand and to make
14  sure that we are paying things in a -- you
15  know, in -- in -- in an informed way. And, you
16  know -- and we're -- and we're paying things
17  pursuant to vendor contracts and things like
18  that.
19     Q.   So as part of that, is it possible
20  that seeing $7.4 million go out you would have
21  promissory notes made in order to keep a paper
22  trail, assuming that those were loans, when
23  perhaps they were never intended to be loans by
24  Mr. Dondero?
25        MR. MORRIS: Objection to the form

Page 289

WATERHOUSE - 10-19-21

1
2  of the question.
3     A.   I don't know. As I testified
4  earlier, I had conversations with Mr. Dondero
5  about -- about the -- the -- the moneys that
6  were needed for the NAV error. And I recall
7  him saying go get it from Highland -- or get it
8  from Highland.
9     Q.   Well, why did you sign those
10  promissory notes and why didn't you have him
11  sign them?
12        MR. MORRIS: Objection to the form
13  of the question.
14     A.   I don't know. I don't know.
15     Q.   You mentioned earlier that you
16  typically don't sign promissory notes. Am I
17  remembering your testimony correctly?
18        I mean, promissory notes on behalf
19  of the entities. Not yourself, obviously.
20     A.   Yes, that is what I said earlier.
21     Q.   Do you recall any other promissory
22  notes in the million-plus range that you had
23  ever signed before on behalf of any entity?
24     A.   There is -- there has been a lot of
25  transactions over the years. I don't -- I

Page 290

WATERHOUSE - 10-19-21

1 don't -- I don't recall generally. I don't --
2 I don't recall.
3 Q. So -- but to the best of your
4 recollection, it was on your initiative,
5 following your discussion with Mr. Dondero,
6 that you had someone draft those two promissory
7 notes; is that correct?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. Yes, we would have -- the team, as I
11 stated earlier, we don't draft promissory
12 notes. "The team" meaning the accounting and
13 finance team.
14 So the team would have worked with
15 the legal group at Highland to draft any notes.
16 Q. Do you believe or do you have any
17 recollection as to whether you would have done
18 that pursuant to an email or telephone call or
19 in-person meeting?
20 MR. MORRIS: Objection to the form
21 of the question.
22 A. Are you asking if I would have -- if
23 those notes would have been drafted pursuant to
24 an email or phone call?
25

Page 291

WATERHOUSE - 10-19-21

1 Q. Strike that.
2 Do you recall whether you sent an
3 email to anyone asking them to draft those two
4 promissory notes?
5 A. I don't recall because, again,
6 once -- I would have instructed -- likely
7 instructed the team to -- to work with the
8 legal group to draft these documents.
9 I -- I -- I -- yeah, I didn't -- I
10 mean, that is more an operational-type
11 procedure. So, you know, a manager or a
12 controller or working with legal. You know,
13 they -- they can certainly handle that task to
14 get that -- you know, to request that from
15 legal.
16 Q. And who on your team do you think
17 you would have asked to do that?
18 MR. MORRIS: Objection --
19 Q. Who would have been the logical
20 person or people, if you don't remember their
21 name today?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. It -- it -- there is only two
25

Page 292

WATERHOUSE - 10-19-21

1 managers of the group. That would have been
2 Dave Klos or Kristin Hendrix.
3 Dave was the -- one of his duties
4 was managing the valuation team, and so he was
5 intimately involved with this process. So, you
6 know...
7 Q. Okay.
8 A. I don't recall specifically but, I
9 mean, my general -- you know, I -- I -- I
10 likely would have talked to Dave first about it
11 versus someone like Kristin who hadn't been
12 intimately involved.
13 Q. And -- and do you have a view as to
14 whether it is most likely that you would have
15 done that by email or in-person or how would
16 you believe you would have communicated that to
17 Mr. Klos?
18 MR. MORRIS: Objection to the form
19 of the question.
20 A. I likely would have done that in
21 person. Again, if things of this nature
22 that -- again, you have to put ourselves back
23 to, we have been working on this very stressful
24 project for many, many months. And once the
25

Page 293

WATERHOUSE - 10-19-21

1 go-ahead was to -- you know, we see the light
2 at the end of the tunnel with wrapping this up
3 and making shareholders whole -- sorry to say
4 "we" -- you know, the -- so the folks that are
5 involved in it.
6 I like to talk to people
7 face-to-face and -- and -- and go to -- and go
8 to their desk, because that shows if I'm going
9 to their desk that -- that is something that I
10 want done, you know.
11 Q. And do you remember, Mr. Waterhouse,
12 getting those two promissory notes in paper
13 format or by email before they were executed?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. I don't recall.
17 Q. For whatever was the ordinary course
18 back then in May 2019, would you expect to have
19 received them only on paper or would you have
20 expected to have received them in Word document
21 or PDF document by email?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. I -- I didn't sign -- I signed very
25

Page 294

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    few documents via email.  I can't say that it
3    never happened, but people either stopped by my
4    office and physically walked in documents for
5    signature that we discussed face-to-face.
6           Or documents were -- if -- if --
7    if -- if -- let's say I wasn't there or I
8    wasn't available, documents were dropped off.
9    I had -- I had some in- and outboxes in front
10   of my -- my office there at the Crescent.
11          Documents would be dropped off for
12   signature.  There would be a cover sheet that
13   would be -- have been applied to those
14   documents detailing, you know, who dropped it
15   off, the purpose, why, what time.
16          And then, you know, as I stated, I
17   don't draft documents and I always go to the
18   legal group and the compliance group to make
19   sure that they're in the loop.  And there is
20   a -- a box or section that says, Has legal
21   reviewed or approved, or something to that
22   nature.
23          Again, I don't -- I don't have
24   access to that cover sheet anymore, but it
25   was -- it was something to that effect.

Page 295

1    WATERHOUSE - 10-19-21
2           And my assistant, you know, if she
3    was there, she would review that -- you know,
4    whatever was being dropped off.  And if that
5    has legal, you know, reviewed or -- reviewed or
6    approved it, if that wasn't -- if that stuff
7    hadn't been done, it was like she would just
8    tell them like, go -- go -- go to the legal
9    group, because --
10       Q.   Let me -- let me pause --
11          MS. DANDENEAU:  Let him finish.
12          MR. MORRIS:  Thank you.  Go ahead.
13       A.   I take -- go to the legal group
14   because that -- that was my -- you know, I
15   didn't -- I didn't review anything that -- that
16   they weren't -- you know, or there wasn't some
17   representation made to me that they had
18   reviewed, approved in some capacity.
19          Again, my -- my -- my goal, as CFO,
20   is to provide transparency and make sure that
21   groups like compliance and other things -- and
22   the other group in legal are -- are in -- you
23   know, their -- they're made aware of
24   transactions of -- you know, that are crossing
25   my desk.

Page 296

1    WATERHOUSE - 10-19-21
2           Because I'm not in every
3    conversation.  They're not in every
4    conversation -- meaning legal compliance -- and
5    I just want to make sure that -- that everyone
6    is in sync to, you know, to -- to the extent
7    possible.
8        Q.   So if we summarize, you don't
9    specifically remember signing these two notes,
10   but most likely it would have been that they
11   would have presented -- been presented to you
12   physically on paper?
13          MR. MORRIS:  Objection to the form
14   of the question.
15       A.   They would -- they would have been
16   presented physically on paper most likely or
17   someone would have left it.  But, I mean,
18   again, I don't -- I don't recall.
19       Q.   I understand.  Understand.
20          When you signed -- when you signed
21   documents, when you personally signed
22   documents, did you typically use a ink pen or
23   did you use a stamp?
24       A.   No, I -- I -- I use a -- an -- an
25   ink pen.

Page 297

1    WATERHOUSE - 10-19-21
2        Q.   Do you know -- was there a file at
3    Highland kept anywhere with ink-signed
4    originals of a promissory notes in general or
5    these two promissory notes specifically?
6           MR. MORRIS:  Objection to the form
7    of the question.
8        A.   Sorry, I just want to make sure I
9    understand your question.  Are you saying is
10   there a file somewhere that has ink-signed
11   originals of these two promissory notes?
12       Q.   Yes.
13       A.   I would -- I would assume they're
14   some place.  I mean --
15       Q.   Well, was there a -- was there a
16   place where Highland generally kept originals
17   of promissory notes owed to it?
18       A.   I wouldn't -- no.
19          MR. RUKAVINA:  Mr. Nguyen, would you
20   please pull up my A7, alpha 7.
21       Q.   These are the two promissory notes,
22   Mr. Waterhouse.
23          (Exhibit A7 marked.)
24       Q.   And please -- Mr. Waterhouse, please
25   command my associate to scroll down as you need

Case 3:21-cv-00881-X   Document 186-3   Filed 01/09/24   Page 7 of 131
Case 3:21-cv-00881-X   Document 78-18   Filed 05/09/24   Page 141 of 200   PageID 44485
Appendix   Page 009289

Page 298

WATERHOUSE - 10-19-21

1  to, but I want you to take a very close look at
2  your two signatures here and tell me whether
3  you believe, in fact, that you ink signed them
4  or whether you --
5      MS. DANDENEAU:  Mr. Rukavina,
6  Mr. Waterhouse has the copies.
7      MR. RUKAVINA:  Perfect.  Then you
8  can take this down, Mr. Nguyen.
9      A.   These -- these -- these signatures
10  are identical, now that I stare at them, and I
11  mean, they are so close -- I mean, they're
12  identical that, I mean, even with my chicken
13  scratch signature, I don't know if I can -- you
14  know, I do this 100 times, could I do that
15  as -- as precisely as I see between the two
16  notes.
17     Q.   Well, that is why I ask.
18  Mr. Waterhouse, now that you have examined
19  them, does it seem like it is more likely that
20  you actually electronically signed these?
21     MR. MORRIS:  Objection to the form
22  of the question.
23     A.   Is -- I don't -- I don't recall
24  specifically.  As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1  did have a -- an electronic signature, and that
2  was used from time to time.  It wasn't as
3  common practice back in 2019.  It definitely
4  was more common practice when we had to work
5  from home and remotely for COVID because it
6  that made it almost impossible to, right,
7  provide wet signatures since we're all working
8  from home remotely.
9      Q.   Well, going just for these two
10  promissory notes, Mr. Waterhouse, in light of
11  your inability to remember any details, are you
12  sure you actually signed either or both of
13  those notes?
14     MS. DANDENEAU:  Objection to form.
15     A.   I don't recall specifically
16  signing -- actually physically signing these
17  notes.  As I said before, I don't recall doing
18  that.  This -- this looks like my signature,
19  but yet these two signatures are identical.
20     Q.   So you don't recall physically
21  signing them, and I take it you don't recall
22  electronically signing them either?
23     A.   I don't recall.  You know, Highland
24  has all my emails.  If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1  you know, I don't have any of these records is
2  what I'm saying.  I don't have any of those
3  records.
4      Q.   That is why I'm asking you these
5  questions in great detail because I don't have
6  those emails.  I'm trying to -- I'm hoping that
7  you will give me some names or some details so
8  I can go look for more emails, but again, you
9  don't remember any -- any individual, other
10  than Mr. Dondero that we've discussed, you
11  don't remember any individual with whom you
12  discussed these promissory notes prior to their
13  execution?
14     MR. MORRIS:  Objection to the form
15  of the question.
16     A.   I don't recall discussing it with
17  anybody else.
18     Q.   Okay.
19     A.   I mean, prior --
20     Q.   I understand.
21     A.   You know, there was no one else --
22  there was no one else in that meeting that I
23  recall with Mr. Dondero.
24     Q.   Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1  May of 2019 --
2      A.   And -- and from what I recall, and
3  the reason why I was by myself is -- is, you
4  know, I don't -- I don't want to speculate, I'm
5  sorry.
6      Q.   Okay.  We have established that by
7  May of 2019, in your view, the liabilities of
8  HCMFA exceeded its assets; correct?
9      A.   Yeah.  I mean, again, I don't have
10  financial statements in front of me, but I
11  think, if I recall, we'd have to go through the
12  testimony with Mr. Morris, I believe that was
13  the case.
14     Q.   In fact, you will recall that in
15  April of 2019, Mr. Dondero signed a document
16  that extended the demand feature of two prior
17  notes to May 31, 2019.  Do you recall that?
18     MS. DEITSCH-PEREZ:  I think you
19  might -- maybe have the court reporter read
20  that back.  You might have misspoke.
21     (Record read.)
22     MR. RUKAVINA:  And I did misspeak.
23     Q.   I meant to say to May 31, 2021.  Do
24  you recall that, sir?

Page 302

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2        MR. MORRIS:  Objection to the form
3  of the question.
4     A.  Yes.
5        MR. RUKAVINA:  And, Mr. Nguyen, just
6  so that the record is clear, will you please
7  pull up my Exhibit Alpha 10, A10.
8        (Exhibit A10 marked.)
9     Q.  You don't have this one in front of
10  you, Mr. Waterhouse?  This is the one that
11  Mr. Morris used earlier.  Do you see that
12  document, sir?
13     A.  Yes, I do.
14     Q.  And this is what you were testifying
15  about before when Mr. Morris was asking you.
16  Do you remember that?
17     A.  Yes.
18     Q.  So here is my question for you,
19  Mr. Waterhouse:  As the chief financial officer
20  of Highland, was it prudent for Highland less
21  than three weeks later to be lending
22  $7.2 million to an insolvent entity that
23  couldn't even then pay its debts back to
24  Highland?
25        MS. DANDENEAU:  Objection to form.

Page 303

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2        MR. MORRIS:  Objection to the form
3  of the question.
4     A.  Sorry, I just want to make sure –
5  are you asking me, did you say, was it prudent
6  for Highland to loan $7.4 million to HCMFA a
7  few weeks after this document was executed?
8     Q.  Yes, and at a time when HCMFA's
9  liabilities exceeded its assets.
10        MR. MORRIS:  Objection to the form
11  of the question.
12     A.  I don't – it is odd.  I don't know.
13        MR. RUKAVINA:  You can take this
14  exhibit down, Mr. Nguyen.
15     Q.  Do you recall asking anyone,
16  Mr. Dondero or – or anyone outside as to
17  whether Highland ought to be lending
18  $7.4 million to HCMF regarding HCMF's
19  creditworthiness?
20        MR. MORRIS:  Objection to the form
21  of the question.
22     A.  I don't recall.
23     Q.  Did you receive personally any of
24  that $7.4 million?
25     A.  No.

Page 304

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2     Q.  Did you even –
3        MR. MORRIS:  I didn't hear that
4  question, sir.
5        MR. RUKAVINA:  The one that he
6  answered, John, or my new one?
7        MR. MORRIS:  No, no, your question,
8  Davor.
9        MR. RUKAVINA:  I had asked him
10  whether he received any of the
11  $7.4 million.  He said no.
12        MR. MORRIS:  Yeah.  I thought there
13  was a question after that.  Maybe I was
14  mistaken.  I apologize.
15        MR. RUKAVINA:  I had started a new
16  question, so here, let me start the new
17  question again.
18     Q.  Did you personally receive any
19  direct benefit from those two notes for
20  $7.4 million?
21     A.  No.
22     Q.  Did you ever personally consider
23  yourself obligated to repay either or both of
24  those notes?
25     A.  No.

Page 305

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2        MR. RUKAVINA:  Pull up those notes
3  again, Mr. Nguyen.
4     Q.  You can have them in front of you,
5  Exhibit 7, Mr. Waterhouse, whatever is easier
6  for you.  If you go to your signature page, my
7  question to you is, why did you not include
8  your title as treasurer by your name, Frank
9  Waterhouse?
10        MS. DANDENEAU:  Objection to form.
11     A.  I didn't – I didn't draft this
12  document.
13     Q.  So you relied on whoever drafted it
14  to draft it correctly?
15     A.  Yes.
16     Q.  Okay.  But back then when you signed
17  this, did it ever cross your mind that you were
18  the maker on these notes?
19     A.  No.
20     Q.  Back then when you signed this
21  document, did it ever cross your mind that you
22  could be a co-obligor on these notes?
23     A.  No.  I didn't receive $7.4 million,
24  I mean...
25     Q.  But can you say that HCMFA received

Page 306

WATERHOUSE - 10-19-21

1  $7.4 million?
2      A.   I would have to go back and look and
3  check in, you know, the -- the financial
4  records and the bank statements.
5      MR. RUKAVINA:  You can take this
6  exhibit down, Mr. Nguyen.
7      Q.   Mr. Waterhouse, I'm not trying to be
8  a smart-ass, but if the law says that because
9  of the way that you signed this promissory
10  note, if that is what the law says, that that
11  made you personally -- personally liable, then
12  you would agree with me that that was never
13  your intent?
14      MR. MORRIS:  Objection to the form
15  of the question.
16      A.   That was never -- I wouldn't sign a
17  note and not get consideration in return.
18      Q.   So putting all other issues aside,
19  if the law -- if the law says that you were
20  liable for those notes because of how you
21  signed them, then would you agree with me that
22  these notes are a mistake?
23      MR. MORRIS:  Objection to the form
24  of the question.

Page 307

WATERHOUSE - 10-19-21

1      MS. DANDENEAU:  Objection to the
2  form.
3      A.   Yes.
4      Q.   So do you agree with me that it's
5  odd -- I think that is the word you used --
6  that Highland would be loaning $7.4 million a
7  few weeks after that extension to an entity
8  whose liabilities exceeded its assets, and you
9  would agree with me that it was never your
10  intention to be in any way liable for these two
11  promissory notes; correct?
12      MR. MORRIS:  Objection to the form
13  of the question.
14      A.   Sorry, you -- you asked a lot there.
15      MR. RUKAVINA:  I will strike it and
16  I will move on.
17      Let's go to -- pull up Exhibit 9,
18  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19  9, A9.
20      (Exhibit A9 marked.)
21      Q.   Sir, take a moment to look at this,
22  but this is an email, and you will see attached
23  July 31, 2020 affiliate notes.
24      Do you see that attachment?

Page 308

WATERHOUSE - 10-19-21

1      A.   Yes.
2      Q.   Okay.  And do you see an entry for
3  Highland Capital Management Fund Advisors?
4      MR. MORRIS:  I'm sorry, hold on.
5  Where are you looking?
6      MR. RUKAVINA:  Last page, John.
7      MR. MORRIS:  Is it the page on the
8  screen?
9      MR. RUKAVINA:  Oh, I'm sorry.
10  Mr. Nguyen just did it.  Yes, the last page
11  there.
12      MR. MORRIS:  Thank you.
13      Q.   Do you see an entry there for HCMFA?
14      A.   Yes.
15      Q.   About $10.5 million.
16      Do you see that?
17      A.   I do.
18      Q.   And, now, do you have any
19  explanation for why if HCMFA owed $7.4 million,
20  plus the 5.3 million that had been extended,
21  why that amount was only 10.5 million?
22      A.   I don't know.  Okay.
23      MR. RUKAVINA:  Close this one and
24  pull up, Mr. Nguyen, the schedules,

Page 309

WATERHOUSE - 10-19-21

1  schedule of assets.  What exhibit is this
2  of ours, Mr. Nguyen?
3      MR. NGUYEN:  This is A11.
4      MR. RUKAVINA:  Oh, this will be A11.
5      (Exhibit A11 marked.)
6      Q.   You don't have this in front of you,
7  Mr. Waterhouse?
8      A.   Okay.
9      Q.   This is what Mr. Morris used
10  earlier.  Do you remember looking at this with
11  Mr. Morris?
12      A.   Yes.
13      MR. RUKAVINA:  You might have to
14  zoom in a little.  Okay.
15      Q.   Now, I see Affiliate Note A, B, and
16  C.
17      Do you have any recollection as to
18  why the names of the affiliates are omitted?
19      A.   I don't.  I testified earlier that,
20  you know, the team worked with DSI in providing
21  these.  I -- I don't -- I don't know.
22      Q.   Can we deduce -- is it logical to
23  deduce that Affiliate Note A would be NexPoint
24  given its size of $24.5 million?

**Page 310**

WATERHOUSE - 10-19-21

1
2    MR. MORRIS: Objection to the form
3  of the question.
4    A.  I mean, it – it is a – it is – it
5  is approximate.
6    Q.  Well, can we – can we deduce – or,
7  I'm sorry, strike that.
8       Can you, sitting here today,
9  logically conclude that Affiliate Note B or C
10  represents HCMFA?
11    MR. MORRIS: Objection to the form
12  of the question.
13    A.  I don't know.  I don't know.  I
14  can't.
15    Q.  Okay.  As of the petition date, we
16  have established that HCMFA, under promissory
17  notes, owed $7.4 million and $5.3 million to
18  the debtor; correct?
19    MR. MORRIS: Objection to the form
20  of the question.
21    A.  Yes.
22    Q.  Okay.  And by my reckoning, that
23  would be somewhere approaching $13 million.
24    MR. MORRIS: Objection to the form
25  of the question.

