Page 296

DONDERO - 10/29/21

1      Q.   Are you the maker on promissory
2 notes in favor of Highland Capital Management
3 Services, Inc.?
4      A.   I don't know. I believe -- I
5 believe so, or I believe I have in the past,
6 but I don't know.
7      Q.   Do you have any -- any estimate as
8 to how much money you owe Highland Capital
9 Management Services, Inc. today?
10      MS. DEITSCH-PEREZ:   Asked and
11      answered.
12      A.   No.
13      Q.   Can you say if it is more or less
14 than $50 million?
15      A.   I don't know.
16      Q.   Can you say if it is more or less
17 than $25 million?
18      A.   I don't know.
19      Q.   As a general matter, is it fair to
20 say that you know how to read and understand
21 promissory notes?
22      MS. DEITSCH-PEREZ:   Object to the
23      form.
24      A.   In general, yes.

Page 297

DONDERO - 10/29/21

1      Q.   Okay. When you were in control of
2 Highland, you personally decided who was hired
3 at that company; is that fair?
4      A.   Sometimes, in senior positions.
5      Q.   Okay. Did your duties as president
6 of Highland include being familiar with the
7 debts and obligations that were owed to
8 Highland?
9      MS. DEITSCH-PEREZ:   Object to the
10      form.
11      A.   I mean, generally.
12      Q.   Okay. Did you ever do anything to
13 familiarize yourself with the debts and
14 obligations that were owed to Highland?
15      A.   Are you referring to the affiliate
16 notes or --
17      Q.   Sure.
18      A.   -- or what -- what are --
19      Q.   I was -- I was asking -- I
20 apologize. I don't mean to step on your words.
21      A.   No, you just -- because I don't
22 think Highland had a lot of other obligations
23 due from other parties, and the affiliated
24 notes in aggregate were always de minimis to

Page 298

DONDERO - 10/29/21

1 Highland than now, at any time.
2      Q.   It is your -- it is your position
3 that the affiliate notes to Highland were de
4 minimis in amount?
5      A.   Yes.
6      Q.   And how do you define de minimus for
7 that purpose?
8      A.   I believe the balance sheet of
9 Highland today for the last three years, four
10 years, five years has been between 5 and
11 $600 million. I believe the notes have never
12 been more than 8 or 10 or 12 percent of that
13 number.
14      Q.   And you believe that 8 or 10 or
15 12 percent of Highland's asset base you
16 would -- you would define as de minimis?
17      A.   Yes.
18      Q.   Okay. As -- as president of
19 Highland, did you ever do anything to
20 familiarize yourself with the number and amount
21 of affiliate loans that Highland carried on its
22 books and records?
23      A.   Not that I can recall.
24      Q.   Was there anybody at Highland who

Page 299

DONDERO - 10/29/21

1 was charged with the responsibility of knowing
2 the number and amount of affiliate loans that
3 Highland carried on its balance sheet?
4      A.   Sure.
5      Q.   Can you identify the people who were
6 responsible for that?
7      A.   The people in accounting responsible
8 for tracking assets and liabilities in
9 preparing all the audited financial statements
10 every year and the quarterly unaudited
11 financial statements that were prepared and the
12 monthly operating reports.
13      Q.   Can you -- can you name any names of
14 the people who had the responsibilities that
15 you just described?
16      A.   I think it changed regularly, but it
17 would have been people in Frank's group in
18 accounting.
19      Q.   Did Frank have any responsibility
20 for knowing and understanding the affiliate
21 loans that Highland carried on its balance
22 sheet?
23      A.   Sure. I -- as CFO he had to sign
24 off on the audited financials and rep letters

Page 300

DONDERO - 10/29/21

1
2 and -- yes.
3    Q.   And can you -- can you identify the
4 name of any person in the accounting group in,
5 let's say, the three years prior to the
6 bankruptcy who had responsibility for knowing
7 and understanding the scope of affiliate loans
8 that Highland carried on its balance sheet?
9    A.   No, I would just be speculating but
10 it would be -- the senior people in Frank's
11 group would be responsible for the financial
12 statements.
13    Q.   Are you able to name the people, the
14 senior people in Frank's group in the couple of
15 years prior to the bankruptcy?
16    A.   Yes, but I don't know -- like
17 David Klos was a senior person, Cliff Stoops
18 was a senior person.  There were a couple
19 up-and-comers below them, but who did the
20 financials -- how Frank assigned the work in
21 his group, I have no idea.
22    Q.   Did you ever ask?
23    A.   No.
24    Q.   Do you have any knowledge as you sit
25 here today who within Frank's group had

Page 301

DONDERO - 10/29/21

1
2 responsibility for knowing and understanding
3 the affiliate loans that Highland carried on
4 its balance sheets?
5    A.   No.
6    Q.   And to the best of your knowledge as
7 you sit here today, you never personally did
8 anything to know and understand the extent and
9 scope of the affiliate loans that Highland
10 carried on its balance sheet; is that right?
11    A.   Correct.
12    Q.   Okay.  You appointed Mr. Waterhouse
13 as Highland's CFO; is that right?
14    A.   I think it was appointed and
15 recommended by Patrick Boyce, but I agreed with
16 the selection.
17    Q.   And you --
18    A.   That -- (speaking simultaneously.)
19    Q.   I apologize, are you done?
20    A.   I'm just saying that was a long time
21 ago, but I don't remember the details exactly.
22    Q.   But you had the authority and you
23 used that authority to appoint Frank as CFO;
24 correct?
25        MS. DEITSCH-PEREZ:  There's a lag in

Page 302

DONDERO - 10/29/21

1
2 the video.  I don't know if it matters, but
3 for a while Jim was frozen.  And I know
4 because -- since there was voice and no --
5 his mouth wasn't moving.  So let's just --
6 if the videographer sees there is a
7 problem, please let us know.
8    Q.   I --
9    A.   Yes.  I'm sorry, could you just
10 repeat the question regarding Frank, please?
11    Q.   Sure.
12        As the president of Highland, did
13 you have the authority and did you exercise
14 that authority to appoint him as Highland's
15 CFO?
16    A.   Yes.
17    Q.   Okay.  Do you recall when you
18 appointed Mr. Waterhouse CFO of Highland?
19    A.   No.
20    Q.   Was it more than five years prior to
21 the bankruptcy?
22    A.   Yes.
23    Q.   As the president -- during the time
24 that you served as president of Highland, did
25 you believe that Mr. Waterhouse fulfilled his

Page 303

DONDERO - 10/29/21

1
2 duties as chief financial officer?
3    A.   Yes.
4    Q.   Can you recall anything that
5 Mr. Waterhouse did in his capacity as
6 Highland's CFO that did not comport with your
7 expectations?
8    A.   I think we will talk about some of
9 those today.
10    Q.   Okay.  Do you have any reason to
11 believe that Mr. Waterhouse ever breached his
12 duties to Highland during the time that you
13 served as president?
14        COURT REPORTER:  We can't hear you
15 speaking.
16    Q.   We haven't heard any portion of your
17 answer, Mr. Dondero.
18        MR. MORRIS:  I don't know if people
19 can -- can hear, but I cannot hear
20 Mr. Dondero.
21        COURT REPORTER:  I can't either.
22        MR. MORRIS:  Yeah, Deborah, can you
23 speak, please.
24        COURT REPORTER:  They're on the same
25 speaker.

Page 304

DONDERO - 10/29/21

1
2    VIDEOGRAPHER: Do we want to go off
3 the record?
4    MR. MORRIS: Yes, please.
5    VIDEOGRAPHER: Off the record,
6 10:41.
7 (Recess taken 10:41 a.m. to 10:47 a.m.)
8    VIDEOGRAPHER: Back on the record,
9 10:47.
10    Q.   Okay. Let me just ask the question
11 again so the record is clean, Mr. Dondero.
12    Do you have any reason to believe as
13 you sit here right now that Mr. Waterhouse ever
14 breached his duties to Highland during the time
15 that you served as president?
16    MS. DEITSCH-PEREZ: Asked and
17 answered.
18    A.   Yeah, I think I did ask and answer
19 that. Again, not intentionally, not
20 maliciously. I am -- I guess things we're
21 going to talk about today are for periods of
22 time after I was president, so...
23    Q.   Right. That is going to be the next
24 question that I ask. But to be clear -- I just
25 want to have a clear record -- during the time

Page 305

DONDERO - 10/29/21

1
2 that you were president, do you have any reason
3 to believe that Mr. Waterhouse breached his
4 duties to Highland?
5    MS. DEITSCH-PEREZ: Asked and
6 answered. This is the third time.
7    A.   No.
8    MR. MORRIS: It is actually not.
9    Q.   But thank you, Mr. Dondero. I
10 appreciate that.
11    After you ceased to be president of
12 Highland, do you have any reason to believe
13 that Mr. Waterhouse breached his duties to
14 Highland?
15    A.   Breached his duties to -- I don't --
16 I don't know if it is -- I don't want to -- I
17 don't want to make a judgment overall. When we
18 talk about the notes we can make conclusions
19 then.
20    Q.   All right. But you're not able to
21 tell me in response to my question whether you
22 believe today that Mr. Waterhouse breached his
23 duties to Highland after the time that you
24 served as president?
25    MS. DEITSCH-PEREZ: Object to the

Page 306

DONDERO - 10/29/21

1
2 form of the question.
3    A.   I don't want to comment off the top
4 of my head, but I've highlighted that we will
5 discuss it around the note issue.
6    Q.   Okay. You are familiar with an
7 entity called Highland Capital Management Fund
8 Advisors, L.P.; is that correct?
9    A.   Yes.
10    Q.   And we're going to refer to that
11 entity as HCMFA. Is that okay?
12    A.   Yes.
13    Q.   Do you know who owns HCMFA?
14    A.   I believe it is myself and
15 Mark Okada.
16    Q.   Okay. And do you have an
17 understanding as to -- as to the percentage of
18 each of your interests, ownership interests in
19 HCMFA?
20    A.   No, and I don't know the entities.
21 I don't know if I own it directly or through
22 Dugaboy. And I do believe Okada tends to use
23 his trusts, but I don't know the percentages
24 either.
25    Q.   Do you own a -- do you own a

Page 307

DONDERO - 10/29/21

1
2 major- -- withdrawn.
3    Do you directly or indirectly own a
4 majority of the ownership interests in HCMFA?
5    A.   I believe so.
6    Q.   Okay. And do you control HCMFA?
7    A.   Yes.
8    Q.   And do you know when HCMFA was
9 created?
10    A.   No, I do not.
11    Q.   Do you know if it was before or
12 after 2010?
13    A.   I don't know.
14    Q.   Have you controlled HCMFA since the
15 time it was created?
16    A.   I believe so, but I don't know for
17 sure.
18    Q.   Can you think of any period of time
19 when you didn't control HCMFA?
20    A.   I don't know. I don't remember the
21 ownership structure prior and I don't remember
22 when it started, so I don't know.
23    Q.   Okay. I'm asking about control and
24 not ownership.
25    Can you think of any period of time

Page 308

DONDERO - 10/29/21

1  when you did not control HCMFA?
2      A.   I don't know.
3      Q.   Okay.  Can you tell me what the
4  nature of HCMFA's business is?
5      A.   It largely housed our mutual funds.
6      Q.   What does it mean to house mutual
7  funds?
8      A.   It managed -- it managed the mutual
9  funds from a portfolio asset side and captured
10 the management fees as the advisor or sub
11 advisor -- I can't remember the structure.  I
12 can't remember if it was the advisor and
13 Highland was the sub advisor or vice versa, but
14 in general, a good portion, or most of the
15 portfolio team that managed the mutual funds
16 was employed at HCMFA.
17     Q.   Do you have a title with HCMFA
18 today?
19     A.   I don't know.
20     Q.   Do you know who the president of
21 HCMFA is?
22     A.   I would believe -- I would -- I
23 would think I am, but I don't know.
24     Q.   Do you know of any title that you

Page 309

DONDERO - 10/29/21

1  have at HCMFA today?
2      A.   I know I'm the portfolio manager on
3  a bunch of the funds, one of usually two or
4  three portfolio managers, and I believe I'm the
5  president, but I don't know beyond that.
6      Q.   Okay.  Did Frank Waterhouse serve as
7  treasurer of HCMFA at any point in time?
8      A.   I don't know.  I don't know.  I
9  just -- I don't know.  I don't remember.
10         MR. MORRIS:  Can I ask my -- my
11     colleague to please put up a document that
12     was premarked as Exhibit 35 to see if I can
13     refresh your recollection.
14         MS. DEITSCH-PEREZ:  Is that in the
15     book that you sent over?
16         MR. MORRIS:  No.  She will post it
17     and she will put it in the chat room.
18     Q.   Are you able to see that,
19 Mr. Dondero?
20     A.   Yes.
21     Q.   Can you see that this is an
22 incumbency certificate?
23     A.   Yes.
24     Q.   Do you know what an incumbency

Page 310

DONDERO - 10/29/21

1  certificate is?
2      A.   I'm reading it here for a second.  I
3  guess it is an officer statement or signature
4  authority, or some combination thereof.
5      Q.   Is that your signature at the bottom
6  of this document?
7      A.   Yes.
8      Q.   And do you see that this is an
9  incumbency certificate for HCMFA that you
10 signed effective as of April 11th, 2019?
11     A.   Yes.
12     Q.   Do you see that Frank Waterhouse is
13 identified as the treasurer of HCMFA as of that
14 date?
15     A.   Yes.
16     Q.   Does that refresh your recollection
17 that Mr. Waterhouse served as the treasurer of
18 HCMFA?
19     A.   It seems to be an authoritative
20 document, but I didn't have a recollection.
21     Q.   Do you know of anybody else who has
22 ever served as the treasurer of HCMFA other
23 than Mr. Waterhouse?
24     A.   I don't recall.

Page 311

DONDERO - 10/29/21

1      Q.   Did you, in your capacity as the
2  person who was in control of HCMFA, appoint
3  Mr. Waterhouse as the treasurer of that entity?
4          MS. DEITSCH-PEREZ:  Object to the
5      form.
6      A.   It appears to me that that's what
7  this incumbency certificate does, but...
8      Q.   Is it fair to say that you knew for
9  at least a few years prior to the petition date
10 that Mr. Waterhouse was simultaneously serving
11 as Highland's CFO and HCMFA's treasurer?
12     A.   No.  I mean, like I said, I don't
13 remember, and a lot of the officers had
14 multiple roles and multiple entities.  I mean,
15 it is not surprising, but I didn't have any
16 recollection.
17     Q.   Are you aware that Mr. Waterhouse
18 served in any capacity in the Highland universe
19 of companies other than as CFO of Highland
20 Capital Management, L.P.?
21     A.   I would -- I would assume he would
22 have a position like this in multiple other
23 entities, but I don't know which ones or what
24 titles he would have off the top of my head.

Page 312

DONDERO - 10/29/21

2  Q.  Is it fair to say, though, that he
3  wouldn't have obtained any of those titles
4  without your knowledge and approval?
5  A.  It is -- it is fair to say he was --
6  he had -- the lawyers or whoever worked on
7  general corporate structuring, Frank was a
8  senior officer in good standing, so they would
9  have used him as appropriate in different
10  things.
11      So to that extent, I guess I approve
12  it, but I sign hundreds of things like this.
13  Would -- you know, would I have been
14  specifically aware or remember -- remember it
15  is a very low likelihood.
16  Q.  Is there any position that
17  Mr. Waterhouse has ever held that you learned
18  about and you objected to on the grounds that
19  you hadn't approved it?
20  A.  No, not that I recall.
21  Q.  Okay.  Do you know if Mr. Waterhouse
22  held any positions with any of the retail
23  funds?
24  A.  I don't know.
25  Q.  He may have, you just don't recall;

Page 313

DONDERO - 10/29/21

1  is that right?
2  A.  That is correct.
3  Q.  And you can't identify any title
4  that Mr. Waterhouse held during the time that
5  you served as Highland's president other than
6  CFO of Highland.  Do I have that right?
7  A.  No, I don't think that is fair.
8  Q.  Okay.
9  A.  I mean -- I mean, he was CFO, but he
10  was other things before he was CFO.  And as we
11  were just saying, he's -- he's treasurer on
12  this incumbency certificate, but I think he
13  might have been on other incumbency
14  certificates, so I think your -- your summary
15  was too narrow.
16  Q.  Okay.  Can you identify any position
17  that Mr. Waterhouse held at the same time that
18  he is CFO of Highland other than treasurer of
19  HCMFA as reflected on this document?
20  A.  I can't recall, but I imagine there
21  to be others.
22  Q.  And to the extent there are others,
23  is it fair to say that you knew at the time
24  that Mr. Waterhouse was serving in more than

Page 314

DONDERO - 10/29/21

2  one role?
3  A.  Yes.
4  Q.  Okay.  And in his capacity as CFO of
5  Highland, did he report directly to you?
6  A.  Yes.
7  Q.  In his capacity as treasurer of
8  HCMFA, did he report directly to you?
9  A.  Yeah, it appears that, yes, that is
10  how it was structured.
11  Q.  Can you think of any position that
12  Mr. Waterhouse ever held in the Highland family
13  of companies where he didn't report directly to
14  you?
15  A.  I can't -- I can't think of any.
16  Q.  Is Mr. Waterhouse the treasurer of
17  HCMFA today?
18  A.  I don't know.  I'm not aware of any
19  changes, nor did I orchestrate any changes, but
20  I don't know for sure.
21  Q.  Can you identify any position that
22  Mr. Waterhouse holds with any former affiliated
23  company of Highland today?
24  A.  Again, I'm not aware of any changes,
25  nor did I orchestrate or precipitate any

Page 315

DONDERO - 10/29/21

2  changes.  With the formation of Skyview, I
3  don't know if there was changes.  I'm not
4  aware.
5  Q.  Have you considered firing
6  Mr. Waterhouse from any of the positions that
7  he holds with any of the companies that were
8  formerly affiliated with Highland?
9  A.  No.
10  Q.  As the president of HCMFA --
11  withdrawn.
12      As the person who was in control of
13  HCMFA, did you have any responsibility for
14  being familiar with HCMFA's debts and
15  obligations?
16      MS. DEITSCH-PEREZ:  Object to the
17  form.
18  A.  I don't know.
19  Q.  Did you ever do anything in your
20  capacity as the person in control of HCMFA to
21  familiarize yourself with HCMFA's debts and
22  obligations?
23  A.  Not during -- I mean, not prior to
24  bankruptcy.
25  Q.  So before the bankruptcy, you didn't

Page 316

DONDERO - 10/29/21

1 take any steps to familiarize yourself with
2 HCMFA's debts and obligations. Do I have that
3 right?
4 A. Correct, not specifically.
5 Q. Okay. Who was responsible for
6 knowing and understanding the scope and extent
7 of HCMFA's debts and obligations?
8 A. That would have fallen on Frank and
9 his group.
10 Q. Okay. Do you have an understanding
11 as to who was authorized to incur obligations
12 on behalf of HCMFA?
13 A. I mean, beyond – beyond due course,
14 I struggle to see why it would be anybody other
15 than me, but I don't know.
16 Q. Do you know if Mr. Waterhouse was
17 authorized as the treasurer of HCMFA to incur
18 obligations on its behalf?
19 A. He wasn't the senior operating or
20 executive positions there. So the answer is
21 no, beyond, you know – beyond the normal
22 course of operating expenses or whatever, but
23 it would – he would never be the person on
24 anything of significance.

Page 317

DONDERO - 10/29/21

1 Q. How do you define "significance"?
2 A. Like waiving fees on a mutual fund,
3 purchasing another mutual fund, yeah, things
4 like that.
5 Q. Was there any document or policy
6 that you are aware of that specifically
7 identifies the scope of Mr. Waterhouse's
8 authority as the treasurer of HCMFA?
9 A. No.
10 Q. Is there anything that you are aware
11 of that specifically limits Mr. Waterhouse's
12 authority other than what might be in your
13 head?
14 A. No, I would – I would say what is
15 in my head is – would be typical industry
16 practice. You wouldn't – you wouldn't have
17 executive vice presidents or ownership defined
18 if you were going to delegate everything to an
19 employee three levels down, you know.
20 MS. DEITSCH-PEREZ: Okay. John,
21 I've had a request from Davor to take a
22 quick restroom break, so –
23 MR. MORRIS: You know, I really –
24 Davor, I'm happy to accommodate, but at

Page 318

DONDERO - 10/29/21

1 some point we have got to be able to get
2 more than 10 minutes of testimony in a row.
3 So let's take a short break.
4 MS. DEITSCH-PEREZ: Thank you.
5 VIDEOGRAPHER: Going off the record.
6 The time is 11:08.
7 (Recess taken 11:08 a.m. to 11:16 a.m.)
8 VIDEOGRAPHER: Back on the record,
9 11:16.
10 Q. Mr. Dondero, did you communicate
11 with anybody on the break about the substance
12 of your testimony?
13 A. No.
14 Q. As treasurer of HCMFA, did
15 Mr. Waterhouse's responsibilities include being
16 familiar with HCMFA's debts and obligations?
17 A. Yes.
18 Q. Do you have any reason to believe as
19 you sit here today that Mr. Waterhouse failed
20 to fulfill his responsibilities as treasurer of
21 HCMFA and familiarize himself with their debts
22 and responsibilities?
23 MS. DEITSCH-PEREZ: Object to the
24 form.

Page 319

DONDERO - 10/29/21

1 A. I don't know.
2 Q. I appreciate that you don't know,
3 but do you have any reason as you sit here
4 today to believe that he failed to fulfill that
5 particular responsibility?
6 A. I don't know.
7 Q. Okay. Are you an authorized
8 signatory on HCMFA's bank accounts?
9 A. I don't know.
10 Q. Do you know who the authorized
11 signatories are on HCMFA's bank accounts?
12 A. No.
13 Q. Do you know whether anybody now
14 employed or previously employed by Highland was
15 an authorized signatory with respect to any of
16 HCMFA's bank accounts?
17 A. I don't know.
18 Q. Do you know whether Mr. Waterhouse
19 was an authorized signatory on any of HCMFA's
20 bank accounts?
21 A. I don't know how he had – had it
22 set up. There would have been, I imagine,
23 checks and balances. We run, as far as I know,
24 a compliant accounting group, you know, with

Page 320

DONDERO - 10/29/21

1  the right audit controls, et cetera.  So I
2  would imagine there would have been somebody
3  preparing it and multiple signatures or
4  multiple sign-offs on wires, but I have no
5  awareness of this.  I mean, I would believe
6  that it was done compliantly and correctly, but
7  I don't have any specific awareness.
8      Q.   Okay.  Do you know Lauren Thedford?
9      A.   Yes.
10     Q.   And was Ms. Thedford an employee of
11  Highland at one time?
12     A.   Yes.
13     Q.   Do you recall what position she held
14  at any particular point in time?
15     A.   I believe she held several different
16  positions over the years, but I remember most
17  as a corporate attorney working on document --
18  documents when we -- we do new funds or amend
19  old funds.
20     Q.   Okay.  Do you recall whether she
21  served as an officer of HCMFA?
22     A.   Wasn't her name on the incumbency
23  certificate we had up earlier?
24     Q.   It was.  We can put it back up if

Page 321

DONDERO - 10/29/21

1  you want to look at that.
2      A.   No, but I think that is -- that is
3  the answer, but that is my only awareness.
4      Q.   Okay.  Do you have -- do you have --
5  do you know whether she was ever appointed to
6  any position within the Highland corporate
7  family other than as an attorney with Highland
8  and as the secretary of HCMFA?
9      A.   I don't know.
10     Q.   Other than Ms. Waterhouse --
11  withdrawn.
12         Other than Mr. Waterhouse and
13  Ms. Thedford, can you identify any current or
14  former employee of Highland that ever served as
15  an officer of HCMFA?
16     A.   I don't know.
17     Q.   Okay.  Can you identify any current
18  or former employee of Highland who was
19  simultaneously also an employee of HCMFA?
20     MS. DEITSCH-PEREZ:  Object to the
21  form.
22     A.   You mean somebody who was a dual
23  employee?
24     Q.   Yeah, who was actually -- yeah, to

Page 322

DONDERO - 10/29/21

1  be clear, who was actually employed by both,
2  who received, you know, income from both.
3      A.   I don't know regarding income, but
4  some of that historic portfolio managers like
5  Michael Gregory or Jonathan Lamensdorf, they
6  did work for HCMFA primarily, but they also did
7  other things for Highland.  I don't know how
8  their compensation or their bonuses were split.
9  I just -- I wouldn't have awareness of that.
10     Q.   Let's move on to NexPoint.  You're
11  familiar with an entity called NexPoint
12  Advisors, L.P.; correct?
13     A.   Yes.
14     Q.   We will refer to that as NexPoint,
15  okay?
16     A.   Sure.
17     Q.   Do you know who owns NexPoint?
18     A.   Directly or indirectly, I believe I
19  do.
20     Q.   Okay.  And do you control NexPoint?
21     A.   Yes.
22     Q.   And do you know when NexPoint was
23  created?
24     A.   More than five years ago, but I

Page 323

DONDERO - 10/29/21

1  don't remember when.
2      Q.   Can you tell me generally the nature
3  of NexPoint's business?
4      A.   It is generally real estate related.
5      Q.   Have you controlled NexPoint
6  throughout its corporate existence, to the best
7  of your knowledge?
8      A.   Yes.
9      Q.   Do you have a title with NexPoint
10  today?
11     A.   I believe I'm president, but I don't
12  know for sure.
13     Q.   Did you appoint Mr. Waterhouse to
14  serve as treasurer of NexPoint?
15     A.   I don't know.
16     MR. MORRIS:  Please put up Exhibit
17  37.
18     Q.   This is another incumbency
19  certificate, sir?
20     A.   Yes.
21     Q.   And do you see, is that your
22  signature at the bottom?
23     A.   Looks like it, yes.
24     Q.   And does that refresh your

Page 324

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | recollection that you personally identified |
| 3 | Mr. Waterhouse as the treasurer of NexPoint |
| 4 | Advisors, L.P. effective as of April 11th, |
| 5 | 2019? |
| 6 | A. No, I mean, not – no. |
| 7 | Q. Do you have any reason to doubt that |
| 8 | Mr. Waterhouse served as the treasurer of |
| 9 | NexPoint Advisors prior to the petition date? |
| 10 | A. No, I don't have a reason to |
| 11 | disagree with it. I just didn't have an |
| 12 | awareness. And when you asked me earlier, the |
| 13 | thing that was running through my mind is that |
| 14 | it could have been, you know, Brian Mitts who |
| 15 | has a strong accounting background at NexPoint. |
| 16 | I just wasn't – I didn't know, based on |
| 17 | recollection, who was treasurer. |
| 18 | Q. Okay. Were you aware that – but |
| 19 | you were aware, were you not, that |
| 20 | Mr. Waterhouse wore multiple hats? |
| 21 | MS. DEITSCH-PEREZ: Objection to |
| 22 | form. |
| 23 | Q. Withdrawn. |
| 24 | You were aware, were you not, sir, |
| 25 | that during the time that you served as |

Page 325

| | |
|---|---|
| 1 | president of Highland, that Mr. Waterhouse |
| 2 | served in capacities with respect to affiliated |
| 3 | companies? |
| 4 | A. I was aware that multiple senior |
| 5 | executives had multiple titles at multiple |
| 6 | different entities, but I didn't have specific |
| 7 | awareness whatsoever on entities that Frank was |
| 8 | or was not involved in. |
| 9 | Q. Okay. But to the extent that he |
| 10 | held a title with one of the affiliated |
| 11 | companies, those affiliated companies would |
| 12 | have been managed or controlled by you; |
| 13 | correct? |
| 14 | A. Generally. |
| 15 | Q. You can't think of any title that he |
| 16 | held with an affiliated company that wasn't |
| 17 | managed by you, can you? |
| 18 | A. No, not off the top of my head. |
| 19 | Q. And you knew and intended prior to |
| 20 | the petition date to have Mr. Waterhouse serve |
| 21 | in multiple roles; is that fair? |
| 22 | A. Yes. |
| 23 | Q. Have you ever considered firing |
| 24 | Mr. Waterhouse from his position as treasurer |

Page 326

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | of NexPoint Advisors? |
| 3 | A. No. |
| 4 | Q. Okay. As the president of NexPoint |
| 5 | Advisors, do you believe that you had a |
| 6 | responsibility to familiarize yourself with |
| 7 | NexPoint's debts and obligations? |
| 8 | MS. DEITSCH-PEREZ: Object to the |
| 9 | form. |
| 10 | A. Just generally. |
| 11 | Q. Okay. Did you do anything to |
| 12 | generally inform yourself of NexPoint's debts |
| 13 | and obligations? |
| 14 | A. Not – not specifically that I can |
| 15 | recall. |
| 16 | Q. Can you recall doing anything to |
| 17 | familiarize yourself with NexPoint's debts and |
| 18 | obligations at any time? |
| 19 | MS. DEITSCH-PEREZ: Object to the |
| 20 | form. |
| 21 | A. Not that I recall. |
| 22 | Q. Did you ever look at NexPoint's |
| 23 | balance sheet? |
| 24 | A. Not – not that I – not that I |
| 25 | recall. |

Page 327

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | Q. Do you know whether NexPoint's |
| 3 | balance sheet reflected obligations that it |
| 4 | carried as liabilities that were due and owing |
| 5 | to Highland? |
| 6 | A. I was aware generally of the notes, |
| 7 | but I didn't study the NexPoint balance sheet. |
| 8 | Q. Do you believe that Mr. Waterhouse |
| 9 | had any responsibility as NexPoint's treasurer |
| 10 | to familiarize himself with NexPoint's debts |
| 11 | and obligations? |
| 12 | A. Yeah. I mean, the role is different |
| 13 | and the burden is different, and Frank and his |
| 14 | team orchestrated all the audits and compliance |
| 15 | statements and regulatory stuff for all of the |
| 16 | funds managed by NexPoint. |
| 17 | Q. Well, you personally were |
| 18 | responsible for Highland's audited financial |
| 19 | statements, weren't you? |
| 20 | MS. DEITSCH-PEREZ: Objection, form. |
| 21 | A. No. I mean, "responsible" is not |
| 22 | the right word. I mean, we – I have to – as |
| 23 | the senior most executive, I have to – to |
| 24 | sign – sign statements regarding completeness |
| 25 | and no known frauds and those kinds of things, |

| Page 328 | Page 329 |
|---|---|
| DONDERO - 10/29/21 | DONDERO - 10/29/21 |
| 1 | 1 |

**Page 328**

DONDERO - 10/29/21

2  but I am in no way involved in the preparation.

3     Q.   We will talk about that in a bit.

4       Do you have any reason to believe

5  today that Mr. Waterhouse failed to fulfill his

6  responsibilities as treasurer of NexPoint to

7  familiarize himself with NexPoint's debts and

8  obligations?

9     A.   I don't know.

10     Q.   You can't identify any particular

11  reason that you might have for concluding that

12  Mr. Waterhouse failed to fulfill his duties as

13  treasurer of NexPoint to familiarize himself

14  with NexPoint's duties and respons – duties

15  and obligations; correct?

16     A.   Yes, I don't know.

17     Q.   Okay. Do you know who the

18  authorized signatories are on NexPoint's bank

19  accounts?

20     A.   No.

21     Q.   Do you know if you're an authorized

22  signatory on NexPoint's bank accounts?

23     A.   I don't know.

24     Q.   Do you know if Mr. Waterhouse is an

25  authorized signatory on NexPoint's bank

**Page 329**

DONDERO - 10/29/21

2  accounts?

3     A.   I don't know.

4     Q.   Do you know whether there is any

5  current or former employee of Highland who did

6  not hold an officer position at NexPoint who

7  would have been an authorized signatory on

8  NexPoint's bank accounts?

9       MS. DEITSCH-PEREZ: Object to the

10  form.

11     A.   I don't know.

12     Q.   Can you identify any current or

13  former employee of Highland who served as an

14  officer of NexPoint at any time other than

15  Ms. Thedford and Mr. Waterhouse?

16     A.   I don't know.

17     Q.   Okay. Let's go to HCMS. Are you

18  familiar with an entity called Highland Capital

19  Management Services, Inc.?

20     A.   Generally, yes.

21     Q.   And can we refer to that as HCMS?

22     A.   Yes.

23     Q.   Do you have a direct or indirect

24  ownership interest in HCMS?

25     A.   I believe so.

**Page 330**

DONDERO - 10/29/21

2     Q.   And do you own a majority of the

3  interest directly or indirectly in HCMS?

4     A.   I believe so.

5     Q.   Do you control HCMS?

6     A.   I believe so.

7     Q.   Have you – has there ever been a

8  period of time in HCMS's corporate existence

9  where you did not control that entity?

10     A.   Not that I'm aware of.

11     Q.   Do you recall when HCMS was created?

12     A.   More than five years ago, but I

13  don't remember when.

14     Q.   Do you have an understanding of the

15  nature of HCMS's business?

16     A.   It manages some assets, and it was

17  trying to create track records that then could

18  be marketed.

19     Q.   What does it mean to create a track

20  record that could be marketed?

21     A.   You execute investments and

22  investment strategy that you can refine and

23  articulate and show good results to potential

24  third-party investors as – as evidence that

25  you can do it. And then that track record is

**Page 331**

DONDERO - 10/29/21

2  something the investors are willing to take a

3  chance on and then give you separate account

4  money along those lines.

5     Q.   Do you have a title with HCMS today?

6     A.   I don't know.

7     Q.   But you do control the entity; is

8  that fair?

9       MS. DEITSCH-PEREZ: Object to the

10  form, asked and answered.

11     A.   I believe so.

12     Q.   Okay. Do you know whether

13  Mr. Waterhouse has ever served as an officer of

14  HCMS?

15     A.   I have no idea.

16     Q.   Can you identify any person in the

17  world who has ever served as an officer of

18  HCMS?

19     A.   I don't know what the incumbency

20  certificate would look like for services, but

21  I'm willing to be refreshed.

22     Q.   Do you know if anybody ever served

23  as the chief – withdrawn.

24       Did HCMF ever have anybody serve in

25  the capacity of chief financial officer?

Page 332

DONDERO - 10/29/21

2  A.  The subject of that question was
3  HCMF.  Is that what you meant to say, or did
4  you mean Services?
5  Q.  No, I apologize.  Thank you for the
6  clarification.  I did mean HCMS, so let me try
7  again.
8      Has anybody ever served in the
9  capacity of chief financial officer of HCMS?
10  A.  HCMF.
11  MS. DEITSCH-PEREZ:  S.
12  A.  Not –
13  Q.  S.
14  A.  Not of Services – not that –
15  again, I don't know.  I'm willing to be
16  refreshed, but I – I have no awareness.
17  Q.  Okay.  As president – as the person
18  in control of HCMS, do you believe you had any
19  responsibility to familiarize yourself with
20  that entity's debts and obligations?
21  A.  Again, just generally, to the extent
22  that they were material or an issue or
23  whatever, but no more than generally.
24  Q.  Can you describe anything you ever
25  did to generally familiarize yourself with

Page 333

DONDERO - 10/29/21

2  HCMS's debts and obligations?
3  A.  I guess my answer, which would apply
4  to all of these entities, is awareness to know
5  that the amounts were de minimis relative to
6  the value of the entity, and the debt service
7  costs or issues were very de minimis relative
8  to the entities, but beyond that, I didn't
9  study them.
10  Q.  Well, did – did HCMFA have
11  obligations to HCMLP that you would
12  characterize as di minimis from HCMFA's
13  perspective?
14  A.  Yeah, or just – it never had
15  obligations that were more than de minimis.
16  Q.  As – as the person in control of
17  HCMFA, did you ever have any concern that HCMFA
18  would not be able to satisfy its obligations to
19  HCMLP if – if a demand was made?
20  A.  No.
21  Q.  Okay.  Was anybody charged with the
22  responsibility of familiarizing themselves with
23  HCMS's debts and obligations?
24  A.  Again, to differentiate or separate
25  myself from the treasury function or from what

Page 334

DONDERO - 10/29/21

2  Frank and his group were doing.
3      From my perspective, I had to be
4  aware about it – aware of any obligations or
5  notes or debt service costs, et cetera, but to
6  the extent that I was aware and knew that it
7  was de minimis, I didn't spend any time
8  focusing on it, studying it, calculating it
9  exactly, or anything like that.
10      Having said that, we are highly
11  compliant.  We do – we did audits every year
12  with reputable accounting firms that were
13  complete and in depth.  And any obligations
14  and/or assets, de minimis or not, in my view,
15  would nonetheless have to be reflected or
16  captured accurately and prepared for the
17  auditors in supplying, you know, detail or
18  source documents or whatever, whatever they do
19  in accounting as part of the audit function.
20      And all that would have done – been
21  done exactly and expertly, as far as I know,
22  and it would have been done by Frank and his
23  group.
24  Q.  Okay.
25  A.  That is – I'm trying to give a

Page 335

DONDERO - 10/29/21

2  complete answer regarding a myriad of ways
3  you've asked me kind of the same structural
4  questions.
5  Q.  I am, and just to be clear, I'm
6  asking kind of the same structural questions
7  with respect to each of the entities at issue.
8  I think you picked up on that.  I hope you
9  don't think I'm being repetitive.
10      You mentioned Frank and his group in
11  the context of HCMS.  Did I hear that
12  correctly?
13  A.  Yes.
14  Q.  Okay.  HCMS did not have a shared
15  services agreement with Highland; correct?
16  MS. DEITSCH-PEREZ:  You mean a
17  written shared services agreement, John?
18  Q.  Do you understand the question, sir?
19  A.  Yeah.  My answer would be the
20  advisors like NexPoint and HFAM that had to
21  have by law and regulatory statute have to have
22  formal sub advisors and shared services
23  agreements had formal shared services
24  agreement.
25      Entities that didn't need to have

Page 336

DONDERO - 10/29/21

1  
2  formal written shared services agreements were
3  often serviced similarly or -- or exactly the
4  same as those entities, but without a written
5  agreement, but with a verbal shared services
6  agreement providing, again, all the same
7  similar services.
8      And the entities that didn't have a
9  written shared services agreement weren't
10  getting shared services or support from any
11  other entities other than Highland doing the
12  same thing for them that it did for the mutual
13  funds.
14      Q.   Okay. Can you tell me who entered
15  into an oral shared services agreement between
16  Highland and HCMS?
17      A.   Boy, I can imagine way back in the
18  day it would have been myself and Frank, but he
19  and his group understood and knew that they
20  were doing it for all the new entities that
21  came along, and I can't imagine it was even
22  talked about much over the years.
23      Q.   Did -- did HCMFA and NexPoint pay
24  money to Highland under the shared services
25  agreement until let's just say late 2020?

Page 337

DONDERO - 10/29/21

1  
2      A.   Yeah, yes, and early into '21, I
3  believe also.
4      Q.   Okay. As -- as part of the oral
5  agreement that you referenced, was there -- was
6  there ever an agreement that HCMS would pay any
7  money to Highland in exchange for the services
8  that Highland provided to it?
9      A.   I do not believe there was a
10  financial remuneration aspect of it.
11      Q.   Okay. And do you recall during your
12  time as president of Highland whether Highland
13  ever received payment from HCMS for services
14  rendered?
15      MS. DEITSCH-PEREZ:  And are we just
16  talking about money?
17      MR. MORRIS:  Correct.
18      Yeah, I don't -- I don't recall
19  moneys being -- well, you know what, let me --
20  let me clarify that a little bit.
21      If there were any direct costs that
22  Highland would have incurred like getting the
23  audits done, you know, like if Price Waterhouse
24  said, okay, give us the details on, you know,
25  all the different entities that roll up into

Page 338

DONDERO - 10/29/21

1  
2  the Highland entity.
3      And then -- and they prepared
4  statements or did work for services, Frank and
5  his group would have passed through those costs
6  and expected services and/or Dugaboy or any of
7  the other entities to pay for direct
8  out-of-pocket costs. But it wouldn't have paid
9  a supplemental fee or profit or anything to
10  Highland.
11      Q.   Okay. To the best of your
12  recollection, during the time that you were
13  president of Highland, did Highland ever
14  receive anything of value from HCMS on account
15  of services other than the reimbursement of
16  out-of-pocket expenses?
17      A.   Yeah, I'm going to go back to my
18  comment in terms of building track record. And
19  I would use -- yeah, we had done it several
20  times in the past and it had worked
21  effectively. And that is -- you know, yeah, I
22  mean, the -- the track record in CLO paper was
23  what was used to track -- (inaudible) -- as an
24  investor.
25      And so, you know, to the extent that

Page 339

DONDERO - 10/29/21

1  
2  the DAF wasn't paying a fee, along the way, to
3  Highland for shared services, Highland got the
4  benefit of the track record that was being
5  built at the DAF to then market to third
6  parties, which then created a revenue stream
7  for Highland down the road.
8      And I would say that was the same
9  intent on Services.
10      Q.   Is there anything -- anything else
11  of value that you believe HCMS provided to
12  Highland in exchange for the services that
13  Highland rendered?
14      A.   That would be primarily it. I would
15  say there is probably times where Services
16  provided liquidity for Highland or helped on
17  investments that Highland was involved in, but
18  I would have to refresh myself on exactly what.
19      Q.   Is it fair to say that HCMF -- HCMS
20  never provided a revenue stream to Highland
21  similar to the revenue stream that was provided
22  by HCMFA and NexPoint under the shared services
23  agreements?
24      A.   That is correct.
25      Q.   Okay. Did anybody at HCMF --

DONDERO - 10/29/21

1
2  withdrawn.
3       Did anybody at HCMS ever have the
4  responsibility for familiarizing themselves
5  with HCMS' debts and obligations?
6       MS. DEITSCH-PEREZ:  Object to the
7  form.
8       A.   Frank and his team, as part of
9  preparing the audited financials for all the
10  entities, would have definitively been aware of
11  all of them.  Who else on the services
12  incumbency certificate or -- would be aware or
13  have knowledge, I don't know.
14       Q.   Okay.  And when you refer to "Frank
15  and his team," are any of them acting as an
16  officer or employee of HCMS in what you are
17  thinking about?
18       A.   I -- I don't know.  I don't know.
19  Did -- we haven't -- have we looked at the
20  incumbency certificate for services?
21       Q.   No.
22       A.   I don't know.  I don't know off the
23  top of my head.
24       Q.   Okay.  Let's just finish this up.
25       Can you identify any current or

DONDERO - 10/29/21

1
2  former Highland employee who served as an
3  officer of HCMS at any time?
4       A.   No, I would need to be refreshed.
5       Q.   Okay.  Can you identify --
6  withdrawn.  Let's go to the last one, HCRE.
7       Are you familiar with an entity
8  called HCRE Partners, LLC?
9       A.   Yes.
10       Q.   And is that entity now known as
11  NexPoint Real Estate Partners, LLC?
12       A.   You know what, I do believe it had a
13  name change.  I don't know if that is the name
14  change, but that would make sense.
15       Q.   Okay.  Can we just refer to that
16  entity as HCRE?
17       A.   That is fine.
18       Q.   Okay.  Do you have any direct or
19  indirect ownership interest in HCRE?
20       A.   Yes.
21       Q.   And is it a majority interest to the
22  best of your knowledge?
23       A.   Yes.
24       Q.   Do you control HCRE?
25       A.   Yes.

DONDERO - 10/29/21

1
2       Q.   Have you controlled HCRE throughout
3  its corporate existence?
4       A.   Yes.
5       Q.   Can you tell me what the nature of
6  HCRE's business is?
7       A.   It makes real estate investments.
8       Q.   Do you have a title with that
9  entity?
10       A.   I don't know, but I'm willing to be
11  refreshed.  And I assume its incumbency
12  certificate looks similar to the ones that you
13  have put up.
14       Q.   Can you identify for me today
15  anybody who has ever served as an officer of
16  HCRE at any time?
17       A.   I would rather be refreshed.  I
18  would imagine myself and Matt McGraner are two
19  of those people, but I don't know for sure.
20       Q.   Okay.  Without the incumbency
21  certificates or other documentation, you are
22  not able to give me any names other than Mr. --
23  other than you and Mr. McGraner; is that fair?
24       A.   That's correct.
25       Q.   Okay.  Do you know whether anybody

DONDERO - 10/29/21

1
2  has ever been given the responsibility --
3  withdrawn.
4       Do you know whether anybody has ever
5  had the responsibility for familiarizing
6  themselves with the debts and obligations of
7  HCRE?
8       A.   It would be the same answer as given
9  on the other entities.  It would be the
10  treasurer, which is probably Frank.  And if not
11  the treasurer it would be Frank in his role and
12  his team of putting together the complete and
13  accurate financials of HCRE.
14       Q.   Other than putting together the
15  complete and accurate financials of HCRE, did
16  Frank and his team have any other
17  responsibility with respect to understanding
18  the debts and obligations of HCRE?
19       MS. DEITSCH-PEREZ:  Objection, form.
20       A.   Again, just the general overlay
21  being that they were de minimis and -- de
22  minimus, and the service obligations were de
23  minimus relative to the value or operating
24  income of the enterprise.
25       In other words, had they been more

Page 344

DONDERO - 10/29/21

1    material or material, they would have had more
2    focus.  But they didn't deserve more focus.
3        Q.   And so is it fair to say that you
4    didn't do anything to familiarize yourself with
5    HCRE's debts and obligations?
6        MS. DEITSCH-PEREZ:  Object to the
7    form.
8        A.   Not on a regular detailed basis, you
9    know, just a general awareness.
10       Q.   Did you ever take any steps to
11   review the affiliate loans and obligations that
12   were due between and among Highland and its
13   affiliated companies?
14       A.   Again, just generally.
15       Q.   What did you do?
16       A.   Like I said, I had a general
17   awareness of them.
18       Q.   And did you receive from time to
19   time lists or information that specifically
20   described the amounts that were due and owing
21   from the affiliates to Highland?
22       A.   Yeah, from time to time the amounts,
23   yes.
24       Q.   Let's just quickly go to the
25

Page 345

DONDERO - 10/29/21

1    30(b)(6) notices if we can.
2        MR. MORRIS:  Can we put up a
3    document that has been marked as
4    Exhibit 47.
5        (Exhibit 47 marked.)
6        Q.   Do you understand, Mr. Dondero, that
7    you are here today in your individual capacity
8    and in your capacity as what is called a
9    30(b)(6) witness for certain entities?
10       A.   Yes, a little bit to my chagrin.
11   And I don't think you will see me again as a
12   30(b)(6) witness, but yes.
13       Q.   All right.  Well, it wasn't my
14   choice, so let's just go through it quickly.
15       Have you seen this document before,
16   sir?
17       A.   Yes.
18       Q.   And do you understand that you are
19   here today in your capacity as NexPoint's
20   corporate representative?
21       A.   Yes.
22       Q.   And do you understand that your
23   answers today in your capacity as NexPoint's
24   corporate representative will be binding on
25

Page 346

DONDERO - 10/29/21

1    NexPoint?
2        MS. DEITSCH-PEREZ:  As qualified by
3    the objections that we made.
4        MR. MORRIS:  Sure.
5        A.   I will do the best I can.
6        Q.   Thank you so much.
7        MR. MORRIS:  Can we go to the next
8    page, please.  The last page.  The topics.
9        Q.   Okay.  Have you seen these topics
10   before, sir?
11       A.   Yes.
12       Q.   Okay.  Do you see that we asked for
13   somebody to testify as to NexPoint's answer?
14       A.   Yes.
15       Q.   Okay.  Are you aware that
16   NexPoint -- are you aware that NexPoint filed
17   an answer to Highland's amended complaint?
18       A.   Yes.
19       Q.   And did you review NexPoint's answer
20   at any time before today's deposition?
21       A.   It was in the binder, I believe,
22   that you guys sent over.
23       Q.   I think that's right.  Are you
24   prepared to answer questions today about
25

Page 347

DONDERO - 10/29/21

1    NexPoint's answer?
2        MS. DEITSCH-PEREZ:  Again, subject
3    to our objection, but...
4        A.   Yeah, to the best I can.
5        Q.   Okay.  The next topic concerns
6    affirmative defenses.
7        Do you see that?
8        A.   Yes.
9        Q.   Do you have an understanding of what
10   an affirmative defense is?
11       A.   Yes.
12       Q.   What is your understanding of an
13   affirmative defense?
14       A.   I think it is those -- phrase that
15   you see in most of our answers, the
16   justification, estoppel, waiver, and then --
17   and then there is some specific answers beyond
18   that, I guess.
19       Q.   Okay.  Are you prepared --
20       MS. DEITSCH-PEREZ:  John, I take it
21   you will show him.  He doesn't have to have
22   them memorized.
23       MR. MORRIS:  No, of course not.
24       MS. DEITSCH-PEREZ:  So if you are
25

Page 348

DONDERO - 10/29/21

1    going to ask him, you will put it in front
2    of him?
3         MR. MORRIS:  Of course.
4         MS. DEITSCH-PEREZ:  Thank you.
5    Q.   Are you prepared to testify today to
6    the circumstances, communications, documents,
7    and facts concerning NexPoint's affirmative
8    defenses?
9    A.   Yeah, to the best that I can.
10   Q.   Okay.  Do you see Topic 3 concerns
11   the demand notes?
12   A.   Yes.
13   Q.   Okay.  Are you prepared to testify
14   about the demand notes, including with respect
15   to the specific issues identified in that
16   topic?
17        MS. DEITSCH-PEREZ:  Again, subject
18   to the objections, particularly I think
19   with respect to use of the proceeds.
20   Q.   We will get to that.
21        Are you prepared to testify?
22   A.   I hope so.
23   Q.   And -- and I know that there is an
24   objection there, but just a simple yes or no,

Page 349

DONDERO - 10/29/21

1    are you -- do you have knowledge of the -- of
2    NexPoint's use of the proceeds of the note?
3    A.   Not specifically.
4    Q.   All right.  Maybe I will refresh
5    your recollection later.
6         And then the last topic is discovery
7    requests.
8         Do you see that?
9    A.   Yes.
10   Q.   Are you prepared to testify today on
11   NexPoint's behalf concerning Highland's
12   discovery requests?
13   A.   To the best of my knowledge.
14   Q.   Okay.  Did you do anything to
15   prepare for today's deposition?
16   A.   I met with Deborah.
17   Q.   When did you do that?
18   A.   A couple of days ago for a couple of
19   hours, and a few days before that for a couple
20   of hours.
21   Q.   How many times --
22        MS. DEITSCH-PEREZ:  Are you also
23   asking about calls?
24        MR. MORRIS:  I appreciate that.

Page 350

DONDERO - 10/29/21

1    A.   Yeah.  There were a couple of phone
2    calls too.
3    Q.   How many times did you communicate
4    with Deborah in preparation for today's
5    deposition?
6    A.   A half dozen, maybe, you know.
7    Q.   How many times --
8    A.   You know, in-person and phone calls,
9    but...
10   Q.   How many times did you meet with her
11   in-person?
12   A.   Two, maybe three.
13   Q.   And can you just tell me an estimate
14   of the total time spent preparing for this
15   deposition, inclusive of both the meetings and
16   the phone calls?
17   A.   I don't know.  Does it matter?  I
18   mean, I don't know.  I don't know, four hours,
19   four hours.
20   Q.   Okay.  Did anybody participate in
21   these meetings or phone calls other than your
22   lawyers?
23   A.   No.
24   Q.   Did any lawyers participate in any

Page 351

DONDERO - 10/29/21

1    of these meetings or phone calls who didn't
2    represent you in your individual capacity?
3    A.   No.  It was just -- it was just
4    Deborah and I.
5    Q.   Okay.  Have you had a chance to
6    review the transcript of Mr. Waterhouse's
7    deposition?
8    A.   No.  I haven't seen it yet.
9    Q.   You haven't seen any portion of that
10   deposition?
11   A.   No.
12   Q.   Are you aware of anything that
13   Mr. Waterhouse testified to in his deposition?
14   A.   No.
15   Q.   You have no knowledge of anything
16   that Mr. Waterhouse said last week in his
17   deposition; do I have that right?
18   A.   That's correct.
19   Q.   Okay.  Do you have any knowledge as
20   to anything your sister said in her deposition?
21   A.   No, other than she is glad it is
22   over.
23   Q.   I hope -- I hope -- I hope she
24   thinks at least I was respectful.

Page 352

DONDERO - 10/29/21

1
2    Did -- did you ever see her
3    transcript -- the transcript from her
4    deposition?
5    A.   No.
6    Q.   How about Mr. Seery, did you see the
7    transcript from Mr. Seery's deposition?
8    A.   I didn't even know that Seery was
9    deposed, so the answer is no.
10    Q.   Okay.  Are you aware that Dave Klos
11    was deposed?
12    A.   You know what, I think I had
13    awareness of that, but I haven't seen that
14    deposition.
15    Q.   Do you know anything about anything
16    that he testified to the other day?
17    A.   Nope.
18    Q.   How about Kristin -- Kristin
19    Hendrix, are you aware that she was deposed?
20    A.   I think I heard that she was also.
21    Q.   Do you know anything about anything
22    that she testified to?
23    A.   No.
24    Q.   Did you look at any documents to
25    refresh your recollection in advance of this

Page 353

DONDERO - 10/29/21

1
2    deposition other than the stack that I provided
3    and the deposition notices?
4    A.   I mean just -- no, just a listing of
5    the notes, but that is it.
6    Q.   Did you see any emails at all in
7    connection with your preparation for today's
8    deposition?
9    A.   No, not a single email.
10    MR. MORRIS:  Okay.  Let's put up
11    Exhibit 48, please.
12    (Exhibit 48 marked.)
13    Q.   And I think you will see that this
14    is the 30(b)(6) notice for HCMS.  If we can go
15    to the next page.  And it is really the same --
16    I will represent to you that the topics for
17    HCMS are the same as the topics for NexPoint.
18    Have you seen HCMS's 30(b)(6) notice
19    that is up on the screen right now?
20    A.   Yes.
21    Q.   And if we took the time -- if I took
22    the time to ask you the same questions about
23    your ability to answer on behalf of HCMS --
24    HCMS with respect to the topics identified
25    there and subject to your counsel's objections,

Page 354

DONDERO - 10/29/21

1
2    would you be able to do so?
3    A.   Yes.
4    MR. MORRIS:  Let's put up Exhibit
5    49, please.
6    (Exhibit 49 marked.)
7    Q.   And this is the 30(b)(6) notice for
8    HCRE.  You're here today to testify on behalf
9    of HCRE as its corporate representative.  Do
10    you understand that?
11    A.   Yes.
12    Q.   And did you review the list of
13    topics that we included in our 30(b)(6) notice
14    for HCRE?
15    A.   Yes.
16    Q.   And subject to your counsel's
17    objections, are you prepared to testify to the
18    topics that are listed on the page that is up
19    on the screen?
20    A.   Yes.
21    MR. MORRIS:  Okay.  Can we please
22    put up Exhibit 31.
23    (Exhibit 31 marked.)
24    Q.   Mr. Dondero, we're putting up on the
25    screen now your answer to the -- to Highland's

Page 355

DONDERO - 10/29/21

1
2    amended complaint.
3    MS. DEITSCH-PEREZ:  Is that in the
4    notebook?
5    MR. MORRIS:  No, no.  This is one
6    that we had -- we had --
7    MS. DEITSCH-PEREZ:  All right.  Hang
8    on.
9    MR. MORRIS:  That's okay.  That is
10    why we're putting it up on the screen, and
11    we will put it in the chat room.  It is
12    already in there, actually.
13    MS. DEITSCH-PEREZ:  Yeah, I think we
14    have it here.  Hold on.  I think Nancy
15    walked off with the duplicate of this, so
16    if you need it, I will hand it to you.
17    Q.   Mr. Dondero, while we wait to see if
18    your counsel has a hard copy, do you recall
19    reviewing your answer to the plaintiff's
20    amended complaint before it was filed?
21    A.   I don't know if I was involved at
22    that juncture.
23    Q.   All right.  So just to refresh your
24    recollection, this is a document that was filed
25    with the Court at the beginning of September.

Page 356

DONDERO - 10/29/21

1
2  If you recall, Highland filed an original
3  complaint, and after you amended your answer
4  late in August pursuant to an agreement,
5  Highland filed amended complaints against
6  certain of the obligors in the notes
7  litigation.
8      Does that refresh your recollection
9  that this document was prepared in early
10 September?
11     A.  Okay.
12     Q.  Okay.
13     A.  I don't have specific memory.
14     Q.  Okay.  So as always, Mr. Dondero, we
15 have done this many times before, if there is
16 anything in the document that you think that
17 you need to because it is a little bit of a
18 lengthy document, will you let me know that?
19     A.  Sure.
20     MS. DEITSCH-PEREZ:  Yeah.  And we
21 have a copy if you need to stop and take a
22 look.  We did get a hard copy.  We have a
23 hard copy here.
24     Q.  Okay.
25     A.  All right.

Page 357

DONDERO - 10/29/21

1
2      Q.  So -- so let me ask the question
3  again then:  Do you recall, with that
4  background, having reviewed and approved the
5  filing of this document at the beginning of
6  September 2021?
7      A.  Generally.
8      Q.  Okay.  As you sit here today, are
9  you aware of anything in this document that is
10 inaccurate?
11     A.  Not that I'm aware of.
12     Q.  Okay.  Are you aware of anything in
13 the document that you believe should be
14 modified or amended to make it more complete or
15 more accurate?
16     A.  Not as of this moment.
17     Q.  Okay.  Can we please go to Paragraph
18 83.  Okay.  Right there.
19     So do you see that on -- on page 13
20 of the exhibit, we have in Paragraphs 82
21 through 91 what are called your affirmative
22 defenses?
23     A.  Yes.
24     Q.  All right.  I'm going to skip the
25 one in 82 for the moment, but focusing on 83.

Page 358

DONDERO - 10/29/21

1
2  Can you just read that to yourself and tell me
3  when you have done that?
4      A.  Yes.
5      Q.  Are you aware of any facts that
6  concern this particular affirmative defense?
7      A.  Which notes are these again?
8      Q.  These would be your personal notes.
9      A.  The -- personal notes.  I'm trying
10 to remember.  No, I -- well, if you read the
11 question one more time.
12     Q.  Sure.  Just so -- so to make sure
13 that you understand, because I'm not here to
14 trick you, this is your answer to Highland's
15 complaint against you where Highland is trying
16 to recover on the notes that you signed.
17     Do you understand that?
18     A.  Right.
19     Q.  Okay.  So in Paragraph 83 you have
20 asserted an affirmative defense that the
21 plaintiff's claims are barred in whole or in
22 part due to waiver.
23     Do you see that?
24     A.  Yes.
25     Q.  Do you have any facts that you can

Page 359

DONDERO - 10/29/21

1
2  share with me that concern that particular
3  affirmative defense?
4      MS. DEITSCH-PEREZ:  And, again, just
5  in this particular answer.
6      MR. MORRIS:  That is all I'm asking
7  about.
8      Q.  We're going to go through the answer
9  for each one of them.  So just one at a time.
10 We're only talking about your -- your notes.
11     A.  No, not the moment.
12     Q.  Let's go to Paragraph 84.
13     Do you see Paragraph 84 states,
14 among other things, that plaintiff's claims are
15 barred, in whole or in part, due to estoppel?
16     A.  Yes.
17     Q.  Can you share with me any facts that
18 you are aware of that concern that particular
19 affirmative defense?
20     A.  No.
21     Q.  Okay.  I'm going to skip over 85
22 because I've gotten that answer elsewhere.  If
23 we can go to 86, do you see that Paragraph 86
24 asserts as an affirmative defense, among other
25 things, that, quote:  Plaintiff's claims may be

Page 360

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | barred, in whole or in part, due to failure of |
| 3 | consideration, closed quote? |
| 4 | A.   Right, I see that. |
| 5 | Q.   Do you -- do you -- do you |
| 6 | acknowledge that Highland transferred to you an |
| 7 | amount of money equal to the principal amount |
| 8 | on each of the notes that are at issue? |
| 9 | A.   I believe -- yes. |
| 10 | Q.   Okay.  I appreciate that. |
| 11 | Do you have any facts that would |
| 12 | support the affirmative defense that is set |
| 13 | forth in Paragraph 86? |
| 14 | A.   No. |
| 15 | Q.   Okay.  And then, finally, |
| 16 | Paragraph 88 asserts, among other things, that |
| 17 | the fraudulent transfer claim should be barred, |
| 18 | in whole or in part, because the alleged |
| 19 | fraudulent transfer -- and I'm summarizing |
| 20 | here -- was taken in good faith and for |
| 21 | reasonably equivalent value. |
| 22 | Do you see that? |
| 23 | A.   Yes. |
| 24 | Q.   Okay.  Do you have any facts that |
| 25 | concern that particular affirmative defense? |

Page 361

| | |
|---|---|
| 1 | A.   Let me read that one more time. |
| 2 | Q.   Take your time. |
| 3 | A.   I think that one is -- I'm trying -- |
| 4 | I'm trying to remember if that one -- if the |
| 5 | partner defense is on alternative comp that |
| 6 | could have been taken or forgiveness that was |
| 7 | in lieu of other comp -- I'm trying to remember |
| 8 | if that falls under this category.  I think it |
| 9 | does. |
| 10 | Q.   Okay.  Is there anything else that |
| 11 | you can -- any other facts that you can think |
| 12 | of that concern the affirmative defense in |
| 13 | Paragraph 88? |
| 14 | A.   I mean, the -- yes.  Okay.  To the |
| 15 | extent that the -- in lieu of additional comp |
| 16 | falls under there, so does the incentives to -- |
| 17 | the incentive to me to help monetize illiquid |
| 18 | investments better faster. |
| 19 | Q.   And does that relate to the three |
| 20 | portfolio companies that are the subject of the |
| 21 | oral agreement between you and your sister or |
| 22 | to something else? |
| 23 | A.   It is -- |
| 24 | MS. DEITSCH-PEREZ:  Objection, form. |

Page 362

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | A.   -- regarding that, yeah. |
| 3 | Q.   It is the same thing.  Do I have |
| 4 | that right? |
| 5 | A.   Yes. |
| 6 | Q.   Okay.  Thank you very much. |
| 7 | Is there anything else you can share |
| 8 | with me about the facts that concern the |
| 9 | affirmative defense in Paragraph 88? |
| 10 | A.   I think that is -- that is -- that |
| 11 | is it. |
| 12 | Q.   Okay.  Can we change now to |
| 13 | Exhibit 16, which you should have in your pile, |
| 14 | which is the answer that was filed by the HCMS |
| 15 | to Highland's amended complaint. |
| 16 | (Exhibit 16 marked.) |
| 17 | A.   Which number is this? |
| 18 | Q.   It is number 16. |
| 19 | A.   16 in the binder? |
| 20 | Q.   It should be, yeah. |
| 21 | A.   Yes.  Okay.  I got it. |
| 22 | Q.   Okay.  And is the first page titled |
| 23 | Defendant, Highland Capital Management |
| 24 | Services, Inc.'s Answer to Amended Complaint? |
| 25 | A.   Yes. |

Page 363

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | Q.   Okay.  So these questions I'm asking |
| 3 | in your capacity as HCMS' 30(b)(6) witness. |
| 4 | Okay? |
| 5 | A.   Okay. |
| 6 | Q.   And you recall that one of the |
| 7 | topics under the deposition notice was HCMS' |
| 8 | answer; right? |
| 9 | Are you prepared to answer questions |
| 10 | about this document? |
| 11 | A.   Yep, to the best I can. |
| 12 | Q.   Okay.  Have you seen it before? |
| 13 | A.   Yes. |
| 14 | Q.   And do you know whether HCMS |
| 15 | authorized this Stinson firm to file this |
| 16 | document on its behalf at the beginning of |
| 17 | 2021? |
| 18 | A.   Yes. |
| 19 | Q.   Did you personally have any role in |
| 20 | reviewing and preparing this document? |
| 21 | A.   I mean, just generally that the |
| 22 | transition of former Judge Lynn passing and |
| 23 | Bonds Ellis not being able to handle |
| 24 | complexity -- maybe I shouldn't say it like |
| 25 | that -- or handle this aspect of the case |

DONDERO - 10/29/21

1   and/or -- I think it was -- yeah, just
2   whatever. He moved to Stinson from -- I think
3   maybe it started at Bonds Ellis and then maybe
4   it went to Wick Phillips and then it went to
5   Stinson, but, you know, there was a migration
6   of these notes in general.
7       Q.   Was there a particular person who
8   was charged with the responsibility of
9   approving and authorizing the filing of this
10  document on behalf of HCMS?
11      A.   Like I said, I think generally that
12  was myself.
13      Q.   Okay. Are you aware of anything in
14  this document today that is inaccurate in any
15  way?
16      A.   Not specifically.
17      Q.   Are you aware of anything generally
18  in this document that is inaccurate in any way?
19      A.   Not at the moment.
20      Q.   Are you aware of anything in this
21  document that you believe should be modified or
22  amended to make it more complete or more
23  accurate?
24      A.   Not yet.

DONDERO - 10/29/21

1       Q.   Let's go to Paragraph 40 -- 94,
2   please.
3       MS. DEITSCH-PEREZ:  We may be
4   imperfect creatures as lawyers.
5       A.   Yes.
6       Q.   Okay.
7       A.   Yes.
8       Q.   Okay. I was just going to say, do
9   you see from Paragraphs 94 through 102 HCMS has
10  set forth its affirmative defenses?
11      A.   Yes.
12      Q.   Okay. Let's -- let's start with the
13  first one.
14          Do you see in Paragraph 94 HCMS
15  asserts that, quote: Plaintiff's claims are
16  barred, in whole or in part, by the doctrine of
17  justification and/or repudiation?
18      A.   Yes.
19      Q.   Are you aware of any facts that
20  concern that particular defense?
21      A.   I believe there -- they were material
22  prepayments of the loan. I believe that is --
23  those are the -- they were material and
24  numerous prepayments of the loan, which I think

DONDERO - 10/29/21

1   was -- that is incorporated into that defense.
2       Q.   Okay. We will talk about the -- the
3   details of that in a moment, but are there any
4   other kind of broad statements that you can
5   give me that identify facts related to this
6   particular affirmative defense?
7       MS. DEITSCH-PEREZ:  Object to the
8       form.
9       A.   That is all I have at the moment.
10      Q.   Okay. Do you know whether any
11  document that HCMS ever filed with the
12  bankruptcy court ever asserted, as in a
13  defense, that they didn't have to pay because
14  they had prepaid any obligations that were due
15  and owing?
16      MS. DEITSCH-PEREZ:  Object to the
17      form.
18      A.   I don't have awareness.
19      Q.   And this document doesn't -- doesn't
20  use the word "prepayment" anywhere, does it?
21      MS. DEITSCH-PEREZ:  Object to the
22      form.
23      A.   I don't know.
24      Q.   Do you know of anything that HCMS

DONDERO - 10/29/21

1   ever did before this week to put Highland on
2   notice that it contended that it didn't have to
3   pay its obligations under the notes because of
4   a prepayment defense?
5       MS. DEITSCH-PEREZ:  Object to the
6       form.
7       A.   We have no records. I'm not sure we
8   would have ever been in a position to -- to do
9   that. The -- you know, we were relying on
10  shared services from Highland, and Highland had
11  all the records regarding the amounts and
12  prepayments, et cetera.
13      Q.   When did you learn that HCMS had
14  made a prepayment to Highland?
15      A.   I don't know, but I -- I imagine --
16  I imagine it was -- if you are asking why it
17  wasn't mentioned earlier but then mentioned
18  later, it is because somewhere in that time
19  period we became aware.
20      Q.   So you didn't -- you didn't have
21  knowledge of the prepayment until the debtor
22  produced documents. Do I have that right?
23          Withdrawn.
24          How did you learn that HCMS made a

Page 368

DONDERO - 10/29/21

1 prepayment?

2    A.  I don't know. I just know that we

3 became aware of that being a material fact

4 somewhere along the line.

5    Q.  Do you remember when you learned

6 that material fact?

7    A.  No.

8    Q.  Do you have any facts that you can

9 share with me concerning the prepayment?

10    A.  Eventually there was a spreadsheet

11 that summarized it, but I don't -- I don't

12 know -- I don't know when that occurred.

13    Q.  Does -- does this defense of

14 prepayment apply to demand notes or a term

15 note?

16    A.  I would -- I would -- I would say,

17 you know, primarily a term note, but -- yeah, I

18 think primarily the term note because I think

19 that was the one that was declared to be in

20 default of share, you know, whatever, so I

21 think it was regarding the term note.

22    Q.  Do you recall -- do you have any

23 knowledge as to when the prepayment was made?

24    A.  I believe there were numerous and

---

Page 369

DONDERO - 10/29/21

1 material prepayments, but I don't know exactly

2 when they were made.

3    Q.  Do you know what year they were

4 made?

5    A.  No, but -- no, but -- no, I don't.

6    MS. DEITSCH-PEREZ: If you want,

7 John, if you would like for him to give you

8 dates, he could probably dig up the

9 spreadsheet and give you dates, but you

10 have it also.

11    MR. MORRIS: Thank you. Okay. I

12 think we're doing just fine here.

13    Q.  Do you know if there were any

14 prepayments made by HCMS in 2018?

15    A.  I don't know the specifics off the

16 top of my head.

17    Q.  Do you know if HCMS made any

18 prepayments in 2019?

19    A.  I don't know the specifics off the

20 top of my head.

21    Q.  Are you aware that under the term

22 note, HCMS was required to pay annual

23 installment payments at the end of each year?

24    MS. DEITSCH-PEREZ: Object to the

25

---

Page 370

DONDERO - 10/29/21

1 form.

2    A.  I wouldn't say it like that.

3    Q.  We will look -- we will look at the

4 documents in a few minutes.

5    Are you aware of any facts that

6 support the justification or repudiation

7 defense in Paragraph 94 other than what you

8 have testified to so far?

9    A.  I think it is largely the prepayment

10 aspect of it that is captured there.

11    Q.  Okay. And -- and -- all right. I

12 will leave it at that.

13    Let's go to Paragraph 95. Do you

14 see the affirmative defense in 95 is that,

15 quote, plaintiff's claims are barred in whole

16 or in part by the doctrine of estoppel.

17    Do you see that?

18    A.  Yes.

19    Q.  Do you have any facts as the

20 30(b)(6) witness of HCMS that concern that

21 particular affirmative defense?

22    A.  You know, I think for both 95 and

23 96, the way I understand it is that was

24 reliance on Highland's and Highland's screw-up,

25

---

Page 371

DONDERO - 10/29/21

1 to the extent that there was a screw-up, on the

2 term loans.

3    Q.  What screw-up are you referring to?

4    A.  Well, we didn't have accountants or

5 employees at Services, you know, and Services

6 was relying on Highland and shared services to

7 stay in compliance or to -- on the various

8 loans.

9    Q.  Did you ever personally instruct

10 anybody in December of 2020 to make a payment

11 on behalf of HCMS under the term note?

12    A.  To make -- I'm sorry, is this --

13 what was the timeframe again?

14    Q.  December 2020 -- let's just say

15 anytime in 2020. Did you, in your capacity as

16 the person in control of HCMS, ever direct or

17 authorize any person in the world to make a

18 payment from HCMS to Highland in satisfaction

19 of the obligation that was due under the term

20 note at the end of the year?

21    A.  Not that -- not that I recall.

22    Q.  Okay. Do you know whether anybody

23 acting on behalf of HCMS ever instructed or

24 authorized Highland to make a payment on

25

---

Page 372

DONDERO - 10/29/21

1    account of HCMS's term note to Highland?
2        A.    Well, again, and maybe I didn't say
3    it clearly enough.  I think there was a
4    reliance in the due course paper, especially
5    on small amounts, and it would have been done
6    by Highland personnel on behalf of Services.
7        MR. MORRIS:  Okay.  Move to strike.
8        Q.    And I'm going to ask you,
9    Mr. Dondero, to be patient with me and to
10   listen carefully to my question.
11            Are you aware of anybody acting on
12   behalf of HCMS, whoever instructed Highland to
13   make a payment in satisfaction of any payment
14   that was due at the year-end of 2020 under the
15   term note?
16       A.    Not specifically, but I'm saying I
17   don't think it needed to be made specifically.
18       Q.    Okay.  So you are not aware of any
19   instruction that was ever given to Highland by
20   HCMS to make the payment; is that fair?  You
21   relied on the course of dealing?
22       A.    Right.  I relied on ordinary course.
23   I don't believe there was a specific -- I'm not
24   aware of a specific request.

Page 373

DONDERO - 10/29/21

1        Q.    Okay.  And you were aware that the
2    payment was due at the end of the year; isn't
3    that right?
4        MS. DEITSCH-PEREZ:  Object to the
5        form.
6        A.    Not -- not specifically.  There
7    is -- to be bona fide notes, there is -- I know
8    there is -- there is tax structuring and things
9    that the auditors want to see in terms of -- of
10   regular payment that everything just doesn't
11   accrue indefinitely, but what those roles are
12   and when and if it needs to be paid and whether
13   it was by the end of the year or not.
14            I'm generally not specifically
15   knowledgeable of or involved in, and nor do I
16   have an awareness that was it or could it have
17   been satisfied by other payments throughout the
18   year.  I'm not -- I'm not the person for that
19   knowledge.
20       Q.    Now, do you recall in December of
21   2020 there was some tension between you and
22   Mr. Seery?
23       A.    Tension between me and Mr. Seery.  I
24   would say there was tension between Mr. Seery

Page 374

DONDERO - 10/29/21

1    and everybody.  He was trying to steal the
2    estate, you know, so yes.
3        MR. MORRIS:  I move to strike.
4        Q.    You were asked to resign from
5    Highland in late September of 2020; correct?
6        A.    Yes.
7        Q.    And you did resign as of October
8    9th, 2020; correct?
9        A.    Yes.
10       Q.    And do you recall that in early
11   December, Highland sought a temporary
12   restraining order against you?
13       A.    Yes.
14       Q.    And do you recall that Highland
15   obtained a temporary restraining order against
16   you in early December?
17       A.    Yes.
18       Q.    Okay.  Do you recall that the
19   advisors that you controlled filed a motion
20   against the debtor in mid December 2020?
21       A.    Yes.
22       Q.    Okay.  And do you recall that that
23   motion was curved by the Court in the middle of
24   December?

Page 375

DONDERO - 10/29/21

1        A.    Yes, roughly.
2        Q.    And do you recall that at the end of
3    November, Highland had given notice of
4    termination of the shared services agreements
5    with the advisors?
6        A.    I believe they did that multiple
7    times or extended it multiple times.  I can't
8    remember if that was -- if it was done then or
9    not.
10       Q.    Okay.  And it is your testimony that
11   notwithstanding those facts and circumstances,
12   you relied on Highland to make the payment that
13   HCMS owed at the end of the year?
14       A.    Yes, absolutely.  We were still
15   deluded in terms of thinking that Seery was
16   working to resolve the estate, not to steal the
17   estate.
18       MR. MORRIS:  I move to strike.
19       Q.    Do you have any other facts and
20   circumstances that relate to the affirmative
21   defenses in Paragraphs 95 and 96?
22       A.    I mean, not at the moment, not that
23   I want to volunteer.  When you ask more
24   questions about the specifics, I guess we will

Page 376

DONDERO - 10/29/21

2  get to some of it.
3      Q.   Well, I'm asking you questions now.
4  You are the 30(b)(6) witness.  This is one of
5  the topics that you were supposed to be
6  prepared to answer questions about, and I would
7  just like to know everything that you have in
8  your head as to facts that relate to these two
9  affirmative defenses.
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      Q.   Because if I don't ask the right
13  question later, you know, we can't do that;
14  right?
15      So do you have any other facts that
16  you are aware of that relate to these two
17  particular affirmative defenses?
18      MS. DEITSCH-PEREZ:  John, the fact
19  that it's a 30(b)(6) deposition doesn't
20  absolve you of the necessity to ask
21  questions.
22      MR. MORRIS:  I asked the question.
23      Q.   Can I please have an answer?
24      A.   Again, the notes in general are de
25  minimis relative to asset values of Highland or

Page 377

DONDERO - 10/29/21

2  the counterparties.  So the annual obligations
3  are even more de minimis or a million bucks or
4  less than a million bucks.
5      There was never an intent, nor would
6  there be a logical intent to -- from my
7  perspective or any of the entities that had
8  notice to Highland to be in default.  And it is
9  not logical that they would do that for any
10  purpose.
11      And the facts around the curing
12  quickly of the notes and getting the curing
13  amounts from Highland and making the payments
14  and Highland accepting them as they're defining
15  what it took to cure it, I think, are all, you
16  know, the key facts that make any, you know,
17  acceleration argument, you know, ridiculous.
18      Q.   Okay.  Anything else?
19      A.   That's it at this point.
20      MR. MORRIS:  Okay.  Let's go to
21  Exhibit 17, please.
22      (Exhibit 17 marked.)
23      Q.   This is HCRE's answer.  Do you see
24  that, sir?
25      A.   Yes.

Page 378

DONDERO - 10/29/21

2      Q.   And I'm going to ask these questions
3  in your capacity as the 30(b)(6) representative
4  of HCRE.  Do you understand that?
5      A.   Yes.
6      Q.   Have you seen this document before?
7      A.   Yes.
8      Q.   Are you aware of anything in this
9  document that is inaccurate today?
10      A.   I mean, I think 96 we put in there
11  similar to the other affirmative defenses in
12  case there was a prepayment.  But, again, we
13  have been so blocked from getting information
14  and detail we didn't know it at the time
15  regarding, you know, prepayments.
16      So I don't think the prepayment
17  defense works for 96.  So that would be my
18  clarification of an inaccuracy.
19      Q.   Why do you believe that the
20  prepayment defense doesn't work in Paragraph 96
21  for HCRE?
22      A.   Because I don't think there were any
23  prepayments.
24      Q.   All right.  I appreciate that.
25      A.   We didn't -- we didn't know it at

Page 379

DONDERO - 10/29/21

2  the time --
3      Q.   Okay.
4      A.   -- we put this together.
5      Q.   Is there any other aspect of this
6  document that you believe is inaccurate today?
7      A.   Not as far as I know.
8      Q.   Is there anything in this document
9  that you believe should be modified or amended
10  to make it more accurate or more complete?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13      A.   Not yet.
14      Q.   Okay.  Looking at Paragraph 96, I
15  believe you just testified that,
16  notwithstanding the assertion of the defense
17  therein, you are not aware of any facts
18  concerning the prepayment defense that you
19  described earlier for HCMS.
20      Do I have that right?
21      A.   Yes.
22      Q.   Okay.  Do you have any facts at all
23  that relate to the affirmative defense in
24  Paragraph 96?
25      A.   I don't believe so at this moment.

Page 380

DONDERO - 10/29/21

1
2 Q. Okay. How about Paragraphs 97 and
3 98? Do you have any facts that relate to those
4 affirmative defenses?
5 A. It would be the same answer as on
6 the last one.
7 Q. Okay. I appreciate that. And so --
8 but we don't have to go over it again. I will
9 just leave it at that.
10 Let's go to Exhibit 15, please.
11 (Exhibit 15 marked.)
12 MR. MORRIS: This is the next --
13 MS. DEITSCH-PEREZ: Hey, John.
14 John, can we take a -- like a very quick
15 restroom break?
16 MR. MORRIS: You know, if we could
17 just get through this document, which
18 shouldn't take long, then perhaps we can
19 take a short half-hour lunch break.
20 MS. DEITSCH-PEREZ: Well, we can
21 take a short half-hour lunch break after we
22 get through this, but I just need to run to
23 the restroom.
24 MR. MORRIS: Okay.
25 MS. DEITSCH-PEREZ: So you can leave

Page 381

DONDERO - 10/29/21

1
2 the screen on if you want so that we can
3 get back fast.
4 MR. MORRIS: My pleasure, Deborah.
5 No problem.
6 MS. DEITSCH-PEREZ: Thank you.
7 VIDEOGRAPHER: Off the record,
8 12:40.
9 (Recess taken 12:40 p.m. to 12:51 p.m.)
10 Q. Before we go on to this document,
11 sir, did HCRE have a shared services agreement
12 with Highland?
13 VIDEOGRAPHER: We're back on the
14 record.
15 MR. MORRIS: Oh, do I need to read
16 the question again?
17 COURT REPORTER: No, I've got it.
18 A. I -- I don't believe it is a formal
19 written one. I think it is just a verbal one.
20 Q. And who is the verbal agreement
21 between?
22 A. It was between Highland and HCRE.
23 Now it is between NexPoint and HCRE.
24 Q. And who entered into the agreement
25 between Highland and HCRE?

Page 382

DONDERO - 10/29/21

1
2 A. I would give the same answer I gave
3 before where it was just -- it was just
4 understood that we supported all the related
5 entities or entrepreneurial efforts and it was,
6 you know, modest amounts of work.
7 There wasn't specific financial
8 remuneration, but -- and NexPoint is a good
9 example, too. There was a significant track
10 record gulf that was able to be used to raise
11 other money.
12 Q. I'm just asking you who entered into
13 the agreement between Highland and -- and HCRE
14 for the provision of services by Highland?
15 MS. DEITSCH-PEREZ: Asked and
16 answered.
17 A. Yeah, again, same answer as before.
18 I don't think anybody specifically, formally
19 did it.
20 Q. Okay. Is it -- are the terms of the
21 agreement written down anywhere?
22 A. No, like I said, it is just
23 understood the accounting department and tax
24 department would handle the accounting and tax
25 for all entities.

Page 383

DONDERO - 10/29/21

1
2 Q. Did the legal department also
3 provide services to HCRE?
4 A. It would depend on the specific
5 entity. In the case of HCRE I think they used
6 the -- the two lawyers that worked at NexPoint.
7 I don't think they used the legal
8 staff per se. I think they -- the shared
9 services that they relied on were accounting
10 and tax primarily.
11 Q. Did Mark Patrick do work for HCRE
12 while he was employed by Highland?
13 A. Boy, I don't know. I imagine
14 probably tax-related stuff.
15 Q. Did HCRE ever pay Highland anything
16 for the services that it received?
17 MS. DEITSCH-PEREZ: Are you talking
18 about cash or --
19 MR. MORRIS: Please, please, please.
20 -- I'm trying to be really patient,
21 Deborah, but please no speaking objections.
22 Mr. Dondero is a very sophisticated man.
23 We have done this many times
24 together. He will ask me if he doesn't
25 understand the question. And if you would

Page 384

DONDERO - 10/29/21

1  like to object, by all means. I don't have
2  a problem with that. I don't.
3     MS. DEITSCH-PEREZ: But I asked --
4  (speaking simultaneously.)
5     Q.  Mr. Dondero -- Mr. Dondero --
6  Mr. Dondero, did HCRE ever pay anything to
7  Highland for services rendered?
8     MS. DEITSCH-PEREZ: Asked and
9  answered.
10    A.  Yeah, that is what I was going to
11  say. Same answer. You know, not -- not a
12  formal cash remuneration, but, you know, a --
13  which wouldn't have been much anyway. But --
14  but more in terms of track record and presence
15  in the market that then Highland or NexPoint
16  could use to further its business.
17    Q.  Are you saying that -- that all of
18  the entities were working kind of as a unified
19  unit and got synergistic benefits from the work
20  that it did?
21    MS. DEITSCH-PEREZ: Object to the
22  form.
23    A.  I don't want to over generalize and
24  say yes to that, but -- but there were

Page 385

DONDERO - 10/29/21

1  definitely -- you know, when I use the DAF
2  example, you know, we would have never got the
3  Harvard vest as an investor if it wasn't for
4  the track record that the DAF had in CLO
5  equity.
6     I think there is business that
7  NexPoint got in the real estate space
8  benefiting from the HCRE performance. So I do
9  believe there was specific definable benefit
10  gained for the modest amount of cost of
11  services provided.
12    Q.  And you --
13    A.  There wasn't specific remuneration.
14    Q.  And you controlled all of these
15  entities; right?
16    MS. DEITSCH-PEREZ: Object to the
17  form.
18    A.  Well, the DAF is independent and
19  separate, but the -- the HCRE-type entity, yes.
20    Q.  And did you decide that HCRE and
21  HCMS and the DAF wouldn't be required to pay
22  for services rendered to Highland?
23    MS. DEITSCH-PEREZ: Object to the
24  form.

Page 386

DONDERO - 10/29/21

1     A.  My recollection on the services and
2  the HCRE is that the dollar value of the
3  services provided was -- was small and nominal.
4     With regard to the DAF, it was more
5  complicated. There is rules -- there is
6  charging rules in terms of fees and then there
7  is also -- I wasn't the one that decided that.
8  And there are other issues there other than
9  just the value for services argument.
10    And so I don't -- the short answer
11  is, I don't know and I'm not involved in that,
12  and I don't understand why sometimes there is
13  one and sometimes there isn't one. Even to
14  this day I don't know the answer to that.
15    Q.  Did -- did -- did you decide on
16  behalf of Highland that Highland would provide
17  services to DAF without receiving a stream of
18  income in return?
19    MS. DEITSCH-PEREZ: John, I think
20  we're really far outside of either any of
21  the 30(b)(6)s or the permissible topics for
22  Mr. Dondero's personal deposition.
23    So could you move on?
24    MR. MORRIS: Okay. I will after I

Page 387

DONDERO - 10/29/21

1  get an answer to this question.
2     Q.  Can you repeat the question?
3     Q.  Sure.
4     Did you make the decision on behalf
5  of Highland to provide services to the DAF
6  without receiving a stream of income in return?
7     MS. DEITSCH-PEREZ: Same objection.
8     A.  Yeah, I think I answered it with my
9  rambling a few minutes ago, but the short
10  answer is no.
11    Q.  Who made that decision? Who made
12  that decision?
13    MS. DEITSCH-PEREZ: Was that Mike's
14  dog or yours?
15    MR. MORRIS: That was my dog. I
16  apologize.
17    MS. DEITSCH-PEREZ: Okay.
18    Q.  Who made that decision, sir?
19    A.  I wasn't sure --
20    MS. DEITSCH-PEREZ: Again -- again,
21  John, this is well beyond the scope of the
22  30(b)(6)s or even anything permissible for
23  Mr. Dondero's personal. And, in fact, you
24  said last time that is it, that was my last

Page 388

DONDERO - 10/29/21

1  question. So...
2      MR. MORRIS: That is -- that is
3  because I thought that he would say as the
4  control person at the enterprise that he
5  made the decision, but he said that he
6  didn't.
7      So I'm just asking one follow-up
8  question. I just want to know -- Deborah,
9  please.
10     Q.   I just want to know who made the
11 decision on behalf of Highland to render
12 services to the DAF without receiving a stream
13 of income in return.
14     MS. DEITSCH-PEREZ: Object to the
15 form of the question for all of the reasons
16 I stated before.
17     A.   And I don't know the answer.
18     Q.   Okay. So looking back at the
19 document on the screen, we're going to ask --
20 I'm going to ask these questions in your
21 capacity as NexPoint's 30(b)(6) representative,
22 okay?
23     A.   Sure.
24     Q.   And do you understand that the

Page 389

DONDERO - 10/29/21

1  document on the screen is NexPoint's answer to
2  Highland's amended complaint?
3      A.   Yes.
4      Q.   Did you review this document before?
5      A.   Just generally.
6      Q.   And did you authorize the filing of
7  this document on behalf of NexPoint?
8      A.   Yes, yes.
9      Q.   Are you aware of anything in this
10 document today that you believe to be
11 inaccurate?
12     A.   I think the -- on the affirmative
13 defenses on the -- do you remember on the prior
14 one we had the -- I think it was called
15 justification as the first one, but there
16 wasn't a prepay in that one?
17     Q.   Correct.
18     A.   I think this one there were prepays,
19 but the justification defense is missing from
20 the front here. And I think that is -- I think
21 if that were to continue -- I think that is
22 partly due to different law firms and what was
23 known at the time, et cetera, but I would say
24 that is -- that is the -- that is the one thing

Page 390

DONDERO - 10/29/21

1  that jumps out at me between the two.
2      MR. MORRIS: Okay. Can we go to
3  Paragraph 80, and let's see if we can see
4  what Mr. Dondero is talking about.
5      Q.   Okay. So I'm just going to focus on
6  the first three paragraphs, 80, 81, and 82, and
7  ask you whether -- whether you are aware of any
8  facts that concern the affirmative defenses set
9  forth in those paragraphs. And I think they're
10 related, and that is why I'm asking you to do
11 it all together, but we can do it one at a
12 time, whatever you are comfortable with.
13     MS. DEITSCH-PEREZ: Object to the
14 form. I mean, other than the facts in
15 those paragraphs?
16     MR. MORRIS: You are doing it again,
17 Deborah.
18     MS. DEITSCH-PEREZ: It --
19     MR. MORRIS: Please, please.
20     MS. DEITSCH-PEREZ: John, when you
21 ask questions -- I understand Mr. Dondero
22 is sophisticated, but he's also not a
23 lawyer, and when you ask questions that are
24 misleading, I'm going to interject

Page 391

DONDERO - 10/29/21

1  something.
2      MR. MORRIS: It is completely
3  improper. He doesn't need to be a lawyer.
4  He's a 30(b)(6) witness, and I'm asking
5  such a simple question, what facts do you
6  have that support the affirmative defense.
7      A.   Okay. Is it okay if I repeat some
8  of them from the prior one?
9      Q.   Sure. Whatever you are comfortable
10 with.
11     A.   The -- to the extent that -- to the
12 extent that the notes were prepaid -- prepaid
13 significantly, it is a real question on whether
14 or not there could have been a breach at the
15 end of the year, even if there wasn't a payment
16 at the end of the year.
17     There is no logical reason, nor
18 would I have ever authorized or suggested no
19 payment to put us on -- in default due to a de
20 minimis amount of money, like a few hundred
21 thousand dollars, even if I was highly annoyed
22 with Seery, even if we knew that Seery and
23 Highland had overcharged NexPoint by whatever
24 it was, 14, 16 million bucks, I would not have

Page 392

DONDERO - 10/29/21

1  let a small amount cause a – cause a breach.
2       You know, the – how would I – how
3  would I add to that now.  The overpayment on
4  the $14 million, holding back additional shared
5  services amount, made an inordinate amount of
6  sense.
7       There was supposed to be at that
8  time – there was another netting from Seery in
9  terms of wanting to be fair and reasonable, you
10  know, with employees and with the transition of
11  the estate, et cetera, and everything was going
12  to get trued up.
13       So I do believe there was an
14  expectation of a netting, et cetera, but
15  overall, Highland should have paid it.  It
16  shouldn't have let it breach the cause, but at
17  least when I found out about it and they knew I
18  was annoyed.  And I told them I didn't want it
19  to be in default, they gave me the numbers and
20  the amounts to cure it in their mind, and they
21  accepted it.
22       Now, I think they should have gone
23  back and incorporated prepays and said that no
24  amounts were due because of the prepays, et

Page 393

DONDERO - 10/29/21

1  cetera, but the calculation that they came up
2  to get it in compliance in good standing was a
3  million 4.  And just like we relied on them to
4  pay it and keep us out of default, we relied on
5  them to set the amount to cure.
6       But I guess I would make the
7  argument that it shouldn't have been, but
8  again, I don't want to mince – I didn't want
9  to on small dollars make an argument that could
10  get us in bigger trouble – bigger trouble.  So
11  it was easier to – to pay the million bucks
12  than it was to argue that it wasn't due.
13       Q.   Did you at any time in your capacity
14  as the person in control of NexPoint instruct
15  anybody at Highland to make the payment that
16  was due at the end of 2020?
17       A.   Not specifically to pay it or not
18  specifically not to pay it.  It was something,
19  again, small and de minimis that I expected to
20  be done in due course.
21       MR. MORRIS:  I move to strike.
22       Q.   It's a very simple question.
23       Did you personally take any steps to
24  ensure that NexPoint made the payment that was

Page 394

DONDERO - 10/29/21

1  due at the end of 2020?
2       MS. DEITSCH-PEREZ:  Asked and
3  answered.
4       A.   Yes, I would like to repeat my same
5  answer.
6       Q.   Did you tell anybody to make the
7  payment on behalf of NexPoint at the end of
8  2020?
9       MS. DEITSCH-PEREZ:  Asked and
10  answered.
11       A.   I would like to give the same answer
12  that you – you – you struck.
13       Q.   Can you just say yes or no, sir, did
14  you tell anybody to make the payment at the end
15  of 2020 on behalf of NexPoint?
16       MS. DEITSCH-PEREZ:  Asked and
17  answered.
18       A.   I don't want to give anything beyond
19  the answer that I gave.
20       Q.   Okay.
21       A.   I get myself in trouble because I
22  paraphrase.  I don't want to answer yes – I
23  don't think yes or no would be an appropriate
24  answer.  I want to stay with the answer that I

Page 395

DONDERO - 10/29/21

1  gave.
2       Q.   Okay.  I'm going to say the word
3  "Yankees," and every time I say the word
4  "Yankees" today, everybody should know that
5  that is the question that I'm going to bring to
6  the Court on a motion to compel, okay?
7       It's a very simple question.  It's a
8  very simple question.  I will ask one more
9  time, and if you don't want to answer, that is
10  fine.
11       MS. DEITSCH-PEREZ:  What –
12       Q.   Mr. Dondero – Mr. Dondero, in
13  December of 2020, did you give anybody any
14  instructions at Highland to make sure that
15  NexPoint made the payment that was due at the
16  end of the year?
17       MS. DEITSCH-PEREZ:  Asked and
18  answered.
19       A.   I think that means I'm supposed to
20  stick with the answer that I gave.
21       MS. DEITSCH-PEREZ:  You're on mute,
22  John.  John, you're on mute.  John, you're
23  on mute.  John, we can't hear you.
24       THE WITNESS:  I do like it better

Page 396

DONDERO - 10/29/21

1
2  when he yells at me on mute.
3      MS. DEITSCH-PEREZ:  John, we can't
4  hear you.
5      COURT REPORTER:  We can't hear you,
6  John.
7      MR. MORRIS:  You can't hear me?
8      COURT REPORTER:  Now we can.
9      MS. DEITSCH-PEREZ:  Now we can hear
10  you, but we couldn't hear you.  It looks
11  like you were yelling, but we couldn't hear
12  you.
13      A.   I do like it better when you yell at
14  me on mute.
15      Q.   I try not to yell at you, and I hope
16  that you haven't perceived this -- we do have a
17  videotape this time.  So to the extent that
18  anybody perceives your comment as suggesting
19  that I have yelled at you, I would invite them
20  to look at the video.
21      MS. DEITSCH-PEREZ:  Well, we said we
22  couldn't hear you, but your animation
23  looked like that.
24      Q.   Sir, can you identify any person in
25  the world acting on behalf of NexPoint who

Page 397

DONDERO - 10/29/21

1
2  instructed Highland to make the payment that
3  was due on the NexPoint term note in December
4  of 2020?
5      MS. DEITSCH-PEREZ:  John, that is
6  the fifth or sixth time.
7      MR. MORRIS:  It is a completely
8  different question.  Please.
9      MS. DEITSCH-PEREZ:  Could you read
10  it back, if I was mistaken.  So read it
11  back.
12      (Record read.)
13      A.   NexPoint did not have the accounting
14  staff or the systems or the records or the
15  knowledge to have any person in the world at
16  NexPoint to give that instruction.
17      So the long answer -- the short
18  answer is no, but the long answer is we had
19  been kept away from our books and records.  I
20  think we largely still don't have them, and
21  there would -- I am not aware of anybody who --
22  anybody in the world at NexPoint who made that
23  request.
24      Q.   Frank Waterhouse was the treasurer
25  of NexPoint in December of 2020; is that

Page 398

DONDERO - 10/29/21

1
2  correct?
3      A.   I think he was very much viewing his
4  responsibilities as Highland related and as an
5  employee of Highland.  But yes, based on that
6  incumbency certificate, but that is your --
7  your question to ask Frank if he was taking
8  that seriously, but NexPoint was relying on
9  Highland.
10      Q.   Do you have any other facts that you
11  are aware of that relate to the affirmative
12  defenses set forth in Paragraphs 81 through 82?
13      A.   I think I -- I think I've said them
14  all.
15      MR. MORRIS:  Okay.  It is 2:13
16  Eastern time.  Let's just take a short
17  half-hour lunch break, and let's return at
18  2:45, or 1:45 Central.
19      VIDEOGRAPHER:  Off the record, 1:13.
20  (Recess taken 1:13 p.m. to 1:48 p.m.)
21      VIDEOGRAPHER:  Back on the record,
22  1:48.
23      Mr. Dondero, are you comfortable?
24      A.   Yes.
25      Q.   And are you able to proceed?

Page 399

DONDERO - 10/29/21

1
2      A.   Yes.
3      Q.   Okay.  Did you speak with anybody
4  during the break about the substance of this
5  deposition?
6      A.   No.
7      Q.   You entered into certain oral
8  agreements with your sister concerning some of
9  the notes at issue in these lawsuits.
10      Do I have that right?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13      A.   Can you rephrase or repeat, please?
14      Q.   Sure.
15      You entered into certain oral
16  agreements with your sister concerning certain
17  of the notes at issue in these lawsuits.
18      Do I have that right?
19      MS. DEITSCH-PEREZ:  Object --
20      A.   Yes.
21      MS. DEITSCH-PEREZ:  Object to the
22  form.  And I'm going to object -- object
23  every time because it just -- just so it is
24  on the record because you are saying "your
25  sister" without giving her -- her capacity.

Page 400

DONDERO - 10/29/21

1
2  A.  Okay.
3      MS. DEITSCH-PEREZ:  But I don't want
4  to disrupt the deposition, so I'm just
5  telling you why I'm doing it and he can
6  continue to answer thereafter.  That is why
7  I'm doing it.
8  Q.  Okay.  Can we – can we agree,
9  Mr. Dondero, when I refer to your notes in the
10 context of oral agreements that she was
11 entering into those agreements with you as a
12 representative of Dugaboy – as Dugaboy
13 trustee, as representative for a majority of
14 the class A interest holders of Highland?
15 A.  Yeah.  How about just to make it
16 simple let's just call it the Dugaboy trustee,
17 and everybody will know that it is my sister
18 and everybody will know that it is the majority
19 of the class A unit holders.
20 Q.  Okay.  Okay.  I appreciate that and
21 I will do just that.
22     You entered into certain oral
23 agreements with the Dugaboy trustee concerning
24 certain of the notes at issue in these
25 lawsuits; is that right?

Page 401

DONDERO - 10/29/21

1
2  A.  Yes.
3  Q.  Okay.  Let's discuss the purpose of
4  those oral agreements.
5      MR. MORRIS:  Can we put back up on
6  the screen Mr. Dondero's answer.
7  Q.  And while we're doing that,
8  Mr. Dondero, can you confirm that your sister
9  is the only trustee of the Dugaboy Investment
10 Trust?
11     MS. DEITSCH-PEREZ:  Object to the
12 form.
13 A.  For what period of time are we
14 talking about?
15 Q.  During the period of time at which
16 you entered into the oral agreements with the
17 Dugaboy trustee.
18     MS. DEITSCH-PEREZ:  Object to the
19 form.
20 A.  Yeah, I believe she has been the
21 trustee since 2015 and remains so today.  I
22 don't have an awareness of – I don't have an
23 awareness of another functional trustee.
24     So some of these – sometimes
25 complex trusts have other layers that are

Page 402

DONDERO - 10/29/21

1
2  called trustees but they're not trustees per
3  se.  But I think I'm over thinking it.  But I'm
4  not aware of anybody I've interacted with,
5  other than her, as trustee with regard to the
6  notes.
7  Q.  Okay.  So up on the screen we
8  have – no, that is the wrong document.
9      MR. MORRIS:  We need Exhibit 31,
10 please.
11 Yeah, there you go.  That one.
12 Perfect.  Okay.
13     MS. DEITSCH-PEREZ:  31 is not – oh,
14 is that the '03 answer?
15     MR. MORRIS:  Correct, that is
16 Mr. Dondero's answer.
17 Q.  Do you see that, sir, on the screen?
18     MS. DEITSCH-PEREZ:  Hang on.  I'm
19 going to get it again.
20     Okay.  If you want a hard copy, I
21 have one here but he's got it up.
22 Q.  Do you see on the screen,
23 Mr. Dondero, marked as Exhibit 31 is your
24 answer to Highland's amended complaint?
25 A.  Yes.

Page 403

DONDERO - 10/29/21

1
2  Q.  Okay.
3      MR. MORRIS:  Can we go to
4  Paragraph 82, please.
5  Q.  Is it your understanding that
6  Paragraph 82 describes, among other things, in
7  general terms your oral agreements with –
8  between you and the Dugaboy trustee?
9  A.  Yes.
10 Q.  Is it your position that the oral
11 agreements that you entered into with your
12 sister – withdrawn.
13     Is it your contention that the oral
14 agreements you entered into with the Dugaboy
15 trustee applied to each of the notes that were
16 executed by NexPoint and that are the subject
17 of Highland's lawsuit against NexPoint?
18 A.  Yes.
19 Q.  Is it your contention that the oral
20 agreements that were entered into with the
21 Dugaboy trustee apply to the notes executed by
22 HCMS that are the subject of Highland's lawsuit
23 against HCMS?
24 A.  Yes.
25 Q.  Is it your contention that the oral

Page 404

DONDERO - 10/29/21

1
2  agreements between you and the Dugaboy trustee
3  apply to the notes that were executed by HCRE
4  that are the subject of the lawsuit that
5  Highland has commenced against HCRE?
6      A.   Yes.
7      Q.   Okay.  Do I understand correctly
8  that your oral agreements with your sister do
9  not apply to the notes that were executed on
10  behalf of HCMFA that are the subject of the
11  lawsuit that Highland commenced against HCMFA?
12     A.   Correct.
13     Q.   Okay.  I appreciate that.
14          Do you see in this paragraph towards
15  the middle it says, quote:  The purpose of this
16  agreement was to provide compensation to
17  defendant, James Dondero, who was otherwise
18  underpaid, compared to reasonable compensation
19  levels in the industry through the use of
20  forgivable loans, a practice that was standard
21  at HCMLP in the industry.
22          Have I read that correctly?
23     A.   Yes.
24     Q.   Is that the purpose of the agreement
25  that you entered into with your sister --

Page 405

DONDERO - 10/29/21

1
2  withdrawn.
3          Is that the purpose of the agreement
4  that you entered into with the Dugaboy trustee
5  concerning the notes at issue in the lawsuits
6  that were commenced against you personally?
7          Withdrawn.  That was a bad question.
8          Does that purpose apply only to the
9  notes that you executed or does it apply to the
10  corporate notes as well?
11         MS. DEITSCH-PEREZ:  Object to the
12  form.
13         Other than HCMFA?
14         MR. MORRIS:  Correct.  I think we've
15  established the scope of the agreements.
16     A.   To give a complete answer, from my
17  perspective it is about 50 million of notes
18  between -- current balance between NexPoint,
19  Services, myself, and HCRE.
20     Q.   And HCMS; right?
21     A.   Yes, Services, Highland Capital
22  Management, yes.
23     Q.   Okay.  So I just want to know, that
24  sentence there concerning the purpose was
25  omitted from the answers of NexPoint, HCMS,

Page 406

DONDERO - 10/29/21

1
2  HCRE.
3          And I'm happy to walk you through to
4  show you.  And I just want to know in your
5  capacity as a 30(b)(6) witness for those
6  entities, if you know why that statement of
7  purpose was omitted.
8      A.   Well, we talked about it earlier.  I
9  think there is some cleanup.  There has been
10  multiple lawyers involved.  We didn't know
11  which loans were prepaid, which loans weren't.
12  But, you know, I don't know why it was omitted
13  but it applies to all of them.
14         MS. DEITSCH-PEREZ:  I think that is
15  the first time that I've noticed that.  So,
16  John, I'm going to take a mea culpa.  I
17  think that is a cut-and-paste error.
18         MR. MORRIS:  All right.  Well, I
19  will -- I will just point out that the
20  affirmative defense concerning the oral
21  agreements is the exact same in all four
22  answers, except for the omission of the
23  statement of purpose for the three
24  corporate entities.
25     Q.   And so, Mr. Dondero, is it fair to

Page 407

DONDERO - 10/29/21

1
2  say that you don't know why that statement of
3  purpose was omitted from the corporate
4  entities' answers?
5      A.   Yeah, I don't know why it is omitted
6  or why the complaints aren't consistent with
7  that regard.
8      Q.   Okay.  But it is your -- it is your
9  position as the purpose -- as one of the people
10  who entered into this oral agreement that the
11  purpose for the -- for the condition subsequent
12  agreement is the same as for the corporate
13  entities as it is for you, as stated in this
14  paragraph; is that right?
15     A.   Yes.
16     Q.   Okay.  We talked a little bit about
17  the NexPoint term note.
18         Do you remember that?
19     A.   Yes.
20     Q.   And do you recall that in its
21  original form the NexPoint term note was for a
22  principal amount of approximately $30 million?
23     A.   Yes.
24     Q.   And do you recall that the NexPoint
25  term note was a rollup of the outstanding

Page 408

DONDERO - 10/29/21

1  principal and interest then due on certain
2  promissory notes that had previously been given
3  by NexPoint to Highland?
4  A.  Yes.
5  Q.  Okay.
6  MR. MORRIS:  Can we put up, please,
7  Exhibit Number 2, which I believe is the
8  complaint against NexPoint.
9  (Exhibit 2 marked.)
10  MR. MORRIS:  And if we can go to
11  Exhibit Number 1 of Deposition Exhibit
12  Number 2.
13  Q.  Okay.  And do you see -- I'm sorry,
14  sir, do you see that Exhibit Number 1 to the
15  complaint is a promissory note dated May 31st,
16  2017 in the approximate amount of
17  $30.75 million?
18  A.  Yes.
19  Q.  Okay.  And is that your signature on
20  page 2?
21  A.  Looks like it.
22  Q.  Okay.  And did you sign this note on
23  behalf of NexPoint on or around May 31st, 2017?
24  A.  I assume so.

Page 409

DONDERO - 10/29/21

1  Q.  Do you know if you read the note
2  before you signed it?
3  A.  Not likely.
4  Q.  Do you recall whether there was
5  anything about the note that you didn't
6  understand before you signed it on behalf of
7  NexPoint?
8  MS. DEITSCH-PEREZ:  Object to the
9  form.
10  A.  Yeah, I'm not -- I doubt I read it,
11  so I don't remember objecting to anything.
12  Q.  Okay.  Looking at Paragraph 2.1, am
13  I characterizing that section fairly when I say
14  that the borrower was required to make an
15  annual installment payment at the end of each
16  calendar year?
17  MS. DEITSCH-PEREZ:  Object to the
18  form.
19  A.  I see that paragraph, yes.
20  Q.  Okay.  And did you understand when
21  you signed it that an annual installment
22  payment would be due at the end of each year by
23  NexPoint?
24  MS. DEITSCH-PEREZ:  Object to the

Page 410

DONDERO - 10/29/21

1  form.
2  A.  I never read it that closely.
3  Q.  So as the control person of
4  NexPoint, is it fair to say then that you don't
5  recall having an understanding when you signed
6  this note that NexPoint would be required to
7  make annual payments at the end of each year?
8  MS. DEITSCH-PEREZ:  Object to the
9  form.
10  A.  I didn't have knowledge of the
11  specifics, and again, I would describe those
12  specifics as de minimis.
13  Q.  Okay.  Do you see -- do you have any
14  idea who drafted this note?
15  A.  It would have come from accounting.
16  I think they have boilerplate -- I don't know
17  if they work with legal at all.  I have no
18  idea, but it would have come through
19  accounting.
20  Q.  Do you recall that all three of the
21  term notes at issue were signed on the same
22  day, May 31st, 2017?
23  A.  That doesn't surprise me.  I think
24  there was an accounting reason, if I remember

Page 411

DONDERO - 10/29/21

1  correctly.  I think it had something to do with
2  either the audit or the financials or if we had
3  a credit facility at the time.  I think that is
4  probably why, but I don't remember exactly.
5  Q.  Do you have any other recollection
6  as to why all three notes were executed at the
7  end of May 2017?
8  A.  Again, I believe they're -- the --
9  aggregating or solidifying them into one
10  defined note I think was required by the
11  auditors or the -- the accounting department as
12  best practices.  I don't think -- it wasn't a
13  regulatory reason and it wasn't a compliance
14  reason.  I believe it was just an accounting or
15  an audit reason.
16  Q.  Did you ever make sure on behalf of
17  NexPoint that the terms of the promissory note
18  were fair and reasonable?
19  MS. DEITSCH-PEREZ:  Object to the
20  form.
21  A.  Yeah, I don't remember ever
22  negotiating or reading it that closely.  And
23  again, I think the view from all concerned is
24  that it was relatively de minimis from the

Case 3:21-cv-00881-X Document 179-19 Filed 12/01/23 Page 30 of 71 PageID 44574
Case 3:21-cv-00881-X Document 179-19 Filed 12/01/23 Page 30 of 190 PageID 44574
Appendix

Page 412

DONDERO - 10/29/21

1
2  balance sheet at Highland then or now and/or de
3  minimis relevant to NexPoint's value.
4      Q.   It is a $30 million note.  Do I have
5  that right?
6      A.   Yes.
7      Q.   Okay.  And it was material enough to
8  be included in Highland's financial statements;
9  is that correct?
10     A.   Anything material or not as part of
11 doing proper audited financials needs to be
12 properly included.
13     Q.   Okay.  And you know, because you
14 signed the management representation letter,
15 that this note was specifically disclosed to
16 PwC and included in both Highland's and
17 NexPoint's audited financial statements;
18 correct?
19     A.   I would -- I would have been shocked
20 if it wasn't, if it is an asset and a liability
21 respectively of the companies.
22     Q.   Okay.  Do you see the section on
23 acceleration upon default, Paragraph 4?
24     A.   Yes.
25     Q.   Have you ever seen that section

Page 413

DONDERO - 10/29/21

1
2  before?
3      A.   No.
4      Q.   Do you think a prudent executive
5  signing a $30 million note should take the time
6  to read the terms and conditions of the note?
7      A.   Not necessarily.
8      Q.   Under what circumstances do you
9  think that an executive shouldn't take the time
10 to read the terms and conditions of a
11 $30 million promissory note?
12     A.   When it is between affiliates,
13 between friendly affiliates with no even
14 inkling that bankruptcy or the parties could be
15 at odds create a note, when it is a soft note
16 with limited collateral and limited other
17 protections.  And then the servicing or value
18 of the note is de minimis relative to the
19 balance sheets of each entity I think is a good
20 reason or logical reason for the executives on
21 both sides not to spend much time focusing on
22 it.
23     Q.   All right.  So you thought it was
24 reasonable not to read this particular note for
25 the reasons you just gave.

Page 414

DONDERO - 10/29/21

1
2      Do I have that right?
3      A.   Right.
4      MR. MORRIS:  Okay.  Can we go to the
5  next page, please.
6      Q.   Do you see Paragraph 5?  There is a
7  paragraph entitled Waiver.
8      A.   Yes.
9      Q.   And I will read it out loud:  Maker
10 hereby waives grace, demand, presentment for
11 payment, notice of non-payment, protest, notice
12 of protest, notice of intent to accelerate,
13 notice of acceleration, and all other notices
14 of any kind hereunder.
15     Have I read that correctly?
16     A.   Yes.
17     Q.   Do you know that that paragraph is
18 included in every single note that you signed
19 that is part of the litigation that we're here
20 to talk about today?
21     A.   You have to -- you have to define
22 when.  You know, like today I know that it
23 is -- it is in those notes.
24     At the end of '20, Seery and DSI
25 were withholding all notes, all information,

Page 415

DONDERO - 10/29/21

1
2  anything regarding the company from any of the
3  other subsidiaries, and Frank was administering
4  the notes on behalf of both the related parties
5  and Highland.
6      So at the time -- at the time I
7  would have -- I would have never known that at
8  the end of 2020.  And it is crazy to think I
9  would have remembered a clause in a soft note
10 from three years earlier.
11     Q.   Okay.  Is it fair to say that -- do
12 you understand today that that provision is
13 included in every note that you signed?
14     MS. DEITSCH-PEREZ:  Object to the
15 form.
16     A.   You're saying it, so I believe you.
17 I'm not asking you to go show me all the other
18 notes, but --
19     Q.   Thank you.
20     A.   -- I'm assuming it is in all the
21 other notes.  I will take your word for it.
22     Q.   And is it fair to say that at the
23 time you signed these notes you didn't take the
24 time to read that particular provision?
25     MS. DEITSCH-PEREZ:  Object to the

Page 416

1    DONDERO - 10/29/21
2    form.
3        A.   That is correct.  A lot of it is
4    boilerplate.  And, again, treasury or
5    accounting would have put in what was necessary
6    for regulatory, tax, audit purposes.  Maybe the
7    auditors put that in.  I have no idea.
8        But the content and the bullet
9    points here, the nine paragraphs on a soft note
10   would have been put in by other people and
11   administered by other people other than me.
12       Q.   What is a soft note?
13       A.   You know, like a secured -- I mean,
14   a note that isn't a hard note, like a note that
15   isn't secured, deed in lieu, UCC filed,
16   guaranteed, you know, performance and bad boy
17   clauses and all of that other stuff.
18       A soft note is an unsecured loan
19   that has basic terms to it, but it is likely
20   subject to renegotiation over time.
21       Q.   Were any of the notes that you
22   signed subject to negotiation?
23       A.   Well, I'm saying by definition that
24   is what a soft note is.
25       Q.   One that -- that is not subject to

Page 417

1    the negotiation -- to negotiations?
2        A.   No, one that is over time subject to
3    negotiation or modification.
4        Q.   Okay.
5        A.   Because there is -- there is
6    limited -- there is limited, team collateral,
7    guarantee, bad boy features in -- in a soft
8    note.
9        Q.   Okay.  Perhaps my question wasn't
10   clear.
11       Did the notes that you signed -- did
12   you negotiate them with anybody, the terms of
13   each note?
14       A.   No.
15       Q.   Okay.  Did you personally decide on
16   the terms of each note?
17       A.   No.  Again, they were two highly
18   solvent, highly well-capitalized subsidiaries,
19   and the amount of the notes was de minimis and
20   friendly, and they were soft notes administered
21   by a centralized treasury shared services
22   department.
23
24       They were the ones deciding what it

Page 418

1    DONDERO - 10/29/21
2    took to be compliant from an accounting
3    regulatory-wise standpoint, but wasn't -- they
4    were trying to come up with a balance note,
5    which I think this is, such that it wouldn't
6    have to be negotiated or haggled by any of the
7    parties.
8        And there is no evidence of any of
9    the notes ever being haggled or ever being
10   negotiated.
11       Q.   Okay.  I appreciate that.
12       At the time you signed each of the
13   notes on behalf of the obligors, did the
14   obligors have an intention at the time you put
15   your signature on the page of repaying the
16   notes in accordance with their terms?
17       A.   Yes.  They're all -- soft note
18   doesn't mean it's not a bona fide note.  They
19   were all intended to be bona fide notes, and
20   they all are bona fide notes that were intended
21   to be paid and for the -- virtually most part,
22   were always paid or prepaid and, you know, paid
23   in accordance.
24       Q.   Do you see to the right there is a
25   list of prior notes?

Page 419

1    DONDERO - 10/29/21
2        A.   Yes.
3        Q.   And is it your understanding that
4    this note substituted and superseded the
5    promissory notes that are listed on Exhibit A
6    on the page there?
7        A.   Yeah.  I mean, effectively pay those
8    off and reestablish an aggregate note.
9        Q.   Right.  And Exhibit A actually set
10   forth the outstanding principal and interest
11   that NexPoint owed Highland under the prior
12   notes as defined there as of May 31st, 2017;
13   right?
14       A.   Yeah, that is what it looks like.
15       Q.   Okay.  And -- and so the initial
16   principal amount of the prior notes was what is
17   stated there, approximately $27.675 million?
18       A.   Right.
19       Q.   Okay.  You wouldn't have signed this
20   note on behalf of NexPoint if you didn't
21   believe at the time you signed it that NexPoint
22   owed Highland that amount of money; correct?
23       A.   Yeah, it is a bona fide note,
24   consistent with my testimony.
25       Q.   Okay.  Do you know why NexPoint

Page 420

DONDERO - 10/29/21

1        DONDERO - 10/29/21
2  borrowed the money from Highland at the times
3  and in the amounts listed on Exhibit A?
4        A.   No.
5        Q.   Did you authorize NexPoint to borrow
6  the money that is reflected in the prior note
7  set forth on Exhibit A?
8        A.   I don't know.  Probably some of
9  them, yes.
10       Q.   Okay.  And you have no recollection
11  at all as to why NexPoint borrowed over
12  $27 million from Highland in the 12-month
13  period from August 2014 to July 2015?
14       A.   Not without being refreshed.
15       Q.   Okay.  Do you have any knowledge as
16  to what NexPoint did with the proceeds from
17  these loans?
18       A.   Not without being refreshed.
19       Q.   Okay.  And you contend that this
20  note is subject to -- subject to one of your
21  oral agreements with the Dugaboy trustee;
22  correct?
23       A.   Yes.
24       Q.   Who decided to include this
25  particular note in your agreement with the

Page 421

1        DONDERO - 10/29/21
2  Dugaboy trustee?
3        A.   Me, myself.
4        Q.   Okay.  What was the purpose of
5  including this note in your agreement with the
6  Dugaboy trustee?
7             Was it to provide you with a
8  compensation?
9        A.   Yeah.  I mean, in fact, I think it
10  was articulated in that big paragraph
11  reasonably well that my cash compensation, I
12  believe through any lens, people would look at
13  it as de minimis from the standpoint of
14  Highland as asset manager.
15             I don't think it was more than a
16  couple million bucks in a year and it went
17  down, I think, in the '15 through '20 period.
18             So I think it is common in private
19  companies to loan money that is bona fide debt
20  and then forgive it at different times to
21  manage compensation and incentives to managers
22  of private companies.
23             This is a -- we're in -- we each
24  have experts talking about it, but I think this
25  is, you know, typical.

Page 422

1        DONDERO - 10/29/21
2        Q.   Can you identify any moment in the
3  25 or 26 year history that you were president
4  of Highland where Highland forgave an
5  intercompany loan for the purpose of providing
6  compensation to you or any other employee
7  except for the agreements that are described in
8  Paragraph 82 of your answer?
9        A.   Boy, I know we have masked it.  I
10  don't know if we -- it sounds like we may not
11  have sent it to you, but we have done it for a
12  dozen employees over the years in -- in fairly
13  significant amount --
14       Q.   I'm going to interrupt you, sir,
15  because it's not responsive to my question.  I
16  apologize for that.  I'm just focusing on
17  intercompany loans.
18             Can you identify any loan in the 25
19  or 26 years that you were president, an
20  intercompany loan where -- where Highland was
21  the payee that was forgiven for purposes of
22  giving you or any employee compensation, other
23  than -- other than the agreements that you
24  struck with the Dugaboy trustee?
25       A.   It is an odd question because I'm

Page 423

1        DONDERO - 10/29/21
2  the only one at the compensation level with the
3  interrelated entities who could possibly get
4  intercompany loans forgiven as part of the
5  comp, but it --
6        Q.   Okay.  So let me ask a cleaner --
7  let me ask a cleaner question.  I appreciate
8  that clarification.
9             Other than the agreements described
10  in Paragraph 82, can you think of any other
11  intercompany loan that was ever forgiven while
12  you were president of Highland for the purpose
13  of giving you compensation?
14       A.   I don't -- I don't know.
15       Q.   This is an important issue; right?
16  The notion of a prior practice.  It is your
17  contention that there was a prior practice at
18  Highland -- hold on one second.  I apologize.
19             Sorry about that.  Somebody almost
20  dropped an air conditioner out the window.
21             MS. DEITSCH-PEREZ:  That would not
22  be good.
23             MR. MORRIS:  No.
24             All right.  Apologies.
25             MR. MORRIS:  May I have the last

Page 424

DONDERO - 10/29/21

1
2    question read back?
3       (Record read.)
4    Q.  I'm going to start all over here.
5       Mr. Dondero, do you contend that
6  there was a practice at Highland of forgiving
7  loans; is that correct?
8    A.  Yes.
9    Q.  And do you recall that we talked
10  about that issue back in May?
11    A.  Yes.
12    Q.  Okay.  And since -- since that time
13  have you made any effort to gather any
14  information that would demonstrate that there
15  was a prior practice at Highland of forgiving
16  loans?
17    A.  Yes.
18    Q.  And what efforts have you made?
19    A.  Like I said, we amassed a list, and
20  not insignificant list and not insignificant
21  amounts, proportionate to the people's
22  compensation where it was a practice.
23       You know, for some people for
24  relocation, for some people for bonuses, for
25  house purposes, for senior executives, senior

Page 425

DONDERO - 10/29/21

1
2  executives at the bank and board members at the
3  bank in the seven-figure kind of numbers that
4  were then subsequently forgiven.
5       It is -- I know we amassed more than
6  a dozen examples that were significant and
7  material.
8      MR. MORRIS:  Deborah, I apologize.
9  It is certainly possible I missed it, but I
10  don't recall seeing any list or any
11  documents of any kind that Mr. Dondero has
12  described.
13      Have they been produced?
14      MS. DEITSCH-PEREZ:  I think so.  I
15  will double-check, but I believe that
16  they're listed --
17      MR. MORRIS:  I know there is a list
18  of -- I apologize.  I know there is a list
19  of names in one of the discovery responses.
20  But other than the list of names in the
21  discovery response, I don't recall
22  receiving any documents at all.
23      MS. DEITSCH-PEREZ:  No.  And I think
24  we asked you for the documents because we
25  don't have access to the documents on

Page 426

DONDERO - 10/29/21

1
2  Highland's server.  The only thing I can
3  think of that we might owe you is there
4  might be a few additional names to list in
5  the interrogatory, and I will check whether
6  that has been done.
7      MR. MORRIS:  Okay.
8    Q.  Mr. Dondero, you sign management
9  representation letters in connection with
10  Highland's audit each year; is that right?
11    A.  Yes.
12    Q.  Do you understand that you have an
13  obligation when you sign the management
14  representation to disclose to the auditor all
15  agreements with affiliated entities and people
16  that are deemed to be material?
17      MS. DEITSCH-PEREZ:  Object to the
18  form.
19    A.  Generally, yes.
20    Q.  Okay.  And is it your understanding
21  that at least since 2008 Highland has disclosed
22  to its auditors all agreements with affiliates
23  that are material, as defined in the management
24  representation letter?
25    A.  Yes.

Page 427

DONDERO - 10/29/21

1
2    Q.  And would that include any
3  agreements to forgive loans that were deemed to
4  be material amounts?
5    A.  No, because it is contingent in long
6  term and speculative.
7    Q.  But at some point if it is forgiven
8  would that be -- would that be an event that
9  would be disclosed to the auditor?
10    A.  Sure.
11    Q.  Okay.  So is it fair to say that all
12  loans that were deemed to be material to the
13  extent they were forgiven were disclosed to the
14  auditors?
15    A.  Yes.
16    Q.  Okay.
17    A.  But, yeah, the only caveat I would
18  put on it is we have such limited information
19  regarding Cornerstone and Trust Life, which is
20  part of my agreement with the Dugaboy trustee
21  or with the majority of class A holders.
22       They could have been sold in
23  secrecy, without disclosure to us, such that
24  the notes are all forgiven at this point, but
25  we -- we -- we may never know.

Page 428

DONDERO - 10/29/21

1
2    Q.    So you can't rely on anything that
3    you don't know; is that fair?
4    A.    Yeah.
5    MS. DEITSCH-PEREZ:  Objection to
6    form.
7    A.    Yeah, we can't rely on things we
8    don't know and we can't rely on the debtor to
9    be honorable.
10    Q.    Well, the debtor has produced to
11    you, sir, every single audited financial
12    statement without redaction since 2008.  Are
13    you aware of that?
14    A.    That is actually news to me because
15    we were asking for them a couple of months ago.
16    That must be -- that must be a new production.
17    Q.    No.  Actually, it was produced to
18    you way back in July.  You are not aware of
19    that?
20    A.    No, I'm looking --
21    MS. DEITSCH-PEREZ:  Hang on.
22    A.    I'm looking at Deborah.  She'll --
23    MS. DEITSCH-PEREZ:  I will get the
24    date.
25    A.    Yeah.  I would love to see them.

Page 429

DONDERO - 10/29/21

1
2    Q.    So then -- so then it -- so is it
3    fair to say, sir, that when you are describing
4    this practice of forgiveness of loans, you are
5    doing so without having reviewed any of the
6    audited financial statements that Highland
7    provided to your attorneys going back to 2008?
8    MS. DEITSCH-PEREZ:  Object to the
9    form.
10    A.    What I'm saying, I guess, is that we
11    haven't treated the loans as forgiven yet
12    because if the condition precedent has been
13    satisfied, we're not aware of it yet.
14    Now, if there is something in those
15    financial statements that will show that the
16    condition precedent is satisfied, then we have
17    a decision to make about the -- or figure out
18    what the mechanism is for forgiving the loans.
19    Q.    Are you saying that there are loans
20    out there subject to forgiveness where the
21    maker is somebody other than you or an entity
22    that you control?
23    A.    No, I'm just -- I'm talking about
24    the 50 million of loans that we've been talking
25    about.

Page 430

DONDERO - 10/29/21

1
2    Q.    Okay.  So -- so I just want to go
3    back and focus on your assertion that there was
4    this practice of loan forgiveness.  I think you
5    have agreed with me that any loan that was
6    forgiven in a material amount would be
7    contained within the Highland audited financial
8    statements; right?
9    A.    I believe they -- material or not,
10    they were all included in the Highland
11    financials.  Now, they might not have been
12    specifically footnoted, you know.
13    Like in other words, if we gave
14    somebody half a million bucks to relocate and
15    then forgave the loan, it might just be mixed
16    with all other compensation in the line item.
17    It might not have been listed separately
18    because it would have been small relative to
19    the overall financial statement.
20    Q.    But you're just speculating right
21    now because, in fact, you haven't read the
22    audited financial statements for the purpose of
23    seeing whether or not there were loan -- loans
24    that were forgiven and disclosed; right?
25    MS. DEITSCH-PEREZ:  Object to the

Page 431

DONDERO - 10/29/21

1
2    form.
3    A.    Well, what I'm saying, just to be
4    clear, is I haven't looked at the presentation
5    of forgiven loans in the historic financials
6    because I was unaware that we had gotten
7    historic financials, but I am testifying that
8    we had amassed at least a dozen, 15 material
9    examples of material loan forgiveness amounts
10    to different executives.
11    Q.    All right.  Do you have any
12    documentation to support your assertion of the
13    practice of forgiving loans at Highland?
14    A.    Again, we have very, very little
15    access to anything, and we didn't take anything
16    with us that we weren't supposed to take, so we
17    don't have any of that documentation.
18    At NexBank, one of the sister
19    companies that we still have full control over
20    our records, we could show seven-figure-plus
21    loans to senior management and the entire board
22    of directors and forgiveness thereof as an
23    example, but that -- that is the only
24    documentation that we would be able to present
25    without having access to the records that you

Page 432

DONDERO - 10/29/21

1    guys are keeping from us.
2        MR. MORRIS: I move to strike the
3    last comment, and I take offense to it,
4    sir. We're not withholding anything, okay.
5        Q.    Would the NexBank audited financial
6    statements include a disclosure of the loans
7    that you are describing?
8        A.    Yes.
9        Q.    Okay. So is it fair to say that if
10   Highland forgave loans, it would be disclosed
11   in its audited financial statements?
12       MS. DEITSCH-PEREZ: Object, asked
13   and answered.
14       A.    Well, just to be clear, these loans
15   like the one up on the sheet, those were
16   included in Highland's financials, those loans,
17   just like the NexBank loans, when they were
18   made to senior executives were included. But
19   there wasn't a - at NexBank there wasn't any
20   kind of disclosure that said, these might be
21   forgiven, or these are the terms that they
22   would be forgiven under, just like there was no
23   disclosure in the Highland financials that
24   these are the terms that it might be forgiven

Page 433

DONDERO - 10/29/21

1    under, et cetera, et cetera.
2        Q.    It's certainly disclosed in the
3    financials when it was forgiven. Will you --
4    will you concede that point?
5        A.    Yes, sure.
6        Q.    Okay. Let's move on.
7            Let's go to HCMS. Are you familiar
8    with the notes at issue in the lawsuit that was
9    commenced by Highland against HCMS?
10       MS. DEITSCH-PEREZ: S or --
11       A.    S as in Services. Yes.
12       MR. MORRIS: Okay. Can we please
13   put up Exhibit 3.
14       (Exhibit 3 marked.)
15       MS. DEITSCH-PEREZ: Is that in the
16   binder that you sent?
17       MR. MORRIS: Yes, as Exhibit 3.
18       MS. DEITSCH-PEREZ: Okay.
19       MR. MORRIS: And if we could go to
20   the Exhibits 1 through 4, okay.
21       Q.    Sir, we've put up on the screen
22   Exhibit 1 to Exhibit 3, which is the complaint
23   against HCMS. Do you see Exhibit 1 up on your
24   screen?

Page 434

DONDERO - 10/29/21

1        A.    Yeah. This is the $150,000
2    promissory note; is that what that is?
3        Q.    Yes, sir.
4        A.    Okay. As long as I can see it on
5    the screen, I don't need to find it in hard
6    copy, do I?
7        MS. DEITSCH-PEREZ: Yeah.
8        MR. MORRIS: Can you scroll to the
9    second page, PJ.
10       Q.    Is that your signature, sir?
11       A.    Close.
12       Q.    Are you aware that your signature is
13   affixed to a $150,000 promissory note that was
14   made by HCMS to Highland Capital Management?
15       A.    Like I said --
16       MS. DEITSCH-PEREZ: Objection, form.
17       A.    Like I said, it's close. I don't
18   know if that is mine, but it's close.
19       Q.    Do you have any reason to believe
20   that either you or somebody you authorized
21   didn't sign this particular promissory note?
22       A.    Not specifically.
23       MR. MORRIS: Okay. Can we go to the
24   first page, please.

Page 435

DONDERO - 10/29/21

1        Q.    Did HCMS receive a loan from
2    Highland in the amount of $150,000 on March
3    28th, 2018?
4        A.    I assume so.
5        Q.    Okay. You wouldn't have either
6    signed or allowed your signature to be affixed
7    to this document if you didn't understand that
8    HCMS had received from Highland $150,000;
9    correct?
10       A.    This is one of the many things I
11   would have signed on a given day.
12       Q.    Okay. And -- and are you aware that
13   this note was given to Highland's auditors?
14       A.    It could. I'm not aware
15   specifically, but it should be.
16       Q.    Okay. Do you have any recollection
17   as to why HCMS obtained this loan from
18   Highland?
19       A.    Unless it says it on these two
20   pages, I have no idea.
21       Q.    Okay. Do you have any recollection
22   as to what HCMS did with the proceeds of this
23   loan?
24       A.    No.

Page 436

DONDERO - 10/29/21

1
2    Q.   Okay.  Let's just flip through the
3    Exhibits 2, 3, and 4, if we could.
4         Looking at Exhibit 2, is that your
5    signature on Exhibit 2, sir?
6    A.   Again, it is close.
7    Q.   Okay.  And do you have any reason to
8    believe that that is either not your signature
9    or that you did not authorize somebody to sign
10   this on behalf of HCMS in June of 2018?
11   A.   No.
12   Q.   Okay.
13       MR. MORRIS:  Can we go to Exhibit 3,
14   please, and if we can go to the signature
15   line.
16   Q.   Do you see that that is Frank
17   Waterhouse?
18   A.   Yes.
19       MR. MORRIS:  Okay.  And can we go to
20   the page before that, the first page.
21   Q.   Frank Waterhouse was the treasurer
22   of HCMS in May 2019; correct?
23   A.   That is what it said right on that
24   thing we saw earlier; right?
25   Q.   Incumbency certificate.

Page 437

DONDERO - 10/29/21

1
2    A.   Yes.
3    Q.   Do you recall that HCMS borrowed
4    $400,000 from Highland in or around May 2019?
5    A.   Not specifically.
6    Q.   Do you have any reason to believe
7    that it didn't?
8    A.   I have no knowledge -- I have no
9    knowledge of what it was used for and whether
10   it did or didn't.
11       MR. MORRIS:  Okay.  Let's go to the
12   next exhibit, please.
13   Q.   Do you see Frank Waterhouse signed
14   here on behalf of the maker, HCMS Services?
15   A.   Yes.
16   Q.   Okay.  Are you aware that HCMS
17   borrowed $150,000 from Highland in June 2019?
18   A.   No.
19   Q.   Okay.  Do you have --
20   A.   I'm not aware and --
21   Q.   Do you have --
22   A.   I didn't -- I'm sorry, go ahead.  I
23   was just saying, looking at Frank's signature,
24   you know, we're switching from me signing to
25   Frank signing.  And I guess we're saying Frank

Page 438

DONDERO - 10/29/21

1
2    is an authorized signatory, although if you
3    look at Frank's, it looks like an automated
4    signature versus, you know, an actual
5    signature, but I assume you went over this with
6    him, but I don't have specific knowledge of
7    these at all.
8    Q.   And do you know that Mr. Waterhouse
9    from time to time used an electronic signature?
10       MS. DEITSCH-PEREZ:  Object to the
11   form.
12   A.   I believe he did.
13   Q.   And you saw -- you have seen his
14   electronic signature on other documents; is
15   that right?
16   A.   Yes.
17   Q.   So it doesn't surprise you to see
18   his electronic signature on a note; correct?
19   A.   Yeah.  Yeah, okay, I don't
20   know.  But whether or not he did it or somebody
21   else did it or -- we're just getting a little
22   far afoot from me signing it; right?  That is
23   all.
24   Q.   Right.
25   A.   To -- Frank -- Frank may have signed

Page 439

DONDERO - 10/29/21

1
2    it.  He may have done it electronically or
3    somebody may have done it electronically for
4    him.  Those are just different answers than me
5    signing it; right?
6    Q.   Okay.  And -- and that is fair.
7         Are you aware that on December 3rd,
8    2020, Highland made a demand upon HCMS for
9    payment under these four notes that we have
10   just looked at?
11   A.   I knew there was a demand on the
12   NexPoint one.  Can you refresh me on this one?
13   Q.   Sure.
14       MR. MORRIS:  Can we go to the next
15   exhibit in Exhibit 3.  Exhibit 5.
16   Q.   You will see that there is a letter
17   dated December 3rd, 2020, from Mr. Seery to
18   HCMS?
19   A.   Yep.
20   Q.   And do you see that it was sent to
21   the attention of Mr. Waterhouse?
22       Do you see that, sir?
23   A.   Yes, yep.
24   Q.   And, again, Mr. Waterhouse at that
25   time was the treasurer of HCMS to the best of

Page 440

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  your recollection; correct?
3     A.   He primarily was the CFO of
4  Highland. But, yes, I mean, I do see that.
5     Q.   Okay. And did you learn on or
6  around December 3rd that Highland had made
7  demand upon HCMS for payment of all outstanding
8  principal and interest due under the four
9  demand notes that are listed on the page there?
10    A.   Yes, yep.
11    Q.   So you knew that at the time; right?
12    A.   Well, more importantly I knew they
13  were all subject to the same forgiveness
14  provisions as the other note.
15    Q.   Okay. So I move to strike.
16        You knew in December 3rd, 2020, that
17  Highland made demand; correct?
18    A.   Yes.
19    Q.   Okay. And do you see that Highland
20  gave HCMS an eight-day grace period or until
21  December 11th, 2020, to make payment?
22    A.   Yes.
23    Q.   Under the demand note do you have
24  any understanding that Highland was required to
25  give any grace period at all?

Page 441

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2     A.   I don't know.
3        MS. DEITSCH-PEREZ: Object to the
4  form.
5     Q.   Do you know whether HCMS ever
6  responded to this demand letter prior to the
7  commencement of litigation?
8     A.   I don't know.
9     Q.   Prior to the commencement of
10  litigation, did you discuss with anyone whether
11  HCMS should respond to Highland's demand
12  letter?
13    A.   Did I discuss with anyone? No, I
14  don't remember -- I don't remember talking
15  about this with Frank at all where --
16        MS. DEITSCH-PEREZ: And I'm just
17  going to stop you to make sure you don't
18  blurt out any privileged communications, if
19  there are any.
20        We object to the disclosure. But
21  with that caveat, go ahead.
22    A.   I'm sorry, repeat the question
23  again. Let me try and keep it simple here.
24    Q.   Sure. It may be my fault.
25        Mr. Dondero, you testified that you

Page 442

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  were aware that Highland made a demand for
3  payment on these four notes; correct?
4     A.   Yes.
5     Q.   Okay. Did you have any
6  non-privileged communications at any time after
7  Highland sent this letter about whether and how
8  HCMS should respond?
9     A.   You know, let me just -- let me
10  adjust the prior answer for a second.
11        I'm aware that this letter was sent.
12  I'm not sure I knew contemporaneously or when I
13  knew the letter was sent. I can't -- I have no
14  recollection of receiving it at the time.
15        And to answer your question, I can't
16  recollect talking to Frank or anybody else
17  about it at the time. I'm not sure I knew
18  about it at the time. But I have -- I don't
19  have any recollection of discussing it with
20  anybody at or around the time.
21    Q.   Did you ever instruct anybody at any
22  time to respond to this letter, whenever it is
23  you learned about it?
24    A.   No.
25    Q.   Do you know if anyone acting on

Page 443

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  behalf of HCMS ever informed Highland of HCMS'
3  defenses to the -- the demand letter prior
4  to the commencement of litigation?
5     A.   Yeah, Frank would be the person to
6  ask there. I don't know.
7     Q.   I'm just asking you. Prior to the
8  commencement of litigation, did you ever
9  instruct anyone to inform Highland that the
10  HCMS notes were subject to oral agreements with
11  the Dugaboy trustee?
12    A.   I believe former Judge Lynn sent a
13  letter in that regard. But other than that, I
14  don't remember talking to anybody -- I don't
15  remember talking to the debtor about it per se.
16    Q.   It is your recollection that
17  Judge Lynn sent a letter to Highland before the
18  commencement of litigation, putting Highland on
19  notice that the HCMS notes were the subject of
20  oral agreements between you and the Dugaboy
21  trust.
22        Do I have that right?
23    A.   Yeah, that they were part of
24  forgiveness or compensation or something. He
25  sent a letter in that regard.

Page 444

DONDERO - 10/29/21

1           DONDERO - 10/29/21
2    Q.   And was this part of a settlement
3  discussion or was this in response to this
4  demand letter?
5    A.   I don't know.
6    Q.   Have you produced that letter in
7  discovery?
8      MS. DEITSCH-PEREZ:  I'm aware that
9  you have the letter.  I don't know if it
10  was attached to something, but I know you
11  have it.
12      MR. MORRIS:  Because you produced it
13  in discovery or because Mr. Dondero is
14  testifying that his recollection was that
15  Mr. Dondero sent this letter to the debtor?
16      MS. DEITSCH-PEREZ:  The -- the
17  letter has either been produced or was
18  attached to something or was used in a
19  deposition, but I am aware that you have
20  it.  If you need it to be Bates stamped, we
21  could do that.
22      MR. MORRIS:  I definitely need it to
23  be Bates stamped, I do, because I'm not
24  aware of this particular letter.  But I
25  appreciate that.

Page 445

1      MR. RUKAVINA:  This is Davor.
2  Couple things, John -- and I apologize for
3  interjecting.  I have not made an
4  appearance yet today.  Deborah has been
5  objecting for everyone.
6      Thomas Berghman will take over
7  around 3:00 o'clock.  Is that okay with
8  you, John?
9      He is probably just going to sit
10  here and not object.
11      MR. MORRIS:  I will miss you and I
12  hope you have safe travels.
13      MR. RUKAVINA:  Okay.  Thank you very
14  much.
15      And, second, I think the letter
16  that is being referred to is the email
17  letter, so I have produced it to you.
18      With that, thank you everyone.
19      MR. MORRIS:  Okay.  Take care.
20    Q.   Did anyone -- did you ever instruct
21  anyone in December 2020 to make the payments
22  that Highland demanded under the HCMS notes?
23      MS. DEITSCH-PEREZ:  The demand notes
24  that are listed here on the Exhibit 5?


Page 446

1           DONDERO - 10/29/21
2      MR. MORRIS:  Yes.
3    A.   Yes, not that I recall.
4    Q.   Did you ever instruct anyone in
5  December 2020 not to make the payments that
6  Highland demanded that are listed in this
7  exhibit?
8    A.   No.
9    Q.   Do you know why HCMS did not make
10  the payments that Highland demanded under the
11  notes?
12    A.   Again, beyond compensation
13  forgiveness argument, no.
14      MR. MORRIS:  Okay.  Let's go to the
15  next exhibit, 6.
16      (Exhibit 6 marked.)
17    Q.   And this is another one of the term
18  notes; right?
19    A.   Yes.
20      MR. MORRIS:  And can we just go to
21  the signature line, please.
22    Q.   Is that your signature, sir?
23    A.   That looks more like it.
24    Q.   And do you -- are you willing to
25  agree that you signed this promissory note in

Page 447

1           DONDERO - 10/29/21
2  favor of Highland on May 31st, 2017?
3    A.   Yes.
4    Q.   And is it fair to say you didn't
5  read this note before you signed it?
6    A.   Correct.  No reason to, really.
7    Q.   Okay.  So it is fair to say that
8  there is not a provision of this note that you
9  didn't understand before you signed it;
10  correct?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13    A.   That I didn't review it, so
14  therefore I didn't have an opinion one way or
15  the other.
16    Q.   Okay.  This note substituted and
17  superseded for the promissory notes that are
18  set forth on Exhibit A to this document;
19  correct?
20    A.   Yes.
21    Q.   So just like NexPoint and HCMS, HCRE
22  also consolidated their outstanding demand
23  notes into one term notes at the end of
24  May 2017; right?
25    A.   Yep.

Page 448

DONDERO - 10/29/21

1        Q.   Okay.  Let's go to HCRE, if we can

2   take this down and put up Exhibit 4.

3        Actually, before we go to that, do

4   you have any recollection as to why HCRE

5   borrowed money from Highland in the amounts

6   equal to the prior notes as set forth to the

7   exhibit to the term note?

8        A.   Nope.

9        Q.   Do you have any recollection at all

10  as to what HCRE did with the proceeds of the

11  loans that it obtained from Highland?

12       A.   No.

13       Q.   This is Exhibit 4, so this is the

14  complaint -- this is actually the complaint

15  against HCRE.

16       MR. MORRIS:  Can we go to Exhibit 6,

17  please.

18       MS. DEITSCH-PEREZ:  Exhibit 6 of

19  Exhibit 4?

20       MR. MORRIS:  No, I apologize.  That

21  was my mistake.  Yes, Exhibit 6 to Exhibit

22  4.

23       MS. DEITSCH-PEREZ:  Okay.  If you

24  want the hard copy, it is in a booklet.

Page 449

DONDERO - 10/29/21

1        Otherwise, she is pulling it up.

2        Q.   So this is the last of the three

3   term notes.  Do you see that?

4        A.   Yes.

5        Q.   Also signed on May 31st, 2017;

6   correct?

7        A.   Yes.

8        Q.   And if we could look at the

9   signature line, is that your signature, sir?

10       A.   Yes.

11       Q.   And did you sign this note on behalf

12  of HCRE on or about May 31st, 2017?

13       A.   Yes.

14       Q.   Did you read this note before you

15  signed it?

16       A.   No.

17       Q.   And since you didn't read it, is it

18  fair to say that there wasn't a provision of

19  this agreement that you didn't understand at

20  the time that you signed it?

21       MS. DEITSCH-PEREZ:  Object to the

22  form.

23       A.   There is -- there wasn't a

24  provisions I did or didn't understand because I

Page 450

DONDERO - 10/29/21

1   didn't review it.

2        Q.   Okay.  This note substituted and

3   superseded for the promissory notes that are

4   listed on Exhibit A on the right side of the

5   page; correct?

6        A.   Yes.

7        Q.   And Exhibit A set forth the

8   outstanding principal and interest that HCRE

9   owed to Highland under the prior notes as of

10  May 31st, 2017; correct?

11       A.   Uh-huh.

12       Q.   That is a yes, sir; correct?

13       A.   Yes.

14       Q.   Okay.  Do you know why HCRE borrowed

15  the money from Highland at the times and -- and

16  in the amounts set forth on Exhibit A to the

17  promissory note?

18       A.   No.

19       Q.   Do you have any recollection as to

20  what HCRE did with the proceeds of the loans

21  that they had obtained from Highland between

22  January 2014 and April 2015?

23       A.   No.

24       Q.   Can we call the three term notes

Page 451

DONDERO - 10/29/21

1   that were signed by NexPoint, HCRE, and HCMS on

2   May 31st, 2017 collectively as the term notes?

3        A.   Yes.

4        Q.   Okay.  You had the authority to sign

5   each of the term notes on behalf of each of the

6   respective makers; correct?

7        A.   Yes.

8        Q.   Each of the term notes was for a

9   30-year term; correct?

10       A.   I believe so.

11       Q.   Okay.  Who decided to give each note

12  a 30-year term, if you know?

13       A.   The auditors, the accountants, not

14  me.

15       Q.   But you knew that each of the notes

16  was for a 30-year term; is that fair?

17       A.   Yes, I guess, yes.

18       Q.   Notes were unsecured; right?

19       A.   Yes.

20       Q.   And the notes were not the product

21  of any negotiations; correct?

22       A.   Correct.

23       Q.   Is it fair to say that none of the

24  makers of the term notes ever sought financing

Page 452

DONDERO - 10/29/21

1  from a third party as an alternative to the
2  Highland notes?
3     A.  That's correct.
4     Q.  Okay.  You don't have any reason to
5  believe that an unrelated third party would
6  have loaned money to NexPoint, HCRE, and HCMS
7  on the terms set forth in each of the term
8  notes, do you?
9        MS. DEITSCH-PEREZ:  Object to the
10       form.
11    A.  I -- it is not fair to draw that
12 conclusion.  You know, particularly NexPoint
13 has borrowed a lot of money at much lower rates
14 at or around 2017 and later, and to this day.
15    Q.  So then why --
16    A.  The same thing with HCRE.
17    Q.  So then why would HCRE and NexPoint
18 enter into these loans rather than obtaining
19 loans at lower interest rates if they were
20 available?
21    A.  These are soft loans, again, so
22 they're -- especially affiliate soft loans to
23 other creditors are viewed almost as equity or
24 subordinated to senior secured mortgages or

Page 453

DONDERO - 10/29/21

1  other financings that NexPoint and HCRE did.
2  So I would say that is -- that is the reason.
3     Q.  Are you saying that Highland today
4  really has equity interests in NexPoint, HCRE,
5  and HCMS?
6        MS. DEITSCH-PEREZ:  Object to the
7        form.
8     A.  Yeah, no, I didn't say that.  I'm
9  saying it has subordinated debt interest, but
10 they are soft notes, so they're viewed as
11 deeply subordinated equity-ish, so to speak, as
12 far as the senior secured debtholders are
13 concerned.
14    Q.  Well, that would be true of any
15 senior secured debt relative to unsecured debt;
16 isn't that right?
17    A.  Yes, but again, these are
18 particularly soft notes, you know.
19    Q.  Okay.  At the time you signed these
20 notes, were you aware that each of the term
21 notes required payment of an annual installment
22 on December 31st of each year?
23       MS. DEITSCH-PEREZ:  Object to the
24       form.

Page 454

DONDERO - 10/29/21

1     A.  I knew there was more required
2  periodic payments than historically, and that
3  was part of -- partly driven by the -- the
4  auditors, I believe.
5        THE WITNESS:  You know what, can
6        we -- can we take a break for like five or
7        10 minutes, and then, you know, at most --
8        at most I've got another hour in me today,
9        and then so we could just work on when it
10       fits on everybody else's calendar if we
11       can't wrap up in an hour; okay?
12       MR. MORRIS:  No problem,
13       Mr. Dondero.  So the time now is what --
14       what time do we have?
15       VIDEOGRAPHER:  Off the record, 2:56.
16 (Recess taken 2:56 p.m. to 3:19 p.m.)
17       VIDEOGRAPHER:  Back on the record,
18 3:19.
19    Q.  Are you ready to proceed, sir?
20    A.  Yes.
21    Q.  Okay.  Did you speak with anybody
22 during the break about the substance of this
23 deposition?
24    A.  No.

Page 455

DONDERO - 10/29/21

1     Q.  So we were just looking at the third
2  in the series of term notes, and if we can go
3  to the -- I apologize, the first page of this
4  one, just to refresh your recollection after
5  the break that this is the term note that was
6  executed by you on behalf of HCRE Partners on
7  May 31st, 2017.
8        Do you see that?
9     A.  Yes.
10    Q.  Okay.  And I looked at Paragraph 5
11 before, but I just want to make sure, you're
12 telling me that you didn't read this before you
13 signed it, do I have that right, Paragraph 5?
14    A.  Yes.
15    Q.  And so you are unaware -- when did
16 you first -- when did you first become aware of
17 the provision that is set forth in Paragraph 5?
18       MS. DEITSCH-PEREZ:  Object to the
19       form.
20    A.  I don't know.
21    Q.  Okay.  Was it before or after the
22 commencement of the litigation?
23    A.  I don't know.
24    Q.  Okay.  NexPoint didn't make the

Page 456

DONDERO - 10/29/21

1  installment payment that was due at the end of
2  2020; correct?
3       MS. DEITSCH-PEREZ:  Object to -- are
4  you still talking -- have you left HCRE?
5       MR. MORRIS:  No.  I said what I
6  meant to.  So we can take down the exhibit
7  if that's the part that is confusing you.
8  I appreciate that.
9       MS. DEITSCH-PEREZ:  Okay.
10      Q.   Okay.  NexPoint didn't make the
11  installment payment that was due at the end of
12  2020; correct?
13      MS. DEITSCH-PEREZ:  Object to the
14  form.
15      A.   Yeah.  I mean, I think maybe the
16  right way to describe it is Highland or --
17  yeah, Highland or Frank Waterhouse on behalf of
18  NexPoint didn't make the payment.
19      Q.   Okay.  And HCRE didn't make the
20  installment payment that was due at the end of
21  2020; correct?
22      A.   I don't -- I guess -- okay, if they
23  missed it too, I -- I did not have specific
24  awareness to that, I guess, but if you are
25

Page 457

DONDERO - 10/29/21

1  suing under it, I guess they did.
2       Q.   Right.  And HCMS didn't make the
3  payment that was due at the end of the year, to
4  the best of your knowledge; correct?
5       MS. DEITSCH-PEREZ:  Object to the
6  form.
7       A.   Yeah.  I mean, what I'd just
8  separate in my notes here is the HCMFA was just
9  not -- it wasn't a bona fide note, I guess,
10  is -- that is -- which I guess is a
11  different -- a different conversation.
12      Q.   Yeah.  Do you understand that the
13  question was about HCMS?  Let me restate the
14  question.
15      MS. DEITSCH-PEREZ:  Yes.
16      Q.   HCMS --
17      Oh, I'm sorry.
18      MS. DEITSCH-PEREZ:  John, I'm sorry,
19  it is really hard on the video to
20  distinguish between HCMF and HCMS, so if
21  you could just --
22      A.   How about just say Services for
23  Highland Capital Management Services, just
24  say -- instead of S, just say Services.
25

Page 458

DONDERO - 10/29/21

1       Q.   Sure.  All right.  So from now on, I
2  will try and use the word "Services" and you
3  will know that that means Highland Management
4  Services, Inc.; is that fair?
5       A.   Yes, okay.
6       Q.   Okay.  So Services didn't make the
7  installment payment that was due at year-end;
8  correct?
9       A.   Yes.
10      Q.   Okay.  And I just want to make sure
11  that I have this right.  Is it -- is it the
12  corporate obligors' -- those three corporate
13  obligors' contention that one of the reasons
14  they didn't make the payments at the end of the
15  year is that they were relying on Highland to
16  make the payment for them?
17      A.   Absolutely.
18      Q.   Okay.
19      A.   It was due course de minimis, and
20  those entities didn't have a single employee or
21  capable financial person other than the people
22  at Highland that were doing the shared services
23  for them.
24      Q.   NexPoint didn't have any employees
25

Page 459

DONDERO - 10/29/21

1  in December 2020.  Is that your testimony?
2       A.   I was thinking about HCRE and
3  Services had zero employees.  NexPoint had
4  employees but none that were involved in basic
5  accounting functions.
6       Q.   Okay.  And -- and there are people,
7  including yourself, who were officers or
8  employees of NexPoint in December 2020;
9  correct?
10      A.   Yes.
11      Q.   And HCRE had officers in December
12  2020, including you; correct?
13      A.   Yes.  Officers, yes.
14      Q.   And Services had officers in
15  December 2020, including you; correct?
16      A.   Yes.
17      Q.   Okay.  I think in summary form, to
18  be fair, I think we have identified one of the
19  defenses for these three corporate obligors.
20      Two of them have the defense of
21  prepayment; right?
22      A.   Yes.
23      Q.   And one of them is NexPoint,
24  NexPoint has the defense of prepayment.

Page 460

DONDERO - 10/29/21

```
1              DONDERO - 10/29/21
2          Do you have that -- do I have that
3   right?
4      A.   Yes.
5      Q.   Which of the other two, remind me?
6      A.   Services.
7      Q.   Okay.  So NexPoint and Services have
8   the defense of prepayment.  Are there any other
9   reasons that you know of that these three
10  corporate obligors didn't make the annual
11  installment payment that was due at the end of
12  the year?
13         MS. DEITSCH-PEREZ:  Object to the
14     form.
15     A.   Again, they -- they should have been
16  in regular course.  Those payments -- using the
17  word "payment" is almost like an overstatement
18  of the significance or the amount.  If the
19  amounts were small in all cases, they should
20  have been made or they should have been paid,
21  even in the context of contention and even in
22  the context of the larger amounts of money that
23  Highland owed us.
24     Q.   I'm just -- I'm just asking a pretty
25  simple question, sir.  I don't mean to be
```

Page 461

DONDERO - 10/29/21

```
1   contentious with you.  We have identified one
2   defense that these corporate obligors contends
3   exists; and that is, Highland was supposed to
4   make the payment.  Fair?
5      A.   Yes.
6      Q.   And then we have identified a second
7   defense for NexPoint and HCMS, and that is
8   their defense that they prepaid.
9          Do I have that generally right?
10     A.   Yes.
11     Q.   Can you describe for me any other
12  defenses that these three corporate obligors
13  have for not making the payment that was due at
14  the end of the year?
15         MS. DEITSCH-PEREZ:  Object to the
16     form.
17     A.   I'm thinking.  Not at the moment.
18     Q.   Okay.  Did you instruct anyone in
19  December of 2020 to make the installment
20  payments that were due on December 31st under
21  these three term notes?
22         MS. DEITSCH-PEREZ:  Object to the
23     form, asked and answered.
24     A.   No.
```

Page 462

DONDERO - 10/29/21

```
1              DONDERO - 10/29/21
2      Q.   Okay.  Did you take any steps to
3   confirm that Highland would make the payments
4   that were due under these three term notes at
5   the end of the year?
6          MS. DEITSCH-PEREZ:  Object to the
7      form.
8      A.   No.  I testified already the first I
9   heard about it was a week or two later.  And I
10  called up Frank and confirmed with him to make
11  sure they got paid and make sure they were back
12  in compliance.
13     Q.   Okay.
14         MR. MORRIS:  I move to strike
15     everything after the word "no."
16     Q.   Do you know whether anybody on
17  behalf of any of the three corporate obligors
18  under the term notes ever directed Highland to
19  make the payments under them at the end of the
20  year?
21         MS. DEITSCH-PEREZ:  Object to the
22     form.
23     A.   Not before the end of the year, no.
24     Q.   Okay.  And do you know whether
25  anybody acting on behalf of any of the three
```

Page 463

DONDERO - 10/29/21

```
1              DONDERO - 10/29/21
2   corporate obligors under the term notes ever
3   took any steps in December 2020 to make sure
4   that Highland would, in fact, make the payments
5   that were due at year-end?
6          MS. DEITSCH-PEREZ:  Object to the
7      form.
8      A.   No, there was a reliance on
9   Highland.
10     Q.   Okay.  Is it your testimony that
11  Highland was authorized to make the payments
12  under the notes at year-end without being
13  directed by a representative of the three
14  corporate obligors?
15     A.   Yes.  It is my contention that that
16  is how it worked in prior years also.
17     Q.   And so you believe that nobody on
18  behalf of any of the corporate obligors ever
19  authorized or directed Highland to make the
20  payments but that Highland did it without --
21  without direction?
22         MS. DEITSCH-PEREZ:  Object to the
23     form.
24     A.   Yes, typically.  And in 2017 or
25  2018, 2019, for sure.
```

Page 464

DONDERO - 10/29/21

1  Q.  Okay.  We have looked at one -- at
2  one December 3rd letter.  I mean, do you
3  remember that you also received a number of
4  letters on December 3rd demanding payment on
5  certain promissory notes?
6  A.  No.
7  Q.  All right.
8  MR. MORRIS:  Can we call up
9  Exhibit 2, please.  No, I apologize.  Not
10  Exhibit 2, Exhibit 4.
11  (Exhibit 4 marked.)
12  MS. DEITSCH-PEREZ:  Exhibit 4 in the
13  notebook?
14  MR. MORRIS:  Yes, ma'am.
15  Okay.  And now let's -- let's go to
16  the exhibits.  Exhibit 2, Exhibit 3,
17  Exhibit 4, Exhibit 5.
18  Q.  Do you see, sir, that this is a
19  letter addressed to you on behalf of HCRE
20  Partners that is also dated December 3rd, 2020?
21  A.  Yes.
22  Q.  Does that refresh your recollection
23  that you also received notices, demand notices
24  on or around December 3rd, 2020, with respect

Page 465

DONDERO - 10/29/21

1  to notes that were held by Highland?
2  A.  No.
3  Q.  Do you recall this letter at all?
4  A.  No, if I -- if I had, I would have
5  made the forgiveness argument or I would have
6  told someone to make the forgiveness argument,
7  but I don't remember this at all.
8  Q.  Okay.  Is it fair to say that
9  neither you nor anyone acting on behalf of
10  yourself, HCMS, or HCRE ever responded to any
11  of the demand letters at the beginning of
12  December 2020?
13  MS. DEITSCH-PEREZ:  Object to the
14  form.
15  A.  Yes, I don't -- I don't know.
16  Q.  You don't have any knowledge of
17  that; is that fair?
18  MS. DEITSCH-PEREZ:  Object to the
19  form.
20  A.  I don't know.
21  Q.  And you don't have any knowledge of
22  anybody responding to any demand letter that
23  was sent to HCMFA; correct?
24  MS. DEITSCH-PEREZ:  Object to the

Page 466

DONDERO - 10/29/21

1  form.
2  A.  HCMFA or Services?
3  Q.  HCMFA?
4  A.  I -- I don't know.  I don't have any
5  knowledge.
6  MR. MORRIS:  Can we put up
7  Exhibit 1, please.
8  (Exhibit 1 marked.)
9  MR. MORRIS:  We probably want to go
10  to Exhibit 3 of that document.
11  Q.  This one was sent to Mr. Waterhouse.
12  Do you see that?
13  A.  Yes.
14  Q.  Okay.  And did you become aware on
15  or around December 3rd, 2020, that Highland
16  made demand under the two notes listed in this
17  letter?
18  A.  Yes.  Why would this one go to
19  Frank Waterhouse?
20  Q.  Was he the treasurer -- was he the
21  treasurer of Highland Capital Management Fund
22  Advisors at the time?
23  A.  Right.
24  Q.  So does it make sense that the payee

Page 467

DONDERO - 10/29/21

1  on a note might send a demand letter to the
2  treasurer of the maker of the note?
3  MS. DEITSCH-PEREZ:  Object to form.
4  A.  I'm just saying they could have sent
5  the NexPoint letter or the Services letter to
6  him also; right?
7  Q.  I don't -- I think the NexPoint is
8  only a term note; right?  So there is no demand
9  letter.
10  A.  No, I know that.  But whatever --
11  whatever the other one we were just looking at,
12  the Services one could have gone to him, too.
13  Anyway, whatever.  It doesn't
14  matter.  But, no, I don't have a specific
15  recollection of this, if that was your
16  question.
17  Q.  You don't have -- you don't have any
18  recollection of Highland making demand under
19  promissory notes that were issued by you and
20  certain of your affiliates in early December
21  2020.  You don't remember that at all?
22  A.  There was a lot going on then.  And,
23  again, it wasn't something that we either
24  thought was legitimate based on forgiveness or

Page 468

DONDERO - 10/29/21

1 other issues or it wasn't things that we
2 thought were legitimate as part of the overall
3 settlement.
4 You've got to remember we didn't
5 realize Seery betrayed the estate at this
6 point. We thought we were moving towards, you
7 know, resolution or a pot plan.
8 Q. Okay.
9 MR. MORRIS: I move to strike.
10 Q. And please listen carefully to my
11 question.
12 Did you have any knowledge in early
13 December 2020 that Highland made demand for
14 payment under demand notes that were issued by
15 you and certain of your affiliates?
16 A. Same answer.
17 Q. Were you aware or you were not
18 aware?
19 A. Well, no specific knowledge for the
20 reasons articulated in the answer that you --
21 you moved to strike.
22 Q. Okay. So -- so you had -- you had
23 no particularized knowledge of the demands in
24 December 2020; correct?
25

Page 469

DONDERO - 10/29/21

1 A. Right.
2 Q. Okay. And so it is fair to say that
3 you never directed anybody to respond to these
4 demands because you didn't have knowledge of
5 them; correct?
6 A. Right.
7 Q. Okay. Do you know whether anybody
8 responded on behalf -- on your behalf or any of
9 the corporate obligors' behalf to any of the
10 demand letters that were -- that you now know
11 were sent in early December 2020?
12 A. Well, yes. I mean, I know
13 eventually. I don't know when, but I don't
14 think anybody believes these -- these HVIN
15 notes are legitimate notes.
16 I know the response was more around
17 it being payments for the TerreStar regulatory
18 obligations for all the things that Highland
19 had mucked up in the TerreStar situation.
20 Q. While you were president of that
21 entity; right?
22 A. Yes.
23 Q. Okay. And -- and
24 PricewaterhouseCoopers certainly doesn't think
25

Page 470

DONDERO - 10/29/21

1 these are frivolous obligations, does it?
2 MS. DEITSCH-PEREZ: Object to the
3 form.
4 A. PricewaterhouseCoopers doesn't --
5 Q. PricewaterhouseCoopers specifically
6 included a disclosure of all of these
7 promissory notes in the audited financial
8 statements; correct?
9 MS. DEITSCH-PEREZ: Object to the
10 form.
11 A. I mean, as they should have with the
12 information they had at the time, but I think
13 what has come out since then is that they -- it
14 was moneys that moved from Highland to HFAM for
15 things that were caused by Highland and people,
16 not me, not even Frank, I think, but other
17 people assumed it was a note and made notes out
18 of it. And that is what PricewaterhouseCoopers
19 put into the financials, but I think what
20 everybody acknowledges is that they were
21 never -- they were never notes.
22 Q. Is there a document that you have
23 ever seen in your life that supports what you
24 just said?
25

Page 471

DONDERO - 10/29/21

1 MS. DEITSCH-PEREZ: Object to the
2 form.
3 A. Yes.
4 Q. Can you identify that document for
5 me?
6 A. Yeah. It is a -- it is a settlement
7 with the SEC in terms of what they said the
8 breaches were, and why they were finding HFAM,
9 the rationale that they had in the regulatory
10 breaches and in the settlement, and all of the
11 breaches in the settlement were things that
12 Highland did, not that HFAM did.
13 It was all valuation, it was all --
14 it was all services that HFAM had contracted
15 with Highland that were performed deficiently
16 in the eyes of the SEC.
17 Q. Okay. We will -- we will get to
18 that in more detail, but I just would like to
19 know if you believe that any correspondence to
20 the SEC specifically stated that Highland
21 Capital Management, L.P. and not Highland
22 Capital Management Fund Advisors, L.P. was
23 responsible for the TerreStar valuation error.
24 A. The SEC would not have parsed
25

Page 472

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2   between the different players in the entities.
3   They would have said what they thought the
4   breaches were overall in their letter, and what
5   would govern the split is the shared services
6   agreement and where were the employees that
7   performed the activities that they cited.
8       Q.   Okay.  We will get to that at a
9   later time.
10          All right.  Let's go back to the
11  oral agreements that you entered into with the
12  Dugaboy trustee.
13          MR. MORRIS:  And let's start by
14      putting back up Exhibit 31, Paragraph 82.
15          MS. JEFFRIES:  I'm sorry, can you
16      repeat that?
17          MR. MORRIS:  Yes.  Exhibit 31,
18      Paragraph 82, yes.
19      Q.   And, again, Mr. Dondero, I think you
20  have testified already that you believe
21  Paragraph 82 generally describes the oral
22  agreement that you entered into with the
23  Dugaboy trustee with respect to the promissory
24  notes that we've described; right?
25      A.   Yes.

Page 473

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2       Q.   And -- and it is -- and that
3   includes the promissory notes that you signed
4   that Highland is suing on as well as the
5   promissory notes that HCRE, HCMS, and NexPoint
6   signed that Highland is suing on; correct?
7       A.   Yes.
8       Q.   Okay.  Do you contend that the oral
9   agreements that you entered into with the
10  Dugaboy trustee modified the parties' rights
11  under the original promissory notes?
12          MS. DEITSCH-PEREZ:  Object to the
13      form.
14      A.   Modify, boy, sounds like a legal
15  term.  It said conditions by which they could
16  be forgiven.
17      Q.   And there were no such conditions in
18  the original notes; right?
19      A.   That is correct.
20      Q.   Okay.  So I'm just asking you from
21  your perspective whether the oral agreements
22  that you entered into with the Dugaboy trustee
23  were intended to modify the parties' rights and
24  obligations under the original promissory
25  notes.

Page 474

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2          MS. DEITSCH-PEREZ:  Object to the
3      form.
4       A.   It was meant to condition the
5   forgiveness.
6       Q.   Did it change --
7       A.   I would like to use those words
8   versus modified the agreement.
9       Q.   Did it -- did it alter the parties'
10  rights and obligations?
11          MS. DEITSCH-PEREZ:  Object to the
12      form.
13      Q.   I'm not trying to play a game with
14  you.  I just --
15          MS. DEITSCH-PEREZ:  That is exactly
16      what you are doing.  Why don't you just ask
17      him --
18          MR. MORRIS:  Please stop talking.
19      Please stop talking.
20      Q.   Mr. Dondero, is it fair to say that
21  the promissory notes that are the subject of
22  your oral agreements with the Dugaboy --
23  Dugaboy trustee set forth the parties' rights
24  and obligations thereunder, both the maker and
25  the payee?

Page 475

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2          MS. DEITSCH-PEREZ:  Can you read
3      that back again.
4       Q.   Is it fair to say that the original
5   promissory notes that are the subject of the
6   oral agreements between you and the Dugaboy --
7   withdrawn.
8          Is it fair to say that the original
9   promissory notes that Highland is suing under
10  set forth the maker and the payees' rights and
11  obligations under those notes?
12          MS. DEITSCH-PEREZ:  Object to the
13      form.  Object to the form.
14      A.   Yeah, I -- again, I want to -- I
15  want to avoid using the term "modification" or
16  implying modification because, again, the notes
17  are soft, and they really just talk about a
18  rate and/or payment or amortizations, but
19  they're soft notes.  Something in the agreement
20  that lays out the conditions for forgiveness
21  aren't necessarily a modification of the note,
22  and I'd like that to be --
23      Q.   Let me --
24      A.   -- my testimony.
25      Q.   Let me ask it this way:  Under each

Page 476

DONDERO - 10/29/21

1   of the demand notes, Highland as the payee had
2   the unfettered right to demand payment at any
3   time; correct? Did you understand that?
4        MS. DEITSCH-PEREZ: At the time that
5   the notes were first signed?
6        MR. MORRIS: Yes, ma'am.
7        A.   Yeah. I mean, at the -- at the time
8   that they were first put in place, but by the
9   time the demand was made, they had already been
10  subject to the conditions present or the
11  conditions for forgiveness.
12       Q.   Okay. So this is exactly what I'm
13  trying to get at. At the time the notes were
14  signed, Highland had the right to make demand
15  for payment at any time; correct?
16       A.   Yes.
17       Q.   And when you entered into the oral
18  agreements with the Dugaboy trustee, Highland's
19  right to make a demand -- pick your word,
20  modified, altered, amended, changed -- it
21  was -- your oral agreement had an impact on
22  Highland's rights under the promissory notes;
23  correct?
24       MS. DEITSCH-PEREZ: Object to form

Page 477

DONDERO - 10/29/21

1   of the question.
2        Q.   You can answer.
3        A.   The conditions subsequent -- the
4   condition precedent -- precedence for
5   forgiveness changed the ability for the demand
6   notes to be demanded.
7        Q.   Okay. And -- and each of the oral
8   agreements that you entered into with the
9   Dugaboy trustee was related to the loans that
10  were reflected in the promissory notes;
11  correct?
12       A.   Well, it was related to the
13  promissory notes themselves.
14       Q.   Correct. And the promissory notes
15  reflect notes that were made from the payee to
16  the maker; correct?
17       A.   Yeah. Most of them were roll-ups
18  from prior.
19       Q.   No. Those are the term notes. I'm
20  only talking about the demand notes.
21       A.   Okay.
22       Q.   Okay. So with respect to the demand
23  notes, the oral agreements that you entered
24  into with the Dugaboy trustee related to the

Page 478

DONDERO - 10/29/21

1   loans that were the subject of the promissory
2   notes; correct?
3        A.   Yeah, I -- I -- I am just not
4   understanding the nuance enough to answer that
5   question.
6        Q.   Did the oral agreements relate to
7   the loans that were the subject of the
8   promissory notes?
9        A.   The oral agreements affected the
10  term loans and the demand notes.
11       Q.   Okay.
12       A.   Does that answer your question?
13       Q.   And so -- and so is it fair to say
14  that the oral agreements related to -- to
15  the -- to the -- to the loans that were the
16  subject of the notes?
17       A.   I don't know.
18       Q.   Okay.
19       A.   I'm not -- I'm not sure what you are
20  asking, but I don't know the answer.
21       Q.   Okay. It is your --
22       MS. DEITSCH-PEREZ: John, just
23  how -- I just think the witness is lagging
24  a little. So how much longer do you think

Page 479

DONDERO - 10/29/21

1   you have?
2        MR. MORRIS: Oh, I've got probably
3   four hours, so I don't expect to finish
4   today. If Mr. Dondero -- if Mr. Dondero
5   wants to stop --
6        Q.   Are you unable to continue right
7   now, Mr. Dondero?
8        A.   Well, if we have four more hours, I
9   would rather do it a day next -- next week, one
10  afternoon.
11       MR. MORRIS: Okay. Can we check our
12  calendars before we go off the record?
13       We have a deposition on Tuesday.
14  I'm not available on Monday. I can make
15  myself free on Wednesday, Thursday, or
16  Friday. And I think that we should expect,
17  you know, a substantial period of time,
18  perhaps as long as a full day.
19       I mean, with all due respect --
20       MS. DEITSCH-PEREZ: How do you have
21  a full day? You have already gone -- you
22  have already gone more than half a day.
23       MR. MORRIS: Yeah. And just -- just
24  to be clear -- and I'm happy, you know,

Page 480

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2   to -- to discuss this with you offline, but
3   I didn't decide that Mr. Dondero would
4   appear in his personal capacity and on
5   behalf of three separate 30(b)(6)
6   witnesses.
7          If you had given me a different
8   witness for each, I would have a total of
9   28 hours.  I don't expect to use anything
10  remotely close to that time, but I am
11  examining four witnesses here and I
12  would -- I would appreciate --
13         MS. DEITSCH-PEREZ:  But we also --
14         MR. MORRIS:  I would appreciate it.
15  And, look, you can stop me at any time.  If
16  I haven't finished asking the questions
17  that I believe I'm entitled to, I will, you
18  know, take it to the judge.  I'm just
19  putting you on notice.  I have -- I'm on
20  page 27 of a 57-page outline, so...
21         MS. DEITSCH-PEREZ:  Oh, geez.
22         MR. MORRIS:  Yeah, so I do have a
23  fair amount more to cover.  Okay?
24         MS. DEITSCH-PEREZ:  All right.
25         MR. MORRIS:  So Wednesday, Thursday,

Page 481

1   or Friday, Mr. Dondero, I will make myself
2   available at your convenience.
3          THE WITNESS:  I have all day board
4   meetings on Wednesday.
5          MR. MORRIS:  Okay.
6          THE WITNESS:  I could do Thursday
7   afternoon or I can do Friday afternoon.
8   Hold on.
9          MS. DEITSCH-PEREZ:  Let me put this
10  on mute and we will look at our calendars.
11         MR. MORRIS:  Thank you.
12         VIDEOGRAPHER:  Do you want to stay
13  on the record?
14         MR. MORRIS:  Yes, please.
15         THE WITNESS:  Hello.  All right.  I
16  can do Thursday afternoon for four hours.
17  And if we need more time than that we can
18  either do Friday afternoon or sometime
19  the -- the week after that, but I have -- I
20  have got --
21         MR. MORRIS:  Thank you very much.
22         What time on Thursday works for you,
23  sir?
24         THE WITNESS:  How about 1:00 o'clock

Page 482

1          DONDERO - 10/29/21
2   my time?
3          MR. MORRIS:  Okay.  I appreciate it.
4   Thank you very much.  1:00 o'clock Central,
5   it is, next Thursday for the continuation
6   of this.
7          And hopefully I will finish that
8   day, you know, if we can go without a lot
9   of breaks and the rest of it.  Hopefully I
10  can finish that day.  My intention is to do
11  that.  Okay?
12         THE WITNESS:  Perfect.  Thank you.
13         MS. DEITSCH-PEREZ:  Can -- can I get
14  the rough?
15         COURT REPORTER:  Yes.  Yes.
16         MR. MORRIS:  All right.  We can go
17  off the record.
18         MS. DEITSCH-PEREZ:  Thank you.
19         COURT REPORTER:  Thank you.
20         VIDEOGRAPHER:  Off the record, 3:53.
21  (Deposition adjourned at 3:53 p.m.)
22
23
24
25

Page 483

1          DONDERO - 10/29/21
2   _____
3          JAMES DONDERO
4
5   Subscribed and sworn to before me
6   this        day of         2021.
7
8   -------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | C E R T I F I C A T E |
| 3 | |
| 4 | I, SUSAN S. KLINGER, a certified shorthand |
| 5 | reporter within and for the State of Texas, do |
| 6 | hereby certify: |
| 7 | That JAMES DONDERO, the witness whose |
| 8 | deposition is hereinbefore set forth, was duly |
| 9 | sworn by me and that such deposition is a true |
| 10 | record of the testimony given by such witness. |
| 11 | I further certify that I am not related to |
| 12 | any of the parties to this action by blood or |
| 13 | marriage; and that I am in no way interested in |
| 14 | the outcome of this matter. |
| 15 | IN WITNESS WHEREOF, I have hereunto set my |
| 16 | hand this 29th of October, 2021. |
| 17 | |
| 18 | _____ |
| 19 | Susan S. Klinger, RMR-CRR, CSR |
| 20 | Texas CSR# 6531 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | NAME OF CASE:  In re: Highland Capital |
| 3 | DATE OF DEPOSITION:  October 29, 2021 |
| 4 | NAME OF WITNESS:  James Dondero |
| 5 | Reason Codes: |
| 6 | 1. To clarify the record. |
| 7 | 2. To conform to the facts. |
| 8 | 3. To correct transcription errors. |
| 9 | Page____Line_____Reason_____ |
| 10 | From_____to_____ |
| 11 | Page____Line_____Reason_____ |
| 12 | From_____to_____ |
| 13 | Page____Line_____Reason_____ |
| 14 | From_____to_____ |
| 15 | Page____Line_____Reason_____ |
| 16 | From_____to_____ |
| 17 | Page____Line_____Reason_____ |
| 18 | From_____to_____ |
| 19 | Page____Line_____Reason_____ |
| 20 | From_____to_____ |
| 21 | Page____Line_____Reason_____ |
| 22 | From_____to_____ |
| 23 | Page____Line_____Reason_____ |
| 24 | From_____to_____ |
| 25 | |

**$**

**$100** 294:8

**$14** 392:5

**$150,000** 434:2,14
435:3,9 437:17

**$200** 294:2

**$25** 296:18

**$27** 420:12

**$27.675** 419:17

**$30** 407:22 412:4
413:5,11

**$30.75** 408:18

**$400,000** 437:4

**$50** 296:15

**$600** 298:12

**$75** 294:11

**0**

**03** 402:14

**1**

**1** 288:4 408:12,15
433:21,23,24 466:8,9

**10** 298:13,15 318:3
454:8

**10/29/21** 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1

341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
428:1 429:1 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1
446:1 447:1 448:1
449:1 450:1 451:1
452:1 453:1 454:1
455:1 456:1 457:1
458:1 459:1 460:1
461:1 462:1 463:1
464:1 465:1 466:1
467:1 468:1 469:1
470:1 471:1 472:1
473:1 474:1 475:1
476:1 477:1 478:1
479:1 480:1 481:1
482:1

**102** 365:10

**10:21** 288:8

**10:41** 304:6,7

**10:47** 304:7,9

**11:08** 318:7,8

**11:16** 318:8,10

**11th** 310:11 324:4
440:21

**12** 298:13,16

**12-month** 420:12

**12:40** 381:8,9

**12:51** 381:9

**13** 357:19

**14** 391:25

**15** 380:10,11 421:17
431:8

**16** 362:13,16,18,19
391:25

**17** 377:21,22

**1994** 291:10

**1:00** 481:25 482:4

**1:13** 398:19,20

**1:45** 398:18

**1:48** 398:20,22

**2**

**2** 288:4 408:8,10,13,
21 436:3,4,5 464:10,
11,17

**2.1** 409:13

**20** 414:24 421:17

**2008** 292:11 426:21
428:12 429:7

**2010** 307:12

**2014** 420:13 450:23

**2015** 401:20 420:13
450:23

**2017** 408:17,24
410:23 411:8 419:12
447:2,24 449:6,13
450:11 451:3 452:15
455:8 463:24

**2018** 369:15 435:4
436:10 463:25

**2019** 310:11 324:5
369:19 436:22 437:4,
17 463:25

**2020** 291:11 336:25
371:11,15,16 372:15
373:22 374:6,9,21
393:17 394:2,9,16
395:14 397:4,25
415:8 439:8,17
440:16,21 445:22
446:5 456:3,13,22
459:2,9,13,16 461:20
463:3 464:21,25
465:13 466:16
467:22 468:14,25
469:12

**2021** 288:7 357:6
363:17

**21** 337:2

**25** 292:15,16 422:3,
18

**25-year** 293:15

**26** 292:16 422:3,19

**27** 480:20

**28** 480:9

**28th** 435:4

**29** 288:7

**2:13** 398:15

**2:45** 398:18

**2:56** 454:16,17

**3**

**3** 348:11 433:14,15,
18,23 436:3,13
439:15 464:17
466:11

**30(b)(6)** 345:2,10,13
353:14,18 354:7,13
363:3 370:21 376:4,
19 378:3 388:22
391:5 406:5 480:5

**30(b)(6)s** 386:22
387:23

**30-year** 451:10,13,17

**31** 354:22,23 402:9,
13,23 472:14,17

**31st** 408:16,24
410:23 419:12 447:2

**449:6,13 450:11**
451:3 453:23 455:8
461:21

**35** 292:7 309:13

**37** 323:18

**3:00** 445:8

**3:19** 454:17,19

**3:53** 482:20,21

**3rd** 439:7,17 440:6,16
464:3,5,21,25 466:16

**4**

**4** 393:4 412:23 433:21
436:3 448:3,14,20,23
464:11,12,13,18

**40** 365:2

**47** 345:5,6

**48** 353:11,12

**49** 354:5,6

**5**

**5** 298:11 414:6 439:15
445:25 455:11,14,18
464:18

**50** 405:17 429:24

**57-page** 480:20

**6**

**6** 446:15,16 448:17,
19,22

**8**

**8** 298:13,15

**80** 390:4,7

**81** 390:7 398:12

**82** 357:20,25 390:7
398:12 403:4,6 422:8
423:10 472:14,18,21

**83** 357:18,25 358:19

**84** 359:12,13

**85** 359:21

**86** 359:23 360:13

**88** 360:16 361:14 362:9

**9**

**91** 357:21

**94** 291:8 365:2,10,15 370:8

**95** 370:14,15,23 375:22

**96** 370:24 375:22 378:10,17,20 379:14, 24

**97** 380:2

**98** 380:3

**9th** 291:11 374:9

**A**

**a.m.** 288:8 304:7 318:8

**ability** 289:25 353:23 477:6

**absolutely** 375:15 458:18

**absolve** 376:20

**accelerate** 414:12

**acceleration** 377:17 412:23 414:13

**accepted** 392:22

**accepting** 377:14

**access** 425:25 431:15,25

**accommodate** 317:25

**accordance** 418:16, 23

**account** 331:3 338:14 372:2

**accountants** 371:5 451:14

**accounting** 299:8, 19 300:4 319:25 324:15 334:12,19 382:23,24 383:9 397:13 410:16,20,25 411:12,15 416:5 418:2 459:6

**accounts** 319:9,12, 17,21 328:19,22 329:2,8

**accrue** 373:12

**accurate** 343:13,15 357:15 364:24 379:10

**accurately** 334:16

**acknowledge** 360:6

**acknowledges** 470:21

**acting** 340:15 371:24 372:12 396:25 442:25 462:25 465:10

**activities** 472:7

**actual** 438:4

**add** 392:4

**additional** 361:16 392:5 426:4

**addressed** 464:20

**adjourn** 290:4

**adjourned** 482:21

**adjust** 291:24 442:10

**administered** 416:11 417:21

**administering** 415:3

**advance** 352:25

**advisor** 308:11,12, 13,14

**advisors** 306:8 322:13 324:4,9 326:2,5 335:20,22 374:20 375:6 466:23 471:23

**affected** 478:10

**affiliate** 298:4,22

299:3,21 300:7 301:3,9 344:12 452:23

**affiliated** 297:16,24 314:22 315:8 325:3, 11,12,17 344:14 426:15

**affiliates** 344:22 413:12,13 426:22 467:21 468:16

**affirmative** 347:7,11, 14 348:8 357:21 358:6,20 359:3,19,24 360:12,25 361:13 362:9 365:11 366:7 370:15,22 375:21 376:9,17 378:11 379:23 380:4 389:13 390:9 391:7 398:11 406:20

**affixed** 434:14 435:7

**afoot** 438:22

**afternoon** 479:11 481:8,17,19

**aggregate** 293:23 295:16 297:25 419:8

**aggregating** 411:10

**agree** 400:8 446:25

**agreed** 301:15 430:5

**agreement** 335:15, 17,24 336:5,6,9,15, 25 337:5,6 356:4 361:22 381:11,20,24 382:13,21 404:16,24 405:3 407:10,12 420:25 421:5 427:20 449:20 472:6,22 474:8 475:19 476:22

**agreements** 335:23 336:2 339:23 375:5 399:8,16 400:10,11, 23 401:4,16 403:7, 11,14,20 404:2,8 405:15 406:21 420:21 422:7,23 423:9 426:15,22 427:3 443:10,20 472:11 473:9,21 474:22 475:6 476:19 477:9,24 478:7,10,15

**ahead** 437:22 441:21

**air** 423:20

**alleged** 360:18

**allowed** 435:7

**alter** 474:9

**altered** 476:21

**alternative** 291:18 361:6 452:2

**amassed** 424:19 425:5 431:8

**amend** 320:19

**amended** 346:18 355:2,20 356:3,5 357:14 362:15,24 364:23 379:9 389:3 402:24 476:21

**amortizations** 475:18

**amount** 293:23 294:12 295:17 298:5, 21 299:3 360:7 385:11 391:21 392:2, 6 393:6 407:22 408:17 417:20 419:16,22 422:13 430:6 435:3 460:18 480:23

**amounts** 333:5 344:21,23 367:12 372:6 377:13 382:6 392:21,25 420:3 424:21 427:4 431:9 448:6 450:17 460:19, 22

**and/or** 334:14 338:6 364:2 365:18 412:2 475:18

**animation** 396:22

**annoyed** 391:22 392:19

**annual** 369:23 377:2 409:16,22 410:8 453:22 460:10

**answers** 345:24 347:16,18 405:25 406:22 407:4 439:4

**ahead** 437:22 441:21 — 

**anytime** 371:16

**Apologies** 423:24

**apologize** 288:21 295:12 297:21 301:19 332:5 387:17 422:16 423:18 425:8, 18 445:3 448:21 455:4 464:10

**appearance** 445:5

**appearances** 288:17

**appears** 311:7 314:9

**applied** 403:15

**applies** 406:13

**apply** 333:3 368:15 403:21 404:3,9 405:8,9

**appoint** 301:23 302:14 311:3 323:14

**appointed** 301:12,14 302:18 321:6

**approval** 312:4

**approve** 312:11

**approved** 312:19 357:4

**approving** 364:10

**approximate** 408:17

**approximately** 407:22 419:17

**April** 310:11 324:4 450:23

**arbitrary** 290:19

**area** 292:18

**argue** 393:13

**argument** 377:17 386:10 393:8,10 446:13 465:6,7

**articulate** 330:23

**articulated** 421:10 468:21

**aspect** 337:10 363:25 370:11 372:5 379:5

Index: asserted..capacity

**asserted** 358:20
366:13

**assertion** 379:16
430:3 431:12

**asserts** 359:24
360:16 365:16

**asset** 291:19 298:16
308:10 376:25
412:20 421:14

**assets** 292:4 299:9
330:16 334:14

**assigned** 300:20

**assume** 311:22
342:11 408:25 435:5
438:5

**assumed** 470:18

**assuming** 415:20

**attached** 444:10,18

**attention** 439:21

**attorney** 320:18
321:8

**attorneys** 429:7

**audit** 320:2 334:19
411:3,16 416:6
426:10

**audited** 299:10,25
327:18 340:9 412:11,
17 428:11 429:6
430:7,22 432:6,12
470:8

**auditor** 426:14 427:9

**auditors** 334:17
373:10 411:12 416:7
426:22 427:14
435:14 451:14 454:5

**audits** 327:14 334:11
337:23

**August** 356:4 420:13

**authoritative** 310:20

**authority** 301:22,23
302:13,14 310:5
317:9,13 451:5

**authorize** 371:18
389:7 420:5 436:9

**authorized** 316:12,
18 319:8,11,16,20
328:18,21,25 329:7
363:15 371:25
391:19 434:21 438:2
463:11,19

**authorizing** 364:10

**automated** 438:3

**avoid** 475:15

**aware** 311:18 312:14
314:18,24 315:4
317:7,11 324:18,19,
24 325:5 327:6
330:10 334:4,6
340:10,12 346:16,17
351:13 352:10,19
357:9,11,12 358:5
359:18 364:14,18,21
365:20 367:20 368:4
369:22 370:6 372:12,
19,25 373:2 376:16
378:8 379:17 389:10
390:8 397:21 398:11
402:4 428:13,18
429:13 434:13
435:13,15 437:16,20
439:7 442:2,11
444:8,19,24 453:21
455:17 466:15
468:18,19

**awareness** 320:6,8
321:4 322:10 324:12
325:8 332:16 333:4
344:10,18 352:13
366:19 373:17
401:22,23 456:25

**B**

**back** 294:19 304:8
318:9 320:25 336:17
338:17 381:3,13
388:19 392:5,24
397:10,11 398:21
401:5 424:2,10
428:18 429:7 430:3
454:18 462:11
472:10,14 475:3

**background** 324:15
357:4

**bad** 405:7 416:16
417:8

**balance** 293:8 298:9
299:4,22 300:8
301:4,10 326:23
327:3,7 405:18 412:2
413:19 418:4

**balances** 319:24

**ballpark** 295:18

**bank** 319:9,12,17,21
328:18,22,25 329:8
425:2,3

**bankruptcy** 300:6,
15 302:21 315:24,25
366:13 413:14

**barred** 358:21
359:15 360:2,17
365:17 370:16

**base** 298:16

**based** 324:16 398:5
467:25

**basic** 416:19 459:5

**basis** 294:5 344:9

**Bates** 444:20,23

**begin** 289:6,12,18

**beginning** 288:4
355:25 357:5 363:16
465:12

**behalf** 293:4 316:13,
19 349:12 353:23
354:8 363:16 364:11
371:12,24 372:7,13
386:17 387:5 388:12
389:8 394:8,16
396:25 404:10
408:24 409:7 411:17
415:4 418:13 419:20
436:10 437:14 443:2
449:12 451:6 455:7
456:18 462:17,25
463:18 464:20
465:10 469:9,10
480:5

**believes** 469:15

**benefit** 339:4 385:10

**benefiting** 385:9

**benefits** 384:20

**Berghman** 445:7

**betrayed** 468:6

**big** 421:10

**bigger** 393:11

**billion** 292:7

**binder** 346:22 362:19
433:17

**binding** 345:25

**bit** 328:3 337:20
345:11 356:17
407:16

**blocked** 378:13

**blurt** 441:18

**board** 425:2 431:21
481:4

**boilerplate** 410:17
416:4

**bona** 373:8 418:18,
19,20 419:23 421:19
457:10

**Bonds** 363:23 364:4

**bonuses** 322:9
424:24

**book** 309:16

**booklet** 448:25

**books** 298:23 397:19

**borrow** 295:7 420:5

**borrowed** 295:3,8,13
420:2,11 437:3,17
448:6 450:15 452:14

**borrower** 409:15

**bottom** 310:6 323:23

**boy** 336:17 383:13
416:16 417:8 422:9
473:14

**Boyce** 301:15

**breach** 391:15 392:2,
17

**breached** 303:11
304:14 305:3,13,15,
22

**breaches** 471:9,11,
12 472:4

**break** 317:23 318:4,
12 380:15,19,21
398:17 399:4 454:7,
23 455:6

**breaks** 482:9

**Brian** 324:14

**bring** 395:6

**broad** 366:5

**bucks** 377:3,4
391:25 393:12
421:16 430:14

**building** 338:18

**built** 339:5

**bullet** 416:8

**bunch** 309:4

**burden** 327:13

**business** 291:14
308:5 323:4 330:15
342:6 384:17 385:7

**C**

**calculating** 334:8

**calculation** 393:2

**calendar** 409:17
454:11

**calendars** 479:13
481:11

**call** 400:16 450:25
464:9

**called** 306:7 322:12
329:18 341:8 345:9
357:21 389:15 402:2
462:10

**calls** 349:24 350:3,9,
17,22 351:2

**capable** 290:7
458:22

**capacities** 325:3

**capacity** 303:5
311:2,19 314:4,7
315:20 331:25 332:9
345:8,9,20,24 351:3
363:3 371:16 378:3
388:22 393:14

399:25 406:5 480:4

**Capital** 288:6 290:23
294:10,15,21 295:4,
6,14,21,23 296:3,9
306:7 311:21 329:18
362:23 405:21
434:15 457:24
466:22 471:22,23

**captured** 308:10
334:16 370:11

**care** 445:20

**carefully** 372:11
468:11

**carried** 298:22
299:4,22 300:8
301:3,10 327:4

**case** 363:25 378:12
383:5

**cases** 460:19

**cash** 383:18 384:13
421:11

**categorized** 292:24

**category** 361:9

**caused** 470:16

**caveat** 427:17
441:21

**ceased** 305:11

**Central** 398:18 482:4

**centralized** 417:22

**certificate** 309:23
310:2,10 311:8
313:13 320:24
323:20 331:20
340:12,20 342:12
398:6 436:25

**certificates** 313:15
342:21

**cetera** 320:2 334:5
367:13 389:24
392:12,15 393:2
433:2

**CFO** 299:24 301:13,
23 302:15,18 303:6
311:12,20 313:7,10,
11,19 314:4 440:3

**chagrin** 345:11

**chance** 331:3 351:6

**change** 341:13,14
362:12 474:6

**changed** 299:17
476:21 477:6

**characterize** 333:12

**characterizing**
409:14

**charged** 299:2
333:21 364:9

**charging** 386:7

**chat** 309:18 355:11

**check** 426:5 479:12

**checks** 319:24

**chief** 303:2 331:23,
25 332:9

**choice** 345:15

**circumstances**
348:7 375:12,21
413:8

**cited** 472:7

**claim** 360:17

**claims** 358:21
359:14,25 365:16
370:16

**clarification** 332:6
378:18 423:8

**clarify** 337:20

**class** 400:14,19
427:21

**clause** 415:9

**clauses** 416:17

**clean** 304:11

**cleaner** 423:6,7

**cleanup** 406:9

**clear** 295:11 304:24,
25 322:2 335:5
417:11 431:4 432:15
479:25

**Cliff** 300:17

**CLO** 338:22 385:5

**close** 434:12,18,19
436:6 480:10

**closed** 360:3

**closely** 410:3 411:23

**collateral** 413:16
417:7

**colleague** 309:12

**collectively** 451:3

**combination** 310:5

**comfortable** 390:13
391:10 398:23

**commenced** 404:5,
11 405:6 433:10

**commencement**
441:7,9 443:4,8,11
455:23

**comment** 306:3
338:18 396:18 432:4

**common** 421:18

**communicate**
318:11 350:4

**communications**
348:7 441:18 442:6

**comp** 361:6,8,16
423:5

**companies** 311:20
314:13 315:7 325:4,
12 344:14 361:21
412:21 421:19,22
431:19

**company** 297:4
314:23 325:17 415:2

**compared** 404:18

**compel** 395:7

**compensation**
322:9 404:16,18
421:8,11,21 422:6,22
423:2,13 424:22
430:16 443:24
446:12

**complaint** 346:18
355:2,20 356:3
358:15 362:15,24
389:3 402:24 408:9,

16 433:23 448:15

**complaints** 356:5
407:6

**complete** 290:5
334:13 335:2 343:12,
15 357:14 364:23
379:10 405:16

**completely** 391:3
397:7

**completeness**
327:24

**complex** 401:25

**complexity** 363:24

**compliance** 327:14
371:8 393:3 411:14
462:12

**compliant** 319:25
334:11 418:2

**compliantly** 320:7

**complicated** 386:6

**comport** 303:6

**concede** 433:5

**concern** 333:17
358:6 359:2,18
360:25 361:13 362:8
365:21 370:21 390:9

**concerned** 411:24
453:14

**concerns** 347:6
348:11

**concluding** 328:11

**conclusion** 452:13

**conclusions** 305:18

**condition** 407:11
429:12,16 474:4
477:5

**conditioner** 423:20

**conditions** 413:6,10
473:15,17 475:20
476:11,12 477:4

**confirm** 401:8 462:3

**confirmed** 462:10

**confusing** 456:8

**connection** 294:17
353:7 426:9

**consideration** 360:3

**considered** 315:5
325:24

**consistent** 407:6
419:24

**consolidated**
447:22

**contained** 430:7

**contemporaneousl
y** 442:12

**contend** 420:19
424:5 473:8

**contended** 367:3

**contends** 461:3

**content** 416:8

**contention** 403:13,
19,25 423:17 458:14
460:21 463:15

**contentious** 461:2

**context** 335:11
400:10 460:21,22

**contingent** 427:5

**continuation** 482:5

**continue** 290:4,20
389:22 400:6 479:7

**contracted** 471:15

**control** 297:2 307:6,
19,23 308:2 311:3
315:12,20 322:21
330:5,9 331:7 332:18
333:16 341:24
371:17 388:5 393:15
410:4 429:22 431:19

**controlled** 307:14
323:6 325:13 342:2
374:20 385:15

**controls** 320:2

**convenience** 481:3

**conversation**
457:12

**copy** 355:18 356:21,
22,23 402:20 434:7

448:25

Cornerstone 427:19

corporate 312:7
320:18 321:7 323:7
330:8 342:3 345:21,
25 354:9 405:10
406:24 407:3,12
458:13 459:20
460:10 461:3,13
462:17 463:2,14,18
469:10

correct 290:24 295:4
301:11,24 306:8
313:3 316:5 322:13
325:14 328:15
335:15 337:17
339:24 342:24
351:19 374:6,9
389:18 398:2 402:15
404:12 405:14 412:9,
18 416:3 419:22
420:22 424:7 435:10
436:22 438:18 440:2,
17 442:3 447:6,10,19
449:7 450:6,11,13
451:7,10,22,23 452:4
456:3,13,22 457:5
458:9 459:10,13,16
465:24 468:25 469:6
470:9 473:6,19
476:4,16,24 477:12,
15,17 478:3

correctly 320:7
335:12 404:7,22
411:2 414:15

correspondence
471:20

cost 385:11

costs 333:7 334:5
337:21 338:5,8

counsel 288:19
289:6,8,9 355:18

counsel's 353:25
354:16

counterparties
377:2

couple 300:14,18
349:19,20 350:2
421:16 428:15 445:3

court 288:9 303:14,
21,24 355:25 366:13
374:24 381:17 395:7
396:5,8 482:15,19

cover 480:23

crazy 415:8

create 291:7 330:17,
19 413:15

created 307:9,15
322:24 330:11 339:6

creatures 365:5

credit 291:17 411:4

creditors 452:24

crisis 292:12

culpa 406:16

cure 377:15 392:21
393:6

curing 377:11,12

current 321:14,18
329:5,12 340:25
405:18

curved 374:24

cut-and-paste
406:17

_____

D

DAF 339:2,5 385:2,5,
19,22 386:5,18 387:6
388:13

date 288:7 310:15
311:10 324:9 325:21
428:24

dated 408:16 439:17
464:21

dates 369:9,10

Dave 352:10

David 300:17

Davor 317:22,25
445:2

day 290:5 336:18
352:16 386:15
410:23 435:12
452:15 479:10,19,22,

23 481:4 482:8,10

days 349:19,20

de 297:25 298:4,7,17
333:5,7,15 334:7,14
343:21,22 376:24
377:3 391:20 393:20
410:13 411:25 412:2
413:18 417:20
421:13 458:20

dealing 372:22

Deborah 288:14,18
291:25 303:22
349:17 350:5 351:5
381:4 383:21 388:9
390:18 425:8 428:22
445:5

debt 333:6 334:5
421:19 453:10,16

debtholders 453:13

debtor 367:22
374:21 428:8,10
443:15 444:15

debts 297:8,14
315:14,21 316:3,8
318:17,22 326:7,12,
17 327:10 328:7
332:20 333:2,23
340:5 343:6,18 344:6

December 371:11,
15 373:21 374:12,17,
21,25 395:14 397:3,
25 439:7,17 440:6,
16,21 445:22 446:5
453:23 459:2,9,12,16
461:20,21 463:3
464:3,5,21,25 465:13
466:16 467:21
468:14,25 469:12

decide 385:21
386:16 417:16 480:3

decided 297:3 386:8
420:24 451:12

deciding 417:25

decision 387:5,12,
13,19 388:6,12
429:17

declared 368:20

deed 416:15

deemed 426:16
427:3,12

deeply 453:12

default 368:21 377:8
391:20 392:20 393:5
412:23

defendant 362:23
404:17

defendants 289:7

defense 347:11,14
358:6,20 359:3,19,24
360:12,25 361:6,13
362:9 365:21 366:2,
7,14 367:5 368:14
370:8,15,22 378:17,
20 379:16,18,23
389:20 391:7 406:20
459:21,25 460:8
461:3,8,9

defenses 347:7
348:9 357:22 365:11
375:22 376:9,17
378:11 380:4 389:14
390:9 398:12 443:3
459:20 461:13

deficiently 471:16

definable 385:10

define 298:7,17
317:2 414:21

defined 317:18
411:11 419:12
426:23

defining 377:14

definition 416:23

definitively 340:10

Deitsch-perez
288:16,18 291:21
292:2 294:3,16,19,24
296:11,23 297:10
301:25 304:16 305:5,
25 309:15 311:5
315:16 317:21 318:5,
24 321:21 324:21
326:8,19 327:20
329:9 331:9 332:11
335:16 337:15 340:6
343:19 344:7 346:3
347:3,21,25 348:5,18
349:23 355:3,7,13

356:20 359:4 361:25
365:4 366:8,17,22
367:6 369:7,25 373:5
376:10,18 379:11
380:13,20,25 381:6
382:15 383:17 384:4,
9,22 385:17,24
386:20 387:8,14,18,
21 388:15 390:14,19,
21 394:3,10,17
395:12,18,22 396:3,
9,21 397:5,9 399:11,
19,21 400:3 401:11,
18 402:13,18 405:11
406:14 409:9,18,25
410:9 411:20 415:14,
25 423:21 425:14,23
426:17 428:5,21,23
429:8 430:25 432:13
433:11,16,19 434:8,
17 438:10 441:3,16
444:8,16 445:24
447:11 448:19,24
449:22 452:10 453:7,
24 455:19 456:4,10,
14 457:6,16,19
460:13 461:16,23
462:6,21 463:6,22
464:13 465:14,19,25
467:4 470:3,10 471:2
473:12 474:2,11,15
475:2,12 476:5,25
478:23 479:21
480:13,21,24 481:10
482:13,18

delegate 317:19

deluded 375:16

demand 333:19
348:12,15 368:15
414:10 439:8,11
440:7,9,17,23 441:6,
11 442:2 443:3 444:4
445:24 447:22
464:24 465:12,23
466:17 467:2,9,19
468:14,15 469:11
476:2,3,10,15,20
477:6,21,23 478:11

demanded 445:23
446:6,10 477:7

demanding 464:5

demands 468:24
469:5

**demonstrate** 424:14

**department** 382:23, 24 383:2 411:12 417:23

**depend** 383:4

**deposed** 352:9,11, 19

**deposition** 288:5,20, 25 289:18,22 290:5 346:21 349:16 350:6, 16 351:8,11,14,18,21 352:4,7,14 353:2,3,8 363:7 376:19 386:23 399:5 400:4 408:12 444:19 454:24 479:14 482:21

**depth** 334:13

**describe** 291:13 332:24 410:12 456:17 461:12

**describes** 403:6 472:21

**describing** 429:3 432:8

**deserve** 344:3

**detail** 334:17 378:14 471:19

**detailed** 344:9

**details** 301:21 337:24 366:4

**di** 333:12

**differentiate** 333:24

**dig** 369:9

**direct** 329:23 337:21 338:7 341:18 371:17

**directed** 462:18 463:13,19 469:4

**direction** 463:21

**directly** 306:21 307:3 314:5,8,13 322:19 330:3

**directors** 431:22

**disagree** 324:11

**disappeared** 294:17

**disclose** 426:14

**disclosed** 412:15 426:21 427:9,13 430:24 432:11 433:3

**disclosure** 427:23 432:7,21,24 441:20 470:7

**discovery** 349:7,13 425:19,21 444:7,13

**discuss** 306:5 401:3 441:10,13 480:2

**discussing** 442:19

**discussion** 444:3

**disrupt** 400:4

**distinguish** 457:21

**diversified** 291:17

**doctrine** 365:17 370:17

**document** 309:12 310:7,21 313:20 317:6 320:18 345:4, 16 355:24 356:9,16, 18 357:5,9,13 363:10,16,20 364:11, 15,19,22 366:12,20 378:6,9 379:6,8 380:17 381:10 388:20 389:2,5,8,11 402:8 435:8 447:18 466:11 470:23 471:5

**documentation** 342:21 431:12,17,24

**documents** 320:19 334:18 348:7 352:24 367:23 370:5 425:11, 22,24,25 438:14

**dog** 387:15,16

**dollar** 386:3

**dollars** 391:22 393:10

**Dondero** 288:1,5,11, 19,22 289:1,15 290:1 291:1,23 292:1,3 293:1 294:1 295:1,3 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1,17,20

304:1,11 305:1,9 306:1 307:1 308:1 309:1,20 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,11 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1,7 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1,24 355:1,17 356:1,14 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,10 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1,22 384:1,6,7 385:1 386:1 387:1 388:1 389:1 390:1,5, 22 391:1 392:1 393:1 394:1 395:1,13 396:1 397:1 398:1,23 399:1 400:1,9 401:1,8 402:1,23 403:1 404:1,17 405:1 406:1,25 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1,5 425:1,11 426:1,8 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1,25 442:1 443:1 444:1,13,15 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1,14 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1

464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1,19 473:1 474:1,20 475:1 476:1 477:1 478:1 479:1,5,8 480:1,3 481:1,2 482:1

**Dondero's** 386:23 387:24 401:6 402:16

**double-check** 425:15

**doubt** 324:7 409:11

**dozen** 350:7 422:12 425:6 431:8

**dozens** 293:19,21

**drafted** 410:15

**draw** 452:12

**driven** 454:4

**dropped** 423:20

**DSI** 414:24

**dual** 321:23

**due** 297:24 316:14 327:4 344:13,21 358:22 359:15 360:2 366:15 371:20 372:5, 15 373:3 389:23 391:20 392:25 393:13,17,21 394:2 395:16 397:3 408:2 409:23 440:8 456:2, 12,21 457:4 458:8,20 460:11 461:14,21 462:4 463:5 479:20

**Dugaboy** 306:22 338:6 400:12,16,23 401:9,17 403:8,14,21 404:2 405:4 420:21 421:2,6 422:24 427:20 443:11,20 472:12,23 473:10,22 474:22,23 475:6 476:19 477:10,25

**duly** 288:12

**duplicate** 355:15

**duties** 297:6 303:2, 12 304:14 305:4,13, 15,23 328:12,14

**E**

**earlier** 320:24 324:12 367:18 379:19 406:8 415:10 436:24

**early** 337:2 356:9 374:11,17 467:21 468:13 469:12

**easier** 393:12

**Eastern** 398:16

**effective** 310:11 324:4

**effectively** 338:21 419:7

**effort** 424:13

**efforts** 382:5 424:18

**eight-day** 440:20

**electronic** 438:9,14, 18

**electronically** 439:2,3

**Ellis** 363:23 364:4

**else's** 454:11

**email** 353:9 445:17

**emails** 353:6

**employed** 308:17 319:15 322:2 383:12

**employee** 317:20 320:11 321:15,19,20, 24 329:5,13 340:16 341:2 398:5 422:6,22 458:21

**employees** 371:6 392:11 422:12 458:25 459:4,5,9 472:6

**end** 369:24 371:21 373:3,14 375:3,14 391:16,17 393:17 394:2,8,15 395:17 409:16,23 410:8 411:8 414:24 415:8 447:23 456:2,12,21 457:4 458:15 460:11 461:15 462:5,19,23

**ensure** 393:25

**enter** 452:19

**entered** 336:14 381:24 382:12 399:7, 15 400:22 401:16 403:11,14,20 404:25 405:4 407:10 472:11, 22 473:9,22 476:18 477:9,24

**entering** 400:11

**enterprise** 343:24 388:5

**entire** 431:21

**entities** 306:20 311:15,24 325:7,8 333:4,8 335:7,25 336:4,8,11,20 337:25 338:7 340:10 343:9 345:10 377:7 382:5, 25 384:19 385:16 406:6,24 407:13 423:3 426:15 458:21 472:2

**entities'** 407:4

**entitled** 414:7 480:17

**entity** 291:3 306:7,11 311:4 322:12 329:18 330:9 331:7 333:6 338:2 341:7,10,16 342:9 383:5 385:20 413:19 429:21 469:22

**entity's** 332:20

**entrepreneurial** 382:5

**equal** 360:7 448:7

**equity** 385:6 452:24 453:5

**equity-ish** 453:12

**equivalent** 360:21

**error** 406:17 471:24

**established** 405:15

**estate** 323:5 341:11 342:7 374:3 375:17, 18 385:8 392:12 468:6

**estimate** 290:21 296:8 350:14

**estoppel** 347:17 359:15 370:17

**event** 427:8

**eventually** 368:11 469:14

**evidence** 330:24 418:8

**exact** 406:21

**EXAMINATION** 289:13

**examining** 480:11

**examples** 425:6 431:9

**exceeded** 293:25

**exchange** 337:7 339:12

**execute** 330:21

**executed** 403:16,21 404:3,9 405:9 411:7 455:7

**executive** 316:21 317:18 327:23 413:4, 9

**executives** 325:6 413:20 424:25 425:2 431:10 432:19

**exercise** 302:13

**exhibit** 309:13 323:17 345:5,6 353:11,12 354:4,6, 22,23 357:20 362:13, 16 377:21,22 380:10, 11 402:9,23 408:8, 10,12,15 419:5,9 420:3,7 433:14,15, 18,23,24 436:4,5,13 437:12 439:15 445:25 446:7,15,16 447:18 448:3,8,14, 17,19,20,22 450:5,8, 17 456:7 464:10,11, 12,13,17,18 466:8,9, 11 472:14,17

**exhibits** 433:21 436:3 464:17

**existence** 323:7 330:8 342:3

**exists** 461:4

**expect** 479:4,17 480:9

**expectation** 392:15

**expectations** 303:7

**expected** 338:6 393:20

**expenses** 316:23 338:16

**expert** 292:18

**expertly** 334:21

**experts** 421:24

**extended** 375:8

**extent** 301:8 312:11 313:23 316:7 325:10 332:21 334:6 338:25 361:16 371:2 391:12, 13 396:17 427:13

**eyes** 471:17

**F**

**facility** 411:4

**fact** 368:4,7 376:18 387:24 421:9 430:21 463:4

**facts** 348:8 358:5,25 359:17 360:11,24 361:12 362:8 365:20 366:6 368:9 370:6,20 375:12,20 376:8,15 377:11,16 379:17,22 380:3 390:9,15 391:6 398:10

**failed** 318:20 319:5 328:5,12

**failure** 360:2

**fair** 290:20 293:2,14, 18,21,22 296:20 297:4 311:9 312:2,5 313:8,24 325:22 331:8 339:19 342:23 344:4 372:21 392:10 406:25 410:5 411:19

**415:11,22 427:11 428:3 429:3 432:10 439:6 447:4,7 449:19 451:17,24 452:12 458:5 459:19 461:5 465:9,18 469:3 474:20 475:4,8 478:14 480:23**

**fairly** 409:14 422:12

**faith** 360:20

**fallen** 316:9

**falls** 361:9,17

**familiar** 297:7 306:6 315:14 318:17 322:12 329:18 341:7 433:8

**familiarize** 297:14 298:21 315:21 316:2 318:22 326:6,17 327:10 328:7,13 332:19,25 344:5

**familiarizing** 333:22 340:4 343:5

**family** 314:12 321:8

**fast** 381:3

**faster** 361:19

**fault** 295:12 441:24

**favor** 296:3 447:2

**features** 417:8

**fee** 338:9 339:2

**feel** 290:3

**feeling** 289:3,17,21

**fees** 308:11 317:3 386:7

**fide** 373:8 418:18,19, 20 419:23 421:19 457:10

**figure** 429:17

**file** 363:15

**filed** 346:17 355:20, 24 356:2,5 362:14 366:12 374:20 416:15

**filing** 357:5 364:10

**389:7**

**finally** 360:15

**financial** 292:11 299:10,12 300:11 303:2 327:18 331:25 332:9 337:10 382:7 412:8,17 428:11 429:6,15 430:7,19,22 432:6,12 458:22 470:8

**financials** 299:25 300:20 340:9 343:13, 15 411:3 412:11 430:11 431:5,7 432:17,24 433:4 470:20

**financing** 451:25

**financings** 453:2

**find** 434:6

**finding** 471:9

**fine** 341:17 369:13 395:11

**finish** 290:15 340:24 479:4 482:7,10

**finished** 480:16

**firing** 315:5 325:24

**firm** 363:15

**firms** 334:12 389:23

**fits** 454:11

**flip** 436:2

**focus** 292:19 344:3 390:6 430:3

**focusing** 334:8 357:25 413:21 422:16

**follow-up** 388:8

**footnoted** 430:12

**forcing** 290:6

**forgave** 422:4 430:15 432:11

**forgivable** 404:20

**forgive** 421:20 427:3

**forgiven** 422:21

423:4,11 425:4
427:7,13,24 429:11
430:6,24 431:5
432:22,23,25 433:4
473:16

**forgiveness** 361:7
429:4,20 430:4
431:9,22 440:13
443:24 446:13 465:6,
7 467:25 474:5
475:20 476:12 477:6

**forgiving** 424:6,15
429:18 431:13

**form** 294:4 296:24
297:11 306:2 311:6
315:17 318:25
321:22 324:22 326:9,
20 327:20 329:10
331:10 340:7 343:19
344:8 361:25 366:9,
18,23 367:7 370:2
373:6 376:11 379:12
384:23 385:18,25
388:16 390:15
399:12,22 401:12,19
405:12 407:21
409:10,19 410:2,10
411:21 415:15 416:2
426:18 428:6 429:9
431:2 434:17 438:11
441:4 447:12 449:23
452:11 453:8,25
455:20 456:15 457:7
459:18 460:14
461:17,24 462:7,22
463:7,23 465:15,20
466:2 467:4 470:4,11
471:3 473:13 474:3,
12 475:13 476:25

**formal** 335:22,23
336:2 381:18 384:13

**formally** 382:18

**formation** 315:2

**formats** 291:19

**found** 291:6 392:18

**founded** 290:23

**Frank** 299:20 300:20
301:23 302:10 309:7
310:13 312:7 316:9
325:8 327:13 334:2,
22 335:10 336:18

338:4 340:8,14
343:10,11,16 397:24
398:7 415:3 436:16,
21 437:13,25 438:25
441:15 442:16 443:5
456:18 462:10
466:20 470:17

**Frank's** 299:18
300:10,14,25 437:23
438:3

**frauds** 327:25

**fraudulent** 360:17,
19

**free** 479:16

**Friday** 479:17 481:2,
8,19

**friendly** 413:13
417:21

**frivolous** 470:2

**front** 348:2 389:21

**frozen** 302:3

**fulfill** 318:21 319:5
328:5,12

**fulfilled** 302:25

**full** 431:19 479:19,22

**function** 333:25
334:19

**functional** 401:23

**functions** 459:6

**fund** 306:7 317:3,4
466:22 471:23

**funds** 308:6,8,10,16
309:4 312:23 320:19,
20 327:16 336:13

G

**gained** 385:11

**game** 474:13

**gather** 424:13

**gave** 382:2 392:20
394:20 395:2,21
413:25 430:13
440:20

**geez** 480:21

**general** 293:7
296:20,25 308:15
312:7 343:20 344:10,
17 364:7 376:24
403:7

**generalize** 384:24

**generally** 297:12
323:3,5 325:15
326:10,12 327:6
329:20 332:21,23,25
344:15 357:7 363:21
364:12,18 373:15
389:6 426:19 461:10
472:21

**give** 331:3 334:25
337:24 342:22 366:6
369:8,10 382:2
394:12,19 395:14
397:16 405:16
440:25 451:12

**giving** 399:25 422:22
423:13

**glad** 351:22

**good** 308:15 312:8
330:23 360:20 382:8
393:3 413:19 423:22

**govern** 472:5

**grace** 414:10 440:20,
25

**grade** 291:17

**green** 289:2

**Gregory** 322:6

**grounds** 312:18

**group** 299:18 300:4,
11,14,21,25 316:10
319:25 334:2,23
335:10 336:19 338:5

**guarantee** 417:8

**guaranteed** 416:16

**guess** 304:20 310:4
312:11 333:3 347:19
375:25 393:7 429:10
437:25 451:18
456:23,25 457:2,10,
11

**gulf** 382:10

**guys** 346:23 432:2

H

**haggled** 418:6,9

**half** 350:7 430:14
479:23

**half-hour** 380:19,21
398:17

**hand** 355:16

**handle** 363:23,25
382:24

**Hang** 355:7 402:18
428:21

**happy** 317:25 406:3
479:25

**hard** 355:18 356:22,
23 402:20 416:14
434:6 448:25 457:20

**Harvard** 385:4

**hats** 324:20

**HCMF** 331:24 332:3,
10 339:19,25 457:21

**HCMFA** 306:11,13,
19 307:4,6,8,14,19
308:2,17,18,22
309:2,8 310:10,14,
19,23 311:3 313:20
314:8,17 315:10,13,
20 316:13,18 317:9
318:15,22 320:22
321:9,16,20 322:7
333:10,17 336:23
339:22 404:10,11
405:13 457:9 465:24
466:3,4

**HCMFA's** 308:5
311:12 315:14,21
316:3,8 318:17
319:9,12,17,20
333:12

**HCMLP** 333:11,19
404:21

**HCMS** 288:20
329:17,21,24 330:3,
5,11 331:5,14,18

332:6,9,18 335:11,14
336:16 337:6,13
338:14 339:11,19
340:3,16 341:3
353:14,17,23,24
362:14 363:14
364:11 365:10,15
366:12,25 367:14,25
369:15,18,23 370:21
371:12,17,19,24
372:13,21 375:14
379:19 385:22
403:22,23 405:20,25
433:8,10,24 434:15
435:2,9,18,23
436:10,22 437:3,14,
16 439:8,18,25
440:7,20 441:5,11
442:8 443:2,10,19
445:23 446:9 447:21
451:2 452:7 453:6
457:3,14,17,21 461:8
465:11 473:5

**HCMS'** 340:5 363:3,7
443:2

**HCMS's** 330:8,15
333:2,23 353:18
372:2

**HCRE** 288:20 341:6,
8,16,19,24 342:2,16
343:7,13,15,18
354:8,9,14 378:4,21
381:11,22,23,25
382:13 383:3,5,11,15
384:7 385:9,21 386:3
404:3,5 405:19 406:2
447:21 448:2,5,11,16
449:13 450:9,15,21
451:2 452:7,17,18
453:2,5 455:7 456:5,
20 459:3,12 464:20
465:11 473:5

**HCRE's** 342:6 344:6
377:23

**HCRE-TYPE** 385:20

**head** 292:2 306:4
311:25 317:14,16
325:19 340:23
369:17,21 376:8

**hear** 289:15 303:14,
19 335:11 395:24
396:4,5,7,9,10,11,22

Case 3:21-cv-00805-X Doc 4 Filed 12/01/05/22 Entered 12/01/05/22 12:18 Page 62 of 71
Case 3:21-cv-00881-X Document 1781-9 Filed 06/09/23 Page 57 of 190 PageID 44601

Index: heard..investor

**heard** 303:16 352:20 462:9

**held** 312:17,22 313:5, 18 314:12 320:14,16 325:11,17 465:2

**helped** 339:16

**Hendrix** 352:19

**hereunder** 414:14

**Hey** 380:13

**HFAM** 335:20 470:15 471:9,13,15

**Highland** 288:6 289:9 290:23 291:3, 7,14 292:5,15 293:16,20,25 294:10, 14,21 295:4,6,7,14, 21,23 296:3,9 297:3, 7,9,15,23 298:2,4,10, 20,22,25 299:4,22 300:8 301:3,9 302:12,18,24 303:12 304:14 305:4,12,14, 23 306:7 308:14 311:19,20 313:7,19 314:5,12,23 315:8 319:15 320:12 321:7, 8,15,19 322:8 325:2 327:5 329:5,13,18 335:15 336:11,16,24 337:7,8,12,22 338:2, 10,13 339:3,7,12,13, 16,17,20 341:2 344:13,22 356:2,5 358:15 360:6 362:23 367:2,11,15 371:7, 19,25 372:2,7,13,20 374:6,12,15 375:4,13 376:25 377:8,13,14 381:12,22,25 382:13, 14 383:12,15 384:8, 16 385:23 386:17 387:6 388:12 391:24 392:16 393:16 395:15 397:2 398:4, 5,9 400:14 404:5,11 405:21 408:4 412:2 415:5 419:11,22 420:2,12 421:14 422:4,20 423:12,18 424:6,15 426:21 429:6 430:7,10 431:13 432:11,24

433:10 434:11 435:3, 9,19 437:4,17 439:8 440:4,6,17,19,24 442:2,7 443:2,9,17, 18 445:23 446:6,10 447:2 448:6,12 450:10,16,22 452:3 453:4 456:17,18 457:24 458:4,16,23 460:23 461:4 462:3, 18 463:4,9,11,19,20 465:2 466:16,22 467:19 468:14 469:19 470:15,16 471:13,16,21,22 473:4,6 475:9 476:2, 15

**Highland's** 291:9 298:16 301:13 302:14 303:6 311:12 313:6 327:18 346:18 349:12 354:25 358:14 362:15 370:25 389:3 402:24 403:17,22 412:8,16 426:2,10 432:17 435:14 441:11 476:19,23

**highlighted** 306:4

**highly** 334:10 391:22 417:18,19

**hired** 297:3

**historic** 322:5 431:5, 7

**historically** 454:3

**history** 422:3

**hold** 294:16 329:6 355:14 423:18 481:9

**holders** 400:14,19 427:21

**holding** 392:5

**holds** 314:22 315:7

**honorable** 428:9

**hope** 335:8 348:23 351:24 396:15 445:13

**hour** 454:9,12

**hours** 290:13 349:20,

21 350:19,20 479:4,9 480:9 481:17

**house** 308:7 424:25

**housed** 308:6

**hundred** 391:21

**hundreds** 293:15 312:12

**HVIN** 469:15

---

**I**

**idea** 300:21 331:15 410:15,19 416:7 435:21

**identified** 310:14 324:2 348:16 353:24 459:19 461:2,7

**identifies** 317:8

**identify** 299:6 300:3 313:4,17 314:21 321:14,18 328:10 329:12 331:16 340:25 341:5 342:14 366:6 396:24 422:2, 18 471:5

**illiquid** 361:18

**imagine** 290:12 313:21 319:23 320:3 336:17,21 342:18 367:16,17 383:13

**impact** 476:22

**imperfect** 365:5

**implying** 475:16

**important** 423:15

**importantly** 440:12

**improper** 391:4

**in-person** 350:9,12

**inaccuracy** 378:18

**inaccurate** 357:10 364:15,19 378:9 379:6 389:12

**inaudible** 338:23

**Inc.'s** 362:24

**incentive** 361:18

**incentives** 361:17 421:21

**include** 297:7 318:16 420:24 427:2 432:7

**included** 354:13 412:8,12,16 414:18 415:13 430:10 432:17,19 470:7

**includes** 473:3

**including** 348:15 421:5 459:8,13,16

**inclusive** 350:16

**income** 322:3,4 343:24 386:19 387:7 388:14

**incorporated** 366:2 392:24

**incumbency** 309:23,25 310:10 311:8 313:13,14 320:23 323:19 331:19 340:12,20 342:11,20 398:6 436:25

**incur** 316:12,18

**incurred** 337:22

**indefinitely** 373:12

**independent** 385:19

**indirect** 329:23 341:19

**indirectly** 307:3 322:19 330:3

**individual** 345:8 351:3

**industry** 317:16 404:19,21

**inform** 326:12 443:9

**information** 344:20 378:13 414:25 424:14 427:18 470:13

**informed** 443:2

**initial** 419:15

**inkling** 413:14

**inordinate** 392:6

**insignificant** 424:20

**installment** 369:24 409:16,22 453:22 456:2,12,21 458:8 460:11 461:20

**instruct** 371:10 393:15 442:21 443:9 445:21 446:4 461:19

**instructed** 371:24 372:13 397:2

**instruction** 372:20 397:16

**instructions** 395:15

**intended** 325:20 418:19,20 473:23

**intent** 339:9 377:5,6 414:12

**intention** 418:14 482:10

**intentionally** 304:19

**interacted** 402:4

**intercompany** 422:5,17,20 423:4,11

**interest** 329:24 330:3 341:19,21 400:14 408:2 419:10 440:8 450:9 452:20 453:10

**interests** 306:18 307:4 453:5

**interject** 390:25

**interjecting** 445:4

**interrelated** 423:3

**interrogatory** 426:5

**interrupt** 422:14

**investment** 291:16 330:22 401:9

**investments** 330:21 339:17 342:7 361:19

**investor** 292:21 338:24 385:4

**investors** 330:24
331:2

**invite** 396:19

**involved** 325:9 328:2
339:17 355:21
373:16 386:12
406:10 459:5

**issue** 306:5 332:22
335:7 360:8 399:9,17
400:24 405:5 410:22
423:15 424:10 433:9

**issued** 467:20
468:15

**issues** 333:7 348:16
386:9 468:2

**item** 430:16

---

**J**

**James** 288:5,11
404:17

**January** 291:10
450:23

**JEFFRIES** 472:15

**Jim** 302:3

**John** 291:21 317:21
335:17 347:21 369:8
376:18 380:13,14
386:20 387:22
390:21 395:23,24
396:3,6 397:5 406:10
445:3,9 457:19
478:23

**Jonathan** 322:6

**judge** 363:22 443:12,
17 480:18

**judgment** 305:17

**July** 420:13 428:18

**jumps** 390:2

**juncture** 355:22

**June** 436:10 437:17

**justification** 347:17
365:18 370:7 389:16,
20

---

**K**

**keeping** 432:2

**key** 377:16

**kind** 335:3,6 366:5
384:19 414:14 425:3,
11 432:21

**kinds** 327:25

**Klos** 300:17 352:10

**knew** 311:9 313:24
325:20 334:6 336:19
391:23 392:18
439:11 440:11,12,16
442:12,13,17 451:16
454:2

**knowing** 294:5
299:2,21 300:6 301:2
316:7

**knowledge** 300:24
301:6 312:4 323:8
340:13 341:22 349:2,
14 351:16,20 367:22
368:24 373:20
397:15 410:11
420:15 437:8,9 438:6
457:5 465:17,22
466:6 468:13,20,24
469:5

**knowledgeable**
373:16

**Kristin** 352:18

---

**L**

**L.P.** 288:6 290:24
306:8 311:21 322:13
324:4 471:22,23

**lag** 301:25

**lagging** 478:24

**Lamensdorf** 322:6

**largely** 291:16 308:6
370:10 397:20

**larger** 460:22

**largest** 292:4

**late** 288:22 336:25
356:4 374:6

---

**Lauren** 320:9

**law** 335:21 389:23

**lawsuit** 403:17,22
404:4,11 433:9

**lawsuits** 399:9,17
400:25 405:5

**lawyer** 390:24 391:4

**lawyers** 312:6
350:23,25 365:5
383:6 406:10

**layers** 401:25

**lays** 475:20

**learn** 367:14,25
440:5

**learned** 312:17 368:6
442:23

**leave** 288:24 370:13
380:9,25

**left** 456:5

**legal** 383:2,7 410:18
473:14

**legitimate** 467:25
468:3 469:16

**lengthy** 356:18

**lens** 421:12

**letter** 412:14 426:24
439:16 441:6,12
442:7,11,13,22
443:3,13,17,25
444:4,6,9,15,17,24
445:16,18 464:3,20
465:4,23 466:18
467:2,6,10 472:4

**letters** 299:25 426:9
464:5 465:12 469:11

**level** 423:2

**levels** 317:20 404:19

**liabilities** 299:9
327:4

**liability** 412:20

**lieu** 361:8,16 416:15

**life** 427:19 470:24

**likelihood** 312:15

---

**limited** 413:16 417:7
427:18

**limits** 317:12

**lines** 331:4

**liquidity** 339:16

**list** 354:12 418:25
424:19,20 425:10,17,
18,20 426:4

**listed** 354:18 419:5
420:3 425:16 430:17
440:9 445:25 446:6
450:5 466:17

**listen** 372:11 468:11

**listing** 353:4

**lists** 344:20

**litigation** 289:9
356:7 414:19 441:7,
10 443:4,8,18 455:23

**LLC** 341:8,11

**loan** 365:23,25
416:18 421:19 422:5,
18,20 423:11 430:4,
5,15,23 431:9 435:2,
18,24

**loaned** 452:7

**loans** 298:22 299:3,
22 300:7 301:3,9
344:12 371:3,9
404:20 406:11
420:17 422:17 423:4
424:7,16 427:3,12
429:4,11,18,19,24
430:23 431:5,13,21
432:7,11,15,17,18
448:12 450:21
452:19,20,22,23
477:10 478:2,8,11,16

**logical** 377:6,9
391:18 413:20

**long** 301:20 380:18
397:17,18 427:5
434:5 479:19

**longer** 478:25

**looked** 340:19
396:23 431:4 439:10
455:11 464:2

---

**lot** 291:22 297:23
311:14 416:3 452:14
467:23 482:8

**loud** 414:9

**love** 428:25

**low** 312:15

**lower** 452:14,20

**lunch** 380:19,21
398:17

**Lynn** 363:22 443:12,
17

---

**M**

**made** 333:19 346:4
367:15,25 368:24
369:3,5,15,18 372:18
387:12,19 388:6,11
392:6 393:25 395:16
397:22 424:13,18
432:19 434:15 439:8
440:6,17 442:2 445:4
460:20 465:6 466:17
468:14 470:18
476:10 477:16

**major-** 307:2

**majority** 307:4 330:2
341:21 400:13,18
427:21

**make** 288:15 305:17,
18 341:14 357:14
358:12 364:23
371:11,13,18,25
372:14,21 375:13
377:16 379:10 387:5
393:7,10,16 394:7,15
395:15 397:2 400:15
409:15 410:8 411:17
429:17 440:21
441:17 445:22 446:5,
9 455:12,25 456:11,
19,20 457:3 458:7,
11,15,17 460:10
461:5,20 462:3,10,
11,19 463:3,4,11,19
465:7 466:25 476:15,
20 479:15 481:2

**maker** 295:22 296:2
414:9 429:21 437:14
467:3 474:24 475:10

Index: makers..Nexpoint

477:17

**makers** 451:7,25

**makes** 342:7

**making** 377:13
461:14 467:19

**maliciously** 304:20

**man** 383:22

**manage** 293:4
421:21

**managed** 308:9,16
325:13,18 327:16

**management** 288:6
290:24 292:5,18
294:11,22 295:4,14,
21,23 296:3,10 306:7
308:11 311:21
329:19 362:23
405:22 412:14 426:8,
13,23 431:21 434:15
457:24 458:4 466:22
471:22,23

**manager** 291:19
293:2 309:3 421:14

**managers** 309:5
322:5 421:21

**manages** 330:16

**March** 435:3

**Mark** 306:15 383:11

**marked** 345:4,6
353:12 354:6,23
362:16 377:22
380:11 402:23
408:10 433:15
446:16 464:12 466:9

**market** 339:5 384:16

**marketed** 330:18,20

**marks** 288:3

**masked** 422:9

**material** 332:22
344:2 365:22,24
368:4,7 369:2 412:7,
10 425:7 426:16,23
427:4,12 430:6,9
431:8,9

**Matt** 342:18

**matter** 288:5 293:7
296:20 350:18
467:15

**matters** 302:2

**Mcgraner** 342:18,23

**mea** 406:16

**means** 384:2 395:20
458:4

**meant** 332:3 456:7
474:4

**mechanism** 429:18

**meet** 350:11

**meetings** 350:16,22
351:2 481:5

**members** 425:2

**memorized** 347:23

**memory** 356:13

**mentally** 289:24

**mentioned** 335:10
367:18

**met** 349:17

**Michael** 322:6

**mid** 374:21

**middle** 374:24
404:15

**migration** 364:6

**Mike's** 387:14

**million** 294:2,8,11
296:15,18 298:12
377:3,4 391:25 392:5
393:4,12 405:17
407:22 408:18 412:4
413:5,11 419:17
420:12 421:16
429:24 430:14

**mince** 393:9

**mind** 324:13 392:21

**mine** 434:19

**minimis** 297:25
298:5,17 333:5,7,12,
15 334:7,14 343:21
376:25 377:3 391:21
393:20 410:13

411:25 412:3 413:18
417:20 421:13
458:20

**minimus** 298:7
343:22,23

**minute** 291:24

**minutes** 318:3 370:5
387:10 454:8

**misleading** 390:25

**missed** 425:9 456:24

**missing** 389:20

**mistake** 448:22

**mistaken** 397:10

**Mitts** 324:14

**mixed** 430:15

**modest** 382:6 385:11

**modification** 417:4
475:15,16,21

**modified** 357:14
364:22 379:9 473:10
474:8 476:21

**modify** 473:14,23

**moment** 357:16,25
359:11 364:20 366:4,
10 375:23 379:25
422:2 461:18

**Monday** 479:15

**monetize** 361:18

**money** 292:18,25
293:4 295:3,7,8,13
296:9 331:4 336:24
337:7,16 360:7
382:11 391:21
419:22 420:2,6
421:19 448:6 450:16
452:7,14 460:22

**moneys** 337:19
470:15

**monitor** 288:8

**monthly** 299:13

**months** 428:15

**MORRIS** 288:14
289:5,14 291:25
294:18 295:2 303:18,

22 304:4 305:8
309:11,17 317:24
323:17 337:17 345:3
346:5,8 347:24 348:4
349:25 353:10 354:4,
21 355:5,9 359:6
369:12 372:8 374:4
375:19 376:22
377:20 380:12,16,24
381:4,15 383:19
386:25 387:16 388:3
390:3,17,20 391:3
393:22 396:7 397:7
398:15 401:5 402:9,
15 403:3 405:14
406:18 408:7,11
414:4 423:23,25
425:8,17 426:7 432:3
433:13,18,20 434:9,
24 436:13,19 437:11
439:14 444:12,22
445:12,20 446:2,14,
20 448:17,21 454:13
456:6 462:14 464:9,
15 466:7,10 468:10
472:13,17 474:18
476:7 479:3,12,24
480:14,22,25 481:6,
12,15,22 482:3,16

**mortgages** 452:25

**motion** 374:20,24
395:7

**mouth** 302:5

**move** 322:11 372:8
374:4 375:19 386:24
393:22 432:3 433:7
440:15 462:14
468:10

**moved** 364:3 468:22
470:15

**moving** 302:5 468:7

**mucked** 469:20

**multiple** 311:15,23
320:4,5 324:20
325:5,6,22 375:7,8
406:10

**mute** 395:22,23,24
396:2,14 481:11

**mutual** 308:6,7,9,16
317:3,4 336:12

**myriad** 335:2

**N**

**names** 299:14
342:22 425:19,20
426:4

**Nancy** 288:19 355:14

**narrow** 313:16

**nature** 308:5 323:3
330:15 342:5

**nauseous** 289:4

**necessarily** 413:7
475:21

**necessity** 376:20

**needed** 372:18

**negotiate** 417:13

**negotiated** 418:6,10

**negotiating** 411:23

**negotiation** 416:22
417:2,4

**negotiations** 417:2
451:22

**netting** 392:9,15

**news** 428:14

**Nexbank** 431:18
432:6,18,20

**Nexpoint** 322:11,12,
15,18,21,23 323:6,
10,15 324:3,9,15
326:2,4 327:7,16
328:6,13 329:6,14
335:20 336:23
339:22 341:11 346:2,
17 353:17 381:23
382:8 383:6 384:16
385:8 389:8 391:24
393:15,25 394:8,16
395:16 396:25 397:3,
13,16,22,25 398:8
403:16,17 405:18,25
407:17,21,24 408:4,
9,24 409:8,24 410:5,
7 411:18 419:11,20,
21,25 420:5,11,16
439:12 447:21 451:2
452:7,13,18 453:2,5

455:25 456:11,19 458:25 459:4,9,24,25 460:7 461:8 467:6,8 473:5

**Nexpoint's** 323:4 326:7,12,17,22 327:2,9,10 328:7,14, 18,22,25 329:8 345:20,24 346:14,20 347:2 348:8 349:3,12 388:22 389:2 412:3, 17

**night** 290:10

**nods** 292:2

**nominal** 386:4

**non-payment** 414:11

**non-privileged** 442:6

**nonetheless** 334:15

**normal** 316:22

**note** 306:5 349:3 368:16,18,19,22 369:23 371:12,21 372:2,16 397:3 407:17,21,25 408:16, 23 409:2,6 410:7,15 411:11,18 412:4,15 413:5,6,11,15,18,24 414:18 415:9,13 416:9,12,14,18,24 417:9,14,17 418:4, 17,18 419:4,8,20,23 420:6,20,25 421:5 434:3,14,22 435:14 438:18 440:14,23 446:25 447:5,8,16 448:8 449:12,15 450:3,18 451:12 455:6 457:10 467:2, 3,9 470:18 475:21

**notebook** 355:4 464:14

**notes** 293:12,15,19, 24 294:23 295:22 296:3,22 297:17,25 298:4,12 305:18 327:6 334:5 348:12, 15 353:5 356:6 358:7,8,9,16 359:10

360:8 364:7 367:4 368:15 373:8 376:24 377:12 391:13 399:9, 17 400:24 402:6 403:15,21 404:3,9 405:5,9,10,17 408:3 410:22 411:7 414:23, 25 415:4,18,21,23 416:21 417:12,20,21 418:9,13,16,19,20,25 419:5,12,16 427:24 433:9 439:9 440:9 442:3 443:10,19 445:23,24 446:11,18 447:17,23 448:7 449:4 450:4,10,25 451:3,6,9,16,19,21, 25 452:3,9 453:11, 19,21,22 455:3 457:9 461:22 462:4,18 463:2,12 464:6 465:2 466:17 467:20 468:15 469:16 470:8, 18,22 472:24 473:3, 5,11,18,25 474:21 475:5,9,11,16,19 476:2,6,14,23 477:7, 11,14,15,16,20,21,24 478:3,9,11,17

**notice** 353:14,18 354:7,13 363:7 367:3 375:4 377:8 414:11, 12,13 443:19 480:19

**noticed** 406:15

**notices** 345:2 353:2 414:13 464:24

**notion** 423:16

**notwithstanding** 375:12 379:16

**November** 375:4

**nuance** 478:5

**number** 298:14,21 299:3 362:17,18 408:8,12,13,15 464:4

**numbers** 392:20 425:3

**numerous** 365:25 368:25

**O**

**object** 296:23 297:10 305:25 311:5 315:16 318:24 321:21 326:8, 19 329:9 331:9 340:6 344:7 366:8,17,22 367:6 369:25 373:5 376:10 379:11 384:2, 22 385:17,24 388:15 390:14 399:11,19,21, 22 401:11,18 405:11 409:9,18,25 410:9 411:20 415:14,25 426:17 429:8 430:25 432:13 438:10 441:3, 20 445:11 447:11 449:22 452:10 453:7, 24 455:19 456:4,14 457:6 460:13 461:16, 23 462:6,21 463:6,22 465:14,19,25 467:4 470:3,10 471:2 473:12 474:2,11 475:12,13 476:25

**objected** 312:18

**objecting** 409:12 445:6

**objection** 294:3 324:21 327:20 343:19 347:4 348:25 361:25 387:8 428:5 434:17

**objections** 346:4 348:19 353:25 354:17 383:21

**obligation** 371:20 426:13

**obligations** 294:14, 21 295:20 297:8,15, 23 315:15,22 316:3, 8,12,19 318:17 326:7,13,18 327:3,11 328:8,15 332:20 333:2,11,15,18,23 334:4,13 340:5 343:6,18,22 344:6,12 366:15 367:4 377:2 469:19 470:2 473:24 474:10,24 475:11

**obligors** 356:6

**obligors'** 458:13,14 469:10

**obtained** 312:3 374:16 435:18 448:12 450:22

**obtaining** 452:19

**occurred** 368:13

**October** 288:7 374:8

**odd** 422:25

**odds** 413:15

**offense** 432:4

**officer** 303:2 310:4 312:8 320:22 321:16 329:6,14 331:13,17, 25 332:9 340:16 341:3 342:15

**officers** 311:14 459:8,12,14,15

**offline** 480:2

**Okada** 306:15,22

**omission** 406:22

**omitted** 405:25 406:7,12 407:3,5

**operating** 299:13 316:20,23 343:23

**opinion** 447:14

**oral** 336:15 337:4 361:22 399:7,15 400:10,22 401:4,16 403:7,10,13,19,25 404:8 406:20 407:10 420:21 443:10,20 472:11,21 473:8,21 474:22 475:6 476:18, 22 477:8,24 478:7, 10,15

**orchestrate** 314:19, 25

**orchestrated** 327:14

**order** 374:13,16

**ordinary** 372:23

418:13,14 459:20 460:10 461:3,13 462:17 463:2,14,18

**original** 356:2 407:21 473:11,18,24 475:4,8

**out-of-pocket** 338:8,16

**outline** 480:20

**outstanding** 295:17 407:25 419:10 440:7 447:22 450:9

**overcharged** 391:24

**overlay** 343:20

**overpayment** 392:4

**overstatement** 460:17

**owe** 294:10 296:9 426:3

**owed** 297:8,15 375:14 419:11,22 450:10 460:23

**owing** 327:4 344:21 366:16

**ownership** 306:18 307:4,21,24 317:18 329:24 341:19

**owns** 306:13 322:18

**P**

**p.m.** 381:9 398:20 454:17 482:21

**pages** 435:21

**paid** 338:8 373:13 392:16 418:21,22 460:20 462:11

**paper** 338:22

**paragraph** 357:17 358:19 359:12,13,23 360:13,16 361:14 362:9 365:2,15 370:8,14 378:20 379:14,24 390:4 403:4,6 404:14 407:14 409:13,20 412:23 414:6,7,17 421:10 422:8 423:10 455:11,14,18 472:14, 18,21

**paragraphs** 357:20 365:10 375:22 380:2 390:7,10,16 398:12 416:9

**paraphrase** 394:23

**parsed** 471:25

**part** 334:19 337:4 340:8 358:22 359:15 360:2,18 365:17 370:17 412:10 414:19 418:21 423:4 427:20 443:23 444:2 454:4 456:8 468:3

**participate** 289:24 350:21,25

**particularized** 468:24

**parties** 297:24 339:6 413:14 415:4 418:7

**parties'** 473:10,23 474:9,23

**partly** 389:23 454:4

**partner** 361:6

**Partners** 341:8,11 455:7 464:21

**party** 452:2,6

**passed** 338:5

**passing** 363:22

**past** 296:6 338:20

**patient** 372:10 383:20

**Patrick** 301:15 383:11

**pay** 336:23 337:6 338:7 366:14 367:4 369:23 383:15 384:7 385:22 393:5,12,18, 19 419:7

**payee** 295:24 422:21 466:25 474:25 476:2 477:16

**payees'** 475:10

**paying** 339:2

**payment** 337:13 371:11,19,25 372:14,

21 373:3,11 375:13 391:16,20 393:16,25 394:8,15 395:16 397:2 409:16,23 414:11 439:9 440:7, 21 442:3 453:22 456:2,12,19,21 457:4 458:8,17 460:11,17 461:5,14 464:5 468:15 475:18 476:3, 16

**payments** 369:24 373:18 377:13 410:8 445:22 446:5,10 454:3 458:15 460:16 461:21 462:3,19 463:4,11,20 469:18

**peak** 292:3

**people** 293:5 299:6, 8,15,18 300:10,13,14 303:18 342:19 407:9 416:10,11 421:12 424:23,24 426:15 458:22 459:7 470:16, 18

**people's** 424:21

**perceived** 396:16

**perceives** 396:18

**percent** 298:13,16

**percentage** 306:17

**percentages** 306:23

**Perfect** 402:12 482:12

**performance** 385:9 416:16

**performed** 471:16 472:7

**period** 293:16 307:18,25 330:8 367:20 401:13,15 420:13 421:17 440:20,25 479:18

**periodic** 454:3

**periods** 304:21

**permissible** 386:22 387:23

**person** 300:4,17,18

311:3 315:12,20 316:24 331:16 332:17 333:16 364:8 371:17,18 373:19 388:5 393:15 396:24 397:15 410:4 443:5 458:22

**personal** 358:8,9 386:23 387:24 480:4

**personally** 297:3 301:7 324:2 327:17 363:19 371:10 393:24 405:6 417:16

**personnel** 372:7

**perspective** 333:13 334:3 377:7 405:17 473:21

**petition** 311:10 324:9 325:21

**Phillips** 364:5

**phone** 350:2,9,17,22 351:2

**phrase** 347:15

**physically** 289:23

**pick** 476:20

**picked** 335:8

**pile** 362:13

**PJ** 434:10

**place** 476:9

**plaintiff** 289:8

**plaintiff's** 355:19 358:21 359:14,25 365:16 370:16

**plan** 468:8

**play** 474:13

**players** 472:2

**pleasure** 381:4

**point** 288:25 290:22 309:8 318:2 320:15 377:19 406:19 427:7, 24 433:5 468:7

**points** 416:9

**policy** 317:6

**portfolio** 308:10,16 309:3,5 322:5 361:21

**portion** 303:16 308:15 351:10

**position** 298:3 311:23 312:16 313:17 314:11,21 320:14 321:7 325:25 329:6 367:9 403:10 407:9

**positions** 297:5 312:22 315:6 316:21 320:17

**possibly** 423:3

**post** 309:17

**pot** 468:8

**potential** 330:23

**practice** 317:17 404:20 423:16,17 424:6,15,22 429:4 430:4 431:13

**practices** 411:13

**precedence** 477:5

**precedent** 429:12,16 477:5

**precipitate** 314:25

**premarked** 309:13

**prepaid** 366:15 391:13 406:11 418:22 461:9

**preparation** 328:2 350:5 353:7

**prepare** 349:16

**prepared** 299:12 334:16 338:3 346:25 347:20 348:6,14,22 349:11 354:17 356:9 363:9 376:6

**preparing** 299:10 320:4 340:9 350:15 363:20

**prepay** 389:17

**prepayment** 366:21 367:5,15,22 368:2, 10,15,24 370:10 378:12,16,20 379:18

459:22,25 460:8

**prepayments** 365:23,25 367:13 369:2,15,19 378:15, 23

**prepays** 389:19 392:24,25

**presence** 384:15

**present** 431:24 476:11

**presentation** 431:4

**presentment** 414:10

**president** 291:10,15 292:6,14 293:16,20, 25 297:6 298:19 302:12,23,24 303:13 304:15,22 305:2,11, 24 308:21 309:6 313:6 315:10 323:12 325:2 326:4 332:17 337:12 338:13 422:3, 19 423:12 469:21

**presidents** 317:18

**pretty** 460:24

**previously** 319:15 408:3

**Price** 337:23

**Pricewaterhouseco opers** 469:25 470:5, 6,19

**primarily** 322:7 339:14 368:18,19 383:10 440:3

**principal** 293:23 295:17 360:7 407:22 408:2 419:10,16 440:8 450:9

**prior** 300:5,15 302:20 307:21 311:10 315:23 324:9 325:20 389:14 391:9 418:25 419:11,16 420:6 423:16,17 424:15 441:6,9 442:10 443:3,7 448:7 450:10 463:16 477:19

**private** 421:18,22

**privileged** 441:18

**problem** 302:7 381:5 384:3 454:13

**proceed** 289:22 291:25 398:25 454:20

**proceeds** 348:20 349:3 420:16 435:23 448:11 450:21

**produced** 367:23 425:13 428:10,17 444:6,12,17 445:18

**product** 451:21

**production** 428:16

**profit** 338:9

**promissory** 293:11, 12,15,19,24 294:23 295:22 296:2,22 408:3,16 411:18 413:11 419:5 434:3, 14,22 446:25 447:17 450:4,18 464:6 467:20 470:8 472:23 473:3,5,11,24 474:21 475:5,9 476:23 477:11,14,15 478:2,9

**proper** 412:11

**properly** 412:12

**proportionate** 424:21

**protections** 413:17

**protest** 414:11,12

**provide** 383:3 386:17 387:6 404:16 421:7

**provided** 337:8 339:11,16,20,21 353:2 385:12 386:4 429:7

**providing** 336:6 422:5

**provision** 382:14 415:12,24 447:8 449:19 455:18

**provisions** 440:14 449:25

**prudent** 413:4

**pulling** 449:2

**purchasing** 317:4

**purpose** 298:8 377:10 401:3 404:15, 24 405:3,8,24 406:7, 23 407:3,9,11 421:4 422:5 423:12 430:22

**purposes** 416:6 422:21 424:25

**pursuant** 356:4

**put** 290:18 309:12,18 320:25 323:17 342:13 345:3 348:2 353:10 354:4,22 355:11 367:2 378:10 379:4 391:20 401:5 408:7 416:5,7,10 418:14 427:18 433:14,22 448:3 466:7 470:20 476:9 481:10

**putting** 343:12,14 354:24 355:10 443:18 472:14 480:19

**Pwc** 412:16

---

**Q**

**qualified** 346:3

**quarterly** 299:11

**question** 294:25 295:11,25 302:10 304:10,24 305:21 306:2 332:2 335:18 357:2 358:11 372:11 376:13,22 381:16 383:25 387:2,3 388:2,9,16 391:6,14 393:23 395:6,8,9 397:8 398:7 405:7 417:10 422:15,25 423:7 424:2 441:22 442:15 457:14,15 460:25 467:17 468:12 477:2 478:6, 13

**questions** 335:4,6

346:25 353:22 363:2, 9 375:25 376:3,6,21 378:2 388:21 390:22, 24 480:16

**quick** 317:23 380:14

**quickly** 344:25 345:15 377:12

**quote** 359:25 360:3 365:16 370:16 404:15

---

**R**

**raise** 382:10

**rambling** 387:10

**rate** 475:18

**rates** 452:14,20

**rationale** 471:10

**read** 293:8 296:21 358:2,10 361:2 381:15 397:9,10,12 404:22 409:2,11 410:3 413:6,10,24 414:9,15 415:24 424:2,3 430:21 447:5 449:15,18 455:13 475:2

**reading** 310:3 411:23

**ready** 454:20

**real** 323:5 341:11 342:7 385:8 391:14

**realize** 468:6

**reason** 303:10 304:12 305:2,12 318:19 319:4 324:7, 10 328:4,11 391:18 410:25 411:14,15,16 413:20 434:20 436:7 437:6 447:6 452:5 453:3

**reasonable** 392:10 404:18 411:19 413:24

**reasons** 388:16 413:25 458:14 460:9 468:21

**recall** 292:8 298:24 302:17 303:4 310:25 312:20,25 313:21 320:14,21 326:15,16, 21,25 330:11 337:11, 18 355:18 356:2 357:3 363:6 368:23 371:22 373:21 374:11,15,19,23 375:3 407:20,24 409:5 410:6,21 424:9 425:10,21 437:3 446:3 465:4

**receive** 338:14 344:19 435:2

**received** 322:3 337:13 383:16 435:9 464:4,24

**receiving** 386:18 387:7 388:13 425:22 442:14

**recess** 304:7 318:8 381:9 398:20 454:17

**recollect** 442:16

**recollection** 309:14 310:17,21 311:17 324:2,17 338:12 349:6 352:25 355:24 356:8 386:2 411:6 420:10 435:17,22 440:2 442:14,19 443:16 444:14 448:5, 16 450:20 455:5 464:23 467:16,19

**recommended** 301:15

**reconvene** 289:3

**record** 304:3,5,8,11, 25 318:6,9 330:20,25 338:18,22 339:4 381:7,14 382:10 384:15 385:5 397:12 398:19,21 399:24 424:3 454:16,18 479:13 481:14 482:17,20

**records** 298:23 330:17 367:8,12 397:14,19 431:20,25

**recover** 358:16

**redaction** 428:12

**reestablish** 419:8

**refer** 291:2 306:10 322:15 329:21 340:14 341:15 400:9

**referenced** 337:5

**referred** 445:17

**referring** 297:16 371:4

**refine** 330:22

**reflect** 477:16

**reflected** 294:22 295:21 313:20 327:3 334:15 420:6 477:11

**refresh** 309:14 310:17 323:25 339:18 349:5 352:25 355:23 356:8 439:12 455:5 464:23

**refreshed** 331:21 332:16 341:4 342:11, 17 420:14,18

**regard** 386:5 402:5 407:7 443:13,25

**regular** 344:9 373:11 460:16

**regularly** 299:17

**regulatory** 327:15 335:21 411:14 416:6 469:18 471:10

**regulatory-wise** 418:3

**reimbursement** 338:15

**relate** 361:20 375:21 376:8,16 379:23 380:3 398:11 478:7

**related** 323:5 366:6 382:4 390:11 398:4 415:4 477:10,13,25 478:15

**relative** 333:5,7 343:23 376:25 413:18 430:18 453:16

**relevant** 412:3

**reliance** 370:25
372:5 463:8

**relied** 372:22,23
375:13 383:9 393:4,5

**relocate** 430:14

**relocation** 424:24

**rely** 428:2,7,8

**relying** 367:10 371:7
398:8 458:16

**remains** 401:21

**remember** 301:21
307:20,21 308:12,13
309:10 311:14
312:14 320:17 323:2
330:13 358:10 361:5,
8 368:6 375:9 389:14
407:18 409:12
410:25 411:5,22
441:14 443:14,15
464:4 465:8 467:22
468:5

**remembered** 415:9

**remind** 460:5

**remotely** 480:10

**remuneration**
337:10 382:8 384:13
385:14

**render** 388:12

**rendered** 337:14
339:13 384:8 385:23

**renegotiation**
416:20

**rep** 299:25

**repaying** 418:15

**repeat** 294:24 295:25
302:10 387:3 391:8
394:5 399:13 441:22
472:16

**repetitive** 335:9

**rephrase** 295:10
399:13

**report** 314:5,8,13

**reporter** 288:9

**responsibility**
299:2,20 300:6 301:2
315:13 319:6 326:6
327:9 332:19 333:22
340:4 343:2,5,17
364:9

**responsible** 299:7,8
300:11 316:6 327:18,
21 471:24

**responsive** 422:15

**rest** 290:17 482:9

**restate** 457:14

**restraining** 374:13,
16

**restroom** 317:23
380:15,23

**results** 330:23

**retail** 312:22

**return** 386:19 387:7
388:14 398:17

**revenue** 339:6,20,21

**review** 344:12
346:20 351:7 354:12
389:5 447:13 450:2

**reviewed** 357:4
429:5

**reviewing** 355:19
363:20

**ridiculous** 377:17

**rights** 473:10,23
474:10,23 475:10
476:23

**road** 339:7

**role** 314:2 327:12
343:11 363:19

**roles** 311:15 325:22
373:12

**roll** 337:25

**roll-ups** 477:18

**rollup** 407:25

**room** 309:18 355:11

**rough** 482:14

**roughly** 375:2

**row** 318:3

**RUKAVINA** 445:2,14

**rules** 386:6,7

**run** 319:24 380:22

**running** 324:13

─────────
**S**
─────────

**safe** 445:13

**satisfaction** 371:19
372:14

**satisfied** 373:18
429:13,16

**satisfy** 333:18

**scope** 300:7 301:9
316:7 317:8 387:22
405:15

**screen** 353:19
354:19,25 355:10
381:2 388:20 389:2
401:6 402:7,17,22
433:22,25 434:6

**screw-up** 370:25
371:2,4

**scroll** 434:**9**

**sec** 291:22 471:8,17,
21,25

**secrecy** 427:23

**secretary** 321:9

**section** 409:14
412:22,25

**secured** 416:13,15
452:25 453:13,16

**Seery** 352:6,8
373:23,24,25 375:16
391:23 392:9 414:24
439:17 468:6

**Seery's** 352:7

**sees** 302:6

**selection** 301:16

**send** 467:2

**senior** 297:5 300:10,
14,17,18 312:8
316:20 325:5 327:23

**424:25 431:21
432:19 452:25
453:13,16**

**sense** 341:14 392:7
466:25

**sentence** 405:24

**separate** 331:3
333:24 385:20 457:9
480:5

**separately** 430:17

**September** 355:25
356:10 357:6 374:6

**series** 455:3

**serve** 291:9 309:7
323:15 325:21
331:24

**served** 302:24
303:13 304:15
305:24 310:18,23
311:19 313:6 320:22
321:15 324:8,25
325:3 329:13 331:13,
17,22 332:8 341:2
342:15

**server** 426:2

**service** 333:6 334:5
343:22

**serviced** 336:3

**services** 294:11,22
295:4,7,9,14,21,23
296:4,10 329:19
331:20 332:4,14
335:15,17,22,23
336:2,5,7,9,10,15,24
337:7,13 338:4,6,15
339:3,9,12,15,22
340:11,20 362:24
367:11 371:6,7 372:7
375:5 381:11 382:14
383:3,9,16 384:8
385:12,23 386:2,4,
10,18 387:6 388:13
392:6 405:19,21
417:22 433:12
437:14 457:23,24,25
458:3,5,7,23 459:4,
15 460:6,7 466:3
467:6,13 471:15
472:5

Index: servicing..subject

**servicing** 413:17

**serving** 311:11
313:25

**set** 291:22 319:23
360:12 365:11 390:9
393:6 398:12 419:9
420:7 447:18 448:7
450:8,17 452:8
455:18 474:23
475:10

**settlement** 444:2
468:4 471:7,11,12

**seven-figure** 425:3

**seven-figure-plus**
431:20

**share** 359:2,17 362:7
368:10,21

**shared** 335:14,17,22,
23 336:2,5,9,10,15,
24 339:3,22 367:11
371:7 375:5 381:11
383:8 392:5 417:22
458:23 472:5

**She'll** 428:22

**sheet** 298:9 299:4,23
300:8 301:10 326:23
327:3,7 412:2 432:16

**sheets** 293:8 301:4
413:19

**shocked** 412:19

**shoot** 290:13

**short** 318:4 380:19,
21 386:11 387:10
397:17 398:16

**shorter** 291:23

**show** 330:23 347:22
406:4 415:17 429:15
431:20

**side** 308:10 450:5

**sides** 413:21

**sign** 299:24 312:12
327:24 408:23 426:8,
13 434:22 436:9
449:12 451:5

**sign-offs** 320:5

**signatories** 319:12
328:18

**signatory** 319:9,16,
20 328:22,25 329:7
438:2

**signature** 310:4,6
323:23 408:20
418:15 434:11,13
435:7 436:5,8,14
437:23 438:4,5,9,14,
18 446:21,22 449:10

**signatures** 320:4

**signed** 293:11,14,18,
24 310:11 358:16
409:3,7,22 410:6,22
412:14 414:18
415:13,23 416:22
417:12 418:12
419:19,21 435:7,12
437:13 438:25
446:25 447:5,9
449:6,16,21 451:2
453:20 455:14 473:3,
6 476:6,15

**significance** 316:25
317:2 460:18

**significant** 382:9
422:13 425:6

**significantly** 391:14

**signing** 413:5
437:24,25 438:22
439:5

**similar** 336:7 339:21
342:12 378:11

**similarly** 336:3

**simple** 348:25 391:6
393:23 395:8,9
400:16 441:23
460:25

**simultaneously**
301:18 311:11
321:20 384:5

**single** 353:9 414:18
428:11 458:21

**sir** 295:11 323:20
324:24 335:18
345:17 346:11
377:24 381:11
387:19 394:14

**396:24 402:17**
408:15 422:14
428:11 429:3 432:5
433:22 434:4,11
436:5 439:22 446:22
449:10 450:13
454:20 460:25
464:19 481:24

**sister** 351:21 361:22
399:8,16,25 400:9,17
401:8 403:12 404:8,
25 431:18

**sit** 300:24 301:7
304:13 318:20 319:4
357:8 445:10

**situation** 469:20

**sixth** 397:6

**skip** 357:24 359:21

**Skyview** 315:2

**small** 372:6 386:4
392:2 393:10,20
430:18 460:19

**soft** 413:15 415:9
416:9,12,18,24
417:8,21 418:17
452:22,23 453:11,19
475:17,19

**sold** 427:22

**solidifying** 411:10

**solvent** 417:19

**sophisticated**
292:21,25 383:22
390:23

**sought** 374:12
451:25

**sounds** 295:5 422:10
473:14

**source** 334:18

**space** 385:8

**speak** 303:23 399:3
453:12 454:22

**speaker** 303:25

**speaking** 301:18
303:15 383:21 384:5

**specific** 320:8 325:7
347:18 348:16

**356:13 372:24,25**
382:7 383:4 385:10,
14 438:6 456:24
467:15 468:20

**specifically** 312:14
316:5 317:7,12
326:14 344:20 349:4
364:17 372:17,18
373:7,15 382:18
393:18,19 412:15
430:12 434:23
435:16 437:5 470:6
471:21

**specifics** 369:16,20
375:25 410:12,13

**speculating** 300:9
430:20

**speculative** 427:6

**spend** 334:7 413:21

**spent** 350:15

**split** 322:9 472:5

**spreadsheet** 368:11
369:10

**stack** 353:2

**staff** 383:8 397:14

**stamped** 444:20,23

**standard** 404:20

**standing** 312:8
393:3

**standpoint** 418:3
421:13

**start** 365:13 424:4
472:13

**started** 307:22 364:4

**starting** 288:22

**stated** 388:17 407:13
419:17 471:21

**statement** 288:15
310:4 406:6,23 407:2
428:12 430:19

**statements** 299:10,
12 300:12 327:15,19,
24 338:4 366:5
412:8,17 429:6,15
430:8,22 432:7,12
470:9

**states** 359:13

**statute** 335:21

**stay** 371:8 394:25
481:13

**steal** 374:2 375:17

**step** 297:21

**steps** 316:2 344:11
393:24 462:2 463:3

**stick** 395:21

**Stinson** 288:18
363:15 364:3,6

**Stoops** 300:17

**stop** 289:2 356:21
441:17 474:18,19
479:6 480:15

**strap** 291:17

**strategy** 330:22

**stream** 339:6,20,21
386:18 387:7 388:13

**strike** 372:8 374:4
375:19 393:22 432:3
440:15 462:14
468:10,22

**strong** 324:15

**struck** 394:13 422:24

**structural** 335:3,6

**structure** 307:21
308:12

**structured** 314:10

**structuring** 312:7
373:9

**struggle** 316:15

**study** 327:7 333:9

**studying** 334:8

**stuff** 327:15 383:14
416:17

**subject** 332:2 347:3
348:18 353:25
354:16 361:21
403:16,22 404:4,10
416:20,22,25 417:3
420:20 429:20
440:13 443:10,19

474:21 475:5 476:11
478:2,8,17

**subordinated**
452:25 453:10,12

**subsequent** 407:11
477:4

**subsequently** 425:4

**subsidiaries** 415:3
417:19

**substance** 318:12
399:4 454:23

**substantial** 479:18

**substituted** 419:4
447:16 450:3

**suggested** 391:19

**suggesting** 396:18

**suing** 457:2 473:4,6
475:9

**summarized** 368:12

**summarizing**
360:19

**summary** 313:15
459:18

**superseded** 419:4
447:17 450:4

**supplemental** 338:9

**supplying** 334:17

**support** 336:10
360:12 370:7 391:7
431:12

**supported** 382:4

**supports** 470:24

**supposed** 289:11
376:5 392:8 395:20
431:16 461:4

**surprise** 410:24
438:17

**surprising** 311:16

**swear** 288:9

**switching** 437:24

**sworn** 288:12

**synergistic** 384:20

**systems** 397:14

---

**T**

**taking** 398:7

**talk** 303:8 304:21
305:18 328:3 366:3
414:20 475:17

**talked** 336:22 406:8
407:16 424:9

**talking** 337:16
359:10 383:17 390:5
401:14 421:24
429:23,24 441:14
442:16 443:14,15
456:5 474:18,19
477:21

**tax** 373:9 382:23,24
383:10 416:6

**tax-related** 383:14

**team** 308:16 327:14
340:8,15 343:12,16
417:7

**telling** 400:5 455:13

**temporary** 374:12,
16

**tension** 373:22,24,25

**term** 368:15,18,19,22
369:22 371:3,12,20
372:2,16 397:3
407:17,21,25 410:22
427:6 446:17 447:23
448:8 449:4 450:25
451:3,6,9,10,13,17,
25 452:8 453:21
455:3,6 461:22
462:4,14,18 463:2 467:9
473:15 475:15
477:20 478:11

**termination** 375:5

**terms** 338:18 373:10
375:16 382:20
384:15 386:7 392:10
403:7 411:18 413:6,
10 416:19 417:13,17
418:16 432:22,25
452:8 471:8

**Terrestar** 469:18,20

471:24

**testified** 288:12
351:14 352:16,22
370:9 379:15 441:25
462:8 472:20

**testify** 346:14 348:6,
14,22 349:11 354:8,
17

**testifying** 431:7
444:14

**testimony** 318:3,13
375:11 419:24 459:2
463:10 475:24

**Thedford** 320:9,11
321:14 329:15

**thereof** 310:5 431:22

**thereunder** 474:24

**thing** 324:13 336:12
362:3 389:25 426:2
436:24 452:17

**things** 292:19 304:20
312:10,12 313:11
317:4 322:8 327:25
359:14,25 360:16
373:9 403:6 428:7
435:11 445:3 468:2
469:19 470:16
471:12

**thinking** 340:17
375:16 402:3 459:3
461:18

**thinks** 351:25

**third-party** 330:24

**Thomas** 445:7

**thought** 388:4
413:23 467:25 468:3,
7 472:3

**thousand** 391:22

**thousands** 293:5

**throw** 290:9

**Thursday** 479:16
480:25 481:7,17,23
482:5

**time** 288:7 290:3,19
293:19 298:2 301:20
302:23 303:12

304:14,22,25 305:6,
23 307:15,18,25
309:8 313:5,18,24
318:7 320:12,15
324:25 326:18
329:14 330:8 334:7
337:12 338:12 341:3
342:16 344:19,20,23
346:21 350:15
353:21,22 358:11
359:9 361:2,3 367:19
378:14 379:2 387:25
389:24 390:13 392:9
393:14 395:4,10
396:17 397:6 398:16
399:23 401:13,15
406:15 411:4 413:5,
9,21 415:6,23,24
416:20 417:3 418:12,
14 419:21 424:12
438:9 439:25 440:11
442:6,14,17,18,20,22
449:21 453:20
454:14,15 466:23
470:13 472:9 476:4,
5,8,10,14,16 479:18
480:10,15 481:18,23
482:2

**timeframe** 371:14

**times** 338:20 339:15
349:22 350:4,8,11
356:15 375:8 383:23
420:2 421:20 450:16

**title** 308:18,25 313:4
323:10 325:11,16
331:5 342:8

**titled** 362:22

**titles** 311:25 312:3
325:6

**today** 290:13 291:3
294:10 295:17
296:10 298:10
300:25 301:7 303:9
304:21 305:22
308:19 309:2 314:17,
23 318:20 319:5
323:11 328:5 331:5
342:14 345:8,20,24
346:25 348:6 349:11
354:8 357:8 364:15
378:9 379:6 389:11
395:5 401:21 414:20,
22 415:12 445:5

453:4 454:9 479:5

**today's** 288:7 289:18
346:21 349:16 350:5
353:7

**told** 392:19 465:7

**top** 306:3 311:25
325:19 340:23
369:17,21

**topic** 347:6 348:11,
17 349:7

**topics** 346:9,10
353:16,17,24 354:13,
18 363:7 376:5
386:22

**total** 350:15 480:8

**track** 330:17,19,25
338:18,22,23 339:4
382:9 384:15 385:5

**tracking** 299:9

**transcript** 351:7
352:3,7

**transfer** 360:17,19

**transferred** 360:6

**transition** 363:22
392:11

**travels** 445:13

**treasurer** 309:8
310:14,18,23 311:4,
12 313:12,19 314:7,
16 316:18 317:9
318:15,21 323:15
324:3,8,17 325:25
327:9 328:6,13
343:10,11 397:24
436:21 439:25
466:21,22 467:3

**treasury** 333:25
416:4 417:22

**treated** 429:11

**trick** 358:14

**trouble** 393:11
394:22

**true** 453:15

**trued** 392:13

**trust** 289:9 401:10

427:19 443:21

**trustee** 400:13,16,23
401:9,17,21,23 402:5
403:8,15,21 404:2
405:4 420:21 421:2,6
422:24 427:20
443:11 472:12,23
473:10,22 474:23
476:19 477:10,25

**trustees** 402:2

**trusts** 306:23 401:25

**Tuesday** 479:14

**typical** 317:16
421:25

**typically** 463:24

———

**U**

**UCC** 416:15

**Uh-huh** 450:12

**unable** 290:20 479:7

**unaudited** 299:11

**unaware** 431:6
455:16

**underpaid** 404:18

**understand** 289:20,
25 293:8 296:21
301:8 335:18 345:7,
19,23 354:10 358:13,
17 370:24 378:4
383:25 386:13
388:25 390:22 404:7
409:7,21 415:12
426:12 435:8 447:9
449:20,25 457:13
476:4

**understanding**
299:21 300:7 301:2
306:17 316:7,11
330:14 343:17
347:10,13 403:5
410:6 419:3 426:20
440:24 478:5

**understood** 336:19
382:4,23

**unfettered** 476:3

**unified** 384:19

**unit** 384:20 400:19

**universe** 311:19

**unrelated** 452:6

**unsecured** 416:18
451:19 453:16

**up-and-comers**
300:19

———

**V**

**valuation** 471:14,24

**values** 376:25

**variety** 291:19

**verbal** 336:5 381:19,
20

**versa** 308:14

**versus** 438:4 474:8

**vest** 385:4

**vice** 308:14 317:18

**video** 288:4,8 302:2
396:20 457:20

**videotape** 396:17

**view** 334:14 411:24

**viewed** 452:24
453:11

**viewing** 398:3

**virtually** 418:21

**voice** 302:4

**Volume** 288:4

**volunteer** 375:24

———

**W**

**wait** 355:17

**waiver** 347:17
358:22 414:7

**waives** 414:10

**waiving** 317:3

**walk** 406:3

**walked** 355:15

**wanted** 288:17

**wanting** 392:10

**Waterhouse** 301:12
302:18,25 303:5,11
304:13 305:3,13,22
309:7 310:13,18,24
311:4,11,18 312:17,
21 313:5,18,25
314:12,16,22 315:6
316:17 318:20
319:19 321:11,13
323:14 324:3,8,20
325:2,21,25 327:8
328:5,12,24 329:15
331:13 337:23
351:14,17 397:24
436:17,21 437:13
438:8 439:21,24
456:18 466:12,20

**Waterhouse's**
317:8,12 318:16
351:7

**ways** 335:2

**weather** 288:23

**Wednesday** 479:16
480:25 481:5

**week** 290:5,17
351:17 367:2 462:9
479:10 481:20

**well-capitalized**
417:19

**whatsoever** 325:8

**Wick** 364:5

**window** 423:20

**wires** 320:5

**withdrawn** 307:2
315:11 321:12
324:23 331:23 340:2
341:6 343:3 367:24
403:12 405:2,7 475:7

**withholding** 414:25
432:5

**witnesses** 480:6,11

**word** 327:22 366:21
395:3,4 415:21 458:3
460:17 462:15

476:20

**words** 291:14 297:21
343:25 430:13 474:7

**wore** 324:20

**work** 300:20 322:7
338:4 378:20 382:6
383:11 384:20
410:18 454:10

**worked** 312:6 338:20
383:6 463:16

**working** 320:18
375:17 384:19

**works** 378:17 481:23

**world** 331:17 371:18
396:25 397:15,22

**wrap** 454:12

**written** 335:17 336:2,
4,9 381:19 382:21

**wrong** 402:8

———

**Y**

**Yankees** 395:4,5

**year** 292:8 299:11
334:11 369:4,24
371:21 373:3,14,19
375:14 391:16,17
395:17 409:17,23
410:8 421:16 422:3
426:10 453:23 457:4
458:16 460:12
461:15 462:5,20,23

**year-end** 372:15
458:8 463:5,12

**years** 291:18 292:15
298:10,11 300:5,15
302:20 311:10
320:17 322:25
330:12 336:22
415:10 422:12,19
463:16

**yell** 396:13,15

**yelled** 396:19

**yelling** 396:11

**yells** 396:2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 3, 2021**

_____
United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

|  | Adversary No.: 21-03006-sgj |
|---|---|
| v.<br><br>HIGHLAND CAPITAL MANAGEMENT<br>SERVICES, INC., JAMES DONDERO, NANCY<br>DONDERO, AND THE DUGABOY INVESTMENT<br>TRUST,<br><br>    Defendants. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL<br>ESTATE PARTNERS, LLC), JAMES DONDERO,<br>NANCY DONDERO AND THE DUGABOY<br>INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj |

## MEMORANDUM OPINION AND ORDER DENYING ARBITRATION REQUEST AND RELATED RELIEF

### I.    Introduction and Background

The four above-referenced adversary proceedings, Adversary Proceeding Nos. 21-3003, 21-3005, 21-3006, and 21-3007, started out as what seemed like simple suits by a Chapter 11 Debtor to collect on large promissory notes owed to it (collectively, the "Note Adversary Proceedings"). The court held a hearing on November 9, 2021 ("Hearing") on various motions filed by certain defendants in the Note Adversary Proceedings. This Memorandum Opinion and Order addresses certain motions to compel arbitration and to stay these Note Adversary Proceedings while arbitration would be proceeding.[1] For the reasons set forth below, the court will not compel arbitration or stay these Note Adversary Proceedings.

The Note Adversary Proceedings were originally brought many months ago by Plaintiff Highland Capital Management L.P., now a reorganized debtor ("Highland" or "Reorganized Debtor"), again, as simple suits on notes—that is, alleging breach of contract and seeking turnover of amounts owed from the various obligors under the notes (the "Note Obligor Defendants"). Each Note Obligor Defendant was closely related to Highland's former president, James Dondero ("Mr. Dondero),[2] and collectively borrowed tens of millions of dollars from Highland prepetition. The

---

[1] Certain defendants herein earlier filed a motion to withdraw the reference in these Note Adversary Proceedings (arguing that the claims were statutory noncore claims or that the bankruptcy court otherwise did not have Constitutional authority to enter final orders). The District Court accepted the bankruptcy court's report and recommendation that the reference should be withdrawn when these Note Adversary Proceedings are trial-ready with the bankruptcy court acting essentially in the position of a magistrate judge for the District Court prior to trial, presiding over all pretrial matters.

[2] In fact, Mr. Dondero personally was an obligor on three notes.

indebtedness was memorialized in a series of demand and term notes. The indebtedness represented by those notes remains unpaid.

The Note Adversary Proceedings morphed, so to speak, when the Note Obligor Defendants defended the Note Adversary Proceedings by alleging that an oral agreement existed such that the underlying notes would be forgiven by Highland as compensation to Highland's former president, Mr. Dondero, if certain conditions subsequent occurred. The oral agreement was allegedly made on behalf of Highland, acting through one of its largest limited partners, Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, on which the trustee is his sister Nancy Dondero ("Ms. Dondero").

When this "oral agreement" defense was articulated, this court granted Highland's request for leave to amend its original complaints in each of the Note Adversary Proceedings to allege alternative theories of liability and add Mr. Dondero,[3] Dugaboy, and Ms. Dondero as additional defendants on new counts—the theories being that, if such an oral agreement was made, it may have given rise other causes of action on the part of the actors involved. Highland amended its complaints in each of the Note Adversary Proceedings, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

Presently before the court are a set of virtually identical motions filed by Mr. Dondero, Dugaboy, and Ms. Dondero in each of the four Note Adversary Proceedings seeking to compel arbitration as to Counts V, VI, and VII of, and stay litigation altogether in, the Note Adversary Proceedings, pending the arbitration of Counts V, VI, and VII (the *Motion to Compel Arbitration and Stay Litigation* [Doc. 85, 66, 74, and 65, respectively, in each sequentially-numbered Note Adversary Proceeding[4], the "Arbitration Motions"). Highland timely filed objections to the motions [Doc. 92, 76, 81, and 77] and replies were filed by Mr. Dondero, Dugaboy and Ms. Dondero [Doc. 107, 88, 93, and 88].[5]

As set forth below, Mr. Dondero, Dugaboy, and Ms. Dondero (hereinafter the "Dondero/Dugaboy Defendants") rely on a mandatory arbitration clause in Highland's Limited Partnership Agreement as the basis for their arbitration request. To be clear, there are no arbitration clauses in the underlying promissory notes. And the Note Obligor Defendants are not seeking arbitration of the breach of contract claims, turnover claims, or fraudulent transfer claims. It is

---

[3] Mr. Dondero was actually already a Note Obligor Defendant in Adv. Proc. No. 21-3003, as he as an obligor on three notes.

[4] All subsequent "Doc." references in this Memorandum Opinion and Order follow this convention.

[5] The court considered these replies despite the lateness of their filing, less than two business days before the Hearing. At the Hearing, Highland noted its displeasure with these replies being filed 37 days after Highland filed its objections but did expressly did not ask the court to strike the replies. The court reminds the parties, as Highland correctly pointed out, that the Local Civil Rules for the Northern District of Texas, and not the Local Bankruptcy Rules, apply to these adversary proceedings in all respects, since the reference to the Bankruptcy Court was withdrawn and this court is conducting all proceedings in the position of a magistrate judge for the District Court. The replies here were required to be filed no later than 14 days following the filing of Highland's objections. *See* Local Civil Rule 7.1(f).

only the Dondero/Dugaboy Defendants seeking arbitration as to Count V (seeking declaratory judgment as to provisions of the Highland limited partnership agreement) and Counts VI and VII (the fiduciary duty claims). The court denies the Arbitration Motions for the reasons stated below.

## II.     The Agreement Containing the Arbitration Clause

First, a word about what is and is not in dispute regarding the Arbitration Motions. The parties agree that Highland's ***Fourth Amended and Restated Agreement of Limited Partnership*** (the "LPA")[6] contained Section 6.14, a typical mandatory arbitration provision that requires parties to the LPA to arbitrate certain disputes under certain circumstances (the "Arbitration Clause"):

> In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act …

The Arbitration Clause also significantly limited discovery that could occur in arbitration:

> The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.

***The parties further agree that the LPA, as an executory contract, was rejected under 11 U.S.C. § 365 in connection with the court's order confirming Highland's plan of reorganization in February 2021.***

The Dondero/Dugaboy Defendants acknowledge that Counts I–IV of the Amended Complaints (Breach of Contract; Turnover; Fraudulent Transfers under 11 U.S.C. § 548; and Fraudulent Transfers under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act) are not subject to the Arbitration Clause.

The Dondero/Dugaboy Defendants argue in the Arbitration Motions, however, that Counts V, VI, and VII of the Amended Complaints (seeking a declaratory judgment as to provisions of LPA and claiming breach of fiduciary duty and aiding and abetting of breach of fiduciary duty—

---

[6] The LPA was executed by Highland's then-general partner, Strand Advisors, Inc., through the individual James Dondero, who was also then Highland's CEO and Highland's majority limited partner, The Dugaboy Investment Trust, James Dondero's family trust, through its trustee, the individual Nancy Dondero, James Dondero's sister. (Various other limited partners also signed the LPA, but they are not Note Obligor Defendants.) The "oral agreement" defense alleges that The Dugaboy Investment Trust, through Nancy Dondero as trustee, as the holder of a Majority Interest (as defined in the LPA), entered into oral agreements on behalf of Highland with James Dondero to forgive the demand notes at the center of these Note Adversary Proceedings if certain conditions subsequent were met.

4

all counts that, notably, Highland only added after the Note Obligor Defendants articulated their "oral agreement" defense) *are* subject to the Arbitration Clause. Highland counters that: (a) the rejection of the LPA excuses Highland from being forced to submit to mandatory arbitration of Counts V, VI, and VII; (b) the Dondero/Dugaboy Defendants have waived the Arbitration Clause by not invoking it at any earlier point in these Note Adversary Proceedings; and (c) the Dondero/Dugaboy Defendants should be judicially estopped from invoking the Arbitration Clause now. Highland also argues that arbitration of some but not all the counts of the Amended Complaints would be inefficient and wasteful, and that any stay of proceedings in this court would do a disservice to the resolution of the admittedly non-arbitrable issues in Counts I–IV.

## III. The Significance of the Rejection of the Executory Contract (*i.e.*, the LPA) that Contained the Arbitration Clause

The court acknowledges that there is a wealth of federal case law dictating the strong federal policy undergirding the Federal Arbitration Act ("**FAA**"). *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) (describing the FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements"). The FAA was enacted by Congress in 1925 and became effective in 1926. It is codified at Title 9 of the United States Code and is predicated upon Congress's exercise of the Commerce Clause powers granted in the Constitution. The FAA contemplates the judiciary's respect for and enforcement of private parties' agreements to resolve disputes through arbitration. The FAA provides:

> A written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[7]

Thus, arbitration, pursuant to the FAA, is entirely a matter of contract. And, where a contract contains a provision in which parties agreed to submit future disputes thereunder to arbitration, these provisions should be enforced according to their terms. Section 4 of the FAA specifically directs a court to order parties to arbitrate upon a request by a party that is entitled to demand arbitration in a written contract. The courts have often stated that the FAA reflects a liberal federal policy favoring arbitration and requires arbitration agreements to be rigorously enforced according to their terms.[8]

The court also notes that some courts have grappled with whether a bankruptcy court needs to treat an arbitration provision in a contract any "less mandatory" than other courts. After all, bankruptcy cases are not like other lawsuits; they are multi-faceted, multi-party, and fast-moving. It has often been stated that the underlying purposes of the Bankruptcy Code are to: (a) provide debtors and creditors with orderly and effective administration of bankruptcy estates; and (b) *centralize disputes over debtors' assets and obligations in one forum*. But there is *no* "bankruptcy exception" to an arbitration agreement *per se*—not in any statute and not according

---

[7] 9 U.S.C. § 2.

[8] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

5

to any court so far. Some courts have opined or suggested that a bankruptcy court, when presiding over a proceeding involving "non-core" disputes pursuant to 28 U.S.C. § 157(b)—*i.e.,* disputes that are merely related to a bankruptcy case and would have been litigated elsewhere but for the broad nexus created by the debtor's bankruptcy filing—*generally* must abstain from adjudication and direct the parties to arbitration when presented with an applicable arbitration provision.[9] But when a bankruptcy court is presented with a "core" dispute—*i.e.,* one which derives from the provisions of the Bankruptcy Code—it *may* be permissible for the bankruptcy court to decline to order arbitration; after determining that "core" disputes are involved, courts tend to employ a framework for analysis derived from a nonbankruptcy Supreme Court case called *Shearson/Am. Express, Inc. v. McMahon,* 482 U.S. 220 (1987). In a nutshell, the *McMahon* Court held that a party seeking to avoid arbitration pursuant to an otherwise applicable agreement must show that Congress—in enacting whatever statute is involved (*i.e.,* the Bankruptcy Code) intended to preclude arbitration and that intent must be deducible from: (1) the statute's text; (2) its legislative history; or (3) "an inherent conflict between arbitration and the statute's underlying purposes."[10] Thus, courts—after finding "core" disputes are involved—tend to plow down a complicated trail of considering whether there is an "inherent conflict" between arbitration and the Bankruptcy Code in whatever dispute happens to be before the court.

The Fifth Circuit has addressed the topic of enforceability of arbitration clauses in bankruptcy in the cases of *In re Gandy* and *In re Nat'l Gypsum.*[11] In those cases, the Fifth Circuit instructed that a bankruptcy court may refuse to enforce arbitration clauses and may itself adjudicate a dispute when it finds that: (a) a matter is core or derives from rights under the Bankruptcy Code; *and* (b) enforcement of the arbitration provision would irreconcilably conflict with the purposes or goals of the Bankruptcy Code.[12]

While this is all somewhat enlightening, a slightly different argument is presented to this court by Highland in its argument that the bankruptcy court should not compel arbitration. Highland does not deny the existence of any of the above case law nor the fact that Counts V, VI, and VII involve non-core matters that do not derive from rights under the Bankruptcy Code. Rather, Highland argues, these Note Adversary Proceedings present a circumstance that very few courts have addressed. ***The LPA (or at least the Arbitration Clause) was an executory contract that Highland rejected in its confirmed Chapter 11 plan.*** As noted above, no one disputes that the LPA was rejected pursuant to Bankruptcy Code section 365. The result, argues Highland, is

---

[9] At least one court has suggested that there is a "presumption in favor of arbitration [that] usually trumps the lesser interest of bankruptcy courts in adjudicating non-core proceedings." *MBNA Am. Bank, N.A. v. Hill,* 436 F.3d 104, 108 (2d Cir. 2006). *But see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149, 1156-1158 (3d Cir. 1989) (determining there is no discretion to deny arbitration in non-core matters). *See also Gandy v. Gandy (In re Gandy),* 299 F.3d 489, 496 (5th Cir. 2002) ("it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings under 28 U.S.C. § 157(b)"); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.),* 118 F.3d 1056 (5th Cir. 1997) (same).

[10] *McMahon,* 482 U.S. at 227.

[11] *Gandy,* 299 F.3d at 489; *Nat'l Gypsum Co.,* 118 F.3d at 1056.

[12] *In re Nat'l Gypsum Co.,* 118 F.3d at 1068-69.

APP 779

that Highland is no longer bound by the LPA's provisions that impose *specific performance* obligations on it—provisions such as the Arbitration Clause. A counterparty to a rejected executory contract can merely seek monetary damages, Highland argues, but it cannot force a debtor to *perform* under a rejected executory contract.

Highland's argument finds support in a both lengthy and well-reasoned opinion by District Judge David Godbey of this District — *Janvey v. Alguire*, 2014 U.S. Dist. LEXIS 193394 (N.D. Tex. Jul. 20, 2014), *aff'd on different grounds* at 847 F.3d 231 (5th Cir. 2017), dealing with federal receiverships (in which the court made analogies to the bankruptcy process)—as well as in an old law review article written by renowned University of Texas Law School Professor Jay Westbrook (often considered the modern-day expert on executory contracts in bankruptcy). *See* Jay Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 UNIV. OF MINN. LAW SCHOOL 595 (1983).

The *Janvey* opinion arose in the context of a federal receivership commenced at the request of the Securities and Exchange Commission in response to the massive R. Allen Stanford Ponzi scheme. Ralph S. Janvey was the receiver ("Receiver") who took possession of all receivership assets and records. Pursuant to those powers, the Receiver filed suit against former employees (the "Employee Defendants") who previously worked in various capacities for the Stanford enterprises ("Stanford Entities") and received salary, commissions, bonuses, or later forgiven loans from the Stanford Entities. The Receiver's suit alleged that the Employee Defendants received fraudulent transfers in violation of the Texas Uniform Fraudulent Transfer Act (TUFTA) or, in the alternative, were unjustly enriched at the expense of the creditors of the Receivership Estate. Some of the Employee Defendants filed motions to compel arbitration. According to a later Fifth Circuit opinion, the arbitration agreements were contained in: (1) promissory notes between the Employee Defendants and the company that governed the upfront loan payments that the company awarded to the Employee Defendants when they joined Stanford; (2) the broker-dealer forms that the company submitted to the Financial Industry Regulation Authority (FINRA) when registering the Employee Defendants as brokers; (3) FINRA's internal rules governing disputes between brokers and their employers; and (4) the company's Performance Appreciation Rights plan. The arbitration clauses provided that "any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, bylaws, rules and regulations of the National Association of Securities Dealers (NASD)." *Janvey v. Alguire*, 847 F.3d 231, 237 (5th Cir. 2017).

The issue of whether arbitration was required went back and forth between Judge Godbey and the Fifth Circuit and, ultimately, the precise issue pending before Judge Godbey was whether to deny or grant the motions to compel arbitration based on the question of "whether the Receiver is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities."

Judge Godbey declined to order arbitration because the Receiver had not adopted the arbitration agreements at issue and because arbitration of the Receiver's claims would frustrate a central purpose of federal equity receiverships. Judge Godbey noted that, before a general requirement to arbitrate exists, a party must first be bound to an arbitration agreement — either as a signatory or through a principle of law or equity. Judge Godbey stated that discussions of

possible exceptions to this general requirement to arbitrate, like *McMahon*'s contrary congressional command, *are only necessary after such an initial determination*. Judge Godbey opined that equity receivers, as non-signatories to an arbitration agreement, can, in fact, be bound to the arbitration agreement to the same extent receivership entities would be bound. But there remained a significant resultant question: whether the Employee Defendants' arbitration agreements were contracts that the Receiver could *reject*, "an ability that has deep historical roots for both federal equity receivers and bankruptcy trustees and that continues to be an important tool for both."

Applying Professor Vern Countryman's material breach test, Judge Godbey concluded that arbitration agreements must be analyzed as separate executory contracts, based on the nature of the agreement as well as arbitration caselaw regarding severability. Citing Professor Westbrook, he noted that, "'[v]iewed as an independent contractual obligation of the parties, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought.' *Westbrook*, *supra note 26, at 623* (footnote omitted). Furthermore, the appropriate remedy in this circumstance cannot be for the Court to require specific performance by the trustee — *i.e.,* to compel arbitration — because 'injured part[ies] cannot insist on specific performance by the trustee.' *See id. at 619* (collecting cases)." *Janvey*, 2014 U.S. Dist. LEXIS 193394 at *113.

Judge Godbey went on to opine that the Receiver had rejected the arbitration agreement, that the rejection was proper, and that the Receiver was not bound to arbitrate—further noting that if the court required the Receiver to adopt the arbitration agreements, it would greatly burden and deplete the receivership estate. Such a result, weighed in the balance, would be unjust and inequitable.

The Fifth Circuit ultimately affirmed, 847 F.3d 231 (5th Cir. 2017), but applied a different analysis. It determined that the Stanford entity in whose shoes the Receiver had stepped, for purposes of bringing the TUFTA claims (*i.e.,* Stanford International Bank), was not a signatory to the arbitration agreements and was not otherwise bound by them. The Fifth Circuit also determined that, with regard to one Employee Defendant (Giusti) who stood in a unique position (in that there was an arbitration agreement that the Receiver's predecessor was party to and bound), that Giusti waived the right to arbitrate by substantially invoking the judicial process (through the filing of a motion to dismiss, an answer, serving written discovery and answering discovery— which had caused delay and expense. As for Judge Godbey's "broader policy argument" that the federal receivership statutes were at odds with the FAA's mandate in favor of arbitration, noting that these were "important concerns," the Fifth Circuit stated that "we are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court." *Id.* at 245. But the Fifth Circuit did not otherwise address the arguments.

While the *Janvey* case involved a federal receiver, Judge Godbey looked almost entirely to bankruptcy law and to Bankruptcy Code section 365 to reach his ruling. This court finds *Janvey* to be persuasive (and possibly binding) on this court. Moreover, just as a federal receiver is analogous to a bankruptcy trustee, a debtor-in-possession is, of course, statutorily the same as a bankruptcy trustee. *See, e.g.,* 11 U.S.C. § 1107.

To be clear, if a bankruptcy trustee rejects an executory contract, the rejection, of course, constitutes a breach of the contract and subjects the estate to a claim for money damages on behalf of the injured party. 11 U.S.C. § 365(g). Significantly, however, *the injured party cannot insist on specific performance by the trustee.* *See* Westbrook, *The Coming Encounter,* at 619 (and numerous cases cited therein). Instead, the injured party is treated as having a prepetition claim for damages arising as if the breach occurred immediately before the filing of the bankruptcy petition. Professor Westbrook notes that the issue then becomes whether such a prepetition claim, including a claim arising from rejection, must be liquidated pursuant to the arbitration clause. *Most jurisprudence in the bankruptcy context dealing with arbitration clauses does not analyze this as a traditional executory contract conundrum.* And yet, to use Professor Westbrook's words, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought. *Id.* at 623. And although "arbitration survives the contract" *as a matter of contract law,* "executory obligations may be avoided by the trustee as a matter of bankruptcy law through the exercise of the trustee's power to reject executory contracts." *Id.* "If specific performance is not available against a trustee, it follows that an arbitration agreement is like any other executory contract which the trustee may reject." *Id.* at 624.

The *Janvey* decision is not the only case to have addressed the effect of rejection on the viability of an arbitration clause within a rejected executory contract. The Dondero/Dugaboy Defendants cite the court to *In re Fleming Companies, Inc.,* 325 B.R. 687 (Bankr. D. Del. 2005), a case from another bankruptcy court that predates *Janvey* by almost a decade, for the proposition that rejection of an executory contract does not prevent a party from invoking an arbitration clause in that contract. With due respect, the court believes the reasoning in *Janvey* to be more persuasive than the bankruptcy court's in *Fleming Cos.* (and *Janvey* is potentially binding precedent on this court). It also bears noting that it was the debtor in *Fleming Cos.,* not the executory contract's counterparty, who was invoking the arbitration clause in the contract the debtor had previously rejected. That distinction is not without significance.

In summary, this court accepts Highland's argument that the LPA was an executory contract duly rejected pursuant to Bankruptcy Code section 365, and that the Arbitration Clause should likewise be considered a separate executory agreement that was rejected. Accordingly, Highland cannot be forced to specifically perform under the Arbitration Clause or the LPA by mandatorily participating in arbitration of Counts V, VI, and VII. The court defers to the compelling reasoning of Judge Godbey in *Janvey* on this point. The court, like Judge Godbey, also finds as a matter of fact that requiring arbitration in this case would impose undue and unwarranted burdens and expenses on the parties to the detriment of Highland's creditors.

## IV.    Waiver

Even if this court is in error in determining that the Arbitration Clause is no longer binding on Highland because it was rejected pursuant to Bankruptcy Code section 365, the court finds as a matter fact that the Dondero/Dugaboy Defendants have waived any right to invoke the Arbitration Clause. The court has taken judicial notice of its own docket, both in these Note Adversary Proceedings and in the administrative Chapter 11 case, and has considered the entire

9

record of both proceedings, as well as the *Declaration of John A. Morris in Support of Debtor's Objection to Motion to Compel Arbitration and Stay Litigation* [Doc. 94, 78, 83, and 78], and the exhibits annexed thereto, in making the following findings of fact.

The Note Adversary Proceedings were filed in January 2021 (after Highland earlier made demands on the Note Obligor Defendants or otherwise declared events of default). One of the Note Obligor Defendants (Mr. Dondero) timely answered, pleading an affirmative defense that Highland agreed not collect on the underlying notes—but that answer contained nothing more specific than this, nor any mention of arbitration. Amended Answers were later filed by the Note Obligor Defendants, elaborating on and/or adopting the affirmative defense that, through the oral agreement, Highland agreed to forgive the obligations under the notes as compensation to Mr. Dondero "upon fulfillment of conditions precedent." Roughly 90 days after the filing of the Note Adversary Proceedings, the Note Obligor Defendants filed motions to withdraw the reference, which this court spent significant time addressing in making a report and recommendation to the District Court in each Note Adversary Proceeding. No mention of arbitration was made to this court during those proceedings. During a hearing before the court on June 10, 2021, Highland announced its intention to add claims against the Dondero/Dugaboy Defendants for breach of fiduciary duty, yet the issue of arbitration was not raised at that point, or a month later when the Dondero/Dugaboy Defendants received a draft of the Amended Complaint adding Counts V, VI, and VII. Pursuant to the parties' agreement, Highland filed that Amended Complaint on August 27, 2021, as the Dondero/Dugaboy Defendants' "oral agreement" defense became clearer. Only on September 1, 2021, did the Dondero/Dugaboy Defendants file their Arbitration Motions and raise the issue of arbitration under the Arbitration Clause for the first time in these proceedings, more than seven months after the litigation began. At the same time, the Dondero/Dugaboy Defendants also pursued extensive discovery, seeking and obtaining responses to interrogatories and documents requests in scope and number *significantly more than the Arbitration Clause permitted*, all in accordance with pre-trial stipulations the defendants both negotiated with Highland and then asked this court to approve, which the court did.

Although courts in the Fifth Circuit sometimes apply a presumption against waiver of an arbitration right, the right can certainly be waived.[13] "Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party."[14] In this context, prejudice "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.'"[15] A party waives arbitration when it "'engage[s] in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.'"[16]

---

[13] *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995).

[14] *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986).

[15] *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 327 (5th Cir. 1999) (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997)).

[16] *Keytrade USA v. Ain Temouchent M/V*, 404 F.3d 891, 897 (5th Cir. 2005) (quoting *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004)). *See also Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d

While every situation is unique, here the court finds that the Dondero/Dugaboy Defendants waived their right (if any still remained) to demand arbitration, due to their multiple answers, their motions to withdraw the reference, extensive discovery that far exceeded what the Arbitration Clause permitted, and complete silence about the possibility of arbitration for more than eight months. Even though Counts V, VI, and VII were not added by Highland until more than seven months after the Note Adversary Proceedings were filed, the Dondero/Dugaboy Defendants had reason to know that their "oral agreement" affirmative defense might implicate the LPA and the Arbitration Clause, and yet they didn't raise the subject of arbitration until many months of litigation activity in the Note Adversary Proceedings had occurred in this court.[17] The resulting delay and expense warrant this court's applying waiver as permitted by the Fifth Circuit authority cited above. This court finds as a matter of fact that the Dondero/Dugaboy Defendants waived the relief they seek in the Arbitration Motions.

## V.    Judicial Estoppel, Waste and Inefficiency

Highland also asked the court: (a) to judicially estop the Dondero/Dugaboy Defendants from arguing entitlement to arbitration in light of prior contradictory positions these defendants took in earlier pleadings and arguments before this court, and (b) to decline to order arbitration because of the waste and inefficiency arbitration would represent for these proceedings. Because the court rules that rejection of the Arbitration Clause precludes Highland's being forced to submit to arbitration, and because the court finds that the Dondero/Dugaboy Defendants waived the relief they sought in the Arbitration Motions, the court need not and does not address Highland's arguments pertaining to judicial estoppel or the practical implications of ordering arbitration.

## VI.    Stay of Counts I–IV

Finally, because the court denies the arbitration requested in the Arbitration Motions, there is no good cause to stay litigation in the entire Note Adversary Proceedings. Even if the court has erred in its ruling on the Arbitration Motions, there still exists no good cause to stay the Note Adversary Proceeding as to Counts I-IV. The Dondero/Dugaboy Defendants acknowledge that Counts I-IV are non-arbitrable claims and, moreover, in the event Plaintiff were to prevail on them, it is likely that Plaintiff would not even pursue Counts V–VII. To clarify, if Plaintiff prevails on Counts I and II (*i.e.,* the breach of contract claims and turnover)—which would involve a finding that there was no oral agreement for nonpayment—then all other counts would become moot. And, if the court were to find that there *were* such an agreement, Plaintiff could potentially still prevail on Counts III and IV (the claims that such an agreement would constitute a fraudulent transfer—also non-arbitrable). It would seem that only if Plaintiff loses on all of these non-arbitrable claims would it have any interest in pursuing Counts V-VII (*i.e.,* an interest in arguing that the oral agreements amounted to breach of fiduciary duty and aiding and abetting breach of fiduciary duty).

---

1156, 1162 (5th Cir. 1986) (party waived arbitration because it "initiated extensive discovery, answered twice, filed motions to dismiss and for summary judgment, filed and obtained two extensions of pre-trial deadlines, all without demanding arbitration").

[17] The court notes that all Note Obligor Defendants consist of either Mr. Dondero or entities he controls.

APP 784

The requested stay would also be illogical in this context. The "oral agreement" defense relies on the existence of an oral contract between Highland (via Dugaboy, through its trustee, Ms. Dondero) and Mr. Dondero. The existence of that contract is ***not*** an arbitrable issue. The implications of that contract's existence are what would potentially be arbitrable. If litigation on Counts I–IV demonstrates that there was no such "oral agreement," then there would be nothing to arbitrate because Counts V–VII would be rendered moot. Staying the litigated determination regarding the existence of the "oral agreement" in favor of arbitrating issues that only arise if there ever were such an agreement strikes the court as backwards. Arbitration should await that determination, not the other way around.

Accordingly, the Dondero/Dugaboy Defendants' requests to stay the Note Adversary Proceedings have no merit and are denied.

## ORDER

For the reasons stated in the above Memorandum Opinion and Order, the Arbitration Motions and Stay Motions related thereto are DENIED.

*### End of Order ###*

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | §  Case No. 19-34054-sgj11 |
| Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | §  Adversary Proceeding No. |
| | § |
| vs. | §  21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES | § |
| DONDERO, NANCY DONDERO, AND THE | § |
| DUGABOY INVESTMENT TRUST, | § |
| | § |
| Defendants. | § |

## REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as the plaintiff (the "Debtor"), and files this its *Reply* (the "Reply") in support of its *Motion to Extend Expert Disclosure and Discovery Deadlines* (the "Motion"), and replying to the *Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* (the "Objection"), filed by the Debtor, respectfully stating as follows:

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 1

APP 786

# I.     <u>SUMMARY</u>

1.     The Shared Services Agreement required the Debtor to assist and *advise* with payments, including on notes. That is in the contract. The Debtor's former CFO confirmed it. The Shared Services Agreement contains a standard of care that the Debtor had to follow. That is also in the contract. And the Fifth Circuit confirms that expert testimony is appropriate, and potentially *required*, when the standard of care is not obvious. Here, it was obvious until it wasn't. Before Mr. Waterhouse's deposition, the standard of care was not at issue *per se*. The Defendant simply alleged the Debtor was obligated to facilitate the December payment but did not. That came down to simple contract interpretation. No expert was needed because any lay juror could understand that the Debtor breached its duties by doing nothing to facilitate the payment. But things changed after Mr. Waterhouse's testimony in late October, when he testified that Mr. Dondero allegedly *told* him not to pay this note. The question then became what the Debtor was obligated to do next under the contractual standard of care. The answer is not obvious. And it is the type of issue on which a jury could only benefit from expert opinion testimony. This is precisely the type of case where the Fifth Circuit finds expert testimony appropriate, if not required. Nor is there prejudice to the Debtor: there is no trial setting, the Debtor can contest the admission of the expert's testimony and present its own rebuttal, and, if the Debtor prevails, it also can also seek to recover all collection costs.

## II.     <u>THE EXPERT TESTIMONY IS APPROPRIATE</u>

2.     The Shared Services Agreement, in place during November and December, 2020, provides as follows:

> Section 6.01.  <u>Standard of Care</u>. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 2

APP 787

inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies, and procedures in performing its duties hereunder.

*See* Rukavina Declaration, Exh. A at § 6.01.

3.      "Covered Person" includes the "Staff and Services Provider," *i.e.* the Debtor, and its managers, directors, officers, and shareholders. *See id*. at p 2. There can be no dispute that section 6.01 applied to the Debtor itself, to Mr. Waterhouse, and to the other employees involved (David Kloss, the controller, and Kristin Hendrix, the senior accountant).

4.      The Debtor argues that section 6.01 applies only to duties specifically set forth in the Shared Services Agreement, and that the duty to facilitate payments on NexPoint's behalf is not among those duties. This argument is wrong. The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

(a)      *Back- and Middle Office*. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, book keeping, cash management . . . accounts payable . . .

(k)      *Ancillary Services*. Assistance and advice on all things ancillary or incidental to the foregoing.

(l)      *Other*. Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.

*See id*. at § 2.02 (emphasis added).

5.      Assistance and advice—again, *advice*—with respect to "payments" is expressly included. And, should there be any doubt, the Debtor's own Chief Financial Officer at the time confirmed that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note." *See* Rukavina Declaration at Exh. C, 337:22-338:8. That is why NexPoint was paying millions of dollars to the Debtor, to assist and *advise* NexPoint with respect to NexPoint's payment obligations. Advice would include advising NexPoint of the consequences of a potential default, especially given the

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 3

APP 788

Debtor's conflict-of-interest at the time between being NexPoint's creditor as well as its accounting, payment, and legal professional. This is especially the case if Mr. Dondero in fact instructed Mr. Waterhouse not to make the payment on the belief that the payment was not due, or would be netted against NexPoint's overpayments to the Debtor.

6.      Next, the Debtor argues that expert testimony is not proper on the scope of a party's legal duty, because that is a legal conclusion for the Court. NexPoint agrees. The Debtor also argues that whether the Debtor owed or breached a legal duty is for the jury to decide. NexPoint agrees in part: whether duties are *breached* is an issue for the jury; not whether duties were owed. *See Askanese v. Fajto*, 130 F.3d 657, 673 (5th Cir. 1997). None of these issues are present here: the Court will construe the Shared Services Agreement as a matter of law; that agreement contains section 6.01, and the Court will construe that section. But, the standard of care in that section is:

> the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*See* Rukavina Declaration, Exh. A at § 6.01.

7.      The issue is simple: if the jury finds that Mr. Dondero did in fact instruct Mr. Waterhouse not to make the payment, then did the Debtor fail to act with "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" by failing to do anything to advise NexPoint as to the consequences of a default, failing to confirm that Mr. Waterhouse correctly understood the instruction, or not even trying to dissuade Mr. Dondero from his alleged instruction? As simple as this issue appears to sophisticated bankruptcy professionals, it is not one a lay juror could resolve from personal experience or common sense.

---

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 4

8.      "Expert testimony is generally <u>required</u> to prove the applicable standard of care."

*Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (emphasis added); *Streber v. Hunter*,

221 F.3d 701, 724 (5th Cir. 2000) ("Breach of the standard of care must generally be proven by

expert testimony").  [E]xpert testimony is <u>necessary</u> to establish the standard of care . . . Similarly,

breach of a fiduciary duty or a conflict of interest <u>requires</u> proof of expert testimony."  *Geiserman*

*v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (internal quotations removed) (emphasis

added).  An expert is appropriate, and potentially needed, for the jury to understand whether the

Debtor employed "the care, skill, prudence and diligence under the circumstances then prevailing

that a prudent person acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims."  That should not be a controversial

proposition.

9.      The Debtor cites the Fifth Circuit's opinion in *Askanese v. Fajto* as support for its

argument.  130 F.3d 657 (5th Cir. 1997).  In that opinion, the Fifth Circuit affirmed the exclusion

of an expert because "[i]t is not for [the expert] to tell the trier of fact what to decide."  *Id*. at 1997.

Here, NexPoint's expert would not be telling the jury what to decide; only whether, in his opinion,

the Debtor's actions and inactions breached the duties as otherwise specified in the Shared Services

Agreement and construed by the Court.  The Debtor would have the ability to have a rebuttal

expert, and the jury would be free to disregard the expert's testimony.  NexPoint's expert would

not be telling the jury how to decide, only his opinion as to whether the standard of care as specified

in the agreement and construed by the Court was met.  Conversely, if NexPoint's lay witnesses

purported to present evidence on these duties at trial, the Debtor would certainly object to any such

evidence because it would *not* be expert testimony.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 5

APP 790

## III.    REPLY REGARDING "GOOD CAUSE"

### A.    NexPoint's Need and Good Cause for Leave

10.    The Debtor argues that NexPoint seeks leave because the testimony of its witness, Mr. Waterhouse, allegedly did not go well.  But the Debtor takes some liberties in its argument. For one thing, Mr. Waterhouse is not one of NexPoint's witnesses.  In fact, the Debtor took his deposition and he is not NexPoint's witness.  Also, his deposition did not go badly for NexPoint. On the contrary, other than his unexpected testimony regarding Mr. Dondero's alleged instruction not to pay the note, his testimony was not harmful to NexPoint and was, objectively, neither helpful nor harmful to either side.  The Debtor makes these wrong allegations solely to shoehorn its argument into a case that it cites. *See* Objection at ¶ 43.

11.    But the more pertinent objection is that, as NexPoint has always argued that the Debtor caused the alleged default, NexPoint should have retained an expert months ago: "[i]If NexPoint wanted to offer 'expert testimony' concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that." Objection at ¶ 44.  This argument is wrong as a matter of Fifth Circuit law.

12.    Prior to Mr. Waterhouse's deposition, NexPoint did not know that Mr. Dondero allegedly instructed Mr. Waterhouse not to make the payment.  NexPoint understood that the Debtor's employees simply dropped the ball on ensuring that the payment was made.  Under those facts, expert testimony would not have been needed because anyone, using common sense, can determine whether the Debtor in that case breached it duties.  But the situation changed when Mr. Waterhouse gave his deposition testimony because, if the jury believes that Mr. Dondero gave the instruction, now the situation is much more complicated; *i.e.* whether, in light of such an alleged instruction, the Debtor nevertheless breached its duties.  This important distinction has been aptly explained by the Fifth Circuit in a case where the issue was whether a trustee breached his duties:

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 6

Finders of fact are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.  Accordingly, we have explained that, as a general rule, expert testimony is not needed in many if not most cases. Moreover, although expert testimony may be necessary in a professional negligence case to establish the standard of care for the industry, an exception applies in instances of negligence that are a matter of common knowledge comprehensible to laymen.

Although Liberty Mutual contends that expert testimony was required in this case, Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and in the face of repeated warnings and inquiries by a concerned creditor, a layperson could discern that the standard of care was not met in this case.

We agree with Lamesa that, under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken *some* form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013) (internal citations and quotations omitted).

13.     So too, here, NexPoint did not need an expert for the jury to conclude that the Debtor breached its duties by doing *nothing* in light of the upcoming payment, without Mr. Dondero's alleged instruction.  But if the jury finds that that instruction occurred, the situation is more complicated: did the Debtor have an affirmative duty after receiving such instruction to seek confirmation, advise as to the potential consequences of a default, or try to dissuade Mr. Dondero? These issues are not within a lay person's common knowledge or common sense.  And this is all the more important because, at the same time, the Debtor was providing legal services to NexPoint; *i.e.* the Debtor was NexPoint's law firm.

14.     By analogy, it is one thing for a lawyer to fail to inform his client of an upcoming deposition, which leads to a "death penalty" order.  Anyone can know, using common sense, that the lawyer committed professional negligence.  But what if the lawyer advises the client of the

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 7

APP 792

deadline, but the client tells the lawyer he does not feel like attending the deposition? Can the

lawyer sit on his hands and do nothing, or must the lawyer take affirmative steps, for example, to

inform the client of the potential consequences, try to reschedule the deposition, or try to dissuade

the client from his decision? That is a much more difficult question. Here again:

> the general rule is that expert testimony is required to establish the standard of care
> in a legal malpractice action; an exception to the general rule is recognized where
> the attorney's lack of care and skill is so evident that the jury can find negligence
> as a matter of common knowledge, e.g., when an attorney allows the statute of
> limitations to run on a client's claim.

*Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008).

15. The Debtor's objection that the expert testimony is irrelevant is likewise wrong.

NexPoint has explained above why expert testimony is appropriate, and arguably required, to

address the standard of care in the Shared Services Agreement. NexPoint has likewise

demonstrated that the Shared Services Agreement expressly provides for assistance and advice

with respect to "payments." Here, the Debtor attempts misdirection:

> NexPoint does not and cannot identify any provision in the SSA that imposes a duty
> on Highland to make Annual Installment payments on NexPoint's behalf without
> direction from an authorized NexPoint representative.

Objection at ¶ 49.

16. NexPoint has never argued that the Debtor should have made the payment "on

NexPoint's behalf," in the sense that the Debtor would do so from its funds. And, the issue is not

whether the payment should have been made without direction from an authorized NexPoint

representative—itself a disputed question of fact made much more complicated by the fact that it

was the same individual responsible for the payment on both sides, who was also an officer of both

parties. Even if the Debtor is correct, though, the point is that the Debtor failed in its duties to *seek*

such authorization.

---

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 8

APP 793

17.     The Debtor also argues that, as NexPoint should always have known that Mr. Dondero did not authorize the payment, Mr. Waterhouse's testimony that Mr. Dondero instructed him not to make the payment does not change the situation such that NexPoint's delay is unreasonable. First, the issue is not whether NexPoint instructed the Debtor to make the payment; that is merely the Debtor's interpretation of its duties under the Shared Services Agreement and the Court or the jury will have to decide whether that is correct. NexPoint does not agree that is the correct standard (and its expert has not been asked to opine on that issue). Second, the issue is the Debtor's failure to *advise* NexPoint on the issue—and *advice* is an express duty under the contract. Third, the Debtor fails to recount the whole of Mr. Dondero's testimony on the "authorization" issue:

> Q. Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A.    No, there was a reliance on Highland.
>
> Q.    Okay. Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?
>
> A. Yes.  It is my contention that that is how it worked in prior years also.
>
> Q. And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A.    Yes, typically.  And in 2017 or 2018, 2019, for sure.

Morris Declaration Exh. 4 at: 462:24-463:25.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 9

APP 794

18.     And contrary to the Debtor's characterization of Mr. Waterhouse's testimony, Mr.

Waterhouse testified as follows:

Q.     Well, what about long term loans?  Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under long-term notes?

MR. MORRIS:  Objection to the form of the question.

MS. DANDENEAU:  Objection to form.

A.     I mean, that is one of the things that the Highland personnel did provide to the advisors.  Yes, we would -- we would – over the years, yes, we -- we -- we -- we did do that generally.  Again, I don't remember specifically but, yes, generally we – you know, we did do that.

*       *       *

Q. And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?

A. We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the advisors, we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections. If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that.

Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat.  But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

*       *       *

Q.  And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

MR. MORRIS: Objection to form of the question.

MS. DANDENEAU: Objection to form.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 10

APP 795

A.  Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody

Rukavina Declaration at Exh. C: 333:14-338:8.

19.     The situation was not, therefore, as the Debtor construes it; that the Debtor could sit around and do nothing until an instruction to pay was issued.  On the contrary, as the Shared Services Agreement requires, it was to *advise* NexPoint: "to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are [] upcoming . . . [and] scheduled to be paid."  Whatever else can be said about what happened, and whether the jury will believe Mr. Dondero or Mr. Waterhouse, one thing is clear: the course that had been followed for years was not followed here, because the Debtor failed to inform Mr. Dondero of the upcoming alleged obligation, whether outright or because of Mr. Dondero's alleged instruction not to pay.

20.     On the issue of timing, NexPoint has already explained that, while it understood that Mr. Dondero instructed Mr. Waterhouse to make no further payments on the Shared Services Agreement, Mr. Dondero never made a similar instruction regarding the Note.  *See* Rukavina Declaration at ¶ 10.  Mr. Waterhouse's counsel prevented NexPoint's counsel from discussing the matter with Mr. Waterhouse, due to ongoing litigation between the Debtor and Mr. Waterhouse. *See id.* at ¶ 11.  If the Court questions the truthfulness of this, the Court need only review the transcript of Mr. Waterhouse' deposition, where NexPoint's attorney asked four (4) times whether Mr. Waterhouse was sure of the instruction, as evidence of counsel's surprise at the answer.  *See* Rukavina Declaration a Exh. C: 390:4-392:17.

21.     At the same time, it appears that the Debtor knew what Mr. Waterhouse's answer would be well ahead of time—an issue also relevant below to prejudice.  On May 11, 2021, the Debtor served its amended responses to NexPoint's discovery.  *See* Supplemental Rukavina

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 11

APP 796

Declaration [filed concurrently herewith] at Exh. "A." In those, the Debtor answered the following

interrogatory:

### INTERROGATORY NO. 2:

If the Debtor contends that it was not responsible for causing payments to be made
under the Note on NexPoint's behalf pursuant to the Shared Services Agreement,
explain the legal and factual basis for such contention.

### RESPONSE TO INTERROGATORY NO. 2:

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal
conclusion or legal analysis. Subject to its objection, the Shared Services
Agreement did not provide that the Debtor was responsible for causing payments
to be made under the Note. The Debtor further states that after the Debtor sent
NexPoint the Default Letters, NexPoint did not contend that the Debtor was
required to make payments under the Note on NexPoint's behalf. The Debtor's
personnel caused the January Payment to be processed upon instruction from
NexPoint.

*See* Supplemental Rukavina Declaration at Exh. "B" at p. 7.

22. Even though NexPoint asked the Debtor to explain, factually, why the Debtor was

not responsible for causing payments to be made, rather than including in its answer that Mr.

Dondero gave Mr. Waterhouse the alleged instruction, the Debtor merely answered (as it does

now, despite the clear language of the Shard Services Agreement) that the contract did not impose

this responsibility on the Debtor. Yet, the Debtor's answer to the following request for production

strongly suggests that the Debtor knew of the alleged instruction, yet did not include it in the

interrogatory answer:

### REQUEST FOR PRODUCTION NO. 1:

All Communications pursuant to which any director, officer, or employee of the
Debtor was advised or instructed not to make the December Payment or to cause
the December Payment to be made.

---

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 12

APP 797

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. <u>Any Communications responsive to Request for Production No. 1 were verbal.</u>

*See id.* at p. 10 (emphasis added).

23.     The Debtor could and should have stated what these verbal communications were in May, 2021. Instead, NexPoint was forced to wait until Mr. Waterhouse's deposition to learn of the alleged verbal communication. Alternatively, the Debtor too did not know ahead of time how Mr. Waterhouse would answer, but then it can hardly accuse NexPoint of any delay.

**B.    EXPERT TESTIMONY IS RELEVANT**

24.     NexPoint has already addressed above why expert testimony is appropriate, why it may even be required, and why, both pursuant to the language of the contract and the Debtor's CFO's testimony, the Debtor had *some* level of duties with respect to the payment.

25.     The Debtor argues that the agreement exculpates the Debtor for "any acts or omissions unless it is determined by a court of competent jurisdiction to 'be the result of gross negligence or to constitute fraud or willful misconduct.'" Objection at p. 13, n. 8. That is not true. That exculpation provision applies only to the "conduct of the business of [NexPoint]." Rukavina Declaration Exh. A at § 6.02. The payment of a note is not the "business" of NexPoint; its business is managing and advising funds and investments. Even so, if the Debtor argues otherwise, then that is a matter for the jury, and the issue is not one appropriate to the present Motion.

26.     The Debtor's reliance on the Shared Service Agreement's indemnification provision is likewise unavailing: "an indemnity provision does not apply to claims between the parties to the agreement." *Derr Constr. Co. v. Houston*, 846 S.W.2d 854, 858 (Tex. App. – Houston [14th Dist.] 1992). *Accord In re 1701 Commerce LLC*, 2014 Bankr. LEXIS 3962 at *40 (Bankr. N.D. Tex. 2014) ("[u]nder Texas law, indemnity agreements do not generally apply to

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 13

APP 798

claims between the parties to an agreement"). There is an exception if the agreement expressly provides that the indemnification applies to a claim brought by one party against the other, *see In re 1701 Commerce LLC*, 2014 Bankr. LEXIS at *40, but the language in the Shared Services Agreement does not so provide.

## C.     THE DEBTOR WILL NOT BE PREJUDICED

27.     The Debtor will not suffer prejudice if the Motion is granted. If the Debtor hires a rebuttal expert and prevails at trial, then it will be entitled to the costs of that expert. The scheduling order provided for expert designations by October 29, 2021. NexPoint filed its motion on that day. The Debtor cannot credibly argue prejudice with respect to added costs when the Debtor would have incurred those costs anyway had NexPoint provided an expert report on that day. In this respect:

> any additional costs incurred from an extension would not be unreasonable. Here, Plaintiffs seek an extension so they can offer an expert witness for their products liability claims. Defendants have been aware of these claims since this case's inception. Because expert witnesses are crucial for Plaintiffs' prima facie case, Defendants have known they would need to prepare rebuttal evidence since this case began on October 14, 2019. These facts do not present an instance in which a party adds an additional claim, or introduces an eleventh-hour witness, to foist additional litigation costs without warning.

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 at *12 (E.D. Tex. 2021).

28.     Likewise here, the Debtor always knew of NexPoint's defense. And, as discussed above, it appears that the Debtor (but not NexPoint) knew what Mr. Waterhouse's testimony would be in May, 2021. Again, had NexPoint provided an expert report on October 29, the Debtor would have incurred whatever costs it would have incurred anyway, except that, in that instance, the Debtor would likely be moving to extend the expert deadline, since the scheduling order does not provide for a separate rebuttal expert deadline. Moreover, the Debtor will have every opportunity

---

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 14

APP 799

to contest the expert's admission at trial; the Court's approval of the Motion does not mean that the expert's testimony is admissible.

29.     The Debtor's discussion of a "continuance" is irrelevant, as trial has not been set and likely will not be set for a long time given the Debtor's own desire to pursue summary judgment practice.  In that respect, assuming the Court grants the Motion on December 13, 2021, and the Debtor needs one month for a rebuttal expert, and the parties need two weeks for expert depositions, that would still mean that this case would be trial ready by the end of February, 2022—thirteen (13) months after being filed.  This is not unreasonable and is faster than many cases are declared trial ready.  In fact, the Debtor has indicated that it will move for summary judgment by December 17, 2021, with responses due on January 17, 2022, with the Debtor's reply on January 31, 2022—a schedule the Court accepted.  And, on December 7, 2021, the Debtor apparently filed motions seeking to consolidate for trial various note cases, including this one, which motion alone will likely take significant time to decide as several District Court judges are involved.  In other words, this Adversary Proceeding is not going to be certified as trial ready for a few months at least.  Nor would granting this Motion affect the timing of the summary judgment proceedings; whether the Debtor breached the standard of care is a question of fact outside the scope of summary judgment.

## IV.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court overrule the Debtor's objection and grant the Motion.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 15

APP 800

RESPECTFULLY SUBMITTED this 8th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 8th, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served via the Court's CM/ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.     My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.     I am an attorney duly licensed to practice law in the State of Texas.  I am lead counsel for NexPoint Advisors, L.P. ("NexPoint"), in the above styled and numbered Adversary Proceeding.  As such, I directly supervised discovery served by NexPoint in this Adversary Proceeding and the receipt of responses to the same from Highland Capital Management, LP (the "Debtor"), and I have personal knowledge of the same (although not the underlying facts).

3.     Attached to this Declaration as Exhibit "A" is a true and correct copy of discovery served by NexPoint on the Debtor on or about March 31, 2021.

SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA—Page 1

4.      Attached to this Declaration as Exhibit "B" is a true and correct copy of the Debtor's amended responses to said discovery.

5.      I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed: December 8, 2021.

/s/ Davor Rukavina
DAVOR RUKAVINA

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for NexPoint Advisors, L.P*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S REQUESTS FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION TO PLAINTIFF

TO:    Highland Capital Management, L.P. through its counsel of record, Jeffrey Pomerantz and John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, jpomerantz@pszjlaw.com; jmorris@pszjlaw.com; Zachery Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, TX 75231, zannable@haywardfirm.com

NexPoint Advisors, L.P., the defendant in the above-styled and numbered adversary

proceeding, hereby serves these *Requests for Admissions, Interrogatories, and Requests for*

---

EXHIBIT "A"

*Production* pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and Rules

7033, 7034, and 7036 of the Federal Rules of Bankruptcy Procedure.

Highland Capital Management, L.P. is instructed to serve its responses to these requests

and interrogatories, along with all documents responsive to these requests, no later than **April 30,**

**2021**, by delivering them to Julian Vasek, Munsch Hardt Kopf & Harr P.C., 500 N. Akard St., Ste.

3800, Dallas, Texas 75201, jvasek@munsch.com.

Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), made applicable to this adversary

proceeding by Federal Rule of Bankruptcy Procedure 7034, electronically stored information

should be produced in native format.

## I. DEFINITIONS

1. "Adversary Proceeding" means the above-captioned adversary proceeding.

2. "Committee" means the Official Committee of Unsecured Creditors appointed in

the Debtor's bankruptcy case, including its officers, directors, employees, agents, and

representatives.

3. "Communication" or "Communications" means every kind of written, recorded, or

oral transmission of information.

4. "Complaint" means the *Complaint for (I) Breach of Contract and (II) Turnover of*

*Property of the Debtor's Estate* filed at Dkt. No. 1 in the Adversary Proceeding.

5. "Debtor" means Highland Capital Management, L.P., including its officers,

directors, employees, agents, and representatives.

6. "December Payment" means the payment that was allegedly due on December 31,

2020 under the Note.

7.     "<u>Default Letters</u>" means the letters sent from the Debtor to NexPoint dated January 7, 2021 and January 15, 2021 that are attached as exhibits to the Complaint.

8.     "<u>Document</u>" or "<u>Documents</u>" means writings of every type and from any source, including e-mail and electronic documents and including originals and nonidentical copies thereof that are in your possession, custody, or control or known by you to exist.

The term also includes communications not only in words, but in symbols, pictures, sound recordings, film, tapes, and information stored in, or accessible through, computer or other information storage or retrieval systems.  If the information is kept in a computer or informational storage or retrieval system, the term also includes codes and programming instructions and other materials necessary to understand such systems.

The term includes, but is not limited to:  the original and all copies (regardless of origin and whether or not including additional writing thereon or attached thereto) of pictures, loan agreements, memoranda, reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, inter-office and intra-office communications, contracts, cables, electronic mails, deleted electronic mails, text messages, notations or memoranda of any sort of any conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes and amendments of any of the foregoing), graphic or oral records or representations of any kind, (including, without limitation, tapes, cassettes, discs and records)

and other written, printed, typed, photographed, or other graphic recorded matter of any kind or nature, however reproduced and whether preserved in writing, phono record, film, photograph, type or video tape.

9. "January Payment" means the payment made by NexPoint under the Note on January 14, 2021 in the amount of $1,406,111.92.

10. "NexPoint" means NexPoint Advisors, L.P., including its officers, directors, employees, agents, and representatives.

11. "Note" means that certain *Promissory Note* attached to the Complaint as Exhibit 1.

12. "Shared Services Agreement" means that certain *Amended and Restated Shared Services Agreement* between NexPoint and the Debtor, dated effective as of January 1, 2018.

## II. REQUESTS FOR ADMISSIONS

1. Admit that the Debtor was responsible for making payments under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

2. Admit that the Debtor was responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

3. Admit that the Debtor did not make the December Payment on NexPoint's behalf.

4. Admit that the Debtor did not cause the December Payment to be made on NexPoint's behalf.

5. Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2018.

6. Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2018.

7.      Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

8.      Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2019.

9.      Admit that, prior to the alleged default on December 31, 2020, NexPoint never defaulted under the Note.

### III.   INTERROGATORIES

1.      If the Debtor contends that it was not responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

2.      If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

3.      Provide the following information with respect to each payment made under the Note since its inception: (a) the date such payment was made; (b) the amount of such payment; (c) the individuals involved in making such payment or causing such payment to be made; (d) the account from which such payment was made; and (e) the method by which such payment was made.

4.      Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Note, the December Payment, the January Payment, and/or the alleged default.

5.      Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Debtor's obligations to make a payment or cause a payment to be made under the Note on NexPoint's behalf.

6.      Identify all records the Debtor kept regarding services the Debtor provided to NexPoint under the Shared Services Agreement with respect to the Note, and indicate whether such records identify what employee(s) provided services, when such services were provided, and how much time was spent providing such services.

7.      For each request for admission above that the Debtor did not unequivocally admit, explain the factual and legal basis for not doing so.

## IV.    REQUESTS FOR PRODUCTION

1.      All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

2.      All Communications between directors, officers, and/or employees of the Debtor related to the Note.

3.      All Communications between directors, officers, and/or employees of the Debtor related to any and all defaults under the Note.

4.      All Communications between directors, officers, and/or employees of the Debtor related to the December Payment.

5.      All Communications between directors, officers, and/or employees of the Debtor related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

6. All Communications between directors, officers, and/or employees of the Debtor related to the January Payment.

7. All Communications with third parties related to the Note.

8. All Communications with third parties related to the December Payment.

9. All Communications with third parties related to the January Payment.

10. All Communications with third parties related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

11. All Communications with third parties related to any and all defaults under the Note.

12. All Communications with the Committee (including, but not limited to, Communications solely between counsel for the Debtor and the Committee) related to the Note, any and all defaults under the Note, the December Payment, the January Payment, and/or the Default Letters.

13. All ledgers, statements, and accounting records related to payments made under the Note to date.

14. All Documents pursuant to which the Debtor was authorized and/or required to make payments or cause payments to be made on NexPoint's behalf under the Note.

15. All Documents and Communications pursuant to which the Debtor contends it was relieved of its obligation to make payments or cause payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

16. All Communications related to potentially marketing and/or selling the Note.

17. The Shared Services Agreement, including all amendments and supplements thereto, whether informal or formal, regardless of how documented.

18.     All Documents and Communications construing the Debtor's obligations to NexPoint under the Shared Services Agreement.

19.     All Documents and Communications related to the scope of the Debtor's obligations to NexPoint under the Shared Services Agreement.

20.     All Documents and Communications identified in connection with Interrogatory 6 above.

21.     All billing statements from Pachulski Stang Ziehl & Jones LLP and Hayward PLLC related to fees the Debtor seeks to collect in the Adversary Proceeding.

RESPECTFULLY SUBMITTED this 31st day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Julian P. Vasek*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR NEXPOINT
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 31st day of March, 2021, a true and correct copy of this document was electronically served via email on counsel for the Debtor (jpomerantz@pszjlaw.com; jmorriss@pszjlaw.com; zannable@haywardfirm.com), as well as by first class U.S. mail, postage prepaid to the following recipients:

Zachery Z. Annable
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Jeffrey N. Pomerantz
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

/s/ *Julian P. Vasek*

Julian P. Vasek, Esq.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

EXHIBIT "B"

**DEBTOR'S AMENDED RESPONSES AND OBJECTIONS TO NEXPOINT ADVISORS,**
**L.P.'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,**
**AND REQUESTS FOR PRODUCTION**

Highland Capital Management, L.P., ("Plaintiff" or the "Debtor") hereby responds to

*Defendant's Requests for Admissions, Interrogatories, and Requests for Production to Plaintiff*

(the "Requests")[2] served by NexPoint Advisors, L.P. ("NexPoint" or "Defendant") in the above-

captioned adversary proceeding (the "Adversary Proceeding").  The Debtor's amended responses

and objections to the Requests (the "Amended Responses") are made pursuant to Federal Rules of

Civil Procedure ("FRCP") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to

Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to

each and every Response and are incorporated into each Response as though set forth in full:

1.      The Responses contained herein are based upon information presently

known and ascertained by the Debtor.

2.      The Debtor objects to the Requests to the extent they seek information or

documents that are protected from discovery by the attorney-client privilege, the attorney work

product doctrine or any other privilege or immunity.  The inadvertent disclosure or production of

any document that is protected from discovery by any privilege or immunity shall not constitute a

waiver of any such privilege or immunity.  All references in these objections and responses to the

Debtor's agreement to produce documents shall be construed to mean non-privileged documents.

3.      The Debtor objects to the Requests to the extent they request information

that is not reasonably or readily available to it, in its possession, custody or control, or is more

---

[2]  Capitalized terms not defined herein shall have the meanings set forth in the Requests.

readily available to NexPoint from another source or for which the burden of obtaining such information is not substantially greater for NexPoint than it is for the Debtor.

4.     The Debtor objects to the Requests to the extent they call for legal conclusions and/or legal analyses.

5.     All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.     The Debtor objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.     The Debtor's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.     These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1**:

Admit that the Debtor was responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

The Debtor denies Request for Admission No. 1 on the ground that the Shared Services Agreement does not provide that the Debtor was responsible for making payments under the Note.

**REQUEST FOR ADMISSION NO. 2**:

Admit that the Debtor was responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

The Debtor denies Request for Admission No. 2 on the ground that the Shared Services Agreement does not provide that Debtor was responsible for causing payments to be made under the Note.

**REQUEST FOR ADMISSION NO. 3:**

Admit that the Debtor did not make the December Payment on NexPoint's behalf.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admit, providing that NexPoint did not request that any such payment be made, and providing also that when the Debtor received instruction from NexPoint to make a payment during January 2021, it did make the payment.

**REQUEST FOR ADMISSION NO. 4:**

Admit that the Debtor did not cause the December Payment to be made on NexPoint's behalf.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit, providing also that when the Debtor received instruction from NexPoint to cause a payment to be made during January 2021, it did so.

**REQUEST FOR ADMISSION NO. 5**:

    Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

    The Debtor admits that it made a payment on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2018. The Debtor otherwise denies Request for Admission No. 5 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 6**:

    Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

    The Debtor admits that it caused a payment to be made on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2018. The Debtor otherwise denies Request for Admission No. 6 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 7**:

    Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

    The Debtor admits that it made a payment on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2019. The Debtor otherwise denies Request for Admission No. 7 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 8**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

The Debtor admits that it caused a payment to be made on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2019.  The Debtor otherwise denies Request for Admission No. 8 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 9**:

Admit that, prior to the alleged default on December 31, 2020, NexPoint never defaulted under the Note.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admit.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If the Debtor contends that it was not responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 1:**

The Debtor objects to Interrogatory No. 1 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not require that the Debtor to make payments under the Note on NexPoint's behalf. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel processed the January Payment upon instruction from NexPoint.

**INTERROGATORY NO. 2:**

If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

**INTERROGATORY NO. 3:**

Provide the following information with respect to each payment made under the Note since its inception: (a) the date such payment was made; (b) the amount of such payment; (c) the individuals involved in making such payment or causing such payment to be made; (d) the account from which such payment was made; and (e) the method by which such payment was made.

APP 819

**RESPONSE TO INTERROGATORY NO. 3:**

See **Exhibit A**.

**INTERROGATORY NO. 4:**

Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Note, the December Payment, the January Payment, and/or the alleged default.

**RESPONSE TO INTERROGATORY NO. 4:**

The Debtor objects to Interrogatory No. 4 on the grounds that it calls for a legal conclusion or legal analysis, is vague and ambiguous, and is overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1). Subject to its objection, the Debtor identifies the following individuals and entity in response to Interrogatory No. 4:

Jim Seery

Greg Demo

John Morris

Frank Waterhouse

Kristin Hendrix

DSI Consulting

**INTERROGATORY NO. 5:**

Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Debtor's obligations to make a payment or cause a payment to be made under the Note on NexPoint's behalf.

**RESPONSE TO INTERROGATORY NO. 5:**

The Debtor objects to Interrogatory No. 5 on the grounds that it assumes the Debtor was obligated to make payments or cause a payment to be made under the Note on NexPoint's behalf. The Debtor further objects on the grounds that it calls for a legal conclusion or analysis, and is

overly broad and unduly burdensome. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>. Subject to its objection, the

Debtor identifies the following individuals and entity in response to Interrogatory No. 5:

> Jim Seery

> Greg Demo

> John Morris

> Frank Waterhouse

> Kristin Hendrix

> Blair Hillis

> DSI Consulting

## INTERROGATORY NO. 6:

Identify all records the Debtor kept regarding services the Debtor provided to NexPoint under the Shared Services Agreement with respect to the Note, and indicate whether such records identify what employee(s) provided services, when such services were provided, and how much time was spent providing such services.

## RESPONSE TO INTERROGATORY NO. 6:

The Debtor does not possess information responsive to Interrogatory No. 6.

## INTERROGATORY NO. 7:

For each request for admission above that the Debtor did not unequivocally admit, explain the factual and legal basis for not doing so.

## RESPONSE TO INTERROGATORY NO. 7:

The Debtor objects to Interrogatory No. 7 on the grounds that it calls for a legal analysis

or legal conclusion, and is overly broad and unduly burdensome. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 1:

All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. Any Communications responsive to Request for Production No. 1 were verbal.

### REQUEST FOR PRODUCTION NO. 2:

All Communications between directors, officers, and/or employees of the Debtor related to the Note.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 2.

### REQUEST FOR PRODUCTION NO. 3:

All Communications between directors, officers, and/or employees of the Debtor related to any and all defaults under the Note.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 3.

### REQUEST FOR PRODUCTION NO. 4:

All Communications between directors, officers, and/or employees of the Debtor related to the December Payment.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 4.

**REQUEST FOR PRODUCTION NO. 5:**

All Communications between directors, officers, and/or employees of the Debtor related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 5.

**REQUEST FOR PRODUCTION NO. 6:**

All Communications between directors, officers, and/or employees of the Debtor related to the January Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 6.

**REQUEST FOR PRODUCTION NO. 7:**

All Communications with third parties related to the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 7.

**REQUEST FOR PRODUCTION NO. 8:**

All Communications with third parties related to the December Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 8.

**REQUEST FOR PRODUCTION NO. 9:**

All Communications with third parties related to the January Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 9.

**REQUEST FOR PRODUCTION NO. 10:**

All Communications with third parties related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 11:**

All Communications with third parties related to any and all defaults under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 11.

**REQUEST FOR PRODUCTION NO. 12:**

All Communications with the Committee (including, but not limited to, Communications solely between counsel for the Debtor and the Committee) related to the Note, any and all defaults under the Note, the December Payment, the January Payment, and/or the Default Letters.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 12.

**REQUEST FOR PRODUCTION NO. 13:**

All ledgers, statements, and accounting records related to payments made under the Note to date.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 13.

**REQUEST FOR PRODUCTION NO. 14:**

    All Documents pursuant to which the Debtor was authorized and/or required to make payments or cause payments to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

    The Debtor objects to Request for Production No. 14 to the extent that it assumes that the Debtor was required to make payments or cause payments to be made on NexPoint's behalf under the Note. Subject to its General and Specific Objections, the Debtor is not aware of documents otherwise responsive to Request for Production No. 14.

**REQUEST FOR PRODUCTION NO. 15:**

    All Documents and Communications pursuant to which the Debtor contends it was relieved of its obligation to make payments or cause payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

    The Debtor objects to Request for Production No. 15 to the extent that it assumes that the Debtor was obligated to make payments or cause payments to be made on NexPoint's behalf under the Note. Subject to its General and Specific Objections, the Debtor is not aware of documents otherwise responsive to Request for Production No. 15.

**REQUEST FOR PRODUCTION NO. 16:**

    All Communications related to potentially marketing and/or selling the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

    The Debtor objects to Request for Production No. 16 on the ground that it is not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 17:**

    The Shared Services Agreement, including all amendments and supplements thereto, whether informal or formal, regardless of how documented.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 17.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and Communications construing the Debtor's obligations to NexPoint under the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

The Debtor objects to Request for Production No. 18 on the ground that it is vague and ambiguous, overly broad, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 19:**

All Documents and Communications related to the scope of the Debtor's obligations to NexPoint under the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

The Debtor objects to Request for Production No. 19 on the ground that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications identified in connection with Interrogatory 6 above.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

The Debtor objects to Request for Production No. 20 on the ground that it is not aware of any such documents. Subject to the General and Specific Objections, the Debtor will search for and produce documents responsive to Request for Production No. 20.

**REQUEST FOR PRODUCTION NO. 21:**

All billing statements from Pachulski Stang Ziehl & Jones LLP and Hayward PLLC related to fees the Debtor seeks to collect in the Adversary Proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 21.

Dated: May 11, 2021

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
              ikharasch@pcszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**EXHIBIT A**

**Response to Interrogatory No. 3**

**NexPoint Advisors**
**Note Receivable Payment Summary**

| Payment Date | Total Paid | Pmt Account | Pmt Method | Individuals Involved in Making Pmt |
|---|---|---|---|---|
| 10/20/2017 | 800,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/5/2017 | 1,301,504.99 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 4/10/2018 | 439,721.54 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 5/1/2018 | 146,573.85 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 5/9/2018 | 879,927.65 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 9/5/2018 | 280,765.40 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 9/21/2018 | 1,023,750.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/18/2018 | 294,695.10 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 3/29/2019 | 750,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 4/16/2019 | 1,300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 6/4/2019 | 300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 6/19/2019 | 2,100,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 7/9/2019 | 630,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 8/13/2019 | 1,300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/30/2019 | 530,112.36 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 1/14/2021 | 1,406,111.92 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |

EXHIBIT "A"

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## <u>NOTICE OF EXPERT REPORT OF STEVEN J. PULLY</u>

NexPoint Advisors, L.P., one of the defendants in the above styled and numbered

Adversary Proceeding, hereby serves upon all parties the *Expert Report of Steven J. Pully, CPA,*

*CFA, Esq.*, a true, correct, and full copy of which is attached hereto.

---

NOTICE OF EXPERT REPORT OF STEVEN J. PULLY—Page 1

Dated at Dallas, Texas this the 10th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina _____
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 10th, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served via the Court's CM/ECF system on parties entitled to notice thereof, including on counsel for the Debtor/Plaintiff.

/s/ Davor Rukavina _____
Davor Rukavina

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Adversary Proceeding No. |
| DONDERO, NANCY DONDERO, AND | § | 21-03005 |
| THE DUGABOY INVESTMENT | § | |
| TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HIGHLAND CAPITAL | § | Adversary Proceeding No. |
| MANAGEMENT SERVICES, INC., | § | 21-03006 |
| JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HCRE PARTERS, LLC (N/K/A/ | § | Adversary Proceeding No. |
| NEXPOINT REAL ESTATE | § | 21-03007 |
| PARTNERS, LLC), JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## EXPERT REPORT OF
## STEVEN J. PULLY, CPA, CFA, ESQ.

### December 10, 2021

*Confidential*

# TABLE OF CONTENTS

I.    BACKGROUND AND QUALIFICATIONS ........................................................ 3

II.    ENGAGEMENT ............................................................................................... 6

III.   BRIEF SUMMARY OF OPINIONS .............................................................. 7

IV.   ASSUMPTIONS ............................................................................................. 7

V.    SERVICES AGREEMENTS GENERALLY ................................................. 13

VI.   OPINIONS ...................................................................................................... 15

VII. CONCLUSION ............................................................................................. 21

APP 833

# I. BACKGROUND AND QUALIFICATIONS

1. My professional background includes over thirty-six years of experience as an investment banker, corporate board member, corporate executive, hedge fund executive, attorney, consultant, and expert witness.

2. I graduated with honors from Georgetown University in 1982 with a BSBA in Accounting, and I graduated from The University of Texas at Austin in 1985 with a Doctor of Jurisprudence degree. I hold the Chartered Financial Analyst (CFA) designation and am a licensed CPA and attorney in the State of Texas. I also hold the Series 7, 63, and 79 FINRA securities licenses[1]. My CFA designation and my law, CPA, and FINRA licenses are all current.

3. I currently work as a corporate executive, as a corporate board member, as an investment banker, and as an expert witness.

   a. I work on a part-time basis as the Chief Executive Officer of Harvest Oil & Gas, a former public company that is in the process of dissolving. I was Chairman of the Board of Harvest before assuming the Chief Executive Officer role. Until recently, Harvest was largely managed by another company pursuant to a services agreement. When the services agreement was entered into, the services provider and the predecessor of Harvest were affiliates, which they ceased to be during the term of the agreement. Services provided under the agreement included treasury, accounting, and operating functions. One of my roles as Chief Executive Officer is to replace the former service provider by bringing most business functions in-house.

   b. I currently serve on the boards of seven private companies. I am typically appointed to boards by large shareholders. In total, I have been on the boards of thirty-two public and private companies. Those companies have operated in a broad cross section of industries, including agriculture, aviation, energy, entertainment, manufacturing, real estate, refining, retail, restaurants, technology, and telecom. I have served on the boards of companies that have outsourced most of their corporate functions or provided outsourcing services for other companies.

   c. I conduct my investment banking work through Speyside Partners, LLC ("Speyside Partners"), an entity that I co-founded.[2] At Speyside I work on mergers, acquisitions and divestitures, financings, and restructurings.

4. Through the end of 2014, I spent thirteen years working for two different hedge funds. I was the General Counsel and a partner of Carlson Capital, the most recent hedge fund for which I worked. Carlson Capital managed approximately $9 billion across a number of different funds during much of my tenure and followed a multi-strategy investing approach. Prior to working at Carlson Capital, I worked for Newcastle Capital Management, a hedge fund that pursued a deep value and activist investment strategy. I was the President of Newcastle Capital

---

[1] I formerly held the Series 24 FINRA license.
[2] The website for Speyside Partners is www.speysidepartners.com.

3

Management and worked there for almost six years. Newcastle Capital Management managed as much as $650 million across a variety of funds while I was employed there. During my tenure, I served as the Chief Executive Officer of two companies controlled by the firm. Both Carlson Capital and Newcastle Capital Management had "shared-services" arrangements, where a separate entity provided a variety of back office, mid-office, and front office services to an affiliated party.

5. Prior to becoming a hedge fund executive, I was an investment banker for approximately twelve years at various large firms, including as a Managing Director for Bank of America Securities and as a Senior Managing Director for Bear Stearns. I also worked as an investment banker at Kidder Peabody, PaineWebber, and Wasserstein Perella. Over the course of my work at large investment banking firms, I focused on mergers, acquisitions, divestitures, capital raising, and restructurings.

6. Prior to becoming an investment banker, I was a securities and corporate lawyer for almost four years at Baker Botts.

7. Based on the work that I have done over the past thirty-six years, I have developed a deep understanding of services agreements and outsourcing generally as well as corporate governance-related matters. I applied the knowledge and experience that I have gained over the past thirty-six years to my analysis in this report.

8. I have previously served as a testifying and/or consulting witness in the following actions:

   a. Ascent Resources – *Utica, LLC (f/k/a American Energy – Utica, LLC); Ascent Resources, LLC (f/k/a American Energy Appalachia Holdings, LLC); Ascent Resources Utica Holdings, LLC (f/k/a American Energy Ohio Holdings, LLC); The Energy & Minerals Group Fund III, LP; EMG Fund III Offshore Holdings, LP; FR AEU Holdings, LLC and FR AE Marcellus Holdings, LLC v. Duane Morris LLP*, in the 165th Judicial District Court of Harris County, Cause No. 2015-46550) — Consulting and Testifying witness for Plaintiffs.

   b. *In re Paladin Energy Corp.*, Case No. 16-13590, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division — Consulting and Testifying witness for Debtor.

   c. *In re: Potential Complaint Against Larry Noble, Noble Operating, LLC, Noble Natural Resources, L.L.C. and Javier Urias to Avoid Transfers* — Testifying witness for Potential Defendants.

   d. *James D. Sallah, not individually but solely in his capacity as Corporate Monitor for OM Global Investment Fund LLC and OM Global LP, Plaintiff, v. BGT Consulting, LLC, d/b/a BGT Fund Administration, and Lara Goldberg, Defendants* — Testifying witness on behalf of Defendants BGT Consulting, LLC, d/b/a BGT Fund Administration and Lara Goldberg.

   e. *Kenneth A. Kristofek, Gruene Interests, LLC and Gruene Interests Services, LLC, Gran Toro Rojo, LLC, and Gruene USFC, LLC, v. David Gunderson, Horace Winchester, Stan*

4

*Bradshaw, and Jerry Williamson, Gruenepointe Holdings, LLC, Adora 8, LLC, Adora 9, LLC, Adora 10, LLC, Adora 14 Realty, LLC, Onpointe Healthcare Development, LLC, U.S. Freedom Capital Holdings, LLC, Lake Ohana, LLC, U.S. Freedom Capital, LLC, and Encantado Investments, LLC*, in the District Court of Dallas County, Texas, No. DC-16-07674 — Testifying witness on behalf of Plaintiffs.

f.  *In re SunEdison Securities Litigation,* in the U.S. District Court for the Southern District of New York, 16-md-2742-PKC  —  Testifying witness on behalf of Plaintiffs.

g.  *Avid Controls, Inc. v. GE Energy Power Conversion Technology, Ltd.; General Electric Company; and Current Power Solutions, Inc*., In the United States District Court for the Southern District of Texas  -  Houston Division,  Civil Action No. 4:19-CV-01076 — Testifying witness on behalf of Plaintiff.

h.  *Lumos Partners, LLC, Claimant v. VAC-TRON EQUIPMENT, L.L.C., Respondent,* In Arbitration before the American Arbitration Association  —  Testifying witness on behalf of Claimant.

i.  *Lord Abbett Affiliated Fund, Inc., et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Navient Corporation, et al., Defendants*, Case No. 1:16-cv-112-GMS, in the United States District Court for the District of Delaware, Case No. 1:16-cv-112-MN — Testifying witness on behalf of Plaintiff.

j.  *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation, Plaintiffs, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC and Private Bankers Life and Annuity Co., Ltd., Defendants*, in the General Court of Justice Superior Court Division, 19 CV 13093 —Testifying witness on behalf of Defendants.

k.  *Baylor University and Southwestern Baptist Theological Seminary, Plaintiffs, v. Harold E. Riley Foundation and Mike C. Hughes, Defendants*, in the District Court of Tarrant County, Texas, 67th Judicial District — Testifying witness on behalf of Defendants.

l.  *Advsr, LLC, Plaintiff, v. Magisto, Ltd. And Yahal Zilka, Defendants,* in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:19-cv-2670  — Testifying witness on behalf of Defendants.

m.  *Lumos Partners, LLC, Claimant v. Altavian, Inc.,* In Arbitration before the American Arbitration Association —  Testifying witness on behalf of Claimant.

n.  *Fouad Saade; and Kobi Electric, LLC, Claimants, v. Woodbridge International LLC, f/k/a Woodbridge Group, LLC; and Texender "Tex" Sekhon, Respondents,* In Arbitration before the American Arbitration Association  -  Testifying witness on behalf of Claimant.

9.  I have attached a copy of my curriculum vitae as <u>Exhibit A</u> to this expert report ("Report").

<div align="center">5</div>

## II. **ENGAGEMENT**

10. Highland Capital Management, L.P., is the debtor in the bankruptcy proceeding, *In re: Highland Capital Management, L.P., Debtor,* and is referred to herein as the "Debtor" or the "Plaintiff." I have been engaged in the matters related to the bankruptcy proceeding that are listed below (collectively referred to as the "Actions").

   a. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03005, as a consulting and testifying expert witness on behalf of NexPoint Advisors, L.P. ("NexPoint"), and James Dondero ("Dondero" and NexPoint are collectively referred to as the "NexPoint Defendants").

   b. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03006, as a consulting and testifying expert witness on behalf of Highland Capital Management Services, Inc. ("HCMS"), and Dondero (Dondero and HCMS are collectively referred to as the "HCMS Defendants").

   c. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,* Defendants, Adversary Proceeding No. 21-03007, as a consulting and testifying expert witness on behalf of HCRE Partners, LLC ("HCRE"), and Dondero (Dondero and HCRE are collectively referred to as the "HCRE Defendants").

   d. The NexPoint Defendants, the HCMS Defendants, and the HCRE Defendants are collectively referred to as the "Defendants."

11. The Plaintiff has made claims against the Defendants for breach of contract, turnover of property, fraudulent transfer, and breach of fiduciary duty.

12. My engagement is through the law firms of Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") and Stinson LLP ("Stinson"), which are acting as counsel to the Defendants. I am being compensated for my time at the rate of $750.00 per hour. My compensation is not in any way contingent on (i) the opinions I express in this Report or any additional report, (ii) the content of any testimony I may give, or (iii) the outcome of the Action.

13. I have met with Dondero as well as D. J. Sauter, who is the General Counsel of NexPoint. I have also met with attorneys from counsel to the Defendants: Munsch Hardt, and Stinson.

14. I was asked to provide my opinion regarding whether it was appropriate for the Plaintiff to not pay the interest and principal on the Notes (as hereinafter defined) on behalf of NexPoint, HCMS and HCRE (collectively, the "Makers") by December 31, 2020.

APP 837

## III. BRIEF SUMMARY OF OPINIONS

15. I believe that the Plaintiff did not act reasonably by failing to pay amounts due on the Notes on behalf of the Makers by December 31, 2020, and otherwise in how it comported itself with respect to the Notes. Section 6.01 of the NexPoint Services Agreement (as hereinafter defined) sets forth a standard of care that the Plaintiff was supposed to comply with in paying the NexPoint Term Note; I also believe that each of the services agreements between the Plaintiff and the Makers required the Plaintiff to act in a reasonable way.

16. In forming my opinions and preparing this Report, I relied on all the materials listed in Exhibit B or otherwise cited herein as well as my background and personal experiences.

17. In offering my opinions, I am not opining on the legal enforceability of any agreements between the parties to the Actions.

18. I reserve the right to amend my Report should new information become available, including any assertions of the parties, witnesses, or any experts made in response to this Report.

## IV. ASSUMPTIONS

19. The Debtor filed for bankruptcy on October 16, 2019. During the Debtor's bankruptcy, James Seery ("Seery") served as the Chief Executive Officer and/or Chief Restructuring Officer of the Debtor.

20. The Debtor was formerly managed by Dondero, who was the firm's co-founder and was its President until January 9, 2020, at which time he resigned all positions with the Debtor and also relinquished control of the Debtor.[3] As of October 9, 2020, Dondero ceased to have any involvement as an officer or director of the Debtor.[4] Dondero also testified that there was tension between Seery and him as well as Seery and others at Highland.[5]

21. During 2020, the relationship between Dondero and the Plaintiff became increasingly adversarial. For example, in addition to Dondero ceasing to have any involvement as an officer or director of the Plaintiff, there were various adversarial proceedings between the parties.[6]

22. NexPoint, HCMS and HCRE executed certain notes in favor of the Debtor as described below:

   a. NexPoint executed a promissory note in the original principal amount of $30,746,812.33, and payable in thirty annual installments beginning by December 31, 2017 (the "NexPoint Term Note").[7] The NexPoint Note was fully payable in

---

[3] Dondero Deposition, Volume 2, Page 291, lines 9 – 12.
[4] Id. at Page 374, lines 8 – 10.
[5] Id. at page 87, lines 8 – 14.
[6] See, e.g., Id. at page 374, lines 6 – 9.
[7] Amended Complaint dated August 27, 2021 (the "NexPoint Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

the event of default.[8]   As of December 31, 2020, $23,610,194.59 of principal remained outstanding on the NexPoint Term Note.[9]

    b.  HCMS executed a term note in the original principal amount of $20,247,628.02 and payable in thirty annual installments beginning on December 31, 2017 (the "HCMS Term Note").[10]   The HCMS Term Note was fully payable in the event of default.[11]

    c.  HCRE executed a term note in the original principal amount of $6,059,831.51 and payable in thirty annual installments beginning on December 31, 2017 (the "HCRE Term Note").[12]   The HCRE Term Note was fully payable in the event of default.[13]

23. The Debtor and the Makers were all involved in the investment management business, collectively managing billions of dollars on behalf of investors at various points over the course of their relationship with each other. At the time that the NexPoint Term Note, the HCMS Term Note, and the HCRE Term Note (collectively, the "Notes") were entered into, the Plaintiff, NexPoint, HCMS, and HCRE were all related parties as a result of overlapping equity ownership of the entities.  As of December 31, 2020, NexPoint, HCMS, and HCRE ceased to have any overlapping equity ownership with the Plaintiff but continued to have overlapping ownership with each other.

24. The Plaintiff and NexPoint are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (the "NexPoint Services Agreement") pursuant to which Plaintiff provided a broad array of services to NexPoint.[14]   NexPoint operated its business with a small number of employees, relying on Plaintiff's much larger workforce to provide many key services for NexPoint to run its business.   The NexPoint Services Agreement details numerous areas where the Plaintiff was to provide services to NexPoint, with the Plaintiff essentially providing the entire workforce for most areas of NexPoint's business.  The areas that the Plaintiff provided services to NexPoint were detailed under the following headings in the NexPoint Services Agreement: Back- and Middle-Office, Legal Compliance/Risk Analysis, Tax, Management of Clients and Accounts, Valuation, Execution and Documentation, Marketing, Reporting, Administrative Services, Ancillary Services, and Other.[15]   The NexPoint Services Agreement essentially covered all functional areas of NexPoint's business other than the executive and investment functions.

---

[8] NexPoint Amended Complaint, Exhibit 3.  Additionally, I am informed that there was the potential for forgiveness of the Notes in certain circumstances that had also not occurred by December 31, 2020.

[9] D-NNI -074142.

[10] Amended Complaint dated August 27, 2021 ("HCMS Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[11] HCMS Amended Complaint, Exhibit 6.

[12] Amended Complaint dated August 27, 2021 ("HCRE Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, HCRE Partners, LLC, James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[13] HCRE Amended Complaint, Exhibit 6.

[14] Amended and Restated Services Agreement dated January 1, 2018, Exhibit 9 to Seery Deposition.

[15] *Id.* at pages 3 – 5.

APP 839

25. The NexPoint Services Agreement contains several provisions relating to the Plaintiff's obligation to make interest and principal payments on the NexPoint Term Note, including the following:

    a. Section 2.02(a) details various "Back and Middle Office" tasks that the Plaintiff was responsible for performing on behalf of NexPoint.[16] Those services included "payments,"[17] which encompassed payments of interest and principal on the NexPoint Term Note.

    b. Section 2.02 (b) provided for the Plaintiff to provide "[a]ssistance and advice with respect to legal issues…".[18]

    c. Section 6.01 describes the standard of care that the Plaintiff was supposed to provide to NexPoint.[19] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

    d. Section 8.01 required that any amendments or modifications to the agreement were required to be in writing and signed by each party.[20]

    e. Section 8.07 provided that any "condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties."[21]

26. The Plaintiff first sought to provide notice of termination of the NexPoint Services Agreement in November of 2020, however, the termination date was extended[22] and the NexPoint Services Agreement was still in effect as of December 31, 2020.

27. While there was no written agreement between either HCMS or HCRE, on the one hand, and the Plaintiff, on the other hand, relating to services that the Plaintiff was to supply to either party, the services that the Plaintiff provided to HCMS and HCRE were essentially the same services that the Plaintiff provided to NexPoint[23] and involved a comprehensive array of services that were necessary in the day-to-day operations of the business of HCMS and HCRE. Like with NexPoint, by December 31, 2020, there was a long history of the Plaintiff having provided services to HCMS and HCRE.[24]

---

[16] *Id.* at pages 3 - 4.
[17] *Id.,* Section 2.02(a) provided, "Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, bookkeeping, cash management . . . accounts payable . . ."
[18] *Id.* at page 4.
[19] *Id.* at 11.
[20] *Id.* at 14.
[21] *Id.* at 16.
[22] Dondero Deposition, Volume 2, page 375, lines 3-10.
[23] *See, e.g.,* Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13; Waterhouse Deposition, page 353, lines 6 – 10, and page 357, lines 19 – 24.
[24] Dondero Deposition, Volume 2, page 94, lines 20 – 22; page 95, lines 4 – 9.

APP 840

28. When asked about whether the Plaintiff had a services agreement with HCMS, Dondero replied as follows during his deposition[25]:

> My answer would be the advisors like NexPoint and HFAM that had to have by law and regulatory statute have to have formal sub advisors and shared services agreements had formal shared services agreement. Entities that didn't need to have formal written shared services agreements were often serviced similarly or -- or exactly the same as those entities, but without a written agreement, but with a verbal shared services agreement providing, again, all the same similar services, and the entities that didn't have a written shared services agreement ·weren't getting shared services or support from any other entities other than Highland doing the same thing for them that it did for the mutual funds.

29. Dondero had a similar response with regard to there being an oral agreement for the Plaintiff to provide services to HCRE.[26]

30. There was extensive testimony about the services that the Plaintiff provided to HCMS and HCRE:

   a. Under the oral agreements to provide services to HCMS and HCRE, the Plaintiff was responsible for making payments of interest and principal on the HCMS Notes and the HCRE Notes, which had previously been made by December 31, 2017, 2018, and 2019.[27]

   b. HCMS and HCRE relied on the Plaintiff to provide services because HCMS and HCRE, like NexPoint, did not have the employees or infrastructure to run its business without the services provided by the Plaintiff.[28]

   c. According to Frank Waterhouse ("Waterhouse"), the Chief Financial Officer of the Plaintiff throughout 2020[29], the Plaintiff provided the same services to HCRE and HCMSS that it did for NexPoint.[30] He also specifically testified that Plaintiff's services included timely paying of bills and loan payments for HCMS[31] and the same bill paying for HCRE that it did for HCMS and NexPoint.[32]

31. Interest and principal were due on the Notes by December 31, 2020. Neither interest nor any principal payments were paid on any of the Notes by December 31, 2020. The Plaintiff was supposed to facilitate these payments even though the payments were supposed to be to itself.

---

[25] Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13.
[26] *Id*. at page 381, lines 10 – 23.
[27] Waterhouse Deposition, page 354, lines 2 – 23, page 357, lines 2 – 18.
[28] Dondero Deposition, Volume 2, page 371, lines 5-9.
[29] Waterhouse Deposition, page 28, lines 15-16.
[30] *Id.,* page 353, 6-10; 357: 19 – 24.
[31] *Id*. at page 354, lines 2 to page 357, line 18.
[32] *Id*. at page 358, lines 12 – 24.

10

32. On January 7, 2021, the Debtor delivered a letter to each of the Makers (the "Acceleration Letters") indicating that a default had occurred on each of the Notes and demanding the immediate full payment of "all principal, interest, and any other amounts due on the Note…".[33] The effect of the Acceleration Letters was that millions of dollars of principal payments were suddenly due; had the Acceleration Letters not been sent, principal on the Notes would have amortized ratably through 2047.

33. In addition to being the Plaintiff's Chief Financial Officer, Waterhouse was also an officer of two of the three Makers as of December 31, 2020.

    a. He was the Treasurer of NexPoint, an officer-level role, during all periods relevant to my Report. Waterhouse reported at his deposition, "I still manage the finance and accounting function for NexPoint."[34]

    b. He was the treasurer and acting treasurer of HCMS.[35]

34. Plaintiff alleges that Dondero orally instructed Waterhouse to not pay the interest and principal on the NexPoint Term Note that was due on December 31, 2021.[36] No evidence has been presented that suggests that Dondero's alleged instructions for the Plaintiff to not pay interest and principal on the NexPoint Term Note was in writing. The apparent rational for the alleged instruction was that NexPoint believed that there had been substantial overcharges totaling in the millions of dollars by the Plaintiff under the NexPoint Services Agreement. The overcharges related to charges for employees who were no longer working for the Plaintiff but that were still being charged to NexPoint, which was a violation of the NexPoint Services Agreement. Furthermore, Dondero denies that he instructed Waterhouse not to pay the NexPoint Term Note.[37]

    a. Dondero denies that he instructed that no interest and principal be paid on the NexPoint Term Note, testifying, "There is no logical reason, nor would I have ever authorized or suggested no payment to put us…in default due to a *deminimis* amount of money….even if I was highly annoyed with Seery, even if we knew that Seery and Highland had overcharged NexPoint by whatever it was, 14, 16, million bucks, I would not have let a small amount cause a…breach."[38]

    b. Dondero also testified that the Plaintiff made the payments due on the Notes by December 31 of 2017, 2018 and 2019 without any specific authorization from any of the Makers.[39]

35. No evidence was presented suggesting that Dondero, HCMS or HCRE instructed the Plaintiff not to make payments on the HCMS Term Note or the HCRE Term Note. HCMS and HCRE had a reasonable expectation that interest and principal on the HCMS Notes and HCRE Notes

---

[33] Exhibit 6 to Seery Deposition taken on October 21, 2021.
[34] Waterhouse Deposition, page 28, lines 15-16.
[35] *Id*., at page 30, lines 9 – 16.
[36] *Id*., at page 390, lines 4 – 13.
[37] Dondero Deposition, Volume 2, page 391:18-25.
[38] *Id*.
[39] *Id*. at page 463, lines 10-25.

would be paid by December 31, 2020, given past practices and the Plaintiff's obligation to do so.

36. Mr. Waterhouse testified about his responsibility in connection with making the payments on the Notes that were due by December 21, 2020[40]:

> Q: Did you approve of each payment that was made against principal and interest on the notes that were given by the affiliates of Mr. Dondero?
>
> A: Did I approve the payments? I approve - I approve - if there was cash - if there was cash being repaid on a note payment, yes, I approved in the general sense of being made aware of the payment and the amount."
>
> Q: And are you the person who authorized Highland's employees to effectuate those payments?
>
> A: Yes.

37. No evidence has been presented of any discussions that the Plaintiff had with Dondero or any of the Makers prior to December 31, 2020, with regard to payments on the Notes other than the alleged discussion between Dondero and Waterhouse described above relating to the NexPoint Term Note. Specifically, the evidentiary record reflects that there was no follow-up by Waterhouse or anyone else at the Plaintiff confirming that it was Dondero's intent for there not to be any payments made on the NexPoint Term Note.[41]

   a. A number of Plaintiff's employees knew about Dondero's alleged instructions prior to December 31, 2020, with respect to the NexPoint Term Note, yet no effort was undertaken to investigate Dondero's instructions by speaking with him or otherwise confirming what NexPoint's intent was regarding the NexPoint Term Note.

   b. Deposition testimony by Kristin Hendrix ("Hendrix"), who was the assistant controller of the Plaintiff at the time, revealed that she knew by November 30, 2020, or December 1, 2020, that the Plaintiff was not going to pay the interest and principal on the NexPoint Term Note that was due by December 31, 2020.[42]

   c. Waterhouse testified that he did not follow-up with Dondero about whether NexPoint should make the payments required by December 31, 2020.[43]

38. Waterhouse also testified that there had not been any instructions from anyone to the Plaintiff to not make the required payments on the HCMS Term Note or the HCRE Term Note by December 31, 2020.[44] When asked about Dondero's tone when he talked to him about the fact that the payments had not been made on the HCMS Term Note and the HCRE Term Note,

---

[40] Waterhouse Deposition, page 56, line 21 to page 57, line 10.
[41] *Id.*, at page 391, lines 18 – 21.
[42] Hendrix Deposition, page 12, lines 4 – 7.
[43] Waterhouse deposition, pages 391: line 18 to page 392, line 2.
[44] Waterhouse Deposition, pages 393, line 21 – 25 to page 394, line 4.

APP 843

Waterhouse said that the tone was very negative and that Dondero's reaction was consistent with the fact that Dondero was surprised that the payments had not been made.[45]

## V. <u>SERVICES AGREEMENTS GENERALLY</u>

39. Companies seeking to conduct operations more efficiently frequently outsource various operational, accounting, treasury, and other functions to a service provider. By outsourcing such functions, the customer of the services provider can avoid costly employee and infrastructure investments that would otherwise be required to conduct the outsourced functions.

40. The agreement between the party receiving the services and the party providing the services is often referred to as a "services agreement," an "outsourcing agreement," or a "shared services agreement." These terms have the same meaning for purposes of this Report although the term "shared services" is often used in the context of a company sharing services with an affiliated party.

41. The parties to a services agreement are sometimes related and other times are completely separate with no prior business relationship.

42. The actual agreement that comprises the services to be provided under a services agreement varies in form. Some services agreements are comprehensive, others provide limited written direction, and still others are oral.

43. Smaller companies are often more likely to outsource a broad set of business functions, typically because they are growing rapidly and do not have the financial resources or time to build out various important business functions.

44. Virtually every company outsources some type of business function to a third-party. For example, many companies outsource limited functions such as payroll processing or IT services to various vendors. There is a distinct difference, however, between outsourcing limited functions to a vendor that provides services for many clients versus the more fulsome relationship that is embodied by the typical services agreement involving the services provider managing major aspects of a company's operational and back-office functions.

    a. Providers of more fulsome services have additional duties relative to a provider that is responsible for limited services. Those additional duties generally emanate from the level of responsibility that the services provider takes on and the services provider's more intimate knowledge of its customer's business.

    b. Said another way, a provider of a straightforward and often outsourced service such as payroll processing has no reason to understand the underlying business issues of its customers or the perspectives of the employees for which it processes payroll. On the other hand, a provider of more fulsome services has an intimate knowledge

---

[45] *Id.* at page 394, lines 12 – 21.

13

APP 844

of the goals, objectives, and capabilities of its customers and in discharging its
obligations, cannot ignore that knowledge.

45. In the case of services agreements that cover a fulsome set of activities for the customer, even
if there is a comprehensive agreement between the parties, it is difficult to enumerate with
specificity each individual task that the services provider is expected to perform. Tasks are
therefore often described in broad terms as opposed to specific detail (i.e., the service provider
is required to handle accounting functions for its customer as opposed to saying that a trial
balance is required 15 days after month-end, or the annual audit must be completed by a
specified date).

   a. Despite the difficulty in describing each task with specificity that the services
   provider is required to perform, the specific tasks become apparent as the services
   provider performs functions on behalf of its customer. In the ordinary course,
   practices develop that inevitably are deemed acceptable to the services provider and
   its customer. Such practices are generally fully clarified within one year of the
   inception of the services agreement because that timeframe allows the parties to
   interact with each other over the course of a full accounting cycle.

   b. Following the initial cycle of activities, those previously performed practices are
   often referred to as "past practices" and such past practices become an important
   piece in gauging whether  the services provider has met it obligations in future
   periods. Having been affiliated with companies that are customers of services
   providers, I think of past practices as having virtually the same effect as a written
   document provided that the services agreement is not written in a way that prohibits
   such an interpretation.

46. Services agreements between related parties often present complicated issues, especially if the
relationship changes between the parties during the term of the services agreement. For
example, at the beginning of the term of the services agreement, two related parties might
constructively work together, almost obviating the need for a detailed agreement between the
parties. If there is a change in the relationship between the parties that leads to less cooperation,
the original agreement may not be comprehensive enough to optimally deal with the change in
circumstances.

   a. In such situations, past practices can become an even more important factor in
   determining the services provider's obligations and the reasonable expectations that
   the customer should have if the contract language is not explicit on the point.

   b. While the services provider and a customer that is related at the outset of an
   agreement may cease to be related at some point during the term of the agreement,
   the services provider's knowledge of the customer's business objectives does not
   necessarily become stale immediately upon the  change in affiliate status.
   Consequently, any higher duty that comes about from the knowledge that the
   services provider has about its customer is not necessarily impacted if the affiliate
   status of the services provider and its customer changes.

14

# VI. OPINIONS

> **A. The Plaintiff was obligated to pay interest and principal on the NexPoint Term Note by December 31, 2021, on behalf of NexPoint. Despite the alleged instruction from Dondero that the Plaintiff should not make any payments on NexPoint's behalf, the Plaintiff's obligations to make the payments did not end. At a minimum, the Plaintiff had a duty to investigate whether the payments should have been made, which it did not do. In not making the payments on the NexPoint Term Note and not undertaking steps to further investigate whether the payments should have been made, the Plaintiff did not act reasonably.**

47. The payment terms of the NexPoint Term Note required that interest and principal was due to the Plaintiff from NexPoint on or before December 31, 2020. It is undisputed that interest and principal were not paid on the NexPoint Term Note by the required date.

48. The Plaintiff was obligated to make the payment of interest and principal on behalf of NexPoint on or before December 31, 2020, under the NexPoint Services Agreement.

49. The Plaintiff has taken the position that the interest and principal that was due on the NexPoint Term Note by December 31, 2020, was not paid because of Dondero's alleged directive to Waterhouse to not make the payments.[46]

50. The evidentiary record highlights several noteworthy facts:

   a. The Plaintiff had conflicting roles because it was the payee of the NexPoint Term Note and also had the obligation to cause the payments to be made on the NexPoint Term Note. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

   b. The Plaintiff stood to benefit mightily if NexPoint defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of the NexPoint Term Note. Without a default, some of the principal of the Notes could have been outstanding until 2047.

   c. Waterhouse was an officer of the Plaintiff and was also an officer of NexPoint, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given his dual roles, he had knowledge of the business objectives and financial condition of NexPoint, which should have made it clear to him that NexPoint would not welcome a default on the NexPoint Term Note.

   d. NexPoint allegedly made overpayments to the Plaintiff that Dondero wanted to be offset against the required interest and principal payments on the NexPoint Term Loan.[47] The overpayments related to workers that the Plaintiff was charging to NexPoint that no longer worked for the Plaintiff, which violated the terms of the

---

[46] Waterhouse Deposition, page 390, lines 4 – 13.
[47] Seery Deposition, page 226, lines 2 – 4; Dondero Deposition, Volume 2, page 392, lines 3 – 7.

APP 846

NexPoint Services Agreement. There were ongoing discussions between Dondero and Seery leading up to the end of 2020 relating to the topic.

e.   There is no evidentiary record describing any effort by the Plaintiff to warn NexPoint of the implications of Dondero's alleged request for the payments on the NexPoint Term Note to not be made.  For example, despite the fact that the NexPoint Services Agreement required the Plaintiff to provide NexPoint with legal services, the Plaintiff failed to provide NexPoint with legal advice that failing to pay interest and principal could result in an acceleration of the NexPoint Term Loan.

51. In my opinion, Dondero's alleged statement to Waterhouse that the Plaintiff should not make payments on the NexPoint Term Note on December 31, 2020, did not provide a basis for the Plaintiff to not make the payments on the Notes given its obligations to NexPoint under the NexPoint Services Agreement.  Several reasons support my opinion:

a.   There is no evidence that the Plaintiff took any reasonable steps to address the myriad of conflicts that it faced.

i.   The Plaintiff's obligations regarding the required payments of the Notes involved the conflict-ridden task of authorizing and making a payment to itself.  Additionally, the Plaintiff stood to benefit significantly by putting the NexPoint Term Note into default given that a default would allow the Plaintiff to realize the proceeds from repayment of the note far earlier than it otherwise would have; had the NexPoint Term Loan not been accelerated, it would have remained outstanding until 2047.  While the evidence is silent on whether the Plaintiff was considering the repayment benefit of the NexPoint Term Loan to itself, from an appearance standpoint, the conflict was glaring.

ii.   The Plaintiff apparently took no steps to address these conflicts either by conferring with NexPoint or Dondero.  Conferring with NexPoint or Dondero would have helped in establishing that NexPoint and Dondero really did not want the Plaintiff to transfer funds to pay interest and principal on the NexPoint Term Loan.

iii.   The Plaintiff also has presented no evidentiary record reflecting how any internal steps were taken to address the conflict.  Such steps might have included conducting meetings internally with minutes to reflect discussion regarding the conflict or any efforts to seek guidance from counsel to assist with the conflict.

iv.   According to deposition testimony by Hendrix, who was the assistant controller of the Plaintiff at the time[48], she recalled receiving a phone call from Waterhouse on either November 30, 2020, or December 1, 2020, where Waterhouse indicated that no payments would made by the Plaintiff

---

[48] Hendrix Deposition, page 12, lines 4 – 7.

16

on behalf of NexPoint.[49]   Accordingly, it seems that Plaintiff decided as
early November 30, 2020 or December 1, 2020, to not make the payments
on the NexPoint Term Note.  Given the apparent time frame of the decision
to not make the payment, the Plaintiff had ample time to confirm in writing
with Dondero that the payments should not be made or to otherwise take
reasonable steps to ensure that a mistake was not being made and that the
Plaintiff was acting reasonably.

b.  The Plaintiff had an obligation to act reasonably in discharging its obligations to
make the payments on the NexPoint Term Note on behalf of NexPoint.  In addition
to not properly addressing conflicts as set forth above, the evidentiary record further
reflects that the Plaintiff did not act reasonably.

   i.  No effort was undertaken to inform Dondero that the Plaintiff disagreed
with his assumption that there were offsets to the required interest and
principal payment requirements on the NexPoint Term Note. Absent any
communication from the Plaintiff, Dondero simply had no way of knowing
that the Plaintiff disagreed with his perspective that a right of offset did
exist, so it was reasonable for him to think that discussion of an offset was
on the table.

   ii.  Waterhouse had worked for or with Dondero for many years, making him
very familiar with Dondero's management style.   Dondero is a
decisionmaker who is willing and does change his mind when presented
with new facts, something that Waterhouse should have been aware of yet
did nothing to address.

   iii.  Given the massive implications of a default of the NexPoint Term Loan to
NexPoint, which the Plaintiff should have understood given the robust
services that it was providing to NexPoint and the dual financial
responsibilities that Waterhouse had to both organizations, the Plaintiff
should have acted more responsibly by engaging with NexPoint and
Dondero to confirm NexPoint's intent.

   iv.  The NexPoint Services Agreement provides that the Plaintiff was supposed
to provide NexPoint with legal advice. In effect, the Plaintiff was
NexPoint's law firm.  Had the Plaintiff met its commitment, it would have
had its internal counsel consult with NexPoint to point out the legal
ramifications of the interest and principal payments not being made.  There
is no evidence suggesting that the Plaintiff took any steps to meet its
obligation to provide legal advice as required under the NexPoint Services
Agreement.

c.  Waterhouse had a conflict separate from the conflicts that the Plaintiff otherwise
had given that he was an officer of both the Plaintiff and the NexPoint.  Among

---

[49] *Id*. at 71, lines 4 – 7.

APP 848

other things, Waterhouse's officer role for NexPoint must have provided him with insights into NexPoint's business objectives, which could not have included any appetite for having the Notes accelerated. Yet there is no evidence that Waterhouse's knowledge was utilized in Plaintiff's decision making regarding the required payments of the Notes. It is inapposite to argue that because Waterhouse had knowledge about NexPoint from a source other than the Plaintiff, that he was entitled to ignore that knowledge. In discharging its duties under the NexPoint Services Agreement, the Plaintiff should have been using all information that it had available in its work on behalf of NexPoint.

   d. The NexPoint Services Agreement provided that any amendment to the agreement needed to be in writing[50] and any consent to a change in the agreement needed to be in writing.[51] No such effort to comply with the writing requirement was undertaken and highlights the fact that any oral statement by Dondero regarding the NexPoint Term Loan not being paid was insufficient under the express terms of the NexPoint Services Agreement.

   e. Section 6.01 of the NexPoint Services Agreement also describes the standard of care that the Plaintiff was supposed to provide to NexPoint in the discharge of its obligations under the agreement.[52] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." For reasons already described herein, the Plaintiff did not discharge its duties with such care.

52. For the foregoing reasons, any alleged default under the NexPoint Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to NexPoint.

   **B. Based on the oral agreement that the Plaintiff had with HCMS and HCRE and consistent with the services that the Plaintiff had previously provided, HCMS and HCRE had a reasonable expectation that the Plaintiff would continue paying interest and principal on behalf of those entities absent explicit direction to the contrary. As there was no directive from anyone affiliated with HCMS or HCRE to relieve the Plaintiff of that responsibility, the Plaintiff did not act reasonably by not meeting its obligations to make payments of interest and principal on behalf of HCMS and HCRE.**

53. While the services agreements between Plaintiff, on the one hand, and HCMS and HCRE, on the other hand, were oral, the existence of an oral services agreement between affiliated parties involved in the investment management business is common and is something that I have regularly observed.

---

[50] Amended Services Agreement, Section 8.01.
[51] *Id.* at Section 8.07.
[52] *Id.* at Section 6.01.

APP 849

54. Like with NexPoint, the Plaintiff provided HCMS and HCRE with a comprehensive array of services that were necessary to the day-to-day operation of their businesses. There was a lengthy history of the Plaintiff providing HCMS and HCRE with such services. The broad array of services provided by the Plaintiff to NexPoint were the same as the scope of work performed by the Plaintiff for HCMS and HCRE.

55. The evidentiary record highlights several noteworthy facts:

   a. The evidentiary record reflects that the Plaintiff historically made payments on behalf of the HCMS Term Note and HCRE Term Note in addition to providing an array of other critical services to HCMS and HCRE not dissimilar from many of the services that the Plaintiff provided to NexPoint under the NexPoint Services Agreement.[53]

   b. No evidence has been presented suggesting that there was any communication from HCMS, HCRE, or Dondero suggesting that the payments on the HCMS Term Note and the HCRE Term Note should not continue.

   c. No evidence has been presented suggesting that on payment dates in years prior to 2020 HCMS or HCRE had to notify the Plaintiff that it wanted the Plaintiff to make the required payments on the HCMS Term Note or the HCRE Term Note. Accordingly, it would not have been reasonable for the Plaintiff to expect that HCMS or HCRE were required to take any affirmative steps to have payments made on their notes.

   d. The Plaintiff had conflicting roles because it was the payee of the HCMS Term Note and the HCRE Term Note and also had the obligation to cause the payments to be made of those notes. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

   e. The Plaintiff stood to benefit mightily if HCMS and HCRE defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of those notes. Without a default, some of the principal of the HCMS Term Note and the HCRE Term Note could have been outstanding until 2047.

   f. Waterhouse was an officer of the Plaintiff and was also an officer of HCMS, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given Waterhouse's dual roles, he had knowledge of HCMS's business objectives and financial condition, which should have alerted him that HCMS would not welcome a default on the HCMS Term Note.

---

[53] *See, e.g.,* Dondero Deposition, Volume 2, pages 335:19 to 336:13; page 381, lines 10-23.

APP 850

g. The Plaintiff made no effort to warn HCMS or HCRE of the implications of the Plaintiff not making payments on the HCMS Term Note or HCRE Term Note by December 31, 2020.

56. Dondero testified about the payments that were required on the HCMS Term Note by December 31, 2020, indicating that there was an expectation by HCMS that the payments were going to be made, regardless of whether there were specific instructions by HCMS to do so:[54]

Q: Okay. Do you know whether anybody acting on behalf of HCMS ever instructed or authorized Highland to make a payment on account of HCMS's term note to Highland?

A. Well, again, and maybe I didn't say it clearly enough. I think there was a reliance in the due course aspect, especially on small amounts, and it would have been done by Highland personnel on behalf of Services.

\* \* \* \* \*

Q. And I'm going to ask you, Mr. Dondero, to be patient with me and to listen carefully to my question. Are you aware of anybody acting on behalf of HCMS, whoever instructed Highland to make a payment in satisfaction of any payment that was due at the year-end of 2020 under the term note?

A. Not specifically, but I'm saying I don't think it needed to be made specifically.

57. The Plaintiff was required to act reasonably in the performance of its obligations to HCMS and HCRE given the record of past practices and the precedent created by similar work done by the Plaintiff for NexPoint. With respect to the payments required under the HCMS Term Note and the HCRE Term Note by the Plaintiff, HCMS and HCRE had a reasonable expectation that they would continue receiving such payment services absent a clear termination by Plaintiff of its obligations to HCMS and HCRE. Given that there is no evidence suggesting that any of the parties had terminated the Plaintiff's obligations to provide services to HCMS and HCRE as of December 31, 2020, especially given that the Plaintiff continued to perform other services on behalf of those entities as of such date, the Plaintiff did not act reasonably by not making the payments on the HCMS Term Note and the HCRE Term Note by December 31, 2021. Likewise, it was also not reasonable for the Plaintiff to not discuss with HCMS and HCRE that payments were not going to be made on the HCMS Term Note and the HCRE Term Note given that payments had been made in prior years without any request by HCMS or HCRE.

58. Hendrix testified that the instruction to her not to make the NexPoint Term Loan payment by December 31, 2020, did not apply to the payments required on the HCMS Term Note and the HCRE Term Note by December 31, 2020.[55] She also testified that she made no attempt or effort to determine whether Dondero wanted the payments required on the HCMS Term Note

---

[54] Dondero Deposition, Volume 2, pages 371:23 – 372:18.
[55] Hendrix Deposition, page 100, lines 20 – 23; page 101, lines 8 – 12.

20

and the HCRE Term Note to be paid by December 31, 2020.[56] Finally, Hendrix made no attempt to check with anyone whether the payments should be made.[57] Hendrix's testimony underscores that Plaintiff did not act reasonably in discharging its obligations to HCMS and HCRE.

59. For the foregoing reasons, any alleged default under the HCMS Term Note and the HCRE Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to HCMS and HCRE.

## VII.   <u>CONCLUSION</u>

60. In summary, based on the evidence that I have reviewed and relied upon, as well as my training and experience, it is my opinion that the Plaintiff did not act reasonably in choosing not to pay the interest and principal due under the Notes. As a result of Plaintiff's failures to act reasonably, it should not have accelerated payment of the principal amount of the Notes.

Respectfully submitted,

_____

Steven J. Pully, CPA, CFA, ESQ.

---

[56] *Id*. at page 102, lines 10 – 13.
[57] *Id*. at page 105, lines 8 – 11.

21

**STEVEN J. PULLY**

4564 Meadowood Road, Dallas, Texas

(214) 587-6133

sjpully@yahoo.com

---

*Employment History*

---

| | |
|---|---|
| October 2014 – Present | **SPEYSIDE PARTNERS/INVESTMENT BANKER/CONSULTANT/BOARD DIRECTOR/CORPORATE EXECUTIVE** |

- *Investment banker/consultant to companies, investors and creditors on matters including capital raising, distressed debt restructurings, asset dispositions, activist investing defense, strategic opportunities, and expert witness matters*
- *Chief Executive Officer and Chairman, Harvest Oil & Gas (post-reorg)*

| | |
|---|---|
| January 2008 – Sept. 2014 | **CARLSON CAPITAL, L.P.,** General Counsel and Partner, Dallas, Texas |

- *Responsible for legal affairs of hedge fund with over $9.0 B of AUM; worked closely with affiliated oil and gas private equity fund with $700 of AUM beginning in 2010*
- *Member of Management, Operating and Valuation Committees (Chair)*

| | |
|---|---|
| Dec. 2001 – October 2007 | **NEWCASTLE CAPITAL MANAGEMENT, L.P.,** President, Dallas, Texas |

- *Activist fund with $650 MM of assets under management*
- *Operating positions for portfolio companies: CEO of Pinnacle Frames, Jan. 2003 – June 2004 (largest domestic picture frame manufacturer with 600 employees; involved in multiple visits to Wal-Mart, visited China and identified new CEO for company); CEO of New Century Equity Holdings, June 2003 – Oct. 2007 (cash shell seeking to acquire business)*

| | |
|---|---|
| May 2000 – Dec. 2001 | **BANC OF AMERICA SECURITIES**, Managing Director, Investment Banking - M&A/ Energy & Power Groups; Houston and Dallas, Texas |
| January 1997 – May 2000 | **BEAR STEARNS & CO. INC.,** Senior Managing Director - Investment Banking Department; Dallas, Texas |
| April 1996 – Dec. 1996 | **CONVERGENT ASSOCIATES, INC.,** President, Dallas, Texas. |

- *Private equity firm that controlled three technology-oriented companies involved in travel, media and software; affiliated with EDS*

| | |
|---|---|
| January 1996 - April 1996 | **WASSERSTEIN PERELLA & CO., INC.,** Vice President - Investment Banking Department; Dallas, Texas |

- *Left after brief association because supervisor announced departure plans*

| | |
|---|---|
| July 1989 - Dec. 1995 | **PAINEWEBBER INCORPORATED/ KIDDER, PEABODY & CO.,** First Vice President - Investment Banking Department; New York City and Houston, Texas |
| October 1985 - July 1989 | **BAKER & BOTTS, Attorneys,** Associate – Corporate Department; Houston, Texas |

---

### *Board Experience*

**Board Leadership**  -  Experience as Lead Director, Chairman of the Board, Executive Committee member and Chairman of Audit, Compensation, Governance and Strategic Committees

**Accounting/Finance**  -  CPA and CFA certifications, significant experience with financial statements and analysis, member of several audit committees including chair role

**Strategic Transactions/Capital Raising**  -  Substantial history with successful strategic transactions and efficient capital raising, including debt restructurings

**Governance/Activist Investing Expertise**  -  Extensive experience with shareholder governance and activist investing/defense; positive reputation with shareholders as a value creator

**Legal/Regulatory**  -  Licensed attorney, extensive experience managing legal/compliance department

### Public Company Directorships

**Previous:** Bellatrix Exploration, Energy XXI (Chair – Comp and Strategic), EPL Oil & Gas Inc. (Lead Director, Chair - Comp), Ember Resources, Cano Petroleum, Goodrich Petroleum, Harvest Oil and Gas (Chairman of the Board, Chair – Audit), Peerless Systems (Chair – Audit), New Century Equity Holdings, MaxWorldwide, Geoworks Corporation, Pizza Inn (Chair – Governance), Titan Energy, VAALCO Energy (Chair – Governance, Comp), Whitehall Jewelers (Chairman)

### Private Company Directorships

**Current:** Harvest Oil & Gas (Chairman of the Board and Chief Executive Officer, formerly public company), Limetree Bay Energy, Heritage Power, Response Team 1, Wild Rivers, OWS, ExpressJet

**Previous:** Fox & Hound, GenCanna Global, Pinnacle Frames & Accents, Aspire Holdings (Chair – Comp), PermianLide, Tribune Resources (Chair – Audit), PGi, Southland Royalty, Greylock Energy, Karya Properties, PRIMEXX Energy, Titan Energy

---

### *Professional Certifications, Education and Other Interests*

**CHARTERED FINANCIAL ANALYST,** 2004 (Active member), **CERTIFIED PUBLIC ACCOUNTANT,** Texas, 1985 (Active member), **STATE BAR OF TEXAS,** 1985 (Active member), **FINRA** Series 7, 63 and 79 (Current)

**The University of Texas School of Law, 1985**
International Law Journal, Moot Court, Board of Advocates

**Georgetown University, BSBA with honors, 1982, Major in accounting with 3.90 GPA in major**
President of Student Government Senate, National Model U.N. Team
**Centre for Management Studies, Oxford University, England**, **Summer 1981**

Sailing, golf, writing, biking and travel; married with two adult daughters

Board of Advisors, Georgetown McDonough School of Business, 2015 - 2018

Exhibit B to
Expert Report of Steven J. Pully

## Documents Reviewed

Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (Dkt. No. 1, Adv. Proc. No. 21-03004)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03005)

Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint (Dkt. No. 64, Adv. Proc. No. 21-03005)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 68, Adv. Proc. No. 21-03006)

Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint (Dkt. No. 6, Adv. Proc. No. 21-03006)

Defendant Highland Capital Management Services, Inc.'s Answer to Amended Complaint (Dkt. No. 73, Adv. Proc. No. 21-03006)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03007)

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)'s Answer to Amended Complaint (Dkt. No. 68, Adv. Proc. No. 21-03007)

Defendant James Dondero's Answer to Amended Complaint (Dkt. No. 83, Adv. Proc. No. 21-03003)

Remote Videotaped Deposition of Frank Waterhouse, taken October 19, 2021 and Exhibits

Video Deposition of James P. Seery, Jr., taken October 21, 2021 and Exhibits

Deposition of Kristin Hendrix, taken October 27, 2021 and Exhibits

Deposition of David Klos, taken October 27, 2021

Remote Deposition of James Dondero, Volume II, taken October 29, 2021 (Rough draft) and Exhibits

Remote Deposition of James Dondero, Volume III, taken November 4, 2021 (Rough draft) and Exhibits

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11** <br> Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Dallas, Texas <br> Monday, December 13, 2021 <br> 10:30 a.m. Docket |
| Debtor. |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | **Adversary Proceeding 21-3005-sgj** |
|  | MOTION TO EXTEND EXPERT |
| Plaintiff, | DISCLOSURE AND DISCOVERY <br> DEADLINES |
| v. |  |
| NEXPOINT ADVISORS, L.P., et al., |  |
| Defendants. |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | **Adversary Proceeding 21-3006-sgj** |
|  | MOTION TO EXTEND EXPERT |
| Plaintiff, | DISCLOSURE AND DISCOVERY <br> DEADLINES |
| v. |  |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., et al., |  |
| Defendants. |  |

APP 856

2

```
 1                            )
    HIGHLAND CAPITAL          )    Adversary Proceeding 21-3007-sgj
 2  MANAGEMENT, L.P.,         )
                             )    MOTION TO EXTEND EXPERT
 3          Plaintiff,        )    DISCLOSURE AND DISCOVERY
                             )    DEADLINES
 4  v.                        )
                             )
 5  HCRE PARTNERS, LLC        )
    (n/k/a NEXPOINT REAL      )
 6  ESTATE PARTNERS, LLC),    )
                             )
 7          Defendant.        )
    _____ )
 8
 9                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10              UNITED STATES BANKRUPTCY JUDGE.

11  WEBEX APPEARANCES:

12  For the Debtor-Plaintiffs:  Hayley Winograd
                                PACHULSKI STANG ZIEHL & JONES, LLP
13                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
14                              (212) 561-7700

15  For NexPoint Advisors,      Davor Rukavina
    LP:                         Julian Preston Vasek
16                              MUNSCH HARDT KOPF & HARR, P.C
                                500 N. Akard Street, Suite 3800
17                              Dallas, TX  75201-6659
                                (214) 855-7587
18
    For HCMS and HCRE:          Michael P. Aigen
19                              Deborah Rose Deitsch-Perez
                                STINSON LEONARD STREET
20                              3102 Oak Lawn Avenue, Suite 777
                                Dallas, TX  75219
21                              (214) 560-2201

22  Recorded by:                Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
23                              1100 Commerce Street, 12th Floor
                                Dallas, TX  75242
24                              (214) 753-2062

25
```

APP 857

Case 21-03005-sgj    Doc 148-3    Filed 01/05/22    Entered 01/05/22 18:18:43    Desc
Case 3:21-cv-00881-X    Document 78-19    Filed 03/09/22    Page 151 of 190    PageID 44695

3

1   Transcribed by:            Kathy Rehling

2                          311 Paradise Cove
                              Shady Shores, TX  76208

3                          (972) 786-3063

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            Proceedings recorded by electronic sound recording;
24         transcript produced by transcription service.

25

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 01/09/23   Page 152 of 190   PageID 44696

4

1              DALLAS, TEXAS - DECEMBER 13, 2021 - 10:55 A.M.

2              THE COURT:  I will now take up the Highland three

3    motions to extend expert deadlines.  So let me get appearances

4    from lawyers.  First, who do we have appearing for the Debtor

5    this morning?

6              MS. WINOGRAD:  Good morning, Your Honor.  My name is

7    Hayley Winograd of Pachulski Stang Ziehl & Jones appearing on

8    behalf of Highland.

9              THE COURT:  Okay.  Good morning.  For NexPoint

10   Advisors, who do we have appearing?

11             MR. RUKAVINA:  Your Honor, good morning.  Davor

12   Rukavina and Julian Vasek.

13             THE COURT:  Good morning.  All right.  For HCMS and

14   NPRE, who do we have appearing?

15        (No response.)

16             THE COURT:  Okay.  Maybe I should say these names in

17   full.

18             MS. DEITSCH-PEREZ:  I apologize, Your Honor.  This is

19   Deborah Deitsch-Perez.  I believe Michael Aigen will be

20   appearing for HCRE and HCMS.  And I wonder if he's having

21   technical difficulties.  I saw him on the line a few minutes

22   ago.  I'm going to go off and call to make sure that there

23   isn't a problem.

24             THE COURT:  Okay.

25             MR. RUKAVINA:  But Your Honor, I'll be handling the

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/29/2899   Page 153 of 190   PageID 44697

5

1   bulk of the arguments, and Mr. Aigen will cover a much smaller

2   amount.

3            THE COURT:  Okay.  Well, we'll --

4            MR. AIGEN:  Your Honor, this is Michael Aigen.  Are

5   you able to hear me now?

6            THE COURT:  I can hear you now.

7            MR. AIGEN:  I apologize.  Michael Aigen for HCMS and

8   HCRE.

9            THE COURT:  All right.  I presume those are our only

10  formal appearances, but is there anyone else who wished to

11  appear?

12     (No response.)

13           THE COURT:  All right.  Well, Mr. Rukavina, I'll hear

14  your argument.

15       MR. RUKAVINA:  Thank you, Your Honor.

16     I'm sure that the Court has read our papers, and by this

17  motion we seek to extend the expert deadline so that we can

18  retain Steven Pully as our expert on the standard of care.

19  Mr. Pully is on the video.  I can see him right now.  So, good

20  morning, Mr. Pully.

21     And Your Honor, I'd like for you to be aware that Friday

22  evening I did file on the docket Mr. Pully's report.

23  Obviously, the Court hasn't granted this motion, but I wanted

24  the Court to know that we moved as rapidly as possible, and

25  Mr. Pully has now finalized his report.  So there's no future

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/23   Page 154 of 190   PageID 44698

6

1   need for additional time on my end if the Court grants this

2   motion.

3        Your Honor, before I get to the actual merits of this

4   motion, I feel it important to address a hearing that occurred

5   a few weeks ago that I was not present at because this motion

6   was discussed briefly at the end.  This was a hearing held on

7   Ms. Deitsch-Perez's motion to dismiss and compel arbitration.

8        And Mr. Vasek, if you could please pull up the transcript

9   of that and scroll down to near the end where this motion is

10  discussed.

11       Your Honor will maybe recall that we have the transcript

12  where Ms. Deitsch-Perez mentioned as a scheduling matter that

13  this motion had been filed.  And the Court says, What on earth

14  does that have to do with this litigation?  I don't mean to be

15  flippant and laugh, but what on earth does that have to do

16  with notes?

17       And if we scroll down some more, Your Honor, Ms. Deitsch-

18  Perez was attempting to explain to the Court the purpose of

19  this motion, and the Court notes that, It sounds like you're

20  talking about an affirmative defense that hasn't been

21  articulated yet.

22       And if we scroll down some more, Ms. Deitsch-Perez

23  attempts to tell the Court that, in fact, this is an

24  affirmative defense that has always been asserted.

25       And the Court notes there in her dialogue with Ms.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 06/09/23   Page 155 of 190   PageID 44699

7

1    Deitsch-Perez that, I'm just letting you know you have a very

2    uphill battle convincing me that experts regarding shared

3    services agreements would be germane.

4        And the Court goes on to say that it has heard a lot about

5    shared services agreements during the past few years,

6    including experts on the witness stand in the *Acis* case.  And

7    the Court notes that, Under the pleadings as now in the

8    record, I just can't imagine why experts on shared services

9    agreements are going to be relevant evidence.

10       I think, Mr. Vasek, you can pull that down.

11       And I point this out only because, again, I know that the

12   Court has prepared for this hearing, but this is an

13   affirmative defense that has always been pled from the

14   beginning.  It does not involve the interpretation of the

15   contract.  We're not talking about the shared services

16   agreement.  We're not talking about the contract.  And recall,

17   Your Honor, that both Your Honor and the District Courts have

18   agreed that jury rights do attach here.  So the question

19   really is not the Court's familiarity with shared services

20   agreements but whether expert testimony will be relevant to

21   help the jury.

22       So, what is that expert evidence, Your Honor, and how did

23   this arise?  NexPoint is the obligor, the maker on a $30

24   million note -- I'm using round numbers -- and that note had

25   been paid down to some $24 million.

Case 21-03005-sgj    Doc 148-3    Filed 01/05/22    Entered 01/05/22 18:18:43    Desc
Case 3:21-cv-00881-X    Document 78-19    Filed 03/09/23    Page 156 of 190    PageID 44700

8

1      The note purports to require a payment every year on

2   December the 31st.  And in the year 2020, although we argued

3   that the payment was prepaid, that payment was not made

4   timely.  It was made a couple weeks later, when Mr. Dondero

5   realized what had happened.

6      Our version, NexPoint's version of why this payment did

7   not happen has until recently been that the Debtor dropped the

8   ball.  Under the shared services agreement, and as Mr. Dondero

9   and Mr. Frank Waterhouse, the Debtor's former CFO, confirmed,

10   the Debtor was for years responsible to facilitate the annual

11   payment.  The Debtor didn't pay from its own funds.  It would

12   pay it from our funds.  But that was both in the contract and

13   that was the practice.  Again, Mr. Waterhouse -- and Your

14   Honor has seen in my papers and in his transcript -- confirmed

15   that it was reasonable for NexPoint to rely on the Debtor to

16   ensure that this payment would be made.

17      So Mr. Vasek, if we can pull up the shared services

18   agreement here.

19      I know that the Court likes to look at contracts, so I

20   will briefly take Your Honor through some of the pertinent

21   provisions, because this relates to directly to Mr. Pully.

22      And Mr. Vasek, if you'll please scroll down to the

23   definitions of Covered Person.

24      And Your Honor can read it for herself.  This is just a

25   definitional that we need as we go forward.   But Covered

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 01/09/24   Page 157 of 190   PageID 44701

9

1    Person means the staff and services provider.  That is

2    Highland.  That is the Debtor.  And it includes managers,

3    members, employees, et cetera.  Well, that would be Mr. Frank

4    Waterhouse.  Mr. Waterhouse at that time was the Debtor' chief

5    financial officer, and he was also an officer of NexPoint.  So

6    he, like many people here, wore two hats.

7         Mr. David Klos at that time was the controller for

8    Highland, and Ms. Kristin Hendrix was a senior accountant at

9    Highland.  Both Mr. Klos and Ms. Hendrix were providing the

10   services we're going to discuss.

11        If you'll scroll down, Mr. Vasek.

12        The next provision, Your Honor, relates to what services

13   were being provided.

14        Scroll up just a -- just a tad.

15        So you'll see under Section 2.02 the parties are now

16   agreeing here's the services that Highland will be provided.

17   And it's important to note, Your Honor, that at this time this

18   agreement was in place.  This agreement was terminated I want

19   to say at the end of February this year.  But in December and

20   November of 2020, this agreement was in place.

21        And if the Court looks at the services being provided, the

22   first one there is assistance and advice.  That word "advice"

23   is important.  Assistance and advice with respect to various

24   things.  And you see down there those things include finance

25   and accounting, payments, bookkeeping, cash management, cash

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 06/09/23   Page 158 of 190   PageID 44702

10

1   forecasting, accounts payable, et cetera.

2        Keep scrolling down, Mr. Vasek.  Obviously, as the Court

3   very well knows, the Debtor was also providing legal services.

4        And if you keep scrolling down, Mr. Vasek, to the next

5   page, there you go, to K and L.

6        These are more catch-all.  So if the language of what I

7   just showed you is not express or specific enough, here you

8   have these catch-alls, such as advice on all things ancillary

9   or incidental to the foregoing and advice relating to other

10  back- and middle-office services in connection with the day-

11  to-day business.

12       So, again, we're not here today, we're not asking the

13  Court to decide, nor do I think that it would be this Court to

14  decide, whether the Debtor had a duty to facilitate the

15  December payment.  I'm just pointing out that we have, I think

16  anyone would agree, at least a *prima facie* colorable argument

17  that the Debtor would have such duty.

18       And just to address an issue that the Debtor raised, Mr.

19  Vasek, if you'll scroll down to 6.01, and then if you'll zoom

20  in.

21       Here, now, Your Honor, is the language that is of

22  relevance, the direct relevance.  So we've seen that Covered

23  Person is defined, and we have seen that -- and we can now see

24  that this agreement requires Covered Person -- that includes

25  the Debtor; that includes Mr. Waterhouse; that includes Mr.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/2899   Page 159 of 190   PageID 44703

11

1   Klos -- to discharge its duties under this agreement.  We've

2   seen that there's certainly a colorable argument that the

3   duties under this agreement include facilitating payments and

4   advice with payments and accounts payable and the like, and

5   that the Debtor has to discharge its duties with the care,

6   skill, prudence, and diligence under the circumstances then

7   prevailing that a prudent person acting in a like capacity and

8   familiar with such matters would use in the conduct of an

9   enterprise of a like character and with like aims.

10      That, Your Honor, is what we need the expert on.  Not to

11  tell the jury what this contract says, not to tell the jury

12  that the Debtor had a duty, but to look at, under the facts,

13  did the Debtor's performance or lack thereof -- and I'll tell

14  you why that's important in a moment -- did that performance

15  or lack thereof comport with this standard of care?

16      This is a matter for an expert.  The average juror, the

17  average layperson, myself, I would not know what the care,

18  skill, prudence, and diligence of a reasonable prudent person

19  in this situation would be.  I can theorize on that.  I can

20  opine on that.  I'm not an expert on that.  This is a matter

21  for an expert, the same as with medical malpractice, legal

22  malpractice, breach of fiduciary duty.

23      While we're on this agreement, just to address another

24  argument that the Debtor makes, the Debtor says that this

25  agreement exculpates negligence.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/23   Page 160 of 190   PageID 44704

12

1        Mr. Vasek, if you'll please scroll down to the

2    exculpation.

3        And there is an exculpation provision.  But if Your Honor

4    -- and it does exculpate negligence.  It doesn't exculpate

5    gross negligence, et cetera.  But it talks about that only

6    acts or omissions -- it's Romanette (i) -- acts or omissions

7    arising out of or in connection with the conduct of the

8    business of the management company that is exculpated.  Again,

9    we're not here today to decide what this means, but the

10   business of NexPoint is not note-making; the business of

11   NexPoint is advising thousands of investors and funds with

12   respect to a billion dollars of investments.

13       It is -- the Debtor does have an argument, and either the

14   Court or the jury will have to decide whether this exculpation

15   provision applies.  And then if -- and you can remove this,

16   Mr. Vasek -- the Debtor likewise says that the agreement's

17   indemnification provision prohibits this argument.  We pointed

18   out in our briefing, Your Honor, that, in fact,

19   indemnification under Texas law does not apply to the parties

20   to the contract.  It applies to claims made by third parties.

21   But, again, that's an argument that the Debtor has.

22       So we have this contract in place.  Late November/early

23   December rolls around, and both Mr. Dondero and Mr. Waterhouse

24   testify that they had a meeting.  What was said at that

25   meeting is in dispute.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 07/09/24   Page 161 of 190   PageID 44705

13

1      Mr. Dondero believes that he told Mr. Waterhouse, stop

2    paying on the shared services agreement.  It's NexPoint's

3    position -- Your Honor knows we filed an administrative claim

4    -- it's NexPoint's position that it had overpaid millions of

5    dollars under the shared services agreement, in part because

6    many of the employees of the Debtor that we were supposed to

7    be paying our respective share of weren't there anymore.  So

8    Mr. Dondero says to Mr. Waterhouse, stop paying on this shared

9    services agreement.

10      Those are the facts as we knew them going into late

11    October.  Based on that fact, and based on the fact that the

12    Debtor did not facilitate the payment, we've always asserted

13    as an affirmative defense that our lender, who is also our

14    lawyer, who's also our accountant, who's also our treasury

15    management people, and who have always facilitated these

16    payments in the past, dropped the ball.  They committed simple

17    negligence, they dropped the ball, thereby causing the alleged

18    default.

19      We did not need an expert opinion on that at that time.

20    You've seen in my reply briefing, Your Honor, that, in fact,

21    the Fifth Circuit holds in multiple instances that when it's

22    simply a matter of missing a deadline -- a lawyer missing

23    limitations, if you will -- expert testimony is not required,

24    and in fact may be inappropriate because a lay person can

25    figure out that, a lay juror can figure out that, well, if you

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 01/09/23   Page 162 of 190   PageID 44706

14

1   just simply didn't do something, whether that's -- whether

2   that comports with the standard of care or not.

3        On October the 19th of this year, the Debtor and we

4   deposed Mr. Waterhouse.  And Mr. Waterhouse had a different

5   testimony.  He had a different recollection of that meeting.

6   Mr. Waterhouse said that Mr. Dondero told him in late November

7   or early December, don't make this NexPoint payment.  In other

8   words, that Mr. Dondero expressly said the payment that's

9   coming up for NexPoint, do not make this payment.

10       That was news to us.  I was so surprised by that testimony

11  that I actually asked Mr. Waterhouse that question four times.

12  And opposing counsel actually got angry at me, kept saying,

13  how many times are you going to keep asking this question?  I

14  was surprised.

15       I was not able to talk to Mr. Waterhouse meaningfully

16  before that.  Mr. Waterhouse has attorneys, Mr. Waterhouse is

17  in litigation with the Debtor, and those attorneys require

18  that I not communicate with him directly, I communicate only

19  through them.  I never took up the chance to ask them about

20  this meeting because the only information that I had and that

21  my client had was that there was no such instruction.  The

22  Debtor may or may not have been surprised as well.

23       Mr. Vasek, if you'll please pull up discovery.

24       Your Honor, we're sharing with you now certain of the

25  discovery in this case -- in particular, the Debtor's

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 07/09/2899   Page 163 of 190   PageID 44707

15

1  responses.

2       And if you'll go to Interrogatory No. 1, Mr. Vasek.

3       So, Your Honor obviously can read this.  But I ask the

4  Debtor, if it contends that it was not responsible for making

5  payments under the note on NexPoint's behalf, please explain

6  the legal and factual basis for such contention.  I asked for

7  a factual basis as well.  And Your Honor can see in the

8  response that the Debtor objects, the Debtor says that it was

9  not required to make the payment, but nowhere here does the

10  Debtor say that it had received an instruction not to make the

11  payment.

12       Pardon me, Your Honor.

13       This was, I believe, from May or June.  In any event, it

14  was early in this litigation.  Nowhere here am I put on any

15  kind of notice that it's the Debtor's position that it

16  received an instruction not to make the payment.

17       If we scroll down to Request for Production, I believe

18  it's No. 1, Mr. Vasek.

19       Here, we -- I ask for all communications pursuant to which

20  the Debtor was advised or instructed not to make the payment

21  or to cause the payment to be made.  And the Debtor's answer

22  includes the following:  Any communications responsive to

23  Request for Production No. 1 were verbal.

24       Okay.  I had to await depositions.  That's fine.  I had

25  asked in an interrogatory, I didn't get a factual response,

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/2899   Page 164 of 190   PageID 44708

16

1   and then I'm now being told that any communications were

2   verbal.

3       Now, the Debtor may not have known about Mr. Waterhouse's

4   instruction, it may not have, in which case I don't think it's

5   fair to accuse NexPoint or its counsel of dropping the ball.

6   Or the Debtor may have known of the instruction, in which case

7   the Debtor should have answered Interrogatory No. 1 factually

8   by saying, oh, wait, not only were we not required to make the

9   payment, et cetera, et cetera, but we received an instruction

10  from your boss, NexPoint, not to make the payment.

11      You can remove that.

12      So, here we go into October 19th.  We depose Mr.

13  Waterhouse.  We now see that, in fact, I guess it's -- I

14  forget who -- who the author is, but the plot has thickened.

15  The situation is now much more complicated.  Whereas

16  previously we argued that the Debtor had dropped the ball, the

17  question now is, okay, if in fact the jury believes that Mr.

18  Dondero went to Mr. Waterhouse and said, don't make this

19  payment, did that discharge the Debtor's duties as specified

20  by the contract or not?

21      It's our belief that it did not.  It's our belief that Mr.

22  Waterhouse should have, at a minimum, asked Mr. Dondero after

23  that, did I get you right, Jim?  Did I understand correctly?

24  Did you mean not to make this payment?  It's our belief that

25  the Debtor -- our legal advisers, our accountants, people that

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 01/09/23   Page 165 of 190   PageID 44709

17

1    are supposed to advise us -- should have called back and said,

2    Jim, you know that if you don't make this payment you're going

3    to have a note accelerated and it's going to be $24 million.

4    They should have advised Mr. Dondero of the potential

5    consequences, especially given their clear conflict of

6    interest.

7        At the same time, they're our lender to the tune of $24

8    million, and they're providing us all this assistance and

9    advice that we're paying millions and millions of dollars for.

10       And then also, if Mr. Dondero gave such an instruction,

11   did the Debtor have some duty to try to dissuade him by

12   saying, Jim, you're being a hothead, this is a very serious

13   matter, it's only $1.4 million, make the payment?  In fact, we

14   did make the payment in January, after this issue was learned

15   about.  But the Debtor didn't do any of those things.

16       So, again, the question now is, did the Debtor's lack of

17   any subsequent follow-up -- putting its head in the sand, so

18   to speak -- did that comport with the duties as specified,

19   what would a reasonable person discharging his or her duties

20   under the facts and circumstances in that industry then in

21   place, what should or would have such a reasonable person

22   done?  That's where Mr. Pully comes in.

23       I deposed Mr. Seery a few days after this deposition and I

24   asked him about this, and Mr. Seery said that no, in his view,

25   Mr. Waterhouse acted perfectly appropriately, that Mr.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/23   Page 166 of 190   PageID 44710

18

1    Waterhouse had no duty to seek clarification or explain the

2    ramifications or anything else.  And it was clear to me that

3    Mr. Seery is going to testify to that effect.

4         So at that point in time, now that we knew Mr.

5    Waterhouse's testimony, we decided that it is not only

6    advisable but perhaps necessary to retain an expert.  And we

7    moved very quickly.  I have had the fortune of working with

8    Mr. Pully before, so I knew him.  I was able to rapidly retain

9    him because of our prior familiarity with each other.  Mr.

10   Pully reviewed all the transcripts.  He reviewed the

11   discovery.  He prepared a full and final report.  So, from

12   beginning to end, we were done in maybe five weeks, maybe six

13   weeks.

14        And we're not proposing, Your Honor, that the Debtor

15   doesn't have whatever time it needs to prepare a rebuttal.

16   We're not proposing that the Debtor can't depose Mr. Seery

17   [sic].  Of course it can.

18        So where this adversary proceeding now is is that

19   discovery is over.  The Debtor will be filing by December the

20   17th a motion for summary judgment.  Your Honor will recall

21   that Your Honor approved a scheduling order on that.  And

22   there will be hearings before this Court on summary judgment,

23   and perhaps opposing counsel can remind me, but it's going to

24   be in late January, or I'm going by memory here, maybe early

25   February.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 07/09/24   Page 167 of 190   PageID 44711

19

1   So that is, Your Honor, what happened.  That is how it

2   happened.  It's the truth.  It's -- there's no laying behind

3   the log here.  There's no litigation decisions that are now

4   backfiring and we're trying to get out of them.  What happened

5   here is exactly what should happen in a lawsuit like this,

6   where discovery has illuminated various issues and now we have

7   to deal with the consequences of that discovery as we prepare

8   for trial.

9       October the 29th was the date in the scheduling order to

10  disclose experts and provide their reports.  Mr. Pully

11  couldn't even hypothetically do that in time since I had

12  retained him a few days before that.  But we moved very

13  quickly to file this motion, to file it before the deadline

14  actually expired, in hopes, again, of not -- not only of

15  showing Your Honor that we moved diligently and rapidly when

16  this issue unfolded, but also that we didn't need *nunc pro*

17  *tunc* relief.

18      So, Rule 16 does apply.  The good cause requirement does

19  apply.  But this is not some talismanic super-high burden to

20  meet.  Yes, there's a burden.  Yes, I must demonstrate to Your

21  Honor why leave based on good cause is required.  But we're

22  not trying to unscramble the eggs, and we're not seeking

23  something extraordinary or exotic here.

24      The Fifth Circuit has specified the four factors that the

25  Court should look at.  In the Fifth Circuit cases that we've

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 01/09/24   Page 168 of 190   PageID 44712

20

1   seen and that we've briefed, the deadline had already expired

2   and the people were seeking *nunc pro tunc* relief.  I don't

3   think we have that high of a burden here, but even if we do,

4   we've analyzed those four factors.

5        And the first factor is the explanation for the lateness.

6   Again, did NexPoint act diligently?  Did NexPoint hide behind

7   the log?  Is there some litigation strategy here that has

8   backfired?  None of that, Your Honor, is present.  There's

9   been no delay.  We deposed, pursuant to agreed deposition

10  schedules, we deposed all of the main witnesses in October.

11  When we deposed Mr. Waterhouse, this issue arose.  We moved as

12  rapidly as we could thereafter.  And you've seen, Your Honor,

13  in the interrogatory answer, that if the Debtor knew about

14  this instruction, then, really, the Debtor should have

15  answered its interrogatory to say, we got an instruction not

16  to pay and that's why we didn't pay.

17       Maybe the Debtor -- maybe the Debtor didn't know that.

18  But when we deposed Mr. Klos and Ms. Hendrix, who are still

19  employees of the Debtor, they testified that they heard Mr.

20  Waterhouse tell them that in late November last year.  So they

21  -- they testified that in late November last year Frank

22  Waterhouse told them, Jim Dondero told me, don't make this

23  payment.

24       So, even if the Debtor didn't know what Mr. Waterhouse

25  would testify to, Mr. Klos and Ms. Henderson [sic] did.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/23   Page 169 of 190   PageID 44713

21

1       Again, I am not pointing the fingers here at the Debtor.

2  I'm not saying that their answer to Interrogatory No. 1 was

3  manipulative, that it was calculated to deceive.  I'm not

4  suggesting that.  I'm just suggesting that, had the Debtor

5  given a more fulsome answer, we would have immediately

6  investigated and immediately retained an expert back in May or

7  June of this year.

8       The next element, or the next factor, rather, is the

9  importance of this extension.  And Your Honor, we have quoted

10  at length Fifth Circuit opinions that say that when the

11  standard of care is involved, expert opinion is appropriate

12  and may be required.

13       It goes back to, again, if the Debtor just dropped the

14  ball and didn't facilitate the payment, that's easy.  That

15  doesn't need an expert.  But if the Debtor was instructed by

16  Mr. Dondero not to make the payment and there was a month left

17  before the payment was to be made, did the standard of care as

18  specified in the contract require the Debtor to do something

19  that it failed to do?

20       So we are talking about the standard of care.  That is

21  appropriate expert testimony.  It may be required.  And it is

22  not something that I can argue to a lay juror just based on a

23  deadline being missed.

24       So, yes, this -- the relief we're seeking is important,

25  especially given the jury nature of this trial.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 07/09/24   Page 170 of 190   PageID 44714

22

1      The third factor is the potential prejudice.  So, the

2    Debtor says, well, this will increase costs.  Yes, it will.

3    But costs alone is not the legally -- the legal standard here.

4    Every litigation has costs.  Every litigation has burdens.

5    And if the Debtor prevails in this lawsuit, they will claim

6    attorneys' fees and costs.  They're entitled to that under the

7    note and under Texas law.

8      So there will be an incremental cost for the Debtor to

9    retain an expert, but that would have been present as of

10   October the 29th anyway.

11     Remember, I filed this motion on the deadline.  We're

12   seeking six weeks of delay here.  This is not late-stage

13   litigation where all the facts are known, all the witnesses

14   have been deposed, everyone's ready for trial, and suddenly a

15   party seeks to increase its opponent's litigation costs here

16   with a last-second expert.  This is not that case.

17     So, there is no prejudice, at least not in the legally

18   relevant way by way of costs, nor is there any prejudice by

19   delay.  And this also ties into the fourth factor, which

20   discusses a continuance.  There is no prejudice here because

21   we're not trial-set.  We don't know when we're going to be

22   trial-set.

23     Even if the Court denies summary judgment in whole or in

24   part at the end of January or early February -- which I don't

25   think that's very realistic because I think the Court is going

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/2899   Page 171 of 190   PageID 44715

23

1    to want to think about it some, the Court is going to want to

2    prepare a report and recommendation -- this is not going to be

3    a straightforward summary judgment proceeding.

4         What is also out there is that the Debtor has filed a

5    motion to consolidate all these note cases in front of one

6    District Court judge.  That's going to have to be reviewed by

7    the District Court judges and ruled on.

8         So we are months, months away from being trial-ready, and

9    then we don't know how long it's going to be before we're up

10   for a week or two long jury trial.  No one knows that.  That

11   is plenty of time for the Debtor to get a rebuttal expert.

12   It's plenty of time for the Debtor to depose Mr. Pully.  It's

13   plenty of time for everything to come to play so that this

14   case will be certified trial-ready, irrespective of whether

15   there's an expert or not.  This is not going to delay the

16   process.  We're not seeking to delay the process.

17        Nor are we seeking to derail the summary judgment

18   proceedings.  If the Debtor wants to retain an expert for

19   summary judgment proceedings, that just proves that there is a

20   question of fact here that precludes summary judgment.

21        But as far as continuance or trial-setting, that's just

22   not present here.

23        And I've quoted Your Honor at length a District Court's

24   opinion from the Eastern District of Texas that talks about

25   prejudice, that talks about costs.  And that judge basically

Case 21-03005-sgj    Doc 148-3    Filed 01/05/22    Entered 01/05/22 18:18:43    Desc
Case 3:21-cv-00881-X    Document 78-19    Filed 03/09/23    Page 172 of 190    PageID 44716

24

1    said, look, when it's -- when it's an affirmative defense that

2    you've known that since the beginning, which the Debtor has

3    known here since the beginning, then, really, it's not a last-

4    second tactic.  It's not real prejudice.  Yeah.  Yeah, there's

5    a delay.  Yeah, there's an increased cost.  But the plaintiff

6    is now trying to fundamentally change this lawsuit, to

7    fundamentally interject something new here.  The plaintiff

8    just needs some more time.  And the question is, should the

9    plaintiff have more time?

10        Your Honor, those are the factors.  We have -- we have the

11    exhibits.  We have the record prepared.  It's a part of the

12    motion and the Debtor's response.  And Your Honor, we ask that

13    the Court grant this motion -- again, reminding the Court that

14    this does relate to an affirmative defense that's been around

15    since the beginning.  It does relate to one that was -- only

16    -- only really became the subject of expert testimony in late

17    October.  And it's only because discovery in this case worked

18    as it should.  No one laid behind the log.  No one made a

19    calculated decision that has backfired.  No one delayed

20    anything or was less than diligent.

21        Under these circumstances, Your Honor, because the point

22    of a trial in front of a jury is to get to the truth and it's

23    to enable the jury to have what it needs to make a true, full,

24    and informed decision, we believe that good cause exists, and

25    we'd ask -- NexPoint would ask that the Court grant this

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/29/2899   Page 173 of 190   PageID 44717

25

1    motion.

2              THE COURT:  All right.  Thank you.

3        I'll ask Mr. Aigen, does he have anything he wants to

4    supplement with?

5              MR. AIGEN:  Yes, Your Honor.  I can make a very quick

6    argument here.

7        As you know, HCMS and HCRE have filed a joinder, asking

8    for the same relief.  The only thing I want to quickly point

9    out is that the only difference between our clients and Mr.

10   Rukavina's client is the lack of a written services agreement.

11   But I would point out, as the evidence we submitted in our

12   briefing shows, the undisputed testimony is that there was an

13   oral agreement to provide these services, that the Debtor did

14   provide these same exact services that they provided from --

15   for NexPoint to HCMS and HCRE, that they had done this for

16   years, and this included making loan payments.

17       So I just wanted to point that out, and I think what this

18   means is that, for the same reasons that Mr. Rukavina asked

19   for this relief, we believe we are entitled to the same

20   relief.  And I won't bother to go through all the same

21   arguments that Mr. Rukavina just made to the Court.  So that's

22   all I have, Your Honor.

23             THE COURT:  All right.  Thank you.  Ms. Winograd?

24             MS. WINOGRAD:  May it please the Court?

25             THE COURT:  You may proceed.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/2899   Page 174 of 190   PageID 44718

26

1          MS. WINOGRAD:  Your Honor, the motion should be

2     denied because there is no good cause for modifying the

3     scheduling order.  The motion is untimely.  The expert

4     testimony Defendants seek to gather is both improper and

5     irrelevant.  And if the motion is granted, Highland will be

6     prejudiced.

7          This is -- this adversary -- adversary proceeding is a

8     garden-variety collection action on a simple note, it has been

9     going on for roughly a year, and it continues to get delayed

10    due to unnecessary and costly motion practice.  Defendants'

11    latest motion is not only another delay tactic, but it is also

12    completely unsupported.

13         And before I tell you why it is unsupported, I want to

14    take a step back and just summarize the context of Defendants'

15    motion.  Defendants have always and continue to assert the

16    same affirmative defense, which is that their default under

17    the note was the result of Highland's negligence under the

18    shared services agreement.  It is Defendants' position that

19    before Mr. Waterhouse's deposition an expert was not needed to

20    testify regarding Highland's duties under the shared services

21    agreement.

22         Mr. Waterhouse then testified that Mr. Dondero gave him

23    instruction not to make a payment under the note.  It is now

24    Defendants' contention that, solely in light of this

25    testimony, all of a sudden an expert is needed to testify

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/23   Page 175 of 190   PageID 44719

27

1  regarding whether Highland owed an affirmative duty under that

2  same shared services agreement to ask Mr. Dondero if he

3  understood the implications of his instruction, and if so, if

4  Highland breached such a purported duty.

5      First of all, Your Honor, based on the clear terms of the

6  shared services agreement, there is no affirmative duty for

7  Highland to ask Mr. Dondero if he understood the implications

8  of his own instruction.

9      Moreover, Your Honor, the question of what Highland's

10  duties are is a legal issue reserved for the Court, and the

11  issue of whether Highland breached -- and Highland submits

12  there was no such breach -- but that issue is reserved for the

13  jury.

14      Your Honor, if expert testimony wasn't needed before, it

15  is not needed now.

16      This Court entered a scheduling order in September of

17  2021.  Under Rule 16(b) of the Federal Rules of Civil

18  Procedure, an existing scheduling order can only be modified

19  upon a showing of good cause.  The purpose of Rule 16 is for

20  the Court to prevent unforeseeable and never-ending litigation

21  expenditures.

22      So the critical question before Your Honor today is

23  whether there is good cause to modify the scheduling order.

24  And Highland submits there is not.

25      Courts consider four general factors to determine whether

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/59/28 99 Page 176 of 190   PageID 44720

28

1    there's good cause.  It's the party's explanation for failing

2    to previously identify the witness.  It's the importance of

3    the witness's testimony.  And it's the prejudice to the other

4    side in allowing the testimony.  All of these factors weigh in

5    favor of denying the motion.

6        Regarding the first factor, Defendants' explanation for

7    failing to previously identify the witness is entirely without

8    merit.  Again, NexPoint first raised its affirmative defense

9    that its default under the note was the result of Highland's

10   own negligence back in March of 2021.  In other words,

11   NexPoint had nine months to retain an expert to testify

12   regarding Highland's duties for nine months.

13       NexPoint seeks to create -- to distinguish between these

14   notions of Highland somehow, quote, dropping the ball versus

15   Highland not asking Mr. Dondero if he understood the

16   implications of his own instruction.  Defendants cite no

17   authority in support of the notion that one of these factual

18   circumstances would somehow require an expert but that the

19   other would not.

20       What this comes down to, Your Honor, is that Defendants

21   are using this testimony as an excuse to muddy the water, to

22   muddy the waters as to the critical issues in this case and as

23   a latch-ditch attempt to bolster their defense.

24       I don't want to bog you down with case law that's already

25   cited in our brief, but I want to flag a particularly on-point

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/23   Page 177 of 190   PageID 44721

29

1 case, and that is *Reliance*, <mark>110 F.3d at 257</mark>.  The Fifth

2 Circuit affirmed the lower court's denial of a party's motion

3 to modify the scheduling order when that -- when a deposition

4 didn't go well, specifically holding District Courts have the

5 power to control their dockets by refusing to give ineffective

6 litigants a second chance to develop their case.

7     The suggested expert testimony also is improper as a

8 matter of law.  It is well-settled law in the Fifth Circuit

9 that an expert cannot testify regarding the scope of a party's

10 contractual duties under an agreement and whether that party

11 fulfilled such duties.  And that is exactly what NexPoint and

12 Defendants are trying to do here.  It is trying to have its

13 expert interpret the terms of a shared services agreement and

14 testify regarding Highland's duties thereunder and ultimately

15 whether it thinks Highland breached those duties.

16     This is an improper subject for expert testimony and

17 precisely the type of expert testimony that the Northern

18 District of Texas rejected in *Panhandle* and which the Fifth

19 Circuit affirmed the rejection of in *Askanase*, two cases cited

20 in our papers.

21     Even if the suggested expert testimony were proper, which

22 it is not, it is also irrelevant.  In order to be relevant,

23 expert testimony must assist the trier of fact understand a

24 complex or distinct issue in a case.  Here, the critical issue

25 for Defendants is whether they can prove that their default

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/79/2899 Page 178 of 190   PageID 44722

30

1   under the note was the result of Highland's negligence.  This

2   issue is well within the common understanding of a lay person.

3       Again, this is a garden-variety collection action.  All of

4   the cases NexPoint cites in its papers in support of the

5   notion that expert testimony is required, all of those cases

6   involve professional malpractice cases, whether legal or

7   medical.  And in those cases, an expert was required to

8   testify regarding the general standard of care in a particular

9   industry.

10      Here, NexPoint doesn't seek to have an expert testify

11  regarding the general standard of care in a particular

12  industry.  That is not an issue in this case.  And this

13  certainly is not a professional malpractice case.

14      NexPoint seeks to have its expert opine as to the scope of

15  Highland's legal duties in a shared services agreement and

16  ultimately whether Highland breached the purported duties,

17  which, again, we submit it did not.

18      The other case NexPoint cites to, *In re Schooler,* that

19  case also doesn't support Defendants' position, and in fact

20  supports Highland's position.  In that case, the Fifth Circuit

21  noted, and I quote, Expert testimony is not needed in many, if

22  not most, cases.

23      I also want to briefly address NexPoint's argument raised

24  for the first time in its reply that Highland was also acting

25  as an attorney to Defendants during this time.  As a

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-13   Filed 03/09/23   Page 179 of 190   PageID 44723

31

1   procedural matter, this argument is entirely improper because

2   it is not proper to raise an argument for the first time in a

3   reply.

4        And on the merits, again, this is not a professional

5   malpractice case.  So for these reasons alone, such a

6   contention should be summarily disregarded by the Court.

7        Finally, Your Honor, Highland would suffer prejudice if

8   the motion is granted because it would be forced to expend

9   significant and costly resources responding to the testimony

10  in the form of retaining a rebuttal expert, taking and

11  defending additional depositions, and engaging in more motion

12  practice.  This would be a waste of resources for both parties

13  and for the Court because this testimony isn't ultimately

14  going to be needed at trial.

15       It is improper because it opines as to the ultimate legal

16  issues in this case that are reserved for the Court and then

17  for the jury.  And it is also irrelevant because all of the

18  issues in this case are well within the common understanding

19  of a lay person.

20       I also want to note that HCRE and HCMS's motions asking

21  for the same relief are equally if not more frivolous than

22  NexPoint's because HCMS and HCRE aren't even parties to the

23  shared services agreement.  To the extent HCMS and HCRE are

24  asking an expert to testify regarding Highland's alleged

25  duties under an oral agreement, the terms of which are

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/09/22   Page 180 of 190   PageID 44724

32

1    unknown, such a contention is frivolous on its face.

2        But even if such an alleged oral agreement exists, which

3    it does not, this does not change the Rule 16(b) analysis.

4    The Defendants fail to show good cause for modifying the

5    scheduling order.

6        In brief, Your Honor, this motion is simply a delay

7    tactic, the expert testimony is improper, and the motion

8    should be denied.  Thank you.

9            THE COURT:  Thank you.

10       All right.  Movants get the last word.  Mr. Rukavina,

11   anything further?

12           MR. RUKAVINA:  Yes, Your Honor.  Most of what

13   opposing counsel says is the topic of a *Daubert* issue.  We're

14   not seeking to prejudice *Daubert* today, and they have every

15   ability in the future to argue that Mr. Pully's testimony

16   should not be admissible.

17       Second, this is not a garden-variety case.  It is not.  It

18   is a case where, again, our lender was also our officer, was

19   providing all kinds of payment services, accounting services,

20   and legal services.  It may not be unique, it may not have

21   never happened before, but it is not a garden-variety.

22       I do take issue with the notion that there has been any

23   delay in this case.  That is not correct.  I just looked at

24   the docket again to refresh my memory.  We had a contested

25   hearing on my motion to withdraw the reference that the Debtor

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 09/09/22   Page 181 of 190   PageID 44725

33

1    objected to, arguing that 542 was a core matter.  Your Honor

2    rejected that argument, and Your Honor agreed with me, as did

3    the District Court, that the reference will be withdrawn when

4    this trial -- when this case is certified trial-ready.

5         So the notion that there has been delay, intentional delay

6    by us, that this is a matter of delay, is absolutely wrong.

7    In fact, this lawsuit has gone on quickly.  It's been handled

8    professionally.  Both sides have been cooperative, giving each

9    other various accommodations.  And I am proud, I think, of how

10   every lawyer has handled themselves in this lawsuit.  To

11   suggest delay or intentional delay is wrong.

12        On the law, Your Honor, *In re Schooler*, I heard counsel

13   argue that it's just illogical and wrong to argue that an

14   expert wasn't required in one situation but now is.  But

15   that's *In re Schooler*, the Fifth Circuit, Your Honor, 725 F.3d

16   498, that I quote at length from.  That's one where the

17   trustee dropped the ball, a Chapter 7 trustee failed to give

18   property of the estate.  And that's the one where the Fifth

19   Circuit does say, Accordingly, we have explained that, as a

20   general rule, expert testimony is not needed in many, if not

21   most, cases.  And then the Fifth Circuit says that, It

22   requires no technical or expert knowledge to recognize that

23   she -- the trustee -- affirmatively should have undertaken

24   some form of action to acquire for the bankruptcy estate the

25   assets to which it was entitled.

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 09/09/22   Page 182 of 190   PageID 44726

34

1        But, again, this is not that case.  This was that case

2    before Mr. Waterhouse testified, and now it's not.  This is

3    not a case anymore where the debtor simply dropped the ball,

4    as did that trustee, or as does the doctor who amputates the

5    wrong leg, or as does the lawyer who misses a limitations

6    deadline.  This is now a case where, if the jury believes Mr.

7    Waterhouse, the plot has thickened.

8        And finally, Your Honor, again, I'm not here to point

9    fingers, but look at the Debtor's response to Interrogatory

10   No. 1.  All that the Debtor needed to say six or seven months

11   ago to avoid this delay is that, oh, wait, we received an

12   instruction not to pay.  It would have taken ten words, one

13   sentence, by the Debtor to fully answer an interrogatory and

14   this motion would not have been necessary.

15       Thank you.

16            THE COURT:  All right.  Mr. Aigen, anything further

17   from you?

18            MR. AIGEN:  No, nothing further, Your Honor.  We just

19   join in Mr. Rukavina's reply points.

20            THE COURT:  All right.  As I understand it, the

21   deadline was October 29th for disclosure of experts, and the

22   record shows that at 5:22 p.m. on October 29th the Defendants

23   -- let me double-check that.  That was actually the

24   declaration of Mr. Rukavina.  No, 5:22 p.m. on the deadline,

25   the motion of the Defendant to extend the expert disclosure

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 03/29/23   Page 183 of 190   PageID 44727

35

1   and discovery deadlines was filed.

2        The legal authority that governs here is Rule 16(b).  As

3   everyone has acknowledged, it provides that deadlines in

4   scheduling orders may be modified for good cause.  I think the

5   standard does apply here.  While I guess a lot of the cases

6   analyze it in terms of a request after a deadline has expired,

7   I think a motion on the day of the deadline at 5:22 p.m. is

8   going to be governed by Rule 16(b).

9        So, as the parties have argued to the Court, the Fifth

10  Circuit has specified four factors in guiding a decision in

11  this situation:  the explanation for failure to timely move

12  for leave to amend; the importance of the amendment; potential

13  prejudice in allowing the amendment; and availability of a

14  continuance to cure such prejudice.

15       Here, as I think everyone readily acknowledges, these

16  Defendants have always asserted as a defense that the Debtor

17  dropped the ball, I think was one phrase used.  That, in any

18  event, it was the fault of the Debtor that the Defendants did

19  default on the payment of these notes.  I do not think the

20  sudden statement of Frank Waterhouse suddenly is a game-

21  changer that creates some new need for an expert.  So,

22  therefore, looking at the factors, I don't think the

23  explanation here to extend the deadlines has merit.

24       Moreover, as far as the importance of the amendment,

25  Factor No. 2, I think it is appropriate to look at the big

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 09/09/2899   Page 184 of 190   PageID 44728

36

1    picture here a little bit, even though we're not in a *Daubert*

2    situation, and look at what the expert is argued to be needed

3    for.  And I do not think an expert can testify about

4    contractual duties and attempt to interpret its provisions.

5    That is the job of the Court, and I think it is improper

6    subject matter for an expert.

7        I don't buy into any notion that this is terribly unique

8    territory or exotic.  I mean, it was a contract.  Shared

9    services agreements are not all that unique, shall we say?

10   It's not a device that is used solely in the investment

11   advisor fund world.  It's in the corporate world generally.

12   Courts see these in all kinds of cases.  So, again, I don't

13   think contract interpretation needs an expert here or should

14   have an expert here.

15       And just because experts are sometimes -- often, I should

16   say -- appropriate in legal malpractice or medical malpractice

17   or other kinds of tort cases where duties might be needing of

18   elaboration, here, the contract spells out the duties, and I

19   just don't think any of those cases argued are applicable.

20       Prejudice, I do think there is potential prejudice in

21   allowing an extension of this deadline.  It will be costly,

22   add a layer of expense and delay to this litigation, when I

23   don't think it would be admissible at trial ultimately.

24       So the motions are denied.

25       Ms. Winograd, could you please prepare a form of order?

Case 21-03005-sgj   Doc 148-3   Filed 01/05/22   Entered 01/05/22 18:18:43   Desc
Case 3:21-cv-00881-X   Document 78-19   Filed 09/09/24   Page 185 of 190   PageID 44729

37

1  It can be a simple form of order.  Run it by opposing counsel

2  before you upload it, please.  All right?

3          MS. WINOGRAD:  Yes, Your Honor.

4          THE COURT:  Thank you.  We're adjourned.

5          MS. WINOGRAD:  Thank you.

6          THE CLERK:  All rise.

7      (Proceedings concluded at 11:47 a.m.)

8                          --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                              **12/13/2021**

24  _____     _____
    Kathy Rehling, CETD-444                              Date
25  Certified Electronic Court Transcriber

38

INDEX

PROCEEDINGS                                                    4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                       34

END OF PROCEEDINGS                                            37

INDEX                                                         38



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 21, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| In re: | § |
|  | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
|  | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
|  | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
|  | § |
| Plaintiff, | § Adversary Proceeding No. |
|  | § |
| vs. | § 21-03005-sgj |
|  | § |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § |
|  | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
|  | § |
| Plaintiff, | § Adversary Proceeding No. |
|  | § |
| vs. | § 21-03006-sgj |
|  | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| | § | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03007-sgj |
| | § | |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| | § | |
| Defendants. | § | |

## ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

This matter having come before the Court on the (a) *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 86] (the "NexPoint Motion") filed by NexPoint Advisors, L.P. ("NexPoint"); (b) *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 91] (the "HCMS Motion") filed by Highland Capital Management Services, Inc. ("HCMS"); and (c) *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3007, Docket No. 86] (the "HCRE Motion," and collectively with the NexPoint Motion and the HCMS Motion, the "Motions") filed by HCRE Partners, LLC ("HCRE," and collectively with NexPoint and HCMS, "Defendants"); and this Court having considered (i) the Motions; (ii) *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 104; Adv. Proc. 21-3006, Docket No. 109; Adv. Proc. 21-3007, Docket No. 104] (the "Objection") filed by Highland Capital Management, L.P. ("Highland"); (iii) the (a) *Reply of*

*Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 115] (the "NexPoint Reply") filed by NexPoint; and (b) *Highland Capital Management Services, Inc. and HCRE partners, LLC's Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 120, and Adv. Proc. 21-3007, Docket No. 115] (the "HCRE and HCMS Replies," and together with the NexPoint Reply, the "Replies") filed by HCRE and HCMS; and (iv) the arguments made during the hearing held on December 13, 2021 (the "Hearing"); and this Court having found that Defendants have not established "good cause" under Rule 16(b) of the Federal Rules of Civil Procedure for the relief requested in the Motions; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motions in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court, and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth during the Hearing on these Motions, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motions are **DENIED**.

2. This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Case Admin Sup    txnb_appeals@txnb.uscourts.gov

Bryan Christopher Assink    bryan.assink@bondsellis.com

Clay M Taylor    clay.taylor@bondsellis.com

Daniel P Elms    elmsd@gtlaw.com, guerrak@gtlaw.com

Davor Rukavina    drukavina@munsch.com

Deborah Rose Deitsch-Perez    deborah.deitsch-perez@stinson.com, kinga.mccoy@stinson.com, patricia.tomasky@stinson.com

Douglas Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com, gbrouphy@hellerdraper.com, vgamble@hellerdraper.com

Gregory V Demo    gdemo@pszjlaw.com, hwinograd@pszjlaw.com, jfried@pszjlaw.com, lsc@pszjlaw.com

Jeffrey N Pomerantz    jpomerantz@pszjlaw.com

John A Morris    jmorris@pszjlaw.com, hwinograd@pszjlaw.com, lsc@pszjlaw.com

Julian Preston Vasek    jvasek@munsch.com

Leslie A Collins    lcollins@hellerdraper.com, dhepting@hellerdraper.com

Michael P Aigen    michael.aigen@stinson.com, stephanie.gratt@stinson.com

Stacey G Jernigan    sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

Zachery Z. Annable    zannable@haywardfirm.com, zannable@franklinhayward.com

/s/ Davor Rukavina
Davor Rukavina