**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 21-03005-sgj<br><br>Case No. 3:21-cv-00880 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 21-03004-sgj<br><br>Case No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 21-03003-sgj<br><br>Case No. 3:21-cv-01010 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 21-03006-sgj<br><br>Case No. 3:21-cv-01378 |

| | | |
|---|---|---|
| NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§<br>§ | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br>vs.<br><br>HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 21-03007-sgj<br><br>Case No. 3:21-cv-01379 |

**ORDER GRANTING**
**DEFENDANT'S MOTION TO CONSOLIDATE THE NOTE CASES**

Before this Court is Defendant's Motion to Consolidate the Note Cases [Doc. No. 16] (the "Motion"). Having considered the Motion the Court finds that consolidation of the Note Cases is warranted under Rule 42(a) of the Federal Rules of Civil Procedure and that the interests of judicial efficiency are best served by consolidation of the Note Cases under Case No. 3:21-cv-881. Consolidating the cases under 3:21-cv-881 best services judicial efficiency because (a) Case No. 3:21-cv-881 is the lowest-numbered case in the Dallas Division,[1] and (b) because the undersigned was originally assigned two of the five Note Cases captioned above (before transfer of the three others to the undersigned), as well as other cases arising out of the Highland Bankruptcy.[2] The Court therefore **GRANTS** defendant's motion to consolidate.

[1] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here is 3:21-cv-880, previously assigned to Judge Sam Cummings. However, the Court finds that judicial efficiency is best served by consolidating under 3:21-cv-881 because 3:21-cv-880 and 3:21-cv-881 were filed in district court on the same day and several other factors (explained above the line) are served by consolidation under 881 as opposed to 880.

[2] In 3:21-cv-1010, the plaintiffs moved to consolidate under that case. [Doc. No. 10.] That request is denied. Importantly, plaintiffs agree that consolidation of all five note cases is warranted and promotes judicial efficiency.

**IT IS HEREBY ORDERED THAT**:

1. The Note Cases are consolidated under the lead case, No. 3:21-cv-00881 for all purposes other than that Case No. 3:21-cv-00881-X may be tried separately (or that the determination of whether such case shall be tried separately is deferred until after all summary judgement motions are heard and decided), to be heard by the Honorable Judge Starr.

2. The cases consolidated under No. 3:21-cv-881 are:
   - No. 3:21-cv-00880
   - No. 3:21-cv-01010
   - No. 3:21-cv-01378
   - No. 3:21-cv-01379

3. All future filings related to all five cases shall be filed on the docket for No. 3:21-cv-881.

**IT IS SO ORDERED** this 6th day of January, 2022.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03007-sgj** |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

COMES NOW, Defendants James Dondero, NexPoint Advisors, L.P., Highland Capital Management Services, Inc., and HCRE Partners, LLC, the Defendants in the above-captioned and related adversary proceedings, and hereby submit this *Opposition to Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Opposition"). Defendants fully incorporate by reference their brief in response filed contemporaneously with this Opposition and would show the Court as follows:

**RELIEF REQUESTED**

1. By this Opposition, Defendants respectfully request that the Court enter an order denying Plaintiff's Motion for Partial Summary Judgment.

2. Pursuant to Rule 7056(d) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas and Rule 56.4(b) of the Local Rules of the Northern District of Texas, a separate memorandum of law is being filed contemporaneously with this Opposition that will state why Defendants oppose the Motion for Partial Summary Judgment and is incorporated by reference.

**PRAYER**

WHEREFORE, Defendants respectfully request that the Court deny the relief requested in Plaintiff's Motion for Partial Summary Judgment and grant Defendants such further and other relief to which they are entitled.

Dated: January 20, 2022

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**ATTORNEYS FOR JAMES DONDERO, NANCY
DONDERO, HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC. AND NEXPOINT REAL ESTATE
PARTNERS, LLC**

*/s/Clay M. Taylor*
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**ATTORNEYS FOR JAMES DONDERO**

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P. AND
HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/172202497.1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| **vs.** | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § § | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § | **Adv. Proc. No. 21-03007-sgj** |

# DEFENDANTS'[1] MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

[1] Defendants Jim Dondero, HCMS, HCRE, and NexPoint, are collectively referred to as the "Defendants" throughout this Memorandum of Law unless otherwise expressly named.

# TABLE OF CONTENTS

**Page**

I. Preliminary Statement ..... 1

II. Statement of Facts ..... 1

A. Procedural Background ..... 1

B. The Promissory Notes ..... 2

C. Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent ..... 2

1. Forgivable Loans as Compensation Are Not Uncommon. ..... 2

2. The Agreements to Forgive the Notes ..... 3

3. The Agreements Were Never Kept "Secret" from Anyone ..... 5

4. Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified. ..... 7

5. Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements ..... 9

D. Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE ..... 11

1. The NexPoint Shared Services Agreement ..... 11

2. The HCMS and HCRE Shared Services Agreements ..... 13

E. Prepayment on the Term Notes ..... 15

1. NexPoint's Prepayments ..... 15

2. HCMS' Prepayments ..... 16

III. Argument and Authorities ..... 17

A. Legal Standard ..... 17

B. Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses ..... 18

1. The Agreements to Forgive the Notes ..... 18

a. The Evidence Shows that the Agreements Exist ..... 18

(i) The Evidence Shows That Jim Dondero Identifies Material Terms of the Agreements ..... 19

(ii) The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements ..... 20

(iii) Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist ..... 20

(iv) Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence. ..... 21

CORE/3522697.0002/171927721.9

(v) Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence. ..... 21

(vi) The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence. ..... 22

(vii) Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation. ..... 22

b. Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence. ..... 22

c. The Evidence Shows the Agreements Were Supported by Consideration ..... 25

d. The Evidence Shows the Agreements Were Definite ..... 28

e. The Evidence Shows the Agreements Were Supported by a Meeting of the Minds ..... 29

f. Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements. ..... 31

(i) Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements. ..... 32

(ii) Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements. ..... 32

(iii) Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements. ..... 34

(iv) Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements. ..... 35

2. The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements ..... 36

a. The Affirmative Defense ..... 36

b. The Law ..... 36

c. The NexPoint SSA and the Debtor's Duties Thereunder ..... 37

3. The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation ..... 42

4. Debtor's Negligence and Fault In Creating Alleged Default ..... 44

(i) If Dondero Did Not Issue the Non-Payment Instruction ..... 44

(ii) If Dondero Issued the Non-Payment Instruction: Offer of Proof ..... 45

5. The HCMS and HCRE SSAs. ..... 47

6. Prepayments by NexPoint and HCMS ..... 47

a. NexPoint Prepayments ..... 47

b. HCMS Prepayments ..... 52

IV. Conclusion ..... 55

CORE/3522697.0002/171927721.9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*,
584 S.W.3d 53 (Tex. App. 2018)....................26

*271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*,
03-07-00498-CV, 2008 WL 2387630 (Tex. App.—Austin June 11, 2008, no pet.)....................24

*Al-Saud v. Youtoo Media, L.P.*,
3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. Mar. 15, 2017)....................18, 20

*Alexander v. Good Marble & Tile Co.*,
4 S.W.2d 636 (Tex. Civ. App. 1928)....................37, 38

*Anderson Bros. Corp. v. O'Meara*,
306 F.3d 672 (5th Cir. 1962)....................35

*Anderson v. Liberty Lobby Inc.*,
477 U.S. 242 (1986)....................44

*Armstrong v. Assocs. Int'l Holding Corp.*,
No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043 (N.D. Tex. Sept. 20, 2006)....................34

*Bacher v. Maddux*,
550 S.W.2d 405 (Tex. Civ. App. 1977)....................48

*Brown v. Jackson*,
40 S.W. 162 (Tex. Civ. App. 1897)....................26

*Buxani v. Nussbaum*,
940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ)....................23

*In re Capco Energy, Inc.*,
669 F.3d 274 (5th Cir. 2012)....................30

*Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*,
297 S.W.3d 248 (Tex. 2009)....................47

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005)....................18

*Collier v. Robinson*,
129 S.W. 389, 61 Tex. Civ. App. 164 (Tex. Civ. App. 1910)....................36

*Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*,
No. 3:21-CV-01748-N, 2021 LEXIS 247218 (N.D. Tex., Dec. 29, 2021)....................................35

*Craig Sessions M.D., P.A. v. TH Healthcare Ltd.*
412 S.W.3d 738 (Tex. App. – Texarkana 2013)....................................38, 48

*Critchfield v. Smith*,
151 S.W.3d 225 (Tex. App.—Tyler 2004, pet. denied)....................................22

*Curry v. O'Daniel*,
102 S.W.2d 481 (Tex. Civ. App. 1937)....................................48

*Del Bosque v. AT&T Adver., L.P.*,
441 Fed. Appx. 258 (5th Cir. Sept. 16, 2011)....................................36

*DeWitt County Elec. Coop. Inc. v. Parks*,
1 S.W.3d 96 (Tex. 1999)....................................48

*Diamond v. Hodges*,
58 S.W.2d 187 (Tex. Civ. App. 1933)....................................54

*Dorsett v. Hispanic Hous. & Educ. Corp.*,
389 S.W.3d 609 (Tex. App.—Houston [14th Dist.] 2012, no pet.)....................................18

*Envtl. Conservation Org. v. City of Dallas, Tex.*,
529 F.3d 519 (5th Cir. 2008)....................................18

*First Com. Bank v. Palmer*,
226 S.W.3d 396 (Tex. 2007)....................................26

*First Nat'l Bank v. Whirlpool Corp.*,
517 S.W.2d 262 (Tex. 1974)....................................51

*Fischer v. CTMI, LLC*,
479 S.W.3d 231 (Tex. 2016)....................................29

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.*,
3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015)....................................23, 24

*Floyd v. Hefner*,
556 F. Supp. 2d 617 (S.D. Tex. 2008)....................................45

*Franklin v. Regions Bank*,
CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021)....................................24

*Garcia v. Lumacorp, Inc.*,
No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635 (N.D. Tex. July 27, 2004),
aff'd, 429 F.3d 549 (5th Cir. 2005)....................................28

*Getto v. Gray*,
627 S.W.2d 437 (Tex. App. 1981)....................48

*Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*,
600 S.W.2d 856 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e)....................34

*Hallmark v. Hand*,
885 S.W.2d 471 (Tex. App.—El Paso 1994, writ denied)....................30

*Haverda v. Hays County*,
723 F.3d 586 (5th Cir. 2013)....................18

*Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*,
480 S.W.2d 607 (Tex. 1972)....................23

*Hoard v. McFarland*,
229 S.W. 687 (Tex. Civ. App. 1921)....................26

*Honore v. Douglas*,
833 F.2d 565 (5th Cir.1987)....................25

*Ibarra v. Texas Employment Commission*,
823 F.2d 873 (5th Cir. 1987)....................34

*Katy Int'l, Inc. v. Jinchun Jiang*,
451 S.W.3d 74 (Tex. App. 2014)....................26

*Katz v. Intel Pharma*,
CV H-18-1347, 2019 WL 13037048 (S.D. Tex. Apr. 19, 2019)....................29

*Looney v. Irvine Sensors Corp*,
CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010)....................17

*Mack v. John L. Wortham & Son, L.P.*,
541 Fed. Appx. 348 (5th Cir. 2013)....................30

*Mandell & Wright v. Thomas*,
441 S.W.2d 841 (Tex. 1969)....................35

*Martinez v. Pilgrim's Pride Corp.*,
3:16-CV-3043-D, 2017 WL 6372385 (N.D. Tex Dec. 13, 2017)....................30

*Marx v. FDP, LP*,
474 S.W.3d 368 (Tex. App. 2015)....................26

*Nat'l Union Fire Ins. Co. v. CBI Indus.*,
907 S.W.2d 517 (Tex. 1995)....................48

*O'Connor v. United States*,
479 U.S. 27 (1986)....48

*In re Palms at Water's Edge, L.P.*,
334 B.R. 853 (Bankr. W.D. Tex. 2005)....23

*Parrish v. Haynes*,
62 F.2d 105 (5th Cir. 1932)....51

*PGP Gas Products, Inc. v. Reserve Equip., Inc.*,
667 S.W.2d 604 (Tex. App.—Austin 1984, writ ref'd n.r.e.)....24

*Phillips v. Herdon*,
78 Tex. 378 (Tex. 1890)....52

*Roark v. Stallworth Oil and Gas, Inc.*,
813 S.W.2d 492 (Tex. 1991)....28

*Runnells v. Firestone*,
746 S.W.2d 845 (Tex. App.—Houston [14th Dist.] 1988, writ denied)....23

*Samuel v. Holmes*,
138 F.3d 173 (5th Cir.1998)....18

*In re Schooler*,
725 F.3d 498 (5th Cir. 2013)....45

*Sinclair Oil Corp. v. Heights Energy Corp*.,
4:05-CV-825-Y, 2007 WL 9718223 (N.D. Tex. Nov. 13, 2007)....30

*Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*,
No. 05-17-01176-CV, 2018 WL 3454801 (Tex. App. July 18, 2018)....26

*Szanto v. Pagel*,
47 S.W.2d 632 (Tex. Civ. App. – Austin 1932)....37

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso*,
847 S.W.2d 218 (Tex. 1992)....29

*Texas Co. v. Schram*,
93 S.W.2d 544 (Tex. Civ. App. – Austin 1936)....52

*Vaughan v. Crown Plumbing & Sewer Serv., Inc.*,
523 S.W.2d 72 (Tex. Civ. App. 1975)....54

*W.E. Grace Mfg. Co. v. Levin*,
506 S.W.2d 580 (Tex. 1974)....51

*WCW Int'l, Inc. v. Broussard*,
No. 14–12–00940–CV, 2014 WL 2700892 (Tex.App.-Houston [14th Dist.] Mar. 4, 2014, pet. filed) ....26

*Williams v. Cambridge Cos.*,
615 S.W.2d 172 (Tex. 1981)....48

*Yaquinto v. Segerstrom (In re Segerstrom)*,
247 F.3d 218 (5th Cir.2001) ....18

**Other Authorities**

Restatement (Second) of Contracts § 12(2) (1981) ....36

Restatement (Second) of Contracts § 33 comment A ....29

14 Tex. Jur. 3d Contracts § 157 ....26

3 Williston on Contracts § 7:44 (4th ed.)....26

Defendants file this Memorandum of Law in Response to Highland Capital Management, L.P.'s ("Highland Capital" or "Plaintiff") *Motion for Partial Summary Judgment* (the "Motion").

## I. Preliminary Statement

1. Plaintiff's central argument is that it does not believe – and therefore, this Court should not believe – Defendants' "story," a set of facts that is supported by sworn declarations and uncontroverted deposition testimony. Plaintiff's assertion that "there is a complete absence of evidence to support each of Defendants' affirmative defenses" is demonstrably false and misleading. Indeed, the very fact that Plaintiff's principal argument is that the "Defendants' stories are so weak that the Court must grant [Plaintiff's] Motion" is a concession that the case turns on disputed genuine issues of material fact, regardless of how loudly or snidely Plaintiff avows disbelief. Plaintiff's disdain for Defendants' defenses does not equate to an absence of evidence. Defendants' affirmative defenses are supported by facts and evidence in their Appendix, and the Court – when viewing the evidence in the light most favorable to the Defendants – must deny Plaintiff's Motion. Plaintiff's Motion is essentially a closing argument at trial – arguing that Plaintiff's version of the facts should be accepted over Defendants' version – rather than a motion for summary judgment, as it is based almost entirely on the credibility of disputed facts and lacks authorities addressing the legal sufficiency of Defendants' evidence. In this Response, Defendants direct the Court to summary judgment evidence supporting their defenses that create genuine issues of material fact requiring the Court to deny Plaintiff's Motion.

## II. Statement of Facts

### A. Procedural Background

2. Defendants generally agree with Plaintiff's recitation of procedural background recited in ¶¶ 6-18 of its Motion; however, the procedural history and the description of claims on which Plaintiff is not moving are not relevant to this Motion.

**B. The Promissory Notes**

3. Plaintiff issued three demand promissory notes (collectively, the "Dondero Demand Notes") to Jim Dondero in 2018.[2] Defendant Jim Dondero does not dispute the amounts or the existence of the Dondero Demand Notes as Plaintiff has recited and referenced them.[3]

4. Plaintiff issued four demand promissory notes to Highland Capital Management Services, Inc. ("HCMS") in 2019 (collectively, the "HCMS Demand Notes").[4] Defendant HCMS does not dispute the initial amount loaned or the existence of the HCMS Demand Notes.[5]

5. Plaintiff issued one promissory term note payable on a term schedule with NexPoint Advisors, L.P. ("NexPoint"), on May 31, 2017 (the "NexPoint Term Note").[6] Defendant NexPoint does not dispute the initial amount loaned or the existence of the NexPoint Term Note.[7]

6. Plaintiff issued five promissory notes payable on demand and one promissory note payable on a term schedule with HCRE Partners, LLC ("HCRE"), between November of 2013 and October of 2018 (the "HCRE Demand Notes" and the "HCRE Term Note").[8] Defendant HCRE does not dispute the initial amounts loaned or the existence of either the HCRE Demand Notes or the HCRE Term Note.[9]

**C. Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent**

**1. Forgivable Loans as Compensation Are Not Uncommon.**

7. Contrary to Plaintiff's assertion that "There is No History of Loans Being Forgiven [by Plaintiff]," it was not an uncommon practice for Plaintiff to provide executives with forgivable

[2] Def. Ex. 1, Declaration of James Dondero ("J Dondero Dec."), ¶¶ 5-7, Def. Appx. 5.
[3] Motion, ¶ 20(i).
[4] Def. Ex. 1, J Dondero Dec., ¶¶ 14-18, Def. Appx. 9-11.
[5] Motion, ¶ 20(iii).
[6] Def. Ex. 1, J Dondero Dec., ¶ 8, Def. Appx. 6-7.
[7] Motion, ¶ 20(iii).
[8] Def. Ex. 1, J Dondero Dec., ¶¶ 9-13, Def. Appx. 7-9.
[9] Motion, ¶¶ 29-31.

loans as compensation.[10] Along with Jim Dondero, several of Plaintiff's executives received loans that were forgiven, including Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery.[11] Plaintiff's corporate representative, James Seery, confirmed that several of the above-named individuals received loans that were forgiven in the past.[12] Further, Plaintiff's own Motion contradicts itself by claiming there is no history of loans being forgiven, but in the very next paragraph concedes that "[Plaintiff] has not forgiven any loan to Mr. Dondero since at least 2008," recognizing that, in fact, Plaintiff has forgiven loans to Jim Dondero in the past.[13] Using forgivable loans to compensate Jim Dondero made sense for Plaintiff, as Jim Dondero was undercompensated in his position compared to other similarly-situated contemporaries at comparable investment firms.[14]

### 2. The Agreements to Forgive the Notes

8. The Highland Capital Limited Partnership Agreement (the "LPA") authorized the Dugaboy Family Trust ("Dugaboy") to approve compensation for the General Partner and Affiliates of the General Partner. Specifically, the LPA provides, in pertinent part:

> (a) Compensation. The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements *unless approved by a Majority Interest.*"[15]

The LPA defines the relevant actors in the Compensation provision as follows:

---

[10] Motion, ¶ 103; Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 98, Jim Dondero 10/29/21 Tr. 424:4-8, Pl. Appx. 01777.

[11] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 24, Jim Dondero's Objections and Responses to Plaintiff's Requests for Admission, Interrogatories, and Requests for Production, Pl. Appx. 00526; Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 109:7-22, Pl. Appx. 03154; Pl. Ex. 195, David Klos 10/27/21 Tr. 106:6-22, Pl. Appx. 03208; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 212:4-25, Pl. Appx. 02011.

[12] Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982; Def. Ex. 3-A, Deposition of James P. Seery, Jr. (177:19-178:5), Def. Appx. 141-142.

[13] Motion, ¶ 104.

[14] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 160:10-161:3; 218:12-222:14, Pl. Appx. 02013-02014; Def. Ex. 3-B, Deposition of Bruce McGovern Tr. 24:7-25:4, Def. Appx. 193 (providing expert testimony that the Agreements did not create taxable income for Jim Dondero).

[15] Pl. Ex. 30, 4th LPA, § 3.10(a) (emphasis added), Pl. Appx. 00622.

> ***"'Majority Interest'*** means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[16]
>
> ***"'Class A Limited Partners'*** means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A."[17]
>
> **Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.[18]

Nancy Dondero is the Dugaboy Trustee and was therefore the individual entitled to approve compensation under the pertinent LPA provisions above.[19]

9. In December of 2017 or January of 2018, Nancy Dondero – on behalf of Plaintiff and as representative for a majority of Class A shareholders – entered into an oral agreement with Jim Dondero that Plaintiff would forgive the Notes issued in 2017 upon the fulfilment of certain conditions subsequent.[20] Specifically, if certain portfolio companies were sold at or above cost – Trussway, Cornerstone, or MGM – the Notes would be forgiven.[21] Jim and Nancy Dondero entered into identical Agreements subsequent to each Note at issue in this litigation in 2018, 2019, and 2020, respectively (referred to collectively as the "Agreements").[22] Notably, nowhere in Plaintiff's Motion does it dispute that Jim Dondero and Nancy Dondero had the authority to enter into these Agreements or that the Agreements would be legally binding on Plaintiff.

10. The Agreements themselves served as an incentive for Jim Dondero to work particularly diligently on the sale of the portfolio companies and to make sure they were

---

[16] *Id.*, § 2.1, Pl. Appx. 00612.
[17] *Id.*, § 2.1, Pl. Appx. 00610.
[18] *Id.*, Exhibit A, line 5, Pl. Appx. 00639.
[19] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 22:13-15, Pl. Appx. 01880; Pl. Ex. 98, James Dondero 10/29/21 Tr. 400:8-19, Pl. Appx. 01771; Def. Ex. 1, J Dondero Dec., ¶ 21, Def. Appx. 13; Def. Ex. 2, N Dondero Dec., ¶ 3, Def. Appx. 80; Def. Ex. 2-A, Nancy Dondero Acceptance of Appointment of [Dugaboy] Family Trustee, Def. Appx. 89.
[20] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.
[21] *Id.*
[22] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 7-8, Def. Appx. 81-83

successful.[23] This incentive benefitted Plaintiff by maintaining its profitability and reputation across the industry for successful performance as a private equity firm.[24] The Agreements acted to motivate and retain Jim Dondero as Plaintiff's employee.[25] Further, Jim Dondero forwent opting to increase his own salary with cash compensation in accordance with § 3.10 of the LPA, as he would have been allowed to do. Instead, Jim Dondero elected to make his potential compensation conditional upon his own successful performance, and Plaintiff benefitted from the Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero thought was "great for the [Plaintiff] at the time," and "reduces other compensation [that he would have otherwise taken]. [26] Therefore, Plaintiff benefited from the Agreements on two fronts: (i) receiving more focused and dedicated work from Jim Dondero in his efforts to make the portfolio companies more profitable, and (ii) not paying Jim Dondero a higher base compensation.

**3. The Agreements Were Never Kept "Secret" from Anyone**

11. Plaintiff's assertion that the Agreements were "kept secret" and "never disclosed by Mr. Dondero" is not only irrelevant to the Motion, but also inaccurate.[27] Jim Dondero indicated to both Frank Waterhouse and Plaintiff's counsel that the Notes were forgivable. Well before these proceedings, Jim Dondero told Frank Waterhouse, the Debtor's Chief Financial Officer, that there were "mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate."[28] Further, on February 1, 2021, counsel for Jim Dondero – the late Judge Michael Lynn – informed opposing counsel that "[a]s you are aware, in addition to other defenses, Mr. Dondero views the notes in question as *having*

---

[23] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[24] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[25] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[26] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-18, Pl. Appx. 01660; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[27] Motion ¶ 98.
[28] Pl. Ex. 99, James Dondero 11/4/21 Tr. 167:10-16, Pl. Appx. 01854; Def. Ex. 1, J Dondero Dec., ¶ 28, Def. Appx. 15.

*been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero*."[29] Although that correspondence did not detail every facet of the Agreements, it alerted Debtor to Defendants' position that the Notes were potentially forgivable, which Debtor did not question.

12. Jim Dondero did not disclose the Agreements to the financial auditors at Highland Capital because such disclosure was unnecessary.[30] In light of Highland Capital's sizable financial assets, potential Note forgiveness under the Agreements was *de minimis*.[31] Thus, such a disclosure was not considered material, and would have been unwarranted.[32] And, of course, whether the Agreements were disclosed to the financial auditors – or anyone else for that matter – has no bearing on whether the Agreements are legally enforceable.

13. Plaintiff's claim in ¶ 47 of its Motion that: "[i]f PwC had learned before June 3, 2019, at any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed," is demonstrably untrue, as cross-examination testimony from Peet Burger of PwC – the testimonial basis for Plaintiff's position – concedes.[33] On cross examination, Burger confirmed that disclosure of the Agreements would only have been required when the Notes were *actually forgiven*, not that they *might* be forgivable.[34] Thus, Peet Burger

---

[29] Def. Ex. 1-D, Letter to Pachulski Stang Ziehl & Jones, LLP, Def. Appx. 74 (emphasis added).
[30] Def. Ex. 1, J Dondero Dec., ¶ 27, Def. Appx. 15.
[31] *Id.*
[32] *Id.*
[33] Motion, ¶ 47, citing the Deposition of Peet Burger (74:19-76:12), Pl. Appx. 1571.
[34] Pl. Ex. 94 Peet Burger 7/30/21 Tr. 78:11-79:13, Pl. Appx. 01572:

Q: And I want to focus on this. I know these are [Plaintiff's counsel's] questions, so it may not have been your language, but you were asked if it [the loans] might be forgiven. What does that mean to you? Are we talking about is there a difference for you if there was a 1 percent chance that something would be forgiven or a 90 percent chance of it being forgiven?

A: If we learned about something, let's say, we learned [it] might be forgiven, that would have resulted in additional audit work. *The question I understood to be and the answer I gave was if something happened where there was an event that actually occurred before or on June 3rd, we would have required disclosure.*

Q: Got it. So is it fair to say that in response to all of [Plaintiff's counsel's] questions about what would have been required to be disclosed, in your mind he was referring those events or items have *actually occurred* and the notes being *actually forgiven* at that point in time; is that correct?

CORE/3522697.0002/171927721.9

very quickly changed his position and conceded that he misunderstood Plaintiff's counsel's question when he gave the quote that forms the basis of Plaintiff's Motion, ¶ 47. Plaintiff is fully aware of the recantation, making its use of a demonstrably false statement in its Motion a concession of the Motion's lack of merit.

**4. Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified.**

14. Plaintiff's assertion that Jim and Nancy Dondero disagree as to whether or not Jim Dondero identified which notes were subject to the Agreements is a mischaracterization of the deposition testimony.[35] Nancy Dondero testified that she understood which Notes were subject to the Agreements:

> "Q: At the time that you entered into the agreements, did you have any understanding that the agreements would cover all notes executed by your brother, NexPoint, HCRE and HCMS?
>
> A: Yes."[36]
>
> . . . .
>
> "Q: Was it your understanding that when you entered into each of these agreements, that the agreements would cover every promissory note that was executed by your brother, by NexPoint, by HCMS, and by HCRE, irrespective of whether it wound up being part of the lawsuit?
>
> A: My understanding for the agreement I had with Jim is just for these 13 notes."[37]
>
> . . . .
>
> "Q: Why don't you tell me what the conversations were that led to each of the agreements to best that you can recall.
>
> A: The conversations with my brother that took place towards the end of each of the years that we're discussing, they started as general conversations about business, about work. And Jim would bring up the loans that were done earlier in the year. He had stated in the conversation that he thought he was undercompensated for the work that he does and the time that he

Q: I didn't hear your answer.
A: Correct.

[35] Motion, ¶ 93 ("Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope. Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement. Mr. Dondero, on the other hand, disagrees.").

[36] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 186:7-12, Pl. Appx. 01921.

[37] *Id.* at (186:25-187-10), Pl. Appx. 01921.

puts in. And he wanted those loans to be forgiven if any of the three portfolio companies that we talked about monetized at a higher value.

Q: And you agreed with that?

A: Well, it was – yes, I did agree with that proposal. I thought it was a win-win for everybody. [38]

Nancy Dondero reaffirms in her declaration: "During our conversations in which we made the Agreements, I understood which Notes were subject to the Agreements."[39]

15. Jim Dondero did not "disagree" with Nancy Dondero that he identified the Notes subject to the Agreements. Rather, Plaintiff cites a portion of Jim Dondero's deposition in which, in response to unclear questioning,[40] Jim Dondero indicated that he communicated to Nancy Dondero that the Notes were made by different entities:

"Q: No. I'm just asking if during your discussions with the Dugaboy trustee, you ever disclosed the name of the maker of any of the Notes that were subject to the agreements?

