Page 102

J. Seery

Q.   Okay.  And when you read
Mr. Waterhouse's -- parts of his transcript,
did it include Ms. Deborah Deitsch-Perez's
questions?

A.   There was a section at the end that
it was unclear to me who was asking the
question, because I think there was also a --
another attorney --

Q.   Okay.

A.   -- Debra Dandeneau.

(Simultaneous speaking.)

A.   -- so I wasn't sure who was -- who
was asking -- I didn't know who represented
whom and who was asking the questions.

Q.   Did you ever discuss with
Mr. Waterhouse the substance of what
Mr. Dondero told him vis-a-vis not making any
more payments?

A.   I don't believe so, no.

Q.   Did you ever -- other than legal
counsel, did you ever discuss that with
anyone at Highland, to your recollection?

A.   Yes.

Q.   Okay.  With whom?

Page 103

J. Seery

A.   Ms. Hendrix and Mr. Klos.

Q.   Why Mr. Klos?

A.   He's my CFO.

Q.   To your knowledge, did he overhear
Mr. Waterhouse or Mr. Dondero say something
to that same effect?

A.   I don't believe he did, no.

Q.   Is it fair to say that other than
Mr. Waterhouse's deposition from a few days
ago, the universe of what you heard about
what Mr. Dondero instructed came from
Ms. Hendrix?

A.   I don't think that's fair.  I might
have heard it from Mr. Klos, who heard it
from Mr. Hendrix -- from Ms. Hendrix, I'm
sorry.

Q.   Okay.

A.   So around this time it was clear
that the payment wasn't made, the shared
services payments had -- had not been made,
none of the payments from related entities
had been made, and it was clear Mr. Dondero
had directed that no payments be made.  And
even around the negotiations for any kind of

Page 104

J. Seery

transition, it was very difficult to agree on
any payments because Mr. Dondero had this
edict of no payments.

And I just don't recall if it was
before January 7, at January 7 or immediately
thereafter.  I just -- it -- I don't recall.
It may have even been as far back as
December.  I don't know the exact answer.

Q.   Did Highland, prior to the plan
becoming effective, have any written policies
or procedures in place with respect to how it
would operate any aspect of its business
practices?

A.   Certainly.

Q.   Okay.  Do you recall whether any of
those policies or -- or procedures related to
enforcing debt obligations due and payable to
Highland?

A.   I -- I don't recall seeing anything
like that.

Q.   Do you recall whether you ever
tried to consult any policies and procedures
before your letter of January the 6th?

A.   I, I did not nor -- nor would I

Page 105

J. Seery

have.

Q.   Because, again, you made the
determination that the payment hadn't been
made, the note says what it says, and it was
the fiduciary obligation that you felt to the
estate to call the note?

A.   That's correct.

MR. MORRIS:  Objection to the
form of the question.

Q.   Did any part of your motivation
involve trying to stick it to Mr. Dondero?

A.   Not at all.

Q.   Okay.  Did you consider any
alternatives to the January 6 letter before
you sent it?

MR. MORRIS:  Objection to the
form of the question.

Q.   And I think -- let's exclude
discussions you might have had with counsel.

MR. MORRIS:  Same objection.

A.   No, I -- I think I just considered
that the note was due and we would accelerate
it.  It wasn't paid, we'd accelerate it and
try to collect the whole.

Page 106

1    J. Seery
2        Q.    After you sent your letter of
3    January 7, did you issue any instructions to
4    Mr. Waterhouse or anyone else at the debtor
5    with respect to anything having to do with
6    the NexPoint note or missed payment?
7        A.    I don't believe so, no.
8        Q.    Are you aware that on or about
9    January 12, 2021, Mr. Waterhouse and
10   Mr. Dondero had a telephone conversation, at
11   least one, regarding the missed payment?
12       A.    I am aware of that from your --
13   Mr. Waterhouse's deposition.  I had no
14   knowledge of that before the --
15       Q.    Mr. Waterhouse never talked to you
16   about that prior to you seeing it in his
17   deposition?
18       A.    No.
19       Q.    Okay.  You're aware that on or
20   about January the 14th, 2021, NexPoint did
21   make a $1.4 million and change payment?
22       A.    Yes, I am.
23             MR. RUKAVINA:  Okay.
24             (Brief off-record discussion.)
25             MR. RUKAVINA:  Sir, this is going

Page 107

1    J. Seery
2    to be marked Exhibit 8.  This is your
3    letter of January 15, 2021.
4             (Exhibit 8, Correspondence
5    Dated January 15, 2021, marked for
6    identification, as of this date.)
7             (Brief off-record discussion.).
8             THE WITNESS:  Oh, 7 is to come?
9             MR. RUKAVINA:  Yes, sir.
10       Q.    Do you recognize Exhibit 8?
11       A.    I do, yes.
12       Q.    Okay.  Do you recall authorizing
13   this to be sent under your electronic
14   signature?
15       A.    Yes.
16       Q.    Okay.  Do you recall what prompted
17   you to send Exhibit 8?
18       A.    Yes.
19       Q.    What was it?
20       A.    I believe the -- I think it's the
21   day before I was on the stand in a court
22   hearing, and I testified that I'd accelerated
23   this note.  Mr. Dondero was there.
24             It appears to me that he
25   immediately learned or realized, oh, my gosh,

Page 108

1    J. Seery
2    my edict caused the acceleration of note.  I
3    don't know if he paid attention to the prior
4    demand -- acceleration and demand note.
5             So a payment was received on the
6    14th for $1.4 million.  And under the terms
7    of the note, my understanding of the law, we
8    applied the payment to the balance and
9    reiterated our demand.
10       Q.    When you were just now putting
11   words in Mr. Dondero's mouth, were you
12   speculating as to his mental process or did
13   he say anything like that to you?
14       A.    He wasn't allowed to talk to me and
15   I didn't -- so I was speculating, but part of
16   it is that -- I believe the colloquy you had
17   yesterday with Frank had -- or two days ago,
18   had a reference to Mr. Dondero being in
19   court.  I don't remember if that was on an
20   email or if it was in the -- the colloquy
21   that you had.
22       Q.    But at least as of January the
23   15th, 2021, your then mental impression was
24   that it was an event that occurred on January
25   the 14th, 2021 that prompted that

Page 109

1    J. Seery
2    $1.4 million payment?
3        A.    I -- I think so, either the 14th or
4    the 13th.  I know -- I recall testifying to
5    the acceleration and that the note -- the
6    payment had been missed and we had
7    accelerated it.
8        Q.    Do you recall what -- was that like
9    the Dondero PI -- do you recall what
10   proceeding that was?
11       A.    I don't -- I don't recall --
12             (Simultaneous speaking.)
13       A.    -- at least two that week, I
14   believe.
15       Q.    Sitting here today, you think it
16   was January 13 or January 14?
17       A.    Yes.
18       Q.    Okay.  Did you ask Mr. Waterhouse
19   anything about that $1.4 million payment
20   before you sent Exhibit 8?
21       A.    No.
22       Q.    Okay.  Did you ask anyone else at
23   the debtor -- again, we're excluding legal
24   counsel.
25             Did you ask anyone else at the

Page 110

J. Seery

1  debtor as to anything having to do with why
2  that $1.4 million payment had come in?
3  
4      A.    I did not.  I don't -- well, I
5  don't recall doing that.
6      Q.    Why didn't you return -- I'm sorry,
7  strike that.
8          Why didn't the debtor return the
9  payment?
10     A.    Because I would apply it on account
11 and reduce the total amount owed and make the
12 demand again.
13     Q.    Why wouldn't you have applied it to
14 the amounts owing under the shared services
15 agreement and payroll reimbursement
16 agreement?
17     A.    I believe because it was on account
18 of the note, and the note had already been
19 accelerated, so any payments are on account
20 of the note.
21     Q.    What led you to believe that the
22 payment was on account of the note?
23     A.    I don't recall.
24     Q.    So until you read Mr. Waterhouse's
25 transcript, you had no knowledge of his -

Page 111

J. Seery

1  let's just say January 12, whatever day it
2  was - conference with Mr. Dondero, correct?
3      A.    None.
4      Q.    And no knowledge of what they may
5  have discussed?
6      A.    No.
7      Q.    Okay.  Can you think of a reason
8  why Dondero would have caused that
9  $1.4 million payment to have been made?
10         MR. MORRIS:  Objection to the
11     form of the question.
12     A.    Can I speculate?
13     Q.    If you're speculating, tell me
14 you're speculating, sure.
15     A.    I -- I can speculate, yeah.
16     Q.    Speculate.
17     A.    He realized that the note had been
18 accelerated and that he was going to try to
19 decelerate it.
20         You know, one thing sort of
21 interesting that -- well, maybe there's a
22 question on it.
23         MR. RUKAVINA:  Let's go off the
24     record for a second.

Page 112

J. Seery

1      (Brief off-record discussion.)
2      VIDEO TECHNICIAN:  The time is
3  3:40.  We're going off the record.
4      (Recess taken.)
5      VIDEO TECHNICIAN:  The time is
6  3:42.  We're back on the record.
7      (Brief off-record discussion.)
8      MR. RUKAVINA:  So during --
9  during the break, Mr. Morris was kind
10 enough to print out exhibit -- the --
11 the prior report that we had seen that
12 is now marked as Exhibit 7.
13     And I will represent to you,
14 Mr. Seery, and to the Court that Exhibit
15 7 is a true and correct copy of what was
16 previously on the Zoom, care of my
17 associate.
18     Okay.  Sir, we're going to now go
19 to 9, Exhibit 9, which is going to be the
20 shared services agreement.
21     (Exhibit 9, Amended and Restated
22 Shared Services Agreement, marked for
23 identification, as of this date.)
24 Q.    Now, sir, I've handed you

Page 113

J. Seery

1  Exhibit 9, and you're certainly free to read
2  it.  This purports to be the amended and
3  restated shared services agreement between
4  NexPoint and the debtor.
5      I'll represent to you that it is a
6  true and correct copy, as filed by your
7  attorneys.  And if I'm wrong about that, then
8  certainly you're not going to be held to your
9  answers.
10     But just sitting here today, do you
11 have any reason to suspect the authenticity
12 of Exhibit 9?
13     A.    No.
14     Q.    Okay.  All right.  So this is
15 called the "Amended and Restated Shared
16 Services Agreement" as of January 1, 2018.
17     To the best of your knowledge, was
18 this the latest iteration prior to its
19 termination or were there any subsequent
20 amendments?
21         MR. MORRIS:  Objection to the
22     form of the question.
23     A.    I don't recall.
24     Q.    And obviously the document speaks

Page 114

J. Seery

1  J. Seery
2  for itself, but as the CRO/CEO, what was your
3  understanding of what this contract
4  effectuated as between the debtor and
5  NexPoint?
6      A.   Part of the way the debtor was set
7  up and the way it was run was that the debtor
8  would provide certain services to certain of
9  the affiliated entities.  And those would be,
10 to some degree, embodied in this agreement.
11          Oftentimes the debtor provided
12 services to affiliates without any agreement,
13 oftentimes they provided additional services
14 that may not have been in the agreement, and
15 that was because they were such closely
16 related parties.
17     Q.   As of December 2020, do you agree
18 with me -- as of December 31, 2020, do you
19 agree with me that this agreement had not yet
20 been terminated?
21     A.   As of December 20?
22     Q.   I'm sorry.
23          As of December 31, 2020, do you
24 agree with me that this agreement had not yet
25 been terminated?

Page 115

J. Seery

1      A.   Yeah, I think the termination
2  notice had gone out but it had not yet become
3  effective.
4      Q.   Okay.  And we see here what -- some
5  of the services that the debtor was
6  providing.  We see it on the top of page 4,
7  if you want to flip there.
8          It says, amongst other things,
9  finance and accounting, payments,
10 bookkeeping, cash management.
11          Do you see all that, sir?
12     A.   Yes.
13     Q.   Okay.  Do you have an understanding
14 of what those terms under this agreement
15 meant?
16          MR. MORRIS:  Objection to the
17     form of the question.
18     A.   Yes, I do.
19     Q.   Okay.  Give me your understanding,
20 please, sir.
21     A.   The debtor provided back office
22 support for -- under those terms, for the
23 affiliated entity and received some form of
24 remuneration in exchange for that and other

Page 116

J. Seery

1  services.
2      Q.   And when you said affiliated
3  entity, in this instance, are you referring
4  to NexPoint?
5      A.   Uh-huh.  Yes, I am.
6      Q.   Okay.  When you say back office
7  services, would that have included, as of
8  December 2020, helping NexPoint ensure that
9  NexPoint pays from its own funds its
10 obligations coming due?
11     A.   I -- I think as part of back office
12 services -- that's the heading of the
13 section, and so part of it is to assist in
14 preparing payments and calculating what those
15 should be.
16     Q.   So obviously the debtor wasn't
17 responsible for paying NexPoint's
18 obligations, right?
19     A.   That's correct.
20     Q.   But the debtor had some level of
21 responsibility to help NexPoint pay its
22 accounts payable on a timely basis, correct?
23     A.   Yes.
24     Q.   And that would have been from

Page 117

J. Seery

1  NexPoint's funds?
2      A.   Correct.
3      Q.   And is the same true for NexPoint's
4  loan obligations?
5      A.   I believe so, yes.
6      Q.   So if Mr. Waterhouse testified that
7  it was reasonable for NexPoint, in December
8  2020, to rely on the debtor to facilitate the
9  December 31 note payment, would you have
10 reason to disagree with that?
11          MR. MORRIS:  Objection to the
12     form of the question.
13     A.   I would, yes.
14     Q.   Okay.  And what's your disagreement
15 and your reason for the disagreement?
16     A.   Because the debtor does work to
17 figure out how much payments are, whether
18 they be on notes or whether they be for some
19 other service that the affiliated entity has
20 gotten.
21          The debtor's accounting team puts
22 together that schedule, and then the debtor
23 needs direction from an officer at NexPoint
24 to make the payment.  If the debtor has

Page 118

1    J. Seery
2  already been told don't make the payment, it
3  wouldn't be scheduled.
4    Q.    So, to summarize, it's ultimately
5  up to NexPoint to specifically approve or
6  disapprove any potentially scheduled
7  payments?
8    A.    Correct.
9    Q.    Okay.  And in this instance, what
10 you've learned is that Mr. Waterhouse was
11 told by Dondero, don't make the payment?
12   A.    Correct.
13   Q.    Okay.  And that -- that is the sum
14 of your understanding as to why the
15 December 31 payment wasn't made?
16   A.    I don't think that's the sum of it.
17 There's -- there's emails that show that
18 Ms. Hendrix prepared and requested from
19 Mr. Waterhouse payment of these amounts
20 okayed and he approves them.  So they -- they
21 are the amounts that are permitted to be
22 approved, and they're all to third parties.
23 None of them are to HCMLP.
24   Q.    Are you aware of any email where
25 Ms. Hendrix prepared the December 31 note

Page 119

1    J. Seery
2  payment by NexPoint for Mr. Waterhouse's
3  approval?
4    A.    No, I'm not.
5    Q.    If there is no such email, do you
6  have any explanation or understanding for why
7  there wouldn't be such an email?
8    A.    Sure.
9    Q.    Okay.  What is it?
10   A.    She was told not to make the
11 payment.
12   Q.    So, consequently, she did not
13 include it in any upcoming payment list?
14   A.    Correct.
15   Q.    And that goes back to what you
16 tell -- told me before, that Waterhouse told
17 her what Dondero told him, right?
18   A.    That's correct.
19   Q.    Okay.  And are you aware that
20 Mr. Waterhouse said -- testified that that
21 instruction had come sometime in early
22 December of 2020?
23   A.    I don't recall.
24         This was in the testimony
25 yesterday?

Page 120

1    J. Seery
2    Q.    From a couple days ago.
3    A.    Yeah, two days ago, I'm sorry.
4          I don't recall the specific dates
5  that he said that.
6    Q.    Well, whatever the -- whatever the
7  dates that he testified about were with
8  respect to the Dondero discussion, would you
9  have any reason to dispute those dates?
10   A.    No.
11   Q.    Okay.  So, sir, is it your
12 understanding that having been given that
13 instruction by Mr. Dondero, that employees of
14 the debtor, including Mr. Waterhouse, had no
15 further obligation with respect to that
16 December 31 payment?
17         MR. MORRIS:  Objection to the
18   form of the question.
19   A.    I think they -- I think they took
20 the direction of Mr. Dondero to heart and
21 followed his direction.
22   Q.    Is it your belief that they had no
23 obligation to subsequently ask Mr. Dondero
24 whether he meant it?
25         MR. MORRIS:  Objection to the

Page 121

1    J. Seery
2  form of the question.
3    A.    Absolutely.
4    Q.    Did they have no such obligation?
5    A.    No.
6    Q.    Is it your understanding that they
7  had no obligation to communicate with
8  Mr. Dondero and inform him of the
9  consequences that would happen if that
10 payment wasn't made?
11         MR. MORRIS:  Objection to the
12   form.
13         (Simultaneous speaking and
14   reporter interjection.)
15   A.    I -- I don't think it would be
16 appropriate for the employees of the debtor
17 to go to the founder of the organization, who
18 owns and controls all of the entities, after
19 he's given them a direction, to go challenge
20 his direction.  And that's just not the way
21 Highland ever worked, from what I could see.
22   Q.    Did you believe, in December of
23 2020, that employees of Highland had a
24 conflict of interest with respect to their
25 dual role as employees of NexPoint with

Page 122

J. Seery

1  respect to that promissory note?
2      A.    Not specifically with respect to
3  the promissory note, but generally it was a
4  concern of mine throughout the case.
5      Q.    Well, we can -- can we agree on
6  this; that when Mr. Dondero gave
7  Mr. Waterhouse that instruction,
8  Mr. Waterhouse should have known that that
9  instruction was not on behalf of Highland
10 because Mr. Dondero no longer had any
11 management role with Highland?
12     MR. MORRIS:  Objection to the
13     form of the question.
14     A.    I think he should have known that,
15 yes.
16     Q.    And can we therefore agree that
17 Mr. Waterhouse should have known that that
18 instruction from Dondero was coming from
19 NexPoint --
20     MR. MORRIS:  Objection --
21     (Simultaneous speaking.)
22     Q.    -- Dondero wearing his NexPoint
23 hat?
24     A.    I -- I think you're trying to parse

Page 123

J. Seery

1  something that doesn't exist.  There's no
2  hats.  There's one hat for Mr. Dondero.  He
3  controls all of the entities other than
4  HCMLP.
5      And his edicts, whether they be
6  from prior to our taking over HCMLP as
7  independent directors or with respect to any
8  of the other entities, are final.
9      Q.    Mr. Dondero might not have had two
10 hats, but in December of 2020, would you
11 agree that Mr. Waterhouse wore two hats?
12     A.    Yes, he did.
13     Q.    The CFO of the debtor and the
14 treasurer of NexPoint?
15     A.    That's correct.
16     Q.    And both being executive officer
17 positions, correct?
18     A.    Correct.
19     Q.    Pardon me.  With, to your
20 understanding, under Delaware law, fiduciary
21 duties to his respective principals, correct?
22     A.    I believe these are both Delaware
23 but I'm not positive.
24     Q.    Certainly you would have expected

Page 124

J. Seery

1  Mr. Waterhouse to have fiduciary duties, in
2  December of 2020, to the debtor?
3      A.    Yes.
4      Q.    Okay.  That's the role that I'm
5  asking about, sir.
6      Mr. Waterhouse simultaneously being
7  the CFO of the debtor, the payee on a large
8  promissory note, and the treasurer of
9  NexPoint, the maker on that same promissory
10 note, did you not perceive there to be any
11 conflict of interest?
12     MR. MORRIS:  Objection to the
13     form of the question.
14     A.    No, no more than -- I -- I
15 perceived a concern throughout the case, but
16 no more than there had been at any other time
17 with any of these related entities.
18     Q.    Except, sir, that at this time,
19 Mr. Waterhouse had a fiduciary duty to the
20 bankruptcy estate.
21     Would you agree with that?
22     A.    Yes.
23     Q.    Okay.  And do you agree that his
24 fiduciary duty to the bankruptcy estate, in

Page 125

J. Seery

1  December of 2020 with respect to this
2  promissory note, might have conflicted with
3  his duties - whatever they were - to
4  NexPoint?
5      (Simultaneously speaking.)
6      (Reporter interjection.)
7      A.    I'm sorry.
8      MR. MORRIS:  Objection to the
9      form of the question.
10     A.    Potentially but not necessarily.
11 Mr. Waterhouse took direction from the man in
12 control of NexPoint.  That man directs his
13 inferiors, which would include the treasurer.
14 So following that direction doesn't cause any
15 conflict with respect to NexPoint.
16     Q.    On the debtor's side, you mentioned
17 before, for example, that -- that you
18 believed after the payment was made, that
19 your fiduciary duties necessitated the
20 calling of the note, right?
21     A.    I don't know if they necessitated
22 it.  They certainly informed it.
23     Q.    Informed it.
24     But -- so they certainly informed

Page 126

J. Seery

1  it, correct?
2  A.    Yes.
3  Q.    Okay.  And would you expect
4  Mr. Waterhouse to have had similar duties to
5  the bankruptcy estate?
6  MR. MORRIS:  Objection to the
7  form of the question.
8  A.    No, I believe that would be my
9  direction, if I had -- I would be his
10 superior at HCMLP.  If I directed that we
11 collect it, we collect it.  If I direct that
12 we don't, then we don't.
13 Q.    Is it fair to say, from your prior
14 testimony, that at no time prior to January
15 1, 2021 did Mr. Waterhouse, Mr. Klos or
16 Ms. Hendrix tell you about the Dondero
17 instruction not to make any more payments?
18 MR. MORRIS:  Objection to the
19 form of the question.
20 A.    Prior to when?
21 Q.    January 1, 2021.
22 A.    I -- I don't -- as I said, I don't
23 recall if it was right around the time of
24 the -- the payment had been failed to be made
25

Page 128

J. Seery

1  Q.    Well, but you could have learned
2  that Mr. Dondero had instructed that the
3  December 31 payment not be made ahead of
4  time, could you not have?
5  A.    I -- I could have, but I did not
6  learn that.
7  Q.    Okay.  That's -- that's what I'm
8  trying -- that's what I'm trying to
9  ascertain.  I'm trying to refresh your
10 memory.
11 So you can now testify that prior
12 to the payment not being made, you did not
13 know about the Dondero instruction not to
14 make the payment?
15 A.    With respect to the -- the note
16 payment, that's correct.
17 Q.    Okay.  So what -- that's what I
18 mean.
19 It would have had to have been
20 January 1 or after -- January 1, 2021 or
21 after that you learned about that?
22 A.    I would have to have learned of the
23 effect of it.  If the -- if the actual
24 statement was don't make any payments
25

Page 127

J. Seery

1  on the 31st, and we sent it, or if it was in
2  December.  I believe I testified to that
3  before.  And the shared service payments
4  hadn't been made, so there's may have been some
5  discussion that Dondero's cut it off.
6  Q.    Well, I -- I think I asked you
7  before about the timing in reference to the
8  January 7 letter, when --
9  A.    Correct.
10 Q.    -- you said it might have been
11 right around there.
12 Am, am I understanding -- or strike
13 all that.
14 Is it your testimony that maybe you
15 learned about the Dondero instruction on or
16 before December 31, 2020?
17 MR. MORRIS:  Objection, asked and
18 answered.
19 A.    That -- that's correct.  I don't
20 recall when I learned but, factually, I know
21 that the payments on shared services hadn't
22 been made.  I could not have known that the
23 December 31 payment wouldn't have been made
24 on December 31 until after December 31.
25

Page 129

J. Seery

1  irrespective of when they're due, that could
2  have been made in early December.  I wouldn't
3  have known the effect of it.
4  I knew the effect with respect to
5  the shared service because it wouldn't be
6  paid.  He might have changed his mind and I
7  didn't know that.
8  Q.    Okay.  I'm going to -- I'm going to
9  try again.
10 On or about January 31, 2020 --
11 A.    December 31.
12 Q.    Thank you.
13 On or before December 31, 2020,
14 sitting here today, do you remember being
15 informed of the Dondero instruction not to
16 make payments?
17 MR. MORRIS:  Objection, asked and
18 answered.
19 A.    Again, I don't recall the exact
20 date I learned.  I believe I certainly knew
21 that the shared service payments had not been
22 made.  I believe I knew that that related to
23 a Dondero edict.
24 Q.    So you're saying shared services in
25

Page 130

1          J. Seery
2    response to my answer.
3          Why, why does -- why is that
4    relevant?  Because from that you deduced that
5    all payments were to cease?
6    A.    No, they were due before.
7    Q.    That's -- okay, I apologize.
8          So this shared services contract
9    required periodic payments, right?
10   A.    Correct.
11   Q.    And, and -- and are you saying that
12   before December 31, 2020, NexPoint had
13   already failed to make at least one of those
14   periodic payments?
15   A.    I believe so, yes.
16   Q.    Okay.  Did you, at that point in
17   time, inquire as to why that payment hadn't
18   been made?
19   A.    I don't recall, but I loosely
20   recall - but I don't know exactly when I
21   learned it - that there had been this edict.
22   Q.    Okay.  I'll use that word "edict."
23   That's the one -- we're both saying the same
24   thing, right --
25   A.    Correct.

Page 131

1          J. Seery
2    Q.    -- where Dondero tells Waterhouse
3    no more payments, right?
4    A.    Fair enough.
5    Q.    So sitting here today, it is
6    possible that before December 31, 2020, you
7    had heard vis-a-vis Ms. Hendrix that NexPoint
8    would not be making its scheduled payment
9    because of the Dondero edict?
10   A.    Scheduled payment on the note?
11   Q.    On the note.
12   A.    No, I don't think that's fair.
13   Q.    That's all I'm -- okay.  So I'm --
14   I'm asking just about the note.
15         As of December 31, 2020, sitting
16   here today, do you remember having heard that
17   NexPoint would not be making its December 31
18   payment because of the Dondero edict?
19   A.    I pretty clearly recall that the
20   payments had not been made, and I had heard
21   that there had been an edict.
22         The full implication of that edict
23   and whether it extended to the note I did not
24   know until the payment was missed.
25   Q.    Understood.  I think that -- I

Page 132

1          J. Seery
2    think -- thank you.  I understand now.
3          So you knew that there had been an
4    edict not to make payments, you just didn't
5    realize definitively that that edict also
6    applied to the promissory note payment?
7    A.    Correct.
8    Q.    Okay.  By December 31, 2020, had
9    the debtor laid off certain people, certain
10   employees, let's just say for cost-cutting
11   purposes as opposed to regular terminations,
12   you know -- you know what I'm trying to say?
13   Had there been just --
14   A.    Had there been a RIF?
15   Q.    A reduction --
16         (Simultaneous speaking.)
17   Q.    Yes, yes.
18   A.    No, there had not been.
19   Q.    So to your understanding, the
20   debtor personnel that would have had any
21   involvement with these treasury and payment
22   services, helping affiliated companies make
23   their payments, all those personnel were
24   still there?
25   A.    Largely the same.

Page 133

1          J. Seery
2    Q.    Okay.  When you say largely, can
3    you think of anyone right now that was no
4    longer there or changed?
5    A.    Not specifically.  There were --
6    there was some attrition during 2020 and we
7    didn't specifically replace some of those,
8    but some -- some people we did replace.  We
9    actually hired people in 2020.
10   Q.    But as with respect -- pardon me.
11   As it respects -- strike that.
12         With respect only to the payment
13   we're talking about, i.e. scheduling future
14   permission to pay them, all those personnel
15   that would have had a role in -- on that for
16   the debtor were still there in December 2020?
17   A.    I -- I believe that group was
18   largely the same.
19   Q.    Waterhouse, Klos and Hendrix?
20   A.    Ellison Rober -- I can't remember
21   her last name.  So there -- there were a
22   couple others in that group as well, and then
23   there were some other junior people that
24   would have assisted them.
25   Q.    I'm going to ask you a hypothetical

**App. 130**

Page 134

J. Seery

1 J. Seery
2 question.  Let's say that on December the
3 10th, 2020, Hendrix tells you that Dondero
4 has instructed that the note payment by
5 NexPoint will not be made.
6         Would you have issued any
7 instructions to employees of the debtor
8 following up on that, what you just learned?
9         MR. MORRIS:  Objection to the
10    form of the question.
11    A.   I, I don't know -- know if --
12 knowing what I know now and that they hadn't
13 made the shared service payments at that time
14 and that it seemed to be going towards
15 litigation, I would not have done anything, I
16 don't think.
17    Q.   Okay.  So, again, to round off this
18 topic, you do not believe that employees of
19 the debtor had any obligation, after
20 Dondero's edict, to follow up with NexPoint
21 about its upcoming note payment?
22    A.   No.
23    Q.   Okay.  Did you consult this shared
24 services agreement, to your recollection,
25 before your January 7, 2021 letter?

Page 135

J. Seery

1 J. Seery
2    A.   I certainly --
3         MR. MORRIS:  Objection to the --
4         (Simultaneous speaking and
5    reporter interjection.)
6    A.   I certainly was familiar with the
7 agreement and had consulted it numerous
8 times.
9         If your question is did I consult
10 this agreement with respect to that demand
11 letter, the answer's no.
12    Q.   Okay.  If you'll turn to Section
13 2.06 of this agreement for me, sir.
14         And certainly you can look at the
15 definitions, but the staff and services
16 provider, that's the debtor, right?
17    A.   Yes.
18    Q.   And management company, that's
19 NexPoint, right?
20    A.   Yes.
21    Q.   Okay.  So Section 2.06, the last
22 sentence, sir, that basically says that the
23 debtor will not have any duties or
24 obligations to NexPoint unless those duties
25 and obligations are specifically provided for

Page 136

J. Seery

1 J. Seery
2 in this agreement.
3         Did I paraphrase that correctly?
4    A.   Roughly, yes.
5    Q.   Okay.  And if we flip to Section
6 6.01, sir, and -- and take a second, please,
7 to read that section.
8    A.   (Document review.)
9         Okay.
10    Q.   And -- and you might want to look
11 at the definition of covered person real
12 quick.  I believe you'll find it includes the
13 debtor.
14    A.   Okay.
15    Q.   So I read this and, and -- and it
16 says (as read):
17         Except as otherwise
18    expressly provided herein, each
19    covered person shall discharge its
20    duties under this agreement with
21    the care, skill, prudence and
22    diligence under the circumstances
23    then prevailing that a prudent
24    person acting in a like capacity
25    and familiar with such matters

Page 137

J. Seery

1 J. Seery
2    would use in the conduct of an
3    enterprise of a like character and
4    with like aims.
5         Did I read that correctly?
6    A.   Roughly.
7    Q.   Okay.  Do you have any
8 understanding of that section, sitting here
9 today?
10    A.   I know what every one of those
11 words mean.
12    Q.   Okay.  Reading that, do you still
13 believe that Mr. Waterhouse and Mr. Klos and
14 Ms. Hendrix had no duty to go back to
15 Mr. Dondero and advise him of the
16 ramifications of his edict and try to
17 persuade him otherwise?
18         MR. MORRIS:  Objection to the
19    form of the question.
20    A.   Yes, I do.
21    Q.   Okay.
22    A.   I believe that they didn't have any
23 further duty.
24    Q.   If you had issued an edict in the
25 heat of the moment or based on bad advice,

Page 138

J. Seery

2 would you expect your officers to come to you
3 and say, Mr. Seery, just so you know, there's
4 going to be consequences, please reconsider?
5         MR. MORRIS:  Objection to the --
6     A.    Me personally?
7     Q.    Yes.
8         MR. MORRIS:  -- form of the
9     question.
10        (Simultaneous speaking and
11    reporter interjection.)
12    A.    My relationship with people who
13 work with or for me is very different than I
14 understand Mr. Dondero's.  But as a
15 professional and someone who's been doing
16 this for thirty years, if I give my
17 direction, I expect it to be followed.  And I
18 know, from what I have heard and seen,
19 Mr. Dondero is that to the nth degree.
20    Q.    So, again, I understand that you
21 expect your instructions, Mr. Seery's
22 instructions, to be followed.
23    A.    Yes.
24    Q.    But from your officers, do you
25 believe that they have an obligation to come

Page 139

J. Seery

2 to you, after you issue an instruction and if
3 they believe it's bad for the company, to
4 dissuade you of that instruction?
5     A.    I, I --
6         MR. MORRIS:  Objection to the
7     form of the question.
8     A.    I would prefer that they did, yes.
9     Q.    Okay.  NexPoint was paying the
10 debtor's employees in this -- including
11 Mr. Waterhouse, Mr. Klos and Ms. Hendrix, for
12 services under this contract, correct?
13    A.    Correct.
14    Q.    And other than amounts in
15 controversy that are not insignificant,
16 NexPoint paid millions of dollars to the
17 debtor under this contract, did it not?
18    A.    I don't believe it paid millions --
19    Q.    Okay.
20    A.    -- of dollars.
21        MR. MORRIS:  Yeah, objection.
22    Q.    Okay.  But it paid -- it paid some
23 amount under this contract?
24    A.    I would say for the services, one
25 would easily say a paltry amount.  And the

Page 140

J. Seery

2 vehicle, NPA, was used largely to strip
3 assets and value out of Highland.
4     Q.    But the same Mr. Waterhouse that
5 has a duty to you, as the chief executive
6 officer, to tell you that one of your courses
7 of action is going to be detrimental has no
8 such duty to Mr. Dondero, because
9 Mr. Dondero's a tyrant?
10        MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I said I would prefer that a
13 Mr. Waterhouse or anyone else who works for
14 or with me advise me if they think the course
15 of action I'm taking is incorrect.  If I
16 listen to their advice and make my decision,
17 then we live with my decision.  I don't want
18 to revisit it ten times.
19        So I don't know whether
20 Mr. Waterhouse told Mr. Dondero that that
21 course might have ramifications.  One would
22 think that a man who's run these businesses
23 for this long and had put this company into
24 bankruptcy and had left hundreds of millions
25 of dollars strewn across the street of

Page 141

J. Seery

2 losses, that one would have some
3 understanding of what those ramifications
4 might be, and maybe Mr. Waterhouse didn't.  I
5 don't know; I wasn't there.
6     Q.    Do you agree, sir, that Section 601
7 also applied to you with respect to -- as a
8 covered person, with respect to how you
9 conducted business under this contract?
10        Do you --
11    A.    Could I -- no, I think it -- well,
12 I can --
13    Q.    Take a second -- take a second to
14 read the definition of covered person.
15    A.    Uh-huh.
16    Q.    And, look, we can agree that you're
17 not making any legal conclusions here.  I'm
18 just...
19    A.    (Document review.)
20        I believe it does, yes.
21    Q.    Yet before you sent your January 7
22 letter, you did not check to see whether
23 NexPoint had made any prepayments on the
24 note, correct?
25    A.    I think I testified that I didn't

Page 142

J. Seery

1  check, but our -- my understanding, based
2  upon the work of the accounting group, was
3  that the payment was due and scheduled.  It
4  had to be paid.
5       If it had not been due, it had been
6  prepaid, it would not have been scheduled.
7  So there was no need for me to go doublecheck
8  that.
9       Q.   And you did not separately inquire
10 of anyone at the debtor as to whether
11 NexPoint had a defense to your January 7
12 letter, correct?
13      MR. MORRIS:  Objection to the
14      form of the question.
15      A.   No, I did not.
16      Q.   Is that not, sir, something that
17 would have been prudent to do pursuant to
18 Section 601, check as to whether NexPoint had
19 made a prepayment or had a defense?
20      MR. MORRIS:  Objection --
21      A.   I --
22      (Simultaneous speaking.)
23      A.   -- I don't believe that's something
24 that would have been required by this or any

Page 143

J. Seery

1  other provision.
2       Q.   Do you believe that Section 601
3  played any role at all, now that you're
4  reading it, with respect to your decision to
5  call the note as opposed to call NexPoint and
6  say, hey, what happened?
7       A.   I don't -- I don't believe it
8  governs it at all.
9       Q.   Do you believe it governed in any
10 respect whatever Mr. Waterhouse and
11 Mr. Dondero discussed on or about January --
12 January 12, 2021?
13      A.   I don't know the substance of their
14 discussion, other than that the -- what we've
15 referred to as the edict, at least that's as
16 it's been reported.  So I don't know what
17 colloquy they had with respect to
18 ramifications of making a payment or not.
19      Clearly, there should have been
20 more ramifications for not making the shared
21 services payments, but Mr. Dondero issued a
22 similar edict or --
23      (Simultaneous speaking.)
24      Q.   Mr. Dondero didn't issue a similar

Page 144

J. Seery

1  edict?
2       A.   I said he did.
3       Q.   He did.
4       So why didn't you terminate the
5  services agreement immediately upon
6  NexPoint's failure to pay?
7       A.   Well, we would have, I think, if we
8  thought we could.  We also had an issue that
9  both NexPoint and HCMFA were providing
10 services to retail funds and had no ability
11 to provide any of those services without
12 Highland.  They literally had left themselves
13 completely exposed, while just stripping out
14 fees.
15      Q.   Do you believe with respect to
16 Section 601, standard of care, that the
17 parties prior course of dealing, i.e. rolling
18 up prior notes, had any role on January 7,
19 2021?
20      MR. MORRIS:  Objection to the
21      form of the question.
22      A.   No, I don't.
23      Q.   Okay.  Did you take any prior
24 course of action between the parties into

Page 145

J. Seery

1  account when you executed and issued your
2  January 27, 2021 letter?
3       A.   Certainly.  The payments are
4  typically made on time, and if they're not
5  paid, then it's prudent and required to
6  accelerate the note.
7       Q.   But five times before, you -- you
8  knew by then that five times before, demand
9  notes were rolled up into a term note, which
10 you said before, I believe, was for an
11 improper purpose?
12      MR. MORRIS:  Objection to the
13      form --
14      A.   At least three of them that are
15 sub -- subject to the current litigation.  I
16 don't recall if it was five, but this one
17 contained five notes, if -- three term notes
18 that were rolled up.  But those were done
19 prior to bankruptcy and they were done with
20 Mr. Dondero on both sides of the transaction.
21      Q.   So your borrower, who owes you
22 24 million and change that you're under a
23 contract with that the borrower is paying
24 you, where you provide employees to the

Page 146

J. Seery

1  J. Seery
2  borrower, and your affiliate entity misses a
3  scheduled payment, you believe that you have
4  no obligation to do anything before you
5  called the note immediately due?
6      A.    That -- that's absolutely correct.
7          MR. RUKAVINA:  Okay.  Do you mind
8  if we take another restroom break?
9          MR. MORRIS:  Sure.
10         MR. RUKAVINA:  I'm getting
11  near -- near the end.  Five minutes,
12  please.
13         (Brief off-record discussion.)
14         VIDEO TECHNICIAN:  The time is
15  4:16.  We're off the record.
16         (Recess taken.)
17         VIDEO TECHNICIAN:  The time is
18  4:21.  We're back on the record.
19  BY MR. RUKAVINA:
20     Q.    Did you have a view, as of December
21  2020 or January 2021, as to whether the
22  debtor owed any fiduciary duties to NexPoint?
23         MR. MORRIS:  Objection to the
24  form of the question.
25     A.    I -- I believe I did.

Page 147

J. Seery

1  J. Seery
2      Q.    And what was your view?
3      A.    I don't think -- certainly by that
4  time, if there ever had been, I don't think
5  by that time there were any fiduciary duties
6  owed.
7      Q.    Okay.  Real quick, we're still on
8  this shared services agreement, sir, page 4.
9  This is a list of services to be provided.
10 I'm just -- you can read it in detail, but I
11 just have a very simple question.  4B talks
12 about legal compliance risk analysis.
13        In December of 2020, was the debtor
14 providing legal services to NexPoint?
15     A.    I don't believe so, or at least not
16 any -- there might have been some assistance.
17 I'm trying to think what would have been done
18 at that time in terms of support, but there
19 certainly -- compliance was probably
20 transferred pretty fully by then.
21        I don't think NexPoint was involved
22 in any litigation at that point, certainly
23 not that the debtor was supporting, so I -- I
24 don't think very much, if anything.
25     Q.    Okay.  Do you know whether NexPoint

Page 148

J. Seery

1  J. Seery
2  had written policies and procedures in place
3  with respect to how it conducted its
4  business?
5      A.    I'm not sure.
6          MR. RUKAVINA:  Okay.  You can put
7  that down, sir.
8          (Brief off-record discussion.)
9          MR. RUKAVINA:  So this is going
10 to be Exhibit 10.
11         (Exhibit 10, Email Chain
12 D-NNL-007578 - D-NNL-007579, marked
13 for identification, as of this date.)
14 BY MR. RUKAVINA:
15     Q.    Sir, you are not on this email
16 chain, so I don't expect to authenticate it.
17        But have you seen this email chain
18 before, between Mr. Waterhouse and
19 Ms. Hendrix on January 12, 2021?
20     A.    I believe I have, yes.
21     Q.    Okay.  Was it in preparation for
22 this deposition or had you seen it before?
23     A.    Only in preparation for the
24 deposition.
25     Q.    Were you aware that Mr. Waterhouse

Page 149

J. Seery

1  J. Seery
2  was asking Ms. -- asking Ms. Hendrix for the
3  total principal on this note on January 12,
4  2021?
5          I'm sorry, were you aware of it at
6  about that point in time?
7      A.    No, not until I saw this email.
8      Q.    Okay.  Did you ever discuss -- so I
9  think -- I think you've -- you've said it
10 earlier, that you did not know until
11 Mr. Waterhouse's deposition that
12 Mr. Waterhouse and James Dondero had a
13 communication on January 12, 2021, right?
14     A.    I did not know.
15     Q.    Did, did -- did you know from
16 Ms. Hendrix that she had had any
17 communications with Mr. Waterhouse on or
18 about January 12, 2021, about how much the
19 missed payment was?
20     A.    No, I did not.
21     Q.    Okay.  Have you asked her about
22 what this email was in reference to since
23 you've seen this email?
24     A.    No, I have not.
25         MR. RUKAVINA:  Okay.  This is

Page 150

J. Seery

1   going to be Exhibit 11, sir.
2        (Exhibit 11, Email Chain
3   D-NNL-028514 - D-NNL-028515, marked
4   for identification, as of this date.)
5        Q.   So, Mr. Seery, this -- you're not
6   on this email chain, but this email begins on
7   December 10, 2020, from Ms. Hendrix to
8   Mr. Romey -- I'm sorry, from Mr. Romey to
9   Ms. Hendrix, where he writes (as read):
10        Can you tell me the original
11        maturity date for the NPA loan
12        before it was restructured?  Sorry
13        for the hustle.  Seery is asking
14        for this ASAP for today's court
15        hearing.
16        Do you see that, sir?
17        A.   I do see it.
18        Q.   Do you recall asking Mr. Romey
19   anything about that loan or anything about
20   this on or about January -- December 10,
21   2020?
22        MR. MORRIS:  Objection to the --
23        A.   Not specifically.
24        Q.   Okay.  It says that you were --

Page 151

J. Seery

1   there was a court hearing.
2        Do you remember what that court
3   hearing might have been?
4        A.   I -- I don't.
5        Q.   Okay.  Do you have any recollection
6   as to why you would have been asking about
7   the original maturity date of the NPA loan
8   before it was restructured?
9        A.   I think it's a mistake, that there
10   were -- there were five notes --
11        Q.   Okay.
12        A.   -- that were rolled into this one.
13        I may have just been checking
14   whether they were all demand or if any of
15   them have had a maturity.  I don't -- I don't
16   know why I would have been asking for it.  I
17   don't recall what the hearing was about.
18        Q.   Fair enough.  You testified before
19   that -- and I'm not trying to put words in
20   your mouth, sir.
21        You testified before that there was
22   something maybe inappropriate or shady about
23   the roll-up of the five notes into the one
24   NexPoint note.

Page 152

J. Seery

1        Whatever -- whatever words you
2   used, was that your speculation as to why it
3   happened, was that your logical deduction, or
4   did someone tell you that that's why the
5   notes were rolled up?
6        MR. MORRIS:  Objection --
7        (Simultaneous speaking.)
8        A.   -- logical deduction.
9        (Reporter clarification.)
10   BY MR. RUKAVINA:
11        Q.   Excluding lawyers, sir, and
12   excluding now in litigation, that back
13   when -- when the debtor existed and you were
14   the CEO/CRO, did you ask anyone at the debtor
15   or did you ask Mr. Dondero why those notes
16   had been rolled up into the $30.7 million
17   note?
18        A.   I don't believe I asked
19   Mr. Dondero.
20        I know I inquired as to whether the
21   debtor got anything for the extension of the
22   maturity.
23        Q.   Who did you inquire of?
24        A.   I don't recall specifically.

Page 153

J. Seery

1        Q.   Mr. Surgent?
2        A.   I don't recall specifically.  He
3   wouldn't, he wouldn't have -- it would either
4   have been Frank Waterhouse or someone else in
5   accounting; was anything paid?  And --
6   because there were a number of notes that
7   were rolled up in a similar fashion, and it
8   all happened around the same thing; a number
9   of things were happening to the debtor at
10   that time.
11        Q.   Why did the debtor or the
12   reorganized debtor not retain Mr. Waterhouse
13   after the termination of the shared services
14   agreements?
15        A.   I didn't need him.
16        Q.   Okay.  Mr. Klos was promoted to
17   CFO?
18        A.   Correct.
19        Q.   Okay.  Did you have any personal
20   dislike of Mr. Waterhouse ever?
21        A.   No.
22        Q.   Did you have any personal views
23   that his services as CFO were not up to
24   par --

**App. 135**

Page 154

J. Seery

1
2       MR. MORRIS:  Objection --
3       Q.      -- not up to what you expected them
4   to be?
5       A.      No, I just preferred, for what we
6   were doing, Mr. Klos.
7       Q.      Did you ever form the opinion that
8   Mr. Waterhouse was -- I don't know what word
9   to use -- Mr. Dondero's stooge or tentacle?
10      A.      No.
11      Q.      Okay.  Did you have any opinion as
12  to whether he was -- again, I don't know what
13  word to use -- whether he was a responsible,
14  proper CFO when he was the CFO of Highland
15  and you were the CRO?
16      A.      While he was CFO, I -- I think he
17  was adequate, but I think the challenge that
18  the employees had at Highland was the pull
19  that Dondero had, the go-betweens that he
20  had.
21          And it's hard to say at a specif==ic==
22  time, because I know a lot more now,
23  including to do with payments, including tens
24  of millions of dollars offshore, with respect
25  to Ellington.

Page 155

J. Seery

1
2       So I -- I know way more now, so
3   it's hard to separate those things.  But with
4   respect to Mr. Waterhouse, I think he was --
5   he was adequate.  I think the team was very
6   good.  And I think that the -- I was always
7   concerned about loyalties.
8       Q.      Did you ever, when you were the
9   CRO, discipline, censure, caution
10  Mr. Waterhouse about anything?
11          MR. MORRIS:  Objection to the
12      form of the question.
13      A.      I actually gave him a raise on his
14  base salary because he couldn't get bonuses
15  because of the Court order structure.  I did
16  caution him and many employees about
17  loyalties and their duties to the debtor.
18      Q.      And you remember cautioning him
19  specifically about that or as part of larger
20  group?
21      A.      As part -- I -- I believe it was
22  part of the larger group.  I certainly did it
23  with both legal and accounting, particularly
24  after Judge Jernigan's expressed --
25  expression of concern in -- in and around

Page 156

J. Seery

1
2   July of 2020.
3       Q.      After you learned about the
4   NexPoint missed December 31, 2020 payment,
5   did you give any instructions to
6   Mr. Waterhouse or anyone else to the effect
7   of don't negotiate any settlement or cure or
8   anything on that default without talking to
9   me first?
10      A.      I don't believe that I had any
11  discussion like that with anybody, but it
12  would have been clear, I think, that once the
13  demand letter went out and I had been
14  responsible for initiating it, that the full
15  amount was due, and if anybody wanted to
16  negotiate anything, they would have to do it
17  through me.
18          And certainly no one had the
19  ability to negotiate any monetary settlements
20  with respect to the debtor's assets without
21  talking to me and the board.
22      Q.      Okay.  Why is that?
23      A.      Because we were in bankruptcy and I
24  was the CEO, and I told everybody on the team
25  that they had to come through me.  Any

Page 157

J. Seery

1
2   material decisions had to go through me.
3       Q.      And you told that to
4   Mr. Waterhouse?
5       A.      The whole accounting team as well
6   as the legal team.
7       Q.      Do you recall if that's in writing
8   anywhere?
9       A.      I don't think so.
10      Q.      Did you define materiality to them;
11  do you recall?
12      A.      I don't think so.
13      Q.      Okay.  So you never expressly
14  prohibited Mr. Waterhouse from hypothetically
15  accepting any cure to reinstate that note,
16  but you would have expected him to know that
17  he had no authority to do so on behalf of the
18  debtor?
19      A.      Oh, I --
20          MR. MORRIS:  Object -- objection
21      to the form of the question.
22      A.      -- I -- I think it would have been
23  beyond obvious that he had no authority to do
24  that for the debtor.
25      Q.      Do you think that would have been

Page 158

J. Seery

1  beyond obvious to Mr. Dondero?
2      A.   Yes, I do, well --
3      Q.   Why --
4      A.   -- beyond -- well beyond obvious.
5      Q.   Why is that?
6      A.   Because the shared services had
7  already been terminated.  We were heading
8  towards a confirmation of a monetization
9  plan.  He had already failed to pay shared
10 service amounts.  He had already been found
11 in contempt of court.
12      The idea that he could cut a deal
13 with a former employee over material asset of
14 the debtor is nonsensical.
15      Q.   Okay.  Mr. Waterhouse wasn't a
16 former employee on January 12, 2021, was he?
17      A.   No, he was not, correct.
18      Q.   And although the notice of
19 termination had gone out for the shared
20 services agreement, it had not been
21 terminated as of January 12, 2021, correct?
22      A.   That's correct.
23      Are you -- are you implying that --
24 that there was such a deal and you're going
25

Page 159

J. Seery

1  to make up a new story?
2      Q.   Well, sir, I object to you saying
3  I'm going to make anything up.  I'll let
4  Mr. Waterhouse and Mr. Dondero testify as
5  they did.
6      But certainly you would -- you
7  would not be aware of any deal that Frank or
8  James Dondero might have made, right?
9      A.   I -- I would not be aware of any
10 such deal.
11      Q.   Certainly you would have never,
12 ahead of time or after the fact, authorized
13 any such deal?
14      A.   No, I would not.
15      Q.   Okay.  Why not?  Why not accept a
16 cure and reinstate the note?
17      A.   Because the full amount of the note
18 was due.  We're in a monetization plan.  This
19 is an opportunity to monetize an asset.
20      MR. RUKAVINA:  Just a moment,
21 please.
22      THE WITNESS:  Sure.
23      MR. RUKAVINA:  It's 4:30 local,
24 right?
25

Page 160

J. Seery

1      Mr. Seery, allow me just five
2  minutes to consult with my co-counsel.  I
3  believe that I'm done, but before I make
4  that decision, I just want to have a few
5  minutes.
6      THE WITNESS:  Certainly.
7      VIDEO TECHNICIAN:  The time is
8  4:34.  We're going off the record.
9      (Recess taken.)
10     VIDEO TECHNICIAN:  The time is
11 4:40.  We're back on the record.
12     (Brief off-record discussion.)
13     MR. MORRIS:  Pass the witness.
14     Mr. Seery, thank you for doing this
15 in person in your beautiful city.
16     THE WITNESS:  Thank you.  It's
17 coming back, slowly.
18     MS. DEITSCH-PEREZ:  Okay.  Good
19 afternoon, Mr. Seery.
20     THE WITNESS:  Good afternoon.
21 EXAMINATION
22 BY MS. DEITSCH-PEREZ:
23     Q.   When Mr. Rukavina started
24 questioning you, and you were describing your
25

Page 161

J. Seery

1  background, you mentioned that you had been
2  involved in hundreds of bankruptcies.
3      Could you tell us, just by listing
4  them, the -- the most substantial companies
5  that you were involved with bankruptcies for?
6      A.   United Airlines, TWA, Columbia Gas,
7  Lehman Brothers.  It, it -- it's a
8  thirty-year career, so...
9      Q.   I'm just asking for the highlights.
10     A.   Those aren't bad.
11     Q.   Okay.  Were there any other
12 financial services companies that you were
13 involved in the bankruptcy or restructuring
14 of?
15     A.   Lehman Brothers would be considered
16 a financial services company.
17     Q.   Okay.  And what kind of company
18 would you consider Highland?
19     A.   Highland is a financial advisor.
20     Q.   Okay.  Were there any other
21 financial advisors that you were involved in
22 the restructuring or bankruptcy of?
23     A.   I guess technically MF Global, in
24 some of its places, would fall into that

Page 162

J. Seery

1   category.  Madoff would fall into that
2   category.
3
4        Q.    Any others?
5        A.    There may be.  Off the top of my
6   head, I don't recall.
7        Q.    Okay.  And in the course of those
8   engagements, were you generally aware of the
9   top-level executive compensation for the
10  top-level executives prior to the -- the
11  bankruptcies?
12       A.    Not specifically.  It just depends
13  on each -- each company.
14       Q.    Generally, were you -- were you
15  aware?  Is that the kind of thing you took
16  note of?
17       A.    Not -- it -- I was more concerned
18  with the particular issue that I was dealing
19  with as opposed to whether somebody -- what
20  somebody made.
21       Q.    In the bankruptcies that you were
22  involved with, with the -- with the larger
23  companies and all of the financial services
24  or financial advisory companies, can you --
25  can you tell me generally the range of

Page 163

J. Seery

1   compensation for the CEOs --
2        A.    I, I --
3              (Simultaneous speaking.)
4        A.    -- no, I wouldn't be able to tell
5   you that.
6        Q.    Even a ballpark you couldn't --
7   couldn't say?
8        A.    They're all different kinds of
9   companies.
10       Q.    I understand, but can you -- for
11  any of those companies, can you give me a
12  ballpark of what the compensation was?
13       A.    It could be anywhere in any
14  particular year from zero to $25 million.
15       Q.    Okay.  And is there a general
16  pattern that founder CEOs have higher
17  compensation than hired-off-the-street CEOs?
18            MR. MORRIS:  Objection to the
19       form of the question.
20       A.    No, there's not.  In fact, it could
21  sometimes go the other way.
22       Q.    But -- but is it sometimes the
23  case, in your experience, that founder CEO
24  compensation is on the high end?
25

Page 164

J. Seery

1            MR. MORRIS:  Objection to the
2       form of the question.
3        A.    I, I -- I don't have any basis to
4   say that.  It really depends upon the company
5   and it depends on the performance of the
6   company.  Just because you founded something
7   and you sit on a log doesn't mean you get
8   paid a lot of money.
9        Q.    Do you know what the CEO
10  compensation was for the CEO of Lehman prior
11  to the bankruptcy?
12       A.    In which year?
13       Q.    The, the year prior -- the years
14  prior to the bankruptcy.
15       A.    I -- I don't know.
16       Q.    Does it -- does it refresh your
17  recollection that it was in the range of
18  $70 million?
19       A.    There's no chance it was in the
20  range of $70 million.  He would have gotten
21  stock awards and it would depend on what
22  those were worth.
23            (Simultaneous speaking.)
24       A.    Obviously -- obviously, they ended

Page 165

J. Seery

1   up being worth -- I think the number is -- I
2   think it's zero.
3              You're aware of that, correct?
4        Q.    Prior to the bankruptcy.
5        A.    Oh, prior to it being worth zero,
6   it -- it was worth a lot more.
7        Q.    But as you sit here today, you
8   don't know what any of the CEOs of the
9   companies you advised made --
10            MR. MORRIS:  Objection --
11       Q.    -- that's what you're telling us?
12            MR. MORRIS:  Objection to the
13       form of the question.
14       A.    I didn't say I advised those
15  companies.
16            MR. MORRIS:  Thank you.
17       Q.    But you were involved in the -- in
18  the bankruptcy or reorganization --
19       A.    No --
20            (Simultaneous speaking.)
21       A.    -- I -- I don't have at my
22  fingertips the amount that the CEOs of
23  various companies made in various industries
24  over the last thirty years.
25

Page 166

J. Seery

2    Q.    And -- and not even in a general
3  way, other than zero to 25 million?
4    A.    That's a pretty good range.
5    Q.    Okay.  Do you have an understanding
6  of what the typical compensation is -- for a
7  financial advisory CEO is for a company that
8  has a billion or more under management?
9    A.    It depends on the type of assets
10  that are under management, it tends -- it
11  depends on the performance of the assets and
12  it depends on the cost structure of the
13  business.
14    Q.    And taking those things into
15  account, can you describe for us what the
16  compensation for a CEO of a financial advisor
17  firm is, where there are assets under
18  management of a billion or more?
19    A.    When you [mean] a financial
20  advisor, do you mean an FA type firm or do
21  you -- financial advisor, or do you mean
22  somebody who advises investors?
23    Q.    I -- I'm talking about a company
24  similar to Highland.
25    A.    So high -- Highland is a -- is a

Page 167

J. Seery

2  combination of types of businesses.  It's
3  basically, in the last five years, at best a
4  melting ice cube.  It receives certain
5  management fees and then it gives away
6  services at below cost.
7    So Highland was run at a loss.
8  Typically people who run businesses that
9  operate at an operating loss don't get paid a
10  lot of money.
11    Q.    Let me -- let me ask you, you're
12  now -- you've been the CEO of Highland for a
13  while, right?
14    A.    That's correct.
15    Q.    And you're going to remain the CEO
16  for a while longer?
17    A.    Perhaps.
18    Q.    And do you have an expectation of
19  how many years in total you'll likely be the
20  CEO of Highland?
21    A.    The less the better.
22    Q.    But aside from that, do you have an
23  expectation of how many years you will likely
24  be the CEO of Highland?
25    A.    I don't.  I hope we complete the

Page 168

J. Seery

2  monetization by 2022.  Whether I'm the CEO or
3  not that will depend on the oversight board
4  and whether I want to continue to do it.
5    Q.    Okay.  And if you are as -- as
6  successful as you hope to be, whatever that
7  is, how much do you expect to make as the CEO
8  of Highland on average for each year that you
9  will have been the CEO of Highland?
10    MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I -- I don't have a particular
13  expectation right now.  I have to negotiate
14  that, but I would expect to make a few
15  million dollars a year.
16    Q.    Have you not negotiated your
17  potential contingent compensation yet?
18    A.    I have not.
19    Q.    What -- what do you intend to ask
20  for?
21    MR. MORRIS:  Objection to the
22    form of the question.
23    A.    I'd like to get a significant
24  amount of money, as much as I can get and
25  treat my team fairly, but it has to be fair

Page 169

J. Seery

2  based on the returns that we get for the
3  investors.
4    Q.    So based on, if you were as -- as
5  successful as you hope to be, what do you
6  think that number would be on an annual
7  basis?
8    (Simultaneous speaking and
9    reporter interjection.)
10    MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I would expect it to be at least a
13  few million dollars a year.  If I was as
14  successful as I think we will be, it should
15  be significantly more than that.
16    Q.    Okay.  And so what does -- what
17  is -- because I don't know you very well,
18  Mr. Seery.
19    To you, what is significantly more
20  than a few million a year?
21    A.    Just to be clear, you don't know me
22  at all.  We've never met, so we'll -- we'll
23  make sure that that's clear so we don't --
24  there's no implication that there's some
25  prior relationship or that we've ever worked

Page 170

J. Seery

1 in any matter, in any connection whatsoever
2 other than this one.
3
4        Now, your question was?
5        MS. DEITSCH-PEREZ:  Can you read
6    it back?
7        (As read by the reporter):
8        "QUESTION:  And so what does --
9    what is -- because I don't know you
10   very well, Mr. Seery.  To you, what is
11   significantly more than a few million a
12   year?"
13   A.    It will depend on -- on the cost.
14 It depends on the overall performance, and --
15 and that will dictate whether there's upside
16 to a performance bonus.
17   Q.    Is significantly -- let -- let's
18 break this down to little pieces.
19        A few million, is that two, three,
20 four, five?  What is a few million?
21   A.    Typically I think of two as a
22 couple, three as a few.
23   Q.    Okay.  Is four also a few?
24   A.    Four is a little more than a few,
25 but it could be in that neighborhood.

Page 171

J. Seery

1   Q.    Okay.  So what is significantly
2 more than 3 to 4 million?
3        Is that twenty?
4   A.    That would be --
5        MR. MORRIS:  Objection --
6        (Simultaneous speaking and
7    reporter interjection.)
8   A.    Twenty is significantly more than a
9 few, but it's -- it's not any -- there's no
10 prospect of $20 million of a bonus in this
11 type of arrangement.  There's simply not
12 enough assets here.
13   Q.    Okay.  So when you say
14 significantly more than a few, do you mean
15 something like ten, 10 million a year?
16        MR. MORRIS:  Objection to the
17    form of the question.
18   A.    Again, I -- I don't have a specific
19 number in mind.  I think that's -- that
20 there's no chance of that either.
21   Q.    So can you tell me what you mean by
22 significantly more than a few million?
23   A.    Five is significantly more than
24 three.
25

Page 172

J. Seery

1   Q.    Okay.  Does that mean you're hoping
2 for compensation of 8 million a year or
3 5 million a year, just so I understand you?
4        MR. MORRIS:  Objection to the
5    form of the question.  Come on.
6   A.    There's no chance of $8 million a
7 year here.  There's not enough assets.
8 There's not enough value in the estate to pay
9 anybody that amount, which is why Highland
10 would never pay anybody that amount anyway,
11 because when you have a melting ice cube and
12 you don't get any performance fees because
13 your performance is terrible, you don't pay
14 somebody that much money.
15 MO*    MS. DEITSCH-PEREZ:  Move to
16    strike.
17   Q.    In your experience with the various
18 companies you've mentioned, have you seen
19 executives given loans as part of their
20 executive compensation?
21   A.    You know, I don't --
22        MR. MORRIS:  Objection to the
23    form of the question.
24   A.    I don't know.  I don't -- I don't

Page 173

J. Seery

1 recall.  I've certainly seen loans be given
2 as part of compensation.
3        Typically senior executives, in my
4 experience, don't get loans because loans
5 either have to be paid back or structured in
6 an odd way.
7        If they're structured just to avoid
8 taxes, most legitimate companies don't want
9 to do that, so most companies will either pay
10 somebody a -- base salary and deferred
11 amounts or will pay them with stock.
12   Q.    But you have seen loans given as
13 part of compensation?
14   A.    I -- I don't think I've seen it.  I
15 know that it exists.  I -- I don't recall any
16 senior executives in any companies that I've
17 worked around where a loan to a senior
18 executive was a -- was a material issue in a
19 case.
20   Q.    Have you also seen circumstances
21 where executives or just high-level employees
22 are given loans that are eventually forgiven
23 as part of their compensation?
24   A.    I -- I know it exists.  Again, I

Page 174

J. Seery

1 don't think it's been something or -- or
2 characteristic in any case either that I've
3 been involved with, invested in, worked on.
4    Q.    Given the nature of your work in
5 bankruptcies, does that simply mean that the
6 issue of loans and the forgiveness of the
7 loans has not been materially challenged in
8 the various engagements that you've
9 undertaken?
10    A.    No, I don't think -- I think it's
11 because it's not a material issue, and so you
12 don't -- you don't see very many companies
13 that I have been around where significant
14 amounts of the assets are company --
15 intercompany related loans or -- or loans to
16 the senior executives, where it's all
17 controlled by the same executive.  It's a --
18    Q.    Have you --
19    A.    -- it's a rare item.
20    Q.    Have you made any investigation, as
21 part of your role in this case, into whether
22 there are other companies that -- that have
23 similar loan programs, where executives or
24 senior officers receive loans that have the

Page 175

J. Seery

1 potential to be forgiven?
2        MR. MORRIS:  Objection to the
3    form of the question.
4    A.    Yeah, again, I don't -- I don't --
5 I don't think there's a program involved in
6 this situation, and I don't think there's any
7 potential for loans to be forgiven, so I --
8 it's not something that I've seen elsewhere,
9 although forgivable loans can be used for
10 certain types of compensation to employees to
11 retain them, certainly would be -- be
12 humorous to do that with respect to a
13 founder, but I don't -- in my experience, I
14 haven't seen this as a -- as a material issue
15 like it is in this case.
16    Q.    And I was asking whether you had
17 investigated, so that you could -- currently,
18 whether or not there are other companies in
19 which there was a practice like the one you
20 just described.
21        MR. MORRIS:  Objection, asked and
22    answered.
23    A.    I haven't done any other
24 investigation, other than -- than my

Page 176

J. Seery

1 experience.
2    Q.    Okay.  Did you investigate whether
3 or not any of the following people - mike
4 Hurley, Tim Lawlor, Pat Daugherty, Jack Yang,
5 Paul Adkins, Labraya Mamoud [ph], Jean Luc
6 Everland [ph] or Appou Landoseri [ph]
7 received loans that were potentially
8 forgivable and then that were, in whole or in
9 part, forgiven?
10        MR. MORRIS:  Objection to the
11    form of the question.
12    A.    I have looked at that, yes.
13    Q.    Okay.  And what did you determine?
14    A.    I determined that Highland, I don't
15 believe, has made a loan to any employee
16 other than Okada and Dondero in about twelve
17 years; that no loans were forgiven, notes --
18 so they were -- actually, I don't believe
19 they got any before 2014, maybe '13.
20        No senior executive got it except
21 with respect to Yang, but he was employed by
22 New York, not by HCMLP.  That was part --
23 effectively, was part of a severance when he
24 left.  And I don't think there's been any

Page 177

J. Seery

1 that have been north of $500,000, so nothing
2 like this.
3        And I did determine that Okada's --
4 I believe he only had one loan.  I could be
5 wrong on that, but that's the only one I
6 recollect, and he paid it back.
7    Q.    And did he pay it back in
8 connection with this bankruptcy, a demand of
9 the bankruptcy?
10    A.    He did, yes.
11    Q.    Under threat of lawsuit?
12    A.    No.  I spoke to Mark and I said you
13 should go talk to your counsel, you have a
14 very good counsel, Sullivan & Cromwell.
15        He went and talked to them and he
16 said you're right, they said I have to pay it
17 back.  And he did, and we structured it.
18    Q.    So did you determine that the --
19 you mentioned Yang.
20        But the others that I listed, did
21 you determine whether they had or had not
22 received loans that had been forgiven in
23 whole or in part?
24    A.    It looks like they had, and that

Page 178

J. Seery

1   was about more than ten or twelve years ago
2   and it had not been done since.  None of
3   those were obviously a founder, none of them
4   were more than $500,000.
5       Q.   Okay.  And did you learn that all
6   of the notes that existed in relation to
7   those loans for the people that I listed --
8   none of the notes actually contained the
9   forgiveness term?
10           MR. MORRIS:  Objection to the
11       form of the question.
12      A.   I -- I do not know that, no.
13      Q.   Well, did you search for the notes
14   at issue?
15      A.   I did not look at the notes, I just
16   looked at the dollar amounts.
17      Q.   Did you talk to anyone who had been
18   involved in the -- the issuance of the notes
19   to the people that I listed that were
20   eventually forgiven?
21      A.   No.
22      Q.   Okay.  Are -- are you aware that
23   it's generally the case, when companies use
24   potentially forgivable loans as a part of

Page 179

J. Seery

1   compensation, that the notes are bona fide
2   notes from the start that don't have a
3   forgiveness term and that the forgiveness
4   term, for tax purposes, is subsequent and
5   that taxes then are only paid when the note
6   is actually forgiven?
7           MR. MORRIS:  Objection to the
8       form of the question.
9       A.   My experience and understanding of
10   that is actually different.  When an employee
11   receives a forgivable loan as part of either
12   their retention, and often it happens as a --
13   a way to either retain somebody or to employ
14   someone, that it's very clear that it's
15   forgivable up front.  Otherwise, it would be
16   a trust-me loan.
17           Now, certainly the founder who
18   controls everything can make his own trust-me
19   loan because he can trust himself, but -- but
20   to structure it to avoid taxes, my experience
21   is that that's actually illegal.
22      Q.   If you make payments on the loan
23   and it's only forgivable if certain
24   conditions occur in the future that are not

Page 180

J. Seery

1   certain --
2           MR. MORRIS:  Objection to the
3       form.
4       Q.   -- doesn't that -- does -- in your
5   understanding, isn't that a -- a loan that,
6   until it's forgiven, is a bona fide loan of
7   which no taxes are owed?
8           MR. MORRIS:  Objection to the
9       form of the question.
10      A.   I think you've described -- I
11   apologize.
12           I think you've described what I'd
13   call a scam.
14      Q.   Let's step -- step back a second,
15   Mr. Seery.
16           If I use the term "tax efficient
17   transaction," what do you understand that to
18   mean?
19           MR. MORRIS:  Objection to the --
20           (Simultaneous speaking.)
21      Q.   -- something is tax efficient, what
22   does that mean to you, so I just make sure
23   we're -- we're talking the same language?
24           MR. MORRIS:  Objection to the

Page 181

J. Seery

1       form of the question.
2       A.   It -- it means a transaction
3   that's -- that's structured in a way to
4   minimize the -- the tax cost.
5       Q.   Okay.  And is your impression of
6   Mr. Dondero that, if he has a choice between
7   doing a transaction in a tax efficient way
8   and a non-tax efficient way, that he would
9   pick the tax efficient way?
10      A.   I believe he would, yes.
11      Q.   Okay.  And are you condemning of
12   that --
13      A.   No.
14      Q.   -- is it a bad thing?
15      A.   Tax -- tax avoidance is a --
16      Q.   Taxi efficiency.
17      A.   I said tax avoidance is a duty,
18   taxi evasion is a crime.
19      Q.   Okay.  So when you say "duty," what
20   do you mean?
21           Remember, a jury is listening to
22   this so I want it to be clear.
23      A.   I believe --
24           MR. MORRIS:  That's not entirely

**App. 142**

Page 182

J. Seery

1    clear, just to be -- just to be
2    certain.  You may never get to a jury,
3    but go ahead.
4        A.   I don't recall if that was a -- a
5    quote from Learned Hand or one of the other
6    well known --
7        Q.   It had that sound to you?
8        A.   -- judges, but I -- I think that
9    structuring a transaction that has legitimate
10   purposes in a tax efficient way is not
11   necessarily problematic.
12        Structuring a transaction to avoid
13   taxes, and -- and mainly or solely to avoid
14   taxes, is actually a -- a violation of the
15   Internal Revenue Code.
16        Q.   And looking at the various loans to
17   Mr. Dondero and the related company loans
18   that are the subject of the notes litigation
19   that you are here today to testify about, was
20   it the case that annual payments both on the
21   term loans and interest payments on the
22   demand loans were made?
23        A.   Oftentimes, yes.
24        Q.   Okay.  And is that a characteristic

Page 183

J. Seery

1    of a bona fide loan, that --
2        MR. MORRIS:  Objection to the
3    form of the question.
4        (Technical disruption.)
5        Q.   -- later, but as long as that
6    hasn't happened, interest payments should be
7    made, and if it's a --
8        MR. RUKAVINA:  We lost you,
9    Deborah.  Deborah, we lost you.
10        MS. DEITSCH-PEREZ:  Can you --
11   did you hear me?
12        MR. RUKAVINA:  No.
13        MS. DEITSCH-PEREZ:  Okay.  I'll,
14   I'll -- I'll start over then.
15        Q.   In your experience, is it a
16   characteristic of a bona fide loan, whether
17   demand or a term loan, that until it is
18   actually forgiven -- until and unless it is
19   forgiven, that annual interest payments
20   should be made on a demand loan, and whatever
21   is due pursuant to the terms of the note on
22   the term loan should also be made annually?
23        MR. MORRIS:  Objection to the
24   form of the question.

Page 184

J. Seery

1        A.   I -- I think that's a
2    characteristic of a bona fide loan, but I
3    think that you can have an accruing loan that
4    doesn't have those payments that is also a
5    bona fide loan.  And so I -- I do think these
6    are bona fide loans.  The money was given, a
7    note was signed, the amounts are owed.
8        Q.   And do you have a reason to believe
9    that if it was in Mr. Dondero's power to
10   attempt to have these loans subject to a
11   condition under which there would be
12   forgiveness of the loan, is that something
13   that is -- that surprises you?
14        MR. MORRIS:  Objection to the
15   form of the question.
16        A.   It -- it shocks me.
17        Q.   So you don't think that if
18   Mr. Dondero had the opportunity to -- to have
19   contingent compensation rather than
20   compensation in 2017, 2018 or '19, but move
21   it out into the future, it surprises you
22   that -- that he would want to do that?
23        MR. MORRIS:  Objection to the
24   form of the question.

Page 185

J. Seery

1        A.   Can -- can you read that question
2    back --
3        (Simultaneous speaking.)
4        A.   -- I didn't understand it.
5        MS. DEITSCH-PEREZ:  The court
6    reporter can read it back.
7        (As read by the reporter):
8        "QUESTION:  So you don't think
9    that if Mr. Dondero had the opportunity
10   to have contingent compensation rather
11   than compensation in 2017, 2018 or '19,
12   but move it out into the future, it
13   surprises you that -- that he would
14   want to do that?"
15        MR. MORRIS:  Objection to the
16   form of the question.
17        A.   I -- I don't see any evidence
18   whatsoever that that's what he did.  And in
19   fact, the way the business was run and the
20   monies he took out from various different
21   places connected to the business shows that
22   that wasn't the case.
23   MO*      MS. DEITSCH-PEREZ:  Move to strike
24   because you didn't answer --

Page 186

J. Seery

1          J. Seery
2              MR. MORRIS: And, and -- and I --
3      and I object, you asked him if -- I
4      just -- I, I --
5              MS. DEITSCH-PEREZ: Well, John --
6              MR. MORRIS: -- it's not -- the
7          judge will rule.
8          Go ahead.
9  BY MS. DEITSCH-PEREZ:
10     Q.    You've heard of -- Highland has
11     interests in Cornerstone, Trussway and MGM,
12     that's correct?
13             MR. MORRIS: Objection to the
14         form of the question.
15     A.    You should be precise. Highland
16     owns certain equity interests in Cornerstone,
17     approximately 4 percent. Highland owns,
18     indirectly, all of the interests -- almost
19     all of the interests in Trussway. Highland
20     owns a small piece of MGM.
21     Q.    Okay. And have you made any
22     inquiry into whether employees at Highland
23     referred to these colloquially as portfolio
24     companies?
25     A.    I --

Page 187

J. Seery

1          J. Seery
2              MR. MORRIS: Object --
3      A.    I -- I know that cornerstone is
4      sometimes referred to as a portfolio company.
5      I know that Trussway is referred to as a
6      portfolio company.
7              It would be -- I've never heard
8      anyone refer to as -- MGM as a portfolio
9      company.
10     Q.    Have you ever made an inquiry as to
11     whether sometimes it was colloquially called
12     a portfolio company?
13     A.    I -- I haven't made an inquiry as
14     to it, no. I've been around the business for
15     a year-and-a-half, nineteen months.
16     Q.    Have you ever heard Mr. Dondero
17     refer to MGM as one of the portfolio
18     companies?
19     A.    No, I haven't. It would be very
20     odd if he would.
21     Q.    When you -- in the early days, when
22     you communicated with Mr. Dondero about the
23     prospects for the assets at Highland, did he
24     appear to have high hopes for the
25     monetization and increase in value of

Page 188

J. Seery

1          J. Seery
2      Cornerstone, Trussway and MGM?
3              MR. MORRIS: Objection to the
4          form of the question.
5      A.    I don't recall him ever talking to
6      me very much about Cornerstone and potential
7      upside or Trussway.
8              He did have high hopes, or
9      expressed high hopes, of upside value in MGM.
10     But at the same time, he sold 1.7 million
11     shares after the filing for 7250. So that
12     sort of belied that optimism, but he
13     expressed some optimism that MGM would have
14     upside. And of course he sat on the board,
15     so he'd have some insight into it.
16     Q.    And it looks like, hopefully, he
17     was right to -- in that optimism?
18             MR. MORRIS: Objection to the
19         form of the question.
20     Q.    Is that right?
21     A.    We'll find out.
22     Q.    So far it appears that his optimism
23     may be justified; is that right?
24     A.    There's -- there's a transaction.
25     It's subject to approval and closure.

Page 189

J. Seery

1          J. Seery
2      Q.    Okay.
3      A.    Certainly hope so.
4      Q.    If in fact all three of those
5      companies, MGM -- or Highland's interest in
6      those three companies are successfully
7      monetized, will the assets of Highland exceed
8      its liabilities?
9              MR. MORRIS: Objection to the
10         form of the question.
11     A.    Extremely unlikely.
12     Q.    Possible though?
13             MR. MORRIS: Objection to the
14         form of the question.
15     Q.    In your educated opinion --
16         (Simultaneous speaking.)
17     A.    Can I -- can I answer your
18     question --
19     Q.    Yes.
20     A.    -- unless "possible though" is just
21     a quip, because then I won't answer it.
22     Q.    No --
23     A.    Is that a question?
24     Q.    -- it's not a quip --
25     A.    Oh, okay.

Page 190

1        J. Seery
2        Q.    -- it is a question.
3        A.    It's -- we know what the -- at
4   least now what the potential upside is to
5   MGM.  We don't know what the upside is for
6   Cornerstone or Trussway, but we understand
7   the performance of the companies and the
8   framework with which somebody would value
9   them.
10        So it would be extremely unlikely,
11   not impossible but extremely unlikely, for
12   those two companies - with MGM capped - to
13   have a performance that exceeded the total
14   amount of claims.
15        Q.    How close a matter is it?
16        MR. MORRIS:  Objection --
17        (Simultaneous speaking and
18   reporter interjection.)
19        Q.    How -- how close -- how close --
20   let me -- let me strike that and start again.
21        What would MGM, Trussway and
22   Cornerstone need to be monetized for in order
23   for the overall assets of Highland to exceed
24   its liabilities?
25        MR. MORRIS:  Objection to the

Page 191

1        J. Seery
2   form of the question.
3        A.    I'm not in a position to answer
4   that, but all of the assets minus the
5   expenses to get there would need to exceed
6   $400 million.
7        Q.    And right now, what do you think
8   the assets are worth?
9        MR. MORRIS:  Objection to the
10   form of the question.
11        A.    Again, I don't -- I know what MGM
12   is potentially worth, but it's hard to -- I
13   can't count that until it's done.
14        Q.    I know but --
15        (Simultaneous speaking.)
16        MR. MORRIS:  Let him finish,
17   please let him finish.
18        A.    You don't -- can't count that until
19   it's done.  And then the other -- the other
20   businesses we have to put through a process,
21   to see what they're worth.  And they're,
22   they're, they're -- they've got potential
23   upside but they have challenges as well.
24        Q.    Okay.  Assuming you are as
25   successful as you hope to be, and crediting

Page 192

1        J. Seery
2   for the moment the potential value of the MGM
3   transaction, what do you think the assets of
4   Highland are likely to be worth?
5        MR. MORRIS:  Objection to the
6   form of the question.
7        A.    I -- I don't know.  Part of it
8   depends on -- again, it's the costs.  It's
9   collection of $63 million notes in these
10   litigations, and then it's the ultimate value
11   of those assets.
12        But I would hope that we would be
13   very successful in the asset monetization,
14   where we would be able to get at lease
15   $300 million with those -- those assets and
16   others.
17        Q.    Do you think that if you're as
18   successful as you hope to be, that the assets
19   will be worth more than 400 million net of
20   the collection costs?
21        A.    I --
22        MR. MORRIS:  Objection to the
23   form of the question.
24        A.    I believe I already said I believe
25   that's unlikely, but I'm an optimistic

Page 193

1        J. Seery
2   fellow.
3        Q.    So then you hope it is likely?
4        A.    I certainly hope so.
5        And, again, that -- that hope
6   counts on $63 million of note collections
7   that I do expect to collect.
8        MR. MORRIS:  Deborah?
9        MS. DEITSCH-PEREZ:  Yes.
10        MR. MORRIS:  I apologize for
11   interrupting, but sometime between now
12   and 6:00 I'm going to have to take
13   about a ten or a twelve-minute break.
14   I have no idea how much you have.
15        If you're going to finish in twenty
16   minutes, then let's do that.  If you're
17   going to take more than an hour, I
18   just -- just please stop at some point
19   by, you know, 5:30, 5:35, so I can take
20   that break.
21        I just have to attend to something
22   that -- it won't take too long, but I
23   just wanted to let you know that so you
24   weren't surprised.
25        MS. DEITSCH-PEREZ:  Okay.  If

**App. 145**

Page 194

J. Seery

1    you're okay, let me do one more segment
2    and then I'll let you -- I'll excuse
3    you to -- to do your errands and we'll
4    come back?
5            MR. MORRIS:  Sure.
6            (Brief off-record discussion.)
7            MS. DEITSCH-PEREZ:  He needs --
8    he needs his ten or twelve minutes
9    before 6:00 --
10           THE WITNESS:  Got it, got it.
11           MS. DEITSCH-PEREZ:  -- is that
12   right?
13           MR. MORRIS:  Yep.
14   BY MS. DEITSCH-PEREZ:
15       Q.   Okay.  When Mr. Rukavina was
16   questioning you, he was questioning you about
17   the nonpayment of the NexPoint Advisors loan.
18   Remember that?
19           And you -- were you only talking
20   about NexPoint, that -- that loan not the
21   HCMS term loan and not the HCRE term loan?
22       A.   He was only asking me about the
23   NexPoint, as I understood it.
24       Q.   Okay.  So let me ask you, are you

Page 195

J. Seery

1    aware that there were what -- at issue in
2    these litigations, a term loan between
3    Highland and HCMS?
4        A.   Yes.
5        Q.   And a term loan between Highland
6    and HCRE?
7        A.   Yes.
8        Q.   Okay.  And when was the last
9    payment due on the HCMS term loan and the
10   HCRE term loan?
11           MR. MORRIS:  Objection to the
12   form of the question.
13       A.   I -- I don't recall exactly.  I
14   thought they were -- they were all in and
15   around the same time.  If they weren't the
16   31st, they were right there.
17       Q.   All right.  And were the annual
18   payments for the HCMS and HCRE term loans
19   made by December 31, 2020?
20       A.   They were not.
21       Q.   And were the annual -- and was a
22   payment made on each of those loans in
23   January of 2021?
24       A.   I believe a payment was made after

Page 196

J. Seery

1    they were accelerated for each of those
2    loans, similar to the situation with the NPA
3    loan.
4        Q.   Let me show you - hang on, let me
5    pull it up - what I have marked as -- I
6    marked it as exhibit -- premarked it as
7    Exhibit 111, just to make sure I cleared
8    Mr. Rukavina's exhibits.  But it's an
9    arbitrary number, we're not missing 100-odd
10   exhibits.
11           Okay.  Can you see the exhibit?
12           And I did email it to Mr. Morris
13   prior to the deposition.  Do you have it
14   there?
15           MR. MORRIS:  No, I didn't see
16   your email.
17       A.   I see it on the screen.
18       Q.   Okay.  You have it in your email.
19   If there are any of them that you need to
20   break for a moment and have the exhibits
21   printed so that you can look at the whole
22   thing, please let me know and we can stop,
23   okay?
24           So have you seen what I've marked

Page 197

J. Seery

1    as Exhibit 111 before?
2        A.   I believe I have.
3        Q.   Okay.  And did you cause the letter
4    to be sent out?
5        A.   I did, yes.
6        Q.   And did you write the letter?
7        A.   I don't believe I wrote it.  I
8    would have marked it up to some degree.
9        Q.   Who wrote Exhibit 111, which is the
10   letter to Mr. Dondero from you, dated
11   January 7, entitled "Demand on Promissory
12   Note"?
13           MR. MORRIS:  Objection to the
14   form of the question.
15       A.   My counsel.
16       Q.   Okay.  Do you know in particular
17   who wrote it?
18
19   DI*          MR. MORRIS:  I'm going to direct
20   the witness not to answer.
21           MS. DEITSCH-PEREZ:  Just he can
22   answer that, whether he knows who wrote
23   it?
24           MR. MORRIS:  Sure, he can answer
25   that question.

Page 198

J. Seery
2  A.   Yes, I know.
3  Q.   Okay.  And can you tell me who
4  wrote it?
5       MR. MORRIS:  No.
6  Q.   And that's because your counsel has
7  directed you not to answer --
8       MR. MORRIS:  That's right.
9  Q.   -- or because you don't know?
10      MR. MORRIS:  It's because I'm
11  directing him not to answer.  We're not
12  going to even find out whether he knows
13  or not because it's privileged.
14  Q.   Okay.  Is this the only letter that
15  you caused to be sent to Highland Capital
16  Management Services with regard to the term
17  loan in the original principal amount of
18  20,247,628?
19  A.   I don't recall.  I would expect
20  there to have been a follow-up letter as
21  well, but I don't recall specifically.
22       Perhaps you have it.
23  Q.   I do not.  That's why I'm asking, I
24  don't see a letter like the one that we saw
25  earlier that was to NexPoint.

Page 199

J. Seery
2  A.   I don't recall specifically; I
3  would have to look.  If we had it, we would
4  have produced it.
5  Q.   Okay.  And if you had it, would you
6  also have attached it to the complaint --
7       MR. MORRIS:  Objection to the
8  form --
9  Q.   -- the way the NexPoint letter was
10  attached to the complaint?
11      MR. MORRIS:  Objection to the
12  form of the question.
13  A.   I -- I don't know if we would have
14  or not.  I think the demand is sufficient on
15  its own.
16  Q.   Other than the possibility that
17  there was a -- let me back up.
18       Was there a payment made in January
19  on the HCMS term loan?
20  A.   I thought there was, but I don't
21  recall specifically.  I'd have to look at
22  the -- it would be in the complaint, I would
23  think.
24  Q.   Okay.  And if the complaint says
25  there was, then there -- then that would be

Page 200

J. Seery
2  the case?
3  A.   If there was, it would have --
4  similar to the NPA, it would have been
5  applied on account.
6  Q.   Other than the letter that's been
7  marked as Exhibit 111, did you have any
8  communications with anyone at Highland
9  Capital Management Services about the note or
10  the payment or the nonpayment other than this
11  possible post-payment letter and the -- that
12  was similar to the NexPoint one that we
13  looked at earlier?
14      MR. MORRIS:  Objection to the
15  form of the question.
16  A.   I would only have communicated
17  through the demands.
18  Q.   Okay.  So just to make it very
19  clear, did you talk with Mr. Dondero about
20  the HCMS note payment, nonpayment or status
21  of the -- of the demand?
22  A.   No.
23  Q.   And did you talk with
24  Mr. Waterhouse about the note, the payment,
25  the nonpayment or the status of the demand?

Page 201

J. Seery
2  A.   Not that I recall.
3  Q.   Okay.  What about Ms. Hendrix and
4  Mr. Klos; did you talk with either of them
5  about the note, the nonpayment, the payment
6  or the status of the -- of -- of the loan?
7  A.   Do you mean at the time this demand
8  note was sent?
9  Q.   Yes, in -- in December of 2020 or
10  January/February of 2021, that time frame.
11  A.   Not that I recall specifically, no.
12  Q.   And was it your understanding that
13  Highland provided shared services to Highland
14  Capital Management Services?
15      MR. MORRIS:  Objection to the
16  form of the question.
17  A.   It did not have a shared service
18  arrangement --
19  Q.   That wasn't -- wasn't my question.
20  A.   I'm answering your question .
21       But lots of free services were
22  given to lots of Dondero entities by lots of
23  Highland employees, who were never paid, over
24  the years.
25  Q.   Was it your understanding that

Page 202

J. Seery

1  Highland provided shared services to Highland
2  Capital Management Services?
3
4      A.   No.
5          MR. MORRIS:  Objection to the
6      form --
7      A.   Sorry.
8          MR. MORRIS:  -- of the question.
9      A.   No, shared -- shared services refer
10 to a specific agreement.  There was no --
11 there was no agreement or other arrangement.
12         Highland employees did things
13 wherever Dondero asked them to do.
14     Q.   I, I -- I assume, when you say
15 there was no agreement, you're talking about
16 no formal written agreement like the one
17 we've looked at for NexPoint earlier today --
18         MR. MORRIS:  Objection to --
19     Q.   -- is that what you're referring
20 to?
21         MR. MORRIS:  Objection to the
22     form of the question.
23     A.   No, I'm referring to any type of
24 agreement.
25         You, you -- you refer to these

Page 203

J. Seery

1  companies as if they're standalone operating
2  entities that actually do things.  These are
3  entries on paper that move money around.
4          So when Dondero asks an employee to
5  do work on behalf of himself, whether that's
6  closing his own house loans, whether that's
7  coming over and doing work at his house or
8  whether it's working for Highland Capital
9  Management Services, they -- they did it and
10 Highland was not compensated.
11     Q.   Have you -- have you investigated
12 whether there was effective compensation for
13 the services that Highland provided to
14 Highland Capital Management Services?
15         MR. MORRIS:  Objection to the
16     form of the question.
17     A.   I -- I don't know what effective
18 compensation means, but I have investigated
19 whether Highland Capital Management received
20 anything from HCM Services.
21     Q.   And who did you ask?
22     A.   It's been part of the ongoing
23 review of the business throughout the second
24 half of this case and into the spring of this
25

Page 204

J. Seery

1  year.
2      Q.   And did you determine, in the
3  course of that investigation, that there was
4  a pattern and practice of Highland providing
5  services like the ones in the NexPoint shared
6  services agreement to Highland Capital
7  Management Services?
8      A.   I think you asked me if we got some
9  sort of -- I think you said either indirect
10 or some other form of compensation.
11         The answer was no.  There were
12 things that Highland employees did at
13 different times at Mr. Dondero's directions
14 for these various entities, none of which
15 were paid for.
16     Q.   Was it generally the case that
17 Highland provided the back office services
18 for Highland Capital Management Services,
19 such as bill paying?
20     A.   Sometimes.  I don't know that it
21 was generally the case.  It depended.  And
22 Highland Capital --
23         (Simultaneous speaking.)
24     A.   -- and Highland Capital Management

Page 205

J. Seery

1  Services really just owned certain things and
2  took money out of Highland.
3          The fact of the matter is, Highland
4  Capital Services' main business is that it
5  gives money to Jim Dondero.  I think he owes
6  around a hundred million to services.
7  MO*      MS. DEITSCH-PEREZ:  Move to
8      strike.  That wasn't my question.
9      Q.   I asked you whether or not you
10 noticed, in the course of your various
11 investigations, that Highland Capital
12 Management provided back office services like
13 bill paying for cap -- for Highland Capital
14 Management Services?
15     A.   I --
16         MR. MORRIS:  Objection to the
17     form of the question.
18     A.   And I -- and I answered that I
19 don't think you can think of this company --
20 this entity - or company, Highland Capital
21 Services Inc. - in that manner.
22         It didn't -- it didn't have, for
23 example, advisory services that anybody there
24 was performing for third parties like NPA.

Page 206

J. Seery

1   So there wasn't doing work for a fund, et
2   cetera, so I don't -- there were certain
3   things that were done.  Whether they were ad
4   hoc or specific, I didn't see any true
5   pattern that this was similar to an agreement
6   where third -- true third-party services were
7   being continually performed.
8   Q.    Did Highland Capital Management
9   Services have employees that you knew of?
10   A.    No.
11   Q.    Okay.  So if it wanted to pay a
12   bill, it was using employees at Highland
13   Capital Management to do that, correct?
14   A.    If it had a bill, yeah.
15   Q.    Okay.  And in fact, did -- did
16   Highland Capital Management charge Highland
17   Capital Management Services for shared
18   services?
19   A.    I don't believe so.
20   MS. DEITSCH-PEREZ:  Let me show
21   you another document that I'll -- has
22   been premarked as Exhibit 110.
23   MR. MORRIS:  Are we going to be
24   able to take that break shortly?

Page 207

J. Seery

1   MS. DEITSCH-PEREZ:  If you want
2   to take it now, that's fine.
3   MR. MORRIS:  Yeah, I would
4   appreciate it.
5   MS. DEITSCH-PEREZ:  Well,
6   actually, why don't -- if you don't
7   mind, let me just finish 110.
8   MR. MORRIS:  Okay.
9   MS. DEITSCH-PEREZ:  I think that
10   will be pretty quick and then --
11   MR. MORRIS:  Okay.
12   MS. DEITSCH-PEREZ:  -- then we
13   can break.
14   Is that all right?
15   MR. MORRIS:  Sure.
16   BY MS. DEITSCH-PEREZ:
17   Q.    Okay.  Okay.  Can you see Exhibit
18   110?
19   A.    I can, yes.
20   Q.    Okay.  And I'm going to scroll down
21   because what I'm going to ask you about is
22   the email from Fred Caruso to Brian Collins,
23   JP Sevilla, Frank Waterhouse, Dave Klos, with
24   a copy to you.

Page 208

J. Seery

1   Do you recall Exhibit 110?
2   A.    Not specifically, no.
3   Q.    Do you generally -- well, first,
4   who's Fred Caruso?
5   A.    He is a partner at DSI.
6   Q.    Okay.  And were Brian -- and who
7   are Brian Collins, JP Sevilla -- the other --
8   the others we've spoken about.
9   So who are Collins and Sevilla?
10   A.    Brian Collins -- at this time
11   Collins, I believe, was still head of HR at
12   HCMLP and Sevilla was a counsel at HCMLP, but
13   they were really working for the transition,
14   which I don't know if it had a name at that
15   point, whether it was Highgate or Skyview.
16   But that's what they were working
17   on, and this had to do with transition of the
18   business, the service part of the business,
19   from Highland to other entities.
20   Q.    But am I correct that this is a
21   demand from HCMLP to the companies listed in
22   Exhibit 110 for money?
23   A.    It looks to be that, yes.
24   Q.    Okay.  And the email says there are

Page 209

J. Seery

1   outstanding fees and cost reimbursements.
2   What kind of fees were these?
3   A.    I believe some of these were fees
4   related to shared services and others were
5   reimbursements for costs.
6   Q.    Okay.  And do you see that there is
7   a line item for HCM Services and a -- and the
8   amount 116,531 is listed?
9   A.    Yes.
10   Q.    And so was that HCMLP demanding
11   money from HCM Services for services that
12   HCMLP had provided to HCM Services?
13   A.    I don't --
14   MR. MORRIS:  Objection to the
15   form of the question.
16   A.    I don't think so.
17   Q.    Why not?
18   A.    I think it's for cost
19   reimbursement.
20   Q.    What, what cost was -- was it
21   seeking to be reimbursed for?
22   A.    I -- I don't recall.  This is not
23   a -- something I recall specifically.
24   Q.    But in any event, this Exhibit 110

**App. 149**

Page 210

J. Seery

1  confirms that HCMLP was either providing
2  services or advancing costs for HCM Services
3  and then billing HCM Services?
4          THE WITNESS:  Objection to the
5      form of the question.
6      A.    I -- I believe it was the latter.
7      Q.    Can you exclude the possibility
8  that this was an instance of HCMLP billing
9  HCM Services for services performed by HCMLP?
10     A.    Well, there was no agreement, so I
11 don't know the basis of it, but we could look
12 for it.  I don't -- I don't think that's the
13 case.
14     Q.    Do you know whether or not there
15 was an oral agreement with respect to HCM
16 providing services to HCM Services?
17     A.    Not that I ever heard of.
18     Q.    Did you ever specifically make an
19 inquiry --
20     A.    I, I have made --
21          (Simultaneous speaking.)
22     A.    You're not finished?  I'm sorry.
23     Q.    You can -- you can answer.
24     A.    I, I have --

Page 211

J. Seery

1      Q.    I take it you got the gist.
2      A.    I have made inquiry regarding
3  whether there was any arrangement for -- to
4  provide services and pay back for those
5  services, and I was told there wasn't.
6      Q.    Who did you make --
7      A.    That's my recollection.
8      Q.    Who did you -- who did you make an
9  inquiry to?
10     A.    Our -- our accounting team.
11     Q.    And any -- which people?
12     A.    That would be Waterhouse and Klos
13 and Hendrix.
14          It's not a specific inquiry that I
15 made.  There was -- this was over the time
16 during the case.
17     Q.    You actually have a specific
18 recollection of speaking to any of the people
19 that you just listed, like to Surgent, Klos
20 and --
21     A.    I didn't mention Surgent.
22     Q.    Okay.  Klos, Hendrix and
23 Waterhouse?
24     A.    Yes.

Page 212

J. Seery

1      Q.    Okay.  Do you have a specific
2  recollection of asking any or -- any of them
3  whether there was an unwritten agreement
4  between HCM and HCM Services for HCM to
5  provide shared services, back office
6  services, to HCM Services?
7      A.    No, I never would have asked that
8  question.
9      Q.    Did -- do you have a specific
10 recollection of what question you did ask?
11     A.    Yes.
12     Q.    What was it?
13     A.    Do we have a shared services
14 agreement.
15     Q.    Did you make it clear that you were
16 asking for a written or unwritten agreement?
17     A.    No.  As I said, if I asked if there
18 was an agreement, I would have assumed it was
19 a formal written agreement because that's the
20 way the business was run.
21          And I didn't ask if there was some
22 unwritten, secret, hidden or not so secret
23 but not shared with anybody agreement.  I
24 don't -- it's not something I inquired about.

Page 213

J. Seery

1      Q.    Did you ask whether there was an
2  agreement caused by a pattern and practice of
3  conduct?
4      A.    No.
5          MR. MORRIS:  Hey, Deborah, I'd
6      really like to take that break now.
7      That's why I started giving a --
8          MS. DEITSCH-PEREZ:  Okay.
9          MR. MORRIS:  -- a warning quite
10     some time ago.
11         Thank you.
12         MS. DEITSCH-PEREZ:  Okay, okay.
13         MR. MORRIS:  Yep, let -- let's
14     come back --
15         VIDEO TECHNICIAN:  The time is
16     5:37.  We're going off the record.
17         (Recess taken.)
18         VIDEO TECHNICIAN:  The time is
19     5:58.  We're back on the record.
20 BY MS. DEITSCH-PEREZ:
21     Q.    Mr. Seery, I'm showing you what's
22 been premarked as Exhibit 112.  I don't know
23 if you have it there, but if not, let me
24 scroll through it.

**App. 150**

Page 214

J. Seery

2  Have you seen it before?

3  A.    It -- it looks familiar, yes.

4  Q.    Okay.  This is a letter dated
5  January 7, from you to Mr. Dondero at HCR --
6  HCRE Partners.

7  Did you cause this letter to be
8  sent?

9  A.    Yes.

10  Q.    And like Exhibit 1 -- I think 111,
11  was this written by your counsel?

12  A.    It -- it certainly had my counsel's
13  input and my input, so how --

14  Q.    Okay.

15  A.    -- I probably got a base and marked
16  it up, and they finished it.

17  Q.    Okay.  And --

18  A.    Same as the other.

19  Q.    Okay.  And was there any
20  communication, other than Exhibit 112,
21  between you and HCRE Partners about the HCRE
22  term loan?

23  A.    No.

24  Q.    Do you know whether -- was there a
25  payment due on the HCRE term loan, in your

Page 215

J. Seery

2  view, by December 31, 2020?

3  A.    I believe there was, yes.

4  Q.    And was it made?

5  A.    No.

6  Q.    And was the payment made in January
7  of 2021?

8  A.    A payment was made in January of
9  2021 on account that -- the full amount that
10  was demanded.

11  Q.    Well, when high -- when HCM
12  received the payment from HCRE Partners, who
13  facilitated the -- the making of the payment,
14  as far as you know?

15  A.    I don't know.

16  Q.    Do you know if anyone from Highland
17  Capital Management was involved in the making
18  of HCRE's payment to HCM?

19  A.    I don't know.

20  Q.    Do you know whether HCRE had
21  employees?

22  A.    I don't believe it did.

23  Q.    And so was it your understanding,
24  generally, that HCM employees provided
25  services like paying bills for HCRE Partners?

Page 216

J. Seery

2  MR. MORRIS:  Objection to the
3  form of the question.

4  A.    It was similar to HCM Services, but
5  that doesn't mean they were the only people
6  to do anything for HCRE; I just don't know.

7  Q.    Well, when HCM received the
8  payments in January of 2021 from HCRE and HCM
9  Services, was there any communication that
10  these payments were being made to pay down
11  the term loan generally as opposed to -- to
12  making the payment otherwise to be made on
13  December 31, 2020?

14  MR. MORRIS:  Objection to the
15  form of the question.

16  A.    I -- I'm not sure I understand your
17  question, but I -- I don't recall any
18  specific communication.  Certainly if there
19  was a payment made, we would have applied it
20  on the total balance due, as you described.

21  Q.    But did anyone on behalf of the
22  HCRE or HCMS communicate that the payments
23  were to be applied to the total balance due
24  as opposed to fulfilling the payment that
25  otherwise was typically made at the end of

Page 217

J. Seery

2  the -- of the year?

3  MR. MORRIS:  Objection to the
4  form of the question.

5  A.    Again, I -- I don't think I
6  understand your question, but I don't know if
7  there was any communication at all.  I just
8  don't recall.

9  Q.    You don't recall one?

10  A.    No.

11  Q.    Did you look, in the course of
12  responding to the discovery, at the -- what
13  the -- the means by which HCM received the
14  payments from HCRE and HCMS?

15  MR. MORRIS:  Objection to the
16  form of the question.

17  A.    I -- I believe I did.  I certainly
18  looked at the total payments that came in
19  from various entities and how we applied
20  them, but I don't recall any specifics around
21  communication.

22  Q.    Well, did you look for the wire
23  transfer information?

24  MR. MORRIS:  Objection to the
25  form of the question.

**App. 151**

Page 218

J. Seery

1     
2    A.    I, I --
3    Q.    Was there -- let me rephrase.
4          Was -- did the payments come in by
5    wire?
6    A.    I don't recall.
7    Q.    Did you look for any communication
8    that would accompany the payment?
9          For example, a check can have a
10   note on the note line, a wire can have a note
11   on the re line, an ACH payment can have a
12   note on a re line.  Did you attempt, in
13   responding to the discovery in these notes
14   cases, to find any such communications?
15   MR. MORRIS:  Objection to the
16   form of the question.
17   A.    I'm relatively certain it didn't
18   come in as a check, because I would have
19   known that.  I just don't recall if it came
20   in by wire or ACH, and I didn't look for any
21   specific communication that accompanied the
22   wire or the ACH payment.
23   Q.    Okay.  And with respect to HCRE,
24   did you send a letter like the one we looked
25   at earlier for NexPoint, contending that the

Page 219

J. Seery

1    payment had been applied to the principal
2    balance as opposed to satisfying and curing
3    any default on the note?
4    MR. MORRIS:  Objection to the
5    form of the question.
6    A.    If -- if we did send it, it would
7    have been in the -- the production.  It
8    certainly would have -- there was no cure
9    provision in the notes, so we would have
10   applied it in the same way as we did the NPA
11   payment and the services payment.
12   Q.    If there are in fact no
13   post-payment letters for the HCRE term loan
14   and the HCMS term loan, was there a reason
15   for that?
16   A.    No, no reason if there are none.
17   They're not required.  The notes are very
18   clear with respect to the waiver of demand,
19   presentment.
20         So there's no requirement of it.  I
21   thought there would be, that I would have
22   sent it, but I don't -- don't recall
23   specifically.
24   Q.    Did anyone on behalf of HCRE ever

Page 220

J. Seery

1    communicate an acknowledgment or acceptance
2    that the loan was in default and that the
3    payment would be applied to the principal --
4    to the balance?
5    A.    Other than the terms of the note,
6    no.
7    Q.    And do you have an understanding of
8    why -- strike that.
9          Do you have an understanding, based
10   on personal knowledge, of why the HCRE and
11   HCMS payments were not made in December of
12   2020?
13   MR. MORRIS:  Objection to the
14   form of the question.
15   A.    I -- I believe I do.
16   Q.    And what is that knowledge based
17   on?
18   A.    The same edict that we discussed
19   with Mr. Rukavina earlier in the day.
20   Q.    So tell me the actual words that
21   you contend Ms. Hendrix said to you that
22   caused you to believe whatever it is you
23   believe about what Mr. Dondero said.
24   MR. MORRIS:  Objection to the

Page 221

J. Seery

1    form of the question, and -- asked and
2    answered.
3    A.    I -- I don't recall the specific
4    words.
5    Q.    Now, at -- in -- and -- and you
6    don't recall when the words were sent to you
7    either; you can't say whether it was December
8    or January or some other time?
9    MR. MORRIS:  Objection to the
10   form of the question --
11   A.    No, I --
12   MR. MORRIS:  -- mischaracterizes
13   the testimony.
14   A.    -- I'm pretty clear that it -- I
15   learned of the action in December.
16         I may have learned of the words in
17   December.  It could have been in January, on
18   or about the time I sent the demand note.
19   But it wouldn't have been, as you phrased it,
20   some other time.
21   Q.    Now, in -- in or around December of
22   2020, you understood there was a dispute
23   between Mr. Dondero and -- and affiliated
24   companies and the debtor about whether the

**App. 152**

Page 222

J. Seery

2 affiliated companies had overpaid shared
3 service fees to Highland, correct?
4     A.    Absolutely not.
5     Q.    Are you not aware that Mr. Dondero
6 contended that NexPoint, for example, had
7 overpaid Highland by many millions of dollars
8 for shared service fees?
9     A.    I'm quite aware that Mr. Dondero
10 has fabricated a story as part of the
11 negotiations for a pot plan.  In fact, he
12 included it in one of the term sheets, to
13 fabricate a claim about additional services.
14         I'm also quite aware of other
15 evidence that shows that's not the case.
16     Q.    Let's take this in pieces.
17         How much did Mr. Dondero contend
18 shared services had been overpaid --
19     A.    I don't recall --
20     Q.    -- what amount?
21     A.    I don't recall the exact amount.
22     Q.    More than 10 million?
23     A.    I think he claimed 14, some number
24 like that, but it doesn't have any connection
25 to reality.

Page 223

J. Seery

2     Q.    Mr. Seery, what did you do to
3 investigate whether or not there had been
4 overpayments of shared service fees by
5 NexPoint to Highland?
6         MR. MORRIS:  I'm just going to
7     caution the -- the questioner not to go
8     too far down this path.  These are
9     topics that are related to a completely
10     separate contested matter, actually --
11         (Simultaneous speaking.)
12         MR. MORRIS:  Okay.  So I just --
13     okay, that's fine.
14         MR. RUKAVINA:  Yeah, I'm not
15     trying to litigate that, it's --
16         MR. MORRIS:  Yep.
17         MS. DEITSCH-PEREZ:  -- it's
18     relevant to this whole incident that
19     Mr. Seery is --
20         MR. MORRIS:  I don't think so,
21     but --
22         MS. DEITSCH-PEREZ:  -- is --
23         MR. MORRIS:  -- but go ahead, I'm
24     not directing him not to answer.
25         MS. DEITSCH-PEREZ:  I -- I'm not

Page 224

J. Seery

2     going to call him a liar like he's been
3     calling everybody else, so I'll be
4     polite about it, but it is relevant --
5         THE WITNESS:  Well, the reason
6     for that is because I don't lie, and I
7     just -- I just don't do it.  I don't
8     fabricate testimony.  So you can call
9     me whatever you like.  It doesn't
10     matter.  I -- I tell the truth.
11         I have a very good memory.  To the
12     extent I can't remember the ==specific==
13 ==ic== words of something from months ago, I --
14     I'm unable to remember those ==specif==
15 ==ic== words, but I have a pretty darn good
16     memory.
17 BY MS. DEITSCH-PEREZ:
18     Q.    Okay.  But -- but it would be in
19 your interest -- interest to -- to take
20 something that was said about a clear dispute
21 about the shared services payments and try to
22 apply it to some other payments, wouldn't it,
23 Mr. Seery?
24     A.    Not -- not in any way whatsoever.
25     Q.    Well, that's why I'm asking,

Page 225

J. Seery

2 Mr. Seery.  You were aware of the dispute,
3 whether -- regardless of your belief as to
4 the bona fides of it, you were aware of an
5 actual dispute about whether NexPoint had
6 overpaid shared services fees, correct?
7     A.    I --
8         MR. MORRIS:  Objection to the
9     form of the question.
10     A.    I -- I would not concede that
11 there's a dispute, because there is no
12 legitimate disagreement among what was
13 performed and what was paid.
14         I will -- I will agree that
15 Mr. Dondero came up with a story, or we can
16 say a -- an idea, that NexPoint had somehow
17 overpaid for the services that it received.
18     Q.    Ms. -- Mr. Seery, I -- I understand
19 that you're -- you are anxious to be an
20 advocate for your side.  I'm asking you for
21 strictly factual testimony.
22         Was there a dispute, meaning one
23 side said one thing and the other side said
24 the other, about whether shared services fees
25 had been overpaid?

**App. 153**

Page 226

J. Seery

2    MR. MORRIS:  Objection, asked and
3  answered.
4    A.    I -- I will concede that
5  Mr. Dondero claimed that shared services by
6  NexPoint were overpaid for.
7    Q.    Okay.  And will you also concede
8  that you disagreed with that?
9    A.    I don't need to concede that.  I do
10  disagree with that.
11    Q.    Okay.  Hence, we have a dispute,
12  okay.
13    MR. MORRIS:  Objection to the
14  form of the question.
15    Q.    Mr. Seery, if you don't recall the
16  words that Ms. Hendrix said to you, how do
17  you know that whatever this edict was that
18  you have mentioned did not relate simply to
19  don't pay any more shared services because
20  they have been overpaid?
21    MR. MORRIS:  Objection to the
22  form of the question, "ans" and
23  answered -- asked and answered.
24    A.    Again, I believe that it was
25  Ms. Hendrix.  It could have been Mr. Klos.

Page 227

J. Seery

1  Over time it could be both.  We've certainly
2  had discussions about it.  I believe that it
3  related to the shared services.  I believe it
4  also related to the notes, because the notes
5  weren't paid.
6    Q.    Okay.  And am I correct that the
7  only reason you believe it also applied to
8  the notes was because the notes weren't
9  paid --
10    MR. MORRIS:  Objection --
11    Q.    -- not because of the words used?
12    A.    The -- the words were not limiting
13  to -- that I recall in any way.
14    Q.    Were the words -- did the words
15  specifically include don't pay the notes?
16    A.    I believe I testified that I don't
17  recall the specific words, so I can't --
18    Q.    Okay.
19    A.    -- say what the specific words
20  were.
21    Q.    And -- and, Mr. Seery, I recognize
22  that you're a smart guy and a cagey witness,
23  so you have said several times that the
24  reason you believe the edict applied to the

Page 228

J. Seery

1  notes was because they weren't paid.
2    And I'm just asking you to answer,
3  honestly, whether your belief that the edict
4  concerned the notes was simp -- happenstance
5  of what happened, not because of what was
6  said to you?
7    MR. MORRIS:  Objection to the
8  form of the question, asked and
9  answered.
10    A.    The idea that you're calling me
11  cagey is -- is insulting and rude, so you
12  should please withdraw that.  No one's ever
13  called me cagey, and I always am honest.
14    I said very specifically to
15  Mr. Rukavina how I heard what I heard, how I
16  came to understand it.  I don't recall the
17  specific words or the exact time.  It is
18  clear what the facts are and what happened,
19  so that supports my interpretation of what I
20  heard and my recollection of it.
21    Q.    You -- you can't admit, as you sit
22  here today, you're not sure whether or not
23  the edict concerned the notes?
24    A.    I didn't hear the edict.  All I

Page 229

J. Seery

1  know is that we didn't get the shared service
2  payments and we didn't get the -- we didn't
3  get the -- the note payments, and I read
4  Mr. Waterhouse's testimony from two days ago,
5  which seemed to confirm everything I just
6  said.
7    So it -- I think it makes sense,
8  but I don't have a specific recollection of
9  what was told to me and I do recollect that
10  the shared service payments were not made,
11  but that was before the amounts on the notes
12  were due, so there wouldn't have been a
13  discussion about the notes.
14    Q.    Now, did you look at the payment
15  history on all of the term loan notes that --
16  that payments had been made prior to December
17  31, 2020 in excess of the amounts due, if
18  you -- if -- if the obligor was paying the
19  minimums for the number of years the notes
20  had been outstanding?
21    A.    Which -- which notes?
22    Q.    All of the note -- did you do that
23  exercise for all of the notes, all of the
24  term loan notes?

**App. 154**

Page 230

J. Seery

2    MR. MORRIS: Objection to the
3    form of the question.
4    A.    We -- we looked at the payments on
5    each of the notes, yes.
6    Q.    And did you determine whether or
7    not the amounts paid in total prior to
8    December 31, 2020 exceeded the total amount
9    due of principal and interest on the minimum
10    principal and interest payments due on those
11    notes --
12    (Simultaneous speaking.)
13    A.    I --
14    Q.    -- outstanding?
15    A.    We certainly looked at that.  I
16    don't believe that's the case for each of
17    them, but I don't have a specific
18    recollection of how they each balance out.
19    Q.    Did any of the loans have payments
20    that were made that, in total, exceeded the
21    total amount of minimum principal and
22    interest payments due on the loans for the
23    number of years they had been outstanding?
24    A.    One of them may have; I don't
25    recall.  I don't recall specifically which

Page 231

J. Seery

1    one.
3    Q.    And were there documents that you
4    looked at in connection with that inquiry?
5    A.    There would be a payment ledger.
6    Q.    And have you produced that payment
7    ledger?
8    A.    Yes.
9    MR. MORRIS: Yes, we have.
10    Q.    Is there anyone from HCRE that you
11    contend -- and I apologize if I asked that,
12    because I'm -- I'm maybe mixing up HC -- HCMS
13    and HCRE.
14    But is there anyone from HCRE
15    that -- that acknowledged to you or said
16    something to you, admitting that the payment
17    that was made in January of 2021 was a
18    payment towards the overall principal and not
19    the payment that was due at the end of 2020?
20    A.    No, I don't believe I had
21    discussion with anybody who claimed to
22    represent HCRE; which, as you said, had no
23    employees.
24    Q.    Have you -- strike that.
25    Earlier I couldn't tell if it was

Page 232

J. Seery

2    Mr. Morris talking or you, and I apologize
3    for that, but somebody said something like
4    constructive fraud is not an issue in any of
5    the note cases and therefore, you know, we
6    shouldn't be looking at -- at solvency.
7    MR. MORRIS:  That would have --
8    MS. DEITSCH-PEREZ:  Was that you?
9    MR. MORRIS:  -- that would --
10    that would have been me.
11    There is no claim for constructive
12    fraudulent transfer.
13    BY MS. DEITSCH-PEREZ:
14    Q.    And so let me ask Mr. Seery, as the
15    30(b)(6) witness for HCM, is it your position
16    that constructive fraud and therefore
17    solvency has no bearing on any of the note
18    cases?
19    MR. MORRIS:  Objection to the
20    form of the question.
21    A.    With respect to these claims, I
22    think that the -- the allegations are pretty
23    clear that there is no agreement, there's no
24    subsequent agreement.  That's nonsense.  If
25    there is one --

Page 233

J. Seery

2    Q.    Mr. -- Mr. Seery --
3    A.    Well, I'm answering your question.
4    (Simultaneous speaking.)
5    MR. MORRIS:  Please let him
6    finish.
7    A.    So when -- if, in some world, that
8    story is bought, then we think it's clearly
9    an actual fraud.
10 MO*    MS. DEITSCH-PEREZ:  Move to
11    strike.
12    Q.    I'm asking a simple question,
13    Mr. Seery.  As HCM's 30(b)(6) witness, do you
14    agree with the assertion of your counsel that
15    constructive fraud is not an issue, is not
16    something HCM is asserting in the note cases?
17    A.    That's correct.
18    Q.    Okay.  And therefore, is it also
19    your position, as the 30(b)(6) witness for
20    HCM, that whether Highland was or was not
21    solvent at the time the notes were made or at
22    the time the forgiveness condition was agreed
23    upon, that the solvency of Highland is
24    irrelevant to those issues?
25    MR. MORRIS:  Objection, it's not

Page 234

J. Seery

1 a 30(b)(6) topic, and I object to the
2 extent it calls for a legal conclusion.
3        MS. DEITSCH-PEREZ:  I'm -- I'm
4 just -- can you read it back and have
5 the witness answer.
6        MR. MORRIS:  Okay.
7        (As read by the reporter):
8        "QUESTION:  And therefore, is it
9 also your position, as the 30(b)(6)
10 witness for HCM, that whether Highland
11 was or was not solvent at the time the
12 notes were made or at the time the
13 forgiveness condition was agreed upon,
14 that the solvency of Highland is
15 irrelevant to those issues?"
16 A.    I -- I don't think it's irrelevant.
17 It's not a precondition to a case for an
18 actual fraud.  But when these things are done
19 in the face of solve -- insolvency, when
20 they're -- when -- when the supposed
21 agreements are done on the eve or after
22 bankruptcy, that sure adds to the badges of
23 fraud.
24        MS. DEITSCH-PEREZ:  Then, John,

Page 235

J. Seery

1 we -- we may have an issue about
2 picking up this deposition.  Let me --
3 let me ask another question.
4 Q.    Do you have a solvency analysis
5 done for these note cases?
6 A.    Not for these note cases, no.
7 Q.    And are you prepared to explain
8 right now, in this deposition, how -- what
9 Highland's solvency was at any of the time
10 periods, either when the notes were made or
11 when the alleged agreement regarding
12 forgiveness -- potential forgiveness of the
13 notes was entered into?
14        Are you prepared today to tell us
15 what you think about Highland's solvency and
16 why?
17        MR. MORRIS:  Objection to the
18 form of the question.
19 A.    I -- I believe I already did, but I
20 can do it again, if you'd like.  Mr. Rukavina
21 asked me very specific questions about where
22 I thought solvency was, and I gave my very
23 specific answers.
24 Q.    For each -- for the dates of each

Page 236

J. Seery

1 of -- each of the notes and when the
2 forgiveness condition arose, what is your
3 answer as to whether Highland was solvent and
4 why?
5        MR. MORRIS:  Objection to the
6 form of the question.
7 A.    There's -- there's about twelve
8 different dates in there, but why don't I
9 make it easy.
10        In '17, I think Highland was
11 insolvent.  Highland had significant exposure
12 to litigation claims that it had not properly
13 put on its balance sheet, and I think the
14 actions of the principals show that they
15 understood the risks with respect to those
16 claims.  And that's why you have a number of
17 actions, including taking money offshore,
18 including rolling out these notes thirty
19 years.  That's 2017.
20        '18 is similar, because the --
21 because the actions get more and more
22 developed and the claims against Highland get
23 bigger and bigger.
24        In '19 it comes crumbling down and

Page 237

J. Seery

1 Redeemer gets a very large arbitration award
2 that it's about to win and Highland files for
3 bankruptcy.
4        I don't -- the -- the idea that
5 there are these subsequent agreements, we
6 don't even agree that that exists.  We think
7 it's completely fabricated and false.  But to
8 the extent it incurred -- occurred during '17
9 '18, December/January.  '18, '19,
10 December/January.  '19, '20 after the
11 bankruptcy, yeah, I think that -- that pretty
12 much shows that they fall into insolvency.
13        Again, with an actual fraud, we
14 don't need it.  But it certainly helps with
15 the badges of fraud.
16 Q.    Is that your complete answer?
17 A.    To -- to your question, yes.
18 Q.    And do you have -- Highland has
19 made breach of fiduciary duty claims against
20 Dugaboy and then aiding and abetting claims
21 against Nancy Dondero and Jim Dondero?
22 A.    That's correct.
23 Q.    Can you tell me from whence those
24 fiduciary duties come?

Page 238

```
1              J. Seery
2      A.    Yes.
3      Q.    Where are -- where can we find
4  them?
5            MR. MORRIS:  Objection to the
6  form of the question.
7      A.    They're -- they're in the amended
8  complaint.
9      Q.    No, no, no, where -- where do the
10 duties come from?  What are the duties based
11 on?
12     A.    With respect to both Dugaboy and
13 Nancy Dondero, Nancy Dondero is the trustee
14 of Dugaboy.  Dugaboy was a limited partner.
15 Limited partners are not permitted to run the
16 affairs of the partnership.
17           She has testified that she made
18 agreements on behalf of Highland.  So she
19 stepped into the role of a general partner,
20 as did Dugaboy.  Her testimony was very clear
21 on these points, that she cut the agreements
22 on behalf of Highland.
23     Q.    Okay.  So it is -- are you saying
24 that it is the HCMLP partnership agreement
25 that gives rise to the fiduciary duties?
```

Page 239

```
1              J. Seery
2            MR. MORRIS:  Objection to the
3  form of the question, asked and
4  answered, mischaracterizes the
5  testimony.  It calls for a legal
6  conclusion.
7      A.    It -- it's -- in my opinion, it's
8  the law, and our position is it's the law,
9  that when a limited partner takes over the
10 operation and running of the partnership and
11 takes on those duties, they step into the
12 role of a general partner.
13           And that is the -- we don't believe
14 this agreement exists, but if it were to
15 somehow metastasize into something of an
16 agreement, then clearly we believe that it
17 breached the fiduciary duties that those
18 persons and entities who took on those duties
19 would have to the partnership.
20     Q.    Okay.  And I'm -- I'm just -- I'm
21 just trying to understand your testimony.
22           You're talking about duties under
23 the -- the HCM fourth amended limited
24 partnership agreement?
25           MR. MORRIS:  Objection to the
```

Page 240

```
1              J. Seery
2  form of the question, mischaracterizes
3  the testimony.
4      A.    The duties are under Delaware law
5  related to partnerships.
6      Q.    Yes.  And the partnership duties
7  that you're talking about are the HCMLP --
8  the fourth amended partnership agreement; is
9  that right?
10           MR. MORRIS:  Objection to the
11 form of the question, calls for a legal
12 conclusion.
13     A.    That's the partnership agreement,
14 yes.
15     Q.    Okay.  And you're not saying these
16 duties just arise out of the air?
17           MR. MORRIS:  Objection to the
18 form of the question, mischaracterizes
19 the testimony.
20     A.    I didn't say they arise out of the
21 air, no.
22     Q.    Okay.  I mean, you are the witness
23 designated to talk about these -- these
24 breach of fiduciary duty claims, correct?
25     A.    That is correct.
```

Page 241

```
1              J. Seery
2      Q.    Is there anything other than law,
3  generally, and the fourth amended limited
4  partnership agreement of Highland Capital
5  Management that gives rise to the duties that
6  you are contending Dugaboy breached and Nancy
7  Dondero and Jim Dondero allegedly aided in
8  the breaching of?
9            MR. MORRIS:  Objection, asked and
10 answered.
11     A.    There's also facts.
12     Q.    Okay.  And the, the facts -- the
13 fact that you said underlaid the claim was
14 their -- the supposed stepping into the shoes
15 of the general partner, is -- is --
16           MR. MORRIS:  Objection to --
17     Q.    -- anything else?
18           MR. MORRIS:  Objection to the
19 form of the question, mischaracterizes
20 the testimony, asked and answered.
21     A.    Stepping into --
22     Q.    Mr. Seery, correct me if I'm wrong.
23 If there's some other fact that you are
24 pointing to, let me know.
25           MR. MORRIS:  Objection to the
```

Page 242

J. Seery

1  form of the question, asked and
2  answered.
3  A.   I -- I believe I gave a pretty
4  good, concise summary, but is there more that
5  you want to know?
6       When it -- our position is that
7  when a limited partner takes over the
8  management or any of the management roles of
9  the partnership and enters into an agreement
10 on behalf of the partnership, they stepped
11 into the general partner role.
12      When they're in the general partner
13 role they have fiduciary duties to the
14 partnership and all of the partners.  When
15 they breach those duties, which we argue is
16 the case if this supposed agreement were
17 actually something, then they should be
18 liable for the damages caused by those
19 breaches.
20 Q.   You've said, a couple times now, if
21 a limited partner steps in and manages the
22 partnership.
23      Can you tell me every way in which
24 you contend Dugaboy or Nancy Dondero as the

Page 243

J. Seery

1  trustee of Dugaboy took a management step?
2  A.   Nancy Dondero and Jim Dondero claim
3  that Nancy Dondero and Dugaboy entered into
4  an agreement on behalf of the partnership and
5  gave away 63 million -- or maybe that's the
6  total amount of the notes, but some 50
7  million-ish amount of notes for virtually
8  nothing - and in most instances could
9  actually be nothing - with no investigation,
10 no discussion, no analysis and really no
11 authority.
12      But they -- they assert that that
13 was the agreement.  And without any
14 consideration received by this entity,
15 nothing, they claim that they did this.
16      Now we don't -- we don't believe
17 this agreement exists, again, to be clear.
18 We think it's fabricated.  We think that
19 that's really beyond any kind of dispute.  We
20 think you all know that too, but we'll play
21 along.
22 Q.   Is there any other action that you
23 contend is management that you contend
24 Dugaboy or Nancy undertook with respect to

Page 244

J. Seery

1  Highland?
2  A.   No.  Taking control of the payment
3  to an affiliate of the general partner for no
4  consideration and claiming that you are able
5  to do that, we think that is sufficient.
6  MO*      MR. DEITSCH-PEREZ:  Move to
7       strike everything after "No."
8  Q.   Let me just get it clear.  There is
9  no other action, other than entering into
10 this agreement, that you contend is
11 management by Dugaboy or Nancy Dondero; is
12 that correct?
13 A.   No, that's not correct.  It's
14 everything around the supposed agreement.
15 So, so it -- it can't be cabined to just what
16 the supposed agreement is, it's all of the
17 other -- lack of -- of -- if it were a real
18 agreement, the lack of any sort of care, the
19 lack of any sort of loyalty, it all permeates
20 from this supposed agreement --
21      (Simultaneous speaking.)
22 A.   -- these folks haven't thought
23 through --
24      MR. MORRIS:  Just let him finish.

Page 245

J. Seery

1  A.   -- the full implications of what
2  they are arguing.
3  Q.   Okay.  Other than the things that
4  you have testified to in the last ten or
5  fifteen minutes, there are no other acts of
6  supposed management that you contend Dugaboy
7  or Nancy undertook that form the basis for
8  the breach of fiduciary duty claims, correct?
9       MR. MORRIS:  Objection to the
10      form of the question.
11 A.   I -- I think I've touched on all of
12 them.
13 Q.   Okay.  Thank you.  Okay.  I'm going
14 to show you what has been marked as --
15 premarked as Exhibit 109.
16      Is this a document that you have
17 seen before?
18 A.   I -- I believe I have, but you're
19 literally just showing me a slice of the
20 heading.
21 Q.   I know.  It's the -- it's the
22 Notice of Filing of Debtor's Amended
23 Schedules, and then annexed to it - let me
24 get to that - are the Global Notes and

**App. 158**

Page 246

J. Seery

1  Statement of Limitations, Methods and
2  Disclaimers Regarding Debtor's Amended
3  Schedules of Assets and Liabilities.
4         Is that a document that you have
5  seen before?
6     A.   I -- I don't recall it
7  specifically.
8     Q.   Well, let me ask a different way.
9  In -- this was filed in September of 2020.
10        What was your role with respect to
11 filings of the debtor in September of 2020?
12    A.   Depending on the filing, I executed
13 many of them.  So if I executed this one,
14 please let me know.
15        I certainly was around and
16 consulted with respect to all the filings.  I
17 was the CEO of the company.
18        That's my signature, so I've seen
19 this.
20    Q.   Okay, okay.
21        (Simultaneous speaking.)
22    A.   I may not have seen the -- I don't
23 know if I -- I just don't recall the, the --
24 the piece at the top.

Page 247

J. Seery

1     Q.   Okay.  But, generally, if you
2  signed a declaration under penalty of perjury
3  for non-individual debtors that was then
4  annexed to a filing, you would have looked
5  through the filing and assured yourself that
6  it was correct, to the best of your knowledge
7  and belief?
8     A.   I would have either looked through
9  the filing or I would have reviewed it with
10 my team, whomever prepared it.
11    Q.   And so as you sit here today, do
12 you have any reason to believe that there are
13 inaccuracies in docket 1082?
14        MR. MORRIS:  Do you want to
15    give -- do you need to read the
16    document?
17    A.   I have no --
18    Q.   Yeah.  And I -- and I emailed it to
19 John, so if you want to sit down and take a
20 look at it, please --
21        (Simultaneous speaking.)
22    A.   No, I -- I don't need to review it.
23        No one's brought anything to my
24 attention.  I don't -- I have no reason to

Page 248

J. Seery

1  believe it wasn't accurate at the time.
2     MS. DEITSCH-PEREZ:  Okay.  Thank
3     you.
4        Okay.  Why don't we take a few
5  minutes and I'm going to have a look at
6  my notes and -- and I'll have a better
7  idea of how much longer I have then.
8        VIDEO TECHNICIAN:  The time is
9     6:36.  We're going off the record.
10        (Recess taken.)
11        VIDEO TECHNICIAN:  The time is
12    6:41.  We're back on the record.
13        MS. DEITSCH-PEREZ:  Okay.  Thank
14    you.
15        Thank you very much, Mr. Seery.
16    I'm going to pass back to whomever might
17    want to ask you anything more.
18        MR. RUKAVINA:  Well, I think
19    Mr. Horn is busy.  I have one more
20    question for you, Mr. Seery.
21        MR. HORN:  I -- I have no
22    questions, so I'll defer to Davor if he
23    has --
24        MR. RUKAVINA:  Thank you, thank

Page 249

J. Seery

1     you.
2  EXAMINATION
3  BY MR. RUKAVINA:
4     Q.   My only question was as follows:
5  When you were answering counsel's questions,
6  you mentioned something about a payment
7  ledger on the notes.
8        Do you recall that?
9     A.   Not a specific -- I would have
10 looked at a payment ledger.  I don't have
11 a -- I'm not thinking of one particular
12 payment ledger.
13        The one that -- that was one of the
14 exhibits --
15    Q.   That's where I'm going --
16    A.   -- is a type of payment ledger.
17        That one, it looks like it was --
18 that's actually the actual schedule of
19 payment, because it shows as if the payments
20 had made -- it doesn't show what's been made,
21 but it actually shows you the schedule of --
22 all the way to maturity, I believe, and so --
23    Q.   Well, here's -- here's where I'm
24 going with this.

**App. 159**

Page 250

```
1                J. Seery
2       A.    Okay.
3       Q.    For the $30.7 million note, to the
4   best of your knowledge, did the debtor
5   maintain a payment ledger showing any
6   historical payments on that $30.7 million
7   note?
8       A.    Yes, we would have -- we would
9   have.
10      Q.    And to the best of your knowledge,
11  would that have been produced in this
12  litigation?
13      A.    Yes.
14      Q.    Okay.  To the best of your
15  knowledge, is Exhibit 7 that or is Exhibit 7
16  something else?
17      A.    I think Exhibit 7 is something
18  else.  It's just because I hadn't seen this
19  one.  It may be that this was -- I think
20  it's -- I think it's something else.
21  RQ*     MR. RUKAVINA:  Okay.  Mr. Morris,
22      I'll just ask the debtor, I've -- I've
23      asked and we only got this in PDF,
24      there's no metadata.
25          I would just ask if the debtor
```

Page 251

```
1                J. Seery
2   would be willing to please check to see
3   what the native of this Exhibit 7 is and
4   please send it to me, along with any
5   metadata.
6       MR. MORRIS:  Email that exhibit
7   to me --
8       MR. RUKAVINA:  I will.
9       MR. MORRIS:  -- and I'll be able
10  to do that, but I do know that if you
11  look -- I'm certain it was in one of
12  the supplemental productions.
13      MR. RUKAVINA:  Yes, we received
14  it recently.
15      MR. MORRIS:  Right.  So in one of
16  the supplemental productions I know
17  that we produced schedules showing all
18  payments made against all notes at
19  issue, and I think we even gave you the
20  backup with the bank statements, you
21  know, fully redacted -- yeah.
22      MR. MORRIS:  -- to show only the
23  payments --
24      MR. RUKAVINA:  Let's talk
25  offline --
```

Page 252

```
1                J. Seery
2          (Simultaneous speaking.)
3       MR. MORRIS:  -- you've got all of
4   that.
5       MR. RUKAVINA:  Let's talk
6   offline, because I'm not sure that I
7   agree we have that --
8       MR. MORRIS:  Yeah.
9       MR. RUKAVINA:  -- but if the
10  debtors produced it, then we'll --
11      MR. MORRIS:  I know I instructed
12  my team to produce it, so I -- I'm --
13      MR. RUKAVINA:  Okay.
14      MR. MORRIS:  -- I'm pretty
15  confident they did what I asked.
16      MR. RUKAVINA:  That was all I
17  had.  Thank you, sir.
18      THE WITNESS:  Thank you.
19      MS. DEITSCH-PEREZ:  Okay.  Let me
20  follow up with that -- with the
21  witness.  And then if it's really a
22  conversation with counsel, we could
23  move it on to that.
24  EXAMINATION
25  BY MS. DEITSCH-PEREZ:
```

Page 253

```
1                J. Seery
2       Q.    But to your knowledge, were the
3   native files such as spreadsheets and emails
4   provided to counsel to produce them, such
5   that we should be able to see the Word
6   versions of the notes, any emails about the
7   notes and the payments, so --
8       MR. MORRIS:  You -- you've got
9       that.  That's not for this witness.  We
10      can talk about that offline.  He
11      doesn't know anything about like the
12      actual --
13      Q.    Well, let -- let me just ask him.
14          Did he provide the native files to
15  counsel?
16      A.    I'm not quite sure what you mean by
17  native files, but counsel had access to -- we
18  did full -- had access to the systems, and we
19  did full data review of the systems and
20  produced everything responsive.
21          So I'm not sure exactly what you
22  mean by that, but -- but certainly counsel
23  had access to -- to those --
24          (Simultaneous speaking.)
25      Q.    -- understand that -- that native
```

Page 254

J. Seery

1   J. Seery
2   files means a document, if it's in Excel,
3   providing it in Excel; or if it's in email,
4   providing it as a -- in a -- in email format,
5   a PST format or something that will show the
6   metadata; or if it's a Word document, in --
7   in Word, with its properties showing.
8          That's -- that's what I mean.  Do
9   you know if that was done?
10     A.   Counsel certainly had access to all
11  of that.  We didn't just PDF things and send
12  them to counsel.  It was done electronically.
13  So anything on the system responsive was --
14  was accessible.
15     Q.   Okay.  And just who is the person
16  who conducted the searches to respond to
17  discovery requests?
18     A.   It would have been through the
19  Pachulski firm, you know, working in -- with
20  outside -- either DSI or one of the outside
21  providers, to go through and -- and find
22  certain -- whatever the terms they came up
23  with to find the data.
24     Q.   And do you know who the actual
25  people were that -- that did the -- the

Page 255

J. Seery

1   searching?
2      A.   At Pachulski?  I don't -- I should
3   know, but I worked mostly through John.
4      Q.   Okay.  And then what about the
5   non-lawyers; who were the non-lawyers who
6   worked on collecting materials responsive to
7   the discovery requests?
8      A.   I believe -- at third parties or
9   at --
10         (Simultaneous speaking.)
11     Q.   -- you just mentioned DSI or I
12  mean --
13     A.   DSI --
14     Q.   -- anyone other than the lawyer --
15  outside lawyers.
16     A.   Yeah, DSI.  The outside firm, ISI.
17  I don't know if Robert Half was involved in
18  some of this production as well.  He's been
19  on --
20         MR. MORRIS:  Robert Half does
21     document review.
22     A.   -- the payroll for a long time now
23  during this case.
24         MR. MORRIS:  They do -- they do

Page 256

J. Seery

1   J. Seery
2   the document review.
3          I mean, I could just -- I could
4   just represent to you that -- that we
5   came up with search terms, my firm ran
6   the searches.  There may have been
7   certain financial data that we had to get
8   from DSI, but we produced whatever came
9   up with the search terms to -- to Robert
10  Half.
11         They -- they did their review, they
12  sent the documents to us.  We did a
13  little quality control and we produced
14  it.
15     Q.   Okay.  And are -- are you
16  confident, Mr. Seery, that you have looked
17  for and produced whatever documents there
18  are that concern the -- the loan payments due
19  and made at the end of 2020, beginning of
20  2021?
21     A.   I -- I am.  It was done in the
22  same -- same manner that -- that Mr. Morris
23  just described.
24         MR. MORRIS:  Yeah.  And I would
25     again encourage you guys -- I've asked

Page 257

J. Seery

1   J. Seery
2   probably five different ways in
3   interrogatories, in emails, if you
4   actually think there's something out
5   there, instead of just fishing, you
6   should let me know if you think that
7   there's --
8          MR. RUKAVINA:  Oh, oh, no, and I
9   do think --
10         MR. MORRIS:  Yeah, I mean --
11         (Simultaneous speaking.)
12         MR. MORRIS:  I've asked so many
13  times and -- and I --
14         MR. RUKAVINA:  There's no --
15  there's no need to have this on the
16  record --
17         MS. DEITSCH-PEREZ:  Yeah, and
18  Mr. Seery mentioned in -- in the course
19  of the examination than they had not
20  looked at the actual transfer
21  documents, the -- I think the -- if
22  there was a wire or an ACH, to see if
23  there were notations on them and
24  that --
25         MR. MORRIS:  He said he didn't.

**App. 161**

Page 258

```
 1              J. Seery
 2         THE WITNESS:  I said I didn't.
 3         MR. MORRIS:  He said he didn't.
 4         THE WITNESS:  I said I didn't.
 5  BY MS. DEITSCH-PEREZ:
 6    Q.    Well, do you know if anybody did?
 7    A.    I don't know, but certainly that's
 8  something that accounting would see rather
 9  easily.
10  RQ*      MS. DEITSCH-PEREZ:  Okay.  So I
11       would like confirmation that that was
12       looked for, and -- and the same as I
13       requested previously, the Word versions
14       of -- of the notes.
15         MR. MORRIS:  Okay.
16         THE WITNESS:  I, I -- I think
17       that the materials that Mr. Morris
18       described has all that with bank
19       statements.
20         MR. MORRIS:  It's okay, thank
21       you.
22         Are we done?
23         MS. DEITSCH-PEREZ:  Thank you.
24         MR. MORRIS:  Yep.
25         MS. DEITSCH-PEREZ:  Yes.
```

Page 259

```
 1              J. Seery
 2         VIDEO TECHNICIAN:  The time is
 3       6:49.  This concludes today's
 4       deposition, Thursday, October 21, 2021.
 5
 6
 7
 8
 9
10  I,           , do hereby certify under
11  penalty of perjury that I have read the foregoing
12  transcript of my deposition taken on          ;
13  that I have made such corrections as appear noted
14  herein in ink, initialed by me; that my testimony as
15  contained herein, as corrected, is true and correct.
16
17  DATED this ____ day of _____, 20  ,
18  at _____,        .
19
20
21
22
23         JAMES P. SEERY, JR.
24
25
```

Page 260

```
 1
 2         C E R T I F I C A T E
 3
 4  STATE OF NEW YORK      )
 5                         )ss.:
 6  COUNTY OF NEW YORK     )
 7
 8         I, MARIANNE WITKOWSKI-SMITH, a Notary
 9  Public within and for the State of New York,
10  do hereby certify:
11         That JAMES P. SEERY, JR., the witness
12  whose deposition is hereinbefore set forth,
13  was duly sworn by me and that such deposition
14  is a true record of the testimony given by
15  the witness.
16         I further certify that I am not
17  related to any of the parties to this action
18  by blood or marriage, and that I am in no
19  way interested in the outcome of this
20  matter.
21         IN WITNESS WHEREOF, I have hereunto
22  set my hand this 22nd day of October, 2021.
23
24
25         MARIANNE WITKOWSKI-SMITH
```

Page 261

```
 1
 2  ---------------I N D E X--------------
 3  WITNESS        EXAMINATION BY        PAGE
 4  JAMES P.      MR. RUKAVINA        6, 249
    SEERY, JR.
 5                MS. DEITSCH-PEREZ   160, 252
 6
 7  Directions:  197
 8  Motions:  172, 185, 205, 233, 244
 9
10  ------------ PRODUCTION REQUESTS ------------
11  PAGE:  250  Native Exhibit 7 and metadata.
12         258  Transfer documents notations and
                 Word versions of notes.
13
14
15  --------------------EXHIBITS------------------
16  EXHIBIT                    PAGE LINE
17  Exhibit 1
    Notice of Deposition
18  Seery                      8   20
19  Exhibit 2
    Notice of Deposition
20  30(b)(6)                   9   20
21  Exhibit 3
    Email Chain
22  Re: HCMLP Roles            23  20
23  Exhibit 4
    Seery Declaration in Support of
24  Motion for TRO             43   9
25         (Continued on Next Page)
```

Page 262

```
 1
 2   ---------------EXHIBITS(Cont'd)---------------
 3   EXHIBIT                              PAGE LINE
 4   Exhibit 5
     Promissory Note
 5   Dated May 31, 2017                    55    12
 6   Exhibit 6
     Correspondence
 7   Dated January 7, 2021                 69    16
 8   Exhibit 7
     Loan Document
 9   D-NNL-029141                          99    12
10   Exhibit 8
     Correspondence
11   Dated January 15, 2021               107     4
12   Exhibit 9
     Amended and Restated
13   Shared Services Agreement            112    22
14   Exhibit 10
     Email Chain
15   D-NNL-007578 - D-NNL-007579          148    11
16   Exhibit 11
     Email Chain
17   D-NNL-028514 - D-NNL-028515          150     3
18                    * * *
19   PREMARKED
     EXHIBITS                             PAGE LINE
20   (Not Provided to Reporter)
21   Exhibit 109                          245    16
22   Exhibit 110                          206    23
23   Exhibit 111                          196     8
24   Exhibit 112                          213    23
25
```

Page 263

```
 1                   ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No. Now Reads    Should Read  Reason
 6   ____ ____ _____  _____   _____
 7   ____ ____ _____  _____   _____
 8   ____ ____ _____  _____   _____
 9   ____ ____ _____  _____   _____
10   ____ ____ _____  _____   _____
11   ____ ____ _____  _____   _____
12   ____ ____ _____  _____   _____
13   ____ ____ _____  _____   _____
14   ____ ____ _____  _____   _____
15   ____ ____ _____  _____   _____
16   ____ ____ _____  _____   _____
17   ____ ____ _____  _____   _____
18   ____ ____ _____  _____   _____
19   ____ ____ _____  _____   _____
20
                         _____
21                       Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2021.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

Index: $1.4..7250

## $

**$1.4** 106:21 108:6 109:2,19 110:3 111:10

**$2** 27:17

**$20** 171:11

**$200** 27:18

**$24** 93:15

**$24,471,000** 88:23

**$25** 163:15

**$3** 57:19

**$30.7** 25:6 52:24 152:17 250:3,6

**$300** 192:15

**$400** 191:6

**$500,000** 177:2 178:5

**$575,550.56** 90:21

**$6** 89:7

**$63** 192:9 193:6

**$70** 164:19,21

**$8** 172:7

## 1

**1** 5:3 8:18,20,24 9:7 46:7,8 113:17 126:16,22 128:21 214:10

**1.7** 188:10

**10** 148:10,11 150:8, 21 171:16 222:22

**100-odd** 196:10

**1082** 247:14

**109** 245:16

**10th** 134:3

**11** 11:15 52:3 150:2,3

**110** 206:23 207:8,19 208:2,23 209:25

**111** 196:8 197:2,10 200:7 214:10

**112** 213:23 214:20

**116,531** 209:9

**12** 37:4 106:9 111:2 143:13 148:19 149:3, 13,18 158:17,22

**12/30/19** 91:7

**12/31** 92:16

**13** 109:16 176:20

**13th** 109:4

**14** 109:16 222:23

**14th** 106:20 108:6,25 109:3

**15** 107:3,5

**15th** 108:23

**17** 236:11 237:9

**18** 236:21 237:10

**19** 184:21 185:12 236:25 237:10,11

**1990** 11:2

## 2

**2** 9:7,18,20,23 33:12

**2.06** 135:13,21

**2.1** 65:13 66:4 67:7

**20** 93:11 114:21 237:11 259:17

**20,247,628** 198:18

**2000** 33:11

**2014** 176:20

**2016** 32:13 34:16,22

**2017** 32:11 34:22 53:19 54:12 55:2,13 56:22 59:25 63:12 184:21 185:12 236:20

**2018** 32:9 34:22 113:17 184:21 185:12

**2019** 33:8,12 34:22

**58**:9

**2020** 12:12 13:3,12, 13 17:7,16 18:5 19:20 20:19,20 21:15,16 22:23 23:14 24:7,11 25:6 26:5,9, 11,14 27:24 29:19 30:2 35:15 36:19 39:16,25 40:2,17 41:9 42:10 44:15 49:16,19 50:18 51:12,20 52:3,24 62:19 63:4,23 64:22 81:12 86:11,14 87:19 88:17 92:8,23 114:17,18,23 116:9 117:9 119:22 121:23 123:11 124:3 125:2 127:17 129:11,14 130:12 131:6,15 132:8 133:6,9,16 134:3 146:21 147:13 150:8,22 156:2,4 195:20 201:9 215:2 216:13 220:13 221:23 229:18 230:8 231:19 246:10,12 256:19

**2021** 5:8 36:24 37:4 38:19,25 39:14 58:13,20 61:24 69:14,17 80:7,15 83:10 94:3 96:6 106:9,20 107:3,5 108:23,25 126:16,22 128:21 134:25 143:13 144:20 145:3 146:21 148:19 149:4, 13,18 158:17,22 195:24 201:10 215:7, 9 216:8 231:17 256:20 259:4

**2022** 168:2

**21** 259:4

**21st** 5:8

**24** 145:23

**240** 57:11

**25** 166:3

**26** 51:14

**27** 51:14 53:19 145:3

**27,675,000** 56:19

**28th** 38:25

**29** 51:17,19

**2:02** 5:8

## 3

**3** 23:19,20 51:20 63:4 66:2,15 67:16,24 171:3

**30** 51:18

**30(b)(6)** 8:18 9:19 232:15 233:13,19 234:2,10

**30,746,812.33** 56:24

**31** 25:6 55:13 56:22 58:13,20 61:24 64:22 71:23 81:12 84:10 85:17 88:17 92:7,23 94:4 114:18,23 117:10 118:15,25 120:16 127:17,24,25 128:4 129:11,12,14 130:12 131:6,15,17 132:8 156:4 195:20 215:2 216:13 229:18 230:8

**31st** 65:16,21,23 67:7,9 127:2 195:17

**3:18** 99:2

**3:29** 99:5

**3:40** 112:4

**3:42** 112:7

**3rd** 52:23

## 4

**4** 43:7,9 51:7 115:7 147:8 171:3 186:17

**400** 192:19

**4:16** 146:15

**4:21** 146:18

**4:30** 159:24

**4:34** 160:9

**4:40** 160:12

**4B** 147:11

## 5

**5** 55:10,12 60:18 61:22 63:2,17,22 65:13 80:24 172:4

**5/31/2020** 90:18

**50** 243:7

**5:30** 193:19

**5:35** 193:19

**5:37** 213:17

**5:58** 213:20

## 6

**6** 69:11,14,16 70:20 79:16,20 81:8 88:20 93:16,25 97:6 98:10 100:19 105:15

**6.01** 136:6

**601** 141:6 142:19 143:3 144:17

**63** 243:6

**6:00** 193:12 194:10

**6:36** 248:10

**6:41** 248:13

**6:49** 259:3

**6th** 104:24

## 7

**7** 25:11 51:12 69:14, 17 94:3 96:6 99:12, 13 104:6 106:3 107:8 112:13,16 127:9 134:25 141:21 142:12 144:19 197:12 214:5 250:15, 17 251:3

**7250** 188:11

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 178-21    Filed 07/09/24    Page 43 of 178    PageID 44977

Index: 8..anxious

**8**

**8** 107:2,4,10,17 109:20 172:3

**9**

**9** 12:12 13:3 17:16 18:5 20:19 21:15 24:11 26:9,11,14,15 29:19,22 30:2 35:15 36:19 56:2 112:20,22 113:2,13

**9th** 24:6

**A**

**Aaron** 69:21

**abetting** 237:21

**ability** 35:17 36:10 144:11 156:19

**absolutely** 39:12 101:25 121:3 146:6 222:4

**abstained** 20:4

**accelerate** 72:3 105:23,24 145:7

**accelerated** 65:7 84:14 107:22 109:7 110:19 111:19 196:2

**acceleration** 84:15 108:2,4 109:5

**accent** 7:23

**accept** 45:16 159:16

**acceptable** 44:17

**acceptance** 220:2

**accepting** 157:15

**access** 78:10 253:17,18,23 254:10

**accessible** 254:14

**accidentally** 79:13

**accompanied** 218:21

**accompany** 218:8

**account** 18:22 22:7 27:8 63:13 77:11 110:10,17,19,22 145:2 166:15 200:5 215:9

**accounting** 90:15 115:10 117:22 142:3 153:6 155:23 157:5 211:11 258:8

**accounts** 116:23

**accrual** 57:24 67:22

**accrue** 60:25 61:16

**accrued** 52:2 60:20 66:19,25 67:16,18

**accrues** 67:20

**accruing** 184:4

**accurate** 24:25 44:25 248:2

**ACH** 218:11,20,22 257:22

**Acis** 27:16

**acknowledged** 231:15

**acknowledgment** 220:2

**acted** 61:20

**acting** 136:24

**action** 71:20 97:7 140:7,15 144:25 221:16 243:23 244:10

**actions** 236:15,18,22

**active** 11:17

**activities** 20:14

**acts** 245:6

**actual** 33:25 128:24 220:21 225:5 233:9 234:19 237:14 249:19 253:12 254:24 257:20

**acumen** 26:18 27:5

**ad** 206:4

**ad-hoc** 75:18

**add** 35:5 99:25

**addition** 16:21 35:10

**additional** 100:21 114:13 222:13

**adds** 234:23

**adequate** 154:17 155:5

**Adkins** 176:6

**administering** 11:14,16

**admit** 228:22

**admitting** 231:16

**admonished** 100:2

**advance** 79:23 80:17

**advanced** 90:24

**advancing** 210:3

**advantage** 86:15

**advertise** 85:11

**advice** 137:25 140:16

**advise** 137:15 140:14

**advised** 165:10,15

**advises** 166:22

**advisor** 48:6,15 58:23 161:20 166:16, 20,21

**advisors** 5:7,18 12:16 26:4,8 38:10 49:7,18 59:5 71:3 161:22 194:18

**advisory** 162:24 166:7 205:24

**advocate** 225:20

**affairs** 238:16

**affiliate** 146:2 244:4

**affiliated** 25:20 50:20 114:9 115:24 116:3 117:20 132:22 221:24 222:2

**affiliates** 62:7 114:12

**afield** 21:10

**afternoon** 6:22 160:20,21

**agenda** 75:13 80:16, 23 81:4 83:24

**aggrandizing** 62:8

**aggregate** 58:4

**agree** 29:6,13 86:13 97:5 104:2 114:17, 19,24 122:6,17 123:12 124:22,24 141:6,16 225:14 233:14 237:7 252:7

**agreed** 21:24 38:24 233:22 234:14

**agreement** 17:17 20:22 37:11,16,20 39:2,8 48:21 59:18 110:15,16 112:21,23 113:4,17 114:10,12, 14,19,24 115:15 134:24 135:7,10,13 136:2,20 144:6 147:8 158:21 202:10,11,15, 16,24 204:7 206:6 210:11,16 212:4,15, 17,19,20,24 213:3 232:23,24 235:12 238:24 239:14,16,24 240:8,13 241:4 242:10,17 243:5,14, 18 244:11,15,17,19, 21

**agreements** 38:19 46:5 153:15 234:22 237:6 238:18,21

**ahead** 33:8 128:4 159:13 182:4 186:8 223:23

**aided** 241:7

**aiding** 237:21

**Aigen** 6:3

**aims** 137:4

**air** 240:16,21

**Airlines** 161:7

**allegations** 232:22

**alleged** 235:12

**allegedly** 241:7

**allowed** 60:19,25 68:2 108:14

**alternatives** 105:15

**ambiguity** 88:4

**amended** 112:22 113:3,16 238:7 239:23 240:8 241:3 245:23 246:3

**amendments** 113:21

**amount** 13:20,22 56:18 57:19 64:3 85:8 87:6 88:5,22 89:3,6,7 93:13,20 98:3 110:11 139:23, 25 156:15 159:18 165:23 168:24 172:10,11 190:14 198:17 209:9 215:9 222:20,21 230:8,21 243:7,8

**amounts** 67:13 86:24 110:14 118:19, 21 139:14 158:11 173:12 174:15 178:17 184:8 229:12, 18 230:7

**analysis** 147:12 235:5 243:11

**and/or** 13:11

**annexed** 245:24 247:5

**annual** 65:16 86:16 169:6 182:21 183:20 195:18,22

**annually** 183:23

**ans** 226:22

**answer's** 135:11

**answering** 201:20 233:3 249:6

**answers** 113:10 235:24

**anticipating** 95:2

**anxious** 225:19

Case 21-03005-sgj   Doc 157   Filed 01/20/22   Entered 01/20/22 22:18:05   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 01/09/24   Page 44 of 178   PageID 44978

Index: apologize..breach

**apologize** 9;12,14, 15 20:5 24:15 70:4,5 89:18 93:15 130:7 180:12 193:10 231:11 232:2

**apology** 89:19

**appears** 66:13 107:24 188:22

**applied** 66:24 108:8 110:13 132:6 141:7 200:5 216:19,23 217:19 219:2,11 220:4 227:8,25

**apply** 110:10 224:22

**applying** 32:17

**appointed** 12:8

**Appou** 176:7

**approval** 119:3 188:25

**approve** 118:5

**approved** 19:21,22, 25 20:7,10 21:17 118:22

**approves** 118:20

**approximately** 5:8 7:15 12:10 64:3 186:17

**April** 58:9

**aptly** 50:12

**arbitrary** 196:10

**arbitration** 237:2

**argue** 242:16

**arguing** 245:3

**arise** 240:16,20

**arose** 236:3

**arrangement** 171:12 201:18 202:11 211:4

**ASAP** 150:15

**ascertain** 128:10

**ascribing** 87:17

**asks** 203:5

**aspect** 104:13

**assert** 243:13

**asserting** 233:16

**assertion** 233:14

**asset** 19:2,6,7 30:8 31:10 53:23 71:18 158:14 159:20 192:13

**assets** 18:21 22:12 29:10 49:10 50:13,17 52:20 97:22 140:3 156:20 166:9,11,17 171:13 172:8 174:15 187:23 189:7 190:23 191:4,8 192:3,11,15, 18 246:4

**assist** 116:14

**assistance** 147:16

**assistant** 70:2

**assisted** 133:24

**assisting** 47:15

**associate** 70:3 99:7 112:18

**association** 5:12

**assume** 93:21 202:14

**assumed** 65:3 212:19

**assuming** 43:18 191:24

**assumption** 45:19

**assured** 247:6

**attached** 199:6,10

**attempt** 184:11 218:12

**attend** 193:21

**attention** 108:3 247:25

**attorney** 70:4 102:9

**attorneys** 113:8

**attrition** 133:6

**audio-record** 74:4

**audio-recorded** 83:13

**August** 40:23 41:9 42:10 44:15

**authenticate** 148:16

**authenticity** 113:12

**authority** 14:19 18:2 157:17,23 243:12

**authorized** 71:2 81:7 159:13

**authorizing** 107:12

**automatically** 92:5

**average** 168:8

**avoid** 173:8 179:21 182:13,14

**avoidance** 181:16, 18

**award** 237:2

**awards** 164:22

**aware** 25:19 52:24 62:22 100:22 106:8, 12,19 118:24 119:19 148:25 149:5 159:8, 10 162:8,15 165:4 178:23 195:2 222:5, 9,14 225:2,4

**B**

**BA** 10:15,19

**back** 21:12 22:2 43:24 44:3,5,14 60:9 62:18 63:6 67:6,15, 23 79:15 88:20 91:12,18 99:5 104:8 112:7 115:22 116:7, 12 119:15 137:14 146:18 152:13 160:12,18 170:6 173:6 177:7,8,18 180:15 185:3,7 194:5 199:17 204:18 205:13 211:5 212:6 213:15,20 234:5 248:13,17

**background** 10:11, 14 14:3 21:8 161:2

**backup** 54:20 251:20

**bad** 137:25 139:3 161:11 181:15

**badges** 234:23 237:16

**balance** 28:24 29:8 31:14,17 35:4,7 108:8 216:20,23 219:3 220:5 230:18 236:14

**ballpark** 163:7,13

**bank** 251:20 258:18

**bankruptcies** 161:3, 6 162:11,21 174:6

**bankruptcy** 11:12, 15,23 12:2 13:24 14:9,11 28:4,15,20 31:22 41:21 124:21, 25 126:6 140:24 145:20 156:23 161:14,23 164:12,15 165:5,19 177:9,10 234:23 237:4,12

**bar** 70:10,14

**bargain** 52:15

**base** 155:14 173:11 214:15

**based** 31:14 54:24 62:5 137:25 142:2 169:2,4 220:10,17 238:10

**basic** 45:18

**basically** 22:25 29:14 47:3 55:19 135:22 167:3

**basis** 8:15 59:11 75:19 88:7 116:23 164:4 169:7 210:12 245:8

**bear** 89:16

**bearing** 232:17

**beautiful** 160:16

**befell** 65:9

**beginning** 27:19 52:17 256:19

**begins** 150:7

**begun** 53:24

**behalf** 5:21 122:10 157:17 203:6 216:21 219:25 238:18,22 242:11 243:5

**belied** 188:12

**belief** 120:22 225:3 228:4 247:8

**believed** 47:3 78:16 125:19

**believing** 78:4

**benefit** 15:22

**bidding** 22:25

**bigger** 236:24

**bill** 204:20 205:14 206:13,15

**billing** 210:4,9

**billion** 166:8,18

**bills** 215:25

**bit** 35:24 43:25 49:14 61:12 100:5,6

**board** 18:6,16,20,24 19:15,21,24 20:6 22:12 23:2 71:7 72:8, 20 73:10,15,18 74:6, 9,24 75:7,8,12 79:16 156:21 168:3 188:14

**body** 55:19

**bona** 179:2 180:7 183:2,17 184:3,6,7 225:4

**bonus** 170:16 171:11

**bonuses** 155:14

**bookkeeping** 115:11

**borrowed** 35:11

**borrower** 65:15 66:4,6 145:22,24 146:2

**bought** 233:8

**bouncing** 100:6

**breach** 237:20 240:24 242:16 245:9

**breached** 239:17
241:6

**breaches** 242:20

**breaching** 241:8

**break** 30:4 44:4 95:9
98:23 99:17 100:3,16
112:10 146:8 170:18
193:13,20 196:21
206:25 207:14 213:7

**Brian** 207:23 208:7,8,
11

**bridge** 42:11,13,17
43:2,5 44:7

**briefly** 14:3

**bring** 89:17

**broad** 69:7

**Brothers** 161:8,16

**brought** 247:24

**bunch** 41:15

**burden** 34:6

**burned** 27:17

**business** 8:13 20:15
26:18 27:5 46:18
104:13 141:9 148:4
166:13 185:20,22
187:14 203:24 205:5
208:19 212:21

**businesses** 46:21
50:15 140:22 167:2,8
191:20

**busy** 248:20

**button** 74:14

**buy** 63:17

———

**C**

———

**cabined** 244:16

**cagey** 227:23
228:12,14

**calculate** 93:20

**calculated** 89:2

**calculating** 116:15

**calendar** 65:17 75:4

**call** 38:21 59:21
60:13 72:17 73:16,19
75:6 97:13 105:7
143:6 180:14 224:2,8

**called** 40:18 52:13
98:5 113:16 146:5
187:11 228:14

**calling** 8:14 125:21
224:3 228:11

**calls** 18:23 22:10
234:3 239:5 240:11

**camera** 100:7

**cap** 205:14

**capacity** 136:24

**Capital** 5:6,21,22
12:2,17,18 198:15
200:9 201:14 202:3
203:9,15,20 204:7,
19,23,25 205:5,12,
14,21 206:9,14,17,18
215:17 241:4

**capped** 190:12

**care** 112:17 136:21
144:17 244:19

**career** 11:20 161:9

**Caruso** 83:7 207:23
208:5

**case** 7:18 11:19 12:3
30:6 31:3 33:16
41:12,21 49:10 52:11
71:14 122:5 124:16
163:24 173:20 174:3,
22 175:16 178:24
182:21 185:23 200:2
203:25 204:17,22
210:14 211:17
222:15 230:16
234:18 242:17
255:24

**cases** 11:12 218:14
232:5,18 233:16
235:6,7

**cash** 82:3,6,25 84:6
115:11

**cash-flow** 81:15
92:15,19

**category** 162:2,3

**caused** 43:20 108:2
111:9 198:15 213:3
220:23 242:19

**caution** 155:9,16
223:7

**cautioning** 155:18

**Cayman** 53:23

**CCO** 40:10

**cease** 39:8 130:5

**censure** 155:9

**CEO** 12:9 13:11
14:23,24 16:18 17:8
19:15,20 20:10,20
21:16 49:11 156:24
163:24 164:10,11
166:7,16 167:12,15,
20,24 168:2,7,9
246:18

**CEO/CRO** 59:2 61:4,
20 152:15

**CEOS** 163:2,17,18
165:9,23

**certified** 5:10

**certify** 259:10

**cetera** 206:3

**CFO** 16:25 103:4
123:14 124:8 153:18,
24 154:14,16

**chain** 23:20,25
148:11,16,17 150:3,7

**challenge** 43:23
121:19 154:17

**challenged** 27:6
174:8

**challenges** 191:23

**chance** 72:8 164:20
171:21 172:7

**chances** 64:14,16

**change** 88:23 106:21
145:23

**changed** 21:25
129:7 133:4

**changing** 61:23

**Chapter** 11:15

**character** 137:3

**characteristic** 174:3
182:25 183:17 184:3

**characterization**
48:14 60:12 71:25

**charge** 16:2,3,4,14
206:17

**check** 141:22 142:2,
19 218:9,18 251:2

**checking** 151:14

**chief** 36:20,23 37:3
39:6,9,17,18,21
83:25 140:5

**choice** 181:7

**circulated** 75:13

**circumstances**
136:22 173:21

**city** 8:6 160:16

**claim** 222:13 232:11
241:13 243:3,16

**claimant** 15:6,8,10,
11,22,24 16:4

**claimed** 222:23
226:5 231:21

**claiming** 244:5

**claims** 30:9 31:10
32:24 41:19 190:14
232:21 236:13,17,23
237:20,21 240:24
245:9

**clarification** 6:9
18:12 19:5 37:25
46:20 62:15 76:12
82:5 86:4 87:13
90:19 152:10

**clear** 6:25 12:13 31:9
35:6 45:13 46:5,14
48:2 52:9 53:14
68:11 69:7 78:24
98:21 100:6 103:19,
23 156:12 169:21,23
179:15 181:23 182:2
200:19 212:16
219:19 221:15
224:20 228:19
232:23 238:20

**Chapter** 243:18 244:9

**cleared** 196:8

**client** 33:3 49:17

**CLOS** 19:4,8

**close** 45:16 190:15,
19

**closely** 114:15

**closing** 203:7

**closure** 188:25

**co-counsel** 160:3

**code** 28:15,20
182:16

**Colgate** 10:20

**collect** 52:20 58:19
86:23 87:3,7,24 88:5
97:21 105:25 126:12
193:7

**collected** 87:6

**collecting** 255:7

**collection** 192:9,20

**collections** 193:6

**collective** 73:25

**college** 10:18

**Collins** 207:23
208:8,10,11,12

**colloquially** 186:23
187:11

**colloquy** 108:16,21
143:18

**Columbia** 161:7

**column** 91:15

**combination** 167:2

**comfortable** 24:20

**committee** 41:20,23
42:5,8,18 44:18
45:10,16 47:10,19
48:22 49:6 72:13,16
79:17,21 80:7,10,18,
20

**common** 92:17

**communicate** 36:15
121:7 216:22 220:2

Case 21-03005-sgj   Doc 157   Filed 01/20/22   Entered 01/20/22 22:18:05   Desc Main
Case 3:21-cv-00881-X   Document 78-21   Filed 01/09/23   Page 46 of 178   PageID 44980

Index: communicated..CRO

**communicated** 187:22 200:16

**communication** 149:13 214:20 216:9, 18 217:7,21 218:7,21

**communications** 149:17 200:8 218:14

**companies** 132:22 161:5,13 162:23,24 163:10,12 165:10,16, 24 172:19 173:9,10, 17 174:13,23 175:19 178:24 186:24 187:18 189:5,6 190:7,12 203:2 208:22 221:25 222:2

**company** 135:18 139:3 140:23 161:17, 18 162:13 164:5,7 166:7,23 174:15 182:18 187:4,6,9,12 205:20,21 246:18

**compensated** 203:11

**compensation** 162:9 163:2,13,18,25 164:11 166:6,16 168:17 172:3,21 173:3,14,24 175:11 179:2 184:20,21 185:11,12 203:13,19 204:11

**complaint** 34:9 199:6,10,22,24 238:8

**complete** 26:7 78:9 167:25 237:17

**completely** 57:14 59:9 86:21 144:14 223:9 237:8

**compliance** 147:12, 19

**concede** 225:10 226:4,7,9

**concepts** 28:4

**concern** 21:9 32:20 122:5 124:16 155:25 256:18

**concerned** 155:7 162:17 228:5,24

**concerns** 23:5

**concise** 242:5

**concluded** 31:13

**concludes** 259:3

**conclusion** 57:3 234:3 239:6 240:12

**conclusions** 141:17

**condemning** 181:12

**condition** 184:12 233:22 234:14 236:3

**conditions** 179:25

**conduct** 137:2 213:4

**conducted** 19:3 141:9 148:3 254:16

**conference** 111:3

**confident** 252:15 256:16

**confirm** 24:10 229:6

**confirmation** 71:1 158:9 258:11

**confirmed** 12:3

**confirms** 24:8 210:2

**conflict** 121:24 124:12 125:16

**conflicted** 125:3

**confusing** 33:15 35:25

**connected** 21:5 185:22

**Connecticut** 11:5

**connection** 40:25 170:2 177:9 222:24 231:4

**consequences** 121:9 138:4

**consideration** 53:25 62:13 243:15 244:5

**considered** 105:22 161:16

**constructive** 34:8 232:4,11,16 233:15

**construed** 43:5

**consult** 75:25 104:23 134:23 135:9 160:3

**consulted** 93:19 135:7 246:17

**contained** 145:18 178:9 259:15

**contempt** 36:3 158:12

**contend** 220:22 222:17 231:11 242:25 243:24 244:11 245:7

**contended** 222:6

**contending** 218:25 241:6

**contention** 25:4

**contentions** 24:16

**contested** 223:10

**context** 28:14 29:3,7 90:4

**contingent** 35:5 168:17 184:20 185:11

**continually** 35:10 206:8

**continue** 45:3 168:4

**continues** 26:6

**contract** 114:3 130:8 139:12,17,23 141:9 145:24

**control** 12:17 26:7 125:13 244:3 256:13

**controlled** 61:14 174:18

**controlling** 17:18

**controls** 64:13 121:18 123:4 179:19

**controversy** 139:15

**conversation** 76:11 106:10 252:22

**convey** 46:25

**conveyance** 63:12

64:9 87:12,15

**COO** 40:14 44:21

**copious** 72:25

**copy** 112:16 113:7 207:25

**cornerstone** 186:11, 16 187:3 188:2,6 190:6,22

**corporate** 14:9,14 17:25 18:8 27:13 40:7,13 51:24

**correct** 7:18 12:21 13:5 16:9 17:9,10,13 20:8 25:2,8,12,13 36:22 37:17 38:11 39:19,22 41:5,21 43:6 44:19 45:2 48:6, 7 50:6,21,22,24,25 51:4,5,16 55:21 56:13,20,21,24 63:14 64:19,20 66:8 67:3,4 87:9,20 91:24 96:7 97:4,15 100:13 105:8 111:3 112:16 113:7 116:20,23 117:3 118:8,12 119:14,18 123:16,18,19,22 126:2 127:10,20 128:17 130:10,25 132:7 139:12,13 141:24 142:13 146:6 153:19 158:18,22,23 165:4 167:14 186:12 206:14 208:21 222:3 225:6 227:7 233:17 237:23 240:24,25 241:22 244:13,14 245:9 247:7 259:15

**corrected** 259:15

**corrections** 259:13

**correctly** 136:3 137:5

**Correspondence** 69:16 107:4

**cost** 166:12 167:6 170:13 181:5 209:2, 19,21

**cost-cutting** 132:10

**costs** 192:8,20 209:6

210:3

**counsel** 5:14 16:25 34:19 40:4 42:17,18 43:18 49:5 51:21 75:16 77:3,23 78:8, 21 84:15,23,24 85:7, 16 102:22 105:20 109:24 177:14,15 197:16 198:6 208:13 214:11 233:14 252:22 253:4,15,17, 22 254:10,12

**counsel's** 10:3 214:12 249:6

**count** 191:13,18

**counter-party** 64:13

**counts** 193:6

**couple** 100:23 120:2 133:22 170:22 242:21

**couple/three** 100:24

**courses** 10:17 140:6

**court** 5:11 6:14 17:18 19:22 20:22 21:17 50:9 64:2 99:10 100:2,7 107:21 108:19 112:15 150:15 151:2,3 155:15 158:12 185:6

**courtesy** 69:8

**covenants** 54:7

**covered** 136:11,19 141:8,14

**create** 41:16

**created** 89:25

**crediting** 191:25

**creditor** 41:19

**creditor's** 42:5,7

**creditors** 41:16

**creditors'** 41:20

**creditworthy** 64:13

**crime** 181:19

**CRO** 11:19 12:8 13:11 17:8 19:15,20

Index: CRO/CEO..describing

20:11,20 21:16
154:15 155:9

**CRO/CEO** 114:2

**Cromwell** 177:15

**crumbling** 236:25

**crystalize** 45:22

**crystallized** 45:24

**cube** 167:4 172:12

**cure** 97:9 156:7
157:15 159:17 219:9

**curing** 219:3

**curious** 95:6

**current** 57:5,14
145:16

**cut** 127:6 158:13
238:21

**cutover** 37:7

---

**D**

**D-NNL-007578**
148:12

**D-NNL-007579**
148:12

**D-NNL-028514**
150:4

**D-NNL-028515**
150:4

**D-NNL-029141**
99:14

**damages** 242:19

**Dandeneau** 102:11

**dangerous** 20:17

**darn** 224:15

**data** 47:18 253:19
254:23 256:7

**date** 8:22 9:22 16:12
17:5 23:13,22 32:3
36:25 37:18 38:6
43:11 55:14 67:22
69:18 71:16 84:12
85:8 96:9 97:25
99:15 107:6 112:24
129:21 148:13 150:5,

12 151:8

**dated** 55:13 69:17
107:5 197:11 214:4
259:17

**dates** 26:13 30:14
35:24 37:6 39:4 75:6
120:4,7,9 235:25
236:9

**Daugherty** 176:5

**Dave** 83:3 207:24

**David** 16:25

**Davor** 5:16 32:19
78:24 248:23

**day** 65:16,23 67:7,9
81:17,19 107:21
111:2 220:20 259:17

**days** 38:4,5 80:12
100:23,24 103:10
108:17 120:2,3
187:21 229:5

**deal** 86:20 158:13,25
159:8,11,14

**dealing** 144:18
162:18

**debate** 34:12

**Deborah** 6:2 102:4
183:10 193:8 213:6

**Debra** 102:11

**debt** 104:18

**debtor** 12:6,19
14:13,15,16,19 15:9,
13,16,21 16:2,4,18,
20 17:4,9,19 20:23
21:18,25 24:18,19,
22,23 25:11 30:13,15
31:13 32:2,6,16
34:15,21 35:6,10,11
36:21,24 37:4,12,15
38:24 39:18,25 41:18
48:5,22 50:3,13,18
52:20 53:20 54:11
59:3 60:2,19,22 61:4,
19 62:10 63:15 68:23
71:22 80:17,23 85:2,
19 86:11,24 87:18
88:10,16 89:23 93:19
96:20 97:7,11 106:4
109:23 110:2,8 113:5

114:4,6,7,11 115:6,
22 116:17,21 117:9,
17,23,25 120:14
121:16 123:14 124:3,
8 132:9,20 133:16
134:7,19 135:16,23
136:13 139:17
142:11 146:22
147:13,23 152:14,15,
22 153:10,12,13
155:17 157:18,24
158:15 221:25
246:12 250:4,22,25

**debtor's** 16:12 24:16
25:4 29:20 30:16,24
35:17 48:19 49:10
50:2 51:21 77:2,14,
15 86:14 117:22
125:17 139:10
156:20 245:23 246:3

**debtors** 247:4
252:10

**debts** 28:23 29:15
31:20

**decelerate** 111:20

**December** 25:6 26:5
37:23 39:14,16,25
40:2 46:7,8 49:16,19
51:11,18,20 52:3,18,
23 62:18,19 63:4,23
64:22 65:17,21,23
67:8,9 71:23 81:12
84:10 85:17 86:11,13
87:19 88:17 92:7,23
93:11 94:4 104:9
114:17,18,21,23
116:9 117:8,10
118:15,25 119:22
120:16 121:22
123:11 124:3 125:2
127:3,17,24,25 128:4
129:3,12,14 130:12
131:6,15,17 132:8
133:16 134:2 146:20
147:13 150:8,21
156:4 195:20 201:9
215:2 216:13 220:12
221:8,16,18,22
229:17 230:8

**December/january**
237:10,11

**decide** 52:6

**decision** 25:14,19
52:21 97:12,16
140:16,17 143:5
160:5

**decisions** 157:2

**declaration** 43:9,13,
20 51:7 62:21 247:3

**declare** 80:24

**deduced** 130:4

**deduction** 54:24
152:4,9

**default** 64:17,23 65:6
72:9 97:9 156:8
219:4 220:3

**defense** 142:12,20

**defenses** 86:22
98:6,11

**defer** 248:23

**deferred** 173:11

**define** 157:10

**defined** 66:6

**definition** 28:19
29:8,11,14,16 34:19
136:11 141:14

**definitional** 42:25

**definitions** 28:8
32:17 34:20 135:15

**definitively** 132:5

**degree** 10:16 25:21
26:19 47:21 48:11,13
114:10 138:19 197:9

**Deitsch-perez** 5:25
6:2 70:13,16 160:19,
23 170:5 172:16
183:11,14 185:6,24
186:5,9 193:9,25
194:8,12,15 197:21
205:8 206:21 207:2,
6,10,13,17 213:9,13,
21 223:17,22,25
224:17 232:8,13
233:10 234:4,25
244:7 248:3,14
252:19,25 257:17
258:5,10,23,25

**Deitsch-perez's**

102:4

**Delaware** 123:21,23
240:4

**delegation** 17:25

**demand** 50:24 51:15
52:3,6,7,12,21 53:18
56:12 58:12,17
59:13,20 60:14,15
61:23 62:20,21 69:6
84:16 85:9,10 98:2
108:4,9 110:12
135:10 145:9 151:15
156:13 177:9 182:23
183:18,21 197:12
199:14 200:21,25
201:7 208:22 219:19
221:19

**demanded** 52:10
59:14 60:8 215:10

**demanding** 51:24
209:11

**demands** 54:10
59:17 200:17

**depend** 164:22 168:3
170:13

**depended** 63:7
204:22

**depending** 29:7
246:13

**depends** 29:3 30:25
72:23 162:12 164:5,6
166:9,11,12 170:14
192:8

**deposed** 7:13
100:23

**deposition** 5:4
101:3,24 103:10
106:13,17 148:22,24
149:11 196:14 235:3,
9 259:4,12

**Deposition/30(b)(6)**
9:21

**Deposition/seery**
8:21

**describe** 166:15

**describing** 44:10
160:25

**designated** 9:4 10:5 240:23

**detail** 10:12 25:10 147:10

**determination** 105:4

**determine** 30:8 41:17 176:14 177:4,19,22 204:3 230:6

**determined** 78:19,20,25 176:15

**detrimental** 140:7

**developed** 45:24 236:23

**developments** 75:19

**DI** 197:19

**dictate** 170:15

**differ** 54:17

**differently** 85:20

**difficult** 22:17 53:24 104:2

**diligence** 136:22

**direct** 126:12 197:19

**directed** 95:5,24 96:19,24 103:24 126:11 198:7

**directing** 198:11 223:24

**direction** 18:23 20:14 22:9 36:2 117:24 120:20,21 121:19,20 125:12,15 126:10 138:17

**directions** 36:4 204:14

**directly** 16:6 47:13

**director** 11:19 12:7,11,14,15 13:15,18 26:10 29:19

**directors** 12:21 13:2,8,21 76:14 123:8

**directs** 125:13

**disagree** 117:11 226:10

**disagreed** 226:8

**disagreement** 117:15,16 225:12

**disapprove** 118:6

**discharge** 136:19

**disciplinary** 11:10

**discipline** 155:9

**Disclaimers** 246:3

**discount** 87:9

**discounted** 63:25

**discovery** 75:23 76:17 77:19 78:16 217:12 218:13 254:17 255:8

**discretionary** 68:3,5,20

**discuss** 71:5 72:12 81:8 102:16,22 149:8

**discussed** 32:18 71:21 73:11,12 85:5,6 98:16 111:6 143:12 220:19

**discussing** 51:14 74:25 84:17,25

**discussion** 8:19 23:23 43:12 55:15 69:19 71:10 72:7 79:19 84:7,23 92:17,20 106:24 107:7 112:2,8 120:8 127:6 143:15 146:13 148:8 156:11 160:13 194:7 229:14 231:21 243:11

**discussions** 47:10,23 48:3,12 72:20 74:5 83:18 92:15 93:7 105:20 227:3

**dishonest** 27:3

**dislike** 153:21

**dispute** 120:9 221:23 224:20 225:2,5,11,22 226:11 243:20

**disruption** 183:5

**dissuade** 139:4

**distinguish** 76:5

**distressed** 14:8

**divide** 41:17

**docket** 43:17 247:14

**document** 8:25 58:10 70:21 71:2,6 89:22,25 99:7,13 113:25 136:8 141:19 206:22 245:17 246:5 247:17 254:2,6 255:22 256:2

**documents** 83:23 231:3 256:12,17 257:21

**dollar** 178:17

**dollars** 86:22 139:16,20 140:25 154:24 168:15 169:13 222:7

**domination** 26:7

**Dondero** 6:5 17:12,17 21:23 22:18 23:9 24:6 25:21 26:11 27:22 35:16 36:10 40:17 41:4 42:3,17 44:16 45:10,14 46:17 47:11,15 48:3 49:5,13 50:19,21 51:23 52:11 53:20,25 58:10 60:3 62:8 64:10 95:5,24 96:18 97:2 99:19 100:13 101:19 102:18 103:6,12,23 104:3 105:12 106:10 107:23 108:18 109:9 111:3,9 118:11 119:17 120:8,13,20,23 121:8 122:7,11,19,23 123:3,10 126:17 127:16 128:3,14 129:16,24 131:2,9,18 134:3 137:15 138:19 140:8,20 143:12,22,25 145:21 149:12 152:16,20 154:19 158:2 159:5,9 176:17 181:7 182:18 184:19 185:10 187:16,22 197:11

**Dondero's** 20:14,22 21:18 26:4,12 27:2 47:4 108:11 127:6 134:20 138:14 140:9 154:9 184:10 204:14

**Donohue** 83:5

**doublecheck** 142:8

**doubt** 72:14

**dozens** 19:10

**draft** 84:15

**Draper** 6:11

**drew** 49:8,13

**DS** 84:24

**DSI** 48:9,11 49:4 83:5,9 84:25 85:7 89:4 90:7,9 93:16,18 208:6 254:20 255:12,14,17 256:8

**dual** 121:25

**Dubel** 12:24 14:5,6 76:13

**due** 25:5,12,15 28:24 29:15 31:20 33:2 52:2,12 60:8 80:25 86:24 88:22 92:10 93:13 95:8 97:14,25 98:4,17 104:18 105:23 116:11 129:2 130:6 142:4,6 146:5 156:15 159:19 183:22 195:10 214:25 216:20,23 229:13,18 230:9,10,22 231:19 256:18

**Dugaboy** 6:12 237:21 238:12,14,20 241:6 242:25 243:2,4,25 244:12 245:7

**duly** 6:17

**duplicative** 78:25

**200:**19 201:22 202:13 203:5 205:6 214:5 220:24 221:24 222:5,9,17 225:15 226:5 237:22 238:13 241:7 242:25 243:3,4 244:12

**duties** 123:22 124:2 125:4,20 126:5 135:23,24 136:20 146:22 147:5 155:17 237:25 238:10,25 239:11,17,18,22 240:4,6,16 241:5 242:14,16

**duty** 97:24 124:20,25 137:14,23 140:5,8 181:18,20 237:20 240:24 245:9

**Duval** 14:2

**E**

**earlier** 32:21 52:11 69:22 149:10 198:25 200:13 202:17 218:25 220:20 231:25

**early** 30:6 31:3 45:5 62:19 63:23 64:15 83:10 86:11 119:21 129:3 187:21

**easily** 82:16 139:25 258:9

**easy** 54:6 236:10

**economic** 15:20 86:15

**edict** 104:4 108:2 129:24 130:21,22 131:9,18,21,22 132:4,5 134:20 137:16,24 143:16,23 144:2 220:19 226:17 227:25 228:4,24,25

**edicts** 123:6

**educated** 54:24 189:15

**educational** 10:13

**effect** 103:7 128:24 129:4,5 156:6

**effective** 12:4,5 13:4 14:12 16:12 17:5 104:11 115:4 203:13,18

**effectively** 13:16

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 78-21    Filed 01/20/22    Page 49 of 178    PageID 44983
Document 172-21    Page 49 of 305

Index: effectuated..fail

15:23 38:7 176:24

**effectuated** 114:4

**efficiency** 181:17

**efficient** 180:17,22 181:8,9,10 182:11

**elaborate** 27:7

**electronic** 70:24 107:13

**electronically** 254:12

**element** 33:5

**Ellington** 40:3 154:25

**Ellison** 133:20

**email** 10:4 23:20,25 77:11 78:10 99:23 100:12 108:20 118:24 119:5,7 148:11,15,17 149:7, 22,23 150:3,7 196:13,17,19 207:23 208:25 251:6 254:3,4

**emailed** 99:10 247:19

**emails** 7:5 77:18 79:2 118:17 253:3,6 257:3

**embodied** 114:10

**employ** 179:14

**employed** 17:4 176:22

**employee** 18:3 158:14,17 176:16 179:11 203:5

**employees** 22:18,24 35:18 36:3 85:19 88:16 93:19 120:13 121:16,23,25 132:10 134:7,18 139:10 145:25 154:18 155:16 173:22 175:11 186:22 201:23 202:12 204:13 206:10,13 215:21,24 231:23

**encourage** 256:25

**end** 39:11 63:10 102:6 146:11 163:25 216:25 231:19 256:19

**ended** 164:25

**enforce** 61:4

**enforcement** 59:3

**enforcing** 60:23 104:18

**engagements** 162:8 174:9

**ensure** 88:11 116:9

**entered** 235:14 243:4

**entering** 244:10

**enterprise** 137:3

**enters** 242:10

**entire** 11:20 98:3

**entities** 27:14 50:20 95:5 103:22 114:9 121:18 123:4,9 124:18 201:22 203:3 204:15 208:20 217:19 239:18

**entitled** 33:5 197:12

**entity** 12:13 14:15 115:24 116:4 117:20 146:2 205:21 243:15

**entity's** 48:8

**entries** 203:4

**entry** 91:7

**equity** 186:16

**errands** 194:4

**estate** 8:8 50:16 65:9 71:18 97:21,22 105:7 124:21,25 126:6 172:9

**estates** 11:15

**et al** 5:7

**evasion** 181:19

**eve** 234:22

**event** 70:5 76:24 108:24 209:25

**eventually** 173:23 178:21

**Everland** 176:7

**evidence** 33:17 54:18 185:18 222:15

**evident** 82:2

**exact** 36:25 37:6 38:6 71:16 96:9 104:9 129:20 222:21 228:18

**examination** 6:20 101:12,15,17 160:22 249:3 252:24 257:19

**examined** 6:19

**examples** 27:20

**exceed** 29:9 189:7 190:23 191:5

**exceeded** 31:10 190:13 230:8,20

**Excel** 92:3 254:2,3

**excess** 229:18

**exchange** 115:25

**exclude** 105:19 210:8

**excluding** 109:23 152:12,13

**excruciating** 10:12

**excuse** 194:3

**executed** 53:11 55:3 58:10 145:2 246:13, 14

**execution** 54:15

**executive** 39:18 49:24 83:25 123:17 140:5 162:9 172:21 173:19 174:18 176:21

**executives** 162:10 172:20 173:4,17,22 174:17,24

**exercise** 229:24

**exercised** 37:15

**exhibit** 8:18,20,24 9:18,20,23 23:20

43:9 55:10,12,18 60:18 61:22 63:2,17, 22 65:12 69:14,16 70:20 79:16,20 80:24 81:8 88:20 89:14,17 93:16,25 97:6 98:10 99:12,13 100:19 107:2,4,10,17 109:20 112:11,13,15,20,22 113:2,13 148:10,11 150:2,3 196:7,8,12 197:2,10 200:7 206:23 207:18 208:2, 23 209:25 213:23 214:10,20 245:16 250:15,17 251:3,6

**exhibits** 196:9,11,21 249:15

**exist** 123:2

**existed** 152:14 178:7

**existence** 41:18 62:23

**existing** 22:17

**exists** 173:16,25 237:7 239:14 243:18

**expect** 87:7 126:4 138:2,17,21 148:16 168:7,14 169:12 193:7 198:19

**expectation** 167:18, 23 168:13

**expected** 23:2 93:14 123:25 154:3 157:16

**expenses** 191:5

**experience** 11:14 54:25 163:24 172:18 173:5 175:14 176:2 179:10,21 183:16

**experienced** 14:8

**expert** 11:23 77:14

**explain** 235:8

**explanation** 119:6

**explore** 33:6

**exposed** 144:14

**exposure** 236:12

**express** 32:20

**expressed** 155:24 188:9,13

**expression** 155:25

**expressly** 136:18 157:13

**extend** 38:24 59:18 60:7

**extended** 54:2,3 58:12 131:23

**extension** 152:22

**extensions** 37:19 39:3

**extent** 224:12 234:3 237:9

**extremely** 64:16 189:11 190:10,11

**F**

**FA** 166:20

**fabricate** 222:13 224:8

**fabricated** 222:10 237:8 243:19

**face** 234:20

**faced** 11:9

**facilitate** 42:11,14 44:11,22 45:9 47:12 48:21 52:15 117:9

**facilitated** 215:13

**facilitating** 85:20

**facing** 60:2

**fact** 54:19 59:15 69:4 85:2 89:13 92:16 159:13 163:21 185:20 189:4 205:4 206:16 219:13 222:11 241:13,23

**facts** 228:19 241:11, 12

**factual** 225:21

**factually** 127:21

**fail** 88:10

**failed** 25:4 82:19 126:25 130:13 158:10

**failure** 28:23 57:17 144:7

**fair** 7:8,12 15:19,25 17:20 18:4,7 19:13 31:12 42:2,6,9,19 45:24 48:10,14 49:2 58:25 60:10,17 67:23 71:25 73:4 78:6 86:19 103:9,14 126:14 131:4,12 151:19 168:25

**fairly** 168:25

**fall** 161:25 162:2 237:13

**false** 237:8

**familiar** 9:3 24:4 28:3,7 58:9 135:6 136:25 214:3

**fashion** 153:8

**fast** 7:23

**February** 38:18,25

**feel** 22:23

**fees** 144:15 167:5 172:13 209:2,3,4 222:3,8 223:4 225:6, 24

**fellow** 13:21 193:2

**felt** 20:12,16 46:12 105:6

**fide** 179:2 180:7 183:2,17 184:3,6,7

**fides** 225:4

**fiduciary** 97:19,20 105:6 123:21 124:2, 20,25 125:20 146:22 147:5 237:20,25 238:25 239:17 240:24 242:14 245:9

**fifteen** 7:20 245:6

**figure** 93:16 117:18

**file** 92:3

**filed** 43:18,21 50:3 51:10,11 53:22 113:7

246:10

**files** 237:3 253:3,14, 17 254:2

**filing** 32:8,16 188:11 245:23 246:13 247:5, 6,10

**filings** 246:12,17

**final** 123:9

**finance** 115:10

**finances** 43:3

**financial** 36:21,23 37:3 39:6,9,22 48:5, 15 49:7,9 161:13,17, 20,22 162:23,24 166:7,16,19,21 256:7

**find** 75:5 77:7 80:11 81:11 87:23 136:12 188:21 198:12 218:14 238:3 254:21, 23

**finding** 36:4

**fine** 79:4 207:3 223:13

**fingertips** 165:23

**finish** 191:16,17 193:15 207:8 233:6 244:25

**finished** 210:23 214:16

**firm** 166:17,20 254:19 255:17 256:5

**fishing** 257:5

**fix** 72:9

**flip** 115:8 136:5

**float** 40:17

**flow** 82:3,7,25 84:6

**folks** 74:2 244:23

**follow** 134:20 252:20

**follow-up** 198:20

**foregoing** 259:11

**forgivable** 175:10 176:9 178:25 179:12, 16,24

**forgiven** 173:23 175:2,8 176:10,18 177:23 178:21 179:7 180:7 183:19,20

**forgiveness** 174:7 178:10 179:4 184:13 233:22 234:14 235:13 236:3

**forgot** 89:17

**form** 17:23 19:17 20:3,25 21:21 25:23 26:12,17,20,25 27:4, 13 28:18 29:20 30:7, 11,16,19,23 31:4,6, 16,20,24 34:24 35:21 40:21 48:25 55:6,23 57:8,22 59:7 61:10 62:2 63:19,24 64:25 66:12 67:11 82:14 84:4 86:6,18 87:22 90:12 91:5 93:4 94:21 95:17 96:17 105:10,18 111:12 113:23 115:18,24 117:13 120:18 121:2, 12 122:14 124:14 125:10 126:8,20 134:10 137:19 138:8 139:7 140:11 142:15 144:22 145:14 146:24 154:7 155:12 157:21 163:20 164:3 165:14 168:11,22 169:11 171:18 172:6, 24 175:4 176:12 178:12 179:9 180:4, 10 181:2 183:4,25 184:16,25 185:17 186:14 188:4,19 189:10,14 191:2,10 192:6,23 195:13 197:15 199:8,12 200:15 201:16 202:6, 22 203:17 204:11 205:18 209:16 210:6 216:3,15 217:4,16,25 218:16 219:6 220:15 221:2,11 225:9 226:14,22 228:9 230:3 232:20 235:19 236:7 238:6 239:3 240:2,11,18 241:19 242:2 245:8,11

**formal** 202:16 212:20

**format** 254:4,5

**formed** 27:21

**fortune** 65:9

**forward** 52:18

**found** 77:6,22 158:11

**founded** 164:7

**founder** 121:17 163:17,24 175:14 178:4 179:18

**fourth** 239:23 240:8 241:3

**frame** 13:7 57:20 80:8 201:10

**framework** 190:8

**Frank** 36:20 83:3 96:23,24 108:17 153:5 159:8 207:24

**fraud** 232:4,16 233:9, 15 234:19,24 237:14, 16

**fraudulent** 33:4 34:2,8 63:11 64:9 87:11,14 232:12

**Fred** 83:7 207:23 208:5

**free** 113:2 201:21

**front** 7:2,10 179:16

**fulfilling** 216:24

**full** 85:8 87:7 88:5 131:22 156:14 159:18 215:9 245:2 253:18,19

**fully** 147:20 251:21

**fund** 206:2

**funds** 49:25 116:10 117:2 144:11

**furtherance** 97:23

**futile** 45:13

**future** 133:13 179:25 184:22 185:13

## G

**gap** 42:12

**Garcia** 5:9

**Gas** 161:7

**gave** 9:11 59:18 122:7 155:13 235:23 242:4 243:6 251:19

**general** 15:15 16:24 19:12 40:4 58:8 163:16 166:2 238:19 239:12 241:15 242:12,13 244:4

**generally** 44:25 54:4 58:9 64:12 72:21 122:4 162:8,14,25 178:24 204:17,22 208:4 215:24 216:11 241:3 247:2

**gist** 19:12 211:2

**give** 11:13 18:18 23:11 69:9 115:20 138:16 156:5 163:12 247:16

**giving** 72:8 213:8

**Global** 161:24 245:25

**Gmail** 77:11

**go-betweens** 154:19

**good** 6:22 11:24 65:10 73:25 155:6 160:19,21 166:4 177:15 224:11,15 242:5

**gosh** 107:25

**governed** 143:10

**governs** 143:9

**GP** 12:16 14:17 15:18 16:20

**grace** 69:6

**graduate** 10:24

**grand** 52:15

**great** 27:9

Index: group..incorrect

**group** 74:20,22 90:15 133:17,22 142:3 155:20,22

**guess** 13:17 40:22 161:24

**guy** 227:23

**guys** 256:25

---

**H**

**H-O-R-N** 6:10

**half** 40:16,22 50:18 203:25 255:18,21 256:10

**hand** 69:12 82:9,11 182:6

**handed** 8:23 112:25

**hands-on** 48:15

**handwritten** 75:25 76:18 77:3

**hang** 196:5

**happen** 47:5 59:17 71:11 75:20 87:2 121:9

**happened** 14:12,15 17:15 58:15 63:7 65:8 143:7 152:4 153:9 183:7 228:6,19

**happening** 153:10

**happenstance** 228:5

**hard** 154:21 155:3 191:12

**hat** 122:24 123:3

**hats** 123:3,11,12

**HC** 231:12

**HCM** 203:21 209:8, 12,13 210:3,4,10,16, 17 212:5,7 215:11, 18,24 216:4,7,8 217:13 232:15 233:16,20 234:11 239:23

**HCM's** 233:13

**HCMA** 33:16

**HCMFA** 58:8,11,21 59:16 61:23 62:4 144:10

**HCMLP** 23:21 36:7,9 58:19 62:10 85:13 97:20 118:23 123:5,7 126:11 176:23 208:13,22 209:11,13 210:2,9,10 238:24 240:7

**HCMLP's** 90:15

**HCMS** 6:6 194:22 195:4,10,19 199:19 200:20 216:22 217:14 219:15 220:12 231:12

**HCR** 214:5

**HCRE** 6:5 194:22 195:7,11,19 214:6, 21,25 215:12,20,25 216:6,8,22 217:14 218:23 219:14,25 220:11 231:10,13,14, 22

**HCRE's** 215:18

**head** 64:4 162:6 208:12

**heading** 116:13 158:8 245:21

**headings** 68:13,19 91:13

**hear** 84:22 183:12 228:25

**heard** 41:3 72:24 96:23 101:23 103:11, 15 131:7,16,20 138:18 186:10 187:7, 16 210:18 228:16,21

**hearing** 38:20,22 107:22 150:16 151:2, 4,18

**heart** 120:20

**heat** 137:25

**held** 113:9

**Heller** 6:11

**helping** 116:9 132:22

**helps** 237:15

**Hendrix** 83:3 96:22 97:3 99:18 103:2,13, 16 118:18,25 126:17 131:7 133:19 134:3 137:14 139:11 148:19 149:2,16 150:8,10 201:3 211:14,23 220:22 226:16,25

**hereof** 67:2

**hereon** 66:25

**hesitate** 7:24 8:2

**hey** 143:7 213:6

**hidden** 212:23

**high** 64:17 163:25 166:25 187:24 188:8, 9 215:11

**high-level** 173:22

**higher** 163:17

**Highgate** 208:16

**Highland** 5:5,21 8:13 12:2,9,16,18 13:14 41:21 102:23 104:10, 19 121:21,23 122:10, 12 140:3 144:13 154:14,18 161:19,20 166:24,25 167:7,12, 20,24 168:8,9 172:10 176:15 186:10,15,17, 19,22 187:23 189:7 190:23 192:4 195:4,6 198:15 200:8 201:13, 23 202:2,12 203:9, 11,14,15,20 204:5,7, 13,18,19,23,25 205:3,4,12,14,21 206:9,13,17 208:20 215:16 222:3,7 223:5 233:20,23 234:11,15 236:4,11,12,23 237:3,19 238:18,22 241:4 244:2

**Highland's** 189:5 235:10,16

**highlights** 161:10

**hired** 133:9

**hired-off-the-street** 163:18

**historical** 250:6

**history** 10:15,19 229:16

**hoc** 206:5

**hold** 15:14

**holder** 58:19 68:25 72:5

**holding** 27:11

**holds** 15:12,17

**honest** 74:2 228:14

**honestly** 228:4

**honesty** 26:12 27:2

**honored** 22:10

**hope** 46:6,9 167:25 168:6 169:5 189:3 191:25 192:12,18 193:3,4,5

**hopes** 187:24 188:8, 9

**hoping** 64:22 65:2 172:2

**Horn** 6:7,10,11 248:20,22

**hour** 193:17

**house** 203:7,8

**HR** 208:12

**humorous** 175:13

**hundred** 205:7

**hundreds** 11:21 140:24 161:3

**Hurley** 176:5

**hustle** 150:14

**hypothetical** 133:25

**hypothetically** 92:25 157:14

---

**I**

**i.e.** 133:13 144:18

**ice** 167:4 172:12

**idea** 41:14 89:25 158:13 193:14 225:16 228:11 237:5 248:8

**identification** 8:22 9:22 23:21 43:11 55:14 69:18 99:15 107:6 112:24 148:13 150:5

**illegal** 179:22

**imagine** 74:17

**immediately** 25:12, 15 80:25 97:14 104:6 107:25 144:6 146:5

**implication** 69:8 131:22 169:24

**implications** 245:2

**imply** 70:14

**implying** 158:24

**impossible** 190:11

**impression** 108:23 181:6

**improper** 145:12

**inability** 31:19

**inaccuracies** 247:14

**inappropriate** 62:5, 16 151:23

**inappropriately** 61:21

**inaudible** 6:8

**incident** 223:18

**include** 102:4 119:13 125:14 227:16

**included** 50:19 116:8 222:12

**includes** 136:12

**including** 97:22 101:18 120:14 139:10 154:23 236:18,19

**incorrect** 73:2 140:15

**increase** 187:25

**increased** 57:19

**incurred** 237:9

**independent** 11:19 12:7,11,14,15,21 13:2,7,15,17 18:6,15, 20,24 19:15,21,23 23:2 26:10 29:19 71:7 123:8

**independently** 22:14

**indirect** 204:10

**indirectly** 186:18

**individuals** 20:18 48:21

**industries** 165:24

**industry** 61:6,11

**inferiors** 125:14

**inflows** 64:14

**inform** 121:8

**information** 7:5 49:9,14 94:17 217:23

**informed** 10:8 125:23,24,25 129:16

**initial** 37:21 56:18 57:18

**initialed** 259:14

**initially** 21:23

**initiating** 156:14

**ink** 259:14

**input** 214:13

**inquire** 130:17 142:10 152:24

**inquired** 152:21 212:25

**inquiry** 186:22 187:10,13 210:20 211:3,10,15 231:4

**insight** 188:15

**insignificant** 139:15

**insolvency** 28:5,24 29:8,12 32:18 33:5,6

**234:20 237:13**

**insolvent** 31:14 32:2,6,7,16 34:16,21 236:12

**installment** 65:16

**instance** 116:4 118:9 210:9

**instances** 243:9

**instruct** 35:17 36:10 88:9

**instructed** 103:12 128:3 134:4 252:11

**instruction** 51:21 119:21 120:13 122:8, 10,19 126:18 127:16 128:14 129:16 139:2, 4

**instructions** 85:18 88:15 106:3 134:7 138:21,22 156:5

**insulting** 228:12

**intend** 7:11 168:19

**intended** 50:11,13

**intentionally** 78:11, 15 79:9,13

**intercompany** 174:16

**interest** 15:17 24:24 52:2 54:5 56:23 57:4, 17 60:20 66:19,25 67:13,17,19,20 87:2, 4 90:25 121:24 124:12 182:22 183:7, 20 189:5 224:19 230:9,10,22

**interesting** 111:22

**interests** 62:9 186:11,16,18,19

**interjection** 21:14 29:4 94:19 121:14 125:7 135:5 138:11 169:9 171:8 190:18

**Internal** 182:16

**interpretation** 228:20

**interrogatories** 257:3

**interrupting** 193:11

**introduce** 5:14

**inures** 15:21

**invent** 41:11

**invested** 174:4

**investigate** 176:3 223:3

**investigated** 175:18 203:12,19

**investigation** 174:21 175:25 204:4 243:10

**investigations** 205:12

**Investment** 6:12

**investor** 11:18

**investors** 166:22 169:3

**involve** 105:12

**involved** 11:17 27:16 47:13,14,21,22 48:3 89:18 147:21 161:3, 6,14,22 162:22 165:18 174:4 175:6 178:19 215:17 255:18

**involvement** 132:21

**irrelevant** 233:24 234:16,17

**irrespective** 129:2

**ISI** 255:17

**Islands** 53:23

**issuance** 178:19

**issue** 32:24 34:5 36:10,12,13 65:25 85:18 88:15 106:3 139:2 143:25 144:9 162:18 173:19 174:7, 12 175:15 178:15 195:2 232:4 233:15 235:2 251:19

**issued** 58:11 71:3

**134:6 137:24 143:22 145:2**

**issues** 21:6 233:24 234:16

**item** 174:20 209:8

**items** 76:8

**iteration** 113:19

## J

**Jack** 83:5 176:5

**James** 5:4,23 6:5,24 17:12 149:12 159:9 259:23

**January** 12:12 13:3 17:16 18:5 20:19 21:15 25:10 26:9,14, 15 29:19,22 30:2 36:24 37:4 69:14,17 80:7,15 83:10 94:3 96:6 104:6,24 105:15 106:3,9,20 107:3,5 108:22,24 109:16 111:2 113:17 126:15, 22 127:9 128:21 129:11 134:25 141:21 142:12 143:12,13 144:19 145:3 146:21 148:19 149:3,13,18 150:21 158:17,22 195:24 197:12 199:18 214:5 215:6,8 216:8 221:9, 18 231:17

**January/february** 201:10

**JD** 10:16,22,25

**Jean** 176:6

**Jefferies** 22:11

**Jernigan's** 155:24

**Jim** 205:6 237:22 241:7 243:3

**job** 97:20

**John** 5:19 12:24 33:3 76:11,13 186:5 234:25 247:20 255:4

**Jones** 5:21

**JP** 207:24 208:8

**Jr** 5:5,24 6:24 259:23

**judge** 13:24 155:24 186:7

**judges** 182:9

**judgments** 27:25

**July** 13:12,13 17:7 19:19,20 20:20 21:15 22:23 156:2

**junior** 133:23

**jury** 38:15 181:22 182:3

**justified** 188:23

## K

**key** 22:24 48:20

**kind** 69:7 73:15 76:24 90:4,8,9 103:25 112:10 161:18 162:15 209:3 243:20

**kinds** 163:9

**Klos** 16:25 17:3 83:4 84:20 103:2,3,15 126:16 133:19 137:13 139:11 153:17 154:6 201:4 207:24 211:13,20,23 226:25

**knew** 52:18 84:13 89:9 94:5 95:22,23 129:5,21,23 132:3 145:9 206:10

**knowing** 134:12

**knowledge** 47:13 54:15 103:5 106:14 110:25 111:5 113:18 220:11,17 247:7 250:4,10,15 253:2

**Kristin** 83:3 96:22

## L

**Label** 5:3

**Labraya** 176:6

**lack** 95:12,14 244:18, 19,20

**laid** 132:9

**Landoseri** 176:7

**language** 180:24

**laptop** 7:2

**large** 124:8 237:2

**largely** 132:25 133:2, 18 140:2

**larger** 155:19,22 162:22

**late** 27:24 37:22 84:14

**latest** 113:19

**law** 10:16,23,25 11:23 34:12 108:7 123:21 239:8 240:4 241:2

**Lawlor** 176:5

**Lawrence** 69:21 70:6,7,9,15

**lawsuit** 24:17,24 32:25 75:24 77:20 177:12

**lawsuits** 21:6 53:22

**lawyer** 11:4,7,10,18 41:13 255:15

**lawyers** 49:3 152:12 255:16

**lax** 59:3,21,23 60:13, 16

**lead** 13:17

**leader** 20:13

**learn** 96:11,15 128:7 178:6

**learned** 18:10,14 84:9 86:10 92:22 95:12,13,22 96:10,12 100:19 107:25 118:10 127:16,21 128:2,22,23 129:21 130:21 134:8 156:3 182:6 221:16,17

**lease** 192:14

**leash** 35:12

**leaving** 52:14

**led** 110:21

**ledger** 231:5,7 249:8, 11,13,17 250:5

**left** 140:24 144:13 176:25

**legal** 5:10 102:21 109:23 141:17 147:12,14 155:23 157:6 234:3 239:5 240:11

**legitimate** 50:15 173:9 182:10 225:12

**Lehman** 161:8,16 164:11

**lender** 55:2,8

**lengthy** 101:6

**letter** 69:15 72:12 73:12 81:7,9 93:24 94:15 97:6 104:24 105:15 106:2 107:3 127:9 134:25 135:11 141:22 142:13 145:3 156:13 197:4,7,11 198:14,20,24 199:9 200:6,11 214:4,7 218:24

**letters** 51:22 219:14

**letting** 61:15

**level** 73:20 116:21

**liabilities** 29:9 35:5,9 189:8 190:24 246:4

**liable** 242:19

**liar** 224:2

**licensed** 11:4,6

**lie** 224:6

**life** 32:21

**limit** 16:11

**Limitations** 246:2

**limited** 14:17 15:12 238:14,15 239:9,23 241:3 242:8,22

**limiting** 227:13

**liquidity** 35:13

**list** 119:13 147:9

**listed** 93:13 177:21 178:8,20 208:22 209:9 211:20

**listen** 140:16

**listening** 181:22

**listing** 161:4

**literally** 144:13 245:20

**litigate** 223:15

**litigation** 16:7 54:10 75:16 134:15 145:16 147:22 152:13 182:19 236:13 250:12

**litigations** 27:15 192:10 195:3

**live** 8:5,6,9 140:17

**LLP** 6:2

**loan** 99:13 117:5 150:12,20 151:8 173:18 174:24 176:16 177:5 179:12, 17,20,23 180:6,7 183:2,17,18,21,23 184:3,4,6,13 194:18, 21,22 195:3,6,10,11 196:4 198:17 199:19 201:6 214:22,25 216:11 219:14,15 220:3 229:16,25 256:18

**loans** 172:20 173:2, 5,13,23 174:7,8,16, 25 175:8,10 176:8,18 177:23 178:8,25 182:17,18,22,23 184:7,11 195:19,23 196:3 203:7 230:19, 22

**local** 159:24

**log** 164:8

**logbook** 75:5

**logical** 57:2 67:8 152:4,9

**logically** 66:7 82:23

**long** 27:11 30:3 52:9 63:9 140:23 183:6 193:22 255:23

**long-dated** 64:10

**longer** 122:11 133:4 167:16 248:8

**looked** 76:3,7 176:13 178:17 200:13 202:17 217:18 218:24 230:4,15 231:4 247:5,9 249:11 256:16 257:20 258:12

**loosely** 130:19

**loss** 167:7,9

**losses** 141:2

**lost** 44:2 183:9,10

**lot** 154:22 164:9 165:7 167:10

**lots** 10:16 201:21,22

**low** 54:5 64:16

**loyalties** 155:7,17

**loyalty** 244:20

**LP** 5:6,7,18,22 12:2, 17,18 26:4

**Luc** 176:6

**M**

**made** 19:15,20 22:11 25:19 33:9 52:10,21 57:13 62:19 81:12,22 85:3 89:11 90:10,21 92:24 94:16,24 95:3, 6,15,19,23 96:11,13, 15,19 97:12 98:12,21 103:20,21,23,24 105:3,5 111:10 118:15 121:10 125:19 126:25 127:5, 23,24 128:4,13 129:3,23 130:18 131:20 134:5,13 141:23 142:20 145:5 159:9 162:20 165:10, 24 174:21 176:16

**made-up** 76:23

**Madoff** 162:2

**main** 205:5

**maintain** 250:5

**maintained** 22:5

**make** 25:5,14 27:25 36:2,4 52:6 53:13 58:23 76:4 79:6 84:10 94:4 95:7 97:16 98:20 106:21 110:11 117:25 118:2, 11 119:10 126:18 128:15,25 129:17 130:13 132:4,22 140:16 159:2,4 160:4 168:7,14 169:23 179:19,23 180:23 196:8 200:18 210:19 211:7,9 212:16 236:10

**maker** 55:2,7 63:11 66:7,17 69:5,10 124:10

**makes** 35:19 229:8

**making** 54:23 85:21 88:17 102:18 131:8, 17 141:17 143:19,21 215:13,17 216:12

**mal-intent** 87:18

**Mamoud** 176:6

**man** 125:12,13 140:22

**manage** 22:18

**managed** 18:22 22:7

**management** 5:6,22 12:2,17,18 14:9,10

Case 21-03005-sgj   Doc 157   Filed 01/20/22   Entered 01/20/22 22:18:05   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 01/09/24   Page 54 of 178   PageID 44988

Index: manager..named

26:21 115:11 122:12
135:18 166:8,10,18
167:5 198:16 200:9
201:14 202:3 203:10,
15,20 204:8,19,25
205:13,15 206:9,14,
17,18 215:17 241:5
242:9 243:2,24
244:12 245:7

**manager** 22:6

**manages** 242:22

**manner** 205:22
256:22

**Manuel** 5:9

**margin** 22:10

**margins** 18:23

**Marianne** 5:12

**mark** 8:17 177:13

**marked** 8:21 9:21
23:21 43:10 51:7
55:13 56:5 69:13,17
99:11,14 107:2,5
112:13,23 148:12
150:4 196:6,7,25
197:9 200:7 214:15
245:15

**material** 7:4 71:18
78:14 157:2 158:14
173:19 174:12
175:15

**materiality** 157:10

**materially** 174:8

**materials** 255:7
258:17

**math** 57:9

**matter** 5:5 170:2
190:15 205:4 223:10
224:10

**matters** 136:25

**maturity** 58:17
150:12 151:8,16
152:23 249:23

**maximize** 50:16
97:20

**meaning** 29:9 68:14
225:22

**means** 65:20 80:6
181:3 203:19 217:13
254:2

**meant** 115:16 120:24

**Media** 5:3

**mediation** 41:2 46:2

**meet** 18:23,25

**meeting** 73:10,15,
16,18 75:6,9,12,13
79:25 81:2

**meetings** 71:13
72:20 74:8 75:2 80:6,
9,14 81:15 82:25
83:12,16

**melting** 167:4 172:12

**members** 20:6 41:23
72:21 73:11 74:6,9,
24 75:7

**memories** 73:25

**memory** 23:18 24:5,
9 73:8 128:11
224:11,16

**mental** 108:12,23

**mention** 211:22

**mentioned** 17:8 50:2
80:2 83:22 99:18
125:17 161:2 172:19
177:20 226:18 249:7
255:12 257:18

**met** 31:23 169:22

**metadata** 250:24
251:5 254:6

**metastasize** 239:15

**Methods** 246:2

**metrics** 28:8

**MF** 161:24

**MGM** 186:11,20
187:8,17 188:2,9,13
189:5 190:5,12,21
191:11 192:2

**Michael** 6:3

**mid** 38:18

**middle** 41:15 49:4
88:21

**mike** 176:4

**million** 25:6 27:17,18
52:24 57:19 89:7
93:15 106:21 108:6
109:2,19 110:3
111:10 145:23
152:17 163:15
164:19,21 166:3
168:15 169:13,20
170:11,19,20 171:3,
11,16,23 172:3,4,7
188:10 191:6 192:9,
15,19 193:6 205:7
222:22 243:6 250:3,6

**million-ish** 243:8

**millions** 86:22
139:16,18 140:24
154:24 222:7

**mind** 45:22 46:11
129:7 146:7 171:20
207:8

**mine** 122:5

**minimize** 181:5

**minimum** 230:9,21

**minimums** 229:20

**minus** 191:4

**minutes** 59:25 73:18
83:17,19 98:23
146:11 160:3,6
193:16 194:9 245:6
248:6

**mischaracterizes**
221:13 239:4 240:2,
18 241:19

**missed** 71:23 72:2
85:17 87:20 98:3
106:6,11 109:6
131:24 149:19 156:4

**misses** 88:11 146:2

**missing** 9:6 196:10

**misstate** 44:13

**mistake** 52:10
151:10

**mixing** 231:12

**MO** 172:16 185:24
205:8 233:10 244:7

**moment** 137:25
159:21 192:2 196:21

**moments** 99:9

**monetary** 156:19

**monetization** 46:15
50:3,5,10 52:19
63:21 158:9 159:19
168:2 187:25 192:13

**monetize** 50:13
62:25 159:20

**monetized** 189:7
190:22

**money** 27:12,13
35:11,13 41:15 58:22
67:21 92:16 164:9
167:10 168:24
172:15 184:7 203:4
205:3,6 208:23
209:12 236:18

**monies** 185:21

**months** 45:4 187:15
224:13

**Morris** 5:19,20 9:5,9
17:22 19:16 20:2,24
21:3,20 25:22 28:17,
22 30:18,22 31:15
32:19 33:7,11,18,22,
25 34:4,24 35:20
40:20 48:24 55:5,22
57:7,21 59:7 61:9,25
64:24 66:11 67:10
69:23 70:2,8,11
78:23 82:13 84:3
85:23 86:5,17 87:21
89:19 90:11 91:4
93:3 94:20 95:16
96:16 97:10 99:10
105:9,17,21 111:11
112:10 113:22
115:17 117:12
120:17,25 121:11
122:13,21 124:13
125:9 126:7,19
127:18 129:18 134:9
135:3 137:18 138:5,8
139:6,21 140:10
142:14,21 144:21
145:13 146:9,23
150:23 152:7 154:2
155:11 157:20
160:14 163:19 164:2

**Morris'** 24:14

**Motion** 43:10

**motivation** 105:11

**mouth** 108:11 151:21

**move** 172:16 184:21
185:13,24 203:4
205:8 233:10 244:7
252:23

**moves** 41:18

**moving** 27:12,13
46:15 52:18 71:15

**multiple** 20:16 46:3

---

**N**

**named** 50:12

165:11,13,17 168:10,
21 169:10 171:6,17
172:5,23 175:3,22
176:11 178:11 179:8
180:3,9,20,25 181:25
183:3,24 184:15,24
185:16 186:2,6,13
187:2 188:3,18
189:9,13 190:16,25
191:9,16 192:5,22
193:8,10 194:6,14
195:12 196:13,16
197:14,19,24 198:5,
8,10 199:7,11 200:14
201:15 202:5,8,18,21
203:16 205:17
206:24 207:4,9,12,16
209:15 213:6,10,14
216:2,14 217:3,15,24
218:15 219:5 220:14,
25 221:10,13 223:6,
12,16,20,23 225:8
226:2,13,21 227:11
228:8 230:2 231:9
232:2,7,9,19 233:5,
25 234:7 235:18
236:6 238:5 239:2,25
240:10,17 241:9,16,
18,25 244:25 245:10
247:15 250:21 251:6,
9,15,22 252:3,8,11,
14 253:8 255:21,25
256:22,24 257:10,12,
25 258:3,15,17,20,24

---

Index: names..offers

**names** 12:23

**Nancy** 6:5 237:22
238:13 241:6 242:25
243:3,4,25 244:12
245:8

**native** 251:3 253:3,
14,17,25

**nature** 83:24 97:8
174:5

**nebulous** 61:12

**necessarily** 86:25
125:11 182:12

**necessitated**
125:20,22

**needed** 20:13 35:11
36:17 89:19

**negative** 91:9 92:2,3

**negotiate** 156:7,16,
19 168:13

**negotiate/
renegotiate** 69:2

**negotiated** 168:16

**negotiating** 46:16

**negotiations** 46:2
48:12,16 103:25
222:11

**neighborhood**
170:25

**Nelms** 12:24 13:23
76:14

**net** 192:19

**Netflix** 27:11

**Nexpoint** 5:6,17
24:17 25:4,20 26:4,8
27:23 28:2 37:12
38:9 49:18 52:25
54:12 64:23 71:3
72:8 75:23 77:20
80:24 81:13 82:10,18
84:10 85:2,21 86:15
87:20 88:11,17 94:3
96:10,12 97:8,17
98:11 106:6,20 113:5
114:5 116:5,9,10,22
117:8,24 118:5 119:2
121:25 122:20,23

123:15 124:10 125:5,
13,16 130:12 131:7,
17 134:5,20 135:19,
24 139:9,16 141:23
142:12,19 143:6
144:10 146:22
147:14,21,25 151:25
156:4 194:18,21,24
198:25 199:9 200:12
202:17 204:6 218:25
222:6 223:5 225:5,16
226:6

**Nexpoint's** 82:12
116:18 117:2,4 144:7

**Nguyen** 89:14 90:17
91:19

**nineteen** 187:15

**non-individual**
247:4

**non-lawyer** 63:21

**non-lawyers** 31:25
255:6

**non-tax** 181:9

**nonpayment** 194:18
200:10,20,25 201:5

**nonresponsive**
77:9

**nonsense** 76:24
232:24

**nonsensical** 86:21
98:6 158:15

**normal** 71:20

**north** 177:2

**Notary** 6:18

**notations** 257:23

**note** 21:4,9 25:7,11,
15 33:10,11,12,16
52:25 53:4 55:3,11,
12,21 56:11,18 57:19
58:8 59:13 60:14
61:15 62:23 63:2,8,9,
11,17,22 64:10,18,23
65:6,12 66:19,23
67:20 68:24,25 72:6,
9,25 80:24 84:14
87:5,8 88:6 89:8,12
92:6,13 93:10 97:13,
22,24 98:15,16

105:5,7,23 106:6
107:23 108:2,4,7
109:5 110:18,20,22
111:18 117:10
118:25 122:2,4
124:9,11 125:3,21
128:16 131:10,11,14,
23 132:6 134:4,21
141:24 143:6 145:7,
10 146:5 149:3
151:25 152:18
157:15 159:17,18
162:16 179:6 183:22
184:8 193:6 197:13
200:9,20,24 201:5,8
218:10,12 219:4
220:6 221:19 229:4,
23 232:5,17 233:16
235:6,7 250:3,7

**note-taker** 72:25

**noted** 259:13

**notes** 45:18,20
50:19,23,24 51:2,3,
15 52:3,7,12,22
53:15,16,17,18,19
54:3,4,8,15,20,22
55:3,8,18,20 56:4,7,
12 57:4 58:11,12,17,
20 59:4 60:3 61:6,22,
23 62:12,21 72:19
73:6,9,17,21 75:25
76:6,7,18 77:3,9 93:8
95:8,25 117:19
144:19 145:10,18,19
151:11,24 152:6,16
153:7 176:18 178:7,
9,14,16,19 179:2,3
182:19 192:9 218:13
219:10,18 227:5,9,16
228:2,5,24 229:12,
14,16,20,22,24,25
230:5,11 233:21
234:13 235:11,14
236:2,19 243:7,8
245:25 248:7 249:8
251:18 253:6,7
258:14

**notes'** 60:20

**notice** 8:18,20 9:20
25:11 37:22,24 85:9,
10 98:2 115:3 158:19
245:23

**noticed** 205:11

**Notices** 9:16

**November** 37:22,23
45:5 46:5

**NPA** 38:2,3,9,15
63:10 64:14 87:6
90:14 92:16 140:2
150:12 151:8 196:3
200:4 205:25 219:11

**nth** 138:19

**number** 7:17 22:20
63:2 92:2 97:19,23
153:7,9 165:2 169:6
171:20 196:10
222:23 229:20
230:23 236:17

**numerous** 135:7

**nutshell** 50:7

---

**O**

**object** 34:24 72:4
85:16 157:20 159:3
186:3 187:2 234:2

**objected** 34:19

**objection** 17:22
19:16 20:2,24 21:20
24:15 25:22 28:17
30:18,22 31:15 35:20
40:20 48:24 55:5,22
57:7,21 59:7 61:9,25
64:24 66:11 67:10
72:3 82:13 84:3
85:23 86:5,17 87:21
90:11 91:4 93:3
94:20 95:16 96:16
97:10 105:9,17,21
111:11 113:22
115:17 117:12
120:17,25 121:11
122:13,21 124:13
125:9 126:7,19
127:18 129:18 134:9
135:3 137:18 138:5
139:6,21 140:10
142:14,21 144:21
145:13 146:23
150:23 152:7 154:2
155:11 157:20
163:19 164:2 165:11,
13 168:10,21 169:10

**objections** 10:3

**obligation** 105:6
120:15,23 121:4,7
134:19 138:25 146:4

**obligations** 104:18
116:11,19 117:5
135:24,25

**obligor** 58:18 229:19

**obligors** 51:24

**obviated** 98:19

**obvious** 60:6 64:8
157:23 158:2,5

**occur** 179:25

**occurred** 108:24
237:9

**October** 5:7 23:14
24:6,9,11 26:10,14,
15 35:15 36:19 46:3
259:4

**odd** 91:7 173:7
187:20

**off-record** 8:19
23:23 43:12 55:15
69:19 106:24 107:7
112:2,8 146:13 148:8
160:13 194:7

**offers** 63:16

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 172-21    Filed 01/30/23    Page 56 of 178    PageID 44990

Index: office..performance

**office** 115:22 116:7, 12 204:18 205:13 212:6

**officer** 36:21,24 37:4 39:7,9,17,18,22,24 40:8,13 49:24 117:24 123:17 140:6

**officers** 16:19 40:7 138:2,24 174:25

**official** 75:8,11 80:10

**offline** 251:25 252:6 253:10

**offshore** 154:24 236:18

**oftentimes** 80:19 114:11,13 182:24

**Okada** 176:17

**Okada's** 177:4

**okayed** 118:20

**one's** 228:13 247:24

**ongoing** 203:23

**operate** 104:13 167:9

**operating** 74:22 167:9 203:2

**operation** 239:10

**operational** 36:9

**operations** 16:13,15 36:6

**opinion** 26:12,17,20, 23,25 27:4 29:20 30:7,11,16 31:4,7,21, 24 32:5 63:19,20,24 154:7,11 189:15 239:7

**opinions** 27:21

**opportunities** 46:13

**opportunity** 159:20 184:19 185:10

**opposed** 62:10 87:8 92:2 97:17 132:11 143:6 162:19 216:11, 24 219:3

**opt** 37:15

**optimism** 188:12,13, 17,22

**optimistic** 192:25

**options** 87:11

**oral** 210:16

**order** 17:18 155:15 190:22

**organization** 20:12, 17 22:16 121:17

**original** 56:3,19 150:11 151:8 198:17

**originally** 53:10

**outflows** 59:17

**Outlook** 75:10 80:5

**outstanding** 52:14 56:23 85:8 209:2 229:21 230:14,23

**overhear** 103:5

**overpaid** 222:2,7,18 225:6,17,25 226:6,20

**overpayments** 223:4

**overrule** 18:25

**oversight** 18:15,19 168:3

**owed** 87:5 92:16,18 110:11 146:22 147:6 180:8 184:8

**owes** 145:22 205:6

**owing** 52:13 86:23 93:14 98:4,17 110:14

**owned** 205:2

**ownership** 15:17 26:7

**owns** 121:18 186:16, 17,20

**P**

**p.m.** 5:8

**Pachulski** 5:20 254:19 255:3

**paid** 64:15 88:6

91:15,17 93:14 105:24 108:3 129:7 139:16,18,22 142:5 145:6 153:6 164:9 167:9 173:6 177:7 179:6 201:23 204:16 225:13 227:6,10 228:2 230:7

**palatable** 42:5,7

**paltry** 139:25

**pandemic** 27:10

**paper** 203:4

**par** 153:25

**paragraph** 51:13,17, 19 66:2 68:8

**paralegal** 69:24

**paraphrase** 136:3

**pardon** 26:24 48:4 53:8 123:20 133:10

**parentheses** 91:8

**parse** 122:25

**part** 17:15 30:6 42:3 66:18 71:21 101:2,16 105:11 108:15 114:6 116:12,14 155:19,21, 22 172:20 173:3,14, 24 174:22 176:10,23, 24 177:24 178:25 179:12 192:7 203:23 208:19 222:10

**participants** 74:19

**parties** 114:16 118:22 144:18,25 205:25 255:9

**partner** 6:3 208:6 238:14,19 239:9,12 241:15 242:8,12,13, 22 244:4

**partners** 214:6,21 215:12,25 238:15 242:15

**partnership** 14:17 15:12,15 238:16,24 239:10,19,24 240:6, 8,13 241:4 242:10, 11,15,23 243:5

**partnerships** 240:5

**parts** 22:15 102:3

**party** 59:15

**pass** 160:14 248:17

**past** 85:22

**Pat** 176:5

**path** 223:8

**pattern** 163:17 204:5 206:6 213:3

**Paul** 176:6

**pay** 28:23 29:15 31:19 57:17 58:2,4, 22 65:15 82:11,19 116:22 133:14 144:7 158:10 172:9,11,14 173:10,12 177:8,17 206:12 211:5 216:10 226:19 227:16

**pay-downs** 57:25

**payable** 25:12,16 80:25 88:22 97:14 104:18 116:23

**payee** 59:4 60:23 61:5,13 69:2,9 124:8

**paying** 45:19 116:18 139:9 145:24 204:20 205:14 215:25 229:19

**payment** 25:5 51:25 52:11,22 65:21 71:23 72:2 81:12,22 82:12 84:11,13 85:3,4,18, 21,25 86:2,16 87:20 88:12,18 90:21 91:10 92:8,9,13,23,25 94:4, 16 95:3,12,14,15,19 96:10,11,12 98:3,12, 20,21 103:20 105:4 106:6,11,21 108:5,8 109:2,6,19 110:3,9, 22 111:10 117:10,25 118:2,11,15,19 119:2,11,13 120:16 121:10 125:19 126:25 127:24 128:4, 13,15,17 130:17 131:8,10,18,24 132:6,21 133:12 134:4,21 142:4

143:19 146:3 149:19 156:4 195:10,23,25 199:18 200:10,20,24 201:5 214:25 215:6, 8,12,13,18 216:12, 19,24 218:8,11,22 219:2,12 220:4 229:15 231:5,6,16, 18,19 244:3 249:7, 11,13,17,20 250:5

**payments** 57:12 58:6 66:23 82:20,21 89:11 90:24 91:20 95:6,8,22 96:2,19 99:20 101:20 102:19 103:21,22,24 104:3,4 110:19 115:10 116:15 117:18 118:7 126:18 127:4,22 128:25 129:17,22 130:5,9,14 131:3,20 132:4,23 134:13 143:22 145:4 154:23 179:23 182:21,22 183:7,20 184:5 195:19 216:8,10,22 217:14,18 218:4 220:12 224:21,22 229:3,4,11,17 230:4, 10,19,22 249:20 250:6 251:18,23 253:7 256:18

**payoff** 59:17

**payor** 61:13

**payroll** 110:15 255:23

**pays** 116:10

**PDF** 250:23 254:11

**penalty** 247:3 259:11

**people** 13:6 19:24 20:15 132:9 133:8,9, 23 138:12 167:8 176:4 178:8,20 211:12,19 216:5 254:25

**perceive** 124:11

**perceived** 124:16

**percent** 186:17

**performance** 164:6 166:11 170:14,16

Index: performed..provided

172:13,14 190:7,13

**performed** 36:17
206:8 210:10 225:13

**performing** 205:25

**period** 30:3 39:9
45:4,25 50:14 60:21

**periodic** 130:9,14

**periodically** 8:9

**periods** 27:11
235:11

**perjury** 247:3 259:11

**permeates** 244:20

**permission** 72:18
74:18,25 133:14

**permitted** 35:23
61:16 118:21 238:15

**permitting** 61:21

**person** 16:14 61:14
69:22 136:11,19,24
141:8,14 160:16
254:15

**personal** 54:14
77:17 153:20,23
220:11

**personally** 9:17 45:8
138:6

**personnel** 132:20,23
133:14

**persons** 239:18

**perspective** 18:9
35:8

**persuade** 137:17

**petition** 32:3

**ph** 14:2 176:6,7

**phone** 7:10

**phrased** 221:20

**PI** 109:9

**pick** 181:10

**picking** 235:3

**piece** 186:20 246:25

**pieces** 170:18
222:16

**pin** 37:9

**place** 37:11 44:3
74:13 104:12 148:2

**places** 161:25
185:22

**plan** 12:3,5 13:3
14:11 15:22 24:23
40:18 41:3,8,14 42:3
44:17 45:11,18 46:15
47:4 50:3,5,8,10
52:16,19 53:7 63:6
54:10 158:10
159:19 222:11

**plans** 62:25

**play** 243:21

**played** 143:4

**player** 11:17

**point** 31:6,9,13 45:7,
12 47:2 49:15 53:4,7
55:24 62:24 93:2
94:2 130:16 147:22
149:6 193:18 208:16

**pointed** 94:24

**pointing** 91:21
241:24

**points** 238:21

**policies** 104:11,17,
23 148:2

**polite** 224:4

**portfolio** 22:5,6
186:23 187:4,6,8,12,
17

**position** 49:11 191:3
232:15 233:19
234:10 239:8 242:7

**positions** 123:18

**positive** 123:24

**possibility** 199:16
210:8

**post** 16:12

**post-confirmation**
15:3

**post-payment**
200:11 219:14

**pot** 40:18 41:3,8,14,
16 42:3 44:16 45:11,
17 47:4 52:16 222:11

**potential** 77:3,23,24
168:17 175:2,8 188:6
190:4 191:22 192:2
235:13

**potentially** 54:9
118:6 125:11 176:8
178:25 191:12

**power** 184:10

**practice** 82:24
175:20 204:5 213:3

**practices** 104:14

**practitioner** 14:8

**preamble** 56:8

**precarious** 53:21

**precise** 186:15

**precondition** 234:18

**prefer** 139:8 140:12

**preferred** 154:5

**premarked** 196:7
206:23 213:23
245:16

**prepaid** 92:7,8,13,
14,18,25 93:12
98:15,19 142:7

**preparation** 148:21,
23

**prepared** 10:4 92:19
118:18,25 235:8,15
247:11

**preparing** 116:15

**prepay** 66:2,17
67:16,18,21

**prepayment** 65:25
66:16 68:2 142:20

**prepayments** 93:9
141:23

**presentment** 69:6
98:2 219:20

**press** 22:3

**pressed** 74:14

**pretty** 11:24 23:6
35:5 46:14 48:2 52:8,
9 64:8,17 74:2 98:20
131:19 147:20 166:4
207:11 221:15
224:15 232:22
237:12 242:4 252:14

**prevailing** 136:23

**previous** 93:2

**previously** 17:3
112:17 258:13

**principal** 51:25
56:23 66:18 67:2
89:7 90:25 91:17
149:3 198:17 219:2
220:4 230:9,10,21
231:18

**principals** 123:22
236:15

**print** 112:11

**printed** 196:22

**prior** 10:8 13:13 17:4,
11 22:23 32:2 39:9
42:21 46:4 55:18,20
56:4,7,12 59:2 61:3,
20 67:6 71:6 75:13
80:4,14 85:17 90:23
94:15 98:10 100:18
104:10 106:16 108:3
112:12 113:19 123:7
126:14,15,21 128:12
144:18,19,24 145:20
162:10 164:11,14,15
165:5,6 169:25
196:14 229:17 230:7

**privilege** 77:24

**privileged** 78:14,19
198:13

**problem** 42:25

**problematic** 182:12

**problems** 60:2

**procedure** 74:22

**procedures** 104:12,
17,23 148:2

**proceeding** 109:10

**proceedings** 11:10

**process** 108:12
191:20

**produce** 252:12
253:4

**produced** 79:2,11
89:22 90:3,14 199:4
231:6 250:11 251:17
252:10 253:20 256:8,
13,17

**production** 77:4,24
219:8 255:19

**productions** 251:12,
16

**professional** 54:25
138:15

**professionals** 49:3

**program** 175:6

**programs** 174:24

**prohibited** 68:23
157:14

**promissory** 25:7
50:19,23 51:2 55:12
56:11 57:4 58:11
59:4 61:6 122:2,4
124:9,10 125:3 132:6
197:12

**promoted** 153:17

**prompted** 107:16
108:25

**proper** 154:14

**properly** 35:4 236:13

**properties** 254:7

**property** 8:9

**propose** 42:4 44:16

**proposing** 41:8

**prospect** 171:11

**prospects** 187:23

**provide** 52:15 114:8
144:12 145:25 211:5
212:6 253:14

**provided** 31:25
47:17,18 76:25 78:7,
9 114:11,13 115:22
135:25 136:18 147:9

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 78-21    Filed 01/25/24    Page 58 of 178    PageID 44992

Index: provider..related

201:13 202:2 203:14
204:18 205:13
209:13 215:24 253:4

**provider** 135:16

**providers** 254:21

**providing** 115:7
144:10 147:14 204:5
210:2,17 254:3,4

**proving** 34:6

**provision** 143:2
219:10

**prudence** 136:21

**prudent** 136:23
142:18 145:6

**PST** 254:5

**Public** 6:18

**pull** 89:14 154:18
196:6

**pulled** 43:17

**pulling** 20:15

**purports** 113:3

**purpose** 60:4,5
145:12

**purposes** 21:8 68:13
132:11 179:5 182:11

**pursuant** 17:17
20:21 21:17 82:24
142:18 183:22

**put** 22:2 23:17 24:13
33:16 34:8 41:15
73:14 140:23 148:6
151:20 191:20
236:14

**puts** 117:22

**putting** 108:10

---

## Q

**quality** 256:13

**question** 17:23
19:17,18 20:3,25
21:11,12,21 22:22
25:23 28:18 30:19,23
31:16 34:25 35:18,21
36:8 40:21 48:25

55:6,23 57:8,22 59:8
60:10,11 61:10 62:2
64:25 66:12 67:11
72:11 77:10 82:14,20
84:4 85:15 86:18
87:22 90:12 91:5
93:4 94:21 95:17
99:21,22 102:8
105:10,18 111:12,23
113:23 115:18
117:13 120:18 121:2
122:14 124:14
125:10 126:8,20
134:2,10 135:9
137:19 138:9 139:7
140:11 142:15
144:22 146:24
147:11 155:12
157:21 163:20 164:3
165:14 168:11,22
169:11 170:4,8
171:18 172:6,24
175:4 176:12 178:12
179:9 180:10 181:2
183:4,25 184:16,25
185:2,9,17 186:14
188:4,19 189:10,14,
18,23 190:2 191:2,10
192:6,23 195:13
197:15,25 199:12
200:15 201:16,19,20
202:8,22 203:17
205:9,18 209:16
210:6 212:9,11
216:3,15,17 217:4,6,
16,25 218:16 219:6
220:15 221:2,11
225:9 226:14,22
228:9 230:3 232:20
233:3,12 234:9
235:4,19 236:7
237:18 238:6 239:3
240:2,11,18 241:19
242:2 245:11 248:21
249:5

**questioner** 223:7

**questioning** 99:8
160:25 194:17

**questions** 21:8
85:16 102:5,15
235:22 248:23 249:6

**quick** 136:12 147:7
207:11

**quickly** 23:7 100:4

**Quinn** 69:24 70:6

**quip** 189:21,24

**quote** 44:7 182:6

---

## R

**raise** 155:13

**ramifications**
137:16 140:21 141:3
143:19,21

**ran** 22:14 256:5

**range** 162:25 164:18,
21 166:4

**rare** 174:20

**rate** 54:5

**re-trades** 46:4

**read** 21:12 51:19
56:2 62:20 65:14,22
66:16,22 67:8 101:2,
11,14,16,23 102:2
110:24 113:2 136:7,
15,16 137:5 141:14
147:10 150:10 170:5,
7 185:2,7,8 229:4
234:5,8 247:16
259:11

**reading** 22:4 137:12
143:5

**real** 8:8 45:15 62:13
136:11 147:7 244:18

**reality** 222:25

**realize** 132:5

**realized** 107:25
111:18

**reason** 30:12 43:22
57:16,18 64:7 73:23
83:11 111:8 113:12
117:11,16 120:9
184:9 219:15,17
224:5 227:8,25
247:13,25

**reasonable** 117:8

**recall** 23:13,25 37:6,
10,14,18,21 38:5,17,
21,23 39:4 40:19

43:13 47:6,21 58:6
64:5 71:9,12 72:14
73:13 74:13,23 76:9,
16,20,25 80:21 81:2,
4,21,23 82:9,15
84:12,17,19,21,25
89:2 94:5,14 101:14
104:5,7,16,20,22
107:12,16 109:4,8,9,
11 110:5,23 113:24
119:23 120:4 126:24
127:21 129:20
130:19,20 131:19
145:17 150:19
151:18 152:25 153:3
157:7,11 162:6
173:2,16 182:5 188:5
195:14 198:19,21
199:2,21 201:2,11
208:2 209:23,24
216:17 217:8,9,20
218:6,19 219:23
221:4,7 222:19,21
226:15 227:14,18
228:17 230:25 246:7,
24 249:9

**receive** 174:25

**received** 81:24 108:5
115:24 176:8 177:23
203:20 215:12 216:7
217:13 225:17
243:15 251:13

**receives** 167:4
179:12

**recently** 251:14

**recess** 99:3 112:5
146:16 160:10
213:18 248:11

**recitation** 11:13

**recognize** 70:21
107:10 227:22

**recollect** 177:7
229:10

**recollection** 39:5
40:9 82:9 88:15
93:11 97:2 100:14,
17,21 102:23 134:24
151:6 164:18 211:8,
19 212:3,11 228:21
229:9 230:18

**reconsider** 138:4

**reconstituted** 14:16

**record** 8:4 23:17
24:14 38:15 53:14
73:23 74:14,25 99:2,
5,7 111:25 112:4,7
146:15,18 160:9,12
213:17,20 248:10,13
257:16

**recorded** 74:18 80:5
83:12

**recording** 99:23
100:12

**redacted** 251:21

**Redeemer** 237:2

**reduce** 110:11

**reduction** 132:15

**refer** 187:8,17 202:9,
25

**reference** 108:18
127:8 149:22

**references** 55:18

**referred** 143:16
186:23 187:4,5

**referring** 96:5 116:4
202:19,23

**refresh** 23:18 24:5
128:10 164:17

**regard** 198:16

**regular** 8:15 71:13
132:11

**reimbursed** 209:22

**reimbursement**
110:15 209:20

**reimbursements**
209:2,6

**reinstate** 157:15
159:17

**reiterated** 108:9

**relate** 226:18

**related** 32:23 80:23
95:4 103:22 104:17
114:16 124:18
129:23 174:16

182:18 209:5 223:9
227:4,5 240:5

**relation** 178:7

**relationship** 62:6
138:12 169:25

**relevant** 11:14 130:4
223:18 224:4

**relied** 48:10

**rely** 59:15 117:9

**remain** 167:15

**remember** 36:25
71:16 79:19 84:8
108:19 129:15
131:16 133:20 151:3
155:18 181:22
194:19 224:12,14

**remotely** 7:3

**removed** 17:18
21:24

**remuneration**
115:25

**renegotiating** 68:23

**renegotiation** 68:2,
4,9,20

**reorganization**
165:19

**reorganized** 15:9,
13,15,20 16:2,3
24:19,23 30:13 41:17
77:2,15 153:13

**rephrase** 7:25 19:18
218:3

**replace** 133:7,8

**report** 16:10 81:25
83:22 90:9 112:12

**reported** 22:12
143:17

**reporter** 5:11 6:9,15
18:12 19:5 21:14
29:4 37:25 46:20
62:15 76:12 82:5
86:4 87:13 90:19
94:19 99:11 100:3,7
121:14 125:7 135:5
138:11 152:10 169:9
170:7 171:8 185:7,8

190:18 234:8

**Reporting** 5:11,13

**reports** 22:4 92:20

**represent** 5:17 43:16
90:2 112:14 113:6
231:22 256:4

**representations**
58:23

**representatives**
51:22

**represented** 102:14

**representing** 5:23
6:4,12

**request** 36:17

**requested** 76:9
118:18 258:13

**requesting** 74:18

**requests** 75:23 76:5,
6,17 77:20 78:17
254:17 255:8

**required** 130:9
142:25 145:6 219:18

**requirement** 219:21

**requires** 33:4

**resignation** 23:9

**resigned** 24:6 26:11
35:16

**respect** 11:12,25
14:19 17:24 33:2
35:13,23,25 36:5,6,
14 62:3,11 77:18
84:6 85:20 101:20
104:12 106:5 120:8,
15 121:24 122:2,3
123:8 125:2,16
128:16 129:5 133:10,
12 135:10 141:7,8
143:5,11,18 144:16
148:3 154:24 155:4
156:20 175:13
176:22 210:16
218:23 219:19
232:21 236:16
238:12 243:25
246:11,17

**respective** 123:22

**respects** 133:11

**respond** 71:22
254:16

**responding** 75:22
217:12 218:13

**response** 76:16
130:2

**responsibility**
116:22

**responsible** 116:18
154:13 156:14

**responsive** 76:2,15
77:19 78:7,16 253:20
254:13 255:7

**restate** 33:23

**restated** 112:22
113:4,16

**restroom** 98:23
146:8

**restructured** 150:13
151:9

**restructuring** 39:17
161:14,23

**retail** 144:11

**retain** 153:13 175:12
179:14

**retained** 24:24

**retention** 179:13

**return** 110:6,8

**returns** 169:2

**Revenue** 182:16

**review** 77:4,17,24
136:8 141:19 203:24
247:23 253:19
255:22 256:2,11

**reviewed** 247:10

**reviewing** 7:4

**revisit** 140:18

**RIF** 132:14

**rights** 59:4 60:23
61:5

**rise** 238:25 241:5

**risen** 73:20

**risk** 147:12

**risks** 236:16

**Rober** 133:20

**Robert** 255:18,21
256:9

**role** 12:6 13:14
14:18,22 15:7 20:22
21:18 22:5 26:4
49:17 121:25 122:12
124:5 133:15 143:4
144:19 174:22
238:19 239:12
242:12,14 246:11

**roles** 21:24 23:21
242:9

**roll** 54:21

**roll-up** 53:17,18
56:12 61:21 62:11
63:13 151:24

**rolled** 54:2,22
145:10,19 151:13
152:6,17 153:8

**rolling** 60:3 144:18
236:19

**Romey** 150:9,19

**room** 54:18

**roughly** 57:11 136:4
137:6

**roughshod** 22:15

**round** 23:6 88:2,8
134:17

**RQ** 250:21 258:10

**rude** 228:12

**Rukavina** 5:16,17
6:21 8:17 9:11,14
18:17 19:11 23:15,24
33:2,10,14,19,24
34:3,11,14 38:8 43:7
46:24 55:9,16 62:17
69:11 70:19 76:15
79:4 86:9 87:16
89:13,20 90:20 98:22
99:6,16 106:23,25
107:9 111:24 112:9
146:7,10,19 148:6,9,
14 149:25 152:11

159:21,24 160:24
183:9,13 194:16
220:20 223:14
228:16 235:21
248:19,25 249:4
250:21 251:8,13,24
252:5,9,13,16 257:8,
14

**Rukavina's** 196:9

**rule** 18:8 186:7

**run** 15:23 50:15
114:7 140:22 167:7,8
185:20 212:21
238:15

**running** 21:10 27:23
239:10

**runs** 16:5

**Russ** 76:13

**Russell** 12:24

---

## S

**salary** 155:14 173:11

**sales** 19:3,6,7

**sat** 188:14

**satisfy** 35:8

**satisfying** 219:3

**scam** 180:14

**schedule** 54:21
117:23 249:19,22

**scheduled** 118:3,6
131:8,10 142:4,7
146:3

**schedules** 245:24
246:4 251:17

**scheduling** 133:13

**School** 10:23,25

**Scott** 40:3

**screen** 196:18

**scroll** 89:23 90:16
91:12,18 207:21
213:25

**search** 178:14 256:5,
9

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 72-21    Filed 08/06/21    Page 60 of 178    PageID 44994

Index: searches..sir

**searches** 254:16 256:6

**searching** 255:2

**secret** 212:23

**section** 56:2 65:13 66:4,15 67:7,16,24, 25 102:6 116:14 135:12,21 136:5,7 137:8 141:6 142:19 143:3 144:17

**security** 54:6

**seek** 63:8

**seeking** 72:18 74:25 209:22

**Seery** 5:1,5,24 6:1,24 7:1 8:1,23 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1,9 44:1 45:1,8 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1,24,25 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,20 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1,7 80:1 81:1 82:1,10 83:1 84:1 85:1 86:1 87:1 88:1 89:1,22 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1,8,17 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1,15 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1

137:1 138:1,3 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1,6,14 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1,2,15,20 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1,18 170:1,10 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1,16 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1,22 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1,2, 19 224:1,23 225:1,2, 18 226:1,15 227:1,22 228:1 229:1 230:1 231:1 232:1,14 233:1,2,13 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1,22 242:1 243:1 244:1 245:1 246:1 247:1 248:1,16,21 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1,16 257:1,18 258:1 259:1,23

**Seery's** 138:21

**segment** 194:2

**Select** 18:22 22:7 27:8

**sell** 63:8

**selling** 87:8

**send** 67:21 77:23 85:10 107:17 218:24

219:7 251:4 254:11

**sending** 71:6 72:9 94:15 98:10

**senior** 11:18 173:4, 17,18 174:17,25 176:21

**sense** 35:19 229:8

**sensitive** 30:14

**sentence** 65:14,18 135:22

**separate** 30:12 155:3 223:10

**separately** 142:10

**separation** 46:16

**September** 46:3 246:10,12

**server** 77:15

**service** 82:20 117:20 127:4 129:6,22 134:13 158:11 201:17 208:19 222:3, 8 223:4 229:2,11

**services** 36:2,5,15, 16 37:11 38:19 39:2, 8 46:22 62:5 95:4 103:21 110:14 112:21,23 113:4,17 114:8,12,13 115:6 116:2,8,13 127:22 129:25 130:8 132:22 134:24 135:15 139:12,24 143:22 144:6,11,12 147:8,9, 14 153:14,24 158:7, 21 161:13,17 162:23 167:6 198:16 200:9 201:13,14,21 202:2, 3,9 203:10,14,15,21 204:6,7,8,18,19 205:2,7,13,15,22,24 206:7,10,18,19 209:5,8,12,13 210:3, 4,10,17 211:5,6 212:5,6,7,14 215:25 216:4,9 219:12 222:13,18 224:21 225:6,17,24 226:5,19 227:4

**Services'** 205:5

**set** 81:17 85:9 114:6

**settled** 27:16

**settlement** 20:21 21:17,23 44:11,18 45:9 46:13 156:7

**settlements** 156:19

**severance** 176:24

**Sevilla** 207:24 208:8, 10,13

**shady** 151:23

**shared** 35:25 36:5, 14,16 37:10 38:19 39:2,7 46:22 62:5 80:16 82:20 95:3 103:20 110:14 112:21,23 113:4,16 127:4,22 129:6,22,25 130:8 134:13,23 143:21 147:8 153:14 158:7,10,20 201:13, 17 202:2,9 204:6 206:18 209:5 212:6, 14,24 222:2,8,18 223:4 224:21 225:6, 24 226:5,19 227:4 229:2,11

**shares** 188:11

**sheet** 28:24 29:9 31:14,18 35:4,7 236:14

**sheets** 222:12

**shocks** 184:17

**shoes** 241:14

**shorting** 27:10,11

**shortly** 71:14 95:21 206:25

**show** 118:17 196:5 206:21 236:15 245:15 249:21 251:22 254:5

**showed** 99:8

**showing** 213:22 245:20 250:5 251:17 254:7

**shows** 185:22 222:15 237:13 249:20,22

**side** 8:7 48:19 64:11 125:17 225:20,23

**sides** 54:2 145:21

**sign** 91:9

**signature** 70:24 107:14 246:19

**signed** 184:8 247:3

**significant** 13:20,22 168:23 174:14 236:12

**significantly** 169:15,19 170:11,17 171:2,9,15,23,24

**similar** 77:10 80:4 126:5 143:23,25 153:8 166:24 174:24 196:3 200:4,12 206:6 216:4 236:21

**simp** 228:5

**simple** 147:11 233:12

**simply** 171:12 174:6 226:18

**simultaneous** 9:13 21:13 29:2,25 33:21 42:23 44:6 49:22 59:10 70:18 79:3 85:24 94:11,18 98:24 102:12 109:12 121:13 122:22 132:16 135:4 138:10 142:23 143:24 152:8 163:4 164:24 165:21 169:8 171:7 180:21 185:4 189:16 190:17 191:15 204:24 210:22 223:11 230:12 233:4 244:22 246:22 247:22 252:2 253:24 255:11 257:11

**simultaneously** 124:7 125:6

**single** 73:24

**sir** 6:22 8:4 9:15,23 12:23 13:10 14:22 16:11,23 24:2 28:21 33:14 43:14 49:20 51:11 56:16 61:3

65:12,13,18 66:20
68:22 69:12 88:24
90:18 91:15 92:4
106:25 107:9 112:19,
25 115:12,21 120:11
124:6,19 135:13,22
136:6 141:6 142:17
147:8 148:7,15
150:2,17 151:21
152:12 159:3 252:17

**sit** 164:8 165:8
228:22 247:12,20

**sitting** 10:9 109:15
113:11 129:15 131:5,
15 137:8

**situation** 175:7
196:3

**sixty** 38:4

**sixty-day** 37:24 38:2

**skill** 136:21

**skills** 26:21

**Skyview** 208:16

**slice** 245:20

**sloppiness** 66:10

**slow** 100:5

**slowly** 160:18

**small** 186:20

**smart** 227:23

**Smith** 5:12

**sold** 22:11 188:10

**solely** 13:14 182:14

**solicit** 63:16

**solve** 234:20

**solvency** 28:4,10,13,
19 29:21 30:7,17,24
31:5,7 34:4,5,6
232:6,17 233:23
234:15 235:5,10,16,
23

**solvent** 233:21
234:12 236:4

**sort** 43:3 48:15
111:21 188:12
204:10 244:19,20

**sound** 43:2 182:8

**sounds** 48:18

**speaking** 9:13 21:13
29:2,25 33:21 42:23
44:6 49:22 59:10
70:18 79:3 85:24
94:11,18 98:24 100:3
102:12 109:12
121:13 122:22 125:6
132:16 135:4 138:10
142:23 143:24 152:8
163:4 164:24 165:21
169:8 171:7 180:21
185:4 189:16 190:17
191:15 204:24
210:22 211:19
223:11 230:12 233:4
244:22 246:22
247:22 252:2 253:24
255:11 257:11

**speaks** 113:25

**specific** 20:13 39:4
46:4 47:23 76:8,21,
22 84:12 93:10 97:25
120:4 154:21 171:19
202:10 206:5 211:15,
18 212:2,10 216:18
218:21 221:4 224:12,
14 227:18,20 228:18
229:9 230:17 235:22,
24 249:10

**specifically** 43:15
71:12 77:8 81:23
90:5,6 97:24 118:5
122:3 133:5,7 135:25
150:24 152:25 153:3
155:19 162:12
198:21 199:2,21
201:11 208:3 209:24
210:19 219:24
227:16 228:15
230:25 246:8

**specifics** 217:20

**speculate** 111:13,
16,17

**speculating** 108:12,
15 111:14,15

**speculation** 152:3

**spend** 86:22

**spent** 13:18,20,22

**spoke** 177:13

**spoken** 208:9

**spreadsheets** 253:3

**spring** 203:25

**staff** 135:15

**stand** 107:21

**standalone** 203:2

**standard** 72:5 74:21
79:24 144:17

**standards** 61:7,11

**Stang** 5:20

**start** 5:3 52:20 179:3
183:15 190:20

**started** 46:16 160:24
213:8

**starting** 40:23 41:8
42:10 44:15

**State** 6:23 8:10,14

**statement** 52:4
58:18 128:25 246:2

**statements** 251:20
258:19

**states** 11:3

**status** 200:20,25
201:6

**stayed** 18:3

**step** 180:15 239:11
243:2

**stepped** 238:19
242:11

**stepping** 241:14,21

**steps** 98:9 242:22

**stick** 105:12

**Stinson** 6:2,4

**stock** 164:22 173:12

**stooge** 154:9

**stop** 193:18 196:23

**stopped** 45:7,9

**story** 76:23 159:2
222:10 225:15 233:8

**Strand** 12:16 13:14

**street** 140:25

**strewn** 140:25

**strictly** 60:23 225:21

**strike** 26:24 39:15
47:8 51:18 53:8
61:17 78:4,12 83:17
86:12 93:23 110:7
127:13 133:11
172:17 185:24
190:20 205:9 220:9
231:24 233:11 244:8

**strip** 140:2

**stripping** 53:23
144:14

**structure** 45:17
155:15 166:12
179:21

**structured** 173:6,8
177:18 181:4

**structuring** 182:10,
13

**struggle** 85:14

**style** 67:24

**stylistic** 68:13

**Sub-trust** 16:8

**subject** 10:2 18:5
54:9 145:16 182:19
184:11 188:25

**subsequent** 76:23
113:20 179:5 232:24
237:6

**subsequently** 12:8
18:10,13 19:2 120:23

**substance** 72:12
73:12,14 79:20 81:9
102:17 143:14

**substantial** 87:9
161:5

**substantially** 63:25
64:6,7

**successful** 168:6
169:5,14 191:25
192:13,18

**successfully** 189:6

**sucked** 35:14

**sued** 33:3

**sufficient** 199:14
244:6

**suggest** 60:22

**suggests** 68:22

**suing** 63:10 87:11

**suit** 64:9

**Sullivan** 177:15

**sum** 118:13,16

**summarize** 118:4

**summary** 17:16,20
242:5

**superior** 126:11

**superseded** 55:20
56:4

**supplemental**
251:12,16

**supplied** 93:16

**support** 43:10 58:24
115:23 147:18

**supporting** 147:23

**supports** 228:20

**supposed** 234:21
241:14 242:17
244:15,17,21 245:7

**Surgent** 16:24 17:3
40:8 153:2 211:20,22

**Surgeon** 17:2

**surprised** 193:24

**surprises** 184:14,22
185:14

**suspect** 113:12

**swear** 6:15

**sworn** 6:18

**syphoned** 62:9

**system** 254:13

**systems** 253:18,19

Case 21-03005-sgj   Doc 157   Filed 01/20/22   Entered 01/20/22 22:18:05   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 01/20/22   Page 62 of 178   PageID 44996

Index: takes..twenty

**T**

**takes** 8:14 239:9,11 242:8

**taking** 7:4 73:21 123:7 140:15 166:14 236:18 244:3

**talk** 7:23 24:16 108:14 177:14 178:18 200:19,23 201:4 240:23 251:24 252:5 253:10

**talked** 27:9 41:4 71:14 106:15 177:16

**talking** 56:11 57:10 61:13 71:19 80:15 133:13 156:8,21 166:23 180:24 188:5 194:20 202:15 232:2 239:22 240:7

**talks** 66:15 68:8,12 88:21 147:11

**tangential** 62:6

**tax** 179:5 180:17,22 181:5,8,10,16,18 182:11

**taxes** 173:9 179:6,21 180:8 182:14,15

**taxi** 181:17,19

**team** 46:17 47:18 49:9 92:21 117:22 155:5 156:24 157:5,6 168:25 211:11 247:11 252:12

**technical** 183:5

**technically** 161:24

**TECHNICIAN** 5:2 6:14 98:25 99:4 112:3,6 146:14,17 160:8,11 213:16,19 248:9,12 259:2

**telephone** 106:10

**telling** 43:19 165:12

**tells** 131:2 134:3

**ten** 98:23 140:18 171:16 178:2 193:13

194:9 245:5

**tenor** 63:9

**tens** 154:23

**tentacle** 154:9

**term** 41:3,10 51:3 53:4,10,15,16,17 54:8 59:19 60:7 65:3,6 95:8 145:10,18 178:10 179:4,5 180:17 182:22 183:18,23 194:22 195:3,6,10,11,19 198:16 199:19 214:22,25 216:11 219:14,15 222:12 229:16,25

**terminate** 37:16 144:5

**terminated** 37:20 38:7 114:20,25 158:8,22

**termination** 38:22, 25 39:7 46:18,22 113:20 115:2 153:14 158:20

**terminations** 132:11

**terms** 54:2,3,6 60:24 65:12 108:6 115:15, 23 147:18 183:22 220:6 254:22 256:5,9

**terrible** 172:14

**test** 31:14,18,21

**testified** 6:19 59:24 62:22 101:19 107:22 117:7 119:20 120:7 127:3 141:25 151:19, 22 227:17 238:17 245:5

**testify** 10:4 128:12 159:5 182:20

**testifying** 109:4

**testimony** 61:3 101:22 119:24 126:15 127:15 221:14 224:8 225:21 229:5 238:20 239:5, 21 240:3,19 241:20 259:14

**Texas** 8:10,14

**texts** 7:5

**there'll** 99:20

**thing** 7:21 42:21 65:10 73:24 99:25 111:21 130:24 153:9 162:15 181:15 196:23 225:23

**things** 18:11,14 19:13 22:13 50:8 53:19 76:24 115:9 153:10 155:3 166:14 202:12 203:3 204:13 205:2 206:4 234:19 245:4 254:11

**thinking** 249:12

**third-party** 206:7

**thirteen-week** 82:4, 6 83:22 84:6

**thirty** 38:5 54:4 62:12 138:16 165:25 236:19

**thirty-year** 53:10 87:5 161:9

**Thomas** 16:24

**thought** 27:13 50:14 52:14 59:24 65:10 78:7 144:9 195:15 199:20 219:22 235:23 244:23

**threat** 177:12

**Thursday** 259:4

**ties** 67:6

**tight** 35:12

**Tim** 176:5

**time** 13:7,18,19,21,22 19:9 23:8 27:2,12,24 40:15 44:2 45:7,25 47:2 49:15 50:14 51:3 52:7,13,17,19, 23 53:4,7,24 54:16 57:20 59:2,18 60:8 62:24 71:17 75:15 80:7 83:4 94:2,8 95:21 98:25 99:4 100:18 103:19 112:3, 6 124:17,19 126:15,

24 128:5 130:17 134:13 145:3 146:14, 17 147:4,5,18 149:6 153:11 154:22 159:13 160:8,11 188:10 195:16 201:7, 10 208:11 211:16 213:11,16,19 221:9, 19,21 227:2 228:18 233:21,22 234:12,13 235:10 248:2,9,12 255:23 259:2

**timely** 116:23

**times** 7:15 35:14 58:2 135:8 140:18 145:8,9 204:14 227:24 242:21 257:13

**timing** 127:8

**today** 5:24 9:17 10:5, 9 14:20 24:17 55:11 109:15 113:11 129:15 131:5,16 137:9 165:8 182:20 202:17 228:23 235:15 247:12

**today's** 150:15 259:3

**told** 34:21 72:17 81:14,21 82:10 84:15 96:18,21 97:2,3 99:18,19 101:19 102:18 118:2,11 119:10,16,17 140:20 156:24 157:3 211:6 229:10

**tons** 62:9

**top** 64:4 115:7 162:5 246:25

**top-level** 162:9,10

**topic** 88:9 94:25 134:18 234:2

**topics** 9:4,9 10:5,8 76:21,22 223:9

**total** 91:15 110:11 149:3 167:19 190:13 216:20,23 217:18 230:7,8,20,21 243:7

**totally** 79:4

**touched** 245:12

**traded** 18:21

**transaction** 145:21 180:18 181:3,8 182:10,13 188:24 192:3

**transcript** 101:24 102:3 110:25 259:12

**transfer** 33:4,9 34:2, 9 217:23 232:12 257:20

**transferred** 147:20

**transition** 104:2 208:14,18

**treasurer** 49:24 123:15 124:9 125:14

**treasury** 132:21

**treat** 168:25

**trial** 38:18,21

**TRO** 43:10

**true** 36:20 43:4 52:4 86:23 112:16 113:7 117:4 206:5,7 259:15

**Trussway** 186:11,19 187:5 188:2,7 190:6, 21

**trust** 6:13 15:12,22, 24 16:5 45:20 179:20

**trust-me** 179:17,19

**trustee** 15:3,5,6,8, 10,11 238:13 243:2

**truth** 43:19 224:10

**TSG** 5:10,12

**Tuesday** 81:20

**turn** 135:12

**turned** 79:14 87:18

**TWA** 161:7

**twelve** 176:17 178:2 194:9 236:8

**twelve-minute** 193:13

**twenty** 171:4,9 193:15

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 178-21    Filed 01/20/22    Page 63 of 178    PageID 44997
Document    Page 63 of 305
Index: twenty-five..Zoom

twenty-five 7:16

twenty-plus 88:7

type 166:9,20 171:12
202:23 249:17

types 167:2 175:11

typical 166:6

typically 65:24 74:11
83:2 145:5 167:8
170:21 173:4 216:25

tyrant 140:9

___

**U**

Uh-huh 56:9,17
94:13 116:6 141:15

ulterior 60:4,5

ultimate 35:8 192:10

ultimately 25:10
47:18 63:8 97:13
118:4

unable 29:14 224:14

unclear 57:24 102:7

uncommon 61:15

underlaid 241:13

underlying 60:24

understand 7:25
21:22 28:12 41:7
48:18 49:16 53:3,9,
12 58:15 61:7 65:5
94:2 132:2 138:14,20
163:11 172:4 180:18
185:5 190:6 216:16
217:6 225:18 228:17
239:21 253:25

understanding 14:4
20:9 25:25 26:2
44:24 108:7 114:3
115:14,20 118:14
119:6 120:12 121:6
123:21 127:13
132:19 137:8 141:3
142:2 166:5 179:10
180:6 201:12,25
215:23 220:8,10

understood 78:22
79:15 131:25 194:24

221:23 236:16

undertaken 97:7
174:10

undertook 243:25
245:8

unfair 59:9 60:13

United 161:7

units 14:17 15:13,15

universe 103:11

university 10:18,20,
21

unpaid 22:5 51:25
60:20 66:18,24 67:2

unsecured 64:18
88:6

unusual 73:14

unwritten 212:4,17,
23

upcoming 119:13
134:21

update 83:24

Upper 8:6

upside 170:15 188:7,
9,14 190:4,5 191:23

___

**V**

Vague 24:3

vaguely 24:3

values 30:9

vehicle 140:2

version 9:10

versions 253:6
258:13

veteran 7:22

video 5:2 6:14 98:25
99:4 101:8 112:3,6
146:14,17 160:8,11
213:16,19 248:9,12
259:2

video-record 74:4

video-recorded 5:4

view 34:15 45:21
146:20 147:2 215:2

viewed 64:12

views 153:23

violation 182:15

virtually 59:11 243:8

virtue 54:19

vis-a-vis 45:11
102:18 131:7

visually 83:12

void 56:5

volunteer 94:17

volunteered 98:18

___

**W**

wait 88:6

waived 98:2

waiver 69:5,7 219:19

waives 69:6

wanted 22:2 60:6
99:25 156:15 193:23
206:12

warning 213:10

Warren 6:7,10

waste 44:2

Waterhouse 36:20
39:6,21 47:2,12
48:20 49:8,17 81:6,9
83:3 84:18 92:12
96:23,24 97:2 99:19
100:23 101:18
102:17 103:6 106:4,
9,15 109:18 117:7
118:10,19 119:16,20
120:14 122:8,9,18
123:12 124:2,7,20
125:12 126:5,16
131:2 133:19 137:13
139:11 140:4,13,20
141:4 143:11 148:18,
25 149:12,17 153:5,
13,21 154:8 155:4,10
156:6 157:4,14
158:16 159:5 200:24
207:24 211:13,24

Waterhouse's 92:21
102:3 103:10 106:13
110:24 119:2 149:11
229:5

ways 20:16 257:2

wearing 122:23

Webex 74:10,14,21

Wednesday 81:20

week 81:17,19
109:13

weekly 81:15 82:25

West 8:6

whatsoever 53:25
170:2 185:19 224:24

wherewithal 35:7

whomever 247:11
248:17

win 64:9 237:3

wire 217:22 218:5,10,
20,22 257:22

withdraw 228:13

withhold 78:4,12,15,
18 79:10

word 43:4 45:24 50:4
66:4 67:25 130:22
154:8,13 253:5
254:6,7 258:13

words 14:14 44:12
99:21 108:11 137:11
151:20 152:2 220:21
221:5,7,17 224:13,15
226:16 227:12,13,15,
18,20 228:18

wore 123:12

work 8:12 117:17
138:13 142:3 174:5
203:6,8 206:2

worked 22:19 97:18
121:21 169:25
173:18 174:4 255:4,7

working 203:9
208:14,17 254:19

works 140:13

world 233:7

Waterhouse's 92:21

worth 164:23 165:2,
6,7 191:8,12,21
192:4,19

write 197:7

writes 150:10

writing 73:21 99:23
157:7

written 104:11 148:2
202:16 212:17,20
214:11

wrong 9:12 113:8
177:6 241:22

wrote 197:8,10,18,22
198:4

___

**Y**

Yang 176:5,22
177:20

year 19:2 65:17
163:15 164:13,14
168:8,15 169:13,20
170:12 171:16 172:3,
4,8 204:2 217:2

year-and-a-half
187:15

years 22:20 54:4
57:11 60:21 62:12
88:7 138:16 164:14
165:25 167:3,19,23
176:18 178:2 201:24
229:20 230:23
236:20

yesterday 108:17
119:25

York 8:6 10:23,24
11:5 176:23

___

**Z**

Ziehl 5:20

Zoom 27:10 74:9,14,
21 112:17

# Exhibit B

Page 1

1              McGovern - 11-9-2021

2          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION

4    In re:                    )
                               )
5    HIGHLAND CAPITAL          )    Case No.
     MANAGEMENT, LP,           )    19-34054 L.P.
6                              )    Chapter 11
            Debtor,            )
7    ----------------------------)
     HIGHLAND CAPITAL MANAGEMENT,  )
8    LP,                       )
                               )
9            Plaintiff,        )  Adversary No.
                               )  21-03003-sgi
10       vs.                   )
                               )
11   JAMES D. DONDERO,         )
                               )
12           Defendant.        )

13

14

15

16

17            REMOTE DEPOSITION OF

18              BRUCE McGOVERN

19              Houston, Texas

20       Tuesday, 9th day of November, 2021

21

22

23   Reported by:

24   Daniel J. Skur, Notary Public and CSR

25   Job No. 202067

Page 2

1          McGovern – 11-9-2021

2

3

4

5

6

7          9th day of November, 2021

8          10:01 a.m. – 10:34 a.m.

9

10

11          Remote Deposition of BRUCE McGOVERN,

12   located in Houston, Texas, before Daniel J.

13   Skur, Notary Public and Certified Shorthand

14   Reporter in and for the State of Texas

15   located in Waxahachie, Texas.

16

17

18

19

20

21

22

23

24

25

Page 3

1          McGovern – 11-9-2021

2   A P P E A R A N C E S :

3          Pachulski Stang Ziehl & Jones

4          Attorney(s) for Debtor

5          780 Third Avenue

6          New York, New York 10017

7          By: John Morris, Esq.

8

9

10

11

12          Stinson

13          Attorney(s)for James Dondero, HCMS

14          and HCRE

15          3102 Oak Lawn Avenue

16          Dallas, Texas 75219

17          By: Michael Aigen, Esq.

18

19

20

21

22   ALSO PRESENT:

23          La Asia Canty, Paralegal

24          Haley Winograd

25

Page 4

1          McGovern – 11-9-2021

2

3          IT IS HEREBY STIPULATED AND AGREED

4   by and between the attorneys for the respective

5   parties herein, that filing and sealing be and

6   the same are hereby waived.

7          IT IS FURTHER STIPULATED AND AGREED

8   that all objections, except as to the form  of

9   the question, shall be reserved to the

10   time of the trial.

11          IT IS FURTHER STIPULATED AND AGREED

12   that the within deposition may be sworn to and

13   signed before any officer authorized to

14   administer an oath, with the same force and

15   effect as if signed and sworn to before the

16   Court.

17                    - oOo -

18

19

20

21

22

23

24

25

Page 5

1          McGovern – 11-9-2021

2          P R O C E E D I N G S

3          REMOTE ORAL DEPOSITION OF

4          BRUCE McGOVERN

5          (REPORTER NOTE:  This deposition is

6   being conducted remotely in accordance with

7   the Current Emergency Order regarding the

8   COVID-19 State of Disaster.

9          Today's date is the 9th day of

10   November, 2021.  The time is 10:01 a.m.

11   Daylight Savings Time.  The witness is

12   located in Houston, Texas.)

13          BRUCE ALLEN MCGOVERN,

14   having been duly cautioned sworn to tell the

15   truth, the whole truth and nothing but the

16   truth, testified as follows:

17          (10:01 a.m.)

18          EXAMINATION

19   BY MR. MORRIS:

20          Q.    Could you please state your name for

21   the record?

22          A.    My name is Bruce Allen McGovern.

23          Q.    Good morning, Mr. McGovern.  My name

24   is John Morris.  I'm an attorney at Pachulski

25   Stang Ziehl & Jones.  We are counsel to

Page 6

McGovern - 11-9-2021

1   Highland Capital Management, LP, a company that
2   has been reorganized following its bankruptcy
3   in Texas.
4           Are you aware of the bankruptcy?
5       A.   Yes, I am.
6       Q.   Okay.  And we're here today for your
7   deposition; is that right?
8       A.   Yes, that's correct.
9       Q.   And you've been deposed on a number
10  of occasions in your professional capacity.
11          Do I have that right?
12      A.   I believe there have been three
13  occasions, yes.
14      Q.   Okay.  So I'm not going to ask you
15  about those occasions.  I want to try to get
16  this done as quickly as we can.
17          I'll just tell you that -- I don't
18  know if any of those occasions were remote
19  depositions, but remote depositions are
20  particularly difficult, only because we're not
21  in the same room.
22          From time to time, we'll put
23  documents on the screen.  If there's anything
24  that you need to see, will you please let me

Page 7

McGovern - 11-9-2021

1   know that?  And we'll scroll down to the
2   portions that you think you need to see.
3           Is that okay?
4       A.   Yes, I will.
5       Q.   And if there's anything that I ask
6   that you don't understand, will you let me know
7   that?
8       A.   Yes, I will.
9       Q.   Okay.  You were retained by the
10  Stinson firm to provide expert testimony on
11  behalf of James Dondero; is that correct?
12      A.   Yes, that's correct.
13      Q.   Okay.  And when were you retained?
14      A.   I was retained sometime at the
15  beginning of 2021, I believe.  I don't recall
16  the exact date, but it was in the first few
17  months of 2021.
18      Q.   How did it come -- how did your
19  retention come about?
20      A.   I received a phone call, I believe,
21  from Michael Aigen, who is here today; and he
22  discussed with me the general nature of the
23  underlying litigation and the issue on which he
24  and his firm were seeking expert testimony.

Page 8

McGovern - 11-9-2021

1   And after discussing that with him, I agreed to
2   serve as an expert witness.
3       Q.   And what exactly were you asked to
4   do?
5       A.   I was asked to prepare a report on a
6   specific legal issue that has to do with the
7   structure of some loans from Highland Capital
8   Management, LP, to Mr. Dondero and subsequently
9   to -- I understand there were similar loans to
10  entities controlled by Mr. Dondero.
11      Q.   When we use the phrase "Highland"
12  today, can we agree that we're specifically
13  referring to Highland Capital Management, LP?
14      A.   Yes, that's fine.
15      Q.   Okay.  When you were told about the
16  nature of the litigation, do you recall whether
17  you were informed that Mr. Dondero had already
18  filed an answer to the complaint?
19      A.   Yes.  I was informed of that, and I
20  was provided with copies -- at least at that
21  time, copies of the promissory notes that he
22  had signed and also the complaint by Highland
23  Capital against Mr. Dondero as well as the copy
24  of the amended answer in the litigation.

Page 9

McGovern - 11-9-2021

1       Q.   Okay.  So -- so you were given a
2   copy of the amended answer that he filed at the
3   time that you were retained?  Do I have that
4   right?
5       A.   That's correct.
6       Q.   So you couldn't have been retained
7   before the time the amended answer was filed;
8   is that fair?
9       A.   I'm just thinking through your
10  question, so...  That's correct.  That's
11  correct.
12      Q.   Okay.  Have you ever been retained
13  by the Stinson firm before your engagement in
14  this case?
15      A.   No, I have not.
16      Q.   Okay.  Have you ever provided any
17  services to Highland before?
18      A.   No, I have not.
19      Q.   Have you ever met James Dondero?
20      A.   No, I have never met him.
21      Q.   Have you ever spoken with him?
22      A.   No, I have not.
23      Q.   So your report is not based in any
24  way on anything Mr. Dondero has told you; is

**App. 189**

Page 10

McGovern - 11-9-2021

1  that fair?
2      A.   That's correct.
3      Q.   Okay.  And I want to go a little bit
4  broader.  I think I used the words whether
5  you -- I'd asked whether you had spoken with
6  him.
7          So let me ask a different question:
8  Have you ever communicated with Mr. Dondero by
9  email or otherwise?
10     A.   No.  I've never had any
11 communications with him.
12     Q.   Is it fair to say that all of your
13 communications relating to the work that you've
14 done in this lawsuit have been exclusively with
15 one or more lawyers from the Stinson firm?
16     A.   Yes, that's correct.
17     Q.   Okay.  Have you ever communicated
18 with anybody else regarding any of the work
19 that you've done in connection with this
20 engagement other than lawyers from the Stinson
21 firm?
22     A.   No.  I have not.
23     Q.   Okay.  I'm going to ask you --
24     MR. AIGEN:  John.

Page 11

McGovern - 11-9-2021

1      MR. MORRIS:  Yes.
2      MR. AIGEN:  I just want to point
3  something out.  The witness may not be
4  aware that one of our conversations, Dan
5  Elms was listening, I believe.
6          Actually, I apologize.  I may be
7  convincing -- confusing this with other
8  witnesses.  Dan Elms is not a lawyer at our
9  firm.  Now that I'm saying that, I actually
10 may be confusing it with conversations with
11 our other expert, so...
12     A.   I don't recall him being in any of
13 our discussions.
14     MR. AIGEN:  I apologize.  I probably
15 should just be quiet.
16 BY MR. MORRIS:
17     Q.   I'm going to ask my colleague, La
18 Asia Canty, to put on the screen a copy of your
19 report, which has been premarked as Exhibit 61.
20     (Exhibit 61 introduced.)
21 BY MR. MORRIS:
22     Q.   And can you see that, sir?
23     A.   Yes, I can.
24     Q.   Okay.

Page 12

McGovern - 11-9-2021

1      MR. MORRIS:  And if we could just
2  scroll to the last page, the signature
3  line.
4  BY MR. MORRIS:
5      Q.   And that's your signature, sir?
6      A.   Yes, it is.
7      Q.   And did you sign this on or around
8  May 28th, 2021?
9      A.   Yes, I did.
10     MR. MORRIS:  You can go back to the
11 top.
12 BY MR. MORRIS:
13     Q.   As you sit here today, is there
14 anything that you believe is inaccurate about
15 your report?
16     A.   No.
17     Q.   Is there anything that you believe
18 should be modified to state more clearly the
19 opinions and the bases for them, as set forth
20 in this report?
21     A.   No.
22     Q.   Your report has not been amended or
23 supplemented in any way, correct?
24     A.   That is correct.

Page 13

McGovern - 11-9-2021

1      MR. MORRIS:  If we can scroll down a
2  little bit.
3  BY MR. MORRIS:
4      Q.   You reviewed five documents for
5  purposes of preparing your report.  Do I have
6  that right?
7      A.   Yes, that's correct.
8      Q.   Okay.  And it's those five documents
9  that are listed in the first page of your
10 report, right?
11     A.   Yes, that's correct.
12     Q.   Okay.  Since signing this report on
13 May 28th, 2021, have you been provided with any
14 additional documents that relate in any way to
15 your opinions?
16     A.   I've been provided with copies of
17 the promissory notes that were executed on
18 behalf of some of the entities controlled by
19 Mr. Dondero in favor of Highland Capital, and I
20 believe I also have a copy of the complaint in
21 the adversary proceeding filed against the
22 entities.
23     Q.   When were you given those documents?
24     A.   I was provided those documents, I

**App. 190**

Page 14

McGovern - 11-9-2021

1  believe, sometime last week.
2      Q.    And to confirm, those documents
3  haven't caused you to change your opinions as
4  set forth in your report in any way, correct?
5      A.    That's correct.
6      Q.    Did you have any discussion with
7  anybody about why you weren't given those
8  documents before you completed your report on
9  May 28th?
10      A.    No.  I was not provided any
11  explanation of that.  What did occur is that I
12  met with attorneys from the Stinson law firm to
13  discuss the deposition today; and following
14  that conversation, I was sent by email copies
15  of the additional documents.
16      Q.    Okay.  But you don't recall having
17  any discussion about why you hadn't been given
18  copies of those documents before you completed
19  your report on May 28th, 2021, correct?
20      A.    That's correct.
21      Q.    Okay.  Were you ever given any
22  information concerning Highland's treatment of
23  the loans on Highland's books and records?
24      A.    No, I was not.
25

Page 15

McGovern - 11-9-2021

1      Q.    Did you ever ask for any information
2  concerning Highland's treatment of the loans in
3  its books and records?
4      A.    No, I did not.
5      Q.    Is Highland's treatment of the loans
6  in its books and records relevant at all to
7  your opinions as set forth in Exhibit 61?
8      A.    No, I don't believe it is.
9      Q.    Were you given copies of Highland's
10  audited financial statements?
11      A.    No, I was not.  I've discussed
12  already all of the documents that I was
13  provided to you, both to prepare the report and
14  that I was provided subsequent to the report.
15      Q.    Did you ask to see Highland's
16  audited financial statements?
17      A.    No, I did not.
18      Q.    Is it fair to say that the treatment
19  of the loans in Highland's audited financial
20  statements is irrelevant to your opinions as
21  set forth in Exhibit 61?
22      A.    Yes.  I think that's a fair
23  assessment.
24      Q.    Did you ask for any documents that
25

Page 16

McGovern - 11-9-2021

1  are not listed in your report?
2      A.    No, I did not.
3      Q.    So is it fair to say that you never
4  looked at any documents that were filed in
5  Highland's bankruptcy case?
6      A.    The only documents I've looked at
7  that were filed in the bankruptcy case are the
8  complaint and the amended answer.
9      Q.    And you never asked for any
10  documents that were filed in the bankruptcy
11  case other than the documents set forth in your
12  report, correct?
13      A.    That's correct.
14      Q.    As a general matter, is Highland's
15  treatment of the loans relevant at all to your
16  opinions?
17      A.    No, it's not, because I was asked to
18  make certain assumptions in connection with
19  preparing my report.
20      Q.    Okay.  Can you identify any of the
21  promissory notes that you were given in the
22  last week or so?
23      A.    Off the top of my head, I can't.
24  I'd have to look in my files, but I recall, for

Page 17

McGovern - 11-9-2021

1  example, that there were promissory notes
2  signed by a few different entities controlled
3  by Mr. Dondero that were organized in different
4  forms.
5      One, I believe, was HCE, but I can't
6  recall off the top of my head if that was a
7  limited partnership or a corporation.
8      Q.    I take it that you have never seen
9  any of Mr. Dondero's written responses to
10  Highland's discovery requests?
11      A.    That is correct.
12      Q.    Have you ever seen any transcripts
13  from any depositions that have been given in
14  these adversary proceedings?
15      A.    No, I have not.
16      Q.    Have you ever asked to see any
17  transcripts of any depositions that were given
18  in these adversary proceedings?
19      A.    No, I have not.
20      Q.    Okay.  So your opinions don't take
21  into account any of the testimony that was
22  adduced in any depositions that were given in
23  these adversary proceedings, correct?
24      A.    That's correct.
25

**App. 191**

Page 18

McGovern - 11-9-2021

Q.    Okay.

MR. MORRIS:  If we could turn to the assumptions.

Okay.  Right there is fine.

BY MR. MORRIS:

Q.    So you were asked to assume the facts that are set forth in the five numbered paragraphs on this page, correct?

A.    Yes, that's correct.

Q.    Okay.  And, in fact, you satisfied yourself, have you not, that Assumed Fact Number 1 is actually true, correct?

A.    That is an assumption.

MR. AIGEN:  Objection, form.

A.    I don't have any basis for -- for example, identifying that that's actually Mr. Dondero's signature; but I was asked to assume that for purposes of the report, that he had signed these promissory notes.

BY MR. MORRIS:

Q.    Did anybody tell you that Mr. Dondero disputed his execution of the three promissory notes that were given to you?

A.    No.

Page 19

McGovern - 11-9-2021

Q.    Okay.  Let's look at the second assumed fact.

It says, quote:  Subsequent to Mr. Dondero's execution of the notes, but before Highland Capital made demand for payment of the notes, Highland Capital and Mr. Dondero entered into an oral agreement, which I think you're defining there as "the subsequent agreement."

Have I read that correctly?

A.    Yes, that is correct.

Q.    Have you been given any document -- withdrawn.

Have you been given any documentary evidence concerning the subsequent agreement?

A.    No, I have not.

Q.    Do you know whether -- has anybody ever informed you whether such documentation exists?

A.    Nobody has ever suggested that to me.

Q.    Okay.  Did you ask to see any documents concerning the existence of the subsequent agreement?

Page 20

McGovern - 11-9-2021

A.    No, I did not.

Q.    And that's because you were just asked to assume that the subsequent agreement existed, correct?

A.    It's because I was asked to assume that there was an oral agreement, and normally there would be no documentation of an oral agreement.

Q.    Okay.  It's possible that after somebody enters into an oral agreement, somebody makes a note to -- to write down the terms that were agreed to; isn't that fair?

A.    Yes, that's possible.

Q.    Okay.  And in your expertise, would you expect somebody to -- withdrawn.

Do you know when the subsequent -- withdrawn.

I'm going to use the phrase "subsequent agreement" to refer to the agreement that's described in Assumption Number 2.  Is that okay?

A.    Yes, that's fine.

Q.    Okay.  Do you know when the subsequent agreement was entered into?

Page 21

McGovern - 11-9-2021

A.    I don't know the exact date.  I was asked to assume only that it had occurred after the execution of the original promissory notes.

Q.    Were you asked to make any assumptions concerning the number of subsequent agreements that were entered into between Mr. Dondero and Highland Capital?

A.    I'm sorry, could you -- could you restate that?

Q.    Were you asked to assume that there was one subsequent agreement between Highland Capital and Mr. Dondero or more than one subsequent agreement between Highland Capital and Mr. Dondero?

A.    My assumption has been that there was only a single oral agreement; however, given that there were multiple promissory notes, it's conceivable that there could have been separate oral agreements for each note.  But, in general, I've been assuming a single oral agreement that applied to all of the notes.

Q.    And you don't have any personal knowledge regarding the number of subsequent

Page 22

McGovern - 11-9-2021

1  agreements that may exist, correct?
2      A.    That's correct.
3      Q.    And you weren't asked to assume that
4  more than one subsequent agreement existed,
5  correct?
6      A.    That's correct.
7      Q.    And when you prepared your report,
8  the assumption that you made was that there was
9  only one subsequent agreement, correct?
10     A.    Yes, the subsequent agreement to
11 which I refer in my report.
12     Q.    Okay.  Do you know who entered the
13 subsequent agreement on behalf of Highland
14 Capital?
15     A.    No, I do not.
16     Q.    Do you know if the subsequent
17 agreement was ever disclosed to Highland
18 Capital's outside auditors?
19     A.    No, I do not.
20     Q.    Is it fair to say that the
21 circumstances surrounding the entry into the
22 subsequent agreement are not relevant to your
23 opinions as set forth in Exhibit 61?
24     A.    Yes, that's correct, because I'm

Page 23

McGovern - 11-9-2021

1  assuming only that there was a subsequent
2  agreement that occurred after the execution of
3  the notes, but before demand for payment on the
4  notes had been made.
5      Q.    So you're not offering any opinion
6  that the subsequent agreement actually exists,
7  correct?
8      A.    That's correct.
9      Q.    And you're not offering any opinion
10 that the terms of the subsequent agreement were
11 reasonable, correct?
12     A.    That's correct.
13     Q.    You're not offering any opinion that
14 the subsequent agreement was fair to both
15 parties, correct?
16     A.    That's correct.
17     Q.    And you're not offering any opinion
18 that the person who entered into the subsequent
19 agreement on behalf of Highland Capital
20 fulfilled his or her or its duties, correct?
21     A.    That's correct.
22     Q.    Are you offering any opinion at all
23 about the subsequent agreement?
24         MR. AIGEN:  Objection, form.

Page 24

McGovern - 11-9-2021

1      A.    I'm offering an opinion only about
2  the effect of the subsequent agreement,
3  assuming that the subs- -- subsequent agreement
4  is as I described in my report.
5  BY MR. MORRIS:
6      Q.    Okay.  What if I asked you to assume
7  that there was no subsequent agreement?  Would
8  that change your opinions?
9          MR. AIGEN:  Objection, form.
10     A.    It -- it would not change my
11 ultimate opinion, which is that there is no
12 cancellation of indebtedness income for
13 Mr. Dondero.
14 BY MR. MORRIS:
15     Q.    And your opinion today is that
16 there's no taxable income to Mr. Dondero
17 because the conditions subsequent that you were
18 asked to assume have not yet been satisfied; is
19 that fair?
20     A.    That's correct.  My opinion is that
21 there was no income for him at the time of the
22 original loans because of his obligation to
23 repay, and that assuming the subsequent
24 agreement occurred, that the subsequent

Page 25

McGovern - 11-9-2021

1  agreement did not change the outcome for him,
2  that it -- it would not cause him to have
3  income from the -- the loans.
4      Q.    And so if there is no subs- -- if I
5  ask you to assume that there is no subsequent
6  agreement, would your opinion be that
7  Mr. Dondero therefore owes any unpaid principal
8  and interest due under each of the notes that
9  you've reviewed?
10     A.    Based on the -- my review of the
11 promissory notes, yes, that the notes are
12 demand notes in favor of Highland Capital.
13     Q.    Okay.  Let's go to Assumed Fact
14 Number 3.  It states, quote:  In the subsequent
15 agreement between Highland Capital and
16 Mr. Dondero, Highland Capital agreed that it
17 would not collect on the notes unless certain
18 conditions defined as "the conditions," could
19 not be satisfied.  In other words, Highland
20 Capital agreed that the loans will be forgiven
21 only if the conditions are satisfied.
22         Do I have that right?
23     A.    Yes, that's correct.
24     Q.    Okay.  And -- and -- and that all

Page 26

McGovern - 11-9-2021

1  of that -- everything in Number 3 is -- is an
2  assumption that you were asked to make in
3  rendering your opinion, correct?
4      A.    Yes, that's correct.
5      Q.    Do you know what the conditions
6  were?
7      A.    I don't know the details of the
8  conditions.  I was asked to assume only that
9  the conditions related to things beyond
10  Mr. Dondero's control, such as the sale of
11  certain assets above cost.
12     Q.    Okay.  That bleeds into the fourth
13  assumption, but I just want to stick with
14  Number 3 for the moment.  Do you have any other
15  information about what the conditions were,
16  other than the sale of an asset above cost?
17     A.    No, I do not.
18     Q.    Did you ask any questions about the
19  nature, extent, and scope of the conditions?
20     A.    Only if whether the conditions were
21  things beyond his control, but other than that,
22  I did not ask for details.
23     Q.    Were you given any information
24  concerning the likelihood that the conditions

Page 27

McGovern - 11-9-2021

1  would be satisfied?
2      A.    No, I was not.
3      Q.    Did you ask any -- did you ask for
4  any information concerning the likelihood that
5  the conditions would be satisfied?
6      A.    No, I did not.
7      Q.    Is it fair to say that the opinions
8  set forth in Exhibit 61 do not take into
9  account the likelihood that the conditions
10  would be satisfied?
11     A.    I think that's an accurate
12  statement.  The -- the only assumption is that
13  these conditions are things that will be beyond
14  Mr. Dondero's control and subject to
15  influences, such as market values.
16     Q.    So the likelihood that the
17  conditions would be satisfied was not relevant
18  to your analysis, correct?
19     A.    As far as probability, that's
20  correct.
21     Q.    Okay.  And you're not offering any
22  opinion as to the likelihood that any of the
23  conditions would be satisfied, correct?
24     A.    That's correct.
25

Page 28

McGovern - 11-9-2021

1      Q.    Okay.  Let's move on to the fourth
2  assumed fact.  It states, quote:  Whether the
3  conditions are satisfied was not and is not
4  within Mr. Dondero's control because they
5  included the condition that certain portfolio
6  company assets be sold above cost or in a
7  manner outside of Mr. Dondero's control.
8          Have I read that correctly?
9      A.    Yes, you did.
10     Q.    What if the satisfaction of the
11  conditions was within Mr. Dondero's control?
12  If you make that assumption, how does your --
13  how do your opinions change, if at all?
14     A.    I'm just thinking through your
15  question.  If the conditions are within his
16  control, then that could potentially change the
17  outcome as to whether there was income from the
18  discharge of indebtedness, but in order to
19  provide an opinion on that, I would have to
20  know the details of the conditions; that is,
21  exactly what they are and how it is that he has
22  control over them.
23     Q.    Okay.  So are you aware that
24  Mr. Dondero controlled Highland prior to the

Page 29

McGovern - 11-9-2021

1  bankruptcy?
2      A.    Yes, I am.
3      Q.    Are you aware that he had -- I'll --
4  I'll ask you to assume that he had the
5  authority to buy and sell assets on behalf of
6  Highland.  Can you -- can you accept that
7  assumption?
8      A.    Yes.
9      Q.    Okay.  If you -- if you accept that
10  assumption for purposes of my hypothetical, and
11  you also assume that the portfolio company
12  assets that are the subject of the conditions
13  were valued above cost at the time the
14  subsequent agreement was entered into, would
15  that impact your opinions if you assumed -- so
16  I'm asking you to really make just two
17  assumptions:  Number one, Mr. Dondero had the
18  ability to sell the portfolio company assets
19  any time he wanted, and number two, that at the
20  time he entered into the subsequent agreement,
21  the value of the portfolio company assets was
22  above cost.  How did those two assumptions, if
23  you -- if you accept them, how do they change
24  your analysis, if -- if at all?

Page 30

McGovern - 11-9-2021

1    McGovern - 11-9-2021
2        A.    Assuming those two facts, they could
3    change the analysis of the issue of whether
4    Mr. Dondero had income from the cancellation of
5    indebtedness.  The key question really is
6    whether Highland Capital, at the time of the
7    subsequent agreement, was actually agreeing to
8    cancel the loans at that time, or was it
9    agreeing in the future to cancel the loans if
10   certain conditions occurred?
11           If those conditions are within the
12   control of Mr. Dondero and in effect already in
13   place, then it's quite possible that he would
14   have had income from the discharge of
15   indebtedness at that time because the loans in
16   fact had been forgiven.
17       Q.    But you weren't ass- -- you weren't
18   asked to assume that Highland placed any
19   condition on the timing of the forgiveness,
20   correct?
21       A.    That's correct.
22       Q.    And -- and you, in fact, were asked
23   to assume that if the portfolio company assets
24   were sold above cost, the loans would be
25   forgiven, correct?

Page 31

1    McGovern - 11-9-2021
2        A.    That's correct.  Although in -- in
3    fairness, as I've said, I don't know the
4    details of all the conditions, but was asked to
5    assume that they included the condition that
6    these assets be sold above cost.
7        Q.    Yeah, I just want to focus on -- on
8    the assumptions that you were asked to make, so
9    let me give you a hypothetical.  Let's say one
10   of the company assets was valued at $50 million
11   on the date the subsequent agreement was
12   entered into, but that Highland's cost for
13   acquiring its interest in that asset was only
14   $10 million, and Mr. Dondero had the ability to
15   sell that asset at -- at any time prior to the
16   bankruptcy filing.
17           Under that hypothetical, would
18   Mr. Dondero have to realize the income?
19       A.    If he actually sold the assets, then
20   -- then yes.
21       Q.    And what about if he didn't sell the
22   assets, but that it was within his control to
23   do so at any time?
24       A.    It's possible that that could change
25   the outcome, as far as whether he had income

Page 32

1    McGovern - 11-9-2021
2    from the cancellation of indebtedness, but if
3    that's true, that means that the loans actually
4    had been forgiven at that time.
5        MR. MORRIS:  I have no further
6    questions.
7        MR. AIGEN:  I have one thing to
8    clear up, I think.
9               EXAMINATION
10   BY MR. AIGEN:
11       Q.    Early on in the deposition, when
12   asked what your assignment was, you mentioned
13   that you were providing an opinion on a legal
14   issue.  I just want to make sure, you we- --
15   you're not sitting here today opining on the
16   law.  You're applying certain facts to the law;
17   is that correct?
18       A.    That's correct.  I am taking an
19   assumed set of facts, and I've been asked to
20   provide an opinion on what is the outcome on a
21   particular legal issue as app- -- applying the
22   law to those facts, that's correct.
23       MR. AIGEN:  Okay.  That's all I
24   have, John.
25       MR. MORRIS:  Okay.  Thank you,

Page 33

1    McGovern - 11-9-2021
2    professor.  I appreciate your time and --
3    and -- and your attention.
4        THE WITNESS:  All right.  Thank you
5    so much.
6        MR. MORRIS:  Okay.  Have a good day.
7        THE WITNESS:  Thank you.
8        MR. MORRIS:  Bye, now.
9        THE REPORTER:  Mr. Aigen, do you
10   need a copy of this deposition?
11       MR. AIGEN:  If we can just get a
12   rough when one's available, and then we'll
13   take the original whenever it's due.
14       (Time Noted:  10:34 a.m.)
15
16
17
                BRUCE McGOVERN
18
19   Subscribed and sworn to before me
     this _____ day of _____, 2021.
20
21
22
23
24
25

Page 34

```
 1                McGovern - 11-9-2021
 2              C E R T I F I C A T E
   STATE OF TEXAS    )
 3                   )
   COUNTY OF ELLIS   )
 4
 5        I, Daniel J. Skur, a Notary Public
   within and for the State of Texas, do
   hereby certify:
 6        That BRUCE McGOVERN, the witness
   whose deposition is hereinbefore set forth,
 7   was duly sworn by me and that such
   deposition is a true record of the
 8   testimony given by such witness.
      That pursuant to Rule 30 of the Federal
 9   Rules of Civil Procedure, signature of the
   witness was not reserved by the witness or
10   other party before the conclusion of the
   deposition;
11        I further certify that I am not
   related to any of the parties to this
12   action by blood or marriage; and that I am
   in no way interested in the outcome of this
13   matter.
          IN WITNESS WHEREOF, I have hereunto
14   set my hand this 9th day of November,
   2021.
15
16
17
18        Daniel J. Skur,
19        Notary Public, State of Texas.
          My Commission Expires 7/7/2022
20        TSG Reporting, Inc.
          228 East 45th Street, Suite 810
          New York, New York
21        (877) 702-9580
22
23
24
25
```

Page 35

```
 1                ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No.  Now Reads    Should Read  Reason
 6   ___  ___  _____    _____    _____
 7   ___  ___  _____    _____    _____
 8   ___  ___  _____    _____    _____
 9   ___  ___  _____    _____    _____
10   ___  ___  _____    _____    _____
11   ___  ___  _____    _____    _____
12   ___  ___  _____    _____    _____
13   ___  ___  _____    _____    _____
14   ___  ___  _____    _____    _____
15   ___  ___  _____    _____    _____
16   ___  ___  _____    _____    _____
17   ___  ___  _____    _____    _____
18   ___  ___  _____    _____    _____
19   ___  ___  _____    _____    _____
20
                            _____
21                          Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS ____ DAY OF _____, 2021.
24   _____
25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

Page 36

```
 1                McGovern - 11-9-2021
 2            -------I N D E X-------
 3   WITNESS:      EXAMINATION BY          PAGE:
 4   BRUCE McGOVERN
 5         Mr. Morris              5
 6         Mr. Aigen              32
 7
 8              *****
 9   --------------------EXHIBITS-------------------
10                            PAGE/LINE
11   Exhibit 61  Expert Report of      11/21
                 Bruce McGovern
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 178-21    Filed 02/09/22    Page 75 of 178    PageID 45009

Index: $10..Dan

**$**

**$10** 31:14
**$50** 31:10

**1**

**1** 18:13
**10:01** 5:10,17
**10:34** 33:14
**11-9-2021** 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1

**2**

**2** 20:22
**2021** 5:10 7:16,18
12:9 13:14 14:20
33:19
**28th** 12:9 13:14
14:10,20

**3**

**3** 25:15 26:2,15

**6**

**61** 11:20,21 15:8,22
22:24 27:9

**9**

**9th** 5:9

**A**

**a.m.** 5:10,17 33:14
**ability** 29:19 31:14
**accept** 29:7,10,24

**accordance** 5:6
**account** 17:22 27:10
**accurate** 27:12
**acquiring** 31:13
**additional** 13:15
14:16
**adduced** 17:23
**adversary** 13:22
17:15,19,24
**agree** 8:13
**agreed** 8:2 20:13
25:17,21
**agreeing** 30:7,9
**agreement** 19:8,10,
16,25 20:4,7,9,11,20,
21,25 21:12,14,17,22
22:5,10,11,14,18,23
23:3,7,11,15,20,24
24:3,4,8,25 25:2,7,16
29:15,21 30:7 31:11
**agreements** 21:7,20
22:2
**Aigen** 7:22 10:25
11:3,15 18:15 23:25
24:10 32:7,10,23
33:9,11
**Allen** 5:13,22
**amended** 8:25 9:3,8
12:23 16:9
**analysis** 27:19 29:25
30:3
**apologize** 11:7,15
**app-** 32:21
**applied** 21:22
**applying** 32:16,21
**Asia** 11:19
**ass-** 30:17
**assessment** 15:24
**asset** 26:17 31:13,15
**assets** 26:12 28:7
29:6,13,19,22 30:23
31:6,10,19,22

**assignment** 32:12
**assume** 18:7,19
20:4,6 21:3,11 22:4
24:7,19 25:6 26:9
29:5,12 30:18,23
31:5
**assumed** 18:12 19:3
25:14 28:3 29:16
32:19
**assuming** 21:21
23:2 24:4,24 30:2
**assumption** 18:14
20:21 21:16 22:9
26:3,14 27:13 28:13
29:8,11
**assumptions** 16:19
18:4 21:6 29:18,23
31:8
**attention** 33:3
**attorney** 5:24
**attorneys** 14:13
**audited** 15:11,17,20
**auditors** 22:19
**authority** 29:6
**aware** 6:5 11:5 28:24
29:4

**B**

**back** 12:11
**bankruptcy** 6:3,5
16:6,8,11 29:2 31:16
**based** 9:24 25:11
**bases** 12:20
**basis** 18:16
**beginning** 7:16
**behalf** 7:12 13:19
22:14 23:20 29:6
**bit** 10:4 13:3
**bleeds** 26:13
**books** 14:24 15:4,7
**broader** 10:5
**Bruce** 5:4,13,22

33:17
**buy** 29:6
**Bye** 33:8

**C**

**call** 7:21
**cancel** 30:8,9
**cancellation** 24:13
30:4 32:2
**Canty** 11:19
**capacity** 6:11
**Capital** 6:2 8:8,14,24
13:20 19:6,7 21:8,13,
14 22:15 23:20
25:13,16,17,21 30:6
**Capital's** 22:19
**case** 9:15 16:6,8,12
**caused** 14:4
**cautioned** 5:14
**change** 14:4 24:9,11
25:2 28:14,17 29:24
30:3 31:24
**circumstances**
22:22
**clear** 32:8
**colleague** 11:18
**collect** 25:18
**communicated**
10:9,18
**communications**
10:12,14
**company** 6:2 28:7
29:12,19,22 30:23
31:10
**complaint** 8:19,23
13:21 16:9
**completed** 14:9,19
**conceivable** 21:19
**condition** 28:6 30:19
31:5
**conditions** 24:18
25:19,22 26:6,9,10,

16,20,21,25 27:6,10,
14,18,24 28:4,12,16,
21 29:13 30:10,11
31:4
**conducted** 5:6
**confirm** 14:3
**confusing** 11:8,11
**connection** 10:20
16:19
**control** 26:11,22
27:15 28:5,8,12,17,
23 30:12 31:22
**controlled** 8:11
13:19 17:3 28:25
**conversation** 14:15
**conversations** 11:5,
11
**convincing** 11:8
**copies** 8:21,22 13:17
14:15,19 15:10
**copy** 8:24 9:3 11:19
13:21 33:10
**corporation** 17:8
**correct** 6:9 7:12,13
9:6,11,12 10:3,17
12:24,25 13:8,12
14:5,6,20,21 16:13,
14 17:12,24,25 18:9,
10,13 19:12 20:5
22:2,3,6,7,10,25
23:8,9,12,13,16,17,
21,22 24:21 25:24
26:4,5 27:19,21,24,
25 30:20,21,25 31:2
32:17,18,22
**correctly** 19:11 28:9
**cost** 26:12,17 28:7
29:14,23 30:24 31:6,
12
**counsel** 5:25
**COVID-19** 5:8
**Current** 5:7

**D**

**Dan** 11:5,9

**date** 5:9 7:17 21:2
31:11

**day** 5:9 33:6,19

**Daylight** 5:11

**defined** 25:19

**defining** 19:9

**demand** 19:6 23:4
25:13

**deposed** 6:10

**deposition** 5:3,5 6:8
14:14 32:11 33:10

**depositions** 6:20
17:14,18,23

**details** 26:8,23 28:21
31:4

**difficult** 6:21

**Disaster** 5:8

**discharge** 28:19
30:14

**disclosed** 22:18

**discovery** 17:11

**discuss** 14:14

**discussed** 7:23
15:12

**discussing** 8:2

**discussion** 14:7,18

**discussions** 11:14

**disputed** 18:23

**document** 19:13

**documentary** 19:15

**documentation**
19:19 20:8

**documents** 6:24
13:5,9,15,24,25 14:3,
9,16,19 15:13,25
16:5,7,11,12 19:24

**Dondero** 7:12 8:9,
11,18,24 9:20,25
10:9 13:20 17:4
18:23 19:7 21:8,13,
15 24:14,17 25:8,17
28:25 29:18 30:4,12
31:14,18

**Dondero's** 17:10
18:18 19:5 26:11
27:15 28:5,8,12

**due** 25:9 33:13

**duly** 5:14

**duties** 23:21

E

**Early** 32:11

**effect** 24:3 30:12

**Elms** 11:6,9

**email** 10:10 14:15

**Emergency** 5:7

**engagement** 9:14
10:21

**entered** 19:8 20:25
21:7 22:13 23:19
29:15,21 31:12

**enters** 20:11

**entities** 8:11 13:19,
23 17:3

**entry** 22:22

**evidence** 19:16

**exact** 7:17 21:2

**EXAMINATION** 5:18
32:9

**exclusively** 10:15

**executed** 13:18

**execution** 18:23
19:5 21:4 23:3

**exhibit** 11:20,21
15:8,22 22:24 27:9

**exist** 22:2

**existed** 20:5 22:5

**existence** 19:24

**exists** 19:20 23:7

**expect** 20:16

**expert** 7:11,25 8:3
11:12

**expertise** 20:15

**explanation** 14:12

**extent** 26:20

F

**fact** 18:11,12 19:3
25:14 28:3 30:16,22

**facts** 18:8 30:2
32:16,19,22

**fair** 9:9 10:2,13 15:19,
23 16:4 20:13 22:21
23:15 24:20 27:8

**fairness** 31:3

**favor** 13:20 25:13

**filed** 8:19 9:3,8 13:22
16:5,8,11

**files** 16:25

**filing** 31:16

**financial** 15:11,17,20

**fine** 8:15 18:5 20:23

**firm** 7:11,25 9:14
10:16,22 11:10 14:13

**focus** 31:7

**forgiven** 25:21
30:16,25 32:4

**forgiveness** 30:19

**form** 18:15 23:25
24:10

**forms** 17:5

**fourth** 26:13 28:2

**fulfilled** 23:21

**future** 30:9

G

**general** 7:23 16:15
21:21

**give** 31:9

**good** 5:23 33:6

H

**HCE** 17:6

**head** 16:24 17:7

**Highland** 6:2 8:8,12,
14,23 9:18 13:20
19:6,7 21:8,12,14
22:14,18 23:20
25:13,16,17,20 28:25
29:7 30:6,18

**Highland's** 14:23,24
15:3,6,10,16,20 16:6,
15 17:11 31:12

**Houston** 5:12

**hypothetical** 29:11
31:9,17

I

**identify** 16:21

**identifying** 18:17

**impact** 29:16

**inaccurate** 12:15

**included** 28:6 31:5

**income** 24:13,17,22
25:4 28:18 30:4,14
31:18,25

**indebtedness** 24:13
28:19 30:5,15 32:2

**influences** 27:16

**information** 14:23
15:2 26:16,24 27:5

**informed** 8:18,20
19:19

**interest** 25:9 31:13

**introduced** 11:21

**irrelevant** 15:21

**issue** 7:24 8:7 30:3
32:14,21

J

**James** 7:12 9:20

**John** 5:24 10:25
32:24

**Jones** 5:25

K

**key** 30:5

**knowledge** 21:25

L

**La** 11:18

**law** 14:13 32:16,22

**lawsuit** 10:15

**lawyer** 11:9

**lawyers** 10:16,21

**legal** 8:7 32:13,21

**likelihood** 26:25
27:5,10,17,23

**limited** 17:8

**listed** 13:10 16:2

**listening** 11:6

**litigation** 7:24 8:17,
25

**loans** 8:8,10 14:24
15:3,6,20 16:16
24:23 25:4,21 30:8,9,
15,24 32:3

**located** 5:12

**looked** 16:5,7

**LP** 6:2 8:9,14

M

**made** 19:6 22:9 23:5

**make** 16:19 21:5 26:3
28:13 29:17 31:8
32:14

**makes** 20:12

**Management** 6:2
8:9,14

**manner** 28:8

**market** 27:16

**matter** 16:15

**Mcgovern** 5:1,4,13,
22,23 6:1 7:1 8:1 9:1

Index: means..statements

10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1,
17

**means** 32:3

**mentioned** 32:12

**met** 9:20,21 14:13

**Michael** 7:22

**million** 31:10,14

**modified** 12:19

**moment** 26:15

**months** 7:18

**morning** 5:23

**Morris** 5:19,24 11:2,
17,22 12:2,5,11,13
13:2,4 18:3,6,21
24:6,15 32:5,25 33:6,
8

**move** 28:2

**multiple** 21:18

### N

**nature** 7:23 8:17
26:20

**note** 5:5 20:12 21:20

**Noted** 33:14

**notes** 8:22 13:18
16:22 17:2 18:20,24
19:5,7 21:4,19,23
23:4,5 25:9,12,13,18

**November** 5:10

**number** 6:10 18:13
20:21 21:6,25 25:15
26:2,15 29:18,20

**numbered** 18:8

### O

**Objection** 18:15
23:25 24:10

**obligation** 24:23

**occasions** 6:11,14,
16,19

**occur** 14:12

**occurred** 21:3 23:3
24:25 30:10

**offering** 23:6,10,14,
18,23 24:2 27:22

**one's** 33:12

**opining** 32:15

**opinion** 23:6,10,14,
18,23 24:2,12,16,21
25:7 26:4 27:23
28:20 32:13,20

**opinions** 12:20
13:16 14:4 15:8,21
16:17 17:21 22:24
24:9 27:8 28:14
29:16

**oral** 5:3 19:8 20:7,8,
11 21:17,20,22

**order** 5:7 28:19

**organized** 17:4

**original** 21:4 24:23
33:13

**outcome** 25:2 28:18
31:25 32:20

**owes** 25:8

### P

**Pachulski** 5:24

**paragraphs** 18:9

**parties** 23:16

**partnership** 17:8

**payment** 19:6 23:4

**person** 23:19

**personal** 21:24

**phone** 7:21

**phrase** 8:12 20:19

**place** 30:13

**point** 11:3

**portfolio** 28:6 29:12,
19,22 30:23

**portions** 7:3

**potentially** 28:17

**premarked** 11:20

**prepare** 8:6 15:14

**prepared** 22:8

**preparing** 13:6
16:20

**principal** 25:8

**prior** 28:25 31:15

**probability** 27:20

**proceeding** 13:22

**proceedings** 17:15,
19,24

**professional** 6:11

**professor** 33:2

**promissory** 8:22
13:18 16:22 17:2
18:20,24 21:4,18
25:12

**provide** 7:11 28:20
32:20

**provided** 8:21 9:17
13:14,17,25 14:11
15:14,15

**providing** 32:13

**purposes** 13:6 18:19
29:11

**put** 6:23 11:19

### Q

**question** 9:11 10:8
28:16 30:5

**questions** 26:19
32:6

**quickly** 6:17

**quiet** 11:16

**quote** 19:4 25:15
28:3

### R

**read** 19:11 28:9

**realize** 31:18

**reasonable** 23:12

**recall** 7:16 8:17
11:13 14:17 16:25
17:7

**received** 7:21

**record** 5:21

**records** 14:24 15:4,7

**refer** 20:20 22:12

**referring** 8:14

**relate** 13:15

**related** 26:10

**relating** 10:14

**relevant** 15:7 16:16
22:23 27:18

**remote** 5:3 6:19,20

**remotely** 5:6

**rendering** 26:4

**reorganized** 6:3

**repay** 24:24

**report** 8:6 9:24 11:20
12:16,21,23 13:6,11,
13 14:5,9,20 15:14,
15 16:2,13,20 18:19
22:8,12 24:5

**REPORTER** 5:5 33:9

**requests** 17:11

**responses** 17:10

**restate** 21:10

**retained** 7:10,14,15
9:4,7,13

**retention** 7:20

**review** 25:11

**reviewed** 13:5 25:10

**room** 6:22

**rough** 33:12

### S

**sale** 26:11,17

**satisfaction** 28:11

**satisfied** 18:11 24:19
25:20,22 27:2,6,11,
18,24 28:4

**Savings** 5:11

**scope** 26:20

**screen** 6:24 11:19

**scroll** 7:2 12:3 13:2

**seeking** 7:25

**sell** 29:6,19 31:15,21

**separate** 21:20

**serve** 8:3

**services** 9:18

**set** 12:20 14:5 15:8,
22 16:12 18:8 22:24
27:9 32:19

**sign** 12:8

**signature** 12:3,6
18:18

**signed** 8:23 17:3
18:20

**signing** 13:13

**similar** 8:10

**single** 21:17,21

**sir** 11:23 12:6

**sit** 12:14

**sitting** 32:15

**sold** 28:7 30:24 31:6,
19

**specific** 8:7

**specifically** 8:13

**spoken** 9:22 10:6

**Stang** 5:25

**state** 5:8,20 12:19

**statement** 27:13

**statements** 15:11,
17,21

states 25:15 28:3

stick 26:14

Stinson 7:11 9:14
10:16,21 14:13

structure 8:8

subject 27:15 29:13

subs- 24:4 25:5

Subscribed 33:19

subsequent 15:15
19:4,9,16,25 20:4,17,
20,25 21:6,12,14,25
22:5,10,11,14,17,23
23:2,7,11,15,19,24
24:3,4,8,18,24,25
25:6,15 29:15,21
30:7 31:11

subsequently 8:9

suggested 19:21

supplemented
12:24

surrounding 22:22

sworn 5:14 33:19

**T**

taking 32:18

taxable 24:17

terms 20:13 23:11

testified 5:16

testimony 7:11,25
17:22

Texas 5:12 6:4

thing 32:7

things 26:10,22
27:14

thinking 9:10 28:15

time 5:10,11 6:23
8:22 9:4,8 24:22
29:14,20,21 30:6,8,
15 31:15,23 32:4
33:2,14

timing 30:19

today 6:7 7:22 8:13

12:14 14:14 24:16
32:15

Today's 5:9

told 8:16 9:25

top 12:12 16:24 17:7

transcripts 17:13,18

treatment 14:23
15:3,6,19 16:16

true 18:13 32:3

truth 5:15,16

turn 18:3

**U**

ultimate 24:12

underlying 7:24

understand 7:7 8:10

unpaid 25:8

**V**

valued 29:14 31:10

values 27:16

**W**

wanted 29:20

we- 32:14

week 14:2 16:23

withdrawn 19:14
20:16,18

witnesses 11:9

words 10:5 25:20

work 10:14,19

write 20:12

written 17:10

**Z**

Ziehl 5:25

# Exhibit C

Privileged and Confidential - Work Product

**Notes Payable to Highland**

8-Apr-21

| Maker | Term | Amount Owed Per Lawsuit | Original Loan Amount | Loan Date | Adversary Proceeding |
|-------|------|------------------------|----------------------|-----------|----------------------|
| Nexpoint Advisors | 30 yr | 23,071,195 | $30,746,812 | 5/31/2017 | 21-3005 |
| HCM Services | 30 yr | 6,757,249 | $20,247,628 | 5/31/2017 | 21-3006 |
| HCM Services | Demand | 947,519 | 150,000.00 | 3/26/2018 | 21-3006 |
|  |  |  | 200,000.00 | 6/25/2018 | 21-3006 |
|  |  |  | 400,000.00 | 5/29/2019 | 21-3006 |
|  |  |  | 150,000.00 | 6/26/2019 | 21-3006 |
| JD | Demand | 9,004,013 | $3,825,000 | 2/2/2018 | 21-3003 |
|  |  |  | $2,500,000 | 8/1/2018 | 21-3003 |
|  |  |  | $2,500,000 | 8/13/2018 | 21-3003 |
| HCRE | 30 yr | 6,145,467 | $6,059,832 | 5/31/2017 | 21-3007 |
| HCRE | Demand | 5,012,261 | 100,000.00 | 11/27/2013 | 21-3007 |
|  |  |  | 2,500,000.00 | 10/12/2017 | 21-3007 |
|  |  |  | 750,000.00 | 10/15/2018 | 21-3007 |
|  |  |  | 900,000.00 | 9/25/2019 | 21-3007 |
|  |  | 50,937,704 |  |  |  |

Confidential

DEFENDANTS-0000434

# Exhibit D

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Wed, 25 Nov 2020 10:01:23 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Wednesday, November 25, 2020 10:01 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**

| | | | |
|---|---|---|---|
| AT&T | USD | 2,845.06 | |
| Grubhub | USD | 1,422.24 | |

**HCMFA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 17,373.85 | Dec premiums |

**NPA**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 38,453.01 | Dec premiums |
| UMB Bank | USD | 355.31 | |

**HCFD Operating**

| | | | |
|---|---|---|---|
| HCMFA | USD | 61,691.00 | Shared Services |
| HCM Insurance Acct | USD | 51,779.84 | Dec premiums |

**Eagle Equity**

| | | | |
|---|---|---|---|
| HCM Insurance Acct | USD | 2,323.63 | Dec premiums |

Okay to release?

**Kristin Hendrix, CPA | Assistant Controller**



HIGHLAND CAPITAL
M A N A G E M E N T

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com

**Exhibit A1**

**App. 204**

ACL-019692

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Mon, 30 Nov 2020 10:45:44 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Monday, November 30, 2020 10:46 AM
**To:** Frank Waterhouse
**Subject:** Wires for today

**HCM**
Arris Western   USD   11,000.00

**HCMFA**
HCM           USD   308,374.00   Shared Services
HCFD Oper     USD   250,000.00   Equity Contribution

**NPA**
HCMFA         USD   325,000.00   one day loan
HCFD Oper     USD   120,762.09   Transfer Pricing

**HCFD Oper**
Sea Island    USD   23,511.90    Final Presidents Club bill

**HCFD 12B-1**
HCMFA         USD   37,822.00    12B-1 Reimbursement

**Falcon GP**
HCM           USD      15,000.00   Shared Services

**NREA**
HCM           USD   80,000.00    Shared Services

Okay to release?

Kristin Hendrix, CPA | Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** RE: Wires for today
**Date:** Tue, 1 Dec 2020 12:04:49 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

ok

**From:** Kristin Hendrix
**Sent:** Tuesday, December 1, 2020 12:00 PM
**To:** Frank Waterhouse
**Subject:** Wires for today

### HCM

| | | |
|---|---|---|
| Crescent TC | USD | 158,695.74 |
| Seery | USD | 150,000.00 |
| Nelms | USD | 30,000.00 |
| Dubel | USD | 30,000.00 |
| Simek | USD | 42,598.52 |

### HCMNY

| | | |
|---|---|---|
| Times Sq | USD | 27,454.67 |

### HCMFA

| | | | |
|---|---|---|---|
| NPA | USD | 325,000.00 | 11/30/2020 Loan Repayment |
| HIGHLAND TOTAL RETURN | USD | 72,912.75 | Advisory Fees |
| HIGHLAND FIXED INCOME | USD | 55,287.79 | Advisory Fees |
| HIGHLAND/IBOXX SRLOAN ETF | USD | 25,004.95 | Advisory Fees |
| HIGHLAND SMALL CAP EQUITY | USD | 19,293.59 | Advisory Fees |

### HCFD

| | | | |
|---|---|---|---|
| Paul DeMaio | USD | 2,000.00 | Return of IT Holdback |

Okay to send?

**Kristin Hendrix, CPA** | Assistant Controller



300 Crescent Court | Suite 700 | Dallas, Texas 75201

**From:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**To:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**Cc:** David Klos <DKlos@HighlandCapital.com>
**Subject:** FW: HCM - HCMFA/NPA
**Date:** Mon, 21 Dec 2020 12:30:25 -0600
**Importance:** Normal

FYI

**From:** Jack Donohue
**Sent:** Monday, December 21, 2020 12:15 PM
**To:** Kristin Hendrix
**Cc:** Fred Caruso
**Subject:** HCM - HCMFA/NPA

Kristin,

Has NPA paid the December payments $168k and 252k payments for shared service and subadvisor? The last payment I see was 11/2/2020. Has HCMFA paid the December payment of $416k? The last payment I see was on 11/2/2020.

Thanks,

Jack

Jack M. Donohue, CPA

Development Specialists, Inc.

10 South LaSalle Street, Suite 3300| Chicago, Illinois 60603

**Phone:** (312) 263-4141| **Fax:** (312) 263-1180

http://DSIconsulting.com/

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Wed, 23 Dec 2020 11:05:46 -0600
**Importance:** Normal
**Inline-Images:** image001.jpg

---

Ok

On Dec 23, 2020, at 11:00 AM, Kristin Hendrix wrote:

**HCM**
| | | | |
|---|---|---|---|
| HCM Ins | USD | 49,213.01 | health insurance premium funding |
| EAC | USD | 36,000.00 | Retainer Invoice; approved by Seery |

**HCMFA**
| | | | |
|---|---|---|---|
| HCM Ins | USD | 8,686.93 | health insurance premium funding |
| ACA | USD | 375.00 | |
| Principal Life | USD | 71.53 | |

**NPA**
| | | | |
|---|---|---|---|
| HCM Ins | USD | 20,079.46 | health insurance premium funding |

**HCFD Oper**
| | | | |
|---|---|---|---|
| HCM Ins | USD | 26,339.40 | health insurance premium funding |

**EEA**
| | | | |
|---|---|---|---|
| HCM Ins | USD | 1,161.82 | health insurance premium funding |

Okay to release?

**Kristin Hendrix, CPA** | Assistant Controller

300 Crescent Court | Suite 700 | Dallas, Texas 75201

O: 972.628.4127 | F: 972.628.4147

khendrix@highlandcapital.com | www.highlandcapital.com



# Exhibit E

**From:** Frank Waterhouse <FWaterhouse@HighlandCapital.com>
**To:** Kristin Hendrix <KHendrix@HighlandCapital.com>
**Subject:** Re: Wires for today
**Date:** Thu, 31 Dec 2020 12:13:42 -0600
**Importance:** Normal

Ok

On Dec 31, 2020, at 12:11 PM, Kristin Hendrix wrote:

**HCM**

| | | | |
|---|---|---|---|
| Meta-e | USD | 360,384.10 | approved by Seery |
| Houlihan Lokey | USD | 41,460.00 | approved by Seery |
| Bloomberg Finance LP | USD | 16,491.04 | approved by Seery |
| Arris Western Corp. | USD | 11,000.00 | approved by Seery |
| TW Telecom Holdings, llc | USD | 6,182.17 | approved by Seery |
| Mauro Staltari | USD | 3,299.50 | final Garden leave payment (processed outside of payroll) |
| Canteen Vending Services | USD | 2,243.84 | approved by Seery |
| Shawn Raver | USD | 1,984.95 | approved by Seery |
| Four Seasons Plantscaping | USD | 481.71 | approved by Seery |
| Action Shred of Texas | USD | 450.00 | approved by Seery |
| ProStar Services, Inc | USD | 367.38 | approved by Seery |
| UPS Supply Chain Solutions | USD | 164.31 | approved by Seery |

**HCMFA**

| | | |
|---|---|---|
| Shawn Raver | USD | 4,631.55 |
| DTCC ITP LLC | USD | 892.88 |

**NPA**

| | | |
|---|---|---|
| Bloomberg Finance LP | USD | 26,177.78 |
| DST Asset Manager Solutions | USD | 17,152.20 |
| Dallas Zoological Society | USD | 9,404.00 |
| AnchorsGordan, PA | USD | 1,605.75 |
| Dow Jones & Company, Inc. | USD | 1,599.00 |
| UPS Supply Chain Solutions | USD | 521.37 |
| CHASE COURIERS, INC | USD | 24.48 |

**HCFD Oper**

| | | | |
|---|---|---|---|
| Highland Capital Management Fund Advisors | USD | 64,562.00 | Nov shared services |
| DST Technologies, Inc. | USD | 5,741.59 | |
| UPS Supply Chain Solutions | USD | 114.68 | |

**Falcon**
**E&P**

| | | | |
|---|---|---|---|
| HCM | USD | 15,000.00 | Dec shared services |



# Exhibit F

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Adversary Proceeding No. |
| DONDERO, NANCY DONDERO, AND | § | 21-03005 |
| THE DUGABOY INVESTMENT | § | |
| TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HIGHLAND CAPITAL | § | Adversary Proceeding No. |
| MANAGEMENT SERVICES, INC., | § | 21-03006 |
| JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HCRE PARTERS, LLC (N/K/A/ | § | Adversary Proceeding No. |
| NEXPOINT REAL ESTATE | § | 21-03007 |
| PARTNERS, LLC), JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**EXPERT REPORT OF**
**STEVEN J. PULLY, CPA, CFA, ESQ.**

**December 10, 2021**

*Confidential*

**App. 212**

## TABLE OF CONTENTS

I.    BACKGROUND AND QUALIFICATIONS .......................................................................... 3

II.   ENGAGEMENT ................................................................................................................. 6

III.  BRIEF SUMMARY OF OPINIONS ..................................................................................... 7

IV.  ASSUMPTIONS ................................................................................................................. 7

V.   SERVICES AGREEMENTS GENERALLY ....................................................................... 13

VI.  OPINIONS......................................................................................................................... 15

VII. CONCLUSION .................................................................................................................. 21

App. 213

## I. BACKGROUND AND QUALIFICATIONS

1. My professional background includes over thirty-six years of experience as an investment banker, corporate board member, corporate executive, hedge fund executive, attorney, consultant, and expert witness.

2. I graduated with honors from Georgetown University in 1982 with a BSBA in Accounting, and I graduated from The University of Texas at Austin in 1985 with a Doctor of Jurisprudence degree. I hold the Chartered Financial Analyst (CFA) designation and am a licensed CPA and attorney in the State of Texas. I also hold the Series 7, 63, and 79 FINRA securities licenses[1]. My CFA designation and my law, CPA, and FINRA licenses are all current.

3. I currently work as a corporate executive, as a corporate board member, as an investment banker, and as an expert witness.

   a. I work on a part-time basis as the Chief Executive Officer of Harvest Oil & Gas, a former public company that is in the process of dissolving. I was Chairman of the Board of Harvest before assuming the Chief Executive Officer role. Until recently, Harvest was largely managed by another company pursuant to a services agreement. When the services agreement was entered into, the services provider and the predecessor of Harvest were affiliates, which they ceased to be during the term of the agreement. Services provided under the agreement included treasury, accounting, and operating functions. One of my roles as Chief Executive Officer is to replace the former service provider by bringing most business functions in-house.

   b. I currently serve on the boards of seven private companies. I am typically appointed to boards by large shareholders. In total, I have been on the boards of thirty-two public and private companies. Those companies have operated in a broad cross section of industries, including agriculture, aviation, energy, entertainment, manufacturing, real estate, refining, retail, restaurants, technology, and telecom. I have served on the boards of companies that have outsourced most of their corporate functions or provided outsourcing services for other companies.

   c. I conduct my investment banking work through Speyside Partners, LLC ("Speyside Partners"), an entity that I co-founded.[2] At Speyside I work on mergers, acquisitions and divestitures, financings, and restructurings.

4. Through the end of 2014, I spent thirteen years working for two different hedge funds. I was the General Counsel and a partner of Carlson Capital, the most recent hedge fund for which I worked. Carlson Capital managed approximately $9 billion across a number of different funds during much of my tenure and followed a multi-strategy investing approach. Prior to working at Carlson Capital, I worked for Newcastle Capital Management, a hedge fund that pursued a deep value and activist investment strategy. I was the President of Newcastle Capital

---

[1] I formerly held the Series 24 FINRA license.
[2] The website for Speyside Partners is www.speysidepartners.com.

**App. 214**

Management and worked there for almost six years.  Newcastle Capital Management managed as much as $650 million across a variety of funds while I was employed there.  During my tenure, I served as the Chief Executive Officer of two companies controlled by the firm.  Both Carlson Capital and Newcastle Capital Management had "shared-services" arrangements, where a separate entity provided a variety of back office, mid-office, and front office services to an affiliated party.

5. Prior to becoming a hedge fund executive, I was an investment banker for approximately twelve years at various large firms, including as a Managing Director for Bank of America Securities and as a Senior Managing Director for Bear Stearns.  I also worked as an investment banker at Kidder Peabody, PaineWebber, and Wasserstein Perella. Over the course of my work at large investment banking firms, I focused on mergers, acquisitions, divestitures, capital raising, and restructurings.

6. Prior to becoming an investment banker, I was a securities and corporate lawyer for almost four years at Baker Botts.

7. Based on the work that I have done over the past thirty-six years, I have developed a deep understanding of services agreements and outsourcing generally as well as corporate governance-related matters.  I applied the knowledge and experience that I have gained over the past thirty-six years to my analysis in this report.

8. I have previously served as a testifying and/or consulting witness in the following actions:

   a. Ascent Resources – *Utica, LLC (f/k/a American Energy – Utica, LLC); Ascent Resources, LLC (f/k/a American Energy Appalachia Holdings, LLC); Ascent Resources Utica Holdings, LLC (f/k/a American Energy Ohio Holdings, LLC); The Energy & Minerals Group Fund III, LP; EMG Fund III Offshore Holdings, LP; FR AEU Holdings, LLC and FR AE Marcellus Holdings, LLC v. Duane Morris LLP*, in the 165th Judicial District Court of Harris County, Cause No. 2015-46550) — Consulting and Testifying witness for Plaintiffs.

   b. *In re Paladin Energy Corp.*, Case No. 16-13590, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division — Consulting and Testifying witness for Debtor.

   c. *In re:  Potential Complaint Against Larry Noble, Noble Operating, LLC, Noble Natural Resources, L.L.C. and Javier Urias to Avoid Transfers* — Testifying witness for Potential Defendants.

   d. *James D. Sallah, not individually but solely in his capacity as Corporate Monitor for OM Global Investment Fund LLC and OM Global LP, Plaintiff, v. BGT Consulting, LLC, d/b/a BGT Fund Administration, and Lara Goldberg, Defendants* — Testifying witness on behalf of Defendants BGT Consulting, LLC, d/b/a BGT Fund Administration and Lara Goldberg.

   e. *Kenneth A. Kristofek, Gruene Interests, LLC and Gruene Interests Services, LLC, Gran Toro Rojo, LLC, and Gruene USFC, LLC, v. David Gunderson, Horace Winchester, Stan*

4

**App. 215**

*Bradshaw, and Jerry Williamson, Gruenepointe Holdings, LLC, Adora 8, LLC, Adora 9, LLC, Adora 10, LLC, Adora 14 Realty, LLC, Onpointe Healthcare Development, LLC, U.S. Freedom Capital Holdings, LLC, Lake Ohana, LLC, U.S. Freedom Capital, LLC, and Encantado Investments, LLC*, in the District Court of Dallas County, Texas, No. DC-16-07674 — Testifying witness on behalf of Plaintiffs.

f.  *In re SunEdison Securities Litigation,* in the U.S. District Court for the Southern District of New York, 16-md-2742-PKC — Testifying witness on behalf of Plaintiffs.

g.  *Avid Controls, Inc. v. GE Energy Power Conversion Technology, Ltd.; General Electric Company; and Current Power Solutions, Inc*., In the United States District Court for the Southern District of Texas  -  Houston Division,  Civil Action No. 4:19-CV-01076 — Testifying witness on behalf of Plaintiff.

h.  *Lumos Partners, LLC, Claimant v. VAC-TRON EQUIPMENT, L.L.C., Respondent,* In Arbitration before the American Arbitration Association — Testifying witness on behalf of Claimant.

i.  *Lord Abbett Affiliated Fund, Inc., et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Navient Corporation, et al., Defendants*, Case No. 1:16-cv-112-GMS, in the United States District Court for the District of Delaware, Case No. 1:16-cv-112-MN — Testifying witness on behalf of Plaintiff.

j.  *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation, Plaintiffs, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC and Private Bankers Life and Annuity Co., Ltd., Defendants*, in the General Court of Justice Superior Court Division, 19 CV 13093 — Testifying witness on behalf of Defendants.

k.  *Baylor University and Southwestern Baptist Theological Seminary, Plaintiffs, v. Harold E. Riley Foundation and Mike C. Hughes, Defendants*, in the District Court of Tarrant County, Texas, 67th Judicial District — Testifying witness on behalf of Defendants.

l.  *Advsr, LLC, Plaintiff, v. Magisto, Ltd. And Yahal Zilka, Defendants,* in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:19-cv-2670 — Testifying witness on behalf of Defendants.

m.  *Lumos Partners, LLC, Claimant v. Altavian, Inc.,* In Arbitration before the American Arbitration Association — Testifying witness on behalf of Claimant.

n.  *Fouad Saade; and Kobi Electric, LLC, Claimants, v. Woodbridge International LLC, f/k/a Woodbridge Group, LLC; and Texender "Tex" Sekhon, Respondents,* In Arbitration before the American Arbitration Association  -  Testifying witness on behalf of Claimant.

9.  I have attached a copy of my curriculum vitae as <u>Exhibit A</u> to this expert report ("Report").

## II. **ENGAGEMENT**

10. Highland Capital Management, L.P., is the debtor in the bankruptcy proceeding, *In re: Highland Capital Management, L.P., Debtor,* and is referred to herein as the "Debtor" or the "Plaintiff." I have been engaged in the matters related to the bankruptcy proceeding that are listed below (collectively referred to as the "Actions").

    a. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03005, as a consulting and testifying expert witness on behalf of NexPoint Advisors, L.P. ("NexPoint"), and James Dondero ("Dondero" and NexPoint are collectively referred to as the "NexPoint Defendants").

    b. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03006, as a consulting and testifying expert witness on behalf of Highland Capital Management Services, Inc. ("HCMS"), and Dondero (Dondero and HCMS are collectively referred to as the "HCMS Defendants").

    c. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,* Defendants, Adversary Proceeding No. 21-03007, as a consulting and testifying expert witness on behalf of HCRE Partners, LLC ("HCRE"), and Dondero (Dondero and HCRE are collectively referred to as the "HCRE Defendants").

    d. The NexPoint Defendants, the HCMS Defendants, and the HCRE Defendants are collectively referred to as the "Defendants."

11. The Plaintiff has made claims against the Defendants for breach of contract, turnover of property, fraudulent transfer, and breach of fiduciary duty.

12. My engagement is through the law firms of Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") and Stinson LLP ("Stinson"), which are acting as counsel to the Defendants. I am being compensated for my time at the rate of $750.00 per hour. My compensation is not in any way contingent on (i) the opinions I express in this Report or any additional report, (ii) the content of any testimony I may give, or (iii) the outcome of the Action.

13. I have met with Dondero as well as D. J. Sauter, who is the General Counsel of NexPoint. I have also met with attorneys from counsel to the Defendants: Munsch Hardt, and Stinson.

14. I was asked to provide my opinion regarding whether it was appropriate for the Plaintiff to not pay the interest and principal on the Notes (as hereinafter defined) on behalf of NexPoint, HCMS and HCRE (collectively, the "Makers") by December 31, 2020.

## III. BRIEF SUMMARY OF OPINIONS

15. I believe that the Plaintiff did not act reasonably by failing to pay amounts due on the Notes on behalf of the Makers by December 31, 2020, and otherwise in how it comported itself with respect to the Notes. Section 6.01 of the NexPoint Services Agreement (as hereinafter defined) sets forth a standard of care that the Plaintiff was supposed to comply with in paying the NexPoint Term Note; I also believe that each of the services agreements between the Plaintiff and the Makers required the Plaintiff to act in a reasonable way.

16. In forming my opinions and preparing this Report, I relied on all the materials listed in Exhibit B or otherwise cited herein as well as my background and personal experiences.

17. In offering my opinions, I am not opining on the legal enforceability of any agreements between the parties to the Actions.

18. I reserve the right to amend my Report should new information become available, including any assertions of the parties, witnesses, or any experts made in response to this Report.

## IV. ASSUMPTIONS

19. The Debtor filed for bankruptcy on October 16, 2019. During the Debtor's bankruptcy, James Seery ("Seery") served as the Chief Executive Officer and/or Chief Restructuring Officer of the Debtor.

20. The Debtor was formerly managed by Dondero, who was the firm's co-founder and was its President until January 9, 2020, at which time he resigned all positions with the Debtor and also relinquished control of the Debtor.[3] As of October 9, 2020, Dondero ceased to have any involvement as an officer or director of the Debtor.[4] Dondero also testified that there was tension between Seery and him as well as Seery and others at Highland.[5]

21. During 2020, the relationship between Dondero and the Plaintiff became increasingly adversarial. For example, in addition to Dondero ceasing to have any involvement as an officer or director of the Plaintiff, there were various adversarial proceedings between the parties.[6]

22. NexPoint, HCMS and HCRE executed certain notes in favor of the Debtor as described below:

    a. NexPoint executed a promissory note in the original principal amount of $30,746,812.33, and payable in thirty annual installments beginning by December 31, 2017 (the "NexPoint Term Note").[7] The NexPoint Note was fully payable in

---

[3] Dondero Deposition, Volume 2, Page 291, lines 9 – 12.
[4] *Id.* at Page 374, lines 8 – 10.
[5] *Id.* at page 87, lines 8 – 14.
[6] *See, e.g., Id.* at page 374, lines 6 – 9.
[7] Amended Complaint dated August 27, 2021 (the "NexPoint Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

**App. 218**

the event of default.[8]  As of December 31, 2020, $23,610,194.59 of principal remained outstanding on the NexPoint Term Note.[9]

   b.  HCMS executed a term note in the original principal amount of $20,247,628.02 and payable in thirty annual installments beginning on December 31, 2017 (the "HCMS Term Note").[10]  The HCMS Term Note was fully payable in the event of default.[11]

   c.  HCRE executed a term note in the original principal amount of $6,059,831.51 and payable in thirty annual installments beginning on December 31, 2017 (the "HCRE Term Note").[12]  The HCRE Term Note was fully payable in the event of default.[13]

23. The Debtor and the Makers were all involved in the investment management business, collectively managing billions of dollars on behalf of investors at various points over the course of their relationship with each other. At the time that the NexPoint Term Note, the HCMS Term Note, and the HCRE Term Note (collectively, the "Notes") were entered into, the Plaintiff, NexPoint, HCMS, and HCRE were all related parties as a result of overlapping equity ownership of the entities.  As of December 31, 2020, NexPoint, HCMS, and HCRE ceased to have any overlapping equity ownership with the Plaintiff but continued to have overlapping ownership with each other.

24. The Plaintiff and NexPoint are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (the "NexPoint Services Agreement") pursuant to which Plaintiff provided a broad array of services to NexPoint.[14]  NexPoint operated its business with a small number of employees, relying on Plaintiff's much larger workforce to provide many key services for NexPoint to run its business.  The NexPoint Services Agreement details numerous areas where the Plaintiff was to provide services to NexPoint, with the Plaintiff essentially providing the entire workforce for most areas of NexPoint's business.  The areas that the Plaintiff provided services to NexPoint were detailed under the following headings in the NexPoint Services Agreement: Back- and Middle-Office, Legal Compliance/Risk Analysis, Tax, Management of Clients and Accounts, Valuation, Execution and Documentation, Marketing, Reporting, Administrative Services, Ancillary Services, and Other.[15]  The NexPoint Services Agreement essentially covered all functional areas of NexPoint's business other than the executive and investment functions.

---

[8] NexPoint Amended Complaint, Exhibit 3.  Additionally, I am informed that there was the potential for forgiveness of the Notes in certain circumstances that had also not occurred by December 31, 2020.
[9] D-NNI -074142.
[10] Amended Complaint dated August 27, 2021 ("HCMS Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.
[11] HCMS Amended Complaint, Exhibit 6.
[12] Amended Complaint dated August 27, 2021 ("HCRE Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, HCRE Partners, LLC, James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.
[13] HCRE Amended Complaint, Exhibit 6.
[14] Amended and Restated Services Agreement dated January 1, 2018, Exhibit 9 to Seery Deposition.
[15] *Id.* at pages 3 – 5.

25. The NexPoint Services Agreement contains several provisions relating to the Plaintiff's obligation to make interest and principal payments on the NexPoint Term Note, including the following:

    a. Section 2.02(a) details various "Back and Middle Office" tasks that the Plaintiff was responsible for performing on behalf of NexPoint.[16] Those services included "payments,"[17] which encompassed payments of interest and principal on the NexPoint Term Note.

    b. Section 2.02 (b) provided for the Plaintiff to provide "[a]ssistance and advice with respect to legal issues…".[18]

    c. Section 6.01 describes the standard of care that the Plaintiff was supposed to provide to NexPoint.[19] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

    d. Section 8.01 required that any amendments or modifications to the agreement were required to be in writing and signed by each party.[20]

    e. Section 8.07 provided that any "condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties."[21]

26. The Plaintiff first sought to provide notice of termination of the NexPoint Services Agreement in November of 2020, however, the termination date was extended[22] and the NexPoint Services Agreement was still in effect as of December 31, 2020.

27. While there was no written agreement between either HCMS or HCRE, on the one hand, and the Plaintiff, on the other hand, relating to services that the Plaintiff was to supply to either party, the services that the Plaintiff provided to HCMS and HCRE were essentially the same services that the Plaintiff provided to NexPoint[23] and involved a comprehensive array of services that were necessary in the day-to-day operations of the business of HCMS and HCRE. Like with NexPoint, by December 31, 2020, there was a long history of the Plaintiff having provided services to HCMS and HCRE.[24]

---

[16] *Id*. at pages 3 - 4.

[17] *Id.,* Section 2.02(a) provided, "Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, bookkeeping, cash management . . . accounts payable . . ."

[18] *Id.* at page 4.

[19] *Id.* at 11.

[20] *Id.* at 14.

[21] *Id*. at 16.

[22] Dondero Deposition, Volume 2, page 375, lines 3-10.

[23] *See, e.g.,* Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13; Waterhouse Deposition, page 353, lines 6 – 10, page 357, lines 19 – 24.

[24] Dondero Deposition, Volume 2, page 94, lines 20 – 22; page 95, lines 4 – 9.

**App. 220**

28. When asked about whether the Plaintiff had a services agreement with HCMS, Dondero replied as follows during his deposition[25]:

> My answer would be the advisors like NexPoint and HFAM that had to have by law and regulatory statute have to have formal sub advisors and shared services agreements had formal shared services agreement. Entities that didn't need to have formal written shared services agreements were often serviced similarly or -- or exactly the same as those entities, but without a written agreement, but with a verbal shared services agreement providing, again, all the same similar services, and the entities that didn't have a written shared services agreement ·weren't getting shared services or support from any other entities other than Highland doing the same thing for them that it did for the mutual funds.

29. Dondero had a similar response with regard to there being an oral agreement for the Plaintiff to provide services to HCRE.[26]

30. There was extensive testimony about the services that the Plaintiff provided to HCMS and HCRE:

   a. Under the oral agreements to provide services to HCMS and HCRE, the Plaintiff was responsible for making payments of interest and principal on the HCMS Notes and the HCRE Notes, which had previously been made by December 31, 2017, 2018, and 2019.[27]

   b. HCMS and HCRE relied on the Plaintiff to provide services because HCMS and HCRE, like NexPoint, did not have the employees or infrastructure to run its business without the services provided by the Plaintiff.[28]

   c. According to Frank Waterhouse ("Waterhouse"), the Chief Financial Officer of the Plaintiff throughout 2020[29], the Plaintiff provided the same services to HCRE and HCMSS that it did for NexPoint.[30] He also specifically testified that Plaintiff's services included timely paying of bills and loan payments for HCMS[31] and the same bill paying for HCRE that it did for HCMS and NexPoint.[32]

31. Interest and principal were due on the Notes by December 31, 2020. Neither interest nor any principal payments were paid on any of the Notes by December 31, 2020. The Plaintiff was supposed to facilitate these payments even though the payments were supposed to be to itself.

---

[25] Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13.
[26] Id. at page 381, lines 10 – 23.
[27] Waterhouse Deposition, page 354, lines 2 – 23, page 357, lines 2 – 18.
[28] Dondero Deposition, Volume 2, page 371, lines 5-9.
[29] Waterhouse Deposition, page 28, lines 15-16.
[30] Id., page 353, 6-10; 357: 19 – 24.
[31] Id. at page 354, lines 2 to page 357, line 18.
[32] Id. at page 358, lines 12 – 24.

10

**App. 221**

32. On January 7, 2021, the Debtor delivered a letter to each of the Makers (the "Acceleration Letters") indicating that a default had occurred on each of the Notes and demanding the immediate full payment of "all principal, interest, and any other amounts due on the Note…".[33] The effect of the Acceleration Letters was that millions of dollars of principal payments were suddenly due; had the Acceleration Letters not been sent, principal on the Notes would have amortized ratably through 2047.

33. In addition to being the Plaintiff's Chief Financial Officer, Waterhouse was also an officer of two of the three Makers as of December 31, 2020.

   a. He was the Treasurer of NexPoint, an officer-level role, during all periods relevant to my Report.  Waterhouse reported at his deposition, "I still manage the finance and accounting function for NexPoint."[34]

   b. He was the treasurer and acting treasurer of HCMS.[35]

34. Plaintiff alleges that Dondero orally instructed Waterhouse to not pay the interest and principal on the NexPoint Term Note that was due on December 31, 2021.[36]  No evidence has been presented that suggests that Dondero's alleged instructions for the Plaintiff to not pay interest and principal on the NexPoint Term Note was in writing. The apparent rational for the alleged instruction was that NexPoint believed that there had been substantial overcharges totaling in the millions of dollars by the Plaintiff under the NexPoint Services Agreement.  The overcharges related to charges for employees who were no longer working for the Plaintiff but that were still being charged to NexPoint, which was a violation of the NexPoint Services Agreement. Furthermore, Dondero denies that he instructed Waterhouse not to pay the NexPoint Term Note.[37]

   a. Dondero denies that he instructed that no interest and principal be paid on the NexPoint Term Note, testifying, "There is no logical reason, nor would I have ever authorized or suggested no payment to put us…in default due to a *deminimis* amount of money….even if I was highly annoyed with Seery, even if we knew that Seery and Highland had overcharged NexPoint by whatever it was, 14, 16, million bucks, I would not have let a small amount cause a…breach."[38]

   b. Dondero also testified that the Plaintiff made the payments due on the Notes by December 31 of 2017, 2018 and 2019 without any specific authorization from any of the Makers.[39]

35. No evidence was presented suggesting that Dondero, HCMS or HCRE instructed the Plaintiff not to make payments on the HCMS Term Note or the HCRE Term Note.  HCMS and HCRE had a reasonable expectation that interest and principal on the HCMS Notes and HCRE Notes

---

[33] Exhibit 6 to Seery Deposition taken on October 21, 2021.
[34] Waterhouse Deposition, page 28, lines 15-16.
[35] *Id*., at page 30, lines 9 – 16.
[36] *Id*., at page 390, lines 4 – 13.
[37] Dondero Deposition, Volume 2, page 391:18-25.
[38] *Id.*
[39] *Id*. at page 463, lines 10-25.

**App. 222**

would be paid by December 31, 2020, given past practices and the Plaintiff's obligation to do so.

36. Mr. Waterhouse testified about his responsibility in connection with making the payments on the Notes that were due by December 21, 2020[40]:

> Q:  Did you approve of each payment that was made against principal and interest on the notes that were given by the affiliates of Mr. Dondero?
>
> A:  Did I approve the payments?  I approve  -  I approve  -  if there was cash  -  if there was cash being repaid on a note payment, yes, I approved in the general sense of being made aware of the payment and the amount."
>
> Q:  And are you the person who authorized Highland's employees to effectuate those payments?
>
> A:  Yes.

37. No evidence has been presented of any discussions that the Plaintiff had with Dondero or any of the Makers prior to December 31, 2020, with regard to payments on the Notes other than the alleged discussion between Dondero and Waterhouse described above relating to the NexPoint Term Note.  Specifically, the evidentiary record reflects that there was no follow-up by Waterhouse or anyone else at the Plaintiff confirming that it was Dondero's intent for there not to be any payments made on the NexPoint Term Note.[41]

   a.  A number of Plaintiff's employees knew about Dondero's alleged instructions prior to December 31, 2020, with respect to the NexPoint Term Note, yet no effort was undertaken to investigate Dondero's instructions by speaking with him or otherwise confirming what NexPoint's intent was regarding the NexPoint Term Note.

   b.  Deposition testimony by Kristin Hendrix ("Hendrix"), who was the assistant controller of the Plaintiff at the time, revealed that she knew by November 30, 2020, or December 1, 2020, that the Plaintiff was not going to pay the interest and principal on the NexPoint Term Note that was due by December 31, 2020.[42]

   c.  Waterhouse testified that he did not follow-up with Dondero about whether NexPoint should make the payments required by December 31, 2020.[43]

38. Waterhouse also testified that there had not been any instructions from anyone to the Plaintiff to not make the required payments on the HCMS Term Note or the HCRE Term Note by December 31, 2020.[44]  When asked about Dondero's tone when he talked to him about the fact that the payments had not been made on the HCMS Term Note and the HCRE Term Note,

---

[40] Waterhouse Deposition, page 56, line 21 to page 57, line 10.
[41] *Id.*, at page 391, lines 18 – 21.
[42] Hendrix Deposition, page 12, lines 4 – 7.
[43] Waterhouse deposition, pages 391: line 18 to page 392, line 2.
[44] Waterhouse Deposition, pages 393, line 21 – 25 to page 394, line 4.

Waterhouse said that the tone was very negative and that Dondero's reaction was consistent with the fact that Dondero was surprised that the payments had not been made.[45]

## V.  SERVICES AGREEMENTS GENERALLY

39. Companies seeking to conduct operations more efficiently frequently outsource various operational, accounting, treasury, and other functions to a service provider.  By outsourcing such functions, the customer of the services provider can avoid costly employee and infrastructure investments that would otherwise be required to conduct the outsourced functions.

40. The agreement between the party receiving the services and the party providing the services is often referred to as a "services agreement," an "outsourcing agreement," or a "shared services agreement."  These terms have the same meaning for purposes of this Report although the term "shared services" is often used in the context of a company sharing services with an affiliated party.

41. The parties to a services agreement are sometimes related and other times are completely separate with no prior business relationship.

42. The actual agreement that comprises the services to be provided under a services agreement varies in form.  Some services agreements are comprehensive, others provide limited written direction, and still others are oral.

43. Smaller companies are often more likely to outsource a broad set of business functions, typically because they are growing rapidly and do not have the financial resources or time to build out various important business functions.

44. Virtually every company outsources some type of business function to a third-party.  For example, many companies outsource limited functions such as payroll processing or IT services to various vendors.  There is a distinct difference, however, between outsourcing limited functions to a vendor that provides services for many clients versus the more fulsome relationship that is embodied by the typical services agreement involving the services provider managing major aspects of a company's operational and back-office functions.

   a. Providers of more fulsome services have additional duties relative to a provider that is responsible for limited services.  Those additional duties generally emanate from the level of responsibility that the services provider takes on and the services provider's more intimate knowledge of its customer's business.

   b. Said another way, a provider of a straightforward and often outsourced service such as payroll processing has no reason to understand the underlying business issues of its customers or the perspectives of the employees for which it processes payroll. On the other hand, a provider of more fulsome services has an intimate knowledge

---

[45] *Id.* at page 394, lines 12 – 21.

13

**App. 224**

of the goals, objectives, and capabilities of its customers and in discharging its obligations, cannot ignore that knowledge.

45. In the case of services agreements that cover a fulsome set of activities for the customer, even if there is a comprehensive agreement between the parties, it is difficult to enumerate with specificity each individual task that the services provider is expected to perform. Tasks are therefore often described in broad terms as opposed to specific detail (i.e., the service provider is required to handle accounting functions for its customer as opposed to saying that a trial balance is required 15 days after month-end, or the annual audit must be completed by a specified date).

    a. Despite the difficulty in describing each task with specificity that the services provider is required to perform, the specific tasks become apparent as the services provider performs functions on behalf of its customer. In the ordinary course, practices develop that inevitably are deemed acceptable to the services provider and its customer. Such practices are generally fully clarified within one year of the inception of the services agreement because that timeframe allows the parties to interact with each other over the course of a full accounting cycle.

    b. Following the initial cycle of activities, those previously performed practices are often referred to as "past practices" and such past practices become an important piece in gauging whether  the services provider has met it obligations in future periods. Having been affiliated with companies that are customers of services providers, I think of past practices as having virtually the same effect as a written document provided that the services agreement is not written in a way that prohibits such an interpretation.

46. Services agreements between related parties often present complicated issues, especially if the relationship changes between the parties during the term of the services agreement. For example, at the beginning of the term of the services agreement, two related parties might constructively work together, almost obviating the need for a detailed agreement between the parties. If there is a change in the relationship between the parties that leads to less cooperation, the original agreement may not be comprehensive enough to optimally deal with the change in circumstances.

    a. In such situations, past practices can become an even more important factor in determining the services provider's obligations and the reasonable expectations that the customer should have if the contract language is not explicit on the point.

    b. While the services provider and a customer that is related at the outset of an agreement may cease to be related at some point during the term of the agreement, the services provider's knowledge of the customer's business objectives does not necessarily become stale immediately upon the  change in affiliate status. Consequently, any higher duty that comes about from the knowledge that the services provider has about its customer is not necessarily impacted if the affiliate status of the services provider and its customer changes.

**App. 225**

# VI. OPINIONS

**A. The Plaintiff was obligated to pay interest and principal on the NexPoint Term Note by December 31, 2021, on behalf of NexPoint. Despite the alleged instruction from Dondero that the Plaintiff should not make any payments on NexPoint's behalf, the Plaintiff's obligations to make the payments did not end. At a minimum, the Plaintiff had a duty to investigate whether the payments should have been made, which it did not do. In not making the payments on the NexPoint Term Note and not undertaking steps to further investigate whether the payments should have been made, the Plaintiff did not act reasonably.**

47. The payment terms of the NexPoint Term Note required that interest and principal was due to the Plaintiff from NexPoint on or before December 31, 2020. It is undisputed that interest and principal were not paid on the NexPoint Term Note by the required date.

48. The Plaintiff was obligated to make the payment of interest and principal on behalf of NexPoint on or before December 31, 2020, under the NexPoint Services Agreement.

49. The Plaintiff has taken the position that the interest and principal that was due on the NexPoint Term Note by December 31, 2020, was not paid because of Dondero's alleged directive to Waterhouse to not make the payments.[46]

50. The evidentiary record highlights several noteworthy facts:

   a. The Plaintiff had conflicting roles because it was the payee of the NexPoint Term Note and also had the obligation to cause the payments to be made on the NexPoint Term Note. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

   b. The Plaintiff stood to benefit mightily if NexPoint defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of the NexPoint Term Note. Without a default, some of the principal of the Notes could have been outstanding until 2047.

   c. Waterhouse was an officer of the Plaintiff and was also an officer of NexPoint, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given his dual roles, he had knowledge of the business objectives and financial condition of NexPoint, which should have made it clear to him that NexPoint would not welcome a default on the NexPoint Term Note.

   d. NexPoint allegedly made overpayments to the Plaintiff that Dondero wanted to be offset against the required interest and principal payments on the NexPoint Term Loan.[47] The overpayments related to workers that the Plaintiff was charging to NexPoint that no longer worked for the Plaintiff, which violated the terms of the

---

[46] Waterhouse Deposition, page 390, lines 4 – 13.
[47] Seery Deposition, page 226, lines 2 – 4; Dondero Deposition, Volume 2, page 392, lines 3 – 7.

NexPoint Services Agreement. There were ongoing discussions between Dondero and Seery leading up to the end of 2020 relating to the topic.

    e. There is no evidentiary record describing any effort by the Plaintiff to warn NexPoint of the implications of Dondero's alleged request for the payments on the NexPoint Term Note to not be made. For example, despite the fact that the NexPoint Services Agreement required the Plaintiff to provide NexPoint with legal services, the Plaintiff failed to provide NexPoint with legal advice that failing to pay interest and principal could result in an acceleration of the NexPoint Term Loan.

51. In my opinion, Dondero's alleged statement to Waterhouse that the Plaintiff should not make payments on the NexPoint Term Note on December 31, 2020, did not provide a basis for the Plaintiff to not make the payments on the Notes given its obligations to NexPoint under the NexPoint Services Agreement. Several reasons support my opinion:

    a. There is no evidence that the Plaintiff took any reasonable steps to address the myriad of conflicts that it faced.

        i. The Plaintiff's obligations regarding the required payments of the Notes involved the conflict-ridden task of authorizing and making a payment to itself. Additionally, the Plaintiff stood to benefit significantly by putting the NexPoint Term Note into default given that a default would allow the Plaintiff to realize the proceeds from repayment of the note far earlier than it otherwise would have; had the NexPoint Term Loan not been accelerated, it would have remained outstanding until 2047. While the evidence is silent on whether the Plaintiff was considering the repayment benefit of the NexPoint Term Loan to itself, from an appearance standpoint, the conflict was glaring.

        ii. The Plaintiff apparently took no steps to address these conflicts either by conferring with NexPoint or Dondero. Conferring with NexPoint or Dondero would have helped in establishing that NexPoint and Dondero really did not want the Plaintiff to transfer funds to pay interest and principal on the NexPoint Term Loan.

        iii. The Plaintiff also has presented no evidentiary record reflecting how any internal steps were taken to address the conflict. Such steps might have included conducting meetings internally with minutes to reflect discussion regarding the conflict or any efforts to seek guidance from counsel to assist with the conflict.

        iv. According to deposition testimony by Hendrix, who was the assistant controller of the Plaintiff at the time[48], she recalled receiving a phone call from Waterhouse on either November 30, 2020, or December 1, 2020, where Waterhouse indicated that no payments would made by the Plaintiff

---

[48] Hendrix Deposition, page 12, lines 4 – 7.

on behalf of NexPoint.[49]   Accordingly, it seems that Plaintiff decided as early November 30, 2020 or December 1, 2020, to not make the payments on the NexPoint Term Note.  Given the apparent time frame of the decision to not make the payment, the Plaintiff had ample time to confirm in writing with Dondero that the payments should not be made or to otherwise take reasonable steps to ensure that a mistake was not being made and that the Plaintiff was acting reasonably.

b.  The Plaintiff had an obligation to act reasonably in discharging its obligations to make the payments on the NexPoint Term Note on behalf of NexPoint.  In addition to not properly addressing conflicts as set forth above, the evidentiary record further reflects that the Plaintiff did not act reasonably.

   i.  No effort was undertaken to inform Dondero that the Plaintiff disagreed with his assumption that there were offsets to the required interest and principal payment requirements on the NexPoint Term Note. Absent any communication from the Plaintiff, Dondero simply had no way of knowing that the Plaintiff disagreed with his perspective that a right of offset did exist, so it was reasonable for him to think that discussion of an offset was on the table.

   ii.  Waterhouse had worked for or with Dondero for many years, making him very familiar with Dondero's management style.  Dondero is a decisionmaker who is willing and does change his mind when presented with new facts, something that Waterhouse should have been aware of yet did nothing to address.

   iii.  Given the massive implications of a default of the NexPoint Term Loan to NexPoint, which the Plaintiff should have understood given the robust services that it was providing to NexPoint and the dual financial responsibilities that Waterhouse had to both organizations, the Plaintiff should have acted more responsibly by engaging with NexPoint and Dondero to confirm NexPoint's intent.

   iv.  The NexPoint Services Agreement provides that the Plaintiff was supposed to provide NexPoint with legal advice. In effect, the Plaintiff was NexPoint's law firm.  Had the Plaintiff met its commitment, it would have had its internal counsel consult with NexPoint to point out the legal ramifications of the interest and principal payments not being made.  There is no evidence suggesting that the Plaintiff took any steps to meet its obligation to provide legal advice as required under the NexPoint Services Agreement.

c.  Waterhouse had a conflict separate from the conflicts that the Plaintiff otherwise had given that he was an officer of both the Plaintiff and the NexPoint.  Among

---

[49] *Id*. at 71, lines 4 – 7.

17

**App. 228**

other things, Waterhouse's officer role for NexPoint must have provided him with insights into NexPoint's business objectives, which could not have included any appetite for having the Notes accelerated. Yet there is no evidence that Waterhouse's knowledge was utilized in Plaintiff's decision making regarding the required payments of the Notes. It is inapposite to argue that because Waterhouse had knowledge about NexPoint from a source other than the Plaintiff, that he was entitled to ignore that knowledge. In discharging its duties under the NexPoint Services Agreement, the Plaintiff should have been using all information that it had available in its work on behalf of NexPoint.

d. The NexPoint Services Agreement provided that any amendment to the agreement needed to be in writing[50] and any consent to a change in the agreement needed to be in writing.[51] No such effort to comply with the writing requirement was undertaken and highlights the fact that any oral statement by Dondero regarding the NexPoint Term Loan not being paid was insufficient under the express terms of the NexPoint Services Agreement.

e. Section 6.01 of the NexPoint Services Agreement also describes the standard of care that the Plaintiff was supposed to provide to NexPoint in the discharge of its obligations under the agreement.[52] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." For reasons already described herein, the Plaintiff did not discharge its duties with such care.

52. For the foregoing reasons, any alleged default under the NexPoint Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to NexPoint.

**B. Based on the oral agreement that the Plaintiff had with HCMS and HCRE and consistent with the services that the Plaintiff had previously provided, HCMS and HCRE had a reasonable expectation that the Plaintiff would continue paying interest and principal on behalf of those entities absent explicit direction to the contrary. As there was no directive from anyone affiliated with HCMS or HCRE to relieve the Plaintiff of that responsibility, the Plaintiff did not act reasonably by not meeting its obligations to make payments of interest and principal on behalf of HCMS and HCRE.**

53. While the services agreements between Plaintiff, on the one hand, and HCMS and HCRE, on the other hand, were oral, the existence of an oral services agreement between affiliated parties involved in the investment management business is common and is something that I have regularly observed.

---

[50] Amended Services Agreement, Section 8.01.
[51] *Id.* at Section 8.07.
[52] *Id.* at Section 6.01.

54. Like with NexPoint, the Plaintiff provided HCMS and HCRE with a comprehensive array of services that were necessary to the day-to-day operation of their businesses. There was a lengthy history of the Plaintiff providing HCMS and HCRE with such services. The broad array of services provided by the Plaintiff to NexPoint were the same as the scope of work performed by the Plaintiff for HCMS and HCRE.

55. The evidentiary record highlights several noteworthy facts:

   a. The evidentiary record reflects that the Plaintiff historically made payments on behalf of the HCMS Term Note and HCRE Term Note in addition to providing an array of other critical services to HCMS and HCRE not dissimilar from many of the services that the Plaintiff provided to NexPoint under the NexPoint Services Agreement.[53]

   b. No evidence has been presented suggesting that there was any communication from HCMS, HCRE, or Dondero suggesting that the payments on the HCMS Term Note and the HCRE Term Note should not continue.

   c. No evidence has been presented suggesting that on payment dates in years prior to 2020 HCMS or HCRE had to notify the Plaintiff that it wanted the Plaintiff to make the required payments on the HCMS Term Note or the HCRE Term Note. Accordingly, it would not have been reasonable for the Plaintiff to expect that HCMS or HCRE were required to take any affirmative steps to have payments made on their notes.

   d. The Plaintiff had conflicting roles because it was the payee of the HCMS Term Note and the HCRE Term Note and also had the obligation to cause the payments to be made of those notes. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

   e. The Plaintiff stood to benefit mightily if HCMS and HCRE defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of those notes. Without a default, some of the principal of the HCMS Term Note and the HCRE Term Note could have been outstanding until 2047.

   f. Waterhouse was an officer of the Plaintiff and was also an officer of HCMS, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given Waterhouse's dual roles, he had knowledge of HCMS's business objectives and financial condition, which should have alerted him that HCMS would not welcome a default on the HCMS Term Note.

---

[53] *See, e.g.,* Dondero Deposition, Volume 2, pages 335:19 to 336:13; page 381, lines 10-23.

g.  The Plaintiff made no effort to warn HCMS or HCRE of the implications of the Plaintiff not making payments on the HCMS Term Note or HCRE Term Note by December 31, 2020.

56. Dondero testified about the payments that were required on the HCMS Term Note by December 31, 2020, indicating that there was an expectation by HCMS that the payments were going to be made, regardless of whether there were specific instructions by HCMS to do so:[54]

Q: Okay. Do you know whether anybody acting on behalf of HCMS ever instructed or authorized Highland to make a payment on account of HCMS's term note to Highland?

A. Well, again, and maybe I didn't say it clearly enough.  I think there was a reliance in the due course aspect, especially on small amounts, and it would have been done by Highland personnel on behalf of Services.

\* \* \* \* \*

Q. And I'm going to ask you, Mr. Dondero, to be patient with me and to listen carefully to my question. Are you aware of anybody acting on behalf of HCMS, whoever instructed Highland to make a payment in satisfaction of any payment that was due at the year-end of 2020 under the term note?

A. Not specifically, but I'm saying I don't think it needed to be made specifically.

57. The Plaintiff was required to act reasonably in the performance of its obligations to HCMS and HCRE given the record of past practices and the precedent created by similar work done by the Plaintiff for NexPoint.  With respect to the payments required under the HCMS Term Note and the HCRE Term Note by the Plaintiff, HCMS and HCRE had a reasonable expectation that they would continue receiving such payment services absent a clear termination by Plaintiff of its obligations to HCMS and HCRE.   Given that there is no evidence suggesting that any of the parties had terminated the Plaintiff's obligations to provide services to HCMS and HCRE as of December 31, 2020, especially given that the Plaintiff continued to perform other services on behalf of those entities as of such date, the Plaintiff did not act reasonably by not making the payments on the HCMS Term Note and the HCRE Term Note by December 31, 2021.  Likewise, it was also not reasonable for the Plaintiff to not discuss with HCMS and HCRE that payments were not going to be made on the HCMS Term Note and the HCRE Term Note given that payments had been made in prior years without any request by HCMS or HCRE.

58. Hendrix testified that the instruction to her not to make the NexPoint Term Loan payment by December 31, 2020, did not apply to the payments required on the HCMS Term Note and the HCRE Term Note by December 31, 2020.[55]  She also testified that she made no attempt or effort to determine whether Dondero wanted the payments required on the HCMS Term Note

---

[54] Dondero Deposition, Volume 2, pages 371:23 – 372:18.
[55] Hendrix Deposition, page 100, lines 20 – 23; page 101, lines 8 – 12.

**App. 231**

and the HCRE Term Note to be paid by December 31, 2020.[56]  Finally, Hendrix made no attempt to check with anyone whether the payments should be made.[57]  Hendrix's testimony underscores that Plaintiff did not act reasonably in discharging its obligations to HCMS and HCRE.

59. For the foregoing reasons, any alleged default under the HCMS Term Note and the HCRE Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to HCMS and HCRE.

## VII.   <u>CONCLUSION</u>

60. In summary, based on the evidence that I have reviewed and relied upon, as well as my training and experience, it is my opinion that the Plaintiff did not act reasonably in choosing not to pay the interest and principal due under the Notes. As a result of Plaintiff's failures to act reasonably, it should not have accelerated payment of the principal amount of the Notes.

Respectfully submitted,

_____

Steven J. Pully, CPA, CFA, ESQ.

---

[56] *Id*. at page 102, lines 10 – 13.
[57] *Id*. at page 105, lines 8 – 11.

21

**Exhibit A**

**STEVEN J. PULLY**
**4564 Meadowood Road, Dallas, Texas**
**(214) 587-6133**
**sjpully@yahoo.com**

---
### *Employment History*
---

| | |
|---|---|
| October 2014 – Present | **SPEYSIDE PARTNERS/INVESTMENT BANKER/CONSULTANT/BOARD DIRECTOR/CORPORATE EXECUTIVE** |

- *Investment banker/consultant to companies, investors and creditors on matters including capital raising, distressed debt restructurings, asset dispositions, activist investing defense, strategic opportunities, and expert witness matters*
- *Chief Executive Officer and Chairman, Harvest Oil & Gas (post-reorg)*

January 2008 – Sept. 2014 — **CARLSON CAPITAL, L.P.,** General Counsel and Partner, Dallas, Texas
- *Responsible for legal affairs of hedge fund with over $9.0 B of AUM; worked closely with affiliated oil and gas private equity fund with $700 of AUM beginning in 2010*
- *Member of Management, Operating and Valuation Committees (Chair)*

Dec. 2001 – October 2007 — **NEWCASTLE CAPITAL MANAGEMENT, L.P.,** President, Dallas, Texas
- *Activist fund with $650 MM of assets under management*
- *Operating positions for portfolio companies: CEO of Pinnacle Frames, Jan. 2003 – June 2004 (largest domestic picture frame manufacturer with 600 employees; involved in multiple visits to Wal-Mart, visited China and identified new CEO for company); CEO of New Century Equity Holdings, June 2003 – Oct. 2007 (cash shell seeking to acquire business)*

May 2000 – Dec. 2001 — **BANC OF AMERICA SECURITIES**, Managing Director, Investment Banking - M&A/ Energy & Power Groups; Houston and Dallas, Texas

January 1997 – May 2000 — **BEAR STEARNS & CO. INC.,** Senior Managing Director - Investment Banking Department; Dallas, Texas

April 1996 – Dec. 1996 — **CONVERGENT ASSOCIATES, INC.,** President, Dallas, Texas.
- *Private equity firm that controlled three technology-oriented companies involved in travel, media and software; affiliated with EDS*

January 1996 - April 1996 — **WASSERSTEIN PERELLA & CO., INC.,** Vice President - Investment Banking Department; Dallas, Texas
- *Left after brief association because supervisor announced departure plans*

July 1989 - Dec. 1995 — **PAINEWEBBER INCORPORATED/ KIDDER, PEABODY & CO.,** First Vice President - Investment Banking Department; New York City and Houston, Texas

October 1985 - July 1989 — **BAKER & BOTTS, Attorneys,** Associate – Corporate Department; Houston, Texas

**App. 233**

---

### *Board Experience*

---

**Board Leadership**  -  Experience as Lead Director, Chairman of the Board, Executive Committee member and Chairman of Audit, Compensation, Governance and Strategic Committees

**Accounting/Finance**  -  CPA and CFA certifications, significant experience with financial statements and analysis, member of several audit committees including chair role

**Strategic Transactions/Capital Raising**  -  Substantial history with successful strategic transactions and efficient capital raising, including debt restructurings

**Governance/Activist Investing Expertise**  -  Extensive experience with shareholder governance and activist investing/defense; positive reputation with shareholders as a value creator

**Legal/Regulatory**  -  Licensed attorney, extensive experience managing legal/compliance department

#### Public Company Directorships

**Previous:** Bellatrix Exploration, Energy XXI (Chair – Comp and Strategic), EPL Oil & Gas Inc. (Lead Director, Chair - Comp), Ember Resources, Cano Petroleum, Goodrich Petroleum, Harvest Oil and Gas (Chairman of the Board, Chair – Audit), Peerless Systems (Chair – Audit), New Century Equity Holdings, MaxWorldwide, Geoworks Corporation, Pizza Inn (Chair – Governance), Titan Energy, VAALCO Energy (Chair – Governance, Comp), Whitehall Jewelers (Chairman)

#### Private Company Directorships

**Current:** Harvest Oil & Gas (Chairman of the Board and Chief Executive Officer, formerly public company), Limetree Bay Energy, Heritage Power, Response Team 1, Wild Rivers, OWS, ExpressJet

**Previous:**  Fox & Hound, GenCanna Global, Pinnacle Frames & Accents, Aspire Holdings (Chair – Comp), PermianLide, Tribune Resources (Chair – Audit), PGi, Southland Royalty, Greylock Energy, Karya Properties, PRIMEXX Energy, Titan Energy

---

### *Professional Certifications, Education and Other Interests*

---

**CHARTERED FINANCIAL ANALYST,** 2004 (Active member), **CERTIFIED PUBLIC ACCOUNTANT,** Texas, 1985 (Active member), **STATE BAR OF TEXAS,** 1985 (Active member), **FINRA** Series 7, 63 and 79 (Current)

**The University of Texas School of Law, 1985**
International Law Journal, Moot Court, Board of Advocates

**Georgetown University, BSBA with honors, 1982, Major in accounting with 3.90 GPA in major**
President of Student Government Senate, National Model U.N. Team
**Centre for Management Studies, Oxford University, England**, **Summer 1981**

Sailing, golf, writing, biking and travel; married with two adult daughters

Board of Advisors, Georgetown McDonough School of Business, 2015 - 2018

**App. 234**

**Documents Reviewed**

Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (Dkt. No. 1, Adv. Proc. No. 21-03004)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03005)

Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint (Dkt. No. 64, Adv. Proc. No. 21-03005)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 68, Adv. Proc. No. 21-03006)

Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint (Dkt. No. 6, Adv. Proc. No. 21-03006)

Defendant Highland Capital Management Services, Inc.'s Answer to Amended Complaint (Dkt. No. 73, Adv. Proc. No. 21-03006)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03007)

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)'s Answer to Amended Complaint (Dkt. No. 68, Adv. Proc. No. 21-03007)

Defendant James Dondero's Answer to Amended Complaint (Dkt. No. 83, Adv. Proc. No. 21-03003)

Remote Videotaped Deposition of Frank Waterhouse, taken October 19, 2021 and Exhibits

Video Deposition of James P. Seery, Jr., taken October 21, 2021 and Exhibits

Deposition of Kristin Hendrix, taken October 27, 2021 and Exhibits

Deposition of David Klos, taken October 27, 2021

Remote Deposition of James Dondero, Volume II, taken October 29, 2021 (Rough draft) and Exhibits

Remote Deposition of James Dondero, Volume III, taken November 4, 2021 (Rough draft) and Exhibits

# Exhibit G

STRICTLY CONFIDENTIAL

```
-----------------------------------------------------------x
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
RE: Highland Capital Management, L.P.                      :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
-----------------------------------------------------------x
```

## EXPERT REPORT OF ALAN M. JOHNSON

**MAY 28, 2021**

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

|  | **Page** |
|---|---|
| Introduction | 3 |
| Background | 4 – 5 |
| Summary of Opinions | 6 – 7 |
| Statement of Opinions | 8 – 15 |
| Conclusion | 16 |
| Exhibit A:  Work History and Education | 17 |
| Exhibit B:  Alan M. Johnson Prior Expert Testimony Since 2016 | 18 |
| Exhibit C:  Actual Compensation vs. Estimated Market Compensation Range | 19 |
| Exhibit D:  Select Public Peer Comparators | 20 |
| Exhibit E:  Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019) | 21 – 23 |
| Exhibit F: Discussions of Investment Management Compensation in the Public Domain | 24 |
| Documents Reviewed | 25 |
| Bibliography | 26 |

**App. 238**

STRICTLY CONFIDENTIAL

## INTRODUCTION

I have been retained by Stinson LLP ("Stinson"), counsel to Mr. James Dondero, to provide expert opinions based on my knowledge and experience advising asset management and other financial service firms on compensation over the period 2013 to 2019.  Specifically, I have been asked to independently analyze the competitiveness of compensation provided to Mr. Dondero compared to compensation received by executives and senior employees with similar experience and roles. In addition, I was asked to opine on and provide information on the use of loans in the marketplace as a form of compensation.  Mr. Dondero is the Founder and, throughout the period, was the CEO, and head portfolio manager of Highland Capital Management LP ("HCM") and in that role, performed the same services for related companies and companies managed by HCM, including Highland Capital Management Financial Advisors ("HCMFA") and NexPoint Advisors ("NPA").  Market competitive compensation for Mr. Dondero during this period is relevant based on the apparent shortfall in annual compensation to Mr. Dondero. Throughout this period, he received loans in lieu of additional current compensation. Consistent with company practice, the loans were considered a form of deferred compensation that could be realized over time as the loans were forgiven and the income recognized by the individuals.

My opinions in this report are based on my experience consulting on executive compensation since 1980, my review of certain materials produced on Highland and its affiliates, and my perspectives on compensation programs for comparable senior executives and key employees in the industry.

**App. 239**

STRICTLY CONFIDENTIAL

# BACKGROUND

**<u>Professional Experience</u>**

The issues I have been asked to provide opinions on are topics I have regularly

encountered during many years of advising financial services firms, including asset management

firms.  I am an executive compensation consultant, and my firm, Johnson Associates, is a

prominent boutique compensation consulting firm.  My firm has specialized for many years in

analyzing and advising the financial services industry, including major investment and asset

management firms, hedge funds and other alternative investment firms, advisory firms,

commercial banks, insurance companies, and brokerage firms.

I have extensive experience reviewing and assessing appropriate market levels of

compensation for clients.  I have worked as a compensation consultant since 1980.  In 1992, I

founded my own compensation consulting firm, Johnson Associates in New York City.  Johnson

Associates, where I am currently Managing Director, is a boutique firm specializing in

compensation consulting for the financial services industry.  We routinely consult on and have a

strong understanding of market compensation levels for senior professionals and executives.

Prior to founding my own firm, I was a consultant at several leading compensation advisory

firms.

Our clients have included many of the world's most significant financial institutions,

asset managers and alternative investment firms across a broad range of issues.  A summary of

my work history and education is attached as Exhibit A.  I am regularly quoted on compensation

issues in major publications, including *The Wall Street Journal*, *Business Week*, *The New York

Times*, *Fortune*, *The Washington Post*, *Bloomberg* and many others.

**App. 240**

STRICTLY CONFIDENTIAL

Over the past 20 years, I have provided expert testimony in more than 40 cases and have been qualified as an expert in the field of executive compensation 30+ times since founding my firm in 1992 (both on the employee and employer side). A list of cases in which I have rendered expert testimony since 2016 is attached as Exhibit B.

**<u>Compensation</u>**

I am being compensated at my normal hourly rate of $715 per hour for preparing this report. My compensation is not contingent on the content of my opinions. I have been assisted in this engagement by my associate, Michael Perniciaro. Michael's normal hourly rate is $225 per hour. All opinions in this report are my own.

**<u>Facts and Data Considered</u>**

In preparing this report, I considered certain documents provided to me, interviews with Mr. Dondero and former Highland or affiliate employees. The documents include information about Highland and its related entities, Mr. Dondero's compensation history, and financial statements over the period. Importantly, given the state of document production in this case, I did not receive all the documents typical for an assessment of compensation. The result of which could lead to a conservative bias in my assessment of market competitive compensation. I have evaluated publicly disclosed proxy statements of a select group of Highland peer firms, as well as information from news sources. The information is consistent with the data and outcomes across our client studies.

**App. 241**

STRICTLY CONFIDENTIAL

## SUMMARY OF OPINIONS

Based on my experience as an executive compensation consultant and my review of the compensation and other documents, it is my opinion that:

- Reasonable compensation for Mr. Dondero's role is positioned well above the market median, toward the market high end. Based on analysis and market research, it is apparent that Mr. Dondero was the key leader of the firm and deeply involved in all its operations, with contributions well beyond the traditional CEO / Chief Investment Officer role at comparators. Competitive market high-end for Mr. Dondero's role is about $6.0M per year while his actual compensation over the period was an average of about $3.0M per year. Therefore, the aggregate shortfall in compensation provided to Mr. Dondero against reasonable compensation levels in the market is at least $21M over the period I examined. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder. Founders are often paid significantly more in the market.

- I understand from Mr. Dondero that the 2018 loans that are the subject of this suit were modified by an agreement in late 2018 or early 2019 under which the loans would be forgiven upon the sale at over cost of substantially all of any of three portfolio company assets held in the Highland platform, MGM, Cornerstone and/or Trussway. Based on interviews from prior employees, the use of forgivable loans was a known business practice at Highland and there was a clear expectation similar loans would be forgiven. Loans are often used both in private firms and more broadly in the market, both as a perk without forgiveness and also with forgiveness as deferred compensation.

**App. 242**

STRICTLY CONFIDENTIAL

- While I do not have sufficient data to know the capital in the firm at year end 2018,[1] the substantial amount of capital remaining in the firm at the time of bankruptcy (i.e., ≅ $399.6M) includes undistributed earnings to its Founders and primary shareholders, Mr. Dondero and Mr. Okada. For asset management firms, it is market practice to distribute most earnings annually to the firm's equity holders. The retention of the earnings in the business, further illustrate the shortfall in payments made to Mr. Dondero over the period.

---

[1] I have been told that the Debtor has not produced much of what was requested by Mr. Dondero and that Mr. Dondero no longer has access to the Highland server.  Therefore, I understand, what information he provided was from his own accountants, recollections, and/or from companies over which he still has control.

**App. 243**

STRICTLY CONFIDENTIAL

## STATEMENT OF OPINIONS

### Factual Background

From my review and analysis of available materials and research, I understand the consolidated Highland business ("Highland") is a multi-strategy asset management firm focused on CLOs, hedge funds, and several private investments. Prior to the financial crisis, in 2008, Highland was very successful, reaching its peak revenue and assets under management levels. Looking at the post financial crisis period from 2013 to 2019, Highland continued to operate under the leadership of Mr. Dondero. During this period, several loans were made to Mr. Dondero. Part of my mandate was to assess market compensation levels during this period relative to firms with similar size and earnings. To do so, an assessment of Highland's financial information is necessary. I did not receive all of the financial information for HCM that I would have liked to have had because, I was told, HCM refused to produce most of the documentation requested from it. However, I was able to review the actual financials of HCMFA and NPA, and to obtain information Mr. Dondero possessed and/or recollected. The revenues for HCMFA and NPA ranged from $30.5M to $65.9M over the period with assets under management of $4.7B to $7.5B. To complete my analysis, Mr. Dondero provided his best recollection of the size and structure of the consolidated three entities stating assets under management from 2013 to 2019 ranging from $10.0B to $20.0B, with a primary focus on CLOs and an average of about $1.0B being in hedge funds. Based on the incomplete nature of my data review, there is a possibility that the market figures provided in this report could be understated based on my conservative approach, relying primarily on the documented data for HCMFA and NPA but only the recollection of Mr. Dondero for HCM, not the actual documentation, such as audited financial statements.

**App. 244**

STRICTLY CONFIDENTIAL

When examining Mr. Dondero's role at Highland relative to others in the market, it is apparent that his contributions and responsibilities exceeded the traditional duties of executive officers and lead investors who are paid significant amounts elsewhere. Mr. Dondero was the key man running daily business and operations, attracting clients, and overall investments. Given his outsized role, it would be reasonable to expect his compensation to be well above the market median. The sources utilized to ascertain specifics of his role and arrive at this conclusion include interviews with former Highland or Highland affiliate employees, as well as articles in the public domain and discussions with Mr. Dondero.

The total annual compensation for Mr. Dondero from 2013 - 2019 was $3.0M on average and the aggregate compensation over the period was $21.0M (source: W-2 filings). To assess the compensation in the market and determine the final market range, I utilized three methodologies including: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top portfolio managers. Market compensation figures provided in this report strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

To opine on the use of the loans as a form of compensation, I relied on market research, industry expertise, and interviews. My findings from this assessment are the use of forgivable loans was a normal business practice for Highland and there was a clear expectation they would be forgiven over time, based on varying performance criteria, depending on the employee.

An important additional consideration is the Founders, Mr. Dondero and Mr. Okada, did not receive the typical amount of distribution payments from their equity ownership. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital

**App. 245**

in the business amounting to $399.6M. This amount includes undistributed earnings to the original equity shareholders, primarily Mr. Dondero.

**Market Assessment of Executive and Investor Compensation**

During my career as a compensation expert, I have had significant experience assessing and designing annual compensation awards across the financial services industry, including comparable asset management firms.  Accordingly, I am familiar with typical annual compensation levels for senior executives and senior portfolio managers at comparable asset management firms.  I would expect pay levels for a key individual such as Mr. Dondero to be substantial, given his contributions, responsibilities, and the competitive market for investment management pay.

To assess reasonable compensation across the competitive market range, it is important to determine Mr. Dondero's responsibilities and contributions relative to others in the industry. It is my understanding that Mr. Dondero worked tremendously long hours, was involved in all aspects of the business including investment decisions, fundraising, business management / administration and the operation of portfolio companies. An article published in the *Dallas Morning News* states, "Mr. Dondero works 70 hours weeks… his days are filled with board and investor meetings, company strategy sessions and constant monitoring and adjusting of the firm's portfolios."[2] In my opinion, Mr. Dondero's role as CEO and head portfolio manager clearly exceeds the traditional duties of executive officers who are paid significant amounts elsewhere. Based on his significant responsibilities and key man status for the firm, it would be reasonable to expect annual compensation significantly above the market median.

---

[2] "High Intensity Pays Off For Highland," The Dallas Morning News, September 3, 2003, https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

**App. 246**

STRICTLY CONFIDENTIAL

The appropriate positioning for Mr. Dondero is further accentuated by the assessment of "replacement cost". If Mr. Dondero departed Highland in the period of 2013 to 2019, the cost of replacing him as CEO / head investor with a similar level of contribution across all functions would be multiples of his annual compensation. In assessing and providing market compensation for Mr. Dondero's role, I considered how his skillsets and contributions are valued in the market. My assessment of market compensation considers the cost of replacing Mr. Dondero with an outside hire.

The final market range provided in Exhibit C reflects my industry experience and expertise as well as three methodologies for determining competitive compensation magnitudes. These methodologies include: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms over the period, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top Portfolio Managers. Several methodologies utilized to capture Mr. Dondero's specific role as CEO and head portfolio manager. The market figures do not include any premium for being a Founder. In the market, Founders can be, and generally are, paid substantially more.

As shown below and in Exhibit E, the average annual compensation of public company asset management CEOs from 2013 to 2019 ranges from $2.1M - $4.1M. Importantly, in the market it is common for some senior investment professionals to earn more than the CEO or other corporate officers. Incorporating firm leadership functions into the investment role is a savings of sorts, as someone must still do this job.

| Proxy Analysis CEO  Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | $2,049 |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | $2,700 |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | $3,375 |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | $4,091 |

App. 247

STRICTLY CONFIDENTIAL

While we examined the disclosed compensation of a select group of public peers (Exhibit D), few of Highland's direct competitors are public and disclose the pay of their top investment professionals (see Exhibit F for some discussions about investment management compensation in the public domain).  Instead, firms are either 1) private, or 2) if public, disclosed officers most often are not highly paid portfolio management professionals.

Specifics of individual portfolio management pay are closely guarded for competitive reasons. That said, there are some articles quoting portfolio manager pay in the public domain showing compensation for portfolio managers can be well above the competitive range for public asset management CEOs (see Exhibit F). For example, according to an article published by "efinancialcareers" top performing portfolio managers at the average Hedge Funds with greater than $4.0B assets under management earned $6.8M in total compensation.[3] While Highland's structure differs from a pure hedge fund, the skills and role responsibilities are comparable to Mr. Dondero. Another example is the CEO of the Harvard Endowment, Mr. Narvekar, earned $6.25M in 2019.[4] The McLagan "Highland Capital CEO Compensation Analysis" (April 2020) produced by HCM, shows 2018 total compensation for the Head of Alternative Credit Strategy / CIO of $4.1M at the 75th percentile and 2018 total compensation for CEO With/Without CIO Responsibilities making $5.4M at the market median and $9.6M at the market 75th percentile.

The final method for assessing compensation in the market is a top-down analysis of competitive percentages of revenue attributed to portfolio managers or their teams in the market. Based on competitive market research and industry knowledge, 10% to 12% of revenue would

---

[3] Dan Butcher, "Here Are the Salaries and Bonuses at Hedge Funds in the U.S.," eFinancialCareers, May 5, 2018, https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

[4] Janet Lorin, "Harvard Endowment Chief Narvekar $6.25 Million for 2019," Bloomberg.com (Bloomberg, May 14, 2021), https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

**App. 248**

STRICTLY CONFIDENTIAL

be within the competitive market range for someone in Mr. Dondero's role. One public example

of a dual CEO and CIO sharing directly in profitability is Mario Gabelli; he earns a fixed 10% of

aggregate pre-tax profit every year per his employment agreement.[5]

The final competitive range below (Exhibit C) reflects the market competitive annual

total compensation range. This competitive range was determined based on my interactions with

asset management firms and over 30 years of industry experience and the insights gained from

the three methodologies for determining competitive market compensation outlined above.

Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and

does not include any premium as a Founder.

| *Figures in 000s* | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

Based on the market research and the insights gained through my extensive experience

advising on compensation in the industry, reasonable annual compensation for Mr. Dondero's

extensive role as CEO and portfolio manager is positioned at the market high-end at **$6.0M per**

**year**. This figure takes into account firm size, profitability, asset class, and both the investment

functions, as well as responsibilities for running the firm.  In summary, given his outsized role,

his compensation should be positioned toward the market high-end.  If the comparison was

directly to hedge fund portfolio managers, the figures would be far higher (i.e., often $10M+

---

[5] "Schedule 14A GAMCO INVESTORS, INC.," SEC.gov, April 29, 2020,
https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm

**App. 249**

STRICTLY CONFIDENTIAL

annually). Additionally, market figures do not include any premium for being a Founder. In the market, Founders are often paid substantially more than the market figures shown.

Mr. Dondero's aggregate compensation during the period of 2013 to 2019 is well below the reasonable market compensation level. Mr. Dondero's aggregate actual compensation from 2013 - 2019 was $21.0M (source: W-2 filings).  Reasonable competitive compensation for Mr. Dondero based on our analysis of his role is $6.0M per year or $42.0M in aggregate over the period. The shortfall in actual compensation to Mr. Dondero versus reasonably expected competitive compensation levels over the period is about **$21.0M** (Exhibit C). Market figures provided do not include any premium as a Founder, which further broadens the shortfall to market. An important additional consideration is the relative lack of typical equity distributions to Mr. Dondero for his historic ownership of the firm.

### Use of Loans as Compensation

In my expert opinion, the use of loans from a company to its senior professionals continues to be a common practice for private businesses. At Highland, the use of loans was a common practice with the clear expectation among senior professionals that the loans would be forgiven over time based on performance, particularly of success in specified projects. I heard from former Highland or Highland affiliate employees that similar loans were used at Highland as deferred incentive compensation and intended to be forgiven over time or on the occurrence of particular achievements.

While, for public companies, Sarbanes Oxley Section 402 explicitly prohibits publicly traded companies from making loans to executive officers it is still a common practice at private

STRICTLY CONFIDENTIAL

companies.[6] The use of these loans at private companies is beneficial for retention by allowing the firm to provide annual or periodic or other forgiveness for a portion the loan and eventually forgiving the full amount. The amount of loan forgiveness is considered income to the professionals and is taxable when forgiven. This was the case at Highland as well. In a publicly available article for the *Dow Jones Private Equity Analyst – Global Compensation Study*, two Proskauer partners outline the tax regulations for similar loans to professionals.[7]

## Market Practices on Equity Distributions

It is the standard practice in the market to distribute the majority of earnings to equity owners each year for asset management businesses. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital in the business equaling $399.6M. This amount included undistributed earnings to the primary equity holders, Mr. Dondero and Mr. Okada. Highland did not distribute these earnings based on their philosophy of "delayed gratification". This policy has been in place since the inception of the firm, including the peak years prior to the financial crisis. Very recently, the "delayed gratification" approach paid off in connection with Highland's private direct investment in MGM which was announced to be acquired by Amazon with significant economics attached.[8]

---

[6] Sarbanes-Oxley Act (2002).

[7] Michael J Album and James E Gregory, "Human Capital Considerations For Maturing Private Equity Firms," Dow Jones Private Equity Analyst-Global Compensation Study, 2012, pp. 84-96, https://www.proskauer.com/insights/download-pdf/1930.

[8] Annie Palmer, "Amazon to Buy MGM Studios for $8.45 Billion," CNBC (CNBC, May 26, 2021), https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 251**

STRICTLY CONFIDENTIAL

## CONCLUSION

It is my opinion that Mr. Dondero's aggregate compensation from 2013 to 2019 is significantly below the reasonable competitive compensation level for his role relative to similarly situated firms. In aggregate, the total shortfall in Mr. Dondero's actual compensation versus reasonable competitive compensation is at least $21.0M. This shortfall does not include any premium as a Founder, which could be considerable. Additionally, it is my opinion that the loans provided to Mr. Dondero should be considered potential deferred compensation as they were similar to loans given to other professionals at the firm. Lastly, the significant amount of capital in the business at the time of bankruptcy is at least partially attributable to Mr. Dondero as un-recognized payments as a prior equity holder, and indicates the rationale for having the potential for considerable deferred compensation.

*       *       *

I reserve the right to supplement this report and/or to supplement or modify my opinions in light of any additional facts or data that may come to my attention.

Dated:  May 28, 2021

Respectfully submitted,

Alan Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
Phone: (212) 221-740

**App. 252**

STRICTLY CONFIDENTIAL

---

**Exhibit A: Work History and Education**

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

**Professional Experience**

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 – 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 – 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 – 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 – 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 – 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 – Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

**Education**

| | |
|---|---|
| 1973 – 1975 | U.S. Naval Academy |
| 1975 – 1977 | University of Florida, B.A. (History/Economics) |
| 1977 – 1978 | University of Virginia, Graduate Economics |
| 1978 – 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**
- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms. I consult on the design and magnitudes of compensation programs for senior executives on a regular basis. I am quoted extensively in the press on compensation issues related to major financial service firms.

**App. 253**

## Exhibit B: Alan M. Johnson Prior Expert Testimony for Previous Five Years

| LAW FIRM: | CASE: | COURT: | |
| --- | --- | --- | --- |
| Schulte Roth & Zabel LLP | Mark Rohman and Sean Cunningham v. Capstone Advisory Group, LLC. | Arbitration | (April 2016) |
| Gibson Dunn & Crutcher LLP | United States v. Greebel | Eastern District of NY | (December 2017) |
| Cohen Tauber Spievack & Wagner P.C. | Jeffry Brown v. Neuberger Berman Group LLC, and NB Alternatives Advisers LLC | Arbitration | (January 2018) |
| Gibson Dunn & Crutcher LLP | Robert Emerson Mulholland v. UBS Financial Services Inc. | FINRA Dispute Resolution Arbitration | (December 2018) |
| Proskauer Rose LLP | Damian Dalla-Longa v. Magnetar Capital LLC | Arbitration | (September 2019) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Isaly v. OrbiMed | Arbitration | (January 2020) |
| Pachulski Stang Ziehl & Jones LLP | RTI Holding Company vs. Debtors | Delaware Bankruptcy Court | (December 2020) |

STRICTLY CONFIDENTIAL

## Exhibit C: Actual Compensation vs. Estimated Market Compensation Range

### Mr. Dondero Actual Compensation (2013 - 2019)

**Notes:** Mr. Dondero's compensation reflects amounts disclosed in W-2 filings for 2013 to 2019

- Does not include equity distributions over the period; typically, not included in competitive assessments of compensation.

| James Dondero Compensation | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Income | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Average |
| Highland Capital Management W-2 Income | $1,911,538 | $3,282,693 | $2,875,058 | $772,904 | $566,370 | $566,370 | $568,542 | $10,543,475 | $1,506,211 |
| Nexpoint Residential Trust W-2 Income | -- | -- | -- | -- | -- | $893,262 | -- | $893,262 | -- |
| NextPoint Advisors W-2 Income | -- | -- | -- | $1,628,736 | $3,118,250 | $2,870,278 | $1,953,455 | $9,570,718 | $2,392,679 |
| **Total W-2 Income (Source: W-2)** | **$1,911,538** | **$3,282,693** | **$2,875,058** | **$2,401,639** | **$3,684,620** | **$4,329,910** | **$2,521,996** | **$21,007,455** | **$3,001,065** |

### Estimated Market Compensation Range

**Notes:** Market annual total compensation range reflecting my direct interactions with asset management firms and over 30 years of industry experience

- We have factored in Mr. Dondero's out-sized role / contributions on both the investment management and firm-stewardship responsibilities where applicable.
- Greater than findings from public proxy analysis reflecting higher compensation to portfolio managers in the market / alternatives space.
- Represents finding from the 3 methodologies outlined for determining market compensation.
- Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder

| *Figures in 000s* | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

### Compensation Shortfall

**Notes:** In my opinion, reasonable competitive annual compensation for Mr. Dondero over the period is $6.0M, positioning him toward the market high-end to reflect his out-sized role and contribution to the firm

| | |
|---|---|
| Aggregate Reasonable Competitive Compensation | $42,000,000 |
| Less: Actual Total Compensation | $21,007,455 |
| **Shortfall in Compensation** | **$20,992,545** |

**App. 255**

STRICTLY CONFIDENTIAL

## Exhibit D: Select Public Peer Comparators

**Notes:**

- Industry consolidation continues to shrink pool of publicly available compensation data for the asset management industry, even at much larger firms than Highland
- Group intended to represent a range of firms that are relevant but not perfectly similar
- Disclosure of Portfolio Manager positions limited as typically not included in publicly filed data (no compulsion to disclose as with executive officers)
- Highland data includes good faith estimate of consolidated entities assets under management during the period. Actual financials not assessed due to the non-disclosure of Highland Capital Management ("HCM") information. Data for "HCMFA" and "NPA" reviewed.

| Peers | Assets Under Management ($B) | | | | | | | Revenue ($M) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| **Asset Management** | | | | | | | | | | | | | | |
| Cohen & Steers | $72 | $55 | $62 | $60 | $53 | $53 | -- | $411 | $381 | $378 | $350 | $329 | $314 | $298 |
| Pzena Investment | $41 | $33 | $39 | $30 | $26 | $28 | $25 | $151 | $154 | $141 | $108 | $117 | $113 | $96 |
| Silvercrest | $25 | $19 | $21 | $19 | $18 | $18 | $16 | $102 | $99 | $91 | $80 | $75 | $69 | $60 |
| Diamond Hill | $23 | $19 | $22 | $19 | $17 | $16 | $12 | $137 | $146 | $145 | $136 | $124 | $105 | $81 |
| Manning & Napier | $19 | $20 | $25 | $32 | $35 | $48 | $51 | $136 | $161 | $202 | $249 | $328 | $405 | $376 |
| Westwood Holdings | $15 | $17 | $24 | $21 | $21 | $20 | $19 | $84 | $122 | $134 | $123 | $131 | $113 | $92 |
| Hennessy Advisors | $5 | $6 | $7 | $7 | $6 | $6 | $4 | $43 | $55 | $53 | $51 | $45 | $35 | $24 |
| Main Street Capital | $4 | $3 | $3 | -- | -- | -- | -- | $173 | $214 | $235 | -- | -- | -- | -- |
| **Consolidated Highland\*** | -- | $10.0 | $14.0 | $15.0 | $18.0 | $20.0 | $19.0 | -- | -- | -- | -- | -- | -- | -- |
| **Highland Hedge Fund\*** | | $1.9 | $1.0 | $0.9 | $1.3 | $1.0 | $0.7 | -- | -- | -- | -- | -- | -- | -- |
| **HCMFA & NP (only)** | $7.5 | $6.1 | $5.1 | $4.8 | $5.2 | $5.7 | $4.7 | $66 | $52 | $42 | $41 | $50 | $31 | $31 |

*Represents estimated for the consolidated three entities. Financial for Highland Capital Management ("HCM") not provided by the debtor

**App. 256**

Case 21-03005-sgj    Doc 157    Filed 01/20/22    Entered 01/20/22 22:18:05    Desc Main
Case 3:21-cv-00881-X    Document 78-21    Filed 12/03/04305    Page 135 of 178    PageID 45069

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

**Notes:**

- Reflects disclosed senior executive officer compensation in $ thousands
- CEO not necessarily the highest paid employee at any given firm
- Senior investment professionals' pay often not disclosed and can be greater than CEO
- GAMCO not included; Mr. Gabelli receives 10% of aggregate pre-tax profit annually
- Indicates awards granted for performance each, not outstanding or fully vested compensation
- Where applicable, partial year salaries annualized. One-time awards annualized over appropriate vesting periods. Performance share values reflects target award values; does not reflect payouts from past cycles

### Summary of Proxy Analysis

| Proxy Analysis CEO  Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **Average** |
| **25th Percentile** | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | **$2,049** |
| **Median** | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | **$2,700** |
| **75th Percentile** | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | **$3,375** |
| **90th Percentile** | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | **$4,091** |

### Proxy Analysis by Year and Individual

| Chief Executive Officer - 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Cohen & Steers | Steers, R. | CEO | $750 | $835 | **$1,585** | $0 | $2,915 | $0 | **$2,915** | $0 | **$4,500** |
| Manning & Napier | Mayer, M. | CEO | $500 | $2,250 | **$2,750** | $145 | $755 | $0 | **$900** | $0 | **$3,650** |
| Silvercrest | Hough, R. | Pres & CEO | $700 | $1,000 | **$1,700** | $800 | $475 | $0 | **$1,275** | $240 | **$3,215** |
| Main Street Capital | Hyzak, D. | CEO | $625 | $650 | **$1,275** | $0 | $1,395 | $0 | **$1,395** | $0 | **$2,670** |
| Pzena Investment | Pzena, R. | Chairman, CEO, & Co-CIO | $365 | $685 | **$1,055** | $0 | $1,425 | $0 | **$1,425** | $0 | **$2,480** |
| Hennessy Advisors | Hennessy, N. | Chairman & CEO | $350 | $1,455 | **$1,805** | $0 | $155 | $0 | **$155** | $0 | **$1,960** |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $0 | **$650** | $0 | $0 | $0 | **$0** | $0 | **$650** |
| 25th Percentile | | | $435 | $670 | $1,165 | $0 | $315 | $0 | $530 | $0 | $2,220 |
| 50th Percentile | | | $625 | $835 | $1,585 | $0 | $755 | $0 | $1,275 | $0 | $2,670 |
| 75th Percentile | | | $675 | $1,230 | $1,755 | $75 | $1,410 | $0 | $1,410 | $0 | $3,435 |
| 90th Percentile | | | $720 | $1,775 | $2,185 | $405 | $2,020 | $0 | $2,020 | $95 | $3,990 |

**App. 257**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2018

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cohen & Steers | Steers, R. | CEO | $750 | $650 | $1,400 | $0 | $2,355 | $0 | $2,355 | $0 | $3,755 |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $1,065 | $1,715 | $0 | $0 | $1,995 | $1,995 | $0 | $3,710 |
| Pzena Investment | Pzena, R. | Chairman, CEO, & CIO | $365 | $995 | $1,360 | $0 | $1,925 | $0 | $1,925 | $0 | $3,285 |
| Main Street Capital | Hyzak, D. | CEO | $555 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,275 | $0 | $3,230 |
| Silvercrest | Hough, R. | CEO | $700 | $1,600 | $2,300 | $500 | $40 | $0 | $540 | $240 | $3,080 |
| Hennessy Advisors | Hennessy, N. | CEO | $350 | $2,420 | $2,770 | $0 | $220 | $0 | $220 | $0 | $2,990 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $500 | $800 | $0 | $1,000 | $0 | $1,000 | $510 | $2,310 |
| Manning & Napier | Coons, J. | Co-CEO & President | $400 | $520 | $920 | $0 | $0 | $0 | $0 | $0 | $920 |
| Manning & Napier | Goldberg, R. | Co-CEO & Director | $750 | $0 | $750 | $0 | $155 | $0 | $155 | $0 | $905 |
| 25th Percentile | | | $365 | $520 | $920 | $0 | $40 | $0 | $220 | $0 | $2,310 |
| 50th Percentile | | | $555 | $995 | $1,400 | $0 | $220 | $0 | $1,000 | $0 | $3,080 |
| 75th Percentile | | | $700 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,925 | $0 | $3,285 |
| 90th Percentile | | | $750 | $1,765 | $2,395 | $100 | $2,010 | $400 | $2,065 | $295 | $3,720 |

### Chief Executive Officer - 2017

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,540 | $2,190 | $0 | $0 | $1,995 | $1,995 | $0 | $4,185 |
| Cohen & Steers | Steers, R. | CEO | $750 | $735 | $1,485 | $0 | $2,615 | $0 | $2,615 | $0 | $4,100 |
| Main Street Capital | Foster, V. | Chairman, CEO | $610 | $1,500 | $2,110 | $0 | $1,780 | $0 | $1,780 | $0 | $3,890 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,240 | $3,590 | $0 | $245 | $0 | $245 | $0 | $3,835 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $2,560 | $2,925 | $0 | $0 | $0 | $0 | $0 | $2,925 |
| Silvercrest | Hough, R. | CEO | $700 | $1,500 | $2,200 | $0 | $40 | $0 | $40 | $240 | $2,480 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $550 | $850 | $0 | $0 | $0 | $0 | $1,180 | $2,030 |
| Manning & Napier | Stamey, C. | Co-CEO, Sales / Distribution | $300 | $1,140 | $1,440 | $0 | $135 | $0 | $135 | $0 | $1,575 |
| 25th Percentile | | | $340 | $1,040 | $1,475 | $0 | $0 | $0 | $30 | $0 | $2,370 |
| 50th Percentile | | | $490 | $1,500 | $2,150 | $0 | $90 | $0 | $190 | $0 | $3,380 |
| 75th Percentile | | | $665 | $1,795 | $2,380 | $0 | $630 | $0 | $1,835 | $60 | $3,945 |
| 90th Percentile | | | $715 | $2,765 | $3,125 | $0 | $2,030 | $600 | $2,180 | $520 | $4,125 |

### Chief Executive Officer - 2016

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | CEO | $650 | $1,350 | $2,000 | $0 | $0 | $3,955 | $3,955 | $0 | $5,955 |
| Cohen & Steers | Steers, R. | CEO | $750 | $675 | $1,425 | $0 | $2,425 | $0 | $2,425 | $0 | $3,850 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,075 | $3,425 | $0 | $350 | $0 | $350 | $0 | $3,775 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $600 | $900 | $0 | $0 | $0 | $0 | $1,180 | $2,080 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $1,600 | $1,965 | $0 | $0 | $0 | $0 | $0 | $1,965 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $55 | $0 | $55 | $240 | $1,720 |
| Manning & Napier | Manning, W. | CEO | $1,400 | $0 | $1,400 | $0 | $0 | $0 | $0 | $0 | $1,400 |
| 25th Percentile | | | $360 | $640 | $1,415 | $0 | $0 | $0 | $0 | $0 | $1,845 |
| 50th Percentile | | | $650 | $725 | $1,425 | $0 | $0 | $0 | $55 | $0 | $2,080 |
| 75th Percentile | | | $725 | $1,475 | $1,985 | $0 | $205 | $0 | $1,390 | $120 | $3,815 |
| 90th Percentile | | | $1,010 | $2,190 | $2,570 | $0 | $1,180 | $1,580 | $3,035 | $615 | $4,690 |

App. 258

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2015

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $2,065 | $2,665 | $0 | $0 | $2,090 | $2,090 | $0 | $4,755 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $2,515 | $2,865 | $0 | $370 | $0 | $370 | $0 | $3,230 |
| Cohen & Steers | Steers, R. | CEO | $750 | $485 | $1,235 | $0 | $1,790 | $0 | $1,790 | $0 | $3,025 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $0 | $500 | $0 | $0 | $2,000 | $2,000 | $0 | $2,500 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $380 | $605 | $980 | $0 | $0 | $1,330 | $1,330 | $0 | $2,310 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $240 | $0 | $240 | $0 | $1,665 |
| 25th Percentile | | | $370 | $545 | $990 | $0 | $0 | $0 | $850 | $0 | $2,405 |
| 50th Percentile | | | $500 | $640 | $1,235 | $0 | $0 | $1,330 | $1,600 | $0 | $2,600 |
| 75th Percentile | | | $650 | $1,395 | $2,045 | $0 | $305 | $1,800 | $1,895 | $0 | $3,130 |
| 90th Percentile | | | $720 | $2,245 | $2,745 | $0 | $940 | $2,035 | $2,035 | $0 | $3,840 |

### Chief Executive Officer - 2014

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,995 | $2,595 | $0 | $0 | $2,060 | $2,060 | $0 | $4,650 |
| Cohen & Steers | Steers, R. | CEO | $750 | $460 | $1,210 | $0 | $1,660 | $0 | $1,660 | $0 | $2,870 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,750 | $2,100 | $0 | $280 | $0 | $280 | $0 | $2,380 |
| Silvercrest | Hough, R. | CEO | $650 | $725 | $1,375 | $0 | $70 | $0 | $70 | $0 | $1,445 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $495 | $995 | $0 | $0 | $0 | $0 | $0 | $995 |
| 25th Percentile | | | $395 | $530 | $1,055 | $0 | $0 | $0 | $125 | $0 | $1,680 |
| 50th Percentile | | | $550 | $685 | $1,295 | $0 | $35 | $0 | $940 | $0 | $2,490 |
| 75th Percentile | | | $640 | $1,495 | $1,920 | $0 | $230 | $1,200 | $1,645 | $0 | $2,805 |
| 90th Percentile | | | $700 | $1,875 | $2,350 | $0 | $970 | $1,830 | $1,860 | $0 | $3,760 |

### Chief Executive Officer - 2013

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|
| Manning & Napier | Cunningham, P. | CEO | $500 | $1,500 | $2,000 | $0 | $4,020 | $0 | $4,020 | $0 | $6,020 |
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,505 | $2,105 | $0 | $0 | $1,395 | $1,395 | $0 | $3,500 |
| Cohen & Steers | Steers, R. | CEO | $750 | $365 | $1,115 | $0 | $1,800 | $0 | $1,800 | $0 | $2,915 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,170 | $1,520 | $0 | $90 | $0 | $90 | $0 | $1,610 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $280 | $1,145 | $1,420 | $0 | $0 | $0 | $0 | $0 | $1,420 |
| Silvercrest | Hough, R. | CEO | $500 | $600 | $1,100 | $0 | $70 | $0 | $70 | $0 | $1,170 |
| 25th Percentile | | | $355 | $620 | $1,110 | $0 | $0 | $0 | $80 | $0 | $1,515 |
| 50th Percentile | | | $500 | $1,145 | $1,420 | $0 | $70 | $0 | $1,395 | $0 | $2,600 |
| 75th Percentile | | | $550 | $1,335 | $1,760 | $0 | $945 | $700 | $1,700 | $0 | $3,210 |
| 90th Percentile | | | $660 | $1,500 | $2,040 | $0 | $2,690 | $1,475 | $2,690 | $0 | $4,510 |

App. 259

## Exhibit F: Discussions of Investment Management Compensation in the Public Domain

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

"Eight Hedge Fund Managers Earned More Than $1 Billion Each in 2019. Cue the Questions." *Institutional Investo*r.  March 25, 2020. https://www.institutionalinvestor.com/article/b1kwjngp2rnp9y/Eight-Hedge-Fund-Managers-Earned-More-Than-1-Billion-Each-in-2019-Cue-the-Questions

Langlois, Shawn. "Think celebrities and CEOs make way too much money? Check out this chart" *MarketWatch.com*. November 29, 2019. https://www.marketwatch.com/story/hedge-fund-managers-to-taylor-swift-and-disneys-bob-iger-hold-my-beer-2019-11-26

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

Moore, Heidi.  "Bill Gross reportedly earns $290m bonus even as investors withdraw billions from Pimco funds" *The Guardian.*  November 14, 2014. https://www.theguardian.com/business/2014/nov/14/pimco-paid-15bn-bonus-pool-executives-according-to-disputed-report

Rosenburg, John S.  "Harvard Discloses Leaders' Annual Compensation" *Harvard Magazine*. May 11, 2018 https://www.harvardmagazine.com/2018/05/harvard-endowment-manager-and-administrator-pay

**App. 260**

STRICTLY CONFIDENTIAL

## Documents Reviewed

### Data Items Reviewed from Debtor
- Bates Label Range: D-JDNL-017439 to D-JDNL-017441

### Data Items Reviewed:
- Bates Label Range: EXPERT 0000001 to EXPERT 0002316

### Individual Documents - Starting Bates Label

- Expert 1 – EXPERT 0000001
- Expert 1 – EXPERT 0000003
- Expert 1 – EXPERT 0000004
- Expert 1 – EXPERT 0000024
- Expert 1 – EXPERT 0000026
- Expert 1 – EXPERT 0000028
- Expert 1 – EXPERT 0000030
- Expert 1 – EXPERT 0000365
- Expert 1 – EXPERT 0000367
- Expert 1 – EXPERT 0000372
- Expert 1 – EXPERT 0000383
- Expert 1 – EXPERT 0000384
- Expert 1 – EXPERT 0000385
- Expert 1 – EXPERT 0000387
- Expert 1 – EXPERT 0000389
- Expert 1 – EXPERT 0000679
- Expert 1 – EXPERT 0000703
- Expert 1 – EXPERT 0000928
- Expert 1 – EXPERT 0000929
- Expert 1 – EXPERT 0000931
- Expert 1 – EXPERT 0000933
- Expert 1 – EXPERT 0000935
- Expert 1 – EXPERT 0000937
- Expert 1 – EXPERT 0000940
- Expert 1 – EXPERT 0000942
- Expert 1 – EXPERT 0000944
- Expert 1 – EXPERT 0000968
- Expert 1 – EXPERT 0000970
- Expert 1 – EXPERT 0000972
- Expert 1 – EXPERT 0000974
- Expert 1 – EXPERT 0000979
- Expert 1 – EXPERT 0001003
- Expert 1 – EXPERT 0001021
- Expert 1 – EXPERT 0001023
- Expert 1 – EXPERT 0001324
- Expert 1 – EXPERT 0001578
- Expert 1 – EXPERT 0001579
- Expert 1 – EXPERT 0001580
- Expert 1 – EXPERT 0001581
- Expert 1 – EXPERT 0001881
- Expert 1 – EXPERT 0001897
- Expert 1 – EXPERT 0001898
- Expert 1 – EXPERT 0001900
- Expert 1 – EXPERT 0001902
- Expert 1 – EXPERT 0001903
- Expert 1 – EXPERT 0001905
- Expert 1 – EXPERT 0001928
- Expert 1 – EXPERT 0001935
- Expert 1 – EXPERT 0001957
- Expert 1 – EXPERT 0001975
- Expert 1 – EXPERT 0001998
- Expert 1 – EXPERT 0002233
- Expert 1 – EXPERT 0002234
- Expert 1 – EXPERT 0002253
- Expert 1 – EXPERT 0002260
- Expert 1 – EXPERT 0002267
- Expert 1 – EXPERT 0002285
- Expert 1 – EXPERT 0002304

**App. 261**

STRICTLY CONFIDENTIAL

**Bibliography**

"High Intensity Pays Off For Highland." *The Dallas Morning News*, September 3, 2003.
https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S."
eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-
and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com.
Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-
endowment-chief-narvekar-6-25-million-for-2019.

"Schedule 14A GAMCO INVESTORS, INC." SEC.gov, April 29, 2020.
https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020
.htm.

Sarbanes-Oxley Act (2002).
https://www.friedfrank.com/siteFiles/Publications/681A0950DF7BC8CF412DF4C4A4805E09.p
df.

Album, Michael J, and James E Gregory. "Human Capital Considerations For Maturing Private
Equity Firms."  Dow Jones Private Equity Analyst-Global Compensation Study, 2012.
https://www.proskauer.com/insights/download-pdf/1930.

Palmer, Annie. "Amazon to Buy MGM Studios for $8.45 Billion." CNBC. CNBC, May 26,
2021. https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 262**

# Exhibit H

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | Adversary No. 21-03003-sgj |
| | § | |
| JAMES D. DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

DOCS_NY:44139.2 36027/003

**App. 264**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03007-sgj |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## HIGHLAND'S RESPONSES AND OBJECTIONS TO
## DEFENDANTS' JOINT DISCOVERY REQUESTS

Highland Capital Management, L.P., the reorganized debtor[1] ("Highland" or, as may be temporally required, the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case") and plaintiff in the above-captioned adversary proceedings (the "Adversary Proceedings"), hereby responds to *Defendants' Joint Discovery Requests To Highland Capital Management, L.P.* (the "Requests")[2] served by defendants James Dondero ("Mr. Dondero"), Nancy Dondero, ("Ms.

---

[1] On February 22, 2021, the Bankruptcy Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital* Management, *L.P.*, as modified (the "Plan"). The Plan went Effective (as defined in the Plan) on August 11, 2021, and Highland is the Reorganized Debtor (as defined in the Plan) since the Effective Date. *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Requests.

Dondero"), The Dugaboy Investment Trust ("Dugaboy"), NexPoint Advisors, L.P. ("NexPoint"),

Highland Capital Management Services, Inc. ("HCMS"), and NexPoint Real Estate Partners, LLC

("NREP") (collectively, "Defendants"). Highland's responses and objections to the Requests (the

"Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34 as

made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026,

7033, and 7034.

## GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to

each and every Response and are incorporated into each Response as though set forth in full:

1.     The Responses contained herein are based upon information presently

known and ascertained by the Highland and Highland reserves the right to amend, supplement, or

modify these Responses during depositions or otherwise.

2.     Highland objects to the Requests to the extent they seek information or

documents that are protected from discovery by the attorney-client privilege, the attorney work

product doctrine or any other privilege or immunity. The inadvertent disclosure or production of

any document that is protected from discovery by any privilege or immunity shall not constitute a

waiver of any such privilege or immunity. All references in these objections and responses to

Highland's agreement to produce documents shall be construed to mean non-privileged

documents.

3.     Highland objects to the Requests to the extent they request information that

is not reasonably or readily available to it, in its possession, custody or control, or is more readily

available to the Defendants from another source or for which the burden of obtaining such

information is not substantially greater for the Defendants than it is for Highland.

4.      Highland objects to the Requests to the extent they call for legal conclusions and/or analyses.

5.      All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.      Highland objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.      Highland's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.      Notwithstanding Highland's production of certain documents that were lodged on the main docket or in one or more of the Adversary Proceedings, Highland has not reviewed all documents lodged therein and reserves the right to use, reply upon, or offer into evidence any such documents.

9.      Unless indicated otherwise, Highland's search for responsive documents and communications covers the period December 1, 2018 to the present.

10.    These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 1, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 2**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 2, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 3**:

Produce all documents and communications supporting or related to your Declaratory Relief claims (Count 5 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 3, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 4**:

Produce all documents and communications supporting or related to your Breach of Fiduciary Duty claims (Count 6 of the Amended Complaint) made against Dugaboy and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 4, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 5**:

Produce all documents and communications supporting or related to your Aiding and Abetting a Breach of Fiduciary Duty claims (Count 7 of the Amended Complaint) against James Dondero and Nancy Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 5, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 6**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against NPA.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 6, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 7**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCMS.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 7, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 8**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against HCRE.

**RESPONSE:**

Subject to the General Objections and this specific objection, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 8, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.  Highland reserves its right to supplement its Response to this Request in light of ongoing discovery.

**REQUEST FOR PRODUCTION NO. 9**:

Produce all documents and communications supporting or related to your Avoidance and Recovery of Actual Fraudulent Transfer claims (Counts 3 and 4 of the Amended Complaint) made against James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 9, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 10**:

Produce all documents and communications supporting or related to any damages that you are seeking pursuant to your Amended Complaints.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 10, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 11**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that, "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 11, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 12**:

Produce all documents and communications related to the Alleged Agreement referenced in the Amended Complaints.

**RESPONSE:**

In response to Request for Production No. 12, Highland states that it is not aware of any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the Debtor's books and records do not reflect the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 13, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 14**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement.)"

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 14, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 15**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 15, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 16**:

Produce all communications between the Debtor and Debtor's outside auditor.

**RESPONSE:**

Highland objects to Request for Production No. 16 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 16, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the Notes.

**REQUEST FOR PRODUCTION NO. 17**:

      Produce all communications between the Debtor and Debtor's outside auditor related to any allegations in the Amended Complaints.

**RESPONSE:**

      Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 17, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 18**:

      Produce all communications between Mr. Dondero and Debtor's CFO (as that term is used in the Amended Complaints) related to the Notes.

**RESPONSE:**

      Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 18, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 19**:

      Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "Nancy Dondero also lacked the authority to enter into the Alleged Agreement or to otherwise bind the Debtor."

**RESPONSE:**

      Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 19, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 20**:

      Produce all communications between Nancy Dondero and James Dondero.

**RESPONSE**:

Highland objects to Request for Production No. 20 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case to the extent it asks for "all" communications between Nancy Dondero and James Dondero. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>. Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 20, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information concerning or relating to the allegations in the Amended Complaint or the Notes or the Amended Answer.

**REQUEST FOR PRODUCTION NO. 21**:

Produce all communications between Nancy Dondero and James Dondero related to the allegations in the Amended Complaints.

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 21, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 22**:

Produce all communications between Nancy Dondero and James Dondero related to James Dondero's compensation from the Debtor.

**RESPONSE**:

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 22, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 23**:

Produce all documents and communications supporting or related to the allegations in the Amended Complaints that each of the Defendants entered into the "Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 23, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 24**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that the "Alleged Agreement was not subject to negotiation."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 24, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 25**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that "the value of the consideration received by the Debtor for the transfers was not reasonably equivalent value."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 25, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 26**:

Produce all documents and communications evidencing the value of the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 26.

**REQUEST FOR PRODUCTION NO. 27**:

Produce all documents and communications evidencing the value of the consideration received by the Debtor related to the Notes.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 27, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 28**:

Produce all documents and communications supporting or related to the allegation in the Amended Complaints that James Dondero and Nancy Dondero "were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor."

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 28, including using search terms and identifying custodians that the Debtor believes are most likely to yield responsive information.

**REQUEST FOR PRODUCTION NO. 29**:

Produce all documents and communications supporting any damages you are seeking related to the Amended Complaints.

**RESPONSE:**

Highland objects to Request for Production No. 29 on the ground that it is duplicative of Request for Production No. 10. Subject to the General Objections and this specific objection, Highland incorporates by reference its Response to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 30**:

Produce all documents and communications relating to the solvency and financial condition of the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 30 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 30.

**REQUEST FOR PRODUCTION NO. 31**:

Produce all monthly balance sheets of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 31 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 31.

**REQUEST FOR PRODUCTION NO. 32**:

Produce all of the Debtor's internal monthly reporting packages for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 32 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark> Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 32.

**REQUEST FOR PRODUCTION NO. 33**:

Produce all of the Debtor's financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 33 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 33.

**REQUEST FOR PRODUCTION NO. 34**:

Produce all "loan summaries" of the Debtor for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 34 on the grounds that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 34.

**REQUEST FOR PRODUCTION NO. 35**:

Produce all of the Debtor's audited financial statements for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 35 on the ground that Highland has previously produced documents responsive to this Request and does not intend to produce all such documents again.

**REQUEST FOR PRODUCTION NO. 36**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of the following entities:

Trussway Holdings, LLC, Trussway Industries, LLC, MGM Holdings, and Cornerstone Healthcare for the period from January 1, 2013 to the present.

**RESPONSE:**

Highland objects to Request for Production No. 36 on the grounds that it is overly broad,

unduly burdensome, and not proportional to the needs of the case. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark>

Subject to the General Objections, Highland will conduct a reasonable search for, and produce,

documents responsive to Request for Production No. 36.

**REQUEST FOR PRODUCTION NO. 37**:

Produce all valuation reports, including all annual and/or periodic valuation reports, and all other documents reflecting the enterprise value and/or asset value of all entities and assets owned, directly or indirectly, by the following entities and in which the Debtor has an interest: Highland Select Equity Fund, L.P., Highland Restoration Capital Partners, L.P., Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Capital Management Korea Limited, and Cornerstone Healthcare.

**RESPONSE:**

Highland objects to Request for Production No. 37 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark>  .

**REQUEST FOR PRODUCTION NO. 38**:

Produce all documents showing the financial performance of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 38 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1).</mark>

**REQUEST FOR PRODUCTION NO. 39**:

Produce all financial statements for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 39 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 40**:

Produce all monthly balance sheets for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 40 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 41**:

Produce all internal monthly reporting packages for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE:**

Highland objects to Request for Production No. 41 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 42**:

Produce all documents reflecting the assets under management for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 42 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 43**:

Produce all documents reflecting the investment results and/or performance for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 43 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 44**:

Produce all documents reflecting marketing materials for the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; and (v) any other entity owned, controlled, and/or managed by the Debtor.

**RESPONSE**:

Highland objects to Request for Production No. 44 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 45**:

Produce all documents related to any employment and/or shareholder or partnership agreement between Dondero, on the one hand, and any of the following entities on the other hand, for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 45 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 46**:

Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by Dondero from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 46 on the grounds that it is overly broad,

unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims

or defense. *See* Fed. R. Civ. P. 26(b)(1).  Subject to the General Objections and these specific

objections, Highland will conduct a reasonable search for, and produce, documents responsive to

this Request to the extent they relate to (i) the Debtor.

**REQUEST FOR PRODUCTION NO. 47**:

Produce all documents related to any compensation (including, without limitation, base salary, annual bonus, long-term incentives, equity distributions, equity interests, perks, long-term awards, loans, forgiveness of debt, or otherwise) received by any Related Entity for Dondero or on Dondero's behalf, from any of the following entities for the period from January 1, 2010 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries,

both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 47 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 48**:

Produce all documents reflecting and/or relating to any organizational charts for any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 48 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).  Subject to the forgoing objection, Highland refers the Defendants to documents filed on this main docket in the above-referenced bankruptcy case.

**REQUEST FOR PRODUCTION NO. 49**:

Produce all documents reflecting and/or relating to Dondero's employment, investment, and/or managerial role(s) in any of the following entities for the period from January 1, 2013 to the present: (i) the Debtor; (ii) all of the Debtor's Managed Funds; (iii) all of the Debtor's subsidiaries, both direct and indirect majority-owned; (iv) all Affiliates of the Debtor; (v) any other entity owned, controlled, and/or managed by the Debtor; and (vi) Strand Advisors, Inc.

**RESPONSE:**

Highland objects to Request for Production No. 49 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 50**:

Produce the Debtor's "books and records" referred to in paragraph 66(j) of the Amended Complaint filed against Defendant James Dondero.

**RESPONSE:**

Subject to the General Objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 50.

**REQUEST FOR PRODUCTION NO. 51**:

Produce all documents and communications evidencing any action taken by any limited partner of the Debtor to (i) take part in the control (within the meaning of the Delaware Act) of the Partnership's business; (ii) transact any business in the Partnership's name; and/or (iii) sign any documents or otherwise bind the Partnership in accordance with the LPA.

**RESPONSE:**

Highland objects to Request for Production No. 51 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 52**:

Produce all documents and communications evidencing the value of the HCRE Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 52.

**REQUEST FOR PRODUCTION NO. 53**:

Produce all documents and communications evidencing the value of the HCMS Notes.

**RESPONSE:**

Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 53.

**REQUEST FOR PRODUCTION NO. 54**:

    Produce all documents and communications evidencing the value of the NPA Note.

**RESPONSE:**

    Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 54.

**REQUEST FOR PRODUCTION NO. 55**:

    Produce all documents and communications evidencing the value of the Dondero Notes.

**RESPONSE:**

    Subject to the General Objections and these specific objections, Highland will conduct a reasonable search for, and produce, documents responsive to Request for Production No. 55.

**REQUEST FOR PRODUCTION NO. 56**:

    Produce the loan documentation for all loans made by Debtor to any then-current executive, consultant, or employee of Debtor or any related Person.

**RESPONSE:**

    Highland objects to Request for Production No. 56 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense, *see* Fed. R. Civ. P. 26(b)(1), and (b) the phrases "loan documentation," "consultant," and "any related Person" are vague and ambiguous.  Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 57**:

    Produce all documents reflecting the payment status of all loans identified in response to the above (No. 56) Request for Production, and if forgiven, all documents reflecting the conditions for forgiveness.

**RESPONSE:**

Highland objects to Request for Production No. 57 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* <mark>Fed. R. Civ. P. 26(b)(1)</mark>, and (b) the phrases "loan documentation," "consultant," and "any related Person" in Request for Production No. 56 are vague and ambiguous. Subject to the General Objections and these specific objections, Highland states that loans made by Debtor to any then-current executive, employee, or related party are identified and described in Highland's audited financial statements previously produced to James Dondero.

**REQUEST FOR PRODUCTION NO. 58**:

Produce all documents related to any audits of the Debtor from 2013 forward, including, but not limited to, any management letters, audit notes, and audit files.

**RESPONSE:**

Highland objects to Request for Production No. 58 on the grounds that  it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defense. *See* <mark>Fed. R. Civ. P. 26(b)(1)</mark>.  Subject to the General Objections and these specific objections, Highland and PricewaterhouseCoopers previously produced documents responsive to Request for Production No. 58.

**REQUEST FOR PRODUCTION NO. 59**:

Produce all documents related to the sale or potential sale of any portfolio companies of the Debtor or interests in any portfolio companies owned by the Debtor, including, but not limited to, MGM, Trussway, and Cornerstone.

**RESPONSE:**

Highland objects to Request for Production No. 59 on the grounds that (a) it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses, *see* <mark>Fed. R. Civ. P. 26(b)(1)</mark>, and (b) the phrase "potential sale" is vague and

ambiguous.  Subject to the General Objections and these specific objections, Highland states that

it has no documents responsive to Request for Production No. 59.

## RESPONSES TO REQUESTS FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1:

Admit that Highland Capital Management, L.P. entered into the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "LPA"), on or about December 24, 2015.

### RESPONSE:

Deny.  Highland Capital Management, L.P. did not enter into, and is not a party to, the

LPA.

### REQUEST FOR ADMISSION NO. 2:

Admit that the LPA provided that the Majority Interest of Highland Capital Management, L.P. could approve compensation for the General Partner and its Affiliates (as those terms are defined in the LPA).

### RESPONSE:

Deny.  Request for Admission No. 2 inaccurately summarizes Section 3.10 of the LPA,

which speaks for itself.

### REQUEST FOR ADMISSION NO. 3:

Admit that James Dondero was an Affiliate of the General Partner in 2017 (as those terms are defined in the LPA).

### RESPONSE:

Admit.

### REQUEST FOR ADMISSION NO. 4:

Admit that James Dondero was an Affiliate of the General Partner in 2018 (as those terms are defined in the LPA).

### RESPONSE:

Admit.

### REQUEST FOR ADMISSION NO. 5:

Admit that James Dondero was an Affiliate of the General Partner in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that James Dondero was an Affiliate of the General Partner in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Admit that James Dondero was an Affiliate of the General Partner from January 1 through January 9, 2020, and otherwise deny Request for Admission No. 6 on the basis of the corporate governance settlement that Mr. Dondero entered into and that was approved by the Court.  See Docket Nos. 338 and 339.

**REQUEST FOR ADMISSION NO. 7:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2017 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 8:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2018 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 9:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2019 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 10:**

Admit that the Dugaboy Family Trust held a Majority Interest in Highland Capital Management, L.P. in 2020 (as those terms are defined in the LPA).

**RESPONSE:**

Deny.  "Dugaboy Family Trust" is neither a defined term nor a party to the LPA.

**REQUEST FOR ADMISSION NO. 11:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2017.

**RESPONSE:**

HCMLP objects to Request for Admission No. 11 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 11.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2017.

**REQUEST FOR ADMISSION NO. 12:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2018.

**RESPONSE:**

HCMLP objects to Request for Admission No. 12 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 12.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2018.

**REQUEST FOR ADMISSION NO. 13:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2019.

**RESPONSE:**

HCMLP objects to Request for Admission No. 13 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 13.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2019.

**REQUEST FOR ADMISSION NO. 14:**

Admit that Nancy Dondero was the Dugaboy Family Trustee (as defined in the LPA) in 2020.

**RESPONSE:**

HCMLP objects to Request for Admission No. 14 on the ground that "Dugaboy Family Trust" is not defined in the LPA.  HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matter asserted in Request for Admission No. 14.  HCMLP acknowledges that the Defendants apparently contend that Nancy Dondero was the Dugaboy Family Trustee in 2020.

**REQUEST FOR ADMISSION NO. 15:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2017.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 15.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 16:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2018.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 16.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 17:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2019.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 17.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 18:**

Admit that James Dondero was the primary beneficiary and the lifetime beneficiary of Dugaboy in 2020.

**RESPONSE:**

HCMLP denies knowledge or information sufficient to form a belief as to the truth of the matters asserted in Request for Admission No. 18.  HCMLP acknowledges that Mr. Dondero contends that he is the primary beneficiary and the lifetime beneficiary of Dugaboy and that HCMLP has relied on such contentions in other aspects of the Bankruptcy Case.

**REQUEST FOR ADMISSION NO. 19:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2017.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2017.

**REQUEST FOR ADMISSION NO. 20:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities in January 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 21:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2018.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2018.

**REQUEST FOR ADMISSION NO. 22:**

Admit that the Debtor's assets (including assets held through direct or indirect subsidiaries) exceeded its liabilities as of December 31, 2019.

**RESPONSE:**

Deny because the Debtor's assets (including assets held through direct or indirect subsidiaries) did not exceed its liabilities as of December 31, 2019.

**REQUEST FOR ADMISSION NO. 23:**

Admit that within Highland each of MGM, Cornerstone and Trussway were referred to as "Portfolio Companies."

**RESPONSE:**

Highland objects to Request for Admission No. 24 on the ground that the phrase "within Highland" is vague and ambiguous.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all damages that you are seeking against each of the Defendants, including, how those damages are calculated.

**RESPONSE:**

Against each maker of each Notes, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, (b) all accrued and unpaid interest under each Note, and (c) all actual expenses of collection, including court costs, and reasonable attorneys' fees in connection with each of the Adversary Proceedings. HCMLP incorporates by reference its prior written responses to discovery and refers the defendants to the Notes and the invoices of Pachulski Stang Ziehl & Jones, LLP other documents being produced in this adversary proceeding.

Against Nancy Dondero and Dugaboy, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Against James Dondero for aiding and abetting Nancy Dondero's and Dugaboy's breach of fiduciary duty, HCMLP seeks damages in an amount equal to (a) all unpaid principal under each Note, and (b) all accrued and unpaid interest under each Note.

Damages will continue to increase as interest continues to accrue and Highland continues to incur additional costs of collection.

**INTERROGATORY NO. 2:**

Provide the factual basis for your allegation in the Amended Complaints that Dugaboy owed a fiduciary duty to the Debtor.

**RESPONSE:**

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement on behalf of HCMLP pursuant to which HCMLP agreed to forgive collection on all or any of the Notes, then Dugaboy will have owed a fiduciary duty to the Debtor because, among

**App. 294**

other things, (a) Dugaboy would have been acting on the Debtor's behalf, (b) Dugaboy would have bound the Debtor, and (c) Dugaboy would have been required to act reasonably under the circumstances.

## INTERROGATORY NO. 3:

Provide the factual basis for your allegation in the Amended Complaints that Nancy Dondero owed a fiduciary duty to the Debtor.

## RESPONSE:

HCMLP incorporates by reference its response to Interrogatory No. 3 and further notes that Ms. Dondero would have caused Dugaboy to enter into the Alleged Agreement.

## INTERROGATORY NO. 4:

Identify all acts or omissions by each of the Defendants that breached any alleged fiduciary duties owed to the Debtor.

## RESPONSE:

Assuming that a court of competent jurisdiction finds that Dugaboy entered into an agreement pursuant to which HCMLP agreed to forgive collection on the Notes, then Dugaboy and Nancy would have breached their fiduciary duties by acting unreasonably by (a) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million for $1 in value, (b) agreeing to forgive Notes with an aggregate principal amount in excess of $70 million at a time when they had no obligation to do so and received woefully inadequate consideration in return, and (c) otherwise acting unreasonably under the circumstances, including failing to perform reasonable diligence, failing to document and otherwise disclose the "agreement" to the Debtor's management and auditors, and by failing to disclose the "agreement" to the Bankruptcy Court at any time.

**INTERROGATORY NO. 5:**

Identify all acts or omissions by each of the Defendants that aided and abetted the breach of any alleged fiduciary duties owed to the Debtor.

**RESPONSE:**

Highland incorporates by reference its response to Interrogatory No. 5 and further states -

that James Dondero would have further aided and abetted in the breach of fiduciary duties by using

undue influence to persuade Ms. Dondero to enter into the Alleged Agreement on behalf of

Dugaboy.

**INTERROGATORY NO. 6:**

Provide the factual basis for your allegation in the Amended Complaints that "At all relevant times, Mr. Dondero controlled the Debtor."

**RESPONSE:**

The evidence that Mr. Dondero controlled the Debtor is extensive and HCMLP objects to

Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, and has been

admitted to at various points in the Bankruptcy Case. Subject to the General Objections, the

evidence that Mr. Dondero controlled the Debtor through at least January 9, 2020, includes his

admissions, his control of Strand Advisors, Inc., his role as President of HCMLP, his authorization

of the commencement of the Bankruptcy Case on behalf of HCMLP, and his agreement to the

corporate governance settlement as embodied in Docket Nos. 338 and 339.

**INTERROGATORY NO. 7:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled NPA.

**RESPONSE:**

The evidence that Mr. Dondero controlled NPA is extensive and HCMLP objects to

Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome, and has been

admitted to at various points in the Bankruptcy Case. Subject to the forgoing objection, the

evidence that Mr. Dondero controls NPA includes, among other things, his admissions, the admissions of DC Sauter and Jason Post at various points in this case, and prior judicial findings, holdings, rulings, and orders.

**INTERROGATORY NO. 8:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCRE.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCRE is extensive and HCMLP objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case.  Subject to the forgoing objection, the evidence that Mr. Dondero controls HCRE includes, among other things, his own admissions, his direct or indirect ownership interest in HCRE, and the positions he holds and has with respect to HCRE..

**INTERROGATORY NO. 9:**

Provide the factual basis for your allegations in the Amended Complaint that James Dondero controlled HCMS.

**RESPONSE:**

The evidence that Mr. Dondero controlled HCMS is extensive and HCMLP objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, and has been admitted to at various points in the Bankruptcy Case.  Subject to the forgoing objection, the evidence that Mr. Dondero controls HCMS includes, among other things, his own admissions, his direct or indirect ownership interest in HCMS, and the positions he holds and has with respect to HCMS.

**INTERROGATORY NO. 10:**

Provide the factual basis for your allegation in the Amended Complaints that "the Alleged Agreement is a fiction."

**RESPONSE:**

Highland incorporates by reference and refers the Defendants to (a) the purported terms of the Alleged Agreement, (b) the purported purpose of the Alleged Agreement, (c) Mr. Dondero's prior sworn testimony in Adv. Pro. 21-03003; (d) documents identified on Docket Nos. 31 and 35, respectively, in Adv. Pro. 21-3004; (e) Mr. Dondero's Rule 26 disclosures in Adv. Pro. 21-03003; (f) the deposition testimony of PricewaterhouseCoopers and the exhibits marked during that deposition; (g) the lack of any documentation memorializing the terms of the Alleged Agreement, and (h) the lack of disclosure of the alleged "agreement" to the Bankruptcy Court .at any time prior to confirmation, including in connection with that objection to the Debtor's Plan.

**INTERROGATORY NO. 11:**

Provide the factual basis for your allegation in the Amended Complaints that "Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor."

**RESPONSE:**

Highland contends that the evidence will prove that the Alleged Agreement is a fiction but if a court of competent jurisdiction finds otherwise, that the evidence will prove that Mr. Dondero entered into the Alleged Agreement when he knew that certain creditors, including the Redeemer Committee and Joshua Terry, were on the verge of obtaining substantial judgments against Highland and as he had at various times in the face of adverse litigation, sought to fraudulently transfer assets to limit (if not eliminate) judgment creditors' ability to collect.

**INTERROGATORY NO. 12:**

Identify the "value of the consideration received by the Debtor for the transfers," as that term is used in the Amended Complaint, and provide the basis for how that value was calculated.

**RESPONSE:**

Highland made the payments reflected in each Note in exchange for a promise by each maker that payment would be made on the terms set forth therein, including the payment of all principal and interest and all costs of collection, including attorneys' fees.

**INTERROGATORY NO. 13:**

Identify any portfolio companies that Debtor owns (wholly or partially).

**RESPONSE:**

Highland objects to Interrogatory No. 13 on the grounds that (a) "portfolio companies" is undefined, and (b) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case.

**INTERROGATORY NO. 14:**

Identify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies) owned (wholly or partially) by the Debtor, including, but not limited to, Trussway, MGM and Cornerstone, including the date of the sale, the buyer, and the amount paid.

**RESPONSE:**

Highland objects to Interrogatory No. 14 on the grounds that (a) "portfolio companies" is undefined, (b) the phrase "potential sale" is vague and ambiguous, (c) it is overly broad, unduly burdensome and is not relevant to any party's claim or defense nor is it proportional to the needs of this case, and (d) "potential sales" are not a term of the Alleged Agreement and otherwise constitute proprietary and confidential information.  Subject to the forgoing objections, Highland has not sold Trussway, MGM or Cornerstone as of this time.

Dated:  September 27, 2021                    PACHULSKI STANG ZIEHL & JONES LLP
                                              Jeffrey N. Pomerantz (CA Bar No. 143717)
                                              (*admitted pro hac vice*)
                                              Ira D. Kharasch (CA Bar No. 109084)
                                              (*admitted pro hac vice*)
                                              John A. Morris (NY Bar No. 266326)
                                              (*admitted pro hac vice*)
                                              Gregory V. Demo (NY Bar No. 5371992)
                                              (*admitted pro hac vice*)
                                              Hayley R. Winograd (NY Bar No. 5612569)
                                              (*admitted pro hac vice*)
                                              10100 Santa Monica Blvd., 13th Floor
                                              Los Angeles, CA 90067
                                              Telephone: (310) 277-6910
                                              Facsimile: (310) 201-0760
                                              E-mail:     jpomerantz@pszjlaw.com
                                                          ikharasch@pcszjlaw.com
                                                          jmorris@pszjlaw.com
                                                          gdemo@pszjlaw.com
                                                          hwinograd@pszjlaw.com

                                              -and-

                                              */s/ Zachery Z. Annable*
                                              HAYWARD & ASSOCIATES PLLC
                                              Melissa S. Hayward (Texas Bar No. 24044908)
                                              Zachery Z. Annable (Texas Bar No. 24053075)
                                              10501 N. Central Expy, Ste. 106
                                              Dallas, Texas 75231
                                              Tel: (972) 755-7100
                                              Fax: (972) 755-7110
                                              Email:      MHayward@HaywardFirm.com
                                                          ZAnnable@HaywardFirm.com

                                              *Counsel for Highland Capital Management, L.P.*