

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 17, 2021**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| | § | Case No.: 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Pro. No. 21-03006-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., | § | |
| | § | |
| | § | |
| Defendant. | § | |

---

### ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S
### MOTION FOR LEAVE TO AMEND ANSWER TO PLAINTIFF'S COMPLAINT

---

On this day, the Court considered Defendant Highland Capital Management Services,

Inc.'s ("Defendant") Motion for Leave to Amend its Answer to Plaintiff's Complaint (the

---

"Motion"). Having considered the Motion, the pleadings, and the arguments of counsel, for the reasons stated on the record, the Court hereby **GRANTS** the Motion, as set forth below.

IT IS THEREFORE ORDERED that Defendant may file its First Amended Answer by 11:59 p.m. (prevailing Central Time) on June 11, 2021. It is further

ORDERED that Defendant's First Amended Answer shall include, in connection with Defendant's condition subsequent defense, the following information: (i) who made the subsequent agreement(s); (ii) the date of the agreement(s); (iii) what is the agreement; and (iv) what documents reflect the agreement.

### END OF ORDER ###



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 14, 2021**

_____
**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | CASE NO. 19-34054-SGJ-11 |
| L.P., | § | (CHAPTER 11) |
|     DEBTOR. | § | |
| _____ | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| L.P., | § | ADVERSARY NO. 21-03006 |
|     PLAINTIFF, | § | (CIV. ACTION #3:21-CV-01378-N) |
| | § | |
| VS. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., | § | |
|     DEFENDANT. | § | |

_____
**REPORT AND RECOMMENDATION TO DISTRICT COURT PROPOSING THAT IT:
(A) GRANT DEFENDANT'S MOTION TO WITHDRAW THE REFERENCE AT SUCH
TIME AS BANKRUPTCY COURT CERTIFIES THAT ACTION IS TRIAL READY;
AND (B) DEFER PRETRIAL MATTERS TO BANKRUPTCY COURT**
_____

## I.   INTRODUCTION

The above-referenced adversary proceeding (the "Adversary Proceeding") is related to the

bankruptcy case of Highland Capital Management, L.P. (the "Bankruptcy Case").[1] Highland

Capital Management, L.P. (the "Debtor" or "Highland") filed a voluntary Chapter 11 petition on

October 16, 2019 in the United States Bankruptcy Court of Delaware.  That court subsequently

entered an order transferring venue to the Northern District of Texas, Dallas Division, on

December 4, 2019.  A Chapter 11 plan was confirmed by the bankruptcy court on February 22,

2021.

On January 22, 2021, shortly before its Chapter 11 plan was confirmed, the Debtor, as Plaintiff,

brought this Adversary Proceeding against the Defendant, Highland Capital Management

Services, Inc. ("HCMS-Defendant").

 The Adversary Proceeding pertains to five promissory notes (collectively, the "Notes")

executed by HCMS-Defendant in favor of the Debtor from 2017 through 2019. The Notes consist

of a term note (the "Term Note") with annual payments and four demand notes (the "Demand

Notes").

On December 3, 2020, the Debtor sent HCMS-Defendant a letter demanding payment by

December 11, 2020 on each of the Demand Notes, as allowed under the terms of the Demand

Notes. The HCMS-Defendant failed to make payment on any of the Demand Notes. On December

31, 2020, HCMS-Defendant failed to make the annual payment due under the Term Note. On

January 7, 2021, following HCMS-Defendant's failure to pay, the Debtor accelerated the Term

---

[1] Bankruptcy Case No. 19-34054.

Note, under its terms, and demanded full payment on $6,757,248.95 outstanding and due under the Term Note.

Following HCMS-Defendant's failure to pay on the Notes in response to the demand letters, the Debtor brought this action to collect on the Notes. The Debtor's Chapter 11 plan contemplates collection on the Notes (as well as several other notes of parties related to HCMS-Defendant) as part of its funding to pay creditors.

Under the United States District Court for the Northern District of Texas' standing order of reference[2], proceedings arising in, or related to, a case under Title 11 are automatically referred to the bankruptcy court. HCMS-Defendant submitted a *Motion for Withdrawal the Reference*[3] (the "Motion") and *Brief in Support of Motion to Withdraw the Reference*[4] (the "Brief in Support") seeking to have the reference withdrawn, such that this Adversary Proceeding would be adjudicated in the District Court. The bankruptcy court conducted a status conference concerning the Motion, pursuant to Local Bankruptcy Rule 5011-1, on July 8, 2021.

The bankruptcy court submits the following report and recommendation to the District Court, ultimately recommending that the Motion be granted, ***but only at such time as the bankruptcy court certifies to the District Court that the lawsuit is trial ready***. The bankruptcy court further recommends that the District Court ***defer to the bankruptcy court the handling of all pretrial matters***.

---

[2] Misc. Order No. 33.
[3] Adversary Case No. 21-03006, Dkt. 19.
[4] Adversary Case No. 21-03006, Dkt. 20.

## II.  NATURE OF THE ADVERSARY PROCEEDING

### a.  The Complaint and Procedural History

The Debtor commenced this Adversary Proceeding by filing its *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate*[5] on January 22, 2021. The Debtor's Complaint asserts two causes of action: (1) a breach of contract claim ("Count 1") and (2) a turnover action under 11 U.S.C. § 542(b) for the amounts owed on the Notes ("Count 2"). The principal amounts and execution dates for each of the four Demand Notes were: (i) $150,000, executed March 28, 2018, (ii) $200,000, executed June 25, 2018, (iii) $400,000, executed May 29, 2019, and (iv) $150,000, executed June 26, 2019.  The principal amount of the Term Note was originally $20,247,628.02 and it was executed on May 31, 2017.  The Debtor now seeks combined monetary damages on the Notes totaling $7,704,768.38, plus accrued but unpaid interest and cost of collection. Because the Debtor alleges the amount due on the Notes are property of its estate, it argues that turnover pursuant to 11 U.S.C. § 542(b) is appropriate.

After being served with summons on January 25, 2021, HCMS-Defendant filed its *Original Answer*[6] on March 3, 2021 and *First Amended Answer*[7] on June 11, 2021.

HCMS-Defendant filed two proofs of claim in the Bankruptcy Case, Proof of Claim Nos. 175 and 176.  Both proofs of claim were based on alleged post-petition actions or inaction of the Debtor as fund investment advisor in managing funds in which HCMS-Defendant is an investor. On October 9, 2020, the bankruptcy court entered a *First Supplemental Order Sustaining First Omnibus Claims Objection*[8], which disallowed both of HCMS-Defendant's proofs of claim. ***The disallowed proofs of claim did not relate to the Notes.***

---

[5] Adversary Case No. 21-03006, Dkt. 1.
[6] Adversary Case No. 21-03006, Dkt. 6.
[7] Adversary Case No. 21-03006, Dkt. 34.
[8] Bankruptcy Case No. 19-34054, Dkt. 1155.

4

### b.   The Motion to Withdraw the Reference, Response Opposed, and Reply

On June 3, 2021, HCMS-Defendant filed the Motion. As a result, the above-captioned civil action was created in the District Court. The Debtor never filed a responsive pleading to the Motion filed by the HCMS-Defendant. The bankruptcy court held a status conference, as required by Local Bankruptcy Rule 5011-1, on July 8, 2021, to assist in the bankruptcy court's preparation of this Report and Recommendation.

#### i.   *The Movant's Position*

HCMS-Defendant argues there is cause shown for permissive withdrawal of the reference because: (1) the Texas Constitution guarantees a party to a contract a right to a jury trial; (2) the contract claim is a purely state law, non-core claim; (3) the turnover claim, under the Bankruptcy Code, is wholly derivative of the contract claim, as the amount to be turned over is based on the resolution of the contract claim; and (4) efficiency, uniformity and forum shopping factors all favor withdrawal.[9]

Further, HCMS-Defendant contends it has made a demand for a jury trial and has not consented, expressly or impliedly, to the equitable jurisdiction of the bankruptcy court to enter final orders in the Adversary Proceeding or hold a jury trial. HCMS-Defendant argues it has never filed a proof of claim related to the Notes, thus negating any argument it has consented to the bankruptcy court having jurisdiction over the litigation of the Notes.

Finally, HCMS-Defendant alleges that permissive withdrawal is proper, because the turnover claim is being used as a "Trojan Horse" to attempt to make a non-core breach of contract claim become core.[10]

---

[9] Adversary Case No. 21-03006, Dkt. 20 at 6-11.

[10] *Id.* at 8-9; *see In re Soundview Elite Ltd.*, 543 B.R. 78, 97 (Bankr. S.D.N.Y. 2016).

As far as timing, HCMS-Defendant requests that the District Court immediately withdraw the reference and hear all pre-trial matters until the parties are trial-ready.

### III.   THE BREACH OF CONTRACT CLAIMS AT THE CENTER OF THE ADVERSARY PROCEEDING ARE NONCORE CLAIMS, AND THE DISALLOWED PROOFS OF CLAIM OF HCMS-DEFENDANT ARE UNRELATED TO THEM

Permissive withdrawal of the reference is described in 28 U.S.C. § 157(d) as follows: "The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The Bankruptcy Code does not define "cause shown," but the United States Court of Appeal for the Fifth Circuit, interpreting the Supreme Court case of *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, has identified a number of factors for courts to consider in determining whether permissive withdrawal of the reference is appropriate: (1) whether the matter is core or noncore; (2) whether the matter involves a jury demand; (3) whether withdrawal would further uniformity in bankruptcy administration; (4) whether withdrawal would reduce forum-shopping and confusion; (5) whether withdrawal would foster economical use of debtors' and creditors' resources; and (6) whether withdrawal would expedite the bankruptcy process.[11] Courts in this District have placed an emphasis on the first two factors.[12]

As explained by the Supreme Court in *Stern v. Marshall*, Congress has divided bankruptcy **proceedings** (*i.e.,* adversary proceedings or contested matter within a bankruptcy case)—over which there is bankruptcy subject matter jurisdiction—into three different categories: (a) those that "aris[e] under" Title 11; (b) those that "aris[e] in" a Title 11 case; and (c) those that are "related

---

[11] *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998-99 (5th Cir. 1985); *Mirant Corp. v. The Southern Co.*, 337 B.R. 107, 115-23 (N.D. Tex. 2006); 458 U.S. 50 (1982).
[12] See *Mirant*, 337 B.R. at 115-122.

to" a case under Title 11.[13]  Further, those that arise under Title 11 or arise in a Title 11 case are defined as "core" matters[14] and those that are merely "related to" a Title 11 case are defined as "noncore" matters. The significance of the "core"/"noncore" distinction is that bankruptcy courts may statutorily enter final judgments in "core" proceedings in a bankruptcy case, while in "noncore" proceedings, the bankruptcy courts instead may only (absent consent from all of the parties) submit proposed findings of fact and conclusions of law to the district court, for that court's review and issuance of final judgment. This is the statutory framework collectively set forth in 28 U.S.C. § 1334 and 28 U.S.C. § 157.  But while a proceeding may be "core" in nature, under 28 U.S.C. § 157(b)(2), and the bankruptcy court, therefore, has the **statutory** power to enter a final judgment on the claim under 28 U.S.C. § 157(b)(1), *Stern* instructs that any district court, in evaluating whether a bankruptcy court has the ability to issue final orders and judgments, must resolve not only: (a) whether the bankruptcy court has the statutory authority under 28 U.S.C. § 157(b) to issue a final judgment on a particular claim; but also (b) whether the conferring of that authority on an Article I bankruptcy court is **constitutional** (and this turns on whether "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").[15]

    With respect to the claims asserted against HCMS-Defendant, it might be argued that both counts asserted against it are **statutorily** core in nature.[16] While Count 1 is a breach of contract claim for collection of amounts due under promissory notes—one of the simplest forms of a state law lawsuit—it might be argued that Count 1 is statutorily core under the catchall provision of 28

---

[13] 28 U.S.C. § 1334(b); *Stern v. Marshall*, 564 U.S. 462, 473-474 (2011).

[14] *Stern*, 564 U.S. at 473-474.  Core proceedings include, but are not limited to, 16 different types of matters, including "counterclaims by [a debtor's] estate against persons filing claims against the estate." 28 U.S.C. § 157(b)(2)(C).

[15] *Stern*, 564 U.S. at 499.

[16] 28 U.S.C. § 157(b)(2)(E), (O).

7

U.S.C. § 157(b)(2)(O), as the resolution of the claim would be "affecting the liquidation of the assets of the estate." However, this position would not pass constitutional muster. The cause of action does not stem from the bankruptcy itself (*i.e.*, it stems from alleged defaults on pre-petition notes) and would not be resolved through the claims allowance process (***since no pending proof of claim exists related to the Notes***). In other words, the resolution of Count 1 cannot be inextricably intertwined with the resolution of HCMS-Defendant's disallowed proofs of claim so as to confer constitutional authority on the bankruptcy court to enter a final judgment on the breach of contract claims.

Count 2, the turnover cause of action, is brought pursuant to 11 U.S.C. § 542(b) and is listed as statutorily core under 28 U.S.C. § 157(b)(2)(E). If Count 2 were freestanding and the debts due under the Notes were undisputed, it is unrefuted by HCMS-Defendant that a turnover action under 11 U.S.C. § 542(b) would be both a statutory and constitutional core claim. ***The issue is whether a turnover action to collect on disputed pre-petition promissory notes can be viewed as a core claim***. There is a split in authority on this issue. Authority exists that a turnover action is a core claim when collecting ***matured*** debts, as property of the estate, regardless of whether the indebtedness is ***disputed***.[17] In contrast, HCMS-Defendant cites authority that the scope of turnover claims under the Bankruptcy Code should not be expanded to encompass debts in dispute that arose outside of bankruptcy, including authority from this court.[18]

---

[17] *Shaia*, 476 B.R. at 230 ("To properly constitute a core proceeding under § 157(b)(2)(E), the debt must be 'matured, payable on demand, or payable on order.' 'Matured' refers to 'debts that are presently payable, as opposed to those that are contingent and become payable only upon the occurrence of a certain act or event.' …. While the Defendants assert they are not indebted to the Trustee, it is simply not relevant that the Defendants dispute liability on the instrument. The presence of a dispute does not preclude a debt from being matured. … A cause of action is a turnover proceeding under § 542(b) of the Bankruptcy Code where it seeks collection rather than creation or liquidation of a matured debt."); *see also In re Willington Convalescent Home, Inc.*, 850 F.2d at 52 n.2 ("The mere fact that Connecticut denies that it owes the matured debt for Willington's services because of a recoupment right 'does not take the trustee's action outside the scope of section 542(b)'").
[18] *In re Se. Materials, Inc.*, 467 B.R. 337, 354 (Bankr. M.D.N.C. 2012)( The distinction is when "an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding"); *In re*

This court views the turnover claim as derivative of the breach of contract claims. The breach of contract claims are clearly non-core, and the bankruptcy court lacks constitutional authority to confer jurisdiction over them (absent consent—which does not exist here). A turnover action under 11 U.S.C. § 542(b) cannot be tacked onto a complaint so as to confer authority in the bankruptcy court to adjudicate an otherwise non-core claim. To hold otherwise would run counter to the dictates of the Supreme Court in *Marathon*.

In summary, this court believes that the turnover claim in the Complaint, to collect on a disputed indebtedness under the Notes, "do[es] not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E)," absent a judgment or stipulation resolving the dispute as to the indebtedness.[19] Thus, the turnover claim, as brought, is not a core claim that the bankruptcy court can finally adjudicate, absent the consent of all parties.

## IV.    JURY TRIAL RIGHTS AND DEMAND

Pursuant to 28 U.S.C. § 157(e), if a litigant has the right to a jury trial under applicable non-bankruptcy law, a bankruptcy court may conduct the jury trial only if: (a) the matters to be finally adjudicated fall within the scope of bankruptcy subject matter jurisdiction; (b) the district court of which the bankruptcy court is a unit authorizes the bankruptcy court to do so; and (c) all of the parties consent.[20]

Starting first with whether a right to a jury trial even exists, the Seventh Amendment, of course, provides a jury trial right in cases in which the value in controversy exceeds twenty dollars and

---

*Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986) ("[T]his Court holds that actions to collect accounts receivable based upon state law contract principles do not fall within the scope of turnover actions as contemplated by § 542 and § 157(b)(2)(E), absent a final judgment from a court of competent jurisdiction, a stipulation, or some other binding determination of liability.").

[19] *Satelco*, 58 B.R. at 789.

[20] "If the right to a jury trial applies in a proceeding that may be heard under this section by a bankruptcy judge, the bankruptcy judge may conduct the jury trial if specially designated to exercise such jurisdiction by the district court and with the express consent of all the parties." 28 U.S.C. § 157(e) (West 2019).

the cause of action is to enforce statutory rights that are at least analogous to rights that were tried at law in the late 18th century English courts.[21] Suits "at law" refers to "suits in which legal rights were to be ascertained and determined" as opposed to "those where equitable rights alone were recognized and equitable remedies were administered."[22] This analysis requires two steps: (1) a comparison of the "statutory action to 18th century actions brought in the courts of England prior to the merger of the courts of law and equity"; and (2) whether the remedy sought is "legal or equitable in nature . . . [t]he second stage of this analysis" being "more important than the first."[23]

It is well established that the act of filing a proof of claim can operate to deprive a creditor of a jury trial right, by subjecting a claim, that would otherwise sound only in law, to the equitable claims allowance process.[24] Thus, if both of HCMS-Defendant's proofs of claims were *pending*, it would have consented to the bankruptcy court's equitable jurisdiction and waived its right to a jury trial as to the subject matter of the *pending* proofs of claim.[25]  However, as earlier noted, prior to the commencement of this Adversary Proceeding on January 22, 2021, HCMS-Defendant had both of its proofs of claim disallowed on October 9, 2020.  Without a pending claim related to the Notes, the breach of contract claim is precisely the kind of action that would sound in law rather than in equity. By not having a filed proof of claim related to the Notes, HCMS-Defendant never subjected the Notes to the claims allowance process of the bankruptcy court and preserved its right to a jury trial on the Notes.[26] HCMS-Defendant has also not consented to the bankruptcy court conducting a jury trial pursuant to 11 U.S.C. § 157(e).

---

[21] *See City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 708 (1999).
[22] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989).
[23] *See Levine v. M & A Custom Home Builder & Developer, LLC*, 400 B.R. 200, 205 (S.D. Tex. 2008) (quoting *Granfinanciera*, 492 U.S. at 42).
[24] *See Langenkamp v. Culp*, 498 U.S. 42, 44–45 (1990).
[25] *Id.*
[26] *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995) ("[T]he successful withdrawal of a claim pursuant to Fed. R. Bankr. P. 3006 prior to the trustee's initiation of an adversarial proceeding renders the withdrawn claim a legal nullity and leaves parties as if the claim had never been brought."); *In re Goldblatt's Bargain Stores, Inc.*, No. 05 C 03840,

In summary, HCMS-Defendant's lack of waiver of its jury trial rights, expressly or impliedly, is further reason why the bankruptcy court does not believe it can finally adjudicate the claims in the Adversary Proceeding.

## V.    PENDING MATTERS

On July 8, 2021, the bankruptcy court held a status conference with regard to the Motion. At such time, the bankruptcy court approved, in part, *Defendant's Expedited Motion to Stay Pending the Resolution of Motion to Withdraw the Reference of Adversary Proceeding*.[27] In its oral ruling, the court granted the HCMS-Defendant's request for a stay pending resolution of the Motion as to dispositive motions in the Adversary Proceeding, but did not grant a stay as to any discovery. Under the *Agreed Scheduling Order,*[28] fact discovery concluded on July 5, 2021 and expert discovery will conclude on July 16, 2021. No dispositive motions have been filed at this time. At this point, the parties are not trial-ready.

## VI.    RECOMMENDATION

In light of: (a) the noncore, related-to claims in the Complaint; (b) the lack of a proof of claim or any other claim related to the Notes asserted by HCMS-Defendant; and (c) the lack of any other consent by HCMS-Defendant to the equitable jurisdiction of the bankruptcy court related to the Notes, the bankruptcy court recommends the District Court: refer all pre-trial matters to the bankruptcy court, and grant the Motion upon certification by the bankruptcy court that the parties are trial-ready.

---

2005 WL 8179250, at *5 (N.D. Ill. Dec. 6, 2005) (claims withdrawn before adversary proceeding are as if never filed); *see generally, In re Manchester, Inc.*, No. 08-30703-11-BJH, 2008 WL 5273289, at *3-6 (Bankr. N.D. Tex. Dec. 19, 2008) (permissible to withdraw a claim to preserve jury trial right).

[27] Adversary Case No. 21-03006, Dkt. 26.

[28] Adversary Case No. 21-03006, Dkt. 9.

With regard to such pretrial matters, the bankruptcy court further recommends that, to the extent a dispositive motion is brought that the bankruptcy court determines should be granted and would finally dispose of claims in this Adversary Proceeding, the bankruptcy court should submit a report and recommendation to the District Court for the District Court to adopt or reject.

### ***END OF REPORT AND RECOMMENDATION***



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed August 23, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

## ORDER GRANTING DEBTOR'S UNOPPOSED MOTION FOR LEAVE
## TO SERVE AND FILE AMENDED COMPLAINT

Before the Court is the *Debtor's Unopposed Motion for Leave to Serve and File Amended*

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

*Complaint* [Docket No. 60] (the "<u>Motion</u>"), filed by Highland Capital Management L.P., the debtor

and debtor-in-possession (the "<u>Debtor</u>") in the above-captioned chapter 11 case (the "<u>Bankruptcy</u>

<u>Case</u>") and the plaintiff in the above-captioned adversary proceeding (the "<u>Adversary</u>

<u>Proceeding</u>"), requesting leave to file its *Amended Complaint for (I) Breach of Contract, (II)*

*Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* (the

"<u>Amended Complaint</u>"), attached to the Motion as **Exhibit B**.  Having considered the (i) Motion

and the arguments set forth therein, (ii) the Amended Complaint annexed to the Motion, and (iii)

the *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues*, attached to

the Motion as **Exhibit C**; and this Court having jurisdiction over this matter pursuant to 28 U.S.C.

