1               WATERHOUSE - 10-19-21

2          A.     -- Highland's responsibility.

3     Highland's responsibility.

4          Q.     Who, at Highland, was responsible

5     for drafting this section of the audit report?

6          A.     I -- I don't know the answer to

7     that.  Again, there was a team who worked on

8     this.  And I don't know, you know, whether it

9     was the staff or the manager.

10              Again, this is where I let the teams

11    manage.  And, you know, there may be a

12    corporate accountant who worked on this.  I

13    just -- you know, I wasn't part of that process

14    to give that person experience.  I don't know.

15         Q.     Do you recall having any

16    communications with anybody at any time

17    concerning this section of the report?

18         A.     Yeah, I don't recall.

19         Q.     Do you recall whether you ever told

20    anybody at any time that any aspect of this

21    section of the report was inaccurate or

22    incomplete?

23         A.     I don't recall.

24         Q.     As you sit here today, do you have

25    any reason to believe that this section of the

Case 3:10-05806-Sgic 8 Doc File d 10/20/21 10/29/21 red 10/20/21 10/29/21 31:54:01 17:sc 397
Case 3:21-cv-00881-X  Document 178-30  Filed 06/09/24  Page 2 of 282  PageID 46925

Page 117

```
 1                    WATERHOUSE - 10-19-21

 2    audit report is incomplete or inaccurate in any

 3    way?

 4              And I'm happy to give you a moment

 5    to -- to look at it, if you would like.

 6              MS. DANDENEAU:  Objection to form.

 7              MS. DEITSCH-PEREZ:  Same.

 8        A.    I mean, I would have to look at -- I

 9    would have to look at the bill to the note

10    schedule to make sure I know you presented me

11    with materiality, but again, there might be a

12    note as of 12/31/18 that somehow was -- was

13    under materiality not disclosed.  I don't -- I

14    don't know.  I would need more information.

15        Q.    Okay.  But without more information,

16    you have no reason to believe anything this

17    section is inaccurate; correct?

18              MS. DANDENEAU:  Objection to form.

19        A.    I don't.  I mean, you know, this was

20    part of the audit.

21        Q.    Thank you.  Now, you will see if we

22    could scroll just a little bit more that each

23    of the first five paragraphs concerns

24    specifically the four affiliates that we've

25    been discussing and Mr. Dondero.
```

```
 1                  WATERHOUSE - 10-19-21

 2              MR. MORRIS:  If we could go the

 3      other way, La Asia.  We don't need Okada.

 4      We're going to have to thread the needle.

 5      Okay.  Good, perfect.

 6         Q.    Do you see those five paragraphs

 7   certain the four affiliates and Mr. Dondero as

 8   we've been referring to today?

 9         A.    Yes.

10         Q.    Okay.  And do you see at the end of

11   every paragraph it states, quote:  A fair value

12   of a partnership's outstanding notes receivable

13   approximates the carrying value of the notes

14   receivable?

15         A.    Yes, I see that.

16         Q.    Do you have an understanding of what

17   that means?

18         A.    Yes.

19         Q.    What is your understanding of that

20   sentence?

21         A.    It is the -- again, the -- the fair

22   value, right, which is -- which is what the --

23   what Highland could sell that asset for.  This

24   statement is comparing the fair value of the

25   notes to the carrying value, so the carrying
```

```
1                    WATERHOUSE - 10-19-21

2      value is the line item that you showed me

3      earlier that is in Notes and Other Amounts Due

4      from Affiliates.

5           Q.    Okay.  Is another way to say this is

6      that the fair market value of the notes equals

7      the principal amount and -- withdrawn.

8                 Is the fair way to interpret this

9      that the fair market value of the notes equals

10     all remaining unpaid principal and interest due

11     under the notes?

12                MS. DANDENEAU:  Object to the form.

13                MS. DEITSCH-PEREZ:  Objection, form.

14          A.    I don't know the answer to that,

15     because I don't recall where -- where any --

16     where -- in what line item was the interest

17     component reported.

18          Q.    All right.  Well, if we look in this

19     audit report, you will see in the middle of the

20     first paragraph, for example, it states that as

21     of December 31st, 2018, total interest and

22     principal due on outstanding promissory notes

23     was approximately $5.3 million.

24                Do you see that?

25          A.    I do.
```

Case 3:05-06-00906-Doc 8 Doc Filed 10/20/21/29/21 red Entered 10/20/21 12/29 13:11:54 Page 120 of 397
Case 3:21-cv-00881-X  Document 158-30 Filed 03/09/24  Page 5 of 282  PageID 46928
Page 120

1              WATERHOUSE - 10-19-21

2        Q.     Is that the carrying value or the

3    fair value?

4        A.     That would be the carrying value --

5        Q.     And is the last --

6        A.     -- in my opinion.

7        Q.     Okay.  And it is in your opinion as

8    the chief financial officer of Highland during

9    the period of time that you described; right?

10   It is an educated opinion?

11       A.     I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13       Q.     Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16             MS. DANDENEAU:  Objection to form.

17             MS. DEITSCH-PEREZ:  Objection, form.

18       A.     Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21       Q.     Correct.

22       A.     If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,

1                    WATERHOUSE - 10-19-21

2    look, I mean, if you -- I mean, if you are

3    saying the 5.3 million is in the notes and

4    other amounts due from affiliates, then the

5    last statement is saying the fair value

6    approximates 5.3 million.  That is what that

7    last sentence is saying.

8         Q.    Do you see in the middle of the

9    first paragraph -- not in the middle, the next

10   to last sentence there is a statement that the

11   partnership will not demand payment on amounts

12   that exceed HCMFA's excess cash availability

13   prior to May 31st, 2021.

14              Do you see that?

15        A.    I do.

16        Q.    Do you know when Highland agreed not

17   to demand payment as described in that

18   sentence?

19        A.    I don't know specifically.

20        Q.    Do you know why Highland agreed not

21   to demand payment on HCMFA's notes until May

22   2021?

23        A.    Yes.

24        Q.    Why was that decision made?

25        A.    You know, well, it -- it -- that

1                    WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5         Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10              MS. DANDENEAU:  Objection to form.

11        A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13        Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16              MS. DANDENEAU:  Objection to form.

17        A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21        Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25        A.    I'm trying to remember.  I don't

Case 3:21-cv-00881-X Document 518-30 Filed 10/20/23 Entered 10/20/23 12:13:54 Page 12 of 397
Case 3:21-cv-00881-X Document 518-30 Filed 10/20/23 Page 8 of 282 PageID 46931
Page 123

```
 1                    WATERHOUSE - 10-19-21

 2    remember exactly -- I don't remember if it was

 3    myself or -- or Jim Dondero who -- who -- there

 4    was -- there was something signed, from what I

 5    recall, that -- that -- that backed up this

 6    line item in the -- in the notes I'm -- look,

 7    I'm, I'm --

 8         Q.    We will get to that.

 9         A.    You --

10         Q.    I'm just --

11         A.    You have -- I mean --

12         Q.    We're going to give that to you.

13    I'm going to give that to you.

14         A.    You -- you -- you have all the

15    documents.  I don't have the documents, and

16    that is what makes it so hard.  I don't have

17    any documents to prepare for this deposition;

18    right?  You have all -- I don't -- I don't -- I

19    don't remember, but, you know, again, it would

20    probably be myself or Jim.

21         Q.    Do you know if Highland received

22    anything in return for its agreement not to

23    make a demand for two years?

24         A.    I don't -- I don't think it referred

25    anything.
```

Case 3:00-cv-00816-Doc 8 Doc Filed 10/20/21 Entered 10/20/21 12:31:54 Doc 124 of 397
Case 3:21-cv-00881-X Document 18-30 Filed 10/20/21 Page 9 of 282 PageID 46932
Page 124

1                    WATERHOUSE - 10-19-21

2         Q.    And did you and Mr. Dondero discuss

3    HCMFA's ability to satisfy the notes if a

4    demand was made at the time this agreement was

5    entered into?

6              MS. DANDENEAU:  Objection to form.

7         A.    I don't -- I don't -- I don't recall

8    having a specific conversation, if I did, or --

9    or David Klos.

10        Q.    Okay.  I'm just asking if you recall

11   any conversations that you had.

12        A.    I don't recall.

13        Q.    Okay.  Do you know why Highland

14   loaned the money to HCMFA that is the subject

15   of the notes described in this paragraph?

16        A.    I don't remember specifically why

17   5.3 million was loaned.  I mean, I -- it would

18   have to be put in the context.

19        Q.    Do you have any recollection at all

20   as to why Highland ever loaned any money to

21   HCMFA?

22        A.    Yes.

23              MS. DANDENEAU:  Objection to form.

24        Q.    What do you remember about that?

25        A.    There was a Highland Global

Case 3:00-05006-cgc-8 Doc 5 Filed 10/20/21 Entered 10/20/21 20:21:31 Page 125 of 397
Case 3:21-cv-00881-X   Document 178-30   Filed 07/06/24   Page 10 of 282   PageID 46933
Page 125

```
1                    WATERHOUSE - 10-19-21

2    Allocation Fund, which was a -- a fund managed

3    by Highland Capital Management Fund Advisors.

4    There was a -- we -- I'm just telling you,

5    there was -- there was -- there was a -- a

6    ultimately a NAV error found in this fund while

7    it was an open-ended fund and, you know, there

8    were amounts owed by the advisor in -- in

9    relation to that NAV error.

10                  There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16       Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19       A.    These started back -- I think, I

20   mean --

21       Q.    I apologize.

22       A.    -- that -- I mean, the answer to

23   that is no.

24       Q.    I apologize, the loans that were

25   made in connection with the events that you're
```

1                   WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3                   MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5         A.   I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8         Q.   Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13        A.   This is for NexPoint Advisors?

14        Q.   Yes.

15        A.   I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18        Q.   Do you know why?

19        A.   But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21        Q.   Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24        A.   Yes.

25        Q.   Why did High -- why do you recall --

Case 3:00-cv-00806-Doc 8 Document 110/20/21 Entered 10/20/21 29:23:81:54 Page 127 of 397
Case 3:21-cv-00881-X Document 178-80 Filed 07/00/2446 Page 12 of 282 PageID 46935

Page 127

1          WATERHOUSE - 10-19-21

2     what is the reason you recall Highland lending

3     money to NexPoint?

4          A.    I mean, I was just -- I just -- I

5     just recall.  I mean, I just -- I don't

6     remember why.

7          Q.    I understand.  And I'm asking you if

8     you recall --

9          A.    Oh, why -- I thought you say --

10    NexPoint Advisors was launching a fund which

11    is -- I believe that the legal name is NexPoint

12    Capital, Inc.  And it -- it provided a

13    co-invest into that fund.

14              And, from what I remember, the --

15    the -- that NexPoint borrowed money from

16    Highland at the time to make that co-invest.

17         Q.    So this was an investment that

18    NexPoint was required to make; is that right?

19              MS. DANDENEAU:  Objection to form.

20         A.    I don't know if it was required to

21    make, I don't recall that, or if it just made

22    it.

23         Q.    Okay.  But your recollection is that

24    NexPoint made an investment and they borrowed

25    money from Highland to finance the investment.

1              WATERHOUSE - 10-19-21

2              Do I have that right?

3         A.    Yes.

4         Q.    How about HCRE?  Do you know why

5    HCRE borrowed money from Highland?

6         A.    I don't remember specifically.

7         Q.    Do you remember generally?

8         A.    Generally, yeah -- I mean, yes.

9         Q.    Can you tell me your general

10   recollection as to why Highland loaned money to

11   HCRE?

12        A.    For -- for -- for investment

13   purposes.

14        Q.    So HCRE made the investment and it

15   obtained a loan, or loans, from Highland in

16   order to finance that investment or those

17   investments.

18              Do I have that right?

19        A.    I mean, I -- you know, generally.

20        Q.    Okay.  How about Highland Management

21   Services, Inc.?

22              Do you have any recollection as to

23   why HCMS borrowed money from Highland?

24        A.    Generally.

25        Q.    What is your general recollection as

Case 3:21-cv-00806-S   Doc 8   Filed 10/20/21   Entered 10/20/21 21:31:54   Page 129 of 397
Case 3:21-cv-00881-X   Document 168-20   Filed 07/08/24   Page 14 of 282   PageID 46937
Page 129

1

2     to why HCMS borrowed money from Highland?

3          A.     For -- for investment purposes.

4          Q.     So it is the same thing, HCMS wanted

5     to make investments and it borrowed money from

6     Highland in order to finance those investments;

7     is that right?

8          A.     I mean, yes, generally.  I mean, I

9     can't -- I don't -- on the services, there --

10    there are several loans in these schedules.

11    You know, I can't remember why every single one

12    of these were made, but I would say, yeah, I

13    mean, generally.

14         Q.     Okay.  I appreciate that.

15              MR. MORRIS:  Let's go to the page

16         with Bates No. 251.  La Asia, are you

17         there?

18              MS. CANTY:  Sorry, John.  It went

19         out for a minute.  Can you say that again.

20         I don't know what is going on.

21              MR. MORRIS:  The page with Bates

22         No. 251, can we go to that.

23              MS. CANTY:  Yes, sorry.

24              MR. MORRIS:  Keep going to the

25         bottom.  Yeah, there you go.

Case 3:21-cv-00881-X Document 174-1 Filed 10/20/21 Entered 10/20/21 21:31:54 Desc
Case 3:21-cv-00881-X Document 168-30 Filed 07/06/24 Page 15 of 282 PageID 46938

Page 130

1                    WATERHOUSE - 10-19-21

2          Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5          A.    I do.

6          Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11         A.    I mean, it relates to it, but not in

12   its entirety.

13         Q.    Okay.

14               MR. MORRIS:  If we can scroll up to

15         capture the entirety of this section right

16         here.

17         Q.    And what do you mean by that, sir?

18               MR. MORRIS:  Yeah, right there.

19         Perfect.

20         A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25         Q.    Okay.  And -- and would the type of

```
 1                    WATERHOUSE - 10-19-21

 2   subsequent event relating to affiliate loans be

 3   captured in this section if they were -- if

 4   they were made after the end of the fiscal year

 5   and prior to the issuance of the audit report?

 6        A.    Yes, if they were deemed material or

 7   disclosable.

 8        Q.    Okay.  I appreciate that.

 9              Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically
```

1                        WATERHOUSE - 10-19-21

2      if -- you know, what -- if that 7.4 million was

3      solely attributable to the NAV error.

4          Q.    Okay.  But there is no question that

5      Highland told PricewaterhouseCoopers that over

6      the course of 2019 HCMFA issued promissory

7      notes to the partnership in the aggregate

8      amount of $7.4 million; correct?

9          A.    In the course of the audit, we would

10     have produced all promissory notes in our

11     possession, including the ones that are

12     detailed here.

13         Q.    Do you recall that you signed the

14     two promissory notes that are referenced in

15     that provision?

16              MS. DANDENEAU:  Objection to form.

17         A.    I didn't recall initially but I've

18     been reminded.

19         Q.    Okay.  And -- and do you recall that

20     those notes are dated May 2nd and May 3rd,

21     2019?

22         A.    Yes.

23         Q.    So that was just a month before the

24     audit was completed; correct?

25         A.    Yes.  I think we had a June 3rd

```
 1                    WATERHOUSE - 10-19-21

 2   date, right, if -- if my memory serves me

 3   right.

 4        Q.    Yes, I will represent to you that

 5   your memory is accurate in that regard.

 6              Did anybody ever instruct you as the

 7   CFO to correct this statement that we're

 8   looking at in subsequent events?

 9        A.    So let me understand.  You're saying

10   when I was CFO at Highland Capital did anyone

11   ever ask me to correct the -- over the course

12   of 2019 through the report date HCMFA issued

13   promissory notes, this statement?

14        Q.    Right.

15        A.    Not that I'm aware.

16        Q.    While you were the CFO of Highland,

17   did anybody ever tell you that that sentence

18   was wrong?

19        A.    Not that I'm aware.

20        Q.    Highland -- withdrawn.

21              HCMFA disclosed these notes in its

22   own audited financial statements; right?

23              MR. RUKAVINA:  Objection, form.

24        A.    I assume that these would be

25   material -- if these are material financial
```

```
 1                    WATERHOUSE - 10-19-21

 2   statements, yes, they -- they -- they should be

 3   and they were likely disclosed.

 4        Q.    Now, there is no statement

 5   concerning the 2019 notes about the forbearance

 6   that we looked at in the affiliated note

 7   section of the report; right?

 8              MS. DANDENEAU:  Objection to form.

 9        Q.    I'll withdraw.  That was bad.

10              Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15        A.    Yes.

16        Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18        A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21        Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25        A.    Right.  But this is through
```

```
 1                  WATERHOUSE - 10-19-21

 2   June 3rd.  It could have been done on June 4th.

 3   I don't -- I don't -- I don't recall.

 4        Q.    Okay.

 5              MR. MORRIS:  Can we put up on the

 6        screen the HCMFA audit report.  And while

 7        we're --

 8              MS. DANDENEAU:  What exhibit is

 9        this?

10              MR. MORRIS:  La Asia, what number is

11        that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14        as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17        in the chat.

18              MS. DANDENEAU:  Thank you.

19        Q.    Okay.  All right.  Do you see that

20   this is the consolidated financial statements

21   for HCMFA for the period ending 12/31/18?

22        A.    Yes.

23        Q.    As the treasurer of HCMFA at the

24   time, did you have to sign a management

25   representation letter similar to the one that
```

Case 3:00-cv-00806-Bjc 8-C-File-1 10720/210/29/areatEntered 10/20/210/29/2123 1:54:01 136 of 397
Case 3:21-cv-00881-X  Document 168-20  Filed 08/30/24  Page 21 of 282  PageID 46944
Page 136

```
 1                WATERHOUSE - 10-19-21

 2    we looked at earlier for Highland?

 3        A.    I would imagine I would have been

 4    asked to.  I don't recall if I did.

 5        Q.    Do you recall ever being asked by an

 6    auditor to sign a management representation

 7    letter and then not doing it?

 8        A.    No.

 9              MR. MORRIS:  Can we just scroll down

10         again.  I just want to see the date of the

11         document.

12        A.    I mean, let me -- you know, there

13    are different versions to management

14    representation letters I will qualify.

15              Yes, there are certain -- from time

16    to time auditors can make representations

17    that -- in the rep letter that is being

18    proposed that are inaccurate or out of scope or

19    things like that and they've asked for

20    signature.

21              In that context, yes.  I mean, you

22    know -- I mean, if I have been asked to sign

23    and make those representations and those

24    representations are invalid, yes, I would not,

25    I mean, I -- I wouldn't sign that.
```

```
 1                    WATERHOUSE - 10-19-21

 2          Q.     Okay.  PricewaterhouseCoopers served

 3     as HCMFA's outside auditors as well; correct?

 4          A.     Yes.

 5          Q.     Do you see that this audit report is

 6     signed on June 3rd, 2019, just like the

 7     Highland audit report?

 8          A.     That is correct.

 9          Q.     And did the process of -- of

10     preparing HCMFA's audit report, was that the

11     same process that Highland followed when it did

12     its audit report at this time?

13          A.     I mean, it is a different entity.

14     There are different assets.  You know, it --

15     it -- it is -- as you saw, Highland's

16     financials are on a consolidated basis.  This

17     is different, so it is under the same control

18     environment and team.

19          Q.     Okay.  I appreciate that.  So the

20     same control environment and team participated

21     in the preparation of the audit for Highland

22     and for HCMFA at around the same time; correct?

23          A.     Yes.

24                 MR. MORRIS:  Can we go to page 17 of

25          the report.  I don't have the Bates number.
```

WATERHOUSE - 10-19-21

1

2      Q.    Okay.  Do you see that just like

3    Highland's audited financial report, HCMFA's

4    audited financial report also has a section

5    related to subsequent events?

6      A.    Yes.

7      Q.    And am I reading this correctly that

8    just as Highland had done, HCMFA disclosed in

9    its audited financial report a subsequent event

10   that related to the issuance of promissory

11   notes to Highland in the aggregate amount of

12   $7.4 million in 2019?

13     A.    That is what I see in the report.

14     Q.    And you were the treasurer of HCMFA

15   at the time; right?

16     A.    Yes, to the best of my knowledge.

17     Q.    And did anybody ever tell you prior

18   to the time of the issuance of this audit

19   report that that sentence relating to HCMFA's

20   2019 notes was inaccurate or wrong in any way?

21     A.    Not that I recall.

22     Q.    As you sit here right now, has

23   anybody ever told you that that sentence is

24   inaccurate or wrong in any way?

25     A.    Not that I recall.

```
 1                    WATERHOUSE - 10-19-21

 2         Q.     I apologize if I asked you this

 3    already, but has anybody ever told you at any

 4    time that you are not authorized to sign the

 5    promissory notes that are the subject of the

 6    sentence we're looking at?

 7         A.     Not that I recall.

 8         Q.     Did anybody ever tell you at any

 9    time that you had made a mistake when you

10    signed the promissory notes that are the

11    subject of this sentence?

12         A.     Say that again.  Did anyone ever say

13    that I made a mistake?

14         Q.     Let me ask the question again.

15                Did anybody ever tell you at any

16    time that you made a mistake when you signed

17    the two promissory notes in Highland's favor on

18    behalf of HCMFA in 2019?

19         A.     Not that I recall.

20                MR. MORRIS:  Let's just look at the

21         promissory notes quickly.  Can we please

22         put up Document Number 1, and so this is in

23         the pile that y'all have.  We'll just go

24         for a few more minutes and we can take our

25         lunch break.
```

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    All right.  So I don't know if you

 3   have seen this before, sir.  Do you see that

 4   this is a complaint against HCMFA?

 5        A.    Yes, I am looking at it on the

 6   screen.

 7        Q.    Okay.  And have you ever seen this

 8   document before?

 9        A.    I went through some of these

10   documents with my counsel here yesterday.

11             MR. MORRIS:  All right.  Can we go

12        to Exhibit 1 of this document.

13        Q.    Do you see Exhibit 1 is a

14   $2.4 million promissory note back in 2019?

15        A.    Yeah, I found it in the book.  Yes,

16   I have it here in front of me.

17        Q.    And this is a demand note, right, if

18   you look at Paragraph 2?

19        A.    Yes.

20        Q.    And this is a note where the maker

21   is HCMFA, and Highland is the payee; right?

22        A.    Yes.

23             MR. MORRIS:  And if we can scroll

24        down, can we just see Mr. Waterhouse's

25        signature.
```

Case 3:21-cv-00881-X Document 88 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 14 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 09/06/24 Page 26 of 282 PageID 46949

Page 141

```
                      WATERHOUSE - 10-19-21

 1

 2        Q.    Is that your signature, sir?

 3        A.    Yes, it is.

 4        Q.    And did you sign this document on or

 5  around May 2nd, 2019?

 6        A.    I don't recall specifically signing

 7  this, but this is my signature.

 8        Q.    Okay.  And do you recall that

 9  Highland transferred $2.4 million to HCMFA at

10  or around the time you signed this document?

11        A.    I don't recall specifically.  I

12  would want to, as I sit here today, go back and

13  confirm that, but again, presumably that --

14  that -- that did happen.

15        Q.    You wouldn't have signed this

16  document if you didn't believe that HCMFA

17  either received or was going to receive

18  $2.4 million from Highland; is that fair?

19        A.    I mean, it -- if -- if -- if there

20  wasn't a transfer of value, yeah, I mean, you

21  know, I would have no reason to -- to sign a

22  note.

23        Q.    And -- and Highland wouldn't have

24  given this note to PricewaterhouseCoopers if --

25  withdrawn.
```

```
 1                    WATERHOUSE - 10-19-21

 2              HCMFA wouldn't have given this note

 3   to PricewaterhouseCoopers if it hadn't received

 4   the principal value of -- of the note in the

 5   form of a loan; correct?

 6              MR. RUKAVINA:  Objection, legal

 7         conclusion, speculation and form.

 8         A.    Again, we -- what we provided to PwC

 9   were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14              MR. MORRIS:  Okay.  Can we go to

15         Exhibit 2.

16              (Exhibit 2 marked.)

17         Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20         A.    Yes.

21         Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23         A.    Yes.

24         Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?
```

                        WATERHOUSE - 10-19-21

 1

 2      A.    Yes.

 3      Q.    And if we go to the bottom, can we

 4   just confirm that that is your signature?

 5      A.    Yes.

 6      Q.    And together these notes are the

 7   notes that are referred to both in Highland and

 8   HCMFA's audited financial reports in the

 9   subsequent event sections; correct?

10           MS. DANDENEAU:  Objection to form.

11      A.    They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13      Q.    Okay.  And you were authorized to

14   sign these two notes; correct?

15           MR. RUKAVINA:  Objection, legal

16      conclusion.

17      A.    Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22      Q.    And you believed you were authorized

23   to sign the notes; is that fair?

24      A.    I signed a lot of documents in my

25   capacity, just because it is operational in

Case 3:00-05066-cgc Doc 8 Doc Filed 10/20/21 Entered 10/20/21 21:31:54 Desc 1 Desc 397
Case 3:21-cv-00881-X Document 168-20 Exhibit 20 Filed 09/30/246 Page 29 of 282 PageID 46952

Page 144

1          WATERHOUSE - 10-19-21

2    nature.  So, you know, to me this was just

3    another document, to be perfectly honest.

4          Q.    Sir, would you have signed

5    promissory notes with the principal amount of

6    $7.4 million if you didn't believe you were

7    authorized to do so?

8               MS. DANDENEAU:  Objection to form.

9          Q.    Are you frozen?

10         A.    No.  I'm just -- you know, it is --

11   you know, again, I typically don't sign

12   promissory notes, and I don't recall why I

13   signed these, but -- you know, but I did.

14         Q.    All right.  So listen carefully to

15   my question.  Would you have ever signed

16   promissory notes with a face amount of

17   $7.4 million without believing that you were

18   authorized to do so?

19         A.    No.  I mean, I'm -- I'm putting my

20   signature on there, so no.

21         Q.    Okay.  And would you have signed two

22   promissory notes obligating HCMFA to pay

23   Highland $7.4 million without Mr. Dondero's

24   prior knowledge and approval?

25               MS. DEITSCH-PEREZ:  Object to the

1              WATERHOUSE - 10-19-21

2       form.

3       A.    You know, from -- from what I recall

4    around these notes, you know, I don't recall

5    specifically Mr. -- Mr. Dondero saying to -- to

6    make this a loan.

7            So my conversation with Mr. Dondero

8    around the culmination of the NAV error as

9    related to TerreStar which was a -- a -- I

10   think it was a year and a half process.  I

11   don't know, it was a multi-month process, very

12   laborious, very difficult.

13           When we got to the end, I had a

14   conversation with Mr. Dondero on where to, you

15   know, basically get the funds to reimburse the

16   fund, and I recall him saying, get the money

17   from Highland.

18      Q.    And so he told you to get the money

19   from Highland; is that right?

20      A.    That is what I recall -- in my

21   conversation with him, that is -- that is what

22   I can recall.

23      Q.    Do you know who drafted these notes?

24      A.    I don't.

25      Q.    Did you ask somebody to draft the

```
 1                WATERHOUSE - 10-19-21

 2    notes?

 3         A.    I didn't ask -- I don't specifically

 4    ask people to draft notes really.  I mean,

 5    again, you know, the legal group at Highland is

 6    responsible and has always been responsible for

 7    drafting promissory notes.

 8         Q.    So based on your -- based on the

 9    practice, you believe that somebody from the

10    Highland's legal department would have drafted

11    these notes.  Do I have that right?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  John, I also asked you for the Word

14         versions of these notes so we could look at

15         the properties, and you have not provided

16         them.  Are you intending to?

17              MR. MORRIS:  No.

18         Q.    Can you answer my question, sir?

19         A.    Again, I --

20              MS. DANDENEAU:  Do you want him to

21         repeat it?

22         A.    Yeah, why don't you repeat it?

23         Q.    Sure.  Mr. Waterhouse, based on the

24    practice that you have described in your

25    understanding, do you believe that these notes
```

```
 1                  WATERHOUSE - 10-19-21

 2    would have been drafted by somebody in the

 3    legal department?

 4              MS. DEITSCH-PEREZ:  Object to the

 5          form.

 6        A.    Yes.

 7        Q.    Okay.  And do you know who would

 8    have instructed -- do you have any knowledge as

 9    to who would have instructed the legal

10    department to draft these notes?

11              MS. DEITSCH-PEREZ:  Object to the

12          form.

13        A.    It was whoever was working -- I

14    mean, it was likely someone on the team.  I

15    mean, I don't remember exactly on every note or

16    every document, but, again, a lot of these

17    things of this nature -- they're operational in

18    nature -- were handled by the team.

19              The team knows to -- I mean, we

20    don't draft documents.  We're not lawyers.

21    We're not attorneys.  It is not what I do or

22    accountants do.

23              So they are always instructed to go

24    and -- and go to the legal team to get

25    documents like this drafted.  Also, when you go
```

```
1              WATERHOUSE - 10-19-21

2    to the legal team, the -- you know, we always

3    loop in compliance.  And compliance -- when you

4    go to the legal team, compliance is part of

5    legal team.  They're made aware of -- of -- of

6    these types of transactions.

7         Q.    And do you believe that you had

8    the -- withdrawn.

9              Did you ever tell Mr. Dondero --

10   (inaudible) -- did you see those?

11        A.    Sorry.

12             MS. DEITSCH-PEREZ:  I did not hear

13        the end of that question.

14        Q.    Did you ever tell Mr. Dondero that

15   you signed these two notes?

16        A.    I don't recall ever -- no, I don't

17   recall having a conversation with him.

18        Q.    Did you ever discuss these two notes

19   with him at any time?

20        A.    The conversation, I recall, was what

21   I described earlier.  And that is the only time

22   I recall ever discussing this.

23        Q.    Okay.  But the corporate accounting

24   group had a copy of this -- of these two notes.

25   And pursuant to the audit process, the
```

```
 1                    WATERHOUSE - 10-19-21

 2    corporate accounting group gave the two notes

 3    to PricewaterhouseCoopers in connection with

 4    the audit; correct?

 5                    MS. DANDENEAU:  Objection to form.

 6         A.    Yes.  I mean, that is -- yeah, I

 7    mean, they -- unless the legal team can also

 8    retain copies of items like this.  I mean, I

 9    don't know everything that they would retain as

10    well.

11                    The legal team would also, if they

12    had documents as part of audits, turn that over

13    to the auditors as well.  So it could have been

14    the corporate accounting team.  It could be

15    someone on the legal team.

16         Q.    All right.  So you didn't -- you

17    didn't draft this note; right?

18         A.    I -- I -- I did not.

19         Q.    But somebody at Highland did; is

20    that fair?

21                    MS. DEITSCH-PEREZ:  Object to the

22         form.

23         A.    I don't know.  I mean, we can go to

24    the legal team.  I don't -- I'm not sitting

25    behind someone in legal.  Maybe they went to
```

```
1                 WATERHOUSE - 10-19-21

2    outside counsel.  I have no idea.

3         Q.    Did you have any reason to believe

4    you weren't authorized to sign this note,

5    either of these two notes?

6         A.    I think I have already answered that

7    question.

8         Q.    Okay.  You didn't give these notes

9    to PricewaterhouseCoopers; correct?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17             MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21             MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23             VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)
```

```
 1                    WATERHOUSE - 10-19-21

 2               VIDEOGRAPHER:  We are back on the

 3        record at 1:49 p.m.

 4        Q.    Mr. Waterhouse, did you speak with

 5   anybody during the break about the substance of

 6   this deposition?

 7        A.    I spoke to -- to Deb and Michelle.

 8        Q.    About the substance of the

 9   deposition?

10        A.    Yes.

11        Q.    Can you tell me what you talked

12   about?

13               MS. DANDENEAU:  No.  We object on

14        the basis of privilege.

15        Q.    Okay.  You are going to follow your

16   counsel's objection here?

17        A.    Yes.

18        Q.    Okay.

19               MR. MORRIS:  Can we put up on the

20        screen Exhibit 35.

21               (Exhibit 35 marked.)

22        Q.    Are you able to see that document,

23   sir?

24        A.    Yes.

25        Q.    Have you ever seen an incumbency
```

```
 1                    WATERHOUSE - 10-19-21

 2    certificate before?

 3          A.    I have.

 4          Q.    Do you have a general understanding

 5    of what an incumbency certificate is?

 6          A.    I have a general understanding.

 7          Q.    What is your general understanding?

 8          A.    You know, those -- my general

 9    understanding is that the incumbency

10    certificate basically lists folks that can --

11    are like authorized signers.

12          Q.    Okay.  And do you see that this is

13    an incumbency certificate for Highland Capital

14    Management Fund Advisors, L.P.?

15          A.    Yes.

16          Q.    Okay.  And if we could scroll down

17    just a little bit, do you see that it's dated

18    effective as of April 11th, 2019?

19          A.    Yes, I see that.

20          Q.    Okay.  And is that your signature in

21    the middle of the signature block?

