Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Attorneys for Highland Capital Management
Services, Inc. and HCRE Partners, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND HCRE PARTNERS, LLC'S REPLY IN SUPPORT OF DEFENDANTS' MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW, Highland Capital Management Services, Inc. ("HCMS") and HCRE Partners, LLC ("HCRE"), Defendants in the above styled and numbered Adversary Proceedings initiated by Highland Capital Management, L.P. as Plaintiff (the "Debtor"), and files this, their *Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* and respectfully show as follows:

## I.    REPLY POINTS

### The Court Should Allow HCRE And HCMS To Designate A Shared Services Expert Because, Contrary To Debtor's Assertion, They Do Have A Shared Services Agreement With The Debtor.[1]

1.    The Debtor argues that even if NexPoint were allowed an extension of time to add a shared services expert, HCRE and HCMS should not be afforded the same extension of time because they were not a party to the Shared Services Agreement between NexPoint and the Debtor and because they were not a party to any shared services agreement with the Debtor. While the Debtor is correct that HCRE and HCMS were not a party to the Shared Services Agreement between NexPoint and the Debtor, HCRE and HCMS did have their own shared services agreements with the Debtor.

2.    As Mr. Dondero testified, while there was no written agreement between either HCMS or HCRE, on the one hand, and the Debtor, on the other hand, relating to services that the Debtor was to supply to either party, the services that the Debtor provided to HCMS and HCRE

---

[1] HCRE and HCMS join the applicable arguments NexPoint makes as to why their request to add an expert now is warranted and not prejudicial to the Debtor.

CORE/3522697.0002/171385863.1

were essentially the same services that the Debtor provided to NexPoint.[2]  As with NexPoint, there was a long history of the Debtor providing services to HCMS and HCRE.  The Debtor provided HCMS and HCRE with these services pursuant to an oral agreement.[3]  As Mr. Pully will testify to, this is common in the industry.  Under that oral agreement, the Debtor was responsible for making payments of principal and interest on the HCMS notes and the HCRE notes, which had previously been made in 2017, 2018, and 2019, and HCMS and HCRE relied on the Debtor to provide these services because HCMS and HCRE, like NexPoint, did not have employees or infrastructure to run its business without the services provided by the Debtor.[4]

3.     When asked about whether the Debtor had a services agreement with HCMS, Mr. Dondero replied as follows during his deposition:

> My answer would be the advisors like NexPoint and HFAM that had to have by law and regulatory statute have to have formal sub advisors and shared services agreements had formal shared services agreement.  Entities that didn't need to have formal written shared services agreements were often serviced similarly or -- or exactly the same as those entities, but without a written  agreement, but with a verbal shared services agreement providing, again, all the same similar services, and the entities that didn't  have a written shared services agreement weren't getting shared services or support from  any other entities other than Highland doing the same thing for them that it did for the mutual funds.[5]

4.     Mr. Dondero had a similar response with regard to there being an oral agreement for the Plaintiff to provide services to HCRE.[6]  Notably, the Debtor has not even attempted to provide any evidence or testimony indicating that there was no services agreement between these parties.  And even if there was no oral agreement, there is certainly evidence of an implied

---

[2] James Dondero Deposition, Volume 2, dated October 29, 2021, at 335:19-336:13, a copy of which is attached as Exhibit 1 to the Declaration of Michael P. Aigen, dated December 8, 2021 ("Aigen Decl.").
[3] *Id.*
[4] *Id.* at 371:5-9.  While HCRE and HCMS did not pay cash for these services, HCRE and HCMS provided value to HCM by creating track records that HCM could point to in order to raise money for similar services it would market for which it receive compensation. *Id.* at 338:11-339:18.
[5] *Id.* at 335:19-336:13.
[6] *Id.* at 381:10-23.

CORE/3522697.0002/171385863.1

agreement for the Debtor to provide services to HCRE and HCMS based on the actions and conduct of the parties, including the fact that the Debtor previously made these loan payments on behalf of these entities.[7]   Therefore, because the Debtor is simply incorrect about there being no services agreement between HCRE and HCMS, on one hand, and the Debtor, on the other,  HCRE and HCMS should be permitted an extension of time to designate Mr. Pully as a shared services expert.

## II.      __PRAYER__

WHEREFORE, PREMISES CONSIDERED, Defendants Highland Capital Management Services, Inc. and HCRE Partners, LLC respectfully request this Court enter an order (i) granting Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting Defendants such other and further relief as may be proper.

---

[7] An implied in fact contract arises from the actions and conduct of the parties. *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972); *Notley v. Sterling Bank*, No. 05–07–00891–CV, 2008 WL 4952835, at *3 (Tex. App.-Dallas Nov. 21, 2008, no pet.).

Dated:  December 8, 2021

Respectfully submitted,

**STINSON LLP**

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Telecopier: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS
HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC. AND HCRE PARTNERS,
LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 8, 2021, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties who are registered to receive notices in this case.

<div align="right">

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez

</div>

CORE/3522697.0002/171385863.1

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

*Attorneys for Highland Capital Management*
*Services, Inc. and HCRE Partners, LLC*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054-SGJ-11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff.** | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC., JAMES DONDERO,** | § | |
| **NANCY DONDERO, AND THE DUGABOY** | § | |
| **INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |
| | | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff.** | § | |
| | § | |
| v. | § | |
| | § | **Adversary No.: 21-03007-sgj** |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT** | § | |
| **REAL ESTATE PARTNERS, LLC), JAMES** | § | |
| **DONDERO, NANCY DONDERO, AND** | § | |
| **DUGABOY INVESTMENT TRUST** | § | |
| | § | |
| **Defendants.** | § | |

Case 21-03006-sgj    Doc 120-1    Filed 12/08/21    Entered 12/08/21 12:13:16    Desc
Case 3:21-cv-00881-X Document 178-32 Filed 01/09/24    Page 28 of 201    PageID 47453
Exhibit D Declaration of Michael P. Aigen    Page 2 of 3

**DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF**
**<u>MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES</u>**

I, Michael P. Aigen, pursuant to <mark>28 U.S.C. § 1746(a)</mark>, under penalty of perjury, declare as follows:

1.      I am a member of the law firm of Stinson LLP, counsel to Highland Capital Management Services, Inc. ("<u>HCMS</u>") and HCRE Partners, LLC ("<u>HCRE</u>"), and I submit this Declaration in support of the *Motion to Extend Expert Disclosure and Discovery Deadlines*, filed on October 29, 2021.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit 1** is a true and correct copy of excerpts of the Transcript of the October 29, 2021 Remote Videotaped Deposition of James Dondero, Volume 2, at 335:19-336:13, 338:11-339:18, 371:5-9, and 381:10-23.

Dated:  December 8, 2021.                            */s/ Michael P. Aigen*
                                                        Michael P. Aigen

2

# Exhibit 1

```
 1                 DONDERO - 10/29/21

 2         IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
 3                  DALLAS DIVISION
     ------------------------------
 4   IN RE:

 5                              Chapter 11
     HIGHLAND CAPITAL
 6   MANAGEMENT, L.P.,          CASE NO.
                                19-34054-SGI11
 7
              Debtor.
 8   ------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
 9
              Plaintiff,
10   vs.                           Adversary
                                   Proceeding No.
11   JAMES D. DONDERO,             21-03003-sgi

12            Defendant.
     ------------------------------
13

14         REMOTE VIDEOTAPED DEPOSITION OF

15           JAMES DONDERO - VOLUME 2

16              October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874
```

```
 1                    DONDERO - 10/29/21

 2

 3

 4                    October 29, 2021

 5                    10:21 a.m.

 6

 7

 8

 9        Remote Deposition of JAMES DONDERO, held

10   before Susan S. Klinger, a Registered Merit

11   Reporter and Certified Realtime Reporter of the

12   State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 21-03006-sgj   Doc 120-1   Filed 12/08/21   Entered 12/08/21 12:13:16   Desc
Case 3:21-cv-00881 Exhibit Document 78-38 Michael D. Aigen   Page 12 of 201   PageID 47457

Page 285

```
 1                DONDERO - 10/29/21

 2   A P P E A R A N C E S:

 3   (All appearances via Zoom.)

 4   Attorneys for the Reorganized Highland Capital

 5   Management:

 6        John Morris, Esq.

 7        Hayley Winograd, Esq.

 8        Gregory Demo, Esq.

 9        PACHULSKI STANG ZIEHL & JONES

10        780 Third Avenue

11        New York, New York 10017

12

13   Attorneys for NexPoint Advisors, LP and

14   Highland Capital Management Fund Advisors,

15   L.P.:

16        Davor Rukavina, Esq.

17        Thomas Berghman, Esq.

18        MUNSCH HARDT KOPF & HARR

19        500 North Akard Street

20        Dallas, Texas 75201

21

22

23

24

25
```

1                   DONDERO - 10/29/21

2      complete answer regarding a myriad of ways

3      you've asked me kind of the same structural

4      questions.

5           Q.    I am, and just to be clear, I'm

6      asking kind of the same structural questions

7      with respect to each of the entities at issue.

8      I think you picked up on that.  I hope you

9      don't think I'm being repetitive.

10               You mentioned Frank and his group in

11     the context of HCMS.  Did I hear that

12     correctly?

13          A.    Yes.

14          Q.    Okay.  HCMS did not have a shared

15     services agreement with Highland; correct?

16               MS. DEITSCH-PEREZ:  You mean a

17          written shared services agreement, John?

18          Q.    Do you understand the question, sir?

19          A.    Yeah.  My answer would be the

20     advisors like NexPoint and HFAM that had to

21     have by law and regulatory statute have to have

22     formal sub advisors and shared services

23     agreements had formal shared services

24     agreement.

25               Entities that didn't need to have

Case 21-03006-sgj   Doc 120-1   Filed 12/08/21   Entered 12/08/21 12:13:16   Desc
Case 3:21-cv-00881 Exhibit Document 73-8 Michael Filed 01/10/22   Page 8 of 201   PageID 47459

Page 336

```
 1                      DONDERO - 10/29/21

 2    formal written shared services agreements were

 3    often serviced similarly or -- or exactly the

 4    same as those entities, but without a written

 5    agreement, but with a verbal shared services

 6    agreement providing, again, all the same

 7    similar services.

 8              And the entities that didn't have a

 9    written shared services agreement weren't

10    getting shared services or support from any

11    other entities other than Highland doing the

12    same thing for them that it did for the mutual

13    funds.

14         Q.    Okay.  Can you tell me who entered

15    into an oral shared services agreement between

16    Highland and HCMS?

17         A.    Boy, I can imagine way back in the

18    day it would have been myself and Frank, but he

19    and his group understood and knew that they

20    were doing it for all the new entities that

21    came along, and I can't imagine it was even

22    talked about much over the years.

23         Q.    Did -- did HCMFA and NexPoint pay

24    money to Highland under the shared services

25    agreement until let's just say late 2020?
```

Case 21-03006-sgj    Doc 120-1    Filed 12/08/21    Entered 12/08/21 12:13:16    Desc
Case 3:21-cv-0088 Exhibit Document 78-38 Michael 11 Filed 11 Page 15 of 201    PageID 47460

Page 338

```
 1                    DONDERO - 10/29/21

 2   the Highland entity.

 3           And then -- and they prepared

 4   statements or did work for services, Frank and

 5   his group would have passed through those costs

 6   and expected services and/or Dugaboy or any of

 7   the other entities to pay for direct

 8   out-of-pocket costs.  But it wouldn't have paid

 9   a supplemental fee or profit or anything to

10   Highland.

11       Q.    Okay.  To the best of your

12   recollection, during the time that you were

13   president of Highland, did Highland ever

14   receive anything of value from HCMS on account

15   of services other than the reimbursement of

16   out-of-pocket expenses?

17       A.    Yeah, I'm going to go back to my

18   comment in terms of building track record.  And

19   I would use -- yeah, we had done it several

20   times in the past and it had worked

21   effectively.  And that is -- you know, yeah, I

22   mean, the -- the track record in CLO paper was

23   what was used to track -- (inaudible) -- as an

24   investor.

25           And so, you know, to the extent that
```

1                    DONDERO - 10/29/21

2    the DAF wasn't paying a fee, along the way, to

3    Highland for shared services, Highland got the

4    benefit of the track record that was being

5    built at the DAF to then market to third

6    parties, which then created a revenue stream

7    for Highland down the road.

8              And I would say that was the same

9    intent on Services.

10        Q.    Is there anything -- anything else

11   of value that you believe HCMS provided to

12   Highland in exchange for the services that

13   Highland rendered?

14        A.    That would be primarily it.  I would

15   say there is probably times where Services

16   provided liquidity for Highland or helped on

17   investments that Highland was involved in, but

18   I would have to refresh myself on exactly what.

19        Q.    Is it fair to say that HCMF -- HCMS

20   never provided a revenue stream to Highland

21   similar to the revenue stream that was provided

22   by HCMFA and NexPoint under the shared services

23   agreements?

24        A.    That is correct.

25        Q.    Okay.  Did anybody at HCMF --

Page 371

                    DONDERO - 10/29/21

1

2    to the extent that there was a screw-up, on the

3    term loans.

4         Q.    What screw-up are you referring to?

5         A.    Well, we didn't have accountants or

6    employees at Services, you know, and Services

7    was relying on Highland and shared services to

8    stay in compliance or to -- on the various

9    loans.

10        Q.    Did you ever personally instruct

11   anybody in December of 2020 to make a payment

12   on behalf of HCMS under the term note?

13        A.    To make -- I'm sorry, is this --

14   what was the timeframe again?

15        Q.    December 2020 -- let's just say

16   anytime in 2020.  Did you, in your capacity as

17   the person in control of HCMS, ever direct or

18   authorize any person in the world to make a

19   payment from HCMS to Highland in satisfaction

20   of the obligation that was due under the term

21   note at the end of the year?

22        A.    Not that -- not that I recall.

23        Q.    Okay.  Do you know whether anybody

24   acting on behalf of HCMS ever instructed or

25   authorized Highland to make a payment on

Case 21-03006-sgj   Doc 120-1   Filed 12/08/21   Entered 12/08/21 12:13:16   Desc
Case 3:21-cv-00888 Exhibit Declaration 7 of 32 Michael P. Filed 11/09/24   Page 128 of 201   PageID 47463

Page 381

```
 1                   DONDERO - 10/29/21

 2        the screen on if you want so that we can

 3        get back fast.

 4              MR. MORRIS:  My pleasure, Deborah.

 5        No problem.

 6              MS. DEITSCH-PEREZ:  Thank you.

 7              VIDEOGRAPHER:  Off the record,

 8        12:40.

 9        (Recess taken 12:40 p.m. to 12:51 p.m.)

10        Q.    Before we go on to this document,

11   sir, did HCRE have a shared services agreement

12   with Highland?

13              VIDEOGRAPHER:  We're back on the

14        record.

15              MR. MORRIS:  Oh, do I need to read

16        the question again?

17              COURT REPORTER:  No, I've got it.

18        A.    I -- I don't believe it is a formal

19   written one.  I think it is just a verbal one.

20        Q.    And who is the verbal agreement

21   between?

22        A.    It was between Highland and HCRE.

23   Now it is between NexPoint and HCRE.

24        Q.    And who entered into the agreement

25   between Highland and HCRE?
```

Case 21-03006-sgj   Doc 120-1   Filed 12/08/21   Entered 12/08/21 12:13:16   Desc
Case 3:21-cv-0088ExhibiD Deolaratidn78f Michaed Ri1A0g2e4   Page 189 of 1301   PageID 47464

Page 484

```
 1                   DONDERO - 10/29/21

 2                C E R T I F I C A T E

 3

 4        I, SUSAN S. KLINGER, a certified shorthand

 5   reporter within and for the State of Texas, do

 6   hereby certify:

 7        That JAMES DONDERO, the witness whose

 8   deposition is hereinbefore set forth, was duly

 9   sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 29th of October, 2021.

17

18   _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25
```

```
                 IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION

                                  )    Case No. 19-34054-sgj-11
In Re:                            )    Chapter 11
                                  )
HIGHLAND CAPITAL                  )    Dallas, Texas
MANAGEMENT, L.P.,                 )    Monday, December 13, 2021
                                  )    10:30 a.m. Docket
          Debtor.                 )
_____ )
                                  )
HIGHLAND CAPITAL                  )    Adversary Proceeding 21-3005-sgj
MANAGEMENT, L.P.,                 )
                                  )    MOTION TO EXTEND EXPERT
          Plaintiff,              )    DISCLOSURE AND DISCOVERY
                                  )    DEADLINES
v.                                )
                                  )
NEXPOINT ADVISORS, L.P.,          )
et al.,                           )
                                  )
          Defendants.             )
_____ )
                                  )
HIGHLAND CAPITAL                  )    Adversary Proceeding 21-3006-sgj
MANAGEMENT, L.P.,                 )
                                  )    MOTION TO EXTEND EXPERT
          Plaintiff,              )    DISCLOSURE AND DISCOVERY
                                  )    DEADLINES
v.                                )
                                  )
HIGHLAND CAPITAL                  )
MANAGEMENT SERVICES, INC.,        )
et al.,                           )
                                  )
          Defendants.             )
_____ )
```

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 181-21   Filed 09/29/23   Page 21 of 201   PageID 47466
Document    Page 20 of 238

2

| | | |
|---|---|---|
| 1 | | ) |
| 2 | HIGHLAND CAPITAL | ) **Adversary Proceeding 21-3007-sgj** |
| | MANAGEMENT, L.P., | ) |
| 3 | | ) MOTION TO EXTEND EXPERT |
| | Plaintiff, | ) DISCLOSURE AND DISCOVERY |
| | | ) DEADLINES |
| 4 | v. | ) |
| | | ) |
| 5 | HCRE PARTNERS, LLC | ) |
| | (n/k/a NEXPOINT REAL | ) |
| 6 | ESTATE PARTNERS, LLC), | ) |
| | | ) |
| 7 | Defendant. | ) |
| | ———————————————————— | ) |

```
8
9                        TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11    WEBEX APPEARANCES:

12    For the Debtor-Plaintiffs:  Hayley Winograd
                                  PACHULSKI STANG ZIEHL & JONES, LLP
13                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
14                                (212) 561-7700

15    For NexPoint Advisors,      Davor Rukavina
      LP:                         Julian Preston Vasek
16                                MUNSCH HARDT KOPF & HARR, P.C
                                  500 N. Akard Street, Suite 3800
17                                Dallas, TX  75201-6659
                                  (214) 855-7587

18    For HCMS and HCRE:          Michael P. Aigen
                                  Deborah Rose Deitsch-Perez
19                                STINSON LEONARD STREET
                                  3102 Oak Lawn Avenue, Suite 777
20                                Dallas, TX  75219
                                  (214) 560-2201

21
22    Recorded by:                Michael F. Edmond, Sr.
                                  UNITED STATES BANKRUPTCY COURT
23                                1100 Commerce Street, 12th Floor
                                  Dallas, TX  75242
24                                (214) 753-2062

