PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com


-and-

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

---

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., <br><br> Plaintiff, <br><br> vs. <br><br> JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, <br><br> Defendants. | Adv. Proc. No. 21-03003-sgj <br><br> Case No. 3:21-cv-01010-E |

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                        Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.,

                        Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-03004-sgj

Case No. 3:21-cv-00881-X

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                        Plaintiff,

vs.

NEXPOINT ADVISORS, L.P., JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

                        Defendants.

§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-03005-sgj

Case No. 3:21-cv-00880-C

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                        Plaintiff,

vs.

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC., JAMES DONDERO,
NANCY DONDERO, AND THE DUGABOY
INVESTMENT TRUST,

                        Defendants.

§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-03006-sgj

Case No. 3:21-cv-01378-N

---

-------------------------------------------------------

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., §<br>§<br>§<br>Plaintiff, §<br>§<br>vs. §<br>§<br>§<br>HCRE PARTNERS, LLC (n/k/a NexPoint §<br>Real Estate Partners, LLC), JAMES §<br>DONDERO, NANCY DONDERO, AND §<br>THE DUGABOY INVESTMENT TRUST, §<br>§<br>§<br>Defendants. § | Adv. Proc. No. 21-03007-sgj<br><br>Case No. 3:21-cv-01379-X |

HIGHLAND CAPITAL MANAGEMENT, L.P.,

§
§
§

Plaintiff,

§

Adv. Proc. No. 21-03007-sgj

§

vs.

§
§

§

Case No. 3:21-cv-01379-X

HCRE PARTNERS, LLC (n/k/a NexPoint
Real Estate Partners, LLC), JAMES
DONDERO, NANCY DONDERO, AND
THE DUGABOY INVESTMENT TRUST,

§
§
§
§
§
§

Defendants.

§

-------------------------------------------------------

## APPENDIX IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN NOTES ACTIONS

| Ex. | Description | Appx.# |
|---|---|---|
| 1. | Complaint against HCMFA **(Adv. Pro. No. 21-3004)** | 1-21 |
| 2. | Amended Complaint against NPA et al. **(Adv. Pro. No. 21-3005)** | 22-95 |
| 3. | Amended Complaint against HCMS **(Adv. Pro. No. 21-3006)** | 96-179 |
| 4. | Amended Complaint against HCRE et al **(Adv. Pro. No. 21-3007)** | 180-263 |
| 5. | HCMFA's Original Answer **(Adv. Pro. No. 21-3004)** | 264-271 |
| 6. | HCMS's Answer to Plaintiff's Complaint **(Adv. Pro. No. 21-3006)** | 272-281 |
| 7. | HCRE's Answer to Plaintiff's Complaint **(Adv. Pro. No. 21-3007)** | 282-291 |
| 8. | HCMS's Motion For Leave to File Amended Answer and Brief In Support **(Adv. Pro. No. 21-3006)** | 292-312 |
| 9. | HCRE's Motion For Leave to File Amended Answer and Brief In Support **(Adv. Pro. No. 21-3007)** | 313-333 |
| 10. | HCMFA's Motion For Leave to Amend Answer **(Adv. Pro. No. 21-3004)** | 334-383 |
| 11. | NexPoint's Motion For Leave to Amend Answer **(Adv. Pro. No. 21-3005)** | 384-393 |
| 12. | HCMS's First Amended Answer to Plaintiff's Complaint **(Adv. Pro. No. 21-3006)** | 394-404 |
| 13. | HCMFA's Amended Answer **(Adv. Pro. No. 21-3004)** | 405-414 |
| 14. | NexPoint's First Amended Answer **(Adv. Pro. No. 21-3005)** | 415-423 |
| 15. | NexPoint's Answer to Amended Complaint **(Adv. Pro. No. 21-3005)** | 424-437 |
| 16. | HCMS's Answer to Amended Complaint **(Adv. Pro. No. 21-3006)** | 438-453 |
| 17. | HCRE's Answer to Amended Complaint **(Adv. Pro. No. 21-3007)** | 454-470 |
| 18. | HCMFA's Objections and Responses to Plaintiff's Requests For Admissions, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3004)** | 471-478 |
| 19. | NexPoint's Objections and Responses to Plaintiff's Requests For Admissions, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3005)** | 479-487 |
| 20. | HCMS's Responses to Highland Capital Management, L.P.'s First Requests For Admissions **(Adv. Pro. No. 21-3006)** | 488-492 |

| Ex. | Description | Appx.# |
|---|---|---|
| 21. | HCMS's Answers to Highland Capital Management, L.P.'s First Set of Interrogatories **(Adv. Pro. No. 21-3006)** | 493-498 |
| 22. | HCRE's Responses to Debtor Highland Capital Management, L.P.'s Requests For Admissions **(Adv. Pro. No. 21-3007)** | 499-505 |
| 23. | HCRE's Answers to Highland Capital Management, L.P.'s First Set of Interrogatories **(Adv. Pro. No. 21-3007)** | 506-512 |
| 24. | James Dondero's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3003)** | 513-529 |
| 25. | Nancy Dondero's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3003)** | 530-546 |
| 26. | The Dugaboy Investment Trust's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3003)** | 547-562 |
| 27. | NexPoint's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3005)** | 563-576 |
| 28. | HCMS's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3006)** | 577-590 |
| 29. | HCRE's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3007)** | 591-604 |
| 30. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. | 605-641 |
| 31. | James Dondero's Answer to Amended Complaint **(Adv. Pro. No. 21-3003)** | 642-657 |
| 32. | Amended Complaint against James Dondero, et. al **(Adv. Pro. No. 21-3003)** | 658-728 |
| 33. | June 3, 2019 Management Representation Letter **(J. Dondero 5/8/21 Depo., Ex. 16) (P. Burger 7/30/21 Depo., Ex. 1)** | 729-740 |
| 34. | Highland's Consolidated Financial Statements, dated December 31, 2018 **(J. Dondero 5/8/21 Depo., Ex. 15) (P. Burger 7/30/21 Depo., Ex. 4)** | 741-787 |
| 35. | HCMFA's Incumbency Certificate, April 2019 | 788-789 |
| 36. | Email string re 15(c) Follow up (10/2/21 – 10/6/21) | 790-794 |
| 37. | NexPoint's Incumbency Certificate | 795-796 |

| <u>Ex.</u> | <u>Description</u> | <u>Appx.#</u> |
|---|---|---|
| 38. | Schedule of HCMLP receipts from other Dondero-related notes | 797-798 |
| 39. | HCMLP Operating Results (February 2018) **(Adv. Pro. No. 21-3003)** | 799-811 |
| 40. | Summary of Assets and Liabilities for Non-Individuals **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 17)** | 812-815 |
| 41. | December 2019 Monthly Operating Report **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 22)** | 816-825 |
| 42. | September 2020 Monthly Operating Report **(Adv. Pro. No. 21-3003)** | 826-835 |
| 43. | Dondero Promissory Note in the amount of $7.9m dated January 18, 2018 | 836-838 |
| 44. | **INTENTIONALLY OMITTED** | 839 |
| 45. | HCMFA's Consolidated Financial Statements and Supplemental Information (December 31, 2018) **(Adv. Pro. No. 21-3004) (FILED UNDER SEAL)** | 840 |
| 46. | NexPoint's 2019 Audited Financial Statements **(FILED UNDER SEAL)** | 841 |
| 47. | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition to NexPoint Advisors, L.P. **(Adv. Pro. No. 21-3005)** | 842-847 |
| 48. | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition to HCMS **(Adv. Pro. No. 21-3006)** | 848-853 |
| 49. | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition to HCRE **(Adv. Pro. No. 21-3007)** | 854-859 |
| 50. | Jim Dondero 2017 PY Comp Statement | 860-861 |
| 51. | Jim Dondero 2018 PY Comp Statement | 862-863 |
| 52. | Jim Dondero 2019 PY Comp Statement | 864-865 |
| 53. | 5/2/19 e-mail and attachment (spreadsheet) | 866-869 |
| 54. | 5/2/19 e-mail and attachment (Promissory Note) | 870-873 |
| 55. | List of Wire Transfers (5/2/19) | 874-875 |
| 56. | 5/3/19 e-mail | 876-877 |
| 57. | 5/3/19 Promissory Note | 878-880 |
| 58. | 13 Week Cash Flows 12.14.20 | 881-882 |

| **Ex.** | **Description** | **Appx.#** |
|---|---|---|
| 59. | Supplemental 15(c) Information Request 10.23.20 | 883-890 |
| 60. | 7.31.20 HCMLP Requests | 891-895 |
| 61. | **INTENTIONALLY OMITTED** | 896 |
| 62. | **INTENTIONALLY OMITTED** | 897 |
| 63. | HCMLP Audited Financial Statements for 2008 | 898-954 |
| 64. | HCMLP Audited Financial Statements for 2009 | 955-1002 |
| 65. | HCMLP Audited Financial Statements for 2010 | 1003-1050 |
| 66. | HCMLP Audited Financial Statements for 2011 | 1051-1100 |
| 67. | James Dondero 2019 Form W-2 (NexPoint Residential Trust Inc.) **(REDACTED)** | 1101-1103 |
| 67-2. | James Dondero 2017 Form W-2 (NexPoint Residential Trust Inc.) **(REDACTED)** | 1104-1107 |
| 67-3. | James Dondero 2013 Form 1040 (pdf page 279 of 335) **(REDACTED)** | 1108-1110 |
| 67-4. | James Dondero 2014 Form 1040 (pdf page 235 of 290) **(REDACTED)** | 1111-1113 |
| 67-5. | James Dondero 2015 Form 1040 (pdf page 200 of 254) **(REDACTED)** | 1114-1116 |
| 67-6. | James Dondero 2016 Form 1040 (pdf page 182 of 235) **(REDACTED)** | 1117-1119 |
| 67-7. | James Dondero 2017 Form 1040 (pdf page 170 of 225) **(REDACTED)** | 1120-1122 |
| 67-8. | James Dondero 2018 Form 1040 (pdf page 248 of 300) **(REDACTED)** | 1123-1125 |
| 67-9. | James Dondero 2019 Form 1040 (pdf page 242 of 301) **(REDACTED)** | 1126-1128 |
| 68. | Jim Dondero 2016 PY Comp Statement | 1129-1130 |
| 69. | HCMLP Audited Financial Statements for 2014 | 1131-1180 |
| 70. | HCMLP Audited Financial Statements for 2015 | 1181-1235 |
| 71. | HCMLP Audited Financial Statements for 2016 | 1236-1286 |
| 72. | Highland's Audited Financial Statements for 2017 **(J. Dondero 5/8/21 Depo., Ex. 13) (P. Burger 7/30/21 Depo., Ex. 2)** | 1287-1335 |
| 73. | Schedule of HCMLP receipts from Dondero notes | 1336-1337 |

