**stop** 20:19 76:19,25

**straight** 35:4

**stream** 89:17

**strike** 36:8

**strongly** 18:18

**structure** 89:19

**stuff** 69:10 77:2

**subheading** 35:7

**subject** 51:8,9 84:22

**subparts** 21:4

**subsequent** 39:24 40:23 48:24 54:14,23 55:5 67:23 68:12 72:2 73:3 74:7 76:9 77:25 80:20

**summary** 25:15 43:25

**supposed** 10:10 11:13 38:7 40:5

**sworn** 5:4

**T**

**tab** 43:9,13,20 44:9 45:7,14 57:3,11 62:14,23 64:6 68:16, 21 70:10,16

**tabs** 45:17 46:13,15, 18

**taking** 8:5

**talked** 89:7 90:24

**talking** 41:17 69:10 77:22 78:16 82:2

**tax** 64:7,8,9,10,14,20 66:6

**taxes** 66:12

**team** 13:11 56:8

**technology** 18:25

**template** 20:8 45:8 60:23

**term** 38:19 90:5

**terms** 8:19 9:16,18 17:11 25:19 36:11

**50:5** 87:20

**test** 61:18 62:20

**testified** 5:4 57:4 84:19

**testify** 80:16

**testifying** 84:13

**testimony** 79:15

**testing** 61:5,25 62:8 65:16

**things** 28:24 49:25 77:14 82:8 86:7

**third-party** 87:6

**thought** 15:20

**ties** 45:16

**time** 6:7 7:6,20 8:7 11:7,17 12:15 13:24 14:23 30:8 37:3,5 39:17 55:13 56:25 70:7 76:19 77:5,9 79:9 93:17

**time-to-time** 23:11

**title** 5:16 32:13 42:6

**today** 77:6,8 79:15 80:16

**told** 66:4 77:5

**top** 19:12 21:7 25:9 31:12 45:11

**topics** 89:6

**total** 61:9

**totaling** 63:4

**track** 47:5

**transaction** 11:15 88:15 89:12 90:12

**transactions** 24:12 26:20 27:5,6,21 28:8, 25 34:19,23 35:2 51:19,24 89:7

**trial** 43:21,24 44:5 61:14

**two-page** 14:25

**type** 43:2 75:6

**typical** 14:17

**typically** 13:10 20:5 77:24

**U**

**unable** 59:23

**unaffiliated** 90:8

**uncorrected** 25:15 50:2

**understand** 8:4,11, 12 10:13 19:7,12 20:22 25:20 32:24 41:20 77:3

**understanding** 24:9 25:10 34:22 36:12 38:4 45:23 64:11 65:24 66:10 70:20 80:11

**understood** 78:23

**undertaken** 62:9

**undertaking** 46:8

**undertook** 9:25 58:7

**undue** 50:8

**unit** 6:19 11:3

**unqualified** 50:13, 20

**upload** 14:2,6

**upstream** 89:19

**users** 88:11

**V**

**vague** 69:9

**valuation** 79:23 91:23

**verbatim** 89:14

**versus** 90:12

**view** 26:8 87:25

**visits** 14:13,16

**W**

**WANDER** 9:12 16:2, 7 24:14 30:12 32:24

**36:5** 45:25 60:5 68:18 88:12 93:21

**Waterhouse** 13:4,11 19:9,15,17,20 21:3, 11 23:5 24:10,18 25:22 27:20 28:23 70:21 72:6,8,14,19, 24 83:7,16

**Wilson** 83:4,15

**withdrawn** 27:8 32:7 35:12 37:3 39:4,14, 16 46:9 53:6 55:2 56:11 61:2,8 68:3

**word** 8:5 13:6

**words** 26:18 38:20 46:14 50:4,7 86:15

**work** 11:15 42:14 44:7 60:14 77:2 78:22 81:24 82:24 85:14 87:19 88:21

**worked** 82:14 84:4

**working** 6:24

**workpaper** 41:11 43:6

**workpapers** 10:15 41:2,6 42:25 55:8,21 56:14 58:25 59:19 68:17,22

**written** 69:2,20,24 70:6

**wrong** 25:23 53:17

**Y**

**year** 10:23 11:20,24 16:24 20:15 21:9,19 41:19 43:16 51:10 52:21 82:10

**year-end** 22:4

**years** 6:20 13:23 51:8 82:9 85:19

# EXHIBIT 95

Page 1

1

2       IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
3                   DALLAS DIVISION
     IN RE:                    )
4                              ) CHAPTER 11
     HIGHLAND CAPITAL          )
5    MANAGEMENT, L.P.,         ) CASE NO.
                               ) 19-34054-sgj11
6          Debtor.            )
     _____  )
7
     HIGHLAND CAPITAL          )
8    MANAGEMENT, L.P.,         )
                               ) Adversary Proceeding
9          Plaintiff,          ) No. 20-3190-sgj11
                               )
10   v.                        )
                               )
11   JAMES D. DONDERO,         )
                               )
12         Defendant.          )
     _____  )
13

14        REMOTE VIDEO-RECORDED DEPOSITION OF

15              JAMES D. DONDERO

16          TUESDAY, JANUARY 5, 2021

17

18

19

20

21

22

23   REPORTED BY:

24   MICHAEL E. MILLER, FAPR, RDR, CRR

25   JOB NO. 188154

Appx. 01587

Page 2

```
1
2
3
4
5          Tuesday, January 5, 2021
6          9:50 a.m. CST
7
8
9          REMOTE ORAL VIDEO-RECORDED DEPOSITION
10  OF JAMES D. DONDERO, held via Zoom conference
11  pursuant to the Federal Rules of Civil Procedure
12  before Michael E. Miller, Fellow of the Academy
13  of Professional Reporters, Registered Diplomate
14  Reporter, Certified Realtime Reporter and Notary
15  Public in and for the State of Texas.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   REMOTE APPEARANCES:
3      PACHULSKI STANG ZIEHL & JONES
4      Attorneys for Debtor
5      780 Third Avenue
6      New York, NY 10017
7   BY:    JOHN MORRIS, ESQ.
8          HAYLEY WINOGRAD, ESQ.
9          JEFFREY POMERANTZ, ESQ.
10         GREGORY DEMO, ESQ.
11         IRA KHARASCH, ESQ.
12
13     LATHAM & WATKINS
14     Attorney For UBS
15     885 Third Avenue
16     New York, NY 10022
17  BY:    SHANNON MCLAUGHLIN, ESQ.
18         ZACHARY PROULX, ESQ.
19
20     JENNER & BLOCK
21     Attorney for Redeemer Committee
22     353 North Clark Street
23     Chicago, IL 60654
24  BY:    TERRI MASCHERIN, ESQ.
25
```

Page 4

```
1
2   REMOTE APPEARANCES:
3      SIDLEY AUSTIN
4      Attorneys For the Creditors Committee
5      2021 McKinney Avenue
6      Dallas, TX 75201
7   BY:    PENNY REID, ESQ.
8          PAIGE MONTGOMERY, ESQ.
9          MATTHEW CLEMENTE, ESQ.
10         ALYSSA RUSSELL, ESQ.
11
12     KING & SPALDING
13     Attorney for Highland CLO Funding, Ltd.
14     500 West 2nd Street
15     Austin, TX 78701
16  BY:    REBECCA MATSUMURA, ESQ.
17
18     BONDS ELLIS EPPICH SCHAFER JONES
19     Attorneys for James Dondero
20     420 Throckmorton Street
21     Fort Worth, TX 76102
22  BY:    JOHN BONDS, ESQ.
23         BRYAN ASSINK, ESQ.
24
25
```

Page 5

```
1
2   REMOTE APPEARANCES:
3      DEBEVOISE & PLIMPTON
4      Attorneys for HarbourVest Partners
5      919 Third Avenue
6      New York, NY 10022
7   BY:    ERICA WEISGERBER, ESQ.
8
9      CARLYON CICA CHARTERED
10     Attorneys for Integrated Financial
11     Associates Inc.
12     265 East Warm Springs Road
13     Las Vegas, NV 89119
14  BY:    CANDACE CARLYON, ESQ.
15
16  ALSO PRESENT:
17     La Asia Canty, Paralegal
18     Pachulski Stang Ziehl & Jones LLP
19
20  VIDEOGRAPHER:
21     Rick Richey, TSG Reporting Inc.
22
23
24
25
```

Page 6

1
2      ———
3         P R O C E E D I N G S
4      January 5, 2021, 9:50 a.m. CST
5
6         THE VIDEOGRAPHER:  Good morning,
7  ladies and gentlemen.  My name is Rick Richey.
8  I'm a legal videographer in association with
9  TSG Reporting Inc.
10         Due to the severity of the COVID-19
11  and following the practice of social distancing,
12  I will not be in the same room with the witness.
13  Instead, I will record this videotaped deposition
14  remotely.
15         The court reporter, Mike Miller, also
16  will not be in the same room and will swear the
17  witness remotely.
18         Do all parties stipulate to the
19  validity of this video recording and remote
20  swearing and that it will be admissible in the
21  courtroom as if it had been taken following Rule
22  30 of the Federal Rules of Civil Procedure and
23  the state rules where the case is pending?
24         Do all agree?
25         MR. MORRIS:  Yes.

Page 7

1
2         MR. BONDS:  Yes.
3         MR. MORRIS:  Does anyone not agree?
4         (Pause.)
5         MR. MORRIS:  Having heard nothing,
6  let's proceed.  Thank you.
7         THE VIDEOGRAPHER:  This will be the
8  start of Media No. 1 in the video-recorded
9  deposition of James Dondero.  Today's date is
10  January 5th, 2021.  It's 9:52 a.m. Central
11  Standard Time.
12         The case is In re Highland Capital
13  Management LP, Debtor, Chapter 11, Case
14  No. 19-34054-sgj11 in the United States
15  Bankruptcy Court for the Northern District of
16  Texas, Dallas Division.
17         The attorneys' appearances have
18  already been noted on the steno record, so would
19  the court reporter please swear the witness.
20         MR. BONDS:  Wait just one second.
21  There's an adversary proceeding that this case is
22  actually -- or this deposition is actually being
23  taken in.  It's 20-03190-sgj.  Thank you.
24  ///
25  ///

Page 8

1            J. DONDERO
2            ———
3         JAMES D. DONDERO,
4      having been duly sworn,
5         testified as follows:
6            ———
7            EXAMINATION
8
9  BY MR. MORRIS:
10     Q.  Good morning, Mr. Dondero.  Can you
11  hear me okay?
12     A.  Yes.
13     Q.  Okay.  My name is John Morris from
14  Pachulski Stang Ziehl & Jones, counsel for the
15  debtor.
16         Where are you located this morning,
17  sir?
18     A.  Highland Capital Management's
19  conference room, same as last time.
20     Q.  Is there anybody in the room with you
21  right now?
22     A.  No.
23     Q.  Do you have a telephone with you?
24     A.  Yes.
25     Q.  Is the phone off?

Page 9

1            J. DONDERO
2     A.  Yes.
3     Q.  Are you aware that the debtor sent a
4  letter to your lawyers instructing you not to be
5  on the premises after December 31st, 2020?
6     A.  Yes.
7     Q.  Did you get the debtor's permission
8  to enter the premises this morning?
9     A.  Implicitly for this depo, I believe.
10     Q.  Okay.  Did you get any explicit
11  consent or approval for you to be in the offices
12  this morning?
13     A.  Not that I'm aware of.
14     Q.  Did you ask or did anybody on your
15  behalf ask the debtors if you could participate
16  in today's deposition at the Highland offices?
17     A.  I don't know.
18     Q.  You're not aware of that, right?
19     A.  Correct.
20     Q.  Okay.  John Bonds is defending you
21  today; is that right?
22     A.  Yes.
23     Q.  And he's at the Bonds Ellis firm,
24  right?
25     A.  Yes.

J. DONDERO

1
2    Q.  And the Bonds Ellis firms represents
3    you in your individual capacity, correct?
4    A.  Yes.
5    Q.  Is there any other law firm that
6    represents you in your individual capacity in the
7    Highland bankruptcy or in the adversary
8    proceeding?
9    A.  I don't believe so.
10   Q.  Okay.  Does the Bonds Ellis firm
11   represent any entity in which you have an
12   ownership or control interest, or do they just
13   represent you in your individual capacity?
14   A.  I don't know for sure.
15   Q.  Okay.  But as you sit here right now,
16   do you have any reason to believe that the Bonds
17   Ellis firm represents anybody other than you in
18   your individual capacity in connection with the
19   bankruptcy case?
20   A.  I don't know.
21   Q.  Okay.  You understand that we're here
22   today for your deposition, right?
23   A.  Yes.
24   Q.  And do you understand that today's
25   deposition is being taken in connection with the

J. DONDERO

1
2    debtor's motion for -- (audio malfunction) --
3        (Clarification requested by the
4        stenographer.)
5        MR. MORRIS:  I'll ask it again.
6    BY MR. MORRIS:
7    Q.  Mr. Dondero, do you understand that
8    today's deposition is being taken in connection
9    with the debtor's motion for preliminary
10   injunction against you?
11   A.  Yes.
12   Q.  Do you intend to participate in the
13   hearing on the debtor's motion for preliminary
14   injunction?
15       MR. BONDS:  Objection, form.
16       MR. MORRIS:  You can answer.
17   A.  I don't know.
18   BY MR. MORRIS:
19   Q.  Do you intend to make -- do you
20   intend to testify at the debtor's hearing for
21   preliminary injunction?
22       MR. BONDS:  Objection, form.
23   A.  I don't know.
24   BY MR. MORRIS:
25   Q.  You may or you may not; is that

J. DONDERO

1
2    right?
3    A.  Yes.
4    Q.  Okay.  Are you on any drugs or any
5    medication right now?
6    A.  No.
7    Q.  Is there anything that you're aware
8    of that might affect your memory today?
9    A.  No.
10   Q.  Are you aware of anything that would
11   prevent you from testifying competently today to
12   the best of your ability?
13   A.  No.
14   Q.  You understand that you're under oath
15   right now?
16   A.  Yes.
17   Q.  Are you aware that on December 10th
18   the debtor obtained a temporary restraining order
19   against you?
20   A.  Roughly.
21   Q.  Okay.  Did you ever personally read a
22   copy of the temporary restraining order?
23   A.  No.
24   Q.  So you've never seen the order
25   itself; is that right?

J. DONDERO

1
2        MR. BONDS:  Objection, form.
3    A.  Correct.
4    BY MR. MORRIS:
5    Q.  Do you have an understanding of what
6    the order restrains you from doing?
7    A.  Just in the most general sense.
8    Q.  Tell me your understanding of what
9    the temporary order restrains you from doing.
10   A.  Talking to the independent board
11   directly or talking directly to Highland
12   employees.
13   Q.  Is there any other aspect of the
14   temporary restraining order that you're aware of
15   that would otherwise constrain or restrain your
16   conduct?
17   A.  Those are the points I remember.
18   Q.  Do you recall that before the Court
19   entered the temporary restraining order, it held
20   a hearing to consider the debtor's request?
21   A.  I -- I don't know.
22   Q.  Did you listen to the hearing?
23   A.  No.
24   Q.  Did you read a transcript of the
25   hearing?

Page 14

```
1              J. DONDERO
2       A. No.
3       Q. Do you respect the Court's authority
4  in this case?
5          MR. BONDS: Objection, form.
6       A. Yes.
7  BY MR. MORRIS:
8       Q. Is there any particular reason why
9  you didn't take the time to read the Court's
10  temporary restraining order that was entered
11  against you?
12      A. No.
13      Q. James Seery is a member of the board
14  of Strand Advisors, the debtor's general partner,
15  right?
16      A. Yes.
17      Q. And you've been aware of that since
18  at least last January, correct?
19      A. Yes.
20      Q. And you're also aware that Mr. Seery
21  is the debtor's CEO and CRO, right?
22      A. Yes.
23      Q. And you've been aware of that since
24  last July, correct?
25      A. Yes.
```

Page 15

```
1              J. DONDERO
2       Q. Did you ever review the declaration
3  that Mr. Seery submitted in connection with the
4  debtor's motion for a temporary restraining order
5  against you?
6          MR. BONDS: Objection, form.
7       A. No.
8  BY MR. MORRIS:
9       Q. Do you know what Mr. Seery alleged in
10  his declaration -- withdrawn.
11         Do you know the substance of what
12  Mr. Seery alleged in his declaration in support
13  of the debtor's motion for the TRO?
14      A. No.
15      Q. Did you care that the debtor was
16  seeking a TRO against you?
17      A. I didn't think about it.
18      Q. Have you thought about it since the
19  order was entered?
20      A. Not really.
21      Q. Okay. You didn't submit a
22  declaration of your own in opposition of the
23  motion for TRO, right?
24      A. I don't know.
25      Q. You don't recall signing anything, do
```

Page 16

```
1              J. DONDERO
2  you?
3       A. I've signed a lot of things, but
4  I'm -- I don't recall an opposition.
5       Q. Let's talk about some of the events
6  that led to the entry of the TRO.
7          The debtor serves -- (audio
8  malfunction) --
9          (Clarification requested by the
10  stenographer.)
11         THE WITNESS: I didn't touch the
12  microphone at this end and it's six inches or
13  eight inches from my mouth.
14         MR. MORRIS: Yeah, let's try again,
15  Mr. Dondero. Thank you.
16  BY MR. MORRIS:
17      Q. The debtor serves as the portfolio
18  manager for certain collateralized loan
19  obligation vehicles; isn't that right?
20      A. I don't want to testify to that.
21      Q. Does the -- does the debtor manage
22  CLOs?
23         MR. BONDS: Objection, form.
24         MR. MORRIS: Withdrawn.
25         ///
```

Page 17

```
1              J. DONDERO
2  BY MR. MORRIS:
3       Q. Can we agree that CLO stands for
4  collateralized loaning obligations?
5       A. Yes.
6       Q. Okay. And does the debtor -- is the
7  debtor party to certain contracts that gives it
8  the right and responsibility to manage certain
9  CLO vehicles?
10         MR. BONDS: Objection, form.
11         MR. MORRIS: You can answer.
12      A. Yes.
13  BY MR. MORRIS:
14      Q. And you're aware of that because you
15  personally signed some of those contracts and
16  agreements, right?
17      A. I don't know.
18      Q. Okay. NexPoint Advisors LP, are you
19  familiar with that firm?
20      A. Yes.
21      Q. That's an advisory firm; is that
22  right?
23      A. Yes.
24      Q. And we'll just refer to that as
25  NexPoint; is that okay?
```

**Appx. 01591**

Page 18

1           J. DONDERO
2       A. Yes.
3       Q. You have a direct or indirect
4   economic or ownership interest in NexPoint,
5   correct?
6           MR. BONDS: Objection, form.
7           MR. MORRIS: You can answer.
8       A. Yes.
9   BY MR. MORRIS:
10      Q. You're the president of NexPoint,
11  correct?
12      A. I believe so.
13      Q. And you own NexPoint's general
14  partner; is that right?
15      A. I don't know.
16      Q. Do you know who owns NexPoint's
17  general partner?
18      A. No.
19      Q. As the president of NexPoint, is it
20  fair to say that you control that entity?
21      A. Generally.
22      Q. Highland Capital Management Fund
23  Advisors LP, are you familiar with that firm?
24      A. Yes.
25      Q. And that's also an advisory firm,

Page 19

1           J. DONDERO
2   correct?
3       A. Yes.
4       Q. And we'll refer to that firm as Fund
5   Advisors; is that fair?
6       A. Sure.
7       Q. And we'll refer to Fund Advisors and
8   NexPoint together just as "the advisors"; is that
9   fair?
10      A. I think you should be more specific
11  than that, but --
12      Q. Okay. I apologize. Are you
13  finished?
14          If at any time I ask a question and
15  you don't understand, will you let me know that?
16      A. Yes.
17      Q. Okay. You have a direct or indirect
18  economic or ownership interest in Fund Advisors,
19  correct?
20      A. Yes.
21      Q. You're the president of Fund
22  Advisors; is that true?
23      A. I believe so.
24      Q. And you own Fund Advisors' general
25  partner; is that right?

Page 20

1           J. DONDERO
2       A. I don't believe I own as much of it
3   as I own of NexPoint, but I don't know the
4   numbers.
5       Q. Okay. As one of the two beneficial
6   owners of Fund Advisors and as the president of
7   Fund Advisors, is it fair to say that you control
8   that entity?
9       A. Yes.
10      Q. Okay. And Fund Advisors and NexPoint
11  manage certain investment funds; is that right?
12      A. I'm sorry, I missed the point of that
13  question.
14      Q. Didn't hear? Okay.
15          Fund Advisors, which we've talked
16  about, and NexPoint, which we've talked about,
17  those two entities manage certain investment
18  funds; is that right?
19      A. Yes.
20      Q. And one of the investment funds that
21  the advisors manage is Highland Income Fund. Do
22  I have that right?
23      A. Yes. I'm not sure which fund that
24  is, but yes, that's -- that's one of them.
25      Q. Are you the portfolio manager of the

Page 21

1           J. DONDERO
2   Highland Income Fund?
3       A. I believe so.
4       Q. Do you hold any titles at the
5   Highland Income Fund other than portfolio
6   manager?
7           MR. BONDS: To the extent you know.
8   Don't speculate.
9       A. I don't -- I don't know. I know I'm
10  portfolio manager on virtually all of the funds.
11  BY MR. MORRIS:
12      Q. Is there any fund that you're not the
13  portfolio manager for that you're aware of?
14      A. I don't know.
15      Q. Are you the portfolio manager of
16  NexPoint Capital Inc.?
17      A. If that name refers to a fund, I
18  believe so.
19      Q. Okay. You're not sure if that refers
20  to a fund?
21      A. There's a fund with the symbol NHF.
22  If that's the name -- which I don't think you
23  have the exact name. If that's the name of it,
24  then I believe -- I believe I'm the portfolio
25  manager. The name that you just gave sounded

Page 22

```
1                J. DONDERO
2   more like a holding company name or a subsidiary
3   name for NexPoint.  If it's not a fund, I'm not
4   the portfolio manager.  If it is a fund, I
5   believe I am.
6        Q.  Okay.  Do you hold -- are you
7   familiar with an entity called NexPoint
8   Capital Inc.?
9        A.  No.
10       Q.  Okay.  How about NexPoint Strategic
11  Opportunities Fund, is that a fund that is
12  managed by one of the advisors?
13       A.  I believe that's the name for NHF.
14  That's what I thought you were referring to.
15  That's the one that's a fund, and that's the one
16  that I'm portfolio manager on.
17       Q.  Okay.  Do you hold any titles at
18  NexPoint Strategic Opportunity Fund other than
19  portfolio manager?
20       A.  I don't know.
21       Q.  The advisors caused each of the funds
22  to invest in certain CLOs that are managed by the
23  debtor, right?
24           MR. BONDS:  To the extent you know.
25  Don't speculate.
```

Page 23

```
1                J. DONDERO
2           MR. MORRIS:  John, if there's an
3   objection, I welcome it.  If there's a direction
4   not to answer, I welcome it.  But what I don't
5   welcome is guiding the witness.  If he doesn't
6   remember, he's done this so many times, he knows
7   what he's doing.
8           You want me to ask the question
9   again, Mr. Dondero?
10          THE WITNESS:  Please.
11  BY MR. MORRIS:
12       Q.  The two advisors that we talked
13  about, they manage funds, right?
14       A.  Yes.
15       Q.  And those funds have invested in
16  certain CLOs that are managed by the debtor,
17  correct?
18       A.  The problem I have with that question
19  and the part that I don't want to testify as
20  agreeing to or acknowledging is that the debtor
21  manages those CLOs, because I won't testify to
22  the debtor being in good standing, and I won't
23  testify to the debtor not being in default, and I
24  won't testify to the debtor having the capability
25  to manage those CLOs --
```

Page 24

```
1                J. DONDERO
2        Q.  Will you -- I'm sorry to interrupt.
3   Go ahead.
4        A.  No, I mean, that's -- so I won't -- I
5   won't testify affirmatively to the second half of
6   that question.
7        Q.  Okay.  But you will admit, won't you,
8   that the debtor has -- is party to contracts that
9   give it the right to manage CLOs in which the
10  advisors caused the funds to invest, right?
11          MR. BONDS:  Objection, form.
12          MR. MORRIS:  You can answer.
13       A.  The beginning and end of what I want
14  to testify to is that the advisor is parties --
15  party to contracts.  The contracts have --
16  provide the ability to manage assets in the CLO
17  subject to a bunch of different things, subject
18  to not being in default, subject to the ability,
19  subject to the capability and being registered
20  advisor, et cetera, et cetera.
21          I don't want to have any testimony
22  that implies that the advisor is in good standing
23  or able or capable of managing those CLOs or that
24  Jim Seery is even an investment professional.
25          ///
```

Page 25

```
1                J. DONDERO
2   BY MR. MORRIS:
3        Q.  Okay.  I think I understand.
4           When you used the word "advisor" in
5   your last answer, you were referring to the
6   debtor; is that right?
7           MR. BONDS:  Objection, form.
8   BY MR. MORRIS:
9        Q.  It's the debtor that has -- let me
10  try again.
11          It's the debtor that has the
12  contracts with the CLO, right?
13       A.  Yes.
14       Q.  But it's your contention that the
15  debtor is in default and that Mr. Seery and the
16  debtor otherwise don't have the capability to
17  manage the CLOs.  That's what you're saying,
18  right?
19       A.  I don't want to argue, and it's for
20  the lawyers and the Court to decide, but I don't
21  want to be affirmatively acknowledging that
22  Seery's an investment professional.  I don't want
23  to be affirmatively acknowledging that he has any
24  employees and staff when he's told them all
25  they're being terminated in the next few weeks.
```

**Appx. 01593**

Page 26

J. DONDERO

1
2      I don't want to acknowledge that he
3   is in compliance and can operate those contracts
4   if I believe those contracts are in default
5   because, A, the advisor's in bankruptcy, and B,
6   none of the key man provisions are being adhered
7   to by the advisor.
8      I don't want to in any form or
9   fashion acknowledge or represent or somehow be
10  twisted into testifying that he is in good
11  standing or has the ability to manage those CLOs.
12  It may be found by somebody that he is, but I
13  don't want to be in any way inferred to be
14  sanctioning it.
15      Q.  Okay.  Are you aware -- have any of
16  the contracts pursuant to which the CLOs and the
17  debtor are the parties, have any of those
18  contracts been terminated, to the best of your
19  knowledge, since the petition date?
20      A.  I believe they're subject to stays,
21  among other things, but I'm not -- I'm not a
22  lawyer.
23      Q.  Has anybody sought to lift the stay
24  in order to terminate the contracts, to the best
25  of your knowledge?

Page 27

J. DONDERO

1
2      A.  I don't know where -- I don't know.
3      Q.  Has any of the CLOs ever contended
4   that the debtor was in breach in their agreement?
5      A.  I believe the beneficial holders
6   have.
7      Q.  I understand that --
8      A.  But I don't know -- I don't know if
9   the CLOs have.
10      Q.  Okay.  I'm asking you a different
11  question, and just answer my question.
12      To the best of your knowledge, has
13  any CLO contended that the debtor is in breach of
14  any of the agreements that they have between
15  them?
16      MR. BONDS:  Objection, form.
17      A.  I don't know.
18  BY MR. MORRIS:
19      Q.  You're not aware of any such
20  contention, right?
21      A.  I don't know.
22      Q.  You're not aware of any contention by
23  the CLOs that the debtor is in default under any
24  CLO contract, correct?
25      MR. BONDS:  Objection, form.

Page 28

J. DONDERO

1
2      A.  I don't know regarding the CLOs.
3   BY MR. MORRIS:
4      Q.  Did you ever ask them?  Withdrawn.
5      Did you ever ask anybody on behalf of
6   the CLOs whether they were going to declare a
7   default under the CLO management agreements?
8      MR. BONDS:  Objection, form.
9      A.  I don't know.
10  BY MR. MORRIS:
11      Q.  You don't know if you asked?  I'm
12  just asking you if you ever asked the question.
13      A.  Not of the CLOs.  Those questions
14  were asked regarding the beneficial owners, and I
15  think the beneficial owners did that, but I
16  didn't have direct knowledge or contact with the
17  CLOs.
18      Q.  Okay.  And the beneficial owners are
19  not parties to the CLO management agreements
20  between the CLOs and the debtor, correct?
21      MR. BONDS:  Objection, form.
22      A.  I don't want to draw a legal
23  conclusion of the rights of the beneficial owners
24  and the people who have the risk and the people
25  who have the ultimate decision authority whether

Page 29

J. DONDERO

1
2   or not they can be circumvented or ignored by an
3   intermediate nonfinancial -- nonfinancially
4   interested party.  I don't want to -- I don't
5   want to speculate on that.
6      MR. MORRIS:  Okay.  I move to strike.
7      And I'm not asking for a legal
8   conclusion; I'm asking for your understanding.
9   BY MR. MORRIS:
10      Q.  Is it your understanding that
11  beneficial owners are parties to the CLO
12  management agreements between the debtor and the
13  CLOs?
14      MR. BONDS:  Objection to form.
15      MR. MORRIS:  You can answer.
16      A.  I think that asks for a legal
17  conclusion.
18  BY MR. MORRIS:
19      Q.  It does not.  I'm asking you as a
20  factual matter based on your understanding as the
21  portfolio manager of the funds and the president
22  of the advisors who made these investments.  I'm
23  asking you --
24      MR. BONDS:  Objection, form.
25      ///

**Appx. 01594**

Page 30

J. DONDERO

1
2  BY MR. MORRIS:
3       Q.  – in that capacity.
4       In that capacity, do you have any
5  understanding that the beneficial owners are
6  parties to the CLO management agreements between
7  the debtor and the CLOs?
8       MR. BONDS:  Objection, form.
9       A.  My understanding is that the
10  beneficial owner should always be considered.
11       MR. MORRIS:  Okay.  I move to strike.
12  I'm not asking you whether they should be
13  considered.
14  BY MR. MORRIS:
15       Q.  I'm asking you very specifically
16  whether you believe that they are parties to the
17  contract.
18       MR. BONDS:  Objection, form, asked
19  and answered.
20       A.  Yeah, I believe you're asking me for
21  a legal conclusion, and I won't give one.
22  BY MR. MORRIS:
23       Q.  Okay.
24       MR. MORRIS:  La Asia, can we please
25  put up Exhibit 1.  Let's share the screen and put

Page 31

J. DONDERO

1
2  up Exhibit 1.
3       (Dondero Deposition Exhibit 1
4  marked.)
5  BY MR. MORRIS:
6       Q.  Mr. Dondero, I appreciate that it's
7  difficult to do this remotely, and as we
8  discussed last time, the one thing that I'm
9  certainly not doing today is playing gotcha with
10  documents.
11       So I'm going to put documents up on
12  the screen from time to time, and to the extent
13  that you think you need to read more of the
14  document in order to have full context, will you
15  let me know that?
16       A.  Sure.
17       Q.  Okay.  This is a letter dated
18  October 16th from NexPoint to Mr. Seery.
19       Do you see that?
20       A.  Yep.
21       Q.  Okay.  Are you familiar with this
22  document?  Have you ever seen it before?
23       A.  Generally.  I'm generally familiar
24  with it, but I haven't seen it before.
25       Q.  Okay.  Do you recall when you first

Page 32

J. DONDERO

1
2  learned that this document was sent?  Was it at
3  or around the time the document was sent?
4       A.  It was at or around the time, yes.
5       Q.  Did you discuss with NexPoint any of
6  the substance that is in this letter?  And again,
7  I'm happy to scroll through it if that would be
8  helpful.
9       MR. BONDS:  Objection, form.
10       A.  Just generally.
11  BY MR. MORRIS:
12       Q.  Did you – I don't want to know about
13  any conversations, but did you speak with anybody
14  at K&L Gates about this particular letter, just
15  yes or no?
16       A.  My primary conversation was with
17  internal counsel.  K&L Gates might have been on
18  some phone call or two.
19       Q.  Okay.  Whose idea was it to send this
20  out?
21       MR. BONDS:  Objection, form.
22       A.  Whose idea?  I – I don't think
23  anybody viewed it as an idea as much as a
24  regulatory necessity.
25       ///

Page 33

J. DONDERO

1
2  BY MR. MORRIS:
3       Q.  And did you authorize the sending of
4  this particular letter?
5       A.  Not specifically.
6       Q.  Did you generally support the sending
7  of the letter?
8       A.  Yes.
9       Q.  And you knew the letter was being
10  sent; is that fair?
11       A.  Yes.
12       Q.  And you didn't object to the sending
13  of this letter, right?
14       A.  I did not object.
15       Q.  Okay.  And since learning that the
16  letter was sent, have you ever directed NexPoint
17  to withdraw the letter?
18       A.  No.
19       Q.  You have the power to do that, don't
20  you, sir?
21       A.  I – I don't believe so.  When the
22  chief compliance officer believes it's a breach
23  of regulatory compliance, the chief compliance
24  officer in financial institutions has personal
25  liability, and I don't believe that other C-suite

Page 34

J. DONDERO

1  J. DONDERO
2  executives can overrule the chief compliance
3  officer.
4      Q. Who is the chief compliance officer?
5      A. Jason Post.
6      Q. Did Mr. Post ever say that he would
7  not withdraw the letter because of regulatory
8  compliance?
9          MR. BONDS: Objection, form.
10     A. I -- not that I know of.
11  BY MR. MORRIS:
12     Q. Did you ever discuss with Mr. Post
13  whether or not this letter should be withdrawn?
14     A. Again, I didn't believe I had the
15  authority to.
16     Q. Okay. And he never told you that he
17  couldn't; that's just the implicit conclusion
18  that you drew because he was the chief compliance
19  officer; is that fair?
20     A. Implicit conclusion? It's more the
21  understanding I have of compliance from having
22  lived it the last 20 years.
23          MR. MORRIS: Okay. Let's put up
24  Exhibit 2, please.
25          (Dondero Deposition Exhibit 2

Page 35

1  J. DONDERO
2  marked.)
3          MS. CANTY: Do you see it, John?
4          MR. MORRIS: I think we still have
5  Exhibit 1.
6          MS. CANTY: Okay. Give me a second.
7  BY MR. MORRIS:
8      Q. Okay. This is another letter that
9  was sent by NexPoint to Mr. Seery, this one dated
10  November 24, 2020.
11         Do you see that, sir?
12     A. Yes.
13     Q. And you saw this letter at or around
14  the time it was sent, right?
15     A. I didn't see the letter specifically,
16  but I'm aware of it.
17     Q. And you knew it was going to be sent;
18  is that fair?
19     A. Yes.
20     Q. And did you authorize this letter to
21  be sent on behalf of the advisors and the funds
22  that are listed there?
23          MR. BONDS: Objection, form.
24     A. Let me give the consistent testimony
25  I gave last time. It wasn't an authorization. I

Page 36

1  J. DONDERO
2  was aware of it. It was, I believe, a continued
3  regulatory breach from the standpoint of the --
4  of compliance that drove the letter.
5  BY MR. MORRIS:
6      Q. When there's a regulatory breach, is
7  there an obligation to alert anybody other than
8  the portfolio manager?
9      A. I know that's being investigated. I
10  don't know the answer regarding a breach like
11  this.
12     Q. Are you aware of any notification
13  that NexPoint made to anybody in the world, other
14  than Mr. Seery, with respect to the matters set
15  forth in Exhibit 1 and Exhibit 2?
16          MR. BONDS: Objection, form.
17     A. I don't know, and I'm not in a
18  position to comment at this point.
19  BY MR. MORRIS:
20     Q. I'm just asking you if you know
21  whether -- I'm asking for your knowledge.
22         Do you know whether NexPoint ever
23  advised anybody, other than Mr. Seery, of the
24  allegations that are set forth in Exhibit 1 and
25  Exhibit 2?

Page 37

1  J. DONDERO
2          MR. BONDS: Objection, form.
3      A. I don't know, nor would I necessarily
4  be informed if compliance self-reports this to
5  the SEC or other regulatory bodies. But I do not
6  know.
7  BY MR. MORRIS:
8      Q. And nobody told you that, right?
9      A. I don't know.
10     Q. Is there -- did you see any written
11  analysis or memorandum that was prepared by
12  your -- by the chief compliance officer with
13  respect to the matters set forth in Exhibit 1 and
14  Exhibit 2?
15     A. I know there was a multipage analysis
16  that was done, but I've never seen it.
17     Q. And was it written by the chief
18  compliance officer or was it written by legal
19  staff?
20     A. I was told he did it in conjunction
21  with external counsel.
22     Q. But you've never seen it?
23     A. I've never seen it.
24     Q. Did you support the sending of this
25  letter?

Page 38

J. DONDERO

1
2     A. Yes.
3     Q. Since learning that this letter was
4  sent, have you directed NexPoint to withdraw this
5  letter?
6     A. No, I have not.
7     Q. Okay. Around Thanksgiving you
8  learned that Mr. Seery was seeking to sell
9  certain securities that were owned by certain
10  CLOs managed by the debtor, right?
11     A. I believe I was informed after the
12  fact.
13     Q. You were informed that certain sales
14  of securities owned by the CLOs were being sold
15  at Mr. Seery's direction, right?
16     A. Yes.
17        MR. BONDS: Objection, form.
18  BY MR. MORRIS:
19     Q. Okay. And at around that time, once
20  you learned that, you personally intervened to
21  stop those trades, right?
22        MR. BONDS: Objection, form.
23     A. Yes.
24        MR. MORRIS: Can we put up Exhibit 3,
25  please.

Page 39

J. DONDERO

1
2        (Dondero Deposition Exhibit 3
3  marked.)
4  BY MR. MORRIS:
5     Q. This is an e-mail string. We're
6  going to start at the bottom and work up, just so
7  we can get it in order. And you'll see the
8  bottom begins with an e-mail from Hunter Covitz.
9        Do you see that?
10     A. Yes.
11     Q. Who is Mr. Covitz?
12     A. Covitz, Hunter Covitz manages our CLO
13  asset -- or our CLO assets, primarily.
14     Q. Is he a High- -- is he a debtor
15  employee or is he employed by any other entity?
16     A. I believe he's a debtor employee.
17     Q. Okay. Do you see there's a reference
18  there to gatekeeper@hcmlp.com?
19     A. Yes.
20     Q. Are you -- withdrawn.
21        Is that -- withdrawn.
22        Is it your understanding that that's
23  kind of a basket of different e-mail addresses
24  that are held together by the Gatekeeper address?
25     A. I wouldn't describe it that way, but

Page 40

J. DONDERO

1
2  it is a bucket of e-mails.
3     Q. Okay. And is your e-mail address or
4  was your e-mail address included within
5  Gatekeeper?
6     A. Historically, it was.
7     Q. And do you know when that stopped
8  being the case?
9     A. I do not know.
10     Q. Was it after the time that you
11  resigned from your position at the debtor?
12     A. I do not know.
13     Q. Okay. Matt Pearson is below
14  Gatekeeper. Do you know who Mr. Pearson is?
15     A. He is -- generally an equity trader
16  that works for Joe Sowin.
17     Q. And are Mr. Pearson and Mr. Sowin
18  employees of the debtor?
19     A. I don't believe so. I don't believe
20  Joe is. I don't know if Matt is. I don't know.
21     Q. Okay. But is it fair to say that
22  pursuant to this e-mail, Mr. Covitz is giving
23  direction to sell certain securities held by the
24  CLOs?
25     A. Yes.

Page 41

J. DONDERO

1
2     Q. Can we scroll to the e-mail above
3  that, please. And then Mr. Pearson acknowledged
4  that e-mail a little bit later in the day, right?
5     A. Yes.
6     Q. Okay. And if we can --
7        (Interruption by the videographer.)
8        MR. MORRIS: It's okay. Let's
9  proceed and we'll do the best we can.
10  BY MR. MORRIS:
11     Q. Mr. Covitz's e-mail was the -- do you
12  see the subject matter is Sky Equity?
13     A. Yes.
14     Q. And do you have an understanding of
15  what Sky Equity refers to?
16     A. It's a -- it's a post-restructured
17  equity that the funds have held for years.
18     Q. Okay. So if we could scroll up to
19  your e-mail that's right there, did you receive a
20  copy of Mr. Covitz's original e-mail?
21     A. It appears so.
22     Q. Okay. And did you give the
23  instruction to the recipients of Mr. Hunter
24  Covitz's e-mail not to sell the Sky Equity as had
25  been instructed by Mr. Seery?

Page 42

```
1          J. DONDERO
2      A. Yes.
3      Q. And you understood at the time that
4  you gave the instruction to the people on this
5  e-mail that they were trying to execute trades
6  that Mr. Seery had authorized, right?
7      MR. BONDS:  Objection, form.
8      THE WITNESS:  Can you repeat the
9  question, please.
10      MR. MORRIS:  Sure.
11  BY MR. MORRIS:
12      Q. At the time that you gave the
13  instruction, no, do not, you knew that you were
14  stopping trades that had been authorized and
15  directed by Mr. Seery, correct?
16      A. Yes.
17      Q. Did you speak with Mr. Seery before
18  instructing the recipients of your e-mail not to
19  execute the SKY transactions?
20      A. No, I did not.
21      Q. Did you take any steps to seek the
22  debtor's consent before instructing the
23  recipients of this e-mail not to execute the SKY
24  transactions?
25      A. I'm sorry, please repeat that again.
```

Page 43

```
1          J. DONDERO
2  The -- I missed the first part of the sentence.
3      Q. No problem.
4      Did you take any steps to seek the
5  debtor's consent before instructing the
6  recipients of your e-mail --
7      MR. BONDS:  Objection, form.
8  BY MR. MORRIS:
9      Q. -- to stop the SKY transactions, to
10  stop executing the SKY transactions?
11      A. No.
12      Q. Thank you.
13      Can we scroll up to the response.
14  Okay.  Stop there.
15      Mr. Pearson responded later that
16  afternoon.  Do you see that?
17      A. Yes.
18      Q. And in response, he canceled all of
19  the SKY and AVYA sales that the debtor had
20  directed but which had not yet been executed,
21  right?
22      A. Yes.
23      Q. And if we can scroll up to the e-mail
24  above that, you responded to that as well, didn't
25  you?
```

Page 44

```
1          J. DONDERO
2      A. Yep.
3      Q. Can you please read your response out
4  loud.
5      A. HFAM and DAF -- or HFAM and DAF has
6  instructed Highland in writing not to sell any
7  CLO underlying assets.  There is potential
8  liability.  Don't do it again, please.
9      Q. All right.  The written instructions,
10  is that a reference to the first two exhibits
11  that we looked at?  And if you want to go back
12  and check them out, we can, but I'm trying to --
13  I want to know what writings you're referring to.
14  Withdrawn.
15      Are the writings that you're
16  referring to the two exhibits that we just looked
17  at, Exhibit 1 and Exhibit 2?
18      MR. BONDS:  Objection, form.
19      A. Generally, yes.
20  BY MR. MORRIS:
21      Q. Are you --
22      A. I don't know if -- I don't know if
23  there were more than those two, but generally,
24  letters of those substances -- well, generally,
25  letters of those substance -- of that substance
```

Page 45

```
1          J. DONDERO
2  is what I'm referring to.
3      Q. I appreciate that, Mr. Dondero.
4      Do you recall any other writings that
5  you were referring to at the time you sent this
6  e-mail?
7      A. I'm just saying I don't know if there
8  were others or if there were other e-mails.  I
9  don't know.  But there were -- they would have
10  been similar in terms of substance as those two.
11      Q. Okay.  Do you see the reference there
12  in the latter portion of your e-mail, quote,
13  there is potential liability, don't do it again?
14      A. Yes.
15      Q. Who was the intended recipient of
16  that message?
17      A. At this juncture, it's to Matt
18  Pearson, I believe.
19      Q. And why would Matt Pearson have
20  personal liability -- withdrawn.
21      Why did you decide to tell
22  Mr. Pearson that he had potential liability for
23  executing the transactions that Mr. Seery had
24  directed?
25      MR. BONDS:  Objection, form.
```

Page 46

J. DONDERO

1
2    A.  Yeah, to be clear, it doesn't say
3    personal liability.  I said potential liability.
4    I believe this is -- I believe what was done here
5    is bona fide typical class action activity that
6    we've suffered from historically, when the
7    interests of beneficial holders are ignored when
8    assets are sold for no business purpose.  No
9    business purpose.  No definable, discernible,
10   articulated business purpose.
11          There's -- I think there's potential
12   liability for the manager, the fund complex, you
13   know, and sometimes for the individuals involved.
14   But my potential liability was a general
15   statement.
16          THE WITNESS:  You know what, guys,
17   listen.  I've got a couple of calls I've got to
18   make that I'm ten minutes late for, so we're
19   going to need to take a break for a few minutes
20   here, ideally now, or after the next question,
21   please.
22          MR. MORRIS:  I'm happy to take a
23   break now.  How long are you thinking, though?
24          THE WITNESS:  Ten or 15 minutes.
25          MR. MORRIS:  Yeah, that's perfectly

Page 47

J. DONDERO

1
2    fine, Mr. Dondero.  Can you just state on the
3    record that you will not talk to any Highland
4    employee, including Mr. Ellington or
5    Mr. Leventon, you will not communicate with them
6    or their counsel in any way with respect to this
7    deposition?
8          THE WITNESS:  Yeah, I promise.  I
9    haven't -- yeah.  I will not talk to them.  The
10   only Highland employee I might talk to is Jerome,
11   who's handling the systems for this call, and
12   that's it.
13          MR. MORRIS:  I'm fine with that, but
14   really, I'm requesting not only Highland
15   employees but not to talk to anybody about the
16   testimony today.  I'm going to accommodate you
17   and --
18          THE WITNESS:  I won't.  Nobody cares
19   about this deposition.  I won't talk to anybody.
20          MR. MORRIS:  Okay.
21          THE WITNESS:  I'll be back in ten or
22   15 minutes, okay?
23          MR. MORRIS:  Okay.
24          THE VIDEOGRAPHER:  10:41 a.m. Central
25   Standard Time, we're off the record.

Page 48

J. DONDERO

1
2    (Recess taken, 10:41 a.m. to
3    11:16 a.m. CST)
4          THE VIDEOGRAPHER:  11:16 a.m., we're
5    back on the record.
6    BY MR. MORRIS:
7          Q.  Mr. Dondero, can you hear me?
8          A.  Yes.
9          Q.  Okay.  Are you aware that the
10   deposition taking place today is pursuant to
11   Court order?
12          A.  Yes.
13          Q.  Did you schedule meetings and
14   telephone calls during the day today,
15   notwithstanding the Court's order?
16          A.  I didn't formally schedule anything.
17          Q.  Okay.  So you have nothing scheduled
18   for the rest of the day; is that right?  You're
19   here to answer questions?
20          A.  Correct.
21          MR. MORRIS:  Okay.  Can we get the
22   last exhibit back up on the screen, please.
23   Okay.  Can we scroll --
24   BY MR. MORRIS:
25          Q.  We were last looking at your e-mail.

Page 49

J. DONDERO

1
2    Can we see the response above that, please?
3    Okay.  And that's Mr. Sowin responding.
4          Do you see that?
5          A.  Yes.
6          Q.  And Mr. Sowin was following your
7    instructions; is that right?
8          A.  His response is what it is.  I'm
9    not -- what do you mean by following my
10   instructions?
11          Q.  Well, he issued an order -- it says,
12   quote:  Please block all orders from hitting the
13   trading desk for the -- I assume he meant the
14   funds -- Jim mentioned.
15          Do you see that?
16          A.  Yes.
17          MR. BONDS:  Objection, form.
18   BY MR. MORRIS:
19          Q.  And that's exactly what you wanted to
20   happen, right?
21          A.  I'm sorry, could you unhighlight
22   that?  It's hard for me to read with the
23   highlight.  Okay.  Thank you.
24          Yeah, they -- I think he tried to
25   figure out a way to prevent it from inadvertently

Page 50

J. DONDERO

1   happening.
2       Q.  Okay.  And Mr. Sowin's – the
3   substance of Mr. Sowin's e-mail is consistent
4   with your intent to prevent any further trades
5   from the CLOs, right?
6       MR. BONDS:  Objection, form.
7   A.  My intent was to prevent trades that
8   weren't in the best interests of investors, that
9   investors – the beneficial holders had
10  articulated they didn't want sold while these
11  funds were in transition, and that the – there
12  was no business purpose or benefit to the debtor
13  to sell these assets.
14  BY MR. MORRIS:
15      Q.  That –
16      A.  So that's – that was the rationale I
17  was trying to capture.
18      THE WITNESS:  Hold on for me one
19  second.  Jerome just stepped in.  What does the
20  systems guy want Jerome to do?
21      MR. MORRIS:  Figure out a way to turn
22  the lights on.
23      (Technical comments off the
24  stenographic record.)

Page 51

J. DONDERO

1       MR. MORRIS:  Let's go forward.
2       THE WITNESS:  So we're okay with
3   Jerome?  That's it for now?
4       MR. MORRIS:  Yeah.
5       THE WITNESS:  All right.  Thank you.
6   BY MR. MORRIS:
7       Q.  You didn't correct anything that
8   Mr. Sowin did – said in this e-mail, did you?
9       A.  No.
10      Q.  You didn't tell –
11      MR. BONDS:  Can you repeat the
12  question?  I didn't understand it.
13      MR. MORRIS:  That's okay.
14  BY MR. MORRIS:
15      Q.  Mr. Dondero, you didn't correct
16  anything that Mr. Sowin wrote in this e-mail, did
17  you?
18      A.  No.
19      Q.  You didn't tell Mr. Sowin that he
20  misunderstood your intent, did you?
21      A.  I don't believe so.
22      Q.  And you didn't give any explanation
23  to him as to why you did not want to sell any CLO
24  underlying assets except for what you wrote in

Page 52

J. DONDERO

1   that e-mail below, right?
2       MR. BONDS:  Objection, form.
3       A.  I – I believe I – well, the e-mails
4   stand on their own.  I think the reasons below
5   are sufficient.  I think I had a conversation
6   with Joe besides that, and there was an
7   unawareness on the trading desk and with Hunter
8   that the interest of investors had been expressed
9   and ignored by Seery, you know, so – they
10  weren't aware of that.  They thought that was
11  unusual and inappropriate.
12  BY MR. MORRIS:
13      Q.  In your role as portfolio manager, is
14  it – do you believe it's your responsibility to
15  always defer to the desires of your investors?
16  Do you cede – do you cede – withdrawn.
17      Do you cede responsibility and your
18  business judgment for making transactions to your
19  investors?
20      MR. BONDS:  Objection, form.
21      A.  In this case, it would be
22  appropriate.  In general, it would depend.
23  BY MR. MORRIS:
24      Q.  Okay.  A few days later, you learned

Page 53

J. DONDERO

1   that Mr. Seery was trying a work-around to
2   effectuate the trades anyway, right?
3       A.  Yes.
4       Q.  And you wrote to Thomas Surgent to
5   let him know that you were aware that Seery was
6   trying a work-around to effectuate the trades,
7   right?
8       A.  I believe there was such an e-mail.
9       Q.  Okay.  Can you just scroll up and see
10  that e-mail, please.  All right.  Stop right
11  there.
12      Who is Mr. Surgent?
13      A.  He's the chief compliance officer of
14  Highland Capital.
15      Q.  The debtor?
16      A.  Yes.
17      Q.  Okay.  And how long has he held that
18  position to the best of your recollection?
19      A.  A long time.  More than five years.
20      Q.  What does it mean to – when you
21  wrote that Mr. Seery was, quote, working on a
22  work-around to trade these securities?  What does
23  that mean?
24      A.  As a noninvestment professional and

Appx. 01600

Page 54

J. DONDERO

1
2  as a nontrader and as a nonportfolio manager, he
3  set up an account for himself, I believe,
4  directly with Jefferies to trade the securities
5  in the CLOs.
6      Q. How did you learn that?
7      A. I think we still get trade reports
8  from Jefferies, or Jefferies – the Jefferies
9  trades get reported back into the system and have
10 to be input by Joe, and so Joe sees the trades
11 come back from Jefferies at the end of the day.
12     Q. And Joe is Joe Sowin?
13     A. Yes.
14     Q. And he works for you; is that right?
15         MR. BONDS: Objection, form.
16         MR. MORRIS: Withdrawn.
17 BY MR. MORRIS:
18     Q. He works for one of the advisors; is
19 that right?
20     A. I believe he works for HFAM, but I'm
21 not a hundred percent certain.
22     Q. And the work-around was – is that
23 another way of saying that Mr. Seery tried to do
24 the trades that he thought were appropriate
25 without your interference?

Page 55

J. DONDERO

1
2         MR. BONDS: Objection, form.
3      A. I'm not going to agree with that
4  speculation. If you want me to speculate, I
5  think Seery had no business purpose and he was
6  doing it to tweak myself and everybody else.
7  BY MR. MORRIS:
8      Q. Did he tell you that?
9      A. No. I'm speculating.
10     Q. Okay. Do you have any idea why he
11 made the trades?
12     A. He – he had no --
13     Q. Withdrawn. I'm sorry.
14         Do you have any idea why he wanted to
15 make the trades?
16     A. I didn't speak to him directly.
17     Q. Okay.
18     A. Indirectly – I didn't speak to him.
19 I didn't speak to him directly. It was --
20     Q. Do you have any personal knowledge as
21 you sit here right now as to why Mr. Seery wanted
22 to effectuate the trades that you were blocking?
23         MR. BONDS: Objection, form.
24     A. I've thought about it at length. I
25 can't come up with a business purpose that would

Page 56

J. DONDERO

1
2  supersede an account that's in transition and the
3  beneficial owners have made it clear that the
4  manager's not in compliance, they're moving the
5  accounts, and knowing the individual assets that
6  were sold, I can't – I couldn't think of a
7  business purpose that Seery would be operating
8  under.
9          MR. MORRIS: Okay. I move to strike.
10 I'm not asking you for what you think. I'm
11 asking you for facts.
12 BY MR. MORRIS:
13     Q. Do you have any knowledge of any
14 facts as to the business justification or
15 rationale for why Mr. Seery wanted to make these
16 trades?
17         MR. BONDS: Objection, form.
18     A. No, I don't believe there are any.
19 BY MR. MORRIS:
20     Q. And you never asked him; is that
21 right?
22     A. Correct.
23     Q. And you never instructed anybody on
24 your behalf or on behalf of the advisors or on
25 behalf of the funds to ask Mr. Seery why he

Page 57

J. DONDERO

1
2  wanted to make these trades, right?
3      A. That's not correct.
4      Q. Nobody ever told you that they'd had
5  a conversation with Mr. Seery in which
6  Mr. Seery – (audio malfunction) --
7          (Clarification requested by the
8  stenographer.)
9  BY MR. MORRIS:
10     Q. Did anybody ever tell you that they
11 had spoken with Mr. Seery and Mr. Seery had
12 provided an explanation, a business rationale for
13 the transactions that he wanted to effectuate?
14         MR. BONDS: Objection, form.
15     A. Yes. Yes.
16 BY MR. MORRIS:
17     Q. Who was that?
18     A. Joe Sowin.
19     Q. When did he tell you about this
20 conversation?
21     A. It was at or about this time in...
22     Q. And what did Mr. Sowin tell you?
23     A. Seery told him it was for risk
24 minimization or risk reduction.
25     Q. Did he tell him anything else?

Page 58

J. DONDERO

1
2     A.  No.  He said risk reduction was why
3   he was selling the securities.
4     Q.  That's the only rationale that
5   Mr. Seery gave to Mr. Sowin; is that your
6   testimony?
7     A.  Yes.
8     Q.  Okay.  Did Mr. Sowin tell you that he
9   asked any questions of Mr. Seery?
10    A.  He asked him why he was selling them.
11    Q.  And you've given me the entirety of
12  the answer as conveyed by Mr. Sowin to you; is
13  that right?
14    A.  Yes.
15    Q.  Is Mr. Sowin's conversation with
16  Mr. Seery about the justification for these
17  trades reflected in any document or any e-mail
18  anywhere that you can recall?
19    A.  Not that I recall.
20    Q.  Did K&L Gates explain their
21  understanding of the business rationale of these
22  trades in any of the letters that they sent on
23  behalf of the funds or any of the advisors?
24    A.  Not that I'm aware of.  I'm not
25  aware.

Page 59

J. DONDERO

1
2     Q.  Do you know Dustin Norris?
3     A.  Yes.
4     Q.  Do you know that he testified in
5   December in connection with this bankruptcy
6   matter?
7     A.  Yes.
8     Q.  Did you ever tell Dustin Norris about
9   the conversation Mr. Sowin had with Mr. Seery
10  that you've described here?
11    A.  I believe he was aware of it.
12    Q.  Do you know – did you talk to him in
13  advance of his testimony?
14    A.  I talk to Dustin most every day.
15    Q.  And did you tell Dustin that he
16  should make sure to alert the Court about this
17  conversation with Mr. Sowin and Mr. Seery?
18    A.  No.
19    Q.  Did you think it was important that
20  the Court know Mr. Seery's business rationale?
21    A.  I thought it was a nonsensical answer
22  on Seery's part.  I didn't have an opinion on
23  whether or not the Court should know.
24    Q.  Now, you – at the time, you were
25  speaking to Mr. Seery directly; isn't that right?

Page 60

J. DONDERO

1
2     A.  Rarely.  I didn't – since the
3   injunction or since – rarely.  I can't remember
4   the last time I've spoken to him.  Scott
5   Ellington has been the appropriate go-between as
6   far as I understand it.
7     Q.  Okay.  Was there anything that
8   prevented you in November 2020 from picking up
9   the phone to talk to Mr. Seery about his desire
10  to effectuate these transactions?
11    A.  No.  The last time I – yeah, I'm
12  remembering, the last time I talked to Seery was
13  the day after Thanksgiving.
14    Q.  Okay.  Is there anything that you're
15  aware of that prevented you from picking up the
16  phone and asking Mr. Seery for his business
17  justification for these trades prior to
18  December 10, 2020?
19        MR. BONDS:  Objection, form.
20    A.  No.  I expressed my disapproval via
21  e-mail.
22  BY MR. MORRIS:
23    Q.  Okay.  Why did you decide to write to
24  Mr. Surgent on November 27th?
25    A.  I wasn't sure he was aware of Seery's

Page 61

J. DONDERO

1
2   work-around, and I know Thomas has an acute
3   awareness of his personal liability for
4   regulatory breaches or doing things that aren't
5   in the best interests of investors, and I don't
6   believe he has the extra insurance and
7   indemnities that Seery has.
8     Q.  If he was acutely aware of it, why
9   did you feel the need to remind him of that in
10  your e-mail to him?
11    A.  Because I don't think he was aware
12  that Seery was doing a work-around on behalf of
13  the debtor that he was compliance officer of.  I
14  wasn't convinced he was aware, so I included him
15  on the e-mail.
16    Q.  Did you intend to suggest that by
17  following Mr. Seery's orders to execute the
18  trades, that Mr. Surgent faced personal
19  liability?
20    A.  That's the way it works.
21    Q.  Okay.  And you wanted him to know
22  that, right?
23    A.  I wanted him to know that Seery was
24  doing inappropriate trades and doing
25  inappropriate work-around, in my opinion.  I

**Appx. 01602**

Page 62

J. DONDERO

1 didn't think Thomas was aware. I thought Seery
2 was operating independently.
3        Thomas might have been aware, but I
4 didn't think so. I don't talk to -- I haven't
5 talked to Thomas in I don't know when, so I
6 thought it was important for him to know.
7    Q. Okay. You have communicated with
8 Mr. Seery from time to time via text message,
9 right?
10    A. Yes.
11        MR. MORRIS: Can we put up Exhibit 4,
12 please.
13        (Dondero Deposition Exhibit 4
14 marked.)
15        MR. MORRIS: And if we can scroll
16 down a little bit. Okay.
17 BY MR. MORRIS:
18    Q. This is a text that you sent at the
19 bottom there at 5:26 p.m. to Mr. Seery; is that
20 right?
21    A. Yes.
22    Q. Can you just read that text, that
23 5:26 out loud?
24    A. Be careful what you do, last warning.

*(Note: line numbers 1-25)*

Page 63

J. DONDERO

1    Q. Why did you write that?
2    A. Because all the reasons we just went
3 over. And I think he's violating the Advisers
4 Act. He's putting the funds and the debtor at
5 risk, in jeopardy of class action lawsuits, and
6 he's going against the interests of investors
7 that are in transition, and expressed a desire to
8 not have their assets sold, especially when
9 there's no business reason.
10        And for all the reasons articulated
11 below -- I mean, for all the reasons we just went
12 over, and there are a few others I probably
13 haven't remembered off the top of my head, but
14 it's -- I think it's -- I think his activities
15 regarding the CLOs is incredibly inappropriate,
16 unfounded and malicious, and he hadn't sold that
17 many securities at that point in time, somewhat
18 de minimis amounts, but it was a warning to tell
19 him to stop; otherwise, rightfully, the
20 beneficial owners would take more significant
21 actions, which I think they should and they will.
22    Q. What significant action are the
23 beneficial owners going to take?
24    A. I don't know. But there's a lot more

Page 64

J. DONDERO

1 things that they can push on, like you were
2 suggesting earlier, asking earlier in terms of
3 self-reporting to the SEC.
4    Q. But you haven't done that yet, to the
5 best of your knowledge; is that right?
6    A. I'm not aware.
7    Q. You wrote there that it's the last
8 warning.
9        Do you see that?
10    A. Yes.
11    Q. How many other warnings have you
12 given Mr. Seery?
13    A. All the e-mails we just went over.
14    Q. Anything else?
15    A. No.
16    Q. Okay. You got document requests in
17 this -- in connection with this matter; isn't
18 that right?
19    A. Yes.
20        MR. MORRIS: Okay. Can we put up
21 Exhibit 5, please.
22 BY MR. MORRIS:
23    Q. You know, before we look at that,
24 earlier this morning you mentioned -- you made a

Page 65

J. DONDERO

1 reference to internal counsel.
2        Do you recall that?
3    A. Yes.
4    Q. Okay. Who were you referring to?
5    A. D.C. Sauter.
6    Q. And D.C. Sauter is internal counsel
7 for who?
8    A. I'm sorry, was there a question
9 there?
10    Q. Yes. I apologize.
11        D.C. Sauter is internal counsel for
12 who, for which entity?
13    A. NexPoint.
14    Q. Okay. Were you referring to anybody
15 else?
16    A. No.
17    Q. Okay. You mentioned Scott Ellington
18 earlier, right?
19    A. Yes.
20    Q. And who is Mr. Ellington?
21    A. He's general counsel at Highland
22 historically. I think his role has been
23 redefined as settlement counsel, that's how it
24 was described to me, I guess, six, nine months

J. DONDERO

1
2  ago, six months ago.
3      Q.  Mr. Ellington is employed by the
4  debtor, right?
5      A.  Yes.
6      Q.  And do you know when he first became
7  employed by the debtor?
8      A.  Over a decade ago.
9      Q.  Do you know whether Mr. Ellington has
10  any employer other than the debtor?
11      A.  I don't know.
12      Q.  He never told you that he had an
13  employer other than the debtor, did he?
14      A.  I don't know.
15      Q.  You know if he told you or not,
16  right?  Did he ever tell you that?
17      A.  He never told me he did, no.
18      Q.  And you have no facts or reason to
19  believe, as you sit here right now, that the
20  debtor is -- withdrawn.
21          You have no facts or reason to
22  believe right now that Mr. Ellington has any
23  employer other than the debtor, correct?
24      MR. BONDS:  Objection, form.
25      A.  I'd like to stick with:  I don't

J. DONDERO

1
2  know.
3  BY MR. MORRIS:
4      Q.  You have no reason to believe that;
5  is that fair?
6      A.  Correct, I don't know.
7      Q.  Okay.  He's not -- Mr. Ellington is
8  not your personal lawyer, right?
9      A.  No.
10      Q.  He's never represented Jim Dondero
11  personally; is that right?
12      A.  No.
13      MR. MORRIS:  Let's look at the
14  document request, please, Exhibit 5.
15          (Dondero Deposition Exhibit 5
16  marked.)
17  BY MR. MORRIS:
18      Q.  If we could go -- let me just ask you
19  generally, Mr. Dondero.
20          Have you ever seen this document
21  before?
22      A.  No.
23      Q.  Are you aware that the debtor served
24  document requests on the Bonds Ellis firm for
25  documents in connection with its motion for a

J. DONDERO

1
2  preliminary injunction?
3      A.  Yes.
4      Q.  How did you learn that?
5      A.  I heard about it from my lawyers.
6      Q.  Okay.  Did you oversee the search for
7  responsive documents?
8      A.  Response -- I know we were responsive
9  and compliant, but I delegated it to my
10  assistants and the employees at Bonds Ellis.
11      Q.  Which assistants did you delegate
12  this to?
13      A.  Tara Loiben.  I think primarily Tara
14  Loiben.
15      Q.  And who is Ms. Loiben?
16      A.  She's my assistant.
17      Q.  And who is she --
18      A.  I'm sorry?
19      Q.  Who is she employed by?
20      A.  I -- I don't know for sure.  I think
21  Highland, but I don't know.  I don't want to
22  speculate.
23      Q.  What instructions -- (audio
24  malfunction) --
25          (Clarification requested by the

J. DONDERO

1
2  stenographer.)
3  BY MR. MORRIS:
4      Q.  What instructions did you give her in
5  order to search for documents?
6      A.  I didn't -- I didn't give her any.
7  She worked with that and she had -- she has full
8  access to my e-mail, and I gave her my phone for
9  the better part of a couple days in the office.
10      Q.  You -- until the end of 2020, you had
11  an e-mail address with an HCMLP or a Highland
12  e-mail address, right?
13      A.  Yes.
14      Q.  Have you stopped -- has that e-mail
15  address ceased to be in use?
16      A.  I've switched to an e-mail at the
17  bank as of -- whatever it was, last week or...
18      Q.  In the year 2020, did you use any
19  e-mail address other than the Highland e-mail
20  address?
21      A.  No.
22      Q.  You don't have a Gmail address or any
23  other personal e-mail address?
24      A.  I have an old Gmail address, but it's
25  dormant.  I haven't logged on to it in years.

J. DONDERO

1
2    Q.   Okay.  And you understood that the
3    debtor's document request called for the
4    production of all text messages that were
5    responsive to the requests, right?
6       A.   Yes.
7       Q.   Can we just scroll down to the
8    requests themselves?  Right there.
9          Do you see Request No. 3 is for all
10   communications between you and any person
11   employed by the debtor?
12      A.   Yes.
13      Q.   And did you understand that the
14   request was limited to the time period of, I
15   think, December 10th, 2020 to the end of the
16   month?
17      A.   I didn't read the details of this.  I
18   didn't get into it.  I didn't do the document
19   production that I believe was completed and
20   responsive.  I delegated that.
21      Q.   Did you review the documents before
22   they were produced?  Do you know what was
23   produced?  Withdrawn.  Two different questions.
24         Did you review the documents for
25   completeness before your lawyers delivered them

J. DONDERO

1
2    to my firm?
3       A.   Only in the most general -- when
4    she'd print out a stack of them, I'd just thumb
5    through the stack of them, and that was it.  But
6    other than that, no.
7       Q.   Did you do anything to satisfy
8    yourself that you had produced all responsive
9    documents?
10      A.   I trust Tara's work ethic and
11   capabilities, and I trust the lawyers at Bonds
12   Ellis, so I didn't -- I didn't intervene or
13   supersede or supervise.
14      Q.   So you didn't do anything to make
15   sure -- you didn't do anything personally --
16   withdrawn.
17         You didn't take any steps personally
18   to make sure that all responsive documents had
19   been produced, right?
20         MR. BONDS:  Objection, form.
21      A.   I wasn't involved personally, but I
22   do believe it was responsive and complete.
23   BY MR. MORRIS:
24      Q.   Until early December, you had a phone
25   that was bought and paid for by the debtor,

J. DONDERO

1
2    right?
3       A.   Yes.
4       Q.   What happened to that phone?
5       A.   It was disposed of as part of getting
6    a replacement phone in anticipation of
7    potentially a transition.
8       Q.   Who decided to dispose of it?
9       A.   That's historically what we've done
10   with all of our historic phones, when we've
11   gotten new phones.  I've gotten a new phone, I
12   guess, every four or five years, and the old ones
13   have always been destroyed.
14      Q.   Who decided to destroy this --
15   withdrawn.
16         When you say it was disposed of, what
17   does that mean?
18      A.   As far as I know, it was disposed of
19   in the garbage, but I don't know if it was
20   recycled or whatever.
21      Q.   And who decided to throw it in the
22   garbage?
23      A.   We've always -- we've always done
24   that when we've gotten new phones, versus trading
25   them in, for the senior executives.

J. DONDERO

1
2       Q.   I appreciate that, but I'm just
3    talking about the very specific phone that the
4    debtor bought and paid for your benefit.  Who
5    made the decision to dispose and throw that phone
6    away?
7          MR. BONDS:  Objection, form.
8       A.   I -- like I said, I understood it to
9    be our standard process and protocol.  I don't
10   know.  I can't label anybody with the decision.
11   BY MR. MORRIS:
12      Q.   Well, who threw it away?
13      A.   I don't know.
14      Q.   You don't know if you threw the phone
15   away?
16      A.   No, I -- I don't know.  No, I don't
17   remember throwing it away, but I don't know who
18   did.
19      Q.   Did you have conversations with
20   anybody about the decision to throw away the
21   phone?
22      A.   Like I said, it wasn't a decision or
23   a new decision.  It's been the process, as far as
24   I understand it, every time we've upgraded phones
25   over the last 30 years.

J. DONDERO

1
2     Q.  You just throw it in the garbage?
3  You don't try to get a credit for it by returning
4  it?
5     A.  No.
6     Q.  Okay.  Did you ever speak with
7  Mr. Ellington about your phone that was bought
8  and paid for by the debtor?
9     A.  I think Ellington's phone and my
10  phone and I think -- I think right around the
11  same time, in anticipation, in case there was a
12  transition or in case there was a liquidation
13  plan, it was time to move the phone ownership
14  away from the estate.  The estate wasn't going to
15  pay for it anymore anyway in another couple of
16  weeks so, I --
17     Q.  Were you aware --
18     A.  I'm sorry, what's your question?
19     Q.  Are you aware that the UCC had asked
20  for your text messages before the time that you
21  disposed of your phone?
22     A.  No.
23     Q.  Nobody ever told you that the UCC
24  wanted your phone?
25     A.  No.

J. DONDERO

1
2     Q.  When exactly did you dispose of your
3  phone?
4     A.  On or about when I got my new phone.
5     Q.  Who at the debtor did you tell that
6  you disposed of your phone?
7     A.  I don't -- I don't remember who.  Was
8  it Jason Rothstein was involved in getting my new
9  phone and knew that I was disposing of my old
10  phone?  I don't know who else knew.  But again,
11  it was standard procedure.
12     Q.  Did it ever occur to you to get the
13  debtor's consent before doing this?
14        MR. BONDS:  Objection, form.
15     A.  No.
16  BY MR. MORRIS:
17     Q.  Did you have the phone number
18  transferred to your personal account?
19     A.  Yes.
20     Q.  Did you ever ask the debtor for its
21  permission to do that?
22     A.  No.
23     Q.  Did you ever give the debtor notice
24  that you were doing that?
25     A.  I didn't believe it was necessary or

J. DONDERO

1
2  appropriate.
3     Q.  So you wanted it to be a secret?
4        MR. BONDS:  Objection, form.
5     A.  No.  No, I wouldn't describe it as a
6  secret.  I would say I didn't think it was
7  necessary or appropriate.
8        Every executive that's ever left
9  Highland has always kept their phone number,
10  period.  Highland's never said, no, we're keeping
11  the phone number, ever, out of the two or 300
12  people that have come through Highland.  And I
13  don't believe most businesses try and retain the
14  phone number of employees when they leave.  It's
15  ludicrous on its surface.
16  BY MR. MORRIS:
17     Q.  Okay.  So let me just make sure that
18  I understand this.
19        You threw the phone -- withdrawn.
20        Somebody threw the phone that the
21  debtor bought and paid for in the garbage without
22  the debtor's knowledge or consent; is that right?
23        MR. BONDS:  Objection, form.
24     A.  I'd just repeat my testimony, that
25  it's always been our process to destroy old

J. DONDERO

1
2  phones when we get new phones.
3  BY MR. MORRIS:
4     Q.  You were no longer an employee of the
5  debtor at the time, correct?
6     A.  At the time?  I believe I was an
7  employee of the debtor since January.
8     Q.  Well, you stayed on as an unpaid
9  employee until mid October; isn't that right?
10     A.  Right, but I -- but I don't even
11  think my phone was paid for by the debtor.  I
12  think my phone was paid for by shared services by
13  NexPoint.  I -- I don't know what you're -- I
14  don't know what you're getting at or what
15  you're -- you're asking me.
16     Q.  It's not complicated.
17        Did you tell the debtor that you
18  threw away your phone at any time until this
19  deposition?
20     A.  Did I tell the debtor?  Like I said,
21  I didn't think it was the debtor's phone.  No, I
22  did not tell the debtor or get permission.  No, I
23  did not.
24     Q.  And did you tell the debtor that you
25  were changing the phone number?

Page 78

J. DONDERO

1
2     A. No.
3     Q. And did Mr. Ellington help you change
4  the phone number?
5         MR. BONDS: Objection, form.
6     A. I didn't change the phone number.
7  BY MR. MORRIS:
8     Q. Withdrawn.
9         Did Mr. Ellington help you have the
10  phone number transitioned to your personal
11  account?
12         MR. BONDS: Objection, form.
13     A. No. No. It was Jason -- Jason
14  Rothstein handles the technology stuff and the
15  phone stuff.
16  BY MR. MORRIS:
17     Q. Did Mr. Ellington also change his
18  phone number to his own personal account?
19     A. My understanding was there was
20  numerous senior executives that changed their
21  phone in anticipation of being terminated by the
22  debtor shortly.
23     Q. Who else did it?
24     A. I don't know. I thought it was -- I
25  didn't think it was just Ellington and I. I

Page 79

J. DONDERO

1
2  thought it was a bunch of senior execs. But --
3     Q. What's the basis --
4     A. -- who cares? Who cares? I didn't
5  care. I don't know. I mean --
6     Q. I don't care if you care or not. I'm
7  asking you questions.
8         What is the basis for your statement
9  that other people besides you and Mr. Ellington
10  changed the phone numbers?
11         MR. BONDS: Objection, form.
12     A. That was my understanding. That was
13  my understanding. But I don't -- I don't recall
14  specifics. I didn't pay attention.
15  BY MR. MORRIS:
16     Q. What is the basis for the
17  understanding? Did somebody tell you that?
18         MR. BONDS: Can you repeat the
19  question?
20  BY MR. MORRIS:
21     Q. What is the basis for your
22  understanding? Did somebody tell you that
23  employees of Highland other than Mr. Ellington
24  had changed the phone numbers?
25     A. Yes. My understanding was everybody

Page 80

J. DONDERO

1
2  had to move their phones in the next 30 days or
3  next 25 days, based on Seery's termination
4  notice.
5     Q. Did Jim Seery -- withdrawn. I'm
6  perfectly fine.
7         MR. MORRIS: Can we put up Exhibit 6,
8  please.
9         (Dondero Deposition Exhibit 6
10  marked.)
11  BY MR. MORRIS:
12     Q. That's Jason Rothstein.
13         Do you see that?
14     A. Yes.
15     Q. He didn't throw the phone in the
16  garbage, did he?
17     A. I don't know.
18     Q. Well, according to the text that he
19  sent you on December 10th, he left your own --
20  old phone in the drawer of Tara's desk.
21         Do you see that?
22     A. Yes.
23     Q. So he didn't think that it was his
24  responsibility as of December 10th to throw it in
25  the garbage, did he?

Page 81

J. DONDERO

1
2     A. I don't know.
3     Q. He left it in Tara's desk, didn't he?
4     A. On December 10th. But I don't know
5  what he did on December 11th.
6     Q. Did you tell him to do anything?
7     A. I don't -- all I know is the phone's
8  been disposed of. That's all I know.
9     Q. Okay. Did you tell Mr. Rothstein to
10  take the phone out of Tara's desk and throw it in
11  the garbage?
12     A. I did not.
13     Q. Did you tell Tara to take the phone
14  out of her desk and throw it in the garbage?
15     A. I did not.
16         MR. MORRIS: Okay. Can we put up
17  Exhibit 7, please.
18         (Dondero Deposition Exhibit 7
19  marked.)
20         MR. MORRIS: Can we just scroll down
21  a little bit.
22  BY MR. MORRIS:
23     Q. Is this a text message from you to
24  Tara?
25     A. Yep.

Page 82

J. DONDERO

1
2    Q.  If we could scroll up just a little
3 bit so we can see the date.
4       Well, it doesn't have a date, but do
5 you recall when you asked Tara to come in to
6 work -- (audio malfunction) --
7       (Clarification requested by the
8 stenographer.)
9 BY MR. MORRIS:
10    Q.  -- to come in to work on discovery.
11 Do you recall when you sent this text message,
12 Mr. Dondero?
13    A.  No.
14    Q.  Do you know how Tara -- withdrawn.
15       Did Tara come in to work on discovery
16 at any time?
17    A.  Yes.
18    Q.  And did you give her any instructions
19 on what to do?
20    A.  Again, just generally.
21    Q.  What were the general instructions
22 that you gave her?
23    A.  Work with the Bonds Ellis guys.
24 Here's the access to my computer and my phone.
25 Be complete and be responsive.

Page 83

J. DONDERO

1
2    Q.  Did you ever speak with Mr. Ellington
3 about your document production?
4    A.  No.
5    Q.  Did Mr. Ellington play any role in
6 searching for, reviewing or producing responsive
7 documents?
8    A.  Nope.
9    Q.  Did you ever speak with Mr. Leventon
10 about your document production?
11    A.  Nope.
12    Q.  Did Mr. Leventon play any role in
13 searching for, reviewing or producing responsive
14 documents?
15    A.  Nope.
16    Q.  Did you ever speak with anybody
17 employed by the debtor, other than Tara, about
18 your document production?
19    A.  Tara's got an assistant, or my other
20 assistant that works with Tara, Kelly, would have
21 been the only other person.
22       She might have been -- Tara had to go
23 back and see her girls during lunch, so I think
24 she used Kelly to do some of the legwork.
25    Q.  Let's talk about the TRO for a

Page 84

J. DONDERO

1
2 second.
3       MR. MORRIS:  Can we put up Exhibit 9,
4 please.
5       (Dondero Deposition Exhibit 9
6 marked.)
7 BY MR. MORRIS:
8    Q.  This is the temporary restraining
9 order that was signed on December 10th.
10       Do you see that?
11       If we could scroll down just a little
12 bit.  Yeah.
13    A.  Okay.
14    Q.  You've never seen this document
15 before, right?
16    A.  Yes, I haven't read it.
17    Q.  And I know I asked you earlier today
18 what your understanding was of how this order
19 restrained you.
20       Do you remember those questions?
21    A.  Yes.
22    Q.  Okay.  Is there anything, upon
23 reflection, that you need to add in order to make
24 the record complete as to your understanding of
25 the scope of the injunction?

Page 85

J. DONDERO

1
2    A.  Not at this moment.
3       MR. MORRIS:  Can you put up
4 Exhibit 10, please.
5       (Dondero Deposition Exhibit 10
6 marked.)
7 BY MR. MORRIS:
8    Q.  All right.  Have you seen this letter
9 before, sir?
10    A.  No.  I mean, not specifically.  I
11 probably received it, but I haven't read it.
12    Q.  All right.  I just want to go back to
13 the phone for a second to see if I can nail this
14 down.
15       Did you dispose of the phone
16 somewhere around December 10th, 2020?
17    A.  I -- I don't know.  Probably.
18    Q.  Well, we just looked at that e-mail,
19 right, that was from Mr. Rothstein.
20       MR. MORRIS:  Can we get that back?
21    A.  Yes.
22       MR. MORRIS:  I just want to see what
23 the date of that was.  Yes.  Okay.
24 BY MR. MORRIS:
25    Q.  So that's December 10th at 6:25 p.m.,

Appx. 01608

Page 86

J. DONDERO

2 right?

3     A. Yes.

4     Q. Okay. So according to Mr. Rothstein,

5 as of that date at that time, your phone was in

6 Tara's desk, right?

7     A. Yes.

8     Q. You have no reason to disbelieve

9 that, do you?

10     MR. BONDS: Can you repeat the

11 question? I'm sorry.

12     MR. MORRIS: Withdrawn.

13 BY MR. MORRIS:

14     Q. So is it fair to say, then, that the

15 phone was disposed of and thrown in the garbage

16 sometime after December 10th?

17     A. I don't know.

18     Q. Well, as of December 10th,

19 Mr. Rothstein told you that it was in Tara's

20 desk, right?

21     A. Yes.

22     Q. Okay. So if he -- Jason's not a

23 liar, is he?

24     A. No.

25     Q. Do you have any reason to believe

Page 87

J. DONDERO

2 that the phone was anywhere other than Tara's

3 desk at 6:25 p.m. on December 10th?

4     A. I don't know.

5     Q. You have no reason to believe that

6 that statement by Mr. Rothstein is untrue,

7 correct?

8     A. Correct.

9     Q. Do you know how it came to be that

10 the phone was disposed of in the manner that

11 you've described?

12     A. Nope.

13     Q. You can't tell me who did it; is that

14 right?

15     A. Correct.

16     Q. And you can't tell me when, after

17 December 10th, that happened, right?

18     A. Correct.

19     Q. Okay. Thank you. Let's go back to,

20 I guess, Exhibit 10. If we can just scroll down

21 a little bit.

22     I understand that you haven't seen

23 this document before. Go to the next page,

24 please -- no. Yeah, next page.

25     Do you see the first full paragraph

Page 88

J. DONDERO

2 there beginning "On December 22nd"?

3     A. I'm going to have to get up and read

4 that. Just hold on a sec.

5     Q. Okay. Take your time.

6     A. Yes, I see that.

7     Q. Okay. Having read that paragraph, do

8 you have any basis to dispute any of the

9 statements in that paragraph?

10     MR. BONDS: I'm sorry. Can you read

11 it again or can you ask your question again?

12     MR. MORRIS: Sure. I'd like to know

13 if Mr. Dondero has any basis to dispute any

14 assertion made in that paragraph.

15     A. I disagree with every sentence in

16 that paragraph based on my 30 years of experience

17 and understanding how to operate a registered

18 investment advisor and how to do it in the

19 interest of performance, investors and a

20 registered investment advisor.

21 BY MR. MORRIS:

22     Q. All right. Let's try this

23 differently. I shouldn't have done that.

24     The first sentence, do you have any

25 basis to disagree with any aspect of the first

Page 89

J. DONDERO

2 sentence of that paragraph? And let me just read

3 it aloud, if I may.

4     A. That -- all right. What's your

5 question?

6     Q. Is there anything inaccurate about

7 the first sentence?

8     A. I believe my instructions in the

9 e-mails we went over were to not do the trades.

10 You know, that sentence implies not settle the

11 trade, which means to not do the trades once they

12 were already bona fide. I -- I don't recall that

13 ever being my contention.

14     I would have preferred they be

15 reversed, but my instructions, I believe, in

16 everything we went over were to not do the

17 trades, stop doing trades that are adverse to the

18 interests of investors, but it wasn't regarding

19 settling outstanding trades. So I think that

20 sentence on its face is in error.

21     Q. Okay. So but it's true, then, that

22 you instructed employees of NPA and HCMFA on or

23 around December 22nd to stop doing the trades of

24 Avaya and Sky, correct?

25     A. Yes.

Page 90

J. DONDERO

1
2     Q.  Near the closing bell on — we're
3  going to go back in time just a couple of days —
4  on Friday the 18th, Mr. Sowin informed you that
5  Seery wanted to sell these securities, right?
6     A.  I don't recall that specifically.
7     MR. MORRIS:  Okay.  Can we put up
8  Exhibit 11, please.
9     (Dondero Deposition Exhibit 11
10  marked.)
11     MR. MORRIS:  Okay.  And if we can
12  just go down to the bottom of it.  Yeah.
13  BY MR. MORRIS:
14     Q.  So that e-mail at the bottom, that's
15  Mr. Seery's direction to sell Avaya securities
16  from the CLOs, right?
17     A.  I don't know what's happening here.
18  I don't know if this is fuzzy or my eyes are
19  getting worse, but can we enlarge these a little
20  bit, or I'm going to have to get up each time.
21     Yeah.  This is nutty and vindictive.
22  I think everybody realizes that there's no
23  liquidity in the markets the three days before
24  Thanksgiving and Christmas.  There's no urgency
25  or reason to sell any of these securities that

Page 91

J. DONDERO

1
2  couldn't have waited until January or February.
3     There's no business purpose in
4  selling any of those securities, yet he's pushing
5  them through for self-serving or vindictive
6  reasons.  I — or maybe trying to get more issues
7  in front of the judge.  I have no idea, but
8  this — this stuff makes absolutely no sense and
9  no business purpose.
10     But I'm sorry, what's your question?
11     MR. MORRIS:  Okay.  I move to strike
12  and I'd ask you to listen to my question.
13  BY MR. MORRIS:
14     Q.  It's simply that you learned, just
15  before the closing bell on Friday, December 18th,
16  that Mr. Seery wanted to sell Avaya securities
17  out of the CLOs?
18     MR. BONDS:  Objection, form.
19     THE WITNESS:  Yeah, hold on.  I need
20  to interrupt for a second.  When you strike
21  something, does that mean it doesn't end up in
22  the record?
23     MR. MORRIS:  The judge will decide
24  whether or not it does.  It's my request that the
25  judge strike it from the record.  She'll make the

Page 92

J. DONDERO

1
2  ruling.
3     THE WITNESS:  Okay.  But then my
4  lawyer can ask to put it in as my understanding
5  of something at the end or something of the
6  deposition or...
7     MR. MORRIS:  I don't want to give you
8  legal advice, Mr. Dondero, but yes, that's
9  generally how it works.
10     THE WITNESS:  Okay.  Thank you.
11  BY MR. MORRIS:
12     Q.  So again, the question is simply
13  whether you learned near the closing bell on
14  Friday, December 18th, that Mr. Seery wanted to
15  sell Avaya shares out of the CLOs?
16     MR. BONDS:  Objection, form.
17     A.  It appears so.
18  BY MR. MORRIS:
19     Q.  Okay.  And can you just scroll up
20  above that, please.  And — okay.
21     Do you see that Mr. Sowin, in fact,
22  forwards this right to you?
23     A.  Yes.
24     Q.  And it was on the basis of this that
25  you instructed the NPA and HCMFA employees not to

Page 93

J. DONDERO

1
2  execute these sales?
3     A.  Yes.
4     Q.  After the TRO was issued, did you
5  ever instruct any employees of NPA or HCMFA not
6  to interfere or impede with the debtor's
7  management of the CLOs?
8     A.  No.
9     Q.  To the best of your knowledge, did
10  anyone ever instruct the employees of NPA and
11  HCMFA not to interfere or impede with the
12  debtor's management of the CLOs?
13     A.  No.
14     Q.  Did you ever provide a copy of the
15  TRO to any employees of NPA and HCMFA?
16     A.  I did not.
17     Q.  Do you know if anybody ever provided
18  a copy of the TRO to any of the employees of NPA
19  and HCMFA?
20     A.  I do not know.
21     MR. MORRIS:  Okay.  Can we put up
22  Exhibit 12, please.
23     (Dondero Deposition Exhibit 12
24  marked.)
25     ///

Page 94

J. DONDERO

1
2  BY MR. MORRIS:
3      Q.  Okay.  This is a letter that was sent
4  to K&L Gates.
5          Do you know who K&L Gates represents
6  in connection with this matter?
7      A.  Some of the retail funds.
8      Q.  And do they also represent the two
9  advisors?
10     A.  Yes.  I believe they're one of --
11  yes.
12     Q.  Attached to this letter, there's an
13  Exhibit A, if we can go down, and we'll find a
14  letter from K&L Gates there.  Okay.
15         This is another letter from K&L Gates
16  dated December 22nd, 2020.  Are you able to see
17  that, sir?  Can we scroll down a little bit?
18     A.  Yes.  Yes, I can see the letter.
19     Q.  Okay.  Were you aware that this
20  letter was sent at the time that it was?
21     A.  I was aware, yes.
22     Q.  And these are the same entities,
23  except for CLO Holdco, that had filed the prior
24  motion that was denied by the Court, right?
25     A.  I'm sorry, ask that question again.

Page 95

J. DONDERO

1
2  These were --
3      Q.  Yeah, let me just do a little
4  background.
5          A couple of -- about a week before
6  this letter was sent, the entities represented by
7  K&L Gates, except for CLO Holdco, had made a
8  motion in the bankruptcy court, right?
9      A.  Yes.
10     Q.  They had asked the Court to pause, to
11  impose a pause on the debtor from selling any CLO
12  assets; is that right?
13     A.  I don't -- I don't know what
14  exactly -- I don't know the details of what they
15  requested.
16     Q.  Okay.  Did you authorize the filing
17  of that motion?
18     A.  Authorize the filing?  I
19  championed -- I pushed and encouraged the chief
20  compliance officer and the general counsel to do
21  what they believed was right as rigorously as
22  possible, and it manifested itself in the letters
23  that you're speaking of.
24     Q.  And you -- and you approved of these
25  letters, right?

Page 96

J. DONDERO

1
2      A.  I -- not directly and not
3  specifically, but I encouraged them to do what
4  they thought was right.
5      Q.  Okay.  And you were aware that
6  letters with the substance contained in them were
7  going to be sent -- (audio malfunction) --
8          (Clarification requested by the
9  stenographer.)
10  BY MR. MORRIS:
11     Q.  -- to the debtor?
12         THE STENOGRAPHER:  And the answer
13  again, please?
14         MR. BONDS:  And I objected as to
15  form.
16         THE STENOGRAPHER:  And the answer
17  again, please?
18     A.  I was aware that letters were being
19  sent, and I was aware that motions -- or a motion
20  was being filed.
21  BY MR. MORRIS:
22     Q.  This letter was also sent on behalf
23  of CLO Holdco, Ltd.
24         Do you see that?
25     A.  Yes.

Page 97

J. DONDERO

1
2      Q.  Are you the direct or indirect
3  economic or beneficial owner of CLO Holdco, Ltd.?
4      A.  No.
5      Q.  Who is?
6      A.  I believe the DAF and HarbourVest.
7      Q.  And who controls the DAF?
8      A.  Grant Scott.
9      Q.  Who is the beneficial owner of the
10  DAF?
11     A.  Three char- -- three or four
12  charitable organizations.
13     Q.  And who controls CLO Holdco?
14     A.  I don't know exactly.
15     Q.  Do you?
16     A.  No.
17     Q.  And who are the possibilities?
18     A.  CLO Holdco, my understanding is it
19  was a -- it was an investment amalgamation
20  between HarbourVest and the DAF, so with the DAF
21  having the primary -- or the largest ownership
22  interest.
23     Q.  And with that largest ownership
24  interest, is the DAF able to control CLO Holdco?
25     A.  I don't know.  Maybe.

1          J. DONDERO
2     Q. You've never asked that question?
3     A. Nope.
4     Q. Did you ever instruct any of the
5  advisors or funds to withdraw this letter?
6        MR. BONDS: Objection, form.
7     A. No.
8  BY MR. MORRIS:
9     Q. To the best of your knowledge, has
10  anyone on behalf of the advisors, the funds or
11  CLO Holdco ever instructed K&L Gates to withdraw
12  this letter?
13     A. Not that I'm aware of.
14     Q. Okay. I want to just see if I can
15  refresh your recollection a bit.
16        When you talked about the DAF and
17  HarbourVest, is it possible that you're confusing
18  that with HCLOF?
19     A. You know, you're right. It could be.
20  Maybe it is CLO Holdco — you know what, let me
21  just — let me not speculate. But the CLO Holdco
22  might just be the DAF, and the combined entity
23  might be the level above that. I — I don't know
24  exactly. Let me leave it at that.
25     Q. Okay. That's fair.

1          J. DONDERO
2     This is the — I think you've
3  testified — I'm trying to speed this up a little
4  bit, believe it or not — that you supported the
5  sending of this particular letter, right? And if
6  you need to read more of it, let me know.
7     A. No, I — again, the thrust of it, the
8  theme of it, the — when you think bad or illegal
9  or regulatorily inappropriate stuff has happened,
10  what did you do, when you knew it, et cetera.
11  And I think the responsibilities of that
12  transcend a lot of things, you know.
13     Q. But you are aware that these very
14  same entities, except for CLO Holdco, had
15  advanced the very same arguments to the
16  bankruptcy court just six days earlier and their
17  motion is denied, right?
18        MR. BONDS: Objection, form.
19     A. Yes. And with all due respect to the
20  Court, it doesn't mean that it was wrong or
21  inappropriate to advance the argument.
22  BY MR. MORRIS:
23     Q. Okay. But having advanced the
24  argument on December 16th and having had it
25  rejected, you support these entities pressing the

1          J. DONDERO
2  same arguments again against the debtor, right?
3     A. We try and do what's right.
4        MR. MORRIS: Okay. Can we put up
5  Exhibit 13, please.
6        (Dondero Deposition Exhibit 13
7  marked.)
8        MR. MORRIS: And if we can go to
9  Exhibit A on the back. Thanks.
10  BY MR. MORRIS:
11     Q. This is another letter sent the next
12  day, right, on December 23rd, from K&L Gates?
13  And we can scroll down further, again.
14        Do you recall that there was yet
15  another letter sent on the 23rd?
16     A. Yeah, I don't recall specifically,
17  but...
18     Q. Can we scroll down a little bit
19  further in this document.
20        Do you recall that there came a time
21  when K&L Gates, on behalf of the advisors and the
22  funds, told the debtor and its counsel that it
23  was considering initiating the process for
24  removing the debtor as portfolio manager of the
25  CLOs?

1          J. DONDERO
2        MR. BONDS: Objection, form.
3     A. I believe they — I don't know if
4  you're asking me a reservation of rights or
5  whatever, but I think they should do everything
6  as rigorously as possible to try and protect the
7  investors.
8  BY MR. MORRIS:
9     Q. Are you aware of any prohibition of
10  doing what you're — withdrawn.
11        Are you aware that the debtor made an
12  offer to assign the CLO management agreements to
13  NexPoint back in the beginning of December?
14     A. I — I do remember that, and I did
15  get a summary of that, and it was untenable in
16  terms of what it was wrapped in.
17     Q. What was untenable about it?
18     A. Off the top of my head, it would give
19  Seery releases for bad acts or inappropriate
20  trades. It required a reimbursement for, I
21  think, a million dollars of Pachulski fees
22  relative to this subject, and I think it also
23  wanted an up-front payment for the present value
24  of the future management fees to be paid to the
25  estate.

J. DONDERO

1
2    Q.  And who made the decision to reject
3  the debtor's offer?
4    A.  Made a decision to reject the --
5  reject the -- it wasn't a rejection of the offer
6  as much as a disagreement that that is the way
7  CLO contracts transfer, that the manager doesn't
8  have the right to extort from the next manager
9  when the investors want to transfer.
10      So there's a facilitation that
11  Highland could provide, but Highland is not in a
12  position, based on our understanding of the
13  market, to demand consideration.
14    Q.  Okay.  Who made the decision to
15  reject the offer?
16    A.  I was involved in that.  It wasn't a
17  formal rejection, but it was a view that it was
18  an inappropriate offer.
19    Q.  Did anybody decide or suggest that
20  maybe we should make an appropriate offer?
21    A.  Not yet.
22    Q.  Was there any reason why, for the
23  past month, when the debtor has provided an
24  opportunity to transfer these CLO management
25  contracts, that none of the advisors or anybody

J. DONDERO

1
2  representing them has sought fit to make an
3  appropriate counteroffer?
4    A.  We can get an appropriate
5  counteroffer out tomorrow.
6    Q.  Okay.  Is there anything that's
7  prevented that over the last month instead of
8  writing letters and engaging in this litigation?
9    A.  The fundamental prerequisites were so
10  inappropriate that it dissuaded us from putting a
11  normal, commercial, reasonable thing forward.
12  But we'll put something commercial, reasonable
13  and appropriate through tomorrow, and we'll see
14  how far it goes.
15    Q.  Did you support the sending of this
16  particular letter at the time it was sent?
17    A.  I -- generally, yes.
18    Q.  Okay.  Have you authorized any of the
19  entities on this letter to initiate the process
20  to remove the debtor as the fund manager of any
21  CLO?
22      MR. BONDS:  Objection, form.
23    A.  That's not my position, and it's not
24  without legal considerations regarding what's
25  subject to a stay and what's appropriate at this

J. DONDERO

1
2  juncture.
3      But -- but I believe, subject to
4  whatever is legally appropriate, they should and
5  they will be moving to replace the manager as
6  quickly as possible and holding the manager
7  responsible for bad acts prior to transfer.
8  BY MR. MORRIS:
9    Q.  Have you authorized any of the
10  parties that are signatory to this letter to
11  initiate the process to remove the debtor as the
12  fund manager for the CLOs?
13    A.  I am not that involved.  I haven't
14  authorized it per se.  Again, I'm encouraging the
15  executives in charge to do the right thing, given
16  the circumstances and what's best for investors,
17  especially their retail investors and their
18  obligations under the '40 Act.
19    Q.  You're the president of the two
20  advisors, right?
21    A.  Yes.
22    Q.  And you're the portfolio manager of
23  the funds, right?
24    A.  Yes.
25    Q.  Couldn't you give the direction to

J. DONDERO

1
2  take steps to initiate the process to remove the
3  debtor?
4      MR. BONDS:  I'm sorry, can you repeat
5  the question?
6  BY MR. MORRIS:
7    Q.  Don't you have the power to do that?
8      MR. BONDS:  I'm sorry.  I couldn't
9  hear your question.
10      MR. MORRIS:  Withdrawn.
11  BY MR. MORRIS:
12    Q.  Did you ever discuss with any -- with
13  anybody about whether to initiate the process to
14  remove the debtor as the portfolio manager of the
15  CLOs?
16    A.  I think it's a logical remedy, and I
17  believe the executives, and particularly like the
18  executives -- the chief compliance officer always
19  has personal liability, and I think Jason Post
20  knows that, and I think he's pushing as hard as
21  he can for the benefit of investors in a
22  situation where people are moving against the
23  best interests of investors.
24      And I encourage him to move as
25  aggressively as possible subject to whatever the

J. DONDERO

1  limits of bankruptcy court is, but I can't be --
2  I've got too many other things to do to be
3  directly involved in the details, so I'm not
4  involved in the details.
5      Q. I see.
6      Did you ever instruct the parties
7  that are signatory -- withdrawn.
8      Did you ever instruct K&L Gates to
9  withdraw this letter?
10     A. No.
11     Q. To the best of your knowledge, has
12  anybody on behalf of the advisors, the funds or
13  CLO Holdco ever instructed K&L Gates to withdraw
14  this letter?
15     A. No.
16     Q. Will you commit that each of the
17  entities on whose behalf this letter was sent
18  will cease and desist from taking any steps to
19  initiate the process to remove the debtor as the
20  CLO manager?
21     MR. BONDS: Objection, form.
22     A. Say that again.
23  BY MR. MORRIS:
24     Q. Will you commit on behalf of each of

J. DONDERO

1  the funds and the advisors to cease and desist
2  from taking any steps to replace the debtor as
3  the portfolio manager of the CLOs?
4      A. That would be inappropriate. I'm not
5  sure it would be illegal, but I think it would be
6  a regulatory breach, and I think it would not be
7  in the best interest of investors if we were to
8  agree to anything like that. I think that's nuts
9  and it's nutty to ask that.
10     Q. People say that about me all the
11  time.
12     Did you ever exchange any e-mails or
13  texts with any employee of the parties on this
14  document, on the issue of whether or how to
15  remove the debtor as the CLO's fund manager?
16     A. Not that I recall.
17     Q. Did you ever discuss with any
18  employee of the debtor the topic of removing the
19  debtor as the portfolio manager of the CLOs?
20     A. Not that I recall.
21     MR. MORRIS: Okay. It's 1:35. Can
22  we just take a ten-minute break and resume -- is
23  it 12:35 where you are, Mr. Dondero? We'll
24  resume at 1:45 Eastern, 12:45 Central.

J. DONDERO

1      THE WITNESS: I'm sorry, I can't hear
2  you. We return at what time?
3      MR. MORRIS: In ten minutes, at
4  12:45.
5      MR. BONDS: And I want to say too,
6  John, that your notice showed that there was a
7  1:30 deposition Central Time of somebody else,
8  and we intend -- I mean, we planned on that, so
9  we're going to need to be through at 1:30.
10     MR. MORRIS: Yeah, you can do that if
11  you want. You can do that if you want, but the
12  record will also reflect that we started at least
13  20 minutes late and we took at least a 35-minute
14  break for Mr. Dondero. So you leave whenever you
15  want, but be guided by that.
16     Let's take a break.
17     MR. BONDS: Well, I'm telling you
18  that if you want to go forward, you can.
19     MR. MORRIS: I will. Thank you. I
20  appreciate that.
21     THE WITNESS: All right. See you
22  guys in 10 minutes.
23     THE VIDEOGRAPHER: 12:36 p.m.,
24  Central Standard Time. We're off the record.

J. DONDERO

1      (Recess taken, 12:36 p.m. to
2  12:49 p.m. CST)
3      THE VIDEOGRAPHER: 12:49 p.m.,
4  Central Standard Time. We're back on the record.
5  BY MR. MORRIS:
6      Q. All right. Can you hear me,
7  Mr. Dondero?
8      A. Yes.
9      Q. Is it fair -- do you think it's fair
10  to say that your personal interests are adverse
11  to the debtor's?
12     A. No.
13     Q. They asked for your resignation back
14  in October, right?
15     A. Yes.
16     Q. And you opposed the debtor's plan on
17  file, right?
18     A. Yes.
19     Q. And you objected to the debtor's
20  settlement with ACIS; is that right?
21     A. Yes.
22     Q. And you're going to object to the
23  debtor's settlement with HarbourVest; is that
24  right?

Page 110

1          J. DONDERO
2          MR. BONDS:  Objection, form.
3          A.  I don't know for sure.  I believe so.
4    I don't know.
5    BY MR. MORRIS:
6          Q.  And the debtor commenced an adversary
7    proceeding against you; is that right?
8          MR. BONDS:  Objection, form.
9          A.  I'm not aware of that in particular.
10   BY MR. MORRIS:
11         Q.  The debtor sought and obtained a TRO
12   against you; isn't that right?
13         A.  Oh.  Okay, yes.
14         Q.  And they also started a lawsuit?
15   They filed a complaint against you -- is that
16   right -- for preliminary and permanent injunctive
17   relief?
18         A.  I'm aware of it, yes.
19         Q.  And the debtor has removed you from
20   its offices, right?
21         A.  Yes.
22         Q.  And based on all of that, would you
23   agree that your personal interests are adverse to
24   the debtor?
25         A.  No.

Page 111

1          J. DONDERO
2          Q.  Okay.  Since the TRO was entered,
3    have you ever discussed your litigation strategy
4    with Mr. Ellington?
5          A.  Not -- no.  Not that I'm aware of.
6    That's not the subject of our conversations.
7    He's more of a go-between, and he's more of an
8    overall strategist.
9          Q.  And he's a strategist for your -- you
10   know, for the defense and prosecution of your
11   personal interests, right?
12         A.  No.
13         Q.  No?
14         Do you remember that there were
15   actually two motions on the calendar on
16   December 16th?  There was the motion that you
17   brought that was called, I guess, the active
18   ordinary course transactions motion, and then
19   there was the motion brought by the K&L Gates
20   firm on behalf of -- (audio malfunction) --
21         (Clarification requested by the
22   stenographer.)
23   BY MR. MORRIS:
24         Q.  -- the advisors and the funds, where
25   they sought the pause of the sale of CLO assets.

Page 112

1          J. DONDERO
2          Do you remember that those two
3    motions were on the calendar a couple of weeks
4    ago?
5          A.  I remember that K&L Gates one.  The
6    first one, I don't remember.
7          Q.  Do you remember discussing with
8    Mr. Ellington the need for a witness for one of
9    those motions?
10         A.  No.  I don't remember the motion.
11         Q.  Do you remember that Mr. Ellington
12   suggested that J.P. Sevilla serve as a witness
13   for one of those motions?
14         A.  I don't remember that.
15         MR. MORRIS:  Put up Exhibit 15,
16   please.
17         (Dondero Deposition Exhibit 15
18   marked.)
19   BY MR. MORRIS:
20         Q.  If we can go down here, do you see
21   that on Saturday, December 12th, Mr. Lynn wrote
22   to you and said:  It looks like a trial?
23         A.  Yes.
24         Q.  Can you scroll up above that, please.
25   Keep going.  And then Mr. Lynn -- I'm sorry, not

Page 113

1          J. DONDERO
2    so much.
3          And then Mr. Lynn wrote:  That said,
4    we must have a witness now.
5          Do you see that?
6          A.  Yes.
7          Q.  Now, go up to the top, and
8    Mr. Ellington writes to you and to others:  It
9    will be J.P. Sevilla.  I will tell him that he
10   needs to contact you first thing in the morning.
11         Have I read that correctly?
12         A.  Yes.
13         Q.  Now, this is after the TRO is
14   entered, right?
15         A.  Like I said, I'm not -- I see my name
16   on the cc list.  I don't have an awareness of
17   what this is about, so...
18         Q.  Okay.  Do you know what trial
19   Mr. Sevilla was going to testify at?
20         A.  No.
21         Q.  You didn't produce --
22         A.  You can refresh my memory, but I
23   don't have a recollection from this.
24         Q.  To be fair, Mr. Dondero, I don't
25   know.  This is discovery, and I'm just asking a

Page 114

J. DONDERO

1          J. DONDERO
2   question, if you know.
3          A. Okay.
4          Q. Do you recall if you produced this
5   e-mail in discovery?
6          A. I have no idea.
7          Q. Do you recall looking to
8   Mr. Ellington for leadership in helping to
9   coordinate all the lawyers acting on your behalf
10  and on behalf of the entities owned and
11  controlled by you?
12         A. I know I needed some coordination,
13  but I think I went in a different direction, and
14  that's why I brought on Douglas Draper, and he's
15  been functioning in that role of joint defense
16  and coordination.
17         Q. But you did tell Mr. Ellington, after
18  the TRO was entered, that you needed him to
19  provide leadership with respect to the
20  coordination of your litigation interests, right?
21         A. I -- I don't -- I don't remember.
22  Like I said, I ended up going in a different
23  direction, but I -- I don't -- I don't know as
24  far as your question is concerned.
25         MR. MORRIS: Okay. Can we put up

Page 115

J. DONDERO

1          J. DONDERO
2   Exhibit 16, please.
3          (Dondero Deposition Exhibit 16
4   marked.)
5          MR. MORRIS: Scroll down to the
6   bottom. Not that far. Right there.
7   BY MR. MORRIS:
8          Q. So this is an e-mail from Mr. Draper
9   to you on December 16th.
10         Do you see that?
11         A. Yes.
12         MR. BONDS: I'm going to object.
13  Mr. Draper is a lawyer.
14         MR. MORRIS: He is. I understand
15  that.
16         MR. BONDS: Anything that was
17  produced that relates to Douglas Draper and Mike
18  Lynn and Jim Dondero is attorney-client
19  privileged.
20         MR. MORRIS: You're entitled to make
21  that assertion, but if we just look at the top so
22  we can clear this up. All the way to the top.
23  Mr. Dondero forwards this to Mr. Ellington.
24  Mr. Ellington is not Mr. Dondero's personal
25  lawyer. He is the lawyer for the debtor, and

Page 116

J. DONDERO

1          J. DONDERO
2   your firm doesn't represent any business
3   interest, so there's no claim that this is
4   somehow provided pursuant to a shared services
5   agreement. Unless you can tell me that there's a
6   common -- (audio malfunction) --
7          (Clarification requested by the
8   stenographer.)
9          MR. MORRIS: -- a common interest
10  between Mr. Ellington and Mr. Dondero,
11  Mr. Dondero has waived the privilege. State your
12  position, and I'm happy to state mine, but I need
13  to ask questions.
14         Can we go back down to the bottom,
15  please. All right.
16  BY MR. MORRIS:
17         Q. So on December 16th, Mr. Draper is
18  looking to get a joint meeting together, right?
19         Do you remember that?
20         A. I'm sorry, what's the question?
21         Q. Do you recall that on or around
22  December 16th, Mr. Draper was looking to get a
23  joint meeting among all the lawyers representing
24  you and your business interests as well as the
25  employees for Highland?

Page 117

J. DONDERO

1          J. DONDERO
2          A. What I do know is Douglas Draper has
3   put together a mutual defense agreement, and I
4   think the 16th is right about when he came on
5   board. He had to reach out and get people's
6   e-mails and contact information and be able to
7   coordinate it.
8          But he's now fully engaged and fully
9   functional in that role. Ellington is not
10  involved in that role at all. Can you -- but I
11  don't know exact time frames or exactly who said
12  what to whom, but go ahead, ask me whatever
13  you want.
14         Q. You mentioned a mutual defense
15  agreement. Do I have that right?
16         MR. BONDS: Objection --
17         A. I don't know what -- I don't know
18  what the legal term is.
19  BY MR. MORRIS:
20         Q. Okay. But there's a joint --
21         MR. BONDS: Don't talk about that,
22  Jim.
23         MR. MORRIS: Okay.
24  BY MR. MORRIS:
25         Q. Let me ask you this: Did Scott

Page 118

J. DONDERO

1
2 Ellington participate in the drafting of the
3 joint interest or mutual defense agreement?
4     A. No.
5     Q. Did Isaac Leventon participate in the
6 drafting of a joint defense or mutual defense
7 agreement?
8     A. No.
9     Q. Did you ever discuss with either of
10 them the topic of a joint defense or a mutual
11 defense agreement?
12     A. That was entirely with Draper.
13     Q. Okay. Let's scroll up the page a
14 little bit. There's a response from Mr. Lynn.
15     Do you see that?
16     A. Yes.
17     Q. And then if we scroll up a little
18 further, you forward it to Mr. Ellington, right?
19 If we can go to the --
20     A. Yes.
21     Q. And you said: I'm going to need you
22 to provide leadership here.
23     Have I read that correctly?
24     A. Yes.
25     Q. Why did you send this e-mail string

Page 119

J. DONDERO

1
2 to Mr. Ellington on December 16th?
3     A. I don't remember.
4     Q. What leadership were you looking for?
5     A. I can't piece it together from here.
6 I don't remember. I can't piece it together from
7 the e-mail, and I don't remember.
8     Q. Why did you need Mr. Ellington to
9 provide leadership?
10     A. I don't know.
11     Q. Does --
12     A. I don't remember.
13     Q. Okay. Does looking at the topic, a
14 list for a joint meeting, refresh your
15 recollection that you wanted Mr. Ellington to
16 coordinate all of the lawyers working on your
17 behalf and on behalf of the entities in which you
18 own an interest?
19     A. No. I mean, because that was the
20 beginning of the string, but the middle of the
21 string starts going in different directions. I
22 can't say -- I can't say what I wanted him to
23 have leadership with.
24     Q. Can you think of any -- any issue at
25 all, looking at this e-mail string, as to what he

Page 120

J. DONDERO

1
2 would be providing leadership for if it's not to
3 coordinate your defense counsel?
4     A. I don't want to speculate, but
5 again -- I don't want to speculate, but again,
6 the middle of the string looks like it goes in
7 different directions than just forming the mutual
8 defense thing.
9     Q. Okay. So you have no recollection
10 why you forwarded this e-mail to Mr. Ellington on
11 December 16th and why you told him that you need
12 him to provide leadership here; is that your
13 testimony?
14     A. Correct.
15     Q. Is Mr. Ellington a party to any joint
16 defense or mutual defense agreement that you're a
17 party to?
18     A. I believe the employees' counsel is
19 part of the working group, although I've been on
20 calls when the employees' counsel has been on and
21 when it hasn't. But I don't even -- I think the
22 employee group is divided into a couple different
23 groups, and I don't know if Ellington is part of
24 both groups.
25     But I -- Ellington individually is

Page 121

J. DONDERO

1
2 not part of the working group, and I'm not sure
3 which, if one or both, of the employee groups
4 he's in.
5     Q. So there's two employee groups; is
6 that right?
7     A. I'm beyond my involvement and
8 expertise, but I thought there were two employee
9 groups, but I don't even know that for sure.
10     Q. And has your counsel conferred with
11 counsel for either or both of the employee
12 groups?
13     MR. BONDS: I'm sorry, can you repeat
14 the question?
15     MR. MORRIS: Yes.
16 BY MR. MORRIS:
17     Q. Has your counsel at Bonds Ellis
18 conferred with counsel for either or both of the
19 employee groups?
20     A. I don't know.
21     MR. MORRIS: John, I would call for
22 the immediate production of any --
23     MR. BONDS: I don't think we have it,
24 but I can check on that.
25     MR. MORRIS: I would call for the

Page 122

J. DONDERO

1
2  immediate production of any joint defense or
3  mutual defense agreement to which any debtor
4  employee is a party –
5       MR. BONDS:  I don't think that there
6  are any.
7       MR. MORRIS:  And I would call for any
8  drafts, okay?
9       MR. BONDS:  Again, I don't think
10  there are any.
11       MR. MORRIS:  Okay.  You can give me
12  that representation.
13  BY MR. MORRIS:
14       Q.  Let's look at the top, at
15  Mr. Ellington's response.  And what did he tell
16  you in response to your statement that you need
17  him to provide leadership?
18       A.  You mean the two words there?
19       Q.  Yep.
20       A.  It looks like he typed back:  On it.
21       Q.  Yeah.
22       Did Mr. Ellington subsequently
23  provide leadership, as you had asked?
24       A.  I don't remember.  Nothing I can
25  recall.

Page 123

J. DONDERO

1
2       Q.  Did Mr. Ellington ever participate in
3  any conference calls with your counsel at Bonds
4  Ellis?
5       A.  Not that – not that I recall.
6  Ellington's time has been spent primarily, the
7  vast majority, representing and working with the
8  employee group.  I know that.  It's been
9  difficult to get his attention on anything else
10  so –
11       Q.  Listen carefully to my question.  I'm
12  not asking you to tell me what Mr. Ellington
13  does.  I'm simply asking whether you know that
14  Mr. Ellington has participated in conference
15  calls with your counsel at Bonds Ellis at any
16  time after December 10th.
17       A.  I don't know.
18       Q.  Did you ever participate in any calls
19  with Mr. Ellington and any lawyer at Bonds Ellis
20       A.  Over the year, for sure.  There have
21  been – earlier in the year there were several
22  times, but I can't recall one recently.
23       Q.  So you have no recollection of ever
24  participating in a phone call with Mr. Ellington
25  and any lawyer at Bonds Ellis at any time since

Page 124

J. DONDERO

1
2  December 10th; is that your testimony?
3       A.  I – I can't recall.  I'm willing to
4  be refreshed.  I can't recall.  There were –
5  there were – some of the calls that stick out in
6  my mind I believe occurred prior to that date, so
7  I can't – I can't recall any post that date.
8       Q.  Okay.  You didn't produce this e-mail
9  in response to the Court's order, did you?
10       A.  I don't know.
11       Q.  And that's because you didn't take
12  the time to look at the production before it was
13  delivered to my firm, right?
14       A.  I – I believe the – yeah, I mean,
15  it's a process I don't – I don't apologize.  I'm
16  involved in.  Counsel has to decide what's
17  responsive, what's privileged, what's complete,
18  what's appropriate.  That's not my job.
19       Q.  Are you aware that any documents for
20  which a privilege was asserted were supposed to
21  be delivered to the Court last December 31st?
22       A.  I'm not saying that's what – I have
23  no idea whether we produced this or didn't
24  produce it.  And if we didn't, I don't know why.
25       Q.  Do you know that the UCC has asked

Page 125

J. DONDERO

1
2  for the financial statements for Dugaboy and Get
3  Good?
4       MR. BONDS:  Objection, you're going
5  far afield from where we're – this TRO.
6       MR. MORRIS:  You can take that
7  position if you want, but I assure you, when I'm
8  done, you'll understand.
9       MR. BONDS:  I'm going to instruct the
10  witness not to answer the question.
11       MR. MORRIS:  You're not going to let
12  him answer as to whether or not the UCC wanted
13  the Dugaboy and Get Good financial statements?
14       MR. BONDS:  I can't hear you.
15       MR. MORRIS:  Yeah, I apologize.
16  It's – it's not me, John.  Let me just ask
17  again.  Are you – you're going to instruct your
18  witness not to answer the question of whether he
19  knew that the UCC wanted the Dugaboy and Get Good
20  financial statements?
21       MR. BONDS:  I'll let you go one –
22  you can ask that one question.  But anything
23  further into Dugaboy is not something that is for
24  the Court to determine at this point in this
25  case.

1           J. DONDERO
2      MR. MORRIS:  Okay.
3      So you can answer that question, sir.
4      A. I think there have been several times
5  over the last year that Dugaboy financials have
6  been requested by a variety of entities.  I don't
7  know when or recently or if the UCC requested it
8  recently.
9  BY MR. MORRIS:
10     Q. You know a number of different
11  parties have asked for the Dugaboy and Get Good
12  financial statements; is that right?
13         MR. BONDS:  I'm going to object to
14  any answer that you may give following up on
15  Dugaboy.  Dugaboy is not subject to the TRO and
16  you're stuck with your adversary proceeding.
17         MR. MORRIS:  John, there is a text
18  message that we're going to get to in a moment,
19  so I'll end the suspense.  Mr. Dondero
20  specifically says:  Don't produce the Dugaboy
21  financial statements without a subpoena.  Those
22  documents were in the debtor's possession.  I
23  will tell you that I personally made at least a
24  half a dozen requests of Mr. Ellington and
25  Mr. Leventon for those documents.

1           J. DONDERO
2      I will tell you that Jim Seery
3  instructed them to provide those documents
4  because they're in the debtor's possession,
5  custody and control.
6      I will tell you that there's no
7  shared services agreement between Dugaboy or Get
8  Good and the debtor, and there is no basis for
9  those – for Mr. Ellington and Mr. Leventon to
10  have obstructed the debtor's obligation to
11  provide those documents except in Mr. Dondero's
12  hands.
13         MR. BONDS:  I'm going to instruct the
14  witness not to answer the question.
15         MR. MORRIS:  I think that might be a
16  good idea.  On what basis?
17         MR. BONDS:  I don't need to give a
18  basis.  I think that you've gone far, far from
19  what we're here on today, which is –
20         MR. MORRIS:  I believe that it's –
21         MR. BONDS:  – specifically –
22         MR. MORRIS:  I'm sorry to interrupt.
23  Go ahead, John.
24         MR. BONDS:  Specifically, it's the
25  TRO and the injunction.

1           J. DONDERO
2      MR. MORRIS:  Correct.  And the TRO
3  specifically – I know Mr. Dondero doesn't know
4  this because he hasn't read the document, but in
5  addition to the things that he mentioned, it also
6  prevents him from interfering with the debtor's
7  business.
8      The debtor is a litigant here.  The
9  debtor has an obligation to provide these
10  documents.  And he interfered with that
11  obligation.
12     Let me ask my questions and you can
13  direct him not to answer every single time if you
14  want, okay?
15         MR. BONDS:  Okay.
16  BY MR. MORRIS:
17     Q. Do you know a woman named Melissa,
18  Mr. Dondero?
19     A. Yes.
20     Q. And who is that?
21     A. She's my personal accountant.
22     Q. Does she work at the Highland
23  offices?
24     A. Yes.
25     Q. Is she employed by the debtor?

1           J. DONDERO
2      A. I believe so.
3      Q. Do you know what her title is?
4      A. No.
5      Q. Do you directly or indirectly
6  control – withdrawn.
7      Do you directly or indirectly own
8  Dugaboy?
9      A. No.
10     Q. Who owns Dugaboy?
11         MR. BONDS:  I'm going to instruct the
12  witness not to answer that question.
13         MR. MORRIS:  Are you going to follow
14  your counselor's advice?
15         THE WITNESS:  Yes.
16  BY MR. MORRIS:
17     Q. Who controls Dugaboy?
18         MR. BONDS:  I'm going to instruct the
19  witness not to answer that question, for the
20  second time.
21         MR. MORRIS:  Are you going to
22  follow – yeah, we'll do this every time, John,
23  just for the record.
24         MR. BONDS:  That's fine.
25         MR. MORRIS:  So I apologize.  I

Page 130

J. DONDERO

1      appreciate, you know, you do your job, I'll do
2      mine.
3          Mr. Dondero, are you going to follow
4      your counsel's advice?
5          THE WITNESS:  Yes.
6      BY MR. MORRIS:
7          Q.  To the best of your knowledge,
8      Dugaboy does not have a shared services agreement
9      with the debtor, correct?
10         You can answer, sir.
11         THE WITNESS:  I'm not answering,
12     right?  I'm not answering any questions on this
13     subject.
14         MR. MORRIS:  Only if your lawyer
15     instructs you to do that, and he hasn't done that
16     for this question.
17         MR. BONDS:  I'm going to instruct the
18     witness not to answer the question.
19         MR. MORRIS:  You're not going to let
20     him answer whether Dugaboy has a shared services
21     agreement with the debtor?
22         MR. BONDS:  I think that you're
23     entitled to that, so Jim, you can answer that
24     question.
25

Page 131

J. DONDERO

1          A.  I -- I don't know.
2      BY MR. MORRIS:
3          Q.  Okay.  Are you familiar with an
4      entity called Get Good?
5          A.  Yes.
6          Q.  Do you directly or indirectly own Get
7      Good?
8          A.  No.
9          Q.  Do you control, directly or
10     indirectly, Get Good?
11         A.  I don't believe so.
12         Q.  Who owns Get Good?
13         MR. BONDS:  I'm going to instruct the
14     witness not to answer the question.
15         MR. MORRIS:  Are you going to follow
16     your counselor's advice?
17         THE WITNESS:  Yes.
18     BY MR. MORRIS:
19         Q.  Who controls Get Good?
20         MR. BONDS:  Instruct the witness not
21     to answer the question.
22         MR. MORRIS:  Are you going to follow
23     your counselor's advice, Mr. Dondero?
24         THE WITNESS:  I'm going to follow his
25

Page 132

J. DONDERO

1      advice, yes.
2      BY MR. MORRIS:
3          Q.  To the best of your knowledge, Get
4      Good does not have a shared services agreement
5      with the debtor, does it?
6          THE WITNESS:  Can I answer that or
7      not answer that one?
8          MR. BONDS:  Yes, you can.
9          A.  I don't know.
10     BY MR. MORRIS:
11         Q.  Did you ever discuss the request by
12     any party to produce the financial statements of
13     Get Good and Dugaboy with Scott Ellington?
14         MR. BONDS:  I'm going to tell you --
15     advise you not to answer the question.
16         MR. MORRIS:  Are you going to follow
17     your counselor's advice?
18         THE WITNESS:  Yes.
19     BY MR. MORRIS:
20         Q.  Did you ever communicate with
21     Mr. Leventon on the subject matter of whether or
22     not the financial statements for Get Good and
23     Dugaboy needed to be produced by the debtor?
24         MR. BONDS:  I'm going to advise the
25

Page 133

J. DONDERO

1      witness not to answer the question.
2          MR. MORRIS:  Are you going to follow
3      your counselor's advice?
4          THE WITNESS:  Yes.
5      BY MR. MORRIS:
6          Q.  Did you ever communicate with anybody
7      at any time who was employed by the debtor
8      regarding the production of the Dugaboy and Get
9      Good financial statements?
10         MR. BONDS:  I'm going to instruct the
11     witness not to answer the question.
12         MR. MORRIS:  Are you going to follow
13     your counselor's advice?
14         THE WITNESS:  Yes.
15     BY MR. MORRIS:
16         Q.  Melissa is Melissa Schroth, right?
17         A.  Yes.
18         Q.  She's an executive accountant
19     employed by the debtor, right?
20         A.  Yes.
21         Q.  And after December 10th, 2020
22     Ms. Schroth told you that a request had been made
23     for the production of the Dugaboy financial
24     statements, correct?
25

Page 134

```
1              J. DONDERO
2         MR. BONDS:  You can answer the
3    question.
4         A.  I don't remember.
5         MR. MORRIS:  Okay.  Can we put up
6    Exhibit 17, please.
7         (Dondero Deposition Exhibit 17
8    marked.)
9         MR. MORRIS:  Can you scroll down a
10   little bit?  I'm sorry.  Scroll up so we can see
11   who this text was sent to.
12   BY MR. MORRIS:
13        Q.  Is that Melissa Schroth?
14        A.  Yes.
15        Q.  And if we scroll back down, do you
16   see that you tell Ms. Schroth on December 16th:
17   No Dugaboy details without a subpoena?
18        A.  Yes.
19        Q.  That's a text that you sent to her on
20   December 16th, correct?
21        A.  I believe so.
22        Q.  What prompted you to send this text?
23        A.  I don't know.
24        Q.  You don't have any recollection as to
25   why you would tell Melissa, quote, no Dugaboy
```

Page 135

```
1              J. DONDERO
2    details without a subpoena?
3         A.  No, but that would -- I mean, I stand
4    behind that response, but I don't remember why.
5         Q.  Do you remember who was asking for
6    the documents?
7         A.  Nope.
8         Q.  Do you remember any discussion with
9    any person at any time concerning the production
10   of the Dugaboy or Get Good financial statements?
11        A.  Nope.
12        Q.  Do you have any objection to the
13   debtor producing the Dugaboy and Get Good
14   financial statements?
15        A.  I'm sorry, say that again?
16        Q.  Would you consent to the debtor's
17   production of the Get Good and Dugaboy financial
18   statements?
19        A.  With a subpoena.  I stand by that
20   statement, yeah.
21        Q.  Okay.  Do you know of any reason why
22   Mr. Ellington and Mr. Leventon would have failed
23   to respond to Mr. Seery's instruction to produce
24   the Dugaboy and Get Good financial statements
25   that were requested by the -- (audio
```

Page 136

```
1              J. DONDERO
2    malfunction) --
3         (Clarification requested by the
4    stenographer.)
5    BY MR. MORRIS:
6         Q.  -- UCC?
7         A.  I don't want to speculate.
8         Q.  Have you heard of the law firm
9    Baker & McKenzie?
10        A.  Yes.
11        Q.  Does that firm or any lawyer at that
12   firm represent you in your individual capacity?
13        A.  No.
14        Q.  Does that firm or any lawyer at that
15   firm represent any entity in which you have a
16   direct or indirect ownership interest?
17        A.  No.  Not that I'm aware of, no.
18        Q.  I'm sorry, one second.
19        Does that firm or any lawyer at that
20   firm represent any entity that you directly or
21   indirectly control?
22        A.  Not that I'm aware of.
23        Q.  Do you recall asking Isaac Leventon
24   for the contact information for the -- for the
25   lawyers at Baker & McKenzie?
```

Page 137

```
1              J. DONDERO
2         A.  I -- I don't -- I don't -- it might
3    have been for part of the shared defense, mutual
4    defense, whatever, agreement, but that's --
5    that's the only reason why I would have asked for
6    it.
7         Q.  Okay.  What's your understanding as
8    to -- (audio malfunction) --
9         (Clarification requested by the
10   stenographer.)
11   BY MR. MORRIS:
12        Q.  -- the parties to that mutual defense
13   agreement that you just referred to, or shared
14   defense?
15        A.  I -- it's what I've testified
16   already, Douglas Draper is coordinating it.
17   I'm -- I'm not sure whether the employees are on
18   it or not, and I'm not sure if there's one
19   employee group or two employee groups, and I'm
20   not sure if one or both of them are part of that
21   agreement or not.
22        But the -- in recent history, my only
23   awareness of Baker McKenzie is with regard to
24   representing the employees.  That's my only
25   awareness of that firm.
```

Page 138

J. DONDERO

1
2     Q.  Have you ever spoken with an attorney
3  at Baker McKenzie?
4     A.  No, I have not.
5       MR. MORRIS:  Okay.  Can you put up
6  Exhibit 18, please.
7       (Dondero Deposition Exhibit 18
8  marked.)
9  BY MR. MORRIS:
10     Q.  That's Mr. Leventon.  Do I have that
11  right?
12     A.  Yes.
13     Q.  And you're communicating with him on
14  or around -- after December 10th, right?
15     A.  Yes.
16     Q.  Okay.  And if you could scroll down a
17  little bit, right there, on December 22nd, you
18  asked Mr. Leventon to send you the Baker &
19  McKenzie contact person, right?
20     A.  Yes.
21     Q.  And if you scroll down a little bit.
22  Did he ever send that to you?
23     A.  I'm sorry?
24     Q.  Did he ever send that to you?
25     A.  I don't know.  I don't remember.

Page 139

J. DONDERO

1
2     Q.  Why did you want the Baker & McKenzie
3  contact information?
4     A.  I was trying to help Draper
5  coordinate the mutual shared defense agreement.
6     Q.  And it was your intent and desire to
7  have the Baker McKenzie firm participate in that
8  agreement, right?
9     A.  No.  I'm not a lawyer.  The
10  appropriateness of who's in that group under what
11  circumstances representing who was a legal
12  decision made by Draper.
13     Q.  So why didn't you just have Draper
14  deal with this?  Why did you deal with it?
15     A.  He was scurrying around, moving
16  quickly, trying to get contact information for
17  potential various different parties.  I was just
18  helping him get the contact information.
19     Q.  And you --
20       MR. BONDS:  I'm going to instruct you
21  not to say anything relating to this as far as
22  what he and Draper discussed.
23  BY MR. MORRIS:
24     Q.  You were aware at the time that you
25  asked for the Baker & McKenzie contact

Page 140

J. DONDERO

1
2  information that Baker & McKenzie was a law firm
3  that -- that employees were considering retaining
4  for their personal interests, right?
5     A.  I knew they were involved with the
6  employees.  Whether -- whether or when they were
7  engaged and by which employee group and -- I
8  don't have details like that.  I never did.
9     Q.  But the one thing that you did know,
10  when you asked for the Baker & McKenzie contact
11  information, is that Baker & McKenzie would be
12  representing some group of Highland employees,
13  correct?
14     A.  Or they might be.  Or they were being
15  interviewed at the time.  I think they weren't
16  formally engaged until later.  I don't know these
17  details and never did.
18       MR. BONDS:  I'm going to instruct the
19  witness --
20       THE WITNESS:  I'm sorry, what?
21       MR. BONDS:  You need to stop.
22       THE WITNESS:  Okay.
23       MR. MORRIS:  Why is that?  Please
24  don't interrupt the witness.  Assert the
25  privilege if you want, direct him not to answer,

Page 141

J. DONDERO

1
2  but don't interrupt his answers.
3  BY MR. MORRIS:
4     Q.  Baker & McKenzie was ultimately
5  retained by some group of the debtor's employees,
6  correct?
7     A.  I believe so.
8     Q.  Do you know how Baker McKenzie got
9  their retainer, their retainer money?
10     A.  No idea.
11     Q.  Do you know -- are you familiar with
12  an entity called Gov Re?
13     A.  Yes.
14     Q.  What's Gov Re?
15     A.  It's a Bermuda-based reinsurance
16  company.
17     Q.  Do you have an ownership interest in
18  Gov Re?
19     A.  I don't know.
20     Q.  Do any -- do any entities in which
21  you have an interest have an ownership interest
22  in Gov Re?
23     A.  I don't know.
24     Q.  Do you know who controls Gov Re?
25     A.  I don't know.

Page 142

J. DONDERO

1
2      Q.  Do you make any decisions on behalf
3  of Gov Re?
4      A.  Not recently.  Not in the last year.
5  In prior years, I think I've helped them with
6  investments and some strategy, but not recently.
7      Q.  Do you know whether Gov Re has made
8  any payment to Baker & McKenzie in the last
9  30 days?
10      A.  I have no idea.
11      Q.  Did you ever have a communication
12  with anybody at any time in the last 30 days as
13  to -- (audio malfunction) --
14          (Clarification requested by the
15  stenographer.)
16  BY MR. MORRIS:
17      Q.  -- as to whether Gov Re would pay
18  money to Baker & McKenzie on behalf of some of
19  the debtor's employees?
20      A.  Nope.  No, I have no idea.  I've
21  never heard the daisy chain you're connecting.
22  I've never heard it before.
23          MR. MORRIS:  Let's take a break.  I
24  might be finished.  The time now is 2:32, or 1:32
25  Central.  Let's just come back sharply at 1:45,

Page 143

J. DONDERO

1
2  or 2:45.
3          THE VIDEOGRAPHER:  1:32 p.m. Central
4  Standard Time.  We're off the record.
5          (Recess taken, 1:32 p.m. to
6  1:50 p.m. CST)
7          THE VIDEOGRAPHER:  1:50 p.m. Central
8  Standard Time.  We're back on the record.
9  BY MR. MORRIS:
10      Q.  I just have a few more minutes here.
11          Going back to Gov Re, Mr. Dondero,
12  are you on the board of that entity?
13      A.  I don't know.
14      Q.  Can you identify any person who sits
15  on that board?
16      A.  No.
17      Q.  Do you know how many people sit on
18  that board?
19      A.  No.
20      Q.  Do you have an understanding as to
21  who makes decisions as to whether or not Gov Re
22  should make -- (audio malfunction) --
23          (Clarification requested by the
24  stenographer.)
25          MR. MORRIS:  Withdrawn.

Page 144

J. DONDERO

1
2  BY MR. MORRIS:
3      Q.  Mr. Dondero, do you know who makes
4  decisions on behalf of Gov Re as to whether or
5  not to make payments on claims?
6      A.  No.
7      Q.  Did you ever participate in any
8  decisions concerning the payment of claims made
9  under a Gov Re policy?
10      A.  Not in five years.  I think I was
11  more involved five years ago, but I don't
12  remember.
13      Q.  So you don't know if you sit on the
14  board of directors, you don't know who makes
15  decisions to pay claims, and you can't identify
16  any members of the board; is that right?
17      A.  Correct.
18      Q.  Okay.  And you don't know if you have
19  an indirect or direct ownership interest in
20  Gov Re; is that right?
21      A.  Correct.
22      Q.  Okay.  You've spent some time over
23  the last months trying to put together a
24  so-called pot plan; is that right?
25      A.  Yes.

Page 145

J. DONDERO

1
2      Q.  Since December 10th, 2020, have you
3  had any communications with any employee of the
4  debtor concerning the pot plan?
5      A.  It's been a struggle to put together
6  a pot plan.  There's been an intentional block of
7  any information, even assets, at Highland, so any
8  pot plan is a stab in the dark for me when I put
9  it forward, relative to current assets and likely
10  outcome.
11          But developing the pot plan has been
12  something I think that's been applauded by the
13  judge; at different times it's been encouraged by
14  creditors, you know.  But the only people -- Dave
15  Klos has helped with creating the model so that
16  the model makes sense and adds up and is
17  distributable.  Dave Klos has been the person
18  that I've accessed throughout the year regarding
19  the pot plan.
20      Q.  And is it fair to say that you've
21  communicated with Mr. Klos about the pot plan
22  since December 10th, 2020?
23      A.  Probably.  You know, to the extent
24  that the pot plan has come up, been considered or
25  distributed, yes.

Page 146

```
1            J. DONDERO
2      Q.  Okay.  Can you identify any other
3   employees of the debtor with whom you've
4   discussed the pot plan with since December 10th,
5   2020?
6      A.  No.
7      Q.  Did you discuss it with
8   Mr. Waterhouse?
9      A.  Mr. Waterhouse is Klos' direct
10  supervisor.  He probably had an awareness of it
11  from those conversations.  I don't recall.  I
12  mean, I don't -- maybe -- I mean, there have
13  been, maybe, peripherally, not significant, I
14  don't think, since the 16th, but I don't recall.
15     Q.  Did you ever get any balance sheets
16  or financial information about MultiStrat from
17  Scott Ellington?
18     A.  No.
19     Q.  Did you ever get any financial
20  information, including balance sheets, concerning
21  MultiStrat, from Isaac Leventon?
22     A.  No.  They -- I wouldn't believe that
23  those guys would have it.  I wouldn't even think
24  to ask them for it.  It wouldn't be -- I don't
25  think it's natural for them to have it.  But no,
```

Page 147

```
1            J. DONDERO
2   I never did, no.
3      MR. MORRIS:  Okay.  I have no further
4   questions, just two points that I'd like to make.
5      John, will you agree on behalf of
6   Mr. Dondero to have him appear at Friday's
7   hearing when the preliminary injunction takes
8   place or do I need to serve a subpoena?
9      MR. BONDS:  No, we haven't made that
10  decision yet.
11     MR. MORRIS:  Okay.  Will you accept a
12  subpoena on behalf of Mr. Dondero?
13     MR. BONDS:  Sure.
14     MR. MORRIS:  Okay.  We'll get that
15  over to you tomorrow.
16     And then lastly, the deposition of
17  Andrew Clubok has been adjourned to a date to be
18  determined.
19     MR. BONDS:  Okay.
20     MR. MORRIS:  Thank you very much,
21  all.
22     MR. BONDS:  Thanks.
23     THE VIDEOGRAPHER:  1:56 p.m. --
24  1:57 p.m. Central Standard Time.  We're off the
25  record.  This concludes the deposition.
```

Page 148

```
1            J. DONDERO
2      (Time noted: 1:57 p.m. CST)
3
4
5
6
7
8      _____
9        JAMES D. DONDERO
10
11  Subscribed and sworn to before me this _____
12  day of _____, 20____.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 149

```
1            C E R T I F I C A T E
2
3
4      I, MICHAEL E. MILLER, FAPR, RDR, CRR,
5   Notary Public in and for the State of Texas, do
6   hereby certify:
7      That JAMES D. DONDERO, the witness
8   whose deposition is hereinbefore set forth, was
9   duly sworn by me and that such deposition is a
10  true record of the testimony given by such
11  witness;
12     That pursuant to FRCP Rule 30,
13  signature of the witness was not requested by the
14  witness or other party before the conclusion of
15  the deposition;
16     I further certify that I am not
17  related to any of the parties to this action by
18  blood or marriage; and that I am in no way
19  interested in the outcome of this matter.
20     IN WITNESS WHEREOF, I have hereunto
21  set my hand on January 5, 2021.
22
23     _____
24  MICHAEL E. MILLER, FAPR, RDR, CRR
25  NOTARY PUBLIC IN AND FOR THE STATE OF TEXAS
```

Page 150

```
1
2    ----------------- I N D E X -----------------
3
4    WITNESS:  JAMES D. DONDERO
5    EXAMINATION:                      PAGE
6    BY MR. MORRIS                     8
7
8
9    ---- LITIGATION SUPPORT INDEX ----   PAGE
10   Instruction Not To Answer         125
11   Instruction Not To Answer         125
12   Instruction Not To Answer         129
13   Instruction Not To Answer         130
14   Instruction Not To Answer         131
15   Instruction Not To Answer         131
16   Instruction Not To Answer         133
17   Instruction Not To Answer         133
18   Instruction Not To Answer         139
19   Instruction Not To Answer         140
20
21
22
23
24
25
```

Page 151

```
1
2    ---- E X H I B I T S ----
3    EXHIBIT                           PAGE
4    Exhibit 1   10/16/20 NexPoint Letter to    31
5              Seery
6    Exhibit 2   11/24/20 NexPoint Letter to    35
7              Seery
8    Exhibit 3   E-mail(s)                 39
9    Exhibit 4   Dondero Text Messages     62
10   Exhibit 5   Request for Production of  67
11             Documents
12   Exhibit 6   Dondero Text Messages with  80
13             Jason Rothstein
14             Dondero_000022
15   Exhibit 7   Dondero Text Messages with Tara  81
16             Loiben
17             Dondero_000013
18   Exhibit 8   Skipped in Series
19   Exhibit 9   Temporary Restraining Order  84
20   Exhibit 10  12/23/20 Pachulski Letter to  85
21             Lynn
22   Exhibit 11  E-mail(s)                 90
23   Exhibit 12  12/24/20 Pachulski Letter to  93
24             Wright
25
```

Page 152

```
1
2    Exhibit 13  12/24/20 Pachulski Letter to   100
3              Wright
4    Exhibit 14  Skipped in Series
5    Exhibit 15  E-mail(s)                 112
6    Exhibit 16  E-mail(s)                 115
7    Exhibit 17  Dondero Text Messages with   134
8              Melissa Schroth
9              Dondero_000014
10   Exhibit 18  Dondero Text Messages with   138
11             Isaac Leventon
12             Dondero_000043
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 153

```
1
2    ERRATA SHEET FOR THE TRANSCRIPT OF:
3    Case Name:      IN RE HIGHLAND/HIGHLAND v. DONDERO
4    Dep. Date:      January 5, 2021
5    Deponent:       JAMES D. DONDERO
6    Pg. Ln.   Now Reads   Should Read   Reason
7    ___ ___   _____   _____   _____
8    ___ ___   _____   _____   _____
9    ___ ___   _____   _____   _____
10   ___ ___   _____   _____   _____
11   ___ ___   _____   _____   _____
12   ___ ___   _____   _____   _____
13   ___ ___   _____   _____   _____
14   ___ ___   _____   _____   _____
15   ___ ___   _____   _____   _____
16   ___ ___   _____   _____   _____
17
18
19           _____
20           Signature of Deponent
21   SUBSCRIBED AND SWORN BEFORE ME
22   THIS _____ DAY OF _____, 20____.
23
24   _____
25   (Notary Public) MY COMMISSION EXPIRES: _____
```

Appx. 01625

**1**

**1** 7:8 30:25 31:2,3 35:5 36:15,24 37:13 44:17

**10** 60:18 85:4,5 87:20 108:23

**10:41** 47:24 48:2

**10th** 12:17 70:15 80:19,24 81:4 84:9 85:16,25 86:16,18 87:3,17 123:16 124:2 133:22 138:14 145:2, 22 146:4

**11** 7:13 90:8,9

**11:16** 48:3,4

**11th** 81:5

**12** 93:22,23

**12:35** 107:24

**12:36** 108:24 109:2

**12:45** 107:25 108:5

**12:49** 109:3,4

**12th** 112:21

**13** 100:5,6

**15** 46:24 47:22 112:15,17

**16** 115:2,3

**16th** 31:18 99:24 111:16 115:9 116:17, 22 117:4 119:2 120:11 134:16,20 146:14

**17** 134:6,7

**18** 138:6,7

**18th** 90:4 91:15 92:14

**19-34054-sgj11** 7:14

**1:30** 108:8,10

**1:32** 142:24 143:3,5

**1:35** 107:22

**1:45** 107:25 142:25

**1:50** 143:6,7

**1:56** 147:23

**1:57** 147:24

**2**

**2** 34:24,25 36:15,25 37:14 44:17

**20** 34:22 108:14

**20-03190-sgj** 7:23

**2020** 9:5 35:10 60:8, 18 69:10,18 70:15 85:16 94:16 133:22 145:2,22 146:5

**2021** 6:4 7:10

**22nd** 88:2 89:23 94:16 138:17

**23rd** 100:12,15

**24** 35:10

**25** 80:3

**27th** 60:24

**2:32** 142:24

**2:45** 143:2

**3**

**3** 38:24 39:2 70:9

**30** 6:22 73:25 80:2 88:16 142:9,12

**300** 76:11

**31st** 9:5 124:21

**35-minute** 108:14

**4**

**4** 62:12,14

**40** 104:18

**5**

**5** 6:4 64:22 67:14,15

**5:26** 62:20,24

**5th** 7:10

**6**

**6** 80:7,9

**6:25** 85:25 87:3

**7**

**7** 81:17,18

**9**

**9** 84:3,5

**9:50** 6:4

**9:52** 7:10

**A**

**a.m.** 6:4 7:10 47:24 48:2,3,4

**ability** 12:12 24:16, 18 26:11

**absolutely** 91:8

**accept** 147:11

**access** 69:8 82:24

**accessed** 145:18

**accommodate** 47:16

**account** 54:3 56:2 75:18 78:11,18

**accountant** 128:21 133:19

**accounts** 56:5

**ACIS** 109:21

**acknowledge** 26:2,9

**acknowledged** 41:3

**acknowledging** 23:20 25:21,23

**Act** 63:5 104:18

**acting** 114:9

**action** 46:5 63:6,23

**actions** 63:22

**active** 111:17

**activities** 63:15

**activity** 46:5

**acts** 101:19 104:7

**acute** 61:2

**acutely** 61:8

**add** 84:23

**addition** 128:5

**address** 39:24 40:3, 4 69:11,12,15,19,20, 22,23,24

**addresses** 39:23

**adds** 145:16

**adhered** 26:6

**adjourned** 147:17

**admissible** 6:20

**admit** 24:7

**advance** 59:13 99:21

**advanced** 99:15,23

**adversary** 7:21 10:7 110:6 126:16

**adverse** 89:17 109:11 110:23

**advice** 92:8 129:14 130:5 131:17,24 132:2,18 133:4,14

**advise** 132:16,25

**advised** 36:23

**Advisers** 63:4

**advisor** 24:14,20,22 25:4 26:7 88:18,20

**advisor's** 26:5

**advisors** 14:14 17:18 18:23 19:5,7,8, 18,22 20:6,7,10,15, 21 22:12,21 23:12 24:10 29:22 35:21 54:18 56:24 58:23 94:9 98:5,10 100:21 102:25 104:20 106:13 107:2 111:24

**Advisors'** 19:24

**advisory** 17:21 18:25

**affect** 12:8

**affirmatively** 24:5 25:21,23

**afield** 125:5

**afternoon** 43:16

**aggressively** 105:25

**agree** 6:24 7:3 17:3 55:3 107:9 110:23 147:5

**agreeing** 23:20

**agreement** 27:4 116:5 117:3,15 118:3,7,11 120:16 122:3 127:7 130:9,22 132:5 137:4,13,21 139:5,8

**agreements** 17:16 27:14 28:7,19 29:12 30:6 101:12

**ahead** 24:3 117:12 127:23

**alert** 36:7 59:16

**allegations** 36:24

**alleged** 15:9,12

**aloud** 89:3

**amalgamation** 97:19

**amounts** 63:19

**analysis** 37:11,15

**Andrew** 147:17

**answering** 130:12, 13

**answers** 141:2

**anticipation** 72:6 74:11 78:21

**anymore** 74:15

**apologize** 19:12 65:11 125:15 129:25

**appearances** 7:17

**appears** 41:21 92:17

**applauded** 145:12

**appropriateness** 139:10

**approval** 9:11

**approved** 95:24

**argue** 25:19

**argument** 99:21,24

**arguments** 99:15 100:2

**articulated** 46:10 50:11 63:11

**Asia** 30:24

**asks** 29:16

**aspect** 13:13 88:25

**Assert** 140:24

**asserted** 124:20

**assertion** 88:14 115:21

**asset** 39:13

**assets** 24:16 39:13 44:7 46:8 50:14 51:25 56:5 63:9 95:12 111:25 145:7,9

**assign** 101:12

**assistant** 68:16 83:19,20

**assistants** 68:10,11

**association** 6:8

**assume** 49:13

**assure** 125:7

**Attached** 94:12

**attention** 79:14 123:9

**attorney** 138:2

**attorney-client** 115:18

**attorneys'** 7:17

**audio** 11:2 16:7 57:6 68:23 82:6 96:7 111:20 116:6 135:25

137:8 142:13 143:22

**authority** 14:3 28:25 34:15

**authorization** 35:25

**authorize** 33:3 35:20 95:16,18

**authorized** 42:6,14 103:18 104:9,14

**Avaya** 89:24 90:15 91:16 92:15

**AVYA** 43:19

**aware** 9:3,13,18 12:7,10,17 13:14 14:17,20,23 17:14 21:13 26:15 27:19,22 35:16 36:2,12 48:9 52:11 53:6 58:24,25 59:11 60:15,25 61:8, 11,14 62:2,4 64:7 67:23 74:17,19 94:19,21 96:5,18,19 98:13 99:13 101:9,11 110:9,18 111:5 124:19 136:17,22 139:24

**awareness** 61:3 113:16 137:23,25 146:10

_____

**B**

**back** 44:11 47:21 48:5,22 54:9,11 83:23 85:12,20 87:19 90:3 100:9 101:13 109:5,14 116:14 122:20 134:15 142:25 143:8,11

**background** 95:4

**bad** 99:8 101:19 104:7

**Baker** 136:9,25 137:23 138:3,18 139:2,7,25 140:2,10, 11 141:4,8 142:8,18

**balance** 146:15,20

**bank** 69:17

**bankruptcy** 7:15 10:7,19 26:5 59:5 95:8 99:16 106:2

**based** 29:20 80:3 88:16 102:12 110:22

**basis** 79:3,8,16,21 88:8,13,25 92:24 127:8,16,18

**basket** 39:23

**beginning** 24:13 88:2 101:13 119:20

**begins** 39:8

**behalf** 9:15 28:5 35:21 56:24,25 58:23 61:12 96:22 98:10 100:21 106:13,18,25 111:20 114:9,10 119:17 142:2,18 144:4 147:5,12

**believed** 95:21

**believes** 33:22

**bell** 90:2 91:15 92:13

**beneficial** 20:5 27:5 28:14,15,18,23 29:11 30:5,10 46:7 50:10 56:3 63:21,24 97:3,9

**benefit** 50:13 73:4 105:21

**Bermuda-based** 141:15

**bit** 41:4 62:17 81:21 82:3 84:12 87:21 90:20 94:17 98:15 99:4 100:18 118:14 134:10 138:17,21

**block** 49:12 145:6

**blocking** 55:22

**board** 13:10 14:13 117:5 143:12,15,18 144:14,16

**bodies** 37:5

**bona** 46:5 89:12

**Bonds** 7:2,20 9:20, 23 10:2,10,16 11:15, 22 13:2 14:5 15:6 16:23 17:10 18:6

21:7 22:24 24:11 25:7 27:16,25 28:8, 21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 51:12 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 67:24 68:10 71:11,20 73:7 75:14 76:4,23 78:5, 12 79:11,18 82:23 86:10 88:10 91:18 92:16 96:14 98:6 99:18 101:2 103:22 105:4,8 106:22 108:6,18 110:2,8 115:12,16 117:16,21 121:13,17,23 122:5,9 123:3,15,19,25 125:4,9,14,21 126:13 127:13,17,21,24 128:15 129:11,18,24 130:18,23 131:14,21 132:9,15,25 133:11 134:2 139:20 140:18, 21 147:9,13,19,22

**bottom** 39:6,8 62:20 90:12,14 115:6 116:14

**bought** 71:25 73:4 74:7 76:21

**breach** 27:4,13 33:22 36:3,6,10 107:7

**breaches** 61:4

**break** 46:19,23 107:23 108:15,17 142:23

**brought** 111:17,19 114:14

**bucket** 40:2

**bunch** 24:17 79:2

**business** 46:8,9,10 50:13 52:19 55:5,25 56:7,14 57:12 58:21 59:20 60:16 63:10 91:3,9 116:2,24 128:7

**businesses** 76:13

_____

**C**

**C-SUITE** 33:25

**calendar** 111:15 112:3

**call** 32:18 47:11 121:21,25 122:7 123:24

**called** 22:7 70:3 111:17 131:5 141:12

**calls** 46:17 48:14 120:20 123:3,15,18 124:5

**canceled** 43:18

**CANTY** 35:3,6

**capabilities** 71:11

**capability** 23:24 24:19 25:16

**capable** 24:23

**capacity** 10:3,6,13, 18 30:3,4 136:12

**Capital** 7:12 8:18 18:22 21:16 22:8 53:15

**capture** 50:18

**care** 15:15 79:5,6

**careful** 62:25

**carefully** 123:11

**cares** 47:18 79:4

**case** 6:23 7:12,13,21 10:19 14:4 40:8 52:22 74:11,12 125:25

**caused** 22:21 24:10

**cease** 106:19 107:2

**ceased** 69:15

**cede** 52:17,18

**Central** 7:10 47:24 107:25 108:8,25 109:5 142:25 143:3,7 147:24

**CEO** 14:21

**cetera** 24:20 99:10

**chain** 142:21

**championed** 95:19

**change** 78:3,6,17

**changed** 78:20 79:10,24

**changing** 77:25

**Chapter** 7:13

**char-** 97:11

**charge** 104:15

**charitable** 97:12

**check** 44:12 121:24

**chief** 33:22,23 34:2, 4,18 37:12,17 53:14 95:19 105:18

**Christmas** 90:24

**circumstances** 104:16 139:11

**circumvented** 29:2

**Civil** 6:22

**claim** 116:3

**claims** 144:5,8,15

**clarification** 11:3 16:9 57:7 68:25 82:7 96:8 111:21 116:7 136:3 137:9 142:14 143:23

**class** 46:5 63:6

**clear** 46:2 56:3 115:22

**CLO** 17:3,9 24:16 25:12 27:13,24 28:7, 19 29:11 30:6 39:12, 13 44:7 51:24 94:23 95:7,11 96:23 97:3, 13,18,24 98:11,20,21 99:14 101:12 102:7, 24 103:21 106:14,21 111:25

**CLO's** 107:16

**CLOS** 16:22 22:22 23:16,21,25 24:9,23 25:17 26:11,16 27:3, 9,23 28:2,6,13,17,20

**compliant** 68:9

**complicated** 77:16

**computer** 82:24

**concerned** 114:24

**concludes** 147:25

**conclusion** 28:23 29:8,17 30:21 34:17, 20

**conduct** 13:16

**conference** 8:19 123:3,14

**conferred** 121:10,18

**confusing** 98:17

**conjunction** 37:20

**connecting** 142:21

**connection** 10:18, 25 11:8 15:3 59:5 64:18 67:25 94:6

**consent** 9:11 42:22 43:5 75:13 76:22 135:16

**consideration** 102:13

**considerations** 103:24

**considered** 30:10, 13 145:24

**consistent** 35:24 50:4

**constrain** 13:15

**contact** 28:16 113:10 117:6 136:24 138:19 139:3,16,18,25 140:10

**contained** 96:6

**contended** 27:3,13

**contention** 25:14 27:20,22 89:13

**context** 31:14

**continued** 36:2

**contract** 27:24 30:17

**contracts** 17:7,15

**closing** 90:2 91:15 92:13

**Clubok** 147:17

**collateralized** 16:18 17:4

**combined** 98:22

**commenced** 110:6

**comment** 36:18

**comments** 50:24

**commercial** 103:11, 12

**commit** 106:17,25

**common** 116:6,9

**communicate** 47:5 132:21 133:7

**communicated** 62:8 145:21

**communicating** 138:13

**communication** 142:11

**communications** 70:10 145:3

**company** 22:2 141:16

**competently** 12:11

**complaint** 110:15

**complete** 71:22 82:25 84:24 124:17

**completed** 70:19

**completeness** 70:25

**complex** 46:12

**compliance** 26:3 33:22,23 34:2,4,8,18, 21 36:4 37:4,12,18 53:14 56:4 61:13 95:20 105:18

24:8,15 25:12 26:3,4, 16,18,24 102:7,25

**control** 10:12 18:20 20:7 97:24 127:5 129:6 131:10 136:21

**controlled** 114:11

**controls** 97:7,13 129:17 131:20 141:24

**conversation** 32:16 52:6 57:5,20 58:15 59:9,17

**conversations** 32:13 73:19 111:6 146:11

**conveyed** 58:12

**convinced** 61:14

**coordinate** 114:9 117:7 119:16 120:3 139:5

**coordinating** 137:16

**coordination** 114:12,16,20

**copy** 12:22 41:20 93:14,18

**correct** 9:19 10:3 13:3 14:18,24 18:5, 11 19:2,19 23:17 27:24 28:20 42:15 48:20 51:8,16 56:22 57:3 66:23 67:6 77:5 87:7,8,15,18 89:24 120:14 128:2 130:10 133:25 134:20 140:13 141:6 144:17, 21

**correctly** 113:11 118:23

**counsel** 8:14 32:17 37:21 47:6 65:2,7,12, 22,24 95:20 100:22 120:3,18,20 121:10, 11,17,18 123:3,15 124:16

**counsel's** 130:5

**counselor's** 129:14 131:17,24 132:18 133:4,14

**counteroffer** 103:3, 5

**couple** 46:17 69:9 74:15 90:3 95:5 112:3 120:22

**court** 6:15 7:15,19 13:18 25:20 48:11 59:16,20,23 94:24 95:8,10 99:16,20 106:2 124:21 125:24

**Court's** 14:3,9 48:15 124:9

**courtroom** 6:21

**COVID-19** 6:10

**Covitz** 39:8,11,12 40:22

**Covitz's** 41:11,20,24

**creating** 145:15

**credit** 74:3

**creditors** 145:14

**CRO** 14:21

**CST** 6:4 48:3 109:3 143:6

**current** 145:9

**custody** 127:5

**D**

**D.C.** 65:6,7,12

**DAF** 44:5 97:6,7,10, 20,24 98:16,22

**daisy** 142:21

**Dallas** 7:16

**dark** 145:8

**date** 7:9 26:19 82:3,4 85:23 86:5 124:6,7 147:17

**dated** 31:17 35:9 94:16

**Dave** 145:14,17

**day** 41:4 48:14,18 54:11 59:14 60:13 100:12

**days** 52:25 69:9 80:2, 3 90:3,23 99:16 142:9,12

**de** 63:19

**deal** 139:14

**debtor** 7:13 8:15 9:3 12:18 15:15 16:7,17, 21 17:6,7 22:23 23:16,20,22,23,24 24:8 25:6,9,11,15,16 26:17 27:4,13,23 28:20 29:12 30:7 38:10 39:14,16 40:11,18 43:19 50:13 53:16 61:13 63:5 66:4,7,10,13,20,23 67:23 70:11 71:25 73:4 74:8 75:5,20,23 76:21 77:5,7,11,17, 20,22,24 78:22 83:17 95:11 96:11 100:2, 22,24 101:11 102:23 103:20 104:11 105:3, 14 106:20 107:3,16, 19,20 110:6,11,19,24 115:25 122:3 127:8 128:8,9,25 130:10,22 132:6,24 133:8,20 135:13 145:4 146:3

**debtor's** 9:7 11:2,9, 13,20 13:20 14:14,21 15:4,13 42:22 43:5 70:3 75:13 76:22 77:21 93:6,12 102:3 109:12,17,20,24 126:22 127:4,10 128:6 135:16 141:5 142:19

**debtors** 9:15

**decade** 66:8

**December** 9:5 12:17 59:5 60:18 70:15 71:24 80:19,24 81:4, 5 84:9 85:16,25 86:16,18 87:3,17 88:2 89:23 91:15 92:14 94:16 99:24 100:12 101:13 111:16 112:21 115:9 116:17,22 119:2 120:11 123:16 124:2, 21 133:22 134:16,20

**138**:14,17 145:2,22 146:4

**decide** 25:20 45:21 60:23 91:23 102:19 124:16

**decided** 72:8,14,21

**decision** 28:25 73:5, 10,20,22,23 102:2,4, 14 139:12 147:10

**decisions** 142:2 143:21 144:4,8,15

**declaration** 15:2,10, 12,22

**declare** 28:6

**default** 23:23 24:18 25:15 26:4 27:23 28:7

**defending** 9:20

**defense** 111:10 114:15 117:3,14 118:3,6,10,11 120:3, 8,16 122:2,3 137:3,4, 12,14 139:5

**defer** 52:16

**definable** 46:9

**delegate** 68:11

**delegated** 68:9 70:20

**delivered** 70:25 124:13,21

**demand** 102:13

**denied** 94:24 99:17

**depend** 52:23

**depo** 9:9

**deposition** 6:13 7:9, 22 9:16 10:22,25 11:8 31:3 34:25 39:2 47:7,19 48:10 62:14 67:15 77:19 80:9 81:18 84:5 85:5 90:9 92:6 93:23 100:6 108:8 112:17 115:3 134:7 138:7 147:16, 25

**describe** 39:25 76:5

**desire** 60:9 63:8 139:6

**desires** 52:16

**desist** 106:19 107:2

**desk** 49:13 52:8 80:20 81:3,10,14 86:6,20 87:3

**destroy** 72:14 76:25

**destroyed** 72:13

**details** 70:17 95:14 106:4,5 134:17 135:2 140:8,17

**determine** 125:24

**determined** 147:18

**developing** 145:11

**differently** 88:23

**difficult** 31:7 123:9

**direct** 18:3 19:17 28:16 97:2 128:13 136:16 140:25 144:19 146:9

**directed** 33:16 38:4 42:15 43:20 45:24

**direction** 23:3 38:15 40:23 90:15 104:25 114:13,23

**directions** 119:21 120:7

**directly** 13:11 54:4 55:16,19 59:25 96:2 106:4 124:15 129:5,7 131:7,10 136:20

**directors** 144:14

**disagree** 88:15,25

**disagreement** 102:6

**disapproval** 60:20

**disbelieve** 86:8

**discernible** 46:9

**discovery** 82:10,15 113:25 114:5

**discuss** 32:5 34:12 105:12 107:18 118:9 132:12 146:7

**discussed** 31:8 111:3 139:22 146:4

**discussing** 112:7

**discussion** 135:8

**dispose** 72:8 73:5 75:2 85:15

**disposed** 72:5,16,18 74:21 75:6 81:8 86:15 87:10

**disposing** 75:9

**dispute** 88:8,13

**dissuaded** 103:10

**distancing** 6:11

**distributable** 145:17

**distributed** 145:25

**District** 7:15

**divided** 120:22

**Division** 7:16

**document** 31:14,22 32:2,3 58:17 64:17 67:14,20,24 70:3,18 83:3,10,18 84:14 87:23 100:19 107:15 128:4

**documents** 31:10, 11 67:25 68:7 69:5 70:21,24 71:9,18 83:7,14 124:19 126:22,25 127:3,11 128:10 135:6

**dollars** 101:21

**dondero** 7:9 8:1,3,10 9:1 10:1 11:1,7 12:1 13:1 14:1 15:1 16:1, 15 17:1 18:1 19:1 20:1 21:1 22:1 23:1,9 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1, 3,6 32:1 33:1 34:1,25 35:1 36:1 37:1 38:1 39:1,2 40:1 41:1 42:1 43:1 44:1 45:1,3 46:1 47:1,2 48:1,7 49:1 50:1 51:1,16 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1,14 63:1

**64**:1 65:1 66:1 67:1, 10,15,19 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1,9 81:1,18 82:1,12 83:1 84:1,5 85:1,5 86:1 87:1 88:1,13 89:1 90:1,9 91:1 92:1,8 93:1,23 94:1 95:1 96:1 97:1 98:1 99:1 100:1,6 101:1 102:1 103:1 104:1 105:1 106:1 107:1,24 108:1,15 109:1,8 110:1 111:1 112:1,17 113:1,24 114:1 115:1,3,18,23 116:1, 10,11 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1,19 127:1 128:1,3,18 129:1 130:1,4 131:1,24 132:1 133:1 134:1,7 135:1 136:1 137:1 138:1,7 139:1 140:1 141:1 142:1 143:1,11 144:1,3 145:1 146:1 147:1,6,12

**Dondero's** 115:24 127:11

**dormant** 69:25

**Douglas** 114:14 115:17 117:2 137:16

**dozen** 126:24

**drafting** 118:2,6

**drafts** 122:8

**Draper** 114:14 115:8, 13,17 116:17,22 117:2 118:12 137:16 139:4,12,13,23

**draw** 28:22

**drawer** 80:20

**drew** 34:18

**drove** 36:4

**drugs** 12:4

**due** 6:10 99:19

Index: Dugaboy..Friday

**Dugaboy** 125:2,13, 19,23 126:5,11,15,20 127:7 129:8,10,17 130:9,21 132:14,24 133:9,24 134:17,25 135:10,13,17,24

**duly** 8:4

**Dustin** 59:2,8,14,15

**E**

**e-mail** 39:5,8,23 40:3,4,22 41:2,4,11, 19,20,24 42:5,18,23 43:6,23 45:6,12 48:25 50:4 51:9,17 52:2 53:9,11 58:17 60:21 61:10,15 69:8, 11,12,14,16,19,23 85:18 90:14 114:5 115:8 118:25 119:7, 25 120:10 124:8

**e-mails** 40:2 45:8 52:4 64:14 89:9 107:13 117:6

**earlier** 64:3,25 65:19 84:17 99:16 123:21

**early** 71:24

**Eastern** 107:25

**economic** 18:4 19:18 97:3

**effectuate** 53:3,7 55:22 57:13 60:10

**Ellington** 47:4 60:5 65:18,21 66:3,9,22 67:7 74:7 78:3,9,17, 25 79:9,23 83:2,5 111:4 112:8,11 113:8 114:8,17 115:23,24 116:10 117:9 118:2, 18 119:2,8,15 120:10,15,23,25 122:22 123:2,12,14, 19,24 126:24 127:9 132:14 135:22 146:17

**Ellington's** 74:9 122:15 123:6

**Ellis** 9:23 10:2,10,17 67:24 68:10 71:12

**employed** 39:15 66:3,7 68:19 70:11 83:17 128:25 133:8, 20

**employee** 39:15,16 47:4,10 77:4,7,9 107:14,19 120:22 121:3,5,8,11,19 122:4 123:8 137:19 140:7 145:3

**employees** 13:12 25:24 40:18 47:15 68:10 76:14 79:23 89:22 92:25 93:5,10, 15,18 116:25 137:17, 24 140:3,6,12 141:5 142:19 146:3

**employees'** 120:18, 20

**employer** 66:10,13, 23

**encourage** 105:24

**encouraged** 95:19 96:3 145:13

**encouraging** 104:14

**end** 16:12 24:13 54:11 69:10 70:15 91:21 92:5 126:19

**ended** 114:22

**engaged** 117:8 140:7,16

**engaging** 103:8

**enlarge** 90:19

**enter** 9:8

**entered** 13:19 14:10 15:19 111:2 113:14 114:18

**entirety** 58:11

**entities** 20:17 94:22 95:6 99:14,25 103:19 106:18 114:10 119:17 126:6 141:20

**entitled** 115:20 130:24

**entity** 10:11 18:20 20:8 22:7 39:15 65:13 98:22 131:5 136:15,20 141:12 143:12

**entry** 16:6

**equity** 40:15 41:12, 15,17,24

**error** 89:20

**estate** 74:14 101:25

**ethic** 71:10

**events** 16:5

**exact** 21:23 117:11

**EXAMINATION** 8:7

**exchange** 107:13

**execs** 79:2

**execute** 42:5,19,23 61:17 93:2

**executed** 43:20

**executing** 43:10 45:23

**executive** 76:8 133:19

**executives** 34:2 72:25 78:20 104:15 105:17,18

**exhibit** 30:25 31:2,3 34:24,25 35:5 36:15, 24,25 37:13,14 38:24 39:2 44:17 48:22 62:12,14 64:22 67:14,15 80:7,9 81:17,18 84:3,5 85:4, 5 87:20 90:8,9 93:22, 23 94:13 100:5,6,9 112:15,17 115:2,3 134:6,7 138:6,7

**exhibits** 44:10,16

**experience** 88:16

**expertise** 121:8

**explain** 58:20

**explanation** 51:23 57:12

**explicit** 9:10

**expressed** 52:9 60:20 63:8

**extent** 21:7 22:24 31:12 145:23

**external** 37:21

**extort** 102:8

**extra** 61:6

**eyes** 90:18

**F**

**face** 89:20

**faced** 61:18

**facilitation** 102:10

**fact** 38:12 92:21

**facts** 56:11,14 66:18, 21

**factual** 29:20

**failed** 135:22

**fair** 18:20 19:5,9 20:7 33:10 34:19 35:18 40:21 67:5 86:14 98:25 109:10 113:24 145:20

**familiar** 17:19 18:23 22:7 31:21,23 131:4 141:11

**fashion** 26:9

**February** 91:2

**Federal** 6:22

**feel** 61:9

**fees** 101:21,24

**fide** 46:5 89:12

**figure** 49:25 50:22

**file** 109:18

**filed** 94:23 96:20 110:15

**filing** 95:16,18

**financial** 33:24 125:2,13,20 126:12, 21 132:13,23 133:10, 24 135:10,14,17,24 146:16,19

**financials** 126:5

**find** 94:13

**fine** 47:2,13 80:6 129:24

**finished** 19:13 142:24

**firm** 9:23 10:5,10,17 17:19,21 18:23,25 19:4 67:24 71:2 111:20 116:2 124:13 136:8,11,12,14,15, 19,20 137:25 139:7 140:2

**firms** 10:2

**fit** 103:2

**follow** 129:13,22 130:4 131:16,23,25 132:17 133:3,13

**form** 11:15,22 13:2 14:5 15:6 16:23 17:10 18:6 24:11 25:7 26:8 27:16,25 28:8,21 29:14,24 30:8,18 32:9,21 34:9 35:23 36:16 37:2 38:17,22 42:7 43:7 44:18 45:25 49:17 50:7 52:3,21 54:15 55:2,23 56:17 57:14 60:19 66:24 71:20 73:7 75:14 76:4,23 78:5,12 79:11 91:18 92:16 96:15 98:6 99:18 101:2 103:22 106:22 110:2,8

**formal** 102:17

**formally** 48:16 140:16

**forming** 120:7

**forward** 51:2 103:11 108:19 118:18 145:9

**forwarded** 120:10

**forwards** 92:22 115:23

**found** 26:12

**frames** 117:11

**Friday** 90:4 91:15

92:14

**Friday's** 147:6

**front** 91:7

**full** 31:14 69:7 87:25

**fully** 117:8

**functional** 117:9

**functioning** 114:15

**fund** 18:22 19:4,7,18,
21,24 20:6,7,10,15,
21,23 21:2,5,12,17,
20,21 22:3,4,11,15,
18 46:12 103:20
104:12 107:16

**fundamental** 103:9

**funds** 20:11,18,20
21:10 22:21 23:13,15
24:10 29:21 35:21
41:17 49:14 50:12
56:25 58:23 63:5
94:7 98:5,10 100:22
104:23 106:13 107:2
111:24

**future** 101:24

**fuzzy** 90:18

**G**

**garbage** 72:19,22
74:2 76:21 80:16,25
81:11,14 86:15

**Gatekeeper** 39:24
40:5,14

**gatekeeper@
hcmlp.com** 39:18

**Gates** 32:14,17 58:20
94:4,5,14,15 95:7
98:11 100:12,21
106:9,14 111:19
112:5

**gave** 21:25 35:25
42:4,12 58:5 69:8
82:22

**general** 13:7 14:14
18:13,17 19:24 46:14
52:23 65:22 71:3
82:21 95:20

**generally** 18:21
31:23 32:10 33:6
40:15 44:19,23,24
67:19 82:20 92:9
103:17

**gentlemen** 6:7

**girls** 83:23

**give** 24:9 30:21 35:6,
24 41:22 51:23 69:4,
6 75:23 82:18 92:7
101:18 104:25
122:11 126:14
127:17

**giving** 40:22

**Gmail** 69:22,24

**go-between** 60:5
111:7

**good** 6:6 8:10 23:22
24:22 26:10 125:3,
13,19 126:11 127:8,
16 131:5,8,11,13,20
132:5,14,23 133:10
135:10,13,17,24

**gotcha** 31:9

**Gov** 141:12,14,18,22,
24 142:3,7,17
143:11,21 144:4,9,20

**Grant** 97:8

**group** 120:19,22
121:2 123:8 137:19
139:10 140:7,12
141:5

**groups** 120:23,24
121:3,5,9,12,19
137:19

**guess** 65:25 72:12
87:20 111:17

**guided** 108:16

**guiding** 23:5

**guy** 50:21

**guys** 46:16 82:23
108:23 146:23

**H**

**half** 24:5 126:24

**handles** 78:14

**handling** 47:11

**hands** 127:12

**happen** 49:20

**happened** 72:4
87:17 99:9

**happening** 50:2
90:17

**happy** 32:7 46:22
116:12

**Harbourvest** 97:6,
20 98:17 109:24

**hard** 49:22 105:20

**HCLOF** 98:18

**HCMFA** 89:22 92:25
93:5,11,15,19

**HCMLP** 69:11

**head** 63:14 101:18

**hear** 8:11 20:14 48:7
105:9 108:2 109:7
125:14

**heard** 7:5 68:5 136:8
142:21,22

**hearing** 11:13,20
13:20,22,25 144:7:7

**held** 13:19 39:24
40:23 41:17 53:18

**helped** 142:5 145:15

**helpful** 32:8

**helping** 114:8 139:18

**HFAM** 44:5 54:20

**High-** 39:14

**Highland** 7:12 8:18
9:16 10:7 13:11
18:22 20:21 21:2,5
44:6 47:3,10,14
53:15 65:22 68:21
69:11,19 76:9,12
79:23 102:11 116:25
128:22 140:12 145:7

**Highland's** 76:10

**highlight** 49:23

**historic** 72:10

**historically** 40:6
46:6 65:23 72:9

**history** 137:22

**hitting** 49:12

**hold** 21:4 22:6,17
50:19 88:4 91:19

**Holdco** 94:23 95:7
96:23 97:3,13,18,24
98:11,20,21 99:14
106:14

**holders** 27:5 46:7
50:10

**holding** 22:2 104:6

**hundred** 54:21

**Hunter** 39:8,12 41:23
52:8

**I**

**idea** 32:19,22,23
55:10,14 91:7 114:6
124:23 127:16
141:10 142:10,20

**ideally** 46:20

**identify** 143:14
144:15 146:2

**illegal** 99:8 107:6

**impede** 93:6,11

**implicit** 34:17,20

**Implicitly** 9:9

**implies** 24:22 89:10

**important** 59:19
62:7

**impose** 95:11

**inaccurate** 89:6

**inadvertently** 49:25

**inappropriate** 52:12
61:24,25 63:16 99:9,
21 101:19 102:18
103:10 107:5

**inches** 16:12,13

**included** 40:4 61:14

**including** 47:4
146:20

**Income** 20:21 21:2,5

**incredibly** 63:16

**indemnities** 61:7

**independent** 13:10

**independently** 62:3

**indirect** 18:3 19:17
97:2 136:16 144:19

**indirectly** 55:18
129:5,7 131:7,11
136:21

**individual** 10:3,6,13,
18 56:5 136:12

**individually** 120:25

**individuals** 46:13

**inferred** 26:13

**information** 117:6
136:24 139:3,16,18
140:2,11 145:7
146:16,20

**informed** 37:4 38:11,
13 90:4

**initiate** 103:19
104:11 105:2,13
106:20

**initiating** 100:23

**injunction** 11:10,14,
21 60:3 68:2 84:25
127:25 147:7

**injunctive** 110:16

**input** 54:10

**institutions** 33:24

**instruct** 93:5,10 98:4
106:7,9 125:9,17
127:13 129:11,18
130:18 131:14,21
133:11 139:20
140:18

**instructed** 41:25
44:6 56:23 89:22
92:25 98:11 106:14
127:3

**instructing** 9:4

42:18,22 43:5

**instruction** 41:23
42:4,13 135:23

**instructions** 44:9
49:7,10 68:23 69:4
82:18,21 89:8,15

**instructs** 130:16

**insurance** 61:6

**intend** 11:12,19,20
61:16 108:9

**intended** 45:15

**intent** 50:5,8 51:21
139:6

**intentional** 145:6

**interest** 10:12 18:4
19:18 52:9 88:19
97:22,24 107:8
116:3,9 118:3 119:18
136:16 141:17,21
144:19

**interested** 29:4

**interests** 46:7 50:9
61:5 63:7 89:18
105:23 109:11
110:23 111:11
114:20 116:24 140:4

**interfere** 93:6,11

**interfered** 128:10

**interference** 54:25

**interfering** 128:6

**intermediate** 29:3

**internal** 32:17 65:2,
7,12

**interrupt** 24:2 91:20
127:22 140:24 141:2

**interruption** 41:7

**intervene** 71:12

**intervened** 38:20

**interviewed** 140:15

**invest** 22:22 24:10

**invested** 23:15

**investigated** 36:9

**investment** 20:11,
17,20 24:24 25:22
88:18,20 97:19

**investments** 29:22
142:6

**investors** 50:9,10
52:9,16,20 61:5 63:7
88:19 89:18 101:7
102:9 104:16,17
105:21,23 107:8

**involved** 46:13 71:21
75:8 102:16 104:13
106:4,5 117:10
124:16 140:5 144:11

**involvement** 121:7

**Isaac** 118:5 136:23
146:21

**issue** 107:15 119:24

**issued** 49:11 93:4

**issues** 91:6

---

**J**

**J.P.** 112:12 113:9

**James** 7:9 8:3 14:13

**January** 6:4 7:10
14:18 77:7 91:2

**Jason** 34:5 75:8
78:13 80:12 105:19

**Jason's** 86:22

**Jefferies** 54:4,8,11

**jeopardy** 63:6

**Jerome** 47:10 50:20,
21 51:4

**Jim** 24:24 49:14
67:10 80:5 115:18
117:22 127:2 130:24

**job** 124:18 130:2

**Joe** 40:16,20 52:7
54:10,12 57:18

**John** 8:13 9:20 23:2
35:3 108:7 121:21
125:16 126:17
127:23 129:22 147:5

**joint** 114:15 116:18,
23 117:20 118:3,6,10
119:14 120:15 122:2

**Jones** 8:14

**judge** 91:7,23,25
145:13

**judgment** 52:19

**July** 14:24

**juncture** 45:17 104:2

**justification** 56:14
58:16 60:17

---

**K**

**K&I** 32:14,17 58:20
94:4,5,14,15 95:7
98:11 100:12,21
106:9,14 111:19
112:5

**keeping** 76:10

**Kelly** 83:20,24

**key** 26:6

**kind** 39:23

**Klos** 145:15,17,21

**Klos'** 146:9

**knew** 33:9 35:17
42:13 75:9,10 99:10
125:19 140:5

**knowing** 56:5

**knowledge** 26:19,25
27:12 28:16 36:21
55:20 56:13 64:6
76:22 93:9 98:9
106:12 130:8 132:4

---

**L**

**La** 30:24

**label** 73:10

**ladies** 6:7

**largest** 97:21,23

**lastly** 147:16

**late** 46:18 108:14

**law** 10:5 136:8 140:2

**lawsuit** 110:14

**lawsuits** 63:6

**lawyer** 26:22 67:8
92:4 115:13,25
123:19,25 130:15
136:11,14,19 139:9

**lawyers** 9:4 25:20
68:5 70:25 71:11
114:9 116:23 119:16
136:25

**leadership** 114:8,19
118:22 119:4,9,23
120:2,12 122:17,23

**learn** 54:6 68:4

**learned** 32:2 38:8,20
52:25 91:14 92:13

**learning** 33:15 38:3

**leave** 76:14 98:24
108:15

**led** 16:6

**left** 76:8 80:19 81:3

**legal** 6:8 28:22 29:7,
16 30:21 37:18 92:8
103:24 117:18
139:11

**legally** 104:4

**legwork** 83:24

**length** 55:24

**letter** 9:4 31:17 32:6,
14 33:4,7,9,13,16,17
34:7,13 35:8,13,15,
20 36:4 37:25 38:3,5
85:8 94:3,12,14,15,
18,20 95:6 96:22
98:5,12 99:5 100:11,
15 103:16,19 104:10
106:10,15,18

**letters** 44:24,25
58:22 95:22,25 96:6,
18 103:8

**level** 98:23

**Leventon** 47:5 83:9,
12 118:5 126:25
127:9 132:22 135:22
136:23 138:10,18

146:21

**liability** 33:25 44:8
45:13,20,22 46:3,12,
14 61:3,19 105:19

**liar** 86:23

**lift** 26:23

**lights** 50:23

**limited** 70:14

**limits** 106:2

**liquidation** 74:12

**liquidity** 90:23

**list** 113:16 119:14

**listed** 35:22

**listen** 13:22 46:17
91:12 123:11

**litigant** 128:8

**litigation** 103:8
111:3 114:20

**lived** 34:22

**loan** 16:18

**loaning** 17:4

**located** 8:16

**logged** 69:25

**logical** 105:16

**Loiben** 68:13,14,15

**long** 46:23 53:18,20

**longer** 77:4

**looked** 44:11,16
85:18

**lot** 16:3 63:25 99:12

**loud** 44:4 62:24

**LP** 7:13 17:18 18:23

**ludicrous** 76:15

**lunch** 83:23

**Lynn** 112:21,25
113:3 115:18 118:14

---

**M**

**made** 29:22 36:13

55:11 56:3 64:25
73:5 88:14 95:7
101:11 102:2,4,14
126:23 133:23
139:12 142:7 144:8
147:9

**majority** 123:7

**make** 11:19 46:18
55:15 56:15 57:2
59:16 71:14,18 76:17
84:23 91:25 102:20
103:2 115:20 142:2
143:22 144:5 147:4

**makes** 91:8 143:21
144:3,14 145:16

**making** 52:19

**malfunction** 11:2
16:8 57:6 68:24 82:6
96:7 111:20 116:6
136:2 137:8 142:16
143:22

**malicious** 63:17

**man** 26:6

**manage** 16:21 17:8
20:11,17,21 23:13,25
24:9,16 25:17 26:11

**managed** 22:12,22
23:16 38:10

**management** 7:13
18:22 28:7,19 29:12
30:6 93:7,12 101:12,
24 102:24

**Management's** 8:18

**manager** 16:18
20:25 21:6,10,13,15,
25 22:4,16,19 29:21
36:8 46:12 52:14
54:2 100:24 102:7,8
103:20 104:5,6,12,22
105:14 106:21 107:4,
16,20

**manager's** 56:4

**manages** 23:21
39:12

**managing** 24:23

**manifested** 95:22

**manner** 87:10

**marked** 31:4 35:2
39:3 62:15 67:16
80:10 81:19 84:6
85:6 90:10 93:24
100:7 112:18 115:4
134:8 138:8

**market** 102:13

**markets** 90:23

**Matt** 40:13,20 45:17,
19

**matter** 29:20 41:12
59:6 64:18 94:6
132:22

**matters** 36:14 37:13

**Mckenzie** 136:9,25
137:23 138:3,19
139:2,7,25 140:2,10,
11 141:4,8 142:8,18

**means** 89:11

**meant** 49:13

**Media** 7:8

**medication** 12:5

**meeting** 116:18,23
119:14

**meetings** 48:13

**Melissa** 128:17
133:17 134:13,25

**member** 14:13

**members** 144:16

**memorandum**
37:11

**memory** 12:8 113:22

**mentioned** 49:14
64:25 65:18 117:14
128:5

**message** 45:16 62:9
81:23 82:11 126:18

**messages** 70:4
74:20

**microphone** 16:12

**mid** 77:9

**middle** 119:20 120:6

**Mike** 6:15 115:17

**Miller** 6:15

**million** 101:21

**mind** 124:6

**mine** 116:12 130:3

**minimis** 63:19

**minimization** 57:24

**minutes** 46:18,19,24
47:22 108:4,14,23
143:10

**missed** 20:12 43:2

**misunderstood**
51:21

**model** 145:15,16

**moment** 85:2 126:18

**money** 141:9 142:18

**month** 70:16 102:23
103:7

**months** 65:25 66:2
144:23

**morning** 6:6 8:10,16
9:8,12 64:25 113:10

**Morris** 6:25 7:3,5 8:9,
13 11:5,6,16,18,24
13:4 14:7 15:8 16:14,
16,24 17:2,11,13
18:7,9 21:11 23:2,11
24:12 25:2,8 27:18
28:3,10 29:6,9,15,18
30:2,11,14,22,24
31:5 32:11 33:2
34:11,23 35:4,7 36:5,
19 37:7 38:18,24
39:4 41:8,10 42:10,
11 43:8 44:20 46:22,
25 47:13,20,23 48:6,
21,24 49:18 50:15,22
51:2,5,7,14,15 52:13,
24 54:16,17 55:7
56:9,12,19 57:9,16
60:22 62:12,16,18
64:21,23 67:3,13,17
69:3 71:23 73:11
75:16 76:16 77:3
78:7,16 79:15,20
80:7,11 81:16,20,22
82:9 84:3,7 85:3,7,
20,22,24 86:12,13
88:12,21 90:7,11,13

91:11,13,23 92:7,11,
18 93:21 94:2 96:10,
21 98:8 99:22 100:4,
8,10 101:8 104:8
105:6,10,11 106:24
107:22 108:4,11,20
109:6 110:5,10
111:23 112:15,19
114:25 115:5,7,14,20
116:9,16 117:19,23,
24 121:15,16,21,25
122:7,11,13 125:6,
11,15 126:2,9,17
127:15,20,22 128:2,
16 129:13,16,21,25
130:7,15,20 131:3,
16,19,23 132:3,11,
17,20 133:3,6,13,16
134:5,9,12 136:5
137:11 138:5,9
139:23 140:23 141:3
142:16,23 143:9,25
144:2 147:3,11,14,20

**motion** 11:2,9,13
15:4,13,23 67:25
94:24 95:8,17 96:19
99:17 111:16,18,19
112:10

**motions** 96:19
111:15 112:3,9,13

**mouth** 16:13

**move** 29:6 30:11
56:9 74:13 80:2
91:11 105:24

**moving** 56:4 104:5
105:22 139:15

**multipage** 37:15

**Multistrat** 146:16,21

**mutual** 117:3,14
118:3,6,10 120:7,16
122:3 137:3,12 139:5

---

**N**

**nail** 85:13

**named** 128:17

**natural** 146:25

**necessarily** 37:3

**necessity** 32:24

**needed** 114:12,18
132:24

**Nexpoint** 17:18,25
18:4,10,19 19:8 20:3,
10,16 21:16 22:3,7,
10,18 31:18 32:5
33:16 35:9 36:13,22
38:4 65:14 77:13
101:13

**Nexpoint's** 18:13,16

**NHF** 21:21 22:13

**nonfinancial** 29:3

**nonfinancially** 29:3

**noninvestment**
53:25

**nonportfolio** 54:2

**nonsensical** 59:21

**nontrader** 54:2

**normal** 103:11

**Norris** 59:2,8

**Northern** 7:15

**noted** 7:18

**notice** 75:23 80:4
108:7

**notification** 36:12

**notwithstanding**
48:15

**November** 35:10
60:8,24

**NPA** 89:22 92:25
93:5,10,15,18

**number** 75:17 76:9,
11,14 77:25 78:4,6,
10,18 126:10

**numbers** 20:4 79:10,
24

**numerous** 78:20

**nuts** 107:9

**nutty** 90:21 107:10

**O**

oath 12:14

object 33:12,14
109:23 115:12
126:13

objected 96:14
109:20

objection 11:15,22
13:2 14:5 15:6 16:23
17:10 18:6 23:3
24:11 25:7 27:16,25
28:8,21 29:14,24
30:8,18 32:9,21 34:9
35:23 36:16 37:2
38:17,22 42:7 43:7
44:18 45:25 49:17
50:7 52:3,21 54:15
55:2,23 56:17 57:14
60:19 66:24 71:20
73:7 75:14 76:4,23
78:5,12 79:11 91:18
92:16 98:6 99:18
101:2 103:22 106:22
110:2,8 117:16 125:4
135:12

obligation 16:19
36:7 127:10 128:9,11

obligations 17:4
104:18

obstructed 127:10

obtained 12:18
110:11

occur 75:12

occurred 124:6

October 31:18 77:9
109:15

offer 101:12 102:3,5,
15,18,20

office 69:9

officer 33:22,24 34:3,
4,19 37:12,18 53:14
61:13 95:20 105:18

offices 9:11,16
110:20 128:23

operate 26:3 88:17

operating 56:7 62:3

opinion 59:22 61:25

Opportunities 22:11

opportunity 22:18
102:24

opposed 109:17

opposition 15:22
16:4

order 12:18,22,24
13:6,9,14,19 14:10
15:4,19 26:24 31:14
39:7 48:11,15 49:11
69:5 84:9,18,23
124:9

orders 49:12 61:17

ordinary 111:18

organizations 97:12

original 41:20

outcome 145:10

outstanding 89:19

overrule 34:2

oversee 68:6

owned 38:9,14
114:10

owner 30:10 97:3,9

owners 20:6 28:14,
15,18,23 29:11 30:5
56:3 63:21,24

ownership 10:12
18:4 19:18 74:13
97:21,23 136:16
141:17,21 144:19

owns 18:16 129:10
131:13

**P**

p.m. 62:20 85:25 87:3
108:24 109:2,3,4
143:3,5,6,7 147:23,
24

Pachulski 8:14
101:21

paid 71:25 73:4 74:8

76:21 77:11,12
101:24

paragraph 87:25
88:7,9,14,16 89:2

part 23:19 43:2 59:22
69:9 72:5 120:19,23
121:2 137:3,20

participate 9:15
11:12 118:2,5 123:2,
18 139:7 144:7

participated 123:14

participating 123:24

parties 6:18 24:14
26:17 28:19 29:11
30:6,16 104:10 106:7
107:14 126:11
137:12 139:17

partner 14:14 18:14,
17 19:25

party 17:7 24:8,15
29:4 120:15,17 122:4
132:13

past 102:23

pause 7:4 95:10,11
111:25

pay 74:15 79:14
142:17 144:15

payment 101:23
142:8 144:8

payments 144:5

Pearson 40:13,14,17
41:3 43:15 45:18,19,
22

pending 6:23

people 28:24 42:4
76:12 79:9 105:22
107:11 143:17
145:14

people's 117:5

percent 54:21

perfectly 46:25 80:6

performance 88:19

period 70:14 76:10

peripherally 146:13

permanent 110:16

permission 9:7
75:21 77:22

person 70:10 83:21
135:9 138:19 143:14
145:17

personal 33:24
45:20 46:3 55:20
61:3,18 67:8 69:23
75:18 78:10,18
105:19 109:11
110:23 111:11
115:24 128:21 140:4

personally 12:21
17:15 38:20 67:11
71:15,17,21 126:23

petition 26:19

phone 8:25 32:18
60:9,16 69:8 71:24
72:4,6,11 73:3,5,14,
21 74:7,9,10,13,21,
24 75:3,4,6,9,10,17
76:9,11,14,19,20
77:11,12,18,21,25
78:4,6,10,15,18,21
79:10,24 80:15,20
81:10,13 82:24
85:13,15 86:5,15
87:2,10 123:24

phone's 81:7

phones 72:10,11,24
73:24 77:2 80:2

picking 60:8,15

piece 119:5,6

place 48:10 147:8

plan 74:13 109:17
144:24 145:4,6,8,11,
19,21,24 146:4

planned 108:9

play 83:5,12

playing 31:9

point 20:12 36:18
63:18 125:24

points 13:17 147:4

policy 144:9

portfolio 16:17 20:25

21:5,10,13,15,24
22:4,16,19 29:21
36:8 52:14 100:24
104:22 105:14 107:4,
20

portion 45:12

position 36:18 40:11
53:19 102:12 103:23
116:12 125:7

possession 126:22
127:4

possibilities 97:17

post 34:5,6,12
105:19 124:7

post-restructured
41:16

pot 144:24 145:4,6,8,
11,19,21,24 146:4

potential 44:7 45:13,
22 46:3,11,14 139:17

potentially 72:7

power 33:19 105:7

practice 6:11

preferred 89:14

preliminary 11:9,13,
21 68:2 110:16 147:7

premises 9:5,8

prepared 37:11

prerequisites 103:9

present 101:23

president 18:10,19
19:21 20:6 29:21
104:19

pressing 99:25

prevent 12:11 49:25
50:5,8

prevented 60:8,15
103:7

prevents 128:6

primarily 39:13
68:13 123:6

primary 32:16 97:21

**print** 71:4

**prior** 60:17 94:23
104:7 124:6 142:5

**privilege** 116:11
124:20 140:25

**privileged** 115:19
124:17

**problem** 23:18 43:3

**procedure** 6:22
75:11

**proceed** 7:6 41:9

**proceeding** 7:21
10:8 110:7 126:16

**process** 73:9,23
76:25 100:23 103:19
104:11 105:2,13
106:20 124:15

**produce** 113:21
124:8,24 126:20
132:13 135:23

**produced** 70:22,23
71:8,19 114:4 115:17
124:23 132:24

**producing** 83:6,13
135:13

**production** 70:4,19
83:3,10,18 121:22
122:2 124:12 133:9,
24 135:9,17

**professional** 24:24
25:22 53:25

**prohibition** 101:9

**promise** 47:8

**prompted** 134:22

**prosecution** 111:10

**protect** 101:6

**protocol** 73:9

**provide** 24:16 93:14
102:11 114:19
118:22 119:9 120:12
122:17,23 127:3,11
128:9

**provided** 57:12
93:17 102:23 116:4

**providing** 120:2

**provisions** 26:6

**purpose** 46:8,9,10
50:13 55:5,25 56:7
91:3,9

**pursuant** 26:16
40:22 48:10 116:4

**push** 64:2

**pushed** 95:19

**pushing** 91:4 105:20

**put** 30:25 31:11 34:23
38:24 62:12 64:21
80:7 81:16 84:3 85:3
90:7 92:4 93:21
100:4 103:12 112:15
114:25 117:3 134:5
138:5 144:23 145:5,8

**putting** 63:5 103:10

---

**Q**

**question** 19:14
20:13 23:8,18 24:6
27:11 28:12 42:9
46:20 51:13 65:9
74:18 79:19 86:11
88:11 89:5 91:10,12
92:12 94:25 98:2
105:5,9 114:2,24
116:20 121:14
123:11 125:10,18,22
126:3 127:14 129:12,
19 130:17,19,25
131:15,22 132:16
133:2,12 134:3

**questions** 28:13
48:19 58:9 70:23
79:7 84:20 116:13
128:12 130:13 147:4

**quickly** 104:6 139:16

**quote** 45:12 49:12
53:22 134:25

---

**R**

**rarely** 60:2,3

**rationale** 50:17
56:15 57:12 58:4,21

59:20

**reach** 117:5

**read** 12:21 13:24
14:9 31:13 44:3
49:22 62:23 70:17
84:16 85:11 88:3,7,
10 89:2 99:6 113:11
118:23 128:4

**realizes** 90:22

**reason** 10:16 14:8
63:10 66:18,21 67:4
86:8,25 87:5 90:25
102:22 135:21 137:5

**reasonable** 103:11,
12

**reasons** 52:5 63:3,
11,12 91:6

**recall** 13:18 15:25
16:4 31:25 45:4
58:18,19 65:3 79:13
82:5,11 89:12 90:6
100:14,16,20 107:17,
21 114:4,7 116:21
122:25 123:5,22
124:3,4,7 136:23
146:11,14

**receive** 41:19

**received** 85:11

**recent** 137:22

**recently** 123:22
126:7,8 142:4,6

**recess** 48:2 109:2
143:5

**recipient** 45:15

**recipients** 41:23
42:18,23 43:6

**recollection** 53:19
98:15 113:23 119:15
120:9 123:23 134:24

**record** 6:13 7:18
47:3,25 48:5 50:25
84:24 91:22,25
108:13,25 109:5
129:23 143:4,8
147:25

**recording** 6:19

**recycled** 72:20

**redefined** 65:24

**reduction** 57:24 58:2

**refer** 17:24 19:4,7

**reference** 39:17
44:10 45:11 65:2

**referred** 137:13

**referring** 22:14 25:5
44:13,16 45:2,5 65:5,
15

**refers** 21:17,19 41:15

**reflect** 108:13

**reflected** 58:17

**reflection** 84:23

**refresh** 98:15 113:22
119:14

**refreshed** 124:4

**regard** 137:23

**registered** 24:19
88:17,20

**regulatorily** 99:9

**regulatory** 32:24
33:23 34:7 36:3,6
37:5 61:4 107:7

**reimbursement**
101:20

**reinsurance** 141:15

**reject** 102:2,4,5,15

**rejected** 99:25

**rejection** 102:5,17

**relates** 115:17

**relating** 139:21

**relative** 101:22 145:9

**releases** 101:19

**relief** 110:17

**remedy** 105:16

**remember** 13:17
23:6 60:3 73:17 75:7
84:20 101:14 111:14
112:2,5,6,7,10,11,14
114:21 116:19 119:3,

6,7,12 122:24 134:4
135:4,5,8 138:25
144:12

**remembered** 63:14

**remembering** 60:12

**remind** 61:9

**remote** 6:19

**remotely** 6:14,17
31:7

**remove** 103:20
104:11 105:2,14
106:20 107:16

**removed** 110:19

**removing** 100:24
107:19

**repeat** 42:8,25 51:12
76:24 79:18 86:10
105:4 121:13

**replace** 104:5 107:3

**replacement** 72:6

**reported** 54:9

**reporter** 6:15 7:19

**Reporting** 6:9

**reports** 54:7

**represent** 10:11,13
26:9 94:8 116:2
136:12,15,20

**representation**
122:12

**represented** 67:10
95:6

**representing** 103:2
116:23 123:7 137:24
139:11 140:12

**represents** 10:2,6,
17 94:5

**request** 13:20 67:14
70:3,9,14 91:24
132:12 133:23

**requested** 11:3 16:9
57:7 68:25 82:7
95:15 96:8 111:21
116:7 126:6,7 135:25
136:3 137:9 142:14

143:23

**requesting** 47:14

**requests** 64:17
67:24 70:5,8 126:24

**required** 101:20

**reservation** 101:4

**resignation** 109:14

**resigned** 40:11

**respect** 14:3 36:14
37:13 47:6 99:19
114:19

**respond** 135:23

**responded** 43:15,24

**responding** 49:3

**response** 43:13,18
44:3 49:2,8 68:8
118:14 122:15,16
124:9 135:4

**responsibilities**
99:11

**responsibility** 17:8
52:15,18 80:24

**responsible** 104:7

**responsive** 68:7,8
70:5,20 71:8,18,22
82:25 83:6,13 124:17

**rest** 48:18

**restrain** 13:15

**restrained** 84:19

**restraining** 12:18,22
13:14,19 14:10 15:4
84:8

**restrains** 13:6,9

**resume** 107:23,25

**retail** 94:7 104:17

**retain** 76:13

**retained** 141:5

**retainer** 141:9

**retaining** 140:3

**return** 108:3

**returning** 74:3

**reversed** 89:15

**review** 15:2 70:21,24

**reviewing** 83:6,13

**Richey** 6:7

**Rick** 6:7

**rightfully** 63:20

**rights** 28:23 101:4

**rigorously** 95:21
101:6

**risk** 28:24 57:23,24
58:2 63:6

**role** 52:14 65:23
83:5,12 114:15
117:9,10

**room** 6:12,16 8:19,20

**Rothstein** 75:8
78:14 80:12 81:9
85:19 86:4,19 87:6

**Roughly** 12:20

**Rule** 6:21

**rules** 6:22,23

**ruling** 92:2

—— S ——

**sale** 111:25

**sales** 38:13 43:19
93:2

**sanctioning** 26:14

**satisfy** 71:7

**Saturday** 112:21

**Sauter** 65:6,7,12

**schedule** 48:13,16

**scheduled** 48:17

**Schroth** 133:17,23
134:13,16

**scope** 84:25

**Scott** 60:4 65:18 97:8
117:25 132:14
146:17

**screen** 30:25 31:12
48:22

**scroll** 32:7 41:2,18
43:13,23 48:23 53:10
62:16 70:7 81:20
82:2 84:11 87:20
92:19 94:17 100:13,
18 112:24 115:5
118:13,17 134:9,10,
15 138:16,21

**scurrying** 139:15

**search** 68:6 69:5

**searching** 83:6,13

**sec** 37:5 64:4 88:4

**secret** 76:3,6

**securities** 38:9,14
40:23 53:23 54:4
58:3 63:18 90:5,15,
25 91:4,16

**seek** 42:21 43:4

**seeking** 15:16 38:8

**Seery** 14:13,20 15:3,
9,12 24:24 25:15
31:18 35:9 36:14,23
38:8 41:25 42:6,15,
17 45:23 52:10 53:2,
6,22 54:23 55:5,21
56:7,15,25 57:5,6,11,
23 58:5,9,16 59:9,17,
25 60:9,12,16 61:7,
12,23 62:2,9,20
64:13 80:5 90:5
91:16 92:14 101:19
127:2

**Seery's** 25:22 38:15
59:20,22 60:25 61:17
80:3 90:15 135:23

**sees** 54:10

**self-reporting** 64:4

**self-reports** 37:4

**self-serving** 91:5

**sell** 38:8 40:23 41:24
44:6 50:14 51:24
90:5,15,25 91:16
92:15

**selling** 58:3,10 91:4
95:11

**send** 32:19 118:25
134:22 138:18,22,24

**sending** 33:3,6,12
37:24 99:5 103:15

**senior** 72:25 78:20
79:2

**sense** 13:7 91:8
145:16

**sentence** 43:2
88:15,24 89:2,7,10,
20

**serve** 112:12 147:8

**served** 67:23

**serves** 16:7,17

**services** 77:12 116:4
127:7 130:9,21 132:5

**set** 36:14,24 37:13
54:3

**settle** 89:10

**settlement** 65:24
109:21,24

**settling** 89:19

**severity** 6:10

**Sevilla** 112:12 113:9,
19

**share** 30:25

**shared** 77:12 116:4
127:7 130:9,21 132:5
137:3,13 139:5

**shares** 92:15

**sharply** 142:25

**she'd** 71:4

**She'll** 91:25

**sheets** 146:15,20

**shortly** 78:22

**showed** 108:7

**signatory** 104:10
106:8

**signed** 16:3 17:15
84:9

**significant** 63:21,23
146:13

**signing** 15:25

**similar** 45:10

**simply** 91:14 92:12
123:13

**single** 128:13

**sir** 8:17 33:20 35:11
85:9 94:17 126:3
130:11

**sit** 10:15 55:21 66:19
143:17 144:13

**sits** 143:14

**situation** 105:22

**Sky** 41:12,15,24
42:19,23 43:9,10,19
89:24

**so-called** 144:24

**social** 6:11

**sold** 38:14 46:8 50:11
56:6 63:9,17

**sought** 26:23 103:2
110:11 111:25

**sounded** 21:25

**Sowin** 40:16,17 49:3,
6 51:9,17,20 54:12
57:18,22 58:5,8,12
59:9,17 90:4 92:21

**Sowin's** 50:3,4 58:15

**speak** 32:13 42:17
55:16,18,19 74:6
83:2,9,16

**speaking** 59:25
95:23

**specific** 19:10 73:3

**specifically** 30:15
33:5 35:15 85:10
90:6 96:3 100:16
126:20 127:21,24
128:3

**specifics** 79:14

**speculate** 21:8
22:25 29:5 55:4
68:22 98:21 120:4,5
136:7

**speculating** 55:9

**speculation** 55:4

Index: speed..told

**speed** 99:3

**spent** 123:6 144:22

**spoken** 57:11 60:4 138:2

**stab** 145:8

**stack** 71:4,5

**staff** 25:24 37:19

**stand** 52:5 135:3,19

**standard** 7:11 47:25 73:9 75:11 108:25 109:5 143:4,8 147:24

**standing** 23:22 24:22 26:11

**standpoint** 36:3

**stands** 17:3

**Stang** 8:14

**start** 7:8 39:6

**started** 108:13 110:14

**starts** 119:21

**state** 6:23 47:2 116:11,12

**statement** 46:15 79:8 87:6 122:16 135:20

**statements** 88:9 125:2,13,20 126:12, 21 132:13,23 133:10, 25 135:10,14,18,24

**States** 7:14

**stay** 26:23 103:25

**stayed** 77:8

**stays** 26:20

**steno** 7:18

**stenographer** 11:4 16:10 57:8 69:2 82:8 96:9,12,16 111:22 116:8 136:4 137:10 142:15 143:24

**stenographic** 50:25

**stepped** 50:20

**steps** 42:21 43:4

**stick** 66:25 124:5

**stipulate** 6:18

**stop** 38:21 43:9,10, 14 53:11 63:20 89:17,23 140:21

**stopped** 40:7 69:14

**stopping** 42:14

**Strand** 14:14

**Strategic** 22:10,18

**strategist** 111:8,9

**strategy** 111:3 142:6

**strike** 29:6 30:11 56:9 91:11,20,25

**string** 39:5 118:25 119:20,21,25 120:6

**struggle** 145:5

**stuck** 126:16

**stuff** 78:14,15 91:8 99:9

**subject** 24:17,18,19 26:20 41:12 101:22 103:25 104:3 105:25 111:6 126:15 130:14 132:22

**submit** 15:21

**submitted** 15:3

**subpoena** 126:21 134:17 135:2,19 147:8,12

**subsequently** 122:22

**subsidiary** 22:2

**substance** 15:11 32:6 44:25 45:10 50:4 96:6

**substances** 44:24

**suffered** 46:6

**sufficient** 52:6

**suggest** 61:16 102:19

**suggested** 112:12

**suggesting** 64:3

**summary** 101:15

**supersede** 56:2 71:13

**supervise** 71:13

**supervisor** 146:10

**support** 15:12 33:6 37:24 99:25 103:15

**supported** 99:4

**supposed** 124:20

**surface** 76:15

**Surgent** 53:5,13 60:24 61:18

**suspense** 126:19

**swear** 6:16 7:19

**swearing** 6:20

**switched** 69:16

**sworn** 8:4

**symbol** 21:21

**system** 54:9

**systems** 47:11 50:21

---

## T

**takes** 147:7

**taking** 48:10 106:19 107:3

**talk** 16:5 47:3,9,10, 15,19 59:12,14 60:9 62:5 83:25 117:21

**talked** 20:15,16 23:12 60:12 62:6 98:16

**talking** 13:10,11 73:3

**Tara** 68:13 81:13,24 82:5,14,15 83:17,20, 22

**Tara's** 71:10 80:20 81:3,10 83:19 86:6, 19 87:2

**technical** 50:24

**technology** 78:14

**telephone** 8:23 48:14

**telling** 108:18

**temporary** 12:18,22 13:9,14,19 14:10 15:4 84:8

**ten** 46:18,24 47:21 108:4

**ten-minute** 107:23

**term** 117:18

**terminate** 26:24

**terminated** 25:25 26:18 78:21

**termination** 80:3

**terms** 45:10 64:3 101:16

**testified** 8:5 59:4 99:3 137:15

**testify** 11:20 16:20 23:19,21,23,24 24:5, 14 113:19

**testifying** 12:11 26:10

**testimony** 24:21 35:24 47:16 58:6 59:13 76:24 120:13 124:2

**Texas** 7:16

**text** 62:9,19,23 70:4 74:20 80:18 81:23 82:11 126:17 134:11, 19,22

**texts** 107:14

**Thanksgiving** 38:7 60:13 90:24

**theme** 99:8

**thing** 31:8 103:11 104:15 113:10 120:8 140:9

**things** 16:3 24:17 26:21 61:4 64:2 99:12 106:3 128:5

**thinking** 46:23

**Thomas** 53:5 61:2 62:2,4,6

**thought** 15:18 22:14 52:11 54:24 55:24 59:21 62:2,7 78:24 79:2 96:4 121:8

**threw** 73:12,14 76:19,20 77:18

**throw** 72:21 73:5,20 74:2 80:15,24 81:10, 14

**throwing** 73:17

**thrown** 86:15

**thrust** 99:7

**thumb** 71:4

**time** 7:11 8:19 14:9 19:14 31:8,12 32:3,4 35:14,25 38:19 40:10 42:3,12 45:5 47:25 53:20 57:21 59:24 60:4,11,12 62:9 63:18 70:14 73:24 74:11,13,20 77:5,6, 18 82:16 86:5 88:5 90:3,20 94:20 100:20 103:16 107:12 108:3, 8,25 109:5 117:11 123:6,16,25 124:12 128:13 129:20,22 133:8 135:9 139:24 140:15 142:12,24 143:4,8 144:22 147:24

**times** 23:6 123:22 126:4 145:13

**title** 129:3

**titles** 21:4 22:17

**today** 9:21 10:22 12:8,11 31:9 47:16 48:10,14 84:17 127:19

**today's** 7:9 9:16 10:24 11:8

**told** 25:24 34:16 37:8,20 57:4,23 66:12,15,17 74:23 86:19 100:22 120:11 133:23

**tomorrow** 103:5,13
147:15

**top** 63:14 101:18
113:7 115:21,22
122:14

**topic** 107:19 118:10
119:13

**touch** 16:11

**trade** 53:23 54:4,7
89:11

**trader** 40:15

**trades** 38:21 42:5,14
50:5,8 53:3,7 54:9,
10,24 55:11,15,22
56:16 57:2 58:17,22
60:17 61:18,24 89:9,
11,17,19,23 101:20

**trading** 49:13 52:8
72:24

**transactions** 42:19,
24 43:9,10 45:23
52:19 57:13 60:10
111:18

**transcend** 99:12

**transcript** 13:24

**transfer** 102:7,9,24
104:7

**transferred** 75:18

**transition** 50:12 56:2
63:8 72:7 74:12

**transitioned** 78:10

**trial** 112:22 113:18

**TRO** 15:13,16,23
16:6 83:25 93:4,15,
18 110:11 111:2
113:13 114:18 125:5
126:15 127:25 128:2

**true** 19:22 89:21

**trust** 71:10,11

**TSG** 6:9

**turn** 50:22

**tweak** 55:6

**twisted** 26:10

**typed** 122:20

**typical** 46:5

---

**U**

**UCC** 74:19,23 124:25
125:12,19 126:7
136:6

**ultimate** 28:25

**ultimately** 141:4

**unawareness** 52:8

**underlying** 44:7
51:25

**understand** 10:21,
24 11:7 12:14 19:15
25:3 27:7 51:13 60:6
70:13 73:24 76:18
87:22 115:14 125:8

**understanding**
13:5,8 29:8,10,20
30:5,9 34:21 39:22
41:14 58:21 78:19
79:12,13,17,22,25
84:18,24 88:17 92:4
97:18 102:12 137:7
143:20

**understood** 42:3
70:2 73:8

**unfounded** 63:17

**unhighlight** 49:21

**United** 7:14

**unpaid** 77:8

**untenable** 101:15,17

**untrue** 87:6

**unusual** 52:12

**up-front** 101:23

**upgraded** 73:24

**urgency** 90:24

---

**V**

**validity** 6:19

**variety** 126:6

**vast** 123:7

**vehicles** 16:19 17:9

**versus** 72:24

**video** 6:19

**video-recorded** 7:8

**view** 102:17

**viewed** 32:23

**vindictive** 90:21
91:5

**violating** 63:4

**virtually** 21:10

---

**W**

**Wait** 7:20

**waited** 91:2

**waived** 116:11

**wanted** 49:19 55:14,
21 56:15 57:2,13
61:21,23 74:24 76:3
90:5 91:16 92:14
101:23 119:15,22
125:12,19

**warning** 62:25 63:19
64:9

**warnings** 64:12

**Waterhouse** 146:8,9

**week** 69:17 95:5

**weeks** 25:25 74:16
112:3

**withdraw** 33:17 34:7
38:4 98:5,11 106:10,
14

**withdrawn** 15:10
16:24 28:4 34:13
39:20,21 44:14 45:20
52:17 54:16 55:13
66:20 70:23 71:16
72:15 76:19 78:8
80:5 82:14 86:12
101:10 105:10 106:8
129:6 143:25

**woman** 128:17

**word** 25:4

**words** 122:18

**work** 39:6 71:10
82:6,10,15,23 128:22

**work-around** 53:2,7,
23 54:22 61:2,12,25

**worked** 69:7

**working** 53:22
119:16 120:19 121:2
123:7

**works** 40:16 54:14,
18,20 61:20 83:20
92:9

**world** 36:13

**worse** 90:19

**wrapped** 101:16

**write** 60:23 63:2

**writes** 113:8

**writing** 44:6 103:8

**writings** 44:13,15
45:4

**written** 37:10,17,18
44:9

**wrong** 99:20

**wrote** 51:17,25 53:5,
22 64:8 112:21 113:3

---

**Y**

**year** 69:18 123:20,21
126:5 142:4 145:18

**years** 34:22 41:17
53:20 69:25 72:12
73:25 88:16 142:5
144:10,11

---

**Z**

**Ziehl** 8:14

# EXHIBIT 96

1            Dondero - 5-28-2021

2      IN THE UNITED STATES BANKRUPTCY COURT

3        FOR THE NORTHERN DISTRICT OF TEXAS

4            DALLAS DIVISION

5   In re:                  )
                            )
6   HIGHLAND CAPITAL           )   Case No.
    MANAGEMENT, LP,            ) 19-34054 L.P.
7                          ) Chapter 11
          Debtor,          )
8   -----------------------------)
    HIGHLAND CAPITAL MANAGEMENT,  )
9   LP,                   )
                            )
10        Plaintiff,       ) Adversary No.
                        ) 21-03003-sgi
11      vs.                )
                            )
12   JAMES D. DONDERO,          )
                            )
13        Defendant.        )

14

15         REMOTE DEPOSITION OF

16          JAMES DONDERO

17

18         Pages 103 - 282

19          Dallas, Texas

20     Friday, 28th day of May, 2021

21

22

23   Job No. 194690

24   Reported by:

25   Daniel J. Skur, Notary Public and CSR

Page 104

```
1        Dondero - 5-28-2021
2
3
4
5
6
7
8        28th day of May, 2021
9        9:33 a.m. - 1:59 p.m.
10
11
12       Remote Deposition of JAMES DONDERO,
13   located in Dallas, Texas, before Daniel J.
14   Skur, Notary Public and Certified Shorthand
15   Reporter in and for the State of Texas
16   located in Waxahachie, Texas.
17
18
19
20
21
22
23
24
25
```

Page 105

```
1        Dondero - 5-28-2021
2  A P P E A R A N C E S:
3     Pachulski Stang Ziehl & Jones
      Attorney(s) for Debtor
4     780 Third Avenue
      New York, New York 10017
5
6     BY:   John Morris, Esq.
7          Gregory Demo, Esq.
8
      Stinson
9      Attorney(s) for The Witness
      3102 Oak Lawn Avenue
10
      Dallas, Texas 75219
11
      BY:  Deborah Deitsch-Perez
12
         Michael Aigen, Esq.
13
         Paul Lackey, Esq.
14
15
      Sidley Austin
16     Attorney(s) for The Committee
      2021 McKinney Avenue
17
      Dallas, Texas 75201
18
      BY:  Paige Montgomery, Esq.
19
20
21  ALSO PRESENT:
22      Davor Rukavina, NexPoint
23      La Asia Canty
24
25
```

Page 106

```
1        Dondero - 5-28-2021
2
3        IT IS HEREBY STIPULATED AND AGREED
4   by and between the attorneys for the respective
5   parties herein, that filing and sealing be and
6   the same are hereby waived.
7        IT IS FURTHER STIPULATED AND AGREED
8   that all objections, except as to the form  of
9   the question, shall be reserved to the
10  time of the trial.
11       IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be sworn to and
13  signed before any officer authorized to
14  administer an oath, with the same force and
15  effect as if signed and sworn to before the
16  Court.
17          - oOo -
18
19
20
21
22
23
24
25
```

Page 107

```
1        Dondero - 5-28-2021
2        P R O C E E D I N G S
3        REMOTE ORAL DEPOSITION OF
4             JAMES DONDERO
5        (REPORTER NOTE:  This deposition is
6   being conducted remotely in accordance with
7   the Current Emergency Order regarding the
8   COVID-19 State of Disaster.
9        Today's date is the 28th day of
10  May, 2021.  The time is 9:33 a.m. Daylight
11  Savings Time.  The witness is located in
12  Dallas, Texas.)
13       JAMES DONDERO,
14  having been duly cautioned and sworn to tell
15  the truth, the whole truth and nothing but the
16  truth, testified as follows:
17        (9:33 A.M.)
18        EXAMINATION
19  BY MR. MORRIS:
20  Q.   Good morning, Mr. Dondero.
21  A.   Morning.
22  Q.   It's John Morris, again, from
23  Pachulski on behalf of the debtor.  We're here
24  for your deposition today.
25       Do you understand that?
```

Page 108

Dondero - 5-28-2021

1
2     A.   Yes.
3     Q.   Okay.  We've done this a few times,
4  so I'm going to kind of cut to the chase; but I
5  do want to remind you that we're going to be
6  looking at a number of documents today.
7          And because of the difficulty
8  sometimes of doing this on a Zoom or by video,
9  if, at any time, you believe you need to see
10 other portions of the document, please let me
11 know that.  Okay?
12    A.   Sure.
13    Q.   Okay.
14        MR. MORRIS:  Can we put up the first
15    exhibit, please?
16        (Exhibit 1 introduced.)
17 BY MR. MORRIS:
18    Q.   Okay.  This is a document that's got
19 a title, "Promissory Note."  It's dated
20 February 2, 2018, and the amount of the note is
21 $3,825,000.
22        Do you see that?
23    A.   Yes.
24        MR. MORRIS:  Can we just go to the
25    signature line, please?

Page 109

Dondero - 5-28-2021

1
2  BY MR. MORRIS:
3     Q.   Is that your signature, sir?
4     A.   I believe that's my assistant on my
5  behalf.
6     Q.   Did you authorize --
7          (Audio distortion.)
8     A.   I'm sorry?
9  BY MR. MORRIS:
10    Q.   I don't want to step on your words.
11    Were you finished with your answer?
12        MS. DEITSCH-PEREZ:  Yeah.  Can
13    you -- yeah, can you ask it again?
14        MR. MORRIS:  Sure.
15 BY MR. MORRIS:
16    Q.   Is that your signature, sir?
17    A.   Yes, for -- yes.
18        MR. MORRIS:  Can we go back to the
19    top of the document?
20 BY MR. MORRIS:
21    Q.   And was this document signed on or
22 around February 2, 2018?
23    A.   Yes.
24    Q.   Did you receive $3,825,000 from the
25 debtor on or around February 2nd, 2018?

Page 110

Dondero - 5-28-2021

1
2     A.   I -- I believe so.  I don't have
3  direct awareness, but I believe so.
4     Q.   Okay.  And did you sign this
5  promissory note in exchange for that cash that
6  you believe you received?
7     A.   Yes.
8     Q.   Okay.  Are you familiar with the
9  term "demand note"?
10    A.   Yes.
11    Q.   Can you describe for me your
12 understanding of what a demand note is?
13    A.   It's a note that's -- maturity is
14 defined by the term "demand" versus a -- a
15 stipulated date.
16    Q.   And if we look down to paragraph 2,
17 at the time that you signed this document on
18 February 2, 2018, did you understand, based on
19 paragraph 2, that you were signing a demand
20 note, as you've characterized it?
21    A.   Yes.
22    Q.   Okay.
23        MR. MORRIS:  Can we go back to the
24    top of the document?
25 BY MR. MORRIS:

Page 111

Dondero - 5-28-2021

1
2     Q.   Is it fair to say that under this
3  demand note, you promised to pay Highland
4  Capital Management, L.P., the sum of
5  $3,825,000?
6     A.   Yes.
7     Q.   Okay.  And at the time that you
8  signed this document on February 2nd, 2018, did
9  you intend to repay to Highland Capital
10 Management, L.P., $3,825,000 plus interest?
11    A.   Yes.
12    Q.   And at the time you signed this
13 document, did you intend to repay the principal
14 amount plus interest upon demand by HCMLP?
15    A.   Whatever was appropriate to pay,
16 what hadn't been paid if it -- if it had --
17 yeah, if it had -- whatever the terms are, the
18 terms are.
19    Q.   Okay.  Did you read the promissory
20 note before you signed it?
21    A.   No.
22    Q.   Is there anything about the
23 promissory note today that you don't
24 understand?
25    A.   I haven't looked at it closely.  I'm

Page 112

Dondero - 5-28-2021

1
2  aware of it but -- you know, but I'm not aware.
3  I haven't looked at it closely.
4      Q.   Well, but you do know that the
5  debtor has sued you to collect on this note,
6  right?
7      A.   Yes.
8      Q.   Okay.  And can you identify anything
9  in this note today that you don't understand?
10     MS. DEITSCH-PEREZ:  Object to the
11  form.
12     A.   Again, I don't want to make any
13  legal interpretation or analysis of the
14  contract.
15  BY MR. MORRIS:
16     Q.   And I appreciate that.
17     And to be clear, I'm not asking you
18  for any legal opinion or any legal analysis.
19  I'm asking for facts.
20     As a factual matter, as a layperson,
21  is there anything about this note today that
22  you do not understand?
23     MS. DEITSCH-PEREZ:  Object, no
24  foundation.
25     A.   And I can't say.

Page 113

Dondero - 5-28-2021

1
2  BY MR. MORRIS:
3      Q.   Okay.  You're not aware of anything;
4  is that fair?
5      MS. DEITSCH-PEREZ:  Object, no
6  foundation.
7      A.   No.  I'm saying I can't give an
8  opinion.
9  BY MR. MORRIS:
10     Q.   All right.  I'll try one more time a
11  slightly different way.
12     Can you identify any language in
13  this promissory note that you, as the maker of
14  the note and as a layperson, as a matter of
15  fact, do not understand?
16     MS. DEITSCH-PEREZ:  Objection, no
17  foundation.
18     A.   I -- I don't have -- I haven't
19  reviewed it.  I don't have a comment.
20  BY MR. MORRIS:
21     Q.   At the time that you signed this,
22  did you believe that this note reflected all of
23  the terms and conditions with respect to the
24  subject matter of the note?
25     MS. DEITSCH-PEREZ:  Object, no

Page 114

Dondero - 5-28-2021

1
2  foundation.
3      A.   Yeah, I believe largely at the time,
4  yes.
5  BY MR. MORRIS:
6      Q.   In fact, if we go to paragraph 8,
7  there's -- the last sentence is what's commonly
8  referred to as an integration clause.
9      Do you see that last sentence of
10  paragraph 8?
11     A.   Yes.
12     Q.   And did you agree with the debtor
13  that the terms and provisions of the paragraph
14  control and supersede every other provision of
15  all other agreements between the payee and the
16  maker in conflict herewith?
17     A.   I see it.  I mean, I read it.  But
18  what's -- what's the question?
19     Q.   Withdrawn.  It's okay.  It speaks
20  for itself.
21     You were the CEO of Highland at the
22  time that you signed the note, correct?
23     A.   Yes.
24     Q.   And you controlled Highland at that
25  time; is that fair?

Page 115

Dondero - 5-28-2021

1
2      A.   Yes.
3      Q.   And at the time that you signed the
4  note, the Redeemer Committee had not yet
5  obtained a judgment against Highland Capital
6  Management or anybody else; is that -- any
7  other Highland entity; is that right?
8      A.   I -- and I don't recall the -- the
9  timing --
10     Q.   Okay.
11     A.   -- of their arbitration award or...
12     Q.   Let me ask you to just go back in
13  time, February of 2018.  Do you recall having
14  any concern in February 2018 that you might
15  lose control of Highland?
16     A.   No, I don't recall.
17     Q.   While you were the CEO, did
18  Highland -- withdrawn.
19     I'm going to refer to Highland
20  Capital Management, L.P., variously today as
21  either the debtor, Highland, or HCMLP; is that
22  fair?
23     MS. DEITSCH-PEREZ:  John, I think
24  it's a little confusing if you do that.  I
25  mean, if you could refer to the

Page 116

Dondero - 5-28-2021

1    post-bankruptcy entity as "the debtor" and,
2    when you're talking about prebankruptcy,
3    call it "Highland" or "HCM"?
4        MR. MORRIS:  Okay.
5        MS. DEITSCH-PEREZ:  I – I think
6    that would probably be clearer.
7        MR. MORRIS:  That's fair.  I'll try
8    and do just that.  Thank you very much.
9    BY MR. MORRIS:
10       Q.   While you were the CEO of HCMLP, did
11   HCMLP, prepare, in the ordinary course of
12   business, a document called a "Monthly
13   Reporting Package"?
14       A.   I don't know – I don't know the
15   name – I don't know that name in particular,
16   but we did do monthly financials, I believe.
17       Q.   Okay.  And did you personally review
18   the monthly financials each month that they
19   were prepared?
20       A.   No.
21       Q.   Do you know who was responsible for
22   preparing the monthly financials?
23       A.   It would have been in accounting.  I
24   don't know who in accounting.

Page 117

Dondero - 5-28-2021

1        Q.   Was Frank Waterhouse responsible for
2    preparing the Monthly Operating Reports?
3        A.   He was our CFO.  So everything,
4    ultimately, in accounting reported up through
5    him, but I don't know his involvement in that
6    report.
7        Q.   Can you identify any person who was
8    responsible for preparing the Monthly Operating
9    Reports for HCMLP, while you were the CEO?
10       A.   No.
11       Q.   Do you know what the Monthly
12   Operating Reports were used for?
13       Withdrawn.
14       What was the purpose of preparing
15   Monthly Operating Reports, if you know?
16       A.   I don't know.
17       Q.   Were they delivered to you each
18   month, even if you didn't read them?
19       A.   I don't believe so.  Not physically,
20   that I can remember.  If there was an email, I
21   don't remember.
22       Q.   Did you ever discuss any of the
23   Monthly Operating Reports with Mr. Waterhouse?
24       A.   I can't – I can't recall.

Page 118

Dondero - 5-28-2021

1        MS. DEITSCH-PEREZ:  I mean, do you
2    mean the report specifically or Highland's
3    financials generally?
4        MR. MORRIS:  The Monthly Operating
5    Reports that we're talking about.
6        And I would appreciate it, Deborah,
7    if you have an objection, just say "Object
8    to the form of the question"; and I'll do
9    the best I can to – to try to understand
10   what you're saying, but I'd prefer no
11   speaking objections.
12   BY MR. MORRIS:
13       Q.   Do you recall ever speaking with
14   anybody in accounting with respect to any
15   Monthly Operating Report that they prepared?
16       A.   I don't recall.
17       Q.   Okay.
18       MR. MORRIS:  Can we put up Exhibit
19   Number 2, please?
20       (Exhibit 2 introduced.)
21   BY MR. MORRIS:
22       Q.   Looking at the first page, sir, does
23   this appear to be what we've been describing as
24   a Monthly Operating Report for Highland Capital

Page 119

Dondero - 5-28-2021

1    Management?
2        A.   It says "Operating Results."  I – I
3    have no recollection of seeing this cover sheet
4    before.
5        Q.   Okay.
6        MR. MORRIS:  Can we go to the second
7    page, please?
8        Stop right there.
9    BY MR. MORRIS:
10       Q.   This is the second page of the
11   Operating Results for February 2018, and it's
12   headed "Significant Items Impacting HCMLP's
13   Balance Sheet."
14       Do you see that?
15       A.   Yes.
16       Q.   Do you know whether the accounting
17   department was charged with the responsibility
18   of identifying on a monthly basis significant
19   items that would impact Highland's balance
20   sheet?
21       A.   I have no particular awareness.
22       Q.   Okay.  Do you see at the bottom
23   under the title "Other," it's $3.8 million and
24   it's referred to as "Partner Loan"?

Page 120

Dondero - 5-28-2021

1
2    A.   Yes.
3    Q.   Do you have an understanding that
4    that 3.8 million-dollar partner loan refers to
5    what we just looked at as Exhibit 1, the
6    promissory note?
7         MS. DEITSCH-PEREZ:  Object, no
8    foundation.
9    A.   I have -- I have no particular
10   awareness other than the amounts are similar.
11   BY MR. MORRIS:
12   Q.   And -- and do you know whether
13   Highland recorded the promissory note as an
14   asset on its balance sheet as of February 2018?
15   A.   I -- I don't know.
16   Q.   So, you signed a promissory note for
17   $3.8 million in February 2018; and as the CEO,
18   you don't know if Highland carried that
19   promissory note on its balance sheet.  Do I
20   have that right?
21   A.   I'm saying I don't have particular
22   knowledge.  I -- I am a CPA and GAAP accounting
23   would suggest that it was, but I don't have --
24   I don't have particular knowledge on how it was
25   accounted for.

Page 121

Dondero - 5-28-2021

1
2    Q.   Okay.  Later in the year, you signed
3    two more promissory notes in favor of Highland;
4    is that right?
5    A.   I -- I believe so.  Yeah.
6         MR. MORRIS:  Can you put up
7    Exhibit 3, please?
8         (Exhibit 3 introduced.)
9    BY MR. MORRIS:
10   Q.   And can we go to the signature line?
11        (Scrolling.)
12   BY MR. MORRIS:
13   Q.   Is that your signature, sir?
14   A.   Yes.
15        MR. MORRIS:  Go to the top of the
16   page.
17   BY MR. MORRIS:
18   Q.   Did you sign a promissory note on or
19   about August 1st, 2018, in the amount of
20   $2.5 million in favor of Highland?
21   A.   Yes.
22   Q.   Did you receive from Highland
23   Capital Management, L.P., $2.5 million on or
24   about August 1st, 2018?
25   A.   I believe so.

Page 122

Dondero - 5-28-2021

1
2    Q.   And did you, in fact, sign this
3    promissory note in exchange for that
4    $2.5 million?
5    A.   Yes.
6         MR. MORRIS:  Can we go down to
7    paragraph 2, please?
8         (Scrolling.)
9    BY MR. MORRIS:
10   Q.   Looking at paragraph 2, would you
11   characterize this as a demand note, using the
12   understanding that you described earlier today?
13   A.   Yes.
14   Q.   And -- and this note, like the
15   other, because they're demand notes, there's no
16   conditions for -- for the demand, is that
17   right, at least as drafted.
18        Withdrawn.  That wasn't a great
19   question.
20        Were these unconditional demand
21   notes, these two documents that we've
22   looked at?
23   A.   I -- I don't want to make a legal
24   interpretation.
25   Q.   I'm just asking for your

Page 123

Dondero - 5-28-2021

1
2    understanding as the person who signed the
3    note.  At the time you signed it, at that time,
4    did you understand that there were any
5    conditions placed on Highland's ability to make
6    a demand?
7    A.   I don't know.
8    Q.   Okay.  Did you understand that under
9    these demand notes, that if you defaulted, all
10   amounts that were due and payable would
11   accelerate?
12        MS. DEITSCH-PEREZ:  Object to the
13   form.
14   A.   I don't know.
15   BY MR. MORRIS:
16   Q.   Did you read this -- did you read
17   this promissory note before you signed it?
18   A.   No.
19   Q.   Do you know whose idea it was to
20   give you the principal amount of these notes
21   and for you to execute the promissory notes in
22   exchange?
23   A.   I -- again, I think it's proper
24   accounting consistent with what we've done
25   with -- we've done historically -- or Highland

Page 124

Dondero - 5-28-2021

1  did historically and what Highland did
2  historically for other employees.
3      Q.   Okay.  I'm not asking about that.
4  I'm asking just about you and the two notes
5  that we've looked at so far:  Who made the
6  decision at the respective moments in time to
7  transfer to you the principal amount of the
8  notes and for you to execute the notes?
9      A.   I believe it would have come from
10  accounting.
11     Q.   Who decided -- who decided the
12  principal amount of the note?
13     A.   I don't know.  It would -- I don't
14  know.
15     Q.   Did you ask to borrow money?
16          Did you ask the folks in accounting
17  for a loan from Highland in the principal
18  amount of the notes and request that they
19  document it accordingly?
20     A.   No.
21     Q.   Who was your assistant at this time?
22     A.   My accounting assistant at this time
23  was Melissa Schroth.
24     Q.   And was she authorized to sign these

Page 125

Dondero - 5-28-2021

1  notes on your behalf?
2      A.   I -- that -- sometimes she signs
3  stuff.  I don't know on this.  I'm -- I'm not
4  denying that it's a bona fide -- signed by me.
5  Or if it wasn't signed by me, it was --
6  somebody who was authorized signed it on my
7  behalf.
8      Q.   Okay.  I appreciate that.  Thank
9  you.
10          Is there anything about --
11  withdrawn.
12          Was there anything about this
13  promissory note that you didn't understand at
14  the time that either you signed it or it was
15  signed on your behalf?
16          MS. DEITSCH-PEREZ:  Object, no
17  foundation.
18     A.   Again, I didn't evaluate it
19  carefully, and I didn't actually even read it.
20  BY MR. MORRIS:
21     Q.   Okay.  As you sit here today, can
22  you identify anything in this document that you
23  do not understand?
24          MS. DEITSCH-PEREZ:  Object, no

Page 126

Dondero - 5-28-2021

1  foundation.
2      A.   I -- I don't want to make a legal
3  interpretation on a legal document.
4  BY MR. MORRIS:
5      Q.   I appreciate that, but I have no
6  ability to ask any follow-up questions.  So let
7  me ask it just a different way:  Is there
8  anything about this document that you don't
9  understand today?
10          MS. DEITSCH-PEREZ:  Object, no
11  foundation.
12  BY MR. MORRIS:
13     Q.   You can answer.
14     A.   I don't know.
15     Q.   Okay.  Do you understand that if
16  there was something that -- that you did not
17  understand, you have an obligation to tell me
18  that right now?
19          MS. DEITSCH-PEREZ:  Object, no
20  foundation.
21     A.   I -- I -- the answer is the same.  I
22  don't know.
23          MR. MORRIS:  Can we go to Exhibit
24  Number 4, please?

Page 127

Dondero - 5-28-2021

1      (Exhibit 4 introduced.)
2          MR. MORRIS:  Can we go to the
3  signature line when you get there?
4  BY MR. MORRIS:
5      Q.   Is that your signature, sir?
6      A.   Yes.
7      Q.   And did you sign this document or --
8  or -- let me ask two questions first.  Did you
9  personally sign this document?
10     A.   And again, it was either me or
11  someone with my approval, but that doesn't look
12  like my typical signature, but it's close.
13     Q.   Okay.  And whoever signed it had the
14  authority from you to sign on your behalf; is
15  that fair?
16     A.   Yes.
17     Q.   Okay.
18          MR. MORRIS:  Can we go to the top of
19  the page, please?
20  BY MR. MORRIS:
21     Q.   And did you or somebody acting on
22  your behalf sign this promissory note on
23  August 13, 2018, in the amount of $2.5 million?
24     A.   Yes.

Dondero - 5-28-2021

1          MR. MORRIS:  Can we go to
2     paragraph 2, please?
3     BY MR. MORRIS:
4          Q.    Looking at paragraph 2 and the term
5     contained therein, would you agree that this is
6     a demand note, using the definition that you
7     supplied earlier today?
8          A.    Yes.
9          Q.    At the time that this note was
10    signed on your behalf, did you intend to comply
11    with the terms of this note?
12         A.    Yes.
13         Q.    At the time that this note was
14    signed on your behalf, did you intend to pay
15    all unpaid principal and accrued, but unpaid,
16    interest upon demand of the payee?
17         A.    Let me say I -- I expected to honor
18    the agreement.  I don't know if I can answer
19    that with regard to that one term.
20         Q.    Well, I do just want to make sure
21    that -- withdrawn.
22             You understood at the time you
23    signed this document, or it was signed on your
24    behalf, that it was a demand note, correct?

Dondero - 5-28-2021

1          A.    That it was structured -- no.  I
2     think what I've testified or tried to testify
3     to is that they are demand notes or they're
4     written as demand notes.  I didn't read them or
5     pay attention at the time to the structure of
6     the note.
7          Q.    Okay.  And as demand notes, you
8     understood that any unpaid principal and
9     interest would be due upon demand, correct?
10         A.    Again, I don't want to make -- I
11    don't want to make -- I don't want to affirm
12    that statement.  I would say I don't know
13    because I don't want to -- I don't know the
14    rest of the context of the rest of the note and
15    how it all interplays.
16         Q.    All right.  Well, I'm happy to --
17    to -- it's a very short document, so we can
18    look at it for as long as you want, but I
19    really need to know what -- what you, as the
20    maker, understood when you signed the note.  So
21    I'm going to ask a very simple question, and I
22    encourage you to -- to ask to see whatever
23    portions of the document you want, okay?
24             When these three notes were signed

Dondero - 5-28-2021

1     by you or signed by someone you authorized to
2     sign, what did you understand the payment terms
3     to be?
4          A.    I -- I didn't.  I didn't have an
5     understanding at the time.
6          Q.    So -- but -- but you would agree
7     that your intention was to comply with the
8     terms of the note; is that fair?
9          A.    In aggregate, yes.
10         Q.    Okay.
11             MR. MORRIS:  Go to Exhibit 5,
12    please.
13             (Exhibit 5 introduced.)
14    BY MR. MORRIS:
15         Q.    Is it your practice to sign
16    documents or to have people sign documents on
17    your behalf that you haven't read?
18         A.    Yes.
19         Q.    This is a document that's entitled
20    "Operating Results" for August 2018.  Do you
21    see that?
22         A.    Yes.
23             MR. MORRIS:  And if we could just go
24    to the second page.

Dondero - 5-28-2021

1     BY MR. MORRIS:
2          Q.    Do you see under Significant Items
3     Impacting Highland's bank -- balance sheet for
4     August 2018 at the bottom, there's a reference
5     to $5 million in "partner loan."  Do you see
6     that?
7          A.    Yes.
8          Q.    Do you have an understanding as to
9     whether or not that refers to the two
10    2.5 million-dollar notes that we just looked at
11    that were signed in August 2018?
12         A.    I don't know.
13         Q.    Do you have any recollection at
14    all or -- withdrawn.
15             Were you personally referred to as a
16    partner of Highland in August 2018?
17         A.    I believe so.
18         Q.    Are you aware of any partner loans
19    that were made by Highland in August 2018 other
20    than the two loans that we just looked at?
21         A.    I don't know.
22         Q.    You're not aware of any; is that
23    fair?
24             MS. DEITSCH-PEREZ:  Object, no

Page 132

Dondero - 5-28-2021

1       foundation.

2      A.   I don't know.

3    BY MR. MORRIS:

4      Q.   There came a time when the debtor

5   made demand on these three notes, right?

6      A.   I don't know.  I believe -- I don't

7   know specifically, but I believe so.

8        MR. MORRIS:  Can we put up

9   Exhibit 6, please?

10      (Exhibit 6 introduced.)

11   BY MR. MORRIS:

12      Q.   Do you see this is a -- it's a

13   letter dated December 3rd, and it's addressed

14   to you.

15        And if we scroll down a little bit,

16   it's signed by Mr. Seery as the CEO and CRO of

17   Highland Capital Management.

18        Do you see that?

19      A.   Yes.

20      Q.   Do you recall on or around

21   December 3rd, 2020, the debtor made a demand

22   for all outstanding principal and interest due

23   under the three notes that we just looked at?

24      A.   I -- I see the letter.  I don't have

---

Page 133

Dondero - 5-28-2021

1   a recollection.

2      Q.   All right.  Do you understand that

3   in December 2020, the debtor made a demand for

4   payment of all unpaid principal and interest

5   under the three notes that we just looked at,

6   even if you don't remember this particular

7   letter?

8      A.   I'm sorry.  What was -- yeah, I

9   accept the letter, and I'll accept that it was

10   delivered.

11        What -- what's your question,

12   please?

13      Q.   I'm trying to just get -- get your

14   understanding.

15        And I think you testified that you

16   don't recall seeing this letter.  Do I have

17   that right?

18      A.   That's correct.

19      Q.   Okay.  So, putting the letter to the

20   side, did you become aware in December 2020

21   that the debtor had demanded that you pay all

22   unpaid principal and interest due under the

23   three promissory notes that we just looked at?

24      A.   Again, just generally.

---

Page 134

Dondero - 5-28-2021

1      Q.   Did you make any payment to the

2   debtor in response to that demand?

3      A.   No.

4      Q.   Did you or anybody acting on your

5   behalf respond to the debtor's demand in any

6   way?

7        MS. DEITSCH-PEREZ:  Object to the

8   form.

9   BY MR. MORRIS:

10      Q.   Withdrawn.  That's fair.

11        Let me ask a different question.

12        Did you or anybody acting on your

13   behalf respond to the debtor's demand at any

14   time prior to the commencement of this

15   adversary proceeding?

16        MS. DEITSCH-PEREZ:  Object to the

17   form.

18      A.   Can you repeat it one more time?

19   BY MR. MORRIS:

20      Q.   Sure.  Did you or anybody acting on

21   your behalf respond to the debtor's demand for

22   payment of all unpaid principal and interest at

23   any time prior to the commencement of this

24   lawsuit?

---

Page 135

Dondero - 5-28-2021

1        MS. DEITSCH-PEREZ:  Object to the

2   form.

3        I want -- I want to answer that

4   question as -- as follows:  I'm not saying on

5   my behalf, but I know there was a lot of

6   conversations with lawyers and business people

7   around the notes and their shared services and

8   the split and the overpayments to Highland and

9   -- trying to reach some amicable resolution of

10   shared services -- in fact, the entire

11   estate -- but I don't -- I don't -- I don't

12   recall specifically or -- what lawyers or what

13   business people were saying what to the debtor,

14   but I -- I know there were a lot of

15   conversations that were going on.

16   BY MR. MORRIS:

17      Q.   Can you identify any aspect of any

18   of the conversations you just described that

19   pertained to the debtor's demand for payment of

20   all unpaid principal and interest on the three

21   notes?

22      A.   Not -- not specifically.

23      Q.   Okay.  There came a time when an

24   answer to the debtor's complaint was filed on

Dondero - 5-28-2021

2 your behalf.

3      Do you remember that?

4   A.   No, but I'm willing to be refreshed.

5   Q.   Okay.

6      MR. MORRIS:  Can we please put up

7 Exhibit 7?

8      (Exhibit 7 introduced.)

9      MR. MORRIS:  And if we could just

10   scroll down to the title.

11 BY MR. MORRIS:

12   Q.   Do you see that this document is

13 called "Defendant James Dondero's Original

14 Answer"?

15   A.   Yes.

16   Q.   And if we scroll back to the top of

17 the document, do you see that it was filed on

18 the docket on March 16, 2021?

19   A.   Yes.

20   Q.   Did you personally read this

21 document before it was filed?

22   A.   No.

23   Q.   Did you have an understanding as to

24 the contents of the document before it was

25 filed?

Dondero - 5-28-2021

2   A.   No.

3   Q.   Did you authorize Bonds Ellis to

4 file this document on your behalf?

5   A.   Not specifically that I remember.

6   Q.   Did you know on or around March 16,

7 2021, that Bonds Ellis had filed "Defendant

8 James Dondero's Original Answer" in this

9 adversary proceeding?

10   A.   Not specifically.  There's a lot

11 going on.

12   Q.   As you sit here right now--and,

13 again, happy to page through the document--can

14 you tell me whether you have ever read

15 Defendant James Dondero's Original Answer?

16   A.   Not that I recall.

17   Q.   So, as of -- and that's true as of

18 today; is that fair?

19   A.   Can we scroll through this, please?

20   Q.   Yes.  Just let us know if you want

21 us to slow down or speed up.

22      MS. DEITSCH-PEREZ:  Yeah, just go

23      slow enough so he could sort of eyeball

24      each page.

25      MR. MORRIS:  You bet.

Dondero - 5-28-2021

2      THE WITNESS:  Yep, keep going.

3      (Scrolling.)

4      THE WITNESS:  Hold on.  Could you go

5      back a little bit, please?  It just goes --

6      stop right there.

7   A.   I do remember paragraph 5.  I think

8 that was recently tried last week or so, but I

9 think that was always the -- always the way it

10 was described to me by lawyers, was that these

11 notes shouldn't be in her Court.

12      MS. DEITSCH-PEREZ:  Okay.  And I'll

13      just -- I'll just caution the witness to

14      not disclose communications with counsel,

15      but it's okay if something catches your eye

16      and you, at least, remember that part, say,

17      "Oh, yeah, I remember that one," but

18      without going into details as to any

19      communications with your lawyers.

20      MR. MORRIS:  And -- and that's fine.

21      That's fine.  I'm certainly not looking for

22      that.

23 BY MR. MORRIS:

24   Q.   The question is really simple:  Have

25 you ever seen this document before and --

Dondero - 5-28-2021

2      MS. DEITSCH-PEREZ:  John, I think he

3 said he needs to scroll through it to see

4 if anything --

5      MR. MORRIS:  I understand.

6      MS. DEITSCH-PEREZ:  -- triggers a

7 recollection.  He just said he's looking at

8 5, yeah, that looks familiar.  If you want

9 to keep going, we could find out if there

10 are any others that -- that look familiar

11 to him.

12      THE WITNESS:  Let's keep going.

13      (Scrolling.)

14      MS. DEITSCH-PEREZ:  You'll agree

15 that most answers are not particularly

16 memorable when they say things like --

17      (Simultaneous conversation.)

18      MR. MORRIS:  Please stop.  Please

19 stop.  Please stop talking.  Please stop

20 talking.  It's inappropriate.

21      MS. DEITSCH-PEREZ:  I -- I know.

22 It's your deposition, and you could do all

23 this stuff, but --

24      (Simultaneous conversation.)

25      MR. MORRIS:  Please stop talking.

Dondero - 5-28-2021

1  Please stop talking.
2  MS. DEITSCH-PEREZ: I hear you.
3  THE WITNESS: Keep -- keep going.
4  (Scrolling.)
5  THE WITNESS: Okay. Keep going.
6  (Scrolling.)
7  THE WITNESS: It looks to me like --
8  MS. DEITSCH-PEREZ: Keep -- let --
9  let him go through the whole thing.
10  THE WITNESS: Sure. Keep going.
11  (Scrolling.)
12  THE WITNESS: Okay. Is that it?
13  MR. MORRIS: Yes.
14  THE WITNESS: Okay.
15  BY MR. MORRIS:
16  Q. Do you recall ever seeing this
17  document before, sir?
18  A. The -- the substance of it, again,
19  some of it I -- I remember, and the -- there --
20  it strikes me as a legal argument and defenses
21  regarding the payment of the notes, and I do
22  remember a lot of conversation regarding it
23  being -- it should be outside -- it should be
24  in a different court, and it should be a jury

Dondero - 5-28-2021

1  trial. And those are two main points in here,
2  but it seems like there are a bunch of other
3  defenses listed.
4  Q. Okay.
5  A. And I have -- and I have an
6  awareness of it, but I'm not a lawyer.
7  Q. I appreciate that you're not a
8  lawyer; but looking at the document, does that
9  refresh your recollection that you read and
10  reviewed this document before it was filed on
11  your behalf?
12  A. I have -- I have an awareness of it,
13  but I wouldn't -- I wouldn't have been deeply
14  involved in its drafting or detailed approval.
15  MR. MORRIS: Can we go to page 6 of
16  8, please?
17  BY MR. MORRIS:
18  Q. And directing your attention to
19  paragraph 40, do you see it says, as the first
20  affirmative defense, quote, "Defendant asserts
21  that plaintiff's claims should be barred
22  because it was previously agreed by plaintiff
23  that plaintiff would not collect on the notes."
24  Do you see that?

Dondero - 5-28-2021

1  A. Yes.
2  Q. Okay. Have I read that accurately?
3  A. Yes.
4  Q. Did the plaintiff ever agree that
5  plaintiff would not collect on the notes?
6  A. Yes.
7  Q. You subsequently amended this
8  defense; isn't that right?
9  A. I believe so.
10  Q. And do you understand that you
11  amended it to add a few words relating to
12  conditions subsequent?
13  A. I -- I -- other than for
14  clarification and completeness, the -- it was
15  amended. I don't have specific knowledge of
16  what was amended.
17  Q. Okay. When did the plaintiff agree
18  that the plaintiff would not collect on the
19  notes?
20  A. Boy, that was early on in the case.
21  Every proposal, every POT plan, every
22  settlement discussion never included value for
23  notes.
24  Q. All right. I'm going to ask the

Dondero - 5-28-2021

1  question again: When did the plaintiff agree
2  that it would not collect on the notes?
3  MS. DEITSCH-PEREZ: Are you talking
4  about the subsequent agreements in the next
5  pleading?
6  MR. MORRIS: I'm asking for an
7  answer as to when the agreement referred to
8  in paragraph 40 was entered into.
9  A. First quarter of -- first quarter of
10  2020.
11  BY MR. MORRIS:
12  Q. So it was after the petition date?
13  MS. DEITSCH-PEREZ: Are you asking
14  about the 2018 notes?
15  MR. MORRIS: Yes, those are defined
16  to be "the notes."
17  BY MR. MORRIS:
18  Q. So -- so did -- this is your
19  defense.
20  Is it your position, Mr. Dondero,
21  that in the first quarter of 2020, the
22  plaintiff agreed that it would not collect on
23  the notes?
24  A. I -- I -- I don't -- I want to leave

Dondero - 5-28-2021

1  my testimony as what I just said a minute ago.
2  The notes were never part of any POT plan or
3  suggested POT plan or suggested grand bargain
4  or suggested as having any value starting in
5  the first quarter of '20 – or most of the
6  year, I believe, until the – towards the end
7  of the year.
8      Q.   All right.  Was there ever an
9  agreement between you and the plaintiff that
10  the plaintiff would not collect on the notes if
11  there was no grand bargain or no POT plan?
12      A.   Yeah, the – I'm sorry.  Repeat
13  again.
14      Q.   Who entered the agreement on behalf
15  of the debtor that the plaintiff would not
16  collect on the notes?
17      A.   (Indiscernible speech.)
18          Agreement on – you know, the –
19  the – you know the – I think I'm looking at
20  this question from a perspective of the
21  negotiation, you know, at that time and not
22  including the subsequent conditions that were
23  overlaid on the notes, I guess.  So I guess
24  it's a combination of both.

Dondero - 5-28-2021

1      Q.   I'm asking you to identify the
2  person who acted on behalf of the debtor in
3  reaching the agreement with you that the
4  plaintiff would not collect on the notes.  Who
5  did that?
6      MS. DEITSCH-PEREZ:  John, I think
7  the problem is you're referring to the
8  debtor, so he's looking at post-bankruptcy.
9  You might ask it two questions, one –
10      MR. MORRIS:  No.  Please stop.
11  Please stop.  Please stop.
12      (Simultaneous conversation.)
13      MS. DEITSCH-PEREZ:  You agreed to
14  that condition.  You agreed to distinguish
15  between the debtor –
16      (Simultaneous conversation.)
17      MR. MORRIS:  Deborah –
18      MS. DEITSCH-PEREZ.  – bankruptcy –
19      MR. MORRIS:  Deborah –
20      (Simultaneous conversation.)
21      THE REPORTER:  I can't – I can't
22  write two people at the same time.
23      MR. MORRIS:  This is so improper.
24  He has –

Dondero - 5-28-2021

1      MS. DEITSCH-PEREZ:  It is not.  You
2  agreed –
3      MR. MORRIS:  Please let me finish.
4  Please let me finish.
5      He has described the conversations
6  as taking place in 2020.  I should be
7  referring to the debtor.  He is
8  describing –
9      MS. DEITSCH-PEREZ:  Right.
10      MR. MORRIS:  – the context –
11      MS. DEITSCH-PEREZ:  But if you want
12  to know about something that happened
13  before bankruptcy, ask about Highland.
14      MR. MORRIS:  But I'm not.  I
15  don't – please stop interrupting.
16      MS. DEITSCH-PEREZ:  It's your
17  deposition.  If you want a muddy record, be
18  my guest.
19      MR. MORRIS:  I would really
20  appreciate it.  I think I know what I'm
21  doing.
22  BY MR. MORRIS:
23      Q.   Mr. Dondero, who, on behalf of the
24  debtor, during these conversations about a

Dondero - 5-28-2021

1  grand bargain and a POT plan told you or
2  entered into the agreement that the plaintiff
3  would not collect on the notes?
4      A.   I – I – during the bankruptcy,
5  we're talking about, right?
6      Q.   I'm just following up on your
7  statement that the conversation – that the
8  agreement was entered into in the first quarter
9  of 2020.
10      Do I have that right, or is that
11  wrong?
12      A.   Well –
13      Q.   Let's start again.  Let's start
14  again.
15      This affirmative defense refers to
16  an agreement.  Do you see that?
17      A.   Yes.
18      Q.   This is your affirmative defense;
19  isn't that correct?
20      A.   Yes.
21      Q.   And according to this affirmative
22  defense, the agreement was that the plaintiff
23  would not collect on the notes.  Do I have that
24  right?

Page 148

```
1          Dondero - 5-28-2021
2     A.   Yes.
3     Q.   Let's start with: When was that
4  agreement entered into?
5     A.   Okay. I'm going to have to parse,
6  and I'm going to have to answer your question
7  as accurately as I can.
8          The subsequent conditions for
9  forgiveness of the notes were established
10 during a comp period in early 2019 for these
11 notes that were drafted in '18.
12         And the agreement was reached
13 with -- I believe it's a majority of, whatever,
14 the Class A holders in the fourth amended
15 Highland Capital partnership -- partnership
16 agreement. And that's what set up the
17 subsequent conditions and the ability for the
18 loans to be forgiven.
19         When you get into bankruptcy,
20 whether it was Seery, the independent board, or
21 whoever, no one ever put any value nor was it
22 ever included in any -- were the notes included
23 in any settlement discussions, period.
24    Q.   All right. So, it's your testimony
25 that the debtor in settlement negotiations
```

Page 149

```
1          Dondero - 5-28-2021
2  never, ever, ever asked for or demanded the
3  repayment of any unpaid principal or interest
4  under these three notes?
5          That's your sworn testimony?
6     A.   No.
7     Q.   So how did I get that wrong, then?
8     A.   Well, a few minutes ago we went over
9  a letter from the debtor making a demand, but
10 that was, I believe, this year or -- yeah, I
11 believe that was this year or the end of '20.
12         What I'm saying is through '20, the
13 full year of '20 when we were trying to work on
14 a POT plan or global settlement before Seery
15 betrayed the estate, we were -- we never --
16 there was never value assigned to the notes.
17    Q.   And you never offered to make any
18 payment of any kind, principal or interest, on
19 any of the notes in connection with any
20 proposal you ever made as part of the grand
21 bargain or POT plan; is that right?
22    A.   I think -- I believe on the -- not
23 through 2020. I'll say that.
24         By the time 2021 came along, on the
25 eve of trial when I sent over a capitulation
```

Page 150

```
1          Dondero - 5-28-2021
2  offer -- I think it was even titled that -- I
3  think I threw more money than everybody
4  deserved or was entitled to, to try and resolve
5  it. And implicitly, there was -- because it
6  was more than everybody was entitled to, I
7  think implicitly it included value for the
8  notes.
9     Q.   And is it your testimony that at no
10 time prior to the delivery of the demand letter
11 did the debtor ever make an offer to you or --
12 of any kind that included any repayment of any
13 principal or interest due under the three
14 notes?
15    A.   I'm willing to be refreshed, but not
16 that I recall.
17    Q.   Okay. And is it your testimony that
18 anybody acting on behalf of the debtor ever
19 agreed not to collect on the notes?
20    A.   I'm sorry. Repeat that one more
21 time, just --
22    Q.   Is it your testimony -- withdrawn.
23         Did anybody acting on behalf of the
24 debtor ever agree with you that it would not
25 collect on the notes, irrespective of whether
```

Page 151

```
1          Dondero - 5-28-2021
2  there was a settlement?
3          MS. DEITSCH-PEREZ: Object to form.
4     A.   Yeah. Again, that was my
5  understanding through 2020.
6  BY MR. MORRIS:
7     Q.   Do you have --
8          THE WITNESS: Let's -- let's --
9  before the next question, let's take a
10 ten-minute break, ten-minute bathroom
11 break, please.
12         MR. MORRIS: No problem.
13         MS. DEITSCH-PEREZ: Okay. We've
14 been going an hour, so we'll come back
15 at -- 10:30, come back at 10:40?
16         MR. MORRIS: That's fine. Thank
17 you.
18         (Recess held.)
19 BY MR. MORRIS:
20    Q.   Is the agreement that you're
21 referring to and that's referred to in
22 paragraph 40, is that reflected in any document
23 that you're aware of?
24    A.   Not that I'm aware of.
25    Q.   And I believe you mentioned -- and
```

**Appx. 01652**

Page 152

Dondero - 5-28-2021

1   we'll talk about this more later, but the part
2   about the subsequent conditions or the
3   conditions subsequent, that was the agreement
4   that was entered into, did you say the – in
5   part – as part of a compensation committee
6   meeting?
7       A.   As part of our compensation process
8   in – early in 2019.
9       Q.   Okay.  And when you say "early
10  2019," can you – do you recall what month?
11      A.   In January/February.
12      Q.   So, it's your testimony that in
13  January or February 2019, you and the debtor
14  reached the agreement that's referred to in
15  paragraph 40 as subsequently amended by your
16  amended answer; is that right?
17          MS. DEITSCH-PEREZ:  Object to the
18  form.
19          John, I thought you were going to
20  agree to call Highland Highland –
21          MR. MORRIS:  That's fine.  That's
22  fine.
23          (Simultaneous conversation.)
24          MS. DEITSCH-PEREZ:  -- thereafter.

Page 153

Dondero - 5-28-2021

1       MR. MORRIS:  That's fine.  So, let
2   me rephrase the question.
3   BY MR. MORRIS:
4       Q.   I just want to make sure that I have
5   this right, Mr. Dondero.  It's your
6   recollection that in January or February of
7   2019, you reached an agreement with Highland
8   that's reflected in paragraph 40 as
9   subsequently amended to include the phrase
10  "conditions subsequent."  Do I have that right?
11      A.   I gave my testimony.  I don't know
12  if – I don't want to opine on the legal
13  document and whether the legal document
14  captures it there or somewhere else, but my –
15  my recollection regarding pre-bankruptcy and
16  post-bankruptcy is as I – as I stated already.
17      Q.   Let me – let me try this a
18  different way.
19          We looked at the three promissory
20  notes.  Were those promissory notes ever
21  amended, to the best of your knowledge?
22      A.   No, not that – I mean, not – not
23  in writing.
24      Q.   Okay.

Page 154

Dondero - 5-28-2021

1       A.   They were amended – they were
2   amended – they were amended verbally.
3       Q.   Okay.  And did that verbal agreement
4   take place in January or February 2019?
5       A.   Yes.
6       Q.   Was there any verbal agreement
7   related to the notes that occurred other than
8   the one you're referring to in January or
9   February 2019?
10      A.   Well, I gave my testimony during
11  bankruptcy in 2020, the substance of all
12  negotiations never assigned value to the – the
13  notes.
14      Q.   But you never reached an agreement
15  with the debtor on – on any settlement that
16  would include either payment for or forgiveness
17  of the notes; is that fair?
18          You never reached an agreement?
19      A.   Not in writing, but I believe we
20  were operating with an understanding that
21  the – weren't likely to have value to the
22  estate.
23          MR. MORRIS:  Okay.  I move to
24  strike, and I'll ask the question again.

Page 155

Dondero - 5-28-2021

1   BY MR. MORRIS:
2       Q.   Do you have any agreement with the
3   debtor -- agreement with the debtor with
4   respect to any of the three notes?
5           MS. DEITSCH-PEREZ:  Object to the
6   form.
7       A.   I believe the debtor in bankruptcy
8   inherits that subsequent condition agreements
9   from the first quarter of 2019; and I believe
10  in 2020, the debtor operated and participated
11  and acted in a way all negotiations
12  suggested the notes had – were unlikely to
13  have any value to the estate.
14          MR. MORRIS:  Okay.  I move to
15  strike.
16  BY MR. MORRIS:
17      Q.   And I'd ask you to please listen
18  carefully to my question and only answer the
19  question that's asked.
20          Is there any agreement that pertains
21  to the notes other than –
22          MS. DEITSCH-PEREZ:  Objection,
23  asked –
24  BY MR. MORRIS:

Page 156

Dondero - 5-28-2021

1
2   Q.   – with –
3   A.   Yeah, I'm going to stick with my
4   same answer that I've given twice.
5   Q.   I'm actually – I'm actually asking
6   a different question; and if you would let me
7   finish, this would go a lot more smoothly.
8        Is there any agreement, written or
9   verbal, between you and the debtor concerning
10  the notes other than the verbal agreement that
11  you contend was entered into in January and
12  February 2019?
13       I don't want to know about
14  operations or offers or settlement discussions.
15  I want to know about agreements:  Is there any
16  agreement pertaining to the notes other than
17  the verbal agreement entered into in January or
18  February 2019?
19       MS. DEITSCH-PEREZ:  Object to the
20   form.
21  A.   Yes.
22  BY MR. MORRIS:
23  Q.   What other agreement exists?
24  A.   The agreement between, I guess, me
25  and to the extent other related parties that

Page 157

Dondero - 5-28-2021

1
2   had notes with the debtor, beginning in the
3   first quarter after the bankruptcy, that the
4   notes were unlikely to have any value to the
5   estate or have any value in settlement.
6   Q.   Okay.  I don't want to know about
7   value.  I want to know if there is an agreement
8   not to collect.
9        So let me try and answer – ask the
10  question differently.
11       Other than the agreement that you
12  assert was entered into in January or
13  February 2019, did anybody acting on behalf of
14  Highland or the debtor enter into any other
15  agreement pursuant to which the debtor agreed
16  not to collect on the notes?
17  A.   I'm – I'm going – same answer:
18  Implicitly, yes.
19  Q.   Okay.  Is that – is that implicit
20  agreement written down anywhere?
21       You know what?  I'm going to move
22  on, Mr. Dondero, and I look forward to the jury
23  trial.
24       MR. MORRIS:  Can we put up the next
25   exhibit, Number 8?

Page 158

Dondero - 5-28-2021

1
2        (Exhibit 8 introduced.)
3   BY MR. MORRIS:
4   Q.   Did you –
5        MR. MORRIS:  If we could scroll down
6    a little bit.
7   BY MR. MORRIS:
8   Q.   Are you aware that the debtor served
9   discovery in connection with this action?
10  A.   Not specifically.
11  Q.   Do you see that these are your
12  objections and responses to the debtor's
13  requests for admission?
14  A.   Yes.
15  Q.   Have you ever seen this document
16  before?
17       And we can scroll down, if you'd
18  like.
19       MS. DEITSCH-PEREZ:  Scroll through
20   it, please.
21       THE WITNESS:  Yeah, let's scroll
22   through it.
23       (Scrolling.)
24       THE WITNESS:  Can you keep going,
25   please?

Page 159

Dondero - 5-28-2021

1
2        MR. MORRIS:  That's the end.
3        THE WITNESS:  Okay.
4   BY MR. MORRIS:
5   Q.   Have you ever seen this document
6   before, sir?
7   A.   I'm aware of it – I mean, yes, but
8   I don't remember – ask whatever questions you
9   want about it, and we'll go from there.
10  Q.   Did you see this document before –
11  before it was sent to my firm on April 28th,
12  2021?
13  A.   I mean, I'm sure I did and – or I'm
14  sure I did if I was supposed to approve it, but
15  I don't specifically remember.
16  Q.   And did you, in fact, authorize your
17  attorneys to serve this particular document?
18  A.   I – I believe so.
19       MR. MORRIS:  Can we just go to the
20   very last request for admission, number 14?
21       (Scrolling.)
22  BY MR. MORRIS:
23  Q.   You'll see that Request For
24  Admission Number 14 asks you to admit that as
25  of January 22nd, 2021, you hadn't paid the

Dondero - 5-28-2021

1        Dondero - 5-28-2021
2   debtor the outstanding amount.
3         Do you see that?
4      A.   Yes.
5      Q.   And the definition of an
6   "outstanding amount" is the number that's just
7   above that.
8         And in response, you admitted only
9   that you hadn't paid the debtor the amount the
10  debtor asserts is due on the notes in the
11  amount of approximately $9 million.  Do you see
12  that?
13     A.   Yes.
14     Q.   Okay.  I just want to ask a slightly
15  different question:  Have you paid any amounts
16  to the debtor on account of the notes since
17  December 1st, 2020?
18     A.   I -- I don't -- I don't know for
19  sure, but I don't believe so.
20     Q.   Okay.
21        MR. MORRIS:  Can we go to the next
22  exhibit, please, Number 9?
23        (Exhibit 9 introduced.)
24        MR. MORRIS:  Okay.  And if we can
25  scroll down just a little bit.

1        Dondero - 5-28-2021
2   BY MR. MORRIS:
3      Q.   You'll see that these are the
4   "Objections and Answers" that were tendered on
5   your behalf in response to the debtor's first
6   set of interrogatories.
7         Do you see that?
8      A.   Yes.
9         MR. MORRIS:  And if we can go to the
10  last page.
11        MS. DEITSCH-PEREZ:  Could you also
12  scroll through it so he could --
13        MR. MORRIS:  Well, I'm happy to do
14  it.  I'd like to do it my way, please.
15  Thank you.
16        Can we go to the last page, please?
17        (Scrolling.)
18  BY MR. MORRIS:
19     Q.   Is that your signature there, sir?
20     A.   Yes.
21     Q.   And did you sign this document in
22  front of a notary public?
23     A.   Yes.
24     Q.   And did you certify that you had
25  read the document and the objections to the

1        Dondero - 5-28-2021
2   interrogatories?
3      A.   Yes.
4      Q.   And did you swear that the answers
5   were true and correct?
6      A.   Yes.
7      Q.   Okay.
8         MR. MORRIS:  Now let's go back to
9   the top of the document.
10  BY MR. MORRIS:
11     Q.   Did you, in fact, read this document
12  before you signed the Verification in front of
13  a notary?
14     A.   Yes.
15     Q.   Okay.
16        MR. MORRIS:  Go to page 4 of 6,
17  please.
18  BY MR. MORRIS:
19     Q.   Just to help you out, do you see
20  there's a reference to "Purported Agreement" in
21  the first interrogatory, 1(a)?
22     A.   Uh-huh.
23     Q.   That's a "yes," sir; is that right?
24     A.   Yes.
25     Q.   Okay.  The Purported Agreement

1        Dondero - 5-28-2021
2   refers back to the agreement that we were
3   looking at in paragraph 40 of the answer -- and
4   I can just read it again -- that says -- the
5   agreement says, quote, "Plaintiff would not
6   collect on the Notes."
7         And I asked you three questions in
8   the interrogatory.  Did this interrogatory
9   accurately state, to the best of your
10  knowledge, that you, personally, entered into
11  the Purported Agreement on behalf of the
12  debtor?
13     A.   Which -- which one are you -- which
14  agreement are you talking about?
15     Q.   Just the one that we were talking
16  about earlier -- and I'll just read it again
17  for you.  We can call it back on the screen, if
18  it's helpful -- but the agreement that you
19  referred to in your answer that, quote,
20  "plaintiff would not collect on the notes."
21  That's the Purported Agreement.
22        And so, I just want you to confirm
23  that in your answer to Interrogatory No. 1, you
24  stated that it was true and accurate that you
25  entered into that agreement on behalf of the

Dondero - 5-28-2021

1   debtor.
2       Do I have that right?
3       A.   I'm -- I'm going to say no because I
4   think you're using the wrong description of the
5   debtor versus Highland prebankruptcy.
6       Q.   I appreciate that.  I apologize.
7   Let me rephrase the question.  That's a fair
8   point.
9       Did you enter into the agreement
10  referred to in your answer on behalf of
11  Highland?
12      A.   The -- the agreement on behalf of
13  Highland prebankruptcy was agreed to by
14  majority of the Class A members, which I
15  believe at the time was Dugaboy.
16      Q.   All right.  That doesn't say that in
17  your answer here, does it?
18      A.   Again, there was an original, I
19  think, answers; and then there were amended
20  answers.  I think the lawyers did the best they
21  could to capture -- but, evidently, the parsing
22  between pre-bankruptcy agreements and
23  post-bankruptcy agreements was done the best it
24  could be by the lawyers but I -- I -- I don't

Dondero - 5-28-2021

1   want to comment on the legal.
2       Q.   I don't want to comment on legal
3   stuff, either; but you signed this document,
4   you verified this document, and you verified
5   that it was true and accurate.  Correct?
6       A.   Yes.
7       Q.   Okay.  And in the first sentence to
8   your answer in Interrogatory 1, you wrote, or
9   somebody wrote on your behalf, quote:  "The
10  agreements were entered into on behalf of the
11  debtor by James Dondero, subsequent to the time
12  each note was executed."
13      Is that an accurate statement, or is
14  it an inaccurate statement?
15      A.   Again, it was between me and the
16  Class A, the majority of the Class A members.
17  It was a Class A -- the Class A members were
18  representing Highland, never the debtor,
19  because the debtor didn't exist yet.
20      But then, again, I don't know if
21  this paragraph refers to, again, how we
22  operated in bankruptcy, which was the
23  assumption that the notes had -- were likely --
24  were not likely to have any value for the

Dondero - 5-28-2021

1   estate.  I don't -- I don't know which this is
2   referring to.
3       Q.   You understand that the definition
4   of the "debtor" includes Highland Capital
5   Management, L.P.?
6       A.   I think we started off the depo by
7   saying that there was a Highland prior to
8   bankruptcy and then there was a Highland in
9   bankruptcy and the debtor is Highland in
10  bankruptcy.
11      Q.   Let me just ask you this question,
12  sir:  Is that first sentence accurate, or is it
13  wrong?
14      A.   I didn't write it, so -- and you
15  swore to it.  You're the one who said it was
16  true and accurate.  So now I'm asking you:  Is
17  it actually true and accurate?
18      A.   I'm going to stick with my testimony
19  so far.  I don't want to opine on that.  I
20  think it depends -- it's not -- maybe it's not
21  perfectly written, but...
22      Q.   Sir, with all due respect, please
23  answer my question:  Is the first sentence true
24  and correct, as you verified?

Dondero - 5-28-2021

1       MS. DEITSCH-PEREZ:  He already
2   answered your question, John.
3       MR. MORRIS:  That's fine.  You can
4   have the objection, asked and answered.
5       I'm asking him to answer again.
6   BY MR. MORRIS:
7       Q.   Is that first sentence true and
8   correct as you verified it?
9       A.   "Behalf" probably isn't, like I
10  said, the right word.  It should be "between"
11  the debtor and James Dondero.  So that's how I
12  would wordsmith that.
13      Q.   Okay.  So this -- this first
14  sentence is not true and correct, to the best
15  of your knowledge; is that fair?
16      A.   I -- I don't want to say that other
17  than I think it could be stated better.
18      Q.   Okay.  But as stated right now, it
19  says that the agreement was entered into on
20  behalf of the debtor by James Dondero.  Have I
21  read that correctly?
22      A.   Yeah.  I mean, that is what it says.
23  Again, I feel like I'm interpreting legal
24  phraseology here, like "on behalf of the

Dondero - 5-28-2021

1    debtor." If it was an agreement between the
2    debtor and the Class A entered into –
3        MS. DEITSCH-PEREZ: Mr. Morris knows
4    very well there's another – that there's
5    an amendment to this. I don't know why
6    he's doing this.
7        Mr. Morris –
8        (Simultaneous conversation.)
9        MR. MORRIS: Please stop. Please
10   stop.
11       I'm allowed to go through his sworn
12   statements. Give me a break. Please stop.
13   Don't coach –
14       MS. DEITSCH-PEREZ: You've been
15   asking the same question over and over and
16   over.
17       MR. MORRIS: You know, I'm going to
18   shut this down if you do it one more time.
19   I will, and I'm happy to make the motion to
20   the Judge. I'm begging you, please stop
21   interfering.
22       My apologies, Mr. Dondero. Never
23   directed at you personally.
24   BY MR. MORRIS:
25

Dondero - 5-28-2021

1        Q.   The second sentence of the answer,
2    have you been able to identify any documents
3    that reflect or memorialize the agreements?
4        A.   I mean, I – I – I don't – I don't
5    know, but I don't think so.
6        Q.   Thank you very much.
7        MR. MORRIS: Go to the next
8    document, please.
9        (Exhibit 10 introduced.)
10   BY MR. MORRIS:
11       Q.   Do you see that this is the "Amended
12   Answer" that was filed on your behalf?
13       MS. DEITSCH-PEREZ: Let's please –
14       THE WITNESS: Yes.
15       MS. DEITSCH-PEREZ: – scroll
16   through.
17       THE WITNESS: Yeah, please scroll
18   through.
19       (Scrolling.)
20   BY MR. MORRIS:
21       Q.   All right. Have you seen this
22   document before, sir?
23       A.   Yes, generally.
24       Q.   Did you – do you recall if you saw
25

Dondero - 5-28-2021

1    it prior to the time it was served and filed on
2    your behalf?
3        A.   Probably.
4        Q.   Did you authorize it to be filed on
5    your behalf?
6        A.   Yes.
7        MR. MORRIS: Can we please go to
8    page 6 of 8?
9        (Scrolling.)
10       MR. MORRIS: And if we can scroll
11   just down to the "Affirmative Defenses."
12   BY MR. MORRIS:
13       Q.   All right. Do you see
14   paragraph 40 –
15       A.   Yeah.
16       Q.   – as compared to the prior version
17   of your answer, has added the words, quote,
18   "upon fulfillment of conditions subsequent."
19   Do you see that?
20       A.   Yes.
21       Q.   Why were those words added?
22       MS. DEITSCH-PEREZ: Object to the
23   form.
24       A.   I think to make this document more
25

Dondero - 5-28-2021

1    complete and more clarified as things were
2    learned and investigated.
3    BY MR. MORRIS:
4        Q.   And were things "learned and
5    investigated" after the time that you submitted
6    the – withdrawn.
7        Were things "learned and
8    investigated" after the time the original
9    answer was served and filed on your behalf?
10       MS. DEITSCH-PEREZ: Object to the
11   form.
12       And I would also just caution the
13   witness before he speaks to think – to
14   make sure he doesn't disclose
15   attorney-client communications.
16       A.   I'm sorry, could you please repeat
17   the question?
18   BY MR. MORRIS:
19       Q.   Sure. Did you, personally, learn or
20   discover anything related to this amended
21   paragraph 40 after the time that the original
22   answer was filed on your behalf?
23       MS. DEITSCH-PEREZ: Same objection.
24       A.   We went through the – the –
25

Page 172

Dondero - 5-28-2021

1          Dondero - 5-28-2021
2          MS. DEITSCH-PEREZ:  When you say
3      "we," are you talking about you and
4      lawyers?
5          THE WITNESS:  Yes.
6          MS. DEITSCH-PEREZ:  Don't disclose
7      your communications with lawyers.
8   BY MR. MORRIS:
9      Q.   All right.  I don't want to know
10     anything about your communications with
11     lawyers, but I'm going to ask you for facts.
12          What facts, if any, did you learn
13     after the original answer was filed that relate
14     to the words, quote, "upon fulfillment of
15     conditions subsequent."
16     A.   The "conditions subsequent" involved
17     in the first quarter of 2019 were always an
18     event, but it wasn't captured properly or
19     needed to be clarified in the amendment.
20     Q.   Well, you mentioned that "things
21     were learned and investigated" after the answer
22     was filed, and I'm just trying to pin down what
23     that was?
24     A.   I -- I took it more seriously with
25     the lawyers as it -- as the notes became more

Page 173

Dondero - 5-28-2021

1      of an issue, and it's -- I'm very busy over
2      here and then spent more time going through the
3      details, and this needed to be clarified or
4      stated differently.
5      Q.   Okay.  With respect to the agreement
6      referred to in paragraph 40, whose idea was it
7      to enter into that agreement?
8      A.   It was -- it was mine.
9      Q.   Okay.  And who were -- who were the
10     majority of Class A holders that you referred
11     to earlier?
12     A.   That was the counterparty
13     decision-maker for Highland prior to
14     bankruptcy, and like I said, I believe it was
15     Dugaboy.
16     Q.   Can you think of any other member of
17     Class A who entered into this agreement on
18     behalf of the debtor in the early part of 2019
19     other than Dugaboy?
20          MS. DEITSCH-PEREZ:  Object to the
21     form.
22     A.   I do believe it was necessary.
23     Dugaboy alone was the requisite majority.  I
24     didn't -- I don't remember or remember even

Page 174

Dondero - 5-28-2021

1      thinking about including anybody else.
2   BY MR. MORRIS:
3      Q.   Okay.  And to be clear, Mr. Dondero,
4      I'm not -- I don't have a view one way or the
5      other as to whether you should or shouldn't --
6      who you should have contacted.
7          I just want to know who -- if you
8      can identify for me the Class A members who
9      acted to approve the agreement that's referred
10     to in paragraph 40.
11          Is there anybody other than Dugaboy?
12     A.   Not -- not -- not -- not
13     specifically regarding that comp cycle.
14     Q.   Okay.  And who acted on behalf of
15     Dugaboy to enter into the agreement that's
16     referred to in paragraph 40?
17     A.   The trustee.
18     Q.   The trustee of Dugaboy?
19     A.   Yes.
20     Q.   And who was the trustee of Dugaboy
21     in the January/February 2019 time period that
22     entered into this agreement on behalf of the
23     debtor?
24     A.   My sister Nancy.

Page 175

Dondero - 5-28-2021

1      Q.   Did you and Nancy discuss this
2      agreement at all?
3      A.   This agreement?  No.
4      Q.   Can you describe --
5          MS. DEITSCH-PEREZ:  What do you mean
6      by "this agreement"?
7          (Simultaneous conversation.)
8      A.   Not the one that's on the screen.
9   BY MR. MORRIS:
10     Q.   Yes.  That's the only one that I'm
11     talking about, so --
12          MS. DEITSCH-PEREZ:  So you mean --
13          MR. MORRIS:  Please, please, Deb --
14          MS. DEITSCH-PEREZ:  John, can you
15     please clarify:  Are you asking if he
16     discussed the answer with Nancy or the --
17          MR. MORRIS:  I didn't use the word
18     "answer."  I used the word "agreement," so
19     let me --
20          MS. DEITSCH-PEREZ:  I know, but he
21     pointed to the screen.
22          (Simultaneous conversation.)
23          MR. MORRIS:  Are you done?
24          MS. DEITSCH-PEREZ:  Yes.

1            Dondero - 5-28-2021
2   BY MR. MORRIS:
3       Q.   Mr. Dondero, can you describe for
4   me -- withdrawn.
5            Did you discuss with your sister
6   Nancy, the agreement that's referred to in
7   paragraph 40?
8       A.   The agreement to subsequent
9   conditions, yes, absolutely.  But this
10  agreement that's on the screen, I've never --
11  I've never -- I've never shown her this
12  document or talked to her about it.
13      Q.   I'm not asking about the document.
14  I'm not asking about the document.  I'm asking
15  about the agreement that's referred to in
16  paragraph 40.
17           Do you understand that?
18      A.   Yes.  And, yes, we had several
19  conversations about it.
20      Q.   Okay.  Can you describe for me
21  everything you remember about your discussions
22  with Nancy concerning the agreement that's
23  referred to in paragraph 40?
24      A.   That the loans that were in place
25  would be forgiven upon a monetization -- the

1            Dondero - 5-28-2021
2   favorable monetization of certain large or
3   liquid assets on the Highland balance sheet;
4   and the three that were focused on was MGM,
5   Trussway, and Cornerstone.
6       Q.   Did she say anything in response?
7       A.   Just, "How much are we talking
8   about?"  And I told her it was about 9 million
9   in aggregate, and -- and I told her that it
10  was -- that the forgiveness or the compensation
11  was compliant regarding any credit covenants or
12  Hunter Mountain covenants --
13      Q.   Do you recall any --
14      A.   -- that -- that if it were to be
15  forgiven, that additional compensation would be
16  compliant or permitted and really not material
17  relative to any outstanding credit agreements
18  that Highland had or agreements with Hunter
19  Mountain.
20      Q.   Is this something that you discussed
21  with her, or is this just information that
22  you're giving me?
23      A.   This is what I discussed -- that's
24  almost the entirety of the conversation.  It
25  happened over a couple different conversations,

1            Dondero - 5-28-2021
2   but...
3       Q.   Did anybody participate in any of
4   the conversations you're describing other than
5   you and your sister?
6       A.   I don't believe it was necessary, it
7   didn't include anybody else.
8       Q.   Okay.  Again, I'm not here to
9   question.  I'm just looking for facts,
10  Mr. Dondero.
11           So nobody participated in any of
12  these conversations that you can recall other
13  than you and Nancy; is that correct?
14      A.   Correct, that I -- yes, there was
15  never a third party involved in our
16  conversations.  I don't know -- I don't think
17  she discussed it with anybody else, but I don't
18  know.
19      Q.   Did -- was the agreement subject to
20  any negotiation?  Did she make any
21  counterproposal of any kind?
22      A.   No.  No, I -- again, I believe both
23  of our views at the time was that it was
24  immaterial to Highland overall or any other
25  agreements.

1            Dondero - 5-28-2021
2       Q.   Do you know if she sought any
3   independent advice before entering into the
4   agreement that you've described?
5       A.   I don't know.
6       Q.   Do you recall whether you provided
7   her with any documents of any kind in
8   connection with the discussions that led to the
9   agreement that's referred to in paragraph 40?
10      A.   I -- I have no -- I don't -- I don't
11  believe -- no, I don't believe I gave her
12  copies of the relevant Hunter Mountain
13  limitations, or whatever.  I just spoke to her
14  about it.
15      Q.   Okay.  I'm just asking -- I'm asking
16  a broader question:  Do you recall giving her
17  any documents of any kind in connection with
18  the discussions that led to the agreement in
19  paragraph 40?
20      A.   Not -- not that I recall.  She --
21  she may -- she may have some, but I don't
22  remember.
23      Q.   Do you know if there were any
24  resolutions that were adopted by Highland to
25  reflect the agreement that's referred to in

Page 180

Dondero - 5-28-2021

1   paragraph 40?
2      A.   Resolutions that -- no, not that I'm
3   aware of.
4      Q.   Did you give -- did you give Nancy a
5   copy of the three promissory notes that were
6   the subject of the agreement referred to in
7   paragraph 40?
8      A.   No.
9      Q.   Did she ask to see any documents
10  before entering into the agreement that's
11  referred to in paragraph 40?
12     A.   I -- I don't remember.
13     Q.   Did you suggest that she speak with
14  anybody prior to the time that she entered into
15  the agreement that's referred to in
16  paragraph 40?
17         MS. DEITSCH-PEREZ:  Asked and
18  answered.
19     A.   Yeah.  No.
20  BY MR. MORRIS:
21     Q.   Do you know whether she actually
22  spoke with anybody concerning the subject
23  matter of the agreement that's referred to in
24  paragraph 40 prior to the time it was entered

Page 181

Dondero - 5-28-2021

1   into?
2      A.   I don't know.
3      Q.   Is there any time period by which
4   the subsequent -- the conditions subsequent
5   have to be fulfilled, or are they open-ended?
6      A.   I believe it was open-ended.
7      Q.   Under the agreement that's referred
8   to in paragraph 40, did the debtor surrender
9   its right to make a demand under the promissory
10  notes?
11         MS. DEITSCH-PEREZ:  And, again, are
12  you talking about the debtor as in
13  post-bankruptcy or --
14         MR. MORRIS:  I apologize.  Thank
15  you.  Thank you.  Thank you.  Thank you.
16         Withdrawn.
17  BY MR. MORRIS:
18     Q.   Under the agreement that you reached
19  with Nancy that's referred to in paragraph 40,
20  was it your understanding that Highland
21  surrendered its right to make a demand for
22  payment of unpaid principal and interest under
23  the notes?
24     A.   I think essentially, yes.

Page 182

Dondero - 5-28-2021

1      Q.   Okay.  What did Highland receive in
2   return for its agreement to surrender its right
3   to make a demand for unpaid principal and
4   interest, if anything?
5      A.   I think with all forgiveness of
6   notes, what it gets is it gets focus in terms
7   of the monetization and it reduces additional
8   compensation that I could have/would have taken
9   otherwise, or could have/would have been
10  entitled to otherwise.
11         So, it's -- yeah, I mean, I think
12  it's, again, heightened focused for something
13  that would be great for the debtor or great for
14  Highland at the time and reduces -- that form
15  of forgiveness becomes compensation when and if
16  it occurs, and then it -- it theoretically
17  reduces other compensation.
18     Q.   So why not just forgive it at that
19  moment?
20         Why tie it to "conditions
21  subsequent"?
22     A.   I thought it was more appropriate.
23     Q.   Did you and Nancy discuss at all
24  what the benefit would be to Highland from this

Page 183

Dondero - 5-28-2021

1   arrangement?
2      A.   The focus -- the focus parts for
3   sure.
4      Q.   And without -- without the agreement
5   that's referred to in paragraph 40, you
6   wouldn't have been focused on maximizing the
7   enterprises; is that right?
8      A.   No.
9      Q.   So -- I'm sorry, maybe I missed it.
10         When you used the word "focus" --
11  let me -- when you use the word "focus," what
12  do you mean?
13         What is the benefit to the debtor?
14         MS. DEITSCH-PEREZ:  Object to the
15  form.
16         He said "heightened focus."
17     A.   Yeah, heightened focused was my
18  words, which --
19  BY MR. MORRIS:
20     Q.   Okay.
21     A.   -- you know, means beyond normal
22  focus.  It means additional effort just like in
23  any company or what we do here with other
24  employees, for things you really want to get

**Appx. 01660**

Page 184

Dondero - 5-28-2021

1  done or focus on, you provide that extra
2
3  incentive.
4      Q.   Okay.  So -- so that's the benefit
5  to Highland, was that you were going to have a
6  heightened focus on maximizing value; is that
7  fair?
8          MS. DEITSCH-PEREZ:  Object to the
9      form.
10     A.   And then also the part 2 of my
11  answer, right, which, you know, that
12  forgiveness would be compensation which
13  would -- in any given year, additional
14  compensation coming from forgiveness reduces
15  other compensation.
16  BY MR. MORRIS:
17     Q.   Was that part of the agreement that
18  you reached with Nancy?  Was that -- was that
19  when these notes were forgiven, you would forgo
20  an amount equivalent to the outstanding
21  principal and unpaid interest?
22          MS. DEITSCH-PEREZ:  Object to the
23      form, misstates his prior testimony.
24     A.   Yeah.  I remember discussing the
25  focus part with her.  The -- I was giving that

Page 185

Dondero - 5-28-2021

1  answer when you were asking me what would be
2  the benefit or consideration to Highland and
3  then ultimately to debtor.  I was giving you
4  compensation answer.
5
6  BY MR. MORRIS:
7      Q.   Okay.  So I just -- but I do want to
8  try to understand from your perspective the
9  benefit to the debtor.
10         And, one, you told me about the
11  heightened focus, and the second --
12     A.   Right.
13     Q.   -- I think you said, and correct me
14  if I'm wrong, that it would relieve the debtor
15  of paying some compensation in the future.
16         Am I mistaken about that?
17     A.   Yeah, I mean -- I'm sorry.  Repeat
18  that one more time, please.
19     Q.   I believe you said that the second
20  benefit to Highland from entering into the
21  agreement referred to in paragraph 40 is that
22  it would relieve them of a future obligation to
23  pay compensation in the same amount.
24         Do I have that right?
25         MS. DEITSCH-PEREZ:  Object to the

Page 186

Dondero - 5-28-2021

1  form.
2     A.   Maybe not exactly "the same amount,"
3  but it would -- it would -- it would reduce
4  comp -- yes, it would -- it would, like, in the
5  next cycle, reduce -- or when it was realized,
6  would likely reduce comp then.
7
8  BY MR. MORRIS:
9      Q.   Okay.  And by what amount would it
10  likely reduce comp, then?
11     A.   I don't know.  By significant --
12  by -- by a significant amount, by something
13  similar to the 9 million bucks.
14     Q.   Okay.  So, is there any -- I'm just
15  trying to understand your perspective.
16         One of the benefits from entering
17  into the agreement referred to in paragraph 40
18  is that upon the realization of the forgiveness
19  of the debt, Highland or the debtor, whatever
20  the case may be, in the future would be
21  relieved from paying you an amount similar to
22  the principal amount of the notes?
23         Do I have that right?
24     A.   Yeah, or -- or -- yeah.  I guess the
25  reason why I keep going back and forth on the

Page 187

Dondero - 5-28-2021

1  exactness of the answer is that if --
2  there's -- depending on what the compensation
3  target is and whether or not you wanted to grow
4  something up or you're looking for a net
5  amount, but forgiveness of debt becomes a
6  taxable event with no -- no additional ability
7  to pay taxes.  So it's usually not an exact
8  offset to future compensation, the way we've
9  done it here historically.
10     Q.   In the agreement that you reached
11  with Nancy that's referred to in paragraph 40,
12  were there any other -- withdrawn.
13         In the agreement that you reached
14  with Nancy that's referred to in paragraph 40,
15  were there any circumstances under which you
16  would have been obligated to pay all unpaid
17  principal and interest under the notes?
18     A.   If the illiquid assets weren't -- or
19  if -- if none of the illiquid assets were
20  monetized.
21     Q.   But you were -- you were, at the
22  time you entered into this oral agreement, in
23  control of whether or not to monetize those
24  illiquid assets, right?

Page 188

Dondero - 5-28-2021

1
2    A.   And I expected they would be over
3    time, yes.
4    Q.   Okay.  So, based on your control of
5    the enterprise at the time that you entered
6    into the agreement, is there any -- did you
7    have any -- any scenario under which you
8    believed you might actually have to pay back
9    the unpaid principal and interest due under the
10   notes?
11   A.   If they weren't monetized.
12   Q.   Okay.  Anything else?
13   A.   Assets weren't monetized, yeah.
14   Q.   Anything else?
15   A.   That's -- that's my recollection.
16   Q.   If -- if you -- have the "conditions
17   subsequent" been met yet?
18   A.   I believe the announcement of the
19   MGM sale will meet the conditions precedent
20   when it closes four or five months from now.
21   Q.   Okay.  But none of them have been
22   met -- have the conditions subsequent been met
23   as of today?
24   A.   Have the conditions subsequent been
25   met today.  I don't have awareness of --

Page 189

Dondero - 5-28-2021

1
2    despite objecting vehemently, we don't have
3    awareness of what the debtor is doing with
4    Trussway or Cornerstone.  So there's a
5    potential that those could have triggered, but
6    I don't -- I don't have -- I don't have
7    awareness.
8    Q.   Okay.  Do you know -- and forgive
9    the question, sir, honestly.  But do you
10   know --
11   A.   Sure.
12   Q.   -- whether your estate would be
13   liable to pay all of the undue principal --
14   unpaid principal and interest if you passed
15   before the conditions subsequent were
16   satisfied?
17       MS. DEITSCH-PEREZ:  Object to the
18   form.
19   A.   I -- I don't know that answer.
20   BY MR. MORRIS:
21   Q.   That wasn't something that you and
22   your sister discussed in January or February of
23   2019; is that fair?
24   A.   I wasn't contemplating that event at
25   that point in time.

Page 190

Dondero - 5-28-2021

1
2    Q.   That's why I say "forgive the
3    question," sir.
4        Did you ever ask anybody to write
5    the agreement in paragraph 40 down on paper so
6    that it was memorialized somewhere?
7    A.   No.
8    Q.   Did you and Nancy --
9        (Simultaneous conversation.)
10   A.   I'm sorry, go ahead.
11   BY MR. MORRIS:
12   Q.   Do you and Nancy communicate by
13   email from time to time?
14   A.   Almost entirely phone.  I -- from
15   time to time, but it's almost entirely phone.
16   Q.   All right.  Let's -- let's move on.
17   A.   Can I clarify something from before?
18   Q.   Of course.
19   A.   If the assets were never monetized
20   or the -- the notes would stay in place and not
21   be forgiven.
22       If the assets were all monetized
23   below cost or what was considered a less
24   favorable scenario, then it would be -- to
25   forgive it, something would have to be

Page 191

Dondero - 5-28-2021

1
2    monetized above cost, you know; but if they
3    were all monetized below cost, that would make
4    the note payable.
5    Q.   I appreciate that.
6        MR. MORRIS:  Let's go to the next
7    document, document Number 11.
8        (Exhibit 11 introduced.)
9        MR. MORRIS:  If we could just scroll
10   down, please.
11       (Scrolling.)
12   BY MR. MORRIS:
13   Q.   All right.  Now, these are your
14   objections and responses to the debtor's second
15   request for admissions.  Do you see that?
16   A.   Yes.
17       MR. MORRIS:  And let's scroll down
18   to page 4, please.
19       (Scrolling.)
20   BY MR. MORRIS:
21   Q.   Okay.  Do you recall whether you saw
22   this document before it was served and filed on
23   your behalf?
24   A.   Yes.  Can we go all the way through,
25   just go all the way down?

Page 192

Dondero - 5-28-2021

2  Q.  Was this notarized, also?

3  Q.  No, because these are responses to
4  requests to admit.  You only --

5  A.  Okay.

6  Q.  You only notarize responses to
7  interrogatories, for whatever reason.  So these
8  were not.  Yeah.

9  But I'm just asking you if you have
10  a memory of reviewing the requests for
11  admission before they were served and filed on
12  your behalf?

13  A.  Yes.

14  Q.  Okay.  And did you authorize your
15  lawyers to serve and file this document on your
16  behalf?

17  A.  Yes.

18  Q.  Okay.  Looking at Request For
19  Admission Number 1, it asks you to admit that
20  in December 2019, you made a payment to the
21  debtor, a portion of which was applied to
22  reduce principal and/or interest due under one
23  or more of the notes.

24  Have I read that correctly?

25  A.  Yes.

Page 193

Dondero - 5-28-2021

2  Q.  And you've admitted that that
3  statement is true and accurate as written,
4  right?

5  A.  Yeah, I believe so.  The -- yeah, I
6  believe so.  Let me let you ask the questions.

7  Q.  Okay.  Do you have any reason to
8  believe, as you sit here right now -- let me
9  ask you a different question.

10  Do you want to amend your response
11  in any way right now?

12  A.  I -- I'm not aware of small amounts
13  in terms of, like, interest or principal; and
14  then sometimes the tax guys will say periodic
15  interest payments are important to -- for the
16  character of the notes, so sometimes periodic
17  interest payments are made.  Sometimes I think
18  they peck on some of the notes.

19  I don't -- I don't know or remember,
20  but I hope that something like this is correct.
21  Sometimes, if there was a need for cash into
22  Highland, the easiest way to -- for me or a
23  different entity to put cash into Highland was
24  to reduce a principal amount of a note with the
25  thought that we could create new notes or

Page 194

Dondero - 5-28-2021

2  increase another note later.

3  So how many times or how often
4  interest payments were made or if there was
5  some small principal payment made at some
6  point, I don't know the details; but I'm hoping
7  that's accurate.

8  Q.  Okay.  We looked at three notes that
9  were signed by you in 2018, correct?

10  A.  Yes.

11  Q.  You signed other notes in favor of
12  Highland prior to that time, correct?

13  A.  I believe -- yeah.  I mean, I
14  believe there were numerous notes beyond these.

15  Q.  Were -- were -- did you ever sign a
16  note in favor of Highland that was forgiven?

17  A.  I don't -- I don't know.

18  Q.  Do you have any recollection of ever
19  paying taxes in connection with a note that was
20  subsequently forgiven by Highland?

21  A.  If there was -- if there was a
22  forgiveness and it was taxable, I would have
23  paid the taxes.  We were compliant in that
24  regard.  I'm a hundred percent comfortable
25  we're compliant, but I don't know.

Page 195

Dondero - 5-28-2021

2  Q.  Okay.  And I appreciate -- I didn't
3  mean to suggest that you weren't compliant,
4  sir.  I'm just asking you if you can identify
5  any note that you made in favor of Highland
6  that was ever forgiven.

7  MS. DEITSCH-PEREZ:  And I'm just
8  going to object because, while he's not
9  30(b)(6) witness, this is a deposition
10  taken in a particular case and he may have
11  not looked at the records going back to
12  2000, or whatever, that's -- since when
13  Highland was started.

14  MR. MORRIS:  I just can't tell you
15  how inappropriate that is.

16  BY MR. MORRIS:

17  Q.  Go ahead, Mr. Dondero.

18  A.  The same answer, I don't know.

19  Q.  Okay.  You did, in fact, pay in full
20  all principal and interest due on notes that
21  you made in favor of Highland other than the
22  three notes at issue in this case, correct?

23  MS. DEITSCH-PEREZ:  Object to the
24  form.

25  A.  I -- I don't know.  I would repeat

Dondero - 5-28-2021

1        the answer I gave a few minutes ago when I kind
2    of rambled about cash management.
3    BY MR. MORRIS:
4        Q.   Do you know how many notes you made
5    in favor of Highland beyond the three that are
6    the subject of this litigation?
7            MS. DEITSCH-PEREZ:  Object to the
8        form.
9        A.   I -- I do not, regarding myself
10   personally.
11           I am aware that the aggregate amount
12   of affiliated notes is approximately 70 or
13   $80 million, including my notes; but that's it.
14   I mean, that's all I know.
15   BY MR. MORRIS:
16       Q.   All right.  I'm just asking you
17   about you, in your individual capacity.
18       A.   I don't know.
19       Q.   You don't know --
20           (Audio distortion.)
21           THE REPORTER:  You broke up, sir.
22   BY MR. MORRIS:
23       Q.   You don't know the number of
24   notes -- (audio distortion) -- Highland beyond

Dondero - 5-28-2021

1    these three, correct?
2        A.   Correct.
3        Q.   And you can't recall whether any --
4    any notes that you made in favor of Highland
5    were ever forgiven, correct?
6        A.   I -- I don't know.
7        Q.   Okay.  So, did you ever object to
8    the application of the payment referred to in
9    Request For Admission Number 1 to principal
10   and/or interest due under one or more of the
11   notes?
12           Did you ever object to the
13   application of the payment in that way?
14           MS. DEITSCH-PEREZ:  Object to the
15       form.
16       A.   I think the decision on how to
17   handle cash needed at Highland was entirely
18   made and the application to note principal or
19   interest was -- was entirely decided by the
20   accounting group.
21   BY MR. MORRIS:
22       Q.   But did you know that decision was
23   made in or around December 2019?
24       A.   Not really, no.  Not specifically.

Dondero - 5-28-2021

1        Q.   Well, you've admitted to the fact.
2    So, when did you learn that in December 2019 a
3    payment made on your behalf, at least a portion
4    of which was applied to reduce principal and/or
5    interest due under one or more of the notes?
6    When did you learn that?
7        A.   I don't know.  It would have been as
8    part of the process in preparing this document.
9        Q.   So it's your testimony that somebody
10   used your money in December 2019 to reduce
11   principal and/or interest due under one or more
12   of the notes without your knowledge?
13       A.   Yeah, without my specific knowledge.
14   There was a reason to put money in at that
15   point in time, and then how they applied it was
16   not my decision --
17       Q.   Making --
18       A.   -- or not --
19       Q.   Making a payment -- you would agree
20   that making a payment of principle or interest
21   under one or more of the notes conflicts with
22   the agreement that you reached with Nancy,
23   right?
24           MS. DEITSCH-PEREZ:  Object to the

Dondero - 5-28-2021

1        form.
2        A.   No, that's not true.
3    BY MR. MORRIS:
4        Q.   Well, the conditions subsequent
5    hadn't arisen yet; is that fair?
6        A.   The notes were in '18, correct?
7        Q.   Yes, sir.
8        A.   And then, yeah, the subsequent
9    condition was in the first quarter of '19.
10       Q.   Right.  And then, in December of
11   '19, a payment of principal and/or interest was
12   made against one or more of the notes, right?
13       A.   Yes.
14       Q.   And I'm just asking you, sir, if
15   that's inconsistent with the agreement that you
16   reached with Nancy.
17           MS. DEITSCH-PEREZ:  Object to the
18       form.
19       A.   And I'm saying -- I'm saying no.  I
20   mean, it's --
21   BY MR. MORRIS:
22       Q.   Okay.  Since learning of the
23   payment, have you tried to identify the person
24   who was responsible for applying your money in

Page 200

Dondero - 5-28-2021

1    the way that's described in Request For
2    Admission Number 1?
3        A.   No.
4            MR. MORRIS:   Can we go down to
5        number 4, please?
6    BY MR. MORRIS:
7        Q.   In your amended answer, I think you
8    asserted that the – "each note is ambiguous."
9    Do I have that right?
10           We can go back, if you would like to
11   look?
12       A.   Is this admission number 4?  Is that
13   where you're pointing to?
14       Q.   It is, and I'll just read it.  It
15   refers to paragraph 45 of the amended answer,
16   and I'll read it.  But I'm happy to go back and
17   put it on the screen, if you'd would like.
18           But it says simply:  "Defendant
19   further asserts that each note is ambiguous."
20           So request for number 4 asks you to
21   admit that before you served that amended
22   answer, you had never informed the debtor of
23   your belief that any provision of the notes was
24   ambiguous.

Page 201

Dondero - 5-28-2021

1        Do you see that?
2        A.   Yes.
3        Q.   And you've denied that request for
4    admission.
5        Do you see that?
6        A.   Yes.
7        Q.   So, who did you inform at the debtor
8    of your belief that a provision of the notes
9    was ambiguous?
10           Who did you –
11           MS. DEITSCH-PEREZ:  Object.
12   BY MR. MORRIS:
13       Q.   Who did you communicate that to?
14           MS. DEITSCH-PEREZ:  Object to the
15       form, no foundation.
16       A.   I – I – I don't – "I don't know"
17   is my answer to pretty much any question you
18   could ask there.
19   BY MR. MORRIS:
20       Q.   This is – you're denying the
21   request for admission, and that's your right.
22           Did you ever inform the debtor of
23   your belief that a provision of the notes was
24   ambiguous?

Page 202

Dondero - 5-28-2021

1        MS. DEITSCH-PEREZ:  Object, no
2        foundation.
3        A.   As – ask the question again,
4    please.
5    BY MR. MORRIS:
6        Q.   Did you ever inform the debtor of
7    your belief that any provision of the notes was
8    ambiguous?
9            MS. DEITSCH-PEREZ:  Object, no
10       foundation.
11       A.   You know, I don't know what
12   conversations were had between lawyers.  I – I
13   don't know.
14   BY MR. MORRIS:
15       Q.   Okay.  So I'm going to ask a
16   slightly different question because of your
17   answer:  Can you tell me whether you or anybody
18   acting on your behalf ever informed the debtor
19   of your belief that any provision of any of the
20   notes was ambiguous?
21           MS. DEITSCH-PEREZ:  Object, no
22       foundation.
23       A.   I'm going to have to say, yes, I
24   believe that statement is true; but I don't

Page 203

Dondero - 5-28-2021

1    have specific knowledge.
2    BY MR. MORRIS:
3        Q.   Do you have any knowledge, can you
4    identify any person who informed the debtor of
5    your belief?
6        A.   I don't have specific knowledge.  I
7    don't – I don't – I don't know.
8        Q.   Can you tell me when the debtor was
9    informed of your belief that any provision of
10   the notes was ambiguous?
11           MS. DEITSCH-PEREZ:  Object, no
12       foundation.
13       A.   I don't know.
14   BY MR. MORRIS:
15       Q.   Can you identify the person who was
16   acting on behalf of the debtor who was informed
17   by you or anyone acting on your behalf of your
18   belief that any provision of the notes was
19   ambiguous?
20           MS. DEITSCH-PEREZ:  Object, no
21       foundation.
22       A.   I don't know.
23   BY MR. MORRIS:
24       Q.   Okay.

Page 204

Dondero - 5-28-2021

1          MR. MORRIS:  Let's go to the next
2  exhibit, please.
3          THE WITNESS:  Is this a good time
4  for a lunch break?
5          MR. MORRIS:  Yeah.  I'm happy to do
6  it.  I'm trying to move as quickly as I
7  can, Mr. Dondero.  This is a little bit
8  longer than you and I usually sit for, and
9  I apologize for that, but I'm happy to take
10  as long a break as you -- as you need.
11          MS. DEITSCH-PEREZ:  How long do you
12  think you have for the rest of the
13  deposition?  What's your guess?
14          MR. MORRIS:  I would say more than
15  an hour, less than two.
16          MS. DEITSCH-PEREZ:  Do you want to
17  take a really short --
18          THE WITNESS:  Can we take a half
19  hour, like 12:30 our time, 1:30 East Coast
20  time?
21          MR. MORRIS:  Of course.
22          THE WITNESS:  Yeah.  So, we'll take
23  35 minutes, and then we'll get back to it.
24  You know --
25

Page 205

Dondero - 5-28-2021

1          THE REPORTER:  Are we still on the
2  record, please?
3          MR. MORRIS:  Yes.
4          COURT REPORTER:  Okay.
5          MS. DEITSCH-PEREZ:  We'll --
6          MR. MORRIS:  If you have time
7  constraints -- if you have time
8  constraints, Mr. Dondero, I'm prepared to
9  keep going.  I'll take a shorter break.  I
10  don't want -- you know, I apologize for the
11  burden, but these are relevant questions.
12          THE WITNESS:  Yeah, let's -- let's
13  do 35 minutes, and we will try and wrap it
14  up in -- like you're saying, like an hour
15  or less than two.
16          MR. MORRIS:  Yeah.
17          THE WITNESS:  Yeah.  I do need to be
18  someplace in the early afternoon.
19          MR. MORRIS:  I assure you, I'll do
20  my best to keep to that time frame.
21          THE WITNESS:  Okay.  Thank you.
22          THE REPORTER:  And we're off the
23  record.
24          (Lunch recess held.)
25

Page 206

Dondero - 5-28-2021

1          MR. MORRIS:  Can we put up the next
2  exhibit, which I believe is Number 12?
3          (Exhibit 12 introduced.)
4  BY MR. MORRIS:
5      Q.   Okay.  So, Mr. Dondero, these are
6  interrogatories, and so I direct you first to
7  the last page of the document, the Verification
8  page.
9          And is that your signature, sir?
10      A.   Yes.
11      Q.   Now, this wasn't notarized.  Is
12  there a reason why you didn't get this
13  notarized?
14      A.   No.
15      Q.   Okay.
16          MR. MORRIS:  If we could just scroll
17  back up.
18  BY MR. MORRIS:
19      Q.   But is the Verification true --
20          MR. MORRIS:  If we just go back to
21  it.
22  BY MR. MORRIS:
23      Q.   At the time you signed this
24  document, had you read the Defendant's
25

Page 207

Dondero - 5-28-2021

1  Objections and Answers to Highland Capital
2  Management, L.P.'s Second Set of
3  Interrogatories?
4      A.   Yes.
5      Q.   And did you believe that the facts
6  stated therein were both within your personal
7  knowledge and were true and correct?
8      A.   Yes.
9      Q.   Okay.
10          MR. MORRIS:  Can we go to the
11  substance of the document on page 4 of 6?
12  BY MR. MORRIS:
13      Q.   Okay.  So, in the answer to
14  Interrogatory No. 1, you identify the
15  conditions subsequent that were the subject of
16  the agreement that we've been talking about
17  that you and Nancy entered into.
18          Do I have that right?
19      A.   Yes.
20      Q.   And to the best of your knowledge,
21  does the answer that's set forth in response to
22  Interrogatory No. 1 fully and accurately set
23  forth the conditions subsequent that were the
24  subject of the agreement?
25

**Appx. 01666**

Page 208

1        Dondero - 5-28-2021
2        MS. DEITSCH-PEREZ:  Object to the
3    form.
4    A.    Repeat the question, please.
5    BY MR. MORRIS:
6    Q.    Does this answer to Interrogatory
7    No. 1 set forth, to the best of your knowledge
8    and understanding, the conditions subsequent
9    that were part of the agreement that you and
10   Nancy entered into in January or February 2019?
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.    Yes, large – yes, largely –
14   BY MR. MORRIS:
15   Q.    Okay.
16   A.    – or yes.
17   Q.    Is there any aspect of this that you
18   believe right now is incorrect?
19   A.    No.
20   Q.    Is there any aspect of your
21   agreement with Nancy on the conditions
22   subsequent that's not described in this answer?
23       MS. DEITSCH-PEREZ:  Object to the
24   form.
25   A.    My recollection is that that largely

Page 209

1        Dondero - 5-28-2021
2    captures it.
3    BY MR. MORRIS:
4    Q.    Okay.  There's a reference there to,
5    quote, "the disposition of the portfolio
6    company interests managed and/or owned directly
7    or indirectly by Highland and/or its affiliates
8    or managed funds."
9        Do you see that?
10   A.    Yes.
11   Q.    What does that refer to?
12   A.    Just, you know, MGM is owned in a
13   variety of places, Cornerstone is owned in a
14   variety of places, and then Trussway is owned
15   in a subsidiary of Highland.
16       So there – I believe it's to
17   capture the fact of the different ownerships or
18   controls of those three different investments.
19   Q.    Are those the only portfolio company
20   interests managed and/or directly or indirectly
21   by Highland or its affiliates – withdrawn.
22   That was bad.
23       This answer doesn't refer
24   specifically to any particular assets, correct?
25   A.    It does not.

Page 210

1        Dondero - 5-28-2021
2    Q.    Okay.
3    A.    Well, yeah.  I think what the intent
4    was – those three companies I just mentioned
5    were always considered portfolio companies.
6    There have been a few others over the years,
7    but those are – those – I think they're
8    trying to capture them that way, but I only
9    remember talking to her about those three.
10   Q.    Are there any other portfolio
11   company interests that are managed and/or owned
12   directly or indirectly by Highland and/or its
13   affiliates or managed funds?  Are there any
14   other assets?
15       MS. DEITSCH-PEREZ:  Object to the
16   form.
17   A.    There were some lesser private
18   equity investments or companies, yes.
19   BY MR. MORRIS:
20   Q.    Can you identify them?
21   A.    CCS Medical.  I think OmniMax was
22   one.  Kerri International.  Yeah, those –
23   those are ones that come to mind.
24   Q.    Okay.  But notwithstanding the
25   answer here, to the best of your recollection,

Page 211

1        Dondero - 5-28-2021
2    the agreement that you had with Nancy pertained
3    only to MGM, Cornerstone, and Trussway.  Do I
4    have that right?
5        MS. DEITSCH-PEREZ:  0bject to the
6    form.
7    A.    The monetization of those three were
8    the – were the conditions subsequent, yes.
9    BY MR. MORRIS:
10   Q.    Okay.  And there's a reference there
11   to being disposed of, quote, on a favorable
12   basis.
13       Do you see that?
14   A.    Yes.
15   Q.    What does that mean?
16   A.    Above cost or book value.
17   Q.    How much above cost or book value
18   would you have to dispose of MGM, Cornerstone,
19   and Trussway in order to trigger the conditions
20   subsequent?
21   A.    There wasn't – there was just
22   monetization on a favorable basis.  There
23   wasn't a specific amount on each individual
24   one.  It only took one to trigger it.
25   Q.    Oh.  So the sale of any of those

Page 212

Dondero - 5-28-2021

1 three assets would trigger the conditions
2 subsequent?
3 A. Correct.
4 Q. Okay. And who decided whether the
5 asset was sold on a favorable basis?
6 Who made that decision, under your
7 agreement with Nancy?
8 A. It was just defined relative to
9 cost, so it was just -- it was just a
10 factual -- there's nothing to decide. It would
11 just be a factual answer.
12 Q. So, I just want to make sure I
13 understand.
14 Your agreement with Nancy was that
15 --
16 A. Yes.
17 Q. -- that -- all right. Withdrawn.
18 Your agreement with Nancy in January
19 or February 2019, was that if any of MGM,
20 Cornerstone, or Trussway was sold at cost, the
21 debtor would forgive your obligations under the
22 three notes.
23 Do I have that right?
24 MS. DEITSCH-PEREZ: Object to the

Page 213

Dondero - 5-28-2021

1 form.
2 A. If any of them were sold above cost,
3 it would -- monetization would trigger the --
4 the three notes -- forgiveness of the three
5 notes, yes.
6 BY MR. MORRIS:
7 Q. Okay. And I just want to see if I
8 can understand: Did you and Nancy discuss in
9 January or February 2019 how much above cost
10 the sale would have to be in order for the
11 debtor to forgive your obligations under the
12 three notes?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 A. No. It just had to be above cost,
16 not a amount above cost.
17 BY MR. MORRIS:
18 Q. Okay.
19 A. Because just monetizing it -- just
20 monetizing it and getting liquidity for an
21 illiquid investment, even if it was at cost, is
22 good. So something above cost is great. And
23 those are all big assets, and the notes were
24 small.

Page 214

Dondero - 5-28-2021

1 Q. Okay. So, again, I just want to
2 really understand your agreement with Nancy.
3 Did you and her specifically agree
4 in January or February 2019 that if you sold
5 either MGM or Cornerstone or Trussway for at
6 least $1 more than cost, then your obligations
7 under the three notes would be forgiven?
8 MS. DEITSCH-PEREZ: Object to the
9 form.
10 A. Before I answer that, I just -- can
11 you repeat so I can get all the subjects and
12 participants straight in my head from the
13 beginning of that question?
14 BY MR. MORRIS:
15 Q. Sure. Did you and Nancy agree in
16 January or February 2019 that if Highland sold
17 either MGM or Cornerstone or Trussway for an
18 amount that was equal to at least $1 more than
19 cost, that -- that Highland would forgive your
20 obligations under the three notes?
21 MS. DEITSCH-PEREZ: Object to the
22 form.
23 A. I believe that is correct.
24 BY MR. MORRIS:

Page 215

Dondero - 5-28-2021

1 Q. Thank you very much.
2 Was Grant Scott the trustee of the
3 Dugaboy trust in January or February 2019?
4 A. He was at one point. I don't know
5 if he was -- I don't know when he was the
6 trustee, but he got replaced at a -- some point
7 in time.
8 Q. Do you know if it was before or
9 after the petition date?
10 A. Before or after the petition date.
11 It was before the petition date.
12 MR. MORRIS: Okay. I'd ask for the
13 production of any documents that show that
14 Nancy Dondero was the trustee of the
15 Dugaboy trust in January or February 2019.
16 MS. DEITSCH-PEREZ: I'll take your
17 request under advisement.
18 BY MR. MORRIS:
19 Q. Now, the last portion of
20 Interrogatory No. 1, the answer to it, refers
21 to a, quote, "basis wholly outside Dondero's
22 control."
23 Do you see that?
24 A. Uh-huh.

Page 216

Dondero - 5-28-2021

1
2     Q.    Was that part of the agreement that
3   you entered into with Nancy in January or
4   February 2019?
5     A.    Yeah.  It was probably unnecessary
6   complexity, but yes.
7     Q.    Was there anything that you
8   envisioned in January or February 2019 that
9   would have caused you to lose control of
10  Highland?
11        MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.    No, and I wasn't -- that wasn't the
14  thought process.
15  BY MR. MORRIS:
16    Q.    So what was the thought process?
17  Why was that phrase part of -- why --
18  withdrawn.
19        Did you include that -- that aspect
20  of the conditions subsequent -- withdrawn.
21        Who decided that one of the
22  conditions subsequent would be the disposition
23  of the assets that you've described, quote,
24  "wholly outside of Dondero's control."
25        Whose idea was it to put that into

Page 217

Dondero - 5-28-2021

1
2   the agreement?
3     A.    It was -- it was mine.  And, again,
4   it was probably unnecessary complexity, but...
5     Q.    And why did you want that piece of
6   it into the agreement?
7     A.    MGM ended up being a success story,
8   but the value of MGM and the prospects of MGM
9   have bounced around considerably over the last
10  decade.  And we never owned more than 17 or
11  18 percent and there was a 32 percent holder,
12  and Carl Icahn was involved at different points
13  in time.  There was definitely a chance that,
14  over our objections, it could have been sold at
15  a lower price without our support.
16        And as far as Cornerstone was
17  concerned, there was a half or a majority that
18  was in the Restoration Fund that had a whole
19  bunch of outside investors in it; and,
20  theoretically, that could have been sold
21  without our -- or against our recommendations.
22        So it was really meant to capture
23  those two possibilities.
24    Q.    Did you tell Frank Waterhouse at any
25  time about your agreement with Nancy that's

Page 218

Dondero - 5-28-2021

1
2   subject to the conditions subsequent referred
3   to here in Interrogatory No. 1?
4     A.    I don't know if Frank knew the
5   specifics.  I think Frank really was aware that
6   the loans could and would likely be forgiven
7   and -- yes.  That's all to that answer.
8     Q.    Did you tell him that?
9     A.    Yes, and -- I mean, partly he knew
10  it from the history of Highland, and the
11  structure of the notes are structured in a way
12  that facilitates forgiveness.
13        MR. MORRIS:  I move to strike.
14  BY MR. MORRIS:
15    Q.    Did you ever tell Frank Waterhouse
16  about the agreement that you reached with
17  Nancy?
18        MS. DEITSCH-PEREZ:  Object to the
19    form.
20    A.    Not -- not the specifics.
21  BY MR. MORRIS:
22    Q.    Did you ever mention anything about
23  any aspect of your agreement with Nancy -- with
24  Nancy to Frank Waterhouse?
25        MS. DEITSCH-PEREZ:  Object to the

Page 219

Dondero - 5-28-2021

1
2   form.
3     A.    I -- listen, I don't -- I don't
4   remember talking to him about the specifics,
5   but, in general, I -- he -- he -- he was deeply
6   involved in the thought process and the
7   conclusion that the notes were forgiven or
8   going to be for--
9        MR. MORRIS:  I'm going to move to
10    strike.
11  BY MR. MORRIS:
12    Q.    And I'm not asking you to get into
13  his head to tell me what you think he knew.
14  I'm asking you about what you told him.
15        Did you ever tell Mr. Waterhouse
16  that you reached an agreement with Nancy
17  pursuant to which the debtor had agreed not to
18  collect on the notes subject to the conditions
19  subsequent set forth in your answer to
20  Interrogatory No. 1?
21        MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.    I don't remember.  I -- I don't
24  remember enough to say conclusively one way or
25  the other.

Page 220

1           Dondero - 5-28-2021
2   BY MR. MORRIS:
3       Q.   Do you have any recollection of
4   telling any employee at Highland at any time of
5   your agreement with Nancy?
6           MS. DEITSCH-PEREZ:  Object to the
7   form.
8       A.   I -- I don't know.
9   BY MR. MORRIS:
10      Q.   Okay.  Did you tell anybody employed
11  or representing the debtor at any time of your
12  agreement with Nancy?
13          MS. DEITSCH-PEREZ:  Object to the
14  form.
15      A.   Not that I -- not that I recall.
16  Again, I didn't think there was a reason to,
17  initially.
18          MR. MORRIS:  Can we go to
19  Exhibit 13, please?
20          (Exhibit 13 introduced.)
21  BY MR. MORRIS:
22      Q.   All right.  When you were the CEO,
23  did PricewaterhouseCoopers serve as Highland's
24  auditors?
25          MS. DEITSCH-PEREZ:  Object to the

Page 221

1           Dondero - 5-28-2021
2   form.
3       A.   At different times they were, and
4   then KPMG was.  I don't remember who it was in
5   '17.
6   BY MR. MORRIS:
7       Q.   Okay.  And it's a fact, is it not,
8   that until at least year-end 2018, Highland had
9   audited the financial statements prepared for
10  itself, right?
11      A.   I don't know.  I wasn't aware they
12  stopped.
13      Q.   Okay.  Okay.
14          So, I'm putting up on the screen the
15  "Consolidated Financial Statements and
16  Supplemental Information" for the period
17  December 31st, 2017.
18          Do you see that?
19      A.   Uh-huh.
20          MR. MORRIS:  And if we can go first
21  to the page marked 33470, which is, I
22  think, the --
23          And is this -- does this refresh
24  your recollection that PWC served as
25  Highland's independent auditors for the

Page 222

1           Dondero - 5-28-2021
2   financial statements prepared for the year
3   ending December 31st, 2017?
4           MR. MORRIS:  If you could scroll
5   down to the bottom of the page so
6   Mr. Dondero can see the date.
7       A.   Okay.
8   BY MR. MORRIS:
9       Q.   Do you see that?
10      A.   If you're asking me to agree that it
11  was Pricewaterhouse, yes, I agree.
12      Q.   And do you see that they signed
13  their letter on May 18th, 2018?  Do you see
14  that?
15      A.   Yeah.
16      Q.   And do you see, towards the top of
17  the page, there's a statement about
18  "Management's Responsibility for the
19  Consolidated Financial Statements"?
20      A.   Yes.
21      Q.   And that's a pretty standard clause
22  that auditors include in audited financial
23  statements, in your experience; isn't that
24  right?
25      A.   Yes.

Page 223

1           Dondero - 5-28-2021
2           MR. MORRIS:  Can we go to the
3   page -- the next page, 3471?
4   BY MR. MORRIS:
5       Q.   This is the Consolidated Balance
6   Sheet for the period December 31, 2017, and
7   it's been redacted except to show "Notes and
8   other amounts due from affiliates."  Do you see
9   that?
10      A.   Uh-huh.
11      Q.   When you were the CEO, did Highland
12  carry the Notes and Other Amounts Due from
13  Affiliates as assets on its balance sheet?
14      A.   Yes.
15      Q.   Okay.  And that's what's reflected
16  on this page; is that correct?
17      A.   I mean, that's what the heading
18  says, yes.
19      Q.   Okay.
20          MR. MORRIS:  Can we go to Bates
21  number 33499.
22          (Scrolling.)
23  BY MR. MORRIS:
24      Q.   And you're aware, are you not, that
25  in the Notes to the financial statements, PWC

Appx. 01670

Page 224

Dondero - 5-28-2021

1  described all of the notes and other amounts
2  that were due to affiliates -- due from
3  affiliates?
4      MS. DEITSCH-PEREZ:  Object to the
5  form.
6      A.  Yes.
7  BY MR. MORRIS:
8      Q.  And were you aware that in the
9  financial statements prepared for Highland for
10  the period ending December 31st, 2017, that PWC
11  included in its notes amounts due from Highland
12  Capital Management Fund Advisors, L.P.?
13      A.  The 0.2 million in the first
14  sentence, is that your question?
15      Q.  Yes.  You know, the whole -- who at
16  Highland was responsible for providing
17  information to PWC relating to Notes and Other
18  Amounts Due from Affiliates?
19      A.  The accounting department.
20      Q.  And who was the head of the
21  accounting department as of the end of 2017?
22      A.  Frank Waterhouse.
23      Q.  And did Frank Waterhouse remain the
24  head of the accounting department until at

*(Note: line numbers 1-25)*

Page 225

Dondero - 5-28-2021

1  least the end of 2020, to the best of your
2  knowledge?
3      A.  Yes.
4      Q.  And when did Frank Waterhouse become
5  the head of the accounting department?
6      A.  A few years earlier.
7      Q.  So, to the best of your
8  recollection, Frank Waterhouse has been the
9  head of the accounting department on a
10  continuous basis from the period approximately
11  2015 until the end of 2020; is that right?
12      A.  If not earlier, but yes.  But I
13  don't know the dates.
14      Q.  Okay.
15      MR. MORRIS:  Can we scroll down to
16  the next to the last paragraph there, the
17  one that refers to Mr. Dondero?  There you
18  go.
19  BY MR. MORRIS:
20      Q.  Do you see that, according to this
21  financial report, you "did not issue any new
22  promissory notes to the Partnership" during the
23  year 2017?
24      A.  Yeah.

Page 226

Dondero - 5-28-2021

1      Q.  And to the best of your
2  recollection, was that accurate?
3      A.  Yes.
4      Q.  Okay.  And to the best of your
5  recollection, was it also accurate that as of
6  the end of 2017, the total interest and
7  principal due on an -- on outstanding
8  promissory notes was approximately 14 and a
9  half million dollars and was payable in annual
10  installments throughout the term of the note?
11      A.  Yes.
12      Q.  And prior to your execution of the
13  demand notes, do you recall that you had made,
14  in favor of Highland, certain term notes?
15      A.  I don't -- I don't recall.
16      Q.  Do you remember having to make
17  payments to Highland to satisfy the terms of
18  any notes prior to 2018?
19      A.  I can't recall.  I didn't refresh --
20  I didn't refresh myself on anything else, on
21  any other notes for this deposition.
22      Q.  Okay.  But looking at this
23  paragraph, is there anything about it that you
24  currently believe is inaccurate or incorrect?

Page 227

Dondero - 5-28-2021

1      MS. DEITSCH-PEREZ:  Object to the
2  form.
3      A.  I -- I don't know.  I don't know.
4  BY MR. MORRIS:
5      Q.  Okay.  We can scroll through the
6  entire page, if you would like, but I just --
7  I'll ask the question first, and then you tell
8  me what you need to read.
9      Do you recall whether
10  PricewaterhouseCoopers' audited financial
11  statements ever disclosed the forgiveness of
12  any loan ever made by Highland to you or any of
13  its employees?
14      MS. DEITSCH-PEREZ:  Object to the
15  form.
16      A.  I don't -- I don't know.
17  BY MR. MORRIS:
18      Q.  Do you have a recollection of any?
19      A.  I don't have a recollection --
20  recollection of any.  As a CPA, I'm not sure
21  it's required until it's forgiven, but I'm not
22  the expert.  I can't remember seeing it or not
23  seeing it.
24      Q.  Did the debtor make --

Page 228

Dondero - 5-28-2021

1        MR. MORRIS:  You know what?  Let's
2    look -- let's look at each of these.  We
3    can start with the bottom of the page.
4  BY MR. MORRIS:
5       Q.   Can you identify any of the makers
6  of the notes that are referred to in this
7  section that are not directly or indirectly
8  owned or controlled by you, other than
9  Mr. Okada?
10       So, if we start at the top, is
11  Highland Capital Management Fund Advisors,
12  L.P., an entity that is either directly or
13  indirectly owned or controlled by you?
14       A.   Yes.
15       Q.   NexPoint Advisors, L.P., the next
16  paragraph, is that an entity that is directly
17  or indirectly owned or controlled by you?
18       A.   Yes.
19       Q.   HCRE Partners, LLC, is that an
20  entity that is directly or indirectly owned or
21  controlled by you?
22       A.   Yes.
23       Q.   Highland Capital Management
24  Services, Inc., is that an entity that is

Page 229

Dondero - 5-28-2021

1  directly or indirectly owned or controlled by
2  you?
3       A.   Yes.
4       Q.   All right.  And you're the subject
5  of the next paragraph, right?
6       The next paragraph relates to Mark
7  Okada.  Are you aware of any loan that was ever
8  made by Highland to Mr. Okada that was
9  forgiven?
10       A.   I don't know.
11       Q.   Okay.
12       MR. MORRIS:  Can we go to the next
13    paragraph, please?
14  BY MR. MORRIS:
15       Q.   There's a reference to The Dugaboy
16  Investment Trust.  Do you see that?
17       A.   Yes.
18       Q.   Either your sister or Mr. Scott have
19  served as the sole trustee of Dugaboy since the
20  time it was created; is that correct?
21       MS. DEITSCH-PEREZ:  Object to the
22    form.
23       A.   I -- I don't know.
24  BY MR. MORRIS:

Page 230

Dondero - 5-28-2021

1       Q.   Do you recall anybody at any time
2  serving as the trustee of The Dugaboy
3  Investment Trust other than Nancy or Mr. Scott?
4       MS. DEITSCH-PEREZ:  Object to the
5    form.
6       A.   I -- I don't remember.
7  BY MR. MORRIS:
8       Q.   Are you the lifetime beneficiary of
9  The Dugaboy Investment Trust?
10       A.   Yes.
11       Q.   And have you been -- withdrawn.
12       Are you the sole lifetime
13  beneficiary of The Dugaboy Investment Trust?
14       MS. DEITSCH-PEREZ:  Object to the
15    form.
16       A.   I believe so.
17  BY MR. MORRIS:
18       Q.   Okay.  And has that been true since
19  the time The Dugaboy Investment Trust was
20  created?
21       MS. DEITSCH-PEREZ:  Object to the
22    form.
23       A.   I don't know for sure.
24  BY MR. MORRIS:

Page 231

Dondero - 5-28-2021

1       Q.   Okay.  The next paragraph refers to
2  a Contribution Agreement.  Do you see that?
3       A.   Yes.
4       Q.   Are you familiar who the affiliated
5  trust is that entered into the Contribution
6  Agreement?
7       A.   No.  I'm willing to be refreshed,
8  but I don't remember.
9       Q.   Is it the Hunter Mountain Investment
10  Trust?
11       A.   It could be.
12       Q.   Can you think of any other
13  affiliated trust other than Hunter Mountain who
14  carried a note receivable in the amount of
15  $63 million due to the partnership?
16       A.   No.
17       Q.   Do you directly or indirectly own or
18  control the Hunter Mountain Trust?
19       A.   No.
20       Q.   Let's go -- do you have any interest
21  in the Hunter Mountain Trust?
22       A.   No.
23       Q.   Directly or indirectly?
24       A.   No.

Appx. 01672

Page 232

```
1              Dondero - 5-28-2021
2         MR. MORRIS:  Can we go to 33510,
3    please?
4         (Scrolling.)
5    BY MR. MORRIS:
6    Q.   Just to refresh your recollection,
7    PricewaterhouseCoopers's letter is dated
8    May 18th, 2018.
9         And you see there, note 16 refers to
10   "Subsequent Events."  Do you see that?
11   A.   Yep.
12   Q.   So, sometime between January 1st and
13   May 18, 2018, which is the report date,
14   PricewaterhouseCoopers is disclosing that you
15   issued promissory notes in the amount of
16   $11.7 million.  Do you see that?
17   A.   Yes.
18   Q.   Do you believe that was true and
19   accurate at the time?  Is that your
20   recollection?
21   A.   Yes.
22   Q.   Now, of the three notes that we
23   looked at, only one of them was issued before
24   May 18, 2018.  That was the 2 and a half
25   million-dollar note.
```

Page 233

```
1              Dondero - 5-28-2021
2    Do you remember that?
3    A.   I apologize.  Withdrawn.
4         That was the 3.825 million-dollar
5    note.
6         Do you remember that?
7    A.   Okay.  Yes.
8    Q.   Okay.  So, if that note was 3. –
9    let's just call it roughly $3.9 million, does
10   that mean that there were $7.8 million of other
11   notes that you made in favor of Highland during
12   the first five months of 2018?
13        MS. DEITSCH-PEREZ:  Object to the
14        form.
15   A.   Yeah, I think you got the wrong –
16   well, you're -- I'm not the accounting
17   department.  I'm not the auditor.  My comment
18   would be our financial statements have always
19   been – our audited financial statements have
20   always been extremely accurate and
21   Pricewaterhouse and KPMG literally do a hundred
22   percent sampling of all transactions.
23   Everything is reflected accurately in the
24   financials, and there's no missing note or
25   misstated note or unequal amount, or whatever.
```

Page 234

```
1              Dondero - 5-28-2021
2    And I refuse to go in that direction just
3    because I don't know the details.
4    BY MR. MORRIS:
5    Q.   I appreciate that, sir, and I didn't
6    mean to take you into that direction.  I'm just
7    asking you if you know what accounts for the
8    difference between the $11.7 million stated and
9    the 3.825 million-dollar note that we looked at
10   as Exhibit Number 1 that was tendered by you on
11   February 2nd, 2018.  That's all.
12   A.   I – I don't know.  I have no – I
13   have no idea.
14   Q.   Okay.  In the course of the audit,
15   you personally sign management representation
16   letters, right?
17   A.   Usually at the end.
18   Q.   Yeah.
19        MR. MORRIS:  So can we call the next
20        exhibit up, please?
21        (Exhibit 14 introduced.)
22   BY MR. MORRIS:
23   Q.   And happy to take a look at it.  I'm
24   going to point you to a couple of things.
25        MR. MORRIS:  But if we could go to
```

Page 235

```
1              Dondero - 5-28-2021
2    the document, it's page 9 of the document,
3    Bates number 33408.  All right.
4         And scroll up to the prior page,
5    please.  Just looking for the signatures.
6    BY MR. MORRIS:
7    Q.   All right.  Is that your signature
8    there, sir?
9    A.   Yeah.
10   Q.   And did you sign this management
11   representation letter on behalf of Highland in
12   your capacity as the Strand Advisors, Inc.,
13   general partner on or about May 18th, 2018?
14   A.   Yeah.
15   Q.   And Frank Waterhouse, is that -- do
16   you know that to be his signature below?
17   A.   It resembles it, yes.
18   Q.   Okay.  Do you have an understanding
19   of why you signed this document?
20   A.   Despite all their auditing and
21   double-checking of all source information,
22   they – they want a validation from management,
23   also.
24   Q.   And is that standard and customary,
25   to the best of your experience?
```

Appx. 01673

Dondero - 5-28-2021

1
2  A.  Yes.
3  Q.  Okay.
4       MR. MORRIS:  Can we go back to the
5  first page, please?
6       (Scrolling.)
7  BY MR. MORRIS:
8  Q.  Do you see in the second paragraph,
9  the last sentence, there's a reference to
10  "materiality"?
11       MR. MORRIS:  If you can just scroll
12  down a bit.
13  BY MR. MORRIS:
14  Q.  And it says, quote, "Materiality
15  used for purposes of these representations is
16  $2,000,000."
17       Am I reading that correctly?
18  A.  Yes.
19  Q.  And did you understand that Highland
20  was to provide to PWC, so that it could prepare
21  the audited financial statements with
22  information relating to issues and transactions
23  that were material, using that definition?
24  A.  Yes.
25       MR. MORRIS:  Let's go to the next

Dondero - 5-28-2021

1
2  document.
3       (Exhibit 15 introduced.)
4  BY MR. MORRIS:
5  Q.  These are the audited financials for
6  the period ending December 31st, 2018.
7       MR. MORRIS:  And if you could go to
8  the third page, the one ending in 33424.
9       No, above.  Yeah, right there.
10       Do you see PricewaterhouseCoopers
11  signed the audit letter on June 3rd, 2019?
12  A.  Yep.
13       MR. MORRIS:  And if we can scroll up
14  to the top of the page, it has the same
15  statement concerning "Management's
16  Responsibility for the Consolidated
17  Financial Statements" that we looked at
18  earlier in the 2017 audit, correct?
19  A.  Yes.
20  BY MR. MORRIS:
21  Q.  Okay.  And that's -- looking at it,
22  that's customary language that auditors include
23  in audited financial statements, correct?
24  A.  Yep.
25       MR. MORRIS:  Can we go to the next

Dondero - 5-28-2021

1
2  page, please?
3  BY MR. MORRIS:
4  Q.  Again, you'll see that this is the
5  Consolidated Balance Sheet for the period
6  ending December 31st, 2018.  Do you see that?
7  A.  Yes.
8  Q.  And is it accurate that Highland
9  continued to carry on its balance sheet as an
10  asset all "Notes and Other Amounts Due from
11  Affiliates"?
12  A.  Yes.
13       MS. DEITSCH-PEREZ:  Object to the
14  form.
15  BY MR. MORRIS:
16  Q.  And you knew -- you knew at the time
17  that the audited financials were finalized that
18  Highland was carrying on its balance sheet
19  "Notes and Other Amounts Due from Affiliates,"
20  correct?
21  A.  Yup.
22  Q.  Did you personally tell anybody at
23  PWC in connection with the preparation of the
24  audited financial statements for 2018 that you
25  had entered into the agreement with your sister

Dondero - 5-28-2021

1
2  Nancy in January or February of 2019?
3       MS. DEITSCH-PEREZ:  Object to the
4  form.
5  A.  Not that I recall.
6  BY MR. MORRIS:
7  Q.  Do you know if anybody told PWC,
8  prior to the completion of the audited
9  financial statements for the period ending
10  December 31st, 2018, of your agreement with
11  Nancy?
12       MS. DEITSCH-PEREZ:  Object to the
13  form.
14  A.  Not that I know of.
15  BY MR. MORRIS:
16  Q.  Did you ever instruct anybody to
17  inform PWC about the agreement you reached with
18  Nancy in --
19       MS. DEITSCH-PEREZ:  Object to the
20  form.
21  BY MR. MORRIS:
22  Q.  -- January --
23       MR. MORRIS:  Please let me finish
24  the question.
25       MS. DEITSCH-PEREZ:  You took a

Page 240

Dondero - 5-28-2021

1  breath.  Sorry.
2      MR. MORRIS:  Are you finished?
3      MS. DEITSCH-PEREZ:  As I
4  explained, you took a breath, and I thought
5  you were done.  Sorry.
6  BY MR. MORRIS:
7      Q.   Did you ever instruct anybody to
8  inform PWC of your agreement that you reached
9  with Nancy in January or February 2019?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      A.   No.
13      MR. MORRIS:  Can you please go to
14  page 33451?
15      (Scrolling.)
16  BY MR. MORRIS:
17      Q.   And we've got the "Notes and Other
18  Amounts Due from Affiliates."  We had gone
19  through all of this before and I'm not going to
20  do it again, but I do want to ask you, sir:
21  Did you personally approve and authorize each
22  of the notes that are reflected in the PWC
23  disclosure concerning Notes and Other Amounts
24  Due from Affiliates?
25

Page 241

Dondero - 5-28-2021

1      MS. DEITSCH-PEREZ:  Object to the
2  form.
3      A.   Repeat the question.
4      Did I personally approve?  Was that
5  the question or –
6  BY MR. MORRIS:
7      Q.   Yes.  Withdrawn.
8      I'll ask a different question.
9      And I'm happy to give you the time
10  needed to look at the full disclosure, but are
11  you aware of any note or other amount due from
12  affiliate that you didn't approve and
13  authorize?
14      A.   I'm not aware.
15      MR. MORRIS:  Okay.  If we could just
16  focus in on that bottom paragraph relating
17  to Mr. Dondero.
18  BY MR. MORRIS:
19      Q.   So there's a reference there to your
20  having "issued promissory notes to the
21  Partnership in the aggregate amount of
22  $14.9 million" during 2018.
23      Do you see that?
24      A.   Yes.
25

Page 242

Dondero - 5-28-2021

1      Q.   That would include the three notes
2  at issue in this lawsuit; is that right?
3      MS. DEITSCH-PEREZ:  Object to the
4  form.
5      A.   (No response.)
6  BY MR. MORRIS:
7      Q.   Let me ask a different question.
8      The three – the three notes at
9  issue in this lawsuit were all issued in 2018,
10  correct?
11      A.   Yes.
12      Q.   Okay.  Do you have a recollection as
13  to what notes account for the difference
14  between the $8.8 million or so that's at issue
15  in this lawsuit and the $14.9 million
16  referenced in this disclosure?
17      A.   I don't, other than that – I
18  believe the audit is accurate and, you know,
19  there could have been principle or interest
20  paydowns.  I don't know the reason for the
21  difference.
22      Q.   This disclosure, as it pertains to
23  you, doesn't mention any oral agreement, does
24  it?
25

Page 243

Dondero - 5-28-2021

1      A.   No.
2      Q.   And it doesn't mention any amendment
3  to any of the notes, correct?
4      A.   No.
5      Q.   It doesn't describe any conditions
6  that have been placed on the collectability of
7  the notes from you, correct?
8      A.   No.
9      Q.   It doesn't state that the notes
10  might be forgiven upon some conditions
11  subsequent, correct?
12      A.   No, it does not.
13      MR. MORRIS:  Can we turn to
14  page 33461, please?
15      (Scrolling.)
16  BY MR. MORRIS:
17      Q.   And these are "Subsequent Events,"
18  and I just want to look through them –
19  withdrawn.
20      You understand that these financial
21  statements are for the period ending
22  December 31st, 2018, correct?
23      A.   Yes.
24      Q.   And the agreement that you reached
25

Page 244

Dondero - 5-28-2021

1    with Nancy, to the best of your recollection,
2    occurred in January or February 2019, correct?
3        (Simultaneous conversation.)
4    A.   Yes --
5        MS. DEITSCH-PEREZ:  Object to the
6    form.
7        THE REPORTER:  I didn't hear an
8    answer.
9    A.   Repeat the question again, just in
10   case.
11   BY MR. MORRIS:
12   Q.   Sure.  The agreement that you -- the
13   agreement that you reached with Nancy on behalf
14   of Highland was an agreement that was reached
15   in January or February 2019, correct?
16   A.   Was in -- the last was in January or
17   February of '19, yes.  Yes.
18   Q.   Okay.  So I just want to show you
19   the entirety of the "Subsequent Events" because
20   they cover the period from December 31st, 2018,
21   until the report date of June 3, 2019.
22       MR. MORRIS:  If we could just look
23   at that.
24   BY MR. MORRIS:

Page 245

Dondero - 5-28-2021

1    Q.   Is there any reference made to the
2    agreement that you reached with Nancy in
3    January or February 2019?
4    A.   No.
5        MS. DEITSCH-PEREZ:  And I just want
6    to object for the record that we asked the
7    debtor for all of the Highland financial --
8    audited financial statements.  We got
9    highly redacted ones where the debtor has
10   clearly left unredacted only those things
11   it wanted to use while denying Mr. Dondero
12   the unredacted copies.  So we do not have
13   here, for him to look at, the unredacted
14   Highland audited financial statements.
15       MR. MORRIS:  But this is the only
16   portion of the document -- well, I'm not
17   going to argue.
18       MS. DEITSCH-PEREZ:  Yes.  You showed
19   us what you wanted to show him in an
20   unredacted (audio distortion) gave him
21   fully redacted copies.  I understand that.
22       MR. MORRIS:  Yeah, and I'll be happy
23   to submit a unredacted copy to the Judge
24   under seal so that she can see whether or

Page 246

Dondero - 5-28-2021

1    not there's any other aspect of the
2    financial statements that --
3        MS. DEITSCH-PEREZ:  That's fine.
4        MR. MORRIS:  -- pertain to the
5    notes.
6        Give me a break.  Stop.
7        MS. DEITSCH-PEREZ:  I know.
8    Litigation isn't a one-way -- one-way
9    disco.
10       MR. MORRIS:  Okay.  All right.
11       The next document, please.
12       THE WITNESS:  How are we doing on
13   time?
14       MR. MORRIS:  We're doing pretty
15   well.  I think we're going to fit within --
16   we're not quite an hour back on, but I'm
17   confident that we'll fit within the one- to
18   two-hour -- we'll be done within an hour.
19   That's my point.
20       THE WITNESS:  Okay.  I'm going to
21   give a hard stop at 2:00.  Okay?
22       MR. MORRIS:  You can do whatever you
23   want.  If we're not finished, we'll just
24   have to figure out a time to come back.  So

Page 247

Dondero - 5-28-2021

1    let's get through as much as we can, and
2    we'll see where we are.
3    BY MR. MORRIS:
4    Q.   The next document is the management
5    representation letter.
6        (Exhibit 16 introduced.)
7    BY MR. MORRIS:
8    Q.   And I would just ask you to look at,
9    I guess, page 33419 and just confirm for me
10   that that's your signature.
11   A.   Yes.
12   Q.   Okay.  And this contains the same
13   representations that you made to PWC that we
14   looked at in the earlier management rep letter,
15   right?
16   A.   Yes.
17   Q.   Okay.  Let's look at the next
18   document, please.
19       (Exhibit 17 introduced.)
20   BY MR. MORRIS:
21   Q.   So PWC issues the audited financials
22   in June of 2019, and then Highland files for
23   bankruptcy in October.
24       Do I have that right?

Page 248

Dondero - 5-28-2021

1
2    A.    Yes.
3    Q.    And at the time Highland filed for
4    bankruptcy, you were the president and CEO of
5    Highland, correct?
6    A.    Yes.
7    Q.    And you personally authorized
8    Highland's bankruptcy filing, correct?
9    A.    On Pachulski's recommendation.
10   Q.    But you're the only person who
11   authorized the filing; is that correct?
12   A.    Yes.
13   Q.    And did you understand -- you have
14   familiarity with bankruptcy proceedings, right?
15         MS. DEITSCH-PEREZ:  Object to the
16   form.
17   A.    Not this kind of bankruptcy, but,
18   yes, we have experience in bankruptcies.
19   BY MR. MORRIS:
20   Q.    And you had experience in the Acis
21   bankruptcy, for example, correct?
22   A.    Yes.
23         MS. DEITSCH-PEREZ:  Object to the
24   form.
25   BY MR. MORRIS:

Page 249

Dondero - 5-28-2021

1
2    Q.    And you understand that debtors in
3    bankruptcy have to make certain disclosures; is
4    that right?
5          MS. DEITSCH-PEREZ:  Object to the
6    form.
7    BY MR. MORRIS:
8    Q.    You can answer.
9    A.    Yes.
10   Q.    And you understand that the purpose
11   of the disclosures is to give interested
12   parties an opportunity to review the financial
13   information relating to the debtors, right?
14         MS. DEITSCH-PEREZ:  Object to the
15   form.
16   A.    Generally.
17   BY MR. MORRIS:
18   Q.    The debtor is supposed to be
19   transparent.  Is that a statement you would
20   agree with?
21   A.    I'd agree the debtor is supposed to
22   be.
23   Q.    So, are you aware that the debtor
24   filed certain schedules in connection with the
25   bankruptcy case?

Page 250

Dondero - 5-28-2021

1
2    A.    I'm sure they filed many schedules.
3    Q.    And did you -- did you review the
4    debtor's schedules before they were filed?
5    A.    No.
6    Q.    All right.  So, here is a summary of
7    the debtor's assets and liabilities that was
8    filed in December -- on December 12th, 2019.
9          Do you see the timeline at the top?
10   A.    Yes.
11   Q.    And you were still in control of the
12   debtor at that time, correct?
13   A.    Yep.
14   Q.    And was Mr. Waterhouse responsible
15   for preparing the debtor's Summary of Assets
16   and Liabilities on behalf of Highland at that
17   time?
18   A.    I -- I don't know whether DSI was in
19   control at that point.  I don't know.
20   Q.    Did DSI rely on Mr. Waterhouse and
21   the accounting team for the information that
22   was used to create the debtor's disclosures?
23         MS. DEITSCH-PEREZ:  Object to the
24   form.
25   BY MR. MORRIS:

Page 251

Dondero - 5-28-2021

1
2    Q.    Withdrawn.
3          To the best of your knowledge, did
4    DSI rely on Mr. Waterhouse and the accounting
5    team at Highland in order to prepare the
6    debtor's schedules and financial disclosures?
7          MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.    I don't know.
10   BY MR. MORRIS:
11   Q.    Did you ever discuss with
12   Mr. Waterhouse the debtor's financial
13   disclosures during the bankruptcy case?
14   A.    Nope.
15   Q.    Did you ever look at the Summary of
16   Assets and Liabilities that was filed with the
17   Court in December 2019?
18   A.    Nope.
19         MR. MORRIS:  Turn to the second
20   page, please.  Let's just go down right --
21   right there.
22   BY MR. MORRIS:
23   Q.    Do you see in part 11 -- part 11
24   pertains to all other assets and in Item
25   Number 71, there's a reference to "Notes

Page 252

Dondero - 5-28-2021

1   Receivable."
2   A.   Yep.
3   Q.   And do you see that the Notes
4   Receivable are for an aggregate amount of
5   approximately $150 million?
6   A.   Yep.
7   Q.   And it refers to Exhibit D.  Do you
8   see that?
9   A.   Yes.
10   Q.   All right.
11      MR. MORRIS:  Can we turn -- go to
12   the next page?
13   BY MR. MORRIS:
14   Q.   And exhibit -- this page is Exhibit
15   D.
16      Do you see that?
17   A.   Yes.
18   Q.   And this shows an aggregate amount
19   of -- the face amount of notes to be the same
20   $150.3 million that we just saw, correct?
21      MS. DEITSCH-PEREZ:  Object to the
22   form.
23   BY MR. MORRIS:
24   Q.   We can go back and look, if you
25

Page 253

Dondero - 5-28-2021

1   want.
2   A.   It seems to tie.
3   Q.   Okay.  And it was disclosed on the
4   docket in the bankruptcy case that you
5   personally had made Notes Receivable
6   outstanding in the approximate amount of
7   $9.3 million.  Do you see that?
8   A.   Yes.
9   Q.   Okay.
10      MR. MORRIS:  Can we just go to the
11   top?  I want to just show the date.
12   BY MR. MORRIS:
13   Q.   It's December 13.  That's the date
14   that this disclosure is made.  Do you see that?
15   A.   Yes.
16   Q.   And there's a footnote there, number
17   [1], that says "Doubtful or Uncollectible
18   accounts are evaluated at year end."  Do you
19   see that?
20   A.   Yes.
21   Q.   Now, nothing on this document shows
22   any of the notes as being doubtful or
23   uncollectible, correct?
24   A.   Correct.
25

Page 254

Dondero - 5-28-2021

1   Q.   Do you know if the debtor's
2   schedules were ever amended after
3   December 13th, 2019, to reflect "Doubtful or
4   Uncollectible" Notes Receivable?
5      MS. DEITSCH-PEREZ:  Object to the
6   form.
7   A.   Yeah.  I believe the Hunter Mountain
8   56 was written off.
9   BY MR. MORRIS:
10   Q.   Okay.  Anything else?
11      MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.   I -- I don't know.
14   BY MR. MORRIS:
15   Q.   Okay.  Did you ever ask anyone to
16   amend the debtor's schedules to reflect any
17   Doubtful or Uncollectible receivable that's set
18   forth on this page?
19   A.   I did not.
20   Q.   Okay.
21      MR. MORRIS:  La Asia, I'm actually
22   going to just skip the next exhibit.  And
23   if we could go to the one that you and I
24   had marked as 19.  We'll just mark it as 18
25

Page 255

Dondero - 5-28-2021

1   for purposes of the deposition.
2      MS. DEITSCH-PEREZ:  I think that's
3   confusing.  I don't mind if you just mark
4   18 as "omitted."  I would want a sheet with
5   "18 omitted."  That way, your numbering can
6   stay the same.
7      MR. MORRIS:  Okay.  That's fine.
8   Thank you.  So we'll mark 18 as "omitted",
9   and this will be 19.
10      (Exhibit 19 introduced.)
11   BY MR. MORRIS:
12   Q.   Are you aware of -- that the debtor
13   filed disclosures called Statements of
14   Financial Affairs, often referred to as SoFAs?
15   A.   I've heard of the form before, yes.
16   Q.   Did you ever review the debtor's
17   SoFAs?
18   A.   No.
19   Q.   So, do you know who was responsible
20   at Highland for preparing the debtor's SoFAs?
21   A.   No.
22   Q.   Would it have been -- would --
23   whoever it was, would that person have either
24   been or reported to Frank Waterhouse, as the
25

Dondero - 5-28-2021

1         Dondero - 5-28-2021
2 CFO?
3    A.  I'm sorry.  Can you repeat that one
4 more time?
5    Q.  I appreciate the fact that you
6 don't -- you can't identify the person who
7 prepared the SoFAs; but within the
8 organizational structure of Highland during the
9 time that you were the CEO, would the person
10 have been either Frank Waterhouse or somebody
11 who reported to Frank Waterhouse?
12    A.  Or DSI.
13    Q.  Okay.
14        MR. MORRIS:  Can we go to page 2,
15 please.
16        (Scrolling.)
17 BY MR. MORRIS:
18    Q.  Do you see at number 4 here, there's
19 a reference to payments made to insiders within
20 a year of the bankruptcy case?
21    A.  Yup.
22    Q.  Are you aware -- withdrawn.
23        Were you aware in December 2019 that
24 Highland was going to disclose all payments
25 made to insiders within a year of the

1         Dondero - 5-28-2021
2 bankruptcy case?
3    A.  No.
4        MR. MORRIS:  Let's go to page 19 of
5 34, please.
6        (Scrolling.)
7        MR. MORRIS:  If we could, scroll
8 down near the bottom.
9 BY MR. MORRIS:
10    Q.  You'll see that there's two entries
11 for Highland Capital Management Fund Advisors.
12        Do you see that?
13    A.  Yup.
14    Q.  And in May 2019, the debtor paid
15 Highland Capital Management Fund Advisors the
16 aggregate amount of $7.4 million.  Am I reading
17 that correctly?
18    A.  Yes.
19    Q.  Okay.  And those payments were -- in
20 exchange for those payments, Highland received
21 two promissory notes, correct?
22        MS. DEITSCH-PEREZ:  John, I'm going
23     to object.  You're straying from the
24     subject of this adversary and going into
25     another, and I'm really not comfortable

1         Dondero - 5-28-2021
2 with that since he's only prepared for
3 his -- his -- for this proceeding and has
4 not refreshed himself on anything else.
5 So, this is outside of what the scope of
6 this deposition ought to be.
7        MR. MORRIS:  Okay.  So you have two
8 choices, Deborah:  You can either state
9 your objection, "beyond the scope," or you
10 can direct the witness not to answer.
11 Which would you like to do?
12        MS. DEITSCH-PEREZ:  I am going to
13 state my objection that it's beyond the
14 scope, but I'm asking you because -- as a
15 matter of fairness, that you restrain
16 yourself and limit your deposition to this
17 adversary proceeding --
18        MR. MORRIS:  Okay.  I appreciate --
19        MS. DEITSCH-PEREZ:  -- and not --
20        (Simultaneous conversation.)
21        MS. DEITSCH-PEREZ:  And if the
22 witness isn't prepared to answer these
23 questions, it's not fair that you proceed
24 on them.
25        MR. MORRIS:  Okay.  So I'll just say

1         Dondero - 5-28-2021
2 that for a couple of questions to ask the
3 former CEO about a 7.4 million-dollar
4 payment made to an affiliate that he owns
5 or controls, I'm going to ask you to give
6 me a little latitude.
7 BY MR. MORRIS:
8    Q.  Mr. Dondero, were those two payments
9 backed up by promissory notes in favor of the
10 debtor, to the best of your knowledge?
11    A.  I don't know.
12    Q.  Okay.
13        MR. MORRIS:  Let's go to the next
14 page, please.
15        Can we go towards the middle of the
16 page.  Right there.  That's fine.
17 BY MR. MORRIS:
18    Q.  Do you see your name, James Dondero,
19 there?
20    A.  Yes.
21    Q.  And you were paid $3.75 million
22 within a year of the bankruptcy, correct?
23    A.  Yes.
24    Q.  Who determined that you should --
25 who made the decision for Highland to pay you

Page 260

Dondero - 5-28-2021

2  that amount?

3      A.   Me?  I don't know.

4      Q.   Is there anybody else who had the

5  authority to determine your compensation prior

6  to the petition date, other than yourself?

7      A.   Especially -- besides myself --

8  okay.  Let me answer that question first.

9      The Class A -- majority Class A

10  holders can, and then I can.

11      Q.   Anybody else?

12      A.   Not that -- not that I know.

13      Q.   In practice, did anybody other than

14  you set your compensation?

15      A.   In practice, yes, sometimes majority

16  Class A did.

17      Q.   And at any time prior to the

18  petition date, can you think of an instance

19  where the majority of the Class A refused to

20  compensate you in the manner in which you

21  wanted?

22      A.   There was -- no, because there was

23  no reason to because there was plenty of head

24  room in all the agreements and compared to

25  market levels.

Page 261

Dondero - 5-28-2021

2      MR. MORRIS:  Let's go to the next

3  document, please.

4      (Exhibit 20 introduced.)

5  BY MR. MORRIS:

6      Q.   Are you aware that, during the

7  course of the bankruptcy proceeding, the

8  debtor, in addition to the schedules and SoFAs,

9  also filed every month a document called the

10  "Monthly Operating Report"?

11      A.   I'm not aware, specifically.

12      Q.   Did you ever review any of the

13  debtor's Monthly Operating Reports?

14      A.   Not that I can recall.

15      Q.   Okay.

16      MR. MORRIS:  We can scroll down a

17  bit.

18  BY MR. MORRIS:

19      Q.   You see there's -- there's two

20  signatures here:  One electronic, one

21  handwritten, both dated December 2nd.  Do you

22  see that Brad Sharp has signed as an authorized

23  individual as the Chief Restructuring Officer?

24      A.   Yup.

25      Q.   Okay.  And then below that, there's

Page 262

Dondero - 5-28-2021

2  the electronic signature of Mr. Waterhouse.  Do

3  you see?

4      A.   Yes.

5      Q.   Okay.  Were -- to the best of your

6  knowledge as the CEO at the time, were

7  Mr. Sharp and Mr. Waterhouse authorized to sign

8  and file Monthly Operating Reports with the

9  Court?

10      A.   Again, it's not my sphere of

11  knowledge.  It looks like -- individually or

12  jointly, I -- I don't have a comment.

13      Q.   I'm just asking you, as the CEO, did

14  you expect Mr. Waterhouse and Mr. Sharp to take

15  care of all financial disclosures required

16  under the bankruptcy code?

17      A.   Yes.

18      Q.   And did you expect them to do that

19  completely, transparently and accurately?

20      A.   Yes.

21      Q.   Do you have any reason to believe

22  that they failed to do so?

23      A.   Not that I'm aware.

24      MR. MORRIS:  Can we go to page 6 of

25  11?

Page 263

Dondero - 5-28-2021

2      (Scrolling.)

3  BY MR. MORRIS:

4      Q.   You haven't seen this document

5  before; is that right?

6      A.   I do not believe so.

7      Q.   Okay.  But you see that it was filed

8  in late January 2020, but it was signed in

9  December, right?

10      A.   Yeah.

11      Q.   Okay.  And do you see that among the

12  assets listed are amounts "Due from

13  affiliates"?

14      A.   Yep.

15      Q.   And do you have any reason to

16  believe that the amounts due from affiliates

17  are anything other than the same notes and

18  amounts due that we saw in the audited

19  financial statements?

20      MS. DEITSCH-PEREZ:  Object to the

21  form.

22      A.   I don't know.

23  BY MR. MORRIS:

24      Q.   Okay.

25      THE WITNESS:  I do look at this and

Page 264

Dondero - 5-28-2021

1        get wistful.  You guys should be ashamed of

2        yourselves, what you've done to this

3        company.

4             MR. MORRIS:  I move to strike.

5        Can we take a look at footnote (1),

6        please?

7  BY MR. MORRIS:

8     Q.   Do you see that it "Includes various

9  notes receivable at carrying value"?

10    Do you have any understanding of

11  what that --

12       MS. DEITSCH-PEREZ:  You didn't state

13     the whole sentence, John.  Please, if

14     you're going to point him to things, read

15     him the whole sentence.

16  BY MR. MORRIS:

17     Q.   Sir, do you have any understanding

18  as to what footnote (1) refers to or means?

19     A.   It says what it says.

20     Q.   Okay.

21       MR. MORRIS:  Let's look at the next

22     document, please.

23     (Exhibit 21 introduced.)

24       MR. MORRIS:  All right.  So if you

Page 265

Dondero - 5-28-2021

1  could just stop right there.

2  BY MR. MORRIS:

3    Q.   This is the Monthly Operating Report

4  for the period ending November 2019.  Do you

5  see that?

6    A.   Yes.

7      MR. MORRIS:  Can we scroll down a

8    bit?

9  BY MR. MORRIS:

10    Q.   And that's Mr. Sharp's and

11  Mr. Waterhouse's signatures, correct?

12    A.   Yes.

13    Q.   Do you see on this version,

14  Mr. Sharp is identified as the "Responsible

15  Party," but Mr. Waterhouse is identified as the

16  "Preparer"?

17    A.   Yes.

18    Q.   Do you recall ever telling Mr.

19  Waterhouse, in his capacity as the preparer of

20  Monthly Operating Reports, that there was

21  anything inaccurate in any Monthly Operating

22  Report filed by the debtor?

23    A.   No.

24    Q.   Do you recall ever telling

Page 266

Dondero - 5-28-2021

1  Mr. Sharp, as the responsible party, that there

2  was anything inaccurate in any monthly --

3  Monthly Operating Report filed by the debtor?

4    A.   No.

5      MR. MORRIS:  Can we go to the next

6  page, please?

7    (Scrolling.)

8      THE WITNESS:  I'm going to give the

9  12-minute warning here.  I can be back at

10  4:00, but I'm going to need a couple hours.

11      MR. MORRIS:  I'm trying to finish

12  up, okay?

13      THE WITNESS:  Okay.

14      MR. MORRIS:  I'd rather not come

15  back, to be honest with you.

16    Can we go to the next page, please?

17  BY MR. MORRIS:

18    Q.   Again, the debtor reported that the

19  amounts due from affiliates were assets of the

20  debtor's estate, correct?

21    A.   Yep.

22    Q.   Do you -- do you have any issue with

23  the fact that the debtor reported the notes,

24  including your own notes, as assets of the

Page 267

Dondero - 5-28-2021

1  estate?

2      MS. DEITSCH-PEREZ:  Object to the

3    form.

4    A.   Until they're forgiven, they're bona

5  fide notes.

6  BY MR. MORRIS:

7    Q.   And you don't think the "conditions

8  subsequent" agreement that you entered into

9  with Nancy calls into question whether the

10  debtor would ever recover on their notes that

11  you issued to them?

12      MS. DEITSCH-PEREZ:  Object to the

13    form.

14    A.   Again, I don't believe it's material

15  or GAAP, is my understanding.

16  BY MR. MORRIS:

17    Q.   Well, almost a third of the debtor's

18  assets are notes "Due from affiliates," right?

19    A.   You have to back out Hunter

20  Mountain, and you have to back out -- you have

21  to back out about 80 million to get to the 70

22  million of affiliated notes; and then, from

23  there, you have to back out 60 of them to get

24  to the 9 million.

Dondero - 5-28-2021

1
2       MS. DEITSCH-PEREZ:  Mr. Morris,
3    please don't make faces at Mr. Dondero.
4  BY MR. MORRIS:
5       Q.   Why -- why are we backing out Hunter
6  Mountain?
7       A.   I think the Hunter Mountain -- there
8  were notes going both ways, but I think the
9  Hunter Mountain is out of the estate, I
10  believe.
11       Q.   But Hunter Mountain -- the debtor
12  held notes that were made by Hunter Mountain in
13  the approximate amount of $60 million, right?
14       A.   But subsequent to these dates, I
15  think -- I think they realized it was just a
16  cross-transaction.  There were dues and
17  payables that were essentially equal from
18  Hunter Mountain, so I think Hunter Mountain
19  came out of that.
20       Q.   Isn't it -- isn't it a fact that
21  they wrote them off because they didn't believe
22  they were collectible?
23       A.   Yeah, because the payment on those
24  notes depended upon Highland honoring its
25  agreements to Hunter Mountain, which Highland

Dondero - 5-28-2021

1  had no intention of doing.  So, there's no
2  ability for Hunter Mountain to pay Highland.
3       Q.   Does Highland -- does Hunter
4  Mountain today have the ability to pay back any
5  of the $60 million that it -- that was
6  reflected in the notes?
7       MS. DEITSCH-PEREZ:  Object.
8       A.   No, not that I know of but --
9  BY MR. MORRIS:
10       Q.   Okay.
11       MS. DEITSCH-PEREZ:  And, Mr. Morris,
12  once again, I think we're straying from
13  this adversary.
14       MR. MORRIS:  Can we go to page 5 of
15  9, please?
16       (Scrolling.)
17       MR. MORRIS:  Above that, I think.
18  Next page, 5 of 9.  We must be looking at
19  the wrong exhibit.
20       Is the one that was marked 22?  No,
21  it's the next -- I believe it's the next
22  document.
23       Let's pull up the next document,
24  please.
25

Dondero - 5-28-2021

1
2       (Exhibit 22 introduced.)
3       MR. MORRIS:  Yeah, that's it.
4       Go to page 5, please.  Thank you.
5  BY MR. MORRIS:
6       Q.   Do you see that box there?  It says
7  "Non-Operating Receipts - Other."
8       A.   Yes.
9       Q.   Okay.  And do you understand that
10  that shows that, in December 2019, while you
11  were still personally in control of the debtor,
12  that certain payments of "principle or
13  interest" were made with respect to notes made
14  in favor of the debtor?
15       A.   Yes.
16       Q.   Okay.  And do you understand that
17  the one dated December 23rd in the approximate
18  amount of $783,000, that was a payment that was
19  made by you?
20       MS. DEITSCH-PEREZ:  Object to the
21  form.
22       A.   If you say so.  I don't have a basis
23  for denying it or confirming it.
24  BY MR. MORRIS:
25       Q.   Okay.  But it's true, you do recall

Dondero - 5-28-2021

1
2  that in December 2019, after the petition date,
3  while you were still in control of the debtor,
4  that certain payments of principal and interest
5  were made on notes that were made in favor of
6  the debtor, correct?
7       MS. DEITSCH-PEREZ:  Asked -- asked
8  and answered about an hour ago.
9  BY MR. MORRIS:
10       Q.   You can answer, sir.
11       A.   I believe -- I believe so.
12       Q.   Thank you.  Do you recall that in
13  connection with its Plan and Disclosure
14  Statement, that the debtor prepared a
15  Liquidation Analysis?
16       A.   Yes.
17       MR. MORRIS:  Can we call the next
18  document up on the screen, please?
19       (Exhibit 23 introduced.)
20       MR. MORRIS:  And if we can go to the
21  next page.
22  BY MR. MORRIS:
23       Q.   Your lawyers and lawyers acting on
24  behalf of entities you own and control or
25  otherwise have an interest spent considerable

Page 272

Dondero - 5-28-2021

1          Dondero - 5-28-2021
2   time on the debtor's Liquidation Analysis and
3   confirmation.
4          Do you remember that?
5      A.   I can't -- I can't agree or disagree
6   with that.
7   BY MR. MORRIS:
8      Q.   Okay.  Did you personally review the
9   debtor's Liquidation Analysis?
10     A.   Briefly.
11     Q.   Okay.
12         MR. MORRIS:  Can we go to the next
13   page, please?
14   BY MR. MORRIS:
15     Q.   Do you see that this page contains a
16   list of "Assumptions"?
17     A.   Yes.
18         MR. MORRIS:  And can we scroll up a
19   little further so we can see the date?
20   BY MR. MORRIS:
21     Q.   You'll see that on November 24th,
22   2020, the debtor filed a Liquidation Analysis
23   that contained, as among the Assumptions,
24   quote, "All demand notes are collected in the
25   year 2021."  Do you see that?

Page 273

1          Dondero - 5-28-2021
2      A.   Yes.
3      Q.   Did you or anybody acting on your
4   behalf ever inform the Court that you believed
5   that assumption was unreasonable?
6      A.   I -- I don't know, but I know we've
7   been fighting the notes consistently through
8   various mechanisms.
9      Q.   Okay.  Did you or anybody acting on
10   your behalf ever inform the Court of your
11   agreement with Nancy?
12         MS. DEITSCH-PEREZ:  Object to the
13   form.
14     A.   Not -- not that I know of.
15   BY MR. MORRIS:
16     Q.   Did you ever instruct anybody to
17   inform the Court that you had an agreement with
18   Nancy that rendered Assumption C unreasonable?
19         MS. DEITSCH-PEREZ:  Object to the
20   form.
21     A.   I did not.
22         MR. MORRIS:  Let's look at the last
23   document, please.
24         (Exhibit 24 introduced.)
25   BY MR. MORRIS:

Page 274

1          Dondero - 5-28-2021
2      Q.   Do you recall that there came a time
3   just prior to the confirmation hearing that the
4   debtor amended its Liquidation Analysis?
5      A.   No.  Okay.  Yes.
6          MR. MORRIS:  Okay.  And if we could
7   go to the next page.
8   BY MR. MORRIS:
9      Q.   You'll see at the bottom right-hand
10   corner it's dated January 28th, 2021.
11         MR. MORRIS:  We wanted page up but
12   just -- yeah, page up, the assumptions.
13         Yeah, right there.
14   BY MR. MORRIS:
15     Q.   You see it's dated January 28, 2021?
16     A.   Yes.
17     Q.   Okay.  And let's look at Assumption
18   C.  It's been amended somewhat.
19         And it now says, quote:  "All demand
20   notes are collected in the year 2021; 3 term
21   notes defaulted and have been demanded based on
22   default provisions; payment estimated in 2021."
23         Do you see that?
24     A.   Yes.
25     Q.   Did you or anybody on your behalf

Page 275

1          Dondero - 5-28-2021
2   ever inform the Court that this assumption was
3   unreasonable?
4          MS. DEITSCH-PEREZ:  Object to the
5   form.
6      A.   Yes.  Well, Lynn wrote a letter to
7   all the counsels, which I think ended up being
8   put in the Court record, that the notes were
9   all subject to defenses and could not be
10   considered unencumbered, I think, if they're
11   sold, or whatever.  He was -- he was -- he --
12   he realized the attitude towards the notes had
13   shifted, and he penned something to everybody
14   and to make the notes so that they couldn't be
15   sold without notifying people that there were
16   good defenses to them.
17   BY MR. MORRIS:
18     Q.   Did you or anybody acting on your
19   behalf ever challenge this assumption in
20   connection with the debtor's confirmation
21   hearing?
22         MS. DEITSCH-PEREZ:  Object to the
23   form, asked and answered.
24     A.   Yeah.  I think Lynn's letter
25   objected to that vehemently.  It was just

Page 276

Dondero - 5-28-2021

1 ignored.
2
3 BY MR. MORRIS:
4     Q.   Do you know anything else –
5 anything else you're aware of?
6     A.   I think that's powerful enough.
7     Q.   That's not my question, sir.  My
8 question is:  Are you aware of any other facts
9 that you're relying upon to answer my question
10 as to whether or not you or anybody acting on
11 your behalf informed the Court that Assumption
12 C is unreasonable?
13        MS. DEITSCH-PEREZ:  Object to the
14 form.
15     A.   Just the Lynn letter.  I have no
16 other specific awareness.
17        MR. MORRIS:  Thank you very much.  I
18 have no further questions.  Thank you so
19 much, folks.  Been a pleasure.
20        MS. DEITSCH-PEREZ:  Reserve until
21 trial.
22        (Time Noted:  1:59 p.m.)

Page 277

Dondero - 5-28-2021
C E R T I F I C A T E
STATE OF TEXAS    )
                  )
COUNTY OF ELLIS   )

   I, Daniel J. Skur, a Notary Public
within and for the State of Texas, do
hereby certify:
   That JAMES DONDERO, the witness whose
deposition is hereinbefore set forth, was
duly sworn by me and that such deposition
is a true record of the testimony given by
such witness.
   That pursuant to Rule 30 of the Federal
Rules of Civil Procedure, signature of the
witness was not reserved by the witness or
other party before the conclusion of the
deposition;
   I further certify that I am not
related to any of the parties to this
action by blood or marriage; and that I am
in no way interested in the outcome of this
matter.
   IN WITNESS WHEREOF, I have hereunto
set my hand this 28th day of May, 2021.

_____
Daniel J. Skur
Notary Public, State of Texas.
My Commission Expires 7/7/2022
TSG Reporting, Inc.
228 East 45th Street, Suite 810
New York, New York
(877) 702-9580

Page 278

Dondero - 5-28-2021
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:
   IN THE UNITED STATES BANKRUPTCY COURT
     FOR THE NORTHERN DISTRICT OF TEXAS
              DALLAS DIVISION
In re:            )
HIGHLAND CAPITAL        )  Case No.
MANAGEMENT, LP,    )  19-34054 L.P.
Debtor.        )  Chapter 11
—————————————
HIGHLAND CAPITAL MANAGEMENT,  )
LP,                    )
   Plaintiff,      )  Adversary No.
vs.              )  21-03003-sgi
JAMES D. DONDERO,       )
   Defendant.        )
Dep. Date:  05/28/2021
Deponent:  JAMES DONDERO

Reason codes:
1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
       CORRECTIONS:
Pg. LN.  Now Reads   Should Read   Reason
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____

Page 279

Dondero - 5-28-2021
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____
___ ___ _____ _____ _____

        _____
        JAMES DONDERO

SUBSCRIBED AND SWORN BEFORE ME
THIS _____ DAY OF _____, 2021.

_____
(Notary Public)  MY COMMISSION EXPIRES:_____

Page 280

1          Dondero - 5-28-2021
2          ——— I N D E X ———
3   WITNESS:      EXAMINATION BY        PAGE:
4   JAMES DONDERO
5      Mr. Morris          107
6
7          ———EXHIBITS———
8   Defendant's              PAGE/LINE
9   Exhibit 1   2/2/2020 Promissory Note   108/16
            2 pages
10
    Exhibit 2   February 2020 Highland   118/21
11          Capital Management, L.P.
            Operating Results
12          12 pages
13   Exhibit 3   8/1/2020 Promissory Note   121/8
            2 pages
14
    Exhibit 4   8/13/2018 Promissory Note   127/2
15          2 pages
16   Exhibit 5   August 2018 Highland   130/14
            Capital Management, L.P.
17          Operating Results
            9 pages
18
    Exhibit 6   12/3/2020 Demand Letter   132/11
19          3 pages
20   Exhibit 7   Defendant James Dondero's   136/8
            Original Answer
21          8 pages
22   Exhibit 8   Defendant James Dondero's   158/2
            Objections and Responses
23          to Highland Capital
            Management, L.P.'s First
24          Request For Admissions
            6 pages
25

Page 281

1          Dondero - 5-28-2021
2          ———EXHIBITS———
3   Defendant's              PAGE/LINE
4   Exhibit 9   Defendant James Dondero's   160/23
            Objections and Answers to
5          Highland Capital
            Management, L.P.'s First
6          Set of Interrogatories
            6 pages
7
    Exhibit 10   Defendant James Dondero's   169/10
8          Amended Answer
            8 pages
9
    Exhibit 11   Defendant James Dondero's   191/8
10          Objections and Responses
            to Highland Capital
11          Management, L.P.'s Second
            Request For Admissions
12          5 pages
13   Exhibit 12   Exhibit 20, Defendant   206/4
            James Dondero's Objections
14          and Answers to Highland
            Capital Management, L.P.'s
15          Second Set of Interrogatories
            7 pages
16
    Exhibit 13   Highland Capital   220/20
17          Management, L.P.'s
            Consolidated Financial
18          Statements and
            Supplemental Information
19          12/31/2020
            48 pages
20
    Exhibit 14   5/18/2020 Management   234/21
21          Representation Letter
            11 pages
22
    Exhibit 15   Highland Capital   237/3
23          Management, L.P.'s Consolidated
            Financial Statements and
24          Supplemental Information
            12/31/2018
25          46 pages

Page 282

1          Dondero - 5-28-2021
2          ———EXHIBITS———
3   Defendant's              PAGE/LINE
4   Exhibit 16   6/3/2019 Management   247/7
            Representation Letter
5          11 pages
6   Exhibit 17   12/13/2019 Summary of   247/20
            Assets and Liabilities For
7          Nonindividuals
            3 pages
8
    Exhibit 18   (Skipped by Agreement)
9
    Exhibit 19   12/13/2019 Statement of   255/11
10          Financial Affairs For
            Nonindividuals Filing
11          Bankruptcy
            42 pages
12
    Exhibit 20   10/31/2019 Monthly   261/4
13          Operating Report
            11 pages
14
    Exhibit 21   10/31/2019 Monthly   264/24
15          Operating Report
            11 pages
16
    Exhibit 22   December 2019 Monthly   270/2
17          Operating Report
            9 pages
18
    Exhibit 23   Exhibit C, Liquidation   271/19
19          Analysis/Financial
            Projections
20          8 pages
21   Exhibit 24   1/28/2021 Highland Capital   273/24
            Management LP Disclaimer
22          For Financial Projections
            7 pages
23
24
25

**$**

**$1** 214:7,19

**$11.7** 232:16 234:8

**$14.9** 241:23 242:16

**$150** 252:6

**$150.3** 252:21

**$2,000,000** 236:16

**$2.5** 121:20,23 122:4 127:24

**$3,825,000** 108:21 109:24 111:5,10

**$3.75** 259:21

**$3.8** 119:24 120:17

**$3.9** 233:9

**$5** 131:6

**$60** 268:13 269:6

**$63** 231:16

**$7.4** 257:16

**$7.8** 233:10

**$783,000** 270:18

**$8.8** 242:15

**$80** 196:14

**$9** 160:11

**$9.3** 253:8

**(**

**(1)** 264:6,19

**-**

--------------------
**EXHIBITS**--------------
----- 280:7 281:2 282:2

-------I 280:2

**0**

**0.2** 224:14

**05/28/2021** 278:11

**0bject** 211:5

**1**

**1** 108:16 120:5 163:23 165:9 192:19 197:10 200:3 207:15,23 208:7 215:21 218:3 219:20 234:10 253:18 278:13 280:9

**1(a)** 162:21

**1/28/2021** 282:21

**10** 169:10 281:7

**10/31/2019** 282:12, 14

**107** 280:5

**108/16** 280:9

**10:30** 151:15

**10:40** 151:15

**11** 191:7,8 251:23 262:25 278:6 281:9 282:5

**118/21** 280:10

**12** 206:3,4 280:12 281:13

**12-minute** 266:10

**12/13/2019** 282:6,9

**12/3/2020** 280:18

**12/31/2020** 281:19

**121/8** 280:13

**127/2** 280:14

**12:30** 204:20

**12th** 250:8

**13** 127:24 220:19,20 253:14 281:16

**130/14** 280:16

**132/11** 280:18

**136/8** 280:20

**13th** 254:4

**14** 159:20,24 226:9 234:21 281:20

**15** 237:3 281:22

**158/2** 280:22

**16** 136:18 137:6 232:9 247:7 282:4

**160/23** 281:4

**169/10** 281:7

**17** 217:10 221:5 247:20 282:6

**18** 148:11 199:7 217:11 232:13,24 254:25 255:5,6,9 282:8

**18th** 222:13 232:8 235:13

**19** 199:10,12 244:18 254:25 255:10,11 257:4 282:9

**19-34054** 278:6

**191/8** 281:9

**1:30** 204:20

**1:59** 276:22

**1st** 121:19,24 160:17 232:12

**2**

**2** 108:20 109:22 110:16,18,19 118:20, 21 122:7,10 128:3,5 184:10 232:24 256:14 280:10,15

**2.5** 131:11

**2/2/2020** 280:9

**20** 144:6 149:11,12, 13 261:4 281:13 282:12

**2000** 195:12

**2015** 225:12

**2017** 221:17 222:3 223:6 224:11,22 225:24 226:7 237:18

**2018** 108:20 109:22, 25 110:18 111:8 115:13,14 119:12 120:14,17 121:19,24

127:24 130:21 131:5, 12,17,20 143:15 194:9 221:8 222:13 226:19 232:8,13,24 233:12 234:11 235:13 237:6 238:6, 24 239:10 241:23 242:10 243:23 244:21 280:16

**2019** 148:10 152:9, 11,14 153:8 154:5,10 155:10 156:12,18 157:13 172:17 173:19 174:22 189:23 192:20 197:24 198:3,11 208:10 212:20 213:10 214:5,17 215:4,16 216:4,8 237:11 239:2 240:10 244:3,16,22 245:4 247:23 250:8 251:17 254:4 256:23 257:14 265:5 270:10 271:2 282:16

**2020** 132:22 133:4,21 143:11,22 146:7 147:10 149:23 151:5 154:12 155:11 160:17 225:2,12 263:8 272:22 280:10

**2021** 107:10 136:18 137:7 149:24 159:12, 25 272:25 274:10,15, 20,22 277:14 279:11

**206/4** 281:13

**21** 264:24 282:14

**21-03003-sgi** 278:9

**22** 269:21 270:2 282:16

**220/20** 281:16

**228** 277:20

**22nd** 159:25

**23** 271:19 282:18

**234/21** 281:20

**237/3** 281:22

**23rd** 270:17

**24** 273:24 282:21

**247/20** 282:6

**247/7** 282:4

**24th** 272:21

**255/11** 282:9

**261/4** 282:12

**264/24** 282:14

**270/2** 282:16

**271/19** 282:18

**273/24** 282:21

**28** 274:15

**28th** 107:9 159:11 274:10 277:14

**2:00** 246:22

**2nd** 109:25 111:8 234:11 261:21

**3**

**3** 121:7,8 233:8 244:22 274:20 278:14 280:13,19

**3.8** 120:4

**3.825** 233:4 234:9

**30** 277:8

**30(b)(6)** 195:9

**31** 223:6

**31st** 221:17 222:3 224:11 237:6 238:6 239:10 243:23 244:21

**32** 217:11

**33408** 235:3

**33419** 247:10

**33424** 237:8

**33451** 240:15

**33461** 243:15

**33470** 221:21

**33499** 223:21

**33510** 232:2

**34** 257:5

**3471** 223:3

**35** 204:24 205:14

**3rd** 132:14,22 237:11

---

**4**

**4** 126:25 127:2 162:16
191:18 200:6,13,21
207:12 256:18
280:14

**40** 141:20 143:9
151:22 152:16 153:9
163:3 170:15 171:22
173:7 174:11,17
176:7,16,23 179:9,19
180:2,8,12,17,25
181:9,20 183:6
185:21 186:17
187:12,15 190:5

**45** 200:16

**45th** 277:20

**46** 281:25

**4:00** 266:11

---

**5**

**5** 130:12,14 138:7
139:8 269:15,19
270:4 280:16 281:12

**5-28-2021** 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1

**168:1** 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1

**5/18/2020** 281:20

**56** 254:9

---

**6**

**6** 132:10,11 141:16
162:16 170:9 207:12
262:24 280:18

**6/3/2019** 282:4

**60** 267:24

---

**7**

**7** 136:7,8 280:20

**7.4** 259:3

**7/7/2022** 277:19

**70** 196:13 267:22

**71** 251:25

---

**8**

**8** 114:6,10 141:17
157:25 158:2 170:9
280:21,22 282:20

**8/1/2020** 280:13

**8/13/2018** 280:14

**80** 267:22

**810** 277:20

**877 702-9580**
277:21

---

**9**

**9** 160:22,23 177:8
186:13 235:2 267:25
269:16,19 281:4

**9:33** 107:10,17

---

**A**

**a.m.** 107:10,17

**ability** 123:5 126:7
148:17 187:7 269:3,5

**absolutely** 176:9

**accelerate** 123:11

**accept** 133:10

**accordance** 107:6

**account** 160:16
242:14

**accounted** 120:25

**accounting** 116:24,
25 117:5 118:15
119:17 120:22
123:24 124:11,17,23

**accounts** 234:7
253:19

**accrued** 128:16

**accurate** 163:24
165:6,14 166:13,17,
18 193:3 194:7
226:3,6 232:19
233:20 238:8 242:19

**accurately** 142:3
148:7 163:9 207:23
233:23 262:19

**Acis** 248:20

**acted** 145:3 155:12
174:10,15

**acting** 127:22 134:5,
13,21 150:18,23
157:13 202:19
203:17,18 271:23
273:3,9 275:18
276:10

**action** 158:9 277:12

**add** 142:12

**added** 170:18,22

**addition** 261:8

**additional** 177:15
182:8 183:23 184:13
187:7

**addressed** 132:14

**admission** 158:13
159:20,24 192:11,19
197:10 200:3,13
201:5,22

**admissions** 191:15
280:24 281:11

**admit** 159:24 192:4,
19 200:22

**admitted** 160:8
193:2 198:2

**adopted** 179:24

**adversary** 134:16
137:9 257:24 258:17
269:14 278:9

**advice** 179:3

**advisement** 215:18

**Advisors** 224:13
228:12,16 235:12
257:11,15

**Affairs** 255:15
282:10

**affiliate** 241:13 259:4

**affiliated** 196:13
231:5,14 267:23

**affiliates** 209:7,21
210:13 223:8,13
224:3,4,19 238:11,19
240:19,25 263:13,16
266:20 267:19

**affirm** 129:12

**affirmative** 141:21
147:16,19,22 170:12

**afternoon** 205:19

**aggregate** 130:10
177:9 196:12 241:22
252:5,19 257:16

**agree** 114:12 128:6
130:7 139:14 142:5,
18 143:2 150:24
152:21 198:20 214:4,
16 222:10,11 249:20,
21 272:5

**agreed** 141:23
143:23 145:14,15
146:3 150:19 157:15
164:14 219:17

**agreement** 128:19
143:8 144:10,15,19
145:4 147:3,9,17,23
148:4,12,16 151:20
152:4,15 153:8
154:4,7,15,19 155:3,
4,21 156:8,10,16,17,
23,24 157:7,11,15,20
162:20,25 163:2,5,
11,14,18,21,25
164:10,13 167:20
168:2 173:6,8,18
174:10,16,23 175:3,
4,7,19 176:6,8,10,15,
22 178:19 179:4,9,
18,25 180:7,11,16,24
181:8,19 182:3 183:5

184:17 185:21
186:17 187:11,14,23
188:6 190:5 198:23
199:16 207:17,25
208:9,21 211:2
212:8,15,19 214:3
216:2 217:2,6,25
218:16,23 219:16
220:5,12 231:3,7
238:25 239:10,17
240:9 242:24 243:25
244:13,14,15 245:3
267:9 273:11,17
282:8

**agreements** 114:15
143:5 155:9 156:15
164:23,24 165:11
169:4 177:17,18
178:25 260:24
268:25

**ahead** 190:10 195:17

**allowed** 168:12

**ambiguous** 200:9,
20,25 201:10,25
202:9,21 203:11,20

**amend** 193:10
254:17

**amended** 142:8,12,
16,17 148:14 152:16,
17 153:10,22 154:2,3
164:20 169:12
171:21 200:8,16,22
254:3 274:4,18 281:8

**amendment** 168:6
172:19 243:3

**amicable** 135:10

**amount** 108:20
111:14 121:19
123:20 124:8,13,19
127:24 160:2,6,9,11
184:20 185:23 186:3,
9,12,21,22 187:6
193:24 196:12
211:23 213:17
214:19 231:15
232:15 233:25
241:12,22 252:5,19,
20 253:7 257:16
260:2 268:13 270:18

**amounts** 120:10
123:10 160:15

**analysis** 112:13,18
271:15 272:2,9,22
274:4

**Analysis/financial**
282:19

**and/or** 192:22 197:11
198:5,12 199:12
209:6,7,20 210:11,12

**announcement**
188:18

**annual** 226:10

**answers** 139:15
161:4 162:4 164:20,
21 207:2 281:4,14

**apologies** 168:23

**apologize** 164:7
181:15 204:10
205:11 233:3

**application** 197:9,
14,19

**applied** 192:21
198:5,16

**applying** 199:25

**approval** 127:12
141:15

**approve** 159:14
174:10 240:22 241:5,
13

**approximate** 253:7
268:13 270:17

**approximately**
160:11 196:13
225:11 226:9 252:6

**April** 159:11

**arbitration** 115:11

**argue** 245:18

**argument** 140:21

**arisen** 199:6

**arrangement** 183:2

**ashamed** 264:2

**Asia** 254:22

**asks** 159:24 192:19
200:21

**aspect** 135:18
208:17,20 216:19
218:23 246:2

**assert** 157:12

**asserted** 200:9

**asserts** 141:21
160:10 200:20

**asset** 120:14 212:6

**asset all** 238:10

**assets** 177:3 187:19,
20,25 188:13 190:19,
22 209:24 210:14
212:2 213:24 216:23
223:13 250:7,15
251:16,24 263:12
266:20,25 267:19
282:6

**assigned** 149:16
154:13

**assistant** 109:4
124:22,23

**assumption** 165:24
273:5,18 274:17
275:2,19 276:11

**assumptions**
272:16,23 274:12

**assure** 205:20

**attention** 129:6
141:19

**attitude** 275:12

**attorney-client**
171:16

**attorneys** 159:17

**audio** 109:7 196:21,
25 245:21

**audit** 234:14 237:11,
18 242:19

**audited** 221:9 222:22
227:11 233:19
236:21 237:5,23
238:17,24 239:8
245:9,15 247:22
263:18

**auditing** 235:20

**auditor** 233:17

**auditors** 220:24
221:25 222:22
237:22

**August** 121:19,24
127:24 130:21 131:5,
12,17,20 280:16

**authority** 127:15
260:5

**authorize** 109:6
137:3 159:16 170:5
192:14 240:22
241:14

**authorized** 124:25
125:7 130:2 248:7,11
261:22 262:7

**award** 115:11

**aware** 112:2 113:3
131:19,23 133:21
151:23,24 158:8
159:7 180:4 193:12
196:12 218:5 221:11
223:24 224:9 229:8
241:12,15 249:23
255:13 256:22,23
261:6,11 262:23
276:5,8

**awareness** 110:3
119:22 120:10 141:7,
13 188:25 189:3,7
276:16

—————————

**B**

**back** 109:18 110:23
115:12 136:16 138:5
151:14,15 162:8
163:2,17 186:25
188:8 195:11 200:11,
17 204:24 206:18,21
236:4 246:17,25
252:25 266:10,16
267:20,21,22,24
269:5

**backed** 259:9

**backing** 268:5

**bad** 209:22

**balance** 119:14,20
120:14,19 131:4
177:3 223:5,13
238:5,9,18

**bank** 131:4

**bankruptcies**
248:18

**bankruptcy** 145:19
146:14 147:5 148:19
154:12 155:8 157:3
165:23 166:9,10,11
173:15 247:24 248:4,
8,14,17,21 249:3,25
251:13 253:5 256:20
257:2 259:22 261:7
262:16 278:3 282:11

**bargain** 144:4,12
147:2 149:21

**barred** 141:22

**based** 110:18 188:4
274:21

**basis** 119:19 211:12,
22 212:6,6 215:22
225:11 270:22

**Bates** 223:20 235:3

**bathroom** 151:10

**begging** 168:21

**beginning** 157:2
214:14

**behalf** 107:23 109:5
125:2,8,16 127:15,23
128:11,15,25 130:18
134:6,14,22 135:6
136:2 137:4 141:12
144:15 145:3 146:24
150:18,23 157:13
161:5 163:11,25
164:11,13 165:10,11
167:10,21,25 169:13
170:3,6 171:10,23
173:19 174:15,23
191:23 192:12,16
198:4 202:19 203:17,
18 235:11 244:14
250:16 271:24 273:4,
10 274:25 275:19
276:11

**belief** 200:24 201:9,
24 202:8,20 203:6,

10,19

**believed** 188:8 273:4

**beneficiary** 230:9,14

**benefit** 182:25 183:14 184:4 185:3, 9,20

**benefits** 186:16

**bet** 137:25

**betrayed** 149:15

**big** 213:24

**bit** 132:16 138:5 158:6 160:25 204:8 236:12 261:17 265:9

**blood** 277:12

**board** 148:20

**bona** 125:5 267:5

**Bonds** 137:3,7

**book** 211:16,17

**borrow** 124:16

**bottom** 119:23 131:5 222:5 228:4 241:17 257:8 274:9

**bounced** 217:9

**box** 270:6

**Boy** 142:21

**Brad** 261:22

**break** 151:10,11 168:13 204:5,11 205:10 246:7

**breath** 240:2,5

**Briefly** 272:10

**broader** 179:16

**broke** 196:22

**bucks** 186:13

**bunch** 141:3 217:19

**burden** 205:12

**business** 116:13 135:7,14

**busy** 173:2

**C**

**call** 116:4 152:21 163:17 233:9 234:19 271:17

**called** 116:13 136:13 255:14 261:9

**calls** 267:10

**capacity** 196:18 235:12 265:20

**Capital** 111:4,9 115:5,20 118:25 121:23 132:18 148:15 166:5 207:2 224:13 228:12,24 257:11,15 278:5,7 280:11,16,23 281:5, 10,14,16,22 282:21

**capitulation** 149:25

**capture** 164:22 209:17 210:8 217:22

**captured** 172:18

**captures** 153:15 209:2

**care** 262:15

**carefully** 125:20 155:19

**Carl** 217:12

**carried** 120:18 231:15

**carry** 223:12 238:9

**carrying** 238:18 264:10

**case** 142:21 186:20 195:10,22 244:11 249:25 251:13 253:5 256:20 257:2 278:3,5

**cash** 110:5 193:21,23 196:3 197:18

**catches** 138:15

**caused** 216:9

**caution** 138:13 171:13

**cautioned** 107:14

**CCS** 210:21

**CEO** 114:21 115:17 116:11 117:10 120:17 132:17 220:22 223:11 248:4 256:9 259:3 262:6,13

**certify** 161:24 277:5, 11

**CFO** 117:4 256:2

**challenge** 275:19

**chance** 217:13

**Chapter** 278:6

**character** 193:16

**characterize** 122:11

**characterized** 110:20

**charged** 119:18

**chase** 108:4

**Chief** 261:23

**choices** 258:8

**circumstances** 187:16

**Civil** 277:9

**claims** 141:22

**clarification** 142:15

**clarified** 171:2 172:19 173:4

**clarify** 175:16 190:17 278:13

**Class** 148:14 164:15 165:17,18 168:3 173:11,18 174:9 260:9,16,19

**clause** 114:8 222:21

**clear** 112:17 174:4

**clearer** 116:7

**close** 127:13

**closely** 111:25 112:3

**closes** 188:20

**coach** 168:14

**Coast** 204:20

**code** 262:16

**codes** 278:12

**collect** 112:5 141:24 142:6,19 143:3,23 144:11,17 145:5 147:4,24 150:19,25 157:8,16 163:6,20 219:18

**collectability** 243:7

**collected** 272:24 274:20

**collectible** 268:22

**combination** 144:25

**comfortable** 194:24 257:25

**commencement** 134:15,24

**comment** 113:19 165:2,3 233:17 262:12

**Commission** 277:19 279:14

**committee** 115:4 152:6

**commonly** 114:7

**communicate** 190:12 201:14

**communications** 138:14,19 171:16 172:7,10

**comp** 148:10 174:14 186:5,7,10

**companies** 210:4,5, 18

**company** 183:24 209:6,19 210:11 264:4

**compared** 170:17 260:24

**compensate** 260:20

**compensation** 152:6,8 177:10,15 182:9,16,18 184:12, 14,15 185:5,15,23 187:3,9 260:5,14

**complaint** 135:25

**complete** 171:2

**completely** 262:19

**completeness** 142:15

**completion** 239:8

**complexity** 216:6 217:4

**compliant** 177:11,16 194:23,25 195:3

**comply** 128:11 130:8

**concern** 115:14

**concerned** 217:17

**conclusion** 219:7 277:10

**conclusively** 219:24

**condition** 145:15 155:9 199:10

**conditions** 113:23 122:16 123:5 142:13 144:23 148:8,17 152:3,4 153:11 170:19 172:15,16 176:9 181:5 182:21 188:16,19,22,24 189:15 199:5 207:16, 24 208:8,21 211:8,19 212:2 216:20,22 218:2 219:18 243:6, 11 267:8

**conducted** 107:6

**confident** 246:18

**confirm** 163:22 247:10

**confirmation** 272:3 274:3 275:20

**confirming** 270:23

**conflict** 114:16

**conflicts** 198:22

**conform** 278:13

**confusing** 115:24 255:4

**connection** 149:19 158:9 179:8,17

194:19 238:23
249:24 271:13
275:20

**considerable**
271:25

**considerably** 217:9

**consideration** 185:3

**considered** 190:23
210:5 275:10

**consistent** 123:24

**consistently** 273:7

**Consolidated**
221:15 222:19 223:5
237:16 238:5 281:17,
23

**constraints** 205:8,9

**contacted** 174:7

**contained** 128:6
272:23

**contemplating**
189:24

**contend** 156:11

**contents** 136:24

**context** 129:15
146:11

**continued** 238:9

**continuous** 225:11

**contract** 112:14

**Contribution** 231:3,
6

**control** 114:14
115:15 187:24 188:4
215:23 216:9,24
231:19 250:11,19
270:11 271:3,24

**controlled** 114:24
228:9,14,18,22 229:2

**controls** 209:18
259:5

**conversation**
139:17,24 140:23
145:13,17,21 147:8
152:24 168:9 175:8,
23 177:24 190:9

244:4 258:20

**conversations**
135:7,16,19 146:6,25
176:19 177:25 178:4,
12,16 202:13

**copies** 179:12
245:13,22

**copy** 180:6 245:24

**corner** 274:10

**Cornerstone** 177:5
189:4 209:13 211:3,
18 212:21 214:6,18
217:16

**correct** 114:22
128:25 129:10
133:19 147:20 162:5
165:6 166:25 167:9,
15 178:13,14 185:13
193:20 194:9,12
195:22 197:2,3,6
199:7 207:8 209:24
212:4 214:24 223:16
229:21 237:18,23
238:20 242:11 243:4,
8,12,23 244:3,16
248:5,8,11,20 250:12
252:21 253:24,25
257:21 259:22
265:12 266:21 271:6
278:14

**CORRECTIONS**
278:15

**correctly** 167:22
192:24 236:17
257:17

**cost** 190:23 191:2,3
211:16,17 212:10,21
213:3,10,16,17,22,23
214:7,20

**counsel** 138:14

**counsels** 275:7

**counterparty**
173:13

**counterproposal**
178:21

**COUNTY** 277:3

**couple** 177:25
234:24 259:2 266:11

**court** 138:11 140:25
205:5 251:17 262:9
273:4,10,17 275:2,8
276:11 278:3

**covenants** 177:11,
12

**cover** 119:4 244:21

**COVID-19** 107:8

**CPA** 120:22 227:21

**create** 193:25 250:22

**created** 229:21
230:21

**credit** 177:11,17

**CRO** 132:17

**cross-transaction**
268:16

**Current** 107:7

**customary** 235:24
237:22

**cut** 108:4

**cycle** 174:14 186:6

**D**

**Dallas** 107:12 278:4

**Daniel** 277:4,18

**date** 107:9 110:15
143:13 215:10,11,12
222:6 232:13 244:22
253:12,14 260:6,18
271:2 272:19 278:11

**dated** 108:19 132:14
232:7 261:21 270:17
274:10,15

**dates** 225:14 268:14

**day** 107:9 277:14
279:11

**Daylight** 107:10

**Deb** 175:14

**Deborah** 118:7
145:18,20 258:8

**debt** 186:19 187:6

**debtor** 107:23

109:25 112:5 114:12
115:21 116:2 132:5,
22 133:4,22 134:3
135:14 144:16 145:3,
9,16 146:8,25 148:25
149:9 150:11,18,24
152:14 154:16 155:4,
8,11 156:9 157:2,14,
15 158:8 160:2,9,10,
16 163:12 164:2,6
165:12,19,20 166:5,
10 167:12,21 168:2,3
173:19 174:24 181:9,
13 182:14 183:14
185:4,9,14 186:19
189:3 192:21 200:23
201:8,23 202:7,19
203:5,9,17 212:22
213:12 219:17
220:11 227:25 245:8,
10 249:18,21,23
250:12 255:13
257:14 259:10 261:8
265:23 266:4,19,24
267:11 268:11
270:11,14 271:3,6,14
272:22 274:4 278:6

**debtor's** 134:6,14,22
135:20,25 158:12
161:5 191:14 250:4,
7,15,22 251:6,12
254:2,17 255:17,21
261:13 266:21
267:18 272:2,9
275:20

**debtors** 249:2,13

**decade** 217:10

**December** 132:14,
22 133:4,21 160:17
192:20 197:24 198:3,
11 199:11 221:17
222:3 223:6 224:11
237:6 238:6 239:10
243:23 244:21 250:8
251:17 253:14 254:4
256:23 261:21 263:9
270:10,17 271:2
282:16

**decide** 212:11

**decided** 124:12
197:20 212:5 216:21

**decision** 124:7

197:17,23 198:17
212:7 259:25

**decision-maker**
173:14

**deeply** 141:14 219:5

**default** 274:22

**defaulted** 123:9
274:21

**Defendant** 136:13
137:7,15 141:21
200:19 278:10
280:20,22 281:4,7,9,
13

**Defendant's** 206:25
280:8 281:3 282:3

**defense** 141:21
142:9 143:20 147:16,
19,23

**defenses** 140:21
141:4 170:12 275:9,
16

**defined** 110:14
143:16 212:9

**definition** 128:7
160:5 166:4 236:23

**DEITSCH-PEREZ**
109:12 112:10,23
113:5,16,25 115:23
116:6 118:2 120:7
123:12 125:17,25
126:11,20 131:25
134:8,17 135:2
137:22 138:12 139:2,
6,14,21 140:3,9
143:4,14 145:7,14,19
146:2,10,12,17
151:3,13 152:18,25
155:6,23 156:19
158:19 161:11 167:2
168:4,15 169:14,16
170:23 171:11,24
172:2,6 173:21
175:6,13,15,21,25
180:18 181:12
183:15 184:8,22
185:25 189:17 195:7,
23 196:8 197:15
198:25 199:18
201:12,15 202:2,10,
22 203:12,21 204:12,

17 205:6 208:2,11,23
210:15 211:5 212:25
213:14 214:9,22
215:17 216:11
218:18,25 219:21
220:6,13,25 224:5
227:2,15 229:22
230:5,15,22 233:13
238:13 239:3,12,19,
25 240:4,11 241:2
242:4 244:6 245:6,19
246:4,8 248:15,23
249:5,14 250:23
251:7 252:22 254:6,
12 255:3 257:22
258:12,19,21 263:20
264:13 267:3,13
268:2 269:8,12
270:20 271:7 273:12,
19 275:4,22 276:13,
20

**delivered** 117:18
133:11

**delivery** 150:10

**demand** 110:9,12,
14,19 111:3,14
122:11,15,16,20
123:6,9 128:7,17,25
129:4,5,8,10 132:6,
22 133:4 134:3,6,14,
22 135:20 149:9
150:10 181:10,22
182:4 226:14 272:24
274:19 280:18

**demanded** 133:22
149:2 274:21

**denied** 201:4

**denying** 125:5
201:21 245:12
270:23

**Dep** 278:11

**department** 119:18
224:20,22,25 225:6,
10 233:17

**depended** 268:24

**depending** 187:3

**depends** 166:21

**depo** 166:7

**Deponent** 278:11

**deposition** 107:3,5,
24 139:22 146:18
195:9 204:14 226:22
255:2 258:6,16
277:6,7,10

**describe** 110:11
175:5 176:3,20 243:6

**describing** 118:24
146:9 178:4

**description** 164:5

**deserved** 150:4

**detailed** 141:15

**details** 138:18 173:4
194:6 234:3

**determine** 260:5

**determined** 259:24

**difference** 234:8
242:14,22

**differently** 157:10
173:5

**difficulty** 108:7

**direct** 110:3 206:7
258:10

**directed** 168:24

**directing** 141:19

**direction** 234:2,6

**directly** 209:6,20
210:12 228:8,13,17,
21 229:2 231:18,24

**disagree** 272:5

**Disaster** 107:8

**Disclaimer** 282:21

**disclose** 138:14
171:15 172:6 256:24

**disclosed** 227:12
253:4

**disclosing** 232:14

**disclosure** 240:24
241:11 242:17,23
253:15 271:13

**disclosures** 249:3,
11 250:22 251:6,13
255:14 262:15

**disco** 246:10

**discover** 171:21

**discovery** 158:9

**discuss** 117:23
175:2 176:5 182:24
213:9 251:11

**discussed** 175:17
177:20,23 178:17
189:22

**discussing** 184:24

**discussion** 142:23

**discussions** 148:23
156:14 176:21 179:8,
18

**dispose** 211:18

**disposed** 211:11

**disposition** 209:5
216:22

**distinguish** 145:15

**distortion** 109:7
196:21,25 245:21

**DISTRICT** 278:4

**DIVISION** 278:4

**docket** 136:18 253:5

**document** 108:10,18
109:19,21 110:17,24
111:8,13 116:13
124:20 125:23 126:4,
9 127:8,10 128:24
129:18,24 130:20
136:12,17,21,24
137:4 138:25 140:18
141:9,11 151:22
153:14 158:15 159:5,
10,17 161:21,25
162:9,11 165:4,5
169:9,23 170:25
176:12,13,14 191:7,
22 192:15 198:9
206:8,25 207:12
235:2,19 237:2
245:17 246:12 247:5,
19 253:22 261:3,9
263:4 264:23 269:23,
24 271:18 273:23

**document--can**
137:13

**documents** 108:6
122:21 130:17 169:3
179:7,17 180:10
215:14

**dollars** 226:10

**Dondero** 107:1,4,13,
20 108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1,21
144:1 145:1 146:1,24
147:1 148:1 149:1
150:1 151:1 152:1
153:1,6 154:1 155:1
156:1 157:1,22 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1,12 166:1
167:1,12,21 168:1,23
169:1 170:1 171:1
172:1 173:1 174:1,4
175:1 176:1,3 177:1
178:1,10 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1,17
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1,8
205:1,9 206:1,6
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1,15
216:1 217:1 218:1
219:1 220:1 221:1
222:1,6,23 224:1
225:1,18 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1,18 242:1
243:1 244:1 245:1,12
246:1 247:1 248:1
249:1 250:1 251:1

**Dondero's** 136:13
137:8,15 215:22
216:24 280:20,22
281:4,7,9,13

**double-checking**
235:21

**doubtful** 253:18,23
254:4,18

**drafted** 122:17
148:11

**drafting** 141:15

**DSI** 250:18,20 251:4
256:12

**due** 123:10 129:10
132:23 133:23
150:13 160:10
166:23 188:9 192:22
195:20 197:11 198:6,
12 223:8,12 224:3,
12,19 226:8 231:16
238:10,19 240:19,25
241:12 263:12,16,18
266:20 267:19

**dues** 268:16

**Dugaboy** 164:16
173:16,20,24 174:12,
16,19,21 215:4,16
229:16,20 230:3,10,
14,20

**duly** 107:14 277:7

---

**E**

**earlier** 122:12 128:8
163:16 173:12 225:7,
13 237:18 247:15

**early** 142:21 148:10
152:9,10 173:19
205:19

**easiest** 193:22

**East** 204:20 277:20

**effort** 183:23

**electronic** 261:20 262:2

**Ellis** 137:3,7 277:3

**email** 117:21 190:13

**Emergency** 107:7

**employed** 220:10

**employee** 220:4

**employees** 124:3 183:25 227:14

**encourage** 129:23

**end** 144:7 149:11 159:2 224:22 225:2, 12 226:7 234:17 253:19

**ended** 217:7 275:7

**ending** 222:3 224:11 237:6,8 238:6 239:9 243:22 265:5

**enter** 157:14 164:10 173:8 174:16

**entered** 143:9 144:15 147:3,9 148:4 152:5 156:11,17 157:12 163:10,25 165:11 167:20 168:3 173:18 174:23 180:15,25 187:23 188:5 207:18 208:10 216:3 231:6 238:25 267:9

**entering** 179:3 180:11 185:20 186:16

**enterprise** 188:5

**enterprises** 183:8

**entire** 135:11 227:7

**entirety** 177:24 244:20

**entities** 271:24

**entitled** 130:20 150:4,6 182:11

**entity** 115:7 116:2 193:23 228:13,17,21, 25

**entries** 257:10

**envisioned** 216:8

**equal** 214:19 268:17

**equity** 210:18

**equivalent** 184:20

**ERRATA** 278:2

**errors** 278:14

**essentially** 181:25 268:17

**established** 148:9

**estate** 135:12 149:15 154:23 155:14 157:5 166:2 189:12 266:21 267:2 268:9

**estimated** 274:22

**evaluate** 125:19

**evaluated** 253:19

**eve** 149:25

**event** 172:18 187:7 189:24

**Events** 232:10 243:18 244:20

**evidently** 164:22

**exact** 187:8

**exactness** 187:2

**EXAMINATION** 107:18 280:3

**exchange** 110:5 122:3 123:22 257:20

**execute** 123:21 124:9

**executed** 165:13

**execution** 226:13

**exhibit** 108:15,16 118:19,21 120:5 121:7,8 126:24 127:2 130:12,14 132:10,11 136:7,8 157:25 158:2 160:22,23 169:10 191:8 204:3 206:3,4

**entity** 220:19,20 234:10,20, 21 237:3 247:7,20 252:8,15 254:23 255:11 261:4 264:24 269:20 270:2 271:19 273:24 280:9,10,13, 14,16,18,20,22 281:4,7,9,13,16,20, 22 282:4,6,8,9,12,14, 16,18,21

**exist** 165:20

**exists** 156:23

**expect** 262:14,18

**expected** 128:18 188:2

**experience** 222:23 235:25 248:18,20

**expert** 227:23

**Expires** 277:19 279:14

**explained** 240:5

**extent** 156:25

**extra** 184:2

**extremely** 233:20

**eye** 138:15

**eyeball** 137:23

**F**

**face** 252:20

**faces** 268:3

**facilitates** 218:12

**fact** 113:15 114:6 122:2 135:11 159:16 162:11 195:19 198:2 209:17 221:7 256:5 266:24 268:20

**facts** 112:19 172:11, 12 178:9 207:6 276:8 278:13

**factual** 112:20 212:11,12

**failed** 262:22

**fair** 111:2 113:4 114:25 115:22 116:8

**finalized** 238:17

**financial** 221:9,15 222:2,19,22 223:25 224:10 225:22 227:11 233:18,19 236:21 237:17,23 238:24 239:9 243:21 245:8,9,15 246:3 249:12 251:6,12 255:15 262:15 263:19 281:17,23 282:10,22

**financials** 116:17, 19,23 118:4 233:24 237:5 238:17 247:22

**find** 139:9

**fine** 138:20,21 151:16 152:22,23 153:2 167:4 246:4 255:8 259:16

**finish** 146:4,5 156:7 239:23 266:12

**finished** 109:11 240:3 246:24

**firm** 159:11

**fit** 246:16,18

**focus** 182:7 183:3, 11,12,17,23 184:2,6, 25 185:11 241:17

**focused** 177:4 182:13 183:7,18

**folks** 124:17 276:19

**follow-up** 126:7

**footnote** 253:17 264:6,19

**for-** 219:8

**forgive** 182:19 189:8 190:2,25 212:22 213:12 214:20

**forgiven** 148:18 176:25 177:15 184:19 190:21 194:16,20 195:6 197:6 214:8 218:6 219:7 227:22 229:10 243:11 267:5

**forgiveness** 148:9

**familiar** 110:8 139:8, 10 231:5

**familiarity** 248:14

**favor** 121:3,20 194:11,16 195:5,21 196:6 197:5 226:15 233:11 259:9 270:14 271:5

**favorable** 177:2 190:24 211:11,22 212:6

**February** 108:20 109:22,25 110:18 111:8 115:13,14 119:12 120:14,17 152:14 153:7 154:5, 10 156:12,18 157:13 189:22 208:10 212:20 213:10 214:5, 17 215:4,16 216:4,8 234:11 239:2 240:10 244:3,16,18 245:4 280:10

**Federal** 277:8

**feel** 167:24

**fide** 125:5 267:6

**fighting** 273:7

**figure** 246:25

**file** 137:4 192:15 262:8

**filed** 135:25 136:17, 21,25 137:7 141:11 169:13 170:2,5 171:10,23 172:13,22 191:22 192:11 248:3 249:24 250:2,4,8 251:16 255:14 261:9 263:7 265:23 266:4 272:22

**files** 247:23

**filing** 248:8,11 282:10

**fairness** 258:15

154:17 177:10 182:6,
16 184:12,14 186:18
187:6 194:22 213:5
218:12 227:12

**forgo** 184:19

**form** 112:11 118:9
123:13 134:9,18
135:3 151:3 152:19
155:7 156:20 170:24
171:12 173:22
182:15 183:16 184:9,
23 186:2 189:18
195:24 196:9 197:16
199:2,19 201:16
208:3,12,24 210:16
211:6 213:2,15
214:10,23 216:12
218:19 219:2,22
220:7,14 221:2 224:6
227:3,16 229:23
230:6,16,23 233:14
238:14 239:4,13,20
240:12 241:3 242:5
244:7 248:16,24
249:6,15 250:24
251:8 252:23 254:7,
13 255:16 263:21
267:4,14 270:21
273:13,20 275:5,23
276:14

**forward** 157:22

**foundation** 112:24
113:6,17 114:2 120:8
125:18 126:2,12,21
132:2 201:16 202:3,
11,23 203:13,22

**fourth** 148:14

**frame** 205:21

**Frank** 117:2 217:24
218:4,5,15,24
224:23,24 225:5,9
235:15 255:25
256:10,11

**front** 161:22 162:12

**fulfilled** 181:6

**fulfillment** 170:19
172:14

**full** 149:13 195:19
241:11

**fully** 207:23 245:22

**Fund** 217:18 224:13
228:12 257:11,15

**funds** 209:8 210:13

**future** 185:15,22
186:20 187:9

---

### G

**GAAP** 120:22 267:16

**gave** 153:12 154:11
179:11 196:2 245:21

**general** 219:5 235:13

**generally** 118:4
133:25 169:24
249:16

**get all** 214:12

**give** 113:7 123:20
168:13 180:5 241:10
246:7,22 249:11
259:5 266:9

**giving** 177:22 179:16
184:25 185:4

**global** 149:14

**good** 107:20 204:4
213:23 275:16

**grand** 144:4,12 147:2
149:20

**Grant** 215:3

**great** 122:18 182:14
213:23

**group** 197:21

**grow** 187:4

**guess** 144:24 156:24
186:24 204:14
247:10

**guest** 146:19

**guys** 193:14 264:2

---

### H

**half** 204:19 217:17
226:10 232:24

**hand** 277:14

**handle** 197:18

**handwritten** 261:21

**happened** 146:13
177:25

**happy** 129:17 137:13
161:13 168:20
200:17 204:6,10
234:23 241:10
245:23

**hard** 246:22

**have/would** 182:9,
10

**HCM** 116:4

**HCMLP** 111:14
115:21 116:11,12
117:10

**HCMLP's** 119:13

**HCRE** 228:20

**head** 214:13 219:13
224:21,25 225:6,10
260:23

**headed** 119:13

**heading** 223:17

**hear** 140:3 244:8

**heard** 255:16

**hearing** 274:3
275:21

**heightened** 182:13
183:17,18 184:6
185:11

**held** 151:18 205:25
268:12

**helpful** 163:18

**hereinbefore** 277:6

**hereunto** 277:13

**herewith** 114:16

**Highland** 111:3,9
114:21,24 115:5,7,
15,18,19,21 116:4
118:25 120:13,18
121:3,20,22 123:25
124:2,18 131:17,20
132:18 135:9 146:14
148:15 152:21 153:8

157:14 164:6,12,14
165:19 166:5,8,9,10
173:14 177:3,18
178:24 179:24
181:21 182:2,15,25
184:5 185:3,20
186:19 193:22,23
194:12,16,20 195:5,
13,21 196:6,25
197:5,18 207:2
209:7,15,21 210:12
214:17,20 216:10
218:10 220:4 221:8
223:11 224:10,12,17
226:15,18 227:13
228:12,24 229:9
233:11 235:11
236:19 238:8,18
244:15 245:8,15
247:23 248:3,5
250:16 251:5 255:21
256:8,24 257:11,15,
20 259:25 268:24,25
269:3,4 278:5,7
280:10,16,23 281:5,
10,14,16,22 282:21

**Highland's** 118:3
119:20 123:5 131:4
220:23 221:25 248:8

**highly** 245:10

**historically** 123:25
124:2,3 187:10

**history** 218:10

**Hold** 138:4

**holder** 217:11

**holders** 148:14
173:11 260:10

**honest** 266:16

**honestly** 189:9

**honor** 128:18

**honoring** 268:24

**hope** 193:20

**hoping** 194:6

**hour** 151:14 204:16,
20 205:15 246:17,19
271:8

**hours** 266:11

**hundred** 194:24
233:21

**Hunter** 177:12,18
179:12 231:10,14,19,
22 254:8 267:20
268:5,7,9,11,12,18,
25 269:3,4

---

### I

**Icahn** 217:12

**idea** 123:19 173:7
216:25 234:13

**identified** 265:15,16

**identify** 112:8 113:12
117:8 125:23 135:18
145:2 169:3 174:9
195:4 199:24 203:5,
16 207:15 210:20
228:6 256:6

**identifying** 119:19

**illiquid** 187:19,20,25
213:22

**immaterial** 178:24

**impact** 119:20

**Impacting** 119:13
131:4

**implicit** 157:19

**implicitly** 150:5,7
157:18

**important** 193:15

**improper** 145:24

**inaccurate** 165:15
226:25 265:22 266:3

**inappropriate**
139:20 195:15

**incentive** 184:3

**include** 153:10
154:17 178:7 216:19
222:22 237:22 242:2

**included** 142:23
148:22 150:7,12
224:12

**includes** 166:5 264:9

**including** 144:23
174:2 196:14 266:25

**inconsistent** 199:16

**incorrect** 208:18
226:25

**increase** 194:2

**independent** 148:20
179:3 221:25

**indirectly** 209:7,20
210:12 228:8,14,18,
21 229:2 231:18,24

**indiscernible**
144:18

**individual** 196:18
211:23 261:23

**individually** 262:11

**inform** 201:8,23
202:7 239:17 240:9
273:4,10,17 275:2

**information** 177:21
221:16 224:18
235:21 236:22
249:13 250:21
281:18,24

**informed** 200:23
202:19 203:5,10,17
276:11

**inherits** 155:9

**initially** 220:17

**insiders** 256:19,25

**installments** 226:11

**instance** 260:18

**instruct** 239:16
240:8 273:16

**integration** 114:8

**intend** 111:9,13
128:11,15

**intent** 210:3

**intention** 130:8
269:2

**interest** 111:10,14
128:17 129:10
132:23 133:5,23
134:23 135:21 149:3,

18 150:13 181:23
182:5 184:21 187:18
188:9 189:14 192:22
193:13,15,17 194:4
195:20 197:11,20
198:6,12,21 199:12
226:7 231:21 242:20
270:13 271:4,25

**interested** 249:11
277:12

**interests** 209:6,20
210:11

**interfering** 168:22

**International** 210:22

**interplays** 129:16

**interpretation**
112:13 122:24 126:4

**interpreting** 167:24

**interrogatories**
161:6 162:2 192:7
206:7 207:4 281:6,15

**interrogatory**
162:21 163:8,23
165:9 207:15,23
208:6 215:21 218:3
219:20

**interrupting** 146:16

**introduced** 108:16
118:21 121:8 127:2
130:14 132:11 136:8
158:2 160:23 169:10
191:8 206:4 220:20
234:21 237:3 247:7,
20 255:11 261:4
264:24 270:2 271:19
273:24

**investigated** 171:3,
6,9 172:21

**investment** 213:22
229:17 230:4,10,14,
20 231:10

**investments** 209:18
210:18

**investors** 217:19

**involved** 141:15
172:16 178:15
217:12 219:6

**involvement** 117:6

**irrespective** 150:25

**issue** 173:2 195:22
225:22 242:3,10,15
266:23

**issued** 232:15,23
241:21 242:10
267:12

**issues** 236:22
247:22

**Item** 251:24

**items** 119:13,20
131:3

— J —

**James** 107:4,13
136:13 137:8,15
165:12 167:12,21
259:18 277:6 278:10,
11 279:9 280:4,20,22
281:4,7,9,13

**January** 152:14
153:7 154:5,9
156:11,17 157:12
159:25 189:22
208:10 212:19
213:10 214:5,17
215:4,16 216:3,8
232:12 239:2,22
240:10 244:3,16,17
245:4 263:8 274:10,
15

**January/february**
152:12 174:22

**John** 107:22 115:23
139:2 145:7 152:20
167:3 175:15 257:22
264:14

**jointly** 262:12

**Judge** 168:21 245:24

**judgment** 115:5

**June** 237:11 244:22
247:23

**jury** 140:25 157:22

— K —

**Kerri** 210:22

**kind** 108:4 149:18
150:12 178:21 179:7,
17 196:2 248:17

**knew** 218:4,9 219:13
238:16

**knowledge** 120:22,
24 142:16 153:22
163:10 167:16
198:13,14 203:2,4,7
207:8,21 208:7 225:3
251:3 259:10 262:6,
11

**KPMG** 221:4 233:21

— L —

**L.P.** 111:4,10 115:20
121:23 166:6 224:13
228:13,16 278:6
280:11,16

**L.p.'s** 207:3 280:23
281:5,11,14,17,23

**La** 254:22

**language** 113:12
237:22

**large** 177:2 208:13

**largely** 114:3 208:13,
25

**late** 263:8

**latitude** 259:6

**lawsuit** 134:25
242:3,10,16

**lawyer** 141:7,9

**lawyers** 135:7,13
138:10,19 164:21,25
172:4,7,11,25 192:15
202:13 271:23

**layperson** 112:20
113:14

**learn** 171:20 172:12
198:3,7

**learned** 171:3,5,8

172:21

**learning** 199:23

**leave** 143:25

**led** 179:8,18

**left** 245:11

**legal** 112:13,18
122:23 126:3,4
140:21 153:13,14
165:2,3 167:24

**lesser** 210:17

**letter** 132:14,25
133:8,10,17,20 149:9
150:10 222:13 232:7
235:11 237:11 247:6,
15 275:6,24 276:15
280:18 281:21 282:4

**letters** 234:16

**levels** 260:25

**liabilities** 250:7,16
251:16 282:6

**liable** 189:13

**lifetime** 230:9,13

**limit** 258:16

**limitations** 179:13

**liquid** 177:3

**Liquidation** 271:15
272:2,9,22 274:4
282:18

**liquidity** 213:21

**list** 272:16

**listed** 141:4 263:12

**listen** 155:18 219:3

**literally** 233:21

**litigation** 196:7
246:9

**LLC** 228:20

**LN** 278:16

**loan** 119:25 120:4
124:18 131:6 227:13
229:8

**loans** 131:19,21
148:18 176:24 218:6

**located** 107:11

**long** 129:19 204:11, 12

**longer** 204:9

**looked** 111:25 112:3 120:5 122:22 124:6 131:11,21 132:24 133:6,24 153:20 194:8 195:11 232:23 234:9 237:17 247:15

**lose** 115:15 216:9

**lot** 135:6,15 137:10 140:23 156:7

**lower** 217:15

**LP** 278:6,8 282:21

**lunch** 204:5 205:25

**Lynn** 275:6 276:15

**Lynn's** 275:24

**M**

**made** 124:6 131:20 132:6,22 133:4 149:20 192:20 193:17 194:4,5 195:5,21 196:5 197:5,19,24 198:4 199:13 212:7 226:14 227:13 229:9 233:11 245:2 247:14 253:6, 15 256:19,25 259:4, 25 268:12 270:13,19 271:5

**main** 141:2

**majority** 148:13 164:15 165:17 173:11,24 217:17 260:9,15,19

**make** 112:12 122:23 123:5 126:3 128:21 129:11,12 134:2 149:17 150:11 153:5 168:20 170:25 171:15 178:20 181:10,22 182:4 191:3 212:13 226:17 227:25 249:3 268:3 275:14

**maker** 113:13 114:16 129:21

**makers** 228:6

**making** 149:9 198:18,20,21

**managed** 209:6,8,20 210:11,13

**management** 111:4, 10 115:6,20 119:2 121:23 132:18 166:6 196:3 207:3 224:13 228:12,24 234:15 235:10,22 247:5,15 257:11,15 278:6,7 280:11,16,23 281:5, 11,14,17,20,23 282:4,21

**Management's** 222:18 237:15

**manner** 260:20

**March** 136:18 137:6

**mark** 229:7 254:25 255:4,9

**marked** 221:21 254:25 269:21

**market** 260:25

**marriage** 277:12

**material** 177:16 236:23 267:15

**materiality** 236:10, 14

**matter** 112:20 113:14,24 180:24 258:15 277:13

**maturity** 110:13

**maximizing** 183:7 184:6

**means** 183:22,23 264:19

**meant** 217:22

**mechanisms** 273:8

**Medical** 210:21

**meet** 188:19

**meeting** 152:7

**Melissa** 124:24

**member** 173:17

**members** 164:15 165:17,18 174:9

**memorable** 139:16

**memorialize** 169:4

**memorialized** 190:6

**memory** 192:10

**mention** 218:22 242:24 243:3

**mentioned** 151:25 172:20 210:4

**met** 188:17,22,25

**MGM** 177:4 188:19 209:12 211:3,18 212:20 214:6,18 217:7,8

**middle** 259:15

**million** 119:24 120:17 121:20,23 122:4 127:24 131:6 160:11 177:8 186:13 196:14 224:14 226:10 231:16 232:16 233:9,10 234:8 241:23 242:15, 16 252:6,21 253:8 257:16 259:21 267:22,23,25 268:13 269:6

**million-dollar** 120:4 131:11 232:25 233:4 234:9 259:3

**mind** 210:23 255:4

**mine** 173:9 217:3

**minute** 144:2

**minutes** 149:8 196:2 204:24 205:14

**missed** 183:10

**missing** 233:24

**misstated** 233:25

**misstates** 184:23

**mistaken** 185:16

**moment** 182:20

**moments** 124:7

**monetization** 176:25 177:2 182:8 211:7,22 213:4

**monetize** 187:24

**monetized** 187:21 188:11,13 190:19,22 191:2,3

**monetizing** 213:20, 21

**money** 124:16 150:3 198:11,15 199:25

**month** 116:19 117:19 152:11 261:9

**monthly** 116:13,17, 19,23 117:3,9,12,16, 24 118:5,16,25 119:19 261:10,13 262:8 265:4,21,22 266:3,4 282:12,14,16

**months** 188:20 233:12

**morning** 107:20,21

**Morris** 107:19,22 108:14,17,24 109:2, 9,14,15,18,20 110:23,25 112:15 113:2,9,20 114:5 116:5,8,10 118:5,13, 19,22 119:7,10 120:11 121:6,9,12, 15,17 122:6,9 123:15 125:21 126:5,13,24 127:3,5,19,21 128:2, 4 130:12,15,24 131:2 132:4,9,12 134:10,20 135:17 136:6,9,11 137:25 138:20,23 139:5,18,25 140:14, 16 141:16,18 143:7, 12,16,18 145:11,18, 20,24 146:4,11,15, 20,23 151:6,12,16,19 152:22 153:2,4 154:24 155:2,15,17, 25 156:22 157:24 158:3,5,7 159:2,4,19, 22 160:21,24 161:2, 9,13,18 162:8,10,16, 18 167:4,7 168:4,8, 10,18,25 169:8,11,21 170:8,11,13 171:4,19 172:8 174:3 175:10, 14,18,24 176:2 180:21 181:15,18 183:20 184:16 185:6 186:8 189:20 190:11 191:6,9,12,17,20 195:14,16 196:4,16, 23 197:22 199:4,22 200:5,7 201:13,20 202:6,15 203:3,15,24 204:2,6,15,22 205:4, 7,17,20 206:2,5,17, 19,21,23 207:11,13 208:5,14 209:3 210:19 211:9 213:7, 18 214:15,25 215:13, 19 216:15 218:13,14, 21 219:9,11 220:2,9, 18,21 221:6,20 222:4,8 223:2,4,20, 23 224:8 225:16,20 227:5,18 228:2,5 229:13,15,25 230:8, 18,25 232:2,5 234:4, 19,22,25 235:6 236:4,7,11,13,25 237:4,7,13,20,25 238:3,15 239:6,15, 21,23 240:3,7,14,17 241:7,16,19 242:7 243:14,17 244:12,23, 25 245:16,23 246:5, 11,15,23 247:4,8,21 248:19,25 249:7,17 250:25 251:10,19,22 252:12,14,24 253:11, 13 254:10,15,22 255:8,12 256:14,17 257:4,7,9 258:7,18, 25 259:7,13,17 261:2,5,16,18 262:24 263:3,23 264:5,8,17, 22,25 265:3,8,10 266:6,12,15,18 267:7,17 268:2,4 269:10,12,15,18 270:3,5,24 271:9,17, 20,22 272:7,12,14, 18,20 273:15,22,25 274:6,8,11,14 275:17 276:3,17 280:5

**motion** 168:20

Index: Mountain..pages

**Mountain** 177:12,19
179:12 231:10,14,19,
22 254:8 267:21
268:6,7,9,11,12,18,
25 269:3,5

**move** 154:24 155:15
157:21 190:16 204:7
218:13 219:9 264:5

**muddy** 146:18

**N**

**Nancy** 174:25 175:2,
17 176:6,22 178:13
180:5 181:20 182:24
184:18 187:12,15
190:8,12 198:23
199:17 207:18
208:10,21 211:2
212:8,15,19 213:9
214:3,16 215:15
216:3 217:25 218:17,
23,24 219:16 220:5,
12 230:4 239:2,11,18
240:10 244:2,14
245:3 267:10 273:11,
18

**needed** 172:19 173:4
197:18 241:11

**negotiation** 144:22
178:20

**negotiations** 148:25
154:13 155:12

**net** 187:5

**Nexpoint** 228:16

**Non-operating**
270:7

**Nonindividuals**
282:7,10

**normal** 183:22

**NORTHERN** 278:4

**notarize** 192:6

**notarized** 192:2
206:12,14

**notary** 161:22 162:13
277:4,18 279:14

**note** 107:5 108:19,20

110:5,9,12,13,20
111:3,20,23 112:5,9,
21 113:13,14,22,24
114:22 115:4 120:6,
13,16,19 121:18
122:3,11,14 123:3,17
124:13 125:14
127:23 128:7,10,12,
14,25 129:7,15,21
130:9 165:13 191:4
193:24 194:2,16,19
195:5 197:19 200:9,
20 226:11 231:15
232:9,25 233:5,8,24,
25 234:9 241:12
280:9,13,14

**Noted** 276:22

**notes** 121:3 122:15,
21 129:9,20,21
124:5,9,19 125:2
129:4,5,8,25 131:11
132:6,24 133:6,24
135:8,22 138:11
140:22 141:24 142:6,
20,24 143:3,15,17,24
144:3,11,17,24 145:5
147:4,24 148:9,11,22
149:4,16,19 150:8,
14,19,25 153:21
154:8,14,18 155:5,
13,22 156:10,16
157:2,4,16 160:10,16
163:6,20 165:24
172:25 180:6 181:11,
24 182:7 184:19
186:22 187:18
188:10 190:20
192:23 193:16,18,25
194:8,11,14 195:20,
22 196:5,13,14,25
197:5,12 198:6,13,22
199:7,13 200:24
201:9,24 202:8,21
203:11,19 212:23
213:5,6,13,24 214:8,
21 218:11 219:7,18
223:7,12,25 224:2,
12,18 225:23 226:9,
14,15,19,22 228:7
232:15,22 233:11
238:10,19 240:18,23,
24 241:21 242:2,9,14
243:4,8,10 246:6
251:25 252:4,20
253:6,23 254:5

257:21 259:9 263:17
264:10 266:24,25
267:6,11,19,23
268:8,12,24 269:7
270:13 271:5 272:24
273:7 274:20,21
275:8,12,14

**notifying** 275:15

**notwithstanding**
210:24

**November** 265:5
272:21

**now--and** 137:12

**number** 108:6
118:20 126:25
157:25 159:20,24
160:6,22 191:7
192:19 196:24
197:10 200:3,6,13,21
206:3 223:21 234:10
235:3 251:25 253:17
256:18

**numbering** 255:6

**numerous** 194:14

**O**

**object** 112:10,23
113:5,25 118:8 120:7
123:12 125:17,25
126:11,20 131:25
134:8,17 135:2 151:3
152:18 155:6 156:19
170:23 171:11
173:21 183:15 184:8,
22 185:25 189:17
195:8,23 196:8
197:8,13,15 198:25
199:18 201:12,15
202:2,10,22 203:12,
21 208:2,11,23
210:15 212:25
213:14 214:9,22
216:11 218:18,25
219:21 220:6,13,25
224:5 227:2,15
229:22 230:5,15,22
233:13 238:13 239:3,
12,19 240:11 241:2
242:4 244:6 245:7
248:15,23 249:5,14
250:23 251:7 252:22

254:6,12 257:23
263:20 267:3,13
269:8 270:20 273:12,
19 275:4,22 276:13

**objected** 275:25

**objecting** 189:2

**objection** 113:16
118:8 155:23 167:5
171:24 258:9,13

**objections** 118:12
158:12 161:4,25
191:14 207:2 217:14
280:22 281:4,10,13

**obligated** 187:17

**obligation** 126:18
185:22

**obligations** 212:22
213:12 214:7,21

**obtained** 115:5

**occurred** 154:8
244:3

**occurs** 182:17

**October** 247:24

**offer** 150:2,11

**offered** 149:17

**offers** 156:14

**Officer** 261:23

**offset** 187:9

**Okada** 228:10 229:8,
9

**omitted** 255:5,6,9

**Omnimax** 210:21

**one-** 246:18

**one-way** 246:9

**open-ended** 181:6,7

**operated** 155:11
165:23

**operating** 117:3,9,
13,16,24 118:5,16,25
119:3,12 130:21
154:21 261:10,13
262:8 265:4,21,22
266:4 280:11,17

282:13,15,17

**operations** 156:14

**opine** 153:13 166:20

**opinion** 112:18
113:8

**opportunity** 249:12

**oral** 107:3 187:23
242:24

**order** 107:7 211:19
213:11 251:5

**ordinary** 116:12

**organizational**
256:8

**original** 136:13
137:8,15 164:19
171:9,22 172:13
280:20

**outcome** 277:12

**outstanding** 132:23
160:2,6 177:17
184:20 226:8 253:7

**overlaid** 144:24

**overpayments**
135:9

**owned** 209:6,12,13,
14 210:11 217:10
228:9,14,18,21 229:2

**ownerships** 209:17

**owns** 259:4

**P**

**p.m.** 276:22

**Pachulski** 107:23

**Pachulski's** 248:9

**Package** 116:14

**PAGE/LINE** 280:8
281:3 282:3

**pages** 280:9,12,13,
15,17,19,21,24
281:6,8,12,15,19,21,
25 282:5,7,11,13,15,
17,20,22

Index: paid..promissory

**paid** 111:16 159:25 160:9,15 194:23 257:14 259:21

**paper** 190:5

**paragraph** 110:16, 19 114:6,10,13 122:7,10 128:3,5 138:7 141:20 143:9 151:22 152:16 153:9 163:3 165:22 170:15 171:22 173:7 174:11, 17 176:7,16,23 179:9,19 180:2,8,12, 17,25 181:9,20 183:6 185:21 186:17 187:12,15 190:5 200:16 225:17 226:24 228:17 229:6, 7,14 231:2 236:8 241:17

**parse** 148:5

**parsing** 164:22

**part** 138:16 144:3 149:20 152:2,6,8 173:19 184:10,17,25 198:9 208:9 216:2,17 251:23

**participants** 214:13

**participate** 178:3

**participated** 155:11 178:11

**parties** 156:25 249:12 277:11

**partly** 218:9

**partner** 119:25 120:4 131:6,17,19 235:13

**Partners** 228:20

**partnership** 148:15 225:23 231:16 241:22

**parts** 183:3

**party** 178:15 265:16 266:2 277:10

**passed** 189:14

**pay** 111:3,15 128:15 129:6 133:22 185:23 187:8,17 188:8

189:13 195:19 259:25 269:3,5

**payable** 123:10 191:4 226:10

**paydowns** 242:21

**payee** 114:15 128:17

**paying** 185:15 186:21 194:19

**payment** 130:3 133:5 134:2,23 135:20 140:22 149:18 154:17 181:23 192:20 194:5 197:9,14 198:4,20,21 199:12,24 259:4 268:23 270:18 274:22

**payments** 193:15,17 194:4 226:18 256:19, 24 257:19,20 259:8 270:12 271:4

**peck** 193:18

**penned** 275:13

**people** 130:17 135:7, 14 145:23 275:15

**percent** 194:24 217:11 233:22

**perfectly** 166:22

**period** 148:10,23 174:22 181:4 221:16 223:6 224:11 225:11 237:6 238:5 239:9 243:22 244:21 265:5

**periodic** 193:14,16

**permitted** 177:16

**person** 117:8 123:2 145:3 199:24 203:5, 16 248:10 255:24 256:6,9

**personal** 207:7

**personally** 116:18 127:10 131:16 136:20 163:10 168:24 171:20 196:11 234:15 238:22 240:22 241:5

248:7 253:6 270:11 272:8

**perspective** 144:21 185:8 186:15

**pertain** 246:5

**pertained** 135:20 211:2

**pertaining** 156:16

**pertains** 155:21 242:23 251:24

**petition** 143:13 215:10,11,12 260:6, 18 271:2

**Pg** 278:16

**phone** 190:14,15

**phrase** 153:10 216:17

**phraseology** 167:25

**physically** 117:20

**piece** 217:5

**pin** 172:22

**place** 146:7 154:5 176:24 190:20

**places** 209:13,14

**plaintiff** 141:23,24 142:5,6,18,19 143:2, 23 144:10,11,16 145:5 147:3,23 163:5,20 278:9

**plaintiff's** 141:22

**plan** 142:22 144:3,4, 12 147:2 149:14,21 271:13

**pleading** 143:6

**pleasure** 276:19

**plenty** 260:23

**point** 164:9 189:25 194:6 198:16 215:5,7 234:24 246:20 250:19 264:15

**pointed** 175:22

**pointing** 200:14

**points** 141:2 217:12

**portfolio** 209:5,19 210:5,10

**portion** 192:21 198:4 215:20 245:17

**portions** 108:10 129:24

**position** 143:21

**possibilities** 217:23

**post-bankruptcy** 116:2 145:9 153:17 164:24 181:14

**POT** 142:22 143:3,4, 12 147:2 149:14,21

**potential** 189:5

**powerful** 276:6

**practice** 130:16 260:13,15

**pre-bankruptcy** 153:16 164:23

**prebankruptcy** 116:3 164:6,14

**precedent** 188:19

**prefer** 118:11

**preparation** 238:23

**prepare** 116:12 236:20 251:5

**prepared** 116:20 118:16 205:9 221:9 222:2 224:10 256:7 258:2,22 271:14

**preparer** 265:17,20

**preparing** 116:23 117:3,9,15 198:9 250:15 255:21

**president** 248:4

**pretty** 201:18 222:21 246:15

**previously** 141:23

**price** 217:15

**Pricewaterhouse** 222:11 233:21

**Pricewaterhouseco opers** 220:23 232:14 237:10

**Pricewaterhouseco opers'** 227:11

**Pricewaterhouseco opers's** 232:7

**principal** 111:13 123:20 124:8,13,18 128:16 129:9 132:23 133:5,23 134:23 135:21 149:3,18 150:13 181:23 182:4 184:21 186:22 187:18 188:9 189:13, 14 192:22 193:13,24 194:5 195:20 197:10, 19 198:5,12 199:12 226:8 271:4

**principle** 198:21 242:20 270:12

**prior** 134:15,24 150:10 166:8 170:2, 17 173:14 180:15,25 184:23 194:12 226:13,19 235:4 239:8 260:5,17 274:3

**private** 210:17

**problem** 145:8 151:12

**Procedure** 277:9

**proceed** 258:23

**proceeding** 134:16 137:9 258:3,17 261:7

**proceedings** 248:14

**process** 152:8 198:9 216:14,16 219:6

**production** 215:14

**Projections** 282:19, 22

**promised** 111:3

**promissory** 108:19 110:5 111:19,23 113:13 120:6,13,16, 19 121:3,18 122:3 123:17,21 125:14 127:23 133:24

153:20,21 180:6
181:10 225:23 226:9
232:15 241:21
257:21 259:9 280:9,
13,14

**proper** 123:23

**properly** 172:18

**proposal** 142:22
149:20

**prospects** 217:8

**provide** 184:2
236:20

**provided** 179:6

**providing** 224:17

**provision** 114:14
200:24 201:9,24
202:8,20 203:10,19

**provisions** 114:13
274:22

**public** 161:22 277:4,
18 279:14

**pull** 269:24

**Purported** 162:20,25
163:11,21

**purpose** 117:15
249:10

**purposes** 236:15
255:2

**pursuant** 157:15
219:17 277:8

**put** 108:14 118:19
121:6 132:9 136:6
148:21 157:24
193:23 198:15
200:18 206:2 216:25
275:8

**putting** 133:20
221:14

**PWC** 221:24 223:25
224:11,18 236:20
238:23 239:7,17
240:9,23 247:14,22

**Q**

**quarter** 143:10,22

**R**

144:6 147:9 155:10
157:3 172:17 199:10

**question** 114:18
118:9 122:19 129:22
133:12 134:12 135:5
138:24 143:2 144:21
148:6 151:9 153:3
154:25 155:19,20
156:6 157:10 160:15
164:8 166:12,24
167:3 168:16 171:18
178:9 179:16 189:9
190:3 193:9 201:18
202:4,17 208:4
214:14 224:15 227:8
239:24 241:4,6,9
242:8 244:10 260:8
267:10 276:7,8,9

**questions** 126:7
127:9 145:10 159:8
163:7 193:6 205:12
258:23 259:2 276:18

**quickly** 204:7

**quote** 141:21 163:5,
19 165:10 170:18
172:14 209:5 211:11
215:22 216:23
236:14 272:24
274:19

**rambled** 196:3

**reach** 135:10

**reached** 148:12
152:15 153:8 154:15,
19 181:19 184:18
187:11,14 198:23
199:17 218:16
219:16 239:17 240:9
243:25 244:14,15
245:3

**reaching** 145:4

**read** 111:19 114:17
117:19 123:16
125:20 129:5 130:18
136:20 137:14
141:10 142:3 161:25
162:11 163:4,16
167:22 192:24
200:15,17 206:25

227:9 264:15 278:16

**reading** 236:17
257:16

**Reads** 278:16

**realization** 186:18

**realized** 186:6
268:15 275:12

**reason** 186:25 192:7
193:7 198:15 206:13
220:16 242:21
260:23 262:21
263:15 278:12,16

**recall** 115:8,13,16
117:25 118:14,17
132:21 133:17
135:13 137:16
140:17 150:16
152:11 169:25
177:13 178:12 179:6,
16,20 191:21 197:4
220:15 226:14,16,20
227:10 230:2 239:5
261:14 265:19,25
270:25 271:12 274:2

**Receipts** 270:7

**receivable** 231:15
252:2,5 253:6 254:5,
18 264:10

**receive** 109:24
121:22 182:2

**received** 110:6
257:20

**recently** 138:8

**recess** 151:18
205:25

**recollection** 119:4
131:14 133:2 139:7
141:10 153:7,16
188:15 194:18
208:25 210:25 220:3
221:24 225:9 226:3,6
227:19,20,21 232:6,
20 242:13 244:2

**recommendation**
248:9

**recommendations**
217:21

**record** 146:18 205:3,
24 245:7 275:8 277:7
278:13

**recorded** 120:13

**records** 195:11

**recover** 267:11

**redacted** 223:7
245:10,22

**Redeemer** 115:4

**reduce** 186:4,6,7,10
192:22 193:24 198:5,
11

**reduces** 182:8,15,18
184:14

**refer** 115:19,25
209:11,23

**reference** 131:5
162:20 209:4 211:10
229:16 236:9 241:20
245:2 251:25 256:19

**referenced** 242:17

**referred** 114:8
119:25 131:16 143:8
151:21 152:15
163:19 164:11 173:7,
11 174:10,17 176:6,
15,23 179:9,25
180:7,12,16,24
181:8,20 183:6
185:21 186:17
187:12,15 197:9
218:2 228:7 255:15

**referring** 145:8
146:8 151:21 154:9
166:3

**refers** 120:4 131:10
147:16 163:2 165:22
200:16 215:21
225:18 231:2 232:9
252:8 264:19

**reflect** 169:4 179:25
254:4,17

**reflected** 113:22
151:22 153:9 223:15
233:23 240:23 269:7

**refresh** 141:10
221:23 226:20,21
232:6

**refreshed** 136:4
150:15 231:8 258:4

**refuse** 234:2

**refused** 260:19

**regard** 128:20
194:24

**relate** 172:13

**related** 154:8 156:25
171:21 277:11

**relates** 229:7

**relating** 142:12
224:18 236:22
241:17 249:13

**relative** 177:17 212:9

**relevant** 179:12
205:12

**relieve** 185:14,22

**relieved** 186:21

**rely** 250:20 251:4

**relying** 276:9

**remain** 224:24

**remember** 117:21,
22 133:7 136:3 137:5
138:7,16,17 140:20,
23 159:8,15 173:25
176:21 179:22
180:13 184:24
193:19 210:9 219:4,
23,24 221:4 226:17
227:23 230:7 231:9
233:2,6 272:4

**remind** 108:5

**REMOTE** 107:3

**remotely** 107:6

**rendered** 273:18

**rep** 247:15

**repay** 111:9,13

**repayment** 149:3
150:12

**repeat** 134:19 144:13
150:20 171:17
185:17 195:25 208:4
214:12 241:4 244:10
256:3

**rephrase** 153:3
164:8

**replaced** 215:7

**report** 117:7 118:3,
16,25 225:22 232:13
244:22 261:10 265:4,
23 266:4 282:13,15,
17

**reported** 117:5
255:25 256:11
266:19,24

**REPORTER** 107:5
145:22 196:22 205:2,
5,23 244:8

**Reporting** 116:14
277:19

**Reports** 117:3,10,13,
16,24 118:6 261:13
262:8 265:21

**representation**
234:15 235:11 247:6
281:21 282:4

**representations**
236:15 247:14

**representing** 165:19
220:11

**request** 124:19
159:20,23 191:15
192:18 197:10 200:2,
21 201:4,22 215:18
280:24 281:11

**requests** 158:13
192:4,10

**required** 227:22
262:15

**requisite** 173:24

**resembles** 235:17

**Reserve** 276:20

**reserved** 277:9

**resolution** 135:10

**resolutions** 179:24
180:3

**resolve** 150:4

**respect** 113:23
118:15 155:5 166:23
173:6 270:13

**respective** 124:7

**respond** 134:6,14,22

**response** 134:3
160:8 161:5 177:6
193:10 207:22 242:6

**responses** 158:12
191:14 192:3,6
280:22 281:10

**responsibility**
119:18 222:18
237:16

**responsible** 116:22
117:2,9 199:25
224:17 250:14
255:20 265:15 266:2

**rest** 129:15 204:13

**Restoration** 217:18

**restrain** 258:15

**Restructuring**
261:23

**Results** 119:3,12
130:21 280:11,17

**return** 182:3

**review** 116:18
249:12 250:3 255:17
261:12 272:8

**reviewed** 113:19
141:11

**reviewing** 192:10

**right-hand** 274:9

**room** 260:24

**roughly** 233:9

**Rule** 277:8

**Rules** 277:9

---

**S**

**sale** 188:19 211:25
213:11

**sampling** 233:22

**satisfied** 189:16

**satisfy** 226:18

**Savings** 107:11

**scenario** 188:7
190:24

**schedules** 249:24
250:2,4 251:6 254:3,
17 261:8

**Schroth** 124:24

**scope** 258:5,9,14

**Scott** 215:3 229:19
230:4

**screen** 163:17 175:9,
22 176:10 200:18
221:14 271:18

**scroll** 132:16 136:10,
16 137:19 139:3
158:5,17,19,21
160:25 161:12
169:16,18 170:11
191:9,17 206:17
222:4 225:16 227:6
235:4 236:11 237:13
257:7 261:16 265:8
272:18

**Scrolling** 121:11
122:8 138:3 139:13
140:5,7,12 158:23
159:21 161:17
169:20 170:10
191:11,19 223:22
232:4 236:6 240:16
243:16 256:16 257:6
263:2 266:8 269:17

**seal** 245:25

**section** 228:8

**Seery** 132:17 148:20
149:14

**sentence** 114:7,9
165:8 166:13,24
167:8,15 169:2
224:15 236:9 264:14,
16

**serve** 159:17 192:15
220:23

**served** 158:8 170:2
171:10 191:22
192:11 200:22
221:24 229:20

**services** 135:8,11
228:25

**serving** 230:3

**set** 148:16 161:6
207:3,22,23 208:7
219:19 254:18
260:14 277:6,14
281:6,15

**settlement** 142:23
148:23,25 149:14
151:2 154:16 156:14
157:5

**shared** 135:8,11

**Sharp** 261:22 262:7,
14 265:15 266:2

**Sharp's** 265:11

**sheet** 119:4,14,21
120:14,19 131:4
177:3 223:6,13
238:5,9,18 255:5
278:2

**shifted** 275:13

**short** 129:18 204:18

**shorter** 205:10

**show** 215:14 223:7
244:19 245:20
253:12

**showed** 245:19

**shown** 176:11

**shows** 252:19
253:22 270:10

**shut** 168:19

**side** 133:21

**sign** 110:4 121:18
122:2 124:25 127:8,
10,15,23 130:3,16,17
161:21 194:15
234:15 235:10 262:7

**signature** 108:25
109:3,16 121:10,13
127:4,6,13 161:19
206:10 235:7,16
247:11 262:2 277:9

**signatures** 235:5
261:20 265:12

**signed** 109:21
110:17 111:8,12,20
113:21 114:22 115:3

**120**:16 121:2 123:2,
3,17 125:5,6,7,15,16
127:14 128:11,15,24
129:21,25 130:2
131:12 132:17
162:12 165:4 194:9,
11 206:24 222:12
235:19 237:11
261:22 263:8

**significant** 119:13,
19 131:3 186:11,12

**signing** 110:19

**signs** 125:3

**similar** 120:10
186:13,21

**simple** 129:22
138:24

**simply** 200:19

**simultaneous**
139:17,24 145:13,17,
21 152:24 168:9
175:8,23 190:9 244:4
258:20

**sir** 109:3,16 118:23
121:13 127:6 140:18
159:6 161:19 162:23
166:13,23 169:23
189:9 190:3 195:4
196:22 199:8,15
206:10 234:5 235:8
240:21 264:18
271:10 276:7

**sister** 174:25 176:5
178:5 189:22 229:19
238:25

**sit** 125:22 137:12
193:8 204:9

**skip** 254:23

**skipped** 282:8

**Skur** 277:4,18

**slightly** 113:11
160:14 202:17

**slow** 137:21,23

**small** 193:12 194:5
213:25

**smoothly** 156:7

**Sofas** 255:15,18,21 256:7 261:8

**sold** 212:6,21 213:3 214:5,17 217:14,20 275:11,15

**sole** 229:20 230:13

**someplace** 205:19

**sort** 137:23

**sought** 179:2

**source** 235:21

**speak** 180:14

**speaking** 118:12,14

**speaks** 114:19 171:14

**specific** 142:16 198:14 203:2,7 211:23 276:16

**specifically** 118:3 132:8 135:13,23 137:5,10 158:10 159:15 174:14 197:25 209:24 214:4 261:11

**specifics** 218:5,20 219:4

**speech** 144:18

**speed** 137:21

**spent** 173:3 271:25

**sphere** 262:10

**split** 135:9

**spoke** 179:13 180:23

**standard** 222:21 235:24

**start** 147:14 148:3 228:4,11

**started** 166:7 195:13

**starting** 144:5

**state** 107:8 163:9 243:10 258:8,13 264:13 277:2,5,18

**stated** 153:17 163:24 167:18,19 173:5 207:7 234:8

**statement** 129:13 147:8 165:14,15 193:3 202:25 222:17 237:15 249:19 271:14 282:9

**statements** 168:13 221:9,15 222:2,19,23 223:25 224:10 227:12 233:18,19 236:21 237:17,23 238:24 239:9 243:22 245:9,15 246:3 255:14 263:19 281:18,23

**STATES** 278:3

**stay** 190:20 255:7

**step** 109:10

**stick** 156:3 166:19

**stipulated** 110:15

**stop** 119:9 138:6 139:18,19,25 140:2 145:11,12 146:16 168:10,11,13,21 246:7,22 265:2

**stopped** 221:12

**story** 217:7

**straight** 214:13

**Strand** 235:12

**straying** 257:23 269:13

**Street** 277:20

**strike** 154:25 155:16 218:13 219:10 264:5

**strikes** 140:21

**structure** 129:6 218:11 256:8

**structured** 129:2 218:11

**stuff** 125:4 139:23 165:4

**subject** 113:24 178:19 180:7,23 196:7 207:16,25 218:2 219:18 229:5 257:24 275:9

**subjects** 214:12

**submit** 245:24

**submitted** 171:6

**SUBSCRIBED** 279:11

**subsequent** 142:13 143:5 144:23 148:8, 17 152:3,4 153:11 155:9 165:12 170:19 172:15,16 176:8 181:5 182:22 188:17, 22,24 189:15 199:5,9 207:16,24 208:8,22 211:8,20 212:3 216:20,22 218:2 219:19 232:10 243:12,18 244:20 267:9 268:14

**subsequently** 142:8 152:16 153:10 194:20

**subsidiary** 209:15

**substance** 140:19 154:12 207:12

**success** 217:7

**sued** 112:5

**suggest** 120:23 180:14 195:3

**suggested** 144:4,5 155:13

**Suite** 277:20

**sum** 111:4

**summary** 250:6,15 251:15 282:6

**supersede** 114:14

**Supplemental** 221:16 281:18,24

**supplied** 128:8

**support** 217:15

**supposed** 159:14 249:18,21

**surrender** 181:9 182:3

**surrendered** 181:22

**swear** 162:4

**swore** 166:16

**sworn** 107:14 149:5 168:12 277:7 279:11

--- T ---

**taking** 146:7

**talk** 152:2

**talked** 176:12

**talking** 116:3 118:6 139:19,20,25 140:2 143:4 147:6 163:14, 15 172:3 175:12 177:7 181:13 207:17 210:9 219:4

**target** 187:4

**tax** 193:14

**taxable** 187:7 194:22

**taxes** 187:8 194:19, 23

**team** 250:21 251:5

**telling** 220:4 265:19, 25

**ten-minute** 151:10

**tendered** 161:4 234:10

**term** 110:9,14 128:5, 20 226:11,15 274:20

**terms** 111:17,18 113:23 114:13 128:12 130:3,9 182:7 193:13 226:18

**testified** 107:16 129:3 133:16

**testify** 129:3

**testimony** 144:2 148:24 149:5 150:9, 17,22 152:13 153:12 154:11 166:19 184:23 198:10 277:7

**Texas** 107:12 277:2, 5,18 278:4

**theoretically** 182:17 217:20

**thing** 140:10

**things** 139:16 171:2, 5,8 172:20 183:25 234:24 245:11 264:15

**thinking** 174:2

**thought** 152:20 182:23 193:25 216:14,16 219:6 240:5

**threw** 150:3

**tie** 182:21 253:3

**time** 107:10,11 108:9 110:17 111:7,12 113:10,21 114:3,22, 25 115:3,13 123:3 124:7,22,23 125:15 128:10,14,23 129:6 130:6 132:5 134:15, 19,24 135:24 144:22 145:23 149:24 150:10,21 164:16 165:12 168:19 170:2 171:6,9,22 173:3 174:22 178:23 180:15,25 181:4 182:15 185:18 187:23 188:3,5 189:25 190:13,15 194:12 198:16 204:4, 20,21 205:7,8,21 206:24 215:8 217:13, 25 220:4,11 229:21 230:2,20 232:19 238:16 241:10 246:14,25 248:3 250:12,17 256:4,9 260:17 262:6 272:2 274:2 276:22

**timeline** 250:9

**times** 108:3 194:3 221:3

**timing** 115:9

**title** 108:19 119:24 136:10

**titled** 150:2

**today** 107:24 108:6 111:23 112:9,21 115:20 122:12 125:22 126:10 128:8

137:18 188:23,25
269:5

**Today's** 107:9

**told** 147:2 177:8,9
185:10 219:14 239:7

**top** 109:19 110:24
121:15 127:19
136:16 162:9 222:16
228:11 237:14 250:9
253:12

**total** 226:7

**transactions** 233:22
236:22

**TRANSCRIPT** 278:2

**transcription**
278:14

**transfer** 124:8

**transparent** 249:19

**transparently**
262:19

**trial** 141:2 149:25
157:23 276:21

**trigger** 211:19,24
212:2 213:4

**triggered** 189:5

**triggers** 139:6

**true** 137:17 162:5
163:24 165:6 166:17,
18,24 167:8,15 193:3
199:3 202:25 206:20
207:8 230:19 232:18
270:25 277:7

**Trussway** 177:5
189:4 209:14 211:3,
19 212:21 214:6,18

**trust** 215:4,16 229:17
230:4,10,14,20
231:6,11,14,19,22

**trustee** 174:18,19,21
215:3,7,15 229:20
230:3

**truth** 107:15,16

**TSG** 277:19

**turn** 243:14 251:19
252:12

**two-hour** 246:19

**typical** 127:13

---

**U**

**Uh-huh** 162:22
215:25 221:19
223:10

**ultimately** 117:5
185:4

**uncollectible**
253:18,24 254:5,18

**unconditional**
122:20

**understand** 107:25
110:18 111:24 112:9,
22 113:15 118:10
123:4,8 125:14,24
126:10,16,18 130:3
133:3 139:5 142:11
166:4 176:17 185:8
186:15 212:14 213:9
214:3 236:19 243:21
245:22 248:13 249:2,
10 270:9,16

**understanding**
110:12 120:3 122:12
123:2 130:6 131:9
133:15 136:23 151:5
154:21 181:21 208:8
235:18 264:11,18
267:16

**understood** 128:23
129:9,21

**undue** 189:13

**unencumbered**
275:10

**unequal** 233:25

**UNITED** 278:3

**unnecessary** 216:5
217:4

**unpaid** 128:16 129:9
133:5,23 134:23
135:21 149:3 181:23
182:4 184:21 187:17
188:9 189:14

**unreasonable**
273:5,18 275:3

276:12

**unredacted** 245:11,
13,14,21,24

---

**V**

**validation** 235:22

**variety** 209:13,14

**variously** 115:20

**vehemently** 189:2
275:25

**verbal** 154:4,7 156:9,
10,17

**verbally** 154:3

**Verification** 162:12
206:8,20

**verified** 165:5 166:25
167:9

**version** 170:17
265:14

**versus** 110:14 164:6

**video** 108:8

**view** 174:5

**views** 178:23

---

**W**

**wanted** 187:4
245:12,20 260:21
274:11

**warning** 266:10

**Waterhouse** 117:2,
24 217:24 218:15,24
219:15 224:23,24
225:5,9 235:15
250:14,20 251:4,12
255:25 256:10,11
262:2,7,14 265:16,20

**Waterhouse's**
265:12

**ways** 268:8

**week** 138:8

**WHEREOF** 277:13

**wholly** 215:22

216:24

**wistful** 264:2

**withdrawn** 114:19
115:18 117:14
122:18 125:12
128:22 131:15
134:11 150:22 171:7
176:4 181:17 187:13
209:21 212:18
216:18,20 230:12
233:3 241:8 243:20
251:2 256:22

**word** 167:11 175:18,
19 183:11,12

**words** 109:10 142:12
170:18,22 172:14
183:19

**wordsmith** 167:13

**work** 149:13

**wrap** 205:14

**write** 145:23 166:15
190:4

**writing** 153:24
154:20

**written** 129:5 156:8
157:20 166:22 193:3
254:9

**wrong** 147:12 149:7
164:5 166:14 185:14
233:15 269:20

**wrote** 165:9,10
268:21 275:6

---

**X**

**X-------** 280:2

---

**Y**

**year** 121:2 144:7,8
149:10,11,13 184:13
222:2 225:24 253:19
256:20,25 259:22
272:25 274:20

**year-end** 221:8

**years** 210:6 225:7

**York** 277:20

**Yup** 238:21 256:21
257:13 261:24

---

**Z**

**Zoom** 108:8

# EXHIBIT 97

Appx. 01702

Page 283

1                    Dondero - 6-1-2021

2          IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION

4    In Re:                      )
                                 )
5    HIGHLAND CAPITAL            )   Case No.
      MANAGEMENT, LP,            ) 19-34054 L.P.
6                                )  Chapter 11
           Debtor,              )
7    ------------------------------)
     HIGHLAND CAPITAL MANAGEMENT,  )
8    LP,                        )
                                 )
9         Plaintiff,           ) Adversary No.
                                ) 21-03003-sgi
10       vs.                     )
                                 )
11   JAMES D. DONDERO,           )
                                 )
12         Defendant.          )

13

14             REMOTE DEPOSITION OF

15              JAMES DONDERO

16                 Volume 3

17             Pages 283 - 385

18              Dallas, Texas

19   Tuesday, 1st day of June, 2021

20

21

22

23   Reported by:

24   Daniel J. Skur, Notary Public and CSR

25   Job No. 194691

Page 284

```
 1          Dondero - 6-1-2021
 2
 3
 4
 5
 6
 7       1st day of June, 2021
 8       9:34 a.m. - 12:01 p.m.
 9
10
11       Remote Deposition of JAMES DONDERO,
12  located in Dallas, Texas before Daniel J.
13  Skur, Notary Public and Certified Shorthand
14  Reporter in and for the State of Texas
15  located in Waxahachie, Texas.
16
17
18
19
20
21
22
23
24
25
```

Page 285

```
 1          Dondero - 6-1-2021
 2  R E M O T E   A P P E A R A N C E S:
 3  Pachulski Stang Ziehl & Jones
       Attorney(s) for Debtor
 4   780 Third Avenue
 5   New York, New York 10017
 6   BY:  John Morris, Esq.
 7       Gregory Demo, Esq.
 8
 9   Sidley Austin
       Attorney(s) for The Committee
10   2021 McKinney Avenue
11   Dallas, Texas 75201
12   BY:  Paige Montgomery, Esq.
13       Juliana Hoffman, Esq.
14       Matthew Clemente, Esq.
15       Alyssa Russell, Esq.
16
17   Kelly Hart & Pitre
       Attorney(s) for Mark Patrick
18   400 Poydras Street
19   New Orleans, Louisiana 70130
20   BY:  Amelia Hurt, Esq.
21
22   Bonds Ellis Eppich Schafer Jones
       Attorney(s) for The Witness
23   420 Throckmorton Street
24   Fort Worth, Texas 76102
25   BY:  Clay Taylor, Esq.
```

Page 286

```
 1          Dondero - 6-1-2021
 2
 3  R E M O T E   A P P E A R A N C E S  (continued)
 4   Sbaiti & Company
       Attorney(s) for Charitable DAF, CLO HoldCo
 5    and Sbaiti & Company
       2200 Ross Avenue
 6
       Dallas, Texas 75201
 7
       BY:  Mazin Sbaiti, Esq.
 8
 9
10
11  ALSO PRESENT:
12       La Asia Canty, Paralegal
13       Debra Dandeneau, Baker & McKenzie
14       J. Pomerantz
15       Lauren Drawhorn, Wick Phillips
16       Mark Patrick
17
18
19
20
21
22
23
24
25
```

Page 287

```
 1          Dondero - 6-1-2021
 2       IT IS HEREBY STIPULATED AND AGREED
 3  by and between the attorneys for the respective
 4  parties herein, that filing and sealing be and
 5  the same are hereby waived.
 6       IT IS FURTHER STIPULATED AND AGREED
 7  that all objections, except as to the form  of
 8  the question, shall be reserved to the
 9  time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to and
12  signed before any officer authorized to
13  administer an oath, with the same force and
14  effect as if signed and sworn to before the
15  Court.
16           - oOo -
17
18
19
20
21
22
23
24
25
```

Appx. 01704

Page 288

Dondero - 6-1-2021

1           Dondero - 6-1-2021
2       P R O C E E D I N G S
3       REMOTE ORAL DEPOSITION OF
4           JAMES DONDERO
5       (REPORTER NOTE:  This deposition is
6   being conducted remotely in accordance with
7   the Current Emergency Order regarding the
8   COVID-19 State of Disaster.
9       Today's date is the 1st day of
10  June, 2021.  The time is 9:34 a.m. Daylight
11  Savings Time.  The witness is located in
12  Dallas, Texas.)
13          JAMES DONDERO,
14  having been duly cautioned and sworn to tell
15  the truth, the whole truth and nothing but the
16      truth, testified as follows:
17          (9:33 A.M.)
18          EXAMINATION
19  BY MR. MORRIS:
20      Q.   Good morning, Mr. Dondero.  Can you
21  hear me?
22      A.   Yes.
23      Q.   Your microphone is a little soft as
24  well.
25          Can you tell me where you're located

Page 289

1           Dondero - 6-1-2021
2   right now?
3       A.   4940 Chase Tower.
4       (Interruption by reporter.)
5       (Pause.)
6   BY MR. MORRIS:
7       Q.   Good morning, Mr. Dondero.
8       (Audio distortion.)
9       (Interruption by reporter.)          00:-01
10  BY MR. MORRIS:                           00:-01
11      Q.   Good morning, Mr. Dondero.
12          Can you hear me now?
13      A.   Yes.
14      Q.   You understand we're here today for
15  your deposition in connection with next week's
16  contempt proceeding; is that right?
17      A.   Yes.
18      Q.   Okay.  We have a few documents to
19  put up on the screen today; and as usual, if
20  there's anything that you need to see, will you
21  let me know that?
22      A.   Yes.
23      Q.   All right.  I want to start with
24  some background.
25          MR. MORRIS:  Can we please put up

Page 290

1           Dondero - 6-1-2021
2   the first exhibit, the organizational
3   chart?
4       MR. TAYLOR:  John, before we start,
5   I just wanted to note that this is going to
6   be limited to two hours.
7       MR. MORRIS:  I'm not sure where you
8   get that from, but let's just proceed.
9       MR. TAYLOR:  You specifically asked
10  for two hours of time, and I told you we'd
11  give two hours of time, and so we're
12  limiting it to two hours.
13      MR. MORRIS:  You do whatever you
14  need to do, Clay.
15      (Exhibit 1 introduced.)
16  BY MR. MORRIS:
17      Q.   Mr. Dondero, have you seen this
18  document before, sir?
19      A.   Yes.
20      Q.   Do you know what it is?
21      A.   It's the org chart of the DAF and
22  CLO HoldCo.
23      Q.   Do you know why this structure was
24  set up the way it was?
25          MR. TAYLOR:  Objection, form.

Page 291

1           Dondero - 6-1-2021
2       A.   Only generally.
3   BY MR. MORRIS:
4       Q.   Can you tell me your general
5   understanding of why this structure was set up
6   the way it was?
7       A.   To be compliant for tax purposes.
8       Q.   Was this structure set up at your
9   request?
10          MR. TAYLOR:  Objection, form.
11      A.   Set up at my request.  No.
12  BY MR. MORRIS:
13      Q.   Who decided to set up this
14  structure; do you know?
15      A.   Mark Patrick.
16      Q.   And do you know if anybody asked
17  Mark Patrick to set up this structure?
18      A.   The -- he was tasked with setting up
19  a charitable entity for Highland at that time,
20  for Highland and my -- for Highland and the
21  partners to -- to foster charitable giving and
22  provide the appropriate tax deductions for
23  such.
24      Q.   And who gave him that task, if you
25  know?

Page 292

Dondero - 6-1-2021

1       A.   I believe I did.
2       Q.   Okay.  So, you tasked Mr. Patrick
3   with setting up an organizational structure to
4   carry out the charitable giving on behalf of
5   Highland Capital Management, L.P., and its
6   partners?
7       Do I have that right?
8       A.   Yes.
9       Q.   Okay.  Looking at the top line, do
10  you see that there's four foundations that are
11  identified as third parties?
12      A.   Yes.
13      Q.   Are you familiar with those
14  foundations?
15      A.   Yes.
16      Q.   And do you serve as an officer or
17  director of any of those foundations?
18      A.   I -- I believe I have or I could be
19  with regard to Dallas Foundation, but I'm not
20  certain.
21      Q.   Okay.  Do you know if you have any
22  role with any of the other three foundations
23  that are on there?
24      A.   I do not believe so.
25

Page 293

Dondero - 6-1-2021

1       Q.   Okay.  Looking at the next row,
2   there's four incorporated or there's four
3   entities that are identified as supporting
4   organizations.
5       Do you see that?
6       A.   Yes.
7       Q.   Do you have an understanding of what
8   a "supporting organization" is?
9       A.   No, and I don't know the difference
10  between the first line and the second line,
11  and I don't know if my involvement with Dallas
12  Foundation was at the first line or the second
13  line.
14      Q.   Do you know when Mr. Patrick set up
15  this structure?
16      A.   Many years ago at the beginning of
17  the -- I don't think it's changed over the
18  years.  As far as I know, the general -- or
19  this -- this structure was put in place at the
20  beginning, I believe, sometime in the late
21  2000s.
22      Q.   Do you know what the Donor Advised
23  Funds are, the DAF funds?
24      MR. SBAITI:  I'm going to object to
25

Page 294

Dondero - 6-1-2021

1   the form of the question.
2       John, if you could be clear as to
3   which line -- are you talking about
4   charitable DAF HoldCo, or are you talking
5   about charitable DAF Fund, L.P.?
6       MR. TAYLOR:  If you could be as
7   specific as possible, and he'll try to
8   answer as specifically as possible.  I'm
9   not sure which box you're talking about.
10      MR. MORRIS:  All right, Clay.  Thank
11  you.
12  BY MR. MORRIS:
13      Q.   Mr. Dondero, are you familiar with
14  the phrase "DAF"?
15      A.   Yes.
16      Q.   Have you used that phrase before?
17      A.   Yes.
18      Q.   When you refer to -- when you use
19  the phrase "DAF," what are you referring to?
20      A.   It would depend.
21      Q.   On what?
22      A.   What the question is.
23      Q.   What's -- do you have an
24  understanding of what the Charitable DAF GP,
25

Page 295

Dondero - 6-1-2021

1   LLC, is?
2       A.   The exact structural differences,
3   I -- I -- I -- I don't know.
4       Q.   So when you use the phrase "DAF,"
5   what are you referring to?
6       A.   In general, when I use the
7   expression, it's the -- the overall entity, the
8   overall pool of capital and/or the overall
9   entity that makes the donations from the pool
10  of capital.
11      Q.   And which entity -- withdrawn.
12      Do you have an understanding as to
13  which entity holds the pool of capital?
14      A.   No.  It's -- no, I don't know for
15  sure.
16      Q.   Do you know if it's CLO HoldCo,
17  Ltd.?
18      MR. SBAITI:  Objection, asked and
19  answered.
20      A.   I don't know.
21  BY MR. MORRIS:
22      Q.   Do you know if Charitable DAF Fund,
23  L.P., holds any assets?
24      MR. SBAITI:  Objection, relevance,
25

Page 296

Dondero - 6-1-2021

1  no foundation.
2  A.  I – I don't know which entities
3  hold which of the assets.
4  BY MR. MORRIS:
5  Q.  Did you – did you approve of the
6  organizational structure that Mr. Patrick
7  created at your request?
8  A.  Yes.
9  MR. TAYLOR:  Objection, vague.
10 BY MR. MORRIS:
11 Q.  I'm sorry.  Did – did you answer,
12 sir?
13 A.  Yes.
14 Q.  Okay.  Who is Grant Scott?
15 A.  I understand he was the trustee of
16 the DAF for a number of years.
17 Q.  When you say "he was the trustee of
18 the DAF," what are you referring to?
19 A.  I always refer to him as "trustee,"
20 but I see it's labeled here as "managing
21 member."
22 Q.  Do you know how he came to be
23 appointed the trustee of the DAF?
24 A.  I believe it was on my
25

Page 297

Dondero - 6-1-2021

1  recommendation.
2  Q.  Who did you make the recommendation
3  to?
4  A.  It would have been Mark Patrick.
5  Q.  Did Mark Patrick have the authority
6  to appoint Mr. Scott as the trustee of the DAF?
7  MR. SBAITI:  Objection, vague.
8  Object to the extent it calls for a legal
9  conclusion.
10 A.  Yeah, I don't know.
11 BY MR. MORRIS:
12 Q.  Well, you've known Mr. Scott since
13 high school; isn't that right?
14 A.  Yes.
15 Q.  You went to UVA together; isn't that
16 right?
17 A.  Yes.
18 Q.  You were housemates together in
19 college; isn't that right?
20 A.  Yes.
21 Q.  He was the best man at your wedding;
22 isn't that right?
23 A.  Yes.
24 Q.  You picked Mr. Scott to serve as the
25

Page 298

Dondero - 6-1-2021

1  trustee of the DAF; isn't that right?
2  MR. TAYLOR:  Objection.  That's not
3  what he stated.
4  A.  I – on the original formation, I
5  recommended Grant Scott.
6  BY MR. MORRIS:
7  Q.  And you recommended Mr. Scott to
8  Mr. Patrick?
9  A.  That's my recollection, I believe,
10 but I don't remember specifically.
11 Q.  Do you remember if Mr. Patrick held
12 any role in any entity on the chart that stands
13 before you?
14 Withdrawn.
15 Do you know if Mr. Patrick held any
16 role with any entity prior to January 1st,
17 2021?
18 MR. SBAITI:  Objection, vague.
19 A.  I don't know.
20 BY MR. MORRIS:
21 Q.  Why did you make the recommendation
22 to Mr. Patrick?
23 A.  Initially?  You're saying the
24 initial recommendation when it was set up?
25

Page 299

Dondero - 6-1-2021

1  Q.  Correct.
2  A.  13, 14, 15 years ago.
3  The – it – we thought – I thought
4  at the time he would be suitable.
5  Q.  But why did you select Mr. Patrick
6  as the person to whom to make your
7  recommendation?
8  A.  Because he was responsible for
9  setting up the overall structure.
10 Q.  Did he – were you seeking his
11 approval when you made the recommendation to
12 him?
13 A.  I – I don't know the roles he was
14 playing at the – at that moment, so I – I
15 don't know.
16 Q.  At the time that you recommended
17 Mr. Scott to serve as the trustee of the DAF,
18 did you have any understanding as to who had
19 the authority to actually appoint Mr. Scott?
20 A.  I did not specifically.
21 Q.  Did you ever learn who had the power
22 to appoint the trustee of the DAF?
23 A.  I did not.
24 Q.  As you sit here today, do you have
25

Page 300

1          Dondero - 6-1-2021
2   any understanding as to who has the power to
3   appoint the trustee of the DAF?
4          MR. TAYLOR:  I'll instruct the
5      witness not to answer to the extent it
6      would require him to reveal privileged
7      communications with counsel.
8          MR. MORRIS:  I'm not asking him for
9      any communications, to be clear.
10          MR. TAYLOR:  Or anything he heard
11      from counsel.
12          (Audio distortion.)
13          MR. MORRIS:  Please don't -- Clay,
14      you're a very good lawyer, please don't
15      coach the witness.  He's a very
16      sophisticated witness.
17   BY MR. MORRIS:
18      Q.   Do you have any understanding, as
19   you sit here today, sir, as to who has the
20   authority to appoint the trustee of the DAF?
21      A.   I know it's complicated.  I know it
22   has to do with shares.  I know it's -- I know
23   it's multiple levels, but I don't have specific
24   knowledge.
25      Q.   Do you know if Mr. Patrick ever

Page 301

1          Dondero - 6-1-2021
2   considered appointing -- withdrawn.
3          MR. MORRIS:  Could we please put up
4      the next exhibit, Patrick File 6,
5      Document 1?
6          (Exhibit 2 introduced.)
7          MR. SBAITI:  John, is that document
8      you put up a labeled exhibit for, the like
9      Exhibit 1 or something, the one you have up
10      right here.
11          MR. MORRIS:  Yeah, that will be
12      marked as Exhibit 1, thank you.
13          So, now we're going to put up
14      Exhibit 2.
15   BY MR. MORRIS:
16      Q.   Do you see that that's the Amended
17   and Restated Limited Liability Company
18   Agreement of the Charitable DAF GP, LLC?
19      A.   Yes.
20      Q.   And do you see that it's dated
21   effective as of January 1st, 2012?
22      A.   Yes.
23      Q.   So, that's approximately nine plus
24   years ago.
25      Do I have that right?

Page 302

1          Dondero - 6-1-2021
2      A.   Yes.
3      Q.   Okay.
4          MR. MORRIS:  Can we go to the last
5      page, please?
6   BY MR. MORRIS:
7      Q.   Is that your signature on that page,
8   sir?
9      A.   Yes.
10      Q.   And do you understand that, pursuant
11   to this agreement, Mr. Scott replaced you as
12   the managing member of the DAF GP, LLC?
13      A.   I -- I don't have a recollection of
14   that.
15      Q.   Do you remember that you served as
16   the managing member of the DAF GP, LLC?
17      A.   I don't -- I don't recall that.
18      Q.   Now, Mr. Scott is a lawyer, correct?
19      A.   Yes.
20      Q.   He's a patent lawyer.  Do I have
21   that right?
22      A.   Yes.
23      Q.   He has no experience or expertise in
24   finance, does he, to the best of your
25   knowledge?

Page 303

1          Dondero - 6-1-2021
2      A.   I would not say he has expertise.  I
3   wouldn't say he's an expert in it, but I -- I'd
4   say he's more sophisticated than the average
5   layperson.
6      Q.   Well, at the time that you
7   recommended him to Mr. Patrick, did you do so
8   because you thought he had valuable experience
9   and expertise in finance or investment?
10          MR. SBAITI:  Objection, assumes
11      facts not in evidence before the witness.
12   BY MR. MORRIS:
13      Q.   That wasn't one of the reasons you
14   recommended Mr. Scott, is it?
15      A.   He wasn't going to be the investment
16   advisor.  DAF had a separate investment
17   advisor.
18      Q.   And who was going to be the
19   investment advisor?
20      A.   Highland.
21      Q.   And you owned and controlled
22   Highland at the time, correct?
23          MR. TAYLOR:  Objection.
24   BY MR. MORRIS:
25      Q.   Withdrawn.

Page 304

Dondero - 6-1-2021

1          Dondero - 6-1-2021
2          You controlled Highland at the time,
3   correct?
4      A.   Yes.
5      Q.   Did Mr. Scott have any experience or
6   expertise running charitable organizations, to
7   the best of your knowledge?
8      A.   No.
9      Q.   Had he ever, to the best of your
10  knowledge, made any decisions concerning
11  collateralized loan obligations?
12     A.   No.
13     Q.   Can you tell me why you recommended
14  to Mr. Patrick that Mr. Scott serve as the
15  trustee of DAF?
16          MR. TAYLOR:  Objection, asked and
17      answered.
18     A.   I – I thought he would be a good
19  fit for the position.
20  BY MR. MORRIS:
21     Q.   Why?
22     A.   It required – I don't – in my
23  mind – or I believed it would require a lawyer
24  and someone with legal skills, and I thought he
25  would be good at the position.

Page 305

1          Dondero - 6-1-2021
2      Q.   And you trusted him; is that right?
3      A.   I – yes.
4      Q.   And you had a life-long relationship
5   with him; isn't that right?  Isn't that one of
6   the reasons why you recommended him for this
7   position?
8      A.   Yes.
9      Q.   Do you know whether Mr. Patrick –
10  withdrawn.
11          Is Mr. – do you believe that
12  Mr. Patrick is the person who appointed
13  Mr. Scott as your successor as managing member
14  in 2012?
15          MR. SBAITI:  Objection, asked and
16      answered, calls for speculation; and object
17      to the extent it calls for a legal
18      conclusion.
19     A.   I could – I could repeat the answer
20  again.
21          I don't know the formal process, but
22  I do remember recommending to Mark Patrick that
23  Grant would be a good candidate.  Now, how –
24  what mechanism and how the process works and
25  who actually approved that, I – I don't know.

Page 306

1          Dondero - 6-1-2021
2   BY MR. MORRIS:
3      Q.   Did you recommend anybody else, or
4   was Mr. Scott the only person that you
5   recommended?
6      A.   I don't – I don't remember.  I
7   don't remember.  I don't remember recommending
8   anybody else or if the process required it.  I
9   don't remember the process.
10     Q.   Was anybody involved in the process
11  other than you and Mr. Patrick?
12          MR. TAYLOR:  Objection to the extent
13      it calls for speculation.
14  BY MR. MORRIS:
15     Q.   Withdrawn.
16          Do you know – do you know if
17  anybody was in the process – involved in the
18  process other than you and Mr. Patrick?
19     A.   Again, I don't know the process and
20  the mechanism, if there were offshore boards
21  involved or if the four underlying charities
22  were involved.  It was – it was complicated,
23  and I delegated the process to Mark Patrick.
24     Q.   Okay.  I'm not asking you to
25  speculate.  I'm just asking for your knowledge.

Page 307

1          Dondero - 6-1-2021
2          Can you identify any person or
3   entity who was involved in the appointment of
4   Mr. Scott as your successor as managing member
5   of the DAF GP, LLC, other than yourself and
6   Mr. Patrick?
7          MR. SBAITI:  Objection, assumes
8      facts.
9      A.   Yeah, I don't – I don't have
10  specific knowledge.
11  BY MR. MORRIS:
12     Q.   Okay.  Do you understand that in
13  addition to becoming the managing member of the
14  Charitable DAF GP, LLC, that Mr. Scott also
15  became the sole director of the Charitable DAF
16  HoldCo, Ltd., Charitable DAF Fund, L.P., and
17  CLO HoldCo, Ltd.?
18          MR. TAYLOR:  Objection, assumes
19      facts not before the witness.
20     A.   No.
21  BY MR. MORRIS:
22     Q.   Do you know if he ever held the
23  directorship of any of those entities?
24          MR. SBAITI:  Objection, vague.
25     A.   I – I don't know what his exact

Page 308

Dondero - 6-1-2021

1  role is now, but I -- I thought I was informed
2  that that's -- his role now has something to do
3  with directorship.
4  BY MR. MORRIS:
5      Q.  Can we put the chart back up,
6  Exhibit 1, please?
7          (Exhibit 1 on screen.)
8  BY MR. MORRIS:
9      Q.  Do you know whether Mr. Scott held
10  any position at all with Charitable DAF HoldCo,
11  Ltd., at any time?
12      A.  I don't know.
13      Q.  Can you identify any person who's
14  ever -- who you believe had the authority to
15  act on behalf of the Charitable DAF HoldCo,
16  Ltd., prior to March 1st, 2021?
17          MR. SBAITI:  Objection, assumes
18      facts not in evidence.
19      A.  I don't know.
20  BY MR. MORRIS:
21      Q.  You can't name anybody in the world
22  who was authorized on behalf of -- who was
23  authorized to act on behalf of the Charitable
24  DAF HoldCo, Ltd., prior to March 1st, 2021?

Page 309

Dondero - 6-1-2021

1          MR. TAYLOR:  Objection, asked and
2      answered.
3          MR. SBAITI:  Objection, calls for a
4      legal opinion.
5      A.  I don't know.
6  BY MR. MORRIS:
7      Q.  How about the Charitable DAF Fund,
8  L.P.; can you identify anybody in the world who
9  was authorized to act on behalf of that entity
10  prior to March 1st, 2021?
11          MR. SBAITI:  Objection, calls for a
12      legal opinion.
13      A.  I mean, other than Grant Scott, the
14  org chart seems to roll up back up to him.
15  BY MR. MORRIS:
16      Q.  Okay.  So, you're willing to say
17  that Grant Scott acted on behalf of that
18  entity?
19          Do I have that right?
20          MR. TAYLOR:  That's not --
21      mischaracterizes his statements.  He's
22      giving you his general --
23          MR. MORRIS:  Just object to the form
24      of the question.  Please, no speaking

Page 310

Dondero - 6-1-2021

1  objections.  It's very simple.
2          MR. TAYLOR:  So, John, I'm going to
3      make my record.  If you don't like it, then
4      bring it up with the Judge.
5  BY MR. MORRIS:
6      Q.  Mr. Dondero, do you understand that
7  Mr. Scott was authorized to act on behalf of
8  the Charitable DAF Fund, L.P., prior to
9  March 1st, 2021?
10          MR. TAYLOR:  Objection, calls for a
11      legal conclusion.
12      A.  I -- I don't know.
13  BY MR. MORRIS:
14      Q.  Okay.  Do you know if anybody was
15  authorized to act on behalf of CLO HoldCo,
16  Ltd., prior to March 1st, 2021?
17          MR. TAYLOR:  Objection, calls for a
18      legal conclusion.
19      A.  I -- I don't know the specifics on
20  how this operated.
21  BY MR. MORRIS:
22      Q.  But you can't identify any person,
23  do I have that right, you don't know the
24  identity of any person who was ever authorized

Page 311

Dondero - 6-1-2021

1  to act on behalf of CLO HoldCo, Ltd., prior to
2  March 1st, 2021; is that right?
3          MR. TAYLOR:  Objection, calls for a
4      legal conclusion.
5          MR. MORRIS:  I'm not asking for a
6      legal conclusion.  I'm asking for
7      Mr. Dondero's knowledge of the facts or his
8      understanding of the facts.
9          MR. TAYLOR:  With all due respect,
10      it calls for a legal conclusion.
11          MR. MORRIS:  I cannot wait -- I
12      cannot wait until next Tuesday.  This is
13      going to be brilliant.
14  BY MR. MORRIS:
15      Q.  Mr. Dondero, let me try one last
16  time.
17          Can you identify any person who you
18  believed was authorized to act on behalf of CLO
19  HoldCo, Ltd., prior to March 1st, 2021?
20      A.  I need to answer the question this
21  way:  My knowledge begins and ends with Grant
22  as the trustee, or on this org chart, managing
23  member; and his control, it looks like it flows
24  down through all those entities.  Now -- or --

Page 312

Dondero - 6-1-2021

1 or ownership, at least, or maybe control or
2 agreement.
3
4        Now, what other people or boards or
5 trustees or -- or entity he had to go through,
6 whether US Cayman Guernsey, et cetera, to get
7 things done and where the assets were held, I
8 do not have specific knowledge and I don't know
9 the names of the people or the entities that
10 were on those boards or -- supervisory or
11 holders of shares, or whatever.  I wasn't
12 specifically involved in the operation of this
13 structure.
14     Q.    Did the Charitable DAF Fund, L.P.,
15 and Highland Capital Management, L.P., enter
16 into an Amended and Restated Investment
17 Advisory Agreement, to the best of your
18 knowledge?
19     A.    There was an Investment Advisory
20 Agreement, as far as I knew.
21     Q.    And what is your understanding of
22 the purpose of the Investment Advisory
23 Agreement?
24     A.    Excuse me.
25        To provide portfolio management to

Page 313

Dondero - 6-1-2021

1 achieve adequate returns on the portfolio to
2 support the charitable giving of the DAF.
3
4     Q.    Did Mr. Scott lack the capability to
5 provide portfolio management services to the
6 Charitable DAF Fund, L.P., to the best of your
7 knowledge?
8     A.    I would not say that.
9     Q.    So why -- why did -- withdrawn.
10        Was the -- did you participate in
11 the negotiation -- withdrawn.
12        Can we please put up the next
13 exhibit?  We'll call it Exhibit 3.
14        (Exhibit 3 introduced.)
15 BY MR. MORRIS:
16     Q.    Do you see this is an Amended and
17 Restated Investment Advisory Agreement between
18 the Charitable DAF Fund, L.P.; the Charitable
19 DAF, GP, LLC; and Highland Capital Management,
20 L.P.?
21     A.    Yes.
22     Q.    Is this the agreement you were just
23 referring to?
24     A.    Unless there was another amended
25 one.  I believe there was always one -- best

Page 314

Dondero - 6-1-2021

1 practice is to have an investment advisory
2 group.
3     Q.    And do you know who prepared this
4 document?
5     A.    No.
6     Q.    Do you know if it was the subject of
7 any negotiation?
8     A.    I don't know.
9     Q.    Do you know if the Charitable DAF
10 Fund, L.P., or the Charitable DAF GP, LLC, had
11 independent counsel in connection with the
12 negotiation and execution of this Amended and
13 Restated Investment Advisory Agreement?
14     A.    I don't know.
15     Q.    Do you know if the Charitable DAF
16 Fund, L.P., or the Charitable DAF GP, LLC, ever
17 hired independent counsel prior to the
18 commencement of Highland's bankruptcy in
19 October 2019?
20     A.    I don't know.
21     Q.    Did those entities also enter into a
22 Shared Services Agreement with Highland Capital
23 Management?
24     A.    I believe there was a Shared

Page 315

Dondero - 6-1-2021

1 Services Agreement.  I don't know which DAF
2 entities entered it.
3     Q.    Before we get to that, pursuant to
4 the Investment and Advisory Agreement, did
5 Highland Capital Management, L.P., manage the
6 assets of the DAF and CLO HoldCo?
7        MR. TAYLOR:  Objection, vague.
8     A.    Can you repeat the question again?
9 BY MR. MORRIS:
10     Q.    Sure.  Is it your understanding that
11 pursuant to this agreement, HCMLP managed the
12 assets of the DAF and CLO HoldCo?
13     A.    This agreement discusses the DAF,
14 right?
15        This disagreement doesn't discuss
16 CLO HoldCo, right?
17     Q.    Do you know whether HCMLP ever had
18 any agreement of any kind with CLO HoldCo
19 pursuant to which it managed CLO HoldCo's
20 assets?
21     A.    I don't know for certain.
22     Q.    Do you have any understanding at all
23 as to whether such an agreement existed?
24     A.    I -- I don't know for certain.  I'm

Appx. 01711

Page 316

Dondero - 6-1-2021

1 willing to be refreshed.

2    Q.   Do you know who provides --

3 withdrawn.

4       Do you know whether anybody provides

5 independent -- withdrawn.

6       Do you know whether anybody has an

7 agreement with the Charitable DAF Fund, L.P.,

8 or the Charitable DAF GP, LLC, today similar to

9 the type that had been previously entered into

10 with HCMLP?

11       MR. TAYLOR:  Objection, vague.

12    A.   I believe Skygate has a similar --

13 similar agreements in place.

14 BY MR. MORRIS:

15    Q.   Is it your understanding that

16 Skygate effectively replaced HCMLP as the

17 investment advisor to the DAF?

18    A.   Let me clarify that for a second.

19       I believe Skygate has the Shared

20 Services Agreement.  I don't know whether it's

21 Skygate or NexPoint has the Investment Advisory

22 Agreement or if it was another entity.  I

23 don't -- I don't know.  I -- I don't know the

24 specifics.

Page 317

Dondero - 6-1-2021

1    Q.   Okay.  While Mr. Scott served -- I

2 think you said as the trustee of the DAF, can

3 you identify any investment decision that HCMLP

4 had recommended that Mr. Scott rejected?

5    A.   No.

6    Q.   Can you think of any investment that

7 Mr. Scott made on behalf of the DAF that didn't

8 originate with HCMLP?

9    A.   He wasn't the investment advisor,

10 but, no, I don't -- I don't recall.

11    Q.   Let's just speed this up a bit.

12       Do you recall that in October 2019,

13 the debtor filed for bankruptcy?

14    A.   Yes.

15    Q.   And do you recall that after the

16 debtor filed for bankruptcy, CLO HoldCo, Ltd.,

17 retained John Kane to act as counsel on its

18 behalf?

19    A.   I -- I know he was retained.  I

20 don't know which entities in particular.

21    Q.   Do you have any understanding as to

22 who Mr. Kane represented?

23    A.   My understanding was that he

24 represented the DAF.  Now, whether it included

Page 318

Dondero - 6-1-2021

1 all entities, CLO HoldCo, the offshore

2 entities, which entities, I -- I don't know.

3    Q.   Do you know if -- do you know how

4 Mr. Kane came to be retained by the DAF?

5       MR. SBAITI:  Objection to the extent

6 it calls for the DAF's confidential

7 privileged information (inaudible).

8    A.   I -- I don't remember.  I know the

9 lawyers -- I let the legal department or

10 lawyers find and identify good -- I let them go

11 through the process of identifying and vetting

12 law firms.

13 BY MR. MORRIS:

14    Q.   And are the lawyers that you're

15 referring to in-house counsel at HCMLP?

16    A.   I -- I don't know which lawyers were

17 involved.

18    Q.   Well, you just said that you let the

19 lawyers do the vetting.  Which lawyers were you

20 referring to?

21    A.   It could have been the HCMLP

22 lawyers, it could have been NexPoint lawyers.

23 I don't know.

24    Q.   Could it have been any other lawyers

Page 319

Dondero - 6-1-2021

1 besides the HCMLP lawyers and the NexPoint

2 lawyers?

3    A.   I mean -- yes.  I mean, sometimes we

4 get recommendations from outside counsel

5 regarding other outside counsel.  The

6 recommendation could have come from one of the

7 other bankruptcy attorneys involved in the

8 case.  I don't know.

9    Q.   Do you recall that in October 2020,

10 Mr. Scott caused CLO HoldCo to amend its proof

11 of claim?

12       MR. TAYLOR:  Objection, assumes

13 facts not before the witness.

14    A.   Yeah, I don't -- I don't know.

15 BY MR. MORRIS:

16    Q.   Let me take it out of the --

17       (Simultaneous conversation.)

18 BY MR. MORRIS:

19    Q.   Okay.  Let me take it out of the

20 time frame.

21       Do you recall that there came a

22 moment in time when Mr. Scott caused CLO HoldCo

23 to amend its proof of claim by reducing the

24 value of the claim to zero dollars?

Page 320

Dondero - 6-1-2021

1
2     A.   I -- I know there was ultimately a
3   settlement agreement.  I don't know how that
4   manifested itself.
5     Q.   Okay.  So, just to be clear, you
6   don't have any memory of CLO HoldCo --
7   withdrawn.
8         Do you have a memory of CLO HoldCo
9   filing its original proof of claim in the
10  amount of approximately $11 million?
11    A.   I -- I don't recall the amount.  I
12  do remember that the DAF was overbilled by
13  Highland and there was a claim.  Whether it was
14  a POC or an administrative claim or -- I don't
15  know how that manifested itself in the
16  bankruptcy.  It's -- yeah.
17    Q.   Okay.  And regardless of the form of
18  the claim, do you remember that there came a
19  point in time when Mr. Scott amended the claim
20  to reduce the value to zero?
21    A.   I -- I heard a hundred thousand
22  dollars, but it's essentially zero, I guess.
23    Q.   And did you know that Mr. Scott was
24  going to amend the proof of claim in that
25  manner prior to the time that he actually did

Page 321

Dondero - 6-1-2021

1
2   so?
3         MR. TAYLOR:  Objection to the extent
4     it calls for him to invade the
5     attorney-client privilege.
6     A.   I don't -- I don't have knowledge of
7   what you just said.  I -- my recollection is
8   there was a legitimate overbilling that
9   Highland did to multiple parties who have
10  pursued multiple -- those multiple claims
11  against the estate, but I don't have -- I don't
12  have specific knowledge of why the 11 was
13  reduced to zero, but --
14  BY MR. MORRIS:
15    Q.   Did you ever discuss with Mr. Scott
16  his decision to reduce the claim to zero?
17    A.   Not -- not before he did it.
18    Q.   At any time, did you ever discuss
19  with Mr. Scott his decision to reduce the claim
20  to zero?
21    A.   I believe afterwards.
22    Q.   And what do you recall about your
23  discussions with Mr. Scott afterwards?
24    A.   That he had given up bona fide
25  claims against the debtor, and I didn't

Page 322

Dondero - 6-1-2021

1
2   understand why.
3     Q.   Did he explain to you why he thought
4   he was not giving up bona fide claims --
5   withdrawn.
6         What did he say in response?
7         MR. SBAITI:  Objection, calls
8     for legal --
9         (Audio distortion.)
10  BY MR. MORRIS:
11    Q.   If anything?
12    A.   I don't remember him having an
13  explanation.
14    Q.   Was anybody else -- did anybody else
15  participate in this discussion?
16    A.   No.
17    Q.   Did this discussion occur in a
18  singular phone call, or was it in multiple --
19  during multiple conversations?
20    A.   A couple, one or two.
21    Q.   Do you remember anything about your
22  discussions with Mr. Scott concerning his
23  decision to amend CLO HoldCo's proof of claim
24  by reducing it to zero, other than what you've
25  testified to so far?

Page 323

Dondero - 6-1-2021

1
2         MR. TAYLOR:  Objection, vague.
3     A.   No, but I'm willing -- I'm willing
4   to be refreshed or answer more questions, but
5   those are the only things that come to mind.
6   BY MR. MORRIS:
7     Q.   Okay.  So, I think what you've told
8   me--and I just want to make sure that I have
9   this right--that after the amendment was filed,
10  you had several conversations with Mr. Scott in
11  which you told him that you believed he had
12  given up bona fide claims against the debtor,
13  but that you don't recall what, if anything, he
14  said in response.
15        Have I missed anything?
16    A.   You used "several."  It's -- I said
17  "a couple."
18    Q.   Okay.
19    A.   But otherwise, that's -- that's my
20  testimony.
21    Q.   Do you recall that sometime after
22  that, CLO HoldCo had filed an objection to the
23  proposed HarbourVest Settlement?
24    A.   Yes.
25    Q.   And did you subsequently learn that

Page 324

Dondero - 6-1-2021

1
2  CLO HoldCo withdrew its objection to the
3  HarbourVest Settlement?
4      A.   Yes.
5      Q.   Do you recall if you learned that
6  before or after CLO HoldCo withdrew its
7  objection -- withdrawn.
8          That wasn't a good question.
9          Did you know, prior to the time that
10  CLO HoldCo announced that it was withdrawing
11  its objection, that it intended to do so; or
12  did you learn about that after -- you know, as
13  the announcement was being made?
14      MR. SBAITI:  Objection, compound.
15      MR. TAYLOR:  Objection, compound.
16  BY MR. MORRIS:
17      Q.   You can answer.
18      A.   I learned about it at the hearing.
19  BY MR. MORRIS:
20      Q.   Were you surprised?
21      A.   Yes.
22      Q.   And why were you surprised?
23      A.   It was inappropriate.
24      Q.   Why did you believe it was
25  inappropriate?

Page 325

Dondero - 6-1-2021

1
2      A.   The night before, Counsel had
3  confirmed with other counsel.
4      MR. TAYLOR:  Instruct the witness
5  not to reveal any privileged information.
6      THE WITNESS:  Okay.
7  BY MR. MORRIS:
8      Q.   Mr. Dondero, you and I have done
9  this many, many times.  I hope that you
10  understand that I'm never, ever asking or
11  hoping that you'll mistakenly divulge
12  attorney-client communications.
13      A.   Yeah.  Let me rephrase.
14      Q.   Yeah.  So, having said that, you
15  said that you believed it was inappropriate;
16  and the question is really simple:  Why did you
17  believe it was inappropriate?
18      A.   There was legal basis or legal
19  interpretation, I believed, in the governing
20  partnership agreement justifying the objection;
21  and I also believed there were duties under the
22  Advisors Act to -- for the DAF to continue with
23  its -- or to argue its objections.
24      Q.   And after you learned that Mr. Scott
25  instructed his attorneys to withdraw CLO

Page 326

Dondero - 6-1-2021

1
2  HoldCo's objection to the HarbourVest
3  Settlement, did you have a conversation with
4  Mr. Scott about his decision?
5      MR. TAYLOR:  Objection, assumes
6  facts not in evidence.
7      A.   Yeah, I don't agree with the first
8  part of that question, so I need you to
9  rephrase it, please.
10  BY MR. MORRIS:
11      Q.   After you -- after you learned that
12  CLO HoldCo withdrew the objection, did you
13  speak with Mr. Scott about that?
14      A.   Yes.
15      Q.   Okay.  Did you have one conversation
16  or more than one conversation with Mr. Scott
17  concerning CLO HoldCo's withdrawal of its
18  objection to the HarbourVest Settlement?
19      A.   I -- I only recall one.
20      Q.   Did anybody participate in that
21  conversation besides the two of you?
22      A.   No.
23      Q.   Did that conversation take place on
24  the telephone or in some other form?
25      A.   I -- I don't know.

Page 327

Dondero - 6-1-2021

1
2      Q.   Do you know how long after the
3  conclusion of the hearing the conversation took
4  place?  Was it the same day?  Was it
5  afterwards?
6      A.   I believe it was the same day or
7  shortly thereafter.
8      Q.   And what do you recall -- please
9  tell me everything you recall about the
10  conversation, everything that you said and
11  everything that he said.
12      A.   The only two points I remember was
13  that it was inappropriate for the DAF to change
14  direction an hour before the hearing without
15  informing anybody else when it was -- yeah,
16  when it was a reversal of the direction he had
17  been going in for weeks and that it was also
18  inappropriate to -- well, no, that's -- that
19  was -- that was really -- that was really it, I
20  guess.
21      Q.   Do you recall what, if anything,
22  Mr. Scott said in response?
23      MR. SBAITI:  Objection calls --
24  (inaudible.)
25      MR. MORRIS:  What's the basis for

1          Dondero - 6-1-2021
2     the objection?
3          MR. TAYLOR:  Objection, calls for
4     hearsay.
5          MR. SBAITI:  Calls for hearsay.
6   BY MR. MORRIS:
7     Q.    You can answer.
8     A.    That he had done it based on advice
9   of counsel.
10    Q.    Did you have any reason to doubt
11  that?
12    A.    It -- it didn't -- it didn't make
13  sense that counsel would change their opinion
14  between the night before and the morning of the
15  hearing, but I guess that -- that is a reason
16  to doubt it.
17    Q.    Do you think -- do you think
18  Mr. Scott acted in good faith when he made the
19  decision to withdraw CLO HoldCo's objection to
20  the HarbourVest Settlement?
21    A.    Can you ask that question -- ask
22  that question again, please?
23    Q.    Sure.  Do you believe that Mr. Scott
24  acted in good faith when he made the decision
25  to withdraw the CLO HoldCo objection to the

1          Dondero - 6-1-2021
2   HarbourVest Settlement?
3     A.    I don't believe he operated in the
4   best interest of the DAF or CLO HoldCo by
5   withdrawing the claims or withdrawing the
6   objectives -- objections.
7     Q.    Did you -- did the subject of the
8   Advisors Act come up during this conversation?
9     A.    I don't -- I don't remember if it
10  specifically came up.
11    Q.    Do you recall if the subject of
12  "fiduciary duties" came up in this
13  conversation?
14    A.    Not using those words, but reminding
15  him he needed to do what was in the best
16  interest of the DAF was definitely part of the
17  conversation.
18    Q.    Earlier you said -- and I -- if I
19  miss -- if I don't get this right, please feel
20  free to correct me; but I believe you said that
21  it was inappropriate for the DAF to change
22  direction without informing anybody else.
23         Do I have that right?
24    A.    Yes.
25    Q.    And who do you believe Mr. Scott

1          Dondero - 6-1-2021
2   needed to inform of his decision?
3     A.    There was some coordination and
4   cooperation among lawyers representing
5   different parties and I believe there was some
6   obligation -- some professional obligation as
7   part of that to inform and keep people abreast
8   of it.
9     Q.    And would the lawyers at Bonds
10  Ellis, your personal counsel, be among those
11  lawyers that you believed he had the
12  professional obligation to inform?
13         MR. SBAITI:  Objection --
14    A.    I don't know.
15         MR. SBAITI:  -- lacks foundation.
16    A.    I don't know who was in the
17  coordination group.
18  BY MR. MORRIS:
19    Q.    Do you believe that he had an
20  obligation to inform you in advance?
21         MR. SBAITI:  Objection, vague.
22    A.    I don't know if I would use the word
23  "obligation," but, again, as the founder and the
24  primary donor and continued donor to the DAF
25  and as the investment advisor fighting for

1          Dondero - 6-1-2021
2   above-average returns on a daily basis for the
3   fund, significant decisions that affect the
4   finances of the fund would be something I would
5   expect typically a trustee to discuss with a
6   primary donor.
7   BY MR. MORRIS:
8     Q.    And which primary donor are you
9   referring to?
10    A.    Highland, prior to bankruptcy, and
11  myself or NexPoint post-bankruptcy.
12    Q.    Is Dugaboy -- The Dugaboy Investment
13  Trust a donor to the DAF?
14         MR. SBAITI:  Objection, relevance.
15    A.    I -- I believe it's been a donor
16  over the years.  It wasn't the initial donor, I
17  don't believe.
18  BY MR. MORRIS:
19    Q.    How about the Get Good Trust?  Is
20  the Get Good Trust a donor to the DAF?
21         MR. SBAITI:  Objection, relevance.
22    A.    I don't know.
23  BY MR. MORRIS:
24    Q.    Do you know if either the Get Good
25  Trust or the Dugaboy Trust has any beneficial

Page 332

Dondero - 6-1-2021

1 interest in any of the DAF entities?

2 A. It does not -- or they do not.

3 Q. Do you know if either of the Get

4 Good or Dugaboy trusts have an interest in the

5 CLO HoldCo, Ltd., entity?

6 A. They -- they do not. They do not.

7 Q. Do you recall that a short while

8 later or -- or maybe even within the same

9 month, the debtor commenced a lawsuit against

10 the entities that we've referred to previously

11 as the Advisors, the Funds, and CLO HoldCo,

12 Ltd.?

13 A. Which litigation is that?

14 Q. That was the one where the debtor is

15 seeking injunctive relief; and there was a

16 hearing in late January on the debtor's motion

17 for preliminary injunction against the Funds,

18 the Advisors, and CLO HoldCo?

19 A. There's -- there's -- which

20 specifically?

21 Q. Do you remember that there came a

22 point in time when -- when Mr. Scott, on behalf

23 of CLO HoldCo, reached a settlement with the

24 debtor that resolved the debtor's claim against

Page 333

Dondero - 6-1-2021

1 CLO HoldCo, Ltd.?

2 A. I'm aware there was a settlement

3 that resolved most of his -- the -- most of the

4 issues with the debtor.

5 Q. Okay. And do you recall how you

6 learned about that settlement?

7 MR. TAYLOR: Objection to the extent

8 it invades any attorney-client privilege.

9 A. I learned about it after it was

10 done.

11 BY MR. MORRIS:

12 Q. Okay. And do you have an

13 understanding of the basic terms of the

14 settlement?

15 A. I think that was the hundred

16 thousand I spoke of earlier that the -- as the

17 11 or $12 million of overbilling that every

18 other entity has pursued, you know, for -- the

19 overbilling was traded for a hundred thousand

20 dollars, and the -- I think Grant agreed to not

21 pursue some historic actions and not pursue

22 replacement of HCMLP as manager, regardless of

23 whether it was in the best interest of the DAF

24 or not.

Page 334

Dondero - 6-1-2021

1 Q. And did you ever have a conversation

2 with Mr. Scott about his decision to enter into

3 that settlement on behalf of CLO HoldCo, Ltd.?

4 A. Yes.

5 Q. And did that -- did the

6 communications take place in one conversation,

7 more than one conversation, or in some other

8 form?

9 A. It was a couple times.

10 Q. Do you recall if anybody --

11 (Simultaneous conversation.)

12 BY MR. MORRIS:

13 Q. I'm sorry, were you finished?

14 A. It might have been just once, but

15 either one or two times.

16 Q. Okay. And did anybody participate

17 in that conversation other than the two of you?

18 A. No.

19 Q. Can you recall everything that was

20 discussed during that conversation, everything

21 that you recall saying in sum or substance and

22 everything that you can recall Mr. Scott

23 saying?

24 A. My message was what I just

Page 335

Dondero - 6-1-2021

1 articulated, that -- that the compromise or the

2 settlement wasn't in the best interest of the

3 DAF, it wasn't in the best interest of the

4 investments in the DAF.

5 Q. Do you recall how long the

6 conversation lasted?

7 A. No. It wasn't that long.

8 Q. Do you recall that shortly after

9 Mr. Scott reached the settlement on behalf of

10 CLO HoldCo, that he gave notice of his intent

11 to resign his positions with the DAF

12 entities and CLO HoldCo, Ltd.?

13 A. Yes.

14 Q. And do you recall that there was a

15 telephone conversation between and among you

16 and Mr. Scott and certain lawyers at around the

17 same time?

18 A. I don't -- I don't remember that

19 specifically with the lawyers.

20 MR. MORRIS: Can we please put up

21 the next exhibit, which I think we're

22 marking as Exhibit 4, which is Scott Bates

23 No. 11?

24 (Exhibit 4 introduced.)

Page 336

1          Dondero - 6-1-2021
2  BY MR. MORRIS:
3      Q.   So, I'll represent to you, at
4  Mr. Dondero, that the hearing at which the CLO
5  HoldCo, Ltd., settlement was presented took
6  place on January 26th.  And so, this is the
7  following Sunday.
8          And do you see there's a list of
9  people who were going to participate in a
10  conference call on Sunday, January 31st?
11     A.   Yes.
12     Q.   And you and Mr. Scott are among
13  those people?
14     A.   Yes.
15     Q.   Do you recall if this phone call
16  took place?
17     A.   Yes.
18     Q.   Do you recall the purpose of the
19  phone call?
20     A.   Yes.  It didn't have anything to do
21  with his resignation, this phone call.
22     Q.   So, what was the purpose of this
23  call?
24     A.   Earlier, I stated that to make -- to
25  pivot the plans or what he was -- or to

Page 337

1          Dondero - 6-1-2021
2  withdraw without telling anybody, to reach
3  settlements without telling anybody that had a
4  material negative impact on the DAF was
5  inappropriate.  And I believe the purpose of
6  this call was his representation that John Kane
7  had, in fact, told everybody, so -- but when I
8  spoke with everybody else, everybody said he
9  hadn't talked to them, and so to figure out --
10  to try and figure out what the truth was, we
11  had a conference call with everybody.
12     Q.   Did you figure out what the truth
13  was during that conference call?
14         MR. TAYLOR:  Objection.  I'm going
15     to have to instruct the client not to
16     answer.  This was a conversation with
17     attorneys that were acting in concert under
18     joint-defense agreement, or at least had a
19     common interest in litigation at that point
20     in time.
21         MR. MORRIS:  I think it's a little
22     late for that.
23  BY MR. MORRIS:
24     Q.   And there's no lawyer for you on
25  this call, at least that's identified on this

Page 338

1  email string, correct?
2         MR. TAYLOR:  That's incorrect.
3     You'll see -- note that Judge Lynn's -- why
4     it was his email, I don't know, but Judge
5     Lynn's email address is on there.
6         MR. MORRIS:  Okay.  I think having
7     told me the purpose of the call, I think he
8     ought to be able to disclose what the
9     result of the call was.  So I'm going to
10     ask my question again.
11  BY MR. MORRIS:
12     Q.   And that is, did you learn the truth
13  as to whether or not Mr. Kane had given advance
14  notice to any of the lawyers on this email
15  string about any of the decisions you're
16  referring to?
17         MR. TAYLOR:  I'm going to renew my
18     objection.  You can answer the question,
19     but I do want to state for the record we
20     believe it's inappropriate and if brought
21     up in later proceedings, we'll move to
22     strike.
23     A.   None of the lawyers on this email or
24  that participated in the call acknowledged any

Page 339

1          Dondero - 6-1-2021
2  advanced conversations with Kane.
3  BY MR. MORRIS:
4     Q.   Do you remember anything else about
5  the phone call that's referred to on this
6  exhibit?
7         MR. TAYLOR:  I'm just going to renew
8     my objection.
9     A.   No.
10  BY MR. MORRIS:
11     Q.   And do you recall that Mr. Scott
12  gave notice of his intent to resign on the same
13  day?
14     A.   I -- I didn't know it was exactly
15  the same day, but I knew it was on or around
16  that time.
17     Q.   Okay.
18         MR. MORRIS:  Can we pull up the next
19     exhibit, please, Exhibit Number 5, which is
20     Bates stamped Scott 18 and start at the
21     bottom.
22         (Exhibit 5 introduced.)
23  BY MR. MORRIS:
24     Q.   Do you recall receiving this email
25  from Mr. Scott on January 31st, in the

Page 340

Dondero - 6-1-2021

1
2 afternoon?
3     A.  Yes.
4     Q.   Do you know why Mr. Scott gave
5 notice of his resignation at that time?
6         MR. TAYLOR:  Objection, calls for
7     speculation.
8     A.  No.  It -- you would have to
9 answer -- I have my own speculation, but you
10 would have to ask him.
11 BY MR. MORRIS:
12    Q.   Did you ever have a conversation
13 with Mr. Scott where he informed you of the
14 reasons for his decision to give notice of his
15 resignation?
16        MR. TAYLOR:  Objection, calls for
17    hearsay.
18    A.   I knew he was suffering from anxiety
19 and health issues regarding the challenges and
20 the confrontation.
21        MR. MORRIS:  I move to strike.
22        I just want you to listen carefully
23    to my question, sir.
24 BY MR. MORRIS:
25    Q.   Did Mr. Scott tell you why he had

Page 341

Dondero - 6-1-2021

1
2 decided to give notice of his intent to resign?
3         MR. TAYLOR:  Objection, calls for
4     hearsay.
5     A.   He told me he was suffering from
6 health and anxiety issues regarding the
7 confrontation and the challenges of
8 administering the DAF, given the bankruptcy.
9 BY MR. MORRIS:
10    Q.   I'm sorry, did you use the word
11 "confrontation"?
12    A.   Yes.
13    Q.   Do you have an understanding as to
14 what confrontation he was referring to?
15        MR. TAYLOR:  Objection, calls for
16    speculation.
17    A.   I believe it was the interaction,
18 challenges of dealing with your firm.
19 BY MR. MORRIS:
20    Q.   Did you have any advanced notice
21 that Mr. Scott would be sending this email to
22 you?
23    A.   Not exactly.  But a couple days
24 beforehand, he did propose it, that he was
25 considering resigning.

Page 342

Dondero - 6-1-2021

1
2     Q.   Did you ever ask him to reconsider?
3     A.   No.
4     Q.   You'll see in the third paragraph,
5 he states, quote:  My resignation will not be
6 effective until I approve of the
7 indemnification provisions and obtain any and
8 all necessary releases.
9         Do you see that?
10    A.   Yes.
11    Q.   Did he ever explain to you why his
12 release wouldn't become -- his resignation
13 wouldn't become effective until those things
14 happened?
15        MR. TAYLOR:  Objection, calls for
16    hearsay.
17    A.   No.
18 BY MR. MORRIS:
19    Q.   Did he ever tell you who he wanted a
20 release from?
21        MR. TAYLOR:  Objection, calls for
22    hearsay.
23    A.   No.
24 BY MR. MORRIS:
25    Q.   Do you know if there is any

Page 343

Dondero - 6-1-2021

1
2 agreement today that relates to the
3 indemnification and release provisions cited in
4 Mr. Scott's email?
5         MR. SBAITI:  Objection, calls for a
6     legal conclusion, lacks foundation, lacks
7     relevance.
8     A.   There's no new agreement that I'm
9 aware of.  There's an existing agreement from
10 when he was originally put in place.
11 BY MR. MORRIS:
12    Q.   Did you ask for Mr. Scott's
13 resignation?
14    A.   No.
15    Q.   Did Mr. Scott or anybody acting on
16 his behalf ever explain to you or anybody
17 acting on your behalf why he wanted the
18 indemnification and release provisions?
19        MR. TAYLOR:  Objection, hearsay.
20    A.   No.
21 BY MR. MORRIS:
22    Q.   Did you ever say or suggest to
23 Mr. Scott that he had breached his fiduciary
24 duties to anybody at any time?
25    A.   I -- I don't -- I don't remember if

Appx. 01718

Page 344

Dondero - 6-1-2021

1  I spoke to anybody else about it.
2      Q.   I'm just asking if you ever -- if
3  you or anybody on your behalf ever told that to
4  Mr. Scott or anybody acting on Mr. Scott's
5  behalf, like Mr. Kane.
6          MR. SBAITI:  Objection, compound.
7      A.   I -- I believe I testified already
8  that I told him he didn't do what was in the
9  best interest of the fund.
10 BY MR. MORRIS:
11     Q.   And did you ever tell him, in sum or
12 substance, that you believed he had breached
13 his fiduciary duties to anybody in the world by
14 not acting in the best interest of the fund?
15         MR. SBAITI:  Objection, vague.
16     A.   I don't recall if I had those
17 discussions with somebody else.  I mean -- no,
18 that's -- I don't -- I don't recall if I've had
19 those conversations with anybody else.
20 BY MR. MORRIS:
21     Q.   Did you ever threaten to sue
22 Mr. Scott?
23     A.   Did I -- no.
24     Q.   Did you ever tell Mr. Scott that you
25

Page 345

Dondero - 6-1-2021

1  were considering suing him?
2      A.   I remember telling him he needed to
3  do what was in the best interest of the funds.
4  That's -- that's as far as I remember.
5      Q.   Did you ever tell Mr. Scott that you
6  believed that the fund had claims against him?
7      A.   I believe anytime you're a trustee
8  and you don't do what's in the best interest of
9  the funds, you leave yourself open for that,
10 potentially.
11     Q.   I appreciate that that's your
12 perspective, but I'm asking you whether you
13 ever told Mr. Scott that you believed that the
14 fund could assert claims against him.
15     A.   I don't recall that.
16     Q.   Do you recall if you ever told
17 Mr. Scott that you believed the fund should
18 assert claims against him?
19     A.   No, I don't recall that.
20     Q.   Okay.  Did you ever tell Mr. Scott
21 that you believed anybody in the world had
22 potential causes of action against him for
23 actions or inactions taken on behalf of the DAF
24 or CLO HoldCo?
25

Page 346

Dondero - 6-1-2021

1          MR. SBAITI:  Objection, vague.
2      A.   I don't recall that.
3  BY MR. MORRIS:
4      Q.   What did you do after you received
5  this email?
6          Withdrawn.
7          Did you do anything in response to
8  receiving this email?
9          MR. TAYLOR:  For the record, we're
10 talking about Exhibit 5?
11         MR. MORRIS:  Yes, I believe so.
12         Is that right, La Asia?
13         MR. TAYLOR:  For that -- sorry, 4.
14         MS. CANTY:  I'm sorry, John.  Repeat
15 that.
16         MR. MORRIS:  Is this document on the
17 screen Exhibit 5?
18         MS. CANTY:  It's going to be
19 Exhibit 5, but what we had -- we had
20 premarked them.  So, we skipped one in
21 sequence.  So, when I upload it, it will be
22 5.
23         MR. MORRIS:  Okay.  Thank you.
24         MS. CANTY:  You're welcome.
25

Page 347

Dondero - 6-1-2021

1          MR. MORRIS:  Yes, Clay, we're going
2  to -- ultimately, this will be marked as
3  Exhibit 5.
4          MR. TAYLOR:  Thank you.
5          MR. MORRIS:  Yeah.
6  BY MR. MORRIS:
7      Q.   So, the question, Mr. Dondero, is:
8  Do you recall doing anything after receiving
9  this email?
10         MR. TAYLOR:  Objection, vague.
11     A.   I don't remember doing anything with
12 it.  I -- I didn't know what to do with it.  I
13 didn't know how the DAF structure worked when
14 there was a resignation.
15 BY MR. MORRIS:
16     Q.   Did you ask Mr. Scott why he chose
17 to send it to you?
18     A.   No.
19     Q.   Did you forward it to anybody?
20     A.   I don't recall.
21     Q.   Did you notify anybody that you had
22 received this?
23     A.   I -- I don't remember.
24         MR. MORRIS:  Can we scroll up to

Page 348

Dondero - 6-1-2021

1           Dondero - 6-1-2021
2       Mr. Dondero's response?
3           (Scrolling.)
4   BY MR. MORRIS:
5       Q.   You can see --
6           MR. MORRIS:  That's perfect right
7       there.
8   BY MR. MORRIS:
9       Q.   You can see in the first sentence of
10  Mr. Scott's email there's a reference to
11  resigning and divesting.  Do you see that?  I'm
12  summarizing.
13      A.   Yes.
14      Q.   And you responded, and you requested
15  clarification that -- the next morning; is that
16  fair?
17          That's the first question.
18      A.   Yes.
19      Q.   And then you tried to explain to
20  Mr. Scott what your view was of the phrase
21  "divestment" or "divest."
22          Do I have that right?
23      A.   Yes.  Divest has a different meaning
24  in investments than it does, I guess, in legal
25  structuring; and I just wanted to make sure

Page 349

1           Dondero - 6-1-2021
2   you -- you didn't mean liquidation of the
3   assets.
4       Q.   Okay.  That's what I'm getting to.
5           MR. MORRIS:  So can we scroll up to
6   Mr. Scott's response?
7           (Scrolling.)
8   BY MR. MORRIS:
9       Q.   And Mr. Scott tried to clarify why
10  he -- he used the word "divest."  Do you see
11  that?
12      A.   Yes.
13      Q.   Okay.
14          MR. MORRIS:  And then if we can
15  scroll up to your response.
16          (Scrolling.)
17  BY MR. MORRIS:
18      Q.   Do you see your response says:  What
19  does that mean?  Quote, you need to tell me
20  ASAP that you have no intent to divest assets.
21          Do you see that?
22      A.   Yes.
23      Q.   Why did you write that?
24      A.   It was unpredictable -- some of his
25  behavior was unpredictable at this point.  I

Page 350

1           Dondero - 6-1-2021
2   just wanted to make sure he wasn't liquidating
3   or intending to liquidate the portfolio.
4       Q.   What interest did you have in making
5   sure that Mr. Scott didn't liquidate the
6   portfolio?
7       A.   It could materially damage the value
8   of the DAF and its ability to continue its
9   mission as a charitable entity.
10      Q.   Had Mr. Scott ever divested assets
11  before?
12          MR. TAYLOR:  Objection, vague.
13      A.   Well, by giving up the
14  11 million-dollar disclaim against the debtor,
15  he divested an 11 million-dollar asset.
16  BY MR. MORRIS:
17      Q.   Anything else?
18      A.   Not that I can recall.
19      Q.   When was the last time you
20  communicated with Mr. Scott?
21      A.   I sent him a Happy Birthday text a
22  couple days ago.
23      Q.   And when was the last time you spoke
24  with him?
25      A.   It's been a couple months.

Page 351

1           Dondero - 6-1-2021
2       Q.   Is the last time you spoke to him at
3   around the time that he gave notice of his
4   intent to resign?
5       A.   No.  It was about a month after
6   that.
7       Q.   Mr. Patrick replaced Mr. Scott as
8   the managing member of the DAF GP and as the
9   director of the affiliated DAF entities and CLO
10  HoldCo, correct?
11          MR. SBAITI:  Objection --
12          (Audio distortion.)
13      A.   Ultimately, yes.
14  BY MR. MORRIS:
15      Q.   Do you know how Mr. Patrick came to
16  replace Mr. Scott?
17          MR. TAYLOR:  Objection to the extent
18      it calls for a legal conclusion.
19      A.   I -- I found out about it after it
20  happened, you know, only from things that Mark
21  Patrick told me.
22  BY MR. MORRIS:
23      Q.   Did you know that it was going to
24  happen before the event occurred, before the
25  actual replacement occurred?

Page 352

Dondero - 6-1-2021

1
2    MR. TAYLOR:  Objection, relevance.
3    A.   No.
4  BY MR. MORRIS:
5    Q.   Do you know who -- who gave
6  Mr. Patrick -- withdrawn.
7        Do you know anything about the
8  circumstances by which Mr. Patrick replaced
9  Mr. Scott?
10   A.   I -- only from conversations with
11  Mark Patrick after the fact.
12   Q.   What did Mr. Patrick tell you?
13       MR. TAYLOR:  Objection, hearsay.
14   A.   He had struggled to -- he had
15  struggled to find other candidates or entities.
16  He had struggled with D&O insurance around some
17  of the alternative candidates.
18       And one day, when he was talking to
19  Grant Scott, they came to some -- I don't know
20  who said what to who, but that -- why doesn't
21  Mark Patrick do it and he has knowledge of the
22  structure, he enjoys the charitable giving
23  part.
24       And unbeknownst to me, they agreed,
25  and he sent over the appropriate documentation

Page 353

Dondero - 6-1-2021

1
2  or transfer of shares of voting--again, I don't
3  know how it works specifically--and Grant
4  signed it, and Mark Patrick became the trustee.
5  BY MR. MORRIS:
6    Q.   So, it's your testimony that, prior
7  to the time they signed the documentation
8  pursuant to which Patrick replaced Scott, you
9  had no knowledge that there were discussions
10  underway pursuant to which that would occur?
11   A.   Correct.
12   Q.   You mentioned that Mr. Patrick told
13  you that they had trouble getting D&O
14  insurance.
15       Do I have that right?
16   A.   That was -- yeah, that was one of
17  the factors with a couple of the candidates.
18   Q.   And did he tell you who those
19  candidates were?
20       MR. TAYLOR:  Objection, hearsay.
21   A.   He did at the time.  I can't
22  remember who they were.  One was -- one was a
23  former Dean Foods executive, I believe; and the
24  other was an offshore sole practitioner.
25  BY MR. MORRIS:

Page 354

Dondero - 6-1-2021

1
2    Q.   Did he tell you what the
3  difficulties were in obtaining D&O insurance?
4    A.   No.
5    Q.   Did you ask?
6    A.   No.
7    Q.   Do you know where Mr. Patrick got
8  the authority to -- withdrawn.
9        Do you know who determined to
10  replace Mr. Scott with Mr. Patrick?
11       MR. TAYLOR:  Objection to the extent
12       it calls for a legal conclusion.
13   A.   As I testified, I believe it was the
14  two of them together.
15  BY MR. MORRIS:
16   Q.   And do you have any understanding as
17  to what authority they had to designate
18  Mr. Scott's successor?
19       MR. TAYLOR:  Objection, calls for a
20       legal conclusion.
21   A.   I -- I believed, between the two of
22  them, they knew how the structure worked, and I
23  believed between the two of them, they had
24  authority -- believed they had authority, and
25  that's why they effectuated it.

Page 355

Dondero - 6-1-2021

1
2  BY MR. MORRIS:
3    Q.   Okay.  Was Mr. Patrick ever employed
4  by HCMLP?
5    A.   Yes.
6    Q.   Do you know what period of time he
7  was employed by HCMLP?
8    A.   He's been there for quite a while.
9  I mean, he was there for quite a while.  I
10  believe over a decade.
11   Q.   And what positions did he hold, if
12  you recall?
13   A.   He headed up our tax department.  I
14  don't remember him having any position other
15  than that or before that.
16   Q.   Is he a lawyer, to the best of your
17  knowledge?
18   A.   He's -- he's a tax lawyer, yeah.
19   Q.   And do you know if he's employed
20  today?
21   A.   I -- yes.
22   Q.   Do you know where he's employed?
23   A.   Yes.
24   Q.   Where do you understand Mr. Patrick
25  is employed?

Page 356

Dondero - 6-1-2021

1
2      A.    At SkyBridge.
3      Q.    Do you know where SkyBridge's
4  offices are located?
5      A.    Yes.
6      Q.    Where are they located?
7      A.    On McKinney Avenue.  I believe it's
8  2515.
9      Q.    Is that the same suite of offices
10  where your office is located?
11          MR. SBAITI:  Objection, vague.
12      A.    It's not the same floor.  We -- we
13  left, as you know, the Highland offices
14  suddenly, and so until we establish permanent
15  office locations, they're located there, but I
16  expect they will be relocating in the
17  not-too-distant future.
18  BY MR. MORRIS:
19      Q.    Did you have any discussions with
20  Mr. Patrick concerning the positions he was
21  inheriting from Mr. Scott before he agreed to
22  accept them?
23      A.    No.
24      Q.    Do you have any written or oral
25  agreements with Mr. Patrick of any kind?

Page 357

Dondero - 6-1-2021

1
2          MR. SBAITI:  Objection --
3          MR. TAYLOR:  Objection, vague.
4      A.    Yeah, not that I know of, but I'm
5  not sure what you're asking.
6  BY MR. MORRIS:
7      Q.    All right.  Do you have any written
8  or oral agreements of any kind with Mr. Patrick
9  pertaining to his role as an authorized
10  representative of any of the DAF entities or
11  CLO HoldCo, Ltd.?
12          MR. TAYLOR:  Objection, vague.
13      A.    I do not, no.
14  BY MR. MORRIS:
15      Q.    Do you know if Mr. Patrick has any
16  agreement with any of the DAF entities or CLO
17  HoldCo, Ltd., other than those set forth in the
18  limited partnership agreement and the Amended
19  and Restated Limited Liability Company
20  Agreement for the general partnership?
21      A.    I don't know of any.
22      Q.    Okay.  So, there was almost a
23  two-year period between the date that Mr. Scott
24  sent his notice to you of his intent to resign
25  and Mr. Patrick's replacement of Mr. Scott at

Page 358

Dondero - 6-1-2021

1  the end of March.  Do I have that right?
2      Q.    MR. TAYLOR:  Objection.  I think you
3          said two-year period.
4          MR. MORRIS:  If I did, let me
5          restate it.
6  BY MR. MORRIS:
7      Q.    There was approximately a two-month
8  period between the time that Mr. Scott sent his
9  notice to you of his intention to resign and
10  Mr. Patrick's replacement at the end of
11  March 2021.  Do I have that right?
12      A.    Yes.
13      Q.    Okay.  Are you aware that during
14  that interim period, Mr. Patrick gave certain
15  instructions to Mr. Scott?
16          MR. TAYLOR:  Objection, calls for
17          hearsay.
18          MR. SBAITI:  Lacks foundation.
19      A.    I -- I don't know specifically.
20  BY MR. MORRIS:
21      Q.    Do you know generally?  Are you
22  aware of any instructions that Mr. --
23  withdrawn.
24          Can I call that period between
25

Page 359

Dondero - 6-1-2021

1  January 31st and the time that Mr. Patrick
2  formally replaced Mr. Scott as "the interim
3  period"?  Is that okay?
4      A.    Sure.
5      Q.    Okay.  Did you ever learn at any
6  time during the interim period that Mr. Patrick
7  was giving Mr. Scott instructions with respect
8  to the duties and responsibilities concerning
9  the DAF and CLO HoldCo?
10          MR. SBAITI:  Objection, assumes
11          facts not in evidence.
12      A.    Not that I recall.
13  BY MR. MORRIS:
14      Q.    Okay.  Did you communicate with
15  Mr. Scott at all during the interim period
16  other than the birthday text that you
17  mentioned?
18          MR. SBAITI:  Objection, misstates
19          testimony.
20      A.    I don't -- I don't recall.  I mean,
21  I know I've had some conversations with him,
22  yeah, about that -- I have a house in Aspen
23  but -- and we had some conversations about
24  Aspen and skiing and stuff like that, but I

Page 360

Dondero - 6-1-2021

2 don't remember -- I don't remember
3 specifically --
4 BY MR. MORRIS:
5     Q.   Did -- did --
6     A.   -- anything else.
7     Q.   -- Mr. Patrick --
8         I apologize, Mr. Dondero.  Were you
9 finished?
10     A.   Yeah, I'm done.
11     Q.   Okay.  Did Mr. Patrick inform you of
12 any issues that were being raised that needed
13 to be addressed with Mr. Scott during the
14 interim period?
15     A.   Not that I recall.
16     Q.   Did you ever instruct Mr. Patrick on
17 what to tell Mr. Scott with respect to any
18 matter concerning any of the DAF entities or
19 CLO HoldCo during the interim period?
20     A.   Not that I recall.
21     Q.   Are you familiar with the phrase
22 "adherence agreement"?
23     A.   No.
24         MR. MORRIS:  Can we please put up
25     the next exhibit, which we'll mark as

Page 361

Dondero - 6-1-2021

2 Exhibit 6, Grant Scott, beginning at Bates
3 No. 85.
4         (Exhibit 6 introduced.)
5         MR. MORRIS:  And if we could --
6 BY MR. MORRIS:
7     Q.   Did you ever learn that there was a
8 point in time when the debtor was requesting
9 that CLO HoldCo, Ltd., enter into an adherence
10 agreement?
11     A.   No.
12         MR. MORRIS:  Can we scroll up a
13     little bit, please?
14         (Scrolling.)
15         MR. MORRIS:  And just a little
16     further.
17         (Scrolling.)
18 BY MR. MORRIS:
19     Q.   And do you see that Grant Scott
20 forwards it to Mark Patrick and says, "This
21 relates to the second issue from the debtor"?
22     A.   Yes.
23         MR. MORRIS:  And can you scroll up a
24     little more?
25         (Scrolling.)

Page 362

Dondero - 6-1-2021

2 BY MR. MORRIS:
3     Q.   And you see Mr. Patrick's
4 instruction, "Do not sign the adherence
5 agreement from the debtor.  The successor will
6 address this"?
7     A.   Yes.
8     Q.   Do you have any knowledge that
9 Mr. Patrick instructed Mr. Scott on March 2nd,
10 2001, not to sign an adherence agreement from
11 the debtor?
12     A.   I have no knowledge prior to this.
13     Q.   Okay.
14         MR. MORRIS:  Can you scroll to the
15     top?
16         (Scrolling.)
17 BY MR. MORRIS:
18     Q.   Do you see Mr. Patrick further
19 instructed Mr. Scott on March 2nd to, quote,
20 "Stand down on any communication," close quote?
21     A.   Yes.
22     Q.   Were you aware that Mr. Patrick had
23 instructed Mr. Scott to stand down?
24     A.   No.
25     Q.   Did you ever tell Mr. Patrick to

Page 363

Dondero - 6-1-2021

2 instruct Mr. Scott to stand down?
3     A.   No.
4     Q.   Do you have any understanding as to
5 where Mr. Patrick obtained the authority to
6 instruct Mr. Scott to stand down?
7         MR. SBAITI:  Objection, vague,
8     assumes facts not in evidence.
9     A.   I -- I wouldn't view it as an
10 authority issue.  I think they had a long-term
11 relationship, friendship, working relationship
12 with regard to the DAF; and I think Mark was
13 giving him advice.
14         MR. MORRIS:  Okay.  It's 12:20 New
15     York time.  I'd like to just take a short
16     break until 12:30, and I shouldn't have too
17     much more left.
18         MR. TAYLOR:  Okay.
19         (Recess held 11:19a-11:31a.)
20         MR. MORRIS:  Okay.  Hopefully just
21     15 or 20 minutes more.  A half hour at
22     most, I promise.
23 BY MR. MORRIS:
24     Q.   Are you ready to proceed,
25 Mr. Dondero?

Appx. 01723

Page 364

Dondero - 6-1-2021

1
2     A.   Yes.
3     Q.   You've told me that you expressed to
4  Mr. Scott--and I'm, you know,
5  paraphrasing--that you expressed to Mr. Scott
6  your concerns with respect to his – certain of
7  the decisions that he made during the course of
8  the bankruptcy.
9         Do I have that right?  Is that fair?
10    A.   Yes.
11    Q.   Do you know whether anybody else
12 besides yourself expressed any concerns to
13 Mr. Scott concerning any of the decisions that
14 he made during the post-petition period?
15         MR. SBAITI:  Objection, vague.
16    A.   I – I don't recall.
17 BY MR. MORRIS:
18    Q.   Are you aware of anybody other than
19 yourself telling Mr. Scott, in sum or
20 substance, that any of the decisions he made
21 post-petition were inappropriate or not in the
22 best interests of the DAF or CLO HoldCo, Ltd.?
23    A.   I don't know.
24    Q.   Okay.  You're not aware of anybody;
25 is that fair?

Page 365

Dondero - 6-1-2021

1
2     A.   Not as I sit here today.
3     Q.   Okay.  We talked earlier about the
4  suggestion – and again, if I get this wrong,
5  just correct me.
6         But I think you testified that
7  implicit in your conversations with Mr. Scott
8  was your belief that he wasn't acting in the
9  best interests of the DAF and CLO HoldCo, Ltd.,
10 and had breached his fiduciary duties; is that
11 fair?
12    A.   I think I testified that I didn't
13 use the word "fiduciary duties" but – I don't
14 recall using those words, but I do recall
15 stating that he was making decisions that
16 weren't in the best interest of the fund.
17    Q.   Okay.  And I appreciate the
18 clarification and – I appreciate the
19 clarification.
20         Do you have your own personal belief
21 as to whom Mr. Scott owed fiduciary duties to?
22         MR. SBAITI:  Objection, vague.
23         MR. MORRIS:  Withdrawn.
24         I'm going to try and do this a
25 different way.

Page 366

Dondero - 6-1-2021

1
2         Ms. Canty, can we please put back up
3  on the screen Exhibit 1?
4         (Exhibit 1 on the screen.)
5  BY MR. MORRIS:
6     Q.   Can you see that, sir?
7     A.   Yes.
8     Q.   Is there any entity on this
9  Exhibit 1 that you do not believe Mr. Scott
10 owed a fiduciary duty to prior to the time of
11 his resignation in late March 2021?
12         MR. SBAITI:  Object to the extent it
13    calls for a legal conclusion.
14    A.   Yeah.  I – I can't answer that
15 question.
16 BY MR. MORRIS:
17    Q.   Well, do you believe that Mr. Scott
18 owed a fiduciary duty to the three entities
19 that have in their name "Charitable DAF"?
20         MR. SBAITI:  Same objection.
21    A.   Again, regardless of where the
22 assets are held, he has a responsibility, in my
23 mind, as the trustee or the managing member, to
24 optimize those assets and protect those assets
25 and to efficiently, effectively administer

Page 367

Dondero - 6-1-2021

1
2  expenses.
3  BY MR. MORRIS:
4     Q.   I appreciate that.  I'm just asking
5  you to whom he owes the duty to do those
6  things, if you have an understanding.  I'm
7  just – I'm not asking for a legal conclusion.
8  I'm asking you if you have an understanding as
9  to whom he owes those duties.
10    A.   Not specifically.
11    Q.   Okay.  Did you ever discuss at any
12 time with Mr. Patrick your views concerning
13 Mr. Scott's decision to withdraw the objection
14 to the HarbourVest Settlement?
15         MR. SBAITI:  Objection, vague, lacks
16    foundation.
17    A.   I don't – I don't specifically
18 recall.  It's – I'm willing to be refreshed,
19 but I – I don't specifically recall, but
20 that's – yeah, I don't specifically recall.
21 It's not – I don't want to speculate.
22 BY MR. MORRIS:
23    Q.   I don't want you to speculate,
24 either.
25         Do you have any recollection of –

Page 368

Dondero - 6-1-2021

1   at all of ever discussing with Mr. Patrick your
2   views as to Mr. Scott's decision to withdraw
3   the objection to the HarbourVest Settlement?
4        MR. TAYLOR:  Objection, asked and
5        answered.
6   A.   Yeah, I don't recall.
7   BY MR. MORRIS:
8        Q.   Did you -- do you have any
9   recollection at all of ever discussing with
10  Mr. Patrick your views concerning Mr. Scott's
11  decision to enter into the settlement agreement
12  on behalf of CLO HoldCo?
13       A.   I don't recall.
14       Q.   I'm sorry.  Are you -- yeah, are you
15  aware that CLO HoldCo and the DAF, Ltd.,
16  commenced the lawsuit against the debtor and
17  others in the United States District Court for
18  the Northern District of Texas?
19       A.   Yes.
20       Q.   Okay.
21       MR. MORRIS:  Can we put that
22       complaint up on the screen and mark it as
23       Exhibit 7, I believe?
24       (Exhibit 7 introduced.)

Page 369

Dondero - 6-1-2021

1   BY MR. MORRIS:
2        Q.   I'll just represent to you that this
3   is the first page of the complaint.  If you
4   need to refer to it for any purpose, just let
5   me know.
6        But I'm going to start with the
7   question of, have you ever seen a copy of the
8   complaint that was filed by the Charitable DAF
9   Fund, L.P., and CLO HoldCo, Ltd., against the
10  debtor and certain other entities?
11       A.   Yes.
12       Q.   When did you see the complaint for
13  the first time, that you recall?
14       MR. TAYLOR:  Objection, vague.
15       A.   Near final versions before it was
16  filed.
17  BY MR. MORRIS:
18       Q.   So you saw -- you saw versions of
19  the complaint before it was filed.  Do I have
20  that right?
21       A.   Yes.
22       Q.   Okay.  Did you participate in any
23  discussions concerning the substance of the
24  complaint before it was filed?

Page 370

Dondero - 6-1-2021

1        MR. TAYLOR:  I'm just going to
2   caution the witness:  You can tell him if
3   you participated in any conversations; but
4   to the extent that you had conversations
5   with any attorneys who were acting as
6   lawyers, please do not go into the
7   substance of those conversations.
8        A.   Yeah.  I mean, yes, I had
9   conversations with attorneys.
10  BY MR. MORRIS:
11       Q.   Which attorneys did you speak with
12  about this complaint before it was filed?
13       A.   Mazin.  I can't remember -- I can't
14  remember -- I talked to a lot of attorneys.  I
15  can't remember -- I can't remember besides
16  Mazin.
17       Q.   Okay.  Now, Mazin doesn't represent
18  you personally, does he?
19       A.   No.
20       Q.   Can you please tell me everything
21  you discussed with Mazin concerning this
22  complaint?
23       MR. TAYLOR:  Objection,
24       attorney-client privilege.

Page 371

Dondero - 6-1-2021

1        MR. SBAITI:  Well, I'm also -- DAF
2   is asserting work-product privilege and
3   joint-interest privilege regarding
4   communication through DAF with us.
5        MR. MORRIS:  I'm sorry.  I'm sorry.
6   I'm having a little trouble hearing you.  I
7   think I heard attorney work product.  What
8   over privileges are being asserted here?
9        MR. SBAITI:  Joint interest.  As
10  advisor to the DAF, he provided us some
11  information that we used and helped us
12  identify information that we were using.
13  So, helping his advisee's counsel perform
14  their duties falls under the work-product
15  privilege.  We're claiming work-product
16  privilege over the content of his
17  conversation.
18       MR. MORRIS:  Okay.  Did I hear
19  somebody say attorney-client privilege,
20  too?
21       MR. TAYLOR:  I had said that, but I
22  was just making sure that Mazin jumped in
23  with his objections --
24       (Whereupon, the court reporter's

Page 372

1          Dondero - 6-1-2021
2     computer crashed, calls were made, and an
3     iPad was engaged to finish the deposition.)
4          MR. MORRIS:  All right.
5     Mr. Dondero, can you hear me?
6          THE WITNESS:  Yes.
7          MR. MORRIS:  Mr. Court Reporter, can
8     you hear me?
9          THE REPORTER:  Yes, sir.
10    BY MR. MORRIS:
11         Q.   Mr. Dondero, did you provide any
12    comments to the Sbaiti firm on any draft of the
13    complaint before it was filed?
14         MR. SBAITI:  You can answer that
15         question yes or no.  I'll just instruct the
16         witness not to answer with any content of
17         any kind on the basis -- and we're
18         instructing him not to answer on the basis
19         of work-product privilege and
20         joint-interest privilege.
21         A.   Some.
22    BY MR. MORRIS:
23         Q.   Can you disclose for me all of the
24    information and comments you provided that --
25    to the draft complaints?

Page 373

1          Dondero - 6-1-2021
2          MR. SBAITI:  Instruct the witness
3     not to answer on the basis of work-product
4     privilege and joint-interest privilege.
5     BY MR. MORRIS:
6          Q.   Are you going to follow Counsel's
7     advice, Mr. Dondero?
8          A.   Yes.
9          Q.   Did you provide any conceptual or
10    strategic ideas about what claims to pursue to
11    the Sbaiti firm prior to the time the complaint
12    was filed?
13         MR. SBAITI:  Can you repeat the
14         question?
15    BY MR. MORRIS:
16         Q.   Did you provide any thoughts or
17    ideas as to what claims should be pursued in
18    this complaint prior to the time it was filed?
19         MR. TAYLOR:  I'm going to first
20         lodge an objection as to vague, and I
21         believe Mazin has some other objection.
22         MR. SBAITI:  Yeah.  I would -- I
23         will say the same objection, and we will
24         object to any content of the -- within the
25         attorney-client work-product and

Page 374

1          Dondero - 6-1-2021
2     joint-interest privilege.
3          A.   Not that I recall.
4     BY MR. MORRIS:
5          Q.   Did you provide any facts that are
6     set forth in the complaint?
7          Withdrawn.
8          Did you -- did you provide to the
9     Sbaiti firm any facts that are reflected in the
10    final version of the complaint?
11         MR. SBAITI:  Mr. Dondero, you can
12         answer that question yes or no; otherwise,
13         we instruct you not to answer on the basis
14         of -- the content on the basis of
15         attorney-client, work-product and
16         joint-interest privilege.
17         A.   Not that I recall.
18    BY MR. MORRIS:
19         Q.   You don't recall providing any facts
20    at all?
21         A.   Not specifically.
22         Q.   Did you provide any general facts or
23    ideas to the Sbaiti firm in connection with
24    your review of the drafts of the complaint?
25         MR. SBAITI:  Same instruction, same

Page 375

1          Dondero - 6-1-2021
2     objections.
3          A.   Maybe some.
4     BY MR. MORRIS:
5          Q.   Okay.  Can you describe those for
6     me, please?
7          MR. SBAITI:  I'll instruct you not
8         to answer that on the basis of
9         attorney-client work-product privilege and
10        joint-interest privilege.
11    BY MR. MORRIS:
12         Q.   Are you going to follow Counsel's
13    advice, Mr. Dondero?
14         A.   Yes.
15         Q.   Did you have any discussions with
16    the Sbaiti firm concerning whether or not to
17    name James Seery as a defendant in the original
18    complaint?
19         MR. SBAITI:  I'll instruct the
20         witness not to answer on the basis of
21         attorney-client, work-product and
22         joint-interest privilege as doing so would
23         reveal the contents of such communication.
24    BY MR. MORRIS:
25         Q.   Can you just answer yes or no?

Page 376

```
1           Dondero - 6-1-2021
2      A.   No.
3      Q.   You didn't have -- that wasn't part
4  of any of the discussions you had prior to the
5  time the complaint was filed?
6           MR. SBAITI: Same instruction. Just
7      don't answer.
8           THE WITNESS: So please don't
9      answer, right, or don't answer --
10          MR. SBAITI: Don't answer.
11          THE WITNESS: Okay.
12 BY MR. MORRIS:
13     Q.   Are you going to follow Counsel's
14 advice?
15     A.   Yes.
16     Q.   Did you -- did you suggest that
17 Mr. Seery should be named as a defendant in
18 this lawsuit to the Sbaiti firm prior to the
19 time it was filed?
20          MR. SBAITI: Instruct the witness
21     not to answer on the basis of
22     attorney-client work product and
23     joint-interest privilege, as doing so would
24     reveal the contents of those
25     communications.
```

Page 377

```
1           Dondero - 6-1-2021
2  BY MR. MORRIS:
3      Q.   Are you going to follow Counsel's
4  advice?
5      A.   Yes.
6      Q.   Did you know, prior to the time the
7  complaint was filed, that the Sbaiti firm
8  intended to file a motion for leave to amend
9  their complaint to add Mr. Seery as a
10 defendant?
11          MR. SBAITI: You can answer that
12     question yes or no, but, otherwise, it will
13     reveal the content of any underlying
14     communication on the basis of
15     attorney-client work product, or
16     joint-interest privilege.
17     A.   No.
18 BY MR. MORRIS:
19     Q.   When did you learn that the Sbaiti
20 firm filed a motion for leave to amend their
21 complaint to add Mr. Seery as a defendant?
22     A.   I don't -- I don't recall.
23     Q.   Do you recall whether you had any
24 conversations with anybody in the world at any
25 time prior to the time that motion was filed
```

Page 378

```
1           Dondero - 6-1-2021
2  regarding the possibility of filing a motion
3  for leave to amend the pleading to add
4  Mr. Seery as a defendant?
5           MR. SBAITI: Objection, vague, lacks
6      foundation; and instruct the witness not to
7      reveal the content of any communications on
8      the basis protected under the
9      attorney-client, work-product,
10     common-interest privilege.
11     A.   I don't recall.
12 BY MR. MORRIS:
13     Q.   Okay. Did you ever discuss with
14 Mr. Patrick the topic of whether or not
15 Mr. Seery should be sued?
16     A.   No.
17     Q.   Did you ever discuss with the Sbaiti
18 firm the topic of whether Mr. Seery should be
19 sued?
20          MR. SBAITI: Instruct the witness
21     not to answer on the basis of attorney work
22     product -- attorney-client, and
23     common-interest privilege as answering
24     would reveal the contents of such
25     communications, if they occurred.
```

Page 379

```
1           Dondero - 6-1-2021
2  BY MR. MORRIS:
3      Q.   Are you going to follow Counsel's
4  advise?
5      A.   Yes.
6           MR. MORRIS: I think I may be done.
7      Can we just take a three-minute
8      break and let me just check my notes?
9           MR. SBAITI: Sure.
10          (Recess held.)
11          MR. MORRIS: All right. I have no
12     further questions. I would request the
13     production of a privilege log reflecting
14     the communications, if any, between
15     Mr. Dondero and the Sbaiti firm; but,
16     otherwise, I have nothing further at this
17     time.
18          MR. SBAITI: Okay.
19          MR. MORRIS: Again, I appreciate
20     your time, Mr. Dondero.
21          MR. SBAITI: We'll reserve our
22     questions.
23          MR. MORRIS: Okay. Thank you,
24     everybody.
25          MR. SBAITI: Thank you. Take care.
```

Appx. 01727

Page 380

Dondero - 6-1-2021

1
2  THE REPORTER:  Mr. Sbaiti, do you
3  guys need a copy of this deposition?
4  MR. SBAITI:  Yeah, we would just
5  need a PTX of the deposition transcript and
6  soft copies of the exhibits.  Are you going
7  to send something to the witness to read
8  and sign?  I think you could send it to him
9  either directly or to Mr. Taylor on his
10  behalf.
11  (Time Noted:  12:01 p.m.)
12
13
14
        JAMES DONDERO
15
16  Subscribed and sworn to before me
    this _____ day of _____, 2021.
17
18
19
20
21
22
23
24
25

Page 381

Dondero - 6-1-2021

1
2       C E R T I F I C A T E
   STATE OF TEXAS     )
3                     )
   COUNTY OF ELLIS    )
4
5       I, Daniel J. Skur, a Notary Public
   within and for the State of Texas, do
   hereby certify:
6       That JAMES DONDERO, the witness whose
   deposition is hereinbefore set forth, was
7  duly sworn by me and that such deposition
   is a true record of the testimony given by
8  such witness.
       That pursuant to Rule 30 of the Federal
9  Rules of Civil Procedure, signature of the
   witness was reserved by the witness or
10  other party before the conclusion of the
   deposition;
11       I further certify that I am not
   related to any of the parties to this
12  action by blood or marriage; and that I am
   in no way interested in the outcome of this
13  matter.
14       IN WITNESS WHEREOF, I have hereunto
   set my hand this 1st day of June, 2021.
15
16
17
    _____
18       Daniel J. Skur
       Notary Public, State of Texas.
19  My Commission Expires 7/7/2022
   TSG Reporting, Inc.
20  228 East 45th Street, Suite 810
   New York, New York
21  (877) 702-9580
22
23
24
25

Page 382

1       Dondero - 6-1-2021
2  ERRATA SHEET FOR THE TRANSCRIPT OF:
3  Case Name:
       IN THE UNITED STATES BANKRUPTCY COURT
4    FOR THE NORTHERN DISTRICT OF TEXAS
           DALLAS DIVISION
5  In re:
   HIGHLAND CAPITAL        )  Case No.
6  MANAGEMENT, LP,         )  19-34054 L.P.
   Debtor,                 )  Chapter 11
7  ------------------------)
   HIGHLAND CAPITAL MANAGEMENT,  )
8  LP,                     )
                           )
9       Plaintiff,         )  Adversary No.
   vs.                     )  21-03003-sgi
10  JAMES D. DONDERO,       )
   Defendant.              )
11  Dep. Date:  06/01/2021
   Deponent:  JAMES DONDERO
12
   Reason codes:
13  1. To clarify the record.
    2. To conform to the facts.
14  3. To correct transcription errors.
15         CORRECTIONS:
16  Pg. LN.  Now Reads     Should Read    Reason
17  ___ ___  _____   _____  _____
18  ___ ___  _____   _____  _____
19  ___ ___  _____   _____  _____
20  ___ ___  _____   _____  _____
21  ___ ___  _____   _____  _____
22  ___ ___  _____   _____  _____
23  ___ ___  _____   _____  _____
24  ___ ___  _____   _____  _____
25  ___ ___  _____   _____  _____

Page 383

1       Dondero - 6-1-2021
2  ___ ___  _____   _____  _____
3  ___ ___  _____   _____  _____
4  ___ ___  _____   _____  _____
5  ___ ___  _____   _____  _____
6  ___ ___  _____   _____  _____
7  ___ ___  _____   _____  _____
8  ___ ___  _____   _____  _____
9  ___ ___  _____   _____  _____
10  ___ ___  _____   _____  _____
11  ___ ___  _____   _____  _____
12  ___ ___  _____   _____  _____
13  ___ ___  _____   _____  _____
14  ___ ___  _____   _____  _____
15  ___ ___  _____   _____  _____
16  ___ ___  _____   _____  _____
17
18       _____
        JAMES DONDERO
19
20
21  SUBSCRIBED AND SWORN BEFORE ME
    THIS _____ DAY OF _____, 2021.
22
23
    _____
24  (Notary Public)  MY COMMISSION EXPIRES:_____
25

Page 384

1          Dondero - 6-1-2021
2          -------I N D E X-------
3  WITNESS:    EXAMINATION BY     PAGE:
4  JAMES DONDERO
5        Mr. Morris         288
6
7              *****
8  --------------------EXHIBITS--------------------
9  Deposition Exhibits         PAGE/LINE
10  Exhibit 1   DAF/CLO Holder Structure   290/15
         Chart
11        Bates No. GScott000007
12  Exhibit 2   Amended and Restated     301/6
        Limited Liability Company
13        Agreement of Charitable
        DAF GP, LLC
14        Bates No. PATRICK_000031
        through 000035
15
    Exhibit 3   Amended and Restated     313/14
16        Investment Advisory
        Agreement
17        Bates No. GScott000325
        through 000340
18
    Exhibit 4   Phone Conference      335/25
19        Invitation For 1/31/2021
        Bates No. GScott000011
20
    Exhibit 5   January/February 2021    339/22
21        Email String Regarding
        Notice of Intent to Resign
22        and Divest From CLO
        HoldCo, Ltd., and Related
23        Entities
        Bates No. GScott000018
24        through 000019
25

Page 385

1          Dondero - 6-1-2021
2  --------------------EXHIBITS--------------------
3  Deposition Exhibits         PAGE/LINE
4  Exhibit 6   March 2021 Email String    361/4
        Regarding Highland
5        Adherence Agreement
        (Highland CLO Funding) in
6        Connection With Transfer
        of HarbourVest Shares
7        Bates No. GScott000085
        through 000088
8
    Exhibit 7   Original Complaint in Re:   368/25
9        Charitable DAF Fund, L.P.
        and CLO HoldCo, Ltd., V
10        Highland Capital
        Management, L.P. and
11        Others
        Bates No. GScott000389
12        through 000414
13
14
15
16
17
18
19
20
21
22
23
24
25

**Appx. 01729**

**$**

**$11** 320:10

**$12** 333:18

**0**

**00:-01** 289:9,10

**1**

**1** 290:15 301:5,9,12
308:7,8 366:3,4,9

**11** 321:12 333:18
335:24 350:14,15

**11:19a-11:31a**
363:19

**12:01** 380:11

**12:20** 363:14

**12:30** 363:16

**13** 299:3

**14** 299:3

**15** 299:3 363:21

**18** 339:20

**1st** 288:9 298:17
301:21 308:17,25
309:11 310:10,17
311:3,20 381:14

**2**

**2** 301:6,14

**20** 363:21

**2000s** 293:22

**2001** 362:10

**2012** 301:21 305:14

**2019** 314:20 317:13

**2020** 319:10

**2021** 288:10 298:18
308:17,25 309:11
310:10,17 311:3,20
358:12 366:11
380:16 381:14

**228** 381:20

**2515** 356:8

**26th** 336:6

**2nd** 362:9,19

**3**

**3** 313:13,14

**30** 381:8

**31st** 336:10 339:25
359:2

**4**

**4** 335:23,25 346:14

**45th** 381:20

**4940** 289:3

**5**

**5** 339:19,22 346:11,
18,20,23 347:4

**6**

**6** 301:4 361:2,4

**6-1-2021** 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1

356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1

**7**

**7** 368:24,25

**7/7/2022** 381:19

**8**

**810** 381:20

**85** 361:3

**877 702-9580**
381:21

**9**

**9:33** 288:17

**9:34** 288:10

**A**

**a.m.** 288:10,17

**ability** 350:8

**above-average**
331:2

**abreast** 330:7

**accept** 356:22

**accordance** 288:6

**achieve** 313:2

**acknowledged**
338:25

**act** 308:16,24 309:10
310:8,16 311:2,19
317:18 325:22 329:8

**acted** 309:18 328:18,
24

**acting** 337:17
343:15,17 344:5,15

**365:8** 370:6

**action** 345:23 381:12

**actions** 333:22
345:24

**actual** 351:25

**add** 377:9,21 378:3

**addition** 307:13

**address** 338:6 362:6

**addressed** 360:13

**adequate** 313:2

**adherence** 360:22
361:9 362:4,10

**administer** 366:25

**administering** 341:8

**administrative**
320:14

**advance** 330:20
338:14

**advanced** 339:2
341:20

**advice** 328:8 363:13
373:7 375:13 376:14
377:4

**advise** 379:4

**Advised** 293:23

**advisee's** 371:14

**advisor** 303:16,17,19
316:18 317:10
330:25 371:11

**Advisors** 325:22
329:8 332:12,19

**advisory** 312:17,19,
22 313:17 314:2,14
315:5 316:22

**affect** 331:3

**affiliated** 351:9

**afternoon** 340:2

**agree** 326:7

**agreed** 333:21
352:24 356:21

**agreement** 301:18
302:11 312:3,17,20,

23 313:17,22 314:14,
23 315:2,5,12,14,19,
24 316:8,21,23 320:3
325:20 337:18 343:2,
8,9 357:16,18,20
360:22 361:10 362:5,
10 368:12

**agreements** 316:14
356:25 357:8

**alternative** 352:17

**amend** 319:11,24
320:24 322:23 377:8,
20 378:3

**amended** 301:16
312:16 313:16,24
314:13 320:19
357:18

**amendment** 323:9

**amount** 320:10,11

**and/or** 295:9

**announced** 324:10

**announcement**
324:13

**answering** 378:23

**anxiety** 340:18 341:6

**anytime** 345:8

**apologize** 360:8

**appoint** 297:7
299:20,23 300:3,20

**appointed** 296:24
305:12

**appointing** 301:2

**appointment** 307:3

**approval** 299:12

**approve** 296:6 342:6

**approved** 305:25

**approximately**
301:23 320:10 358:8

**argue** 325:23

**articulated** 335:2

**ASAP** 349:20

**Asia** 346:13

**Aspen** 359:23,25

**assert** 345:15,19

**asserted** 371:9

**asserting** 371:3

**asset** 350:15

**assets** 295:24 296:4 312:7 315:7,13,21 349:3,20 350:10 366:22,24

**assumes** 303:10 307:7,18 308:18 319:13 326:5 359:11 363:8

**attorney** 371:8 378:21

**attorney-client** 321:5 325:12 333:9 370:25 371:20 373:25 374:15 375:9, 21 376:22 377:15 378:9,22

**attorneys** 319:8 325:25 337:17 370:6, 10,12,15

**audio** 289:8 300:12 322:9 351:12

**authority** 297:6 299:20 300:20 308:15 354:8,17,24 363:5,10

**authorized** 308:23, 24 309:10 310:8,16, 25 311:19 357:9

**Avenue** 356:7

**average** 303:4

**aware** 333:3 343:9 358:14,23 362:22 364:18,24 368:16

**B**

**back** 308:6 309:15 366:2

**background** 289:24

**bankruptcy** 314:19 317:14,17 319:8

320:16 331:10 341:8 364:8

**based** 328:8

**basic** 333:14

**basis** 325:18 327:25 331:2 372:17,18 373:3 374:13,14 375:8,20 376:21 377:14 378:8,21

**Bates** 335:23 339:20 361:2

**beginning** 293:17,21 361:2

**begins** 311:22

**behalf** 292:5 308:16, 23,24 309:10,18 310:8,16 311:2,19 317:8,19 332:23 334:4 335:10 343:16, 17 344:4,6 345:24 368:13 380:10

**behavior** 349:25

**belief** 365:8,20

**believed** 304:23 311:19 323:11 325:15,19,21 330:11 344:13 345:7,14,18, 22 354:21,23,24

**beneficial** 331:25

**birthday** 350:21 359:17

**bit** 317:12 361:13

**blood** 381:12

**boards** 306:20 312:4,10

**bona** 321:24 322:4 323:12

**Bonds** 330:9

**bottom** 339:21

**box** 294:10

**breached** 343:23 344:13 365:10

**break** 363:16 379:8

**brilliant** 311:14

**bring** 310:5

**brought** 338:21

**C**

**call** 313:13 322:18 336:10,15,19,21,23 337:6,11,13,25 338:8,10,25 339:5 358:25

**calls** 297:9 305:16,17 306:13 309:4,12 310:11,18 311:4,11 318:7 321:4 322:7 327:23 328:3,5 340:6,16 341:3,15 342:15,21 343:5 351:18 354:12,19 358:17 366:13 372:2

**candidate** 305:23

**candidates** 352:15, 17 353:17,19

**Canty** 346:15,19,25 366:2

**capability** 313:4

**capital** 292:6 295:9, 11,14 312:15 313:19 314:23 315:6

**care** 379:25

**carefully** 340:22

**carry** 292:5

**case** 319:9

**caused** 319:11,23

**caution** 370:3

**cautioned** 288:14

**Cayman** 312:6

**certify** 381:5,11

**cetera** 312:6

**challenges** 340:19 341:7,18

**change** 327:13 328:13 329:21

**changed** 293:18

**charitable** 291:19,21

292:5 294:5,6,25 295:23 301:18 304:6 307:14,15,16 308:11, 16,24 309:8 310:9 312:14 313:3,6,18 314:10,11,16,17 316:8,9 350:9 352:22 366:19 369:9

**charities** 306:21

**chart** 290:3,21 298:13 308:6 309:15 311:23

**Chase** 289:3

**check** 379:8

**chose** 347:17

**circumstances** 352:8

**cited** 343:3

**Civil** 381:9

**claim** 319:12,24,25 320:9,13,14,18,19,24 321:16,19 322:23 332:25

**claiming** 371:16

**claims** 321:10,25 322:4 323:12 329:5 345:7,15,19 373:10, 17

**clarification** 348:15 365:18,19

**clarify** 316:19 349:9

**Clay** 290:14 294:11 300:13 347:2

**clear** 294:3 300:9 320:5

**client** 337:15

**CLO** 290:22 295:17 307:17 310:16 311:2, 19 315:7,13,17,19,20 317:17 318:2 319:11, 23 320:6,8 322:23 323:22 324:2,6,10 325:25 326:12,17 328:19,25 329:4 332:6,12,19,24 333:2 334:4 335:11,13 336:4 345:25 351:9

357:11,16 359:10 360:19 361:9 364:22 365:9 368:13,16 369:10

**close** 362:20

**coach** 300:15

**collateralized** 304:11

**college** 297:20

**commenced** 332:10 368:17

**commencement** 314:19

**comments** 372:12, 24

**Commission** 381:19

**common** 337:19

**common-interest** 378:10,23

**communicate** 359:15

**communicated** 350:20

**communication** 362:20 371:5 375:23 377:14

**communications** 300:7,9 325:12 334:7 376:25 378:7,25 379:14

**Company** 301:17 357:19

**complaint** 368:23 369:4,9,13,20,25 370:13,23 372:13 373:11,18 374:6,10, 24 375:18 376:5 377:7,9,21

**complaints** 372:25

**compliant** 291:7

**complicated** 300:21 306:22

**compound** 324:14, 15 344:7

**compromise** 335:2

**computer** 372:2

**conceptual** 373:9

**concerns** 364:6,12

**concert** 337:17

**conclusion** 297:10 305:18 310:12,19 311:5,7,11 327:3 343:6 351:18 354:12, 20 366:13 367:7 381:10

**conducted** 288:6

**conference** 336:10 337:11,13

**confidential** 318:7

**confirmed** 325:3

**confrontation** 340:20 341:7,11,14

**connection** 289:15 314:12 374:23

**considered** 301:2

**contempt** 289:16

**content** 371:17 372:16 373:24 374:14 377:13 378:7

**contents** 375:23 376:24 378:24

**continue** 325:22 350:8

**continued** 330:24

**control** 311:24 312:2

**controlled** 303:21 304:2

**conversation** 319:18 326:3,15,16, 21,23 327:3,10 329:8,13,17 334:2,7, 8,12,18,21 335:7,16 337:16 340:12 371:18

**conversations** 322:19 323:10 339:2 344:20 352:10 359:22,24 365:7 370:4,5,8,10 377:24

**cooperation** 330:4

**coordination** 330:3, 17

**copies** 380:6

**copy** 369:8 380:3

**correct** 299:2 302:18 303:22 304:3 329:20 338:2 351:10 353:11 365:5

**counsel** 300:7,11 314:12,18 317:18 318:16 319:5,6 325:2,3 328:9,13 330:10 371:14

**Counsel's** 373:6 375:12 376:13 377:3 379:3

**COUNTY** 381:3

**couple** 322:20 323:17 334:10 341:23 350:22,25 353:17

**court** 368:18 371:25 372:7

**COVID-19** 288:8

**crashed** 372:2

**created** 296:8

**Current** 288:7

**D**

**D&o** 352:16 353:13 354:3

**DAF** 290:21 293:24 294:5,6,15,20,25 295:5,23 296:17,19, 24 297:7 298:2 299:18,23 300:3,20 301:18 302:12,16 303:16 304:15 307:5, 14,15,16 308:11,16, 25 309:8 310:9 312:14 313:3,6,18,19 314:10,11,16,17 315:2,7,13,14 316:8, 9,18 317:3,8,25 318:5 320:12 325:22 327:13 329:4,16,21 330:24 331:13,20

**DAF's** 318:7

**daily** 331:2

**Dallas** 288:12 292:20 293:12

**damage** 350:7

**Daniel** 381:4,18

**date** 288:9 357:23

**dated** 301:20

**day** 288:9 327:4,6 339:13,15 352:18 380:16 381:14

**Daylight** 288:10

**days** 341:23 350:22

**dealing** 341:18

**Dean** 353:23

**debtor** 317:14,17 321:25 323:12 332:10,15,25 333:5 350:14 361:8,21 362:5,11 368:17 369:11

**debtor's** 332:17,25

**decade** 355:10

**decided** 291:13 341:2

**decision** 317:4 321:16,19 322:23 326:4 328:19,24 330:2 334:3 340:14 367:13 368:3,12

**decisions** 304:10 331:3 338:16 364:7, 13,20 365:15

**deductions** 291:22

**defendant** 375:17 376:17 377:10,21 378:4

**delegated** 306:23

**department** 318:10 355:13

**depend** 294:21

**deposition** 288:3,5 289:15 372:3 380:3,5 381:6,7,10

**describe** 375:5

**designate** 354:17

**determined** 354:9

**difference** 293:10

**differences** 295:3

**difficulties** 354:3

**direction** 327:14,16 329:22

**directly** 380:9

**director** 292:18 307:15 351:9

**directorship** 307:23 308:4

**disagreement** 315:16

**Disaster** 288:8

**disclaim** 350:14

**disclose** 338:9 372:23

**discuss** 315:16 321:15,18 331:5 367:11 378:13,17

**discussed** 334:21 370:22

**discusses** 315:14

**discussing** 368:2,10

**discussion** 322:15, 17

**discussions** 321:23 322:22 344:18 353:9 356:19 369:24 375:15 376:4

**distortion** 289:8 300:12 322:9 351:12

**District** 368:18,19

**divest** 348:21,23 349:10,20

**divested** 350:10,15

**divesting** 348:11

**divestment** 348:21

**divulge** 325:11

**document** 290:18 301:5,7 314:5 346:17

**documentation** 352:25 353:7

**documents** 289:18

**dollars** 319:25 320:22 333:21

**donations** 295:10

**Dondero** 288:1,4,13, 20 289:1,7,11 290:1, 17 291:1 292:1 293:1 294:1,14 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1,7 311:1, 16 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1,8 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1,4 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1,8 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1,8 361:1 362:1 363:1,25 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,5,11 373:1,7 374:1,11 375:1,13 376:1 377:1 378:1 379:1,15,20 380:1,14 381:1,6

**Dondero's** 311:8 348:2

**donor** 293:23 330:24 331:6,8,13,15,16,20

**doubt** 328:10,16

**draft** 372:12,25

**drafts** 374:24

**due** 311:10

**Dugaboy** 331:12,25 332:5

**duly** 288:14 381:7

**duties** 325:21 329:12 343:24 344:14 359:9 365:10,13,21 367:9 371:15

**duty** 366:10,18 367:5

___

**E**

**earlier** 329:18 333:17 336:24 365:3

**East** 381:20

**effective** 301:21 342:6,13

**effectively** 316:17 366:25

**effectuated** 354:25

**efficiently** 366:25

**Ellis** 330:10 381:3

**email** 338:2,5,6,15,24 339:24 341:21 343:4 346:6,9 347:10 348:10

**Emergency** 288:7

**employed** 355:3,7, 19,22,25

**end** 358:2,11

**ends** 311:22

**engaged** 372:3

**enjoys** 352:22

**enter** 312:15 314:22 334:3 361:9 368:12

**entered** 315:3 316:10

**entities** 293:4 296:3 307:23 311:25 312:9 314:22 315:3 317:21 318:2,3 332:2,11 335:13 351:9 352:15 357:10,16 360:18 366:18 369:11

**entity** 291:19 295:8, 10,12,14 298:13,17 307:3 309:10,19 312:5 316:23 332:6 333:19 350:9 366:8

**essentially** 320:22

**establish** 356:14

**estate** 321:11

**event** 351:24

**evidence** 303:11 308:19 326:6 359:12 363:8

**exact** 295:3 307:25

**EXAMINATION** 288:18

**Excuse** 312:24

**execution** 314:13

**executive** 353:23

**exhibit** 290:2,15 301:4,6,8,9,12,14 308:7,8 313:13,14 335:22,23,25 339:6, 19,22 346:11,18,20 347:4 360:25 361:2,4 366:3,4,9 368:24,25

**exhibits** 380:6

**existed** 315:24

**existing** 343:9

**expect** 331:5 356:16

**expenses** 367:2

**experience** 302:23 303:8 304:5

**expert** 303:3

**expertise** 302:23 303:2,9 304:6

**Expires** 381:19

**explain** 322:3 342:11

343:16 348:19

**explanation** 322:13

**expressed** 364:3,5, 12

**expression** 295:8

**extent** 297:9 300:5 305:17 306:12 318:6 321:3 333:8 351:17 354:11 366:12 370:5

___

**F**

**fact** 337:7 352:11

**factors** 353:17

**facts** 303:11 307:8, 19 308:19 311:8,9 319:14 326:6 359:12 363:8 374:5,9,19,22

**fair** 348:16 364:9,25 365:11

**faith** 328:18,24

**falls** 371:15

**familiar** 292:14 294:14 360:21

**Federal** 381:8

**feel** 329:19

**fide** 321:24 322:4 323:12

**fiduciary** 329:12 343:23 344:14 365:10,13,21 366:10, 18

**fighting** 330:25

**figure** 337:9,10,12

**file** 301:4 377:8

**filed** 317:14,17 323:9, 22 369:9,17,20,25 370:13 372:13 373:12,18 376:5,19 377:7,20,25

**filing** 320:9 378:2

**final** 369:16 374:10

**finance** 302:24 303:9

**finances** 331:4

**find** 318:11 352:15

**finish** 372:3

**finished** 334:14 360:9

**firm** 341:18 372:12 373:11 374:9,23 375:16 376:18 377:7, 20 378:18 379:15

**firms** 318:13

**fit** 304:19

**floor** 356:12

**flows** 311:24

**follow** 373:6 375:12 376:13 377:3 379:3

**Foods** 353:23

**form** 290:25 291:10 294:2 309:24 320:17 326:24 334:9

**formal** 305:21

**formally** 359:3

**formation** 298:5

**forward** 347:20

**forwards** 361:20

**foster** 291:21

**found** 351:19

**foundation** 292:20 293:13 296:2 330:15 343:6 358:19 367:16 378:6

**foundations** 292:11, 15,18,23

**founder** 330:23

**frame** 319:21

**free** 329:20

**friendship** 363:11

**fund** 294:6 295:23 307:16 309:8 310:9 312:14 313:6,18 314:11,17 316:8 331:3,4 344:10,15 345:7,15,18 365:16 369:10

**finances** 331:4

**funds** 293:24 332:12, 18 345:4,10

**future** 356:17

___

**G**

**gave** 291:24 335:11 339:12 340:4 351:3 352:5 358:15

**general** 291:4 293:19 295:7 309:23 357:20 374:22

**generally** 291:2 358:22

**give** 290:11 340:14 341:2

**giving** 291:21 292:5 309:23 313:3 322:4 350:13 352:22 359:8 363:13

**good** 288:20 289:7, 11 300:14 304:18,25 305:23 318:11 324:8 328:18,24 331:19,20, 24 332:5

**governing** 325:19

**GP** 294:25 301:18 302:12,16 307:5,14 313:19 314:11,17 316:9 351:8

**Grant** 296:15 298:6 305:23 309:14,18 311:22 333:21 352:19 353:3 361:2, 19

**group** 314:3 330:17

**Guernsey** 312:6

**guess** 320:22 327:20 328:15 348:24

**guys** 380:3

___

**H**

**half** 363:21

**hand** 381:14

**happen** 351:24

**happened** 342:14 351:20

**Happy** 350:21

**Harbourvest** 323:23 324:3 326:2,18 328:20 329:2 367:14 368:4

**HCMLP** 315:12,18 316:11,17 317:4,9 318:16,22 319:2 333:23 355:4,7

**he'll** 294:8

**headed** 355:13

**health** 340:19 341:6

**hear** 288:21 289:12 371:19 372:5,8

**heard** 300:10 320:21 371:8

**hearing** 324:18 327:3,14 328:15 332:17 336:4 371:7

**hearsay** 328:4,5 340:17 341:4 342:16,22 343:19 352:13 353:20 358:18

**held** 298:12,16 307:22 308:10 312:7 363:19 366:22 379:10

**helped** 371:12

**helping** 371:14

**hereinbefore** 381:6

**hereunto** 381:13

**high** 297:14

**Highland** 291:19,20 292:6 303:20,22 304:2 312:15 313:19 314:23 315:6 320:13 321:9 331:10 356:13

**Highland's** 314:19

**hired** 314:18

**historic** 333:22

**hold** 296:4 355:11

**Holdco** 290:22 294:5

295:17 307:16,17 308:11,16,25 310:16 311:2,20 315:7,13, 17,19 317:17 318:2 319:11,23 320:6,8 323:22 324:2,6,10 326:12 328:25 329:4 332:6,12,19,24 333:2 334:4 335:11,13 336:5 345:25 351:10 357:11,17 359:10 360:19 361:9 364:22 365:9 368:13,16 369:10

**Holdco's** 315:20 322:23 326:2,17 328:19

**holders** 312:11

**holds** 295:14,24

**hope** 325:9

**hoping** 325:11

**hour** 327:14 363:21

**hours** 290:6,10,11,12

**house** 359:23

**housemates** 297:19

**hundred** 320:21 333:16,20

---

**I**

**ideas** 373:10,17 374:23

**identified** 292:12 293:4 337:25

**identify** 307:2 308:14 309:9 310:23 311:18 317:4 318:11 371:13

**identifying** 318:12

**identity** 310:25

**impact** 337:4

**implicit** 365:7

**in-house** 318:16

**inactions** 345:24

**inappropriate** 324:23,25 325:15,17

327:13,18 329:21 337:5 338:21 364:21

**inaudible** 318:8 327:24

**included** 317:25

**incorporated** 293:3

**incorrect** 338:3

**indemnification** 342:7 343:3,18

**independent** 314:12,18 316:6

**inform** 330:2,7,12,20 360:11

**information** 318:8 325:5 371:12,13 372:24

**informed** 308:2 340:13

**informing** 327:15 329:22

**inheriting** 356:21

**initial** 298:25 331:16

**Initially** 298:24

**injunction** 332:18

**injunctive** 332:16

**instruct** 300:4 325:4 337:15 360:16 363:2, 6 372:15 373:2 374:13 375:7,19 376:20 378:6,20

**instructed** 325:25 362:9,19,23

**instructing** 372:18

**instruction** 362:4 374:25 376:6

**instructions** 358:16, 23 359:8

**insurance** 352:16 353:14 354:3

**intended** 324:11 377:8

**intending** 350:3

**intent** 335:11 339:12

341:2 349:20 351:4 357:24

**intention** 358:10

**interaction** 341:17

**interest** 329:4,16 332:2,5 333:24 335:3,4 337:19 344:10,15 345:4,9 350:4 365:16 371:10

**interested** 381:12

**interests** 364:22 365:9

**interim** 358:15 359:3,7,16 360:14,19

**interpretation** 325:19

**interruption** 289:4,9

**introduced** 290:15 301:6 313:14 335:25 339:22 361:4 368:25

**invade** 321:4

**invades** 333:9

**investment** 303:9, 15,16,19 312:16,19, 22 313:17 314:2,14 315:5 316:18,22 317:4,7,10 330:25 331:12

**investments** 335:5 348:24

**involved** 306:10,17, 21,22 307:3 312:12 318:18 319:8

**involvement** 293:12

**ipad** 372:3

**issue** 361:21 363:10

**issues** 333:5 340:19 341:6 360:12

---

**J**

**James** 288:4,13 375:17 380:14 381:6

**January** 298:17 301:21 332:17 336:6,

10 339:25 359:2

**John** 290:4 294:3 301:7 310:3 317:18 337:6 346:15

**Joint** 371:10

**joint-defense** 337:18

**joint-interest** 371:4 372:20 373:4 374:2, 16 375:10,22 376:23 377:16

**Judge** 310:5 338:4,5

**jumped** 371:23

**June** 288:10 381:14

**justifying** 325:20

---

**K**

**Kane** 317:18,23 318:5 337:6 338:14 339:2 344:6

**kind** 315:19 356:25 357:8 372:17

**knew** 312:20 339:15 340:18 354:22

**knowledge** 300:24 302:25 304:7,10 306:25 307:10 311:8, 22 312:8,18 313:7 321:6,12 352:21 353:9 355:17 362:8, 12

---

**L**

**L.P.** 292:6 294:6 295:24 307:16 309:9 310:9 312:14,15 313:6,18,20 314:11, 17 315:6 316:8 369:10

**La** 346:13

**labeled** 296:21 301:8

**lack** 313:4

**lacks** 330:15 343:6 358:19 367:15 378:5

**lasted** 335:7

**late** 293:21 332:17
337:22 366:11

**law** 318:13

**lawsuit** 332:10
368:17 376:18

**lawyer** 300:14
302:18,20 304:23
337:24 355:16,18

**lawyers** 318:10,11,
15,17,20,23,25
319:2,3 330:4,9,11
335:17,20 338:15,24
370:7

**layperson** 303:5

**learn** 299:22 323:25
324:12 338:13 359:6
361:7 377:19

**learned** 324:5,18
325:24 326:11 333:7,
10

**leave** 345:10 377:8,
20 378:3

**left** 356:13 363:17

**legal** 297:9 304:24
305:17 309:5,13
310:12,19 311:5,7,11
318:10 322:8 325:18
343:6 348:24 351:18
354:12,20 366:13
367:7

**legitimate** 321:8

**levels** 300:23

**Liability** 301:17
357:19

**life-long** 305:4

**limited** 290:6 301:17
357:18,19

**limiting** 290:12

**liquidate** 350:3,5

**liquidating** 350:2

**liquidation** 349:2

**list** 336:8

**listen** 340:22

**litigation** 332:14
337:19

**LLC** 295:2 301:18
302:12,16 307:5,14
313:19 314:11,17
316:9

**loan** 304:11

**located** 288:11,25
356:4,6,10,15

**locations** 356:15

**lodge** 373:20

**log** 379:13

**long** 327:2 335:6,8

**long-term** 363:10

**lot** 370:15

**Lynn's** 338:4,6

---

**M**

**made** 299:12 304:10
317:8 324:13 328:18,
24 364:7,14,20 372:2

**make** 297:3 298:22
299:7 310:4 323:8
328:12 336:24
348:25 350:2

**makes** 295:10

**making** 350:4 365:15
371:23

**man** 297:22

**manage** 315:6

**managed** 315:12,20

**management** 292:6
312:15,25 313:5,19
314:24 315:6

**manager** 333:23

**managing** 296:21
302:12,16 305:13
307:4,13 311:23
351:8 366:23

**manifested** 320:4,15

**manner** 320:25

**March** 308:17,25
309:11 310:10,17

**311**:3,20 358:2,12
362:9,19 366:11

**mark** 291:15,17
297:5,6 305:22
306:23 351:20
352:11,21 353:4
360:25 361:20
363:12 368:23

**marked** 301:12 347:3

**marking** 335:23

**marriage** 381:12

**material** 337:4

**materially** 350:7

**matter** 360:18 381:13

**Mazin** 370:14,17,18,
22 371:23 373:10

**Mckinney** 356:7

**me--and** 323:8

**meaning** 348:23

**mechanism** 305:24
306:20

**member** 296:22
302:12,16 305:13
307:4,13 311:24
351:8 366:23

**memory** 320:6,8

**mentioned** 353:12
359:18

**message** 334:25

**microphone** 288:23

**million** 320:10
333:18

**million-dollar**
350:14,15

**mind** 304:23 323:5
366:23

**minutes** 363:21

**mischaracterizes**
309:22

**missed** 323:15

**mission** 350:9

**misstates** 359:19

**mistakenly** 325:11

**moment** 299:15
319:23

**month** 332:10 351:5

**months** 350:25

**morning** 288:20
289:7,11 328:14
348:15

**MORRIS** 288:19
289:6,10,25 290:7,
13,16 291:3,12
294:11,13 295:22
296:5,11 297:12
298:7,21 300:8,13,17
301:3,11,15 302:4,6
303:12,24 304:20
306:2,14 307:11,21
308:5,9,21 309:7,16,
24 310:6,14,22
311:6,12,15 313:15
315:10 316:15
318:14 319:16,19
321:14 322:10 323:6
324:16,19 325:7
326:10 327:25 328:6
330:18 331:7,18,23
333:12 334:13
335:21 336:2 337:21,
23 338:7,12 339:3,
10,18,23 340:11,21,
24 341:9,19 342:18,
24 343:11,21 344:11,
21 346:4,12,17,24
347:2,6,7,16,25
348:4,6,8 349:5,8,14,
17 350:16 351:14,22
352:4 353:5,25
354:15 355:2 356:18
357:6,14 358:5,7,21
359:14 360:4,24
361:5,6,12,15,18,23
362:2,14,17 363:14,
20,23 364:17 365:23
366:5,16 367:3,22
368:8,22 369:2,18
370:11 371:6,19
372:4,7,10,22 373:5,
15 374:4,18 375:4,
11,24 376:12 377:2,
18 378:12 379:2,6,
11,19,23

**motion** 332:17
377:8,20,25 378:2

**move** 338:22 340:21

**multiple** 300:23
321:9,10 322:18,19

---

**N**

**named** 376:17

**names** 312:9

**needed** 329:15 330:2
345:3 360:12

**negative** 337:4

**negotiation** 313:11
314:8,13

**Nexpoint** 316:22
318:23 319:2 331:11

**night** 325:2 328:14

**Northern** 368:19

**not-too-distant**
356:17

**Notary** 381:4,18

**note** 288:5 290:5
338:4

**Noted** 380:11

**notes** 379:8

**notice** 335:11 338:15
339:12 340:5,14
341:2,20 351:3
357:24 358:10

**notify** 347:22

**number** 296:17
339:19

---

**O**

**object** 293:25 297:9
305:16 309:24
366:12 373:24

**objection** 290:25
291:10 295:19,25
296:10 297:8 298:3,
19 303:10,23 304:16
305:15 306:12 307:7,
18,24 308:18 309:2,
4,12 310:11,18 311:4
315:8 316:12 318:6
319:13 321:3 322:7

323:2,22 324:2,7,11,
14,15 325:20 326:2,
5,12,18 327:23
328:2,3,19,25
330:13,21 331:14,21
333:8 337:14 338:19
339:8 340:6,16
341:3,15 342:15,21
343:5,19 344:7,16
346:2 347:11 350:12
351:11,17 352:2,13
353:20 354:11,19
356:11 357:2,3,12
358:3,17 359:11,19
363:7 364:15 365:22
366:20 367:13,15
368:4,5 369:15
370:24 373:20,21,23
378:5

**objections** 310:2
325:23 329:6 371:24
375:2

**objectives** 329:6

**obligation** 330:6,12,
20,23

**obligations** 304:11

**obtain** 342:7

**obtained** 363:5

**obtaining** 354:3

**occur** 322:17 353:10

**occurred** 351:24,25
378:25

**October** 314:20
317:13 319:10

**office** 356:10,15

**officer** 292:17

**offices** 356:4,9,13

**offshore** 306:20
318:2 353:24

**open** 345:10

**operated** 310:21
329:3

**operation** 312:12

**opinion** 309:5,13
328:13

**optimize** 366:24

**oral** 288:3 356:24
357:8

**Order** 288:7

**org** 290:21 309:15
311:23

**organization** 293:9

**organizational**
290:2 292:4 296:7

**organizations** 293:5
304:6

**original** 298:5 320:9
375:17

**originally** 343:10

**originate** 317:9

**outcome** 381:12

**overbilled** 320:12

**overbilling** 321:8
333:18,20

**owed** 365:21 366:10,
18

**owes** 367:5,9

**owned** 303:21

**ownership** 312:2

———————

**P**

**p.m.** 380:11

**paragraph** 342:4

**paraphrasing--that**
364:5

**part** 326:8 329:16
330:7 352:23 376:3

**participate** 313:10
322:15 326:20
334:17 336:9 369:23

**participated** 338:25
370:4

**parties** 292:12 321:9
330:5 381:11

**partners** 291:21
292:7

**partnership** 325:20
357:18,20

**party** 381:10

**patent** 302:20

**Patrick** 291:15,17
292:3 293:15 296:7
297:5,6 298:9,12,16,
23 299:6 300:25
301:4 303:7 304:14
305:9,12,22 306:11,
18,23 307:6 351:7,
15,21 352:6,8,11,12,
21 353:4,8,12 354:7,
10 355:3,24 356:20,
25 357:8,15 358:15
359:2,7 360:7,11,16
361:20 362:9,18,22,
25 363:5 367:12
368:2,11 378:14

**Patrick's** 357:25
358:11 362:3

**Pause** 289:5

**people** 312:4,9 330:7
336:9,13

**perfect** 348:6

**perform** 371:14

**period** 355:6 357:23
358:4,9,15,25 359:4,
7,16 360:14,19
364:14

**permanent** 356:14

**person** 299:7 305:12
306:4 307:2 308:14
310:23,25 311:18

**personal** 330:10
365:20

**personally** 370:19

**perspective** 345:13

**pertaining** 357:9

**phone** 322:18
336:15,19,21 339:5

**phrase** 294:15,17,20
295:5 348:20 360:21

**picked** 297:25

**pivot** 336:25

**place** 293:20 316:14
326:23 327:4 334:7
336:6,16 343:10

**party** 381:10

**plans** 336:25

**playing** 299:15

**pleading** 378:3

**POC** 320:14

**point** 320:19 332:23
337:19 349:25 361:8

**points** 327:12

**pool** 295:9,10,14

**portfolio** 312:25
313:2,5 350:3,6

**position** 304:19,25
305:7 308:11 355:14

**positions** 335:12
355:11 356:20

**possibility** 378:2

**post-bankruptcy**
331:11

**post-petition**
364:14,21

**potential** 345:23

**potentially** 345:11

**power** 299:22 300:2

**practice** 314:2

**practitioner** 353:24

**preliminary** 332:18

**premarked** 346:21

**prepared** 314:4

**presented** 336:5

**previously** 316:10
332:11

**primary** 330:24
331:6,8

**prior** 298:17 308:17,
25 309:11 310:9,17
311:2,20 314:18
320:25 324:9 331:10
353:6 362:12 366:10
373:11,18 376:4,18
377:6,25

**privilege** 321:5
333:9 370:25 371:3,
4,16,17,20 372:19,20
373:4 374:2,16

**privileged** 300:6
318:8 325:5

**privileges** 371:9

**Procedure** 381:9

**proceed** 290:8
363:24

**proceeding** 289:16

**proceedings** 338:22

**process** 305:21,24
306:8,9,10,17,18,19,
23 318:12

**product** 371:8
376:22 377:15
378:22

**production** 379:13

**professional** 330:6,
12

**promise** 363:22

**proof** 319:11,24
320:9,24 322:23

**propose** 341:24

**proposed** 323:23

**protect** 366:24

**protected** 378:8

**provide** 291:22
312:25 313:5 372:11
373:9,16 374:5,8,22

**provided** 371:11
372:24

**providing** 374:19

**provisions** 342:7
343:3,18

**PTX** 380:5

**Public** 381:4,18

**pull** 339:18

**purpose** 312:22
336:18,22 337:5
338:8 369:5

**purposes** 291:7

375:9,10,22 376:23
377:16 378:10,23
379:13

**pursuant** 302:10
315:4,12,20 353:8,10
381:8

**pursue** 333:22
373:10

**pursued** 321:10
333:19 373:17

**put** 289:19,25 293:20
301:3,8,13 308:6
313:12 335:21
343:10 360:24 366:2
368:22

**Q**

**question** 294:2,23
309:25 311:21 315:9
324:8 325:16 326:8
328:21,22 338:11,19
340:23 347:8 348:17
366:15 369:8 372:15
373:14 374:12
377:12

**questions** 323:4
379:12,22

**quote** 342:5 349:19
362:19,20

**R**

**raised** 360:12

**reach** 337:2

**reached** 332:24
335:10

**read** 380:7

**ready** 363:24

**reason** 328:10,15

**reasons** 303:13
305:6 340:14

**recall** 302:17 317:11,
13,16 319:10,22
320:11 321:22
323:13,21 324:5
326:19 327:8,9,21
329:11 332:8 333:6
334:11,20,22,23
335:6,9,15 336:15,18
339:11,24 344:17,19

**reflected** 374:9

**reflecting** 379:13

**refreshed** 316:2
323:4 367:18

**regard** 292:20
363:12

**rejected** 317:5

**related** 381:11

**relates** 343:2 361:21

**relationship** 305:4
363:11

**release** 342:12,20
343:3,18

**releases** 342:8

**relevance** 295:25
331:14,21 343:7
352:2

**relief** 332:16

**relocating** 356:16

**remember** 298:11,
12 302:15 305:22
306:6,7,9 318:9
320:12,18 322:12,21
327:12 329:9 332:22
335:19 339:4 343:25
345:3,5 347:12,24
353:22 355:14 360:2
370:14,15,16

**reminding** 329:14

**REMOTE** 288:3

**remotely** 288:6

**renew** 338:18 339:7

**repeat** 305:19 315:9
346:15 373:13

**rephrase** 325:13
326:9

**replace** 351:16
354:10

**replaced** 302:11
316:17 351:7 352:8
353:8 359:3

**replacement** 333:23
351:25 357:25
358:11

345:16,17,20 346:3
347:9,21 350:18
355:12 359:13,21
360:15,20 364:16
365:14 367:18,19,20
368:7,14 369:14
374:3,17,19 377:22,
23 378:11

**reporter** 288:5
289:4,9 372:7,9
380:2

**reporter's** 371:25

**Reporting** 381:19

**represent** 336:3
369:3 370:18

**representation**
337:6

**representative**
357:10

**represented** 317:23,
25

**representing** 330:4

**request** 291:9,11
296:8 379:12

**requested** 348:14

**requesting** 361:8

**require** 300:6 304:23

**required** 304:22
306:8

**reserve** 379:21

**reserved** 381:9

**resign** 335:12 339:12
341:2 351:4 357:24
358:10

**resignation** 336:21
340:5,15 342:5,12
343:13 347:15
366:11

**resigning** 341:25
348:11

**resolved** 332:25
333:4

**respect** 311:10 359:8
360:17 364:6

**responded** 348:14

**response** 322:6
323:14 327:22 346:8
348:2 349:6,15,18

**responsibilities**
359:9

**responsibility**
366:22

**responsible** 299:9

**restate** 358:6

**Restated** 301:17
312:16 313:17
314:14 357:19

**result** 338:10

**retained** 317:18,20
318:5

**returns** 313:2 331:2

**reveal** 300:6 325:5
375:23 376:24
377:13 378:7,24

**reversal** 327:16

**review** 374:24

**right--that** 323:9

**role** 292:23 298:13,
17 308:2,3 357:9

**roles** 299:14

**roll** 309:15

**row** 293:2

**Rule** 381:8

**Rules** 381:9

**running** 304:6

**S**

**Savings** 288:11

**Sbaiti** 293:25 295:19,
25 297:8 298:19
301:7 303:10 305:15
307:7,24 308:18
309:4,12 318:6 322:7
324:14 327:23 328:5
330:13,15,21 331:14,
21 343:5 344:7,16
346:2 351:11 356:11
357:2 358:19 359:11,
19 363:7 364:15
365:22 366:12,20
367:15 371:2,10
372:12,14 373:2,11,
13,22 374:9,11,23,25
375:7,16,19 376:6,
10,18,20 377:7,11,19
378:5,17,20 379:9,
15,18,21,25 380:2,4

**reconsider** 342:2

**record** 310:4 338:20
346:10 381:7

**reduce** 320:20
321:16,19

**reduced** 321:13

**reducing** 319:24
322:24

**refer** 294:19 296:20
369:5

**reference** 348:10

**referred** 332:11
339:5

**referring** 294:20
295:6 296:19 313:23
318:16,21 331:9
338:17 341:14

**received** 346:5
347:23

**receiving** 339:24
346:9 347:9

**recess** 363:19
379:10

**recollection** 298:10
302:13 321:7 367:25
368:10

**recommend** 306:3

**recommendation**
297:2,3 298:22,25
299:8,12 319:7

**recommendations**
319:5

**recommended**
298:6,8 299:17
303:7,14 304:13
305:6 306:5 317:5

**recommending**
305:22 306:7

**Appx. 01737**

**school** 297:14

**Scott** 296:15 297:7,
13,25 298:6,8
299:18,20 302:11,18
303:14 304:5,14
305:13 306:4 307:4,
14 308:10 309:14,18
310:8 313:4 317:2,5,
8 319:11,23 320:19,
23 321:15,19,23
322:22 323:10
325:24 326:4,13,16
327:22 328:18,23
329:25 332:23 334:3,
23 335:10,17,23
336:12 339:11,20,25
340:4,13,25 341:21
343:15,23 344:5,23,
25 345:6,14,18,21
347:17 348:20 349:9
350:5,10,20 351:7,16
352:9,19 353:8
354:10 356:21
357:23,25 358:9,16
359:3,8,16 360:13,17
361:2,19 362:9,19,23
363:2,6 364:5,13,19
365:7,21 366:9,17

**Scott's** 343:4,12
344:5 348:10 349:6
354:18 367:13 368:3,
11

**Scott--and** 364:4

**screen** 289:19 308:8
346:18 366:3,4
368:23

**scroll** 347:25 349:5,
15 361:12,23 362:14

**Scrolling** 348:3
349:7,16 361:14,17,
25 362:16

**seeking** 299:11
332:16

**Seery** 375:17 376:17
377:9,21 378:4,15,18

**select** 299:6

**send** 347:18 380:7,8

**sending** 341:21

**sense** 328:13

**sentence** 348:9

**separate** 303:16

**sequence** 346:22

**serve** 292:17 297:25
299:18 304:14

**served** 302:15 317:2

**services** 313:5
314:23 315:2 316:21

**set** 290:24 291:5,8,
11,13,17 293:15
298:25 357:17 374:6
381:6,14

**setting** 291:18 292:4
299:10

**settlement** 320:3
323:23 324:3 326:3,
18 328:20 329:2
332:24 333:3,7,15
334:4 335:3,10 336:5
367:14 368:4,12

**settlements** 337:3

**Shared** 314:23,25
316:20

**shares** 300:22
312:11 353:2

**short** 332:8 363:15

**shortly** 327:7 335:9

**sign** 362:4,10 380:8

**signature** 302:7
381:9

**signed** 353:4,7

**significant** 331:3

**similar** 316:9,13,14

**simple** 310:2 325:16

**simultaneous**
319:18 334:12

**singular** 322:18

**sir** 290:18 296:13
300:19 302:8 340:23
366:6 372:9

**sit** 299:25 300:19
365:2

**skiing** 359:25

**skills** 304:24

**skipped** 346:21

**Skur** 381:4,18

**Skybridge** 356:2

**Skybridge's** 356:3

**Skygate** 316:13,17,
20,22

**soft** 288:23 380:6

**sole** 307:15 353:24

**sophisticated**
300:16 303:4

**speak** 326:13 370:12

**speaking** 309:25

**specific** 294:8
300:23 307:10 312:8
321:12

**specifically** 290:9
294:9 298:11 299:21
312:12 329:10
332:21 335:20
358:20 360:3 367:10,
17,19,20 374:21

**specifically--and**
353:3

**specifics** 310:20
316:25

**speculate** 306:25
367:21,23

**speculation** 305:16
306:13 340:7,9
341:16

**speed** 317:12

**spoke** 333:17 337:8
344:2 350:23 351:2

**stamped** 339:20

**stand** 362:20,23
363:2,6

**stands** 298:13

**start** 289:23 290:4
339:20 369:7

**state** 288:8 338:20
381:2,5,18

**stated** 298:4 336:24

**statements** 309:22

**states** 342:5 368:18

**stating** 365:15

**strategic** 373:10

**Street** 381:20

**strike** 338:23 340:21

**string** 338:2,16

**structural** 295:3

**structure** 290:23
291:5,8,14,17 292:4
293:16,20 296:7
299:10 312:13
347:14 352:22
354:22

**structuring** 348:25

**struggled** 352:14,15,
16

**stuff** 359:25

**subject** 314:7 329:7,
11

**Subscribed** 380:16

**subsequently**
323:25

**substance** 334:22
344:13 364:20
369:24 370:8

**successor** 305:13
307:4 354:18 362:5

**suddenly** 356:14

**sue** 344:22

**sued** 378:15,19

**suffering** 340:18
341:5

**suggest** 343:22
376:16

**suggestion** 365:4

**suing** 345:2

**suitable** 299:5

**suite** 356:9 381:20

**sum** 334:22 344:12
364:19

**summarizing**
348:12

**Sunday** 336:7,10

**supervisory** 312:10

**support** 313:3

**supporting** 293:4,9

**surprised** 324:20,22

**sworn** 288:14 380:16
381:7

---

**T**

**talked** 337:9 365:3
370:15

**talking** 294:4,5,10
346:11 352:18

**task** 291:24

**tasked** 291:18 292:3

**tax** 291:7,22 355:13,
18

**Taylor** 290:4,9,25
291:10 294:7 296:10
298:3 300:4,10
303:23 304:16
306:12 307:18 309:2,
21 310:3,11,18
311:4,10 315:8
316:12 319:13 321:3
323:2 324:15 325:4
326:5 328:3 333:8
337:14 338:3,18
339:7 340:6,16
341:3,15 342:15,21
343:19 346:10,14
347:5,11 350:12
351:17 352:2,13
353:20 354:11,19
357:3,12 358:3,17
363:18 368:5 369:15
370:2,24 371:22
373:19 380:9

**telephone** 326:24
335:16

**telling** 337:2,3 345:3
364:19

**terms** 333:14

**testified** 288:16

322:25 344:8 354:13 365:6,12

**testimony** 323:20 353:6 359:20 381:7

**Texas** 288:12 368:19 381:2,5,18

**text** 350:21 359:17

**things** 312:7 323:5 342:13 351:20 367:6

**thought** 299:4 303:8 304:18,24 308:2 322:3

**thoughts** 373:16

**thousand** 320:21 333:17,20

**threaten** 344:22

**three-minute** 379:7

**time** 288:10,11 290:10,11 291:19 299:5,17 303:6,22 304:2 308:12 311:17 319:21,23 320:19,25 321:18 324:9 332:23 335:18 337:20 339:16 340:5 343:24 350:19,23 351:2,3 353:7,21 355:6 358:9 359:2,7 361:8 363:15 366:10 367:12 369:14 373:11,18 376:5,19 377:6,25 379:17,20 380:11

**times** 325:9 334:10,16

**today** 289:14,19 299:25 300:19 316:9 343:2 355:20 365:2

**Today's** 288:9

**told** 290:10 323:7,11 337:7 338:8 341:5 344:4,9 345:14,17 351:21 353:12 364:3

**top** 292:10 362:15

**topic** 378:14,18

**Tower** 289:3

**traded** 333:20

**transcript** 380:5

**transfer** 353:2

**trouble** 353:13 371:7

**true** 381:7

**Trust** 331:13,19,20, 25

**trusted** 305:2

**trustee** 296:16,18, 20,24 297:7 298:2 299:18,23 300:3,20 304:15 311:23 317:3 331:5 345:8 353:4 366:23

**trustees** 312:5

**trusts** 332:5

**truth** 288:15,16 337:10,12 338:13

**TSG** 381:19

**Tuesday** 311:13

**two-month** 358:8

**two-year** 357:23 358:4

**type** 316:10

**typically** 331:5

U

**ultimately** 320:2 347:3 351:13

**unbeknownst** 352:24

**underlying** 306:21 377:13

**understand** 289:14 296:16 302:10 307:12 310:7 322:2 325:10 355:24

**understanding** 291:5 293:8 294:25 295:13 299:19 300:2, 18 311:9 312:21 315:11,23 316:16 317:22,24 333:14 341:13 354:16 363:4 367:6,8

**underway** 353:10

**United** 368:18

**unpredictable** 349:24,25

**upload** 346:22

**usual** 289:19

**UVA** 297:16

V

**vague** 296:10 297:8 298:19 307:24 315:8 316:12 323:2 330:21 344:16 346:2 347:11 350:12 356:11 357:3, 12 363:7 364:15 365:22 367:15 369:15 373:20 378:5

**valuable** 303:8

**version** 374:10

**versions** 369:16,19

**vetting** 318:12,20

**view** 348:20 363:9

**views** 367:12 368:3, 11

**voting--again** 353:2

W

**wait** 311:12,13

**wanted** 290:5 342:19 343:17 348:25 350:2

**wedding** 297:22

**week's** 289:15

**weeks** 327:17

**WHEREOF** 381:13

**withdraw** 325:25 328:19,25 337:2 367:13 368:3

**withdrawal** 326:17

**withdrawing** 324:10 329:5

**withdrawn** 295:12 298:15 301:2 303:25

305:10 306:15 313:9, 11 316:4,6 320:7 322:5 324:7 346:7 352:6 354:8 358:24 365:23 374:7

**withdrew** 324:2,6 326:12

**word** 330:22 341:10 349:10 365:13

**words** 329:14 365:14

**work** 371:8 376:22 377:15 378:21

**work-product** 371:3,15,16 372:19 373:3,25 374:15 375:9,21 378:9

**worked** 347:14 354:22

**working** 363:11

**works** 305:24 353:3

**world** 308:22 309:9 344:14 345:22 377:24

**write** 349:23

**written** 356:24 357:7

**wrong** 365:4

Y

**years** 293:17,19 296:17 299:3 301:24 331:16

**York** 363:15 381:20

# EXHIBIT 98

Page 283

1          DONDERO - 10/29/21

2     IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
3             DALLAS DIVISION
   ------------------------------
4   IN RE:

5                       Chapter 11
   HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,        CASE NO.
                      19-34054-SGI11
7
         Debtor.
8   ------------------------------
   HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
         Plaintiff,
10   vs.                    Adversary
                      Proceeding No.
11   JAMES D. DONDERO,          21-03003-sgi

12        Defendant.
   ------------------------------
13

14        REMOTE VIDEOTAPED DEPOSITION OF

15         JAMES DONDERO - VOLUME 2

16            October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874

Page 284

```
1            DONDERO - 10/29/21
2
3
4            October 29, 2021
5            10:21 a.m.
6
7
8
9       Remote Deposition of JAMES DONDERO, held
10  before Susan S. Klinger, a Registered Merit
11  Reporter and Certified Realtime Reporter of the
12  State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 285

```
1            DONDERO - 10/29/21
2   A P P E A R A N C E S :
3   (All appearances via Zoom.)
4   Attorneys for the Reorganized Highland Capital
5   Management:
6       John Morris, Esq.
7       Hayley Winograd, Esq.
8       Gregory Demo, Esq.
9       PACHULSKI STANG ZIEHL & JONES
10      780 Third Avenue
11      New York, New York 10017
12
13  Attorneys for NexPoint Advisors, LP and
14  Highland Capital Management Fund Advisors,
15  L.P.:
16      Davor Rukavina, Esq.
17      Thomas Berghman, Esq.
18      MUNSCH HARDT KOPF & HARR
19      500 North Akard Street
20      Dallas, Texas 75201
21
22
23
24
25
```

Page 286

```
1            DONDERO - 10/29/21
2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3   and HCMS:
4       Deborah Deitsch-Perez, Esq.
5       Michael Aigen, Esq.
6       STINSON
7       3102 Oak Lawn Avenue
8       Dallas, Texas 75219
9
10  Attorneys for Dugaboy Investment Trust:
11      Douglas Draper, Esq.
12      Michael Landis, Esq.
13      HELLER, DRAPER & HORN
14      650 Poydras Street
15      New Orleans, Louisiana 70130
16  Attorneys for Marc Kirschner as the trustee for
17  the litigation SunTrust:
18      Deborah Newman, Esq.
19      QUINN EMANUEL URQUHART & SULLIVAN
20      51 Madison Avenue
21      New York, New York 10010
22  Also Present:
23      Dan Elms
24      Aaron Lawrence
25      Patricia Jeffries, Pachulski Stang
```

Page 287

```
1            DONDERO - 10/29/21
2           I N D E X
3   WITNESS                        PAGE
4   JAMES DONDERO
5   EXAMINATION BY MR. MORRIS           289
6           E X H I B I T S
7   No.                         Page
8   Exhibit 1  Original Complaint       466
9   Exhibit 2  NexPoint Complaint       408
10  Exhibit 3  HCMS Complaint           433
11  Exhibit 4  Letter, 12/3/20          464
12  Exhibit 6  Term note                446
13  Exhibit 15 NexPoint Advisors Answer 380
14  Exhibit 16 HCMS's Answer            362
15  Exhibit 17 HCRE's Answer            377
16  Exhibit 31 Answer to Complaint      354
17  Exhibit 35 Incumbency Certificate   309
18  Exhibit 37 Incumbency Certificate   323
19  Exhibit 47 NexPoint 30(b)(6) notice 345
20  Exhibit 48 HCMS 30(b)(6) notice     353
21  Exhibit 49 HCRE 30(b)(6) notice     354
22
23
24
25
```

Appx. 01742

Page 288

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2        P R O C E E D I N G S
3        VIDEOGRAPHER:  This marks the
4    beginning of Video 1 in Volume 2 of the
5    deposition of James Dondero in the matter
6    In Re: Highland Capital Management, L.P.
7    Today's date is October 29, 2021.  The time
8    on the video monitor is 10:21 a.m.
9        Will the court reporter please swear
10   in the witness.
11       JAMES DONDERO,
12   having been first duly sworn, testified as
13   follows:
14       MR. MORRIS:  Deborah, would you like
15   to make a statement?
16       MS. DEITSCH-PEREZ:  I didn't know if
17   you wanted appearances first.  Sure.  This
18   is Deborah Deitsch-Perez from Stinson.  I'm
19   counsel for Mr. Dondero, Nancy Dondero,
20   HCRE and HCMS in this deposition.
21       I want to apologize for everybody
22   that we're starting late.  Mr. Dondero was
23   under the weather.  It is – he has taken
24   something, so he should not have to leave
25   the deposition, but if at any point he

Page 289

1    DONDERO - 10/29/21
2    looks green to me, I will ask that we stop
3    and reconvene when he is not feeling
4    nauseous.
5        MR. MORRIS:  All right.  I would
6    like to just begin here.  We have counsel
7    on the line for all of the defendants, we
8    have counsel for the plaintiff, and we have
9    counsel for the Highland Litigation Trust,
10   and I think that that is everybody who
11   is – is supposed to be here, so I would
12   like to just begin.
13       EXAMINATION
14   BY MR. MORRIS:
15   Q.    Mr. Dondero, can you hear me okay?
16   A.    Yes.
17   Q.    Okay.  And are you feeling well
18   enough to begin today's deposition?
19   A.    Yes.
20   Q.    Okay.  I understand that you are not
21   feeling well.  And I want you to know that I do
22   not want to proceed with this deposition unless
23   you believe that you are physically and
24   mentally able to participate to the best of
25   your ability.  Okay?  Do you understand that?

Page 290

1    DONDERO - 10/29/21
2    A.    Yes.
3    Q.    So if at any time you don't feel
4    like you can continue, I would rather adjourn
5    to one day next week to complete the deposition
6    rather than forcing you to do something that
7    you don't believe you're capable of doing.
8    Okay?
9    A.    Yes.  Yes.  I did throw up twice
10   last night.
11   Q.    Okay.
12   A.    I imagine we could go for – let's
13   shoot for four hours today, you know, maybe –
14   maybe five, I don't know, but if we don't
15   finish –
16   Q.    I don't want to –
17   A.    – we will do the rest next week.
18   Q.    Okay.  I don't want to put an
19   arbitrary time on it.  You tell me if you are
20   unable to continue.  Okay?  Is that fair?
21   A.    Yes.  That is my estimate at this
22   point.
23   Q.    Okay.  You founded Highland Capital
24   Management, L.P.; correct?
25   A.    Yes.

Page 291

1    DONDERO - 10/29/21
2    Q.    And we are going to refer to that
3    entity and that entity only today as Highland;
4    is that okay?
5    A.    Yes.
6    Q.    When did you found – when did you
7    create Highland?
8    A.    '94.
9    Q.    And did you serve as Highland's
10   president from 1994 until on or around January
11   9th, 2020?
12   A.    Yes.
13   Q.    Did – can you describe in your own
14   words what the business of Highland was while
15   you were president?
16   A.    We were largely below investment
17   grade, credit strap, and we diversified over
18   the years to become more of an alternative
19   asset manager in a variety of formats.
20   Q.    And –
21       MS. DEITSCH-PEREZ:  I'm sorry, John,
22   one sec.  This was set up by someone a lot
23   shorter than Mr. Dondero.  Let me just take
24   one minute to adjust it.
25       MR. MORRIS:  May I proceed, Deborah?

Appx. 01743

Page 292

DONDERO - 10/29/21

1
2    MS. DEITSCH-PEREZ:  (Nods head.)
3    Q.   Okay.  Mr. Dondero, at its peak,
4  what is the -- the largest value of assets that
5  Highland had under management while you were
6  president?
7    A.   35 billion.
8    Q.   And do you recall what year that
9  was?
10   A.   Not exactly.
11   Q.   Was it before the 2008 financial
12 crisis?
13   A.   Yes.
14   Q.   Okay.  So you were the president of
15 Highland for about 25 years; is that right?
16   A.   Yes, 25, 26, whatever.
17   Q.   And do you consider yourself to be
18 expert in the area of money management?
19   A.   Yeah, on the things that we focus
20 on.
21   Q.   You are a sophisticated investor;
22 right?
23   A.   Yes.  I would believe I'm
24 categorized as such.
25   Q.   And you are a sophisticated money

Page 293

DONDERO - 10/29/21

1
2  manager; is that fair?
3    A.   Yes.
4    Q.   And you manage money on behalf of
5  thousands of people; isn't that right?
6    A.   Yes.
7    Q.   And as a general matter, you know
8  how to read and understand balance sheets,
9  don't you?
10   A.   Yes.
11   Q.   You have signed promissory --
12 promissory notes before, haven't you?
13   A.   Yes.
14   Q.   Is it fair to say you have signed
15 hundreds of promissory notes during the 25-year
16 period that you were the president of Highland?
17   A.   No.
18   Q.   Is it fair to say that you signed
19 dozens of promissory notes during the time that
20 you were president of Highland?
21   A.   Yeah, dozens is probably fair.
22   Q.   Okay.  And is it fair to say that
23 the aggregate principal amount of the
24 promissory notes that you signed while you were
25 president of Highland likely exceeded

Page 294

DONDERO - 10/29/21

1
2  $200 million?
3    MS. DEITSCH-PEREZ:  Objection to the
4    form.
5    A.   I don't have a basis for knowing
6  that.
7    Q.   You do know that it is more than
8  $100 million, don't you?
9    A.   No.
10   Q.   Do you owe today Highland Capital
11 Management Services more than $75 million?
12   A.   I don't know what the amount is.  I
13 don't believe it is that much.
14   Q.   Are the obligations to Highland
15 Capital --
16   MS. DEITSCH-PEREZ:  Hold on.  Hold
17   on.  My connection just disappeared.
18   MR. MORRIS:  Okay.
19   MS. DEITSCH-PEREZ:  Okay, I'm back.
20   Q.   Okay.  Did the -- did the
21 obligations that you have to Highland Capital
22 Management Services, are they reflected in
23 promissory notes?
24   MS. DEITSCH-PEREZ:  Could you repeat
25   that question?

Page 295

DONDERO - 10/29/21

1
2    MR. MORRIS:  Sure.
3    Q.   Mr. Dondero, you borrowed money from
4  Highland Capital Management Services; correct?
5    A.   I'm sorry, it sounds like at first
6  you were asking me, did Highland Capital
7  Services borrow money from Highland.  Now
8  you're asking me if I borrowed money from
9  Services?
10   Q.   Yeah, let me -- let me rephrase the
11 question, sir, because if it is not clear, that
12 is my fault, and I apologize.
13       Did you -- have you borrowed money
14 from Highland Capital Management Services?
15   A.   I believe so.
16   Q.   Okay.  Do you know the aggregate
17 principal amount that is outstanding today,
18 ballpark?
19   A.   No.
20   Q.   Are the obligations that you have to
21 Highland Capital Management Services reflected
22 in promissory notes where you're the maker and
23 Highland Capital Management Services is the
24 payee?
25   A.   Please repeat that question.

Page 296

DONDERO - 10/29/21

1
2    Q.   Are you the maker on promissory
3    notes in favor of Highland Capital Management
4    Services, Inc.?
5    A.   I don't know.  I believe -- I
6    believe so, or I believe I have in the past,
7    but I don't know.
8    Q.   Do you have any -- any estimate as
9    to how much money you owe Highland Capital
10   Management Services, Inc. today?
11        MS. DEITSCH-PEREZ:  Asked and
12   answered.
13   A.   No.
14   Q.   Can you say if it is more or less
15   than $50 million?
16   A.   I don't know.
17   Q.   Can you say if it is more or less
18   than $25 million?
19   A.   I don't know.
20   Q.   As a general matter, is it fair to
21   say that you know how to read and understand
22   promissory notes?
23        MS. DEITSCH-PEREZ:  Object to the
24   form.
25   A.   In general, yes.

Page 297

DONDERO - 10/29/21

1
2    Q.   Okay.  When you were in control of
3    Highland, you personally decided who was hired
4    at that company; is that fair?
5    A.   Sometimes, in senior positions.
6    Q.   Okay.  Did your duties as president
7    of Highland include being familiar with the
8    debts and obligations that were owed to
9    Highland?
10        MS. DEITSCH-PEREZ:  Object to the
11   form.
12   A.   I mean, generally.
13   Q.   Okay.  Did you ever do anything to
14   familiarize yourself with the debts and
15   obligations that were owed to Highland?
16   A.   Are you referring to the affiliated
17   notes or --
18   Q.   Sure.
19   A.   -- or what -- what are --
20   Q.   I was -- I was asking -- I
21   apologize.  I don't mean to step on your words.
22   A.   No, you just -- because I don't
23   think Highland had a lot of other obligations
24   due from other parties, and the affiliated
25   notes in aggregate were always de minimis to

Page 298

DONDERO - 10/29/21

1
2    Highland than now, at any time.
3    Q.   It is your -- it is your position
4    that the affiliate notes to Highland were de
5    minimis in amount?
6    A.   Yes.
7    Q.   And how do you define de minimus for
8    that purpose?
9    A.   I believe the balance sheet of
10   Highland today for the last three years, four
11   years, five years has been between 5 and
12   $600 million.  I believe the notes have never
13   been more than 8 or 10 or 12 percent of that
14   number.
15   Q.   And you believe that 8 or 10 or
16   12 percent of Highland's asset base you
17   would -- you would define as de minimis?
18   A.   Yes.
19   Q.   Okay.  As -- as president of
20   Highland, did you ever do anything to
21   familiarize yourself with the number and amount
22   of affiliate loans that Highland carried on its
23   books and records?
24   A.   Not that I can recall.
25   Q.   Was there anybody at Highland who

Page 299

DONDERO - 10/29/21

1
2    was charged with the responsibility of knowing
3    the number and amount of affiliate loans that
4    Highland carried on its balance sheet?
5    A.   Sure.
6    Q.   Can you identify the people who were
7    responsible for that?
8    A.   The people in accounting responsible
9    for tracking assets and liabilities in
10   preparing all the audited financial statements
11   every year and the quarterly unaudited
12   financial statements that were prepared and the
13   monthly operating reports.
14   Q.   Can you -- can you name any names of
15   the people who had the responsibilities that
16   you just described?
17   A.   I think it changed regularly, but it
18   would have been people in Frank's group in
19   accounting.
20   Q.   Did Frank have any responsibility
21   for knowing and understanding the affiliate
22   loans that Highland carried on its balance
23   sheet?
24   A.   Sure.  I -- as CFO he had to sign
25   off on the audited financials and rep letters

Page 300

DONDERO - 10/29/21

1
2    and -- yes.
3        Q.   And can you -- can you identify the
4    name of any person in the accounting group in,
5    let's say, the three years prior to the
6    bankruptcy who had responsibility for knowing
7    and understanding the scope of affiliate loans
8    that Highland carried on its balance sheet?
9        A.   No, I would just be speculating but
10   it would be -- the senior people in Frank's
11   group would be responsible for the financial
12   statements.
13       Q.   Are you able to name the people, the
14   senior people in Frank's group in the couple of
15   years prior to the bankruptcy?
16       A.   Yes, but I don't know -- like
17   David Klos was a senior person, Cliff Stoops
18   was a senior person.  There were a couple
19   up-and-comers below them, but who did the
20   financials -- how Frank assigned the work in
21   his group, I have no idea.
22       Q.   Did you ever ask?
23       A.   No.
24       Q.   Do you have any knowledge as you sit
25   here today who within Frank's group had

Page 301

DONDERO - 10/29/21

1    responsibility for knowing and understanding
2    the affiliate loans that Highland carried on
3    its balance sheets?
4
5        A.   No.
6        Q.   And to the best of your knowledge as
7    you sit here today, you never personally did
8    anything to know and understand the extent and
9    scope of the affiliate loans that Highland
10   carried on its balance sheet; is that right?
11       A.   Correct.
12       Q.   Okay.  You appointed Mr. Waterhouse
13   as Highland's CFO; is that right?
14       A.   I think it was appointed and
15   recommended by Patrick Boyce, but I agreed with
16   the selection.
17       Q.   And you --
18       A.   That -- (speaking simultaneously.)
19       Q.   I apologize, are you done?
20       A.   I'm just saying that was a long time
21   ago, but I don't remember the details exactly.
22       Q.   But you had the authority and you
23   used that authority to appoint Frank as CFO;
24   correct?
25           MS. DEITSCH-PEREZ:  There's a lag in

Page 302

DONDERO - 10/29/21

1    the video.  I don't know if it matters, but
2    for a while Jim was frozen.  And I know
3    because -- since there was voice and no --
4    his mouth wasn't moving.  So let's just --
5    if the videographer sees there is a
6    problem, please let us know.
7        Q.   I --
8        A.   Yes.  I'm sorry, could you just
9    repeat the question regarding Frank, please?
10       Q.   Sure.
11           As the president of Highland, did
12   you have the authority and did you exercise
13   that authority to appoint him as Highland's
14   CFO?
15       A.   Yes.
16       Q.   Okay.  Do you recall when you
17   appointed Mr. Waterhouse CFO of Highland?
18       A.   No.
19       Q.   Was it more than five years prior to
20   the bankruptcy?
21       A.   Yes.
22       Q.   As the president -- during the time
23   that you served as president of Highland, did
24   you believe that Mr. Waterhouse fulfilled his

Page 303

DONDERO - 10/29/21

1    duties as chief financial officer?
2        A.   Yes.
3        Q.   Can you recall anything that
4    Mr. Waterhouse did in his capacity as
5    Highland's CFO that did not comport with your
6    expectations?
7        A.   I think we will talk about some of
8    those today.
9        Q.   Okay.  Do you have any reason to
10   believe that Mr. Waterhouse ever breached his
11   duties to Highland during the time that you
12   served as president?
13           COURT REPORTER:  We can't hear you
14   speaking.
15       Q.   We haven't heard any portion of your
16   answer, Mr. Dondero.
17           MR. MORRIS:  I don't know if people
18   can -- can hear, but I cannot hear
19   Mr. Dondero.
20           COURT REPORTER:  I can't either.
21           MR. MORRIS:  Yeah, Deborah, can you
22   speak, please.
23           COURT REPORTER:  They're on the same
24   speaker.

Page 304

DONDERO - 10/29/21

1
2    VIDEOGRAPHER:  Do we want to go off
3    the record?
4    MR. MORRIS:  Yes, please.
5    VIDEOGRAPHER:  Off the record,
6    10:41.
7    (Recess taken 10:41 a.m. to 10:47 a.m.)
8    VIDEOGRAPHER:  Back on the record,
9    10:47.
10   Q.   Okay.  Let me just ask the question
11   again so the record is clean, Mr. Dondero.
12       Do you have any reason to believe as
13   you sit here right now that Mr. Waterhouse ever
14   breached his duties to Highland during the time
15   that you served as president?
16       MS. DEITSCH-PEREZ:  Asked and
17   answered.
18   A.   Yeah, I think I did ask and answer
19   that.  Again, not intentionally, not
20   maliciously.  I am – I guess things we're
21   going to talk about today are for periods of
22   time after I was president, so...
23   Q.   Right.  That is going to be the next
24   question that I ask.  But to be clear – I just
25   want to have a clear record – during the time

Page 305

DONDERO - 10/29/21

1    that you were president, do you have any reason
2    to believe that Mr. Waterhouse breached his
3    duties to Highland?
4        MS. DEITSCH-PEREZ:  Asked and
5        answered.  This is the third time.
6        A.   No.
7        MR. MORRIS:  It is actually not.
8        Q.   But thank you, Mr. Dondero.  I
9    appreciate that.
10       After you ceased to be president of
11   Highland, do you have any reason to believe
12   that Mr. Waterhouse breached his duties to
13   Highland?
14       A.   Breached his duties to – I don't –
15   I don't know if it is – I don't want to – I
16   don't want to make a judgment overall.  When we
17   talk about the notes we can make conclusions
18   then.
19       Q.   All right.  But you're not able to
20   tell me in response to my question whether you
21   believe today that Mr. Waterhouse breached his
22   duties to Highland after the time that you
23   served as president?
24       MS. DEITSCH-PEREZ:  Object to the

Page 306

DONDERO - 10/29/21

1
2    form of the question.
3    A.   I don't want to comment off the top
4    of my head, but I've highlighted that we will
5    discuss it around the note issue.
6    Q.   Okay.  You are familiar with an
7    entity called Highland Capital Management Fund
8    Advisors, L.P.; is that correct?
9    A.   Yes.
10   Q.   And we're going to refer to that
11   entity as HCMFA.  Is that okay?
12   A.   Yes.
13   Q.   Do you know who owns HCMFA?
14   A.   I believe it is myself and
15   Mark Okada.
16   Q.   Okay.  And do you have an
17   understanding as to – as to the percentage of
18   each of your interests, ownership interests in
19   HCMFA?
20   A.   No, and I don't know the entities.
21   I don't if I own it directly or through
22   Dugaboy.  And I do believe Okada tends to use
23   his trusts, but I don't know the percentages
24   either.
25   Q.   Do you own a – do you own a

Page 307

DONDERO - 10/29/21

1
2    major- -- withdrawn.
3        Do you directly or indirectly own a
4    majority of the ownership interests in HCMFA?
5    A.   I believe so.
6    Q.   Okay.  And do you control HCMFA?
7    A.   Yes.
8    Q.   And do you know when HCMFA was
9    created?
10   A.   No, I do not.
11   Q.   Do you know if it was before or
12   after 2010?
13   A.   I don't know.
14   Q.   Have you controlled HCMFA since the
15   time it was created?
16   A.   I believe so, but I don't know for
17   sure.
18   Q.   Can you think of any period of time
19   when you didn't control HCMFA?
20   A.   I don't know.  I don't remember the
21   ownership structure prior and I don't remember
22   when it started, so I don't know.
23   Q.   Okay.  I'm asking about control and
24   not ownership.
25       Can you think of any period of time

Appx. 01747

Page 308

DONDERO - 10/29/21

1
2    when you did not control HCMFA?
3        A.   I don't know.
4        Q.   Okay.  Can you tell me what the
5    nature of HCMFA's business is?
6        A.   It largely housed our mutual funds.
7        Q.   What does it mean to house mutual
8    funds?
9        A.   It managed -- it managed the mutual
10   funds from a portfolio asset side and captured
11   the management fees as the advisor or sub
12   advisor -- I can't remember the structure.  I
13   can't remember if it was the advisor and
14   Highland was the sub advisor or vice versa, but
15   in general, a good portion, or most of the
16   portfolio team that managed the mutual funds
17   was employed at HCMFA.
18       Q.   Do you have a title with HCMFA
19   today?
20       A.   I don't know.
21       Q.   Do you know who the president of
22   HCMFA is?
23       A.   I would believe -- I would -- I
24   would think I am, but I don't know.
25       Q.   Do you know of any title that you

Page 309

DONDERO - 10/29/21

1
2    have at HCMFA today?
3        A.   I know I'm the portfolio manager on
4    a bunch of the funds, one of usually two or
5    three portfolio managers, and I believe I'm the
6    president, but I don't know beyond that.
7        Q.   Okay.  Did Frank Waterhouse serve as
8    treasurer of HCMFA at any point in time?
9        A.   I don't know.  I don't know.  I
10   just -- I don't know.  I don't remember.
11       MR. MORRIS:  Can I ask my -- my
12   colleague to please put up a document that
13   was premarked as Exhibit 35 to see if I can
14   refresh your recollection.
15       MS. DEITSCH-PEREZ:  Is that in the
16   book that you sent over?
17       MR. MORRIS:  No.  She will post it
18   and she will put it in the chat room.
19       Q.   Are you able to see that,
20   Mr. Dondero?
21       A.   Yes.
22       Q.   Can you see that this is an
23   incumbency certificate?
24       A.   Yes.
25       Q.   Do you know what an incumbency

Page 310

DONDERO - 10/29/21

1
2    certificate is?
3        A.   I'm reading it here for a second.  I
4    guess it is an officer statement or signature
5    authority, or some combination thereof.
6        Q.   Is that your signature at the bottom
7    of this document?
8        A.   Yes.
9        Q.   And do you see that this is an
10   incumbency certificate for HCMFA that you
11   signed effective as of April 11th, 2019?
12       A.   Yes.
13       Q.   Do you see that Frank Waterhouse is
14   identified as the treasurer of HCMFA as of that
15   date?
16       A.   Yes.
17       Q.   Does that refresh your recollection
18   that Mr. Waterhouse served as the treasurer of
19   HCMFA?
20       A.   It seems to be an authoritative
21   document, but I didn't have a recollection.
22       Q.   Do you know of anybody else who has
23   ever served as the treasurer of HCMFA other
24   than Mr. Waterhouse?
25       A.   I don't recall.

Page 311

DONDERO - 10/29/21

1
2        Q.   Did you, in your capacity as the
3    person who was in control of HCMFA, appoint
4    Mr. Waterhouse as the treasurer of that entity?
5        MS. DEITSCH-PEREZ:  Object to the
6    form.
7        A.   It appears to me that that's what
8    this incumbency certificate does, but...
9        Q.   Is it fair to say that you knew for
10   at least a few years prior to the petition date
11   that Mr. Waterhouse was simultaneously serving
12   as Highland's CFO and HCMFA's treasurer?
13       A.   No.  I mean, like I said, I don't
14   remember, and a lot of the officers had
15   multiple roles and multiple entities.  I mean,
16   it is not surprising, but I didn't have any
17   recollection.
18       Q.   Are you aware that Mr. Waterhouse
19   served in any capacity in the Highland universe
20   of companies other than as CFO of Highland
21   Capital Management, L.P.?
22       A.   I would -- I would assume he would
23   have a position like this in multiple other
24   entities, but I don't know which ones or what
25   titles he would have off the top of my head.

Page 312

DONDERO - 10/29/21

1
2  Q.  Is it fair to say, though, that he
3  wouldn't have obtained any of those titles
4  without your knowledge and approval?
5      A.  It is -- it is fair to say he was --
6  he had -- the lawyers or whoever worked on
7  general corporate structuring, Frank was a
8  senior officer in good standing, so they would
9  have used him as appropriate in different
10 things.
11        So to that extent, I guess I approve
12 it, but I sign hundreds of things like this.
13 Would -- you know, would I have been
14 specifically aware or remember -- remember it
15 is a very low likelihood.
16     Q.  Is there any position that
17 Mr. Waterhouse has ever held that you learned
18 about and you objected to on the grounds that
19 you hadn't approved it?
20     A.  No, not that I recall.
21     Q.  Okay.  Do you know if Mr. Waterhouse
22 held any positions with any of the retail
23 funds?
24     A.  I don't know.
25     Q.  He may have, you just don't recall;

Page 313

DONDERO - 10/29/21

1
2  is that right?
3      A.  That is correct.
4      Q.  And you can't identify any title
5  that Mr. Waterhouse held during the time that
6  you served as Highland's president other than
7  CFO of Highland.  Do I have that right?
8      A.  No, I don't think that is fair.
9      Q.  Okay.
10     A.  I mean -- I mean, he was CFO, but he
11 was other things before he was CFO.  And as we
12 were just saying, he's -- he's treasurer on
13 this incumbency certificate, but I think he
14 might have been on other incumbency
15 certificates, so I think your -- your summary
16 was too narrow.
17     Q.  Okay.  Can you identify any position
18 that Mr. Waterhouse held at the same time that
19 he is CFO of Highland other than treasurer of
20 HCMFA as reflected on this document?
21     A.  I can't recall, but I imagine there
22 to be others.
23     Q.  And to the extent there are others,
24 is it fair to say that you knew at the time
25 that Mr. Waterhouse was serving in more than

Page 314

DONDERO - 10/29/21

1
2  one role?
3      A.  Yes.
4      Q.  Okay.  And in his capacity as CFO of
5  Highland, did he report directly to you?
6      A.  Yes.
7      Q.  In his capacity as treasurer of
8  HCMFA, did he report directly to you?
9      A.  Yeah, it appears that, yes, that is
10 how it was structured.
11     Q.  Can you think of any position that
12 Mr. Waterhouse ever held in the Highland family
13 of companies where he didn't report directly to
14 you?
15     A.  I can't -- I can't think of any.
16     Q.  Is Mr. Waterhouse the treasurer of
17 HCMFA today?
18     A.  I don't know.  I'm not aware of any
19 changes, nor did I orchestrate any changes, but
20 I don't know for sure.
21     Q.  Can you identify any position that
22 Mr. Waterhouse holds with any former affiliated
23 company of Highland today?
24     A.  Again, I'm not aware of any changes,
25 nor did I orchestrate or precipitate any

Page 315

DONDERO - 10/29/21

1
2  changes.  With the formation of Skyview, I
3  don't know if there was changes.  I'm not
4  aware.
5      Q.  Have you considered firing
6  Mr. Waterhouse from any of the positions that
7  he holds with any of the companies that were
8  formerly affiliated with Highland?
9      A.  No.
10     Q.  As the president of HCMFA --
11        withdrawn.
12        As the person who was in control of
13 HCMFA, did you have any responsibility for
14 being familiar with HCMFA's debts and
15 obligations?
16        MS. DEITSCH-PEREZ:  Object to the
17 form.
18     A.  I don't know.
19     Q.  Did you ever do anything in your
20 capacity as the person in control of HCMFA to
21 familiarize yourself with HCMFA's debts and
22 obligations?
23     A.  Not during -- I mean, not prior to
24 bankruptcy.
25     Q.  So before the bankruptcy, you didn't

**Appx. 01749**

Page 316

DONDERO - 10/29/21

1 take any steps to familiarize yourself with
2 HCMFA's debts and obligations. Do I have that
3 right?
4     A.   Correct, not specifically.
5     Q.   Okay. Who was responsible for
6 knowing and understanding the scope and extent
7 of HCMFA's debts and obligations?
8     A.   That would have fallen on Frank and
9 his group.
10     Q.   Okay. Do you have an understanding
11 as to who was authorized to incur obligations
12 on behalf of HCMFA?
13     A.   I mean, beyond – beyond due course,
14 I struggle to see why it would be anybody other
15 than me, but I don't know.
16     Q.   Do you know if Mr. Waterhouse was
17 authorized as the treasurer of HCMFA to incur
18 obligations on its behalf?
19     A.   He wasn't the senior operating or
20 executive positions there. So the answer is
21 no, beyond, you know – beyond the normal
22 course of operating expenses or whatever, but
23 it would – he would never be the person on
24 anything of significance.

Page 317

DONDERO - 10/29/21

1     Q.   How do you define "significance"?
2     A.   Like waiving fees on a mutual fund,
3 purchasing another mutual fund, yeah, things
4 like that.
5     Q.   Was there any document or policy
6 that you are aware of that specifically
7 identifies the scope of Mr. Waterhouse's
8 authority as the treasurer of HCMFA?
9     A.   No.
10     Q.   Is there anything that you are aware
11 of that specifically limits Mr. Waterhouse's
12 authority other than what might be in your
13 head?
14     A.   No, I would – I would say what is
15 in my head is – would be typical industry
16 practice. You wouldn't – you wouldn't have
17 executive vice presidents or ownership defined
18 if you were going to delegate everything to an
19 employee three levels down, you know.
20     MS. DEITSCH-PEREZ:   Okay. John,
21 I've had a request from Davor to take a
22 quick restroom break, so –
23     MR. MORRIS:   You know, I really –
24 Davor, I'm happy to accommodate, but at
25

Page 318

DONDERO - 10/29/21

1 some point we have got to be able to get
2 more than 10 minutes of testimony in a row.
3 So let's take a short break.
4     MS. DEITSCH-PEREZ:   Thank you.
5     VIDEOGRAPHER:   Going off the record.
6 The time is 11:08.
7 (Recess taken 11:08 a.m. to 11:16 a.m.)
8     VIDEOGRAPHER:   Back on the record,
9 11:16.
10     Q.   Mr. Dondero, did you communicate
11 with anybody on the break about the substance
12 of your testimony?
13     A.   No.
14     Q.   As treasurer of HCMFA, did
15 Mr. Waterhouse's responsibilities include being
16 familiar with HCMFA's debts and obligations?
17     A.   Yes.
18     Q.   Do you have any reason to believe as
19 you sit here today that Mr. Waterhouse failed
20 to fulfill his responsibilities as treasurer of
21 HCMFA and familiarize himself with their debts
22 and responsibilities?
23     MS. DEITSCH-PEREZ:   Object to the
24 form.

Page 319

DONDERO - 10/29/21

1     A.   I don't know.
2     Q.   I appreciate that you don't know,
3 but do you have any reason as you sit here
4 today to believe that he failed to fulfill that
5 particular responsibility?
6     A.   I don't know.
7     Q.   Okay. Are you an authorized
8 signatory on HCMFA's bank accounts?
9     A.   I don't know.
10     Q.   Do you know who the authorized
11 signatories are on HCMFA's bank accounts?
12     A.   No.
13     Q.   Do you know whether anybody now
14 employed or previously employed by Highland was
15 an authorized signatory with respect to any of
16 HCMFA's bank accounts?
17     A.   I don't know.
18     Q.   Do you know whether Mr. Waterhouse
19 was an authorized signatory on any of HCMFA's
20 bank accounts?
21     A.   I don't know how he had – had it
22 set up. There would have been, I imagine,
23 checks and balances. We run, as far as I know,
24 a compliant accounting group, you know, with

Page 320

DONDERO - 10/29/21

1    the right audit controls, et cetera.  So I
2    would imagine there would have been somebody
3    preparing it and multiple signatures or
4    multiple sign-offs on wires, but I have no
5    awareness of this.  I mean, I would believe
6    that it was done compliantly and correctly, but
7    I don't have any specific awareness.
8    Q.    Okay.  Do you know Lauren Thedford?
9    A.    Yes.
10    Q.    And was Ms. Thedford an employee of
11    Highland at one time?
12    A.    Yes.
13    Q.    Do you recall what position she held
14    at any particular point in time?
15    A.    I believe she held several different
16    positions over the years, but I remember most
17    as a corporate attorney working on document –
18    documents when we – we do new funds or amend
19    old funds.
20    Q.    Okay.  Do you recall whether she
21    served as an officer of HCMFA?
22    A.    Wasn't her name on the incumbency
23    certificate we had up earlier?
24    Q.    It was.  We can put it back up if
25

Page 321

DONDERO - 10/29/21

1    you want to look at that.
2    A.    No, but I think that is – that is
3    the answer, but that is my only awareness.
4    Q.    Okay.  Do you have – do you have –
5    do you know whether she was ever appointed to
6    any position within the Highland corporate
7    family other than as an attorney with Highland
8    and as the secretary of HCMFA?
9    A.    I don't know.
10    Q.    Other than Ms. Waterhouse –
11    withdrawn.
12    Other than Mr. Waterhouse and
13    Ms. Thedford, can you identify any current or
14    former employee of Highland that ever served as
15    an officer of HCMFA?
16    A.    I don't know.
17    Q.    Okay.  Can you identify any current
18    or former employee of Highland who was
19    simultaneously also an employee of HCMFA?
20    MS. DEITSCH-PEREZ:  Object to the
21    form.
22    A.    You mean somebody who was a dual
23    employee?
24    Q.    Yeah, who was actually – yeah, to
25

Page 322

DONDERO - 10/29/21

1    be clear, who was actually employed by both,
2    who received, you know, income from both.
3    A.    I don't know regarding income, but
4    some of that historic portfolio managers like
5    Michael Gregory or Jonathan Lamensdorf, they
6    did work for HCMFA primarily, but they also did
7    other things for Highland.  I don't know how
8    their compensation or their bonuses were split.
9    I just – I wouldn't have awareness of that.
10    Q.    Let's move on to NexPoint.  You're
11    familiar with an entity called NexPoint
12    Advisors, L.P.; correct?
13    A.    Yes.
14    Q.    We will refer to that as NexPoint,
15    okay?
16    A.    Sure.
17    Q.    Do you know who owns NexPoint?
18    A.    Directly or indirectly, I believe I
19    do.
20    Q.    Okay.  And do you control NexPoint?
21    A.    Yes.
22    Q.    And do you know when NexPoint was
23    created?
24    A.    More than five years ago, but I

Page 323

DONDERO - 10/29/21

1    don't remember when.
2    Q.    Can you tell me generally the nature
3    of NexPoint's business?
4    A.    It is generally real estate related.
5    Q.    Have you controlled NexPoint
6    throughout its corporate existence, to the best
7    of your knowledge?
8    A.    Yes.
9    Q.    Do you have a title with NexPoint
10    today?
11    A.    I believe I'm president, but I don't
12    know for sure.
13    Q.    Did you appoint Mr. Waterhouse to
14    serve as treasurer of NexPoint?
15    A.    I don't know.
16    MR. MORRIS:  Please put up Exhibit
17    37.
18    Q.    This is another incumbency
19    certificate, sir?
20    A.    Yes.
21    Q.    And do you see, is that your
22    signature at the bottom?
23    A.    Looks like it, yes.
24    Q.    And does that refresh your
25

Page 324

DONDERO - 10/29/21

1   recollection that you personally identified
2   Mr. Waterhouse as the treasurer of NexPoint
3   Advisors, L.P. effective as of April 11th,
4   2019?
5       A.   No, I mean, not -- no.
6       Q.   Do you have any reason to doubt that
7   Mr. Waterhouse served as the treasurer of
8   NexPoint Advisors prior to the petition date?
9       A.   No, I don't have a reason to
10  disagree with it.  I just didn't have an
11  awareness.  And when you asked me earlier, the
12  thing that was running through my mind is that
13  it could have been, you know, Brian Mitts who
14  has a strong accounting background at NexPoint.
15  I just wasn't -- I didn't know, based on
16  recollection, who was treasurer.
17      Q.   Okay.  Were you aware that -- but
18  you were aware, were you not, that
19  Mr. Waterhouse wore multiple hats?
20          MS. DEITSCH-PEREZ:  Objection to
21      form.
22      Q.   Withdrawn.
23          You were aware, were you not, sir,
24  that during the time that you served as

Page 325

DONDERO - 10/29/21

1   president of Highland, that Mr. Waterhouse
2   served in capacities with respect to affiliated
3   companies?
4       A.   I was aware that multiple senior
5   executives had multiple titles at multiple
6   different entities, but I didn't have specific
7   awareness whatsoever on entities that Frank was
8   or was not involved in.
9       Q.   Okay.  But to the extent that he
10  held a title with one of the affiliated
11  companies, those affiliated companies would
12  have been managed or controlled by you;
13  correct?
14      A.   Generally.
15      Q.   You can't think of any title that he
16  held with an affiliated company that wasn't
17  managed by you, can you?
18      A.   No, not off the top of my head.
19      Q.   And you knew and intended prior to
20  the petition date to have Mr. Waterhouse serve
21  in multiple roles; is that fair?
22      A.   Yes.
23      Q.   Have you ever considered firing
24  Mr. Waterhouse from his position as treasurer

Page 326

DONDERO - 10/29/21

1   of NexPoint Advisors?
2       A.   No.
3       Q.   Okay.  As the president of NexPoint
4   Advisors, do you believe that you had a
5   responsibility to familiarize yourself with
6   NexPoint's debts and obligations?
7           MS. DEITSCH-PEREZ:  Object to the
8       form.
9       A.   Just generally.
10      Q.   Okay.  Did you do anything to
11  generally inform yourself of NexPoint's debts
12  and obligations?
13      A.   Not -- not specifically that I can
14  recall.
15      Q.   Can you recall doing anything to
16  familiarize yourself with NexPoint's debts and
17  obligations at any time?
18          MS. DEITSCH-PEREZ:  Object to the
19      form.
20      A.   Not that I recall.
21      Q.   Did you ever look at NexPoint's
22  balance sheet?
23      A.   Not -- not that I -- not that I
24  recall.

Page 327

DONDERO - 10/29/21

1       Q.   Do you know whether NexPoint's
2   balance sheet reflected obligations that it
3   carried as liabilities that were due and owing
4   to Highland?
5       A.   I was aware generally of the notes,
6   but I didn't study the NexPoint balance sheet.
7       Q.   Do you believe that Mr. Waterhouse
8   had any responsibility as NexPoint's treasurer
9   to familiarize himself with NexPoint's debts
10  and obligations?
11      A.   Yeah.  I mean, the role is different
12  and the burden is different, and Frank and his
13  team orchestrated all the audits and compliance
14  statements and regulatory stuff for all of the
15  funds managed by NexPoint.
16      Q.   Well, you personally were
17  responsible for Highland's audited financial
18  statements, weren't you?
19          MS. DEITSCH-PEREZ:  Objection, form.
20      A.   No.  I mean, "responsible" is not
21  the right word.  I mean, we -- I have to -- as
22  the senior most executive, I have to -- to
23  sign -- sign statements regarding completeness
24  and no known frauds and those kinds of things,

Page 328

DONDERO - 10/29/21

1 but I am in no way involved in the preparation.
2    Q.   We will talk about that in a bit.
3       Do you have any reason to believe
4 today that Mr. Waterhouse failed to fulfill his
5 responsibilities as treasurer of NexPoint to
6 familiarize himself with NexPoint's debts and
7 obligations?
8    A.   I don't know.
9    Q.   You can't identify any particular
10 reason that you might have for concluding that
11 Mr. Waterhouse failed to fulfill his duties as
12 treasurer of NexPoint to familiarize himself
13 with NexPoint's duties and respons -- duties
14 and obligations; correct?
15    A.   Yes, I don't know.
16    Q.   Okay.  Do you know who the
17 authorized signatories are on NexPoint's bank
18 accounts?
19    A.   No.
20    Q.   Do you know if you're an authorized
21 signatory on NexPoint's bank accounts?
22    A.   I don't know.
23    Q.   Do you know if Mr. Waterhouse is an
24 authorized signatory on NexPoint's bank

Page 329

DONDERO - 10/29/21

1 accounts?
2    A.   I don't know.
3    Q.   Do you know whether there is any
4 current or former employee of Highland who did
5 not hold an officer position at NexPoint who
6 would have been an authorized signatory on
7 NexPoint's bank accounts?
8       MS. DEITSCH-PEREZ:  Object to the
9 form.
10    A.   I don't know.
11    Q.   Can you identify any current or
12 former employee of Highland who served as an
13 officer of NexPoint at any time other than
14 Ms. Thedford and Mr. Waterhouse?
15    A.   I don't know.
16    Q.   Okay.  Let's go to HCMS.  Are you
17 familiar with an entity called Highland Capital
18 Management Services, Inc.?
19    A.   Generally, yes.
20    Q.   And can we refer to that as HCMS?
21    A.   Yes.
22    Q.   Do you have a direct or indirect
23 ownership interest in HCMS?
24    A.   I believe so.

Page 330

DONDERO - 10/29/21

1    Q.   And do you own a majority of the
2 interest directly or indirectly in HCMS?
3    A.   I believe so.
4    Q.   Do you control HCMS?
5    A.   I believe so.
6    Q.   Have you -- has there ever been a
7 period of time in HCMS's corporate existence
8 where you did not control that entity?
9    A.   Not that I'm aware of.
10    Q.   Do you recall when HCMS was created?
11    A.   More than five years ago, but I
12 don't remember when.
13    Q.   Do you have an understanding of the
14 nature of HCMS's business?
15    A.   It manages some assets, and it was
16 trying to create track records that then could
17 be marketed.
18    Q.   What does it mean to create a track
19 record that could be marketed?
20    A.   You execute investments and
21 investment strategy that you can refine and
22 articulate and show good results to potential
23 third-party investors as -- as evidence that
24 you can do it.  And then that track record is

Page 331

DONDERO - 10/29/21

1 something the investors are willing to take a
2 chance on and then give you separate account
3 money along those lines.
4    Q.   Do you have a title with HCMS today?
5    A.   I don't know.
6    Q.   But you do control the entity; is
7 that fair?
8       MS. DEITSCH-PEREZ:  Object to the
9 form, asked and answered.
10    A.   I believe so.
11    Q.   Okay.  Do you know whether
12 Mr. Waterhouse has ever served as an officer of
13 HCMS?
14    A.   I have no idea.
15    Q.   Can you identify any person in the
16 world who has ever served as an officer of
17 HCMS?
18    A.   I don't know what the incumbency
19 certificate would look like for services, but
20 I'm willing to be refreshed.
21    Q.   Do you know if anybody ever served
22 as the chief -- withdrawn.
23       Did HCMF ever have anybody serve in
24 the capacity of chief financial officer?

Page 332

DONDERO - 10/29/21

2  A.  The subject of that question was
3  HCMF.  Is that what you meant to say, or did
4  you mean Services?
5  Q.  No, I apologize.  Thank you for the
6  clarification.  I did mean HCMS, so let me try
7  again.
8      Has anybody ever served in the
9  capacity of chief financial officer of HCMS?
10  A.  HCMF.
11  MS. DEITSCH-PEREZ:  S.
12  A.  Not --
13  Q.  S.
14  A.  Not of Services -- not that --
15  again, I don't know.  I'm willing to be
16  refreshed, but I -- I have no awareness.
17  Q.  Okay.  As president -- as the person
18  in control of HCMS, do you believe you had any
19  responsibility to familiarize yourself with
20  that entity's debts and obligations?
21  A.  Again, just generally, to the extent
22  that they were material or an issue or
23  whatever, but no more than generally.
24  Q.  Can you describe anything you ever
25  did to generally familiarize yourself with

Page 333

DONDERO - 10/29/21

2  HCMS's debts and obligations?
3  A.  I guess my answer, which would apply
4  to all of these entities, is awareness to know
5  that the amounts were de minimis relative to
6  the value of the entity, and the debt service
7  costs or issues were very de minimis relative
8  to the entities, but beyond that, I didn't
9  study them.
10  Q.  Well, did -- did HCMFA have
11  obligations to HCMLP that you would
12  characterize as di minimis from HCMFA's
13  perspective?
14  A.  Yeah, or just -- it never had
15  obligations that were more than de minimis.
16  Q.  As -- as the person in control of
17  HCMFA, did you ever have any concern that HCMFA
18  would not be able to satisfy its obligations to
19  HCMLP if -- if a demand was made?
20  A.  No.
21  Q.  Okay.  Was anybody charged with the
22  responsibility of familiarizing themselves with
23  HCMS's debts and obligations?
24  A.  Again, to differentiate or separate
25  myself from the treasury function or from what

Page 334

DONDERO - 10/29/21

2  Frank and his group were doing.
3      From my perspective, I had to be
4  aware about it -- aware of any obligations or
5  notes or debt service costs, et cetera, but to
6  the extent that I was aware and knew that it
7  was de minimis, I didn't spend any time
8  focusing on it, studying it, calculating it
9  exactly, or anything like that.
10      Having said that, we are highly
11  compliant.  We do -- we did audits every year
12  with reputable accounting firms that were
13  complete and in depth.  And any obligations
14  and/or assets, de minimis or not, in my view,
15  would nonetheless have to be reflected or
16  captured accurately and prepared for the
17  auditors in supplying, you know, detail or
18  source documents or whatever, whatever they do
19  in accounting as part of the audit function.
20      And all that would have done -- been
21  done exactly and expertly, as far as I know,
22  and it would have been done by Frank and his
23  group.
24  Q.  Okay.
25  A.  That is -- I'm trying to give a

Page 335

DONDERO - 10/29/21

2  complete answer regarding a myriad of ways
3  you've asked me kind of the same structural
4  questions.
5  Q.  I am, and just to be clear, I'm
6  asking kind of the same structural questions
7  with respect to each of the entities at issue.
8  I think you picked up on that.  I hope you
9  don't think I'm being repetitive.
10      You mentioned Frank and his group in
11  the context of HCMS.  Did I hear that
12  correctly?
13  A.  Yes.
14  Q.  Okay.  HCMS did not have a shared
15  services agreement with Highland; correct?
16  MS. DEITSCH-PEREZ:  You mean a
17  written shared services agreement, John?
18  Q.  Do you understand the question, sir?
19  A.  Yeah.  My answer would be the
20  advisors like NexPoint and HFAM that had to
21  have by law and regulatory statute have to have
22  formal sub advisors and shared services
23  agreements had formal shared services
24  agreement.
25      Entities that didn't need to have

Page 336

1              DONDERO - 10/29/21
2    formal written shared services agreements were
3    often serviced similarly or -- or exactly the
4    same as those entities, but without a written
5    agreement, but with a verbal shared services
6    agreement providing, again, all the same
7    similar services.
8              And the entities that didn't have a
9    written shared services agreement weren't
10   getting shared services or support from any
11   other entities other than Highland doing the
12   same thing for them that it did for the mutual
13   funds.
14      Q.   Okay.  Can you tell me who entered
15   into an oral shared services agreement between
16   Highland and HCMS?
17      A.   Boy, I can imagine way back in the
18   day it would have been myself and Frank, but he
19   and his group understood and knew that they
20   were doing it for all the new entities that
21   came along, and I can't imagine it was even
22   talked about much over the years.
23      Q.   Did -- did HCMFA and NexPoint pay
24   money to Highland under the shared services
25   agreement until let's just say late 2020?

Page 337

1              DONDERO - 10/29/21
2      A.   Yeah, yes, and early into '21, I
3    believe also.
4      Q.   Okay.  As -- as part of the oral
5    agreement that you referenced, was there -- was
6    there ever an agreement that HCMS would pay any
7    money to Highland in exchange for the services
8    that Highland provided to it?
9      A.   I do not believe there was a
10   financial remuneration aspect of it.
11      Q.   Okay.  And do you recall during your
12   time as president of Highland whether Highland
13   ever received payment from HCMS for services
14   rendered?
15      MS. DEITSCH-PEREZ:  And we just
16   talking about money?
17      MR. MORRIS:  Correct.
18      A.   Yeah, I don't -- I don't recall
19   moneys being -- well, you know what, let me --
20   let me clarify that a little bit.
21          If there were any direct costs that
22   Highland would have incurred like getting the
23   audits done, you know, like if Price Waterhouse
24   said, okay, give us the details on, you know,
25   all the different entities that roll up into

Page 338

1    the Highland entity.
2          And then -- and they prepared
3    statements or did work for services, Frank and
4    his group would have passed through those costs
5    and expected services and/or Dugaboy or any of
6    the other entities to pay for direct
7    out-of-pocket costs.  But it wouldn't have paid
8    a supplemental fee or profit or anything to
9    Highland.
10      Q.   Okay.  To the best of your
11   recollection, during the time that you were
12   president of Highland, did Highland ever
13   receive anything of value from HCMS on account
14   of services other than the reimbursement of
15   out-of-pocket expenses?
16      A.   Yeah, I'm going to go back to my
17   comment in terms of building track record.  And
18   I would use -- yeah, we had done it several
19   times in the past and it had worked
20   effectively.  And that is -- you know, yeah, I
21   mean, the -- the track record in CLO paper was
22   what was used to track -- (inaudible) -- as an
23   investor.
24          And so, you know, to the extent that

Page 339

1    the DAF wasn't paying a fee, along the way, to
2    Highland for shared services, Highland got the
3    benefit of the track record that was being
4    built at the DAF to then market to third
5    parties, which then created a revenue stream
6    for Highland down the road.
7          And I would say that was the same
8    intent on Services.
9      Q.   Is there anything -- anything else
10   of value that you believe HCMS provided to
11   Highland in exchange for the services that
12   Highland rendered?
13      A.   That would be primarily it.  I would
14   say there is probably times where Services
15   provided liquidity for Highland or helped on
16   investments that Highland was involved in, but
17   I would have to refresh myself on exactly what.
18      Q.   Is it fair to say that HCMF -- HCMS
19   never provided a revenue stream to Highland
20   similar to the revenue stream that was provided
21   by HCMFA and NexPoint under the shared services
22   agreements?
23      A.   That is correct.
24      Q.   Okay.  Did anybody at HCMF --

Page 340

DONDERO - 10/29/21

1 withdrawn.
2        Did anybody at HCMS ever have the
3 responsibility for familiarizing themselves
4 with HCMS' debts and obligations?
5        MS. DEITSCH-PEREZ:  Object to the
6    form.
7        A.    Frank and his team, as part of
8 preparing the audited financials for all the
9 entities, would have definitively been aware of
10 all of them.  Who else on the services
11 incumbency certificate or – would be aware or
12 have knowledge, I don't know.
13       Q.    Okay.  And when you refer to "Frank
14 and his team," are any of them acting as an
15 officer or employee of HCMS in what you are
16 thinking about?
17       A.    I – I don't know.  I don't know.
18 Did – we haven't – have we looked at the
19 incumbency certificate for services?
20       Q.    No.
21       A.    I don't know.  I don't know off the
22 top of my head.
23       Q.    Okay.  Let's just finish this up.
24       Can you identify any current or

Page 341

DONDERO - 10/29/21

1 former Highland employee who served as an
2 officer of HCMS at any time?
3       A.    No, I would need to be refreshed.
4       Q.    Okay.  Can you identify –
5 withdrawn.  Let's go to the last one, HCRE.
6       Are you familiar with an entity
7 called HCRE Partners, LLC?
8       A.    Yes.
9       Q.    And is that entity now known as
10 NexPoint Real Estate Partners, LLC?
11      A.    You know what, I do believe it had a
12 name change.  I don't know if that is the name
13 change, but that would make sense.
14      Q.    Okay.  Can we just refer to that
15 entity as HCRE?
16      A.    That is fine.
17      Q.    Okay.  Do you have any direct or
18 indirect ownership interest in HCRE?
19      A.    Yes.
20      Q.    And is it a majority interest to the
21 best of your knowledge?
22      A.    Yes.
23      Q.    Do you control HCRE?
24      A.    Yes.

Page 342

DONDERO - 10/29/21

1       Q.    Have you controlled HCRE throughout
2 its corporate existence?
3       A.    Yes.
4       Q.    Can you tell me what the nature of
5 HCRE's business is?
6       A.    It makes real estate investments.
7       Q.    Do you have a title with that
8 entity?
9       A.    I don't know, but I'm willing to be
10 refreshed.  And I assume its incumbency
11 certificate looks similar to the ones that you
12 have put up.
13      Q.    Can you identify for me today
14 anybody who has ever served as an officer of
15 HCRE at any time?
16      A.    I would rather be refreshed.  I
17 would imagine myself and Matt McGraner are two
18 of those people, but I don't know for sure.
19      Q.    Okay.  Without the incumbency
20 certificates or other documentation, you are
21 not able to give me any names other than Mr. –
22 other than you and Mr. McGraner; is that fair?
23      A.    That's correct.
24      Q.    Okay.  Do you know whether anybody

Page 343

DONDERO - 10/29/21

1 has ever been given the responsibility –
2 withdrawn.
3       Do you know whether anybody has ever
4 had the responsibility for familiarizing
5 themselves with the debts and obligations of
6 HCRE?
7       A.    It would be the same answer as given
8 on the other entities.  It would be the
9 treasurer, which is probably Frank.  And if not
10 the treasurer it would be Frank in his role and
11 his team of putting together the complete and
12 accurate financials of HCRE.
13      Q.    Other than putting together the
14 complete and accurate financials of HCRE, did
15 Frank and his team have any other
16 responsibility with respect to understanding
17 the debts and obligations of HCRE?
18      MS. DEITSCH-PEREZ:  Objection, form.
19      A.    Again, just the general overlay
20 being that they were de minimis and – de
21 minimus, and the service obligations were de
22 minimus relative to the value or operating
23 income of the enterprise.
24      In other words, had they been more

Page 344

DONDERO - 10/29/21

1      material or material, they would have had more
2      focus. But they didn't deserve more focus.
3          Q.   And so is it fair to say that you
4      didn't do anything to familiarize yourself with
5      HCRE's debts and obligations?
6          MS. DEITSCH-PEREZ:  Object to the
7      form.
8          A.   Not on a regular detailed basis, you
9      know, just a general awareness.
10         Q.   Did you ever take any steps to
11     review the affiliate loans and obligations that
12     were due between and among Highland and its
13     affiliated companies?
14         A.   Again, just generally.
15         Q.   What did you do?
16         A.   Like I said, I had a general
17     awareness of them.
18         Q.   And did you receive from time to
19     time lists or information that specifically
20     described the amounts that were due and owing
21     from the affiliates to Highland?
22         A.   Yeah, from time to time the amounts,
23     yes.
24         Q.   Let's just quickly go to the

Page 345

DONDERO - 10/29/21

1      30(b)(6) notices if we can.
2          MR. MORRIS:  Can we put up a
3      document that has been marked as
4      Exhibit 47.
5          (Exhibit 47 marked.)
6          Q.   Do you understand, Mr. Dondero, that
7      you are here today in your individual capacity
8      and in your capacity as what is called a
9      30(b)(6) witness for certain entities?
10         A.   Yes, a little bit to my chagrin.
11     And I don't think you will see me again as a
12     30(b)(6) witness, but yes.
13         Q.   All right.  Well, it wasn't my
14     choice, so let's just go through it quickly.
15         Have you seen this document before,
16     sir?
17         A.   Yes.
18         Q.   And do you understand that you are
19     here today in your capacity as NexPoint's
20     corporate representative?
21         A.   Yes.
22         Q.   And do you understand that your
23     answers today in your capacity as NexPoint's
24     corporate representative will be binding on

Page 346

DONDERO - 10/29/21

1      NexPoint?
2          MS. DEITSCH-PEREZ:  As qualified by
3      the objections that we made.
4          MR. MORRIS:  Sure.
5          A.   I will do the best I can.
6          Q.   Thank you so much.
7          MR. MORRIS:  Can we go to the next
8      page, please.  The last page.  The topics.
9          Q.   Okay.  Have you seen these topics
10     before, sir?
11         A.   Yes.
12         Q.   Okay.  Do you see that we asked for
13     somebody to testify as to NexPoint's answer?
14         A.   Yes.
15         Q.   Okay.  Are you aware that
16     NexPoint -- are you aware that NexPoint filed
17     an answer to Highland's amended complaint?
18         A.   Yes.
19         Q.   And did you review NexPoint's answer
20     at any time before today's deposition?
21         A.   It was in the binder, I believe,
22     that you guys sent over.
23         Q.   I think that's right.  Are you
24     prepared to answer questions today about

Page 347

DONDERO - 10/29/21

1      NexPoint's answer?
2          MS. DEITSCH-PEREZ:  Again, subject
3      to our objections, but...
4          A.   Yeah, to the best I can.
5          Q.   Okay.  The next topic concerns
6      affirmative defenses.
7          Do you see that?
8          A.   Yes.
9          Q.   Do you have an understanding of what
10     an affirmative defense is?
11         A.   Yes.
12         Q.   What is your understanding of an
13     affirmative defense?
14         A.   I think it is those -- phrase that
15     you see in most of our answers, the
16     justification, estoppel, waiver, and then --
17     and then there is some specific answers beyond
18     that, I guess.
19         Q.   Okay.  Are you prepared --
20         MS. DEITSCH-PEREZ:  John, I take it
21     you will show him.  He doesn't have to have
22     them memorized.
23         MR. MORRIS:  No, of course not.
24         MS. DEITSCH-PEREZ:  So if you are

Page 348

DONDERO - 10/29/21

1 going to ask him, you will put it in front
2
3 of him?
4        MR. MORRIS:  Of course.
5        MS. DEITSCH-PEREZ:  Thank you.
6    Q.   Are you prepared to testify today to
7 the circumstances, communications, documents,
8 and facts concerning NexPoint's affirmative
9 defenses?
10   A.   Yeah, to the best that I can.
11   Q.   Okay.  Do you see Topic 3 concerns
12 the demand notes?
13   A.   Yes.
14   Q.   Okay.  Are you prepared to testify
15 about the demand notes, including with respect
16 to the specific issues identified in that
17 topic?
18        MS. DEITSCH-PEREZ:  Again, subject
19 to the objections, particularly I think
20 with respect to use of the proceeds.
21   Q.   We will get to that.
22        Are you prepared to testify?
23   A.   I hope so.
24   Q.   And -- and I know that there is an
25 objection there, but just a simple yes or no,

Page 349

DONDERO - 10/29/21

1 are you -- do you have knowledge of the -- of
2
3 NexPoint's use of the proceeds of the note?
4    A.   Not specifically.
5    Q.   All right.  Maybe I will refresh
6 your recollection later.
7        And then the last topic is discovery
8 requests.
9        Do you see that?
10   A.   Yes.
11   Q.   Are you prepared to testify today on
12 NexPoint's behalf concerning Highland's
13 discovery requests?
14   A.   To the best of my knowledge.
15   Q.   Okay.  Did you do anything to
16 prepare for today's deposition?
17   A.   I met with Deborah.
18   Q.   When did you do that?
19   A.   A couple of days ago for a couple of
20 hours, and a few days before that for a couple
21 of hours.
22   Q.   How many times --
23        MS. DEITSCH-PEREZ:  Are you also
24 asking about calls?
25        MR. MORRIS:  I appreciate that.

Page 350

DONDERO - 10/29/21

1 A.   Yeah.  There were a couple of phone
2
3 calls too.
4    Q.   How many times did you communicate
5 with Deborah in preparation for today's
6 deposition?
7    A.   A half dozen, maybe, you know.
8    Q.   How many times --
9    A.   You know, in-person and phone calls,
10 but...
11   Q.   How many times did you meet with her
12 in-person?
13   A.   Two, maybe three.
14   Q.   And can you just tell me an estimate
15 of the total time spent preparing for this
16 deposition, inclusive of both the meetings and
17 the phone calls?
18   A.   I don't know.  Does it matter?  I
19 mean, I don't know.  I don't know, four hours,
20 four hours.
21   Q.   Okay.  Did anybody participate in
22 these meetings or phone calls other than your
23 lawyers?
24   A.   No.
25   Q.   Did any lawyers participate in any

Page 351

DONDERO - 10/29/21

1 of these meetings or phone calls who didn't
2
3 represent you in your individual capacity?
4    A.   No.  It was just -- it was just
5 Deborah and I.
6    Q.   Okay.  Have you had a chance to
7 review the transcript of Mr. Waterhouse's
8 deposition?
9    A.   No.  I haven't seen it yet.
10   Q.   You haven't seen any portion of that
11 deposition?
12   A.   No.
13   Q.   Are you aware of anything that
14 Mr. Waterhouse testified to in his deposition?
15   A.   No.
16   Q.   You have no knowledge of anything
17 that Mr. Waterhouse said last week in his
18 deposition; do I have that right?
19   A.   That's correct.
20   Q.   Okay.  Do you have any knowledge as
21 to anything your sister said in her deposition?
22   A.   No, other than she is glad it is
23 over.
24   Q.   I hope -- I hope -- I hope she
25 thinks at least I was respectful.

Page 352

DONDERO - 10/29/21

1 
2    Did -- did you ever see her
3 transcript -- the transcript from her
4 deposition?
5    A.   No.
6    Q.   How about Mr. Seery, did you see the
7 transcript from Mr. Seery's deposition?
8    A.   I didn't even know that Seery was
9 deposed, so the answer is no.
10    Q.   Okay.  Are you aware that Dave Klos
11 was deposed?
12    A.   You know what, I think I had
13 awareness of that, but I haven't seen that
14 deposition.
15    Q.   Do you know anything about anything
16 that he testified to the other day?
17    A.   Nope.
18    Q.   How about Kristin -- Kristin
19 Hendrix, are you aware that she was deposed?
20    A.   I think I heard that she was also.
21    Q.   Do you know anything about anything
22 that she testified to?
23    A.   No.
24    Q.   Did you look at any documents to
25 refresh your recollection in advance of this

Page 353

DONDERO - 10/29/21

1 
2 deposition other than the stack that I provided
3 and the deposition notices?
4    A.   I mean just -- no, just a listing of
5 the notes, but that is it.
6    Q.   Did you see any emails at all in
7 connection with your preparation for today's
8 deposition?
9    A.   No, not a single email.
10    MR. MORRIS:  Okay.  Let's put up
11 Exhibit 48, please.
12    (Exhibit 48 marked.)
13    Q.   And I think you will see that this
14 is the 30(b)(6) notice for HCMS.  If we can go
15 to the next page.  And it is really the same --
16 I will represent to you that the topics for
17 HCMS are the same as the topics for NexPoint.
18    Have you seen HCMS's 30(b)(6) notice
19 that is up on the screen right now?
20    A.   Yes.
21    Q.   And if we took the time -- if I took
22 the time to ask you the same questions about
23 your ability to answer on behalf of HCMS --
24 HCMS with respect to the topics identified
25 there and subject to your counsel's objections,

Page 354

DONDERO - 10/29/21

1 
2 would you be able to do so?
3    A.   Yes.
4    MR. MORRIS:  Let's put up Exhibit
5 49, please.
6    (Exhibit 49 marked.)
7    Q.   And this the 30(b)(6) notice for
8 HCRE.  You're here today to testify on behalf
9 of HCRE as its corporate representative.  Do
10 you understand that?
11    A.   Yes.
12    Q.   And did you review the list of
13 topics that we included in our 30(b)(6) notice
14 for HCRE?
15    A.   Yes.
16    Q.   And subject to your counsel's
17 objections, are you prepared to testify to the
18 topics that are listed on the page that is up
19 on the screen?
20    A.   Yes.
21    MR. MORRIS:  Okay.  Can we please
22 put up Exhibit 31.
23    (Exhibit 31 marked.)
24    Q.   Mr. Dondero, we're putting up on the
25 screen now your answer to the -- to Highland's

Page 355

DONDERO - 10/29/21

1 
2 amended complaint.
3    MS. DEITSCH-PEREZ:  Is that in the
4 notebook?
5    MR. MORRIS:  No, no.  This is one
6 that we had -- we had --
7    MS. DEITSCH-PEREZ:  All right.  Hang
8 on.
9    MR. MORRIS:  That's okay.  That is
10 why we're putting it up on the screen, and
11 we will put it in the chat room.  It is
12 already in there, actually.
13    MS. DEITSCH-PEREZ:  Yeah, I think we
14 have it here.  Hold on.  I think Nancy
15 walked off with the duplicate of this, so
16 if you need it, I will hand it to you.
17    Q.   Mr. Dondero, while we wait to see if
18 your counsel has a hard copy, do you recall
19 reviewing your answer to the plaintiff's
20 amended complaint before it was filed?
21    A.   I don't know if I was involved at
22 that juncture.
23    Q.   All right.  So just to refresh your
24 recollection, this is a document that was filed
25 with the Court at the beginning of September.

Page 356

DONDERO - 10/29/21

1   If you recall, Highland filed an original
2   complaint, and after you amended your answer
3   late in August pursuant to an agreement,
4   Highland filed amended complaints against
5   certain of the obligors in the notes
6   litigation.
7       Does that refresh your recollection
8   that this document was prepared in early
9   September?
10      A.   Okay.
11      Q.   Okay.
12      A.   I don't have specific memory.
13      Q.   Okay.  So as always, Mr. Dondero, we
14  have done this many times before, if there is
15  anything in the document that you think that
16  you need to see because it is a little bit of a
17  lengthy document, will you let me know that?
18      A.   Sure.
19          MS. DEITSCH-PEREZ:  Yeah.  And we
20      have a copy if you need to stop and take a
21      look.  We did get a hard copy.  We have a
22      hard copy here.
23      Q.   Okay.
24      A.   All right.

Page 357

DONDERO - 10/29/21

1       Q.   So – so let me ask the question
2   again then:  Do you recall, with that
3   background, having reviewed and approved the
4   filing of this document at the beginning of
5   September 2021?
6       A.   Generally.
7       Q.   Okay.  As you sit here today, are
8   you aware of anything in this document that is
9   inaccurate?
10      A.   Not that I'm aware of.
11      Q.   Okay.  Are you aware of anything in
12  the document that you believe should be
13  modified or amended to make it more complete or
14  more accurate?
15      A.   Not as of this moment.
16      Q.   Okay.  Can we please go to Paragraph
17  83.  Okay.  Right there.
18          So do you see that on – on page 13
19  of the exhibit, we have in Paragraphs 82
20  through 91 what are called your affirmative
21  defenses?
22      A.   Yes.
23      Q.   All right.  I'm going to skip the
24  one in 82 for the moment, but focusing on 83.

Page 358

DONDERO - 10/29/21

1   Can you just read that to yourself and tell me
2   when you have done that?
3       A.   Yes.
4       Q.   Are you aware of any facts that
5   concern this particular affirmative defense?
6       A.   Which notes are these again?
7       Q.   These would be your personal notes.
8       A.   The – personal notes.  I'm trying
9   to remember.  No, I – well, if you read the
10  question one more time.
11      Q.   Sure.  Just so – so to make sure
12  that you understand, because I'm not here to
13  trick you, this is your answer to Highland's
14  complaint against you where Highland is trying
15  to recover on the notes that you signed.
16          Do you understand that?
17      A.   Right.
18      Q.   Okay.  So in Paragraph 83 you have
19  asserted an affirmative defense that the
20  plaintiff's claims are barred in whole or in
21  part due to waiver.
22          Do you see that?
23      A.   Yes.
24      Q.   Do you have any facts that you can

Page 359

DONDERO - 10/29/21

1   share with me that concern that particular
2   affirmative defense?
3           MS. DEITSCH-PEREZ:  And, again, just
4       in this particular answer.
5           MR. MORRIS:  That is all I'm asking
6       about.
7       Q.   We're going to go through the answer
8   for each one of them.  So just one at a time.
9   We're only talking about your – your notes.
10      A.   No, not these.
11      Q.   Let's go to Paragraph 84.
12          Do you see Paragraph 84 states,
13  among other things, that plaintiff's claims are
14  barred, in whole or in part, due to estoppel?
15      A.   Yes.
16      Q.   Can you share with me any facts that
17  you are aware of that concern that particular
18  affirmative defense?
19      A.   No.
20      Q.   Okay.  I'm going to skip over 85
21  because I've gotten that answer elsewhere.  If
22  we can go to 86, do you see that Paragraph 86
23  asserts as an affirmative defense, among other
24  things, that, quote:  Plaintiff's claims may be

Page 360

DONDERO - 10/29/21

1  barred, in whole or in part, due to failure of
2  consideration, closed quote?
3  A.   Right, I see that.
4  Q.   Do you – do you – do you
5  acknowledge that Highland transferred to you an
6  amount of money equal to the principal amount
7  on each of the notes that are at issue?
8  A.   I believe – yes.
9  Q.   Okay.  I appreciate that.
10      Do you have any facts that would
11  support the affirmative defense that is set
12  forth in Paragraph 86?
13  A.   No.
14  Q.   Okay.  And then, finally,
15  Paragraph 88 asserts, among other things, that
16  the fraudulent transfer claim should be barred,
17  in whole or in part, because the alleged
18  fraudulent transfer – and I'm summarizing
19  here – was taken in good faith and for
20  reasonably equivalent value.
21      Do you see that?
22  A.   Yes.
23  Q.   Okay.  Do you have any facts that
24  concern that particular affirmative defense?

Page 361

DONDERO - 10/29/21

1  A.   Let me read that one more time.
2  Q.   Take your time.
3  A.   I think that one is – I'm trying –
4  I'm trying to remember if that one – if the
5  partner defense is on alternative comp that
6  could have been taken or forgiveness that was
7  in lieu of other comp – I'm trying to remember
8  if that falls under this category.  I think it
9  does.
10  Q.   Okay.  Is there anything else that
11  you can – any other facts that you can think
12  of that concern the affirmative defense in
13  Paragraph 88?
14  A.   I mean, the – yes.  Okay.  To the
15  extent that the – in lieu of additional comp
16  falls under there, so does the incentives to –
17  the incentive to me to help monetize illiquid
18  investments better faster.
19  Q.   And does that relate to the three
20  portfolio companies that are the subject of the
21  oral agreement between you and your sister or
22  to something else?
23  A.   It is –
24      MS. DEITSCH-PEREZ:  Objection, form.

Page 362

DONDERO - 10/29/21

1  A.   – regarding that, yeah.
2  Q.   It is the same thing.  Do I have
3  that right?
4  A.   Yes.
5  Q.   Okay.  Thank you very much.
6      Is there anything else you can share
7  with me about the facts that concern the
8  affirmative defense in Paragraph 88?
9  A.   I think that is – that is – that
10  is it.
11  Q.   Okay.  Can we change now to
12  Exhibit 16, which you should have in your pile,
13  which is the answer that was filed by the HCMS
14  to Highland's amended complaint.
15      (Exhibit 16 marked.)
16  A.   Which number is this?
17  Q.   It is number 16.
18  A.   16 in the binder?
19  Q.   It should be, yeah.
20  A.   Yes.  Okay.  I got it.
21  Q.   Okay.  And is the first page titled
22  Defendant, Highland Capital Management
23  Services, Inc.'s Answer to Amended Complaint?
24  A.   Yes.

Page 363

DONDERO - 10/29/21

1  Q.   Okay.  So these questions I'm asking
2  in your capacity as HCMS' 30(b)(6) witness.
3  Okay?
4  A.   Okay.
5  Q.   And you recall that one of the
6  topics under the deposition notice was HCMS'
7  answer; right?
8      Are you prepared to answer questions
9  about this document?
10  A.   Yep, to the best I can.
11  Q.   Okay.  Have you seen it before?
12  A.   Yes.
13  Q.   And do you know whether HCMS
14  authorized this Stinson firm to file this
15  document on its behalf at the beginning of
16  2021?
17  A.   Yes.
18  Q.   Did you personally have any role in
19  reviewing and preparing this document?
20  A.   I mean, just generally that the
21  transition of former Judge Lynn passing and
22  Bonds Ellis not being able to handle
23  complexity – maybe I shouldn't say like
24  that – or handle this aspect of the case

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2   and/or -- I think it was -- yeah, just
3   whatever.  He moved to Stinson from -- I think
4   maybe it started at Bonds Ellis and then maybe
5   it went to Wick Phillips and then it went to
6   Stinson, but, you know, there was a migration
7   of these notes in general.
8       Q.   Was there a particular person who
9   was charged with the responsibility of
10  approving and authorizing the filing of this
11  document on behalf of HCMS?
12      A.   Like I said, I think generally that
13  was myself.
14      Q.   Okay.  Are you aware of anything in
15  this document today that is inaccurate in any
16  way?
17      A.   Not specifically.
18      Q.   Are you aware of anything generally
19  in this document that is inaccurate in any way?
20      A.   Not at the moment.
21      Q.   Are you aware of anything in this
22  document that you believe should be modified or
23  amended to make it more complete or more
24  accurate?
25      A.   Not yet.

1    DONDERO - 10/29/21
2       Q.   Let's go to Paragraph 40 -- 94,
3   please.
4            MS. DEITSCH-PEREZ:  We may be
5       imperfect creatures as lawyers.
6       A.   Yes.
7       Q.   Okay.
8       A.   Yes.
9       Q.   Okay.  I was just going to say, do
10  you see from Paragraphs 94 through 102 HCMS has
11  set forth its affirmative defenses?
12      A.   Yes.
13      Q.   Okay.  Let's -- let's start with the
14  first one.
15           Do you see in Paragraph 94 HCMS
16  asserts that, quote:  Plaintiff's claims are
17  barred, in whole or in part, by the doctrine of
18  justification and/or repudiation?
19      A.   Yes.
20      Q.   Are you aware of any facts that
21  concern that particular defense?
22      A.   I believe this -- they were material
23  prepayments of the loan.  I believe that is --
24  those are the -- they were material and
25  numerous prepayments of the loan, which I think

1    DONDERO - 10/29/21
2   was -- that is incorporated into that defense.
3       Q.   Okay.  We will talk about the -- the
4   details of that in a moment, but are there any
5   other kind of broad statements that you can
6   give me that identify facts related to this
7   particular affirmative defense?
8            MS. DEITSCH-PEREZ:  Object to the
9       form.
10      A.   That is all I have at the moment.
11      Q.   Okay.  Do you know whether any
12  document that HCMS ever filed with the
13  bankruptcy court ever asserted, as in a
14  defense, that they didn't have to pay because
15  they had prepaid any obligations that were due
16  and owing?
17           MS. DEITSCH-PEREZ:  Object to the
18      form.
19      A.   I don't have awareness.
20      Q.   And this document doesn't -- doesn't
21  use the word "prepayment" anywhere, does it?
22           MS. DEITSCH-PEREZ:  Object to the
23      form.
24      A.   I don't know.
25      Q.   Do you know of anything that HCMS

1    DONDERO - 10/29/21
2   ever did before this week to put Highland on
3   notice that it contended that it didn't have to
4   pay its obligations under the notes because of
5   a prepayment defense?
6            MS. DEITSCH-PEREZ:  Object to the
7       form.
8       A.   We have no records.  I'm not sure we
9   would have ever been in a position to -- to do
10  that.  The -- you know, we were relying on
11  shared services from Highland, and Highland had
12  all the records regarding the amounts and
13  prepayments, et cetera.
14      Q.   When did you learn that HCMS had
15  made a prepayment to Highland?
16      A.   I don't know, but I -- I imagine --
17  I imagine it was -- if you are asking why it
18  wasn't mentioned earlier but then mentioned
19  later, it is because somewhere in that time
20  period we became aware.
21      Q.   So you didn't -- you didn't have
22  knowledge of the prepayment until the debtor
23  produced documents.  Do I have that right?
24           Withdrawn.
25           How did you learn that HCMS made a

Page 368

1        DONDERO - 10/29/21
2    prepayment?
3        A.   I don't know.  I just know that we
4    became aware of that being a material fact
5    somewhere along the line.
6        Q.   Do you remember when you learned
7    that material fact?
8        A.   No.
9        Q.   Do you have any facts that you can
10   share with me concerning the prepayment?
11       A.   Eventually there was a spreadsheet
12   that summarized it, but I don't -- I don't
13   know -- I don't know when that occurred.
14       Q.   Does -- does this defense of
15   prepayment apply to demand notes or a term
16   note?
17       A.   I would -- I would -- I would say,
18   you know, primarily a term note, but -- yeah, I
19   think primarily the term note because I think
20   that was the one that was declared to be in
21   default of share, you know, whatever, so I
22   think it was regarding the term note.
23       Q.   Do you recall -- do you have any
24   knowledge as to when the prepayment was made?
25       A.   I believe there were numerous and

Page 369

1        DONDERO - 10/29/21
2    material prepayments, but I don't know exactly
3    when they were made.
4        Q.   Do you know what year they were
5    made?
6        A.   No, but -- no, but -- no, I don't.
7        MS. DEITSCH-PEREZ:  If you want,
8    John, if you would like for him to give you
9    dates, he could probably dig up the
10   spreadsheet and give you dates, but you
11   have it also.
12       MR. MORRIS:  Thank you.  Okay.  I
13   think we're doing just fine here.
14       Q.   Do you know if there were any
15   prepayments made by HCMS in 2018?
16       A.   I don't know the specifics off the
17   top of my head.
18       Q.   Do you know if HCMS made any
19   prepayments in 2019?
20       A.   I don't know the specifics off the
21   top of my head.
22       Q.   Are you aware that under the term
23   note, HCMS was required to pay annual
24   installment payments at the end of each year?
25       MS. DEITSCH-PEREZ:  Object to the

Page 370

1        DONDERO - 10/29/21
2    form.
3        A.   I wouldn't say it like that.
4        Q.   We will look -- we will look at the
5    documents in a few minutes.
6        Are you aware of any facts that
7    support the justification or repudiation
8    defense in Paragraph 94 other than what you
9    have testified to so far?
10       A.   I think it is largely the prepayment
11   aspect of it that is captured there.
12       Q.   Okay.  And -- and -- all right.  I
13   will leave it at that.
14       Let's go to Paragraph 95.  Do you
15   see the affirmative defense in 95 is that,
16   quote, plaintiff's claims are barred in whole
17   or in part by the doctrine of estoppel.
18       Do you see that?
19       A.   Yes.
20       Q.   Do you have any facts as the
21   30(b)(6) witness of HCMS that concern that
22   particular affirmative defense?
23       A.   You know, I think for both 95 and
24   96, the way I understand it is that was
25   reliance on Highland's and Highland's screw-up,

Page 371

1        DONDERO - 10/29/21
2    to the extent that there was a screw-up, on the
3    term loans.
4        Q.   What screw-up are you referring to?
5        A.   Well, we didn't have accountants or
6    employees at Services, you know, and Services
7    was relying on Highland and shared services to
8    stay in compliance or to -- on the various
9    loans.
10       Q.   Did you ever personally instruct
11   anybody in December of 2020 to make a payment
12   on behalf of HCMS under the term note?
13       A.   To make -- I'm sorry, is this --
14   what was the timeframe again?
15       Q.   December 2020 -- let's just say
16   anytime in 2020.  Did you, in your capacity as
17   the person in control of HCMS, ever direct or
18   authorize any person in the world to make a
19   payment from HCMS to Highland in satisfaction
20   of the obligation that was due under the term
21   note at the end of the year?
22       A.   Not that -- not that I recall.
23       Q.   Okay.  Do you know whether anybody
24   acting on behalf of HCMS ever instructed or
25   authorized Highland to make a payment on

Page 372

DONDERO - 10/29/21

1

2  account of HCMS's term note to Highland?

3       A.   Well, again, and maybe I didn't say

4  it clearly enough.  I think there was a

5  reliance in the due course aspect, especially

6  on small amounts, and it would have been done

7  by Highland personnel on behalf of Services.

8       MR. MORRIS:  Okay.  Move to strike.

9       Q.   And I'm going to ask you,

10  Mr. Dondero, to be patient with me and to

11  listen carefully to my question.

12            Are you aware of anybody acting on

13  behalf of HCMS, whoever instructed Highland to

14  make a payment in satisfaction of any payment

15  that was due at the year-end of 2020 under the

16  term note?

17       A.   Not specifically, but I'm saying I

18  don't think it needed to be made specifically.

19       Q.   Okay.  So you are not aware of any

20  instruction that was ever given to Highland by

21  HCMS to make the payment; is that fair?  You

22  relied on the course of dealing?

23       A.   Right.  I relied on ordinary course.

24  I don't believe there was a specific -- I'm not

25  aware of a specific request.

Page 373

DONDERO - 10/29/21

1

2       Q.   Okay.  And you were aware that the

3  payment was due at the end of the year; isn't

4  that right?

5       MS. DEITSCH-PEREZ:  Object to the

6  form.

7       A.   Not -- not specifically.  There

8  is -- to be bona fide notes, there is -- I know

9  there is -- there is tax structuring and things

10  that the auditors want to see in terms of -- of

11  regular payment that everything just doesn't

12  accrue indefinitely, but what those roles are

13  and when and if it needs to be paid and whether

14  it was by the end of the year or not.

15            I'm generally not specifically

16  knowledgeable of or involved in, and nor do I

17  have an awareness that was it or could it have

18  been satisfied by other payments throughout the

19  year.  I'm not -- I'm not the person for that

20  knowledge.

21       Q.   Now, do you recall in December of

22  2020 there was some tension between you and

23  Mr. Seery?

24       A.   Tension between me and Mr. Seery.  I

25  would say there was tension between Mr. Seery

Page 374

DONDERO - 10/29/21

1

2  and everybody.  He was trying to steal the

3  estate, you know, so yes.

4       MR. MORRIS:  I move to strike.

5       Q.   You were asked to resign from

6  Highland in late September of 2020; correct?

7       A.   Yes.

8       Q.   And you did resign as of October

9  9th, 2020; correct?

10       A.   Yes.

11       Q.   And do you recall that in early

12  December, Highland sought a temporary

13  restraining order against you?

14       A.   Yes.

15       Q.   And do you recall that Highland

16  obtained a temporary restraining order against

17  you in early December?

18       A.   Yes.

19       Q.   Okay.  Do you recall that the

20  advisors that you controlled filed a motion

21  against the debtor in mid December 2020?

22       A.   Yes.

23       Q.   Okay.  And do you recall that that

24  motion was curved by the Court in the middle of

25  December?

Page 375

DONDERO - 10/29/21

1

2       A.   Yes, roughly.

3       Q.   And do you recall that at the end of

4  November, Highland had given notice of

5  termination of the shared services agreements

6  with the advisors?

7       A.   I believe they did that multiple

8  times or extended it multiple times.  I can't

9  remember if that was -- if it was done then or

10  not.

11       Q.   Okay.  And it is your testimony that

12  notwithstanding those facts and circumstances,

13  you relied on Highland to make the payment that

14  HCMS owed at the end of the year?

15       A.   Yes, absolutely.  We were still

16  deluded in terms of thinking that Seery was

17  working to resolve the estate, not to steal the

18  estate.

19       MR. MORRIS:  I move to strike.

20       Q.   Do you have any other facts and

21  circumstances that relate to the affirmative

22  defenses in Paragraphs 95 and 96?

23       A.   I mean, not at the moment, not that

24  I want to volunteer.  When you ask more

25  questions about the specifics, I guess we will

Page 376

DONDERO - 10/29/21

1   get to some of it.
2       Q.   Well, I'm asking you questions now.
3   You are the 30(b)(6) witness.  This is one of
4   the topics that you were supposed to be
5   prepared to answer questions about, and I would
6   just like to know everything that you have in
7   your head as to facts that relate to these two
8   affirmative defenses.
9       MS. DEITSCH-PEREZ:  Object to the
10  form.
11      Q.   Because if I don't ask the right
12  question later, you know, we can't do that;
13  right?
14      So do you have any other facts that
15  you are aware of that relate to these two
16  particular affirmative defenses?
17      MS. DEITSCH-PEREZ:  John, the fact
18  that it's a 30(b)(6) deposition doesn't
19  absolve you of the necessity to ask
20  questions.
21      MR. MORRIS:  I asked the question.
22      Q.   Can I please have an answer?
23      A.   Again, the notes in general are de
24  minimis relative to asset values of Highland or

Page 377

DONDERO - 10/29/21

1   the counterparties.  So the annual obligations
2   are even more de minimis or a million bucks or
3   less than a million bucks.
4       There was never an intent, nor would
5   there be a logical intent to -- from my
6   perspective or any of the entities that had
7   notice to Highland to be in default.  And it is
8   not logical that they would do that for any
9   purpose.
10      And the facts around the curing
11  quickly of the notes and getting the curing
12  amounts from Highland and making the payments
13  and Highland accepting them as they're defining
14  what it took to cure it, I think, are all, you
15  know, the key facts that make any, you know,
16  acceleration argument, you know, ridiculous.
17      Q.   Okay.  Anything else?
18      A.   That's it at this point.
19      MR. MORRIS:  Okay.  Let's go to
20  Exhibit 17, please.
21      (Exhibit 17 marked.)
22      This is HCRE's answer.  Do you see
23  that, sir?
24      A.   Yes.

Page 378

DONDERO - 10/29/21

1       Q.   And I'm going to ask these questions
2   in your capacity as the 30(b)(6) representative
3   of HCRE.  Do you understand that?
4       A.   Yes.
5       Q.   Have you seen this document before?
6       A.   Yes.
7       Q.   Are you aware of anything in this
8   document that is inaccurate today?
9       A.   I mean, I think 96 we put in there
10  similar to the other affirmative defenses in
11  case there was a prepayment.  But, again, we
12  have been so blocked from getting information
13  and detail we didn't know it at the time
14  regarding, you know, prepayments.
15      So I don't think the prepayment
16  defense works for 96.  So that would be my
17  clarification of an inaccuracy.
18      Q.   Why do you believe that the
19  prepayment defense doesn't work in Paragraph 96
20  for HCRE?
21      A.   Because I don't think there were any
22  prepayments.
23      Q.   All right.  I appreciate that.
24      A.   We didn't -- we didn't know it at

Page 379

DONDERO - 10/29/21

1   the time --
2       Q.   Okay.
3       A.   -- we put this together.
4       Q.   Is there any other aspect of this
5   document that you believe is inaccurate today?
6       A.   Not as far as I know.
7       Q.   Is there anything in this document
8   that you believe should be modified or amended
9   to make it more accurate or more complete?
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      A.   Not yet.
13      Q.   Okay.  Looking at Paragraph 96, I
14  believe you just testified that,
15  notwithstanding the assertion of the defense
16  therein, you are not aware of any facts
17  concerning the prepayment defense that you
18  described earlier for HCMS.
19      Do I have that right?
20      A.   Yes.
21      Q.   Okay.  Do you have any facts at all
22  that relate to the affirmative defense in
23  Paragraph 96?
24      A.   I don't believe so at this moment.

DONDERO - 10/29/21

1
2    Q.   Okay.  How about Paragraphs 97 and
3  98?  Do you have any facts that relate to those
4  affirmative defenses?
5    A.   It would be the same answer as on
6  the last one.
7    Q.   Okay.  I appreciate that.  And so –
8  but we don't have to go over it again.  I will
9  just leave it at that.
10        Let's go to Exhibit 15, please.
11        (Exhibit 15 marked.)
12        MR. MORRIS:  This is the next –
13        MS. DEITSCH-PEREZ:  Hey, John.
14  John, can we take a – like a very quick
15  restroom break?
16        MR. MORRIS:  You know, if we could
17  just get through this document, which
18  shouldn't take long, then perhaps we can
19  take a short half-hour lunch break.
20        MS. DEITSCH-PEREZ:  Well, we can
21  take a short half-hour lunch break after we
22  get through this, but I just need to run to
23  the restroom.
24        MR. MORRIS:  Okay.
25        MS. DEITSCH-PEREZ:  So you can leave

DONDERO - 10/29/21

1
2  the screen on if you want so that we can
3  get back fast.
4        MR. MORRIS:  My pleasure, Deborah.
5  No problem.
6        MS. DEITSCH-PEREZ:  Thank you.
7        VIDEOGRAPHER:  Off the record,
8  12:40.
9  (Recess taken 12:40 p.m. to 12:51 p.m.)
10    Q.   Before we go on to this document,
11  sir, did HCRE have a shared services agreement
12  with Highland?
13        VIDEOGRAPHER:  We're back on the
14  record.
15        MR. MORRIS:  Oh, do I need to read
16  the question again?
17        COURT REPORTER:  No, I've got it.
18    A.   I – I don't believe it is a formal
19  written one.  I think it is just a verbal one.
20    Q.   And who is the verbal agreement
21  between?
22    A.   It was between Highland and HCRE.
23  Now it is between NexPoint and HCRE.
24    Q.   And who entered into the agreement
25  between Highland and HCRE?

DONDERO - 10/29/21

1
2    A.   I would give the same answer I gave
3  before where it was just – it was just
4  understood that we supported all the related
5  entities or entrepreneurial efforts and it was,
6  you know, modest amounts of work.
7        There wasn't specific financial
8  remuneration, but – and NexPoint is a good
9  example, too.  There was a significant track
10  record gulf that was able to be used to raise
11  other money.
12    Q.   I'm just asking you who entered into
13  the agreement between Highland and – and HCRE
14  for the provision of services by Highland?
15        MS. DEITSCH-PEREZ:  Asked and
16  answered.
17    A.   Yeah, again, same answer as before.
18  I don't think anybody specifically, formally
19  did it.
20    Q.   Okay.  Is it – are the terms of the
21  agreement written down anywhere?
22    A.   No, like I said, it is just
23  understood the accounting department and tax
24  department would handle the accounting and tax
25  for all entities.

DONDERO - 10/29/21

1
2    Q.   Did the legal department also
3  provide services to HCRE?
4    A.   It would depend on the specific
5  entity.  In the case of HCRE I think they used
6  the – the two lawyers that worked at NexPoint.
7        I don't think they used the legal
8  staff per se.  I think they – the shared
9  services that they relied on were accounting
10  and tax primarily.
11    Q.   Did Mark Patrick do work for HCRE
12  while he was employed by Highland?
13    A.   Boy, I don't know.  I imagine
14  probably tax-related stuff.
15    Q.   Did HCRE ever pay Highland anything
16  for the services that it received?
17        MS. DEITSCH-PEREZ:  Are you talking
18  about cash or –
19        MR. MORRIS:  Please, please, please.
20  – I'm trying to be really patient,
21  Deborah, but please no speaking objections.
22  Mr. Dondero is a very sophisticated man.
23        We have done this many times
24  together.  He will ask me if he doesn't
25  understand the question.  And if you would

Page 384

DONDERO - 10/29/21

1    like to object, by all means.  I don't have
2    a problem with that.  I don't.
3         MS. DEITSCH-PEREZ:  But I asked –
4         (speaking simultaneously.)
5    Q.   Mr. Dondero – Mr. Dondero –
6    Mr. Dondero, did HCRE ever pay anything to
7    Highland for services rendered?
8         MS. DEITSCH-PEREZ:  Asked and
9    answered.
10   A.   Yeah, that is what I was going to
11   say.  Same answer.  You know, not – not a
12   formal cash remuneration, but, you know, a –
13   which wouldn't have been much anyway.  But –
14   but more in terms of track record and presence
15   in the market that then Highland or NexPoint
16   could use to further its business.
17   Q.   Are you saying that – that all of
18   the entities were working kind of as a unified
19   unit and got synergistic benefits from the work
20   that it did?
21        MS. DEITSCH-PEREZ:  Object to the
22   form.
23   A.   I don't want to over generalize and
24   say yes to that, but – but there were

Page 385

DONDERO - 10/29/21

1    definitely – you know, when I use the DAF
2    example, you know, we would have never got the
3    Harvard vest as an investor if it wasn't for
4    the track record that the DAF had in CLO
5    equity.
6         I think there is business that
7    NexPoint got in the real estate space
8    benefiting from the HCRE performance.  So I do
9    believe there was specific definable benefit
10   gained for the modest amount of cost of
11   services provided.
12   Q.   And you –
13   A.   There wasn't specific remuneration.
14   Q.   And you controlled all of these
15   entities; right?
16        MS. DEITSCH-PEREZ:  Object to the
17   form.
18   A.   Well, the DAF is independent and
19   separate, but the – the HCRE-type entity, yes.
20   Q.   And did you decide that HCRE and
21   HCMS and the DAF wouldn't be required to pay
22   for services rendered to Highland?
23        MS. DEITSCH-PEREZ:  Object to the
24   form.

Page 386

DONDERO - 10/29/21

1    A.   My recollection on the services and
2    the HCRE is that the dollar value of the
3    services provided was – was small and nominal.
4         With regard to the DAF, it was more
5    complicated.  There is rules – there is
6    charging rules in terms of fees and then there
7    is also – I wasn't the one that decided that.
8    And there are other issues there other than
9    just the value for services argument.
10        And so I don't – the short answer
11   is, I don't know and I'm not involved in that,
12   and I don't understand why sometimes there is
13   one and sometimes there isn't one.  Even to
14   this day I don't know the answer to that.
15   Q.   Did – did – did you decide on
16   behalf of Highland that Highland would provide
17   services to DAF without receiving a stream of
18   income in return?
19        MS. DEITSCH-PEREZ:  John, I think
20   we're really far outside of either any of
21   the 30(b)(6)s or the permissible topics for
22   Mr. Dondero's personal deposition.
23        So could you move on?
24        MR. MORRIS:  Okay.  I will after I

Page 387

DONDERO - 10/29/21

1    get an answer to this question.
2    A.   Can you repeat the question?
3    Q.   Sure.
4         Did you make the decision on behalf
5    of Highland to provide services to the DAF
6    without receiving a stream of income in return?
7         MS. DEITSCH-PEREZ:  Same objection.
8    A.   Yeah, I think I answered it with my
9    rambling a few minutes ago, but the short
10   answer is no.
11   Q.   Who made that decision?  Who made
12   that decision?
13        MS. DEITSCH-PEREZ:  Was that Mike's
14   dog or yours?
15        MR. MORRIS:  That was my dog.  I
16   apologize.
17        MS. DEITSCH-PEREZ:  Okay.
18   Q.   Who made that decision, sir?
19   A.   I wasn't sure –
20        MS. DEITSCH-PEREZ:  Again – again,
21   John, this is well beyond the scope of the
22   30(b)(6)s or even anything permissible for
23   Mr. Dondero's personal.  And, in fact, you
24   said last time that is it, that was my last

Page 388

1          DONDERO - 10/29/21
2    question.  So...
3          MR. MORRIS:  That is – that is
4    because I thought that he would say as the
5    control person at the enterprise that he
6    made the decision, but he said that he
7    didn't.
8          So I'm just asking one follow-up
9    question.  I just want to know – Deborah,
10   please.
11    Q.   I just want to know who made the
12   decision on behalf of Highland to render
13   services to the DAF without receiving a stream
14   of income in return.
15         MS. DEITSCH-PEREZ:  Object to the
16   form of the question for all of the reasons
17   I stated before.
18    A.   And I don't know the answer.
19    Q.   Okay.  So looking back at the
20   document on the screen, we're going to ask –
21   I'm going to ask these questions in your
22   capacity as NexPoint's 30(b)(6) representative,
23   okay?
24    A.   Sure.
25    Q.   And do you understand that the

Page 389

1          DONDERO - 10/29/21
2    document on the screen is NexPoint's answer to
3    Highland's amended complaint?
4    A.   Yes.
5    Q.   Did you review this document before?
6    A.   Just generally.
7    Q.   And did you authorize the filing of
8    this document on behalf of NexPoint?
9    A.   Yes, yes.
10    Q.   Are you aware of anything in this
11   document today that you believe to be
12   inaccurate?
13    A.   I think the – on the affirmative
14   defenses on the – do you remember on the prior
15   one we had the – I think it was called
16   justification as the first one, but there
17   wasn't a prepay in that one?
18    Q.   Correct.
19    A.   I think this one there were prepays,
20   but the justification defense is missing from
21   the front here.  And I think that is – I think
22   if that were to continue – I think that is
23   partly due to different law firms and what was
24   known at the time, et cetera, but I would say
25   that is – that is the – that is the one thing

Page 390

1    that jumps out at me between the two.
2    MR. MORRIS:  Okay.  Can we go to
3    Paragraph 80, and let's see if we can see
4    what Mr. Dondero is talking about.
5    Q.   Okay.  So I'm just going to focus on
6    the first three paragraphs, 80, 81, and 82, and
7    ask you whether – whether you are aware of any
8    facts that concern the affirmative defenses set
9    forth in those paragraphs.  And I think they're
10   related, and that is why I'm asking you to do
11   it all together, but we can do it one at a
12   time, whatever you are comfortable with.
13         MS. DEITSCH-PEREZ:  Object to the
14   form.  I mean, other than the facts in
15   those paragraphs?
16         MR. MORRIS:  You are doing it again,
17   Deborah.
18         MS. DEITSCH-PEREZ:  It –
19         MR. MORRIS:  Please, please.
20         MS. DEITSCH-PEREZ:  John, when you
21   ask questions – I understand Mr. Dondero
22   is sophisticated, but he's also not a
23   lawyer, and when you ask questions that are
24   misleading, I'm going to interject

Page 391

1    something.
2          MR. MORRIS:  It is completely
3    improper.  He doesn't need to be a lawyer.
4    He's a 30(b)(6) witness, and I'm asking
5    such a simple question, what facts do you
6    have that support the affirmative defense.
7    A.   Okay.  Is it okay if I repeat some
8    of them from the prior one?
9    Q.   Sure.  Whatever you are comfortable
10   with.
11    A.   The – to the extent that – to the
12   extent that the notes were prepaid – prepaid
13   significantly, it is a real question on whether
14   or not there could have been a breach at the
15   end of the year, even if there wasn't a payment
16   at the end of the year.
17         There is no logical reason, nor
18   would I have ever authorized or suggested no
19   payment to put us on – in default due to a de
20   minimis amount of money, like a few hundred
21   thousand dollars, even if I was highly annoyed
22   with Seery and if we knew that Seery and
23   Highland had overcharged NexPoint by whatever
24   it was, 14, 16 million bucks, I would not have

Page 392

DONDERO - 10/29/21

1 let a small amount cause a – cause a breach.
2 You know, the – how would I – how
3 would I add to that now.  The overpayment on
4 the $14 million, holding back additional shared
5 services amount, made an inordinate amount of
6 sense.
7 There was supposed to be at that
8 time – there was another netting from Seery in
9 terms of wanting to be fair and reasonable, you
10 know, with employees and with the transition of
11 the estate, et cetera, and everything was going
12 to get trued up.
13 So I do believe there was an
14 expectation of a netting, et cetera, but
15 overall, Highland should have paid it.  It
16 shouldn't have let it breach the cause, but at
17 least when I found out about it and they knew I
18 was annoyed.  And I told them I didn't want it
19 to be in default, they gave me the numbers and
20 the amounts to cure it in their mind, and they
21 accepted it.
22 Now, I think they should have gone
23 back and incorporated prepays and said that no
24 amounts were due because of the prepays, et

Page 393

DONDERO - 10/29/21

1 cetera, but the calculation that they came up
2 to get it in compliance in good standing was a
3 million 4.  And just like we relied on them to
4 pay it and keep us out of default, we relied on
5 them to set the amount to cure.
6 But I guess I would make the
7 argument that it shouldn't have been, but
8 again, I didn't want to mince – I didn't want
9 to on small dollars make an argument that could
10 get us in bigger trouble – bigger trouble.  So
11 it was easier to – to pay the million bucks
12 than it was to argue that it wasn't due.
13 Q.   Did you at any time in your capacity
14 as the person in control of NexPoint instruct
15 anybody at Highland to make the payment that
16 was due at the end of 2020?
17 A.   Not specifically to pay it or not
18 specifically not to pay it.  It was something,
19 again, small and de minimis that I expected to
20 be done in due course.
21 MR. MORRIS:  I move to strike.
22 Q.   It's a very simple question.
23 Did you personally take any steps to
24 ensure that NexPoint made the payment that was

Page 394

DONDERO - 10/29/21

1 due at the end of 2020?
2 MS. DEITSCH-PEREZ:  Asked and
3 answered.
4 A.   Yes, I would like to repeat my same
5 answer.
6 Q.   Did you tell anybody to make the
7 payment on behalf of NexPoint at the end of
8 2020?
9 MS. DEITSCH-PEREZ:  Asked and
10 answered.
11 A.   I would like to give the same answer
12 that you – you – you struck.
13 Q.   Can you just say yes or no, sir, did
14 you tell anybody to make the payment at the end
15 of 2020 on behalf of NexPoint?
16 MS. DEITSCH-PEREZ:  Asked and
17 answered.
18 A.   I don't want to give anything beyond
19 the answer that I gave.
20 Q.   Okay.
21 A.   I get myself in trouble because I
22 paraphrase.  I don't want to answer yes – I
23 don't think yes or no would be an appropriate
24 answer.  I want to stay with the answer that I

Page 395

DONDERO - 10/29/21

1 gave.
2 Q.   Okay.  I'm going to say the word
3 "Yankees," and every time I say the word
4 "Yankees" today, everybody should know that
5 that is the question that I'm going to bring to
6 the Court on a motion to compel, okay?
7 It's a very simple question.  It's a
8 very simple question.  I will ask one more
9 time, and if you don't want to answer, that is
10 fine.
11 MS. DEITSCH-PEREZ:  What –
12 Q.   Mr. Dondero – Mr. Dondero, in
13 December of 2020, did you give anybody any
14 instructions at Highland to make sure that
15 NexPoint made the payment that was due at the
16 end of the year?
17 MS. DEITSCH-PEREZ:  Asked and
18 answered.
19 A.   I think that means I'm supposed to
20 stick with the answer that I gave.
21 MS. DEITSCH-PEREZ:  You're on mute,
22 John.  John, you're on mute.  John, you're
23 on mute.  John, we can't hear you.
24 THE WITNESS:  I do like it better

DONDERO - 10/29/21

1    when he yells at me on mute.
2    MS. DEITSCH-PEREZ:  John, we can't
3    hear you.
4    COURT REPORTER:  We can't hear you,
5    John.
6    MR. MORRIS:  You can't hear me?
7    COURT REPORTER:  Now we can.
8    MS. DEITSCH-PEREZ:  Now we can hear
9    you, but we couldn't hear you.  It looks
10   like you were yelling, but we couldn't hear
11   you.
12   A.   I do like it better when you yell at
13   me on mute.
14   Q.   I try not to yell at you, and I hope
15   that you haven't perceived this -- we do have a
16   videotape this time.  So to the extent that
17   anybody perceives your comment as suggesting
18   that I have yelled at you, I would invite them
19   to look at the video.
20   MS. DEITSCH-PEREZ:  Well, we said we
21   couldn't hear you, but your animation
22   looked like that.
23   Q.   Sir, can you identify any person in
24   the world acting on behalf of NexPoint who

DONDERO - 10/29/21

1    instructed Highland to make the payment that
2    was due on the NexPoint term note in December
3    of 2020?
4    MS. DEITSCH-PEREZ:  John, that is
5    the fifth or sixth time.
6    MR. MORRIS:  It is a completely
7    different question.  Please.
8    MS. DEITSCH-PEREZ:  Could you read
9    it back, if I was mistaken.  So read it
10   back.
11   (Record read.)
12   A.   NexPoint did not have the accounting
13   staff or the systems or the records or the
14   knowledge to have any person in the world at
15   NexPoint to give that instruction.
16   So the long answer -- the short
17   answer is no, but the long answer is we had
18   been kept away from our books and records.  I
19   think we largely still don't have them, and
20   there would -- I am not aware of anybody who --
21   anybody in the world at NexPoint who made that
22   request.
23   Q.   Frank Waterhouse was the treasurer
24   of NexPoint in December of 2020; is that

DONDERO - 10/29/21

1    correct?
2    A.   I think he was very much viewing his
3    responsibilities as Highland related and as an
4    employee of Highland.  But yes, based on that
5    incumbency certificate, but that is your --
6    your question to ask Frank if he was taking
7    that seriously, but NexPoint was relying on
8    Highland.
9    Q.   Do you have any other facts that you
10   are aware of that relate to the affirmative
11   defenses set forth in Paragraphs 81 through 82?
12   A.   I think I -- I think I've said them
13   all.
14   MR. MORRIS:  Okay.  It is 2:13
15   Eastern time.  Let's just take a short
16   half-hour lunch break, and let's return at
17   2:45, or 1:45 Central.
18   VIDEOGRAPHER:  Off the record, 1:13.
19   (Recess taken 1:13 p.m. to 1:48 p.m.)
20   VIDEOGRAPHER:  Back on the record,
21   1:48.
22   Q.   Mr. Dondero, are you comfortable?
23   A.   Yes.
24   Q.   And are you able to proceed?

DONDERO - 10/29/21

1    A.   Yes.
2    Q.   Okay.  Did you speak with anybody
3    during the break about the substance of this
4    deposition?
5    A.   No.
6    Q.   You entered into certain oral
7    agreements with your sister concerning some of
8    the notes at issue in these lawsuits.
9    Do I have that right?
10   MS. DEITSCH-PEREZ:  Object to the
11   form.
12   A.   Can you rephrase or repeat, please?
13   Q.   Sure.
14   You entered into certain oral
15   agreements with your sister concerning certain
16   of the notes at issue in these lawsuits.
17   Do I have that right?
18   MS. DEITSCH-PEREZ:  Object --
19   A.   Yes.
20   MS. DEITSCH-PEREZ:  Object to the
21   form.  And I'm going to object -- object
22   every time because it just -- just so it is
23   on the record because you are saying "your
24   sister" without giving her -- her capacity.

Page 400

DONDERO - 10/29/21

1
2   A.   Okay.
3       MS. DEITSCH-PEREZ:  But I don't want
4   to disrupt the deposition, so I'm just
5   telling you why I'm doing it and he can
6   continue to answer thereafter.  That is why
7   I'm doing it.
8   Q.   Okay.  Can we – can we agree,
9   Mr. Dondero, when I refer to your sister in the
10  context of oral agreements that she was
11  entering into those agreements with you as a
12  representative of Dugaboy – as Dugaboy
13  trustee, as representative for a majority of
14  the class A interest holders of Highland?
15  A.   Yeah.  How about just to make it
16  simple let's just call it the Dugaboy trustee,
17  and everybody will know that it is my sister
18  and everybody will know that it is the majority
19  of the class A unit holders.
20  Q.   Okay.  Okay.  I appreciate that and
21  I will do just that.
22       You entered into certain oral
23  agreements with the Dugaboy trustee concerning
24  certain of the notes at issue in these
25  lawsuits; is that right?

Page 401

DONDERO - 10/29/21

1
2   A.   Yes.
3   Q.   Okay.  Let's discuss the purpose of
4   those oral agreements.
5       MR. MORRIS:  Can we put back up on
6   the screen Mr. Dondero's answer.
7   Q.   And while we're doing that,
8   Mr. Dondero, can you confirm that your sister
9   is the only trustee of the Dugaboy Investment
10  Trust?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13  A.   For what period of time are we
14  talking about?
15  Q.   During the period of time at which
16  you entered into the oral agreements with the
17  Dugaboy trustee.
18      MS. DEITSCH-PEREZ:  Object to the
19  form.
20  A.   Yeah, I believe she has been the
21  trustee since 2015 and remains so today.  I
22  don't have an awareness of – I don't have an
23  awareness of another functional trustee.
24      So some of these – sometimes
25  complex trusts have other layers that are

Page 402

DONDERO - 10/29/21

1
2   called trustees but they're not trustees per
3   se.  But I think I'm over thinking it.  But I'm
4   not aware of anybody I've interacted with,
5   other than her, as trustee with regard to the
6   notes.
7   Q.   Okay.  So up on the screen we
8   have – no, that is the wrong document.
9       MR. MORRIS:  We need Exhibit 31,
10  please.
11      Yeah, there you go.  That one.
12  Perfect.  Okay.
13      MS. DEITSCH-PEREZ:  31 is not – oh,
14  is that the '03 answer?
15      MR. MORRIS:  Correct, that is
16  Mr. Dondero's answer.
17  Q.   Do you see that, sir, on the screen?
18      MS. DEITSCH-PEREZ:  Hang on.  I'm
19  going to get it again.
20      Okay.  If you want a hard copy, I
21  have one here but he's got it up.
22  Q.   Do you see on the screen,
23  Mr. Dondero, marked as Exhibit 31 is your
24  answer to Highland's amended complaint?
25  A.   Yes.

Page 403

DONDERO - 10/29/21

1
2   Q.   Okay.
3       MR. MORRIS:  Can we go to
4   Paragraph 82, please.
5   Q.   Is it your understanding that
6   Paragraph 82 describes, among other things, in
7   general terms your oral agreements with –
8   between you and the Dugaboy trustee?
9   A.   Yes.
10  Q.   Is it your position that the oral
11  agreements that you entered into with your
12  sister – withdrawn.
13      Is it your contention that the oral
14  agreements you entered into with the Dugaboy
15  trustee applied to each of the notes that were
16  executed by NexPoint and that are the subject
17  of Highland's lawsuit against NexPoint?
18  A.   Yes.
19  Q.   Is it your contention that the oral
20  agreements that were entered into with the
21  Dugaboy trustee apply to the notes executed by
22  HCMS that are the subject of Highland's lawsuit
23  against HCMS?
24  A.   Yes.
25  Q.   Is it your contention that the oral

Page 404

DONDERO - 10/29/21

1
2 agreements between you and the Dugaboy trustee
3 apply to the notes that were executed by HCRE
4 that are the subject of the lawsuit that
5 Highland has commenced against HCRE?
6     A.  Yes.
7     Q.  Okay.  Do I understand correctly
8 that your oral agreements with your sister do
9 not apply to the notes that were executed on
10 behalf of HCMFA that are the subject of the
11 lawsuit that Highland commenced against HCMFA?
12     A.  Correct.
13     Q.  Okay.  I appreciate that.
14         Do you see in this paragraph towards
15 the middle it says, quote:  This paragraph of this
16 agreement was to provide compensation to
17 defendant, James Dondero, who was otherwise
18 underpaid, compared to reasonable compensation
19 levels in the industry through the use of
20 forgivable loans, a practice that was standard
21 at HCMLP in the industry.
22         Have I read that correctly?
23     A.  Yes.
24     Q.  Is that the purpose of the agreement
25 that you entered into with your sister --

Page 405

DONDERO - 10/29/21

1
2 withdrawn.
3         Is that the purpose of the agreement
4 that you entered into with the Dugaboy trustee
5 concerning the notes at issue in the lawsuits
6 that were commenced against you personally?
7         Withdrawn.  That was a bad question.
8         Does that purpose apply only to the
9 notes that you executed or does it apply to the
10 corporate notes as well?
11     MS. DEITSCH-PEREZ:  Object to the
12 form.
13     Other than HCMFA?
14     MR. MORRIS:  Correct.  I think we've
15 established the scope of the agreements.
16     A.  To give a complete answer, from my
17 perspective it is about 50 million of notes
18 between -- current balance between NexPoint,
19 Services, myself, and HCRE.
20     Q.  And HCMS; right?
21     A.  Yes, Services, Highland Capital
22 Management, yes.
23     Q.  Okay.  So I just want to know, that
24 sentence there concerning the purpose was
25 omitted from the answers of NexPoint, HCMS,

Page 406

DONDERO - 10/29/21

1
2 HCRE.
3         And I'm happy to walk you through to
4 show you.  And I just want to know in your
5 capacity as a 30(b)(6) witness for those
6 entities, if you know why that statement of
7 purpose was omitted.
8     A.  Well, we talked about it earlier.  I
9 think there is some cleanup.  There has been
10 multiple lawyers involved.  We didn't know
11 which loans were prepaid, which loans weren't.
12 But, you know, I don't know why it was omitted
13 but it applies to all of them.
14     MS. DEITSCH-PEREZ:  I think that is
15 the first time that I've noticed that.  So,
16 John, I'm going to take a mea culpa.  I
17 think that is a cut-and-paste error.
18     MR. MORRIS:  All right.  Well, I
19 will -- I will just point out that the
20 affirmative defense concerning the oral
21 agreements is the exact same in all four
22 answers, except for the omission of the
23 statement of purpose for the three
24 corporate entities.
25     Q.  And so, Mr. Dondero, is it fair to

Page 407

DONDERO - 10/29/21

1
2 say that you don't know why that statement of
3 purpose was omitted from the corporate
4 entities' answers?
5     A.  Yeah, I don't know why it is omitted
6 or why the complaints aren't consistent with
7 that regard.
8     Q.  Okay.  But it is your -- it is your
9 position as the purpose -- as one of the people
10 who entered into this oral agreement that the
11 purpose for the -- for the condition subsequent
12 agreement is the same as for the corporate
13 entities as it is for you, as stated in this
14 paragraph; is that right?
15     A.  Yes.
16     Q.  Okay.  We talked a little bit about
17 the NexPoint term note.
18         Do you remember that?
19     A.  Yes.
20     Q.  And do you recall that in its
21 original form the NexPoint term note was for a
22 principal amount of approximately $30 million?
23     A.  Yes.
24     Q.  And do you recall that the NexPoint
25 term note was a rollup of the outstanding

Page 408

DONDERO - 10/29/21

1
2  principal and interest then due on certain
3  promissory notes that had previously been given
4  by NexPoint to Highland?
5     A.   Yes.
6     Q.   Okay.
7        MR. MORRIS:  Can we put up, please,
8     Exhibit Number 2, which I believe is the
9     complaint against NexPoint.
10       (Exhibit 2 marked.)
11       MR. MORRIS:  And if we can go to
12    Exhibit Number 1 of Deposition Exhibit
13    Number 2.
14    Q.   Okay.  And do you see -- I'm sorry,
15  sir, do you see that Exhibit Number 1 to the
16  complaint is a promissory note dated May 31st,
17  2017 in the approximate amount of
18  $30.75 million?
19    A.   Yes.
20    Q.   Okay.  And is that your signature on
21  page 2?
22    A.   Looks like it.
23    Q.   Okay.  And did you sign this note on
24  behalf of NexPoint on or around May 31st, 2017?
25    A.   I assume so.

Page 409

DONDERO - 10/29/21

1
2     Q.   Do you know if you read the note
3  before you signed it?
4     A.   Not likely.
5     Q.   Do you recall whether there was
6  anything about the note that you didn't
7  understand before you signed it on behalf of
8  NexPoint?
9        MS. DEITSCH-PEREZ:  Object to the
10    form.
11    A.   Yeah, I'm not -- I doubt I read it,
12  so I don't remember objecting to anything.
13    Q.   Okay.  Looking at Paragraph 2.1, am
14  I characterizing that section fairly when I say
15  that the borrower was required to make an
16  annual installment payment at the end of each
17  calendar year?
18       MS. DEITSCH-PEREZ:  Object to the
19    form.
20    A.   I see that paragraph, yes.
21    Q.   Okay.  And did you understand when
22  you signed it that an annual installment
23  payment would be due at the end of each year by
24  NexPoint?
25       MS. DEITSCH-PEREZ:  Object to the

Page 410

DONDERO - 10/29/21

1
2     form.
3     A.   I never read it that closely.
4     Q.   So as the control person of
5  NexPoint, is it fair to say then that you don't
6  recall having an understanding when you signed
7  this note that NexPoint would be required to
8  make annual payments at the end of each year?
9        MS. DEITSCH-PEREZ:  Object to the
10    form.
11    A.   I didn't have knowledge of the
12  specifics, and again, I would describe those
13  specifics as de minimis.
14    Q.   Okay.  Do you see -- do you have any
15  idea who drafted this note?
16    A.   It would have come from accounting.
17  I think they have boilerplate -- I don't know
18  if they work with legal at all.  I have no
19  idea, but it would have come through
20  accounting.
21    Q.   Do you recall that all three of the
22  term notes at issue were signed on the same
23  day, May 31st, 2017?
24    A.   That doesn't surprise me.  I think
25  there was an accounting reason, if I remember

Page 411

DONDERO - 10/29/21

1
2  correctly.  I think it had something to do with
3  either the audit or the financials or if we had
4  a credit facility at the time.  I think that is
5  probably why, but I don't remember exactly.
6     Q.   Do you have any other recollection
7  as to why all three notes were executed at the
8  end of May 2017?
9     A.   Again, I believe they're -- the --
10  aggregating or solidifying them into one
11  defined note I think was required by the
12  auditors or the -- the accounting department as
13  best practices.  I don't think -- it wasn't a
14  regulatory reason and it wasn't a compliance
15  reason.  I believe it was just an accounting or
16  an audit reason.
17    Q.   Did you ever make sure on behalf of
18  NexPoint that the terms of the promissory note
19  were fair and reasonable?
20       MS. DEITSCH-PEREZ:  Object to the
21    form.
22    A.   Yeah, I don't remember ever
23  negotiating or reading it that closely.  And
24  again, I think the view from all concerned is
25  that it was relatively de minimis from the

Page 412

DONDERO - 10/29/21

1  balance sheet at Highland then or now and/or de
2  minimis relevant to NexPoint's value.
3  Q.   It is a $30 million note.  Do I have
4  that right?
5  A.   Yes.
6  Q.   Okay.  And it was material enough to
7  be included in Highland's financial statements;
8  is that correct?
9  A.   Anything material or not as part of
10  doing proper audited financials needs to be
11  properly included.
12  Q.   Okay.  And you know, because you
13  signed the management representation letter,
14  that this note was specifically disclosed to
15  PwC and included in both Highland's and
16  NexPoint's audited financial statements;
17  correct?
18  A.   I would -- I would have been shocked
19  if it wasn't, if it is an asset and a liability
20  respectively of the companies.
21  Q.   Okay.  Do you see the section on
22  acceleration upon default, Paragraph 4?
23  A.   Yes.
24  Q.   Have you ever seen that section


Page 412

DONDERO - 10/29/21

1  balance sheet at Highland then or now and/or de
2  minimis relevant to NexPoint's value.
3  Q.   It is a $30 million note.  Do I have
4  that right?
5  A.   Yes.
6  Q.   Okay.  And it was material enough to
7  be included in Highland's financial statements;
8  is that correct?
9  A.   Anything material or not as part of
10  doing proper audited financials needs to be
11  properly included.
12  Q.   Okay.  And you know, because you
13  signed the management representation letter,
14  that this note was specifically disclosed to
15  PwC and included in both Highland's and
16  NexPoint's audited financial statements;
17  correct?
18  A.   I would -- I would have been shocked
19  if it wasn't, if it is an asset and a liability
20  respectively of the companies.
21  Q.   Okay.  Do you see the section on
22  acceleration upon default, Paragraph 4?
23  A.   Yes.
24  Q.   Have you ever seen that section

Page 413

DONDERO - 10/29/21

1  before?
2  A.   No.
3  Q.   Do you think a prudent executive
4  signing a $30 million note should take the time
5  to read the terms and conditions of the note?
6  A.   Not necessarily.
7  Q.   Under what circumstances do you
8  think that an executive shouldn't take the time
9  to read the terms and conditions of a
10  $30 million promissory note?
11  A.   When it is between affiliates,
12  between friendly affiliates with no even
13  inkling that bankruptcy or the parties could be
14  at odds create a note, when it is a soft note
15  with limited collateral and limited other
16  protections.  And then the servicing or value
17  of the note is de minimis relative to the
18  balance sheets of each entity I think is a good
19  reason or logical reason for the executives on
20  both sides not to spend much time focusing on
21  it.
22  Q.   All right.  So you thought it was
23  reasonable not to read this particular note for
24  the reasons you just gave.

Page 414

DONDERO - 10/29/21

1  Do I have that right?
2  A.   Right.
3  MR. MORRIS:  Okay.  Can we go to the
4  next page, please.
5  Q.   Do you see Paragraph 5?  There is a
6  paragraph entitled Waiver.
7  A.   Yes.
8  Q.   And I will read it out loud:  Maker
9  hereby waives grace, demand, presentment for
10  payment, notice of non-payment, protest, notice
11  of protest, notice of intent to accelerate,
12  notice of acceleration, and all other notices
13  of any kind hereunder.
14  Have I read that correctly?
15  A.   Yes.
16  Q.   Do you know that paragraph is
17  included in every single note that you signed
18  that is part of the litigation that we're here
19  to talk about today?
20  A.   You have to -- you have to define
21  when.  You know, like today I know that it
22  is -- it is in those notes.
23  At the end of '20, Seery and DSI
24  were withholding all notes, all information,

Page 415

DONDERO - 10/29/21

1  anything regarding the company from any of the
2  other subsidiaries, and Frank was administering
3  the notes on behalf of both the related parties
4  and Highland.
5  So at the time -- at the time I
6  would have -- I would have never known that at
7  the end of 2020.  And it is crazy to think I
8  would have remembered a clause in a soft note
9  from three years earlier.
10  Q.   Okay.  Is it fair to say that -- do
11  you understand today that that provision is
12  included in every note that you signed?
13  MS. DEITSCH-PEREZ:  Object to the
14  form.
15  A.   You're saying it, so I believe you.
16  I'm not asking you to go show me all the other
17  notes, but --
18  Q.   Thank you.
19  A.   -- I'm assuming it is in all the
20  other notes.  I will take your word for it.
21  Q.   And is it fair to say that at the
22  time you signed these notes you didn't take the
23  time to read that particular provision?
24  MS. DEITSCH-PEREZ:  Object to the

Page 416

DONDERO - 10/29/21

1    form.
2    A.   That is correct.  A lot of it is
3    boilerplate.  And, again, treasury or
4    accounting would have put in what was necessary
5    for regulatory, tax, audit purposes.  Maybe the
6    auditors put that in.  I have no idea.
7         But the content and the bullet
8    points here, the nine paragraphs on a soft note
9    would have been put in by other people and
10   administered by other people other than me.
11   Q.   What is a soft note?
12   A.   You know, like a secured — I mean,
13   a note that isn't a hard note, like a note that
14   isn't secured, deed in lieu, UCC filed,
15   guaranteed, you know, performance and bad boy
16   clauses and all of that other stuff.
17        A soft note is an unsecured loan
18   that has basic terms to it, but it is likely
19   subject to renegotiation over time.
20   Q.   Were any of the notes that you
21   signed subject to negotiation?
22   A.   Well, I'm saying by definition that
23   is what a soft note is.
24   Q.   One that — that is not subject to
25

Page 417

DONDERO - 10/29/21

1    the negotiation — to negotiations?
2    A.   No, one that is over time subject to
3    negotiation or modification.
4    Q.   Okay.
5    A.   Because there is — there is
6    limited — there is limited, team collateral,
7    guarantee, bad boy features in — in a soft
8    note.
9    Q.   Okay.  Perhaps my question wasn't
10   clear.
11        Did the notes that you signed — did
12   you negotiate them with anybody, the terms of
13   each note?
14   A.   No.
15   Q.   Okay.  Did you personally decide on
16   the terms of each note?
17   A.   No.  Again, they were two highly
18   solvent, highly well-capitalized subsidiaries,
19   and the amount of the notes was de minimis and
20   friendly, and they were soft notes administered
21   by a centralized treasury shared services
22   department.
23
24        They were the ones deciding what it
25

Page 418

DONDERO - 10/29/21

1    took to be compliant from an accounting
2    regulatory-wise standpoint, but wasn't — they
3    were trying to come up with a balance note,
4    which I think this is, such that it wouldn't
5    have to be negotiated or haggled by any of the
6    parties.
7         And there is no evidence of any of
8    the notes ever being haggled or ever being
9    negotiated.
10   Q.   Okay.  I appreciate that.
11        At the time you signed each of the
12   notes on behalf of the obligors, did the
13   obligors have an intention at the time you put
14   your signature on the page of repaying the
15   notes in accordance with their terms?
16   A.   Yes.  They're all — soft note
17   doesn't mean it's not a bona fide note.  They
18   were all intended to be bona fide notes, and
19   they all are bona fide notes that were intended
20   to be paid and for the — virtually most part,
21   were always paid or prepaid and, you know, paid
22   in accordance.
23   Q.   Do you see to the right there is a
24   list of prior notes?
25

Page 419

DONDERO - 10/29/21

1    A.   Yes.
2    Q.   And is it your understanding that
3    this note substituted and superseded the
4    promissory notes that are listed on Exhibit A
5    on the page there?
6    A.   Yeah.  I mean, effectively pay those
7    off and reestablish an aggregate note.
8    Q.   Right.  And Exhibit A actually set
9    forth the outstanding principal and interest
10   that NexPoint owed Highland under the prior
11   notes as defined there as of May 31st, 2017;
12   right?
13   A.   Yeah, that is what it looks like.
14   Q.   Okay.  And — and so the initial
15   principal amount of the prior notes was what is
16   stated there, approximately $27.675 million?
17   A.   Right.
18   Q.   Okay.  You wouldn't have signed this
19   note on behalf of NexPoint if you didn't
20   believe at the time you signed it that NexPoint
21   owed Highland that amount of money; correct?
22   A.   Yeah, it is a bona fide note,
23   consistent with my testimony.
24   Q.   Okay.  Do you know why NexPoint
25

DONDERO - 10/29/21

1
2  borrowed the money from Highland at the times
3  and in the amounts listed on Exhibit A?
4      A.   No.
5      Q.   Did you authorize NexPoint to borrow
6  the money that is reflected in the prior note
7  set forth on Exhibit A?
8      A.   I don't know.  Probably some of
9  them, yes.
10     Q.   Okay.  And you have no recollection
11  at all as to why NexPoint borrowed over
12  $27 million from Highland in the 12-month
13  period from August 2014 to July 2015?
14     A.   Not without being refreshed.
15     Q.   Okay.  Do you have any knowledge as
16  to what NexPoint did with the proceeds from
17  these loans?
18     A.   Not without being refreshed.
19     Q.   Okay.  And you contend that this
20  note is subject to – subject to one of your
21  oral agreements with the Dugaboy trustee;
22  correct?
23     A.   Yes.
24     Q.   Who decided to include this
25  particular note in your agreement with the

DONDERO - 10/29/21

1
2  Dugaboy trustee?
3      A.   Me, myself.
4      Q.   Okay.  What was the purpose of
5  including this note in your agreement with the
6  Dugaboy trustee?
7          Was it to provide you with a
8  compensation?
9      A.   Yeah.  I mean, in fact, I think it
10  was articulated in that big paragraph
11  reasonably well that my cash compensation, I
12  believe through any lens, people would look at
13  it as de minimis from the standpoint of
14  Highland as asset manager.
15         I don't think it was more than a
16  couple million bucks in a year and it went
17  down, I think, in the '15 through '20 period.
18         So I think it is common in private
19  companies to loan money that is bona fide debt
20  and then forgive it at different times to
21  manage compensation and incentives to managers
22  of private companies.
23         This is a – we're in – we each
24  have experts talking about it, but I think this
25  is, you know, typical.

DONDERO - 10/29/21

1
2      Q.   Can you identify any moment in the
3  25 or 26 year history that you were president
4  of Highland where Highland forgave an
5  intercompany loan for the purpose of providing
6  compensation to you or any other employee
7  except for the agreements that are described in
8  Paragraph 82 of your answer?
9      A.   Boy, I know we have masked it.  I
10  don't know if we – it sounds like we may not
11  have sent it to you, but we have done it for a
12  dozen employees over the years in – in fairly
13  significant amount –
14     Q.   I'm going to interrupt you, sir,
15  because it's not responsive to my question.  I
16  apologize for that.  I'm just focusing on
17  intercompany loans.
18         Can you identify any loan in the 25
19  or 26 years that you were president, an
20  intercompany loan where – where Highland was
21  the payee that was forgiven for purposes of
22  giving you or any employee compensation, other
23  than – other than the agreements that you
24  struck with the Dugaboy trustee?
25     A.   It is an odd question because I'm

DONDERO - 10/29/21

1
2  the only one at the compensation level with the
3  interrelated entities who could possibly get
4  intercompany loans forgiven as part of the
5  comp, but it –
6      Q.   Okay.  So let me ask a cleaner –
7  let me ask a cleaner question.  I appreciate
8  that clarification.
9          Other than the agreements described
10  in Paragraph 82, can you think of any other
11  intercompany loan that was ever forgiven while
12  you were president of Highland for the purpose
13  of giving you compensation?
14     A.   I don't – I don't know.
15     Q.   This is an important issue; right?
16  The notion of a prior practice.  It is your
17  contention that there was a prior practice at
18  Highland – hold on one second.  I apologize.
19         Sorry about that.  Somebody almost
20  dropped an air conditioner out the window.
21         MS. DEITSCH-PEREZ:  That would not
22  be good.
23         MR. MORRIS:  No.
24     Q.   All right.  Apologies.
25         MR. MORRIS:  May I have the last

Page 424

DONDERO - 10/29/21

1    question read back?
2        (Record read.)
3    Q.   I'm going to start all over here.
4        Mr. Dondero, do you contend that
5    there was a practice at Highland of forgiving
6    loans; is that correct?
7    A.   Yes.
8    Q.   And do you recall that we talked
9    about that issue back in May?
10   A.   Yes.
11   Q.   Okay.  And since -- since that time
12   have you made any effort to gather any
13   information that would demonstrate that there
14   was a prior practice at Highland of forgiving
15   loans?
16   A.   Yes.
17   Q.   And what efforts have you made?
18   A.   Like I said, we amassed a list, and
19   not insignificant list and not insignificant
20   amounts, proportionate to the people's
21   compensation where it was a practice.
22       You know, for some people for
23   relocation, for some people for bonuses, for
24   house purposes, for senior executives, senior

Page 425

DONDERO - 10/29/21

1    executives at the bank and board members at the
2    bank in the seven-figure kind of numbers that
3    were then subsequently forgiven.
4        It is -- I know we amassed more than
5    a dozen examples that were significant and
6    material.
7        MR. MORRIS:  Deborah, I apologize.
8    It is certainly possible I missed it, but I
9    don't recall seeing any list or any
10   documents of any kind that Mr. Dondero has
11   described.
12       Have they been produced?
13       MS. DEITSCH-PEREZ:  I think so.  I
14   will double-check, but I believe that
15   they're listed --
16       MR. MORRIS:  I know there is a list
17   of -- I apologize.  I know there is a list
18   of names in one of the discovery responses.
19   But other than the list of names in the
20   discovery response, I don't recall
21   receiving any documents at all.
22       MS. DEITSCH-PEREZ:  No.  And I think
23   we asked you for the documents because we
24   don't have access to the documents on

Page 426

DONDERO - 10/29/21

1    Highland's server.  The only thing I can
2    think of that we might owe you is there
3    might be a few additional names to list in
4    the interrogatory, and I will check whether
5    that has been done.
6        MR. MORRIS:  Okay.
7    Q.   Mr. Dondero, you sign management
8    representation letters in connection with
9    Highland's audit each year; is that right?
10   A.   Yes.
11   Q.   Do you understand that you have an
12   obligation when you sign the management
13   representation to disclose to the auditor all
14   agreements with affiliated entities and people
15   that are deemed to be material?
16       MS. DEITSCH-PEREZ:  Object to the
17   form.
18   A.   Generally, yes.
19   Q.   Okay.  And is it your understanding
20   that at least since 2008 Highland has disclosed
21   to its auditors all agreements with affiliates
22   that are material, as defined in the management
23   representation letter?
24   A.   Yes.

Page 427

DONDERO - 10/29/21

1    Q.   And would that include any
2    agreements to forgive loans that were deemed to
3    be material amounts?
4    A.   No, because it is contingent in long
5    term and speculative.
6    Q.   But at some point if it is forgiven
7    would that be -- would that be an event that
8    would be disclosed to the auditor?
9    A.   Sure.
10   Q.   Okay.  So is it fair to say that all
11   loans that were deemed to be material to the
12   extent they were forgiven were disclosed to the
13   auditors?
14   A.   Yes.
15   Q.   Okay.
16   A.   But, yeah, the only caveat I would
17   put on it is we have such limited information
18   regarding Cornerstone and Trust Life, which is
19   part of my agreement with the Dugaboy trustee
20   or with the majority of class A holders.
21       They could have been sold in
22   secrecy, without disclosure to us, such that
23   the notes are all forgiven at this point, but
24   we -- we -- we may never know.

DONDERO - 10/29/21

1  
2   Q.   So you can't rely on anything that
3   you don't know; is that fair?
4   A.   Yeah.
5       MS. DEITSCH-PEREZ:  Objection to
6   form.
7   A.   Yeah, we can't rely on things we
8   don't know and we can't rely on the debtor to
9   be honorable.
10  Q.   Well, the debtor has produced to
11  you, sir, every single audited financial
12  statement without redaction since 2008.  Are
13  you aware of that?
14  A.   That is actually news to me because
15  we were asking for them a couple of months ago.
16  That must be – that must be a new production.
17  Q.   No.  Actually, it was produced to
18  you way back in July.  You are not aware of
19  that?
20  A.   No, I'm looking –
21      MS. DEITSCH-PEREZ:  Hang on.
22  A.   I'm looking at Deborah.  She'll –
23      MS. DEITSCH-PEREZ:  I will get the
24  date.
25  A.   Yeah.  I would love to see them.

DONDERO - 10/29/21

1  
2   Q.   So then – so then it – so is it
3   fair to say, sir, that when you are describing
4   this practice of forgiveness of loans, you are
5   doing so without having reviewed any of the
6   audited financial statements that Highland
7   provided to your attorneys going back to 2008?
8       MS. DEITSCH-PEREZ:  Object to the
9   form.
10  A.   What I'm saying, I guess, is that we
11  haven't treated the loans as forgiven yet
12  because if the condition precedent has been
13  satisfied, we're not aware of it yet.
14      Now, if there is something in those
15  financial statements that will show that the
16  condition precedent is satisfied, then we have
17  a decision to make about the – or figure out
18  what the mechanism is for forgiving the loans.
19  Q.   Are you saying that there are loans
20  out there subject to forgiveness where the
21  maker is somebody other than you or an entity
22  that you control?
23  A.   No, I'm just – I'm talking about
24  the 50 million of loans that we've been talking
25  about.

DONDERO - 10/29/21

1  
2   Q.   Okay.  So – so I just want to go
3   back and focus on your assertion that there was
4   this practice of loan forgiveness.  I think you
5   have agreed with me that any loan that was
6   forgiven in a material amount would be
7   contained within the Highland audited financial
8   statements; right?
9   A.   I believe they – material or not,
10  they were all included in the Highland
11  financials.  Now, they might not have been
12  specifically footnoted, you know.
13      Like in other words, if we gave
14  somebody half a million bucks to relocate and
15  then forgave the loan, it might just be mixed
16  with all other compensation in the line item.
17  It might not have been listed separately
18  because it would have been small relative to
19  the overall financial statement.
20  Q.   But you're just speculating right
21  now because, in fact, you haven't read the
22  audited financial statements for the purpose of
23  seeing whether or not there were loan – loans
24  that were forgiven and disclosed; right?
25      MS. DEITSCH-PEREZ:  Object to the

DONDERO - 10/29/21

1  
2   form.
3   A.   Well, what I'm saying, just to be
4   clear, is I haven't looked at the presentation
5   of forgiven loans in the historic financials
6   because I was unaware that we had gotten
7   historic financials, but I am testifying that
8   we had amassed at least a dozen, 15 material
9   examples of material loan forgiveness amounts
10  to different executives.
11  Q.   All right.  Do you have any
12  documentation to support your assertion of the
13  practice of forgiving loans at Highland?
14  A.   Again, we have very, very little
15  access to anything, and we didn't take anything
16  with us that we weren't supposed to take, so we
17  don't have any of that documentation.
18      At NexBank, one of the sister
19  companies that we still have full control over
20  our records, we could show seven-figure-plus
21  loans to senior management and the entire board
22  of directors and forgiveness thereof as an
23  example, but that – that is the only
24  documentation that we would be able to present
25  without having access to the records that you

Page 432

DONDERO - 10/29/21

1 guys are keeping from us.
2
3       MR. MORRIS:  I move to strike the
4   last comment, and I take offense to it,
5   sir.  We're not withholding anything, okay.
6       Q.   Would the NexBank audited financial
7   statements include a disclosure of the loans
8   that you are describing?
9       A.   Yes.
10      Q.   Okay.  So is it fair to say that if
11   Highland forgave loans, it would be disclosed
12   in its audited financial statements?
13          MS. DEITSCH-PEREZ:  Object, asked
14      and answered.
15      A.   Well, just to be clear, these loans
16   like the one up on the sheet, those were
17   included in Highland's financials, those loans,
18   just like the NexBank loans, when they were
19   made to senior executives were included.  But
20   there wasn't a -- at NexBank there wasn't any
21   kind of disclosure that said, these might be
22   forgiven, or these are the terms that they
23   would be forgiven under, just like there was no
24   disclosure in the Highland financials that
25   these are the terms that it might be forgiven

Page 433

DONDERO - 10/29/21

1 under, et cetera, et cetera.
2
3       Q.   It's certainly disclosed in the
4   financials when it was forgiven.  Will you --
5   will you concede that point?
6       A.   Yes, sure.
7       Q.   Okay.  Let's move on.
8          Let's go to HCMS.  Are you familiar
9   with the notes at issue in the lawsuit that was
10   commenced by Highland against HCMS?
11          MS. DEITSCH-PEREZ:  S or --
12      A.   S as in Services.  Yes.
13          MR. MORRIS:  Okay.  Can we please
14      put up Exhibit 3.
15          (Exhibit 3 marked.)
16          MS. DEITSCH-PEREZ:  Is that in the
17      binder that you sent?
18          MR. MORRIS:  Yes, as Exhibit 3.
19          MS. DEITSCH-PEREZ:  Okay.
20          MR. MORRIS:  And if we could go to
21      the Exhibits 1 through 4, okay.
22      Q.   Sir, we've put up on the screen
23   Exhibit 1 to Exhibit 3, which is the complaint
24   against HCMS.  Do you see Exhibit 1 up on your
25   screen?

Page 434

DONDERO - 10/29/21

1       A.   Yeah.  This is the $150,000
2   promissory note; is that what that is?
3       Q.   Yes, sir.
4       A.   Okay.  As long as I can see it on
5   the screen, I don't need to find it in hard
6   copy, do I?
7          MS. DEITSCH-PEREZ:  Yeah.
8          MR. MORRIS:  Can you scroll to the
9      second page, PJ.
10      Q.   Is that your signature, sir?
11      A.   Close.
12      Q.   Are you aware that your signature is
13   affixed to a $150,000 promissory note that was
14   made by HCMS to Highland Capital Management?
15          MS. DEITSCH-PEREZ:  Objection, form.
16      A.   Like I said, it's close.  I don't
17   know if that is mine, but it's close.
18      Q.   Do you have any reason to believe
19   that either you or somebody you authorized
20   didn't sign this particular promissory note?
21      A.   Not specifically.
22          MR. MORRIS:  Okay.  Can we go to the
23      first page, please.

Page 435

DONDERO - 10/29/21

1       Q.   Did HCMS receive a loan from
2   Highland in the amount of $150,000 on March
3   28th, 2018?
4       A.   I assume so.
5       Q.   Okay.  You wouldn't have either
6   signed or allowed your signature to be affixed
7   to this document if you didn't understand that
8   HCMS had received from Highland $150,000;
9   correct?
10      A.   This is one of the many things I
11   would have signed on a given day.
12      Q.   Okay.  And -- are you aware that
13   this note was given to Highland's auditors?
14      A.   It could.  I'm not aware
15   specifically, but it should be.
16      Q.   Okay.  Do you have any recollection
17   as to why HCMS obtained this loan from
18   Highland?
19      A.   Unless it says it on these two
20   pages, I have no idea.
21      Q.   Okay.  Do you have any recollection
22   as to what HCMS did with the proceeds of this
23   loan?
24      A.   No.

Page 436

DONDERO - 10/29/21

1
2    Q.   Okay.  Let's just flip through the
3    Exhibits 2, 3, and 4, if we could.
4          Looking at Exhibit 2, is that your
5    signature on Exhibit 2, sir?
6    A.   Again, it is close.
7    Q.   Okay.  And do you have any reason to
8    believe that that is either not your signature
9    or that you did not authorize somebody to sign
10   this on behalf of HCMS in June of 2018?
11   A.   No.
12   Q.   Okay.
13        MR. MORRIS:  Can we go to Exhibit 3,
14        please, and if we can go to the signature
15        line.
16   Q.   Do you see that that is Frank
17   Waterhouse?
18   A.   Yes.
19        MR. MORRIS:  Okay.  And can we go to
20        the page before that, the first page.
21   Q.   Frank Waterhouse was the treasurer
22   of HCMS in May 2019; correct?
23   A.   That is what it said right on that
24   thing we saw earlier; right?
25   Q.   Incumbency certificate.

Page 437

DONDERO - 10/29/21

1
2    A.   Yes.
3    Q.   Do you recall that HCMS borrowed
4    $400,000 from Highland in or around May 2019?
5    A.   Not specifically.
6    Q.   Do you have any reason to believe
7    that it didn't?
8    A.   I have no knowledge -- I have no
9    knowledge of what it was used for and whether
10   it did or didn't.
11        MR. MORRIS:  Okay.  Let's go to the
12        next exhibit, please.
13   Q.   Do you see Frank Waterhouse signed
14   here on behalf of the maker, HCMS Services?
15   A.   Yes.
16   Q.   Okay.  Are you aware that HCMS
17   borrowed $150,000 from Highland in June 2019?
18   A.   No.
19   Q.   Okay.  Do you have --
20   A.   I'm not aware and --
21   Q.   Do you have --
22   A.   I didn't -- I'm sorry, go ahead.  I
23   was just saying, looking at Frank's signature,
24   you know, we're switching from me signing to
25   Frank signing.  And I guess we're saying Frank

Page 438

DONDERO - 10/29/21

1    is an authorized signatory, although if you
2    look at Frank's, it looks like an automated
3    signature versus, you know, an actual
4    signature, but I assume you went over this with
5    him, but I don't have specific knowledge of
6    these at all.
7    Q.   And do you know that Mr. Waterhouse
8    from time to time used an electronic signature?
9        MS. DEITSCH-PEREZ:  Object to the
10        form.
11   A.   I believe he did.
12   Q.   And you saw -- you have seen his
13   electronic signature on other documents; is
14   that right?
15   A.   Yes.
16   Q.   So it doesn't surprise you to see
17   his electronic signature on a note; correct?
18   A.   Yeah.  Yeah, okay.  Yeah, I don't
19   know.  But whether or not he did it or somebody
20   else did it or -- we're just getting a little
21   far afoot from me signing it; right?  That is
22   all.
23   Q.   Right.
24   A.   To -- Frank -- Frank may have signed

Page 439

DONDERO - 10/29/21

1    it.  He may have done it electronically or
2    somebody may have done it electronically for
3    him.  Those are just different answers than me
4    signing it; right?
5    Q.   Okay.  And -- and that is fair.
6        Are you aware that on December 3rd,
7    2020, Highland made a demand upon HCMS for
8    payment under these four notes that we have
9    just looked at?
10   A.   I knew there was a demand on the
11   NexPoint one.  Can you refresh me on this one?
12   Q.   Sure.
13        MR. MORRIS:  Can we go to the next
14        exhibit in Exhibit 3.  Exhibit 5.
15   Q.   You will see that there is a letter
16   dated December 3rd, 2020, from Mr. Seery to
17   HCMS?
18   A.   Yep.
19   Q.   And do you see that it was sent to
20   the attention of Mr. Waterhouse?
21        Do you see that, sir?
22   A.   Yes, yep.
23   Q.   And, again, Mr. Waterhouse at that
24   time was the treasurer of HCMS to the best of

Page 440

DONDERO - 10/29/21

1   your recollection; correct?
2      A.   He primarily was the CFO of
3   Highland.  But, yes, I mean, I do see that.
4      Q.   Okay.  And did you learn on or
5   around December 3rd that Highland had made
6   demand upon HCMS for payment of all outstanding
7   principal and interest due under the four
8   demand notes that are listed on the page there?
9      A.   Yes, yep.
10     Q.   So you knew that at the time; right?
11     A.   Well, more importantly I knew they
12  were all subject to the same forgiveness
13  provisions as the other note.
14     Q.   Okay.  So I move to strike.
15        You knew in December 3rd, 2020, that
16  Highland made demand; correct?
17     A.   Yes.
18     Q.   Okay.  And do you see that Highland
19  gave HCMS an eight-day grace period or until
20  December 11th, 2020, to make payment?
21     A.   Yes.
22     Q.   Under the demand note do you have
23  any understanding that Highland was required to
24  give any grace period at all?

Page 441

DONDERO - 10/29/21

1      A.   I don't know.
2         MS. DEITSCH-PEREZ:  Object to the
3   form.
4      Q.   Do you know whether HCMS ever
5   responded to this demand letter prior to the
6   commencement of litigation?
7      A.   I don't know.
8      Q.   Prior to the commencement of
9   litigation, did you discuss with anyone whether
10  HCMS should respond to Highland's demand
11  letter?
12     A.   Did I discuss with anyone?  No, I
13  don't remember -- I don't remember talking
14  with this with Frank at all where --
15        MS. DEITSCH-PEREZ:  And I'm just
16     going to stop you to make sure you don't
17     blurt out any privileged communications, if
18     there are any.
19        We object to the disclosure.  But
20     with that caveat, go ahead.
21     A.   I'm sorry, repeat the question
22     again.  Let me try and keep it simple here.
23     Q.   Sure.  It may be my fault.
24        Mr. Dondero, you testified that you

Page 442

DONDERO - 10/29/21

1   were aware that Highland made a demand for
2   payment on these four notes; correct?
3      A.   Yes.
4      Q.   Okay.  Did you have any
5   non-privileged communications at any time after
6   Highland sent this letter about whether and how
7   HCMS should respond?
8      A.   You know, let me just -- let me
9   adjust the prior answer for a second.
10        I'm aware that this letter was sent.
11  I'm not sure I knew contemporaneously or when I
12  knew the letter was sent.  I can't -- I have no
13  recollection of receiving it at the time.
14        And to answer your question, I can't
15  recollect talking to Frank or anybody else
16  about it at the time.  I'm not sure I knew
17  about it at the time.  But I have -- I don't
18  have any recollection of discussing it with
19  anybody at or around the time.
20     Q.   Did you ever instruct anybody at any
21  time to respond to this letter, whenever it is
22  you learned about it?
23     A.   No.
24     Q.   Do you know if anyone acting on

Page 443

DONDERO - 10/29/21

1   behalf of HCMS ever informed Highland of HCMS'
2   defenses to the -- to the demand letter prior
3   to the commencement of litigation?
4      A.   Yeah, Frank would be the person to
5   ask there.  I don't know.
6      Q.   I'm just asking you.  Prior to the
7   commencement of litigation, did you ever
8   instruct anyone to inform Highland that the
9   HCMS notes were subject to oral agreements with
10  the Dugaboy trustee?
11     A.   I believe former Judge Lynn sent a
12  letter in that regard.  But other than that, I
13  don't remember talking to anybody -- I don't
14  remember talking to the debtor about it per se.
15     Q.   It is your recollection that
16  Judge Lynn sent a letter to Highland before the
17  commencement of litigation, putting Highland on
18  notice that the HCMS notes were the subject of
19  oral agreements between you and the Dugaboy
20  trust.
21        Do I have that right?
22     A.   Yeah, that they were part of
23  forgiveness or compensation or something.  He
24  sent a letter in that regard.

Page 444

DONDERO - 10/29/21

1
2    Q.   And was this part of a settlement
3    discussion or was this in response to this
4    demand letter?
5        A.   I don't know.
6        Q.   Have you produced that letter in
7    discovery?
8            MS. DEITSCH-PEREZ:  I'm aware that
9        you have the letter.  I don't know if it
10       was attached to something, but I know you
11       have it.
12           MR. MORRIS:  Because you produced it
13       in discovery or because Mr. Dondero is
14       testifying that his recollection was that
15       Mr. Dondero sent this letter to the debtor?
16           MS. DEITSCH-PEREZ:  The -- the
17       letter has either been produced or was
18       attached to something or was used in a
19       deposition, but I am aware that you have
20       it.  If you need it to be Bates stamped, we
21       could do that.
22           MR. MORRIS:  I definitely need it to
23       be Bates stamped, I do, because I'm not
24       aware of this particular letter.  But I
25       appreciate that.

Page 445

DONDERO - 10/29/21

1
2        MR. RUKAVINA:  This is Davor.
3    Couple things, John -- and I apologize for
4    interjecting.  I have not made an
5    appearance yet today.  Deborah has been
6    objecting for everyone.
7        Thomas Berghman will take over
8    around 3:00 o'clock.  Is that okay with
9    you, John?
10       He is probably just going to sit
11   here and not object.
12           MR. MORRIS:  I will miss you and I
13   hope you have safe travels.
14           MR. RUKAVINA:  Okay.  Thank you very
15   much.
16       And, second, I think that the letter
17   that is being referred to is the email
18   letter, so I have produced it to you.
19       With that, thank you everyone.
20           MR. MORRIS:  Okay.  Take care.
21       Q.   Did anyone -- did you ever instruct
22   anyone in December 2020 to make the payments
23   that Highland demanded under the HCMS notes?
24           MS. DEITSCH-PEREZ:  The demand notes
25       that are listed here on the Exhibit 5?

Page 446

DONDERO - 10/29/21

1
2        MR. MORRIS:  Yes.
3        A.   Yes, not that I recall.
4        Q.   Did you ever instruct anyone in
5    December 2020 not to make the payments that
6    Highland demanded that are listed in this
7    exhibit?
8        A.   No.
9        Q.   Do you know why HCMS did not make
10   the payments that Highland demanded under the
11   notes?
12       A.   Again, beyond compensation
13   forgiveness argument, no.
14           MR. MORRIS:  Okay.  Let's go to the
15       next exhibit, 6.
16           (Exhibit 6 marked.)
17       Q.   And this is another one of the term
18   notes; right?
19       A.   Yes.
20           MR. MORRIS:  And can we just go to
21       the signature line, please.
22       Q.   Is that your signature, sir?
23       A.   That looks more like it.
24       Q.   And do you -- are you willing to
25   agree that you signed this promissory note in

Page 447

DONDERO - 10/29/21

1
2    favor of Highland on May 31st, 2017?
3        A.   Yes.
4        Q.   And is it fair to say you didn't
5    read this note before you signed it?
6        A.   Correct.  No reason to, really.
7        Q.   Okay.  So it is fair to say that
8    there is not a provision of this note that you
9    didn't understand before you signed it;
10   correct?
11           MS. DEITSCH-PEREZ:  Object to the
12       form.
13       A.   That I didn't review it, so
14   therefore I didn't have an opinion one way or
15   the other.
16       Q.   Okay.  This note substituted and
17   superseded for the promissory notes that are
18   set forth on Exhibit A to this document;
19   correct?
20       A.   Yes.
21       Q.   So just like NexPoint and HCMS, HCRE
22   also consolidated their outstanding demand
23   notes into one term notes at the end of
24   May 2017; right?
25       A.   Yep.

Page 448

DONDERO - 10/29/21

1
2    Q.   Okay.  Let's go to HCRE, if we can
3    take this down and put up Exhibit 4.
4          Actually, before we go to that, do
5    you have any recollection as to why HCRE
6    borrowed money from Highland in the amounts
7    equal to the prior notes as set forth to the
8    exhibit to the term note?
9    A.   Nope.
10   Q.   Do you have any recollection at all
11   as to what HCRE did with the proceeds of the
12   loans that it obtained from Highland?
13   A.   No.
14   Q.   This is Exhibit 4, so this is the
15   complaint -- this is actually the complaint
16   against HCRE.
17         MR. MORRIS:  Can we go to Exhibit 6,
18   please.
19         MS. DEITSCH-PEREZ:  Exhibit 6 of
20   Exhibit 4?
21         MR. MORRIS:  No, I apologize.  That
22   was my mistake.  Yes, Exhibit 6 to Exhibit
23   4.
24         MS. DEITSCH-PEREZ:  Okay.  If you
25   want the hard copy, it is in a booklet.

Page 449

DONDERO - 10/29/21

1
2    Otherwise, she is pulling it up.
3    Q.   So this is the last of the three
4    term notes.  Do you see that?
5    A.   Yes.
6    Q.   Also signed on May 31st, 2017;
7    correct?
8    A.   Yes.
9    Q.   And if we could look at the
10   signature line, is that your signature, sir?
11   A.   Yes.
12   Q.   And did you sign this note on behalf
13   of HCRE on or about May 31st, 2017?
14   A.   Yes.
15   Q.   Did you read this note before you
16   signed it?
17   A.   No.
18   Q.   And since you didn't read it, is it
19   fair to say that there wasn't a provision of
20   this agreement that you didn't understand at
21   the time that you signed it?
22         MS. DEITSCH-PEREZ:  Object to the
23   form.
24   A.   There is -- there wasn't a
25   provisions I did or didn't understand because I

Page 450

DONDERO - 10/29/21

1
2    didn't review it.
3    Q.   Okay.  This note substituted and
4    superseded for the promissory notes that are
5    listed on Exhibit A on the right side of the
6    page; correct?
7    A.   Yes.
8    Q.   And Exhibit A set forth the
9    outstanding principal and interest that HCRE
10   owed to Highland under the prior notes as of
11   May 31st, 2017; correct?
12   A.   Uh-huh.
13   Q.   That is a yes, sir; correct?
14   A.   Yes.
15   Q.   Okay.  Do you know why HCRE borrowed
16   the money from Highland at the times and -- and
17   in the amounts set forth on Exhibit A to the
18   promissory note?
19   A.   No.
20   Q.   Do you have any recollection as to
21   what HCRE did with the proceeds of the loans
22   that they had obtained from Highland between
23   January 2014 and April 2015?
24   A.   No.
25   Q.   Can we call the three term notes

Page 451

DONDERO - 10/29/21

1
2    that were signed by NexPoint, HCRE, and HCMS on
3    May 31st, 2017 collectively as the term notes?
4    A.   Yes.
5    Q.   Okay.  You had the authority to sign
6    each of the term notes on behalf of each of the
7    respective makers; correct?
8    A.   Yes.
9    Q.   Each of the term notes was for a
10   30-year term; correct?
11   A.   I believe so.
12   Q.   Okay.  Who decided to give each note
13   a 30-year term, if you know?
14   A.   The auditors, the accountants, not
15   me.
16   Q.   But you knew that each of the notes
17   was for a 30-year term; is that fair?
18   A.   Yes, I guess, yes.
19   Q.   Notes were unsecured; right?
20   A.   Yes.
21   Q.   And the notes were not the product
22   of any negotiations; correct?
23   A.   Correct.
24   Q.   Is it fair to say that none of the
25   makers of the term notes ever sought financing

Page 452

DONDERO - 10/29/21

1
2    from a third party as an alternative to the
3    Highland notes?
4        A.   That's correct.
5        Q.   Okay.  You don't have any reason to
6    believe that an unrelated third party would
7    have loaned money to NexPoint, HCRE, and HCMS
8    on the terms set forth in each of the term
9    notes, do you?
10       MS. DEITSCH-PEREZ:  Object to the
11   form.
12       A.   I -- it is not fair to draw that
13   conclusion.  You know, particularly NexPoint
14   has borrowed a lot of money at much lower rates
15   at or around 2017 and later, and to this day.
16       Q.   So then why --
17       A.   The same thing with HCRE.
18       Q.   So then why would HCRE and NexPoint
19   enter into these loans rather than obtaining
20   loans at lower interest rates if they were
21   available?
22       A.   These are soft loans, again, so
23   they're -- especially affiliate soft loans to
24   other creditors are viewed almost as equity or
25   subordinated to senior secured mortgages or

Page 453

DONDERO - 10/29/21

1
2    other financings that NexPoint and HCRE did.
3    So I would say that is -- that is the reason.
4        Q.   Are you saying that Highland today
5    really has equity interests in NexPoint, HCRE,
6    and HCMS?
7        MS. DEITSCH-PEREZ:  Object to the
8    form.
9        A.   Yeah, no, I didn't say that.  I'm
10   saying it has subordinated debt interest, but
11   they are soft notes, so they're viewed as
12   deeply subordinated equity-ish, so to speak, as
13   far as the senior secured debtholders are
14   concerned.
15       Q.   Well, that would be true of any
16   senior secured debt relative to unsecured debt;
17   isn't that right?
18       A.   Yes, but again, these are
19   particularly soft notes, you know.
20       Q.   Okay.  At the time you signed these
21   notes, were you aware that each of the term
22   notes required payment of an annual installment
23   on December 31st of each year?
24       MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 454

DONDERO - 10/29/21

1
2        A.   I knew there was more required
3    periodic payments than historically, and that
4    was part of -- partly driven by the -- the
5    auditors, I believe.
6        THE WITNESS:  You know what, can
7    we -- can we take a break for like five or
8    10 minutes, and then, you know, at most --
9    at most I've got another hour in me today,
10   and then so we could just work on when it
11   fits on everybody else's calendar if we
12   can't wrap up in an hour; okay?
13       MR. MORRIS:  No problem,
14   Mr. Dondero.  So the time now is what --
15   what time do we have?
16       VIDEOGRAPHER:  Off the record, 2:56.
17   (Recess taken 2:56 p.m. to 3:19 p.m.)
18       VIDEOGRAPHER:  Back on the record,
19   3:19.
20       Q.   Are you ready to proceed, sir?
21       A.   Yes.
22       Q.   Okay.  Did you speak with anybody
23   during the break about the substance of this
24   deposition?
25       A.   No.

Page 455

DONDERO - 10/29/21

1
2        Q.   So we were just looking at the third
3    in the series of term notes, and if we can go
4    to the -- I apologize, the first page of this
5    one, just to refresh your recollection after
6    the break that this is the term note that was
7    executed by you on behalf of HCRE Partners on
8    May 31st, 2017.
9        Do you see that?
10       A.   Yes.
11       Q.   Okay.  And I looked at Paragraph 5
12   before, but I just want to make sure, you're
13   telling me that you didn't read this before you
14   signed it, do I have that right, Paragraph 5?
15       A.   Yes.
16       Q.   And so you are unaware -- when did
17   you first -- when did you first become aware of
18   the provision that is set forth in Paragraph 5?
19       MS. DEITSCH-PEREZ:  Object to the
20   form.
21       A.   I don't know.
22       Q.   Okay.  Was it before or after the
23   commencement of the litigation?
24       A.   I don't know.
25       Q.   Okay.  NexPoint didn't make the