# DIRECTORY

## Highland Argentina Regional Opportunity Fund, Ltd.

**Directors:**

Claire Kasumba
Martin Laufer
Sophia Dilbert

**Registered Office:**

Maples Corporate Services Limited
P.O. Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands

**Investment Manager:**

Highland Capital Management Latin America, L.P.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201

**Administrator and Principal Office:**

MUFG Fund Services (Cayman) Limited
2nd Floor, Strathvale House
90 North Church Street
P.O. Box 609
Grand Cayman  KY1-1107
Cayman Islands

**Auditors:**

PricewaterhouseCoopers LLP
5th Floor Strathvale House
P.O. Box 258
Grand Cayman  KY1-1104
Cayman Islands

**Sponsor:**

Ogier Corporate Finance Limited
44 Esplanade, St. Helier
Jersey JE4 9WG
Channel Islands

**Legal Advisor as to Cayman Islands Law:**

Maples and Calder
P.O. Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands

**Legal Advisor as to United States Law:**

Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue
Suite 4100
Dallas, TX 75201

**Prime Broker:**

Société Générale
440 S. LaSalle St., Suite 2400
Chicago, IL 60605

BNP Paribas Prime Brokerage, Inc.
787 Seventh Avenue
The Equitable Tower
New York, NY 10019

Appx. 03785

# NOTICE

### *THIS OFFERING MEMORANDUM*

This Offering Memorandum ("Memorandum") relates to the offering of Series A and Series B Shares of Highland Argentina Regional Opportunity Fund, Ltd. (the "Fund"), a company incorporated under the Companies Law (Revised) of the Cayman Islands as an exempted company limited by shares and of unlimited duration.

This Memorandum is confidential and intended solely for the use of the person to whom it has been delivered by the Fund for the purpose of enabling the recipient to evaluate an investment in the Fund, and it is not to be reproduced or distributed to any other persons.  Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to its tax and other professional advisors, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure.

The Directors of the Fund whose names appear in the Directory accept responsibility for the information contained in this document.  To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case) the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

### *INVESTOR RESPONSIBILITY*

No representations or warranties of any kind are intended or should be inferred with respect to the economic return from, or the tax consequences of, an investment in the Fund. No assurance can be given that existing laws will not be changed or interpreted adversely. Prospective investors are not to construe this Memorandum as legal, investment or tax advice.  No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum.  This Memorandum supersedes all prior versions thereof and should be reviewed prior to making an investment decision.

Prospective investors should review this Memorandum carefully and in its entirety and consult with their legal, tax and financial advisors in relation to (i) the legal and regulatory requirements within their own countries for the purchase, holding, redemption or disposal of shares of the Fund ("Shares"); (ii) any foreign exchange restrictions to which they are subject in their own countries in relation to the purchase, holding, redemption or disposal of Shares; and (iii) the legal, tax, financial or other consequences of subscribing for, purchasing, holding, redeeming or disposing of Shares.

**Appx. 03786**

### *DISTRIBUTION AND SELLING RESTRICTIONS*

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities.  The distribution of this Memorandum and the offering or purchase of the Shares may be restricted in certain jurisdictions.  No persons receiving a copy of this Memorandum or the accompanying Subscription Documents (as defined herein) in any such jurisdiction may treat this Memorandum or such Subscription Documents as constituting an invitation to them to subscribe for Shares, nor should they in any event use such Subscription Documents, unless in the relevant jurisdiction such an invitation could lawfully be made to them and such Subscription Documents could lawfully be used without compliance with any registration or other legal requirements. Accordingly, this Memorandum does not constitute an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not lawful or in which the person making such offer or solicitation is not qualified to do so or to anyone to whom it is unlawful to make such offer or solicitation. It is the responsibility of any persons in possession of this Memorandum and any persons wishing to apply for Shares pursuant to this Memorandum to inform themselves of and to observe all applicable laws and regulations of any relevant jurisdiction.

The Fund may not make an invitation to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands Stock Exchange.  For these purposes, "public" has the same meaning as "public in the Islands" as defined in the Mutual Funds Law (Revised) of the Cayman Islands.  Apart from this restriction, persons resident, domiciled, established, incorporated or registered pursuant to the laws of the Cayman Islands may beneficially own Shares.

The Fund does not constitute a recognized collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the "Act"). In addition, the Investment Manager is not authorized or supervised by the United Kingdom Financial Conduct Authority ("FCA") as an "alternative investment fund manager" or "AIFM", as defined in the Financial Services and Markets Act 2000 (Alternative Investment Fund Managers) Regulations 2013 (SI 2013/1773) ("UK AIFMD Regulations").  The promotion and offering or placement of the Fund and the distribution of this Memorandum in the United Kingdom are accordingly restricted by law.  The distribution of this Memorandum in the United Kingdom:

(a) if made by a person who is not an authorized person under the Act, must be made to, and/or directed at, only persons (A) who are professional investors, as defined in the UK AIFMD Regulations; or (B) to whom it may lawfully be made or directed at under the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended), including persons who are authorized under the Act ("authorized persons"), certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors; and

(b) if made by a person who is an authorized person under the Act must be made to, and/or directed at, only persons (A) who are professional investors, as defined in the UK AIFMD Regulations; or (B) to whom it may lawfully be made or directed at under the

Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (as amended) or chapter 4, section 4.12 of the FCA's Conduct of Business Sourcebook, including authorized persons, certain persons having professional experience of participating in unregulated schemes, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts, persons who qualify as certified sophisticated investors and clients of the person making the distribution for whom that person has taken reasonable steps to ensure that the investment in the Fund is suitable.

All such persons in (a) and (b) above together are referred to as "Relevant Persons." Any investment or investment activity to which this communication relates must only be made available to Relevant Persons in the United Kingdom and this Memorandum must not be distributed to or relied on or acted upon by any other persons in the United Kingdom.

The Shares of the Fund have not been admitted for marketing in Germany. The Shares have only been admitted for marketing to professional investors in the territory of Germany. Accordingly, the Shares may not be offered and marketed to semi-professional and retail investors within the meaning of section 1(19) no. 31 and 33 German Capital Investment Act (Kapitalanlagege-Setzbuch) in the territory of Germany. The Memorandum may not be passed on to semi-professional and retail investors in Germany.

The Shares described in this Memorandum have not been, and will not be, registered under the United States Securities Act of 1933, as amended, or any similar law, rule or regulation in any other jurisdiction (including without limitation any law, rule or regulation of England and Wales, the Cayman Islands or any of the states of the United States of America). Shares of the Fund may not be directly or indirectly offered or sold to or for the benefit of any United States Person (as defined herein) except pursuant to placements exempt from registration under the United States Securities Act of 1933, as amended. In addition, the Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended, or any similar law, rule or regulation in any other jurisdiction (including without limitation any law, rule or regulation of England and Wales, the Cayman Islands or any of the states of the United States of America).

The Shares offered hereby may not be publicly offered, sold or advertised in Switzerland pursuant to Article 2 of the Swiss Investment Fund Act 1995 and this Memorandum may only be circulated to a limited number of persons in Switzerland. Therefore, no steps have been taken to register the Fund and/or this Memorandum as a prospectus in Switzerland.

## ADDITIONAL INFORMATION CONCERNING THE DISTRIBUTION OF THE FUND IN SWITZERLAND

The Shares of the Fund can be distributed in Switzerland exclusively to qualified investors as defined by Article 10 § 3 of the Collective Investment Scheme Act (CISA) and Article 6 of the Collective Investment Scheme Ordinance (CISO) (Qualified Investors). The Fund has not been and will not be registered with the Swiss Financial Market Supervisory Authority (FINMA). This offering memorandum and/or any other offering materials relating to the Shares may be made available in Switzerland solely to Qualified Investors.

The Representative of the Fund in Switzerland is Hugo Fund Services SA, with its registered office at 6 Cours de Rive, CH-1204 Geneva. The offering documents and annual or semi-annual reports can be obtained free of charge from the Representative. The place of performance for Shares of the Fund offered or distributed in or from Switzerland are the registered office of the Representative. The courts of the canton of Geneva shall have jurisdiction in relation to any disputes arising out of the duties of the Representative. Any dispute related to the distribution of Shares of the Fund in and from Switzerland shall be subject to the jurisdiction of the registered office of the distributor. The Paying Agent in Switzerland is Banque Heritage SA, 61 Route de Chêne, CH-1208 Geneva, Switzerland. Shares may be subscribed and/or redeemed with the Paying Agent. A handling commission will be charged by the Paying Agent and deducted from the subscription or redemption amount paid or received. If a subscription or redemption is made through the Paying Agent, instructions and money must be received by the paying agent at least 24 hours before the appropriate dealing cut-off time.

The fees and expenses associated with the representation, paying agency and other distribution items may be charged to the Fund. As applicable, the actual amount of such fees and expenses will be disclosed in the audited annual report.

In distributing shares of the Fund in Switzerland, the Fund is authorised to pass on distribution fees to the distributors and sales partners listed below:

- Distributors subject to authorization as defined in Article 19 al. 1 of the CISA (Swiss or foreign distributors regulated in their home jurisdiction)
- Distributors that are not required to obtain an authorization as defined under Article 19 al 1 of the CISA and article 8 of CISO (financial intermediaries regulated by FINMA, banks, insurance companies, fund managers, representatives
- Sales partners who place shares in the Fund with their customers exclusively through a written commission-based investment management or advisory mandate (e.g. independent asset managers or advisors).

When a retrocession payment may give rise to a conflict of interest, the recipient of the retrocession must ensure transparent disclosure and inform investors, unsolicited and free of charge, of the amount of retrocession it may receive for distribution. Upon request, the recipient must disclose the actual amount of retrocession received for distributing the Fund to the investor requiring information.

### *RELIANCE ON THIS MEMORANDUM*

The Shares are offered only on the basis of the information contained in this Memorandum and the latest audited annual accounts of the Fund. Any further information or representations given or made by any dealer, broker or other person should be disregarded and, accordingly, should not be relied upon. No person has been authorized to give any information or to make any representations in connection with the offering of Shares in the Fund other than those contained in this Memorandum and in any subsequent annual report for the Fund and, if given or made, such information or representations must not be relied on as having been authorized by the Fund, the Directors, the Investment Manager or the Administrator (each as defined herein). Statements in this Memorandum are based on the law and practice currently in force in the Cayman Islands

at the date hereof and are subject to change. Neither the delivery of this Memorandum nor the issue of Shares shall under any circumstance create any implication or constitute any representation that the affairs of the Fund have not changed since the date of this Memorandum.

## RISKS

Investment in the Fund carries with it a degree of risk. The value of Shares and the income from them may go down as well as up, and investors may not get back the amount invested. Because of the risks involved, investment in the Fund is only suitable for sophisticated investors who are able to bear the loss of a substantial portion or even all of the money they invest in the Fund, who understand the high degree of risk involved, believe that investment in the Fund is suitable for them based on their investment objectives and financial needs and have no need of liquidity of investment.  Investors are therefore advised to seek independent professional advice on the implications of investing in the Fund.  Certain risk factors for an investor to consider are set out in the Section headed "Certain Risk Factors."

There is no public market for the Shares and no active secondary trading market is expected to develop in the future.

## REGULATION

The Fund is a regulated mutual fund for the purposes of the Mutual Funds Law (Revised) of the Cayman Islands.  The Fund is registered with the Cayman Islands Monetary Authority pursuant to section 4(3) of that Law and this Memorandum has been filed with the Monetary Authority. Such registration does not imply that the Monetary Authority or any other regulatory authority in the Cayman Islands has approved this Memorandum or the offering of the Shares.  For a summary of the continuing regulatory obligations of the Fund and a description of the regulatory powers of the Monetary Authority, see the Section headed "The Fund– Regulations."

## CONFIDENTIALITY

Any information forwarded to the Fund by any potential investors will be treated on a confidential basis except as outlined in the Data Protection policy in the accompanying Subscription Documents and that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each investor upon subscribing for Shares shall be deemed to have consented to such release of such confidential information pursuant to the terms of Clause 3(2)(b)(i) (or any amendment thereto) of the Confidential Relationships (Preservation) Law (Revised) of the Cayman Islands.

---

# DEFINITIONS

---

In this Memorandum, the following words and phrases have the meanings set forth below:

| | |
|---|---|
| "Administration Agreement" | the agreement between the Master Fund and the Administrator referred to in the Section headed "Management and Administration" below; |
| "Administrator" | MUFG Fund Services (Cayman) Limited or such other person as may be appointed administrator of the Feeder Funds and the Master Fund from time to time; |
| "Articles" | the articles of association of the Fund for the time being in force and as may be amended from time to time; |
| "Auditors" | PricewaterhouseCoopers LLP or such other person as may be appointed auditor of the Master Fund from time to time; |
| "Business Day" | a day on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for business or such other day or days in addition thereto or in substitution therefor as the Directors may determine generally, or in any particular case; |
| "Companies Law" | the Companies Law (Revised) of the Cayman Islands as amended or re-enacted from time to time; |
| "Directors" | The directors of the Fund for the time being and any duly constituted committee thereof; |
| "Domestic Fund" | Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership; |
| "Eligible Investors" | has the meaning set forth in the Subscription Documents; |
| "Exchange" | The International Stock Exchange; |
| "Feeder Funds" | means the Fund and the Domestic Fund, each of which places all of its investable assets in, and conducts all of its investment and trading activities in parallel through, the Master Fund; |
| "Fund" | Highland Argentina Regional Opportunity Fund, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands with registration number CR-162177; |

| | |
|---|---|
| "IFRS" | International Financial Reporting Standards issued by the International Accounting Standards Board; |
| "Investments" | investments in securities or other financial or intangible investment instruments, contracts or products made by the Master Fund, as described in this Memorandum; |
| "Investment Management Agreement" | the agreement between the Feeder Funds, the Master Fund, the Master Fund General Partner and the Investment Manager referred to in the Section headed "Management and Administration" below; |
| "Investment Manager" | Highland Capital Management Latin America, L.P. or such other person as may be appointed investment manager of the Feeder Funds and the Master Fund from time to time; |
| "Latin America" | the countries of Central and South America, of the Caribbean and Mexico; |
| "Management Fee" | the management fee payable to the Investment Manager (at the Master Fund level) in respect of each Series pursuant to the Investment Management Agreement; |
| "Management Share" | a voting, non-participating management share of US$0.01 par value in the capital of the Fund; |
| "Master Fund" | Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership; |
| "Master Fund General Partner" | Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company and the general partner of the Domestic Fund and the Master Fund; |
| "Master Fund Partnership Agreement" | an exempted limited partnership agreement of the Master Fund, as may be amended from time to time; |
| "Material Contracts" | the Administration Agreement and the Investment Management Agreement; |
| "Memorandum" | this offering memorandum and the Fund's most recent annual report and accounts or, if more recent, its interim report and accounts; |
| "Monetary Authority" | the Cayman Islands Monetary Authority; |

| | |
|---|---|
| "Mutual Funds Law" | the Mutual Funds Law (Revised) of the Cayman Islands as from time to time modified or re-enacted or consolidated, and shall include any subordinate legislation made from time to time under that law; |
| "Net Asset Value" | in respect of the Master Fund, the Fund or each Series of Shares, the Net Asset Value of the Master Fund, the Fund or that Series determined using the valuation principles described in the Section headed "Subscription, Redemption and Transfer of Shares" below; |
| "Net Asset Value per Share" | in respect of a Share of any Series, the Net Asset Value for the relevant Series divided by the number of Shares of such Series then in issue; |
| "Ordinary Resolution" | a resolution passed at a quorate meeting of the Fund by a simple majority of the votes cast in its favor by the holders of the Management Shares or a resolution approved in writing by all such holders of Management Shares expressed to be an ordinary resolution; |
| "Performance Allocation" | the performance allocation allocable to the Special Limited Partner at the Master Fund level in respect of each sub-series of Shares pursuant to the Master Fund Partnership Agreement; |
| "Recognized Exchange" | any regulated market or exchange (which is an exchange within the meaning of the law of the country concerned relating to exchanges) in the United States of America, member states of the European Union or the Organization for Economic Co-operation and Development or any other regulated exchange or market; |
| "Redemption Day" | the last Business Day of each calendar month or such additional Business Day or Business Days as the Directors may in their sole discretion determine, either in any particular case or generally; |
| "Redemption Request" | a redemption request form in the terms set out in the Subscription Documents; |
| "Redemption Price" | the redemption price of a Share as calculated in accordance with the Articles and described herein; |
| "Series" | any series of Shares designated by the Directors pursuant to the Articles; |

| | |
|---|---|
| "Series A Shares" | the Shares designated as "A" Shares being offered pursuant to this Memorandum; |
| "Series B Shares" | the Shares designated as "B" Shares being offered pursuant to this Memorandum; |
| "Services Agreement" | an agreement by and between the Investment Manager and Highland Latin America Consulting, Ltd. referred to in the Section headed "Management and Administration" below; |
| "Share" | a non-voting, participating, redeemable share of US$0.01 par value each in the capital of the Fund.  The use of the term "Share" in this Memorandum excludes the Management Shares; |
| "Shareholder" | a holder of Shares; |
| "Special Limited Partner" | Highland Capital Management Latin America, L.P., in its capacity as the special limited partner of the Master Fund; |
| "Special Resolution" | a resolution passed at a quorate meeting of the Fund by a two-thirds majority of the holders of the Management Shares thereat or approved in writing by all of such holders of Management Shares and expressed to be a special resolution; |
| "Subscription Day" | the first day of each calendar month or such additional day or days as the Directors may in their sole discretion determine, either in any particular case or generally; |
| "Subscription Documents" | the subscription documents of the Fund; |
| "Subscription Price" | the Subscription Price for Series A Shares and Series B Shares will be based on the Net Asset Value per Share of such Series on the Valuation Day that occurs after notice of the subscription is received and approved by the Fund and immediately preceding the applicable Subscription Day, as calculated in accordance with the Articles and described herein; |
| "US$" or "U.S. Dollars" | the lawful currency of the United States of America; |
| "United States" or "U.S." | the United States of America, its territories and possessions or areas subject to its jurisdiction; |
| "U.S. Person" | as defined under Regulation S under the United States Securities Act of 1933, as amended; and |

"Valuation Day"                    with respect to a Share, each Redemption Day, the Business Day immediately preceding each Subscription Day and/or such other day or days as the Directors may determine generally or in any particular case.

# EXECUTIVE SUMMARY

The following summary should be read in conjunction with the full text of this Memorandum, the Articles, the Master Fund Partnership Agreement and other Material Contracts disclosed in this Memorandum and is qualified in its entirety by reference to such documents:

| | |
|---|---|
| **The Fund** | Highland Argentina Regional Opportunity Fund, Ltd. is incorporated under the provisions of the Companies Law (Revised) of the Cayman Islands as an exempted company with limited liability.  It was incorporated on February 8, 2006, as MBA Latin America Opportunity Fund, Ltd.  The Fund's name was changed to Highland Argentina Regional Opportunity Fund, Ltd. on July 28, 2017. |
| | It has an authorized share capital of US$50,000 made up of 100 Management Shares and 4,999,900 Shares. The Directors have designated two Series of Shares, Series A Shares and Series B Shares.  The Directors may also designate further Series of Shares in the future that will be attributable to the single underlying portfolio of the Fund.  Each additional Series of Shares may be offered on different terms and in such different currencies as the Directors may determine. |
| | See the Section headed "Description of the Fund's Shares" below for full details. |
| **Investment Objective and Strategies** | The investment objective of the Fund is to maximize the total return of its assets in US Dollars through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund. The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series of limited partner interests, each of which will correspond to a Series of Shares. |
| | The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized. The Investment Manager will be focused on identifying assets |

that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs.  There is no set allocation among these and any other strategies that the Investment Manager may use.

**Master-Feeder Structure**   In order to facilitate investments by U.S. taxable and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently sponsored Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership. The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.  Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund. The Feeder Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund.  Except as the context otherwise requires, the term "Fund" also includes the Master Fund.

The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts.

**Management**   The Directors of the Fund are Claire Kasumba, Martin Laufer and Sophia Dilbert.

Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership, is the investment manager of the Feeder Funds and the Master Fund with responsibility for overseeing the investment of the Fund's assets (through the Master Fund) and the distribution of the Shares in accordance with the investment objective and policies of the Master Fund.  With the approval of the Master Fund General Partner, the Investment Manager may delegate certain of its duties to other companies and entities, which may be affiliated with, or independent of, the Investment Manager.

MUFG Fund Services (Cayman) Limited, a company formed under the laws of the Cayman Islands, has been appointed as the administrator of the Feeder Funds and the Master Fund pursuant to the Administration Agreement.  The Administrator is responsible for conducting the day-to-day administration, including processing subscriptions, transfers and redemptions of Shares, net asset value calculation and coordinating the payment of the Fund's and Master Fund's expenses.

See the Section headed "Management and Administration" below for full details.

**Offering**

The Series A Shares and Series B Shares offered pursuant to this Memorandum are available for issue to Eligible Investors at a Subscription Price based on the Net Asset Value per Share of such Series on the Valuation Day that occurs after the Subscription Documents are received and approved by the Fund and immediately preceding the relevant Subscription Day, as calculated in accordance with the Articles and described herein.

The Fund reserves the right to reject an application for Shares.

See the Section headed "Subscription, Redemption and Transfer of Shares" below for full details.

**Minimum Investment**

The minimum initial investment for the Series A Shares and Series B Shares is US$500,000. The minimum subsequent investment for the Series A Shares and Series B Shares is US$500,000. In each case, the Investment Manager may in its sole discretion determine other minimum investment amounts in respect of a particular Shareholder or group of Shareholders, subject to the Listing Rules of the Exchange but not below US$100,000 in respect of the Series B Shares.

**Eligible Investors**

Only Eligible Investors may subscribe for Shares. See the Subscription Documents.

**Redemptions**

Shares generally may be redeemed as of the last Business Day of any calendar month, on 30 calendar days' prior written notice, at Net Asset Value per Share prevailing at the close of business of such Redemption Day.

Partial redemptions will only be accepted in minimum amounts of US$100,000.

The Fund may also compulsorily redeem Shares in certain circumstances.

Redemption proceeds will be paid in cash (in US$) by electronic transfer at the Shareholder's risk and expense or, in certain circumstances, in securities, or partly in cash and partly in securities. Except as set forth above, no redemption charges will apply to the Shares.

Any Shareholder who redeems Series B Shares prior to the first anniversary of its purchase of such Series B Shares may be assessed an early redemption fee of up to 3% of the Net Asset Value per Series B Share prevailing at the close of business of such Redemption Day, payable to the Fund.   For purposes hereof, an anniversary shall occur on the 365th consecutive day (counting the closing date as the first day) or, if such 365th day is not a Business Day, the immediately preceding Business Day.

See the Section headed "Subscription, Redemption and Transfer of Shares – Redemption of Shares" below for full details.

|  |  |
|---|---|
| **Transfers** | Shares may not be transferred without the prior written consent of the Directors.   See Section headed "Subscription, Redemption and Transfer of Shares – Transfer of Shares" below for full details. |
| **Dividends** | The Fund may pay dividends or other distributions to Shareholders in the sole and exclusive discretion of the Directors, although generation of income is not a principal objective of the Fund. |
| **Fees and Expenses** | Series A Shares |

The Investment Manager will receive a quarterly Management Fee in respect of the Series A Shares at an annual rate equal to 1.75% of the net assets of the Fund attributable to each Series A Share, calculated monthly and payable quarterly in arrears. The Management Fee is paid at the Master Fund level.

The Special Limited Partner will be entitled to a quarterly Performance Allocation in respect of each sub-series of Series A Shares calculated and allocated at the Master Fund level, but is effectively equal to 20% of the net profits (including unrealized gains), if any, applicable to each Series A Share for each fiscal quarter; but only to the extent that such profits exceed any losses carried forward from prior years.

Series B Shares

The Investment Manager will receive a quarterly Management Fee in respect of the Series B Shares at an annual rate equal to 1.25% of the net assets of the Fund attributable to each Series B Share, calculated monthly and payable quarterly in arrears. The Management Fee is paid at the Master Fund level.

The Special Limited Partner will be entitled to a quarterly Performance Allocation in respect of each sub-series of Series B Shares calculated and allocated at the Master Fund level, but is effectively equal to 17.5% of the net profits (including unrealized gains), if any, applicable to each Series B Share for each fiscal quarter; but only to the extent that such profits exceed any losses carried forward from prior years.

Series A and Series B Shares

The Investment Manager pays all the fees and expenses of the Investment Manager and certain other service providers out of the Management Fee and Performance Allocation (it receives in its capacity as the Special Limited Partner) it receives from the Master Fund.  The Fund shall have no obligation to the Investment Manager for any such fees.

The Administrator is entitled to fees as agreed under the Administration Agreement.

The Fund bears all costs, fees and expenses arising in connection with the Fund's operations.   The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement.  The Fund is responsible for paying its own initial organizational expenses and its *pro rata* share of the initial organizational expenses of the Master Fund.  See the Section headed "Management and Administration – Fees and Expenses" below.

|  |  |
|---|---|
| **Risk Factors** | An investment in the Fund entails certain risks.  Prospective investors should review carefully the discussion under the Section headed "Certain Risk Factors" below. |
| **Reporting** | The Fund will furnish to each Shareholder an annual report that will include audited financial statements as of the end of each fiscal year.  In accordance with and to the extent required by the Exchange listing rules, the Fund will also provide Shareholders with interim unaudited reports made up to June 30 in each year, including income statements and a statement of charges included in the calculation of the Net Asset Value of the Fund, and quarterly statements of the Net Asset Value of the Fund. |
| **Fiscal Year** | December 31. |
| **Tax** | The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital |

gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund, the Master Fund or the Shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund and/or the Master Fund. The Fund and the Master Fund generally do not expect to be subject to United States federal income tax, except potential U.S. federal withholding with respect to U.S. source dividends (including certain dividend equivalent amounts) and certain interest from U.S. sources.

The Fund has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (Revised) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the Shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its shareholders or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

See the Section headed "Taxation" below.

| | |
|---|---|
| **Application Procedure** | To participate, an investor must complete and return the Subscription Documents and arrange for the transfer of their funds to the bank account of the Fund. |

# THE FUND

## *STRUCTURE*

The Fund is an exempted company limited by shares and is of unlimited duration. It was incorporated under the provisions of the Companies Law (Revised) of the Cayman Islands on February 8, 2006, as MBA Latin America Opportunity Fund, Ltd. The Fund's name was changed to Highland Argentina Regional Opportunity Fund, Ltd. on July 28, 2017. The location of the Fund's principal office and its registered office are listed in the Directory. The Fund has been structured as an investment fund to allow its Shareholders to indirectly invest in the Master Fund pursuant to its investment objectives and strategies set out herein. The Fund will only accept subscriptions for Shares from Eligible Investors and reserves the right to reject any subscriptions.

## *REGULATION*

The Fund is regulated as a mutual fund under the Mutual Funds Law (Revised) of the Cayman Islands (the "Mutual Funds Law"). The Cayman Islands Monetary Authority (the "Monetary Authority") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Monetary Authority. As a regulated mutual fund, the Monetary Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies. Failure to comply with these requests by the Monetary Authority may result in substantial fines on the part of the Directors and may result in the Monetary Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio (in each case through the Master Fund) by the Monetary Authority or any other governmental authority in the Cayman Islands, although the Monetary Authority does have power to investigate the activities of the Fund in certain circumstances. Neither the Monetary Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors. The powers of the Monetary Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund. There are other remedies available to the Monetary Authority including the ability to apply to court for approval of other actions.

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 19 of 200   PageID 51456
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 184 of
324

The Fund, or any Directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (Revised), or by the Tax Information Authority, under the Tax Information Authority Law (Revised) or Reporting of Savings Income Information (European Union) Law (Revised) and associated regulations, agreements, arrangements and memoranda of understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, Director or agent, may be prohibited from disclosing that the request has been made.

### *ADDITIONAL INFORMATION*

This Memorandum does not purport to be and should not be construed as a complete description of the Memorandum and Articles of Association of the Fund, the Master Fund Partnership Agreement or the Material Contracts.  Before investing in the Fund, each prospective investor should examine this Memorandum, the Subscription Documents, the Memorandum of Association and Articles of the Fund, the Master Fund Partnership Agreement and the Material Contracts and satisfy itself that an investment in the Fund is appropriate.  Additionally, and prior to the sale of any Shares, the Fund will make available to each subscriber or his or her representative the opportunity to ask questions of and receive written answers from representatives of the Fund concerning any aspect of the investment and to obtain any additional information, to the extent that the Fund possesses such information or can acquire it without unreasonable effort or expense.

**An investment in the Fund may be deemed speculative and is not intended as a complete investment program.  It is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or total loss of their investment in the Fund.**

# THE MASTER FUND

### *THE MASTER FUND'S PARTNERSHIP INTERESTS*

The Master Fund's partnership interests are currently held exclusively by the Fund and the Domestic Fund as limited partners, the Investment Manager as the special limited partner of the Master Fund, and the Master Fund General Partner as the general partner of the Master Fund, pursuant to the Master Fund Partnership Agreement.  The Master Fund General Partner is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision).

### *THE MASTER FUND PARTNERSHIP AGREEMENT*

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "Exempted Limited Partnership Law").  A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners.  Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement.  Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.  Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

**Liability of Partners and Indemnification of the Master Fund General Partner and Others.** The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets.  As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

    (i)      as expressed in the partnership agreement,

    (ii)     if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited

partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

The Master Fund Partnership Agreement provides that none of the Master Fund General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the Master Fund General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives (each such person, an "Indemnified Party") will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law.  An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  In addition, in no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all liabilities suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party or in connection with the Master Fund Partnership Agreement or the Master Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Party.  The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the Master Fund General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct, subject to receiving a written undertaking from the Indemnified Party to repay such amounts if and to the extent that it is finally determined that the Indemnified Party was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the exculpation or indemnification of any Indemnified Party for any liability

(including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud. Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware)) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the Master Fund General Partner and the Investment Manager for such costs.

**Contributions and Withdrawals by the Fund.**  Limited partners of the Master Fund may make contributions at such times and in such amounts as the Master Fund General Partner determines. As a limited partner of the Master Fund, the Fund may, subject to the consent of the Master Fund General Partner, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine.  The Master Fund General Partner may, at any time, suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests in the Master Fund; (c) the withdrawal by limited partners of their interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) during any period which: (i) any stock exchange on which a substantial part of investments owned by the Master Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Master Fund would not be reasonably practicable and might seriously prejudice the limited partners of the Master Fund, or (B) it is not reasonably practicable for the Master Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Master Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Master Fund; or (v) in the sole discretion of the Master Fund General Partner, it is necessary to preserve the Master Fund's assets.

**Amendment of the Master Fund Partnership Agreement.**  The Master Fund Partnership Agreement may be amended by an instrument in writing signed by each of the limited partners of the Master Fund and the Master Fund General Partner; provided that, the Master Fund General

Partner may amend the Master Fund Partnership Agreement without the consent of the limited partners so long as the amendment does not adversely affect any rights of the limited partners.

**Dissolution of the Master Fund.**  The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)   the written election of the Master Fund General Partner to terminate the Master Fund; or

(ii)   if the Master Fund General Partner is the sole or last remaining general partner, the date (the "Automatic Dissolution Date") falling 90 days after the date of the service of a notice by the Master Fund General Partner (or its legal representative) on all the limited partners informing the limited partners of:

(1)   the commencement of liquidation or bankruptcy proceedings in relation to the Master Fund General Partner; or

(2)   the withdrawal, removal or making of a winding up or dissolution order in relation to the Master Fund General Partner;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued.  If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

**Power of Attorney.**  Each limited partner of the Master Fund shall make, constitute and appoint the Master Fund General Partner (and each of its successors and permitted assigns) for the time being, with full power of substitution, as its true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the Master Fund General Partner be required by law), including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement.  Each limited partner of the Master Fund shall authorize the Master Fund General Partner to take any further action that the Master Fund General Partner considers necessary or advisable in connection with the foregoing.  Such power of attorney granted is intended to secure a proprietary interest of the Master Fund General Partner and the performance by each limited partner of the Master Fund of its obligations under the Master Fund Partnership Agreement and shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

## *VALUATION OF ASSETS*

The Master Fund General Partner has delegated the valuation of the Master Fund's assets to the Administrator, which will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the Master Fund General Partner in its sole discretion.   In addition, the Administrator must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.   In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Investment Manager's valuation policy is available upon request from the Master Fund General Partner.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

Appx. 03808

# INVESTMENT OBJECTIVE AND STRATEGY

### *INVESTMENT OBJECTIVE*

The investment objective of the Fund is to maximize the total return of its assets in US Dollars through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund. The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series of limited partner interests, each of which will correspond to a Series of Shares.

The objects for which the Fund is established are unrestricted and the Fund shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law.

### *INVESTMENT STRATEGY*

The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized. The Investment Manager believes that focusing on a multi-strategy approach will enable the Master Fund to enhance results by compounding returns generated by each strategy and at the same time have the needed flexibility to adjust to potentially changing regulations and market conditions.

The Investment Manager will be focused on identifying assets that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs. There is no set allocation among these and any other strategies that the Investment Manager may use.

The Master Fund may hold long and short positions in a wide range of liquid or illiquid fixed income securities including, but not limited to, sovereign and private debt, distressed debt, secured and unsecured debt, structured debt, loans, asset-backed securities and collateralized debt obligations. Furthermore, the Master Fund may invest, both long and short, in a wide range of liquid or illiquid equity-related instruments including, but not limited to, equities, convertible bonds, options, equity-linked notes, preferred shares and warrants, whether or not listed or traded on one or more Recognized Exchanges.

The Master Fund may hold any of these positions indirectly by entering into swaps, options, futures, forward contracts or similar derivative transactions.

The Master Fund may hold both US Dollar and non US Dollar denominated securities.

The Master Fund may leverage its investment portfolio by up to 100% of the Master Fund's Net Asset Value (calculated at the time of investment) by borrowing for investment purposes and by using leverage techniques and products.  It is anticipated that by doing so the performance of the Master Fund will be enhanced.   While the use of the leverage may improve the return on invested capital, leverage may also significantly increase the impact of adverse movement in the value of the Master Fund.

The Master Fund may also utilize hedging strategies in order to maximize returns and reduce the risk to principal or the volatility associated with its holdings.  As part of these hedging strategies, the Master Fund may hedge any of its investments with long or short positions in any financial instrument, which the Investment Manager deems appropriate.  The Master Fund may utilize US and European securities for hedging purposes.

The Master Fund may invest through one or more subsidiaries established in an appropriate jurisdiction in order to take advantage of applicable tax treaties or increase the tax efficiency of the Master Fund's investments, or in such other circumstances as the Master Fund General Partner, following consultation with the Investment Manager, deem appropriate, including compliance with local investment laws.

The Master Fund may maintain assets in cash or cash equivalent instruments, money market funds, repurchase agreements, or other cash management vehicles pending investment, for defensive purposes, to fund withdrawals requested by the limited partners of the Master Fund or otherwise at the discretion of the Investment Manager. The Master Fund may hold with no limitation US and European AAA fixed income securities for defensive purposes.

### *INVESTMENT RESTRICTIONS*

In deploying the investment strategy, the Master Fund will observe the following investment restrictions.  The Master Fund will not at the time of investment:

1. Invest more than 50 percent of its gross assets in its net holdings of equities;

2. Borrow more than 100 percent of its net assets;

3. Invest more than 20 percent of its gross assets in a single equity position;

4. Invest more than 20 percent of its gross assets in a single corporate issuer position;

5. Invest more than 30 percent of its gross assets in a single GDP-linked warrant position;

6. Invest more than 30 percent of its gross assets in a single sovereign issuer security position; and

7.  Invest more than 30 percent of its gross assets in a single provincial issuer.

If a percentage limitation on investment or use of assets set forth above is adhered to at the time a transaction is effected, later changes in percentage resulting from changing values will not be considered a violation.

In the event that the Investment Manager discovers that a violation of any of the Master Fund's investment limitations has occurred (the date of such discovery being the "Discovery Date"), the Investment Manager shall inform the limited partners of the Master Fund, including the Fund, who shall: (i) notify each of their limited partners or shareholders, as applicable, in writing within 30 Business Days after the Discovery Date of the nature of the violation, the steps taken, or to be taken, to remedy the violation and the reason the violation occurred and (ii) use reasonable commercial efforts to cause the Investment Manager to remedy such violation within 90 Business Days after the Discovery Date (the "Remedy Date"). If such violation has not been remedied on or before the Remedy Date, the limited partners of the Master Fund, including the Fund, shall: (i) notify each of their limited partners or shareholders, as applicable, in writing, 30 Business Days after the Remedy Date, of the steps taken to remedy the violation and the reason that the violation has not been remedied by the Remedy Date (the "Remedy Notice") and (ii) use reasonable commercial efforts to cause the Master Fund's portfolio to be examined by an independent auditor other than the Auditors and shall request that such independent auditor issue a report to the investors in each of the Master Fund's limited partners as to its concurrence or disagreement with the statements in the Remedy Notice. The Investment Manager shall pay for the costs of such audit and the costs of the Remedy Notice if the violation that was the subject of the Remedy Notice occurred as a result of the Investment Manager's willful misfeasance, bad faith or gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware). In addition, the failure to remedy the violation in a timely manner may give rise to special redemption rights. See "Redemption of Shares - General."

## *DISTRIBUTION POLICY*

The Fund's objective is to maximize capital appreciation and accordingly it is not envisaged that any income or gains derived from the investments made by the Master Fund will be distributed by way of dividend. This does not preclude the Directors from declaring a dividend at any time in the future if they consider it appropriate to do so. To the extent that a dividend may be declared, it will be paid in compliance with any applicable laws.

*The investment objectives and strategies summarized herein represent the Investment Manager's current intentions. Depending on conditions and trends in the securities markets and the economy in general, the Investment Manager may pursue any strategies, employ any investment techniques or purchase any type of security that it considers appropriate, whether or not described in this section, subject to any applicable law or regulation. The discussion herein includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured. There can be no assurance that the investment strategy of the Master Fund will achieve the intended investment objective. The Master Fund's investment program is speculative and involves a high degree of risk, including, without limitation, the risk of loss of the entire amount invested.*

# CERTAIN RISK FACTORS

An investment in the Fund entails substantial risks, including, but not limited to, those listed below, and prospective investors should carefully consider the following factors, among others, in determining whether an investment in the Fund is suitable for them.  There can be no assurance that the Master Fund's program will be successful or that investments purchased by the Master Fund will increase in value.  An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital.  All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.

For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.

### *RISK FACTORS SPECIFIC TO THE INVESTMENT OBJECTIVE AND STRATEGY*

**Changes in Strategy.**  The Investment Manager has the power to expand, revise or alter its trading strategies on behalf of the Master Fund without prior approval by, or notice to, the Fund or the Shareholders.  Any such change could result in exposure of the Fund's assets (through the Master Fund) to additional risks, which may be substantial.  The Investment Manager may also invest in additional instruments than those specifically identified in the "Investment Objective and Strategy" section.

**Latin America Investments.** The Master Fund invests in securities of companies based in Latin America or issued by Latin American governments, or in the securities of companies which are not incorporated in Latin America, but which derive some of their revenues from business activities conducted in Latin America.  Such investment involves certain considerations not usually associated with investing in securities of developed countries or of companies located in developed countries, including political and economic consideration, such as greater risks of expatriation, nationalization and general, political, and economic instability, the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and substantially greater price volatility, fluctuations in the rate of exchange between currencies, and costs associated with currency conversions, certain government policies that may restrict the Master Fund's investment opportunities and problems that may arise in connection with the clearance and settlements of trades.  In addition, accounting and financial reporting standards that prevail in such countries are not equivalent to standards in more developed countries, consequently, less information is available to investors in companies located in more developed countries.  There is also less regulation, generally, of the securities markets in Latin American countries than there is in more developed countries.

**Risks Related to Investing in Argentina**.  Argentina has experienced high interest rates, economic volatility, inflation, currency devaluations and high unemployment rates.  The

economy is heavily dependent on exports and commodities. Argentina's default on its debt in 2001, and its past nationalization of private pensions and national oil company YPF, continues to impact the confidence of investors in Argentina, which might adversely impact returns in the Master Fund, and thus, the Fund.

**Argentina's Economy**. Argentina's economy could grow at a lower rate than in past years, or could contract. Factors that could negatively affect Argentina's rate of economic growth, its public finances and Argentina's ability to service its debt include: the competitiveness of Argentine exports, which are influenced by the peso's value relative to the value of the currencies of Argentina's trading partners and trade competitors; the level of inflation in Argentina; international commodities prices, foreign currency exchange rates and the levels of consumer consumption and foreign and domestic investment; negative economic developments in Argentina's major trading partners, or "contagion" effects more generally; and Argentina's ability to meet its energy requirements.

**Uncertainty of Economic Reforms**. A runoff election on November 22, 2015 resulted in Mr. Mauricio Macri being elected President of Argentina. The Macri administration assumed office on December 10, 2015. Since assuming office on December 10, 2015, the Macri administration has announced several significant economic and policy reforms, including methodological reforms with respect to the calculation of certain macroeconomic statistics, the loosening of foreign exchange controls, reduction of tariffs, other easing of international trade restrictions, infrastructure reforms and reopened negotiation with holders of debt in default since 2001. The impact that these measures and any future measures taken by the new administration will have on the Argentine economy as a whole and the financial sector in particular cannot be predicted. The Investment Manager believes that the effect of the planned liberalization of the economy and renewed access to capital markets will be positive for the Master Fund's intended investments by stimulating economic activity, but it is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm companies in Argentina. The Investment Manager cannot predict how the Macri administration will address certain other political and economic issues that were central during the 2015 presidential election campaign, such as the financing of public expenditures, public service subsidies and tax reforms, the resolution of holdout debt or the impact that any measures related to these issues that are implemented by the Macri administration will have on the Argentine economy as a whole.

**Currency Controls**. In the past, Argentina imposed exchange controls and transfer restrictions substantially limiting the ability of companies to retain foreign currency or make payments abroad. Although the Macri government lifted exchange controls and liberalized capital controls, there can be no assurances regarding future modifications to exchange and capital controls. Exchange and capital controls could adversely affect the financial condition or results of operations of issuers in whose securities the Master Fund intends to invest, as well as their ability to meet foreign currency obligations and to execute financing plans.

**Challenges to Argentina's Debt Payments**. Argentina's payments in connection with a debt offering may be attached, enjoined or otherwise challenged. In recent years, hold-out creditors have used litigation against sovereign debtors, most prominently Peru and Nicaragua, to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 30 of 200   PageID 51477
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 195 of
324

agreed to a debt restructuring and accepted new securities in an exchange offer.  Argentina has been subjected to suits to collect on amounts due on defaulted bonds, including actions in the United States, the United Kingdom, Italy and Germany.  Some of these actions have resulted in judgments against Argentina.  There can be no assurance that a creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with payments made in connection with a debt offering.

**Pro Rata Payment Litigation**.  Argentina's defaults with respect to the payment of its foreign debt could prevent the government and the private sector from accessing the international capital markets, which could adversely affect the financial condition of sovereign and corporate issuers in which the Master Fund invests. In September 2014, the Argentine Congress passed a law to restructure foreign-law bonds held by exchange bondholders to allow the payment in Argentina and to appoint a new paying agent. On September 29, 2014, the U.S. District Court for the Southern District of New York held Argentina in contempt of court as a result of this law. The U.S. District Court authorized limited exceptions to the injunction allowing certain custodians of Argentine law-governed bonds to process payments in August 2014, September 2014 and December 2014.

On May 11, 2015, the plaintiffs that obtained pari passu injunctions asked the U.S. district court to amend their complaints to include claims alleging that Argentina's issuance and servicing of its 2024 dollar-denominated bonds, and its external indebtedness in general, would violate the pari passu clause. On June 5, 2015, the Second Circuit granted partial summary judgment to a group of 526 "me-too" plaintiffs in 36 separate lawsuits, finding that, consistent with the previous ruling of such court, Argentina violated a pari passu clause in bonds issued to the "me-too" bondholders. The decision obligates Argentina to pay the plaintiffs $5.4 billion before it can make payments on restructured debt.

In 2016, the Argentine government working under a court appointed mediator, entered into settlement agreements with a large portion of hold-out debt holders contingent on Argentina repealing laws that prevented the country from complying with rulings by U.S. courts. In this context Judge Thomas Griesa ruled he would lift the injunctions preventing Argentina from serving post-2005 exchange debt if these laws are repealed.  Argentina's lower chamber approved the repeal of these laws and Argentina's senate voted to approve the same in March 2016.  In April 2016, the Second Circuit Court of Appeals in the United States upheld Judge Griesa's ruling, finding that he did not abuse his discretion in lifting the pari passu injunctions.

The repercussions of restructuring Argentina's bond debts are ongoing.  The 2016 U.S. court rulings only settled claims of certain bondholders.  Argentina reached a $475 million settlement with other bondholders in November 2016.  Financial indices have only just started moving Argentina back to "emerging market" status, where it had been before 2009.

Argentina's default with respect to the payment of its foreign debt, its delay in completing the debt restructuring process with creditors that did not participate in the related exchange offers, the complaints filed against Argentina discussed above, the U.S. Supreme Court's decision not to hear Argentina's appeal, the declaration of contempt, and the long-term difficulty of reestablishing itself in the global marketplace could prevent Argentina's government from

obtaining international private financing or receiving direct foreign investment, as well as private sector companies in Argentina from accessing the international capital markets. Without access to international private financing, Argentina may not be able to finance its obligations, and financing from multilateral financial institutions may be limited or not available. Without access to direct foreign investment, the government may not have sufficient financial resources to foster economic growth and the performance of the Master Fund's investments in Argentina could be materially and adversely affected.

### *GENERAL RISK FACTORS*

**Overall Investment Risk**.  All securities investments risk the loss of capital.  The nature of the securities to be purchased and traded by the Master Fund and the investment techniques and strategies to be employed in an effort to increase profits may increase this risk.  While the Investment Manager will devote its commercially reasonable best efforts to the management of the Master Fund's portfolio, there can be no assurance that the Master Fund, and thus, the Fund will not incur losses.  Many unforeseeable events, including actions by various government agencies, and domestic and international political events, may cause sharp market fluctuations.

**Limited Operating History.**  The Fund has limited operating history and the Master Fund and the Master Fund General Partner do not have operating histories upon which prospective investors can evaluate the anticipated performance of the Fund.  Although the principals of the Investment Manager have extensive prior experience in Latin America, past performance of the Investment Manager should not be construed as an indication of the future results of an investment in the Fund.  The Master Fund's investment program should be evaluated on the basis that there can be no assurance that the Investment Manager's assessment of the short-term or long-term prospects of its investment strategy will prove accurate, or that the Master Fund will achieve its investment objectives.

**Illiquidity of Shares**.  Shares are not transferable without the approval of the Directors, and there will be no secondary market for Shares.  Consequently, Shareholders may not be able to dispose of their Shares except by means of the redemption privilege and may receive securities rather than cash in exchange for their Shares.

**Possible Effect of Substantial Redemptions**.  Substantial redemptions of Shares from the Fund could require the Master Fund to liquidate its positions more rapidly than otherwise desired in order to raise the cash necessary to fund the redemptions.  Illiquidity in certain securities could make it difficult for the Master Fund to liquidate positions on favorable terms, which could result in losses or a decrease in the Net Asset Value of the Master Fund, and thus, the Fund.  The Master Fund is permitted to borrow cash necessary to make payments in connection with redemption of Shares from the Fund when the Investment Manager determines that it would not be advisable to liquidate portfolio assets for that purpose.  The Master Fund is also authorized to pledge portfolio assets as collateral security for the repayment of such loans.  In these circumstances, the continuing Shareholders will bear the risk of any subsequent decline in the value of the Fund's assets.

**Master-Feeder Structure.**  The Fund will invest all of its investable assets in the Master Fund. The "master-feeder" fund structure presents certain risks to the Shareholders.  Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Domestic Fund that invest in the Master Fund.  However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Domestic Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

**Absence of Regulatory Oversight.**  Although the Fund is a regulated mutual fund under the Mutual Funds Law (Revised) of the Cayman Islands, the Fund is not required to, and does not intend to, register under the laws of any other jurisdiction, and, accordingly, the provisions of statutes of certain jurisdictions (which may provide certain regulatory safeguards to investors) are not applicable.  For example, neither the Fund nor the Master Fund is required to maintain custody of its securities or place its securities in the custody of a bank or a member of a recognized securities exchange in the manner required under the statutes of certain jurisdictions. A registered investment company that places its securities in the custody of a member of a recognized securities exchange is generally required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and which contains other provisions complying with applicable regulations.  The Master Fund may maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies.  The bankruptcy of any such brokerage firms might have a greater adverse effect on the Master Fund and the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

**Handling of Mail.**  Mail addressed to the Fund and received at its registered office will be forwarded unopened to the forwarding address supplied by the Investment Manager to be dealt with.  None of the Fund, its Directors, officers, advisors or service providers (including the organisation which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the forwarding address.  In particular, the Directors will only receive, open or deal directly with mail which is addressed to them personally (as opposed to mail which is addressed just to the Fund).

**Subscription Monies.**  Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant Subscription Day notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant Subscription Day. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant Subscription Day.

**Effect of Redemptions.**  Where a redemption request is accepted, the Shares will be treated as having been redeemed with effect from the relevant Redemption Day irrespective of whether or not such redeeming Shareholder has been removed from the Fund's register of members or the

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 33 of 200   PageID 51480
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 198 of
324

Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Day, Shareholders in their capacity as such will not be entitled to or be capable of exercising any rights arising under the Articles with respect to Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Fund) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Day but not yet paid (in each case with respect to the Shares being redeemed). Such redeemed Shareholders will be creditors of the Fund with respect to the Redemption Price. In an insolvent liquidation, redeemed Shareholders will rank behind ordinary creditors but ahead of Shareholders.

**Limited Rights of Shareholders**.  Shareholders holding Shares will have no right to participate in the day to day operations of the Fund and will not be entitled to receive notice of, nor attend or vote at, general meetings of the Fund other than general meetings to vote upon a variation of the rights of the Shares.  Consequently, Shareholders will not have any control over the management of the Fund or the appointment and removal of its Directors and service providers.   The Investment Manager, as holder of all the Management Shares, control all of the voting interests in the Fund, except on proposals to vary the rights of the Shares, and may make such changes to the Memorandum of Association and Articles of the Fund as it deems appropriate, including increasing the share capital, consolidating the Shares and sub-dividing the Shares.  Accordingly, only the Investment Manager can appoint and remove the Directors of the Fund and only the Directors may terminate the services of the Investment Manager, the Administrator and other agents of the Fund.  An investment in the Fund should be regarded as a passive investment.

**Valuation of the Master Fund's Investments**.  Valuation of the Master Fund's securities and other investments may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the Net Asset Value of the Master Fund and the Fund could be adversely affected.  Independent pricing information may not at times be available or otherwise utilized regarding certain of the Master Fund's securities and other investments. Valuation determinations will be made in good faith in accordance with the policies of the Investment Manager in effect from time to time, a copy of which will be made available upon request.

The Master Fund may have some of its assets in investments, which by their very nature may be extremely difficult to accurately value.   To the extent that the value assigned by the Administrator to any such investment differs from the actual value, the Net Asset Value of the Master Fund and the Fund may be understated or overstated, as the case may be.  In light of the foregoing, there is a risk that a Shareholder who redeems all or part of its Shares while the Master Fund holds such investments will be paid an amount less than it would otherwise be paid if the actual value of such investments is higher than the value designated by the Administrator. Similarly, there is a risk that such Shareholder might, in effect, be overpaid if the actual value of such investments is lower than the value designated by the Administrator.  In addition, there is risk that an investment in the Fund by a new Shareholder (or an additional investment by an existing Shareholder) could dilute the value of such investments for the other Shareholders if the designated value of such investments is higher than the value designated by the Administrator. Further, there is risk that a new Shareholder (or an existing Shareholder that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is

lower than the value designated by the Administrator. The Administrator does not intend to adjust the Net Asset Value of the Master Fund and the Fund retroactively.

None of the Directors, the Fund, the Master Fund, the Master Fund General Partner or the Administrator shall have any liability in the event that any price or valuation, used in good faith in connection with the above procedures, proves to be an incorrect or an inaccurate estimate or determination of the price or value of any part of the property of the Master Fund.

**In-Kind Distributions.** A redeeming Shareholder may, in the discretion of the Directors, receive securities owned by the Fund (through the Master Fund) in lieu of, or in combination with, cash. The value of securities distributed may increase or decrease before the securities can be sold (either by the Shareholder or by the Fund if the Directors establishes a liquidating account on behalf of the Shareholder to sell such assets), and the investor will incur transaction costs in connection with the sale of such securities. Additionally, securities distributed with respect to a redemption by a Shareholder may not be readily marketable. The risk of loss and delay in liquidating these securities will be borne by the investor, with the result that such investor may receive less cash than it would have received on the date of redemption.

**Business and Regulatory Risks of Hedge Funds.** Legal, tax and regulatory changes could occur during the term of the Fund that may adversely affect the Fund. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Master Fund and the ability of the Master Fund to obtain the leverage it might otherwise obtain or to pursue its trading strategies. In addition, securities and futures markets are subject to comprehensive statutes, regulations and margin requirements. Regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. The regulation of derivative transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial actions. The effect of any future regulatory change on the Fund could be substantial and adverse.

**Side Letters.** The Investment Manager, in consultation with the Directors, or the Fund may from time to time enter into letter agreements or other similar agreements (collectively, "Side Letters") with one or more Shareholders which provide such Shareholder(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation, minimum investment amounts, voting rights and liquidity terms) than such Shareholder(s) have pursuant to this Memorandum. As a result of such Side Letters, certain Shareholders may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to redeem Shares on shorter notice and/or expanded informational rights) which other Shareholders will not receive. For example, a Side Letter may permit a Shareholder to redeem its Shares on less notice and/or at different times than other Shareholders. As a result, should the Fund experience a decline in performance over a period of time, a Shareholder who is party to a Side Letter that permits less notice and/or different redemption times may be able to redeem its Shares prior to other Shareholders. In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other Shareholders of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional

and/or different rights and/or terms to any or all of the other Shareholders.  The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time.  The other Shareholders will have no recourse against the Fund and/or the Investment Manager in the event certain Shareholders receive additional and/or different rights and/or terms as a result of such Side Letters.  A Shareholder will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

**Competition**.  The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds.  There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment.  The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

**Cybersecurity**.  Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors.  Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.  The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

### *INVESTMENT AND TRADING RISKS*

**Derivative Instruments**.  The Investment Manager may use various derivative instruments, including futures, options, forward contracts, swaps and other derivatives which may be volatile and speculative.  Certain positions may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses.  Use of derivative instruments presents various risks, including the following:

- *Tracking* – When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Investment Manager

from achieving the intended hedging effect or expose the portfolio to the risk of loss.

- *Liquidity* – Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Investment Manager may not be able to close out a position without incurring a loss. In addition, daily limits on price fluctuations and speculative positions limits on exchanges on which the Investment Manager may conduct its transactions in certain derivative instruments may prevent prompt liquidation of positions, subjecting the portfolio to the potential of greater losses.

- *Leverage* – Trading in derivative instruments can result in large amounts of leverage. Thus, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Master Fund and could cause the Master Fund's net asset value to be subject to wider fluctuations than would be the case if the Investment Manager did not use the leverage feature in derivative instruments.

- *Over-the-Counter-Trading* – Derivative instruments that may be purchased or sold for the portfolio may include instruments not traded on an exchange. Over-the-counter options, unlike exchanged-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of non-performance by the obligor on such an instrument may be greater and the ease with which the Investment Manager can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange. Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

**Short Sales**. Short sales by the Master Fund that are not made "against the box" create opportunities to increase the Master Fund's return but, at the same time, involve special risk considerations and may be considered a speculative technique. Since the Master Fund, in effect, profits from a decline in the price of the securities sold short without the need to invest the full purchase price of the securities on the date of the short sale, the value of the Master Fund will tend to increase more when the securities it has sold short decrease in value, and to decrease more when the securities it has sold short increase in value, than otherwise would be the case if it had not engaged in such short sales. Short sales theoretically involve unlimited loss potential, as the market price of securities sold short may increase continuously, although the Master Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions the Master Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales may be used with the intent of hedging against the risk of

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 37 of 200   PageID 51484
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 202 of
324

declines in the market value of the Master Fund's long portfolio, but there can be no assurance that such hedging operations will be successful.

**Risks of Execution of Investment Strategies**.  The Master Fund will invest in a number of securities and obligations that entail substantial inherent risks.  Although the Master Fund will attempt to manage those risks through careful research, ongoing monitoring of investments and appropriate hedging techniques, there can be no assurance that the securities and other instruments purchased by the Master Fund will in fact increase in value or that the Master Fund will not incur significant losses.

**Market Risks and Liquidity.**  The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments.  There can be no assurance that the Master Fund will be able to predict accurately these price movements.  Although the Master Fund may attempt to mitigate market risk through the use of long and short positions or other methods, there is always some, and occasionally a significant, degree of market risk.

Furthermore, the Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which they invest, which may impair the Master Fund's ability to adjust their position.  The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, deleveraging as a consequence of a decision by a broker to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio.  Some of the underlying investments of the Master Fund may not be actively traded and there may be uncertainties involved in the valuation of such investments. Potential investors should be warned that under such circumstances, the Net Asset Value of the Master Fund may be adversely affected.

**Hedging.**  Although the Master Fund will attempt to hedge its exposure to specific arbitrage positions, it will not always be possible fully to hedge risk from such positions or any other position.  In addition, the Master Fund may take positions based on the expected future direction of the markets without fully hedging the market risks.

**Currency Risks**.  A portion of the Master Fund's assets may be invested in securities denominated in various currencies and in other financial instruments, the price of which is determined with reference to such currencies.  The account of the Master Fund will, however, be valued in U.S. Dollars.  To the extent unhedged, the value of the net assets of the Master Fund will fluctuate with U.S. Dollars exchange rates as well as with price changes of their investments in the various local markets and currencies.  Forward currency contracts and options may be utilized by the Master Fund to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

**Counterparty and Settlement Risk.**  Due to the nature of some of the investments which the Master Fund may make, the Master Fund may rely on the ability of the counterparty to a transaction to perform its obligations.  In the event that any such party fails to complete its obligations for any reason, the Master Fund may suffer losses.  The Master Fund will therefore be exposed to a credit risk on the counterparties with which it trades.  The Master Fund will also

bear the risk of settlement default by clearing houses and exchanges.  Any default by a counterparty or on settlement could have a material adverse effect on the Master Fund.

**Borrowing**.  The Master Fund is permitted to finance its operations with secured and unsecured borrowing up to 100% of its net assets, to the extent allowable under applicable credit regulations.  Like other forms of leverage, the use of borrowing can enhance the risk of capital loss in the event of adverse changes in the level of market prices of the assets being financed with the borrowings.

**Distributions**.  Since the Fund will not ordinarily make distributions by way of dividends to the Shareholders, all earnings of the Fund are expected to be retained for reinvestment (through the Master Fund).

**Discretion of the Investment Manager; Concentration of Investments**.  The Investment Manager will seek to engage in the investment activities described herein.  Nonetheless, the Master Fund's portfolio may be altered at any time in the sole discretion of the Investment Manager and without the approval of any investors in the limited partners of the Master Fund, including the Shareholders.  Although the Investment Manager will follow a general policy of seeking to spread the Master Fund's capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Master Fund's capital.  The result of such concentration of investments is that a loss in any such position could materially reduce the Master Fund's capital.

**Difficult Market for Investment Opportunities**.  The activity of identifying, completing and realizing on attractive investments involves a high degree of uncertainty.  There can be no assurance that the Master Fund will be able to locate and complete investments which satisfy the Master Fund's rate of return objective or realize upon their values or that the Master Fund will be able to invest fully its subscribed capital in a manner consistent with its investment strategy.

### *TAX RELATED RISKS*

**Uncertainty and Complexity of Tax Treatment**.  The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain.  Statutory provisions and administrative regulations have been interpreted inconsistently by the courts.  Additionally, some statutory provisions remain to be interpreted by administrative regulations.  Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund.  Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.  Prospective investors are strongly urged to review the discussion below under "*Taxation*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

**Risk of Adverse Determination**.  There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "Service") or another applicable taxing authority, or significantly modified by new legislation, changes in the Service's positions, or court decisions.  The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service or any other applicable taxing authority

with respect to any of the tax consequences described in this Memorandum.  No representation or warranty of any kind is made by the Fund or the Investment Manager with respect to the tax consequences relating to an investment in the Fund.  The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the Service, other applicable taxing authorities or courts.  Should any such positions be successfully challenged by the Service or any other applicable taxing authority, there could be a materially adverse effect on the Fund.

**Tax Audit**.  An audit of the Fund by the Service or any other applicable taxing authority could result in adjustments to the tax consequences initially reported by the Fund, which examination could affect the after-tax returns of a shareholder's investment in the Fund.  If such audit adjustments result in an increase in the Fund's tax liability for any year, the Fund may also be liable for interest and penalties with respect to the amount of underpayment.  The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund.

**Tax-Exempt Entities**.  Certain prospective investors may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Fund (through the Master Fund) may utilize from time-to-time (e.g., short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification).  While the Master Fund believes its investment program is generally appropriate for U.S. tax-exempt organizations for which an investment in the Fund would otherwise be suitable, each type of exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund.  Investments in the Fund by entities subject to ERISA (as defined below), and other tax-exempt entities, require special consideration.  Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

**Tax Considerations Taken into Account**.  The Investment Manager may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

**Adverse Taxation Events**.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Shareholder Level Taxation**.  Tax consequences to each shareholder will depend on tax laws in that shareholder's jurisdiction.  Shareholders should consult their professional advisors as to the possible tax consequences of subscribing for, buying, holding, selling, transferring or redeeming Shares under the laws of their country of citizenship, residence or domicile.

**Possible Law Changes**.   No assurance can be given that legislative, administrative or judicial changes that could alter, either prospectively or retroactively, the U.S. tax considerations or risk factors discussed in this Memorandum will not occur.   Currently, various proposals in the U.S. Congress, possibly with retroactive effect, are pending which, if enacted, could result in changes in U.S. federal income tax laws that may adversely affect the federal income tax consequences of an investment in the Fund.   Prospective investors should seek, and must rely on, the advice of their own advisors with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.   Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund.   In addition, as the investment program of the Master Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors.   No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.*

## POTENTIAL CONFLICTS OF INTEREST

### Highland Group & Highland Accounts

Given the nature and size of Highland Capital Management, L.P.'s ("Highland Capital") operations, various potential conflicts of interest arise in connection with its advisory services and the advisory services provided by its affiliates.   Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed.   The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "Highland Group") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "CDOs") and other vehicles managed by members of the Highland Group ("Highland Accounts") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of

investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

## Allocation of Trading Opportunities

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a

manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request.  However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers.  In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund, and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

**Cross Transactions and Principal Transactions**

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates.  The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction to be fair to the Master Fund and such other client.   By purchasing Shares, a Shareholder is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements.  In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies.  Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates.  In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The principal of the Investment Manager, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of Shares of the Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

**Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates**

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests. Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

**Affiliated Entity Services**

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund. NexBank, SSB ("NexBank SSB") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc.,NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager, as more fully described below in "*Management and Administration – Investment Manager.*"

**Management Fees**

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors. Accordingly, investors should recognize that a

placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

**Diverse Membership**

The Shareholders are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes. Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments. As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Shareholder than for another type of Shareholder, including Shareholders affiliated with the Investment Manager. The results of the Fund's activities may affect individual Shareholders differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss. In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Shareholders in separate transactions. In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Shareholder individually. However, there can be no assurance that a result will not be more advantageous to some Shareholders than to others or to the Investment Manager and/or its affiliates than to a particular Shareholder.

**Performance Allocation**

As described herein, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Investment Manager, in its capacity as the Special Limited Partner. The Performance Allocation may create an incentive for the Investment Manager, as the Special Limited Partner, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

**Soft Dollars**

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the Master Fund General Partner may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund. See "*Brokerage and Custody*."

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 45 of 200   PageID 51492
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 210 of
324

**No Separate Counsel**

Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") serves as counsel to the Fund, the Master Fund, the Investment Manager, the Master Fund General Partner and certain of their Affiliates (the "Clients") in connection with the formation of certain Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the Master Fund General Partner and certain of the Fund's other service providers (including, without limitation, biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, P.O. Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund, the Master Fund and the Master Fund General Partner. In connection with the Fund's offering of Shares and subsequent advice to the Fund, the Master Fund and the Master Fund General Partner, Maples and Calder will not be representing shareholders and/or limited partners. No independent legal counsel has been retained to represent the shareholders and/or limited partners. Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of shareholders/limited partners may differ from those of the Fund, the Master Fund and/or the Master Fund General Partner. Maples and Calder does not represent the shareholders' and/or the limited partners' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund, the Master Fund and/or the Master Fund General Partner.

**Non-Public Information**

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information. Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

**Directors**

The Directors will at all times have regard to their obligations to act in the best interests of the Fund and its Shareholders so far as practicable.  The Directors will seek to ensure that any conflict of interest is resolved fairly and in the interests of the Fund and its Shareholders.

**The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.**

# MANAGEMENT AND ADMINISTRATION

## *BOARD OF DIRECTORS*

The Directors are responsible for the overall management and control of the Fund in accordance with its Memorandum and Articles of Association. However, the Directors are not responsible for the day-to-day operations and administration of the Fund, nor are they responsible for making or approving any investment decisions having delegated such investment responsibilities to the Investment Manager pursuant to the Investment Management Agreement, and the day-to-day administrative functions to the Administrator pursuant to the Administration Agreement in accordance with their powers of delegation as set out in the Articles. The Directors will review, on a periodic basis, the performance of the Investment Manager and the Administrator.

Biographical information for each Director is set forth below.

**Claire Kasumba**. Claire serves as an independent director on a wide range of investment structures, including hedge funds, private equity funds, fund of funds and segregated portfolio companies. Claire joined Maples Fiduciary Services (Cayman) Limited ("Maples Fiduciary"), a regulated entity in the Cayman Islands, in 2016 and has over 10 years' legal experience. Claire previously worked as an Associate in the Investment Funds team at Maples and Calder from 2011 where she focused on hedge fund and private equity structuring and formation. Prior to joining Maples and Calder, Claire worked at Nabarro LLP in London in the Funds and Indirect Real Estate team for over five years. During Claire's time at Nabarro LLP, she also completed a six month secondment in the legal department at Aviva Investors. Claire received a Bachelor of Arts degree with first class honours majoring in Economics and Law from the University of Leicester, UK and Göteborgs Universitet, Sweden in 2003. She received a Master of Laws in Commercial and Corporate Law from the University College London, UK. Claire completed her Legal Practice Course in 2005 from BPP Law School, UK. She has been admitted to practice law in England and Wales and the Cayman Islands. Claire also holds an Accredited Director designation from the Institute of Chartered Secretaries and Administrators Canada.

**Martin Laufer**. Martin works at Maples Fiduciary and serves as an independent director on a wide range of alternative investment funds, including fund of funds, hedge funds and unit trusts. Prior to joining Maples Fiduciary, Martin worked for BNY Mellon Fund Management (Cayman) Limited where he was the Financial Fund Manager from 2010 to 2016, providing fiduciary services to a multi-billion dollar portfolio of unit trusts operating as investment funds as well as administration services to a large portfolio of Cayman Islands domiciled hedge funds and fund of funds. Prior to that, Martin worked for CIBC Bank and Trust Company (Cayman) Limited as a Senior Client Accountant. From 2003 to 2007 Martin worked for KPMG Argentina as a Senior Consultant. Martin graduated from Buenos Aires University as a Certified Public Accountant and holds a Master of Business Administration from the International College of the Cayman Islands. He is a CFA Charterholder and a qualified Trust and Estate Practitioner. Martin is a

Appx. 03831

member of the Society of Trust and Estate Practitioners (STEP), the Cayman Islands CFA Society and the Cayman Islands Institute of Professional Accountants (CIIPA).

**Sophia Dilbert**.  Sophia Dilbert serves as an independent director on a wide range of alternative investment funds, including fund of funds, hedge funds, private equity funds and segregated portfolio companies. Sophia works at Maples Fiduciary, which she joined in 2012. Prior to joining Maples Fiduciary, Sophia was Global Head of Legal at Admiral Administration Ltd. in the Cayman Islands, starting there in 2007, where she was responsible for advising on all legal and regulatory matters. Sophia was also responsible for the implementation of global policies and procedures. Prior to that, Sophia worked for Stuart Walker Hersant as a senior associate in the Cayman Islands, specializing in investment funds and general corporate law. Sophia commenced her career with Maples and Calder where she spent eight years as an associate attorney specializing in capital markets and investment funds. Her area of practice also included general corporate and commercial law, real estate, immigration and employment matters. Sophia graduated from the University of Liverpool with a Bachelor of Laws with Honours. She is an Attorney-at-Law and is a member of the Caymanian Bar Association, the Cayman Islands Law Society and the Honourable Society of Middle Temple in the United Kingdom. Sophia has also received the Accredited Director designation from the Chartered Secretaries Canada and is a member of the Cayman Islands Directors Association and the Council of the Cayman Islands Stock Exchange.

The services of Claire Kasumba, Martin Laufer and Sophia Dilbert will be provided by Maples Fiduciary.  Maples Fiduciary is an affiliate of Maples and Calder, who will be engaged as the Fund's legal counsel.  Maples Fiduciary will enter into a Director Services Agreement with the Fund which sets out the terms on which it will provide the services of Claire Kasumba, Martin Laufer and Sophia Dilbert.

Maples Fiduciary will be entitled to remuneration from the Fund at its customary rates and for reimbursement of its out-of-pocket expenses, including all travelling, hotel and other expenses properly incurred by the Directors supplied by Maples Fiduciary in attending meetings of the Directors or any shareholders meeting held in connection with the business of the Fund.

The Directors provided by Maples Fiduciary are non-executive Directors of the Fund and are not required to devote their full time and attention to the business of the Fund.  They may be engaged in any other business and/or be concerned or interested in or act as directors or officers of any other company or entity.  Neither Maples Fiduciary nor any of the Directors supplied by Maples Fiduciary will be responsible for (i) the commercial structuring of the Fund or the Master Fund or the Master Fund's investment strategy, (ii) the purchase or sale of any investment on behalf of the Master Fund (which will be the responsibility solely of the Investment Manager), (iii) the valuation of the assets of the Master Fund and the Fund, or (iv) any loss or damage caused by the acts or omissions of the Investment Manager, the Administrator or any of their delegates or sub-delegates unless any such loss or damage is actually occasioned by the actual fraud, willful default or Gross Negligence (as defined in the Director Services Agreement) of the Directors supplied by Maples Fiduciary.

The Director Services Agreement provides that none of Maples Fiduciary nor any of the Directors provided by the Maples Group shall be liable to the Fund under or in connection with the Director Services Agreement in an amount of more than US$5,000,000, except in circumstances where such liability was caused by the actual fraud of Maples Fiduciary or, as the case may be, any of the Directors provided by the Maples Group.

The Articles do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation.  There is no shareholding qualification for the Directors.  The Directors are empowered to exercise all of the borrowing powers of the Fund.  The borrowing powers of the Fund may be varied by the Directors or by an amendment to the Articles.

The Articles provide that the Fund may, by Ordinary Resolution, remove a Director from office and may, by Ordinary Resolution, appoint a person who is willing to act to be a Director either to fill a vacancy or as an additional Director.  The Directors may appoint any person who is willing to act to be a Director, either to fill a vacancy or as an additional Director, provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with the Articles as the maximum number of Directors.

The Articles further provide that the office of a Director shall be vacated if: (a) he becomes prohibited by law from being a Director; (b) he becomes bankrupt or makes any arrangement or composition with his creditors generally; (c) he dies, or is, in the opinion of all his co-Directors, incapable by reason of mental disorder of discharging his duties as Director; (d) he resigns his office by notice to the Company; (e) he has for more than six consecutive months been absent without permission of the Directors from meetings of Directors held during that period and his alternate Director (if any) has not during such period attended any such meetings instead of him, and the Directors resolve that his office be vacated; or (f) he is removed from office by notice addressed to him at his last known address and signed by all his co-Directors.

The Articles provide that, so long as the nature of their interest is or has been declared at the earliest opportunity, a Director or prospective Director may enter into any contract or arrangement with the Fund and such contract or arrangement shall not be liable to be avoided and the Director concerned shall not be liable to account to the Fund for any profit realized by any such contract or arrangement by reason of his holding of that office or the fiduciary relationship so established and may hold any other office or place of profit with the Fund (except that of auditor) in conjunction with the office of Director on such terms as to tenure of office and otherwise as the Directors may determine.  Provided that a Director has disclosed his material interest pursuant to the Articles, a Director may vote at any meeting of Directors or of a committee of Directors on any resolution concerning a matter in which he has, directly or indirectly, an interest or duty. The Director shall be counted in the quorum present at a meeting when any such resolution is under consideration and if he votes his vote shall be counted.

As at the date of this Memorandum, no Director nor any connected person has any interest, beneficial or non-beneficial, in the share capital of the Fund nor any material interest in the Shares of the Fund nor any options in respect of such Shares nor in any agreement or arrangement with the Fund.  Other than the Investment Management Agreement, there are no contracts or arrangements subsisting at the date of this Memorandum in which a Director of the

Fund is materially interested and which is significant in relation to the business of the Fund. There are no loans or guarantees provided by the Fund to or for the benefit of the Directors as at the date of this Memorandum.

Other than the Investment Management Agreement, no Director has any direct or indirect interest in any contract or arrangement that was either unusual in its nature or significant to the business of the Fund in previous years and remains outstanding.

The Articles provide certain rights of exculpation and indemnification in favor of Directors and officers of the Fund against legal liability and expenses if such persons did not, in connection with the matter giving rise to a particular claim, engage in gross negligence or willful default in the performance of their duties.

The Directors may change any of the Fund's service providers, including the Fund's auditors, without the consent of the Shareholders.  In addition, the remuneration being paid to service providers by the Fund (and any other term of their respective service agreements) may be amended by the mutual consent of the Directors and the relevant service providers.  This may be necessary from time to time to keep such remuneration in line with the prevailing market rates being charged.

### *INVESTMENT MANAGER*

The Fund's Investment Manager is Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership formed on April 13, 2017.  The Investment Manager is responsible for overseeing the investment of the Fund's assets (through the Master Fund) and the distribution of the Shares, subject to the overall control of the Master Fund General Partner.  With the approval of the Master Fund General Partner, the Investment Manager may delegate certain of its duties to other companies and entities, which may be affiliated with, or independent of, the Investment Manager.  The Investment Manager has power to terminate such appointments and to make other appointments in place of them.

The Investment Manager is a wholly-owned subsidiary of Highland Capital Management, L.P., a Delaware limited partnership and a registered investment adviser with the U.S. Securities Exchange Commission (CRD# 110126 / SEC# 801-54874).  As an advisory affiliate of Highland Capital Management, L.P., the Investment Manager is also subject to compliance with the provisions of the U.S. Investment Advisers Act of 1940, as amended.

The Investment Manager is not required to be licensed in the Cayman Islands because it is providing investment management services exclusively to persons that fall within an exemption under the Securities Investment Business Law (Revised) of the Cayman Islands.  Accordingly, the Investment Manager has filed an initial declaration of exemption with the Cayman Islands Monetary Authority and will update that filing on an annual basis.  The Investment Manager will not provide investment services to any class of person that would require it to be licensed under the Securities Investment Business Law (Revised) without first obtaining such a license.  The Investment Manager does not envisage obtaining such a license.

The Investment Manager engaged Highland Latin America Consulting, Ltd., a Cayman Islands exempted company ("Highland Latin America"), a wholly-owned subsidiary of the Investment Manager, to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, subject to the Services Agreement. The Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages.

The key investment professionals of the Investment Manager and Highland Latin America who are responsible for the Master Fund's investment activities are described below:

***James Dondero, CFA, CMA, President, Co-Founder***. Mr. Dondero is Co-Founder and President of Highland Capital Management, L.P. and a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NYRT), Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

***Gustavo Prilick.*** Mr. Prilick is a Managing Partner at Highland Capital Brasil and a registered asset manager in Brazil, and is a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. He has extensively worked in several of Highland Capital Brasil's portfolio companies in the US mainly as CEO. Prior to his involvement with Highland Capital Brasil, he was a Partner at South America Fund, a private equity firm, mainly focused on providing financial services to export companies in Argentina and Uruguay. Prior to South America Fund, he was the Chief Operating Officer of Millicom International Cellular for 7 years, serving Latin America, Asia, Africa and ten operations in Russia. Prior to Millicom, he served as the Director of International Business for Oracle Corporation where he was responsible for the establishment of most of Oracle's International Subsidiaries on several continents, including the Brazilian operation. Later he became President of Oracle South America with oversight of several countries in South America. He also served as CEO of Nacion Factoring, a subsidiary of Banco Nacion in Argentina building its operations to reach one of the leading positions in the country. Mr. Prilick received an MBA from the Stanford University Graduate School of Business and a degree in Electrical Engineering from Universidad de Buenos Aires. He has also held teaching positions as a visiting professor in several leading Business Schools in Argentina.

Highland Latin America will enter into relationships and agreements with Argentine relevant parties and/or individuals to obtain supporting services for the management of the Fund, the Domestic Fund and the Master Fund, and will enter into consulting agreements with Andrés Pitchón, Julieta Prieto and Javier Casabal pursuant to which these consultants will provide investment and related services to the Feeder Funds and the Master Fund.  Mr. Pitchón will provide portfolio management services to the Master Fund under the overall supervision of the Investment Manager.

***Andrés Pitchón***.  Mr. Pitchón, through a consulting arrangement with Highland Latin America Consulting, Ltd., provides portfolio management services to the Master Fund.  Mr. Pitchón began his career in 1993 as Head of Equity Research for Argentina for MBA-Salomon Brothers and later he also became responsible for Fixed income. As Head of the Research Department his work was recognized by international publications such as Institutional Investor, Latin Finance, The Reuters Survey and The Greenwich Survey. Since 1997 and 1999 he has managed the Fund's equity and fixed income mutual funds. Since 2003 Mr. Pitchón had been Senior Portfolio Manager of the Fund's hedge funds. Mr. Pitchón received a BA degree in IT, focused on Business Administration from the University of Belgrano (1989), together with an academic merit medal for highest GPA in the School of Technology. Mr. Pitchón also received a Master's degree in Business Administration from Anderson Graduate School of Business at UCLA in 1992.

**Investment Management Agreement**

Under the Investment Management Agreement among the Investment Manager, the Master Fund General Partner, the Feeder Funds and the Master Fund, the Investment Manager has agreed to provide investment management and distribution services to the Feeder Funds and the Master Fund in accordance with the investment objective and strategies of the Master Fund, and the selling restrictions, set forth above.  The Directors have delegated the following list of authorities to the Investment Manager under the Investment Management Agreement (to be exercised in consultation with the Directors): (i) authority to approve the rescission of a request for voluntary redemption submitted by a Shareholder; (ii) authority to waive any applicable requirements and restrictions in relation to the redemption of Shares by any Shareholder; (iii) authority to waive certain eligibility requirements with respect to any new subscription for participating shares or the transfer of Shares; (iv) authority to waive any of the subscription requirements as set out in this Memorandum with respect to any new subscription for Shares; (v) authority to permit a Shareholder  to redeem its Shares at any time in the event that continuing to hold the Shares becomes impractical or illegal, upon a Shareholder's death or total disability, or in order for a Shareholder  to avoid materially adverse tax or regulatory consequences; (vi) authority to make in-kind distributions of Fund assets; (vii) authority to approve the establishment of reserves for contingencies and distribution holdbacks; (viii) authority to approve Side Letters; (ix) authority to accept subscriptions below the minimum subscription amount; and (x) authority to accept redemptions of Shares outside the frequency established by the Memorandum and Articles of the Fund.

Under the terms of the Investment Management Agreement, the Fund pays to the Investment Manager, for its services as Investment Manager, a quarterly "Management Fee" as described below.

<u>Management Fee for Series A Shares</u>

The Management Fee is an amount equal to 1.75% per annum of the Net Asset Value of each Series A Share. The Management Fee is calculated monthly based on the Net Asset Value of each Series A Share on the last day of each calendar month (before issuing new Series A Shares related to subscriptions made as of the first day of the immediately succeeding month and before redemptions, if any, made during such calendar month and before deduction of the Management Fee for such quarter) and is payable quarterly in arrears on the last day of each calendar quarter. The Management Fee is paid at the Master Fund level.  The Master Fund will pay the Management Fee in U.S. Dollars promptly following the end of each calendar quarter.  The Management Fee will be deducted in computing the net profit or net loss of the Fund attributed to the Series A Shares.  In the event that the Investment Manager is not acting as Investment Manager for an entire calendar quarter, the Management Fee payable by the Master Fund for such calendar quarter will be prorated to reflect the portion of such calendar quarter in which the Investment Manager is acting as such under the Investment Management Agreement.

The Master Fund General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Shareholder.  The Investment Manager may assign all or any portion of the Management Fee to any of its affiliates or any other person designated by the Investment Manager in its discretion.

<u>Management Fee for Series B Shares</u>

The Management Fee is an amount equal to 1.25% per annum of the Net Asset Value of each Series B Share. The Management Fee is calculated monthly based on the Net Asset Value of each Series B Share on the last day of each calendar month (before issuing new Series B Shares related to subscriptions made as of the first day of the immediately succeeding month and before redemptions, if any, made during such calendar month and before deduction of the Management Fee for such quarter) and is payable quarterly in arrears on the last day of each calendar quarter. The Management Fee is paid at the Master Fund level.  The Master Fund will pay the Management Fee in U.S. Dollars promptly following the end of each calendar quarter.  The Management Fee will be deducted in computing the net profit or net loss of the Fund attributed to the Series B Shares.  In the event that the Investment Manager is not acting as Investment Manager for an entire calendar quarter, the Management Fee payable by the Master Fund for such calendar quarter will be prorated to reflect the portion of such calendar quarter in which the Investment Manager is acting as such under the Investment Management Agreement.

The Master Fund General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Shareholder.  The Investment Manager may assign all or any portion of the Management Fee to any of its affiliates or any other person designated by the Investment Manager in its discretion.

<u>Performance Allocation for Series A Shares</u>

Generally, as of the close of each fiscal quarter and subject to the limitations described below, the Performance Allocation is debited against each applicable Master Fund capital sub-account relating to a sub-series of Series A Shares attributable to a Shareholder and simultaneously credited to the Master Fund capital account of the Special Limited Partner.  The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to 20.0% of the Net Capital Appreciation (as defined below) of each Series A Share for such fiscal quarter.

The "Net Capital Appreciation" applicable to a Series A Share means the amount by which the Net Asset Value of such Series A Share on the last day of the fiscal quarter (or on the Redemption Day, if applicable) exceeds the higher of the following amounts: (i) the highest Net Asset Value of such Series A Share as of the commencement of any fiscal quarter and (ii) the issue price of such Series A Share (the amount set forth in clause (i) or clause (ii), whichever is higher, the "High Water Mark").  All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and redemptions made during the quarter.

Once the Performance Allocation is made to the Special Limited Partner, it will not be returned to the Master Fund if the Net Asset Value of the Series A Shares on which a Performance Allocation has previously been made subsequently declines.  The Performance Allocation is allocated based on both realized and unrealized appreciation.

<u>Performance Allocation for Series B Shares</u>

Generally, as of the close of each fiscal quarter and subject to the limitations described below, the Performance Allocation is debited against each applicable Master Fund capital sub-account relating to a sub-series of Series B Shares attributable to a Shareholder and simultaneously credited to the Master Fund capital account of the Special Limited Partner.  The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to 17.5% of the Net Capital Appreciation (as defined below) of each Series B Share for such fiscal quarter.

The "Net Capital Appreciation" applicable to a Series B Share means the amount by which the Net Asset Value of such Series B Share on the last day of the fiscal quarter (or on the Redemption Day, if applicable) exceeds the higher of the following amounts: (i) the highest Net Asset Value of such Series B Share as of the commencement of any fiscal quarter and (ii) the issue price of such Series B Share (the amount set forth in clause (i) or clause (ii), whichever is higher, the "High Water Mark").  All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and redemptions made during the quarter.

Once the Performance Allocation is made to the Special Limited Partner, it will not be returned to the Master Fund if the Net Asset Value of the Series B Shares on which a Performance

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 55 of 200   PageID 51502
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 220 of
324

Allocation has previously been made subsequently declines. The Performance Allocation is allocated based on both realized and unrealized appreciation.

Performance Allocation – General

The Special Limited Partner may assign all or any portion of the Performance Allocation to any of its affiliates or any other person designated by the Special Limited Partner in its discretion.

The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each sub-series of the relevant Series of Shares attributable to a Shareholder. No separate Performance Allocation will be charged at the Fund level.

The Performance Allocation generally will be allocable to the Special Limited Partner after the end of each fiscal quarter and as of any Redemption Day occurring prior to the end of any fiscal quarter. The Performance Allocation allocated with respect to any Series of Shares redeemed prior to the end of a fiscal quarter will be determined solely by reference to such redeemed Shares and will be allocable to the Special Limited Partner on the Redemption Day. The Performance Allocation with respect to any Shareholder may be fully or partially waived or rebated by the Master Fund General Partner in its sole discretion.

The Investment Management Agreement provides that, in the absence of gross negligence (as defined under the laws of the State of Delaware), willful misconduct or fraud, each of the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives, will be indemnified by the Fund, the Domestic Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.

The Investment Management Agreement is terminable upon the dissolution of any Feeder Fund or the Master Fund or by the holder of the management shares of the Fund upon at least 90 days' prior notice.

**Services Agreement**

Under the Services Agreement between Highland Latin America and the Investment Manager, Highland Latin America has agreed to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, the Domestic Fund and the Master Fund. These services include: back- and middle-office services; credit analysis; investment vehicle management; valuation; execution and documentation; marketing; reporting; administrative services; and other ancillary services.

The Services Agreement provides that in the absence of bad faith, gross negligence, fraud or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), the Investment Manager will, to the extent permitted by law, indemnify and hold

harmless Highland Latin America, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities incurred by such person in performing their duties under the Services Agreement.  The Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages, and the Fund will not bear any costs or expenses related to the services provided by Highland Latin America.

The Services Agreement will terminate (i) automatically upon the dissolution of the Investment Manager or (ii) at the election of either the Investment Manager or Highland Latin America upon 30 days' notice to the other party.

## *ADMINISTRATOR*

Pursuant to an administration agreement ("Administration Agreement"), the Master Fund has appointed MUFG Fund Services (Cayman) Limited as administrator of the Feeder Funds and the Master Fund (the "Administrator").

MUFG Fund Services is a leading, independent administrator for the alternative investment industry. The Administrator is a Cayman Islands company that is licensed as a Mutual Fund Administrator in the Cayman Islands.  It is an indirect wholly owned subsidiary of MUFG Fund Services (Bermuda) Group Limited.  The registered office of the Administrator is 2nd Floor Strathvale House, 90 North Church Street, P.O. Box 609, George Town, Grand Cayman KY1-1107, Cayman Islands.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the Master Fund General Partner, for certain matters pertaining to the administration for the Fund, including: (i) maintaining the accounts of the Fund and the Master Fund, (ii) calculating the Master Fund's net asset value, (iii) maintaining the principal corporate records of the Fund and the Master Fund, (iv) communicating with Shareholders, (v) accepting the subscriptions of new Shareholders, (vi) making redemptions of Shares, (vii) maintaining the register of sub-fund investments, (viii) executing sub-fund subscriptions and redemptions as instructed by the Fund, and (ix) ensuring compliance with Cayman Islands law and regulation (including anti-money laundering regulations).  For its services, the Administrator receives a fee from the Master Fund.

The Administration Agreement is governed by the law of the Cayman Islands and is subject to termination by the Administrator or the Master Fund upon ninety (90) days' written notice or, under certain circumstances, shorter notice.  In such event, the Master Fund may enter into a new agreement with a new administrator on behalf of the Master Fund and the Feeder Funds, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.  Under the Administration Agreement, the Master Fund agrees to indemnify and hold harmless the Administrator and its affiliated persons and delegates, as well as their respective officers, directors, employees and agents for, and to defend and hold each such person harmless from, any and all taxes, claims, demands, actions, suits, judgments, liabilities, losses, damages, costs, charges, counsel fees (on a solicitor and his own client basis), fines, assessments, amounts

paid in settlement and expenses imposed on, incurred by, or asserted against the person which may arise out of or in connection with the Administration Agreement.  The Administrator or any other indemnified person will not be indemnified for their own gross negligence, wilful default or fraud.

The Administrator is not responsible for valuing the Master Fund's investments, monitoring any investment restrictions of the Master Fund, determining compliance by the Master Fund with its investment restrictions, the Master Fund's trading activities, the management or performance of the Master Fund, or the accuracy or adequacy of this Memorandum.  In addition, the Administrator does not assume any liability to any person or entity, including Shareholders, except as specifically provided in the Administration Agreement.  The Administrator may delegate certain services and share information concerning the Fund and its Shareholders with its various non-United States affiliates subject to applicable confidentiality provisions.

**The Administrator has no responsibility with respect to trading activities, the Investment Manager, the management or performance of the Fund, or the accuracy or adequacy of this Memorandum.**

## *BROKERAGE AND CUSTODY*

### Brokerage Arrangements

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions.  Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments.  Portfolio transactions through brokers involve a commission to the broker.  Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer.  Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion.  The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at Société Générale and BNP Paribas Prime Brokerage, Inc. or other prime brokers or custodians selected by the Investment Manager.  Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors.  Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Administrator.

Société Générale and BNP Paribas Prime Brokerage, Inc. and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services).  In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in

the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager.  The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager.  However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "*soft dollar items*").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers.  Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions.  Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide.  Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above.  A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or

services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended.  Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund.   Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients.   In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage.   Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided.   Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts.   As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction.   In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients.   The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid.  Research received from brokers will be supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products. As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes.  In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.   The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's

Appx. 03843

and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources. The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

**Custody**

The majority of the Master Fund's securities are held in the custody of its prime brokers. The Master Fund is eligible for insurance coverage against loss with respect to assets held in the custody of the prime brokers in the event of the bankruptcy or liquidation of either of the prime brokers to the same extent as that broker's other customers. The Master Fund's and the Fund's cash may be held at banks as well as the prime brokers. Ownership interests which are not represented by certificates generally will be recorded through book-entry systems maintained by the issuer or its agent, and the underlying documentation relating to the acquisition and disposition of these assets for the account of the Master Fund will be held at the business offices of the Investment Manager.

## *PAYMENTS TO SERVICE PROVIDERS OF THE FUND*

The Investment Manager may pay (or cause to be paid) fees to persons (whether or not affiliated with the Investment Manager) who are instrumental in the sale of Shares in the Fund. Any such fees will in no event be payable by or chargeable to the Fund or any Shareholder or prospective Shareholder.

## *EXPENSES*

**Operating Expenses**

The Fund will bear all costs, fees and expenses arising in connection with the Fund's operations. The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement. Expenses payable by the Fund in connection with the Master Fund's investment program, include, but are not limited to, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses, and costs related to monitoring investments (collectively, the "investment-related expenses"). Expenses payable by the Fund in connection with its operations include, but are not limited to, fees and expenses of advisers and consultants; the Management Fee; fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers; indemnification expenses and the cost of insurance against potential indemnification liabilities; interest and other borrowing expenses; legal, administrative, accounting, tax, audit and insurance expenses; expenses of preparing and distributing reports, financial statements and notices to Shareholders; litigation or other extraordinary expenses; any withholding, transfer or other taxes payable by the Fund (including

any interest and penalties); and the cost of periodically updating the Memorandum.  The Fund will not bear any placement agent fees.

If the Master Fund General Partner or the Investment Manager, as appropriate, incurs any expenses for both the Master Fund and one or more Other Accounts (as defined below), the Master Fund General Partner or the Investment Manager, as appropriate, will allocate such expenses among the Master Fund and each such Other Account in proportion to the size of the investment made by each in the activity or entity to which the expenses relate, or in such other manner as the Master General Partner considers fair and reasonable.

"Other Account" means any assets or investment of the Master Fund General Partner or the Investment Manager, or any assets managed by the Master Fund General Partner, the Investment Manager or any of their respective affiliates for the account of any person or entity (including investment vehicles) other than the Master Fund, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Master Fund.

# DESCRIPTION OF THE FUND'S SHARES

## *GENERAL*

The authorized share capital of the Fund is US$50,000 divided into 100 Management Shares and 4,999,900 Shares, which may be issued in Series.  Subject to the provisions of the Articles, the unissued Shares of the Fund are under the control of the Directors who may issue, allot and dispose of or grant options over them to such persons, or on such terms and in such manner as they may think fit and no member has any pre-emptive right to purchase such Shares.

## *MANAGEMENT SHARES*

100 Management Shares are in issue, fully paid and held by the Investment Manager.  The Management Shares are not transferable without the prior written consent of the Directors, who do not intend to give such consent except in respect of transfers to affiliates of the Investment Manager.  The Management Shares have the entire voting power of the Fund except on a variation of rights issue.  However, they do not entitle the holder to participate in the Fund's profits and losses and they are not redeemable.  Upon the winding up of the Fund, the holders of Management Shares are entitled to receive their paid in capital of US$0.01 per Management Share.

## *SHARES*

The holders of the Shares have no right to receive notice of or to attend or to vote at general meetings of the Fund and have no other voting rights (except on a variation of rights issue – see the Section below entitled "Rights of Shareholders") but they are entitled to receive, to the exclusion of the holders of the Management Shares, any dividends that may be declared by the Fund and, upon the winding up of the Fund, the full amount of the assets of the Fund available for the distribution (after all debts and liabilities of the Fund have been paid) will be distributed to registered holders of Shares other than the paid in capital in respect of the Management Shares of US$0.01 per Management Share.  Shares, when issued, will be fully paid.  Within each Series, all Shares (excluding Management Shares) of the Fund have equal dividend, distribution and liquidation rights.

Any dividend which cannot be paid to a Shareholder and/or which remains unclaimed after six months from the date of declaration of such dividend may, in the discretion of the Directors, be paid into a separate account in the Fund's name, provided that the Fund shall not be constituted as a trustee in respect of that account and the dividend shall remain as a debt due to the Shareholder.  Any dividend which remains unclaimed after a period of six years from the date of declaration of such dividend shall be forfeited and shall revert to the Fund.

The issue of the Series A Shares was authorized by resolution of the Directors passed on May 22, 2006.  The Series A Shares each have a par value of US$0.01 per share and carry identical rights.

The issue of the Series B Shares was authorized by resolution of the Directors passed on February 28, 2013.  The Series B Shares each have a par value of US$0.01 per share and carry identical rights.

The Directors may designate further Series of Shares in the future that will be attributable to the single underlying portfolio of the Fund (held through the Master Fund).  Each additional Series of Shares may be offered on different terms from the Shares being offered pursuant to this Memorandum (including the offering of Shares in a different currency) and any additional Series of Shares may rank in priority to, or equally with, the outstanding Series of Shares, but within each new Series, all Shares will have equal dividend, distribution and liquidation rights.  Additionally, the Fund may, for administrative convenience, issue sub-series of Shares, and in this Memorandum, unless the context requires otherwise, references in this Memorandum to the term "Series" shall include any sub-series derived from that Series.

### RECORDS

The Fund shall establish in its books a separate record with its own distinct designation for each Series of Shares.  The proceeds from the allotment and issue of each Series of Shares shall be applied in the books of the Fund to the record established for that Series of Shares.  The assets, profits, gains, income and liabilities, losses and expenses attributable to a particular Series shall be applied to the record relating to such Series at the end of each fiscal period – see the Section headed "Financial Information and Reports – Fiscal Periods" below.

### RIGHTS OF SHAREHOLDERS

All shareholders are entitled to the benefit of, are bound by and are deemed to have notice of the provisions of the Memorandum and Articles of the Fund.

Under the terms of the Fund's Memorandum of Association and Articles, the liability of the Shareholders is limited to any amount unpaid on their Shares.  As the Shares can only be issued if they are fully paid, the Shareholders will not be liable for any debt, obligation or default of the Fund beyond their interest in the Fund.

The Fund's objects are set out in clause 3 of its Memorandum of Association and are unrestricted.

The Fund's Articles have been drafted in broad and flexible terms to allow the Directors the authority to, in their discretion, determine a number of issues including the period of notice to be given for redemptions and whether or not to charge subscription or redemption fees, generally or in any particular case.  In approving the offering of Shares on the terms set out in this Memorandum, the Directors have exercised a number of these discretions in accordance with the Fund's Articles.

As an exempted company, the Fund is not required to hold scheduled annual general meetings of Shareholders.  General meetings of the holders of Management Shares may be called by the Directors and will be called at the request of the holders of Management Shares holding a simple

majority of the outstanding Management Shares in issue.  All meetings of the holders of Management Shares will be held in the Cayman Islands, or such other location as the Directors will determine.  All meetings of the holders of Management Shares require 7 days' prior notice.  Notice may be sent by hand, mail, fax or email, or alternatively, where the recipient has agreed, by posting the notice on a secure nominated web-site.

Except where a Special Resolution is otherwise required by the Companies Law, all decisions of the holders of Management Shares will be made by an Ordinary Resolution, provided that a quorum of the holders of one-third of the Management Shares is present by proxy or in person at the meeting.  Any matter referred to herein may also be adopted by resolution in writing of all the holders of Management Shares.

The rights attaching to any Series of Shares may, whether or not the Fund is being wound up, be varied with the consent in writing of the holders of two-thirds of the issued Shares of that Series, or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Shares of that Series, at a separate meeting of the holders of the Shares of that Series.

Any Series of Shares may be converted into a different Series of Shares with the consent in writing of the holders of two-thirds of the issued Shares of that Series, or with the sanction of a resolution passed by a two-thirds majority of the holders of the issued Shares of that Series, at a separate meeting of the holders of the Shares of that Series.

Further, subject to and in so far as permitted by the provisions of the Companies Law, the Fund may from time to time by Ordinary Resolution alter or amend its memorandum of association to: increase its share capital by such sum as the resolution shall prescribe and with such rights, priorities and privileges annexed thereto as set out in such Ordinary Resolution; consolidate and divide all or any of its share capital into shares of larger amounts than its existing shares; convert all or any of its paid-up shares into stock and reconvert that stock into paid-up shares of any denomination; sub-divide its existing shares, or any of them, into shares of smaller amounts than is fixed by the Memorandum; and cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person, and diminish the amount of its share capital by the amount of the shares so cancelled.

The Shares have no conversion or pre-emptive rights.  All Shares of the Fund, when duly issued, will be fully paid and non-assessable.

From time to time, the Fund, by an Ordinary Resolution, may increase its authorized share capital in order to have a substantial number of Shares available at all times for issuance.

The Memorandum of Association and the Articles may be amended, and the Fund may be wound up at any time, upon the passing of a Special Resolution by the holders of the Management Shares.

# SUBSCRIPTION, REDEMPTION AND TRANSFER OF SHARES

### *SUBSCRIPTION FOR SHARES*

**Offering of Shares**

The Fund is conducting an offering of its Series A Shares and Series B Shares to a limited number of experienced and sophisticated investors who are Eligible Investors. The purchase of Series A Shares and Series B Shares is not open to the general public and Series A Shares and Series B Shares will be privately offered only to Eligible Investors. The description of an Eligible Investor is set forth in the Subscription Documents.

The minimum initial and subsequent investment for the Series A Shares and Series B Shares is US$500,000 or, in each case, such other amount as the Investment Manager may in its sole discretion determine in respect of a particular Shareholder or group of Shareholders, subject to the Listing Rules of the Exchange but not below US$100,000 in respect of Series B Shares.

The Series A Shares are to be listed on the Exchange by way of an offer for subscription.

The Fund has not applied for the Series B Shares to be admitted to: (i) the Official List of The International Stock Exchange; or (ii) listing on any other stock exchange, and no such application is proposed or expected to be made.

**Offer Price, Initial and Subsequent Issuance**

The Series A Shares and Series B Shares offered pursuant to this Memorandum are available for issue to Eligible Investors at a Subscription Price based on the Net Asset Value per Share of such Series on the Valuation Day that occurs after the Subscription Documents are received and approved by the Fund and immediately preceding the relevant Subscription Day, as calculated in accordance with the Articles and described herein.

Shares will be issued on each Subscription Day at the Directors' sole discretion. Applications for Shares must be received by 5 pm (Cayman Islands time) no later than the first Business Day before each Subscription Day and payment for such subscriptions (inclusive of any initial charge) must be received by the Administrator in cleared funds in U.S. Dollars at least no later than the Business Day before each Subscription Day in order for Shares to be issued on such Subscription Day. If any application or payment is received late it will be dealt with on the next Subscription Day.

**Payment**

Payment for Shares must be made in cash by electronic transfer, net of bank charges, and is due in cleared funds in U.S. Dollars.  Payment must be sent to the bank details noted on the Subscription Documents.

The Directors may however accept subscriptions in kind.  No subscriptions in kind will be accepted unless the Directors are satisfied that:

(i)      the investments to be transferred are valued in accordance with the valuation provisions set out in the Articles and summarized herein; and

(ii)     the terms of any such transfer shall not materially prejudice the remaining Shareholders.

In the event that subscription monies are received in any currency other than U.S. Dollars, conversion into U.S. Dollars will be arranged by the Administrator at the risk and expense of the applicant.  Any bank charges in respect of electronic transfers will be deducted from subscriptions and the net amount only invested in Shares.

**Prevention of Money Laundering**

 In order to comply with legislation or regulations aimed at the prevention of money laundering, the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds.  Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a Shareholder (i.e. a subscriber or a transferee).  Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required where an exemption applies under the Money Laundering Regulations (Revised) of the Cayman Islands, as amended and revised from time to time or any other applicable law.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a Shareholder if the Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such Shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or money laundering or is involved with terrorism or terrorist financing and property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law (Revised) of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (Revised) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**Procedure for the Purchase of Shares**

Applications are subject to the terms of this Memorandum, the Memorandum of Association and Articles of the Fund, the accompanying Subscription Documents and the Master Fund Partnership Agreement.

Only Eligible Investors may subscribe for Shares. Shares may only be issued in the names of companies, partnerships or individuals.  Further, Shares purchased for those under 18 years of age must be registered in the name of the parent or legal guardian.

Application must be made in the form of the accompanying Subscription Documents, which should be sent to the Administrator at the address or facsimile number set forth in the Subscription Documents.

Where applications are made by facsimile, the original written form should be forwarded without delay to the Administrator.  Shares will not be issued until the original Subscription Documents and all other relevant due diligence documents have been received by the Administrator.

Shares will be issued to two decimal places and any smaller fractions of a Share that would otherwise arise will be rounded down, with the relevant subscription monies being retained for the benefit of the Fund.

Any application may be rejected or scaled down in the absolute discretion of the Directors. Where applications are scaled down or rejected, subscription monies received by the Fund will be returned to the account from where the monies were initially remitted, without interest.

**Form of Shareholding**

Shares will be held in registered form.  Share certificates will generally not be issued nor will any other documentation be issued, other than confirmation notices.  Confirmation notices will include a Shareholder Identification number and details of the Shares that have been allotted. However, confirmation notices will be sent to subscribers only after approval of their

Subscription Documents and satisfactory completion of due diligence.  Share certificates will only be issued if an investor can demonstrate to the Directors or any authorised agent of the Fund that he is legally required to hold certificated shares.  Certificates will be issued in registered form only.  If a valid request for share certificates is made, certificates representing Shares will normally be dispatched at the applicant's risk within 28 days to the address specified in the Subscription Documents.  Temporary certificates of title will not be issued.

### *REDEMPTION OF SHARES*

**General**

Series A Shares and Series B Shares may be redeemed on any Redemption Day at the Redemption Price; provided that partial redemptions may be made only in minimum amounts of US$100,000.

If a holder of Series A Shares or Series B Shares requests a redemption that would cause its total investment in the Series A Shares or Series B Shares to fall below a minimum of US$100,000, such shareholder will be required by the Investment Manager to redeem all of its Series A Shares or Series B Shares.

Shareholders wishing to redeem their Series A Shares or Series B Shares should deliver an executed Redemption Request to the Administrator, at the address specified in the Redemption Request.  The completed Redemption Request must be actually received by the Administrator no later than the 30th calendar day before the Redemption Day on which the redemption is to be effected, and if received thereafter will be held over and dealt with on the next Redemption Day. The Directors may provide for a redemption notice period of less than 30 calendar days in a particular case or generally if, in their discretion, they determine that, under the circumstances, to waive such requirement will not have an adverse effect on the Master Fund's portfolio.  In no event, however, will redemption requests be accepted for processing as of a particular Redemption Day if the Redemption Form is received by the Administrator after 5 pm (Cayman Islands time) on such Redemption Day.

The Redemption Request may be delivered to the Administrator by facsimile, so long as the original Redemption Request is immediately forwarded to the Administrator. None of the Fund, the Directors, the Administrator or any other agents of the Fund accepts any responsibility for any errors in facsimile transmissions.  Where a Redemption Request is forwarded by facsimile, no redemption proceeds will be paid to the Shareholder until the original Redemption Request for the Shares being redeemed has been received by the Administrator.

Cayman Islands law imposes certain restrictions on the redemption of Shares, particularly where the Fund is not funding such redemption out of profits or the proceeds of fresh issues of Shares made for the purposes of redemption.  In particular, any redemption payment out of capital will only be possible if the Fund remains able to pay its debts as they fall due in the ordinary course of business after such redemption payment is made out of capital.

The Fund, or the Administrator on its behalf, also reserves the right to refuse to make any redemption payment or distribution to a Shareholder if any of the Directors of the Fund or the

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 69 of 200   PageID 51516
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 234 of
324

Administrator suspects or is advised that the payment of any redemption or distribution moneys to such Shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, its Directors or the Administrator with any such laws or regulations in any relevant jurisdiction.

Once given, a Redemption Request may not be revoked by the Shareholder save where determination of the Net Asset Value is suspended by the Directors in the circumstances set out below or except as otherwise agreed by the Directors.

Notwithstanding anything herein to the contrary, the Special Limited Partner may, unless prohibited by law, make withdrawals of all or any part of its Performance Allocation and gains thereon from its capital account in the Master Fund as of any Redemption Day.

On giving at least 30 calendar days' notice to Shareholders, the Directors may amend the frequency of redemptions, provided that such change shall only take effect following the Redemption Day next succeeding such notice.

Should any violation of any of the Master Fund's investment limitations fail to be remedied on or before the Remedy Date, any Shareholder may redeem all or part of its Shares on the next Redemption Day and will not be subject to any early redemption fee, provided that such Shareholder has requested such a redemption in writing within 30 Business Days after the Remedy Date.  See "Investment Restrictions."

**Soft Lock-Up Period and Early Redemption Fee**

Any Shareholder who redeems Series B Shares prior to the first anniversary of its purchase of such Series B Shares may be assessed an early redemption fee of up to 3% of the Net Asset Value per Series B Share prevailing at the close of business of such Redemption Day, payable to the Fund.  For purposes hereof, an anniversary shall occur on the 365th consecutive day (counting the closing date as the first day) or, if such 365th day is not a Business Day, the immediately preceding Business Day.

**Redemption Proceeds**

At redemption, Shareholders will be paid the Redemption Price, which is calculated in accordance with the Articles and is based on the Net Asset Value per Share on the applicable Redemption Day.

The Redemption Price will be paid in U.S. Dollars by electronic transfer at the request and expense of the redeeming Shareholder usually within 10 Business Days of the relevant Redemption Day.

The Fund aims to effect the payment of all redemption proceeds in cash.  However, the Directors under circumstances of low liquidity or adverse market conditions may elect to effect the payment of the redemptions in assets of the Fund (received from the Master Fund).   No Investment will be transferred to a Shareholder unless the Directors are satisfied that:

(i)     the value of the investments to be transferred, calculated in accordance with the valuation provisions set out in the Articles and summarized herein, is equal to and does not exceed the Net Asset Value of the Shares to be redeemed less all fiscal duties and charges arising in connection with the vesting of such Investments in the Shareholder; and

(ii)    the terms of any such transfer do not materially prejudice the interests of the remaining Shareholders.

Investments may be transferred directly to the redeeming Shareholder or may be transferred to a liquidating account and sold by the Fund for the benefit of the redeeming Shareholder, in which case payment of that proportion of the Redemption Price attributable to such investments will be delayed until such Investments are sold and the amount payable in respect of such Investments will depend on the performance of such Investments through to the date on which they are sold. The cost of operating the liquidating account and selling the Investment(s) will be deducted from the proceeds of sale paid to the redeeming Shareholder.

**Compulsory Redemption**

Shareholders are required to notify the Fund and the Administrator immediately in the event that they cease to be Eligible Investors whereupon they may be required to, and the Fund shall be entitled to redeem their Shares at the Net Asset Value per Share as at the next Redemption Day succeeding the date of such notification.  The Fund reserves the right to redeem any Shares that are or become owned, directly or indirectly, by or for the benefit of any person who is not an Eligible Investor.

Further, the Fund shall be entitled, with or without cause, by notice in writing to the Shareholders being redeemed, to redeem all or any Shares on any day designated by the Directors, provided that any such Redemption Day shall be not less than 7 days from the date of such notice (or immediately if the Fund, in its sole discretion, determines that such Shareholder's continued investment in the Fund may cause the Fund, the Master Fund, the Master Fund General Partner or the Investment Manager to violate any applicable law).

For the avoidance of doubt, no early redemption fee will apply in the event of a compulsory redemption.

***DETERMINATION OF NET ASSET VALUE***

The Net Asset Value of each Series and the Net Asset Value per Share will be calculated, based on the calculation of the Master Fund's assets, by the Administrator as of the close of business on each Valuation Day in accordance with the valuation policies of the Investment Manager in effect from time to time, as summarized below, a copy of which will be made available upon request.  The Net Asset Value of a Share of the relevant Series will be calculated by dividing the assets of the Fund attributable to the Series to which such Share belongs, less the liabilities attributable to such Series, by the number of Shares of such Series in issue.

The value of the assets of the Fund will be determined on the accrual basis of accounting using IFRS (except for amortization of organizational costs) as a guideline, unless otherwise deemed appropriate in the discretion of the Directors, and in accordance with the principles set out in the Articles and summarized below.

**Assets**

The assets of the Fund shall be deemed to include, without limitation, (1) all cash on hand or on deposit, including any interest accrued thereon, (2) all bills and demand notes and accounts receivable (including proceeds of investments and other assets sold but not delivered), (3) all investments and other assets owned or contracted for by the Fund (through the Master Fund), (4) all dividends and distributions payable in stock, cash or other property receivable by the Fund (through the Master Fund), provided that the Administrator may make adjustments with respect to fluctuations in the market value of investments caused by trading ex-dividend or ex-rights or by similar practices, (5) all interest accrued on any interest-bearing instruments owned by the Fund (through the Master Fund), except to the extent that the same is included or reflected in the valuation of such instruments, and (6) all other assets of every kind and nature, including prepaid expenses (it being understood that goodwill shall be deemed to have no value).

**Liabilities**

The liabilities of the Fund shall be deemed to include, without limitation, (1) all loans, bills and accounts payable, (2) all accrued or payable expenses and fees chargeable to the Fund including dividends declared but unpaid and amortized organizational expenses (provided that expenses of a regular or recurring nature may be calculated on an estimated figure for yearly or other periods in advance and accrued over any such period) and accrued Management Fees and Performance Allocations (each borne at the Master Fund level), (3) its *pro rata* portion of gross acquisition cost of Investments and other property contracted to be purchased by the Master Fund, (4) such sum (if any) as the Directors consider appropriate to allow for brokerage, stamp duty and any other governmental tax or charges, (5) dividends declared on the Shares, but not yet paid, and (6) all other liabilities, including unknown or unfixed contingencies and such reserves as the Directors may reasonably deem advisable.

**Valuations**

Positions in Investments held by the Master Fund shall be valued in accordance with the valuation policies of the Investment Manager, as amended from time to time, a copy of which will be provided upon request.

Values of assets expressed in a currency other than U.S. Dollars will be converted into U.S. Dollars at the latest available exchange rate.

The Administrator will notify the Exchange, immediately upon calculation, of the Net Asset Value per Share on each Valuation Day.

### *TEMPORARY SUSPENSION OF DEALINGS*

The Directors may, at any time, suspend (i) the calculation of Net Asset Value of the Shares (and the applicable Valuation Day); (ii) the issuance of Shares; (iii) the redemption by Shareholders of Shares (and the applicable Redemption Day); and/or (iv) the payment of redemption proceeds (even if the Valuation Days and Redemption Days are not postponed) (each, a "Suspension") during any period which:

(a)     any stock exchange on which a substantial part of Investments owned by the Fund (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended;

(b)     there exists any state of affairs as a result of which (i) disposal of a substantial part of the Investments owned by the Fund (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Shareholders or (ii) it is not reasonably practicable for the Fund fairly to determine the value of its net assets;

(c)     none of the Redemption Requests which have been made may lawfully be satisfied by the Fund in U.S. Dollars;

(d)     there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the Investments of the Fund (through the Master Fund);

(e)     in the sole discretion of the Directors, it is necessary to preserve the Fund's assets; or

(f)     automatically upon any suspension of withdrawals by the Master Fund for similar reasons.

During such period, the valuation, sale, purchase and redemption of Shares will be suspended. The Administrator will promptly notify each Shareholder who has submitted a Redemption Request and to whom payment in full of the amount being redeemed has not yet been remitted of any Suspension of redemptions or Suspension of the payment of redemption proceeds. Any remaining amount of a Redemption Request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully withdrawn. Such Shareholders will not be given any priority with respect to the redemption of Shares after the cause for such Suspension or limitation ceases to exist. The Directors may in their sole discretion, however, permit such Shareholders to withdraw their Redemption Requests to the extent that the relevant Redemption Day has not yet passed. For the avoidance of doubt, where a Suspension of the payment of redemption proceeds is declared between the relevant Redemption Day and the remittance of such payment proceeds, affected Shareholders shall not have any right to withdraw their Redemption Requests. Upon the reasonable determination by the Directors that conditions leading to a Suspension no longer apply, the Administrator will notify the Shareholders of the end of the Suspension. At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, redemption rights shall be promptly reinstated and any pending Redemption Requests which were not withdrawn (or new,

timely Redemption Requests) will be effected as of the first Redemption Day following the removal of the Suspension, subject to the foregoing restrictions on redemptions.

In addition, the Directors have the right to postpone the calculation of the Net Asset Value date up to one Business Day without the requirement to give notice to Shareholders when, in the opinion of the Directors, a significant proportion of the assets (which is five percent or more) of the Fund cannot be valued on an equitable basis and such difficulty is expected by the Directors to be overcome within that period.

### *TRANSFER OF SHARES*

Shares may not be transferred without the prior written consent of the Directors, which consent may be withheld by the Directors in their absolute discretion.  Furthermore, transfers of Shares may only be conducted in accordance with the anti-money laundering policies and procedures of the Administrator.  A transferee will be required to complete the Subscription Documents and will be subject to the requirements set forth for Eligible Investors in the Fund.

# FINANCIAL INFORMATION AND REPORTS

## *FISCAL YEAR*

The fiscal year of the Fund ends on December 31 of each year.

## *FISCAL PERIODS*

Since Shares may be issued and redeemed, and dividends may be declared on Shares, during the course of a fiscal year, the Fund's Articles of Association provide for fiscal periods, which are portions of a fiscal year, for the purpose of allocating net profits and net losses to the records maintained for each Series.  A new fiscal period will commence on the date next following the date of any redemption of Shares, the date of any issuance of Shares and the date established by the Directors for determining the record ownership of Shares of any Series for the payment of dividends, and the prior fiscal period will terminate on the date immediately preceding the first day of a new fiscal period.

## *FINANCIAL STATEMENTS*

The Fund's financial statements will be prepared using IFRS as a guideline, unless otherwise deemed appropriate in the sole discretion of the Directors.  The books and records of the Fund will be audited at the end of each fiscal year by auditors selected by the Directors.

As a regulated mutual fund, the Fund is required to file copies of its audited financial statements with the Monetary Authority within 180 days of the end of each financial year.

## *AUDITORS*

PricewaterhouseCoopers LLP are the auditors for the Fund and have consented in writing to their appointment as auditors of the Fund and to all references to them as such in this Memorandum. The Directors may replace the auditors without prior notice to the Shareholders.

## *REPORTS TO SHAREHOLDERS*

Each year, Shareholders will be sent audited financial statements of the Fund within 120 days of the end of the year (or as soon as practicable thereafter) including a statement of profit or loss for such fiscal year and of an unaudited status of such Shareholder's holdings in the Fund at such time.  Shareholders will also receive, upon making a request to the Administrator, copies of semi-annual financial statements of the Fund.  In addition, the Net Asset Value of the Fund's listed Shares will be notified to the Exchange monthly and these net asset valuations are available to subscribers to the Reuters network.

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 75 of 200   PageID 51522
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 240 of
324

# TAXATION

***GENERAL***

The following is a general discussion of certain of the anticipated income tax considerations relevant to Non-U.S. Shareholders (as defined below) and to certain Tax-Exempt U.S. Shareholders (as defined below) arising from the purchase, ownership and disposition of Shares. Prospective investors should consult their own tax advisors to determine the application and effect of tax laws with respect to their own particular circumstances. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations (the "Treasury Regulations") promulgated thereunder in force on the date of this Memorandum, and administrative and judicial interpretations thereof, all as currently in effect, all of which may change or be subject to different interpretations, possibly with retroactive effect. The Fund does not intend to seek a ruling from the Service, or any similar state or local authority, with respect to any of the tax issues affecting the Fund.

In view of the number of different jurisdictions where local laws may apply to Shareholders, the discussion below does not address all the tax consequences to potential investors of the purchase, ownership, and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries, jurisdictions in which they conduct business and jurisdictions in which they hold Shares. This discussion does not constitute tax advice.

This summary does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Shares as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. Dollar or (iv) persons that do not hold Shares as capital assets within the meaning of Code Section 1221.

If a partnership holds Shares, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

This summary assumes that only persons that are *not* "United States persons" as defined in Code Section 7701(a)(30) (such investors, "Non-U.S. Shareholders") and organizations that are exempt from U.S. federal income tax under Section 501(a) of the Code (such investors, "Tax-Exempt U.S. Shareholders") will invest in the Fund.

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 76 of 200   PageID 51523
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 241 of
324

The summary assumes that no U.S. taxable investors will invest in the Fund and, therefore, does not address the U.S. tax consequences to such investors. Potential U.S. taxable investors should be aware that the Fund is expected to be a passive foreign investment company for U.S. federal income tax purposes (a "PFIC") and does not intend to provide information to any U.S. person for purposes of such person qualifying to make an election to treat the Fund as a "qualifying electing fund" ("QEF") for U.S. federal income tax purposes. Accordingly, potential U.S. investors are urged to consult their own tax advisors in this regard.

Unless the context indicates otherwise, the activities and tax items of the Fund will include the activities of the Master Fund, and the Fund's distributive share of the Master Fund's tax items, as applicable.

EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT ITS TAX ADVISOR IN ORDER TO FULLY UNDERSTAND THE U.S. FEDERAL, STATE, LOCAL AND/OR NON-U.S. TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

### *UNITED STATES*

### Classification and Taxation of the Fund and the Master Fund

The Fund is expected to be treated as a non-U.S. corporation for U.S. federal income tax purposes. The Master Fund is expected to be treated as a partnership, and not as an association taxable as a corporation, for U.S. federal income tax purposes. The following discussion assumes that, for U.S. federal income tax purposes, the Fund will be treated as a non-U.S. corporation and the Master Fund will be treated as a partnership.

As a non-U.S. corporation, the U.S. federal income tax treatment of the Fund will vary depending on whether the Fund derives income or gains that are treated as effectively connected with the conduct of a trade or business in the United States. It is intended that the Fund's affairs will generally be conducted in a manner such that no income realized by the Fund is expected to be effectively connected with the conduct of a U.S. trade or business or otherwise subject to regular U.S. federal income taxation on a net basis. As a result, it is anticipated that no gains realized by the Fund (other than gains, if any, realized on the disposition of U.S. real property interests) will be subject to U.S. federal income taxation, but generally dividends, dividend equivalent amounts and certain interest income from U.S. sources will be subject to U.S. federal withholding tax as discussed further below.

In general, under Section 881 of the Code, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to withholding tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business. Income subject to such a flat tax rate is of a fixed or determinable annual or periodical nature, including dividends and certain interest income. Therefore, to the extent that the Fund receives dividend income (including "dividend equivalent" income under Section 871(m) of the Code) through the Master Fund from U.S. sources, the Fund will be subject to U.S. withholding tax at a 30% rate. U.S. source interest income received by the Fund through the Master Fund generally will be exempt from U.S. federal income and withholding tax to the extent such interest qualifies as "portfolio interest," or qualifies under another statutory

exemption.  Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto).  In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to withholding tax.  Interest (including original issue discount) derived by the Fund or the Master Fund from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%.  Capital gains from the sale of stock or other capital assets such as commodities generally are not subject to U.S. withholding tax.

**Taxation of Non-U.S. Shareholders**

For U.S. federal income tax purposes, a Non-U.S. Shareholder will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of the Shares or gains recognized on the sale, exchange or redemption of the Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the Shareholder in the United States.  In limited circumstances, an individual Non-U.S. Shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of the Shares in such year.  Individual Shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of the Shares, to any U.S. federal gift or estate taxes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, PFICs, foreign insurance companies that hold the Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax.  Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of the Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of the Shares held by such Shareholder unless such Shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding.  Backup withholding is not an additional tax.  Rather, the U.S. federal income tax liability of non-U.S. persons subject to backup withholding will be reduced by the amount of tax withheld.  If backup withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are timely filed with the Service.

**Taxation of Tax-Exempt U.S. Shareholders**

Tax-Exempt U.S. Shareholders are subject to U.S. tax on their "unrelated business taxable income" ("UBTI") as defined in Section 512 of the Code.  UBTI is generally the excess of gross income from any unrelated trade or business conducted by a tax-exempt entity over the

deductions attributable to such trade or business, with certain modifications.   These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt financed income" within the meaning of Section 514 of the Code and the Treasury Regulations, and certain other requirements are met.  Income that a Tax-Exempt U.S. Shareholder derives from an investment in the Shares generally should not give rise to UBTI, except to the extent that such Shareholder's acquisition of the Shares is debt financed.

The Fund expects to be classified as a PFIC for U.S. federal income tax purposes. Under the Treasury Regulations, a U.S. tax-exempt entity is generally not subject to the PFIC rules, except to the extent that a "dividend" from such PFIC would be taxable as income under subchapter F of the Code, for example, as unrelated debt-financed income.  Hence, a tax-exempt entity would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of, the interests of a PFIC in only limited circumstances. Additionally, the Treasury Regulations provide that a tax-exempt entity that is not taxable under the PFIC rules may not make a QEF election under Section 1295 of the Code and the Fund will not provide any QEF information to investors.  Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts.  Accordingly, potential Tax-Exempt U.S. Shareholders are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective Tax-Exempt U.S. Shareholders are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the Shares.**

**Information Reporting Requirements**

A U.S. person, within the meaning of the Code, (including in certain circumstances a Tax-Exempt U.S. Shareholder) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service.  In the event a U.S. Shareholder fails to file any required form, such Shareholder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

Under the Treasury Regulations, a U.S. person, within the meaning of the Code (including a Tax-Exempt U.S. Shareholder), owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the interests of a non-U.S. entity that is treated as a non-U.S. corporation for U.S. federal income tax purposes, such as the Fund, or whose ownership interest changes by a statutorily specified amount, may be required to file an information return with the Service containing certain disclosures concerning the filing shareholder, other U.S. shareholders and the non-U.S. entity.  The Fund has not committed to provide all of the information about the Fund or its Shareholders necessary to complete such an information return.  Prospective investors should consult their tax advisors about such information return filing requirements.

Certain U.S. Persons are required to file FinCEN Form 114 with the Service with respect to financial interests in foreign financial accounts held by such U.S. Persons during the previous

calendar year if the aggregate value of such accounts exceeds $10,000 at any time during the calendar year.  Significant penalties may apply in respect of the failure to file FinCEN Form 114 in respect of foreign financial accounts.  Thus, potential Tax-Exempt U.S. Shareholders should consult their tax advisors as to whether to file FinCEN Form 114 in respect of ownership of Shares.

**Investor Tax Filings and Record Retention.**

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions.  In general, these Treasury Regulations require investors in specified transactions (including certain shareholders in foreign corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements.  Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules.  Investors should consult their own tax advisors in this regard.

**Reporting Under FATCA**

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("IGA") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "FATCA") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("FFI"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution.  In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners.  These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance.  In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "Cayman-U.S. IGA"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014, and guidance notes thereunder, each as updated from time to time.

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 80 of 200   PageID 51527
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 245 of
324

Both the Fund and the Master Fund are likely to be considered FFIs.  In order to avoid incurring U.S. withholding under FATCA, the Master Fund and the Fund each are generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Fund has registered with the Service and the Master Fund intends to register with the Service, and expect that they will be required to identify and report on certain direct and indirect U.S. owners in order to comply with the Cayman-U.S. IGA.  Therefore, the Fund and the Master Fund generally do not expect to become subject to U.S. withholding under FATCA.  An investor may be required to provide to the Fund information which identifies its direct and indirect ownership.  Any such information provided to the Fund may ultimately be shared with the Cayman Islands Tax Information Agency ("Cayman TIA") and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

By investing (or continuing to invest) in the Fund (and indirectly invest in the Master Fund), investors shall be deemed to have acknowledged, and to have given their consent to, the following:

(i)     the Fund (or its agent) may be required to disclose to the Cayman TIA and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, date of birth, tax identification number (if any), social security or national insurance number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii)    the Cayman TIA may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities, and the Master Fund or the Fund (or its agents) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii)   in the event an investor's failure to comply with any FATCA related reporting requirements gives rise to any withholding tax, the Fund reserves the right to ensure that any such withholding tax and any related cost, interest, penalties and other losses or liabilities suffered by the Fund, the Master Fund, the Master Fund General Partner, the Administrator or any other investor, or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv)    in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Master Fund's) satisfaction of its FATCA related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Master Fund) or its investors being subject to U.S. withholding under FATCA, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of

the investor's failure to comply with the requirements described above, including compulsory redemption or withdrawal of the investor concerned; and

(v)     no investor affected by any such action or remedy shall have any claim against the Fund, the Master Fund, the Master Fund General Partner, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

**Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Shares.**

## *CAYMAN ISLANDS*

### Fund Level

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the Shareholders.  The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (Revised) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

### Shareholder Level

Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands, with respect to the Shares owned by them and dividends received on such Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands.

## *OTHER JURISDICTIONS*

It is possible that certain dividends, interest and other income received by the Fund from sources within certain countries will be subject to withholding taxes imposed by such countries.  In addition, the Fund may also be subject to capital gains taxes or other taxes in some of the countries where it purchases and sells securities or otherwise conducts business.  It is impossible to predict the rate of tax that the Fund will pay in advance since the amount of the Fund's assets to be invested in various countries is not known.

# ERISA CONSIDERATIONS

*GENERAL*

Fiduciaries and other persons who are proposing to purchase Shares on behalf of retirement plans, investment retirement accounts ("IRAs") and other employee benefit plans ("Plans") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the Code, must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Shareholders to redeem all or any part of their Shares or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

*PLAN ASSET REGULATIONS AND BENEFIT PLAN INVESTORS*

The United States Department of Labor ("DOL") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("Plan Assets"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "significant participation test"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "Plan Asset Entity").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 83 of 200   PageID 51530
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 248 of
324

of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the Master Fund General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the compulsory redemption of Shares. Each Shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Shares the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "Maximum Percentage") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations. In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA. As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

### *REPRESENTATION BY PLANS*

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions

of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

## INELIGIBLE PURCHASERS

Shares may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

## PLANS' REPORTING OBLIGATIONS

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

***Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.***

# GENERAL

## *DIRECTORS' REPORT*

As at the date of this Memorandum, the Fund has not, nor has it since its date of incorporation, declared any dividends. The Fund does not have, nor has it had since its incorporation, and is not expected to have, any employees.

The Fund is not, nor has it been, engaged in any legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Fund is aware) which may have or have had since its incorporation a significant effect on its financial position.

As at the date of this Memorandum, the Fund has not issued any debt securities, incurred any other indebtedness or borrowings or granted any mortgages, charges, guarantees or other contingent liabilities.

## *MATERIAL CONTRACTS*

The following contracts, which are summarized in the Section "Management and Administration" above, have been entered into and are, or may be, material:

(i)     Investment Management Agreement among the Feeder Funds, the Master Fund, the Master Fund General Partner and the Investment Manager pursuant to which the Investment Manager was appointed to provide certain investment management services to the Feeder Funds and the Master Fund; and

(ii)    Administration Agreement between the Master Fund and the Administrator pursuant to which the Administrator was appointed administrator and registrar and transfer agent of the Feeder Funds and the Master Fund.

(iii)   Services Agreement between the Investment Manager and Highland Latin America pursuant to which Highland Latin America was appointed to provide certain administrative and consulting services to the Investment Manager.

## *DOCUMENTS AVAILABLE FOR INSPECTION*

The following documents are available for inspection and copies may be obtained free of charge during the normal business hours, on weekdays (Saturdays, Sundays and public holidays excepted) at the registered office of the Fund:

(a)     the Memorandum of Association and Articles of the Fund;

(b)     the Companies Law (Revised) and the Mutual Funds Law (Revised) of the Cayman Islands;

(c)     the Material Contracts referred to above; and

(d)     the Master Fund Partnership Agreement.

The statutory records of the Fund are kept at its registered office, which is located at:

Maples Corporate Services Limited
P.O. Box 309
Ugland House
Grand Cayman KY1-1104
Cayman Islands

The offices of the Sponsor are located at:

Ogier Corporate Finance Limited
44 Esplanade, St. Helier
Jersey JE4 9WG
Channel Islands

### *INQUIRIES*

Inquiries concerning the Fund and this offering (including information concerning subscription procedures) should be directed to:

MUFG Fund Services (Cayman) Limited
2nd Floor Strathvale House
90 North Church Street
P.O. Box 609
Grand Cayman KY1-1107
Cayman Islands
Facsimile: (345) 745 7690
Telephone: (345) 745 7600
Email: investorserviceshalifax@mfsadmin.com

Memorandum Number _____

# Confidential Private Placement Memorandum

*Series A Interests*
*Series B Interests*
*Series C Interests*
*in*

# Highland Argentina Regional Opportunity Fund, L.P.

*General Partner*

## Highland Argentina Regional Opportunity Fund GP, LLC

*Investment Manager*

## Highland Capital Management Latin America, L.P.

## March 2019

208786464 v12

## <u>TABLE OF CONTENTS</u>

Page

NOTICE...................................................................................................................... ii

DIRECTORY ............................................................................................................ v

EXECUTIVE SUMMARY ........................................................................................1

INVESTMENT PROGRAM ......................................................................................3

MANAGEMENT AND ADMINISTRATION ...........................................................6

SUMMARY OF TERMS .........................................................................................10

THE MASTER FUND .............................................................................................25

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST ......................29

BROKERAGE AND CUSTODY .............................................................................47

TAX CONSIDERATIONS .......................................................................................50

ERISA AND OTHER REGULATORY CONSIDERATIONS ..................................63

Appx. 03872

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 89 of 200   PageID 51536
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 254 of
324

**NOTICE**

This Confidential Private Placement Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors considering the purchase of limited partner interests (the "***Interests***") in Highland Argentina Regional Opportunity Fund, L.P. (the "***Fund***"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Argentina Regional Opportunity Fund GP, LLC (the "***General Partner***"). Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other matters relevant to the suitability of an investment in the Fund for such investor.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws.

The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "***Investment Company Act***"), since Interests will only be sold to persons who are "qualified purchasers," as defined in the Investment Company Act.

Each subscriber for an Interest will be required to certify that it is an "accredited investor" as defined in Regulation D under the Securities Act and a "qualified purchaser," as defined in the Investment Company Act.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "***CFTC***"), Highland Capital Management Latin America, L.P., the investment manager to the Fund (the "***Investment Manager***"), is not registered with the CFTC as a commodity pool operator ("***CPO***") and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the

ii

aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors. The Investment Manager qualifies for an exemption from registration as a commodity trading advisor pursuant to CFTC Rule 4.14(a)(8).

Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program.  The Fund's investment practices, by their nature, may be considered to involve a substantial degree of risk.  See "*Risk Factors and Potential Conflicts of Interest*."  No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom.  The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund, as amended (the "***Partnership Agreement***").  Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner.

The Interests are offered subject to the right of the General Partner to reject any subscription in whole or in part.

This Memorandum is intended solely for the use of the person to whom it has been delivered by the General Partner or its authorized representative for the purpose of evaluating a possible investment by the recipient in the Interests described herein, and is not to be reproduced or distributed to any other persons (other than professional advisors of the prospective investor receiving this Memorandum from the General Partner or its authorized representative).

This Memorandum does not purport to be, and should not be construed as, a complete description of the Partnership Agreement or the investment management agreement by and among the Investment Manager, the General Partner, the Master Fund, the Offshore Fund (each as defined below) and the Fund (the "***Investment Management Agreement***").  Each prospective investor in the Fund is encouraged to review the Partnership Agreement carefully, in addition to consulting appropriate legal and tax advisors.  To the extent of any inconsistency between this Memorandum and the Partnership Agreement, the terms of the Partnership Agreement shall control.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund or Highland Argentina Regional

Appx. 03874

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 91 of 200   PageID 51538
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 256 of
324

Opportunity Master Fund, L.P. (the "**_Master Fund_**") since the date hereof.  An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology.  Due to various risks and uncertainties, including those described in "_Risk Factors and Potential Conflicts of Interest_," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

All references herein to "$" refer to U.S. dollars.  Except as the context otherwise requires, references to the term "Fund" in this Memorandum shall be deemed to include the Master Fund.

Appx. 03875

## DIRECTORY

| | |
|---|---|
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Investment Manager** | Highland Capital Management Latin America, L.P.<br>c/o Highland Capital Management, L.P.<br>300 Crescent Court, Suite 700<br>Dallas, TX 75201 |
| **Administrator** | MUFG Fund Services (Cayman) Limited<br>2nd Floor, Strathvale House<br>90 North Church Street<br>P.O. Box 609<br>Grand Cayman  KY1-1107<br>Cayman Islands |
| **Auditor** | PricewaterhouseCoopers LLP<br>5th Floor Strathvale House<br>P.O. Box 258<br>Grand Cayman  KY1-1104<br>Cayman Islands |
| **Prime Brokers** | Société Générale<br>440 S. LaSalle St., Suite 2400<br>Chicago, IL 60605<br><br>BNP Paribas Prime Brokerage, Inc.<br>787 Seventh Avenue<br>The Equitable Tower<br>New York, NY 10019 |
| **Legal Counsel** | *In the United States:*<br>Akin Gump Strauss Hauer & Feld LLP<br>1700 Pacific Avenue<br>Suite 4100<br>Dallas, TX 75201 |

Appx. 03876

## EXECUTIVE SUMMARY

Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina.

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands. Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "***Investment Manager***" and, together with its affiliates, shareholders, directors, members, partners, officers and employees, the "***Advisory Parties***"), serves as investment manager to the Fund, the Offshore Fund (as defined below) and the Master Fund and manages the Master Fund's investment program. Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "***Principal***").

In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund. References in this Memorandum to the Fund shall include the Master Fund, unless otherwise specified or the context so requires.

The Fund (but not the Master Fund) is seeking subscriptions from investors who qualify as both "accredited investors" and "qualified purchasers" (each as defined in the Fund's subscription materials). The minimum initial investment is $500,000, and thereafter, the minimum subsequent investment is $500,000, although, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests. The Fund generally accepts subscriptions on the first day of each calendar month. A subscriber admitted to the Fund as a limited partner (each, a "***Limited Partner***") will receive, in exchange for its initial capital contribution and any subsequent capital contribution, a limited partner interest representing a proportionate share of the net assets of the Fund at that time.

The Fund intends to issue multiple series of limited partner interests ("***Interests***") over time. Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary. The Fund is currently offering Series A Interests, Series B Interests and Series C Interests pursuant to this Memorandum.

For its services to the Master Fund, the Investment Manager is generally entitled to a management fee (the "***Management Fee***"), which is calculated monthly and paid quarterly in arrears at the Master Fund level. The Management Fee is calculated at an annual rate of (i) 1.75% of each Limited Partner's capital account that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's capital account that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's capital account that is attributable to a Series C Interest.

1

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 94 of 200   PageID 51541
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 259 of
324

In addition, the Investment Manager, in its capacity as the special limited partner of the Master Fund (the "***Special Limited Partner***"), is entitled to a quarterly performance-based profits allocation (the "***Performance Allocation***") at the end of each fiscal quarter.  The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the amount by which the net asset value of each Series A Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series A Interest, if any, (ii) 17.5% of the amount by which the net asset value of each Series B Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series B Interest, if any, and (iii) 15.0% of the amount by which the net asset value of each Series C Interest on the last day of a fiscal quarter exceeds the "high water mark" for such Series C Interest, if any.

Subject to a one-year "soft lock-up" with an early withdrawal reduction attributable to Series B Interests only and a two-year "soft lock-up" with an early withdrawal reduction attributable to Series C Interests only, a Limited Partner is generally permitted to withdraw all or a portion of its Interest on 30 calendar days' prior written notice on the last business day of each calendar month.  Withdrawals may be subject to reserves for contingencies and suspension restrictions as discussed further in this Memorandum.

The Fund may agree with certain Limited Partners to a variation of the terms set forth in this Memorandum or establish additional series of Interests that have terms that differ from those described herein, including, without limitation, different management fees, performance allocations and withdrawal rights.

Appx. 03878

## INVESTMENT PROGRAM

## INVESTMENT OBJECTIVE

The investment objective of the Fund is to maximize the total return of its assets through capital appreciation by investing all of its investable assets in the Master Fund, which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina, and that the Investment Manager believes would provide profitable investment opportunities for the Master Fund.  The Master Fund will invest in a single portfolio of assets and does not currently intend to have a separate portfolio of assets for each of its series, each of which will correspond to a series of limited partner interests in the Fund.

## INVESTMENT STRATEGY

The Master Fund is a multi-strategy investment fund and there is no limit on the investment strategies that may be utilized.  The Investment Manager believes that focusing on a multi-strategy approach will enable the Master Fund to enhance results by compounding returns generated by each strategy and at the same time have the needed flexibility to adjust to potentially changing regulations and market conditions.

The Investment Manager will be focused on identifying assets that are mispriced against similar assets and/or against the Investment Manager's expectations for assets' fair values and market movements, special situations, such as mergers, financial restructurings, hostile takeovers, or leveraged buy-outs.  There is no set allocation among these and any other strategies that the Investment Manager may use.

The Master Fund may hold long and short positions in a wide range of liquid or illiquid fixed income securities including, but not limited to, sovereign and private debt, distressed debt, secured and unsecured debt, structured debt, loans, asset-backed securities and collateralized debt obligations. Furthermore, the Master Fund may invest, both long and short, in a wide range of liquid or illiquid equity-related instruments including, but not limited to, equities, convertible bonds, options, equity-linked notes, preferred shares and warrants, whether or not listed or traded on one or more exchanges.

The Master Fund may hold any of these positions indirectly by entering into swaps, options, futures, forward contracts or similar derivative transactions.

The Master Fund may hold both U.S. dollar and non-U.S. dollar denominated securities.

The Master Fund may leverage its investment portfolio by up to 100% of the Master Fund's net asset value (calculated at the time of investment) by borrowing for investment purposes and by using leverage techniques and products.  It is anticipated that by doing so the performance of the Master Fund will be enhanced.  While the use of the leverage may improve the return on invested capital, leverage may also significantly increase the impact of adverse movement in the value of the Master Fund.

The Master Fund may also utilize hedging strategies in order to maximize returns and reduce the risk to principal or the volatility associated with its holdings.  As part of these hedging strategies, the Master Fund may hedge any of its investments with long or short positions in any financial instrument, which the Investment Manager deems appropriate.  The Master Fund may utilize U.S. and European securities for hedging purposes.

Appx. 03879

The Master Fund may invest through one or more subsidiaries established in an appropriate jurisdiction in order to take advantage of applicable tax treaties or increase the tax efficiency of the Master Fund's investments, or in such other circumstances as the General Partner, in its capacity as the general partner of the Master Fund, following consultation with the Investment Manager, deem appropriate, including compliance with local investment laws.

The Master Fund may maintain assets in cash or cash equivalent instruments, money market funds, repurchase agreements, or other cash management vehicles pending investment, for defensive purposes, to fund withdrawals requested by the limited partners of the Master Fund or otherwise at the discretion of the Investment Manager.  The Master Fund may hold with no limitation U.S. and European AAA fixed income securities for defensive purposes.

**INVESTMENT RESTRICTIONS**

In deploying the investment strategy, the Master Fund will observe the following investment restrictions.  The Master Fund will not at the time of investment:

1. Invest more than 50 percent of its gross assets in its net holdings of equities;

2. Borrow more than 100 percent of its net assets;

3. Invest more than 20 percent of its gross assets in a single equity position;

4. Invest more than 20 percent of its gross assets in a single corporate issuer position;

5. Invest more than 30 percent of its gross assets in a single GDP-linked warrant position; and

6. Invest more than 30 percent of its gross assets in a single sovereign issuer security position; and

7.  Invest more than 30 percent of its gross assets in a single provincial issuer.

If a percentage limitation on investment or use of assets set forth above is adhered to at the time a transaction is effected, later changes in percentage resulting from changing values will not be considered a violation.

In the event that the Investment Manager discovers that a violation of any of the Master Fund's investment limitations has occurred (the date of such discovery being the "***Discovery Date***"), the Investment Manager shall inform the limited partners of the Master Fund, including the Fund, who shall: (i) notify each of their limited partners or shareholders, as applicable, in writing within 30 business days after the Discovery Date of the nature of the violation, the steps taken, or to be taken, to remedy the violation and the reason the violation occurred and (ii) use reasonable commercial efforts to cause the Investment Manager to remedy such violation within 90 business days after the Discovery Date (the "***Remedy Date***").  If such violation has not been remedied on or before the Remedy Date, the limited partners of the Master Fund, including the Fund, shall: (i) notify each of their limited partners or shareholders, as applicable, in writing, 30 business days after the Remedy Date, of the steps taken to remedy the violation and the reason that the violation has not been remedied by the Remedy Date (the "***Remedy Notice***") and (ii) use reasonable commercial efforts to cause the Master Fund's portfolio to be examined by an independent auditor other than PricewaterhouseCoopers LLP and shall request that such independent auditor issue a report to the investors in each of the Master Fund's limited partners as to its

4

Appx. 03880

concurrence or disagreement with the statements in the Remedy Notice.  The Investment Manager shall pay for the costs of such audit and the costs of the Remedy Notice if the violation that was the subject of the Remedy Notice occurred as a result of the Investment Manager's willful misfeasance, bad faith or gross negligence.  In addition, the failure to remedy the violation in a timely manner may give rise to special withdrawal rights.  See "*Summary of Terms – Withdrawals; Lock-Ups*."

## DISTRIBUTION POLICY

The Fund's objective is to maximize capital appreciation and accordingly it is not envisaged that any income or gains derived from the investments made by the Master Fund will be distributed by way of dividend.  This does not preclude the General Partner from declaring a dividend at any time in the future if it considers it appropriate to do so.  To the extent that a dividend may be declared, it will be paid in compliance with any applicable laws.

*The investment objectives and strategies summarized herein represent the Investment Manager's current intentions.  Depending on conditions and trends in the securities markets and the economy in general, the Investment Manager may pursue any strategies, employ any investment techniques or purchase any type of security that it considers appropriate, whether or not described in this section, subject to any applicable law or regulation.  The discussion herein includes and is based upon numerous assumptions and opinions of the Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.  There can be no assurance that the investment strategy of the Master Fund will achieve the intended investment objective.  The Master Fund's investment program is speculative and involves a high degree of risk, including, without limitation, the risk of loss of the entire amount invested.*

5

Appx. 03881

## MANAGEMENT AND ADMINISTRATION

**The General Partner and the Investment Manager**

Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "*General Partner*"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.

Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership (the "*Investment Manager*"), serves as the investment manager of the Fund, the Offshore Fund and the Master Fund and has responsibility for the Master Fund's investment program.

Each of the General Partner and the Investment Manager is ultimately controlled by James D. Dondero (the "*Principal*").

**The Investment Management Agreement**

The Investment Manager was appointed as the investment manager to the Fund, the Offshore Fund and the Master Fund pursuant to an investment management agreement (the "*Investment Management Agreement*"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Master Fund in pursuit of the investment objective and strategy described in this Memorandum. For its services, the Investment Manager is entitled to the Management Fee, as well as reimbursement for any Feeder Fund or Master Fund expenses incurred by the Investment Manager.

The Investment Management Agreement provides that, in the absence of gross negligence, willful misconduct or fraud, each of the Investment Manager, its members, shareholders, partners, managers, directors, any person who controls the Investment Manager, each of the respective affiliates of the foregoing, and each of their respective executors, heirs, assigns, successors and other legal representatives, will be indemnified by the Fund, the Offshore Fund and/or the Master Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.

**Services Agreement**

The Investment Manager engaged Highland Latin America Consulting, Ltd., a Cayman Islands exempted company and a wholly-owned subsidiary of the Investment Manager ("*Highland Latin America*"), pursuant to a services agreement (the "*Services Agreement*") to provide certain administrative and consulting services to the Investment Manager related to its management of the Fund, the Offshore Fund and the Master Fund, including back- and middle-office services; credit analysis; investment vehicle management; valuation; execution and documentation; marketing; reporting; administrative services; and other ancillary services.

The Services Agreement provides that in the absence of bad faith, gross negligence, fraud or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), the Investment Manager will, to the extent permitted by law, indemnify and hold harmless Highland Latin America, any of its affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents against any and all claims, demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities incurred by such person in performing their duties under the Services Agreement. The

Appx. 03882

Fund will not be liable for any consulting services provided by Highland Latin America or any consultants or service providers that Highland Latin America engages, and the Fund will not bear any costs or expenses related to the services provided by Highland Latin America.

**Investment Personnel**

The key investment professionals of the Investment Manager and Highland Latin America who will be responsible for the Master Fund's investments are described below:

***James Dondero, CFA, CMA, President, Co-Founder***. Mr. Dondero is Co-Founder and President of Highland Capital Management, L.P. and a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NYRT), Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

***Gustavo Prilick***. Mr. Prilick is a Managing Partner at Highland Capital Brasil and a registered asset manager in Brazil, and is a Director of Highland Latin America GP, Ltd., the general partner of the Investment Manager. He has extensively worked in several of Highland Capital Brasil's portfolio companies in the US mainly as CEO. Prior to his involvement with Highland Capital Brasil, he was a Partner at South America Fund, a private equity firm, mainly focused on providing financial services to export companies in Argentina and Uruguay. Prior to South America Fund, he was the Chief Operating Officer of Millicom International Cellular for 7 years, serving Latin America, Asia, Africa and ten operations in Russia. Prior to Millicom, he served as the Director of International Business for Oracle Corporation where he was responsible for the establishment of most of Oracle's International Subsidiaries on several continents, including the Brazilian operation. Later he became President of Oracle South America with oversight of several countries in South America. He also served as CEO of Nacion Factoring, a subsidiary of Banco Nacion in Argentina building its operations to reach one of the leading positions in the country. Mr. Prilick received an MBA from the Stanford University Graduate School of Business and a degree in Electrical Engineering from Universidad de Buenos Aires. He has also held teaching positions as a visiting professor in several leading Business Schools in Argentina.

Highland Latin America will enter into relationships and agreements with Argentine relevant parties and/or individuals to obtain supporting services for the management of the Fund, the Offshore Fund and the Master Fund, and will enter into consulting agreements with Andrés Pitchón, Julieta Prieto and Javier Casabal pursuant to which these consultants will provide investment and related services to the Feeder Funds and the Master Fund. Mr. Pitchón will provide portfolio management services to the Master Fund under the overall supervision of the Investment Manager.

*Andrés Pitchón*. Mr. Pitchón, through a consulting arrangement with Highland Latin America Consulting, Ltd., provides portfolio management services to the Master Fund.  Mr. Pitchón began his career in 1993 as Head of Equity Research for Argentina for MBA-Salomon Brothers and later he also became responsible for Fixed income. As Head of the Research Department, his work was recognized by international publications such as Institutional Investor, Latin Finance, The Reuters Survey and The Greenwich Survey. Since 1997 and 1999, he has managed the Offshore Fund's equity and fixed income mutual funds. Since 2003, Mr. Pitchón had been Senior Portfolio Manager of the Offshore Fund's hedge funds. Mr. Pitchón received a BA degree in IT, focused on Business Administration from the University of Belgrano (1989), together with an academic merit medal for highest GPA in the School of Technology. Mr. Pitchón also received a Master's degree in Business Administration from Anderson Graduate School of Business at UCLA in 1992.

**The Administrator**

The Master Fund has entered into an Administration Agreement (the "***Administration Agreement***") with MUFG Fund Services (Cayman) Limited (the "***Administrator***") pursuant to which the Administrator performs certain administrative and accounting services for the Feeder Funds and the Master Fund, subject to the oversight and control of the General Partner, in its capacity as the general partner of the Master Fund.

Pursuant to the Administration Agreement, the Administrator is responsible, under the overall supervision of the General Partner, in its capacity as the general partner of the Master Fund, for certain matters pertaining to the administration for the Fund, including: (i) maintaining the accounts of the Fund and the Master Fund, (ii) calculating the Master Fund's net asset value, (iii) maintaining the principal corporate records of the Fund and the Master Fund, (iv) communicating with Limited Partners, (v) accepting the subscriptions of new Limited Partners, (vi) effecting withdrawals of Interests, (vii) maintaining the register of sub-fund investments, (viii) executing sub-fund subscriptions and withdrawals as instructed by the Fund, and (ix) ensuring compliance with applicable law and regulation (including anti-money laundering regulations).  For its services, the Administrator receives a fee from the Master Fund.

The Administration Agreement may be terminated by the Administrator or the Master Fund upon ninety (90) days' written notice or, under certain circumstances, shorter notice.  In such event, the Master Fund may enter into a new agreement with a new administrator on behalf of the Master Fund and the Feeder Funds, in its discretion and on such terms as it deems advisable, without prior notice to, or approval of, investors.

Under the Administration Agreement, the Master Fund agrees to indemnify and hold harmless the Administrator and its affiliated persons and delegates, as well as their respective officers, directors, employees and agents for, and to defend and hold each such person harmless from, any and all taxes, claims, demands, actions, suits, judgments, liabilities, losses, damages, costs, charges, counsel fees (on a solicitor and his own client basis), fines, assessments, amounts paid in settlement and expenses imposed on, incurred by, or asserted against the person which may arise out of or in connection with the Administration Agreement.  The Administrator or any other indemnified person will not be indemnified for their own gross negligence, wilful default or fraud.

The Administrator is not responsible for valuing the Master Fund's investments, monitoring any investment restrictions of the Master Fund, determining compliance by the Master Fund with its investment restrictions, the Master Fund's trading activities, the management or performance of the

Appx. 03884

Master Fund or the accuracy or adequacy of this Memorandum.  In addition, the Administrator does not assume any liability to any person or entity, including Limited Partners, except as specifically provided in the Administration Agreement.  The Administrator may delegate certain services and share information concerning the Fund and its Limited Partners with its various non-United States affiliates subject to applicable confidentiality provisions.

**The Administrator has no responsibility with respect to trading activities, the Investment Manager, the management or performance of the Master Fund, or the accuracy or adequacy of this Memorandum**.

Appx. 03885

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms governing an investment in the Fund, and is subject, and qualified in its entirety by reference, to the Partnership Agreement, the exempted limited partnership agreement of the Master Fund, as amended (the "**Master Fund Partnership Agreement**"), and the Fund's subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement, the Master Fund Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements.  Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | Highland Argentina Regional Opportunity Fund, L.P., a Delaware limited partnership (the "***Fund***"), primarily seeks to maximize the total return of its assets through capital appreciation by investing all of its investable assets in Highland Argentina Regional Opportunity Master Fund, L.P., a Cayman Islands exempted limited partnership (the "***Master Fund***"), which intends to hold primarily a portfolio of investments in securities of Latin American corporate and sovereign issuers as well as non-Latin American issuers that derive a portion of their revenues from business activities in Latin America, in each case with a primary focus on Argentina. |
| **General Partner** | Highland Argentina Regional Opportunity Fund GP, LLC, a Delaware limited liability company (the "***General Partner***"), acts as the general partner of the Fund and the Master Fund and is registered as a foreign company in the Cayman Islands.  James D. Dondero (the "***Principal***") ultimately controls the General Partner. |
| **Investment Manager** | Highland Capital Management Latin America, L.P., a Cayman Islands exempted limited partnership controlled by the Principal (the "***Investment Manager***"), serves as investment manager to the Feeder Funds (as defined below) and the Master Fund and has responsibility for the Master Fund's investments. |
| **Master-Feeder Structure** | In order to facilitate investments by non-U.S. and certain U.S. tax-exempt investors, the Investment Manager and its affiliates recently assumed the management of an existing investment fund, Highland Argentina Regional Opportunity Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***" and, together with the Fund, the "***Feeder Funds***"). The Feeder Funds will place all of their investable assets in, and conduct all of their investment and trading activities in parallel through, the Master Fund.  Accordingly, references herein to the investment activity of the Fund should be construed to refer to the Fund's investment activities through the Master Fund.  The Feeder Funds share all items of profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund.  Except as the context otherwise requires, the term "Fund" also includes the Master Fund. |

Appx. 03886

|                     | The Investment Manager or an affiliate may also sponsor one or more additional investment funds or accounts. |
|---------------------|---|

**Eligible Investors**

Limited partner interests ("*Interests*") may be purchased only by investors who qualify as both "accredited investors" and "qualified purchasers," each as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Series of Interests**

The Fund intends to issue multiple series of Interests over time. Not all series of Interests will be available for subscription at the same time and the terms among the series of Interests will vary. Each series will have separate rights and preferences, including, without limitation, with respect to fees and withdrawal rights. The Fund is currently offering Series A Interests, Series B Interests and Series C Interests (each, a "*Series*").

New series of Interests may be established by the General Partner without notice to or approval of the Limited Partners (defined below). References herein to "Interests" or "Limited Partners" shall include all Series and Limited Partners unless otherwise specified or context so requires.

**Subscriptions**

Subscriptions for Interests may be accepted as of the first day of each calendar month and/or such other days as the General Partner may determine in its discretion from time to time, generally subject to the receipt of cleared funds no later than the Business Day immediately preceding the acceptance date. The initial minimum investment is $500,000, and thereafter, a Limited Partner may make additional investments, with the consent of the General Partner, in increments of not less than $500,000; provided that, in each case, the Fund may accept investments in a lesser amount, but no less than $100,000 with respect to Series B Interests.

"*Business Day*" is defined as any day on which banks in the Cayman Islands, Buenos Aires and New York City are authorized to open for

11

**Appx. 03887**

business or such other days as the General Partner may determine generally, or in any particular case.

A subscriber admitted to the Fund (a "**Limited Partner**") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in this Memorandum and the Subscription Documents.

**Placement Agents**

There will be no sales charge payable by or to the Fund in connection with the offering of Interests.  However, the General Partner and/or the Investment Manager may enter into arrangements with placement agents (which may include its affiliates) to solicit investors in the Fund, and such arrangements may provide for the compensation of such placements agents for their services at the General Partner's and/or the Investment Manager's expense or such placement agents may be paid a portion of the Management Fee.  For the avoidance of doubt, the Fund will not bear any placement agent fees.

Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

**Capital Accounts**

The Fund will maintain a book capital account (a "**Capital Account**"), which may be divided into capital sub-accounts, for the General Partner and each Limited Partner (each, a "**Partner**" and together, the "**Partners**") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss, with each sub-account being maintained as if it were the Capital Account of a separate Partner in order to calculate the Series B Early Withdrawal Reduction and Series C Early Withdrawal Reduction (each as defined below), as applicable, and the Performance Allocation (as defined below) for each capital contribution.  The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner.

If a Partner invests in more than one Series, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the

Capital Account of a separate Partner for purposes of determining the Management Fee (as defined below) and Performance Allocation applicable to each Capital Account.

The Master Fund will issue to the Fund a limited partner interest in the Master Fund and will maintain capital accounts and sub-accounts that correspond to Limited Partners' Capital Accounts in the Fund.

**Affiliated Investors**     The Investment Manager, the General Partner and their respective affiliates, principals, employees, partners, agents, the respective family members of such personnel and trusts and other entities established primarily for their benefit or for charitable purposes ("***Affiliated Investors***") may not be subject to restrictions on withdrawals or be assessed the Management Fee or the Performance Allocation that are applicable to other investors in the Fund, but do share *pro rata* in all other applicable expenses of the Fund; provided that, the Special Limited Partner may, unless prohibited by law, make withdrawals of all or any part of its Performance Allocation and gains thereon from its capital account in the Master Fund as of any Withdrawal Date (as defined below).

**Borrowing and Leverage**     The Master Fund may buy securities or commodities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities or commodities in order to employ leverage when the Investment Manager deems such action appropriate. The Master Fund may not borrow more than 100% of its net assets as described in "*Investment Program – Investment Restrictions*" above.

**Management Fee**     For its services to the Master Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***") calculated monthly and payable quarterly in arrears at an annual rate of (i) 1.75% of each Limited Partner's Capital Account balance that is attributable to a Series A Interest, (ii) 1.25% of each Limited Partner's Capital Account balance that is attributable to a Series B Interest, and (iii) 1.00% of each Limited Partner's Capital Account balance that is attributable to a Series C Interest. The Management Fee is paid at the Master Fund level. The Management Fee will be prorated for any period that is less than a full calendar quarter.

The General Partner or the Investment Manager may elect to reduce, waive or calculate differently the Management Fee with respect to any Limited Partner, including, without limitation, Affiliated Investors. To effect such reduction, waiver or difference in calculation, the Fund may issue a separate series of Interests.

The General Partner may delay the timing or alter the structure of fees payable to the Investment Manager so long as such changes are not materially adverse to the Limited Partners. The Investment Manager may also assign all or any portion of fees payable to the Investment Manager,

Appx. 03889

|   | including the Management Fee and the Performance Allocation, to any affiliate thereof or any third party in its sole discretion. |
|---|---|
| **Performance Allocation** | Pursuant to the Master Fund Partnership Agreement, generally, as of the close of each fiscal quarter and subject to the limitations described below, a performance-based profits allocation (the "***Performance Allocation***") is debited against the Master Fund capital sub-account relating to each Series attributable to a Limited Partner and simultaneously credited to the Master Fund capital account of the Special Limited Partner.   The Performance Allocation is calculated and allocated at the Master Fund level, but is effectively equal to (i) 20.0% of the Net Capital Appreciation (as defined below) of each Series A Interest for such fiscal quarter, (ii) 17.5% of the Net Capital Appreciation of each Series B Interest for such fiscal quarter, and (iii) 15.0% of the Net Capital Appreciation of each Series C Interest for such fiscal quarter. |
|   | The "***Net Capital Appreciation***" applicable to an Interest shall mean the amount by which the net asset value of such Interest on the last day of the fiscal quarter (or on the Withdrawal Date, if applicable) exceeds the higher of the following amounts: (i) the highest net asset value of such Interest as of the commencement of any fiscal quarter and (ii) the issue price of such Interest.   All such calculations include realized and unrealized gains and losses and are made before deduction of the Performance Allocation, but after deduction of the accrued applicable expenses of the Fund and the Master Fund for the applicable period, and in each case adjusted for any subscriptions and withdrawals made during the quarter. |
|   | The Performance Allocation is calculated and allocated at the Master Fund level through the use of separate memorandum sub-accounts with respect to the Fund's capital account in the Master Fund that correspond to each Series attributable to a Limited Partner.  No separate Performance Allocation will be charged at the Fund level. |
|   | The Performance Allocation generally will be allocable to the Special Limited Partner after the end of each fiscal quarter and as of any Withdrawal Date occurring prior to the end of any fiscal quarter.  The Performance Allocation payable with respect to any Interests withdrawn prior to the end of a fiscal quarter will be determined solely by reference to such withdrawn Interests and will be allocable to the Special Limited Partner on the Withdrawal Date.   The Performance Allocation with respect to any Limited Partner may be fully or partially waived or rebated by the General Partner in its sole discretion. |
| **Other Fees and Expenses** | The Fund bears all of its own initial organizational expenses and its *pro rata* share of the initial organizational expenses of the Master Fund.   In general, the Fund's financial statements will be prepared in accordance with generally accepted accounting principles in the United States ("***GAAP***").  However, the General Partner intends to amortize the Fund's |

14

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 107 of 200   PageID 51554
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 272 of
324

organizational expenses over a period of 60 calendar months from the date the Fund commenced operations because it believes such treatment is more equitable than expensing the entire amount of the organizational expenses in the Fund's first year of operation, as is required by GAAP. The General Partner may, however, limit the amount of start-up and organizational expenses that the Fund amortizes so that the audit opinion issued with respect to the Fund's financial statements will not be qualified.

The Fund pays all costs, fees and expenses arising in connection with the Fund's operations.   The Fund also bears its *pro rata* share of the cost of the Master Fund's operations and investments as provided in the Master Fund Partnership Agreement.   Expenses payable by the Fund in connection with the Master Fund's investment program, include, but are not limited to, brokerage commissions, other expenses related to buying and selling securities (including trading errors that are not the result of the Investment Manager's gross negligence, willful misconduct or fraud), costs of due diligence regardless of whether a particular transaction is consummated, the costs of attending shareholder meetings, research expenses and costs related to monitoring investments.  Expenses payable by the Fund in connection with its operations include, but are not limited to, fees and expenses of advisers and consultants; the Management Fee; fees and expenses of any custodians, escrow or transfer agents or other investment-related service providers; indemnification expenses and the cost of insurance against potential indemnification liabilities; interest and other borrowing expenses; legal, administrative, accounting, tax, audit and insurance expenses; expenses of preparing and distributing reports, financial statements and notices to Limited Partners; litigation or other extraordinary expenses; any withholding, transfer or other taxes payable by the Fund (including any interest and penalties), and the cost of periodically updating this Memorandum and the Partnership Agreement.

The Investment Manager may retain, in connection with its responsibilities under the Investment Management Agreement, the services of others to assist in the investment advice to be given to the Master Fund, including, but not limited to, any affiliate of the Investment Manager.   Payment for any such services will be assumed by the Investment Manager.  However, the Investment Manager, in its sole discretion, may retain the services of independent third party professionals on behalf of the Master Fund, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Master Fund, and the Master Fund will bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

The Fund and the Master Fund do not have their own separate employees or office, and neither the Fund nor the Master Fund will reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment

Appx. 03891

Manager.  A portion of the commissions generated on the Master Fund's brokerage transactions may generate soft dollar credits that the Investment Manager is authorized to use to pay for research and other research-related services and products used by the Investment Manager. It is the current policy of the Investment Manager to limit such use of soft dollars to fall within the safe harbor of Section 28(e) of the Securities Exchange Act of 1934, as amended, or to be otherwise reasonably related to the investment decision-making process or for Master Fund expenses. See "*Brokerage and Custody*."

If the General Partner or the Investment Manager, as appropriate, incurs any expenses for both the Master Fund and one or more Other Accounts (as defined herein), the General Partner or the Investment Manager, as appropriate, will allocate such expenses among the Master Fund and each such Other Account in proportion to the size of the investment made by each in the activity or entity to which the expenses relate, or in such other manner as the General Partner considers fair and reasonable.

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund is allocated among the Capital Accounts of the Partners as of the close of each calendar month, at any other time when the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine (each, a "***Fiscal Period***").

The net profit or net loss of the Fund for any calendar month or other valuation period will reflect, with respect to all positions:

(a)  the dividends and interest accrued during the period;

(b)  the net realized gains or losses from the sale or other disposition of investments during the period allocated by the Fund;

(c)  the net change in the unrealized appreciation or depreciation of investments during the period held at the close of the period (*i.e.*, the difference between the fair market value of each investment at the end of the period compared with either the fair market value at the commencement of the period or, in the case of any investment made after the commencement of the period, the cost); and

(d)  the expenses of the Fund incurred or accrued during the period (other than the Management Fee and any other items that are charged on a Partner-by-Partner basis).

As of the close of each Fiscal Period, the net profit or net loss (subject to any applicable Performance Allocation paid at the Master Fund level) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period.  Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the

Appx. 03892

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 109 of 200   PageID 51556
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 274 of
324

Partner's Capital Account at such time in relation to the sum of the Capital Accounts of all of the Partners at such time.

The Management Fee will be calculated separately with respect to each Limited Partner and will be debited from the capital sub-account at the Master Fund level corresponding to each Limited Partner's Capital Account.

**Distributions**    Subject to the monthly withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment.  Limited Partners should not expect the Fund to make any dividend distributions.

**Withdrawals; Lock-Up**    Subject to certain withdrawal restrictions described below, a Limited Partner is generally permitted to withdraw all or a portion of its Capital Account as of the last Business Day of each calendar month (and/or such other Business Days as the General Partner may determine in its sole discretion) (each, a "***Withdrawal Date***"); provided that, any partial withdrawals may only be made in minimum amounts of $100,000. Notwithstanding the foregoing, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series B Interest prior to the one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of up to 3.0% of the net asset value of the portion of the Series B Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fee, the "***Series B Early Withdrawal Reduction***").  In addition, any Limited Partner that withdraws all or a portion of its Capital Account with respect to a Series C Interest prior to the:

(i)     one-year anniversary of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 5.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date, and

(ii)    two-year anniversary, but on or after the one-year anniversary, of the date such capital was contributed to the Fund is subject to an early withdrawal reduction of 3.0% of the net asset value of the portion of the Series C Interest being withdrawn, as determined at the close of business of such Withdrawal Date (such fees with respect to Series C Interests, the "***Series C Early Withdrawal Reduction***" and together with the Series B Early Withdrawal Reduction, the "***Early Withdrawal Reduction***").

The Early Withdrawal Reduction is retained by the Fund (and generally invested in the Master Fund) and deducted from the withdrawal proceeds of the withdrawing Limited Partner.  The Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal (defined below).

Appx. 03893

Written notice of any withdrawal request must be received in writing by the Administrator at least 30 calendar days prior to the requested Withdrawal Date. The General Partner may waive such notice requirements, or permit withdrawals under such other circumstances, if, in its sole discretion, it determines that, under the circumstances, to waive such requirement will not have an adverse effect on the Master Fund's portfolio.

If the Master Fund violates the investment restrictions and fails to remedy the violation on or before the Remedy Date (as described in "*Investment Program – Investment Restrictions*"), any Limited Partner may withdraw all or part of its Capital Account on the next Withdrawal Date and will not be subject to the Early Withdrawal Reduction; provided that, such Limited Partner has requested such withdrawal in writing within 30 Business Days after the Remedy Date.

**Settlement of Withdrawal Proceeds**

A withdrawal request is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund (received from the Master Fund), whether or not readily marketable, generally within 10 Business Days after the Withdrawal Date; provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund. In the event that the General Partner satisfies a withdrawal request with assets in kind, such securities may be transferred to a liquidating account and sold by the Fund for the benefit of the withdrawing Limited Partner, in which case, payment of the withdrawal proceeds attributable to such investments will be delayed until such investments are sold. The amount payable in respect of such investments will depend on the performance of such investments through to the date on which they are sold. The cost of operating the liquidating account and selling the investment(s) will be deducted from the proceeds of sale paid to the withdrawing Limited Partner.

Notwithstanding anything to the contrary herein, the General Partner may establish reserves and holdbacks for estimated accrued expenses, liabilities and contingencies, including, without limitation, general reserves for unspecified contingencies (even if such reserves or holdbacks are not otherwise required by GAAP) or liabilities stemming from tax obligations (as such may be determined in the sole discretion of the General Partner and whether or not incurred directly or indirectly), which could reduce the amount of a distribution upon a Limited Partner's withdrawal. The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal, as well as any Early Withdrawal Reduction described above.

Appx. 03894

| | |
|---|---|
| **Withdrawal Conditions** | The General Partner or the Administrator may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require.  This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes.  In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the Limited Partner, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the Limited Partner and the owner of the account to which the withdrawal proceeds will be paid.  The withdrawal proceeds will not be paid to a third-party account if the Limited Partner and/or owner of the account fails to provide such information. |
| **Compulsory Withdrawals** | The General Partner reserves the right, in its sole discretion, to compel the withdrawal of a Limited Partner's Interest at any time and for any reason on not less than seven days' prior written notice (or immediately if the General Partner, in its sole discretion, determines that such Limited Partner's continued investment in the Fund may cause the Fund, the Master Fund, the General Partner or the Investment Manager to violate any applicable law) (a "***Compulsory Withdrawal***").  The General Partner will compel the withdrawal of a Limited Partner's Interest in its entirety if a Limited Partner requests a withdrawal that would cause its total investment with respect to a particular Series to fall below a minimum of $100,000 (a "***Minimum Required Withdrawal***").   In either case, settlements are made in the same manner as voluntary withdrawals, except that the Early Withdrawal Reduction will not apply in the event of a Compulsory Withdrawal, but will apply to any Minimum Required Withdrawal. |
| **Suspension of Withdrawals and Withdrawal Payments** | The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Interests (and the applicable valuation date); (b) the issuance of Interests, (c) the withdrawal by Limited Partners of Interests (and the applicable Withdrawal Date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and Withdrawals Dates are not postponed) (each, a "***Suspension***") during any period which: (i) any stock exchange on which a substantial part of investments owned by the Fund (through the Master Fund) are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Fund (through the Master Fund) would not be reasonably practicable and might seriously prejudice the Limited Partners, or (B) it is not reasonably practicable for the Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the |

investments of the Fund (through the Master Fund); (v) in the sole discretion of the General Partner, it is necessary to preserve the Fund's assets; or (vi) automatically upon any suspension of withdrawals by the Master Fund for similar reasons as described in "*The Master Fund*," below.

The Administrator will promptly notify each Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted of any Suspension of withdrawals or Suspension of the payment of withdrawal proceeds.  Any remaining amount of a withdrawal request that is not satisfied due to such a Suspension remains at risk as per other amounts invested in the Fund and subject to the applicable Management Fee until such amount is finally and fully withdrawn.  Such Limited Partners will not be given any priority with respect to the withdrawal of Interests after the cause for such Suspension or limitation ceases to exist.  The General Partner may in its sole discretion, however, permit such Limited Partners to withdraw their withdrawal requests to the extent that the relevant Withdrawal Date has not yet passed.  For the avoidance of doubt, where a suspension of the payment of withdrawal proceeds is declared between the relevant Withdrawal Date and the remittance of such payment proceeds, affected Limited Partners shall not have any right to withdraw their withdrawal requests.  Upon the reasonable determination by the General Partner that conditions leading to a Suspension no longer apply, the Administrator will notify the Limited Partners of the end of the Suspension.  At such time, any such suspended payments shall generally be paid in accordance with the normal process for making such payments, withdrawal rights shall be promptly reinstated and any pending withdrawal requests which were not withdrawn (or new, timely withdrawal requests) will be effected as of the first Withdrawal Date following the removal of the Suspension, subject to the foregoing restrictions on withdrawals.

| | |
|---|---|
| **Transfers** | Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in its sole discretion.  The General Partner will require any transferee or assignee of any Limited Partner to execute the Subscription Documents. |
| **Duty of Care; Indemnification** | Pursuant to the Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement, the General Partner, the Investment Manager, each member, shareholder, partner, manager and director of, and any person who controls, the General Partner or the Investment Manager, each of the respective affiliates of the foregoing and each of their respective executors, heirs, assigns, successors and other legal representatives (each such person, an "***Indemnified Party***") shall not be liable to the Master Fund, the Fund or the Limited Partners for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence, willful misconduct or fraud, or as otherwise required by |

20

law.   In no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement contain provisions for the indemnification of the Indemnified Parties by the Master Fund and the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been an Indemnified Party or in connection with the Partnership Agreement, the Master Fund Partnership Agreement, the Investment Management Agreement, or the Master Fund's or the Fund's business or affairs to the fullest extent permitted by law in the absence of gross negligence, willful misconduct or fraud.  The General Partner is not personally liable to any Limited Partner for the repayment of any withdrawal proceeds or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the U.S. federal or state income tax laws applicable to the Fund or its investors.

**Non-Exclusivity; Allocation of Opportunities**

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund.

The Master Fund Partnership Agreement requires the General Partner, and the Investment Manager as delegatee of the General Partner, to act in a manner that it considers fair and equitable over time in allocating investment opportunities to the Master Fund.  Although the General Partner and the Investment Manager consider certain factors set forth in the Investment Manager's policies to determine how to allocate trades, the Investment Manager's policies and the Master Fund Partnership Agreement do not otherwise impose any specific obligations or requirements concerning the allocation of time, effort or investment opportunities to the Master Fund or any restrictions on the nature or timing of investments for the account of the Master Fund and for the General Partner's or the Investment Manager's own accounts or for other accounts that the General Partner, the Investment Manager or their affiliates may manage (each, an "***Other Account***").  The General Partner and the Investment Manager are not obligated to devote any specific amount of time to the affairs of the Master Fund and are not required to accord exclusivity or priority to the Master Fund in the event of limited investment opportunities arising from the application of speculative position limits or other factors.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the

Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate. The Investment Manager has the authority to allocate trades to multiple accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more accounts on other than a *pari passu* basis. See "*Risk Factors and Potential Conflicts of Interest*" below.

|                              |   |
|------------------------------|---|
| **Affiliated Service Providers** | NexBank, SSB ("***NexBank SSB***") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund and other vehicles in which the Fund, through the Master Fund, may invest) or third parties engaged in transactions involving the Investment Manager. NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest). Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB. Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer. |

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc.,NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest. Highland Latin America, an affiliate of the Investment Manager, has been engaged to provide certain administrative and consulting services to the Investment Manager. See "*Risk Factors and Potential Conflicts of Interest*" below.

Appx. 03898

| | |
|---|---|
| **Valuations** | In general, the Fund's financial statements will be prepared in accordance with GAAP.  The General Partner has delegated the valuation of the Fund's assets, based on the Master Fund's assets, to the Administrator who values the Fund's assets as of the close of each Fiscal Period in accordance with the Investment Manager's valuation policies and procedures. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate.  At the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Limited Partners at the time when such reserve is created, increased or decreased, as the case may be, or alternatively may be charged or credited to those investors who were Limited Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Limited Partners during any such prior period(s). |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Limited Partners** | The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) such tax information as is necessary for each Partner to complete U.S. federal and state income tax or information returns, along with any other tax information required by law. Within 120 days of the end of each year (or as soon as practicable thereafter), the Fund distributes to each Partner audited financial statements of the Fund, including a statement of profit or loss for such fiscal year and an unaudited status of each such Partner's holdings in the Fund at such time.  Partners will also receive, upon request to the Administrator, copies of semi-annual financial statements of the Fund. |
| **Tax Status** | The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and should not itself be subject to U.S. federal income taxation.  Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions.  Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period |

23

**Appx. 03899**

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 116 of 200   PageID 51563
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 281 of
324

may differ from its financial or economic results.  The deductibility of a Limited Partner's share of any Fund losses or deductions may be limited. See "*Tax Considerations*."

**ERISA**

The Investment Manager intends to limit investment in the Master Fund by "benefit plan investors" so that the assets of the Master Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").  It is anticipated that the assets of the Fund may constitute "plan assets" for purposes of ERISA.  See "*ERISA and Other Regulatory Considerations*."

**Amendment of the Limited Partnership Agreement**

The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent.  However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund, in each case, without the consent of each Limited Partner adversely affected thereby.  The above consent may be obtained by negative consent.

Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund (without being subject to the Early Withdrawal Reduction) as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment.

**Variation of Terms**

The General Partner or the Investment Manager, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of, the Partnership Agreement or of any Subscription Documents (including those relating to access to information, the Management Fee, the Performance Allocation, minimum investment amount, voting rights and withdrawal rights) with respect to such Limited Partner(s).

Appx. 03900

## THE MASTER FUND

**The Master Fund's Partnership Interests**

The Master Fund's partnership interests are currently held exclusively by the Fund and the Offshore Fund as limited partners, the Investment Manager as the special limited partner of the Master Fund, and the General Partner as the general partner of the Master Fund, pursuant to the Master Fund Partnership Agreement.  The General Partner is registered as a foreign company in the Cayman Islands pursuant to Part IX of the Companies Law (2016 Revision).

**The Master Fund Partnership Agreement**

The Master Fund is constituted as a Cayman Islands exempted limited partnership under the Exempted Limited Partnership Law, 2014 (the "***Exempted Limited Partnership Law***").  A Cayman Islands exempted limited partnership is constituted by the signing of the relevant partnership agreement and its registration with the Registrar of Exempted Limited Partnerships in the Cayman Islands.

A Cayman Islands exempted limited partnership is not a separate legal person distinct from its partners.  Under the Exempted Limited Partnership Law, any property which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner, and if more than one, then by the general partners jointly upon trust, as an asset of the partnership in accordance with the terms of the partnership agreement.  Any debt or obligation incurred by a general partner in the conduct of the business of an exempted limited partnership shall be a debt or obligation of the exempted limited partnership.  Registration under the Exempted Limited Partnership Law entails that the partnership becomes subject to, and the limited partners therein are afforded the limited liability and other benefits of, the Exempted Limited Partnership Law (subject to compliance therewith).

*Liability of Partners and Indemnification of the General Partner and Others*.  The business of a Cayman Islands exempted limited partnership will be conducted by its general partner(s) who will be liable for all debts and obligations of the exempted limited partnership to the extent that the partnership has insufficient assets.  As a general matter, a limited partner of a Cayman Islands partnership will not be liable for the debts and obligations of the exempted limited partnership, other than:

(i)     as expressed in the partnership agreement,

(ii)    if such limited partner takes part in the conduct of the business of an exempted limited partnership in its dealings with persons who are not partners, then that limited partner shall be liable, in the event of the insolvency of the exempted limited partnership, for all debts and obligations of that exempted limited partnership incurred during the period that he so participates in the conduct of the business as though he were, for such period, a general partner, provided always that he shall be rendered liable pursuant to the foregoing provision only to a person who transacts business with the exempted limited partnership during such period with actual knowledge of such participation and who then reasonably believed such limited partner to be a general partner, or

(iii)   if such limited partner is obligated pursuant to Section 34(1) of the Exempted Limited Partnership Law to return a distribution made to it (with interest at a rate of 10% per annum, unless otherwise specified in the Master Fund Partnership Agreement) when the exempted limited partnership is insolvent or within six months prior to such insolvency.

Appx. 03901

The Master Fund Partnership Agreement provides that none of the Indemnified Parties will be liable to the Master Fund or any limited partner of the Master Fund (including the Feeder Funds) for any loss or damage arising by reason of being or having been an Indemnified Party or from any acts or omissions in the performance of its services as an Indemnified Party in the absence of gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud, or as otherwise required by law.  An Indemnified Party may consult with counsel and accountants in respect of the Master Fund's affairs and will be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel or accountants, provided that they were selected in accordance with the standard of care set forth above.  In addition, in no event shall any Indemnified Party be liable for any consequential damages, special or indirect damages or lost profits.

The Master Fund Partnership Agreement provides that the Master Fund shall, to the fullest extent permitted by law, indemnify and hold harmless each Indemnified Party from and against any and all liabilities suffered or sustained by an Indemnified Party by reason of the fact that it, he or she is or was an Indemnified Party or in connection with the Master Fund Partnership Agreement or the Master Fund's business or affairs, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, suit or proceeding, provided that such liability did not result from the gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud of such Indemnified Party.  The Master Fund Partnership Agreement also provides that the Master Fund will, in the sole discretion of the General Partner, advance to any Indemnified Party reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action, suit or proceeding which arises out of such conduct, subject to receiving a written undertaking from the Indemnified Party to repay such amounts if and to the extent that it is finally determined that the Indemnified Party was not entitled to indemnification in respect thereof.

Notwithstanding any of the foregoing, the provisions of the Master Fund Partnership Agreement do not provide for the exculpation or indemnification of any Indemnified Party for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the above provisions to the fullest extent permitted by law.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Indemnified Party, the Master Fund (and not the applicable Indemnified Party) will be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence (as such term is defined and interpreted in accordance with the laws of the State of Delaware), willful misconduct or fraud.  Given the volume of transactions executed on behalf of the Master Fund, trading errors (and similar errors) will occur and the Master Fund will be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Indemnified Party.

The Indemnified Parties will also be indemnified by each limited partner of the Master Fund for any amounts of tax withheld or required to be withheld with respect to that limited partner, and also for any amounts of interest, additions to tax, penalties and other costs borne by any such persons in connection therewith to the extent that the balance of the limited partner's capital account is insufficient to fully compensate the General Partner and the Investment Manager for such costs.

*Contributions and Withdrawals by the Fund*.  Limited partners of the Master Fund may make contributions at such times and in such amounts as the General Partner determines.  As a limited partner of the Master Fund, the Fund may, subject to the consent of the General Partner, voluntarily request a withdrawal of all or part of its capital in the Master Fund at such times and in such amounts as it may determine.  The General Partner may, at any time, suspend (a) the calculation of the net asset value of the Master Fund (and the applicable valuation date); (b) the issuance of limited partner interests in the Master Fund; (c) the withdrawal by limited partners of their interests (and the applicable withdrawal date); and/or (d) the payment of withdrawal proceeds (even if the calculation dates and withdrawal dates are not postponed) during any period which: (i) any stock exchange on which a substantial part of investments owned by the Master Fund are traded is closed, other than for ordinary holidays, or dealings thereon are restricted or suspended; (ii) there exists any state of affairs as a result of which (A) disposal of a substantial part of the investments owned by the Master Fund would not be reasonably practicable and might seriously prejudice the limited partners of the Master Fund, or (B) it is not reasonably practicable for the Master Fund fairly to determine the value of its net assets; (iii) none of the withdrawal requests which have been made may lawfully be satisfied by the Master Fund; (iv) there is a breakdown in the means of communication normally employed in determining the prices of a substantial part of the investments of the Master Fund; or (v) in the sole discretion of the General Partner, it is necessary to preserve the Master Fund's assets.

*Amendment of the Master Fund Partnership Agreement*.  The Master Fund Partnership Agreement may be amended by an instrument in writing signed by each of the limited partners of the Master Fund and the General Partner; provided that, the General Partner may amend the Master Fund Partnership Agreement without the consent of the limited partners so long as the amendment does not adversely affect any rights of the limited partners.

*Dissolution of the Master Fund*.  The Master Fund shall be wound up and dissolved upon the first to occur of any of the following liquidating events, and Sections 36(1)(b), 36(9) and 36(12) of the Exempted Limited Partnership Law shall not apply to the Master Fund:

(i)     the written election of the General Partner to terminate the Master Fund; or

(ii)    if the General Partner is the sole or last remaining general partner, the date (the "***Automatic Dissolution Date***") falling 90 days after the date of the service of a notice by the General Partner (or its legal representative) on all the limited partners informing the limited partners of:

        (1)    the commencement of liquidation or bankruptcy proceedings in relation to the General Partner; or

        (2)    the withdrawal, removal or making of a winding up or dissolution order in relation to the General Partner;

*provided that*, if a majority in number of the limited partners elects one or more new general partners before the Automatic Dissolution Date, the business of the Master Fund shall be resumed and continued.  If a new general partner is not elected by the Automatic Dissolution Date, the Master Fund shall be wound up and dissolved in accordance with terms of the Master Fund Partnership Agreement and the Exempted Limited Partnership Law.

Appx. 03903

*Power of Attorney*.  Each limited partner of the Master Fund shall make, constitute and appoint the General Partner (and each of its successors and permitted assigns) for the time being, with full power of substitution, as its true and lawful agent and attorney-in-fact of, and in the name, place and stead of, such Partner with the power from time to time to make, execute, sign, acknowledge, swear to (and deliver as may be appropriate) on its behalf and file and record in the appropriate public offices and publish (as may in the reasonable judgment of the General Partner be required by law), including the admission of any new partners of the Master Fund and any amendments to the Master Fund Partnership Agreement. Each limited partner of the Master Fund shall authorize the General Partner to take any further action that the General Partner considers necessary or advisable in connection with the foregoing.  Such power of attorney granted is intended to secure a proprietary interest of the General Partner and the performance by each limited partner of the Master Fund of its obligations under the Master Fund Partnership Agreement and shall be irrevocable and shall survive and not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of any limited partner of the Master Fund.

**Valuation of Assets**

The General Partner has delegated the valuation of the Master Fund's assets to the Administrator, which will generally compute the value of the securities and other assets of the Master Fund as of the close of business on the last day of each fiscal period and on any other date selected by the General Partner in its sole discretion.  In addition, the Administrator must compute the value of the securities that are being distributed in-kind as of their date of distribution in accordance with the Master Fund Partnership Agreement.  In determining the value of the assets of the Master Fund, no value is placed on the goodwill or name of the Master Fund, or the office records, files, statistical data or any similar intangible assets of the Master Fund not normally reflected in the Master Fund's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

A copy of the Investment Manager's valuation policy is available upon request from the General Partner.

The value of each security and other asset of the Master Fund and the net worth of the Master Fund as a whole determined pursuant Master Fund Partnership Agreement are conclusive and binding on all of the partners of the Master Fund and all persons claiming through or under them.

Appx. 03904

### RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves substantial risks, including, but not limited to, those summarized below. The Fund is not suitable for all investors and is intended for sophisticated investors who can accept the risks associated with their investments. Prospective investors should carefully consider the risk factors described in this section, among others, in determining whether an investment in the Fund is suitable for them. There can be no assurance that the Master Fund's program will be successful or that investments purchased by the Master Fund will increase in value. An investor must be prepared to bear capital losses that might result from an investment in the Fund, including a complete loss of the investor's invested capital. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

*For purposes of this section, references to the "Fund" should be understood to mean each of the Fund and the Master Fund, as applicable, and each of the risk factors set forth herein, while not exhaustive, shall apply equally to each of the Fund and the Master Fund, as applicable.*

**General Risks**

*Lack of Operating History.* The Fund, the Master Fund and the General Partner do not have operating histories upon which investors can evaluate the anticipated performance of the Fund. Although the principals of the Investment Manager have extensive prior experience in Latin America, past performance of the Investment Manager should not be construed as an indication of the future results of an investment in the Fund. The Master Fund's investment program should be evaluated on the basis that there can be no assurance that the Investment Manager's assessment of the short-term or long-term prospects of its investment strategy will prove accurate, or that the Master Fund will achieve its investment objectives.

*Risks Associated With Investments in Securities.* Any investment in securities carries market risks. An investment in the Fund is highly speculative and involves a high degree of risk due to the nature of the Master Fund's investments and the strategies to be employed. An investment in the Fund should not in itself be considered a balanced investment program, but rather is intended to provide diversification in a more complete investment portfolio.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Master Fund, there is always some, and occasionally a significant, degree of market risk.

*Limited Liquidity; Additional Information.* An investment in the Fund provides limited liquidity since the Interests are not freely transferable and may only be withdrawn at such times as set forth in this Memorandum. The General Partner may suspend withdrawals, in whole or in part, when such a suspension is warranted by extraordinary circumstances described in "*Summary of Terms – Suspension of Withdrawals and Withdrawal Payments*" above. The General Partner may also delay the payment of withdrawal proceeds as more fully described elsewhere in this Memorandum. Investments that remain in the Fund are subject to all risks related to an investment in the Fund as described in this Memorandum.

Also, certain Limited Partners (including, without limitation, the Affiliated Investors), may invest on terms that provide access to information that is not generally available to other Limited Partners and,

29

as a result, may be able to act on such additional information (e.g., withdraw their Interests) that other Limited Partners do not receive.  An investment in the Fund is suitable only for sophisticated investors who have no need for current liquidity.

*Effect of Substantial Withdrawals*.  Substantial withdrawals from the Fund could require the Master Fund to liquidate its positions more rapidly than otherwise desired in order to raise the cash necessary to fund the withdrawals at the Fund level.  Illiquidity in certain securities could make it difficult for the Master Fund to liquidate positions on favorable terms, which could result in losses or a decrease in the net asset value of the Master Fund, and thus, the Fund.  The Master Fund is permitted to borrow cash necessary to make payments in connection with withdrawals from the Fund when the Investment Manager determines that it would not be advisable to liquidate portfolio assets for that purpose.  The Master Fund is also authorized to pledge portfolio assets as collateral security for the repayment of such loans.  In these circumstances, the continuing Limited Partners will bear the risk of any subsequent decline in the value of the Fund's assets.

*Effect of Withdrawal by Limited Partner on its Investment*.  Where a withdrawal request is accepted, an Interest will be treated as having been withdrawn effective as of the relevant Withdrawal Date, irrespective of whether or not such withdrawing Limited Partner has been removed from the Fund's books and records or the withdrawal proceeds have been determined or remitted. Accordingly, on and from the relevant Withdrawal Date, Limited Partners in their capacity as such will not be entitled to or be capable of exercising any rights arising under the Partnership Agreement or Subscription Documents with respect to the Interest being withdrawn, save the right to receive the withdrawal proceeds.  Such withdrawing Limited Partners will be creditors of the Fund with respect to the withdrawal proceeds.  In an insolvent liquidation, withdrawing Limited Partners will rank behind ordinary creditors but ahead of existing Limited Partners.

*Master-Feeder Structure*.  The Fund will invest all of its investable assets in the Master Fund.  The "master-feeder" fund structure presents certain risks to the Limited Partners.  Smaller feeder funds may be materially affected by the actions of larger feeder funds.

While the Investment Manager, as investment manager of the Master Fund, generally will not consider tax issues applicable to any particular investors, it generally will take into account the tax positions of the Fund and the Offshore Fund that invest in the Master Fund.  However, the use of a "master-feeder" structure may create a conflict of interest in that different tax considerations for the Fund and the Offshore Fund may cause or result in the Master Fund structuring or disposing of an investment in a manner or at a time that is more advantageous (or disadvantageous) for tax purposes to one Feeder Fund or its investors.

*Management Fee and Performance Allocations*.  As described above, the Master Fund Partnership Agreement provides for the payment of the Management Fee to the Investment Manager and the Performance Allocation to the Investment Manager, in its capacity as the Special Limited Partner.  The Performance Allocation may create an incentive for the Investment Manager, as the Special Limited Partner, to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Side Letters*.  The Investment Manager or the Fund may from time to time enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more Limited Partners which provide such Limited Partner(s) with additional and/or different rights (including, without limitation, with respect to access to information, the Management Fee, the Performance Allocation,

Appx. 03906

minimum investment amounts, voting rights and withdrawal rights) than such Limited Partner(s) have pursuant to this Memorandum.  As a result of such Side Letters, certain Limited Partners may receive additional benefits (including, but not limited to, reduced fee obligations, the ability to withdraw Interests on shorter notice and/or expanded informational rights) which other Limited Partners will not receive.  For example, a Side Letter may permit a Limited Partner to withdraw its Interest on less notice and/or at different times than other Limited Partners.  As a result, should the Fund experience a decline in performance over a period of time, a Limited Partner who is party to a Side Letter that permits less notice and/or different withdrawal times may be able to withdraw its Interest prior to other Limited Partners.  In general, the Fund and/or the Investment Manager will not be required to notify any or all of the other Limited Partners of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund and/or the Investment Manager be required to offer such additional and/or different rights and/or terms to any or all of the other Limited Partners.  The Fund and/or the Investment Manager may cause the Fund to enter into such Side Letters with any party as the Fund and/or the Investment Manager may determine in its sole discretion at any time.  The other Limited Partners will have no recourse against the Fund and/or the Investment Manager in the event certain Limited Partners receive additional and/or different rights and/or terms as a result of such Side Letters.  A Limited Partner will be required to enter into such undertakings with respect to maintaining the confidentiality of any such additional information as the Fund and/or the Investment Manager may in their sole discretion determine.

*Valuation Considerations*.  Valuation of the Master Fund's securities and other investments may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the net asset value of the Master Fund and the Fund could be adversely affected.  Independent pricing information may not at times be available or otherwise utilized regarding certain of the Master Fund's securities and other investments.  Valuation determinations will be made in good faith in accordance with the policies of the Investment Manager in effect from time to time, a copy of which will be made available upon request.

The Master Fund may have some of its assets in investments, which by their very nature may be extremely difficult to accurately value.  To the extent that the value assigned by the Administrator to any such investment differs from the actual value, the net asset value of the Master Fund and the Fund may be understated or overstated, as the case may be.  In light of the foregoing, there is a risk that a Limited Partner that withdraws all or part of its Interests while the Master Fund holds such investments will be paid an amount less than it would otherwise be paid if the actual value of such investments is higher than the value designated by the Administrator.  Similarly, there is a risk that such Limited Partner might, in effect, be overpaid if the actual value of such investments is lower than the value designated by the Administrator.  In addition, there is risk that an investment in the Fund by a new Limited Partner (or an additional investment by an existing Limited Partner) could dilute the value of such investments for the other Limited Partners if the designated value of such investments is higher than the value designated by the Administrator.  Further, there is risk that a new Limited Partner (or an existing Limited Partner that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is lower than the value designated by the Administrator.  The Administrator does not intend to adjust the net asset value of the Master Fund and the Fund retroactively.

None of the Fund, the Master Fund, the General Partner, the Investment Manager or the Administrator shall have any liability in the event that any price or valuation, used in good faith in connection with the above procedures, proves to be an incorrect or an inaccurate estimate or determination of the price or value of any part of the property of the Master Fund, subject to the standard of care set forth in "*Summary of Terms – Duty of Care; Indemnification*" above.

*No Participation by Investors*.  All decisions with respect to the management of the day-to-day affairs of the Fund are made exclusively by the General Partner and the Investment Manager.  Limited Partners have no right or power to take part in the management of the Fund.  The Investment Manager makes all of the trading and investment decisions of the Master Fund.  In the event of the withdrawal of the Investment Manager, generally the Fund will be liquidated.

*Investment Strategies*.  The Investment Manager will seek to engage in the investment activities that have been discussed in "*Investment Program*" herein.  There can be no assurance that the Investment Manager will be successful in applying any such strategy and that losses will be avoided.

*Competition*.  The markets in which the Master Fund invests are competitive and some of the opportunities that the Investment Manager may explore may be pursued by better known investors or investment funds.  There can be no assurance that the Investment Manager will be able to identify or successfully pursue such opportunities in this environment.  The Investment Manager competes with many firms that may have greater financial resources, more extensive development, better marketing and service capabilities, more favorable financing arrangements, larger research staffs and more securities traders than are available to the Investment Manager.

*In-Kind Distributions*.  A withdrawing Limited Partner may, in the discretion of the General Partner and/or Investment Manager, receive securities owned by the Fund (through the Master Fund) in lieu of, or in combination with, cash.  The value of securities distributed may increase or decrease before the securities can be sold (either by the Limited Partner or by the Fund if the General Partner establishes a liquidating account on behalf of the Limited Partner to sell such assets), and the Limited Partner will incur transaction costs in connection with the sale of such securities.  Additionally, securities distributed with respect to a withdrawal by a Limited Partner may not be readily marketable.  The risk of loss and delay in liquidating these securities will be borne by the Limited Partner, with the result that such Limited Partner may receive less cash than it would have received on the date of withdrawal.

*No Current Income*.  Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current income.  Moreover, an investor is required to report and pay taxes on his allocable share of income from the Fund, even though no cash is distributed by the Fund.

*Cybersecurity*.  Information and technology systems may be vulnerable to damage or interruption from computer viruses, network failures, computer and telecommunication failures, infiltration by unauthorized persons and security breaches, usage errors by their respective professionals, power outages and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes.  Although the Investment Manager has implemented various measures to manage risks relating to these types of events, if these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Investment Manager, the Master Fund and/or the Fund may have to make a significant investment to fix or replace them, which expense may be borne in whole or in part by the Fund. The failure of these systems and/or of disaster recovery plans for any reason could cause significant interruptions in the Investment Manager's, the Master Fund's and/or the Fund's operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to investors.  Such interruptions could harm the Investment Manager's, the Master Fund's and/or the Fund's reputation, subject any such entity and their respective affiliates to legal claims and otherwise affect their business and financial performance.  The foregoing risks and consequences are also extant at any issuer in which the Master Fund invests and could manifest as adverse performance of such investment.

Appx. 03908

**Investment Strategy and Investment Risks**

*Changes in Strategy.*  The Investment Manager has the power to expand, revise or alter its trading strategies on behalf of the Master Fund without prior approval by, or notice to, the Fund or the Limited Partners.  Any such change could result in exposure of the Fund's assets (through the Master Fund) to additional risks, which may be substantial.   The Investment Manager may also invest in additional instruments than those specifically identified in the "*Investment Program*" section.

*Latin America Investments*. The Master Fund invests in securities of companies based in Latin America or issued by Latin American governments, or in the securities of companies which are not incorporated in Latin America, but which derive some of their revenues from business activities conducted in Latin America.  Such investment involves certain considerations not usually associated with investing in securities of developed countries or of companies located in developed countries, including political and economic consideration, such as greater risks of expatriation, nationalization and general, political, and economic instability, the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and substantially greater price volatility, fluctuations in the rate of exchange between currencies, and costs associated with currency conversions, certain government policies that may restrict the Master Fund's investment opportunities and problems that may arise in connection with the clearance and settlements of trades.  In addition, accounting and financial reporting standards that prevail in such countries are not equivalent to standards in more developed countries, consequently, less information is available to investors in companies located in more developed countries.  There is also less regulation, generally, of the securities markets in Latin American countries than there is in more developed countries.

*Risks Related to Investing in Argentina*.  Argentina has experienced high interest rates, economic volatility, inflation, currency devaluations and high unemployment rates. The economy is heavily dependent on exports and commodities.  Argentina's default on its debt in 2001, and its past nationalization of private pensions and national oil company YPF, continues to impact the confidence of investors in Argentina, which might adversely impact returns in the Master Fund, and thus, the Fund.

*Argentina's Economy*.  Argentina's economy could grow at a lower rate than in past years, or could contract.  Factors that could negatively affect Argentina's rate of economic growth, its public finances and Argentina's ability to service its debt include: the competitiveness of Argentine exports, which are influenced by the peso's value relative to the value of the currencies of Argentina's trading partners and trade competitors; the level of inflation in Argentina; international commodities prices, foreign currency exchange rates and the levels of consumer consumption and foreign and domestic investment; negative economic developments in Argentina's major trading partners, or "contagion" effects more generally; and Argentina's ability to meet its energy requirements.

*Uncertainty of Economic Reforms*. A runoff election on November 22, 2015 resulted in Mr. Mauricio Macri being elected President of Argentina. The Macri administration assumed office on December 10, 2015. Since assuming office on December 10, 2015, the Macri administration has announced several significant economic and policy reforms, including methodological reforms with respect to the calculation of certain macroeconomic statistics, the loosening of foreign exchange controls, reduction of tariffs, other easing of international trade restrictions, infrastructure reforms and reopened negotiation with holders of debt in default since 2001. The impact that these measures and any future measures taken by the new administration will have on the Argentine economy as a whole and the financial sector in particular cannot be predicted. The Investment Manager believes that the effect of the planned liberalization of the economy and renewed access to capital markets will be positive for the

Master Fund's intended investments by stimulating economic activity, but it is not possible to predict such effect with certainty and such liberalization could also be disruptive to the economy and fail to benefit or harm companies in Argentina. The Investment Manager cannot predict how the Macri administration will address certain other political and economic issues that were central during the 2015 presidential election campaign, such as the financing of public expenditures, public service subsidies and tax reforms, the resolution of holdout debt or the impact that any measures related to these issues that are implemented by the Macri administration will have on the Argentine economy as a whole.

*Currency Controls*. In the past, Argentina imposed exchange controls and transfer restrictions substantially limiting the ability of companies to retain foreign currency or make payments abroad. Although the Macri government lifted exchange controls and liberalized capital controls, there can be no assurances regarding future modifications to exchange and capital controls. Exchange and capital controls could adversely affect the financial condition or results of operations of issuers in whose securities the Master Fund intends to invest, as well as their ability to meet foreign currency obligations and to execute financing plans.

*Challenges to Argentina's Debt Payments.* Argentina's payments in connection with a debt offering may be attached, enjoined or otherwise challenged. In recent years, hold-out creditors have used litigation against sovereign debtors, most prominently Peru and Nicaragua, to attach or interrupt payments made by these sovereign debtors to, among others, bondholders who have agreed to a debt restructuring and accepted new securities in an exchange offer. Argentina has been subjected to suits to collect on amounts due on defaulted bonds, including actions in the United States, the United Kingdom, Italy and Germany. Some of these actions have resulted in judgments against Argentina. There can be no assurance that a creditor will not be able to interfere, through an attachment of assets, injunction, temporary restraining order or otherwise, with payments made in connection with a debt offering.

*Pro Rata Payment Litigation.* Argentina's defaults with respect to the payment of its foreign debt could prevent the government and the private sector from accessing the international capital markets, which could adversely affect the financial condition of sovereign and corporate issuers in which the Master Fund invests. In September 2014, the Argentine Congress passed a law to restructure foreign-law bonds held by exchange bondholders to allow the payment in Argentina and to appoint a new paying agent. On September 29, 2014, the U.S. District Court for the Southern District of New York held Argentina in contempt of court as a result of this law. The U.S. District Court authorized limited exceptions to the injunction allowing certain custodians of Argentine law-governed bonds to process payments in August 2014, September 2014 and December 2014.

On May 11, 2015, the plaintiffs that obtained pari passu injunctions asked the U.S. district court to amend their complaints to include claims alleging that Argentina's issuance and servicing of its 2024 dollar-denominated bonds, and its external indebtedness in general, would violate the pari passu clause. On June 5, 2015, the Second Circuit granted partial summary judgment to a group of 526 "me-too" plaintiffs in 36 separate lawsuits, finding that, consistent with the previous ruling of such court, Argentina violated a pari passu clause in bonds issued to the "me-too" bondholders. The decision obligates Argentina to pay the plaintiffs $5.4 billion before it can make payments on restructured debt.

In 2016, the Argentine government working under a court appointed mediator, entered into settlement agreements with a large portion of hold-out debt holders contingent on Argentina repealing laws that prevented the country from complying with rulings by U.S. courts. In this context Judge Thomas Griesa ruled he would lift the injunctions preventing Argentina from serving post-2005 exchange debt if these laws are repealed. Argentina's lower chamber approved the repeal of these laws

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 127 of 200   PageID 51574
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 292 of
324

and Argentina's senate voted to approve the same in March 2016.  In April 2016, the Second Circuit Court of Appeals in the United States upheld Judge Griesa's ruling, finding that he did not abuse his discretion in lifting the pari passu injunctions.

The repercussions of restructuring Argentina's bond debts are ongoing.  The 2016 U.S. court rulings only settled claims of certain bondholders.  Argentina reached a $475 million settlement with other bondholders in November 2016.  Financial indices have only just started moving Argentina back to "emerging market" status, where it had been before 2009.

Argentina's default with respect to the payment of its foreign debt, its delay in completing the debt restructuring process with creditors that did not participate in the related exchange offers, the complaints filed against Argentina discussed above, the U.S. Supreme Court's decision not to hear Argentina's appeal, the declaration of contempt, and the long-term difficulty of reestablishing itself in the global marketplace could prevent Argentina's government from obtaining international private financing or receiving direct foreign investment, as well as private sector companies in Argentina from accessing the international capital markets. Without access to international private financing, Argentina may not be able to finance its obligations, and financing from multilateral financial institutions may be limited or not available. Without access to direct foreign investment, the government may not have sufficient financial resources to foster economic growth and the performance of the Master Fund's investments in Argentina could be materially and adversely affected.

*Derivative Instruments.*  The Investment Manager may use various derivative instruments, including futures, options, forward contracts, swaps and other derivatives which may be volatile and speculative.  Certain positions may be subject to wide and sudden fluctuations in market value, with a resulting fluctuation in the amount of profits and losses.  Use of derivative instruments presents various risks, including the following:

- *Tracking* – When used for hedging purposes, an imperfect or variable degree of correlation between price movements of the derivative instrument and the underlying investment sought to be hedged may prevent the Investment Manager from achieving the intended hedging effect or expose the portfolio to the risk of loss.

- *Liquidity* – Derivative instruments, especially when traded in large amounts, may not be liquid in all circumstances, so that in volatile markets the Investment Manager may not be able to close out a position without incurring a loss.  In addition, daily limits on price fluctuations and speculative positions limits on exchanges on which the Investment Manager may conduct its transactions in certain derivative instruments may prevent prompt liquidation of positions, subjecting the portfolio to the potential of greater losses.

- *Leverage* – Trading in derivative instruments can result in large amounts of leverage.  Thus, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Master Fund and could cause the Master Fund's net asset value to be subject to wider fluctuations than would be the case if the Investment Manager did not use the leverage feature in derivative instruments.

- *Over-the-Counter-Trading* – Derivative instruments that may be purchased or sold for the portfolio may include instruments not traded on an exchange.  Over-the-counter options, unlike exchanged-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller.  The risk of non-performance by the obligor on such an instrument may be

Appx. 03911

Case 3:21-cv-00881-X    Document 179-2    Filed 01/09/24    Page 128 of 200    PageID 51575
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20    Entered 02/24/20 17:25:25    Page 293 of
324

greater and the ease with which the Investment Manager can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument.  In addition, significant disparities may exist between "bid" and "asked" prices for derivative instruments that are not traded on an exchange.  Derivative instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

*Short Sales.*   Short sales by the Master Fund that are not made "against the box" create opportunities to increase the Master Fund's return but, at the same time, involve special risk considerations and may be considered a speculative technique.  Since the Master Fund, in effect, profits from a decline in the price of the securities sold short without the need to invest the full purchase price of the securities on the date of the short sale, the value of the Master Fund will tend to increase more when the securities it has sold short decrease in value, and to decrease more when the securities it has sold short increase in value, than otherwise would be the case if it had not engaged in such short sales.  Short sales theoretically involve unlimited loss potential, as the market price of securities sold short may increase continuously, although the Master Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly.  Under adverse market conditions the Master Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales.  Short sales may be used with the intent of hedging against the risk of declines in the market value of the Master Fund's long portfolio, but there can be no assurance that such hedging operations will be successful.

*Risks of Execution of Investment Strategies.*   The Master Fund will invest in a number of securities and obligations that entail substantial inherent risks.  Although the Master Fund will attempt to manage those risks through careful research, ongoing monitoring of investments and appropriate hedging techniques, there can be no assurance that the securities and other instruments purchased by the Master Fund will in fact increase in value or that the Master Fund will not incur significant losses.

*Market Risks and Liquidity.*   The profitability of a significant portion of the Master Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments.  There can be no assurance that the Master Fund will be able to predict accurately these price movements.  Although the Master Fund may attempt to mitigate market risk through the use of long and short positions or other methods, there is always some, and occasionally a significant, degree of market risk.

Furthermore, the Master Fund may be adversely affected by a decrease in market liquidity for the instruments in which they invest, which may impair the Master Fund's ability to adjust their position. The size of the Master Fund's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, deleveraging as a consequence of a decision by a broker to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Master Fund's portfolio.  Some of the underlying investments of the Master Fund may not be actively traded and there may be uncertainties involved in the valuation of such investments.  Potential investors should be warned that under such circumstances, the net asset value of the Master Fund may be adversely affected.

*Hedging.*   Although the Master Fund will attempt to hedge its exposure to specific arbitrage positions, it will not always be possible fully to hedge risk from such positions or any other position.  In

Appx. 03912

addition, the Master Fund may take positions based on the expected future direction of the markets without fully hedging the market risks.

*Currency Risks.* A portion of the Master Fund's assets may be invested in securities denominated in various currencies and in other financial instruments, the price of which is determined with reference to such currencies. The account of the Master Fund will, however, be valued in U.S. Dollars. To the extent unhedged, the value of the net assets of the Master Fund will fluctuate with U.S. Dollars exchange rates as well as with price changes of their investments in the various local markets and currencies. Forward currency contracts and options may be utilized by the Master Fund to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be effective.

*Counterparty and Settlement Risk.* Due to the nature of some of the investments which the Master Fund may make, the Master Fund may rely on the ability of the counterparty to a transaction to perform its obligations. In the event that any such party fails to complete its obligations for any reason, the Master Fund may suffer losses. The Master Fund will therefore be exposed to a credit risk on the counterparties with which it trades. The Master Fund will also bear the risk of settlement default by clearing houses and exchanges. Any default by a counterparty or on settlement could have a material adverse effect on the Master Fund.

*Borrowing.* The Master Fund is permitted to finance its operations with secured and unsecured borrowing up to 100% of its net assets, to the extent allowable under applicable credit regulations. Like other forms of leverage, the use of borrowing can enhance the risk of capital loss in the event of adverse changes in the level of market prices of the assets being financed with the borrowings.

*Concentration of Investments.* Although the Investment Manager will follow a general policy of seeking to spread the Master Fund's capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Master Fund's capital. The result of such concentration of investments is that a loss in any such position could materially reduce the Master Fund's capital.

*Difficult Market for Investment Opportunities.* The activity of identifying, completing and realizing on attractive investments involves a high degree of uncertainty. There can be no assurance that the Master Fund will be able to locate and complete investments which satisfy the Master Fund's rate of return objective or realize upon their values or that the Master Fund will be able to invest fully its subscribed capital in a manner consistent with its investment strategy.

**Certain Regulatory Risks**

*Absence of Regulatory Oversight.* While the Fund may be considered similar to an investment company, it is not required and does not intend to register as such under the Investment Company Act of 1940, as amended (the "***Investment Company Act***"), and, accordingly, the provisions of the Investment Company Act (which may provide certain regulatory safeguards to investors) are not applicable to investors in the Fund. Neither the Fund nor the Master Fund will maintain custody of its securities or place its securities in the custody of a bank or a member of a national securities exchange in the manner required of registered investment companies under rules promulgated by the Securities and Exchange Commission (the "***SEC***"). A registered investment company which places its securities in the custody of a member of a national securities exchange is required to have a written custodian agreement, which provides that securities held in custody will be at all times individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment

37

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 130 of 200   PageID 51577
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 295 of
324

company, and which contains other provisions complying with SEC regulations.  The Master Fund generally will maintain such accounts at brokerage firms that do not separately segregate such assets as would be required in the case of registered investment companies.  Under the provisions of the Securities Investor Protection Act of 1970, as amended, the bankruptcy of any such brokerage firm might have a greater adverse effect on the Master Fund and the Fund than would be the case if the accounts were maintained to meet the requirements applicable to registered investment companies.

*Forward-Looking Statements*.  Certain statements contained in this Memorandum, including without limitation, statements containing the words "believes," "anticipates," "intends," "expects," and words of similar import constitute "forward-looking statements."  Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause the actual results, performance or achievements of the Fund to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  Certain of these factors are discussed in more detail elsewhere in this Memorandum, including without limitation under "*Summary of Terms*," "*Certain Risk Factors*," and "*Investment Program*."  Given these uncertainties, prospective investors are cautioned not to place undue reliance on such forward-looking statements.  The Investment Manager and the Fund disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

*Impact of U.S. Presidential Election.*  On January 20, 2017, Donald Trump became President of the United States of America.  President Trump and other members of the Republican Party have proposed to reverse some of the recent regulation of the financial industry and to change tax policy.  If some of these proposals were enacted, banks could dramatically increase their lending practices and accept additional types of collateral, borrowers could reduce their demand for debt financing, certain investment advisers could de-register with SEC and portfolio companies that are net importers or hold significant assets outside of the United States could be subject to increased tax liability.  The effect of any such regulatory or tax changes on the Master Fund and the markets in which it trades and invests is uncertain.

*Evolving Regulatory Risks of Private Investment Funds.*  The regulatory environment for private investment funds is evolving, and changes in the regulation of private investment funds and their advisers may adversely affect the value of investments held by the Master Fund.

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**"), which was enacted in July 2010, regulates markets, market participants and financial instruments that were historically unregulated and has substantially altered the regulation of many other markets, market participants and financial instruments.  Certain provisions of Dodd-Frank subject registered investment advisers to requirements to keep records and to report information to the SEC, which could in turn be supplied to the Board of Governors of the Federal Reserve, a new Financial Services Oversight Council or other U.S. governmental agencies or Congress.  Under Dodd-Frank, the information includes, among other things, the amount of assets under management, use of leverage (including off-balance sheet leverage), counterparty credit risk exposures, trading and investment positions, and trading practices.  All such records are subject to examination by the SEC at any time.  It is anticipated that there may be significant changes to the financial regulatory environment as a result of the outcome of the recent U.S. elections.   There is currently pending legislation in U.S. Congress which if enacted would result in the repeal of portions of Dodd-Frank which in turn would have a significant impact on the regulatory environment for private investment funds.  In addition, the impact of the legislation on current and future rulemaking by various regulators under Dodd-Frank is difficult to predict.  It is possible that rules that

38

have been proposed by various regulators, which had been anticipated to take effect previously, may no longer be implemented in their proposed form or at all. Further, there may also be substantial changes in the enforcement and interpretation of existing statutes and rules by governmental regulatory authorities or self-regulatory organizations that supervise the financial markets. The effect of future regulatory change on the Fund and the Master Fund and their operations is uncertain. Prospective investors should seek, and must rely on, the advice of their own advisers with respect to the possible impact on its investment of any future proposed legislation or administrative or judicial action.

**Tax Related Risks**

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA and Other Regulatory Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the U.S. Internal Revenue Service (the "**Service**") or other applicable taxing authority, or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the General Partner with respect to the tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*. An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund. If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund. The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Entity-Level Audits*. Pursuant to the Bipartisan Budget Act of 2015, for taxable years beginning after December 31, 2017, the Service generally will be permitted to determine adjustments to items of income, gain, deduction, loss or credit of the Fund, and assess and collect taxes attributable thereto (including any applicable penalties and interest), at the Fund level. If this new regime applies to the Fund (which depends, among other things, on whether the Fund has more than 100 partners or has any partner that is itself classified as a partnership for U.S. federal income tax purposes), then any person

who is a partner of the Fund in the relevant year of the adjustment may indirectly bear the economic burden of any such taxes assessed or collected (initially determined at the highest rate of tax applicable to an individual or corporation in effect for the reviewed year), regardless of whether such person was a Limited Partner during any reviewed year.  It is expected that guidance will be issued that permits the Fund to reduce the underpayment of taxes owed by the Fund, including to the extent that the Fund demonstrates such taxes are allocable to a Limited Partner that would not owe any tax by reason of its status as a "tax-exempt entity" or the character of income is subject to a lower rate of tax.  The Fund may under circumstances have the ability to avoid such entity-level tax assessment or collection by electing to issue a statement to each partner of any reviewed year with its share of such adjustment, resulting in such partner being required to take into account any such adjustment for the taxable year which includes the date such statement was furnished.  In such case, the partners of the reviewed year would also incur a two-percentage point increase on the interest rate that would otherwise have been imposed on any underpayment of taxes.  There can be no assurances, however, that the Fund will avoid, or be able to avoid, any entity-level determination, assessment or collection.  Limited Partners should note that there is substantial uncertainty regarding the implementation of these rules and the impact on any current or future allocations made or cash available for distributions or withdrawals by the Fund.  The Fund may also be exposed to the risk that these rules apply to any lower-tier entity in which the Fund directly or indirectly invests and that is treated as a partnership for U.S. federal income tax purposes.  If this new legislation applies to the Fund, the Fund will designate a tax representative, which is expected to be the General Partner, the Investment Manager, or an affiliate thereof, who shall have the sole authority to act on behalf of the Fund with respect to dealings with the Service under these new procedures.  Prospective Limited Partners should consult their own tax advisors regarding this new legislation.

*Tax Considerations Taken into Account*.  The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Foreign Taxation*.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, and imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.  The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Liabilities Without Distributions*.  If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its allocable share of the Fund's profits, whether or not such profits have been distributed.  Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities.  In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund.  Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter.  In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter.  Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 133 of 200   PageID 51580
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 298 of
324

*Delayed Schedules K-1.* The Fund will provide Schedules K-1 as soon as practicable after receipt of all of the necessary information. However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year. The General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income.* The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("***UBTI***") under Sections 512 and 514 of the U.S. Internal Revenue Code of 1986, as amended (the "***Code***"). Thus, an investment in the Fund may be less desirable for certain tax-exempt investors. For example, the Fund may incur leverage giving rise to UBTI or may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes. Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the General Partner's objective of maximizing the pre-tax returns of all the Limited Partners, the General Partner may be required to make certain decisions to maximize pre-tax returns that result in tax-exempt investors recognizing more UBTI than might otherwise be the case. In some cases, the General Partner may forgo actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes.* Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Code may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund. Prospective investors should read this entire Memorandum and consult with their own advisers before deciding to invest in the Fund. In addition, as the investment program of the Fund develops and changes over time, an investment in the Fund may be subject to additional and different risk factors. No assurance can be made that profits will be achieved or that substantial losses will not be incurred.*

*In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.*

## Potential Conflicts of Interest

Given the nature and size of Highland Capital Management, L.P.'s ("***Highland Capital***") operations, various potential conflicts of interest arise in connection with its advisory services and the

Appx. 03917

advisory services provided by its affiliates.  Information about Highland Capital and its potential conflicts of interest is provided in Highland Capital's Form ADV Part 2 Brochure that can be found by going to https://adviserinfo.sec.gov/IAPD/Default.aspx, searching by firm name and selecting the Part 2 Brochure to be viewed.  The Fund is subject to these conflicts of interest, as well as the other items discussed below.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "**Highland Group**") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund or the Master Fund. The Investment Manager is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Master Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "**CDOs**") and other vehicles managed by members of the Highland Group ("**Highland Accounts**") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund and the Master Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Master Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and the Master Fund and the Master Fund's portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Master Fund and, therefore, may compete with the Master Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Master Fund; and (viii) the Investment Manager will devote to the Master Fund and the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Master Fund's and the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the

Appx. 03918

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 135 of 200   PageID 51582
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 300 of
324

account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Master Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Manager will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the Investment Advisers Act of 1940, as amended. The Investment Manager will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy, a copy of which will be provided upon request. However, there is no assurance that such investment opportunities will be allocated to the Master Fund fairly or equitably in the short-term or over time and there can be no assurance that the Master Fund will be able to participate in all investment opportunities that are suitable for it

The Investment Manager may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Investment Manager, the Master Fund and other accounts managed by the Investment Manager are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Cross Transactions and Principal Transactions*

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Master Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Master Fund any time that the Investment Manager believes such transaction to be fair to the Master Fund and such other client. By subscribing for an Interest, a Limited Partner is deemed to have consented to such client cross-transactions between the Master Fund and another client of the Investment Manager or one of its affiliates.

The Investment Manager may direct the Master Fund to acquire or dispose of securities in cross trades between the Master Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Master Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Master Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Master Fund may invest in assets originated by the Investment Manager or its affiliates. In each case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Master Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or

Appx. 03919

such affiliates.  In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Master Fund and for the other party to the transaction, to the extent permitted under applicable law.

The Principal, as well as the employees and officers of the Investment Manager and of organizations affiliated with the Investment Manager, may buy and sell securities for their own account or the account of others, but may not buy securities from or sell securities to the Master Fund (such prohibition does not extend to the purchase or sale of interests in the Fund), unless such purchase or sale is in compliance with the applicable provisions of the Investment Advisers Act of 1940, as amended.

*Conflicts Relating to Equity and Debt Ownership by the Master Fund and Affiliates*

In certain circumstances, the Master Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure.  If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Master Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Master Fund and such other accounts may have competing claims for the remaining assets of such issuers.  Under these circumstances it may not be feasible for the Investment Manager to reconcile the conflicting interests in the Master Fund and such other accounts in a way that protects the Master Fund's interests.  Additionally, the Investment Manager or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Manager in that such votes or actions may favor the interests of one account over another account.  Furthermore, the Investment Manager's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Affiliated Entity Services*

Affiliated entities of the Investment Manager may provide services with respect to the Investment Manager, the Master Fund or the Fund.  NexBank, SSB ("*NexBank SSB*") is an affiliate of the Investment Manager and may, from time to time, provide banking and/or agency services to the Investment Manager, clients of the Investment Manager or collective investment vehicles for which the Investment Manager provides investment advisory services (including the Fund, the Master Fund and other vehicles in which the Fund (through the Master Fund) may invest) or third parties engaged in transactions involving the Investment Manager.  NexBank SSB may also act as an agent in connection with certain securities transactions involving the Investment Manager's client accounts (including the Master Fund and other vehicles in which the Master Fund may invest).  Principals of the Investment Manager own a majority of the equity interests in NexBank SSB and employees or affiliates of the Investment Manager own or may own a substantial equity interest in NexBank SSB.  Certain Master Fund investment transactions may be executed through NexBank Securities, Inc., an affiliate of the Investment Manager and a registered broker-dealer.

Additionally, the Investment Manager or affiliates of the Investment Manager, including, without limitation, Nexbank SSB, NexBank Securities, Inc., NexBank Capital Advisors and Governance Re, Ltd., may provide financial advisory, management, insurance, title insurance or other services for a fee to portfolio companies in which the Master Fund may have an interest.  Highland Latin America Consulting, Ltd., an affiliate of the Investment Manager, has been engaged to provide certain

Appx. 03920

administrative and consulting services to the Investment Manager, as more fully described below in "*Management –Services Agreement.*"

*Management Fee*

A portion of any Management Fee may be paid to broker-dealers, placement agents or independent third parties, other than the Investment Manager, for services provided in connection with the solicitation of subscriptions from investors.  Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.  Investors should consider these potential conflicts of interest in making their investment decisions.  Each placement agent shall comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

*Diverse Membership*

The Limited Partners are expected to include entities, persons, or entities organized in various jurisdictions and subject to different tax and regulatory regimes.  Such diverse investors may thus have conflicting investment, tax and other interests, relating to, among other things, the nature of investments made by the Master Fund, the structuring or the acquisition of investments and the timing of disposition of investments.  As a result, conflicts of interest may arise in connection with decisions made by the Investment Manager including as to the nature and structure of investments that may be more beneficial for one type of Limited Partner than for another type of Limited Partner, including Limited Partners affiliated with the Investment Manager.  The results of the Fund's activities may affect individual Limited Partners differently, depending upon their individual financial and tax situations because, for instance, of the timing of an event of realization of gain or loss and its characterization as long-term or short-term gain or loss.  In addition, the Master Fund may make investments that may have a negative impact on related investments made by the Limited Partners in separate transactions.  In selecting, structuring and managing investments appropriate for the Master Fund, the Investment Manager will consider the investment and tax objectives of the Master Fund and the Feeder Funds as a whole, not the investment, tax, or other objectives of any Limited Partner individually.  However, there can be no assurance that a result will not be more advantageous to some Limited Partners than to others or to the Investment Manager and/or its affiliates than to a particular Limited Partner.

*Soft Dollars*

The Investment Manager's authority to use "soft dollar" credits generated by the Master Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Manager or the General Partner may give the Investment Manager an incentive to select brokers or dealers for Master Fund transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Manager rather than giving exclusive consideration to the interests in the Master Fund.  See "*Brokerage and Custody.*"

*No Separate Counsel*

Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") serves as counsel to the Fund, the Master Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "***Clients***") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time.  Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable

45

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 138 of 200   PageID 51585
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 303 of
324

law or the governing documents of the Fund.  In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.  No independent counsel has been retained to represent the Limited Partners.  In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the Principal's biographical data, summaries of market conditions, the planned investment strategy of the Master Fund and the performance of the Master Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Offshore Fund, the Master Fund and the General Partner.  In connection with the offering of interests and subsequent advice to the Offshore Fund, the Master Fund and the General Partner, Maples and Calder will not be representing shareholders and/or limited partners.  No independent legal counsel has been retained to represent the shareholders and/or limited partners. Maples and Calder's representation of the General Partner is limited to specific matters as to which it has been consulted by the General Partner.  There may exist other matters that could have a bearing on the Master Fund as to which Maples and Calder has not been consulted.  In addition, Maples and Calder does not undertake to monitor compliance by the General Partner and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws.  In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the General Partner, there are times when the interests of the shareholders/limited partners may differ from those of the Offshore Fund, Master Fund and/or the General Partner.  Maples and Calder does not represent the shareholders and/or limited partners' interests in resolving these issues.   In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the General Partner and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Offshore Fund, Master Fund and/or the General Partner.

*Non-Public Information*

From time to time, the Investment Manager may come into possession of non-public information concerning specific companies although internal structures are in place to prevent the receipt of such information.  Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies.  The Master Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*The foregoing list of risk factors and potential conflicts of interest do not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum and consult with their own legal, tax and financial advisers before deciding to invest in the Fund.*

Appx. 03922

## BROKERAGE AND CUSTODY

**Brokerage Arrangements**

The Investment Manager will be responsible for the placement of the portfolio transactions of the Master Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion. The Investment Manager is not required to weigh any of these factors equally.

Substantially all of the Master Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at Société Générale and BNP Paribas Prime Brokerage, Inc. or other prime brokers or custodians selected by the Investment Manager. Instruments not constituting marketable securities generally are recorded through book entry by the borrower or by an agent for the borrower or the creditors. Documentary evidence of the acquisition, ownership and disposition of these assets typically will be held by the Administrator.

Société Générale and BNP Paribas Prime Brokerage, Inc. and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including price quotes, the size of the transaction, the nature of the market for the financial instrument, the timing of the transaction, difficulty of execution, the broker-dealer's expertise in the specific financial instrument or sector in which the Master Fund seeks to trade, the extent to which the broker-dealer makes a market in the financial instrument involved or has access to such markets, the broker-dealer's skill in positioning the financial instruments involved, the broker-dealer's promptness of execution, the broker-dealer's financial stability, reputation for diligence, fairness and integrity, quality of service rendered by the broker-dealer in other transactions for the Investment Manager and its respective affiliates, confidentiality considerations, the quality and usefulness of research services and investment ideas presented by the broker-dealer, the broker-dealer's willingness to correct errors, the broker-dealer's ability to accommodate any special execution or order handling requirements that may surround the particular transaction, and other factors deemed appropriate by the Investment Manager. The Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost or spread.

Accordingly, if the Investment Manager concludes that the commissions charged by a broker or the spreads applied by a dealer are reasonable in relation to the quality of services rendered by such broker or dealer (including, without limitation, the value of the brokerage and research products or services provided by such broker or dealer), the Master Fund may pay commissions to, or be subject to spreads applied by, such broker-dealer in an amount greater than the amount another broker-dealer might charge or apply.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund, the Master Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not

Appx. 03923

believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Master Fund.

Research-related goods and services provided by brokers and dealers through which portfolio transactions for the Master Fund are executed, settled and cleared may include research reports on particular industries and companies, economic surveys and analyses, recommendations as to specific securities, certain research services, and other goods and services providing lawful and appropriate assistance to the Investment Manager in the performance of investment decision-making responsibilities on behalf of the Master Fund and related accounts (collectively, "***soft dollar items***").

Soft dollar items may be provided directly by brokers and dealers, by third parties at the direction of brokers and dealers or purchased on behalf of the Master Fund with credits or rebates provided by brokers and dealers. Soft dollar items may arise from over-the-counter principal transactions, as well as exchange traded agency transactions. Brokers and dealers sometimes suggest a level of business they would like to receive in return for the various services they provide. Actual business received by any broker or dealer may be less than the suggested allocations, but can (and often does) exceed the suggestions, because total transaction volume is allocated on the basis of all the considerations described above. A broker or dealer will not be excluded from executing transactions for the Master Fund because it has not been identified as providing soft dollar items.

The use of commissions or "soft dollars" if any, generated by the Master Fund through agency and certain riskless principal transactions to pay for research and research-related products or services, if any, will fall within the safe harbor created by Section 28(e) of the Securities Exchange Act of 1934, as amended. Under Section 28(e), research products or services obtained with soft dollars generated by the Master Fund may be used by the Investment Manager to service accounts other than the Master Fund. Soft dollars generated in respect of futures, currency and derivatives transactions and principal transactions (that are not riskless principal transactions) do not generally fall within the safe harbor created by Section 28(e) and will be utilized only with respect to research-related products and services for the benefit of the account generating such soft dollars.

Research and brokerage products and services may be used by the Investment Manager in servicing some or all of the Investment Manager's clients. In addition, some research and brokerage may not be used by the Investment Manager in servicing the clients whose commission dollars provided for the research or brokerage. Clients may not, in any particular instance, be the direct or indirect beneficiaries of the research or brokerage provided. Certain clients, who are the beneficiaries of research or brokerage, may have an investment style which results in the generation of a small amount of brokerage commissions due to a lack of active trading for their accounts. As a result, clients who generate sizeable commissions subsidize research or brokerage provided to clients whose accounts generate minimal brokerage commissions since the commission dollars generated by transactions for such clients are not sufficient to pay for research or brokerage that may be received by such clients from other brokers.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be

48

supplemental to the Investment Manager's own research efforts.  While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products.  As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate.  In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes.  The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Master Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources.  The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients, including the Master Fund.

**Custody**

The majority of the Master Fund's securities are held in the custody of its prime brokers.  The Master Fund is eligible for insurance coverage against loss with respect to assets held in the custody of the prime brokers in the event of the bankruptcy or liquidation of either of the prime brokers to the same extent as that broker's other customers.  The Master Fund's and the Fund's cash may be held at banks as well as the prime brokers.  Ownership interests which are not represented by certificates generally will be recorded through book-entry systems maintained by the issuer or its agent, and the underlying documentation relating to the acquisition and disposition of these assets for the account of the Master Fund will be held at the business offices of the Investment Manager.

Appx. 03925

## TAX CONSIDERATIONS

**Introduction**

The following is a summary of certain aspects of the U.S. federal income taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the U.S. Treasury regulations promulgated under the Code (the "***Treasury Regulations***"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code Section 1221.

Further, this summary does not address the tax considerations relevant to an investment in the Fund by a person that is not a "United States person" as defined in Section 7701(a)(30) of the Code because this summary assumes that all such persons will invest in the Offshore Fund.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the Fund. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or foreign tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("***AMT***") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

**THE TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND ARE PARTICULARLY COMPLEX. ACCORDINGLY, PROSPECTIVE INVESTORS SHOULD NOT CONSIDER THIS DISCUSSION AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. PROSPECTIVE INVESTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS, ATTORNEYS OR ACCOUNTANTS ON MATTERS RELATING TO AN INVESTMENT IN THE FUND WITH SPECIAL REFERENCE TO SUCH INVESTOR'S PARTICULAR SITUATION.**

Appx. 03926

**Certain United States Taxation Matters**

<u>U.S. Entity Classification of the Fund</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, each of the Fund and the Master Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). The General Partner believes that the Fund may qualify for an exemption from the publicly traded partnership rules, although there is no assurance that the Fund will so qualify.

The remainder of this discussion assumes that the Fund and the Master Fund will each be treated as a partnership for U.S. federal income tax purposes and not as a publicly-traded partnership treated as an association that is taxable as a corporation. Unless the context requires otherwise, references to the Fund in the following discussion include the Master Fund.

<u>Taxation of the Master Fund</u>

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Master Fund or the limited partners of the Master Fund. Interest, dividends and gains payable to the Master Fund and all distributions by the Master Fund to its limited partners will be received free of any Cayman Islands income or withholding taxes. The Master Fund has registered as an exempted limited partnership under Cayman Islands law and the Master Fund has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of 50 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits or income or gains or appreciations shall apply to the Master Fund or to any partner thereof in respect of the operations or assets of the Master Fund or the interest of a partner therein; and may further provide that any such taxes or any tax in the nature of estate duty or inheritance tax shall not be payable in respect of the obligations of the Master Fund or the interests of the partners therein. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Master Fund.

<u>U.S. Federal Income Taxation of the Fund and Partners Generally</u>

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner otherwise subject to tax will be required to report separately on its U.S. federal income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's

Appx. 03927

taxable income and gain regardless of whether it has received or will receive a distribution from the Fund.  Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit.  The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns.  Under current law, an audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners.  For tax years beginning before January 1, 2018 (and absent an election by the Fund to apply the new partnership tax audit rules described in more detail below), the administrative proceeding is managed by the "***Tax Matters Partner***." For tax years beginning on or after January 1, 2018 (or in the case of an election by the Fund to apply the new partnership tax audit rules), the Fund will be required to appoint one person as the "***Partnership Representative***" to act on its behalf in connection with an audit by the Service and related proceedings. Pursuant to the Partnership Agreement, the General Partner or its delegate will be designated as the Tax Matters Partner and/or the Partnership Representative. The Partnership Representative's actions, including the Partnership Representative's agreement to adjustments of the Fund's income in settlement of an audit by the Service of the Fund, will bind all Limited Partners, and opt-out rights available to certain Limited Partners in connection with certain actions of the Tax Matters Partner under the current partnership tax audit rules for tax years beginning before January 1, 2018 will no longer be available.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority.  All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency.  Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest.  There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation.  If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or an investor, and not as a dealer, with respect to its securities transactions.  Generally, the gains and losses realized by a trader or an investor on the sale of securities are capital gains and losses.  Thus, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.  An investment held for more than one year generally will be eligible for long-term capital gain or loss treatment. The Fund may also realize income from dividends, which will generally be taxed at either ordinary income rates or, if they are eligible for treatment as "qualified dividend income," at applicable long-term capital gains rates.

Appx. 03928

Dividends from Argentine corporations are generally expected to be treated as "qualified dividend income" only to the extent that the stock for which the dividend is paid is readily tradable on an established securities market in the United States. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals with "modified adjusted gross income" that exceeds certain thresholds (e.g., $250,000 for married individuals filing jointly and $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of: (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold. It is expected that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years may be subject to this tax. This tax will be in addition to any U.S. federal income tax imposed on Limited Partners with respect to their allocable share of income of the Fund. Trusts and estates also may be subject to this additional tax. Prospective investors should consult their own tax advisors regarding the application of this Medicare tax to their investment in the Fund.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments. Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund. For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year. Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

Special "mark to market" rules apply to the Fund's investment in "Section 1256 Contracts." Section 1256 Contracts include certain regulated futures contracts, certain foreign currency forward contracts and certain options contracts. Capital gains and losses from qualifying Section 1256 Contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities. For instance, the Fund may hold debt obligations with "original issue discount." In such case, the Fund will be required to include a portion of such discount in its taxable income on a current basis, and allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving

Appx. 03929

securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund.  The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market.  The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities.  The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment.  In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses.  The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security.  These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment.  Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative.  In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments.  In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260.  The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners.  However, there can be no assurance that the Service or a court would agree with the Fund's position.  Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred, (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain, or (iv) become subject to certain reporting requirements with respect to such investments.  There can be no assurance that the General Partner or the Fund will mitigate, or be able to mitigate, the application of these provisions, or provide certain information with respect to such foreign corporations or such filing requirements.  Potential investors are advised to consult with their own tax

54

advisors with respect to the application of these "anti-deferral provisions" in their particular circumstances.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests.  Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets.  Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash nonliquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn.  Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain.  Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis in its Interest.  To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero).  Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability.  Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest.  To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero).  Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest.  Such capital gain or loss will be short-term or long-term depending upon the Partner's holding

period (or holding periods) for its Interest.  However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations).  For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables).  However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c).  Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership."  Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest.  Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal.  In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners.  Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code Section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses, Deductions and Credits</u>

Limited Partners who are individuals or which are certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund.  For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund, such as the Management Fee) would be deductible only as itemized deductions, subject to the limitations of Sections 67 and 68 of the Code. In this regard, if all or a portion of the Performance Allocation to the Special Limited Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of

Appx. 03932

such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's AMT income and AMT liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Section 469 of the Code. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

For each taxable year, Section 1277 of the Code limits the deduction of the portion of any interest expense on indebtedness incurred by a taxpayer to purchase or carry a security with market discount which exceeds the amount of interest (including original issue discount) includible in the taxpayer's gross income for such taxable year with respect to such security ("**_Net Interest Expense_**"). Net Interest Expense in any taxable year is deductible only to the extent it exceeds the amount of market discount which accrued on the security during the taxable year or portion of the taxable year during which the taxpayer held the security. Net Interest Expense that is non-deductible under the rules described above is carried forward and deducted in the year in which the taxpayer disposes of the security. Alternatively, at the taxpayer's election, such Net Interest Expense can be carried forward and deducted in a year prior to the disposition of the security, if any, in which the taxpayer has net interest income from the security.

Section 1277 would apply to a Limited Partner's share of the Fund's Net Interest Expense attributable to a security held by the Fund (through the Master Fund) with market discount. In such case, a Limited Partner would be denied a current deduction for all or part of that portion of its distributive share of the Fund's ordinary losses attributable to such Net Interest Expense and such losses would be carried forward to future years, in each case as described above. Although no guidance has been issued regarding the election to deduct previously disallowed Net Interest Expense prior to the year of disposition of the bond, it appears that the election would be made by the Fund rather than by the Limited Partner. Section 1277 would also apply to the portion of interest paid by a Limited Partner on money borrowed to finance its investment in the Fund to the extent such interest was allocable to securities held by the Fund (through the Master Fund) with market discount.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income", consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources, including the Fund. Any amount not deductible as a result of the applicability of Section 163(d) may be carried forward to future years, subject to certain limitations.

Limited Partners may be entitled to a foreign tax credit with respect to creditable foreign taxes paid on the income and gains of the Fund. There are complex rules contained in the Code that may,

depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. For example, a Limited Partner's share of gain realized by the Fund will generally be treated as U.S. source income. Consequently, a Limited Partner may not be able to use the foreign tax credit relating to foreign taxes, if any, imposed on such gains unless such credit can be applied against the U.S. tax due on other income derived from foreign sources. Limited Partners should contact their own tax advisors with respect to the availability of any foreign tax credits.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer. Accordingly, non-corporate Limited Partners should consult their tax advisors with respect to the application of these limitations.

The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but generally may, by election of the Fund, be capitalized and amortized for U.S. federal income tax purposes over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

<u>Tax Consequences for Tax-Exempt U.S. Investors</u>

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "***Tax-Exempt U.S. Investor***") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("***UBTI***") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. A Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph). Prospective Tax-Exempt U.S. Investors should be aware that it is unclear under current law whether income from certain swaps or derivative transactions that the Fund may invest or hold a position in, may be excluded from UBTI.

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("***UDFI***"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time. For these purposes, a Limited Partner is deemed to own a proportionate share of the Fund's debt-financed property and the income attributable thereto, and a short sale of publicly traded stock will not create "acquisition indebtedness" unless the Fund borrows funds to post collateral against such short sale.

Appx. 03934

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI may be significant (depending upon the degree of leverage utilized by the Fund). In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

***We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.***

Investor Tax Filings and Record Retention.

The U.S. Department of the Treasury has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the Treasury Regulations require investors in specified transactions (including certain investors in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be applicable as a result of a failure to comply with these tax filing and record retention rules.

The Treasury Regulations are broad in scope and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain Limited Partners to the special tax filing and record retention rules. Additionally, a Limited Partner's recognition of a loss on its disposition of its Interest in the Fund could in certain circumstances subject such Limited Partner to these rules.

Reporting Under FATCA.

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") or information exchange agreement and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the Service (an "***FFI Agreement***"), and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities that do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources and, after December 31, 2018, are expected to apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "***Cayman-U.S. IGA***"), which is treated as in effect, and has issued the Tax Information Authority (International Tax Compliance) (United States of America) Regulations 2014 and guidance notes thereunder, each as updated from time to time.

Appx. 03935

The Master Fund is likely to be considered an FFI. In order to avoid incurring U.S. withholding under FATCA, the Master Fund is generally required to register with the Service and to comply with the Cayman-U.S. IGA and any guidance thereunder. The Master Fund expects to register with the Service and expects to comply with the Cayman-U.S. IGA and, therefore, generally does not expect to become subject to U.S. withholding under FATCA.

In addition, the Fund may be required to act as a withholding agent under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations made to investors.

The General Partner, the Investment Manager and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner, the Investment Manager and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner, the Investment Manager and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the Administrator, the Investment Manager, the Master Fund or the General Partner (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

The Cayman Islands has also signed, along with over 80 other countries, a multilateral competent authority agreement to implement the OECD Standard for Automatic Exchange of Financial Account Information – Common Reporting Standard ("***CRS***" and together with the Cayman-U.S. IGA, "***AEOI***").

Cayman Islands regulations have been issued to give effect to the Cayman-U.S. IGA and CRS (collectively, the "***AEOI Regulations***"). Pursuant to the AEOI Regulations, the Cayman Islands Tax Information Authority (the "***TIA***") has published guidance notes on the application of the Cayman-U.S. IGA and CRS.

All Cayman Islands "Financial Institutions" are required to comply with the registration, due diligence and reporting requirements of the AEOI Regulations, unless they are able to rely on an exemption that allows them to become a "Non-Reporting Financial Institution" (as defined in the relevant AEOI Regulations) with respect to one or more of the AEOI regimes, in which case only the registration requirement would apply under CRS. The Master Fund does not propose to rely on any Non-Reporting Financial Institution exemption and therefore intends to comply with all of the requirements of the AEOI Regulations.

The AEOI Regulations require the Master Fund and/or the General Partner (as applicable) to, amongst other things (i) register with the Service to obtain a GIIN (in the context of the U.S. IGA only), (ii) register with the TIA, and thereby notify the TIA of its status as a "Reporting Financial Institution", (iii) adopt and implement written policies and procedures setting out how it will address its obligations under CRS, (iv) conduct due diligence on its accounts to identify whether any such accounts are

Appx. 03936

considered "Reportable Accounts", and (v) report information on such Reportable Accounts to the TIA. The TIA will transmit the information reported to it to the overseas fiscal authority relevant to a reportable account (e.g. the Service in the case of a US Reportable Account) annually on an automatic basis.

Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests.

<u>State and Local Taxes</u>

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income. Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents. Each potential investor is urged to consult with its own tax advisor in this regard.

***<u>Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.</u>***

<u>Other Taxes</u>

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

Appx. 03937

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Interests. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

Appx. 03938

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 155 of 200   PageID 51602
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 320 of
324

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

**General**

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code, must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

**Plan Asset Regulations and Benefit Plan Investors**

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***").  Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***").   For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded.  An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors.  The term "Benefit Plan Investors" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (i.e., plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (e.g., IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Master Fund from being considered Plan Assets under ERISA, it is the intention of the Master Fund to monitor the investments in the Master Fund and prohibit the acquisition, withdrawal or transfer of any limited partner interests of the Master Fund by any investor, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of limited partner interests of each class of the Master Fund owned by Benefit Plan Investors would be less than 25% of the aggregate value of that class of limited partner interests (determined, as described above, by excluding certain limited partner interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of limited partner interests of the Master Fund by Benefit Plan Investors to less than 25%, the Fund may require the Compulsory Withdrawal of Interests.  Each Limited Partner that is an insurance company

Appx. 03939

acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Interests the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Master Fund.  Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Fund of that occurrence and shall, if and as directed by the Fund, in a manner consistent with the restrictions on transfer set forth herein, withdraw or dispose of some or all of the Interests held in its general account or Plan Asset Entity.

It is anticipated that investment in the Fund by benefit plan investors may be "significant" for purposes of the regulations.  In such event, the underlying assets of the Fund would be deemed to constitute "plan assets" for purposes of ERISA.  As a general rule, if the assets of the Fund were regarded as "plan assets" of a benefit plan investor, the Investment Manager would be deemed a fiduciary with respect to each Plan investing in the Fund.  However, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund.  Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any benefit plan investor.  Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and given the requirement that the Investment Manager follow the directions of the fiduciaries of each benefit plan investor investing in the Fund, as set forth in each such investor's subscription agreement, with respect to the investment by the Fund in the Master Fund, the fiduciary of each such benefit plan investor has retained the fiduciary authority and responsibility with respect to the investor's initial and continuing investment in the Fund as though the benefit plan investor is investing directly in the Master Fund.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities.  By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Limited partner interests may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for

Case 3:21-cv-00881-X   Document 179-2   Filed 01/09/24   Page 157 of 200   PageID 51604
Case 19-34054-sgj11 Doc 474-5 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 322 of
324

investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan.  A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code.  Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code.  Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

*Other Regulatory Matters*

Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or any other securities law, including state securities or blue sky laws.  Interests are offered without registration in reliance upon the exemption contained in Regulation D of the Securities Act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering.  Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

Investment Company Act of 1940

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended (the "***Investment Company Act***"), in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act.  "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million.  Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

Investment Adviser Registration

The Investment Manager is registered as relying adviser to Highland Capital Management, L.P., an investment adviser registered with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended.

Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator ("*CPO*") or commodity trading advisor under the U.S. Commodity Exchange Act and each has filed a notice of claim effectuating exemption.  As such, the General Partner and the Investment Manager will operate the Fund and the Master Fund pursuant to such exemption.  Unlike a registered CPO, the General Partner and the Investment Manager are not required to deliver a disclosure document and a certified annual report to participants in the Fund.  Among other things, the exemption requires the General Partner and the Investment Manager to file a claim of exemption with the National Futures Association. The Investment Manager qualifies for an exemption from registration with the CFTC as a commodity trading adviser pursuant to CFTC Rule 4.14(a)(8).

Cayman Islands Mutual Fund Law

The Offshore Fund and the Master Fund are regulated under the Mutual Funds Law (2015 Revision) of the Cayman Islands ("*Mutual Funds Law*").  The Cayman Islands Monetary Authority (the "*Authority*") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law. Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority.  As a regulated mutual fund, the Authority may at any time instruct the Offshore Fund or the Master Fund to have its or their accounts audited and to submit them to the Authority within such time as the Authority specifies.  Failure to comply with these requests by the Authority may result in substantial fines on the part of the directors of the Offshore Fund or the Master Fund, as applicable, and may result in the Authority applying to the court to have the Offshore Fund or the Master Fund wound up.

Neither the Offshore Fund nor the Master Fund is, however, subject to supervision in respect of their investment activities or the constitution of the Master Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Offshore Fund and the Master Fund in certain circumstances. Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document. There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  The powers of the Authority include the power to require the substitution of the directors of the Offshore Fund or the Master Fund, to appoint a person to advise the Offshore Fund or the Master Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Offshore Fund or the Master Fund, as the case may be.  There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Master Fund and the General Partner or any of its members or agents domiciled in the Cayman Islands may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Cayman Islands Monetary Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2016 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2017 Revision) or Reporting of Savings Income Information (European Union) Law (2014 Revision) and associated regulations, agreements, arrangements and memoranda of

understanding. Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Master Fund, and the General Partner or any of its or their directors or agents, may be prohibited from disclosing that the request has been made.

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations.  Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the Fund or its delegate may require verification of identity from all prospective investors.  Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The Fund reserves the right to request such information as is necessary to verify the identity of a prospective investor.  The Fund also reserves the right to request such identification evidence in respect of a transferee of Interests.  In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the Fund may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The Fund also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the Fund suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

Appx. 03943

# EXHIBIT "F"



# Highland Restoration Fund Structure with Parallel Vehicle*

**Key**

Taxed as partnership for US purposes △ — Taxed as corporation for US purposes ☐ — Not a Fund entity ◯

GP Carried/Capital Interest — — — — Management Fee - - - - ▶ LP Interest

Control, nominal economics ............

* Parallel Vehicle will be formed offshore as a limited partnership and will elect to be taxed as a corporation. ECI, if any, generated by portfolio investments will be taxed to the Parallel Vehicle, not to the Limited Partners. Limited Partners may elect to make a commitment to either the Main Fund or the Parallel Vehicle.

5183267

Case 19-34054-sgj11 Doc 474-7 Filed 02/24/20   Entered 02/24/20 17:25:25   Page 1 of 180

# EXHIBIT "G"

Appx. 03946

SECOND AMENDED AND RESTATED

AGREEMENT OF LIMITED PARTNERSHIP

OF

HIGHLAND RESTORATION CAPITAL PARTNERS OFFSHORE, L.P.

17475053

Appx. 03947

## TABLE OF CONTENTS

Page

ARTICLE I        GENERAL PROVISIONS ................................................................. 1

    Section 1.1        Formation............................................................................. 1

    Section 1.2        Name .................................................................................. 1

    Section 1.3        Purpose............................................................................... 1

    Section 1.4        Place of Business ............................................................... 2

ARTICLE II        DEFINITIONS; DETERMINATIONS; CAPITAL
                  CONTRIBUTIONS; CAPITAL ACCOUNTS .................... 2

    Section 2.1        Definitions; Determinations................................................ 2

    Section 2.2        Capital Contribution Commitment; Key Person Provision .............. 17

    Section 2.3        Capital Accounts ............................................................... 20

    Section 2.4        Distributions in Kind.......................................................... 21

    Section 2.5        Determination of Voting Thresholds .................................. 22

ARTICLE III        DISTRIBUTIONS ................................................................... 22

    Section 3.1        Distribution Policy ............................................................ 22

    Section 3.2        Distribution of Short-Term Investment Income ................. 23

    Section 3.3        Distributions of Current Cash Income and Proceeds From
                  Dispositions of or Partial Realizations with Respect to
                  Investments and In Kind Distributions ............................... 23

    Section 3.4        Foreign Taxes..................................................................... 24

ARTICLE IV        MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES ............. 24

    Section 4.1        Management Fee ................................................................ 24

    Section 4.2        Organizational and Partnership Expenses........................... 26

    Section 4.3        Ordinary Operating Expenses ............................................ 26

ARTICLE V        GENERAL PARTNER........................................................... 26

    Section 5.1        Investment Opportunities; Devotion of Time; Management
                  Authority............................................................................ 26

    Section 5.2        Use of Affiliates ................................................................ 27

    Section 5.3        Indebtedness....................................................................... 27

    Section 5.4        Limitation on Investments ................................................. 28

    Section 5.5        UBTI; USRPI; ECI ........................................................... 29

## TABLE OF CONTENTS
### (continued)

Page

| Section 5.6 | ERISA Matters | 29 |
| Section 5.7 | Conflicts of Interest | 31 |
| Section 5.8 | Transfer of General Partnership Interest; No Withdrawal or Loans | 32 |
| Section 5.9 | Removal of the General Partner | 32 |
| Section 5.10 | No Liability to Limited Partners | 33 |
| Section 5.11 | Indemnification of General Partner, the Manager and Advisory Committee | 33 |
| Section 5.12 | Formation of New Fund or Business Endeavor | 34 |
| Section 5.13 | Interest as a Limited Partner | 35 |
| Section 5.14 | Parallel Vehicles | 35 |
| Section 5.15 | Separate Investment Entities | 36 |
| Section 5.16 | Media Company Investments | 37 |
| Section 5.17 | Co-investment Funds | 38 |
| Section 5.18 | Bridge Leveraging | 39 |
| ARTICLE VI | LIMITED PARTNERS | 41 |
| Section 6.1 | Limited Liability | 41 |
| Section 6.2 | Transfer of Limited Partnership Interests | 41 |
| Section 6.3 | No Withdrawal | 43 |
| Section 6.4 | No Termination | 43 |
| Section 6.5 | Subsequent Limited Partners | 43 |
| Section 6.6 | Regulatory Matters | 44 |
| Section 6.7 | Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback | 45 |
| Section 6.8 | Section 754 Election | 47 |
| Section 6.9 | BHCA Partners | 47 |
| Section 6.10 | Excused Investments | 48 |
| Section 6.11 | Limited Partner's Default on Commitment | 48 |
| Section 6.12 | Investment Company Act Limitations | 50 |
| ARTICLE VII | ADVISORY COMMITTEE | 51 |
| Section 7.1 | Advisory Committee | 51 |

17475053                                         -ii-

## TABLE OF CONTENTS
(continued)

<b>Page</b>

ARTICLE VIII    DURATION AND TERMINATION ............................................................ 52

    Section 8.1    Duration ....................................................................................... 52

    Section 8.2    Early Termination ........................................................................ 52

    Section 8.3    Termination and Liquidation of Partnership Interests; Annual
                       Determination of General Partner Give Back ...................................... 53

ARTICLE IX    VALUATION OF PARTNERSHIP ASSETS ............................................. 53

    Section 9.1    Normal Valuation.......................................................................... 53

    Section 9.2    Restrictions on Transfer or Blockage .................................. 53

    Section 9.3    Objection to Valuation ................................................................ 53

    Section 9.4    Write-down to Value...................................................................... 54

ARTICLE X    BOOKS OF ACCOUNTS; MEETINGS ..................................................... 54

    Section 10.1    Books ............................................................................................. 54

    Section 10.2    Fiscal Year ................................................................................... 54

    Section 10.3    Reports ......................................................................................... 54

    Section 10.4    Certain Tax Elections.................................................................. 55

    Section 10.5    Annual Meeting ........................................................................... 55

ARTICLE XI    MAINTENANCE OF REGISTRATION OF LIMITED
               PARTNERSHIP; POWER OF ATTORNEY ................................................. 55

    Section 11.1    Maintenance of Registration of Limited Partnership.......................... 55

    Section 11.2    Power of Attorney ....................................................................... 55

ARTICLE XII    MISCELLANEOUS ................................................................................... 56

    Section 12.1    Amendments ................................................................................ 56

    Section 12.2    Successors ................................................................................... 57

    Section 12.3    Governing Law; Severability.................................................... 57

    Section 12.4    Notices ......................................................................................... 57

    Section 12.5    Legal Counsel ............................................................................. 58

    Section 12.6    Miscellaneous ............................................................................. 58

<b>Appx. 03950</b>

Schedule 1     Limited Partners/Commitments/Notice Information
Exhibit A      Master Partnership Agreement

17475053                          -iv-

Appx. 03951

# SECOND AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND RESTORATION CAPITAL PARTNERS OFFSHORE, L.P.

THIS SECOND AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is dated April 18, 2008 between Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company (in its capacity as general partner of the Partnership, the "General Partner") and the limited partners listed in Schedule 1 attached hereto (in their capacities as limited partners of the Partnership, the "Limited Partners") (the General Partner and the Limited Partners being herein collectively called the "Partners"). Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in Section 2.1(a).

Highland Restoration Capital Partners Offshore, L.P., is an exempted limited partnership (the "Partnership") registered under the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "ELP Law") on the 12th day of November 2007.

The General Partner and the Initial Limited Partner entered into an Agreement of Limited Partnership, dated as of November 9, 2007 (the "Original Agreement"). The Original Agreement was subsequently amended and restated on November 15, 2007 (the "Amended and Restated Agreement").

The parties hereto wish to amend and restate the Amended and Restated Agreement in the manner set forth herein.

## ARTICLE I

## GENERAL PROVISIONS

Section 1.1 Formation. The Partners hereby agree to amend and restate the Amended and Restated Agreement which is replaced and superseded in its entirety by this Agreement.

Section 1.2 Name. The name of the Partnership will be "Highland Restoration Capital Partners Offshore, L.P." or such other name or names as the General Partner may from time to time designate. The General Partner will notify Limited Partners in writing of any change to the name of the Partnership.

Section 1.3 Purpose. Subject to the express limitations set forth herein, the Partnership is organized for the object and purpose of (i) investing in senior secured bank loans, debt obligations, trade claims and equity securities of middle market Distressed Companies primarily based in the United States generally consistent with the investment strategy described in the Partnership's Confidential Private Placement Memorandum, including, without limitation, privately placed or publicly traded debt securities and other debt obligations, senior and subordinated debt obligations, secured and unsecured debt obligations, privately placed or

17475053

**Appx. 03952**

publicly traded equity securities including common stock, preferred stock and warrants (all of which investments will be made through the Master Partnership (other than investments made through a Separate Investment Entity pursuant to <u>Section 5.15</u>)), (ii) managing and monitoring such investments and (iii) engaging in such activities incidental or ancillary thereto and otherwise permitted by the ELP Law as the General Partner deems necessary or advisable.

Section 1.4   <u>Place of Business</u>.  The Partnership maintains a registered office at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands or at such other place in the Cayman Islands as the General Partner may from time to time designate, and its principal place of business is at Two Galleria Tower, 13455 Noel Road, Dallas, TX 75240, or at such other place or places in the United States as the General Partner may from time to time designate; <u>provided</u>, <u>however</u>, that if the General Partner designates different places of business, it shall promptly notify the Limited Partners in writing.

**ARTICLE II**

**DEFINITIONS; DETERMINATIONS;
CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS**

Section 2.1   <u>Definitions; Determinations</u>.

(a)      For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"<u>Additional Limited Partners</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Advisory Committee</u>" has the meaning set forth in <u>Section 7.1(a)</u>.

"<u>Affiliate</u>" has the meaning set forth in Rule 405 promulgated under the Securities Act.

"<u>Agent</u>" has the meaning set forth in <u>Section 2.4(b)</u>.

"<u>Agreement</u>" has the meaning set forth in the introduction.

"<u>Allocated Expenses</u>" means, for any Partner as of any date with respect to any Portfolio Investment, such Partner's Capital Contributions applied to pay Management Fees, Organizational Expenses and Uncapitalized Partnership Expenses that have been allocated pursuant to <u>Section 3.3(b)</u> to such Portfolio Investment as of such date.

"<u>Amended and Restated Agreement</u>" has the meaning set forth in the introduction.

"<u>Basis</u>" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to <u>Section 9.4</u> and as further adjusted by the General Partner in its reasonable discretion to reverse the effects of any exchange of securities that would result in an increase in tax basis pursuant to the Code.

**Appx. 03953**

"Benefit Plan Investor" means any Partner that is a "benefit plan investor" as defined in Section 3(42) of ERISA and any regulations promulgated thereunder.

"BHC Act" means the U.S. Bank Holding Company Act of 1956, as amended.

"BHCA Partner" means a Limited Partner that is a bank holding company, as defined in Section 2(a) of the BHC Act, or a non-bank subsidiary of such bank holding company, provided, that such Limited Partner shall not be a BHC Partner if (i) it is a financial holding company, as defined in Section 2(p) of the BHC Act, or a non-bank subsidiary thereof and is acting pursuant to Section 4(k)(4)(h) or Section 4(k)(4)(i) of the BHC Act as set forth in a notice to such effect to the General Partner; or (ii) it is a small business investment company licensed as such under the Small Business Investment Act of 1958, as amended.

"Bridge Financing" means, with respect to the Partnership's investment in a Portfolio Company, that portion of the investment that the Partnership provides as interim financing (including guarantees of debt financing) in anticipation of, or to support, a permanent investment by the Partnership in such Portfolio Company and that the Partnership intends to cause the Portfolio Company to repay or refinance within 18 months after the date of such investment in the Portfolio Company and which the General Partner designates in the Capital Call Notice therefor. During the first 18 months following a Bridge Financing, such Bridge Financing shall be treated as a Short-Term Investment. A Bridge Financing that is outstanding 18 months following the making of such Bridge Financing, shall be treated by the Partnership as a permanent investment in a Portfolio Company.

"Bridge Leveraging" means indebtedness incurred by the Partnership to fund the acquisition of a Portfolio Investment pending receipt of Capital Contributions (including as a result of any default by any Limited Partner or limited partner of a Parallel Vehicle in the making of Capital Contributions) pursuant to a Capital Call Notice that the Partnership anticipates issuing pursuant to Section 2.2(a), provided that the Capital Contributions made with respect to such Capital Call Notice are applied by the Partnership upon receipt thereof to repay such indebtedness.

"Business Day" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks located in New York City generally are closed for business.

"Capital Account" has the meaning set forth in Section 2.3.

"Capital Call" has the meaning set forth in Section 2.2(a).

"Capital Call Notice" has the meaning set forth in Section 2.2(a).

"Capital Contribution" of any Partner means the amount received by the Partnership from such Partner as an actual contribution.

"Capitalized Partnership Expenses" means Partnership Expenses that are reflected in the Basis of Portfolio Investments.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

17475053                                    -3-

"Co-Investment Opportunity" has the meaning set forth in Section 5.17(a).

"Co-Investment Fund" means any partnership, limited liability company or other entity that is an Affiliate of the General Partner or the Manager, is not a Parallel Vehicle or a Separate Investment Entity, and is organized to invest in Portfolio Investments pursuant to a Co-Investment Opportunity.

"Co-Investor" has the meaning set forth in Section 5.17(a).

"Commitment" (a) with respect to each Limited Partner means the aggregate amount of cash agreed to be contributed as capital to the Partnership by such Limited Partner as specified in Schedule 1 attached hereto as the same may be modified from time to time under the terms of this Agreement, and (b) with respect to the General Partner means the aggregate amount of cash the General Partner has agreed to contribute as capital to the Partnership and Master Partnership as specified in Schedule 1 attached hereto, as the same may be modified from time to time under the terms of this Agreement.

"Commitment Period" has the meaning set forth in Section 2.2(b).

"Continuity Period" has the meaning set forth in Section 2.2(d).

"Credit Support" has the meaning set forth in Section 5.3.

"Crusader" means Highland Crusader Fund, L.P., and its successors.

"Current Cash Income" means all Current Income paid in cash or cash equivalents.

"Current Income" means all interest and dividend income (including from original issue discount, purchases or investments at a market discount, and payment of in-kind income and other non-cash current income) from a Portfolio Company.

"Defaulting Partner" has the meaning set forth in Section 6.11(a).

"Director Fees" means directors, consulting, monitoring or similar fees in respect of a Portfolio Company, including options, warrants or other non-cash compensation received by a director or officer of a Portfolio Company which shall be valued at the earlier of (v) the time of exercise of such instrument, (w) three years after the underlying security of such instrument becomes a Marketable Security, (x) the dissolution of the Partnership, (y) the date the Partnership disposes of the Portfolio Investment that gave rise to such fee or (z) the date such option, warrant or other non-cash compensation was disposed of by the General Partner, the Manager, the Principals or their Affiliates and thereafter credited against Management Fees pursuant to Section 4.1(c), in each such case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates in respect of Portfolio Investments; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the

Appx. 03955

Manager, the Principals, employees of the Manager or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Disposition" or "Disposed of" means, with respect to all or a portion of a Portfolio Investment, (i) except as provided in the next sentence, the sale, exchange or other disposition by the Partnership of all or a portion of the securities or other interests constituting that Portfolio Investment for cash, securities or other property, (ii) the receipt by the Partnership of a distribution of the proceeds of the sale of all or substantially all of the assets of the Portfolio Company in complete liquidation of the Partnership's entire direct or indirect interest in the Portfolio Investment and (iii) an in-kind distribution of all or part of a Portfolio Investment that has not previously been deemed to have been Disposed of, as of the date of and to the extent of such distribution. A "Disposition" does not include (i) a recapitalization that consists of an exchange of a Portfolio Investment for other securities of or claims against the issuing Portfolio Company, (ii) a business combination that consists of an exchange of substantially all of the Partnership's direct or indirect interest in a Portfolio Investment for securities issued by an acquiring entity, (iii) a business combination that consists of the exchange of all or substantially all of the assets of a Portfolio Company or one or more divisions or operating units of a Portfolio Company for securities issued by an acquiring entity or (iv) a sale, exchange or other disposition that does not constitute a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment.

"Distressed Companies" shall mean persons that, in the opinion of the General Partner, (a) are or have been in financial or other stress; (b) are restructuring, are considered likely to be restructured, or have been restructured in an out-of-court process or in a proceeding under the Federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; (c) are being, are considered likely to be or have been reorganized within or outside of a proceeding under federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; or (d) are engaged, are considered likely to engage or have been engaged in other extraordinary transactions, such as debt restructurings, reorganizations and liquidations outside of bankruptcy.

"ECI" means income that is effectively connected with a United States trade or business within the meaning of Section 864(c) of the Code and the Treasury Regulations promulgated thereunder, but not including any income or gain attributable to the disposition of a "United States real property interest" as defined for purposes of Section 897(c) of the Code.

"Electing Limited Partner" has the meaning set forth in Section 2.4(b).

"ELP Law" has the meaning set forth in the introduction.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"Existing Partners" has the meaning set forth in Section 6.5(c).

"FCC" shall mean the U.S. Federal Communications Commission.

"FCC Attribution Rules" shall mean the ownership attribution rules of the FCC, including, but not limited to, 47 C.F.R. §§ 21.912, Note 1; 24-709; 24.720; 26.101(b), (c); 73.3555, Note 2; 76.501, Note 2; 76.503, Note 2; 76-504, Note 1; Attribution Reconsideration Order, 58 Radio Regulation 2nd 604 (1985); Further Attribution Reconsideration Order, 1 FCC Rcd 802 (1986); Report and Order, 14 FCC Rcd 12559 (1999); Report and Order, 14 FCC Rcd 19014 (1999); Memorandum Opinion and Second Order in Reconsideration, FCC 00-431 (released Jan. 19, 2001); and Memorandum and Opinion and Order on Reconsideration, FCC-00-438 (released Jan. 19, 2001), all as the same may be amended or supplemented from time to time.

"Final Closing" means the final closing of subscriptions by Limited Partners pursuant to Subscription Agreements, which, in any event, shall take place no later than the fourteen month anniversary of the First Closing.

"First Closing" means the first closing of subscriptions by Limited Partners pursuant to Subscription Agreements.

"Follow-on Investment" means investments made after the termination of the Commitment Period in securities of an existing Portfolio Company that are appropriate or necessary in the opinion of the General Partner to preserve, protect or enhance the investment in such Portfolio Company that was made by the Partnership during the Commitment Period.

"Fund Group" means the Partnership, Parallel Vehicles, Separate Investment Entities and their respective Portfolio Investments.

"Funded Commitment" (A) means as to any Limited Partner as of any date, that portion of a Limited Partner's Commitment that has been contributed (or "deemed contributed") to the Partnership to meet a Capital Call (including any amounts contributed pursuant to Section 6.5(b)), reduced by (a) any amounts which are distributed (or "deemed distributed") to such Limited Partner in respect of a proposed Portfolio Investment (or portion thereof) that was not consummated, (b) any amounts which are distributed (or "deemed distributed") to such Limited Partner in respect of a Bridge Financing (or portion thereof) that was sold, refinanced, redeemed or otherwise disposed of within 18 months from the Investment Date of such Bridge Financing in an amount not to exceed the Limited Partner's portion of Funded Commitments used to acquire such Bridge Financing, (c) any amounts paid by such Limited Partner pursuant to subclauses (B) and (C) of the third sentence of Section 6.5(b), (d) any amounts distributed (or "deemed distributed") to such Limited Partner pursuant to Section 6.5 (other than amounts attributable to payments by an Additional Limited Partner pursuant to subclauses (B) and (C) of the third sentence of Section 6.5(b)), and (e) in the sole discretion of the General Partner, any amounts distributed (or "deemed distributed") to such Limited Partner with respect to a Portfolio Investment that was sold, refinanced, redeemed or otherwise disposed of within 48 months after the Investment Date for such Portfolio Investment in an amount not to exceed the portion of such Limited Partner's Funded Commitments used to acquire such Portfolio Investment, all as determined in good faith by the General Partner and (B) as to the General Partner as of any date, that portion of the General Partner's Commitment that has been either (i) contributed (or "deemed contributed") to the Partnership (including any amounts contributed pursuant to Section 6.5(b)) or (ii) contributed (or "deemed contributed") to the Master Partnership (including

Appx. 03957

the aggregate amount of all Deemed Contributions (as defined in the Master Partnership Agreement treated as made to the Master Partnership on or prior to such date), reduced by (w) any amounts which are distributed (or "deemed distributed") to the General Partner by the Master Partnership in respect of a proposed investment in a Portfolio Company (or portion thereof) that was not consummated, (x) any amounts which are distributed to the General Partner by the Master Partnership in respect of a Bridge Financing (or portion thereof) that was sold, refinanced, redeemed or otherwise disposed of within 18 months after the date such Bridge Financing was made, in an amount not to exceed the General Partner's portion of Funded Commitments used to acquire such Bridge Financing, (y) any amounts distributed (or "deemed distributed") to the General Partner pursuant to Section 6.5 (other than amounts attributable to payments by a Limited Partner pursuant to subclause (B) and (C) of the third sentence of Section 6.5(b)), and (z) in the sole discretion of the General Partner, (A) any amounts distributed (or "deemed distributed") to the General Partner by the Master Partnership with respect to a Portfolio Investment that was sold, refinanced, redeemed or otherwise disposed of within 18 months after the Investment Date for such Portfolio Investment in an amount not to exceed the portion of the General Partner's Funded Commitment used to acquire such Portfolio Investment, all as determined in good faith by the General Partner.  For the purposes of this definition, those proceeds otherwise distributable to a Partner that are retained for reinvestment or application to a Capital Call in accordance with the proviso to Section 3.1(b) or the proviso to the second to last sentence in Section 6.5(b) (or, in the case of the General Partner, the corresponding provisions of the Master Partnership Agreement), shall be "deemed distributed" to such Partner by the Partnership (or the Master Partnership, as applicable) and "deemed contributed" by such Partner to the Partnership (or the Master Partnership, as applicable).  The General Partner, in its discretion, may reduce the 48 month period referenced above at any time during the Commitment Period.

"GAAP" means U.S. generally accepted accounting principles as in effect from time to time.

"General Partner" has the meaning set forth in the introduction to this Agreement and includes any successor general partner of the Partnership appointed in accordance with this Agreement.

"GP's Counsel" has the meaning set forth in Section 12.5.

"gross negligence" when used in this Agreement shall be interpreted in accordance with the laws of the U.S. State of Delaware.

"Gross-up Percentage" means the percentage determined by dividing (i) the aggregate Commitments of all Partners by (ii) the aggregate Commitments of all Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b).

"Guaranty Agreement" shall mean the Guaranty Agreement, dated as of the date hereof, by and among the Partnership, the General Partner and the guarantors party thereto, substantially in the form of the agreement set forth in Exhibit A hereto, as amended from time to time in accordance with its terms.

Appx. 03958

"<u>Highland</u>" shall mean Highland Capital Management, L.P., a Delaware limited partnership.

"<u>Highland Accounts</u>" means collectively funds, accounts and vehicles managed by Highland from time to time.

"<u>Highland Investment Allocation Policy</u>" shall mean the investment allocation policy of Highland described in the Partnership's Confidential Private Placement Memorandum and as in effect or modified from time to time.

"<u>Highland Portfolio Company</u>" means each portfolio company (and each of their subsidiaries) as to which Highland and/or the Principals and/or their respective Affiliates have completed, or are in the process of completing, an investment or acquisition or receipt of a debt or equity ownership position therein, including, without limitation through Crusader and other Highland Accounts, at the time of the First Closing, together with follow-on or other additional investments and acquisitions from time to time after the First Closing in or by such companies so long as such investments and acquisitions are reasonably determined by the Principals to be primarily within the general lines or areas of business of such companies as of the First Closing or incidental or related thereto.

"<u>Indemnifying Partner</u>" has the meaning set forth in <u>Section 6.7(a)</u>.

"<u>Initial Fee Period</u>" means the period starting on the First Closing and ending on the earlier of (i) the termination of the Commitment Period, and (ii) the date on which the Manager, the General Partner or an Affiliate thereof closes subscriptions of capital commitments by investors of a Successor Fund.

"<u>Initial Limited Partner</u>" means Virginia Czarnocki an attorney with Walkers, a law firm located in the Cayman Islands.

"<u>Insulated Partner</u>" has the meaning set forth in <u>Section 5.16(a)</u>.

"<u>Insulated Partner Affiliate</u>" has the meaning set forth in <u>Section 5.16(a)</u>.

"<u>Investment Company Act</u>" means the U.S. Investment Company Act of 1940, as amended.

"<u>Investment Date</u>" means, with respect to any Portfolio Investment, the date such Portfolio Investment was acquired by the Partnership.

"<u>Investment Income and Gain</u>" means, with respect to a Portfolio Investment, (i) <u>the excess</u>, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income <u>over</u> the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by <u>Section 2.3</u>, <u>the excess</u>, if any, of the value (as determined pursuant to <u>Article IX</u>) of the portion of such Portfolio Investment distributed to the Partners

17475053                    -8-

over the Basis of such portion of such Portfolio Investment, and (iii) Current Income attributable to such Portfolio Investment.

"Investment Loss" means, with respect to a Portfolio Investment, (i) the deficiency, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income as compared to the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.4, the deficiency, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners as compared to the Basis of such portion of such Portfolio Investment, and (iii) the amount, as reasonably determined by the General Partner in accordance with Section 9.4, by which such Portfolio Investment has permanently declined in value below the Basis of such Portfolio Investment immediately prior to such determination.

"Keyman Group" means James Dondero, Pat Daugherty and John Honis; provided, that the Keyman Group will include replacements chosen pursuant to Section 2.2(d) if a Triggering Event occurs pursuant to clauses (ii) or (iii) therein; provided, further, that, if any one of the members of the Keyman Group ceases to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner, the Keyman Group will include such replacement person that is proposed by the General Partner to the Advisory Committee and who is approved to serve as a member of the Keyman Group by the consent of a majority of the members of the Advisory Committee.

"Limited Partners" means the persons listed in Schedule 1 hereto in their capacity as limited partners of the Partnership (including each person admitted to the Partnership in accordance with Section 6.5) and each person who is admitted to the Partnership as a substitute limited partner pursuant to Section 6.2 or 6.5, so long as each such person continues to be a limited partner of the Partnership hereunder.

"Main Fund" means Highland Restoration Capital Partners, L.P., a Delaware limited partnership.

"Main Fund Agreement" means the Agreement of Limited Partnership of the Main Fund, as amended from time to time.

"Majority in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than 50% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"Management Fee" has the meaning set forth in Section 4.1(a).

"Management Fee Period" has the meaning set forth in Section 4.1(a).

Appx. 03960

"<u>Manager</u>" means Highland Capital Management, L.P., a Delaware limited partnership, or other entity controlled by James Dondero and Mark Okada, and appointed as Manager by the General Partner on behalf of the Partnership from time to time.

"<u>Marketable Securities</u>" means securities that (A) (i) are (x) listed on a national securities exchange in the United States, (y) quoted on the NMS or (z) listed on a securities exchange or quoted on an established quotation system within or without the United States that in the opinion of the General Partner after consultation with the Advisory Committee supports sufficient trading activity and volume to allow for the orderly disposition of such securities by the Partners following a distribution thereof in accordance with <u>Sections 2.4</u> and <u>3.3</u>, and (ii) are not subject to restrictions on transfer as a result of applicable contract provisions, the provisions of the Securities Act or regulations thereunder (other than the volume, manner-of-sale and notice restrictions of Rule 144 promulgated thereunder or any successor rule thereto; <u>provided</u>, that if such securities are subject to volume limitations under Rule 144 and distributed in kind to Limited Partners, each Limited Partner would be able to sell such securities promptly after the distribution thereof in accordance with <u>Sections 2.4</u> and <u>3.3</u> (notwithstanding volume limitations)), or other applicable law, or (B) are immediately convertible, exchangeable or exercisable by the holder thereof into securities that meet the requirements of the foregoing <u>clause (A)</u>.

"<u>Master Partnership</u>" means Highland Restoration Capital Partners Master, L.P., a Delaware limited partnership entered into by the General Partner and the Partnership to make and hold Portfolio Investments.

"<u>Master Partnership Agreement</u>" means the Agreement of Limited Partnership of the Master Partnership, as amended from time to time, substantially in the form of <u>Exhibit A</u> hereto.

"<u>Media Company</u>" shall mean any entity in which the Partnership has or acquires an investment and that directly or indirectly owns, controls or operates any: (i) broadcast radio or television station licensed by the FCC; (ii) U.S. cable television system; (iii) daily newspaper (as such term is defined in Section 73.3555 of the Ownership Rules); (iv) multipoint multichannel distribution system licensed by the FCC; (v) other communications facility the ownership or operation of which is subject to regulation by the FCC under (x) the Communications Act of 1934, as amended, (y) the FCC Attribution Rules, or (z) the FCC Ownership Rules; and (vi) other business or activity that is subject to ownership restrictions imposed by the FCC from time to time.

"<u>Net Funded Commitment</u>" means, in respect of any Partner and as of the first day of any Management Fee Period, such Partner's Funded Commitment as of such date <u>less</u> (i) such Partner's Capital Contributions (or portion thereof, in the case of a partial Disposition) applied by the Partnership to make all Portfolio Investments that have been Disposed of on or prior to such date and applied to pay Capitalized Partnership Expenses relating to such Portfolio Investments and Allocated Expenses with respect to such Portfolio Investment as of such date, (ii) all write downs pursuant to <u>Section 9.4</u> in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date multiplied by such Partner's Partner Interest in each such Portfolio Investment, and (iii) such Partner's Capital Contributions in

-10-

respect of Management Fees and Partnership Expenses allocable to Portfolio Investments that have not been Disposed of on or prior to such date.

"NMS" means the National Market System of the National Association of Securities Dealers, Inc.

"Non-Marketable Securities" means all securities which are not Marketable Securities.

"Non-U.S. Partner" means with respect to any determination hereunder, (i) any Limited Partner that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, or (ii) any Limited Partner that has a direct or indirect beneficial owner that (x) is not a "United States person" within the meaning of Section 7701(a)(30) of the Code and (y) would be required to report on a United States federal income tax return or report ECI that would be derived from the Partnership if the Partnership were classified as a partnership for U.S. federal income tax purposes, to the extent of such beneficial owner's pro rata share of such income, but in each case, only if such Limited Partner has notified the General Partner of such status at any time prior to such determination, by providing the General Partner an IRS Form W-8BEN or by some other method satisfactory to the General Partner.

"Non-Voting Interest" means any interest of a Limited Partner in the Partnership, and if applicable, any interest of a limited partner in a Parallel Vehicle (or portion thereof) with respect to which a Limited Partner or limited partner in a Parallel Vehicle has, or elects to have, no or limited voting rights pursuant to Section 6.9 or a similar provision in the agreement of limited partnership of the Parallel Vehicles, as the case may be.

"Non-Voting Partnership Interests" has the meaning set forth in Section 6.9(b).

"Operating Company" means an "operating company" within the meaning of the Plan Asset Regulation, including a "venture capital operating company."

"Opinion of the Partnership's Counsel" means an opinion of Mayer Brown LLP or other counsel selected by the General Partner and reasonably acceptable (by reason of experience in the area of law involved) to the Limited Partner affected by such opinion or, if more than one Limited Partner is affected by such opinion, a Majority in Interest of the Limited Partners so affected.

"Organizational Expenses" means the reasonable out-of-pocket expenses (including, without limitation, travel, printing, legal and accounting fees and other expenses) of the General Partner, the Manager, the Principals and their respective Affiliates (but not including any Placement Fees) incurred in the formation of the Partnership, any Parallel Vehicle or any Separate Investment Entity or incurred in connection with the organization and funding of the Partnership, any Parallel Vehicle, Separate Investment Entity and the General Partner.

"Original Agreement" has the meaning set forth in the introduction.

"Other Permitted Investment Activities" means the continuing involvement of the Principals, subject to compliance with the devotion of time covenant in Section 5.1(a), (i) in the full range of their activities in connection with their duties and responsibilities as members,

Appx. 03962

owners, partners, directors, officers, employees, shareholders, or consultants of the Manager and Highland Accounts, including Crusader, (ii) in acquisitions and follow-on investments by Highland Portfolio Companies reasonably determined by the Principals to be primarily within the general area of business of a Highland Portfolio Company or incidental or related thereto, (iii) as passive owners, stockholders, debtholders and investors in professionally managed hedge funds, fund of funds and other private investment entities and vehicles, (iv) in investments which do not otherwise meet the investment objectives of the Partnership, and (v) in a Successor Fund organized in accordance with <u>Section 5.12</u>; <u>provided</u>, that none of the activities described in clauses (i) through (v) above shall unreasonably affect the ability of the Principals to fulfill their duties to the Limited Partners and to be actively involved in the business of the Fund Group.

"<u>Ownership Rules</u>" means the multiple and cross-ownership rules of the FCC including, but not limited to, 47 C.F.R. §§ 21.912; 24-709; 24.720; 26.101(a); 73.3555; 74.931(h); 76.501; 76.503; 76.504, and other regulations or written policies of the FCC which limit or restrict ownership in Media Companies, all as the same may be amended or supplemented from time to time.

"<u>Parallel Vehicle</u>" means any entity that is organized pursuant to <u>Section 5.14</u> and designated a Parallel Vehicle by the General Partner, but solely for purposes of this Agreement, the Partnership is not a Parallel Vehicle, and the Main Fund is a Parallel Vehicle.

"<u>Partial Realization</u>" means, with respect to any Portfolio Investment, the realization by the Partnership of Current Income or of proceeds from a recapitalization, extraordinary dividend, sale, redemption or other disposition of less than all of such Portfolio Investment (other than a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment) or any other similar event that does not constitute a Disposition of such Portfolio Investment.

"<u>Participating Partner</u>" means, with respect to any Portfolio Investment, any Limited Partner who made a Capital Contribution (other than solely a Waiver Contribution) that was applied to such Portfolio Investment.

"<u>Partner Interest</u>" means for any Partner that is a Participating Partner with respect to any Portfolio Investment, the proportion that such Participating Partner's Capital Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions of all Partners that were applied to such Portfolio Investment.

"<u>Partner Share</u>" means, for any Partner, and for any period, the amount of Investment Income and Gain, Investment Loss, Current Cash Income, proceeds from the Disposition of or Partial Realization with respect to a Portfolio Investment for such period or Portfolio Investments distributed in kind, as the case may be, or items of Partnership income or expense (other than Management Fees or Placement Fees, if any), in each case for such period multiplied by such Partner's Partner Interest in the Portfolio Investments giving rise to such items or to which such items are allocable pursuant to <u>Section 3.3(b)</u>.

"<u>Partners</u>" means the General Partner and the Limited Partners, collectively.

"<u>Partnership</u>" has the meaning set forth in <u>Section 1.1</u>.

Appx. 03963

"Partnership Expenses" means all reasonable costs and expenses relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company or proposed Portfolio Company), including, but not limited to, (i) all costs and out-of-pocket fees and expenses attributable to acquiring, investing, holding, monitoring and disposing of the Partnership's investments, (ii) all other out-of-pocket costs and out-of-pocket fees and expenses attributable to unconsummated transactions or investment strategies (but excluding marketing strategies) that do not lead to consummated acquisitions, (iii) legal, accounting, auditing, administrative, consulting and other fees and expenses (including, but not limited to, fees of the administrator of the Partnership and insurance and other out-of-pocket expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and forms K-1), (iv) expenses of the Advisory Committee incurred in accordance with Article VII, (v) extraordinary expenses, liabilities, indemnities and other obligations of the Partnership (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements (including, but not limited to, costs and expenses payable under Section 5.11)), and (vi) all debt service obligations, including interest, premium, if any, fees, expenses and other amounts payable in respect of indebtedness of the Partnership incurred in accordance with Section 5.3, but in each case, not including Organizational Expenses in excess of $1,250,000, Management Fees, Placement Fees and those expenses borne by the Manager pursuant to Section 4.3.

"Partnership Legal Matters" has the meaning set forth in Section 12.5.

"Permitted GP Transferee" means, as to any membership or other ownership interest in the General Partner, of or held by any Principal or other member or investor in the General Partner (a) any family member of such person provided the transferor retains all voting control with respect to the interest, (b) any other partner or investor in the General Partner who was a partner or investor in the General Partner as of the Final Closing, and (c) any trust, partnership, foundation corporation or other entity that is either controlled by such person or is primarily for the benefit of such person and/or their family members.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency or political subdivision thereof).

"Placement Fees" means the fees and expenses and any interest on any deferred fees and expenses charged by or paid to any placement agency designated by the Partnership or the General Partner for the marketing and sale of interests in the Partnership and the Parallel Vehicles. The Partnership's pro rata share of any Placement Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the aggregate Commitments of the Limited Partners giving rise to such fees, and the denominator of which is the sum of the aggregate Commitments of the Limited Partners and the aggregate capital commitments of all limited partners in all Parallel Vehicles giving rise to such fees.

"Plan Assets" means "plan assets" as defined in the Plan Asset Regulation.

"Plan Asset Event" has the meaning set forth in Section 5.6(e).

"<u>Plan Asset Regulation</u>" means the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101, or any successor regulation thereto, as in effect at the time of reference, as modified by Section 3(42) of ERISA.

"<u>Portfolio Company</u>" means any corporation, partnership, limited liability, company or other entity in which the Partnership has directly or indirectly made an investment, other than Short-Term Investments.

"<u>Portfolio Investments</u>" means any investments held directly or indirectly by the Partnership, other than Short-Term Investments.  If the Partnership holds multiple classes of securities or other interests that were issued by a Portfolio Company in a single closing or series of related closings, all of such securities or interests in the aggregate shall constitute one Portfolio Investment.

"<u>Principals</u>" means the following senior investment professionals who are partners or members of the General Partner or are employed by the Manager, for so long as such persons have not voluntarily resigned from, or been terminated by, the General Partner or Manager, and any other senior investment professionals from time to time who are designated as such by the General Partner: James Dondero, Mark Okada, Patrick Daugherty and John Honis.

"<u>Qualified Purchaser</u>" has the meaning set forth in Section 2(a)(51) of the Investment Company Act and the regulations promulgated thereunder.

"<u>Redeemed Limited Partner</u>" has the meaning set forth in <u>Section 6.6(c)</u>.

"<u>Redemption Effective Date</u>" has the meaning set forth in <u>Section 6.6(c)</u>.

"<u>Redemption Value</u>" means, with respect to any interest in the Partnership, or such portion thereof in the case of a partial withdrawal, being redeemed because of a Plan Asset Event or Regulatory Issue, the fair market value of such interest as of the applicable Redemption Effective Date, as determined in good faith by the General Partner; <u>provided</u> that, if the Plan Asset Event or the Regulatory Issue is a result of a breach of a representation, warranty or covenant made by the Redeemed Limited Partner, the Redemption Value shall be (in each case as determined in good faith by the General Partner) the lesser of (i) the fair market value of such Redeemed Limited Partner's interest in the Partnership on the applicable Redemption Effective Date and (ii) the fair market value of the applicable portion of the Redeemed Limited Partner's interest in the Partnership being redeemed on the date on which cash is allocated to make redemption payments.  In making such determination of fair market value, the General Partner shall assume that all of the assets of the Partnership will be sold on the applicable date in a commercially reasonable manner and the proceeds of such sale, net of estimated closing costs, as reasonably determined by the General Partner, and all obligations of the Partnership (other than the redemption of the interest or interests in the Partnership being redeemed as of such date), will be distributed to the Partners pursuant to this Agreement.  With respect to a Plan Asset Event or Regulatory Issue that is not a result of a breach of a representation or warranty made by the Redeemed Limited Partner, if the majority of such Redeemed Limited Partners disagree with the General Partner's determination of the Redemption Value of the applicable interests in the Partnership, such Redeemed Limited Partners shall negotiate in good faith to resolve such

Appx. 03965

disagreement, and if such Redeemed Limited Partners continue to disagree after negotiations are held, either side may request that an independent evaluator (who must be reasonably acceptable to the other party) be retained, whose valuation shall be final and binding on the Partnership and all of the Partners. The Partnership will bear the cost of the independent evaluator.

"<u>Registration</u>" has the meaning set forth in <u>Section 11.1</u>.

"<u>Regulated Investor</u>" has the meaning set forth in <u>Section 6.6(b)</u>.

"<u>Regulatory Issue</u>" has the meaning set forth in <u>Section 6.6(b)</u>.

"<u>Securities Act</u>" means the U.S. Securities Act of 1933, as amended.

"<u>Separate Investment Entity</u>" has the meaning set forth in <u>Section 5.15</u>.

"<u>Seventy-Five Percent in Interest of the Limited Partners</u>" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling 75% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"<u>Short-Term Investment Income</u>" means the income earned on Short-Term Investments including in any event any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"<u>Short-Term Investments</u>" means investments in (a) cash, (b) obligations of, or fully guaranteed as to timely payment of principal and interest by, the United States of America and with a maturity date not in excess of 12 months from the date of purchase by the Partnership, (c) interest-bearing accounts and/or certificates of deposit of any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, (d) reverse repurchase agreements using U.S. Treasury securities and entered into with any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, and (e) money market mutual funds with assets of not less than $500 million, substantially all of which assets are reasonably believed by the General Partner to consist of items described in one or more of the foregoing <u>clauses (b)</u>, <u>(c)</u> and <u>(d)</u>.

"<u>Subscription Agreement</u>" means the Subscription Agreements (including a Subscriber Information Form) executed and delivered by Partners investing in the Partnership substantially in the form of the Subscription Agreement, dated as of the date hereof.

"<u>Successor Fund</u>" has the meaning set forth in <u>Section 5.12</u>.

17475053

-15-

"Tax Exempt Partner" means (i) a Limited Partner that is exempt from tax under Section 501 of the Code or (ii) a Limited Partner that has a direct or indirect beneficial owner that (x) is exempt from tax under Section 501 of the Code and (y) would be required to report on a United States federal income tax return or report UBTI that would be derived from the Partnership if the Partnership were classified as a partnership for U.S. federal income tax purposes, to the extent of such beneficial owner's pro rata share of such income, but only in each case if such Limited Partner has notified the General Partner in writing regarding the status of such direct or indirect beneficial owner.

"Topping and Break-up Fees" means topping, break-up or similar fees in connection with prospective Portfolio Investments that are not completed, in each case to the extent actually paid by a prospective Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Transaction and Monitoring Fees" means commitment, transaction, closing, merger and acquisition, divestiture, financing, monitoring and similar advisory fees in respect of a Portfolio Company, in each case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Triggering Event" has the meaning set forth in Section 2.2(d).

"Two-Thirds in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than $66^{2/3}\%$ of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"UBTI" means unrelated business taxable income and unrelated debt financed taxable income, as defined in Sections 512 and 514 of the Code, respectively.

"Unapplied Waived Fee Amounts" has the meaning set forth in the Master Partnership Agreement.

17475053                                    -16-

"Uncapitalized Partnership Expenses" means Partnership Expenses that are not Capitalized Partnership Expenses.

"Unfunded Commitment" means that portion of a Partner's Commitment that is not a Funded Commitment.

"U.S." means the United States of America.

"Waived Fee Amount" has the meaning set forth in Section 4.1(d).

"Waived Fee Notice" has the meaning set forth in Section 4.1(d).

"Waiver Contribution" has the meaning set forth in Section 2.2(a)(ii).

Section 2.2  Capital Contribution Commitment; Key Person Provision.  Subject to Section 5.6(b):

(a)      (i)  Each Partner agrees to make contributions in cash to the capital of the Partnership pro rata based upon such Partner's respective Unfunded Commitment in an aggregate amount up to its Unfunded Commitment when and as called by the General Partner ("Capital Call") upon at least ten Business Days written notice (the "Capital Call Notice"); provided, however, that the General Partner shall contribute its share of any contribution to be used to make a Portfolio Investment directly to the Master Partnership in lieu of making a Capital Contribution to the Partnership for such amount.  The General Partner shall not be obligated to make Capital Contributions to be used to pay the Management Fee or Placement Fees, and Capital Contributions to pay the Management Fee will be made by each Limited Partner based on the amount of each payment of the Management Fee that is borne by such Limited Partner pursuant to Section 4.1(b).  Any Capital Contributions made by the Limited Partners to pay the Partnership's pro rata share of any Placement Fees shall be made by the Limited Partners whose Commitments gave rise to such fees, pro rata in accordance with their respective Commitments.  The aggregate Commitments and capital commitments to all Parallel Vehicles of the General Partner, the Principals, Highland and their Affiliates, shall be pro rata and shall equal the lesser of 5.0% of aggregate Commitments and capital commitments to all Parallel Vehicles and $50 million.  In the event of the election described in Section 2.2(a)(ii), each Limited Partner required to make a Waiver Contribution pursuant to Section 2.2(a)(ii) shall make the Waiver Contribution specified in the Capital Call Notice.  Each Portfolio Investment shall be made through the Master Partnership (other than investments made through a Separate Investment Entity pursuant to Section 5.15), and the Master Partnership shall call capital from the Partnership and the General Partner in the manner set forth in the Master Partnership Agreement for purposes of making such Portfolio Investment.  Each Capital Contribution shall be made by Partners in cash either by delivery to the Partnership of a certified check or wire transfer of immediately available funds to an account designated by the General Partner, provided, however, that the Capital Contributions of the General Partner may be made by cash contributions or by Deemed Contributions as set forth in Section 2.2(a)(ii).

A Capital Call Notice shall: (i) specify the purpose for which the Capital Contributions are required to be made (including a breakdown of the amounts called in respect of Portfolio Investments, Partnership Expenses, Organizational Expenses, Management Fees or Placement

Appx. 03968

Fees); (ii) in the case of a Capital Call Notice with respect to the anticipated making of a Portfolio Investment, include: (A) a brief description of the identity, nature and business of such Portfolio Investment; (B) a statement as to whether the Portfolio Investment might be structured through a Separate Investment Entity; (C) a designation as such of any Bridge Financing to be made as part of such Portfolio Investment, and (D) a statement as to whether the Portfolio Investment is an investment in a Media Company or could, in the reasonable judgment of the General Partner, cause a Limited Partner to recognize UBTI; and (iii) specify a Limited Partner's pro rata share of the Capital Contributions required to be made by such Limited Partner, the portion of the Capital Contribution to be applied towards the payment of Management Fees, and the amount of a Limited Partner's Unfunded Commitment remaining following the funding of such Capital Contribution.

(ii)     Notwithstanding Section 2.2(a)(i) above, at such time as the General Partner delivers any Capital Call Notice, the General Partner's required contribution to the Master Partnership in respect of anticipated or actual Portfolio Investment and/or expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, at the General Partner's election, shall be reduced by an amount up to the lesser of (A) the amount of the contribution to the Master Partnership otherwise required to be made by the General Partner pursuant to Section 2.2(a)(i), or (B) the amount of any existing Unapplied Waived Fee Amounts, and such amount shall instead be funded through Capital Contributions to the Partnership by the Participating Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b), pro rata according to their respective Commitments (for any Partner, a "Waiver Contribution"). If, as of any date, the aggregate amounts described in clause (i) of the definition of "Deemed Contribution" in the Master Partnership Agreement exceed the sum of the amounts described in clause (i) of the definition of "Unapplied Waived Fee Amounts," in the Master Partnership Agreement, the General Partner shall, within ten Business Days after such date, make a Capital Contribution equal to the amount of such excess. Such amount shall be distributed to the Partners as a return of their Capital Contributions, in proportion to their respective Waiver Contributions.

(b)     Each Partner's Commitment will commence on the date of the First Closing and will expire on the earlier of (i) five years from the Final Closing, (ii) the date after the second anniversary of the Final Closing on which the Commitment Period is terminated with the consent of Seventy-Five Percent in Interest of the Limited Partners, (iii) the date on which the General Partner determines that 90% of the aggregate Commitments of the Partners have been funded or are needed for purposes described in clauses (i) through (iii) of the next sentence below, or (iv) the date that the Commitment Period is terminated pursuant to Section 2.2(d), (such period being referred to as the "Commitment Period"). Notwithstanding the expiration or the termination of the Commitment Period, the Partners will remain obligated to make cash contributions throughout the duration of the Partnership pursuant to their respective Unfunded Commitments to the extent needed (i) to make Follow-on Investments; provided, however, that the aggregate of all Follow-on Investments made after the termination of the Commitment Period shall not exceed 15% of the aggregate Commitments, (ii) to make investments that were the subject of written agreements in process or under active consideration prior to or on the date of termination of the Commitment Period and which are consummated within 120 days of the date of termination of the Commitment Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals, and (iii) to pay Partnership Expenses and the Management Fee. The General Partner

Appx. 03969

shall notify the Limited Partners within 30 days of the termination of the Commitment Period as to all in process investments that were the subject of written agreements in process and investments under active consideration to the extent the General Partner is not bound by confidentiality obligations related thereto.

(c)      Subject to the ELP Law, the General Partner shall cause the Partnership to return to the Partners all or any portion of any Capital Contribution to the Partnership which is not invested directly or indirectly in a Portfolio Investment or used to pay Partnership Expenses, Management Fees, Placement Fees or Organizational Expenses or which has been contributed in order to fund a Bridge Financing which is refinanced.  Subject to the ELP Law, each such return of Capital Contributions shall be made pro rata among all Partners in the same proportion as the Partners made such Capital Contributions and shall be made on or before the sixtieth (60th) day following the date such Capital Contributions were due (as set forth in the Capital Call Notice pursuant to which such Capital Contributions were made by the Partners to the Partnership), provided, however, that such Capital Contributions may be retained and applied with respect to another outstanding Capital Call Notice and may also be retained if the General Partner determines in good faith that there will be a Capital Call within thirty (30) days after the date that such Capital Contributions would otherwise be required to be returned, and if not so applied and retained, may be called again by the General Partner according to the provisions of this Section 2.2 as if such returned Capital Contributions had not been previously called.

(d)      If:

(i)      James Dondero and Mark Okada both cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(ii)      the Keyman Group, together with the Principals as of the Final Closing and Permitted GP Transferees thereof, are no longer entitled to receive, directly or indirectly, in the aggregate at least 50% of the Carried Interest (as defined in the Master Partnership Agreement) payable to the General Partner, or

(iii)      any two or more of the members of the Keyman Group cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(the circumstances specified in each of clauses (i), (ii), and (iii), above being referred to herein as a "Triggering Event"), then the Partnership shall automatically enter into a 120 day period (subject to extension for an additional 120 day period as described below) in which the Commitment Period will be suspended (a "Continuity Period").

The Partnership shall not make any new investments during the Continuity Period, except to the extent such investments (a) were the subject of written agreements, (b) were in process or (c) under active consideration prior to the commencement of the Continuity Period, and in each such case, are consummated within 120 days of the commencement of the Continuity Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals for such investments.  The pursuit of Other Permitted Investment Activities by the Principals and the

17475053                                         -19-

Appx. 03970

members of the Keyman Group will not give rise to a Triggering Event. The General Partner
will promptly notify the Limited Partners of the occurrence of a Triggering Event.

During a Continuity Period, if a Triggering Event described in clause (i) above has
occurred, the General Partner, after consultation with the Advisory Committee, will prepare for
and provide to the Limited Partners within 60 days of the Triggering Event a program
recommended by the General Partner for resumption by the Partnership of its full range of
activities at the end of such Continuity Period. Prior to the end of the Continuity Period, but
within a reasonable time period following the delivery of a program recommended by the
General Partner, the General Partner will arrange for a vote of all Limited Partners. By consent
of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early
termination of the Commitment Period, such termination to commence on the date such
Continuity Period expires. If a Continuity Period expires without the occurrence of an effective
consent of the requisite Limited Partners to terminate the Commitment Period, the Partnership,
and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's
full range of activities.

During a Continuity Period, if a Triggering Event described in clauses (ii) or (iii) above
has occurred, within 90 days of the Triggering Event the General Partner may propose to the
Advisory Committee one or more replacements to serve as members of the Keyman Group for
purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve
of such replacement or replacements, such replacement person or persons shall thereafter be
members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall
be authorized and entitled to resume the Partnership's full range of activities. If the Advisory
Committee does not approve of such replacement person or persons within 30 days following the
delivery of the General Partner proposal to the Advisory Committee, the Continuity Period shall
be extended for an additional 120 day period. The General Partner may propose to the Advisory
Committee, within 90 days after the rejection by the Advisory Committee of the initial
replacement person or persons, a different replacement or replacements than originally proposed
to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of
the members of the Advisory Committee approve of such replacement or replacements within 30
days following delivery of the new General Partner proposal, such replacement person or persons
shall thereafter be members of the Keyman Group and the Partnership, and the General Partner
on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities.
If the Advisory Committee does not approve of such replacement person or persons within such
thirty day period, the General Partner will arrange for a vote of all Limited Partners. By consent
of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early
termination of the Commitment Period, such termination to commence on the date the Continuity
Period expires.

Section 2.3  Capital Accounts. A capital account ("Capital Account") will be established
for each Partner on the books of the Partnership and will be adjusted as follows:

(a)    Capital Contributions and Allocations. A Partner's Capital Contribution will be
credited to its Capital Account when received by the Partnership.

Appx. 03971

(b)    <u>Short-Term Investment Income</u>. Short-Term Investment Income earned in each quarterly period with respect to Capital Contributions that have not yet been invested in Portfolio Investments or used to pay fees and expenses of the Partnership will be credited to the Capital Accounts of the Partners <u>pro rata</u> according to their respective Partner Capital Contributions to which such Short-Term Investment Income is attributable. Short-Term Investment Income on undistributed proceeds from Portfolio Investments shall be credited to the Capital Accounts of the Partners ratably in proportion to their respective shares of such undistributed amounts.

(c)    <u>Investment Income and Gain and Investment Loss</u>. Taking into account <u>Section 6.6(d)</u> and except as otherwise provided in this <u>Section 2.3(c)</u>, Investment Income and Gain or Investment Loss shall be allocated among the Partners for each taxable period in such a manner that, as of the end of such taxable period, and to the extent possible, the Capital Account of each Partner shall be equal to the net amount, positive or negative, which would be distributed to each Partner or for which such Partner would be liable to the Partnership under this Agreement, determined as if the Partnership were to liquidate the assets of the Partnership for an amount equal to their Basis, reduced, but not below zero, by the amount of nonrecourse debt, if any, to which such Partnership assets are subject, and distribute the proceeds in liquidation after the payment of all liabilities (other than nonrecourse liabilities) in accordance with <u>Sections 3.2</u> and <u>3.3</u>. For purposes of the foregoing determination, any increase in the Basis of a Portfolio Investment shall be taken into account for this purpose in the same manner as proceeds of a Partial Realization.

(d)    <u>Organizational Expenses, Management Fee</u>. Organizational Expenses that are borne by the Partnership will be apportioned to the Partners <u>pro rata</u> according to their respective Capital Contributions to pay Organizational Expenses. Organizational Expenses that are described in Section 705(a)(2)(B) of the Code will be debited against the Capital Accounts of the Partners in the fiscal period in which they are incurred, and Organizational Expenses that are described in Section 709(b) of the Code will be debited against the Capital Accounts of the Partners over a 180-month period. The Management Fee for any Management Fee Period shall be debited against the Capital Account of each Limited Partner in the amount that is borne by such Limited Partner pursuant to <u>Section 4.1(b)</u> for such Management Fee Period.

(e)    <u>Distributions</u>. Any amounts distributed to the Partners will be debited against their Capital Accounts.

(f)    <u>Partnership Expenses</u>. Uncapitalized Partnership Expenses shall be debited against the Capital Accounts of the Partners in proportion to their respective Commitments.

(g)    <u>Placement Fees</u>. Placement Fees, shall be debited against the Capital Accounts of the Limited Partners whose Commitments gave rise to such fees, in proportion to their respective Commitments.

Section 2.4  <u>Distributions in Kind</u>.

(a)    If any securities are to be distributed in kind to the Partners as provided in <u>Article III</u>, such securities will first be written up or down to their value (as determined pursuant to <u>Article IX</u> as of the date of such distribution), thus creating Investment Income or Gain or

17475053                                    -21-

Investment Loss, which shall be allocated in accordance with Section 2.3 to the Capital Accounts of the Partners, and upon the distribution (or deemed distribution pursuant to Section 2.4(b)) of such securities to the Partners, the value of such securities shall be debited, in accordance with Section 2.3(e), against the Capital Accounts of the Partners.

(b)     The General Partner shall give at least ten Business Days prior notice to the Limited Partners of any proposed distribution of securities pursuant to this Section 2.4 and the date of such proposed distribution.  In connection with any distribution of securities in kind, the General Partner shall offer each Limited Partner the right to elect to receive a distribution of securities or to have the Partnership dispose of all or any portion of such securities for the account of such Limited Partner.  At the election of a Limited Partner (an "Electing Limited Partner"), all distributions of securities that otherwise would be made to the Electing Limited Partner by the Partnership shall be made, as determined by the General Partner, to the General Partner or an independent escrow agent or custodian as agent for the Limited Partner (the "Agent") and, unless otherwise specified in writing, an Electing Limited Partner shall be deemed to have chosen to have the Partnership sell its share of securities in full.  An Electing Limited Partner shall bear all expenses (including, without limitation, underwriting costs and brokerage commissions) relating to the sale by the Partnership of such securities.  The General Partner may require the Electing Limited Partner to make any representations, warranties and covenants as the General Partner shall reasonably determine are necessary or desirable in order to dispose of the securities.  For all purposes of this Agreement, the Limited Partner shall be deemed to have received such distribution of securities on the date that such securities are delivered to the Agent.  Immediately following a distribution to the Agent pursuant to this Section 2.4(b), the General Partner shall notify the Limited Partner of the type and quantity of securities distributed.  The Agent shall thereafter hold such securities for a period of 10 Business Days following which the Agent shall use its reasonable efforts to promptly sell such securities and deliver the net proceeds therefrom to the Limited Partner; provided, however, that the Agent shall not sell such securities and shall instead promptly deliver such securities to the Limited Partner following the conclusion of such 10 Business Day period if, prior to the conclusion of such period, the Limited Partner notifies the Agent that the receipt of such securities would not violate any law, regulation or governmental order applicable to the Limited Partner.  The Agent shall use good faith efforts in selling such securities at the highest available price, but shall not be liable to an Electing Limited Partner in any manner in connection with such sale in the absence of gross negligence or willful misconduct, including for any claim that the Agent was unable to effect any such sale (for any reason) or failed to obtain the highest possible sale price for such securities.

(c)     An Electing Limited Partner's election pursuant to Section 2.4(b) may be revoked by the Electing Limited Partner at any time upon notice to the General Partner; provided, however, that an election may not be revoked with respect to securities if the Agent has entered into a binding commitment to sell securities on behalf of the Electing Limited Partner.

Section 2.5  Determination of Voting Thresholds.  Any vote, approval or consent that is to be based upon a specified proportion of the interests in the Partnership held by the limited partners shall be based upon the Limited Partners' Commitments and the capital commitments of limited partners in Parallel Vehicles, excluding (i) except as specifically provided in Section 6.9, that portion of each Limited Partner's Commitment and the capital commitment of each limited partner in a Parallel Vehicle that represents a Non-Voting Interest, (ii) except as otherwise set

forth in Section 12.1(b), limited partner interests in the Partnership or in any Parallel Vehicle held by a Defaulting Partner or a defaulting partner of a Parallel Vehicle, and (iii) limited partner interests in the Partnership or in any Parallel Vehicle held, directly or indirectly, by the General Partner, Highland, the Principals or any of their respective Affiliates prior to any removal of the General Partner pursuant to Section 5.9, and (iv) in the case of any particular matter that affects or pertains only to the Partners and not to any partner of a Parallel Vehicle, limited partner interests in such Parallel Vehicle held, directly or indirectly, by the General Partner or by any limited partner of such Parallel Vehicle.

## ARTICLE III

## DISTRIBUTIONS

Section 3.1  Distribution Policy.

(a)    The General Partner may in its sole discretion make distributions of cash or Marketable Securities at any time and from time to time subject to the remaining provisions of this Section 3.1; provided, however, that no securities will be distributed in kind to the Partners that are not Marketable Securities until the final distribution of the assets of the Partnership to the Partners pursuant to Section 8.3(b).

(b)    The General Partner will cause the Partnership to distribute (i) Current Cash Income at least semi-annually unless reinvested as described in this Section 3.1(b), (ii) Short-Term Investment Income at least quarterly, and (iii) the net cash proceeds received from Dispositions of or Partial Realizations with respect to Portfolio Investments within 60 days of the receipt thereof unless reinvested as described in this Section 3.1(b), after, in each case, the setting aside by the General Partner, in its discretion, of reasonable reserves for anticipated obligations and commitments of the Partnership as well as any required tax withholdings; provided, however, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the date that an amount that would otherwise be distributed that would be described in clauses (a), (b) and (d) of the definition of Funded Commitment, or if there is an outstanding Capital Call Notice the General Partner may, in its discretion, retain such amount and reduce the amount required to be contributed with respect to such Capital Call.

Section 3.2  Distribution of Short-Term Investment Income.  Short-Term Investment Income will be distributed among the Partners in the same proportions as Short-Term Investment Income was credited to the Partners' Capital Accounts.

Section 3.3  Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions.

(a)    Distributions not attributable to a Portfolio Investment shall be distributed to the Limited Partners in proportion to their Funded Commitments as of the date of such distribution. All distributions of Current Cash Income and all distributions out of net proceeds from Dispositions of or Partial Realizations with respect to Portfolio Investments (in each case, net of Partnership Expenses) and all distributions of Portfolio Investments shall be distributed to the

Appx. 03974

Participating Partners in proportion to their respective Partner Interests with respect to the Portfolio Investment that gave rise to such Current Cash Income or net proceeds or that is being distributed in kind.

(b)  A Partner's Capital Contributions used to pay Organizational Expenses, Management Fees, Placement Fees and Uncapitalized Partnership Expenses that are to be allocated to a Portfolio Investment shall be determined on the date such Portfolio Investment is Disposed of, and shall equal the product of (i) such Capital Contributions not theretofore allocated to Portfolio Investments that have been Disposed of multiplied by (ii) a fraction, the numerator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and the denominator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and all Portfolio Investments that have not been Disposed of on or prior to the date such allocation is effected.  For purposes of the determinations described in clause (b)(i) of the definition of "Excess Partial Realization Proceeds" in the Master Partnership Agreement, such Capital Contributions shall be tentatively allocated to the Portfolio Investment giving rise to such Partial Realization proceeds as though such Portfolio Investment had been Disposed of on the date such proceeds were realized.

Section 3.4  Foreign Taxes.  The amount of any foreign taxes paid by the Partnership (or by an entity in which the Partnership holds an interest, either directly or indirectly through one or more such entities, that is treated as a partnership or is disregarded for federal income tax purposes) or withheld from receipts of the Partnership or such entity from a Portfolio Investment shall be allocated among the Partners as reasonably determined by the General Partner (taking into account any allocation of taxes under Section 6.7) and, for purposes of Sections 3.3(a)(i) – (iii) of the Master Partnership Agreement, shall be deemed to have been distributed to each Partner as Current Cash Income or proceeds from the Disposition of a Portfolio Investment to the extent that the payment or withholding of such foreign taxes reduced Current Cash Income or the proceeds from the Disposition of a Portfolio Investment, as the case may be, otherwise distributable to such Partner as provided herein (for this purpose taking into account with respect to each Partner any reduction in such foreign taxes that occurs by reason of such Partner's status); provided that the General Partner may deem foreign taxes paid by or withheld from receipts of the Partnership and allocable to a Tax Exempt Partner to have been distributed to such Tax Exempt Partner as described above only to the extent that such Tax Exempt Partner incurs and is subject to tax on UBTI relating to such Tax Exempt Partner's Interest in the Partnership, as determined by the General Partner.

# ARTICLE IV

# MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES

Section 4.1  Management Fee.

(a)  During each quarterly period beginning on each January 1, April 1, July 1 and October 1 from and after the First Closing (each such quarterly period, a "Management Fee Period") until the termination of the Partnership, the Partnership will pay the Manager a

Appx. 03975

quarterly fee as calculated below (the "Management Fee"), in advance on each January 1, April 1, July 1 and October 1, as compensation for managing the affairs of the Partnership, provided, however, that the initial payment of the Management Fee shall be for the period from the First Closing to December 31, 2007.

(b)    The Management Fee payable by the Partnership shall be the sum of the amounts determined for each Limited Partner pursuant to this Section 4.1.  No Management Fee shall be payable with respect to the General Partner and their Affiliates.  Subject to Sections 4.1(c) and 4.1(d), the quarterly Management Fee payable with respect to a Limited Partner during the Initial Fee Period shall be 0.4375% of the Commitments of such Limited Partner resulting in an aggregate annual Management Fee of 1.75%.  Following the expiration of the Initial Fee Period, the quarterly Management Fee payable with respect to a Limited Partner shall be 0.4375% of the aggregate Net Funded Commitment of such Limited Partner as reduced by any writedowns or writeoffs pursuant to Section 9.4 in respect of Portfolio Investments that have not been Disposed of on or prior to such date (resulting in an aggregate annual Management Fee of 1.75%).  The Management Fee in any partial quarterly period will be pro rated on a daily basis according to the actual number of days in such period.

(c)    The Management Fee payable with respect to any Management Fee Period and with respect to a Limited Partner will be reduced (but not below zero) by such Limited Partner's Partner Share of eighty-five percent (85%) of the Partnership's pro rata share of all Topping and Break-up Fees, Transaction and Monitoring Fees, and Director Fees.  The Management Fee shall also be reduced, but not below zero, by such Limited Partner's Capital Contributions used pursuant to Section 2.2(a)(i) to pay (x) any Placement Fees and (y) any Organizational Expenses in excess of $1,250,000, paid or payable by the Partnership.  To the extent that such Limited Partner's share of the Management Fee in any Management Fee Period is reduced to zero as a result of the reduction for Placement Fees, Organizational Expenses in excess of $1,250,000, Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees, the excess shall be carried forward to the next Management Fee Period (and, if necessary, to one or more subsequent Management Fee Periods) and applied as a reduction of the Management Fee, but not below zero, for such succeeding Management Fee Period (or a subsequent Management Fee Period).  To the extent that Director Fees, Topping and Break Up Fees and Transaction and Monitoring Fees exceed or cannot be applied as a reduction of Management Fees for succeeding Management Fee Periods, then such excess will first be applied to reimburse the Partnership for any previously unreimbursed Management Fees paid by the Partnership for prior Management Fee Periods (with such amounts being treated for purposes of Section 3.3(a) as distributions in return of the Capital Contributions made to pay such Management Fees), and the remainder of such excess will be paid or contributed to the Partnership and will be distributed pursuant to Section 3.3(a) as if net proceeds from the Disposition of a Portfolio Investment; provided, however, that in the event that any Partner desires not to receive any such excess fee offsets upon the termination of the Partnership, such Partner may elect in writing at any time prior to the termination of the Partnership to waive receipt of any such fee offsets, in which case the amount of fee offsets that would otherwise have been allocated and distributed to such Partner shall instead be allocated and distributed to the other non-waiving Partners on a pro rata basis in accordance with their respective Commitments.  The Partnership's pro rata share of all Topping and Break-up Fees, Transaction and Monitoring Fees and Director Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the Partnership's investment in the

17475053                                    -25-

Portfolio Investment (or proposed investment in the proposed Portfolio Investment) giving rise to such fee and the denominator of which is the aggregate investment or proposed investment in such Portfolio Investment or proposed Portfolio Investment by the Partnership, all Parallel Vehicles, all Separate Investment Entities, all Co-investment Funds and all other co-investment arrangements arranged by the Manager with respect to such Portfolio Investment or proposed Portfolio Investment (provided, that for the avoidance of doubt, any such Co-Investment Funds or other co-investment arrangements will not receive any amount of fee offsets).

(d)     After taking into account any reduction in the Management Fee payable for any Management Fee Period with respect to a Limited Partner pursuant to Section 4.1(c), the Management Fee payable for any Management Fee Period with respect to such Limited Partner shall be further reduced by an amount (the "Waived Fee Amount") equal to the lesser of (i) the amount of the Management Fee to which the Manager would otherwise be entitled pursuant to this Section 4.1 that the Manager has irrevocably elected to waive in a written notice (a "Waived Fee Notice") delivered to the Partnership with respect to each Management Fee Period, at least 15 days prior to the end of the calendar year immediately preceding the calendar year in which such Management Fee Period begins, and with respect to each Management Fee Period in the first calendar year of the term of the Partnership, such Waived Fee Notice delivered on or prior to the delivery of the first Capital Call Notice in respect of Management Fees and (ii) the amount that would be payable to the Manager on such Management Fee Period pursuant to this Section 4.1 in the absence of this Section 4.1(d).  A Limited Partner's share of the Waived Fee Amount for any Management Fee Period is equal to the Waived Fee Amount for such Management Fee Period multiplied by the quotient determined by dividing (i) the Management Fee that would be payable for such Management Fee Period with respect to such Limited Partner in the absence of this Section 4.1(d) by (ii) the total Management Fee that would be payable for such Management Fee Period in the absence of this Section 4.1(d).  If the Manager delivers a Waived Fee Notice with respect to any Management Fee Period that begins before the date of the Final Closing, (i) if such Waived Fee Notice specifies that a percentage of the Management Fee otherwise payable for such Management Fee Period be waived, the Manager shall be deemed to have waived a proportionate amount of the Management Fee otherwise payable for such Management Fee Period by all Additional Limited Partners whose subscriptions are accepted after the date of such Waived Fee Notice and (ii) if such Waived Fee Notice specifies that a fixed dollar amount of such Management Fee otherwise payable for such Management Fee Period be waived, the reduction in the Management Fee for such Management Fee Period shall be allocated to all Limited Partners in the same proportion as the Management Fee is borne by the Limited Partners for such Management Fee Period.

(e)     For purposes of Section 4.1(c), a Limited Partner's share of Director Fees and Transaction and Monitoring Fees is equal to the amount of the Partnership's pro rata share of such fees multiplied by the Limited Partner's Partner Interest in the Portfolio Investment to which such Director Fees and Transaction and Monitoring Fees are attributable, and a Limited Partner's share of Topping and Break-up Fees is equal to the amount of such fees multiplied by the proportion of such Limited Partner's Commitment to the Commitments of all Partners on the first day of the Management Fee Period in which such Topping and Break-up Fees are paid.

Section 4.2  Organizational and Partnership Expenses.  The Partnership will reimburse the General Partner or the Manager for all Organizational Expenses incurred by the General

Partner or the Manager on behalf of the Partnership.  The Partnership will pay all Partnership
Expenses.

        Section 4.3  <u>Ordinary Operating Expenses</u>.  The Manager shall pay all ordinary overhead
expenses of the Partnership, the General Partner, the Manager, the Separate Investment Entities
and the Parallel Vehicles (including salaries, rent, overhead, travel expenses and similar
expenses), other than Partnership Expenses, Organizational Expenses and Placement Fees.


# ARTICLE V

# GENERAL PARTNER

        Section 5.1  <u>Investment Opportunities; Devotion of Time; Management Authority</u>.

        (a)      The Principals shall each be actively involved in the business of the Fund Group
and shall devote such amount of their business time and attention in order to fulfill their fiduciary
duties to the Limited Partners in accordance with the ELP Law; <u>provided</u>, <u>however</u>, that the
Principals may engage and be involved in Other Permitted Investment Activities.  Subject to the
foregoing and to <u>Section 5.12(a)</u> and the Highland Investment Allocation Policy, during the
Commitment Period, the General Partner, the Manager and the Principals will present all
investment opportunities to the Partnership which they believe in good faith are suitable for the
Partnership and fit the investment objective of the Partnership.  However, the Principals and the
Manager will not be restricted from pursuing, engaging in and completing acquisitions and
investments in, through or by Highland Portfolio Companies in connection with Other Permitted
Investment Activities and other investments through other Highland Accounts, in each such case,
in accordance with the Highland Investment Allocation Policy.

        (b)      The General Partner will have full control over the business and affairs of the
Partnership consistent with its duties arising under the ELP Law.  The General Partner will have
the power on behalf and in the name of the Partnership to carry out any and all of the objects and
purposes of the Partnership and to perform all acts and enter into and perform all contracts and
other undertakings which, in its sole discretion, are necessary or advisable or incidental thereto,
including the power to acquire or dispose of any security (including Marketable Securities).
Notwithstanding the foregoing, the management of the Partnership will vest in the Manager
which will provide the Partnership with portfolio management and administrative services,
including investigating, analyzing, structuring and negotiating potential investments, monitoring
the performance of Portfolio Companies and advising as to disposition opportunities.  In no
event shall the Manager, which has been engaged by the Partnership, be treated as an agent or
partner of the General Partner.

        (c)      Except to the extent otherwise provided in this Agreement, all matters concerning
(i) the allocation of Short-Term Investment Income, Current Income, Investment Income and
Gain, Investment Loss, Partnership Expenses, Organizational Expenses, and the distribution of
net proceeds and the return of capital among the Partners, including the taxes thereon, (ii)
accounting procedures and determinations, estimates of the amount of Management Fees or
Placement Fees payable by any Defaulting Partner, (iii) the calculation of the Management Fee

               -27-

Appx. 03978

(including Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees ), and (iv) the reinvestment of any amounts distributed in respect of a Bridge Financing (or portion thereof) that was sold, refinanced or otherwise disposed of within eighteen (18) months from the Investment Date of such Bridge Financing, shall be determined by the General Partner in accordance with its reasonable interpretation of the provisions of this Agreement made in good faith.

Section 5.2   Use of Affiliates.  The General Partner shall retain the services of the Manager and any officers, directors or Affiliates thereof in connection with the operation of the Partnership, and the compensation of the Manager and such persons shall be as provided in Section 4.1 hereof; provided, however, that nothing contained in this Section 5.2 shall be construed to relieve the General Partner of its responsibilities under this Agreement or the duties and limitations set forth in this Article V.

Section 5.3   Indebtedness.  Subject to Section 5.5 and Section 5.4, the Partnership may incur indebtedness consisting of Bridge Leveraging or the issuance of credit support of the obligations of Portfolio Companies or their subsidiaries, which may be in the form of guarantees, letters of credit or pledges of a portion of the Commitments ("Credit Support").  Any such indebtedness will not be considered as Capital Contributions by the Partners unless, until and to the extent the General Partner calls for Capital Contributions in connection therewith pursuant to a Capital Call Notice pursuant to this Agreement.

Section 5.4   Limitation on Investments.

(a)      The Partnership will not invest (including through Credit Support) more than twenty five percent (25%) of the aggregate Commitments in any single Portfolio Company together with any of its Affiliates (valued at original cost).  A Bridge Financing, when added to the amount of permanent investment by the Partnership in the Portfolio Investment that is the subject of the Bridge Financing, may not exceed twenty five percent (25%) of the aggregate Commitments.

(b)      The aggregate amount of Bridge Financings outstanding at any one time shall not exceed fifteen percent (15%) of the aggregate Commitments.

(c)      Subject to Section 5.5, the Partnership may issue Credit Support, which does not at any one time exceed Unfunded Commitments.

(d)      The Partnership shall invest cash in Short-Term Investments.

(e)      The aggregate investments (valued at cost) by the Partnership in Portfolio Companies organized and with principal executive offices outside the United States shall not exceed thirty percent (30%) of the aggregate Commitments.  The Partnership will not invest in Portfolio Companies that are organized or with principal executive offices in countries that are not within the Organization for Economic Cooperation and Development as of the date of the First Closing.

(f)      The Partnership will not invest as a partner or member in any pooled investment fund or "fund of funds" in which an investment adviser or manager of such fund (other than the

Partnership) receives management fees or the right to carried interest distributions on the Partnership's investment or interest therein unless the amount of any such management fee is considered part of the Capital Contribution relating to such Portfolio Investment and the amounts distributable to the General Partner under Sections 3.3(a)(ii) and 3.3(a)(iii) of the Master Partnership Agreement are reduced by the amount of any carried interest payable to such sponsor or investment manager.

(g)     In connection with a Portfolio Investment in any non-U.S. jurisdiction, the General Partner shall obtain an opinion of counsel with respect to such jurisdiction to the effect that (i) no Limited Partner, solely as a result of the Partnership making such investments, will be required either (x) to file an income tax return in such jurisdiction (other than in connection with an application for a refund of withholding or similar taxes) or (y) to pay income tax in such jurisdiction with respect to income not derived from the Partnership, and (ii) no Limited Partner shall be personally liable for any debts or losses of the Partnership in such jurisdiction in excess of such Limited Partner's Unfunded Commitment.  The General Partner shall use commercially reasonable efforts to ensure that any opinion obtained pursuant to this Section 5.4(i) will permit the Limited Partners to rely thereon.  The General Partner shall ask local counsel to confirm and/or update periodically as it deems necessary any opinion it obtains pursuant to this Section 5.4(i).  The Partnership will use commercially reasonable efforts to prepare all tax rebate, reduction or reclaim forms or other filings or elections that are required to obtain any available exemption from, reduction in, or refund of, any withholding or other taxes required in any taxing jurisdiction on behalf of each Limited Partner, for signature by such Limited Partner, and to assist each Limited Partner, at such Limited Partner's expense, to obtain refunds for taxes withheld or paid with respect to such Limited Partner as to which a refund is obtainable.  Each Partner agrees that it will cooperate with the General Partner in making any such filings or elections to the extent the General Partner determines that such cooperation is necessary or desirable.

(h)     The Partnership will not invest (including through Credit Support) more than twenty percent (20%) of the aggregate Commitments in Persons that are not Distressed Companies; provided that the General Partner in its good faith discretion believes that an investment in such Persons is consistent with the Partnership's investment objective.

Section 5.5  UBTI; USRPI; ECI.  The General Partner shall use commercially reasonable efforts not to (i)  structure the Fund's Portfolio Investments in a manner that would result in the realization by a Tax Exempt Partner of a substantial amount of UBTI, (ii) take any action that would cause any Non-U.S. Partner to recognize ECI, (iii) cause the Partnership to acquire a Portfolio Investment that the General Partner reasonably believes at the time of such acquisition is or is likely to become a "United States real property interest" ("USRPI") within the meaning of Section 897(c) of the Code or (iv) take any action that would cause any Non-U.S. Partner to which Section 892 of the Code applies to be considered or deemed to be engaged in a commercial activity for purposes of Section 892 of the Code; provided, however, that the use of Bridge Leveraging and the use of Director Fees, Topping and Break-up Fees, Transaction Fees and Monitoring Fees, and Placement Fees to offset the Management Fee, as described in Section 4.1(c) will not be deemed a violation of this Section 5.5.  The General Partner will consider the economic consequences of the manner in which it structures Portfolio Investments, and will use commercially reasonable efforts to make such Portfolio Investments through structures that are

17475053

-29-

Appx. 03980

intended to minimize the tax cost that will be economically borne by the Limited Partners as a result of such structures, including, where appropriate, making Portfolio Investments through a "blocker" structure, to the extent consistent with applicable law.

Section 5.6 ERISA Matters.

(a)    The General Partner will use reasonable efforts to conduct the affairs and operations of the Partnership in such a manner that the Partnership will qualify as an Operating Company or for another exception from being deemed to hold Plan Assets of any Benefit Plan Investor.  As of the initial Capital Contribution date, the General Partner shall deliver to each Benefit Plan Investor either (i) an opinion from the General Partner's counsel to the effect that the Partnership should qualify as an Operating Company as of the initial Capital Contribution date or (ii) a certificate, based on consultation with the General Partner's counsel, to the effect that the Partnership should qualify for another exemption from being deemed to hold Plan Assets of any Benefit Plan Investor as of the initial Capital Contribution date.  Annually thereafter, the General Partner will provide a certificate to Benefit Plan Investors confirming that the Partnership continues to qualify for an exception from being deemed to hold Plan Assets of any Benefit Plan Investor and specifying which exception from Plan Assets is available to the Partnership as of the date of the certificate.

(b)    Notwithstanding Section 2.2, until such time as the General Partner delivers to each Benefit Plan Investor (and the escrow agent, if any) either the opinion or the certificate described above in Section 5.6(a), the initial Capital Contribution required to be made to the Partnership by a Benefit Plan Investor shall, at the request of the General Partner, instead be deposited directly by such Benefit Plan Investor into an escrow account that is intended to comply with Department of Labor Advisory Opinion 95-04A.

(c)    Each Partner that is or will be a Benefit Plan Investor on the Closing Date when it is admitted to the Partnership shall so notify the General Partner in writing prior to such Closing Date. Any Limited Partner which has not indicated in its Subscription Agreement that it is a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

(d)    It is intended that none of the Partnership, the General Partner, the Manager or any of their Affiliates will act as or be deemed to be a fiduciary under ERISA with respect to any Benefit Plan Investor or the assets of the Partnership; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the ELP Law. Notwithstanding any other provision of this Agreement, the General Partner is authorized to take any action or refrain from taking any action which in its judgment is necessary or desirable in order to prevent any Partnership assets from being deemed to constitute Plan Assets of any Benefit Plan Investor.

(e)    Should the General Partner reasonably determine that the continued participation of a Benefit Plan Investor would result in the assets of the Partnership being deemed Plan Assets of such Benefit Plan Investor (a "Plan Asset Event"), the General Partner shall so notify, each of the Benefit Plan Investors in writing within 30 days of such determination.  Thereafter, the

Appx. 03981

General Partner shall take reasonable steps to correct or cure the Plan Asset Event and, if the General Partner determines that it is not reasonably likely that the Partnership's Plan Asset Event can be reasonably corrected or cured, taking into account the overall interest of the Partnership, the General Partner shall dissolve the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3. In connection with the foregoing obligation, in addition to any other powers the General Partner may have, the General Partner shall have the authority to take any of the following actions, in its sole discretion: (i) any action necessary or desirable, in the General Partner's reasonable judgment, to cure the Partnership's failure to qualify as an Operating Company, if applicable; (ii) in accordance with the provisions of Section 12.1, amend this Agreement to cure any illegality or other material adverse consequences to the Partnership; (iii) amend, terminate or restructure any then existing or contemplated arrangements with third parties to cure any illegality or other adverse consequences to the Partnership so long as such action would not have a material adverse effect on the Limited Partners; (iv) redeem any Limited Partner's interest in the Partnership, in whole or in part, in a manner consistent with the procedures in Section 6.6(d); (v) force the sale of all or any portion of any Benefit Plan Investor's interest in the Partnership to one or more Limited Partners at the Redemption Value or (vi) dissolve the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3.

Section 5.7  Conflicts of Interest.

(a)    The Limited Partners hereby acknowledge and agree that the General Partner and its Affiliates currently manage and may in the future manage Highland Accounts that invest in securities that may be eligible for purchase by the Partnership, which presents the potential for conflicts of interest. While the General Partner and the Manager intend to manage potential conflicts of interest, as Highland has in the past, by following certain guidelines, and to avoid where practicable situations involving conflicts of interest in a portfolio company or otherwise, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership in a portfolio company or otherwise may conflict with the interests of other Highland Accounts, the General Partner, the Manager, the Principals or their respective Affiliates. On any matter involving a conflict of interest not otherwise provided for in this Agreement, the General Partner shall be guided by its good faith judgment as to the best interests of the Partnership and shall take such actions as are determined by the General Partner and Highland to be appropriate and in compliance with the Highland Investment Allocation Policy. Each Limited Partner agrees that the activities of any other Highland Account, the General Partner, the Manager, the Principals and their Affiliates, including Other Permitted Investment Activities, authorized by this Agreement or conducted consistently with this Agreement and the Highland Investment Allocation Policy may be engaged in by such other Highland Accounts, the General Partner, the Manager, the Principals and their Affiliates, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty that might be owed by any such person to the Partnership or to any Partner.

(b)    Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, none of the General Partner, the Manager, the Principals, or any of their respective Affiliates will invest in any securities of any company in which the Partnership either is actively considering making a Portfolio Investment or has an investment; provided, that (x) the foregoing will not apply to Other Permitted Investment Activities or investments made in

17475053                                    -31-

accordance with the Highland Investment Allocation Policy, (y) each such person will be permitted to hold securities which such person received in a distribution by the Partnership and (z) any Parallel Vehicles or Separate Investment Entities will be permitted to invest in Portfolio Companies in accordance with this Agreement.

(c)     Except as permitted by <u>Sections 5.12(a)</u> and <u>5.17(a)</u>, without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, the Partnership will not invest in any securities issued by, acquire investments from, sell investments to, or enter into any transaction with an entity in which the General Partner, the Manager, the Principals, or their respective Affiliates has a material financial interest in respect of such entity; <u>provided</u> that the foregoing will not apply to (w) Other Permitted Investment Activities, (x) investments by the Partnership in Portfolio Companies in which the Parallel Vehicles, Separate Investment Entities or Co-Investment Funds invest in accordance with this Agreement; (y) investments by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material interest that have been made in accordance with the Highland Investment Allocation Policy, or (z) investments by the Partnership in publicly traded securities of Portfolio Companies in which a Highland Account has a material financial interest that are made on arms length terms at prevailing market prices; <u>provided</u>, <u>further</u>, that  the Partnership will not be precluded from investing in securities of a company in which the General Partner, the Manager, the Principals, or their respective Affiliates either (A) in the case of public companies, owns securities issued by such company representing one percent (1%) or less of the outstanding equity securities, or (B) own only securities which such Persons received in a distribution by the Partnership.

(d)     The General Partner will furnish to the Advisory Committee annually at the time annual financial statements of the Partnership are furnished pursuant to <u>Section 10.3(b)</u> a report of each acquisition or investment by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material financial interest that have been made in accordance with the Highland Investment Allocation Policy.

Section 5.8  <u>Transfer of General Partnership Interest; No Withdrawal or Loans</u>.  The General Partner generally may not sell, assign, pledge, mortgage or otherwise dispose of its General Partner interest in the Partnership; <u>provided</u>, <u>however</u>, that the General Partner may transfer its General Partner interest in the Partnership (or consent to the transfer of an interest in the General Partner) in a derivative transaction if the transferor maintains the economic attributes of the interest and voting control of the interest.  The General Partner will not borrow or withdraw any amount from the Partnership or voluntarily withdraw from the Partnership.

Section 5.9  <u>Removal of the General Partner</u>.  By consent of Two-Thirds in Interest of the Limited Partners, the General Partner may be removed in the event of (a) the General Partner's or any member of the Keyman Group's conviction of (or plea of <u>nolo contendere</u> (that is, neither admitting nor denying the charges) to), a material violation of U.S. federal or U.S. state securities law or a U.S. felony criminal violation, (b) the General Partner's adjudication in a final judgment by a court of competent jurisdiction as having committed in respect of the Partnership an act or omission of a material nature involving gross negligence, bad faith, willful misconduct or fraud, or (c) the General Partner's violation of this Agreement which has a material and adverse effect on the Partnership and which remains uncured for 30 days.  Notwithstanding the foregoing, if an

event described in clause (a) above has occurred and the event relates to a violation or act of a member of the Keyman Group, the Limited Partners may remove the General Partner only if such violation or act (i) relates to the Partnership or a Portfolio Company, (ii) has a material adverse effect on the Partnership, (iii) such member of the Keyman Group is not terminated as a member of the General Partner and the Manager within 45 days, and (iv) such member of the Keyman Group does not cease to own any interest in the future carried interest or voting interests in the General Partner following termination. The General Partner will provide the Limited Partners with written notice of the occurrence of any event described in clauses (a), (b) or (c) above. Concurrently with the removal of the General Partner, the Manager shall be removed as manager of the Partnership unless re-appointed by the successor general partner of the Partnership. Upon removal of the General Partner, the Limited Partners may elect to continue the Partnership and appoint a new duly authorized general partner of the Partnership and all Parallel Vehicles with the consent of all of the Limited Partners of the Partnership and each Parallel Vehicle and such election shall be deemed to have occurred as of the date of the removal of the former General Partner. In such an event, the former General Partner shall be entitled to receive distributions equal to any amounts it would have been entitled to had the Partnership been dissolved and wound up in accordance with Sections 8.3(a) and (b) and distributed in kind all Partnership assets as of the date of the election of the Limited Partners to continue the Partnership. The Partnership shall issue an unsecured non-interest bearing promissory note to the former General Partner in the face amount of the liquidating distribution determined in accordance with this Section 5.9, such note to be payable upon the final liquidation of the Partnership. All such distributions shall be subject to the obligations set forth in Section 8.3(c) and (d) of the Master Partnership Agreement; provided, however, that the General Partner's obligation, if any, to fund Commitments in respect of its obligations in Section 8.3(c) of the Master Partnership Agreement relating to such liquidating distribution shall be satisfied by a reduction to the principal amount of the unsecured non-interest bearing promissory note described in this Section 5.9 in the amount of such obligation. For purposes of determining allocation and distributions pursuant to the preceding sentence, securities and other property held by the Partnership shall be valued pursuant to the procedures set forth in Article IX.

Section 5.10  No Liability to Limited Partners.

(a)     None of the General Partner, the Manager, the Principals or their Affiliates, officers, directors, members, partners, shareholders, employees or agents will be liable to any Limited Partner or to the Partnership for any action taken, or omitted to be taken, as General Partner with respect to the Partnership, or for any action taken, or omitted to be taken, by any member, partner, director, officer, employee or agent of the General Partner or Manager in connection with its activities for or on behalf of the Partnership so long as such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership, (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of nolo contendre (including as part of a settlement) by a court of competent jurisdiction.

(b)     No member of the Advisory Committee, or any Affiliate or employer of any member of the Advisory Committee or any Limited Partner represented on the Advisory

17475053                                    -33-