1    certain breaches of fiduciary duty that are possible based on

2    simple negligence, correct?

3    A    They are, and in these instances, they don't -- they don't

4    rise to actionable claims because they're indemnified by the

5    funds.

6    Q    Okay.  You have to explain that to me.  So, the negligence

7    claim is not actionable because someone is indemnifying it?

8    A    Typically, there's no way to recover because it's

9    indemnified by the fund that the investor might be in.  If it

10   goes beyond that, then it wouldn't be.

11   Q    Okay.  So there are potential negligence breach of

12   fiduciary duty claims that might be subject to these

13   exculpations and releases that would not be indemnified?

14   A    Gross negligence and willful misconduct, certainly.

15   Q    Okay.  Now, post-confirmation, post-confirmation, if the

16   Debtor, or the Reorganized Debtor, rather, engages in

17   negligence or any actionable conduct, that's when the

18   channeling injunction comes into play, right?

19   A    I don't quite understand your question.

20   Q    Okay.

21   A    Can you repeat that?

22   Q    Sure.  To your understanding, does the channeling

23   injunction we're looking at right now -- and you can read it

24   if you need to -- does it apply to purely post-confirmation

25   alleged causes of action?

                              Seery - Cross                    204

1    A    It does apply to those, yes.

2    Q    Okay.  And it says that the Bankruptcy Court will have

3    sole and exclusive jurisdiction to determine whether a claim

4    or cause of action is colorable, and, only to the extent

5    legally permissible and as provided for in Article 11, shall

6    have jurisdiction to adjudicate the underlying colorable claim

7    or cause of action.

8         Do you see that, sir?

9    A    I do.

10   Q    Okay.  And this -- the Bankruptcy Court's exclusive

11   jurisdiction here, that would continue after confirmation?  Is

12   that the intent behind the plan?

13   A    It has -- it says what it says.  Will have the sole and

14   exclusive jurisdiction to determine whether a claim is

15   colorable, and then, to the extent permissible, it'll have

16   jurisdiction to adjudicate.

17   Q    Okay.  Nothing in this plan limits the period of the

18   Bankruptcy Court's inquiry to the pre-confirmation time frame,

19   correct?

20   A    I don't believe it does, no.

21   Q    Okay.  Have you taken into account the potential that this

22   bankruptcy case will eventually be closed with a final decree?

23   A    Have I taken that into account?

24   Q    Well, do you know what a final decree in Chapter 11 is?

25   A    I do.

1   Q    Okay.  So, help me understand.  If there's a final decree

2   and the bankruptcy case is closed, then who do I go to,

3   because the Bankruptcy Court has exclusive jurisdiction, to

4   get this clearing injunction cleared?

5           MR. MORRIS:  Objection to the form of the question,

6   Your Honor.

7           THE COURT:  Sustained.  Rephrase.

8           MR. RUKAVINA:  Okay.

9   BY MR. RUKAVINA:

10  Q    Is it the plan's intent, Mr. Seery, that this channeling

11  injunction that we just looked at would continue to apply even

12  after a point in time in which the bankruptcy case is closed?

13  A    I don't believe so.

14          MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15  someone's phone right when he answered, and I didn't hear his

16  answer, if he could please re-answer.

17          THE WITNESS:  I don't -- I don't think if the case is

18  closed that's the intention.

19  BY MR. RUKAVINA:

20  Q    Okay.  What about if there's a final decree entered?

21          MR. MORRIS:  Objection, Your Honor.  You know, the

22  document kind of speaks for itself.

23          THE COURT:  Overruled.  He can answer if he knows.

24          THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25  making a distinction between the case being closed and the

Seery - Cross                                206

1   final decree.  I believe in both instances they'll be pretty

2   close to the same time and we'll make a judgment then as to

3   how to close the case in accordance --

4   Q    Okay.

5   A    -- with the rules.

6        MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

7   to the beginning of this injunction.  A little bit higher.

8   Right there.  Right there.

9   BY MR. RUKAVINA:

10  Q    The very first clause, Mr. Seery, if you'll read with me,

11  says, Upon entry of the confirmation order -- pardon me --

12  all enjoined parties are and shall be permanently enjoined on

13  and after the effective date from taking any actions to

14  interfere with the implementation or consummation of the

15  plan.

16       Do you see that, sir?

17  A    I do, yes.

18  Q    What does interfering with the implementation or

19  consummation of the plan mean?

20  A    It means in some way taking actions to upset, distract,

21  stop, or otherwise prohibit or hurt the estate from

22  implementing or consummating the plan.

23  Q    Okay.  And is that intended -- is that clause we just

24  read and you described intended to be very broad?

25  A    I -- I think it's -- if the words have meaning, yes, that

Seery - Cross                                    207

1  it should -- it's pretty broad.

2  Q   Okay.  Is the Debtor not able to state with more

3  specificity what it would believe interference with the

4  implementation or consummation of the plan would mean?

5           MR. MORRIS:  Objection to the form of the question.

6           THE COURT:  Sustained.

7           THE WITNESS:  I think it's -- I think it's --

8           THE COURT:  Sustained.

9           MR. RUKAVINA:  Okay.

10          THE WITNESS:  I'm sorry.

11 BY MR. RUKAVINA:

12 Q   Well, you just gave us four or five examples of what

13 interfering with the implementation or consummation of the

14 plan might be.  Why isn't that, those four or five examples,

15 why aren't they listed here?

16          MR. MORRIS:  Object to the form of the question.

17          MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18 and I'll argue this at closing argument.

19          THE COURT:  Okay.

20 BY MR. RUKAVINA:

21 Q   When did the Committee agree to you serving as the

22 Claimant Trustee?

23 A   In the late -- in the late fall.  I've been contemplated

24 to be the Claimant Trustee.  I'm willing to take -- if we can

25 come to an agreement.  They have their options open if we

1   can't come to an agreement on compensation.

2   Q   Okay.  And since the Committee agreed to you being the

3   Claimant Trustee, you have reached a resolution with UBS,

4   correct?

5   A   I don't think so.  I think that that was before UBS, the

6   UBS resolution was reached.

7   Q   I'm sorry.  When did you reach the UBS resolution in

8   principle with UBS?

9   A   I don't recall the exact date, but I do recall specific

10  conversations where some of the Committee members were

11  supportive.  I didn't know that UBS wasn't, but I assumed

12  that some meant not all.  And that was UBS, because I don't

13  think we had a deal yet.

14  Q   Well, let me ask the question in a little bit of a

15  different way.  Whenever the Debtor reached the agreement in

16  principle with UBS that your counsel described this morning,

17  whenever that point in time was, the Committee had already

18  agreed before that point in time to you serving as Claimant

19  Trustee, correct?

20  A   I believe so, yes.

21  Q   And is the answer the same with respect to the

22  HarbourVest settlement?

23  A   I believe so.  With HarbourVest, I believe so as well,

24  yes.

25  Q   What about the Acis settlement?

Seery - Cross                                        209

1  A    I don't believe so.  I think Acis came first.  I don't

2  think we settled on an agreement on Claimant Trustee until

3  after the Acis -- certainly after the Acis agreement, maybe

4  not after the Acis 9019.  I just don't recall.

5  Q    Okay.  And the million-dollar cutoff for convenience

6  class creditors, that number was a negotiated amount with the

7  Committee, correct?

8  A    Yes.

9  Q    Okay.  Thank you, Mr. Seery.

10         MR. RUKAVINA:  Your Honor, I'll pass the witness.

11         THE COURT:  All right.  Just for purposes of time,

12  it's 3:00 o'clock, so you went 48 minutes.

13      Who's next?

14         MR. DRAPER:  Mr. Taylor is.

15         THE COURT:  All right.  Mr. Taylor, go ahead.

16         MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17  would like the Court to do, we are asking for a brief

18  continuance and to go into tomorrow, and there is a reason

19  for that and I would like to explain it.

20      Mr. Dondero has communicated an offer which we believe to

21  be a higher and better offer than what the plan analysis,

22  even in its most recent iteration that was just changed last

23  night, will yield significantly higher recoveries.  Those are

24  guaranteed recoveries.  There is a cash component to that

25  offer.  There are some debt components, but they would be

Seery - Cross                                          210

1    secured by substantially all of the assets of Highland.

2        We believe it's a higher and better offer, that the

3    creditors and the Creditors' Committee, Mr. Seery, who

4    obviously has been testifying all day on the stand, may have

5    heard some -- some inkling of it via a text or an email he

6    might have been able to glance at, or maybe not, because he's

7    been too busy, and that's understandable.

8        But we do believe it is a material offer.  It is a real

9    offer.  And for that reason, we would like to request the

10   Court's indulgence.  This has gone rather fast.  We believe

11   that in the event that it does not gain any traction, then we

12   could complete this confirmation hearing tomorrow, or it's

13   more than likely that we could.  And therefore we would

14   request a continuance until tomorrow morning beginning at

15   9:30 so all the parties can confer, consider that offer, and

16   see if it gains any traction.

17             THE COURT:  All right.

18             MR. POMERANTZ:  Your -- Your --

19             THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20   to respond --

21             MR. POMERANTZ:  Your --

22             THE COURT:  -- to that?

23             MR. POMERANTZ:  Your Honor, this is Jeff --

24             THE COURT:  Mr. Pomerantz?

25             MR. POMERANTZ:  This is Jeff Pomerantz. I will

Seery - Cross                                       211

1    respond.

2         I think right at the beginning of the hearing, or

3    slightly after, I did receive an email from Michael Lynn

4    extending this offer.  The email was also addressed to Mr.

5    Clemente.  As we have told Your Honor before, if the Committee

6    is interested in continuing negotiations with Mr. Dondero, far

7    be it from us to stand in the way.

8         So what I would really ask is for Mr. Clemente to respond

9    to think if -- to see if he thinks that this offer is worthy.

10   If it's worthy and the Committee wants to consider it, we

11   would by all means support a continuance.  If it is not, I

12   think this is just a last-minute delay without a reason.  And

13   if there is no likelihood of that being acceptable or the

14   Committee wanting to engage, we would want to continue on.

15            THE COURT:  All right.  Mr. Clemente, what say you?

16            MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17   on behalf of the Committee.

18        Obviously, I haven't had a chance to confer with my

19   Committee members, but there's no reason to not continue the

20   confirmation hearing today.  I will be able to confer with

21   them over email, et cetera, this evening.  There's simply no

22   reason to not continue going forward at this particular point

23   in time, Your Honor.

24        So, although I haven't conferred with the Committee

25   members, that would be what I would recommend to them.  And so

Seery - Cross                                    212

1   my view, the Committee's view, I believe, would be let's

2   continue forward and we'll discuss Mr. Dondero's proposal that

3   I know came across after opening statements this morning, you

4   know, in due course.  But I do not believe that a continuance

5   here is necessary or appropriate.

6          THE COURT:  All right.  Mr. Taylor, that request is

7   denied, so you may cross-examine.

8          MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.

9   I have a couple people that are in my ear.  But yes, I'm ready

10  to proceed.

11         THE COURT:  Okay.

12                         CROSS-EXAMINATION

13  BY MR. TAYLOR:

14  Q   Mr. Seery, I believe you can probably largely testify from

15  your memory of the various iterations of the plan analysis

16  versus the liquidation analysis.  But to the extent that

17  you're unable to, we can certainly pull those up.

18      Mr. Seery, you put forth or Highland put forth on November

19  24th of 2020 a plan analysis versus a liquidation analysis,

20  correct?

21  A   I think that's the approximate date, yes.

22  Q   Okay.  And do you recall what the plan analysis predicted

23  the recovery to general unsecured creditors in Class 8 would

24  be at that time?

25  A   I believe it was in the 80s.

Seery - Cross                                                    213

1  Q    And approximately 87.44 percent?

2  A    That sounds close, yes.

3  Q    Okay.  And then just right before -- the evening before

4  your deposition that took place on January 29th, I believe a

5  revised plan analysis versus a liquidation analysis was

6  provided.  Do you remember that?

7  A    Yes.

8  Q    Okay.  And what was the predicted recovery to general

9  unsecured creditors under that analysis?

10 A    I believe that was --

11        MR. MORRIS:  Object to the form of the question.  I

12 just want to make sure that we're talking about the -- and

13 maybe I misunderstood the question -- plan versus liquidation.

14        THE COURT:  Okay.  Could you restate --

15        MR. TAYLOR:  I said plan analysis.

16        THE COURT:  Plan.

17        THE WITNESS:  I believe that that initially was in

18 the -- in the high 60s.

19 BY MR. TAYLOR:

20 Q    It was --

21 A    Might have been --

22 Q    -- 62.14 percent; is that correct?

23 A    Okay.  Yeah.  That sounds -- I'll take your

24 representation.  That's fine.

25 Q    Okay.  And going back to the November 28th liquidation

Seery - Cross                                     214

1   analysis, what did Highland believe that creditors in Class 8

2   would get under a liquidation analysis?

3   A    I don't recall the -- if you just tell me, I'll -- I'll --

4   if you're reading it, I'll agree with -- because I -- from my

5   memory.

6   Q    62.6 percent?  Is that correct?

7   A    That sounds about right.

8   Q    You would agree with me, would you not, that 62.6 cents on

9   the dollar is higher than 62.14 cents, correct?

10  A    Yes.

11  Q    And so at least comparing the January 28th versus -- of

12  2021 versus the November 24th of 2020, the liquidation

13  analysis actually ended up being higher than the plan

14  analysis, correct?

15  A    Yes.

16  Q    But there was -- there was some changes also in the plan

17  analysis.  I'm sorry.  There were some subsequent changes that

18  were done over the weekend that were provided on February 1st.

19  Is that correct?

20  A    Yes.

21  Q    Okay.  And what were -- give us an overview of what those

22  changes were.

23  A    What are -- what are you comparing?  What would you like

24  me to compare?

25  Q    Okay.  The January to February plan analysis, what were

Seery - Cross                                    215

1    the changes?  Why did it go up from 62.6 to 71.3?

2    A    The main changes, as we discussed earlier, and maybe the

3    only major change, was the UBS claim amount, which went down

4    significantly from the earlier iteration.  And then there was

5    the small change related to the RCP recovery, which was a

6    double-count.

7    Q    Okay.  And you talked about earlier about what assumptions

8    went into these analyses, correct?

9    A    Yes.

10   Q    And you said these assumptions were always done after

11   careful consideration.  Is that a correct summation of what

12   you said?

13   A    I think that's fair.

14   Q    Okay.

15          MR. TAYLOR:  Mr. Assink, could you pull up the

16   November assumptions?

17   BY MR. TAYLOR:

18   Q    I believe that's coming up, Mr. Seery.  The Court.

19       (Pause.)

20          MR. TAYLOR:  And go down one page, please, Mr.

21   Assink.  Roll up.  The Assumption L.

22   BY MR. TAYLOR:

23   Q    So, these are the November assumptions, correct, Mr.

24   Seery?

25   A    I believe so, yes.

Seery - Cross                                    216

1    Q    Okay.  And what was the assumption that you made after

2    careful consideration regarding the claims for UBS and

3    HarbourVest?

4    A    The plan assumes zero, that was L, for those claims.

5    Q    Okay.  And ultimately what did -- and I believe you just

6    announced this today and made this public today -- what is

7    UBS's claim?  What are you proposing that it be allowed at?

8    A    $50 million in Class 8, and then they have a junior claim

9    as well.

10   Q    Okay.  And what about HarbourVest?  What kind of allowed

11   claim did they end up with?

12   A    $45 million in Class 8 and a $35 million junior claim.

13   Q    So your well-reasoned assumption, carefully considered,

14   was off by $95 million; is that correct?

15             MR. MORRIS:  Objection to the form of the question.

16             THE COURT:  Overruled.

17             THE WITNESS:  The difference between zero and those

18   numbers is $95 million, yes.

19   BY MR. TAYLOR:

20   Q    You solicited creditors of the Highland estate based upon

21   the November plan analysis and liquidation analysis that was

22   provided and that we're looking at right now, correct?

23   A    It was one of the bases, yes.  It's the plan is what --

24   what we solicited votes for, not the projections.

25   Q    But this was included within the disclosure statement; is

1  that correct?

2  A    It's one of the bases.  It was included, yes.

3  Q    And this is the bases by which you believe that the best

4  interests of the creditors have been met better than a Chapter

5  7 liquidation, correct?

6  A    I believe this evidences that the best interest test would

7  be satisfied, yes.

8  Q    And so the record is very clear, for this Court and

9  anybody looking at the record, no solicitation was done of the

10 creditor body after the disclosure statement was sent out?  No

11 updates were sent, correct?

12 A    Updated projections were filed, but no solicitation was --

13 was -- there was only one solicitation.  We did not resolicit.

14 That's correct.

15 Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16 if this plan is confirmed, how much are you going to be paid

17 per month to be the Trustee?

18 A    For the Trustee role, $150,000 per month is the base.

19 Q    It's a base amount?  On top of that, you're going to

20 receive some sort of bonus amount, correct?

21 A    There's two bonuses.  There's a bonus for the bankruptcy

22 case, which I'd need Court approval for, and then I'm going to

23 seek a bonus for the Trustee work, which would be a

24 combination of myself and the team for a performance bonus.

25 That's to be negotiated.

Seery - Cross                                              218

1        To be fair, the Committee or the Oversight Group may not

2   agree to any change, in which case we would not have an

3   agreement.

4   Q    And what would happen if you don't come to an agreement,

5   Mr. Seery?

6   A    They would have to get a different Plan Trustee.

7   Q    Okay.  So it's certainly going to have to be greater than

8   zero, correct?

9   A    Typically.

10  Q    Is it going to be in the nature of three or four percent

11  of the sales proceeds, or have you considered that?

12  A    Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13  thinking -- my apologies.  I misunderstood.  I thought you

14  meant any number.  I haven't -- I haven't had negotiation with

15  them.  I'm thinking about looking at the full recovery of the

16  team -- for the team, looking at expected performance numbers,

17  and then trying to negotiate a structure of bonus compensation

18  that would be payable to the whole team, and then allocated by

19  the CEO (garbled) which would be made.

20  Q    When predicting the expenses of the Trust going forward in

21  your projections, did you build in an amount for a bonus fee?

22  A    No.  It wouldn't be part of the expenses.  It would come

23  out at the end.

24  Q    Okay.  So those additional expenses are not shown in the

25  plan analysis, correct?

Seery - Cross                                          219

1   A    No, they're not.  It's just not going to be an expense.

2   It'll be a -- as an operating expense.  It'll be an

3   expenditure at the end out of distributions.

4   Q    Okay.  And did you subtract those from the distributions?

5   A    No.

6   Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7   or more to monetize these assets, is he?

8   A    No.

9   Q    Have you priced how much D&O insurance is going to be on a

10  go-forward basis post-confirmation?

11  A    I'm sorry.  I couldn't -- couldn't hear you.

12  Q    Sorry.  Let me get closer to my mic.  Have you priced what

13  D&O insurance is going to run the Trust on a go-forward basis

14  post-confirmation?

15  A    Yes.

16  Q    Okay.  And what are you projecting that to run?

17  A    About $3-1/2 million.

18  Q    And is that per annum for over the two-year life of this

19  plan?

20  A    Well, it's the two-year projection period, not life.  But

21  I expect that that's for the two-year projection period.

22  Q    Okay.  So approximately one point -- I'm sorry, you said

23  $3.5 million, correct?

24  A    Yes.

25  Q    Okay.  So, $1.75 million per year?

Seery - Cross                                    220

1    A    Yes.

2    Q    On top of the minimum $1.8 million per year that you're

3    going to be paid, correct?

4    A    Well, that's -- that's the base compensation.  But, again,

5    to be fair to the Oversight Committee, they haven't approved

6    it yet.  So the Committee, the Committee reserves their rights

7    to negotiate a total package.

8    Q    And there's going to be a Litigation Trustee, correct?

9    A    Yes.

10   Q    And that Litigation Trustee is going to be paid some

11   amount of compensation, correct?

12   A    Yes.

13   Q    That has not been negotiated yet, correct?

14   A    No, I believe -- I believe the base piece has.  But his --

15   I don't know what the contingency fee or if that's been

16   negotiated yet.  I don't know.

17   Q    And what is the base fee for the Litigation Trustee?

18   A    My recollection is it was about $250,000 a year, some

19   number in that area.

20   Q    Thank you.  So, at this point, over the two-year period,

21   we're looking at approximately $3.6 million to you, $3.5

22   million to the D&O insurance, and approximately $500,000 base

23   fee to the Litigation Trustee, plus a contingency.  Is that

24   correct?

25   A    That's probably real close, yes.

Seery - Cross                                    221

1    Q    Okay.  And how about U.S. Trustee fees?  You've estimated

2    of how much those are going to be during the two-year period,

3    correct?

4    A    They're built into the plan up 'til -- I think it's only

5    up until the actual effective date, but I don't recall the

6    specifics.

7    Q    Okay.  And U.S. Trustee fees, the case is going to stay

8    open and those are going to continue to have to be paid, even

9    after confirmation, correct?

10   A    Yes.

11   Q    Okay.  And do you have an estimate of how much those are

12   going to run per annum or over that two-year period?

13   A    I don't recall, no.

14   Q    Okay.  Well, they're provided within your projections,

15   correct?

16   A    Yes.

17   Q    Okay.  A Chapter 7 trustee would not have to incur any of

18   these costs, would they?

19   A    I don't think they'll have to incur Chapter -- U.S.

20   Trustee fees.  I don't know whether they would bring on a

21   litigation trustee or not.  I would assume, since there's --

22   appear to be valuable claims, they probably would, but perhaps

23   they would do it themselves.  So I don't know the specifics of

24   what they would do.

25   Q    In preparing your liquidation analysis, did you ask

1    Pachulski if they would be willing to work for a Chapter 7

2    trustee if one was appointed?

3    A    I didn't specifically ask, no.

4    Q    Did you ask DIS, your, for lack of a better word,

5    financial advisors in this case, if they would be willing to

6    work with a Chapter 7 trustee?

7    A    DSI.  No, I did not specifically ask them.

8    Q    Okay.  All right.  Any of the accountants that you're

9    working with, did you ask them if they would be willing to

10   work with a Chapter 7 trustee?

11   A    I didn't specifically ask them, no.

12   Q    Okay.  The proposed plan has no requirements that you

13   notice any potential sale of either Highland assets or

14   Highland subsidiary assets; is that correct?

15   A    Do you mean after the effective date?

16   Q    Yes.

17   A    No, it does not.

18   Q    In the SSP sale, which is a subsidiary of Trussway, which

19   is a subsidiary of Highland, or actually it's a sub of a sub

20   of Highland, you conducted the sale of SSP, correct?

21   A    The team did, yes.  I was part.

22   Q    All right.  That was not noticed to the creditor body; is

23   that correct?

24   A    That's correct.

25   Q    And it is the Debtor's and your position that no notice

1  was required because this was a sub of a sub and therefore

2  this was in the ordinary course?

3  A    Not exactly, no.

4  Q    Okay.  Then what is your position?

5  A    It was in the ordinary course.  It was -- I believe it's a

6  sub of a sub of a sub, and a significant portion of the

7  interests are owned by third parties.

8  Q    It is possible, is it not, that had you noticed this to

9  the larger creditor body, that you might have engendered a

10  competitive bidding situation that might have reached a higher

11  return for investors, correct?

12  A    The same possibility is it could have gone lower.

13  Q    But it is possible, correct?

14  A    Certainly possible.

15  Q    In fact, there is normally requirements under the

16  Bankruptcy Code and the Rules that asset sales are noticed out

17  to the creditor body, correct?

18  A    Asset sales that -- property of the estate, yes.  Other

19  than in the ordinary course, of course.

20  Q    I believe you have described Mr. Dondero as being very

21  litigious within this case; is that correct?

22  A    I believe so, yes.

23  Q    Okay.  Did Mr. Dondero initiate any litigation in this

24  case prior to September 2020?

25  A    Prior to September?  I don't believe so.  I don't know

Seery - Cross                                            224

1    when he filed the claim from NexPoint.  It certainly indicated

2    that -- I believe it was from NexPoint.  My memory is slightly

3    off here.  He filed a claim in -- administrative claim, which

4    effectively is like you're bringing a complaint, against HCMLP

5    for the management of Multi-Strat and the sale of the life

6    settlement policies out of Multi-Strat, which was conducted in

7    the spring.

8    Q   And wasn't Mr. Dondero seeking document production related

9    to that sale?

10   A   No.

11   Q   Okay.  I believe that the preliminary injunction that you

12   talked about and were questioned earlier, the plan asks to

13   enjoin (garbled) party from allowing the plan to go effective.

14   Is that correct?

15   A   I'm sorry.  I didn't understand you question.  There was a

16   -- there was a bunch of interference.

17   Q   Okay.  Sure.  I'm sorry about that.  I don't know if

18   that's -- I don't think that's me, but --

19   A   It may not be.  It sounded like someone else.

20   Q   The injunction prohibits anybody from interfering with the

21   plan going effective, correct?

22   A   The plan injunction?

23   Q   Yes.

24   A   Yes.

25   Q   Okay.  Just so I'm clear, is the plan injunction

Seery - Cross                                                  225

1    attempting to strip appellate rights of Mr. Dondero?

2    A    No.

3    Q    Okay.  So, if, for instance, if he were to file any appeal

4    of an order confirming this plan, he wouldn't be in violation

5    of that plan injunction?

6    A    I don't think so, because the order wouldn't be final.

7    Q    Okay.  But it -- it says upon entry of a confirmation

8    order, you're enjoined from doing so.  So that's not the

9    intent?

10   A    It certainly would not be my intent.  I don't think that

11   anybody had that in mind.

12   Q    Okay.  And if Mr. Dondero were to seek a stay pending

13   appeal either during that 14-day period or afterwards, is that

14   plan injunction attempting to stop that -- that sort of

15   action?

16   A    I apologize.  You're breaking up.  But I think I

17   understood your question.  No, it was -- it was your screen as

18   well.  No.  If either this Court stays its own order or a

19   higher court says that the order is stayed, then there would

20   be no way there could be any allegation that it's interfering

21   with an order if it's not effective.

22   Q    Mr. Dondero opposed the Acis sale, correct?

23   A    The Acis settlement?

24   Q    Correct.

25   A    Yes.

Seery - Cross                          226

1  Q    After he opposed the Acis settlement, the next filing Mr.

2  Dondero made was requesting that the Debtor notice the sale of

3  any assets or any major subsidiary assets.  Is that correct?

4  A    I don't recall the sequence of his filings.  I think that

5  Judge Lynn at least sent a letter to that effect.  I don't

6  recall if there is a filing to that effect.

7  Q    Did Mr. Dondero, through his counsel, attempt to resolve

8  that motion without filing anything further?

9  A    I don't recall the specifics of the motion.  I know they

10  asked for some sort of relief that -- that we thought was

11  inappropriate.

12  Q    When the Court postponed any hearing on Mr. Dondero's

13  request for relief until the eve of the confirmation hearing,

14  and Mr. Pomerantz announced that no sales were expected before

15  confirmation, did Mr. Dondero withdraw his motion?

16  A    Again, I don't recall the specifics of the motion.  I only

17  recall the letter from Judge Lynn.

18  Q    Did Mr. Dondero do anything more than object to the

19  HarbourVest deal?

20  A    Not that I know of.

21  Q    Did Mr. Dondero do anything more than respond to the

22  Defendants' injunction suit?

23        MR. MORRIS:  Objection to the form of the question.

24  I mean, -- objection to the form.

25        THE COURT:  Overruled.

Seery - Cross                                    227

1          MR. TAYLOR:  I apologize.  I should have said the

2     Debtor's injunction suit.

3          THE WITNESS:  Yeah, the -- I'm not sure of the

4     specific order, but certainly the communications with me,

5     which I think are prior to the order.  The communications with

6     Mr. Surgent, which I believe are after the order.  Certain

7     communications with Mr. Waterhouse, which were oral.  Those

8     were all similarly difficult and obstreperous actions.

9     BY MR. TAYLOR:

10    Q    Has Mr. Dondero commenced any adversary proceeding or

11    litigation in this case other than filing a competing plan?

12         MR. MORRIS:  Objection to the form of the question.

13         THE COURT:  Over --

14         THE WITNESS:  Yeah, I don't --

15         THE COURT:  -- ruled.

16         THE WITNESS:  I don't believe he's commenced an

17    adversary.  I'm sorry, Judge.  I don't believe he's commenced

18    an adversary proceeding, no.

19    BY MR. TAYLOR:

20    Q    Mr. Dondero didn't file any opposition to the life

21    settlement sale, did he?

22    A    We didn't do the life settlement (garbled) Court.

23    Q    Right.  Again, that wasn't noticed through the -- this

24    Court, was it?

25    A    It was an -- the reason was it was an asset of Multi-Strat

Seery - Cross                                                        228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q    Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A    Yes.

