PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---------------------------------------------------------------------

HIGHLAND CAPITAL MANAGEMENT, L.P.,

                    Plaintiff,

vs.

JAMES DONDERO, NANCY DONDERO, AND THE
DUGABOY INVESTMENT TRUST,

                    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

Adv. Proc. No. 21-03003-sgj

Case No. 3:21-cv-01010-E

---------------------------------------------------------------------

|  |  |  |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adv. Proc. No. 21-3005-sgj |
| vs. | § § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | Case No. 3:21-cv-00880-C |
| Defendants. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adv. Proc. No. 21-3006-sgj |
| vs. | § § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | Case No. 3:21-cv-01378-N |
| Defendants. | § § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § § | Adv. Proc. No. 21-3007-sgj |
| vs. | § § | |
| HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | Case No. 3:21-cv-01379-X |
| Defendants. | § § | |

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

I.    PRELIMINARY STATEMENT ................................................................ 1

    A.    The Alleged Agreement Defendants admit to Plaintiff's Prima Facie Case ......... 3

    B.    Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' Defense based on the Alleged Agreements .................. 4

            1.    No Reasonable Jury Could find that the Alleged Agreements Actually Existed ........................................................ 5

                 (i)    The Undisputed Facts in Support of Summary Judgment ................................................................ 5

                 (ii)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Nancy Dondero was not competent to enter into the Alleged Agreements (Compare Motion ¶¶ 96-97 with Opposition ¶ 69-79). ........................................................ 8

                 (iii)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Highland did not have a "standard practice" of forgiving loans (Compare Motion ¶¶ 103-104 with Opposition ¶ 7)........ 10

                 (iv)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that the Alleged Agreements were "secret" (Compare Motion ¶ 98 with Opposition ¶ 11-13, 45). ......................................... 11

                 (v)    The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Mr. Dondero failed to specifically identify the Notes at issue (Compare Motion ¶ 93 with Opposition ¶¶ 14-15).......................... 11

                 (vi)    The Alleged Agreement Defendants' Contentions of "waiver" and that they only made "periodic interest payments" are false ...................................................... 12

            2.    The Alleged Agreements are not support by Consideration........ 14

    C.    Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' defense that Plaintiff Had an Obligation to Make the Payments Due under the SSAs without instruction or authority .................. 16

    D.    Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' pre-payment defense.................................... 18

CONCLUSION.................................................................................... 20

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AGAINST THE ALLEGED AGREEMENT DEFENDANTS</u>[1]**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the

above-captioned adversary proceedings ("<u>Highland</u>" or "<u>Plaintiff</u>"), hereby files its *Reply*

*Memorandum of Law in Further Support of its Motion for Partial Summary Judgment Against*

*the Alleged Agreement Defendants* (the "<u>Reply</u>") in response to *Defendants' Memorandum of*

*Law in Response to Plaintiff's Motion for Partial Summary Judgment* (the "<u>Opposition</u>")[2] filed

by defendants James Dondero, NexPoint Advisors, L.P. ("<u>NexPoint</u>"), Highland Capital

Management Services, Inc. ("<u>HCMS</u>"), and HCRE Partners, LLC ("<u>HCRE</u>") (collectively, the

"<u>Alleged Agreement Defendants</u>").  In further support of its Motion, Plaintiff states as follows:

## I.     <u>PRELIMINARY STATEMENT</u>

1.     In their Opposition, the Alleged Agreement Defendants (i) ignore substantial

portions of the undisputed evidence supporting the Motion, (ii) unilaterally deem other

material portions "irrelevant" solely because they cannot be disputed, and (iii) otherwise

attempt to fabricate "disputes" on the basis of uncorroborated, self-serving declarations and

snippets of testimony taken out of context.  Applying long-standing Fifth Circuit precedent,

the Opposition is so "weak [and] tenuous on [the] essential fact[s]" and Plaintiff's undisputed,

admissible evidence "is so overwhelming," that the Motion should be granted.

2.     The Opposition is noteworthy for at least three other reasons that cast

considerable doubt on the veracity of the defenses being asserted and that evince utter

disregard for this process.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2] *See* Adv. Pro. No. 21-03003 [Docket No. 154], Adv. Pro. No. 21-03005 [Docket No. 156], Adv. Pro. No. 21-03006 [Docket No. 157], and Adv. Pro. No. 21-03007 [Docket No. 152].

3.      ***First***, Mr. Dondero is so desperate to avoid repaying the money that he and his corporate affiliates indisputably borrowed from Highland that he and his sister have (if their testimony were to be believed) admitted to a litany of bankruptcy violations.  Specifically, they swear that they secretly entered into one of the Alleged Agreements (a) after the Petition Date, (b) while Mr. Dondero controlled the Debtor, (c) without seeking (let alone obtaining) this Court's permission, and (d) without disclosing the secret, unwritten Alleged Agreement to the Court or anyone else until after the commencement of litigation and confirmation of Highland's Plan.[3]  This tale is as brazen as it is unsurprising and unbelievable given Mr. Dondero's conduct throughout this case.  Either the Alleged Agreements are a complete fiction (as Plaintiff believes the admissible evidence conclusively proves) or Mr. Dondero and his sister have admitted to engaging in bankruptcy fraud by purportedly entering into a secret, post-petition agreement intended to divest the Debtor of millions of dollars in assets.

4.      ***Second***, in another audacious act intended to create chaos, the Corporate Obligors defiantly ignored multiple court Orders and did exactly what this Court told them they could not:  (a) offer expert opinions concerning Plaintiff's alleged duties under a written (and allegedly unwritten) Shared Services Agreement, and (b) press an affirmative defense that the Court prohibited after an evidentiary hearing.  Defendants' obstinate decision to ignore this Court's Orders is the subject of a separate motion being filed simultaneously with this Reply.[4]

---

[3] *See Declaration of James Dondero* ¶ 26, identified as Exhibit 1 to the *Appendix In Support of Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment* (the "Defendants' Appendix"), Adv. Pro. No. 21-03003, Docket No. 155 (citations to Defendant's Appendix are noted as "Def. Ex. __ at __, Def. Appx. at __"); and *Declaration of Nancy M. Dondero* ¶ 8, identified as Exhibit 2 in Defendants' Appendix.

[4] *See Plaintiff's Omnibus Motion (A) to Strike Certain Evidence and Arguments, (B) for Sanctions and (C) for an Order of Contempt* (the "Sanctions Motion") being filed simultaneously with this Reply.

5.     ***Finally***, the Opposition is noteworthy for its omissions.  Defendants offer ***no*** probative documents of any kind nor have they submitted ***any*** declarations in support of any affirmative defense from any disinterested person.  Frank Waterhouse -- Mr. Dondero's hand-picked Chief Financial Officer who simultaneously served (and continues to serve) as an officer of HCMFA and NexPoint and who remains responsible for accounting and finance -- is nowhere to be found.  In the end, the limited and self-serving evidence relied upon by the Alleged Agreement Defendants, including a handful of deposition citations, does nothing to create genuine disputes of material facts.

6.     Taken as a whole, the admissible evidence shows that the Alleged Agreements are fictitious.  Even if they weren't, they cannot be enforced due to a complete lack of consideration.  The "Shared Services Agreement" defense also fails (a) as a matter of law because NexPoint's Shared Services Agreement did not authorize (let alone require) Highland to make payments against the Term Notes without direction or instruction from the applicable makers, and (b) as a matter of fact because there is no dispute that the applicable makers ***never*** provided any such direction or instruction.  Finally, the "Pre-Payment" defense fails (i) as a matter of law based on the unambiguous provisions of the Term Notes, and (ii) as a matter of fact based on the undisputed documentary evidence and the facts set forth in Mr. Klos' Declarations.

7.     For the reasons set forth in the Motion, and those set forth herein, the Motion should be granted in its entirety.

**A.     <u>The Alleged Agreement Defendants admit to Plaintiff's Prima Facie Case</u>**

8.     In its Motion, Plaintiff cited to admissible evidence establishing (i) the existence of the Notes in question, (ii) that the Alleged Agreement Defendants signed each applicable Note, (iii) that Plaintiff is the legal owner and holder of each Note, and (iv) that a

certain balance is currently due and owing on each Note.  Plaintiff also established that, except for the date, the amount, the maker, and the interest rate, each of the Demand Notes and each of the Term Notes is identical.  Motion ¶¶ 19-37 (citing evidence).

9.      The Alleged Agreement Defendants do not dispute *any* of the foregoing facts. Indeed, Mr. Dondero has admitted that each of the Alleged Agreement Defendants borrowed funds from Highland in exchange for each of the applicable Notes.  J. Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12.[5]

10.     On the basis of the foregoing, the Court should recommend and report that Plaintiff has proven its prima facie case against the Alleged Agreement Defendants.

**B.      Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' Defense based on the Alleged Agreements**

11.     In its Motion, Plaintiff offered a mountain of admissible evidence in support of its contentions that (a) no reasonable jury could find that the Alleged Agreements actually existed, and (b) even if one could, the Alleged Agreements cannot be enforced as a matter of law due to a lack of consideration.  Motion ¶¶ 39-53, 66-104 (citing evidence).

12.     In response, the Alleged Agreement Defendants fail to dispute any of the key facts cited by Plaintiff and instead attempt to create "disputed facts" largely by relying on the self-serving, unsupportable declarations of Mr. Dondero and his sister.  Those efforts are for naught.

---

[5] Mr. Dondero contends that each Note is an unsecured "soft note" that was not subject to a personal guaranty.  *See generally* J. Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12.  Whatever a "soft note" may be, these facts (even if credited) do nothing to void or mitigate the Alleged Agreement Defendants' obligations under their respective Notes.

1.   <u>**No Reasonable Jury Could find that the Alleged Agreements Actually Existed**</u>

13.   Notwithstanding Mr. and Ms. Dondero's protests to the contrary, no reasonable jury could find that the Alleged Agreements actually exist or ever existed.

14.   Context is critical.   According to Mr. Dondero's expert, Alan Johnson, Highland paid Mr. Dondero approximately $1.7 million during the three-year period 2017-19 as Highland was hurtling towards bankruptcy.  Def. Ex. G at 19, Def. Appx. at 255.  During that same period, the Alleged Agreement Defendants tendered to Highland promissory notes with an aggregate face amount of more than $70 million in exchange for loans of equal value, all of which are purportedly subject to the Alleged Agreements entered into for the supposed purpose of motivating and potentially compensating Highland's allegedly underpaid executive, Mr. Dondero.  Dondero Dec. ¶¶ 5-18, Def. Appx. at 4-12; N. Dondero Dec. ¶ 10, Def. Appx. at 81-83.

(i)   <u>The Undisputed Facts in Support of Summary Judgment</u>

15.   Thus, the face amount of the Notes subject to the Alleged Agreements was more than ***40 times*** Mr. Dondero's direct cash compensation from Highland.  Given the enormity of Mr. Dondero's personal interest in the Alleged Agreements, a jury would reasonably expect Mr. Dondero to have (i) contemporaneously taken steps to make sure those Alleged Agreements were documented and disclosed to remove any impediment to enforcement, and (ii) immediately and accurately recited the relevant facts if enforcement was ever questioned.[6]

---

[6] Ms. Dondero and Dugaboy should have also been motivated to memorialize and disclose the terms and existence of the Alleged Agreements in order to protect themselves from second-guessing or claims of breach of fiduciary duty; to ensure that all stakeholders were aware of Highland's alleged obligations; and to increase the likelihood that Ms. Dondero's brother would reap the benefits of the alleged bargain.  But there is no dispute that Ms. Dondero ***never*** put anything in writing and ***never*** told a soul about the Alleged Agreements.  Ex. 25 (Responses to RFAs 1-6, 9-16,

16.    Yet, the evidence conclusively proves that the ***exact opposite*** occurred such

that, except as described below, the Alleged Agreement Defendants are forced to ignore or

deem "irrelevant" the following undisputed facts that plainly constitute admissions:

- All of the Notes (including the HCMFA Notes) were fully described in Highland's audited financial statements without discount or reference to the Alleged Agreements or any other defense, and those financial statements relied on Mr. Dondero's representation letters (Motion ¶¶ 39-55 (citing evidence));

- Highland carried all of the Notes (including the HCMFA Notes) as assets on its balance sheet without discount or reference to the Alleged Agreements or any other defense. (*Id.* ¶¶67, 70-72 (citing evidence));

- NexPoint and HCMFA informed the Retail Board in October 2020 that they were obligated to pay Highland under their respective Notes without discount or reference to the Alleged Agreements or any other defense.  (*Id.* ¶¶ 56-65 (citing evidence));[7]

- Highland listed the Notes (including the HCMFA Notes) in every one of its Schedules and MORs filed with the Bankruptcy Court without discount or reference to the Alleged Agreements or any other defense. (*Id.* ¶¶ 66-72 (citing evidence));

- None of the Alleged Agreement Defendants objected to the Debtor's projected recovery on the Notes even though the Notes were described as substantial sources of recovery for creditors, and Mr. Dondero and his affiliated companies otherwise lodged myriad objections to the Plan. (*Id.* ¶¶ 73-78 (citing evidence));

- Even though Plaintiff had already commenced the Adversary Proceedings, the Alleged Agreement Defendants remained silent about the Alleged Agreements and all other defenses during the confirmation hearing, despite the fact that Mr. Dondero's counsel cross-examined

---

responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); Motion ¶ 99 (citing evidence).

[7] Notably, on September 21, 2020, a month before the Advisors responded to the Retail Board (Ex. 59, Appx. 885), Plaintiff filed its *Disclosure Statement for the First Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1080] (the "Disclosure Statement").  The Disclosure Statement provided for the anticipated Reorganized Debtor to purse an asset monetization plan. Docket No. 1080 at 7.  Thus, if approved, and the Alleged Agreements actually existed, Mr. Dondero stood to gain tens of millions of dollars because the assets were certain to be sold by a third-party, one of the so-called "conditions subsequent."  A reasonable jury would expect Mr. Dondero and NexPoint to have informed the Retail Board that the obligations under the NexPoint Term Note were likely to be forgiven pursuant to the Alleged Agreements.

Mr. Seery about the Notes and offered arguments concerning them. (*Id*.);

- As described in detail below, Mr. Dondero, HCMS, and NexPoint paid nearly $40,000,000 to Highland from 2017-2019 on account of obligations due under promissory notes, something that would never happen if the Alleged Agreements actually existed;

- Even though they are all indisputably controlled by Mr. Dondero, HCMS, HCRE, and NexPoint all failed to disclose or rely upon the Alleged Agreements in their Original Answers. (*Id.* ¶ 81 (citing evidence));

- In his Original Answer, Mr. Dondero asserted that Plaintiff had already agreed that it "would not collect on the Notes" rather than assert that the Alleged Agreements were subject to "conditions subsequent." (*Id*.);

- After amending his Original Answer to adopt the "conditions subsequent" provision of the Alleged Agreements, Mr. Dondero failed to identify his sister as a person "likely" to have discoverable information even though he named fifteen (15) other people. (*Id.* ¶¶ 82-83 (citing evidence));

- Mr. Dondero initially swore that *he* entered into the Alleged Agreements on behalf of Highland, not Nancy. (*Id.* ¶¶ 84-85 (citing evidence));

- Mr. Dondero failed to initially identify his sister as someone he believed had "actual knowledge of each [Alleged] Agreement." (*Id.* ¶ 86 (citing evidence));

- Nancy Dondero failed to make any inquiry into any fact relevant to the Alleged Agreements, and simply accepted the few "facts" her brother fed her without question. (*Id.* ¶96 (citing evidence); N. Dondero Dec. ¶¶ 4-5, 9, Def. Appx. at 80-81, 83).

- With two legally irrelevant exceptions addressed below, Mr. and Ms. Dondero failed to disclose the terms or existence of the Alleged Agreements to *anyone*. (Motion ¶ 98 (citing evidence)).

- Mr. and Ms. Dondero failed to create *any* document, or even send a confirming e-mail, reflecting the terms or existence of the Alleged Agreements. (*Id.* ¶ 99 (citing evidence)); and

- Ms. Dondero made *no* attempt to negotiate any aspect of the Alleged Agreements with Mr. Dondero. (*Id.* ¶ 102 (citing evidence)).

17.     The Alleged Agreement Defendants do not (and cannot) contest any of the foregoing facts, every one of which was (i) directly contrary to Mr. Dondero's self-interest, and (ii) within Mr. Dondero's control to alter.  Instead, the Alleged Agreement Defendants either ignore the foregoing facts or deem them "irrelevant" on the ground that Plaintiff did not cite to any "legal authority" that any of them are dispositive or that the Alleged Agreement Defendants were required to take, or refrain from taking, any particular action.

18.     Predictably, the Alleged Agreement Defendants miss the point.  Viewed in isolation, none of the foregoing undisputed facts singularly proves that the Alleged Agreements are a fiction (although many, individually, come close).  Yet, when viewed together, there is only one reasonable conclusion: the Alleged Agreement Defendants will never be able to carry their burden of persuading a reasonable jury that the Alleged Agreements actually exist, particularly given the enormous stakes for Mr. Dondero, and the fact that the only evidence supporting their story is their own self-serving statements.

19.     While the foregoing undisputed admissions are more than enough to support Plaintiff's motion for summary judgment, the Alleged Agreement Defendants' attempts to fabricate genuine disputes of material fact fail.

(ii)     The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Nancy Dondero was not competent to enter into the Alleged Agreements (*Compare* Motion ¶¶ 96-97 *with* Opposition ¶ 69-79).

20.     Relying on (a) Ms. Dondero's extensive admissions proving that she had neither the skillset nor the experience to enter into the Alleged Agreements without obtaining professional advice, and did ***nothing*** to educate herself about ***any*** issue concerning the Alleged Agreements, and (b) the expert testimony of Mr. Johnson confirming why her failure

to do so is fatal, Plaintiff established that Ms. Dondero was not competent to enter into the Alleged Agreements.  Motion ¶¶ 96-97 (citing evidence).

21.    In a vain attempt to create a "disputed fact," the Alleged Agreement Defendants rely *exclusively* on Ms. Dondero's conclusory and thread-bare Declaration.  In her Declaration, Ms. Dondero purports to disclose *everything* her brother told her (N. Dondero Dec. ¶ 4, Def. Appx. at 80-81), and *everything* she otherwise knew (N. Dondero Dec. ¶¶ 9-10, Def. Appx. at 83-84).  No reasonable jury could ever consider those disclosures and conclude that Ms. Dondero was sufficiently informed to enter into Alleged Agreements worth over $70 million or that there is any basis for her self-serving and conclusory statements that she had "all of the facts and information [she] considered necessary, reasonable, and appropriate" to enter into the Alleged Agreements and that she "appreciated the effect of what [she] was doing."  (N. Dondero Dec. ¶¶ 11-12, Def. Appx. at 84).[8]

22.    Ms. Dondero's Declaration is notable for one other thing:  she does not dispute a single fact set forth in paragraph 96 of the Motion, only Plaintiff's reasonable conclusions based on those facts.  The Alleged Agreement Defendants have failed to create a genuine dispute of material fact and will never be able to convince a reasonable jury that anyone in Ms. Dondero's position could have or would have entered into a series of agreements worth over $70 million under the circumstances.

---

[8] As described in detail below, if Ms. Dondero had done *any* due diligence, she would have learned, among other things, that (a) each of the three portfolio companies was already "*in the money*" when she supposedly entered into the Alleged Agreements thereby eliminating the supposed "motivation" that constituted the "consideration" Highland allegedly received; (b) Highland did not have a "standard practice" of forgiving loans; had not forgiven any loan in almost a decade; had never forgiven an affiliate loan; and had never forgiven a loan of more than $500,000; (c) Mr. Dondero earned millions of dollars per year from the Highland enterprise even though only a portion was allocated to Highland; and (d) had she consulted a compensation expert such as Mr. Johnson, Mr. Dondero was allegedly "undercompensated" by only $10-20 million for the seven-year period 2013-2019 (Def. Ex. G at 19, Def. Appx. at 255) rendering *completely gratuitous* a loan forgiveness program worth (at the time of entry) over $70 million.  This is in addition to the indisputable fact that Ms. Dondero simply did not have the authority to bind Highland.

      (iii)    <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Highland did not have a "standard practice" of forgiving loans (*Compare* Motion ¶¶ 103-104 *with* Opposition ¶ 7).</u>

23.    In its Motion, Plaintiff cited to audited financial statements and the undisputed testimony of Mr. Dondero and his expert, Mr. Johnson, to establish that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven a loan to Mr. Dondero since at least 2008, and (d) Highland has never forgiven in whole or in part any loan that it extended to any affiliate.  Motion ¶¶ 103-04 (citing evidence).

24.    The Alleged Agreement Defendants purport to contest these facts, relying on (a) Mr. Dondero's uncorroborated assertions (Opposition ¶ 7; J. Dondero Dec. ¶ 23, Def. Appx. at 13-14); and (b) snippets of transcripts from the depositions of David Klos and Kristin Hendrix.  Notably, the Alleged Agreement Defendants do not cite to ***any*** documents to support their contentions and the transcript citations actually support Plaintiff's assertions.[9]  In sum, the Alleged Agreement Defendants have failed to come forward with any admissible evidence to create a genuine dispute of a material fact.[10]

---

[9] The cited testimony of Ms. Hendrix and Mr. Klos (Opposition ¶ 7, n. 11) is consistent with Plaintiff's Motion on this point; indeed, Plaintiff urges the Court to review that testimony together with other portions of their testimony that the Alleged Agreement Defendants ignore.  Ex. 194 (Hendrix) at 133:5-23, Appx. 3160 (to Ms. Hendrix's knowledge going back fifteen years, Highland has **never** forgiven an affiliate loan; and any forgiven loan was ***required*** to be disclosed in HCMLP's audited financial statements); Ex. 195 (Klos) at 122:18-123:24, Appx. 3212 (to Mr. Klos' knowledge, Highland has **never** forgiven an affiliate loan; **no** loan has been forgiven for at least seven (7) years; and **no** loan was forgiven for more than $500,000).  *See also* Ex. 98 (Dondero) at 423:9-14, Appx. 1776 (Mr. Dondero could not identify a single intercompany loan that was ever forgiven as part of compensation).  The Court can also note from its own prior orders that Highland did not forgive the loan of Mr. Okada that was satisfied post-petition.

[10] The Alleged Agreement Defendants contend that Plaintiff has "recognize[ed]" or "conceded" that HCMLP "has forgiven loans to Jim Dondero in the past."  Opposition ¶¶ 7, 47.  Sadly, this is another fabrication.  In the quoted language, Plaintiff obviously referred to the year 2008 as the starting point because it only used audited financial statements in its examination of Mr. Johnson going back that far.  *See* Ex. 101 at 119:14-189:21, Appx. 1988-2005.  Indeed, even Mr. Dondero does not contend that he ever received a loan from Highland that was forgiven in whole or in part.

      (iv)    <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that the Alleged Agreements were "secret" (*Compare* Motion ¶ 98 *with* Opposition ¶ 11-13, 45).</u>

25.      With two irrelevant "exceptions," Defendants do not dispute that neither Mr. Dondero nor his sister nor Dugaboy ever told ***anyone*** about the existence or terms of the Alleged Agreements. *Compare* Motion ¶ 98 *with* Opposition ¶¶ 11, 45.

26.      The two "exceptions" are irrelevant because they are vague, self-serving statements insufficient to create a genuine dispute of material fact. *See* Def. Ex. 1-D, Def. Appx. at 74 (letter sent ***after*** the commencement of litigation that expressed Mr. Dondero's "views" but omitted the words "agreement," "forgiveness," "contingency," "conditions subsequent," "Nancy," and "Dugaboy"); Opposition ¶11, n.28 (even accepting Mr. Dondero's statements as true, Mr. Dondero spoke to Mr. Waterhouse only in the context of settlement discussions and failed to say "agreement," "forgiveness," "contingency," "conditions subsequent," "Nancy," or "Dugaboy").[11]

      (v)    <u>The Alleged Agreement Defendants purport to contest Plaintiff's assertion that Mr. Dondero failed to specifically identify the Notes at issue (*Compare* Motion ¶ 93 *with* Opposition ¶¶ 14-15).</u>

27.      In its Motion, Plaintiff cited to evidence proving that Mr. Dondero never identified the Notes that were subject to each Alleged Agreement during his discussions with his sister. Mr. Dondero's attempt to "correct the record" with his self-serving testimony should be rejected. *Compare* Ex. 99 at 79:6-81:23, Appx. 1832 *with* Opposition ¶¶ 14-15. The relevant question and answer are unambiguous:

Q:     Mr. Dondero, during your discussions with the Dugaboy Trustee, did you identify the Promissory Notes that were going to be the subject of each Agreement?

---

[11] Given Mr. Dondero's own words, his assertion that he "did not discuss every detail of the Agreements" with Mr. Waterhouse is (to be quite charitable) an extraordinary understatement; he admittedly did not discuss ***any*** detail of the Alleged Agreements with him. *See* Ex. 99 at 167:10-168:3, Appx. 1854; Dondero Dec. ¶ 28, Def. Appx. at 15.

MS. DEITSCH-PEREZ: Object to form.

A:      No, not that I recall.

Ex. 99 at 79:6-12, Appx. 1832.

28.     Indeed, under continued questioning, Mr. Dondero ***never*** testified that he identified the Notes subject to the Alleged Agreements. *Id*. at 80:8-17, Appx. 1832 ("She was aware that they were notes due to Highland from a variety of entities."), 81:11-23, Appx. 1832 ("I can't sit here as I remember – as I sit here today and remember whether or not I specifically identified HCRE or not, you know; but she knew they were related entities.").

29.     Mr. Dondero's testimony speaks for itself.   His inability to provide unequivocal testimony on this issue is fatal given the undisputed facts that (i) Nancy Dondero never saw any Note signed by her brother or on behalf of an affiliate, (ii) no writing exists memorializing the terms of the Alleged Agreements, and (iii) no one contemporaneously created a list of the Notes subject to the Alleged Agreements. *See* Motion ¶¶ 96 (fourth bullet point), 99 (citing evidence).

(vi)    The Alleged Agreement Defendants' Contentions of "waiver" and that they only made "periodic interest payments" are false

30.     Mr. Dondero's assertions that Highland "waived" its right to collect on the Notes and that he only "intended to make periodic interest payments … until forgiveness actually occurred" is, once again, demonstrably false. *See* J. Dondero Dec. ¶ 31, Def. Appx. at 16.  Between December 2017 and December 2019 (when Mr. Dondero supposedly entered into the Alleged Agreements), he and NexPoint and HCMS paid Highland nearly $40,000,000 on account of certain of the Notes at issue and other notes that Mr. Dondero tendered to Highland in exchange for loans:

| Borrower | Date | Amount | Exhibit |
|----------|------|--------|---------|

| | | | |
|---|---|---|---|
| HCMS | 03/05/19 | $1,015,000 | 120 |
| HCMS | 08/09/19 | $550,000 | 121 |
| HCMS | 08/21/19 | $5,600,000 | 121 |
| HCMS | 12/30/19 | $65,360 | 122 |
| NexPoint | 03/29/19 | $725,000 | 120 |
| NexPoint | 04/16/19 | $1,300,000 | 117 |
| NexPoint | 06/04/19 | $300,000 | 123 |
| NexPoint | 06/19/19 | $2,100,000 | 118 |
| NexPoint | 07/09/19 | $630,000 | 119 |
| NexPoint | 08/13/19 | $1,300,000 | 121 |
| NexPoint | 12/09/19 | $1,518,575 | 122 |
| NexPoint | 12/30/19 | $530,112 | 122 |
| Dondero | 12/08/17 | $677,501 | 106 |
| Dondero | 12/18/18 | $2,000,000 | 107 |
| Dondero | 12/19/19 | $782,623 | 107 |
| Dondero | 02/14/19 | $3,000,000 | 108 |
| Dondero | 03/13/19 | $5,000,000 | 109 |
| Dondero | 05/02/19 | $2,400,000 | 110 |
| Dondero | 05/03/19 | $4,400,000 | 110 |
| Dondero | 05/07/19 | $600,000 | 110 |
| Dondero | 05/23/19 | $1,500,000 | 110 |
| Dondero | 06/17/19 | $3,000,000 | 111 |
| Dondero | 12/23/19 | $783,012 | 112 |
| | | **$39,777,183** | |

*See also* Ex. 38, Appx. 798, Ex. 73, Appx. 1337.