**Page 311**

WATERHOUSE - 10-19-21

1
2    Q.  It would be $12.7 million.  Is that
3  generally correct?
4    A.  Sorry, the amounts were 7.4, 5.3.
5    Q.  Yes.
6    A.  Okay.  Yeah, that – that – I can
7  do that math, yes.
8    Q.  Do you have any explanation or any
9  understanding of why there is no similar entry
10  listed here on the schedule of assets filed
11  with the bankruptcy court?
12    MR. MORRIS: Objection to the form
13  of the question.
14    A.  I don't know.  We have to look at
15  the supporting schedules, like I talked about
16  other – presumably there is – there is a
17  build to the schedule that would provide the
18  detail.
19    Q.  Well, that was going to be my next
20  question.  You anticipated it.
21    MR. RUKAVINA: You can – you can
22  take this down, Mr. Nguyen.
23    Q.  Do you believe that whenever you and
24  your team provided the underlying data to the
25  financial advisor that the actual names of the

**Page 312**

WATERHOUSE - 10-19-21

1
2  affiliates for Affiliate Note A, B, and C would
3  have been listed there?
4    A.  Are you asking we provided the names
5  to the financial advisor?  I don't – I don't
6  understand who the financial advisor is.
7    Q.  I'm sorry, DSI.
8       Let me ask the question this way,
9  Mr. Waterhouse.
10       Whenever you provided information
11  about the affiliate notes to DSI, do you
12  believe that you would have included the actual
13  names of the affiliates, you or your team, or
14  that you would have done the Affiliate Note A,
15  Note B, Note C?
16    MR. MORRIS: Objection to the form
17  of the question.
18    MS. DANDENEAU: Objection to the
19  form.
20    A.  We – like I testified earlier, when
21  we were – we gave everything to – to DSI.  We
22  were giving all of our records, all of our
23  files, everything to DSI.  We weren't redacting
24  information or saying, hey, here is a note,
25  here is Affiliate Note A or B.

**Page 313**

WATERHOUSE - 10-19-21

1
2  I mean, it was – our job and our
3  focus – and I testified in court back in 2019;
4  right – was – was to be transparent and, you
5  know, get DSI up to speed on – on the matters
6  at Highland.  So I can't see us redacting at
7  that point.
8    MR. RUKAVINA: Mr. Nguyen, will you
9  please pull up Mr. Morris' Exhibit 36.
10  Just the very first page, the very top
11  email.  You might zoom in a little bit.
12    Q.  Now, you recall being asked about
13  this by Mr. Morris?
14    A.  Yes, I do.
15    Q.  And you wrote:  The HCMFA note is a
16  demand note.
17       You wrote that; right?
18    A.  Yes.
19    Q.  And, in fact, weren't there by that
20  point in time several notes?
21    A.  Yes, there were.  Again, I don't –
22  I don't remember everything specifically.  I
23  mean –
24    Q.  I understand.  I understand.
25       So this is an example where – where

Page 314

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    you might have made a mistake by referring to a
3    singular instead of a plural; right?
4        A.   Yes.
5        Q.   Okay.  And you -- you wrote -- a
6    couple of sentences later, you wrote:  There
7    was an agreement between HCMLP and HCMFA the
8    earliest they could demand is May 2021.
9            You wrote that; right?
10       A.   Yes.
11       Q.   But I think you -- you agreed with
12   Mr. Morris that that can't possibly apply to
13   the May 2019 notes, can it?
14           MR. MORRIS:  Objection to the form
15       of the question.  That is not what he
16       testified to.
17       Q.   Let me ask -- let me ask a different
18   question.
19           Sitting here today -- or if you can
20   answer me from your memory on October 6,
21   2020 -- did the April acknowledgment that
22   extended the maturity date apply to the
23   May 2019 notes also?
24       A.   I don't recall specifically.
25       Q.   Well, you recall that the notes that

Page 315

1    WATERHOUSE - 10-19-21
2    you signed were demand notes; right?
3        A.   Yes.
4        Q.   Do you find it logical, based on
5    your experience, that had they intended to have
6    a different or a set maturity date, you would
7    have instructed that that set maturity date be
8    included instead of a demand feature?
9            MR. MORRIS:  Objection to the form
10       of the question.
11       A.   Sorry, just want to make sure I
12   understand.  You are saying that -- that the
13   $5 million note, the $2.4 million note, if
14   those were supposed to be a term note, that I
15   would have made sure that those were a term
16   note?
17       Q.   I'm saying -- I'm saying,
18   Mr. Waterhouse, that on May the 2nd and May the
19   3rd, 2019, if you intended that those two
20   promissory notes could not be called until May
21   2021, would you have included such language in
22   those two promissory notes?
23           MR. MORRIS:  Objection to the form
24       of the question.
25       A.   I guess -- I'm sorry, I don't recall

Page 316

1    WATERHOUSE - 10-19-21
2    putting language in those May notes.  I don't
3    remember what language you are referring to.
4        Q.   Well, let's read this again.
5            There was an agreement between HCMLP
6    and HCMFA the earliest they could demand is May
7    2021.
8            Do you recall that agreement?
9        A.   Yes, that was the agreement we
10   looked at earlier; correct?
11       Q.   Okay.  Yes.
12           Do you -- do you understand now that
13   that agreement that we looked at earlier also
14   applied to the May 2019 notes that you signed?
15       A.   I don't -- I don't know.
16       Q.   But as of October 6, 2020, you're
17   writing that there is one demand note and
18   you're categorizing that demand note as not
19   being demandable on May 2021; correct?
20       A.   Yes.
21       Q.   And you know now that you made at
22   least one mistake in this email; correct?
23           MR. MORRIS:  Objection to the form
24       of the question.
25       A.   Yes.

Page 317

1    WATERHOUSE - 10-19-21
2            MR. RUKAVINA:  You can pull this
3        down, Mr. Nguyen.
4            So, Mr. Waterhouse, you don't
5    remember Mr. Dondero telling you to make these
6    loans or not.  HCMLP was loaning $7.4 million
7    to someone that their assets were less than
8    their liabilities.
9            We don't see on the July list of
10   notes, where there is $12.7 million of notes,
11   we don't see that on the bankruptcy schedules,
12   and we have this Exhibit 36 where you are
13   confused.
14           Are you prepared to tell me, sir,
15   today that you might have made a mistake in
16   executing those two promissory notes?
17           MR. MORRIS:  Objection to the form
18       of the question.
19       A.   I -- I don't know.
20       Q.   And if it turns out that you're
21   personally liable for those promissory notes,
22   it would certainly be a mistake, wouldn't it?
23           MS. DANDENEAU:  Objection to the
24       form.
25           MR. MORRIS:  Join.

Page 318

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  If Mr. Dondero testifies that he
4  never told you to make these loans, would you
5  disagree with his testimony?
6      MR. MORRIS:  Objection to the form
7  of the question.
8  A.  Like I testified earlier with my
9  conversation with Mr. Dondero, all I recall is
10  he said, get the money from Highland.
11  Q.  And if Mr. Dondero testifies that
12  he, in consultation with other senior personnel
13  at Highland, decided that Highland needed to
14  pay HCMFA $7.4 million as compensation for the
15  NAV error and not a loan, would you have any
16  reason to disagree with Mr. Dondero?
17      MR. MORRIS:  Objection to the form
18  of the question.
19  A.  If that was – if that was his
20  intent, yes, it would – I would –
21  Q.  Do you have any reason to disagree
22  with him?
23      MR. MORRIS:  Objection to the form
24  of the question.
25  A.  If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1  know.  I don't know how I disagree with that.
2
3  Q.  And just to confirm, you don't
4  remember ever asking Mr. Dondero whether you
5  should have two promissory notes prepared?
6  A.  No.
7  Q.  And you don't remember discussing
8  with Mr. Dondero what the terms of those two
9  promissory notes should be?
10  A.  I don't recall – I testified all I
11  recall is he said, get the money from Highland.
12  I don't recall – the – the terms of the note, I
13  don't recall ever having a discussion around
14  the terms of the note, but since I don't draft
15  the notes, that – there could have been a
16  conversation with other people later.
17  Q.  Do you have any memory of whether
18  after the notes were drafted, but before you
19  signed them, that you communicated with
20  Mr. Dondero in any way to just confirm or – or
21  get his blessing or ratification to signing
22  those notes?
23      MR. MORRIS:  Objection to the form
24  of the question.
25  A.  I don't recall.

Page 320

WATERHOUSE - 10-19-21

1
2  Q.  Again, the only thing you remember,
3  sitting here today, was Mr. Dondero said, get
4  the money from Highland, and that is it, that
5  is all you remember?
6      MR. MORRIS:  Objection to the form
7  of the question.
8  A.  I testified to that several times.
9  This was over two years ago.  A lot has
10  happened.  That is all I recall.
11  Q.  And help me here.  I'm not very
12  technologically astute.  When you – and I – I
13  recognize that you do it rarely, but when you
14  sign a document electronically, do you believe
15  that there is an electronic record of you
16  having authorized or signed a document
17  electronically?
18      MR. MORRIS:  Objection to the form
19  of the question.
20  A.  I – I don't know the tech answer to
21  that, but, you know, since I don't have – I
22  don't ever attach my signature block
23  electronically, my assistant would have done
24  that, and if that is done over email like we
25  did several times – you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1
2  multiple times over COVID, she would attach my
3  signature block and then email it out to
4  whatever party.
5  Q.  What was your assistant's name in
6  May 2019?
7  A.  It was Naomi Chisum.
8  Q.  Is she the only one?  I'm sorry, was
9  she your only assistant that would have maybe
10  facilitated logistically something like you
11  just described?
12  A.  You know, she was out on maternity
13  leave at some point.  I don't – I don't recall
14  those dates where she was out for maternity
15  leave.  There was – there were folks backing
16  her up.  I don't recall specifically who
17  those – who those, you know, administrative
18  assistants were, and I don't recall
19  specifically if she was out during this time on
20  maternity leave.
21      I do know that that she was out for
22  a period of time, or who knows, or she could
23  have been on vacation that day or, you know, I
24  don't know.
25  Q.  Switching gears now, the two

Page 322

WATERHOUSE - 10-19-21

1  complaints that have been filed that is against
2  HCMFA and NexPoint, did you see any drafts of
3  those complaints before they were filed?
4      MR. MORRIS: Objection to the form
5      of the question, and to the extent that you
6      had any communications with counsel or you
7      were shown drafts of the complaints by
8      counsel while you were employed by
9      Highland, I direct you not to answer.
10     A.  I – I reviewed documents yesterday
11  with counsel here. I believe that is the first
12  time I have ever seen those.
13     Q.  Okay. Did you ever discuss with
14  Mr. Seery these two lawsuits before or after
15  they were filed?
16     A.  I don't recall.
17     Q.  Were you ever interviewed by legal
18  counsel, to your knowledge, about these
19  promissory notes before the complaints were
20  filed? Without going into what was said, were
21  you ever interviewed by legal counsel?
22     MR. MORRIS: Objection to the form
23     of the question.
24     A.  I don't recall.

Page 323

WATERHOUSE - 10-19-21

1      Q.  Obviously with COVID, it changed,
2  but – but before COVID, did you used to meet
3  with Mr. Seery from time to time in-person?
4      A.  Yeah, I mean, so before COVID – so
5  we're talking kind of late March, early April,
6  right, there was about – I don't remember the
7  specific date when the board for Highland was
8  appointed. I believe it was around February of
9  2020, so maybe there was a month-and-a-half,
10  two-month window where we were meeting
11  in-person or, you know, like we were actually
12  in the office, excuse me, we were in the
13  office.
14      And, you know, when they were first
15  appointed, the board members and Mr. Seery
16  were – were definitely down here more
17  in-person.
18      Q.  Did you ever see Mr. Seery taking
19  written notes of – of his meetings with you or
20  others?
21      A.  I don't recall.
22      Q.  Do you recall on any Zoom or video
23  conference with Mr. Seery, seeing him take
24  notes, written notes?

Page 324

WATERHOUSE - 10-19-21

1      A.  The Zoom calls we had, I don't
2  recall having seen video or, you know, or if it
3  was on Zoom, I just remember it being – well,
4  no, you know what, there were some – you know,
5  I take that back.
6      So there were – there were some
7  times that I did remember seeing Mr. Seery
8  on – on some of the Zoom calls.
9      Q.  Well, let me –
10     A.  I don't – sorry, I'm thinking. I'm
11  thinking – I'm going back. I'm trying to
12  process this.
13     Q.  I can make it much quicker,
14  Mr. Waterhouse. I have heard – I have heard
15  that Mr. Seery is a copious note taker.
16      Do you have any knowledge about
17  that?
18     A.  No.
19     Q.  Okay. Switching gears yet again,
20  and this will be last theme. Do you need a
21  restroom break, or are you good to go for
22  another half an hour?
23     MS. DEITSCH-PEREZ: I need a
24     restroom break.

Page 325

WATERHOUSE - 10-19-21

1      MR. RUKAVINA: Can we make it five
2  minutes?
3      THE WITNESS: Five minutes would be
4  great.
5      VIDEOGRAPHER: We're going off the
6  record at 5:53 p.m.
7  (Recess taken 5:53 p.m. to 5:59 p.m.)
8      VIDEOGRAPHER: We are back on the
9  record at 5:59 p.m.
10     Q.  Mr. Waterhouse, I had asked you
11  earlier about contracts between HCMFA and the
12  debtor, and now I'm going to talk about
13  contracts between the debtor and NexPoint
14  Advisors. Okay?
15     A.  Okay.
16     Q.  Now, were there contracts similar to
17  the ones with HCMFA that NexPoint had in the
18  nature of employee reimbursement and shared
19  services?
20     A.  Yes, they – NexPoint Advisors and
21  Highland Capital Management Fund Advisors had
22  cost reimbursement and shared services
23  agreements with Highland Capital Management,
24  L.P.

Page 326

WATERHOUSE - 10-19-21

1
2  Q.  And was that shared services
3  agreement, to the best of your understanding,
4  in place as of December 31, 2020?
5  A.  It was -- it was terminated at some
6  point, and I remember the contracts had
7  different termination dates, but I think the --
8  the date of termination was January 31st of
9  2021, after the termination was put in.
10  So yeah, it would be in place at the
11  end of the year of December -- it would be in
12  place at December 31st, 2020.
13  Q.  And pursuant to that agreement as of
14  December 31st, 2020, was the debtor providing
15  what you would describe as back office services
16  to NexPoint?
17  A.  Yes.
18  Q.  Would those have included accounting
19  services?
20  A.  Yes.
21  Q.  And as part of those accounting
22  services, would the debtor have assisted
23  NexPoint with paying its bills?
24  MR. MORRIS:  Objection to the form
25  of the question.

Page 327

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  So let's break that up.  You were a
4  treasurer of NexPoint as well in December of
5  2020?
6  MR. MORRIS:  Objection to the form
7  of the question.
8  A.  Yes.
9  Q.  Okay.  And in December of 2020, did
10  NexPoint have its own bank accounts?
11  A.  Yes.
12  Q.  And did it use those bank accounts
13  to pay various of its obligations?
14  A.  Yes.
15  Q.  Did employees of the debtor have the
16  ability to cause transfers to be made from
17  those bank accounts on behalf of NexPoint?
18  A.  Yes.
19  Q.  And is that one of services that the
20  debtor provided NexPoint, basically ensuring
21  that accounts payable and other obligations
22  would be paid?
23  A.  Yes.
24  MR. MORRIS:  Objection to the form
25  of the question.

Page 328

WATERHOUSE - 10-19-21

1
2  Q.  You answered yes?
3  A.  Yes.
4  Q.  And the payments, though, whose
5  funds would they be made from?
6  A.  From the bank account of NexPoint
7  Advisors.  If they were NexPoint advisor
8  obligations, it would be made from NexPoint
9  Advisors' bank account.
10  Q.  So let's pull up Exhibit Alpha 1.
11  You should have that -- it is my Tab 1 or my
12  Exhibit 1.
13  (Exhibit A1 marked.)
14  Q.  So this is a -- this is a series of
15  emails, Mr. Waterhouse.  Let's look at the
16  first page here, November 25, 2020, between
17  Kristin Hendrix and yourself.
18  Do you see that, sir?
19  A.  I do.
20  Q.  And do you see where Ms. Hendrix
21  writes:  NPA.
22  Do you know what NPA stood for?
23  A.  Yes.
24  Q.  And what does it stand for?
25  A.  NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1
2  Q.  And was that how you-all internally
3  at Highland refer to NexPoint Advisors, L.P.?
4  A.  I mean, yes, amongst other things.
5  Q.  And she writes at the bottom of her
6  email:  Okay to release?
7  Do you see that?
8  A.  Yes, I do.
9  Q.  So what --
10  MR. MORRIS:  Hold on one second.
11  Okay.  Go ahead.
12  MR. RUKAVINA:  Yeah.
13  Q.  So what is -- what is Ms. Hendrix
14  here on November 25 asking of you?
15  A.  She is asking me -- so she -- these
16  are -- these are payments -- typically we would
17  do an accounts payable run every week at the
18  end of every Friday.  But looking at this date,
19  it is Wednesday, November 25th, which means, to
20  me, it is likely Thanksgiving weekend.
21  So this is the day before
22  Thanksgiving, so this is the last kind of --
23  kind of day before the holidays and vacation
24  and things of that nature.  So it is
25  effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1    So she is -- she is putting in all
2  the payments for the week because we batch
3  payments weekly. And these are the payments
4  that go out that week, and she is informing me
5  of the payments and -- you know, again, at the
6  bottom of the email, she is asking for my okay
7  to -- to release these payments in the wire
8  system.
9    Q. So these would be accounts payable
10  of NexPoint?
11    A. I mean, it would be accounts payable
12  for all of these entities listed on this email.
13    Q. And who was Ms. Hendrix employed by
14  in November and December of 2020?
15    A. Highland Capital Management.
16    Q. Okay. So -- so part of the services
17  that NexPoint had contracted with was for
18  Highland to ensure that NexPoint timely paid
19  its accounts payable; is that accurate?
20    MR. MORRIS: Objection to the form
21  of the question. You have got to be
22  kidding me.
23    Q. Is that accurate?
24    A. Yes.

Page 331

WATERHOUSE - 10-19-21

1    Q. And did NexPoint rely on employees
2  of the debtor to ensure that NexPoint's
3  accounts payable were timely paid?
4    MR. MORRIS: Objection to the form
5  of the question.
6    A. Yes.
7    MR. RUKAVINA: Let's flip to the
8  next page, Mr. Nguyen, if you will please
9  scroll to the next page.
10    Q. So this is an email similar to the
11  prior one, November 30th.
12    Do you see where it says, NPA HCMFA,
13  USD $325,000 one-day loan?
14    Do you see that, sir?
15    A. I do.
16    Q. Do you have any memory of what that
17  was?
18    A. I don't recall what that -- what
19  that payment was for.
20    Q. Did it sometimes occur that one
21  advisor would, on very short-terms, make loans
22  to another advisor?
23    A. Yes. This -- this -- this occurred
24  from -- from -- from time to time. It actually

Page 332

WATERHOUSE - 10-19-21

1  looking at -- I'm -- I'm looking at the date of
2  this email. It is November 30th. It is the
3  last day of the month.
4    HCMFA has obligations it needs to
5  pay to its broker-dealer, which is HCFD. And
6  it likely was short funds to make those
7  obligations under that -- under its agreement,
8  and so it provided a one-day loan because on
9  the next business day on 12/1 -- or the next
10  business day in December, it would receive
11  management fees from the underlying funds that
12  it managed and it would be able to pay back
13  that loan to NexPoint Advisors.
14    Q. So -- so here Ms. Hendrix was
15  seeking your approval to transfer $325,000 from
16  NexPoint to HCMFA for a one-day loan; is that
17  correct?
18    A. That is correct.
19    Q. Let's flip to the next page, sir.
20    MR. RUKAVINA: And, Mr. Nguyen, if
21  you will please scroll down.
22    Now we have an entry for
23  $325,000, 11/30 loan payment.
24    Do you see that, sir?