A: She – she knew they were Notes due to Highland from various entities. So I don't know what your question is. Did I identify specifically that they were Notes due to Highland? I guess the answer to that is yes, *but I don't know what you're asking me*."[41]

. . . .

"A: She was aware that they were notes due to Highland from a variety of entities."[42]

Jim Dondero reiterates in his declaration: "when entering into the Agreements . . . I specifically remember discussing and identifying the Notes to Nancy Dondero."[43] Thus, Plaintiff's argument

[38] *Id.* at (193:19-194:15), Pl. Appx. 01923.
[39] Def. Ex. 2, N Dondero Dec., ¶ 8, Def. Appx. 81-83.
[40] Motion, ¶ 93, citing Ex. 99 at 79:6-81:23, Appx. 1832.
[41] Pl. Ex. 99, James Dondero 11/4/21 Tr. 79:20-80:5, Pl. Appx. 01832 (emphasis added).
[42] *Id.* at (80:16-17), Pl. Appx. 01832. Moreover, Mr. Dondero's additional testimony is even clearer. Pl. Ex. 99, James Dondero 11/4/21 Tr. 28:6-21, Pl. Appx. 01819; Declaration of Jim Dondero, ¶ 24-26; James Dondero 10/29/21 Tr. 403:10-404:12, Pl. Appx. 01771-01771; Pl. Ex. 96, James Dondero 5/28/21 Tr. 153:5-154:6, 180:5-9, 214:16-24, Pl. Appx. 01653, 01660, 01668.
[43] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15.

that there is some discrepancy between Jim Dondero and Nancy Dondero's testimony that supports its summary judgment motion is without foundation.

**5. Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements**

16. Throughout this litigation, Plaintiff has taken the position that the Agreements are fabricated and lack any evidence of their existence.[44] However, Jim and Nancy Dondero have consistently testified under oath that the Agreements took place, exist, and are valid.[45] Further, both Jim and Nancy Dondero have provided this Court with declarations swearing to the Agreements' factual existence:

> 24. At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred. [The Declaration of James Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[46]
>
> 6. In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control. [The Declaration of Nancy Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[47]

17. Plaintiff also suggests that because Jim Dondero would have preferred to use a list of the Notes to refresh his recollection regarding the Agreements during his deposition, no reasonable trier of fact could find the Agreements existed.[48] While whether an agreement was

---

[44] Motion, ¶ 90.
[45] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81-83.
[46] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[47] Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.
[48] Motion, ¶ 91.

actually made is potentially a proper issue for summary judgment in a he said she said situation (which does not exist here), whether or not a witness uses notes to refresh his recollection is not a basis for granting a summary judgment. It would be a factor for a fact-finder to take into account in determining the credibility of a witness. Here, the fuss Debtor makes about Jim Dondero's list of the Notes is much ado about nothing, as shown by the following:

> Q: Thank you very much. The agreements covered each of the notes that are the subject of the lawsuits that Highland commenced against you, HCRE Services, and NexPoint, is that right?
>
> A: The – yes.[49]
>
> . . . .
>
> Q: Can you identify any Promissory Note that is the subject of any specific agreement that you ever entered into with the Dugaboy trustee without looking at the list?
>
> A: I believe it covered virtually all of them. So I don't remember [now] which ones specifically in each year. Generally, it was, I believe, the ones incurred in that year, but I don't remember which entities. But again, the ultimate result being that the term loans, the demand notes, the things incurred, the things outstanding were part of the agreement.[50]

A deposition, much less a 30(b)6(6) deposition, where witnesses frequently bring notebooks full of data to be able to testify to specific details is not a game of gotcha, entitling one party to force the other to testify about dozens of details without the aids a business person would typically use to keep track of such information.

18. Defendants refer the Court to the declarations and deposition testimony of Jim Dondero and Nancy Dondero to demonstrate that the Agreements exist, and Plaintiff's assertion that "no reasonable trier of fact can find that the [] Agreement[] existed" is simply inconsistent with the summary judgment evidence.

---

[49] Pl. Ex. 99, James Dondero 11/4/21 Tr. 14:7-12, Pl. Appx. 01816.
[50] *Id.* at (28:6-21), Pl. Appx. 01819.

### D. Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE

19. The Shared Services Agreements ("SSAs") between Highland Capital and NexPoint, HCMS, and HCRE provided that Highland Capital would manage "back and middle office" tasks, which included making debt payments for NexPoint, HCMS, and HCRE.[51] SSAs are common in the private equity industry, and exist to consolidate function and manpower between large and small entities that share overlapping ownership structure.[52]

#### 1. The NexPoint Shared Services Agreement

20. NexPoint and Plaintiff entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, which resulted in Plaintiff providing almost the entire workforce for NexPoint's business.[53] Specifically, Plaintiff was to provide back- and middle-office, legal compliance, administrative services, management of clients and accounts, and other services to NexPoint.[54] These services included making debt payments on behalf of NexPoint. The NexPoint SSA outlined these responsibilities in Section 2.02:

> Section 2.02 Provision of Services. . . .[T]he Staff and Services Provider [Plaintiff] hereby agrees, from the date hereof, to provide the following back- and middle-offices services and administrative, infrastructure and other services to the Management Company [NexPoint].
>
> (a) *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, ***payments***, operations, book keeping, cash management . . . ***accounts payable*** . . .[55]

Further, the NexPoint SSA provided the standard of care that Plaintiff was required to adhere to when it provided such services for NexPoint:

---

[51] *Id.* at ¶ 36.
[52] *Id.*
[53] Def. Ex. 1, J Dondero Dec., ¶ 32, Def. Appx. 16-17; Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04162.
[54] *Id.*
[55] *Id.* at 04165-04166 (emphasis added).

> Section 6.01 Standard of Care. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .[56]

Thus, the NexPoint SSA itself clearly provided both the specific services that Plaintiff was to provide NexPoint – namely the back- and middle-office tasks of handling payments and accounts payable – and the standard of care under which Plaintiff was to provide those services.

21. Further, Kristin Hendrix – who served as Plaintiff's assistant controller in 2020 and is currently employed by Plaintiff – stated that she knew about the upcoming NexPoint Annual Installment in 2020, but received a phone call from Frank Waterhouse instructing her not to make any payments from the Advisors (which includes NexPoint) to Plaintiff.[57]

22. Therefore, Plaintiff decided on either November 30, 2020 or December 1, 2020 that it was not going to make the annual term payment on the NexPoint Note. However, Plaintiff never reached out in writing to confirm this with Jim Dondero or anyone else at NexPoint, or to inquire about clarification or whether Frank Waterhouse's instruction was a mistake, given the significant consequences of nonpayment. Plaintiff's inaction certainly ran afoul of the NexPoint SSA Section 6.01 "Standard of Care" provision.

23. Plaintiff's characterization of the relationship between Highland and NexPoint under the NexPoint SSA is disputed and inaccurate.[58] Plaintiff claims that "[n]one of the services [provided for under the NexPoint SSA] authorized Highland to…effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint."[59] However, Highland Capital made payments for NexPoint in December of 2017,

[56] *Id.* at 04173.
[57] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 71:3-20, Pl. Appx. 03144.
[58] Motion, ¶ 123-126.
[59] Motion, ¶ 125.

2018, and 2019 ***without any specific authorization, direction, or permission*** from either Jim Dondero or any other NexPoint executive.[60]

24. This course of conduct would lead any reasonable person to believe that Plaintiff would continue to make the annual payments without explicit direction, ***as they had done for three years prior.*** Defendant believed that Plaintiff would continue to make the NexPoint Term Note payments, and was surprised to learn that Plaintiff decided not to make the December 31, 2020 annual payment.[61] Whether or not Plaintiff should have continued to make payments on the NexPoint Note is a genuine issue of material fact. Moreover, Plaintiff failed to bring certain prepayments to NexPoint's attention, resulting in NexPoint believing that payment was due, when it was not, although Plaintiff now claims it was due, even though it failed to make that payment.

**2. The HCMS and HCRE Shared Services Agreements**

25. Similar to the NexPoint SSA, Plaintiff had similar SSAs with both HCMS (the "HCMS SSA") and HCRE (the "HCRE SSA"), which were both established by oral agreement and course of conduct.[62] Plaintiff provided identical services to both HCMS and HCRE as it did to NexPoint, and made sure all their financial obligations were promptly paid on time.[63] There was a lengthy history of Plaintiff providing such services to HCMS and HCRE.[64] The need for these SSAs with HCMS and HCRE were predicated on the fact that both entities – like NexPoint – lacked the internal infrastructure to operate entirely independently.[65] Both HCMS and HCRE heavily relied on Plaintiff to provide these services, as Plaintiff had for years prior.[66] Plaintiff was

[60] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03248-03249; Def. Ex. 1, J Dondero Dec., ¶ 34, Def. Appx. 17.
[61] J Dondero Dec. at ¶ 35, Def. Appx. 17-18.
[62] *Id.* at ¶¶ 36-39, Def. Appx. 18-19.
[63] *Id.*
[64] *Id.* at ¶¶ 36, 38, Def. Appx. 18-19.
[65] Pl. Ex. 98, James Dondero 10/29/21 Tr. 335:14-337:3, Pl. Appx. 01754-01755; Def. Ex. 1, J Dondero Dec., ¶¶ 36, 38, Def. Appx. 18-19.
[66] *Id.*

required to act reasonably in the performance of its obligations to HCMS and HCRE, given the record of past practices and the precedent created by similar work done by Plaintiff for NexPoint.[67]

26. Frank Waterhouse confirmed in his deposition that Plaintiff provided the same services to HCRE and HCMS as it did to NexPoint, including ". . . accounting services, treasury management services, [and] potentially legal services."[68] He also specifically confirmed that loan payments were the "kinds of things that [Plaintiff] would pay on time because of potential consequences of not paying on time" for HCMS and HCRE.[69]

27. Further, Kristin Hendrix testified that it was "fair to say that [she] [did not] remember any instructions telling [her] not to make any payments from HCMS or HCRE,"[70] and that the reason she never made the December 31, 2020 payments on the HCMS or HCRE Term Notes was because she "never got an affirmative instruction to actually make the payment."[71] However, Hendrix later confirmed that Plaintiff "make[s] payments all the time" without the specific instruction of Frank Waterhouse or Jim Dondero.[72] Hendrix made no attempts to determine if Jim Dondero wanted the HCMS or HCRE annual installment payments to be made.[73]

28. Plaintiff ultimately knew about but failed to make the December 31, 2020 payments on both the HCMS Term Note and the HCRE Term Note.[74] No one at HCMS or HCRE – including Jim Dondero – directed any person to miss or skip the payments on these Notes.[75] Whether or not Plaintiff should have continued to make payments on the HCMS Term Note and

---

[67] Def. Ex. 3-F, Expert Report of Steven J. Pully ¶ 57, Def. Appx. 231.
[68] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 353:3-354:12, Pl. Appx. 02137-02138.
[69] *Id*. at (357:2-11), Pl. Appx. 02138.
[70] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 100:20-23, Pl. Appx. 03151.
[71] *Id.* at (101:13-16), Pl. Appx. 03152.
[72] *Id.* at (103:10-16), Pl. Appx. 03152.
[73] *Id.* at (102:10-13), Pl. Appx. 03152.
[74] Def. Ex. 1, J Dondero Dec., ¶¶ 37, 39, Def. Appx. 18-19.
[75] *Id.*

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76] Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments that had been made that relieved it of the obligation to make any additional payment in 2020.

**E. Prepayment on the Term Notes**

**1. NexPoint's Prepayments**

29. NexPoint asserts the affirmative defense of prepayment on the NexPoint Note, which relieved NexPoint of any obligation to make any additional payment in 2020. Thus, the NexPoint Note was not in default when no payment was made on December 31, 2020. NexPoint demonstrates *infra* that there is evidence supporting this affirmative defense and summary judgment denying this affirmative defense is inappropriate as a matter of law.

30. There is no dispute of fact that, between March and August of 2019, the following payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.[77] These payments totaled $6,380,000.00 in 2019.[78] The normal December, 2019 payment of principal and interest on the Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

31. None of the aforementioned payments were scheduled payments or payments on arrears.[79] Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to transfer it funds for liquidity purposes, which NexPoint did.[80] These transfers were intended by

[76] Defendants' position is bolstered by the Expert Report of Steven J. Pully, ¶ 59 (Def. Ex. 3-F, Def. Appx. 232), which was incorrectly not permitted to be included in the record by the Court. Defendants submit this proffer to preserve their objection.
[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] *Id.*
[79] *Id.*
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

both NexPoint and Plaintiff to be prepayments on the Note.[81] This fact is confirmed by testimony from Plaintiff's personnel and its amortization schedule for the NexPoint Note.[82] The only dispute here is how these NexPoint Prepayments should have been applied; more specifically, whether they should have been applied to the December 31, 2020 scheduled payment, rendering further payment at that time unnecessary.

**2. HCMS' Prepayments**

32. Plaintiff's Motion never directly addresses HCMS's prepayment defense. Rather, in its 50-page Motion, Plaintiff lists HCMS in several headings, but then never actually makes any arguments or raises any facts specific to HCMS. Moreover, not once in paragraphs 3-14 Mr. Klos's Declaration addressing the NexPoint prepayment defense (or anywhere else), does Klos mention the HCMS Term Note.[83] Therefore, it does not appear that Plaintiff actually is moving for summary judgment on HCMS' prepayment defense. However, as with NexPoint, any such motion would have no merit.

33. There is no factual dispute that between May of 2017 and December of 2020, the HCMS Term Note's principal amount was paid down by almost $14,000,000.00.[84] Between May of 2017 and December of 2020, the following prepayments were made on the HCMS Note (collectively, the "HCMS Prepayments"): (i) $985,216.44 on June 23, 2017; (ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on

---

[81] *Id.*
[82] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249; Pl. Ex. 194, Kristen Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147 (objections omitted).
[83] Declaration of David Klos in Support of [Plaintiff's] Motion for Partial Summary Judgment in Note Actions, ¶¶ 3-14, Case 21-03003-sgj [Doc. 133].
[84] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.

October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.[85]

34. Again, none of the above payments were scheduled, nor were they ever made on December 31 of any given year.[86] Further, none of these payments were made on arrears.[87] Rather, these prepayments were intended by HCMS to be applied to the scheduled Annual Installment payments, and were obviously accepted as such, since Plaintiff never declared the note to be in default in 2017, 2018, or 2019.[88] Plaintiff presents no legal or factual argument to the contrary, so summary judgment for this defense must be denied.

## III. Argument and Authorities

### A. Legal Standard

35. Plaintiff suggests that there is a separate or independent summary judgment standard for promissory notes.[89] The fact that the elements of breach of promissory note differ from breach of contract in no way lessens Plaintiff's burden of proving there are no genuine issues of material fact.[90] *Looney v. Irvine Sensors Corp*, CIV.A.309-CV-0840-G, 2010 WL 532431 at 2 (N.D. Tex. Feb. 15, 2010) (noting that, although the elements for breach of a promissory note differs from traditional breach of contract, "[s]ummary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, what that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law").

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[89] Compare, Motion, III. A. 1: "Summary Judgment Standard" with III. A. 2: "Summary Judgment Standard for Promissory Notes."
[90] Motion, ¶ 132 (under the heading: "Summary Judgment Standard for Promissory Notes").

36. Plaintiff's Motion is a "no-evidence" motion, arguing that "[t]here is a complete absence of evidence to support each of Defendants' affirmative defenses." Motion, ¶ 2. Therefore, the Court may only grant Plaintiff's Motion if: ". . . (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact."[91]

37. When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.[92] To determine whether a genuine dispute exists such that the case must be submitted to a jury, courts must consider all of the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-moving party, refuse to make credibility determinations or weigh the relative strength of the evidence, and disregard all evidence favorable to the movant that the jury would not be required to believe.[93]

### B. Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses

#### 1. The Agreements to Forgive the Notes

##### a. The Evidence Shows that the Agreements Exist

38. Plaintiff argues that "[t]here is a complete absence of evidence in support of this defense [the Agreements]," claiming that: (i) Jim Dondero could not "identify material terms" of the Agreements, (ii) "Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each. . .Agreement," (iii) Jim Dondero "failed to declare the Notes forgiven" when

---

[91] *Dorsett v. Hispanic Hous. & Educ. Corp*., 389 S.W.3d 609, 613 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005)).
[92] *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008); *Yaquinto v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 223 (5th Cir.2001); *Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir.1998).
[93] *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197, at 2 (N.D. Tex. Mar. 15, 2017) (citing *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013)).

MGM stock was sold in November 2019, (iv) "Ms. Dondero. . .never saw a Note signed by Mr. Dondero. . .and was not competent to enter into the [] Agreements," (v) the Agreements were "never disclosed to anyone," (vi) there is no written evidence of the Agreements, (vii) and "there is no history of loans being forgiven [by Plaintiff]."[94] These are simply closing arguments that address credibility of evidence and are properly made at trial, not at summary judgment.

**(i) The Evidence Shows That Jim Dondero Identified Material Terms of the Agreements**

39. Plaintiff argues that Jim Dondero was not able to identify the material terms of the Agreements.[95] However – as addressed in section C.4, *supra* – Jim Dondero identified that the Notes that were subject to the Agreements and provided general details,[96] but was prevented by the examiner from referencing his list of the Notes to give the specific details of each.[97] Mr. Dondero was noticed for deposition in both his personal and 30(b)(6) capacities and therefore it was appropriate for him to have a list to be able to give precise details for questions that might be asked about the exact amounts, dates and terms of the Notes. There is no surprise about which loans the Agreements applied to since Jim Dondero has consistently stated that all the loans at issue in this litigation were subject to the Agreements.[98] Regardless, Jim Dondero provides the Court with a sworn declaration evidencing his knowledge of the details of the Notes.[99]

40. Plaintiff provides no legal authority supporting its claim that no jury could believe the Agreements exist because Jim Dondero could not reference the specific terms without his

[94] Motion, ¶ 147.
[95] *Id*.
[96] Response, ¶ 15.
[97] *Id.*
[98] See note 42 *supra*.
[99] J Dondero Dec., ¶¶ 5-18 (itemizing the Notes subject to the Agreements, including their amounts and dates of each Note).

notes. Plaintiff's argument is simply an attack on Mr. Dondero's credibility, which is improper at the summary judgment stage. *See, Al-Saud* at 2.

**(ii) The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements**

41. As demonstrated in section C.4, *supra*, Jim and Nancy Dondero do not disagree about whether Jim Dondero identified the Notes subject to the Agreements. Defendants have pointed this court to specific summary judgment evidence that there is no disagreement about which Notes Jim Dondero identified.[100] Further, Plaintiff has no authority supporting its claim that no reasonable trier of fact could find that the Agreements exist in these circumstances.

**(iii) Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist**

42. Regarding whether Jim Dondero failed to declare the Notes forgiven upon the alleged sale of some unspecified amount of HCM's interest in MGM, Plaintiff provides no legal authority (nor have Defendants located any) addressing the relevance of this point. Even if all of Plaintiff's interest in MGM had been sold for more than it had cost (in which case Mr. Dondero would have raised the forgiveness of the Notes), there is no legal proposition in Texas requiring a party to a contract to declare that a contractual term has been completed in an effort to prove that contract's existence. But, in fact, Plaintiff does not assert that HCM's interest in MGM was sufficiently liquidated to trigger forgiveness, and indeed only a tiny amount was sold.[101]

43. More importantly, Plaintiff is estopped from making this argument because it is contradicted by its sworn interrogatory answers. When Defendants requested Plaintiff "[i]dentify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies)

[100] Response, ¶¶ 14-17.
[101] Def. Ex. 1, J Dondero Dec., ¶ 47, Def. Appx. 22.

owned (wholly or partially) by the [Plaintiff], including, but not limited to, Trussway, MGM and Cornerstone…," Plaintiff responded that it "ha[d] not sold Trussway, MGM or Cornerstone.…"[102]

**(iv) Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence.**

44. Whether Nancy Dondero ever saw the Notes is completely irrelevant to whether a reasonable trier of fact could conclude the Agreements existed. Again, Plaintiff cites no legal authority to support its position that this fact has any bearing on the existence of the Agreements. Similar to the MGM issue above, Plaintiff's point is irrelevant and must be disregarded.

**(v) Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence.**

45. Plaintiff argues – without any supporting legal authority – that since the Agreements were "never disclosed . . . to anyone," there is no evidence supporting their existence.[103] However, Plaintiff overlooks the fact that Jim Dondero alerted Frank Waterhouse that there were mechanisms in place for forgiving the Notes,[104] and that Jim Dondero's counsel sent a letter to Plaintiff's counsel indicating that Jim Dondero planned on citing the Agreements as an affirmative defense.[105] Moreover, Plaintiff cites no authority for its proposition that a failure to broadly disclose an agreement has any bearing on whether the agreement does or does not exist. Plaintiff's lack of authority is especially telling in a case that is not a "he said, she said" debate on whether an agreement was made: rather both side to the Agreements (Dugaboy for HCM and Jim Dondero) agree ***that the Agreements were made***. Therefore, again, Plaintiff's argument does not support its motion for summary judgment.

---

[102] Def. Ex. 3-H, Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, Interrogatory 14, Def. Appx. 299.
[103] Motion, ¶¶ 145-147.
[104] Response, ¶ 11.
[105] *Id.*

        **(vi) The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence.**

46. Plaintiff argues that, because there is no written documentation evidencing the oral Agreements, the existence of the oral Agreements cannot be believed.[106] The fact that the oral Agreements between Jim and Nancy Dondero lack written documentation should not be surprising, as they were reached through verbal communication. In Texas, oral contracts have the same validity and enforceability as written contracts. "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied). Plaintiff cites no authority to the contrary.

**(vii) Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation.**

47. Plaintiff's argument that "there is no history of loans being forgiven" by Plaintiff is rebutted by the record. As demonstrated *supra*, Defendants present evidence that Plaintiff has forgiven loans to several executives in the past.[107] Further, Plaintiff has forgiven loans to Jim Dondero in the past, a fact conceded in its Motion and confirmed by its own witness.[108]

**b. Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence.**

48. Jim and Nancy Dondero's testimony alone is sufficient under Texas law to show that the Agreements exist. Plaintiff's lack of legal authority supporting the proposition that when ***both sides*** to an agreement testify to that same agreement's existence, there is somehow still a material issue of fact regarding that agreement's existence, should not come as a surprise. Only one side to an oral agreement is required to testify as to its existence to survive a motion for

[106] Motion, ¶ 147.
[107] Response, ¶ 7.
[108] *Id.*

summary judgment. "Where there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact under Texas law."[109] In other words, Defendants' summary judgment evidence is more than sufficient to provide proof that the Agreements exist and create a genuine issue of material fact, since they present testimony from ***both*** sides to the Agreements while Texas law only requires testimony from ***one***.

49. Further, "whether the parties had a meeting of the minds or common understanding is better suited for the trier of fact and cannot be determined by the court at this [summary judgment] juncture."[110] In *Fisher*, the movant argued on summary judgment that no implied contract with the non-movant existed. However, the court denied summary judgment on the existence of an implied contract where the non-movant produced evidence of a course of conduct that "raised a genuine dispute of material fact as to whether the parties had an implied contract…"[111]

50. Of course, unlike the case cites above, here, ***both sides*** that made the Agreements attest the Agreements exist. Jim and Nancy Dondero – the only two individuals who have firsthand knowledge of the Agreements – have testified numerous times that the Agreements occurred and do exist. Nancy Dondero testified to the Agreements' existence at her deposition:

Q: Is it your testimony that you, as the trustee of The Dugaboy Investment Trust, entered into oral agreements with your brother between December and the year each note was made and February of the following year,

---

[109] *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (emphasis added); *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 610 (Tex. 1972); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ)).

[110] *Fisher v. Blue Cross and Blue Shield of Tex., Inc.*, 3:10-CV-2652-L, 2015 WL 5603711 at 10 (N.D. Tex. Sept. 23, 2015) (analogizing the *In re Palms* in a summary judgment context: "[s]imply alleging there was no meeting of the minds is not a legitimate basis for summary judgment because "[w]here there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact.").

[111] *Id*. at 10.

pursuant to which plaintiff agreed that plaintiff would forgive the notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control?

A: That is correct.[112]

Jim Dondero also testified to the Agreements' existence at his deposition:

Q: Okay. And in the first sentence to your answer in Interrogatory 1, you wrote, or somebody wrote on your behalf, quote: "The agreements were entered into on behalf of the debtor by James Dondero, subsequent to the time each note was executed." Is that an accurate statement, or is it an inaccurate statement?"

A: Again, it was between me and the Class A, the majority of the Class A members. It was a Class A – the Class A members were representing Highland, never the debtor, because the debtor didn't exist yet.[113]

51. Plaintiff ignores this testimony in its Motion. Both Jim and Nancy Dondero also provide this Court with sworn Declarations explicitly asserting that the Agreements exist. Based on the evidence above, Defendant Jim Dondero provides evidence that the Agreements exist, and creates a genuine issue of material fact. *See*, *Fisher* at 10.

52. Plaintiff seems to suggest that testimony from Jim and Nancy Dondero attesting to the Agreements' existence is insufficient to create an issue of material fact that the Agreements exist. While this may be the case in one state with markedly different law than other states (*see Franklin v. Regions Bank*, CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) (statutorily requiring corroborating evidence in addition to testimony from one party to prove an oral contract in excess of $500.00 in Louisiana)), this is not the case in Texas. In Texas, "[t]he existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence."[114] The circumstantial evidence supports the existence of the Agreements. Plaintiff never demanded any

[112] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 164:13-23, Pl. Appx. 1915.
[113] Pl. Ex. 96, James Dondero 5/28/21 Tr. 165:8-20, Pl. Appx. 01656.
[114] *271 Truck Repair & Parts, Inc. v. First Air Express, Inc*., 03-07-00498-CV, 2008 WL 2387630 at 4 (Tex. App.—Austin June 11, 2008, no pet.) (citing *PGP Gas Products, Inc. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.)).

of demand notes at issue in this case (nor did it declare any Term Notes to be in default) until James Seery assumed control of Plaintiff. Actually, it was not until Plaintiff was in bankruptcy that Plaintiff decided to conspicuously call all the demand notes for payment.[115] Prior to the bankruptcy, Plaintiff made no attempt to demand the Notes. Circumstantially, it appears that Plaintiff was operating from 2017 to 2020 as if the Agreements were valid and in effect.

53. Plaintiff's argument that the evidence of the Agreements' existence is factually insufficient flies in the face of black letter law that the court cannot "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."[116] Because Jim and Nancy Dondero have sworn to the existence and validity of the Agreements, Plaintiff's arguments amount to nothing more than factual attacks that impermissibly require this Court to opine on the credibility of Defendants' evidence. Thus, summary judgement must be denied.

**c. The Evidence Shows the Agreements Were Supported by Consideration**

54. Plaintiff also argues that the Agreements are unenforceable due to a lack of consideration.[117] Specifically, Plaintiff simply broadly asserts – without reference to any supporting facts – that ". . . no reasonable trier of fact could find that . . . such oral agreement was exchanged for consideration."[118] Despite Plaintiff's lack of any relevant supporting facts besides a "laundry list" of grievances against the Donderos that have no applicability to Plaintiff's arguments – discussed in more detail *infra* – the Agreements were supported by adequate consideration independent from any pre-existing consideration supporting the Notes.

---

[115] Motion, ¶ 22 (referencing Plaintiff's demand on the Demand Notes); Pl. Ex. 2, Amended Complaint against NPA et al., ¶ 27, Pl. Appx. 00029; Pl. Ex. 3, Amended Complaint against HCMS, ¶ 43, Pl. Appx. 00189; Pl. Ex. 4, Amended Complaint against HCRE et al., ¶ 43, Pl. Appx. 00189.
[116] *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).
[117] Motion, ¶ 148.
[118] Motion, ¶ 149.

55. Consideration is a present exchange bargained for in return for a promise that may consist of ***some*** right, interest, or profit, or benefit that accrues to one party or of ***some*** forbearance, loss, or responsibility that is undertaken or incurred by the other party.[119] Consideration consists of ***either*** a benefit to the promisor ***or*** a detriment to the promisee and thus, there is valid consideration when "when a party gives up a pre-existing legal right."[120]

56. Here, Jim Dondero's forbearance from increasing his own compensation—a legal right he possessed prior to entering into the Agreements—as well as his contribution to increasing the value of all of the portfolio companies in efforts to sell the companies above cost, is adequate consideration for the Agreements. At the time the Agreements were formed, Jim Dondero was authorized as General Partner of the Plaintiff to set his own compensation subject to approval by the Majority Interest.[121] Therefore, Jim Dondero had a legal right to increase his own salary that existed before the Agreement was formed.[122] Accordingly, his decision to set his compensation conditional upon his own performance instead of exercising his right under the LPA to increase the immediate cash component of his compensation provided adequate consideration in exchange

---

[119] *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App. 2014) (emphasis added) (citing *WCW Int'l, Inc. v. Broussard*, No. 14–12–00940–CV, 2014 WL 2700892, at *9 (Tex.App.-Houston [14th Dist.] Mar. 4, 2014, pet. filed) (sub. mem. op.).