§§ 157 and 1334; and this Court having found that venue is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for

a hearing on the Motion were appropriate under the circumstances and that no other notice need

be provided; and this Court having determined that the legal and factual bases set forth in the

Motion establish good cause for the relief granted herein; and upon all of the proceedings had

before this Court; and after due deliberation and sufficient cause appearing therefor and for the

reasons set forth in the record on this Motion, it is **HEREBY ORDERED THAT**:

      1.      The Motion is **GRANTED** as set forth herein.

      2.      The Debtor is deemed to have served the Amended Complaint on the defendant on

July 13, 2021, the Service Date (as defined in the Motion).

      3.      The Debtor is hereby granted leave to file its Amended Complaint.

      4.      This Court shall retain jurisdiction with respect to all matters arising from or

relating to the implementation, interpretation, and enforcement of this Order.

**### END OF ORDER ###**

DOCS_NY:43869.1 36027/002

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC, JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST | § | |
| | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants Highland Capital Management Services, Inc. ("HCMS"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with HCMS, Mr. Dondero, and Ms. Dondero, the "Defendants") alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with HCMS's defaults under (i) four demand notes, in the aggregate principal amount of $900,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $20,247,628.02, and payable in the event of default, all executed by HCMS in favor of the Debtor. HCMS has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      In paragraph 56 of HCMS's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). HCMS further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of HCMS, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"),

2

acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement on behalf of HCMS, he controlled both HCMS and the Debtor and was the lifetime beneficiary of Dugaboy.

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Notes.

4.      Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against HCMS for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims (a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for HCMS's breach of its obligations under the Notes, (b) turnover by HCMS to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, HCMS pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

3

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, HCMS is a company with offices located in Dallas, Texas, and is incorporated in the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## **CASE BACKGROUND**

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:42003.4 36027/002

## STATEMENT OF FACTS

**A.     The HCMS Demand Notes**

20.     HCMS is the maker under a series of demand notes in favor of the Debtor.

21.     Specifically, on March 28, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note").  A true and correct copy of HCMS's First Demand Note is attached hereto as **Exhibit 1**.

22.     On June 25, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note").  A true and correct copy of HCMS's Second Demand Note is attached hereto as **Exhibit 2.**

23.     On May 29, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note").  A true and correct copy of HCMS's Third Demand Note is attached hereto as **Exhibit 3.**

24.     On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "Demand Notes").  A true and correct copy of HCMS's Fourth Demand Note is attached hereto as **Exhibit 4.**

25.     Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

26.     Section 4 of the Demand Notes provide:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and

6

the same shall at once become due and payable and subject to those
remedies of the holder hereof.  No failure or delay on the part of the Payee
in exercising any right, power, or privilege hereunder shall operate as a
waiver hereof.

27.    Section 6 of the Demand Notes provide:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by
acceleration or otherwise) and is placed in the hands of an attorney for
collection, or if it is collected through a bankruptcy court or any other court
after maturity, the Maker shall pay, in addition to all other amounts owing
hereunder, all actual expenses of collection, all court costs and reasonable
attorneys' fees and expenses incurred by the holder hereof.

**B.     HCMS's Defaults Under Each Demand Note**

28.    By letter dated December 3, 2020, the Debtor made demand on HCMS for

payment under the Demand Notes by December 11, 2020 (the "<u>Demand Letter</u>").  A true and

correct copy of the Demand Letter is attached hereto as **<u>Exhibit 5</u>**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal
due and payable on the Notes in the aggregate amount of $947,519.43, which
represents all accrued interest and principal through and including December 11,
2020.

**Payment is due on December 11, 2020, and failure to make payment in full
on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

29.    Despite the Debtor's demand, HCMS did not pay all or any portion of the

amounts demanded by the Debtor on December 11, 2020.

30.    As of December 11, 2020, there was an outstanding principal amount of

$158,776.59 on HCMS's First Demand Note and accrued but unpaid interest in the amount of

$3,257.32, resulting in a total outstanding amount as of that date of $162,033.91.

31.    As of December 11, 2020, there was an outstanding principal balance of

$212,403.37 on HCMS's Second Demand Note and accrued but unpaid interest in the amount of

$2,999.54, resulting in a total outstanding amount as of that date of $215,402.81.

32.    As of December 11, 2020, there was an outstanding principal balance of $409,586.19 on HCMS's Third Demand Note and accrued but unpaid interest in the amount of $5,256.62, resulting in a total outstanding amount as of that date of $414,842.81.

33.    As of December 11, 2020, there was an outstanding principal balance of $153,564.74 on HCMS's Fourth Demand Note and accrued but unpaid interest in the amount of $1,675.16, resulting in a total outstanding amount as of that date of $155,239.90.

34.    Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $947,519.43.  Pursuant to Section 4 of each Demand Note, each Note is in default, and is currently due and payable.

**C.    The HCMS Term Note**

35.    HCMS is the maker under a term note in favor of the Debtor.

36.    Specifically, on May 31, 2017, HCMS executed a term note in favor of the Debtor, as payee, in the original principal amount of $20,247,628.02 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

37.    Section 2 of the Term Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

   2.1    **Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

   2.2    **Final Payment Date**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

38.     Section 3 of the Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

39.     Section 4 of the Term Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

40.     Section 6 of the Term Note provides:

**Attorneys' Fees**.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.     HCMS's Default Under the Term Note**

41.     HCMS failed to make the payment due under the Term Note on December 31, 2020.

42.     By letter dated January 7, 2021, the Debtor made demand on HCMS for immediate payment under the Term Note (the "Second Demand Letter").  A true and correct copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Second Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

9

**The Note is in default, and payment is due <u>immediately</u>.**

Second Demand Letter (emphasis in the original).

43.   As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was $6,757,248.95.

44.   Pursuant to Section 4 of the Term Note, the Note is in default, and is currently due and payable.

**E.   <u>The Debtor Files the Original Complaint</u>**

45.   On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "<u>Original Complaint</u>").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for HCMS's breach of its obligations under the Notes and (ii) turnover by HCMS for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**F.   <u>HCMS's Affirmative Defenses</u>**

46.   On March 13, 2021, HCMS filed *Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint* [Docket No. 6] (the "<u>Original Answer</u>").  In its Original Answer, HCMS asserted four affirmative defenses: (i) the claims are barred in whole or in part under the doctrines of justification or repudiation, (ii) waiver, (iii) estoppel, and (iv) offset and/or setoff (the "<u>Setoff Defense</u>"). *See id.* ¶¶ 53-56.

47.   On June 11, 2021, HCMS filed its *First Amended Answer to Plaintiff's Complaint* [Docket No. 34] (the "<u>Amended Answer</u>"), that omitted the Setoff Defense but asserted two affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes

10

"upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 56, and (ii) the Notes are "ambiguous," *id.* ¶ 57.

48.    According to HCMS, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

49.    According to HCMS, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

50.    Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement on behalf of HCMS.

51.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**G.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

52.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 8**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

53.    Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 8**, § 4.2(b).

54.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

55.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

## **FIRST CLAIM FOR RELIEF**

### **(Against HCMS)**

### **(For Breach of Contract)**

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Notes are binding and enforceable contracts.

58.     HCMS breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

59.     HCMS breached the Term Note by failing to pay all amounts due to the Debtor upon HCMS's default and acceleration.

60.     Pursuant to each Note, the Debtor is entitled to damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Demand Notes.

61.     As a direct and proximate cause of HCMS's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $947,519.43, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

62.     As a direct and proximate cause of HCMS's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,757,248.95, as of January 8, 2021, plus

12

an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF

### (Against HCMS)

### (Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))

63.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

64.     HCMS owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Notes

65.     Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note is matured and payable upon demand.

66.     The Term Note is property of the Debtor's estate and the amounts due under the Term Note is matured and payable upon default and acceleration.

67.     The Debtor has made demand for turnover of the amounts due under each of the Notes

68.     As of the date of filing this Complaint, HCMS has not turned over to the Debtor all or any of the amounts due under each of the Notes.

69.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

## THIRD CLAIM FOR RELIEF
### (Against HCMS)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

70.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

71.     The Debtor made the transfers pursuant to the Alleged Agreement within two years of the Petition Date.

72.     HCMS entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

73.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt HCMS incurred under the Notes demonstrates a scheme of fraud.

74.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

14

75.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

### FOURTH CLAIM FOR RELIEF
#### (Against HCMS)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

76.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

77.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

78.     Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

15

79.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

80.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy and Ms. Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

81.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

82.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

83.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

84.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

85.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

86.    If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

87.    If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

88.    Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

89.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

90.    James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

91.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

92.    The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

93.    Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)    On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by HCMS to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

18

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreements and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)    On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)    On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)    On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result

of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and

exemplary damages; and

(iii)      Such other and further relief as this Court deems just and proper.


Dated:  As of July 13, 2021.                PACHULSKI STANG ZIEHL & JONES LLP
                                            Jeffrey N. Pomerantz (CA Bar No.143717)
                                            Ira D. Kharasch (CA Bar No. 109084)
                                            John A. Morris (NY Bar No. 2405397)
                                            Gregory V. Demo (NY Bar No. 5371992)
                                            Hayley R. Winograd (NY Bar No. 5612569)
                                            10100 Santa Monica Blvd., 13th Floor
                                            Los Angeles, CA 90067
                                            Telephone: (310) 277-6910
                                            Facsimile: (310) 201-0760
                                            E-mail:      jpomerantz@pszjlaw.com
                                                         ikharasch@pszjlaw.com
                                                         jmorris@pszjlaw.com
                                                         gdemo@pszjlaw.com
                                                         hwinograd@pszjlaw.com

                                            -and-

                                            */s/ Zachery Z. Annable*
                                            HAYWARD PLLC
                                            Melissa S. Hayward
                                            Texas Bar No. 24044908
                                            MHayward@HaywardFirm.com
                                            Zachery Z. Annable
                                            Texas Bar No. 24053075
                                            ZAnnable@HaywardFirm.com
                                            10501 N. Central Expy, Ste. 106
                                            Dallas, Texas 75231
                                            Tel: (972) 755-7100
                                            Fax: (972) 755-7110

                                            *Counsel for Highland Capital Management, L.P.*

DOCS_NY:42003.4 36027/002

# EXHIBIT 1

# PROMISSORY NOTE

$150,000.00                                                                                     March 28, 2018


      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.


      1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.


      2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.


      3.    Prepayment Allowed: Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.


      4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.


      5.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.


      6.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

# EXHIBIT 2

# PROMISSORY NOTE

$200,000.00                                                                                    June 25, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

# EXHIBIT 3

# PROMISSORY NOTE

$400,000                                                                                      May 29, 2019


FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

# EXHIBIT 4

# PROMISSORY NOTE

$150,000                                                                      June 26, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

# EXHIBIT 5

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

  Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| **TOTALS** | **$900,000** | **$934,330.79** | **$13,188.64** | **$947,519.43** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 6

## PROMISSORY NOTE

**$20,247,628.02**                                                **May 31, 2017**

        THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from Highland Capital Management Services, Inc., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

        FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY MILLION, TWO HUNDRED FORTY SEVEN THOUSAND, SIX HUNDRED TWENTY EIGHT AND 02/100 DOLLARS ($20,247,628.02), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

        1.        <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

        2.        <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

        2.1        <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

        2.2        <u>Final Payment Date</u>.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

        3.        <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

        4.        <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No

failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

By: _____
Name:
Title:

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 5/29/15 | $500,000 | 2.30% | $523,095 |
| 10/1/15 | $350,000 | 2.58% | $315,500 |
| 10/2/15 | $310,000 | 2.58% | $323,301 |
| 10/27/15 | $200,000 | 2.58% | $208,228 |
| 10/28/15 | $200,000 | 2.58% | $208,214 |
| 10/30/15 | $100,000 | 2.58% | $104,093 |
| 11/23/15 | $100,000 | 2.57% | $103,908 |
| 11/24/15 | $250,000 | 2.57% | $259,752 |
| 2/10/16 | $2,000,000 | 2.62% | $ 83,390 |
| 2/11/16 | $250,000 | 2.62% | $258,524 |
| 4/5/16 | $6,000,000 | 2.25% | $6,155,712 |
| 5/4/16 | $2,700,000 | 2.24% | $2,764,954 |
| 7/1/16 | $30,000 | 2.18% | $30,598 |
| 8/5/16 | $525,000 | 2.18% | $534,375 |
| 8/22/16 | $250,000 | 2.18% | $254,465 |
| 9/22/16 | $185,000 | 2.18% | $187,773 |
| 12/12/16 | $7,700,000 | 2.26% | $7,781,050 |
| 3/31/17 | $150,000 | 2.78% | $150,697 |
| | $21,800,000 | | $20,247,628.02 |

# EXHIBIT 7

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 7, 2021

Highland Capital Management Services, Inc.
c/o Bonds Ellis Eppich Schafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76012
Attention: James Dondero

       Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, Highland Capital Management Services, Inc. entered into that certain promissory note in the original principal amount of $20,247,628.02 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        D. Michael Lynn

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 8

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP
AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR
UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE
ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS
PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL
SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE
PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

ARTICLE 1    GENERAL ............................................................................................................1
    1.1.    Continuation ...................................................................................................1
    1.2.    Name ..............................................................................................................1
    1.3.    Purpose ...........................................................................................................1
    1.4.    Term................................................................................................................1
    1.5.    Partnership Offices; Addresses of Partners.....................................................1

ARTICLE 2    DEFINITIONS .....................................................................................................2
    2.1.    Definitions......................................................................................................2
    2.2.    Other Definitions ...........................................................................................6

ARTICLE 3    FINANCIAL MATTERS.......................................................................................6
    3.1.    Capital Contributions .....................................................................................6
    3.2.    Allocations of Profits and Losses...................................................................8
    3.3.    Allocations on Transfers ................................................................................9
    3.4.    Special Allocations.........................................................................................9
    3.5.    Curative Allocations.....................................................................................10
    3.6.    Code Section 704(c) Allocations..................................................................10
    3.7.    Capital Accounts ..........................................................................................11
    3.8.    Distributive Share for Tax Purpose ..............................................................12
    3.9.    Distributions.................................................................................................12
    3.10.    Compensation and Reimbursement of General Partner ................................14
    3.11.    Books, Records, Accounting, and Reports....................................................14
    3.12.    Tax Matters ..................................................................................................14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS .................................................15
    4.1.    Rights and Obligations of the General Partner..............................................15
    4.2.    Rights and Obligations of Limited Partners..................................................19
    4.3.    Transfer of Partnership Interests ..................................................................19
    4.4.    Issuances of Partnership Interests to New and Existing Partners...................21
    4.5.    Withdrawal of General Partner .....................................................................21
    4.6.    Admission of Substitute Limited Partners and Successor General Partner.....21

ARTICLE 5    DISSOLUTION AND WINDING UP.....................................................................22
    5.1.    Dissolution ...................................................................................................22
    5.2.    Continuation of the Partnership....................................................................23
    5.3.    Liquidation ...................................................................................................23
    5.4.    Distribution in Kind .....................................................................................24
    5.5.    Cancellation of Certificate of Limited Partnership .......................................24
    5.6.    Return of Capital ..........................................................................................24
    5.7.    Waiver of Partition.......................................................................................24

ARTICLE 6    GENERAL PROVISIONS....................................................................................24
    6.1.    Amendments to Agreement...........................................................................24

6.2.    Addresses and Notices .................................................................................................... 25
6.3.    Titles and Captions.......................................................................................................... 25
6.4.    Pronouns and Plurals....................................................................................................... 25
6.5.    Further Action .................................................................................................................. 25
6.6.    Binding Effect .................................................................................................................. 25
6.7.    Integration ........................................................................................................................ 25
6.8.    Creditors........................................................................................................................... 25
6.9.    Waiver ............................................................................................................................... 25
6.10.   Counterparts ..................................................................................................................... 25
6.11.   Applicable Law ................................................................................................................ 25
6.12.   Invalidity of Provisions.................................................................................................... 25
6.13.   Mandatory Arbitration...................................................................................................... 26

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation *("Strand"),* as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in <u>Article 2</u>.

## ARTICLE 1

## GENERAL

**1.1.    Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    <u>Partnership Offices</u>.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    <u>Addresses of Partners</u>.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

## DEFINITIONS

**2.1.    Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect to any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

*"Class B Limited Partner"* means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

*"Class B Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

*"Class B NAV Ratio Trigger Period"* means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

*"Class C Limited Partner"* means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

*"Class C Limited Partnership Interest"* means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

*"Class C NAV Ratio Trigger Period"* means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

*"Code"* means the Internal Revenue Code of 1986, as amended and in effect from time to time.

*"Contribution Note"* means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

*"Default Loan"* has the meaning set forth in Section 3.1(c)(i).

*"Defaulting Partner"* has the meaning set forth in Section 3.1(c).

*"Delaware Act"* means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

**"Effective Date"** means the date first recited above.

*"Fiscal Year"* has the meaning set forth in Section 3.11(b).

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

"***Record Date***" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"***Second Amended Buy-Sell and Redemption Agreement***" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"***Securities***" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"***Securities Act***" means the Securities Act of 1933, as amended, and any successor to such statute.

"***Substitute Limited Partner***" has the meaning set forth in Section 4.6(a).

"***Transfer***" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"***Treasury Regulations***" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.**    **Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

### FINANCIAL MATTERS

**3.1.**    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

(i)     The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)     Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)     Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)     Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

(ii)     Reduction of Percentage Interest. If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

3.2.    Allocations of Profits and Losses.

(a)     Allocations of Profits. Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

(b)     Allocations of Losses. Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)     First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

(c)     <u>Limitation on Loss Allocations</u>.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.     **Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.     **Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     <u>Partnership Minimum Gain Chargeback</u>**.**  Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2)**.**  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g)**.**  This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>**.**  Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2)**.**  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g)**.**  This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     <u>Qualified Income Offset</u>**.**  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)     <u>Gross Income Allocation</u>.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

      (e)    Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

      (f)    Partner Nonrecourse Deductions. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

      (g)    Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

      (h)    Section 481 Adjustments. Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.** The "*Basic Regulatory Allocations*" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4. Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred. For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.** In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property. Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7.    Capital Accounts.

(a)    <u>Maintenance of Capital Accounts</u>.  The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i)    The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii)    The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.  The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)    <u>Negative Capital Accounts</u>.  If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)    <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)    <u>No Withdrawal</u>.  No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e)    <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)    <u>Revaluations</u>.  The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

3.8.   **Distributive Share for Tax Purpose.**   All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion. Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

3.9.   **Distributions**.

(a)   General.   The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f). The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners. Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)   Priority Distributions.   Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)   No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

(iii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)   No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)   <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "***Tax Distribution***").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)   <u>Payments Not Deemed Distributions</u>.   Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)   <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)   <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)   <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10. Compensation and Reimbursement of General Partner.

(a) Compensation. The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b) Reimbursement for Expenses. In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11. Books, Records, Accounting, and Reports.

(a) Records and Accounting. The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose. The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b) Fiscal Year. The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c) Other Information. The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d) Distribution Reporting to Class B Limited Partner and Class C Limited Partner. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12. Tax Matters.

(a) Tax Returns. The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes. The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1. The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)     Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)     Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)     Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.     Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)     Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership. The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties. Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially. Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing. In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence. In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds. The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner. The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership. The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

(e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

(i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

(ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

(iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

(f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

(g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

(h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

17

the "*GP Party*"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

      (i)    Liability of General Partner.

      (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

      (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

      (j)    Reliance by General Partner.

      (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

      (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

      (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

**4.2.**     **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

(a)     Limitation of Liability. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

(b)     Management of Business. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

(c)     Return of Capital. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

(d)     Second Amended Buy-Sell and Redemption Agreement. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

(e)     Default on Priority Distributions. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under Section 3.9(b) and this Section 4.2(e). In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this Section 4.2(e).

**4.3.**     **Transfer of Partnership Interests**.

(a)     Transfer. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

(b)  *Transfers by General Partner*. The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner. Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement. If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)  *Transfers by Limited Partners*. The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)  *Distributions and Allocations in Respect of Transferred Partnership Interests*. If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4. All distributions declared on or before the date of that Transfer shall be made to the transferor. Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest. Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)  *Forfeiture of Partnership Interests Pursuant to the Contribution Note*. In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners. The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)  *Transfers of Partnership Interests Pursuant to the Purchase Notes*. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4.   Issuances of Partnership Interests to New and Existing Partners.

(a)   Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)   Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5.   Withdrawal of General Partner

(a)   Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)   Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6.   Admission of Substitute Limited Partners and Successor General Partner.

(a)   Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner. A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner. In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.** The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

      **5.2.**    **Continuation of the Partnership**. Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event. If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs. If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

      (a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

      (b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

      (c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

      (d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

      **5.3.**    **Liquidation**. Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator. The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest. The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest. Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein. Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein. The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of Section 5.3 that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of Section 5.3, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation.  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time.  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in Sections 5.3 and 5.4, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.** **Addresses and Notices.** Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.** **Titles and Captions.** All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement. All Exhibits hereto are incorporated herein by reference.

**6.4.** **Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.** **Further Action.** The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.** **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.** **Integration.** This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.** **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.** **Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.** **Counterparts.** This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.** **Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.** **Invalidity of Provisions.** If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.   General Partner Discretion.**   Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.   Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.   The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.   A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.   The discovery process shall be limited to the following:   Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.   Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.   The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.   Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.   In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.   All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.   Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.   The duty to arbitrate described above shall survive the termination of this Agreement.   Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.   All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
       James D. Dondero,
       President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its    Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:    President

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

## EXHIBIT A

|  | Percentage Interest | |
| --- | --- | --- |
| CLASS A PARTNERS | By Class | Effective % |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

## EXHIBIT B

### ADDENDUM
### TO THE
### FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
### OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

### RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____ desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

### AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

      Name: _____

      Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

**B1040 (FORM 1040) (12/15)**

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Stinson LLP (for Highland Capital Management Services, Inc. and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor       ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor       ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor    ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☑2 11-Recovery of money/property - §542 turnover of property
- ☐ 12-Recovery of money/property - §547 preference
- ☑3 13-Recovery of money/property - §548 fraudulent transfer
- ☑4 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☑5 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☑1 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ Damages in an amount to be determined at trial |

Other Relief Sought  Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital*
*Management Services, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC., JAMES DONDERO,** | § | |
| **NANCY DONDERO, AND THE DUGABOY** | § | |
| **INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S**
**ANSWER TO AMENDED COMPLAINT**

Defendant Highland Capital Management Services, Inc. ("HCMS"), defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 68] (the "Amended

Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Amended Answer, it is denied.