22          A.    Yes, it is.

23          Q.    And by signing it, did you accept

24    appointment as the treasurer of HCMFA effective

25    as of April 11th, 2019?
```

1            WATERHOUSE - 10-19-21

2        A.    Again, I'm not the legal -- I don't

3    know if this makes me the treasurer or the

4    appointment.  I don't know -- I don't know

5    that, so I don't -- I don't know if that

6    document -- again, I think -- again, I'm not

7    the legal expert.  I think isn't there --

8    aren't there other legal documents that detail

9    who the officers are that could be incorporated

10   or things like that?  Again, I don't want to

11   play armchair attorney here.

12       Q.    I'm not asking you for a legal

13   conclusion.  I'm asking you for your knowledge

14   and understanding.  When you signed this

15   document, did you understand that you were

16   accepting an appointment as the treasurer of

17   HCMFA?

18            MS. DANDENEAU:  Objection to form.

19            MS. DEITSCH-PEREZ:  Objection, form.

20       A.    Again, I don't think this -- that

21   wasn't my understanding.  I don't think this

22   makes -- this document makes me the treasurer.

23       Q.    What do you think this document --

24   why did you sign this document?

25            MS. DEITSCH-PEREZ:  Objection to

```
 1                  WATERHOUSE - 10-19-21

 2         form.

 3                MR. MORRIS:  You're objecting to the

 4         form of the question when I asked him why

 5         did you sign the document?  What is the

 6         basis for the objection?

 7                MS. DEITSCH-PEREZ:  Because, John, I

 8         think that it does call for a legal

 9         conclusion other than -- with him saying

10         because somebody told me to sign this

11         document.  But if you want to go there,

12         that is fine.

13                MR. MORRIS:  Okay.

14                MS. DANDENEAU:  I don't think --

15         he's already said he's not a lawyer.

16                MR. MORRIS:  I'll allow the witness

17         to answer this question.

18         Q.    Why did you sign this document, sir?

19         A.    I mean, our -- our legal group would

20    bring by these incumbency certificates from

21    time to time.  I have no idea why they're being

22    updated, and I was asked to sign.

23         Q.    Did you ask anybody, what is this

24    document?

25         A.    No.
```

1                    WATERHOUSE - 10-19-21

2          Q.     Did anybody tell you why they needed

3    you to sign the document?

4          A.     Not that I can recall.

5          Q.     You testified earlier that you

6    understood that you served as the acting

7    treasurer for HCMFA; correct?

8          A.     Yes.

9          Q.     How did you become the acting

10   treasurer of HCMFA?

11               MS. DANDENEAU:  Objection to form.

12         A.     I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15         Q.     I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18               MS. DANDENEAU:  John, you said --

19               MR. MORRIS:  Stop.

20               MS. DANDENEAU:  -- how did you

21        become the treasurer.  That is --

22               MR. MORRIS:  Please stop.

23               MS. DANDENEAU:  That is a legal

24        question.

25               MR. MORRIS:  I am not asking any

```
1                    WATERHOUSE - 10-19-21

2         legal questions, to be clear.  I'm asking

3         for this witness' understanding as to how

4         he became the acting treasurer of HCMFA.

5         If he doesn't know, he can say he doesn't

6         know, but this legal stuff is nonsense, and

7         I really object to it.

8         Q.    Sir, I'm asking you a very simple

9    question.

10                   MS. DANDENEAU:  Argumentative.

11        Q.    You testified -- you testified that

12   you became the acting treasurer of HCM --

13   HCMFA; correct?

14        A.    Yes.

15        Q.    How did that happen?

16                   MS. DANDENEAU:  Again, object to

17        form.

18                   MR. MORRIS:  I can't wait to do this

19        in a courtroom.  Good God.

20        Q.    Go ahead, sir.

21        A.    I don't know the exact process of

22   how that happened.

23        Q.    Do you have any idea whether signing

24   this document was part of the process?

25                   MR. MORRIS:  You know what --
```

```
 1          WATERHOUSE - 10-19-21

 2          MS. DANDENEAU:  Objection.

 3          MR. MORRIS:  -- withdrawn.  You guys

 4    want to do this, I can't wait.  I can't

 5    wait.  This is the craziest stuff ever.

 6          MS. DANDENEAU:  John, he said he's

 7    not a lawyer, and you are asking him for a

 8    legal conclusion, and he says he doesn't

 9    know, and you persist.

10          MR. MORRIS:  Okay.

11          MS. DANDENEAU:  So you can ask these

12    questions --

13          MR. MORRIS:  Did anyone -- please

14    stop talking.

15          MS. DANDENEAU:  -- at another

16    point -- no, no, no, I'm entitled to talk,

17    too; right?  If you're going to make these

18    accusations as if we're trying to stonewall

19    you, this is not the witness to ask that

20    question.

21          MR. MORRIS:  I can't -- I can't

22    wait -- I can't wait to do this in a

23    courtroom.  I will just leave it at that.

24          MS. DANDENEAU:  That's right, I'm

25    sure you can't.
```

```
 1                    WATERHOUSE - 10-19-21

 2          Q.    Did anyone ever tell you, sir, that

 3     even though you were the acting treasurer of

 4     HCMFA, that you were not authorized to sign the

 5     two promissory notes that we looked at before

 6     lunch?

 7          A.    I'm not sure I understand the

 8     question.  I wasn't -- I mean, I'm -- I'm the

 9     current acting treasurer.

10          Q.    Did anybody ever tell you at any

11     time that even though you were the acting

12     treasurer of HCMFA, that you were not

13     authorized to sign the two promissory notes

14     that we looked at before lunch?

15                MS. DANDENEAU:  Objection to form.

16          A.    Not that I recall.

17          Q.    Did anybody ever tell you at any

18     time that you were not authorized to sign the

19     two promissory notes that we looked at before

20     lunch?

21          A.    Not that I recall.

22          Q.    Did anybody ever tell you at any

23     time that you should not have signed the two

24     promissory notes that we looked at before

25     lunch?
```

1              WATERHOUSE - 10-19-21

2        A.    Not that I recall.

3        Q.    Did you ever tell anybody at any

4   time that you weren't authorized to sign the

5   two promissory notes that we looked at before

6   lunch?

7        A.    Not that I recall.

8        Q.    Did you ever tell anybody at any

9   time that you made a mistake when you signed

10  the two promissory notes that we looked at

11  before lunch?

12       A.    Not that I recall.

13       Q.    As you sit here right now, do you

14  have any reason to believe that you were not

15  authorized to sign the two documents that we

16  looked at before lunch?

17            MS. DANDENEAU:  Objection to form.

18       A.    If -- if this is the -- the valid

19  incumbency certificate, I mean, this does --

20  this does detail who the signers are.

21       Q.    Okay.  And looking at that document,

22  does that give you comfort that you were

23  authorized to sign the two promissory notes

24  that we looked at before lunch?

25            MS. DEITSCH-PEREZ:  Object to the

```
1              WATERHOUSE - 10-19-21

2       form.

3              MS. DANDENEAU:  Objection, form.

4       A.    Yes.

5       Q.    As of October 20th -- withdrawn.

6              I'm trying to take your mind back to

7    a year ago, October 2020.  Do you recall at

8    that time that the boards of the retail funds

9    were making inquiries about obligations that

10   were owed by the advisors to Highland in

11   connection with their 15(c) review?

12             MS. DANDENEAU:  Objection to form.

13      A.    I don't -- I don't recall.

14      Q.    As of October 2020, you had no

15   reason to believe you weren't authorized to

16   sign the two promissory notes that we just

17   looked at; correct?

18             MS. DANDENEAU:  Objection, form.

19             MS. DEITSCH-PEREZ:  Objection to

20      form.

21      A.    I didn't think about it in October

22   of 2020, but I mean --

23      Q.    Did you have any reason to believe

24   at that time that you weren't authorized to

25   sign the two notes that we just looked at?
```

1              WATERHOUSE - 10-19-21

2         A.    Not that I'm aware, no.

3         Q.    Did you have any reason to believe a

4    year ago that you made a mistake when you

5    signed those two notes?

6         A.    Not that I'm aware.

7         Q.    A year ago you believed that HCMFA

8    owed Highland the unpaid principal amounts that

9    were due under those two notes; correct?

10        A.    They're -- they're promissory notes

11   that were -- as you presented, that were --

12   that were executed.  Whether they're valid or

13   if there's other reasons, I didn't -- I don't

14   know.

15        Q.    I'm not asking you whether they're

16   valid or not.  I'm asking you for your state of

17   mind.  A year ago you believed that HCMFA

18   was -- was obligated to pay the unpaid

19   principal amount under the two notes that you

20   signed; correct?

21        A.    Yeah, I'm -- I'm -- yes.

22        Q.    Thank you.  Are you aware -- you're

23   aware that -- that in 2017, NexPoint issued a

24   note in favor of Highland in the approximate

25   amount of $30 million; correct?

1               WATERHOUSE - 10-19-21

2          A.    I'm -- I'm -- I'm generally aware.

3          Q.    Okay.  And are you generally aware

4     that from time to time, after the note was

5     issued by NexPoint, that moneys were applied to

6     principal and interest that were due under the

7     NexPoint note?

8          A.    Yes, I'm generally aware.

9          Q.    Okay.  And did anybody ever tell you

10    that the payments that were made against the

11    NexPoint notes were made by mistake?

12         A.    Yes.

13         Q.    And is it the one payment that we

14    talked about earlier today?

15         A.    We talked about a lot of things

16    today.  What payment are we talking about?

17         Q.    Okay.  Who told you that any payment

18    made against the NexPoint note was made by

19    mistake?

20         A.    D.C. Sauter.

21         Q.    When did Mr. Sauter tell you that?

22         A.    I don't -- I don't remember

23    specifically.

24         Q.    Do you remember what payments --

25         A.    Sometime -- sometime this year.

Case 23-03006-sgj Doc 85 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 16 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 48 of 282 PageID 46971

Page 163

```
 1                    WATERHOUSE - 10-19-21

 2        Q.     Sometime in 2021?

 3        A.     Yes.

 4        Q.     Do you remember what payment he was

 5   referring to?

 6        A.     It was the -- the payment made in

 7   January of 2021 or -- yeah, January of -- of

 8   this -- January of 2021.

 9        Q.     Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12        A.     And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17        Q.     Can you -- can you give me any

18   specificity -- withdrawn.

19               Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24               MS. DANDENEAU:  Can I just --

25               MR. RUKAVINA:  Hold on.  Hold on.
```

```
 1                    WATERHOUSE - 10-19-21
 2          I'm going to object here, and I'm going to
 3          instruct the witness not to answer
 4          depending on the discussion that you had --
 5          Mr. Waterhouse, I'm the lawyer for
 6          NexPoint, and as everyone here knows, D.C.
 7          Sauter is in-house counsel.
 8               So if you and Mr. Sauter were having
 9          a factual discussion and him preparing his
10          affidavit, et cetera, then go ahead and
11          answer that.  But if you were having a
12          discussion as to our legal strategy in this
13          lawsuit, or anything having to do with
14          that, then do not answer that.
15               And if you need to talk to either
16          your counsel or me about that, then we need
17          to have that discussion now.
18     A.    Okay.  Yeah, I don't -- I don't
19 really know how to make that distinction, so
20 maybe I need to talk to counsel before I
21 answer, or if I can answer.
22     Q.    Let me just ask you this question:
23 Did -- did you have any conversation with
24 Mr. Sauter about any payment of principal and
25 interest prior to the time that you left
```

1                    WATERHOUSE - 10-19-21

2    Highland's employment, or did it happen after

3    you left Highland's employment?

4          A.    I don't -- I don't recall if -- I

5    don't recall.  I mean, it was sometime in 2021.

6    I don't remember if it was before or after I

7    was let go from Highland.

8          Q.    Okay.  So -- so nobody told you

9    prior to 2021 that any error or mistake was

10   made in the application of payments against

11   principal and interest due on the NexPoint

12   note.  Do I have that right?

13         A.    Yeah, I don't -- I don't recall this

14   being in 2020.

15         Q.    Okay.  And it didn't happen in 2019;

16   correct?

17         A.    I don't recall that happened.

18         Q.    And it didn't happen in 2018;

19   correct?

20         A.    I don't -- I don't recall that

21   happening.

22         Q.    And it didn't happen in 2017;

23   correct?

24         A.    I don't recall.

25         Q.    But -- but you believe the

1          WATERHOUSE - 10-19-21

2    conversation took place in 2021.  You just

3    don't remember if it was before or after you

4    left Highland's employment.  Do I have that

5    right?

6         A.    It was sometime this year.  I

7    don't -- I don't remember.

8         Q.    Okay.  Did you report this

9    conversation to Mr. Seery at any point?

10        A.    I don't believe so.

11        Q.    Did you report this conversation to

12   anybody at DSI at any time?

13        A.    I don't recall.

14        Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16        A.    Yeah, that's right.  I don't recall

17   doing that.

18        Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21        A.    No, I don't -- I don't recall.

22        Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25        A.    I don't recall.

Case 23-03005-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 23:15:41 Desc 167 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 52 of 282 PageID 46975

Page 167

```
 1                    WATERHOUSE - 10-19-21

 2        Q.     Did you tell any of the employees at

 3   Highland before you left Highland's employment

 4   about this call that you had with Mr. Sauter?

 5               MS. DANDENEAU:  Objection to form.

 6        A.     No, I don't -- no, I don't recall.

 7        Q.     NexPoint -- to the best of your

 8   knowledge, did NexPoint ever file a proof of

 9   claim against Highland to try to recover moneys

10   that were mistakenly paid against the principal

11   and interest due under the note?

12        A.     Okay.  Hold on.  You are saying did

13   NexPoint Advisors file a proof of claim to

14   Highland for errors related to payments under

15   the NexPoint note to Highland?

16        Q.     Correct.

17        A.     I'm -- I'm -- I'm not -- I'm not

18   aware.

19        Q.     Are you aware --

20        A.     I'm not the legal person here, I

21   don't know.

22        Q.     I'm just asking for your knowledge,

23   sir.

24        A.     Yeah, I don't know.  I'm not aware.

25        Q.     Are you aware of any claim of any
```

Case 3:21-cv-00881-Doc Document 168-30 Filed 10/20/21 Entered 10/20/21 09:21:31 Page 168 of 397
Case 3:21-cv-00881-X Document 168-30 Filed 01/06/24 Page 53 of 282 PageID 46976

Page 168

```
 1                    WATERHOUSE - 10-19-21

 2    kind that NexPoint has ever made to try to

 3    recover the amounts that it contends were -- or

 4    that Mr. Sauter contend were mistakenly applied

 5    against principal and interest due under the

 6    NexPoint note?

 7         A.    I'm not aware.

 8               MS. DANDENEAU:  Objection to form.

 9         Q.    Okay.  The advisors' agreements with

10    the retail funds are subject to annual renewal;

11    correct?

12         A.    Yes.

13         Q.    And do you participate in the

14    renewal process each year?

15         A.    Yes.

16         Q.    What role do you play in the renewal

17    process?

18         A.    I'm -- I'm asked by the retail board

19    to walk-through the advisors financials.

20         Q.    And do you do that in the context of

21    a board meeting?

22         A.    Yes, it is -- yes, it is typically

23    done in a board meeting.

24         Q.    And do you recall the time --

25    does -- does the renewal process happen around
```

```
 1                 WATERHOUSE - 10-19-21

 2   the same time each year?

 3        A.    Yes, it is -- it is around the same

 4   time every year.

 5        Q.    And what -- what time period of the

 6   year does the renewal process occur?

 7        A.    Approximately the September

 8   timeframe.

 9        Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --
```

```
1                    WATERHOUSE - 10-19-21

2        Q.    No, I apologize.

3              Do you have an understanding of

4    what -- of what 15(c) refers to in the context

5    of the annual renewal process?

6        A.    Yes, generally.

7        Q.    All right.  What is your general

8    understanding of the term "15(c)" in the

9    context of the annual renewal process?

10       A.    I -- I think 15(c) is the section

11   that -- that -- you know, that -- that the

12   board has to evaluate every year, the retail

13   board.  They have to, you know, go through,

14   evaluate, and go through that approval process

15   on a yearly basis.

16       Q.    Okay.

17             MR. MORRIS:  Can we put up on the

18        screen Exhibit 36, please.

19             (Exhibit 36 marked.)

20             MR. MORRIS:  I guess let's just

21        start at the bottom so Mr. Waterhouse can

22        see what is here.

23       Q.    You see this begins with an email

24   from Blank Rome to a number of people.

25             MR. MORRIS:  And if we can scroll
```

Case 3:21-cv-00881-X Document 80 Doc File 1 10/20/21 10/29/21 Entered 10/20/21 10/29/21 21:54:01 Page 1 Desc 397
Case 3:21-cv-00881-X Document 173-20 Exhibit 20 Filed 02/09/24 Page 56 of 282 PageID 46979

Page 171

1                    WATERHOUSE - 10-19-21

2          up -- keep going just a little bit.

3          Q.    You will see that there is an email

4    from Lauren Thedford to Thomas Surgent and

5    others where she reports that she was attaching

6    and reproducing below additional 15(c)

7    follow-up questions from the board.

8                    Do you see that?

9          A.    Yes.

10         Q.    And do you see Question No. 2 asks

11   whether there are any material outstanding

12   amounts currently payable or due in the future

13   (e.g., notes) to HCMLP by HCMFA or NexPoint

14   Advisors or any other affiliate that provides

15   services to the funds?

16                   Do you see that?

17         A.    Yes.

18         Q.    And -- and did you -- do you recall

19   that in -- in October of 2020 the retail boards

20   were asking for that information?

21         A.    I don't recall it, but there --

22   they're obviously asking in this email.

23         Q.    Okay.

24                   MR. MORRIS:  Can we scroll up a

25         little bit, please.

1                WATERHOUSE - 10-19-21

2        Q.    And then do you see that

3   Ms. Thedford includes you on the email string

4   on Tuesday, October 6th, at 5:52?

5        A.    Yes.

6        Q.    And she asks you and Dave Klos and

7   Kristin Hendrix for advice on that particular

8   Request No. 2 that I have just read; right?

9        A.    Yes.

10       Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12       A.    She was an attorney that was in the

13   legal group.

14       Q.    At Highland Capital Management,

15   L.P.?

16       A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19       Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22       A.    Yes.

23       Q.    And -- okay.

24             Do you know whether Ms. Thedford

25   held any positions in relation to the retail

WATERHOUSE - 10-19-21

1

2    funds as we defined that term?

3         A.    Yes.

4         Q.    What is your understanding of the

5    positions that Ms. Thedford held at the retail

6    funds?

7         A.    I -- I recall her being an officer.

8    I don't recall her title.

9         Q.    Okay.  Is she still an officer at

10   any of the retail funds today?

11        A.    No.

12        Q.    Do you know when she ceased to be an

13   officer of the retail funds?

14        A.    Approximately.

15        Q.    And when did she approximately cease

16   to be an officer of the retail funds?

17        A.    It was in -- it was in early of

18   2021.

19        Q.    Okay.  Do you know when she became

20   an officer of the retail funds?

21        A.    I don't recall.

22        Q.    To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25        A.    I believe so.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know what title she

3    held in her capacity as an officer, if any?

4        A.    I told you I don't remember.

5        Q.    Okay.  So she sends this email to

6    you at 5:52 p.m. on October 6th.

7              And if we can scroll up to the

8    response, you responded a minute later with a

9    one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13   response to the retail board's Question No. 2,

14   right, whether there are any material

15   outstanding amounts currently payable or due in

16   the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19       see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21   few minutes later and she asks whether you

22   could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you

1                    WATERHOUSE - 10-19-21

2     refer her to the balance sheet that was

3     provided to the board as part of the 15(c)

4     materials.

5                    Do you see that?

6          A.    Yes.

7          Q.    And -- and did the advisors provide

8     to the board certain balance sheets in 2020 in

9     connection with the 15(c) review?

10         A.    Yes, they did.

11         Q.    Okay.  And were the amounts that

12    were outstanding or that were to be due in the

13    future by the advisors to Highland included in

14    the liability section of the balance sheet that

15    was given to the retail board?

16         A.    Yes.  Notes would be reflected as

17    liabilities.

18         Q.    Okay.  And --

19         A.    If I'm understanding your question

20    correctly.

21         Q.    You are.  And -- and -- and those

22    liabilities you -- you were -- you believed

23    were responsive to the retail board's question;

24    correct?

25         A.    Yes.

1              WATERHOUSE - 10-19-21

2      Q.    Okay.  And then if we can scroll up,

3  you see Ms. Thedford responds to you

4  nine minutes later with a draft response.

5              Do you see that?

6      A.    Yes.

7      Q.    And she says that she is taking from

8  the 6/30 financials certain information about

9  amounts that were due to HCMLP and affiliates

10  as of June 30th, 2020.

11              Do you see that?

12      A.    I do.

13      Q.    Okay.  And did you believe, as the

14  treasurer of NexPoint and HCMFA and as the CFO

15  of Highland, that the information that

16  Ms. Thedford obtained from the 6/30 financials

17  was accurate and responsive in relation to the

18  retail fund board's question?

19      A.    I just want to make sure I

20  understand the question.

21              Are you saying that the financial

22  information provided to the retail board as

23  part of the 15(c) process, which included

24  financial statements as of June 30th of 2021,

25  did I feel like those were responsive to their

```
1               WATERHOUSE - 10-19-21

2    questions?

3         Q.    Yes.

4         A.    Yes.

5         Q.    Thank you.

6               MS. DEITSCH-PEREZ:  John, it is not

7         in the chat yet.  Can you just make sure it

8         gets put in there.

9               MR. MORRIS:  Sure.

10              MS. CANTY:  I put it in there.  I

11        think maybe I just sent it directly, so let

12        me make sure it says to everyone.  But I

13        did put it in there.  I will try again.

14              MR. MORRIS:  Thank you, La Asia.

15              MS. DANDENEAU:  What number is it.

16              MR. MORRIS:  What, the Bates number?

17              MS. DEITSCH-PEREZ:  No, the --

18        this -- yeah, 36 is not in the chat.

19              MR. MORRIS:  Okay.  We'll get it.

20              MS. DANDENEAU:  I think that

21        Ms. Canty just sent it to me originally.

22        Sorry.

23              MR. MORRIS:  Okay.  We will get it

24        there.

25              MS. CANTY:  Okay.  It is there now
```

```
 1                 WATERHOUSE - 10-19-21

 2        for everyone.

 3              MS. DEITSCH-PEREZ:  Got it.  Thank

 4        you.

 5        Q.    Do you recall if the proposed

 6   response that Ms. Thedford crafted was

 7   delivered to the retail board with the -- with

 8   the yellow dates having been completed?

 9        A.    I don't know.

10              MR. MORRIS:  Davor, I'm going to ask

11        that the advisors and -- the advisors of

12        both HCMFA and NexPoint produce to me any

13        report that was given to the retail board

14        concerning the promissory notes at issue,

15        including the obligations under the notes.

16        Q.    Do you know -- do you know if

17   ultimately NexPoint informed the retail board

18   in response to its question that NexPoint owed

19   Highland approximately 23 or $24 million?

20              MS. DANDENEAU:  Objection to the

21        form.

22        A.    Sorry, are you asking, did NexPoint

23   tell the retail board that it owed Highland?

24        Q.    Let me ask a better question,

25   Mr. Waterhouse.
```

```
 1                    WATERHOUSE - 10-19-21

 2                Did -- do you know if anybody ever

 3     answered the retail board's question that was

 4     Number 2?

 5          A.    I don't -- I can't say for sure.

 6          Q.    Okay.  Do you recall -- I think you

 7     testified earlier that you walked through the

 8     advisors' financials with the retail board;

 9     correct?

10          A.    Yes.

11          Q.    And as part of that process, did you

12     disclose to the retail board the obligations

13     that NexPoint and HCMFA had to Highland under

14     promissory notes?

15          A.    The retail board, as I stated

16     earlier, receives financial information,

17     balance sheet, income statement information

18     from the advisors.  That information is

19     provided to the retail board in connection with

20     the 15(c) process.

21                So any notes between the advisors

22     and the Highland would be -- anything would be

23     detailed in those financial statements.

24          Q.    Do you recall in 2020 ever speaking

25     with the retail board about the advisors'
```

```
 1                  WATERHOUSE - 10-19-21

 2    obligations under the notes to Highland?

 3              MS. DANDENEAU:  Objection to form.

 4              MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6    A.    I don't recall specifically.

 7    Q.    Do you have any general recollection

 8    of discussing with the retail board the

 9    advisors' obligations to Highland under the

10    notes that they issued?

11              MS. DANDENEAU:  Object to the form.

12              MS. DEITSCH-PEREZ:  Object to the

13         form.

14    A.    I just recall generally just -- it

15    is just -- I present the financial statements,

16    and if they have questions, I answer their

17    questions and walk them through.

18              I don't recall what they asked.  I

19    don't recall where the discussion went.  I

20    don't recall anything of that nature.

21    Q.    Okay.  Do you know if anybody on

22    behalf of HCMF -- HCMFA ever told the retail

23    board that HCMFA had no obligations under the

24    two 2019 notes that you signed?  Withdrawn.

25              Do you know whether anybody on
```

1                WATERHOUSE - 10-19-21

2    behalf of HCMFA ever told the retail boards

3    that you weren't authorized to sign either of

4    the two 2019 notes?

5                MS. DANDENEAU:  Objection to form.

6        A.    I'm not aware.

7        Q.    Are you aware of anybody on behalf

8    of HCMFA ever telling the retail boards that

9    your execution of the two 2019 notes was a

10   mistake?

11               MS. DANDENEAU:  Objection to form.

12       A.    I'm not aware.

13       Q.    Are you aware of anybody on behalf

14   of HCMFA ever telling the retail boards that

15   HCMFA did not have to pay the amounts reflected

16   in the two notes that you signed in 2019?

17       A.    I'm not aware.

18       Q.    Do you know whether anybody ever

19   told the retail boards -- withdrawn.

20               Do you know whether anybody ever

21   told the retail boards that Highland has

22   commenced a lawsuit to recover on the two notes

23   that you signed in 2019?

24       A.    I'm not aware.

25       Q.    Are you aware of anybody informing

1                    WATERHOUSE - 10-19-21

2    the retail boards that Highland has sued to

3    recover on the NexPoint note?

4         A.    I'm not aware.

5         Q.    Do you know whether anybody ever

6    told the retail board that Highland had

7    declared a default with respect to the two

8    HCMFA notes that you signed in 2019?

9         A.    I'm not aware.

10        Q.    Are you aware of anybody ever

11   informing the retail boards that Highland had

12   declared a default under the NexPoint note?

13        A.    I'm not aware.

14        Q.    Are you aware of anybody telling the

15   retail board that Highland made a demand for

16   payment under the 2019 notes that you signed on

17   behalf of HCMFA?

18        A.    I'm not aware.

19        Q.    Let's -- let's see if there is a

20   response to Ms. Thedford's email, if we can

21   scroll up.

22              Do you see you responded to

23   Ms. Thedford five minutes after she provided

24   the draft response to you?

25        A.    Yes.

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.  And do you see that Dustin

 3   Norris is copied on this email?

 4        A.    Yes, he is.

 5        Q.    Great.  Do you know whether

 6   Mr. Norris held any positions at either of the

 7   advisors as of October 6, 2020?

 8        A.    I will go back to -- I'm not the

 9   legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13        Q.    Do you know what his title was in

14   October of 2020?

15              MS. DANDENEAU:  Objection to form.

16        A.    I don't -- I don't recall.

17        Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20        A.    I don't recall.

21        Q.    Do you know why he is included on

22   this email string?

23        A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.
```

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Does Mr. Norris play a role in

 3   formulating the advisors' responses to the

 4   questions asked by the retail board in

 5   connection with the 15(c) annual review?

 6             MS. DANDENEAU:  Objection to form.

 7        A.    He -- Dustin Norris is there in the

 8   board meetings.  But -- so he has a role, yes.

 9        Q.    Okay.  And does Mr. Norris hold any

10   positions, to the best of your knowledge, in

11   relation to any of the retail funds?

12        A.    I don't -- I don't believe he does.

13        Q.    How about Mr. Post, do you know

14   whether Mr. Post holds any position in either

15   of the advisors?

16        A.    I mean, he -- he -- yes.

17        Q.    What is your understanding of the

18   positions that Mr. Post holds in relation to

19   the advisors?

20             MS. DANDENEAU:  Objection to form.

21        A.    He is an employee of NexPoint

22   Advisors.  He is also the chief compliance

23   officer for -- for NexPoint.

24        Q.    Who is the chief compliance officer

25   for HCMFA, if you know?
```

```
 1                   WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3         A.    That would be Jason as well.

 4         Q.    Okay.  Now, looking at your

 5   response, you noted initially that nothing was

 6   owed under shared services.  Do I have that

 7   right in substance?

 8         A.    Yeah.  I think I'm being responsive

 9   to Lauren's question here, whether any of the

10   shared service invoices are outstanding.

11         Q.    Right.

12         A.    Yes.

13         Q.    And that is because -- and that is

14   because the retail the retail board has asked

15   for the disclosure of all material obligations

16   that were owed to HCMLP either then or in the

17   future; isn't that right?

18              MS. DANDENEAU:  Objection to form.

19         Q.    We can go back down and look.

20         A.    Look, I don't know if that's a

21   material item, I mean, again, but sure.

22         Q.    Okay.  But there were no shared

23   services outstanding; correct?

24              MS. DANDENEAU:  Objection to form.

25         A.    That is what this email seems to
```

```
 1                  WATERHOUSE - 10-19-21

 2   indicate.

 3        Q.    And you wouldn't have written it if

 4   you didn't believe it to be true at the time;

 5   correct?

 6        A.    Correct.

 7        Q.    And when you referred to shared

 8   services outstanding, what you meant there was

 9   that neither NexPoint nor HCMFA owed Highland

10   any money under the shared services agreements

11   that they had with Highland as of October 6th,

12   2020; right?

13        A.    I don't know if it is as of October

14   6, 2020 or if it was from -- like through the

15   financials -- through the date of the

16   financials as of June 30.

17        Q.    Okay.  And then you noted that

18   HCMA -- the HCMFA note is a demand note; right?

19        A.    Yes.

20        Q.    And then you referred Ms. Thedford

21   to Kristin Hendrix for the term of the NexPoint

22   note.  Do I have that right?

23        A.    Yes.

24        Q.    And then you refer to that agreement

25   that is referenced in the 2018 audited
```

```
 1                 WATERHOUSE - 10-19-21

 2   financials about Highland's agreement not to

 3   make demand upon HCMFA until May 2021; correct?

 4        A.    Correct.

 5        Q.    And then -- and then the next thing

 6   you write is that the attorneys think that BK

 7   doesn't change that, but don't know for sure at

 8   the end of the day.

 9              Do you see that sentence?

10        A.    Yes.

11        Q.    Which attorneys were you referring

12   to?

13        A.    I don't remember.

14        Q.    Did you have a conversation with

15   attorneys concerning whether the bankruptcy

16   would change or alter in any way the agreement

17   not to make a demand under the HCMFA note?

18        A.    Look, yeah, I mean, I don't

19   specifically remember, but generally, I mean,

20   it is in this email.  I don't -- I don't -- I

21   don't -- I don't remember who I talked to or,

22   you know, was it inside counsel, outside

23   counsel, but obviously I talked to somebody.