25
```

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 26-21   Filed 09/02/38   Page 22 of 201   PageID 47467

3

1   Transcribed by:                Kathy Rehling
                                   311 Paradise Cove
2                                  Shady Shores, TX   76208
                                   (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 28-21   Filed 09/07/23   Page 23 of 201   PageID 47468
Document   Page 4 of 238

4

| | |
|---|---|
| 1 | DALLAS, TEXAS - DECEMBER 13, 2021 - 10:55 A.M. |
| 2 | THE COURT:  I will now take up the Highland three |
| 3 | motions to extend expert deadlines.  So let me get appearances |
| 4 | from lawyers.  First, who do we have appearing for the Debtor |
| 5 | this morning? |
| 6 | MS. WINOGRAD:  Good morning, Your Honor.  My name is |
| 7 | Hayley Winograd of Pachulski Stang Ziehl & Jones appearing on |
| 8 | behalf of Highland. |
| 9 | THE COURT:  Okay.  Good morning.  For NexPoint |
| 10 | Advisors, who do we have appearing? |
| 11 | MR. RUKAVINA:  Your Honor, good morning.  Davor |
| 12 | Rukavina and Julian Vasek. |
| 13 | THE COURT:  Good morning.  All right.  For HCMS and |
| 14 | NPRE, who do we have appearing? |
| 15 | (No response.) |
| 16 | THE COURT:  Okay.  Maybe I should say these names in |
| 17 | full. |
| 18 | MS. DEITSCH-PEREZ:  I apologize, Your Honor.  This is |
| 19 | Deborah Deitsch-Perez.  I believe Michael Aigen will be |
| 20 | appearing for HCRE and HCMS.  And I wonder if he's having |
| 21 | technical difficulties.  I saw him on the line a few minutes |
| 22 | ago.  I'm going to go off and call to make sure that there |
| 23 | isn't a problem. |
| 24 | THE COURT:  Okay. |
| 25 | MR. RUKAVINA:  But Your Honor, I'll be handling the |

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 180-21   Filed 09/09/22   Page 24 of 201   PageID 47469
Document     Page 59 of 238

5

 1  bulk of the arguments, and Mr. Aigen will cover a much smaller

 2  amount.

 3          THE COURT:  Okay.  Well, we'll --

 4          MR. AIGEN:  Your Honor, this is Michael Aigen.  Are

 5  you able to hear me now?

 6          THE COURT:  I can hear you now.

 7          MR. AIGEN:  I apologize.  Michael Aigen for HCMS and

 8  HCRE.

 9          THE COURT:  All right.  I presume those are our only

10  formal appearances, but is there anyone else who wished to

11  appear?

12     (No response.)

13          THE COURT:  All right.  Well, Mr. Rukavina, I'll hear

14  your argument.

15          MR. RUKAVINA:  Thank you, Your Honor.

16      I'm sure that the Court has read our papers, and by this

17  motion we seek to extend the expert deadline so that we can

18  retain Steven Pully as our expert on the standard of care.

19  Mr. Pully is on the video.  I can see him right now.  So, good

20  morning, Mr. Pully.

21      And Your Honor, I'd like for you to be aware that Friday

22  evening I did file on the docket Mr. Pully's report.

23  Obviously, the Court hasn't granted this motion, but I wanted

24  the Court to know that we moved as rapidly as possible, and

25  Mr. Pully has now finalized his report.  So there's no future

Case 21-03006-sgj    Doc 126    Filed 12/14/21    Entered 12/14/21 13:43:30    Desc Main
Case 3:21-cv-00881-X    Document 126    Filed 09/23/38    Page 25 of 201    PageID 47470

6

1    need for additional time on my end if the Court grants this

2    motion.

3        Your Honor, before I get to the actual merits of this

4    motion, I feel it important to address a hearing that occurred

5    a few weeks ago that I was not present at because this motion

6    was discussed briefly at the end.  This was a hearing held on

7    Ms. Deitsch-Perez's motion to dismiss and compel arbitration.

8        And Mr. Vasek, if you could please pull up the transcript

9    of that and scroll down to near the end where this motion is

10   discussed.

11       Your Honor will maybe recall that we have the transcript

12   where Ms. Deitsch-Perez mentioned as a scheduling matter that

13   this motion had been filed.  And the Court says, What on earth

14   does that have to do with this litigation?  I don't mean to be

15   flippant and laugh, but what on earth does that have to do

16   with notes?

17       And if we scroll down some more, Your Honor, Ms. Deitsch-

18   Perez was attempting to explain to the Court the purpose of

19   this motion, and the Court notes that, It sounds like you're

20   talking about an affirmative defense that hasn't been

21   articulated yet.

22       And if we scroll down some more, Ms. Deitsch-Perez

23   attempts to tell the Court that, in fact, this is an

24   affirmative defense that has always been asserted.

25       And the Court notes there in her dialogue with Ms.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 30-21   Filed 09/09/23   Page 26 of 201   PageID 47471

7

1    Deitsch-Perez that, I'm just letting you know you have a very

2    uphill battle convincing me that experts regarding shared

3    services agreements would be germane.

4        And the Court goes on to say that it has heard a lot about

5    shared services agreements during the past few years,

6    including experts on the witness stand in the *Acis* case.  And

7    the Court notes that, Under the pleadings as now in the

8    record, I just can't imagine why experts on shared services

9    agreements are going to be relevant evidence.

10       I think, Mr. Vasek, you can pull that down.

11       And I point this out only because, again, I know that the

12   Court has prepared for this hearing, but this is an

13   affirmative defense that has always been pled from the

14   beginning.  It does not involve the interpretation of the

15   contract.  We're not talking about the shared services

16   agreement.  We're not talking about the contract.  And recall,

17   Your Honor, that both Your Honor and the District Courts have

18   agreed that jury rights do attach here.  So the question

19   really is not the Court's familiarity with shared services

20   agreements but whether expert testimony will be relevant to

21   help the jury.

22       So, what is that expert evidence, Your Honor, and how did

23   this arise?  NexPoint is the obligor, the maker on a $30

24   million note -- I'm using round numbers -- and that note had

25   been paid down to some $24 million.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document Document   Page 89 of 238   Page 27 of 201   PageID 47472

8

1       The note purports to require a payment every year on

2   December the 31st.  And in the year 2020, although we argued

3   that the payment was prepaid, that payment was not made

4   timely.  It was made a couple weeks later, when Mr. Dondero

5   realized what had happened.

6       Our version, NexPoint's version of why this payment did

7   not happen has until recently been that the Debtor dropped the

8   ball.  Under the shared services agreement, and as Mr. Dondero

9   and Mr. Frank Waterhouse, the Debtor's former CFO, confirmed,

10  the Debtor was for years responsible to facilitate the annual

11  payment.  The Debtor didn't pay from its own funds.  It would

12  pay it from our funds.  But that was both in the contract and

13  that was the practice.  Again, Mr. Waterhouse -- and Your

14  Honor has seen in my papers and in his transcript -- confirmed

15  that it was reasonable for NexPoint to rely on the Debtor to

16  ensure that this payment would be made.

17      So Mr. Vasek, if we can pull up the shared services

18  agreement here.

19      I know that the Court likes to look at contracts, so I

20  will briefly take Your Honor through some of the pertinent

21  provisions, because this relates to directly to Mr. Pully.

22      And Mr. Vasek, if you'll please scroll down to the

23  definitions of Covered Person.

24      And Your Honor can read it for herself.  This is just a

25  definitional that we need as we go forward.   But Covered

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 32-21   Filed 09/02/22   Page 28 of 201   PageID 47473
Document   Page 9 of 238

9

1    Person means the staff and services provider.  That is

2    Highland.  That is the Debtor.  And it includes managers,

3    members, employees, et cetera.  Well, that would be Mr. Frank

4    Waterhouse.  Mr. Waterhouse at that time was the Debtor' chief

5    financial officer, and he was also an officer of NexPoint.  So

6    he, like many people here, wore two hats.

7         Mr. David Klos at that time was the controller for

8    Highland, and Ms. Kristin Hendrix was a senior accountant at

9    Highland.  Both Mr. Klos and Ms. Hendrix were providing the

10   services we're going to discuss.

11        If you'll scroll down, Mr. Vasek.

12        The next provision, Your Honor, relates to what services

13   were being provided.

14        Scroll up just a -- just a tad.

15        So you'll see under Section 2.02 the parties are now

16   agreeing here's the services that Highland will be provided.

17   And it's important to note, Your Honor, that at this time this

18   agreement was in place.  This agreement was terminated I want

19   to say at the end of February this year.  But in December and

20   November of 2020, this agreement was in place.

21        And if the Court looks at the services being provided, the

22   first one there is assistance and advice.  That word "advice"

23   is important.  Assistance and advice with respect to various

24   things.  And you see down there those things include finance

25   and accounting, payments, bookkeeping, cash management, cash

1   forecasting, accounts payable, et cetera.

2       Keep scrolling down, Mr. Vasek.  Obviously, as the Court

3   very well knows, the Debtor was also providing legal services.

4       And if you keep scrolling down, Mr. Vasek, to the next

5   page, there you go, to K and L.

6       These are more catch-all.  So if the language of what I

7   just showed you is not express or specific enough, here you

8   have these catch-alls, such as advice on all things ancillary

9   or incidental to the foregoing and advice relating to other

10  back- and middle-office services in connection with the day-

11  to-day business.

12      So, again, we're not here today, we're not asking the

13  Court to decide, nor do I think that it would be this Court to

14  decide, whether the Debtor had a duty to facilitate the

15  December payment.  I'm just pointing out that we have, I think

16  anyone would agree, at least a *prima facie* colorable argument

17  that the Debtor would have such duty.

18      And just to address an issue that the Debtor raised, Mr.

19  Vasek, if you'll scroll down to 6.01, and then if you'll zoom

20  in.

21      Here, now, Your Honor, is the language that is of

22  relevance, the direct relevance.  So we've seen that Covered

23  Person is defined, and we have seen that -- and we can now see

24  that this agreement requires Covered Person -- that includes

25  the Debtor; that includes Mr. Waterhouse; that includes Mr.

Case 21-03006-sgj    Doc 126    Filed 12/14/21    Entered 12/14/21 13:43:30    Desc Main
Case 3:21-cv-00881-X    Document 78-21    Filed 01/09/23    Page 30 of 201    PageID 47475

11

1    Klos -- to discharge its duties under this agreement.  We've

2    seen that there's certainly a colorable argument that the

3    duties under this agreement include facilitating payments and

4    advice with payments and accounts payable and the like, and

5    that the Debtor has to discharge its duties with the care,

6    skill, prudence, and diligence under the circumstances then

7    prevailing that a prudent person acting in a like capacity and

8    familiar with such matters would use in the conduct of an

9    enterprise of a like character and with like aims.

10        That, Your Honor, is what we need the expert on.  Not to

11   tell the jury what this contract says, not to tell the jury

12   that the Debtor had a duty, but to look at, under the facts,

13   did the Debtor's performance or lack thereof -- and I'll tell

14   you why that's important in a moment -- did that performance

15   or lack thereof comport with this standard of care?

16        This is a matter for an expert.  The average juror, the

17   average layperson, myself, I would not know what the care,

18   skill, prudence, and diligence of a reasonable prudent person

19   in this situation would be.  I can theorize on that.  I can

20   opine on that.  I'm not an expert on that.  This is a matter

21   for an expert, the same as with medical malpractice, legal

22   malpractice, breach of fiduciary duty.

23        While we're on this agreement, just to address another

24   argument that the Debtor makes, the Debtor says that this

25   agreement exculpates negligence.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 01/09/23   Page 31 of 201   PageID 47476

12

1        Mr. Vasek, if you'll please scroll down to the

2  exculpation.

3        And there is an exculpation provision.  But if Your Honor

4  -- and it does exculpate negligence.  It doesn't exculpate

5  gross negligence, et cetera.  But it talks about that only

6  acts or omissions -- it's Romanette (i) -- acts or omissions

7  arising out of or in connection with the conduct of the

8  business of the management company that is exculpated.  Again,

9  we're not here today to decide what this means, but the

10 business of NexPoint is not note-making; the business of

11 NexPoint is advising thousands of investors and funds with

12 respect to a billion dollars of investments.

13       It is -- the Debtor does have an argument, and either the

14 Court or the jury will have to decide whether this exculpation

15 provision applies.  And then if -- and you can remove this,

16 Mr. Vasek -- the Debtor likewise says that the agreement's

17 indemnification provision prohibits this argument.  We pointed

18 out in our briefing, Your Honor, that, in fact,

19 indemnification under Texas law does not apply to the parties

20 to the contract.  It applies to claims made by third parties.

21 But, again, that's an argument that the Debtor has.

22       So we have this contract in place.  Late November/early

23 December rolls around, and both Mr. Dondero and Mr. Waterhouse

24 testify that they had a meeting.  What was said at that

25 meeting is in dispute.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-12   Filed 01/09/23   Page 32 of 201   PageID 47477

13

1      Mr. Dondero believes that he told Mr. Waterhouse, stop

2    paying on the shared services agreement.  It's NexPoint's

3    position -- Your Honor knows we filed an administrative claim

4    -- it's NexPoint's position that it had overpaid millions of

5    dollars under the shared services agreement, in part because

6    many of the employees of the Debtor that we were supposed to

7    be paying our respective share of weren't there anymore.  So

8    Mr. Dondero says to Mr. Waterhouse, stop paying on this shared

9    services agreement.

10     Those are the facts as we knew them going into late

11    October.  Based on that fact, and based on the fact that the

12    Debtor did not facilitate the payment, we've always asserted

13    as an affirmative defense that our lender, who is also our

14    lawyer, who's also our accountant, who's also our treasury

15    management people, and who have always facilitated these

16    payments in the past, dropped the ball.  They committed simple

17    negligence, they dropped the ball, thereby causing the alleged

18    default.

19     We did not need an expert opinion on that at that time.

20    You've seen in my reply briefing, Your Honor, that, in fact,

21    the Fifth Circuit holds in multiple instances that when it's

22    simply a matter of missing a deadline -- a lawyer missing

23    limitations, if you will -- expert testimony is not required,

24    and in fact may be inappropriate because a lay person can

25    figure out that, a lay juror can figure out that, well, if you

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 176-12   Filed 01/09/23   Page 33 of 201   PageID 47478

14

1    just simply didn't do something, whether that's -- whether

2    that comports with the standard of care or not.

3         On October the 19th of this year, the Debtor and we

4    deposed Mr. Waterhouse.  And Mr. Waterhouse had a different

5    testimony.  He had a different recollection of that meeting.

6    Mr. Waterhouse said that Mr. Dondero told him in late November

7    or early December, don't make this NexPoint payment.  In other

8    words, that Mr. Dondero expressly said the payment that's

9    coming up for NexPoint, do not make this payment.

10        That was news to us.  I was so surprised by that testimony

11   that I actually asked Mr. Waterhouse that question four times.

12   And opposing counsel actually got angry at me, kept saying,

13   how many times are you going to keep asking this question?  I

14   was surprised.

15        I was not able to talk to Mr. Waterhouse meaningfully

16   before that.  Mr. Waterhouse has attorneys, Mr. Waterhouse is

17   in litigation with the Debtor, and those attorneys require

18   that I not communicate with him directly, I communicate only

19   through them.  I never took up the chance to ask them about

20   this meeting because the only information that I had and that

21   my client had was that there was no such instruction.  The

22   Debtor may or may not have been surprised as well.

23        Mr. Vasek, if you'll please pull up discovery.

24        Your Honor, we're sharing with you now certain of the

25   discovery in this case -- in particular, the Debtor's

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 176-21   Filed 05/09/22   Page 34 of 201   PageID 47479

15

1    responses.

2         And if you'll go to Interrogatory No. 1, Mr. Vasek.

3         So, Your Honor obviously can read this.  But I ask the

4    Debtor, if it contends that it was not responsible for making

5    payments under the note on NexPoint's behalf, please explain

6    the legal and factual basis for such contention.  I asked for

7    a factual basis as well.  And Your Honor can see in the

8    response that the Debtor objects, the Debtor says that it was

9    not required to make the payment, but nowhere here does the

10   Debtor say that it had received an instruction not to make the

11   payment.

12        Pardon me, Your Honor.

13        This was, I believe, from May or June.  In any event, it

14   was early in this litigation.  Nowhere here am I put on any

15   kind of notice that it's the Debtor's position that it

16   received an instruction not to make the payment.

17        If we scroll down to Request for Production, I believe

18   it's No. 1, Mr. Vasek.

19        Here, we -- I ask for all communications pursuant to which

20   the Debtor was advised or instructed not to make the payment

21   or to cause the payment to be made.  And the Debtor's answer

22   includes the following:  Any communications responsive to

23   Request for Production No. 1 were verbal.

24        Okay.  I had to await depositions.  That's fine.  I had

25   asked in an interrogatory, I didn't get a factual response,

Case 21-03006-sgj    Doc 126    Filed 12/14/21    Entered 12/14/21 13:43:30    Desc Main
Case 3:21-cv-00881-X    Document 178-12    Filed 01/09/23    Page 35 of 201    PageID 47480

16

1    and then I'm now being told that any communications were

2    verbal.

3        Now, the Debtor may not have known about Mr. Waterhouse's

4    instruction, it may not have, in which case I don't think it's

5    fair to accuse NexPoint or its counsel of dropping the ball.

6    Or the Debtor may have known of the instruction, in which case

7    the Debtor should have answered Interrogatory No. 1 factually

8    by saying, oh, wait, not only were we not required to make the

9    payment, et cetera, et cetera, but we received an instruction

10   from your boss, NexPoint, not to make the payment.

11       You can remove that.

12       So, here we go into October 19th.  We depose Mr.

13   Waterhouse.  We now see that, in fact, I guess it's -- I

14   forget who -- who the author is, but the plot has thickened.

15   The situation is now much more complicated.  Whereas

16   previously we argued that the Debtor had dropped the ball, the

17   question now is, okay, if in fact the jury believes that Mr.

18   Dondero went to Mr. Waterhouse and said, don't make this

19   payment, did that discharge the Debtor's duties as specified

20   by the contract or not?

21       It's our belief that it did not.  It's our belief that Mr.

22   Waterhouse should have, at a minimum, asked Mr. Dondero after

23   that, did I get you right, Jim?  Did I understand correctly?

24   Did you mean not to make this payment?  It's our belief that

25   the Debtor -- our legal advisers, our accountants, people that

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 176-21   Filed 01/09/24   Page 36 of 201   PageID 47481

17

1    are supposed to advise us -- should have called back and said,

2    Jim, you know that if you don't make this payment you're going

3    to have a note accelerated and it's going to be $24 million.

4    They should have advised Mr. Dondero of the potential

5    consequences, especially given their clear conflict of

6    interest.

7        At the same time, they're our lender to the tune of $24

8    million, and they're providing us all this assistance and

9    advice that we're paying millions and millions of dollars for.

10       And then also, if Mr. Dondero gave such an instruction,

11   did the Debtor have some duty to try to dissuade him by

12   saying, Jim, you're being a hothead, this is a very serious

13   matter, it's only $1.4 million, make the payment?  In fact, we

14   did make the payment in January, after this issue was learned

15   about.  But the Debtor didn't do any of those things.

16       So, again, the question now is, did the Debtor's lack of

17   any subsequent follow-up -- putting its head in the sand, so

18   to speak -- did that comport with the duties as specified,

19   what would a reasonable person discharging his or her duties

20   under the facts and circumstances in that industry then in

21   place, what should or would have such a reasonable person

22   done?  That's where Mr. Pully comes in.

23       I deposed Mr. Seery a few days after this deposition and I

24   asked him about this, and Mr. Seery said that no, in his view,

25   Mr. Waterhouse acted perfectly appropriately, that Mr.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 78-21   Filed 01/09/23   Page 37 of 201   PageID 47482

18

1    Waterhouse had no duty to seek clarification or explain the

2    ramifications or anything else.  And it was clear to me that

3    Mr. Seery is going to testify to that effect.

4         So at that point in time, now that we knew Mr.

5    Waterhouse's testimony, we decided that it is not only

6    advisable but perhaps necessary to retain an expert.  And we

7    moved very quickly.  I have had the fortune of working with

8    Mr. Pully before, so I knew him.  I was able to rapidly retain

9    him because of our prior familiarity with each other.  Mr.

10   Pully reviewed all the transcripts.  He reviewed the

11   discovery.  He prepared a full and final report.  So, from

12   beginning to end, we were done in maybe five weeks, maybe six

13   weeks.

14        And we're not proposing, Your Honor, that the Debtor

15   doesn't have whatever time it needs to prepare a rebuttal.

16   We're not proposing that the Debtor can't depose Mr. Seery

17   [sic].  Of course it can.

18        So where this adversary proceeding now is is that

19   discovery is over.  The Debtor will be filing by December the

20   17th a motion for summary judgment.  Your Honor will recall

21   that Your Honor approved a scheduling order on that.  And

22   there will be hearings before this Court on summary judgment,

23   and perhaps opposing counsel can remind me, but it's going to

24   be in late January, or I'm going by memory here, maybe early

25   February.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 78-21   Filed 01/09/24   Page 38 of 201   PageID 47483

19

1    So that is, Your Honor, what happened.  That is how it

2    happened.  It's the truth.  It's -- there's no laying behind

3    the log here.  There's no litigation decisions that are now

4    backfiring and we're trying to get out of them.  What happened

5    here is exactly what should happen in a lawsuit like this,

6    where discovery has illuminated various issues and now we have

7    to deal with the consequences of that discovery as we prepare

8    for trial.

9         October the 29th was the date in the scheduling order to

10   disclose experts and provide their reports.  Mr. Pully

11   couldn't even hypothetically do that in time since I had

12   retained him a few days before that.  But we moved very

13   quickly to file this motion, to file it before the deadline

14   actually expired, in hopes, again, of not -- not only of

15   showing Your Honor that we moved diligently and rapidly when

16   this issue unfolded, but also that we didn't need *nunc pro*

17   *tunc* relief.

18        So, Rule 16 does apply.  The good cause requirement does

19   apply.  But this is not some talismanic super-high burden to

20   meet.  Yes, there's a burden.  Yes, I must demonstrate to Your

21   Honor why leave based on good cause is required.  But we're

22   not trying to unscramble the eggs, and we're not seeking

23   something extraordinary or exotic here.

24        The Fifth Circuit has specified the four factors that the

25   Court should look at.  In the Fifth Circuit cases that we've

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-12   Filed 12/09/88   Page 39 of 201   PageID 47484

20

1   seen and that we've briefed, the deadline had already expired

2   and the people were seeking *nunc pro tunc* relief.  I don't

3   think we have that high of a burden here, but even if we do,

4   we've analyzed those four factors.

5        And the first factor is the explanation for the lateness.

6   Again, did NexPoint act diligently?  Did NexPoint hide behind

7   the log?  Is there some litigation strategy here that has

8   backfired?  None of that, Your Honor, is present.  There's

9   been no delay.  We deposed, pursuant to agreed deposition

10  schedules, we deposed all of the main witnesses in October.

11  When we deposed Mr. Waterhouse, this issue arose.  We moved as

12  rapidly as we could thereafter.  And you've seen, Your Honor,

13  in the interrogatory answer, that if the Debtor knew about

14  this instruction, then, really, the Debtor should have

15  answered its interrogatory to say, we got an instruction not

16  to pay and that's why we didn't pay.

17       Maybe the Debtor -- maybe the Debtor didn't know that.

18  But when we deposed Mr. Klos and Ms. Hendrix, who are still

19  employees of the Debtor, they testified that they heard Mr.

20  Waterhouse tell them that in late November last year.  So they

21  -- they testified that in late November last year Frank

22  Waterhouse told them, Jim Dondero told me, don't make this

23  payment.

24       So, even if the Debtor didn't know what Mr. Waterhouse

25  would testify to, Mr. Klos and Ms. Henderson [sic] did.

1       Again, I am not pointing the fingers here at the Debtor.

2  I'm not saying that their answer to Interrogatory No. 1 was

3  manipulative, that it was calculated to deceive.  I'm not

4  suggesting that.  I'm just suggesting that, had the Debtor

5  given a more fulsome answer, we would have immediately

6  investigated and immediately retained an expert back in May or

7  June of this year.

8       The next element, or the next factor, rather, is the

9  importance of this extension.  And Your Honor, we have quoted

10  at length Fifth Circuit opinions that say that when the

11  standard of care is involved, expert opinion is appropriate

12  and may be required.

13      It goes back to, again, if the Debtor just dropped the

14  ball and didn't facilitate the payment, that's easy.  That

15  doesn't need an expert.  But if the Debtor was instructed by

16  Mr. Dondero not to make the payment and there was a month left

17  before the payment was to be made, did the standard of care as

18  specified in the contract require the Debtor to do something

19  that it failed to do?

20      So we are talking about the standard of care.  That is

21  appropriate expert testimony.  It may be required.  And it is

22  not something that I can argue to a lay juror just based on a

23  deadline being missed.

24      So, yes, this -- the relief we're seeking is important,

25  especially given the jury nature of this trial.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-12   Filed 12/16/21   Page 41 of 201   PageID 47486