| Ex. | Description | Appx.# |
|---|---|---|
| 74. | Dondero Promissory Note in the amount of $3.825m dated February 2, 2020 **(J. Dondero 5/8/21 Depo., Ex. 1)** | 1338-1340 |
| 75. | HCMLP Operating Results (February 2018) **(J. Dondero 5/8/21 Depo., Ex. 2)** | 1341-1353 |
| 76. | Dondero Promissory Note in the amount of $2.5m dated August 1, 2018 **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 3)** | 1354-1356 |
| 77. | Dondero Promissory Note in the amount of $2.5m dated August 13, 2018 **(J. Dondero 5/8/21 Depo., Ex. 4)** | 1357-1359 |
| 78. | HCMLP Operating Results (August 2018) **(J. Dondero 5/8/21 Depo., Ex. 5)** | 1360-1369 |
| 79. | December 3, 2020 Demand Letter **(J. Dondero 5/8/21 Depo., Ex. 6)** | 1370-1373 |
| 80. | James Dondero's Original Answer **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 7)** | 1374-1382 |
| 81. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s First Rebquest For Admissions **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 8)** | 1383-1389 |
| 82. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s First Set of Interrogatories **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 9)** | 1390-1396 |
| 83. | James Dondero's Amended Answer **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 10)** | 1397-1405 |
| 84. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s Second Request For Admissions **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 11)** | 1406-1411 |
| 85. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s Second Set of Interrogatories **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 12)** | 1412-1419 |
| 86. | May 18, 2018 Management Representation Letter **(J. Dondero 5/8/21 Depo., Ex. 14)** | 1420-1431 |
| 87. | Statement of Financial Affairs For Nonindividuals Filing Bankruptcy **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 19)** | 1432-1474 |
| 88. | October 2019 Monthly Operating Report **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 20)** | 1475-1486 |
| 89. | November 2019 Monthly Operating Report **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 21)** | 1487-1496 |
| 90. | Exhibit C, Liquidation Analysis/Financial Projections **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 23)** | 1497-1505 |
| 91. | Highland Capital Management LP Financial Projections (1/28/21) **(J. Dondero 5/8/21 Depo., Ex. 24)** | 1506-1514 |
| 92. | 2017 Workpapers **(P. Burger 7/30/21 Depo., Ex. 3)** | 1514-1530 |

| Ex. | Description | Appx.# |
|---|---|---|
| 93. | 2018 Workpapers **(P. Burger 7/30/21 Depo., Ex. 5)** | 1531-1550 |
| 94. | Peet Burger 7/30/21 Deposition Transcript | 1551-1585 |
| 95. | James Dondero 1/5/21 Deposition Transcript | 1586-1638 |
| 96. | James Dondero 5/28/21 Deposition Transcript | 1639-1701 |
| 97. | James Dondero 6/1/21 Deposition Transcript | 1702-1739 |
| 98. | James Dondero 10/29/21 Deposition Transcript | 1740-1810 |
| 99. | James Dondero 11/4/21 Deposition Transcript | 1811-1872 |
| 100. | Nancy Dondero 10/18/21 Deposition Transcript | 1873-1956 |
| 101. | Alan Johnson (Expert)11_02_21 Deposition Transcript | 1957-2044 |
| 102. | **INTENTIONALLY OMITTED** | 2045 |
| 103. | **INTENTIONALLY OMITTED** | 2046 |
| 104. | **INTENTIONALLY OMITTED** | 2047 |
| 105. | Frank Waterhouse 10/19/21 Deposition Transcript | 2048-2178 |
| 106. | Payment from James Dondero dated 12/08/17 | 2179-2183 |
| 107. | Payment from James Dondero dated 12/18/17 | 2184-2194 |
| 108. | Payment from James Dondero dated 02/14/19 | 2195-2206 |
| 109. | Payment from James Dondero dated 03/13/2019 | 2207-2217 |
| 110. | Payments from James Dondero dated 05/02/19, 05/03/19, 05/07/19, 05/23/19 | 2218-2231 |
| 111. | Payment from James Dondero dated 06/17/19 | 2232-2237 |
| 112. | Payment from James Dondero dated 12/23/19 | 2238-2245 |
| 113. | Payment from HCMFA dated 05/29/19 | 2246-2259 |
| 114. | Payment from HCMFA dated 09/05/19 | 2260-2263 |
| 115. | Payment from HCMFA dated 10/03/19 | 2264-2274 |

| Ex. | Description | Appx.# |
|---|---|---|
| 116. | Payment from HCRE dated 09/30/19 | 2275-2283 |
| 117. | Payment from NPA dated 04/16/2019 | 2284-2293 |
| 118. | Payment from NPA dated 06/19/19 | 2294-2299 |
| 119. | Payment from NPA dated 07/09/19 | 2300-2308 |
| 120. | Payments from HCMSI and NPA dated 03/05/19 and 03/29/19 | 2309-2319 |
| 121. | Payments from  HCMSI and NPA dated 08/09/19, 08/13/19, 08/21/19 | 2320-2323 |
| 122. | Payments from HCRE, HCMSI, NPA dated 12/09/19, 12/30/19 | 2324-2331 |
| 123. | Payments from HCMFA and NPA dated 06/04/19 | 2332-2341 |
| 124. | Payment from NPA, HCMSI, HCRE dated 01/14/21 and 01/21/21 | 2342-2347 |
| 125. | Payment to James Dondero dated 02/02/18 | 2348-2363 |
| 126. | Payments to James Dondero dated 08/01/18 and 08/13/18 | 2364-2367 |
| 127. | Payment to HCMSI dated 05/29/15 | 2368-2371 |
| 128. | Payment to HCMSI dated 10/01/15, 10/02/15, and 10/30/15 | 2372-2379 |
| 129. | Payment to HCMSI dated 10/27/15 | 2380-2383 |
| 130. | Payment to HCMSI dated 10/28/15 | 2384-2387 |
| 131. | Payment to HCMSI dated 11/23/15 | 2388-2393 |
| 132. | Payment to HCMSI dated 11/24/15 | 2394-2397 |
| 133. | Payment to HCMSI dated 02/10/16 | 2398-2404 |
| 134. | Payment to HCMSI dated 02/11/16 | 2405-2421 |
| 135. | Payment to HCMSI dated 04/05/16 | 2422-2434 |
| 136. | Payment to HCMSI dated 05/04/16 | 2435-2438 |
| 137. | Payment to HCMSI dated 07/01/16 | 2439-2443 |
| 138. | Payment to HCMSI dated 08/05/16 | 2444-2458 |

| __Ex.__ | __Description__ | __Appx.#__ |
|---|---|---|
| 139. | Payment to HCMSI dated 08/19/16 | 2459-2463 |
| 140. | Payment to HCMSI dated 09/22/16 | 2464-2476 |
| 141. | Payment to HCMSI dated 12/12/16 | 2477-2481 |
| 142. | Payment to HCMSI dated 03/31/17 | 2482-2486 |
| 143. | Payment to HCMSI dated 03/26/18 | 2487-2490 |
| 144. | Payment to HCMSI dated 06/25/18 | 2491-2494 |
| 145. | Payment to HCMSI dated 05/29/19 | 2495-2508 |
| 146. | Payment to HCMSI dated 06/26/19 | 2509-2518 |
| 147. | Payments to HCMFA dated 05/02/19 and 05/03/19 | 2519-2532 |
| 148. | Payment to HCRE dated 11/27/13 | 2533-2536 |
| 149. | Payment to HCRE dated 01/09/14 | 2537-2544 |
| 150. | Payment to HCRE dated 01/30/14 | 2545-2548 |
| 151. | Payment to HCRE dated 03/28/14 | 2549-2556 |
| 152. | Payment to HCRE dated 01/26/15 | 2557-2560 |
| 153. | Payment to HCRE dated 04/02/15 | 2561-2567 |
| 154. | Payment to HCRE dated 10/12/17 | 2568-2579 |
| 155. | Payment to HCRE dated 10/15/18 | 2580-2589 |
| 156. | Payment to HCRE dated 09/25/19 | 2590-2598 |
| 157. | Payment to NPA dated 08/21/14 | 2599-2603 |
| 158. | Payment to NPA dated 10/01/14 | 2604-2611 |
| 159. | Payment to NPA dated 11/14/14 | 2612-2615 |
| 160. | Payment to NPA dated 01/29/15 | 2616-2620 |
| 161. | Payment to NPA dated 07/22/15 | 2621-2636 |

| Ex. | Description | Appx.# |
|-----|-------------|--------|
| 162. | Robert Half Legal Invoices dated 05/06/21 and 5/20/21 | 2637-2640 |
| 163. | Robert Half Legal Invoice dated 06/17/21 | 2641-2643 |
| 164. | Robert Half Legal Invoice dated 07/01/21 | 2644-2646 |
| 165. | Robert Half Legal Invoice dated 07/15/21 | 2647-2649 |
| 166. | Robert Half Legal Invoice dated 08/19/21 | 2650-2652 |
| 167. | Robert Half Legal Invoice dated 09/16/21 | 2653-2655 |
| 168. | Robert Half Legal Invoices dated 09/02/21 and 09/30/21 | 2656-2659 |
| 169. | Highland December 2020 Billing Detail | 2660-2671 |
| 170. | Highland January 2021 Billing Detail | 2672-2694 |
| 171. | Highland February 2021 Billing Detail | 2695-2700 |
| 172. | Highland March 2021 Billing Detail | 2701-2727 |
| 173. | Highland April 2021 Billing Detail | 2728-2764 |
| 174. | Highland May 2021 Billing Detail | 2765-2813 |
| 175. | Highland June 2021 Billing Detail | 2814-2852 |
| 176. | Highland July 2021 Billing Detail | 2853-2878 |
| 177. | Highland August 2021 Billing Detail | 2879-2883 |
| 178. | Highland Supplemental August 2021 Billing Detail | 2884-2904 |
| 179. | Highland September 2021 Billing Detail | 2905-2914 |
| 180. | Highland October 2021 Billing Detail | 2915-2945 |
| 181. | Declaration of Dennis C. Sauter, Jr. **(Adv. Pro. No. 21-3004)** | 2946-2977 |
| 182. | GAF Resolution Memo dated May 28, 2019 | 2978-2980 |
| 183. | **INTENTIONALLY OMITTED** | 2981 |
| 184. | Defendant James Dondero's Rule 26 Initial Disclosures | 2982-2990 |