5   Q    In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A    He may have.

9   Q    And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A    I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q    So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A    Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

Seery - Cross                                                    229

1      If we have a -- if we have a transaction that's pending

2 that wouldn't be hurt by a notice and that we'd be able to get

3 the Court's imprimatur to maybe more better insulate, if you

4 will, against Mr. Dondero's attacks, then we may well come to

5 the Court to seek that.

6      The problem with noticing sales is that -- that it often

7 depresses value.  That's just not the way folks outside of the

8 bankruptcy world (audio gap) sales.

9 Q    So there's no requirement that either public or private

10 notice be provided, correct?

11 A    No.  Meaning it is correct.

12 Q    Okay.  And if Mr. Dondero had objections either to the

13 pricing of the sale or the manner and means by which the sale

14 was being conducted, he would be prohibited by the plan

15 injunction from bringing any objection to such sale, correct?

16 A    I believe so, yes.

17 Q    Mr. Dondero also had concerns regarding the OmniMax sale,

18 correct?

19 A    Mr. Dondero did not go along with the OmniMax sale with

20 the assets that he managed.  I don't know if he had concerns

21 with -- with our sale or OmniMax's interests.

22 Q    Did Mr. Dondero ever express to you any concern that the

23 value wasn't being maximized regarding the sale of those

24 assets?

25 A    He thought he could get more.  I don't know that he

Seery - Cross                                              230

1   thought that he could get more for his assets that he was

2   managing or whether he thought he could get more for all of

3   the assets.

4   Q   Other than voicing those concerns, did Mr. Dondero file

5   any pleading with this Court attempting to block that sale?

6   A   Pleading with the Court?  No.

7           MR. TAYLOR:  Your Honor, I would like to confer with

8   my colleagues just very briefly and see if they have anything

9   further.  And even if they don't, Mr. Lynn of my firm would

10  like a very brief moment to address the Court prior to me

11  passing the witness.

12      So, if I may have a literally hopefully one-minute break

13  where I can turn my camera off and my microphone off to confer

14  with my colleagues, and then move forward?

15          THE COURT:  Okay.  Well, you can have a one-minute

16  break, but we're going to continue on with cross-examination

17  at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18  wants to raise an issue at this point.  Could you elaborate?

19          MR. TAYLOR:  I will get some elaboration during our

20  30-second to one-minute break, Your Honor.  I was just passed

21  a note.

22          THE COURT:  All right.  So, but I'll just you know,

23  --

24          A VOICE:  Your Honor?

25          THE COURT:  -- I'm inclined to continue with the

Seery - Cross                          231

1    cross-examination.  You know, this isn't a time for, you know,

2    arguments or anything like that.  All right?

3        So, we'll take a one-minute break.  You can turn off your

4    audio and video for one minute, and come back.

5        (Off the record, 3:33 p.m. to 3:34 p.m.)

6            THE WITNESS:  Your Honor?

7            THE COURT:  Yes?

8            THE WITNESS:  It's Jim Seery.  Can I turn it into

9    just a two-minute break, since I've sat in my seat, and it

10   would be better for him to just continue straight through.  I

11   could use one or two minutes.

12           THE COURT:  Okay.

13           THE WITNESS:  I apologize.

14           THE COURT:  All right.  Well, it's been more than

15   minute.  Let's just say a five-minute break for everyone, and

16   we'll come back at 3:39 Central time.  Okay.

17           THE WITNESS:  Okay.  Thank you, Your Honor.  I

18   appreciate that.

19       (A recess ensued from 3:35 p.m. until 3:40 p.m.)

20           THE CLERK:  All rise.

21           THE COURT:  Please be seated.  All right.  We are

22   back on the record.  Mr. Taylor, are you there?

23           MR. TAYLOR:  I am, Your Honor.  My video is not

24   wanting to start, but my -- I believe my audio is on.

25           THE COURT:  Okay.  After you went offline for your

Seery - Cross                                    232

1   one-minute break, Mr. Seery asked for a five-minute bathroom

2   break, or a couple-minute.  Anyway, we've been gone on a

3   bathroom break.  We're back now.

4            MR. TAYLOR:  Thank you.  I was actually -- I was

5   still listening with one ear, --

6            THE COURT:  Okay.

7            MR. TAYLOR:  -- Your Honor, so I understand.

8            THE COURT:  All right.

9            MR. TAYLOR:  So, thank you.

10           THE COURT:  Are you finished with cross, or no?

11           MR. TAYLOR:  Just a little bit of a follow-up.

12                    CROSS-EXAMINATION, RESUMED

13   BY MR. TAYLOR:

14   Q   Mr. Seery, you had previously testified that Mr. Dondero's

15   counsel had threatened you and/or the independent board, I was

16   not exactly sure who you were referring to, with suits, and I

17   believe you said a hundred million dollars' worth of suits and

18   getting dragged into litigation.

19       Is that still your testimony today, that you were -- you

20   were threatened with suit by this firm of a suit of over a

21   hundred million dollars?

22   A   I believe what I was told by my counsel was that, not Mr.

23   Dondero's, but one of the other counsel, who I can name, said

24   specifically that Dondero will sue Seery for hundreds of

25   millions of dollars.  We're going to take it up to the Fifth

Seery - Cross                                    233

1  Circuit, get it reversed, and he'll go after him.

2  Q    Okay.  So it was not Mr. Dondero's counsel, and you were

3  not -- is that correct?

4  A    No.  It was one of the other counsel on the phone today.

5  Q    Okay.  And you base that not upon your own personal

6  knowledge but based on some -- something else that you were

7  told, correct?

8  A    Yes.  By my counsel.

9  Q    Thank you.

10         MR. TAYLOR:  Yes, Your Honor.  We can pass the

11  witness.

12         THE COURT:  Okay.  So, you've gone, or you and Mr.

13  Rukavina collectively have gone one hour and 17 minutes.  Mr.

14  Draper, you're next.

15         MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16  basically have no more than ten questions, so I gather the

17  Court will welcome that.

18         THE COURT:  Okay.

19                   CROSS-EXAMINATION

20  BY MR. DRAPER:

21  Q    Mr. Seery, has the new general partner been formed yet?

22  A    I don't know if they've been -- we've actually done the

23  formation, but it -- it would be in process.

24  Q    So it either has been formed or has not been formed?

25  A    I don't -- I don't know the answer.

Seery - Cross                                    234

1   Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

2   have nothing to do with the Reorganized Debtor, correct?

3   A    Not necessarily, but they don't have a specific role at

4   this time.

5   Q    They won't be officers or directors of the new general

6   partner or the Reorganized Debtor, correct?

7   A    I don't -- I don't believe so, but it's not set in stone.

8   Q    All right.  Has any finance -- has any party who is the

9   beneficiary of an exculpation, a release, or the channeling

10  injunction contributed anything to this plan of reorganization

11  in terms of money?

12  A    No.

13  Q    Have you ever interviewed a trustee as to how they would

14  liquidate the assets or monetize the assets in this case?

15  A    No.

16  Q    And last question is, is there any bankruptcy prohibition

17  that you're aware of that a Chapter 7 trustee could not do

18  what you're doing?

19  A    Which -- which -- what do you mean, under the plan?

20  Q    No.  Could not monetize the assets of the estate in the

21  manner that you're attempting to monetize them.

22  A    I don't think there's a specific rule, but I just haven't

23  -- I haven't seen that before, no.  So I don't think there's a

24  specific rule that I know of.

25  Q    Okay.

                              Seery - Cross                         235

1            MR. DRAPER:  I have nothing further for this witness.

2            THE COURT:  All right.  I should have asked, we had a

3    couple of other objectors.  Ms. Drawhorn, did you have any

4    questions?

5            MS. DRAWHORN:  I have no questions, Your Honor.

6            THE COURT:  All right.  Were there any other

7    objectors out there that I missed that might have questions?

8        All right.  Any redirect?

9            MR. MORRIS:  Your Honor, if I may, can I -- can I

10   just take a short minute to confer with my colleagues?

11           THE COURT:  Sure.  You can --

12           MR. MORRIS:  Thank you.

13           THE COURT:  -- put you --

14           MR. MORRIS:  Two -- two minutes, Your Honor.

15           THE COURT:  Okay.

16       (Pause, 3:45 p.m. until 3:48 p.m.)

17           THE COURT:  All right.  We've been a couple of

18   minutes.  Mr. Morris?

19           MR. MORRIS:  Yes, Your Honor.

20           THE COURT:  What are --

21           MR. MORRIS:  Just, just a few points, Your Honor.

22           THE COURT:  Okay.

23           MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24           THE WITNESS:  I am, yes.

25                          REDIRECT EXAMINATION

Seery - Redirect                                    236

1    BY MR. MORRIS:

2    Q    You were asked a number of questions about your

3    compensation.  Do you recall all that?

4    A    Yes, I do.

5    Q    And you testified to the $150,000 a month.  Do you recall

6    that?

7    A    Yes.

8    Q    Under the -- under the documentation right now, your

9    compensation is still subject to negotiation with the

10   Committee; is that right?

11   A    Yes, it is.

12   Q    Okay.  You were asked a couple of questions about the

13   conduct of Mr. Dondero.  Earlier, you testified that the

14   monetization plan was filed under seal at around the time of

15   the mediation.  Do I have that right?

16   A    Yes.  Right at the start of the mediation.

17   Q    Okay.  And is that the first time that the Debtor made the

18   constituents aware, including Mr. Dondero, that it intended to

19   use that as a catalyst towards getting to a plan?

20   A    That's the first time that we filed it, but that plan had

21   been discussed prior to that.

22   Q    And do you recall that there came a point in time where

23   you -- when the Debtor gave notice that it intended to

24   terminate the shared services agreements with the Dondero-

25   related entities?

Seery - Redirect                                237

1    A    Yes.

2    Q    And when did that happen?

3    A    That was about 60 -- now it's like 62 days ago.

4    Q    Uh-huh.  And you know, from your perspective, from the

5    filing of the monetization plan in August through the notice

6    of shared services, is that what you believe has contributed

7    to the resistance by Mr. Dondero to the Debtor's pursuit of

8    this plan?

9    A    Well, I think there's a number of factors that

10   contributed, but the evidence that I've seen is that when we

11   started talking about a transition, if there wasn't going to

12   be a deal, if Mr. Dondero couldn't reach a deal with the

13   creditors, we were going to push forward with the monetization

14   plan.  And the monetization plan required the transition of

15   the employees.  And indeed, it called specifically, and we had

16   testimony regarding it all through the case, about the

17   employees being terminated or transferred.

18        In order to transfer them over to an entity that's

19   related, Mr. Dondero pulls all of those strings.  And he

20   refused to engage on that.  We started in the fall.  We

21   specifically told employees of the Debtor not to engage.  They

22   couldn't spend his money, which made sense --

23              MR. TAYLOR:  Objection, Your Honor.

24              THE WITNESS:  So, very -- that --

25              THE COURT:  Just -- there's an objection.

Seery - Redirect                          238

1          MR. MORRIS:  There's an objection.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  There was an objection.

4          MR. TAYLOR:  Yes, Your Honor.  Object --

5          THE COURT:  Go ahead.

6          MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

7    Taylor.  Objection.  He's directly said Mr. Dondero told other

8    employees $x$, and that is purely hearsay, not based upon his

9    personal opinion, or his personal knowledge, and therefore

10   that part of the answer should be struck.

11         MR. MORRIS:  Your Honor, it's a statement against

12   interest.

13         THE COURT:  Overrule the objection.  Go ahead.

14         THE WITNESS:  Yeah.  The difficulty of transitioning

15   this business, I've equated it to doing a corporate carve-out

16   transaction on an M&A side.  It's hard, and you need

17   counterparties on the other side willing to engage.  And what

18   we went through over the weekend, on Friday, was seemingly

19   that the Funds, you know, directed by Mr. Dondero, just

20   haven't engaged.

21     We actually gave them an extra two weeks to engage,

22   because it's -- they've really been unable to do anything.  I

23   mean, hopefully, we've got the employees working in a way that

24   can -- that can foster and get around some of this

25   obstreperousness, and I've used that word before, but that's

Seery - Redirect                                    239

1   what it is.  It's really an attempt to just prevent the plan

2   from going forward.

3       And at some point, the plan will go forward.  And if we

4   are unable to transition people, we will simply have to

5   terminate them.  And that is not a good outcome for those

6   employees, but it's not a good outcome for the Funds, either.

7   And the Funds, Mr. Dondero, the Advisors, the boards, nobody

8   wants to do anything except come in this court.

9   BY MR. MORRIS:

10  Q   Do you recall being asked about Mr. Dondero and certain

11  things that he didn't do and certain actions that he hadn't

12  taken?

13  A   Yes.

14  Q   By Mr. Taylor?  To the best of your recollection, did Mr.

15  Dondero personally object to the HarbourVest settlement?

16  A   I -- I don't recall if he did or if it was one of the

17  entities.

18  Q   It was Dugaboy.  Does that refresh your recollection?

19  A   Dugaboy certainly objected, yes.

20  Q   And do you understand that Dugaboy has appealed the

21  granting of the 9019 order in the HarbourVest settlement?

22  A   Yes.

23  Q   And Mr. Taylor asked you to confirm that Mr. Dondero

24  hadn't taken any action with respect to the life settlement

25  deal.  Do you remember that?

Seery - Redirect                                    240

1   A    I do.

2   Q    But are you aware that Dugaboy actually filed an

3   administrative claim relating to the alleged mismanagement of

4   the life settlement sale?

5   A    Yes, I did, I did allude to that.  I wasn't sure it was

6   Dugaboy, but -- but that was very --

7   Q    Uh-huh.

8   A    -- very early on, an objection filed in the form of an

9   administrative claim or complaint against, if you will,

10  against Highland for the management of Multi-Strat.

11  Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12  seeking to inhibit the Debtor from managing the CLO assets; is

13  that right?

14  A    No, not the CLO assets, no.

15  Q    Yeah.  But the Funds and the Advisors did.  That was the

16  hearing on December 16th.  Do you recall that?

17  A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18  and the various Advisors.

19  Q    All right.  Do you recall Mr. Rukavina asking you whether

20  there was any evidence in the record to support your testimony

21  that there was an agreement in place to assume the CLO

22  management agreements?

23  A    I recall the question, yes.

24  Q    Okay.

25          MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

Seery - Redirect                    241

1   to put up on the screen the Debtor's omnibus reply to the plan

2   objections.

3          THE COURT:  Okay.

4          MR. MORRIS:  It was filed -- it was filed on January

5   22nd.  And if we can go, I think, to -- I think it's Paragraph

6   -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

7   BY MR. MORRIS:

8   Q    Take a look at that, Mr. Seery.  Does that -- does that

9   statement in Paragraph 135 accurately reflect the

10  understanding that's been reached between the Debtor and the

11  CLO Issuers with respect to the Debtor's assumption of the CLO

12  management agreements?

13  A    Yes.  I think that's consistent with what I testified to

14  earlier, the substance of the agreement.

15         MR. MORRIS:  And if we can just scroll to the top,

16  just to see the date.  Or the bottom.  I guess the top.

17         THE WITNESS:  Do you mean the date of this pleading?

18  BY MR. MORRIS:

19  Q    Yeah.  So, it was filed on January 22nd, right, ten days

20  ago?  Okay.

21  A    That's correct.

22         MR. MORRIS:  I'd like to put up on the screen an

23  email, Your Honor, that I'd like to mark as Debtor's Exhibit

24  10A.  And this is --

25  BY MR. MORRIS:

Seery - Redirect                                242

1  Q    Do you recall, Mr. Seery, you testified that the agreement

2  was reflected in an email?

3  A    Yes.

4  Q    Is this the email that you're referring to?

5           MR. MORRIS:  If we could scroll down.  Right there.

6           THE WITNESS:  Yes.

7           MR. MORRIS:  Okay.  One -- the email below.  Okay.

8  Right there.

9  BY MR. MORRIS:

10 Q    Is that the -- is that the email you had in mind?

11 A    It was the series of emails.  We -- we had a -- I think I

12 testified in the prior testimony, or my -- one of my

13 depositions, that we had had a number of conversations with

14 the Issuers and their counsel, and this was the summary of the

15 agreement that was contained in these emails.

16 Q    Okay.  And this is, this is the same date as the omnibus

17 reply that we just looked at, right, January 22nd?

18 A    That's correct.

19 Q    Okay.  You were asked a question, I think, late in your

20 cross-examination about a Chapter 7 trustee's ability to sell

21 the assets in the same way as you are proposing to do.  Do you

22 recall that testimony?

23 A    Yes.

24 Q    And I think, if I understood correctly, the question was

25 narrowly tailored to whether there was any legal impediment to

Seery - Redirect                                    243

1    a trustee doing -- performing the same functions as you.  Do I
2    have that right?
3    A    That's the question I was asked, whether the Bankruptcy
4    Code had a specific prohibition.
5    Q    Okay.  And I think, I think you testified that you weren't
6    aware of anything.  Is that right?
7    A    That's correct.
8    Q    All right.  But let's talk about practice.  Do you think a
9    Chapter 7 trustee will realize the same value as you and the
10   team that you're assembling will, in terms of maximizing value
11   and getting the maximum recovery for the assets?
12   A    No.  As I testified earlier, you know, I've been working
13   with these assets now for a year.  It's a complicated
14   structure.  The assets are all slightly different.  And
15   sometimes much more than slightly.  And the team that we're
16   going to have helping managing is familiar with the assets as
17   well.  We believe we'll be able to execute very well in the
18   markets that we (garbled).
19   Q    Do you think a Chapter 7 trustee will have a steep
20   learning curve in trying to even begin to understand the
21   nature of the assets and how to market and sell them?
22   A    I think anybody coming into this, the way this company is
23   set up, as an asset manager, and the diversity of the assets,
24   would have a steep learning curve, yes.
25   Q    Do you have any view as to whether the perception in the

Seery - Redirect                                      244

1    marketplace of a Chapter 7 trustee taking over to sell the
2    assets will have an impact on value as compared to a post-
3    confirmation estate of the type that's being proposed under
4    the plan?
5    A    Yes, I do, and it certainly would be negative, in my
6    experience.  Typically, assets are not conducted -- asset
7    sales are not conducted through a bankruptcy court, and
8    certainly not with a Chapter 7 trustee that has to sell them,
9    and generally is viewed as having to sell them quickly.  So we
10   -- we approach each asset differently, but certainly in a way
11   that would be much more conducive to maximizing value than a
12   Chapter 7 trustee could, just by the nature of their role.
13   Q    Is it -- is it your understanding that, under the proposed
14   plan and under the proposed corporate governance structure,
15   that the Claims Oversight Committee will -- will manage you?
16   That you'll report to that Committee and that they'll have the
17   opportunity to make their assessment as to the quality of your
18   work?
19   A    Yeah, absolutely.  And that's consistent with what we've
20   done before in this case.  Even where it wasn't an asset of
21   the estate or was being sold in the ordinary course, we spent
22   time with the Committee and the Committee professionals before
23   selling assets.
24   Q    And you've worked with the Committee for over -- for a
25   year now, right?

Seery - Redirect                                    245

1    A    It's over a year.

2    Q    And the Committee is comfortable with you taking this

3    role; is that right?

4    A    I think they're supportive of it.  Comfortable might be

5    not the right word choice.

6    Q    Okay.  I appreciate the clarification.  And do you have

7    any reason to believe that the -- that the Oversight Committee

8    is going to allow you the unfettered discretion to do whatever

9    you want with the assets of the Trust?

10   A    Not a chance.  Not with this group.  Nor would I want to.

11   There's no right or wrong answer for most of these things, and

12   the collaborative views from professionals and people who have

13   an economic stake in the outcome will be helpful.

14   Q    Okay.  You were asked some questions about the November

15   projections and the -- and the assumption that was made that

16   valued the HarbourVest and the UBS claims at zero.  Do you

17   recall that?

18   A    Yes.

19   Q    As of that time, was the Debtor still in active litigation

20   with both of those claim holders?

21   A    Very much so.

22   Q    And after the disclosure statement was issued, do you

23   recall that the Court entered its order on UBS's Rule 3018

24   motion?

25   A    Yes.

Seery - Redirect                                    246

1    Q    And do you recall what the -- what the claims estimate was

2    for voting purposes under that order?

3    A    It was about $95 million.  That was -- it was together

4    with the summary judgment orders of that date.  They were

5    separate orders, but that was the lone hearing.

6    Q    And was that public information, that order was publicly

7    filed on the docket; isn't that right?

8    A    Yes, it was.

9    Q    Is there anything in the world that you can think of that

10   would have prevented any claim holder from doing the math to

11   try to figure out the impact on the estimated recoveries from

12   the -- by using that 3018 claims estimate?

13   A    No.  It would have -- it would have been quite easy to do.

14   Q    And, in fact, that's what you wound up doing with respect

15   to the January projections, right?

16   A    That's correct.

17   Q    And do you recall when the HarbourVest settlement, when

18   the 9019 motion was filed?

19   A    I don't recall the actual filing.  It was subsequent to

20   the UBS, though.

21           MR. MORRIS:  Ms. Canty, if you have it, can we just

22   put it on the screen, to see if we can refresh Mr. Seery's

23   recollection?  If we could just look at the very top.

24   BY MR. MORRIS:

25   Q    Does that refresh your recollection that the 9019 motion

Seery - Redirect                                    247

1   was filed on December 23rd?

2   A    Yes, it does.  The agreement was reached before that, but

3   it took a little bit of time to document the particulars and

4   then to -- to get it filed.

5   Q    And this wasn't filed under seal, to the best of your

6   recollection, was it?

7   A    No, no.  This was -- this was open, and we had a very open

8   hearing about it, because it was a related-party objection.

9   Q    And to the best of your recollection, did this 9019 motion

10  publicly disclose all of the material terms of the proposed

11  settlement?

12  A    Yes, it did.

13  Q    Can you think of anything in the world that would have

14  prevented any interested party from doing the math to figure

15  out how this particular settlement would impact the claim

16  recoveries set forth in the Debtor's disclosure statement?

17  A    No.  And just again, to be clear, the plan and the

18  projections had assumptions, but the plan was very clear that

19  the denominator was going to be determined by the total amount

20  of allowed claims.

21  Q    And, again, at the time that that was filed, you hadn't

22  reached a settlement with HarbourVest, had you?

23  A    No.

24  Q    And the order on the 3018 motion hadn't yet been filed; is

25  that right?

Seery - Redirect                              248

1  A    That's correct.

2  Q    Okay.  Has -- are you aware of any creditor expressing any

3  interest in trying to change their vote as a result of the

4  updates of the forecasts?

5  A    Only Mr. Daugherty.  And actually, they have a stipulation

6  with the two -- the two former employees.

7  Q    All right.  But to be fair, that wasn't -- had nothing to

8  do with the revisions to the projections?  That was just in

9  connection with their settlement; is that right?

10  A    That's correct.  As was, I suspect, Mr. Daugherty's, but

11  he'd been aware of the settlements, just like everyone else.

12  Q    Okay.  You were asked a couple of questions, I think, by

13  Mr. Rukavina about whether there is anything that you need to

14  do your job on a go-forward basis.  And I think you said no.

15  Do I -- do I have that right?  Nothing further that you need?

16  A    I -- I'm not really sure what your question means, to be

17  honest.

18  Q    Okay.  Fair enough.  To be clear, is there any chance that

19  you would accept the position as the Claimant Trustee if the

20  gatekeeper and injunction provisions of the proposed plan were

21  extracted from those documents?

22  A    No.  As I said earlier, they're integral in my view to the

23  entire plan, but they're absolutely essential to my bottom.

24  Q    Okay.  And through -- through the date of the effective

25  date, are you relying on the exculpation clause of the -- have

Seery - Redirect                                    249

1    you been relying on the exculpation clause in the January 9th

2    order that you testified to at the beginning of this hearing?

3    A    Yeah.  Both the January 9th order as well as the July

4    order with respect to my CEO/CRO positions.

5    Q    Okay.

6              MR. MORRIS:  I've got nothing further, Your Honor.

7              THE COURT:  All right.  Any recross on that redirect?

8              A VOICE:  I believe Mr. Rukavina is speaking but is

9    muted, Your Honor.

10             THE COURT:  Mr. Rukavina, do you have any recross?

11             MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12   apologize.

13             THE COURT:  Okay.

14             MR. RUKAVINA:  Can you hear me now?

15             THE COURT:  Yes.

16             THE WITNESS:  Yes.

17             MR. RUKAVINA:  Thank you.

18        Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19   Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20   search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21   down.  Stop there.

22                        RECROSS-EXAMINATION

23   BY MR. RUKAVINA:

24   Q    Mr. Seery, do you see what's attached as Exhibit C to the

25   Omnibus Reply, which is proposed language in the confirmation

1    order?

2    A    I see the exhibit.  I didn't know if this was -- I don't

3    know exactly what it's for.  If it's proposed language, I'll

4    accept your representation.

5            MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

6    Vasek.  I want to make sure that I understand what you're

7    saying.  Scroll back up.  Do the word search for where Exhibit

8    C appears first.  Start again.  Okay.  So scroll up.

9    BY MR. RUKAVINA:

10   Q    So, you'll recall Mr. Morris was asking you about the

11   paragraph in here where you outlined the terms of the

12   agreement with the CLOs.  Do you recall that testimony?

13   A    Yes.

14   Q    Okay.  And then you see it says, The Debtor and the CLOs

15   agreed to seek approval of this compromise by adding language

16   to the confirmation order.  A copy of that language is

17   attached hereto as Exhibit C and will be included in the

18   confirmation order.

19       Do you see that, sir?

20   A    I do.

21   Q    Okay.

22           MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23   BY MR. RUKAVINA:

24   Q    So it's correct that this Exhibit C is the referenced

25   agreement that the Debtor and the CLOs will seek approval of,

Seery - Recross                          251

1   correct?

2   A    The -- the -- it may be word-splitting, but I believe it

3   says that they've reached agreement and this is the language

4   that will evidence that agreement or embody that agreement.

5   Q    Okay.

6           MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

7   page, please.

8   BY MR. RUKAVINA:

9   Q    Real quick, do the CLOs owe the Debtor any money for the

10  management fees?

11  A    I don't -- well, the answer is there are accrued fees that

12  haven't been paid, but when they have cash they run through

13  the waterfall and pay them.

14  Q    And I believe you mentioned to me those accrued fees

15  before.  They're several million dollars, correct?

16  A    It -- I don't know right off the top of my head.  They can

17  aggregate and then they get paid down in the quarter depending

18  on the waterfall.  And it's -- it's not a fair statement by

19  either of us to say the CLOs, as if they're all the same.

20  Each one is different.

21  Q    I understand.  But as of today, you agree that the CLOs

22  collectively owe some amount of money to the Debtor in accrued

23  and unpaid management fees?

24  A    I believe that's the case.

25  Q    Okay.  And do you believe it's north of a million dollars?

1   A    I don't recall.

2   Q    Okay.

3        MR. RUKAVINA:  Well, scroll down a couple of more

4   lines, Mr. Vasek.  Stay there.

5   BY MR. RUKAVINA:

6   Q   Sir, if you'll read with me, isn't the Debtor releasing

7   each Issuer, which is the CLOs, for and from any and all

8   claims, debts, et cetera, by this provision?

9   A    Claims.  Not -- not fees, but claims.  I don't believe

10  there's any release of fees that the CLOs might owe and would

11  run through the waterfall here.

12  Q    Okay.  For and from any and all claims, debts,

13  liabilities, demands, obligations, promises, acts, agreements,

14  liens, losses, costs, and expenses, including without

15  limitation attorneys' fees and related costs, damages,

16  injuries, suits, actions, and causes of action, of whatever

17  kind or nature, whether known or unknown, suspected or

18  unsuspected, matured or unmatured, liquidated or unliquidated,

19  contingent or fixed.

20      Are you saying that that does not release whatever fees

21  have accrued and the CLOs owe?

22  A    I don't believe it would.  If it did, your client should

23  be ecstatic.  But I don't believe it does that.

24  Q    And you don't believe that it releases the CLOs of any and

25  all other obligations that they may have to the Debtor and the

1  estate?

2  A    I -- again, I don't believe there are any, but I think

3  it's a broad release of claims away from the actual fees that

4  are generated by the Debtor.  I don't believe there's an

5  intention to release fees that have accrued.

6  Q    Have you seen this language before I showed it to you

7  right now?

8  A    I believe I have, yes.

9  Q    Okay.  Take a minute.  Can you point the Court to anywhere

10 where present or future fees under the CLO agreements are

11 excepted from the release?

12 A    I could go through, I'll take your representation, but I

13 don't believe that that's what it -- it's supposed to release

14 fees.  Again, if the fees are owed, they get paid, if there

15 are assets there to pay them.

16 Q    Okay.  This release and this settlement was never noticed

17 out as part of a 9019, was it?

18 A    I don't believe so, no.

19 Q    Okay.  So, other than bringing it up here today, this is

20 the first that the Court, at least, has heard of this,

21 correct?

22 A    Yeah, again, I don't --

23        MR. MORRIS:  Objection to the form of the question.

24        THE WITNESS:  Yeah.  I just stated before that I

25 don't think this is a -- that there claims.