31.     These payments (a) prove that the Alleged Agreements are fictitious because they cannot be reconciled with Mr. Dondero's claim that he only intended to make "periodic interest payments" (which themselves were not required under the Demand Notes) or the existence of the Alleged Agreements, (b) show that Mr. Dondero actually paid off in full two other Notes (making even more important Mr. Dondero's failure to identify the Notes to his sister or to recall the Notes subject to each Alleged Agreement), and (c) the Court cannot credit any "course of dealing" defense because Mr. Dondero clearly used Highland and its related entities as piggybanks, shifting money from one pocket to another as he wished prior to the Petition Date.

32.     All of that changed with Highland's bankruptcy filing.  Mr. Dondero still apparently has not come to grips with the fact that when he caused Highland to file, he lost control of Highland, others assumed responsibility for its operations, and business could no longer be carried on "as usual" with Mr. Dondero's personal interests carrying the day.

**2.     <u>The Alleged Agreements are not support by Consideration</u>**

33.     According to the Alleged Agreement Defendants, all of the Notes were to be forgiven if either (a) Mr. Dondero sold one of three "portfolio" companies "for greater than cost" (the "<u>Dondero Sale Contingency</u>") or (b) the portfolio companies were sold "on a basis outside of Defendant James Dondero's control" (the "<u>Third Party Contingency</u>").  *See, e.g.*, Ex. 31 ¶ 82, Appx. 655.

34.     Plaintiff cited to admissible evidence establishing that even if a fact-finder found that the Alleged Agreements existed, they are unenforceable as a matter of law due to a lack of consideration.  ¶¶ 100-101.

35.     In response, Alleged Agreement Defendants repeat their contention that the Alleged Agreements were intended to serve as "an incentive for Jim Dondero to work particularly diligently" and to otherwise "motivate and retain" him.  Opposition ¶ 10; J. Dondero Dec. ¶ 24, Def. Appx. at 14; N. Dondero Dec. ¶ 10, Def. Appx. at 83-84. [12]  Not only is this facially absurd, it is also irrelevant because the Dondero Sale Contingency will ***never*** occur.[13]

---

[12] Significantly, even Defendants' "incentive" concept of consideration is completely illusory.  Had Ms. Dondero bothered to ask, her brother would have told her that the value of each of the portfolio companies was either "substantially higher" or "moderately higher" than Highland's cost of acquisition at the time the Alleged Agreements were entered into.  Unsurprisingly, Mr. Dondero could not recall sharing this information with his sister.  Ex. 99 at 74:4-75:19, Appx. 1831.

[13] The Alleged Agreement Defendants also contend that Highland "benefitted from the Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero thought was 'great for the [Plaintiff] at the time,'" and "reduces other compensation [that he would have otherwise taken]."  Opposition ¶ 10.  The Alleged Agreement Defendants have it backwards.  The loans were a benefit to Mr. Dondero, not Highland, because they ostensibly

36.     Instead, the portfolio companies will be sold by the Reorganized Highland and (assuming the Alleged Agreements actually exist) the Third Party Contingency would apply. However, there is **no** evidence in the record establishing that Highland will receive anything of value in that scenario.  Indeed, Ms. Dondero testified as follows:

> Q:      Did you expect Highland to benefit if the portfolio companies were sold on a basis outside of Mr. Dondero's control?
>
> A:      I have no idea, John.
>
> Q:      Did you have any idea – did you or Dugaboy have any idea when you entered into the agreement if Highland would benefit from the sale of the portfolio companies on a basis outside of Mr. Dondero's control?
>
> A:      I wouldn't know that.

Ex. 100 at 203:7-18, Appx. 1925.

37.     In short, the Alleged Agreement Defendants have failed to come forward with **any** admissible evidence showing the consideration Highland received in exchange for forgiving over $50 million in Notes when the portfolio companies are sold in accordance with Highland's confirmed Plan of Reorganization (*i.e.,* the Third Party Contingency) (because there is no conceivable benefit).

38.     Separately, Mr. Dondero's expert, Mr. Johnson, again supports Plaintiff's position, this time that the Alleged Agreements fail due to a lack of consideration.  Mr. Johnson initially concluded that for the seven-year period from 2013 through 2019, Mr. Dondero's alleged "compensation shortfall" was approximately $21 million – or only about (i) 30% of the original aggregate face amount of the Notes ($70 million) or (ii) 40% of the

---

allowed him to defer the realization of income and the concomitant payment of personal income taxes.  Highland, on the hand, still transferred over $70 million in capital in the form of loans and was forced to defer the realization of the expense that would have reduced its taxable income.  This whole scheme was for Mr. Dondero's sole benefit.

current principal due on the Notes ($50 million).  *See* Def. Ex. G at 19, Def. Appx. 255.[14]  But

even Mr. Johnson's initial conclusion was grossly overstated because Mr. Dondero failed to

disclose to Mr. Johnson millions of dollars in compensation he received from the Highland,

largely in the form of stock options.

39.     The Alleged Agreement Defendants offer no argument, let alone admissible

evidence, showing that Highland received fair consideration in forgiving $50-70 million in

loans (depending on the timing) when Mr. Dondero's own expert calculated that his alleged

compensation "shortfall" was only between $10-20 million.

**C.     Summary Judgment Should be Granted Dismissing the Alleged Agreement
Defendants' defense that Plaintiff Had an Obligation to Make the Payments Due
under the SSAs without instruction or authority**

40.     In its Motion, Highland established that (a) its Shared Services Agreement

with NexPoint did not authorize, let alone require, Highland to make payments under the

NexPoint Term Note without receiving instruction or direction from an authorized

representative of NexPoint, and (b) Highland never received and such instruction or direction

in December 2020.  Motion ¶¶ 123-126 (citing evidence).

41.     In response, Mr. Dondero insists that Highland was "responsible" for making

the payment due on December 31, 2020, and he "fully expected" Highland to make the

payment, but there is absolutely nothing to corroborate these self-serving statements.

---

[14] Mr. Johnson prepared his report in the spring of 2021 before the corporate affiliates adopted Mr. Dondero's "conditions subsequent" defense.  As a result, Mr. Johnson was never told that the affiliate notes were part of the Alleged Agreements.  Mr. Johnson's report thus provides further confirmation that the Alleged Agreements are completely fictitious because the Alleged Agreement Defendants will never be able to credibly explain to a jury (a) why they failed to disclose the affiliate loans to Mr. Johnson, or (b) why there is a gap of tens of millions of dollars between the face value of the Notes subject to the Alleged Agreements (*i.e.*, more than $70 million when issued) and Mr. Johnson's conclusion (*i.e.*, Mr. Dondero was undercompensated by $21 million), let alone after his conclusion is properly adjusted downwards by the millions of dollars of compensation Mr. Dondero failed to disclose to him.

Dondero Dec. ¶¶ 32-39, Def. Appx. at 16-19.   And the overwhelming, objective and undisputed facts show that his "expectations" are misplaced, at best:

- Try as they might, the Term Note Defendants have yet to identify any provision under NexPoint's Shared Services Agreement that required (or even authorized) Highland to make the payments required under the Term Notes;

- Mr. Waterhouse was NexPoint's Treasurer who also oversaw Highland's accounting department, yet he offers nothing on the topic and remains gainfully employed on behalf of Mr. Dondero's enterprise; and

- Ms. Hendrix testified without qualification that while she made "overhead" payments in the ordinary course, she would never effectuate an intercompany transfer without direction or instruction from Mr. Dondero or Mr. Waterhouse.

42.     But the best evidence that Mr. Dondero's statements are false is Highland's contemporaneous conduct.   On December 3, 2020, Highland sent letters demanding that HCMS, HCRE, and HCMFA pay, in the aggregate, over $13.5 million under the applicable Demand Notes.  Ex. 1 (Exhibit 3); Ex. 3 (Exhibit 5); Ex. 4 (Exhibit 5).  If Highland believed that it had the right, let alone the obligation, to make payments on behalf of the Term Note Defendants, it surely would have grabbed the money while it could.  And had it done so, Mr. Dondero surely would have protested loudly.  But none of that occurred because Highland did not have the right, let alone the obligation, to take money for itself without direction or instruction from the maker.

43.     By December 30, 2020, (a) Mr. Dondero had been terminated from Highland, (b) Highland had obtained a TRO against Mr. Dondero, (c) Highland was managed by an Independent Board and was no longer affiliated with NexPoint, HCRE, or HCMS, (d) Highland had already made demands under all of its Demand Notes, and (e) Highland had given notice of termination of the Shared Services Agreements.

44.     Given that the Term Notes Defendants cannot identify any provision in the Shared Services Agreement requiring Highland to effectuate the payments under the Term Notes, no jury could reasonably credit Mr. Dondero's "expectations" that Highland would do anything more than required under the circumstances.[15]

## D.     <u>Summary Judgment Should be Granted Dismissing the Alleged Agreement Defendants' pre-payment defense</u>

45.     Plaintiff offered overwhelming evidence to establish that the "pre-payment" defense is meritless as a matter of law and as a matter of fact.  Motion ¶ 128 (citing evidence). In response, NexPoint and HCMS attempt to create ambiguities where none exist and rely on a "course of conduct" that is not supported by any admissible evidence and could not serve to amend the Term Notes in any event.

46.     NexPoint and HCMS go to great lengths to try to impose ambiguities in the Notes.  Opposition ¶¶ 103-112.  But if the plain and ordinary terms are given their plain and ordinary meanings, those efforts fail.  There is no dispute that the makers (a) were required to make Annual Installments and (b) had the right to make "prepayments."  *See, e.g.,* Klos Dec. Ex. A § 2.1, 3.  The only question is how "prepayments" were to be applied.  Section 3 of the Term Notes provides the answer:

> 3.   <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to**

---

[15] Mr. Dondero's self-serving contention that HCMS and HCRE had "oral" or "unwritten" shared services is shameful. Why would that be the case?  Why would Highland obligate itself to provide free services to those entities when NexPoint and HCMFA were paying millions of dollars for the same services?  Why didn't HCMS and HCRE file an administrative claim against Highland like HCMFA and NexPoint?  Or did Highland continue to service HCMS and HCRE but not HCMFA or NexPoint?  Was Highland's "oral agreement" assumed or rejected?  When did Highland give notice of termination, if it ever did?  No document exists reflecting the terms or existence of these "oral agreements" because they do not exist.  Highland's employees may have performed services for these entities when Mr. Dondero controlled them; but that does not prove an enforceable agreement existed, let alone one that authorized and required Highland to pay itself at a time they were in an adversarial position.

> **unpaid accrued interest hereon, and then to unpaid principal hereof.**

*Id.*

47.     This section unambiguously provides that (a) "Prepayment[s] [are] Allowed;" (b) "Renegotiation [is] Discretionary;" (c) prepayments of "unpaid principal or accrued interest" are permitted; and (d) payments "shall be applied first to unpaid accrued interest hereon, and then to unpaid principal."

48.     NexPoint's attempt to create an ambiguity out of the words "accrued interest" fails for the simple reason that it is used in the past tense; it cannot possibly be interpreted to apply to future interest.[16]  And while the parties' "course of dealing" is consistent with Section 3, it cannot serve as an "amendment" to the plain terms of the Notes – particularly after the Petition Date when Mr. Dondero ceded control to an Independent Board, Highland was no longer formally affiliated with NexPoint, HCRE, or HCMS, and there is no evidence that any understanding was reached on these matters.

49.     NexPoint's "pre-payments" were previously addressed by Mr. Klos (Klos Dec. ¶¶ 8-14), and NexPoint comes forward with *no* evidence to rebut his sworn and admissible Declaration.[17]

50.     HCMS fares no better.  When Mr. Dondero controlled both HCMS and Highland, he exercised the right under Section 3 to "renegotiate" the application of

---

[16] Because there is no ambiguity, the litany of cases cited by NexPoint are simply inapplicable.

[17] NexPoint has no admissible evidence to support its defense but it does create multiple strawmen.  Plaintiff does not dispute that Prepayments are possible, nor does it dispute that at year end 2017, 2018, and 2019, NexPoint "never made the full" Annual Installment payment in December.  Opposition ¶ 106.  The question is why NexPoint made any payment at all.  And the answer is simple: applying the unambiguous terms of Section 3, NexPoint's prepayments were "applied first to unpaid accrued interest thereon, and then to unpaid principal."  Thus, the payments made in December of each year equaled all interest that *accrued* between the date each prepayment was made and year end.  That is the indisputable course of dealing; neither NexPoint nor HCMS had any basis to believe that it could forego paying interest.

prepayments.  But even then, ***under his watch***, HCMS ***still*** made its interest payment at year end 2019 -- even though HCMS had paid off millions of dollars in principal just months earlier.

51.     If Mr. Dondero and HCMS truly believed that HCMS's pre-payments applied to eliminate ***all*** future obligations of principal and interest, they never would have paid (a) $65,360.49 on 12/31/19 (when Mr. Dondero was in control of both entities), (b) $181,226.83 on January 21, 2021 (in an effort to "cure" the default even though the HCMS Term Note provides no cure rights); or (c) the payment due at year end 2021 (Klos Reply Dec. ¶¶ 1-7).  And that eliminates any dispute of fact.

## **<u>CONCLUSION</u>**

For the foregoing reasons, and for those set forth in the Motion, the Memorandum of Law in support of the Motion, and Plaintiff's Appendix, Plaintiff respectfully requests that the Court (a) grant the Motion in all respects, (b) provide Plaintiff with a reasonable opportunity to present all of its costs and fees incurred in connection with collection, and (c) grant such other and further relief as the Court deems just and proper.

Dated:  February 7, 2022

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
          jmorris@pszjlaw.com
          gdemo@pszjlaw.com
          hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
          ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

DOCS_NY:45091.5 36027/003

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

-----------------------------------------------------------------

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-01010-E |
| | § | |
| Defendants. | § | |
| | § | |

-----------------------------------------------------------------

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3005-sgj |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-00880-C |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3006-sgj |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | Case No. 3:21-cv-01378-N |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | Adv. Proc. No. 21-3007-sgj |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | Case No. 3:21-cv-01379-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE ALLEGED AGREEMENT DEFENDANTS

| Ex. | Description | Appx. # |
|:---:|:---|:---:|
| 1. | Reply Declaration of David Klos in Further Support of Highland Capital Management L.P.'s Motion for Partial Summary Judgment | 1-6 |
| 2. | Stipulation Governing the Admissibility of Evidence in Connection with Plaintiff's Motion for Partial Summary Judgment (**Adv. Pro. No. 21-3003, Docket No. 128**) | 7-26 |

Dated:  February 7, 2022.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 1

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Adv. Proc. No. 21-03003-sgj |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § | Case No. 3:21-cv-01010-E |
| Defendants. | § § § | |

| | § | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3005-sgj |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Case No. 3:21-cv-00880-C |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-3006-sgj |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | Case No. 3:21-cv-01378-N |
| SERVICES, INC., JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| | § | Adv. Proc. No. 21-3007-sgj |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | Case No. 3:21-cv-01379-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint | § | |
| Real Estate Partners, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

Appx. 00003

**REPLY DECLARATION OF DAVID KLOS IN FURTHER SUPPORT OF HIGHLAND
CAPITAL MANAGEMENT L.P.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, David Klos, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

1.      I am the Chief Financial Officer ("CFO") of the reorganized Highland
Capital Management, L.P. ("Highland"), and I submit this Declaration in support of *Highland
Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Motion").   This
Declaration is based on my personal knowledge.  I could and would testify to the facts and
statements set forth herein if asked or required to do so.

2.      I write to correct the speculative and uniformed arguments advanced by
Highland Capital Management Services, Inc. ("HCMS) in connection with its "pre-payment"
defense.  *See Defendants' Memorandum of Law in Response to Plaintiff's Motion for Partial
Summary Judgment* (the "Opposition") Adv. Pro. 21-03003, Docket No. 154 ¶¶ 103-117.

3.      The argument that Highland's failure to call a "default" because HCMS
made its Annual Installment payment on December 30, 2019 rather than December 31, 2019, is
not serious.  As the HCMS Amortization Schedule conclusively shows, HCMS paid *all* interest
due on December 30, 2019 (in other words, one day early), which included one extra day of
interest, such that zero interest was outstanding on December 31, 2019.  This payment was made
and applied in accordance with Mr. Dondero's direction (at a time when he still controlled both
HCMS and Highland) and was completed to ensure that HCMS's Note had no interest outstanding
as of December 31, 2019.

4.      Mr. Dondero's direction to make the payment, the application of the
payment to all interest due through year end, and the payment itself (if anyone tries to deny the
direction was given) conclusively establish that HCMS knew that all interest due as of December

31, 2019 was required to be paid notwithstanding any prior "pre-payment." Stated another way, if HCMS actually believed that no payments were due at the end of the year because of prior "pre-payments," then why did they effectuate a payment of $65,360.49 on December 30 – an amount precisely equal to all accrued and unpaid interest through the end of the year?

5.      As HCMS's Amortization Schedule conclusively shows, HCMS was current on its obligations under the HCMS Term Note as of December 31, 2019. All "prepayments" had been fully applied to principal and interest such that HCMS's accrued interest balance was $0. No other payments were made on account of HCMS' Term Note until January 21, 2021, three weeks after the due date and after Highland declared a default.

6.      Prior to the Petition Date, while HCMS and Highland were both controlled by Mr. Dondero, certain payments were applied to include short-term prepayments of interest, which is expressly provided for within the terms of the Term Note. This is precisely the type of "renegotiation" that was permitted under section 3 of the HCMS Term Note. But as the Amortization Schedule shows, these prepayments never exceeded one year and the reason that no payment occurred on December 31st in 2017 and 2018 was precisely because no accrued interest was outstanding on December 31, 2017 or December 31, 2018, having each been paid within months of year-end. HCMS's suggestion that payments made in 2017 and 2018 were intended to relieve HCMS of all future interest obligations multiple years into the future is undercut by a complete lack of evidence and documentation – precisely because none exists.

7.      No payments were timely received on or before December 31, 2020, and the Note was properly accelerated. Late payments received after acceleration in January 2021 (which payments were due in December 2020), and December 2021, each which included the amounts of interest and principal accrued and owing on December 31 of year-ends 2020, and

2021, respectively, were applied to the accelerated principal amount of the Note and accrued

interest thereon in accordance with its terms.


Dated: February 7, 2022


_____*/s/ David Klos*_____
                                                        David Klos

# EXHIBIT 2

Case 21-03006-sgj Doc 166 Filed 02/07/22 Entered 02/07/22 23:39:38 Desc Main
Case 3:21-cv-00881-X Document Filed 09/04/30 Page 36 of 162 PageID 52883
Case 21-03003-sgj Doc 128 Filed 12/17/21 Entered 12/17/21 16:30:42 Page 1 of 19

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
            rfeinstein@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
            ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Adv. Proc. No. 21-03003-sgj |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § | Case No. 3:21-cv-01010-E |
| Defendants. | § § § | |

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document   Filed 09/04/30   Page 37 of 162   PageID 52884
Case 21-03003-sgj  Doc 128  Filed 12/17/21   Entered 12/17/21 16:30:42   Page 2 of 19

---

HIGHLAND CAPITAL MANAGEMENT, L.P.,        §
                                          §
                                          §
                                          §
                 Plaintiff,               §     Adv. Proc. No. 21-3004
                                          §
                                          §
vs.                                       §
                                          §
                                          §     Case No. 3:21-cv-00881-X
HIGHLAND CAPITAL MANAGEMENT FUND          §
ADVISORS, L.P.,                           §
                                          §
                                          §
                 Defendant.               §
                                          §
---                                       §
HIGHLAND CAPITAL MANAGEMENT, L.P.,        §
                                          §
                                          §
                 Plaintiff,               §
                                          §     Adv. Proc. No. 21-3005
                                          §
vs.                                       §
                                          §
NEXPOINT ADVISORS, L.P., JAMES            §     Case No. 3:21-cv-00880-C
DONDERO, NANCY DONDERO, AND               §
THE DUGABOY INVESTMENT TRUST,             §
                                          §
                 Defendants.              §
---
HIGHLAND CAPITAL MANAGEMENT, L.P.,        §
                                          §
                                          §
                 Plaintiff,               §
                                          §     Adv. Proc. No. 21-3006
                                          §
vs.                                       §
                                          §
HIGHLAND CAPITAL MANAGEMENT               §     Case No. 3:21-cv-01378-N
SERVICES, INC., JAMES DONDERO,            §
NANCY DONDERO, AND THE DUGABOY            §
INVESTMENT TRUST,                         §
                                          §
                 Defendants.              §
---                                       §

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 179 Filed 04/04/30   Page 38 of 162   PageID 52885
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 3 of 19

---

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | Adv. Proc. No. 21-3007 |
| Plaintiff, § | |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-01379-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint § | |
| Real Estate Partners, LLC), JAMES § | |
| DONDERO, NANCY DONDERO, AND § | |
| THE DUGABOY INVESTMENT TRUST, § | |
| § | |
| § | |
| Defendants. § | |
| § | |

---

## STIPULATION GOVERNING THE ADMISSIBILITY OF
## EVIDENCE IN CONNECTION WITH PLAINTIFF'S MOTION FOR
## <u>PARTIAL SUMMARY JUDGMENT</u>

This Stipulation is entered into between and among Highland Capital Management, L.P., the plaintiff (the "<u>Plaintiff</u>") in the above-referenced adversary proceedings (the "<u>Adversary Proceedings</u>"), on the one hand, and James Dondero ("<u>Mr. Dondero</u>"), Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>"), NexPoint Advisors, L.P. ("<u>NexPoint</u>"), Highland Capital Management Services, Inc. ("<u>HCMS</u>"), and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("<u>HCRE</u>" and together with Mr. Dondero, NexPoint, and HCMS, the "<u>Defendants</u>," and Plaintiff and Defendants together, the "<u>Parties</u>") on the other hand.

## <u>RECITALS</u>

WHEREAS, on January 22, 2021, Plaintiff commenced the Adversary Proceedings against each respective Defendant; and

WHEREAS, Plaintiff subsequently amended its pleading to add additional claims and parties (collectively, the "<u>Amended Complaints</u>"); and

Case 21-03006-sgj    Doc 166    Filed 02/07/22    Entered 02/07/22 23:39:38    Desc Main
Case 3:21-cv-00881-X    Document 1 Filed 09/04/30 Page 39 of 162    PageID 52886
Case 21-03003-sgj Doc 128 Filed 12/17/21    Entered 12/17/21 16:30:42    Page 4 of 19

WHEREAS, on December 17, 2021, Plaintiff will move for partial summary judgment against each of the Defendants on the First and Second Claims for Relief set forth in the Amended Complaints (the "Motion"); and

WHEREAS, the Parties have conferred concerning the admissibility of certain documents that Plaintiff intends to offer into evidence in support of its Motion, and counsel to the Parties pledge to continue to confer in good faith on all evidentiary issues that may arise in connection with Defendants' opposition to the Motion and Plaintiff's reply.

### STIPULATION

NOW, THEREFORE, in consideration of the foregoing, the parties agree and stipulate as follows:

1.    Attached as **Exhibit A** is Plaintiff's Exhibit List that identifies each document that Plaintiff intends to offer into evidence in support of the Motion (collectively, the "Exhibits").

2.    The Parties agree that all Parties, and not just the Plaintiff, can use the Exhibits that are agreed to in this Stipulation with respect to admissibility.

3.    The Defendants, individually and collectively, have no objection to the admission into evidence of any of the Exhibits, except Exhibits 38, 73, 78, 94-101, 105, and 192-195.

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document Consent  Filed 06/04/30 Page 40 of 162   PageID 52887
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 5 of 19

Dated:  December 17, 2021

CONSENTED AND AGREED TO BY:


/s/ John A. Morris
John A. Morris *(pro hac vice)*
(NY Bar No. 266326)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 277-6910
Email: jmorris@pszjlaw.com

*Attorneys for Debtor Highland Capital*
*Management, LP*

/s/ Davor Rukavina
Davor Rukavina (TX Bar No. 24030781)
Julian P. Vasek (TX Bar No. 24070790)
MUNSCH HARDT KOPE & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone:  (214) 855-7500
Email: drukavina@munsch.com
          jvasek@munsch.com

*Attorneys for Defendant NexPoint Advisors, L.P.*


/s/ Michael P. Aigen
Deborah Deitsch-Perez (TX Bar No. 24036072)
Michael P. Aigen (TX Bar No. 24012196)
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone:  (214) 560-2201
Email: Deborah.deitschperez@stinson.com
          Michael.aigen@stinson.com

*Attorneys for NexPoint Advisors, L.P., Highland*
*Capital Management Services, Inc., and HCRE*
*LLC (n/k/a NexPoint Real Estate Partners, LLC)*

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 179-4   Filed 01/09/24   Page 41 of 162   PageID 52888
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 6 of 19

## CERTIFICATE OF SERVICE

I certify that on December 17, 2021, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing system to the parties that are registered or otherwise entitled to receive electronic notices in this adversary proceeding.