Page 333

WATERHOUSE - 10-19-21

1    A. Yes.
2    Q. And that is probably the loan that
3  was approved on the prior page?
4    A. Yes, most likely.
5    Q. So is it also true, sir, that in
6  addition to accounts payable debtor employees
7  would be assisting NexPoint with respect to
8  paying back its debt?
9    MR. MORRIS: Objection to the form
10  of the question.
11    A. I mean, yes, for loans of this
12  nature, yes.
13    Q. Well, what about long term loans?
14  Was it reasonable for NexPoint to expect debtor
15  employees to ensure that NexPoint timely paid
16  its obligations under long-term notes?
17    MR. MORRIS: Objection to the form
18  of the question.
19    MS. DANDENEAU: Objection to form.
20    A. I mean, that is one of the things
21  that the Highland personnel did provide to the
22  advisors. Yes, we would -- we would -- over
23  the years, yes, we -- we -- we -- we did do
24  that generally. Again, I don't remember

Page 334

WATERHOUSE - 10-19-21

1 specifically but, yes, generally we -- you
2 know, we did do that.
3     Q.   So do you recall -- and we can pull
4 it up, if need be -- that under the NexPoint
5 note that Mr. Morris asked you about earlier,
6 the one for more than $30 million, that
7 NexPoint was obligated to make an annual
8 payment of principal and interest?
9         MR. MORRIS:  Objection to the form
10    of the question.
11    A.   Yes, it was -- yes, it -- it was an
12 amortizing note.  It was -- you know, from what
13 we reviewed earlier, it was payable by
14 December 31st of each year.  So -- but are --
15 are you asking me --
16    Q.   I'm just asking you, sir, if you
17 recall the note.
18    A.   Yes, the $30 million note, yes, we
19 reviewed it earlier, yes.
20    Q.   And do you recall Mr. Morris had you
21 go through the fact that NexPoint had made
22 payments in years prior to 2020 on that note?
23    A.   I do.
24    Q.   And do you believe that employees of

Page 335

WATERHOUSE - 10-19-21

1 the debtor would have played any role in
2 NexPoint having made those prior payments?
3         MR. MORRIS:  Objection to the form
4    of the question.
5    A.   Yes.
6    Q.   And what role in years prior to 2020
7 would employees of the debtor have had with
8 respect to NexPoint making that annual payment?
9    A.   We -- we -- we would have -- I keep
10 saying "we."  The team would have calculated
11 any amounts due under that loan and other
12 loans, as -- as standard course.
13        We would -- since we provided
14 treasury services to the advisors, we would
15 inform the -- the -- the -- we informed
16 Mr. Dondero of any cash obligations that are
17 forthcoming, whether we do cash projections.
18        If, you know, any of these payments
19 would have -- or, you know, the sum total of
20 all of these payments, including any note
21 payments, if there were any cash shortfalls, we
22 would have informed Mr. Dondero of any cash
23 shortfalls.  We could adequately plan, you
24 know, in instances like that.

Page 336

WATERHOUSE - 10-19-21

1         Or, sorry, we -- I say "we" -- I
2 keep saying "we" -- I keep wearing my -- again,
3 my -- my treasurer hat.
4         But, yes, it is to -- it is to
5 inform Mr. Dondero of the obligations of the
6 advisors in terms of cash and obligations that
7 are -- are upcoming and that -- and that are --
8 are scheduled to be paid.
9    Q.   And would those obligations that are
10 upcoming and scheduled to be paid prior to 2020
11 have incurred the annual payment on that
12 NexPoint $30 million note?
13        MS. DANDENEAU:  Objection to form.
14        MS. DEITSCH-PEREZ:  Davor, I think
15    you misspoke.  You might want to just
16    repeat the question.
17    Q.   Okay.  Let me repeat the question,
18 sir.
19        Prior to 2020, those services that
20 you just described, would that -- on behalf of
21 the debtor, would that have included NexPoint's
22 payments on the $30 million note?
23    A.   Yes.
24    Q.   So someone at the debtor in treasury

Page 337

WATERHOUSE - 10-19-21

1 or accounting would have sent some schedule or
2 a reminder that a payment would be coming due
3 in the future.  Is that generally the practice?
4    A.   Yes, we would -- you know, again, I
5 didn't -- I didn't micromanage the teams, but
6 we had a -- a corporate accounting calendar
7 that we use as kind of a tickler file to keep
8 track of payments.
9         I actually, you know, don't know how
10 actively they're using that in -- in prior to
11 2020, but it was actively used at some point.
12        We did look at NexPoint cash
13 periodically and cash for the other advisors as
14 well and payments.  You know, we -- payments
15 like this would have appeared in our cash
16 projections, in the advisor's cash projections.
17        And, again, as like I said earlier,
18 they would have appeared there, so there would
19 be time to plan for making any of these
20 payments.
21    Q.   And based on your experience, would
22 it have been reasonable for NexPoint to rely on
23 the debtors' employees to inform NexPoint of an
24 upcoming payment due on the $30 million

Page 338

WATERHOUSE - 10-19-21

1 promissory note?

2 MR. MORRIS: Objection to form of

3 the question.

4 MS. DANDENEAU: Objection to form.

5 A. Yes. Yes, they did. I mean, but I

6 mean, but I don't think these -- these notes

7 were any secret to anybody.

8 Q. I understand, and I'm not suggesting

9 otherwise.

10 MR. RUKAVINA: Please pull up Alpha

11 2, Mr. Nguyen.

12 (Exhibit A2 marked.)

13 Q. Now, this document is similar to the

14 ones we've seen before as of December 31, 2020,

15 and I don't see under NTA anything there for

16 paying the promissory note to Highland.

17 Do you see anything like that?

18 A. I do not.

19 MR. RUKAVINA: You can pull that --

20 that exhibit down, Mr. Nguyen.

21 Q. You are aware, of course, by now

22 that, in fact, NexPoint failed to make the

23 payment due December 31, 2020, are you not?

24 A. I am aware, and yes, I do understand

25

Page 339

WATERHOUSE - 10-19-21

1 it.

2 Q. Were you aware that Highland

3 accelerated that $30 million promissory note?

4 A. I am aware.

5 Q. Were you aware of that acceleration

6 at the time that it occurred?

7 A. I don't remember specifically.

8 Q. Do you recall whether anyone asked

9 you -- prior to the acceleration, anyone asked

10 you at Highland, what Highland should do with

11 respect to the missed payment?

12 A. Did anyone ask me what Highland

13 should do about the missed payment?

14 Q. Yes, before acceleration.

15 MR. MORRIS: Objection to the form

16 of the question.

17 A. I mean, what -- what I recall is

18 there was the -- sorry, are you asking me --

19 MS. DANDENEAU: Why don't you just

20 repeat the question, Mr. Rukavina.

21 Q. Let me try again, Mr. Waterhouse,

22 let me try again.

23 I am saying you're the CFO of

24 someone, in this case, Highland, and the

25

Page 340

WATERHOUSE - 10-19-21

1 borrower failed to make the required payment.

2 Are you with me so far?

3 A. I am.

4 Q. Did anyone then ask you, what should

5 we do with respect to our rights against the

6 borrower that missed the payment?

7 A. Not that I recall.

8 Q. Did you play a role in the decision

9 to accelerate that $30 million promissory note?

10 A. I did not.

11 Q. Do you recall whether Mr. Seery ever

12 asked you before the acceleration as to whether

13 he should accelerate the note?

14 A. I don't recall.

15 Q. And you don't recall when you

16 learned of the acceleration itself?

17 MR. MORRIS: Objection to the form

18 of that question.

19 A. It was -- it was sometime in

20 early -- in early 2021. I don't remember

21 specifically.

22 Q. But do you recall whether it was

23 after the acceleration had already been

24 transmitted?

25

Page 341

WATERHOUSE - 10-19-21

1 MS. DANDENEAU: Objection to the

2 form of the question.

3 A. I don't recall.

4 Q. Do you recall in early to mid

5 January of 2021, after the default, discussing

6 the default with Mr. Dondero?

7 A. I do recall discussing with

8 Mr. Dondero after December 31, 2020?

9 Q. Yes, the fact of the default.

10 A. I don't recall.

11 MR. RUKAVINA: Let's pull up my

12 Exhibit 6, Alpha 6.

13 (Exhibit A6 marked.)

14 MR. RUKAVINA: And, Mr. Nguyen, if

15 you will please scroll down.

16 Q. This email chain begins with you

17 writing to Ms. Hendrix on January the 12th:

18 NexPoint note to HCMLP.

19 Do you see that, sir?

20 A. I do.

21 Q. Were you discussing this same

22 $30 million note we're talking about right now

23 with Ms. Hendrix?

24 A. Yes.

25

Page 342

WATERHOUSE - 10-19-21

1    Q.    Okay.  Do you recall what prompted
2    you to send that email to her?
3    A.    Yes, I had -- I had a conversation
4    with Jim.
5    Q.    Okay.  And what -- what did you
6    discuss with Jim that led to this email chain?
7    A.    He -- he called me and he said he
8    wanted to make payment on the NexPoint note,
9    and I didn't -- I didn't know the -- the amount
10   offhand, so I reached out to Kristin and got
11   the details and relayed that to him.
12   Q.    And you see you sent that email to
13   her at 11:15 a.m.  Does that help you remember
14   when you had this discussion with Mr. Dondero?
15   In other words, was it that morning or the day
16   before, or can you -- can you --
17   A.    No, it was -- it was that morning.
18   Q.    And do you recall how you had that
19   conversation with him?
20   MR. MORRIS:  Objection to the form
21   of the question.
22   Q.    By telephone, by email, in-person?
23   A.    Yeah, he -- he called me.  I was at
24   home.  We were working from home here in
25

Page 343

WATERHOUSE - 10-19-21

1    December of 2020.  He called me from home.  He
2    said he was in court.  He wanted to -- he asked
3    about, you know, making payment on the note and
4    the amount, and so I didn't have those numbers
5    in front of me, so I said I would get back to
6    him.  I wanted all the details, so here is
7    this -- so I reached out to Kristin.
8    Q.    And then she gave you that
9    $1,406,000 figure?
10   MR. RUKAVINA:  Mr. Nguyen, if you
11   will scroll up, please.
12   A.    Yes.  Yeah, she -- the $1,406,112.
13   Q.    And do you recall whether you
14   conveyed that amount to Mr. Dondero?
15   A.    Yes.  I -- I called him back and
16   gave him -- gave him this amount.
17   Q.    Are you aware of whether NexPoint,
18   in fact, then made that 1 million 406 and
19   change payment?
20   A.    Yes, they did.
21   Q.    Did you discuss with Mr. Dondero at
22   that time, either the first conference or the
23   second conference that day -- strike that.
24   When you conveyed the number to
25

Page 344

WATERHOUSE - 10-19-21

1    Mr. Dondero, was -- was it also on January
2    12th?
3    A.    Sorry, when I conveyed the
4    $1.4 million number?
5    Q.    Yes.
6    A.    Yes, yes, it was that -- it was --
7    Q.    So you had --
8    A.    It was that point.
9    Q.    Well, to the best of your
10   recollection, you had a conference with
11   Mr. Dondero by the telephone in the morning,
12   and then another conference with him by
13   telephone after 11:40 a.m. that morning?
14   A.    Yeah, I can't remember -- yeah, it
15   was either that morning or it could have been,
16   you know, early afternoon, but again, I
17   remember calling him back, relaying this
18   information to him, and he said, okay, pay --
19   you know, make -- make this payment.
20   Q.    And during either of those two
21   calls, did you tell Mr. Dondero anything to the
22   effect that making those -- I'm sorry, making
23   that payment would not de-accelerate the
24   promissory note?

Page 345

WATERHOUSE - 10-19-21

1    A.    No.
2    Q.    Did you tell him anything to the
3    effect that making that payment would not cure
4    the default?
5    A.    No.
6    Q.    Did you discuss that in any way with
7    him?
8    A.    No, I did not.
9    Q.    Did he say why he wanted to have
10   that $1.4 million payment made?
11   MR. MORRIS:  Objection to the form
12   of the question.
13   A.    He -- he -- he didn't go into
14   specifics.
15   Q.    Did he say anything to you to the
16   effect that if NexPoint makes that payment,
17   then the note will be de-accelerated?
18   MR. MORRIS:  Objection to the form
19   of the question.
20   A.    I don't recall.
21   MR. RUKAVINA:  You can put this one
22   down, Mr. Nguyen.
23   Q.    And, again, when you say you don't
24   recall, you mean you don't remember right now
25

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 either way; correct?
3    A.   Yeah, I don't remember.  I don't
4 remember us discussing that.
5    Q.   Now -- and we're almost done, I
6 promise.  I'm just going to -- I don't know how
7 to ask this question, so I'm just going to try
8 to do my best.
9        Prior to the default on December 31,
10 2020, did Mr. Seery ever tell you any words to
11 the effect that you or someone at Highland
12 should ensure that NexPoint doesn't make its
13 payment?
14    A.   No.
15    Q.   Did you have any hint or any belief
16 that anyone at NexPoint -- I'm sorry, strike
17 that.
18        Did you have any reason to believe
19 that anyone with Highland was actively trying
20 to get NexPoint to make that default by not
21 paying on December 31?
22    MR. MORRIS:  Objection to the form
23    of the question.
24    A.   Are you asking, did any Highland
25 employees actively work to make -- to

1 WATERHOUSE - 10-19-21
2 somehow --
3    Q.   Yes.  Let me take a step back.  Let
4 me take a step back.
5        So you are aware now that as a
6 result of that default, what was still some
7 25-year note was accelerated and became
8 immediately due.  You are aware of that now;
9 right?
10    A.   Yes.
11    Q.   And can you see how someone at
12 Highland might actually have been pleased with
13 that development?
14    MR. MORRIS:  Objection to the form.
15    Q.   Not that they were — not that they
16 were pleased, but you can see how someone at
17 Highland might have been pleased with that
18 development?
19    MR. MORRIS:  Objection to the form
20    of the question.
21    MS. DANDENEAU:  Object to form.
22    A.   I don't know how they would have
23 reacted to that.
24    Q.   Okay.  But you're not -- you're not
25 aware of any instructions or any actions being

1 WATERHOUSE - 10-19-21
2 given or taken at Highland by Mr. Seery, the
3 independent board, DSI, that -- that would have
4 basically led Highland to ensure that NexPoint
5 would fail to make that payment?
6    A.   I'm not aware.
7    Q.   In other words, there wasn't a trick
8 or a settlement; right?
9    MS. DEITSCH-PEREZ:  Objection to
10    form.
11    MS. DANDENEAU:  Object to form.
12    MR. MORRIS:  Object to form.
13    A.   I'm not aware.
14        Look, I'm not aware.  I'm not in
15 every conversation.  I mean, and I'm just --
16 again, I'm sitting at home.  It is the end of
17 the year.  Again, I'm not aware.
18    Q.   That is a perfectly legitimate
19 answer.  I don't know why -- why you think
20 otherwise.
21        Okay.  Just give me one second to
22 compose my thoughts.
23    MS. DEITSCH-PEREZ:  While you're
24    taking your one second, why don't we take
25    three minutes.  I will be right back.

1 WATERHOUSE - 10-19-21
2    VIDEOGRAPHER:  Do we want to go off
3    the record?
4    MR. RUKAVINA:  Yes.
5    VIDEOGRAPHER:  All right.  We're
6    going off the record at 6:27 p.m.
7    (Recess taken 6:27 p.m. to 6:30 p.m.)
8    VIDEOGRAPHER:  We are back on the
9    record at 6:30 p.m.
10    MR. HORN:  Is Deb back?
11    MS. DANDENEAU:  Are you asking about
12    me?  I'm here.
13    MR. HORN:  Oh, okay.  I don't see
14    you, sorry.
15    Q.   Actually, yeah, Mr. Waterhouse, so
16 when you had --
17    MS. DANDENEAU:  Are you asking about
18    Deb Dandeneau or Deborah?  I mean, there
19    are a lot -- as we talked about, a lot of
20    Debs.  I'm here.
21    MS. DEITSCH-PEREZ:  I'm here.
22    MR. HORN:  Yes, I was asking about
23    DDP.
24    MS. DEITSCH-PEREZ:  Oh, DDP is here.
25    MR. HORN:  Okay.  Here we go.  I'm

Page 350

WATERHOUSE - 10-19-21

1 going back on mute.
2 MS. DANDENEAU: Get the right
3 nomenclature.
4 Q. Mr. Waterhouse, on January 12th,
5 2021, when you had those talks with Mr. Dondero
6 about the $1.4 million payment, did you have a
7 communication or a conversation with Mr. Seery
8 about that payment after January 12th, 2021?
9 A. I don't recall.
10 Q. Well, in response to Mr. Dondero
11 reaching out to you, do you recall on that day,
12 January 12th, talking to Mr. Seery or anyone at
13 Highland other than the email chain we just saw
14 about Mr. Dondero's call with you?
15 A. Did I talk to -- I spoke with
16 Kristin -- I don't know if I spoke to her. I
17 likely spoke to Kristin Hendrix because we had
18 to get the wire on NexPoint's behalf to make
19 the payment to Highland.
20 Q. So it is true, then, that -- that
21 employees of the debtor did actually cause that
22 payment to be made when it was made after
23 January 12th?
24 A. Yes, I mean, we -- we -- as I

Page 351

WATERHOUSE - 10-19-21

1 testified earlier, we provided that accounting
2 finance treasury function as -- under the
3 shared services agreement. And so once I
4 got the -- I talked to Jim, got the approval to
5 make this payment, we have to then make the
6 payment, or the team does, and so the payment
7 was made.
8 Q. Okay. But -- okay. And -- and
9 sitting here right now, after Jim called you,
10 you don't remember talking to anyone other than
11 the -- the couple of people you mentioned,
12 talking to anyone about something to the effect
13 that, hey, Jim wants to make this payment now?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. I don't -- I don't recall.
17 Q. And does that include legal counsel?
18 Without going into any detail, on
19 January 12th or before that payment was made,
20 did you consult with legal counsel about
21 anything having to do with the $1.4 million
22 payment?
23 A. I don't recall.
24 Q. Okay. Thank you, sir, for your

Page 352

WATERHOUSE - 10-19-21

1 time.
2 MR. RUKAVINA: Pass the witness.
3 MR. MORRIS: I just have a few
4 questions, if I may.
5 MS. DEITSCH-PEREZ: Don't you go at
6 the end?
7 MR. MORRIS: Oh, I apologize. He is
8 your witness. I'm surprised you want to
9 ask him questions, but go right ahead.
10 MS. DEITSCH-PEREZ: Just have a
11 couple of things.
12 MR. RUKAVINA: And I will just
13 object to that, that he's our witness.
14 That's not --
15 MR. MORRIS: I'm not talking to you.
16 I'm not talking to you.
17 MS. DANDENEAU: Also, Mr. Morris, it
18 is -- it is --
19 MS. DEITSCH-PEREZ: He is not my
20 witness. He's been subpoenaed by you.
21 Okay?
22 That is no offense, Mr. Waterhouse,
23 I'm -- I'm not -- okay. Anyway.
24 EXAMINATION

Page 353

WATERHOUSE - 10-19-21

1 BY MS. DEITSCH-PEREZ:
2 Q. Good evening. I'm very sorry to be
3 going last and I know you have had a long and
4 taxing day, so I thank you for indulging me.
5 The kinds of services that you
6 describe that the -- that Highland provided for
7 NexPoint, did Highland also provide similar
8 services to that to HCRE and HCMS?
9 A. Yes.
10 MR. MORRIS: Objection to the form
11 of the question.
12 Q. What kind of services did Highland
13 provide to HCRE and HCMS?
14 MR. MORRIS: Objection to the form
15 of the question.
16 MS. DEITSCH-PEREZ: What is your
17 objection, John?
18 MR. MORRIS: It is vague and
19 ambiguous. Unlike the advisors and
20 NexPoint, they actually had shared services
21 agreements.
22 MS. DEITSCH-PEREZ: I got -- I
23 understand your objection. That is fine.
24 Q. Let's take them one at a time.

Page 354

WATERHOUSE - 10-19-21

1
2     What kinds of services did Highland
3     provide to HCRE?
4          MR. MORRIS:  Objection to the form
5     of the question.
6          A.   HCMS, Highland employees provided
7     accounting services, treasury management
8     services, potentially legal services.  I
9     don't -- but I wouldn't have been directly
10    involved in that.  But as far as the teams that
11    I manage, it was accounting, treasury, things
12    of that nature.
13         Q.   Okay.  And that was for HCM, LLP --
14         A.   And -- and, sorry, it would also be
15    any asset valuation if needed as well.
16         Q.   Okay.  We went back and forth on
17    each other and I apologize, so just to clarify.
18         You were talking about the services
19    that Highland Capital Management provided to
20    HCMS; is that right?
21         A.   HCMS.  So, again, yes.  And
22    accounting, treasury, valuation, and also tax
23    services too.
24         Q.   Okay.
25         A.   Tax services.  Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1
2     this, their HR services as well.
3          Q.   Okay.  And did that include bill
4     paying?
5          MR. MORRIS:  Objection to the form
6     of the question.
7          Q.   Did the services that HCM provided
8     to HCMS include bill paying?
9          MR. MORRIS:  Objection to the form
10    of the question.
11         A.   Yes.
12         Q.   And did the services that HCMLP
13    provided to HCMS include scheduling upcoming
14    bills?
15         MR. MORRIS:  Objection to the form
16    of the question.
17         A.   Yes.
18         Q.   And did HCMLP regularly pay -- cause
19    to be paid the payments on loans HCMS had from
20    HCMLP?
21         MR. MORRIS:  Objection to the form
22    of the question.
23         A.   Yes.
24         Q.   Typically -- if there is a
25    typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1
2     HCMLP cause HCMS to pay its bills?
3          MR. MORRIS:  Objection to the form
4     of the question.
5          A.   I mean, it -- it -- it depend -- it
6     depended on the nature of the payment and the
7     vendor, but, you know, if there were -- if
8     there were larger scheduled payments, you know,
9     I would like to give at least 30 days notice.
10         And that is -- that is kind of my
11    rule of thumb so no one is surprised.
12         Q.   Okay.  And was it generally HCMLP's
13    practice to timely pay HCMS' bills?
14         MR. MORRIS:  Objection to the form
15    of the question.
16         A.   It -- it -- it -- that depended on
17    the nature of the payment.
18         Q.   Okay.  And can you explain what you
19    mean by that?
20         A.   Yeah, I mean if -- if it was -- I
21    mean -- if there was some professional fees
22    that weren't -- you know, they were due but
23    they weren't urgent, those fees may not be paid
24    as timely as others that have a due date or --
25    or things like that.