[120] *See, e.g.*, *1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 65–66 (Tex. App. 2018); *Marx v. FDP, LP*, 474 S.W.3d 368, 378–79 (Tex. App. 2015) (cleaned up) (relinquishment of disputed claims against each other adequate consideration agreement granting purchaser option to purchase vendors' homestead); *First Com. Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex. 2007) (guaranties executed in connection with renewal of promissory note to prevent payee from accelerating debt supported by consideration consisting of the payee's forbearance on prior guaranties and agreement to renew and extend the original debt); *Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*, No. 05-17-01176-CV, 2018 WL 3454801, at *5 (Tex. App. July 18, 2018) (extending time for payment of note or debt suffices as consideration); *Hoard v. McFarland*, 229 S.W. 687 (Tex. Civ. App. 1921) (cancellation of vendor's lien note before expiration of limitations period was sufficient consideration for reconveyance), writ refused (June 7, 1922); *Brown v. Jackson*, 40 S.W. 162 (Tex. Civ. App. 1897) (agreement by execution debtor with agent of execution creditor not to bid at execution sale was sufficient consideration for agent's promise to allow the debtor to redeem). *See also* 3 Williston on Contracts § 7:44 (4th ed.) ("Just as a promisor may make an agreement for acts or promises to act, so too may it bargain for forbearances or promises to forbear."); 14 Tex. Jur. 3d Contracts § 157 ("Generally, forbearance from exercising a legal right, or the outright surrender of a legal right that one is not bound to surrender, is sufficient consideration for a contract or promise.").

[121] Pl. Ex. 30, 4th LPA, § 3.10(a), Pl. Appx. 00622.

[122] *Id.*

for the Agreements. Jim Dondero's testimony was clear that the Agreements served to motivate his performance with heightened focus and reduce other compensation Plaintiff would have otherwise had to pay him through an increased salary.[123]

57.    Here, Jim Dondero was incentivized to work particularly hard on the profitability and sale of the three portfolio companies – MGM, Trussway, and Cornerstone – to ensure that Plaintiff maintained its profitability and reputation.[124]    Jim Dondero's increased efforts and workload to maximize these assets was also a right he gave up – and a benefit obtained by Plaintiff – in exchange for the potential for increased deferred compensation.

58.    At the time of the Agreements, Nancy Dondero believed that Jim Dondero was undercompensated for the work that he did for the Debtor and that he was also undercompensated in comparison to other asset managers in similar industry roles.[125]    Therefore, Nancy Dondero understood Jim Dondero's forbearance of pay increase as a fair exchange for the Agreements.

59.    In addition, Nancy Dondero agreed that Jim Dondero's efforts to increase the value of any of the portfolio companies would cause them to be sold for the highest value possible; if she did not believe that to be true, the Agreements would not have been made.[126] Plaintiff's Motion not only fails to cite to any authority to support failed or inadequate consideration, but also misconstrues Nancy Dondero's testimony. The Motion inaccurately states that Nancy Dondero "admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party."[127] What she actually stated, however, was

---

[123] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-19, Pl. Appx. 01660.
[124] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[125] Pl. Ex. 100,  Nancy Dondero 10/18/21 Tr. 193:19-25-194:1-19, 206:17-25-207:1-17, 211:12-23, Pl. Appx. 01922-01923, 01926-01927;  Pl. Ex. 99, James Dondero 11/4/21 Tr. 51:8-13, 52:19-25-53:1-4, Pl. Appx. 01825-01826; Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:4-17, Pl. Appx. 01776; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982.
[126] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 194:20-25-195:1-10, 206:17-25-207:1-17, Pl. Appx. 01926.
[127] Motion, ¶¶ 98, 101.

CORE/3522697.0002/171927721.9

that she entered into the Agreements and understood that if "any of the portfolio companies monetized higher [] the notes would be forgiven."[128] Only when Plaintiff's counsel asked if she expected the Plaintiff to benefit if the portfolio companies were "sold on a basis outside of Mr. Dondero's control" did she answer that she did not know what to expect.[129] Nancy Dondero acknowledged that if the portfolio companies were sold for less than their value by a third party, then that would not be in Jim Dondero's control.[130]

60. Furthermore, "[i]n order for the consideration to be deemed inadequate, it must be *so grossly inadequate as to shock the conscience*, being tantamount to fraud."[131] Even if this Court finds that the exchange was not made for equal value, Jim Dondero's conditional forbearance to increase his own pay and his specific dedication to increase his focus on the profitable sale of the portfolio companies is ***not so inadequate as to shock the conscience***, particularly given that it is common practice in private companies to forgive bona fide debt in order to manage compensation and provide incentives to managers.[132] Simply because Plaintiff disagrees with Mr. Dondero's assessment does not make the consideration "grossly inadequate;" it is an issue of fact for a jury.[133]

**d. The Evidence Shows the Agreements Were Definite**

61. Plaintiff argues, with very limited supportive facts and no legal authority, that the Agreements are not enforceable as a matter of law "for lack of. . .(b) definitiveness."[134] However, Plaintiff never specifically articulates how the Agreements fail for lack of definitiveness.[135]

---

[128] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 205:14-21, Pl. Appx. 01925.
[129] *Id.* at (202:23-25-203:1-11), Pl. Appx. 01925.
[130] *Id.*
[131] *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635, at *11 (N.D. Tex. July 27, 2004), aff'd, 429 F.3d 549 (5th Cir. 2005) (emphasis added, citations omitted).
[132] It was common practice in private companies to loan money that is bona fide debt and then forgive it over time to manage compensation and as incentives to managers of private companies. Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:18-25, Pl. Appx. 1776; Alan Johnson Expert Report p. 14-15.
[133] *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (determining that adequacy of consideration is a question of fact for the jury).
[134] Motion, ¶ 148.
[135] *Id.*

CORE/3522697.0002/171927721.9

62. In Texas, "[i]n order to be legally binding, a [verbal] contract must be sufficiently definite in its terms so that a court can understand what a promisor understood."[136] Further, "[t]he material terms of a contract are determined on a case-by-case basis."[137] "[A] term that 'appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties," and "[t]erms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of an agreement to the contrary."[138]

63. Here, there is certainly enough evidence for the Court to understand what the promisor (Nancy Dondero) understood. Nancy Dondero understood that Jim Dondero was undercompensated, and that the Agreements created an "everybody wins" situation for both the Plaintiff and Jim Dondero.[139] Further, Nancy Dondero and Jim Dondero articulated the terms of the Agreements in their depositions: that if any of the three portfolio companies were sold for above cost, the Notes would be forgiven.[140] The Agreements were simple, and both the promisor and promisee understood their terms.[141] The only individuals that entered into the Agreements were Nancy and Jim Dondero, and both have provided this Court with sworn declarations providing evidence of the Agreements' definitiveness.

**e. The Evidence Shows the Agreements Were Supported by a Meeting of the Minds**

64. Plaintiff's argument that the Agreements were not supported by a meeting of the minds fails because the summary judgment evidence shows that Jim Dondero and Nancy Dondero, on behalf of Plaintiff, objectively assented to the terms of the Agreement.[142] Plaintiff does not

---

[136] *Katz v. Intel Pharma*, CV H-18-1347, 2019 WL 13037048 at 6 (S.D. Tex. Apr. 19, 2019) (quoting *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).
[137] *Intel Pharma* at 6 (quoting *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016)).
[138] *CTMI, LLC* at 239-240 (quoting the Restatement (Second) of Contracts § 33 comment A).
[139] Response, ¶ 14.
[140] Response, throughout.
[141] Response, ¶ 16.
[142] Response, ¶ throughout.

CORE/3522697.0002/171927721.9

articulate how the evidence does not support a meeting of the minds. Nor does Plaintiff articulate specific facts that show there was no meeting of the minds between Jim Dondero and Nancy Dondero, other than the "scope" issue, which Defendants have addressed in section C.4, *supra*. Regardless, the contested issue of whether or not Jim Dondero and Nancy Dondero had a meeting of the minds is an issue of fact that precludes summary judgment.

65. In Texas, "[t]he determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not their subjective state of mind."[143] "[A] meeting of the minds refers to a mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract."[144] Further, ". . .the determination of whether the parties reached an agreement – whether there was a meeting of the minds – is a question of fact, which precludes summary judgment."[145]

66. Plaintiff does not identify what facts lend themselves to the argument that there was no meeting of the minds other than its very brief "scope" argument: "Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement. Mr. Dondero, on the other hand disagrees." Motion, ¶ 93. Nevertheless, Jim and Nancy Dondero provide evidence that they objectively understood and agreed to the essential terms and scope of the Agreements. Nancy Dondero testified that she understood which Notes were subject to the Agreements, as well as the Agreements' terms.[146] These facts are also asserted in Nancy Dondero's declaration.[147]

---

[143] *Martinez v. Pilgrim's Pride Corp*., 3:16-CV-3043-D, 2017 WL 6372385 at 4 (N.D. Tex Dec. 13, 2017) (quoting *In re Capco Energy, Inc.*, 669 F.3d 274, 280 (5th Cir. 2012)).
[144] *Pilgrim's Pride* at 4 (quoting *Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 362 (5th Cir. 2013)).
[145] *Sinclair Oil Corp. v. Heights Energy Corp*., 4:05-CV-825-Y, 2007 WL 9718223 at 3 (N.D. Tex. Nov. 13, 2007) (Court agreeing with respondent that meeting of the minds is an issue of fact precluding summary judgment); *See also: Hallmark v. Hand*, 885 S.W.2d 471, 476 (Tex. App.—El Paso 1994, writ denied) ("Where the element pertaining as to whether or not there was a meeting of the minds is contested, determination of the existence of a contract is a question of fact").
[146] Response, ¶ 14, quoting Nancy Dondero's deposition testimony.
[147] Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81.

67. Plaintiff's assertion that Jim Dondero "disagrees" with Nancy Dondero that he identified the Notes subject to the Agreements misstates Jim Dondero's testimony. Jim Dondero clarified that Nancy Dondero did know that the Notes were made by different entities.[148] These facts are also set forth in Jim Dondero's Declaration.[149]

68. Ignoring Plaintiff's attempt to paraphrase Jim Dondero's testimony out of context – and in light of Nancy Dondero's testimony that Jim Dondero did identify the Notes – it is clear that Jim Dondero communicated to Nancy Dondero that the Notes were made on behalf of the various entities on behalf of which they were made, and Nancy Dondero understood this. Therefore, not only is the issue of whether there is a meeting of the minds a fact issue not susceptible of summary judgment, the evidence also shows the Donderos objectively understood the terms of the Agreements. If anything, the evidence would support summary judgment ***that there was a meeting of the minds***.

**f. Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements.**

69. Plaintiff argues that Nancy Dondero was not "competent" to enter into the Agreements.[150] The cited evidence has nothing to do with Nancy Dondero's competency to contract (as "competency" is normally understood under Texas law), but instead references various bits of information that Nancy Dondero allegedly lacked when she caused Plaintiff to enter into the Agreements. Although mislabeled, the Debtor's argument appears to be that the Agreements are unenforceable because they were the product of a unilateral mistake by Nancy Dondero.

70. This argument fails for several reasons. First, Texas law provides that Nancy Dondero gets to determine the information she needed to decide whether to cause Plaintiff to enter

---

[148] Response, ¶ 15, quoting Jim Dondero's deposition testimony.
[149] *Id.*
[150] Motion ¶ 96.

into the Agreements, and the evidence confirms that she had what she needed. Second, Plaintiff does not argue or submit any evidence suggesting that Plaintiff – the actual party to the Agreements – lacked any relevant information. Third, a unilateral mistake can invalidate a contract only when it goes to a material term, when enforcement of the contract would be unreasonable, and when the mistake is made despite the exercise of due care. Plaintiff does not even allege any of these elements, much less submit any evidence to support them.

**(i) Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements.**

71. The evidence shows that Nancy Dondero had the information she considered necessary and appropriate to cause Plaintiff to enter into the Agreements, and Texas law requires nothing more. Plaintiff's assertion that Nancy Dondero should have had more and different information before entering into those Agreements has no legal effect on their validity or enforceability.

**(ii) Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements.**

72. Plaintiff's allegation that Nancy Dondero was ignorant of the facts and circumstances giving rise to the Agreements is not accurate.[151] Specifically, at the time Nancy Dondero caused Plaintiff to enter into the Agreements, she knew Plaintiff was in the hedge fund business which included buying and selling portfolio companies, and she knew that it owned an interest in each of Cornerstone, MGM and Trussway, the portfolio companies involved in the Agreements.[152] She knew that Jim Dondero's annual salary had historically been around $500,000 to $700,000 in the years preceding the Agreements, and she understood that Jim Dondero was

[151] Motion, ¶ 96; Plaintiff also ignores Nancy Dondero's business experience outlined in Def. Ex. 2, N Dondero Dec., ¶ 2, Def. Appx. 80.
[152] *Id.* at ¶ 9, Def. Appx. 83.

undercompensated as compared to other senior executives in the financial services industry.[153] She also knew that executives in the financial services industry tend to be paid on a bonus or incentive basis.[154] Nancy Dondero knew that potentially increasing Jim Dondero's compensation through contingent loan forgiveness would have less of an impact on Plaintiff's financial condition than requiring it to pay him additional cash in salary or bonus.[155]

73. Nancy Dondero was aware that Plaintiff owned an interest in Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements.[156] Nancy Dondero knew that Plaintiff's business included, among other things, buying and selling portfolio companies or interests in them for a profit.[157] Nancy Dondero also knew that Jim Dondero would the person most involved in, and responsible for, Plaintiff's marketing and eventual sale of Cornerstone, MGM, and Trussway.[158] And Nancy Dondero knew and believed that the Agreements would operate to further motivate and incentivize Jim Dondero to maximize Plaintiff's return on its investments in Cornerstone, MGM, and Trussway.[159] That Nancy Dondero may not have known every detail identified by the Plaintiff has no bearing on whether she had sufficient information to cause Plaintiff to enter into valid and binding Agreements.[160]

---

[153] *Id.* at ¶ 4, Def. Appx. 80-81.
[154] *Id.* at ¶ 9, Def. Appx. 83.
[155] *Id.* at ¶ 10, Def. Appx. 83-84.
[156] *Id.* at ¶ 9, Def. Appx. 83.
[157] *Id.*
[158] *Id.*
[159] *Id.* at ¶ 10, Def. Appx. 83-84.
[160] Plaintiff ignores the fact that Plaintiff was the actual party to the Agreements, and, even if Nancy Dondero lacked specific information, Plaintiff cannot credibly claim that it too lacked that information.

**(iii) Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements.**

74. Under Texas law, the parties to a contract determine what they need to know before entering into the agreement.[161] The summary judgment evidence confirms that Nancy Dondero knew and understood the nature of the Agreements, and had all of the information she believed she needed to cause Plaintiff to enter into them.[162] Nancy Dondero did not investigate the additional specifics identified by the Plaintiff because she did not believe she needed that information in order to make an informed and reasonable decision regarding the Agreements.[163]

75. Nevertheless, Plaintiff seems to argue that the Agreements should be invalidated under the doctrine of unilateral mistake, arguing that Nancy Dondero was mistaken about, or unaware of, certain facts. Under Texas law, a unilateral mistake is generally not grounds for voiding a contract, and can do so only when (i) the mistake relates to a material term, (ii) the mistake makes enforcement of the contract unreasonable, and (iii) the mistake is made despite the exercise of due care.[164] Plaintiff does not allege the existence of any (much less all) of these conditions, or offer any supporting evidence.

76. Unsurprisingly, Texas law does not permit a party to avoid a contractual obligation when it could have conducted further investigation into the facts and circumstances underlying the contract, but chose not to do so.

[161] *Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank,* 600 S.W.2d 856, 861 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) (recognizing that it is presumed that a contracting party has sufficient information to enter into an agreement in Texas).

[162] *Id.* at ¶¶ 11, 12, Def. Appx. 84.

[163] *Id.* The Debtor's claim that Alan Johnson, Jim Dondero's executive compensation expert, would deem Nancy Dondero incompetent to enter into the Agreements is absurd. Mr. Johnson never said this or anything like it. Rather, he testified that he had no awareness of the Agreements and had never ever heard Nancy Dondero's name, other than that she was represented by legal counsel. Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 99:5-100:5, Pl. Appx. 01983.

[164] *Armstrong v. Assocs. Int'l Holding Corp*., No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043, **9-10 (N.D. Tex. Sept. 20, 2006) (*citing Ibarra v. Texas Employment Commission*, 823 F.2d 873, 879 (5th Cir. 1987)).

> It has been stated that 'though a court of equity will relieve against mistake, it will not assist a man whose condition is attributable to the want of due diligence which may be fairly expected from a reasonable person.' This is consistent with the general rule of equity that when a person does not avail himself of an opportunity to gain knowledge of the facts, he will not be relieved of the consequences of acting on supposition.

*Anderson Bros. Corp. v. O'Meara*, 306 F.3d 672, 677 (5th Cir. 1962) (internal citation omitted).

77. Nancy Dondero had all of the information she considered necessary to decide whether to cause Plaintiff to enter into the Agreements.[165] Plaintiff apparently disagrees, listing numerous details and specifics that it believes she should have investigated further.[166] But Texas law does not permit a party to avoid a contract by claiming unilateral mistake when that party has conducted the due diligence it considered appropriate and necessary prior to entering into that contract. *Id.* This is exactly what happened here, and these facts cannot support a finding that the Agreements were – as a matter of law – the result of any "mistake" by Nancy Dondero.

**(iv) Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements.**

78. The only other possible construction of Plaintiff's "competency" argument is that Nancy Dondero lacked the personal capacity to cause Plaintiff to contract. Texas law presumes that every party to a legal contract has sufficient capacity to understand the transaction involved, and the burden of proof to overcome this presumption is on the party challenging it.[167] "A person has the mental capacity to contract under Texas law 'if she appreciated the effect of what she was doing and understood the nature and consequences of her acts.'"[168]

---

[165] Def. Ex. 2, N Dondero Dec., ¶ 11, Def. Appx. 84.
[166] Motion, ¶ 96.
[167] *Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*, No. 3:21-CV-01748-N, 2021 LEXIS 247218, 9 (N.D. Tex., Dec. 29, 2021).
[168] *Id.* (*quoting Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969)).

CORE/3522697.0002/171927721.9

79. A party lacks capacity to contract only when he or she is a minor, under a guardianship, mentally ill, or intoxicated.[169] The summary judgment evidence reflects that at the time she caused Highland Capital to enter into the Agreements, Nancy Dondero appreciated the effect of what she was doing and understood the nature and consequences of those acts.[170] Ms. Dondero was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment at the time she caused Highland Capital to enter into the Agreements.[171]

**2. The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements**

**a. The Affirmative Defense**

80. The Debtor declared a default under the NexPoint Note based on its allegation that NexPoint failed to make the December 2020 annual payment allegedly due under that note. Among other defenses, NexPoint pleads that Plaintiff caused the alleged default through its own negligence and fault. Specifically, NexPoint had outsourced to Plaintiff the responsibility to ensure that NexPoint timely paid its payables, including under the NexPoint Note. Plaintiff failed to properly discharge its responsibilities, causing the alleged default. Accordingly, because Plaintiff caused the alleged default, plaintiff is estopped from seeking to capitalize on it.

**b. The Law**

81. Texas law recognizes that, when the plaintiff, through its negligence, has caused a delay in the defendant's performance of a contractual obligation, that delay is excused.[172] As stated by one Texas appellate court:

---

[169] *Del Bosque v. AT&T Adver., L.P.*, 441 Fed. Appx. 258, 262 (5th Cir. Sept. 16, 2011) (*citing* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 12(2) (1981)).
[170] Def. Ex. 2, N Dondero Dec. at ¶ 12, Def. Appx. 84.
[171] *Id.*
[172] *Collier v. Robinson*, 129 S.W. 389, 61 Tex. Civ. App. 164, 166-67 (Tex. Civ. App. 1910) ("plaintiffs were excused from payment of the purchase price of the property within sixty days from the date of the contract, in the event only of a finding by the jury that they were prevented from so doing by the negligence of the defendants").

> It is settled law that one may not take advantage of, nor recover damages for, delays for which he is himself responsible, and that the time for performance is excused and a corresponding extension of time given where the delay is occasioned by the act or default of the party claiming the damages.

*Szanto v. Pagel*, 47 S.W.2d 632, 635 (Tex. Civ. App. – Austin 1932).[173]

**c. The NexPoint SSA and the Debtor's Duties Thereunder**

82. There is no question of fact that, at all times material to the Debtor's claims of default, NexPoint and the Debtor were parties to the SSA.[174] Under the SSA, NexPoint outsourced various functions to the Debtor and the Debtor was obligated to provide various services to NexPoint. The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

> (a) Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, book keeping, cash management . . . accounts payable . . .
>
> (k) Ancillary Services. Assistance and advice on all things ancillary or incidental to the foregoing.
>
> (l) Other. Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.[175]

83. The SSA itself expressly required the Debtor to provide "assistance" and "advice" with respect to, among other things, "payments" and "account payable," including" all things "ancillary" or "incidental" to the same.

84. There should be no question of fact that the foregoing included providing NexPoint with assistance and advice in making payments allegedly required under the NexPoint Note. At a

---

[173] *Accord Alexander v. Good Marble & Tile Co.*, 4 S.W.2d 636, 639 (Tex. Civ. App. 1928), *writ ref'd* ("it is elementary that the owner is not entitled to recover damages brought about by his own wrong, regardless of whether the contract expressly so provided").

[174] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04163 ("This Amended and Restated Shared Services Agreement. . .is entered into by and between NexPoint Advisors, L.P. . . .and Highland Capital Management, L.P. . . .").

[175] *Id.* at § 2.02, Pl. Appx. 04165-04166 ("Provision of Services") (emphasis added).

minimum, there is a genuine issue of material fact regarding this question. In this respect, it is not parole evidence to consider the parties' past performance under a contract to determine their intention with respect to the same, so long as this is not offered to vary the express terms of a contract.[176] Here, the question is whether assistance and advice with respect to "payments" and "accounts payable," and all things "ancillary" or "incidental" to the same, included the Debtor assisting and advising NexPoint with respect to the alleged December 2020 annual payment. These phrases are not expressly defined in the SSA, so it is appropriate to consider the parties' prior course of dealing to understand the meanings of these terms.

85. In this respect, Waterhouse, the CFO of the Debtor and an officer of NexPoint at the time, confirmed that the Debtor was responsible under the SSA to advise and assist NexPoint with respect to the alleged payment:

> Q. Well, what about long term loans? Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under longterm notes?
>
> A. I mean, that is one of the things that the Highland personnel did provide to the advisors. Yes, we would -- we would – over the years, yes, we -- we -- we – we did do that generally. Again, I don't remember specifically but, yes, generally we – you know, we did do that.
>
> . . . .
>
> Q. And do you recall Mr. Morris had you go through the fact that NexPoint had made payments in years prior to 2020 on that note?
>
> A. I do.
>
> . . . .
>
> Q. And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?
>
> A. We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the

[176] *See Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013). *Accord O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").

advisors,[177] we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections. If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that. Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat. But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

. . . .

Q. Prior to 2020, those services that you just described, would that -- on behalf of the debtor, would that have included NexPoint's payments on the $30 million note?

A. Yes.

Q. So someone at the debtor in treasury or accounting would have sent some schedule or a reminder that a payment would be coming due in the future. Is that generally the practice?

A. Yes, we would -- you know, again, I didn't -- I didn't micromanage the teams, but we had a -- a corporate accounting calendar that we use as kind of a tickler file to keep track of payments.

I actually, you know, don't know how actively they're using that in -- in prior to 2020, but it was actively used at some point.

We did look at NexPoint cash periodically and cash for the other advisors as well and payments. You know, we – payments like this would have appeared in our cash projections, in the advisor's cash projections.

And, again, as like I said earlier, they would have appeared there, so there would be time to plan for making any of these payments.

Q. And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

A. Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody.[178]

[177] The "advisors" include NexPoint.

[178] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 333:14-338:8, Pl. Appx. 02132-02134 (objections omitted) (emphasis added).

86. Debtor was able to perform these services because it had access to and control over the bank accounts of the corporate Defendants, including NexPoint, HCMS and HCRE.[179] In addition to the testimony of Waterhouse—who testified about the issues, roles, and duties of the parties under the SSA—Hendrix, a senior accountant for the Debtor at that time and still the Debtor's controller, confirmed the Debtor's "treasury" duties under the SSA to advise NexPoint of the alleged December, 2020 payment:

Q. You mentioned treasury management as of 2019, May. What do you mean by treasury management? What is that?

A. Generally speaking, we – it's not just me as one person. We have checks and balances.
My team would be in charge of sending out payments, reconciling bank statements, making sure money is in the right accounts, creating cash forecasts and reporting on those every week with the CFO and oftentimes the CEO.
Generally that's everything that fell under the umbrella.

Q. And would your description of treasury management be the same for the December 2020 period?

A. Yes.

. . . .

Q. We'll cut to the chase. In December of 2020, the debtor was providing services to various other entities affiliated with Mr. Dondero; correct?

A. Correct.

Q. That would have included NexPoint Advisors, LP?

A. Correct.

Q. And you're aware that NexPoint Advisors was the obligor on at least one promissory note to the debtor; correct?

A. Correct.

Q. And did the debtor in December 2020 provide so-called treasury management services to NexPoint Advisors?

Q. (BY MR. RUKAVINA) As part of that, in December 2020, would it have been employees of the debtor that would have scheduled for potential payment, subject to approval by NexPoint, NexPoint's future obligations as they were coming due?

[179] Frank Waterhouse 10/19/21 Tr. 327:9-328:9, 359:17-22, 360:8-15, Pl. Appx. 02131, 02139.

A. Yes, we would have scheduled, only with approval.

Q. And would that have included NexPoint's obligations on the promissory note to Highland?

A. Yes.[180]

87. Finally, Jim Dondero, in charge of NexPoint in December, 2020, and in charge of the Debtor in 2019 and prior years of the NexPoint Note, both the past practice and his understanding that the Debtor would advise him of any payments due under the NexPoint Note and his reliance on that advice, and that it did not occur in 2020:

Q. Okay. And I just want to make sure that I have this right. Is it -- is it the corporate obligors' -- those three corporate obligors' contention that one of the reasons they didn't make the payments at the end of the year is that they were relying on Highland to make the payment for them?

A. Absolutely.

Q. Okay.

A. It was due course de minimis, and those entities didn't have a single employee or capable financial person other than the people at Highland that were doing the shared services for them.

Q. NexPoint didn't have any employees in December 2020. Is that your testimony?

A. I was thinking about HCRE and Services had zero employees. NexPoint had employees but none that were involved in basic accounting functions.

. . . .

Q. I'm just – I'm just asking a pretty simple question, sir. I don't mean to be contentious with you. We have identified one defense that these corporate obligors contends exists; and that is, Highland was supposed to make the payment. Fair?

A. Yes.

. . . .

Q. Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?

A. No, there was a reliance on Highland.

---

[180] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 13:14-16:11, Pl. Appx. 03130 (objections omitted) (emphasis added).

Q. Okay. Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?

A. Yes. It is my contention that that is how it worked in prior years also.

Q And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?

A. Yes, typically. And in 2017 or 2018, 2019, for sure.[181]

88. Accordingly, based on the plain language of the SSA and the above testimony, there is ample evidence—if not overwhelming and conclusive evidence—that the Debtor had duties under the SSA to at least remind NexPoint of any upcoming payment on the NexPoint Note and to advise NexPoint regarding the same, if not outright facilitating and making the payment: certainly to advise NexPoint of the upcoming payment and warn of the consequences of not making the payments.

**3. The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation**

89. Notwithstanding its duties under the SSA and the parties' prior understanding of, and practice, under the SSA and those duties, the evidence demonstrates that the Debtor did nothing to assist NexPoint with, or advise NexPoint regarding, much less to facilitate, NexPoint's alleged payment in December, 2020 on the NexPoint Note.

90. First, and despite the testimony of both Waterhouse and Hendrix that the Debtor would have, pursuant to the SSA and prior practice, identified and flagged any upcoming payment obligations on the Note and sought approval from NexPoint to make the same, the evidence is that the Debtor failed to do so. In the record are several weekly runs of upcoming payment obligations of NexPoint, from late November and December, 2020, which fail to include any payment

[181] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786 (objections omitted) (emphasis added).

obligation on the Note, even though various other payment obligations—including upcoming loan payments—are listed and scheduled.[182] Most relevant is the payment run from December 31, 2020 itself, which fails to list or schedule any payment on the NexPoint Note.[183]

91. Second, Dondero's testimony confirms that the Debtor failed to advise or assist him and NexPoint with respect to the alleged payment, or to facilitate the same, cause the same to be made, or to seek his approval to make the same.