In filing this Answer, Defendant HCMS does not waive any rights to compel arbitration, as set forth in Defendants' Motion to Compel Arbitration [Adv. Dkt. 70], filed on September 1, 2021.[1]

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant HCMS admits that HCMS' First Amended Answer speaks for itself.  To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant HCMS denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

---

[1] *Williams v. Cigna Financial Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995) (Defendant did not substantially invoke the judicial process and waive its right to arbitration despite removal of action to federal court, filing motion to dismiss, filing motion to stay proceedings, answering plaintiff's complaint, asserting counterclaim, and exchanging discovery); *Keytrade USA, Inc. v. AIN Temouchent M/V*, 404 F.3d 891 (5th Cir. 2005) (Arbitration not waived when defendant filed a 100-plus page motion for summary judgment and a concurrent motion to arbitrate); *Gulf Guaranty Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476 (5th Cir. 2002) (no waiver of arbitration right when the party seeking arbitration did no more than defend itself against the claims made against it).

**JURISDICTION AND VENUE**

6.      Defendant HCMS admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant HCMS admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant HCMS denies that a breach of contract claim is core.  Defendant HCMS denies that a § 542(b) turnover proceeding is the appropriate mechanism to collect a contested debt. Defendant HCMS admits that a § 542(b) turnover proceeding is statutorily core but denies that it is Constitutionally core under *Stern v. Marshall*.  Defendant HCMS does not consent to the Bankruptcy Court entering final orders or judgment in this Adversary Proceeding. Any allegations in paragraph 8 not expressly admitted are denied.

9.      Subject to the Defendants' Motion to Compel Arbitration, Defendant HCMS admits paragraph 9 of the Amended Complaint.

**THE PARTIES**

10.      Defendant HCMS admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant HCMS admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant HCMS admits that Defendant James Dondero was the President of the Debtor's General Partner, Strand Advisors, Inc. and the Debtor's CEO until his resignation on

January 9, 2020.  The third sentence of paragraph 12 asserts a legal conclusion to which no response is required.  Defendant HCMS denies any remaining allegations contained in paragraph 12.

13.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.     Defendant HCMS admits the allegations in paragraph 15 of the Amended Complaint.

16.     Defendant HCMS admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant HCMS admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant HCMS admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant HCMS admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant HCMS admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant HCMS admits that it signed the document attached to the Complaint as Exhibit 1.  Defendant HCMS denies any allegations in paragraph 21 that are not expressly admitted.

22.     Defendant HCMS admits that it signed the document attached to the Complaint as Exhibit 2.  Defendant HCMS denies any allegations in paragraph 22 that are not expressly admitted.

23.     Defendant HCMS denies that it signed the document attached to the Complaint as Exhibit 3.  Defendant HCMS denies any allegations in paragraph 23 that are not expressly admitted.

24.     Defendant HCMS denies that it signed the document attached to the Complaint as Exhibit 4.  Defendant HCMS denies any allegations in paragraph 21 that are not expressly admitted.

25.     Defendant HCMS admits that Plaintiff correctly transcribed Section 2 of Exhibits 1-4 to the Complaint in paragraph 25.

26.     Defendant HCMS admits that Plaintiff correctly transcribed Section 4 of Exhibits 1-4 to the Complaint in paragraph 26.

27.     Defendant HCMS admits that Plaintiff correctly transcribed Section 6 of Exhibits 1-4 to the Complaint in paragraph 27.

28.     Defendant HCMS admits that Plaintiff sent it a copy of Exhibit 5.  Defendant HCMS admits that Plaintiff correctly transcribed an excerpt of Exhibit 5 in the third sentence of

paragraph 28.  Defendant HCMS denies any allegations in paragraph 28 that are not expressly admitted.

29.     To the extent paragraph 29 asserts a legal conclusion, no response is required, and it is denied.  Defendant HCMS otherwise admits the allegations in paragraph 29.

30.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 30 of the Amended Complaint and therefore denies the same.

31.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 of the Amended Complaint and therefore denies the same.

33.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Amended Complaint and therefore denies the same.

34.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Amended Complaint and therefore denies the same.  Defendant HCMS denies the allegations in the second sentence of paragraph 34 of the Amended Complaint.

35.     Defendant HCMS admits that it has executed at least one promissory note under which Debtor is the payee.  Defendant HCMS denies any allegations in paragraph 35 that are not expressly admitted.

36.     Defendant HCMS admits that it signed the document attached to the Amended Complaint as Exhibit 6.  Defendant HCMS denies any allegations in paragraph 29 that are not expressly admitted.

37.     Defendant HCMS admits that Plaintiff correctly transcribed Section 2 of Exhibit 6 to the Amended Complaint in paragraph 37.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

38.     Defendant HCMS admits that Plaintiff correctly transcribed Section 3 of Exhibit 6 to the Amended Complaint in paragraph 38.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

39.     Defendant HCMS admits that Plaintiff correctly transcribed Section 4 of Exhibit 6 to the Amended Complaint in paragraph 39.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

40.     Defendant HCMS admits that Plaintiff correctly transcribed Section 6 of Exhibit 6 to the Amended Complaint in paragraph 40.  Defendant HCMS denies any allegations in paragraph 37 that are not expressly admitted.

41.     To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  Defendant HCMS otherwise denies paragraph 41 of the Amended Complaint.

42.     Defendant HCMS admits that Plaintiff sent it a copy of Exhibit 7.  Defendant HCMS admits that Plaintiff correctly transcribed an excerpt of Exhibit 7 in the third sentence of paragraph 42 of the Amended Complaint.  Defendant HCMS denies any allegations in paragraph 42 that are not expressly admitted.

43.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 of the Amended Complaint and therefore denies the same.

44.     Defendant HCMS denies the allegations in paragraph 44 of the Amended Complaint.

45.     Defendant HCMS admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 45 of the Amended Complaint. Defendant HCMS denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 45 of the Amended Complaint is denied.

46.     Defendant HCMS admits the allegations in paragraph 46 of the Amended Complaint.

47.     Defendant HCMS admits the allegations in paragraph 47 of the Amended Complaint.

48.     In response to the allegations in paragraph 48 of the Amended Complaint, Defendant HCMS admits that HCMS' First Amended Answer speaks for itself.  To the extent paragraph 48 contradicts the First Amended Answer, it is denied.

49.     Defendant HCMS admits that HCMS' First Amended Answer speaks for itself. To the extent paragraph 49 contradicts the First Amended Answer, it is denied.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

51.     Defendant HCMS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 51 of the Amended Complaint and therefore denies the same.

52.      Defendant HCMS denies the allegations in paragraph 52 of the Amended Complaint.

53.      Defendant HCMS admits that Exhibit 8 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 53 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 53 of the Amended Complaint is denied.

54.      Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

55.      Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## FIRST CLAIM FOR RELIEF
### (against HCMS)
### (for Breach of Contract)

56.      Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

57.      Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.      Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

59.      Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

60.      Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

61.     Defendant HCMS denies paragraph 61 of the Amended Complaint.

62.     Defendant HCMS denies paragraph 62 of the Amended Complaint.

## SECOND CLAIM FOR RELIEF
### (against HCMS)
### (Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))

63.     Paragraph 63 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

67.     Defendant HCMS admits that Plaintiff transmitted Exhibits 5 and 7 to the Amended Complaint.

68.     Paragraph 68 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

69.     Defendant HCMS denies paragraph 69 of the Amended Complaint.

## THIRD CLAIM FOR RELIEF
### (Against HCMS)
### (Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)

70.     Paragraph 70 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

71.     Paragraph 71 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

72.     Paragraph 72 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

73.     Paragraph 73 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

74.     Paragraph 74 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

75.     Paragraph 75 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

### FOURTH CLAIM FOR RELIEF
**(Against HCMS)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

76.     Paragraph 76 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

77.     Paragraph 77 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

78.     Paragraph 78 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

79.     Paragraph 79 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

80.     Paragraph 80 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

81.     Paragraph 81 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

82.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

83.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

84.     Paragraph 84 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

85.     Paragraph 85 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

86.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

87.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

88.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

89.     Paragraph 89 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

90.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

91.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

92.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

93.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant HCMS is not required to respond to this claim.

Defendant HCMS denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

94.     Plaintiff's claims are barred in whole or in part by the doctrine of justification and/or repudiation.

95.     Plaintiff's claims are barred in whole or in part by the doctrine of estoppel.

96.     Plaintiff's claims are barred in whole or in part by the doctrine of waiver.

97.     Plaintiff's claims are barred in whole or in part because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority

of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant HCMS believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

98.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because at all relevant times Defendant HCMS acted in good faith.

99.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the alleged fraudulent transfer (*i.e.*, the "Alleged Agreement") was taken in good faith and for reasonably equivalent value.

100.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because there was no intent to hinder, delay, or defraud any creditors of the Debtor by entering into the "Alleged Agreement."

101.    Defendant HCMS further asserts that Plaintiff's fraudulent transfer claims should be barred, in whole or in part, because the Debtor was solvent at the time the "Alleged Agreement" was made.

102.    Defendant HCMS further asserts that each Note is ambiguous as a whole based on the signatory and/or references to unspecified related agreements.

## JURY DEMAND

103.    Except to the extent compelled to arbitration, Defendant HCMS demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

104.    Defendant HCMS does <u>not</u> consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendant HCMS respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant HCMS such other relief to which it is entitled**.**

Dated: September 1, 2021                    Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email:  deborah.deitschperez@stinson.com
Email:  michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT
HIGHLAND CAPITAL
MANAGEMENT SERVICES, INC.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendant Highland Capital
Management Services, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.'S MOTION
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW, Highland Capital Management Services, Inc. ("HCMS"), one of the

Defendants in the above styled and numbered Adversary Proceeding initiated by Highland Capital

Management, L.P. as Plaintiff (the "Debtor"), and files this, its *Motion to Extend Expert Disclosure

and Discovery Deadlines* (the "Motion"). HCMS respectfully shows as follows:

## I.    <u>RELIEF REQUESTED</u>

1.        On October 29, 2021, NexPoint Advisors, L.P. ("NexPoint") filed its *Motion to Extend Expert Disclosure and Discovery Deadlines* with several exhibits attached (the "NexPoint Motion") in Case No. 19-34054-sgj11, Adversary Proceeding No. 21-03005-sgj, collectively attached hereto as "<mark>Exhibit A</mark>."[1]    HCRE and HCMS incorporate the context of the NexPoint Motion as if fully set forth herein.

2.        As described in the NexPoint Motion, in the NexPoint, HCMS and HCRE Notes cases there is a similar issue regarding whether the Debtor, Highland Capital Management, as the servicer for NexPoint, HCMS and HCRE, failed to make term loan payments at the end of 2020, enabling the Debtor to contend that the term loans were accelerated. As described in the Rukavina Declaration annexed to the NexPoint Motion, unexpected testimony just last week gave rise to the need to investigate whether expert testimony on the duties of a servicer like Highland Capital Management would be useful.

3.        As a result of the timing, it was not possible to retain an expert who could provide a report by the existing deadline, today.    HCRE and HCMS therefore seek an extension of time to potentially obtain an expert report from Mr. Steven Pully.    HCRE and HCMS would act expeditiously to minimize any impact on the schedule.

4.        For generally the same reasons set forth in the NexPoint Motion, HCMS requests this Court grant it the same relief requested by NexPoint.

---

[1] *Motion to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc 86]; *Declaration of Davor Rukavina*, Case 21-03005-sgj [Doc 86-1]; <mark>*Exhibit A*</mark>, Case 21-03005-sgj [Doc 86-2]; *Exhibit B*, Case 21-03005-sgj [Doc 86-3]; *Exhibit C*, Case 21-03005-sgj [Doc 86-4].

2

## II.     PRAYER

WHEREFORE, PREMISES CONSIDERED, HCMS respectfully requests this Court enter an order (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting HCMS such other and further relief as may be proper.

RESPECTUFLLY SUBMITTED this 29th day of October, 2021.

**STINSON LLP**

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANT
HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.**

## CERTIFICATE OF CONFERENCE

Counsel for NexPoint requested counsel for the Debtor to agree to the extension and within minutes, the Debtor declined.  For that reason, counsel for HCRE and HCMS concluded further conferencing would be futile.

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# Exhibit A

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery*

*Deadlines* (the "Motion"), respectfully stating as follows:

## I.    RELIEF REQUESTED

1.      By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "Scheduling Order"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery.  Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment.  This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II.    PROCEDURAL BACKGROUND

2.      The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.      By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note").  The Note is a 30-year note and provides for an annual payment of principal and interest.  After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.      NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action.  This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready.  As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

### III.    FACTS

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment.  Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018.  The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021.  Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services.  NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds.  Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Declaration at Exhibit C, 337:22-338:8.

9.      NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.  NexPoint has always asserted this as an affirmative defense.  *See* Docket No. 6.  NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding.  Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.  To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement.  Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11.      This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment.  Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12.      NexPoint did not know that Waterhouse would provide this testimony.  NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement. But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.     If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision. After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.     Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims." Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.     At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement. This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an

expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential

expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to,

Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion

just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly

review the issues, formulate an opinion, and prepare a report one day after they are retained.

Among other things, Pully needs to review all underlying documents and deposition transcripts,

some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that

approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that

the Debtor should have a period of time to then designate a potential rebuttal expert, and a period

of time for expert discovery.  Such a procedure would be fair for all involved and would constitute

a minimal delay to what has already been a rapidly advanced case.

## IV.     <u>ARGUMENT AND AUTHORITIES</u>

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's

duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care,

skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting

in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like

capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder

of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for

good cause," although there is some uncertainty as to whether this standard applies only after a

deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, <mark>591 F.3d 458, 470</mark> (5th Cir. 2009) ("<mark>Federal Rule of Civil Procedure</mark>

<mark>16(b)</mark> governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.      When the issue concerns an "untimely submission of expert reports," the Fifth

Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the

failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential

prejudice in allowing the amendment; and (4) the availability of a continuance to cure such

prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, <mark>315 F.3d 533, 536</mark> (5th Cir. 2003). Again,

this test applies to a deadline which has already expired. Logically, therefore, a lesser standard

should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.      Applying these or any factors:

(i)      this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)     if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)    the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)     NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)      the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)     there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)    a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22.    NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning.  The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero.  As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony.  It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23.    Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V.    **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina
     State Bar No. 24030781
     Julian P. Vasek.
     State Bar No. 24070790
     500 N. Akard Street, Suite 3800
     Dallas, Texas 75202-2790
     Telephone: (214) 855-7500
     Facsimile: (214) 978-4375
     Email: drukavina@munsch.com
     Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## <u>CERTIFICATE OF CONFERENCE</u>

     The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

          /s/ Davor Rukavina
          Davor Rukavina

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

                    /s/ Davor Rukavina
                    Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

1.      My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

2.      I am an attorney duly licensed to practice law in the State of Texas.  I am a shareholder at Munsch Hardt Kopf & Harr, P.C.  I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

3.      At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

4.      Highland Capital Management, L.P. (the "<u>Debtor</u>") alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated and the Debtor demanded full and immediate payment.

5.      The parties agreed by written stipulation that they would disclose experts and produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires. NexPoint requests an extension of this deadline. The following is the reason why.

6.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "<u>Agreement</u>") between the Debtor and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A." The Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021. NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. NexPoint therefore asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place.

7.      The foregoing has always been an affirmative defense of NexPoint in this Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of which is attached hereto as Exhibit "B."

8.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("<u>Waterhouse</u>"), as did I, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9. Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10. This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11. Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12.     In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13.     Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero. In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14.     I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement. Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true). I do not have a copy of Mr. Seer's deposition yet.

15.     With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.     On October 22, 2021, I began searching for a potential expert. On October 26, 2021, I contacted Steven J. Pully about the potential engagement. After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021. The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time. I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.     Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021. Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents. Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.     NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

---

DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

## R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms.    As used in this Agreement, the following terms shall have the following meanings:

Exhibit A

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation. The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority. Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment. The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services. Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)      *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b) *Legal/Compliance/Risk Analysis.* Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c) *Tax.* Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d) *Management of Clients and Accounts.* Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e) *Valuation.* Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f) *Execution and Documentation.* Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g) *Marketing.* Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h) *Reporting.* Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

4

      (i)    *Administrative Services.* The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

      (j)    *Shared Employees.* To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

      (k)    *Ancillary Services.* Assistance and advice on all things ancillary or incidental to the foregoing; and

      (l)    *Other.* Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

    Section 2.03    Shared Employees.

      (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

(i)      The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)      The Staff and Services Provider shall require that each Shared Employee:

(i)      certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)    provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)      to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)      Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

### CONSIDERATION AND EXPENSES

Section 3.01   Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02   Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03   Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

### REPRESENTATIONS AND COVENANTS

Section 4.01   Representations. Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

## ARTICLE V

## COVENANTS

Section 5.01    Compliance; Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01   Standard of Care.   Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.  The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Section 6.05 <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06 <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01 <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01 <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02 <u>Assignment and Delegation</u>.

(a)     Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)     Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)     The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)   The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)   Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)   Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)   The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)   The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

Section 8.04   <u>Governing Law</u>.

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)    If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General Partner

By:_____
Name: Frank Waterhouse
Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the *Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

Exhibit B

## PRELIMINARY STATEMENT

1.      The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.      Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.      Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.      Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.      Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.      Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.      Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.     Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.     Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.     Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.     Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.     Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.     Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
(Against NexPoint)
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

## SIXTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
### (Breach of Fiduciary Duty)

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

## SEVENTH CLAIM FOR RELIEF
### (Against James Dondero and Nancy Dondero)
### (Aiding and Abetting a Breach of Fiduciary Duty)

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero. Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero. Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## AFFIRMATIVE DEFENSES

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note. Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay. It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
_____
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
_____
Davor Rukavina

Page 1

```
 1              WATERHOUSE - 10-19-21

 2          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 3                   DALLAS DIVISION
       ------------------------------
 4    IN RE:

 5                               Chapter 11
      HIGHLAND CAPITAL
 6    MANAGEMENT, L.P.,          CASE NO.
                                 19-34054-SGI11
 7
                 Debtor.
 8    ------------------------------
      HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
                 Plaintiff,
10    vs.                          Adversary
                                   Proceeding No.
11    HIGHLAND CAPITAL MANAGEMENT    21-03000-SGI
      FUND ADVISORS, L.P.; NEXPOINT
12    ADVISORS, L.P.; HIGHLAND
      INCOME FUND; NEXPOINT
13    STRATEGIC OPPORTUNITIES FUND;
      NEXPOINT CAPITAL, INC.; and
14    CLO HOLDCO, LTD.,

15               Defendants.
      ------------------------------
16

17          REMOTE VIDEOTAPED DEPOSITION OF

18                  FRANK WATERHOUSE

19                  October 19, 2021

20

21

22

23

24    Reported by:  Susan S. Klinger, RMR-CRR, CSR

25    Job No: 201195
```

Exhibit C

```
 1                  WATERHOUSE - 10-19-21

 2

 3

 4                      October 19, 2021

 5                       9:30 a.m.

 6

 7

 8

 9        Remote Deposition of FRANK WATERHOUSE,

10    held before Susan S. Klinger, a Registered

11    Merit Reporter and Certified Realtime Reporter

12    of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 21-03006-sgj Doc 49 Filed 10/20/21 Entered 10/20/21 22:28:54 Page 3 of 897
Case 3:21-cv-00881-X   Document 178-20   Filed 05/20/24   Page 170 of 282   PageID 46811

Page 3

```
 1                    WATERHOUSE - 10-19-21

 2    A P P E A R A N C E S:

 3    (All appearances via Zoom.)

 4    Attorneys for the Reorganized Highland Capital

 5    Management:

 6         John Morris, Esq.

 7         Hayley Winograd, Esq.

 8         PACHULSKI STANG ZIEHL & JONES

 9         780 Third Avenue

10         New York, New York  10017

11    Attorneys for the Witness:

12         Debra Dandeneau, Esq.

13         Michelle Hartmann, Esq.

14         BAKER McKENZIE

15         1900 North Pearl Street

16         Dallas, Texas  75201

17    Attorneys for NexPoint Advisors, LP and

18    Highland Capital Management Fund Advisors,

19    L.P.:

20         Davor Rukavina, Esq.

21         An Nguyen, Esq.

22         MUNSCH HARDT KOPF & HARDD

23         500 North Akard Street

24         Dallas, Texas  75201-6659

25
```

```
 1                WATERHOUSE - 10-19-21

 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3   and HCMS:

 4        Deborah Deitsch-Perez, Esq.

 5        Michael Aigen, Esq.

 6        STINSON

 7        3102 Oak Lawn Avenue

 8        Dallas, Texas  75219

 9

10   Attorneys for Dugaboy Investment Trust:

11        Warren Horn, Esq.

12        HELLER, DRAPER & HORN

13        650 Poydras Street

14        New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18        Deborah Newman, Esq.

19        QUINN EMANUEL URQUHART & SULLIVAN

20        51 Madison Avenue

21        New York, New York  10010

22

23   Also Present:

24        Ms. La Asia Canty

25
```

```
 1                WATERHOUSE - 10-19-21

 2                      I N D E X

 3

 4   WITNESS                              PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS              10

 7   EXAMINATION BY MR. RUKAVINA           256

 8   EXAMINATION BY MS. DEITSCH-PEREZ      352

 9   EXAMINATION BY MR. MORRIS             377

10   EXAMINATION BY MR. RUKAVINA           387

11   EXAMINATION BY MS. DEITSCH-PEREZ      393

12

13                    E X H I B I T S

14   No.                                  Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management             91

17            Representation

18   Exhibit 34 HCMLP Consolidated Financial  94

19            Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)        170

22   Exhibit 39 HCMLP Operating Results 2/18 226

23   Exhibit 40 Summary of Assets and        236

24            Liabilities

25   Exhibit 41 12/19 Monthly Operating Report 258
```

Page 6

```
 1                    WATERHOUSE - 10-19-21

 2    Exhibit 45 HCMFA Consolidated Financial      135

 3              Statements

 4    Exhibit 46 NexPoint 2019 Audited             218

 5              Financials

 6

 7    Exhibit A1 Emails 11/25                       328

 8    Exhibit A2 Emails 12/31                       338

 9    Exhibit A6 Emails 1/12                        341

10    Exhibit A7 Promissory Notes                   297

11    Exhibit A9 Email, 8/31                        307

12    Exhibit A10 Acknowledgment from HCMLP         302

13    Exhibit A11 HCMLP Schedule 71A                309

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1           WATERHOUSE - 10-19-21

 2             P R O C E E D I N G S

 3           VIDEOGRAPHER:  Good morning,

 4    Counselors.  My name is Scott Hatch.  I'm a

 5    certified legal videographer in association

 6    with TSG Reporting, Inc.