24        Q.    Do you have any recollection --

25        A.    Well, I don't even know if it's --
```

                        WATERHOUSE - 10-19-21

 1
 2   actually, it may not even have been me.  I say
 3   the attorneys in, you know, a lot of -- like I
 4   talked about the team.
 5            It could have been someone on the
 6   team, like, hey, we need to run this down, and
 7   maybe they talked to attorneys again and
 8   relayed that information to me.
 9            So I really don't know if I spoke or
10   someone else did or -- or, I mean, and maybe it
11   wasn't even from corporate accounting.  Maybe
12   it was, you know, other -- I'm kind of
13   summarizing, you know, again, so I don't really
14   know -- I can't really say for sure.  I don't
15   remember how I came about of this knowledge.
16       Q.    I appreciate your efforts,
17   Mr. Waterhouse, but I will just tell you that
18   if I ask a question and you don't know the
19   answer or you don't recall, I'm happy to accept
20   that.  I don't -- I don't want you to
21   speculate, so I want to be clear about that.
22   So I appreciate it.
23            Let me just ask you simply:  Do you
24   know what attorneys -- can you identify any of
25   the attorneys who thought that the bankruptcy

1                    WATERHOUSE - 10-19-21

2     process didn't change the agreement?

3          A.     I don't recall.

4          Q.     Okay.  Perfect.

5                 And then let's look at the last

6     sentence.  It says, quote:  The response should

7     include, as I covered in the board meeting,

8     that both entities have the full faith and

9     backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11                Do you see that?

12         A.     Yes.

13         Q.     Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.     Yes.

18         Q.     Do you remember in the context in

19    which you told the retail board that?

20         A.     I mean, generally, yes.

21         Q.     Tell me what you recall.

22         A.     So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show

1        WATERHOUSE - 10-19-21

2    they have liabilities on them that exceed

3    assets.

4              So the retail board has asked, okay,

5    you know, how -- you know, if -- if these

6    liabilities come due or they're payable, you

7    know, how does that come about?

8              And, you know, the response is,

9    well, the advisors have the -- the full faith

10   and backing from -- from Jim Dondero.

11        Q.    And how did you know that the

12   advisors had the full faith and backing from

13   Jim Dondero?  What was the basis for that

14   statement that you made to the retail board?

15        A.    I talked to Jim about it at some

16   point in the past.

17        Q.    And did you tell Mr. Dondero that

18   you were going to inform the retail board that

19   the advisors had his full faith and backing

20   before you actually told that to the retail

21   board?

22        A.    I don't recall having that

23   conversation.

24        Q.    Do you recall if you ever informed

25   Mr. Dondero that you had disclosed or told the

 1                    WATERHOUSE - 10-19-21

 2   retail board that the advisors had the full

 3   faith and backing of Mr. -- Mr. Dondero?

 4           MS. DEITSCH-PEREZ:  Object to the

 5       form.

 6       A.   I don't recall discussing that with

 7   him at the time.

 8       Q.   When you told this to the board, was

 9   Mr. Dondero participating in the discussion?

10       A.   Not that I recall.

11       Q.   Withdrawn.  Was it not -- withdrawn.

12           Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17       A.   I believe I was at home.

18       Q.   Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22           MS. DEITSCH-PEREZ:  Object to the

23       form.

24       A.   I don't recall everyone on the call.

25       Q.   Can you identify anybody who was on

1                WATERHOUSE - 10-19-21

2    the call?

3         A.    Other than the board members?

4         Q.    Yes.

5         A.    Lauren Thedford.  I mean, there

6    are -- there are many -- my section is just one

7    of many sections that are just -- you know, as

8    you can appreciate, this is a long board

9    meeting.

10               I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.    I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.    I think you asked me this already,

18   John.

19        Q.    Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.    I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you know if either of them

 3   have a position with the retail board -- with

 4   the retail funds?

 5        A.    I don't believe Mr. Norris has a

 6   position with the retail funds.

 7        Q.    All right.  What about Mr. Post?

 8        A.    Mr. Post is the CCO of the advisors.

 9        Q.    Okay.  Does he hold any position --

10        A.    I don't believe so.

11        Q.    -- with the retail funds?

12        A.    I don't believe so.

13        Q.    Okay.

14        A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18        Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21              MS. DANDENEAU:  Objection to form.

22        A.    It is -- it is -- it is what has

23   been discussed with them prior.

24        Q.    And were you -- were you trying to

25   give them comfort that even though the
```

1                    WATERHOUSE - 10-19-21

2    liabilities exceeded the assets that the

3    advisors would still be able to meet their

4    obligations as they become due?

5                    MS. DANDENEAU:  Objection to form.

6                    MS. DEITSCH-PEREZ:  Object form.

7         A.    I -- I can't -- I don't remember

8    specifically the conversation, but generally --

9    you know, generally, yes.  And that is why --

10   but, you know, again, in this email saying, you

11   know, I am sure I qualified it with the retail

12   board, you know, as I said I like -- you know,

13   to my knowledge, that hasn't changed.  But,

14   again, generally -- generally that is what I

15   remember.

16        Q.    Okay.  Do you recall if in the

17   advisors' response to the retail board's

18   question if the response included any statement

19   concerning Mr. Dondero and -- and the full

20   faith and backing that he was giving to the

21   advisors?

22                    MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't -- I don't remember

25   specifically what was provided.

1                    WATERHOUSE - 10-19-21

2          Q.     Okay.

3          A.     And I don't really -- I don't really

4     remember generally either.

5          Q.     Okay.

6                    MR. MORRIS:  So -- so, again, I'm

7                 just going to ask Mr. Rukavina if your

8                 clients can produce as soon as possible the

9                 15(c) response, the written response that

10                the advisors made, if any, to the board's

11                Question No. 2.

12                   I'm not looking for the whole

13                response, but I certainly want the response

14                to Question No. 2.

15         Q.     Do you have a general understanding

16    as to the amount by which -- withdrawn.

17                   Did -- did the assets of --

18    withdrawn.

19                   Did the liabilities of HCMFA exceed

20    its assets in 2020?

21                   MS. DANDENEAU:  Objection to form.

22                   MS. DEITSCH-PEREZ:  Objection, form.

23         A.     I believe I have already answered

24    that question earlier, I think.  I believe I

25    said yes.

                        WATERHOUSE - 10-19-21

1

2       Q.    Okay.  And did the liabilities of

3    NexPoint exceed its assets in 2020?

4             MS. DEITSCH-PEREZ:  Objection to

5       form.

6       A.    I don't believe so.

7       Q.    Okay.  So -- so it was only one of

8    the two advisors who had liabilities that

9    exceeded the value of the assets.

10            Do I have that right?

11            MS. DEITSCH-PEREZ:  Objection to

12      form.

13            MS. DANDENEAU:  Form.

14      A.    Yes.

15      Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18            MS. DANDENEAU:  Objection to form.

19      A.    I don't -- I don't recall.

20            MR. MORRIS:  I had specifically

21      requested in discovery the audited

22      financial reports for both advisors and

23      NexPoint.  I think I may have gotten one

24      for NexPoint but I'm still waiting for the

25      balance.  And I'm going to renew my request

1                WATERHOUSE - 10-19-21

2          for those documents too.

3          Q.    Let's go to the next exhibit, which

4    is Number 10.  So I think it is in your stack,

5    Mr. Waterhouse.

6                MR. MORRIS:  And we can take the one

7          down from the screen and put up Number 10

8          for everybody.

9                (Exhibit 10 marked.)

10         Q.    And I don't know if you have ever

11   seen this before, but I'm really putting it up

12   on the screen for purposes of turning to the

13   very last page of the document.

14               So this is a document that we have

15   been -- that we premarked as Exhibit 10.  And

16   we're turning to the last page of the document,

17   which is a document that was filed in the

18   adversary proceeding 21-3004.  And -- no, I

19   apologize, I think we -- right there.  Perfect.

20               And it is page 31 of 31.

21               MR. MORRIS:  I think there may have

22         been some something erroneously stapled to

23         the hard copy that I gave you folks, but

24         I'm looking for page 31 of 31 in the

25         document that begins with the first page of

1                    WATERHOUSE - 10-19-21

2          Exhibit 10.

3          Q.    Do you have that, Mr. Waterhouse?

4          A.    I don't have it yet.  I'm looking.

5          Q.    All right.  If you look at the top

6    right-hand corner, you will see it says page

7    hopefully something of 31?

8          A.    Yes, I've got it now.

9          Q.    Okay.  You have got 31 of 31.  You

10   can take a moment to read that, if you would

11   like.

12         A.    (Reviewing document.)  Okay.

13         Q.    Have you ever seen this before?

14         A.    I don't know if I have seen this

15   specific document, but, you know, I've --

16   I'm -- I'm aware of it.

17         Q.    And is this the document that you

18   had in mind when you sent that email to

19   Ms. Thedford that we just looked at where you

20   said that Highland had agreed not to make a

21   demand upon HCMFA until May 2021?

22         A.    Honestly, I don't -- it wasn't this

23   document.  I mean, it's something like this,

24   yes.  I mean, yes.

25         Q.    Well --

WATERHOUSE - 10-19-21

1

2    A.    It is something like this, but I

3  don't think it was this specific document.

4    Q.    Well, but this document does say in

5  the last sentence that Highland agreed not to

6  seek -- not to demand payment from HCMFA prior

7  to May 31, 2021; right?

8    A.    Yes.

9    Q.    And are you aware of any other

10  document that was ever created pursuant to

11  which Highland agreed not to demand payment on

12  amounts owed by HCMFA before May 31, 2021?

13    A.    Hold on.  Are you asking, am I aware

14  of a document that by HCMFA that basically says

15  otherwise?

16    Q.    No.  Let me try again.

17        Are you aware of any other document

18  pursuant to which -- pursuant to which Highland

19  agreed not to make a demand on HCMFA until May

20  31st, 2021?

21    A.    I'm -- I think there was something

22  in connection with -- with the -- with the

23  audit that basically says the same thing.

24    Q.    Okay.  And do you think that the

25  audit is referring to this particular document?

```
 1                WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5        A.    I do.

 6        Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8        A.    Yes.

 9        Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20             MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.
```

Case 23-0506, Doc 8, Filed 10/20/21, Entered 10/20/21 21:54:01, Dist
Case 3:21-cv-00881-X   Document 178-30   Filed 05/06/246   Page 86 of 282   PageID 47009

Page 201

                    WATERHOUSE - 10-19-21

1

2        A.     May 31 of 2021, excuse me.

3        Q.     And this document states the

4   deferral that you just described; correct?

5        A.     It does.

6        Q.     And this document states the

7   deferral that was described in the audited

8   financial statements that we looked at before;

9   correct?

10       A.     It does.

11              MR. MORRIS:   Okay.  Can we scroll

12       down just a little bit to see who signed on

13       behalf of the acknowledgment there.

14       Q.     Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17       A.     I do.

18       Q.     Okay.  Did you discuss this document

19   or the -- withdrawn.

20              Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23       A.     I think I testified I don't recall.

24       Q.     Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?

Case 3:00-cv-00000-Doc 8 Document 110-1 Filed 10/20/21 Page 202 of 397
Case 3:21-cv-00881-X   Document 178-30   Filed 05/06/24   Page 87 of 282   PageID 47010

Page 202

```
 1                   WATERHOUSE - 10-19-21

 2        A.     I don't recall.

 3               MR. MORRIS:  Can we scroll back up

 4        to the document, please.

 5        Q.     Do you see in the beginning it says,

 6   reference is made to certain outstanding

 7   amounts loaned from Highland to HCMFA for

 8   funding ongoing operations.

 9               Do you see that?

10        A.     Yes.

11        Q.     And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16        A.     Yes.

17        Q.     And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20        A.     Yes.

21        Q.     And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24               MS. DEITSCH-PEREZ:  Object to the

25        form.
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Well, this -- this document dated

 3   April 15, 2019 says they have been deferred to

 4   May 31, 2021.

 5        Q.    Right.  But I'm just sticking to the

 6   first paragraph where they refer to the

 7   outstanding amounts.  And in the end it says

 8   the -- it remained outstanding on December

 9   31st, 2018, and I think you told me that you

10   understood that, and then I'm just trying to

11   capture the last piece of it.

12              Did you understand that there were

13   amounts outstanding from the loan that Highland

14   made to HCMFA to fund ongoing operations as of

15   April 15th, 2019?

16        A.    Yes.

17        Q.    Thank you.  Let's look at the next

18   sentence.  HCMFA expects that it may be unable

19   to repay such amounts should they become due

20   for the period commencing today and continuing

21   through May 31st, 2021.

22              Do you see that?

23              MS. DANDENEAU:  Objection to form.

24        A.    I do.

25        Q.    As the CFO -- withdrawn.
```

```
 1                  WATERHOUSE - 10-19-21

 2                  As the treasurer of HCMFA, did you

 3    believe that -- do you believe that statement

 4    was true and accurate at the time it was

 5    rendered?

 6        A.    I mean, it -- it -- the answer to

 7    that is I really didn't have any -- I didn't

 8    have an opinion really.

 9        Q.    Did you do anything to educate

10    yourself in April of 2019 on the issue of

11    whether HCMFA could repay the amounts that it

12    owed to Highland should they become due?

13        A.    I don't believe so.

14        Q.    Did you at any time form any

15    opinions as to HCMFA's ability to repay all

16    amounts due to Highland should they become due?

17        A.    Not really.  I guess I don't...

18        Q.    Well, you told the retail board that

19    HCMFA's liabilities exceeded their assets in

20    2020; correct?

21        A.    Yes.

22        Q.    Based on the work that you did to

23    prepare for the retail board, did you form any

24    view as to whether HCMFA would be unable to

25    repay the amounts that it owed to Highland
```

Case 23-03005-sgj Doc 85-4 Filed 10/20/23 Entered 10/20/23 21:54:01 Desc
Case 3:21-cv-00881-X Document 178-30 Filed 05/08/24 Page 90 of 282 PageID 47013

Page 205

```
1                   WATERHOUSE - 10-19-21

2   should they become due?

3              MS. DANDENEAU:  Objection to form.

4        A.    I mean, I -- when you look at that,

5   to answer you, completely, you know, again,

6   if -- the response I gave the retail board was,

7   you know, the -- the advice -- HCMFA advisors

8   have the -- have the full faith and backing of

9   Jim Dondero.  So I didn't form an opinion of

10  whether the advisor could pay it or not.

11       Q.    Did you form any view as to whether

12  the advisors could repay the amounts that it

13  owed to Highland should they become due without

14  the full faith and backing of Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Form.

17       A.    I mean, if you -- if you -- if you

18  take that last statement out, I mean, it would

19  be difficult for HCMFA to pay back demand notes

20  at that time.

21       Q.    And it was precisely for that reason

22  that you told the retail board that -- that the

23  retail -- that the advisors had the full faith

24  and backing of Mr. Dondero; correct?

25             MS. DANDENEAU:  Objection to form.
```

```
1                 WATERHOUSE - 10-19-21

2        A.    I mean, yes, as the mouthpiece, I

3    was relaying information.

4        Q.    Okay.  And you relayed that

5    information with the knowledge and approval of

6    Mr. Dondero; correct?

7              MS. DEITSCH-PEREZ:  Object to the

8        form.

9        A.    As I stated in the email, I don't

10   believe, and I think I testified I don't

11   believe I had conversations with Mr. Dondero at

12   the time of that board meeting.

13       Q.    Did you tell the retail board that

14   the advisors had the full faith and backing of

15   Mr. Dondero without Mr. Dondero's prior

16   approval?

17       A.    Yeah, I -- I -- yes, I'm -- like I

18   said, I think I testified earlier, I'm sure I

19   qualified it as well.

20       Q.    What do you mean by that?

21             MS. DANDENEAU:  Objection to form.

22       A.    Again -- again, like I said in the

23   email, it has the full faith and backing of Jim

24   Dondero unless that has changed.

25       Q.    Actually that is not what you said,
```

```
 1                    WATERHOUSE - 10-19-21

 2    so let's put the email back up.

 3         A.    It is -- it is -- it is in the

 4    email.

 5         Q.    Let's put the email back up.  You

 6    didn't say unless it has changed.  You said you

 7    believe it hasn't changed; right?

 8         A.    Okay.  And to my knowledge that

 9    hasn't changed, that is what it says.

10         Q.    That's right.

11         A.    But, again, I mean, that is -- I

12    don't know everything.  And I'm not in every

13    conversation.  I'm not -- to presume that I am,

14    is -- and you have to put myself -- as you

15    started this out, Mr. Morris, I was at home in

16    October of 2020 with COVID -- or, you know,

17    under these COVID times that we described is

18    very difficult.

19               We have all been working at home for

20    really the first time ever, undergoing

21    processes, procedures, control environments

22    that have been untested, and there is poor

23    communication.

24               So I am relaying, as I'm telling you

25    now, what is in the email.  And unless
```

```
 1              WATERHOUSE - 10-19-21

 2   something has changed -- to my knowledge, it

 3   hasn't changed, but it could have changed.

 4        Q.    When you say that the advisors have

 5   the full faith and backing from Mr. Dondero,

 6   did you intend to convey that, to the extent

 7   the advisors were unable to satisfy their

 8   obligations as they become due, Mr. Dondero

 9   would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12        form.

13              And, John, we have given you a lot

14        of leeway here but this does not seem

15        relevant to this case.  You seem sort of

16        taking a complete sort of diversion into

17        the allegations and the complaint just

18        filed on Friday, and so I would ask you to

19        move on because --

20              MR. MORRIS:  And I will tell you --

21        I will tell you that I have never read that

22        complaint cover-to-cover.  I have nothing

23        to do with the prosecution of those claims.

24        And this issue that we're talking about

25        right now is related solely to the
```

Case 3:21-cv-00881-X   Document 88-20   Filed 10/28/21   Entered 10/28/21 12:33:54   Page 209 of 397
Case 3:21-cv-00881-X   Document 178-20   Filed 01/09/24   Page 94 of 282   PageID 47017
Page 209

```
 1                    WATERHOUSE - 10-19-21

 2           promissory notes that your clients refuse

 3           to pay.

 4                    So I'm going to continue to ask my

 5           questions, and I would ask the court

 6           reporter to read back my last question.

 7                         (Record read.)

 8                    MS. DEITSCH-PEREZ:  And then I

 9           believe there were objections to form.

10           Q.    You can answer the question.

11           A.    Yes.

12           Q.    Thank you very much, sir.

13                    MR. MORRIS:  Can we go back to the

14           other document, please?

15           Q.    Mr. Waterhouse, do you know if this

16      document was ever shared with the retail board?

17           A.    I don't recall.

18           Q.    Did you ever share it with the

19      retail board?

20           A.    I don't recall.

21           Q.    Did you ever tell the retail board

22      about the substance of this document?

23           A.    I don't recall.

24           Q.    Did you ever tell the retail board

25      that Highland had agreed not to make a demand
```

1                WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3         A.    I don't recall.

4         Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9         A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11    anybody else responding to the retail board's

12    15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14    anyone else to -- to -- to produce this, to

15    disclose this document?  Is that what you -- I

16    just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20    the retail board, in response to their question

21    as part of the 15(c) process, to -- to tell the

22    retail board about Highland's agreement not to

23    make a demand until 2021?

24                MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.

Case 21-03005-sgj Doc 85-1 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 21 of 397
Case 3:21-cv-00881-X   Document 178-20   Filed 06/09/24   Page 96 of 282   PageID 47019
Page 211

WATERHOUSE - 10-19-21

1

2      Q.      Did you ever inform PwC that HCMFA's

3   liabilities exceeded its assets?

4              MS. DANDENEAU:  Object to the form.

5      A.      I don't -- I don't think I told

6   them.  I mean, they -- they audited the

7   financial statements.

8      Q.      Did -- do you know if anybody on

9   behalf of Highland ever informed

10  PricewaterhouseCoopers that HCMFA may be unable

11  to repay amounts owing to Highland, should they

12  become due?

13             MS. DANDENEAU:  Objection to form.

14     A.      Yes.  Again, I think I testified

15  earlier that -- that this was communicated to

16  the auditors.

17     Q.      Ideally --

18     A.      I don't know who exactly did that.

19  I don't recall doing it, but, yeah, it was --

20  it was communicated.  And that is why -- I

21  mean, there is a disclosure in the financial

22  statements; right?

23     Q.      There is, and that disclosure

24  relates to the last sentence of this document;

25  correct?

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Do you recall looking in the

 4   document and seeing anything that was disclosed

 5   with respect to the sentence above that?

 6        A.    No.

 7        Q.    Do you know whether anybody on

 8   behalf of Highland ever informed

 9   PricewaterhouseCoopers that HCMFA expects that

10   it may be unable to repay amounts due and owing

11   to Highland should they become due?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  I think that is the third time.

14        A.    I don't recall.  Again, as I said,

15   we -- all of this was given to the auditors.

16        Q.    Do you know if Highland received

17   anything of value in exchange for its agreement

18   not to demand payment on amounts owed by HCMFA

19   prior to May 31st, 2021?

20              MS. DEITSCH-PEREZ:  Object to the

21         form.  That is the second time.

22              MS. DANDENEAU:  Object to the form.

23        A.    I have answered this question.

24              MR. RUKAVINA:  Hold on.  Object to

25         legal conclusion.  Go ahead.
```

```
 1              WATERHOUSE - 10-19-21

 2        A.    I have answered this question

 3   before.

 4        Q.    And the answer was no?

 5        A.    I'm not aware.

 6        Q.    Now, this acknowledgment can't

 7   possibly apply to the two notes that you signed

 8   on behalf of HCMFA because those notes were

 9   signed on May 2nd and May 3rd, 2019; is that

10   right?

11              MS. DANDENEAU:  Objection to form.

12        A.    Unless there is a drafting error.

13        Q.    Okay.  Are you aware of a drafting

14   error?

15        A.    I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18        Q.    But you do see it is dated April 15,

19   2019; right?

20        A.    Yes.

21        Q.    And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24              MR. RUKAVINA:  Well, I don't know

25        that so I object to form.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.  Let's go to the first page of

 3   the document and just confirm that.

 4             MR. AIGEN:  Mr. Morris, I just note

 5        that you already said there was some error

 6        with the document that is listed as

 7        exhibit --

 8             MR. MORRIS:  No.  No, no, no.

 9             MS. DEITSCH-PEREZ:  Oh, okay.

10             MR. MORRIS:  What I said is that

11        there is a few pages that were mistakenly

12        stapled to the end of the document.

13             MS. DEITSCH-PEREZ:  Okay.

14             MR. MORRIS:  There is no problem

15        with this document.

16             MS. DEITSCH-PEREZ:  And just so

17        we're clear that the document -- the pages

18        that start with defendant's amended answer

19        are not intended to be part of this

20        document?

21             MR. MORRIS:  That's correct.

22             MS. DEITSCH-PEREZ:  And that the --

23        but it is your representation that the rest

24        of the document is -- is -- is correct

25        because we don't -- we don't have any way
```

Case 3:05-cv-03306-X Document 8 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 215 of 397
Case 3:21-cv-00881-X Document 178-30 Page 2599/2446 Page 100 of 282 PageID 47023

Page 215

```
 1                    WATERHOUSE - 10-19-21

 2         of verifying that, we're just --

 3              MR. MORRIS:  You do, actually.  You

 4         could just go to Docket No. 21-3004.

 5              MS. DEITSCH-PEREZ:  If you want to

 6         stop this deposition so we can go and pull

 7         that document up, we're happy to do it.  So

 8         I am just asking you for your

 9         representation.

10              MR. MORRIS:  Sure.  I gave that.

11              MS. DEITSCH-PEREZ:  Okay.

12         Q.    So do you see that this is a

13    document that was actually filed with the Court

14    by Highland Capital Management Fund Advisors?

15         A.    No.  I get with the first page in

16    the section.  Maybe I'm looking at the wrong

17    thing.  It says, Highland Capital Management.

18         Q.    Don't worry about it.  Don't worry

19    about it.

20         A.    Maybe I went back -- okay.

21              MR. MORRIS:  All right.  Can we put

22         up on the screen Exhibit 2.

23              (Exhibit 2 marked.)

24              MR. MORRIS:  I think it is

25         Exhibit 1.
```

Page 216

                        WATERHOUSE - 10-19-21

1

2              MS. DANDENEAU:  I'm sorry, John, did

3        you say Exhibit 2 or Exhibit 1?

4              MR. MORRIS:  It is Exhibit 2 in the

5        binders so it is premarked Exhibit 2.  And

6        now I'm asking -- right there -- going to

7        Exhibit 1 to the document that was marked

8        as Exhibit 2.

9              MS. DANDENEAU:  Got it.  In the

10       binder there is no --

11             MS. DEITSCH-PEREZ:  There is no

12       Exhibit 1.

13             MR. MORRIS:  All right.  So look at

14       the one on the screen.

15       Q.    Do you see, Mr. Waterhouse, that

16  this is a promissory note dated May 31st, 2017,

17  in the approximate amount of $30.7 million?

18       A.    Yes.

19       Q.    And do you see that the maker of the

20  note is NexPoint?

21       A.    Yes.

22       Q.    And that Highland is the payee; is

23  that right?

24       A.    Yes.

25       Q.    Okay.  And do you see in Paragraph 2

Case 23-03005-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 217 of 397
Case 3:21-cv-00881-X Document 178-30 Page 2609/2446 Page 102 of 282 PageID 47025

Page 217

```
 1                    WATERHOUSE - 10-19-21

 2   this is an annual installment note?

 3        A.    Can you scroll down.

 4        Q.    Sure.

 5              MR. MORRIS:  Can we scroll down --

 6        yeah, there you go.

 7        A.    Right there, yeah.  Yes.

 8              MR. MORRIS:  And can we scroll down

 9        to the signature line.

10        Q.    And do you recognize that as

11   Mr. Dondero's signature?

12        A.    Yes.

13        Q.    And is this the promissory note that

14   we talked about earlier where NexPoint had made

15   certain payments in the aggregate amount of

16   about 6 to $7 million against principal and

17   interest?

18        A.    I don't recall discussing the

19   aggregate principal amounts of 6 to $7 million,

20   but -- so I don't -- I don't recall that prior

21   discussion with those amounts.

22        Q.    All right.  Let's take a look.

23   NexPoint always included this promissory note

24   as a liability on its audited financial

25   statements; right?
```

1                    WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    And NexPoint had its financial

4     statements audited; isn't that correct?

5          A.    Yes.

6          Q.    And was the process of NexPoint's

7     audit similar to the process you described

8     earlier for Highland and HCMFA?

9          A.    Yes, it is similar.

10         Q.    Okay.

11               MR. MORRIS:  Can we put up

12         NexPoint's audited financials and let

13         everybody know what exhibit number it is,

14         La Asia?

15               MS. CANTY:  It is going to be

16         Exhibit 46.

17               (Exhibit 46 marked.)

18         Q.    And do you see, sir, that we've put

19    up NexPoint Advisors' consolidated financial

20    statements and supplemental information for the

21    period ending December 31st, 2019?

22         A.    Yes.

23         Q.    Did you participate in the process

24    whereby these audited financial statements were

25    issued?

WATERHOUSE - 10-19-21

1

2      A.      I didn't participate directly, as

3  I've described before, about the -- the team

4  performing the audit.

5      Q.      Do you recall when the audit of

6  NexPoint's financial statements for the period

7  ending December 31st, 2019 was completed?

8      A.      Yes.

9      Q.      And when do you recall it being

10  completed?

11      A.      In January of 2021.

12      Q.      Do you know why the 2019 audit

13  report wasn't completed until January of 2021?

14      A.      Yes.

15      Q.      Why was the NexPoint audit report

16  for the period ending 12/31/19 not completed

17  until January 2021?

18      A.      Because we had to deal with working

19  from home from -- with COVID, and on top of all

20  of our daily responsibilities and job duties

21  at -- at providing -- at Highland providing

22  services to NexPoint, we had to do all of this

23  extra work for a bankruptcy that was filed in

24  October of 2019.

25              MR. MORRIS:  Can we go to the

```
1                WATERHOUSE - 10-19-21

2           balance sheet on page 3?  Okay.  Stop right

3           there.

4           Q.    Do you see under the liabilities

5    section, the last item is note payable to

6    affiliate?

7           A.    Yes.

8           Q.    And is that the note that we just

9    looked at?

10                MS. DANDENEAU:  Objection to form.

11          Q.    Withdrawn.

12                Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15                MS. DANDENEAU:  Objection to form.

16          A.    I believe no.

17          Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21          A.    I don't recall.

22          Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25                MS. DEITSCH-PEREZ:  Object to the
```

```
1                    WATERHOUSE - 10-19-21

2          form.

3          A.     Approximately.

4          Q.     And does that refresh your

5     recollection that between the time the note was

6     executed and the end of 2019, that NexPoint had

7     paid down approximately $7 million?

8          A.     Yes.  If we are just doing the math,

9     yes.

10         Q.     Okay.  Did NexPoint complete its

11    audit from 2020?

12         A.     Sorry, you kind of broke up.  Do

13    NexPoint complete?

14         Q.     The audit of its financial

15    statements for the period ending December 31st,

16    2020?

17         A.     No.

18         Q.     No, it's not complete?

19         A.     No, it is not complete.

20         Q.     Did HCMFA complete its audit for the

21    year ending December 31st, 2020?

22         A.     No.

23                MR. MORRIS:  Can we go to page 15,

24         please, the paragraph at the bottom.

25         Q.     Do you see that NexPoint has
```

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/23 Entered 10/20/23 21:31:54 Page 22 Desc 397
Case 3:21-cv-00881-X Document 178-30 Page 07/09/446 Page 107 of 282 PageID 47030

Page 222

1              WATERHOUSE - 10-19-21

2   included under notes payable to Highland a

3   reference to the amounts that were outstanding

4   as of the year-end 2019 under the note that we

5   looked at just a moment ago?

6        A.    Yes.  Are you talking about the

7   second paragraph?

8        Q.    I'm actually talking about first

9   paragraph.  Do you understand that the first

10  paragraph is a reference to the 2017 note, and

11  the amounts that were -- the principal amount

12  that was outstanding as of the end of 2019?

13            MS. DANDENEAU:  Objection to form.

14       John, do you mean the first paragraph of

15       that page?

16            MR. MORRIS:  No, the first paragraph

17       under notes payable to Highland.

18       A.    Yeah, I see the paragraph, and

19  again, this is what I answered earlier.  I

20  believe so, just because I don't -- again, this

21  is a number in a balance sheet, and without

22  matching it up and seeing the detail with the

23  schedule like I kind of talked about for

24  Highland's financial statements, it is a little

25  bit more difficult to tie everything in

```
1                    WATERHOUSE - 10-19-21

2    perfectly together.

3         Q.    Okay.  But you're not aware of any

4    note that was outstanding at the end of 2019

5    from NexPoint to Highland other than whatever

6    principal was still due and owing under the

7    $30 million note issued in 2017; correct?

8         A.    Well, it -- I don't -- there is

9    reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12        Q.    Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20              Do you see that?

21        A.    Oh, I do, yes.

22        Q.    So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original
```

Case 3:05-cv-00866-Doc 8 Doc Filed 10/20/21 29/21 ered 10/20/21/22/21 81:54 Page 224 est 397
Case 3:21-cv-00881-X    Document 1761-30    Page 2799/2446 Page 109 of 282    PageID 47032

Page 224

WATERHOUSE - 10-19-21

1    $30 million 2017 note that we looked at a

2    moment ago?

3        A.    Well, we're at the bottom of the

4    page.  Is there anything on page 16?

5        Q.    That is a fair question, sure.  That

6    is it.

7        A.    Okay.  So it appears that that is

8    the only note that is detailed in the notes in

9    the financial statement.

10        Q.    And you don't have any memory of any

11    other note other than the 2017 note, right,

12    being outstanding as of the end of the year?

13        A.    I deal with thousands of

14    transactions every year.  I don't really have a

15    very specific memory for what exactly was

16    outstanding.

17            MR. MORRIS:  Why don't we take a

18        break now.  We've been going for a little

19        while.  It's 3:26.  Let's come back at

20        3:40.

21            VIDEOGRAPHER:  We're going off the

22        record at 3:26 p.m.

23    (Recess taken 3:26 p.m. to 3:39 p.m.)

24            VIDEOGRAPHER:  We are going back on

1          WATERHOUSE - 10-19-21

2      the record at 3:39 p.m.

3      Q.    All right.  Mr. Waterhouse, we -- I

4   don't think we have a lot more here.

5          To the best of your knowledge and

6   recollection, were all affiliate loans and all

7   loans made to Mr. Dondero recorded on

8   Highland's books and records as assets of

9   Highland?

10          MS. DANDENEAU:  Object to the form,

11      asked and answered.

12      A.    To my knowledge, yes.

13      Q.    Okay.  Can you recall any loan to

14   any affiliate or Mr. Dondero that was not

15   recorded on Highland's books and records as an

16   asset?

17      A.    Like during my time as CFO?  I don't

18   recall.

19      Q.    How about after the time that you

20   were CFO?  Did you recall that there was a loan

21   by Highland to an affiliate or to Mr. Dondero

22   that hadn't been previously recorded on

23   Highland's books as an asset?

24          MS. DANDENEAU:  Objection to form.

25      A.    I guess I don't understand the

```
 1                    WATERHOUSE - 10-19-21

 2   question.  I left Highland as of -- I'm not

 3   aware of -- I left Highland in February --

 4   probably the last day of February of 2021.

 5         Q.    Okay.

 6         A.    I'm not -- I'm not aware of any --

 7   I'm not aware of anything past that date.

 8         Q.    Okay.  While you were the CFO at

 9   Highland, did Highland prepare in the ordinary

10   course of business a document that reported

11   operating results on a monthly basis?

12         A.    Yes.

13         Q.    And are you generally familiar with

14   the monthly operating reports?

15         A.    Yeah.  You are referring to the

16   reports that we filed to the Court every month?

17         Q.    I apologize, I'm not.  I'm taking

18   you back to the pre-petition period.  There was

19   a report that I have seen that I'm going to

20   show you, but I'm just asking for your

21   knowledge.

22               MR. MORRIS:  Let's put it up on the

23         screen, Exhibit 39.

24               (Exhibit 39 marked.)

25         Q.    Do you see this is a document that
```

Case 3:00-cv-00881-X Document 81-30 Filed 10/20/21 Prepared 10/20/21 2:31:54 Page 227 of 397
Case 3:21-cv-00881-X Document 178-30 Page 27/99/2446 Page 112 of 282 PageID 47035
Page 227

```
 1                WATERHOUSE - 10-19-21

 2    is called operating results?