22

1        The third factor is the potential prejudice.  So, the

2   Debtor says, well, this will increase costs.  Yes, it will.

3   But costs alone is not the legally -- the legal standard here.

4   Every litigation has costs.  Every litigation has burdens.

5   And if the Debtor prevails in this lawsuit, they will claim

6   attorneys' fees and costs.  They're entitled to that under the

7   note and under Texas law.

8        So there will be an incremental cost for the Debtor to

9   retain an expert, but that would have been present as of

10  October the 29th anyway.

11       Remember, I filed this motion on the deadline.  We're

12  seeking six weeks of delay here.  This is not late-stage

13  litigation where all the facts are known, all the witnesses

14  have been deposed, everyone's ready for trial, and suddenly a

15  party seeks to increase its opponent's litigation costs here

16  with a last-second expert.  This is not that case.

17       So, there is no prejudice, at least not in the legally

18  relevant way by way of costs, nor is there any prejudice by

19  delay.  And this also ties into the fourth factor, which

20  discusses a continuance.  There is no prejudice here because

21  we're not trial-set.  We don't know when we're going to be

22  trial-set.

23       Even if the Court denies summary judgment in whole or in

24  part at the end of January or early February -- which I don't

25  think that's very realistic because I think the Court is going

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 78-12   Filed 01/09/24   Page 42 of 201   PageID 47487

23

1    to want to think about it some, the Court is going to want to

2    prepare a report and recommendation -- this is not going to be

3    a straightforward summary judgment proceeding.

4        What is also out there is that the Debtor has filed a

5    motion to consolidate all these note cases in front of one

6    District Court judge.  That's going to have to be reviewed by

7    the District Court judges and ruled on.

8        So we are months, months away from being trial-ready, and

9    then we don't know how long it's going to be before we're up

10   for a week or two long jury trial.  No one knows that.  That

11   is plenty of time for the Debtor to get a rebuttal expert.

12   It's plenty of time for the Debtor to depose Mr. Pully.  It's

13   plenty of time for everything to come to play so that this

14   case will be certified trial-ready, irrespective of whether

15   there's an expert or not.  This is not going to delay the

16   process.  We're not seeking to delay the process.

17       Nor are we seeking to derail the summary judgment

18   proceedings.  If the Debtor wants to retain an expert for

19   summary judgment proceedings, that just proves that there is a

20   question of fact here that precludes summary judgment.

21       But as far as continuance or trial-setting, that's just

22   not present here.

23       And I've quoted Your Honor at length a District Court's

24   opinion from the Eastern District of Texas that talks about

25   prejudice, that talks about costs.  And that judge basically

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 12/06/23   Page 43 of 201   PageID 47488
Document   Page 42 of 88

24

1   said, look, when it's -- when it's an affirmative defense that

2   you've known that since the beginning, which the Debtor has

3   known here since the beginning, then, really, it's not a last-

4   second tactic.  It's not real prejudice.  Yeah.  Yeah, there's

5   a delay.  Yeah, there's an increased cost.  But the plaintiff

6   is now trying to fundamentally change this lawsuit, to

7   fundamentally interject something new here.  The plaintiff

8   just needs some more time.  And the question is, should the

9   plaintiff have more time?

10       Your Honor, those are the factors.  We have -- we have the

11   exhibits.  We have the record prepared.  It's a part of the

12   motion and the Debtor's response.  And Your Honor, we ask that

13   the Court grant this motion -- again, reminding the Court that

14   this does relate to an affirmative defense that's been around

15   since the beginning.  It does relate to one that was -- only

16   -- only really became the subject of expert testimony in late

17   October.  And it's only because discovery in this case worked

18   as it should.  No one laid behind the log.  No one made a

19   calculated decision that has backfired.  No one delayed

20   anything or was less than diligent.

21       Under these circumstances, Your Honor, because the point

22   of a trial in front of a jury is to get to the truth and it's

23   to enable the jury to have what it needs to make a true, full,

24   and informed decision, we believe that good cause exists, and

25   we'd ask -- NexPoint would ask that the Court grant this

1   motion.

2           THE COURT:  All right.  Thank you.

3       I'll ask Mr. Aigen, does he have anything he wants to

4   supplement with?

5           MR. AIGEN:  Yes, Your Honor.  I can make a very quick

6   argument here.

7       As you know, HCMS and HCRE have filed a joinder, asking

8   for the same relief.  The only thing I want to quickly point

9   out is that the only difference between our clients and Mr.

10  Rukavina's client is the lack of a written services agreement.

11  But I would point out, as the evidence we submitted in our

12  briefing shows, the undisputed testimony is that there was an

13  oral agreement to provide these services, that the Debtor did

14  provide these same exact services that they provided from --

15  for NexPoint to HCMS and HCRE, that they had done this for

16  years, and this included making loan payments.

17      So I just wanted to point that out, and I think what this

18  means is that, for the same reasons that Mr. Rukavina asked

19  for this relief, we believe we are entitled to the same

20  relief.  And I won't bother to go through all the same

21  arguments that Mr. Rukavina just made to the Court.  So that's

22  all I have, Your Honor.

23          THE COURT:  All right.  Thank you.  Ms. Winograd?

24          MS. WINOGRAD:  May it please the Court?

25          THE COURT:  You may proceed.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 176-12   Filed 12/20/23   Page 45 of 201   PageID 47490

26

1          MS. WINOGRAD:  Your Honor, the motion should be

2     denied because there is no good cause for modifying the

3     scheduling order.  The motion is untimely.  The expert

4     testimony Defendants seek to gather is both improper and

5     irrelevant.  And if the motion is granted, Highland will be

6     prejudiced.

7          This is -- this adversary -- adversary proceeding is a

8     garden-variety collection action on a simple note, it has been

9     going on for roughly a year, and it continues to get delayed

10    due to unnecessary and costly motion practice.  Defendants'

11    latest motion is not only another delay tactic, but it is also

12    completely unsupported.

13         And before I tell you why it is unsupported, I want to

14    take a step back and just summarize the context of Defendants'

15    motion.  Defendants have always and continue to assert the

16    same affirmative defense, which is that their default under

17    the note was the result of Highland's negligence under the

18    shared services agreement.  It is Defendants' position that

19    before Mr. Waterhouse's deposition an expert was not needed to

20    testify regarding Highland's duties under the shared services

21    agreement.

22         Mr. Waterhouse then testified that Mr. Dondero gave him

23    instruction not to make a payment under the note.  It is now

24    Defendants' contention that, solely in light of this

25    testimony, all of a sudden an expert is needed to testify

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-12   Filed 12/09/88   Page 46 of 201   PageID 47491

27

1   regarding whether Highland owed an affirmative duty under that

2   same shared services agreement to ask Mr. Dondero if he

3   understood the implications of his instruction, and if so, if

4   Highland breached such a purported duty.

5        First of all, Your Honor, based on the clear terms of the

6   shared services agreement, there is no affirmative duty for

7   Highland to ask Mr. Dondero if he understood the implications

8   of his own instruction.

9        Moreover, Your Honor, the question of what Highland's

10  duties are is a legal issue reserved for the Court, and the

11  issue of whether Highland breached -- and Highland submits

12  there was no such breach -- but that issue is reserved for the

13  jury.

14       Your Honor, if expert testimony wasn't needed before, it

15  is not needed now.

16       This Court entered a scheduling order in September of

17  2021.  Under Rule 16(b) of the Federal Rules of Civil

18  Procedure, an existing scheduling order can only be modified

19  upon a showing of good cause.  The purpose of Rule 16 is for

20  the Court to prevent unforeseeable and never-ending litigation

21  expenditures.

22       So the critical question before Your Honor today is

23  whether there is good cause to modify the scheduling order.

24  And Highland submits there is not.

25       Courts consider four general factors to determine whether

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 78-12   Filed 01/09/23   Page 47 of 201   PageID 47492

28

1    there's good cause.  It's the party's explanation for failing

2    to previously identify the witness.  It's the importance of

3    the witness's testimony.  And it's the prejudice to the other

4    side in allowing the testimony.  All of these factors weigh in

5    favor of denying the motion.

6         Regarding the first factor, Defendants' explanation for

7    failing to previously identify the witness is entirely without

8    merit.  Again, NexPoint first raised its affirmative defense

9    that its default under the note was the result of Highland's

10   own negligence back in March of 2021.  In other words,

11   NexPoint had nine months to retain an expert to testify

12   regarding Highland's duties for nine months.

13        NexPoint seeks to create -- to distinguish between these

14   notions of Highland somehow, quote, dropping the ball versus

15   Highland not asking Mr. Dondero if he understood the

16   implications of his own instruction.  Defendants cite no

17   authority in support of the notion that one of these factual

18   circumstances would somehow require an expert but that the

19   other would not.

20        What this comes down to, Your Honor, is that Defendants

21   are using this testimony as an excuse to muddy the water, to

22   muddy the waters as to the critical issues in this case and as

23   a latch-ditch attempt to bolster their defense.

24        I don't want to bog you down with case law that's already

25   cited in our brief, but I want to flag a particularly on-point

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 12/16/22   Page 48 of 201   PageID 47493
Document   Page 29 of 88

29

1    case, and that is *Reliance*, 110 F.3d at 257.  The Fifth

2    Circuit affirmed the lower court's denial of a party's motion

3    to modify the scheduling order when that -- when a deposition

4    didn't go well, specifically holding District Courts have the

5    power to control their dockets by refusing to give ineffective

6    litigants a second chance to develop their case.

7         The suggested expert testimony also is improper as a

8    matter of law.  It is well-settled law in the Fifth Circuit

9    that an expert cannot testify regarding the scope of a party's

10   contractual duties under an agreement and whether that party

11   fulfilled such duties.  And that is exactly what NexPoint and

12   Defendants are trying to do here.  It is trying to have its

13   expert interpret the terms of a shared services agreement and

14   testify regarding Highland's duties thereunder and ultimately

15   whether it thinks Highland breached those duties.

16        This is an improper subject for expert testimony and

17   precisely the type of expert testimony that the Northern

18   District of Texas rejected in *Panhandle* and which the Fifth

19   Circuit affirmed the rejection of in *Askanase*, two cases cited

20   in our papers.

21        Even if the suggested expert testimony were proper, which

22   it is not, it is also irrelevant.  In order to be relevant,

23   expert testimony must assist the trier of fact understand a

24   complex or distinct issue in a case.  Here, the critical issue

25   for Defendants is whether they can prove that their default

Case 21-03006-sgj    Doc 126    Filed 12/14/21    Entered 12/14/21 13:43:30    Desc Main
Case 3:21-cv-00881-X    Document 78-12    Filed 01/09/23    Page 49 of 201    PageID 47494

30

1   under the note was the result of Highland's negligence.  This

2   issue is well within the common understanding of a lay person.

3       Again, this is a garden-variety collection action.  All of

4   the cases NexPoint cites in its papers in support of the

5   notion that expert testimony is required, all of those cases

6   involve professional malpractice cases, whether legal or

7   medical.  And in those cases, an expert was required to

8   testify regarding the general standard of care in a particular

9   industry.

10      Here, NexPoint doesn't seek to have an expert testify

11  regarding the general standard of care in a particular

12  industry.  That is not an issue in this case.  And this

13  certainly is not a professional malpractice case.

14      NexPoint seeks to have its expert opine as to the scope of

15  Highland's legal duties in a shared services agreement and

16  ultimately whether Highland breached the purported duties,

17  which, again, we submit it did not.

18      The other case NexPoint cites to, *In re Schooler,* that

19  case also doesn't support Defendants' position, and in fact

20  supports Highland's position.  In that case, the Fifth Circuit

21  noted, and I quote, Expert testimony is not needed in many, if

22  not most, cases.

23      I also want to briefly address NexPoint's argument raised

24  for the first time in its reply that Highland was also acting

25  as an attorney to Defendants during this time.  As a

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 178-21   Filed 01/09/24   Page 50 of 201   PageID 47495

31

1    procedural matter, this argument is entirely improper because

2    it is not proper to raise an argument for the first time in a

3    reply.

4         And on the merits, again, this is not a professional

5    malpractice case.  So for these reasons alone, such a

6    contention should be summarily disregarded by the Court.

7         Finally, Your Honor, Highland would suffer prejudice if

8    the motion is granted because it would be forced to expend

9    significant and costly resources responding to the testimony

10   in the form of retaining a rebuttal expert, taking and

11   defending additional depositions, and engaging in more motion

12   practice.  This would be a waste of resources for both parties

13   and for the Court because this testimony isn't ultimately

14   going to be needed at trial.

15        It is improper because it opines as to the ultimate legal

16   issues in this case that are reserved for the Court and then

17   for the jury.  And it is also irrelevant because all of the

18   issues in this case are well within the common understanding

19   of a lay person.

20        I also want to note that HCRE and HCMS's motions asking

21   for the same relief are equally if not more frivolous than

22   NexPoint's because HCMS and HCRE aren't even parties to the

23   shared services agreement.  To the extent HCMS and HCRE are

24   asking an expert to testify regarding Highland's alleged

25   duties under an oral agreement, the terms of which are

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 76-21   Filed 01/29/24   Page 51 of 201   PageID 47496

32

1    unknown, such a contention is frivolous on its face.

2         But even if such an alleged oral agreement exists, which

3    it does not, this does not change the Rule 16(b) analysis.

4    The Defendants fail to show good cause for modifying the

5    scheduling order.

6         In brief, Your Honor, this motion is simply a delay

7    tactic, the expert testimony is improper, and the motion

8    should be denied.  Thank you.

9              THE COURT:  Thank you.

10        All right.  Movants get the last word.  Mr. Rukavina,

11   anything further?

12             MR. RUKAVINA:  Yes, Your Honor.  Most of what

13   opposing counsel says is the topic of a *Daubert* issue.  We're

14   not seeking to prejudice *Daubert* today, and they have every

15   ability in the future to argue that Mr. Pully's testimony

16   should not be admissible.

17        Second, this is not a garden-variety case.  It is not.  It

18   is a case where, again, our lender was also our officer, was

19   providing all kinds of payment services, accounting services,

20   and legal services.  It may not be unique, it may not have

21   never happened before, but it is not a garden-variety.

22        I do take issue with the notion that there has been any

23   delay in this case.  That is not correct.  I just looked at

24   the docket again to refresh my memory.  We had a contested

25   hearing on my motion to withdraw the reference that the Debtor

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 78-21   Filed 03/09/22   Page 52 of 201   PageID 47497

33

1    objected to, arguing that 542 was a core matter.  Your Honor

2    rejected that argument, and Your Honor agreed with me, as did

3    the District Court, that the reference will be withdrawn when

4    this trial -- when this case is certified trial-ready.

5        So the notion that there has been delay, intentional delay

6    by us, that this is a matter of delay, is absolutely wrong.

7    In fact, this lawsuit has gone on quickly.  It's been handled

8    professionally.  Both sides have been cooperative, giving each

9    other various accommodations.  And I am proud, I think, of how

10   every lawyer has handled themselves in this lawsuit.  To

11   suggest delay or intentional delay is wrong.

12       On the law, Your Honor, *In re Schooler*, I heard counsel

13   argue that it's just illogical and wrong to argue that an

14   expert wasn't required in one situation but now is.  But

15   that's *In re Schooler*, the Fifth Circuit, Your Honor, 725 F.3d

16   498, that I quote at length from.  That's one where the

17   trustee dropped the ball, a Chapter 7 trustee failed to give

18   property of the estate.  And that's the one where the Fifth

19   Circuit does say, Accordingly, we have explained that, as a

20   general rule, expert testimony is not needed in many, if not

21   most, cases.  And then the Fifth Circuit says that, It

22   requires no technical or expert knowledge to recognize that

23   she -- the trustee -- affirmatively should have undertaken

24   some form of action to acquire for the bankruptcy estate the

25   assets to which it was entitled.

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 76-21   Filed 01/09/23   Page 53 of 201   PageID 47498

34

1      But, again, this is not that case.  This was that case

2  before Mr. Waterhouse testified, and now it's not.  This is

3  not a case anymore where the debtor simply dropped the ball,

4  as did that trustee, or as does the doctor who amputates the

5  wrong leg, or as does the lawyer who misses a limitations

6  deadline.  This is now a case where, if the jury believes Mr.

7  Waterhouse, the plot has thickened.

8      And finally, Your Honor, again, I'm not here to point

9  fingers, but look at the Debtor's response to Interrogatory

10  No. 1.  All that the Debtor needed to say six or seven months

11  ago to avoid this delay is that, oh, wait, we received an

12  instruction not to pay.  It would have taken ten words, one

13  sentence, by the Debtor to fully answer an interrogatory and

14  this motion would not have been necessary.

15      Thank you.

16          THE COURT:  All right.  Mr. Aigen, anything further

17  from you?

18          MR. AIGEN:  No, nothing further, Your Honor.  We just

19  join in Mr. Rukavina's reply points.

20          THE COURT:  All right.  As I understand it, the

21  deadline was October 29th for disclosure of experts, and the

22  record shows that at 5:22 p.m. on October 29th the Defendants

23  -- let me double-check that.  That was actually the

24  declaration of Mr. Rukavina.  No, 5:22 p.m. on the deadline,

25  the motion of the Defendant to extend the expert disclosure

1    and discovery deadlines was filed.

2         The legal authority that governs here is Rule 16(b).  As

3    everyone has acknowledged, it provides that deadlines in

4    scheduling orders may be modified for good cause.  I think the

5    standard does apply here.  While I guess a lot of the cases

6    analyze it in terms of a request after a deadline has expired,

7    I think a motion on the day of the deadline at 5:22 p.m. is

8    going to be governed by Rule 16(b).

9         So, as the parties have argued to the Court, the Fifth

10   Circuit has specified four factors in guiding a decision in

11   this situation:  the explanation for failure to timely move

12   for leave to amend; the importance of the amendment; potential

13   prejudice in allowing the amendment; and availability of a

14   continuance to cure such prejudice.

15        Here, as I think everyone readily acknowledges, these

16   Defendants have always asserted as a defense that the Debtor

17   dropped the ball, I think was one phrase used.  That, in any

18   event, it was the fault of the Debtor that the Defendants did

19   default on the payment of these notes.  I do not think the

20   sudden statement of Frank Waterhouse suddenly is a game-

21   changer that creates some new need for an expert.  So,

22   therefore, looking at the factors, I don't think the

23   explanation here to extend the deadlines has merit.

24        Moreover, as far as the importance of the amendment,

25   Factor No. 2, I think it is appropriate to look at the big

Case 21-03006-sgj   Doc 126   Filed 12/14/21   Entered 12/14/21 13:43:30   Desc Main
Case 3:21-cv-00881-X   Document 78-21   Filed 06/01/22   Page 55 of 201   PageID 47500

36

1   picture here a little bit, even though we're not in a *Daubert*

2   situation, and look at what the expert is argued to be needed

3   for.  And I do not think an expert can testify about

4   contractual duties and attempt to interpret its provisions.

5   That is the job of the Court, and I think it is improper

6   subject matter for an expert.

7        I don't buy into any notion that this is terribly unique

8   territory or exotic.  I mean, it was a contract.  Shared

9   services agreements are not all that unique, shall we say?

10  It's not a device that is used solely in the investment

11  advisor fund world.  It's in the corporate world generally.

12  Courts see these in all kinds of cases.  So, again, I don't

13  think contract interpretation needs an expert here or should

14  have an expert here.

15       And just because experts are sometimes -- often, I should

16  say -- appropriate in legal malpractice or medical malpractice

17  or other kinds of tort cases where duties might be needing of

18  elaboration, here, the contract spells out the duties, and I

19  just don't think any of those cases argued are applicable.

20       Prejudice, I do think there is potential prejudice in

21  allowing an extension of this deadline.  It will be costly,

22  add a layer of expense and delay to this litigation, when I

23  don't think it would be admissible at trial ultimately.

24       So the motions are denied.

25       Ms. Winograd, could you please prepare a form of order?

1  It can be a simple form of order.  Run it by opposing counsel

2  before you upload it, please.  All right?

3          MS. WINOGRAD:  Yes, Your Honor.

4          THE COURT:  Thank you.  We're adjourned.

5          MS. WINOGRAD:  Thank you.

6          THE CLERK:  All rise.

7       (Proceedings concluded at 11:47 a.m.)

8                        --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                     CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        **12/13/2021**

24  _____     _____

25  Kathy Rehling, CETD-444                        Date
   Certified Electronic Court Transcriber

38

INDEX

PROCEEDINGS                                                          4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                            34

END OF PROCEEDINGS                                                 37

INDEX                                                              38

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-01010-E |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |

1

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-03004-sgj |
| § | |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-00881-X |
| § | |
| HIGHLAND CAPITAL MANAGEMENT FUND § | |
| ADVISORS, L.P., § | |
| § | |
| § | |
| Defendant. § | |
| § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-03005-sgj |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-00880-C |
| NEXPOINT ADVISORS, L.P., JAMES § | |
| DONDERO, NANCY DONDERO, AND § | |
| THE DUGABOY INVESTMENT TRUST, § | |
| § | |
| Defendants. § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-03006-sgj |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-01378-N |
| HIGHLAND CAPITAL MANAGEMENT § | |
| SERVICES, INC., JAMES DONDERO, § | |
| NANCY DONDERO, AND THE DUGABOY § | |
| INVESTMENT TRUST, § | |
| § | |
| Defendants. § | |

---------------------------------------------------------------

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| | § |
| Plaintiff, | §     Adv. Proc. No. 21-03007-sgj |
| | § |
| vs. | § |
| | § |
| | §     Case No. 3:21-cv-01379-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint | § |
| Real Estate Partners, LLC), JAMES | § |
| DONDERO, NANCY DONDERO, AND | § |
| THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| | § |
| Defendants. | § |

---------------------------------------------------------------

### HIGHLAND CAPITAL MANAGEMENT, L.P.'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT IN NOTES ACTIONS

Highland Capital Management, L.P. ("<u>Highland</u>", the "<u>Reorganized Debtor</u>", or "<u>Plaintiff</u>"), the reorganized debtor in the above-captioned chapter 11 case (the "<u>Bankruptcy Case</u>") and plaintiff in the above-referenced adversary proceedings (each, an "<u>Adversary Proceeding</u>" and collectively, the "<u>Adversary Proceedings</u>" or "<u>Notes Actions</u>"), respectfully files this motion (the "<u>Motion</u>") seeking entry of an order, in substantially the form attached hereto as **Exhibit A**, granting partial summary judgment in favor of Highland on its First and Second Claims for Relief set forth in the Notes Actions for the above-captioned defendants' (the "<u>Defendants</u>") (i) breach of contract for Defendants' failure to pay amounts due and owing under certain Notes,[1] and (ii) turnover pursuant to 11 U.S.C. § 542(b) for turnover by Defendants to Highland an amount equal to all amounts due and owing under the Notes.

The Motion is made pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure, Rules 7056-1 and 9014-1 of the

---

[1] Terms not defined herein shall take the meanings ascribed thereto in *Highland Capital Management, L.P.'s Brief in Support of Motion for Partial Summary Judgment in Notes Actions* (the "<u>Brief</u>").

Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas

(the "Local Bankruptcy Rules"), and Rules 56.1 through 56.7 of the Local Civil Rules for the

United States District Court for the Northern District of Texas (the "Local Civil Rules").  The

Motion is based on the records in the Bankruptcy Case and the Notes Actions, the Brief, the

*Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial*

*Summary Judgment in Notes Actions* (the "Appendix"), the *Declaration of David Klos in Support*

*of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions*

(the "Klos Declaration"), and such further evidence as may be presented at or prior to the hearing

on the Motion.  Each of the matters required under Rule 7056-1(c)(1) of the Local Bankruptcy

Rules and Rule 56.3(a) of the Local Civil Rules is set forth in the Brief.

WHEREFORE, Highland prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)    On its Second Claim for Relief, ordering turnover by Defendants to Highland of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)   Ordering such further and additional relief as the Court deems just and appropriate.