| Ex. | Description | Appx.# |
|---|---|---|
| 185. | Plaintiff's Third Amended Notice of Rule 30(b)(6) Deposition to HCMFA **(Adv. Pro. No. 21-3004)** | 2991-2998 |
| 186. | **INTENTIONALLY OMITTED** | 2999 |
| 187. | **INTENTIONALLY OMITTED** | 3000 |
| 188. | Email from David Klos to the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated February 2, 2018 **(Adv. Pro. No. 21-3003)** | 3001-3002 |
| 189. | Email dated February 2, 2018 confirming a wire transfer in the amount of $3,825,000 from the Debtor to James Dondero **(Adv. Pro. No. 21-3003)** | 3003-3004 |
| 190. | (a) Email from Blair Hillis to David Klos and the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated August 1, 2018 and (b) an email from David Klos to the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated August 1, 2018 **(Adv. Pro. No. 21-3003)** | 3005-3006 |
| 191. | Email chain re Objections to Rule 30(b)(6) Notices (October 7 – 15, 2021) | 3007-3012 |
| 192. | Dustin Norris 12/1/21 Deposition Transcript | 3013-3082 |
| 193. | Dennis C. Sauter 11/17/21 Deposition Transcript | 3083-3125 |
| 194. | Kristin Hendrix 10/27/21 Deposition Transcript | 3126-3180 |
| 195. | David Klos 10/27/21 Deposition Transcript | 3181-3238 |
| 196. | Debtor's back-up for the December Monthly Operating Report, titled "December 2019 Due From Affiliates" **(Adv. Pro. No. 21-3003)** | 3239-3240 |
| 197. | Debtor's back-up for the September Monthly Operating Report, titled "September 2020 Due From Affiliates" **(Adv. Pro. No. 21-3003)** | 3241-3242 |
| 198. | Debtor's back-up for the January 2021 Monthly Operating Report, titled "January 2021 Due From Affiliates" **(Adv. Pro. No. 21-3003)** | 3243-3244 |
| 199. | Debtor's January 2021 Affiliates Loan Receivables Summary **(Adv. Pro. No. 21-3003)** | 3245-3246 |
| 200. | Amortization Schedule **(K. Hendrix 10/27/21 Depo., Ex. 14)** | 3247-3258 |
| 201. | Debtor's Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 3259-4125 |
| 202. | Committee's Objection to Debtor's Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 4126-4140 |

| Ex. | Description | Appx.# |
|---|---|---|
| 203. | Joinder of Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Committee's Objection to Debtor's Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 4141-4150 |
| 204. | Debtor's Reply in Support of Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 4151-4161 |
| 205. | NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018 **(Adv. Pro. No. 21-3005)** | 4162-4181 |
| 206. | Transcript of February 2, 2021 Hearing | 4182-4477 |
| 207. | Transcript of February 3, 2021 Hearing | 4478-4735 |

Dated:  December 18, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

Docket #0001  Date Filed: 1/22/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:41996.4 36027/002

1934054210127000000000010

## COMPLAINT FOR (I) BREACH OF CONTRACT
## AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its complaint (the "Complaint") against defendant, Highland Capital Management Fund Advisors, L.P. ("HCMFA" or "Defendant"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

### PRELIMINARY STATEMENT

1.      The Debtor brings this action against HCMFA as a result of HCMFA's defaults under two promissory notes executed by HCMFA in favor of the Debtor in the aggregate original principal amount of $7,400,000 and payable upon the Debtor's demand.  Despite due demand, HCMFA has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      Through this Complaint, the Debtor seeks (a) damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Notes), and (b) turnover by HCMFA to the Debtor of the foregoing amounts.

### JURISDICTION AND VENUE

3.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

2

D-CNL002796

**Appx. 00002**

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

7.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.      Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas and is organized under the laws of the state of Delaware.

## CASE BACKGROUND

9.      On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

10.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis LP and Acis GP.

3

D-CNL002797

**Appx. 00003**

11.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

12.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

## STATEMENT OF FACTS

**A.      The HCMFA Notes**

13.     HCMFA is the maker under a series of promissory notes in favor of the Debtor.

14.     Specifically, on May 2, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note").  A true and correct copy of HCMFA's First Note is attached hereto as **Exhibit 1**.

15.     On May 3, 2019, HCMFA executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "Notes").  A true and correct copy of HCMFA's Second Note is attached hereto as **Exhibit 2**.

16.     Section 2 of each Note provides: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

17.     Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:41996.4 36027/002

18.     Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     HCMFA's Default under Each Note**

19.     By letter dated December 3, 2020, the Debtor made demand on HCMFA for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 3**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

20.     Despite the Debtor's demand, HCMFA did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020 or at any time thereafter.

21.     As of December 11, 2020, there was an outstanding principal amount of $2,457,517.15 on HCMFA's First Note and accrued but unpaid interest in the amount of $35,884.46, resulting in a total outstanding amount as of that date of $2,493,401.61.

22.     As of December 11, 2020, there was an outstanding principal balance of $5,119,827.40 on HCMFA's Second Note and accrued but unpaid interest in the amount of $74,424.05, resulting in a total outstanding amount as of that date of $5,194,251.45.

23.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Notes was $7,687,653.07

DOCS_NY:41996.4 36027/002

D-CNL002799

**Appx. 00005**

24.     Pursuant to Section 4 of each Note, each Note is in default and is currently due and payable.

### FIRST CLAIM FOR RELIEF
#### (For Breach of Contract)

25.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

26.     Each Note is a binding and enforceable contract.

27.     HCMFA breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

28.     Pursuant to each Note, the Debtor is entitled to damages from HCMFA in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

29.     As a direct and proximate cause of HCMFA's breach of each Note, the Debtor has suffered damages in the total amount of at least $7,687,653.07 as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

### SECOND CLAIM FOR RELIEF
#### (Turnover by HCMFA Pursuant to 11 U.S.C. § 542(b))

30.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

31.     HCMFA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs

6

D-CNL002800

**Appx. 00006**

and reasonable attorneys' fees and expenses) for HCMFA's breach of its obligations under each of the Notes.

32.     Each Note is property of the Debtor's estate, and the amounts due under each Note are matured and payable upon demand.

33.     HCMFA has not paid the amounts due under each Note to the Debtor.

34.     The Debtor has made demand for the turnover of the amounts due under each Note.

35.     As of the date of filing of this Complaint, HCMFA has not turned over to the Debtor all or any of the amounts due under each of the Notes.

36.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial, including, among other things, (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMFA to the Debtor of an amount equal to (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii)    Such other and further relief as this Court deems just and proper.

DOCS_NY:41996.4 36027/002

D-CNL002801

Appx. 00007

Dated:  January 22, 2021.               **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

8

D-CNL002802

**Appx. 00008**

# EXHIBIT 1

**EXHIBIT 1**

D-CNL002803

**Appx. 00009**

**PROMISSORY NOTE**

$2,400,000.00                                                                                    May 2, 2019

        FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL
MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the
principal sum of TWO MILLION FOUR HUNDRED THOUSAND and 00/100 Dollars
($2,400,000.00), together with interest, on the terms set forth below (the "*Note*").  All sums
hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address
as Payee may specify to Maker in writing from time to time.

        1.      Interest Rate.  The unpaid principal balance of this Note from time to time
outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%)
in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the
Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on
the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to
1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual
number of days elapsed, and shall be payable on demand of the Payee.

        2.      Payment of Principal and Interest.  The accrued interest and principal of this Note
shall be due and payable on demand.

        3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole
or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall
be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

        4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder
as it becomes due shall, at the election of the holder hereof, without notice, demand,
presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind
which are hereby waived, mature the principal of this Note and all interest then accrued, if any,
and the same shall at once become due and payable and subject to those remedies of the holder
hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege
hereunder shall operate as a waiver thereof.

        5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of
nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and
all other notices of any kind hereunder.

        6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or
otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a
bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other
amounts owing hereunder, all actual expenses of collection, all court costs and reasonable
attorneys' fees and expenses incurred by the holder hereof.

7.      <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002805
**Appx. 00011**

# EXHIBIT 2

**EXHIBIT 2**

D-CNL002806

**Appx. 00012**

# EXHIBIT 1

**PROMISSORY NOTE**

$5,000,000.00                                                                    May 3, 2019

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, LP. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of FIVE MILLION and 00/100 Dollars ($5,000,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "*applicable federal rate*" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.      Payment of Principal and Interest.   The accrued interest and principal of this Note shall be due and payable on demand.

3.      Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.   Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL002808

**Appx. 00015**

# EXHIBIT 3

**EXHIBIT 3**

D-CNL002809

**Appx. 00016**

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Fund Advisors, LP
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Fund Advisors, LP ("Maker") entered into the following promissory notes (collectively, the "Notes"), among others,[1] in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 5/2/2019 | $2,400,000 | $2,457,517.15 | $35,884.46 | $2,493,401.61 |
| 5/3/2019 | $5,000,000 | $5,119,827.40 | $74,424.05 | $5,194,251.45 |
| **TOTALS** | **$7,400,000** | **$7,577,344.55** | **$110,308.52** | **$7,687,653.07** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $7,687,653.07, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are

---

[1] Maker is also obligated to pay amounts due under promissory notes issued in favor of Payee prior to April 15, 2019.  Pursuant to that certain *Acknowledgment from HCMLP*, dated as of April 15, 2019, Payee agreed not to demand payment on such amounts until May 31, 2021.  Payee reserves all rights with respect to such amounts.

expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:     Fred Caruso
        James Romey
        Jeffrey Pomerantz
        Ira Kharasch
        Gregory Demo
        DC Sauter

D-CNL002811

**Appx. 00018**

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

D-CNL002812

**Appx. 00019**

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Highland Capital Management, L.P. | **DEFENDANTS**<br>Highland Capital Management Fund Advisors, L.P. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Hayward LLP<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | **ATTORNEYS** (If Known)<br>Munsch Hardt Kopf & Harr, P.C.<br>500 N. Akard Street, Suite 3800<br>Dallas, Texas 75201  Tel.: (214) 855-7500 |
| **PARTY** (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Count 1:  Breach of contract; Count 2:  Turnover pursuant to 11 U.S.C. 542

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑2 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge -§727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
      actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
      (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court
      if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $7,687,653.07 plus interest, fees, and expenses |
| Other Relief Sought | |

D-CNL002813

**Appx. 00020**

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br> Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br> 19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br> Northern District of Texas | DIVISION OFFICE<br> Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br> January 22, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br> Zachery Z. Annable | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 2

Docket #0063   Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | 21-03005 |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210827000000000012

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding") by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants NexPoint Advisors, L.P. ("NPA"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with NPA, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33, and payable in annual installments.  NPA has failed to pay amounts when due under the Note (as defined below), the Note is in default, and the amounts due under the Note have been accelerated pursuant to the terms of the Note.

2.      In paragraph 42 of NPA's *First Amended Answer* [Docket No. 34-3], NPA contends that the Debtor orally agreed to relieve it of the obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  NPA further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of NPA, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr.

2

D-CNL002936

**Appx. 00024**

Dondero entered into the Alleged Agreement on behalf of NPA, he controlled both NPA and the Debtor and was the lifetime beneficiary of Dugaboy.

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note.