Seery - Recross                                    254

1              THE COURT:  Wait.  Slow down.  I think --

2              MR. SEERY:  Oh, I'm sorry, Your Honor.

3              THE COURT:  -- there was an objection.  Go ahead, Mr.

4      Morris.

5              MR. MORRIS:  The notion that this is the first time

6      the Court has heard of this is just factually incorrect.

7      First of all, it's in the document from January 22nd.  Second

8      of all, Mr. Seery testified to it last week at the preliminary

9      injunction hearing.  I mean, --

10             THE COURT:  I -- I --

11             MR. MORRIS:  -- I don't know what the point of the

12     inquiry is, but there's -- this is not new news.

13             THE COURT:  Okay.  I sustain the objection.

14     BY MR. RUKAVINA:

15     Q   And Mr. Seery, can you point me to any document where

16     counsel for the CLOs has signed this particular confirmation

17     order or any other document agreeing to this language in the

18     confirmation order?

19     A   I don't think there's any document that's signed.  I think

20     we already went over that.  I think the email is evidence

21     their agreement to the general terms.  I don't see any

22     agreement with respect to this particular language.

23     Q   Well, you have no personal information?  You're going on

24     what your lawyers told you that the CLOs agreed to, correct?

25     A   That's correct.

Seery - Recross                                255

1  Q    Okay.  You didn't personally --

2  A    Excuse me.  That's correct with respect to this language,

3  not with respect to the agreement.  I was on the phone when

4  they agreed.

5  Q    Okay.  And they agreed orally, you're saying, to basically

6  the assumption of the CLO management agreements?

7  A    Correct.

8  Q    Okay.

9          MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

10  witness.

11          THE COURT:  All right.  Other recross?

12          MR. TAYLOR:  Yes, Your Honor, I do.

13          THE COURT:  Go ahead.

14                      RECROSS-EXAMINATION

15  BY MR. TAYLOR:

16  Q    Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,

17  let me restart.  I believe you testified earlier, in response

18  to questions by Mr. Morris, that you didn't believe a Chapter

19  7 trustee would be very effective in monetizing these assets,

20  correct?

21  A    I think I said I didn't believe that the Chapter 7 trustee

22  would be as effective at monetizing the assets as the

23  Reorganized Debtor would be, and me in the role as Claimant

24  Trustee.

25  Q    And one of the reasons that you gave is you believe that

Seery - Recross                                    256

1  the Chapter 7 trustee had to liquidate assets so quickly that

2  it could not be effective; is that correct?

3  A    Typically, that's the case, yes.

4  Q    You worked for the Lehman trustee, correct?

5  A    That's incorrect.

6  Q    Okay.  Did you work on the Lehman case?

7  A    Did I work in the case?  No.

8  Q    Okay.  Did you -- how were you involved within -- within

9  the Lehman case?

10 A    It's a long history, but I was a relatively senior person,

11 not senior level, not senior management level person at

12 Lehman.  I ran the loan businesses and I helped a number of

13 other places and I -- in the organization.  I helped construct

14 the sale of Lehman to Barclays out of the broker-dealer and

15 then helped consummate that sale.

16 Q    Okay.  I believe, in that case, it was a SIPC -- the

17 trustee was a SIPC trustee, correct?

18 A    With respect to the broker-dealer.

19 Q    Okay.  And you believe that a SIPC trustee is very -- has

20 very similar rules with respect to asset sales; is that

21 correct?

22 A    There are some similarities, absolutely.

23 Q    Okay.  And so in that case, the trustee was in place for

24 seven years, yet you believe -- you want this Court to believe

25 that a Chapter 7 trustee has to liquidate assets in a very

                          Seery - Recross                      257

1   short time frame, is that correct?

2             MR. MORRIS:  Objection to the form of the question.

3             THE WITNESS:  Yeah, in the Lehman case, --

4             THE COURT:  Overruled.

5             THE WITNESS:  I'm sorry, Judge.

6             THE COURT:  Go ahead.

7             THE WITNESS:  In the Lehman case, the SIPC trustee

8   spent years litigating, not liquidating.  The broker-dealer

9   was sold in our structured deal to Barclays, and then the SIPC

10  trustee liquidated the remainder of the estate, which was the

11  broker-dealer, but most of it had been sold to Barclays.  It

12  was really a litigation case.

13  BY MR. TAYLOR:

14  Q   But it did -- that trustee did sell off subsequent assets

15  after the initial sale, correct?

16  A   That trustee, I don't think, managed -- I don't know about

17  that.  The trustee didn't really manage any assets.  Other

18  than litigations.

19  Q   You've also testified that you didn't believe or that you

20  would not take on this role without the gatekeeper and

21  injunction -- gatekeeper role and injunction being in place;

22  is that correct?

23  A   Yes.

24  Q   And you're also familiar with the Barton Doctrine,

25  correct?

1  A    I'm not.

2  Q    Okay.  Do you believe that a Chapter 7 trustee could be

3  sued by third parties without obtaining either relief from

4  this Court -- let me just stop there.  Do you believe that a

5  Chapter 7 trustee could be sued without seeking leave of this

6  Court?

7  A    I think it would be difficult.  I know that Chapter 7

8  trustees have qualified immunity, so I think, whether it would

9  be leave of this Court or it's just that there's a very high

10  bar to suing them, I'm not exactly sure.  It's not something

11  I've spent time on.

12  Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13  need of the gatekeeper role or injunction if this case were

14  converted to one under Chapter 7, correct?

15  A    That's probably true.

16  Q    Thank you.

17         MR. TAYLOR:  No further questions.

18         THE COURT:  All right.  Any other recross?

19         MR. DRAPER:  Your Honor, I have nothing --

20         THE COURT:  All right.

21         MR. DRAPER:  -- further.

22         THE COURT:  All right.  I think we're done, but

23  anyone I've missed?

24      All right.  Mr. Seery, it's been a long day.  You are

25  excused from the virtual witness stand.

1          THE WITNESS:  Thank you, Your Honor.

2          THE COURT:  All right.  Mr. Morris, let's see if

3    there's anything else we can accomplish today.  It's 4:18

4    Central time.  Who would be your next witness?

5          MR. MORRIS:  My next witness would be John Dubel,

6    Your Honor.

7          THE COURT:  All right.  Can you give us a time

8    estimate for direct?

9          MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10   than 20 minutes or so, but I would offer the Court, if you

11   think it would be helpful, counsel for the CLO Issuers is on

12   the call, and I believe that they would be prepared to just

13   confirm for Your Honor that there is an agreement in

14   principle, just as Mr. Seery has testified to, and maybe you

15   want to hear from her.  I know she's not really a witness, but

16   she might be able to make some representations to give the

17   Court some comfort that everything Mr. Seery has said is true.

18         THE COURT:  I think that would be useful.  Is it Ms.

19   Anderson or who is it?

20         MS. ANDERSON:  That is -- it is, Your Honor.  And you

21   know, I appreciate the testimony given.  I certainly do not

22   want to testify, but thought it might be useful for the Court

23   to hear from us.

24      Amy Anderson on behalf of the Issuers from Jones Walker.

25   Schulte Roth also represents the Issuers.  And I can represent

260

1    to the Court that the agreement as it's represented on Docket

2    1807, as more particularly described in Exhibit C, which Your

3    Honor has seen, is the agreement reached between the Issuers

4    and the Debtor.

5        There was some testimony about fees owed, accrued fees

6    owed to the Debtor.  I certainly cannot speak to the substance

7    of each particular management agreement with each CLO.  They

8    are all distinct and unique and very lengthy documents.  I

9    will -- I can represent to the Court that any accrued fees

10   that are owed were not intended to be included in the release.

11   It is -- it is not meant to release fees owed to Highland

12   under the particular management agreements.

13       Of course, if the Court has any questions or if I can

14   provide anything further, I'm happy to.  And I will be on the

15   hearing today and tomorrow, but I thought it might be useful,

16   given the topic of the testimony this afternoon.

17           THE COURT:  All right.  That was useful.  Thank you,

18   Ms. Anderson.

19       All right.  Well, Mr. Morris, shall we go ahead and hear

20   from Mr. Dubel today, perhaps finish up a second witness?

21           MR. MORRIS:  Yeah.  I think we have the time.  I

22   think Mr. Dubel is here.  Are you here, Mr. Dubel?

23           MR. DUBEL:  I am.  Can you hear me, Your Honor?

24           THE COURT:  I can hear you, but I cannot see you.

25   Oh, now I can see you.  Please raise your right hand.

Dubel - Direct                                        261

1              JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

2              THE COURT:  All right.  Thank you.  Mr. Morris, go

3    ahead.

4              MR. MORRIS:  Thank you very much, Your Honor.

5                      DIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Dubel, can you hear me?

8    A    I can, Mr. Morris.

9    Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13             MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   *C.V.* can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18             THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of

1    management teams, and as a director, both an independent

2    director and a non-independent director.

3         My executive roles have included the -- both an executive

4    director, chief executive officer, president, chief

5    restructuring officer, chief financial officer.  And I have

6    been involved in some of the largest Chapter 11 cases over the

7    last several decades, including cases like *WorldCom* and

8    *SunEdison*.

9    Q    Let's focus your attention for a moment just on the

10   position of independent director.  Have you served in that

11   capacity before this case?

12   A    I have.

13   Q    Can you describe for the Court some of the cases in which

14   you've served as an independent director?

15   A    Sure.  I've served as an independent director in several

16   cases that were I'll call post-reorg cases.  *Werner Company*,

17   which was the largest climbing equipment manufacturer in the

18   world, manufacturer of ladders, Werner Ladders.  You'll see

19   them on every pickup truck running around the countryside.

20        *FXI Corporation*, which is a -- one of the largest foam

21   manufacturers.  Everybody's probably slept or sat on one of

22   their products.

23        *Barneys New York*, back in 2012, when they did an out-of-

24   court restructuring.  I had previously been involved with

25   Barneys 15 years before that, and so I was called upon because

Dubel - Direct                                         263

1  of my knowledge to be an independent director in that

2  situation.  Have had no relationship with Barneys since it

3  emerged from Chapter 11 back in 1998.

4      I have been the independent director in *WMC Mortgage*,

5  which was a mortgage company owned by General Electric.

6      And I am currently serving as an independent director in a

7  company -- in two companies.  One, *Alpha Media*, which is a

8  large radio station chain that recently filed Chapter 11, I

9  believe it was late Sunday night, and I am also an independent

10 director in the *Purdue Pharma* bankruptcy, and have served

11 prior to the bankruptcy and am the chair of the special

12 independent committee of directors -- special committee of

13 independent directors in that particular situation.

14 Q   That sounds like a lot.  In terms of other fiduciary

15 capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16 involved in that case, and if so, how?

17 A   I was.  That was -- for those people who may remember it,

18 that goes back into the 1993 era.  *Leslie Fay* was a large

19 apparel manufacturer, and at the time was one of the largest

20 companies that had gone through an extensive fraud.  I say at

21 the time because it was about a $180 million fraud, which

22 pales by some of the ones that have followed it.

23     I was brought in as the executive vice president in charge

24 of restructuring, chief financial officer, and was also added

25 to the board of directors.  Even though I wasn't independent,

Dubel - Direct                                    264

1   I was added to the board of directors to have the fresh face

2   on the board in that particular situation because of the fraud

3   that had taken place.

4   Q    And --

5   A    *Sun* --

6   Q    Go ahead.

7   A    *SunEdison*, I was brought in as the CEO.  Actually,

8   initially, as the chief restructuring officer, with a mandate

9   to replace the CEO, which took place shortly after I was

10  brought on board and -- because of various issues surrounding

11  investigations by the SEC, DOJ, and allegations by the

12  creditors of fraud.  And so I was brought in to run the

13  company through its Chapter 11 process.

14       As I'd mentioned earlier, *WorldCom*, I was brought in at

15  the beginning of the case as the fresh chief financial

16  officer.  And I think everybody is familiar with what happened

17  in the *WorldCom* situation.

18  Q    All right.  Based on that experience, do you have a view

19  as to whether the appointment of independent directors is

20  unusual?

21  A    It is not.  More recently, it has -- it had been in the

22  past.  Usually, you know, they would try and take the existing

23  directors and form a special committee of the existing

24  directors.  But I think the state of the art has become more

25  where independent directors are brought in, mainly because the

Dubel - Direct                                          265

1    cases have become a lot more complex in nature, and larger,
2    and the transactions themselves are much more sophisticated.
3    And so having somebody independent has been important for
4    analyzing the various transactions.  And also, quite often,
5    it's just bringing a fresh, independent voice to the company
6    on the board.
7    Q    Do you have an understanding as to the purpose and the
8    role of independent directors generally in restructuring and
9    bankruptcy cases?
10   A    Sure.  As I kind of alluded to a little bit earlier, the
11   -- probably the most critical thing is for restoring
12   confidence in the company and in the management in terms of
13   corporate governance, especially when there have been troubled
14   situations, where -- whether it's been fraud or allegations
15   made against the company and its prior management or when
16   management has left under difficult situations.
17        Also, you know, independent thought process being brought
18   to the board is very important for helping guide companies.
19   It's quite often the existing management team or the existing
20   board may get stuck in a rut, as you can say, you know, in
21   terms of their thinking on how to manage it, and having
22   somebody with restructuring experience who provides that
23   independent voice is very important to the operations.
24        In addition, having someone who can look at conflicts that
25   might arise between shareholders or shareholders and the board

Dubel - Direct                                    266

1   members is important.  As I mentioned earlier, the *WMC*
2   *Mortgage* situation was one where I was brought on to -- as an
3   independent member of the board to effectively negotiate an
4   agreement or a settlement between WMC and its parent, General
5   Electric.  That entity was being -- WMC was being sued for
6   billions of dollars, and there were issues as to whether or
7   not General Electric should fund those obligations.  And so
8   that was a role that is quite often occurring in today's day
9   and age.

10       In addition, evaluating transactions for companies is
11  important, whereby either the shareholders who sit on the
12  board or board members may be involved in those transactions,
13  needing an independent voice to review it.  And, you know, I
14  have served in situations.  Again, *Barneys New York* and *Alpha*
15  *Media* is another example where, as an independent director, I
16  am one of the parties responsible for evaluating those
17  transactions and making recommendations to the entire board.

18       And then, again, you know, situations where it's just
19  highly-contentious and having, as I said, having that
20  independent view brought to the table is something that is
21  very helpful in these cases.
22  Q   I appreciate the fulsomeness of the answer.  During the
23  time that you served in these various fiduciary capacities, is
24  it fair to say you spent a lot of time considering and
25  addressing issues relating to D&O and other executive

Dubel - Direct                                    267

1   liability issues?

2   A    It's usually one of the things that you get involved with

3   thinking about prior to taking on the role because you want to

4   make sure that there are the appropriate protections for the

5   director.

6   Q    Can you describe for the Court some of the protections

7   that you've sought or that you've seen employed in some of the

8   cases you've worked on, including this one, by the way?

9   A    Sure.  I mean, one of the first things you look to is does

10  the company -- will the company indemnify the director for

11  serving in that capacity?  And if the company will not

12  indemnify, then there's always a question as to why not, and

13  it's probably something you don't want to get involved with.

14       Generally, that is something that I don't think I've ever

15  seen a case where there has not been indemnification.

16  Obviously, it would, you know, cause great pause or concern if

17  they weren't willing to indemnify.  But that is important.

18       Providing D&O insurance is very important.  And in most

19  situations, you know, over the last 10-15 years, if there's

20  not adequate D&O insurance -- quite often, the D&O insurance

21  has been tapped out because of claims that will -- have been

22  brought or are anticipated to be brought -- new D&O insurance

23  is something that's front and center for the minds of

24  independent directors such as myself.

25       As you -- that gets you into the case and gets you moving.

Dubel - Direct                                    268

1   As you start to look towards the confirmation and exit from

2   the case, things that would be appropriate, that, you know,

3   would always be something you would want to look at would be

4   exculpation language, releases.  And in this particular case,

5   the injunction, or what Mr. Seery earlier referred to as the

6   gatekeeper clause, is something that is very important for

7   directors, both, you know, as they're thinking through it and

8   as they emerge.

9   Q   All right.  Let's shift now to this case, with that

10  background.  How did you learn about this case?

11  A   I had a party who was involved in the case reach out to me

12  in early part of December of 2019 to see if I would be

13  interested in getting involved.  I think that was about the

14  time -- it was after -- as I recall, it was after the case had

15  been moved to Dallas and when there was a -- consideration of

16  either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17  exactly which it was.  But there was talk about a motion to

18  bring on a trustee and get rid of all the management and the

19  like and such.

20  Q   Can you describe in as much detail as you can recall the

21  facts and circumstances that led to your appointment as an

22  independent director?

23  A   Sure.  I, as I said, I had -- early December, I had an --

24  one of the parties involved -- had, probably within the next

25  week, probably two or three others -- that reached out to see

Dubel - Direct                                    269

1  if I would be interested in participating.  I met with the

2  Creditors' Committee or -- I'm not sure if it was all the

3  members, but representatives of the Creditors' Committee,

4  along with counsel, and I believe financial advisors were

5  involved.  They walked me through the issues.  They wanted to

6  hear about my *C.V.*  Quite a few of them knew me, knew me well,

7  but others wanted to hear about my background and how I would

8  look at things as an independent director.

9      That went through into the latter part of December.  I

10 knew that they were talking to other parties.  I think it was

11 probably right around the first of the year or so that I was

12 informed, maybe a little bit earlier than that, that I was

13 informed that Mr. Seery was one of the other parties that they

14 were talking to, and Mr. Seery and I were put in touch with

15 each other.  I had worked with Mr. Seery back probably nine

16 years earlier when I was the CEO of FGIC.  He was involved in

17 a matter that we were restructuring, and so knew him a little

18 bit and was comfortable working with him as a, you know,

19 another independent director.

20     Then we took the time that we had to to -- or, I took the

21 time to -- from the beginning, you know, the early part of

22 December, look at the docket, understand what was taking

23 place.  I -- in addition, I met with the company and its

24 advisors, in-house counsel, the folks at DSI who were at the

25 time the CRO and the company's counsel to better understand

Dubel - Direct                                        270

1    some of the issues.

2         Mr. Seery and I, as I said, were both selected, and we

3    went through the process of, I guess, breaking the tie, I

4    think, if I could say it that way, amongst the creditors and

5    the Debtor as to who would be the third member of the board.

6    And we were given the opportunity to go out, interview, and

7    select the third member, which resulted in Russell Nelms'

8    appointment to the board.  And also during that time, we were

9    given the opportunity to have some input -- not a hundred

10   percent input, but some input -- on the January 9th order that

11   -- the January 9, 2020 order that was put in place appointing

12   us and giving us some of the protections that we felt were

13   appropriate and necessary in this case.

14   Q    All right.  We'll get to that in a moment, but during this

15   diligence period, did you form an understanding as to why an

16   independent board was being formed, why it was being sought?

17   A    Yes.  There was, my words, there was a lot of distrust

18   between the creditors and the management -- not the CRO, but

19   the prior management of the company -- and there had been a

20   motion brought both to obviously bring the case back to Dallas

21   from I think it was originally in Delaware and then there was

22   a motion to seek, you know, to remove management and put in a

23   trustee.

24        There had been a dozen years of litigation with one party,

25   about eight or nine years with another major party, and

1    several other of the major creditors were litigants.  The

2    other, as I understood, the other creditors, main creditors in

3    the case were all lawyers who had not yet gotten paid for the

4    litigation work that they had done.  And so it was obvious

5    that this was a very -- a highly-litigious situation.

6    Q    In addition to speaking with the various constituents, did

7    you do any diligence on your own to try to understand the case

8    before you accepted the appointment?

9    A    Yes.  I went to the docket to look at all the -- not every

10   single thing that had been filed, but to try and look at all

11   the key, relevant items that had been filed, get a better

12   understanding of what was out there.  Looked at some of the

13   initial filings of the company in terms of the, you know, the

14   creditors, to understand who the creditor base was per the

15   schedules that had been filed.  Looked at the -- some of the

16   various pleadings that had been put in place.

17   Q    Did you form a view as to the causes of the bankruptcy

18   filing?

19   A    Litigation.  That was my clear view.  This company had

20   been in litigation with multiple parties, various different

21   parties, since around 2008.  Generally, you would see

22   litigation like the types that were, you know, that were here,

23   you know, you'd litigate for a while, then you'd try and

24   settle it.

25       It did not appear to me that there was any intention on

Dubel - Direct                                            272

1  the -- the Debtor to settle these litigations, but would

2  rather just continue the process and proceed forward on the

3  litigation until the very last minute.  And so it was obvious

4  that this was going to -- that the Debtor was a, as I said, a

5  highly-litigious shop, and that was one of the causes,

6  obviously, the cause of the filing, along with the fact that

7  judgments were about to be entered against the Debtor.

8  Q   All right.  And in January 2020, do you recall that's when

9  the agreement was reached between the Debtor, the Committee,

10 and Mr. Dondero?

11 A    Yeah, it was the first week or so, which resulted in a

12 hearing on I believe it was January 9th in front of Judge

13 Jernigan.

14 Q   And as a part of that -- I think you testified at that

15 hearing.  Do I have that right?

16 A   I don't recall if I did.  I might have.  I might have

17 testified at a subsequent hearing.  But --

18 Q   But was --

19 A   -- I was in the courtroom for that hearing, yes.

20 Q   Was it part of that process by which you accepted the

21 appointment as independent director?

22 A   I accepted it based upon the order that had been

23 negotiated amongst the parties, the creditors, the Debtor, Mr.

24 Dondero, and others.  And that was the key thing that was --

25 and approved by the Court on that date.  And that was key for

Dubel - Direct                                                  273

1   my acceptance of the role as an independent director.

2   Q    And did you and the other prospective independent

3   directors participate in the negotiation of the substance of

4   the agreement?

5   A    We did.  We didn't have a hundred percent say over it, but

6   we were able to get our voices heard.  As Mr. Seery testified

7   earlier, he was instrumental in coming up with an idea about

8   how to put in place the injunction, you know, the -- I think

9   he referred to it as the gatekeeper injunction, which was

10  obviously in this case very critical to all three of us:  Mr.

11  Seery, Mr. Nelms, and myself.

12  Q    Can you describe for the Court kind of the issues of

13  concern to you and the other prospective board members?  What

14  was it that you were focused on in terms of the negotiations?

15  A    Well, obviously, indemnification was important, but that

16  was something that was going to be granted.  Having the right

17  to obtain separate D&O insurance just for the three directors

18  was important.  We were concerned that Strand Advisors, Inc.

19  really had no assets, and so we wanted to make sure that the

20  Debtor was going to get -- was going to basically guarantee

21  the indemnification.

22      The -- because of the litigious nature and what we had

23  heard from all of the various parties involved, including

24  people inside the Debtor who we had talked with, that it would

25  be something that was important for us to make sure that the

Dubel - Direct                                    274

1   injunction, the gatekeeper injunction was put in place.

2   Q    And can you elaborate a little bit on I think you said you

3   had done some diligence and you had formed a view as to the

4   causes of the bankruptcy filing, but did this case present any

5   specific concerns or issues that you and the board members had

6   to address perhaps above and beyond what you experienced in

7   some of the other cases you described?

8   A    Well, as I said earlier, the fact that the litigation --

9   the various litigations with the creditors have been going on

10  for what I viewed as an inordinate amount of years, and that

11  it was clear from my diligence that I had done that this had

12  been directed by Mr. Dondero, to keep this moving forward in

13  the litigation, and to, in essence, just, you know, never give

14  up on the litigation.

15       It was important that the types of protections that we

16  were afforded in the January 9th order were put in place,

17  because we -- none of us -- none of the three of us, and

18  myself in particular, did not want to be in a position where

19  we would be sued and harassed through lawsuits for the next,

20  you know, ten years or so.  That's not something anybody would

21  want to sign up for.

22  Q    All right.  Let's look at the January 9th order and the

23  specific provisions I think that you're alluding to.

24            MR. MORRIS:  Can we call up Exhibit 5Q, please?

25            THE WITNESS:  Pardon me while I put my glasses on to

1  read this.

2          MR. MORRIS:   All right.  And if we can go to

3  Paragraph 4.

4  BY MR. MORRIS:

5  Q   Is that the paragraph, sir, that was intended to address

6  the concern that you just articulated about Strand not having

7  any assets of its own?

8  A   Yes, it is.

9  Q   And can you just describe for the Court how that

10 particular provision addressed that concern?

11 A   Sure.  Since we were directors of Strand, which is the

12 general partner of the Debtor, we felt it was important that

13 the general -- that Highland, the Debtor, would provide the

14 guaranty on indemnification, because Highland had the assets

15 to back up the indemnification.

16     It was also pretty clear, from my experience in having

17 placed D&O insurance, you know, over the last 25-30 years,

18 that if there was no, you know, opportunity for

19 indemnification, putting in place insurance would be very

20 difficult or exorbitantly expensive.  So having this

21 indemnification by Highland was a very important piece of the

22 order that we were seeking.

23 Q   And the next piece is the insurance piece in Paragraph 5.

24 Do you see that?

25 A   I do.

Dubel - Direct                                    276

1   Q    Did you have any involvement in the Debtor's efforts to
2   obtain D&O insurance for the independent board?
3   A    I did.
4   Q    Can you just describe for the Court what role you played
5   and what issues came up as the Debtor sought to obtain that
6   insurance?
7   A    Sure.  The Debtors had been looking to get an insurance
8   policy in place.  They were not able to do that.  I happen to
9   have worked with an insurance broker on D&O situations in some
10  very difficult situations over the years and brought them into
11  the mix.  They were able to go out to the market and find a
12  policy that would cover us, the -- kind of the key components
13  of that policy, though, were, number one, the guaranty that
14  HCMLP would give -- I'm sorry, the guaranty that HCMLP would
15  give to Strand's obligations, and also the -- I'll call it the
16  gatekeeper provision was very important because these parties
17  did not want to have -- they wanted to have what was referred
18  to, commonly referred to as the Dondero Exclusion.
19       So while we were -- we purchased a policy that covered us,
20  it did have an exclusion, unless there were no assets left,
21  and then the what I'll call -- we refer to as kind of a Side A
22  policy would kick in.
23  Q    Okay.  What do you mean by the Dondero Exclusion?
24  A    The insurers did not want to cover the -- any litigation
25  that Mr. Dondero would bring against directors.  It was pretty

Dubel - Direct                          277

1   commonly known in the marketplace that Mr. Dondero was very

2   litigious, and insurers were not willing to write the

3   insurance without the protections that this order afforded

4   because they did not want to be hit with frivolous -- hit with

5   claims on the policy for frivolous litigation that might be

6   brought.

7          MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8   got to object to the last answer.  He testified as to what the

9   insurers' belief was and what they would or would not do based

10  upon their own knowledge.  It's not within his personal

11  knowledge.  And therefore we'd move to strike.

12         THE COURT:  I overrule that objection.

13         MR. MORRIS:  Your Honor?

14         THE COURT:  I overrule the objection.

15         MR. MORRIS:  Thank you.  Thank you, Your Honor.

16  BY MR. MORRIS:

17  Q   Mr. Dubel, can you explain to the Court, in your work in

18  trying to secure the D&O insurance, what rule the gatekeeper

19  provision played in the Debtor's ability to get that?

20  A   Based upon my discussions with the insurance broker, who I

21  have worked with for 25-plus years, had that gatekeeper

22  provision not been put in place, we would not have been able

23  to get insurance.

24  Q   All right.  Let's look at the gatekeeper provision.

25         MR. MORRIS:  Can we go down to Paragraph 10, please?

Dubel - Direct                                    278

1    Perfect.  Right there.

2    BY MR. MORRIS:

3    Q    Is this gatekeeper provision, is this also the source of

4    the exculpation that you referred to?

5    A    Yes.

6    Q    And what's your understanding of how the exculpation and

7    gatekeeper functions together?

8    A    Well, my apologies, I'm not an attorney, so just from a

9    business point of view, the way I look at this is that, you

10   know, obviously, we're -- you know, the directors are not

11   protected from willful misconduct or gross negligence, but any

12   negligence -- you know, claims brought under negligence and

13   the likes of such, and things that might be considered

14   frivolous, would have to first go to Your Honor in the

15   Bankruptcy Court for a review to determine if they were claims

16   that should be entitled to be brought.

17   Q    If you take a look at the provision, right, do you

18   understand that nobody can bring a claim without -- in little

19   i, it says, first determining -- without the Court first

20   determining, after notice, that such claim or cause of action

21   represents a colorable claim of willful misconduct or gross

22   negligence against an indirect -- independent director.  Do

23   you see that?

24   A    I do.

25   Q    Is it your understanding that parties can only bring

Dubel - Direct                                    279

1    claims for gross negligence or willful misconduct if the Court

2    makes a determination that there is a colorable claim?

3    A    That's my understanding.

4    Q    And the second --

5    A    I think they have the right -- I think they have the right

6    to go to the Court to ask if they can bring the claim, but the

7    Court has to make the determination that it's a colorable

8    claim for willful misconduct or gross negligence.