*/s/ Zachery Annable*
Zachery Annable

Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 7 of 19

# **EXHIBIT A**

Case 21-03006-sgj    Doc 166    Filed 02/07/22    Entered 02/07/22 23:39:38    Desc Main
Case 3:21-cv-00881-X    Document 187-2    Filed 01/09/24    Page 43 of 162    PageID 52890
Case 21-03003-sgj Doc 128 Filed 12/17/21    Entered 12/17/21 16:30:42    Page 8 of 19

# Highland Capital Management, L.P. Consolidated Notes Litigation

## *SUMMARY JUDGMENT EXHIBITS*

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 1. | Complaint against HCMFA **(Adv. Pro. No. 21-3004)** | 1 | D-CNL002795 - 814 |
| 2. | Amended Complaint against NPA et al. **(Adv. Pro. No. 21-3005)** | 63 | D-CNL002935 - 3007 |
| 3. | Amended Complaint against HCMS **(Adv. Pro. No. 21-3006)** | 68 | D-CNL003083 - 3165 |
| 4. | Amended Complaint against HCRE et al **(Adv. Pro. No. 21-3007)** | 63 | D-CNL003241 - 3323 |
| 5. | HCMFA's Original Answer **(Adv. Pro. No. 21-3004)** | 6 | D-CNL002868 - 2874 |
| 6. | HCMS's Answer to Plaintiff's Complaint **(Adv. Pro. No. 21-3006)** | 6 | N/A |
| 7. | HCRE's Answer to Plaintiff's Complaint **(Adv. Pro. No. 21-3007)** | 7 | N/A |
| 8. | HCMS's Motion For Leave to File Amended Answer and Brief In Support **(Adv. Pro. No. 21-3006)** | 15 | N/A |
| 9. | HCRE's Motion For Leave to File Amended Answer and Brief In Support **(Adv. Pro. No. 21-3007)** | 16 | N/A |
| 10. | HCMFA's Motion For Leave to Amend Answer **(Adv. Pro. No. 21-3004)** | 32 | N/A |
| 11. | NexPoint's Motion For Leave to Amend Answer **(Adv. Pro. No. 21-3005)** | 35 | N/A |
| 12. | HCMS's First Amended Answer to Plaintiff's Complaint **(Adv. Pro. No. 21-3006)** | 34 | N/A |
| 13. | HCMFA's Amended Answer **(Adv. Pro. No. 21-3004)** | 48 | N/A |
| 14. | NexPoint's First Amended Answer **(Adv. Pro. No. 21-3005)** | 50 | N/A |
| 15. | NexPoint's Answer to Amended Complaint **(Adv. Pro. No. 21-3005)** | 64 | N/A |
| 16. | HCMS's Answer to Amended Complaint **(Adv. Pro. No. 21-3006)** | 73 | N/A |
| 17. | HCRE's Answer to Amended Complaint **(Adv. Pro. No. 21-3007)** | 68 | N/A |
| 18. | HCMFA's Objections and Responses to Plaintiff's Requests For Admissions, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3004)** | N/A | N/A |

Case 21-03006-sgj    Doc 166    Filed 02/07/22    Entered 02/07/22 23:39:38    Desc Main
Case 3:21-cv-00881-X    Document Filed 09/04/30    Page 44 of 162    PageID 52891
Case 21-03003-sgj Doc 128 Filed 12/17/21    Entered 12/17/21 16:30:42    Page 9 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 19. | NexPoint's Objections and Responses to Plaintiff's Requests For Admissions, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3005)** | N/A | N/A |
| 20. | HCMS's Responses to Highland Capital Management, L.P.'s First Requests For Admissions **(Adv. Pro. No. 21-3006)** | N/A | D-CNL003076 - 79 |
| 21. | HCMS's Answers to Highland Capital Management, L.P.'s First Set of Interrogatories **(Adv. Pro. No. 21-3006)** | N/A | D-CNL003071 - 75 |
| 22. | HCRE's Responses to Debtor Highland Capital Management, L.P.'s Requests For Admissions **(Adv. Pro. No. 21-3007)** | N/A | N/A |
| 23. | HCRE's Answers to Debtor Highland Capital Management, L.P.'s First Set of Interrogatories **(Adv. Pro. No. 21-3007)** | N/A | N/A |
| 24. | James Dondero's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3003)** | N/A | N/A |
| 25. | Nancy Dondero's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3003)** | N/A | N/A |
| 26. | The Dugaboy Investment Trust's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3003)** | N/A | N/A |
| 27. | NexPoint's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3005)** | N/A | N/A |
| 28. | HCMS's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3006)** | N/A | N/A |
| 29. | HCRE's Objections and Responses to Plaintiff's Requests For Admission, Interrogatories, and Requests For Production **(Adv. Pro. No. 21-3007)** | N/A | N/A |
| 30. | Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. | N/A | D-CNL002970 – 3005 |
| 31. | James Dondero's Answer to Amended Complaint **(Adv. Pro. No. 21-3003)** | 83 | D-CNL002045 - 59 |
| 32. | Amended Complaint against James Dondero, et. al **(Adv. Pro. No. 21-3003)** | 79 | D-CNL001975 - 2044 |
| 33. | June 3, 2019 Management Representation Letter **(J. Dondero 5/8/21 Depo., Ex. 16) (P. Burger 7/30/21 Depo., Ex. 1)** | N/A | D-JDNL-033411 - 21 |
| 34. | Highland's Consolidated Financial Statements, dated December 31, 2018 **(J. Dondero 5/8/21 Depo., Ex. 15) (P. Burger 7/30/21 Depo., Ex. 4)** | N/A | D-CNL-000212 - 257 |

2

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 178   Filed 01/09/24   Page 45 of 162   PageID 52892
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 10 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 35. | HCMFA's Incumbency Certificate, April 2019 | N/A | D-CNL003578 |
| 36. | Email string re 15(c) Follow up (10/2/21 – 10/6/21) | N/A | D-HCMFA290880 – 83 |
| 37. | NexPoint's Incumbency Certificate | N/A | D-CNL003590 |
| 38. | Schedule of HCMLP receipts from other Dondero-related notes | N/A | D-CNL003683 |
| 39. | HCMLP Operating Results (February 2018) **(Adv. Pro. No. 21-3003)** | 11-13 | N/A |
| 40. | Summary of Assets and Liabilities for Non-Individuals **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 17)** | 11-15 | N/A |
| 41. | December 2019 Monthly Operating Report **(Adv. Pro. No. 21-3003) (J. Dondero 5/8/21 Depo., Ex. 22)** | 11-16 | N/A |
| 42. | September 2020 Monthly Operating Report **(Adv. Pro. No. 21-3003)** | 11-18 | N/A |
| 43. | Dondero Promissory Note in the amount of $7.9m dated January 18, 2018 | N/A | D-CNL000550 - 51 |
| 44. | **INTENTIONALLY OMITTED** | | |
| 45. | HCMFA's Consolidated Financial Statements and Supplemental Information (December 31, 2018) **(Adv. Pro. No. 21-3004)** | 35 | D-CNL002273 - 96 |
| 46. | NexPoint's 2019 Audited Financial Statements | N/A | N/A |
| 47. | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition to NexPoint Advisors, L.P. **(Adv. Pro. No. 21-3005)** | 82 | N/A |
| 48. | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition to HCMS **(Adv. Pro. No. 21-3006)** | 87 | N/A |
| 49. | Plaintiff's Amended Notice of Rule 30(b)(6) Deposition to HCRE **(Adv. Pro. No. 21-3007)** | 82 | N/A |
| 50. | Jim Dondero 2017 PY Comp Statement | N/A | D-CNL003587 |
| 51. | Jim Dondero 2018 PY Comp Statement | N/A | D-CNL003588 |
| 52. | Jim Dondero 2019 PY Comp Statement | N/A | D-CNL003589 |
| 53. | 5/2/19 e-mail and attachment (spreadsheet) | N/A | D-CNL003768-70 |
| 54. | 5/2/19 e-mail and attachment (Promissory Note) | N/A | D-CNL003777-79 |
| 55. | List of Wire Transfers (5/2/19) | N/A | D-CNL003772 |
| 56. | 5/3/19 e-mail | N/A | D-CNL003763 |

DOCS_NY:44700.1 36027/003

**Appx. 00017**

Case 21-03006-sgj    Doc 166    Filed 02/07/22    Entered 02/07/22 23:39:38    Desc Main
Case 3:21-cv-00881-X    Document 175    Filed 09/04/30    Page 46 of 162    PageID 52893
Case 21-03003-sgj  Doc 128  Filed 12/17/21    Entered 12/17/21 16:30:42    Page 11 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 57. | 5/3/19 Promissory Note | N/A | D-CNL003764-65 |
| 58. | 13 Week Cash Flows 12.14.20 | N/A | D-CNL003810 |
| 59. | Supplemental 15(c) Information Request 10.23.20 | N/A | HCMFAS 25-31 |
| 60. | 7.31.20 HCMLP Requests | N/A | D-CNL003795-98 |
| 61. | **INTENTIONALLY OMITTED** | | |
| 62. | **INTENTIONALLY OMITTED** | | |
| 63. | HCMLP Audited Financial Statements for 2008 | N/A | D-CNL000001-56 |
| 64. | HCMLP Audited Financial Statements for 2009 | N/A | D-CNL000258-304 |
| 65. | HCMLP Audited Financial Statements for 2010 | N/A | D-CNL000305-351 |
| 66. | HCMLP Audited Financial Statements for 2011 | N/A | D-CNL000352 - 400 |
| 67. | James Dondero 2019 Form W-2 (NexPoint Residential Trust Inc.) **(REDACTED)** | N/A | EXPERT 0000001 - 02 |
| 67-2. | James Dondero 2017 Form W-2 (NexPoint Residential Trust Inc.) **(REDACTED)** | N/A | EXPERT 0000937 - 39 |
| 67-3. | James Dondero 2013 Form 1040 (pdf page 279 of 335) **(REDACTED)** | N/A | EXPERT 0000031; 308 |
| 67-4. | James Dondero 2014 Form 1040 (pdf page 235 of 290) **(REDACTED)** | N/A | EXPERT 0000390; 623 |
| 67-5. | James Dondero 2015 Form 1040 (pdf page 200 of 254) **(REDACTED)** | N/A | EXPERT 0001325; 1523 |
| 67-6. | James Dondero 2016 Form 1040 (pdf page 182 of 235) **(REDACTED)** | N/A | EXPERT 0001999; 2179 |
| 67-7. | James Dondero 2017 Form 1040 (pdf page 170 of 225) **(REDACTED)** | N/A | EXPERT 0000704; 872 |
| 67-8. | James Dondero 2018 Form 1040 (pdf page 248 of 300) **(REDACTED)** | N/A | EXPERT 0001581; 1828 |
| 67-9. | James Dondero 2019 Form 1040 (pdf page 242 of 301) **(REDACTED)** | N/A | EXPERT 0001023; 1264 |

DOCS_NY:44700.1 36027/003

**Appx. 00018**

Case 21-03006-sgj    Doc 166    Filed 02/07/22    Entered 02/07/22 23:39:38    Desc Main
Case 3:21-cv-00881-X    Document 186-2    Filed 09/01/30    Page 47 of 162    PageID 52894
Case 21-03003-sgj Doc 128 Filed 12/17/21    Entered 12/17/21 16:30:42    Page 12 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 68. | Jim Dondero 2016 PY Comp Statement | N/A | D-CNL003585 |
| 69. | HCMLP Audited Financial Statements for 2014 | N/A | D-CNL000109-157 |
| 70. | HCMLP Audited Financial Statements for 2015 | N/A | D-CNL000158-211 |
| 71. | HCMLP Audited Financial Statements for 2016 | N/A | D-CNL000452-501 |
| 72. | Highland's Audited Financial Statements for 2017 (**J. Dondero 5/8/21 Depo., Ex. 13**) (**P. Burger 7/30/21 Depo., Ex. 2**) | N/A | D-CNL000502-549 |
| 73. | Schedule of HCMLP receipts from Dondero notes | N/A | D-CNL003591 |
| 74. | Dondero Promissory Note in the amount of $3.825m dated February 2, 2020 (**J. Dondero 5/8/21 Depo., Ex. 1**) | N/A | N/A |
| 75. | HCMLP Operating Results (February 2018) (**J. Dondero 5/8/21 Depo., Ex. 2**) | N/A | N/A |
| 76. | Dondero Promissory Note in the amount of $2.5m dated August 1, 2018 (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 3**) | 1-2 | N/A |
| 77. | Dondero Promissory Note in the amount of $2.5m dated August 13, 2018 (**J. Dondero 5/8/21 Depo., Ex. 4**) | N/A | N/A |
| 78. | HCMLP Operating Results (August 2018) (**J. Dondero 5/8/21 Depo., Ex. 5**) | N/A | N/A |
| 79. | December 3, 2020 Demand Letter (**J. Dondero 5/8/21 Depo., Ex. 6**) | N/A | N/A |
| 80. | James Dondero's Original Answer (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 7**) | 6 | N/A |
| 81. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s First Request For Admissions (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 8**) | N/A | N/A |
| 82. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s First Set of Interrogatories (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 9**) | N/A | N/A |
| 83. | James Dondero's Amended Answer (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 10**) | 16 | N/A |
| 84. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s Second Request For Admissions (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 11**) | N/A | N/A |
| 85. | James Dondero's Objections and Responses to Highland Capital Management, L.P.'s Second Set of Interrogatories (**Adv. Pro. No. 21-3003**) (**J. Dondero 5/8/21 Depo., Ex. 12**) | N/A | N/A |
| 86. | May 18, 2018 Management Representation Letter (**J. Dondero 5/8/21 Depo., Ex. 14**) | N/A | D-JDNL-033400-10 |
| 87. | Statement of Financial Affairs For Nonindividuals Filing Bankruptcy (**Case No. 19-34054**) (**J. Dondero 5/8/21 Depo., Ex. 19**) | 248 | N/A |

DOCS_NY:44700.1 36027/003

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document Document   Filed 04/24/23   Page 48 of 162   PageID 52895
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 13 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 88. | October 2019 Monthly Operating Report **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 20)** | 405 | N/A |
| 89. | November 2019 Monthly Operating Report **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 21)** | 289 | N/A |
| 90. | Exhibit C, Liquidation Analysis/Financial Projections **(Case No. 19-34054) (J. Dondero 5/8/21 Depo., Ex. 23)** | 1473 | N/A |
| 91. | Highland Capital Management LP Financial Projections (1/28/21) **(J. Dondero 5/8/21 Depo., Ex. 24)** | N/A | N/A |
| 92. | 2017 Workpapers **(P. Burger 7/30/21 Depo., Ex. 3)** | N/A | N/A |
| 93. | 2018 Workpapers **(P. Burger 7/30/21 Depo., Ex. 5)** | N/A | N/A |
| 94. | Peet Burger 7/30/21 Deposition Transcript | N/A | N/A |
| 95. | James Dondero 1/5/21 Deposition Transcript | N/A | N/A |
| 96. | James Dondero 5/28/21 Deposition Transcript | N/A | N/A |
| 97. | James Dondero 6/1/21 Deposition Transcript | N/A | N/A |
| 98. | James Dondero 10/29/21 Deposition Transcript | N/A | N/A |
| 99. | James Dondero 11/4/21 Deposition Transcript | N/A | N/A |
| 100. | Nancy Dondero 10/18/21 Deposition Transcript | N/A | N/A |
| 101. | Alan Johnson (Expert)11_02_21 Deposition Transcript | N/A | N/A |
| 102. | **INTENTIONALLY OMITTED** | | |
| 103. | **INTENTIONALLY OMITTED** | | |
| 104. | **INTENTIONALLY OMITTED** | | |
| 105. | Frank Waterhouse 10/19/21 Deposition Transcript | N/A | N/A |
| 106. | Payment from James Dondero dated 12/08/17 | N/A | D-CNL003542-45 |
| 107. | Payment from James Dondero dated 12/18/17 | N/A | D-CNL003546-55 |
| 108. | Payment from James Dondero dated 02/14/19 | N/A | D-CNL003490-500 |
| 109. | Payment from James Dondero dated 03/13/2019 | N/A | D-CNL003503-12 |
| 110. | Payments from James Dondero dated 05/02/19, 05/03/19, 05/07/19, 05/23/19 | N/A | D-CNL003515-27 |
| 111. | Payment from James Dondero dated 06/17/19 | N/A | D-CNL003528-32 |

6

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 175-4   Filed 09/04/30   Page 49 of 162   PageID 52896
Case 21-03003-sgj   Doc 128   Filed 12/17/21   Entered 12/17/21 16:30:42   Page 14 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 112. | Payment from James Dondero dated 12/23/19 | N/A | D-CNL003556-62 |
| 113. | Payment from HCMFA dated 05/29/19 | N/A | D-CNL003617-29 |
| 114. | Payment from HCMFA dated 09/05/19 | N/A | D-CNL003663-65 |
| 115. | Payment from HCMFA dated 10/03/19 | N/A | D-CNL003666-75 |
| 116. | Payment from HCRE dated 09/30/19 | N/A | D-CNL003655-62 |
| 117. | Payment from NPA dated 04/16/2019 | N/A | D-CNL003608-16 |
| 118. | Payment from NPA dated 06/19/19 | N/A | D-CNL003639-43 |
| 119. | Payment from NPA dated 07/09/19 | N/A | D-CNL003644-51 |
| 120. | Payments from HCMSI and NPA dated 03/05/19 and 03/29/19 | N/A | D-CNL003598-607 |
| 121. | Payments from  HCMSI and NPA dated 08/09/19, 08/13/19, 08/21/19 | N/A | D-CNL003652-54 |
| 122. | Payments from HCRE, HCMSI, NPA dated 12/09/19, 12/30/19 | N/A | D-CNL003676-82 |
| 123. | Payments from HCMFA and NPA dated 06/04/19 | N/A | D-CNL003630-38 |
| 124. | Payment from NPA, HCMSI, HCRE dated 01/14/21 and 01/21/21 | N/A | D-CNL003593-97 |
| 125. | Payment to James Dondero dated 02/02/18 | N/A | D-JDNL-033060-74 |
| 126. | Payments to James Dondero dated 08/01/18 and 08/13/18 | N/A | D-JDNL-033057-59 |
| 127. | Payment to HCMSI dated 05/29/15 | N/A | HCMS000094-96 |
| 128. | Payment to HCMSI dated 10/01/15, 10/02/15, and 10/30/15 | N/A | HCMS000156-62 |
| 129. | Payment to HCMSI dated 10/27/15 | N/A | HCMS000166-68 |
| 130. | Payment to HCMSI dated 10/28/15 | N/A | HCMS000163-65 |
| 131. | Payment to HCMSI dated 11/23/15 | N/A | HCMS000172-76 |
| 132. | Payment to HCMSI dated 11/24/15 | N/A | HCMS000169-71 |
| 133. | Payment to HCMSI dated 02/10/16 | N/A | HCMS000072-77 |
| 134. | Payment to HCMSI dated 02/11/16 | N/A | HCMS000056-71 |
| 135. | Payment to HCMSI dated 04/05/16 | N/A | HCMS000082-93 |

DOCS_NY:44700.1 36027/003

Appx. 00021

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 175-4   Filed 09/09/22   Page 50 of 162   PageID 52897
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 15 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 136. | Payment to HCMSI dated 05/04/16 | N/A | HCMS000097-99 |
| 137. | Payment to HCMSI dated 07/01/16 | N/A | HCMS000122-125 |
| 138. | Payment to HCMSI dated 08/05/16 | N/A | HCMS000126-39 |
| 139. | Payment to HCMSI dated 08/19/16 | N/A | HCMS000140-43 |
| 140. | Payment to HCMSI dated 09/22/16 | N/A | HCMS000144-55 |
| 141. | Payment to HCMSI dated 12/12/16 | N/A | HCMS000177-80 |
| 142. | Payment to HCMSI dated 03/31/17 | N/A | HCMS000078-81 |
| 143. | Payment to HCMSI dated 03/26/18 | N/A | HCMS000181-83 |
| 144. | Payment to HCMSI dated 06/25/18 | N/A | HCMS000184-86 |
| 145. | Payment to HCMSI dated 05/29/19 | N/A | HCMS000100-12 |
| 146. | Payment to HCMSI dated 06/26/19 | N/A | HCMS000113-21 |
| 147. | Payments to HCMFA dated 05/02/19 and 05/03/19 | N/A | N/A |
| 148. | Payment to HCRE dated 11/27/13 | N/A | D-HCRE-000114-16 |
| 149. | Payment to HCRE dated 01/09/14 | N/A | D-HCRE-000100-06 |
| 150. | Payment to HCRE dated 01/30/14 | N/A | D-HCRE-000060-62 |
| 151. | Payment to HCRE dated 03/28/14 | N/A | D-HCRE-000107-13 |
| 152. | Payment to HCRE dated 01/26/15 | N/A | D-HCRE-000063-65 |
| 153. | Payment to HCRE dated 04/02/15 | N/A | D-HCRE-000066-71 |
| 154. | Payment to HCRE dated 10/12/17 | N/A | D-HCRE-000080-90 |
| 155. | Payment to HCRE dated 10/15/18 | N/A | D-HCRE-000091-99 |
| 156. | Payment to HCRE dated 09/25/19 | N/A | D-HCRE-000072-79 |
| 157. | Payment to NPA dated 08/21/14 | N/A | D-NNL-029156-59 |
| 158. | Payment to NPA dated 10/01/14 | N/A | D-NNL-029160-66 |
| 159. | Payment to NPA dated 11/14/14 | N/A | D-NNL-029167-69 |

8

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document Document Filed 09/04/30   Page 51 of 162   PageID 52898
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 16 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 160. | Payment to NPA dated 01/29/15 | N/A | D-NNL-029152-55 |
| 161. | Payment to NPA dated 07/22/15 | N/A | D-NNL-029171-85 |
| 162. | Robert Half Legal Invoices dated 05/06/21 and 5/20/21 | N/A | D-CNL003821-23 |
| 163. | Robert Half Legal Invoice dated 06/17/21 | N/A | D-CNL003824-25 |
| 164. | Robert Half Legal Invoice dated 07/01/21 | N/A | D-CNL003826-27 |
| 165. | Robert Half Legal Invoice dated 07/15/21 | N/A | D-CNL003828-29 |
| 166. | Robert Half Legal Invoice dated 08/19/21 | N/A | D-CNL003830-31 |
| 167. | Robert Half Legal Invoice dated 09/16/21 | N/A | D-CNL003832-33 |
| 168. | Robert Half Legal Invoices dated 09/02/21 and 09/30/21 | N/A | D-CNL003834-36 |
| 169. | Highland December 2020 Billing Detail | N/A | D-CNL000979-89 |
| 170. | Highland January 2021 Billing Detail | N/A | D-CNL000995-1016 |
| 171. | Highland February 2021 Billing Detail | N/A | D-CNL000990-94 |
| 172. | Highland March 2021 Billing Detail | N/A | D-CNL001080-1105 |
| 173. | Highland April 2021 Billing Detail | N/A | D-CNL000923-58 |
| 174. | Highland May 2021 Billing Detail | N/A | D-CNL001106-53 |
| 175. | Highland June 2021 Billing Detail | N/A | D-CNL001042-79 |
| 176. | Highland July 2021 Billing Detail | N/A | D-CNL001017-41 |
| 177. | Highland August 2021 Billing Detail | N/A | D-CNL001154-57 |
| 178. | Highland Supplemental August 2021 Billing Detail | N/A | D-CNL000959-78 |
| 179. | Highland September 2021 Billing Detail | N/A | D-CNL003812-20 |
| 180. | Highland October 2021 Billing Detail | N/A | D-CNL003837-66 |
| 181. | Declaration of Dennis C. Sauter, Jr. **(Adv. Pro. No. 21-3004)** | 32-1 | N/A |
| 182. | GAF Resolution Memo dated May 28, 2019 | N/A | N/A |
| 183. | **INTENTIONALLY OMITTED** | | |

**Appx. 00023**

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document Document Filed 08/03/22   Page 52 of 162   PageID 52899
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 17 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 184. | Defendant James Dondero's Rule 26 Initial Disclosures | N/A | N/A |
| 185. | Plaintiff's Third Amended Notice of Rule 30(b)(6) Deposition to HCMFA **(Adv. Pro. No. 21-3004)** | 84 | N/A |
| 186. | **INTENTIONALLY OMITTED** | | |
| 187. | **INTENTIONALLY OMITTED** | | |
| 188. | Email from David Klos to the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated February 2, 2018 **(Adv. Pro. No. 21-3003)** | 11-1 | N/A |
| 189. | Email dated February 2, 2018 confirming a wire transfer in the amount of $3,825,000 from the Debtor to James Dondero **(Adv. Pro. No. 21-3003)** | 11-2 | N/A |
| 190. | (a) Email from Blair Hillis to David Klos and the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated August 1, 2018 and (b) an email from David Klos to the Debtor's Corporate Accounting group, with a copy to Melissa Schroth, dated August 1, 2018 **(Adv. Pro. No. 21-3003)** | 11-4 | N/A |
| 191. | Email chain re Objections to Rule 30(b)(6) Notices (October 7 – 15, 2021) | N/A | N/A |
| 192. | Dustin Norris 12/1/21 Deposition Transcript | N/A | N/A |
| 193. | Dennis C. Sauter 11/17/21 Deposition Transcript | N/A | N/A |
| 194. | Kristin Hendrix 10/27/21 Deposition Transcript | N/A | N/A |
| 195. | David Klos 10/27/21 Deposition Transcript | N/A | N/A |
| 196. | Debtor's back-up for the December Monthly Operating Report, titled "December 2019 Due From Affiliates" **(Adv. Pro. No. 21-3003)** | 11-17 | N/A |
| 197. | Debtor's back-up for the September Monthly Operating Report, titled "September 2020 Due From Affiliates" **(Adv. Pro. No. 21-3003)** | 11-19 | N/A |
| 198. | Debtor's back-up for the January 2021 Monthly Operating Report, titled "January 2021 Due From Affiliates" **(Adv. Pro. No. 21-3003)** | 11-21 | N/A |
| 199. | Debtor's January 2021 Affiliates Loan Receivables Summary **(Adv. Pro. No. 21-3003)** | 11-22 | N/A |
| 200. | Amortization Schedule **(K. Hendrix 10/27/21 Depo., Ex. 14)** | N/A | D-NNL-029141-51 |
| 201. | Debtor's Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 474 | N/A |
| 202. | Committee's Objection to Debtor's Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 487 | N/A |

DOCS_NY:44700.1 36027/003

**Appx. 00024**

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 28   Filed 09/04/30   Page 53 of 162   PageID 52900
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 18 of 19

| Tab | Document | Docket No(s). | Bates |
|---|---|---|---|
| 203. | Joinder of Acis Capital Management, L.P. and Acis Capital Management GP, LLC to Committee's Objection to Debtor's Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 489 | N/A |
| 204. | Debtor's Reply in Support of Motion to Cause Distributions to Certain "Related Entities" **(Case No. 19-34054)** | 499 | N/A |
| 205. | NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018 **(Adv. Pro. No. 21-3005)** | 86-2 | N/A |
| 206. | Transcript of February 2, 2021 Hearing | N/A | N/A |
| 207. | Transcript of February 3, 2021 Hearing | N/A | N/A |

DOCS_NY:44700.1 36027/003

**Appx. 00025**

Case 21-03006-sgj   Doc 166   Filed 02/07/22   Entered 02/07/22 23:39:38   Desc Main
Case 3:21-cv-00881-X   Document 177   Filed 09/24/30   Page 54 of 162   PageID 52901
Case 21-03003-sgj Doc 128 Filed 12/17/21   Entered 12/17/21 16:30:42   Page 19 of 19



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

# *In Re: Highland Capital Management, L.P. Consolidated Notes Litigation*

# SUMMARY JUDGMENT EXHIBITS



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 26, 2022**

United States Bankruptcy Judge

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Chapter 11 |
| | § | |
| Plaintiff. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03003-sgj |
| | § | |
| vs. | § | |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Adv. Proc. No. 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## ORDER GRANTING MOTION TO STRIKE APPENDIX IN SUPPORT OF PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST THE ALLEGED AGREEMENT DEFENDANTS

Upon consideration of *Defendants' Motion to Strike Appendix in Support of Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment Against the Alleged Agreement Defendants* (the "Motion"), any response thereto, the pleadings, the record of the above-captioned and related adversary proceedings, and the arguments presented by the parties before this Court, the Court hereby finds that the Motion should be GRANTED.

Accordingly,

**IT IS HEREBY ORDERED** that:

Plaintiff's Reply Declaration of David Klos in Further Support of Highland Capital Management L.P.'s Motion for Partial Summary Judgment is hereby stricken from the record of the summary judgment proceedings.

<center>## END OF ORDER ##</center>

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | | |
|---|---|---|
| In Re: | ) | Case No. 19-34054-sgj11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Adv. Proc. No. 21-03003-sgj |
| | ) | |
| Plaintiff, | ) | |
| | ) | MOTION for SUMMARY JUDGMENT |
| v. | ) | and OMNIBUS MOTION to STRIKE |
| | ) | |
| JAMES DONDERO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Adv. Proc. No. 21-03004-sgj |
| | ) | |
| Plaintiff, | ) | |
| | ) | MOTION for SUMMARY JUDGMENT |
| v. | ) | and OMNIBUS MOTION to STRIKE |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT | ) | |
| FUND ADVISORS., L.P., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Adv. Proc. No. 21-03005-sgj |
| | ) | |
| Plaintiff, | ) | |
| | ) | MOTION for SUMMARY JUDGMENT |
| v. | ) | and OMNIBUS MOTION to STRIKE |
| | ) | |
| NEXPOINT ADVISORS, L.P., et al., | ) | |
| | ) | |
| Defendants. | ) | April 20, 2022 |
| _____ | ) | Dallas, Texas |

Captions continue on next page;
appearances begin on next page.