Page 357

WATERHOUSE - 10-19-21

1
2          Q.   Okay.  Are loan payments the kinds
3     of thing that HCMLP would pay on time because
4     of potential consequences of not paying on
5     time?
6          MR. MORRIS:  Objection to the form
7     of the question.
8          A.   Yes.  As I testified earlier, we
9     would want to give, you know, notice on -- on
10    -- on larger payments and -- and things of that
11    nature so we didn't miss due dates.
12         Q.   Okay.  And over the course of time,
13    did HCMLP generally pay HCMS' loan payments in
14    a timely fashion?
15         MR. MORRIS:  Objection to the form
16    of the question.
17         A.   I can't remember specifically, but
18    generally, yes.
19         Q.   Okay.  Now, did HCMLP provide
20    similar services to HCRE that you have
21    described it provided to HCMS?
22         MR. MORRIS:  Objection to the form
23    of the question.
24         A.   Yes, but I don't think it -- it
25    provided -- I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

2 services.

3    Q.   Can you describe the accounting and

4 treasury services that HCMLP provided for HCRE?

5    A.   Yeah, it -- it would provide

6 bookkeeping services on a -- on a periodic

7 basis.  It would make payments, you know, as

8 needed.

9    Q.   Okay.  So did it provide --

10    A.   And -- and I believe it -- it -- it

11 provided tax services as well.

12    Q.   Okay.  And so did it provide the

13 same kind of bill -- did HCMLP provide the same

14 kind of bill-paying services for HCRE that it

15 provided for HCMS and NexPoint?

16        MR. MORRIS:  Objection to the form

17    of the question.

18    A.   Yes.

19    Q.   And over the course of time, did

20 HCMLP generally cause to be made the loan

21 payments that HCRE owed to HCMLP?

22        MR. MORRIS:  Objection to the form

23    of the question.

24    A.   Yes.

25    Q.   Did HCMLP make loan payment -- the

Page 359

WATERHOUSE - 10-19-21

2 loan payment that was due from HCMS to HCMLP in

3 December of 2020?

4        MR. MORRIS:  Objection to the form

5    of the question.

6    A.   I don't believe that payment --

7 payment was made.

8    Q.   Okay.  And when HCMLP caused HCMS in

9 the past to make loan payments, whose money did

10 it use to make those payments?

11        MR. MORRIS:  Objection to the form

12    of the question.

13    A.   It was the -- the money in HCMS's

14 operating account would be made to that --

15 those moneys would be used to make payment to

16 Highland Capital Management.

17    Q.   Okay.  And Highland -- is it correct

18 that Highland Capital Management personnel had

19 the access to HCMS's accounts to be able to

20 cause such payments to be made?

21    A.   Yes, Highland personnel had access

22 to those accounts.

23    Q.   Okay.  And so now for HCRE, whose

24 money was used when HCMLP caused HCRE

25 payments -- loan payments to Highland to be

Page 360

WATERHOUSE - 10-19-21

2 made?

3        MR. MORRIS:  Objection to the form

4    of the question.

5    A.   It was -- it was cash in HCRE's bank

6 account that would be used to make payments to

7 Highland Capital Management.

8    Q.   Okay.  And so did Highland Capital

9 Management have access to HCRE's funds in order

10 to be able to make such payments?

11        MR. MORRIS:  Objection to the form

12    of the question.

13    A.   Personnel at Highland Capital

14 Management had access to HCRE's bank account to

15 effectuate the payments.

16    Q.   Okay.  And was the payment due from

17 HCRE to HCMLP due in December of 2020 made?

18    A.   It --

19    Q.   In December of 2020.

20    A.   It was not.

21    Q.   Okay.  And was there money in HCRE's

22 account that would have enabled the payment to

23 be made had HCM personnel attempted to make the

24 payment?

25        MR. MORRIS:  Objection to the form

Page 361

WATERHOUSE - 10-19-21

2    of the question.

3    A.   I -- I don't recall.

4    Q.   Do you have any reason to believe

5 that either HCRE or HCMS simply didn't have the

6 funds on hand to make the December 2020

7 payments?

8    A.   I don't know.

9    Q.   I guess I'm asking, do you have any

10 reason to believe that they didn't have the

11 funds?

12    A.   We managed cash for so many

13 different entities and funds, and I don't

14 recall, you know, where the cash position was

15 for HCRE and HCMS at 12/31/2020.

16    Q.   Okay.

17    A.   I just don't recall, and I don't --

18 and I don't remember what the loan payment

19 obligations were from HCRE to Highland, and

20 from HCMS to Highland.  I don't recall.  I

21 don't recall, I mean...

22    Q.   Let me come at it a different way.

23 Were the -- were the payments that would

24 otherwise have been due in December of 2020

25 made in January of 2021 for HCMS and HCRE?

Page 362

WATERHOUSE - 10-19-21

1
2     A.   I believe the HCRE payment was made
3   in January of 2021. I don't recall any
4   payments being made from HCMS to Highland.
5     Q.   If it -- how is it the HCRE payment
6   came to be made? Why did you make it -- why
7   did HCM make the payment in January of 2021?
8     A.   Jim -- Jim called me and instructed
9   me to -- to make the payment on behalf of HCRE,
10  Jim Dondero -- Jim Dondero.
11    Q.   Did he seem upset that -- that the
12  payment had not been made?
13    A.   Yeah. On the note that was, you
14  know, that was the term note, yes, he -- he was
15  displeased that -- that the payment had not
16  been made by year-end.
17    Q.   Okay. And did you make the -- cause
18  the payment to be made as -- as requested?
19    A.   Yes.
20    Q.   And did anyone else from HCM
21  participate with you in causing the payment to
22  be made to -- on the HCRE loan?
23    A.   Yes. It would have been Kristin
24  Hendrix. I -- again, I don't -- as I testified
25  earlier, I'm not an officer of HCRE. I don't

Page 363

WATERHOUSE - 10-19-21

1
2   believe I'm an authorized signer. So I
3   can't -- other personnel have to make payment
4   from HCRE to -- to -- to -- to Highland.
5     Q.   Okay. And in the conversation
6   that -- that you had with Mr. Dondero when he
7   requested the payment to be made, did you say
8   to him words to the effect, Jim, this loan is
9   going to stay in default, are you making
10  the payment for, anything like that?
11    A.   No.
12    Q.   In fact, did you have the impression
13  from him that he thought that the loan would
14  be -- the default would be cured by making the
15  payment?
16    MR. MORRIS: Objection to the form
17  of the question.
18    A.   Did I get the impression from Jim
19  Dondero that the loan would be cured if the
20  payment from HCRE --
21    Q.   Yeah, if that is what he thought.
22    MR. MORRIS: Objection to the form
23  of the question.
24    A.   I didn't get any impression from him
25  on that at the time.

Page 364

WATERHOUSE - 10-19-21

1
2     Q.   Do you know whether there was an
3   HCMS term loan that had a payment due in
4   December of 2020?
5     A.   I don't recall.
6     Q.   Okay. And so the reason you don't
7   recall whether or not there was a payment in
8   January of 2021 is because you just don't
9   remember whether there was such a loan at all?
10    MR. MORRIS: Objection to the form
11  of the question.
12    A.   I don't remember. There is -- there
13  is so many notes, and I mean, demands, and I
14  don't -- I don't remember. It's a lot to keep
15  track in your head.
16    Q.   I understand, and -- and I hear your
17  frustration when you have explained that the
18  debtor has your documents and you don't, and so
19  I fully appreciate it, and this is no knock on
20  you. It's a knock on somebody else on this
21  call.
22    MR. MORRIS: I move to strike. That
23  was pretty obnoxious, but go ahead.
24    Q.   Okay. But so, Mr. Waterhouse, if --
25  if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1
2   January of 2021, do you think it was part of
3   the same conversation where Jim Dondero said,
4   hey, why didn't that get paid, please make
5   that -- get that payment done?
6     MR. MORRIS: I object to the form of
7   the question.
8     A.   Yes. Likely it would have been -- I
9   mean, again, I don't recall a payment being
10  made, but, you know, again, I don't remember
11  everything.
12    Q.   Okay. Did -- at the time you were
13  communicating with Kristin Hendrix about the
14  payment being made, whichever payments were
15  made in January, did she say anything to you
16  about the payments not curing the loan
17  defaults?
18    A.   No.
19    Q.   Okay. All right. So I'm going to
20  take you back to very early in the deposition
21  when Mr. Morris was asking you about the --
22  the -- the -- the agreement with respect to
23  the -- the forgiveness element of the loans, so
24  that is just to orient you.
25    Do you remember that there was a

Page 366

WATERHOUSE - 10-19-21

1 time that you and Mr. Dondero were
2 communicating about potential means of
3 resolving the Highland bankruptcy by what was
4 colloquially referred to as a pot plan?
5 A. Yes.
6 Q. Okay. And can you tell me generally
7 when that was?
8 A. Like mid – mid 2020, sometime in
9 2020, mid 2020.
10 Q. Okay. And did the process of trying
11 to figure out what the numbers should be
12 involve looking at what one should pay for the
13 Highland assets?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. Yes.
17 Q. Okay. And did there come a time
18 when you were proposing some potential numbers
19 and Mr. Dondero said something to you like,
20 well, why are you including payment for the
21 related party notes, those, you know, were
22 likely to be forgiven as part of my deferred
23 executive compensation?
24 MR. MORRIS: Objection to the form
25

Page 367

WATERHOUSE - 10-19-21

1 of the question.
2 A. Yes, we did have that conversation.
3 Q. Okay. Was that conversation in
4 connection with trying to figure out the right
5 numbers for a pot plan?
6 A. Yeah. I mean, it was – it was – I
7 mean, Jim – Jim would ask for, you know,
8 most – most recent asset values, you know, for
9 Highland, and – and myself and the team
10 provided those to him, so it was in that
11 context.
12 Q. Okay. And does that refresh your
13 recollection that these communications were in
14 2020 rather than 2021?
15 MR. MORRIS: Objection to the form
16 of the question.
17 A. The – the – the executive
18 compensation discussions were definitely in
19 2020.
20 Q. Okay. Now, did you ever make
21 proposals that took into account Jim's comment
22 that the notes were likely to end up forgiven
23 as part of his compensation?
24 MR. MORRIS: Objection to the form
25

Page 368

WATERHOUSE - 10-19-21

1 of the question.
2 A. Yes, we – the team and myself put
3 together, you know, asset summaries of Highland
4 at various times for all the assets of
5 Highland, and not including those.
6 Q. Okay. And were those presentations
7 communicated to – to Mr. Seery?
8 A. No. Well, look, I didn't tell – I
9 didn't tell Mr. Seery. I don't know what
10 Mr. Dondero did with the information.
11 Q. Okay.
12 A. I did not have conversations with
13 Mr. Seery.
14 Q. Okay. Do you know who saw the
15 presentations that you put together that didn't
16 include the value of the related party notes?
17 A. We're talking presentations – these
18 are – these are Excel spreadsheets?
19 Q. Uh-huh.
20 A. I don't know who – these were given
21 to – to Jim Dondero. I don't know what was
22 done with them after that.
23 Q. Okay. You also mentioned earlier
24 that sometime during your tenure at Highland
25

Page 369

WATERHOUSE - 10-19-21

1 you knew of the practice of giving forgivable
2 loans to executives.
3 MR. MORRIS: Objection to the form
4 of the question.
5 Q. Can you – can you tell me what you
6 recall about that practice?
7 MR. MORRIS: Objection to the form
8 of the question.
9 A. Yes, so there were – there were –
10 during my tenure at Highland, there were loans
11 or – given to employees that were later
12 forgiven at a future date and time.
13 Q. Okay. And when the loans were
14 given, did the notes, to your recollection, say
15 anything about the potential forgiveness term?
16 MR. MORRIS: Objection to the form
17 of the question.
18 Q. When you say "did the notes," did
19 the promissory notes detail the forgiveness?
20 A. Yes.
21 A. Not that I recall.
22 Q. And until such time as whatever was
23 to trigger the forgiveness occurred, were the
24 notes bona fide notes as far as you were
25

Page 370

```
1              WATERHOUSE - 10-19-21
2   concerned?
3              MR. MORRIS:  Objection to the form
4   of the question.
5       A.   Yes, similar to -- yes.
6       Q.   Okay.  You were going to say similar
7   to what?
8       A.   Mr. Morris earlier today showed
9   notes of the financial statements about various
10  affiliate loans.  I -- I -- I do recall these
11  notes because I -- at that time personally
12  worked on the -- the financial statements of
13  Highland.  That was, you know, in my role as a
14  corporate accountant.
15             And there were -- those loans
16  were -- to the partners were detailed in the
17  notes to the financial statements, similar to
18  what we went through earlier today in the prior
19  testimony about what we saw with Highland
20  and -- and -- and the -- the and HCMFA.
21      Q.   Is it fair to say that on Highland's
22  balance sheet there were any number of assets
23  that the value of which could be affected by
24  subsequent events?
25             MR. MORRIS:  Objection to the form
```

Page 371

```
1              WATERHOUSE - 10-19-21
2   of the question.
3       A.   Yes.  I mean, yes, that -- there
4   are.  And that is -- yes.
5       Q.   Okay.  And is it typical accounting
6   practice that until there is some certainty
7   about those potential future events, that asset
8   value listed on -- on the books doesn't take
9   into account those potential future events?
10             MR. MORRIS:  Objection to the form
11  of the question.
12      A.   Yeah, if those -- yes.  If -- if
13  those future events, you know, at the time of
14  issuance are not known or knowable, like I
15  discussed earlier with, like, market practice,
16  asset dislocation, or, you know, I mean, things
17  like that, you -- I mean, it -- it could affect
18  its fair value --
19      Q.   Okay.
20      A.   -- in the future.
21      Q.   And am I correct you wouldn't feel
22  compelled to footnote in every possible change
23  in -- in an asset when those possibilities are
24  still remote?
25             MR. MORRIS:  Objection to the form
```

Page 372

```
1              WATERHOUSE - 10-19-21
2   of the question.
3       A.   The accounting standard is you have
4   to estimate to the best -- you know, to -- to
5   the best of your ability, the fair value of an
6   asset as of the balance sheet date under --
7   under GAAP.
8       Q.   Did -- strike that.
9             Okay.  Give me a minute.  I'm
10  close -- I'm close to done.  Let me just go off
11  and look at my notes for a second.  So take two
12  minutes.
13             VIDEOGRAPHER:  We're going off the
14  record at 7:02 p.m.
15  (Recess taken 7:02 p.m. to 7:03 p.m.)
16             VIDEOGRAPHER:  We are back on the
17  record at 7:03 p.m.
18      Q.   Mr. Waterhouse, is it generally your
19  understanding that people you work with now
20  have been asking the debtor for full and
21  unfettered access to their own former files?
22             MR. MORRIS:  Objection to the form
23  of the question.
24      A.   Yes, I am -- I am generally aware.
25      Q.   Okay.  And do you think you could
```

Page 373

```
1              WATERHOUSE - 10-19-21
2   have been better prepared for this deposition
3   if the debtor had complied with those requests?
4             MR. MORRIS:  Objection to the form
5   of the question.
6       A.   I -- I -- I most certainly -- yes.
7   I mean, again, these are multiple years,
8   multiple years ago, lots and lots of
9   transactions.
10             You know, we asked about NAV errors
11  and, you know, things like that and these
12  are -- it would make this process a lot more --
13  a lot easier and if we had -- if we had access
14  to that.
15      Q.   Okay.  And has the debtor -- is the
16  debtor suing you right now?
17      A.   Yes.
18      Q.   And is the debtor trying to renege
19  on deals that it had previously made with you?
20             MR. MORRIS:  Objection to the form
21  of the question.
22      A.   Sorry, I need to -- it is my
23  understanding that the litigation trust is
24  suing me.  And not being a lawyer, I don't
25  know -- is that the debtor?
```

Page 374

WATERHOUSE - 10-19-21

1
2      Is that -- I don't know the
3   relationship. So, again, I'm not the lawyers.
4   I've said many times. But my understanding is
5   the litigation trust is suing me. I could be
6   wrong there. I don't know.
7      Q.   Okay. I understand.
8           Someone with some connection to the
9   Highland debtor has brought a claim against
10  you; is that fair?
11          MR. MORRIS: Objection to the form
12     of the question.
13     A.   Yes.
14     Q.   Okay. And is there also some motion
15  practice in the bankruptcy where the debtor or
16  someone associated with the debtor is
17  attempting to undo something that was
18  previously resolved with you?
19     A.   Yes.
20     Q.   And so in one action somebody is
21  associated with the debtors trying to --
22  threatening you with trying to take money from
23  you, and then in the other -- and trying to --
24  and in the other they are threatening not to
25  pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

1
2   is that correct?
3           MR. MORRIS: Objection to the form
4      of the question.
5      A.   I want to be -- yes, I -- there
6   is -- I'm being sued, again, on -- on something
7   that was agreed to with Mr. Seery and myself.
8   I don't -- I don't -- I don't own that claim.
9      Q.   Okay.
10     A.   To be transparent, I don't own that
11  claim. So it is not my personal property.
12     Q.   Okay.
13     A.   And -- and being the nonlawyer, I
14  don't know how I can get sued for something
15  that I don't owe or, like, I don't own
16  anything. I'm not the lawyer. But, I mean, if
17  that is -- if I'm understanding the facts
18  correctly.
19     Q.   Okay. And the lawsuit that was
20  filed that names you, that was just filed
21  this -- this past week; is that right?
22          MS. DANDENEAU: Ms. Deitsch-Perez, I
23  do want to interrupt at this point because
24  just as I told Mr. Morris, that this is a
25  deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

1
2      I really don't want to go -- go
3   afield --
4           MS. DEITSCH-PEREZ: Yeah.
5           MS. DANDENEAU: -- and open up a
6   whole new line of inquiry about the lawsuit
7   or the -- the motion and the bankruptcy
8   court. We will be here all night.
9           MS. DEITSCH-PEREZ: And I
10     understand.
11     Q.   My -- my point is: Do you feel
12  like -- like there is some effort by these
13  parties related to the debtor to intimidate
14  you -- not that you -- I'm not saying you are
15  or you aren't.
16          But do you feel like there is some
17  effort to intimidate you and maybe an effort to
18  deter you from being as prepared as you might
19  be in this deposition?
20          MR. MORRIS: Objection to the form
21     of the question.
22     A.   I was -- I was surprised by the
23  lawsuit, by me being named, because, again, I
24  don't own the asset and things like that.
25  Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

1
2   life at Skyview.
3           MS. DEITSCH-PEREZ: Thank you.
4           THE WITNESS: Thank you.
5           FURTHER EXAMINATION
6   BY MR. MORRIS:
7      Q.   If I may, I just have a few
8   questions.
9           Mr. Waterhouse, we saw a number of
10  documents that Mr. Rukavina put up on the
11  screen where Ms. Hendrix would send you a
12  schedule of payments that were due on behalf of
13  certain Highland affiliates.
14          Do you remember that?
15     A.   Yes.
16     Q.   And in each instance she asked for
17  your approval to make the payments; is that
18  right?
19     A.   Yes, she did.
20     Q.   And was that the -- was that the
21  practice in the second half of 2020 whereby
22  Ms. Hendrix would prepare a list of payments
23  that were due on behalf of Highland associates
24  and ask for approval?
25     A.   Yes.