92. Third, Waterhouse and his team at the Debtor failed to facilitate or to make the payment, despite Dondero's testimony that he relied on them to do so and that this is how the payments had been handed in 2017, 2019, and 2019.[184] Here, there is a disagreement between Dondero and Waterhouse on the facts. Namely, Waterhouse testified that, in late November or early December, 2020, he advised Dondero of the upcoming payment on the NexPoint Note and that Dondero expressly instructed him to not make the payment, as NexPoint had overpaid the Debtor millions of dollars on the SSA.[185] Dondero testified that he only instructed Waterhouse to forbear from making any additional payments for shared services fees because they had been overpaid.[186] Obviously, the Court cannot determine whose version of the events is correct and whose testimony the jury believe, but either way, Waterhouse's testimony confirms that the Debtor failed to assist with, advice, or facilitate the alleged payment, albeit due to an alleged instruction from Dondero. Either way, the Debtor was negligent and at fault for the alleged default, as explained below.

---

[182] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 6:7-8 (referencing Exhibits A1 and A2, which were not included in Plaintiff's Appx), Pl. Appx. 02051; Def. Ex. 3-D, Email from F. Waterhouse to K. Hendrix, dated November 25, 2020, Def. Appx. 204-208; Def. Ex. 3-E, Email from F. Waterhouse to K. Hendrix, dated December 31, 2020, Def. Appx. 210.

[183] *Id.*

[184] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786.

[185] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 390:4-392:17, Pl. Appx. 02147.

[186] Pl. Ex. 99, James Dondero 11/4/21 Tr. 151:8-152:23, Pl. Appx. 01850.

### 4. Debtor's Negligence and Fault In Creating an Alleged Default

93. As demonstrated above, the Debtor failed to advise NexPoint of any upcoming payment on the NexPoint Note, much less to facilitate the same. As such, there is ample evidence, at least to demonstrate a genuine issue of material fact, that it was the Debtor's own negligence and fault that caused the alleged default—all the more so since, on summary judgment, NexPoint's evidence is to be believed and reasonable inferences must be drawn in favor of NexPoint. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

94. In this respect, the SSA sets forth the applicable standard of care by which the Debtor must discharge its duties under the SSA:

> "[T]he care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[187]

95. Here, the analysis diverges depending on whether the jury will believe Waterhouse that he did in fact consult with Dondero regarding whether NexPoint should make the December, 2020 alleged payment and that Dondero instructed him not to make the payment, or whether the jury will believe Dondero that he gave no such instruction and was instead not consulted about the payment. As noted throughout, the Court cannot make this determination on summary judgment. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

#### (i) If Dondero Did Not Issue the Non-Payment Instruction

96. If a jury found that Dondero did not instruct Waterhouse to not cause the December, 2020 payment to be made, then the Debtor clearly breached the standard of care under the SSA by doing *nothing* to assist and advise with respect to the payment, and no expert testimony is required

---

[187] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, § 6.01, Pl. Appx. 04173.

CORE/3522697.0002/171927721.9

on this issue because a layperson juror can reach this conclusion based on his or her own experience:

> under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken some form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013). *Accord Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008) ("an exception to the general rule is recognized where the [ ] lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge").

97. Because the jury could well accept Dondero's testimony, and because the SSA sets forth a standard of care that would therefore have been breached by the Debtor by doing nothing to assist or advise NexPoint on the December 2020 payment, which conclusion the jury may reach without resort to expert testimony, and drawing all reasonable inferences in favor of NexPoint, the Court should deny summary judgment based on NexPoint's affirmative defense of the Debtor's own negligence and fault without any need to consider the alternative if the jury were to accept Waterhouse's testimony on Dondero's alleged instruction.

**(ii) If Dondero Issued the Non-Payment Instruction: Offer of Proof**

98. Conversely, if a jury accepted Waterhouse's testimony that Dondero instructed him to not make the December 2020 alleged payment, expert testimony would be helpful to appreciate the consequences. In such an event, the Debtor would still be at fault and would have committed negligence in failing to take any additional steps after receiving the alleged instruction, including to: (i) double check, at a minimum, that Waterhouse correctly understood Dondero; (ii) advise

Dondero of the potential consequences of a missed payment; and (iii) try to dissuade Dondero from his alleged instruction.

99. In this respect, NexPoint offers the expert opinion of its expert on this issue, Steven J. Pully.[188] The Bankruptcy Court denied NexPoint's motion for leave to extend the expert witness designation, report, and discovery deadlines, even though NexPoint filed its motion seeking such leave only ten (10) days after Waterhouse's deposition, when NexPoint first learned of Waterhouse's testimony regarding the alleged instruction, which first triggered the potential need for expert testimony regarding whether the Debtor properly discharged its duties under the SSA *if* Dondero gave the alleged instruction. NexPoint has timely filed a motion with the District Court seeking its review of the Bankruptcy Court's denial of its motion for leave, and hereby incorporates, to the extent necessary, said motion.[189]

100. Accordingly, under this offer of proof, there is a genuine issue of material fact regarding the Debtor's own negligence and fault in creating the alleged default, even if a jury could accept Waterhouse's testimony regarding Dondero's alleged instruction.

101. At a minimum, there is admissible evidence to create a genuine issue of material fact that the Debtor was negligent and at fault for creating the alleged default, and the law confirms that, in such an event, timely performance under the NexPoint Note was excused as a result of such negligence and fault: (i) the SSA was in place at the time and, under the SSA, NexPoint outsourced payment, accounts payable, and treasury service functions to the Debtor; (ii) these included assisting and advising NexPoint with regard to payment obligations due under the Note, and to facilitate NexPoint's timey payment of such obligations; (iii) the Debtor utterly failed to

---

[188] Def. Ex. 3-F, Expert Report of Steven J. Pully, Def. Appx. 212-235.

[189] *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines*, Case 21-03005-sgj [Doc. 86]; *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, Case 21-03005-sgj [Doc. 138].

take any steps to assist, advise, or facilitate the same or, if Dondero in fact instructed that the payment not be made, the Debtor utterly failed to take any steps thereafter consistent with its duties; and (iv) any resulting default in not making a timely payment under the NexPoint note is excused due to the Debtor's own negligence and fault.

**5. The HCMS and HCRE SSAs.**

102. For the reasons discussed in section D.2, *supra*, Plaintiff also owed the same services to HCMS and HCRE as it did NexPoint pursuant to its verbal SSAs with HCMS and HCRE. Because the HCMS and HCRE SSAs carried with them the same obligations, rights, and duties as the NexPoint SSA, Plaintiff is also responsible for the skipped December 2020 annual payments for the same reasons outlined *supra*. Therefore, there is sufficient summary judgment evidence creating a genuine issue of material fact that Plaintiff is responsible for these missed payments, and the Court must deny summary judgment.

**6. Prepayments by NexPoint and HCMS**

**a. NexPoint Prepayments**

103. NexPoint presents evidence showing a course of conduct wherein prepayments on the NexPoint Term Note were accepted by the Plaintiff without default in prior years in contradiction to Plaintiff's claim that the term Notes required payment precisely on December 31 of each year. This Court cannot resolve this issue at the summary judgment stage, as it raises a genuine issue of material fact regarding NexPoint's defense of prepayment. Since the NexPoint Term Note is a contract, Texas law on contract interpretation and ambiguity must be applied.

104. In Texas, it is clear that this Court's primary goal when interpreting the NexPoint Note is to "determine the parties' intent as reflected in the [Note's] terms." *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009). As further summarized:

> When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law. A term is not ambiguous because of a simple lack of clarity. Nor does an ambiguity arise merely because parties to an agreement proffer different interpretations of a term. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable.

*DeWitt County Elec. Coop. Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex. 1999). However, when a contract contains an ambiguity, ". . . the courts [may] consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument."[190] Additionally, "[e]vidence of trade usage and ***course of conduct*** is admissible to explain, supplement, or qualify a term or an agreement, but it may not be used to contradict an express term."[191] And more importantly, Texas law requires a lender to apply prepayments to upcoming installments absent express, contrary instructions.[192]

105. Here, the NexPoint Term Note itself is ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal. Section 2.1 of the Note provides:

> 2.1 Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment")** until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of

[190] *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).
[191] *Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013) (emphasis added); s*ee also O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").
[192] *See Williams v. Cambridge Cos.*, 615 S.W.2d 172, 175 (Tex. 1981) ("Even in the absence of [instructions to apply a prepayment to the next installment], the prepayment was correctly applied to the installment first maturing."); *Getto v. Gray*, 627 S.W.2d 437, 440 (Tex. App. 1981) ("In the absence of an express stipulation to the contrary, prepayments on an indebtedness are to be applied to the installments first maturing."); *Bacher v. Maddux*, 550 S.W.2d 405, 405 (Tex. Civ. App. 1977) ("Where a party prepays note payments, these prepayments are applied to the installments first maturing."); *Curry v. O'Daniel*, 102 S.W.2d 481, 482 (Tex. Civ. App. 1937) ("Under these circumstances, the law will make the application according to the justice and equity of the case and this usually requires that such payment be applied according to priority of time—that is to the installments first maturing . . . .").

> this Note, commencing on the first such date to occur after the date of execution of this Note.[193]

Section 3 of the Note further provides:

> 3. Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[194]

106. Clearly, the NexPoint Note does not require the annual payment on December 31 despite any prepayments. In fact, the NexPoint Note contains ***no*** provision to the effect that a prepayment will not relieve the maker of any regularly scheduled payment. James Seery – testifying for the Debtor – confirmed this at his deposition.[195] Most importantly, NexPoint ***never made the full annual payment*** on December 31 in 2017, 2018, or 2019.[196] For example, NexPoint paid $294,695.10 on December 18, 2018.[197] NexPoint paid $530,112.36 on December 30, 2019.[198] Yet there were ***no defaults*** because, as explained below, NexPoint had prepaid the annual payment. Therefore, it is clear from the language of the Note, the parties' understanding of the NexPoint Note, and the parties' course of conduct that the annual installment payment can be prepaid, and was prepaid in the past.

107. The ambiguity in the NexPoint Note is fairly straightforward: can NexPoint prepay future interest? The Note itself says that it can "prepay . . . accrued interest."[199] Accrued interest is of course interest that has already accrued, but the Note expressly permits NexPoint to prepay this interest, in effect prepaying future interest. Yet the Note also provides that "payments on this

---

[193] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.
[194] *Id.*
[195] Def. Ex. 3-A, Deposition of James P. Seery (65:20-66:2), Def. Appx. 113-114 ("It's -- it says on, but typically there's no issue about prepayment and that paragraph 3 says you can prepay").
[196] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[197] *Id.*
[198] *Id.*
[199] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.

Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof."[200] This provision forecloses the ability to prepay future interest, since any prepayment can only be applied to accrued interest and then to principal. This is the ambiguity in the Note itself: on the one hand, the Note permits NexPoint to prepay future interest, while on the other hand, such prepayment is impossible.

108. There is no question that the parties – well before this litigation – understood that NexPoint was permitted to prepay future interest. On May 9, 2018, NexPoint paid $879,927.65 on the Note.[201] The ***entirety*** of this payment was applied as a prepayment towards future interest for the months of May through October, 2018, and ***none*** of it was applied to principal.[202] Likewise, on December 5, 2017, NexPoint made a payment of which $127,030.67 was applied to future interest on the NexPoint Note, such that no payment was due – and no payment was made – on December 31, 2017.[203] Similarly, on December 18, 2018, $60,727.60 of NexPoint's payment was applied to future interest.[204] In addition to the parties' actual practice and conduct, Mr. Seery confirmed at his deposition that future interest can be prepaid under the NexPoint Note: "Interest accrues on this note. How you prepay it is you send the money before the accrual date."[205] Thus, NexPoint can prepay and has prepaid future interest under the Note, as evidenced by the parties' actual practice and Mr. Seery's testimony, regardless of Section 3's implication that prepaying future interest is impossible (since that provision provides that any prepayment is first applied to accrued interest and then to principal, leaving no room for any prepayment of future interest).

---

200 *Id.*
201 Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
202 *Id.*
203 *Id.*
204 *Id.*
205 Def. Ex. 3-A, Deposition of James P. Seery (67:15-22), Def. Appx. 114.

109. As noted, NexPoint prepaid the Note by $6,380,000.00 in 2019. Plaintiff clearly concluded that the 2019 annual principal payment on the Note had been prepaid because there was no such payment made on December 31, 2019.[206] But, the Debtor billed NexPoint for $530,112.36 for accrued interest on December 30, 2019, which NexPoint paid.[207] This was the Plaintiff's error. In fact – as consistent with prior payments – the large prepayments in 2019 should have prepaid *future* annual instalments as there is no provision in the Note that links any prepayment to simply the annual payment for the year in which the prepayment is made; *i.e.* nothing in the Note prevents a prepayment of annual instalments due in future years. In sum, when NexPoint made $6,380,000.00 in 2019, those payments should have been applied to future annual installments in accordance with the parties' course of conduct and prior dealings.

110. Fortunately, Texas law addresses the situation where a debt instrument fails to specify how a payment should be applied against the underlying obligation. Generally, the debtor may direct the application of a payment in the absence of a written agreement providing otherwise. *See Parrish v. Haynes*, 62 F.2d 105, 107 (5th Cir. 1932). "When a debtor fails to properly exercise his power to direct the application of the payment, the creditor ordinarily may apply the payment to any valid and subsisting claim he has against the debtor." *W.E. Grace Mfg. Co. v. Levin*, 506 S.W.2d 580, 585 (Tex. 1974). However, the creditor may "not make an application that is inequitable and unjust to the debtor." *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974) (emphasis added). This is a "limitation on the general rule that in the absence of application of payments by the parties themselves the law applies them to the oldest items then due." *Id*.

---

[206] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[207] *Id.*

111. However, if neither the debtor not creditor make a proper application of a payment, then "the law will make the application according to the justice of the case." *Phillips v. Herdon*, 78 Tex. 378, 384 (Tex. 1890). *Accord Texas Co. v. Schram*, 93 S.W.2d 544, 548 (Tex. Civ. App. – Austin 1936) ("the law makes the application which is in accord with the justice and equity of the particular case"). And, importantly:

> that the debtor has the absolute right to make the application if he sees proper to exercise it. If he omits to do so, and it is left to the law to make it for him, it ought, it would seem, to be made in accordance with the presumed intention of the debtor. And we think it must be presumed that the debtor intended to apply it to the debt that would be most beneficial to him.

*Phillips*, 78 Tex. at 385.

112. The Court cannot resolve these ambiguities and course of conduct issues on summary judgment. NexPoint intended that the payments in 2019 be applied as prepayments on the Note in 2019. Plaintiff agreed and understood this to be the case as well.[208] The only question is what the prepayments should be applied to and, in particular, whether they should have been applied to the 2020 annual installment. NexPoint did not expressly direct such prepayment. And, the Plaintiff did not apply the prepayments to the 2020 annual installment. Although the Plaintiff's application is to be given weight, it should not result in a manner that is "inequitable and unjust" to NexPoint. And, the ultimate application of the payments must be made in equity and under the facts and equities of the case, with the presumption that NexPoint "intended to apply [the prepayments] to the debt that would be most beneficial to [it]." *Phillips*, 78 Tex. At 385.

**b. HCMS Prepayments**

113. Similarly-situated to NexPoint, HCMS also presents evidence showing a course of conduct wherein Plaintiff consistently accepted prepayments prior to December 31 of a given

[208] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147.

calendar year for the HCMS Term Note, but never considered the Note to be in default when a payment was not made precisely on December 31.[209] Further, the allocation of HCMS' prepayments on the Note between principal and interest raise the same defensive issue of ambiguity as the NexPoint Note discussed *supra*.

114. The terms of the HCMS Term Note and the NexPoint Term Note are nearly identical, with both presenting the same ambiguity issues. Section 2.1 of the HCMS Term Note provides:

> 2.1 Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.[210]

Further, Section 3 of the HCMS Term Note provides:

> 3. Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[211]

115. HCMS never made a single payment on December 31 of 2017, 2018, or 2019.[212] And, yet again, Plaintiff never called for payment or declared the HCMS Term Note to be in default in January – or any other month – of 2017, 2018, or 2019.[213] However – like NexPoint – HCMS made large payments on the Note in 2017, 2018, and 2019 that it believed applied towards future scheduled payments on the HCMS Term Note.[214] Specifically, HCMS paid $6,395,236.52 on the Note in 2017 ($5,395,319.15 more than the annual installment), $1,160,665.94 on the Note in 2018

[209] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[210] Pl. Ex. 3, Amended Complaint against HCMS, Exhibit 6, Pl. Appx. 00134.
[211] *Id.*
[212] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[213] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25; Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[214] *Id.*

($160,748.57 more than the annual installment), and $7,230,360.49 on the Note in 2019 ($6,230,443.12 more than the annual installment).[215] Again, none of these payments were made on December 31, and at no time did Plaintiff declare the Note in default.[216]

116. Applying the same Texas precedent raised *supra*, the Court should look to the pattern of conduct between the parties to the instrument to determine how a contractual ambiguity should be resolved. Here – similarly to the NexPoint prepayments – the Plaintiff accepted enormous prepayments by HCMS in the past, and never once raised the issue of default when it did not receive the annual installment payment on December 31.[217] Working off of this pattern of conduct, Plaintiff was not entitled to declare the Note in default. Again, however, the Court cannot resolve these ambiguities and course of conduct issues on summary judgment.

117. Additionally, even if there were any missed payments, payments were made on the NexPoint, HCRE, and HCMS Term Notes to cure any defaults. "'An optional acceleration of maturity of a note can be waived by the acts and words of one who holds right of election."' *Vaughan v. Crown Plumbing & Sewer Serv., Inc.*, 523 S.W.2d 72, 75 (Tex. Civ. App. 1975) (quoting *Diamond v. Hodges*, 58 S.W.2d 187, 188 (Tex. Civ. App. 1933)). As Defendants' evidence demonstrates, after learning about the alleged missed payments and talking with Frank Waterhouse, Plaintiff's CFO, Jim Dondero instructed him to make the payments and cure any default, and subsequently caused the payments to be made in January of 2021, payments that would not have been made if Mr. Waterhouse disagreed and told Jim Dondero that the payments would not cure and reinstate the loans.[218] Therefore, to the extent there was a default, it was cured.

---

[215] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[216] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[217] *Id.*
[218] *Id.* at ¶ 40, Def. Appx. 19-20.

## IV. Conclusion

118. WHEREFORE, Defendants respectfully request this Court Deny Plaintiff's Motion for Partial Summary Judgment and grant such other and further relief as the Court deems just and proper.

Dated: January 20, 2022

Respectfully submitted,

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**ATTORNEYS FOR JAMES DONDERO, NANCY DONDERO, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND NEXPOINT REAL ESTATE PARTNERS, LLC**

*/s/Clay M. Taylor*
Clay M. Taylor
State Bar No. 24033261
Bryan C. Assink
State Bar No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**ATTORNEYS FOR JAMES DONDERO**

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P. AND HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**HIGHLAND CAPITAL MANAGEMENT, L.P.**<br><br>**Debtor.** | §<br>§<br>§<br>§<br>§ | **Case No. 19-34054**<br><br>**Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03003-sgj** |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § § | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | § § § § § § § § § § § § | **Adv. Proc. No. 21-03007-sgj** |

**APPENDIX IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants James Dondero, NexPoint Advisors, L.P., Highland Capital Management Services, Inc., and HCRE Partners, LLC file this Appendix in Support of their Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Partial Summary Judgment, and request the Court take judicial notice of the documents contained herein.

CORE/3522697.0002/172203842.1

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| **1** | **Declaration of James Dondero, dated January 20, 2022** | App. 1-23 |
| A | HCMS Payment Ledger | App. 24-25 |
| B | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 26-31 |
| C | Documents showing J. Dondero proof of service as Family Trustee for the Dugaboy Family Trust and subsequent resignation | App. 32-72 |
| D | Letter to J. Pomerantz from D. Lynn, dated February 1, 2021 | App. 73-74 |
| E | Termination of Amended and Restated Shared Services Agreement, among Highland Capital Management, L.P. and NexPoint Advisors, L.P., dated November 30, 2020 | App. 75-76 |
| **2** | **Declaration of Nancy M. Dondero, dated January 20, 2022** | App. 77-85 |
| A | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 86-91 |
| **3** | **Declaration of Michael Aigen, dated January 20, 2022** | App. 92-95 |
| A | Transcript of the Video Deposition of James P. Seery, Jr. on October 21, 2021, Adv. Proc. No. 21-03005 | App. 96-185 |
| B | Transcript of the Remote Deposition of Bruce McGovern on November 9, 2021, Adv. Proc. No 21-03003 | App. 186-200 |
| C | List of Promissory Notes | App. 201-202 |
| D | Email from F. Waterhouse to K. Hendrix, dated November 25, 2020 | App. 203-208 |
| E | Email from F. Waterhouse to K. Hendrix, dated December 31, 2020 | App. 209-210 |
| F | Expert Report of Steven J. Pully | App. 211-235 |
| G | Expert Report of Alan M. Johnson | App. 236-262 |
| H | Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021 | App. 263-300 |

Dated: January 20, 2022                    Respectfully submitted,

                                           */s/Deborah Deitsch-Perez*
                                           Deborah Deitsch-Perez
                                           State Bar No. 24036072
                                           Michael P. Aigen
                                           State Bar No. 24012196
                                           STINSON LLP
                                           3102 Oak Lawn Avenue, Suite 777
                                           Dallas, Texas 75219
                                           (214) 560-2201 telephone
                                           (214) 560-2203 facsimile
                                           Email: deborah.deitschperez@stinson.com
                                           Email: michael.aigen@stinson.com
                                           **ATTORNEYS FOR JAMES DONDERO, NANCY
                                           DONDERO, HIGHLAND CAPITAL MANAGEMENT
                                           SERVICES, INC. AND NEXPOINT REAL ESTATE
                                           PARTNERS, LLC**

                                           */s/Clay M. Taylor*
                                           Clay M. Taylor
                                           State Bar No. 24033261
                                           Bryan C. Assink
                                           State Bar No. 24089009
                                           BONDS ELLIS EPPICH SCHAFER JONES LLP
                                           420 Throckmorton Street, Suite 1000
                                           Fort Worth, Texas 76102
                                           (817) 405-6900 telephone
                                           (817) 405-6902 facsimile
                                           Email: clay.taylor@bondsellis.com
                                           Email: bryan.assink@bondsellis.com
                                           **ATTORNEYS FOR JAMES DONDERO**

                                           */s/Davor Rukavina*
                                           Davor Rukavina
                                           Julian P. Vasek
                                           MUNSCH HARDT KOPF & HARR, P.C.
                                           500 N. Akard Street, Suite 3800
                                           Dallas, Texas 75202-2790
                                           (214) 855-7500 telephone
                                           (214) 978-4375 facsimile
                                           Email:  drukavina@munsch.com

                                           **ATTORNEYS FOR NEXPOINT ADVISORS, L.P.  AND
                                           HIGHLAND CAPITAL MANAGEMENT FUND
                                           ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# Exhibit 1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**HIGHLAND CAPITAL MANAGEMENT, L.P.**<br><br>**Debtor.** | §<br>§<br>§<br>§<br>§ | **Case No. 19-34054**<br><br>**Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03003-sgj** |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,**<br><br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03004-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03007-sgj** |

**DECLARATION OF JAMES DONDERO**

I, James Dondero, hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1. My name is James Dondero. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration. I have personal knowledge of the facts stated in this Declaration.

**A. Background.**

2. I am currently a named Defendant in Adversary Proceedings No. 21-03003-sgj, 21-03005-sgj, 21-03006-sgj, and 21-03007-sgj. I have personal knowledge of the facts contained in this declaration, and if called as a witness to testify, I could and would do so competently.

3. I co-founded Highland Capital Management, L.P. ("HCM") in the year 2000, and have been working in the financial services industry for over thirty (30) years. I served as HCM's President and Chief Executive Officer until my resignation on January 9, 2020.

4. Along with having served as CEO for HCM, I have also served as a high-level executive and controlling portfolio manager for NexPoint Advisors, L.P. ("NexPoint"), HCRE Partners, LLC ("HCRE"), Highland Capital Management Services, Inc. ("HCMS"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA"). I have spent years of service to these companies as a chief executive, and am familiar with each company's internal management and operational structures and procedures.

**B. The Promissory Notes.**

**1. HCM Issued Three (3) Notes to Me.**

5. On February 2, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $3,825,000.00 (the "February 2018 Note").[1] The February 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.66%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the February 2018 Note was a payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note, and was made, as indicated in the promissory note, to help satisfy personal tax obligations.

6. On August 1, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 1, 2018 Note").[2] The August 1, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the August 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note, which was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

7. On August 13, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 13, 2018 Note").[3] The August 13, 2018

---

[1] Pl. Appx. 00678-679.
[2] *Id.* at 00681-682.
[3] *Id.* at 00684-685.

Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the August 2018 Note was payable upon demand by HCM and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

**2. HCM Issued one (1) Term Note to NexPoint.**

8. On May 31, 2017, NexPoint borrowed money from HCM and entered into a promissory note with HCM in the amount of $30,746,812.33 (the "NexPoint Term Note").[4] The NexPoint Term Note bore an interest rate of 6%, to be calculated at a daily rate equal to 1/365th per annum. The NexPoint Term Note was due in thirty (30) equal annual payments, due by the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. This Term Note is paid current. The NexPoint Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due. The purpose of the NexPoint Term Note was in-part to consolidate several prior notes made between NexPoint Advisors, L.P. and HCM. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note. This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any

[4] *Id.* at 00042-43.

prepayment between accrued interest, future interest, and principal, and it did not contain any provision concerning what the impact of prepayments would be on future scheduled payments.

**3. HCM Issued Five (5) Notes to HCRE.**

9. On November 27, 2013, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $100,000 (the "November 27, 2013 Note").[5] The November 27, 2013 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the November 27, 2013 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

10. On May 31, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $6,059,831.51 (the "HCRE Term Note").[6] The HCRE Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. The HCRE Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. The HCRE Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due. The purpose of the HCRE Term Note was made in-part to consolidate several prior notes made between HCRE Partners, LLC, and HCM. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was

[5] *Id.* at 00202-203.
[6] *Id.* at 00218-219.

ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

11. On October 12, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "October 12, 2017 Note").[7] The October 12, 2017 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the October 12, 2017 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

12. On October 15, 2018, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $750,000 (the "October 15, 2018 Note").[8] The October 15, 2018 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the October 15, 2018 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[7] *Id.* at 00205-206.
[8] *Id.* at 00208-209.

13. On September 25, 2019, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $900,000 (the "September 25, 2019 Note").[9] The September 25, 2019 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the September 25, 2019 Note was payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

**4. HCM Issued five (5) Notes to HCMS.**

14. On March 28, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "March 28, 2018 Note").[10] The March 28, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.88%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the March 28, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

[9] *Id.* at 00211-212.
[10] *Id.* at 00118-119.

15. On June 25, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $200,000.00 (the "June 25, 2018 Note").[11] The June 25, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 3.05%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

16. On May 29, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $400,000.00 (the "May 29, 2019 Note").[12] The May 29, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.39%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[11] *Id.* at 00121-122.
[12] *Id.* at 00124-125.

17. On June 26, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "June 26, 2019 Note").[13] The June 26, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.37%, to be calculated at a daily rate equal to 1/365th per annum. On its original terms, the June 26, 2019 Note was payable upon demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

18. On May 31, 2017, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $20,247,628.02 (the "HCMS Term Note").[14] The HCMS Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365th per annum. The HCMS Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047. This Term Note has been paid current. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note. This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal, and it did not contain any

[13] *Id*. at 00127-128.
[14] *Id*. at 00134-135.

provision concerning what the impact of prepayments would be on future scheduled payments. Attached to this Declaration as "Exhibit A" is an amortization table showing payments made on the HCMS Term Note, which was kept in the normal and ordinary course of business and made by someone with knowledge of the payments at the time it was created.

**C. Dugaboy, as the "Majority Interest" Approved Compensation.**

19. HCM was formed as a limited partnership under the laws of the State of Delaware, and was governed by a Limited Partnership Agreement ("LPA").[15] The LPA was entered into on December 24, 2015, between Strand Advisors, Inc. (the General Partner), and the following Limited Partners:

(1) The Dugaboy Investment Trust ("Dugaboy"),

(2) The Mark and Pamela Okada Family Trust – Exempt Trust #1,

(3) The Mark and Pamela Okada Family Trust – Exempt Trust #2, and

(4) Mark Okada.[16]

20. Pursuant to the LPA – specifically in Section 3.10(a) –HCM's "Majority Interest[-holder]" was entitled to approve the compensation of HCM's General Partner and any "Affiliate" of the General Partner.[17] The LPA defines the Majority Interest as "the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[18] The Dugaboy Family Trust ("Dugaboy") represented the Majority Interest of the Limited Partners, owning a 74.4426% interest of the Limited Partners Class A Interest.[19]

---

[15] *Id.* at 00606-641.
[16] *Id.* at 00636-638.
[17] *Id.* at 00622.
[18] *Id.* at 00612.
[19] *Id.* at 00639.