 7           Due to the severity of COVID-19 and

 8    following the practice of social

 9    distancing, I will not be in the same room

10    with the witness.  Instead, I will record

11    this videotaped deposition remotely.  The

12    reporter, Susan Klinger, also will not be

13    in the same room and will swear the witness

14    remotely.

15           Do all parties stipulate to the

16    validity of this video recording and remote

17    swearing, and that it will be admissible in

18    the courtroom as if it had been taken

19    following Rule 30 of the Federal Rules of

20    Civil Procedures and the state's rules

21    where this case is pending?

22           MR. HORN:  Yes.

23           MS. DANDENEAU:  Yes.

24           MR. MORRIS:  Yes.  John Morris.  I

25    would just try to do a negative notice
```

Case 21-03000-sgj Doc 649 Filed 10/28/21 Entered 10/28/22 22:38:54 Page 8 of 897
Case 3:21-cv-00881-X   Document 178-29   Filed 05/09/24   Page 175 of 282   PageID 46816

Page 8

1          WATERHOUSE - 10-19-21

2   here, as we did yesterday.  If anybody has

3   a problem with what was just stated, can

4   you state your objection now?

5          Okay.  No response, so everybody

6   accepts the stipulation and the instruction

7   that was just given.

8          VIDEOGRAPHER:  Thank you.  This is

9   the start of media labeled Number 1 of the

10  video recorded deposition of Frank

11  Waterhouse In Re: Highland Capital

12  Management, L.P., in the United States

13  Bankruptcy Court for the Northern District

14  of Texas, Dallas Division, Case Number

15  21-03000-SGI.

16          This deposition is being held via

17  video conference with participants

18  appearing remotely due to COVID-19

19  restrictions on Tuesday, October 19th, 2021

20  at approximately 9:32 a.m.  My name is

21  Scott Hatch, legal video specialist with

22  TSG Reporting, Inc. headquartered at 228

23  East 45th Street, New York, New York.  The

24  court reporter is Susan Klinger in

25  association with TSG Reporting.

Case 21-03006-sgj Doc 49 Filed 10/29/21 Entered 10/29/22:28:54 Page 9 of 897
Case 3:21-cv-00881-X   Document 178-29   Filed 01/09/24   Page 176 of 282   PageID 46817

Page 9

```
 1              WATERHOUSE - 10-19-21

 2         Counsel, please introduce

 3    yourselves.

 4         MR. MORRIS:  John Morris, Pachulski

 5    Stang Ziehl & Jones for the reorganized

 6    Highland Capital Management, L.P., the

 7    plaintiff in these actions.

 8         MS. DANDENEAU:  Deborah Dandeneau

 9    from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12         MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16         MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19         MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24         MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties
```

Case 23-03009-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 13:54:51 Page 1 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 09/07/24 Page 177 of 282 PageID 46818

Page 10

1          WATERHOUSE - 10-19-21

2          as Deborah Deitsch-Perez.

3               MS. NEWMAN:  This is Deborah Newman

4          from Quinn Emanuel.  We represent the

5          litigation -- Marc Kirschner as the trustee

6          for the litigation SunTrust.

7               MR. MORRIS:  I think that is

8          everybody.

9               VIDEOGRAPHER:  Thank you.  Will the

10         court reporter please swear in the witness.

11                    FRANK WATERHOUSE,

12    having been first duly sworn, testified as

13    follows:

14                      EXAMINATION

15    BY MR. MORRIS:

16         Q.    Please state your name for the

17    record.

18         A.    My name is Frank Waterhouse.

19         Q.    Good morning, Mr. Waterhouse.  I'm

20    John Morris, as you know, from Pachulski Stang

21    Ziehl & Jones.  You understand that my firm and

22    I represent Highland Capital Management, L.P.;

23    is that right?

24         A.    Yes.

25         Q.    Okay.  And do you understand that

```
 1                 WATERHOUSE - 10-19-21

 2     we're here today for your deposition in your

 3     individual capacity?

 4          A.    Yes.

 5          Q.    Did you review and -- did you

 6     receive and review a subpoena that Highland

 7     Capital Management, L.P., served upon you?

 8          A.    Yes.

 9          Q.    You have been deposed before; right?

10          A.    Yes.

11          Q.    How many times have you been

12     deposed?

13          A.    About three or four times.

14          Q.    Okay.  And I defended you in one

15     deposition; isn't that right?

16          A.    That is correct.

17          Q.    So the general ground rules for this

18     deposition are largely the same as the

19     depositions you have given before.  And that is

20     I will ask you a series of questions, and it is

21     important that you allow me to finish my

22     question before you begin your answer; is that

23     fair?

24          A.    Yes.

25          Q.    And it is important that I allow you
```

```
 1                WATERHOUSE - 10-19-21

 2    to finish your answers before I begin a

 3    question, but if I fail to do that, will you

 4    let me know?

 5         A.    I can certainly do that.

 6         Q.    Okay.  Do you understand that this

 7    deposition is being videotaped?

 8         A.    Yes.

 9         Q.    You understand that I may seek to

10    use portions of the videotape in a court of

11    law?

12         A.    I did not know that, until you just

13    said that.

14         Q.    Okay.  And you are aware of that now

15    before the deposition begins substantively; is

16    that right?

17         A.    Yes.

18         Q.    So unlike I think the other

19    depositions that you have given, this one is

20    being given remotely.  So that presents some

21    unique challenges, at least as compared to a

22    deposition that is taken in-person.

23              From time to time we're going to put

24    documents up on the screen, Mr. Waterhouse.

25    And it is important that I give you the
```

1                    WATERHOUSE - 10-19-21

2     opportunity to review any portion of the

3     document that you think you need in order to

4     fully and completely answer the question.

5              So I would ask you to let me know if

6     there is a portion of a document that you need

7     to see in order to fully and completely answer

8     the question.  Can you do that for me?

9          A.   Yes.

10             MS. DANDENEAU:  Mr. Morris, I would

11             just note that we do have hard copies of

12             the documents that you sent, so if you can

13             just refer to the exhibit number as

14             reflected in the documents that you sent,

15             Mr. Waterhouse will be able to look at the

16             hard copies of those documents.

17             MR. MORRIS:  I appreciate that,

18             and -- and I will encourage him to do so.

19             There will be other documents that we did

20             not send to you that we'll be using today

21             though.

22         Q.   Okay.  With that as background, if

23     there is anything that I ask you, sir, that you

24     don't understand, will you let me know?

25         A.   Yes.

Case 3:21-cv-00881-X   Document 178-29   Filed 01/09/24   Entered 01/09/24 21:31:54   Page 14 of 397
Case 3:21-cv-00881-X   Document 178-29   Filed 06/20/24   Page 181 of 282   PageID 46822

Page 14

```
 1                   WATERHOUSE - 10-19-21

 2         Q.    Okay.  Are you currently employed?

 3         A.    Yes.

 4         Q.    By whom?

 5         A.    The Skyview Group.

 6         Q.    When did you become employed by the

 7    Skyview Group?

 8         A.    I believe March 1st of 2021.

 9         Q.    Do you have a title at Skyview?

10         A.    Yes.

11         Q.    What is your title?

12         A.    My title is chief financial officer.

13         Q.    Do you report to anybody in your

14    role as CFO?

15         A.    I don't, no.

16         Q.    No.  Is there a president or a CEO

17    of Skyview?

18         A.    Yes.

19         Q.    Who is that?

20         A.    That is Scott Ellington.

21         Q.    But you don't report to

22    Mr. Ellington; is that right?

23         A.    I don't think so.

24         Q.    Does Skyview Group --

25               MS. DANDENEAU:  Excuse me, we --
```

Case 23-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:13:54 Page 15 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 06/09/24 Page 182 of 282 PageID 46823

Page 15

1              WATERHOUSE - 10-19-21

2         A.    I -- I -- I might.  I just -- I

3    don't recall.

4         Q.    Okay.  Does Skyview Group provide

5    any services to any entity directly or

6    indirectly owned or controlled by Jim Dondero?

7         A.    Yes.

8         Q.    Can you name -- is that pursuant to

9    written contracts?

10        A.    Yes.

11        Q.    And do you know how many contracts

12   exist?

13        A.    Approximately six or so.

14        Q.    And is the Skyview Group made up of

15   individuals who were formerly employees of

16   Highland Capital Management, L.P.?

17        A.    No.

18        Q.    Do you know how many -- how many --

19   how many employees does Skyview have?

20        A.    Approximately 35.

21        Q.    And can you tell me how many of

22   those 35 are former officers, directors, or

23   employees of Highland Capital Management, L.P.?

24        A.    I don't know the exact number.

25        Q.    Is it more than 20?

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 13:51 Page 1 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 06/09/24 Page 183 of 282 PageID 46824
Page 16

                          WATERHOUSE - 10-19-21

1

2        A.    Yes.

3        Q.    Is it more than 30?

4        A.    I don't know.

5        Q.    Can you tell me what portion of

6    Skyview -- Skyview's revenue is derived from

7    entities that are directly or indirectly owned

8    or controlled by Jim Dondero?

9              MS. DANDENEAU:  Mr. Morris, I mean,

10        you called Mr. Waterhouse here individually

11        for purposes of his testimony in connection

12        with the noticed litigation.  I have given

13        you some leeway to ask him some background

14        information about Skyview Group, but this

15        is not a substitute for a deposition in

16        connection with any other pending disputes

17        that exist.  And -- and we agreed to accept

18        the subpoena on the basis of he -- this is

19        testimony that he is giving in connection

20        with the noticed litigation.

21              I really think that you are now

22        going a little bit far afield from the

23        purpose of this deposition.

24              MR. MORRIS:  Okay.  It is -- I'm not

25        intending to use these -- the answers to

Case 23-03006-sgj Doc 36-4 Filed 10/29/21 Entered 10/29/21 21:31:57 Page 1 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 06/06/24 Page 184 of 282 PageID 46825

Page 17

```
1                    WATERHOUSE - 10-19-21

2        these questions for any purpose other than

3        this litigation.  I think you understand

4        fully why I'm asking the questions, and I

5        just have a couple more, if you will bear

6        with me.

7             MS. DANDENEAU:  Okay.

8             MS. DEITSCH-PEREZ:  Can we have an

9        agreement that an objection by one is an

10       objection for any other party here?

11            MR. MORRIS:  Sure.  I would -- I

12       would encourage that, sure.

13            MS. DEITSCH-PEREZ:  Thank you.

14            MR. MORRIS:  It can't be sustained

15       or overruled more than one time, so...

16       Q.    Mr. Waterhouse, can you answer my

17  question, please.

18            MS. DANDENEAU:  Do you want to

19       repeat it, Mr. Morris, for his benefit?

20            MR. MORRIS:  Sure.

21       Q.    Can you -- can you tell me the

22  approximate portion of Skyview's revenue that

23  is derived from entities that are directly or

24  indirectly owned or controlled by Mr. Dondero?

25       A.    I don't know the exact number.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Is it more than 75 percent?

 3        A.    Yes.

 4        Q.    Is it more than 90 percent?

 5        A.    I don't know.

 6        Q.    Okay.  Can I refer to Highland

 7   Capital Management, L.P., as Highland?

 8        A.    Yes.

 9        Q.    All right.  And you previously

10   served as Highland's CFO; correct?

11        A.    Yes.

12        Q.    When did you join Highland?

13        A.    I don't recall the exact date.

14        Q.    Can you tell me what year?

15        A.    2006.

16        Q.    When did you -- in what year did you

17   become Highland's CFO?

18        A.    I don't recall the exact date.

19        Q.    I'm not asking you for the exact

20   date.  I'm asking you if you recall the year in

21   which you were appointed CFO.

22        A.    I don't recall the exact year.

23        Q.    Can you tell me which years it is

24   possible that you were appointed to CFO of

25   Highland?
```

```
1                WATERHOUSE - 10-19-21

2        A.     2011 or 2012.

3        Q.     Did you serve as Highland's CFO on a

4   continuous basis from in or around 2011 or 2012

5   until early 2021?

6        A.     Yes.

7        Q.     During that entire time you reported

8   directly to Jim Dondero; correct?

9        A.     I -- I don't know.

10        Q.     Is there anybody else you reported

11   to -- withdrawn.

12               Did you report to Mr. Dondero for

13   some portion of the time that you served as

14   CFO?

15        A.     Yes.

16        Q.     Is there a portion of time that you

17   don't recall who you reported to?

18        A.     Yes.

19        Q.     What portion of time do you have in

20   your mind when you can't recall who you

21   reported to?

22        A.     From the 2011 to -- for

23   approximately a year or two.

24        Q.     Okay.  So is it fair to say that you

25   reported to Mr. Dondero in your capacity as CFO
```

Case 3:21-cv-00881-X  Document 178-29  Filed 01/09/24  Entered 01/09/24 21:31:59  Page 2 of 397
Case 3:21-cv-00881-X  Document 178-29  Filed 01/09/24  Page 187 of 282  PageID 46828

Page 20

                        WATERHOUSE - 10-19-21

1

2    from at least 2014 until the time you left

3    Highland?

4                MS. DANDENEAU:  Objection to form.

5         A.    I don't want to speculate the exact

6    or what year that changed or -- so I would like

7    to stick with my testimony.

8         Q.    Can you recall when you began

9    reporting to Mr. Dondero?

10        A.    I don't recall.

11        Q.    Can you -- can you give me an

12   estimate of what year you think you might have

13   began reporting to Mr. Dondero?

14        A.    I will go back to my prior

15   testimony.

16        Q.    Okay.  There is no -- you have no

17   ability to tell me when you began reporting to

18   Mr. Dondero.

19                Do I have that right?

20                MS. DANDENEAU:  Objection to form.

21        A.    I don't recall.

22        Q.    Okay.  Do you recall who you might

23   have reported to before you began reporting to

24   Mr. Dondero?

25        A.    Yes.

Case 3:21-cv-00881-X Document 174-29 Filed 01/09/24 Entered 01/09/24 21:21:54 Page 2 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 01/09/24 Page 188 of 282 PageID 46829

Page 21

```
 1                    WATERHOUSE - 10-19-21

 2          Q.      Who might you have reported to in

 3    your capacity as CFO before you started

 4    reporting to Mr. Dondero?

 5          A.      That would have been Patrick Boyce.

 6          Q.      Are you aware that Highland filed

 7    for bankruptcy on October 19th, 2019?

 8          A.      Yes.

 9          Q.      And we refer to that as the petition

10    date?

11          A.      Yes.

12          Q.      Okay.  Do you hold any professional

13    licenses, sir?

14          A.      Yes.

15          Q.      Can you tell me what professional

16    licenses you hold?

17          A.      I'm a certified public accountant.

18          Q.      Okay.  Anything else?

19          A.      No.

20          Q.      Do you have any other professional

21    licenses or certificates?

22          A.      When you say "professional license,"

23    that is not education?

24          Q.      Tell me -- sure.  Anything other

25    than a driver's license.
```

```
 1                  WATERHOUSE - 10-19-21

 2              Do you have any other license or

 3   certificate or certification?

 4       A.    Are you asking, like, where I went

 5   to school and the --

 6       Q.    I am not.  I am not.  I didn't say

 7   education.  I didn't ask about degrees.

 8              Do you know what a license is?

 9       A.    Well, yeah, I mean, a license is

10   something you get after you receive a certain

11   level of proficiency.

12       Q.    Do you have any licenses or

13   certifications other than your CPA?

14              MS. DANDENEAU:  Objection, form.

15              I assume you mean professional

16         licenses, Mr. Morris; correct?

17       Q.    Can you answer my question, sir?

18       A.    Mr. Morris, I'm thinking.  I

19   don't -- I don't think I have any others.

20       Q.    Are you familiar with an entity

21   called Highland Capital Management Fund

22   Advisors?

23       A.    Yes.

24       Q.    Were you ever -- can we refer to

25   that entity as HCMFA?
```

1                  WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Were you ever employed by HCMFA?

4        A.    Not that I recall.

5        Q.    Were you ever -- did you ever hold

6    the title of an officer or director of HCMFA?

7        A.    Yes.

8        Q.    What title did you hold?

9        A.    Treasurer.

10       Q.    When did you become the treasurer of

11   HCMFA?

12       A.    I don't recall.

13       Q.    Can you tell me the year?

14       A.    I don't -- I don't know the year.

15       Q.    Can you approximate the year in

16   which you became the treasurer of HCMFA?

17       A.    I don't know.

18       Q.    Can you tell me if it was before or

19   after 2016?

20       A.    I don't recall.

21       Q.    Are you still the -- do you know if

22   you're still the treasurer of HCMFA today?

23       A.    Today, I am the acting treasurer for

24   HCMFA.

25       Q.    Is there a distinction between

Case 3:00-03000-gj-Spc 86-4 Filed 10/29/21 10/2/21 Entered 10/29/21 07/9/221 18:5 Page 2 Desc397
Case 3:21-cv-00881-X Document 178-29 Filed 07/09/24 Page 191 of 282 PageID 46832

Page 24

WATERHOUSE - 10-19-21

1

2    treasurer and acting treasurer?

3         A.    I said "acting treasurer" as I am an

4    employee of Skyview, as you previously

5    stated -- or asked.

6         Q.    But you are the treasurer of HCMFA

7    today; correct?

8         A.    I am -- I am the acting treasurer

9    for HCMFA.

10         Q.    How did you become the treasurer of

11    HCMFA?

12         A.    Are you asking how I became the

13    treasurer of HCMFA today?

14         Q.    How did you become appointed to

15    serve as the treasurer of HCMFA?

16         A.    Well, in -- in -- in what time

17    capacity?

18         Q.    The first time that you were

19    appointed.

20         A.    First time.  I believe I was asked

21    to serve as treasurer for HCMFA the first time.

22         Q.    By who?  Who asked you to do that?

23         A.    I don't recall.

24         Q.    Is there anything that would refresh

25    your recollection as to who appointed you as

```
 1                    WATERHOUSE - 10-19-21

 2    the treasurer of CF- -- HCMFA for the first

 3    time?

 4         A.    I don't -- I mean, there would be

 5    some documents, some legal documents.  I don't

 6    know where those are.

 7         Q.    How many times have you been

 8    appointed the treasurer of HCMFA?

 9         A.    I don't know.

10         Q.    Was it more than once?

11         A.    I don't know.

12         Q.    Can you tell me any period of time

13    since 2016 that you did not hold the title of

14    treasurer of HCMFA?

15               MS. DANDENEAU:  Objection to form.

16         A.    I don't recall.

17         Q.    What are your duties and

18    responsibilities as the treasurer of HCMFA?

19         A.    My duties are to do the best job

20    that I can as the -- as an accountant and

21    finance guy.

22         Q.    What specific duties and

23    responsibilities do you have as the treasurer

24    of HCMFA?

25         A.    My duties are to do the best job
```

Case 3:21-cv-00881-X   Document 186-4   Filed 10/29/21   Entered 10/29/21 21:31:54   Page 2 of 397
Case 3:21-cv-00881-X   Document 178-29   Filed 07/09/24   Page 193 of 282   PageID 46834

Page 26

```
 1                    WATERHOUSE - 10-19-21

 2      that I can as the accounting and finance person

 3      for HCMFA.

 4           Q.    As the accounting and finance person

 5      for HCMFA, do you have any particular areas of

 6      responsibility?

 7           A.    Yeah, it is to manage the accounting

 8      and finance function for HCMFA.

 9           Q.    Would that include -- do you have

10      responsibility for overseeing HCMFA's annual

11      audit?

12           A.    Can I please elaborate on my prior

13      question?

14           Q.    Of course.  You -- you are giving

15      answers.  I'm asking questions.

16           A.    Okay.  Yes, so the -- it -- like I

17      said, it is to manage the accounting finance

18      aspect, but I am, as we discussed, the

19      treasurer.  That is -- being treasurer is what

20      gives me that -- that management function.

21           Q.    Does anybody report to you in your

22      capacity as treasurer of HCMFA?

23           A.    I don't believe so.

24           Q.    Does HCMFA have a chief financial

25      officer?
```

```
 1                   WATERHOUSE - 10-19-21

 2        A.    I don't -- I don't know.

 3        Q.    You don't know?

 4              You're the treasurer of HCMFA but

 5   you don't know if HCMFA has a chief financial

 6   officer.

 7              Do I have that right?

 8        A.    That's right.

 9        Q.    Okay.  Have you heard of a company

10   called NexPoint Advisors?

11        A.    Yes.

12        Q.    We will refer to that as NexPoint.

13   Okay?

14        A.    Okay.

15        Q.    Were you ever employed by NexPoint?

16        A.    I don't recall.

17        Q.    Did you ever hold any title with

18   respect to the entity known as NexPoint?

19        A.    Yes.

20        Q.    What titles have you held in

21   relation to NexPoint?

22        A.    Treasurer.  I think it was only

23   treasurer.