 3         A.    Yeah, that's the title of it.

 4         Q.    Okay.  And was a report of operating

 5    results prepared by Highland on a monthly basis

 6    during the time that you served as CFO?

 7         A.    No.

 8         Q.    Are you familiar with a document of

 9    this type?  And we can certainly look at the

10    next page or two to refresh your recollection.

11         A.    I'm just looking at the title.  I

12    don't really -- again, as I discussed before, I

13    don't have any records or documents or emails

14    or appointments or anything that I was able to

15    use prior to -- prior to this deposition, so

16    I'm doing the best I can.

17         Q.    Okay.  You don't need to apologize.

18    I'm just asking you if you are familiar with

19    the document called Operating Results that was

20    prepared on a monthly basis at Highland?

21              MS. DEITSCH-PEREZ:  Object to the

22         form.

23         Q.    If you're not, you're not.

24         A.    I don't believe this was prepared on

25    a monthly basis.
```

Case 3:00-CV-08881-Doc 8 Doc File 10/20/21 Entered 10/20/21 21:31:54 Page 228 of 397
Case 3:21-cv-00881-X    Document 178-30    Page 27709/2446    Page 113 of 282    PageID 47036

Page 228

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  Do you see that this one

3    is -- is dated February 2018?

4          A.    Yes.

5          Q.    Do you have -- do you believe --

6    have you ever seen a document that was

7    purporting to report operating results for

8    Highland?

9                MS. DANDENEAU:  Objection to form.

10         A.    Yes.

11         Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15         A.    I believe it was -- it was prepared

16   on an annual basis.

17         Q.    Okay.

18               MR. MORRIS:  Can we look at the next

19         page.

20         Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23               And it is dated February 2018.

24         A.    Yes.

25         Q.    Do you recall that there was a

Case 3:21-cv-00881-X Document 180 Filed 10/20/23 Entered 10/20/23 21:31:54 Page 229 of 397
Case 3:21-cv-00881-X Document 181-30 Page 279/2446 Page 114 of 282 PageID 47037

Page 229

1                    WATERHOUSE - 10-19-21

2      report that Highland prepared that identified

3      significant items impacting the balance sheet?

4           A.    A report that was prepared.

5           Q.    Let me ask a better question:  Did

6      Highland prepare reports to the best of your

7      recollection that identified significant items

8      that impacted its balance sheet?

9           A.    Well, so Highland prepared a -- a

10     monthly close package.  And maybe I'm

11     getting -- and -- and maybe change names at one

12     time or maybe I'm just -- again, just

13     misremembering -- but in that, yes, there is a

14     page that would detail just changes in -- you

15     know, just changes month over month on the

16     balance sheet.

17          Q.    Okay.  And maybe it is my fault.

18     Maybe I didn't know the proper name for it.

19     But let's use the phrase "monthly close

20     package."

21               Did Highland prepare a monthly close

22     package in the ordinary course of business

23     during the time that you served as CFO?

24               MS. DANDENEAU:  Objection to form.

25          A.    Yes.

Case 3:21-cv-00881-X Document 86-1 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 230 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 115 of 282 PageID 47038

Page 230

```
 1                  WATERHOUSE - 10-19-21

 2          Q.    And did the monthly close package

 3   that Highland prepared include information

 4   concerning significant items that impacted

 5   Highland's balance sheet?

 6          A.    Yes, it had a page like that is --

 7   that is on the screen that detailed items

 8   like -- of that nature.

 9          Q.    And do you know who -- was there

10   anybody at Highland who was responsible for

11   overseeing the preparation of the monthly

12   reporting package?

13          A.    That would have been -- again, it

14   varies over time during my tenure as CFO.

15   It -- it varied over -- over time, but -- but

16   typically a -- a corporate accounting manager.

17          Q.    And who were the corporate

18   accounting managers during your tenure as CFO?

19          A.    It would have been Dave Klos and

20   Kristin Hendrix.

21          Q.    And did the corporate accounting

22   manager deliver to you drafts of the monthly

23   close package before it was finalized?

24          A.    Sometimes.

25          Q.    Was that the practice even if there
```

Case 3:19-cv-08806-Doc Filed 107/20/210/29/19ared Entered 10/20/210/292/21 21:54:01 Page 23 of 397
Case 3:21-cv-00881-X   Document 1761-30   Page 2809/2446  Page 116 of 282   PageID 47039

Page 231

```
1                    WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.     The practice meaning that they

4    sometimes lured them to me?

5         Q.     That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8               MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.     I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.     Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17              Do I have that right?

18              MS. DANDENEAU:  Objection to form.

19        A.     Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.     Okay.
```

Case 21-03003-sgj Doc 80-1 Filed 10/20/21 Entered 10/20/21 23:31:54 Page 232 of 397
Case 3:21-cv-00881-X   Document 173-30   Filed 09/02/44   Page 117 of 282   PageID 47040

Page 232

1                   WATERHOUSE - 10-19-21

2          A.     And, quite frankly, I don't even

3     know if these were -- these were sent to me

4     even in any capacity.

5          Q.     What was the purpose of preparing

6     the monthly reporting package -- withdrawn.

7                 What was the purpose of preparing

8     the monthly close package?

9                 MS. DEITSCH-PEREZ:  Object to the

10              form.

11         A.     The -- the original purpose was so

12    that it would just -- it would be a report that

13    was reviewed monthly with senior management.

14         Q.     Who was included in the idea of

15    senior management?

16         A.     You know, I think originally when

17    this was conceived that would have been like

18    Jim Dondero and Mark Okada.

19         Q.     Were monthly reporting -- withdrawn.

20                Were monthly close packages prepared

21    to the best of your knowledge until the time

22    you left Highland?

23         A.     To my knowledge -- I don't know,

24    actually.  I mean, to my knowledge, I believe

25    it was being -- that was still being done.  I

WATERHOUSE - 10-19-21

1
2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6        Q.    Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10       A.    I can't -- I can't -- I can't recall

11   specifically.

12       Q.    Did you speak with the independent

13   board from time to time?

14       A.    Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19       Q.    Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25       A.    I don't recall any conversations

1          WATERHOUSE - 10-19-21

2     specifically.

3          Q.     Do you know if the topic was ever

4     discussed, even if you don't remember it

5     specifically?

6               MS. DANDENEAU:  Objection to form.

7          A.     It -- it -- it may have.  I don't

8     know.  I don't recall.

9          Q.     Do you recall ever discussing any

10    promissory note issued by any of the affiliates

11    or Mr. Dondero with James Seery?

12         A.     I don't -- I don't recall

13    specifically.

14         Q.     Do you recall generally ever

15    discussing the topic of promissory notes issued

16    by any of the affiliates or Mr. Dondero to

17    Highland with Mr. Seery?

18         A.      Nothing -- nothing is really jumping

19    out at me.

20         Q.     Do you recall if you ever told

21    Mr. Seery that any of the affiliates or

22    Mr. Dondero didn't have an obligation to pay

23    all amounts due and owing under their notes?

24         A.     I don't recall having that

25    conversation.

Case 3:21-cv-00881-X Document 87 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 235 of 397
Case 3:21-cv-00881-X Document 178-30 Page 2049/2446Page 120 of 282 PageID 47043

Page 235

```
 1                 WATERHOUSE - 10-19-21

 2        Q.     Did you ever tell Mr. Seery that you

 3   had any reason to believe that the amounts

 4   reflected in the notes issued by the affiliates

 5   and Mr. Dondero were invalid for any reason?

 6        A.     I don't -- I don't recall.

 7        Q.     Did you tell Mr. Dondero -- did you

 8   tell Mr. Seery that you thought the promissory

 9   notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12        A.     I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19        Q.     Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23             MS. DANDENEAU:  Objection to form.

24        A.     Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery
```

Case 3:10-05066-sgj Doc 8 Filed 10/20/10 Entered 10/20/10 12:31:54 Page 236 of 397
Case 3:21-cv-00881-X Document 178-30 Page 2399/2446 Page 121 of 282 PageID 47044

Page 236

                    WATERHOUSE - 10-19-21

 1

 2    anything that -- that said I have concerns over

 3    these notes?

 4        Q.    No.  Let me try again.  Maybe it was

 5    my question.

 6            Did you ever give Mr. Seery any

 7    information concerning any of the notes that

 8    were issued by any of the affiliates or

 9    Mr. Dondero?

10            MS. DANDENEAU:  Objection to form.

11        A.    I don't recall if I did or not.  I

12    don't -- I don't remember.  I mean, you have my

13    emails.  You may have asked.  Again, I don't --

14    I don't know.

15            MR. MORRIS:  Can we put up the

16        document that has been premarked as Exhibit

17        39?

18            MS. DANDENEAU:  John, that is this

19        document, isn't it?

20            MR. MORRIS:  Oh, yeah, it might be,

21        as a matter of fact.  Let's go to Number

22        40.

23            (Exhibit 40 marked.)

24        Q.    During the bankruptcy,

25    Mr. Waterhouse, did you prepare documents that

Case 3:21-cv-00881-X Document 8 Doc File 10/20/21/29/21 Entered 10/20/21/29/21 38:15 Page 23 of 397
Case 3:21-cv-00881-X Document 173-30 Exhibit 30 Page 2369/2446 Page 122 of 282 PageID 47045

Page 237

```
 1                WATERHOUSE - 10-19-21

 2   were filed with the bankruptcy court?

 3       A.    I didn't -- I didn't prepare them

 4   personally.

 5       Q.    Did people prepare them under your

 6   direction?

 7       A.    Yes.  There were members of the team

 8   that prepared them, and they worked in -- you

 9   know, there were members of DSI that were

10   involved in the process as well.

11       Q.    To the best of your knowledge, did

12   DSI rely on the employees of Highland for the

13   information that they used to prepare the

14   bankruptcy filings?

15       A.    Yes.  The books and records were

16   with the Highland personnel.

17       Q.    Okay.  And do you see on the screen

18   here, there is a document that we have marked

19   as Exhibit 40 that is -- that is titled Summary

20   of Assets and Liabilities?

21       A.    Uh-huh.

22       Q.    Okay.  And do you recall reviewing

23   any summary of assets and liabilities before it

24   was filed with the bankruptcy court?

25       A.    Yes, I recall reviewing this at a
```

Case 3:21-cv-00881-X Document 81 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 238 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 02/09/24 Page 123 of 282 PageID 47046

Page 238

```
 1                 WATERHOUSE - 10-19-21

 2   high level.

 3        Q.    And did you believe that it was

 4   accurate at the time it was filed?

 5        A.    I didn't have any other reason to

 6   believe otherwise.

 7        Q.    Okay.  Do you see that the total

 8   value of all properties listed in Part 1 is

 9   approximately $410 million?

10             MS. DEITSCH-PEREZ:  Objection to

11        form.

12        A.    Yes, it is in 1c.

13        Q.    Yes.

14        A.    Yes, I see that.

15        Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22             Do you see that?

23        A.    I do.

24        Q.    And that was a reference to the

25   notes receivable from the affiliates and
```

Case 21-03005-sgj Doc 8 Filed 10/28/21 Entered 10/28/21 22:31:54 Page 239 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 03/09/24 Page 124 of 282 PageID 47047
Page 239

                        WATERHOUSE - 10-19-21

1

2    Mr. Dondero, among others; is that right?

3              MS. DANDENEAU:  Objection to form.

4         A.    Yes.  The affiliate notes and the

5    Dondero notes were in this amount, but they

6    weren't -- again, like you said, and among

7    others.

8         Q.    Okay.  We will look at the

9    specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14             MS. DANDENEAU:  Objection to form.

15        A.    I -- I -- I believe so.

16        Q.    Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.

22             MS. DANDENEAU:  Object to the form.

23        A.    Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.

```
 1                    WATERHOUSE - 10-19-21

 2         Q.     Okay.

 3         A.     You know, but as of the time of this

 4   filing, that is what was put in this filing,

 5   right, but, you know, I mean, numbers --

 6   numbers change, facts and circumstances change.

 7         Q.     But as the CFO of Highland, the

 8   debtor in bankruptcy, did you believe that this

 9   number accurately reflected the total amount

10   due under the notes receivable?

11         A.     That is what we had in our books and

12   records.

13         Q.     Okay.  And did you believe as the

14   CFO that the books and records accurately

15   reported the then value of the debtor's assets?

16                MS. DANDENEAU:  Objection to form.

17         A.     We didn't -- as part of this filing,

18   there was no fair value measurement or

19   anything.  These were just accounting entries

20   for the promissory notes.  There is no analysis

21   for impairment or fair market value adjustments

22   or anything of that nature.  This is purely

23   taking numbers and putting them in our form.

24         Q.     Did you do any impairment analysis

25   at any time while you were employed by
```

                    WATERHOUSE - 10-19-21

1

2    Highland?

3         A.    Yes, we did do impairment analysis

4    on -- on assets.

5         Q.    Okay.  Did you ever do an impairment

6    analysis on any of the promissory notes that

7    were given to Highland by any of the affiliates

8    or Mr. Dondero?

9         A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19              As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?

Case 3:21-cv-00866-B Doc 85 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 242 of 397
Case 3:21-cv-00881-X Document 173-30 Page 0909/2446 Page 127 of 282 PageID 47050

Page 242

WATERHOUSE - 10-19-21

1

2    A.    The audited financials -- yes,

3    audited financial statements are prepared in

4    accordance with GAAP.

5    Q.    Do you recall whether any of

6    Highland or HCMFA or NexPoint ever made a fair

7    market value adjustment to any of the notes

8    issued by any of the affiliates or Mr. Dondero

9    to Highland?

10    A.    I do not recall that happening, but

11    the -- it is because under -- under GAAP,

12    the -- the treatment of liabilities is

13    different than assets.

14    Q.    Okay.  So then let's just focus on

15    Highland's audited financial statements.

16         The last audited financial

17    statements were for the period ending December

18    31st, 2018; correct?

19    A.    That is my understanding.

20    Q.    And you had -- you had an obligation

21    to disclose anything to PricewaterhouseCoopers

22    concerning any subsequent events between the

23    end of 2018 and June 3rd, 2019; correct?

24         MS. DANDENEAU:  Objection to form.

25         MS. DEITSCH-PEREZ:  Form.

1          WATERHOUSE - 10-19-21

2          A.     Correct.

3          Q.     Okay.  To the best of your

4    knowledge, as Highland's CFO, did Highland ever

5    make any fair market value adjustments to any

6    of the promissory notes that were carried on

7    its balance sheet and that were issued by any

8    of the affiliates or Mr. Dondero?

9          A.     I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14         Q.     Okay.

15              MR. MORRIS:  Can we go to the next

16         page.

17         Q.     Do you see this is a note a list of

18   notes receivable?  Do you see that?

19         A.     Yes, I do.

20         Q.     And do you see that this ties into

21   the page that we were just looking?

22         A.     I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.

Case 3:10-cv-00508-Doc 8 Document 1072-10/29/21 Entered 10/29/21 21:51:41 Page 24 of 397
Case 3:21-cv-00881-X   Document 173-30   Filed 08/09/22   Page 129 of 282   PageID 47052

Page 244

WATERHOUSE - 10-19-21

1

2      Q.     Okay.  So now let's look at that

3   schedule.  So this was the face amount of all

4   of the promissory notes that Highland held at

5   the time this document was filed with the

6   bankruptcy court; right?

7      A.     Yes.

8      Q.     There is a footnote there that says,

9   doubtful or uncollectible accounts are

10  evaluated at year-end.

11            Do you see that?

12     A.     I do.

13     Q.     Okay.  And is it fair to say that as

14  of the year-end 2018, the year before this,

15  that to the extent any of these notes were

16  outstanding at that time, they weren't deemed

17  to be doubtful or uncollectible?

18     A.     Yeah.  For the 2018 audit, there

19  weren't any -- there weren't any adjustments to

20  fair value.

21     Q.     Okay.  And during the bankruptcy, do

22  you recall that Highland subsequently reserved

23  for the Hunter Mountain Investment Trust note?

24     A.     Yes.

25     Q.     Why did Highland -- were you

Case 21-30085-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 13:54:01 Desc
Case 3:21-cv-00881-X Document 178-30 Page 290 of 446 Page 130 of 282 PageID 47053

Page 245

1                   WATERHOUSE - 10-19-21

2     involved in the decision to reserve the Hunter

3     Mountain Investment Trust note?

4          A.    I was not.

5          Q.    Do you know why Highland decided to

6     reserve for the Hunter Mountain Investment

7     Trust note?

8          A.    I don't know yet decision was made.

9     I believe it was made by someone at DSI.

10         Q.    Okay.  I'm just asking if you know

11    why.

12               Did you ever ask anyone why they

13    reserved for that particular note?

14         A.    I don't recall.

15         Q.    Do you know whether the debtor

16    reserved for any other note on this list during

17    the bankruptcy?

18         A.    Again, I don't recall.  I wasn't

19    part of any process of -- again, like any fair

20    value adjustments or anything to that degree.

21    Like I said, a lot of that was done by DSI and

22    it was kind of out of our court.

23         Q.    Okay.  Do you know if any note

24    receivable on this list was ever deemed by the

25    debtor to be doubtful or uncollectible?

1          WATERHOUSE - 10-19-21

2     A.    I don't -- I don't have a

3  recollection of every filing, so I don't know.

4     Q.    Did you ever have a discussion with

5  anybody at any time about whether any of the

6  notes receivable on this list should be deemed

7  to be doubtful or uncollectible?

8     A.    No.  As I previously stated, we were

9  told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13          MR. MORRIS:  I move to strike.

14     Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19          MS. DANDENEAU:  Objection to form.

20     A.    I don't recall.

21     Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25          MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 247 of 397
Case 3:21-cv-00881-X Document 178-30 Page 2909/2446 Page 132 of 282 PageID 47055

Page 247

```
 1                     WATERHOUSE - 10-19-21

 2          A.     I don't recall.  I mean, it may have

 3     happened, you know, again, when we initially

 4     getting DSI up to speed and going through

 5     financials, it may have happened, but I don't

 6     recall specifically.

 7          Q.     While you were the CFO of Highland

 8     during the time that the company was in

 9     bankruptcy, did you have any reason to believe

10     that any of the notes receivable on this list

11     other than Hunter Mountain Investment Trust

12     should have been characterized as doubtful or

13     uncollectible?

14               MS. DANDENEAU:  Objection to form.

15               MS. DEITSCH-PEREZ:  Form.

16          A.     I didn't know.  I didn't form an

17     opinion.  Bankruptcy was new to me.  It still

18     is new to me, even after going through this.

19     So I really didn't know what to expect nor

20     really -- you know, I didn't know.

21               MR. MORRIS:  I move to strike.

22          Q.     During the period of Highland's

23     bankruptcy when you were serving as CFO, did

24     you have any reason to believe any of the notes

25     on this list were doubtful or uncollectible?
```

1                    WATERHOUSE - 10-19-21

2                MS. DEITSCH-PEREZ:  This is like the

3        fifth time you've asked it.  Object to the

4        form.

5                MR. MORRIS:  I'm moving to strike,

6        if you haven't noticed, because he's not

7        answering the question.

8                MS. DEITSCH-PEREZ:  He was answering

9        the question, you just didn't like it, like

10       the answer.

11               MR. MORRIS:  Good Lord.

12       Q.    Go ahead, Mr. Waterhouse.

13       A.    Again, I don't -- we brought up a

14   myriad of issues at the start of the bankruptcy

15   case.  I don't recall if this was one of them,

16   but, again, there are a lot of things we

17   couldn't change.  Even, you know, I was told

18   status quo, blah, blah, blah, right, there is a

19   stay, you can't -- you know, I don't recall

20   specifically, but that doesn't mean it didn't

21   happen.

22               MR. MORRIS:  I move to strike.

23       Q.    During the time that Highland was in

24   bankruptcy and you served as CFO, did you have

25   any reason to believe that any of the notes

Case 3:21-cv-00881-X Doc 8 Doc File 10/20/21 Entered 10/20/21 22:31:54 Page 249 of 397
Case 3:21-cv-00881-X Document 178-30 Page 2989/2446 Page 134 of 282 PageID 47057
Page 249

1                    WATERHOUSE - 10-19-21

2     receivable on this list were doubtful or

3     uncollectible?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    Potentially.

7         Q.    Did you ever tell anybody that?

8         A.    As I just stated like five times,

9     yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15        Q.    I don't want to know -- I don't want

16    to know what was --

17             MS. DEITSCH-PEREZ:  Wait, wait.

18        Excuse me.  Mr. Morris, you did not let him

19        finish his answer.

20        A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not

Case 3:00-cv-00806-X Document 8 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 250 of 397
Case 3:21-cv-00881-X Document 173-30 Page 2999/2446 Page 135 of 282 PageID 47058

Page 250

                        WATERHOUSE - 10-19-21

1
2    once, twice, three, four times with -- you

3    know, I mean, we -- I don't -- I don't remember

4    the sum culmination of all these discussions.

5    They all kind of blend together.

6              MR. MORRIS:  Okay.  I move to strike

7         and I will try one more time.

8         Q.    Did you ever tell anybody at DSI

9    that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11             MS. DANDENEAU:  Object to form.

12        A.    Potentially.

13        Q.    Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.    Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.    Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22             MS. DANDENEAU:  Objection to form.

23        A.    I've gone through that.  I don't

24   recall specifically.

25        Q.    So you should just -- I don't want

Case 3:05-cv-00806-S Document 1 Filed 10/20/21 Page 251 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 10/09/24 Page 136 of 282 PageID 47059

Page 251

```
 1                    WATERHOUSE - 10-19-21

 2    to tell what you to do.  Do you have --

 3               MS. DANDENEAU:  Good.

 4        Q.    Other than -- other than telling

 5    them that they should look at the values, do

 6    you have any recollection whatsoever of ever

 7    having told anybody at DSI that any of the

 8    notes receivable on this page were doubtful or

 9    uncollectible?

10               MS. DEITSCH-PEREZ:  Object to the

11          form.

12               MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14    about everything on our balance sheet which

15    would have included these -- these notes

16    receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19    those discussions delved into.

20        Q.    Do you recall any discussion at all

21    on the topic of whether any of these notes on

22    this list were doubtful or uncollectible?

23               MR. AIGEN:  Mr. Morris, how on earth

24          is that question different from the

25          question that you just asked for the last
```

Case 3:21-cv-00881-X Document 180-7 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 252 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3009/2446 Page 137 of 282 PageID 47060
Page 252

1          WATERHOUSE - 10-19-21

2    five times?  I mean, really I thought you

3    were -- (overspeak.)

4         MR. MORRIS:  Because he never

5    answered it.

6         MS. DEITSCH-PEREZ:  Are you

7    listening to him?

8         MR. MORRIS:  You know --

9         MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14        What more do you want him -- to ask

15   of him?

16        MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20        MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24        MR. MORRIS:  Okay.

25        MS. DEITSCH-PEREZ:  -- because it

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Declared Entered 10/20/21 22:31:54 Page 1 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 02/09/446 Page 138 of 282 PageID 47061

Page 253

```
 1                  WATERHOUSE - 10-19-21

 2          suggests that he has not testified

 3          truthfully.

 4              MR. MORRIS:  I will ask my question

 5          again.  And if at any time you want to

 6          direct him not to answer, that is your

 7          prerogative.

 8          Q.    Mr. Waterhouse, do you have any

 9   recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12              MS. DANDENEAU:  Object to form.

13          A.    I don't remember specifically.

14          Q.    Do you remember generally that

15   specific topic?

16          A.    We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23              So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.
```

Case 3:21-cv-00881-X Document 180-9 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 254 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3099/2446 Page 139 of 282 PageID 47062

Page 254

```
 1              WATERHOUSE - 10-19-21

 2        Q.    Do you believe that an affiliate

 3   loan on this list was doubtful or

 4   uncollectible?  Would you have told that to

 5   DSI?

 6              MS. DANDENEAU:  Objection to form.

 7              MS. DEITSCH-PEREZ:  Object to form.

 8        A.    If we had, like -- again, if we --

 9   if -- if we weren't preparing financial

10   statements in accordance with GAAP, and -- you

11   know, if DSI at that point -- they were --

12   again, I was new to bankruptcy.

13              The CRO is -- we are delegating

14   everything to the CRO.  All the decisionmaking.

15   Remember -- remember when you and I went into

16   Delaware Court and we were saying DSI basically

17   does everything, remember this, Mr. Morris?

18              You were my counsel at the time, and

19   basically we're running everything through DSI.

20   That was what this was like in the early part.

21              Everything was communicated through

22   DSI.  So DSI says this.  DSI says that.  That

23   is what we're doing, and we're pointing out

24   things to them.

25              Now, they decide what direction this
```

Case 3:05-cv-00881-Doc 8 Doc File 10/20/21 29/21 Entered 10/20/21 29/21 31:14:01 Page 255 of 397
Case 3:21-cv-00881-X   Document 178-30   Page 30-30/2446  Page 140 of 282   PageID 47063

Page 255

```
 1                 WATERHOUSE - 10-19-21

 2   goes.

 3        Q.    Did you point out that any of

 4   these --

 5        A.    I don't recall specifically.

 6        Q.    Okay.  At any time that you served

 7   as Highland's CFO, did you ever point out to

 8   DSI that any of these loans were doubtful or

 9   uncollectible?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12             MS. DANDENEAU:  Objection.

13        A.    If you're asking me if I had a

14   conversation with DSI, if any of these loans

15   were doubtful or uncollectible, I don't recall

16   specifically.

17        Q.    Do you recall that the debtor filed

18   on the docket monthly operating reports?

19        A.    Yes.

20        Q.    You prepared those personally,

21   didn't you?

22             MS. DEITSCH-PEREZ:  Objection to

23        form.

24        A.    I didn't personally prepare them,

25   the team did with DSI.
```

Case 3:00-806 Doc File 10/20/19/21 Entered 10/20/21 22:31:54 Page 256 of 397
Case 3:21-cv-00881-X   Document 178-30   Filed 07/09/24   Page 141 of 282   PageID 47064

Page 256

1                    WATERHOUSE - 10-19-21

2          Q.    But you signed them; correct?

3          A.    My signature is on the MORs.

4          Q.    And you signed them as the preparer

5     of the document; correct?

6          A.    Yes, I did this pursuant to DSI's

7     instructions.

8          Q.    Okay.  You wouldn't have signed the

9     document if you didn't believe it to be

10    accurate; correct?

11         A.    If I had reason to believe it

12    wasn't, presumably I wouldn't have signed it.

13         Q.    Okay.  And do you have any reason to

14    believe right now that any monthly operating

15    report that has your signature on it was

16    inaccurate in any way?

17              MS. DEITSCH-PEREZ:  Object to the

18         form.

19         A.    My understanding of the monthly

20    operating reports is we were filing them in

21    accordance with the standards set by the Court.

22    It wasn't -- you know, again, I don't -- you

23    know, it wasn't GAAP.  It wasn't these other

24    standards, so I testified I didn't have

25    experience in this.  The CRO was running the

```
 1              WATERHOUSE - 10-19-21

 2   show.  I followed their advice.

 3        Q.    But you assured yourself that

 4   everything in the report was accurate before

 5   you signed them; correct?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    I trusted the guidance from the CRO

 8   and their team and their experience and their

 9   guidance for doing this for many, many, many

10   years to -- to -- to categorize and put things

11   in ways on the form.

12              You know, my team had -- had not

13   filled out these forms before and needed all of

14   this guidance.  I'm not an expert in this.  I

15   have oversight of it.  I signed the form.  DSI

16   told me to.

17        Q.    And you and your team are the source

18   of the information that DSI used to create the

19   reports; correct?

20              MS. DANDENEAU:  Objection to form.

21        A.    The books and records reside with

22   the -- with -- with the corporate accounting

23   team.

24        Q.    Okay.  And the corporate accounting

25   team was the corporate accounting team that was
```

Case 3:21-cv-00881-X Document 178-30 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 258 of 397
Case 3:21-cv-00881-X Document 178-30 Page 309/2446 Page 143 of 282 PageID 47066

Page 258

 1                    WATERHOUSE - 10-19-21

 2    under your direction; correct?

 3         A.    Yes.

 4         Q.    So -- so your team was responsible

 5    for maintaining Highland's books and records;

 6    correct?

 7         A.    I'm sorry, my team was responsible?

 8         Q.    Correct.

 9         A.    Yes.  They -- they -- they were

10    the -- the -- the general ledger of Highland,

11    that responsibility was with the corporate

12    accounting team.

13         Q.    The corporate accounting group

14    reported to you; correct?

15         A.    Yes.

16               MR. MORRIS:  Can we put up 41,

17         please.

18               (Exhibit 41 marked.)

19         Q.    All right.  You will see that this

20    is a report that is dated January 31st, 2020,

21    but it is for the month ending December 2019.

22               Do you see that?

23         A.    I do.

24         Q.    And you signed this report in your

25    capacity as the chief financial officer of

```
1              WATERHOUSE - 10-19-21

2    Highland; correct?

3         A.    Yes.

4         Q.    And you're the preparer -- you're

5    identified as the preparer of the report;

6    correct?

7         A.    That is correct.

8         Q.    Do you recall participating in the

9    preparation of monthly operating reports?

10        A.    As I testified earlier, it was put

11   together, you know, with the team.  The team

12   worked with DSI to put these monthly operating

13   reports together.  We had no experience at this

14   time of the monthly operating reports or things

15   of this nature.

16             MR. MORRIS:  Can you turn to the

17        next page, please.

18        Q.    Do you see a line item under assets

19   due from affiliates?

20        A.    Yes, I do.

21        Q.    Okay.  And to the best of your

22   knowledge and understanding, as the person who

23   is identified as the preparer of this report,

24   does that line item include the affiliate loans

25   that we've been talking about?
```

Case 3:21-cv-00831-S Doc Filed 10/20/21 Entered 10/20/21 21:51:41 Page 260 of 397
Case 3:21-cv-00881-X Document 176-30 Page 3099/2446 Page 145 of 282 PageID 47068

Page 260

WATERHOUSE - 10-19-21

1

2      A.    Again, I would have to see, just

3  like we did with the financial statements of

4  Highland and NexPoint, I would have to see a

5  detailed build, but, you know, if you look at

6  the other line items, you know, the only other

7  place it could be would be in -- in other

8  assets.

9      Q.    Okay.  And as a matter of

10  arithmetic, is it fair to say that is the value

11  of the assets due from affiliates was more than

12  25 percent of the value of Highland's total

13  assets as of 12/31/2019?

14           MS. DANDENEAU:  Objection to form.

15      A.    I'm really not doing the mental math

16  right now, so I've been going at this depo for

17  hours, so I'm really not -- you know --

18      Q.    All right.  No problem.

19      A.    -- these are millions of dollars.

20      Q.    Let's look at the Footnote 1,

21  please.  Do you see there is a reference to the

22  Hunter Mountain note?

23      A.    Yes, I see that in Footnote 1.

24      Q.    Okay.  And that's the reserve that

25  was taken against that note?

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Page 146 of 282 PageID 47069
Case 3:21-cv-00881-X Document 80-1 Filed 10/20/21 Declared 10/20/21 29:23:31 Page 26 of 397

Page 261

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes, that is what this indicates.

 3        Q.    Okay.  And were you aware that the

 4   reserve was being taken on that it was?

 5        A.    I was -- I was aware, yeah, at some

 6   point, yes.

 7        Q.    Okay.  And are you aware of any

 8   reserve being taken with respect to any other

 9   note that was issued in favor of Highland?

10        A.    Again, as I testified, we didn't go

11   through an analysis on -- on -- on the other

12   notes.

13        Q.    Can we turn --

14        A.    I believe -- I believe it says that

15   in Footnote 1, fair value has not been

16   determined with respect to any of the notes.

17              So this footnote -- footnotes, look,

18   there has been no determination.

19        Q.    Okay.  The determination was made in

20   the audited financial statements just six

21   months earlier; right?  We saw that earlier?

22        A.    That was as of 12/31/18.  I mean,

23   things -- circumstances -- there's a bank --

24   circumstances change, things change -- things

25   change over time, you know, facts and
```

Case 3:21-cv-00881-X   Document 180-30   Filed 10/20/23   Entered 10/20/23 21:31:54   Page 2 of 52
Case 3:21-cv-00881-X   Document 178-30   Page 31/09/2446   Page 147 of 282   PageID 47070

Page 262

1              WATERHOUSE - 10-19-21

2   circumstances change.  Again, you have to do an

3   analysis.

4        Q.    Okay.  And you do recall that in

5   Highland's 2018 financial statement, all of the

6   notes issued by affiliates and Mr. Dondero that

7   were due at year-end had a fair value equal to

8   the carrying value; correct?  We looked at

9   that?

10       A.    Yes.  That was in the -- in the

11  disclosure for the -- for the affiliate notes,

12  yes.