Dated:  December 17, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

―――――――――――――――――――――――――――――――――――

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| vs. | § | |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | Case No. 3:21-cv-01010-E |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

―――――――――――――――――――――――――――――――――――

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03004-sgj |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-00881-X |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

―――――――――――――――――――――――――――――――――――

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03005-sgj |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-00880-C |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

―――――――――――――――――――――――――――――――――――

1

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P., §
§
Plaintiff, §                    Adv. Proc. No. 21-03006-sgj
§
vs. §
§
HIGHLAND CAPITAL MANAGEMENT §
SERVICES, INC., JAMES DONDERO, §          Case No. 3:21-cv-01378-N
NANCY DONDERO, AND THE DUGABOY §
INVESTMENT TRUST, §
§
Defendants. §

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P., §
§
Plaintiff, §                    Adv. Proc. No. 21-03007-sgj
§
vs. §
§
HCRE PARTNERS, LLC (n/k/a NexPoint §      Case No. 3:21-cv-01379-X
Real Estate Partners, LLC), JAMES §
DONDERO, NANCY DONDERO, AND §
THE DUGABOY INVESTMENT TRUST, §
§
Defendants. §

---------------------------------------------------------------

## ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT, L.P.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT IN NOTES ACTIONS

This matter having come before the Court on the Motion for *Partial Summary Judgment*

*in Notes Actions* (the "Motion")[1] filed by Highland Capital Management, L.P. ("Highland", the

"Reorganized Debtor", or "Plaintiff"), the reorganized debtor in the above-captioned chapter 11

case (the "Bankruptcy Case") and plaintiff in the above-referenced adversary proceedings (each,

an "Adversary Proceeding" and collectively, the "Adversary Proceedings" or "Notes Actions");

and the Court having considered (a) Highland's Motion, its Brief, the Klos Declaration, and the

evidence submitted in support of the Motion, (b) all responses to the Motion and any evidence

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Motion.

submitted in support of such responses, (c) all replies and other materials filed in connection with the Motion, and (d) the arguments presented by counsel at the hearing on the Motion; and the Court having jurisdiction over this matter; and venue of the Motion being proper; and adequate notice of the Motion having been given; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS:**

1.      The Motion is **GRANTED** as set forth herein.

2.       On its First Claim for Relief, Highland is entitled to damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses).

3.      On its Second Claim for Relief, Defendants are ordered to turn over to Highland, pursuant to 11 U.S.C. § 542(b), an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to Highland's costs of collection (including all court costs and reasonable attorneys' fees and expenses).

### End of Order ###

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---------------------------------------------------------------

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-01010-E |
| | § | |
| Defendants. | § | |
| | § | |

---------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

          Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.,

          Defendant.

Adv. Proc. No. 21-3004

Case No. 3:21-cv-00881-X

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

          Plaintiff,

vs.

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

          Defendants.

Adv. Proc. No. 21-3005

Case No. 3:21-cv-00880-C

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

          Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

          Defendants.

Adv. Proc. No. 21-3006

Case No. 3:21-cv-01378-N

| | § | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | Adv. Proc. No. 21-3007 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-01379-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint | § | |
| Real Estate Partners, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVID KLOS IN SUPPORT OF
## HIGHLAND CAPITAL MANAGEMENT L.P.'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT IN NOTES ACTIONS

I, David Klos, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.      I am the Chief Financial Officer ("CFO") of the reorganized Highland Capital

Management, L.P. ("Highland"), and I submit this Declaration in support of *Highland Capital*

*Management, L.P.'s Motion for Partial Summary Judgment in Notes Actions* (the "Motion"). This

Declaration is based on my personal knowledge. I could and would testify to the facts and

statements set forth herein if asked or required to do so.

2.      I joined Highland in 2009 and served as Controller from 2017 to 2020 and Chief

Accounting Officer from 2020 to February 2021. At all relevant times, I reported to Frank

Waterhouse until he left the company in February 2021. I was appointed CFO in March 2021

following confirmation of Highland's Plan.[1]

---

[1] Capitalized terms not defined herein shall have the meanings ascribed in the Motion.

**A.**   **NexPoint Advisors, LP's ("NexPoint") Prepayment Defense**

3.      I understand that NexPoint contends that it had no obligation to make the Annual Installment payment due on December 31, 2020 under the NexPoint Note because it "pre-paid." Two documents show that NexPoint is mistaken.

4.      The first document is the NexPoint Note, a true and correct copy of which is attached hereto as **Exhibit A**.[2]  Under the NexPoint Note, NexPoint was required to make "Annual Installment" payments on December 31 of each year equal to (i) all unpaid accrued interest, *plus* (ii) 1/30th of the outstanding principal amount of the NexPoint Note.  **Exhibit A ¶**2.1.

5.      NexPoint was permitted to make "prepayments" under the NexPoint Note.  Section 3 of the NexPoint Note sets forth NexPoint's agreement concerning the treatment of "prepayments" and provides:

> 3.  Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.**

**Exhibit A ¶** 3 (emphasis added).

6.      The second relevant document is an amortization schedule (the "Amortization Schedule") that was prepared and maintained in the ordinary course of Highland's business, a true and correct copy of which is attached hereto as **Exhibit B**.[3]  I understand that the Amortization Schedule is the only document that NexPoint relies upon to support its "prepayment defense."

7.      The Amortization Schedule shows, among other things, the following:

---

[2] The NexPoint Note is also included as Highland's Ex. 2 (Exhibit 1),

[3] The Amortization Schedule is also included as Highland's Ex. 200.

- The "Interest Accrual" column shows the periodic interest that accrued under the NexPoint Note between the dates described in the "Date" column;

- The "Total Paid" column shows the amount NexPoint paid against the NexPoint Note[4]; and

- The "Interest Paid" and "Principal Paid" columns show how each payment was applied.

8.      As the Amortization Schedule shows, (a) between October 20, 2017 and August 13, 2019, NexPoint made twelve (12) payments that could broadly be characterized as unscheduled "prepayments" of principal and/or interest (the "Prepayments")[5], and (b) with one exception, each of the Prepayments was applied first to reduce or eliminate all accrued and outstanding interest and then to unpaid principal, as required by Section 3 of the NexPoint Note.[6]

9.      As can also be seen on the Amortization Schedule, **notwithstanding the Prepayments**, NexPoint was still required to make additional payments against the NexPoint Note in December of 2017, 2018, and 2019, in order to reduce "Accrued Interest" to $0 as of December 31 in each year[7] as required by Section 2.1 of the NexPoint Note, which it did in each instance.

10.      Indeed, even though NexPoint made six (6) Prepayments totaling $6.38 million between March 29 and August 13, 2019, NexPoint was still required to pay $530,112.36 to fully

---

[4] Note that for the interest payment made December 30, 2019, interest of $530,112.36 was paid in cash and is reflected on the "Interest Paid" column. The amount is omitted from the "Total Paid" column but has no bearing on the actual calculations contained in the Amortization Schedule. For avoidance of doubt, $530,112.36 of interest was paid to Highland from NexPoint on December 30, 2019.

[5] For the avoidance of doubt, NexPoint made the Prepayments on October 20, 2017, April 10, 2018, May 1, 2018, May 9, 2018, September 5, 2019, September 21, 2019, March 29, 2019, April 16, 2019, June 4, 2019, June 19, 2019, July 9, 2019, and August 13, 2019. *See generally* Ex. B.

[6] The exception is the Prepayment made on May 9, 2018, which prepaid approximately six (6) months of future interest.

[7] NexPoint made payments against the NexPoint Note on December 5, 2017, December 18, 2018, and December 30, 2019, respectively, which reduced "Accrued Interest" to $0 as of December 31 in each of those years in order to comply with Section 2.1 of the NexPoint Note.

satisfy its obligation to make the unpaid interest portion of the Annual Installment payment due as of December 31, 2019, which it did.

11.    As the Amortization Schedule shows, NexPoint did not make any Prepayments on account of the NexPoint Note in 2020.  Thus, as of December 31, 2020, NexPoint was required to make an Annual Installment payment on December 31 equal to  (i) all unpaid accrued interest, *plus* (ii) 1/30th of the outstanding principal amount of the NexPoint Note (the "2020 Annual Installment").  Exhibit A ¶2.1.

12.    NexPoint knew the 2020 Annual Installment was due on December 31, 2020 because it was included in a 13-week forecast that Highland's Corporate Accounting Group updated on a weekly basis and that was provided to (among others) Frank Waterhouse, NexPoint's Treasurer and then Highland's CFO.  *See*, *e.g.*, **Exhibit C** (a true and correct copy of a 13-week forecast prepared for the 13-week period commencing December 14, 2020) Exhibit C shows that Operating Receipts of $2.051 million was due on December 28, 2020 in connection with "Interest Receipts on notes receivable," an amount that included the Required Payment).[8]

13.    NexPoint failed to make the 2020 Annual Installment due on December 31, 2020 as required under Section 2.1 of the NexPoint Note.

14.    On January 14, 2021, after Highland sent notice of default, NexPoint paid Highland $1,406,111.92.  **Exhibit B** (entry dated 1/14/21).

B.    **Highland's Loan Summaries**

15.    Highland's accounting group has a regular practice of creating and maintaining "loan summaries" in the ordinary course of business (the "Loan Summaries").   The Loan

---

[8] This 13-week forecast is also included as Highland's Ex. 58 and is just an example.  For years, the accounting group prepared a 13-week forecast that was updated weekly so that everyone knew what payments and receipts were anticipated.

Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger.  *See* Ex. 199 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

16.    The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business.  For example, Ex. 199 ties exactly into Ex. 198, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  ==Docket No. 2020.==[9]

**C.    The Notes**

17.    In the ordinary course of business, Highland had (and continues to have) a regular practice of maintaining electronic copies of all promissory notes issued by any officer, employee, or corporate affiliate.

18.    Attached as **Exhibit D** is a true and correct copy of a promissory note dated February 2, 2018, executed by James Dondero, as the maker, in the original principal amount of $3,825,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First Dondero Note").

---

[9] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates." ==Docket No. 2030== (balance sheet).  Ex. 198 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  Interest on these notes is accrued in a single account (general ledger account 14010).

19.     Attached as **Exhibit E** is a true and correct copy of a promissory note dated August 1, 2018, executed by James Dondero, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second Dondero Note").

20.     Attached as **Exhibit F** is a true and correct copy of a promissory note dated August 13, 2018, executed by James Dondero, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Third Dondero Note," and together with the First Dondero Note and Second Dondero Note, the "Dondero Notes").

21.     Attached as **Exhibit G** is a true and correct copy of a promissory note dated May 2, 2019, executed by HCMFA, as the maker, in the original principal amount of $2,400,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCMFA Demand Note").

22.     Attached as **Exhibit H** is a true and correct copy of a promissory note dated May 3, 2019, executed by HCMFA, as the maker, in the original principal amount of $5,000,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCMFA Demand Note," and together with the First HCMFA Note, the "HCMFA Demand Notes").

23.     Attached as **Exhibit I** is a true and correct copy of a promissory note dated March 28, 2018, executed by HCMS, as the maker, in the original principal amount of $150,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCMS Demand Note").

24.     Attached as **Exhibit J** is a true and correct copy of a promissory note dated June 25, 2018, executed by HCMS, as the maker, in the original principal amount of $200,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCMS Demand Note").

25.     Attached as **Exhibit K** is a true and correct copy of a promissory note dated May 29, 2019, executed by HCMS, as the maker, in the original principal amount of $400,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Third HCMS Demand Note").

26.     Attached as **Exhibit L** is a true and correct copy of a promissory note dated June 26, 2019, executed by HCMS, as the maker, in the original principal amount of $150,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Fourth HCMS Demand Note," and collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and Third HCMS Demand Notes, the "HCMS Demand Notes").

27.     Attached as **Exhibit M** is a true and correct copy of a promissory note dated November 27, 2013, executed by HCRE, as the maker, in the original principal amount of $100,000 in favor of Highland that was and is maintained in Highland's books and records in the

ordinary course of business and that was provided to PwC in connection with its annual audits (the "First HCRE Demand Note").

28.      Attached as **Exhibit N** is a true and correct copy of a promissory note dated October 12, 2017, executed by HCRE, as the maker, in the original principal amount of $2,500,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Second HCRE Demand Note").

29.      Attached as **Exhibit O** is a true and correct copy of a promissory note dated October 15, 2018, executed by HCRE, as the maker, in the original principal amount of $750,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "Third HCRE Demand Note").

30.      Attached as **Exhibit P** is a true and correct copy of a promissory note dated September 25, 2019, executed by HCRE, as the maker, in the original principal amount of $900,000 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business (the "Fourth HCRE Demand Note," and collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and Third HCRE Demand Notes, the "HCRE Demand Notes," and together with the Dondero Demand Notes and the HCMS Demand Notes, the "Demand Notes").

31.      Attached as **Exhibit A** is a true and correct copy of a promissory note dated May 31, 2017, executed by NexPoint, as the maker, in the original principal amount of $30,746,812.23 in favor of Highland that was and is maintained in Highland's books and records in the ordinary

course of business and that was provided to PwC in connection with its annual audits (the "NexPoint Note").

32.     Attached as **Exhibit Q** is a true and correct copy of a promissory note dated May 31, 2017, executed by HCMS, as the maker, in the original principal amount of $20,247,628.02 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "HCMS Term Note").

33.     Attached as **Exhibit R** is a true and correct copy of a promissory note dated May 31, 2017, executed by HCRE, as the maker, in the original principal amount of $6,059,831.51 in favor of Highland that was and is maintained in Highland's books and records in the ordinary course of business and that was provided to PwC in connection with its annual audits (the "HCRE Term Note," and together with the NexPoint Term Note and the HCMS Term Note, the "Term Notes").

34.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First Dondero Note was $3,708,273.71, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the First Dondero Note was $3,808,783.89.

35.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second Dondero Note was $2,647,880.12, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Second Dondero Note was $2,727,300.55.

36.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third Dondero Note was $2,647,859.55, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third Dondero Note was $2,727,280.61.

37.    Thus, (a) as of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05.

38.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCMFA Note was $2,493,401.61, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the First Dondero Note was $2,553,982.49.

39.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCMFA Note was $5,194,251.45, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Second HCMFA Note was $5,320,453.60.

40.    Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,874,436.09.

41.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCMS Demand Note was $162,033.91, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the First HCMS Demand Note was $166,777.82.

42.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCMS Demand Note was $215,402.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Second HCMS Demand Note was $222,082.34.

43.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third HCMS Demand Note was $414,842.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third HCMS Demand Note was $424,922.32.

44.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Fourth HCMS Demand Note was $155,239.90, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Fourth HCMS Demand Note was $158,980.33.

45.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81.

46.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the First HCRE Demand Note was $171,978.10, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the First HCRE Demand Note was $185,979.85.

47.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Second HCRE Demand Note was $3,191,342.72, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Second HCRE Demand Note was $3,380,385.47.

48.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Third HCRE Demand Note was $885,908.76, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Third HCRE Demand Note was $938,970.62.

49.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the Fourth HCRE Demand Note was $762,941.38, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the Fourth HCRE Demand Note was $825,042.29.

50.     Thus, as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23.

51.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[10]

52.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31[11].

53.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[12]


I declare under penalty of perjury that the forgoing is true and correct.

Dated: December 17, 2021                              _/s/ David Klos____
                                                       David Klos

---

[10] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[11] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

# EXHIBIT A

<div align="center">**PROMISSORY NOTE**</div>

**$30,746,812.33**                                                                        **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

    2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

    2.2    <u>Final Payment Date</u>.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

D-CNL002954

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. <u>Prior Notes</u>. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002955

# EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-CNL002956

# EXHIBIT B

**NPA $30.7M**

| Closing Date | 5/31/2017 |
|---|---|
| Total Commitment | $ 30,746,812 |
| Rate | 6.000% |
| Maturity: | 12/31/2047 |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal | Total Paid |
|---|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | $    30,746,812 | |
| 6/30/2017 | 151,628.12 | | 151,628.12 | 30,746,812.33 | | 30,746,812.33 | |
| 7/31/2017 | 156,682.39 | | 308,310.50 | 30,746,812.33 | | 30,746,812.33 | |
| 8/31/2017 | 156,682.39 | | 464,992.89 | 30,746,812.33 | | 30,746,812.33 | |
| 9/30/2017 | 151,628.12 | | 616,621.00 | 30,746,812.33 | | 30,746,812.33 | |
| 10/20/2017 | 101,085.41 | (717,706.41) | - | 30,746,812.33 | (82,293.59) | 30,664,518.74 | (800,000.00) |
| 10/31/2017 | 55,448.17 | | 55,448.17 | 30,664,518.74 | | 30,664,518.74 | |
| 11/30/2017 | 151,222.28 | | 206,670.46 | 30,664,518.74 | | 30,664,518.74 | |
| 12/5/2017 | 25,203.71 | (358,904.83) | (127,030.67) | 30,664,518.74 | (942,600.16) | 29,721,918.58 | (1,301,504.99) |
| 12/31/2017 | 127,030.67 | | (0.00) | 29,721,918.58 | | 29,721,918.58 | |
| 1/31/2018 | 151,459.64 | | 151,459.64 | 29,721,918.58 | | 29,721,918.58 | |
| 2/28/2018 | 136,802.26 | | 288,261.90 | 29,721,918.58 | | 29,721,918.58 | |
| 3/31/2018 | 151,459.64 | | 439,721.54 | 29,721,918.58 | | 29,721,918.58 | |
| 4/10/2018 | 48,857.95 | (439,721.54) | 48,857.95 | 29,721,918.58 | | 29,721,918.58 | (439,721.54) |
| 4/30/2018 | 97,715.90 | | 146,573.85 | 29,721,918.58 | | 29,721,918.58 | |
| 5/1/2018 | 4,885.79 | (146,573.85) | 4,885.79 | 29,721,918.58 | | 29,721,918.58 | (146,573.85) |
| 5/9/2018 | 39,086.36 | (879,927.65) | (835,955.50) | 29,721,918.58 | | 29,721,918.58 | (879,927.65) |
| 5/31/2018 | 107,487.49 | | (728,468.01) | 29,721,918.58 | | 29,721,918.58 | |
| 6/30/2018 | 146,573.85 | | (581,894.17) | 29,721,918.58 | | 29,721,918.58 | |
| 7/31/2018 | 151,459.64 | | (430,434.53) | 29,721,918.58 | | 29,721,918.58 | |
| 8/31/2018 | 151,459.64 | | (278,974.89) | 29,721,918.58 | | 29,721,918.58 | |
| 9/5/2018 | 24,428.97 | | (254,545.91) | 29,721,918.58 | (280,765.40) | 29,441,153.18 | (280,765.40) |
| 9/21/2018 | 77,434.27 | | (177,111.65) | 29,441,153.18 | (1,023,750.00) | 28,417,403.18 | (1,023,750.00) |
| 9/30/2018 | 42,042.19 | | (135,069.46) | 28,417,403.18 | | 28,417,403.18 | |
| 10/31/2018 | 144,811.97 | | 9,742.51 | 28,417,403.18 | | 28,417,403.18 | |
| 11/30/2018 | 140,140.62 | | 149,883.13 | 28,417,403.18 | | 28,417,403.18 | |
| 12/18/2018 | 84,084.37 | (294,695.10) | (60,727.60) | 28,417,403.18 | | 28,417,403.18 | (294,695.10) |
| 12/31/2018 | 60,727.60 | | (0.00) | 28,417,403.18 | | 28,417,403.18 | |

D-NNL-029141

| Date | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1/31/2019 | 144,811.97 | | 144,811.97 | 28,417,403.18 | | 28,417,403.18 | |
| 2/28/2019 | 130,797.91 | | 275,609.88 | 28,417,403.18 | | 28,417,403.18 | |
| 3/29/2019 | 135,469.26 | (411,079.15) | (0.00) | 28,417,403.18 | (338,920.85) | 28,078,482.33 | (750,000.00) |
| 3/31/2019 | 9,231.28 | | 9,231.28 | 28,078,482.33 | | 28,078,482.33 | |
| 4/16/2019 | 73,850.25 | (83,081.53) | 0.00 | 28,078,482.33 | (1,216,918.47) | 26,861,563.86 | (1,300,000.00) |
| 4/30/2019 | 61,818.39 | | 61,818.40 | 26,861,563.86 | | 26,861,563.86 | |
| 5/31/2019 | 136,883.59 | (198,701.98) | 0.00 | 26,861,563.86 | 198,701.98 | 27,060,265.84 | - |
| 6/4/2019 | 17,793.05 | (17,793.05) | 0.00 | 27,060,265.84 | (282,206.95) | 26,778,058.89 | (300,000.00) |
| 6/19/2019 | 66,028.09 | (66,028.10) | (0.00) | 26,778,058.89 | (2,033,971.90) | 24,744,086.99 | (2,100,000.00) |
| 6/30/2019 | 44,742.73 | | 44,742.73 | 24,744,086.99 | | 24,744,086.99 | |
| 7/9/2019 | 36,607.69 | (81,350.42) | (0.00) | 24,744,086.99 | (548,649.58) | 24,195,437.41 | (630,000.00) |
| 7/31/2019 | 87,501.31 | | 87,501.31 | 24,195,437.41 | | 24,195,437.41 | |
| 8/13/2019 | 51,705.32 | (139,206.62) | 0.00 | 24,195,437.41 | (1,160,793.38) | 23,034,644.03 | (1,300,000.00) |
| 8/31/2019 | 68,157.30 | | 68,157.31 | 23,034,644.03 | | 23,034,644.03 | |
| 9/30/2019 | 113,595.50 | | 181,752.81 | 23,034,644.03 | | 23,034,644.03 | |
| 10/15/2019 | 56,797.75 | | 238,550.56 | 23,034,644.03 | | 23,034,644.03 | |
| 10/31/2019 | 60,584.27 | | 299,134.83 | 23,034,644.03 | | 23,034,644.03 | |
| 11/30/2019 | 113,595.50 | | 412,730.34 | 23,034,644.03 | | 23,034,644.03 | |
| 12/30/2019 | 113,595.50 | -530,112.36 | (3,786.52) | 23,034,644.03 | | 23,034,644.03 | (530,112.36) |
| 12/31/2019 | 3,786.52 | | 0.00 | 23,034,644.03 | | 23,034,644.03 | |
| 1/31/2020 | 117,382.02 | | 117,382.02 | 23,034,644.03 | | 23,034,644.03 | |
| 2/29/2020 | 109,808.99 | | 227,191.01 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2020 | 117,382.02 | | 344,573.03 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2020 | 113,595.50 | | 458,168.54 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2020 | 117,382.02 | (575,550.56) | (0.00) | 23,034,644.03 | 575,550.56 | 23,610,194.59 | |
| 6/30/2020 | 116,433.84 | | 116,433.83 | 23,610,194.59 | | 23,610,194.59 | |
| 7/31/2020 | 120,314.96 | | 236,748.80 | 23,610,194.59 | | 23,610,194.59 | |
| 8/31/2020 | 120,314.96 | | 357,063.76 | 23,610,194.59 | | 23,610,194.59 | |
| 9/30/2020 | 116,433.84 | | 473,497.60 | 23,610,194.59 | | 23,610,194.59 | |
| 10/31/2020 | 120,314.96 | | 593,812.56 | 23,610,194.59 | | 23,610,194.59 | |
| 11/30/2020 | 116,433.84 | | 710,246.40 | 23,610,194.59 | | 23,610,194.59 | |
| 12/31/2020 | 120,314.96 | | 830,561.36 | 23,610,194.59 | | 23,610,194.59 | |
| 1/14/2021 | 54,335.79 | (830,561.36) | 54,335.79 | 23,610,194.59 | (575,550.56) | 23,034,644.03 | (1,406,111.92) |
| 1/31/2021 | 64,370.79 | | 118,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 2/28/2021 | 106,022.47 | | 224,729.05 | 23,034,644.03 | | 23,034,644.03 | |
| 3/31/2021 | 117,382.02 | | 342,111.07 | 23,034,644.03 | | 23,034,644.03 | |
| 4/30/2021 | 113,595.50 | | 455,706.58 | 23,034,644.03 | | 23,034,644.03 | |
| 5/31/2021 | 117,382.02 | | 573,088.60 | 23,034,644.03 | | 23,034,644.03 | |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 6/30/2021 | 113,595.50 | 686,684.10 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2021 | 117,382.02 | 804,066.13 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2021 | 117,382.02 | 921,448.15 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2021 | 113,595.50 | 1,035,043.65 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2021 | 117,382.02 | 1,152,425.67 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2021 | 113,595.50 | 1,266,021.18 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2021 | 117,382.02 | 1,383,403.20 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2022 | 117,382.02 | 1,500,785.22 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2022 | 106,022.47 | 1,606,807.69 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2022 | 117,382.02 | 1,724,189.72 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2022 | 113,595.50 | 1,837,785.22 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2022 | 117,382.02 | 1,955,167.24 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2022 | 113,595.50 | 2,068,762.75 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2022 | 117,382.02 | 2,186,144.77 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2022 | 117,382.02 | 2,303,526.79 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2022 | 113,595.50 | 2,417,122.29 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2022 | 117,382.02 | 2,534,504.32 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2022 | 113,595.50 | 2,648,099.82 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2022 | 117,382.02 | 2,765,481.84 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2023 | 117,382.02 | 2,882,863.86 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2023 | 106,022.47 | 2,988,886.34 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2023 | 117,382.02 | 3,106,268.36 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2023 | 113,595.50 | 3,219,863.86 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2023 | 117,382.02 | 3,337,245.88 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2023 | 113,595.50 | 3,450,841.39 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2023 | 117,382.02 | 3,568,223.41 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2023 | 117,382.02 | 3,685,605.43 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2023 | 113,595.50 | 3,799,200.94 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2023 | 117,382.02 | 3,916,582.96 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2023 | 113,595.50 | 4,030,178.46 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2023 | 117,382.02 | 4,147,560.48 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2024 | 117,382.02 | 4,264,942.51 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2024 | 109,808.99 | 4,374,751.49 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2024 | 117,382.02 | 4,492,133.52 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2024 | 113,595.50 | 4,605,729.02 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2024 | 117,382.02 | 4,723,111.04 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2024 | 113,595.50 | 4,836,706.55 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2024 | 117,382.02 | 4,954,088.57 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029143