4.      Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against NPA for breach of its obligations under the Note and for turnover, the Debtor adds alternative claims (a) against NPA for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note), for NPA's breach of its obligations under the Note, (b) turnover by NPA to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, NPA pursuant to the Note; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

3

D-CNL002937

Appx. 00025

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.      The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.      Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas, and organized under the laws of the state of Delaware.

12.      Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled NPA; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.      Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

D-CNL002938

**Appx. 00026**

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

5

D-CNL002939
Appx. 00027

## STATEMENT OF FACTS

**A.      The NPA Note**

20.      NPA is the maker under a promissory note in favor of the Debtor.

21.      Specifically, on May 31, 2017, NPA executed a promissory note in favor

of the Debtor, as payee, in the original principal amount of $30,746, 812.33 (the "<u>Note</u>").  A true

and correct copy of the Note is attached hereto as **<u>Exhibit 1</u>**.

22.      Section 2 of the Note provides: "**<u>Payment of Principal and Interest</u>**.

Principal and interest under this Note shall be due and payable as follows:

> **2.1      <u>Annual Payment Dates.</u>**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**<u>Annual Installment</u>**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2      <u>Final Payment Date</u>**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**<u>Maturity Date</u>**").

23.      Section 3 of the Note provides:

> <u>Prepayment Allowed: Renegotiation Discretionary</u>.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

24.      Section 4 of the Note provides:

> <u>Acceleration Upon Default</u>.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

6

25.    Section 6 of the Note provides:

> **Attorneys' Fees**.    If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.    NPA's Default Under the Note**

26.    NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

27.    By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").    A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.    The Demand Letter provides:

> Because of Maker's failure to pay, the Note is in default.    Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.    The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.
>
> **The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

28.    On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

29.    The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.    Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

> [T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.    **The Note remains in default, and all amounts due thereunder are due immediately**.

7

> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

30.    Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

31.    As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

32.    Pursuant to Section 4 of the Note, the Note is in default, and is currently due and payable.

**C.    The Debtor Files the Original Complaint**

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for NPA's breach of its obligations under the Note and (ii) turnover by NPA for the outstanding amounts under the Note, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.    NPA's Affirmative Defenses**

34.    On March 1, 2021, NPA filed *Defendant's Original Answer* [Docket No. 6] (the "Original Answer").  In its Original Answer, NPA asserted three affirmative defenses: (i) the claims are barred because the Plaintiff caused NPA to default, (ii) the claims are barred because the Plaintiff caused NPA to delay in making payment, and (iii) waiver and estoppel. *See id.* ¶¶39-41.

35.    On June 9, 2021, NPA filed *Defendant's First Amended Answer* [Docket No. 35-3] (the "Amended Answer"), that asserted a new affirmative defense; namely, that the

8

Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶42.

36.     According to NPA, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

37.     According to NPA, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

38.     Mr. Dondero controlled both NPA and the Debtor at the time he entered into the Alleged Agreement on behalf of NPA.

39.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.     Dugaboy Lacked Authority to Act on Behalf of the Debtor**

40.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 4**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

41.     Section 4.2(b) of the Limited Partnership Agreement states:

Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 4**, § 4.2(b).

42.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

9

43.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor

**FIRST CLAIM FOR RELIEF**
**(Against NPA)**

**(For Breach of Contract)**

44.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

45.     The Note is a binding and enforceable contract.

46.     NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

47.     Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

48.     As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03, as of January 15, 2021, plus an amount equal to all accrued buy unpaid interest from that date, plus the Debtor's cost of collection.

**SECOND CLAIM FOR RELIEF**
**(Against NPA)**
**(Turnover by NPA Pursuant to 11 U.S.C. § 542(b))**

49.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

50.     NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of

D-CNL002944

Appx. 00032

payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

51.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

52.     NPA has not paid the amount due under the Note to the Debtor.

53.     The Debtor has made demand for the turnover of the amount due under the Note.

54.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

55.     The Debtor is entitled to the amount due under the Note.

### THIRD CLAIM FOR RELIEF
#### (Against NPA)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Debtor made the transfer pursuant to the Alleged Agreement within two years of the Petition Date.

58.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

11

D-CNL002945

**Appx. 00033**

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

59.    The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt NPA incurred under the Note demonstrates a scheme of fraud.

60.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfer made pursuant to the Alleged Agreement from NPA.

61.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Note.

### FOURTH CLAIM FOR RELIEF
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.    The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

64.    Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

12

(h) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

65.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from NPA.

66.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Notes.

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

68.    A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

13

D-CNL002947

**Appx. 00035**

69.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

70.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

71.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

72.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

14

73.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

74.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

76.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

77.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

78.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

79.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to

15

the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)     On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)     On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)     On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged

16

D-CNL002950

Appx. 00038

Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages and

(iii)     Such other and further relief as this Court deems just and proper.

D-CNL002951

**Appx. 00039**

Dated:  As of July 13, 2021      PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

18

D-CNL002952

**Appx. 00040**

# EXHIBIT 1

D-CNL002953

**Appx. 00041**

## PROMISSORY NOTE

**$30,746,812.33**                                                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1      Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      Final Payment Date.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

D-CNL002954

**Appx. 00042**

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.      Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002955

**Appx. 00043**

**EXHIBIT A**

**PRIOR NOTES**

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-CNL002956

**Appx. 00044**

# EXHIBIT 2

D-CNL002957

**Appx. 00045**

HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  James Dondero

      Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41916.2 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

D-CNL002959

**Appx. 00047**

**Appendix A**

| | |
|---|---|
| ABA #: | 322070381 |
| Bank Name: | East West Bank |
| Account Name: | Highland Capital Management, LP |
| Account #: | 5500014686 |

# EXHIBIT 3

D-CNL002961

**Appx. 00049**

### HIGHLAND CAPITAL MANAGEMENT, L.P.

January 15, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Partial Payment on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, ("Maker"), entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee"). A copy of the Note is attached hereto as **Appendix A**.

On January 7, 2021, Payee notified you that because of Maker's failure to make the payment due on December 31, 2020 (the "Default"), the Note was in default and that all principal, interest, and any other amounts due on the Note were immediately due and payable. The amount due and payable on the Note as of January 8, 2021, was $24,471,804.98; however, interest continues to accrue under the Note.

On January 14, 2021, Payee received a wire from Maker in the amount of $1,406,111.92 (the "Partial Payment"). To reiterate, the amount due under the Note as of January 8, 2021, was $24,471,804.98. The Partial Payment will be applied as payment against the amounts due under the Note pursuant to Section 3 thereof. **The Note remains in default, and all amounts due thereunder are due immediately.**

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note). Payment of such amount is due immediately. Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved, including the right to recover Payee's expenses incurred in collecting the Note. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41991.1 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter
       A.  Lee Hogewood III

D-CNL002963

Appx. 00051

# Appendix A

## PROMISSORY NOTE

**$30,746,812.33**                                                                                               **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify in writing from time to time.

1.      Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1      Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2      Final Payment Date.      The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.      Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

D-CNL002966

**Appx. 00054**

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

D-CNL002967

Appx. 00055

**Appendix B**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 4

D-CNL002969

**Appx. 00057**

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

D-CNL002970

Appx. 00058

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

TABLE OF CONTENTS

ARTICLE 1    GENERAL ....................................................................................................1
   1.1.    Continuation .......................................................................................................1
   1.2.    Name ...................................................................................................................1
   1.3.    Purpose ...............................................................................................................1
   1.4.    Term. ..................................................................................................................1
   1.5.    Partnership Offices; Addresses of Partners. .......................................................1

ARTICLE 2    DEFINITIONS ...............................................................................................2
   2.1.    Definitions ..........................................................................................................2
   2.2.    Other Definitions ................................................................................................6

ARTICLE 3    FINANCIAL MATTERS ................................................................................6
   3.1.    Capital Contributions .........................................................................................6
   3.2.    Allocations of Profits and Losses .......................................................................8
   3.3.    Allocations on Transfers ....................................................................................9
   3.4.    Special Allocations .............................................................................................9
   3.5.    Curative Allocations .........................................................................................10
   3.6.    Code Section 704(c) Allocations ......................................................................10
   3.7.    Capital Accounts ..............................................................................................11
   3.8.    Distributive Share for Tax Purpose ..................................................................12
   3.9.    Distributions. ....................................................................................................12
   3.10.   Compensation and Reimbursement of General Partner .....................................14
   3.11.   Books, Records, Accounting, and Reports ........................................................14
   3.12.   Tax Matters .......................................................................................................14

ARTICLE 4    RIGHTS AND OBLIGATIONS OF PARTNERS ..........................................15
   4.1.    Rights and Obligations of the General Partner ..................................................15
   4.2.    Rights and Obligations of Limited Partners ......................................................19
   4.3.    Transfer of Partnership Interests ......................................................................19
   4.4.    Issuances of Partnership Interests to New and Existing Partners.......................21
   4.5.    Withdrawal of General Partner .........................................................................21
   4.6.    Admission of Substitute Limited Partners and Successor General Partner.........21

ARTICLE 5    DISSOLUTION AND WINDING UP ............................................................22
   5.1.    Dissolution ........................................................................................................22
   5.2.    Continuation of the Partnership........................................................................23
   5.3.    Liquidation .......................................................................................................23
   5.4.    Distribution in Kind ..........................................................................................24
   5.5.    Cancellation of Certificate of Limited Partnership ...........................................24
   5.6.    Return of Capital ..............................................................................................24
   5.7.    Waiver of Partition. ..........................................................................................24

ARTICLE 6    GENERAL PROVISIONS.............................................................................24
   6.1.    Amendments to Agreement...............................................................................24

i

6.2.    Addresses and Notices ...................................................................................25
6.3.    Titles and Captions.........................................................................................25
6.4.    Pronouns and Plurals......................................................................................25
6.5.    Further Action .................................................................................................25
6.6.    Binding Effect .................................................................................................25
6.7.    Integration .......................................................................................................25
6.8.    Creditors..........................................................................................................25
6.9.    Waiver..............................................................................................................25
6.10.   Counterparts ....................................................................................................25
6.11.   Applicable Law ...............................................................................................25
6.12.   Invalidity of Provisions ..................................................................................25
6.13.   Mandatory Arbitration.....................................................................................26

D-CNL002972

Appx. 00060

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*), as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

## ARTICLE 1

### GENERAL

**1.1.     Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.     Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P.  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.     Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act.  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.     Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.     Partnership Offices; Addresses of Partners**.

(a)     Partnership Offices.  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate.  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate.  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)     Addresses of Partners.  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201.  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership.  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

## ARTICLE 2

### DEFINITIONS

**2.1.**   **Definitions.**   The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

D-CNL002975

Appx. 00063

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in Section 5.3.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; provided, however, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* Liability" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

D-CNL002976

Appx. 00064

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

5

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**.  All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

D-CNL002978

**Appx. 00066**

   (i)  The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

   (ii)  Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

   (c)  Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

   (i)  Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

D-CNL002979

Appx. 00067

(ii)     <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.     Allocations of Profits and Losses**.