9    Q    And if the Court -- is it your understanding that if the

10   Court doesn't find that there is a colorable claim of willful

11   misconduct or gross negligence, then the claim can't be

12   brought against the independent directors?

13   A    That is my understanding, yes.

14   Q    And was -- taken together, Paragraphs 4, 5, and 10, were

15   they of importance to you and the other independent directors

16   before accepting the position?

17   A    They were absolutely critical to me and definitely

18   critical to the other directors, because we all negotiated

19   that together, and it would -- I don't -- I don't think any of

20   the three of us would have taken on this role if those

21   paragraphs had not been included in the order.

22   Q    Okay.  Just speaking for yourself personally, is there any

23   chance you would have accepted the appointment without all

24   three of those provisions?

25   A    I would not have.

Dubel - Direct                                          280

1    Q    And why is that?  In this particular case, why did you

2    personally believe that you needed all three of those

3    provisions?

4    A    Well, you know, people like myself, you know, someone

5    who's coming in as an independent director, come in in a

6    fiduciary capacity.  And, you know, we take on risks.  Now,

7    granted, in a Chapter 11 case, as the saying goes, you know,

8    it's a lot safer because everything has to be approved by the

9    Court, but there are still opportunities for parties to, in

10   essence, have mischief going on and bring nuisance lawsuits

11   that would take a lot of time and effort away from either the

12   role of our job of restructuring the entity or post-

13   restructuring, would just be nuisance things that would cost

14   us money.  And we, you know, I did not want to be involved in

15   that situation, knowing the litigious nature of Mr. Dondero

16   from the research that I had done, you know, the diligence

17   that I had done.  I did not want to subject myself to that.

18   And it has proven an appropriate and very solid order because

19   of the conduct of Mr. Dondero, as Mr. Seery has testified to

20   earlier.

21   Q    Do you have a view as to what the likely effect would be

22   on future corporate restructurings if you and your fellow

23   directors weren't able to obtain the type of protection

24   afforded in the January 9th order?

25   A    I think it would be very difficult to find qualified

Dubel - Direct                           281

1   people who would be willing to serve in these types of

2   positions if they knew they had a target on their backs.  You

3   know, it was something that was clear to us, to Mr. Seery, Mr.

4   Nelms, myself at the time, that if we had a target -- we felt

5   like we would have a target on our back if we didn't have

6   these protections.

7       It just wasn't worth the risk, the stress, the

8   uncertainty, the potential cost to us.  And so I don't think

9   anybody else would be, you know, willing to take on the roles

10  as an independent director with the facts and circumstances

11  and the players involved in this particular case.

12          MR. MORRIS:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Pass the witness.  Let's see.

14  You went -- I'm going to give a time.  You went 32 minutes.

15  So, for cross of this witness, I'm going to limit it to an

16  aggregate of 32 minutes.  Who wants to go first?

17          MR. DRAPER:  Your Honor, this is Douglas Draper.

18  I'll be happy to go first.

19          THE COURT:  All right.

20                      CROSS-EXAMINATION

21  BY MR. DRAPER:

22  Q   Mr. Dubel, prior to your engagement, did you happen to

23  read the case of *Pacific Lumber*?

24  A   I did not.

25  Q   And were you advised about *Pacific Lumber* by somebody

Dubel - Cross                                282

1    other than a -- your lawyer?

2    A    I'm not familiar with the case at all, Mr. Draper.

3    Q    Are you aware, and you've been around a long time, that

4    different circuits have different rules for liabilities of

5    officers, directors, and people like that?

6    A    I am aware that there are different, I don't know what the

7    right term is, but precedents, I guess, in different circuits

8    for any number of things, whether it's a sale motion or

9    protections of officers and directors or anything.  So each

10   circuit has its own unique situations.

11   Q    And one last question.  On a go-forward, after -- if this

12   plan is confirmed and on the effective date, you will not have

13   any role whatsoever as an officer or director of the new

14   general partner, correct?

15   A    I have not been asked to.  As Mr. Seery testified, he may

16   ask for assistance or just -- in most situations that I'm

17   involved with, I may have a continuing role just as a -- I'll

18   call it an advisor or somebody to provide a history.  But at

19   this point in time, I have not been asked to have any

20   involvement.

21   Q    And based on your experience, you know that there's a

22   different liability for a director and an officer versus

23   somebody who is an advisor?

24        MR. MORRIS:  Objection to the form of the question.

25   No foundation.

Dubel - Cross                                                283

1           THE COURT:  Overruled.

2           MR. DRAPER:  Mr. Dubel has shown --

3           THE COURT:  Mr. Dubel, you can answer if you know.

4           MR. DRAPER:  Mr. Dubel, you can answer.

5           THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6    you say overruled.  Thank you.

7       Mr. Draper, I apologize, could you repeat the question?

8    BY MR. DRAPER:

9    Q    The question is you know from your experience that there's

10   a different liability for somebody who is an officer or

11   director versus somebody who's an advisor?

12   A    Yes, that's my experience, which is why in several

13   situations post-reorganization, while I have not been involved

14   *per se*, and I use the term involved meaning, you know, on a

15   day-to-day basis, if someone asks me to assist, I'll usually

16   ask them to bring me in as a non -- an unpaid employee or a,

17   you know, a nominally-amount-paid employee, so that I would be

18   protected by whatever protections the company might provide.

19           MR. DRAPER:  I have nothing further for this witness,

20   Your Honor.

21           THE COURT:  All right.  Other cross?

22           MR. TAYLOR:  Yes, Your Honor.

23           MR. RUKAVINA:  Yes, Your Honor.

24           MR. TAYLOR:  Oh, go ahead, Davor.

25           MR. RUKAVINA:  No, Clay, go ahead.

1                        CROSS-EXAMINATION

2    BY MR. TAYLOR:

3    Q    Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4    Dondero.  I believe you had previously testified in response

5    to questions from Mr. Morris that Mr. Dondero had engaged in a

6    pattern of litigious behavior; is that correct?

7    A    I believe that's the testimony I gave, yes.

8    Q    Okay.  And please give me the specific examples of which

9    cases you believe he has engaged in overly-litigious behavior.

10   A    Well, all of the cases that resulted in creditors, large

11   creditors in our bankruptcy.  That would be the UBS situation,

12   the Crusader situation which became the Redeemer Committee,

13   litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14   as I mentioned earlier, I'd, you know, been informed by

15   members of the management team that it was Mr. Dondero's style

16   to just litigate until the very end to try and grind people

17   down.

18   Q    Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19   in the UBS case?

20   A    No, but what was referred -- what I was referring to was

21   the nature in which he defended it and went overboard and

22   refused to ever, you know, try and settle things in a manner

23   that would have gotten things done.  And just looking at,

24   having been involved in the restructuring industry for the

25   last 40 years, as I said, almost 40 years, and been involved

Dubel - Cross                    285

1    in many, many litigious situations, it's obvious when someone

2    is litigious, whether they're the plaintiff or the defendant.

3    Q    So are you personally familiar with the settlement

4    negotiations in the UBS case that happened pre-bankruptcy,

5    then?

6    A    I have been informed that there were settlement

7    negotiations, and subsequently determined, through discussions

8    with the parties, that they weren't really close to -- to a

9    settlement.

10   Q    But are you aware of --

11   A    Mr. Dondero might have thought they were, but they were

12   not.

13   Q    Okay.  Would you be surprised to learn if UBS had offered

14   to settle pre-bankruptcy for $7 million?

15   A    As I understand, settlements -- settlement offers pre-

16   bankruptcy had a tremendous number of -- I don't know what the

17   right term is -- things tied to it and that clearly were never

18   going to get done.

19   Q    Okay.  When you say things were tied to it, what things

20   were tied to it?

21   A    I don't know all of the settlement discussions that took

22   place, but what I was informed was that there were a lot of

23   conditions that were included in that.  And it's -- if it had

24   been an offer of $7 million and Mr. Dondero didn't settle for

25   that, there must have been a reason why.  So, you know, since

Dubel - Cross                                    286

1    the entities -- all of the entities within the Highland

2    Capital empire, if you'd call it that, were being sued for

3    almost a billion dollars.

4    Q    Okay.  And you say there were lots of conditions that were

5    tied to that.  What were the conditions?

6    A    As I said earlier, I wasn't informed of them on all the

7    prepetition settlements.  That's just what I was told, there

8    was conditions.

9    Q    Okay.  And who were you told these things by?

10   A    Both external counsel and internal counsel.  Mr.

11   Ellington, Scott Ellington, and Isaac -- the litigation

12   counsel.

13   Q    Okay.  So --

14   A    That's -- sorry.

15   Q    Okay.  In each of these cases, you were informed by your

16   views by statements that were made to you by other people?

17   A    Yes.

18   Q    Okay.

19   A    Made -- and particularly made by members of management of

20   the Debtor, which is pretty informed.

21   Q    Okay.  Which members of management were those?

22   A    As I just testified, it was Mr. Ellington, who was the

23   general -- the Debtor's general counsel, and Mr. Leventon,

24   Isaac Leventon, who was the -- I believe his title was

25   associate general counsel in charge of litigation.

Dubel - Cross                                          287

1  Q    Okay.  Thank you.

2            MR. TAYLOR:  No further questions.

3            THE COURT:  All right.  Mr. Rukavina?

4                    CROSS-EXAMINATION

5  BY MR. RUKAVINA:

6  Q    Mr. Dubel, we've never met, although I think we were on

7  the phone once together.  I know you're a director, so you're

8  at the top, but having been in this case for more than a year,

9  you probably have some understanding of the assets that the

10 Debtor has, don't you?

11 A    I do, but I'm not as facile with it as Mr. Seery,

12 obviously.

13 Q    Sure.  Is it true, to your understanding, that the Debtor

14 owns various equity interests in third-party companies?

15 A    Either directly or indirectly.  That's my understanding,

16 yes.

17 Q    Okay.  Have you heard of an entity called Highland Select

18 Equity Fund, LP?

19 A    I have.

20 Q    And is that a publicly-traded company?

21 A    I'm not familiar with its nature there, no.

22 Q    Do you know how much of the equity of that entity the

23 Debtor owns?

24 A    I don't know off the top of my head, no.

25 Q    And again, these may be unfair questions because you're at

Dubel - Cross                                    288

1    the top, so I'm not trying to make you look foolish.  I'm just

2    trying to see.  Let me ask one more.  Have you heard of

3    Wright, W-R-I-G-H-T, Limited?

4              MR. MORRIS:  Objection, Your Honor.  Beyond the

5    scope.

6              MR. RUKAVINA:  Your Honor, I can recall him on my

7    direct, then.

8              THE COURT:  Yeah.  I'll --

9              MR. RUKAVINA:  But I'd just rather get it over with.

10             THE COURT:  I'll allow it.

11             MR. MORRIS:  All right.  If we're going to get rid of

12   --

13             THE COURT:  Overruled.

14             MR. MORRIS:  No, that's fine.

15   BY MR. RUKAVINA:

16   Q    Have you heard of Wright, W-R-I-G-H-T, Limited?

17   A    I think I have, but I just don't recall it, Mr. Rukavina.

18   I'm sorry, Rukavina.  Sorry.

19   Q    It's okay.  It's a --

20   A    I'm looking at your chart here, at your name here, and it

21   looks like Drukavina, so I really apologize.

22   Q    Believe it or not, it's actually a very famous name in

23   Croatia, although it means nothing here.

24        So, all of the entities that the Debtor owns equity in, I

25   guess you probably, just because, again, you're not in the

Dubel - Cross                                   289

1   weeds, you can't tell us how much of that equity the Debtor

2   owns, can you?

3   A   I can't individually, no.  You know, Mr. Seery is our CEO

4   and he's responsible for the day-to-day, you know, issues.  So

5   usually we look at it more on a consolidated basis and not in

6   the, you know, down in the weeds, as you refer to it, unless

7   something specific came up.

8   Q   Well, would you remember whether, when Mr. Seery or the

9   prior CRO would provide you, as the board member, financial

10  reports, whether that included P&Ls and balance sheets and

11  financial reports for the entities that the Debtor owned

12  interests in?

13  A   We might -- we would have seen certain consolidating

14  reports that might -- that would be, you know, consolidating

15  financial statements that would be P&Ls.  Where we didn't

16  consolidate them, I'm not sure we saw the actual individual-

17  entity P&Ls on a regular basis.  We might have seen them if

18  there was a transaction taking place.  But again, you know, I

19  don't have -- I don't remember every single one of them, no.

20  Q   And you would agree with me, sir, that the Pachulski law

21  firm is an excellent restructuring, reorganization, insolvency

22  law firm, wouldn't you?

23  A   Yes, I would agree with you there.

24  Q   Okay.  And you would expect them to ensure that anything

25  that has to be filed with Her Honor is timely filed, wouldn't

Dubel - Cross                                    290

1   you?

2   A    I would expect that they would follow the rules.

3   Q    Okay.  And you have the utmost of confidence, I take it,

4   in your CRO, don't you?

5   A    I have a tremendous amount of confidence in our CEO, who

6   also happens to hold the title of CRO, yes, if that's what

7   you're referring to as, Mr. Seery.

8        (Interruption.)

9             MR. RUKAVINA:  John.

10  BY MR. RUKAVINA:

11  Q    Okay, I think -- yeah, I think I heard that you have

12  tremendous confidence in the CEO, who happens to be the CRO,

13  right?

14  A    Yes, that's the case.

15            MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16  witness.

17            THE COURT:  All right.  Any other cross of Mr. Dubel?

18       All right.  Mr. Morris, redirect?

19            MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                      REDIRECT EXAMINATION

21  BY MR. MORRIS:

22  Q    You were asked about that *Pacific Lumber* case, Mr. Dubel;

23  do you remember that?

24  A    I do remember being asked about it.

25  Q    And you weren't familiar with that case, right?

Dubel - Redirect                              291

1   A    I'm not familiar with the name of the case, no.

2   Q    But you did know that the exculpation and gatekeeping

3   provisions were going to be included in the order; is that

4   fair?

5   A    I did.

6   Q    And did you testify that you wouldn't have accepted the

7   position without it?

8   A    I did testify that way.

9   Q    And if you knew that you couldn't get those provisions in

10  the Fifth Circuit, would you ever accept a position as an

11  independent director in the Fifth Circuit on a go-forward

12  basis?

13  A    Not in a situation such as this, no.

14  Q    Okay.  Okay.

15        MR. MORRIS:  No further questions, Your Honor.

16        THE COURT:  All right.  Any recross on that narrow

17  redirect?

18      All right.  Well, Mr. Dubel, you are excused from the

19  virtual witness stand.

20        THE WITNESS:  Thank you, Your Honor.

21        THE COURT:  All right.  I want to go ahead and --

22        MR. DUBEL:  Do you mind if I turn my video off?

23        THE COURT:  I'm sorry, what?

24        MR. DUBEL:  I said, do you mind if I turn my video

25  off?

292

1          THE COURT:  No, you may.  That's fine.

2          MR. DUBEL:  Thank you, Your Honor.

3          THE COURT:  All right.  I want to break now, unless

4     there's any quick housekeeping matter.  Anything?

5          MR. MORRIS:  No, Your Honor, but I would just ask

6     all parties to let me know by email if they have any

7     objections to any of the exhibits on the witness list that was

8     filed at ==Docket No. 1877==, because I want to begin tomorrow by

9     putting into evidence the balance of our exhibits.

10         MR. RUKAVINA:  And Your Honor, I was responsible for

11    this due to an internal mistake.  The only ones I have an

12    objection to are -- is that 7?  John, is that 7, right, 7OO --

13         MR. MORRIS:  Yes.

14         MR. RUKAVINA:  Your Honor, I only have an objection

15    to 7O and 7P, although I think -- think the Court has already

16    admitted 7P, so my objection is moot.

17         THE COURT:  I have.

18         MR. RUKAVINA:  Okay.

19         THE COURT:  So, what --

20         MR. RUKAVINA:  Then it would just be --

21         THE COURT:  Go ahead.

22         MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23    Septuple O or whatever the word is.

24         THE COURT:  All right.  So I will go ahead and admit

25    7F through 7Q, with the exception of 7O.  Again, these appear

293

1  at Docket Entry 1877.  And Mr. Morris, you can try to get in

2  7O the old-fashioned way if you want to.

3          MR. MORRIS:  Yeah, I'll deal with 7O and the very

4  limited number of other objections at the beginning of

5  tomorrow's hearing.

6          THE COURT:  All right.

7      (Debtor's Exhibits 7F through 7Q, with the exception of

8  7O, are received into evidence.)

9          THE COURT:  So we will reconvene at 9:30 Central time

10 tomorrow.  I think we're going to hear from the Aon, the D&O

11 broker, Mr. Tauber; is that correct?

12         MR. MORRIS:  That's right.  And that should be

13 shorter than even Mr. Dubel.

14         THE COURT:  All right.  Well, we will see you at 9:30

15 in the morning.  We are in recess.

16         MR. MORRIS:  Thank you so much.

17         THE CLERK:  All rise.

18     (Proceedings concluded at 5:09 p.m.)

19                     --oOo--

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                    **02/04/2021**

24 _____     _____

   Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

294

INDEX

PROCEEDINGS                                              5

OPENING STATEMENTS

- By Mr. Pomerantz                                      12
- By Mr. Kathman                                        29
- By Mr. Clemente                                       33
- By Mr. Draper                                         40
- By Mr. Rukavina                                       42
- By Mr. Taylor                                         44
- By Mr. Kathman                                        49
- By Ms. Drawhorn                                       50

WITNESSES

Debtor's Witnesses

James P. Seery
- Direct Examination by Mr. Morris                      58
- Cross-Examination by Mr. Rukavina                    169
- Cross-Examination by Mr. Taylor                      212
- Cross-Examination by Mr. Draper                      233
- Redirect Examination by Mr. Morris                   236
- Recross-Examination by Mr. Rukavina                  249
- Recross-Examination by Mr. Taylor                    255

John S. Dubel
- Direct Examination by Mr. Morris                     261
- Cross-Examination by Mr. Draper                      281
- Cross-Examination by Mr. Taylor                      284
- Cross-Examination by Mr. Rukavina                    287
- Redirect Examination by Mr. Morris                   290

EXHIBITS

Debtor's Docket 1822 Exhibits                   Received  55
   (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
    5T, 6R, 6S, 6T, and 6U)
Debtor's Docket 1866 Exhibits                   Received  56
Debtors' Exhibits 7F through 7Q (exclusive of   Received 293
   Exhibit 7O)
Debtor's Exhibit 7P                             Received 140
Debtor's Exhibit 7Q                             Received  75

295

1

INDEX
Page 2

2

3      RULINGS

4      Confirmation Hearing [1808] - *Continued to 2/3/2021*          293

5      Agreed Motion to (1) Assume Non-Residential Real Property       293
       Lease with Crescent TC Investors, LP upon Confirmation of
6      Plan and (II) Extend Assumption Deadline [1624] -
       *Continued to 2/3/2021*

7
       END OF PROCEEDINGS                                             293
8
       INDEX                                                      294-295
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 207

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                              )    Case No. 19-34054-sgj-11
3    In Re:                   )    Chapter 11
                              )
4    HIGHLAND CAPITAL         )    Dallas, Texas
     MANAGEMENT, L.P.,        )    Wednesday, February 3, 2021
5                             )    9:30 a.m. Docket
                              )
6             Debtor.         )
                              )    CONFIRMATION HEARING [1808]
7                             )    AGREED MOTION TO ASSUME [1624]
                              )
8                             )    Continued from 02/02/2021
     _____)
9                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                   UNITED STATES BANKRUPTCY JUDGE.

11   WEBEX APPEARANCES:

12   For the Debtor:          Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
13                            10100 Santa Monica Blvd.,
                               13th Floor
14                            Los Angeles, CA  90067-4003
                              (310) 277-6910
15
     For the Debtor:          John A. Morris
16                            PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
17                            New York, NY  10017-2024
                              (212) 561-7700
18
     For the Debtors:         Ira D. Kharasch
19                            PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
20                             13th Floor
                              Los Angeles, CA  90067-4003
21                            (310) 277-6910

22   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
23                               One South Dearborn Street
                                 Chicago, IL  60603
24                               (312) 853-7539

25
```

2

```
1   APPEARANCES, cont'd.:

2   For James Dondero:          Clay M. Taylor
                                BONDS ELLIS EPPICH SCHAFER
3                                 JONES, LLP
                                420 Throckmorton Street,
4                                 Suite 1000
                                Fort Worth, TX  76102
5                               (817) 405-6900

6   For Get Good Trust and      Douglas S. Draper
    Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
7                               650 Poydras Street, Suite 2500
                                New Orleans, LA  70130
8                               (504) 299-3300

9   For Certain Funds and       Davor Rukavina
    Advisors:                   Julian Vasek
10                              MUNSCH, HARDT, KOPF & HARR
                                500 N. Akard Street, Suite 3800
11                              Dallas, TX  75201-6659
                                (214) 855-7587
12
    For the NexPoint            Lauren K. Drawhorn
13  Parties:                    WICK PHILLIPS
                                3131 McKinney Avenue, Suite 100
14                              Dallas, TX  75204
                                (214) 692-6200
15
    For the U.S. Trustee:       Lisa L. Lambert
16                              OFFICE OF THE UNITED STATES
                                  TRUSTEE
17                              1100 Commerce Street, Room 976
                                Dallas, TX  75242
18                              (214) 767-8967

19  For Scott Ellington,        Debra A. Dandeneau
    Isaac Leventon, Thomas      BAKER & MCKENZIE, LLP
20  Surgent, and Frank          452 Fifth Avenue
    Waterhouse:                 New York, NY 10018
21                              (212) 626-4875