2

```
In Re:                                  ) Case No. 19-34054-sgj11
                                        )
HIGHLAND CAPITAL MANAGEMENT, L.P.,      )
                                        )
                    Debtor.             )
                                        )
_____)
                                        )
HIGHLAND CAPITAL MANAGEMENT, L.P.,      ) Adv. Proc. No. 21-03006-sgj
                                        )
                    Plaintiff,          )
                                        )
                                        ) MOTION for SUMMARY JUDGMENT
             v.                         ) and OMNIBUS MOTION to STRIKE
                                        )
HIGHLAND CAPITAL MANAGEMENT             )
SERVICES, INC., et al.,                 )
                                        )
                    Defendants.         )
                                        )
_____)
                                        )
HIGHLAND CAPITAL MANAGEMENT, L.P.,      ) Adv. Proc. No. 21-03007-sgj
                                        )
                    Plaintiff,          )
                                        )
                                        ) MOTION for SUMMARY JUDGMENT
             v.                         ) and OMNIBUS MOTION to STRIKE
                                        )
HCRE PARTNERS, LLC (N/k/a               )
NEXPOINT REAL ESTATE PARTNERS,          )
LLC), et al.,                           )
                                        )
                    Defendants.         ) April 20, 2022
_____) Dallas, Texas
```

Appearances:

```
For the Plaintiffs       John A. Morris
  (Via WebEx):           Hayley Winograd
                         Pachulski Stang Ziehl & Jones LLP
                         780 Third Avenue, 39th Floor
                         New York, New York  10017-2024

For Defendant            Michael P. Aigen
James Dondero            Deborah Rose Deitsch-Perez
  (Via WebEx):           Stinson, L.L.P.
                         3102 Oak Lawn Avenue, Suite 777
                         Dallas, Texas  75219


                Appearances continued on next page.
```

Appearances, continued:

```
For Defendant            Jeremy A. Root
John Dondero             Stinson L.L.P.
 (Via WebEx):            230 West McCarty Street
                         Jefferson City, Missouri  65101


For Defendant            Clay M. Taylor
John Dondero             Bonds Ellis Eppich Schafer Jones LLP
  (In courtroom):        420 Throckmorton Street, Suite 1000
                         Fort Worth, Texas  76102


For Defendants           Davor Rukavina
NexPoint and             Julian Preston Vasek
Highland Capital         Munsch, Hardt, Kopf & Harr
Management Fund          500 North Akard Street, Suite 3800
  (Via WebEx):           Dallas, Texas  75201-6659
```


```
Digital Court            United States Bankruptcy Court
Reporter:                Michael F. Edmond Sr., Judicial
                           Support Specialist
                         1100 Commerce Street, Room 1254
                         Dallas, Texas  75242



Certified Electronic     Susan Palmer
Transcriber:             Palmer Reporting Services
```


            Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

*Plaintiff's Motion to Strike*                                              4

1   <u>Wednesday, April 20, 2022</u>                        <u>9:41 o'clock a.m.</u>

2                        P R O C E E D I N G S

3          THE COURT:  All rise.  The United States Bankruptcy

4   Court for the Northern District of Texas, Dallas Division, is

5   now in session, the Honorable Stacey Jernigan presiding.

6          THE COURT:  Good morning.  Please be seated.

7          All right.  We have a long setting today in the

8   Highland Note adversary proceedings.  We have one lawyer here in

9   the courtroom and many on WebEx.  So let's start by getting

10  appearances.  Who do we have appearing for the plaintiff this

11  morning?

12      (Echoing voices.)

13          THE COURT:  All right.

14          MR. MORRIS:  This is —

15          THE COURT:  Go ahead.

16          MR. MORRIS:  This is —

17      (Echoing voices.)

18          THE COURT:  All right.  Mr. Morris, we're getting an

19  echo from you.  I don't know if you can hear what we hear, but

20  do you have two different —

21      (Echoing voices.)

22          MR. MORRIS:  If I exit, I'll be...

23          THE REPORTER:  He's on twice here.

24          THE COURT:  Okay.  We're showing from our end that you

25  are on twice, that you have two —

*Plaintiff's Motion to Strike*                                          5

1          MR. MORRIS:  Okay, is that better?

2          THE COURT:  Oh, yes.

3          MR. MORRIS:  Perfect, we're all set.

4          THE COURT:  There we go.  Okay, so let's get your

5    appearance on the record.

6          MR. MORRIS:  Anything — that I fixed that problem.

7    Good morning, Your Honor.  John Morris, Pachulski, Stang, Ziehl

8    and Jones for Highland Capital Management.  There are three

9    matters on for today's hearing which I'll discuss more fully

10   after I make my appearance.  I just wanted to note that I will

11   argue the plaintiff's motion to strike and for sanctions.  I'm

12   presuming that we go in this order.

13         My colleague Hayley Winograd will argue the

14   defendant's motion to strike and then I will return to argue

15   plaintiff's motion for partial summary judgment.  So you'll hear

16   from me today on two of the three motions and you'll hear from

17   Ms. Winograd on the third motion.

18         THE COURT:  All right.  Thank you.

19         Now for, I guess, the pleadings call them the

20   agreement or the alleged agreement defendants.  Maybe we have

21   multiple attorneys appearing for them.  So I'll hear — well,

22   first for James Dondero, who do we have appearing?

23         MR. TAYLOR:  Good morning.  Clay Taylor on behalf of

24   Mr. Dondero.  However, arguing the motions that are to be heard

25   today will be the Stinson law firm, and I will defer to them, to

*Plaintiff's Motion to Strike*                                              6

1    which individuals are going to be arguing which motions.

2            THE COURT:  Okay.  Thank you.

3            All right.  Hopefully people could hear.  Mr. Taylor

4    appeared for Mr. Dondero here in the courtroom, but he said the

5    Stinson law firm will be making arguments.

6            So who do we have appearing for which defendants at

7    the Stinson law firm?

8            THE REPORTER:  She's on mute, Judge.

9            THE COURT:  You're on mute.

10           Is that Ms. Deitsch-Perez?

11           THE REPORTER:  Yes.

12           MS. DEITSCH-PEREZ:  Yes, it is.  I'm sorry.  Can you —

13   can you hear me now?

14           THE COURT:  Now I can.  Thank you.

15           MS. DEITSCH-PEREZ:  Okay.  Good morning.  This is

16   Deborah Deitsch-Perez from Stinson and we will be arguing on

17   behalf of Mr. Dondero, on behalf of HCRE and HCMS, although we

18   will briefly also cover, just for the sake of coherence in the

19   argument — the arguments that are being made with respect to the

20   term loan slightly, although that will largely be covered by Mr.

21   Rukavina, who will be arguing on behalf of NexPoint and HCMFA.

22           On our side, I will be arguing the motion for summary

23   judgment.  Mr. Root, Jeremy Root, another of my partners, will

24   be arguing the debtor's motion for contempt and sanctions and to

25   strike.  And Mr. Aigen will be arguing the defendant's motion to

*Plaintiff's Motion to Strike*                                    7

1   strike the Klos declaration that included evidence for the first

2   time in the debtor's reply brief.

3          THE COURT:  Okay.  Thank you.

4          MS. DEITSCH-PEREZ:  But I will leave Mr. Rukavina to

5   introduce himself.

6          THE COURT:  All right.  Mr. Rukavina, are you out

7   there?

8          MR. RUKAVINA:  Yes, Your Honor.  Good morning.  Davor

9   Rukavina and Julian Vasek.  Can the Court hear me?

10         THE COURT:  Yes.

11         MR. RUKAVINA:  Your Honor, I'll be handling all

12  matters related to HCMFA and all matters related to NexPoint

13  except the joint issue regarding the alleged agreement.

14         I also, Your Honor, would suggest that we not take

15  these matters piecemeal.  I would suggest that debtor present

16  its arguments and evidence on all motions and then the

17  defendants respond at once.  That's how Ms. Deitsch-Perez and I

18  at least have prepared our presentations.

19         THE COURT:  All right.  First, are there any more

20  lawyer appearances?

21         All right.  Well, let's — let's talk about the

22  sequence and time allotments for arguments.  I know there were

23  emails, I think last Thursday, among counsel and my Courtroom

24  Deputy.  And I just assumed we were going to break these up from

25  the emails, but I don't feel strongly about it.

*Plaintiff's Motion to Strike*                                              8

1           Let me — I'm going to start with Mr. Morris.

2           MR. MORRIS:  If I'm —

3           THE COURT:  Mr. Morris, I mean as plaintiff, it's

4    appropriate to start with you.  What I thought I had signed off

5    on last Thursday afternoon was that each side would have two

6    hours for the motions for summary judgment.  And what I mean,

7    you know, the defendants collectively would have two hours and

8    the plaintiff would have two hours, with plaintiff reserving

9    some of their two hours for rebuttal.  But then I thought we

10   were carving up where the plaintiff's motion to strike, there

11   will be 30 minutes each, and then the defendants' motions to

12   strike, there would be 15 minutes each.  So I kind of have in my

13   brain coming out here that we were going to take it piecemeal,

14   as Mr. Rukavina said.

15          Mr. Morris, what would you like to say about that?

16          MR. MORRIS:  That's exactly my expectation and not

17   only is that the sole communications with the Court, I've never

18   heard of the concept that's being raised now for the first time.

19   Not only was that my understanding, not only was that the

20   presentation that was made to the Court to limit the time for

21   each of the three motions, but I don't understand how you can

22   possibly do this in the way that's being proposed.  I think you

23   need to resolve the two motions to strike before we can get to

24   the summary judgment motions, because the determination on each

25   of those motions is going to impact the scope of the summary

Case 21-03006-sgj   Doc 211   Filed 05/03/22   Entered 05/03/22 13:14:27   Desc Main
Case 3:21-cv-00881-X   Document Unt   Filed 09/07/22   Page 66 of 162   PageID 52913

*Plaintiff's Motion to Strike*                                                      9

1    judgment argument.  I just don't see how you can do it all at

2    once.  It will again allow them to inject into the summary

3    judgment motion the very evidence that I'm seeking to exclude.

4    I object.

5              MR. RUKAVINA:  Your Honor, I would respectfully — Mr.

6    Morris is right, that was our understanding, but part of that

7    understanding was that the summary judgment motions would

8    proceed first.  I think that the Court can easily conclude,

9    whether at the beginning or the end or under advisement, that

10   certain evidence ought to be stricken or ought not to be

11   stricken.  Of course we'll proceed however the Court wants to

12   proceed, but I will just respectfully suggest that they should —

13   they should argue all their motions at once and we'll argue all

14   our motions at once.  But, again, however the Court wants to

15   proceed.

16             THE COURT:  Ms. Deitsch-Perez, anything to add on the

17   point?

18             MS. DEITSCH-PEREZ:  I don't.  We're — I understand

19   each — each person's position.  It might be more useful the

20   Court to hear everything together so it's all together in your

21   mind.  I also hear Mr. Morris' point that he had a plan and it

22   would disrupt him to vary from the plan.  So the defendants are

23   prepared to do as Your Honor likes.

24             THE COURT:  Okay.  All right.  Well, I am going to go

25   with the plan that I thought — I thought you all had adopted.  I

*Plaintiff's Motion to Strike*                                          10

1    thought it was just sort of a question of how many minutes for

2    each.  And so what my brain needs to do is hear the motions to

3    strike first.  And, you know, that's going to affect what I'm

4    willing to hear people talk about in the motions for summary

5    judgment and responses.  So, with that, I will hear the

6    plaintiff's motion to strike first.

7          MR. MORRIS:  All right.  Thank you, Your Honor.

8    Before I begin the substance of that particular motion, I would

9    just ask Ms. Canty to put up on the screen one demonstrative

10   exhibit.  I had — I don't know if you've had a chance to see

11   this Your Honor, but about a half an hour before the scheduled

12   time of the hearing, I circulated to Ms. Ellison and to counsel

13   the demonstrative exhibits that I plan on using.  And I think

14   the first one that will just really be helpful for everybody.

15          As Your Honor knows, we submitted yesterday a 22-page

16   agenda for just three motions.  And obviously the complexity and

17   the paper that has undoubtedly burdened us all is necessitated

18   by the fact that there's five separate adversary proceedings,

19   even though they cover a host of related topics.  So what we did

20   for the convenience of the Court and for the convenience of all

21   parties is try to put in one place kind of a list of where our

22   evidence can be found.  And so, in no particular order, I have:

23   The motion for summary judgment; it shows you which docket

24   number in each adversary proceeding our motion can be found; it

25   highlights below that the three places, the three — the three

1    areas of evidence that we have introduced in support of the

2    motion; Mr. Klos' declaration; there is a separate appendix.

3    And then there's the reply appendix, which I will talk about in

4    our motion in a bit.  And, again, you've got all of the docket

5    entries.

6           And I think that it was probably just a mistake that

7    we didn't put the reply appendix in the HCMFA docket, although

8    the reply appendix really doesn't go to HCMFA, so maybe my

9    colleague decided not to file it there because that reply

10   appendix is limited to the Klos declaration, which is the

11   subject of the term note defendants' motion to strike, as well

12   as a stipulation that's independently filed on the docket

13   concerning the admissibility of plaintiff's exhibits.

14          The next item is our motion to strike.  It's got my

15   declaration with Exhibits 1 through 9.  It's got an errata and

16   it can show where the errata is.  And I'll get to that; the

17   errata really is no big deal.  It's that we had highlighted a

18   portion incorrectly.  And then there is a supplemental Exhibit

19   10 that was also filed in connection with the motion to strike,

20   with the plaintiff's motion to strike.

21          And then you've got defendant's motion to strike.  You

22   can see where our opposition and our brief are filed.  Those are

23   the docket numbers.  And below that is our appendix that we

24   filed in opposition to the defendant's motion to strike, and

25   that's Ms. Winograd's declaration.

*Plaintiff's Motion to Strike*                                    12

1          So I point this out, Your Honor.  I guess we can go to

2     each of these items as the motions come up, but I just wanted

3     the Court to know that we are very cognizant of the difficulty

4     of keeping track of where all of the evidence has been lodged.

5     And I hope — I hope that the Court and counsel find this useful

6     because I don't know that I got it perfect, but I tried my best.

7     And I think it accurately reflects all of the places where our —

8     where our evidence is lodged.  So unless the Court has any

9     questions, I'm prepared to proceed on the plaintiff's motion to

10    strike.

11         THE COURT:  All right.  Thank you for this.  If there

12    are no comments about this, I will hear your argument.

13         All right.

14         MR. MORRIS:  All right.  So, Your Honor, I think that

15    the agreement here is that on this first motion, the plaintiff's

16    motion to strike, each side would have 30 minutes.  We're the

17    movant.  I don't expect to use all 30 minutes.  And whatever

18    time remains, I'm going to just clock myself, I'll just reserve

19    for rebuttal.

20         Your Honor, this motion obviously was not brought

21    lightly.  There was a long string of emails that I engaged with

22    with my adversaries before filing the motion.  If we could just

23    put up the dec. that's associated with this motion.  This motion

24    was necessitated, from our view, because the defendants put into

25    the evidentiary record the Pully report.  The Pully report was

*Plaintiff's Motion to Strike*                                                    13

1    the subject of a motion that the defendants made that I'll talk

2    about in a moment that was denied.  And HCMFA engaged in

3    extensive discussion about an affirmative defense that they had

4    sought leave to — to plead, and that motion was also denied.

5         And so, as — as the defendants have pointed out, I

6    woke up the next morning and I was really — I was upset and I

7    did write an email and it did say that — I put them on notice

8    about what was happening here because I thought it was

9    completely improper to try to include into the record and to

10   make arguments that had been excluded by a very specific order

11   of the Court.

12        And let's be clear here.  The defendants were asking

13   the Court for permission to do something.  HCMFA filed their

14   motion for leave.  It's lodged at Docket 82 on their docket.

15   And they specific requested, quote:  Leave to amend its answer

16   to expressly deny that the notes were signed.  The UCC appears

17   to require a more express denial of signature.

18        So there was — there was a purpose to the motion.

19   They wanted permission from the Court to do something and they

20   wanted permission from the Court to do something because they

21   knew that they needed it in order to prove, you know, one of

22   their defenses.

23        I just have to point out that if you go back and you

24   look at that pleading, —

25        (Tones.)

*Plaintiff's Motion to Strike* 14

1    MR. MORRIS:  — there's like this six — the six steps

2    of assumptions that — that are — that they argue prove that it

3    was all a mistake.  But I just — you know we'll talk about this

4    more on the merits, but this one just jumped out at me.  Mr.

5    Dondero never told Mr. Waterhouse that the transfer was a loan,

6    just that the trans- — just to transfer the funds.  And I have

7    to tell you that statement, the game is over for HCMFA, because

8    Mr. Dondero told Mr. Waterhouse to transfer the funds.  What he

9    didn't tell him, what he didn't tell Mr. Waterhouse, and there

10   will be no dispute about this, is that the transfer was supposed

11   to be compensation.  There will be no evidence that Mr. Dondero

12   told Mr. Waterhouse that the transfer would be compensation.

13   This admission in this motion is the end of the game for HCMFA,

14   and we'll talk about that more in a moment.  But make no

15   mistake, HCMFA came to this Court and they asked for permission.

16       The term note defendants also came to this Court and

17   they asked for permission.  They knew the deadline in the

18   scheduling order had passed or was about to pass.  I think they

19   filed on the day that it was going to pass, and they asked this

20   Court for permission.  And they said:  Please, can you extend

21   the deadline so that I can commission a report and engage in

22   expert discovery.  And, —

23       (Tones.)

24       MR. MORRIS:  — again, no — no dispute, right, this is

25   their pleading.  They requested an extension of the deadline in

*Plaintiff's Motion to Strike*                                          15

1   the scheduling order so that NexPoint could designate a

2   testifying expert on the standards and duties of care under the

3   shared services agreement.  NexPoint wanted to present expert

4   testimony on the question of whether the debtor put their head

5   in the sand, in violation of any affirmative duty or obligation

6   they may have about the matter.  They asked the Court for

7   permission.

8          Twice my client invested a meaningful sum of money to

9   pay my firm to defend these motions.  Your Honor took the time

10  to hear these motions.  We actually had an evidentiary hearing

11  on the motion for leave.  I cross-examined Mr. Sauter for two

12  hours on that.  We had an extensive argument on the motion to

13  extend the expert discovery deadlines and the expert disclosure

14  deadlines.  And following both hearings, the Court entered

15  orders denying the motion.

16         Now from my perspective, the matter was closed.  They

17  could not assert the affirmative defense that they asked the

18  Court to assert because they made a motion and they lost.  Now I

19  understand, I read in their papers it was all out of an

20  abundance of caution:  We don't even think we needed to make it.

21  It's just an element of their case.  Nonsense.

22         The fact of the matter is, Your Honor, if you look at

23  the next slide, go back to the spring of 2021, Mr. Sauter did

24  his investigation, they came to Your Honor with the first motion

25  for leave to amend, and Mr. Sauter swore — a lawyer — Mr. Sauter

*Plaintiff's Motion to Strike*                                           16

1    swore under oath multiple times that Frank Waterhouse signed the

2    notes.  And we've highlighted just a few of them here.

3           Paragraph 22:  The notes were signed by mistake by

4    Waterhouse without authority from HCMFA.  Paragraph 29:

5    Waterhouse was the chief financial officer of both the debtor

6    and HCMFA at the time he signed the notes.  30:  Waterhouse made

7    a mistake in preparing and signing the notes.  32:  HCMFA now

8    believes that it has affirmative defenses to the notes in the

9    nature of mutual mistake, lack of consideration, and no proper

10   authority of Waterhouse to sign the notes.

11          Now, mind you, this declaration is submitted after Mr.

12   Sauter engages in an investigation to determine the origin of

13   the notes.  He interviewed Mr. Waterhouse three times.  And at

14   no time did Mr. Waterhouse say, 'I don't know what you're

15   talking about.  I don't know where these notes came from.'  In

16   fact, we know from the hearing, he said just the opposite.  He

17   told Mr. Sauter, although it's not in his declaration, nor was

18   it in his second declaration, he specifically told Mr. Sauter:

19   The notes were prepared for a very specific purpose; they were

20   prepared because the auditors needed them.  That was the

21   testimony, so the notion that they had always been doing this or

22   that they were just arguing in the alternative, they never

23   argued in the alternative.

24          This statement right here on the screen is the —

25       (Tones.)

*Plaintiff's Motion to Strike*        17

1       MR. MORRIS: — admission by HCMFA that Mr. Waterhouse

2   signed the notes, and we relied on that admission. Right? That

3   admission right there, this is their words, not mine. It's

4   their lawyer, not ours. It's under oath and it was done for the

5   express purpose of trying to persuade the Court that it should

6   be entitled to amend its pleading, where it had no affirmative

7   defenses previously, to assert this affirmative defense. That's

8   where we were.

9       As soon as I saw what they did and included the Pully

10   report and included extensive argument about the affirmative

11   defense that why had excluded, I immediately wrote to them.

12   And, let's be clear, there's only two possible things that are

13   going on here, only two possible things: One, they wanted to

14   make sure that they preserved their — their position for appeal,

15   okay? No problem with that.

16       The second is that they were trying to get into the

17   record, for appellate purposes, evidence and arguments that had

18   been excluded. And that's where I drew the line. They take

19   issue with my decision not to accept their stipulation, but I

20   don't know what lawyer in the world would have accepted their

21   stipulation. To accept their stipulation would have been to

22   give them what they wanted, and that is not to preserve the

23   issue for appeal but to introduce into evidence for purposes of

24   the record on appeal an expert report that was excluded and an

25   affirmative defense that was excluded.

1        I did make my own offer to kind of test what their

2    motivations were, and it's in the record, it's in that email.

3    And I specifically said:  Look, if your concern is preserving

4    the issue for appeal, I'm happy to stipulate to that.  It wasn't

5    much of a give, Your Honor, to be honest with you.  Why?

6    Because they appealed both orders.  Both orders are subject to

7    appeal, so there can be no argument today that the purpose of

8    including this stuff in the record was to preserve their

9    appellate rights.  The appeals have already been made, so what

10   they're trying to do is get into the record now what Your Honor

11   specifically excluded.

12       What do they say in response to our motion?  It's

13   pretty simple:  It's just a proffer.  Proffers are permitted.

14   Proffers are even permitted in summary judgment motions.  Your

15   Honor, I will stipulate to both.  They should not waste any time

16   trying to convince the Court that proffers are acceptable or

17   that proffers are acceptable in summary judgment motions.  What

18   they should be trying to do, what they can't do, is — is argue

19   that a proffer of evidence and arguments that have previously

20   been excluded by Court order can be entered I opposition to

21   summary judgment.  No case has ever held that.  They don't cite

22   to any case for that, okay.  That's why we made our motion,

23   because we think it's patently unfair for them to put this stuff

24   into the record now.  And I will say that I took —

25       (Tones.)

*Plaintiff's Motion to Strike*                                        19

1          MR. MORRIS:  — the time to read their cases and their

2    cases actually support us, they don't support them.  If you take

3    a look at just two of them, I think the two most important cases

4    are Fusco and Walden (phonetics).  And in both cases, they

5    didn't involve summary judgment.  They involve motions in

6    limine.  And what they basically said is:  Look, if you make a

7    proffer in the context of a motion in limine and the proffer is

8    denied, your issue is preserved.  And, in fact, the Fusco court

9    specifically said:  In many cases the grant of the prior motion

10   in limine — here it was a motion to exclude evidence — would

11   make it improper to call such witnesses without prior

12   permission.  All the proponent could do would be to line up the

13   witnesses at trial and then ask permission.

14          The defendants here didn't ask for permission.  In

15   fact, they did ask for permission and they were told no.  And

16   instead they just put this stuff in the record.  And, no matter

17   what I said, they wouldn't back down.

18          I liken this, Your Honor:  Parent and child.  Bear

19   with me for just a moment.  A child comes to a parent and says,

20   'May I have a cookie?'  And the parent says — the parent says to

21   the child, 'You can have a cookie after dinner.  You can have a

22   cookie during dessert.  That's the time to have a cookie.'  And

23   they sit down for dinner and they have dinner.  Dessert comes.

24   Parent puts the plate of cookies on the table.  The child

25   doesn't eat any.  Two hours later, —

*Plaintiff's Motion to Strike* 20

1        (Tones.)

2           MR. MORRIS:  — the parent is putting the child to bed.

3    And the child says, 'May I have a cookie now?'  And the parent

4    says, 'No, the time for having a cookie was at dessert.  You

5    knew what the schedule was.  You knew what the timing was.  You

6    can't have a cookie now.  It's too late.'

7           So child goes to bed.  Parent takes the child to

8    school the next morning.  Parent comes home, goes into the

9    child's room, and there's crumbs everywhere in the bed.  Child

10   comes home.  Parent says, 'I told you you couldn't have a

11   cookie.  What are you doing?'  And the child says, 'You told me

12   I couldn't have a cookie, but you didn't tell me I couldn't have

13   the round thing made of dough with chocolate chips.'  That is

14   exactly what the defendants are saying here.  That's the

15   totality of their response, Your Honor.

16          Their response is that your order denying these

17   motions didn't specifically say that they could proffer

18   evidence.  All they said is that they — I'll leave it to them.

19   I'd like to know what they think the orders meant.  That somehow

20   we went through that whole process and they could just put into

21   evidence and make arguments about matters that this Court said

22   no.  You told them the time for doing all of this has passed.

23   You told them you can't have a cookie, but they ate it anyway.

24          This is substantial prejudice to Highland and it's why

25   — it's why this motion had to be heard before the summary

*Plaintiff's Motion to Strike*                                    21

1  judgment motion.  They want to argue to you now the Pull report

2  even though they know I didn't have a chance to depose Mr.

3  Pully.  They want to argue their affirmative defense that they

4  didn't raise even though they made the motion and they lost

5  because they know I didn't have a chance to take any discovery

6  on this type of defense because they had said until they made

7  their motion that Mr. Waterhouse signed the notes by mistake

8  authority (phonetic).  That's the case I was trying, until we

9  got this motion.

10         So it would be severely prejudicial, and that's the

11  point.  And the interesting thing is, Your Honor, if we could go

12  to the next slide, I just want to conclude by raising a number

13  of questions that I just don't see — unless they answer these

14  questions, I probably won't even have a rebuttal here.  Okay,

15  how is it that Highland is worse off having won the motion.  If

16  hold didn't oppose the motion, we wouldn't have spent any money,

17  the Court wouldn't have been burdened, and I would have been

18  able to take discovery of Mr. Pully and on the affirmative

19  defense.  Had I argued the motion and lost, at least I would

20  have had the opportunity to take discovery.  And I would have

21  had the opportunity to take discovery of both Mr. Pully and on

22  this defense.  But instead I won the motion, so I'm worse off.

23  And now I'm supposed to deal with the summary judgment argument

24  on evidence and arguments that have been excluded that I haven't

25  taken discovery on it.

*Plaintiff's Motion to Strike*                                          22

1        I would like to know from the defendants how it is

2   that my position is worse having won the motions.  I'd also like

3   to know how come they don't address prejudice at all.  How come

4   — and it's not like I haven't raised the issue.  If you look at

5   my last email to Mr. Aigen, I had a laundry list of reasons why

6   I thought this was improper.  They didn't respond to that at

7   all.