Page 378

WATERHOUSE - 10-19-21

1  Q.   And I think you said that there was
2  a – a –
3     A.   It was – I think I testified to
4  this earlier when we talked about procedures
5  and policy, you know, again, I want to be
6  informed of – of – of – of – of any
7  payments that are going out.  I want to be made
8  aware of these payments, and that was just a
9  general policy, not just for 2020.
10     Q.   Okay.  So it went beyond 2020?
11     A.   Yes.
12     Q.   Is that right?
13     A.   Yes.
14     Q.   Okay.  And the corporate accounting
15  group would prepare a calendar that would set
16  forth all of the payments that were anticipated
17  in the – in the three weeks ahead; is that
18  right?
19     A.   I – like I testified earlier, we
20  had a corporate calendar that was set up, you
21  know, to – to provide reminders or, you know,
22  of anything of any nature, whether it is
23  payments or – or financial statements or, you
24  know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1  deadlines.
2     I don't know how, as I testified
3  earlier, how much they were using that
4  calendar.
5     Q.   Okay.  But – but you did get notice
6  and a request to approve the payments that were
7  coming due on behalf of Highland's affiliates.
8  Do I have that right?
9     MS. DANDENEAU:  Objection to form.
10     A.   I mean, generally, yes.  I mean, you
11  know, as we saw with these emails, generally, I
12  mean, did that encompass everything, no.
13     Q.   Okay.  Do you know why the
14  payment – do you know why there was no payment
15  made by NexPoint at the end of 2020?
16     A.   Yes.  There was – there was – we
17  talked about these agreements between the
18  advisors and Highland, the shared services and
19  the cost reimbursement agreement.
20     And in late 2020, there were
21  overpayments, large overpayments that had been
22  made over the years on these agreements, and it
23  was my understanding that the advisors were –
24  were talking with – like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1  to offset any obligations that the advisors
2  owed to Highland as offset to the overpayments
3  on these agreements.
4     Q.   Okay.  Did you participate in any of
5  those conversations?
6     A.   I did not.
7     Q.   Okay.  Do you know – do you recall
8  that the – at the end of November, the debtor
9  did notice to the advisors of their intent to
10  terminate the shared services agreements?
11     A.   Like I testified earlier, there
12  was – the agreements weren't identical, from
13  what I recall, and there is one that had a
14  longer notice period, which I think had a
15  60-day notice period.  I don't recall which one
16  that was, so not all of them were – notice
17  hadn't been given as of November 30th, for all
18  of the agreements.
19     Q.   Upon the receipt of the – the
20  termination notices that you recall, do you
21  know if the advisors decided at that point not
22  to make any further payments of any kind to
23  Highland?
24     MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21

1     A.   No.  The advisors – the advisors
2  had stopped making payments prior to that
3  notice.
4     Q.   Okay.  And how do you know that the
5  advisors stopped making – making payments
6  prior to the notice?
7     A.   I had – I had a conversation
8  with – with Jim Dondero.
9     Q.   And did Mr. Dondero tell you that
10  the advisors would no longer make payments to
11  Highland?
12     MS. DEITSCH-PEREZ:  Object to the
13  form.
14     A.   Yes, he – he – again, he said
15  they – they – the advisors have overpaid on
16  these agreements, to not make any future
17  payments, and that there needs to be offsets,
18  and they're working on getting offsets to these
19  overpayment.
20     Q.   Do you know if anybody ever
21  instructed Highland's employees to make the
22  payment that was due by NexPoint at the end of
23  the year?
24     A.   Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

1    employees to make that payment?
2
3    Q.   Correct.
4    A.   Anyone – not that I'm aware.
5    Q.   Were any of Highland's employees
6    authorized to make the payments on behalf of
7    its affiliates – withdrawn.
8         Was any of Highland's employees
9    authorized to effectuate the payment on behalf
10   of NexPoint that was due at the end of the year
11   without getting approval from either you or
12   Mr. Dondero.
13   A.   They had the – they had the ability
14   to make the payment, but they didn't – you
15   know, that – that payment needed to be
16   approved.
17   Q.   Okay.  And it needed to be approved
18   by you or Mr. Dondero; is that right?
19   A.   I mean, I'm not going to make the
20   unilateral decision.
21   Q.   Is that a decision that you
22   understood had to be made by Mr. Dondero?
23   A.   Yes.  Sitting back in December of
24   2020, the – that – there was this off –
25   offset negotiation that – that was happening,

Page 383

WATERHOUSE - 10-19-21

1    so I mean, until those negotiations were
2    resolved, you know, there wasn't any
3    payments – there weren't any payments.
4    Q.   And – and there were no payments
5    until the negotiations were resolved because
6    that was the directive that you received from
7    Mr. Dondero; correct?
8    A.   I don't think he said – I mean, I
9    think – yeah, I mean – I'm trying to recall
10   the conversation.  It was – you know, there
11   is – there is these negotiations.  There's –
12   there needs to be these offsets.  They're
13   talking with the debtor.  So, you know, until
14   this is resolved, right, I mean, depending on
15   how, whatever that resolution was, were we to
16   take any action.
17   Q.   Okay.  How about with respect to
18   HCMS, did HCMS have a term payment due at the
19   end of the year?
20   A.   Again, I don't – I don't recall.
21   Q.   Okay.  You discussed briefly two
22   payments that were made in January of 2021, one
23   on behalf of NexPoint, and one on behalf of
24   HCMS.  Do I have that right?

Page 384

WATERHOUSE - 10-19-21

1    A.   No.  The two payments I recall were
2    NexPoint and HCRE.
3    Q.   Okay.  And those two payments –
4    thank you for the correction.  And those two
5    payments were made because Mr. Dondero
6    authorized those payments to be made; correct?
7    A.   Yes.
8    Q.   And they hadn't been made before
9    that because Mr. Dondero had not authorized
10   them to be made?
11   MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.   Yes, because of these negotiations.
14   Q.   Okay.  Just a couple of more
15   questions.
16        Did anybody, to the best of your
17   knowledge, on behalf of HCMFA, ever tell the
18   SEC that HCMLP was responsible for the mistakes
19   that were made on the TerreStar valuation?
20   A.   Did anyone from Highland on HCMFA's
21   behalf tell the SEC that Highland – that
22   Highland was responsible for there – I just
23   want to make sure –
24   Q.   It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

1    let me try again.
2    A.   These are very long questions, John.
3    I'm not trying to be –
4    Q.   That is good.  Do you know whether
5    anybody – do you know whether anybody on
6    behalf of HCMFA – HCMFA ever told the SEC that
7    Highland was the responsible party for the
8    TerreStar valuation error?
9    A.   Not that I'm aware.
10   Q.   Okay.  Did anybody on behalf of
11   the – on behalf of HCMFA ever tell the retail
12   board that Highland was responsible for the
13   TerreStar valuation error?
14   A.   Not that I'm aware.
15   Q.   Do you know if HCMFA made an
16   insurance claim with respect to the damages
17   that were incurred in relation to the TerreStar
18   valuation error?
19   A.   Yes.
20   Q.   And do you know why they made that
21   insurance claim?
22   A.   Because there was an error.  I
23   mean –
24   Q.   Was the insured's claim made – was

WATERHOUSE - 10-19-21

1  the insurance claim made under HCMFA's policy?
2      A.   Yes.
3      Q.   Did HCMFA at any time prior to the
4  petition date -- withdrawn.
5          You were asked a couple of questions
6  where -- where you said that Mr. Dondero told
7  you that he was ascribing zero value to the
8  notes as part of a pot plan because he believed
9  that the notes were part of executive
10  compensation.
11         Do I have that right?
12         MS. DEITSCH-PEREZ:  Object to the
13     form.
14     A.   Yes.
15     Q.   Okay.  Have you ever heard that
16  before the time that Mr. Dondero told you that
17  in the conversation about the pot plan?
18     A.   Had I heard that prior to my
19  conversation with Mr. Dondero?
20     Q.   Yes.
21     A.   No, I had not heard that prior.
22     Q.   Okay.  And that was in the context
23  of his formulation of the settlement proposal;
24  is that right?

WATERHOUSE - 10-19-21

1      A.   I mean, generally, yes.  You know,
2  we were asked to provide asset values, right,
3  and he was having settlement discussions.
4  Again, I don't know who those went to
5  ultimately.  I don't recall.
6          MR. MORRIS:  I have no further
7      questions.  Thank you very much for your
8      patience.  I apologize for the late hour.
9          MS. DEITSCH-PEREZ:  John, you stay
10     on about your email when --
11         MR. RUKAVINA:  Hold on, I'm not
12     done.
13         MS. DEITSCH-PEREZ:  Oh, okay.  Davor
14     still has questions.  Sorry.  I was going
15     to say both John and Davor, could you stay
16     on afterwards just to talk about the
17     requests.
18         FURTHER EXAMINATION
19  BY MR. RUKAVINA:
20     Q.   Mr. Waterhouse, you were just now
21  testifying about a discussion you had with
22  Mr. Dondero where he said something like no
23  more payments.
24         Do you remember that testimony?

WATERHOUSE - 10-19-21

1      A.   Yes.
2      Q.   Okay.  And was that late November or
3  early December of 2020?
4      A.   It was, I would say, first or second
5  week of November.
6      Q.   Okay.  Do you recall whether --
7  whenever you had that discussion, whether
8  Mr. Dondero had already been fired by the
9  debtor?
10     A.   Yes, I -- I believe he was not an
11  employee of the debtor anymore at that time.
12     Q.   And when you were discussing this
13  with Mr. Dondero and he said no more payments,
14  you were discussing the two shared services
15  agreements and employee reimbursement
16  agreements we testified -- you testified about
17  before; is that correct?
18         MR. MORRIS:  Objection to the form
19     of the question.
20     A.   That is correct.
21     Q.   And had your office or you -- and we
22  will talk at a future deposition about the
23  administrative claim.
24         But had -- by that time that you

WATERHOUSE - 10-19-21

1  talked to Mr. Dondero, had your office or you
2  done any estimate of what the alleged
3  overpayments were?
4          MR. MORRIS:  Objection to the form
5      of the question.
6      A.   Yes, we had -- there was a -- there
7  was a detailed analysis that was put together
8  by David Klos at the time.
9      Q.   And do you recall just generally
10  what the total amount for both advisors of the
11  overpayments was?
12     A.   It was in excess of $10 million.
13     Q.   Was it in excess of $14 million?
14         MR. MORRIS:  Objection to the form
15     of the question.
16     A.   I -- I remember it was an
17  eight-figure number.  I don't remember
18  specifically.
19     Q.   Okay.  And did you convey that
20  number to Mr. Dondero when you had that
21  conversation?
22     A.   Yes.
23     Q.   What was his reaction?
24     A.   I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

2  Q.  Is it fair to say he was upset?
3  A.  Yes.
4  Q.  Did Mr. Dondero ever expressly tell
5  you to not have NexPoint make the required
6  December 31, 2020, payment?
7  A.  Yes, I recall him saying don't make
8  the payment because it was being negotiated, as
9  I discussed with Mr. Morris, this offset
10  concept.  So there were obligations due by the
11  advisors to Highland, they should be offset
12  that -- you know, those obligations should be
13  offset by this -- by this overpayment.
14  Q.  And when did he tell you that?
15  A.  I would say -- I would say around --
16  probably December -- December-ish.
17  Q.  Early December, late December?
18  A.  I don't recall with as much
19  specificity as -- as -- as -- as stopping the
20  shared services payments, because we had
21  actually made one shared services payment in
22  November.  So that is why I need to remember
23  that one more clearly.  I don't remember where
24  exactly in December that conversation occurred.
25  Q.  Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

2  word "NexPoint" when he was saying don't make
3  these payments?
4  MR. MORRIS:  Objection to the form
5  of the question, asked and answered.
6  A.  Yeah, we were -- we were discussing
7  advisor obligations.  So it was -- you know, it
8  was just obligations from the advisors.
9  And -- and he specifically talked
10  about the NexPoint payment as well.
11  Q.  Okay.  And it is your testimony that
12  he expressly told you not to make that NexPoint
13  December 31 payment?
14  MR. MORRIS:  Objection, asked and
15  answered twice.
16  A.  Yes, he -- he did, during that
17  conversation.
18  Q.  And did you ever follow up with him
19  after that about whether NexPoint should or
20  shouldn't make that payment?
21  A.  I did not.
22  Q.  Did you ever, on or about
23  December 31, 2020, remind him and say, hey,
24  this payment is due, what shall I -- what
25  should I do?

Page 392

WATERHOUSE - 10-19-21

2  A.  I did not.
3  Q.  So sitting here today, you -- you
4  remember distinctly that Dondero in December of
5  2020 expressly told you not to have NexPoint
6  make that payment?
7  MR. MORRIS:  Objection, asked and
8  answered three times.
9  A.  Yes.
10  Q.  Can you say categorically it wasn't
11  just some general discussion where he told you
12  not to make payments?
13  MR. MORRIS:  Objection, asked and
14  answer four times.
15  MR. HORN:  Four times now.  Go for
16  five.
17  A.  Yes.
18  Q.  Did you tell Mr. Seery that?
19  A.  I don't believe I did.  I don't
20  recall.
21  Q.  And was this an in-person discussion
22  or telephone or email?  Do you remember?
23  A.  This was a phone -- a phone
24  conversation.
25  Q.  Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

2  on your cell phone of when that conversation
3  might have taken place?
4  I'm sorry, strike that.
5  Was that by cell phone?
6  A.  I believe -- yes, because we -- I
7  was at home.  I mean, I don't have a landline.
8  All I have is my cell phone.
9  Q.  Do you know whether your cell phone
10  still has records of conversations from
11  December 2020 on it?
12  A.  My call log doesn't go back that
13  far.
14  Q.  Okay.  Thank you.
15  MR. RUKAVINA:  I will pass the
16  witness.
17  MS. DEITSCH-PEREZ:  Just a couple
18  quick questions.
19  FURTHER EXAMINATION
20  BY MS. DEITSCH-PEREZ:
21  Q.  With respect to HCRE and HCMS, am I
22  correct there was -- there was direction not
23  to pay those loan payments?
24  MR. MORRIS:  Objection to the form
25  of the question.

| Page 394 | Page 395 |
|---|---|
| WATERHOUSE - 10-19-21 | WATERHOUSE - 10-19-21 |
| 1 | 1 |
| 2 A. Yes, I don't recall having | 2 Thank you, Mr. Waterhouse. We appreciate |
| 3 conversations about, you know, those -- those | 3 your time. I am logging off the discussion |
| 4 entities. | 4 and I will talk to y'all tomorrow. |
| 5 Q. And, in fact, what was the tone that | 5 MR. MORRIS: Super. |
| 6 Mr. Dondero had when he talked to you about the | 6 VIDEOGRAPHER: If there are no |
| 7 fact that HCRE and HCMS payments hadn't been | 7 further questions, this ends the |
| 8 made when he found out that they hadn't been | 8 deposition -- excuse me. This ends the |
| 9 paid? | 9 deposition, and we are going off the record |
| 10 MS. DANDENEAU: Objection to form. | 10 at 7:30 p.m. |
| 11 MR. MORRIS: Objection to form. | 11 (Deposition concluded at 7:30 p.m.) |
| 12 Q. What was the tone he took with you? | 12 |
| 13 A. Oh, it was -- it was -- it was -- it | 13 _____ |
| 14 was very negative. I mean, I think he cursed | 14 FRANK WATERHOUSE |
| 15 at me and he doesn't usually curse. | 15 |
| 16 Q. Okay. And in your mind, is that | 16 Subscribed and sworn to before me |
| 17 consistent with the fact that he was surprised | 17 this ___ day of _____ 2021. |
| 18 that those payments hadn't been made? | 18 |
| 19 MR. MORRIS: Objection to the form | 19 _____ |
| 20 of the question. | 20 |
| 21 A. Yes. | 21 |
| 22 Q. Okay. Thank you. | 22 |
| 23 MR. MORRIS: I have nothing further. | 23 |
| 24 Thank you so much, Mr. Waterhouse. | 24 |
| 25 MR. HORN: I have no questions. | 25 |

| Page 396 | Page 397 |
|---|---|
| 1 WATERHOUSE - 10-19-21 | 1 WATERHOUSE - 10-19-21 |
| 2 C E R T I F I C A T E | 2 NAME OF CASE: In re: Highland Capital |
| 3 | 3 DATE OF DEPOSITION: October 19, 2021 |
| 4 I, SUSAN S. KLINGER, a certified shorthand | 4 NAME OF WITNESS: Frank Waterhouse |
| 5 reporter within and for the State of Texas, do | 5 Reason Codes: |
| 6 hereby certify: | 6 1. To clarify the record. |
| 7 That FRANK WATERHOUSE, the witness whose | 7 2. To conform to the facts. |
| 8 deposition is hereinbefore set forth, was duly | 8 3. To correct transcription errors. |
| 9 sworn by me and that such deposition is a true | 9 Page____Line____Reason_____ |
| 10 record of the testimony given by such witness. | 10 From_____to_____ |
| 11 I further certify that I am not related to | 11 Page____Line____Reason_____ |
| 12 any of the parties to this action by blood or | 12 From_____to_____ |
| 13 marriage; and that I am in no way interested in | 13 Page____Line____Reason_____ |
| 14 the outcome of this matter. | 14 From_____to_____ |
| 15 IN WITNESS WHEREOF, I have hereunto set my | 15 Page____Line____Reason_____ |
| 16 hand this 19th of October, 2021. | 16 From_____to_____ |
| 17 | 17 Page____Line____Reason_____ |
| 18 _____ | 18 From_____to_____ |
| 19 Susan S. Klinger, RMR-CRR, CSR | 19 Page____Line____Reason_____ |
| 20 Texas CSR# 6531 | 20 From_____to_____ |
| 21 | 21 Page____Line____Reason_____ |
| 22 | 22 From_____to_____ |
| 23 | 23 Page____Line____Reason_____ |
| 24 | 24 From_____to_____ |
| 25 | 25 |

Index: $1,406,000..2

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11
350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18
270:20 271:7,16
272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20
223:7 224:2 334:7,19
336:13,23 337:25
339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14
332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20
271:6 272:7 283:18
315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7
277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8
138:12 143:12 144:6,
17,23 272:16 273:6

287:15 288:6,20
303:6,18,24 304:11,
20 305:23 306:2
307:7 308:20 310:17
317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

**1**

**1** 8:9 35:17 139:22
140:12,13 215:25
216:3,7,12 238:8
260:20,23 261:15
328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15
198:2 266:20 267:3
302:7

**10-19-21** 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1

297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12
122:12 135:21
261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3
350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13,
23 203:3 210:6
213:18 221:23

**15(c)** 5:21 160:11
169:21,23 170:4,8,10
171:6 175:3,9 176:23
179:20 184:5 195:9
210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19
110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

**2**

**2** 5:15 35:18 140:18
142:15,16,22 171:10

Index: 2.4..780

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

125:3 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:7 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

45:13 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:19,6,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

25 314:7 316:5,8,9,
13 326:3,13 332:8
351:4 365:22 379:20

**agreements** 58:16
77:24 83:4 168:9
186:10 279:4,6
325:24 353:22
379:18,23 380:4,11,
13,19 381:17 388:16,
17

**agrees** 243:25

**ahead** 68:22 82:6
156:20 164:10
212:25 248:12
295:12 329:11
352:10 364:23
378:18

**Aigen** 4:5 9:24 214:4
251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21
125:2 273:17 281:8,
23

**allowed** 62:8 81:23,
25

**alpha** 297:20 302:7
307:19 328:10
338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15
214:18

**amortizing** 334:13

**amount** 49:10,11
50:23,24 57:6 119:7
131:13 132:8 138:11
142:18 144:5,16
161:19,25 195:16
196:16 216:17
217:15 220:23
222:11 239:5 240:9
244:3 271:11 277:7
283:18 288:6 308:22
342:10 343:5,15,17
389:11

**amounts** 106:21,25
108:14 109:7,18
110:6 111:2,5,8,12,
23 112:18,24 113:18
114:19 115:3 119:3
120:20 121:4,11
125:8 126:6 161:8
168:3 171:12 174:15,
22 175:11 176:9
181:15 199:12 202:7,
22 203:7,13,19
204:11,16,25 205:12
211:11 212:10,18
217:19,21 222:3,11
234:23 235:3 275:13
282:8 283:2 285:10
288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24
241:3,6 261:11 262:3
265:7,8,17,18,19
389:8

**and/or** 42:8,16 43:3,
14 59:14

**annual** 26:10 84:17,
23 85:2,24 96:7
168:10 170:5,9 184:5
217:2 228:16 334:8
335:9 336:12

**answering** 248:7,8
262:23

**answers** 12:2 16:25
26:15

**anticipated** 311:20
378:17

**anymore** 294:24
388:12

**apologize** 30:10
40:22 78:14 99:22
104:12 125:21,24
139:2 170:2 192:14
197:19 226:17
227:17 304:14 352:8
354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24
56:6 59:17 60:12
162:5 168:4 294:13
316:14

**apply** 213:7 314:12,
22

**appointed** 18:21,24
24:14,19,25 25:8
29:11,15 270:4
323:9,16

**appointment** 152:24
153:4,16

**appointments**
227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5,
10 63:12,17,23
144:24 170:14 206:5,
16 271:17,22 272:13,
14 281:7 332:16
351:5 377:17,24
382:11

**approve** 56:21 57:2,
3,20 61:5,9 231:21
273:6 379:7

**approved** 57:5 60:20
231:14 271:12
294:21 295:6,18
333:4 382:16,17

**approximate** 17:22
23:15 27:24 30:19
36:23 38:15 120:15
161:24 216:17 277:7
310:5

**approximately** 8:20
15:13,20 19:23
109:15,19 110:7
119:23 126:12 169:7
173:14,15 178:19
220:12,24 221:3,7
238:9 277:10,15
278:6

**approximates**
118:13 121:6

**April** 152:18,25 200:4
202:13,23 203:3,15
204:10 210:6 213:18
301:16 314:21 323:6

**areas** 26:5

**Argumentative**
156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4,
9

**ascribing** 386:8

**Asia** 4:24 92:14
118:3 129:16 135:10
177:14 218:14

**asks** 97:12 171:10
172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6,
24 109:14 118:23
225:16,23 265:9
354:15 367:9 368:4
371:7,16,23 372:6
376:24 387:3

**assets** 5:23 107:14
108:10,13 109:20
110:8 122:3,8 137:14
190:3 194:2 195:17,
20 196:3,9,17 204:19
211:3 225:8 235:11,
15 237:20,23 239:13,
19 240:15 241:4,18
242:13 250:18
253:16,24 259:18
260:8,11,13 301:9
303:9 307:9 309:2
311:10 317:7 366:14
368:5 370:22

**assistant** 295:2
298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10
297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15
133:24 297:13