21. My sister Nancy Dondero has served as the Dugaboy Family Trustee since her appointment in 2015. Attached as "Exhibit B" is a copy of Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015, a record which was kept in the ordinary course of business and made by someone with knowledge of the appointment. Prior to Nancy Dondero's service, Grant Scott served as Dugaboy Family Trustee until October 12, 2015. Grant Scott's resignation letter is contained within Exhibit B. Prior to Grant Scott's service as Dugaboy Family Trustee, I personally served as Dugaboy Family Trustee until my resignation on August 26, 2015. Attached as "Exhibit C" is proof of my service as Family Trustee for the Dugaboy Family Trust and my subsequent resignation prior to Grant Scott's appointment, a record which was kept in the ordinary course of business and made by someone with knowledge of the document.. .

**D. Dugaboy Agreed That HCM Would Not Collect on the Notes Upon Fulfillment of Conditions Subsequent, Making the Notes Potentially Deferred Compensation.**

22. Based on my years of experience in working in Private Equity, I am familiar with the compensation structure of similarly situated Private Equity firms. Based on this experience, I am also very familiar with the compensation structure of other similarly situated executives like myself.

23. At HCM, as at other comparable capital investment firms, it was common practice to compensate executives with forgivable loans. My compensation was no exception to this practice. In fact, I was undercompensated in my position compared to similarly-situated contemporaries in my field. I know that several other individuals may have received loans by HCM that were forgiven. These individuals include Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery and this was also a common practice and another company in which I have an interest, NexBank Capital, Inc.

24. At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred. Specifically, if one of specific portfolio companies – either MGM, Cornerstone, or Trussway – were sold for above cost, or sold in a circumstance outside of my control, HCM agreed that the Notes would be forgiven. In late 2013 or early 2014, the Dugaboy Family Trustee had made an identical agreement that applied to the November 27, 2013 Note. The Agreement assured HCM that the monetization of these portfolio companies would have my utmost focus and attention, and served as an incentive for me to work particularly hard to make sure these assets were successful. Further, this agreement provided the additional benefit to HCM of not increasing my base salary, which I normally would have requested and obtained. However, reaching this agreement made my compensation conditional on performance, and ensured that HCM would not immediately realize a change in its financial position through an increase in my salary, something I had the right to increase.

25. At either the end of 2018 or the beginning of 2019, Dugaboy and I entered into another agreement that was identical to the Agreement made in the preceding year (the "2018 Agreement"). This 2018 Agreement covered all the Notes at issue in this litigation that were issued in 2018. The 2018 Agreement provided the same benefits to the HCM as the 2017 Agreement.

26. At either the end of 2019 or the beginning of 2020 (prior to January 9, 2020), Dugaboy and I entered into another agreement that was identical to the 2018 Agreement (the "2019 Agreement"). Again, the 2019 Agreement applied to all the Notes at issue in this litigation that were issued in 2019. The 2019 Agreement provided the same benefits to HCM as the 2018 and 2017 Agreements. Collectively, the 2017, 2018, and 2019 Agreements are referred to herein as

the "Agreements." I understand that Plaintiff claims in its Motion that Nancy Dondero and I do not agree about whether I identified the Notes subject to the Agreements. Despite unclear questioning at my deposition, I testified that I identified the Notes that were subject to the Agreements when entering into the Agreements (which is how Nancy Dondero was aware that they involved the different companies) and I specifically remember discussing and identifying the Notes to Nancy Dondero.

27. In my years of experience in this industry, and experience working with financial auditors, although the Agreements were not disclosed to the financial auditors at HCM, such a disclosure was not necessary since it would not be considered material. When compared to the considerable size of HCM's assets, the Agreement on such small comparative Notes was *de minimus* when viewed in light of such large assets. Therefore, the Agreement was non-material and did not require disclosure.

28. Prior to the commencement of any Adversary Proceedings concerning the Notes, I mentioned to Frank Waterhouse that there were mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate. This came up in the context of discussing what we called the "Pot Plan" discussion for resolving the bankruptcy. I did not discuss every detail of the Agreements, because the important point was that he was made aware that the Notes should be considered as part of my compensation in connection with a resolution of the bankruptcy. By that time there was a great likelihood that some or all of the portfolio companies would be able to be sold for far more that their acquisition price.

29. Further, opposing counsel was alerted on February 1, 2021 that one of the defenses in this litigation was that the Notes were subject to forgiveness as potential compensation. In a letter from my one of my attorneys– to opposing counsel at Pachulski Stang Ziehl & Jones, LLP,

the late retired Bankruptcy Judge Lynn, my lead counsel, made that disclosure. A true and correct copy of this letter is attached to this Declaration as "Exhibit D."

**E. The Agreements Were Made in Good Faith.**

30. The Agreements made between myself and Dugaboy were all entered into in good faith. At no point in time were any of these Agreements made with the intent to hinder or defraud HCM as payee. Dugaboy had the right to approve my compensation under the LPA, and it was exercising that right when it agreed to make the Notes forgivable as compensation, provided that I performed successfully as a HCM executive and made sure that the aforementioned illiquid assets were sold for at-or-above cost.

**F. HCM Waived Any Rights to Collect on the Notes When Dugaboy Made the Agreements.**

31. When the Agreements were made, HCM waived any rights it had to demand repayment of the demand Notes until it became impossible for the condition subsequent to be met. However, I still intended to make periodic interest payments because I understood that until forgiveness actually occurred, the notes were still bona fide notes. Also, making periodic payments kept the Notes from becoming unreasonably large in the event the conditions for forgiveness did not come to pass. The term loans had requirements for interest payments to be made until the conditions for forgiveness were met, which, as discussed below, were met.

**G. Under its Shared Services Agreement with NexPoint, HCM was Responsible for the NexPoint Term Note Payments Being Made.**

32. NexPoint and HCM entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, in which HCM provided a broad array of services to NexPoint, and essentially covered all functional areas of NexPoint's business other than executive

and investment functions.[20] In my experience, these types of shared services agreements are common in my industry, and exist to help consolidate function and manpower between a large entity (like HCM) and smaller entities (like NexPoint) that share overlapping ownership structures.

33. The NexPoint SSA outlined multiple areas in which HCM would provide services for NexPoint, which resulted in HCM providing virtually the entire workforce for NexPoint's business. Among the areas of services provided under the NexPoint SSA, HCM provided services for NexPoint's back- and middle-office divisions, legal compliance and risk divisions, tax division, administrative services division, management of NexPoint's clients and accounts, and many other divisions.[21] Again, this type of shared services agreement covering these types of services is common in the private equity market where ownership overlaps.

34. The result of this shared services agreement was that HCM was responsible for making debt payments on behalf of NexPoint – considered a "back and middle office" task – which included making payments on the NexPoint Term Note. In fact, HCM made the NexPoint Term Note payments – consistent with the SSA, which specifically provided that HCM would make payments to creditors – on December 31 of 2017, 2018, and 2019, without any specific authorization or permission from any of the makers.

35. Although HCM sought to provide notice of termination of the NexPoint SSA in November of 2020, that termination date was subsequently extended and the SSA was still active and in full effect as of December 31, 2020, the date on which the 2020 annual installment payment was due. The letters providing for the subsequent extension of the NexPoint SSA is attached to this Declaration as "Exhibit E"[22] Because HCM was still responsible for making these types of

---

[20] *Id.* at 04163-04181.
[21] *Id.* at 04165-04167, NexPoint SSA, Section 2.02 "Provision of Services" (a-l).
[22] See attached Exhibit B, (Letters confirming Jim Dondero's resignation as Dugaboy Family Trustee, and the appointment of Nancy Dondero as Dugaboy Family Trustee)

payments for NexPoint at that time under the active SSA, HCM was responsible for missing that payment. The fact that HCM did not make that payment – as it had done in previous years – was surprising to me, since I never at any point directed Frank Waterhouse to cease making term payments on any Note. In fact, I fully expected HCM's accounting staff to continue making scheduled payments on the NexPoint Note, since the SSA was still in place. The only thing I instructed Frank Waterhouse to do was to pause payment to HCM regarding the NexPoint SSA because it came to light that NexPoint was being substantially overcharged and had already substantially overpaid. I would not have instructed Frank Waterhouse to not make a $1.4 million installment payment on the NexPoint Term Note – which could result in a default – as the $1.4 million payment would be trivial compared to a note acceleration.

**H. Under its Oral Shared Services Agreement with HCRE, HCM was also Responsible for the HCRE Term Note Payments Being Made.**

36. HCRE had a similar shared services agreement (the "HCRE SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCRE as it did to NexPoint, and orally agreed to do so. Similar to NexPoint, HCRE simply did not have the infrastructure or manpower to run its business without the HCRE SSA. As such, HCM provided a comprehensive array of services to HCRE that included back- and middle-office tasks like making sure HCRE's bills and loans were timely paid. This HCRE SSA was long-standing, as HCM had provided these comprehensive services to HCRE for years, and HCRE relied heavily on HCM to provide these services.

37. HCM – despite having routinely paid on bills and notes for HCRE – did not make the December 31, 2020 payment on the HCRE Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCRE SSA. Further, at no point prior to

that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCRE Term Note. I fully expected HCM's accounting staff to continue providing these services and making the scheduled payments on the HCRE Term Note.

**I. Under its Oral Shared Services Agreement with HCMS, HCM was also Responsible for the HCMS Term Note Payments Being Made.**

38. HCMS also had a similar shared services agreement (the "HCMS SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCMS as it did to NexPoint and HCRE, and orally agreed to do so. Similar to NexPoint and HCRE, HCMS simply did not have the infrastructure or manpower to run its business without the HCMS SSA. As such, HCM provided a comprehensive array of services to HCMS that included back- and middle-office tasks like making sure HCMS's bills and loans were timely paid. This HCMS SSA was long-standing, as HCM had provided these comprehensive services to HCMS for years, and HCMS relied heavily on HCM to provide these services.

39. HCM – despite having routinely paid on bills and notes for HCMS – did not make the December 31, 2020 payment on the HCMS Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCMS SSA. Further, at no point prior to that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCMS Term Note. I fully expected HCM's accounting staff to continue providing these services and making the scheduled payments on the HCMS Term Note.

**J. Payments Were Made on the NexPoint, HCRE, and HCMS Term Notes to Cure Any Defaults.**

40. I did not know that the NexPoint, HCRE, and HCMS Term Notes were in default until I called Frank Waterhouse from an in-person hearing in January 2021. I was surprised,

angered, and annoyed to learn that such *de minimis* amounts had not been paid on the Term Notes

to keep them current.  After asking Frank Waterhouse what it would take to cure them and make

them current, he informed me of the amounts required, and I instructed him to make sure the

payments got made and that the Term Notes were cured.  Much later I learned, discussed further

below, that the NexPoint and HCMS loans had been substantially prepaid so that no payment was

actually due in December 2021.  HCM, which was responsible for keeping track of the status of

the loan, did not remind me of the prepayments in December of 2020 or January of 2021.  So I

pressed Frank Waterhouse, who was HCM's CFO and had the ability and authority to speak on

behalf of and bind HCM, to make the payments HCM should have made if it believed that end of

year payments on the Term Notes were due in 2020, and he told me the amounts needed and

proceeded to make the payments.  I would not have caused these payments to be made if Frank

Waterhouse disagreed and told me that the payments would not cure and reinstate the loans.

41.    As a result of my conversation with Frank Waterhouse, I therefore believed that the

Term Notes would be cured by the payments I directed Frank Waterhouse to make.  Surely if the

payments would not have cured the loans, he -- the lender's CFO -- would have told me that before

making the payments. I could not have been clearer that I was flabbergasted that the payments had

not been made and wanted the payment to be made as soon as possible to bring the loans current.

I specifically discussed with Frank Waterhouse – HCM's CFO at the time – that I wanted these

payments to act as cure payments for all three Term Notes.  Waterhouse did not disagree with me

that the payments would cure the missed payments, and he agreed to make the cure payments.

However, HCM refused to accept the payments as cure for the defaults.

**K.    Prepayments by NexPoint and HCMS.**

42.     The HCMS and NexPoint Term Notes called for annual payments to be made by December 31 of every calendar year.  Not only did HCM make the required term payments, but I also instructed several prepayments to be made on these Notes throughout the years whenever HCM needed liquidity.  I understood that the prepayments I caused to be made on the Term Notes, when cash flow required, would be applied to the next scheduled annual payments if payments were not otherwise able to be made, and any reconciliations would be conducted by the HCM so that the borrowers would not be in default as a result of their voluntary prepayments for HCM's benefit.  I know that both NexPoint and HCMS made substantial prepayments on their term loans.

43.     Between March and August of 2019, the following prepayments were made on the NexPoint Term Note: (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.  These payments totaled $6,380,000.00 in 2019.  Setting aside all issues of prepayment, the normal December, 2019 payment of principal and interest on the NexPoint Term Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

44.     I know that none of the payments listed above were scheduled payments, but rather, they were payments made upon request from HCM because it needed the liquid funds.  Both NexPoint and HCM intended for these payments to count as prepayments on the NexPoint Note to be applied to the December 31, 2020 annual installment payment.

45.     Similar to NexPoint, HCMS made substantial prepayments towards the HCMS Term Note between May of 2017 and December of 2020.  In fact, the prepayments were so large that the HCMS Term Note's principal was paid down by almost $14,000,000.  In that timeframe, the following prepayments were made on the HCMS Term Note: (i) $985,216.44 on June 23, 2017;

(ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.

46. Similar to the NexPoint Term Note prepayments, none of these payments were made on December 31 of any given year, nor were any of these payments made on arrears. Instead, these payments were intended by HCMS to be applied to the annual installment payments, and were believed to be accepted as such, since HCM never declared the HCMS Term Note to be in default in either 2017, 2018, or 2019.

**L. Sale of Shares of MGM.**

47. I understand that Plaintiff raises the issue of a sale of Plaintiff's interest in MGM in its Motion. This sale of a small portion of Plaintiff's interest in MGM would not have implicated the Agreements because it was for a *de minimis* amount of MGM stock and was only necessitated as a result of the UCC not being willing to cooperate in a transaction as part of the bankruptcy process that was agreed to by all of the other participants.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 20, 2022

JAMES DONDERO

# Exhibit A

**HCM Services**
**Exhibit A**

**Closing Date** 5/31/2017
**Total Commitment** $ 20,247,628
**Rate** 2.750%

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | 20,247,628.02 |
| 5/31/2017 | - | | - | 20,247,628.02 | | 20,247,628.02 |
| 6/23/2017 | 35,086.64 | (35,086.64) | - | 20,247,628.02 | (950,129.80) | 19,297,498.22 |
| 6/30/2017 | 10,177.45 | | 10,177.45 | 19,297,498.22 | | 19,297,498.22 |
| 7/6/2017 | 8,723.53 | (18,900.97) | - | 19,297,498.22 | (888,395.28) | 18,409,102.95 |
| 7/18/2017 | 16,643.85 | (16,643.85) | 0.00 | 18,409,102.95 | (1,014,819.85) | 17,394,283.10 |
| 7/31/2017 | 17,036.87 | | 17,036.87 | 17,394,283.10 | | 17,394,283.10 |
| 8/25/2017 | 32,763.20 | (199,329.33) | (149,529.26) | 17,394,283.10 | (1,771,930.80) | 15,622,352.30 |
| 8/31/2017 | 7,062.16 | | (142,467.10) | 15,622,352.30 | | 15,622,352.30 |
| 9/30/2017 | 35,310.80 | | (107,156.30) | 15,622,352.30 | | 15,622,352.30 |
| 10/31/2017 | 36,487.82 | | (70,668.48) | 15,622,352.30 | | 15,622,352.30 |
| 11/30/2017 | 35,310.80 | | (35,357.68) | 15,622,352.30 | | 15,622,352.30 |
| 12/21/2017 | 24,717.56 | | (10,640.13) | 15,622,352.30 | (1,500,000.00) | 14,122,352.30 |
| 12/31/2017 | 10,640.13 | | 0.00 | 14,122,352.30 | | 14,122,352.30 |
| 1/31/2018 | 32,984.40 | | 32,984.40 | 14,122,352.30 | | 14,122,352.30 |
| 2/28/2018 | 29,792.36 | | 62,776.76 | 14,122,352.30 | | 14,122,352.30 |
| 3/31/2018 | 32,984.40 | | 95,761.16 | 14,122,352.30 | | 14,122,352.30 |
| 4/30/2018 | 31,920.39 | | 127,681.54 | 14,122,352.30 | | 14,122,352.30 |
| 5/31/2018 | 32,984.40 | (160,665.94) | 0.00 | 14,122,352.30 | 160,665.94 | 14,283,018.24 |
| 6/30/2018 | 32,283.53 | | 32,283.54 | 14,283,018.24 | | 14,283,018.24 |
| 7/31/2018 | 33,359.65 | | 65,643.19 | 14,283,018.24 | | 14,283,018.24 |
| 8/31/2018 | 33,359.65 | | 99,002.84 | 14,283,018.24 | | 14,283,018.24 |
| 9/30/2018 | 32,283.53 | | 131,286.37 | 14,283,018.24 | | 14,283,018.24 |
| 10/8/2018 | 8,608.94 | (412,000.00) | (272,104.68) | 14,283,018.24 | (588,000.00) | 13,695,018.24 |
| 10/31/2018 | 23,731.78 | | (248,372.91) | 13,695,018.24 | | 13,695,018.24 |
| 11/30/2018 | 30,954.49 | | (217,418.41) | 13,695,018.24 | | 13,695,018.24 |
| 12/31/2018 | 31,986.31 | | (185,432.10) | 13,695,018.24 | | 13,695,018.24 |
| 1/31/2019 | 31,986.31 | | (153,445.79) | 13,695,018.24 | | 13,695,018.24 |
| 2/28/2019 | 28,890.86 | | (124,554.93) | 13,695,018.24 | | 13,695,018.24 |
| 3/5/2019 | 5,159.08 | (37,904.91) | (157,300.76) | 13,695,018.24 | (977,095.09) | 12,717,923.15 |
| 3/31/2019 | 24,913.19 | | (132,387.57) | 12,717,923.15 | | 12,717,923.15 |
| 4/30/2019 | 28,745.99 | | (103,641.58) | 12,717,923.15 | | 12,717,923.15 |
| 5/31/2019 | 29,704.19 | | (73,937.39) | 12,717,923.15 | | 12,717,923.15 |
| 6/30/2019 | 28,745.99 | | (45,191.40) | 12,717,923.15 | | 12,717,923.15 |
| 7/31/2019 | 29,704.19 | | (15,487.21) | 12,717,923.15 | | 12,717,923.15 |
| 8/9/2019 | 8,623.80 | | (6,863.41) | 12,717,923.15 | (550,000.00) | 12,167,923.15 |
| 8/21/2019 | 11,001.14 | (4,137.73) | (0.00) | 12,167,923.15 | (5,595,862.27) | 6,572,060.88 |
| 8/31/2019 | 4,951.55 | | 4,951.55 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2019 | 14,854.66 | | 19,806.21 | 6,572,060.88 | | 6,572,060.88 |
| 10/15/2019 | 7,427.33 | | 27,233.54 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2019 | 7,922.48 | | 35,156.02 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2019 | 14,854.66 | | 50,010.68 | 6,572,060.88 | | 6,572,060.88 |
| 12/30/2019 | 14,854.66 | (65,360.49) | (495.15) | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2019 | 495.16 | | 0.00 | 6,572,060.88 | | 6,572,060.88 |
| 1/31/2020 | 15,349.81 | | 15,349.82 | 6,572,060.88 | | 6,572,060.88 |
| 2/29/2020 | 14,359.50 | | 29,709.32 | 6,572,060.88 | | 6,572,060.88 |
| 3/31/2020 | 15,349.81 | | 45,059.13 | 6,572,060.88 | | 6,572,060.88 |
| 4/30/2020 | 14,854.66 | | 59,913.79 | 6,572,060.88 | | 6,572,060.88 |
| 5/31/2020 | 15,349.81 | | 75,263.60 | 6,572,060.88 | - | 6,572,060.88 |
| 6/30/2020 | 14,854.66 | | 90,118.26 | 6,572,060.88 | | 6,572,060.88 |
| 7/31/2020 | 15,349.81 | | 105,468.08 | 6,572,060.88 | | 6,572,060.88 |
| 8/31/2020 | 15,349.81 | | 120,817.89 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2020 | 14,854.66 | | 135,672.55 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2020 | 15,349.81 | | 151,022.36 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2020 | 14,854.66 | | 165,877.02 | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2020 | 15,349.81 | | 181,226.83 | 6,572,060.88 | | 6,572,060.88 |
| 1/21/2021 | 10,398.26 | (181,226.83) | 10,398.26 | 6,572,060.88 | | 6,572,060.88 |

# Exhibit B

**THE DUGABOY INVESTMENT TRUST**
**James D. Dondero, Primary Beneficiary**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re: The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

**THE DUGABOY INVESTMENT TRUST**
**Grant James Scott, Family Trustee**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re: The Dugaboy Investment Trust

Dear Ms. Breault,

I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

# RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

[signature]
Family Trustee

10/12/2015
Date

STATE OF TEXAS §
COUNTY OF DALLAS §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Micaela Sue Allen
Notary Public's Signature

Expiration: January 15, 2019

**ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE**

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 13th day of October, 2015.

Nancy Marie Dondero
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS §
COUNTY OF DALLAS §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Micaela Sue Allen
Notary Public's Signature

Expiration: January 15, 2019

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

James D. Dondero

# Exhibit C

# TRUST AGREEMENT

Between

DANA SCOTT BREAULT,
Settlor

and

JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees

THE DUGABOY INVESTMENT TRUST

WINSTEAD PC
DALLAS, TEXAS

THE DUGABOY INVESTMENT TRUST

TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS ........................................ 1
1.1 Settlor ........................................ 1
1.2 Jim ........................................ 1
1.3 Trustees ........................................ 1
1.4 Children ........................................ 1
1.5 Descendants ........................................ 1
1.6 Code ........................................ 1
1.7 Per Stirpes ........................................ 1

ARTICLE II FUNDING ........................................ 2

ARTICLE III DISTRIBUTION OF PRINCIPAL AND INCOME ........................................ 2
3.1 Trust for Jim ........................................ 2
3.2 Trust for Child ........................................ 5
3.3 Trusts for Descendants ........................................ 6
3.4 Contingent Distribution ........................................ 9
3.5 General Power of Appointment for Certain Beneficiaries ........................................ 9
3.6 Postponement of Distribution ........................................ 10

ARTICLE IV PROVISIONS AFFECTING DISTRIBUTION ........................................ 10
4.1 Withdrawal Right ........................................ 10
4.2 Restriction Upon Alienation ........................................ 12
4.3 Distributions Constitute Separate Property ........................................ 12
4.4 Method of Payment ........................................ 12
4.5 Evidence of Need ........................................ 12
4.6 Termination of Small Trust ........................................ 12
4.7 Generation-Skipping Transfer Taxes and Payment ........................................ 13

ARTICLE V THE TRUSTEE ........................................ 13
5.1 Resignation of Trustee ........................................ 13
5.2 Appointment and Succession of Trustees. ........................................ 14
5.3 Removal of Trustee ........................................ 16
5.4 Succession of Corporate Trustee ........................................ 16
5.5 Trustee's Fees ........................................ 16
5.6 Bond ........................................ 16
5.7 Liability of Trustee. ........................................ 16
5.8 Predecessor Fiduciary ........................................ 18
5.9 Periodic Accounting ........................................ 18
5.10 Beneficiary under Disability ........................................ 19
5.11 Incapacity of Individual Trustee ........................................ 19

ARTICLE VI TRUST ADMINISTRATION ........................................ 19

TABLE OF CONTENTS
(Continued)

PAGE

6.1 General Powers ....19
6.2 Division of Powers ....24
6.3 Merger of Trusts ....25
6.4 Certain Powers and Rights Limited ....25
6.5 GST Inclusion Ratio ....25
6.6 Out-of-State Properties ....25
6.7 Management of Real Property ....26
6.8 No Court Supervision ....26
6.9 Division of Trusts ....26
6.10 Limitation of Powers ....26
6.11 Dealing with Fiduciaries ....27

ARTICLE VII IRREVOCABILITY ....27

ARTICLE VIII MISCELLANEOUS PROVISIONS ....28
8.1 Applicable Law ....28
8.2 Perpetuities Provision ....28
8.3 Gestation ....28
8.4 Survivorship ....29
8.5 Release of Powers and Interests ....29
8.6 Powers of Appointment. ....29
8.7 Liability of Third Party ....30
8.8 Use of Words ....30
8.9 Unenforceable Provision ....30
8.10 Titles, Headings, and Captions ....30
8.11 Counterpart Signatures ....30
8.12 Trust Name ....30

THE DUGABOY INVESTMENT TRUST

AGREEMENT OF TRUST made and entered into at Dallas, Texas, this ____ day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

ARTICLE I

DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1 Settlor. "Settlor" means DANA SCOTT BREAULT.

1.2 Jim. "Jim" means JAMES D. DONDERO.

1.3 Trustees. The initial Trustee of each trust created hereunder is JAMES D. DONDERO. "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number. "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c). "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b). "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a). The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4 Children. "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement. "Child" means one of the Children.

1.5 Descendants. "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6 Code. "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7 Per Stirpes. "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant. The per

stirpital allocation shall commence with the most senior generation that has a living representative.

ARTICLE II

FUNDING

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

ARTICLE III

DISTRIBUTION OF PRINCIPAL AND INCOME

3.1 Trust for Jim. The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a) Distributions to Jim. The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health. Undistributed income shall be accumulated and added to principal. In exercising its discretion, the Family Trustee shall take into account the following factors:

(i) Jim is the primary beneficiary of the trust.

(ii) The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii) Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv) Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v) Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b) Distributions by Independent Trustee. The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable. It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c) Inter Vivos Special Power of Appointment. During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate. Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d) Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i) If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii) The scope and terms of the power shall be defined in the instrument. Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted. This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes. Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e) Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death. Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i) Pursuant to General Testamentary Power of Appointment. This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death. In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii) Special Testamentary Power of Appointment. This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above. The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii) Alternative Disposition. The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1) If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living. The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof. The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

(2) If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

3.2 Trust for Child. All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

(a) Distributions to Child. The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The Child's standard of living at the creation of the trust.

(ii) The Child is the primary beneficiary of the trust.

(iii) The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

(iv) Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

(b) Distributions to Child's Descendants. The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The primary purpose of the trust.

(ii) The respective needs of each Descendant.

(iii) The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv) Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c) Inter Vivos Special Power of Appointment. The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d) Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child. Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate. The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof. If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, Per Stirpes. If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms. If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3 Trusts for Descendants. The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

Descendants, Per Stirpes. The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

(a) Distributions. The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The Beneficiary's standard of living at the creation of the trust.

(ii) The Beneficiary is the primary beneficiary of the trust.

(iii) The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

(iv) Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

(b) Distributions to Beneficiary's Descendants. The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The primary purpose of the trust.

(ii) The respective needs of each Descendant.

(iii) The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv) Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c) Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d) Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4 Contingent Distribution. If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5 General Power of Appointment for Certain Beneficiaries.

(a) Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable. As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b) If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

(c) The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6 Postponement of Distribution. Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property. At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate. During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education. If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

ARTICLE IV

PROVISIONS AFFECTING DISTRIBUTION

4.1 Withdrawal Right. Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer. A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust. If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes. Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

(a) Amount That May Be Withdrawn. When a contribution is made, Jim may withdraw the lesser of the following amounts:

(i) the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

(ii) the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

(iii) the value of the contribution that is subject to the withdrawal right.

(b) Withdrawal Period and Notice. Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right. Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right. During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf. If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse. For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate. The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

(c) Payment of Withdrawal Amount. If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor. Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust. Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose. Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

(d) Distributions During Withdrawal Period. If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

(e) Lapse of Withdrawal Right. In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

4.2 Restriction Upon Alienation. No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it. Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts. The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process. The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3 Distributions Constitute Separate Property. Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary. Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary. Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4 Method of Payment. The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways: directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability. In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto. The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5 Evidence of Need. In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs. The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6 Termination of Small Trust. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration. In the event of termination, the Trustee shall distribute the trust to the income

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7 Generation-Skipping Transfer Taxes and Payment. It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1 Resignation of Trustee. The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

5.2 Appointment and Succession of Trustees.

(a) Generally.