24        Q.    Can you tell me the approximate year

25   you became the treasurer of NexPoint?
```

```
 1                  WATERHOUSE - 10-19-21

 2          A.     I don't know.

 3          Q.     Are you still the treasurer of

 4   NexPoint today?

 5          A.     I am the acting treasurer for

 6   NexPoint.

 7          Q.     When did your title change from

 8   treasurer to acting treasurer?

 9          A.     I don't know.

10          Q.     Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13          A.     I don't -- I don't believe so.

14          Q.     Why did --

15          A.     I still manage the finance and

16   accounting function for NexPoint.

17          Q.     Why did your title change from

18   treasurer to acting treasurer?

19          A.     I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23          Q.     Okay.

24          A.     And we -- we provide officer

25   services.
```

Case 3:21-cv-00881-X Document 178-29 Filed 01/09/24 Entered 01/09/24 12:22:13 Page 29 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 07/30/24 Page 196 of 282 PageID 46837
Page 29

                    WATERHOUSE - 10-19-21

 1

 2        Q.     And you serve as an officer of

 3    HCMFA; correct?

 4        A.     I think we went over that with my

 5    testimony.  Yes, I'm the acting treasurer for

 6    HCMFA.

 7        Q.     And you are an officer of NexPoint;

 8    correct?

 9        A.     I think -- I am the acting treasurer

10    for NexPoint Advisors.

11        Q.     And -- and who appointed you acting

12    treasurer of NexPoint Advisors?

13        A.     I don't recall specifically.

14        Q.     Do you have any recollection of who

15    might have appointed you the treasurer of

16    NexPoint?

17        A.     I mean, it -- it -- I don't recall

18    exactly who it was.

19        Q.     Who were the possibilities?

20               MS. DEITSCH-PEREZ:  Object to the

21        form.

22        Q.     You can answer.

23        A.     Someone in the legal group for

24    NexPoint.  The other officers as well.

25        Q.     Have you heard of a company called

```
 1                 WATERHOUSE - 10-19-21

 2   Highland Capital Management Services, Inc.?

 3        A.    Yes.

 4        Q.    We will refer to that as HCMS.

 5   Okay?

 6        A.    HCMS.   Okay.

 7        Q.    Were you ever employed by HCMS?

 8        A.    No.

 9        Q.    Have you ever held any titles in

10   relation to HCMF -- I apologize -- HCMS?

11        A.    Yes.

12        Q.    What titles have you held in

13   relation to HCMS?

14        A.    Treasurer and acting treasurer.

15        Q.    When did you first become treasurer

16   or acting treasurer of HCMS?

17        A.    I don't recall the exact dates.

18        Q.    Can you recall -- can you

19   approximate the year that you became the

20   treasurer of HCMS?

21        A.    I don't -- I don't know.

22        Q.    Are you still the treasurer of HCMS

23   today?

24        A.    I am the acting treasurer for HCMS.

25        Q.    And are your duties and
```

Case 23-03006-sgj Doc 86-4 Filed 10/29/24 Entered 10/29/24 21:31:54 Page 3 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 08/09/24 Page 198 of 282 PageID 46839
Page 31

```
1                    WATERHOUSE - 10-19-21
2    responsibilities as the acting treasurer for
3    HCMS and the acting treasurer for NexPoint the
4    same as your duties and responsibilities in
5    your role as the acting treasurer of HCMFA?
6         A.    More or less.
7         Q.    Have you ever heard of a company
8    called HCRE Partners, LLC?
9         A.    Yes.
10        Q.    And do you understand that that
11   entity is now known today as NexPoint Real
12   Estate Partners?
13        A.    I did not know that.
14        Q.    All right.  Can we refer to HCRE
15   Partners as HCRE?
16             MS. DANDENEAU:  Objection to form.
17             Did you mean NexPoint Real Estate
18        Partners, Mr. Morris?
19             MR. MORRIS:  No.
20             MS. DANDENEAU:  Oh.
21             MR. MORRIS:  He said he wasn't
22        familiar that it was succeeded by that
23        entity.  So --
24             MS. DANDENEAU:  Okay.
25             MR. MORRIS:  -- let's go with what
```

1                    WATERHOUSE - 10-19-21

2          the witness knows.

3          Q.    You're familiar with an entity

4    called HCRE Partners, LLC; correct?

5          A.    Yes.

6          Q.    Okay.  So that is the entity that we

7    will refer to as HCRE.  If you're aware of any

8    successor, that is great.  If not, let's just

9    define it as such.

10              Have you ever been employed by HCRE

11   or any entity that you know to have succeeded

12   HCRE?

13         A.    No.

14         Q.    Did you ever serve as an officer or

15   director of HCRE or any successor?

16         A.    Not that I recall.

17         Q.    Okay.  Can we refer to NexPoint and

18   HCMFA as the advisors?

19         A.    Yes.

20         Q.    In general, the advisors provided

21   investment advisory services to certain retail

22   funds; correct?

23         A.    Yes.

24         Q.    And we will refer to the retail

25   funds that are served by the advisors

1                     WATERHOUSE - 10-19-21

2    collectively as the retail funds; is that okay?

3         A.    Okay.

4         Q.    Each of the retail funds is governed

5    by a board; correct?

6         A.    Yes.

7         Q.    And do you know the people who serve

8    on the boards of the retail funds?

9               MS. DANDENEAU:  Objection to form.

10        A.    I don't know all of them.

11        Q.    Do you know whether the same people

12   serve on the board of each of the retail funds

13   as we've defined that term?

14        A.    Which -- so when you say "retail

15   funds" -- again, I want to be -- what retail

16   funds are you referring to, because there are

17   -- there are several distinctions?

18              What retail funds are you using when

19   you refer to them?

20        Q.    That is why -- that is why I tried

21   to define the terms.  So let me do it again.

22              Retail funds for the purposes of

23   this deposition means any retail fund to which

24   either of the advisors provides advisory

25   services.  Okay?

1                    WATERHOUSE - 10-19-21

2          A.     Okay.

3          Q.     Okay.  So do you know whether the

4     same people serve on the board of each of the

5     retail funds?

6          A.     I don't know.

7          Q.     Were you ever employed by any of the

8     retail funds?

9          A.     No.

10         Q.     No?

11         A.     No.

12         Q.     Okay.  Do you have any title with

13    respect to any of the retail funds?

14         A.     Yes.

15         Q.     What titles do you hold --

16    withdrawn.

17                Do you have the same titles with

18    respect to all of the retail funds or do

19    they -- or just something else?

20                MS. DANDENEAU:  Objection to form.

21         Q.     Withdrawn.

22                Do you have the same title with

23    respect to each of the retail funds?

24         A.     No.

25         Q.     Tell me which title you have with

Case 23-03006-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:13:54 Page 3 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 03/09/24 Page 202 of 282 PageID 46843

Page 35

1                    WATERHOUSE - 10-19-21

2    respect to each retail fund.

3              Actually, let's do it a different

4    way.  I withdraw the question.

5              Can you give me one title you have

6    in relation to any retail fund?

7         A.    Yes.

8         Q.    What title -- what title can you

9    give me?

10        A.    Principal executive officer.

11        Q.    Do you serve as principal executive

12   officer for each of the retail funds?

13        A.    No.

14        Q.    Can you identify for me the retail

15   funds in which you serve as the principal

16   executive officer?

17        A.    Yes.  Highland Funds 1, Highland

18   Funds 2, Highland Income Fund, Highland Global

19   Allocation Fund.

20        Q.    I'm sorry, you said "Global

21   Allocation Fund"?

22        A.    Yes.

23              VIDEOGRAPHER:  Excuse me,

24        Mr. Morris.  This is the videographer.  I'm

25        concerned about the lighting in the

```
1                 WATERHOUSE - 10-19-21

2       witness' camera.

3             Do you want to go off the record and

4       make some adjustments?

5             MR. MORRIS:  Sure, but just for this

6       purpose.  I don't want to take a break.  We

7       just started.

8             MS. DANDENEAU:  Yeah, that is fine.

9       That is fine.  We're going to put you on

10      mute.

11            MR. MORRIS:  All right.

12            MS. DANDENEAU:  I'm going to try to

13      open up some of the shades.

14            VIDEOGRAPHER:  We're going off the

15      record at 10:08 a.m.

16      (Recess taken 10:08 a.m. to 10:11 a.m.)

17            VIDEOGRAPHER:  We are back on the

18      record at 10:11 a.m.

19      Q.    Mr. Waterhouse, when did you become

20 the principal executive officer of the four

21 retail funds that you just identified?

22      A.    I don't recall.

23      Q.    Do you recall the approximate year

24 that you became the principal executive officer

25 of the four funds?
```

Case 3:21-cv-00881-X   Document 178-29   Filed 10/29/21   Entered 10/29/21 13:51 Page 3 of 397
Case 3:21-cv-00881-X   Document 178-29   Filed 08/09/24   Page 204 of 282   PageID 46845

Page 37

1                     WATERHOUSE - 10-19-21

2          A.     2021.

3          Q.     Did you ever hold any title with

4   respect to any of the four funds you have just

5   identified other than principal executive

6   officer?

7          A.     I don't recall.

8          Q.     Is it possible that you held a

9   position or a title with the four funds you

10  just identified prior to 2021?

11         A.     Yes.

12         Q.     But you don't recall if you did or

13  not; do I have that right?

14         A.     No.  You -- I thought you asked, did

15  I hold other titles.

16         Q.     Did you hold any title at the four

17  retail funds for which you now serve as

18  principal executive officer at any time prior

19  to 2021?

20         A.     Yes.

21         Q.     What titles did you hold?

22         A.     I don't recall all the titles.

23         Q.     Do you recall any of the titles?

24         A.     Yes.

25         Q.     What titles do you recall holding at

Case 3:21-cv-00881-X   Document 178-29   Filed 10/29/21   Entered 10/29/21 21:31:54   Page 3 of 397
Case 3:21-cv-00881-X   Document 178-29   Filed 08/09/24   Page 205 of 282   PageID 46846

Page 38

                    WATERHOUSE - 10-19-21

1    those four retail funds before 2021?

2    those four retail funds before 2021?

3         A.    Principal executive officer.

4         Q.    Were you the principal executive

5    officer of the four retail funds that you have

6    identified?

7         A.    Sorry, could you repeat the

8    question?

9         Q.    Were you the principal executive

10   officer for each of the four retail funds that

11   you have identified?

12        A.    Yes.

13        Q.    When did you become the principal

14   executive -- withdrawn.

15             Can you give me the approximate year

16   that you became the principal executive officer

17   for each of the four retail funds you've

18   identified?

19        A.    I don't recall.

20        Q.    What are your duties and

21   responsibilities as the principal executive

22   officer of these four retail funds?

23        A.    It is to manage the finance and

24   accounting positions.

25        Q.    So at the same time you serve as the

Case 3:21-cv-00881-X  Document 176-29  Filed 01/09/24  Entered 01/09/24 13:15  Page 39 of 397
Case 3:21-cv-00881-X  Document 178-29  Filed 01/09/24  Page 206 of 282  PageID 46847
Page 39

 1                    WATERHOUSE - 10-19-21

 2     treasurer of the advisors, you also serve as

 3     the principal executive officer of these four

 4     retail funds; correct?

 5          A.    Yes.

 6          Q.    Did you ever hold any title with

 7     respect to any other retail fund?

 8          A.    Not that I recall.

 9          Q.    During the period that you served as

10     Highland's CFO, from time to time Highland

11     loaned money to certain of its officers and

12     employees; correct?

13          A.    Yes.

14          Q.    During the period that you served as

15     Highland's CFO, from time to time Highland

16     loaned money to certain --

17          A.    Let me -- let me retract that,

18     sorry, that -- you asked during the time I was

19     CFO, Highland loaned moneys to employees.  I

20     don't -- I don't recall that during my tenure

21     of CFO.

22          Q.    You have no recollection during the

23     time that you were the CFO of Highland of

24     Highland ever loaning any money to any officer

25     or director of Highland?

Case 3:21-cv-00881-X   Document 178-29   Filed 01/29/24   Entered 01/29/24 21:31:54   Page 4 of 397
Case 3:21-cv-00881-X   Document 178-29   Exhibit 29   Page 009244   Page 207 of 282   PageID 46848
Page 40

```
 1                   WATERHOUSE - 10-19-21

 2          A.    I don't recall during my tenure of

 3    Highland or my -- as CFO of Highland -- yeah,

 4    if there are any loans as CFO of Highland.

 5          Q.    I'm just talking about officers and

 6    employees right now.  You have no recollection

 7    of Highland ever making a loan to any of its

 8    officers or employees during the time that you

 9    served as CFO.  Do I have that right?

10                MS. DANDENEAU:  Objection to form.

11          A.    So I thought you were saying

12    officers and employees as CFO, right, so there

13    were -- I mean, okay, yes.

14          Q.    I would ask you to listen carefully

15    to my question.  If I -- if I'm not clear, let

16    me know, but I'm really trying to be as clear

17    as I can.

18          A.    I'm listening as carefully as I can,

19    and you are asking very specific questions in a

20    timeline.  And I'm trying to answer your

21    questions as specifically as I can, and I

22    apologize if -- if I'm going back.  I am -- you

23    are asking very specific questions.  Thank you.

24          Q.    During the period that you served as

25    Highland's CFO, from time to time Highland
```

```
 1                    WATERHOUSE - 10-19-21

 2     loaned money to certain corporate affiliates;

 3     correct?

 4                MS. DANDENEAU:  Objection to form.

 5         A.    What are corporate affiliates?

 6         Q.    How about the ones that are in

 7     Highland's audited financial statements under

 8     the section entitled Loans to Affiliates.  Why

 9     don't we start with those.  Do you have any

10     understanding of what the phrase "affiliates"

11     means?

12                MS. DANDENEAU:  Objection to form.

13         A.    I understand what affiliates are,

14     yet affiliates can have different meanings in

15     different contexts, so...

16         Q.    Why don't you -- why don't you tell

17     me what your understanding of the term

18     "affiliate" is in relation to Highland Capital

19     Management, L.P.

20         A.    Is that a -- it depends on the

21     context.

22         Q.    How about the context of making

23     loans?

24                MS. DANDENEAU:  Objection to form.

25         A.    I didn't make the determination of
```

```
 1                  WATERHOUSE - 10-19-21

 2    who an affiliate was or is at the time those --

 3    I didn't -- that wasn't my job to make a

 4    determination of who an affiliate is.

 5         Q.    All right.  So as the CFO of

 6    Highland, do you have any ability right now to

 7    tell me which companies that were directly or

 8    indirectly owned and/or controlled by

 9    Mr. Dondero in whole or in part received loans

10    from Highland Capital Management, L.P.?

11              MS. DANDENEAU:  Objection to form.

12              MS. DEITSCH-PEREZ:  Objection, form.

13         A.    Yes.

14         Q.    Okay.  Identify every entity that

15    you can think of that was directly or

16    indirectly owned and/or controlled by

17    Mr. Dondero in whole or in part that received a

18    loan from Highland Capital Management, L.P.

19              MR. RUKAVINA:  Objection, legal

20         conclusion.

21         A.    NexPoint Advisors, Highland Capital

22    Management Fund Advisors, HCM Services,

23    Dugaboy.  Sorry, I don't think -- Dugaboy

24    doesn't fit that definition.  You said owned

25    and controlled.  I don't think that that
```

Case 23-03067-sgj Doc 86-4 Filed 11/29/21 Entered 11/29/21 21:31:54 Page 43 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 09/20/24 Page 210 of 282 PageID 46851

Page 43

```
                    WATERHOUSE - 10-19-21
```

1    definition --

2         Q.   I said owned and/or controlled.

3         A.   I don't -- again, I'm not -- I'm not

4    the legal expert.  I don't think it controls --

5    he controls Dugaboy, so again, I'm not the

6    legal person.

7         Q.   I'm not asking you for a legal

8    conclusion, sir.  I'm asking you for your

9    knowledge, okay, as the CFO -- the former CFO

10   of Highland Capital Management, other than

11   NexPoint, HCMFA, and HCMF -- HCMS, can you

12   think of any other entities that were owned

13   and/or controlled directly or indirectly in

14   whole or in part by Jim Dondero who received a

15   loan from Highland Capital Management, L.P.?

16              MS. DANDENEAU:  Objection to form.

17        A.   HCRE.

18        Q.   Any others?

19        A.   That is -- that is all I can think

20   of.

21        Q.   And you're aware that from time to

22   time while you were the CFO, Highland loaned

23   money to Jim Dondero; correct?

24        A.   Yes.

25

```

Case 21-03006-sgj Doc 86-4 Filed 11/29/21 Entered 11/29/21 13:15 Page 42 of 397
Case 3:21-cv-00881-X   Document 178-29   Filed 01/09/24   Page 211 of 282   PageID 46852
Page 44

```
 1                 WATERHOUSE - 10-19-21

 2         Q.     Okay.  Can we refer to the four

 3    entities that you just named and Mr. Dondero as

 4    the affiliates?

 5         A.     So that would be Jim Dondero,

 6    NexPoint Advisors, Highland Capital Management

 7    Fund Advisors, and HCRE.

 8         Q.     And HCMS?

 9         A.     And HCMS, okay.

10         Q.     And can we refer to the loans that

11    were given to each of those affiliates as the

12    affiliate loans?

13         A.     Yes.

14         Q.     And is it fair to say that each of

15    the affiliates were the borrowers under the

16    affiliate loans as we're defining the term?

17                MR. RUKAVINA:  Objection, legal

18         conclusion.

19         A.     The borrowers are whoever were on

20    the notes.  I don't -- I don't know.  I'm not

21    the legal person.

22         Q.     But you --

23         A.     I don't know.

24         Q.     You do know, as Highland's former

25    CFO, that each of the affiliates that you have
```

```
1                  WATERHOUSE - 10-19-21

2    identified tendered notes to Highland; correct?

3              MR. RUKAVINA:  Hey, John, will you

4         just give me a running objection to legal

5         conclusion to HCM --

6              MR. MORRIS:  No.  No, if you want to

7         object --

8              MR. RUKAVINA:  I will object every

9         time.  Object to legal conclusion.

10             MR. MORRIS:  That is fine.

11   A.      Sorry, can you repeat the question?

12   Q.      Are you aware that each of the --

13   that each of the affiliates, as we have defined

14   the term, gave to Highland a promissory note in

15   exchange for the loans?

16             MR. RUKAVINA:  Objection to the

17        extent that calls for a legal conclusion.

18   A.      I don't.

19   Q.      No, you don't know that?

20   A.      No, they didn't -- you said they

21   exchanged a promissory note for a loan.  I

22   don't -- I don't understand that question, so I

23   said no.

24   Q.      At the time of the bankruptcy

25   filing, did Highland have in its possession
```

Case 3:21-cv-00881-X  Document 178-29  Filed 01/09/24  Entered 01/09/24 21:31:54  Page 4 of 397
Case 3:21-cv-00881-X  Document 178-29  Filed 01/09/24  Page 213 of 282  PageID 46854

Page 46

```
 1                WATERHOUSE - 10-19-21

 2   promissory notes that were signed by each of

 3   the affiliates?

 4        A.    Yes.

 5        Q.    To the best of your knowledge,

 6   during the time that you served as Highland's

 7   CFO, did Highland disclose to its outside

 8   auditors all of the loans that were made to

 9   affiliates?

10             MR. RUKAVINA:  Objection, that calls

11        for a legal conclusion.

12             MS. DEITSCH-PEREZ:  I also couldn't

13        hear you, John, because there was some

14        garbling on -- on the -- on the call.

15             MR. MORRIS:  Folks, I've got to tell

16        you this is not going well, and I'm

17        reserving my right --

18             MS. DANDENEAU:  John, it was just

19        the end of that question.  It was just the

20        end of that question.  I couldn't hear it

21        either.  Sorry, if you could repeat it,

22        please.

23             MR. MORRIS:  That is less than an

24        hour into this, but folks are trying to run

25        out the clock, and so I'm just going to
```

```
 1                WATERHOUSE - 10-19-21

 2        state that now.

 3                MS. DANDENEAU:  You know, and,

 4        Mr. Morris, I really object to that.  I

 5        mean --

 6                MR. MORRIS:  Okay.

 7                MS. DANDENEAU:  -- Mr. Waterhouse

 8        just told you he's trying to listen to your

 9        questions and answer them carefully, and

10        you have no basis for saying that.

11                MR. MORRIS:  Okay.

12                MS. DANDENEAU:  This does not --

13        this is not an experienced witness, so he's

14        trying to do the best he can.

15        Q.    Mr. Waterhouse, during the time that

16    you served as Highland's CFO, did Highland

17    disclose to its outside auditors all of the

18    loans that it made to each of the affiliates

19    that you have identified?

20                MR. RUKAVINA:  Objection, legal

21        conclusion.

22        A.    Yes.

23        Q.    To the best of your knowledge, while

24    you were Highland's CFO, were all of the

25    affiliate loans described in Highland's audited
```

```
 1                  WATERHOUSE - 10-19-21

 2    financial statements?

 3               MR. RUKAVINA:  Objection, legal

 4         conclusion.

 5         A.    When an audit was performed, any

 6    loans that were made by Highland to the

 7    affiliates were disclosed to auditors.

 8         Q.    Are you aware of any loan that was

 9    made to any affiliate that was not disclosed to

10    the auditors?

11         A.    I'm not aware.

12         Q.    To the best of your knowledge, did

13    each of the affiliates who were --

14    (inaudible) -- loaned from Highland execute a

15    promissory note in connection with that loan?

16               MR. RUKAVINA:  Objection, legal

17         conclusion.

18         A.    Sorry, you -- halfway through the

19    question it got muffled.

20               Can you repeat that again?

21         Q.    To the best of your knowledge, did

22    every affiliate execute a promissory note in

23    connection with each loan that it obtained from

24    Highland?

25               MR. RUKAVINA:  Objection, legal
```

Case 23-03060-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 21:31:57 Page 49 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 09/09/24 Page 216 of 282 PageID 46857

Page 49

```
 1                    WATERHOUSE - 10-19-21

 2          conclusion.

 3          A.    Yes.

 4          Q.    You are not aware of any loan that

 5     any affiliate ever obtained from Highland where

 6     the affiliate did not give a promissory note in

 7     return; is that fair?

 8          A.    Yes, I'm not aware.

 9          Q.    And to the best of your knowledge,

10     did Highland loan to each affiliate an amount

11     of money equal to the principal amount of each

12     promissory note?

13               MR. RUKAVINA:  Objection, legal

14          conclusion.

15          A.    Yes.

16          Q.    During the time that you served as

17     CFO, did Highland ever loan money to

18     Mark Okada?

19          A.    I -- I don't recall.

20          Q.    Did you ever see any promissory

21     notes executed by Mark Okada?

22          A.    I don't recall.

23          Q.    Do you know if Highland ever forgave

24     any loan that it ever made to Mr. Okada?

25          A.    I don't recall.
```

```
 1                 WATERHOUSE - 10-19-21

 2      Q.    Do you recall if Mr. Okada paid back

 3  all principal and interest due and owing under

 4  any loan he obtained from Highland?

 5            MS. DEITSCH-PEREZ:  Objection to

 6       form.

 7            MS. DANDENEAU:  Objection to form.

 8      A.    I don't recall.

 9      Q.    Do you recall whether -- during your

10  time as CFO, whether Highland ever loaned money

11  to Jim Dondero?

12      A.    Yes.

13      Q.    To the best of your knowledge, did

14  Mr. Dondero sign and deliver to Highland a

15  promissory note in connection with each loan

16  that he obtained from Highland?

17      A.    If you are referring to the

18  promissory notes that, you know, part of

19  Highland's records, yes.

20      Q.    Okay.  You're not aware of any loan

21  that Mr. Dondero took from Highland that wasn't

22  backed up by -- by a promissory note with a

23  face -- with a principal amount equal to the

24  amount of the loan; correct?

25      A.    Am I aware that Jim Dondero took a
```

Case 23-03037-sgj Doc 86-4 Filed 10/29/24 Entered 10/29/24 21:31:54 Page 5 of 397
Case 3:21-cv-00881-X Document 179 Page 1009/2446 Page 218 of 282 PageID 46859
Page 51

WATERHOUSE - 10-19-21

1  loan?