13       Q.    And -- and you were obligated to

14  share with PwC any subsequent events between

15  the end of 2018 and the date that you signed

16  your management representation letter on June

17  3rd, 2019; correct?

18            MS. DEITSCH-PEREZ:  Object to the

19       form.

20       A.    Yes.  I -- I -- I signed the

21  management, you know, my signature is in the

22  management representation letter -- I hope I'm

23  answering your question -- that is dated in

24  June with the representations made in that

25  management representation letter.

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  And there was nothing that

3     caused PricewaterhouseCoopers to include in

4     subsequent events any adjustment to the

5     conclusion that the fair value of the affiliate

6     notes and the notes issued by Mr. Dondero

7     equaled the carrying value; correct?

8                    MS. DANDENEAU:  Objection to the

9          form.

10         A.    That is correct.  That is what was

11    in the -- in the -- in the footnotes.

12         Q.    Okay.  So are you aware of anything

13    that occurred between June 3rd, 2019 and

14    December 31st, 2019 that would have caused the

15    fair value of the notes to differ from the

16    carrying value?

17         A.    Yeah.  Highland filed for

18    bankruptcy, things changed -- I mean, there was

19    a bankruptcy filed in October of -- of -- of

20    2019, right, the petition date that we've

21    described earlier.

22                    I mean, I had a -- I guess looking

23    back naively, I thought we were going to get an

24    audit from PwC for year-ended 2019, and when we

25    had discussions with PwC, they were like, are

Case 3:21-cv-00881-X Doc 8 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 26 Desc
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 149 of 282 PageID 47072

Page 264

1                    WATERHOUSE - 10-19-21

2    you crazy, we're not auditing this.  Values

3    change, all these things change, bankruptcy

4    changes the entire scenario.  I mean -- and

5    they're like, we're not -- we're not touching

6    this.

7               And so, you know, I was like, okay,

8    sorry, I get it, okay, no an audit.

9               I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12              Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18        Q.    Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21        A.    No.

22        Q.    So --

23        A.    That's right.

24        Q.    So can you identify any fact that

25   would cause the fair value to deviate from the

```
 1                    WATERHOUSE - 10-19-21

 2   carrying value during the seven-month period

 3   between June 3rd and the end of the year, 2019?

 4              MS. DANDENEAU:  Objection to form.

 5        A.    No.  I mean, I'm putting myself back

 6   at that time, right.  Hindsight is 2020, but we

 7   didn't do an analysis, but we would have done a

 8   fulsome analysis and looked at all of the facts

 9   and circumstances at the time, but asset values

10   change.  You know, there could have been a

11   market crash in hindsight in 2020, which --

12   which affected entities' abilities.

13              There could have been all of these

14   things, right, that -- that happen.  It is --

15   it is easy to look back in hindsight, but when

16   you are looking at this in -- in realtime, the

17   analysis is different, and again, we didn't do

18   an analysis.

19        Q.    Okay.  You didn't do an analysis.

20              Do I have that right?

21        A.    I don't -- I don't recall doing one

22   or maybe -- you know, I don't recall doing one.

23              MR. MORRIS:  Okay.  I'm going to

24         take a break.  I may be done, so the time

25         now is -- is 4:30 your time.  Let's just
```

1                WATERHOUSE - 10-19-21

2        take a short break until 4:40 your time.

3             MS. DANDENEAU:  Okay.

4             VIDEOGRAPHER:  We're going off the

5        record, 4:31 p.m.

6        (Recess taken 4:31 p.m. to 4:43 p.m.)

7             VIDEOGRAPHER:  We are back on the

8        record at 4:43 p.m.

9             MR. MORRIS:  I have no further

10       questions.

11            MR. RUKAVINA:  Okay.

12       Mr. Waterhouse, I will go next.

13                     EXAMINATION

14   BY MR. RUKAVINA:

15       Q.   Sir, my name is Davor Rukavina.  I'm

16   the lawyer for --

17            MR. MORRIS:  Hey, Davor, just before

18       you begin, I just want to put on the record

19       Highland's objection to documents that were

20       produced to me 10 minutes before the

21       deposition began.

22            MR. RUKAVINA:  What the basis of

23       your objection?

24            MR. MORRIS:  That they were due

25       quite some time ago, and the fact that you

```
 1                    WATERHOUSE - 10-19-21

 2          had -- I just think it's appropriate to --

 3          to dump documents on somebody 10 minutes

 4          before the deposition.  I just think

 5          that's --

 6                    MR. RUKAVINA:  Well, these are

 7          documents Highland produced.  I'm not aware

 8          of any rule I have to give you advance

 9          documents when I know for the record that

10          other than the exhibits that you sent to us

11          last week, most of the exhibits you used

12          today you did not provide to me prior to

13          this deposition.

14                    MR. MORRIS:  No, but the documents

15          were produced by me in -- in litigation,

16          right?

17                    MR. RUKAVINA:  I'm going to use

18          primarily, John, the documents that you

19          produced to me today, but you may.

20                    MR. MORRIS:  Primarily.  I've got --

21          I've got my objection.  You have got your

22          response.  Proceed.

23          Q.    Mr. Waterhouse, again, I represent

24     the advisors, HCMFA and NexPoint Advisors.

25                    Do you understand that?
```

1              WATERHOUSE - 10-19-21

2       A.    Yes.

3       Q.    You and I have never met or talked

4   before today, have we?

5       A.    No, I have -- I have heard your

6   voice on calls before.

7       Q.    Okay.

8             MR. RUKAVINA:  Madam Court Reporter,

9       I will use a few exhibits today.  My

10      associate, Mr. Nguyen, will find some way

11      to get them to you.  I don't know how to do

12      that, but it looks like you guys do.

13            I am going to use numbers as well.

14      But to differentiate them from Mr. Morris

15      we're going to mark mine with the prefix A

16      for advisors.

17            Do you understand?

18            COURT REPORTER:  Yes.

19            MR. RUKAVINA:  Okay.  Perfect.

20      Q.    Okay.  So, Mr. Waterhouse, let's

21  start with those two HCMFA notes that you were

22  asked about, one for 5 million and one for

23  2.4 million.

24            Do you recall those notes?

25      A.    Yes.

<pre>
                         WATERHOUSE - 10-19-21
 1

 2        Q.     Were you ever the CFO of HCMFA?

 3        A.     I don't recall.

 4        Q.     So to the best of your recollection,

 5   you were still an officer of HCMFA in 2019,

 6   just that your title was treasurer?

 7              MR. MORRIS:  Object to the form of

 8        the question.  There is no leading here.

 9        He works for your client.

10              MS. DANDENEAU:  That is not -- that

11        is not true.

12              MR. MORRIS:  He's the treasurer --

13        he is the treasurer of your client.  I

14        don't -- I'm going to object every time you

15        try to lead, so...

16              MR. RUKAVINA:  Totally fine to

17        object.

18              MR. MORRIS:  Okay.

19        Q.     Please answer my question,

20   Mr. Waterhouse.

21        A.     I'm sorry, could you repeat?  There

22   was...

23        Q.     Yes.  You were -- you testified

24   earlier that in 2019 you were an officer of

25   HCMFA; correct?
</pre>

WATERHOUSE - 10-19-21

1
2     A.    Yes, I testified that I was the

3  treasurer and I didn't know if that incumbency

4  certificate, you know, was one that appointed

5  me as a treasurer, but yes.

6     Q.    I'm just trying to confirm that

7  sitting here today, to the best of your

8  recollection, at that time you were -- your

9  title was treasurer.  It was not chief

10  financial officer.

11     A.    I don't recall that being my title.

12     Q.    Okay.  And in May of 2019, however,

13  I think you testified you were the chief

14  financial officer of the debtor; correct?

15          MR. MORRIS:  Objection to the form

16     of the question.

17     A.    Yes, I was -- yes.

18     Q.    Okay.  As such, in May of 2019, did

19  you have the authority, to your understanding,

20  to unilaterally loan $5 million or $2.4 million

21  to anyone on behalf of the debtor?

22          MR. MORRIS:  Objection to the form

23     of the question.

24     A.    Sorry, can you repeat that?

25     Q.    Yes.  So in your capacity as the

Case 21-03005-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 2 of 397
Case 3:21-cv-00881-X Document 173-30 Filed 01/09/24 Page 156 of 282 PageID 47079
Page 271

```
 1              WATERHOUSE - 10-19-21

 2   chief financial officer of the debtor, Highland

 3   Capital Management, L.P., in May of 2019, did

 4   you believe that you unilaterally, just Frank

 5   Waterhouse, had the authority to loan on behalf

 6   of the debtor to anyone $5 million and

 7   $2.4 million?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10   A.    No.

11   Q.    Is it because loans of that amount

12   would have had to be approved by someone else?

13   A.    Yes.

14   Q.    Who in '20 -- in May of 2019, if

15   Highland wanted to loan 5 million or

16   $2.4 million to someone, what would have been

17   the internal approval procedure?

18              MR. MORRIS:  Objection to the form

19        of the question.

20   A.    If -- if we had loans of that nature

21   that needed to be made due to their size, we

22   would have gotten approval from the -- the

23   president of Highland.

24   Q.    And who that was individual?

25   A.    It was James Dondero.
```

```
 1                WATERHOUSE - 10-19-21

 2       Q.    Okay.  Now, I'm going to ask you a

 3  similar question but for a different entity.

 4             In May of 2019, as the treasurer of

 5  HCMFA, did you believe that you unilaterally

 6  had the ability to cause HCMFA to become the

 7  borrower of a $5 million loan and a

 8  $2.4 million loan?

 9             MR. MORRIS:  Objection to the form

10       of the question.

11       A.    No.

12       Q.    What would -- what would the

13  approval have taken place -- strike that.

14             What would the approval process have

15  been like in May of 2019 at HCMFA for HCMFA to

16  take out a $7.4 million loan?

17             MR. MORRIS:  Objection to the form

18       of the question.

19       A.    The process would have been similar

20  to what we just discussed on -- for Highland to

21  make a loan to others.  So, again, you know,

22  we -- we would have -- either myself or someone

23  on the team would have discussed this with

24  the -- the president and owner of -- of HCMFA.

25       Q.    And who was that individual?
```

Case 3:21-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 2 Desc
Case 3:21-cv-00881-X Document 178-30 Page 229/2446 Page 158 of 282 PageID 47081

Page 273

                        WATERHOUSE - 10-19-21

1

2        A.     That was James -- Jim Dondero.

3        Q.     So do I understand that in May of

4   2019, on behalf of both the lender, Highland,

5   and the borrower, HCMFA, Mr. Dondero would have

6   had to approve $7.4 million in loans?

7               MR. MORRIS:  Objection to the form

8        of the question.

9        A.     Yes.

10       Q.     You mentioned when Mr. Morris was

11  asking you the NAV error, N-A-V error, with

12  respect to TerreStar, without writing us a

13  novel, unless you feel like you have to, can

14  you summarize what that NAV error was?  What

15  happened?

16       A.     There was a -- in the Highland

17  Global Allocation Fund, it owned at the time an

18  equity interest in a company called TerreStar.

19  And TerreStar is -- at the time was a private

20  company, and it may still be today.  Again, I'm

21  putting myself back then as a private company.

22              We had -- sorry, I don't mean we --

23  the fund and the advisor used Houlihan Lokey

24  to -- to value that investment.  And during

25  that time there was some trades that were

Case 3:21-cv-00881-X Document 180-30 Filed 10/29/21 Entered 10/29/21 21:34:41 Page 274 of 397
Case 3:21-cv-00881-X Document 178-30 Page 32992446 Page 159 of 282 PageID 47082

Page 274

```
 1                    WATERHOUSE - 10-19-21

 2   executed at market levels that were much lower

 3   than the Houlihan Lokey model.

 4             And based on information and

 5   discussions with the portfolio managers and,

 6   you know, principals that were very familiar

 7   with TerreStar, it was determined that those

 8   trades were non-orderly and they were not

 9   considered in the valuation as consulted with

10   Houlihan Lokey and PricewaterhouseCoopers at

11   the time.

12             Subsequent to a -- I can't remember

13   the exact circumstances of why the SEC got

14   involved.  I think it was due to this -- this

15   investment became a material position in the

16   fund.  It triggered an SEC, kind of, inquiry.

17   And as part of that inquiry, they questioned

18   the valuation methodology.  "They" meaning the

19   SEC.

20             And at the culmination of that

21   process -- this is all summarized -- the value

22   that was -- that ultimately had to be used in

23   the fund's NAV was different than -- materially

24   different than what the original valuation at

25   Houlihan Lokey provided.
```

```
 1                    WATERHOUSE - 10-19-21

 2              And given that there was this fund

 3    was, as we discussed -- I don't know if we

 4    discussed it, but it was an open-ended fund

 5    that was going -- that was converting to a

 6    close-end fund.

 7              Due to the fact that it was an

 8    open-ended fund, you had to recalculate NAV and

 9    see what the impact was on people -- on

10    investors coming in and out of the fund and if

11    there is a detrimental impact and to calculate

12    what that -- what that impact was and if there

13    was any amounts owed to the fund pursuant to

14    the error.

15         Q.   Were you personally involved

16    internally at either Highland or HCMFA with

17    these investigations and discussions with the

18    SEC?

19         A.   I was.

20         Q.   Which other key people or senior

21    people at Highland were involved, to your

22    recollection?

23         A.   Myself, Thomas Surgent, David Klos,

24    Lauren Thedford, Jason Post.

25         Q.   Mr. Dondero, was he --
```

```
 1                    WATERHOUSE - 10-19-21

 2           A.    I believe Cliff Stoops.  I'm trying

 3      to think.  And maybe that is -- that is -- that

 4      is -- that is all kind I can recall at the

 5      moment.

 6           Q.    Do you recall whether it was

 7      determined that the fund suffered losses as a

 8      result of this error?

 9           A.    The -- the fund -- the -- the --

10      because the open-ended nature of the fund,

11      there were losses that were attributable to

12      investors.  Meaning they -- they would have

13      redeemed and got a less money or -- or they

14      subscribed in and maybe because they didn't get

15      enough shares and then they later sold and then

16      they were harmed in that fashion.

17                   And there is -- there is -- there

18      were very -- there were very detailed

19      calculations and, you know, all these different

20      scenarios that we had to -- I'm sorry, I keep

21      saying "we" -- that the individuals involved

22      had to calculate and quantify.

23           Q.    Well, do you recall whether HCMFA

24      admitted certain fault and liability for this

25      error?
```

Case 3:21-cv-00881-X   Document 180-4   Filed 10/20/23   Entered 10/20/23 21:21:54   Page 277 of 397
Case 3:21-cv-00881-X   Document 178-30   Page 3269/2446   Page 162 of 282   PageID 47085
Page 277

```
 1                   WATERHOUSE - 10-19-21

 2        A.     I don't recall specifically.

 3        Q.     Do you recall whether HCMFA caused

 4   any funds to be paid to the investors and the

 5   fund the subject of the NAV error?

 6        A.     Yes.

 7        Q.     Do you recall the approximate amount

 8   of funds, moneys paid to the investors and the

 9   fund?

10        A.     It was -- it was approximately

11   $7 million.

12        Q.     If I was to suggest 7.8 million,

13   would that ring more true or are you sticking

14   with your original answer?

15        A.     It was -- it was approximately 7 --

16   7 to $8 million.  Again, I don't remember the

17   exact number, but it was in that ballpark.

18        Q.     So regardless of whether HCMFA

19   accepted fault or liability, it caused some

20   $7 million or more to be paid out to affected

21   investors in the fund?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.     And I want to make sure I'm

25   understanding your question because there is a
```

Case 3:21-cv-00881-X Document 88-30 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 278 of 397
Case 3:21-cv-00881-X Document 178-30 Page 32709/2446 Page 163 of 282 PageID 47086

Page 278

```
 1                    WATERHOUSE - 10-19-21

 2     lot of different entities that are going on to

 3     my head.

 4              I think what you are saying is based

 5     on this error, shareholders were harmed by this

 6     approximately $7.8 million -- by approximately

 7     $7.8 million.  Is that what you are asking?

 8     Q.    Yes, sir.

 9     A.    Yes, that was -- again, I don't have

10     the exact numbers.  If I take -- it was -- it

11     was in that ballpark, and there is a detail

12     calculation and write-up that could, that --

13     that exists someplace.

14     Q.    Now, at that time, at the time that

15     the NAV error occurred, was there a contract in

16     place between HCMFA and the debtor pursuant to

17     which the debtor was providing services to

18     HCMFA?

19              MR. MORRIS:  Objection to the form

20         of the question.

21     A.    Yes.

22     Q.    Was that contract generally called a

23     shared services agreement?

24     A.    It was generally called that, but

25     there were -- there were -- I mean, it -- it --
```

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 21:54:01 Page 279 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3289/2446 Page 164 of 282 PageID 47087
Page 279

1

2    it depends on who you talk to, but yes,

3    generally, there were -- there are multiple

4    agreements.

5          Q.    Pursuant to one or more of those

6    agreements, was the debtor providing certain

7    services to HCMFA?

8                MR. MORRIS:  Objection to the form

9          of the question.

10         A.    Yes.

11         Q.    And can you at a very high level

12   summarize in 2018 and 2019 what those services

13   were?

14         A.    Yes, there was a -- yes.

15         Q.    Okay.  Please -- please go -- go

16   through a short summary.

17         A.    There was a -- a cost reimbursement

18   agreement between Highland Capital Management

19   Fund Advisors and Highland Capital Management,

20   L.P.  That agreement was for what we referred

21   to as front office services, so investment

22   management, things of that nature.

23               There was I think what most people

24   refer to as the shared services agreement that

25   was -- that agreement was between Highland

Case 3:21-cv-00881-X   Document 180-30   Filed 10/20/23   Entered 10/20/23 21:31:54   Page 280 of 397
Case 3:21-cv-00881-X   Document 178-30   Page 3299/2446   Page 165 of 282   PageID 47088

Page 280

```
 1                    WATERHOUSE - 10-19-21

 2     Capital Management Fund Advisors and Highland

 3     Capital Management for back office services.

 4          Q.    And can you summarize what you mean

 5     by back office services?

 6          A.    Those services were for accounting,

 7     finance, tax, valuation, HR, IT, you know,

 8     legal compliance, things of -- things of those

 9     nature -- or things of that nature, excuse me.

10          Q.    So in the spring of 2019, do you

11     recall whether HCMFA took the position that it

12     was actually Highland that caused the NAV error

13     to occur pursuant to the valuation services

14     that Highland was providing?

15               MR. MORRIS:  Objection to the form

16          of the question.

17          A.    I do not recall.

18          Q.    Did you ever have any discussions

19     with anyone, Jim Dondero or anyone in the first

20     half of 2019 as to whether Highland, the

21     debtor, that is, had any liability to HCMFA

22     related to the NAV error?

23               MR. MORRIS:  Objection to the form

24          of the question.

25          A.    I do not recall.
```

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 28 of 397
Case 3:21-cv-00881-X Document 178-30 Page 330 of 446 Page 166 of 282 PageID 47089

Page 281

1                    WATERHOUSE - 10-19-21

2          Q.    And then you mentioned that the fund

3     was being closed and some compensation related

4     to that.  Can you -- can you elaborate?  What

5     were you referring to?

6          A.    Right.  So the advisor, pursuant to

7     board approval, put a proposal in front of the

8     shareholders of the Highland Global Allocation

9     Fund to convert it from an open-ended fund to a

10    closed-end fund.

11               So an open-ended fund, when

12    shareholders subscribe to the fund or redeem

13    into the fund, they do it at NAV.

14               When it is -- when you have a

15    closed-end fund, closed-end funds are -- are

16    publicly-traded, like on the New York Stock

17    Exchange, exchanges like that, and -- and

18    shareholders or investors, they're not --

19    they're -- they're not subscribing and

20    redeeming with the fund.  They are like shares

21    of Apple.

22               Those shares of the Highland Global

23    Allocation Fund trade on an exchange, and that

24    is how you, you know, that is how, you know,

25    you become an equity owner in the fund or you

Case 3:10-06-00681-Sjc 8Doc File 107-20/210/29/19ared Enter20/210/29/2131:54age 282 Dec 397
Case 3:21-cv-00881-X Document 178-30 Page 309/2446 Page 167 of 282 PageID 47090

Page 282

1    WATERHOUSE - 10-19-21

2  sell your shares and you are no longer an

3  equity owner.

4           As part of that proposal, the

5  advisor told shareholders if you -- if you vote

6  for this proposal to -- to convert it from an

7  open-ended fund to a closed-end fund, we will

8  pay you some amounts of money.  I forgot -- a

9  certain number of points.  I think it was

10  like -- it was like two to three points or

11  something -- something like that.

12      Q.    Okay.  You mentioned when Mr. Morris

13  was asking you, going back to those two

14  promissory notes, you will recall the 5 million

15  and 2.4 million, you mentioned something to the

16  effect that Mr. Dondero told -- told you to pay

17  some moneys out of Highland.  Do you remember

18  that discussion with Mr. Morris?

19      A.    I do.

20      Q.    So, to the best of your

21  recollection, did you have a discussion with

22  Mr. Dondero about making some payments in May

23  of 2019 out of Highland?

24      A.    I recall, as I testified earlier,

25  that I had a conversation with Mr. Dondero

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 28 of 397
Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Page 168 of 282 PageID 47091

Page 283

                    WATERHOUSE - 10-19-21

1

2   for -- for these amounts attributable to -- it

3   was either the error -- you know, the error,

4   and in that conversation he said, go get the

5   money from Highland.  I believe that is what I

6   testified earlier, and that -- that is my

7   recollection.

8        Q.    Do you recall if that was an

9   in-person meeting or some other mode for the

10  meeting?

11       A.    I -- I -- I recall that being

12  in-person.

13       Q.    Do you recall if anyone else was

14  present, or was it just you and Mr. Dondero?

15       A.    I recall just he and I.

16       Q.    And the moneys that he told you to

17  find from -- or get from Highland, was that in

18  the amount of $5 million and $2.4 million?

19             MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I believe so, but I would have to go

22  back and look and see when those moneys were

23  actually paid into the -- into the fund and,

24  you know, when those transfers were done.  If

25  they were all done around that same time, then

Case 3:21-cv-00881-X  Document 180-30  Filed 10/20/21  Entered 10/20/21 22:31:54  Page 28  of 397
Case 3:21-cv-00881-X  Document 178-30  Page 33397/2446  Page 169 of 282  PageID 47092

Page 284

```
 1                  WATERHOUSE - 10-19-21

 2    yes, I would say it was -- it was all related

 3    to that.

 4         Q.    Did Mr. Dondero tell you that those

 5    funds would be a loan from Highland to HCMFA?

 6         A.    I don't recall.

 7              MR. MORRIS:  Objection to the form

 8         of the question.

 9         Q.    Now, and forgive me, I'm probably

10    the only non-American born here, but I speak

11    reasonably well in English.  I don't recall,

12    does that mean you don't remember or does that

13    mean it didn't happen?

14              MR. MORRIS:  Objection to the form

15         of the question.

16         A.    It -- it means I don't -- I don't

17    remember.

18         Q.    Did Mr. Dondero tell you to have

19    those two promissory notes prepared?

20         A.    I don't recall.

21         Q.    When you -- again, when you say, I

22    don't recall today, that means that sitting

23    here today, you just don't remember one way or

24    the other.  Is that accurate?

25         A.    Yes.
```

Case 3:10-cv-00005-bjc Doc Filed 10/20/21/29/21 red Enter 10/20/21/29/21 31:54 1e 28 5st 397
Case 3:21-cv-00881-X Document 178-30 Page 33 of 2446 Page 170 of 282 PageID 47093

Page 285

                    WATERHOUSE - 10-19-21

 1

 2        Q.    Is it possible that you, having

 3   heard what Mr. Dondero said and seeing funds

 4   being transferred, assumed that that would be a

 5   loan without him actually telling you that

 6   would be a loan?

 7              MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.    Sorry, I want to make sure -- did I

10   ask the amounts that were transferred that I --

11   that -- that I assumed that that was a loan?

12        Q.    Well, let me -- let me take -- let

13   me try again.

14              So you have established already that

15   there were quite a number of promissory notes

16   back and forth -- I'm sorry, quite a number of

17   promissory notes with affiliated companies and

18   individuals owing Highland money; right?

19        A.    Yes.

20        Q.    And you have established that there

21   were many transactions and transfers going back

22   and forth over the years; right?

23              MS. DANDENEAU:  Objection to form.

24        A.    In -- yes, in my capacity as CFO and

25   my employment, yes, that is -- yes.

Case 3:03-cv-00806-Doc-8 Document 11 Filed 10/20/21 Entered 10/20/21 21:38:54 Page 28 of 397
Case 3:21-cv-00881-X   Document 178-30   Page 8359/2446 Page 171 of 282   PageID 47094

Page 286

         WATERHOUSE - 10-19-21

1

2        Q.    And that's part of the reason why

3   you just can't remember some of the details

4   today because this -- this happened years ago,

5   and there were a number of transactions.  Is

6   that accurate?

7             MS. DANDENEAU:  Objection to the

8        form.

9             MR. MORRIS:  Objection to the form

10       of the question.

11       A.    I mean, I deal with thousands of --

12  of -- of -- of transactions, you know, whether

13  it has -- the processing of transactions, you

14  know, if it has got, you know, more -- more

15  zeros, you know, behind it than others.

16            When you look at thousands of

17  transactions over the years for funds and

18  advisors and -- and, you know, financial

19  statements, I mean, it is -- it is very hard

20  going back in -- in -- in my -- you know,

21  14-ish year career at -- at Highland to

22  remember a lot of those details, especially

23  when I don't have any records or books or

24  anything like that, and -- and going back many

25  years.

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    And that is fine.  That -- that --

 3   that is why I asked the question.

 4              Is it possible in May of 2019 when

 5   Mr. Dondero told you to transfer the funds from

 6   Highland, you just assumed on your own that

 7   those would be loans without him actually

 8   telling you that those would be loans?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I don't know.

12        Q.    I'm sorry, you --

13        A.    I said I don't know.

14        Q.    Okay.  Well, as the -- as the CFO

15   for Highland, if you saw $7.4 million going

16   out, you would feel some responsibility to

17   account for that, wouldn't you?

18              MR. MORRIS:  Objection to the form

19        of the question.

20        A.    Yes.

21        Q.    Is it fair to say that those would

22   be in the range large enough to rise up to your

23   level?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Case 23-03006-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 28 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 173 of 282 PageID 47096

Page 288

```
 1                    WATERHOUSE - 10-19-21

 2        A.     If -- I don't know if I understand

 3   your question.  Those amounts would arise to my

 4   level where I would be involved or...

 5        Q.     You would want to know what a

 6   transfer for that amount, $7.4 million, was all

 7   about, as the CFO of Highland, wouldn't you?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10        A.     Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19        Q.     So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25              MR. MORRIS:  Objection to the form
```

```
 1                  WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    I don't know.  As I testified

 4   earlier, I had conversations with Mr. Dondero

 5   about -- about the -- the -- the moneys that

 6   were needed for the NAV error.  And I recall

 7   him saying go get it from Highland -- or get it

 8   from Highland.

 9        Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18              I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I
```

Case 3:00-00 Soc 8 Doc File 1 07/20/21 29/21 ed En 10/20/21 0/29/21 21:51 Page 290 Desc
Case 3:21-cv-00881-X   Document 178-30   Page 3399/2446 Page 175 of 282   PageID 47098

Page 290

```
 1               WATERHOUSE - 10-19-21

 2    don't -- I don't recall generally.  I don't --

 3    I don't recall.

 4        Q.    So -- but to the best of your

 5    recollection, it was on your initiative,

 6    following your discussion with Mr. Dondero,

 7    that you had someone draft those two promissory

 8    notes; is that correct?

 9               MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes, we would have -- the team, as I

12    stated earlier, we don't draft promissory

13    notes.  "The team" meaning the accounting and

14    finance team.

15               So the team would have worked with

16    the legal group at Highland to draft any notes.

17        Q.    Do you believe or do you have any

18    recollection as to whether you would have done

19    that pursuant to an email or telephone call or

20    in-person meeting?

21               MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Are you asking if I would have -- if

24    those notes would have been drafted pursuant to

25    an email or phone call?
```

```
1                    WATERHOUSE - 10-19-21

2         Q.    Strike that.

3              Do you recall whether you sent an

4    email to anyone asking them to draft those two

5    promissory notes?

6         A.    I don't recall because, again,

7    once -- I would have instructed -- likely

8    instructed the team to -- to work with the

9    legal group to draft these documents.

10             I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17        Q.    And who on your team do you think

18   you would have asked to do that?

19             MR. MORRIS:  Objection --

20        Q.    Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    It -- it -- there is only two
```

Case 3:21-cv-00881-X Document 8 Doc Filed 107/10/210/29/8red 107/20/210/292.381:54:01 29:e 2Desc 397
Case 3:21-cv-00881-X Document 178-30 Page 340 09/2446 Page 177 of 282 PageID 47100
Page 292

1                    WATERHOUSE - 10-19-21

2    managers of the group.  That would have been

3    Dave Klos or Kristin Hendrix.

4              Dave was the -- one of his duties

5    was managing the valuation team, and so he was

6    intimately involved with this process.  So, you

7    know...

8         Q.    Okay.

9         A.    I don't recall specifically but, I

10   mean, my general -- you know, I -- I -- I

11   likely would have talked to Dave first about it

12   versus someone like Kristin who hadn't been

13   intimately involved.

14        Q.    And -- and do you have a view as to

15   whether it is most likely that you would have

16   done that by email or in-person or how would

17   you believe you would have communicated that to

18   Mr. Klos?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I likely would have done that in

22   person.  Again, if things of this nature

23   that -- again, you have to put ourselves back

24   to, we have been working on this very stressful

25   project for many, many months.  And once the

Case 3:05-cv-03006-Doc 8 Doc Filed 10/20/21 Entered 10/20/21 29:21:31 Page 29 Dec 397
Case 3:21-cv-00881-X Document 178-30 Page 04/29/24 Page 178 of 282 PageID 47101

Page 293

```
 1                    WATERHOUSE - 10-19-21

 2    go-ahead was to -- you know, we see the light

 3    at the end of the tunnel with wrapping this up

 4    and making shareholders whole -- sorry to say

 5    "we" -- you know, the -- so the folks that are

 6    involved in it.

 7               I like to talk to people

 8    face-to-face and -- and -- and go to -- and go

 9    to their desk, because that shows if I'm going

10    to their desk that -- that is something that I

11    want done, you know.

12        Q.    And do you remember, Mr. Waterhouse,

13    getting those two promissory notes in paper

14    format or by email before they were executed?

15               MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall.

18        Q.    For whatever was the ordinary course

19    back then in May 2019, would you expect to have

20    received them only on paper or would you have

21    expected to have received them in Word document

22    or PDF document by email?

23               MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I -- I didn't sign -- I signed very
```

Case 3:21-cv-00881-X Document 8 Doc File 10/20/21 Entered 10/20/21 22:31:54 Page 29 Desc 397
Case 3:21-cv-00881-X Document 173-30 Page 34/99/2446 Page 179 of 282 PageID 47102

Page 294

1              WATERHOUSE - 10-19-21

2    few documents via email.  I can't say that it

3    never happened, but people either stopped by my

4    office and physically walked in documents for

5    signature that we discussed face-to-face.

6              Or documents were -- if -- if --

7    if -- if -- let's say I wasn't there or I

8    wasn't available, documents were dropped off.

9    I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11             Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16             And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23             Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.

Case 3:00-00-00000-X Doc 8 Doc File 1 07/10/21 10/29/21 Entered 10/20/21 07/22/21 15:24:01 Page 295 Desc 397
Case 3:21-cv-00881-X Document 178-30 Filed 04/09/24 Page 180 of 282 PageID 47103

Page 295

```
 1                  WATERHOUSE - 10-19-21

 2              And my assistant, you know, if she

 3    was there, she would review that -- you know,

 4    whatever was being dropped off.  And if that

 5    has legal, you know, reviewed or -- reviewed or

 6    approved it, if that wasn't -- if that stuff

 7    hadn't been done, it was like she would just

 8    tell them like, go -- go -- go to the legal

 9    group, because --

10        Q.    Let me -- let me pause --

11              MS. DANDENEAU:  Let him finish.

12              MR. MORRIS:  Thank you.  Go ahead.

13        A.    I take -- go to the legal group

14    because that -- that was my -- you know, I

15    didn't -- I didn't review anything that -- that

16    they weren't -- you know, or there wasn't some

17    representation made to me that they had

18    reviewed, approved in some capacity.

19              Again, my -- my -- my goal, as CFO,

20    is to provide transparency and make sure that

21    groups like compliance and other things -- and

22    the other group in legal are -- are in -- you

23    know, their -- they're made aware of

24    transactions of -- you know, that are crossing

25    my desk.
```

Case 3:3005d06-Sgic 8 Dct-File 1 107/10/210/29/Blared Ent26/210/29/2182 15/PageE 296 of 397
Case 3:21-cv-00881-X   Document 678-30   Page 845/9/2446Page 181 of 282   PageID 47104

Page 296

```
 1                  WATERHOUSE - 10-19-21

 2                  Because I'm not in every

 3      conversation.  They're not in every

 4      conversation -- meaning legal compliance -- and

 5      I just want to make sure that -- that everyone

 6      is in sync to, you know, to -- to the extent

 7      possible.

 8           Q.    So if we summarize, you don't

 9      specifically remember signing these two notes,

10      but most likely it would have been that they

11      would have presented -- been presented to you

12      physically on paper?

13                  MR. MORRIS:  Objection to the form

14           of the question.

15           A.    They would -- they would have been

16      presented physically on paper most likely or

17      someone would have left it.  But, I mean,

18      again, I don't -- I don't recall.

19           Q.    I understand.  Understand.

20                  When you signed -- when you signed

21      documents, when you personally signed

22      documents, did you typically use a ink pen or

23      did you use a stamp?

24           A.    No, I -- I -- I use a -- an -- an

25      ink pen.
```

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Do you know -- was there a file at

 3   Highland kept anywhere with ink-signed

 4   originals of a promissory notes in general or

 5   these two promissory notes specifically?