| 8/31/2024 | 117,382.02 | 5,071,470.59 | 23,034,644.03 | 23,034,644.03 |
|-----------|------------|--------------|---------------|---------------|
| 9/30/2024 | 113,595.50 | 5,185,066.10 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2024 | 117,382.02 | 5,302,448.12 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2024 | 113,595.50 | 5,416,043.62 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2024 | 117,382.02 | 5,533,425.64 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2025 | 117,382.02 | 5,650,807.67 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2025 | 106,022.47 | 5,756,830.14 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2025 | 117,382.02 | 5,874,212.16 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2025 | 113,595.50 | 5,987,807.66 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2025 | 117,382.02 | 6,105,189.68 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2025 | 113,595.50 | 6,218,785.19 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2025 | 117,382.02 | 6,336,167.21 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2025 | 117,382.02 | 6,453,549.23 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2025 | 113,595.50 | 6,567,144.74 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2025 | 117,382.02 | 6,684,526.76 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2025 | 113,595.50 | 6,798,122.26 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2025 | 117,382.02 | 6,915,504.29 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2026 | 117,382.02 | 7,032,886.31 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2026 | 106,022.47 | 7,138,908.78 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2026 | 117,382.02 | 7,256,290.80 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2026 | 113,595.50 | 7,369,886.31 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2026 | 117,382.02 | 7,487,268.33 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2026 | 113,595.50 | 7,600,863.83 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2026 | 117,382.02 | 7,718,245.85 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2026 | 117,382.02 | 7,835,627.87 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2026 | 113,595.50 | 7,949,223.38 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2026 | 117,382.02 | 8,066,605.40 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2026 | 113,595.50 | 8,180,200.91 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2026 | 117,382.02 | 8,297,582.93 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2027 | 117,382.02 | 8,414,964.95 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2027 | 106,022.47 | 8,520,987.42 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2027 | 117,382.02 | 8,638,369.44 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2027 | 113,595.50 | 8,751,964.95 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2027 | 117,382.02 | 8,869,346.97 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2027 | 113,595.50 | 8,982,942.47 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2027 | 117,382.02 | 9,100,324.50 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2027 | 117,382.02 | 9,217,706.52 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2027 | 113,595.50 | 9,331,302.02 | 23,034,644.03 | 23,034,644.03 |

D-NNL-029144

| | | | | |
|---|---|---|---|---|
| 10/31/2027 | 117,382.02 | 9,448,684.04 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2027 | 113,595.50 | 9,562,279.55 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2027 | 117,382.02 | 9,679,661.57 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2028 | 117,382.02 | 9,797,043.59 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2028 | 109,808.99 | 9,906,852.58 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2028 | 117,382.02 | 10,024,234.60 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2028 | 113,595.50 | 10,137,830.11 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2028 | 117,382.02 | 10,255,212.13 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2028 | 113,595.50 | 10,368,807.63 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2028 | 117,382.02 | 10,486,189.65 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2028 | 117,382.02 | 10,603,571.68 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2028 | 113,595.50 | 10,717,167.18 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2028 | 117,382.02 | 10,834,549.20 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2028 | 113,595.50 | 10,948,144.71 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2028 | 117,382.02 | 11,065,526.73 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2029 | 117,382.02 | 11,182,908.75 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2029 | 106,022.47 | 11,288,931.22 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2029 | 117,382.02 | 11,406,313.24 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2029 | 113,595.50 | 11,519,908.75 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2029 | 117,382.02 | 11,637,290.77 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2029 | 113,595.50 | 11,750,886.27 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2029 | 117,382.02 | 11,868,268.30 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2029 | 117,382.02 | 11,985,650.32 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2029 | 113,595.50 | 12,099,245.82 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2029 | 117,382.02 | 12,216,627.84 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2029 | 113,595.50 | 12,330,223.35 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2029 | 117,382.02 | 12,447,605.37 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2030 | 117,382.02 | 12,564,987.39 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2030 | 106,022.47 | 12,671,009.86 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2030 | 117,382.02 | 12,788,391.89 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2030 | 113,595.50 | 12,901,987.39 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2030 | 117,382.02 | 13,019,369.41 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2030 | 113,595.50 | 13,132,964.92 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2030 | 117,382.02 | 13,250,346.94 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2030 | 117,382.02 | 13,367,728.96 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2030 | 113,595.50 | 13,481,324.46 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2030 | 117,382.02 | 13,598,706.49 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2030 | 113,595.50 | 13,712,301.99 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 12/31/2030 | 117,382.02 | 13,829,684.01 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2031 | 117,382.02 | 13,947,066.03 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2031 | 106,022.47 | 14,053,088.51 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2031 | 117,382.02 | 14,170,470.53 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2031 | 113,595.50 | 14,284,066.03 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2031 | 117,382.02 | 14,401,448.05 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2031 | 113,595.50 | 14,515,043.56 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2031 | 117,382.02 | 14,632,425.58 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2031 | 117,382.02 | 14,749,807.60 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2031 | 113,595.50 | 14,863,403.11 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2031 | 117,382.02 | 14,980,785.13 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2031 | 113,595.50 | 15,094,380.63 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2031 | 117,382.02 | 15,211,762.65 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2032 | 117,382.02 | 15,329,144.68 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2032 | 109,808.99 | 15,438,953.66 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2032 | 117,382.02 | 15,556,335.69 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2032 | 113,595.50 | 15,669,931.19 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2032 | 117,382.02 | 15,787,313.21 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2032 | 113,595.50 | 15,900,908.72 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2032 | 117,382.02 | 16,018,290.74 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2032 | 117,382.02 | 16,135,672.76 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2032 | 113,595.50 | 16,249,268.27 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2032 | 117,382.02 | 16,366,650.29 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2032 | 113,595.50 | 16,480,245.79 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2032 | 117,382.02 | 16,597,627.81 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2033 | 117,382.02 | 16,715,009.84 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2033 | 106,022.47 | 16,821,032.31 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2033 | 117,382.02 | 16,938,414.33 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2033 | 113,595.50 | 17,052,009.83 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2033 | 117,382.02 | 17,169,391.85 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2033 | 113,595.50 | 17,282,987.36 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2033 | 117,382.02 | 17,400,369.38 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2033 | 117,382.02 | 17,517,751.40 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2033 | 113,595.50 | 17,631,346.91 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2033 | 117,382.02 | 17,748,728.93 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2033 | 113,595.50 | 17,862,324.43 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2033 | 117,382.02 | 17,979,706.46 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2034 | 117,382.02 | 18,097,088.48 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 2/28/2034 | 106,022.47 | 18,203,110.95 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2034 | 117,382.02 | 18,320,492.97 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2034 | 113,595.50 | 18,434,088.47 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2034 | 117,382.02 | 18,551,470.50 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2034 | 113,595.50 | 18,665,066.00 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2034 | 117,382.02 | 18,782,448.02 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2034 | 117,382.02 | 18,899,830.04 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2034 | 113,595.50 | 19,013,425.55 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2034 | 117,382.02 | 19,130,807.57 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2034 | 113,595.50 | 19,244,403.08 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2034 | 117,382.02 | 19,361,785.10 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2035 | 117,382.02 | 19,479,167.12 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2035 | 106,022.47 | 19,585,189.59 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2035 | 117,382.02 | 19,702,571.61 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2035 | 113,595.50 | 19,816,167.12 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2035 | 117,382.02 | 19,933,549.14 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2035 | 113,595.50 | 20,047,144.64 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2035 | 117,382.02 | 20,164,526.67 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2035 | 117,382.02 | 20,281,908.69 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2035 | 113,595.50 | 20,395,504.19 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2035 | 117,382.02 | 20,512,886.21 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2035 | 113,595.50 | 20,626,481.72 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2035 | 117,382.02 | 20,743,863.74 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2036 | 117,382.02 | 20,861,245.76 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2036 | 109,808.99 | 20,971,054.75 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2036 | 117,382.02 | 21,088,436.77 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2036 | 113,595.50 | 21,202,032.28 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2036 | 117,382.02 | 21,319,414.30 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2036 | 113,595.50 | 21,433,009.80 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2036 | 117,382.02 | 21,550,391.82 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2036 | 117,382.02 | 21,667,773.85 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2036 | 113,595.50 | 21,781,369.35 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2036 | 117,382.02 | 21,898,751.37 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2036 | 113,595.50 | 22,012,346.88 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2036 | 117,382.02 | 22,129,728.90 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2037 | 117,382.02 | 22,247,110.92 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2037 | 106,022.47 | 22,353,133.39 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2037 | 117,382.02 | 22,470,515.41 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 4/30/2037 | 113,595.50 | 22,584,110.92 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2037 | 117,382.02 | 22,701,492.94 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2037 | 113,595.50 | 22,815,088.44 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2037 | 117,382.02 | 22,932,470.47 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2037 | 117,382.02 | 23,049,852.49 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2037 | 113,595.50 | 23,163,447.99 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2037 | 117,382.02 | 23,280,830.01 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2037 | 113,595.50 | 23,394,425.52 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2037 | 117,382.02 | 23,511,807.54 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2038 | 117,382.02 | 23,629,189.56 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2038 | 106,022.47 | 23,735,212.03 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2038 | 117,382.02 | 23,852,594.06 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2038 | 113,595.50 | 23,966,189.56 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2038 | 117,382.02 | 24,083,571.58 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2038 | 113,595.50 | 24,197,167.09 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2038 | 117,382.02 | 24,314,549.11 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2038 | 117,382.02 | 24,431,931.13 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2038 | 113,595.50 | 24,545,526.63 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2038 | 117,382.02 | 24,662,908.66 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2038 | 113,595.50 | 24,776,504.16 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2038 | 117,382.02 | 24,893,886.18 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2039 | 117,382.02 | 25,011,268.20 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2039 | 106,022.47 | 25,117,290.68 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2039 | 117,382.02 | 25,234,672.70 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2039 | 113,595.50 | 25,348,268.20 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2039 | 117,382.02 | 25,465,650.22 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2039 | 113,595.50 | 25,579,245.73 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2039 | 117,382.02 | 25,696,627.75 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2039 | 117,382.02 | 25,814,009.77 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2039 | 113,595.50 | 25,927,605.28 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2039 | 117,382.02 | 26,044,987.30 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2039 | 113,595.50 | 26,158,582.80 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2039 | 117,382.02 | 26,275,964.82 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2040 | 117,382.02 | 26,393,346.85 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2040 | 109,808.99 | 26,503,155.83 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2040 | 117,382.02 | 26,620,537.86 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2040 | 113,595.50 | 26,734,133.36 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2040 | 117,382.02 | 26,851,515.38 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 6/30/2040 | 113,595.50 | 26,965,110.89 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2040 | 117,382.02 | 27,082,492.91 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2040 | 117,382.02 | 27,199,874.93 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2040 | 113,595.50 | 27,313,470.44 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2040 | 117,382.02 | 27,430,852.46 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2040 | 113,595.50 | 27,544,447.96 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2040 | 117,382.02 | 27,661,829.98 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2041 | 117,382.02 | 27,779,212.01 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2041 | 106,022.47 | 27,885,234.48 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2041 | 117,382.02 | 28,002,616.50 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2041 | 113,595.50 | 28,116,212.00 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2041 | 117,382.02 | 28,233,594.02 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2041 | 113,595.50 | 28,347,189.53 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2041 | 117,382.02 | 28,464,571.55 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2041 | 117,382.02 | 28,581,953.57 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2041 | 113,595.50 | 28,695,549.08 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2041 | 117,382.02 | 28,812,931.10 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2041 | 113,595.50 | 28,926,526.60 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2041 | 117,382.02 | 29,043,908.63 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2042 | 117,382.02 | 29,161,290.65 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2042 | 106,022.47 | 29,267,313.12 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2042 | 117,382.02 | 29,384,695.14 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2042 | 113,595.50 | 29,498,290.64 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2042 | 117,382.02 | 29,615,672.67 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2042 | 113,595.50 | 29,729,268.17 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2042 | 117,382.02 | 29,846,650.19 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2042 | 117,382.02 | 29,964,032.21 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2042 | 113,595.50 | 30,077,627.72 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2042 | 117,382.02 | 30,195,009.74 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2042 | 113,595.50 | 30,308,605.25 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2042 | 117,382.02 | 30,425,987.27 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2043 | 117,382.02 | 30,543,369.29 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2043 | 106,022.47 | 30,649,391.76 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2043 | 117,382.02 | 30,766,773.78 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2043 | 113,595.50 | 30,880,369.29 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2043 | 117,382.02 | 30,997,751.31 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2043 | 113,595.50 | 31,111,346.81 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2043 | 117,382.02 | 31,228,728.84 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 8/31/2043 | 117,382.02 | 31,346,110.86 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2043 | 113,595.50 | 31,459,706.36 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2043 | 117,382.02 | 31,577,088.38 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2043 | 113,595.50 | 31,690,683.89 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2043 | 117,382.02 | 31,808,065.91 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2044 | 117,382.02 | 31,925,447.93 | 23,034,644.03 | 23,034,644.03 |
| 2/29/2044 | 109,808.99 | 32,035,256.92 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2044 | 117,382.02 | 32,152,638.94 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2044 | 113,595.50 | 32,266,234.45 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2044 | 117,382.02 | 32,383,616.47 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2044 | 113,595.50 | 32,497,211.97 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2044 | 117,382.02 | 32,614,593.99 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2044 | 117,382.02 | 32,731,976.02 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2044 | 113,595.50 | 32,845,571.52 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2044 | 117,382.02 | 32,962,953.54 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2044 | 113,595.50 | 33,076,549.05 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2044 | 117,382.02 | 33,193,931.07 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2045 | 117,382.02 | 33,311,313.09 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2045 | 106,022.47 | 33,417,335.56 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2045 | 117,382.02 | 33,534,717.58 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2045 | 113,595.50 | 33,648,313.09 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2045 | 117,382.02 | 33,765,695.11 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2045 | 113,595.50 | 33,879,290.61 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2045 | 117,382.02 | 33,996,672.64 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2045 | 117,382.02 | 34,114,054.66 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2045 | 113,595.50 | 34,227,650.16 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2045 | 117,382.02 | 34,345,032.18 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2045 | 113,595.50 | 34,458,627.69 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2045 | 117,382.02 | 34,576,009.71 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2046 | 117,382.02 | 34,693,391.73 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2046 | 106,022.47 | 34,799,414.20 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2046 | 117,382.02 | 34,916,796.23 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2046 | 113,595.50 | 35,030,391.73 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2046 | 117,382.02 | 35,147,773.75 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2046 | 113,595.50 | 35,261,369.26 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2046 | 117,382.02 | 35,378,751.28 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2046 | 117,382.02 | 35,496,133.30 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2046 | 113,595.50 | 35,609,728.80 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| 10/31/2046 | 117,382.02 | 35,727,110.83 | 23,034,644.03 | 23,034,644.03 |
| 11/30/2046 | 113,595.50 | 35,840,706.33 | 23,034,644.03 | 23,034,644.03 |
| 12/31/2046 | 117,382.02 | 35,958,088.35 | 23,034,644.03 | 23,034,644.03 |
| 1/31/2047 | 117,382.02 | 36,075,470.37 | 23,034,644.03 | 23,034,644.03 |
| 2/28/2047 | 106,022.47 | 36,181,492.85 | 23,034,644.03 | 23,034,644.03 |
| 3/31/2047 | 117,382.02 | 36,298,874.87 | 23,034,644.03 | 23,034,644.03 |
| 4/30/2047 | 113,595.50 | 36,412,470.37 | 23,034,644.03 | 23,034,644.03 |
| 5/31/2047 | 117,382.02 | 36,529,852.39 | 23,034,644.03 | 23,034,644.03 |
| 6/30/2047 | 113,595.50 | 36,643,447.90 | 23,034,644.03 | 23,034,644.03 |
| 7/31/2047 | 117,382.02 | 36,760,829.92 | 23,034,644.03 | 23,034,644.03 |
| 8/31/2047 | 117,382.02 | 36,878,211.94 | 23,034,644.03 | 23,034,644.03 |
| 9/30/2047 | 113,595.50 | 36,991,807.45 | 23,034,644.03 | 23,034,644.03 |
| 10/31/2047 | 117,382.02 | 37,109,189.47 | 23,034,644.03 | 23,034,644.03 |

CONFIDENTIAL

D-NNL-029151

# EXHIBIT C

**Highland Capital Management, L.P. - Cash**
Next 13 Weeks Commencing December 14, 2020
*(in thousands)*
*CONFIDENTIAL DRAFT FOR ILLUSTRATIVE PURPOSES ONLY - NOT FINAL OR APPROVED FOR FURTHER DISTRIBUTION*

| | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week beginning** | 12/7 | 12/14 | 12/21 | 12/28 | 1/4 | 1/11 | 1/18 | 1/25 | 2/1 | 2/8 | 2/15 | 2/22 | 3/1 | 3/8 |
| **Beginning unrestricted operating cash** | 12,537 | 11,948 | 10,684 | 11,051 | 11,771 | 11,048 | 11,188 | 11,353 | 10,486 | 11,445 | 10,860 | 10,279 | 8,145 | 8,381 |
| **Operating Receipts** | | | | | | | | | | | | | | |
| Management fees | - | - | - | - | - | - | - | - | 676 | - | - | - | - | - |
| CLOs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hedge funds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Private Equity, PetroCap, Port Co's | - | - | - | - | 63 | - | - | - | - | - | 270 | - | - | - |
| Separate accounts | - | - | 776 | - | - | - | - | 750 | 165 | - | 579 | - | - | - |
| Management fees - managed funds | - | - | 776 | - | 63 | - | - | 750 | 841 | - | 849 | - | - | - |
| HCMFA / NPA investment support | - | - | 668 | - | - | 668 | - | - | 668 | - | - | - | 668 | - |
| Shared services receipts | 39 | - | 168 | 385 | - | 168 | 290 | 135 | - | 290 | 60 | 15 | - | - |
| Intercompany and shared services revenue | 39 | - | 836 | 385 | - | 836 | 290 | 135 | 668 | 290 | 60 | 15 | 668 | - |
| Fund reimbursements | - | - | 60 | - | - | - | 100 | - | - | - | 100 | - | - | - |
| Interest receipts on notes receivable | - | - | - | 2,051 | - | - | - | - | - | - | - | - | - | - |
| Dividend receipts (unencumbered) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other miscellaneous receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total other receipts | - | - | 60 | 2,051 | - | - | 100 | - | - | - | 100 | - | - | - |
| **Total operating receipts** | 39 | - | 1,672 | 2,436 | 63 | 836 | 390 | 885 | 1,509 | 290 | 1,009 | 15 | 668 | - |
| **Compensation and benefits** | | | | | | | | | | | | | | |
| Payroll, benefits, and taxes + exp reimb | (408) | (31) | - | (556) | - | (471) | - | (561) | - | (535) | - | (625) | - | (460) |
| Cash bonuses | - | - | - | - | - | - | - | - | - | - | - | (3,394) | - | - |
| **Total compensation and benefits** | (408) | (31) | - | (556) | - | (471) | - | (561) | - | (535) | - | (4,019) | - | (460) |
| **General overhead** | | | | | | | | | | | | | | |
| Outside legal (ordinary course) | (62) | - | (499) | - | (560) | - | - | (560) | - | - | - | (560) | - | - |
| Independent director fees | - | - | - | (210) | - | - | - | - | (210) | - | - | - | (210) | - |
| General overhead - critical vendors (pre-petition) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General overhead - post-petition vendors | (158) | (1,233) | (275) | (275) | (225) | (225) | (225) | (225) | (340) | (340) | (340) | (340) | (222) | (222) |
| **Total general overhead** | (220) | (1,233) | (774) | (485) | (785) | (225) | (225) | (785) | (550) | (340) | (340) | (900) | (432) | (222) |
| **Net change in cash due to operating activity** | (589) | (1,264) | 898 | 1,395 | (723) | 140 | 165 | (461) | 959 | (585) | 669 | (4,904) | 236 | (682) |
| **Re-org related - payments direct to professionals** | | | | | | | | | | | | | | |
| Debtor bankruptcy counsel | - | - | - | (300) | - | - | - | (720) | - | - | - | (720) | - | - |
| Debtor FA/CRO | - | - | - | - | - | - | - | (300) | - | - | - | (300) | - | - |
| Compensation consultant | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Committee counsel | - | - | (359) | (339) | - | - | - | (600) | - | - | - | (600) | - | - |
| Committee FA | - | - | (172) | (138) | - | - | - | (480) | - | - | - | (480) | - | - |
| Claims / noticing agent | - | - | - | - | - | - | - | (30) | - | - | - | (30) | - | - |
| Regulatory & compliance counsel | - | - | - | (100) | - | - | - | (100) | - | - | - | (100) | - | - |
| Mediation | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | - | - | - | - | - | - | (175) | - | - | - | - | - | - |