(a)     <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

(b)     <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

(i)     <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

8

D-CNL002980

**Appx. 00068**

(c)     Limitation on Loss Allocations.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3.     **Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4.     **Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)     Partnership Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(a) is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)     Partner Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Article 3 (other than Section 3.4(a)), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).   The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This Section 3.4(b) is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)     Qualified Income Offset.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(c) shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 3 have been tentatively made without considering this Section 3.4(c).

(d)     Gross Income Allocation.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this Section 3.4(d) shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering <u>Section 3.4(c)</u> or <u>3.4(d)</u>.

       (e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

       (f)    <u>Partner Nonrecourse Deductions</u>.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

       (g)    <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

       (h)    <u>Section 481 Adjustments</u>.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to <u>Section 3.2(c)</u>, and (ii) the allocations pursuant to <u>Sections 3.4</u>.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this <u>Section 3.5</u> shall be made with respect to allocations pursuant to <u>Section 3.4 (g) and (h)</u> only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this <u>Section 3.6</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

10

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7. Capital Accounts.

(a)   Maintenance of Capital Accounts.   The Partnership shall establish and maintain a separate capital account ("*Capital Account*") for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this Section 3.7.

(i)   The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Sections 3.4 and 3.5; and

(ii)   The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Sections 3.2, 3.4 and 3.5.

The provisions of this Section 3.7 and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.   The General Partner may modify the manner in which the Capital Accounts are maintained under this Section 3.7 in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b)   Negative Capital Accounts.   If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c)   Interest.   No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d)   No Withdrawal.   No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in Section 3.9 and Article 5.

(e)   Loans From Partners.   Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f)   Revaluations.   The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL002983

**Appx. 00071**

3.8.    **Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

3.9.    **Distributions**.

(a)    <u>General</u>.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    <u>Priority Distributions</u>.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)     No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)     Tax Distributions.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "**Tax Distribution**").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made to the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under Section 3.9(b).

(d)     Payments Not Deemed Distributions.     Any amounts paid pursuant to Sections 4.1(e) or 4.1(h) shall not be deemed to be distributions for purposes of this Agreement.

(e)     Withheld Amounts.  Notwithstanding any other provision of this Section 3.9 to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this Section 3.9(d) shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)     Special Tax Distributions.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)     Tolling of Priority Distributions.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under Section 3.9(b), to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

**3.10.   Compensation and Reimbursement of General Partner**.

(a)      Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)      Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

**3.11.   Books, Records, Accounting, and Reports**.

(a)      Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)      Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)      Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)      Distribution Reporting to Class B Limited Partner and Class C Limited Partner. Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

**3.12.   Tax Matters**.

(a)      Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)     Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)     Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)     Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.     Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)     Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b)     Certificate of Limited Partnership.   The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c)     Reliance by Third Parties.   Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.   Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.   In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.   In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d)     Partnership Funds.   The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.   The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.   The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i). All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

        (e)     Loans to or from General Partner; Contracts with Affiliates; Joint Ventures.

        (i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; provided, however, the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

        (ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

        (iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

        (f)     Outside Activities' Conflicts of Interest. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

        (g)     Resolution of Conflicts of Interest. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

        (h)     Indemnification. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

D-CNL002989

Appx. 00077

the "**GP Party**"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

        (i)     Liability of General Partner.

        (i)     Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

        (ii)     The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

        (j)     Reliance by General Partner.

        (i)     The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

        (ii)     The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

        (k)     The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL002990

Appx. 00078

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

    **4.2.**    **Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

        (a)    Limitation of Liability.    Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

        (b)    Management of Business.    No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

        (c)    Return of Capital.    No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

        (d)    Second Amended Buy-Sell and Redemption Agreement.    Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

        (e)    Default on Priority Distributions.    If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under Section 3.9(b) and this Section 4.2(e).  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this Section 4.2(e).

    **4.3.**    **Transfer of Partnership Interests**.

        (a)    Transfer.    No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this Section 4.3 and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL002991
**Appx. 00079**

(b)     Transfers by General Partner.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this Section 4.3(b) to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under Section 4.5(a), Section 5.1(b), or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to Section 5.2.

(c)     Transfers by Limited Partners.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)     Distributions and Allocations in Respect of Transferred Partnership Interests.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of Article 4 and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under Section 3.4.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; *provided, however,* if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 4.3(d), whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)     Forfeiture of Partnership Interests Pursuant to the Contribution Note.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this Section 4.3(e) over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)     Transfers of Partnership Interests Pursuant to the Purchase Notes.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.     Issuances of Partnership Interests to New and Existing Partners**.

(a)     Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b)     Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.     Withdrawal of General Partner**.

(a)     Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b)     Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.     Admission of Substitute Limited Partners and Successor General Partner**.

(a)     Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

21

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as <u>Exhibit B</u> (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     <u>Admission of Successor General Partner</u>.  A successor General Partner selected pursuant to <u>Section 5.2</u> or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to <u>Section 4.3(b)</u> shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     <u>Action by General Partner</u>.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of <u>Exhibit A</u> and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.     Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to <u>Section 4.3(b)</u>);

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this <u>Section 5.1</u>, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.   Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)   Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)   The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)   The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)   All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.   Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

D-CNL002995

**Appx. 00083**

(a)      To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)      To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)      To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)      To the Partners in proportion to their respective Percentage Interests.

**5.4.    Distribution in Kind.**  Notwithstanding the provisions of Section 5.3 that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of Section 5.3, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.    Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in Sections 5.3 and 5.4, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.    Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.    Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

**ARTICLE 6**

**GENERAL PROVISIONS**

**6.1.    Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.   Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.   Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.   Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.   Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.   Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.   Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.   Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.   Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.   Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.   Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.   Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

D-CNL002997

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

D-CNL002998

Appx. 00086

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

D-CNL002999

**Appx. 00087**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
    James D. Dondero,
    President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership*

D-CNL003000
**Appx. 00088**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:     Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003001

**Appx. 00089**

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

D-CNL003002

**Appx. 00090**

**EXHIBIT A**

| CLASS A PARTNERS | Percentage Interest | |
|---|---|---|
|  | By Class | Effective % |
| GENERAL PARTNER: |  |  |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: |  |  |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** |  |  |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** |  |  |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** |  |  |
| Class A Partners | 0.5000% |  |
| Class B Partners | 55.0000% |  |
| Class C Partners | 44.5000% |  |

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By:      _____

Name: _____

Title:   _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>NexPoint Advisors, L.P., James Dondero,<br>Nancy Dondero, and The Dugaboy Investment<br>Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C. (for NexPoint);<br>Stinson LLP (for Nancy Dondero); Heller, Draper,<br>& Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual
Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual
Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1);
Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☑2 11-Recovery of money/property – §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☑3 13-Recovery of money/property - §548 fraudulent transfer<br>☑4 14-Recovery of money/property - other<br><br>**FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property<br><br>**FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)<br><br>**FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41-Objection / revocation of discharge -§727(c),(d),(e)<br><br>**FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation<br><br>**FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br> actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny<br><br>**(continued next column)** | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br> (other than domestic support)<br>☐ 65-Dischargeability - other<br><br>**FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☐ 72-Injunctive relief – other<br><br>**FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81-Subordination of claim or interest<br><br>**FRBP 7001(9) Declaratory Judgment**<br>☑5 91-Declaratory judgment<br><br>**FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*<br>☑ 02-Other (e.g. other actions that would have been brought in state court<br> if unrelated to bankruptcy case) |

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants,<br>declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

D-CNL003006

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

D-CNL003007

Appx. 00095

**EXHIBIT 3**

Docket #0068 Date Filed: 8/27/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § | 21-03006 |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC, JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST | § § § § § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_NY:42003.4 36027/002

1934054210827000000000013

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants Highland Capital Management Services, Inc. ("HCMS"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with HCMS, Mr. Dondero, and Ms. Dondero, the "Defendants") alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with HCMS's defaults under (i) four demand notes, in the aggregate principal amount of $900,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $20,247,628.02, and payable in the event of default, all executed by HCMS in favor of the Debtor. HCMS has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      In paragraph 56 of HCMS's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). HCMS further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of HCMS, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"),

2

D-CNL003084

**Appx. 00098**

acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement on behalf of HCMS, he controlled both HCMS and the Debtor and was the lifetime beneficiary of Dugaboy.

3.     Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Notes.

4.     Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against HCMS for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims (a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.     As remedies, the Debtor seeks (a) damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for HCMS's breach of its obligations under the Notes, (b) turnover by HCMS to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, HCMS pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:42003.4 36027/002

D-CNL003085

**Appx. 00099**

**JURISDICTION AND VENUE**

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE PARTIES**

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, HCMS is a company with offices located in Dallas, Texas, and is incorporated in the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

DOCS_NY:42003.4 36027/002

D-CNL003086

**Appx. 00100**

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:42003.4 36027/002

D-CNL003087

Appx. 00101

### STATEMENT OF FACTS

A.   **The HCMS Demand Notes**

20.   HCMS is the maker under a series of demand notes in favor of the Debtor.

21.   Specifically, on March 28, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note").  A true and correct copy of HCMS's First Demand Note is attached hereto as **Exhibit 1**.

22.   On June 25, 2018, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note").  A true and correct copy of HCMS's Second Demand Note is attached hereto as **Exhibit 2.**

23.   On May 29, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note").  A true and correct copy of HCMS's Third Demand Note is attached hereto as **Exhibit 3.**

24.   On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "Demand Notes").  A true and correct copy of HCMS's Fourth Demand Note is attached hereto as **Exhibit 4.**

25.   Section 2 of the Demand Notes provide: "**Payment of Principal and Interest**.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

26.   Section 4 of the Demand Notes provide:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and

6

D-CNL003088

**Appx. 00102**

the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

27.     Section 6 of the Demand Notes provide:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.      HCMS's Defaults Under Each Demand Note**

28.     By letter dated December 3, 2020, the Debtor made demand on HCMS for payment under the Demand Notes by December 11, 2020 (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 5**.  The Demand Letter provided:

By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

29.     Despite the Debtor's demand, HCMS did not pay all or any portion of the amounts demanded by the Debtor on December 11, 2020.

30.     As of December 11, 2020, there was an outstanding principal amount of $158,776.59 on HCMS's First Demand Note and accrued but unpaid interest in the amount of $3,257.32, resulting in a total outstanding amount as of that date of $162,033.91.

31.     As of December 11, 2020, there was an outstanding principal balance of $212,403.37 on HCMS's Second Demand Note and accrued but unpaid interest in the amount of $2,999.54, resulting in a total outstanding amount as of that date of $215,402.81.

7

32.     As of December 11, 2020, there was an outstanding principal balance of $409,586.19 on HCMS's Third Demand Note and accrued but unpaid interest in the amount of $5,256.62, resulting in a total outstanding amount as of that date of $414,842.81.

33.     As of December 11, 2020, there was an outstanding principal balance of $153,564.74 on HCMS's Fourth Demand Note and accrued but unpaid interest in the amount of $1,675.16, resulting in a total outstanding amount as of that date of $155,239.90.