22  For Certain Funds and       A. Lee Hogewood, III
    Advisors:                   K&L GATES, LLP
23                              4350 Lassiter at North Hills
                                  Avenue, Suite 300
24                              Raleigh, NC  27609
                                (919) 743-7306
25
```

3

1    Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
2                                1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
3                                (214) 753-2062

4    Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
5                                Shady Shores, TX  76208
                                 (972) 786-3063
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25

4

1          DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.

2          THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6   right.  We are ready for Day Two of the confirmation hearing

7   in Highland Capital Management, LP, Case No. 19-34054.  I'll

8   just make sure we've got the key parties at the moment.  Do we

9   have Mr. Pomerantz, Mr. Morris, for the Debtor team?

10         MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

11  Pomerantz for the Debtors.

12         MR. MORRIS:  And I'm here as well, Your Honor.

13         THE COURT:  All right.  Good.

14     All right.  For our objecting parties, do we have Mr.

15  Taylor and your crew for Mr. Dondero?

16         MR. TAYLOR:  Yes, Your Honor.

17         THE COURT:  Good morning.

18     All right.  For Dugaboy Trust and Get Good Trust, do we

19  have Mr. Draper?  (No response.)  All right.  I do see Mr.

20  Draper.  I didn't hear an appearance.  You must be on mute.

21         MR. DRAPER:  I'm present, --

22         THE COURT:  Okay.

23         MR. DRAPER:  -- Your Honor.

24         THE COURT:  Okay.  Good morning.

25         MR. DRAPER:  I'm present, Your Honor.

5

1          THE COURT:  Good morning.  I heard you that time.

2     Thank you.

3        All right.  And now for what I'll call the Funds and

4     Advisors Objectors, do we have Ms. Rukavina present?

5          MR. RUKAVINA:  Yes, Your Honor.  Good morning.

6          THE COURT:  Good morning.  All right.  And I will

7     check.  Do we have Mr. Clemente or your team there?

8          MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

9     Clemente from Sidley Austin on behalf of the Committee.

10          THE COURT:  All right.  Ms. Drawhorn, do we have you

11     there for the NexPoint Real Estate Partners and related funds?

12          MS. DRAWHORN:  Yes, Your Honor.  Good morning.

13          THE COURT:  Good morning.  All right.  Did I miss --

14     I think that captured all of our Objectors.  Anyone who I've

15     missed?

16        All right.  Well, when we recessed yesterday, Mr. Morris,

17     I think you were about to call your third witness; is that

18     correct?

19          MR. MORRIS:  It is, Your Honor.  But if I may, I'd

20     like to just address the objections to the remaining exhibits,

21     since I hope that won't take too long.

22          THE COURT:  All right.  You may.

23          MR. POMERANTZ:  Actually, Your Honor, before we go

24     there, we filed the supplemental declaration of Patrick

25     Leatham, as we indicated we would do yesterday.  We just

6

 1    wanted to get confirmation again that nobody intends to cross-
 2    examine him, so that he doesn't have to sit through the
 3    festivities today.
 4              THE COURT:  All right.  Well, I did see that you
 5    filed that.
 6         Does anyone anticipate wanting to cross-examine Mr.
 7    Leatham, the balloting agent?
 8              MR. RUKAVINA:  Your Honor, I take it that that
 9    declaration is part of the record.  As long as the Court
10    confirms that, I do not intend to call the gentlemen.
11              THE COURT:  All right.  Well, I will take judicial
12    notice of it and make it part of the record.  It appears at
13    Docket Entry No. 1887.  Again, it was filed -- well, it was
14    actually filed early this morning, I think.  So, all right.
15    So, with --
16              MR. MORRIS:  And to avoid --
17              THE COURT:  Go ahead.
18              MR. MORRIS:  To -- I was just going to say, to avoid
19    any ambiguity, Your Honor, the Debtor respectfully moves that
20    document into the evidentiary record.
21              THE COURT:  All right.  The Court will --
22         (Interruption.)
23              THE COURT:  Someone needs to put their phone on mute,
24    perhaps.  Unless someone was intentionally speaking.
25         All right.  So, I will grant that request.  Docket Entry

7

1  No. 1887 will be part of the confirmation evidence of this

2  hearing.

3       (Debtor's Patrick Leatham Declaration at Docket 1887 is

4  received into evidence.)

5            THE COURT:  All right.  Anything else?  There were

6  other exhibits I think you were going to talk about?

7            MR. MORRIS:  Yeah.  Let me just go through them one

8  at a time, if I may, Your Honor.

9            THE COURT:  Okay.

10            MR. MORRIS:  All right.  So, I'm going to deal with

11  the transcripts that have been objected to one at a time.  And

12  I'll just take them in order.  The first one can be found at

13  Exhibit B.  It is on Docket No. 1822.

14            THE COURT:  Okay.

15            MR. MORRIS:  Exhibit B is the deposition transcript

16  from the December 16, 2020 hearing on the Advisor and the

17  Funds' motion for an order restricting the Debtor from

18  engaging in certain CLO-related transactions.

19       During that hearing, the Court heard the testimony of

20  Dustin Norris.  Mr. Norris is an executive vice president for

21  each of the Funds and each of the Advisors.

22       We would be offering the transcript for the limited

23  purposes of establishing Mr. Dondero's ownership and control

24  over the Advisors.

25       Mr. Norris also gave some pretty substantial testimony

8

1  concerning the so-called independent board of the Funds.

2      And as a general matter, Your Honor, to the extent that

3  the objection is on hearsay grounds, the transcript -- at

4  least the portions relating to Mr. Norris's testimony --

5  simply are not hearsay under Evidentiary Rule 801(d)(2).

6  These are statements of an opposing party, and I think we fall

7  well within that.

8      So, we would respectfully request that the Court admit

9  into the record the transcript from December 16th, at least

10  the portions of which are Mr. Norris's testimony.

11          THE COURT:  All right.  And, again, these appear at

12  -- I think I heard you say B and then E.  Is that correct?

13          MR. MORRIS:  Just B.  Just B at the moment.  B as in

14  boy.

15          THE COURT:  Okay.  Just B at the moment?

16      All right.  Any objections to that?

17          MR. RUKAVINA:  Your Honor, I had objected, but now

18  that it's offered for that limited purpose, I withdraw my

19  objection.

20          THE COURT:  All right.  Then B -- I'm sorry.  Was

21  there anyone else speaking?

22      B will be admitted.  And, again, it appears at Docket

23  Entry 1822.

24      (Debtor's Exhibit B, Docket Entry 1822, is received into

25  evidence.)

9

1          MR. MORRIS:  Okay.  Next, the next transcript can be

2     found at Exhibit 6R, and that's Docket 1866.  Exhibit 6R is

3     the transcript of the January 9, 2020 hearing where the Court

4     approved the corporate governance settlement.  We think that

5     that transcript is highly relevant, Your Honor, because it

6     reflects not only Mr. Dondero's notice and active

7     participation in the consummation of the corporate governance

8     agreement, but it also reflects the Court and the parties'

9     views and expectations that were established at that time,

10     such that if anybody contends that there's any ambiguity about

11     any aspect of the order, I believe that that would be the best

12     evidence to resolve any such disputes.

13        So, for the purpose of establishing Mr. Dondero's notice,

14     Mr. Dondero's participation, and the parties' discussions and

15     expectations with regard to every aspect of the corporate

16     governance settlement, including Mr. Dondero's stipulation,

17     the order that emerged from it, and the term sheet, we think

18     that that's properly into evidence.

19          THE COURT:  Any objection?

20        All right.  6R will be admitted.  Again, at Docket Entry

21     1822.

22        (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23     evidence.)

24          MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25     as in Sam and 6T as in Thomas.  They're companions.  And they

10

1    can be found at Docket 1866.  And those are the transcripts.

2    The first one is from the October 27th disclosure statement

3    hearing, and the second one actually is from the Patrick

4    Daugherty, I believe, lift stay motion.

5        I'll deal with the first one first, Your Honor.  We

6    believe that the transcript of the October 27th hearing goes

7    to the good faith nature of the Debtor's proposed plan.  It

8    shows that the Debtor and the Committee were not always

9    aligned on every interest.  It shows that the Committee, in

10   fact, strenuously objected to certain aspects of the then-

11   proposed plan by the Debtors.  And we just think it goes to

12   the heart of the good faith argument.

13       The transcript for the 28th, we would propose to offer for

14   the limited purpose of the commentary that you offered at the

15   end of that hearing, where Your Honor made it clear that

16   employee releases would not be -- would not likely be

17   acceptable to the Court unless there was some consideration

18   paid.

19       And it was really, frankly, Your Honor's comments that

20   helped spur the Committee and the Debtor to discuss over the

21   next few weeks the resolution of the issues concerning the

22   employee releases.

23       So we're not offering Exhibit 6T for anything having to do

24   with Mr. Daugherty or his claim, but just the latter portion

25   relating to the discussion about the employee releases.  And,

11

1    with that, we'd move those transcripts into evidence.

2              THE COURT:  Any objection?

3              MR. RUKAVINA:  Your Honor, yes, I do object.  6S is

4    hearsay, and under Rule 804(b)(1) it's admissible only if the

5    witnesses are unavailable to be called.  There's been no

6    suggestion that they're not.

7         As far as 6T, what Your Honor says is not hearsay, so as

8    long as it's just what Your Honor was saying, I do not object

9    to 6T.  I object to the balance of it.

10             THE COURT:  Okay.  What about that objection on 6S?

11             MR. MORRIS:  Yeah.  One second, Your Honor.  I would

12   go to the residual exception to the hearsay rule under 807.

13   807 specifically applies if the statement being offered is

14   supported by sufficient guarantees of trustworthiness and it's

15   more probative on the point -- and the point here is simply to

16   help buttress the Debtor's good faith argument -- and it's

17   more probative on the point than any other evidence.  And I'm

18   not sure what better evidence there would be than an on-the-

19   record discussion between the Debtor and the Committee as to

20   the disputes they were having on the disclosure statement.

21             THE COURT:  All right.  I'm going to overrule the

22   objection and accept that 807 exception as being valid here.

23   So, I am admitting both 6S and 6T.  And for the record, I

24   think you said they appeared at 1866.  They actually appear at

25   1822.

12

1          MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

2    is 6S and 6T, and they are indeed at 1822.  Forgive me.

3          THE COURT:  Okay.

4       (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

5    received into evidence.)

6          MR. MORRIS:  The next transcript and the last one is

7    6U, which is also at 1822.  6U is the transcript from the

8    December 10th hearing on the Debtor's motion for a TRO against

9    Mr. Dondero.  We believe the entirety of that transcript is

10   highly relevant, and it relates specifically to the Debtor's

11   request for the exculpation, gatekeeper, and injunction

12   provisions of their plan.  And on that basis, we would offer

13   that into evidence.

14         THE COURT:  Any objection?

15         MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16   behalf of Mr. Dondero.

17      We do object, on the same basis that it is hearsay.  There

18   has certainly been plenty of testimony before this Court and

19   on the record as to why the Debtor believes that its plan

20   provisions are appropriate and allowable, and there's no need

21   to allow hearsay in for that.  All of the witnesses were

22   available to be called by the Debtor.  The Debtor is in the

23   midst of its case and can call whoever else it needs to call

24   to get these into evidence or to get those docs into evidence.

25   And therefore, we don't believe that any residual exception

13

1   should apply.

2            THE COURT:  Mr. Morris, your response?

3            MR. MORRIS:  First, Your Honor, any statements made

4   by or on behalf of Mr. Dondero would not be hearsay under

5   801(d)(2).

6       And secondly, there is no other evidence of the Debtor's

7   motion of the -- of the argument that was had.  There is no

8   other evidence, let alone better evidence, than the transcript

9   itself.  And I believe 807 is certainly the best rule to

10   capture that.

11       It is a statement that's supported by sufficient

12   guarantees of trustworthiness.  Again, these are the litigants

13   appearing before Your Honor.  It may not be sworn testimony,

14   but I would hope that everybody is doing their best to comply

15   with the guarantee of trustworthiness in that regard, putting

16   aside advocacy.

17       And it is more probative on the point for which we're

18   offering -- and that is on the very issues of exculpation,

19   gatekeeper, and injunction -- than anything else we can offer

20   in that regard.

21            THE COURT:  All right.  I overrule the objection and

22   I will admit 6U.  Okay.

23       (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24   evidence.)

25            MR. MORRIS:  All right.  Going back to the top, Your

14

1   Honor, Companions Exhibit D as in David and E as in Edward,

2   which are at Docket 1822.

3       Exhibit D is an email string that relates to the Debtor's

4   communications with the Creditors' Committee concerning a

5   transaction known as SSP, which stands for Steel Products --

6   Structural and Steel Products.  So that was an asset that the

7   Debtor was selling, trying to sell at a particular point in

8   time.  And Exhibit E is a deck that the Debtor had prepared

9   for the benefit of the UCC.

10      And if we looked that those documents, Your Honor, you'd

11  see that the Debtor was properly following the protocols that

12  were put in place in connection with the January 9th corporate

13  governance settlement.  And the Committee is being informed by

14  the Debtor of what the Debtor intends to do with that

15  particular asset.

16      And the reason that it's particularly relevant here, Your

17  Honor, is Dustin Norris had submitted a declaration in support

18  of their motion that was heard on September -- on December

19  16th.  That declaration is an exhibit to what is Exhibit A on

20  Docket 1822.  Exhibit A on the docket is the Advisor and the

21  Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22  to that Exhibit A is an exhibit, which is Mr. Norris's

23  declaration.

24      At Paragraph 9 of Mr. Norris's declaration, he takes issue

25  with the Debtor's process for the sale of that particular

15

1  asset.

2      And so, having admitted already into the record Mr.

3  Norris's declaration, we believe that these documents rebut

4  the statements made in Mr. Norris's declaration, and indeed,

5  were part of the transcript that has now already been admitted

6  into evidence.  So we think the documents are needed because

7  they were exhibits during that hearing.

8          THE COURT:  All right.  Any objection?

9          MR. RUKAVINA:  Your Honor, yes, I object based on

10  authenticity.  This document has not been authenticated, nor

11  has the attachment.  And on hearsay.  And I don't think that

12  the Debtor can introduce one exhibit just to introduce another

13  to rebut the first.

14          THE COURT:  Your response?

15          MR. MORRIS:  You know, in all honesty, I wish that

16  the authenticity objection had been made yesterday and I might

17  have been able to deal with that.

18      These documents have already been admitted by the Court

19  against these very same parties.  I think it would be a little

20  unfair for them now to exclude the document that they had no

21  objection to the first time around.  They clearly relate to

22  Paragraph 9 of Mr. Norris's declaration, which was admitted

23  into evidence in this case without objection.

24          THE COURT:  All right.  I overrule the objection.  D

25  and E are admitted.

16

1       (Debtor's Exhibits D and E, Docket Entry 1822, is received

2    into evidence.)

3          MR. MORRIS:  Next, Your Honor, we have Exhibits 4D as

4    in David, 4E as in Edward, and 4G as in Gregory.  And those

5    can all be found on Docket 1822.  And to just cut to the

6    chase, Your Honor, these are the K&L Gates letter that were

7    sent in late December and my firm's responses to those

8    letters.

9       Those letters are being offered, again, to support --

10   well, the Debtor contends that, in the context of this case,

11   and at the time and under the circumstances, the letters

12   constituted interference and evinces a disregard for the

13   January 9th order, for Mr. Dondero's TRO, and for the Court's

14   comments at the December 16th hearing.  And they go

15   specifically to the Debtor's request for the gatekeeper,

16   exculpation, and injunction provisions.

17      To the extent that those exhibits contain the letters that

18   were sent on behalf of the Funds and on behalf of the

19   Advisors, they would simply not be hearsay under 801(d)(2).

20   And to the extent the objection goes to my firm's response, I

21   think just as a matter of completeness the Court -- I won't

22   offer them for the truth of the matter asserted.  I'll simply

23   offer the Pachulski responses at those exhibits for the

24   purpose of stating the Debtor's position, without regard to

25   the truth of the matter asserted.

17

1           THE COURT:  All right.  Any objection?

2           MR. RUKAVINA:  Your Honor, with that understanding,

3    I'll withdraw my objection to these exhibits.

4           THE COURT:  All right.  So, 4D, 4E, and 4G are

5    admitted.

6       (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

7    received into evidence.)

8           MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

9    as in Thomas.  That document can be found at Docket No. 1822.

10   Your Honor, that document is a schedule of a long list of

11   promissory notes that are owed to the Debtor by the Advisors,

12   Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13   I'll withdraw that exhibit.

14          THE COURT:  All right.

15      (Debtor's Exhibit 5T is withdrawn.)

16          MR. MORRIS:  And then, finally, just one last one.  I

17   think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18   can be found at Docket No. 1877.  Exhibit 7O are the documents

19   that were admitted in the January 21st hearing, and I believe

20   that they all go -- they're being offered to support the

21   Debtor's application for the gatekeeper, exculpation, and

22   injunction provisions.

23          THE COURT:  All right.  7O is being offered.  Any

24   objection?

25          MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

18

1  are exhibits from a separate adversary proceeding that has not

2  been concluded.  In fact, my witness is still on the stand in

3  that.

4      And I'll note that that's another 20,000 pages that's very

5  duplicative of the current record, and we already are going to

6  have an unwieldy record.  So I question why Mr. Norris -- why

7  Mr. Morris would even need this.

8      So that's my objection, Your Honor.

9          MR. MORRIS:  You know what?  That's a fair point,

10  Your Honor.  And -- that is a fair point, and I guess what I'd

11  like to do is at some point this morning see if I can single

12  out documents that are not duplicative and come back to you

13  with very specific documents.  I think that's a very fair

14  point.

15          THE COURT:  All right.

16          MR. MORRIS:  And with that, Your Honor, I think we've

17  now addressed every single document that the Debtor has

18  offered into evidence, and I believe, other than the

19  withdrawal of --

20          THE COURT:  5T.

21          MR. MORRIS:  -- 5T --

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  -- and the open question on 7O, I

24  believe every single document at Docket 1822, 1866, and 1877

25  has been admitted.  Do I have that right?

19

1          THE COURT:  All right.  Yes, because I did admit

2    yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3    with what you just said.

4          MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5    Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6    Entities List, have not been admitted.  But if I'm wrong on

7    that, then I apologize.

8          THE COURT:  Okay.  5S was part of 1866, which I

9    admitted entirely.

10       And what was the other thing?

11         MR. RUKAVINA:  I'm counting letters, Your Honor.

12   One, two, three, four.  6D, Legal Entities List, Redacted.

13         THE COURT:  Okay.  6B would have been --

14         MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15   6-dog.

16         THE COURT:  Okay.  6D, yeah, that was part of 1822

17   that I admitted *en masse* yesterday.

18         MR. MORRIS:  Yeah, I didn't hear an objection to that

19   one yesterday, and I agree, Your Honor.  My records show that

20   it was already admitted.

21         MR. RUKAVINA:  Then I apologize to the Court.

22         THE COURT:  All right.  Any --

23         MR. MORRIS:  No worries.  Let's get --

24         THE COURT:  Any other housekeeping matters before we

25   go to the next witness?

20

```
 1        MR. MORRIS:  No, Your Honor.  Not from the Debtor.
 2        THE COURT:  Anyone else?
 3    All right.  Well, let's hear from the next witness.
 4        MR. MORRIS:  All right, Your Honor.  The Debtor calls
 5  as its next and last witness Marc Tauber.
 6        THE COURT:  All right.  Mr. --
 7        MR. MORRIS:  Mr. Tauber, if you're on the phone,
 8  please identify yourself.
 9      (No response.)
10        THE COURT:  Mr. Tauber, we're not hearing you.
11  Perhaps you are on mute.  Could you unmute your device?
12      (No response.)
13        THE COURT:  All right.  If it's a phone, you need to
14  hit *6.
15      Hmm.  Any -- do you know which caller he is?
16        THE CLERK:  I'm trying to find out.
17        THE COURT:  All right.  We've got well over a hundred
18  people, so we can't easily identify where he is at the moment.
19      All right.  Mr. Tauber, Marc Tauber?  This is Judge
20  Jernigan.  We cannot hear you, so -- all right.  Well, maybe
21  we can --
22        MR. MORRIS:  Can we just take a three-minute break
23  and let me see if I can track him down?
24        THE COURT:  Yes.  Why don't you do that?  So let's
25  take a three-minute break.
```

21

 1          MR. MORRIS:  Thank you, Your Honor.

 2          THE COURT:  Okay.

 3     (A recess ensued from 10:02 a.m. until 10:04 a.m.)

 4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

 5     in in a moment.  But I've been reminded that there is one more

 6     exhibit.  It's the exhibit I used on rebuttal yesterday with

 7     Mr. Seery.  There was the one document that was on the docket,

 8     and that was the Debtor's omnibus reply to the plan

 9     objections, where we looked at Paragraph 135, I believe.  And

10     we would offer that into evidence for the purpose of just

11     establishing that the Debtor had given notice no later than

12     January 22nd of its agreement in principle to assume the CLO

13     management contracts.

14          And then the second exhibit that we had offered that I

15     think I suggested could be marked as Exhibit 10A was the email

16     string between my firm and counsel for the CLO Issuers where

17     they agreed to the agreement in principle for the Debtor's

18     assumption of the CLO management contracts.

19          And we would offer both of those documents into evidence

20     as well.

21          THE COURT:  All right.  Any objections?

22          All right.  Well, I will admit them.

23          As far as this email string with the CLO Issuers that you

24     called 10A, does that appear on the docket?  I remember you

25     putting it on the screen, but, if not, you'll need to file a

22

```
 1   supplement to the record, a supplemental exhibit.
 2            MR. MORRIS:  We will, Your Honor.  We'll do that for
 3   both of those exhibits.
 4            THE COURT:  And then as -- okay, for both?  Because I
 5   -- I've read that reply, and I could reference the docket
 6   number if we need to.
 7            MR. MORRIS:  We'll clean that up, Your Honor.
 8            THE COURT:  Okay.
 9       (Debtor's Exhibit 10A is received into evidence.)
10       (Clerk advises Court re new caller.)
11            THE COURT:  Oh, okay.  Just a minute.  I was looking
12   up something.
13       (Pause.)
14            THE COURT:  All right.  Well, you're going to file --
15   hmm, I really wanted to just reference where that reply brief
16   appears on the record.  There were a heck of a lot of things
17   filed on January 22nd.
18       (Interruption.)
19            THE COURT:  Okay.  We'll --
20            MR. MORRIS:  All right.  We're just going to need one
21   more minute with Mr. Tauber.  It's my fault, Your Honor.
22            THE COURT:  Okay.
23            MR. MORRIS:  I didn't send him easily-digestible
24   dial-in instructions.  He'll be just a moment.
25            THE COURT:  Okay.
```

23

1        (Court confers with Clerk regarding exhibit.)

2             THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

3  brief that we talked about Paragraph 35, that is at Docket No.

4  1807.  Okay?  All right.

5        (Debtor's Omnibus Reply to Plan Objections, Docket 1807,

6  is received into evidence.)

7        (Pause.)

8             MR. TAUBER:  Hi.  It's Marc Tauber.

9             THE COURT:  All right.

10            MR. MORRIS:  Excellent.

11            THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12  can hear you, but I can't see you.  Do you have a video --

13            MR. TAUBER:  Yeah, I don't know why it's not working.

14            THE COURT:  Hmm.

15            MR. TAUBER:  I'm on WebEx all day.  Usually it works

16  no problem.

17            THE COURT:  Okay.  Well, do you want to give it

18  another try or two?

19            MR. TAUBER:  Yeah.  It looks like it's starting to

20  come up.  It's all -- pictures, so --

21            THE COURT:  Okay.

22            MR. TAUBER:  -- hopefully you'll be able to see me in

23  a second.

24            THE COURT:  Okay.  The first thing I'm going to need

25  to do is swear you in, so we'll see if the video comes up here

24