8        In our motion, we gave a laundry list of reasons why

9   we're prejudiced here.  They didn't — maybe I missed it.  Maybe

10  they'll point out that I missed it.  It's possible.  But I don't

11  recall seeing anything in any of the papers that said why this

12  is proper and why the prejudice to Highland isn't what I say it

13  is.

14       I'd also like to know if the orders don't prohibit a

15  proffer on summary judgment, what exactly do the orders

16  prohibit?  If we didn't move for summary judgment, would the

17  defendants have been permitted to enter the Pully report into

18  evidence and pursue a new defense without having the orders

19  reversed?  Think about that.

20       If we didn't make the motion for summary judgment,

21  where would we be left?  Would they be able to do what they've

22  done now?  How does their position improve because we've made a

23  motion for summary judgment?

24       Number five, if as HCMFA contends it always asserted

25  that Highland didn't sign the notes, — that's a mistake on my

*Plaintiff's Motion to Strike*                                        23

1    part — if it contends that it always asserted that Highland

2    didn't sign the notes and that HCMFA is only challenging an

3    element of Highland's claim, then why did they make the motion?

4    Why did the burden me and my client and the Court with this

5    motion if there was no need for it?

6          There was a need for it, and just look at paragraph 1

7    of their motion.  There was a need for it.  They knew there was

8    a need for it.  They didn't plead in the alternative.  HCMFA

9    will never present a pleading to this Court where they asserted

10   that they didn't sign the note.  In fact, Mr. Sauter's sworn

11   representations to you are the exact opposite.

12         And, finally, I just leave them with this question,

13   because I didn't see it in their brief:  Identify one case

14   anywhere in the United States of America where a court has

15   permitted a party opposing summary judgment to proffer evidence

16   and pursue defenses that were excluded by very explicit,

17   explicit prior Court orders following full hearings on the

18   merits?

19         Unless Your Honor has any questions, — you know, let

20   me just say my goal in life is not to hold lawyers in contempt

21   of court, my goal in life is not to obtain sanctions, my goal in

22   life is to try cases fairly, and this is not fair.  It's just

23   not fair.  It's not consistent with any law.  And it does

24   violate not just the two orders that Your Honor entered but the

25   scheduling order.  And so under Rule 12, under Rule 32, under

*Plaintiff's Motion to Strike*                                    24

1    the rules of contempt that Your Honor is familiar with, the most

2    important thing to me is to keep this stuff out of the record.

3           At some point people have to be held accountable for

4    this kind of conduct, but I leave that to the Court's

5    discretion.  Unless the Court has any questions, I'm going to

6    reserve my 12 minutes for rebuttal.

7           THE COURT:  Okay.  Thank you.

8           All right.  Mr. Rukavina.

9           MR. RUKAVINA:  Your Honor, Ms. Deitsch-Perez will

10   handle half of our response and I'll handle the second half.

11          MR. MORRIS:  Okay.

12          MS. DEITSCH-PEREZ:  It's —

13          MR. RUKAVINA:  I apologize.  No, I apologize.  Not Ms.

14   Deitsch-Perez, her partner.

15          MS. DEITSCH-PEREZ:  Okay.  Mr. Root will argue.

16          THE COURT:  Okay, Mr. Root.

17          MR. ROOT:  Thank you, Your Honor.  This is my first

18   time having the privilege of appearing before you.  Ms.

19   Deitsch-Perez brought me into this case to assist on this motion

20   I think because I am the co-chair of our firm's appellate

21   practice group, and the ways in which arguments are preserved

22   for appeal are important to me professionally and they're

23   important to of course all our firm's clients and I do have a

24   little bit of insight that I have earned from my experience in

25   that area on how these kinds of pitfalls can emerge.

*Plaintiff's Motion to Strike*                                                     25

1          I'm going to address in my argument the portion of the

2    motion that's addressed to the Pully report and Mr. Rukavina is

3    going to address the affirmative defense issue.

4          And, with respect to the Pully report, it's a bit

5    curious to me because the nature of the conduct was clear at all

6    times.  It was clear in the filing to the Court.  It was clear

7    in discussions with Mr. Morris as to what was being done.  The

8    Pully report, — let me see if I can get this PowerPoint up —

9    I'll share it with the Court.  I'm not that adept at this and so

10   I hope I've got this right.

11         Can everyone see this?

12         THE COURT:  Yes.

13         MR. ROOT:  Okay, great.  And, you know, one of the

14   things where Mr. Morris began is with the multiplicity of

15   actions here.  There are multiple actions with multiple

16   defendants that are adversary proceedings that are

17   postconfirmation in bankruptcy court.  And, ultimately, the case

18   — the case is against — these defendants are going to be

19   resolved by a jury trial at the district court.  And that's an

20   important distinction to consider as you think through the

21   issues raised by the plaintiff's motion to strike.

22         You know, overall the plaintiff has not proved the

23   defendants or their counsel violated the express terms of any

24   order of this Court.  You know, with respect to the Pully

25   report, there is no burden to the plaintiff or this Court from

1    the use of a proffer.  And the rules that plaintiff relies upon

2    do not authorize their motion to strike, sanctions, or a finding

3    of contempt.

4            Neither the order denying the extension of the expert

5    witness deadline nor their order denying assertion of

6    affirmative defense, the Court should make any ruling on

7    admissibility of evidence at trial or for summary judgment.

8    This Court's order did not expressly bar the defendants from

9    offering the Pully report as a proffer to complete the summary

10   judgment record, which ultimately should this Court make a

11   conclusion adverse to either side, I assume there will be

12   objections to the report and recommendation that go to the

13   district court.  And, ultimately, the dispositive motions are

14   going to be decided by the district court in the end, not this

15   Court.  This Court will make a report and recommendation on the

16   motions that are heard today, but under the divisions of

17   jurisdictions in cases like this, any final decision is subject

18   to review in the district court.  And that's important because

19   the presence or absence of materials or arguments in the summary

20   judgment record will matter to the completeness of the record at

21   the district court.

22           Before I show you the precise conduct with regard to

23   the Pully report that's alleged to be in violation, I want to

24   make sure we all are oriented correctly to the standards in the

25   Fifth Circuit for contempt.  When a lawyer seeks contempt from a

*Plaintiff's Motion to Strike*                                        27

1    court against other lawyers and other parties, it's a very

2    serious thing to do.  And it's only warranted when someone

3    violates an order of a court requiring specific and definite

4    language that person do or refrain from doing an act.  That

5    hasn't happened here.

6           The orders here denied leave to amend the complaint to

7    add a new or a different affirmative defense and they denied the

8    extension of the date for expert designations in the case.  They

9    did not expressly prohibit a proffer for the purposes of

10   preserving the evidence on appeal, which are important purposes.

11          And so let's look at exactly what the defendants did

12   with are Pully report.  There is one footnote and it is present

13   in the appendix and this is it, right here, footnote 76.  It

14   says:  Defendants' position is bolstered by the expert report of

15   Steven J. Pully, which was incorrectly not permitted to be

16   included in the record by the Court.  Defendants submit this

17   proffer to preserve their objection.

18          That's it.  That's the completeness of the reliance

19   upon the Pully report, the argument really to the Pully report.

20   And right here it expressly acknowledges the Court's order and

21   shows the intention of the defendants to respect the Court's

22   order with which they disagree; that we — they have filed an

23   appeal to the district court.  And what plaintiff advised the

24   Court about the appeal in his argument, he did not mention that

25   in his response to the appeal he says the appeal is improper and

*Plaintiff's Motion to Strike*                                     28

1    should not be heard by the district court.  Well, then we're

2    back here in the soup.  Because if that appeal is improper and

3    we need to do something different to preserve our objections to

4    the exclusion of the Pully report, this is exactly what we've

5    done.  We've put it into the record and made this one footnote

6    reference.  And that's the only thing that's been done with

7    respect to the Pully report.

8         And after — after that, Mr. Morris was upset, as he's

9    candidly admitted, and he demanded that the report and the

10   footnote be withdrawn by January 25th or face sanctions.  And,

11   you know, we advised him in our email about this was — we

12   explicitly stated in our response that the expert order was

13   denied and the evidence was being offered as part of an offer of

14   proof.  And we asked him for authority stating that providing

15   such an offer of proof is improper or could be subject to

16   contempt.  He offered no authority, he responded quickly, and he

17   demanded lateral compliance with — with his demands.  Either

18   comply with the demands or you won't, they don't need any

19   further response.

20        Well, we didn't think that was adequate or sufficient

21   exchange of information among counsel on a subject as serious as

22   contempt.  And so the next day we wrote him back and offered

23   extensive authority regarding offers of proof, including the

24   cases he cites to Your Honor.

25        You know, the — as you know, offers of proof are

*Plaintiff's Motion to Strike*                                    29

1  typically used to permit the trial judge to reevaluate his

2  decision in light of the evidence to be offered and to permit

3  the reviewing court to determine to the exclusion of effective

4  and substantial rights of the party offering it.  That's Fortune

5  Auto from the Second Circuit in 1972, "A proffer of evidence may

6  be required if the trial judge is not well aware of the content

7  and purpose of the evidence."  Or the Tenth Circuit in the

8  Fevrick (phonetic) case.  "The court must be well aware of the

9  substance of the evidence and the record must reflect the

10 substance of the evidence," that's the Sheffield (phonetic) case

11 from the Eleventh Circuit.

12        And the Fifth Circuit, again in Maquay (phonetic),

13 "The proponent must show the substance of the proposed evidence

14 and make known to the court for whatever reasons the evidence is

15 offered."  And on and on.  Ample authority that this is exactly

16 what we should be doing, particularly here where this summary

17 judgment record is going to go to the district court on appeal,

18 or there — and if that happens, the district court needs to have

19 a complete record.  And the complete record, from our

20 perspective, should include the Pully report.

21        We acknowledge the Court's prior ruling with respect

22 to the Pully report.  We acknowledged it in the filing that the

23 plaintiff says is contemptuous and before that all of this

24 authority supports the decision that we made to include it in

25 the record in the minimal way that we've done.

*Plaintiff's Motion to Strike*                                          30

1        But we did more.  We offered to stipulate, and here is

2    an excerpt, the first excerpt from the stipulation, we offered

3    to stipulate the bankruptcy court may disregard the Pully

4    material in the opposition and consideration the opposition as

5    if it did not contain any references to the Pully material until

6    and also the deadline order is modified to allow the Pully

7    report to be used by defendants.

8        That solves entirely his prejudice concerns with

9    respect to the Pully report.  Enter the stipulation, we file it

10   with this Court, the Court disregards the Pully report, and we

11   move on.  And we have completed our record for appeal.

12       And that was the other thing that we asked for in the

13   stipulation:  Can we please agree that we preserved our

14   objections, that we properly preserved any objections that we

15   may have to the expert deadline order and that we properly

16   preserved any objection to the exclusion of the Pully report.

17   That's what we're — that's what we're after.  That was our goal

18   throughout.

19       In response to this stipulation, the plaintiff says:

20   Oh, if your issue is preserving the issue for appeal, I'd

21   consider a stipulation.  And if you're truly concerned with

22   reserving your right, I'll consider a stipulation.

23       But we sent him a stipulation that we thought was

24   appropriate and complete and necessary.  And that should have

25   been the end of the matter.  And we sent it to him the same day,

*Plaintiff's Motion to Strike*                                    31

1    we said, you know, this is an offer of proof, please let us know

2    if you have comments on the stipulation, and let's move forward.

3    No prejudice, no consideration of the Pully report.  Our

4    objections are preserved.

5           And he says this is havoc, and endless questions, and

6    we are insisting on ignoring Your Honor's orders.  That is just

7    not true.  Throughout this correspondence we acknowledge this

8    Court's order.  And we're doing what we believe to be necessary

9    to preserve the objections.

10          And it's the plaintiff's motion that's created this

11   needless burden this morning.  It manufactures expenses for

12   which to seek sanctions.  We offered to stipulate, as you've

13   seen, that the Court could disregard the Pully report.  And even

14   in the absence of a stipulation, the Court may disregard the

15   proffer and say, 'I'm not including it.  You've — my order was

16   the Pully report was untimely.'  And there's just no authority

17   anywhere to impose sanctions arising from circumstances like

18   this.

19          I'm not going to into how the proffer was appropriate.

20   In fact, Mr. Morris has admitted that the proffer is an

21   appropriate way to do this.  He just doesn't believe that's what

22   we're doing.  Well, the evidence is to contrary.  That's all we

23   were doing.  The Fusco (phonetic) case, which he relies upon,

24   does not support their position.  An adequate and complete

25   pretrial proffer will preserve the record.

1    In this case, with the multiplicity of matters, where

2    the Pully report was only informally injected into one of them,

3    in order to make sure the district court had a complete record,

4    we included the Pully report in the appendix.  That's what we

5    did.  That's why we did it.  And, you know, anything otherwise

6    is just contrary to the evidence and the facts.

7    Rule 37 just addresses failures to make disclosures or

8    cooperate in discovery; those matters are not at issue here.

9    And we acknowledge this Court's order and are willing to abide

10   by it and have offered to stipulate in a way that is clear and

11   would remove all prejudice from the defendants.

12   And if this Court were to strike the record, we — it

13   would needlessly complicate the record on appeal.  I have dealt

14   with this situation where in an appellate context a motion to

15   strike below is granted and the evidence that was stricken was

16   sought to be, you know, advanced as part of the argument about

17   the motion to strike, and often my adversaries will say, no, you

18   can't include that stricken evidence in the appendix because the

19   district court struck the evidence and, therefore, it shouldn't

20   be part of the record on appeal.  We're trying to avoid those

21   kinds of fights.  There are enough disputes in this matter.  And

22   the easiest and best way to do this is to deny the motion for

23   sanctions and move forward to the merits.

24   The Pully report merely completes the record.  And at

25   this point I'm going to pass, unless the Court has questions, to

*Plaintiff's Motion to Strike*                                          33

1    Mr. Rukavina to address the affirmative defense issues.

2            THE COURT:   Okay.   Here — here is my question and it

3    goes to Mr. Morris' point that he's worse off for having won the

4    motion to extend time to file the Pully report.   So let me give

5    you a hypo and you tell me if I'm wrong in thinking this is a

6    scenario that could play out.   So —

7            MR. ROOT:   Sure.

8            THE COURT:   — let's assume I deny the motion to

9    strike, okay, and it gets in the record for the limited purpose

10   of, you know, preserving it for appeal.   And let's also assume I

11   end up making a report and recommendation to the district court

12   that it grant the motion for a partial summary judgment.

13           And, then meanwhile, while that's sitting out there on

14   the district judge's bench or desk, the district court reverses

15   my earlier decision to extend the deadline — I should have

16   extended, I should have let the Pully report come in.   Then the

17   district court later gets off its desk my report and

18   recommendation, and it considers the Pully report, okay, because

19   it's reversed my earlier decision.   Isn't it true that the

20   plaintiff never would have gotten its chance to take discovery

21   and maybe present refuting evidence on the motion for summary

22   judgment?

23           MR. ROOT:   Yes.   So in the hypothetical, Judge

24   Jernigan, I think it's really where — where I know that

25   plaintiff will have their opportunity is in the context of the

*Plaintiff's Motion to Strike*                                    34

1    briefing around the objections to a recommendation on summary

2    judgment.  I am confident Mr. Morris would advise the district

3    court, 'If you are going to consider the Pully report, I need an

4    opportunity to take more evidence,' which could happen.  If the

5    district court — you know if the district court concludes Your

6    Honor was incorrect on the extension of the deadline with

7    respect to this report, I don't want to prejudge what will need

8    to happen next, but a natural thing to happen next would be to

9    provide Mr. Morris an opportunity to take a deposition of Mr.

10   Pully and develop any kind of rebuttal evidence that he thought

11   was necessary.

12           I don't know what all that's — you know, I don't — I

13   don't know what path that's going to take.  I can't prejudge, I

14   don't know.  And where we are right now is, is it possible the

15   district court relies on the Pully report and the summary

16   judgment record?  Hypothetically, yes.  But I just know, from

17   even my short time on the case, that Mr. Morris will object

18   strenuously to that.  And — and, from our side, we would not

19   object to Mr. Morris taking discovery — taking expert discovery

20   on the Pully report.  Where we are right now, the Pully report

21   shouldn't be considered, we acknowledge that.  That's Your

22   Honor's order which we disagree with but respect.  But in order

23   to complete the record on this summary judgment motion, we have

24   included it.  In the event that as this case progresses and the

25   various appeals progress, allow for it to be considered.  And

*Plaintiff's Motion to Strike*                                             35

1    whether and when that happens and the circumstances and

2    opportunities that will generate for Mr. Morris are as yet

3    unknown.

4              THE COURT:  All right.

5              MR. ROOT:  But that's where we are.  And I don't think

6    he's worse off from us including it in the record because we

7    have admitted to the Court and to him that it need not be

8    considered as part of the summary judgment in this proceeding in

9    front of Your Honor.

10             MS. DEITSCH-PEREZ:  And, Your Honor, if it helps, we

11   would represent that if Mr. Morris — if the district court did

12   as Your Honor hypothesized, we would not object to Mr. Morris

13   taking Mr. Pully's deposition and we would not object if Mr.

14   Morris thereafter said we need to get a rebuttal expert, and

15   then we would take rebuttal expert's deposition, and it would

16   all be included, so we would stand by that.  Thank you.

17             THE COURT:  All right.  Mr. Rukavina.

18             MR. RUKAVINA:  Thank you, Your Honor.

19             Mr. Vasek, if you will please pull up my PowerPoint.

20             So the facts and circumstances of the failure to sign

21   is a little bit different.

22             Mr. Vasek, the first page, please.  Scroll down now to

23   the next page and the next page.

24             So the time line here, Your Honor, is important.  And

25   I know that the Court prepares her own time line, so we can

*Plaintiff's Motion to Strike*                                      36

1    ignore the top half.  That goes to the merits.

2           But on January 22nd, Highland filed its complaint.

3    Marc 1, we answer.  May 22, we file a motion for leave to assert

4    a mutual mistake and that Mr. Waterhouse was not authorized to

5    sign the notes.  Now that's important because the Court granted

6    that motion for leave, and we ended up on July 6 filing our

7    amended answer.  Your Honor has that amended answer at Docket

8    48.  Twice in there, we expressly state the defendant did not

9    authorize Waterhouse to sign the notes or to bind the defendant.

10          So — so that's — so that was our live pleading, that

11   the defendant did not authorize Waterhouse to sign the note.

12   This is — this is important because now we have to

13   cross-reference to the UCC.  And, Your Honor, we briefed the

14   UCC, it's on page 11 of my opposition brief.  And the UCC says:

15   If the validity of a signature is denied in the pleading, the

16   burden of establishing validity is on the person claiming

17   validity, but the signature is presumed to be authentic.

18          So this now put me in a very interesting position, and

19   there is no case law on this.  We clearly denied the validity of

20   the signature.  We said Waterhouse wasn't authorized, he wasn't

21   our representative.  He didn't have any authority to sign it.

22   But we did not deny the fact of his signature because, as Mr.

23   Morris pointed out our prior investigation, Mr. Sauter asked Mr.

24   Waterhouse and Mr. Waterhouse just flippantly said, 'Well, if

25   it's got my signature, it's my signature.'

*Plaintiff's Motion to Strike*                                        37

1        So — so going back to the time line, on May 28th we

2   serve our requests for production and on June the 28th, Highland

3   responds.

4        Mr. Vasek, if you will please pull up the — the

5   appropriate RFP.

6        So you see, Your Honor, there on number 9 we ask for

7   all Microsoft Word copies of the notes, including meta data.  So

8   the debtor first objects to the term meta data as vague, which I

9   find inconceivable that a trial lawyer wouldn't know what that

10  means, but then it says:  Subject to the objection, to debtor

11  will conduct a reasonable search for and produce responsive

12  documents.

13       So that's the response that I get.  And I'm now led to

14  believe from this response that they're going to look for the

15  originals and they'll produce the originals, maybe not meta

16  data, but they will produce the originals.

17       If we go back to the time line, Mr. Vasek, please.

18       Months go by, Your Honor, and the debtor does not

19  produce the originals.  I ask about it a couple of times and I

20  get no real response.  On October the 19th, as we are deposing

21  Mr. Waterhouse, the man who purportedly signed the notes, Ms.

22  Deitsch-Perez expressly asked Mr. Morris, "Are you going to

23  produce the originals," and he says no, doesn't give any

24  response or reasoning.  He says no.

25       After that, Mr. Morris and I have a few discussions

*Plaintiff's Motion to Strike*                                     38

1   and the debtor does agree to produce the originals.  They're

2   produced on October the 25th, right before I depose Ms. Hendrix

3   (phonetic).  At that point in time, it became clear that Mr.

4   Waterhouse did not sign the notes.  That is a fact.  Ms. Hendrix

5   took copied images, JPGs of his signature and she affixed them

6   to the notes.  Maybe Mr. Waterhouse authorized it, maybe he

7   didn't, there's conflicting evidence on that, but the simple

8   fact is that Mr. Waterhouse did not sign those notes.

9           We promptly file our second motion to amend and this

10  Court denies the second motion to amend.  I will admit that I

11  was surprised that the Court seemed not to take any issue with

12  the discovery gains or at least what I thought was a discovery

13  gain, especially when Mr. Morris' response was, 'Well, Mr.

14  Rukavina, you could have issued a new — should have moved to

15  compel me.'  But the Court denied the motion.

16          Go to the next slide, please.  And go to the next

17  slide, please.  And go to the next slide, please.  And go to the

18  next slide.  And to the next slide.

19          Okay.  So — so where are we now?  We know as a fact

20  that Waterhouse did not sign the notes.  We know that — that we

21  would have known this earlier had the debtor produced the

22  originals.

23          I'd also like to remind Your Honor respectfully that

24  when we were discussing reference withdrawal, I argued both

25  before this Court and the district court that the reference

*Plaintiff's Motion to Strike*                                    39

1    should be withdrawn immediately to avoid a bifurcated

2    proceeding, to avoid a procedurally-confusing proceeding where I

3    really have two courts now addressing the same issues.

4            When we filed the second motion to admit, we did not

5    admit that leave was necessary.  In fact, we expressly pointed

6    out that the UCC is confusing and we filed a second motion for

7    leave out of an abundance of caution.  Also very important, no

8    court has ruled whether the failure to sign is an affirmative

9    defense or not.  This Court did not address that issue or rule

10   on it when it denied my Rule 15 motion and the district court

11   hasn't ruled on it.  And, honestly, there is no case law on

12   that.  But we do know that Texas law permits the general denial,

13   so I believe that the correct way to harmonize is that the

14   failure to sign is not an affirmative defense, but it needs to

15   be denied or, rather, the validity needs to be denied in that

16   UCC section that we mentioned.

17           So now we have the summary judgment motion.  We have

18   no definitive ruling on whether my defense is an affirmative

19   defense or not.  And — and in my response, I expressly state, I

20   expressly referenced this Court's prior denial of the Rule 15

21   motion.  I'm not trying to hide it.  In the meantime, on or

22   about January the 23rd, we filed not an appeal with Judge Starr

23   but a motion to reconsider, because, pursuant to the rules

24   governing magistrates, which this Court has said she's acting as

25   a magistrate, you have 14 days to move the district court to

*Plaintiff's Motion to Strike*                                          40

1    reconsider.  So that's all that we did.

2           But I think most importantly, Highland itself in its

3    motion raised the signature issue.  This is from their own

4    brief.  Highland states that Highland must establish that the

5    nonmovant signed the note.  Highland raised that issue.  And

6    Highland introduced evidence, which I submit is false evidence,

7    that my client signed the notes.  It's in our brief, but

8    Highland's — Highland's motion and brief state that the demand

9    notes are valid, signed by HCMFA, and they reference Mr. Klos'

10   declaration.  Mr. Klos' declaration begins with, "This

11   declaration is based on my personal knowledge."

12          Next slide, please, Mr. Vasek.

13          But at deposition, Mr. Klos said, "I asked Ms. Hendrix

14   to prepare a note."  I asked him, "Did you have anything more to

15   do with papering, preparation, or execution," and he says, "Not

16   that I can remember."

17          I ask him, "Would you have had any role in either or

18   both of the notes actually being signed by ink or

19   electronically," he says, "Likely not, no."

20          So where is his personal knowledge from?  So, Your

21   Honor, the facts here — this is an unfortunate motion, it's

22   unfortunate that I'm facing contempt for the first time ever in

23   my life because all I told was the truth, that Mr. Waterhouse

24   didn't sign the note.  Highland seeks contempt over something

25   that it — that is its fault because it did not timely produce

*Plaintiff's Motion to Strike* 41

1   documents.  Highland seeks contempt over something that it

2   raised in its motion for summary judgment, based on what I

3   suggest is false or misleading evidence.  And Highland seeks

4   contempt when all I'm trying to do is preserve my client's

5   rights before the district court, because what has to be

6   remembered is that my only remedy after this Court issues a

7   report and recommendation is to object.  I cannot introduce new

8   facts.  I cannot file a motion for de novo — or, I'm sorry — a

9   motion to reopen the record.  All I can do object.  So if I do

10  not respond to something that Highland raises, then my client is

11  prejudiced.  Yet we have absolute facts that Mr. Waterhouse

12  didn't sign the notes.

13          Go to the next slide, please.

14          So, in conclusion, Your Honor, on the contempt issue,

15  as a matter of law, no order prohibited me from making this

16  argument or presenting any evidence.  The denial of the Rule 15

17  motion was just that, a denial of the motion.  There is no

18  specific order requiring my client or me to perform or refrain

19  from performing in a particular way.  Nor did I violate the

20  spirit of that order.  It is absolutely easy and cheap for this

21  Court to now report and recommend that this was an affirmative

22  defense that was waived by the failure to timely assert it.

23  This does not require complicated briefing.  This Court can

24  recommend how it wants to go the district court.  There's no

25  prejudice.

*Plaintiff's Motion to Strike*                                          42

1          Mr. Morris' representations about discovery, it's

2    patently false.  Mr. Waterhouse was deposed.  Ms. Hendrix were

3    deposed.  We all asked them questions on these issues.  There is

4    no need to redepose them again, but if they want to redepose

5    them again, fine, I'll pay for it.  So there's no — there is no

6    prejudice by a lack of discovery.  And, again, they caused this

7    issue by not producing the original notes.

8          Rule 12 and 37 don't apply, just as Mr. Root stated.

9    I also submit that the Court does not have core jurisdiction

10   over contempt.  And I believe Your Honor should not strike these

11   arguments and strike this evidence because the Court cannot

12   decide what the district court gets to hear and gets to

13   consider.  That is a constitutional problem.  All that this

14   Court can do is report and recommend.  And if the Court finds it

15   appropriate to report and recommend that this defense should not

16   be considered because it's an affirmative defense that was

17   waived, then that is Your Honor's decision, but I will still

18   then have my right to raise the issue and argue it in front of

19   the district court, which will ultimately decide these issues.

20         So, Your Honor, I think respectfully in the last 20

21   years or so, our practice has become much more bitter — you can

22   close this, Mr. Vasek — it's become much more adversarial, and

23   there is just no need for it, in what is a cold promissory note

24   case, we gave — we offered stipulations, we offered to preserve

25   everyone's rights, and I cannot believe that I am now looking at

*Plaintiff's Motion to Strike*                                      43

1    contempt, as is my client, because all that we did was to tell

2    the truth in response to Highland's own allegation.  Thank you.

3            THE COURT:  All right.  Rebuttal, Mr. Morris.  You've

4    got 12 minutes.

5            MR. MORRIS:  I do.  Let me just take a moment to set

6    my clock.

7            Interestingly, Your Honor, I don't believe that they

8    answered any of the questions that I posed, but I'm going to

9    respond nevertheless.