**assumed** 285:4,11
287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11
172:12

**attorneys** 3:4,11,17
4:2,10,16 147:21
187:6,11,15 188:3,7,
24,25

**attributable** 132:3
276:11 283:2

**audit** 26:11 48:5
52:23 85:24,25 86:9,
23 88:2,6,13,14,16
89:10,11,22 91:11,14
93:4,14 95:6 96:7,10
97:22 98:19 103:25
104:4 106:7,16,17
109:24 110:25
111:20 112:7,24
113:17 114:2,7
115:2,20 116:5
117:2,20 119:19
131:5 132:9,24 135:6
137:5,7,10,12,21
138:18 142:9,11
148:25 149:4 199:23,
25 200:6 218:7
219:4,5,12,15
221:11,14,20 243:12
244:18 263:24 264:8

**audited** 6:4 41:7
47:25 84:16,23 85:3,
19 90:2 93:24 95:14

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

---

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17 248:13 374:9

**build** 107:7 108:22 260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10 229:22 332:10,11

---

**C**

**calculate** 275:11 276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7 378:16,21 379:5

**call** 46:14 55:2 68:6 70:3 154:8 167:4 191:14,15,24 192:2 290:19,25 350:15 364:21 393:12

**called** 16:10 22:21 27:10 29:25 31:8 32:4 81:9 115:3 130:3 227:2,19 228:21 273:18 278:22,24 315:20 342:8,24 343:2,16 351:10 362:8

**calling** 344:18

**calls** 45:17 46:10 55:21 107:5 126:4 268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23 129:18,23 135:12,16 177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25 21:3 24:17 26:22 65:10 97:15 143:25 174:3 232:4 258:25 270:25 285:24 295:18

**Capital** 3:4,18 8:11 9:6,22 10:22 11:7 15:16,23 18:7 22:21 30:2 41:18 42:10,18, 21 43:11,16 44:6 58:15,17,20 70:21 109:23 110:9 125:3 127:12 133:10 152:13 172:14 215:14,17 271:3 279:18,19 280:2,3 308:4 325:22,24 330:16 354:19 359:16,18 360:7,8,13

**capture** 107:10 130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18 47:9 114:14 144:14 223:12

**carried** 107:14,18,21 109:6,11 233:5 243:6

**carrying** 118:13,25 120:2,4,12,14 262:8 263:7,16 265:2

**case** 7:21 8:14 208:15 248:15 301:14 339:25

**cash** 57:3,4 121:12 335:17,18,22,23 336:7 337:13,14,16, 17 360:5 361:12,14

**categorically** 392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24 109:6

**caused** 263:3,14 277:3,19 280:12 359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3 152:2,5,10,13 159:19 183:11 270:4

**certificates** 21:21 154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17, 21,24 19:3,14,25 21:3 39:10,15,19,21, 23 40:3,4,9,12,25 42:5 43:10,23 44:25 46:7 47:16,24 49:17 50:10 51:10,15,20,25 53:9 55:16 60:23 61:21 62:4,8 84:20 85:12 86:3,19,24 88:10,15 90:15 94:4, 23 95:7,15 100:17 107:11 111:16 114:5 133:7,10,16 176:14 202:11 203:25 225:17,20 226:8 227:6 229:23 230:14, 18 240:7,14 243:4 247:7,23 248:24 255:7 269:2 285:24 287:14 288:7 295:19 339:24

**chain** 341:17 342:7 350:14

**challenges** 12:21

**change** 28:7,11,17 93:7 187:7,16 189:2

**changed** 20:6 28:11 189:10 194:13 206:24 207:6,7,9 208:2,3 263:18 264:17 323:2

**characterized** 247:12

**chat** 81:25 92:12 105:2,5 135:17 177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24 27:5 120:8 184:22,24 258:25 270:9,13 271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances** 71:15 231:6 240:6 241:10 261:23,24 262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25 374:9 375:8,11 385:17,22,25 386:2 388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22 55:5 75:16 81:2 156:2 188:21 214:17 238:17 302:6

**client** 74:5,10 75:19 269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21 230:2,23 232:8,20 233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10, 15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2 54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22 193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25 54:11 181:22

**commencing** 203:20

**comment** 252:23 367:22

**common** 299:4,5

**communicate** 64:3

**communicated** 114:9 211:15,20 254:21 292:17 319:19 368:8

**communicating** 365:13 366:3

**communication** 87:6 207:23 350:8

**communications** 66:19 71:13,14 116:16 322:7 367:14

**comp** 78:10

**companies** 42:7 285:17

**company** 27:9 29:25 31:7 247:8 273:18,

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

Case 3:21-cv-00881-X Document 178-13 Filed 01/05/22 Entered 01/05/22 12:48:43 Page 109 of 131
Case 3:21-cv-00881-X Document 78-18 Filed 03/29/23 Page 173 of 200 PageID 44517
Index: COVID-19..Deitsch-perez

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness** 303:19

**Crescent** 294:10

**CRO** 254:13,14 256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8 250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

---

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8 8:14 9:20

**damages** 385:17

**Dandeneau** 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

**dated** 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

**dates** 30:17 178:8 321:14 326:7 355:25 357:11

**Dave** 87:20 172:6 230:19 292:3,4,11

**David** 124:9 275:23 389:9

**Davor** 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

**day** 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate** 344:24

**de-accelerated** 345:18

**deadlines** 86:9 379:2

**deal** 74:25 219:18 224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8, 12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

**debtor's** 233:7 239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

**December-ish** 390:16

**decide** 254:25

**decided** 245:5 318:13 380:22

**deciding** 56:13,17

**decision** 121:24 122:2,21,22 245:2,8 340:9 382:20,21

**decisionmaking** 254:14

**declared** 182:7,12

**deduce** 309:23,24 310:6

**deemed** 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

**default** 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23 201:4,7,21

**deferred** 203:3 366:23

**define** 32:9 33:21 101:6

**defined** 33:13 45:13 51:17 53:13 54:2 99:15 173:2

**defining** 44:16 69:8 109:21

**definition** 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

159:25 160:19 177:6,
17 178:3 180:4,12
191:4,22 194:6,22
195:22 196:4,11
202:24 205:16 206:7
208:11 209:8 212:12,
20 214:9,13,16,22
215:5,11 216:11
220:25 227:21 231:8
232:9 238:10 239:20
242:25 247:15 248:2,
8 249:4,17 251:10
252:6,9,20,25 254:7
255:10,22 256:17
262:18 301:19
324:24 336:15 348:9,
23 349:21,24 352:6,
11,20 353:2,17,23
375:22 376:4,9 377:3
381:13 384:12
386:13 387:10,14
393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7
235:20

**delved** 251:19

**demand** 121:11,17,
21 122:4,7,9,15,19,
23 123:23 124:4
134:13 140:17
142:21 182:15
186:18 187:3,17
198:21 199:6,11,19
200:14 202:18,22
205:19 209:25 210:7,
23 212:18 301:17
313:16 314:8 315:2,8
316:6,17,18

**demandable** 316:19

**demands** 122:14
364:13

**department** 146:10
147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4
164:4 383:15

**depends** 41:20
57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11
8:10,16 11:2,15,18
12:7,15,22 16:15,23
33:23 72:21,23
73:10,15,20 74:6
76:8 77:12 81:3
123:17 151:6,9 215:6
227:15 266:21 267:4,
13 365:20 373:2
375:25 376:19
388:23 395:8,9,11

**depositions** 11:19
12:19

**derived** 16:6 17:23

**describe** 56:4 84:3
111:21 326:15 353:7
358:3

**describing** 125:17
126:2

**description** 108:21,
24

**desk** 293:9,10 295:25

**detail** 107:7 120:25
153:8 159:20 222:22
229:14 278:11 300:6
311:18 351:19
369:20

**detailed** 122:20
132:12 179:23 224:9
230:7 260:5 276:18
370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12
80:8 84:7 104:16
131:25 286:3,22
299:12 300:8 342:12
343:7

**deter** 376:18

**determination**
41:25 42:4 261:18,19

**determine** 53:19
82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development**
347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12
205:19 207:18
222:25

**diligence** 85:5,8,13
169:11

**direct** 113:22 253:6
304:19 322:10

**directed** 57:17

**direction** 237:6
254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7
17:23 19:8 42:7,15
43:14 88:2 177:11
219:2 354:9

**director** 23:6 32:15
39:25

**directors** 15:22 72:7

**disagree** 318:5,16,
21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17
52:11 53:10 88:13
91:12 94:6 99:14,20,
23 103:2 111:21
112:3 113:8 179:12
210:12,15 242:21

**disclosed** 48:7,9
52:19 53:4 93:24
94:18 102:3,7,13,18
103:8,10 113:12
117:13 130:10
133:21 134:3 138:8
190:25 212:4

**disclosure** 100:12
134:12,16 185:15

191:20 211:21,23
262:11

**disclosures** 91:2
94:16

**discovery** 81:4
196:21

**discuss** 99:3 124:2
148:18 201:18,20
322:14 342:7 343:22
345:7

**discussed** 26:18
73:23 74:11 80:14
107:9 114:25 192:12
193:23 227:12 234:4
272:20,23 275:3,4
294:5 300:11,13
371:15 383:22 390:9

**discussing** 117:25
148:22 180:8 191:6
217:18 234:9,15
300:17 319:7 341:6,
8,22 346:4 388:13,15
391:6

**discussion** 164:4,9,
12,17 180:19 191:9
217:21 246:4 249:24
251:20 282:18,21
290:6 319:13 342:15
387:22 388:8 392:11,
21 395:3

**discussions** 58:20
233:6,15 249:11
250:4 251:13,19
253:17,20,25 263:25
264:14 274:5 275:17
280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13,
16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25
52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14
239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6
91:19 92:5 96:3
103:18 104:23 105:5,
10,16 136:11 139:22
140:8,12 141:4,10,16
144:3 147:16 151:22
153:6,15,22,23,24
154:5,11,18,24 155:3
156:24 159:21
197:13,14,16,17,25
198:12,15,17,23
199:3,4,10,14,17,25
200:3,18,22 201:3,6,
15,18 202:4 203:2
209:14,16,22 210:12,
15 211:24 212:4
213:21 214:3,6,12,
15,17,20,24 215:7,13
216:7 226:10,25
227:8,19 228:6
236:16,19 237:18
239:17 244:5 256:5,9
293:21,22 301:16
302:12 303:7 305:12,
21 320:14,16 338:14

**documents** 12:24
13:12,14,16,19 25:5
123:15,17 126:19
140:10 143:24
147:20,25 149:12
153:8 159:15 197:2
227:13 235:19
236:25 266:19 267:3,
7,9,14,18 291:9
294:2,4,6,8,11,14,17
296:21,22 322:11
364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24
260:19

**Don-** 68:19

**Dondero** 4:2 9:14
15:6 16:8 17:24 19:8,
12,25 20:9,13,18,24
21:4 42:9,17 43:15,
24 44:3,5 50:11,14,

Case 3:21-cv-00881-X   Document 178-18   Filed 05/02/24   Page 1 of 131
Case 3:21-cv-00881-X   Document 78-18   Filed 03/09/24   Page 175 of 200   PageID 44519

Index: Dondero's..ensure

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

---

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:23
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 313:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**easier** 305:5 373:13

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25
104:14,19 122:6
124:5

**entire** 19:7 192:13
253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23
43:13 44:3 54:21,25
55:4 101:8,15 189:8
278:2 289:19 330:13
361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7
110:25 157:16

**entity** 15:5 22:20,25
27:18 31:11,23 32:3,
6,11 42:14 109:24
137:13 272:3 289:23
302:22 307:8

**entries** 240:19

**entry** 110:1 308:3,
14 311:9 332:23

**environment** 90:3,5,
9,14,20 113:6
137:18,20

**environments**
207:21

**equal** 49:11 50:23
262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25
282:3

**erroneously** 197:22

**error** 125:6,9 131:17,
24 132:3 145:8 165:9
213:12,14 214:5
273:11,14 275:14
276:8,25 277:5
278:5,15 280:12,22
283:3 289:6 318:15
385:9,14,19,23

**errors** 163:21 167:14
373:10

**Esq** 3:6,7,12,13,20,
21 4:4,5,11,18

**established** 94:2
285:14,20 300:25
301:7 310:16

**estate** 31:12,17
235:11,15

**estimate** 20:12 372:4
389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22
138:9 143:9

**events** 103:13
125:16,25 130:4,10,
21 133:8 138:5
242:22 262:14 263:4
370:24 371:7,9,13

**exact** 15:24 17:25
18:13,18,19,22 20:5
30:17 131:20 156:21
274:13 277:17
278:10

**EXAMINATION** 5:6,
7,8,9,10,11 10:14
266:13 352:25 377:5
387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2
195:19 196:3

**exceeded** 93:25
194:2 196:9,17
204:19 211:3 301:9
303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12
389:13,14

**exchange** 45:15
212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23
201:2 249:18 280:9
323:13 395:8

**execute** 48:14,22

**executed** 49:21
142:10 161:12 221:6
274:2 293:14 303:7

**executing** 317:16

**execution** 181:9
300:14

**executive** 35:10,11,
16 36:20,24 37:5,18
38:3,4,9,14,16,21
39:3 78:10 366:24
367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18,
20,21,22,23,25 6:2,4,
7,8,9,10,11,12,13
13:13 91:20,21
104:23,24 135:8,14,
15 140:12,13 142:15,
16 151:20,21 170:18,
19 197:3,9,15 198:2
214:7 215:22,23,25
216:3,4,5,7,8,12
218:13,16,17 226:23,
24 236:16,23 237:19
258:18 297:23 302:7,
8 303:14 305:5 306:7
307:18,21 309:2,6
313:9 317:12 328:10,
12,13 338:13,21
341:13,14

**exhibits** 267:10,11
268:9

**exist** 15:12 16:17
114:22

**existence** 67:15
69:18 80:16 81:6
99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19
293:19 333:15

**expectation** 231:5

**expected** 200:17,21
293:21

**expects** 203:18
212:9

**experience** 101:14
111:16 116:14
169:10 256:25 257:8
259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19
153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20
311:8

**expressly** 390:4,25
391:12 392:5

**extended** 301:17
308:21 314:22

**extension** 307:8

**extent** 45:17 55:21
66:15 107:5 126:4
208:6 244:15 296:6
322:6

**extra** 219:23

— F —

**face** 50:23 120:11
144:16 244:3

**face-to-face** 293:8
294:5

**facilitated** 321:10

**fact** 62:7 192:20
236:21 264:24
266:25 275:7 298:4
301:15 313:19
334:22 338:23
341:10 343:19
363:12 394:5,7,17

**facts** 111:22 240:6
261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14
49:7 52:4 93:17
99:13 110:21 118:11,
21,24 119:6,8,9
120:3,15 121:5
126:8,21 141:18
143:23 149:20 224:6
239:16 240:18,21
241:17 242:6 243:5
244:13,20 245:19
260:10 261:15 262:7
263:5,15 264:25
287:21 370:21
371:18 372:5 374:10
390:2

**faith** 189:8,15 190:9,
12,19 191:3 193:19
194:20 205:8,14,23
206:14,23 208:5

**familiar** 22:20 31:22
32:3 54:6,9 226:13
227:8,18 274:6

**fashion** 86:11 276:16
357:14

**fault** 229:17 276:24
277:19

**favor** 60:6 62:19
139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21
226:3,4 228:3,23
323:9

**Federal** 7:19

**feel** 81:8,18 176:25
273:13 287:16
371:21 376:11,16

**fees** 332:12 356:21,
23

**fide** 369:25

**figure** 343:10 366:12
367:5

**file** 167:8,13 297:2,10
337:8

**filed** 21:6 197:17
208:18 213:23
215:13 219:23

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:19
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

---

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

---

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18
210:19 211:2 335:16
336:6 337:24

**information** 16:14
80:19 86:10 88:13
91:12 112:5,17
117:14,15 169:11,13
171:20 176:8,15,22
179:16,17,18 188:8
206:3,5 218:20 230:3
236:7 237:13 257:18
274:4 312:10,24
344:19 368:11

**informed** 69:18
178:17 190:24 210:5
211:9 212:8 288:15
335:16,23 378:7

**informing** 64:13
181:25 182:11 330:5

**initially** 132:17 185:5
247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12
274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16
60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3
210:10,13,19 381:25

**instructed** 77:15
147:8,9,23 241:19
291:7,8 315:7 362:8
381:22

**instruction** 8:6
57:11 74:14,23

**instructions** 256:7
347:25

**insufficient** 122:8

**insurance** 385:17,22
386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21
214:19 288:23 315:5,
19

**intending** 16:25
146:16

**intent** 306:14 318:20,
25 380:10

**intention** 81:11
307:11

**interest** 50:3 55:25
56:22 57:18 58:2
59:14,17 60:13 62:18
63:2,10 64:5,15,22
119:10,16,21 120:22
162:6 163:22 164:25
165:11 167:11 168:5
217:17 223:18
273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16
329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16,
18

**interviewed** 322:18,
22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations**
275:17

**investment** 4:10
9:18 32:21 65:11
127:17,24,25 128:12,
14,16 129:3 244:23
245:3,6 247:11
273:24 274:15
279:21

**investments** 128:17
129:5,6 249:23

**investors** 275:10
276:12 277:4,8,21
281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10
245:2 264:17 274:14
275:15,21 276:21
288:4 292:6,13 293:6
354:10

**issuance** 131:5
138:10,18 371:14

**issue** 54:7 178:14
191:13 201:25
204:10 208:24

**issued** 56:16 60:5
62:19 65:8,18 66:8
81:13 82:15,20 93:13
107:13,20 108:2
131:11 132:6 133:12
161:23 162:5 180:10
218:25 223:7,17
233:8 234:10,15
235:4,9,21 236:8
242:8 243:7 261:9
262:6 263:6

**issues** 113:5 248:14
306:19

**item** 108:19 111:11,
18 112:4 119:2,16
123:6 185:21 220:5
238:20 259:18,24

**items** 53:3 97:21
100:9 112:3 131:21
149:8 228:21 229:3,7
230:4,7 249:22 260:6

---

**J**

**James** 234:11
271:25 273:2

**investment** 4:10

**January** 70:16
163:7,8 219:11,13,17
258:20 326:8 341:6,
18 344:2 350:5,9,13,
24 351:20 361:25
362:3,7 364:8 365:2,
15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6
16:8 19:8 43:15,24
44:5 50:11,25 65:16
67:6,22 68:18 71:23
72:7 75:24 78:9,16
82:22 123:3,20
189:9,16 190:10,13,
15 205:9 206:23
232:18 273:2 280:19
342:5,7 351:5,10,14
362:8,10 363:8,18
365:3 367:8 368:22
379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3
219:20 313:2

**John** 3:6 7:24 9:4
10:20 45:3 46:13,18
69:13 74:8 76:15,17
77:10 95:17 105:23
129:18 146:13 154:7
155:18 157:6 177:6
192:18 208:13 216:2
222:14 236:18
267:18 304:6 308:7
353:18 385:3 387:10,
16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21
72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17
99:25 103:2 132:25
135:2 137:6 176:10,
24 186:16 200:7
242:23 262:16,24
263:13 265:3

---

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12
221:12 222:23
245:22 250:5 274:16
276:4 323:6 329:22,
23 337:8 353:13
356:10 358:13,14
380:23

**kinds** 353:6 354:2
357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9
172:6 230:19 275:23
292:3,18 389:9

**knew** 68:18 103:9,10
369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10
46:5 47:23 48:12,21
49:9 50:13 52:5,10
53:10 62:5 63:12,16,
21,23 79:23 80:10
81:5 82:7,8 89:23
93:23 95:3 98:17
101:13,19 102:2,25
106:25 111:16 112:6
138:16 144:24 147:8
153:13 167:8,22
184:10 188:15 189:9
194:13 206:5 207:8
208:2 225:5,12
226:21 232:21,23,24
237:11 243:4 259:22
322:19 324:17
384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21
230:20 292:3,12
328:17 342:11 343:8
350:17,18 362:23
365:13

---

**L**

**L.P.** 3:19 8:12 9:6,23
10:22 11:7 15:16,23

APP 687

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 321:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

**M**

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:13,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4
198:10 222:5 224:3
276:5 307:22

**money** 39:11,16,24
41:2 43:24 49:11,17
50:10 62:9 124:14,20
126:6,23 127:3,15,25
128:5,10,23 129:2,5
145:16,18 186:10
276:13 282:8 283:5
285:18 318:10
319:11 320:4 359:9,
13,24 360:21 374:22

**moneys** 39:19 162:5
167:9 277:8 282:17
283:16,22 289:5
359:15

**month** 59:11 132:23
226:16 229:15
258:21 332:4

**month-and-a-half**
323:10

**monthly** 5:25
226:11,14 227:5,20,
25 228:12 229:10,19,
21 230:2,11,22
231:14 232:6,8,13,
19,20 255:18 256:14,
19 259:9,12,14

**months** 261:21
292:25

**morning** 7:3 10:19
342:16,18 344:12,14,
16

**Morris** 3:6 5:6,9 7:24
9:4 10:7,15,20 13:10,
17 16:9,24 17:11,14,
19,20 22:16,18
31:18,19,21,25 35:24
36:5,11 45:6,10
46:15,23 47:4,6,11
55:4 69:8,11 72:15,
18,25 74:3,9,13,18,
24 75:11,15,19
76:19,23 77:2,11,19,
22 81:16,18,21,23