(i) Family Trustee. Jim is the initial Family Trustee of all trusts created hereunder. If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising. If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee. If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee. If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

(ii) Independent Trustee. GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee. If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code. If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee. If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

(iii) Administrative Trustee. COMMONWEALTH TRUST COMPANY is the initial Administrative Trustee. If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising. If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising. If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above. The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b) Successor Trustee. If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act. If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c) Manner of Appointment; Permissible Trustees. Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee. An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control. The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3 Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4 Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5 Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6 Bond. The Trustee shall not be required to furnish bond or other security.

5.7 Liability of Trustee.

(a) Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b) Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8 Predecessor Fiduciary. No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9 Periodic Accounting. The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10 Beneficiary under Disability. A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11 Incapacity of Individual Trustee. In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

## ARTICLE VI

## TRUST ADMINISTRATION

6.1 General Powers. Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a) Retain Property. To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b) Invest. To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c) Sell. By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper. To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d) Lease. To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e) Real Estate. To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f) Borrow. To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g) Loans. To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h) Conserve Estate. To take any action to conserve the trust estate.

(i) Litigation. To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j) Claims. To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k) Abandon Property. To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l) Documents. To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m) Agents. To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

(n) Securities. To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o) Nominee. To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p) Additional Property. To receive additional property from any source and add it to the trust estate.

(q) Insurance. To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r) Business Powers.

(i) In General. To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii) Closely Held Businesses. This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1) Exoneration from Liability. It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds. Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2) Management Powers. The Family Trustee shall have the exclusive duty to deal with and manage the business. In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A) To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

(B) To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C) To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D) To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E) To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F) To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G) To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or a fiduciary of this Trust; and

(3) Exclusion from Powers. Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s) Income and Principal. To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t) Tax Elections. To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others. The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

(u) Reliance. To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution. The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v) Commingling. To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w) Division and Distribution. To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x) Withholding of Distribution. To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y) Mineral Powers. To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z) Environmental Hazards. To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

(aa) Miscellaneous Powers. Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2 Division of Powers. The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a) Administrative Trustee. The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i) To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii) To maintain storage of tangible personalty and evidence of intangible trust property.

(iii) To maintain trust records.

(iv) To maintain an office for Trustee meetings and other trust business.

(v) To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi) To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii) To execute documents with respect to trust account transactions.

(viii) To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b) Independent Trustee. The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement. These powers may only be exercised by the Independent Trustee.

(c) Family Trustee. The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee. Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate. If there is no Family Trustee serving,

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3 Merger of Trusts. If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement. The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement. If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen. If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire. Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4 Certain Powers and Rights Limited. Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d). All issues applicable to the trust shall be resolved accordingly.

6.5 GST Inclusion Ratio. If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero. If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6 Out-of-State Properties. If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper. The ancillary trustee shall be responsible to the Trustee for all property it administers. The Trustee

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.7 Management of Real Property. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.8 No Court Supervision. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

6.9 Division of Trusts. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

(a) Division and Funding of Separate Trusts. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

(b) Administration of Separate Trusts. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

(c) Powers of Appointment. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

6.10 Limitation of Powers. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

(a) Support Duty. Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries. When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b) Adequacy of Consideration. No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c) Insurance. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d) Borrow. The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e) Substitute Property. The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f) Vote. A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11 Dealing with Fiduciaries. The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement. Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is: a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

## ARTICLE VII

## IRREVOCABILITY

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

8.1 Applicable Law. The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware. However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state. No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes. Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust. Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2 Perpetuities Provision. The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law. If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property. If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement. Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3 Gestation. A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

8.4 Survivorship. Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5 Release of Powers and Interests. Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law. Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6 Powers of Appointment.

(a) Capacity in Which Exercisable. Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b) Manner of Appointment. Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others. Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c) Exercise of Inter Vivos Power. An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it. If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d) Determination of the Exercise of a Testamentary Power. The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised. If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

(e) Tax Consequences. The exercise of a power of appointment may have important tax consequences. The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7 Liability of Third Party. No person paying money or delivering property to the Trustee need see to the application of such money or property. No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8 Use of Words. As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9 Unenforceable Provision. If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10 Titles, Headings, and Captions. All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11 Counterpart Signatures. This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12 Trust Name. The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals. The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement. The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

Dana Scott Breault 23Oct10
DANA SCOTT BREAULT, Settlor

STATE OF TEXAS §
§
COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 23rd day of October, 2010.

Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013
NOTARY PUBLIC
STATE OF TEXAS

JAMES D. DONDERO, Family Trustee

STATE OF TEXAS §
§
COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.

Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

COMMONWEALTH TRUST COMPANY,
Administrative Trustee

By: Cynthia D M Brown
Name: Cynthia D. M. Brown
Title: President

STATE OF DELAWARE §
§
COUNTY OF NEW CASTLE §

BEFORE ME, the undersigned authority on this day personally appeared Cynthia D. M. Brown, President, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed as the act of COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 15th day of ~~October~~ November LMO 2010.

Laura M Owens
Notary Public

LAURA M. OWENS
MY COMMISSION EXPIRES MAY 30, 2014
NOTARY PUBLIC
STATE OF DELAWARE

5480300v.6 47609/1

**THE DUGABOY INVESTMENT TRUST**
**James D. Dondero, Family Trustee**

August 26, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re: The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on August 26, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "Trust") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee, I appoint Grant James Scott as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

James D. Dondero

# RESIGNATION OF FAMILY TRUSTEE

I, **JAMES D. DONDERO**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

I appoint **GRANT JAMES SCOTT** as the successor Family Trustee. This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein Grant James Scott accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF,** I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

______________________ Family Trustee

8.26.15 Date

STATE OF TEXAS §
COUNTY OF DALLAS §

Before me, a notary public, on this day personally appeared **JAMES D. DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 26th day of August, 2015.

______________________ Notary Public's Signature

[SEAL]

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

Expiration: 1-15-2019

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 26th day of August, 2015.

GRANT JAMES SCOTT
**Family Trustee**

STATE OF ~~TEXAS~~ NC §
COUNTY OF ~~DALLAS~~ WAKE §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 26th day of August, 2015.

[SEAL]

Dianna Dees
Notary Public's Signature

Expiration: MY COMMISSION EXPIRES MAY 17, 2018

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee was delivered to and received by me on August 26 2015.

James D. Dondero

# Exhibit D

BONDS ELLIS EPPICH SCHAFER JONES LLP
ATTORNEYS & COUNSELORS

D. MICHAEL LYNN | D: 817.405.6915 | MICHAEL.LYNN@BONDSELLIS.COM

February 1, 2021

***Via Email and First Class Mail:***
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

**Re: Highland Capital Management, L.P.: notes receivable from Dondero et al.**

Dear Jeff:

The Debtor recently commenced suit to collect on certain notes payable to it executed by Mr. Dondero and certain of his affiliates. As you are aware, in addition to other defenses, Mr. Dondero views the notes in question as having been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero.

Please ensure that any transferee of any of the notes is made aware of Mr. Dondero's position and that the Independent Board receives copies of this letter. I thank you in advance for your cooperation in this matter.

Sincerely,

D. Michael Lynn

Cc: Jim Dondero
John Bonds
Douglas Draper
Davor Rukavina
Lee Hogewood
John Kane
Jason Rudd
Lauren Drawhorn

# Exhibit E

November 30, 2020

NexPoint Advisors, L.P.
200 Crescent Court, Suite 700
Dallas, Texas 75201

**RE: Termination of Amended and Restated Shared Services Agreement, dated January 1, 2018, and among Highland Capital Management, L.P. ("HCMLP"), and NexPoint Advisors, L.P. (the "Agreement").**

To Whom It May Concern:

As set forth in Section 7.01 of the Agreement, the Agreement is terminable at will upon at least 30 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement. Such termination will be effective January 31, 2021. HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# Exhibit 2

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**HIGHLAND CAPITAL MANAGEMENT, L.P.**<br><br>**Debtor.** | §<br>§<br>§<br>§<br>§ | **Case No. 19-34054**<br><br>**Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03003-sgj** |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,**<br><br>**Defendant.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03004-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03007-sgj** |

**DECLARATION OF NANCY M. DONDERO**

I, Nancy Marie Dondero, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I reside in Vero Beach, Florida and am over the age of 21. The following facts are based on my personal knowledge and are all true and correct. I am willing and able to testify about these matters if and when called upon to do so.

2. I have successfully owned and operated my own private investigation services business for over 30 years. I also have an undergraduate college degree from Pennsylvania State University, which included the study of basic business operations and management.

3. I am also the Family Trustee of The Dugaboy Investment Trust ("Dugaboy"), and I have held that position since October 2015. A true and correct copy of the document appointing me as Family Trustee is attached to this Declaration as Exhibit A. At the times that the notes discussed below were entered into, Dugaboy owned and represented a majority of the Class A shareholders in Highland Capital Management, L.P. ("Highland Capital"). Jim Dondero is my brother and was, at that time, the President and CEO of Highland Capital. I understood that he was one of the founders of Highland Capital and, through The Dugaboy Investment Trust, a majority interest holder.

4. Jim Dondero told me about his current and previous annual salaries at Highland Capital and explained that he was substantially underpaid as compared to other senior executives in the financial services industry. He told me that his annual salary from Highland Capital had been around $500,000 to $700,000 during the preceding several years. I had no reason to doubt the accuracy of what he told me about his compensation from Highland Capital or how that compared unfavorably to the compensation of others in similar positions with other companies in

the industry.

5. Jim Dondero also advised me that he and certain of his affiliated companies had, on several occasions between 2013 and 2019, borrowed money from Highland Capital and had issued demand and term promissory notes in favor of Highland Capital regarding those loans. He proposed that Highland Capital enter into an agreement with him and the other borrowers to forgive the Notes upon the occurrence of certain conditions subsequent, as a form of additional contingent compensation to him.

6. In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control. I fully understood the implications and terms of this Agreement.

7. At either the end of 2018 or the beginning of 2019, Jim Dondero and I later entered into the same Agreement to apply to subsequent notes that were issued by him or one of his affiliated companies to Highland Capital in 2018. I also fully understood the implications and terms of this Agreement.

8. At either the end of 2019 or the beginning of 2020, Jim Dondero and I again entered into the same agreement to cover and apply to the notes at issue in this litigation that were issued in 2019. All the Notes referenced herein are collectively referred to as the "Notes," and the agreements between Highland Capital and Jim regarding all of the Notes are collectively referred to herein as the "Agreements**.**" I also fully understood the implications and terms of these

Agreements. The Notes are as follows:

i. A demand note executed on February 2, 2018, between Highland Capital and Jim Dondero in the amount of $3,825,000.[1]

ii. A demand note executed on August 1, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[2]

iii. A demand note executed on August 13, 2018, between Highland Capital and Jim Dondero in the amount of $2,500,000.[3]

iv. A demand note executed on March 28, 2018, between Highland Capital and Highland Capital Management Services, Inc. ("HCMS") in the amount of $150,000.[4]

v. A demand note executed on June 25, 2018, between Highland Capital and HCMS in the amount of $200,000.[5]

vi. A demand note executed on May 29, 2019, between Highland Capital and HCMS in the amount of $400,000.[6]

vii. A demand note executed on June 26, 2019, between Highland Capital and HCMS in the amount of $150,000.[7]

viii. A demand note executed on October 12, 2017, between Highland Capital and HCRE Partners, LLC ("HCRE") in the amount of $2,500,000.[8]

ix. A demand note executed on October 15, 2018, between Highland Capital and

[1] Pl. Appx. 00678-679.
[2] Pl. Appx. 00681-682.
[3] Pl. Appx. 00684-685.
[4] Pl. Appx. 00118-119.
[5] Pl. Appx. 00121-122.
[6] Pl. Appx. 00124-125.
[7] Pl. Appx. 00127-128.
[8] Pl. Appx. 00205-206.

HCRE in the amount of $750,000.[9]

x. A demand note executed on September 25, 2019, between Highland Capital and HCRE in the amount of $900,000.[10]

xi. A term note executed on May 31, 2017, between Highland Capital and NexPoint Advisors, L.P. ("NexPoint"), in the amount of $30,746,812.33.[11]

xii. A term note executed on May 31, 2017, between Highland Capital and HCMS in the amount of $20,247,628.02.[12]

xiii. A term note executed on May 31, 2017, between Highland Capital and HCRE in the amount of $6,059,831.51.[13]

9. At the time I caused Highland Capital to enter into each of the Agreements, I knew that Highland Capital was a hedge fund and that its general partner was Strand Advisors, Inc. I also knew that Highland Capital owned an interest in each of Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements. I also knew that Highland Capital's business included buying and selling portfolio companies at a profit. I also knew and believed that Jim would be the person most involved in, and responsible for, the marketing and eventual sale of Cornerstone, MGM, and Trussway by Highland Capital. I also knew and believed that executives in the financial services industry tend to be paid more when the companies they work for perform better.

10. The Agreements had two primary purposes, both of which would benefit Highland Capital's performance and reputation. First, the Agreements would provide additional incentive

[9] Pl. Appx. 00208-209.
[10] Pl. Appx. 00211-212.
[11] Pl. Appx. 00042-43.
[12] Pl. Appx. 00134-135.
[13] Pl. Appx. 00218-219.

and motivation to Jim Dondero to attempt to maximize the value and return to Highland Capital on Trussway, Cornerstone, and MGM, and to remain in Plaintiff's employment. Second, the Agreements would allow Highland Capital to contingently increase Jim Dondero's compensation without requiring additional cash or salary to be paid to him and the consequential effect of such an increase on Highland Capital's financial position.

11.     At the time I caused Highland Capital to enter into each of the Agreements, I did not know every detail about every aspect of Highland Capital's business or the Notes. However, I did have all of the facts and information I considered necessary, appropriate, and reasonable for my decision (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into each of the Agreements. I do not believe that Highland Capital, Dugaboy, or I were deceived or mislead in any manner by Jim Dondero or anyone else regarding the Notes or any of the Agreements.

12.     At the time I caused Highland to enter into each of the Agreements, I appreciated the effect of what I was doing and I understood the nature and consequences of those acts. I was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment.

13.     At the time I caused Highland Capital to enter into each of the Agreements, I believed I had the authority, as the Dugaboy Family Trustee, to cause Dugaboy to cause Highland Capital to enter into the Agreements. I also intended, believed, and expected that each of the Agreements would be a binding and enforceable agreement between Highland Capital and Jim Dondero.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 20, 2022.

Nancy M. Dondero

Nancy M. Dondero

# Exhibit A

**THE DUGABOY INVESTMENT TRUST**
**James D. Dondero, Primary Beneficiary**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re: The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

**THE DUGABOY INVESTMENT TRUST**
**Grant James Scott, Family Trustee**

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re: The Dugaboy Investment Trust

Dear Ms. Breault,

I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

# RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

[signature] 10/12/2015

Family Trustee Date

STATE OF TEXAS §
COUNTY OF DALLAS §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Micaela Sue Allen
Notary Public's Signature

Expiration: January 15, 2019

**ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE**

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this 13th day of October, 2015.

Nancy Marie Dondero
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS §
COUNTY OF DALLAS §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

[SEAL]

Micaela Sue Allen
Notary Public's Signature

Expiration: January 15, 2019

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

James D. Dondero

# Exhibit 3

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:**<br><br>**HIGHLAND CAPITAL MANAGEMENT, L.P.**<br><br>**Debtor.** | §<br>§<br>§<br>§<br>§ | **Case No. 19-34054**<br><br>**Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03003-sgj** |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03007-sgj** |

**<u>DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declares as follows:

1. I am a member of the law firm of Stinson LLP, counsel to Defendant James Dondero, Highland Capital Management Services, Inc. and HCRE Partners, LLC n/k/a NexPoint Real Estate Partners, LLC, and I submit this Declaration in support of the *Defendants' Opposition to Plaintiff Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, which

is being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and the documents listed below.

2.      Attached as **Exhibit A** is a true and correct copy of the Transcript of the Video Deposition of James P. Seery, Jr. taken on October 21, 2021 in Adv. Proc. No. 21-03005.

3.      Attached as **Exhibit** B is a true and correct copy of the Transcript of the Remote Deposition of Bruce McGovern taken on November 9, 2021 in Adv. Proc. No 21-03003.

4.      Attached as **Exhibit C** is a true and correct copy of a List of Promissory Notes, bates labeled DEFENDANTS-0000434, that was used by Mr. Dondero at his deposition and produced to Plaintiff.

5.      Attached as **Exhibit D** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated November 25, 2020.

6.      Attached as **Exhibit E** is a true and correct copy of an email from F. Waterhouse to K. Hendrix, dated December 31, 2020.

7.      Attached as **Exhibit F** is a true and correct copy of the Expert Report of Steven J. Pully, dated December 10, 2021.

8.      Attached as **Exhibit G** is a true and correct copy of the Expert Report of Alan M. Johnson, dated May 28, 2021.

9.      Attached as **Exhibit H** is a true and correct copy of Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021.

Dated:  January 20, 2022                    */s/Michael P. Aigen*
                                                         Michael P. Aigen

# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re: )
) Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P.) Case No.
) 19-34054-sgj11
Debtor. )
-------------------------------- )
)
HIGHLAND CAPITAL MANAGEMENT, L.P.)
)
Plaintiff, )
)
-vs- ) Adversary
) Proceeding No.
NEXPOINT ADVISORS, L.P., JAMES ) 21-03005-sgj
DONDERO, NANCY DONDERO, AND THE )
DUGABOY INVESTMENT TRUST, )
)
Defendants. )
---------------------------------

VIDEO DEPOSITION OF JAMES P. SEERY, JR.

New York, New York

Thursday, October 21, 2021

Reported by:
MARIANNE WITKOWSKI-SMITH
JOB NO. 201192

October 21, 2021

2:02 p.m.

Video Deposition of JAMES P. SEERY, JR., individually and on behalf of HIGHLAND CAPITAL MANAGEMENT LP, held at the offices of Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue, New York, New York, before Marianne Witkowski-Smith, a Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

PACHULSKI STANG ZIEHL & JONES
Attorneys for Highland Capital Management LP and the Witness
780 Third Avenue
New York, New York 10017
BY: JOHN MORRIS, ESQ.
GREGORY DEMO, ESQ.
HAYLEY WINOGRAD, ESQ.

MUNSCH HARDT KOPF & HARR
Attorneys for NexPoint Advisors LP
500 North Akard Street
Dallas, Texas 75201
BY: DAVOR RUKAVINA, ESQ.
THOMAS BERGHMAN, ESQ.

(Continued on Next Page)

A P P E A R A N C E S (Cont'd):

STINSON
Attorneys for James Dondero, Nancy Dondero, HCRE, HCMS
3102 Oak Lawn Avenue
Dallas, Texas 75219
BY: DEBORAH DEITSCH-PEREZ, ESQ.
MICHAEL AIGEN, ESQ.

HELLER, DRAPER, HAYDEN, PATRICK, & HORN
Attorneys for The Dugaboy Investment Trust
650 Poydras Street
New Orleans, Louisiana 70130
BY: WARREN HORN, ESQ.

ALSO PRESENT:
MANUEL GARCIA, Legal Video Specialist
THANHAN NGUYEN, ESQ. (Via Zoom)
AARON LAWRENCE, ESQ. (Via Zoom)
LA ASIA CANTY (Via Zoom)

J. Seery

VIDEO TECHNICIAN: This is the start of Media Label No. 1 in the video-recorded deposition of James P. Seery Jr., in the matter of Highland Capital Management LP vs. NexPoint Advisors LP, et al., on October the 21st, 2021, at approximately 2:02 p.m.

My name is Manuel Garcia. I'm the certified legal videographer from TSG Reporting Inc. The court reporter is Marianne Smith, in association with TSG Reporting.

Counsel, please introduce yourselves.

MR. RUKAVINA: My name is Davor Rukavina. I represent NexPoint Advisors LP.

MR. MORRIS: My name is John Morris from Pachulski Stang Ziehl & Jones, on behalf of Capital -- Highland Capital Management LP, and I'm representing the witness, James P. Seery, Jr., today.

MS. DEITSCH-PEREZ: Hi. This is

J. Seery

Deborah Deitsch-Perez from Stinson LLP. I'm on with my partner, Michael Aigen, also from Stinson. We're representing James Dondero, Nancy Dondero, HCRE and HCMS.

MR. HORN: Warren Horn [inaudible].

(Reporter clarification.)

MR. HORN: Warren Horn, H-O-R-N, with Heller, Draper & Horn, representing The Dugaboy Investment Trust.

VIDEO TECHNICIAN: Will the court reporter please swear in the witness.

J A M E S P. S E E R Y, J R.,

the witness herein, was thereupon duly sworn by the Notary Public and was examined and testified as follows:

EXAMINATION

BY MR. RUKAVINA:

Q. Sir, good afternoon.

State your name, please.

A. James P. Seery, Jr.

Q. And just so we're clear, you have a

J. Seery

laptop in front of you because this is being done remotely as well, but you're not reviewing any material or taking any information or texts or emails like that, are you?

A. No.

Q. Okay. It's fair to say you've been --

A. I -- I have a phone in front of me, but I don't intend to use it.

Q. Okay. Fair to say that you've been deposed before?

A. I have.

Q. Approximately how many times?

A. More -- more than twenty-five.

Q. Okay. And quite a number in this case as well, correct?

A. More than -- probably more than fifteen.

Q. Okay. The only thing I'd ask - you're -- you're a veteran - is I have an accent and sometimes I talk fast, so don't -- don't hesitate to tell me that you didn't understand or ask me to rephrase, please.

J. Seery

Please don't hesitate to do that.

A. Thank you.

Q. Sir, just for the record, where do you live?

A. I live in New York City, Upper West Side.

Q. Do you have any real estate or property that -- where you live periodically in the State of Texas?

A. No.

Q. Okay. Other than your work for Highland here, do you have any business calling that takes you to the State of Texas on a regular basis?

A. No.

MR. RUKAVINA: Okay. We'll mark as Exhibit 1 the Notice of 30(b)(6).

(Brief off-record discussion.)

(Exhibit 1, Notice of Deposition/Seery, marked for identification, as of this date.)

Q. Mr. Seery, you've been handed Exhibit 1.

Have you seen this document?

J. Seery

A. I believe I have, yes.

Q. Okay. And are you familiar with the topics I've designated in here?

MR. MORRIS: I think this is missing a page.

THE WITNESS: Going to 1 to 2 to --

MR. MORRIS: The topics aren't in this version.

MR. RUKAVINA: Oh, I gave you the wrong one; I apologize --

(Simultaneous speaking.)

MR. RUKAVINA: I apologize, I apologize. Sir, that -- that's the one that, that -- that Notices you personally here today. Let me try again, and -- and Exhibit 2 will be the 30(b)(6).

(Exhibit 2, Notice of Deposition/30(b)(6), marked for identification, as of this date.)

Q. Sir, have you seen Exhibit 2 before?

A. I believe I have, yes.

J. Seery

Q. Okay. And subject to your counsel's objections, which he sent to me by email, are you prepared to testify on the topics that are designated in here today?

A. Yes.

Q. Okay. And have you reasonably informed yourself on those topics prior to sitting here today?

A. Yes.

Q. Okay. Now, some background, and we don't need to go into excruciating detail.

What is your educational background?

A. I have a BA in history. I have a law degree, JD. And I've taken lots and lots of courses.

Q. And what university or college is your history BA from?

A. Colgate University.

Q. Okay. And what university is your JD from?

A. New York Law School.

Q. And when did you graduate New York Law School and get your JD?

J. Seery

A. 1990.

Q. Okay. And what states have you been licensed in as a lawyer?

A. New York and Connecticut.

Q. Are you currently licensed as a lawyer?

A. I believe I am.

Q. Okay. Have you ever faced any disciplinary proceedings as a lawyer?

A. No.

Q. With respect to bankruptcy cases, can you give us a brief recitation of -- of your relevant experience in administering Chapter 11 or other bankruptcy estates?

A. Administering, I -- I've been involved or been an active player - either as a lawyer, senior lawyer, investor, and in this case an independent director and CRO - in really my entire career, so I would say hundreds.

Q. Okay. Do you consider yourself an expert on bankruptcy law?

A. I'm pretty good.

Q. Okay. And with respect to the

J. Seery

Highland Capital Management LP bankruptcy case, obviously the plan has been confirmed and it's gone effective.

Before the plan went effective, what was your role with the debtor?

A. I was an independent director, and subsequently I was appointed as the CRO and CEO of Highland.

Q. And approximately when did you become an independent director?

A. January 9, 2020.

Q. And just to be clear, what entity were you an independent director of?

A. I was an independent director of Strand Advisors, which was the GP of Highland Capital Management LP and had control of Highland Capital Management LP, which became the debtor - or was the debtor.

Q. And there were two other independent directors, correct?

A. There were, yes.

Q. What were their names, sir?

A. Russell Nelms and John Dubel.

Q. Okay. And did the three of you --

J. Seery

were the three of you independent directors since January 9, 2020, until the plan became effective?

A. That's correct.

Q. Were there any other people who, during that time frame, were ever independent directors?

A. No.

Q. Okay. And, sir, when did you become the CEO and/or CRO?

A. In July of 2020.

Q. Okay. Prior to July of 2020, was your role with Highland and Strand solely that of an independent director?

A. It -- it was. I effectively was, I guess, probably the lead independent director, just spent the most time -- I shouldn't say the most time.

I spent a significant amount of time on it, as did my fellow directors, but I spent a significant amount of time.

Q. And -- and Mr. Nelms, he was a former bankruptcy judge?

A. Yes.

J. Seery

Q. Okay. And Mr. Duval [ph], what was, just briefly, his background to your understanding?
A. Dubel --
Q. I'm sorry, Dubel.
A. -- and he was a -- he's a very experienced practitioner in distressed corporate management and bankruptcy corporate management.
Q. Okay. After the bankruptcy plan became effective, what happened to the debtor?
In other words, as a corporate entity, what happened to the debtor?
A. The debtor was reconstituted with a new GP and new limited partnership units.
Q. Okay. And do you have any role with respect to authority at the debtor today?
A. I do.
Q. What is your role, sir?
A. I'm the CEO.
Q. The -- I'm sorry, the CEO?
A. Yes.

J. Seery

Q. Okay. And you're also a post-confirmation trustee, are you not?
A. I am, yes.
Q. And what are you the trustee of?
A. The Claimant trustee.
Q. Okay. And what role does the Claimant trustee, if any, have with the reorganized debtor?
A. The Claimant trustee is the claimant -- is the trustee for the Claimant Trust, which holds the limited partnership units for the reorganized debtor.
Q. Okay. And does it also hold any general partnership units for the reorganized debtor?
A. It holds the ownership interest in the GP.
Q. Okay. Is it fair to say that -- that all economic value in the reorganized debtor one way or the other inures to the benefit of the Claimant Trust under the plan?
A. It does effectively run up to the Claimant Trust, yes.
Q. And is it fair to say that you are

J. Seery

in charge of the reorganized debtor?
A. I'm in charge of the reorganized debtor and I'm in charge of the Claimant Trust, but not all of the value runs through me directly.
Q. Because there's also a Litigation Sub-Trust?
A. That's correct, and that doesn't report to me.
Q. As far, sir -- let's just limit it now to the debtor's post effective date operations.
Are you the person in charge of those operations?
A. Yes.
Q. Okay. Are you -- and you said that you're the CEO of the debtor.
Are there any other officers, either at the debtor or its new GP, in addition to you?
A. Yes.
Q. Who -- who, sir?
A. Thomas Surgent is the general counsel and David Klos is the CFO.

J. Seery

Q. Okay. And both Mr. Surgeon -- I'm sorry, Surgent and Mr. Klos were previously employed with the debtor prior to the effective date?
A. They were.
Q. Okay. So in July 2020, you mentioned you became the CEO and CRO of the debtor, correct?
A. That's correct.
Q. Okay. And prior to that -- well, obviously, you know who Mr. James Dondero is, correct?
A. I do.
Q. Okay. And part of what happened on January 9, 2020, in summary, was that Mr. Dondero, pursuant to his agreement and Court order, was removed from controlling the debtor.
Is that a fair summary?
A. Certain --
MR. MORRIS: Objection to the form of the question.
A. Certain -- certainly with respect to the -- the corporate delegation of

J. Seery

authority, yes.

Q. Okay. He stayed on as an employee, but whatever he did - is it fair to say - after January 9, 2020 would be subject to the new independent board?

A. I don't think that would be fair to say. I think from a corporate rule perspective it would be. I think he -- he, subsequently, we learned, did quite a few things without --

(Reporter clarification.)

THE WITNESS: Subsequently we learned he did quite a few things without oversight by the independent board.

BY MR. RUKAVINA:

Q. Okay. Can you give me an example of what he did without oversight by the independent board?

A. He traded -- traded assets; he managed the Select account on his own; he didn't meet margins calls at direction that the -- that the board, independent board, had said to -- to meet; he tried to overrule me

J. Seery

subsequently and later in the year on asset sales that were being conducted out of certain of the CLOs --

(Reporter clarification.)