3      Q.    Without giving a -- let me ask a
4  better question.  I'm sorry, Mr. Waterhouse.

5            Are you aware of any loan that
6  Mr. Dondero obtained from Highland where he
7  didn't give a promissory note in return?

8      A.    I'm not aware.

9      Q.    During the time that you served as
10  Highland's CFO, did Highland ever forgive any
11  loans, in whole or in part, that it made to
12  Mr. Dondero?

13      A.    Not that I'm aware.

14      Q.    At the time that you served as
15  Highland's CFO, did Highland ever forgive any
16  loan, in whole or in part, that it made to any
17  affiliate as we've defined the term today?

18      A.    Not that I'm aware.

19      Q.    During the time that you served as
20  Highland's CFO, did Highland ever forgive, in
21  whole or in part, any loan that it ever made to
22  any officer or employee?

23      A.    Highland forgave loans to officers
24  and employees.  It may not have been at the
25  time when my title was CFO.

```
1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  And so I appreciate the

3    distinction.

4                Is it fair to say that, to the best

5    of your knowledge, Highland did not forgive a

6    loan that it made to an officer or employee

7    after 2013?

8                MS. DANDENEAU:  Objection to form.

9          A.    I don't recall.

10         Q.    To the best of your knowledge, did

11   Highland disclose to its auditors every

12   instance where it forgave, in whole or in part,

13   a loan that it had made to one of its officers

14   or employees?

15         A.    No.

16         Q.    Can you think of -- can you -- can

17   you identify any loan to an officer or employee

18   that was forgiven by Highland, in whole or in

19   part, that was not disclosed to Highland's

20   outside auditors?

21         A.    Look, I don't recall all of the

22   loans and the loan forgiveness.  I just know as

23   part of the audit process there is a

24   materiality concept.

25                So if there were loans to employees
```

Case 3:21-cv-00881-X Document 864 Filed 10/29/21 Entered 10/29/21 21:31:54 Page 53 of 397
Case 3:21-cv-00881-X Document 178-29 Page 0229/2446 Page 220 of 282 PageID 46861

Page 53

```
 1                 WATERHOUSE - 10-19-21

 2    that were of -- you know, that were deemed

 3    immaterial, those items may not have been

 4    disclosed by the team to the auditors.

 5        Q.    I appreciate that.

 6              Do you have an understanding as to

 7    what the level of materiality was?

 8        A.    I don't recall.

 9        Q.    As the CFO of Highland, to the best

10    of your knowledge, did Highland disclose to its

11    outside auditors every loan that was forgiven,

12    in whole or in part, that was material as that

13    term was defined by the outside auditors?

14        A.    Yes.

15        Q.    And do you recall where -- do you

16    recall where the definition of materiality can

17    be found for -- for this particular purpose?

18              MS. DANDENEAU:  Objection to form.

19        A.    No.  You -- I don't determine

20    materiality.

21        Q.    Okay.  I'm just asking you if you

22    can help me understand where it is, but I think

23    we will find it in a few minutes.

24              You are aware that Highland has

25    commenced lawsuits against each of the
```

Case 23-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:31:54 Page 5 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 10/09/24 Page 221 of 282 PageID 46862

Page 54

                         WATERHOUSE - 10-19-21

 1

 2    affiliates, as we've defined the term, to

 3    collect under certain promissory notes; is that

 4    right?

 5         A.    Yes.

 6         Q.    And are you familiar with the notes

 7    that are issue -- at issue in the lawsuits?

 8               MS. DANDENEAU:  Objection to form.

 9         A.    Generally familiar.

10         Q.    Can we refer to the lawsuits that

11    Highland has commenced against the affiliates

12    collectively as the lawsuits?

13         A.    Yes.  And, again, the affiliates are

14    NexPoint, HCMFA, HCMS, and HCRE.

15         Q.    And Mr. Dondero?

16         A.    Okay.  See, that is a new -- and now

17    Mr. Dondero is included in your affiliate

18    definition.

19         Q.    I just --

20         A.    I thought affiliates -- I thought

21    affiliates were just the four prior entities,

22    so I just want to be clear.

23         Q.    I appreciate that.  So let's --

24    let's keep them separate and let's refer to the

25    four corporate entities as the affiliates, and

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 21:31:57 Page 5 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 01/09/24 Page 222 of 282 PageID 46863
Page 55

```
 1                 WATERHOUSE - 10-19-21

 2   Mr. Dondero we will call Mr. Dondero.  Okay?

 3        A.    Okay.  Thank you.  As you can see,

 4   Mr. Morris, there is a lot of entities -- a lot

 5   here.  I just want to be clear.

 6        Q.    Okay.  Now, the affiliates of

 7   Mr. Dondero signed promissory notes that are

 8   not subject to the lawsuit.

 9              Do you understand that?

10              MS. DANDENEAU:  Objection to form.

11        A.    The affiliates and Mr. Dondero

12   signed --

13        Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15              From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20              MR. RUKAVINA:  Objection to the

21         extent that calls for a legal conclusion.

22        A.    Yes.

23        Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that
```

```
 1                   WATERHOUSE - 10-19-21
 2     were given by the affiliates and Mr. Dondero?
 3          A.    Yes.
 4          Q.    Can you describe the process for me?
 5          A.    The process, payment should be
 6     applied as laid out in the -- in the promissory
 7     note.
 8          Q.    From time to time were payments made
 9     that were not required under the promissory
10     notes?
11                MS. DANDENEAU:  Objection to form.
12          A.    Yes.
13          Q.    Who was responsible for deciding
14     when and how much the payments would be made
15     with respect to each of the notes that were
16     issued by the affiliates and Mr. Dondero?
17          A.    Who was responsible for deciding how
18     much was paid prior to the due date?
19          Q.    Yes.
20          A.    I don't know.
21          Q.    Did you approve of each payment that
22     was made against principal and interest on the
23     notes that were given by the affiliates and
24     Mr. Dondero?
25                MS. DANDENEAU:  Objection to form.
```

1                    WATERHOUSE - 10-19-21

2          A.     Did I approve the payments?  I

3   approve -- I approve -- if there was cash -- if

4   there was cash being repaid on a note payment,

5   yes, I approved in the general sense of being

6   made aware of the payment and the amount.

7          Q.     And are you the person who

8   authorized Highland's employees to effectuate

9   those payments?

10         A.     Yes.

11         Q.     When you gave the instruction to

12  effectuate the payment, did you obtain

13  Mr. Dondero's prior approval?

14         A.     I mean, it -- I mean, it -- it

15  depends.

16         Q.     Can you think of any instance where

17  you directed Highland's employees to make a

18  payment of principal or interest against any

19  note that was tendered by an affiliate or

20  Mr. Dondero that Mr. Dondero did not approve of

21  in advance?

22         A.     I can't recall specifically.

23         Q.     Can you identify -- withdrawn.

24                Did Mr. Dondero ever tell you that a

25  payment that was made against principal and

1                  WATERHOUSE - 10-19-21

2     interest due under one of the notes that was

3     tendered by an affiliate or himself should not

4     have been made?

5          A.    Yes.

6          Q.    Can you identify the payment for me?

7          A.    It would be for -- for NexPoint

8     Advisors.

9          Q.    Okay.  And when did Mr. Dondero tell

10    you that a payment that you had initiated on

11    behalf of NexPoint should not have been made?

12         A.    I wasn't initiating payment.  It was

13    in the context of the -- I think you used this

14    term, "the advisors," so NexPoint Advisors and

15    Highland Capital Management Fund Advisors had

16    overpaid on certain agreements with Highland

17    Capital Management, L.P.  And as a part of that

18    process, the advisors -- what I was told at the

19    time were in talks and negotiations and

20    discussions with Highland Capital Management,

21    L.P., on offsets in relation to those

22    overpayments.

23         Q.    When did this conversation take

24    place?

25              MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:31:57 Page 59 of 397
Case 3:21-cv-00881-X   Document 179-29   Filed 01/09/24   Page 226 of 282   PageID 46867

Page 59

                      WATERHOUSE - 10-19-21

1

2        A.    I don't recall specifically.

3        Q.    Do you recall what year it was?

4        A.    Yes.

5        Q.    What year did the conversation with

6   Mr. Dondero take place that you just described?

7        A.    2020.

8        Q.    Okay.  Do you remember if it was

9   December 2020?

10        A.    It -- it -- I don't -- I don't

11   recall what month specifically, but it would

12   have been November or December.

13        Q.    And we're talking here about a

14   payment of principal and/or interest that was

15   due -- withdrawn.

16              We're talking here about a payment

17   of principal and interest that was applied

18   against NexPoint's note; correct?

19              MS. DANDENEAU:  Objection to form.

20        A.    I don't recall what that payment

21   consisted of.

22        Q.    Is it possible that the payment you

23   have in mind related to the shared services

24   agreement?

25              MS. DANDENEAU:  Objection to form.

Page 60

1                    WATERHOUSE - 10-19-21

2        A.    No.

3        Q.    Are you certain that the payment --

4   that the payment that you have in mind related

5   to the promissory note that NexPoint issued in

6   favor of Highland?

7             MS. DANDENEAU:  Objection to form.

8        A.    Yes.

9        Q.    Okay.  Other than that one payment,

10  can you identify any other instance where

11  Mr. Dondero told you that a payment should not

12  have been applied against principal and

13  interest under any promissory note tendered by

14  any affiliate or Mr. Dondero?

15            MS. DANDENEAU:  Objection to form.

16            MS. DEITSCH-PEREZ:  Objection to

17       form.

18       A.    Not that I recall.

19       Q.    Thank you very much.

20            Do you know if Mr. Dondero approved

21  in advance of each loan made to each affiliate

22  and himself during the time that you were the

23  CFO?

24            MS. DEITSCH-PEREZ:  Object to the

25       form.

```
 1                  WATERHOUSE - 10-19-21

 2       A.    Yes, generally.

 3       Q.    Can you identify any loan that was

 4  ever made to an affiliate or to Mr. Dondero

 5  that Mr. Dondero did not approve of in advance?

 6       A.    Other than the ones that are in

 7  dispute, I'm not aware.

 8       Q.    Do you believe that Mr. Dondero did

 9  not approve of each of the loans that are in

10  dispute in advance of the time that the loan

11  was made?

12            MS. DANDENEAU:  Objection to form.

13       A.    Given what is in the dispute, you

14  know, and -- and -- and the way things might --

15  yeah, I mean...

16       Q.    I am not asking about the dispute,

17  and it was probably my mistake to follow you

18  there.

19            Were you aware of every loan made by

20  Highland to each of its affiliates and

21  Mr. Dondero while you were the CFO at the time

22  each loan was made?

23       A.    Was I aware of every loan, yes.

24       Q.    Okay.  And if you put yourself back

25  in time, do you recall that any of the loans
```

```
 1                WATERHOUSE - 10-19-21

 2   that were made to one of the affiliates or

 3   Mr. Dondero during the time that you were the

 4   CFO was made without Mr. Dondero's prior

 5   knowledge and approval?

 6        A.    Not that I recall.

 7        Q.    Thank you.  In fact, do you -- as

 8   the CFO, would you have allowed Highland to

 9   loan money to an affiliate or to Mr. Dondero

10   without obtaining Mr. Dondero's prior approval?

11             MS. DANDENEAU:  Objection to form.

12        A.    I can't -- there was so many times

13   over the years, I can't speak for every single

14   one, but generally, yes, I -- I spoke to him.

15        Q.    You -- you never -- you never --

16   withdrawn.  I will just take that.

17             Can you recall any payment that was

18   ever made against principal and interest on a

19   note that was issued in favor of Highland by an

20   affiliate or Mr. Dondero that you personally

21   did not know about in advance?

22        A.    There are so many through the years,

23   I don't -- I don't -- I don't recall every

24   single one.

25        Q.    Okay.  Can you identify any payment
```

Case 23-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:31:57 Page 63 of 397
Case 3:21-cv-00881-X Document 178-29 Filed 01/09/24 Page 230 of 282 PageID 46871
Page 63

WATERHOUSE - 10-19-21

1

2    that was made against principal and interest on

3    any note tendered by any affiliate or

4    Mr. Dondero that you didn't know about in

5    advance?

6         A.    I don't recall.

7         Q.    Other than Mr. Dondero -- withdrawn.

8              Did anybody at Highland have the

9    authority to make a payment against principal

10   and interest due under a loan given to the

11   affiliates and Mr. Dondero without your

12   knowledge and approval?

13             MS. DANDENEAU:  Objection to form.

14        A.    Sorry, there was -- to make a

15   payment on an affiliate loan, what you are

16   saying would it require my knowledge and

17   approval, yes.

18        Q.    Okay.  I appreciate that.  Thank

19   you.

20             Did anybody at Highland have the

21   authority, to the best of your knowledge, to

22   effectuate a loan to an affiliate without

23   Mr. Dondero's prior knowledge and approval?

24             MS. DANDENEAU:  Objection to form.

25        A.    I can't speak for all, but

```
 1                    WATERHOUSE - 10-19-21
 2   generally, yes.
 3        Q.    Did you personally communicate with
 4   Mr. Dondero to let him know each time a payment
 5   of principal or interest was being made against
 6   any note that was tendered by an affiliate or
 7   Mr. Dondero to Highland?
 8        A.    I don't -- are you saying, did I let
 9   Mr. Dondero know if a payment was made on any
10   affiliate or loan to Mr. Dondero?  I mean,
11   not -- not every -- no.
12        Q.    Let me ask it this way:  Did you
13   have a practice of informing Mr. Dondero when
14   payments were made against principal and
15   interest on any note that was tendered by an
16   affiliate or Mr. Dondero?
17             MS. DEITSCH-PEREZ:  Objection to
18        form.
19             MS. DANDENEAU:  Objection to form.
20        A.    No, I did not.
21        Q.    Did Mr. Dondero ever tell you that a
22   payment of principal or interest had been made
23   against a note that was tendered by an
24   affiliate or himself that he had been unaware
25   of?
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5              Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12              MS. DANDENEAU:  Objection to form.

13        A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15        Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    Yes.

22        Q.    Do you have any understanding as to

23   the terms of that agreement?

24        A.    Yes.

25        Q.    What is your understanding of the
```

Case 3:21-cv-00881-X  Document 174-4  Filed 10/29/21  Entered 10/29/21 21:31:54  Page 60 of 397
Case 3:21-cv-00881-X  Document 179  Exhibit 29  Page 01/59/24446  Page 233 of 282  PageID 46874

Page 66

                        WATERHOUSE - 10-19-21

1

2    terms of the agreement?

3        A.    That there were certain milestones

4    that had to be reached.

5        Q.    Do you have any understanding of the

6    terms of the agreement between Mr. Dondero and

7    Nancy Dondero concerning any of the notes

8    issued by the affiliates or Mr. Dondero other

9    than that there have to be milestones reached?

10            MS. DEITSCH-PEREZ:  Object to the

11       form.

12       A.    There are milestones, I found out

13   yesterday, or there was some --

14            MS. DANDENEAU:  Okay.  I'm just

15       going to object to the extent that you

16       learned anything in conversations with

17       counsel, please don't reveal -- that is

18       privileged, and don't reveal any privileged

19       communications.

20            THE WITNESS:  Okay.

21       A.    So I'm not aware of anything else.

22       Q.    Do you know what the milestones

23   were?

24            MS. DANDENEAU:  Objection to form.

25       A.    I don't.

Case 3:21-cv-00881-X   Document 864   Filed 10/29/21   Entered 10/29/21 23:15   Page 6 of 397
Case 3:21-cv-00881-X   Document 179   Page 01/09/24  Page 234 of 282   PageID 46875

Page 67

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Do you know anything about -- do you

 3    know what promissory notes the agreement

 4    covered?

 5         A.    I don't.

 6         Q.    Do you know if -- if Jim and Nancy

 7    Dondero entered into one agreement or more than

 8    one agreement?

 9              MS. DEITSCH-PEREZ:  Object to the

10         form.

11         A.    I don't know.

12         Q.    Do you know if the agreement is in

13    writing?

14         A.    I don't know.

15         Q.    How did you learn of the existence

16    of the agreement?

17              MS. DANDENEAU:  Objection to form.

18         Again --

19         A.    I don't -- I don't recall who told

20    me.

21         Q.    You have no recollection of who told

22    you about this agreement between Jim and Nancy

23    Dondero?

24              MS. DEITSCH-PEREZ:  Object to the

25         form.
```

Case 3:00-cv-00066-Dpic 38-4 Filed 10/29/21 Entered 10/29/21 22:13:54 Page 68 of 397
Case 3:21-cv-00881-X Document 1829 Filed 11/09/24 Page 235 of 282 PageID 46876

Page 68

```
1              WATERHOUSE - 10-19-21

2      A.    I don't recall.

3      Q.    Do you recall how you learned of the

4  agreement?

5            Was it in a meeting?  Was it in a

6  phone call?  Was it in an email?

7      A.    I don't recall.

8      Q.    Do you recall when you learned of

9  the agreement?

10     A.    Not specifically.

11     Q.    Do you recall what year you learned

12 of the agreement?

13     A.    In -- look, I mean, there are so

14 many notes.  I may be getting -- I believe it

15 was 2020.

16     Q.    All right.  I'm not asking about

17 notes, sir.  I'm asking about the agreement

18 that you testified you knew about between Jim

19 and Don- -- Nancy Dondero.  Okay.

20           Do you understand my question now?

21 Should I ask my question again?

22     A.    Yeah, sure.  Go ahead.

23     Q.    I'm going to use the word

24 "agreement" to refer to the agreement that

25 Mr. Dondero and Nancy Dondero entered into
```

```
 1                    WATERHOUSE - 10-19-21
 2     where you understood that certain milestones
 3     had to be reached.  Okay?
 4          A.    Uh-huh.
 5               MS. DANDENEAU:  Objection.
 6               MS. DEITSCH-PEREZ:  Object to the
 7          form.
 8               MR. MORRIS:  Just defining a term,
 9          what is the objection.
10               MS. DEITSCH-PEREZ:  The objection --
11               MR. MORRIS:  I will move on.  I will
12          move on.
13               MS. DEITSCH-PEREZ:  John --
14          Q.    Sir, are you okay with that
15     definition of agreement?
16          A.    Okay.
17          Q.    Okay.  So you don't recall who --
18     who informed you of the existence of the
19     agreement; is that right?
20          A.    I don't recall.
21          Q.    You don't recall who told you the
22     terms of the agreement.
23               Do I have that right?
24          A.    Correct.
25          Q.    And you don't recall if you learned
```

Case 23-03006-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:31:57 Page 7 of 397
Case 3:21-cv-00881-X   Document 178-29   Page 01/99/2446 Page 237 of 282   PageID 46878

Page 70

                    WATERHOUSE - 10-19-21

1

2    about the agreement in a meeting, through an

3    email, or through a phone call.

4              Do I have that right?

5       A.    I don't recall.

6       Q.    Can you tell me when you learned of

7    the agreement?

8       A.    I don't -- I don't -- I don't

9    remember specifically.

10      Q.    Can you tell me if you learned of

11   the agreement before or after the petition

12   date?

13      A.    It would have been -- it would have

14   been after.

15      Q.    Can you tell me if you learned of

16   the agreement before or after January 9th,

17   2020?

18      A.    It would have been after.

19      Q.    Can you tell me if you learned of

20   the agreement before or after you left Highland

21   Capital Management in February of 2021?

22      A.    I don't -- I don't -- I don't know.

23      Q.    It is possible that you learned of

24   it while you were a Highland employee.

25              Do I have that right?

Case 3:23-cv-00506-S Doc 86-4 Filed 10/29/21 Entered 10/29/21 12:21:31 Page 7 of 397
Case 3:21-cv-00881-X Document 171-29 Page 1209/2446 Page 238 of 282 PageID 46879
Page 71

1                    WATERHOUSE - 10-19-21

2          A.    I don't remember the -- I mean, it

3    was sometime in 2021.  I don't remember when.

4          Q.    All right.  So to the best of your

5    recollection, it was in 2021 but you don't

6    recall if it was before or after you ceased to

7    be a Highland employee.

8                Do I have that right?

9          A.    Yeah, I mean, it was -- it was

10   likely after I was -- after I left Highland

11   because, if I put myself back into the last

12   days of -- of 2021, it was -- you know, the

13   communications with Mr. Dondero were -- were --

14   were -- there weren't as many communications

15   because of the circumstances.

16         Q.    And so based on that you believe

17   that it is most likely that you learned of this

18   agreement sometime after you left Highland

19   employment?

20         A.    I wouldn't use the term "most

21   likely."  I don't recall specifically.  I don't

22   recall.

23         Q.    Do you recall ever telling Jim Seery

24   about this agreement?

25         A.    No, I don't -- I didn't tell

Case 3:21-cv-00881-X  Document 179  Filed 01/09/24  Entered 01/09/24 21:31:57  Page 72 of 397
Case 3:21-cv-00881-X  Document 179  Exhibit 29  Page 01209/2446  Page 239 of 282  PageID 46880

Page 72

```
 1              WATERHOUSE - 10-19-21

 2    Jim Seery.

 3         Q.    Did you tell anybody at DSI about

 4    this agreement?