 6              MR. MORRIS:  Objection to the form

 7        of the question.

 8        A.    Sorry, I just want to make sure I

 9   understand your question.  Are you saying is

10   there a file somewhere that has ink-signed

11   originals of these two promissory notes?

12        Q.    Yes.

13        A.    I would -- I would assume they're

14   some place.  I mean --

15        Q.    Well, was there a -- was there a

16   place where Highland generally kept originals

17   of promissory notes owed to it?

18        A.    I wouldn't -- no.

19              MR. RUKAVINA:  Mr. Nguyen, would you

20   please pull up my A7, alpha 7.

21        Q.    These are the two promissory notes,

22   Mr. Waterhouse.

23              (Exhibit A7 marked.)

24        Q.    And please -- Mr. Waterhouse, please

25   command my associate to scroll down as you need
```

```
 1                   WATERHOUSE - 10-19-21

 2    to, but I want you to take a very close look at

 3    your two signatures here and tell me whether

 4    you believe, in fact, that you ink signed them

 5    or whether you --

 6              MS. DANDENEAU:  Mr. Rukavina,

 7         Mr. Waterhouse has the copies.

 8              MR. RUKAVINA:  Perfect.  Then you

 9         can take this down, Mr. Nguyen.

10         A.    These -- these -- these signatures

11    are identical, now that I stare at them, and I

12    mean, they are so close -- I mean, they're

13    identical that, I mean, even with my chicken

14    scratch signature, I don't know if I can -- you

15    know, I do this 100 times, could I do that

16    as -- as precisely as I see between the two

17    notes.

18         Q.    Well, that is why I ask.

19    Mr. Waterhouse, now that you have examined

20    them, does it seem like it is more likely that

21    you actually electronically signed these?

22              MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Is -- I don't -- I don't recall

25    specifically.  As I said before, my assistant
```

```
 1                  WATERHOUSE - 10-19-21

 2   did have a -- an electronic signature, and that

 3   was used from time to time.  It wasn't as

 4   common practice back in 2019.  It definitely

 5   was more common practice when we had to work

 6   from home and remotely for COVID because it

 7   that made it almost impossible to, right,

 8   provide wet signatures since we're all working

 9   from home remotely.

10        Q.    Well, going just for these two

11   promissory notes, Mr. Waterhouse, in light of

12   your inability to remember any details, are you

13   sure you actually signed either or both of

14   those notes?

15             MS. DANDENEAU:  Objection to form.

16        A.    I don't recall specifically

17   signing -- actually physically signing these

18   notes.  As I said before, I don't recall doing

19   that.  This -- this looks like my signature,

20   but yet these two signatures are identical.

21        Q.    So you don't recall physically

22   signing them, and I take it you don't recall

23   electronically signing them either?

24        A.    I don't recall.  You know, Highland

25   has all my emails.  If that occurred, you know,
```

Case 3:05-ov-00000-Doc 8 Doc File 10/20/21 Entered 10/20/21 Page 300 of 397
Case 3:21-cv-00881-X   Document 173-30   Page 3499/2446   Page 185 of 282   PageID 47108

Page 300

                        WATERHOUSE - 10-19-21

1

2   you know, I don't have any of these records is

3   what I'm saying.  I don't have any of those

4   records.

5        Q.    That is why I'm asking you these

6   questions in great detail because I don't have

7   those emails.  I'm trying to -- I'm hoping that

8   you will give me some names or some details so

9   I can go look for more emails, but again, you

10  don't remember any -- any individual, other

11  than Mr. Dondero that we've discussed, you

12  don't remember any individual with whom you

13  discussed these promissory notes prior to their

14  execution?

15            MR. MORRIS:  Objection to the form

16      of the question.

17       A.    I don't recall discussing it with

18  anybody else.

19       Q.    Okay.

20       A.    I mean, prior --

21       Q.    I understand.

22       A.    You know, there was no one else --

23  there was no one else in that meeting that I

24  recall with Mr. Dondero.

25       Q.    Now, when you established that by

Case 3:10-05806-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 30 of 397
Case 3:21-cv-00881-X Document 178-30 Page 350 of 446 Page 186 of 282 PageID 47109

Page 301

                    WATERHOUSE - 10-19-21

1    May of 2019 --

2        A.    And -- and from what I recall, and

3    the reason why I was by myself is -- is, you

4    know, I don't -- I don't want to speculate, I'm

5    sorry.

6        Q.    Okay.  We have established that by

7    May of 2019, in your view, the liabilities of

8    HCMFA exceeded its assets; correct?

9        A.    Yeah.  I mean, again, I don't have

10   financial statements in front of me, but I

11   think, if I recall, we'd have to go through the

12   testimony with Mr. Morris, I believe that was

13   the case.

14       Q.    In fact, you will recall that in

15   April of 2019, Mr. Dondero signed a document

16   that extended the demand feature of two prior

17   notes to May 31, 2019.  Do you recall that?

18             MS. DEITSCH-PEREZ:  I think you

19       might -- maybe have the court reporter read

20       that back.  You might have misspoke.

21             (Record read.)

22             MR. RUKAVINA:  And I did misspeak.

23       Q.    I meant to say to May 31, 2021.  Do

24   you recall that, sir?

Case 3:21-cv-00881-X   Document 180-30   Filed 10/20/23   Entered 10/20/23 21:31:54   Page 302 of 397
Case 3:21-cv-00881-X   Document 180-30   Exhibit 30   Page 350 of 446   Page 187 of 282   PageID 47110

Page 302

```
1                    WATERHOUSE - 10-19-21

2                    MR. MORRIS:  Objection to the form

3        of the question.

4        A.    Yes.

5                    MR. RUKAVINA:  And, Mr. Nguyen, just

6        so that the record is clear, will you please

7        pull up my Exhibit Alpha 10, A10.

8                    (Exhibit A10 marked.)

9        Q.    You don't have this one in front of

10       you, Mr. Waterhouse?  This is the one that

11       Mr. Morris used earlier.  Do you see that

12       document, sir?

13       A.    Yes, I do.

14       Q.    And this is what you were testifying

15       about before when Mr. Morris was asking you.

16       Do you remember that?

17       A.    Yes.

18       Q.    So here is my question for you,

19       Mr. Waterhouse:  As the chief financial officer

20       of Highland, was it prudent for Highland less

21       than three weeks later to be lending

22       $7.2 million to an insolvent entity that

23       couldn't even then pay its debts back to

24       Highland?

25                   MS. DANDENEAU:  Objection to form.
```

Case 23-03005-sgj Doc 81-1 Filed 10/20/25 Entered 10/20/25 21:31:54 Desc Exhibit 30 Page 357 of 446
Case 3:21-cv-00881-X Document 178-30 Page 357 of 446 Page 188 of 282 PageID 47111

Page 303

```
 1                   WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    Sorry, I just want to make sure --

 5   are you asking me, did you say, was it prudent

 6   for Highland to loan $7.4 million to HCMFA a

 7   few weeks after this document was executed?

 8        Q.    Yes, and at a time when HCMFA's

 9   liabilities exceeded its assets.

10              MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't -- it is odd.  I don't know.

13              MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15        Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20              MR. MORRIS:  Objection to the form

21        of the question.

22        A.    I don't recall.

23        Q.    Did you receive personally any of

24   that $7.4 million?

25        A.    No.
```

Case 3:05-cv-00806-Dc-Fd-J-1 Document 178-30 Filed 10/20/21 Entered 10/20/21 18:11:55 Page 304 of 397
Case 3:21-cv-00881-X Document 178-30 Page 359/2446 Page 189 of 282 PageID 47112

Page 304

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Did you even --

 3             MR. MORRIS:  I didn't hear that

 4        question, sir.

 5             MR. RUKAVINA:  The one that he

 6        answered, John, or my new one?

 7             MR. MORRIS:  No, no, your question,

 8        Davor.

 9             MR. RUKAVINA:  I had asked him

10        whether he received any of the

11        $7.4 million.  He said no.

12             MR. MORRIS:  Yeah.  I thought there

13        was a question after that.  Maybe I was

14        mistaken.  I apologize.

15             MR. RUKAVINA:  I had started a new

16        question, so here, let me start the new

17        question again.

18        Q.    Did you personally receive any

19    direct benefit from those two notes for

20    $7.4 million?

21        A.    No.

22        Q.    Did you ever personally consider

23    yourself obligated to repay either or both of

24    those notes?

25        A.    No.
```

Case 3:21-cv-00881-X Doc 8 Doc Filed 10/20/21 Entered 10/20/21 21:31:54 Page 305 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3549/2446 Page 190 of 282 PageID 47113

Page 305

1                    WATERHOUSE - 10-19-21

2              MR. RUKAVINA:  Pull up those notes

3    again, Mr. Nguyen.

4         Q.    You can have them in front of you,

5    Exhibit 7, Mr. Waterhouse, whatever is easier

6    for you.  If you go to your signature page, my

7    question to you is, why did you not include

8    your title as treasurer by your name, Frank

9    Waterhouse?

10              MS. DANDENEAU:  Objection to form.

11        A.    I didn't -- I didn't draft this

12   document.

13        Q.    So you relied on whoever drafted it

14   to draft it correctly?

15        A.    Yes.

16        Q.    Okay.  But back then when you signed

17   this, did it ever cross your mind that you were

18   the maker on these notes?

19        A.    No.

20        Q.    Back then when you signed this

21   document, did it ever cross your mind that you

22   could be a co-obligor on these notes?

23        A.    No.  I didn't receive $7.4 million,

24   I mean...

25        Q.    But can you say that HCMFA received

Case 3:21-cv-00881-X   Document 180-1   Filed 10/20/21   Entered 10/20/21 22:31:54   Page 306 of 397
Case 3:21-cv-00881-X   Document 178-30   Page 35599/2446   Page 191 of 282   PageID 47114

Page 306

```
 1              WATERHOUSE - 10-19-21

 2   $7.4 million?

 3        A.    I would have to go back and look and

 4   check in, you know, the -- the financial

 5   records and the bank statements.

 6              MR. RUKAVINA:  You can take this

 7   exhibit down, Mr. Nguyen.

 8        Q.    Mr. Waterhouse, I'm not trying to be

 9   a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19        Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Case 3:10-05300-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 307 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3509/2446 Page 192 of 282 PageID 47115

Page 307

                    WATERHOUSE - 10-19-21

1

2              MS. DANDENEAU:  Objection to the

3        form.

4        A.    Yes.

5        Q.    So do you agree with me that it's

6   odd -- I think that is the word you used --

7   that Highland would be loaning $7.4 million a

8   few weeks after that extension to an entity

9   whose liabilities exceeded its assets, and you

10  would agree with me that it was never your

11  intention to be in any way liable for these two

12  promissory notes; correct?

13             MR. MORRIS:  Objection to the form

14        of the question.

15       A.    Sorry, you -- you asked a lot there.

16             MR. RUKAVINA:  I will strike it and

17  I will move on.

18             Let's go to -- pull up Exhibit 9,

19  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20  9, A9.

21             (Exhibit A9 marked.)

22       Q.    Sir, take a moment to look at this,

23  but this is an email, and you will see attached

24  July 31, 2020 affiliate notes.

25             Do you see that attachment?

Case 3:00-cv-00000-Doc 8-1 Doc File 10/20/21 Entered 10/20/21 22:33:54 Page 308 of 397
Case 3:21-cv-00881-X Document 178-30 Exhibit 30 Page 3509/2446 Page 193 of 282 PageID 47116

Page 308

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    Okay.  And do you see an entry for

4   Highland Capital Management Fund Advisors?

5             MR. MORRIS:  I'm sorry, hold on.

6        Where are you looking?

7             MR. RUKAVINA:  Last page, John.

8             MR. MORRIS:  Is it the page on the

9        screen?

10            MR. RUKAVINA:  Oh, I'm sorry.

11       Mr. Nguyen just did it.  Yes, the last page

12       there.

13            MR. MORRIS:  Thank you.

14       Q.    Do you see an entry there for HCMFA?

15       A.    Yes.

16       Q.    About $10.5 million.

17            Do you see that?

18       A.    I do.

19       Q.    And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23       A.    I don't know.  Okay.

24            MR. RUKAVINA:  Close this one and

25       pull up, Mr. Nguyen, the schedules,

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 309 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3599/2446 Page 194 of 282 PageID 47117

Page 309

1              WATERHOUSE - 10-19-21

2       schedule of assets.  What exhibit is this

3       of ours, Mr. Nguyen?

4              MR. NGUYEN:  This is A11.

5              MR. RUKAVINA:  Oh, this will be A11.

6              (Exhibit A11 marked.)

7       Q.    You don't have this in front of you,

8  Mr. Waterhouse?

9       A.    Okay.

10      Q.    This is what Mr. Morris used

11  earlier.  Do you remember looking at this with

12  Mr. Morris?

13      A.    Yes.

14             MR. RUKAVINA:  You might have to

15      zoom in a little.  Okay.

16      Q.    Now, I see Affiliate Note A, B, and

17  C.

18             Do you have any recollection as to

19  why the names of the affiliates are omitted?

20      A.    I don't.  I testified earlier that,

21  you know, the team worked with DSI in providing

22  these.  I -- I don't -- I don't know.

23      Q.    Can we deduce -- is it logical to

24  deduce that Affiliate Note A would be NexPoint

25  given its size of $24.5 million?

Case 3:00-00-05-06-Doc 8-Doc Filed 10/10/10/19/29/2421 Entered 10/10/10/29/2181:54:01 Desc Of 397
Case 3:21-cv-00881-X   Document 178-30   Page 2599/2446   Page 195 of 282   PageID 47118

Page 310

                            WATERHOUSE - 10-19-21

 1

 2              MR. MORRIS:  Objection to the form

 3       of the question.

 4       A.    I mean, it -- it is a -- it is -- it

 5  is approximate.

 6       Q.    Well, can we -- can we deduce -- or,

 7  I'm sorry, strike that.

 8              Can you, sitting here today,

 9  logically conclude that Affiliate Note B or C

10  represents HCMFA?

11              MR. MORRIS:  Objection to the form

12       of the question.

13       A.    I don't know.  I don't know.  I

14  can't.

15       Q.    Okay.  As of the petition date, we

16  have established that HCMFA, under promissory

17  notes, owed $7.4 million and $5.3 million to

18  the debtor; correct?

19              MR. MORRIS:  Objection to the form

20       of the question.

21       A.    Yes.

22       Q.    Okay.  And by my reckoning, that

23  would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25       of the question.

Case 3:21-cv-00881-X Document 178-30 Filed 10/20/21 Entered 10/20/21 22:13:54 Page 31 of 397
Case 3:21-cv-00881-X Document 178-30 Page 360 of 446 Page 196 of 282 PageID 47119

Page 311

1                    WATERHOUSE - 10-19-21

2          Q.    It would be $12.7 million.  Is that

3    generally correct?

4          A.    Sorry, the amounts were 7.4, 5.3.

5          Q.    Yes.

6          A.    Okay.  Yeah, that -- that -- I can

7    do that math, yes.

8          Q.    Do you have any explanation or any

9    understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12              MR. MORRIS:  Objection to the form

13        of the question.

14         A.    I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19         Q.    Well, that was going to be my next

20   question.  You anticipated it.

21              MR. RUKAVINA:  You can -- you can

22        take this down, Mr. Nguyen.

23         Q.    Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the

                      WATERHOUSE - 10-19-21

1

2      affiliates for Affiliate Note A, B, and C would

3      have been listed there?

4          A.    Are you asking we provided the names

5      to the financial advisor?  I don't -- I don't

6      understand who the financial advisor is.

7          Q.    I'm sorry, DSI.

8                Let me ask the question this way,

9      Mr. Waterhouse.

10               Whenever you provided information

11     about the affiliate notes to DSI, do you

12     believe that you would have included the actual

13     names of the affiliates, you or your team, or

14     that you would have done the Affiliate Note A,

15     Note B, Note C?

16               MR. MORRIS:  Objection to the form

17          of the question.

18               MS. DANDENEAU:  Objection to the

19          form.

20          A.    We -- like I testified earlier, when

21     we were -- we gave everything to -- to DSI.  We

22     were giving all of our records, all of our

23     files, everything to DSI.  We weren't redacting

24     information or saying, hey, here is a note,

25     here is Affiliate Note A or B.

```
1                    WATERHOUSE - 10-19-21

2               I mean, it was -- our job and our

3    focus -- and I testified in court back in 2019;

4    right -- was -- was to be transparent and, you

5    know, get DSI up to speed on -- on the matters

6    at Highland.  So I can't see us redacting at

7    that point.

8               MR. RUKAVINA:  Mr. Nguyen, will you

9         please pull up Mr. Morris' Exhibit 36.

10        Just the very first page, the very top

11        email.  You might zoom in a little bit.

12        Q.    Now, you recall being asked about

13   this by Mr. Morris?

14        A.    Yes, I do.

15        Q.    And you wrote:  The HCMFA note is a

16   demand note.

17               You wrote that; right?

18        A.    Yes.

19        Q.    And, in fact, weren't there by that

20   point in time several notes?

21        A.    Yes, there were.  Again, I don't --

22   I don't remember everything specifically.  I

23   mean --

24        Q.    I understand.  I understand.

25               So this is an example where -- where
```

Case 3:21-cv-00881-X Document 871 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 314 Desc
Case 3:21-cv-00881-X Document 178-30 Filed 06/29/24 Page 199 of 282 PageID 47122

Page 314

                      WATERHOUSE - 10-19-21

 1

 2    you might have made a mistake by referring to a

 3    singular instead of a plural; right?

 4         A.    Yes.

 5         Q.    Okay.  And you -- you wrote -- a

 6    couple of sentences later, you wrote:  There

 7    was an agreement between HCMLP and HCMFA the

 8    earliest they could demand is May 2021.

 9              You wrote that; right?

10         A.    Yes.

11         Q.    But I think you -- you agreed with

12    Mr. Morris that that can't possibly apply to

13    the May 2019 notes, can it?

14              MR. MORRIS:  Objection to the form

15         of the question.  That is not what he

16         testified to.

17         Q.    Let me ask -- let me ask a different

18    question.

19              Sitting here today -- or if you can

20    answer me from your memory on October 6,

21    2020 -- did the April acknowledgment that

22    extended the maturity date apply to the

23    May 2019 notes also?

24         A.    I don't recall specifically.

25         Q.    Well, you recall that the notes that

Case 3:20-cv-05300-Doc 8 Doc Filed 10/20/21 Entered 10/20/21 21:31:54 Qt 315 Desc
Case 3:21-cv-00881-X    Document 173-30    Exhibit 30    Page 3509 2446 Page 200 of 282    PageID 47123

Page 315

1                    WATERHOUSE - 10-19-21

2      you signed were demand notes; right?

3          A.    Yes.

4          Q.    Do you find it logical, based on

5      your experience, that had they intended to have

6      a different or a set maturity date, you would

7      have instructed that that set maturity date be

8      included instead of a demand feature?

9                MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Sorry, just want to make sure I

12     understand.  You are saying that -- that the

13     $5 million note, the $2.4 million note, if

14     those were supposed to be a term note, that I

15     would have made sure that those were a term

16     note?

17         Q.    I'm saying -- I'm saying,

18     Mr. Waterhouse, that on May the 2nd and May the

19     3rd, 2019, if you intended that those two

20     promissory notes could not be called until May

21     2021, would you have included such language in

22     those two promissory notes?

23                MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I guess -- I'm sorry, I don't recall

Case 3:21-cv-00881-X Document 180-1 Filed 10/20/21 Entered 10/20/21 22:21:31 Page 316 of 397
Case 3:21-cv-00881-X Document 178-30 Page 66 of 446 Page 201 of 282 PageID 47124

Page 316

```
 1                  WATERHOUSE - 10-19-21

 2    putting language in those May notes.  I don't

 3    remember what language you are referring to.

 4        Q.    Well, let's read this again.

 5              There was an agreement between HCMLP

 6    and HCMFA the earliest they could demand is May

 7    2021.

 8              Do you recall that agreement?

 9        A.    Yes, that was the agreement we

10    looked at earlier; correct?

11        Q.    Okay.  Yes.

12              Do you -- do you understand now that

13    that agreement that we looked at earlier also

14    applied to the May 2019 notes that you signed?

15        A.    I don't -- I don't know.

16        Q.    But as of October 6, 2020, you're

17    writing that there is one demand note and

18    you're categorizing that demand note as not

19    being demandable on May 2021; correct?

20        A.    Yes.

21        Q.    And you know now that you made at

22    least one mistake in this email; correct?

23              MR. MORRIS:  Objection to the form

24        of the question.

25        A.    Yes.
```

Case 3:10-cv-00655-Doc 8 Doc Filed 10/20/21 Entered 10/20/21 23:31:54 Page 3 Desc 397
Case 3:21-cv-00881-X   Document 173-30   Filed 03/09/24   Page 202 of 282   PageID 47125

Page 317

```
 1                 WATERHOUSE - 10-19-21

 2             MR. RUKAVINA:  You can pull this

 3        down, Mr. Nguyen.

 4        Q.    So, Mr. Waterhouse, you don't

 5   remember Mr. Dondero telling you to make these

 6   loans or not.  HCMLP was loaning $7.4 million

 7   to someone that their assets were less than

 8   their liabilities.

 9             We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14             Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    I -- I don't know.

20        Q.    And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23             MS. DANDENEAU:  Objection to the

24        form.

25             MR. MORRIS:  Join.
```

Case 3:21-cv-00881-X Document 180 Filed 10/20/21 Entered 10/20/21 21:51:00 Page 31 Desc 397
Case 3:21-cv-00881-X Document 178-30 Filed 07/09/2446 Page 203 of 282 PageID 47126

Page 318

```
1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    If Mr. Dondero testifies that he

4   never told you to make these loans, would you

5   disagree with his testimony?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    Like I testified earlier with my

9   conversation with Mr. Dondero, all I recall is

10  he said, get the money from Highland.

11       Q.    And if Mr. Dondero testifies that

12  he, in consultation with other senior personnel

13  at Highland, decided that Highland needed to

14  pay HCMFA $7.4 million as compensation for the

15  NAV error and not a loan, would you have any

16  reason to disagree with Mr. Dondero?

17             MR. MORRIS:  Objection to the form

18       of the question.

19       A.    If that was -- if that was his

20  intent, yes, it would -- I would --

21       Q.    Do you have any reason to disagree

22  with him?

23             MR. MORRIS:  Objection to the form

24       of the question.

25       A.    If that was his intent, I don't
```

```
 1              WATERHOUSE - 10-19-21

 2    know.  I don't know how I disagree with that.

 3         Q.    And just to confirm, you don't

 4    remember ever asking Mr. Dondero whether you

 5    should have two promissory notes prepared?

 6         A.    No.

 7         Q.    And you don't remember discussing

 8    with Mr. Dondero what the terms of those two

 9    promissory notes should be?

10         A.    I don't recall -- I testified all I

11    recall is he said, get the money from Highland.

12    I don't -- the -- the terms of the note, I

13    don't recall ever having a discussion around

14    the terms of the note, but since I don't draft

15    the notes, that -- there could have been a

16    conversation with other people later.

17         Q.    Do you have any memory of whether

18    after the notes were drafted, but before you

19    signed them, that you communicated with

20    Mr. Dondero in any way to just confirm or -- or

21    get his blessing or ratification to signing

22    those notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I don't recall.
```

Case 23-03090-sgj Doc 71 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 320 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 08/09/24 Page 205 of 282 PageID 47128
Page 320

```
 1                 WATERHOUSE - 10-19-21

 2          Q.    Again, the only thing you remember,

 3   sitting here today, was Mr. Dondero said, get

 4   the money from Highland, and that is it, that

 5   is all you remember?

 6                 MR. MORRIS:  Objection to the form

 7          of the question.

 8          A.    I testified to that several times.

 9   This was over two years ago.  A lot has

10   happened.  That is all I recall.

11          Q.    And help me here.  I'm not very

12   technologically astute.  When you -- and I -- I

13   recognize that you do it rarely, but when you

14   sign a document electronically, do you believe

15   that there is an electronic record of you

16   having authorized or signed a document

17   electronically?

18                 MR. MORRIS:  Objection to the form

19          of the question.

20          A.    I -- I don't know the tech answer to

21   that, but, you know, since I don't have -- I

22   don't ever attach my signature block

23   electronically, my assistant would have done

24   that, and if that is done over email like we

25   did several times -- you know, multiple,
```

Case 3:21-cv-00881-X  Document 850  Filed 10/20/21/29  Entered 10/20/21/29 23:31:54  Page 32  Desc 397
Case 3:21-cv-00881-X  Document 178-30  Page 8709/2446  Page 206 of 282  PageID 47129

Page 321

1                    WATERHOUSE - 10-19-21

2      multiple times over COVID, she would attach my

3      signature block and then email it out to

4      whatever party.

5           Q.    What was your assistant's name in

6      May 2019?

7           A.    It was Naomi Chisum.

8           Q.    Is she the only one?  I'm sorry, was

9      she your only assistant that would have maybe

10     facilitated logistically something like you

11     just described?

12          A.    You know, she was out on maternity

13     leave at some point.  I don't -- I don't recall

14     those dates where she was out for maternity

15     leave.  There was -- there were folks backing

16     her up.  I don't recall specifically who

17     those -- who those, you know, administrative

18     assistants were, and I don't recall

19     specifically if she was out during this time on

20     maternity leave.

21               I do know that that she was out for

22     a period of time, or who knows, or she could

23     have been on vacation that day or, you know, I

24     don't know.

25          Q.    Switching gears now, the two

1          WATERHOUSE - 10-19-21

2    complaints that have been filed that is against

3    HCMFA and NexPoint, did you see any drafts of

4    those complaints before they were filed?

5              MR. MORRIS:  Objection to the form

6         of the question, and to the extent that you

7         had any communications with counsel or you

8         were shown drafts of the complaints by

9         counsel while you were employed by

10        Highland, I direct you not to answer.

11   A.    I -- I reviewed documents yesterday

12   with counsel here.  I believe that is the first

13   time I have ever seen those.

14   Q.    Okay.  Did you ever discuss with

15   Mr. Seery these two lawsuits before or after

16   they were filed?

17   A.    I don't recall.

18   Q.    Were you ever interviewed by legal

19   counsel, to your knowledge, about these

20   promissory notes before the complaints were

21   filed?  Without going into what was said, were

22   you ever interviewed by legal counsel?

23             MR. MORRIS:  Objection to the form

24        of the question.

25   A.    I don't recall.

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21/29/21 Page 32 Dest 397
Case 3:21-cv-00881-X Document 178-30 Filed 07/29/2446 Page 208 of 282 PageID 47131

Page 323

                         WATERHOUSE - 10-19-21

1

2          Q.     Obviously with COVID, it changed,

3     but -- but before COVID, did you used to meet

4     with Mr. Seery from time to time in-person?

5          A.     Yeah, I mean, so before COVID -- so

6     we're talking kind of late March, early April,

7     right, there was about -- I don't remember the

8     specific date when the board for Highland was

9     appointed.  I believe it was around February of

10    2020, so maybe there was a month-and-a-half,

11    two-month window where we were meeting

12    in-person or, you know, like we were actually

13    in the office, excuse me, we were in the

14    office.

15              And, you know, when they were first

16    appointed, the board members and Mr. Seery

17    were -- were definitely down here more

18    in-person.

19         Q.     Did you ever see Mr. Seery taking

20    written notes of -- of his meetings with you or

21    others?

22         A.     I don't recall.

23         Q.     Do you recall on any Zoom or video

24    conference with Mr. Seery, seeing him take

25    notes, written notes?

Case 3:05-cv-00866-Doc 8  Doc File 10/20/21/29/21  Entered 10/20/21/29/21 31:54:01 24:st397
Case 3:21-cv-00881-X  Document 178-30  Page 2199 of 446 Page 209 of 282  PageID 47132

Page 324

1               WATERHOUSE - 10-19-21

2         A.    The Zoom calls we had, I don't

3    recall having seen video or, you know, or if it

4    was on Zoom, I just remember it being -- well,

5    no, you know what, there were some -- you know,

6    I take that back.

7               So there were -- there were some

8    times that I did remember seeing Mr. Seery

9    on -- on some of the Zoom calls.

10        Q.    Well, let me --

11        A.    I don't -- sorry, I'm thinking.  I'm

12   thinking -- I'm going back.  I'm trying to

13   process this.

14        Q.    I can make it much quicker,

15   Mr. Waterhouse.  I have heard -- I have heard

16   that Mr. Seery is a copious note taker.

17              Do you have any knowledge about

18   that?

19        A.    No.

20        Q.    Okay.  Switching gears yet again,

21   and this will be last theme.  Do you need a

22   restroom break, or are you good to go for

23   another half an hour?

24              MS. DEITSCH-PEREZ:  I need a

25        restroom break.

Case 23-03006-sgj Doc 85-1 Filed 10/10/23 Entered 10/10/23 21:31:54 Desc Exhibit 30 Page 1 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3749/2446 Page 210 of 282 PageID 47133

Page 325

```
 1                    WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Can we make it five

 3       minutes?

 4              THE WITNESS:  Five minutes would be

 5       great.

 6              VIDEOGRAPHER:  We're going off the

 7       record at 5:53 p.m.

 8       (Recess taken 5:53 p.m. to 5:59 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10       record at 5:59 p.m.

11       Q.    Mr. Waterhouse, I had asked you

12  earlier about contracts between HCMFA and the

13  debtor, and now I'm going to talk about

14  contracts between the debtor and NexPoint

15  Advisors.  Okay?

16       A.    Okay.

17       Q.    Now, were there contracts similar to

18  the ones with HCMFA that NexPoint had in the

19  nature of employee reimbursement and shared

20  services?

21       A.    Yes, they -- NexPoint Advisors and

22  Highland Capital Management Fund Advisors had

23  cost reimbursement and shared services

24  agreements with Highland Capital Management,

25  L.P.
```

WATERHOUSE - 10-19-21

1

2       Q.    And was that shared services

3   agreement, to the best of your understanding,

4   in place as of December 31, 2020?

5       A.    It was -- it was terminated at some

6   point, and I remember the contracts had

7   different termination dates, but I think the --

8   the date of termination was January 31st of

9   2021, after the termination was put in.

10            So yeah, it would be in place at the

11  end of the year of December -- it would be in

12  place at December 31st, 2020.

13      Q.    And pursuant to that agreement as of

14  December 31st, 2020, was the debtor providing

15  what you would describe as back office services

16  to NexPoint?

17      A.    Yes.

18      Q.    Would those have included accounting

19  services?

20      A.    Yes.

21      Q.    And as part of those accounting

22  services, would the debtor have assisted

23  NexPoint with paying its bills?

24            MR. MORRIS:  Objection to the form

25       of the question.

Case 21-03005-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 327 of 397
Case 3:21-cv-00881-X Document 173-30 Page 3769/2446 Page 212 of 282 PageID 47135

Page 327

1                    WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    So let's break that up.  You were a

4     treasurer of NexPoint as well in December of

5     2020?

6                MR. MORRIS:  Objection to the form

7          of the question.

8          A.    Yes.

9          Q.    Okay.  And in December of 2020, did

10    NexPoint have its own bank accounts?

11         A.    Yes.

12         Q.    And did it use those bank accounts

13    to pay various of its obligations?

14         A.    Yes.

15         Q.    Did employees of the debtor have the

16    ability to cause transfers to be made from

17    those bank accounts on behalf of NexPoint?

18         A.    Yes.

19         Q.    And is that one of services that the

20    debtor provided NexPoint, basically ensuring

21    that accounts payable and other obligations

22    would be paid?

23         A.    Yes.

24                MR. MORRIS:  Objection to the form

25         of the question.

Case 3:00-05006-bjc 8 Document File 107-0-1 10/29/21 Entered 10/20/21 09:22:31 Page 328 Desc 397
Case 3:21-cv-00881-X Document 178-30 Filed 07/09/24 Page 213 of 282 PageID 47136

Page 328

```
1                WATERHOUSE - 10-19-21

2        Q.    You answered yes?

3        A.    Yes.

4        Q.    And the payments, though, whose

5   funds would they be made from?