| **Total re-org related** | - | - | (531) | (877) | - | - | - | (2,405) | - | - | - | (2,230) | - | - |
| **Net change in cash from ops + reorg costs** | (589) | (1,264) | 367 | 518 | (723) | 140 | 165 | (2,866) | 959 | (585) | 669 | (7,134) | 236 | (682) |
| **Investing cash flows (principal only on notes)** | | | | | | | | | | | | | | |
| Jefferies prime brokerage, net or Select Equity Fund funding | - | - | - | - | - | - | - | 2,000 | - | - | - | 5,000 | - | - |
| Third party fund capital call obligations | - | - | - | - | - | - | - | - | - | - | (1,650) | - | - | - |
| Third party fund expected distributions | - | - | - | - | - | - | - | - | - | - | 400 | - | - | - |
| Highland Capital Management Korea (capital call funding) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Multi Strategy Credit Fund | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Highland Capital Management Latin America | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from outstanding notes | - | - | - | 202 | - | - | - | - | - | - | - | - | - | - |
| Divs, paydowns, misc from non-PB assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Purchases of other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Proceeds from other investments (non-PB) | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to investing activities** | - | - | - | 202 | - | - | - | 2,000 | - | - | (1,250) | 5,000 | - | - |
| **Financing cash flows** | | | | | | | | | | | | | | |
| Required equity distributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Equity contributions | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Existing debt paydowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net change in cash due to financing activities** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending unrestricted operating cash** | 11,948 | 10,684 | 11,051 | 11,771 | 11,048 | 11,188 | 11,353 | 10,486 | 11,445 | 10,860 | 10,279 | 8,145 | 8,381 | 7,699 |

D-CNL003810

# EXHIBIT D

# PROMISSORY NOTE

$3,825,000            February 2, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of THREE MILLION, EIGHT HUNDRED AND TWENTY-FIVE THOUSAND and 00/100 Dollars ($3,825,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.66%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Tax Loan</u>. This Note is paid to the Maker to help satisfy any current tax obligations of a former partner or current partner.

5.     <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.     <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.     <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other

Exhibit 1

amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

8. Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

9. Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

# EXHIBIT E

# PROMISSORY NOTE

$2,500,000                                                                                    August 1, 2018

     FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    <u>Prepayment Allowed: Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**Exhibit 3**

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

2

# EXHIBIT F

# PROMISSORY NOTE

$2,500,000                                                                                     August 13, 2018

FOR VALUE RECEIVED, JAMES DONDERO ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (2.95%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     <u>Payment of Principal and Interest</u>.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     <u>Waiver</u>.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     <u>Attorneys' Fees</u>.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Exhibit 4

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

JAMES DONDERO

# EXHIBIT G

# PROMISSORY NOTE

$2,400,000.00                                                                                                    May 2, 2019

    FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars ($2,400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

    1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

    2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

    3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

    4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

    5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

    6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL002804

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**


_____

FRANK WATERHOUSE

2

D-CNL002805

# EXHIBIT H

# PROMISSORY NOTE

$5,000,000.00                                                                                            May 3, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002808

# EXHIBIT I

Case 21-03006-sgj   Doc 130   Filed 12/17/21   Entered 12/17/21 23:29:32   Desc Main
Case 3:21-cv-00881-X   Document Dnt 1ment   Filed 04/09/8179age 115 of 201   PageID 47560
Case 21-03006-sgj Doc 68-1 Filed 08/27/21   Entered 08/27/21 17:34:12   Page 2 of 3

# PROMISSORY NOTE

$150,000.00                                                       March 28, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.   <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term *"applicable federal rate"* (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.   <u>Payment of Principal and Interest</u>.   The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.   <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.   <u>Waiver</u>.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.   <u>Attorneys' Fees</u>.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL003104

Case 21-03006-sgj    Doc 130    Filed 12/17/21    Entered 12/17/21 23:29:32    Desc Main
Case 3:21-cv-00881-X    Document 177-79    Page 116 of 201    PageID 47561
Case 21-03006-sgj Doc 68-1 Filed 08/27/21    Entered 08/27/21 17:34:12    Page 3 of 3

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003105

# EXHIBIT J

Case 21-03006-sgj   Doc 130   Filed 12/17/21   Entered 12/17/21 23:29:32   Desc Main
Case 3:21-cv-00881-X   Document Document Filed 04/59/8279   Page 118 of 201   PageID 47563
Case 21-03006-sgj  Doc 68-2  Filed 08/27/21   Entered 08/27/21 17:34:12   Page 2 of 3

# PROMISSORY NOTE

$200,000.00                                                                June 25, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL003107

Case 21-03006-sgj   Doc 130   Filed 12/17/21   Entered 12/17/21 23:29:32   Desc Main
Case 3:21-cv-00881-X   Document Document   Filed 04/09/04/79   Page 119 of 201   PageID 47564
Case 21-03006-sgj Doc 68-2 Filed 08/27/21   Entered 08/27/21 17:34:12   Page 3 of 3

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.    The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003108

# EXHIBIT K

**PROMISSORY NOTE**

$400,000                                                                                           May 29, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

D-CNL003110

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

D-CNL003111

# EXHIBIT L

# PROMISSORY NOTE

$150,000                                                                                           June 26, 2019

      FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

FRANK WATERHOUSE

2

D-CNL003114

# EXHIBIT M

# PROMISSORY NOTE

$100,000                                                              November 27, 2013

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED THOUSAND and 00/100 Dollars ($100,000.00), together with interest, on the terms set forth below (the "**Note**").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.    Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

MAKER:

HCRE PARTNERS, LLC

2

D-CNL003263

# EXHIBIT N

Case 21-03006-sgj    Doc 130    Filed 12/17/21    Entered 12/17/21 23:29:32    Desc Main
Case 3:21-cv-00881-X   Document 190-21  Filed 04/09/8479  Page 130 of 201   PageID 47575
Case 21-03007-sgj  Doc 63-2  Filed 08/27/21    Entered 08/27/21 17:39:21    Page 2 of 3

# PROMISSORY NOTE

$2,500,000                                                      October 12, 2017

FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO MILLION, FIVE HUNDRED THOUSAND and 00/100 Dollars ($2,500,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.     <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003265

Case 21-03006-sgj    Doc 130    Filed 12/17/21    Entered 12/17/21 23:29:32    Desc Main
Case 3:21-cv-00881-X    Document Document    Filed 04/09/24    Page 131 of 201    PageID 47576
Case 21-03007-sgj    Doc 63-2    Filed 08/27/21    Entered 08/27/21 17:39:21    Page 3 of 3

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____

HCRE PARTNERS, LLC

2

D-CNL003266

# EXHIBIT O

# PROMISSORY NOTE

$750,000                                                                October 15, 2018

      FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of SEVEN HUNDRED FIFTY THOUSAND and 00/100 Dollars ($750,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

      1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

      2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

      3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

      4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

      5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

      6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

      7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003268

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003269

# EXHIBIT P

# PROMISSORY NOTE

$900,000                                                          September 25, 2019

        FOR VALUE RECEIVED, HCRE PARTNERS, LLC ("**_Maker_**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("**_Payee_**"), in legal and lawful tender of the United States of America, the principal sum of NINE HUNDRED THOUSAND and 00/100 Dollars ($900,000.00), together with interest, on the terms set forth below (the "**_Note_**").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

        1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to 8.00% per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

        2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

        3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

        4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

        5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

        6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

        7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or

D-CNL003271

performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

       8.    <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HCRE PARTNERS, LLC

2

D-CNL003272

# EXHIBIT Q

# PROMISSORY NOTE

$20,247,628.02                                                   **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from Highland Capital Management Services, Inc., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY MILLION, TWO HUNDRED FORTY SEVEN THOUSAND, SIX HUNDRED TWENTY EIGHT AND 02/100 DOLLARS ($20,247,628.02), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date.       The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No

failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    <u>Prior Notes</u>.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

By:_____
Name:
Title:

2

D-CNL003121

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 5/29/15 | $500,000 | 2.30% | $523,095 |
| 10/1/15 | $350,000 | 2.58% | $315,500 |
| 10/2/15 | $310,000 | 2.58% | $323,301 |
| 10/27/15 | $200,000 | 2.58% | $208,228 |
| 10/28/15 | $200,000 | 2.58% | $208,214 |
| 10/30/15 | $100,000 | 2.58% | $104,093 |
| 11/23/15 | $100,000 | 2.57% | $103,908 |
| 11/24/15 | $250,000 | 2.57% | $259,752 |
| 2/10/16 | $2,000,000 | 2.62% | $ 83,390 |
| 2/11/16 | $250,000 | 2.62% | $258,524 |
| 4/5/16 | $6,000,000 | 2.25% | $6,155,712 |
| 5/4/16 | $2,700,000 | 2.24% | $2,764,954 |
| 7/1/16 | $30,000 | 2.18% | $30,598 |
| 8/5/16 | $525,000 | 2.18% | $534,375 |
| 8/22/16 | $250,000 | 2.18% | $254,465 |
| 9/22/16 | $185,000 | 2.18% | $187,773 |
| 12/12/16 | $7,700,000 | 2.26% | $7,781,050 |
| 3/31/17 | $150,000 | 2.78% | $150,697 |
| | $21,800,000 | | $20,247,628.02 |

3

D-CNL003122

# EXHIBIT R

# PROMISSORY NOTE

**$6,059,831.51**                                                  **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from HCRE Partners, LLC, as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HCREA PARTNERS, LLC ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of SIX MILLION, FIFTY NINE THOUSAND, EIGHT HUNDRED THIRTY ONE AND 51/100 DOLLARS ($6,059,831.51), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of eight percent (8.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    Final Payment Date.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

D-CNL003278

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. <u>Prior Notes</u>. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HCRE PARTNERS, LLC

By: _____
Name: James Dondero
Title:

2

D-CNL003279

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 1/9/14 | $100,000.00 | 8.00% | $108,000.00 |
| 1/29/14 | $600,000.00 | 8.00% | $648,000.00 |
| 3/10/14 | $2,000,000.00 | 8.00% | $2,009,643.84 |
| 3/28/14 | $50,000.00 | 8.00% | $54,000.00 |
| 1/26/15 | $1,500,000.00 | 8.00% | $1,545,356.16 |
| 4/2/15 | $1,500,000.00 | 8.00% | $1,545,356 |
| | **$5,750,000.00** | | **$6,059,831.51** |

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:    jpomerantz@pszjlaw.com
          rfeinstein@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:    MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | Case No. 3:21-cv-01010-E |
| Defendants. | § | |
| | § | |
| | § | |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br><br>§<br><br>§<br>Plaintiff,   §<br><br>§<br><br>§<br>vs.   §<br><br>§<br><br>§<br>HIGHLAND CAPITAL MANAGEMENT FUND   §<br>ADVISORS, L.P.,   §<br><br>§<br><br>§<br>Defendant.   § | Adv. Proc. No. 21-3004<br><br><br>Case No. 3:21-cv-00881-X |

HIGHLAND CAPITAL MANAGEMENT, L.P.,   §
                                    §
                                    §
                Plaintiff,          §    Adv. Proc. No. 21-3005
                                    §
                                    §
vs.                                 §
                                    §
NEXPOINT ADVISORS, L.P., JAMES      §    Case No. 3:21-cv-00880-C
DONDERO, NANCY DONDERO, AND         §
THE DUGABOY INVESTMENT TRUST,       §
                                    §
                                    §
                Defendants.         §

HIGHLAND CAPITAL MANAGEMENT, L.P.,   §
                                     §
                                     §
                Plaintiff,           §    Adv. Proc. No. 21-3006
                                     §
                                     §
vs.                                  §
                                     §
HIGHLAND CAPITAL MANAGEMENT          §    Case No. 3:21-cv-01378-N
SERVICES, INC., JAMES DONDERO,       §
NANCY DONDERO, AND THE DUGABOY       §
INVESTMENT TRUST,                    §
                                     §
                Defendants.          §

HIGHLAND CAPITAL MANAGEMENT, L.P., §
§
§
Plaintiff, §  Adv. Proc. No. 21-3007
§
vs. §
§
§  Case No. 3:21-cv-01379-X
HCRE PARTNERS, LLC (n/k/a NexPoint §
Real Estate Partners, LLC), JAMES §
DONDERO, NANCY DONDERO, AND §
THE DUGABOY INVESTMENT TRUST, §
§
§
Defendants. §

## TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ...............................2

    A.    BACKGROUND ...................................................................... 2

        1.    The Bankruptcy Case ................................................... 2

        2.    Procedural History ..................................................... 3

            i.    Commencement of the Adversary Proceedings ............................. 3

            ii.   Defendants' Motions to Withdraw the Reference ......................... 4

            iii.  The Adversary Proceedings are Consolidated for Pretrial Purposes ......................................................................... 4

            iv.   Plaintiff Files the Amended Complaints ............................... 5

    B.    HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT ....................................... 5

        1.    The Demand Notes ................................................... 5

            i.    James Dondero ................................................... 6

            ii.   HCMFA ......................................................... 6

            iii.  HCMS .......................................................... 6

            iv.   HCRE .......................................................... 7

        2.    The Term Notes ..................................................... 9

    C.    THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING ........................ 12

        1.    Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet .................................... 13

        2.    In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes ............. 17

        3.    Without Exception, the Notes were Disclosed in Highland's Books and Records Carried as Assets without Discount ................................... 19

        4.    Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections ................. 21

    D.    THE OBLIGORS' AFFIRMATIVE DEFENSES ............................... 22

<div align="center">i</div>

1.      The Alleged Agreement Defense .................................................................. 22

        i.      The Allegations Materially Changed Over Time.......................... 23

        ii.     The Final Version of the "Alleged Agreement" Defense ............. 24

        iii.    No Reasonable Trier of Fact Can Find that the Alleged Agreement
                Existed........................................................................................ 25

2.      HCMFA's "Mutual Mistake" Defense ..................................................... 30

3.      Waiver and Estoppel [NexPoint, HCMS, HCRE] .................................. 35

4.      Other Defenses ........................................................................................ 36

III.    ARGUMENT ...................................................................................................... 37

    A.  Legal Standard .................................................................................................. 37

        1.      Summary Judgment Standard .................................................................. 37

        2.      Summary Judgment Standard for Promissory Notes ................................ 38

    B.  Highland is Entitled to Summary Judgment for Defendants' Breach of the
        Notes .................................................................................................................. 39

    C.  Defendants Fail to Rebut Highland's Prima Facie Case...................................... 41

        1.      No Reasonable Jury Could Find that the "Alleged Agreement"
                Exists ........................................................................................................ 42

        2.      No Reasonable Jury Could Find the HCMFA Note Was a
                "Mistake" ................................................................................................. 44

        3.      No Reasonable Jury Could Find that NexPoint's, HCRE's, and
                HCMS's Defaults under the Notes Were the Result of Highland's
                Negligence ................................................................................................ 47

        4.      No Reasonable Jury Could Find that NexPoint "Prepaid" on the
                NexPoint Note............................................................................................ 47

CONCLUSION.............................................................................................................. 47

DOCS_NY:44673.8 36027/003

## TABLE OF AUTHORITIES

**CASES**

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
   MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021)................................ 45, 47

*Alton v. Texas A&M University*,
   168 F.3d 196 (5th Cir. 1999) ...................................................................... 36, 38

*Armstrong v. City of Dallas*,
   997 F.2d 62 (5th Cir.1993) ........................................................................ 38

*Crisalli v. ARX Holding Corp.*,
   177 F. App'x 417 (5th Cir. 2006)................................................................. 44

*FDIC v. Cardinal Oil Well Servicing Co.*,
   837 F.2d 1369 (5th Cir.1988) ..................................................................... 38

*Hall v. Branch Banking*,
   No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014).................................. 37

*Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*,
   CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007)........................... 45, 46

*In re Heritage Org., L.L.C.*,
   354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006)............................................. 43, 44

*In re Magna Cum Latte, Inc.*,
   07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) .................... 37, 39, 43

*Latimer v. Smithkline & French Laboratories*,
   919 F.2d 301 (5th Cir.1990) ...................................................................... 37

*Looney v. Irvine Sensors Corp.*,
   CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ......................... passim

*Melanson v. Navistar, Inc.*,
   3:13-CV-2018-D, 2014 WL 4375715 (N.D. Tex. Sept. 4, 2014)............................ 43, 44

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
   40 F.3d 698 (5th Cir. 1994) ...................................................................... 37

*Resolution Tr. Corp. v. Starkey*,
   41 F.3d 1018 (5th Cir. 1995) ............................................................... 38, 39, 41

*Scott v. Wollney*,
   No. 3:20-CV-2825-M-BH, 2021 WL 4202169 (N.D. Tex Aug. 28, 2021)....................... 43

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ..................................................................... 38

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ..................................................................... 36

DOCS_NY:44673.8 36027/003

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
   No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007)........................................... 45, 46

**RULES**

FED. R. CIV. P. 56(c)...................................................................................................................... 36

iv

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-
captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this memorandum of law
in support of its *Motion for Partial Summary Judgment* (the "Motion") on its First and Second
Causes of Action.[1]  In support of its Motion, Highland states as follows:

## I.    PRELIMINARY STATEMENT[2]

1.      In accordance with its Plan and the clear and unambiguous terms of the
Notes, Plaintiff seeks to collect on over $50 million of promissory notes issued by Mr. Dondero
and certain entities controlled by him.  The Notes were tendered in exchange for hard dollars at a
time when Mr. Dondero controlled both the borrower and the lender.  Now, Mr. Dondero refuses
to make good on his promises to repay the money he borrowed.

2.      Plaintiff makes out its prima facie case for summary judgment for
Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the Notes
are (i) valid, (ii) executed by Defendants and in favor of Highland, and (iii) there is a balance due
and owing under the Notes.  Defendants fail to rebut Plaintiff's prima facie case because
Defendants fail to create a genuine issue of material fact regarding their breach.   There is a
complete absence of evidence to support each of Defendants' affirmative defenses.

3.      Nevertheless, Defendants are certain to contest every single fact and erect
countless strawmen regardless of the record in support of their own fabricated stories.  But in the

---

[1] Concurrently herewith, Highland is filing the *Appendix of Exhibits in Support of Highland Capital Management,
L.P.'s Motion for Partial Summary Judgment* (the "Appendix"). Citations to the Appendix are notated as follows: Ex.
#, Appx. #

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

end, there will be no evidence to corroborate the Defendants' contentions other than their own self-serving, conclusory, and unsubstantiated assertions.  There will be no documents or written communications that credibly support Defendants' story.  By contrast, Plaintiffs claims are both simple and buttressed by a mountain of undisputed evidence including contemporaneous written communications, audited financial statements, statements to third parties, books and records, and the plain words of the Defendants and their officers.

4.      Plaintiff does not have to prove its case beyond a reasonable doubt or by clear and convincing evidence nor does Plaintiff have the burden of proving that *no* facts are in dispute.  Instead, Plaintiff need only show that there is no "genuine" dispute of material fact.

5.      Viewed fairly, Plaintiff's evidence is so overwhelming, and Defendants' stories are so weak, that the Court must grant the Motion.

## II.      STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      BACKGROUND[3]

#### 1.      The Bankruptcy Case

6.      On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.      On December 4, 2019, the Delaware Court entered an order transferring venue of Highland's bankruptcy case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") [Bankr. Docket No. 186].[4]

---

[3] Attached to the Motion as **Exhibit B** is *Plaintiff's List of Parties, Witnesses, and Definitions*.

[4] "Bankr. Docket No. __" refers to the docket maintained by the Bankruptcy Court in case no. 19-34054.

8.      On January 22, 2021, Highland filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").

9.      On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order") which confirmed Highland's Plan.[5]

10.     On August 11, 2021, the Plan became Effective (as defined in the Plan), and Highland became the Reorganized Debtor (as defined in the Plan). *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 2700].

   2.   **Procedural History**

        i.      **Commencement of the Adversary Proceedings**

11.     On January 22, 2021, Plaintiff commenced the Adversary Proceedings by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Original Complaints") against each of the Defendants.[6]

12.     In its Original Complaints, Plaintiff asserted claims against each Defendant for (i) breach of contract for the Defendant's breach of its respective obligations under the Notes and (ii) turnover by each Defendant for all accrued and unpaid principal and interest due under the

---

[5] The confirmed Plan included certain amendments filed on February 1, 2021. *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Bankr. Docket No. 1875].

[6] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004 (the "HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action"), Docket No. 1 (the "HCRE Original Complaint").  The forgoing are collectively referred to as the "Original Complaints."

Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

### ii.   Defendants' Motions to Withdraw the Reference

13.   Between April and June 2021, the Obligors each filed a similar motion to withdraw the reference (the "Motions to Withdraw") in which the Obligors sought to withdraw the Adversary Proceedings from the Bankruptcy Court to the District Court.

14.   In July 2021, the Bankruptcy Court issued Reports and Recommendations (the "R&Rs") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions.

15.   The applicable District Court subsequently adopted the Bankruptcy Court's R&Rs in the NexPoint, HCMS, HCRE, and HCMFA Actions, but the decision on the R&R in the Dondero Action remains pending.

### iii.   The Adversary Proceedings are Consolidated for Pretrial Purposes

16.   The Parties subsequently agreed to, among other things, consolidate discovery for all purposes and coordinate the timing of the service of pleadings (i.e., Plaintiff's amended complaints adding the New Claims against the Duty Defendants and the Defendants' responses thereto). That agreement was memorialized in a *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding (collectively, the "Discovery Stipulations").

17.   In furtherance of the intent reflected in the Discovery Stipulations, and consistent with the related Orders granting Plaintiff's unopposed motions for leave to amend its pleadings, Plaintiff was "deemed to have served the Amended Complaint on the [applicable]

4

[D]efendant on July 13, 2021," even though the Amended Complaints were not actually filed on the dockets until August 27, 2021.