34.     Thus, as of December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Demand Notes was $947,519.43.  Pursuant to Section 4 of each Demand Note, each Note is in default, and is currently due and payable.

C.     **The HCMS Term Note**

35.     HCMS is the maker under a term note in favor of the Debtor.

36.     Specifically, on May 31, 2017, HCMS executed a term note in favor of the Debtor, as payee, in the original principal amount of $20,247,628.02 (the "Term Note," and together with the Demand Notes, the "Notes").  A true and correct copy of the Term Note is attached hereto as **Exhibit 6**.

37.     Section 2 of the Term Note provides: "**Payment of Principal and Interest**.  Principal and interest under this Note shall be due and payable as follows:

>    **2.1     Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

>    **2.2     Final Payment Date**.   The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

DOCS_NY:42003.4 36027/002

D-CNL003090

Appx. 00104

38.     Section 3 of the Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.     Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

39.     Section 4 of the Term Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

40.     Section 6 of the Term Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**D.     HCMS's Default Under the Term Note**

41.     HCMS failed to make the payment due under the Term Note on December

31, 2020.

42.     By letter dated January 7, 2021, the Debtor made demand on HCMS for

immediate payment under the Term Note (the "Second Demand Letter").  A true and correct

copy of the Second Demand Letter is attached hereto as **Exhibit 7**.  The Second Demand Letter

provides:

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

9

D-CNL003091

**Appx. 00105**

**The Note is in default, and payment is due <u>immediately.</u>**

Second Demand Letter (emphasis in the original).

43.     As of January 8, 2021, the total outstanding principal and accrued but unpaid interest under the Term Note was $6,757,248.95.

44.     Pursuant to Section 4 of the Term Note, the Note is in default, and is currently due and payable.

**E.      <u>The Debtor Files the Original Complaint</u>**

45.     On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "<u>Original Complaint</u>").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for HCMS's breach of its obligations under the Notes and (ii) turnover by HCMS for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**F.      <u>HCMS's Affirmative Defenses</u>**

46.     On March 13, 2021, HCMS filed *Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint* [Docket No. 6] (the "<u>Original Answer</u>").  In its Original Answer, HCMS asserted four affirmative defenses: (i) the claims are barred in whole or in part under the doctrines of justification or repudiation, (ii) waiver, (iii) estoppel, and (iv) offset and/or setoff (the "<u>Setoff Defense</u>"). *See id.* ¶¶ 53-56.

47.     On June 11, 2021, HCMS filed its *First Amended Answer to Plaintiff's Complaint* [Docket No. 34] (the "<u>Amended Answer</u>"), that omitted the Setoff Defense but asserted two affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes

10

D-CNL003092
**Appx. 00106**

"upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 56, and (ii) the Notes are "ambiguous," *id.* ¶ 57.

48.     According to HCMS, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

49.     According to HCMS, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

50.     Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement on behalf of HCMS.

51.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**G.      Dugaboy Lacked Authority to Act on Behalf of the Debtor**

52.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 8**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

53.     Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 8**, § 4.2(b).

54.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

11

D-CNL003093

**Appx. 00107**

55.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

### FIRST CLAIM FOR RELIEF

### (Against HCMS)

### (For Breach of Contract)

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Notes are binding and enforceable contracts.

58.     HCMS breached each Demand Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

59.     HCMS breached the Term Note by failing to pay all amounts due to the Debtor upon HCMS's default and acceleration.

60.     Pursuant to each Note, the Debtor is entitled to damages from HCMS in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Demand Notes.

61.     As a direct and proximate cause of HCMS's breach of each Demand Note, the Debtor has suffered damages in the amount of at least $947,519.43, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

62.     As a direct and proximate cause of HCMS's breach of the Term Note, the Debtor has suffered damages in the amount of at least $6,757,248.95, as of January 8, 2021, plus

12

D-CNL003094

Appx. 00108

an amount equal to all accrued but unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF

### (Against HCMS)

### (Turnover by HCMS Pursuant to 11 U.S.C. § 542(b))

63.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

64.     HCMS owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each of the Notes, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for HCMS's breach of its obligations under each of the Notes

65.     Each Demand Note is property of the Debtor's estate and the amounts due under each Demand Note is matured and payable upon demand.

66.     The Term Note is property of the Debtor's estate and the amounts due under the Term Note is matured and payable upon default and acceleration.

67.     The Debtor has made demand for turnover of the amounts due under each of the Notes

68.     As of the date of filing this Complaint, HCMS has not turned over to the Debtor all or any of the amounts due under each of the Notes.

69.     The Debtor is entitled to the turnover of all amounts due under each of the Notes.

DOCS_NY:42003.4 36027/002

D-CNL003095

Appx. 00109

### THIRD CLAIM FOR RELIEF
#### (Against HCMS)
#### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)

70.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

71.     The Debtor made the transfers pursuant to the Alleged Agreement within two years of the Petition Date.

72.     HCMS entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

73.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt HCMS incurred under the Notes demonstrates a scheme of fraud.

74.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

DOCS_NY:42003.4 36027/002

D-CNL003096

Appx. 00110

75.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

### FOURTH CLAIM FOR RELIEF
### (Against HCMS)
### (Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))

76.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

77.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

78.     Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, HCMS, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of HCMS with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

15

D-CNL003097

Appx. 00111

79.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from HCMS.

80.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from HCMS an amount equal to all obligations remaining under the Notes.

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

81.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

82.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

83.     A judgment declaring the parties' respective rights and obligations will resolve their dispute.

84.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

DOCS_NY:42003.4 36027/002

D-CNL003098

**Appx. 00112**

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

85.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

86.     If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

87.     If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

88.     Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

17

D-CNL003099

**Appx. 00113**

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

89.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

90.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

91.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

92.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

93.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)     On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by HCMS to the Debtor of an amount equal to (a) the aggregate principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's cost of collection (including all court costs and reasonable attorneys' fees and expenses);

18

D-CNL003100

**Appx. 00114**

(iii)   On its Third Claim for Relief, avoidance of the Alleged Agreements and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)   On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)   On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)   On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)   On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result

DOCS_NY:42003.4 36027/002

D-CNL003101

Appx. 00115

of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and

exemplary damages; and

(iii)     Such other and further relief as this Court deems just and proper.


Dated:  As of July 13, 2021.          PACHULSKI STANG ZIEHL & JONES LLP
                                       Jeffrey N. Pomerantz (CA Bar No.143717)
                                       Ira D. Kharasch (CA Bar No. 109084)
                                       John A. Morris (NY Bar No. 2405397)
                                       Gregory V. Demo (NY Bar No. 5371992)
                                       Hayley R. Winograd (NY Bar No. 5612569)
                                       10100 Santa Monica Blvd., 13th Floor
                                       Los Angeles, CA 90067
                                       Telephone: (310) 277-6910
                                       Facsimile: (310) 201-0760
                                       E-mail:     jpomerantz@pszjlaw.com
                                                   ikharasch@pszjlaw.com
                                                   jmorris@pszjlaw.com
                                                   gdemo@pszjlaw.com
                                                   hwinograd@pszjlaw.com

                                       -and-

                                       */s/ Zachery Z. Annable*
                                       HAYWARD PLLC
                                       Melissa S. Hayward
                                       Texas Bar No. 24044908
                                       MHayward@HaywardFirm.com
                                       Zachery Z. Annable
                                       Texas Bar No. 24053075
                                       ZAnnable@HaywardFirm.com
                                       10501 N. Central Expy, Ste. 106
                                       Dallas, Texas 75231
                                       Tel: (972) 755-7100
                                       Fax: (972) 755-7110

                                       *Counsel for Highland Capital Management, L.P.*

D-CNL003102
Appx. 00116

# EXHIBIT 1

D-CNL003103

**Appx. 00117**

**PROMISSORY NOTE**

$150,000.00                                                                 March 28, 2018

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. (*"Maker"*) promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. (*"Payee"*), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED and FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the *"Note"*). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.  Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term *"applicable federal rate"* (2.88 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

2.  Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

3.  Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.  Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.  Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.  Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003105
**Appx. 00119**

# EXHIBIT 2

D-CNL003106

**Appx. 00120**

# PROMISSORY NOTE

$200,000.00                                                                                              June 25, 2018

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("*Maker*") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP. ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWO HUNDRED THOUSAND and 00/100 Dollars ($200,000.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    Interest Rate. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the long-term "*applicable federal rate*" (3.05 %) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    Payment of Principal and Interest. The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

     3.    Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    Acceleration Upon Default. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.      Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.   The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.      Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT
SERVICES, INC.

2

D-CNL003108
**Appx. 00122**

# EXHIBIT 3

## PROMISSORY NOTE

$400,000                                                                                          May 29, 2019

  FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of FOUR HUNDRED THOUSAND and 00/100 Dollars ($400,000.00), together with interest, on the terms set forth below (the "***Note***"). All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

  1. <u>Interest Rate</u>. The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.39%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

  2. <u>Payment of Principal and Interest</u>. The accrued interest and principal of this Note shall be due and payable on demand.

  3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

  4. <u>Acceleration Upon Default</u>. Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

  5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

  6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

# EXHIBIT 4

D-CNL003112

**Appx. 00126**

**PROMISSORY NOTE**

$150,000                                                                    June 26, 2019

     FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("***Maker***") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, LP ("***Payee***"), in legal and lawful tender of the United States of America, the principal sum of ONE HUNDRED AND FIFTY THOUSAND and 00/100 Dollars ($150,000.00), together with interest, on the terms set forth below (the "***Note***").  All sums hereunder are payable to Payee at 300 Crescent Court, Dallas, TX 75201, or such other address as Payee may specify to Maker in writing from time to time.

     1.    <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a rate equal to the short-term "***applicable federal rate***" (2.37%) in effect on the date hereof for loans of such maturity as determined by Section 1274(d) of the Internal Revenue Code, per annum from the date hereof until maturity, compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on demand of the Payee.

     2.    <u>Payment of Principal and Interest</u>.  The accrued interest and principal of this Note shall be due and payable on demand.

     3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

     4.    <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

     5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

     6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

_____
FRANK WATERHOUSE

2

D-CNL003114

**Appx. 00128**

# EXHIBIT 5

### HIGHLAND CAPITAL MANAGEMENT, L.P.

December 3, 2020

Highland Capital Management Services, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention:  Frank Waterhouse, CFO

      Re:  Demand on Promissory Notes:

Dear Mr. Waterhouse,

Highland Capital Management Services, Inc. ("Maker") entered into the following promissory notes (collectively, the "Notes") in favor of Highland Capital Management, L.P. ("Payee"):

| Date Issued | Original Principal Amount | Outstanding Principal Amount (12/11/20) | Accrued But Unpaid Interest (12/11/20) | Total Amount Outstanding (12/11/20) |
|---|---|---|---|---|
| 3/28/18 | $150,000 | $158,776.59 | $3,257.32 | $162,033.91 |
| 6/25/18 | $200,000 | $212,403.27 | $2,999.54 | $215,402.81 |
| 5/29/19 | $400,000 | $409,586.19 | $5,256.62 | $414,842.81 |
| 6/26/19 | $150,000 | $153,564.74 | $1,675.16 | $155,239.90 |
| **TOTALS** | **$900,000** | **$934,330.79** | **$13,188.64** | **$947,519.43** |

As set forth in Section 2 of each of the Notes, accrued interest and principal is due and payable upon the demand of Payee.  By this letter, Payee is demanding payment of the accrued interest and principal due and payable on the Notes in the aggregate amount of $947,519.43, which represents all accrued and unpaid interest and principal through and including December 11, 2020.