```
 1   in a minute.
 2            MR. TAUBER:  Okay.
 3            THE COURT:  Can you see us, Mr. Tauber?
 4            MR. TAUBER:  I can see four people.  The rest are
 5   just names still.
 6            THE COURT:  Okay.
 7            MR. TAUBER:  I can go out and try to come back in, if
 8   you think that's --
 9            THE COURT:  I'm afraid of losing you.  So, your
10   audio, is it on your phone or is it on --
11            MR. TAUBER:  No.
12            THE COURT:  -- a computer?
13            MR. TAUBER:  On the computer.  Yeah.
14            THE COURT:  Okay.  So you're coming through loud and
15   clear on your computer.
16            MR. TAUBER:  Yeah.  Like I said, we use WebEx for
17   work, so I have them on all day long without any issues,
18   typically.
19            THE COURT:  Okay.
20        (Court confers with Clerk.)
21            THE COURT:  Okay.  Our court reporter thinks it's a
22   bandwidth issue on your end, so I don't --
23            MR. TAUBER:  There's only two of us here at home on
24   the line right now, so I don't know why.  It looks like it's
25   trying to come in, and then just keeps --
```

Tauber - Direct                          25

1          THE COURT:  I at least see your name on the screen

2    now, which I did not before.

3          MR. TAUBER:  Yeah.

4          THE COURT:  So hopefully we're going to -- ah.  We

5    got you.

6          MR. TAUBER:  There it is.

7          THE COURT:  All right.

8          MR. TAUBER:  Yeah.

9          MR. MORRIS:  There we go.

10          MR. TAUBER:  I might lose you, though.  Give me one

11    second, because I have a thing saying the WebEx meeting has

12    stopped working.  Let me close that.

13          THE COURT:  Okay.  We've still got you.  Please raise

14    your right hand.

15          MR. TAUBER:  Okay.

16              MARC TAUBER, DEBTOR'S WITNESS, SWORN

17          THE COURT:  All right.  Thank you.  Mr. Morris?

18          MR. MORRIS:  Thank you, Your Honor.

19                      DIRECT EXAMINATION

20    BY MR. MORRIS:

21    Q    Good morning, Mr. Tauber.

22    A    Good morning.

23    Q    I apologize for the delay in getting you the information.

24    Are you currently employed, sir?

25    A    Yes, sir.

Tauber - Direct                    26

1   Q    By whom?

2   A    Aon Financial Services.

3   Q    And does Aon Financial Services provide insurance

4   brokerage services among its services?

5   A    Yes.

6   Q    And what position do you currently hold?

7   A    Vice president.

8   Q    How long have you been a vice president at Aon?

9   A    Since October of 2019.

10  Q    Can you just describe for the Court generally your

11  professional background?

12  A    Sure.  I spent about 20 years on Wall Street, working in a

13  variety of jobs, in research, trading, and as the COO of a

14  hedge fund.  And then in 2010 I switched to the insurance

15  world.  I was an underwriter for ten-plus years for Zurich and

16  QBE.  And then in 2019 switched to the brokering side for Aon.

17  Q    And what are your duties and responsibilities as a vice

18  president at Aon?

19  A    Well, we're responsible or my team and I are responsible

20  for creating bespoke insurance programs, focusing on D&O and

21  E&O insurance for our insureds.

22  Q    And what is, for the benefit of the record, what do you

23  mean by bespoke insurance program?

24  A    Well, each client is different, so the programs and the

25  policies that we put in place might be off-the-shelf policies,

Tauber - Direct                    27

1    but we endorse and amend them as needed to meet the needs of

2    the individual client.

3    Q    And during your work, both as an underwriter and now as a

4    broker, have you familiarized yourself with the market for D&O

5    and E&O insurance policies?

6    A    Yes.

7    Q    All right.  Let's talk about the early part of this case.

8    Did there come a time in early 2020 when Aon was asked to

9    place insurance on behalf of the board of Strand Advisors?

10   A    Yes.

11   Q    Can you describe for the Court how that came about?

12   A    Sure.  One of our account executives, a man by the name of

13   Jim O'Neill, had a relationship with a man named John Dubel,

14   who was one of the appointees to serve on -- as a member of

15   Strand, which was being appointed, as we understood it, to be

16   the general partner of Highland Capital Management by the

17   Bankruptcy Court.  And they -- we had done -- or, Jim and John

18   had a longstanding relationship.  I had actually underwritten

19   an account for a previous appointment of John's when I was an

20   underwriter, so I had some familiarity with John as well, and

21   actually brokered a subsequent deal for John at Aon.

22        So I had, again, some familiarity with John, and we were,

23   you know, tasked with going out and finding a program for

24   Strand.

25   Q    Can you describe what happened next?  How did you go about

Tauber - Direct                          28

1    accomplishing that task?

2    A    So, there are a number of markets or insurance companies

3    that provide management liability insurance, which this was a

4    management liability-type policy.  D&O is a synonym for

5    management liability, I guess you'd say.  And we approached

6    the, I think, 14 or 15 markets that we knew to provide

7    insurance in this space and that would be willing to buy the

8    type of policy we were seeking and have interest in a risk

9    like this, which had a little hair on it.  Obviously, there

10   was the Dondero involvement, as well as the bankruptcy.

11   Q    As part of that process, did you and your firm put

12   together a package of information for prospective interested

13   parties?

14   A    Yes.

15   Q    Can you describe for the Court what was contained in the

16   package?

17   A    Had the *C.V.s*, some relevant pleadings from the case,

18   court order.  I'd have to go back and look exactly.  But sort

19   of just general, you know, general information that was

20   available about the situation at hand and Strand's

21   appointment.

22   Q    And the court order that you just mentioned, is that the

23   one that had that gatekeeper provision in it?

24   A    Correct.

25   Q    And can you explain to the Court why you and your team

Tauber - Direct                    29

1   decided to include the order with the gatekeeper provision in

2   the package that you were delivering to prospective carriers?

3   A    Sure.  In our initial conversations to discuss our

4   engagement, the gatekeeper function was explained to us by

5   John.  And I'm not sure who else was on the initial call.

6   And, but it was explained to us that I guess Judge Jernigan

7   would sit as the gatekeeper between any potential claimant

8   against the insureds and, you know, would basically have to

9   approve any claim that would be made against (indecipherable),

10  which would thereby prevent any frivolous claims from

11  happening.

12  Q    All right.  Let's just talk for a moment.  How did you and

13  your firm decide which underwriters to present the package to?

14  A    Again, you know, I -- my background, or my Wall Street

15  background, obviously, sort of made me have a -- it was very

16  unique for the insurance world when I switched over, so I had

17  sort of risen to a certain level of expertise within the

18  space.  And, you know, our team also is very experienced, and

19  decades of experience in the insurance world.  So we're very

20  familiar with the markets that are willing to provide these

21  types of policies and the markets that would be likely to take

22  a look at a risk such as this.

23  Q    Okay.  You mentioned that there was -- I think your words

24  were a little hair on this, and one of the things you

25  mentioned was bankruptcy.  How did the fact that Strand was

Tauber - Direct                    30

1   the general partner of a debtor in bankruptcy impact your
2   ability to solicit D&O insurance?
3   A    Well, it's just not a plain vanilla situation, so people
4   are somewhat, you know, are -- I think -- so, the type of
5   insurance, D&O insurance, that we write is very different from
6   auto insurance, as an example.  Auto insurance, people expect
7   there to be a certain amount of claims, and they expect the
8   premiums to cover the claims plus the expenses and then
9   provide them a reasonable profit on top of that.
10       Our insurance is really much more by binary.  The
11  expectation for underwriters is that they will be completing
12  ignoring -- or, avoiding risk at all costs, wherever possible.
13  So anytime there is a situation that looks a little risky, so
14  the premium might be a little higher, the deductible might be
15  a little higher, but, again, the underwriters are really
16  making a bet that they will not have a claim.  Because the
17  premiums pale in comparison to the limits that are available
18  to the policyholder.
19  Q    And so --
20  A    So, -- I'm sorry.  What were you going to say?
21  Q    I didn't mean to interrupt.
22  A    Yeah.
23  Q    Have you finished your answer?
24  A    Sure.
25  Q    Okay.  So, were some of the 14 or 15 markets that you

Tauber - Direct                          31

1   contacted reluctant to underwrite because there was a

2   bankruptcy ongoing?

3   A    Well, I think that probably -- I mean, there are certain

4   markets that we didn't go to in the beginning because they

5   would be very reluctant to write a risk that had that kind of

6   hair on it, based on our experience from dealing with them.

7   And, you know, I think the bankruptcy was certainly a little

8   bit of an issue.  And then, obviously, as people did their

9   research and -- or if they weren't already familiar with

10  Highland and got to know, you know, got -- I will just say for

11  a simple Google search and learned a little bit about Mr.

12  Dondero, I think there was definitely some significant

13  reluctance to write this program.

14  Q    Was the fact that the Debtor -- was the fact that the

15  Debtor is a partnership an issue that came up, in your -- in

16  your process?

17  A    There are certainly some carriers who won't write what's

18  known as general partnership liability insurance.  So, yes,

19  that is part of that.  It was part of the limiting factor in

20  terms of who we went to.

21  Q    Okay.  And, finally, you mentioned Mr. Dondero.  What role

22  did he play in your ability to obtain insurance for the Strand

23  board?

24  A    Well, that's a very significant role.  As, you know, as

25  mentioned, the underwriters are very risk-averse, so the

Tauber - Direct                           32

1  litigiousness of Mr. Dondero is a very strong red flag

2  prohibiting a number of people from writing the insurance at

3  all.  And the ones that were writing, that were willing to

4  provide options, were looking for protections from Mr.

5  Dondero.

6  Q    And what kind of protections were they looking for?

7  A    Well, the gatekeeper function was a key factor.  That was

8  really the only way we could even start a conversation with

9  any of the people that we were able to engage.  And in

10  addition, they wanted a, you know, sort of a belts and

11  suspenders additional protection of having an exclusion

12  preventing any litigation brought by or on behalf of Mr.

13  Dondero.

14  Q    Were you able to identify any carrier who was prepared to

15  underwrite D&O insurance for Strand without the gatekeeper

16  provision or without a Dondero exclusion?

17  A    We were not.

18  Q    Okay.  Let's fast-forward now.  Has your firm been

19  requested to obtain professional management insurance for the

20  contemplated post-confirmation debtor entities and individuals

21  associated with those entities?

22  A    Yes.

23  Q    Okay.  So let's just talk about the entities first, the

24  Claimant Trust and the Litigation Trust.  In response to that

25  request, have you and your team gone out into the marketplace

Tauber - Direct                          33

1   to try to find an underwriter willing to underwrite a policy

2   for those entities?

3   A    Yes.

4   Q    And have you been able to find any carrier who's willing

5   to provide coverage for the Claimant Trust and the Litigation

6   Trust?

7   A    Yes.

8   Q    And how many -- how many have expressed a willingness to

9   do that?

10  A    Two.

11  Q    And have those two carriers indicated that there would be

12  conditions to coverage for the entities?

13  A    Both will require a -- the continuation of the gatekeeper

14  function, as well as a Dondero exclusion.

15  Q    Okay.  Have you also been tasked with the responsibility

16  of trying to find coverage for the individuals associated with

17  the Claimant Trust and the Litigation Trust, meaning the

18  Claimant Trustee, the Litigation Trustee, and the Oversight

19  Board?

20  A    Yes.  So we did it concurrently.

21  Q    Okay.  So, are the two firms that you just mentioned

22  willing to provide insurance for the individuals as well as

23  the entities?

24  A    Correct.  With the same stipulations.

25  Q    They require -- they both require the gatekeeper and the

Tauber - Direct                                          34

1   Dondero exclusion?

2   A    That's correct.

3   Q    Is there any other firm who has indicated a willingness to

4   consider providing D&O insurance for the individuals?

5   A    There is one that is willing to do so, as long as the

6   gatekeeper function remains in place.  They have indicated

7   that if the gatekeeper function was to be removed, that they

8   would then add a Dondero exclusion to their coverage.

9   Q    So is there any insurance carrier that you're aware of who

10  is prepared to insure either the individuals or the entities

11  without a gatekeeper provision?

12  A    No.

13  Q    And that last company, I just want to make sure the record

14  is clear:  If the gatekeeper provision is overturned on appeal

15  or is otherwise not effective, do you have an understanding as

16  to what happens to the insurance coverage?

17  A    They will either add an exclusion for any claims brought

18  by or on behalf of Mr. Dondero or cancel the coverage

19  altogether.

20          MR. MORRIS:  I have no further questions, Your Honor.

21          THE COURT:  All right.  Cross of this witness?

22                  CROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Tauber, I'm a little confused.  So, the insurance

25  that's being written now for the post-bankruptcy entities, did

Tauber - Cross                              35

1    I hear you say that there is one carrier that would give that

2    insurance subject to having a Dondero exclusion?

3    A    So, first of all, there's nothing currently being written.

4    We have solicited quotes.  So, just to make sure that that --

5    I want to make sure that's clear.

6        We have three carriers that are willing to provide varying

7    levels of coverage.  All three will only do so with the

8    existence of the gatekeeper function continuing to be in

9    place.  One of the three has -- two of those three will also

10   provide the coverage with -- even with the gatekeeper function

11   and the Dondero exclusion.  The third one was not requiring a

12   Dondero exclusion unless the gatekeeper function goes away.

13   Q    Okay.  So the third one, you believe, will, whatever the

14   term is, write the insurance or provide the coverage without a

15   gatekeeper, as long as there is a strong Dondero exclusion?

16   A    No.  Their initial requirement is that the gatekeeper

17   function remains in place.  That is their preferred option.

18   If the gatekeeper function is removed, then they will add a

19   Dondero exclusion in place of the gatekeeper exclusion.  In

20   addition, that carrier is only willing to provide coverage for

21   the individuals, not for the entities.

22   Q    Okay.  Thank you.

23            MR. RUKAVINA:  I'll pass the witness, Your Honor.

24            THE COURT:  All right.  Other cross?

25            MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Tauber - Cross                                    36

1          THE COURT:  Okay.

2                        CROSS-EXAMINATION

3   BY MR. TAYLOR:

4   Q    Good morning, Mr. Tauber.

5   A    Good morning.

6   Q    Are you generally familiar with placing D&O insurance at

7   distressed debt level private equity firms?

8   A    I am familiar with it probably more from the underwriting

9   side, and I also worked at a fund that was distressed and had

10  to be liquidated, so I -- as the COO, so I have a fair amount

11  of familiarity, yes.

12  Q    Okay.  Before taking this to market for the first time for

13  the pre-confirmation policies that you have in place, did your

14  firm conduct any due diligence or analysis of comparing the

15  amount of litigation the Highland entities and Mr. Dondero

16  were involved in as compared to other comparable firms in the

17  marketplace?  Say, you know, Apollo, Fortress, Cerberus, other

18  similar market participants?

19  A    Well, it wouldn't really be our role as the broker.

20  That's the role of the underwriter.

21  Q    Are you familiar if any of the underwriters undertook any

22  such analysis?

23  A    I would assume that they did, since they all had concerns

24  about Mr. Dondero almost immediately.

25  Q    Do you have any -- you didn't conduct any personal due

Tauber - Cross                                  37

1    diligence on comparing the amount of litigation that the
2    Highland entities were involved in as compared to, say,
3    Fortress, do you?
4    A    Well, again, that wouldn't really be my role as the
5    broker.  But I will say that I used to write the primary
6    insurance for Fortress Investment Group when I was at Zurich.
7    So I'm extremely familiar with Fortress, to use your example,
8    and I would say that the level of litigation at Fortress was
9    much, just out of personal knowledge, was significantly less
10   than I had encountered or than I had read about at Highland.
11   Q    That you have read about?  Is that based upon a number of
12   cases where Fortress was a plaintiff as compared to Highland
13   was a plaintiff?  Over what time period?
14   A    Again, not my role.  Not something that I've done.  I'm
15   just generally familiar with Fortress and I'm generally
16   familiar with Highland.
17   Q    All right.  So you're generally familiar and you say that
18   -- you're telling me and this Court that Fortress is involved
19   in less litigation.  Could you quantify that for me, please?
20   A    No, but it's really irrelevant to the situation at hand.
21   The issue is not my feelings whatsoever.  The issue is the
22   underwriters' feelings and their concern with Mr. Dondero, not
23   mine or anybody else's.
24   Q    So, I appreciate your answer and thank you for that, but I
25   believe the question that was before you is, have you

Tauber - Cross                                    38

1   quantitatively -- do you have any quantitative analysis by

2   which you can back up the statement that Fortress is less

3   litigious than Highland?

4   A    I wouldn't even try, no.

5   Q    Okay.  Do you have any quantitative analysis for -- that

6   Cerberus is any less litigious than Highland?

7   A    I don't have any real knowledge of Cerberus's

8   litigiousness.

9   Q    Same question as to Apollo.

10  A    Again, the Fortress, you just happened to mention

11  Fortress, which was a special case because I used to be their

12  primary underwriter.  I don't have any specific -- I'm not a

13  claims attorney.  I don't have any specific knowledge of the

14  level of litigiousness.

15       And, again, it's not up to me, my decision.  It's the

16  underwriters' decision of whether or not they're willing to

17  write the coverage, not mine.

18  Q    You mentioned that the -- when you took this out to

19  market, it had a little hair on it.  Correct?

20  A    Correct.

21  Q    And you put together a package of materials that you sent

22  out to 14 or 15 market participants; is -- did I get that

23  correct?

24  A    Yes.

25  Q    And in that package, you had certain pleadings, including

Tauber - Cross                                39

1    the court order, correct?

2    A    Yes.  I believe that's correct.

3    Q    And that was after your initial conversation with John and

4    -- where he pointed out the gatekeeper role.  Correct?

5    A    Correct.

6    Q    And so when you went out to market, presumably you

7    highlighted the gatekeeper role to all the people you

8    solicited offers from because you thought it included less

9    risk, correct?

10   A    It offered a level of protection that was not -- that's

11   not common.  So it's, yes, it's a huge selling point for the

12   risk.

13   Q    Okay.  So, to be clear, you never went out to the market

14   to even see if you could get underwriting the first time

15   without the gatekeeper function; is that correct?

16   A    Well, it's my job as a broker to present the risk in the

17   best possible light.  So if we have a fact that makes the risk

18   a better write for the underwriters, we, of course, will

19   highlight it.  So, no, I did not do that.

20   Q    Okay.  So, the quick answer to the question is no, you did

21   not go out and solicit any bids without the gatekeeper

22   function?

23   A    Correct.

24   Q    When you have approached the market for the post-

25   confirmation potential coverage, did you approach the same 14

Tauber - Cross                              40

1   or 15 parties that you did before?

2   A    I don't have the two lists in front of me.  They would

3   have been vastly similar, yes.

4   Q    Okay.  And so, again, all of the 14 or 15 parties or the

5   lists that you solicited were already familiar with the

6   gatekeeper function, correct?

7   A    Yes.

8   Q    And so therefore they already had that right; they're not

9   going to trade against themselves and therefore say that,

10  without it, we'll go ahead and write coverage.  Correct?

11  A    I -- I -- it'd be hard to answer that question.  I don't

12  know.

13  Q    Okay.  Because you didn't try that, did you?

14  A    I would have had no reason to, no.

15  Q    Okay.  So you don't know if a market exists without the

16  gatekeeper function because you haven't asked, have you?

17  A    I guess that's fair, yeah.

18            MR. TAYLOR:  I have no further questions.

19            THE COURT:  All right.  Any other Objectors with

20  cross-examination?

21            MR. DRAPER:  I have no questions for the witness,

22  Your Honor.

23            THE COURT:  All right.  Anyone else?  Mr. Morris,

24  redirect?

25            MR. MORRIS:  Just one.

Tauber - Redirect                    41

1                      REDIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    One question, Mr. Tauber.  Is there any -- do all

4    underwriters -- any underwriters for Fortress require, as a

5    condition to underwriting the D&O insurance, require a

6    gatekeeping provision?

7    A    In my, you know, 11, 12 years of experience in this

8    industry, in this space, I have never seen that gatekeeper

9    function be available, as an underwriter or as a broker.  So,

10   no.

11              MR. MORRIS:  No further questions, Your Honor.

12              THE COURT:  Any recross on that redirect?

13       All right.  Well, Mr. Tauber, you are excused.  We thank

14   you for your testimony today.  So you can log off.

15              THE WITNESS:  Thank you.

16              THE COURT:  Okay.

17       (The witness is excused.)

18              THE COURT:  Mr. Morris, does the Debtor rest?

19              MR. MORRIS:  The Debtor does rest, Your Honor.

20              THE COURT:  All right.  Well, what are we going to

21   have from the Objectors as far as evidence?

22              MR. RUKAVINA:  Your Honor, I will be very short.  I

23   will call Mr. Seery for less than ten minutes.  I will call

24   Mr. Post for less than ten minutes.  I will have one exhibit.

25   And I think that that's it for all the Objectors, unless I'm

42

1   mistaken, gentlemen.

2           MR. TAYLOR:  Your Honor, I had one witness, Mr.

3   Sevilla, under subpoena to testify, and needed a brief moment

4   to discuss with my colleagues whether we're going to call him,

5   and if so, put him on notice that he would be coming up

6   probably about -- I don't know your schedule, Your Honor, but

7   probably, I'm guessing, either before lunch or after, and I

8   need to let him know that also.

9       So I do need a brief three to five minutes to confer with

10  my colleagues and some direction from the Court to, if we

11  decide to call him, as to when we would tell him to be

12  available.

13          THE COURT:  All right.  Well, before I get to that,

14  Mr. Draper, do you have any witnesses?

15          MR. DRAPER:  I do not.

16          THE COURT:  All right.  Well, let's see.  It's 10:34.

17  We're making good time this morning.  If Seery is truly ten

18  minutes of direct, and Post is truly ten minutes of direct,

19  and I don't know how long the documentary exhibits are going

20  to take, it sounds to me like we are very likely to get to Mr.

21  Sevilla before a lunch break.

22      So if you want to -- you know, I don't know what that

23  involves, you sending text messages or making a quick phone

24  call.  Do you need a five-minute break for that?

25          MR. TAYLOR:  Yes, Your Honor.  It involves a phone

43

1    call and an email.  Just a confirmatory phone call just to

2    make sure that the guy -- just so you know who he is, he is

3    actually a Highland employee, but he's represented by separate

4    counsel, and so we do need to go through him just because

5    that's the right thing to do.

6          THE COURT:  All right.  Well, again, I mean, I never

7    know how long cross is going to take, but I'm guessing, you

8    know, we're going to get to him in an hour or so, if not

9    sooner, it sounds like.  So, all right.  So, do we need a

10   five-minute break?

11         MR. RUKAVINA:  And Your Honor, it might make more

12   sense to make it a ten-minute break.  I suspect that Mr.

13   Taylor will be able to release his witness if he and I will

14   just be able to talk.  So I would ask the Court's indulgence

15   for a ten-minuter.

16         THE COURT:  Okay.  We'll take a ten-minute break.

17   We'll come back at 10:46 Central time.

18         THE CLERK:  All rise.

19      (A recess ensued from 10:36 a.m. until 10:46 a.m.)

20         THE CLERK:  All rise.

21         THE COURT:  Please be seated.  We're going back on

22   the record in the Highland confirmation hearing.  Are the

23   Objectors ready to proceed?

24         MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25         THE COURT:  All right.  Well, Mr. Rukavina, are you

44

1   going to call your witnesses first?

2         MR. RUKAVINA:  Yes, I will.  Before that, if it might

3   help the Court and Mr. Morris:  Mr. Morris, with respect to

4   that last exhibit, I do not object to the admission of any of

5   the exhibits that were admitted at that PI hearing.

6      But I do think, Your Honor, for the record, that -- and I

7   would ask Mr. Morris that he should refile those exhibits here

8   in this case, except for those that are duplicative.  Because,

9   again, there's 10,000 pages of indentures, et cetera.

10        MR. MORRIS:  Thank you very much, sir.

11     Your Honor, if that's acceptable to you, we'll do that as

12   soon as possible.

13        THE COURT:  All right.  And let me make sure the

14   record is clear.  Are we talking about what you've described

15   as 7O?  I'm getting mixed up now.  Am I --

16        MR. MORRIS:  Yes, Your Honor.

17        THE COURT:  Okay.

18        MR. MORRIS:  It's 7O, which is the documents that

19   were introduced into evidence in the prior hearing.  And Mr.

20   Rukavina is exactly right, that there is substantial overlap

21   between that and other documents that have already been

22   admitted in the record in this case.  So we'll just file an

23   abridged version of Exhibit O that only includes non-

24   duplicative documents.

25        THE COURT:  All right.  So that will be admitted, and

Seery - Direct                           45

1   we'll look for your filed abridged version to show up on the

2   docket.  7O.

3        (Debtor's Exhibit 7O is received into evidence as

4   specified.)

5            THE COURT:  All right.  What's next?

6            MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

7   James Seery.

8            THE COURT:  All right.  Mr. Seery, welcome back.

9   Please raise your right hand.

10            MR. SEERY:  Can you -- can you hear me, Your Honor?

11            THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13            THE COURT:  All right.  Thank you.

14        Mr. Rukavina, go ahead.

15                       DIRECT EXAMINATION

16   BY MR. RUKAVINA:

17   Q   Mr. Seery, --

18            MR. RUKAVINA:  Thank you.

19   BY MR. RUKAVINA:

20   Q   Mr. Seery, good morning.

21            MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22   the schedules.

23        What we have here, Your Honor, is Docket 247, the Debtor's

24   schedules.  I'd ask the Court to take judicial notice of it.

25            THE COURT:  All right.  The Court will do so.

Seery - Direct                                46

```
 1  BY MR. RUKAVINA:
 2  Q    Mr. Seery, are you familiar with these entities listed
 3  here on the Debtor's schedules?
 4  A    Generally.  Each one a little bit different.
 5  Q    Okay.  Do you agree that the Debtor still owns equity
 6  interests in these entities?
 7  A    I believe it does, yes.
 8  Q    Okay.  Is it true that none of these entities are publicly
 9  traded?
10  A    I don't believe any of these are publicly-traded entities,
11  no.
12  Q    Okay.  And none of these, to your knowledge, are debtors
13  in this bankruptcy case, right?
14  A    No.  We only have one debtor in the case.
15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor
16  owns more than 20 percent of the equity in that entity, right?
17  A    I believe the Debtor owns the majority of that entity.
18  That is a fund with an on- and offshore feeder.  And I, off
19  the top of my head, don't recall exactly how the allocations
20  of equity work.  But I believe we do.
21  Q    Does 67 percent refresh your memory?  Are you prepared to
22  say that the Debtor owns 67 percent of that equity?
23  A    I'm not prepared to say that, no.
24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20
25  percent of that equity?
```

Seery - Direct                                    47

1   A    There's about -- I don't recall.  There's about at least

2   25 artist, designers, or designs.  Wright, AMES, Hockney,

3   Rothco, all own in different places, and they all own in turn

4   some other thing.  So I don't know what each of them, off the

5   top of my head, own.  There's -- they're part of a myriad of

6   corporate structures here.

7   Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8   20 percent of the equity of that entity?

9   A    Stark?  I don't know.

10  Q    Okay.  I don't know how to pronounce the next one.  Eamis

11  (phonetic) Ltd.  Do you know whether the Debtor owns more than

12  20 percent of that equity?

13  A    Off the top of my head, I don't recall.

14  Q    What about Maple Avenue Holdings, LLC?

15  A    I believe, I don't know if it's directly or indirectly,

16  that we own a hundred percent of that entity.  But I'm not

17  sure.

18  Q    What about Highland Capital Management Korea, Ltd.?

19  A    Effectively, Highland Capital Management is owned a

20  hundred percent.

21  Q    What about Highland Capital Management Singapore Pte.

22  Ltd.?

23  A    We are in the process of shutting it down, so I don't know

24  that -- what the equity percentages are.  It's really just a

25  question -- it's -- it's dissolved save for a signature from a

Seery - Direct                              48

1   Singaporean.

2   Q   Okay.  But did the Debtor own more than 20 percent of that

3   entity?

4   A   I don't know the specific allocations of equity ownership.

5   Q   Okay.  What about Pennant (phonetic) Management, LP?  Do

6   you know whether the Debtor owns or owned more than 20 percent

7   of that entity?

8   A   I don't recall, no.

9        MR. RUKAVINA:  You can take that exhibit down, Mr.

10  Vasek.

11  BY MR. RUKAVINA:

12  Q   Mr. Seery, very quick, are you familiar with Bankruptcy

13  Rule 2015.3?

14  A   I am, yes.

15  Q   Okay.  Has the Debtor filed any Rule 2015.3 statements in

16  this case?

17  A   I don't believe we have.

18  Q   Okay.

19       MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20  witness.

21       THE COURT:  All right.  Any other Objector

22  questioning?  None from Mr. Taylor, none from Mr. Draper, none

23  from Ms. Drawhorn?

24       All right.  Any cross -- any examination from you, Mr.

25  Morris?

Seery - Cross                                    49

1           MR. MORRIS:  Just one question.

2           THE COURT:  Go ahead.

3                           CROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q   Mr. Seery, do you know why the Debtor has not yet filed

6    the 2015.3 statement?

7    A   I have a recollection of it, yes.

8    Q   Can you just describe that for the Court?

9    A   When we -- when we initially filed, when the Debtor filed

10   and it was transferred over, we started trying to get all the

11   various rules completed.  There are, as the Court is aware, at

12   least a thousand and maybe more, more like three thousand,

13   entities in the total corporate structure.

14       We pushed our internal counsel to try to get that done,

15   and were never able to really get it completed.  We did not

16   have -- we were told we didn't have separate consolidating

17   statements for every entity, and it would be difficult.  And

18   just in the rush of things that happened from the first

19   quarter into the COVID into the year, we just didn't complete

20   that filing.  There was no reason for it other than we didn't

21   get it done initially and I think it fell through the cracks.

22           MR. MORRIS:  Nothing further, Your Honor.

23           THE COURT:  All right.  Anything further, Mr.

24   Rukavina?

25                           REDIRECT EXAMINATION

Seery - Redirect                    50

1  BY MR. RUKAVINA:

2  Q   Mr. Seery, I appreciate that answer.  But you never sought

3  leave from the Bankruptcy Court to postpone the deadlines for

4  filing 2015.3, did you?

5  A   No.  If it hadn't fallen through the cracks, it would have

6  been something we recalled and we would have done something

7  with it.  But, frankly, it just fell off the -- through the

8  cracks.  We didn't deal with it.

9  Q   Okay.

10         MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11  Seery.

12         THE COURT:  All right.  Any other Objector

13  examination?

14     Mr. Morris, anything further on that point?

15         MR. MORRIS:  No, thank you, Your Honor.  No further

16  questions.

17         THE COURT:  All right.  Mr. Seery, thank you.  You're

18  excused once again from the witness stand.

19     (The witness is excused.)

20         THE COURT:  Your next witness?

21         MR. SEERY:  Thank you, Your Honor.

22         THE COURT:  Uh-huh.

23         MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24  Post, if you're listening, which I believe you are, if you'll

25  please activate your camera.

Post - Direct                                        51

1          THE COURT:  Mr. Post, we do not see or hear you yet.

2          MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

3    focus on you.

4          MR. POST:  Yes.  Can you hear me now?

5          THE COURT:  We can hear you.  We cannot see you yet.

6    Could you say, "Testing, one, two; testing, one, two"?

7          MR. POST:  Testing, one, two.  Testing, one, two.

8          THE COURT:  There you are.  Okay.  Please raise your

9    right hand.

10       JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

11         THE COURT:  All right.  Thank you.  You may proceed.

12                      DIRECT EXAMINATION

13   BY MR. RUKAVINA:

14   Q    Mr. Post, good morning.  State your name for the record,

15   please.

16   A    Robert Jason Post.

17   Q    How are you employed?

18   A    I'm employed by NexPoint Advisors, LP.

19   Q    What is your title?

20   A    Chief compliance officer.

21   Q    Were you ever employed by the Debtor here?

22   A    Yes.

23   Q    Between when and when?  Approximately?

24   A    I believe it was July of '08 through October of 2020.

25   Q    What was your last title while you were employed at the

Post - Direct                                52

1  Debtor?

2  A    Still chief compliance officer.  For the retail funds.

3  Q    Okay.  Very, very quickly, what does a chief compliance

4  officer do?  Or what do you do?

5  A    It's multiple things.  Interaction with the regulators.

6  Adherence to prospectus and SAI limitations for the funds.

7  And then establishment of written policies and procedures to

8  prevent and detect violations of the federal securities laws

9  and then testing those on a frequent basis.

10 Q    And I believe you mentioned you're the CCO for NexPoint

11 Advisors and Highland Capital Management Fund Advisors.  Are

12 you also the CCO for any funds that they advise?

13 A    Yes.  For all the funds that they advise.

14 Q    Okay.  Does that include so-called retail funds?

15 A    Yes.  They're all retail funds.

16 Q    What is a retail fund?

17 A    It typically constitutes funds that are subject to the

18 Investment Company Act of 1940, such as open-end mutual funds,

19 closed-end funds, ETFs.

20 Q    Obviously, you know who my clients are.  Are any of my

21 clients so-called retail funds that you just described?

22 A    Yes.

23 Q    Name them, please.

24 A    You've got NexPoint Capital, Inc., Highland Income Fund,

25 and NexPoint Strategic Opportunities Fund.

Appx. 04530

Post - Direct                                    53

1   Q    Do those three retails funds hold any voting preference
2   shares in the CLOs that the Debtor manages?
3   A    Yes.
4        MR. RUKAVINA:  Mr. Vasek, if you'll please pull up
5   Exhibit 2.
6        Your Honor, I believe I have a stipulation with Mr. Morris
7   that this exhibit can be admitted, so I'll move for its
8   admission.
9        MR. MORRIS:  No objection, Your Honor.
10       THE COURT:  All right.  Exhibit 2 will be admitted.
11  And let's be clear.  That appears at -- is it Docket No. --
12  let's see.  Is it 1673 that you have your -- no, no, no, no.
13  1670?  Is that where your exhibits are?
14       MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think
15  we did an amended one because we numbered our exhibits instead
16  of having seventeen Os and Ps.  So it's 1863.
17       THE COURT:  1863?  Okay.  All right.  There it is.
18  Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What
19  exhibit?  It's Exhibit 2, is admitted.  Okay.
20       MR. RUKAVINA:  Thank you, Your Honor.
21       (Certain Funds and Advisors' Exhibit 2 is received into
22  evidence.)
23  BY MR. RUKAVINA:
24  Q    Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what
25  do they stand for?  Do they stand for the retail funds you

Post - Direct                                54

1    just named?

2         MR. SEERY:  I don't think he meant me.

3         THE WITNESS:  Yeah.

4    BY MR. RUKAVINA:

5    Q    I'm sorry, Mr. Post.  I didn't hear you.

6    A    You addressed me as Mr. Seery.

7    Q    Oh.  I apologize.  What do those initials stand for?

8    A    The names of the funds that I mentioned.

9    Q    Okay.  And what do these percentages show?

10   A    The percentages show the amount of shares outstanding and

11   the preference shares that each of the respective funds hold

12   of the named CLOs.

13   Q    And those CLOs on the left there, those are the CLOs that

14   the Debtor manages pursuant to agreements, correct?

15   A    Yes.  Those are some of them, correct.

16   Q    Yes.  The ones that the retail funds you mentioned have

17   interests in, correct?

18   A    Correct.

19   Q    And what does the far-right column summarize or show?

20   A    That would be the aggregate across the three retail funds.

21   Q    In each of those CLOs?

22   A    Correct.

23   Q    Thank you.

24        MR. RUKAVINA:  Mr. Vasek, you may pull this down.

25   BY MR. RUKAVINA:

Post - Direct                                    55

1   Q   Mr. Post, in the aggregate, how much do those three retail

2   funds have invested in those CLOs, ballpark?

3   A   I believe it's approximately $130 million, give or take.

4   Q   Is it closer to 140 or 130?

5   A   A hundred -- I think it's 140, actually.

6   Q   Okay.  Thank you.  Who controls those three retail funds?

7   A   Ultimately, the board --

8   Q   And what --

9   A   -- of the funds.

10  Q   What is -- what do you mean by the board?  Do they have

11  independent boards?

12  A   Yes.  They have a majority independent board, the funds

13  do.

14  Q   Do you report to that board?

15  A   Yes.

16  Q   Does Mr. Dondero sit on those boards?

17  A   He does not.

18  Q   Okay.

19          MR. RUKAVINA:  I'll pass the witness, Your Honor.

20  Thank you, Mr. Post.

21          THE COURT:  All right.  Any other Objector

22  examination of Mr. Post?

23      All right.  Mr. Morris, do you have cross?

24          MR. MORRIS:  Yes, Your Honor, I do.

25          THE COURT:  Okay.

Post - Cross                                    56

1                          CROSS-EXAMINATION

2    BY MR. MORRIS:

3    Q    Mr. Post, can you hear me okay, sir?

4    A    Yes, I can hear you.

5    Q    Okay.  Nice to see you again.  When did you first join

6    Highland?

7    A    I believe it was July of '08.

8    Q    So you've worked with the Highland family of companies for

9    about a dozen years now; is that right?

10   A    Yes.

11   Q    And you were actually employed by the Debtor from 2008

12   until October 2020; is that right?

13   A    Correct.

14   Q    And you left at that time and went to join Mr. Dondero as

15   the chief compliance office of the Advisors; do I have that

16   right?

17   A    Yes.  I transitioned to NexPoint Advisors shortly, I

18   believe, after Mr. Dondero left, but I was already the named

19   CCO for that entity.

20   Q    Right, but your employment status changed from being an

21   employee of the Debtor to being an employee of NexPoint; is

22   that right?

23   A    Correct.

24   Q    And that happened shortly after Mr. Dondero resigned from

25   the Debtor and went to NexPoint Advisors, correct?

Post - Cross                                    57

1    A    Correct.

2    Q    Okay.  You mentioned that the funds are controlled by

3    independent boards; do I have that right?

4    A    It's a majority independent board, correct.

5    Q    Okay.  There's no independent board member testifying in

6    this hearing, is there?

7    A    I --

8            MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9    that, but I'll stipulate to that as a fact.

10           THE COURT:  All right.

11           MR. MORRIS:  Okay.

12   BY MR. MORRIS:

13   Q    Did you -- do you speak with the board members from time

14   to time?

15   A    Yes.

16   Q    Did you tell them that it might be best if they came and

17   identified themselves and helped persuade the Court that they

18   were, in fact, independent?

19   A    They have counsel to assist them with that determination.

20   I never mentioned anything along those line to them.

21   Q    Okay.  Can you tell me who the board members are?

22   A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23   Honis, and then Ed Constantino.  He is only a board member,

24   though, for NSOF.  NexPoint Strategic Opportunities Fund.

25   Q    All right.  Mr. Honis, is he -- has he been determined to

Post - Cross                                    58

1    be an interested director, for purposes of the securities

2    laws?

3    A    Yes.

4    Q    Okay.  Mr. Froeh..., do you know much about his

5    background?

6    A    I believe he worked at Deutsche Bank and a couple of the

7    other -- or maybe a couple of other investment firms in the

8    past.  And he also owns a minor league baseball team.

9    Q    Do you know how long he served as a director of the funds?

10   A    I don't know, approximately.  I think maybe seven -- six,

11   seven years.

12   Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work

13   for Highland?

14   A    Not that I can recall.

15   Q    Did Mr. Ward ever work for Highland?

16   A    Not that I can recall.

17   Q    Do you recall how long he's been serving as a director of

18   the funds?

19   A    Mr. Ward?

20   Q    Yes.

21   A    I believe -- I'd be -- I don't recall specifically.  I

22   think it's been, you know, 10 to 12 years, give or take.

23   Q    He was a director when you got to Highland; isn't that

24   right?

25   A    He was on the board of directors.

Post - Cross                                    59

1  Q    Yeah.  So fair to say that Mr. Ward has been a director

2  since at least the mid to late oughts?  2005 to 2008?

3  A    I'm sorry, you cut out.  Late what?

4  Q    The late oughts.  Withdrawn.  Is it fair to say that Mr.

5  Ward's been a director of the funds since somewhere between

6  2005 and 2008?

7  A    Again, I don't recall specifically.  You know, I joined

8  the complex, the retail complex as the named CCO in 2015, and

9  he had been serving in that role prior to that, and I believe

10 it was for probably a period of five to seven years, so that

11 sounds in line.

12 Q    Did you have a chance to review Dustin Norris's testimony

13 from the December 16th hearing?

14 A    I did not.

15 Q    Do you know -- are you aware that he testified at some

16 length regarding the relationship of each of these directors

17 to Mr. Dondero and Highland?

18 A    I didn't review anything, so I don't know what he said or

19 how long it took.

20 Q    Do you know if Mr. Powell's ever worked for Highland?

21 A    He has.

22 Q    Do you know in what capacity and during what time periods?

23 A    He was -- I think his last title was -- I believe was

24 chief product strategist, I believe.  And he was also the

25 named PM for one of -- or, a suite of ETF funds.  I think he

Post - Cross                                    60

1   was last employed maybe --from my recollection, 2014,

2   possibly.  Or 2015.  Somewhere around in there.

3   Q   Okay.  And to the best of your knowledge, did Mr. Dondero

4   appoint Mr. Powell to be the chief product strategist?

5   A   I don't -- I don't know.  I wasn't involved in the

6   decision for his appointment.  I don't know how he attained

7   that role.

8   Q   To the best of your knowledge, did Mr. Dondero appoint Mr.

9   Powell as the PM of the ETF funds?

10  A   Again, I wasn't involved in that determination, but he

11  probably would have had a role in making the determination on

12  who was the PM, along with probably some other investment

13  professionals.

14  Q   Okay.  And did Mr. Powell join the board of the funds

15  before or after he left Highland around 2015?

16  A   I can't recall specifically if he was already on the board

17  or was an interested member, but I believe he, you know, I

18  believe he joined shortly after he left.

19  Q   Okay.  So he went from being an employee and being a

20  portfolio manager at Highland to being on the board of these

21  funds.  Do I have that right?

22  A   Again, I can't recall specifically.  He may have already

23  been on the board as an interested board member.  But, you

24  know, I believe, you know, if that wasn't the case, he would

25  have joined the board shortly after leaving.

Post - Cross                              61

1   Q    And Mr. Ward, I think you said, has been on the funds'
2   board since somewhere between 2005 and 2008.  Does that sound
3   right?
4   A    I think that was a time frame you referenced, and I think
5   that was kind of in line, walking it back.  But I don't recall
6   specifically when he joined.
7   Q    And to the best of your knowledge, have the Advisors for
8   which you serve as the chief compliance officer managed the
9   Funds for which Mr. Ward has served as a director since the
10  time he became a director?
11  A    I'm sorry.  Can you repeat the question?
12  Q    Yeah.  I'm just trying to understand if the advisors --
13  withdrawn.  The Advisors manage the Funds; do I have that
14  right?
15  A    They provide investment advice on behalf of the Funds.
16  Q    And they do that pursuant to written agreements; do I have
17  that right?
18  A    Correct.
19  Q    And is it your understanding that, for the entire time
20  that Mr. Ward has served as a member of the board of the
21  Funds, the Advisors have provided the investment advice to
22  each of those Funds?
23  A    Yes, in one form or fashion.  I believe at one period in
24  time, historically, the Advisor may have changed its name, but
25  it would have been, you know, at the end of the day, one or

Post - Cross                                    62

1    more -- one of either NexPoint Advisors or Highland Capital

2    Management Fund Advisors would have advised those Funds.

3    Q    Is it fair to say that each of the Advisors for which you

4    serve as the chief compliance officer has always been managed

5    by an Advisor owned and controlled by Mr. Dondero?

6    A    I believe so, yes.

7              MR. MORRIS:  I have no further questions, Your Honor.

8              THE COURT:  All right.  Any redirect?

9              MR. RUKAVINA:  Yes.

10             THE COURT:  Okay.  Mr. Rukavina?

11             MR. RUKAVINA:  Your Honor, was I on mute?  I

12   apologize.

13             THE COURT:  Yes.

14                      REDIRECT EXAMINATION

15   BY MR. RUKAVINA:

16   Q    Mr. Post, why did you leave Highland?

17   A    It -- because I was a HCMLP employee and it was --

18   basically, there was conflicts that were created by being an

19   employee of the Debtor and by also serving as the CCO to the

20   named Funds and the Advisors, and it coincided with Jim

21   toggling over from HCMLP to NexPoint.  It just made sense more

22   functionally and from a silo perspective for me to be the

23   named CCO for that entity since he was no longer an employee

24   of HCMLP.

25   Q    And by Jim, you mean Jim Dondero?

Post - Redirect/Recross                                    63

1   A    Yes, sorry.  Jim Dondero.

2   Q    You're not some kind of lackey for Mr. Dondero, where you

3   go wherever he goes, are you?

4            MR. MORRIS:  Objection to the question.

5            THE WITNESS:  No.

6            THE COURT:  Overruled.  He can answer.

7            MR. RUKAVINA:  Okay.

8            THE WITNESS:  No.

9            MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10  pass the witness.

11           THE COURT:  Any other Objector examination?

12       All right.  Any recross, Mr. Morris?

13                     RECROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q    Just one question, sir.  The conflicts that you just

16  mentioned, they were in existence for the one-year period

17  between the petition date and the date you left; isn't that

18  right?

19  A    I think -- I believe so, and I think they became more

20  evident as, you know, time progressed.

21  Q    Okay.  But they existed on day one of the bankruptcy

22  proceeding; isn't that right?

23  A    Yes, I believe so.

24  Q    All right.

25           MR. MORRIS:  No further questions, Your Honor.

Post - Recross                                   64

1          THE COURT:  All right.  Thank you, Mr. Post.  You're

2     excused from the virtual witness stand.

3        (The witness is excused.)

4          THE COURT:  All right.  Your next witness?

5          MR. RUKAVINA:  Your Honor, my exhibit has been

6     admitted, I promised I'd be short, and my evidentiary

7     presentation is done.  Thank you.

8          THE COURT:  All right.  Well, Mr. Taylor, your

9     evidence?

10         MR. TAYLOR:  First of all, given the testimony that

11     we have received just recently, we have released Mr. Sevilla

12     from his subpoena and are not going to call him.

13        With that being said, we do have some documents that we

14     would like to get into evidence.  We filed our witness and

15     exhibit list at Docket No. 1874.  I don't believe any of these

16     are controversial.  I'm trying to keep from duplicating those

17     that are already into evidence by the Debtor.  And therefore I

18     would like to offer into evidence Exhibits No. 6 through 12

19     and 17.  And that is it, Your Honor.

20         THE COURT:  Okay.  Is there any objection to Dondero

21     Exhibits 6 through 12 and 17, appearing at Docket 1874?

22         MR. MORRIS:  I just want to be clear that Exhibits 6

23     and 7, which are letters, I believe, from Mr. Lee (phonetic)

24     are not being offered for the truth of the matter asserted in

25     either letter.

1          MR. TAYLOR:  That is correct, Your Honor.  Just

2    merely that those requests and the words that were stated in

3    there were indeed sent on those dates.

4          MR. MORRIS:  And the same comment, Your Honor, with

5    respect to Exhibits 9 through 12, that those documents are not

6    being offered for the truth of the matter asserted.

7          MR. TAYLOR:  Again, just that those requests were

8    sent and those responses as stated were sent.

9       And I apologize.  I missed one, Your Honor.  Also No. 15.

10   6 through 12, 15, and 17.

11         MR. MORRIS:  Your Honor, the Debtor has no objection

12   to Exhibits 15, 16, and 17.

13         THE COURT:  All right.  So, so they are all admitted

14   with the representation that 6 and 9 through 12 are not being

15   offered for the truth of the matter asserted.  With that

16   representation, you have no objection, Mr. Morris?

17         MR. MORRIS:  That's right.  I do just want to get

18   confirmation that Exhibits 1 through 5 and 13 through 16 -- 13

19   and 14 are not being offered at all.

20         THE COURT:  Mr. Taylor?

21         MR. TAYLOR:  So, that -- that is correct.  1 through

22   5 would be duplicative of what has already been introduced

23   into the record by Mr. Morris, so I am not offering those.

24   And do not believe that 13 and 14 are relevant anymore, and so

25   therefore did not offer those.

66

 1          THE COURT:  Okay.  So, with that, I have admitted 6
 2   through 12, 15, 16, and 17 at Docket Entry 1874.
 3      (Dondero Exhibits 6 through 12 and 15 through 17 are
 4   received into evidence.)
 5          THE COURT:  All right.  Anything else, Mr. Taylor?
 6          MR. TAYLOR:  No, Your Honor.  We are not calling any
 7   witnesses.
 8          THE COURT:  All right.  Mr. Draper, what about you?
 9   Any evidence?
10          MR. DRAPER:  No evidence or witnesses.  The evidence
11   that's been introduced by Mr. Taylor and Mr. Rukavina are
12   sufficient for me.
13          THE COURT:  All right.  Ms. Drawhorn, anything from
14   you?
15          MS. DRAWHORN:  No additional evidence, Your Honor.
16          THE COURT:  All right.  Well, then, Mr. Morris, did
17   you have anything in rebuttal?
18          MR. MORRIS:  No, Your Honor.  I think we can proceed
19   to closing statements.  I would just appreciate confirmation
20   by the Objecting Parties that they rest.
21          THE COURT:  All right.  Well, I guess we'll get that
22   clear if it is isn't clear.  All of the Objectors rest.
23   Confirm, yes, Mr. Rukavina?
24          MR. RUKAVINA:  Confirm.
25          THE COURT:  And Mr. Taylor?

67

1           MR. TAYLOR:  Confirmed, Your Honor.

2           THE COURT:  Okay.  And Draper and Drawhorn?

3           MR. DRAPER:  Yes, Your Honor.

4           MS. DRAWHORN:  Confirmed, Your Honor.

5           THE COURT:  All right.  By the way, I assume Mr.

6    Dondero has been participating this morning.  I didn't

7    actually get that clarification before we started.  Mr.

8    Taylor, is he there with you this morning?

9           MR. TAYLOR:  Your Honor, he is.  He has been

10   participating.  He is sitting directly to my left about

11   slightly more than six feet apart.

12          THE COURT:  Okay.  All right.  Good.

13      All right.  Well, let's talk about our closing arguments

14   and let me figure out, do we have -- should we break a bit

15   before starting?  I have an idea in my brain about a time

16   limitation, but before I do that, let me ask.  Mr. Morris,

17   first I'll ask you.  How much time do you think you need for a

18   closing argument?

19          MR. MORRIS:  Your Honor, --

20          MR. POMERANTZ:  Your Honor?

21          MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22   going to deliver that portion of our presentation today.

23          THE COURT:  All right.  Mr. Pomerantz?

24          MR. POMERANTZ:  Your Honor, I will be making -- yes,

25   Your Honor.  I will be making the majority portion of the

68