10           Mr. Root, nice to meet you.  Welcome to Highland.

11           I just want to respond to a couple of comments that he

12   made.  He raised the issue of a jury trial.  Obviously that's

13   irrelevant here.  This is a motion for summary judgment.  Your

14   Honor is going to make a report and recommendation.  It's going

15   to go to the district court and the district court is going to

16   decide the issue.  So this is not about a jury trial, this is

17   about a bench trial, until we get to the jury.

18           Number two, you know both he and Mr. Rukavina dance

19   around your orders and what the motions were about.  They're

20   telling you that you didn't tell them that they couldn't have

21   that round thing made of dough with chocolate chips, you just

22   told them that they couldn't have a cookie.  I don't get it.

23   For the life of me, I don't get it.

24           With all due respect to Mr. Root, we know well how

25   serious contempt motions are.

*Plaintiff's Motion to Strike*                                        44

1          (Tones.)

2          MR. MORRIS:  We've had a couple of them here.  We

3    briefed them extensively.  The Court is intimately familiar with

4    the standards for contempt.  There was an order, they knew about

5    the order, and they breached it.  It's really not more

6    complicated than that.

7          He tries to minimize, Mr. Root tried to minimize what

8    they've done here, but it goes back to what I said in the

9    beginning, and that is there could only be two reasons for doing

10   this.  One is because you wanted to preserve the appellate right

11   and the other is to sneak this into evidence for purposes of the

12   record.  And he basically admitted that's what they're trying to

13   do.  He pointed to footnote 76, he put it up on the screen.  And

14   he said, 'Gosh, all we did was say, you know, there's something

15   on there.  We didn't even make any arguments.'  They don't care

16   about you, Your Honor.  They don't care about this proceeding.

17   Their eyes are on Judge Starr in the district court, and what

18   they want to be able to do is get this into the record now so

19   they can make their arguments then, and that's the prejudice.

20         The notion that somehow they're graciously willing to

21   give me the opportunity to do discovery later on, that was what

22   their motion was about.  Their motion was to extend an order of

23   this Court to allow them to participate in expert discovery.

24   They made their motion and they lost, and now they say the

25   remedy is to just do what they were told they can't do.  Round

*Plaintiff's Motion to Strike*                                                    45

1    thing made of dough with chocolate chips, but then a cookie.

2           The stipulation.  Mr. Root spent a lot of time on the

3    stipulation.  Again, I would have been perfectly fine, and I'm

4    willing to do it right now, if they withdraw the Pully report —

5    and let me be clear — if they withdraw the Pully report and the

6    arguments related to the barred defense, I will stipulate right

7    now on the record that those issues are preserved for appeal,

8    because they presented them to Your Honor, they asked Your Honor

9    to do something, they made a motion, they asked Your Honor,

10   'Please make a ruling,' now they say it's somehow

11   unconstitutional.  Nobody forced them to do it, what they chose

12   to do.  And Your Honor entered rulings.  And now somehow,

13   because I wouldn't agree to do what they couldn't get you to

14   allow them to do, I'm the bad guy.  Again, my offer remains:  If

15   the issue is preservation of appeal, withdraw the Pully report,

16   withdraw the affirmative defense, and I stipulate those issues

17   are preserved for appeal.  They are already subject of appeal.

18   There's a mention of it's not an appeal, it's a motion for

19   reconsideration.  In my life I've never heard of a motion for

20   reconsideration being made in any court other than the court

21   that issued the order.  But, be that as it may, it is what it

22   is.  That's Mr. Root.

23          Mr. Rukavina spent most of his time arguing yet again

24   the merits.  He said that Mr. — Mr. Waterhouse flippantly said

25   that he signed the notes.  I don't want to spend too much time

*Plaintiff's Motion to Strike*                                              46

1    on the merits, Your Honor, but remember Mr. Sauter's

2    cross-examination on this very motion.  Mr. Waterhouse didn't

3    flippantly say anything.  What he did is he told Mr. Sauter in

4    very clear and unequivocal terms that he knew about the notes

5    and that the notes were prepared for a very specific purpose.

6    That's not flippant.  It wasn't disclosed to you, but it

7    certainly wasn't flippant on Mr. Waterhouse's side.

8            And remember, because Mr. Waterhouse has never denied

9    the existence of the notes, I don't know why they're pressuring

10   Mr. Waterhouse like this.  It's sad to me.  But they are

11   destroying the man.  And why are they destroying the man?

12   Because if they're right and this note was somehow done without

13   Frank's authority, then — then Mr. Waterhouse and Mr. Dondero,

14   by the way, made enormous and grievous mistakes in their

15   representations to the auditors in the dozens of filings in this

16   bankruptcy case that the creditors committee relied upon.  Mr.

17   Waterhouse prepared every single monthly operating report.  So

18   Mr. Waterhouse didn't just make a mistake with respect to these

19   notes, he made dozens of mistakes.  I — they're putting the guy

20   under — under the bus.  That's on them.

21           Mr. Rukavina says that he served a discovery request

22   and we said we'd produce it and that he asked about it a couple

23   of times, the record is clear Mr. Rukavina remained silent for

24   many, many months.  Never followed up.  And while I admit that

25   upon receiving the first follow-up request in the later half of

*Plaintiff's Motion to Strike*                                                47

1   October about this matter, I said no.  The fact is I produced it

2   within 10 days.  I produced everything within 10 days of the

3   follow-up request.  It is not the first time in litigation and

4   it's certainly not the first time in this case that follow-up

5   document productions occurred.  Within 10 days of the follow-up

6   request, they had everything they wanted.

7           Of course they never answer why they didn't do the

8   investigation in May of 2019, when Mr. Dondero was fully in

9   control, and then the notes are actually described in the

10  audited financial statements, but we'll save that for a bit.

11          And Mr. Rukavina complains that there's two courts.

12  Woe is me.  Happens every single day.  There's magistrate

13  judges, there's — there's reports and recommendations.  Your

14  Honor knows better than I do, better than anybody on this — on

15  this hearing how these matters work.  There is nothing unusual

16  about it.  They made a motion, they lost, and now they're

17  ignoring it.  And for those reasons, Your Honor, we know that

18  this — the Pully report should be stricken, they should not have

19  an opportunity to make arguments in the district court.  What

20  they should be able to do and what I will stipulate that they

21  can do is appeal the order.

22          And they can appeal the order.  I mean I don't know if

23  the time has passed, frankly, so I don't — I don't want to open

24  the door to something that may have already been closed.  But

25  the fact of the matter is they should go to Judge Starr and they

*Plaintiff's Motion to Strike*                                          48

1    should explain to Judge Starr why you got it wrong.  They

2    shouldn't be allowed to make me sit in an absolutely worst place

3    than I would have been had I not opposed the motion or had I

4    lost, because that is where we are.  And I don't care how

5    gratuitous they are in saying, 'You could take discovery.'  I

6    had that option last fall and they didn't want to do it.  They

7    can't force it on me now.

8             Unless Your Honor has any questions, I've got nothing

9    further.

10            THE COURT:  Just one.  Just refresh my memory.  I have

11   the memory of a very lengthy hearing on the Rule 15 motion to

12   amend.  And I guess it was the same day the motion to extend

13   time to add Pully as an expert.  Mr. Sauter testified — was it

14   Mr. Sauter?  I'm thinking —

15            MR. MORRIS:  It was — it was Mr. Sauter.  I'm sorry to

16   interrupt, Your Honor, but just to be clear.

17            THE COURT:  Yeah.

18            MR. MORRIS:  Mr. Sauter is the attorney who —

19            THE COURT:  Right.

20            MR. MORRIS:  — submitted the declaration in connection

21   with the first motion for leave to amend.

22            THE COURT:  Okay.

23            MR. MORRIS:  The attorney who submitted the

24   declaration in support of the second motion for leave to amend.

25   And I did cross-examine him at length about, among other things,

*Plaintiff's Motion to Strike*                                    49

1    his conversations with Mr. Waterhouse —

2             THE COURT:  Waterhouse.

3             MR. MORRIS:  — where I brought out that Mr. Waterhouse

4    specifically told him why the notes were prepared.

5             THE COURT:  Okay.  But that's what I thought I

6    remember —

7             MR. ROOT:  Just to —

8             THE COURT:  — but what I wanted to clarify, Waterhouse

9    was not a witness that day.  He —

10            MR. MORRIS:  Correct.

11            THE COURT:  — he didn't submit a declaration at any

12   time in connection with this litigation, correct?

13            MR. MORRIS:  The only statement that we have from Mr.

14   Waterhouse is the singular deposition.

15            THE COURT:  Okay.  All right.  Was someone else

16   wanting to respond —

17            MR. ROOT:  And, just to be clear, —

18            THE COURT:  Um-hum.

19            MR. ROOT:  — and, just to be clear, Your Honor, at the

20   — I believe the transcript on the motion to extend the expert

21   discovery deadline, and there were no witnesses at that hearing,

22   it was a separate hearing.

23            THE COURT:  Okay.

24            MR. RUKAVINA:  Yeah, agreed.  Mr. Root is correct,

25   Your Honor, the hearings were maybe a month apart.

*Plaintiff's Motion to Strike*                                    50

1          THE COURT:  Okay.

2          MR. RUKAVINA:  And I just want to refresh Your Honor's

3    memory, if I may refresh Your Honor's memory that at the

4    beginning of the Rule 15 hearing I had argued that under the

5    Local Rules that live testimony was inappropriate and that we

6    were limited to our respective appendices, Your Honor overruled

7    that objection.  Otherwise Mr. Waterhouse would have been

8    subpoenaed to be there.

9          MR. MORRIS:  Your Honor, I —

10          THE COURT:  Say again.

11          MR. MORRIS:  — I just —

12          THE COURT:  You — you did not want witnesses —

13          MR. MORRIS:  — just —

14          THE COURT:  I said, yes, witnesses were allowed.  And

15    then you say you would have subpoenaed him if you knew how I was

16    going to rule; is that what I just heard?

17          MR. RUKAVINA:  No, Your Honor.  No, Your Honor, that's

18    — that's — I didn't know how Your Honor was going to rule.  We

19    have the transcript if the Court questions my memory.  I had

20    argued that under the Local Rules and our practices, when you

21    have an adversary proceeding in the motion, that you are

22    limited, both sides are limited to the evidence in their

23    appendices.  Mr. Morris disagreed with that.  He had subpoenaed

24    Mr. Sauter.  And the Court said, no, you're allowed to call

25    witnesses at this hearing.

*Plaintiff's Motion to Strike* 51

1          What I'm telling Your Honor is if I had known that it

2     was going to be a live hearing with live witnesses, instead of

3     relying on what I thought was the Local Rule, then we would have

4     subpoenaed Mr. Waterhouse.  He was not there because we're

5     trying to hide him or anyone is trying to him.

6          MR. MORRIS:  Your Honor, just to be very clear as to

7     what happened, I didn't — I served a subpoena on the person who

8     submitted a declaration in support of the motion.  I didn't call

9     any other witnesses, okay, so and I think that that was the

10    substance of Your Honor's ruling, was that if you — if you want

11    to submit a declaration, you have to put — you know when

12    somebody wants to cross-examine, you have to be able to do that.

13    And that's all I did.

14         THE COURT:  Okay.  All right.  Well, I'm going to

15    grant the motion to strike, but I am going to deny a request to

16    issue a contempt order or to impose any sanctions.  I find the

17    latter somewhat of a close call, I will tell you all.  But if

18    it's a close call on something as serious as contempt or

19    sanctions, I think the better exercise of discretion is not to

20    order contempt or sanctions.  And let me be clear about a couple

21    of things.

22         I feel like what we have had here has sounded a whole

23    lot like the defendants rearguing motions that I've earlier

24    denied.  You know as I recall, and it's been a few weeks, with

25    regard to the Steven Pully report, you know I had no doubt about

*Plaintiff's Motion to Strike*                                              52

1   his stellar credentials or anything like that, I simply thought

2   not only was it too late in the game but this was not a proper

3   subject matter for expert testimony as I understood the nature

4   of what he was potentially going to be added for.  And I do

5   agree very much with Mr. Morris' argument that he's worse off

6   than had he not won the motion earlier, because it will be there

7   in the record and maybe he won't end up having a chance to

8   depose or put on his own refuting evidence.

9          You know I gave one hypo, and the defendant lawyer

10  said, oh, we would agree, you know, to reopen discovery or

11  whatnot.  You know I'm also worried about a district court staff

12  who has stacks and stacks of papers who, just like I and my

13  staff, sometimes have troubling keeping up with what's in the

14  record and what's not.  You know they may look at it

15  inadvertently in the scenario that they deny the motion for

16  reconsideration that has been filed by the defendant.  So this

17  must be stricken.

18         And then with regard to the new defense that was

19  attempted of Waterhouse did not personally, physically sign the

20  notes, again I feel like we've had a reargument of my Court's

21  denial of the Rule 15 motion to amend here today, but let me be

22  clear.  You know we always say context matters.  And when this

23  Court denied the Rule 15 motion, you know more often than not

24  certainly this Court gives leave to amend in a Rule 15 context,

25  but the Court did not view this as any run-of-the-mill Rule 15

*Plaintiff's Motion to Strike*                                          53

1    motion.  We had, here's the context:  Notes that I think in the

2    aggregate two HCMFA notes that were 7.6, $7.7 million that were

3    executed or not on May 2nd and May 3rd, 2019, just five months

4    before the bankruptcy.  It seemed, I'll be blunt, not remotely

5    credible what was being urged here at the eleventh hour, or

6    many, many months into the litigation, that an individual who

7    was CFO of Highland and I guess treasurer, I think that was his

8    title, with HCMFA, that he had not from the get-go, when he was

9    totally accessible to the defendants for many months, because he

10   now works in the Skyview new startup of former Highland

11   employees, it just seemed inconceivable that this late in the

12   game suddenly there was a new-found 'Oh, he didn't sign the

13   notes,' it just did not seem remotely true to the Court, based

14   on what was put before me at that hearing.  So I was not going

15   to allow a late-in-the-game Rule 15 amendment when I absolutely

16   did not find the evidence credible to support the motion.

17          So I am going to grant the motion to strike any

18   references to this defense of Waterhouse did not actually just

19   sign the notes.  So, again, I'm denying any sanctions.  I'm

20   going to take the defendants at their word that they were

21   somehow needing to do this to preserve the record on appeal but

22   they've got other ways of preserving and I'm not letting this in

23   the record.

24          Mr. Morris, I am going to ask you to upload an order

25   that needs to be specific.  I mean I know it's easy to carve out

*Plaintiff's Motion to Strike*                                          54

1    the Pully report, but as far as any and all references to the

2    Waterhouse-did-not-sign-the-notes defense, I would prefer for

3    you to sift through and put in the order where those are so the

4    record is just —

5          MR. MORRIS:  Your Honor, if I may, we've already done

6    that, and I think attached to my declaration in support of the

7    motion to strike, which —

8          THE COURT:  Okay.

9          MR. MORRIS:  — just as one example, could be found at

10   the HCMFA Docket 131.  We already highlighted the portions of

11   the pleadings that we thought ought to be stricken as amended by

12   the errata that was —

13         THE COURT:  Oh, that's —

14         MR. MORRIS:  — filed at Docket 141.

15         THE COURT:  That's —

16         MR. MORRIS:  That's what the errata is, because I made

17   a mistake, so we corrected that.

18         THE COURT:  Okay.

19         MR. MORRIS:  But what I'd like to do with the

20   permission of the Court is simply attach those pleadings to the

21   order and deem their pleadings amended to strike the language

22   that — that I've already put into the record in support of the

23   motion.

24         THE COURT:  Okay.  That will work for me mechanically.

25         All right.  Well, let's figure out —

*Plaintiff's Motion to Strike*                                        55

1        MR. RUKAVINA:  Your Honor, may I — Your Honor, I have

2    an important question.

3        THE COURT:  Okay, go ahead.

4        MR. RUKAVINA:  So I understand that I will — I

5    understand that will not be allowed to reference that defense

6    today.  I'm obviously willing to respect and follow the Court's

7    instruction.

8        I want to make it clear that the Court is not trying

9    to prevent me from — from arguing anything that has to do with

10   that in front of Judge Starr.

11       THE COURT:  I don't know what — what you mean.  Are

12   you — well, what do you mean?  I mean there's either going to be

13   a trial in front of him or not.  I doubt he's very likely to

14   give another oral argument on this, but is that what you're

15   talking about, in the unlikely event he gives a second oral

16   argument on this?

17       MR. RUKAVINA:  Your Honor, we have not had oral

18   argument in front of Judge Starr.  My only concern is that —

19   that if the Court reports and recommends that the MSJ be

20   granted, I believe that I should have the ability before another

21   court to say you should not grant — you should not — you should

22   not go with Judge Jernigan's report and recommendation in part

23   because I was prohibited from raising this defense.

24       Again, I just want to make sure that — that an order

25   commanding me not to say something applies before this Court but

*Plaintiff's Motion to Strike*                                                    56

1    the Court is not trying to prohibit me from — from, in front of

2    any other court, raising whatever defense might be at the court

3    appropriate.

4           MR. MORRIS:  If I may, Your Honor?

5           THE COURT:  You may.  I guess I'm thinking through the

6    most likely scenario, —

7           MR. MORRIS:  Insert, yes, —

8           THE COURT:  — that the most likely scenario, I guess,

9    is if I make a report and recommendation, grant partial summary

10   judgment, and then there's a time period and the local district

11   court rules where a party can object to the report and

12   recommendation, Mr. Rukavina wants to say, 'I object and one of

13   the reasons I object is the Court didn't consider this

14   argument,' and he wants to know he won't somehow be sanctioned

15   or prohibited by my ruling from making that argument.

16          Am I — am I getting that correctly — correct, Mr.

17   Rukavina?

18          MR. RUKAVINA:  That's exactly — that's exactly —

19   that's exactly correct, Your Honor.  Because, again, I'm going

20   to take contempt very seriously.

21          MR. MORRIS:  And, to be clear from my perspective,

22   Your Honor, I fully expect the defendants, whether it's through

23   an appeal of the prior orders or this particular order or

24   through an objection to your report and recommendations, to try

25   to persuade the district court that your decisions on these

*Plaintiff's Motion to Strike* 57

1    matters was incorrect.  What I would not expect them to do is to

2    simply put the Pully report and make this argument as part — as

3    part of their merits-based objection.  Because there are orders

4    of the Court right now, so I want to be very clear about this,

5    there will be four different orders of the Court.  There will be

6    a scheduling order.  There will be the orders denying the motion

7    for leave to amend, the motion to put in the Pully report.

8    There will be the order on this.  These are orders of the Court.

9    You don't just pretend that they don't exist and just present

10   the same evidence and the same arguments to the district court.

11   What I think you do is you would either appeal these orders or,

12   at a minimum, and I'm not giving advice here and I'm not

13   consenting to anything, but I would think the approach would be

14   to either appeal the relevant orders or to — or to object to the

15   — to the report and recommendation.  This is if Your Honor

16   recommends that the motion be granted in any respect and say

17   that, you know, the motion — the Court — the district court

18   shouldn't accept the bankruptcy court's recommendation because

19   they improperly excluded evidence.  So if that's all they're

20   trying to do, they shouldn't expect any concern from me, but if

21   they try to introduce the Pully report, you know, for

22   substantive purposes or try to — without having these orders

23   overturned, that's when — that's when they will need a —

24        MR. RUKAVINA:  No, Mr. — Mr. Morris is completely

25   correct, Your Honor.  Of course we're not just going to willy

1   nilly tell the district court, you know, consider these things

2   regardless of what Judge Jernigan ordered.  I just want to make

3   sure that by going to the district court and saying, 'Here's an

4   order that I would like you to reconsider or reverse,' that I am

5   not by raising the defense violating this Court's order.  And I

6   — just, again, I'm — I've got to protect myself, I've got to

7   respect the Court, I've got to protect my client.

8           THE COURT:  Okay.

9           MR. RUKAVINA:  I just want to make sure that I don't

10  run afoul of that —

11          THE COURT:  I think we're all on the same page here,

12  and that being that certainly you can appeal the order I entered

13  today, you can continue to pursue your motion for

14  reconsideration that's already on file in the district court,

15  and you can argue — in the scenario I grant the motion for

16  partial summary judgment — and let me rephrase that.  I don't

17  grant it.  There would be a scenario where I might make a report

18  and recommendation to the district court that it grant it.  In

19  that scenario, you can follow the district court rules and

20  object to that report and argue among your complaints I should

21  have considered the Pully report — without attaching it — and I

22  should have allowed this defense of Frank Waterhouse did not

23  physically sign.  You can make that argument, but, again, that

24  would be in the context of either an appeal of today's order or

25  an objection to a possible report and recommendation of this

*Defendants' Motion to Strike*                                        59

1    Court.  Okay?

2           All right.  So it's 11:08 according to my clock.  I

3    had allocated 30 minutes for the defendant's motion to strike.

4    Can we — you know, it's 15 minutes each side — can we get

5    through that before we take a break?  Is everyone good?

6           All right.

7           MR. AIGEN:  Yes, Your Honor.

8           THE COURT:  Well, who will take the lead, Mr. Root?

9           MR. AIGEN:  No, I will, Your Honor.

10          THE COURT:  Okay.

11          MR. AIGEN:  Mr. Aigen.

12          THE COURT:  You may proceed —

13          MR. AIGEN:  Are you ready for me to proceed?

14          THE COURT:  Yes, please.

15          MR. AIGEN:  Thank you, Your Honor.

16          As I said, Michael Aigen from Stinson, representing

17   the defendants.  And what I will be doing today is arguing

18   defendants' motion to strike, specifically I'll be arguing that

19   the Court must strike plaintiff's supplemental appendix from the

20   record because it was filed in violation of the rules.

21          As you know, back in December plaintiff filed its

22   motion for summary judgment.  And its summary judgment,

23   plaintiff sought summary judgment on defendants' prepayment

24   defenses, which were asserted by two defendants, NexPoint and

25   HCMS.  We then filed our response.  In our response, we pointed

Defendants' Motion to Strike                                    60

1    out that plaintiff forgot, for whatever reason, to include any

2    evidence or any arguments with respect to HCMS' prepayment

3    defense, as opposed to NexPoint, which was actually briefed by

4    plaintiff.

5           So then in February of this year, plaintiff filed its

6    reply.  Along with its reply, it filed an additional appendix

7    continuing new summary judgment evidence.  What this new summary

8    judgment evidence included was a declaration from Mr. Klos,

9    which was two pages of new testimony from him attempting to

10   address, for the first time, HCMS' prepayment defense.

11          Now nowhere in the reply did plaintiff even attempt to

12   explain why it didn't include this testimony in its original

13   motion or why it should be allowed to introduce new evidence in

14   violation of the rules.  I conferred with counsel for plaintiff

15   about this and gave them an opportunity to either withdraw the

16   Klos declaration or explain why this new evidence in the reply

17   was appropriate.  In response, rather than withdrawing it or

18   even providing any legal authority, the only answer I got was

19   the reply declaration was a classic reply.  I'm not really sure

20   what that means, but respectfully it doesn't really matter at

21   this point.

22          As you're well aware, the Northern District of Texas,

23   as does throughout the Fifth Circuit, unambiguously prohibits

24   summary judgment movant from introducing new evidence in its

25   reply.  This is not a controversial legal proposition and it's

*Defendants' Motion to Strike* 61

1   not only not disputed by plaintiff but this general rule is

2   stated in all of the cases that plaintiff put in its brief.  And

3   this makes sense.  It's designed in order to avoid prejudice,

4   like we'd have here where we'd have no opportunity to contest or

5   address evidence filed on part of a summary judgment.  The

6   Racetrack Petroleum (phonetic) case we cited is just like our

7   case, where the district court considered this exact issue,

8   defendant filed a summary judgment reply and submitted new

9   evidence with it, and the plaintiff sought to strike it, and the

10  district court struck it as new evidence.

11         And, to make matters worse here, plaintiff still

12  hasn't even bothered to file a motion for leave or sought leave

13  in any way here.  Instead, their argument is plaintiff suggests

14  that the new Klos declaration is somehow proper because the HCMS

15  prepayment defense was made for the first time in the summary

16  judgment response.  This is in their response at paragraph 20.

17         Two points here.  Initially, that simply is not true.

18  As we explained in detail in our reply, we confirmed to counsel

19  that the prepayment defense was part of our justification

20  defense.  And, as a result, our corporate rep was questioned at

21  length on this defense by plaintiff.  In other words, plaintiff

22  is not going to be able to sit here and seriously argue today

23  that it was not aware that HCMS was asserting its prepayment

24  defense when plaintiff filed its summary judgment, after it

25  specifically deposed our witness on this exact defense.

*Defendants' Motion to Strike*                                      62

1          Plaintiff's only specific complaints about our

2    client's testimony related to defense is that our corporate rep

3    didn't memorize the exact dates on when these specific payments

4    were made, something that easily could have been resolved if

5    plaintiff's attorney showed the witness the relevant documents

6    as was suggested to him, but they didn't bother to do it, so

7    they didn't get the information they wanted.  That's their only

8    complaint about the questions they asked regarding this defense.

9          In other words, this wasn't a new defense that we

10   raised for the first time in our summary judgment response.

11   That's not the case.  Plaintiff knew about this defense and took

12   discovery on it, but didn't like our answers.  The simple fact

13   is plaintiff either forgot to address HCMS' prepayment defense

14   in its judgment or made some tactical decision to withhold it.

15   They included HCMS in its headings related to the prepayment

16   defense along with NexPoint, but they only address NexPoint.

17   Not sure why, but clearly a mistake was made.

18          More importantly, none of this really matters.  Even

19   if this was a new defense, the law is clear:  New evidence is

20   not allowed in the summary judgment reply.  We detail in our

21   brief, as we talk about in our reply brief, none of the

22   unpublished cases cited by plaintiff say that new evidence is

23   allowed to be submitted in reply briefs.  In fact, those cases

24   recognize the opposite.

25          For example, we have the Lynch case that was cited by

*Defendants' Motion to Strike* 63

1   plaintiff.  In that case, the court did allow additional

2   evidence but for a very specific reason.  In that case, the new

3   evidence was deposition testimony as obtained — or that was

4   obtained as a result of the other party's request to delay the

5   summary judgment hearing and take this additional discovery.

6   That's obviously not the case here.

7        And these cases, like they cite, like the Banda

8   (phonetic) case cited by plaintiff, actually say that a summary

9   judgment movant may not file a reply brief appendix without

10  first obtaining leave of court.  They could have filed a motion

11  for leave.  They chose not to do it for whatever reason.

12       Additionally, I point out that these few unpublished

13  cases cited by plaintiff, such as the Murray (phonetic) case and

14  the Banda case, only allow new evidence in what the courts call

15  very limited circumstances, where the new evidence was not part

16  of a new argument.  And that's important here because that's

17  clearly not the case here.

18       This is not a situation, Your Honor, where plaintiff

19  is clarifying or even supplementing arguments made in its

20  original motion for summary judgment briefing related to HCMS'

21  prepayment defense.  That's not the case here.  Plaintiff never

22  made any argument related to HMS and its prepayment defense in

23  its original briefing.  This is a completely new argument that

24  they're making for the first time in reply, making the

25  unpublished cases they cited very different than our case.  This

*Defendants' Motion to Strike*                                              64

1    is a simple issue for the Court.  Defendants' request that the

2    Court strike the appendix containing new evidence from the

3    record because it was found in violation of the rules.  To hold

4    otherwise, Your Honor, would be rewarding plaintiff for its

5    failure to follow the rules and either seek leave or file the

6    evidence in the original motion like it was supposed to.