82:10,13 91:8,18,22,
24 92:9,11,14 95:9
105:4,25 110:22
114:11 118:2 129:15,
21,24 130:14,18
135:5,10,13 136:9
137:24 139:20
140:11,23 142:14
146:17 150:21
151:19 154:3,13,16
155:19,22,25 156:18,
25 157:3,10,13,21
170:17,20,25 171:24
174:18 177:9,14,16,
19,23 178:10 195:6
196:20 197:6,21
201:11 202:3 207:15
208:20 209:13 214:4,
8,10,14,21 215:3,10,
21,24 216:4,13
217:5,8 218:11
219:25 221:23
222:16 224:18
226:22 228:18
236:15,20 243:15
246:13 247:21 248:5,
11,22 249:18 250:6
251:23 252:4,8,16,24
253:4 254:17 258:16
259:16 265:23 266:9,
17,24 267:14,20
268:14 269:7,12,18
270:15,22 271:8,18
272:9,17 273:7,10
277:22 278:19 279:8
280:15,23 282:12,18
283:19 284:7,14
285:7 286:9 287:9,
18,24 288:8,25
289:12 290:9,21
291:19,23 292:19
293:15,23 295:12
296:13 297:6 298:22
300:15 301:13 302:2,
11,15 303:2,10,20
304:3,7,12 306:15,24
307:13 308:5,8,13
309:10,12 310:2,11,
19,24 311:12 312:16
313:13 314:12,14
315:9,23 316:23
317:17,25 318:6,17,
23 319:23 320:6,18
322:5,23 326:24
327:6,24 329:10
330:21 331:5 333:10,

18 334:6,10,21 335:4
338:3 339:16 340:18
342:21 345:12,19
346:22 347:14,19
348:12 351:15 352:4,
8,16,18 353:11,15,19
354:4 355:5,9,15,21
356:3,14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10,22 365:6,
21 366:15,25 367:16,
25 369:4,8,17 370:3,
8,25 371:10,25
372:22 373:4,20
374:11 375:3,24
376:20 377:6 387:7
388:19 389:5,15
390:9 391:4,14
392:7,13 393:24
394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23
245:3,6 247:11
260:22

**mouthpiece** 206:2

**move** 69:11,12
114:11 208:19
246:13 247:21
248:22 250:6 252:23
307:17 364:22
376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3
320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14
249:11

---

**N**

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8
309:19 311:25 312:4,
13 375:20

**Nancy** 4:2 9:14 65:9,
17 66:7 67:6,22
68:19,25 75:25 78:16
82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6
144:2 147:17,18
180:20 230:8 240:22
253:18 259:15
271:20 276:10
279:22 280:9 292:22
294:22 325:19
329:24 333:13
354:12 356:6,17
357:11 378:23

**NAV** 125:6,9 131:17,
24 132:3 145:8
273:11,14 274:23
275:8 277:5 278:15
280:12,22 281:13
289:6 318:15 373:10

**needed** 155:2 250:17
257:13 271:21 289:6
318:13 354:15 358:8
382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19
383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4
9:21 27:10,12,15,18,
21,25 28:4,6,16 29:7,
10,12,16,24 31:3,11,
17 32:17 42:21 43:12
44:6 54:14 58:7,11,
14 60:5 65:6 100:23
126:9,13,16,23
127:3,10,11,15,18,24

161:23 162:5,7,11,18
163:23 164:6 165:11
167:7,8,13,15 168:2,
6 171:13 172:21
176:14 178:12,17,18,
22 179:13 182:3,12
184:21,23 186:9,21
189:15 196:3,23,24
216:20 217:14,23
218:3,19 219:15,22
220:18 221:6,10,13,
25 223:5,24 241:23
242:6 260:4 267:24
309:24 322:3 325:14,
18,21 326:16,23
327:4,10,17,20
328:6,7,8,25 329:3
330:11,18,19 331:2
332:14,17 333:8,15,
16 334:5,8,22 335:3,
9 336:13 337:13,23,
24 338:23 341:19
342:9 343:18 345:17
346:12,16,20 348:4
353:8,21 358:15
379:16 381:23
382:10 383:24 384:3
390:5 391:2,10,12,19
392:5

**Nexpoint's** 59:18
218:6,12 219:6 331:3
336:22 350:19

**Nguyen** 3:21 268:10
297:19 298:9 302:5
303:14 305:3 306:7
307:19 308:11,25
309:3,4 311:22 313:8
317:3 331:9 332:21
338:12,21 341:15
343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american**
284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2,
7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21
48:15,22 49:6,12
50:15,22 51:7 56:7
57:4,19 59:18 60:5,
13 62:19 63:3 64:6,
15,23 78:17 107:20
117:9,12 120:18
122:4 126:12 134:6
140:14,17,20 141:22,
24 142:2,4,18,22
147:15 149:17 150:4
161:24 162:4,7,18
163:23 165:12
167:11,15 168:6
182:3,12 186:18,22
187:17 213:16 214:4
216:16,20 217:2,13,
23 220:5,8,13,18,20,
23 221:5 222:4,10
223:4,7 224:2,9,12
233:22 234:10
243:17 244:23 245:3,
7,13,16,23 260:22,25
261:9 306:11,18
309:16,24 310:9
312:2,14,15,24,25
313:15,16 315:13,14,
16 316:17,18 319:12,
14 324:16 334:6,13,
18,19,23 335:21
336:13,23 338:2,17
339:4 340:10,14
341:19,23 342:9
343:4 344:25 345:18
347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20
45:2 46:2 49:21
50:18 54:3,6 55:7,18,
25 56:10,15,23 58:2
65:7,14,18 66:7 67:3
68:14,17 76:2 82:15,
20 83:6,10,13 106:21
107:2,12 108:2,14,18
109:5,7,17 110:6,25
111:5,8,12,22,25
112:18,23 113:9,10,
13,18 114:19 115:3
118:12,13,25 119:3,
6,9,11,22 120:19
121:3,21 122:8,15
123:6 124:3,15
130:23 131:12,16

**notice** 7:25 356:9
357:9 379:6 380:10,
15,16,17 381:4,7

132:7,10,14,20
133:13,21 134:5,14,
17,23 138:11,20
139:5,10,17,21
142:10 143:6,7,14,
21,23 144:5,12,16,22
145:4,23 146:2,4,7,
11,14,25 147:10
148:15,18,24 149:2
150:5,8,15 158:5,13,
19,24 159:5,10,23
160:16,25 161:5,9,
10,19 162:11 171:13
175:16 178:14,15
179:14,21 180:2,10,
24 181:4,9,16,22
182:8,16 205:19
209:2 210:8 213:7,8
222:2,17 223:13,16,
19,23 224:9 233:8
234:15,23 235:4,9,
14,21 236:3,7
238:20,25 239:4,5,
11,18 240:10,20
241:6 242:7 243:6,
11,18 244:4,15
246:6,15,22 247:10,
24 248:25 250:9
251:8,15,21 252:12
253:10 261:12,16
262:6,11 263:6,15
264:19 268:21,24
282:14 284:19
285:15,17 288:21
289:10,16,18,22
290:8,13,16,24 291:5
293:13 296:9 297:4,
5,11,17,21 298:17
299:11,14,18 300:13
301:18 304:19,24
305:2,18,22 306:21,
23 307:12,24 310:17
312:11 313:20
314:13,23,25 315:2,
20,22 316:2,14
317:10,16,21 319:5,
9,15,18,22 322:20
323:20,25 333:17
338:7 364:13 366:22
367:23 368:6,17
369:15,19,20,25
370:9,11,17 372:11
386:9,10

**noticed** 16:12,20
248:6 375:25

**notices** 380:21

**November** 59:12
328:16 329:14,19
330:15 331:12 332:3
380:9,18 388:3,6
390:22

**NPA** 5:15 189:24
328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13
15:24 17:25 93:7,10
100:10 108:9 111:7
126:10 135:10
137:25 139:22
170:24 177:15,16
179:4 197:4,7 218:13
222:21 236:21
239:25 240:9 277:17
282:9 285:15,16
286:5 343:25 344:5
370:22 377:9 389:18,
21

**numbers** 240:5,6,23
268:13 278:10 343:5
366:12,19 367:6

_____

**O**

_____

**Oak** 4:7

**object** 29:20 45:7,8,9
47:4 60:24 65:19
66:10,15 67:9,24
69:6 73:24 77:13
78:19 79:20,25 97:4
107:16 115:5 119:12
144:25 146:12 147:4,
11 149:21 151:13
156:7,16 159:25
164:2 180:4,11,12
191:4,22 194:6,22
202:24 206:7 208:10,
11 211:4 212:12,20,
22,24 213:25 220:25
225:10 227:21 231:8
232:9 239:20,22
248:3 249:4 250:11
251:10 253:12 254:7
255:10 256:17
262:18 269:7,14,17
347:21 348:11,12

352:14 365:6 381:13
384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9,
10 20:4,20 22:14
25:15 31:16 33:9
34:20 40:10 41:4,12,
24 42:11,12,19 43:17
44:17 45:4,16 46:10
47:20 48:3,16,25
49:13 50:5,7 52:8
53:18 54:8 55:10,20
56:11,25 58:25
59:19,25 60:7,15,16
61:12 62:11 63:13,24
64:17,19 65:12 66:24
67:17 69:5,9,10 75:6,
10 79:4,14 80:12
82:24 83:25 85:15
86:2 91:4 94:3 96:11,
20 99:17 107:4,15
108:5 110:11 111:24
112:20 113:20
114:20 115:6 117:6,
18 119:13 120:16,17
122:10,16 124:6,23
126:3 127:19 132:16
133:23 134:8 142:6
143:10,15 144:8
149:5 150:10,17
151:16 153:18,19,25
154:6 155:11 157:2
158:15 159:17 160:3,
12,18,19 167:5 168:8
178:20 180:3 181:5,
11 183:15 184:6,20
185:2,18,24 193:21
194:5 195:21,22
196:4,11,18 200:20
203:23 205:3,15,25
206:21 210:24
211:13 213:11
220:10,15 222:13
225:24 228:9 229:24
231:18 234:6 235:23
236:10 238:10 239:3,
14 240:16 242:24
246:19,25 247:14
250:22 251:12 254:6
255:12,22 257:6,20
260:14 263:8 265:4
266:19,23 267:21
270:15,22 271:8,18
272:9,17 273:7
277:22 278:19 279:8

280:15,23 283:19
284:7,14 285:7,23
286:7,9 287:9,18,24
288:8,25 289:12
290:9,21 291:19,23
292:19 293:15,23
296:13 297:6 298:22
299:15 300:15 302:2,
25 303:2,10,20
305:10 306:15,24
307:2,13 310:2,11,
19,24 311:12 312:16,
18 314:14 315:9,23
316:23 317:17,23
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:2
342:21 345:12,19
346:22 347:14,19
348:9 351:15 353:11,
15,18,24 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 366:15,25
367:16,25 369:4,8,17
370:3,25 371:10,25
372:22 373:4,20
374:11 375:3 376:20
379:10 380:25
388:19 389:5,15
391:4,14 392:7,13
393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18
262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22
242:20

**obligations** 160:9
178:15 179:12 180:2,
9,23 185:15 194:4
208:8 327:13,21
328:8 332:5,8 333:17
335:17 336:6,7,10
361:19 380:2 390:10,
12 391:7,8

Index: obligor..payable

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5
50:4,16 51:6 126:10
128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13
331:21

**occurred** 103:13
104:5 125:17 126:2
263:13 278:15
299:25 331:24 339:7
369:24 390:24

**October** 8:19 21:7
160:5,7,14,21
169:17,24 171:19
172:4 173:24 174:6
183:7,14 186:11,13
189:13 207:16
219:24 263:19
314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5
294:4,10 323:13,14
326:15 388:22 389:2

**officer** 14:12 23:6
26:25 27:6 28:24
29:2,7 32:14 35:10,
12,16 36:20,24 37:6,
18 38:3,5,10,16,22
39:3,24 51:22 52:6,
17 120:8 143:18
173:7,9,13,16,20,23
174:3 184:23,24
258:25 269:5,24
270:10,14 271:2
302:19 362:25

**officers** 15:22 29:24
39:11 40:5,8,12
51:23 52:13 93:21
153:9

**offset** 380:2,3 382:25
390:9,11,13

**offsets** 58:21 381:18,
19 383:13

**Okada** 49:18,21,24
50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14
332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11
202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-
end** 125:12

**open-ended** 125:7
275:4,8 276:10
281:9,11 282:7

**operating** 5:22,25
90:10 226:11,14
227:2,4,19 228:7
255:18 256:14,20
259:9,12,14 359:14

**operational** 143:25
147:17

**operational-type**
291:11

**operations** 202:8,15
203:14

**opinion** 120:6,7,10
204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11
128:16 129:6 288:21
360:9

**ordinary** 226:9
229:22 293:18

**organizational**
112:13

**orient** 365:24

**original** 223:25
232:11 274:24
277:14

**originally** 177:21
232:16

**originals** 297:4,11,
16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12
119:22 142:10
171:11 174:15
175:12 185:10,23
186:8 202:6,18,23
203:7,8,13 220:18
222:3,12 223:4,14,
19,24 224:13,17
235:10,14 244:16

**overpaid** 58:16
381:16

**overpayment**
381:20 390:13

**overpayments**
58:22 379:22 380:3
389:4,12

**overruled** 17:15

**overseeing** 26:10
86:22 230:11

**oversight** 257:15

**overspeak** 115:16
252:3

**owe** 375:15

**owed** 125:8 160:10
161:8 178:18,23
185:6,16 186:9
199:12 204:12,25
205:13 212:18
275:13 297:17
308:20 310:17
358:21 380:3

**owing** 50:3 211:11
212:10 223:6 234:23
285:18

**owned** 15:6 16:7
17:24 42:8,16,24
43:3,13 273:17

**owner** 272:24 281:25
282:3

**P**

**p.m.** 150:24,25 151:3
174:6 224:23,24
225:2 266:5,6,8
325:7,8,10 349:6,7,9
372:14,15,17 395:10,
11

**Pachulski** 3:8 9:4
10:20 72:9 166:19

**package** 229:10,20,
22 230:2,12,23
232:6,8 233:3

**packages** 231:15
232:20

**pages** 214:11,17

**paid** 50:2 56:18
167:10 221:7 277:4,
8,20 283:23 327:22
330:19 331:4 333:16
336:9,11 355:19
356:23 365:4 394:9

**paper** 288:21 293:13,
20 296:12,16

**paragraph** 92:17
118:11 119:20 121:9
124:15 126:9 134:11
140:18 142:22 203:6
216:25 221:24 222:7,
9,10,14,16,18 223:9,
15

**paragraphs** 117:23
118:6

**part** 42:9,17 43:15
50:18 51:11,16,21
52:12,19,23 53:12
58:17 85:5 88:12,14,
22 90:21 91:14 93:22
103:22 105:9 116:13
117:20 125:12 142:9,
11 148:4 149:12
156:24 169:14,19
175:3 176:23 179:11
193:17 200:16
210:21 213:16
214:19 238:8 240:17
245:19 254:20
274:17 282:4 286:2
288:19 326:21
330:17 365:2 366:23

367:24 386:9,10

**participants** 8:17

**participate** 168:13
218:23 219:2 362:21
380:5

**participated** 87:25
137:20

**participating** 191:9
259:8

**participation** 86:23

**parties** 7:15 9:25
85:7,12 100:14,22
101:6,23 103:4
376:13

**partner** 9:9

**partners** 31:8,12,15,
18 32:4 370:16

**partnership** 121:11
122:6 131:12 132:7

**partnership's**
102:19 103:3 118:12

**party** 17:10 100:19
101:18 102:20 103:4
321:4 366:22 368:17
385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7
359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4
144:22 161:18
181:15 205:10,19
209:3 234:22 282:8,
16 302:23 318:14
327:13 332:6,13
344:19 355:18 356:2,
13 357:3,13 366:13
374:25 393:23

**payable** 171:12
174:15 190:6 202:18,
22 220:5 222:2,17
327:21 329:17
330:10,12,20 331:4

Index: payee..president

333:7 334:14

payee 140:21 142:25 216:22

paying 288:14,16 326:23 333:9 338:17 346:21 355:4,8 357:4

payment 56:5,21 57:4,6,12,18,25 58:6, 10,12 59:14,16,20,22 60:3,4,9,11 62:17,25 63:9,15 64:4,9,22 121:11,17,21 122:7, 19,23 162:13,16,17 163:4,6,10,14 164:24 182:16 199:6,11 212:18 331:20 332:24 334:9 335:9 336:12 337:3,25 338:24 339:12,14 340:2,7 342:9 343:4, 20 344:20,24 345:4, 11,17 346:13 348:5 350:7,9,20,23 351:6, 7,14,20,23 356:6,17 358:25 359:2,6,7,15 360:16,22,24 361:18 362:2,5,7,9,12,15,18, 21 363:3,7,10,15,20 364:3,7,25 365:5,9, 14 366:21 379:15 381:23 382:2,9,14,15 383:19 390:6,8,21 391:10,13,20,24 392:6

payments 55:16,24 56:8,14 57:2,9 64:14 162:10,24 163:16,21 165:10 167:14 217:15 282:22 288:11,12 328:4 329:16 330:3,4,6,8 334:23 335:3,19,21, 22 336:23 337:9,15, 21 355:19 356:8 357:2,10,13 358:7,21 359:9,10,20,25 360:6,10,15 361:7,23 362:4 365:14,16 377:12,17,22 378:8, 9,17,24 379:7 380:23 381:3,6,11,18 382:6 383:4,5,23 384:2,4,6, 7 387:24 388:14 390:20 391:3 392:12

393:23 394:7,18

PDF 293:22

Pearl 3:15

pen 296:22,25

pending 7:21 16:16

people 33:7,11 34:4 89:3 146:4 170:24 237:5 275:9,20,21 279:23 291:21 293:7 294:3 319:16 351:12 372:19

percent 18:2,4 86:15 108:23 109:19 110:8 260:12

percentage 110:19

percentages 86:16

perfect 90:17 118:5 130:19 189:4 197:19 268:19 298:8

perfectly 144:3 223:2 348:18

performed 48:5 246:11

performing 114:7 219:4

period 25:12 39:9,14 40:24 90:15 93:14 95:15 105:18 120:9 135:21 169:5 203:20 218:21 219:6,16 221:15 226:18 231:15 242:17 243:13 247:22 265:2 321:22 380:15,16

periodic 228:13 241:17 288:12 358:6

periodically 337:14

persist 157:9

person 26:2,4 43:7 44:21 57:7 79:9 86:21 87:6,7 114:2,4 116:14 155:16 167:20 191:18 259:22 291:21 292:22

personal 79:22 80:10 97:15 375:11

personally 62:20 64:3 85:23 89:11 95:4 97:9 101:22 237:4 255:20,24 275:15 296:21 303:23 304:18,22 306:12 317:21 370:11

personnel 237:16 318:12 333:22 359:18,21 360:13,23 363:3

pertaining 65:17

petition 21:9 70:11 84:11 235:10,14 241:20 263:20 310:15 386:5

phone 68:6 70:3 290:25 392:23 393:2, 5,8,9

phonetic 249:21

phrase 41:10 229:19

physically 191:16 294:4 296:12,16 299:17,21

pick 101:6

picked 101:10,12

piece 203:11

pile 139:23

place 58:24 59:6 112:16 122:18 166:2 260:7 272:13 278:16 297:14,16 326:4,10, 12 393:3

plaintiff 9:7

plan 335:24 337:20 366:5 367:6 386:9,18

play 85:23 153:11 168:16 184:2 340:9

played 86:3,6,17 335:2

playing 239:9

pleading 213:22

pleased 347:12,16, 17

plural 314:3

point 78:9 87:2,6,7 114:2,4 157:16 166:9 190:16 254:11 255:3, 7 261:6 313:7,20 321:13 326:6 337:12 344:9 375:23 376:11 380:22

pointing 254:23

points 282:9,10

policy 378:6,10 386:2

poor 207:22

poorly 104:10

portfolio 274:5

portion 13:2,6 16:5 17:22 19:13,16,19 112:23

portions 12:10

position 37:9 122:3 184:14 193:3,6,9 274:15 280:11 361:14

positions 38:24 172:25 173:5 183:6 184:10,18 192:16

possession 45:25 113:9 132:11

possibilities 29:19 371:23

possibly 213:7 314:12

post 92:12 184:13, 14,18 192:15,24 193:7,8 275:24

pot 366:5 367:6 386:9,18

potential 250:20 357:4 366:3,19 369:16 371:7,9

potentially 113:5 249:6 250:12,13,14, 16,21 354:8

Poydras 4:13

practice 7:8 64:13 89:20,24,25 90:4

91:11 97:7 98:7,12 106:14 146:9,24 150:13 230:25 231:2, 3,22,24 233:5 299:4, 5 337:4 356:13 369:2,7 371:6,15 374:15 377:21

pre-petition 226:18

precisely 205:21 298:16

prefix 268:15

premarked 91:19 104:23 197:15 216:5 236:16

preparation 137:21 230:11 259:9

prepare 123:17 204:23 226:9 229:6, 21 235:19 236:25 237:3,5,13 241:11 255:24 377:22 378:16

prepared 227:5,20, 24 228:15 229:2,4,9 230:3 232:20 237:8 239:17 241:25 242:3 255:20 284:19 317:14 319:5 373:2 376:18

preparer 256:4 259:4,5,23

preparing 137:10 164:9 232:5,7 241:12,15,16 254:9 264:10

prerogative 253:7

present 4:23 90:23 180:15 191:19 283:14

presentations 368:7,16,18

presented 86:10 113:14 117:10 161:11 296:11,16

presents 12:20

president 14:16 271:23 272:24

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhousecoopers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

83:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

175:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

226:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

## Q

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

APP 694

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

**R**

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

31:14 32:7,17,24
33:19 44:2,10 54:10,
24 68:24 79:17 84:13
95:11 175:2 186:24
203:6 279:24 329:3

**reference** 92:17
103:12 200:12 202:6
222:3,10 223:9
238:20,24 260:21

**referenced** 132:14
186:25

**referred** 84:4 91:15
123:24 143:7 169:21
186:7,20 223:15
279:20 366:5

**referring** 33:16
50:17 75:24 76:6
118:8 163:5 187:11
199:25 223:11
226:15 281:5 314:2
316:3

**refers** 170:4

**reflected** 13:14 75:5
175:16 181:15 235:4
240:9

**refresh** 24:24 105:12
131:15 192:20 221:4
223:22 227:10
367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement**
279:17 325:19,23
379:20 388:16

**relate** 130:6

**related** 59:23 60:4
90:25 100:13,19,22
101:6,18,23 102:19,
20 103:3,4 105:7
131:17 138:5,10
145:9 167:14 208:25
280:22 281:3 284:2
366:22 368:17
376:13

**relates** 76:14 113:6,
18 130:11 211:24

**relating** 131:2
138:19

**relation** 27:21 30:10,
13 35:6 41:18 58:21
112:3 125:9 163:21
172:25 176:17
184:11,18 191:16
264:13 385:18

**relationship** 374:3

**relationships**
100:13 102:20,21
103:4

**relative** 192:16

**relayed** 188:8 206:4
342:12

**relaying** 206:3
207:24 344:18

**release** 329:6 330:8

**relevant** 88:13
208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3
237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23
203:8

**remaining** 119:10
223:25

**remember** 59:8 70:9
71:2,3 80:22,23,24
87:23 95:19 102:9
122:25 123:2,19
124:16,24 127:6,14
128:6,7 129:11
131:19 147:15
162:22,24 163:4
165:6 166:3,7 172:17
174:4 187:13,19,21
188:15 189:18 194:7,
15,24 195:4 200:6,15
234:4 236:12 250:3
253:13,14,23 254:15,
17 274:12 277:16
282:17 284:12,17,23
286:3,22 291:21

293:12 296:9 299:12
300:10,12 302:16
309:11 313:22 316:3
317:5 319:4,7 320:2,
5 323:7 324:4,8
326:6 333:25 339:8
340:21 342:14
344:15,18 345:25
346:3,4 351:11
357:17 361:18 364:9,
12,14 365:10,25
377:14 387:25
389:17,18 390:22,23
392:4,22

**remembering**
289:17

**remind** 72:19 77:17
391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14
8:18 12:20 299:6,9

**rendered** 204:5
233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14,
16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11,
15,25 205:12 211:11
212:10 304:23

**repeat** 17:19 38:7
45:11 46:21 48:20
146:21,22 249:25
269:21 270:24
336:17,18 339:21

**report** 5:25 14:13,21
19:12 26:21 88:2,6,
16 89:12 98:18 105:8
106:4,8,16 110:25
111:21 112:7,12,25
115:20 116:5,17,21

117:2 119:19 131:5,
11 133:12 134:7
135:6 137:5,7,10,12,
25 138:3,4,9,13,19
166:8,11 178:13
219:13,15 226:19
227:4 228:7 229:2,4
232:12 256:15 257:4
258:20,24 259:5,23

**reported** 19:7,10,17,
21,25 20:23 21:2
119:17 120:23
226:10 240:15
258:14

**reporter** 7:12 8:24
10:10 209:6 268:8,18
301:20

**reporting** 7:6 8:22,
25 20:9,13,17,23
21:4 87:22 91:2
114:17 230:12
231:14 232:6,19

**reports** 89:22 113:18
115:2 143:8 171:5
196:22 226:14,16
229:6 255:18 256:20
257:19 259:9,13,14

**represent** 9:25 10:4,
22 133:4 267:23

**representation** 5:17
91:16 94:21 95:5,16
96:9,18,22 97:2,8,13,
19,25 98:9 99:2
103:7,17,23 104:8
106:11,15 130:8,9
135:25 136:6,14
214:23 215:9 262:16,
22,25 295:17

**representations**
92:21 98:19,24
136:16,23,24 262:24

**representing** 9:11,
14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25
172:8 196:25 291:15
379:7

**requested** 196:21
362:18 363:7

**requests** 85:18
373:3 387:18

**require** 63:16

**required** 56:9 94:5
96:17 97:19,20,21,25
98:3 127:18,20 340:2
390:5

**requires** 96:25

**reserve** 245:2,6
260:24 261:4,8

**reserved** 244:22
245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18
383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13,
18,23 35:2 37:4 39:7
56:15 112:17 134:17
182:7 212:5 261:8,16
273:12 333:8 335:9
339:12 340:6 365:22
383:18 385:17
393:21

**respond** 174:25

**responded** 174:8
182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24
174:8,13 176:4
178:6,18 182:20,24
185:5 189:6 190:8
194:17,18 195:9,13
205:6 210:20 267:22
350:11

**responses** 81:4
184:3

**responsibilities**
25:18,23 28:10 31:2,
4 38:21 219:20

**responsibility** 26:6,
10 88:5,9 115:23
116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

**S**

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:16

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 211:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

**sheet** 137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:6 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

**sheet** 192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

**sheet** 268:21 304:16

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

APP 698

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23
77:11,22 81:21,22
106:2 155:19,22
157:14 215:6 220:2

**stopped** 231:16
294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13
8:23

**stressful** 292:24

**strike** 114:12 246:13
247:21 248:5,22
250:6 252:23 272:13
291:2 307:16 310:7
343:24 346:16
364:22 372:8 393:4

**string** 5:21 172:3
183:22

**structure** 87:22
112:13

**stuff** 156:6 157:5
252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8
82:16,21 83:6,10,14
109:24,25 124:14
139:5,11 168:10
277:5

**subpoena** 11:6
16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14
395:16

**subscribing** 281:19

**subsequent** 130:3,
10,21 131:2 133:8
134:19,22 138:5,9

143:9 242:22 262:14
263:4 274:12 370:24

**subsequently**
244:22

**substance** 72:22
73:15,19 74:6 151:5,
8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22
32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24
374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14
279:12 280:4 296:8

**summarized** 274:21

**summarizing**
188:13

**summary** 5:23
237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental**
218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4
275:23

**surprised** 352:9
356:11 376:22
394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25
324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

———

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14
120:12 176:7 208:16
226:17 239:23
240:23 323:19
348:24

**talk** 89:2 157:16
164:15,20 233:19
279:2 293:7 325:13
350:16 387:17
388:23 395:4

**talked** 100:3 113:4
130:8 151:11 162:14,
15 187:21,23 188:4,7
190:15 217:14
222:23 249:14
253:16 268:3 292:11
311:15 349:19 351:5
378:5 379:18 389:2
391:9 394:6

**talking** 40:5 59:13,16
75:14 76:20,23
77:12,22 89:15
101:23 157:14
162:16 208:24 222:6,
8 231:19 259:25
264:19 323:6 341:23
350:13 351:11,13
352:16,17 354:18
368:18 379:25
383:14

**talks** 58:19 100:11
350:6

**task** 291:14

**tax** 280:7 354:22,25
358:11

**taxing** 353:5

**team** 53:4 86:8,12
87:12,14,22 88:21,23
89:2,8 112:10,12
113:8,24 116:7
137:18,20 147:14,18,
19,24 148:2,4,5
149:7,11,14,15,24
150:19,20 188:4,6
200:17 219:3 237:7
255:25 257:8,12,17,
23,25 258:4,7,12
259:11 272:23
290:11,13,14,15
291:8,17 292:5
309:21 311:24
312:13 335:11 351:7
367:10 368:3

**teams** 116:10 337:6
354:10

**tech** 320:20

**technologically**
320:12

**telephone** 191:15
290:19 342:23
344:12,14 392:22

**telling** 71:23 79:10
125:4 166:18 181:8,
14 182:14 207:24
246:21 251:4 253:9
285:5 287:8 317:5

**tendered** 45:2 55:18
57:19 58:3 60:13
63:3 64:6,15,23

**tenure** 39:20 40:2
86:3 94:4 102:11
114:5 230:14,18
368:25 369:11

**term** 28:19 33:13
41:17 44:16 45:14
51:17 53:13 54:2
58:14 69:8 71:20
75:23 79:8 99:16
170:8 173:2 186:21
315:14,15 333:14
362:14 364:3 369:16
383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8,
9 380:21

**terms** 33:21 65:23
66:2,6 69:22 75:8
76:2 78:25 79:23
80:11 83:16,20
319:8,12,14 336:7

**Terrestar** 145:9
273:12,18,19 274:7
384:20 385:9,14,18

**testified** 10:12 68:18
80:7 155:5 156:11
179:7 201:23 206:10,
18 211:14 253:2
256:24 259:10
261:10 269:23 270:2,
13 282:24 283:6
289:3 309:20 312:20
313:3 314:16 318:8
319:10 320:8 351:2
357:8 362:24 378:4,
20 379:3 380:12
388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22
302:14 387:22

**testimony** 16:11,19
20:7,15 29:5 72:22
289:17 301:13 318:5
370:19 387:25
391:11

**Texas** 3:16,24 4:8
8:14

**Thanksgiving**
329:20,22

**Thedford** 171:4
172:3,11,24 173:5
174:20 176:3,16
178:6 182:23 186:20
192:5 198:19 210:10,
13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5
199:23 215:17 320:2
357:3

Index: things..unable

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

**U**

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,19 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

---

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

---

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

**Y**

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

**Z**

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

# EXHIBIT 4

Page 283

 1        DONDERO - 10/29/21

 2      IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
 3            DALLAS DIVISION
    ------------------------------
 4   IN RE:

 5                    Chapter 11
     HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,        CASE NO.
                    19-34054-SGI11
 7
          Debtor.
 8   ------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
          Plaintiff,
10   vs.                    Adversary
                    Proceeding No.
11   JAMES D. DONDERO,           21-03003-sgi

12        Defendant.
    ------------------------------
13

14        REMOTE VIDEOTAPED DEPOSITION OF

15        JAMES DONDERO - VOLUME 2

16           October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874

Page 284

```
1              DONDERO - 10/29/21
2
3
4          October 29, 2021
5          10:21 a.m.
6
7
8
9      Remote Deposition of JAMES DONDERO, held
10  before Susan S. Klinger, a Registered Merit
11  Reporter and Certified Realtime Reporter of the
12  State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 285

```
1              DONDERO - 10/29/21
2   A P P E A R A N C E S:
3   (All appearances via Zoom.)
4   Attorneys for the Reorganized Highland Capital
5   Management:
6      John Morris, Esq.
7      Hayley Winograd, Esq.
8      Gregory Demo, Esq.
9      PACHULSKI STANG ZIEHL & JONES
10     780 Third Avenue
11     New York, New York 10017
12
13  Attorneys for NexPoint Advisors, LP and
14  Highland Capital Management Fund Advisors,
15  L.P.:
16     Davor Rukavina, Esq.
17     Thomas Berghman, Esq.
18     MUNSCH HARDT KOPF & HARR
19     500 North Akard Street
20     Dallas, Texas 75201
21
22
23
24
25
```

Page 286

```
1              DONDERO - 10/29/21
2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3   and HCMS:
4      Deborah Deitsch-Perez, Esq.
5      Michael Aigen, Esq.
6      STINSON
7      3102 Oak Lawn Avenue
8      Dallas, Texas 75219
9
10  Attorneys for Dugaboy Investment Trust:
11     Douglas Draper, Esq.
12     Michael Landis, Esq.
13     HELLER, DRAPER & HORN
14     650 Poydras Street
15     New Orleans, Louisiana 70130
16  Attorneys for Marc Kirschner as the trustee for
17  the litigation SunTrust:
18     Deborah Newman, Esq.
19     QUINN EMANUEL URQUHART & SULLIVAN
20     51 Madison Avenue
21     New York, New York 10010
22  Also Present:
23     Dan Elms
24     Aaron Lawrence
25     Patricia Jeffries, Pachulski Stang
```

Page 287

```
1              DONDERO - 10/29/21
2              I N D E X
3   WITNESS                         PAGE
4   JAMES DONDERO
5   EXAMINATION BY MR. MORRIS              289
6              E X H I B I T S
7   No.                         Page
8   Exhibit 1  Original Complaint        466
9   Exhibit 2  NexPoint Complaint        408
10  Exhibit 3  HCMS Complaint            433
11  Exhibit 4  Letter, 12/3/20           464
12  Exhibit 6  Term note                 446
13  Exhibit 15 NexPoint Advisors Answer      380
14  Exhibit 16 HCMS's Answer             362
15  Exhibit 17 HCRE's Answer             377
16  Exhibit 31 Answer to Complaint       354
17  Exhibit 35 Incumbency Certificate    309
18  Exhibit 37 Incumbency Certificate    323
19  Exhibit 47 NexPoint 30(b)(6) notice    345
20  Exhibit 48 HCMS 30(b)(6) notice      353
21  Exhibit 49 HCRE 30(b)(6) notice      354
22
23
24
25
```

Page 288

DONDERO - 10/29/21

1    PROCEEDINGS
2         P R O C E E D I N G S
3         VIDEOGRAPHER:  This marks the
4    beginning of Video 1 in Volume 2 of the
5    deposition of James Dondero in the matter
6    In Re: Highland Capital Management, L.P.
7    Today's date is October 29, 2021.  The time
8    on the video monitor is 10:21 a.m.
9         Will the court reporter please swear
10   in the witness.
11        JAMES DONDERO,
12   having been first duly sworn, testified as
13   follows:
14        MR. MORRIS:  Deborah, would you like
15   to make a statement?
16        MS. DEITSCH-PEREZ:  I didn't know if
17   you wanted appearances first.  Sure.  This
18   is Deborah Deitsch-Perez from Stinson.  I'm
19   counsel for Mr. Dondero, Nancy Dondero,
20   HCRE and HCMS in this deposition.
21        I want to apologize for everybody
22   that we're starting late.  Mr. Dondero was
23   under the weather.  It is -- he has taken
24   something, so he should not have to leave
25   the deposition, but if at any point he

Page 289

DONDERO - 10/29/21

1    looks green to me, I will ask that we stop
2    and reconvene when he is not feeling
3    nauseous.
4         MR. MORRIS:  All right.  I would
5    like to just begin here.  We have counsel
6    on the line for all of the defendants, we
7    have counsel for the plaintiff, and we have
8    counsel for the Highland Litigation Trust,
9    and I think that that is everybody who
10   is -- is supposed to be here, so I would
11   like to just begin.
12        EXAMINATION
13   BY MR. MORRIS:
14        Q.   Mr. Dondero, can you hear me okay?
15        A.   Yes.
16        Q.   Okay.  And are you feeling well
17   enough to begin today's deposition?
18        A.   Yes.
19        Q.   Okay.  I understand that you are not
20   feeling well.  And I want you to know that I do
21   not want to proceed with this deposition unless
22   you believe that you are physically and
23   mentally able to participate to the best of
24   your ability.  Okay?  Do you understand that?

Page 290

DONDERO - 10/29/21

1         A.   Yes.
2         Q.   So if at any time you don't feel
3    like you can continue, I would rather adjourn
4    to one day next week to complete the deposition
5    rather than forcing you to do something that
6    you don't believe you're capable of doing.
7    Okay?
8         A.   Yes.  Yes.  I did throw up twice
9    last night.
10        Q.   Okay.
11        A.   I imagine we could go for -- let's
12   shoot for four hours today, you know, maybe --
13   maybe five, I don't know, but if we don't
14   finish --
15        Q.   I don't want to --
16        A.   -- we will do the rest next week.
17        Q.   Okay.  I don't want to put an
18   arbitrary time on it.  You tell me if you are
19   unable to continue.  Okay?  Is that fair?
20        A.   Yes.  That is my estimate at this
21   point.
22        Q.   Okay.  You founded Highland Capital
23   Management, L.P.; correct?
24        A.   Yes.

Page 291

DONDERO - 10/29/21

1         Q.   And we are going to refer to that
2    entity and that entity only today as Highland;
3    is that okay?
4         A.   Yes.
5         Q.   When did you found -- when did you
6    create Highland?
7         A.   '94.
8         Q.   And did you serve as Highland's
9    president from 1994 until on or around January
10   9th, 2020?
11        A.   Yes.
12        Q.   Did -- can you describe in your own
13   words what the business of Highland was while
14   you were president?
15        A.   We were largely below investment
16   grade, credit strap, and we diversified over
17   the years to become more of an alternative
18   asset manager in a variety of formats.
19        Q.   And --
20        MS. DEITSCH-PEREZ:  I'm sorry, John,
21   one sec.  This was set up by someone a lot
22   shorter than Mr. Dondero.  Let me just take
23   one minute to adjust it.
24        MR. MORRIS:  May I proceed, Deborah?

Page 292

DONDERO - 10/29/21

1
2    MS. DEITSCH-PEREZ:  (Nods head.)
3    Q.   Okay.  Mr. Dondero, at its peak,
4  what is the -- the largest value of assets that
5  Highland had under management while you were
6  president?
7    A.   35 billion.
8    Q.   And do you recall what year that
9  was?
10    A.   Not exactly.
11    Q.   Was it before the 2008 financial
12  crisis?
13    A.   Yes.
14    Q.   Okay.  So you were the president of
15  Highland for about 25 years; is that right?
16    A.   Yes, 25, 26, whatever.
17    Q.   And do you consider yourself to be
18  expert in the area of money management?
19    A.   Yeah, on the things that we focus
20  on.
21    Q.   You are a sophisticated investor;
22  right?
23    A.   Yes.  I would believe I'm
24  categorized as such.
25    Q.   And you are a sophisticated money

Page 293

DONDERO - 10/29/21

1  manager; is that fair?
2    A.   Yes.
3    Q.   And you manage money on behalf of
4  thousands of people; isn't that right?
5    A.   Yes.
6    Q.   And as a general matter, you know
7  how to read and understand balance sheets,
8  don't you?
9    A.   Yes.
10    Q.   You have signed promissory --
11  promissory notes before, haven't you?
12    A.   Yes.
13    Q.   Is it fair to say you have signed
14  hundreds of promissory notes during the 25-year
15  period that you were the president of Highland?
16    A.   No.
17    Q.   Is it fair to say that you signed
18  dozens of promissory notes during the time that
19  you were president of Highland?
20    A.   Yeah, dozens is probably fair.
21    Q.   Okay.  And is it fair to say that
22  the aggregate principal amount of the
23  promissory notes that you signed while you were
24  president of Highland likely exceeded

Page 294

DONDERO - 10/29/21

1
2  $200 million?
3    MS. DEITSCH-PEREZ:  Objection to the
4    form.
5    A.   I don't have a basis for knowing
6  that.
7    Q.   You do know that it is more than
8  $100 million, don't you?
9    A.   No.
10    Q.   Do you owe today Highland Capital
11  Management Services more than $75 million?
12    A.   I don't know what the amount is.  I
13  don't believe it is that much.
14    Q.   Are the obligations to Highland
15  Capital --
16    MS. DEITSCH-PEREZ:  Hold on.  Hold
17    on.  My connection just disappeared.
18    MR. MORRIS:  Okay.
19    MS. DEITSCH-PEREZ:  Okay, I'm back.
20    Q.   Okay.  Did the -- did the
21  obligations that you have to Highland Capital
22  Management Services, are they reflected in
23  promissory notes?
24    MS. DEITSCH-PEREZ:  Could you repeat
25    that question?

Page 295

DONDERO - 10/29/21

1
2    MR. MORRIS:  Sure.
3    Q.   Mr. Dondero, you borrowed money from
4  Highland Capital Management Services; correct?
5    A.   I'm sorry, it sounds like at first
6  you were asking me, did Highland Capital
7  Services borrow money from Highland.  Now
8  you're asking me if I borrowed money from
9  Services?
10    Q.   Yeah, let me -- let me rephrase the
11  question, sir, because if it is not clear, that
12  is my fault, and I apologize.
13    Did you -- have you borrowed money
14  from Highland Capital Management Services?
15    A.   I believe so.
16    Q.   Okay.  Do you know the aggregate
17  principal amount that is outstanding today,
18  ballpark?
19    A.   No.
20    Q.   Are the obligations that you have to
21  Highland Capital Management Services reflected
22  in promissory notes where you're the maker and
23  Highland Capital Management Services is the
24  payee?
25    A.   Please repeat that question.