THE WITNESS: Asset sales -- I'm sorry, asset sales out of certain of the CLOs.

So there, there -- if we take time, we can go through dozens.

BY MR. RUKAVINA:

Q. Well, I get the general gist. And is it fair to say that those things that he was doing, amongst others, is why the independent board made you the CEO and CRO?

MR. MORRIS: Objection to the form of the question.

Q. Let me rephrase the question.

Why, in July -- first of all, who made you CEO and CRO in July of 2020?

A. The independent board approved it and then the Court approved it.

Q. And you were on that independent board, so you were one of the people that approved it?

J. Seery

MR. MORRIS: Objection to the form of the question.

A. No, I would have abstained.

Q. I apologize.

So the other two board members approved it?

A. Correct.

Q. Okay. Do you have an understanding as to why they approved you becoming CEO and CRO?

A. We felt like the organization needed a specific leader and a specific direction. Mr. Dondero's activities were pulling many of the people in the business multiple ways, and we felt that it was both dangerous for the organization and dangerous for the individuals.

Q. Okay. Between January 9, 2020 and July 2020, when you became CEO and CRO, what should have, pursuant to the settlement and Court agreement, Mr. Dondero's role at the debtor have been?

MR. MORRIS: Objection to the form of the question --

J. Seery

A. He was --

MR. MORRIS: -- and I just -- I just want to note that I, I -- I don't see how this is connected in any way to the issues in the lawsuits.

I'll allow you to ask a few more questions for background purposes, but I -- I just want to note my concern that we're running a little far afield.

But you can answer the question.

A. Can you read back the question --

(Simultaneous speaking and reporter interjection.)

Q. Between January 9, 2020 and July 2020, whenever you became the CEO and CRO, pursuant to the court approved settlement, what should Mr. Dondero's role at the debtor have been?

MR. MORRIS: Objection to the form of the question.

A. I think you have to understand the -- the settlement. Mr. Dondero initially agreed to be removed from all roles at the debtor. At the very last second he changed

J. Seery

that and wanted to be put back in. I think it probably had to do with -- with press reports that he didn't like reading. So he maintained an unpaid role as the portfolio manager. The portfolio that he really managed was the Select account.

What he should have done is he should have taken direction. He should have honored the margin calls that -- that Jefferies had made, he should have sold assets, he should have reported to the board. He did none of those things.

He independently, then, ran roughshod over certain parts of the organization. He should not have done that. And it was very difficult, with the existing employees, to manage them with Mr. Dondero there because they'd worked for him for a number of years.

Q. That was going to be my next question.

Did you feel, prior to July 2020, that some employees, some key employees, were basically doing his bidding instead of what

J. Seery

the independent board expected them to be doing?

A. I think we had -- we certainly had concerns about that, yes.

Q. And we'll round this off pretty quickly.

Did there come a time when you asked Mr. Dondero for his resignation?

A. There did, yes.

Q. And -- and did he give it?

A. He did, yes.

Q. And do you recall the date?

A. It was in October of 2020.

MR. RUKAVINA: I have it in here somewhere. I'm not sure that it's -- well, let's just put it in the record, see if this will refresh your memory.

This is going to be 3, right?

(Exhibit 3, Email Chain Re: HCMLP Roles, marked for identification, as of this date.)

(Brief off-record discussion.)

BY MR. RUKAVINA:

Q. Do you recall this email chain,

J. Seery

sir?

A. Vague -- vaguely. I'm -- I'm familiar with it, yes.

Q. And does this refresh your memory that Mr. Dondero resigned on October the 9th, 2020?

A. I -- I would say it confirms my memory since I said it was in October.

Q. Okay. But can you now confirm that it was October 9, 2020?

A. Yes.

Q. Okay. Thank you. Now, just to put it in the record here because of Mr. Morris' objection, it is -- and I apologize, we're going to talk about the debtor's contentions today in this lawsuit against NexPoint.

Is it okay if I say debtor or you want me to say reorganized debtor or --

A. Whatever you're more comfortable, I'm okay.

Q. It is -- well, the -- the debtor the reorganized debtor under the plan, retained interest in this lawsuit; is that accurate?

J. Seery

A. That's correct.

Q. Okay. So it -- it's -- is it the debtor's contention that NexPoint failed to make a payment due, let's say on or before December 31, 2020, on this $30.7 million promissory note?

A. That's correct.

Q. Okay. And we'll go further in detail, but ultimately, on or about January 7, the debtor sent notice that the note was immediately due and payable, correct?

A. That's correct.

Q. And did you make that decision to say that the note is immediately due and payable?

A. I did, yes.

Q. Okay. Thank you. Now -- and you were aware, when you made that decision, that -- that NexPoint was affiliated to some degree with Mr. Dondero?

MR. MORRIS: Objection to the form of the question.

A. Yes, I was.

Q. What was your understanding then or

J. Seery

what is your understanding now - you answer it how ever you can - as to what Mr. Dondero's role with NexPoint Advisors LP was in December 2020?

A. I believe it was and continues to be complete ownership control and domination of NexPoint Advisors.

Q. Between January 9, 2020, when you became an independent director, and October 9, 2020, when Mr. Dondero resigned, did you form an opinion as to Mr. Dondero's honesty?

A. Between which dates?

Q. January 9 and October 9, 2020.

A. January 9 and October -- yes.

Q. Yes.

And did you form an opinion as to his business acumen?

A. To some degree, yes.

Q. Okay. Did you form an opinion as to his management skills?

A. Yes.

Q. Okay. What was your opinion with -- pardon me, strike that.

What opinion did you form during

J. Seery

that time as to Mr. Dondero's honesty?

A. I think he's dishonest.

Q. Okay. What opinion did you form as to his business acumen?

A. I think it's challenged.

Q. Can you elaborate?

A. I -- the Select account we've talked about is a -- is a great example.

Shorting Zoom in the pandemic and holding it, shorting Netflix for long periods of time, moving money all around without any thought of the corporate form, moving money in and out of different entities.

The litigations that he was involved in; Acis alone he could have settled for $2 million and probably burned nearly $200 million of value.

So those are just beginning examples.

Q. Given the opinions that you formed as to Mr. Dondero, did you believe that that's also how he was running NexPoint at that time in late 2020?

A. I didn't make any judgments about

J. Seery

NexPoint.

Q. Okay. Now, are you familiar with the concepts, in bankruptcy, of solvency or insolvency?

A. Yes.

Q. Okay. Are you familiar with one or more metrics or definitions --

A. Yes.

Q. -- for solvency -- okay.

A. Yes.

Q. Can you tell me how you understand solvency to be.

A. In which context?

Q. Well, under the Bankruptcy Code.

A. There's no --

MR. MORRIS: Objection to the form of the question.

A. There's no definition of solvency in the bankruptcy code.

Q. Sir, there is.

MR. MORRIS: Well --

A. Failure to pay debts as they come due, balance sheet insolvency --

Q. That's what I'm --

J. Seery

(Simultaneous speaking.)

A. -- depends on the context.

(Reporter interjection.)

Q. I'm sorry.

So you agree with me -- you agree with me, again, depending on the context, that one definition of insolvency is balance sheet, meaning that your liabilities exceed your assets?

A. That is one definition of insolvency.

Q. And you agree with me that another definition is when you're basically unable to pay your debts as they become due?

A. That's another definition.

Q. Okay. And I'm going to ask you, when you became -- or after you became an independent director on January 9, 2020, did you form an opinion as to the debtor's solvency?

A. On January 9?

Q. Well, or after that -- after, after --

(Simultaneous speaking.)

J. Seery

Q. -- January 9, 2020.

A. It's a -- it's a long period. So if you want to break it down --

Q. Yeah.

A. -- in the early part of the case I did not form an opinion as to solvency.

I had to determine what the asset values were and what the -- what the claims were.

Q. Did you ever form an opinion -- and the reason why I'm -- I want to separate the debtor from the reorganized debtor. That's why I'm trying to be sensitive on the dates.

So I'm going to say debtor. Did you ever form an opinion as to the debtor's solvency?

MR. MORRIS: Objection to the form of the question.

A. That's -- that's what I answered.

Q. So you did?

MR. MORRIS: Objection to the form of the question.

A. The -- the debtor's solvency depends on when.

J. Seery

Q. Okay.

A. I think early in the case, as I said, I didn't form any opinion as to solvency.

Q. But at some point did you form an opinion as to solvency?

A. Yeah, I don't know exactly when it was, but at -- at some point it became clear to me that the claims exceeded the asset value.

Q. So is it fair to say that at some point you concluded that the debtor was insolvent based on the balance sheet test?

MR. MORRIS: Objection to the form of the question.

A. Certainly on -- on the balance sheet test, yeah.

Q. What about on the inability to pay debts as they become due; did you ever form an opinion on that test?

A. Well, it was in bankruptcy, so that had already been met.

Q. Okay. Did you ever form an opinion or have one provided by non-lawyers to you as

J. Seery

to whether the debtor was insolvent prior to the petition date?

A. Did I, I -- I do now.

Q. Okay. What is your opinion?

A. I think the debtor was insolvent and very much insolvent well before the filing.

Q. Into 2018?

A. Certainly.

Q. 2017?

A. Certainly.

Q. 2016?

A. Yes.

Q. Okay. And when you say that the debtor was well insolvent before filing, are you applying one or both of the definitions we discussed for insolvency?

MR. MORRIS: Davor, I'm just going to express the same concern I did earlier. For the life of me, I don't know -- I mean, I know why you're doing this, but it's certainly not related to any of the claims that are at issue in this lawsuit. So I'm just -- I just --

J. Seery

MR. RUKAVINA: With due respect, John, you've sued my client for fraudulent transfer. That requires insolvency as an element. I'm entitled to explore insolvency.

MR. MORRIS: Sure, for -- for 2019, go right ahead. That's when the transfer was made, right?

MR. RUKAVINA: The note --

MR. MORRIS: The note is 2000 -- the, the note is -- is May 2, 2019, so --

MR. RUKAVINA: No, sir, you're -- I'm sorry, you're confusing this with the HCMA case. Let's put the note into evidence.

MR. MORRIS: Okay.

MR. RUKAVINA: It's -- I'm not trying to be --

(Simultaneous speaking.)

MR. MORRIS: No, no, no, no, no. Let me, let me -- let me restate this.

MR. RUKAVINA: Yeah.

MR. MORRIS: It's for actual

J. Seery

fraudulent transfer.

MR. RUKAVINA: Yes.

MR. MORRIS: Solvency is not an issue. Solvency is not an issue. We have no burden of proving solvency. It's only -- that's exactly why we didn't put constructive fraudulent transfer in the complaint, so we wouldn't do this.

MR. RUKAVINA: We can -- we can debate the law on that, but I think -- I think you have answered it.

BY MR. RUKAVINA:

Q. To your view, the debtor was insolvent certainly as of 2016?

A. Yeah.

Q. Okay. And I asked you, and before counsel objected, what definition or, or -- or both definitions were you using when you told me that the debtor was insolvent in 2019, 2018, 2017 and 2016?

A. I think --

MR. MORRIS: Object to the form of the question.

J. Seery

A. I -- I think both. I think you'd have to go through each, but when you properly look at the balance sheet and you add the contingent liabilities, it was pretty clear that the debtor didn't have the -- the wherewithal from the balance sheet perspective to satisfy those ultimate liabilities.

In addition, the debtor continually borrowed money when it needed it. The debtor was -- was always on a very tight leash with respect to liquidity, as money kept getting sucked out at different times.

Q. Okay. After October 9, 2020, when Mr. Dondero resigned, should Mr. Dondero have had any ability to instruct the debtor's employees as to what to do, if that question makes sense?

MR. MORRIS: Yeah, objection to the form of the question.

A. The -- the answer is with respect -- he was permitted, I believe, after the -- the dates will get a little bit confusing, but with respect to the shared

J. Seery

services, he could make certain direction to the employees and even after the contempt finding could make certain directions with respect to shared services.

With respect to operations of HCMLP, no.

Q. Okay. And that was my question.

So if it was an HCMLP operational issue, Mr. Dondero had no ability to instruct anyone else?

A. Or, or -- or any issue --

Q. Any issue --

A. -- but with respect to shared services, he certainly could communicate with them, and if there were shared services that needed to be performed, he could request those.

Q. Now, as of October 9, 2020, is it true that Frank Waterhouse was the chief financial officer of the debtor?

A. That's correct.

Q. And that he was the chief financial officer of the debtor through January 2021?

A. I don't remember the exact date,

J. Seery

but yes, right around there.

Q. Okay. Was he the chief financial officer of the debtor on January 12, 2021?

A. I -- I believe he was. I don't recall the exact dates that we did the -- the cutover.

Q. Okay. Well, let's -- let's try to pin that down.

You recall that there was a shared services agreement in place between the debtor and NexPoint?

A. Yes.

Q. Okay. And you recall that the debtor exercised its opt -- or right to terminate that agreement?

A. That's correct.

Q. Okay. And do you recall the date, after several extensions, on which that agreement was actually terminated?

A. I don't recall the initial -- I think the notice was in -- in November, late November or December, and it was a -- I believe it was a sixty-day notice for --

(Reporter clarification.)

J. Seery

THE WITNESS: Sixty-day for NPA, I'm sorry, NPA.

And -- there was some sixty days and some thirty days, so I don't recall the exact date that there -- that it was effectively terminated.

BY MR. RUKAVINA:

Q. Well, by NPA, you mean NexPoint Advisors?

A. Correct.

Q. Okay.

A. Isn't that who you asked me about?

Q. I know. I'm just -- for the record, the jury might not know who NPA is.

A. Okay.

Q. Do you recall that we -- you and I had a trial in -- sometime in mid February 2021 about the shared services agreements?

A. I know we had a hearing. I don't recall if you'd call it a trial. It was a hearing on termination.

Q. Okay. And -- and do you recall that the debtor had agreed to extend termination until February the 28th, 2021 of

J. Seery

the shared services agreement?

A. There -- there were extensions; I don't recall the specific dates.

Q. Okay. Was -- to your recollection, was -- was Mr. Waterhouse the chief financial officer until the termination of that shared services agreement or did he cease being the chief financial officer at some period prior to that?

A. I -- I believe it was to the end, but I'm not -- I'm not absolutely certain about that.

Q. So in December of 2021 -- I'm sorry, strike that.

In December of 2020, you were the chief restructuring officer, you were the chief executive officer of the debtor, correct?

A. Yes.

Q. Mr. Waterhouse was the chief financial officer, correct?

A. Yes.

Q. Who else would have been an officer of the debtor in December of 2020?

J. Seery

A. In December of 2020?

Scott Ellington was still the general counsel.

Q. Okay.

A. And I don't believe that we had any other corporate officers.

Q. Mr. Surgent wasn't an officer, to your recollection?

A. He was the CCO --

Q. Okay.

A. -- so I don't believe that's actually a corporate officer.

Q. Was there a COO, do you know?

A. I don't believe so at the time.

Q. Okay. Now, in the latter half of 2020, Mr. Dondero was trying to float some -- what we've all called pot plan.

Do you recall that?

MR. MORRIS: Objection to the form of the question.

A. The latter half, I -- I guess starting in probably around August --

Q. Okay.

A. -- in -- in connection with the

J. Seery

mediation.

Q. You've heard the term "pot plan" that Mr. Dondero has talked about before, correct?

A. I have, yes.

Q. Okay. And what did you understand a pot plan, as he was proposing it starting in August of 2020, to be?

A. Yeah, it's not a novel term. Certainly he didn't invent it or -- or probably didn't get it in this case. He probably got it from his lawyer.

But the idea of a pot plan is to put a bunch of money into the middle and create a pot that then the creditors can determine how to divide, and the reorganized debtor moves on with its existence away from the creditor claims.

Q. There was a creditors' committee in the Highland bankruptcy case, correct?

A. Yes.

Q. And how many committee members were there?

A. Four.

J. Seery

Q. Okay. And is it fair to say that as part of this pot plan, Mr. Dondero was trying to propose something that might be palatable to that creditor's committee?

A. I think it's fair to say it would have to be palatable to that creditor's committee.

Q. And is it fair to say that -- that starting in August of 2020, you were trying to see if you might facilitate or bridge that gap?

A. I wouldn't say bridge but certainly facilitate --

Q. Okay. What --

A. -- or if you want to say I did as a bridge between Mr. Dondero and his counsel and -- and the committee and their counsel, that -- that would be fair.

Q. Okay. Well, let me -- let me look at your prior -- we're saying the same thing, we're just having --

(Simultaneous speaking.)

A. I don't think we're having a definitional problem. I just don't want it

J. Seery

to sound like I was going to bridge it with any sort of finances.

Q. Yeah, that's true, the word "bridge" could be construed to mean that. You're correct.

MR. RUKAVINA: Are we on 4?

THE WITNESS: Yes.

(Exhibit 4, Seery Declaration in Support of Motion for TRO, marked for identification, as of this date.)

(Brief off-record discussion.)

Q. Do you recall this declaration, sir?

A. Not -- not specifically.

Q. Okay. But if I represent to you that I pulled this from the docket as your counsel filed it, and assuming that I'm telling the truth, would it -- would this have been a declaration that you caused to be filed?

A. Yeah, I have no -- no reason to challenge it, yes.

Q. Okay. And we might come back to this a little bit later. I don't want to

J. Seery

waste your time right now. But I've lost my place, so we'll come back to it later, after a break.

Going back --

(Simultaneous speaking.)

A. -- see if there was a bridge quote in here?

Q. No, no, you were -- you were describing that you had been trying to facilitate a settlement, and I was just going to try to use your words so that I wouldn't misstate it.

But, but going back, so -- so in August -- starting in August of 2020, Mr. Dondero was trying to propose some pot plan, and it had to have been acceptable to the committee for there to be any settlement.

So far I'm correct, right?

A. Yes.

Q. And you as the COO was trying to do what you could to see if you could facilitate the two of them coming to an under -- understanding.

Is that generally accurate?

J. Seery

A. That's correct.

Q. Okay. And did you continue doing so for a period of months after that?

A. Certainly into early November.

Q. Okay. Would you say that there was a point in time at which you stopped personally - you, Mr. Seery - personally stopped trying to facilitate some settlement between Mr. Dondero and the committee vis-a-vis a pot plan?

A. I think at some point it became very clear to me that it was futile, that -- that Mr. Dondero was never going to come up with any real value that would be anywhere close to what the committee would accept.

And his structure of his -- his pot plan was always more notes, and the basic assumption was, well, if you're not paying on these notes how -- how do we trust new notes?

Q. And when -- when did that view crystalize in your mind?

A. Probably some -- it probably developed - so crystallized is a fair word - over a period of time. I think in the -- the

J. Seery

mediation, through the negotiations in September and October or the -- the multiple re-trades on -- on very specific prior agreements, by November it was clear to me that -- that there was little hope.

Q. Okay. So we can say by December 1, certainly by December 1, there was very little hope?

A. Yeah, I think that that's probably -- at least in my mind. I don't know if others felt the same, and there was certainly opportunities for settlement beyond that, but it seemed pretty clear to me that we were moving towards a monetization plan and we started negotiating the separation, not with Mr. Dondero but with the team, of -- of the various business and the termination of the --

(Reporter clarification.)

THE WITNESS: Businesses and the termination of the shared services, sorry.

BY MR. RUKAVINA:

Q. Did you convey that to

J. Seery

Mr. Waterhouse at any point in time, basically that you believed that Mr. Dondero's pot plan was -- was not going to happen?

A. I -- I don't recall if I did or not.

Q. Did you -- strike that.

In -- in the course of these discussions between the committee and Mr. Dondero and -- and maybe your trying to facilitate something, was Mr. Waterhouse even involved directly, to your knowledge?

A. He was certainly involved, assisting Mr. Dondero --

Q. Okay.

A. -- and he certainly provided or his team provided data to me, which ultimately went to the committee.

So I would -- I would think he's involved to some degree. I don't recall that he would ever have been involved in -- in specific discussions --

Q. Okay.

A. -- at least not with me.

J. Seery

I think it was pretty clear he was involved with discussions with Mr. Dondero.

Q. You -- not you, pardon me.

The debtor had an outside financial advisor, correct?

A. That's correct.

Q. And what was that entity's name?

A. DSI.

Q. Is it fair to say that you relied on DSI to some degree in the course of these discussions and negotiations?

A. To some degree, but I don't think it's a fair characterization that they were sort of a hands-on financial advisor around the -- these negotiations.

Q. I just want to -- I just want to understand that, that -- it sounds like, to me, at least on the debtor's side, Mr. Waterhouse was not one of the key individuals trying to facilitate an agreement between the debtor and the committee?

A. I, I --

MR. MORRIS: Objection to the form of the question.

J. Seery

A. I don't think that's fair. I think that I -- I and my professionals, lawyers and -- and DSI, were in the middle between Mr. Dondero and his counsel and the committee. The committee had their own financial advisors.

I drew on Mr. Waterhouse and his team for financial information regarding the debtor's assets throughout the case, certainly since I took the position as CEO.

Q. Okay.

A. Mr. Dondero also drew on that information quite a bit.

Q. At that point in time, let's say in December of 2020, did you understand that Mr. Waterhouse had a role with my client, NexPoint Advisors?

A. Did you say December of 2020?

Q. Yes, sir.

A. Did he have a --

(Simultaneous speaking.)

A. -- he was -- I think he was treasurer and he was an executive officer of some -- one of the funds.

J. Seery

Q. Now, you mentioned the debtor's monetization plan that the debtor filed.

I think that's the word you used, right, monetization plan?

A. Correct.

Q. Okay. And in, in -- in a nutshell amongst other things, that plan -- well, you, you tell the -- the Court.

What was the monetization plan intended to do?

A. It was aptly named. It was intended to monetize the assets of the debtor over a period of time that we thought was legitimate to run the businesses in a way that would maximize value for the estate.

Q. And some of the assets of the debtor, at least in the latter half of 2020, included promissory notes from Mr. Dondero and other entities affiliated with Mr. Dondero; is that correct?

A. That's correct.

Q. And some of those promissory notes were demand notes; is that correct?

A. That's correct.

J. Seery

Q. And some of those promissory notes were term notes, at least as of that time; is that correct?

A. That's correct.

Q. Okay. And I think, actually, it's in this declaration which we marked 4, did we?

A. Yes.

Q. Yes. So you filed -- or, I'm sorry, sir, you -- this was filed on December 7, 2020.

And I think if you go to paragraph 26 and 27, you'll see that you're discussing demand notes.

A. That's correct.

Q. And in paragraph 29 it says that on December 30 -- I'm sorry, strike that.

In paragraph 29 it says (as read):

On December 3, 2020, at my instruction, the debtor's counsel sent letters to representatives of Mr. Dondero and each of the corporate obligors, demanding payment of all unpaid principal

J. Seery

and accrued interest due under the demand notes by December 11, 2020.

Was that a true statement?

A. Yes.

Q. Why did you decide to make demand of the demand notes at that time?

A. Well, it was pretty -- this will be a long answer, but it's pretty clear that I made a mistake, that I should have demanded payment from Mr. Dondero earlier in the case.

The demand notes were due and owing, they could be called at any time, and I thought that leaving them outstanding would provide a way to facilitate a grand bargain, or a pot plan.

And by the time -- the beginning of December, when we knew we were moving forward with the monetization plan, it was time to start to collect the assets of the debtor, so I made a decision that we should demand payment on each of the notes.

Q. At that time, on December the 3rd, 2020, were you aware of the $30.7 million NexPoint note?

J. Seery

A. Yes.

Q. Okay. And did you understand that at that point in time that was a term note?

A. Yes.

Q. Okay. And, and did you have a -- a plan at that point in time as to -- and did you -- pardon me. Strike all that.

Did you understand that -- that that had a thirty-year term originally when it was executed?

A. Yeah, you should understand that -- and maybe you do, and that's -- so we'll make sure the record is clear.

Each of the -- the term notes were not term notes. They were -- they became term notes because they were roll-up of demand notes, and they were roll-up of demand notes in 27 -- 2017, when things at the debtor and for Mr. Dondero became very precarious.

Certain lawsuits had been filed, the asset stripping in the Cayman Islands had begun. It was a difficult time. So without any consideration whatsoever, Mr. Dondero, on

J. Seery

both sides, extended the terms -- rolled up those notes and extended the terms of those notes for thirty years and generally - although not all - very low interest rate and very easy terms, no -- no security, no covenants.

So those became the term notes, but they were always potentially subject to other litigation demands.

Q. You weren't around with the debtor or NexPoint in 2017, were you?

A. No.

Q. Okay. So you have no personal knowledge about the execution of any notes at that time?

A. I, I would differ and say I do -- I wasn't in the room, but I have the evidence by the virtue of the fact that I've seen the backup to the notes, and they actually contain the schedule with the roll -- the notes that are being rolled up.

Q. So you're -- you're making an educated deduction, based on your professional experience, but you aren't

J. Seery

either the maker or the lender in 2017, when these notes -- when this note was executed, were you?

MR. MORRIS: Objection to the form of the question.

A. I haven't been the maker or the, or the -- or the lender on any of these notes.

MR. RUKAVINA: Well, this is going to be Exhibit 5. This is the note that we're here on today.

(Exhibit 5, Promissory Note Dated May 31, 2017, marked for identification, as of this date.)

(Brief off-record discussion.)

BY MR. RUKAVINA:

Q. So if we go to the last page of this exhibit, this references prior notes, and the body of this basically says that each of the prior notes are superseded by the new note, correct?

MR. MORRIS: Objection to the form of the question. Can you just point that to Mr. Seery so --

Q. Sure. So, Mr. Seery, if you see

J. Seery

Section 9, (as read):

The original of each of the prior notes superseded hereby shall be marked void.

A. Yes, so --

Q. And then you see the prior notes in the preamble?

A. Uh-huh.

Q. So is this what you were just talking about, that this promissory note was a roll-up of these five prior demand notes?

A. That's correct.

Q. Okay. Now, if -- if we look at this -- I'm looking at the last page here, sir.

A. Uh-huh.

Q. The initial note amount of the original five was 27,675,000; is that correct?

A. That's correct.

Q. And -- and as of May 31, 2017, this says that principal and interest outstanding was 30,746,812.33; is that correct?

A. That's what it says, yes.

J. Seery

Q. Okay. Is -- is the logical conclusion that -- that on those five promissory notes, not even all the interest had been kept current?

A. I, I --

MR. MORRIS: Objection to the form of the question.

A. Yeah, I'd have to do the math on each of them. You're talking about three years, 240 -- yeah, it looks roughly but not all of the -- it looks like some payments were made, but -- but certainly on -- it doesn't look like it completely kept current, at least on some of these.

Q. Well, can you think of a reason -- other than the failure to pay interest, can you think of reason as to why the initial note amount increased by at least $3 million in that time frame?

MR. MORRIS: Objection to the form of the question.

A. No, I -- I would think it would be an accrual. And it's just unclear to me on each of them whether there were pay-downs,

J. Seery

whether there were times where it didn't pay down, but certainly in the -- in the aggregate, they didn't pay down. And so I just don't know if it was -- if there was some payments or not; I don't recall.

Q. Okay. And -- and we're not here on the HCMFA note, but are you general -- generally familiar that in April of 2019, Mr. Dondero executed a document that took two promissory notes that HCMFA had issued that were demand notes and extended them until May 31, 2021?

A. That's not what it did, no.

Q. What do you understand happened?

A. It, it -- they were -- they were demand notes without maturity, and the -- the obligor was given the statement from the holder, HCMLP, that it wouldn't collect on those notes until May 31, 2021.

And that was done because HCMFA did not have the money to pay, and because it was an advisor, it had to make representations that it could support itself.

Q. So is it fair to say that, at least

J. Seery

prior to the time that you became CEO/CRO, the debtor was lax in its enforcement of its rights as the payee under promissory notes from the advisors?

A. That's --

MR. MORRIS: Objection to form of the question.

A. That's completely unfair.

(Simultaneous speaking.)

A. -- virtually no basis for you to say something like that.

It's a demand note that hadn't been demanded, and then -- then it was to a third party, so they could rely on the fact that HCMFA would have -- wouldn't have to have outflows to payoff demands that could happen at any time; that gave an agreement to extend the term, which is not really a term, it's just we won't demand it.

So how -- how you call that lax, I -- that doesn't have -- has nothing to do with being lax.

Q. Well, I thought you testified a few minutes ago that, at least in 2017, the

J. Seery

debtor was facing serious problems and that Mr. Dondero was rolling up these notes for -- for some ulterior purpose?

A. Not ulterior purpose. The purpose is really, really obvious. He wanted to extend out the term so that they wouldn't become due, couldn't be demanded at any time.

Q. Okay. So that -- that goes back to my question, which you said was not a fair question --

A. No, I said your characterization was unfair. You can't call that being lax. It's a demand note. You can either demand it or not demand it, but if you don't demand it, it doesn't mean you're being lax.