 5         A.    No.

 6         Q.    Did you tell any of Highland's

 7    independent directors about this agreement?

 8         A.    No.

 9         Q.    Did you tell anybody at Pachulski

10    Stang Ziehl & Jones about this agreement?

11         A.    No.

12         Q.    Did you tell any employee of

13    Highland about this agreement?

14         A.    No.

15              MS. DANDENEAU:  Mr. Morris, it has

16         been an hour and a half.  Is this a good

17         time for a break?

18              MR. MORRIS:  Sure.

19         Q.    Mr. Waterhouse, I will just remind

20    you that during the break please don't speak

21    with anybody about the deposition, the

22    substance of your testimony or anything else

23    concerning the deposition.  Okay?

24         A.    Yes.

25              MR. MORRIS:  So it is 11:02.  We're
```

1                    WATERHOUSE - 10-19-21

2          at 11:02 your time.  Let's come back, I

3          guess, at 15 -- at 11:15 your time.

4                    VIDEOGRAPHER:  We're going off the

5          record at 11:02 a.m.

6          (Recess taken 11:02 a.m. to 11:20 a.m.)

7                    VIDEOGRAPHER:  We are back on the

8          record at 11:20 a.m.

9          Q.    Mr. Waterhouse, did you speak with

10    anybody during the break about this deposition?

11         A.    No.

12                   MS. DANDENEAU:  Other than -- other

13         than his counsel.

14         Q.    Did you speak to your counsel about

15    the substance of your deposition today?

16         A.    No, I didn't bring it up.

17         Q.    I didn't ask you if you brought it

18    up.  I asked you if you had any conversation

19    with your lawyer about the substance of your

20    deposition.

21                   MS. DANDENEAU:  Yes, he did.

22         Q.    Can you tell me what the -- you

23    discussed?

24                   MS. DANDENEAU:  No, I object to

25         that.  He's not going to answer.  That is a

```
 1              WATERHOUSE - 10-19-21

 2     privileged conversation.

 3              MR. MORRIS:  So I just want to make

 4     sure that I understand.  During the break

 5     you spoke with your client about the

 6     substance of this deposition; is that

 7     right?

 8              MS. DANDENEAU:  Yes, John.

 9              MR. MORRIS:  And you refuse -- you

10     refuse to let your client tell me what was

11     discussed; is that right?

12              MS. DANDENEAU:  That's correct.

13              MR. MORRIS:  You know, I had given

14     the instruction prior to the break not to

15     speak with counsel.  I would have

16     appreciated --

17              MS. DANDENEAU:  No, you didn't --

18     actually, that is not true, Mr. Morris.

19     You said not to speak with anyone.  We

20     never have interpreted that to mean

21     conversations with counsel.  That's never

22     been -- I have never, ever heard that

23     instruction.

24              MR. MORRIS:  Okay.  We will -- we

25     will -- we will deal with it when and if we
```

Case 3:21-cv-00881-X Document 179-4 Filed 01/29/24 Entered 01/29/24 21:31:54 Desc
Case 3:21-cv-00881-X Document 179-29 Page 01209/2446 Page 242 of 282 PageID 46883

Page 75

```
1                 WATERHOUSE - 10-19-21
2          have to.
3          Q.    Mr. Waterhouse, after learning about
4    the agreement, did you ask anybody if the
5    agreement was reflected in a writing?
6               MS. DANDENEAU:  Objection to form.
7          A.    No.
8          Q.    Did you ask anybody if the terms of
9    the agreement were memorialized anywhere?
10              MS. DANDENEAU:  Objection to form.
11              MR. MORRIS:  What is the --
12         A.    No.
13              MS. DANDENEAU:  Well, because you
14         keep talking about this agreement and I --
15         I -- I think, Mr. Morris, that is really
16         not clear what you mean by "the agreement."
17         And maybe you can just go back and restate
18         what that is.
19              MR. MORRIS:  Okay.  Your client has
20         agreed with me twice on the definition, but
21         I will try one more time.
22         Q.    Mr. Waterhouse, do you understand
23    that when I use the term "agreement," I'm
24    referring to the agreement between Jim and
25    Nancy Dondero concerning certain promissory
```

1                    WATERHOUSE - 10-19-21

2      notes where you learned that one of the terms

3      of the agreement was milestones reached?

4           A.    Okay.

5           Q.    And did you understand that that was

6      the -- the agreement that we were referring to

7      every time we used the word "agreement" in this

8      deposition?

9           A.    I don't know anything about this

10     agreement.  So, look, I do -- it -- I don't

11     know whether --

12          Q.    Let's -- let's try this again.

13          A.    Yeah.  Look, I don't know what this

14     agreement relates.

15               MS. DEITSCH-PEREZ:  John, John --

16          Q.    Let me try --

17               MS. DEITSCH-PEREZ:  John, please let

18          the witness finish.

19               MR. MORRIS:  Please stop.  Please

20          stop.  Please stop talking.

21               MS. DEITSCH-PEREZ:  No, you stop.

22          Let the witness --

23               MR. MORRIS:  Stop talking.

24               MS. DEITSCH-PEREZ:  -- finish -- you

25          interrupted him.

```
 1                WATERHOUSE - 10-19-21

 2           MR. MORRIS:  You know what, you

 3      guys, this is really wrong.  It is really,

 4      really wrong.  Okay?

 5           I had the witness agree not once,

 6      but twice to the definition of agreement.

 7      Okay?  I'm going to try and do it a third

 8      time.

 9           MS. DANDENEAU:  No, but, please,

10      John, really --

11           MR. MORRIS:  No, please stop

12      talking.  Please.  It is my deposition.

13      Object to questions.

14           MS. DANDENEAU:  No, but also you

15      instructed him that -- that if you were

16      going -- if you were interrupting him, that

17      he should remind you that you're

18      interrupting him and -- and --

19           MR. MORRIS:  Let him do that.  Let

20      him do that.

21           MS. DANDENEAU:  Okay.  Well, you --

22           MR. MORRIS:  Please stop talking.

23      A.   Okay.  I don't know any of the

24  details of these agreements.  I don't know

25  anything about them.  I heard -- someone -- I
```

```
 1                    WATERHOUSE - 10-19-21

 2   don't know who, I don't know when, as you

 3   asked, sometime in '21, someone told me about

 4   this -- or I don't honestly know -- I don't

 5   even recall exactly how I was made aware of

 6   this, but I was.  I don't know -- I don't know

 7   any of these details, and I'm getting -- again,

 8   there is, you know, I -- I -- I had a passing

 9   conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on
```

Case 3:19-cv-02074-... Document 366-4 Filed 10/29/21 Entered 10/29/21 22:13:15 Page 79 of 397
Case 3:21-cv-00881-X  Document 179-29  Page 01-29/246 Page 246 of 282  PageID 46887
Page 79

WATERHOUSE - 10-19-21

1   milestones that had to be reached; is that

3   right?

4            MS. DANDENEAU:  Objection to form.

5        A.    That was one of the words that was

6   used when I heard about it, yes.

7        Q.    And when you heard about this

8   agreement that had a term in it concerning

9   milestones reached, did you ask the person who

10  was telling you about the agreement whether or

11  not it was in writing?

12       A.    I did not.

13       Q.    Did you ask any questions at all?

14            MS. DANDENEAU:  Objection to form.

15       A.    Not that I recall.

16       Q.    But do you understand that going

17  forward, we're going to refer to the agreement

18  as the agreement that you just described that

19  you were --

20            MS. DANDENEAU:  Object to the form.

21       A.    Yes.

22       Q.    Okay.  You don't have any personal

23  knowledge concerning the terms of the

24  agreement; correct?

25            MS. DEITSCH-PEREZ:  Object to the

```
1                WATERHOUSE - 10-19-21

2         form.

3         Q.     You can answer.

4         A.     I don't -- I heard about the

5     agreement.  I don't know anything -- I heard

6     there was an agreement.  That is -- again, as I

7     testified before -- I said before, heard about

8     it, don't know the details.  I believe it was

9     sometime this year.

10        Q.     Do you have any personal knowledge

11    about the terms of the agreement, sir?

12               MS. DANDENEAU:  Objection to form.

13        A.     Other than what I have previously

14    discussed, I don't -- I don't know.

15        Q.     Did -- did Mr. Dondero tell you

16    about the existence of the agreement?

17        A.     I don't recall.

18        Q.     Do you recall the source of your

19    information when you learned about the

20    agreement?

21        A.     No, I don't -- I don't recall.  I

22    don't remember.  I just -- I heard about it

23    generally.  I don't remember -- I don't

24    remember who, how, if, how.  I don't remember.

25        Q.     You know, Mr. Waterhouse, I just
```

Case 3:21-cv-00881-X   Document 864   Filed 10/29/21   Entered 10/29/21 23:15   Page 8 Desc
Case 3:21-cv-00881-X   Document 178-29   Page 1309/2446 Page 248 of 282   PageID 46889

Page 81

```
 1                WATERHOUSE - 10-19-21

 2    want to be clear that I never would have asked

 3    you to appear at this deposition if your name

 4    hadn't been included in responses to discovery

 5    as to somebody with knowledge about the -- who

 6    was told about the existence of the agreement.

 7              That is what prompted me do this,

 8    and I really do feel compelled to tell you that

 9    I otherwise would never have called you as a

10    witness.  So I regret that you're being put

11    through this today.  I had no intention of

12    burdening you or taking your time, but that is

13    the reason that we issued the subpoena is

14    because certain of the defendants identified

15    you as somebody --

16              MS. DEITSCH-PEREZ:  Mr. Morris, you

17         are here to ask questions, not to have --

18              MR. MORRIS:  I feel badly for the

19         guy.  I really do.

20              MS. DEITSCH-PEREZ:  I'm sure you do.

21              MR. MORRIS:  I do.  Stop.

22              MS. DEITSCH-PEREZ:  You stop.

23              MR. MORRIS:  I'm allowed.

24              MS. DEITSCH-PEREZ:  No, you're not

25         allowed to have a chat with the witness.
```

```
1                    WATERHOUSE - 10-19-21
2        Q.    Okay.  Well, I hope that you
3    appreciate what I'm saying here,
4    Mr. Waterhouse.
5              MS. DANDENEAU:  All right.  Let's go
6         ahead and ask questions, and again, you're
7         entitled to probe his -- his knowledge
8         of -- whatever knowledge he has about
9         this -- this agreement and --
10             MR. MORRIS:  That is what I'm doing.
11             MS. DANDENEAU:  -- he will answer
12        the questions to the best that he can.
13             MR. MORRIS:  That is what I'm doing.
14       Q.    Mr. Waterhouse, I take it you do not
15   know which promissory notes issued by which
16   affiliates or Mr. Dondero are the subject of
17   this agreement; do I have that right?
18       A.    Yes, I don't -- I don't know.
19       Q.    Do you know of any way to determine
20   which promissory notes issued by the affiliates
21   and Mr. Dondero are the subject of this
22   agreement other than asking Jim or Nancy
23   Dondero?
24             MS. DANDENEAU:  Objection to form.
25       A.    I don't know.
```

Page 83

WATERHOUSE - 10-19-21

1

2   Q.   Did you ever make --

3   A.   I don't know anything about these

4   agreements.

5   Q.   Did you ever make any effort to

6   determine which promissory notes are subject to

7   this agreement?

8   A.   No.

9   Q.   Did you ever ask anybody which

10  promissory notes are subject to this agreement?

11  A.   No.

12  Q.   Do you know if there is a list

13  anywhere of the promissory notes that are

14  subject to this agreement?

15  A.   I'm not aware.

16  Q.   Have you ever seen the terms of the

17  agreement written down anywhere?

18  A.   No.

19  Q.   Have you ever asked anybody whether

20  the terms of the agreement were written down

21  anywhere?

22  A.   I have not.

23  Q.   Did learning about the agreement

24  cause you to do anything in response?

25          MS. DANDENEAU:  Objection to form.

Case 23-03006-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 22:13:54 Page 82 of 397
Case 3:21-cv-00881-X  Document 179-29  Page 139/2446 Page 251 of 282  PageID 46892
Page 84

                       WATERHOUSE - 10-19-21

 1

 2        A.    No.

 3        Q.    Did anybody ever describe to you the

 4   nature of the milestones that you referred to

 5   earlier?

 6        A.    No, I don't -- I don't have any

 7   details of this.

 8        Q.    That is fine.

 9              PricewaterhouseCoopers served as

10   Highland's outside auditors prior to the

11   petition date; correct?

12        A.    Yes.

13        Q.    You refer to PricewaterhouseCoopers

14   as PwC?

15        A.    Yes.

16        Q.    PricewaterhouseCoopers audited

17   Highland's financial statements on an annual

18   basis; correct?

19        A.    During my -- during my time as -- as

20   CFO, yes, PricewaterhouseCoopers was the

21   auditor.

22        Q.    Do you know why Highland had its

23   annual financial statements audited each year?

24        A.    Generally.

25        Q.    Tell me your general understanding

Case 23-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 21:31:59 Page 8 of 397
Case 3:21-cv-00881-X Document 179 Page 030/2446 Page 252 of 282 PageID 46893

Page 85

```
 1              WATERHOUSE - 10-19-21
 2    as to the reason why Highland had its annual
 3    financial statements audited each year.
 4         A.    From -- from time to time, they were
 5    used -- or asked for, as part of diligence or
 6    transactions or -- or things of that nature.
 7         Q.    And were they given to third parties
 8    for purposes of diligence or transactions from
 9    time to time?
10         A.    As far as I'm aware, yes.
11         Q.    And was it your understanding as the
12    CFO that the third parties who received the
13    financial statements in diligence or
14    transactions was going to rely on those?
15              MS. DANDENEAU:  Objection to form.
16         A.    I don't know -- I don't know gen --
17    I don't know specifically what they were going
18    to rely on.  You know, we would get requests
19    for audited financial statements.  I don't know
20    what they were relying on.
21         Q.    And --
22         A.    You would have to ask them.
23         Q.    Did you personally play a role in
24    PwC's annual audit and the conduct of the
25    audit?
```

Case 3:23-cv-03005-G-i-Spit 86-4 Filed 10/29/21 Page 11/29/21 Entered 10/29/21 01:29:21 31:54 Page 86 Desc 397
Case 3:21-cv-00881-X   Document 178-29   Filed 03/09/24   Page 253 of 282   PageID 46894

Page 86

WATERHOUSE - 10-19-21

1

2          MS. DANDENEAU:  Objection to form.

3     A.    During my tenure as CFO, I played a

4  very minimal role.

5     Q.    What was the minimal role that you

6  played?

7     A.    You know, again, it was -- it was to

8  check in with the team, to make sure that, you

9  know, audit -- the deadlines were being hit,

10 information was being presented to the auditors

11 in a -- in a timely fashion, but, you know,

12 other than that, it was a very capable team

13 that are still current employees of Highland

14 and, you know, they -- they conducted 99

15 percent of -- look, I don't want to give

16 percentages.  I mean, this is -- but I -- I --

17 I played a minimal role towards the end.

18          Before during my earlier years as

19 CFO, I did more, and then as time went on, I

20 did less in it.

21    Q.    Okay.  Was there a person at

22 Highland who was responsible for overseeing

23 Highland's participation in PwC's audit during

24 the time that you were the CFO?

25    A.    Yeah.  I mean, there was -- there

Case 3:21-cv-00881-X  Document 439  Filed 10/29/24  Entered 10/29/24 22:13:54  Page 8  of 397
Case 3:21-cv-00881-X  Document 179  Page 1369/2446 Page 254 of 282  PageID 46895

Page 87

WATERHOUSE - 10-19-21

1    was a -- there was a point -- it varies.  It

2    varies by year, in function, in time and, you

3    know, depending on the request, but yes, I

4    mean, there is -- there is -- there is

5    generally a point person of communication.

6         Q.    And who was the point person from

7    2016 until the time you left Highland?

8         A.    I don't -- I don't know

9    specifically, but it would have been, you

10   know -- you know, someone on the corporate

11   accounting team.

12        Q.    And was there a head of the

13   corporate accounting team?

14        A.    Yes, so -- yes.

15        Q.    Who was the head of corporate

16   accounting for the five years prior to the time

17   you left Highland?

18        A.    I don't -- if you're asking from

19   2016 on, I don't -- it was Dave Klos, but,

20   again, there was -- there was changes to the

21   team and the reporting structure.  I don't

22   remember exactly when that happened during --

23   you know, over the last -- since 2016.

24        Q.    Did the folks who participated and

25

Case 3:21-cv-00881-X   Document 179   Filed 10/29/21   Entered 10/29/21 13:15   Page 8 of 397
Case 3:21-cv-00881-X   Document 178-29   Page 1709/2446   Page 255 of 282   PageID 46896

Page 88

                    WATERHOUSE - 10-19-21

1   ran the audit all report to you, directly or

2   indirectly?

3        A.    Yes.

4        Q.    And did you have any responsibility

5   for making sure that the audit report was

6   accurate before it was finalized?

7        A.    Yeah.  I mean, you know, that --

8   that is -- my responsibility to the auditors

9   was -- again, is -- and the CFO is to -- we are

10  providing accurate financial statements; right?

11            And -- and -- and as part of any

12  audit, we disclose all relevant information as

13  part of any audit.

14       Q.    Okay.  And as the CFO, did you take

15  steps to make sure that the audit report was

16  accurate?

17       A.    I mean, I would say in a general

18  sense, yes.  But, again, I mean, I had a

19  very -- I had a very capable and competent

20  team.  I wasn't managing them.

21            You know, part of what I do is I let

22  the team -- I want managers to grow.  I want

23  managers to have rope.  And that is -- you

24  know, I'm not a stand-behind-you type of guy.

Case 3:21-cv-00881-X  Document 604-4  Filed 10/29/21/24  Entered 10/29/21 22:31:52  Page 89 of 397
Case 3:21-cv-00881-X  Document 178-29  Page 139/2446  Page 256 of 282  PageID 46897

Page 89

                     WATERHOUSE - 10-19-21

1    If you -- if you talk to my team members, I'm

2    not micromanaging people.  I want people to

3    learn and grow in their function so they can go

4    on and do bigger and better things with their

5    careers.

6              And so, yes, generally I was

7    responsible for it, but I wanted the team to

8    learn and grow and be responsible for the bulk

9    of the audit.

10        Q.    Did you personally review each audit

11   report before it was finalized to satisfy

12   yourself that it was accurate?

13        A.    I don't -- I don't recall, you know,

14   for every single -- we're talking 2016, there

15   would have been three years, 2016 to '17, '18.

16   I don't -- we're -- we're going back

17   five years-plus.  I don't -- you know, I don't

18   recall.

19        Q.    Did you have a practice that you

20   employed to make sure that you were satisfied

21   that Highland's audit reports were true and

22   accurate to the best of your knowledge?

23        A.    I mean, our -- the practice was set

24   up with our -- the -- the practice to put

Page 90

1          WATERHOUSE - 10-19-21

2     together accurate audited or accurate financial

3     statements is to your control environment.

4              So, you know, the -- so the practice

5     was to maintain a stable control environment

6     which then the output is -- is accurate

7     financial statements.

8              So -- so, you know, if I was

9     comfortable that the control environment was

10    operating, then, you know, that would dictate

11    how I would -- you know, what I might or might

12    not do in a given year.

13    Q.    Okay.  Do you recall ever being

14    uncomfortable with the control environment

15    during the period that you served as CFO?

16    A.    Yeah.  I mean, look, yes, there are

17    times -- you know, nothing is perfect.  So

18    there were -- there were times when, yes, you

19    know -- there are times I learned I was

20    uncomfortable with the control environment, and

21    that is part of the management of the process

22    and having, you know -- and -- and working

23    through whatever obstacles present themselves.

24    Q.    Okay.  Were you ever uncomfortable

25    with the control process as it related to

1                    WATERHOUSE - 10-19-21

2   reporting and disclosures of loans to

3   affiliates and Mr. Dondero?

4            MS. DANDENEAU:  Objection to form.

5        A.    I don't -- I don't recall --

6        Q.    So you don't recall --

7        A.    -- the --

8            MS. DANDENEAU:  Mr. Morris --

9        A.    I don't recall being uncomfortable.

10  But, again, we're going back several years.  I

11  don't -- you know, the practice in an audit is

12  to disclose all information to the auditors.

13  And I don't -- I don't recall.

14       Q.    As part of the process of the audit,

15  did you sign what is sometimes referred to as a

16  management representation letter?

17       A.    Yes.

18            MR. MORRIS:  Can we put up on the

19       screen a document that we have premarked as

20       Exhibit 33.

21            (Exhibit 33 marked.)

22            MS. DANDENEAU:  Mr. Morris, that is

23       not in the binder; correct?

24            MR. MORRIS:  Correct.

25       Q.    So you will see, Mr. Waterhouse,

```
 1                    WATERHOUSE - 10-19-21

 2     this is a letter dated June 3rd.  And if we

 3     could go to the signature page.