6        A.    From the bank account of NexPoint

7   Advisors.  If they were NexPoint advisor

8   obligations, it would be made from NexPoint

9   Advisors' bank account.

10        Q.    So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13             (Exhibit A1 marked.)

14        Q.    So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18             Do you see that, sir?

19        A.    I do.

20        Q.    And do you see where Ms. Hendrix

21   writes:  NPA.

22             Do you know what NPA stood for?

23        A.    Yes.

24        Q.    And what does it stand for?

25        A.    NexPoint Advisors.
```

Case 3:21-cv-00881-X Document 180-1 Filed 10/20/23 Entered 10/20/23 21:31:54 Page 329 of 397
Case 3:21-cv-00881-X Document 178-30 Page 31799/2446 Page 214 of 282 PageID 47137

Page 329

```
 1                WATERHOUSE - 10-19-21

 2        Q.    And was that how you-all internally

 3   at Highland refer to NexPoint Advisors, L.P.?

 4        A.    I mean, yes, amongst other things.

 5        Q.    And she writes at the bottom of her

 6   email:  Okay to release?

 7              Do you see that?

 8        A.    Yes, I do.

 9        Q.    So what --

10              MR. MORRIS:  Hold on one second.

11              Okay.  Go ahead.

12              MR. RUKAVINA:  Yeah.

13        Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15        A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21              So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.
```

WATERHOUSE - 10-19-21

1

2          So she is -- she is putting in all

3    the payments for the week because we batch

4    payments weekly.  And these are the payments

5    that go out that week, and she is informing me

6    of the payments and -- you know, again, at the

7    bottom of the email, she is asking for my okay

8    to -- to release these payments in the wire

9    system.

10         Q.    So these would be accounts payable

11   of NexPoint?

12         A.    I mean, it would be accounts payable

13   for all of these entities listed on this email.

14         Q.    And who was Ms. Hendrix employed by

15   in November and December of 2020?

16         A.    Highland Capital Management.

17         Q.    Okay.  So -- so part of the services

18   that NexPoint had contracted with was for

19   Highland to ensure that NexPoint timely paid

20   its accounts payable; is that accurate?

21              MR. MORRIS:  Objection to the form

22         of the question.  You have got to be

23         kidding me.

24         Q.    Is that accurate?

25         A.    Yes.

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 3 Desc 397
Case 3:21-cv-00881-X Document 178-30 Page 330 of 446 Page 216 of 282 PageID 47139

Page 331

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    And did NexPoint rely on employees

 3   of the debtor to ensure that NexPoint's

 4   accounts payable were timely paid?

 5             MR. MORRIS:  Objection to the form

 6        of the question.

 7        A.    Yes.

 8             MR. RUKAVINA:  Let's flip to the

 9        next page, Mr. Nguyen, if you will please

10        scroll to the next page.

11        Q.    So this is an email similar to the

12   prior one, November 30th.

13             Do you see where it says, NPA HCMFA,

14   USD $325,000 one-day loan?

15             Do you see that, sir?

16        A.    I do.

17        Q.    Do you have any memory of what that

18   was?

19        A.    I don't recall what that -- what

20   that payment was for.

21        Q.    Did it sometimes occur that one

22   advisor would, on very short-terms, make loans

23   to another advisor?

24        A.    Yes.  This -- this -- this occurred

25   from -- from -- from time to time.  It actually
```

Case 3:21-cv-00881-X Document 8 Doc File 10720/210/29 ared Entered 10/20/210/29/221 381:54 Page 33 Desc 397
Case 3:21-cv-00881-X Document 178-30 Page 330 f 446 Page 217 of 282 PageID 47140

Page 332

```
 1                 WATERHOUSE - 10-19-21

 2     looking at -- I'm -- I'm looking at the date of

 3     this email.  It is November 30th.  It is the

 4     last day of the month.

 5                 HCMFA has obligations it needs to

 6     pay to its broker-dealer, which is HCFD.  And

 7     it likely was short funds to make those

 8     obligations under that -- under its agreement,

 9     and so it provided a one-day loan because on

10     the next business day on 12/1 -- or the next

11     business day in December, it would receive

12     management fees from the underlying funds that

13     it managed and it would be able to pay back

14     that loan to NexPoint Advisors.

15         Q.    So -- so here Ms. Hendrix was

16     seeking your approval to transfer $325,000 from

17     NexPoint to HCMFA for a one-day loan; is that

18     correct?

19         A.    That is correct.

20         Q.    Let's flip to the next page, sir.

21                 MR. RUKAVINA:  And, Mr. Nguyen, if

22         you will please scroll down.

23         Q.    Now we have as an entry for

24     $325,000, 11/30 loan payment.

25                 Do you see that, sir?
```

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And that is probably the loan that

4    was approved on the prior page?

5        A.    Yes, most likely.

6        Q.    So is it also true, sir, that in

7    addition to accounts payable debtor employees

8    would be assisting NexPoint with respect to

9    paying back its debt?

10            MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I mean, yes, for loans of this

13   nature, yes.

14       Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18            MR. MORRIS:  Objection to the form

19       of the question.

20            MS. DANDENEAU:  Objection to form.

21       A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember

Case 3:21-cv-00881-X Doc 8 Filed 10/20/21 Entered 10/20/21 21:51:01 Page 334 of 397
Case 3:21-cv-00881-X Document 173-30 Page 339/2446 Page 219 of 282 PageID 47142

Page 334

                    WATERHOUSE - 10-19-21

1    specifically but, yes, generally we -- you

2    know, we did do that.

3        Q.    So do you recall -- and we can pull

4    it up, if need be -- that under the NexPoint

5    note that Mr. Morris asked you about earlier,

6    the one for more than $30 million, that

7    NexPoint was obligated to make an annual

8    payment of principal and interest?

9            MR. MORRIS:  Objection to the form

10       of the question.

11       A.    Yes, it was -- yes, it -- it was an

12   amortizing note.  It was -- you know, from what

13   we reviewed earlier, it was payable by

14   December 31st of each year.  So -- but are --

15   are you asking me --

16       Q.    I'm just asking you, sir, if you

17   recall the note.

18       A.    Yes, the $30 million note, yes, we

19   reviewed it earlier, yes.

20       Q.    And do you recall Mr. Morris had you

21   go through the fact that NexPoint had made

22   payments in years prior to 2020 on that note?

23       A.    I do.

24       Q.    And do you believe that employees of

Case 23-03006-sgj Doc 75 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 335 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3049/2446 Page 220 of 282 PageID 47143

Page 335

```
 1                   WATERHOUSE - 10-19-21

 2     the debtor would have played any role in

 3     NexPoint having made those prior payments?

 4               MR. MORRIS:  Objection to the form

 5          of the question.

 6          A.    Yes.

 7          Q.    And what role in years prior to 2020

 8     would employees of the debtor have had with

 9     respect to NexPoint making that annual payment?

10          A.    We -- we -- we would have -- I keep

11     saying "we."  The team would have calculated

12     any amounts due under that loan and other

13     loans, as -- as standard course.

14               We would -- since we provided

15     treasury services to the advisors, we would

16     inform the -- the -- the -- we informed

17     Mr. Dondero of any cash obligations that are

18     forthcoming, whether we do cash projections.

19               If, you know, any of these payments

20     would have -- or, you know, the sum total of

21     all of these payments, including any note

22     payments, if there were any cash shortfalls, we

23     would have informed Mr. Dondero of any cash

24     shortfalls.  We could adequately plan, you

25     know, in instances like that.
```

Case 23-03005-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 21:51:40 Page 336 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3899/2446 Page 221 of 282 PageID 47144

Page 336

                        WATERHOUSE - 10-19-21

1

2              Or, sorry, we -- I say "we" -- I

3    keep saying "we" -- I keep wearing my -- again,

4    my -- my treasurer hat.

5              But, yes, it is to -- it is to

6    inform Mr. Dondero of the obligations of the

7    advisors in terms of cash and obligations that

8    are -- are upcoming and that -- and that are --

9    are scheduled to be paid.

10        Q.   And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14             MS. DANDENEAU:  Objection to form.

15             MS. DEITSCH-PEREZ:  Davor, I think

16        you misspoke.  You might want to just

17        repeat the question.

18        Q.   Okay.  Let me repeat the question,

19   sir.

20             Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24        A.   Yes.

25        Q.   So someone at the debtor in treasury

Case 3:21-cv-00881-X Document 8-1 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 337 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 08/09/24 Page 222 of 282 PageID 47145

Page 337

1              WATERHOUSE - 10-19-21

2      or accounting would have sent some schedule or

3      a reminder that a payment would be coming due

4      in the future.  Is that generally the practice?

5          A.    Yes, we would -- you know, again, I

6      didn't -- I didn't micromanage the teams, but

7      we had a -- a corporate accounting calendar

8      that we use as kind of a tickler file to keep

9      track of payments.

10             I actually, you know, don't know how

11     actively they're using that in -- in prior to

12     2020, but it was actively used at some point.

13             We did look at NexPoint cash

14     periodically and cash for the other advisors as

15     well and payments.  You know, we -- payments

16     like this would have appeared in our cash

17     projections, in the advisor's cash projections.

18             And, again, as like I said earlier,

19     they would have appeared there, so there would

20     be time to plan for making any of these

21     payments.

22         Q.    And based on your experience, would

23     it have been reasonable for NexPoint to rely on

24     the debtors' employees to inform NexPoint of an

25     upcoming payment due on the $30 million

Case 3:03-cv-00881-X Doc 8 Filed 10/20/21 Entered 10/20/21 21:54:01 Page 338 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3509/2446 Page 223 of 282 PageID 47146

Page 338

                    WATERHOUSE - 10-19-21

 1

 2   promissory note?

 3              MR. MORRIS:  Objection to form of

 4       the question.

 5              MS. DANDENEAU:  Objection to form.

 6       A.    Yes.  Yes, they did.  I mean, but I

 7   mean, but I don't think these -- these notes

 8   were any secret to anybody.

 9       Q.    I understand, and I'm not suggesting

10   otherwise.

11              MR. RUKAVINA:  Please pull up Alpha

12   2, Mr. Nguyen.

13              (Exhibit A2 marked.)

14       Q.    Now, this document is similar to the

15   ones we've seen before as of December 31, 2020,

16   and I don't see under NTA anything there for

17   paying the promissory note to Highland.

18              Do you see anything like that?

19       A.    I do not.

20              MR. RUKAVINA:  You can pull that --

21   that exhibit down, Mr. Nguyen.

22       Q.    You are aware, of course, by now

23   that, in fact, NexPoint failed to make the

24   payment due December 31, 2020, are you not?

25       A.    I am aware, and yes, I do understand

Case 3:10-05-00-5gj-sbjc 8Doct Filed 107-20/210/29/18-redEnt0-20/210/2921:B1:54aQe 33Desc397
Case 3:21-cv-00881-X   Document 178-30   Page 33839/2446Page 224 of 282   PageID 47147
Page 339

1    it.

3         Q.    Were you aware that Highland

4    accelerated that $30 million promissory note?

5         A.    I am aware.

6         Q.    Were you aware of that acceleration

7    at the time that it occurred?

8         A.    I don't remember specifically.

9         Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.    Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.    Yes, before acceleration.

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20             MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24             I am saying you're the CFO of

25   someone, in this case, Highland, and the

Case 23-05006-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 340 of 397
Case 3:21-cv-00881-X Document 173-30 Page 3899/2446 Page 225 of 282 PageID 47148
Page 340

WATERHOUSE - 10-19-21

1

2    borrower failed to make the required payment.

3    Are you with me so far?

4         A.    I am.

5         Q.    Did anyone then ask you, what should

6    we do with respect to our rights against the

7    borrower that missed the payment?

8         A.    Not that I recall.

9         Q.    Did you play a role in the decision

10   to accelerate that $30 million promissory note?

11        A.    I did not.

12        Q.    Do you recall whether Mr. Seery ever

13   asked you before the acceleration as to whether

14   he should accelerate the note?

15        A.    I don't recall.

16        Q.    And you don't recall when you

17   learned of the acceleration itself?

18             MR. MORRIS:  Objection to the form

19        of that question.

20        A.    It was -- it was sometime in

21   early -- in early 2021.  I don't remember

22   specifically.

23        Q.    But do you recall whether it was

24   after the acceleration had already been

25   transmitted?

Case 3:00-cv-00806-Doc 804-File 10/20/21/09/21 Entered 10/20/21/09/21381:54:01 Page 341 of 397
Case 3:21-cv-00881-X Document 178-30 Page 3909/2446 Page 226 of 282 PageID 47149

Page 341

WATERHOUSE - 10-19-21

1

2          MS. DANDENEAU:  Objection to the

3      form of the question.

4      A.    I don't recall.

5      Q.    Do you recall in early to mid

6  January of 2021, after the default, discussing

7  the default with Mr. Dondero?

8      A.    I do recall discussing with

9  Mr. Dondero after December 31, 2020?

10     Q.    Yes, the fact of the default.

11     A.    I don't recall.

12          MR. RUKAVINA:  Let's pull up my

13  Exhibit 6, Alpha 6.

14          (Exhibit A6 marked.)

15          MR. RUKAVINA:  And, Mr. Nguyen, if

16      you will please scroll down.

17     Q.    This email chain begins with you

18  writing to Ms. Hendrix on January the 12th:

19  NexPoint note to HCMLP.

20          Do you see that, sir?

21     A.    I do.

22     Q.    Were you discussing this same

23  $30 million note we're talking about right now

24  with Ms. Hendrix?

25     A.    Yes.

Case 3:21-cv-00881-X Document 180 Filed 10/20/23 Entered 10/20/23 21:31:54 Page 342 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 03/09/24 Page 227 of 282 PageID 47150

Page 342

```
                    WATERHOUSE - 10-19-21
 1
 2        Q.    Okay.  Do you recall what prompted
 3   you to send that email to her?
 4        A.    Yes, I had -- I had a conversation
 5   with Jim.
 6        Q.    Okay.  And what -- what did you
 7   discuss with Jim that led to this email chain?
 8        A.    He -- he called me and he said he
 9   wanted to make payment on the NexPoint note,
10   and I didn't -- I didn't know the -- the amount
11   offhand, so I reached out to Kristin and got
12   the details and relayed that to him.
13        Q.    And you see you sent that email to
14   her at 11:15 a.m.  Does that help you remember
15   when you had this discussion with Mr. Dondero?
16   In other words, was it that morning or the day
17   before, or can you -- can you --
18        A.    No, it was -- it was that morning.
19        Q.    And do you recall how you had that
20   conversation with him?
21             MR. MORRIS:  Objection to the form
22        of the question.
23        Q.    By telephone, by email, in-person?
24        A.    Yeah, he -- he called me.  I was at
25   home.  We were working from home here in
```

Case 3:21-cv-00881-X Document 178-30 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 343 of 397
Case 3:21-cv-00881-X Document 178-30 Page 309/2446 Page 228 of 282 PageID 47151

Page 343

```
1              WATERHOUSE - 10-19-21

2    December of 2020.  He called me from home.  He

3    said he was in court.  He wanted to -- he asked

4    about, you know, making payment on the note and

5    the amount, and so I didn't have those numbers

6    in front of me, so I said I would get back to

7    him.  I wanted all the details, so here is

8    this -- so I reached out to Kristin.

9         Q.    And then she gave you that

10   $1,406,000 figure?

11              MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25              When you conveyed the number to
```

```
 1              WATERHOUSE - 10-19-21

 2    Mr. Dondero, was -- was it also on January

 3    12th?

 4          A.    Sorry, when I conveyed the

 5    $1.4 million number?

 6          Q.    Yes.

 7          A.    Yes, yes, it was that -- it was --

 8          Q.    So you had --

 9          A.    It was that point.

10          Q.    Well, to the best of your

11    recollection, you had a conference with

12    Mr. Dondero by the telephone in the morning,

13    and then another conference with him by

14    telephone after 11:40 a.m. that morning?

15          A.    Yeah, I can't remember -- yeah, it

16    was either that morning or it could have been,

17    you know, early afternoon, but again, I

18    remember calling him back, relaying this

19    information to him, and he said, okay, pay --

20    you know, make -- make this payment.

21          Q.    And during either of those two

22    calls, did you tell Mr. Dondero anything to the

23    effect that making those -- I'm sorry, making

24    that payment would not de-accelerate the

25    promissory note?
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did you tell him anything to the

 4   effect that making that payment would not cure

 5   the default?

 6        A.    No.

 7        Q.    Did you discuss that in any way with

 8   him?

 9        A.    No, I did not.

10        Q.    Did he say why he wanted to have

11   that $1.4 million payment made?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    He -- he -- he didn't go into

15   specifics.

16        Q.    Did he say anything to you to the

17   effect that if NexPoint makes that payment,

18   then the note will be de-accelerated?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I don't recall.

22              MR. RUKAVINA:  You can put this one

23        down, Mr. Nguyen.

24        Q.    And, again, when you say you don't

25   recall, you mean you don't remember right now
```

```
 1                  WATERHOUSE - 10-19-21

 2    either way; correct?

 3        A.    Yeah, I don't remember.  I don't

 4    remember us discussing that.

 5        Q.    Now -- and we're almost done, I

 6    promise.  I'm just going to -- I don't know how

 7    to ask this question, so I'm just going to try

 8    to do my best.

 9             Prior to the default on December 31,

10    2020, did Mr. Seery ever tell you any words to

11    the effect that you or someone at Highland

12    should ensure that NexPoint doesn't make its

13    payment?

14        A.    No.

15        Q.    Did you have any hint or any belief

16    that anyone at NexPoint -- I'm sorry, strike

17    that.

18             Did you have any reason to believe

19    that anyone with Highland was actively trying

20    to get NexPoint to make that default by not

21    paying on December 31?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Are you asking, did any Highland

25    employees actively work to make -- to
```

WATERHOUSE - 10-19-21

1
somehow --

3       Q.    Yes.  Let me take a step back.  Let

4   me take a step back.

5            So you are aware now that as a

6   result of that default, what was still some

7   25-year note was accelerated and became

8   immediately due.  You are aware of that now;

9   right?

10      A.    Yes.

11      Q.    And can you see how someone at

12  Highland might actually have been pleased with

13  that development?

14           MR. MORRIS:  Objection to the form.

15      Q.    Not that they were --- not that they

16  were pleased, but you can see how someone at

17  Highland might have been pleased with that

18  development?

19           MR. MORRIS:  Objection to the form

20      of the question.

21           MS. DANDENEAU:  Object to form.

22      A.    I don't know how they would have

23  reacted to that.

24      Q.    Okay.  But you're not -- you're not

25  aware of any instructions or any actions being

Case 23-03006-sgj Doc 80 Filed 10/20/21 Entered 10/20/21 21:51:01 Desc 397
Case 3:21-cv-00881-X Document 173-30 Page 3979/2446 Page 233 of 282 PageID 47156

Page 348

                    WATERHOUSE - 10-19-21

 1    given or taken at Highland by Mr. Seery, the

 2    independent board, DSI, that -- that would have

 3    basically led Highland to ensure that NexPoint

 4    would fail to make that payment?

 5        A.    I'm not aware.

 6        Q.    In other words, there wasn't a trick

 7    or a settlement; right?

 8             MS. DEITSCH-PEREZ:  Objection to

 9        form.

10             MS. DANDENEAU:  Object to form.

11             MR. MORRIS:  Object to form.

12        A.    I'm not aware.

13             Look, I'm not aware.  I'm not in

14    every conversation.  I mean, and I'm just --

15    again, I'm sitting at home.  It is the end of

16    the year.  Again, I'm not aware.

17        Q.    That is a perfectly legitimate

18    answer.  I don't know why -- why you think

19    otherwise.

20             Okay.  Just give me one second to

21    compose my thoughts.

22             MS. DEITSCH-PEREZ:  While you're

23        taking your one second, why don't we take

24        three minutes.  I will be right back.

```
 1                WATERHOUSE - 10-19-21

 2               VIDEOGRAPHER:  Do we want to go off

 3        the record?

 4               MR. RUKAVINA:  Yes.

 5               VIDEOGRAPHER:  All right.  We're

 6        going off the record at 6:27 p.m.

 7        (Recess taken 6:27 p.m. to 6:30 p.m.)

 8               VIDEOGRAPHER:  We are back on the

 9        record at 6:30 p.m.

10               MR. HORN:  Is Deb back?

11               MS. DANDENEAU:  Are you asking about

12        me?  I'm here.

13               MR. HORN:  Oh, okay.  I don't see

14        you, sorry.

15        Q.   Actually, yeah, Mr. Waterhouse, so

16    when you had --

17               MS. DANDENEAU:  Are you asking about

18        Deb Dandeneau or Deborah?  I mean, there

19        are a lot -- as we talked about, a lot of

20        Debs.  I'm here.

21               MS. DEITSCH-PEREZ:  I'm here.

22               MR. HORN:  Yes, I was asking about

23        DDP.

24               MS. DEITSCH-PEREZ:  Oh, DDP is here.

25               MR. HORN:  Okay.  Here we go.  I'm
```

Case 23-03007-sgj Doc 8 Filed 10/20/23 Entered 10/20/23 13:54:01 Desc
Case 3:21-cv-00881-X Document 178-30 Filed 09/02/22 Page 235 of 282 PageID 47158

Page 350

1            WATERHOUSE - 10-19-21

2       going back on mute.

3            MS. DANDENEAU:  Get the right

4       nomenclature.

5       Q.    Mr. Waterhouse, on January 12th,

6  2021, when you had those talks with Mr. Dondero

7  about the $1.4 million payment, did you have a

8  communication or a conversation with Mr. Seery

9  about that payment after January 12th, 2021?

10      A.    I don't recall.

11      Q.    Well, in response to Mr. Dondero

12 reaching out to you, do you recall on that day,

13 January 12th, talking to Mr. Seery or anyone at

14 Highland other than the email chain we just saw

15 about Mr. Dondero's call with you?

16      A.    Did I talk to -- I spoke with

17 Kristin -- I don't know if I spoke to her.  I

18 likely spoke to Kristin Hendrix because we had

19 to get the wire on NexPoint's behalf to make

20 the payment to Highland.

21      Q.    So it is true, then, that -- that

22 employees of the debtor did actually cause that

23 payment to be made when it was made after

24 January 12th?

25      A.    Yes, I mean, we -- we -- as I

Case 3:21-cv-00881-X   Document 81-30   Filed 10/20/21   Page 35 of 397
Case 3:21-cv-00881-X   Document 173-30   Filed 01/09/24   Page 236 of 282   PageID 47159

Page 351

1                    WATERHOUSE - 10-19-21

2    testified earlier, we provided that accounting

3    finance treasury function as -- under the

4    shared services agreement.  And so once I

5    got the -- I talked to Jim, got the approval to

6    make this payment, we have to then make the

7    payment, or the team does, and so the payment

8    was made.

9         Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't -- I don't recall.

18        Q.    And does that include legal counsel?

19             Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24        A.    I don't recall.

25        Q.    Okay.  Thank you, sir, for your

```
 1                 WATERHOUSE - 10-19-21

 2    time.

 3               MR. RUKAVINA:  Pass the witness.

 4               MR. MORRIS:  I just have a few

 5    questions, if I may.

 6               MS. DEITSCH-PEREZ:  Don't you go at

 7    the end?

 8               MR. MORRIS:  Oh, I apologize.  He is

 9    your witness.  I'm surprised you want to

10    ask him questions, but go right ahead.

11               MS. DEITSCH-PEREZ:  Just have a

12    couple of things.

13               MR. RUKAVINA:  And I will just

14    object to that, that he's our witness.

15    That's not --

16               MR. MORRIS:  I'm not talking to you.

17    I'm not talking to you.

18               MS. DANDENEAU:  Also, Mr. Morris, it

19    is -- it is --

20               MS. DEITSCH-PEREZ:  He is not my

21    witness.  He's been subpoenaed by you.

22    Okay?

23               That is no offense, Mr. Waterhouse,

24    I'm -- I'm not -- okay.  Anyway.

25                         EXAMINATION
```

Case 3:21-cv-00881-X  Document 8 Doc Filed 10/20/21 Entered 10/20/21 21:31:54  Page 353 of 397
Case 3:21-cv-00881-X  Document 178-30  Page 0029/2446  Page 238 of 282  PageID 47161

Page 353

```
 1               WATERHOUSE - 10-19-21

 2  BY MS. DEITSCH-PEREZ:

 3       Q.    Good evening.  I'm very sorry to be

 4  going last and I know you have had a long and

 5  taxing day, so I thank you for indulging me.

 6            The kinds of services that you

 7  describe that the -- that Highland provided for

 8  NexPoint, did Highland also provide similar

 9  services to that to HCRE and HCMS?

10       A.    Yes.

11            MR. MORRIS:  Objection to the form

12       of the question.

13       Q.    What kind of services did Highland

14  provide to HCRE and HCMS?

15            MR. MORRIS:  Objection to the form

16       of the question.

17            MS. DEITSCH-PEREZ:  What is your

18       objection, John?

19            MR. MORRIS:  It is vague and

20       ambiguous.  Unlike the advisors and

21       NexPoint, they actually had shared services

22       agreements.

23            MS. DEITSCH-PEREZ:  I got -- I

24       understand your objection.  That is fine.

25       Q.    Let's take them one at a time.
```

                         WATERHOUSE - 10-19-21

 1

 2              What kinds of services did Highland

 3   provide to HCRE?

 4              MR. MORRIS:  Objection to the form

 5        of the question.

 6        A.   HCMS, Highland employees provided

 7   accounting services, treasury management

 8   services, potentially legal services.  I

 9   don't -- but I wouldn't have been directly

10   involved in that.  But as far as the teams that

11   I manage, it was accounting, treasury, things

12   of that nature.

13        Q.   Okay.  And that was for HCM, LLP --

14        A.   And -- and, sorry, it would also be

15   any asset valuation if needed as well.

16        Q.   Okay.  We went back and forth on

17   each other and I apologize, so just to clarify.

18              You were talking about the services

19   that Highland Capital Management provided to

20   HCMS; is that right?

21        A.   HCMS.  So, again, yes.  And

22   accounting, treasury, valuation, and also tax

23   services too.

24        Q.   Okay.

25        A.   Tax services.  Look, I'm expanding

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/23 Entered 10/20/23 21:54:01 Page 355 of 397
Case 3:21-cv-00881-X Document 178-30 Page 0409/2446 Page 240 of 282 PageID 47163

Page 355

```
 1                    WATERHOUSE - 10-19-21

 2   this, their HR services as well.

 3        Q.    Okay.  And did that include bill

 4   paying?

 5             MR. MORRIS:  Objection to the form

 6        of the question.

 7        Q.    Did the services that HCM provided

 8   to HCMS include bill paying?

 9             MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did
```

Case 3:21-cv-00881-X Document 177-30 Filed 10/20/23 Entered 10/20/23 21:54:01 Page 356 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 04/09/24 Page 241 of 282 PageID 47164

Page 356

```
1                   WATERHOUSE - 10-19-21

2    HCMLP cause HCMS to pay its bills?

3               MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I mean, it -- it -- it depend -- it

6    depended on the nature of the payment and the

7    vendor, but, you know, if there were -- if

8    there were larger scheduled payments, you know,

9    I would like to give at least 30 days notice.

10              And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12        Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14              MR. MORRIS:  Objection to the form

15        of the question.

16        A.    It -- it -- it -- that depended on

17   the nature of the payment.

18        Q.    Okay.  And can you explain what you

19   mean by that?

20        A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.
```

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  Are loan payments the kinds

3   of thing that HCMLP would pay on time because

4   of potential consequences of not paying on

5   time?

6                MR. MORRIS:  Objection to the form

7          of the question.

8          A.    Yes.  As I testified earlier, we

9   would want to give, you know, notice on -- on

10  -- on larger payments and -- and things of that

11  nature so we didn't miss due dates.

12         Q.    Okay.  And over the course of time,

13  did HCMLP generally pay HCMS' loan payments in

14  a timely fashion?

15               MR. MORRIS:  Objection to the form

16         of the question.

17         A.    I can't remember specifically, but

18  generally, yes.

19         Q.    Okay.  Now, did HCMLP provide

20  similar services to HCRE that you have

21  described it provided to HCMS?

22               MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Yes, but I don't think it -- it

25  provided -- I don't think it provided HR

Case 23-0050 Doc File 10-10/21/29 Entered 10/20/210/29 21 31:54 01 Page 358 of 397
Case 3:21-cv-00881-X   Document 178-30   Page 4009/2446   Page 243 of 282   PageID 47166

Page 358

WATERHOUSE - 10-19-21

1

2    services.

3        Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5        A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9        Q.    Okay.  So did it provide --

10       A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12       Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16            MR. MORRIS:  Objection to the form

17       of the question.

18       A.    Yes.

19       Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.    Yes.

25       Q.    Did HCMLP make loan payment -- the

Case 3:23-cv-00580-S Doc 8 Doc Filed 10/20/21 Entered 10/20/21 12:33:54 Page 359 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 244 of 282 PageID 47167

Page 359

                      WATERHOUSE - 10-19-21

1        loan payment that was due from HCMS to HCMLP in

2        December of 2020?

3                    MR. MORRIS:  Objection to the form

4            of the question.

5        A.      I don't believe that payment --

6        payment was made.

7        Q.      Okay.  And when HCMLP caused HCMS in

8        the past to make loan payments, whose money did

9        it use to make those payments?

10                   MR. MORRIS:  Objection to the form

11           of the question.

12       A.      It was the -- the money in HCMS's

13       operating account would be made to that --

14       those moneys would be used to make payment to

15       Highland Capital Management.

16       Q.      Okay.  And Highland -- is it correct

17       that Highland Capital Management personnel had

18       the access to HCMS's accounts to be able to

19       cause such payments to be made?

20       A.      Yes, Highland personnel had access

21       to those accounts.

22       Q.      Okay.  And so now for HCRE, whose

23       money was used when HCMLP caused HCRE

24       payments -- loan payments to Highland to be

Case 3:21-cv-00881-X Document 179-30 Filed 01/09/24 Page 360 of 397 PageID 47168
Case 3:21-cv-00881-X Document 179-30 Page 245 of 282 PageID 47168

Page 360

1                  WATERHOUSE - 10-19-21

2    made?

3                  MR. MORRIS:  Objection to the form

4         of the question.

5         A.    It was -- it was cash in HCRE's bank

6    account that would be used to make payments to

7    Highland Capital Management.

8         Q.    Okay.  And so did Highland Capital

9    Management have access to HCRE's funds in order

10   to be able to make such payments?

11                 MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25                 MR. MORRIS:  Objection to the form

```
 1                      WATERHOUSE - 10-19-21

 2           of the question.

 3           A.    I -- I don't recall.

 4           Q.    Do you have any reason to believe

 5      that either HCRE or HCMS simply didn't have the

 6      funds on hand to make the December 2020

 7      payments?

 8           A.    I don't know.

 9           Q.    I guess I'm asking, do you have any

10      reason to believe that they didn't have the

11      funds?

12           A.    We managed cash for so many

13      different entities and funds, and I don't

14      recall, you know, where the cash position was

15      for HCRE and HCMS at 12/31/2020.

16           Q.    Okay.

17           A.    I just don't recall, and I don't --

18      and I don't remember what the loan payment

19      obligations were from HCRE to Highland, and

20      from HCMS to Highland.  I don't recall.  I

21      don't recall, I mean...

22           Q.    Let me come at it a different way.

23      Were the -- were the payments that would

24      otherwise have been due in December of 2020

25      made in January of 2021 for HCMS and HCRE?
```

Case 23-03050-sgj Doc 81 Filed 10/20/23 Entered 10/20/23 13:51:01 Desc
Case 3:21-cv-00881-X Document 178-30 Page 01/09/2446 Page 247 of 282 PageID 47170

Page 362

                        WATERHOUSE - 10-19-21

1

2          A.     I believe the HCRE payment was made

3    in January of 2021.  I don't recall any

4    payments being made from HCMS to Highland.

5          Q.     If it -- how is it the HCRE payment

6    came to be made?  Why did you make it -- why

7    did HCM make the payment in January of 2021?

8          A.     Jim -- Jim called me and instructed

9    me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11         Q.     Did he seem upset that -- that the

12   payment had not been made?

13         A.     Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17         Q.     Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19         A.     Yes.

20         Q.     And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23         A.     Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't

Case 23-03006-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 21:31:54 Desc
Case 3:21-cv-00881-X Document 173-30 Page 001 of 246 Page 248 of 282 PageID 47171

Page 363

WATERHOUSE - 10-19-21

1    believe I'm an authorized signer.  So I

2    can't -- other personnel have to make payment

3    from HCRE to -- to -- to -- to Highland.