### iv.   **Plaintiff Files the Amended Complaints**

18.   On August 27, 2021, Highland filed its Amended Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263).[7]  In the Amended Complaints, Highland added the new claims against new defendants.  Specifically, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[8]

## B.   **HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT**

19.   The Obligors are the makers under a series of promissory notes tendered to Highland in exchange for contemporaneous loans and other consideration.  These Notes were executed between 2013 and 2019 and are described below.

### 1.   **The Demand Notes**

20.   As the documentary evidence specifically identified below establishes, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans as follows:

---

[7] All of the amendments related to the belated assertion of the Alleged Agreement defense.  Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense.

[8] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement.

i.  **James Dondero**

- a Demand Note in the original principal amount of $3,825,000, executed on February 2, 2018, in favor of Highland (the "First Dondero Note"); (Klos Dec.[9] ¶ 18 at Ex. D); Ex. 125 at 9, Appx. 2357; Ex. 188, Appx. 3001-3002; Ex. 189, Appx. 3003-3004; Ex. 74, Appx. 1338-1340; Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Ex. 32 ¶ 20, Appx. 664; Ex. 31 ¶ 20, Appx. 647)

- a Demand Note in the original principal amount of $2,500,000, executed on August 1, 2018, favor of Highland (the "Second Dondero Note"); (Klos Dec. ¶ 19 at Ex. E); Ex. 126 at 2, Appx. 2366; Ex. 190, Appx. 3005-3006; Ex. 76, Appx. 1354-1356; Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Ex. 32 ¶ 21, Appx. 664; Ex. 31 ¶ 21, Appx. 647); and

- a Demand Note in the original principal amount of $2,500,000, executed on August 13, 2018, in favor of Highland (the "Third Dondero Note," collectively with the First Dondero Note and the Second Dondero Note, the "Dondero Notes") (Klos Dec. ¶ 20 at Ex. F); Ex. 126 at 2, Appx. 2366; Ex. 77, Appx. 1357-1359; Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Ex. 32 ¶ 22, Appx. 664; Ex. 31 ¶ 22, Appx. 647).

ii.  **HCMFA**

- a Demand Note in the original principal amount of $2,400,000, executed on May 2, 2019, in favor of Highland (the "First HCMFA Note") (Klos Dec. ¶ 21 at Ex. G); Ex. 147 at 7, Appx. 2526; Ex. 54, Appx. 870-873; Ex. 55, Appx. 874-875; Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 53, Appx. 866-869); and

- a Demand Note in the original principal amount of $5,000,000, executed on May 3, 2019, in favor of Highland (the "Second HCMFA Note," together with the First HCMFA Note, the "HCMFA Notes") (Klos Dec. ¶ 22 at Ex. H); Ex. 147 at 7, Appx. 2526; Ex. 56; Ex. 1 (Exhibit 2), Appx. 12-15; Ex. 57, Appx. 878-880).

iii.  **HCMS**

- a Demand Note in the original principal amount of $150,000, executed on March 28, 2018, in favor of Highland (the "First HCMS Demand Note") (Klos Dec. ¶ 23 at Ex. I); Ex. 143, Appx. 2487-2490; Ex. 3 (Exhibit 1), Appx. 117-119;

---

[9] Refers to the *Declaration of David Klos in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, being filed concurrently herewith.

- a Demand Note in the original principal amount of $200,000, executed on June 25, 2018, in favor of Highland (the "Second HCMS Demand Note") (Klos Dec. ¶ 24 at Ex. J); Ex. 144, Appx. 2491-2494; Ex. 3 (Exhibit 2), Appx. 120-122);

- a Demand Note in the original principal amount of $400,000, executed on May 29, 2019, in favor of Highland (the "Third HCMS Demand Note") (Klos Dec. ¶ 25 at Ex. K); Ex. 145 at 11, Appx. 2506; Ex. 3 (Exhibit 3), Appx. 123-125); and

- a Demand Note in the original principal amount of $150,000, executed on June 26, 2019, in favor of Highland (the "Fourth HCMS Demand Note," collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and the Third HCMS Demand Note, the "HCMS Demand Notes") (Klos Dec. ¶ 26 at Ex. L); Ex. 146 at 7, Appx. 2516; Ex. 3 (Exhibit 4), Appx. 126-128).

iv.   **HCRE**

- a Demand Note in the original principal amount of $100,000, executed on November 27, 2013, in favor of Highland (the "First HCRE Demand Note") (Klos Dec. ¶ 27 at Ex. M); Ex. 148, Appx. 2533-2536; Ex. 4 (Exhibit 1), Appx. 201-203);

- a Demand Note in the original principal amount of $2,500,000, executed on October 12, 2017, in favor of Highland (the "Second HCRE Demand Note") (Klos Dec. ¶ 28 at Ex. N); Ex. 154 at 7, Appx. 2575; Ex. 4 (Exhibit 2), Appx. 204-206);

- a Demand Note in the original principal amount of $750,000, executed on October 15, 2018, in favor of Highland (the "Third HCRE Demand Note") (Klos Dec. ¶ 29 at Ex. O); (Ex. 155 at 5, Appx. 2585; Ex. 4 (Exhibit 3), Appx. 207-209); and

- a Demand Note in the original principal amount of $900,000, executed on September 25, 2019, in favor of Highland (the "Fourth HCRE Demand Note," collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and the Third HCRE Demand Note, the "HCRE Demand Notes") (Klos Dec. ¶ 30 at Ex. P); Ex. 156 at 6, Appx. 2596; Ex. 4 (Exhibit 4), Appx. 210-212).

21.   Except for the date, the amount, the maker, and the interest rate, each of the

Demand Notes is identical and includes the following provisions, among others:

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be *due and payable on demand of the Payee*.

5.      Acceleration Upon Default.  *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, *mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.*  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.      Waiver.  Maker hereby *waives* grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, *the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection*, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Ex. 74, Appx. 1338-1340; Ex. 76, Appx. 1354-1356; Ex. 77, Appx. 1357-1359; Ex. 1 (Exhibits 1-2), Appx. 9-15; Ex. 3 (Exhibits 1-4), Appx. 117-128; and Ex. 4 (Exhibits 1-4), Appx. 201-212 (emphases added).

22.      On December 3, 2020, Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The Demand Letters also included a demand for all costs of collection, including attorneys' fees, as provided in the Notes.  Ex. 79, Appx. 1370-1373; Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216 (collectively, the "Demand Letters").

23.     Neither Mr. Dondero, nor HCMFA, nor HCMS, nor HCRE made any payments to Highland on account of Notes or otherwise responded to the Demand Letters prior to the commencement of the Adversary Proceedings.

24.     Consequently, Mr. Dondero, HCMFA, HCMS, and HCRE breached Section 2 of each Demand Note, and each such Obligor is in default.

25.     As of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

26.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Demand Notes was $7,874,436.09. (Klos Dec. ¶ 40).

27.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. (Klos Dec. ¶ 45).

28.     As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. (Klos Dec. ¶ 50).

## 2.     **The Term Notes**

29.     As the documentary evidence specifically identified below establishes, on May 31, 2017, Mr. Dondero executed a 30-year term note on behalf of NexPoint (the "NexPoint Term Note"), HCMS (the "HCMS Term Note"), and HCRE (the "HCRE Term Note"),

respectively, each as a maker, in favor of Highland (collectively, the "Term Notes"). (Klos Dec. ¶¶ 27-29).

30.     Each of the Term Notes "rolled up" the respective maker's obligations under certain then-outstanding demand notes that were identified as the "Prior Notes" in each Term Note.[10]

31.     The following Term Notes are at issue:

- a Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note") (Klos Dec. ¶ 31 at Ex. A); Ex. 2 (Exhibit 1), Appx. 41-44; Ex. 2 ¶ 21, Appx. 28; Ex. 15 ¶ 21);

- a Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes") (Klos Dec. ¶ 32 at Ex. R); Ex. 3 (Exhibit 6)); and

- a Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes") (Klos Dec. ¶ 33 at Ex. S); Ex. 4 (Exhibit 6)).

32.     According to Mr. Waterhouse, Highland loaned money to NexPoint, HCMS, and HCRE to enable those entities to make investments.  Ex. 105 at 126:21-129:3.[11]

33.     Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Note), each of the Term Notes is identical and includes the following provisions, among others:

2.1     Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note

---

[10] Proof of the loans underlying the Prior Notes (as defined in each Term Note) can be found at Exs. 127-141 (HCMS); Exs. 149-153 (HCRE); Exs. 157-161 (NexPoint (the July 22, 2015 Prior Note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Ex. 161))).

[11] Highland sought to inquire as to the use of the loan proceeds by NexPoint, HCMS, and HCRE (Exs. 47-49 (Rule 30(b)(6) Topic 3(e))), but (a) those Obligors objected on relevance grounds (Ex. 191; Ex. 98 at 348:18-20), and (b) Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds.  Ex. 105 at 420:10-18, 435:17-25, 448:4-13, and 450:3-24.

DOCS_NY:44673.8 36027/003

(and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full. ***Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

4.      Acceleration Upon Default. *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.*** No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver. Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection,*** all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

34.      NexPoint, HCMS, and HCRE each failed to make the Annual Installment payment due on December 31, 2020.

35.      As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[12] (Klos Dec. ¶ 51).

---

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

36.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.[13] (Klos Dec. ¶ 52).

37.     As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[14] (Klos Dec. ¶ 53).

## C.    THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING

38.     As described in more detail below, the existence, validity, and enforceability of the Notes is corroborated by the following undisputed facts:

- Plaintiff's audited financial statements (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse) showed that each of the Notes (including the HCMFA Notes) (a) was carried as an asset on Plaintiff's balance sheet, (b) had a value equal to the unpaid principal and interest then due, and (c) was disclosed without reference to the Alleged Agreement, HCMFA's Mistake Defense, or any other defense;

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 that they were obligated to pay Highland the amounts due under the HCMFA Notes and the NexPoint Notes, respectively, each without any setoff or reservation;

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff;

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the Petition Date through January 9, 2020, when Mr. Dondero solely controlled Plaintiff), Plaintiff's bankruptcy filings (most of which were prepared or signed by Mr. Waterhouse) reported the

---

[13] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[14] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

Notes (including the HCMFA Notes) as being assets of the Debtor's estate, each without any setoff or reservation;

• The Notes (including the HCMFA Notes) were identified as substantial assets and sources of recovery under Plaintiff's proposed Plan, yet none of the Obligors informed the Court, Plaintiff, or any creditors of any of their purported defenses even though (a) each of them filed a Plan Objection, and (b) the Adversary Proceedings had already been commenced when the confirmation hearing on the Plaintiff's Plan was conducted.

1.   **Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet**

39.   The undisputed evidence cited below establishes, among other things, that (a) all of the Notes executed through early May 2019 were provided to PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[15] and (c) neither Highland nor Mr. Dondero disclosed the Alleged Agreement, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principals ("GAAP").

40.   PwC's audit process was extensive and took months to complete.  Ex. 94 at 9:24-12:14.

41.   As part of the process, Highland was responsible for drafting the financial statements and accompanying notes and "management" provided the information that PwC needed

---

[15] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Ex. 34 at 39.  Because the HCMFA Notes were executed after the end of the fiscal year, they were ***not*** included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its *own* 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its *own* balance sheet.  Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3.

13

to conduct its audits.  *Id*. at 14:8-15:14; *see also id*. at 49:11-50:22.  All of Highland's employees who worked on the audit reported to Mr. Waterhouse, and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Ex. 105 at 87:25-89:10.

42.    Before signing off on its audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon.  Ex. 94 at 16:18-17:20, 23:4-9.  *See also* Ex. 105 at 96:24-98:6 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness.").

43.    For at least the fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Ex. 33, Ex. 86, Ex. 94 at 17:21-25, 19:2-22:6; *see also* Ex. 105 at 92:4-8, 94:20-95:12.

44.    On June 3, 2019, in connection with PwC's audit of Highland's financial statements for the period ending December 31, 2018, Mr. Dondero and Mr. Waterhouse made the following representations to PwC:

- The Affiliated Party Notes represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019 (Ex. 33 ¶11; Ex. 94 at 24:6-25:5);[16]

- If there were any errors in Highland's financial statements, they were not "material" (Ex. 33 ¶32; Ex. 94 at 25:6-26:13);

- There were no "material" transactions or agreements that were not recorded in the financial statements (Ex. 33 ¶34; Ex. 94 at 26:14-27:11);

- All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed

---

[16] "Affiliated Party Notes" is the term used by PwC to refer to notes tendered to Highland by officers, employees, or affiliates of Highland.  *See generally* Ex. 33; Ex. 94.

14

in the consolidated financial statements (Ex. 33 ¶35(d); Ex. 94 at 27:12-28:11);

- All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed (Ex. 33 ¶36; Ex. 94 at 28:12-29:5); and

- All subsequent events were disclosed (Ex. 33 (signature page); Ex. 94 at 29:6-30:2).

45.     Under GAAP, Highland was required to disclose to PwC (a) all "material" related party transactions and (b) any circumstances that would call into question the collectability of any of the Notes.  Ex. 94 at 34:17-35:2, 51:17-52:5, 70:20-71:3.[17]

46.     Neither Mr. Dondero nor Highland ever disclosed to PwC (a) the existence or terms of the Alleged Agreement; (b) the existence of any oral or written amendment to any of the Affiliate Notes listed in PwC's 2018 work papers; or (c) that any of the Notes might be forgiven.  Ex. 24 (Responses to RFAs 1-2); Ex. 94 at 67:16-70:19, 71:4-74-8, 92:19-93:12; Ex. 105 at 102:2-5.

47.     If PwC had learned before June 3, 2019, that any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed. Ex. 94 at 74:19-76:12.

48.     For purposes of PwC's audit, "affiliate notes" were considered receivables of Highland and were carried as assets on Highland's balance sheet under "Notes and other amounts due from affiliates."  Ex. 34 at 2; Ex. 72 at 2; Ex. 94 at 23:10-22, 31:11-33:20; Ex. 105 at 106:20-109:12.

---

[17] For purposes of the 2017 audit, the "materiality" threshold was $2 million.  Ex. 86 at 1.  For purposes of the 2018 audit, the "materiality" threshold was $1.7 million or more.  Ex. 33 at 1; Ex. 94 at 22:11-23:3.  *See also* Ex. 105 at 91:14-93:6.

49.     For the 2017 fiscal year, Highland valued "Notes and other amounts due from affiliates" in the aggregate amount of approximately $163.4 million, which then constituted more than 10% of Highland's total assets; for the 2018 fiscal year, Highland valued "Notes and other amounts due from affiliates" in the aggregate amount of approximately $173.4 million, which then constituted more than 15% of Highland's total assets.  Ex. 72 at 2; Ex. 34 at 2; Ex. 94 at 33:21-34:2, 51:2-16.

50.     The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 34:17-36:25; 51:17-53:12; Ex. 105: at 110:22-112:21.

51.     The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 37:11-39:12; 53:19-25.

52.     At the time PwC completed its 2017 and 2018 audits, PwC had no reason to discount the value of any of the Affiliate Notes.  Ex. 94 at 39:17-21; 54:2-8.

53.     Moreover, as reflected in PwC's work papers, and based on the information provided by Highland and PwC's own independent analysis, PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Ex. 92; Ex. 93; Ex. 94 at 41:2-45:6, 55:17-60:22, 68:20-25.

54.     Note 15 to Highland's 2018 audited financial statements disclosed as a "subsequent event" (*i.e.*, an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit) the following:

> Over the course of 2019, through the report date, HCMFA issued
> promissory notes to [Highland] in the aggregate amount of $7.4
> million. The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39. *See also* Ex. 94 at 54:9-55:7).

55.     There will be no evidence that HCMFA issued any notes to Highland in

2019 other than the HCMFA Notes.

### 2.      In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes

56.     The Advisors have contracts to manage certain funds (the "Fund

Agreements"). The Fund Agreements are among the most important contracts the Advisors have;

HCMFA's Rule 30(b)(6) witness acknowledged that its contracts with the Funds are largely the

reason for HCMFA's existence. Ex. 192 at 66:3-67:6.

57.     The Funds are purportedly managed by a board (the "Retail Board"). In the

fall of each year, the Retail Board must determine whether to renew the Fund Agreements with

the Advisors, a process referred to as a "15(c) Review." As part of the 15(c) Review process, the

Retail Board requests information from the Advisors. Ex. 99 at 129:17-130:3, Ex. 105 at 32:17-

33:6, 168:9-12, 169:9-170:16.

58.     Mr. Waterhouse, the Advisors' Treasurer, and Mr. Norris, HCMFA's

Executive Vice President, participated in the annual 15(c) Review process with the Retail Board.

Ex. 192 at 67:7-68:19; Ex. 105 at 168:13-169:8.

59.     In October 2020, as part of its 15(c) Review, the Retail Board asked the

Advisors to provide certain information including the following:

> Are there any outstanding amounts currently payable or due in the
> future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or
> any other affiliate that provides services to the Funds?

Ex. 36 at 3.

60.     Ms. Thedford, the Secretary of the Advisors and an employee of Highland, followed up on this particular question, and Mr. Waterhouse directed her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review. *Id.* at 2.

61.     As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer). Ex. 35; Ex. 37.

62.     Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA." Ex. 36 at 1.

63.     This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3; Ex. 194 at 117:16-122:15; Ex. 195 at 120:23-122:13.

64.     On October 23, 2020, the Advisors provided their final, formal responses to the questions posed by the Retail Board. As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, the Advisors reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA. The Note between HCMLP and NexPoint comes due on December 31, 2047. The earliest the Note between HCMLP and HCMFA could come due is in May 2021. All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter. The Advisor notes that both entities have the full faith and support of James Dondero.

Ex. 59 at 2.

65.     Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the NexPoint Note the HCMFA Notes.

**3.    Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount**

66.     In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the Notes as valid debts due and owing by each of the Obligors to Plaintiff.

67.     For example, in the Debtor's February 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the transfer to Mr. Dondero on February 2, 2018 was contemporaneously identified as "($3.8M) partner loan." Ex. 39 at 2. *See also* Ex. 78 at 2 (in the Debtor's August 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan.").

68.     After the Petition Date, but while Mr. Dondero was still in control of Highland, the Debtor filed its *Schedules of Assets and Liabilities* [Docket No. 247] (the "Debtor's Schedules"). The Debtor's Schedules included the Notes among the Debtor's assets. Ex. 40 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

69.     In every one of the Debtor's *Monthly Operating Reports* (the "MORs") filed with the Court (while Mr. Dondero was in control of Highland and after), the Debtor included as

assets of the estate amounts "Due from affiliates" that included the Notes.  *See, e.g.,* Ex. 41; Ex. 42; Ex. 88; Ex. 89.[18]

70.    Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued interest.  *See, e.g.,* Exs. 196-198 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

71.    Relatedly, Highland's accounting group has a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").  The Loan Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger.  *See* Ex. 199 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

72.    The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business. For example, Ex. 199 ties exactly into Ex. 198, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Docket No. 2020.  Klos Dec. ¶¶15-16.[19]

---

[18] *See also* Docket No. 405 (October 2019); Docket No. 289 (November 2019); Docket No. 418 (December 2019); Docket No. 497 (January 2020); Docket No. 558 (February 2020); Docket No. 634 (March 2020); Docket No. 686 (April 2020); Docket No. 800 (May 2020), as amended in Docket No. 905 (June 2020); Docket No. 913 (June 2020); Docket No. 1014 (July 2020); Docket No. 1115 (August 2020); Docket No. 1329 (September 2020); Docket No. 1493 (October 2020); Docket No. 1710 (November 2020); Docket No. 1949 (December 2020); and Docket No. 2030 (January 2021).

[19] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates." Docket No. 2030 (balance sheet). Ex. 198 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand). Ex. 199, the Loan Summary, is the "back up" to the "back

DOCS_NY:44673.8 36027/003

4.      **Recovery on the Notes Was A Significant Component of the Plan Yet the
Obligors Remained Silent On the Point Despite Lodging Objections**

73.      On November 24, 2020, Highland filed its *Disclosure Statement for the
Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473].
Included therein were the Debtor's Liquidation Analysis/Financial Projections (the "Projections").
Ex. 90.   Among the assumptions supporting the Projections was that "[a]ll demand notes are
collected in the year 2021."   *Id.* at 173 of 178 (Assumption C).

74.      Thus, even though Highland had not yet called the Demand Notes, the
Obligors and all parties in interest were put on notice on November 24, 2020, that the Debtor's
Projections assumed all Demand Notes would be collected the following year.

75.      By early February 2021, Highland had already commenced the Adversary
Proceedings to collect on all of the Notes.   Consequently, it amended the Projections [Docket
No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand notes are
collected in the year 2021; 3 term notes defaulted and have been demanded based on default
provisions; payment estimated in 2021." Ex. 91 at 2 (Assumption C) (the "Assumption").

76.      Thus, as of February 1, 2021, on the eve of confirmation, the Obligors and
all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due
under the Notes would be collected as part of the Plan.

77.      At the confirmation hearing, James P. Seery, Jr., Highland's Chief
Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and
(b) how the commencement of the Adversary Proceedings impacted the Projections.

---

up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding
principal amounts due under each Note.  *See* Klos Dec. ¶¶15-16.

Mr. Dondero's counsel asked limited questions on cross-examination concerning the Notes.
Ex. 206 at 123:23-124:23, 128:23-129:21, 185:8-15.

78.    In his closing argument, Mr. Dondero's counsel discussed the Notes and (a)
vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term
Notes are due and payable and (b) observed that the Notes were not discounted for "collectability
issues," but made no mention of the Alleged Agreement, HCMFA's Mutual Mistake defense, or
any other defense:

> First, there's the notes; and second, there's the assets.  The notes are
> either long-term or demand notes.   Those long-term notes,
> Mr. Seery will tell you some have been validly accelerated and
> therefore are now due and payable.  I think there's arguments to the
> contrary.  But those long-term notes probably have some both time
> value of money and collection costs.  And then, of course, you have
> to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not
> provided any data or analysis as to what discounts were applied to
> those notes.  And, therefore, I don't think that this Court can make
> any determination that the best interests of the creditors have been
> met.

Ex. 207 at 223:22-224:14.

## D.    THE OBLIGORS' AFFIRMATIVE DEFENSES

79.    The Obligors have asserted various defenses to Plaintiff's claims
concerning Counts One and Two and those are addressed below.

### 1.    The Alleged Agreement Defense

80.    Over the course of several months, Mr. Dondero cobbled together an
affirmative defense premised on an alleged oral agreement pursuant to which all of the Notes
would be forgiven based on certain "conditions subsequent" or if certain assets were sold by a
third party.  After Mr. Dondero settled on that defense, all of the Obligors (except HCMFA)
amended their pleadings to adopt the same affirmative defense.

        i.      **The Allegations Materially Changed Over Time**

      81.     In due course, each of the Defendants filed its respective Original Answer.[20] In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes." Ex. 80 ¶40 (the "Alleged Agreement"). None of the Corporate Obligors asserted the Alleged Agreement or any similar defense in its respective Original Answer.

      82.     In late March, Highland asked Mr. Dondero to admit, among other things, that he did not pay taxes on the amounts loaned to him but that Plaintiff allegedly agreed not to collect. Ex. 81 (Responses to RFAs 4, 8, and 12). Having been alerted to a fatal flaw in his defense, Mr. Dondero modified his affirmative defense based on the Alleged Agreement to state that: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes *upon fulfillment of conditions subsequent*." Ex. 83 ("Amended Answer") ¶40.

      83.     On April 15, 2021, about ten days after serving his Amended Answer, Mr. Dondero served his *Rule 26 Initial Disclosures*. Ex. 184 (the "Rule 26 Disclosures"). In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," but his sister, Ms. Dondero, was not among them. *Id.* at 2-5.

      84.     On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories*. Ex. 82.

      85.     In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of

---

[20] Dondero Action, Docket No. 6 (the "Dondero Original Answer"); HCMFA Action, Docket No. 6 (the "HCMFA Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6 (the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

the Debtor *by James Dondero* subsequent to the time each note was executed." *Id*. at 4 (Answer to Interrogatory No. 1) (emphasis added).

86.    In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but – like the Rule 26 Disclosures – Mr. Dondero's sister was not among them. *Id.* (Answer to Interrogatory No. 2).

87.    It was not until later in discovery that Mr. Dondero identified his sister – someone he failed to include as a person likely to have discoverable information or someone he believed had actual knowledge of each Alleged Agreement – as the person who allegedly bound Plaintiff to the Alleged Agreement, rather than himself.[21]

88.    In the weeks that followed, each of the Obligors (except for HCMFA) sought leave from the Court to amend its respective answer to adopt Mr. Dondero's Alleged Agreement defense, contending that it is not liable under any of the Notes because Plaintiff (bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into an oral agreement pursuant to which it promised not to collect on the Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[22]

ii.    **The Final Version of the "Alleged Agreement" Defense**

89.    After months of maneuvering, Mr. Dondero, HCMS, HCRE, and NexPoint finally settled on the following affirmative defense based on the Alleged Agreement:

> Plaintiff's claims are barred … because prior to the demands for
> payment Plaintiff agreed that it would not collect the Notes upon

---

[21] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner interests in Highland. *See* Ex. 31 ¶82.