**Payment is due on December 11, 2020, and failure to make payment in full on such date will constitute an event of default under the Notes.**

Payments on the Notes must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Notes or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Notes will continue to accrue until the Notes are paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41635.1 36027/002

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo

D-CNL003117

**Appx. 00131**

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:   Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 6

D-CNL003119

**Appx. 00133**

## PROMISSORY NOTE

**$20,247,628.02**                                                                                          **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from Highland Capital Management Services, Inc., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY MILLION, TWO HUNDRED FORTY SEVEN THOUSAND, SIX HUNDRED TWENTY EIGHT AND 02/100 DOLLARS ($20,247,628.02), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.       Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.       Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

2.1       Annual Payment Dates.   During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2       Final Payment Date.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.       Prepayment Allowed; Renegotiation Discretionary.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.       Acceleration Upon Default.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No

failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.     Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.     Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.     Prior Notes.   The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

HIGHLAND CAPITAL MANAGEMENT SERVICES, INC.

By: _____
Name:
Title:

2

D-CNL003121

**Appx. 00135**

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|-----------|---------------------|---------------|-------------------------------------------------------|
| 5/29/15 | $500,000 | 2.30% | $523,095 |
| 10/1/15 | $350,000 | 2.58% | $315,500 |
| 10/2/15 | $310,000 | 2.58% | $323,301 |
| 10/27/15 | $200,000 | 2.58% | $208,228 |
| 10/28/15 | $200,000 | 2.58% | $208,214 |
| 10/30/15 | $100,000 | 2.58% | $104,093 |
| 11/23/15 | $100,000 | 2.57% | $103,908 |
| 11/24/15 | $250,000 | 2.57% | $259,752 |
| 2/10/16 | $2,000,000 | 2.62% | $ 83,390 |
| 2/11/16 | $250,000 | 2.62% | $258,524 |
| 4/5/16 | $6,000,000 | 2.25% | $6,155,712 |
| 5/4/16 | $2,700,000 | 2.24% | $2,764,954 |
| 7/1/16 | $30,000 | 2.18% | $30,598 |
| 8/5/16 | $525,000 | 2.18% | $534,375 |
| 8/22/16 | $250,000 | 2.18% | $254,465 |
| 9/22/16 | $185,000 | 2.18% | $187,773 |
| 12/12/16 | $7,700,000 | 2.26% | $7,781,050 |
| 3/31/17 | $150,000 | 2.78% | $150,697 |
|  | $21,800,000 |  | $20,247,628.02 |

3

D-CNL003122

Appx. 00136

# EXHIBIT 7

### HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

Highland Capital Management Services, Inc.
c/o Bonds Ellis Eppich Schafer Jones LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76012
Attention:  James Dondero

       Re:  Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, Highland Capital Management Services, Inc. entered into that certain promissory note in the original principal amount of $20,247,628.02 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year.  Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $6,757,248.95; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately.</u>**  Payments on the Note must be made in immediately available funds.  Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved.  Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full.  Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

DOCS_NY:41914.2 36027/002

cc:     Fred Caruso
         James Romey
         Jeffrey Pomerantz
         Ira Kharasch
         Gregory Demo
         D. Michael Lynn

D-CNL003125

Appx. 00139

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

D-CNL003126
**Appx. 00140**

# EXHIBIT 8

D-CNL003127

**Appx. 00141**

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED
AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

ARTICLE 1   GENERAL .................................................................................................... 1
   1.1.   Continuation ....................................................................................................... 1
   1.2.   Name .................................................................................................................. 1
   1.3.   Purpose ............................................................................................................... 1
   1.4.   Term. .................................................................................................................. 1
   1.5.   Partnership Offices; Addresses of Partners. ...................................................... 1

ARTICLE 2   DEFINITIONS .............................................................................................. 2
   2.1.   Definitions .......................................................................................................... 2
   2.2.   Other Definitions ............................................................................................... 6

ARTICLE 3   FINANCIAL MATTERS ............................................................................... 6
   3.1.   Capital Contributions ......................................................................................... 6
   3.2.   Allocations of Profits and Losses ...................................................................... 8
   3.3.   Allocations on Transfers .................................................................................... 9
   3.4.   Special Allocations ............................................................................................ 9
   3.5.   Curative Allocations ........................................................................................ 10
   3.6.   Code Section 704(c) Allocations ..................................................................... 10
   3.7.   Capital Accounts .............................................................................................. 11
   3.8.   Distributive Share for Tax Purpose ................................................................. 12
   3.9.   Distributions. .................................................................................................... 12
   3.10.   Compensation and Reimbursement of General Partner ................................... 14
   3.11.   Books, Records, Accounting, and Reports ....................................................... 14
   3.12.   Tax Matters ...................................................................................................... 14

ARTICLE 4   RIGHTS AND OBLIGATIONS OF PARTNERS ........................................ 15
   4.1.   Rights and Obligations of the General Partner ................................................ 15
   4.2.   Rights and Obligations of Limited Partners .................................................... 19
   4.3.   Transfer of Partnership Interests ..................................................................... 19
   4.4.   Issuances of Partnership Interests to New and Existing Partners ..................... 21
   4.5.   Withdrawal of General Partner ........................................................................ 21
   4.6.   Admission of Substitute Limited Partners and Successor General Partner ....... 21

ARTICLE 5   DISSOLUTION AND WINDING UP .......................................................... 22
   5.1.   Dissolution ....................................................................................................... 22
   5.2.   Continuation of the Partnership ....................................................................... 23
   5.3.   Liquidation ....................................................................................................... 23
   5.4.   Distribution in Kind ......................................................................................... 24
   5.5.   Cancellation of Certificate of Limited Partnership .......................................... 24
   5.6.   Return of Capital .............................................................................................. 24
   5.7.   Waiver of Partition. .......................................................................................... 24

ARTICLE 6   GENERAL PROVISIONS ............................................................................ 24
   6.1.   Amendments to Agreement .............................................................................. 24

i

6.2.    Addresses and Notices ........................................................................................25
6.3.    Titles and Captions............................................................................................25
6.4.    Pronouns and Plurals.........................................................................................25
6.5.    Further Action ...................................................................................................25
6.6.    Binding Effect ...................................................................................................25
6.7.    Integration .........................................................................................................25
6.8.    Creditors............................................................................................................25
6.9.    Waiver ...............................................................................................................25
6.10.   Counterparts......................................................................................................25
6.11.   Applicable Law .................................................................................................25
6.12.   Invalidity of Provisions .....................................................................................25
6.13.   Mandatory Arbitration.......................................................................................26

D-CNL003130

Appx. 00144

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"*)*,* as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

**ARTICLE 1**

**GENERAL**

1.1.    **Continuation**.  Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act.  Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

1.2.    **Name.**  The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P**.**  The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

1.3.    **Purpose.**  The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act**.**  Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

1.4.    **Term.**  The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

1.5.    **Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices**.**  The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate**.**  The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate**.**  The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners**.**  The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201**.**  The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership**.**  Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

D-CNL003131

**Appx. 00145**

## ARTICLE 2

## DEFINITIONS

**2.1.**    **Definitions.**  The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in Section 3.1(b) of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to Section 3.7 and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question.  As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to Section 3.7(a).

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"*Class B Limited Partner*" means those Partners holding a Class B Limited Partnership Interest, as shown on Exhibit A.

"*Class B Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"*Class B NAV Ratio Trigger Period*" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"*Class C Limited Partner*" means those Partners holding a Class C Limited Partnership Interest, as shown on Exhibit A.

"*Class C Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"*Class C NAV Ratio Trigger Period*" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"*Code*" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"*Contribution Note*" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"*Default Loan*" has the meaning set forth in Section 3.1(c)(i).

"*Defaulting Partner*" has the meaning set forth in Section 3.1(c).

"*Delaware Act*" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"*Effective Date*" means the date first recited above.

"*Fiscal Year*" has the meaning set forth in Section 3.11(b).

D-CNL003133

Appx. 00147

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in <u>Section 5.3</u>.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; <u>provided</u>, <u>however</u>, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities.  Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse Liability*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year.  Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

D-CNL003134

Appx. 00148

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

D-CNL003135

Appx. 00149

"*Record Date*" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"*Second Amended Buy-Sell and Redemption Agreement*" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"*Securities*" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"*Securities Act*" means the Securities Act of 1933, as amended, and any successor to such statute.

"*Substitute Limited Partner*" has the meaning set forth in Section 4.6(a).

"*Transfer*" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"*Treasury Regulations*" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

2.2.    **Other Definitions**. All terms used in this Agreement that are not defined in this Article 2 have the meanings contained elsewhere in this Agreement.

### ARTICLE 3

### FINANCIAL MATTERS

3.1.    **Capital Contributions**.

(a)    Initial Capital Contributions. The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    Additional Capital Contributions.

6

         (i)     The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

         (ii)     Any failure by a Partner to make an Additional Capital Contribution requested under <u>Section 3.1(b)(i)</u> on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

         (c)    <u>Consequences to Defaulting Partners</u>.  In the event a Partner is in default under <u>Section 3.1(b)</u> (a "***Defaulting Partner***"*),* the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

         (i)    <u>Default Loans</u>.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to <u>Section 3.9(a)</u> or <u>Section 5.3</u> or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

        (ii)      <u>Reduction of Percentage Interest</u>.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to <u>Section 3.1(c)(i)</u>, the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this <u>Section 3.1(c)(ii)</u>, any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

    **3.2.**    **Allocations of Profits and Losses**.

        (a)      <u>Allocations of Profits</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Profits for any Fiscal Year will be allocated to the Partners as follows:

        (i)      <u>First</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(i)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(iii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

        (ii)      <u>Next</u>, to the Partners until cumulative Profits allocated under this <u>Section 3.2(a)(ii)</u> for all prior periods equal the cumulative Losses allocated to the Partners under <u>Section 3.2(b)(ii)</u> for all prior periods in the inverse order in which such Losses were allocated; and

        (iii)      <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

        (b)      <u>Allocations of Losses</u>.  Except as provided in <u>Sections 3.4</u>, <u>3.5</u>, and <u>3.6</u>, Losses for any Fiscal Year will be will be allocated as follows:

        (i)      <u>First</u>, to the Partners until cumulative Losses allocated under this <u>Section 3.2(b)(i)</u> for all prior periods equal the cumulative Profits allocated to the Partners under <u>Section 3.2(a)(iii)</u> for all prior periods in the inverse order in which such Profits were allocated; and

        (ii)      <u>Next</u>, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

        (iii)      <u>Then</u>, to all Partners in proportion to their respective Percentage Interests.