```
 1   argument.  Mr. Kharasch will be making the portion of the
 2   argument dealing with the Advisor and Funds' objection.  But I
 3   expect my closing to be quite lengthy, given the 1129
 4   requirements, all the legal issues, which I plan to spend a
 5   fair amount of time.  So I would anticipate a range of an hour
 6   and 45 minutes.
 7           THE COURT:  An hour and 45 minutes?  All right.
 8   Well, --
 9           MR. POMERANTZ:  Correct.
10           THE COURT:  I'm getting an echo.
11           MR. CLEMENTE:  Your Honor, it's Matt Clemente on
12   behalf on the Committee.  I'll have 15 minutes or less, Your
13   Honor.  Just some things I would like to touch on.
14           THE COURT:  All right.  So, two hours.  If I were to
15   --
16           MR. POMERANTZ:  And then you need, Your Honor, to add
17   Mr. Kharasch.  I think he's on.  He can indicate how long his
18   part of the closing will be.
19           THE COURT:  Mr. Kharasch?
20           MR. KHARASCH:  Yes.  I would figure my argument would
21   probably be about 20 minutes to 30 minutes.
22           THE COURT:  Okay.
23           MR. RUKAVINA:  Your Honor, let me interject something
24   that I think will help everyone out.  With the CLOs having
25   consented through their counsel to the assumption, the bulk of
```

69

1   my objection is now moot.  We no longer can and will argue

2   that the contracts are unassignable under 365(b) or (c)

3   because we do have now their consent.  So that will hopefully

4   help the Debtor on that issue.

5         MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

6   not anticipating that.  I believe that that will take away the

7   bulk of my argument.  I'm still going to be dealing with some

8   of the other non-assumption-type arguments raised by the CLO

9   Objectors, kind of dovetailing with Mr. Pomerantz's arguments

10  on the injunction.  But that will greatly reduce, Your Honor,

11  my argument.

12        THE COURT:  All right.  So if I say two hours of

13  argument for the Debtor and Creditors' Committee, Rukavina,

14  Taylor and Draper and Drawhorn, can you collectively manage to

15  share that two hours?  Have a two-hour argument in the

16  aggregate?  That seems fair to me.

17        MR. RUKAVINA:  Your Honor, I think -- I think that's

18  fine, Your Honor.

19        THE COURT:  All right.  And I guess I'll --

20        MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

21        THE COURT:  Okay.  And Mr. Draper?

22        MR. DRAPER:  This is Douglas Draper.  I agree.  I

23  agree also, Your Honor.

24        THE COURT:  All right.  And I'm going to ask --

25        MR. POMERANTZ:  Your Honor, I --

70

1           THE COURT:  Go ahead.

2           MR. POMERANTZ:  Your Honor, we -- I think we may need

3    like two hours and ten minutes, because mine was 1:45, Mr.

4    Clemente was 15, and then Mr. Kharasch.  But we'll be around

5    that.  And I tend to speak fast, so I might even shorten mine.

6           THE COURT:  Okay.  You negotiated me up to two hours

7    and ten minutes, Debtors/Objectors, each.

8      I'm going to ask one more time.  The U.S. Trustee lobbed a

9    written objection, but we've not heard anything from the U.S.

10   Trustee.  Are you out there wanting to make an oral argument?

11          MS. LAMBERT:  Yes, Your Honor.  The United States

12   Trustee is on the line.  And we've been listening to the

13   hearing.  I can turn my video on.  I think you're --

14          THE COURT:  Yes.  I can hear you.  I can't see you.

15          MS. LAMBERT:  Okay.  All right.  And so the U.S.

16   Trustee feels that the issues about the releases have been

17   adequately joined and raised by the other parties and that

18   it's an issue of law.  The U.S. Trustee does not feel that we

19   can add to that dialogue by, you know, wasting more of the

20   Court's time.  I think it's been adequately briefed and it's

21   been adequately argued here today.

22          THE COURT:  Okay.

23          MS. LAMBERT:  And we do have an agreement to include

24   governmental release language in the order.  I understand that

25   agreement is still being honored.  That's a separate agreement

71

1    than the issue of whether the releases are precluded.  But

2    we're going to let the other people carry the water on that.

3              THE COURT:  Okay.

4              MR. POMERANTZ:  Yeah.  And that is correct.  That is

5    correct, Your Honor.  They asked for some information -- a

6    provision on government releases.  They also asked for a

7    provision regarding joint and several liability for Trustee

8    fees.

9        As I mentioned previously, the IRS has asked for a

10   provision in the confirmation order, as have the Texas Taxing

11   Authorities.

12       We have not uploaded a proposed confirmation order, but I

13   will state right now on the record that, before we do so, we

14   will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15   Taxing Authorities the opportunity to review.  We expect there

16   won't be any issue because the language has already been

17   agreed to.

18             THE COURT:  All right.  Well, how about this.  It's

19   11:23 Central time.  Let's break until 12:00 noon Central

20   time, okay, so that gives everyone a little over 30 minutes to

21   have a snack and get their notes together, and we'll start

22   with closing arguments at 12:00 noon.  All right?  So we're in

23   recess until then.

24             THE CLERK:  All rise.

25       (A recess ensued from 11:24 a.m. until 12:05 p.m.)

72