7            Thank you, Your Honor.

8            THE COURT:  All right.  Is this going to be Ms.

9    Winograd's argument?

10           MR. MORRIS:  You're on mute.

11           MS. WINOGRAD:  Good morning, Your Honor.  My name is

12   Hayley Winograd, at Pachulski, Stang, Ziehl and Jones,

13   representing Highland Capital Management, L.P.  May it please

14   the Court?

15           THE COURT:  Yes, you may proceed.

16           MS. WINOGRAD:  I agree with opposing counsel.  This is

17   a very straightforward issue, Your Honor.  There is nothing

18   complicated about it.

19           The second Klos declaration is properly — is properly

20   included with the reply because it serves the sole purpose to

21   rebut argument and evidence raised by HCMS for the first time in

22   its response brief.  Fifth Circuit law is clear that when a

23   nonmovant raises evidence or argument for the first time in its

24   response to summary judgment, the movant is entitled to address

25   and rebut that argument in its reply.  That's exactly what

*Defendants' Motion to Strike*                                     65

1    happened here.

2            Highland did not learn of but facts underlying HCMS'

3    prepayment defense until HCMS filed it response to summary

4    judgment.  I want to briefly summarize the time line for the

5    Court.

6            HCMS never actually pled its prepayment defense.  On

7    October 29th of 2021, when counsel deposed Mr. Dondero as HCMS'

8    30(b)(6), Mr. Dondero was unable to identify any substantive

9    allegations underlying HCMS' prepayment defense.  And, most

10   importantly, he did not identify the HCMS amortization schedule.

11           The first time HCMS identified the amortization

12   schedule was in its response to summary judgment.  That opened

13   the door to Highland addressing and rebutting the HCMS

14   prepayment defense premised on the amortization schedule.

15   Highland included the second Klos declaration in its reply for

16   the purpose of addressing and rebutting the prepayment defense

17   premised on the amortization schedule.  This is not the type of

18   new evidence or new legal theory contemplated under Local Rule

19   56.7 because it does not constitute new argument.  It is

20   rebuttal argument.  It is precisely the type of reply evidence

21   permitted under Fifth Circuit law.

22           I don't want to bog the Court down with case law, but

23   I do want to flag one case particularly on point and that is

24   Lynch v. Union Pacific Railroad.  It's a Northern District of

25   Texas case cited in our papers and discussed by Mr. Aigen.

*Defendants' Motion to Strike*                                              66

1      The Court denied the nonmovants' motion to strike

2 evidence attached to the movant's reply in support of summary

3 judgment, noting that evidence was specifically directed at and

4 responsive to arguments and evidence relied on the nonmovant in

5 their response.  Noting this is not a situation in which new

6 issues were raised for the first time in a reply, the Court held

7 that to hold otherwise would allow the nonmovant an unfair

8 advantage, using a gotcha procedural approach.  Here too the

9 evidence attached to Highland's reply in support of summary

10 judgment is specifically directed at and responsive to evidence

11 and argument — arguments raised for the first time in HCMS'

12 response to summary judgment.

13      In suggesting that there is somehow a blanket

14 prohibition on attaching evidence to a reply in any and all

15 circumstances in summary judgment, defendants ignore the law.

16 But defendants must agree with the law on some level, because

17 they attach an appendix to their reply in support of their

18 motion to strike Highland's reply appendix.  And they did so for

19 the simple and proper purpose of rebutting an argument Highland

20 made in its response to defendants' motion to strike.  And it's

21 not a reply in support of summary judgment, but it's the same

22 concept.

23      The notion that Highland somehow forgot to address the

24 HCMS prepayment defense in its motion for summary judgment is

25 belied by the record.  Two defendants assert the prepayment

*Defendants' Motion to Strike*                                    67

1    defense, NexPoint and HCMS.  Highland was able to adequately

2    address NexPoint's prepayment defense in its motion for summary

3    judgment because Highland was aware that in support of that

4    defense, NexPoint was specifically relying on the NexPoint

5    amortization schedule.

6            The NexPoint amortization schedule was referenced

7    extensively throughout counsel's depositions of Klos, Seery, and

8    Hendrix.  The same is not true with HCMS.  HCMS never identified

9    the amortization schedule until it filed its response to summary

10   judgment.

11           Defendant also implies and argues in its papers that

12   counsel's vague reference to digging out the spreadsheet during

13   a seven-hour deposition was somehow enough to put Highland on

14   notice that HCMS was relying on its amortization schedule and

15   that we took discovery and that we were actually in possession

16   of this document.  We were in possession of a lot of documents,

17   but it was our job to conduct a fishing expedition in order to

18   figure out what specific document counsel may have been

19   referring to during his deposition.  If Highland was aware that

20   HCMS was specifically relying on the HCMS amortization schedule

21   in connection with its prepayment defense, it would have

22   addressed this defense in its motion for summary judgment but

23   the same way it able to do with NexPoint.

24           Highland's inclusion of the Klos declaration in its

25   reply to summary judgment serves the singular purpose of

*Defendants' Motion to Strike*                                        68

1    addressing and rebutting argument and evidence raised for the

2    first time in HCMS' response to summary judgment in connection

3    with it prepayment defense.  And, in doing so, it serves to

4    close the door on this issue and aid the Court in determining

5    whether, based on all of the evidence before it, there is a

6    genuine issue with material fact regarding the merit of the HCMS

7    prepayment defense.

8            Again, this is not the type of new evidence

9    contemplated under Local Rule 56.7 because it constitutes

10   rebuttal argument.  It serves to rebut argument raised by HCMS

11   in its response to summary judgment.  For these reasons,

12   defendants' motion to strike the reply appendix should be

13   denied.  Thank you.

14           THE COURT:  All right.  Mr. Aigen, your rebuttal.

15           MR. AIGEN:  Yes, Your Honor.  Accepting plaintiff's

16   counsel's argument would mean that any party could sit on their

17   hands, stick their head in the sand, not ask questions about a

18   particular defense, and then have the privilege of putting in

19   all their defenses in a reply and just skip putting it in the

20   motion.  They keep saying this was addressed in the first time

21   for summary judgment, but then also concede and admit and agree

22   with me that they questioned our corporate rep on this exact

23   defense.  It clearly was not a defense we asserted for the first

24   time in summary judgment, when they questioned our witness on

25   it.

*Defendants' Motion to Strike*                                    69

1          They talk about this amortization schedule and tell

2     you we should have identified it, but yet we don't hear a

3     response to when our witness said, 'I don't have the dates

4     memorized,' and our counsel said, 'Why don't you use a document

5     to refresh them,' we don't hear a response as to why counsel

6     didn't say, 'Hey, that's a good idea.  Where is that document,

7     what is that document?'  They just said, 'Nope, I'm fine, stuck

8     their head in the sand and preceded to play a game of Gotcha.

9     That's not how this works.

10          They knew about this defense.  They took discovery on

11    it.  They filed a summary judgment.  And, respectfully, is —

12    there was a date.  The heading says HCMS and NexPoint.  The

13    section and the briefing under it don't even mention HCMS.  If

14    they were relying on the fact that they knew nothing about this

15    defense which was asserted, they would have wrote that in their

16    brief.  If they didn't know HCMS was asserting a prepayment

17    defense, they wouldn't have included them in the caption.

18          They made a mistake.  They want to run from it.

19    That's not proper here.  They have to follow the same rules we

20    do.  They could have filed a motion for relief.  They didn't

21    bother.  Maybe they just didn't want to delay any of these

22    proceedings, I don't know.  They talk about this being classic

23    evidence.  The only case that they've mentioned now is the Lynch

24    case.  And I will reemphasize what I talked before, in Lynch the

25    only case they have brought to you now in this argument that

*Defendants' Motion to Strike*                                    70

1    they think supports them, the additional discovery, the

2    additional evidence was submitted were depositions taken after

3    the summary judgment was filed.  So of course the Court let that

4    in.  The other party requested that discovery and, according,

5    said these are very limited circumstances and you need to go

6    file a motion for relief.

7           I will repeat, Your Honor.  If this is allowed, any

8    party could stick their head in the sand, not ask questions, and

9    all of a sudden they didn't know the answers, so they could wait

10   till the summary judgment reply, put in evidence, and not be

11   able to get I it rebutted.

12          And I think it's important — the Klos declaration,

13   what it talks about in paragraphs 3 and 4.  It talks about the

14   payment was made applied at Mr. Dondero's direction to ensure

15   that the note had no interest outstanding.

16          And, in paragraph 4, it talks about that Mr. Dondero's

17   direction to make the payments conclusively establishes that

18   HCMS knew that all interest due as of December 31st was required

19   to be paid, notwithstanding a prior prepayment.

20          What this means is that Mr. Klos is testifying to

21   directions allegedly made by Mr. Dondero regarding the payment.

22   The reasons that Mr. Klos believes that such payments were made

23   and what he thinks HCMS knew and didn't know, without providing

24   — so, basically, he's testifying on the state and mind of intent

25   of a client, stuff he's never testified to before, without

1   giving us the chance to rebut it.  And their reason for thinking

2   they get to do this is they didn't bother asking questions on a

3   defense we asserted, even after it was suggested to them, 'Hey,

4   let's use documents,' and now they have the nerve to come up

5   here and say, oh, well, we — you know, although they produced

6   the document to us, we have too many documents.  How were we

7   supposed to know what document they were going to use even

8   though counsel in the middle of the deposition said, hey, maybe

9   we should use documents to get the answers to this.  And they

10  said, no, we don't feel like it.

11           That's not allowed, Your Honor.  They're here today

12  saying we need to abide by the black letter of every rule.  They

13  need to do the same thing.  Thank you, Your Honor.

14           THE COURT:  A couple of questions.  Do you disagree

15  that this defense was never pleaded?

16           MR. AIGEN:  We pled it as part of justification.  And

17  we made it clear prior to the deposition, just in case, we told

18  counsel, and in correspondence this is recorded, that our

19  prepayment defense was part of justification.  And they then

20  proceeded to take our deposition on that defense.  They had no

21  issues with that.  And if, for some reason, they're taking the

22  position today that this is all based on something we needed to

23  plead and didn't, then that's a proper basis for summary

24  judgment.  It's not a proper basis for violating a completely

25  different rule about what you could stick in a reply brief.  So

*Defendants' Motion to Strike*                                    72

1   we did plead it, we called it justification —

2           THE COURT:  So elaborate.  So elaborate.  I don't have

3   it in front of me, but I don't know if I need it right in front

4   of me, what was the exact wording of your justification defense?

5           MR. AIGEN:  In the actual answer, which I don't have

6   in front of me, we called it justification, and there wasn't

7   details on it.  And then to make it clear before the corporate

8   rep deposition, because he was testifying on our defenses, we

9   sent a letter saying that similar — and this is in the record, I

10  don't have it right in front of me, but it's part of this where

11  we said to them, hey, this includes the prepayment defense, just

12  like NexPoint.

13          THE COURT:  Okay.

14          MR. AIGEN:  And, again, Your Honor, —

15          THE COURT:  Go ahead.

16          MR. AIGEN:  Sorry.  I was going to say even if what

17  they're trying to argue is we can't bring a defense today

18  because it wasn't pled properly in our answer — which I disagree

19  with — but even if they're saying that, the proper recourse was

20  then to move for summary judgment on that defense, which they

21  knew of, and try to strike it, not to violate the other

22  different rules of their choosing by putting additional evidence

23  in a reply brief.  You don't get to pick and choose which rules

24  you want to violate because you think someone else violated a

25  different rule.  You have to go to court to seek leave to get

*Defendants' Motion to Strike*                                              73

1   the relief you want.

2          THE COURT:  Okay.  What about if you could squarely

3   address the argument that it's — it's rebuttal evidence, it's

4   not new evidence because the amortization scheduled was included

5   in the response?

6          MR. AIGEN:  It's not — that's a good question, Your

7   Honor.  The amortization schedule is our evidence.  What their

8   evidence is, is Mr. Klos coming in and interpreting it and

9   telling you why Mr. Dondero made certain payments, without any

10  discussion of how he knows that.  So the amortization schedule

11  is in the record.  We put it in.  They — we produced it to them.

12  They have it, they had it all along.  The new evidence that

13  we're objecting to is Mr. Klos coming in and providing his

14  subjective interpretation as to what HMS knew and thought and

15  believed when it made payments in accordance with that schedule.

16  That's the reason they want to get the Klos declaration in, not

17  to prove payments were made or not made in the amortization

18  schedule.

19         THE COURT:  You don't think that's rebuttal evidence?

20  You don't think that's rebuttal evidence, rebutting the —

21         MR. AIGEN:  Everything in a reply — yeah, everything

22  in a reply is being used to rebut things we stick in a response.

23  That doesn't change the law that you can't stick new evidence in

24  to do that.  The rules and the law and the cases say you can

25  make rebuttal arguments, you can't stick rebuttal evidence in.

*Defendants' Motion to Strike*                                    74

1   You have to seek motions for leave.  In the very limited

2   situations where courts did allow additional evidence, like we

3   said, all the cases they cite say no new evidence in reply, but

4   let me look at these very exceptional circumstances here.

5          So rebuttal arguments, yes.  Rebuttal evidence, no.

6   And the exceptional circumstances, as I said, the case they rely

7   on is the Lynch case where the discovery and the new evidence

8   they were fighting over was taken after the summary judgment at

9   the request of my side, so of course it made sense for it to

10  come in.  So, yes, they're using it to rebut, but they're using

11  it as rebuttal evidence, which is improper, not rebuttal

12  argument, which would be proper.

13         THE COURT:  Okay.  All right.  I think now is a good

14  time for a break.  I'm going to go deliberate on this a few

15  minutes.  The question is do we want it to be a short 15-minute

16  break or maybe a 30-minute lunch break.  Any — because we're

17  going to have a long, I think, four hours to go here.

18         MR. MORRIS:  To the extent my voice carries any weight

19  at all, Your Honor, my preference would be to take the longer

20  break and then just sit for the summary judgment argument.

21         THE COURT:  Okay.  Votes?

22         MS. DEITSCH-PEREZ:  If I could weigh in, just for the

23  purposes of making sure we're all able to pay attention when

24  we're arguing, I would just ask that if Mr. Morris is going to

25  go on for two hours, that we at least have a break before, you

*Defendants' Motion to Strike*                                    75

1    know, a restroom break before we start up again.

2              THE COURT:  Okay, that makes sense.

3              MR. MORRIS:  No problem with that.  Yeah.

4              THE COURT:  Any — any other views?

5              All right.  Well, let's go ahead and take a 30-minute

6    break.  We'll come back and I'll give a ruling on this motion to

7    strike and then we'll hear Mr. Morris' motion for summary

8    judgment.  And then we'll take another break, you know, a

9    15-minute or so break.  And then I'll hear the defendants'

10   responses.  All right, we'll see you at 12:02.

11             COURT SECURITY OFFICER:  All rise.

12             MR. RUKAVINA:  Thank you, Your Honor.

13             MS. DEITSCH-PEREZ:  Thank you, Your Honor.

14        (Luncheon recess taken from 11:33 a.m. to 12:21 p.m.)

15             COURT SECURITY OFFICER:  All rise.

16             THE COURT:  All right.  Please be seated.

17             I apologize for the wait.  Spent a little more time

18   drilling down on the pending motion to strike than I thought I

19   would need to.

20             We have everyone here it looks like that we need.

21             I have one last question before I give a ruling on the

22   motion to strike the supplemental David Klos declaration.  Is

23   there a stipulation that is somehow relevant to this analysis?

24   I saw in the papers a dangling reference to 'We have the

25   stipulation.'  I think it was — I can't remember if it was an

*Defendants' Motion to Strike*                                              76

1    attachment, an email attachment to the motion to strike.  I

2    think that's where it was, where there was —

3              MS. WINOGRAD:  Yes, Your Honor.

4              THE COURT:  Go ahead.

5              MS. WINOGRAD:  I can answer that.

6              THE COURT:  Okay.

7              MS. WINOGRAD:  Highland and NexPoint stipulated that

8    NexPoint has a prepayment defense, and you can different that at

9    Adversary Proceeding 21-3005, at Docket Number 146.  And this

10   was filed on January 2nd of 2022.  I don't think there has been

11   a stipulation, though, that HCMS had the prepayment defense.

12             THE COURT:  Okay.  I'm slow to pull that up.  Okay.

13   Which — which adversary?

14             MS. WINOGRAD:  So that's 21-3005 and that's the

15   NexPoint proceeding.

16             THE COURT:  Okay.  And, again, what docket entry

17   number?  146?  146, January 2nd.

18             MS. WINOGRAD:  And this also describes that NexPoint

19   was using as its supporting documentation the amortization

20   schedule.

21             THE COURT:  Um-hum.  Okay.  And, again, the — your

22   argument is this is significant because there was no similar

23   document in connection with the HCMS and that —

24             MS. WINOGRAD:  Exactly.  So —

25             THE COURT:  Go ahead.

*Defendants' Motion to Strike*                                    77

1          MR. AIGEN:  Well, no, Your Honor, that argument was

2     never made in the papers.  And I if they did, we would have

3     shown that it was produced to them, as they admitted they had

4     them.  They had the document.  They're not saying they never got

5     the document —

6          THE COURT:  Well, no, they admit they had the

7     document.  I've read in the pleading, it was footnote 8 of their

8     response to this motion to strike that they had it, they

9     produced it on June 9th, before HCMS ever answered.  So I guess

10    what I'm getting at — and, again, I asked her, so she's

11    answering.  You know, this is like —

12         MS. WINOGRAD:  But —

13         THE COURT:  — I wondered back in chambers, as I was

14    reading the pleadings and thinking through this, was there a

15    stipulation that might shed light on this in some sort for me

16    because it — it was referenced in your motion to strike, I

17    think, where you reached out and asked them to withdraw this.

18    And, as I recall, Mr. Morris said no.  And we have the

19    stipulation.  And so I was left dangling which stipulation did

20    that mean.

21         MR. AIGEN:  Your Honor, I may be mistaken, but I think

22    that stipulation was part of an email.  And the reason it was

23    part of the record was the other part of that email was Ms.

24    Deitsch-Perez and making sure the other side was aware that

25    prepayment was part of her justification defense.  And that's

*Defendants' Motion to Strike*                                              78

1  why that email was in there.  I think that also happened to be

2  connected to the email you're talking about with a stipulation.

3  So it certainly — as I — our answer was it wouldn't be relevant

4  but that, I think, is why it was in the record, because it was

5  part of the full email chain with the other part of it.

6          MS. WINOGRAD:  And, Your Honor, if I may be heard,

7  because I believe you asked me a question before counsel

8  interrupted me, —

9          THE COURT:  Go ahead.

10         MS. WINOGRAD:  — trying to get some clarity on our

11 argument.  And I would like to note that you nailed the precise

12 argument.  The argument is while we were on notice as of the end

13 of October of 2021 that HCMS was also asserting a prepayment

14 defense, we were not on notice of the supporting documentation

15 underlying that defense as it pertains to HCMS, the way we were

16 with NexPoint.  We knew NexPoint was using the amortization

17 schedule.  That is — that is the specific document that is

18 central to our argument.  We did not know that HCMS was using

19 this specific document.  That is why we had our reply include

20 the Klos declaration as a rebuttal argument to the HCMS

21 prepayment defense that we learned was premised also on an

22 amortization schedule that was raised — and that was raised for

23 the first time in their response brief that HCMS had never

24 previously introduced or identified the amortization schedule

25 the way that NexPoint did.  And that is why we were able to

1    address NexPoint's prepayment argument in our initial motion and

2    we weren't with HCMS.

3            MR. AIGEN:  And, Your Honor, as we put in our motion,

4    Ms. Deitsch-Perez during the deposition, when they tried to make

5    it a memory test, said, 'Hey, why don't you use the schedules

6    that show the payments,' and the answer from counsel was, 'No,

7    thank you.  I'll do it my way.'

8            So I don't know what else they needed other than us

9    introducing exhibits and putting on our own case during our own

10   corporate rep deposition.  They took the deposition, they asked

11   the questions.  They didn't say what documents, or anything.

12   But counsel still said, our counsel, our side, said, 'Hey, why

13   don't you use the documents,' and their answer was literally,

14   'No, thank you.'

15           MS. WINOGRAD:  But —

16           MR. AIGEN:  Not, 'I'll get back to it later'; 'Hey,

17   tell me what documents'; 'They didn't serve discovery; what are

18   you relying on?'  We offered it to them, and they said no thank

19   you.  They're sticking their head in their sand, and they don't

20   get rewarded for that, Your Honor.

21           MS. WINOGRAD:  It's — the burden is on the defendants

22   to prove each element of their affirmative defense.  When we

23   asked from the belt their prepayment defense, they could not

24   provide us with any allegations in support of that defense,

25   including in pertinent part the amortization schedule they are

now relying on. It is not our burden to tell them what documents they are relying on.

THE COURT: Okay.

MR. AIGEN: Your Honor, I don't know what can't — what didn't provide. Counsel said, 'Hey, use the documents.' and they said, 'No, thank you.'

THE COURT: All right.

MR. AIGEN: Well, you can use the documents that shows payments. They wanted to make a memory test.

THE COURT: I've heard enough.

Well, thank you all for your arguments. I know a lot of ink was spilled on this issue and, like I said earlier this morning, this is not a terribly easy contested matter. But I am going to grant the motion to strike. I guess what matters to me more than anything else is that the amortization schedule for HCMS was not a surprise to the plaintiff, in fact they are the ones who apparently initially produced it, again according to this footnote, on June 9th, 2021. So I am going to stick to the normal rule that we don't attach evidence to a reply absent a motion for leave and the Court having a contested hearing on that.

So I will ask Mr. Aigen to upload an order on that motion.

All right. Well, at long last, it's 12:30. We'll now turn to the motion of Highland for partial summary judgment on

1   each of these different notes.

2          Mr. Morris, you may proceed.

3          MR. MORRIS:  Thank you, Your Honor.  John Morris,

4   Pachulski, Stang, Ziehl and Jones, for Highland Capital

5   Management, L.P.

6          I want to begin, Your Honor, by thanking you and your

7   staff for the work that's been done on this.  This should have

8   been a simple collection — collection action on some unambiguous

9   promissory notes, but the record is obviously quite voluminous.

10  And I've spend the last, you know, year plus kind of playing

11  whack the mole and trying to figure out where the defense is

12  going to shift.  Every time I find evidence to rebut an

13  assertion or a contention, a new one arises, a new defense

14  arises, a new twist on the defense arises.

15         And it's been — it's been challenging, but I don't

16  think that all of the maneuvers mount to a hill of beans,

17  frankly.  I think that the presentation that we made in our

18  motion and in our reply, Your Honor, I'm certain that you've —

19  you've spent some time with that.  I'm a hundred percent

20  confident that my team and I have fairly cited to the

21  evidentiary record.  There is actually very little argument, I

22  think, that we make in our papers.  It is more a presentation of

23  what we believe are the undisputed facts.

24         And, again, I appreciate you — this has been —

25     (Tones.)

1          MR. MORRIS:  — a lot of work for everybody, and let's

2     just — let's just get on with this now.

3          And so I'd ask Ms. Canty if she could put up the slide

4     deck that I circulated to the Court and to counsel prior to the

5     beginning of this matter.  And if we could just go to the next

6     slide.

7          I want to begin, Your Honor, where I think I ought to,

8     and that is the law.  And I don't presume to tell the Court what

9     the law is.  The law on summary judgment, I'm sure, is well

10    known to the Court, but with those kind of cautionary remarks, I

11    would just like to go through the legal standards which,

12    consistent with my practice, I try to footnote everything so the

13    Court can see exactly where it's coming from, so you can see the

14    paragraphs of our brief that the following comes from.  And I

15    don't think there's any dispute about the standards, so let me

16    just go through it quickly.

17         Obviously under Rule 56(d), the standard is that there

18    be no genuine dispute of a material fact, right.  And so what

19    does "genuine" mean?  A dispute about a material fact is genuine

20    if the evidence is such that a reasonable jury could return a

21    verdict in favor of the nonmoving party.  That's — that's the

22    standard, right.  It's not is there a — you know, it's not a

23    criminal case, I don't have to prove beyond reasonable doubt.  I

24    don't have to prove, you know, any standard other than this one.

25         I don't have to prove that there's no disputes of

*Plaintiff's Motion for Partial Summary Judgment*                    83

1    fact.  Obviously, you know, if I said today is Wednesday, the

2    defendants would probably say, no, it's not, it's the day after

3    Tuesday, or it's the day before Thursday.  This is — you know,

4    this is the nature of this particular case.  But let's be clear.

5    A dispute about a material fact is genuine only if the evidence

6    is such that a reasonable could return a verdict in favor of the

7    nonmoving party.

8            I think it can meet its burden in one of two weeks.

9    It can demonstrate an absence of evidence, supporting the

10   nonmoving party's claims or, in this case, defenses; or it can

11   succeed by proving the absence of a genuine issue of disputed

12   material fact.

13           The defendants have to show here, more than some

14   metaphysical doubt as to the material facts.  They can't satisfy

15   their burden by relying on conclusory allegations or

16   unsubstantiated assertions are only a scintilla of evidence.

17   The Fifth Circuit has held where critical evidence is so weak or

18   tenuous on an essential fact that it could not support a

19   judgment in favor of the nonmovant or where it is so

20   overwhelming that it mandates judgment in favor of the movant,

21   summary judgment is appropriate.

22           And if we go to the next slide, here is the thing,

23   Your Honor, in all that paper you have, the part that consumes

24   the least amount is our claims, our claims for breach of the

25   demand notes and breach of the term notes.  And why is that?

*Plaintiff's Motion for Partial Summary Judgment*                    84

1    Because there is no way to contest it with the exception of

2    HCMFA.  And I know Mr. Rukavina has passionately attempted to

3    argue that they're not liable under the notes, but in the

4    evidence that we cited to in our motion, in Mr. Dondero's

5    declaration he really admits — although I don't know what Soft

6    Note is, that's just my own lack of knowledge I guess — I don't

7    think that it matters that it was unsecured, right, I don't

8    think any of that matters, but the essential elements are met.

9    There are, with the exception of HCMFA, everybody agrees that

10   they signed the notes, everybody agrees that they received the

11   money, everybody agrees that the notes were given in exchange,

12   and everybody agrees that they didn't pay in December 2020.  And

13   so what we put on the screen, which we take from the first Klos

14   declaration, as to which there was no objection, the damages

15   that arose, you know, unpaid principal and interest as of the

16   date of the motion.  And obviously this will have to be updated

17   if this Court either recommends and the district court grants

18   or, you know, whenever we get a judgment, if we ever get a

19   judgment this will have to be updated, but we present on this

20   slide the damages as of the motion date for the demand notes.

21          And if we can go to the next slide, we've got the

22   damages under the term notes.  And then we're entitled to cost

23   of collection.  Whether it's a demand note or whether it's a

24   term note, they both unambiguously provide that if we have to go

25   to bankruptcy court or otherwise seek to collect, you know,

1    engage counsel, we're entitled to our costs of collection.

2    We've put in a lot of evidence about those costs, but we can't —

3    you know, we're like a dog chasing our tail here, those costs

4    continue to increase at this moment.

5            And so we specifically noted in our motion at

6    footnotes 31 and 32, I believe, that we reserve the right, that

7    we wanted an opportunity to come in and litigate, you know, the

8    issue of costs.  And, in fact, that's exactly what Rule 54(d)(2)

9    provides.

10           So if a judgment is entered, we'll have that

11   opportunity.  And the only thing that we ask the Court to find

12   here, if the Court finds that we're entitled to any portion of

13   the motion for summary judgment or, you know, if you're going to

14   make that recommendation, that you also make the recommendation

15   that Highland is entitled to its costs and fees pursuant to the

16   plain and unambiguous terms of the notes.