Q. Okay. Fair enough. But if, if -- so we're still on Exhibit 5.

If the debtor had allowed for these five notes' accrued interest to go unpaid for a period of one or more years, wouldn't that suggest to you that the debtor was, as -- as a payee, not strictly enforcing its rights?

A. I believe the underlying terms allowed it to accrue.

J. Seery

Q. Okay. Okay. So is it your testimony, sir, that prior to you becoming CEO/CRO, the debtor did or did not enforce its rights as the payee under various promissory notes according to industry standards, as you would understand them to be?

MR. MORRIS: Objection to the form of the question.

A. I think industry standards are -- are a bit nebulous, particularly when you're talking about the payee and the payor being controlled by the same person. But I think there's nothing uncommon about letting a note accrue when it's permitted to accrue.

Q. Do you believe that there -- strike that.

Do you believe that the debtor, prior to you becoming CEO/CRO, had acted inappropriately with permitting the roll-up of these five notes into Exhibit 5 or -- or changing the -- the HCMFA notes from demand to May 31, 2021?

MR. MORRIS: Objection to the

J. Seery

form of the question.

A. Yeah, with -- with respect to the HCMFA, I don't know -- I don't think that's inappropriate, based on the shared services and a tangential relationship between the affiliates, although clearly it was aggrandizing to Mr. Dondero and his interests, which it syphoned off tons of value from the debtor as opposed to HCMLP.

With respect to the roll-up of these notes for thirty years, without -- without real consideration, I think that that was --

(Reporter clarification.)

THE WITNESS: Inappropriate, yes.

BY MR. RUKAVINA:

Q. So if we go back now to December of 2020, early December of 2020, you've made demand - as we've just read in your declaration - on demand notes, and you've testified that you were aware of the existence of this note.

Did you, at that point in time, have any plans as to how to monetize this

J. Seery

note, number -- Exhibit 5 --

A. Yes.

Q. -- on December 3, 2020?

A. Yes.

Q. Okay. What was the plan back then?

A. It depended on what happened to the note, but ultimately we would seek to sell the note because of its long tenor, but likely we would end up suing Mr. -- or NPA, the -- the maker of the note, for fraudulent conveyance in 2017.

Q. On account of the roll-up?

A. Correct.

Q. Okay. Did the debtor ever actually solicit any offers of -- whereby someone might buy this note, No. 5, Exhibit 5?

A. No.

Q. Okay. Did you form an opinion or were -- were you given an opinion from a non-lawyer as to what the monetization value of this note, Exhibit 5, might have been in early December of 2020?

A. I -- we did form an opinion, and -- and we discounted it substantially.

J. Seery

Q. Can you tell the Court approximately what amount?

A. Off the top of my head, I don't recall.

Q. Okay. But -- but substantially?

A. Substantially. The reason is pretty obvious. This is a -- if you don't win the fraudulent conveyance suit, you've got a long-dated note with Mr. Dondero on the other side.

He's not generally viewed as a creditworthy counter-party and he controls the inflows that go into NPA. So the chances you are ever going to be paid early are extremely low, and the chances that it's going to default are probably pretty high.

Q. And this was an unsecured note, correct?

A. That's correct.

Q. Okay. So you -- going into December 31, 2020, were you hoping that NexPoint would default on this note?

MR. MORRIS: Objection to the form of the question.

J. Seery

A. I -- I think hoping is -- is not the right term. I think I -- I assumed that they wouldn't, because you'd have to not understand, you know, what happens when you default on a term note and it gets accelerated.

But if it happened, if I had that -- if that fortune befell the estate, I thought that would be a good thing.

Q. Let's look at the -- some of the terms of this note, sir. So we're on Exhibit 5. And in particular, Section 2.1, sir, the second sentence says (as read):

Borrower shall pay the annual installment on the 31st day of December of each calendar year.

Do you see that sentence, sir?

A. I do.

Q. Do you believe that that means that the payment must be on the 31st of December or is it -- should it be read as on or before the 31st day of December?

A. It's -- it says on, but typically there's no issue about prepayment and that

J. Seery

paragraph 3 says you can prepay.
Q. Well, so you see how -- how this Section 2.1 uses the word "borrower," right?
A. Yes.
Q. And borrower isn't defined here, but logically it's maker, right?
A. Correct.
Q. Okay. So that's just probably sloppiness, right?
MR. MORRIS: Objection to the form of the question.
A. Appears to be.
Q. Okay. And then you, you actually -- you saw Section 3, that talks about the -- the prepayment (as read):
Maker may prepay in whole or in part the unpaid principal or accrued interest of this note.
Do you see that, sir?
A. Yes.
Q. Okay. (As read):
Any payments on this note shall be applied first to unpaid accrued interest hereon and then

J. Seery

to unpaid principal hereof - correct?
A. Correct.
Q. Okay. So that, that goes -- that ties back to your prior answer, that even though Section 2.1 says on the 31st day of December, it's logical to read it on or before the 31st day of December?
MR. MORRIS: Objection to the form of the question.
A. It, it -- it would be. Your -- your interest amounts would be different but yes.
Q. Okay. Well, can -- so going back to Section 3, it says prepay accrued interest.
How does one prepay accrued interest?
A. Interest accrues on this note. How you prepay it is you send the money before the accrual date.
Q. Okay. Fair enough. And going back to Section 3, the -- the style of that section - whatever the word is - it says

J. Seery

prepayment allowed, renegotiation discretionary.
You see where it says renegotiation discretionary?
A. Yes.
Q. Can you -- can you see anything actually in that paragraph that talks about a renegotiation?
A. Nope.
Q. Okay. And just to -- to be clear, do you see anything in here that talks about that headings are for stylistic purposes only and have no meaning?
A. I -- I don't see anything --
Q. Okay.
A. -- that says that.
I just think that, one, the headings are probably appropriate; two, renegotiation is always discretionary.
Q. Okay. Well, but nothing in here suggests to you, does it, sir, that -- that the debtor was prohibited from renegotiating anything about this note?
A. No, the -- the holder of the note,

J. Seery

the payee, could negotiate/renegotiate or not.
In fact, it says that. Because it says it as a waiver, that the maker hereby waives any grace, demand, presentment -- it's got a very clear, broad waiver of any kind of implication that there might be some courtesy that the payee would have to give to the maker.
MR. RUKAVINA: Are we on 6?
Okay. Sir, I'm going to hand you what's -- what's going to be marked as Exhibit 6, which is your January 7, 2021 letter.
(Exhibit 6, Correspondence Dated January 7, 2021, marked for identification, as of this date.)
(Brief off-record discussion.)
THE WITNESS: By the way, who's -- who's Aaron Lawrence? I didn't see that person earlier.
MR. MORRIS: That is, I think, a paralegal with Quinn.
THE WITNESS: Oh, okay.

J. Seery

MR. MORRIS: Or an assistant, maybe an associate.

I apologize if you're an attorney. I apologize. In any event, but -- but, Mr. Lawrence you're with Quinn, right?

MR. LAWRENCE: Yes, I am.

MR. MORRIS: Yeah, thank you.

MR. LAWRENCE: I -- I've -- I've taken the bar.

MR. MORRIS: Yeah. Oh, okay. Thank you.

MS. DEITSCH-PEREZ: Does that imply you've just taken the bar?

MR. LAWRENCE: Yes.

MS. DEITSCH-PEREZ: Okay. Thank you.

(Simultaneous speaking.)

BY MR. RUKAVINA:

Q. Mr. Seery, you have Exhibit 6.

Do you recognize this document?

A. I do, yes.

Q. Okay. And -- and that's your electronic signature there?

A. That is.

J. Seery

Q. And you authorized this document to be issued to NexPoint Advisors?

A. I did, yes.

Q. Okay. Did you discuss this document, prior to you sending it, with the independent board?

A. Yes.

Q. Okay. And what do you recall about that discussion? Who was there; how did it happen?

A. I don't recall it specifically. That would be at regular meetings and we talked about the case. This came shortly after -- as we were moving towards -- I don't remember the exact confirmation date, but it was, you know, in and around that time. And this was a material asset of the estate, so talking to them about that would have been normal course of action.

Q. Part of what you discussed with them, was it how the debtor should respond to the missed December 31 payment?

A. I don't -- I don't think that's a fair characterization. I would have said

J. Seery

that they missed the payment, we're going to accelerate it unless you have some objection. They didn't object. This would have been standard for anyone I know who's a holder of a note.

Q. So there was no discussion with the board about maybe giving NexPoint a chance to fix that default before sending this note?

A. No.

Q. Okay. Same question: Did you discuss the substance of this letter, before you sent it, with the committee?

A. I doubt it and I don't recall. I don't think so. It wouldn't -- it wouldn't have been -- if there had been a committee call, we would have told them about it, but I wouldn't have been seeking permission.

Q. Okay. Did you keep notes of your meetings or discussions with the other board members generally?

A. Sometimes. Not -- not always. It depends.

Q. I've heard tell that you're a copious note -- note-taker; is that

J. Seery

incorrect?

A. I don't -- I don't think that's fair.

Q. Okay.

A. I take -- I take notes but not always.

Q. Do you have any memory, not that you should, as to whether you took any notes of the -- the meeting with the other board members we just discussed, about where the substance of this letter was discussed?

A. I don't recall. It would have been unusual for me to put the substance of that kind of board meeting - if it was a board meeting or if it was just a call - into notes, because I would have -- if it's a board meeting, we would have had minutes, and if it was just a call for something like this, it wouldn't have risen to the level of we're taking notes and writing it down.

Q. Okay.

A. I didn't have any reason to record every single thing I said with them because our collective memories are good and

J. Seery

they're -- they're pretty honest folks.

Q. Okay. Did -- did either you or anyone video-record or audio-record any of the discussions that you had with the other board members ever?

A. No.

Q. Okay. Were any of those meetings with the other board members by Zoom or Webex?

A. Very few, I mean, typically not.

Q. Okay. The very few that might have taken place, do you recall if -- if anyone pressed a record button on Zoom or Webex?

A. Nobody would have.

Q. Okay.

A. I can't imagine anyone would have recorded it without requesting permission from the other participants.

We didn't do much in that group by Zoom or Webex, we just -- it wasn't standard operating procedure for the group.

Q. Do you recall any of the other board members, or anyone else on any board, discussing -- seeking permission to record

J. Seery

any of those meetings?

A. No, never.

Q. Did you keep any calendar or logbook where you might be able to find the dates on which you had any call or meeting with the other board members?

A. If it was an official board meeting, certainly it would have been in Outlook.

Q. Okay. And if it was an official board meeting, would there have been an agenda circulated prior to the meeting?

A. Not always, because these were always done - particularly at this time, where we were in litigation - with counsel.

Q. And I take it that they would have been done more or less sometimes on an ad-hoc basis because of developments that might happen?

A. They -- they could, yes.

Q. Okay. Did you -- in responding to my discovery requests in this NexPoint lawsuit, did you consult any of your handwritten notes, as to whether there was

J. Seery

anything in there responsive?

A. I believe I looked -- I want to make sure I don't -- I don't know if I can distinguish between your requests and the other requests around these notes, but I certainly looked through some of my notes to see if I had any specific items that might have been requested. I don't recall if there was something about whether I had a conversation with John --

(Reporter clarification.)

THE WITNESS: John Dubel and Russ Nelms, the other directors.

BY MR. RUKAVINA:

Q. But you do recall, in response to discovery requests, looking at your handwritten notes to see if there was something responsive?

A. Yes, and I just don't recall the specific topics, because there were some that were specific topics particularly around the, the -- the made-up story about a subsequent event and things like that kind of nonsense.

Q. Do you recall whether you provided

J. Seery

to the debtor's or the reorganized debtor's counsel any handwritten notes for potential review and production?

A. I don't believe I did, because if I -- if I found something, I would have but I -- but I didn't find something specifically, I didn't -- wouldn't have given notes that were nonresponsive.

Q. Similar question: Did you -- you have a Gmail account by email, right?

A. I do, yes.

Q. Okay. And -- and I'm not an expert, but that wouldn't be on the debtor's or reorganized debtor's server, would it?

A. It would not.

Q. Okay. Did you review your personal emails with respect to whether there was anything responsive there to the discovery requests in this NexPoint lawsuit?

A. Yes.

Q. Okay. And if you found something, did you send it to counsel for potential review for privilege and potential production to me?

J. Seery

A. Yes.

Q. Okay. Did you, on your own, withhold anything believing -- well, strike that.

Is it fair to say that anything you thought might be responsive you provided to counsel?

A. I did, and I provided them complete access to my email.

Q. And you didn't intentionally withhold anything that might be -- strike that.

Other than privileged material, did you intentionally withhold anything that you believed was responsive to my discovery requests?

A. I -- I didn't withhold anything. If there was -- determined to be privileged, then it would have been determined by counsel.

Q. Understood.

MR. MORRIS: And if it was -- just to be clear, Davor, if it was determined to be duplicative of other

J. Seery

emails that we produced --

(Simultaneous speaking.)

MR. RUKAVINA: I'm totally fine with that.

Q. I just want to make sure that you, Mr. Seery, did not --

A. No, I didn't --

Q. -- intentionally -- intentionally withhold anything just because you didn't want it produced?

A. No, certainly not, nor -- neither intentionally nor accidentally, because I turned everything over.

Q. Understood. Going back to Exhibit 6, I've asked you about the board, I've asked you about the committee.

And you -- you said, I believe, that you don't remember having a discussion about the substance of Exhibit 6 with the committee, right?

A. I don't think I -- certainly not in advance of it, I would not -- it wouldn't have been standard to -- to do that, unless there had been a meeting right around then,

J. Seery

and I would have mentioned that I had done this.

Q. Did -- similar to the -- the prior answer, would you have recorded in Outlook or some other means any meetings that you had with the committee in the January 2021 time frame?

A. Yeah, it would have -- any meetings with the committee would have been official.

Q. Okay. You could -- you could find out what days those would have been had on?

A. I believe so, yes.

Q. And prior to these meetings, and I'm talking about January 2021 now, were there -- was there an agenda shared in advance either by the debtor or by the committee?

A. I believe oftentimes there was with the committee.

Q. Do you recall - and I think I know your answer - whether there was any such agenda related to whether the debtor should declare the NexPoint note, Exhibit 5, immediately due and payable?

J. Seery

A. Well, I don't recall a meeting around this, so I -- I certainly wouldn't recall an agenda.

Q. Now I'm going to ask about Mr. Waterhouse.

Before you authorized this letter, Exhibit 6, to go out, did you discuss the substance of this letter with Mr. Waterhouse?

A. I don't believe so.

Q. How did you find out that the December 31, 2020 payment had not been made by NexPoint?

A. I believe I was told during the cash-flow meetings that we had weekly.

Q. Okay. What -- was that like a certain set day of the week or --

A. Yeah.

Q. What day of the week was --

A. -- was either Tuesday or Wednesday.

Q. Okay. Do you recall who told you that this payment had not been made?

A. I don't recall specifically, no.

Q. Okay. Would you have received a report from which that would have been

J. Seery

evident?

A. I would get a cash flow, thirteen-week --

(Reporter clarification.)

THE WITNESS: Thirteen-week cash flow. I'm sorry.

Q. So -- so to the best of your recollection, do you recall, on the one hand, whether someone told you, Mr. Seery, NexPoint didn't pay or, on the other hand, whether you said where is NexPoint's payment?

MR. MORRIS: Objection to the form of the question.

A. I -- I don't recall. It could have -- it could have easily been either, because it certainly would have been something I would have asked about. NexPoint and others had already failed to pay their shared service payments, so it was a question as to whether any other payments would be coming.

Q. Okay. And who would have logically been, pursuant to your course of practice, on these weekly cash flow meetings?

J. Seery

A. Typically it would be sometimes Frank Waterhouse, Kristin Hendrix, Dave Klos - not always but most of the time - and Jack Donohue from DSI --

Q. Okay.

A. Fred Caruso as well, I believe --

Q. So in --

A. -- DSI.

Q. -- in early January 2021, do you have any reason to believe that any of those meetings would have been recorded visually or audio-recorded?

A. No, I would think they would not have been.

Q. Would any meetings -- I'm sorry, strike that -- any minutes of those discussions have been kept?

A. No, no minutes would have been kept.

Q. So you would get the, the -- the thirteen-week report you mentioned.

Would you get any other documents in the nature of an agenda or an update to you as the chief executive?

J. Seery

A. I don't --

MR. MORRIS: Objection to the form of the question.

A. I -- I don't believe so with respect to the thirteen-week cash flow discussion.

Q. So what -- what do you remember saying or doing right then, when you learned that NexPoint did not make a December 31 payment?

A. I don't recall the specific date, but as soon as I knew that the payment was late, I would have accelerated the note and told counsel to draft the acceleration and demand.

Q. And you don't recall discussing that with Mr. Waterhouse?

A. I don't recall it.

Q. What about with Mr. Klos?

A. I don't recall it.

Q. And obviously I don't want to hear about your discussion with counsel.

Other than counsel and DS -- or DSI, do you -- do you recall discussing with

J. Seery

anyone at the debtor the fact that NexPoint hadn't made the payment and that you were going to do something about that payment?

A. I would have only discussed it -- I think I would only have discussed it with counsel and with DSI, had DSI get the outstanding full amount up to whatever date we were going to set in the demand notice, and then send out the demand notice.

I wasn't going to advertise to anybody exactly what I was doing, because HCMLP had the right to do what it could do.

Q. Okay. And I'm going to struggle to ask the next question, so it's going to take me several questions and counsel will object.

Prior to the December 31 missed payment, did you issue any instructions to employees of the debtor to do anything differently with respect to facilitating NexPoint making that payment than they had done in the past?

MR. MORRIS: Objection to --

(Simultaneous speaking.)

A. -- payment or any other payment?

J. Seery

Q. This payment.

A. No.

(Reporter clarification.)

MR. MORRIS: I'm sorry, objection to form.

THE WITNESS: And I said -- I think my answer was no.

BY MR. RUKAVINA:

Q. So we've -- we've learned that in early December of 2020, the debtor was going to be able to -- strike that.

You agree with me that in December of 2020, it would have been to the debtor's economic advantage for NexPoint to miss the annual payment?

MR. MORRIS: Objection to the form of the question.

A. I -- I don't know if that's fair, because right now we're having to deal with what I would say are completely nonsensical defenses and spend millions of dollars to collect what are obviously true and owing amounts that are due to the debtor. So I don't know that it was necessarily in our

J. Seery

best interest to have this happen.

Overall, I think we will collect it, and it will be in our interest rather than having a thirty-year note to -- owed by NPA, to have a collected amount, which I expect to collect in full.

Q. As opposed to selling the note at a substantial discount, correct?

A. That would have been one of the options, yes, or suing on a fraudulent conveyance.

(Reporter clarification.)

THE WITNESS: On a fraudulent conveyance.

BY MR. RUKAVINA:

Q. So again, without ascribing any mal-intent here, it turned out for the debtor to be better, in December of 2020, that NexPoint missed its payment, correct?

MR. MORRIS: Objection to the form of the question.

A. Again, we'll -- we'll find out after we collect.

Q. Okay. So I just want to again

J. Seery

round off --

A. Quite -- quite clearly, though, just so -- so it's -- there's no ambiguity, it's far better to collect the full amount of the note than wait to be paid on an unsecured basis over the next twenty-plus years.

Q. And again, just to round off this topic, you did not instruct anyone at the debtor to do anything or fail to do anything to try to ensure that NexPoint misses that payment, did you?

A. No.

Q. Okay. Did you, to the best of your recollection, issue any instructions to employees of the debtor having anything to do with NexPoint making the December 31, 2020 payment?

A. None at all.

Q. Okay. So we go back to Exhibit 6, and you'll see in the middle there it talks about the amount due and payable is $24,471,000 and change.

Do you see that, sir?

A. Yes.

J. Seery

Q. Do you recall who calculated that amount?

A. I believe I got that from DSI.

Q. Okay. Did you ever ask yourself or ask anyone why the amount was more than $6 million less than the principal amount of the note?

A. I knew the answer.

Q. What's the answer?

A. That there were payments made on the note.

MR. RUKAVINA: Okay. In fact -- Mr. Nguyen, pull up the exhibit that I don't have here.

You're going to have to bear with me; I forgot to bring one exhibit, and I apologize to everyone involved.

MR. MORRIS: No apology needed.

BY MR. RUKAVINA:

Q. Okay. So -- so this was -- so, Mr. Seery, this is a document produced by the debtor. Please scroll up and down.

I want to ask you first, do you have any idea who created this document or

J. Seery

when or why? Because I'll represent to you that it was just produced to us like this, without any kind of context.

A. I -- I don't know specifically, no.

Q. You don't know specifically, but could it be DSI?

Is this the kind of -- does it look like the kind of report that DSI would have made?

MR. MORRIS: Objection to the form of the question.

A. I don't think so. I would think this would have been produced by NPA or -- or HCMLP's accounting group.

Q. Well, scroll down to the next page Mr. Nguyen.

So you see, sir, on 5/31/2020, a --

(Reporter clarification.)

MR. RUKAVINA: I'm sorry.

Q. A $575,550.56 payment made?

A. Yes.

Q. Okay. And prior to that, there had been advanced payments, or -- or payments on more than just the principal and interest,

J. Seery

right?

A. There --

MR. MORRIS: Objection to the form of the question.

A. -- there were but there's a very odd entry above that, on 12/30/19 with a -- instead of having parentheses, having a negative sign.

I'm not sure if that's a payment or what that is.

Q. Well, let's scroll back to the first page and see what these headings are.

So if we look in the far right column, total paid, do you see that, sir?

A. Yes, I do.

Q. And principal paid.

So scroll back to the next page, Mr. Nguyen.

Do you see those now, the payments?

A. I do. I just -- I'm just pointing out that that's --

Q. Okay.

A. -- not a correct way to do it, but it could have just -- maybe they did it as a

J. Seery

negative number as opposed to having it negative in the -- in the Excel file --

Q. Well, sir --

A. -- automatically.

Q. -- how do you know that the note hadn't be been prepaid, that the December 31, 2020 payment hadn't been prepaid?

A. Well, I know there was a payment due.

Q. Okay. But you didn't ask Mr. Waterhouse or anyone else whether the note had been prepaid or that payment had been prepaid, did you?

A. In the cash-flow discussions, the fact that NPA owed the money on 12/31 was a common discussion. So if it had been prepaid, it wouldn't have been owed.

Q. And who prepared those cash-flow discussion reports?

A. Waterhouse's team.

Q. Okay. When you learned that the December 31, 2020 payment had not been -- been made, did you ask anyone as to whether that payment had hypothetically been prepaid

J. Seery

at some point in the -- previous to that?

MR. MORRIS: Objection to the form of the question.

A. I don't believe that I did.

Q. Okay.

A. We certainly had discussions on other notes, whether there had been prepayments. And it would have come up around this note, but I don't have a specific recollection of, around December 20, asking whether something had been prepaid. There was an amount due - it was listed as due and owing - and I expected to get it paid.

Q. And I apologize, the $24 million figure in Exhibit 6, DSI supplied that?

A. I believe so.

Q. And do you know whether DSI consulted employees of the debtor to calculate that amount?

A. I assume they did. I don't -- I don't know the answer.

Q. Why didn't you -- strike that.

Before you sent this letter on -- that's Exhibit 6 -- well, first of all, did

J. Seery

you understand at that point in time, on or before January 7, 2021, why NexPoint didn't make the December 31 payment?

A. I don't recall if I knew before that --

Q. Okay.

A. -- or right around that time --

Q. Okay.

A. -- but I -- I came to know --

(Simultaneous speaking.)

Q. You came to know it?

A. Uh-huh.

Q. Do you recall if you asked anyone, prior to sending this letter, why that payment hadn't been made or did someone volunteer that information to you?

(Simultaneous speaking and reporter interjection.)

MR. MORRIS: Objection to the form of the question.

A. I -- I think you asked me that already. I'm not sure if I asked about it being made or someone pointed it out to me.

It was certainly a -- a topic I was

J. Seery

anticipating, as to -- because they had not made the payment in -- on the shared services, as with all the other related entities, because Dondero had directed that those payments not be made. So I was curious as to whether they were going to make the payments that were due on the term notes.

Q. So let's, let's -- let's break that down.

I had asked you before, I believe, as to how you learned of the lack of payment. Now I'm asking you, once you learned about the lack of payment, did you ask why didn't the payment get made?

MR. MORRIS: Objection to the form of the question.

A. No, I -- I don't think I would have asked why the payment didn't get made. Either -- as I said, either right before this, at this time or shortly thereafter, I learned -- I knew that the other payments hadn't been made. I believe that I knew that Dondero had directed that. I just don't know exactly, around these notes, about all of the

J. Seery

payments; if it was before or right around thereafter.

Q. And when you say before or right around thereafter, are you referring to January 7, 2021?

A. Correct.

Q. Okay. And -- and so you can't tell me right now the exact date, but whenever you learned about why the payment -- the NexPoint payment hadn't been made, what did you learn?

A. I learned that the NexPoint payment hadn't been made.

Q. Okay. I'm sorry. What did you learn about why it hadn't been made?

MR. MORRIS: Objection to the form of --

A. I was told that Mr. Dondero directed that no payments be made to the debtor.

Q. Who told you that?

A. I believe it was Kristin Hendrix who had heard it from Frank Waterhouse, was directed by Frank Waterhouse.

Q. So to the best of your

J. Seery

recollection, Dondero told Waterhouse, who told Hendrix, who told you?

A. Correct.

Q. Okay. So do you agree with me that before you sent this Exhibit 6, this letter, the debtor could have undertaken some action in the nature of trying to get NexPoint to cure its default?

MR. MORRIS: Objection to the --

A. The debtor could have, yes.

Q. And you made the decision ultimately to -- let's just say call the note immediately due and payable?

A. That's correct.

Q. Why did you make that decision as opposed to seeing, with NexPoint, if something could be worked out?

A. Number one, I'm a fiduciary. I'm a fiduciary to HCMLP. It's my job to maximize the value of the estate and to collect the assets of the estate, including this note.

Number two, in furtherance of that duty, the note specifically provides that it's due on a specific date and that there is

J. Seery

waived any notice of presentment, any demand. Once the payment is missed, the entire amount is due and owing.

Q. And I believe you've called my defenses nonsensical, right?

A. There -- there's so many different ones, but most of them, yeah.

Q. Okay. And did you take any steps, prior to sending Exhibit 6, to see if NexPoint had any defenses as to why that payment hadn't been made?

A. No.

Q. Okay. And again, you didn't ask anyone whether that note had been prepaid?

A. We had discussed the note and what was due and owing, so it had never been volunteered to me that it otherwise had been prepaid in a way that would have obviated the need to make this payment, so it's pretty clear that this payment had to be made.

MR. RUKAVINA: Okay. I need a restroom break. Five or ten minutes?

(Simultaneous speaking.)

VIDEO TECHNICIAN: The time is

J. Seery

3:18. We're going off the record.

(Recess taken.)

VIDEO TECHNICIAN: The time is 3:29. We're back on the record.

MR. RUKAVINA: So, just for the record, the document that my associate showed to Mr. Seery during questioning a few moments ago is going to be emailed to Mr. Morris and the court reporter, and it will be marked as Exhibit 7.

(Exhibit 7, Loan Document D-NNL-029141, marked for identification, as of this date.)

BY MR. RUKAVINA:

Q. Mr. Seery, before the break you mentioned that Ms. Hendrix told you that Mr. Waterhouse told her that Mr. Dondero said that there'll be no payments -- whatever words you used; that's not my question.

My question is, do you have that in any email or any writing or any recording?

A. I don't believe so.

One thing that I just wanted to add

J. Seery

is that I was admonished by the court reporter during the break that I was speaking a little too quickly, and so I will try to slow down quite a bit. And I'll try to be a little bit more clear. I've been bouncing between the camera and the court reporter.

Q. I think you should look at this one.

A. Okay.

Q. So, again, you said you don't think that there is any email or recording of what Mr. Dondero said, correct?

A. Not to my recollection, no. He didn't -- he didn't say it to me.

Q. Okay. And -- and during the break, did you have any more of a recollection as to the time, whether it's prior to or before Exhibit 6, that you learned that?

A. I, I, I -- I do not have any additional recollection, no.

Q. Okay. Are you aware that Mr. Waterhouse was deposed a couple days ago, a couple/three days ago?

A. I am, yes.

J. Seery

Q. Okay. Did you read all or part of his deposition?

A. Yes.

Q. Okay. All of it?

A. It was rather lengthy so no, not all of it.

Q. Okay. Did you see any of the video of it?

A. No.

Q. Okay. Did you read any of my examination of him?

A. Yes.

Q. Okay. Do you recall if you read the whole of my examination of him?

A. I certainly read the last part of your examination of him.

Q. Including where Mr. Waterhouse testified about what Mr. Dondero told him with respect to these payments?

A. Yes.

Q. Okay. But it's your testimony that you had heard that well before you read that deposition transcript?

A. Oh, absolutely.