 4              And do you see that you and

 5     Mr. Dondero signed this document?

 6         A.    Yes.

 7         Q.    That is your signature; right?

 8         A.    Yes.

 9              MR. MORRIS:  Okay.  Can you go back

10         to the top.

11              MS. DANDENEAU:  Mr. Morris, can you

12         have somebody post this in the chat so that

13         we have can have a copy of this, please.

14              MR. MORRIS:  Yeah, sure.  Asia, can

15         you do that, please.

16         Q.    Okay.  Do you see at the bottom of

17     the second paragraph there is a reference to

18     materiality?

19         A.    Yes.

20         Q.    Okay.  It says, Materiality used for

21     purposes of these representations is

22     $1.7 million.

23              Do you see that?

24         A.    I do.

25         Q.    And did PwC set that level of
```

1                WATERHOUSE - 10-19-21

2    materiality?

3         A.    Yes.

4         Q.    And for purposes of the audit, did

5    PwC set the level of materiality each year?

6         A.    Yes.

7         Q.    Did that number change over time?

8         A.    I'm not aware of what materiality is

9    every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20               If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of

```
 1                  WATERHOUSE - 10-19-21

 2    materiality that PwC established?

 3              MS. DANDENEAU:  Objection to form.

 4        A.     So, again, during my tenure as CFO,

 5    and -- Highland -- it was -- it is required to

 6    disclose any affiliate loans that are in excess

 7    of materiality.

 8              Now, the forgiveness of those loans

 9    may or may not -- I mean, since materiality

10    fluctuates every year, a -- you know, if a loan

11    was forgiven, it may or may not, you know --

12    and, look, I would want to consult the guidance

13    around this.

14              It is not something we do -- you

15    know, it is not -- you know, GAAP can be and

16    disclosures can be very specialized so, again,

17    we want to consult the guidance.  But we would

18    see if and what would need to be disclosed if

19    it were deemed immaterial.

20        Q.     Did you and Mr. Dondero sign

21    management representation letters of this type

22    in each year in which you served as Highland's

23    CFO?

24        A.     I -- I -- I will speak for myself.

25    I signed them.  There may have been others that
```

```
 1                  WATERHOUSE - 10-19-21

 2   signed as well.  I don't -- I don't recall.

 3        Q.    But to the best of your knowledge,

 4   you, personally, signed a management

 5   representation letter in connection with

 6   Highland's audit each year that you served as

 7   the CFO; correct?

 8        A.    I would say generally speaking,

 9   Mr. Morris.  I don't recall for every single

10   year, you know, generally, but I would want to

11   refer to all the rep letters and see who signed

12   them.

13        Q.    Do you recall Highland having its

14   financial statements audited in any year during

15   the period that you were a CFO where you didn't

16   sign the management representation letter?

17        A.    I don't recall.  But, John, we're

18   going back five, six, seven, eight, nine,

19   decade.  I don't -- I don't remember.

20        Q.    I don't want to go back that many

21   decades, but I'm just asking you if you recall

22   that there was you didn't sign it?

23        A.    I -- I -- I don't, but my memory

24   is -- again, I -- I -- I can't tell you what I

25   did in 2012.  I mean, I think generally, yes,
```

Case 3:21-cv-00881-X  Document 179-4  Filed 01/09/24  Entered 01/09/24 21:13:54  Page 9 of 397
Case 3:21-cv-00881-X  Document 179  Exhibit 29  Page 01/59/2446  Page 263 of 282  PageID 46904

Page 96

```
 1                    WATERHOUSE - 10-19-21

 2  but I don't -- I don't know for sure, and I

 3  would want to rely on the document.

 4       Q.    Let me ask the question a little bit

 5  differently then.

 6             Do you have any reason to believe

 7  that Highland had its annual financial audit

 8  and you did not sign a management

 9  representation letter in connection with that

10  audit?

11             MS. DANDENEAU:  Objection to form.

12       A.    I don't believe it would, but,

13  again, I would want to -- I don't recall and I

14  would want to confirm it to -- to make, you

15  know, an affirmative -- to give an affirmative

16  answer.

17       Q.    Do you know whether PwC required

18  management to sign management representation

19  letters?

20             MS. DANDENEAU:  Objection to form.

21       A.    Yes.  I mean, it -- management

22  representation letters are signed by

23  management.

24       Q.    Okay.  And do you know -- do you

25  have any understanding as to why PwC requires
```

1            WATERHOUSE - 10-19-21

2    management to sign management representation

3    letters?

4            MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    I don't know why PwC's -- what PwC's

7    specific practice is.  I know generally what

8    management representation letters are.

9        Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14       A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17       Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20       A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23       Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?

1                    WATERHOUSE - 10-19-21

2          A.    That is -- that is -- other than

3    what I said, it is -- it is -- it is required

4    so -- to ensure that the -- you know, there

5    is -- there is completeness in what is being

6    audited.

7          Q.    Did you -- did you have a practice

8    whereby you and Mr. Dondero conferred about the

9    management representation letters before you

10   signed them?

11         A.    No.

12         Q.    Did you have a practice --

13   withdrawn.

14               Do you see just the next sentence

15   after the materiality, there is a sentence that

16   states:  We confirm, to the best of our

17   knowledge and belief, as of June 3rd, 2019, the

18   date of your report, the following

19   representations made to you during your audit.

20               Do you see that sentence?

21         A.    Yes.

22         Q.    Okay.  Did you understand when you

23   signed this letter that you were confirming the

24   representations that followed?

25         A.    When I signed this management

```
 1                    WATERHOUSE - 10-19-21

 2   letter -- representation letter, yes.

 3        Q.    Okay.  Did you discuss this letter

 4   with Mr. Dondero before you signed it?

 5        A.    I don't recall.

 6        Q.    Do you recall if Mr. Dondero asked

 7   you any questions before he signed the letter?

 8        A.    I don't recall.

 9        Q.    Do you recall if you asked

10   Mr. Dondero any questions before you signed

11   this letter?

12        A.    I don't recall.

13        Q.    Is it fair to say that Mr. Dondero

14   did not disclose to you the existence of the

15   agreement that we have -- as we've defined that

16   term prior to the time you signed this letter?

17              MS. DANDENEAU:  Objection to form.

18        A.    I don't think I understand the

19   question.  So, again, you are saying, did

20   Mr. Dondero not disclose to me the existence of

21   this letter?

22        Q.    No, I apologize.

23              Did Mr. Dondero disclose to you the

24   existence of the agreement prior to the time

25   you signed this letter on June 3rd, 2019?
```

Case 3:00-cv-00806-Sjc 8D-cu-File1107210/210/29/12redEm0e20/210/29/123381:54a0e 100 est397
Case 3:21-cv-00881-X Documen6x1731t29 Page0149992446Page 267 of 282 PageID 46908

Page 100

WATERHOUSE - 10-19-21

1

2          A.     The agreement -- the agreement that

3     we talked about earlier?

4          Q.     Correct.

5          A.     Look, as I said earlier, the first

6     time I heard of this agreement was sometime

7     this year.

8          Q.     Okay.  Can we turn -- let's just

9     look at a couple of items on the list.  If we

10    can go to page 33416.  Do you see in Number 35

11    it talks about the proper recording or

12    disclosure in the financial statements of ND

13    relationships and transactions with related

14    parties.

15               Do you see that?

16         A.     I do.

17         Q.     As the CFO, do you have any

18    understanding as to whether Dugaboy is a

19    related party?

20         A.     I don't recall.

21         Q.     Do you know whether any of the

22    affiliates are related parties?

23         A.     If -- if it was NexPoint, HCMFA,

24    HCMS, HCRE, yeah, if -- if that is the

25    affiliate definition, and there.  In ASC 850 --

Case 3:21-cv-00881-X  Document 179  Filed 10/10/23  Entered 10/10/23 21:31:54  Page 1 of 1  Desc
Case 3:21-cv-00881-X  Document 179  Page 150 of 446  Page 268 of 282  PageID 46909

Page 101

```
 1                WATERHOUSE - 10-19-21

 2    again, I mean, I haven't looked at ASC 850 in

 3    quite some time, but, you know, if -- if there

 4    is a control language, you know, ASC 850, would

 5    that -- that section in GAAP would -- would

 6    pick up and define what are related parties.

 7               So, you know, like I said, if -- one

 8    of the four entities I just described, if -- if

 9    they are in that control definition of ASC 850,

10    they would be picked up in 35D.

11         Q.    Do you -- do you have any reason to

12    believe that they would be picked up in that

13    definition, based on your knowledge and

14    experience?

15         A.    I -- I believe that entities

16    controlled under GAAP are -- are affiliates.

17         Q.    Okay.  Would Mr. Dondero also

18    qualify as a related party for purposes of

19    Section 35D, to the best of your knowledge?

20         A.    Yeah, I don't -- I don't know.  I

21    would think -- I would have to read the code

22    section to see if someone personally -- is it

23    talking about related parties.  So, look, if

24    your own in control, yeah, I mean, I would have

25    to read the section.
```

Case 3:05-cv-00881-X Doc 81 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 1 of 397
Case 3:21-cv-00881-X Document 178-29 Page 159 of 446 Page 269 of 282 PageID 46910

Page 102

                    WATERHOUSE - 10-19-21

1

2        Q.    To the best of your knowledge, was

3   the existence of the agreement ever disclosed

4   to PwC?

5        A.    I'm not -- I'm not aware.

6        Q.    Do you recall if the agreement was

7   ever disclosed in Highland's audited financial

8   statements?

9        A.    I don't -- I don't remember if it

10   was in every Highland's audited financial

11   statements during my tenure.  We would have to

12   read the financial statements to see what was

13   disclosed, but I'm not -- I mean, as I sit here

14   today, I'm not aware.

15        Q.    That is all I'm asking for.

16        A.    I'm not aware.

17        Q.    Can we go to the next page, please,

18   and look at 36.  36 says, we have disclosed to

19   you the identity of the partnership's related

20   party relationships and all the related party

21   relationships and transactions of which we are

22   aware.

23              Do you see that?

24        A.    Yes.

25        Q.    To the best of your knowledge, as of

1          WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6          A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11         Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15         A.    Yes.

16         Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19         A.    Yes.

20         Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24         A.    It is -- it is -- it is just -- it

25   is a typical audit request.

Case 3:005006-Dgc 8 Doc File 10/20/21/29/21ared En20/210/2921381:5Page 10Dest 397
Case 3:21-cv-00881-X    Documen Exhibit 29    Page 15199/2446Page 271 of 282    PageID 46912

Page 104

WATERHOUSE - 10-19-21

1

2      Q.    And do you understand -- do you have

3  an understanding that PwC wanted to know that

4  as of the date of the audit whether any

5  material changes had occurred since the end of

6  the fiscal year, using the definition of

7  materiality that is in this particular

8  management representation letter?

9      A.    It -- it is -- it is -- it is a --

10  it is as described.  It is just a poorly worded

11  question, so it is hard for me to say yes.

12      Q.    If I asked you this, I apologize,

13  but did you ever learn when the agreement was

14  entered into?

15      A.    I don't -- I don't -- like I said

16  before, I don't know or have any details of the

17  agreement.

18      Q.    Okay.  Did you ever ask anybody when

19  the agreement was entered into?

20      A.    I did not.

21      Q.    Let's look at the audited financial

22  statements.  We will put up on the screen a

23  document that has been premarked as Exhibit 34.

24           (Exhibit 34 marked.)

25           MS. DANDENEAU:  And again, if Ms. La

Case 3:21-cv-00881-X   Document 179   Filed 10/20/21   Entered 10/20/21 21:31:54   Page 105 of 397
Case 3:21-cv-00881-X   Document 179   Exhibit 29   Page 15 of 2446   Page 272 of 282   PageID 46913

Page 105

                      WATERHOUSE - 10-19-21

1          Canty could please put that in the chat

2          room, that would be great.

3               MR. MORRIS:  I will assure you we

4          will put every document in the chat room.

5          Q.    Now, I'm just going to ask you

6    questions that are related to the provisions of

7    this report that concern the affiliate loans,

8    but again, Mr. Waterhouse, if there is any part

9    of the document that you need to see or that

10   you think you might need to see in order to

11   refresh your recollection to answer any of my

12   questions, will you let me know that?

13        A.    Yes.

14        Q.    Because this is a pretty lengthy

15   document, but do you see that the cover page

16   here is the Highland consolidated financial

17   statements for the period ending December 31st,

18   2018?

19        A.    Yes.

20        Q.    If we can go to -- I think it is the

21   next one, looking for PwC's signature line.

22             MS. CANTY:  I'm sorry, John, did you

23   say something?

24             MR. MORRIS:  Yes, can we turn the

                    WATERHOUSE - 10-19-21

1

2          page.  I think it is 215.  Yes, stop right

3          there, just above -- I'm sorry, I want to

4          see just the date of the report.

5          Q.    Okay.  Do you see at the bottom of

6    that page there, Mr. Waterhouse,

7    PricewaterhouseCoopers has signed this audit

8    report?

9          A.    Yes, I see their signature.

10         Q.    Okay.  And it is the dated same day

11   as your management representation letter; is

12   that right?

13         A.    It is -- yes, it is the same day.

14         Q.    Was that the practice to sign the

15   management representation letter on the same

16   day that the audit report was signed?

17         A.    Yes, that is typical in every audit.

18         Q.    Can we just scroll down to the

19   balance sheet on the next page.

20               Do you see that there is a line

21   there that says, Notes and Other Amounts Due

22   from Affiliates?

23         A.    Yes.

24         Q.    Does that line, to the best of your

25   knowledge, include the amounts that were due

Case 3:21-cv-00881-X Document 179-29 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 107 of 397
Case 3:21-cv-00881-X Document 179-29 Page 1509/2446 Page 274 of 282 PageID 46915

Page 107

1                    WATERHOUSE - 10-19-21

2       under the affiliate under the notes signed by

3       the affiliates and Mr. Dondero?

4                    MR. RUKAVINA:  Objection to the

5             extent that calls for a legal conclusion.

6             A.    I mean, I would want to see the

7       detail and the build to this $173,398,000, but,

8       yes, I mean, if -- if -- given what we

9       discussed before, you know, it -- it should

10      capture that.

11            Q.    And -- and while you were the CFO of

12      Highland, were all notes held by Highland that

13      were issued by an affiliate or Mr. Dondero

14      carried as assets on Highland's balance sheets?

15                   MS. DANDENEAU:  Objection to form.

16                   MS. DEITSCH-PEREZ:  Object to form.

17            A.    I don't -- I don't know how else

18      they would be carried.

19            Q.    Okay.  Can you think of any -- are

20      you aware of any promissory note issued by an

21      affiliate or Mr. Dondero that was not carried

22      on Highland's audited financial balance sheets?

23            A.    I'm -- I'm -- I'm not aware.

24            Q.    Okay.  Are you aware of any category

25      of asset on Highland's balance sheet in which

Case 3:21-cv-00881-X Document 180-29 Filed 10/20/23 Entered 10/20/23 22:31:54 Page 108 of 397
Case 3:21-cv-00881-X Document 179-29 Page 175 of 446 Page 275 of 282 PageID 46916

Page 108

WATERHOUSE - 10-19-21

1    any of the promissory notes issued by an

2    affiliate or Mr. Dondero would have been

3    included?

4

5                MS. DANDENEAU:  Objection to form.

6        A.    Sorry, am I aware of any asset of an

7    affiliate being included --

8        Q.    That -- let me -- let me try again.

9              Do you see there is a number of

10   different assets that are described on this

11   balance sheet?

12       A.    Yes.

13       Q.    One of the assets that is described

14   is Notes and Other Amounts Due from Affiliates;

15   right?

16       A.    Yes.

17       Q.    And it is reasonable to conclude

18   that the notes from the affiliates and

19   Mr. Dondero are included in that line item;

20   right?

21       A.    Yes, based on this description.

22   Again, I would want to see a build of this to

23   100 percent confirm, but based on the

24   description, the asset description, it is -- it

25   is likely.

```
 1                    WATERHOUSE - 10-19-21

 2                    Now, does that mean absolute?  I

 3    don't know.

 4          Q.     Do you have any reason to believe

 5    that the promissory notes would have been

 6    carried on the balance sheet in a category

 7    other than Notes and Other Amounts Due from

 8    Affiliates?

 9          A.     If they were deemed -- no.  If they

10    were deemed an affiliate, you know, under GAAP,

11    they should be carried in that line.

12    Otherwise, it would go into another line.

13          Q.     Okay.  And do you see the total

14    asset base as of December 31st, 2018, was

15    approximately $1.04 billion?

16          A.     Yes.

17          Q.     Is my math correct that the Notes

18    and Other Amounts Due from Affiliates

19    constituted approximately 17 percent of

20    Highland's assets as of the end of 2018?

21          A.     Well, so how are you defining

22    Highland?

23          Q.     Highland Capital Management, L.P.,

24    the entity that this audit is subject to -- or

25    the subject of.
```

```
 1                    WATERHOUSE - 10-19-21

 2         A.    On a consolidated or unconsolidated

 3    basis?

 4         Q.    I'm looking at the balance sheet.

 5    It is a consolidated balance sheet.  Okay?

 6               Does the Notes and Other Amounts Due

 7    from Affiliates constitute approximately

 8    17 percent of the total assets of Highland

 9    Capital Management, L.P., on a consolidated

10    basis?

11               MS. DANDENEAU:  Objection to form.

12         A.    I don't have a calculator in front

13    of me but I will take your math, if you are

14    taking the 173 divided by the billion.

15         Q.    Okay.

16         A.    If that is accurate, yes.  But,

17    again, on a consolidated basis.

18         Q.    And on an unconsolidated basis the

19    percentage would be higher; correct?

20         A.    I -- no.  I don't know.

21         Q.    Well, okay.  That is fair.

22               MR. MORRIS:  Can we turn to

23         page 241, please.

24         Q.    Do you see that this is a section of

25    the audit report that is entitled Notes and
```

1              WATERHOUSE - 10-19-21

2   Other Amounts Due from Affiliates?

3        A.    Sorry, I can't see the -- the --

4        Q.    It is at the top.

5        A.    Notes and Other Amounts Due from

6   Affiliates, yes, I see that.  I don't -- I

7   don't have a page number, but I'm on a page

8   that says at the top:  Notes and Other Amounts

9   Due from Affiliates.

10       Q.    Okay.  And that is the same title of

11  the line item on the balance sheet that we just

12  looked at; right?  Notes and Other Amounts Due

13  from Affiliates?

14       A.    Yes.

15       Q.    And is it your understanding, based

16  on your experience and knowledge as the CFO,

17  that this is the section of the narrative that

18  ties into the line item that we just looked at?

19       A.    Yes.

20       Q.    And is this section of the audit

21  report intended to describe and disclose all of

22  the material facts concerning the Notes and

23  Other Amounts Due from Affiliates?

24            MS. DANDENEAU:  Objection, form.

25       A.    This -- these notes -- these notes

Page 112

                        WATERHOUSE - 10-19-21

1

2    of the financial statements are -- the purpose

3    is to disclose any material items in relation

4    to that balance sheet line item.

5         Q.    Okay.  And all of the information,

6    to the best of your knowledge, that is set

7    forth in this section of the audit report was

8    provided by Highland; correct?

9         A.    Yes, it would have been provided by

10   the corporate accounting team.

11        Q.    Okay.  And the corporate accounting

12   team, did that team report to you in the

13   organizational structure?

14        A.    Yes.

15        Q.    And did you have any concerns about

16   the controls that were in place to make sure

17   that the information provided with respect to

18   Notes and Other Amounts Due from Affiliates was

19   accurate and complete?

20             MS. DANDENEAU:  Objection to form.

21        A.    Not that I recall.

22        Q.    Okay.  Do you recall ever being

23   concerned that any portion of the Notes and

24   Other Amounts Due from Affiliates in any audit

25   report was inaccurate, incomplete, or not

Case 3:21-cv-00881-X Document 8 Doc 174 Filed 10/20/21 Entered 10/20/21 23:31:54 Page 11 Desc 397
Case 3:21-cv-00881-X Document 178-29 Exhibit 29 Page 0529/2446 Page 280 of 282 PageID 46921

Page 113

1          WATERHOUSE - 10-19-21

2    reliable?

3        A.    I didn't -- I had concerns about,

4    you know, like I talked about before, of there

5    were -- there were potentially issues in the

6    control environment.  But as far as it relates

7    to the audited financial statements, any -- the

8    team would work with the auditors to disclose

9    all -- all notes in Highland's possession.

10             And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15       Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20             MS. DANDENEAU:  Objection to form.

21       A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25             Again, I wasn't anywhere chose to

Case 3:21-cv-00881-X   Doc 8   Filed 10/20/21   Entered 10/20/21 13:54:01   Page 1 of 397
Case 3:21-cv-00881-X   Document 179   Page 16992446   Page 281 of 282   PageID 46922
Page 114

```
 1                    WATERHOUSE - 10-19-21
 2   being the point person of this audit.  And I
 3   can't recall, you know, when -- you know, I
 4   don't even know if I was ever the point person
 5   during my tenure as CFO.
 6             I don't know if PwC had any concerns
 7   when they were performing those audit
 8   procedures.  They may have and they may have --
 9   and it may not have been communicated to me.  I
10   don't know.
11             MR. MORRIS:  All right.  I move to
12        strike.
13        Q.   And I'm going to ask you to listen
14   carefully to my question.
15             Did you -- do you recall ever having
16   a conversation with anybody at any time
17   concerning the accuracy of the reporting
18   provided in the audited financial statement on
19   the topic of Notes and Other Amounts Due?
20             MS. DANDENEAU:  Objection to form.
21        A.   I don't recall for this, but that
22   doesn't mean that it didn't exist.
23        Q.   Okay.  But you have no reason to
24   believe, as you sit here right now, that you
25   ever discussed with anybody concerns over the
```

WATERHOUSE - 10-19-21

1

2    accuracy of the section of the audit reports

3    called Notes and Other Amounts Due from

4    Affiliates; correct?

5              MS. DANDENEAU:  Object to the form.

6              MS. DEITSCH-PEREZ:  Objection to

7         form.

8         A.    I don't recall having any

9    conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.