4    Q.    Okay.  And in the conversation

5    that -- that you had with Mr. Dondero when he

6    requested the payment to be made, did you say

7    to him words to the effect, Jim, this loan is

8    going to stay in default, what are you making

9    the payment for, anything like that?

10   A.    No.

11   Q.    In fact, did you have the impression

12   from him that he thought that the loan would

13   be -- the default would be cured by making the

14   payment?

15         MR. MORRIS:  Objection to the form

16   of the question.

17   A.    Did I get the impression from Jim

18   Dondero that the loan would be cured if the

19   payment from HCRE --

20   Q.    Yeah, if that is what he thought.

21         MR. MORRIS:  Objection to the form

22   of the question.

23   A.    I didn't get any impression from him

24   on that at the time.

Case 3:21-cv-00881-X Document 8 Doc File 1 07/20/21/19/ared Entered 2021/29/21381:54 Pat 36 Casc 397
Case 3:21-cv-00881-X Document 178-30 Page 011/89/2446 Page 249 of 282 PageID 47172

Page 364

1                    WATERHOUSE - 10-19-21

2          Q.     Do you know whether there was an

3     HCMS term loan that had a payment due in

4     December of 2020?

5          A.     I don't recall.

6          Q.     Okay.  And so the reason you don't

7     recall whether or not there was a payment in

8     January of 2021 is because you just don't

9     remember whether there was such a loan at all?

10               MR. MORRIS:  Objection to the form

11          of the question.

12         A.     I don't remember.  There is -- there

13    is so many notes, and I mean, demands, and I

14    don't -- I don't remember.  It's a lot to keep

15    track in your head.

16         Q.     I understand, and -- and I hear your

17    frustration when you have explained that the

18    debtor has your documents and you don't, and so

19    I fully appreciate it, and this is no knock on

20    you.  It's a knock on somebody else on this

21    call.

22               MR. MORRIS:  I move to strike.  That

23          was pretty obnoxious, but go ahead.

24         Q.     Okay.  But so, Mr. Waterhouse, if --

25    if a payment on the HCMS loan was made in

```
 1                    WATERHOUSE - 10-19-21

 2   January of 2021, do you think it was part of

 3   the same conversation where Jim Dondero said,

 4   hey, why didn't that get paid, please make

 5   that -- get that payment done?

 6             MR. MORRIS:  I object to the form of

 7        the question.

 8        A.   Yes.  Likely it would have been -- I

 9   mean, again, I don't recall a payment being

10   made, but, you know, again, I don't remember

11   everything.

12        Q.   Okay.  Did -- at the time you were

13   communicating with Kristin Hendrix about the

14   payment being made, whichever payments were

15   made in January, did she say anything to you

16   about the payments not curing the loan

17   defaults?

18        A.   No.

19        Q.   Okay.  All right.  So I'm going to

20   take you back to very early in the deposition

21   when Mr. Morris was asking you about the --

22   the -- the -- the agreement with respect to

23   the -- the forgiveness element of the loans, so

24   that is just to orient you.

25             Do you remember that there was a
```

```
 1                 WATERHOUSE - 10-19-21

 2    time that you and Mr. Dondero were

 3    communicating about potential means of

 4    resolving the Highland bankruptcy by what was

 5    colloquially referred to as a pot plan?

 6         A.    Yes.

 7         Q.    Okay.  And can you tell me generally

 8    when that was?

 9         A.    Like mid -- mid 2020, sometime in

10    2020, mid 2020.

11         Q.    Okay.  And did the process of trying

12    to figure out what the numbers should be

13    involve looking at what one should pay for the

14    Highland assets?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    Okay.  And did there come a time

19    when you were proposing some potential numbers

20    and Mr. Dondero said something to you like,

21    well, why are you including payment for the

22    related party notes, those, you know, were

23    likely to be forgiven as part of my deferred

24    executive compensation?

25              MR. MORRIS:  Objection to the form
```

Case 3:21-cv-00881-X Document 8 Doc Filed 10/20/21 Entered 10/20/21 23:31:54 Page 367 of 397
Case 3:21-cv-00881-X Document 178-30 Page 11/09/24 Page 252 of 282 PageID 47175

Page 367

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we did have that conversation.

 4        Q.    Okay.  Was that conversation in

 5   connection with trying to figure out the right

 6   numbers for a pot plan?

 7        A.    Yeah.  I mean, it was -- it was -- I

 8   mean, Jim -- Jim would ask for, you know,

 9   most -- most recent asset values, you know, for

10   Highland, and -- and myself and the team

11   provided those to him, so it was in that

12   context.

13        Q.    Okay.  And does that refresh your

14   recollection that these communications were in

15   2020 rather than 2021?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    The -- the -- the executive

19   compensation discussions were definitely in

20   2020.

21        Q.    Okay.  Now, did you ever make

22   proposals that took into account Jim's comment

23   that the notes were likely to end up forgiven

24   as part of his compensation?

25             MR. MORRIS:  Objection to the form
```

Case 3:23-cv-00580-S Doc 51 Filed 10/20/21 Entered 10/20/21 21:51:01 Desc
Case 3:21-cv-00881-X Document 178-30 Page 01/09/2446 Page 253 of 282 PageID 47176

Page 368

```
 1              WATERHOUSE - 10-19-21

 2       of the question.

 3       A.    Yes, we -- the team and myself put

 4  together, you know, asset summaries of Highland

 5  at various times for all the assets of

 6  Highland, and not including the notes.

 7       Q.    Okay.  And were those presentations

 8  communicated to -- to Mr. Seery?

 9       A.    No.  Well, look, I didn't tell -- I

10  didn't tell Mr. Seery.  I don't know what

11  Mr. Dondero did with the information.

12       Q.    Okay.

13       A.    I did not have conversations with

14  Mr. Seery.

15       Q.    Okay.  Do you know who saw the

16  presentations that you put together that didn't

17  include the value of the related party notes?

18       A.    We're talking presentations -- these

19  are -- these are Excel spreadsheets?

20       Q.    Uh-huh.

21       A.    I don't know who -- these were given

22  to -- to Jim Dondero.  I don't know what was

23  done with them after that.

24       Q.    Okay.  You also mentioned earlier

25  that sometime during your tenure at Highland
```

Case 3:21-cv-00881-X Document 8 Doc 1 Filed 10/20/21 Entered 10/20/21 02:31:54 Page 369 of 397
Case 3:21-cv-00881-X Document 178-30 Page 01/09/2446 Page 254 of 282 PageID 47177

Page 369

                    WATERHOUSE - 10-19-21

1      you knew of the practice of giving forgivable

2

3      loans to executives.

4           MR. MORRIS:  Objection to the form

5       of the question.

6      Q.    Can you -- can you tell me what you

7      recall about that practice?

8           MR. MORRIS:  Objection to the form

9       of the question.

10     A.    Yes, so there were -- there were --

11     during my tenure at Highland, there were loans

12     or -- given to employees that were later

13     forgiven at a future date and time.

14     Q.    Okay.  And when the loans were

15     given, did the notes, to your recollection, say

16     anything about the potential forgiveness term?

17          MR. MORRIS:  Objection to the form

18      of the question.

19     A.    When you say "did the notes," did

20     the promissory notes detail the forgiveness?

21     Q.    Yes.

22     A.    Not that I recall.

23     Q.    And until such time as whatever was

24     to trigger the forgiveness occurred, were the

25     notes bona fide notes as far as you were

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 370 of 397
Case 3:21-cv-00881-X Document 178-30 Page 411 of 446 Page 255 of 282 PageID 47178

Page 370

 1                WATERHOUSE - 10-19-21

 2   concerned?

 3                MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    Yes, similar to -- yes.

 6        Q.    Okay.  You were going to say similar

 7   to what?

 8        A.    Mr. Morris earlier today showed

 9   notes of the financial statements about various

10   affiliate loans.  I -- I -- I do recall these

11   notes because I -- at that time personally

12   worked on the -- the financial statements of

13   Highland.  That was, you know, in my role as a

14   corporate accountant.

15                And there were -- those loans

16   were -- to the partners were detailed in the

17   notes to the financial statements, similar to

18   what we went through earlier today in the prior

19   testimony about what we saw with Highland

20   and -- and -- and the -- and HCMFA.

21        Q.    Is it fair to say that on Highland's

22   balance sheet there were any number of assets

23   that the value of which could be affected by

24   subsequent events?

25                MR. MORRIS:  Objection to the form

```
 1                   WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes.  I mean, yes, that -- there

 4   are.  And that is -- yes.

 5        Q.    Okay.  And is it typical accounting

 6   practice that until there is some certainty

 7   about those potential future events, that asset

 8   value listed on -- on the books doesn't take

 9   into account those potential future events?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25             MR. MORRIS:  Objection to the form
```

```
 1                    WATERHOUSE - 10-19-21

 2          of the question.

 3          A.     The accounting standard is you have

 4     to estimate to the best -- you know, to -- to

 5     the best of your ability, the fair value of an

 6     asset as of the balance sheet date under --

 7     under GAAP.

 8          Q.     Did -- strike that.

 9                 Okay.  Give me a minute.  I'm

10     close -- I'm close to done.  Let me just go off

11     and look at my notes for a second.  So take two

12     minutes.

13                 VIDEOGRAPHER:  We're going off the

14          record at 7:02 p.m.

15          (Recess taken 7:02 p.m. to 7:03 p.m.)

16                 VIDEOGRAPHER:  We are back on the

17          record at 7:03 p.m.

18          Q.     Mr. Waterhouse, is it generally your

19     understanding that people you work with now

20     have been asking the debtor for full and

21     unfettered access to their own former files?

22                 MR. MORRIS:  Objection to the form

23          of the question.

24          A.     Yes, I am -- I am generally aware.

25          Q.     Okay.  And do you think you could
```

Case 3:05-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 3 Desc 397
Case 3:21-cv-00881-X Document 178-30 Page 4229/2446 Page 258 of 282 PageID 47181

Page 373

1               WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4               MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10              You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15        Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17        A.    Yes.

18        Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20              MR. MORRIS:  Objection to the form

21        of the question.

22        A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

Case 21-03005-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 37 of 397
Case 3:21-cv-00881-X Document 178-30 Filed 01/09/24 Page 259 of 282 PageID 47182
Page 374

```
 1                    WATERHOUSE - 10-19-21

 2              Is that -- I don't know the

 3    relationship.  So, again, I'm not the lawyers.

 4    I've said many times.  But my understanding is

 5    the litigation trust is suing me.  I could be

 6    wrong there.  I don't know.

 7         Q.   Okay.  I understand.

 8              Someone with some connection to the

 9    Highland debtor has brought a claim against

10    you; is that fair?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.   Yes.

14         Q.   Okay.  And is there also some motion

15    practice in the bankruptcy where the debtor or

16    someone associated with the debtor is

17    attempting to undo something that was

18    previously resolved with you?

19         A.   Yes.

20         Q.   And so in one action somebody is

21    associated with the debtors trying to --

22    threatening you with trying to take money from

23    you, and then in the other -- and trying to --

24    and in the other they are threatening not to

25    pay you things that had previously been agreed;
```

Case 3:21-cv-00881-X Document 181 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 375 of 397
Case 3:21-cv-00881-X Document 178-30 Page 01209/2446 Page 260 of 282 PageID 47183

Page 375

```
1               WATERHOUSE - 10-19-21

2    is that correct?

3               MR. MORRIS:  Objection to the form

4         of the question.

5         A.    I want to be -- yes, I -- there

6    is -- I'm being sued, again, on -- on something

7    that was agreed to with Mr. Seery and myself.

8    I don't -- I don't -- I don't own that claim.

9         Q.    Okay.

10        A.    To be transparent, I don't own that

11   claim.  So it is not my personal property.

12        Q.    Okay.

13        A.    And -- and being the nonlawyer, I

14   don't know how I can get sued for something

15   that I don't owe or, like, I don't own

16   anything.  I'm not the lawyer.  But, I mean, if

17   that is -- if I'm understanding the facts

18   correctly.

19        Q.    Okay.  And the lawsuit that was

20   filed that names you, that was just filed

21   this -- this past week; is that right?

22               MS. DANDENEAU:  Ms. Deitsch-Perez, I

23         do want to interrupt at this point because

24         just as I told Mr. Morris, that this is a

25         deposition about the noticed litigation.
```

Case 21-03006-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:54 Page 376 of 397
Case 3:21-cv-00881-X Document 173-30 Page 42599/2446 Page 261 of 282 PageID 47184

Page 376

```
 1                    WATERHOUSE - 10-19-21

 2              I really don't want to go -- go

 3       afield --

 4              MS. DEITSCH-PEREZ:  Yeah.

 5              MS. DANDENEAU:  -- and open up a

 6       whole new line of inquiry about the lawsuit

 7       or the -- the motion and the bankruptcy

 8       court.  We will be here all night.

 9              MS. DEITSCH-PEREZ:  And I

10       understand.

11       Q.    My -- my point is:  Do you feel

12  like -- like there is some effort by these

13  parties related to the debtor to intimidate

14  you -- not that you -- I'm not saying you are

15  or you aren't.

16              But do you feel like there is some

17  effort to intimidate you and maybe an effort to

18  deter you from being as prepared as you might

19  be in this deposition?

20              MR. MORRIS:  Objection to the form

21       of the question.

22       A.    I was -- I was surprised by the

23  lawsuit, by me being named, because, again, I

24  don't own the asset and things like that.

25  Yeah, I just -- I want to move forward with my
```

Page 377

1                  WATERHOUSE - 10-19-21

2    life at Skyview.

3                  MS. DEITSCH-PEREZ:  Thank you.

4                  THE WITNESS:  Thank you.

5                     FURTHER EXAMINATION

6    BY MR. MORRIS:

7         Q.    If I may, I just have a few

8    questions.

9                  Mr. Waterhouse, we saw a number of

10   documents that Mr. Rukavina put up on the

11   screen where Ms. Hendrix would send you a

12   schedule of payments that were due on behalf of

13   certain Highland affiliates.

14                 Do you remember that?

15        A.    Yes.

16        Q.    And in each instance she asked for

17   your approval to make the payments; is that

18   right?

19        A.    Yes, she did.

20        Q.    And was that the -- was that the

21   practice in the second half of 2020 whereby

22   Ms. Hendrix would prepare a list of payments

23   that were due on behalf of Highland associates

24   and ask for approval?

25        A.    Yes.

1                    WATERHOUSE - 10-19-21

2          Q.    And I think you said that there was

3    a -- a --

4          A.    It was -- I think I testified to

5    this earlier when we talked about procedures

6    and policy, you know, again, I want to be

7    informed of -- of -- of -- of -- of any

8    payments that are going out.  I want to be made

9    aware of these payments, and that was just a

10   general policy, not just for 2020.

11         Q.    Okay.  So it went beyond 2020?

12         A.    Yes.

13         Q.    Is that right?

14         A.    Yes.

15         Q.    Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20         A.    I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet

```
 1                 WATERHOUSE - 10-19-21

 2    deadlines.

 3                 I don't know how, as I testified

 4    earlier, how much they were using that

 5    calendar.

 6        Q.    Okay.  But -- but you did get notice

 7    and a request to approve the payments that were

 8    coming due on behalf of Highland's affiliates.

 9    Do I have that right?

10                 MS. DANDENEAU:  Objection to form.

11        A.    I mean, generally, yes.  I mean, you

12    know, as we saw with these emails, generally, I

13    mean, did that encompass everything, no.

14        Q.    Okay.  Do you know why the

15    payment -- do you know why there was no payment

16    made by NexPoint at the end of 2020?

17        A.    Yes.  There was -- there was -- we

18    talked about these agreements between the

19    advisors and Highland, the shared services and

20    the cost reimbursement agreement.

21                 And in late 2020, there were

22    overpayments, large overpayments that had been

23    made over the years on these agreements, and it

24    was my understanding that the advisors were --

25    were talking with -- like Jim Seery and others
```

Case 3:10-05806-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 380 of 397
Case 3:21-cv-00881-X Document 173-30 Page 0299/2446 Page 265 of 282 PageID 47188

Page 380

WATERHOUSE - 10-19-21

1
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5        Q.    Okay.  Did you participate in any of
6    those conversations?
7        A.    I did not.
8        Q.    Okay.  Do you know -- do you recall
9    that the -- at the end of November, the debtor
10   did notice to the advisors of their intent to
11   terminate the shared services agreements?
12       A.    Like I testified earlier, there
13   was -- the agreements weren't identical, from
14   what I recall, and there is one that had a
15   longer notice period, which I think had a
16   60-day notice period.  I don't recall which one
17   that was, so not all of them were -- notice
18   hadn't been given as of November 30th, for all
19   of the agreements.
20       Q.    Upon the receipt of the -- the
21   termination notices that you recall, do you
22   know if the advisors decided at that point not
23   to make any further payments of any kind to
24   Highland?
25             MR. RUKAVINA:  Objection, form.

                      WATERHOUSE - 10-19-21

1

2        A.    No.  The advisors -- the advisors

3   had stopped making payments prior to that

4   notice.

5        Q.    Okay.  And how do you know that the

6   advisors stopped making -- making payments

7   prior to the notice?

8        A.    I had -- I had a conversation

9   with -- with Jim Dondero.

10       Q.    And did Mr. Dondero tell you that

11  the advisors would no longer make payments to

12  Highland?

13            MS. DEITSCH-PEREZ:  Object to the

14       form.

15       A.    Yes, he -- he -- again, he said

16  they -- they -- the advisors have overpaid on

17  these agreements, to not make any future

18  payments, and that there needs to be offsets,

19  and they're working on getting offsets to these

20  overpayment.

21       Q.    Do you know if anybody ever

22  instructed Highland's employees to make the

23  payment that was due by NexPoint at the end of

24  the year?

25       A.    Did anyone instruct Highland's

Case 3:00-05806-cgc Doc 51-1 07/20/21 Entered 10/20/21 12:31:54 Page 382 Desc 397
Case 3:21-cv-00881-X Document 178-30 Page 04309/2446 Page 267 of 282 PageID 47190

Page 382

WATERHOUSE - 10-19-21

1

2    employees to make that payment?

3        Q.    Correct.

4        A.    Anyone -- not that I'm aware.

5        Q.    Were any of Highland's employees

6    authorized to make the payments on behalf of

7    its affiliates -- withdrawn.

8            Was any of Highland's employees

9    authorized to effectuate the payment on behalf

10   of NexPoint that was due at the end of the year

11   without getting approval from either you or

12   Mr. Dondero?

13       A.    They had the -- they had the ability

14   to make the payment, but they didn't -- you

15   know, that -- that payment needed to be

16   approved.

17       Q.    Okay.  And it needed to be approved

18   by you or Mr. Dondero; is that right?

19       A.    I mean, I'm not going to make the

20   unilateral decision.

21       Q.    Is that a decision that you

22   understood had to be made by Mr. Dondero?

23       A.    Yes.  Sitting back in December of

24   2020, the -- that -- there was this off --

25   offset negotiation that -- that was happening,

                          WATERHOUSE - 10-19-21

 1
 2    so I mean, until those negotiations were
 3    resolved, you know, there wasn't any
 4    payments -- there weren't any payments.
 5         Q.    And -- and there were no payments
 6    until the negotiations were resolved because
 7    that was the directive that you received from
 8    Mr. Dondero; correct?
 9         A.    I don't think he said -- I mean, I
10    think -- yeah, I mean -- I'm trying to recall
11    the conversation.  It was -- you know, there
12    is -- there is these negotiations.  There's --
13    there needs to be these offsets.  They're
14    talking with the debtor.  So, you know, until
15    this is resolved, right, I mean, depending on
16    how, whatever that resolution was, were we to
17    take any action.
18         Q.    Okay.  How about with respect to
19    HCMS, did HCMS have a term payment due at the
20    end of the year?
21         A.    Again, I don't -- I don't recall.
22         Q.    Okay.  You discussed briefly two
23    payments that were made in January of 2021, one
24    on behalf of NexPoint, and one on behalf of
25    HCMS.  Do I have that right?

```
 1              WATERHOUSE - 10-19-21

 2       A.    No.  The two payments I recall were

 3   NexPoint and HCRE.

 4       Q.    Okay.  And those two payments --

 5   thank you for the correction.  And those two

 6   payments were made because Mr. Dondero

 7   authorized those payments to be made; correct?

 8       A.    Yes.

 9       Q.    And they hadn't been made before

10   that because Mr. Dondero had not authorized

11   them to be made?

12            MS. DEITSCH-PEREZ:  Object to the

13        form.

14       A.    Yes, because of these negotiations.

15       Q.    Okay.  Just a couple of more

16   questions.

17            Did anybody, to the best of your

18   knowledge, on behalf of HCMFA, ever tell the

19   SEC that HCMLP was responsible for the mistakes

20   that were made on the TerreStar valuation?

21       A.    Did anyone from Highland on HCMFA's

22   behalf tell the SEC that Highland -- that

23   Highland was responsible for there -- I just

24   want to make sure --

25       Q.    It was a little bit different, so
```

Case 3:21-cv-00881-X Doc 8 Doc File 1 10/20/21 09/21 red Entered 10/20/21 09/21/22 13:41:41 Page 385 of 397
Case 3:21-cv-00881-X Document 78-30 Filed 04/09/24 Page 270 of 282 PageID 47193

Page 385

1                    WATERHOUSE - 10-19-21

2    let me try again.

3         A.    These are very long questions, John.

4    I'm not trying to be --

5         Q.    That is good.  Do you know whether

6    anybody -- do you know whether anybody on

7    behalf of HCMS -- HCMFA ever told the SEC that

8    Highland was the responsible party for the

9    TerreStar valuation error?

10        A.    Not that I'm aware.

11        Q.    Okay.  Did anybody on behalf of

12   the -- on behalf of HCMFA ever tell the retail

13   board that Highland was responsible for the

14   TerreStar valuation error?

15        A.    Not that I'm aware.

16        Q.    Do you know if HCMFA made an

17   insurance claim with respect to the damages

18   that were incurred in relation to the TerreStar

19   valuation error?

20        A.    Yes.

21        Q.    And do you know why they made that

22   insurance claim?

23        A.    Because there was an error.  I

24   mean --

25        Q.    Was the insured's claim made -- was

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/21 Entered 10/20/21 22:31:54 Page 386 of 397
Case 3:21-cv-00881-X Document 178-30 Page 03599/2446 Page 271 of 282 PageID 47194

Page 386

WATERHOUSE - 10-19-21

1

2    the insurance claim made under HCMFA's policy?

3        A.    Yes.

4        Q.    Did HCMFA at any time prior to the

5    petition date -- withdrawn.

6             You were asked a couple of questions

7    where -- where you said that Mr. Dondero told

8    you that he was ascribing zero value to the

9    notes as part of a pot plan because he believed

10   that the notes were part of executive

11   compensation.

12            Do I have that right?

13            MS. DEITSCH-PEREZ:  Object to the

14       form.

15       A.    Yes.

16       Q.    Okay.  Have you ever heard that

17   before the time that Mr. Dondero told you that

18   in the conversation about the pot plan?

19       A.    Had I heard that prior to my

20   conversation with Mr. Dondero?

21       Q.    Yes.

22       A.    No, I had not heard that prior.

23       Q.    Okay.  And that was in the context

24   of his formulation of the settlement proposal;

25   is that right?

Case 3:21-cv-00881-X Document 180-30 Filed 10/20/23 Entered 10/20/23 21:31:54 Desc
Case 3:21-cv-00881-X Document 178-30 Page 439 of 446 Page 272 of 282 PageID 47195

Page 387

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I mean, generally, yes.  You know,

 3   we were asked to provide asset values, right,

 4   and he was having settlement discussions.

 5   Again, I don't know who those went to

 6   ultimately.  I don't recall.

 7             MR. MORRIS:  I have no further

 8        questions.  Thank you very much for your

 9        patience.  I apologize for the late hour.

10             MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12             MR. RUKAVINA:  Hold on, I'm not

13        done.

14             MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19                    FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25             Do you remember that testimony?
```

Case 21-03005-sgj Doc 81 Filed 10/20/21 Entered 10/20/21 21:54:01 Page 388 of 397
Case 3:21-cv-00881-X Document 178-30 Page 4379/2446 Page 273 of 282 PageID 47196

Page 388

                    WATERHOUSE - 10-19-21

 1

 2      A.    Yes.

 3      Q.    Okay.  And was that late November or

 4  early December of 2020?

 5      A.    It was, I would say, first or second

 6  week of November.

 7      Q.    Okay.  Do you recall whether --

 8  whenever you had that discussion, whether

 9  Mr. Dondero had already been fired by the

10  debtor?

11      A.    Yes, I -- I believe he was not an

12  employee of the debtor anymore at that time.

13      Q.    And when you were discussing this

14  with Mr. Dondero and he said no more payments,

15  you were discussing the two shared services

16  agreements and employee reimbursement

17  agreements we testified -- you testified about

18  before; is that correct?

19          MR. MORRIS:  Objection to the form

20      of the question.

21      A.    That is correct.

22      Q.    And had your office or you -- and we

23  will talk at a future deposition about the

24  administrative claim.

25          But had -- by that time that you

Case 3:21-cv-00881-X Document 8 Doc File 10/20/21 10/29/21 Entered 10/20/21 07/29/21 23:1541:01 Page 389 of 397
Case 3:21-cv-00881-X Document 178-30 Page 00389/2446 Page 274 of 282 PageID 47197
Page 389

```
 1                  WATERHOUSE - 10-19-21

 2     talked to Mr. Dondero, had your office or you

 3     done any estimate of what the alleged

 4     overpayments were?

 5                  MR. MORRIS:  Objection to the form

 6          of the question.

 7          A.    Yes, we had -- there was a -- there

 8     was a detailed analysis that was put together

 9     by David Klos at the time.

10          Q.    And do you recall just generally

11     what the total amount for both advisors of the

12     overpayments was?

13          A.    It was in excess of $10 million.

14          Q.    Was it in excess of $14 million?

15                  MR. MORRIS:  Objection to the form

16          of the question.

17          A.    I -- I remember it was an

18     eight-figure number.  I don't remember

19     specifically.

20          Q.    Okay.  And did you convey that

21     number to Mr. Dondero when you had that

22     conversation?

23          A.    Yes.

24          Q.    What was his reaction?

25          A.    I mean, he wasn't happy.
```

```
 1                 WATERHOUSE - 10-19-21

 2        Q.     Is it fair to say he was upset?

 3        A.     Yes.

 4        Q.     Did Mr. Dondero ever expressly tell

 5   you to not have NexPoint make the required

 6   December 31, 2020, payment?

 7        A.     Yes, I recall him saying don't make

 8   the payment because it was being negotiated, as

 9   I discussed with Mr. Morris, this offset

10   concept.  So there were obligations due by the

11   advisors to Highland, they should be offset

12   that -- you know, those obligations should be

13   offset by this -- by this overpayment.

14        Q.     And when did he tell you that?

15        A.     I would say -- I would say around --

16   probably December -- December-ish.

17        Q.     Early December, late December?

18        A.     I don't recall with as much

19   specificity as -- as -- as -- as stopping the

20   shared services payments, because we had

21   actually made one shared services payment in

22   November.  So that is why I need to remember

23   that one more clearly.  I don't remember where

24   exactly in December that conversation occurred.

25        Q.     Did Mr. Dondero expressly use the
```

1                    WATERHOUSE - 10-19-21

2      word "NexPoint" when he was saying don't make

3      these payments?

4                    MR. MORRIS:  Objection to the form

5             of the question, asked and answered.

6             A.    Yeah, we were -- we were discussing

7      advisor obligations.  So it was -- you know, it

8      was just obligations from the advisors.

9                    And -- and he specifically talked

10     about the NexPoint payment as well.

11            Q.    Okay.  And it is your testimony that

12     he expressly told you not to make that NexPoint

13     December 31 payment?

14                   MR. MORRIS:  Objection, asked and

15            answered twice.

16            A.    Yes, he -- he did, during that

17     conversation.

18            Q.    And did you ever follow up with him

19     after that about whether NexPoint should or

20     shouldn't make that payment?

21            A.    I did not.

22            Q.    Did you ever, on or about

23     December 31, 2020, remind him and say, hey,

24     this payment is due, what shall I -- what

25     should I do?

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I did not.

 3        Q.    So sitting here today, you -- you

 4   remember distinctly that Dondero in December of

 5   2020 expressly told you not to have NexPoint

 6   make that payment?

 7             MR. MORRIS:  Objection, asked and

 8        answered three times.

 9        A.    Yes.

10        Q.    Can you say categorically it wasn't

11   just some general discussion where he told you

12   not to make payments?

13             MR. MORRIS:  Objection, asked and

14        answer four times.

15             MR. HORN:  Four times now.  Go for

16        five.

17        A.    Yes.

18        Q.    Did you tell Mr. Seery that?

19        A.    I don't believe I did.  I don't

20   recall.

21        Q.    And was this an in-person discussion

22   or telephone or email?  Do you remember?

23        A.    This was a phone -- a phone

24   conversation.

25        Q.    Okay.  Would you have a record of --
```

```
 1                    WATERHOUSE - 10-19-21

 2   on your cell phone of when that conversation

 3   might have taken place?

 4                    I'm sorry, strike that.

 5                    Was that by cell phone?

 6        A.    I believe -- yes, because we -- I

 7   was at home.  I mean, I don't have a landline.

 8   All I have is my cell phone.

 9        Q.    Do you know whether your cell phone

10   still has records of conversations from

11   December 2020 on it?

12        A.    My call log doesn't go back that

13   far.

14        Q.    Okay.  Thank you.

15                    MR. RUKAVINA:  I will pass the

16   witness.

17                    MS. DEITSCH-PEREZ:  Just a couple

18        quick questions.

19                    FURTHER EXAMINATION

20   BY MS. DEITSCH-PEREZ:

21        Q.    With respect to HCRE and HCMS, am I

22   correct there was -- there was no direction not

23   to pay those loan payments?

24                    MR. MORRIS:  Objection to the form

25        of the question.
```

Page 394

1                    WATERHOUSE - 10-19-21

2          A.    Yes, I don't recall having

3    conversations about, you know, those -- those

4    entities.

5          Q.    And, in fact, what was the tone that

6    Mr. Dondero had when he talked to you about the

7    fact that HCRE and HCMS payments hadn't been

8    made when he found out that they hadn't been

9    paid?

10               MS. DANDENEAU:  Objection to form.

11               MR. MORRIS:  Objection to form.

12         Q.    What was the tone he took with you?

13         A.    Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16         Q.    Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19               MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Okay.  Thank you.

23               MR. MORRIS:  I have nothing further.

24         Thank you so much, Mr. Waterhouse.

25               MR. HORN:  I have no questions.

```
1              WATERHOUSE - 10-19-21

2        Thank you, Mr. Waterhouse.  We appreciate

3        your time.  I am logging off the discussion

4        and I will talk to y'all tomorrow.

5              MR. MORRIS:  Super.

6              VIDEOGRAPHER:  If there are no

7        further questions, this ends the

8        deposition -- excuse me.  This ends the

9        deposition, and we are going off the record

10       at 7:30 p.m.

11       (Deposition concluded at 7:30 p.m.)

12

13                  _____

14                  FRANK WATERHOUSE

15

16  Subscribed and sworn to before me

17  this     day of             2021.

18

19  ---------------------------------

20

21

22

23

24

25
```

```
 1            WATERHOUSE - 10-19-21

 2            C E R T I F I C A T E

 3

 4        I, SUSAN S. KLINGER, a certified shorthand

 5    reporter within and for the State of Texas, do

 6    hereby certify:

 7        That FRANK WATERHOUSE, the witness whose

 8    deposition is hereinbefore set forth, was duly

 9    sworn by me and that such deposition is a true

10    record of the testimony given by such witness.

11        I further certify that I am not related to

12    any of the parties to this action by blood or

13    marriage; and that I am in no way interested in

14    the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16    hand this 19th of October, 2021.

17

18    _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25
```

```
 1              WATERHOUSE - 10-19-21

 2    NAME OF CASE:  In re:  Highland Capital

 3    DATE OF DEPOSITION:  October 19, 2021

 4    NAME OF WITNESS:  Frank Waterhouse

 5    Reason Codes:

 6          1.  To clarify the record.

 7          2.  To conform to the facts.

 8          3.  To correct transcription errors.

 9    Page____Line_____Reason_____

10    From_____to_____

11    Page____Line_____Reason_____

12    From_____to_____

13    Page____Line_____Reason_____

14    From_____to_____

15    Page____Line_____Reason_____

16    From_____to_____

17    Page____Line_____Reason_____

18    From_____to_____

19    Page____Line_____Reason_____

20    From_____to_____

21    Page____Line_____Reason_____

22    From_____to_____

23    Page____Line_____Reason_____

24    From_____to_____

25
```