[22] *See* Ex. 11 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended Answer) ¶42; Ex. 8 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First Amended Answer) ¶56; Ex. 9 (HCRE's Motion for Leave to Amend); Ex. 17 (HCRE's Amended Answer) ¶99.

fulfillment of conditions subsequent.   Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control.   The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP and in the industry.   This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

Ex. 31 ¶ 82 ("Dondero's Answer").[23]

### iii.   No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed

90.   For the reasons set forth below, no reasonable trier of fact can find that the Alleged Agreement ever existed.

91.   Mr. Dondero could not identify a material term of the Alleged Agreements. Mr. Dondero could not describe a material terms of the Alleged Agreements without relying on a document prepared by counsel.   Specifically, without a list prepared by counsel, Mr. Dondero could not identify any of the Notes subject to the Alleged Agreements nor could he recall (i) the number of Notes subject to each Alleged Agreement, (ii) the maker of each Note subject to each Alleged Agreement, (iii) the date of each Note subject to each Alleged Agreement, or (iv) the principal amount of any Note subject to the Alleged Agreements.   Ex. 99 at 13:4-28:22.

92.   Mr. Dondero's inability to identify the notes subject to the Alleged Agreement is significant because he and HCMFA had other notes outstanding at the same time.

---

[23] See also Ex. 15 ¶83 ("NexPoint's Answer"); Ex. 16 ¶97 ("HCMS's Answer"); and Ex. 17 ¶99 ("HCRE's Answer").

*See, e.g.,* Ex. 43 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9

million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26, 2014 note executed by

HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26, 2016 note executed by

HCMFA in the principal amount of $2.3 million).

93.     <u>Mr. and Ms. Dondero dispute a key aspect of the Alleged Agreements</u>.  Mr.

and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements;

namely, its scope.  Ms. Dondero insists that Mr. Dondero identified the notes that are the subject

of each Alleged Agreement.  Mr. Dondero, on the other hand, disagrees.  *Compare* Ex. 100 at

180:8-183:20 *with* Ex. 99 at 79:6-81:23.

94.     <u>Mr. Dondero personally caused MGM stock to be sold in November 2019</u>

<u>and failed to declare the Notes forgiven</u>.  According to Mr. and Ms. Dondero, all of the Notes

would be forgiven if Mr. Dondero sold one of three portfolio companies -- Trussway, Cornerstone,

or MGM -- above cost.  *See* Ex. 31 ¶82.

95.     In November 2019, Mr. Dondero caused the sale of a substantial interest in

MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but failed to

declare all of the Notes forgiven, and remained silent about the Alleged Agreement altogether.  *See*

Ex. 201 ¶29-30; Ex. 202 ¶14; Ex. 203 ¶1; Ex. 204 at 5 n. 5.

96.     <u>Ms. Dondero was not competent to enter into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not competent to enter into the Alleged Agreements,

and she made no effort to educate herself before purportedly binding Highland.  Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a)
  Highland or its business, (b) the financial industry, (c) executive
  compensation matters, or (d) Mr. Dondero's compensation or whether

he was "underpaid compared to reasonable compensation levels in the industry" (Ex. 100 at 42:22-43:8, 48:7-61:9; 211:8-216:21);[24]

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id.* at 61:25-63:13);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (*Id.* at 63:18-80-22; 208:24-210:13);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id.* at 83:14-84:8; 95:3-16; 99:20-100:10; 115:11-116:4; 127:13-128:4; 140:15-141:22, 180:18-23);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id.* 84:9-92:3-100:11-103:8);

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id.* at 103:19-115:10, 119:5-127:7, 129:5-140:14).

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit4).

---

[24] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Ex. 100 at 51:11-22. This information was false. Ex. 68 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

97.     Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions.  Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland. Ex. 101 at 12:3-73:17.

98.     <u>The Alleged Agreements were kept secret and were never disclosed.</u>  The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero:

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement.  Ex. 100 at 190:16-191:17;

- Ms. Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (2) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court.  Exs. 25-26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2); and

- Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada, or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms of the Alleged Agreement to the Bankruptcy Court.  Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17).[25]

99.     <u>No Document Exists that Reflects the Existence or Terms of the Alleged Agreements</u>.  No document was created prior to the Petition Date that memorializes or reflects the existence or terms of the Alleged Agreement:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreement; or (b) is otherwise aware of anything in writing that identifies the promissory notes that are the subject of each Alleged Agreement.  Ex. 100 at 178:25-180:7, 180:24-181:6.

---

[25] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement.  Ex. 24 (Responses to RFAs 3 and 4).  But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only knows that it was subject to "milestones" that he cannot identify.  Ex. 105 at 65:5-72:14, 82:19-84:7.

- The terms of the Alleged Agreement were never reduced to writing. Exs. 25-26 (Responses to RFAs 7-8, Responses to Interrogatories 3-4); Ex. 100 at 217:2-17.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreement; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements. Ex. 24 (Response to RFA 7); Ex. 99 at 28:24-29:12.

100.    <u>Even if the Alleged Agreements existed, they are unenforceable for lack of consideration</u>. Mr. Dondero is the founder of Highland and Highland was the platform he used to support his other businesses, including the Advisors, HCRE, and HCMS. No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the three portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party. Yet, according to Ms. Dondero, "motivating" Mr. Dondero is all Highland received. *See, e.g.,* Ex. 100 at 221:2-225:7.

101.    Indeed, Ms. Dondero admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party. She also acknowledged that (a) Highland would not benefit from the Alleged Agreements if a third party sold the portfolio companies at less than cost and (b) the Notes would all be forgiven even if a third party sold the portfolio companies at a price "substantially below cost." Ex. 100 at 201:24-203:11; 227:17-229:14.

102.    <u>Mr. Dondero fixed the terms of the Alleged Agreements without negotiation</u>. No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero

made no counterproposal of any kind.  Indeed, the undisputed facts show that Ms. Dondero never

(i) made a counterproposal; (ii) negotiated any aspect of the Alleged Agreements; (iii) asked Mr.

Dondero how he selected the portfolio companies; (iv) inquired as to whether Mr. Dondero already

had a duty to maximize value; (v) rejected any aspect of Mr. Dondero's proposal; or (vi) rejected

or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the

portfolio companies were sold by a third party.  Ex. 100 at 194:16-19, 195:14-199:15.

103.    There is No History of Loans Being Forgiven at Highland.  Mr. Dondero,

NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was

standard at Highland." *See, e.g.,* Ex. 31 ¶82. This is demonstrably false.

104.    Mr. Dondero has admitted that Highland disclosed to its auditors all loans

of a material amount that Highland ever forgave.  Ex. 98 at 426:8-427:15.  During his deposition,

Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited

financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21) and

concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the

largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any

loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven

in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10. *See also* Ex. 98

at 422:18-428:14.

### 2.    HCMFA's "Mutual Mistake" Defense

105.    HCMFA's primary affirmative defense is that the HCMFA Notes are "void"

or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority

from Defendant to Waterhouse to executive the same for Defendant."  Ex. 13 ¶ 47.

106.    In support of its defense, HCMFA asserts that Mr. Waterhouse signed the

HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that

30

Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45.

107.    HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.
>
> The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

Ex. 13 ¶¶ 41-42.

108.    On May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, HCMFA did not mention Highland but reported:

> The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value.  As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly."  The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing

exclusively in determining fair value. The "orderly determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "NAV Error").

Ex. 182.

109.    HCMFA will not offer into evidence any document to establish that (a) it ever told Securities and Exchange Commission that Highland, and not HCMFA, was responsible for the NAV Error; (b) it ever told the HGAF Board that anyone other than HCMFA and Houlihan Lokey were responsible for the NAV Error; or that (c) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV error. *See* Ex. 192 at 140:7-11.[26]

110.    **HCMFA Recovers Approximately $5 million Through Insurance to Compensate HGAF for the NAV Error**. HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Ex. 182 at 2. HCMFA admits that it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss.[27]    Despite having received approximately $5 million in insurance proceeds (representing more than two-third of the total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was "compensation" for its negligence and (b) HCMFA was entitled to receive **both** and $5 million in insurance proceeds $7.4 million in "compensation" from Highland even though the total loss was only $7.4 million. HCMFA never told its insurance carrier that Highland was at fault or that Highland paid

---

[26] While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* Ex. 192 at 138 at 15-19.

[27] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of $246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of $2,398,842 to fully fund the loss. Ex. 182 at 2.

HCMFA $7.4 million as compensation for the same loss the carrier covered.  Ex. 192 at 133:14-150:22.

111.    After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4 million from Highland in connection with the Notes. Ex. 192 at 146:20-25.

112.    Thus, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for the total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11.

113.    HCMFA is not aware of (a) anyone on behalf of HCMFA ever informing ICI mutual that it received $7.4 million from Highland on account of the NAV Error, Ex. 192 at 150:3-6, or (b) anyone on behalf of HCMFA ever informing ICI Mutual that HCMFA believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22.  In other words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

114.    <u>Mr. Waterhouse Knew the HCMFA Notes Were Treated as Intercompany Loans</u>.  Highland maintained an e-mail group called "Corporate Accounting" that included Mr. Waterhouse, among others. *See, e.g.,* Ex. 194 at 111:6-112:7.

115.    On May 2, 2019, David Klos, Highland's Controller, sent an e-mail  to the Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA.  This is a new interco loan.  Kristin, can you or Hayley please prep a note for execution.  I'll have further instructions later today, but please process this payment as soon as possible.

Ex. 54.

33

116.    Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP was transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee were asked to prepare a promissory note.

117.    The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a new loan ($4.4M should be coming in from Jim soon).
>
> Hayley, please add this to your loan tracker.  I will paper the loan.

Ex. 56.

118.    Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was going to "paper the loan."  And that's exactly what happened.

119.    HCMFA Represented to Third Parties that the HCMFA Notes Were Liabilities.  As discussed above, HCMFA represented to the Retail Board in October 2020 as part of the 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of HCMFA.  *See* Ex. 59 at 2.  Before filing its Original Answer, HCMFA never told anyone that was there was an error in the letter to the Retail Board.  Ex. 192 at 125:18-127:2.

120.    The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet and Included in its Audited Financial Statements.  HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its balance sheet.  Ex. 45 at 17; Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3.

121.    Nothing in HCMFA's Books and Records Corroborates HCMFA's Mistake Defense.  There is nothing in HCMFA's books and records that corroborates HCMFA's contention

that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Ex. 192 at 59:8-63:20.

122.    Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake Defense.  As discussed *supra*, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the HCMFA Notes as valid debts due and owing by each of the Obligors to Plaintiff.  Thus, regardless of what HCMFA may think, there is no evidence that any purported mistake is "mutual."  Moreover, if Mr. Waterhouse "made a mistake" in preparing and executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he (i) signed off on Highland's and HCMFA's audited financial statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings.

**3.    Waiver and Estoppel [NexPoint, HCMS, HCRE]**

123.    There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020.  Ex. 98 at 462:16-463:9; Ex. 105 at 381:21-382:16.  Nevertheless, NexPoint, HCMS, and HCRE assert that any default under the Notes was the "result of Plaintiff's own negligence, misconduct, breach of contract" under the Shared Services Agreement. Ex. 15 ¶ 80; Ex. 12 ¶¶ 54-55; Ex. 17 ¶¶ 97-98.

124.    NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA").  Ex. __.

125.    Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.  In fact, Article II of the SSA expressly provided that "for the avoidance of doubt   . . . [Highland] shall

35

*not* provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than

the back- and middle office services contemplated herein, with respect to (a) the general

management of [NexPoint], its business or activities . . . ." Ex. __ at § 2.02 (emphasis added).

126.    To emphasize the point further, the SSA expressly curtailed Highland's

authority to act on NexPoint's behalf:

> Section 2.06 <u>Authority</u>.  [Highland's] scope of assistance and advice
> hereunder is ***limited to the services specifically provided for in this
> Agreement.  [Highland] shall not assume or be deemed to assume
> any rights or obligations of [NexPoint] under any other document
> or agreement to which NexPoint is a party***. . . . [Highland] shall not
> have any duties or obligations to [NexPoint] unless those duties and
> obligations are specifically provided for in this Agreement (or in any
> amendment, modification or novation hereto or hereof to which
> [NexPoint] is a party.

*Id*. § 2.06 (emphasis added).

### 4.    **Other Defenses**

127.    Mr. Dondero could not identify any facts to support his affirmative

defenses of waiver, estoppel, or lack of consideration.  Ex. 98 at 357:24-360:14.

128.    NexPoint and HCMS assert that they did not default by failing to make the

December 31, 2020 Annual Installment payment because they "prepaid."  Ex. 98 at 362:12-366:10,

370:6-11, 389:10.   The facts relevant to this defense are described above and in the Klos

Declaration. (Klos Dec. ¶¶ 3-14).  Further, while NexPoint and HCMS now contend that they "pre-

paid," both chose to pay Highland in January 2021 after receiving notice of default (in a transparent

but futile attempt to "cure," for which they had no right rather than assert the "prepayment"

defense. *See* Ex. 2 (Exhibit 3).

### III.   ARGUMENT

#### A.   Legal Standard

##### 1.   Summary Judgment Standard

129.   "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999). The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact.").

130.   "If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than

some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted).

131.    Thus, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n 12 (5th Cir.1993) ("We no longer ask whether literally little evidence, *i.e.,* a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

**2.    Summary Judgment Standard for Promissory Notes**

132.    "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See*

*Resolution*, <mark>41 F.3d at 1023</mark>; *Looney*, <mark>2010 WL 532431</mark>, at *2-3; *Magna Cum Latte*, <mark>2007 WL 3231633</mark>, at *15.

**B.**   **Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes**

133.    Highland has made its *prima facie* case that it is entitled to summary judgment on Defendants' breach of the Notes.

134.    The Dondero Demand Notes are: (i) valid, (ii) signed by Mr. Dondero, and in Highland's favor, (Klos Dec. ¶¶ 18-20, Exs. D, E, F), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,004,013.07, and as of (b) December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

135.    The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

136.    The HCMS Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 23-26, Exs. I, J, K, L), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81, (Klos Dec. ¶ 45).

137.    The HCRE Demand Notes are: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶¶ 27-30, Exs. M, N, O, P), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96,

and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23, (Klos Dec. ¶ 50).

138.    The NexPoint Term Note is: (i) valid, (ii) signed by NexPoint, and in Highland's favor, (Klos Dec. ¶ 31, Ex. A), and (iii) as (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27,[28] (Klos Dec. ¶ 51).

139.    The HCMS Term Note is: (i) valid, (ii) signed by HCMS, and in Highland's favor, (Klos Dec. ¶ 32, Ex. R), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31,[29] (Klos Dec. ¶ 52).

140.    The HCRE Term Note is: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶ 33, Ex. S), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[30] (Klos Dec. ¶ 53).

141.    Each of the Obligors under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand.

---

[28] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[29] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[30] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

DOCS_NY:44673.8 36027/003

142.    Each of the Obligors under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

143.    Highland has been damaged by the Obligors' breaches in amounts that are set forth above but which (a) continued to increase daily, and (b) which do not include a calculation of collection costs and attorneys' fees.[31]

144.    Accordingly, Highland has made out its prima facie case for summary judgment that Defendants have breached the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").[32]

## C.    Defendants Fail to Rebut Highland's Prima Facie Case

145.    Defendants fail cannot rebut Highland's prima facie case for breach of the Notes because there is no substantive or credible evidence to support any of their affirmative defenses and there is substantial evidence to contradict them.

---

[31] Plaintiff seeks to add to its damages accrued and unpaid interest, and Plaintiff's costs of collection, including reasonable attorney's fees. Ex. 162-180.  Plaintiff respectfully requests an opportunity to conduct a final damage calculation if the Court fully grants the Motion.

[32] In the event the Motion is granted, Highland requests that the Court hold a hearing on damages, as interest under the Notes and attorney's fees continue to accrue.

1.       **No Reasonable Jury Could Find that the "Alleged Agreement" Exists**

146.    Mr. Dondero, NexPoint, HCRE, and HCMS fail to show there is any genuine issue of material fact to support their "Alleged Agreement" defense.  There is a complete absence of evidence in support of this defense and there is substantial evidence to contradict them.

147.    As discussed above, (i) Mr. Dondero cannot identify materials terms of the Alleged Agreement, such as (a) which Notes are subject to the Alleged Agreement, (b) the number of Notes subject to the Alleged Agreement, (c) the maker of each Note subject to the Alleged Agreement; (d) the date of each Note subject to the Alleged Agreement, or (e) the principal amount of any Note subject to the Alleged Agreement, (*see supra* ¶¶ 89-90); (ii) Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each Alleged Agreement; (iii) Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the Alleged Agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the Alleged Agreement, (*see supra* ¶¶ 91-92); (iv) Ms. Dondero, the counter-party to the Alleged Agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not competent to enter into the Alleged Agreements (*see supra* ¶¶ 93-94); (v) the existence or terms of the Alleged Agreement was never disclosed by Mr. Dondero or Ms. Dondero to anyone, including PwC, Mr. Waterhouse, Mr. Okada or the Bankruptcy Court, (*see supra* ¶¶ 95); (vi) no document exists memorializing or otherwise reflecting the existence of terms of the Alleged Agreement, (*see supra* ¶ 96); and (vii) there is no history of loans being forgiven at Highland, (*see supra* ¶¶ 100-101).  Accordingly, there is an absence of evidence showing the Alleged Agreement exists.  *See Magna*, 2007 WL 3231633, at *16 (granting summary judgment with respect to breach of promissory note where defendants assert that they are discharged from debt obligations after terms of lease were altered, finding "[t]here is no evidence that any agreement was altered. At best,

the summary judgment evidence supports a theory that the terms of the leases were not what the [] Defendants expected them to be.")

148.    The Alleged Agreement would also be unenforceable as a matter of law for lack of (a) consideration, (b) definiteness, and (c) a meeting of the minds.   In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (in order to prove existence of a valid and binding subsequent oral agreement binding upon parties, party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.")  "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted).  "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014).

149.    Based on the evidence cited above, no reasonable trier of fact could find that there was a meeting of the minds between Ms. Dondero and Mr. Dondero regarding the material terms of the oral Alleged Agreement or that such oral Agreement was exchanged for consideration. *See Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014) (finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make

DOCS_NY:44673.8 36027/003

it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not

find an enforceable contract,'" finding that party "has not identified evidence of record that would

allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the

minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x

417, 419 (5th Cir. 2006)) (citation omitted); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent

oral amendment" defense fails where the summary judgment record does not support the existence

of a subsequent agreement").

150.    Accordingly, there is no genuine issue of material fact regarding the Alleged

Agreement defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's,

NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### 2.    **No Reasonable Jury Could Find the HCMFA Note Was a "Mistake"**

151.    HCMFA's Mistake Defense also fails as a matter of law because there is no

evidence to show that HCMFA and Highland were acting under a shared factual mistake when

executing the HCMFA Notes.

152.    "For mutual mistake to nullify a promissory note, the evidence must show

that both parties were acting under the same misunderstanding of the same material fact." *Looney*,

2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law).  "[A] party must show

that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects

the agreed upon exchange. *Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*, No. H-06-

1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27. 2007) (citing Texas law).  In other words,

"[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but

the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.*

(internal quotations omitted).  "In determining the intent of the parties to a written contract, a court

may consider the conduct of the parties and the information available to them at the time of signing

in addition to the written agreement itself." *Id.* "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake." *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at \*9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at \*6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted). "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at \*7.

153.    Here, the HCMFA Notes were apparently hiding in plain sight for almost two years. The undisputed documentary and testimonial evidence overwhelmingly establishes that both HCMFA and Highland intended the HCMFA Notes to be loans. As discussed above: (i) Mr. Waterhouse, HCMFA's treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan" (*supra*, ¶¶ 111-115); (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets (*supra* ¶__); (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, (see supra ¶ 119), and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times, (*supra*, ¶¶ 116).

154.    There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into this agreement. The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail

DOCS_NY:44673.8 36027/003

Board or (ii) ICI Mutual. (*See supra*, ¶¶ 56-60; 116; 107-110). The purported "mistake" is also not reflected in HCMFA's books and records or audited financials. (*See supra*, ¶¶ 50-53; 117).

155.    HCMFA's Mistake Defense, therefore, fails as a matter of law. *See Hitachi,* 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.) (emphasis in original); *Whitney*, 2007 WL 3145798, at *6 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

156.    Accordingly, there is no genuine issue of material fact regarding HCMFA's Mistake Defense, and Highland is entitled to summary judgment for HCMFA's breach of the HCMFA Demand Notes.

**3.     No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence**

157.    No reasonable jury could find that NexPoint's default under its Note was the result of Highland's negligence under the SSA.[33]   As discussed above, the SSA, by its clear terms, does not impose a duty on Highland to make payments under the Term Notes, on behalf of NexPoint, HCRE, and HCMS, without the express authorization of those entities or an agent of those entities.  *See supra* ¶¶ 120-125.   It is undisputed that Highland was never directed to make the payments under the Term Notes. *See supra* ¶ 120.

158.    Accordingly, there is no genuine issue of material fact regarding NexPoint's, HCRE's, and HCMS's breach under the Term Notes, and Highland is entitled to summary judgment on its claims for breach of the Term Notes.

**4.     No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note**

159.    NexPoint's and HCMS's assertion that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid" is contradicted by undisputed documentary evidence.  (*See* Klos Dec. ¶¶ 3-14).

160.    Accordingly, there can be no genuine dispute of material fact regarding NexPoint's and HCMS's failure to pay amounts due and owing under the NexPoint and HCMS Term Notes.

## CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes,

---

[33] Highland did not enter into shared services agreements with HCRE and HCMS so those Obligors' affirmative defenses fail as a matter of law.

including the costs of collection and reasonable attorneys' fees in an amount to be determined and

(iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:  December 17, 2021          **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com


*Counsel for Highland Capital Management, L.P.*