D-CNL003138

**Appx. 00152**

(c)    <u>Limitation on Loss Allocations</u>.  If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

**3.3.**    **Allocations on Transfers**.  Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

**3.4.**    **Special Allocations.**  If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a)    <u>Partnership Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b)    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>.  Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2).  The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g).  This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c)    <u>Qualified Income Offset</u>.  If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d)    <u>Gross Income Allocation</u>.  If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this Article 3 have been tentatively made without considering Section 3.4(c) or 3.4(d).

        (e)    Nonrecourse Deductions.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

        (f)    Partner Nonrecourse Deductions.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

        (g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

        (h)    Section 481 Adjustments.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

    **3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to Section 3.2(c), and (ii) the allocations pursuant to Sections 3.4.  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 3.5 shall be made with respect to allocations pursuant to Section 3.4 (g) and (h) only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

    **3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this Section 3.6 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

D-CNL003140

**Appx. 00154**

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7. Capital Accounts.

(a) <u>Maintenance of Capital Accounts</u>. The Partnership shall establish and maintain a separate capital account (*"Capital Account"*) for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) <u>Negative Capital Accounts</u>. If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) <u>Interest</u>. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) <u>No Withdrawal</u>. No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e) <u>Loans From Partners</u>. Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) <u>Revaluations</u>. The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

11

D-CNL003141

Appx. 00155

**3.8.    Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion.  Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

**3.9.    Distributions**.

(a)    General.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f).  The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners.  Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

(b)    Priority Distributions.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

(i)    No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

(ii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

12

(iii)   No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)   No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)   <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "***Tax Distribution***").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)   <u>Payments Not Deemed Distributions</u>.   Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)   <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution. To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)   <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)   <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

D-CNL003143

**Appx. 00157**

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

**3.10.   Compensation and Reimbursement of General Partner**.

(a)    Compensation.   The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)    Reimbursement for Expenses.   In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

**3.11.   Books, Records, Accounting, and Reports**.

(a)    Records and Accounting.   The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose. The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)    Fiscal Year.   The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)    Other Information.   The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)    Distribution Reporting to Class B Limited Partner and Class C Limited Partner.   Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

**3.12.   Tax Matters**.

(a)    Tax Returns.   The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes. The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1. The classification, realization, and recognition of income, gain, loss, deduction, credit and

14

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion.  The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)  Tax Elections.  Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)  Tax Controversies.  Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)  Taxation as a Partnership.  No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

**4.1.   Rights and Obligations of the General Partner.**  In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)  Management.  The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership.  Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership.  In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b) <u>Certificate of Limited Partnership</u>.  The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c) <u>Reliance by Third Parties</u>.  Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially.  Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing.  In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence.  In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d) <u>Partnership Funds</u>.  The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner.  The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership.  The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof**.**  Nothing in this Section 4.1(d) shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to Section 4.1(e)(i)**.**  All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives**.**  Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

     (e)     Loans to or from General Partner: Contracts with Affiliates; Joint Ventures.

     (i)     The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans.  The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership.  The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

     (ii)     The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership.  Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

     (iii)     The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

     (f)     Outside Activities' Conflicts of Interest.  The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership.  Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

     (g)     Resolution of Conflicts of Interest.  Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

     (h)     Indemnification.  The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

D-CNL003147

Appx. 00161

the "*GP Party*"*),* against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the General Partner acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this Section 4.1(h) or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this Section 4.1(h) unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

    (i)    Liability of General Partner.

    (i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

    (ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

    (j)    Reliance by General Partner.

    (i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

    (ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

    (k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

D-CNL003148

Appx. 00162

until such Person shall resign or shall have been removed in the manner hereinafter provided.  Any number of offices may be held by the same Person.  The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner.  Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby.  Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

      4.2.    **Rights and Obligations of Limited Partners**.  In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

      (a)    <u>Limitation of Liability</u>.  Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

      (b)    <u>Management of Business</u>.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

      (c)    <u>Return of Capital</u>.  No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

      (d)    <u>Second Amended Buy-Sell and Redemption Agreement</u>.  Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

      (e)    <u>Default on Priority Distributions</u>.  If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>.  In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

      4.3.    **Transfer of Partnership Interests**.

      (a)    <u>Transfer</u>.  No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement.  Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void.  An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books.  The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

19

D-CNL003149

**Appx. 00163**

(b)    <u>Transfers by General Partner</u>.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

(c)    <u>Transfers by Limited Partners</u>.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this <u>Section 4.3(d)</u> that would affect any special allocations made under <u>Section 3.4</u>.  All distributions declared on or before the date of that Transfer shall be made to the transferor.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; ***provided, however,*** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>. Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

20

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes.  Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest.  The Priority Distributions in <u>Section 3.9(b)</u> shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

**4.4.** **Issuances of Partnership Interests to New and Existing Partners**.

(a) <u>Issuance of Partnership Interests to New Limited Partners</u>.  The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner.  All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests.  No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b) <u>Issuance of an Additional Partnership Interest to an Existing Partner</u>.  The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion.  Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately.  Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

**4.5.** **Withdrawal of General Partner**

(a) <u>Option</u>.  In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "***Departing Partner***") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b) <u>Conversion</u>.  If the successor to a Departing Partner does not exercise the option described in <u>Section 4.5(a)</u>, the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

**4.6.** **Admission of Substitute Limited Partners and Successor General Partner**.

(a) <u>Admission of Substitute Limited Partners</u>.  A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest.  To become a substitute Limited Partner (a "***Substitute Limited Partner***"),

D-CNL003151

**Appx. 00165**

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.  Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)     Admission of Successor General Partner.  A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)     Action by General Partner.  In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

5.1.    **Dissolution.**  The Partnership shall be dissolved upon:

(a)     The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)     An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)     Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding:  (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

22

D-CNL003152

**Appx. 00166**

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2.    Continuation of the Partnership**.  Upon the occurrence of an event described in Section 5.1(a), the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event.  If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs.  If an election to continue the Partnership is made upon the occurrence of an event described in Section 5.1(a), then:

(a)    Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b)    The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this Article 5;

(c)    The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d)    All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3.    Liquidation**.  Upon dissolution of the Partnership, unless the Partnership is continued under Section 5.2, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in Section 5.1), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator.  The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest.  The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest.  Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest.  The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein.  Except as expressly provided in this Article 5, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein.  The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

23

(a)     To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)     To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)     To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)     To the Partners in proportion to their respective Percentage Interests.

**5.4.     Distribution in Kind.**  Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.**  Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.**  The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

**5.5.     Cancellation of Certificate of Limited Partnership.**  Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

**5.6.     Return of Capital.**  The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

**5.7.     Waiver of Partition.**  Each Partner hereby waives any rights to partition of the Partnership property.

**ARTICLE 6**

**GENERAL PROVISIONS**

**6.1.     Amendments to Agreement.**  The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.     Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.     Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.     Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.     Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.     Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.     Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.     Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.     Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.    Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.    Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.    Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

25

D-CNL003155

**Appx. 00169**

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13.    General Partner Discretion.**  Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14.    Mandatory Arbitration.**   In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas.  The discovery process shall be limited to the following:  Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.  Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.  The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules.  All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury.  All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

D-CNL003156

Appx. 00170

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero.
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:   Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

D-CNL003158

**Appx. 00172**

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:    Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**EXHIBIT A**

| | Percentage Interest | |
| CLASS A PARTNERS | By Class | Effective % |
| --- | --- | --- |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

D-CNL003161

Appx. 00175

**EXHIBIT B**

**ADDENDUM**
**TO THE**
**FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ____ day of _____, 20__, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____


NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]


D-CNL003163

**Appx. 00177**

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

**PLAINTIFFS**
Highland Capital Management, L.P.

**DEFENDANTS**
Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust

**ATTORNEYS** (Firm Name, Address, and Telephone No.)
Hayward PLLC
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231  Tel.: (972) 755-7100

**ATTORNEYS** (If Known)
Stinson LLP (for Highland Capital Management Services, Inc. and Nancy Dondero); Heller, Draper & Horn, L.L.C. (for The Dugaboy Investment Trust)

**PARTY** (Check One Box Only)
☑ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor          ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor        ☑ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☑2 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐3 13-Recovery of money/property - §548 fraudulent transfer
☑4 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑5 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ Damages in an amount to be determined at trial |

Other Relief Sought  Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

**INSTRUCTIONS**

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located.  Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate.  There also may be lawsuits concerning the debtor's discharge.  If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF).  (CM/ECF captures the information on Form 1040 as part of the filing process.)  When completed, the cover sheet summarizes basic information on the adversary proceeding.  The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court.  The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney).  A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.**  Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.**  Give the names and addresses of the attorneys, if known.

**Party**.  Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.**  Enter the dollar amount being demanded in the complaint.

**Signature.**  This cover sheet must be signed by the attorney of record in the box on the second page of the form.  If the plaintiff is represented by a law firm, a member of the firm must sign.  If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT 4

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adversary Proceeding No. |
| vs. | § § § | 21-03007 |
| HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST | § § § § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210827000000000014

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with HCRE, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with HCRE's defaults under (i) four demand notes, in the aggregate principal amount of $4,250,000, and payable upon the Debtor's demand, and (ii) one term note, in the aggregate principal amount of $6,059,831.51, payable in the event of default, all executed by HCRE in favor of the Debtor. HCRE has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.      In paragraph 58 of HCRE's *First Amended Answer to Plaintiff's Complaint* [Docket No. 34], HCMS contends that the Debtor orally agreed to relieve it of the obligations under the Notes (as defined below) upon fulfillment of "conditions subsequent" (the "Alleged Agreement"). HCRE further contends that the Alleged Agreement was entered into between James Dondero and his sister, Nancy Dondero, as representative of a majority of the Class A

2

D-CNL003242
**Appx. 00182**

shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement on behalf of HCRE, he controlled both HCRE and the Debtor and was the lifetime beneficiary of Dugaboy.

3.      Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Notes.

4.      Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.  Specifically, in addition to pursuing claims against HCMS for breach of its obligations under the Notes and for turnover, the Debtor adds alternative claims (a) against HCMS for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.      As remedies, the Debtor seeks (a) damages from HCRE in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for HCRE's breach of its obligations under the Notes, and (b) turnover by HCRE to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, HCRE pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:42002.5 36027/002

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, HCRE is a limited liability company with offices located in Dallas, Texas, and is organized under the laws of the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled HCRE; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

DOCS_NY:42002.5 36027/002

D-CNL003244

Appx. 00184