```
 1          THE COURT:  All right.  Please be seated.  All right.
 2  This is Judge Jernigan.  We are back on the record in
 3  Highland.  Let me make sure we have the people we need.  Do we
 4  have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?
 5          MR. POMERANTZ:  Yes, you do, Your Honor.
 6          THE COURT:  All right.  For our Objectors, Mr.
 7  Taylor, are you there?
 8          MR. TAYLOR:  Yes, Your Honor, I am.
 9          THE COURT:  All right.  I see Mr. Draper there on the
10  video.  You're there.
11          MR. DRAPER:  I'm here.  Can you hear me?
12          THE COURT:  I can hear you loud and clear, yes.
13          MR. DRAPER:  Great, because I didn't -- I'm not
14  hearing, something so I apologize.
15          THE COURT:  All right.  So we have Mr. Rukavina, and
16  I think I see Mr. Hogewood there as well.  Is that correct?
17  You're ready to go forward?
18          MR. RUKAVINA:  Yes, Your Honor.
19          THE COURT:  All right.
20          MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.
21          THE COURT:  All right.  And Ms. Drawhorn, you're
22  there?
23          MS. DRAWHORN:  Yes, Your Honor.
24          THE COURT:  Okay.  Committee.  Mr. Clemente, are you
25  there?
```

73

1          MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your

2     Honor.

3          THE COURT:  Okay.  Very good.  All right.  So, let me

4     reiterate.  We've given two-hour and 10-minute time

5     limitations for the Debtor, and that'll be both any time you

6     reserve for rebuttal and your closing, initial closing

7     argument.  Mr. Clemente, you're going to be in that time frame

8     as well.  Okay?

9          MR. CLEMENTE:  Yes, Your Honor.

10          THE COURT:  And so, as supporters of the plan.

11     And then, of course, the Objectors, they have collectively

12     two hours and ten minutes.

13     A couple of things.  I'm going to have my law clerk, Nate,

14     who you can't see but he's to my right, he's going to keep

15     time.  I promise I won't be a jerk and cut anyone off

16     midsentence, but please don't push the limit if I say, you

17     know, "Time."

18     The other thing I will tell you is I'll probably have some

19     questions here or there.  And I've told Nate, cut off the

20     timer if we're in a question-answer session.  I won't count

21     that as part of the two hours and ten minutes.

22     All right.  So, with that, Mr. Pomerantz, you may begin.

23          CLOSING STATEMENT ON BEHALF OF THE DEBTOR

24          MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor

25     is aware, the Debtor has been able to resolve all objections

74

1   to confirmation other than the objection by Mr. Dondero or his

2   entities and the United States Trustee.

3       Your Honor, I have a very lengthy closing argument, given

4   the number of issues that are raised in the objections, and I

5   want to make a complete record, since I understand that

6   there's a good likelihood that (garbled) appeal.

7       With that in mind, Your Honor, I'm prepared to go through

8   each and every confirmation requirement in Section 1129.

9   However, as an alternative, I might propose that I can go

10  through each of the Section 1129 requirements that are the

11  subject of pending objections or otherwise depend upon

12  evidence that Your Honor has heard.

13          THE COURT:  Okay.

14          MR. POMERANTZ:  And of course, I'll be happy to

15  answer any questions that you have in the process.

16          THE COURT:  Okay.

17          MR. POMERANTZ:  And after my closing argument, I will

18  turn it over to Mr. Kharasch to address the Advisor and Funds'

19  objections.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  Before I walk the Court through the

22  confirmation requirements, I did want to note for the Court,

23  as I did previously, that we filed an updated ballot summary

24  at Docket No. 1887.  And as reflected in the summary, Classes

25  2 and 7 have voted to accept the plan with the respective

75

1  numerosity and amounts required.  In fact, the votes are a

2  hundred percent.

3      Class 8, however, has voted to reject the plan.  Seventeen

4  creditors in Class 8 voted yes and 24 objectors, which are, I

5  think, all but one the employees with one-dollar claims for

6  voting purposes, voted against.

7      In dollar amount, Class 8 has accepted the plan by 99.8

8  percent of the claims.  And I will address the issues of the

9  cram-down over that class a little bit later on.

10     Lastly, during the course of my presentation, I will

11 identify for the Court certain modifications we have made to

12 address the objections that were filed on January 22nd and

13 then also on February 1st.  And at the end of my presentation,

14 I will raise a couple of other modifications that I won't get

15 to during my presentation and will explain to the Court why

16 all the modifications do not require resolicitation and are

17 otherwise appropriate under Section 1127.

18     Your Honor, as Your Honor is aware, Section 1129 requires

19 the Debtors to demonstrate to the court that the plan

20 satisfies a number of statutory requirements.  1129(a)(1)

21 provides that the plan requires -- complies with all statutory

22 provisions of Title 11, and courts interpreted this provision

23 as requiring the debtor to demonstrate it complies with

24 Section 1122 and 1123.

25     With respect to classification, Your Honor, there has been

1   one objection that was raised to essentially a classification,

2   and that was raised by Mr. Dondero to Article 3C of the plan

3   on the grounds that it purports to eliminate a class that did

4   not have any claims in it as of the effective date but which

5   may later have a claim in that class.

6       I think he was primarily concerned about Class 9

7   subordinated claims.  But Mr. Dondero misunderstands the

8   provision.  It only eliminates a claim for voting purposes,

9   and if there's later a claim in that class, it will be treated

10  as the plan provides the treatment.

11      In any event, Class 9, as we know now, will be populated

12  by the HarbourVest claims, as well as the UBS claims and the

13  Patrick Daugherty claims, if the Court approves the settlement

14  approving those claims.

15      Next, Your Honor, Section 1123(a) contains seven mandatory

16  requirements that a plan must include.  Sections 1, 2, and 3

17  of 1123(a) apply to the classification of claims and where

18  they're impaired and treatment.  The plan does that.

19      There has been an objection to 1123(a)(3) raised by

20  several parties with respect to the classification and

21  treatment of subordinated claims.  The concerns stem from the

22  mistaken belief that the Debtor reserved the right to

23  subordinate claims without providing parties with notice and

24  without obtaining a court order.

25      The Debtor never intended to have unilateral ability to

1  subordinate claims without affording parties due process

2  rights, and we've added some clarificatory language to so

3  provide.

4      We made changes to the plan on January 22nd, and then on

5  February 1st, and the plan addresses all those issues in

6  Article 3(j) and it talks about when a claim is going to be

7  subordinated as a non-creditor.  We've also redefined the

8  definition of subordinated claims to make clear that a claim

9  is only subordinated upon entry of an order subordinating that

10 claim.

11     Mr. Dondero also objected on the grounds that the plan did

12 not contain a deadline pursuant to which the Debtor would be

13 required to seek any subordination, and we have revised

14 Article 7(b) of the plan to provide that any request to

15 subordinate a claim would have to be made on or before the

16 claim objection deadline, which is 180 days after the

17 effective date.

18     Lastly, certain former employees, Mr. Yang and Borud,

19 objection also joined by Mr. Deadman, Travers, and Kauffman,

20 objected to the inclusion of language in the definition of

21 "Subordinated Claims" that a claims arising from a Class A, B,

22 or C limited partnership is deemed automatically subordinated.

23 The concerns were that the language could broadly apply to any

24 potential claims by a former partner, and could be also read

25 to encompass claims outside the statutory scope of 510(b) or

78

1   otherwise relating to limited partnership interests.

2       While the Debtor does reserve the right to seek to

3   subordinate the claims on any basis, we have modified the plan

4   to address that concern and to address the concern that we're

5   not attempting to create any new causes of action for

6   subordination that don't otherwise exist under applicable law,

7   but it just preserves the parties' rights with respect to

8   subordination and deals with that at a later date.

9       Next, Your Honor, Section 1123(a)(5).  I skipped over

10  1123(a)(4) because there are no objections to that provision.

11          THE COURT:  Okay.

12          MR. POMERANTZ:  Section 1123(a)(5), a plan must

13  provide for adequate means of implementation.  And the plan

14  provides a detailed structure and blueprint how the Debtor's

15  operations will continue, how the assets will be monetized,

16  including the establishment of the Claimant Trust,

17  establishment of the Litigation Sub-Trust, the Reorganized

18  Debtor, the Claimant Trust Oversight Board.  And the documents

19  precisely describing how this will occur were filed as part of

20  the various plan supplements.

21      1123(a)(7), Your Honor, requires that the plan only

22  contain provisions that are consistent with the interest of

23  equity holders and creditors with respect to the manner,

24  selection, and -- of any director, officer, or trustee under

25  the plan.  And as discussed in the plan, at the disclosure

1  statement, and as testified to by Mr. Seery, the Committee and

2  the Debtor had arm's-length negotiations regarding the post-

3  effective date corporate governance and believe that the

4  selection of the claimant Trustee, the Litigation Sub-Trustee,

5  and the Claimant Trust Oversight Board are in the best

6  interest of stakeholders.

7      HCMFA has raised a particular objection, I think, to these

8  issues, but I will address it in the context of the

9  requirement under Section 1129(a)(5).

10     Your Honor, Section 1129(a)(2) requires that the plan

11  comply with the disclosure and solicitation requirements under

12  the plan.  Section 1125 requires that the Debtor only solicit

13  with a court-approved disclosure statement.  The Court

14  approved the disclosure statement on November 23rd, and

15  pursuant to the proofs of service on file, the plan and

16  disclosure statement were mailed, along with solicitation

17  materials that the court approved.

18     Now, there has been an objection raised by Dugaboy, and

19  also alluded to by Mr. Taylor in some of his comments before,

20  that the plan does violate 1129(a)(2) because the Debtor's

21  disclosure statement was deficient.

22     In support of that argument, Dugaboy points to the

23  reduction in the anticipated distribution to creditors from

24  the November plan analysis to the January plan analysis, and

25  argues that that reduction requires resolicitation.  However,

80

1   those arguments are not well-taken.

2       First, none of the people making these objections were

3   solicited for their vote on the plan, or if they had been,

4   they didn't vote or decided to reject the plan.  And to the

5   extent that Class 8 creditors, the distribution has gone down

6   -- that's the class that Mr. Taylor and Mr. Draper are

7   concerned about -- you don't hear the Committee, Acis,

8   Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9   making their argument, this argument, and they represent over

10  99 percent of the claims in that class.  And in fact, of the

11  17 Class 8 creditors that have accepted the plan, 15 are

12  represented by the parties I just mentioned.

13      So who are the two creditors that they're so concerned

14  about?  One is Contrarian, which is a claims trader that

15  actually elected to be treated in Class 7, and one is one of

16  the employees who voted to accept the plan.

17      Second, Your Honor, the argument conflates the difference

18  between adverse change to the treatment of a claim or interest

19  that would require a resolicitation under Section 1127 and a

20  change to the distribution that would not.

21      More importantly, Your Honor, the argument is specious.

22  As Mr. Seery testified yesterday, the material differences

23  between the analysis contained on November and late January

24  and the one we filed on February 1st were based on three types

25  of changes:  an update regarding the increased value of assets

81

1   based upon events that had transpired during this period,

2   which included an increase in asset value, no recoveries, and

3   revenues expected to be generated by the CLO management

4   agreements; an update to the expected costs of the Reorganized

5   Debtor and the Claimant Trust as a result of the continued

6   evaluation of staffing needs, operational expenses, and

7   professional fees; and an update to reflect resolution of the

8   HarbourVest and UBS claims.

9        In the filing Monday, Your Honor, we updated the plan

10  projection, a liquidation analysis which revised the unsecured

11  claims based upon the UBS settlement that I was able to

12  disclose to Your Honor.  And in the filing, the distribution

13  now revised to Class 8 creditors is now 71 percent, compared

14  to the 87 percent that was in the disclosure statement that

15  went out for solicitation.

16       Your Honor, there can be no serious argument that the

17  creditors in this case were not fully aware of the potential

18  for the UBS and HarbourVest creditors receiving claims.  Your

19  Honor's UBS 3018 order granting its claim for voting purposes

20  was entered right around the time that the disclosure

21  statement was approved.  And, in fact, a last-minute addition

22  to the disclosure statement disclosed the 3018 amount,

23  although the amount did not make it to the attachment to the

24  disclosure statement.  And that reference, Your Honor, to the

25  UBS claim being allowed for voting purposes can be found at

82

1   Page 41 of Docket No. 1473.

2       And the HarbourVest settlement was filed on about December

3   23, two weeks before the voting deadline, sufficient time for

4   people to take that into consideration.

5       And as Your Honor surely knows, the hearings in this case

6   have been very well-attended by the major parties, and I

7   believe that if we went back and looked at the records of who

8   was on the WebEx system during the HarbourVest and UBS

9   hearings, you would find that representatives of basically

10  every creditor, every major creditor in this case in Class 8

11  participated.

12      Moreover, Your Honor, creditors were not guaranteed any

13  percentage recovery under the plan and disclosure statement,

14  which clearly identified the size of the claims pool as a

15  material risk.

16      Article 4(a)(7) of the disclosure statement, which is at

17  Docket 1473, is entitled "Claims Estimation" and warns

18  creditors that there can be no assurances that the Debtor's

19  claims estimates will prove correct, and that the actual

20  amount of the allowed claims may vary materially.

21      And if Dugaboy is arguing it was misled as the holder of a

22  disputed administrative claim and general unsecured claim,

23  that argument is simply preposterous.

24      Dugaboy cites several cases for the proposition that

25  deficient disclosure may warrant resolicitation, and the

83

1    Debtor agrees with the proposition as a general matter.  But

2    if one looks at the cases that were filed -- that Dugaboy

3    cited to, it will see that they are clearly inapposite and

4    distinguishable.

5        *In re Michaelson*, the Bankruptcy Court for the Eastern

6    District of California, revoked confirmation because the

7    debtor failed to disclose in the disclosure statement a mail

8    fraud indictment of the turnaround specialist who was to lead

9    the reorganization effort and a prior Chapter 7 company he

10   drove into the ground.

11       In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12   of the Bankruptcy Court that the individual debtor's decision

13   to modify its financial projections on the eve of confirmation

14   did not require a resolicitation.  And there, the financial

15   projections were off by 75 percent.

16       And in *Renegade Holdings*, the Bankruptcy Court granted a

17   motion by a group of states to revoke confirmation by the

18   debtors, who manufactured and distributed tobacco products,

19   because the debtors failed to disclose in its disclosure

20   statement that the debtor and its principals were under

21   criminal investigation for unlawful trafficking in cigarettes,

22   which was not disclosed to creditors.

23       Your Honor, none of these cases are remotely analogous to

24   this case, and they certainly do not stand for the proposition

25   that the Debtor was required to resolicit.

84

1    Next, Your Honor, the next requirement is 1129(a)(3),

2  which requires that any plan be proposed in good faith.  As

3  Mr. Seery testified at length, and the Court has personal

4  knowledge of, having presided over this case for a year, the

5  plan is the result of substantial arm's-length negotiations

6  with the Committee over a period of several months.

7    Mr. Seery testified yesterday that, soon after the board

8  was appointed, the Committee wanted to immediately pursue down

9  the path of an asset monetization plan.  However, as Mr. Seery

10 testified, the board decided that it was inappropriate to rush

11 to judgment and that it should consider all potential

12 restructuring alternatives for the Debtor.  And Mr. Seery

13 testified what those alternatives were:  a traditional

14 restructuring and continuation of the Debtor's business; a

15 potential sale of the Debtor's assets in one or more

16 transactions; an asset monetization plan like the one before

17 the Court today; and, last but not least, a grand bargain plan

18 that would involve Mr. Dondero sponsoring the plan with a

19 substantial equity infusion.

20    As Mr. Seery testified, by the early summer of 2020, the

21 Debtor decided that it was appropriate to start moving down

22 the path of an asset monetization plan while it continued to

23 work on the grand bargain plan.  Accordingly, Mr. Seery

24 testified that the Debtor commenced good-faith negotiations

25 with the Committee regarding the asset monetization plan, and

85

 1   that those negotiations took several months, were hard-fought

 2   and at arm's-length, and involved substantial analysis of the

 3   appropriate post-confirmation corporate structure, governance,

 4   operational, regulatory, and tax issues.  And on August 12th,

 5   Your Honor, the plan was filed with the Court.

 6       And although the Debtor at that time had not reached an

 7   agreement with the Committee on some of the most significant

 8   issues, Mr. Seery testified that the independent board

 9   believed that it was important to file that plan at that time,

10   a proverbial stake in the ground to act as a catalyst for

11   reaching a consensual plan with the Committee or others, which

12   it has done.

13       As Mr. Seery testified, he continued to work with Mr.

14   Dondero to try to achieve a grand bargain plan, while at the

15   same time proceeding down the path of the filed plan.

16       He testified that the parties participated in mediation at

17   the end of August and early September to try to reach an

18   agreement on a grand bargain plan, but were unsuccessful.  And

19   the Debtor proceeded on the path of the August 12th plan and

20   sought approval of its disclosure statement on August 27th,

21   2020.

22       Mr. Seery testified that, at that time, the Debtor still

23   had not reached an agreement with the Committee on certain

24   significant issues involving post-confirmation governance and

25   the scope of releases.  And as a result, after a contested

86

1    hearing, Your Honor, Your Honor did not approve the disclosure

2    statement on October 27th, but asked us to go back again to

3    try to work out the issues, and we came back on November 23rd.

4        Mr. Seery testified that the Debtor continued to negotiate

5    with the Committee to resolve the material disputes leading --

6    which led up to the November 23rd hearing, where we came in

7    with the support of the Committee.  But as Mr. Seery has also

8    testified, he has continued to try to reach a consensus on a

9    global plan, notwithstanding the approval of the disclosure

10   statement.  And he spent personally several hundred hours

11   since his appointment trying to build consensus.

12       As part of this process, Mr. Seery testified that Mr.

13   Dondero received access to substantial information regarding

14   the Debtor's assets and liabilities, most recently in

15   connection with a series of informal document requests which

16   were made at the end of December.

17       And after the Court asked the parties to again reengage in

18   efforts to try to reach a global hearing after the Debtor's

19   preliminary injunction motion, Mr. Seery testified that he and

20   the board participated in calls with Mr. Dondero and his

21   advisors and the Committee to see if common ground could be

22   attained.

23       Unfortunately, as Mr. Seery testified, the Committee and

24   Mr. Dondero were not able to reach an agreement.

25       Accordingly, Your Honor, the testimony unequivocally and

1  overwhelmingly demonstrates that the plan was proposed in good

2  faith.

3      I expect the Objectors may argue in closing that they have

4  filed a plan under seal that is a better alternative than that

5  being proposed by the plan that the Debtor seeks to confirm.

6  Your Honor, as a threshold matter, yesterday I said any

7  mention of the specifics of the recent plan would be

8  inappropriate.  We are not here today to debate the merits of

9  Mr. Dondero's plan, which the Court permitted him to file

10  under seal.  He had ample opportunity to file this plan after

11  exclusivity was terminated, seek approval of a disclosure

12  statement, and, if approved, solicit votes in connection with

13  a confirmation hearing, but he failed to do so.

14      What matters today, Your Honor, is whether the Debtor's

15  plan, the plan that has been accepted by 99.8 percent of the

16  amount of creditors, and opposed only by Mr. Dondero, his

17  related entities, and certain employees, meets the

18  confirmation requirements of Section 1129, which we most

19  certainly argue it does.

20      And perhaps most importantly, Your Honor, the Court

21  remarked at the last hearing that, without the Committee's

22  support for a competing plan, Mr. Dondero's plan would be dead

23  on arrival.  And as you have heard from Mr. Clemente, Mr.

24  Dondero does not yet have the Committee's support.

25      Next, Your Honor, is Section 1129(a)(5).  That requires

88

1   that the plan disclose the identity of any director,

2   affiliate, officer, or insider of the debtor, and such

3   appointment be consistent with the best interest of creditors

4   and equity holders.  Courts have held that this section

5   requires the disclosure of the post-confirmation governance of

6   the reorganized entity.

7       HCMFA objects to the plan, arguing that it did not comply

8   with Section 1129(a)(5) because it didn't disclose the people

9   who would control and manage the Reorganized Debtor and who

10  might be a sub-servicer.  HCMFA's objection is off-base.

11  Under the plan, Mr. Seery will be the claimant Trustee and

12  Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13  testified extensively about his background, and he has

14  appeared before the Court many times and the Court is familiar

15  with him.  We have also introduced his *C.V.* into evidence.

16      As he testified, he will be paid $150,000 per month,

17  subject to further negotiations with the Claimant Trust

18  Oversight Committee regarding the monthly amount and any

19  success fee and severance fee, which negotiation is expected

20  to be completed within the 45 days following the effective

21  date.

22      Mr. Seery also testified regarding the names of the

23  members of the Claimant Trust Oversight Committee, which

24  information was also contained in the plan supplement and it

25  generally includes the four members of the Committee and David

89

1  Pauker, a restructuring professional with decades of
2  restructuring experience.

3      The members of the Oversight Committee will serve without
4  compensation, except for Mr. Pauker, who Mr. Seery testified
5  will receive $250,000 in the first year and $150,000 for
6  subsequent years.

7      As set forth in the Claimant Trust agreement, if at any
8  time there is a vacant seat to be filled by another
9  independent member, their compensation will be negotiated by
10 and between the Claimant Trust Oversight Board and them.

11     Mr. Seery has also testified that he believed the Claimant
12 Trust will have sufficient personnel to manage its business.
13 Specifically, he has testified that he intends to employ
14 approximately ten of the Debtor's employees, who will be
15 sufficient to enable him to continue to operate the Debtor's
16 business, including as an advisor to the managed funds and the
17 CLOs, until the Claimant Trust is able to effectively and
18 efficiently monetize its assets for fair value, whether that
19 takes two years or whether that takes 18 months or whether
20 that takes longer.

21     Mr. Seery further testified that he believes that the
22 operations can be best conducted by the Debtor's employees.
23 And while he did consider the retention of a sub-servicer, he
24 ultimately decided, in consultation with the Committee, that
25 the monetization would be a lot more effective if done with a

90

 1  subset of the Debtor's current employees.

 2      The proposed corporate governance is also consistent with

 3  the interests of the Debtor and its stakeholders.  The Court

 4  is very familiar with Mr. Seery and the Debtor, and I believe

 5  that Mr. Clemente, when he comments, will say the Committee

 6  can think of no better person to continue managing the

 7  Claimant Trust than Mr. Seery.

 8      Mr. Kirschner is also well qualified to be the Litigation

 9  Trustee.  His *C.V.* is part of the evidence that's been

10  admitted and contains additional information regarding his

11  background.  And he will receive $40,000 a month for the first

12  three months and $20,000 a month thereafter, plus a to-be-

13  negotiated success fee.

14      There just simply can be no challenge to Mr. Seery's or

15  Mr. Kirschner's qualifications or abilities to act in a manner

16  contemplated by the plan or that their involvement is not in

17  the best interest of the estate and its creditors.

18      Your Honor, the next requirement that is objected to is

19  Section 1129(a)(7).  That, of course, requires the Debtor to

20  demonstrate that creditors will receive not less under the

21  plan than they would receive if the Debtor was to be

22  liquidated in Chapter 7.  And on February 1st, Your Honor, we

23  filed our updated liquidation analysis, which contains the

24  latest-and-greatest evidence to support that.

25      These documents, the updated documents, in connection with

91

1   the prior analysis, was provided to objecting parties in

2   advance of the January 29th deposition, and Your Honor has

3   heard the differences between the January 29th and the

4   February 1st documents being very minimal.

5       The Court heard extensive evidence and testimony from Mr.

6   Seery regarding the assumptions that went into the preparation

7   of the liquidation analysis and the differences of what

8   creditors are projected to receive under the plan as compared

9   to what they are projected to receive in a Chapter 7.

10      Such testimony also included a comparison between the

11  liquidation analysis that was filed with the plan in November,

12  the updated liquidation analysis filed on the -- or, provided

13  to parties on January 28th, and the last version, filed on

14  February 1st.

15      Mr. Seery testified that, on the revenue side, the

16  liquidation analysis was updated to include the HCLOF

17  interest, which was required as part of the settlement with

18  HarbourVest; the increase in value of certain assets,

19  including Trussway; revenue expected to be generated from

20  continued management of the CLOs; and increased recovery on

21  notes as a result of the acceleration of certain related

22  notes.

23      On the expense side, Mr. Seery testified regarding his

24  best estimate of the likely expenses to be incurred by a

25  Chapter 7 trustee -- by the Claimant Trust, including

1   personnel costs; professional costs, which increase because of

2   the litigious nature this case has become; and operating

3   expenses.

4       And lastly, on the claim side, Your Honor, Mr. Seery

5   testified that the claims numbers have been updated to include

6   the settlement from HarbourVest and initially the amount

7   approved to UBS pursuant to the 3018 order and then the

8   reduction at $50 million based upon the settlement announced.

9   And like the prior liquidation analysis, the current analysis

10  demonstrates that creditors will fare substantially better

11  under in Chapter -- under the plan than in Chapter 7.  In

12  fact, the projected recovery under the plan is 85 percent for

13  Class 7 creditors and 71.32 percent for Class 8 creditors, as

14  compared to 54.96 percent for all unsecured creditors in a

15  Chapter 7.

16      Mr. Seery also testified that expenses are expected to be

17  more under Chapter 11 than under Chapter 7, but he also

18  testified that the tens of millions of dollars in greater

19  revenue and asset recoveries under the plan will more than

20  offset the additional expenses.

21      As a result, the Court has more than sufficient

22  evidentiary basis to conclude that the Debtor has carried its

23  burden to prove that it meets the best interest of creditors

24  best.

25      But Mr. Dondero's counsel spent a lot of time crossing --

93

1  cross-examining Mr. Seery, in a vain attempt to demonstrate to

2  the Court that a Chapter 7 actually would be much better for

3  creditors.  And this argument has also been made by Dugaboy

4  and the Advisors and the Funds.

5      Before I address these arguments on its merits, Your

6  Honor, I just wanted to remind the Court of the Objectors --

7  these Objectors' interest in this case.  Mr. Dondero owns no

8  equity in the Debtor.  He owns a general partner.  Strand, in

9  turn, owns a quarter-percent -- a quarter of one percent of

10 the total equity in the Debtor.  And Mr. Dondero's claim, it's

11 only a claim for indemnification.  Dugaboy asserts two claims:

12 a frivolous administrative claim relating to the postpetition

13 management of a Multi-Strat, which, as an administrative

14 claim, if it's valid, would not even be affected by the best

15 interest of creditors test, because it would have to be paid

16 in full.  And he also asserts a claim that the Debtor's

17 subsidiary -- against the Debtor's subsidiary for which it

18 tries to pierce the corporate veil.

19     Just think about it.  Dugaboy, Mr. Dondero's entity, is

20 arguing that he should be able to pierce the corporate veil to

21 get at the entity that was his before the bankruptcy.

22     Dugaboy's only other interest in this case relates to a --

23 a one -- point eighteen and several-hundredths percent of the

24 equity interest of the Debtor, and that is out of the money.

25     And as I mentioned previously, Your Honor, Mr. Rukavina's

94

1    clients either didn't file any general unsecured claims or

2    filed them and withdrew them.  Their only claim is a disputed

3    administrative claim against the Debtor that was filed a week

4    ago and which, at the appropriate time, the Debtor will

5    demonstrate is without merit.

6         And I understand that, just today, NexPoint Advisors also

7    filed administrative claim.

8         So I'm not going to argue to Your Honor that these parties

9    do not have standing, although their standing is tenuous, at

10   best, to assert this argument.  The Court should keep their

11   relative interests in mind when evaluating the merits and the

12   good faith of this objection.

13        The principal objection, as I said, is that creditors will

14   do better in a Chapter 7.  Essentially, they argue that a

15   Chapter 7 trustee can liquidate the assets just as well as Mr.

16   Seery can and not require the cost structure that is included

17   in the Debtor's plan projections.  Yes, they argue that a

18   Chapter 7 will be more efficient.

19        Mr. Seery's testimony, the only testimony on the topic,

20   however, establishes that this preposterous proposition has no

21   basis in reality.  Mr. Seery testified that a Chapter 7

22   trustee's mandate would be to reduce Debtor's assets as fast

23   as possible, while he will monetize assets as and when

24   appropriate to maximize the value.

25        But even if you can assume that the Chapter 7 trustee

95

1    could get court authority in a Chapter 7 to operate, there are

2    several reasons Mr. Seery testified why a liquidation by a

3    Chapter 7 trustee would be far worse than the plan.

4         First, Your Honor, no matter how competent the Chapter 7

5    trustee is -- and Mr. Seery did not say he is more competent

6    than anyone else out there -- the lack of a learning curve

7    that Mr. Seery established through the 13 months in this case

8    puts Mr. Seery at such a major advantage compared to a Chapter

9    7 trustee.

10        Second, Mr. Seery questioned whether the Chapter 7 trustee

11   would be able to retain the Debtor's existing professionals,

12   even assuming they were willing to be retained.  I'm not sure

13   what's the Court's practice or the practice in the Northern

14   District, but in many districts around the country debtor's

15   counsel and professionals cannot be retained by Chapter 7

16   trustee, as general counsel, at least.

17        And I could just imagine, Your Honor, Mr. Dondero's

18   position if the Chapter 7 trustee actually sought to hire

19   Pachulski Stang and DSI.

20        Third, Your Honor, regardless of whether the Chapter 7

21   trustee obtained some operating authority, the market

22   perception will be that a Chapter 7 trustee will sell assets

23   for less value than would Mr. Seery as claimant Trustee.  Mr.

24   Seery testified to that.

25        The argument that the Objectors make that a Chapter 7

96

1  process, whereby the trustee would seek court approval of

2  assets, is better for value than a process overseen by the

3  Claimant Trust Board lacks any evidentiary basis and also is

4  contradicted by Mr. Seery's testimony.

5       In fact, Mr. Seery testified that the Chapter 7 process,

6  the public process of it, would very likely result in less

7  recovery than a sale conducted in the Claimant Trust.

8       And lastly, Mr. Seery testified that it's unlikely that

9  the ten or so valuable employees who Mr. Seery is planning to

10 heavily rely on to assist him with post-confirmation would

11 agree to a work for Chapter 7 trustee.  Your Honor is all too

12 familiar with the fights in the *Acis* case and Chapter 7

13 trustee, and it's just hard to believe that any of the

14 Highland employees would go work for the Chapter 7 trustee.

15      So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16 actually making this objection and advocating for a Chapter 7?

17 It's because they would expect to buy the Debtor's assets on

18 the cheap from a Chapter 7 trustee, exactly what they've been

19 trying to do in this case.

20      Your Honor, moving right now to Section 1129(a)(11), that

21 requires the debtor to demonstrate that the plan is feasible.

22 In other words, it's not likely to be followed by a further

23 liquidation or restructuring.  Under the Fifth Circuit law,

24 the debtor need only demonstrate that the plan will have a

25 reasonable probability of success to satisfy the feasibility

97

1    requirement, and the Debtor has easily met this standard.

2         As Mr. Seery testified, the Debtor's plan contemplates

3    continued operations through which time the assets will be

4    monetized for the benefit of creditors.  The plan contemplates

5    that Class 7 creditors will be paid off shortly after the

6    effective date.  Class 8 creditors are not guaranteed any

7    recovery but will receive pro rata distributions over a period

8    of time.  Class 2, Frontier secured claim, will be paid off

9    over time, and the projections demonstrate that it will -- the

10   Debtor will have money to do so.

11        Mr. Seery testified at length regarding the assumptions

12   that went into the preparation of the projections most

13   recently filed on February 1, and based on that testimony, the

14   Debtor has clearly demonstrated that the plan is feasible.

15        Your Honor, I think that brings us to Section 1129(b).  Of

16   course, again, Your Honor, if Your Honor has any other

17   questions with the sections I'm skipping over.  I believe

18   we've adequately covered them in the briefs and I don't think

19   there's any objection.

20        But as I mentioned before, we have three classes that have

21   voted to reject the plan.  Class 8 is the general unsecured

22   claims.  They voted to reject the plan.  Yes.  Even though,

23   based upon the ballot summary, 99 percent of the amount of

24   claims in that class voted to accept the plan, approximately

25   24 employees voted to reject the plan.  And accordingly, the

98

1    Debtor cannot satisfy the numerosity requirement of Section

2    1126(c).

3         I do want to briefly recount for Your Honor Mr. Seery's

4    testimony regarding the nature of the claims of the 24

5    employees who voted to reject the plan.  And I'm not doing

6    this to argue that the votes from these contingent creditors

7    are not valid or that the Debtor doesn't need to satisfy the

8    cram-down requirements.  The Debtor understands it needs to

9    demonstrate to the Court that Section 1129(b) is satisfied for

10   the Court to confirm the plan.

11        Rather, why I do this, Your Honor, is to provide the Court

12   with context about the nature and extent of the creditors in

13   this class as the Court determines whether the plan is, in

14   fact, fair and equitable and can be crammed down to a

15   dissenting vote.

16        Mr. Seery testified that these employees originally had

17   claims under the annual bonus plan and the deferred

18   compensation plan.  And as he testified, in order for claims

19   under each of those plans to vest -- I think he referred to

20   them as be-in-the-seat plans -- the employee was required to

21   remain employed as of that date.

22        Mr. Seery testified that the Debtor terminated the annual

23   bonus plan in the middle of January and replaced it with the

24   key employee retention plan that the Court previously

25   approved.

99

1        Accordingly, Mr. Seery testified that no employee who

2   voted to reject the plan anymore has a claim on the annual

3   bonus plan.  He also testified that, with respect to the

4   deferred compensation plan, people have contingent claims

5   under that plan and that no payments are due until May 20 --

6   2021.

7        As Mr. Seery testified, if the employees who would be

8   entitled to receive payments under the deferred compensation

9   plan do not agree to enter into a separation agreement that

10  was approved by the Court, they will be terminated before May

11  and there will no -- not longer be any deferred compensation

12  due.

13       Accordingly, while the 24 employees who voted to reject

14  the plan do technically have claims at this time they have

15  voted, Mr. Seery testified the claims will go away soon.

16       I do want to point out something that's obviously

17  painfully obvious at this point, that while Class 8 voted to

18  reject the plan, the Committee, the statutory fiduciary for

19  all unsecured creditors, supports the plan enthusiastically

20  and I believe it does so unanimously.

21       The other classes to reject the plan, Your Honor, are

22  Class 11, the A limited partnerships, and none of the holders

23  in Class B and C limited partnerships voted on the plan, so

24  cram-down is required over those classes as well.  So Your

25  Honor is able to confirm the plan pursuant to the cram-down

100

1   procedures under 1129(b) if the Court determines that the plan

2   is fair and equitable and does not discriminate unfairly

3   against the rejecting classes.

4        Let's first turn to the fair and equitable requirement.  A

5   plan is fair and equitable if it follows the absolute priority

6   rule, meaning that if a class does not receive payment in

7   full, no junior class will receive anything under the plan.

8   With respect to Class 8, no junior class -- junior class to

9   Class 8 will receive payment, and here is the key point,

10  unless Class 8 is paid in full, with appropriate interest.

11  NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12  that the plan does not satisfy the absolute priority rule

13  because Class 10 and Class Equity Interests have a contingent

14  right to receive property under the plan.

15       Your Honor, this argument misunderstands the absolute

16  priority rule.  Class 10 and Class Creditors will only receive

17  payment after distribution to 8 and 9, the unsecured claims

18  and the subordinated claims, are all paid in full, plus

19  interest.

20       And, in fact, Dugaboy, in its brief, to its credit, admits

21  that the argument is contrary to the Bankruptcy Court's

22  decision of Judge Gargotta in the Western District case of *In*

23  *re Introgen Therapeutics*.  There, the Court was faced with a

24  similar argument by a group of unsecured creditors who argued

25  that the debtor's plan violated the absolute priority rule

1   because equity was retaining a contingent interest that would

2   only be payable if general unsecured claims were paid in full.

3      In rejecting the argument, the Court reasoned, and I

4   quote, "The only way Class 4 will receive anything is if Class

5   3, in fact, gets paid in full, in satisfaction of

6   1129(b)(2)(B)(i)," meaning that the absolute priority rule

7   would not be an issue.  If Class 3 is not paid in full, Class

8   4's property interest is not -- is just -- is not just

9   valueless, it just doesn't exist.

10      Your Honor, this is precisely the situation in this case.

11   Equity interests will only receive a recovery if Class 8 and 9

12   are paid in full.

13      But Dugaboy attempts to escape the logical reading of the

14   absolute priority rule by claiming that *Introgen* was wrongly

15   decided and goes against the Supreme Court's decision in

16   *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17   Court decided that property given to a junior class without

18   paying a senior class in full is property, even if it's

19   worthless.

20      But Dugaboy misses the point.  Like the debtor in the

21   *Introgen*, the Debtor here is not arguing that the property  --

22   the absolute priority rule is not violated because the

23   contingent trust is worthless.  Rather, the argument is that

24   the absolute priority rule is not violated; it's, in order to

25   receive anything on account of the junior -- of the equity,

102

1    the senior creditors have to be paid a hundred percent plus

2    interest.

3        In fact, Your Honor, if the plan just didn't give any

4    recovery to the equity Class 10 and 11, I bet you Dugaboy and

5    Mr. Dondero would be arguing that it violated the absolute

6    priority rule because senior classes, unsecured creditors,

7    could potentially receive more than a hundred percent of their

8    interest.  And there's a case in the Southern District of

9    Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10   plan to be confirmed, its stockholders eliminated, creditors

11   must not receive more than payment in full.

12       Excess proceeds, Your Honor, if any, have to go somewhere.

13   They can't go to creditors, so they have to go to equity.  And

14   the absolute priority rule is not violated.

15       And how is Dugaboy harmed?  They say they may want to buy

16   the contingent interests, and the lack of a marketing effort

17   violates the *LaSalle* opinion as well.  And who holds the Class

18   B and Class C partnership interests that come before Dugaboy

19   that Dugaboy is concerned may have this opportunity rather

20   than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21   like Dugaboy, that's owned and controlled by Mr. Dondero.

22       Accordingly, the argument that the plan violates the

23   absolute priority rule is actually a frivolous argument.

24       Turning now to unfair discrimination, Your Honor, Dugaboy

25   argued in its brief Monday that because the projected

103

 1   distribution to unsecured creditors has gone down in the

 2   recent plan projections, the discrepancy between Class 7 and

 3   Class 8 is so large that that amounts to unfair

 4   discrimination.

 5       Again, the Court should first ask why is Dugaboy even the

 6   right party to be making the objection.  Its claim against the

 7   Debtor to pierce the corporate veil, as I mentioned, is

 8   frivolous.  It's subject to objection.  It didn't even bother

 9   to have the claim temporarily allowed for voting purposes, as

10   did other creditors who thought they had a valid claim.  Yet

11   this is another example of Mr. Dondero, through Dugaboy,

12   trying to throw as many roadblocks in front of confirmation as

13   he can.

14       But this argument, like the other ones, fails as well.

15   Class 8 contains the general unsecured creditor claims,

16   predominately litigation claims that have been pending against

17   the Debtor for years.  The Debtor was justified in treating

18   the other unsecured creditors differently.

19       Class 6 consists of the PTO claims in excess of the cap,

20   which are of different quality and nature than the other

21   claims.

22       Class 7 consists of the convenience class.  And it's

23   appropriate to bribe convenience class creditors with a

24   discount option for smaller claims to be cashed out for

25   administrative convenience.

104

1     Mr. Seery testified that when the plan was formulated, the
2   concept was to separately classify liquidated claims in small
3   amounts in Class 7 and unliquidated claims in Class 8.  Mr.
4   Seery also testified that there's a valid business
5   justification to treat the -- hold business 7 -- Class 7
6   claims differently.  These creditors had a reasonable
7   expectation of getting paid promptly, as compared to
8   litigation creditors, who would expect to be paid over time.
9     As the Court is aware, the litigation claims in Class 8
10  involve litigation that has been pending for several years in
11  the case of Acis, Daugherty, Redeemer, and more than a decade
12  in UBS.
13     And most importantly, as Mr. Seery testified, the
14  Committee and the Debtor had significant negotiation regarding
15  the classification and treatment provisions of the plan for
16  Class 7.
17     The Committee does have one constituent who is a Class 7
18  creditor.  However, the other three creditors are all in Class
19  8 and hold claims in excess of $200 million and supported the
20  separate classification and the different treatment.
21     So, Your Honor, discrimination, different treatment among
22  Class 7 and 8 is appropriate, and the different treatment is
23  not unfair.  In the February 1 projections, the Class 8
24  creditors are estimated to receive 71.32 percent of their
25  claims, but that's just an estimate.  As Mr. Seery testified,

105

1   the number can go up based upon the value he can generate from

2   the assets and, importantly, from litigation claims.  Class 8

3   creditors could up end up receiving a hundred percent on

4   account of their claims.  Class 7 creditors are fixed at 85

5   percent.

6        Giving Class 8 creditors the opportunity to roll the dice

7   and potentially get more or less than the 85 percent offered

8   to Class 7 is not at all unfair.

9        For these reasons, Your Honor, the Court has the ability

10  and should confirm the plan pursuant to the cram-down

11  provisions of 1129(b).

12       Your Honor, I'm now going to switch from the statutory

13  requirements to all the issues raised by the release,

14  injunction, and exculpation provisions.

15       I'd just like to take a brief sip of water.

16       Dugaboy -- I will first deal with the Debtor release

17  provided in Article 9(f) of the plan, which we claim is

18  appropriate.  Dugaboy and the U.S. Trustee have objected to

19  the release contained in Article 9(f).  Dugaboy objects

20  because it believes that the Debtor release releases claims

21  that the Claimant Trust or Litigation Trust have that have not

22  yet arisen, and the U.S. Trustee objects because it believes

23  that the release is a third-party release.

24       These objections have no merit, and they should be

25  overruled.

106

1      I would like to ask Ms. Canty to put up a demonstrative

2   which contains the provision Article 9(f) of the plan.

3      Your Honor, as set forth in this Article 9(f), only the

4   Debtor is granting any release.  While that --

5          THE COURT:  And for the record, it's 9(d)?  9(d),

6   right?

7          MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8          THE COURT:  Yes.  Okay.

9          MR. POMERANTZ:  Sorry about that.

10         THE COURT:  Uh-huh.

11         MR. POMERANTZ:  While the release is broad, it does

12  not purport to release the claims of any third party.  The

13  Claimant Trust and the Litigation Trust are only included in

14  the release as successors of the Debtor.  The release is

15  specifically only for claims that the Debtor or the estate

16  would have been legally entitled to assert in their own right.

17     Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18  a plan may provide for the settlement or adjustment of any

19  claims or interests belonging to the debtor or the estate, and

20  that's exactly what the Debtor release provides.

21     Accordingly, Dugaboy is wrong that the release effects a

22  release of claims that the Claimant Trust or the Litigation

23  Sub-Trust have that won't arise until after the effective

24  date.  And the U.S. Trustee is simply wrong; there's no third-

25  party release aspect under the release.