17           If we can go to the next page.  This is just a summary

18   of the various defenses.  Just to try to make it easy so the

19   Court has a score card, there is, you know, four or five

20   principal defenses, different defendants assert different

21   defenses, so we have just kind of laid it out here so the Court

22   has an understanding, right.  And the reason that HCMFA doesn't

23   claim the oral argument subsequent — condition subsequent defend

24   is because they claim that the note should never have been

25   signed, it was a mistake and without authority.  So they can't —

1    I guess they could have pleaded in the alternative, but they

2    didn't.  And so you've got — you know you've got some

3    differences, right?  The failure to perform under the shared

4    services agreement.  That would be inconsistent with HCMFA's

5    defense, and I don't even think Mr. Dondero contends that he had

6    a shared services agreement.  And no defendant except for

7    NexPoint or HCMS contends that they prepaid.

8           So that's kind of a summary of the allegations.  And I

9    want to start with the first one, the oral agreement, the

10   condition subsequent.  If we can go to the next slide.  I'm sure

11   Your Honor has heard the saying, you know, people don't like to

12   see how the sausage is made and there's a reason for that.  And

13   the reason is it's usually pretty ugly.  But what we set out

14   very clearly in our moving papers, which I think was completely

15   ignored by the defendants is how the allegations concerning this

16   alleged agreement that Mr. Dondero or agreements that Mr.

17   Dondero entered into with his sister materially changed over

18   time.

19          And I think that that's critical, because if you go

20   back to the legal standard, Your Honor, of course you know one

21   of the things you'll have to consider in issuing your report and

22   recommendations is whether a reasonable jury is going to buy

23   this defense.  Are there enough disputed facts that would enable

24   a jury to say, yeah, this defense makes sense to me.  This is

25   totally credible.

*Plaintiff's Motion for Partial Summary Judgment*                    87

1    I'm not asking you to make credibility findings on

2    witnesses, right.  You haven't seen any witnesses to do that.

3    You're just reading paper, but — but these are the undisputed

4    facts.  There are — everything I'm about to say is undisputed.

5         These actions were commenced in January of 2021.  And

6    in Mr. Dondero's initial answer on March 3rd, again citations to

7    the footnote here, Mr. Dondero asserted that Highland was not

8    entitled to recover on the notes and that their claims should

9    be, quote, barred, because it was previously agreed that

10   plaintiff would not collect on the notes.  So that was his

11   position:  You can't collect because there is an agreement that

12   you wouldn't collect.  Okay.

13        What's really — what's really notable here, and I'll

14   talk about this more in a moment, is that none of the other

15   three corporate defendants, NexPoint, HCMS, HCRA, who now assert

16   the exact same defense, none of them put that in their initial

17   answer.  And why is that significant, Your Honor?  Because Mr.

18   Dondero is the source of this affirmative defense that he put

19   into his defense.  Why wasn't it put into any of the corporate

20   defendants' defenses initially?  And obviously that's a question

21   that I would ask Mr. Dondero if we were actually in front of a

22   jury:  How do you explain the fact that you forgot to assert

23   this defense on behalf of all of these corporate defendants?

24        So we proceed.  We served some discovery.  We asked

25   Mr. Dondero in light of this defense admit that you didn't pay

*Plaintiff's Motion for Partial Summary Judgment*                    88

1    any taxes on the money that the plaintiff agreed not to collect.

2    And realizing that he didn't pay taxes, right, this is

3    undisputed facts, he answered — he amended his answer at the

4    last second, I think he was within the time period where he

5    could still unilaterally amend his answer, to add the magic

6    words:  Upon fulfillment of conditions subsequent.  So now

7    instead of an agreement in the past that was already in place

8    for forgiveness, now it was going to be dependent on some future

9    event.

10           Ten days later, because this is an adversary

11   proceeding and you have to comply with Rule 26, Mr. Dondero

12   makes his initial disclosures under Rule 26.  And this is not

13   some, you know, happenstance kind of presentation.  Mr. Dondero

14   took the time to identify 15, quote, individuals likely to have

15   discoverable information.  But his sister wasn't on it.  So if

16   we ever get to a jury, he's going to have to explain to a jury

17   why he forgot in his long list of more than a dozen individuals,

18   which I think includes me, by the way, he thought to include me,

19   but he didn't include his sister, the person with whom he

20   entered these agreements.  And, remember, Your Honor, we got

21   this in our — I think it's in our reply.  If you look at Mr.

22   Johnson, Mr. Dondero's expert, his analysis of Mr. Dondero's

23   compensation, he was only paid $500,000 a year for the three

24   years during which all of these notes were entered, for a total

25   of about a million five or a million seven, and we're talking

*Plaintiff's Motion for Partial Summary Judgment*                    89

1   about the forgiveness of $70 million of notes, right.  Can you

2   imagine sitting in front of a jury and saying what would you do

3   — and we're going to talk about this in a moment — if you made

4   $50,000 a year and somebody said there's a way to get two

5   million.  Well, that's the position that Mr. Dondero found

6   himself in.  And yet on April 15th, he forgot his sister.  He's

7   going to have to explain that to the jury.

8           But it gets better, because — or better for us,

9   anyway.  This is the sausage being made, Your Honor.  This is

10  what I meant about whacking the mole.  So now on December — on

11  April 26th, he answers some additional discovery requests.  And

12  we ask him specifically:  Who entered the agreement on behalf of

13  the debtor.  Who entered the agreement on behalf of Highland.

14          Again, you can look at Exhibit 82, page 4, Answer to

15  Interrogatory Number 1, these are just undisputed facts that Mr.

16  Dondero said, quote:  The agreements were entered into on behalf

17  of the debtor by James Dondero, subsequent to the time each note

18  was executed.  He did.  That's his story.  This is in response

19  to interrogatories.  I believe they're sworn.  But whether they

20  are or they aren't, the fact remains that as of April 26th, he

21  took responsibility and said he entered the inter- — into the

22  agreements by himself.

23          He was also asked now more specifically, not just to

24  disclose who had information, who he thought had information

25  about the case, we served him an interrogatory that says:  Tell

*Plaintiff's Motion for Partial Summary Judgment*                    90

1    us everybody who knows about the alleged agreements.  Tell us

2    everybody.  And, again, he identifies five people, none of whom

3    have any relevant evidence, by the way.  Right, they're not —

4    they weren't deposed, they're not — there's nothing in the

5    record about the people who he actually identified.  But, again,

6    kind of a glaring omission.  Who has actual knowledge of the

7    alleged agreement, not Nancy.  Not in this interrogatory

8    response.  Sausages being made.

9            They make a motion to compel, Your Honor.  I don't

10   know if you recall, but they made a motion to compel to require

11   Jim Seery to testify, I think, about the history of the

12   forgiveness of loans.  And we opposed the motion.  And we had an

13   oral argument.  And, if my colleague Ms. Canty can put up on the

14   screen the transcript of the hearing, just a portion of it, so

15   this is the hearing.  The hearing occurs on May 20th.  And if we

16   can go to page 23, towards the bottom, you're going — my

17   response to this, Your Honor.

18           So I say, quote, let's look at what the defenses are,

19   and why we feel like it's a burden to even entertain these

20   concepts, his first answer, Your Honor, said that the notes were

21   forgiven based on an agreement.  So we asked him in an

22   interrogatory or a request to admit, I forget which, shows us

23   your tax returns, that you paid the taxes.  Of course he didn't

24   pay the taxes because of course the note wasn't forgiven.  So

25   instead he amends his answers, he amends the affirmative defense

*Plaintiff's Motion for Partial Summary Judgment*                      91

1   to add the words:  Pursuant to a condition subsequent.

2            Okay, he didn't say that the first time.  The first

3   time it was:  It was forgiven.  And now it's not forgiven.  But

4   it's basically deferred until a condition subsequent.  So he's

5   not even contending, if you look at his amended answer, he's not

6   even contending that it was forgiven.  He's simply saying that

7   the obligation to repay has been deferred pursuant to an oral

8   agreement, under which he does not have to pay, until the debtor

9   completes the liquidation of his assets.  Basically, if you read

10  it, that's what it says, and that's how we got here.

11           Keep scrolling, please.

12           I continue.  I don't know if you picked up on it, Your

13  Honor, but in response to an interrogatory, when we said, "Who

14  made the agreement on behalf of the debtor," Mr. Dondero said

15  that he did.  Okay, this isn't an oral agreement unless he was

16  talking to himself.  This is something that happened, according

17  to him, in his head, that somehow he, as the maker of the note,

18  had a discussion with himself in his capacity as the chief

19  executive officer of the debtor, and the two of them, in his

20  head, agreed that he wouldn't have to pay.  Initially wouldn't

21  have to pay at all and now apparently doesn't have to pay until

22  the debtor completes its sale of assets.  This is what the

23  defense is here.

24           Please continue.

25           So let's be very, very clear about it.  It's not an

1    oral agreement, it's something that he's making up in his head

2    that he didn't make up the first time, that he changed the

3    second time, and that he, that he can't describe at all.  One of

4    the interrogatories said, "When did this take place," he didn't

5    answer that part of the interrogatory.  He wasn't — he hasn't

6    told us.

7              So you could take this down.

8              This is where we are on May 20th.  We've had one big —

9    we've had one substantive changed of the defense from 'They told

10   me I wouldn't have to pay' to 'They told me I wouldn't have to

11   pay based on condition subsequent.'  We've had Rule 26

12   disclosures, no Nancy.  We've had interrogatory response, 'Tell

13   us who has knowledge of the alleged agreement,' no Nancy.  We

14   have an interrogatory response where Mr. Dondero says that he

15   made the agreement.  And so we have this hearing on the 20th and

16   it's got to be a little humiliating, right.  Everybody's got to

17   know this isn't going well.  And so what happens?  He goes back

18   to the office, he meets with his lawyers, and the next week they

19   amended Rule 26 responses, they amend their discovery responses

20   to add Nancy Dondero, and Mr. Dondero testifies on May 28th.

21   This is all record, it's part of Mr. Dondero's transcript.

22             This is how the sausage is made, Your Honor.  You

23   thought that this defense was probably like, yeah, this has been

24   the defense.  It hasn't been the defense, it has changed.  How

25   is Mr. Dondero and Nancy Dondero going to stand up in front of a

1    jury and explain this?  Because here is one last fact.  Some

2    time after May 28th, after all of this happened, after they come

3    up with the Nancy Dondero story, right, his sister, that's when

4    NexPoint, HCMS, and HCRE adopt the same defense.  And that, in

5    conjunction with the withdrawal of the reference, I don't have

6    to remind Your Honor this is what's happening in June of 2021,

7    where we finally just say, fine, withdraw the reference subject

8    to the report and recommendation until — until the cases are

9    trial ready, let's consolidate for discovery purposes, and we

10    proceed from there because now four of the five defendants are

11    adopting the same defense.  That's how the sausage is made, Your

12    Honor.  It's not pretty.  But as you consider how to fashion

13    your report and recommendation, the debtor urges you to take

14    into account the changing nature of the story and the fact that

15    Mr. Dondero three times forgot his sister and said, 'I entered

16    the agreement on behalf of the debtor.'  And it's only after

17    that humiliating presentation on May 20th that they come up with

18    the new Nancy Dondero defense.  That's when it happens, that's

19    the time line.

20             Let's go to the next slide, please.

21             Mr. Dondero is also going to have to explain on behalf

22    of himself and NexPoint and HCRE and HCMS why he always acted

23    against his own self-interest.  Because, as I said, according to

24    Mr. Dondero's expert, he only earned $1.7 million over the three

25    years during which $70 million of notes became subject to these

*Plaintiff's Motion for Partial Summary Judgment*                    94

1    agreements, approximately 40 times his compensation.  He's going

2    to have to explain to the jury the following seven, he's going

3    to have to provide an explanation for the following seven

4    undisputed facts.  Right, they don't address any of these, but

5    he's going to have to explain every single one.  And we ask the

6    Court to consider what's a jury likely to think when they get

7    questions about this.

8             Mr. Dondero and Mrs. Dondero are going to have to

9    explain why they didn't tell anybody about the alleged

10   agreements.  And for this purpose, for this very limited purpose

11   I'll just limit it at the time they were executed, at the time

12   they allegedly were entered into.  There's no facts, there will

13   never be any facts.  It's contradicted by their discovery

14   responses if they try to claim now that they told no one about

15   any of these alleged agreements at the time they were entered.

16   Nancy Dondero was clear that she never told anybody in the

17   history of the world prior to the commencement of this lawsuit

18   about this.  And Mr. Dondero says only, claims only that he told

19   Frank Waterhouse, but the evidence speaks for itself.  He never

20   told Frank Waterhouse, he never used the word agreement, he

21   never used the word Nancy, he never used the word Dugaboy, he

22   never used condition subsequent, he never talked about

23   forgiveness.  He just said, hey, that's part of my compensation.

24   And he said it in the context of settlement discussions, right,

25   negotiations.  We've heard that word recently.

*Plaintiff's Motion for Partial Summary Judgment*                    95

1          How come you didn't tell anybody, Mr. Dondero?
2    Wouldn't it have been in your interest to do that.  How come you
3    didn't tell PWC?  Wouldn't it have been in your interests to
4    tell your auditors, 'Hey, I've got these agreements.  You may
5    not want to — you may not want to value the note at a hundred
6    percent because there's a really good chance they might be
7    forgiven.'  But he never told PWC, even though disclosure was
8    unambiguously required, facts not in dispute, and I'll talk
9    about that more for just a moment shortly.  No dispute that
10   there's no writing that exists that memorialized the terms of
11   the alleged agreements.  How does somebody enter into an
12   agreement for the forgiveness of 40 times your compensation and
13   not send a confirmatory email, not have your board adopt
14   resolutions approving it, not summarize your terms somewhere so
15   that you have a definitive writing so that nobody forgets
16   because there's dozens of promissory notes that are allegedly
17   subject to these myriad agreements?  Didn't put anything in
18   writing.
19          How is he going to explain to the jury that under his
20   watch Highland time and time and time again filed monthly
21   operating reports and schedules of assets that included all of
22   these notes at a hundred percent, right, disclosures made to
23   this Court, no dispute that Frank Waterhouse prepared him, his
24   signature is on them, sometimes electronic, by the way, you
25   know, there's a heresy against electronic signature, but if you

*Plaintiff's Motion for Partial Summary Judgment*                    96

1  look at his signature, it's plainly electronic most if not all

2  the time.  Even in October and November and December, when Jim

3  Dondero was fully in control of the enterprise, all of these

4  notes are disclosed as assets of the estate.  How is he going to

5  explain that to the jury?

6          And the interesting thing, Your Honor, is if you look

7  — I don't remember the exhibit number and I hate to burden the

8  Court, but if you look at some of the monthly operating reports

9  where they discuss — I think it's the operating reports and not

10 the schedules — at the value of the notes, there is actually a

11 footnote that puts the world on notice that the Hunter Mountain

12 note is likely not collectable.  So all of Highland's creditors

13 at least one notice that Hunter Mountain may not be collectable,

14 but there's no disclosure of any kind about these alleged

15 agreements even though it would have been in Mr. Dondero's

16 self-interest to put it in there.

17         We made demands — it's in the record — we made demands

18 for a full payment under the demand notes on December 3rd, 2020.

19 Wouldn't it have been in Mr. Dondero's self-interest to say,

20 'Wait, wait, wait, what are you talking about, I had these

21 agreements with my sister.  Let me tell you about them.'  Right?

22 It would have been in his interest to do that at that time, but

23 he didn't.  He didn't say anything.

24         We had a confirmation hearing.  And Mr. Dondero and

25 the advisors and Dugaboy, and I can't remember how many entities

Case 21-03006-sgj   Doc 211   Filed 05/03/22   Entered 05/03/22 13:14:27   Desc Main
Case 3:21-cv-00881-X   Document Filed 05/04/22   Page 154 of 162   PageID 53001

*Plaintiff's Motion for Partial Summary Judgment*                                  97

1   filed their objections to confirmation.  And they come up with

2   every single argument, absolute priority rule, 2015.3.  I mean

3   they come up with every single argument.  I've skipped number 6.

4   I'll come back to that in a second — actually, no, it is number

5   6.  They come up with every single argument.  And you know the

6   one argument that they don't come up with, kind of weird, those

7   notes that your projections show are assumed to be collected in

8   2021, there's no objection that that projection is unreasonable.

9   There's no objection that that projection is unreliable.

10  There's no statement that Highland has it all wrong.  It's

11  assumption letter C to the projections to the — that were

12  attached as part of, I think, the disclosure statement.  And

13  then they were amended on the eve of trial, because by that time

14  we had already commenced the lawsuits.  So they were amended on

15  the eve of trial to add the term notes.

16          We get to confirmation hearing.  Mr. Dondero's lawyer

17  very diligently cross-examines Mr. Seery.  There's questions

18  about the notes.  There is oral argument about the notes.

19  Wouldn't that have been a good time to say, 'Hey, wait a minute,

20  I've got this agreement with my sister.'

21          None of this ever happened.  And I think this is just

22  such devastating facts, Your Honor, on slide 6 because they

23  ignore it all because they can't dispute any of it, they just

24  can't.  And you're going to have to put yourself in the position

25  of a juror, you're going to ask a jury, are you going to

*Plaintiff's Motion for Partial Summary Judgment*                    98

1    recommend to Judge Starr that he seek a jury so that they can

2    have me cross-examine Mr. Dondero and Ms. Dondero about why they

3    failed to act in their own self-interest on all these occasions.

4    I think that would be a waste of time to pursue.

5              Can we go to the next slide, please?

6              So I mentioned that Mr. Dondero had the obligation to

7    disclose this alleged agreement or the alleged agreements with

8    his sister.  He's a CPA.  You know if he was a compliant

9    executive or if he was part of a compliant organization, he

10   would have stood by the representations that he made to PWC in

11   connection with the audit for the period ending December 18th,

12   2018, but he did not.  He made no disclosure of these agreements

13   with his sister.  And what his singular defense to his failure

14   to disclose is:  They weren't material.

15             Mr. Dondero should no better.  If he was really

16   compliant, he would know that he doesn't decide what's material,

17   the auditors decide what's material.  And the audit letter that

18   he signed, that's Exhibit 33, specifically said materiality is

19   $1.7 million.

20             In our moving papers, Your Honor, we cited to probably

21   five or six different representations that Mr. Dondero and Mr.

22   Waterhouse made to PWC.  I'm only going to focus on two here,

23   but I'm not — I don't want to take the time to repeat everything

24   that's in our brief.  I'm just highlighting a few things here.

25             Number 11, representation.  Number 11 that Mr. Dondero

*Plaintiff's Motion for Partial Summary Judgment*                                    99

1    made, receivables recorded in the consolidated financial

2    statements represent bonafide claims against the debtors for

3    transactions, right, so that's one.

4              But 36 is just the killer:  We have disclosed to you

5    the identity of the partnerships, related parties, and all the

6    related party relationships, and transactions of which are

7    aware.  And the interesting thing about this is, Your Honor,

8    related party transactions are so critical to an auditor's work

9    that it's not even subject to the materiality level.

10             If you take a look at Exhibit 33, on the first page

11   where it discusses materiality, it makes it clear that

12   materiality only applies to those representations where the

13   phrase is used.  The phrase materiality is not even used for

14   related party transactions.  If Mr. Dondero and his sister

15   entered into agreement for $25, according to Representation

16   Number 36 that would have to be disclosed.  There is no

17   disclosure.  Mr. Dondero was a CPA.  Mr. Waterhouse is a CPA.

18   They made these representations to the auditors.  And if these

19   agreements actually exist, then their financial statements,

20   their audited financial statements are materially misleading.

21   It's one or the other.  I think it's the former myself, but

22   that's for you to decide as the judge.

23             You know we made an argument in our papers, in our

24   moving papers and we made the argument again in reply that there

25   is no basis under the partnership agreement for Dugaboy to act

1    in the way that Mr. Dondero contends that he did.  And I don't

2    want to spend a lot of time on it, Your Honor.  You have the

3    partnership agreement.  It's Section 3.  It is a 100-percent

4    legal issue, but we do not believe that Dugaboy even had the

5    authority to do what they now contend it did.  And we hope that

6    — I didn't prepare a slide on that — but we hope that Your Honor

7    will look at that if the Court deems it necessary, because

8    that's an issue that we raised and that we're raising again.

9            Let's go to the next slide.

10           So even if you think that perhaps jury should hear

11   this story, should hear how the sausage was made, should hear

12   Mr. Dondero explain why seven different occasions he failed to

13   act in his own self-interest, the undisputed evidence shows that

14   the alleged agreements would nevertheless be unenforceable due

15   to a complete lack of consideration.  Your Honor, if you've read

16   the papers you know that there's two ways under the alleged

17   agreement that the condition could be met.  One is if certain

18   portfolio companies were sold for greater than cost.  So if Mr.

19   Dondero was in control and certain portfolio companies were sold

20   for greater than cost, $70 million of notes would magically be

21   forgiven.

22           This contingency doesn't apply because Mr. Dondero

23   hasn't sold any of the portfolio companies.  And we did note in

24   our motion papers that he sold a substantial portion of MGM, one

25   of the three so-called portfolio companies, back in November

*Plaintiff's Motion for Partial Summary Judgment*                         101

1    2019, not to suggest that he would have been entitled to

2    forgiveness as a result but to point out, and I could have added

3    it to the prior slide, that would be opportunity number 8, when

4    Mr. Dondero was specifically engaged in the transaction that

5    took Court time, that involved discussions and negotiations with

6    the creditors committee, that might have been another

7    opportunity for him to say, 'You know what, if I sell more of

8    this, I'm out, and you guys — all those notes are going to be

9    forgiven,' but he didn't take advantage of that then either.

10            But here's the deal, Mr. Dondero and Nancy say, fee,

11   the consideration that was given in exchange for this condition

12   subsequent agreement is that it would cause the, quote, utmost

13   focus and attention for Mr. Dondero.  It would incentivize him,

14   I think —

15       (The Court's audio volume greatly decreased at 1:00 p.m.:)

16            THE COURT:  Mr. Morris, if you can hear me, you're

17   frozen.

18            Are anyone else experiencing the same thing?

19       (The Court and staff confer.)

20            THE COURT:  (Tapping microphone.)  Uh-oh.  Okay.  If

21   any lawyers out there can hear me, would you speak up?  (Tapping

22   microphone.)  (Conferring with staff.)

23            Power the microphone up here.

24            I don't know if they can see me.  Whoops, everything

25   just went off.

*Plaintiff's Motion for Partial Summary Judgment*                    102

1          THE LAW CLERK:  I think our whole system went out.  I
2    think they logged me out of it.

3          THE REPORTER:  Hey, I need you up here real quick.
4    Our system just went down again.  Okay.

5       (Back on the record at 1:10 p.m.)

6          THE COURT:  Hey, this is Judge Jernigan.

7          MR. MORRIS:  Yes, I can, Your Honor.

8          THE COURT:  All right.  Maybe we're up and running
9    again.

10         MR. MORRIS:  How much time have I spent?  I don't know
11   if the Court is keeping track.

12         THE COURT:  About 34 minutes.

13         All right.  So we lost you, we — you were —

14         MR. MORRIS:  Okay, I know where —

15         THE COURT:  — talking about the contingency, the sale
16   contingency that won't happen.

17         MR. MORRIS:  Right.

18         THE COURT:  And then I think you were about to talk
19   about the third-party contingency.

20         We've got an IT person in here —

21         MR. MORRIS:  Right.

22         THE COURT:  — so if we have other problems, hopefully
23   we can quickly nip in the bud.

24         All right.  You may proceed.

25         MR. MORRIS:  Okay.  Thank you, Your Honor.

*Plaintiff's Motion for Partial Summary Judgment*                              103

1            So, look, Mr. Dondero and his sister tried to say that

2   the consideration Highland was going to get was that he would

3   incentivize, that he would work particularly hard, that he would

4   be motivated, but here is the thing.  The evidence, the

5   uncontroverted, indisputable evidence is that Mr. Dondero

6   testified very clearly that on the day each of the agreements

7   was entered into, the portfolio companies were already either

8   substantially or at least moderately higher than cost, meaning

9   that there was nothing to incent.

10            They also claim, the other piece of it is that somehow

11   Highland benefitted because they didn't have to pay salary.  I

12   don't see how that makes sense, as we argued in our papers, they

13   still have to part with the capital.  And what Highland was

14   actually deprived of was the opportunity to charge that payment

15   as an expense in order to reduce income.  It allowed Mr. Dondero

16   to defer the payment of taxes, but it harmed, actually harmed

17   Highland because Highland had to pay the money, whether it was

18   compensation or in form of the loan, they still are out the 70

19   million — they're still out the capital that they lent to Mr.

20   Dondero.

21            But here is the thing, none of it matters because that

22   contingency doesn't apply.  The one that would apply, if these

23   alleged agreements actually existed, which we do not believe the

24   evidence supports, it would apply because the portfolio

25   companies are now going to be sold by, you know, Mr. Seery or

*Plaintiff's Motion for Partial Summary Judgment*                    104

1   whatever successor may come along some day, not that I'm

2   anticipating that.  But it's not going to be sold by Mr.

3   Dondero; that's what we do know.

4         You know we have cited the evidence in the record, we

5   have cited the deposition testimony.  I asked Ms. Dondero, who

6   entered, allegedly entered into the agreement on behalf of the

7   debtor, what's in it for Highland, what does Highland get if Mr.

8   Seery sells the assets instead of Mr. Dondero, because Mr. Seery

9   is not motivated to do this, right, he's not getting the pile of

10  money at the end, and her answer —

11       (Tones.)

12       MR. MORRIS:  — and so we don't think there is any

13  basis.  We think the whole thing is manufactured.  I'll use the

14  small f fraud.  We think that the evidence shows how the sausage

15  was made.  There is no explanation for any of these undisputed

16  facts, but even if there were there is absolutely no

17  consideration paid to the debtor.

18        Let's move onto HCMFA's defense.  HCMFA, as we talked

19  about earlier, contends that the notes were issued by mistake

20  and without authority.  I'll remind the Court of undisputed

21  facts that I think HCMFA sometimes either ignores or forgets,

22  and that is Frank Waterhouse was an officer of HCMFA.  Frank

23  Waterhouse was the treasurer.  Frank Waterhouse's responsibility

24  as the treasurer was among the responsibilities, and there is no

25  dispute, I think Mr. Norris testified to this, it's in our

1   papers, was accounting and finance.  He was a fiduciary.  No

2   dispute about any of these things.

3          And we're here on this slide to show the Court the

4   emails, the contemporaneous emails, because we rely on evidence

5   to support our position, and the contemporaneous evidence from

6   May 2nd and May 3rd, the day that these notes were executed,

7   shows exactly what was happening.  And this is not a surprise to

8   Mr. Waterhouse, right.  The reason that he's not surprised is

9   because he's participating in all of this.  And he's

10  participating in all of this, how do we know that, because again

11  no dispute, these emails are sent to corporate accounting.

12  Corporate accounting is an email string that includes Mr.

13  Waterhouse.  No dispute about that.

14         Now I will tell you, Your Honor, that if we ever got

15  to a jury, we'd put Ms. Hendrix on the stand.  Ms. Hendrix and

16  Mr. Klos would both testify, I think they did in their

17  depositions, that they would never make transactions of this

18  type without the approval of Mr. Dondero or Mr. Waterhouse, that

19  Mr. Waterhouse gave the instructions.  But do not have to go

20  that far.  You don't have to resolve what the nature of the

21  instruction was because these documents —

22     (Tones.)

23         MR. MORRIS:  — that Frank Waterhouse, the fiduciary,

24  the treasurer, the officer, the man responsible for accounting

25  and finance was told contemporaneously that these transfers were