*Plaintiff's Motion for Partial Summary Judgment*                    106

1    going to be booked as loans and that the accounting department

2    was going to prepare the notes.  This is what he's told.  It's

3    why he — it's why in none of that long deposition, in none of

4    Mr. Sauter's declarations is there anything where Frank

5    Waterhouse says, 'I had no idea.'  That's what a mutual mistake

6    would be.  That's not the contention.  There's no evidence to

7    support that.

8              If we can go to the next slide.

9              Thirty days later, exactly 30 days later Mr. Dondero

10   and Mr. Waterhouse sign their management representation letters,

11   not just for Highland but for HCMFA.  And not only did

12   Highland's audited financial statements include a disclosure

13   about these two notes that were created in May, but HCMFA's own

14   audited financial statements make the same disclosure, and

15   that's up on the screen, Your Honor.  It's Exhibit 45.

16             THE COURT:  Okay.

17             MR. MORRIS:  And they'll say, oh, but Highland,

18   Highland employees prepared it.  At what point does that refrain

19   become completely untenable?  I thought it did like months ago,

20   but for them to say that now when only Mr. Waterhouse and Mr.

21   Dondero signed management representation letters did they do any

22   due diligence, how are they going to explain to a jury that Dave

23   Klos and Kristen Hendrix somehow securely conspired to stick

24   into these pesky, little audited financial statements this

25   disclosure?  How is a compliant company and a compliant

*Plaintiff's Motion for Partial Summary Judgment*                107

1    executive going to stand before a jury and say that he didn't

2    read this, that he didn't know?  I don't think so.

3            Let's go to the next slide, please.

4            THE COURT:  All right.

5            MR. MORRIS:  The evidence that Mr. —

6            THE COURT:  I — I no longer have on my screen your

7    slides.  I have a hard copy, but is it just me or everyone —

8            MR. MORRIS:  Okay.  It seems to be up on my screen,

9    for whatever that's worth.

10           Ms. Deitsch-Perez, Mr. Rukavina, do you — I mean you

11   guys have hard copies too.

12           MS. DEITSCH-PEREZ:  It's up on the screen.  Maybe

13   what —

14           MR. RUKAVINA:  Yeah, I see it.  I see it too.

15           MS. DEITSCH-PEREZ:  Maybe pull it down put it back up

16   again for the Judge.

17           MR. MORRIS:  Okay, we can try that.

18           La Asia, can you do that, please?

19           THE COURT:  Okay, I got it now.

20           MR. MORRIS:  Okay.  So we're on slide 11.  And, again,

21   we're talking about HCMFA's allegation that the notes were

22   signed by mistake or without authority or, you know, whatever

23   the defense is.  But the evidence that Mr. Waterhouse is fully

24   engaged is overwhelming.  And what the Court would have to find

25   is that some reasonable jury somewhere is going to accept Mr.

*Plaintiff's Motion for Partial Summary Judgment*                                        108

1  Waterhouse's testimony on the following points.  And remember

2  back on the motion to strike, I pointed out to step one in

3  HCMFA's motion for leave to amend because it said that Mr.

4  Waterhouse wasn't told to treat the transfers as a loan, he was

5  only told to make the transfer.  Well, that cuts against him.

6  It doesn't cut for them.  And it cuts against them because there

7  is no dispute, there will be no evidence that Mr. Waterhouse was

8  instructed to treat the transfers as compensation.  So Mr.

9  Dondero has nobody to blame but himself because he didn't make

10 it clear to Mr. Waterhouse.  And Mr. Waterhouse did what Mr.

11 Waterhouse does:  He is the financial officer, he is the

12 fiduciary for HCMFA and for Highland.  He is in charge of

13 accounting and finance.  And he was told to transfer money.

14 That's all he was told.  So there can't be a mutual mistake if

15 Mr. Waterhouse was never told 'Transfer the money as

16 compensation.'  There will be no evidence that Mr. Waterhouse

17 was confused, that he — he heard the direction to treat it as

18 compensation and it was mistakenly treated as a loan.  There

19 will be no evidence that Mr. Dondero gave a specific instruction

20 to treat this as a loan.

21         And it's in our papers.  I don't have it on the

22 screen, Your Honor.  If you look at the contemporaneous

23 documentation that the advisors prepared and sent to their

24 clients, it was the advisors and Houlihan Lokey who did the

25 evaluation.  There is not even a document that supports the

*Plaintiff's Motion for Partial Summary Judgment*                    109

1    notion that Highland was at fault.  You have a lot of testimony

2    about it.  You have a lot of conclusory allegations.  I don't

3    think there is a single document that you're going to see where

4    somebody said that Highland is at fault.

5           The books and records, right, if we can go to the next

6    bullet point, that's what we just saw.  Not the next slide, stay

7    on slide 11.  That's what we just saw, the second bullet point

8    refers to the two emails that we saw that were sent to Mr.

9    Waterhouse.  Again, we think if we got to a jury, the evidence

10   is going to show that Mr. Klos and Ms. Hendrix are very able and

11   — and decent employees and they followed the rules, and they're

12   going to testify that this is what Mr. Waterhouse told them to

13   do.  But, again, they don't have to reach that far.  We saw the

14   emails.

15          I want to point the Court to just two other pieces of

16   evidence that I didn't put up on the slide, but if you take a

17   look at Exhibit 53, Your Honor, perhaps when this is over you

18   will see Mr. Waterhouse participating in the discussions on May

19   2nd about the $2.4 million and that the payment has to come from

20   HCMFA.  And then if you look at Exhibit 85, which is another one

21   of Mr. Dondero's written responses to the discovery, and the

22   important point here is I hear Mr. Rukavina saying it has to go

23   through Legal, it has to go through Legal, it has to go through

24   Legal.  Well, that's not what Mr. Dondero says.

25          Okay, we asked Mr. Dondero to, in Interrogatory Number

*Plaintiff's Motion for Partial Summary Judgment*                110

1  2, and this is at Exhibit 85, to identify, among other things,

2  the person who drafted the note.  And he responded, and I'm

3  quoting:  Dondero does not know who specifically drafted the

4  notes.  However, he believes they were drafted by an individual

5  in either the Highland Legal or Finance Department.  So it's not

6  crazy to Mr. Dondero that somebody in the Finance Department

7  would draft the notes, right, it's just not.  The fact is that

8  Mr. Waterhouse knew the notes were prepared because the

9  transfers were booked as liabilities on HCMFA's books and

10 records.

11         Is Mr. Waterhouse going to be able to explain to the

12 jury either that he didn't know this or that he did it by

13 mistake?  Right.  And this whole notion of mistake — well, we'll

14 get to it in a moment.

15         So the transfers are booked on HCMFA's balance sheet

16 as liabilities.  Mr. Waterhouse and Mr. Dondero signed

17 management representations, and the notes appear as a subsequent

18 event in the audited financials for the period ending December

19 31st, 2018.  Relying on those very books and records, and this

20 is in our papers, the advisors, not Highland, this is Mr.

21 Waterhouse, this is Ms. Stedford (phonetic), Mr. Norris is on

22 here, I think Mr. Sauter, I don't have the emails in front of me

23 but they're well cited in our papers, they take the HCMFA books

24 and records and they send it to the retail board.  Right, so

25 HCMFA actually relied on the books and records to report to the

*Plaintiff's Motion for Partial Summary Judgment*                              111

1   retail board as to what they owed Highland, and it included

2   these notes.

3          I think step six of Mr. — I tell you I could go

4   through Mr. Rukavina's six-step process and deal with all of it,

5   but — but I think his — I think his last step is that there were

6   notes on the books for $6 million, and these notes are about $7

7   million, so people can be confused.  I think the phrase he used

8   was people would naturally assume that they were the same thing.

9   I'd like to be in front of a jury and ask the jury if they would

10  have any trouble distinguishing between $6 million and $7

11  million.  I think a jury of ordinary citizens might say that

12  million dollars would make a difference.  But be that as it may,

13  here is the important thing, Your Honor.  In every single

14  disclosure after these notes are signed, it's not $6 million or

15  $7 million, it's always eight figures, it's $10 or more.  It's

16  $10 million or more to the retail board.  It's $10 million or

17  more in every single monthly operating report.  It's $10 million

18  or more in the schedules.  There is no way to confuse 6,- and

19  7,-, even if that was reasonable, because that never occurred.

20  The number was always 10 million or 12 million.  So that's just

21  another specious argument as opposed to facts.  It's just

22  argument.  And we know the Court will distinguish argument from

23  facts.

24         Mr. Waterhouse is the person who prepared HCMLP's

25  monthly operating reports and schedules that included the HCMFA

*Plaintiff's Motion for Partial Summary Judgment*                    112

1   notes as assets.  How is he going to explain to a jury how he
2   did that two dozen times?  And, by the way, what position does
3   that leave him in having prepared them and signed them and filed
4   them with the Court.  Now they're false, even though the entire
5   bankruptcy estate relied on the accuracy of those reports.  Not
6   a material error, if they're to be believed.

7           Then of course you have Mr. Sauter's investigation,
8   right?  He comes in in the spring of 2021, completely
9   unfettered.  Mr. Waterhouse is no longer employed by Highland.
10  There's no lawyer telling Mr. Waterhouse he can't speak.  They
11  meet three times.  Three times.  And Mr. Waterhouse refuses to
12  accept responsibility for this.  He refuses to say that he made
13  a mistake.  Mr. Sauter, who has no personal knowledge, we've
14  heard this story before, comes in after the fact with no
15  personal knowledge and announces that Frank made a mistake, but
16  that's not what Frank said.

17          If you look — if you look at the transcript, if you
18  look at the transcript of Mr. Norris, right, I got him to admit
19  and then I got Mr. Sauter to admit based on that transcript that
20  Mr. Waterhouse was crystal clear, he knew exactly why the notes
21  were created.  He knew exactly why the notes were created.  I
22  don't know how they're going to explain that to a jury.

23          Let's move to the next slide, a couple of other — the
24  special arguments, Mr. Waterhouse was not authorized to sign the
25  HCMFA notes.  Let me get this right, Your Honor.  He was an

*Plaintiff's Motion for Partial Summary Judgment*                    113

1   officer of HCMFA.  He was the treasurer of HCMFA.  He was a

2   fiduciary.  He was the person responsible for accounting and

3   finance, and they say he wasn't authorized.  Other than the

4   words out of Mr. Dondero's mouth, what evidence is there to

5   support that?  Not only is there no evidence to support it, but

6   it is directly contradicted by everything we heard last week.

7           Mr. Dondero — Mr. Waterhouse signed agreement after

8   agreement after agreement on behalf of not only HCMFA but on

9   behalf of Highland.  He signed shared services agreements, one

10  of which is in evidence in this case.  He signed subadvisory

11  agreements.  He signed payroll reimbursement agreements,

12  agreements that Mr. — that not only did Mr. Waterhouse sign but

13  that HCMFA is somehow trying to collect money on.  How is it?

14  Where is the evidence that says Frank Waterhouse is — and I

15  don't have to remind the Court that Mr. Dondero didn't know

16  anything about anything — where is the evidence in the record

17  that shows that Mr. Waterhouse could sign all of those

18  agreements but he couldn't sign these promissory notes?  Those

19  agreements, by the way, that required HCMFA and NexPoint to pay

20  a multiple of the promissory notes at issue, so it can't be the

21  amount.  I mean there's no evidence of any kind, frankly, that

22  his wings were clipped by Mr. Dondero.

23          He also signed other notes, so it can't be he's not

24  allowed to sign a promissory note because there are other notes

25  in this case that Mr. Waterhouse signed that they don't dispute

*Plaintiff's Motion for Partial Summary Judgment*                    114

1   his ability to sign.  So we think the whole idea and apparent

2   authority, I mean there is no evidence for the notion and it's

3   contradicted by the evidence.

4          They also say, ah-ha, ah-ha, Mr. Waterhouse's title or

5   — or the HCMFA name at the bottom isn't clearly articulated.

6   Again, Your Honor, they are grasping at straws.  The undisputed

7   facts, if you look at the notes that Mr. — that have Mr.

8   Waterhouse's signature, and I'll leave it that way, because

9   that's all I think we have to prove is that his signature is on

10  it, he is an officer and that he was — that he had at least

11  apparent authority to enter into these agreements, that he knew

12  about them, that it's not a surprise to him, he doesn't contend

13  that he didn't know what was happening, right.  None of that is

14  going to be in the record here.

15         So they say, ah, ah, Mr. Waterhouse, it just says

16  maker.  But here's the thing, if you look at the notes, Your

17  Honor, obviously maker is a defined term.  The definition of

18  maker is HCMFA.  Mr. Waterhouse's electronic signature is used

19  for other notes in the same way without dispute.  Mr. Dondero,

20  as we just looked at, on Exhibit 85 has admitted that Highland's

21  Accounting group is authorized to prepare notes, right,

22  otherwise he wouldn't have submitted that interrogatory

23  response.  Based on the audited financials, the books and

24  records, the statements to the retail board, the uninterrupted

25  string of bankruptcy filings prepared and signed by Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    115

1   Waterhouse, I mean I don't think there is any basis for the

2   argument, but it's they should be estopped today from coming in

3   and denying the enforceability of these notes.

4            Let's move to the next defense, is breach of shared

5   services.  You know somehow HCMS and HCRE have gobbed onto this

6   defense.  There is no shared services agreement in the record.

7   There is no shared service agreements in the record.  There is

8   no competent evidence that shows that is shared services

9   agreement exists.  I think if Your Honor were to look at the

10  record and look at my examination of Mr. Dondero, because I

11  asked him about this, he said, you know, they — they — the

12  consideration that Highland received is like a reputational

13  benefit, or something like that.  I mean it's just — it's a

14  bunch of nonsense.  And there is no evidence in the record that

15  there is a shared services agreement.

16           There is one for NexPoint, no doubt about it.  Article

17  2 sets forth very clearly what Highland's duties and

18  responsibilities are.  And if you just look at the evidence, not

19  argument, if you just look at the document, I think every single

20  entry begins with the word "Assist" or "Assistance" or "Advice,"

21  or something like that with respect to certain services.  To

22  this day, HCMFA — I mean, I'm sorry — the term note defendants

23  have failed to identify any particular provision of the shared

24  services agreement that not only authorized but obligated

25  Highland to make payments on their behalf without any

*Plaintiff's Motion for Partial Summary Judgment*                    116

1   instruction or direction of any kind by them.  According to

2   them, Highland really could have done just about anything to pay

3   any obligation that they felt was due and owing by them.  I

4   think it's a ridiculous reading of the agreements.  And I'll

5   wait to hear if counsel actually identifies a provision in the

6   NexPoint shared services agreements that they believe not only

7   authorized but obligated Highland to make these payments.

8          If there were any doubt, Your Honor, Section 2.02 of

9   the NexPoint shared services agreement specifically says that

10  for the avoidance of doubt, Highland shall not provide any

11  advice or perform any duties on behalf of NexPoint other than

12  the back and middle of the services contemplated herein.  Okay,

13  so if it's not in the agreement, they're prohibited from doing

14  it.  Highland followed these provisions in practice throughout

15  the bankruptcy case.  Don't take my word for it, take the

16  defendants' evidence.

17         Can we please put up Exhibits D and E.  So these are

18  exhibits that are attached, I think, to Mr. Aigen's declaration.

19  And if we could just start at the first — the first email.  You

20  will see that it's dated — no, up at — either way, that's fine.

21  Just give me one minute and stop scrolling.

22         So here is an email that was originated by Ms.

23  Hendrix.  And this was the practice.  And, you know, we heard

24  about this last week.  Ms. Hendrix would write to Mr. Waterhouse

25  and she would say, "Here are all the payments that I'm going to

Case 21-03006-sgj   Doc 211   Filed 05/03/22   Entered 05/03/22 13:14:27   Desc Main
Case 3:21-cv-00881-X   Document 170   Filed 11/09/22   Page 12 of 162   PageID 53021

*Plaintiff's Motion for Partial Summary Judgment*                    117

 1  make.  Is it okay."  And Frank Waterhouse would literally have

 2  to approve it.  So — so let's scroll up.  This is, "Okay to

 3  release," she asks.

 4          Frank Waterhouse says okay.  That's December 23rd.

 5  Let's just scroll up and see a few more.  Keep going.  Keep

 6  going.  So here's another one.  "Okay to send."  Right, Kristen

 7  Hendrix asking for permission to make payments on behalf of

 8  HCMFA, HCMS, right, all of the nondebtor entities wanting

 9  permission.  Frank says okay.

10          Keep going.  This is December 1st.  "Okay to release,"

11  she asks Mr. Waterhouse.  Ms. Hendrix doing her job.  Mr.

12  Waterhouse doing his job.  Okay.  Right, so their contention

13  that Highland was not only authorized but obligated to make

14  these payments is belied not only by the contractual language

15  but by the undisputed evidence that they have put into the

16  record that shows that Kristen Hendrix always sought Frank's

17  approval before making these payments.  That's — that's the

18  facts, and this is December 2020, but there's more.  Of course

19  there's more, because there is no dispute that Highland was ever

20  instructed or directed to make these payments at the end of

21  2020.  In fact, the evidence is crystal clear, that no payment

22  was made because of Mr. Dondero's direction, right.

23          The Court doesn't have to resolve the debate between,

24  you know, Mr. — you know, Mr. Waterhouse and Mr. — it wasn't

25  made because he said so.  And here is the funny thing.  We have

*Plaintiff's Motion for Partial Summary Judgment*                118

1    put it in our reply papers, Your Honor, it's Highland actually

2    believed that it had not only the authority but the obligation

3    to make payments on behalf of these entities.  Highland surely

4    would have paid itself on all the demand notes, right?  Is there

5    any reason why it wouldn't have paid itself on December 10th,

6    when Mr. Dondero failed to respond to all of the demand letters?

7    Right, HCMS has all these demand notes.  HCRE has all these

8    demand notes.  Why didn't Highland just pay itself?

9            Can you imagine what Mr. Dondero had done if he woke

10   up on the morning of December 11th and he found out that

11   Highland had helped itself to all of these nondebtor affiliates'

12   cash because he didn't respond to the demand letters?  How is he

13   going to explain to that jury?  He's going to tell the jury

14   that's what he wanted to happen, that's what he expected to

15   happen.  It can't just be with the term notes.  It's got to be

16   either they had the ability to do it or they didn't.  Clearly

17   Highland and Mr. Seery didn't think they had the ability,

18   because if they did, they would have.  Right?  Why wouldn't

19   they?  There is no defense that should be put before the jury on

20   shared services.

21           Let's go to prepayment defense.  There is no dispute

22   the terms of the notes are absolutely unambiguous.  They

23   required the maker to make an annual installment payment at the

24   end of the year of accrued and unpaid interest, and

25   one-thirtieth, I believe, of the principal.

Case 21-03006-sgj   Doc 211   Filed 05/03/22   Entered 05/03/22 13:14:27   Desc Main
Case 3:21-cv-00881-X   Document 179-10   Filed 01/09/24   Page 14 of 162   PageID 53023

*Plaintiff's Motion for Partial Summary Judgment*                    119

1       The term notes also provided that the parties could

2   renegotiate.  I think it's paragraph 3, although forgive me if I

3   get that wrong.  And it said the maker may prepay in whole or in

4   part the unpaid principal or accrued interest on the notes.  Any

5   payment of the interest shall be applied for unpaid accrued

6   interest thereon, and then to unpaid principal here.  This is

7   it.  Clear and unambiguous.  So the parties could agree to do

8   something differently.

9       And, you know, Mr. Klos in his first declaration

10  addresses the NexPoint issue.  And, frankly, it's done at the

11  same theory, so no harm, no foul, I guess.

12      And just look at the amortization schedule, Your

13  Honor.  There is not a single month where interest doesn't

14  accrue.  The last payment made by these entities, these

15  so-called prepayments, was back in 2019, right.  Just look at —

16  we just encourage the Court to look at the amortization schedule

17  and ask itself why, based on the contractual language, they

18  could have ever suspected that interest was no longer going to

19  accrue because it was prepaid and eliminated in 2019 and 2020.

20  In fact, you'll see on the amortization schedule in 2019, even

21  though there is enormous payments that are made at the beginning

22  of the year, the term note defendants are still required to make

23  the interest payment that's due at the end of the year, right.

24  They're treated as having prepaid the principal, but interest

25  continued to accrue.  Interest always accrues.  And so even

*Plaintiff's Motion for Partial Summary Judgment*                        120

1   under Mr. Dondero's watch, in December 2019, the term note

2   defendants, they do what they're supposed to do, and they make

3   the payments.

4           And the fact that payments were due at the end of 2020

5   wasn't a surprise to anybody.  It's not like somebody can

6   credibly come in and say, oh, gee, we didn't know that these

7   payments were due.  And how do we know that, Your Honor?

8   Because Highland prepared 13-week forecasts.  They were prepared

9   under Mr. Waterhouse's direction.  We've put one example before

10  the Court.  I think it's Klos Exhibit C.  And if you look at his

11  — and this is, you know, the first unobjected to declaration,

12  declaration paragraph 13, Exhibit C.  And he explains that all

13  of the payments that were due at the end of 2020 were fully

14  incorporated into the 13-week forecast.  So, again, you know,

15  poor Mr. Waterhouse is going to have to explain to adjacent why

16  that he was completely unaware that these payments were due.

17  It's not going to be good.

18          So that's the prepayment defense.

19          And just quickly, Your Honor, ambiguity.  You know

20  Your Honor can look at the evidence in the record on this point.

21  We have cited all the places in Mr. Dondero's deposition where

22  he refused to engage on the topic, insisting that he wasn't a

23  lawyer.  You know, in fact, Mr. Dondero stated pretty explicitly

24  that he didn't read any of the notes before he signed them, so

25  I'm not sure how the ambiguity now can possibly be a credible

1   defense because it's not ambiguity that he was even aware of at

2   the time he signed all of the notes except for the handful of

3   notes that Mr. Waterhouse signed.  We don't think there is any

4   ambiguity.  They haven't pointed to anything meaningful.

5            There is partial performance.  You know it's partial

6   performance, Mr. Dondero has admitted to partial performance in

7   response to an interrogatory.  And of course in our reply brief,

8   we show that the defendants paid, I think, $40 million back on

9   these notes and other notes prior to the petition date.  So

10  you've got performance.  You know there's just not much more to

11  say on this.  So unless the Court has any questions, at this

12  point I think I've used approximately an hour and five or an

13  hour and 10 minutes.  Can I just get confirmation of that?  And

14  then I'll rest and save the downs for rebuttal.

15           THE COURT:  All right.  Nate, can you confirm?

16      (The Law Clerk confirms off record.)

17           THE COURT:  Okay.  Nate says an hour and five minutes.

18           All right, we'll take a 10-minute break and come back

19  and hear from the defendants.

20           COURT SECURITY OFFICER:  All rise.

21      (Recess taken from 1:40 to 1:51 p.m.)

22           COURT SECURITY OFFICER:  All rise.

23           THE COURT:  Please be seated.  All right, we're back

24  either/or in the Highland note adversaries.  I'll hear from the

25  defendants at this time.

*Plaintiff's Motion for Partial Summary Judgment*                    122

1          All right, can you all hear me?

2          MS. DEITSCH-PEREZ:  Yes, Your Honor, I can hear you.

3          MR. ROOT:  Yes, Your Honor.

4          THE COURT:  Very good.  You may proceed, Ms.

5   Deitsch-Perez.

6          MS. DEITSCH-PEREZ:  Okay.  And I'm going to ask Mr.

7   Aigen to pull up our PowerPoint.  I was not aware that Mr.

8   Morris was going to provide them in advance to the Court and the

9   parties, so we have not — we will look at our PowerPoint to make

10  sure all of the notes and comments are out and circulate to them

11  — circulate them to everyone for their records after the

12  argument and after we've made sure to scrub them of our notes, —

13         THE COURT:  All right.

14         MS. DEITSCH-PEREZ:  — our internal notes.  Thank you.

15         THE COURT:  Um-hum.

16         MS. DEITSCH-PEREZ:  Okay.  And if — we have a couple

17  of hitter slides, please.  Mike can go to page 3, start on page

18  3.

19         And if you step back here and think about what we just

20  heard, it sounded a lot like a jury argument.  It sounded like

21  an opening statement at trial, because that's — that's what it

22  really was, that the debtor doesn't believe Mr. Dondero or

23  anyone related to him or even associated with him, and is

24  counting on the Court feeling the same way.  And I think that

25  situation has emboldened lawyers who surely know better to make

*Plaintiff's Motion for Partial Summary Judgment*                    123

1   a motion for summary judgment on the grounds that the

2   defendants' witnesses and evidence are less credible, less

3   credible than the plaintiff's evidence; and that the inferences

4   to be drawn from the evidence that plaintiff proffers are better

5   than the — and stronger than the inference — inferences from the

6   evidence that the defendants' witnesses bring forward.  And

7   those kinds of things are the very factors that bear on whether

8   you win or lose at trial.

9          And if we were hearing about this, about some other

10  set of lawyers in some other case, we'd probably all laugh and

11  say what are they doing, that's a waste of everybody's time to

12  move for summary judgment on which side is more credible than

13  the other, because that's classically an issue for trial, not

14  for a summary judgment motion.  So let's see, let's look at the

15  arguments that the defendants make and the evidence and the case

16  and what plaintiff argues about it.

17         So one thing that the defendants argue is that the

18  agreements don't exist; but, in fact, Jim Dondero and Nancy

19  Dondero, both sides testified that they exist.  They identify

20  the essential terms.

21         The debtor makes a big deal about the agreement

22  supposedly being secret; we'll see how they weren't.

23         The debtor makes a big deal about the absence of

24  notice of possible forgiveness on the financial statements.

25  That's not a basis for summary judgment.  Might be an

*Plaintiff's Motion for Partial Summary Judgment* 124

1    impeachment point at trial, not summary judgment.

2         The debtor talks about voluntary payments, we'll

3    address that.  That's not a basis for summary judgment.

4         We heard Mr. Morris talk about the fact that Jim

5    didn't demand forgiveness when there was a relatively small

6    stock sale that was — that was basically forced.  He didn't make

7    a demand maybe he could have made; that's not a basis for

8    summary judgment.

9         Whether or not Nancy Dondero looked at the notes when

10   she entered into agreement, that's maybe — maybe an impeachment

11   point at trial, not a basis for summary judgment.

12        And there's evidence that agreements to forgive loans

13   as part of compensation on the occurrence of future events like

14   performance was a practice at Highland and related companies.

15        Defendants also talk about whether the agreements are

16   definite.  Not much — we'll see the cases, not much is required

17   for agreements to be sufficiently definite to preclude summary

18   judgment.

19        And — and the argument that Mr. — that the plaintiff

20   makes that the agreements are not supporting by a meeting of the

21   mind — a meeting of the minds, that's really the same thing as

22   arguing that there's no agreement.  And those are inherently

23   fact issues.  And there are actually cases on that.  And you

24   will see there was a complete absence of authority in Mr.

25   Morris' presentation.

1        So let's go on to the next slide.

2        Okay.  We'll discuss the argument about consideration.

3    Conspicuously absent from Mr. Morris' presentation was the

4    second form of consideration that existed for the agreements,

5    which was that Mr. Dondero could have taken more compensation.

6    These agreements were made at comp time, and he was sitting back

7    and looking over his compensation and saying should I take more,

8    I could take more, I would take more.  But instead he got this

9    agreement.  That's compensation.

10       There's a half-hearted argument in the briefs, not

11   much made of it today by the plaintiff, that Nancy Dondero was

12   incompetent.  You will hear from the defendants the law on what

13   constitutes someone who is incompetent to make a contract.  And

14   plaintiff hasn't put in anything in support to show that Ms.

15   Dondero was drunk or a minor or otherwise legally incompetent to

16   make agreements.

17       And then you'll hear somewhat from me and more from

18   Mr. Rukavina that Highland was responsible for making the loan

19   payments under the shared services agreement.  The plaintiff

20   doesn't deny that there was a written shared services agreement

21   for NexPoint.  And then says, well, there's no shared services

22   agreement for HCRE and HCMS, as if it were the law that the

23   agreements couldn't be oral or implied over a course of conduct.

24   And that's a very unlawyerly suggestion.  Of course we all know

25   that the agreement need not be in writing and could even be

1   implied from a course of conduct.  And the same thing about the

2   prepayment argument.  All Your Honor has to do is look at the

3   amortization tables and see how much was paid on these loans.

4   Huge amounts.  And so is it fair to say they were in default at

5   that time when, A, Highland could have/should have paid them,

6   and so much had already been paid.

7          So let's go on now to the specifics.

8          Okay.  Now before we go further, there's actually some

9   background that's helpful to understanding how — how we actually

10  got in this position.  And to understand how these notes and

11  then the agreements for potential forgiveness came about, as I

12  think Mr. Morris and the Court both said, context is important.

13  This Court has often said that, well, Mr. Dondero hasn't come to

14  grips with Highland being in bankruptcy.  And that's an

15  interesting thought, because it recognizes that until this

16  bankruptcy, Jim Dondero was the heart and soul of Highland.

17         He and Mr. Okada (phonetic) built it up from very

18  little.  And it was something really important to Dallas.  It

19  was a financial powerhouse plunk down in the middle of the

20  country.  Not in New York or L.A., where people expected those

21  kinds of companies to be.  It grew to employ hundreds and it

22  owned portfolio companies that employed thousands.  It survived

23  the financial crisis that wiped out much bigger firms.  And

24  understanding its culture is important to this case, because it

25  was a culture of compensation based on performance.  This was a

*Plaintiff's Motion for Partial Summary Judgment*                    127

1    culture of compensation based on hard work.  It was a culture of

2    growing the business rather than living large.

3            I remember hearing about Highland in the — you know,

4    many years ago where people — outside vendors griping and maybe

5    even some inhouse people griping that — that they had to fly

6    coach because Mr. Dondero flew coach, because he was — he was

7    putting the company first over his own interests.  And so even

8    his distractors acknowledged that Mr. Dondero works tirelessly.

9    And, more importantly, he took ownership and responsibility.

10   And because he was the largest owner, that played a part in how

11   he interacted with the company.

12           So not to get too far ahead of the program, for

13   example, the debtor claims that Mr. Dondero — the fact that Mr.

14   Dondero made payments on notes that were unnecessary, because of

15   the potential forgiveness based on the agreement, that must mean

16   that the agreement didn't exist.  But they're missing the point.

17   That's because — that's assuming that Mr. Dondero would only do

18   what was good for himself and not for the company.  Instead, if

19   Highland did cash, he'd make payments on those demand loans even

20   though if they weren't demanded payment wasn't due.  The same

21   thing about the terms loans.  There was only a certain amount

22   due each year.  But you saw that much more than that was

23   occasionally paid.  And, A, they didn't have to — on the demand

24   notes, they didn't have to be paid because they were subject to

25   the forgiveness, but he still board — caused them to be paid, or

*Plaintiff's Motion for Partial Summary Judgment*                    128

1    the ones that were his own, he paid them down.  Why?  Because he

2    wanted to make sure the enterprise was successful.

3            So when you hear Mr. Morris say, well, how does Mr. —

4    how is Mr. Dondero going to explain that he didn't act in his

5    own self-interest, that's the answer.  That's the answer.  He —

6    he did things he wasn't required to do to make sure that

7    Highland was okay.  And if it needed the money, he paid it down.

8    So that is in evidence that the agreement didn't exist.  It's

9    evidence that he was putting Highland first.

10           And it's also important to remember that at all

11   relevant times the loans here were modest in relation to the

12   overall value of Highland.  If this bankruptcy hadn't been beset

13   by all of the contentiousness that the Court and Mr. Morris have

14   acknowledged by creditors with very personal agendas, by the

15   sharp animosity between the various constituents, by claims

16   trading that maybe skewed the economic interests here, Mr.

17   Dondero expected that he was going to be able to put together a

18   plan that would enable Highland to stay in business, that would

19   pay off all the creditors and move forward.

20           And so when you look at all of the — the argument that

21   Mr. Morris made about sausage-making and why in this sort of

22   really crisis period of the plan being propounded, negotiations

23   over whether it would be the pot plan or the creditors' plan, or

24   something else, and litigation starting up, and Mr. Morris says,

25   'Oh, look, they kept changing their story.  They kept adding

*Plaintiff's Motion for Partial Summary Judgment*                    129

1    things and amending things.'  Well, of course there was quite a

2    bit of chaos.  And so did everything get done perfectly?  Not at

3    all.  But that's an argument to be made to the jury.  Should

4    they have known everything on day one and put it all on the

5    first pleading?  Well, Mr. Morris can argue that, but the

6    defendants will point out the incredible pressure that everybody

7    was under on what was the real focus at the time, which was

8    trying to salvage Highland and trying to have it be a continuing

9    entity and having to have these competing plans.  And the

10   litigation was the by least of it.  And so that's the

11   explanation on the sausage-making.

12           And any lawyer who tells you they haven't amended

13   their interrogatory answers or forgotten a witness or forgotten

14   a document and had to put it in later isn't — really isn't —

15   isn't a litigator or is maybe a baby lawyer or just hasn't been

16   working enough, because it happens to all of us and it

17   particularly happens when there are a whole lot of cooks in the

18   kitchen, shall we say.  And we'll talk a little bit more about

19   that as we go along.

20           So you also know, I mean the debtor knows and Your

21   Honor knows from presiding over this case that Mr. Dondero did

22   not take the kind of huge bonuses out of Highland that we read

23   about in the newspapers.  And we also know that he really was

24   focused on making people perform to get their money.

25           And so, given all of that, how can plaintiff feign

*Plaintiff's Motion for Partial Summary Judgment*                                130

1    surprise that Mr. Dondero would set himself a challenge, a

2    hurdle, to gain forgiveness of that — of the notes?  It just —

3    it really defies belief.

4            And I understand that lawyers put on a show for a jury

5    and that's what Mr. Morris will have to do here, but when you

6    talk about something that's not remotely credible, it's not

7    remotely credible that Highland did not expect that Mr. Dondero

8    would plan that he would try to have tax-efficient compensation

9    and that he would plan that if things would happen that would —

10   would result in — in large — potentially really large payments

11   like we've seen with MGM, that he would be able to benefit from

12   that, along with Highland.

13           So, given all of that, we're not — we're not asking

14   the Court to grant summary judgment for the defendants.  We

15   recognize that the debtor disputes the facts alleged by the

16   defendants and that there are facts that need to be decided by a

17   fact finder, and here it's going to be a jury.  But by the

18   debtor seeking summary judgment and asking this Court to find

19   facts is just as presumptuous as if the defendants had made the

20   same request.  And if the Court granted summary judgment for the

21   defendants, we — we concede it would get reversed.  And it is no

22   different that if the Court granted summary judgment on what are

23   hotly disputed issues if it granted summary judgment for the

24   plaintiff.  And — and we're going to show you the law, which the

25   plaintiff didn't show you.

1          So, Mike, if you could go on to the next slide.

2          Okay.  We heard Mr. Morris say almost for the first

3   time today that the — that the agreement at issue here wasn't

4   authorized by the LPA.  And I have to tell you there is — Mr.

5   Morris contended that's an argument they're making.  It's not in

6   the — you can — you can shake the motion for summary judgment

7   and squeeze it like a sponge, that argument won't come out of

8   there.  The sole argument is there is — and I think I tied it

9   somewhere later in this slide show — they say something like and

10  it wasn't authorized.  There's no case law, no argument, no

11  nothing.  There is a sentence.

12          So in contrast to that sentence, look at the LPA

13  itself.  The LPA gives Dugaboy the right to approve compensation

14  for the GPA of the GP and the affiliates of the general partner.

15  And there is a provision about compensation.  And you have to

16  parse through the agreement.  You have to look at what the

17  various words in the section mean.  So you have to go look at

18  "affiliate," and you will see that that would related to Mr.

19  Dondero.  You have to look at "majority interest," and you can

20  see, if you turn to the page that describes it, that that's

21  Dugaboy.  And if you go to Exhibit A, that also reflects that

22  the majority interest is Dugaboy.  And then if you go look at

23  the Dugaboy trust documents, you will see that as of — starting

24  as of 2015, Nancy Dondero is the Dugaboy trustee and, therefore,

25  the individual entitled to approve the compensation.  That was

*Plaintiff's Motion for Partial Summary Judgment*                132

1    in the LPA, going back to 2015.  I think it was in there before

2    that.  That's — that's Highland's operating agreement.  If they

3    didn't want that, that shouldn't have been the operating

4    agreement.  But that is the agreement.

5           And if we go on now, it defies belief that the debtor

6    says there's no evidence, because there is evidence.  Mr.

7    Dondero testified and Ms. Dondero testified about the agreements

8    and what they were.  And we'll look at that as we go along.  And

9    the agreement was that the notes would be forgiven if Trustway

10   Cornerstone or MGM sold at above — at or above cost.  Mr. Morris

11   made some somewhat confusing assertion that that part of the

12   agreement didn't apply here because it wouldn't be Mr. Dondero

13   doing the selling.  There is nothing in the agreement as

14   described that says that.  But putting that aside, there is no

15   argument in the motion for summary judgment that supports what

16   Mr. Morris said in today and in a footnote that the indisputable

17   fact is that Ms. Dondero did not have the authority to bind

18   Highland.  What we just saw on the prior slide is exactly why

19   Ms. Dondero was the person who could do that.

20          So let's go on to the next slide.

21          Okay.  So, again as I said, both Nancy and Jim

22   testified to the agreement.  And in Texas, and I'll show you the

23   cases in a minute, even if you had a he said/she said dispute,

24   where one side on a contract — on a contract said, 'I made that

25   contract,' and on the other side the other person said, 'No, I

*Plaintiff's Motion for Partial Summary Judgment*                    133

1    didn't make that contract,' the testimony of the one person is

2    actually enough to preclude summary judgment.  And the reason

3    for that is that the Court is not entitled to evaluate the

4    credibility of the witnesses and the relative weight of the

5    evidence.  And there's also no requirement that the contract be

6    in writing.

7            What the debtor points to are facts that the jury

8    might consider in deciding whether there was or wasn't a

9    contract.  They might be convinced, they might not be convinced.

10           Let's go on.

11           Okay.  So now let's look at the applicable law,

12   something that the debtor did not do with you.  We have the In

13   re Palms case.  Now that was an actual trial where the court is

14   a the trier of fact on a proof of claim.  And one party said

15   there was an oral contract and the owner denied it.  The

16   architect said there was a contracted design.  The owner said,

17   no, there is not.  And the court held that whether there was a

18   meeting of the minds is a question of fact.  And even if there

19   was a missing term, that would not be dispositive.  So when the

20   debtor says here, 'Oh, not — you know, Mr. Dondero didn't recite

21   every term in his deposition,' that's not dispositive for a few

22   reasons.  One, that's only talking about what he could remember

23   at the time.  But, two, we're at summary judgment, we're not

24   even at the point of trial.  And this case says it's an issue of

25   fact.

*Plaintiff's Motion for Partial Summary Judgment*                    134

1          And then Fisher versus Blue Cor- — Cross (phonetic)

2    applies the Palms case in a summary judgment and again

3    reiterates that whether or not there is a meeting of minds,

4    that's something for a jury to decide.

5          Bucsany (phonetic) is even closer.  There there is a

6    written construction contract that required change orders and

7    for amendments to be in writing.  Think of that as the parallel

8    to the note.  And then after that there was an oral contract for

9    additional work.  And the owner contended that the notion that

10   there was an oral contract was inconsistent with the written

11   contract and that must mean there was no oral agreement or that

12   it was unenforceable.  And the fact-finder found that an oral

13   contract for additional work is something a jury could find.

14         Senta Alsud (phonetic), another case that's helpful

15   here.  There there was a party that made a loan and also put a

16   downpayment towards a transaction.  And the party that wanted to

17   be repaid and wanted the refund of the downpayment moved for

18   summary judgment.  And there was, like here, conflicting

19   testimony on whether or not there were conditions on repayment,

20   because that's what at issue here, whether there are conditions

21   to repayment, and there were also issues of a similar issue

22   there on the — on whether or not the downpayment had to be

23   refunded, and the court denied summary judgment because

24   conflicting testimony creates a genuine issue of material

25   disputed fact for trial.  And — and that's — that's what we have

*Plaintiff's Motion for Partial Summary Judgment*                           135

1    here.

2              THE COURT:  Let me — let me ask you —

3              MS. DEITSCH-PEREZ:  Now —

4              THE COURT:  — let me ask you a question, because until

5    you got to this case I was going to ask you do you have any

6    cases where an oral agreement was grounds to avert summary

7    judgment on a suit on a note because, as we all know, you know

8    we said it before, suits on promissory notes are, I think,

9    widely regarded as the simplest kind of lawsuits.  There are

10   typically, and they — you know the Fifth Circuit has said they

11   are grist for summary judgment.  So I was going to ask you do

12   you have any cases where an oral agreement that was alleged to

13   exist to be a defense to repayment was accepted as grounds to

14   avert summary judgment.  So —

15             MS. DEITSCH-PEREZ:  Yeah.  And — and that's why we

16   gave you these cases.  They're not going to be a lot —

17             THE COURT:  Well, as best I can tell, none of these

18   cases except maybe Alsud involved a promissory note.  Okay,

19   they're contracts.

20             MS. DEITSCH-PEREZ:  Yeah.

21             THE COURT:  But this one, was it a suit on a

22   promissory note, essentially, that oral amendments —

23             MS. DEITSCH-PEREZ:  I mean there was —

24             THE COURT:  — were argued and the court said, okay,

25   we'll go to trial?

*Plaintiff's Motion for Partial Summary Judgment*                    136

1          MS. DEITSCH-PEREZ:  Well, it was — it was a case in

2   which there was a loan.  And one side said you have to pay it

3   back and the other said, no, there were some conditions on it

4   that were oral.  And so it went to trial.  And, I apologize, I

5   don't know what happened at trial.  But the fact that there

6   aren't many cases like that, Your Honor, is because, you're

7   right, often — often promissory notes are simpler cases, but

8   this is most assuredly not a simple case.  And so — I mean this

9   is — you know the notion that you can have an oral agreement, I

10  think laymen are confused by that and there's a prejudice, I

11  think, that people — people think that if it's not in writing,

12  oh, boy, maybe it didn't happen, but particularly in Texas we

13  know — we know that's not true, that oral agreements even for

14  big amounts can be binding.  You remember Joe Jamal (phonetic)

15  taught us all that.

16          But even more specifically in a he said/she said

17  dispute, the testimony of one side is enough.  And so if we take

18  all the hyperbole and emotion out of this and maybe make this

19  something that seems simpler, let's say I agree to sell my

20  $10,000 car to Mr. Aigen, if he writes — if he wins 10 motions

21  over the next five years.  And I don't tell anyone and he

22  doesn't tell anyone.  Well, the fact that we didn't tell anyone

23  about this doesn't mean there's no agreement.  It's not even

24  evidence that there is no agreement.

25          Now let's say I also do a financial statement and I

*Plaintiff's Motion for Partial Summary Judgment*                    137

1   list my car as being worth $10,000.  Is that evidence on which a

2   creditor of mine could get summary judgment that there was no

3   agreement, so they could go and grab the car?  Of course not, we

4   wouldn't think so —

5          THE COURT:  I guess — I guess what I'm trying to get

6   to here is context matters, this isn't any old contract.  This

7   is — you know we start with the prima facie case, that this is —

8   these are promissory notes.  It's not a typical —

9          MS. DEITSCH-PEREZ:  And it —

10         THE COURT:  — it's not just any old breach of contract

11  suit, it's a suit on a note where, you know, is there a note,

12  did the nonmoving party sign the note, is the movant the legal

13  owner or holder of it.  And, you know, here's the balance due.

14  And that's considered under the law a prima facie case.  Well,

15  you know, again I'm trying to get at do we have any developed

16  law that you can use an oral agreement to defend against this

17  very basic kind of transaction in society.  I hate to get

18  melodramatic —

19         MS. DEITSCH-PEREZ:  Yes, of course —

20         THE COURT:  — I hate to get melodramatic and talk

21  about the slippery slope, but it kind of feels like commerce

22  would come to a screeching halt if every defendant could come in

23  and say, you know, I had an oral agreement with the banker, or

24  whoever, that the note as written —

25         MS. DEITSCH-PEREZ:  But — but that was —

*Plaintiff's Motion for Partial Summary Judgment*                    138

1          THE COURT:  — the note as written was not going to be

2      binder.  I mean we would never have such —

3          MS. DEITSCH-PEREZ:  But there are doctrines, there are

4      legal doctrines that deal with that, and that's why this is such

5      a complex case.  I mean that's where a lot of the lender

6      liability were about and were people able to prove a subsequent

7      agreement, and that's allowed.  I mean parol — parol evidence is

8      only barred in certain circumstances.  Even the debtor doesn't

9      argue that that applies here.

10         So I think we are in open territory where the question

11     is will the trier of fact believe that there was an agreement.

12     And we're going to show you the things — you know, the debtor

13     showed you things to make it appear as though there was an

14     agreement and to convince you there wasn't an agreement, and to

15     say that Mr. Dondero is incredible, and I'm going to go through

16     this now and show you the reasons why you should think it

17     happened and why it made sense and why he did certain things and

18     why the companies did certain things.  But those are facts that

19     a jury should listen to and say they either believe it or they

20     don't.  And that was the case in many of these lender liability

21     cases where somebody said, 'Wait a minute, the — the bank told

22     me that if I went and I did x, y, and z, they weren't going to

23     call my loan.'  And we all know that — that a lot of those cases

24     succeeded because subsequent agreements did occur.

25         THE COURT:  Okay.  Well, I — this is a subject near

*Plaintiff's Motion for Partial Summary Judgment* 139

1  and dear to my heart.  I just wrote a 140-something-page opinion

2  on lender liability and I know it's darn hard win with

3  liability.

4         MS. DEITSCH-PEREZ:  Um-hum.

5         THE COURT:  You usually just kind of look at the

6  agreements —

7         MS. DEITSCH-PEREZ:  I know, and — and — and I

8  understand that.  And I think that's because of the prejudice

9  that, boy it's in writing, you know, you should be stuck with

10  the writing.

11         But we also all know that in reality, things happen.

12  And so some of those lender liabilities cases were real and

13  people really got hurt when the lender didn't, you know, — made

14  an agreement and then wasn't going to live up to it.  And the

15  same thing here, Mr. Dondero could have taken more compensation.

16  It's not — I'm not sure I understand what Mr. Morris was talking

17  about when he was saying the consideration was just that he was

18  going to try harder and that he got the loan.  The consideration

19  was the fact that each comp period and each end of year,

20  January, February, he could have — he could have asked and

21  gotten a whomping, big, fat cashed check then.  He could have

22  taken more compensation.  And instead of taking more

23  compensation at the time, he said, you know what, I'm going to

24  take it on the come, I'm going to get this agreement to make my

25  loans potentially forgivable if good things happen, instead of

*Plaintiff's Motion for Partial Summary Judgment*                     140

1    taking cash out now.

2         He could have had unconditional cash as his

3    compensation.  And instead, he took these agreements.  And so

4    now the debtor wants to take it because and, you know, after he

5    forewent taking his compensation, they're going to say, 'Ha, you

6    can't have your other compensation either.'

7         And it's not like this was a sure thing.  Mr. Morris

8    talks about the portfolio companies being in the money at any

9    given moment.  Well, we all know that that's not a sure thing.

10   Look at 2008.  Look at the huge drop in the market when COVID

11   happened.  Look at what's even happening now with the Ukraine.

12   The fact that in any given moment the portfolio companies were

13   in the money doesn't mean that there was no consideration,

14   because that — the consideration is the fact is — that Jim could

15   have taken sure cash, and he didn't.  He decided to wait for his

16   reward and now the debtor wants to take it away.

17        And did he do it perfectly, would it have been safer,

18   better, more careful, more prudent to have written them down, to

19   put it in the financial statements to say this, that, or the

20   other, — I'm getting ahead of myself — but, yeah, sure, maybe it

21   would have been, but he — but it was also the case that until

22   the contingency occurred, they were straightforward notes, and

23   so they got put in the books as straightforward notes.

24        And in the PWC deposition, Mr. Morris suggests without

25   actually showing you anything, that — that the PWC folks would

*Plaintiff's Motion for Partial Summary Judgment*                              141

1    have wanted to know about the forgiveness condition.

2            And I will grant you, you know, with a little cute

3    questioning he got the PWC accountant to say that, but not 10

4    minutes later, when Mr. Aigen cross-examined him, he said, 'Oh,

5    I didn't understand the question.  I meant that if the

6    forgiveness event occurred, I would want to know about that, not

7    if there was some future potential possibility of the notes

8    being forgiven.'

9            Now was that a bad judgment call on Mr. Waterhouse's

10   and Mr. Dondero's part, to not say to the accountants then,

11   'Gee, there is this agreement.  What should we do, should we

12   write it down or not?'  yeah, maybe.  I mean we wouldn't be here

13   if they had made this clearer.  But that doesn't mean that the

14   agreement doesn't exist.  And it also doesn't mean that it isn't

15   — it isn't enforceable.

16           You know the debtor argues, 'Oh, my God, there's no

17   disinterested party witness.'  I mean that's even sillier,

18   because in most contract cases, think about who the witnesses

19   are.  The witnesses are the interested parties, they're the

20   people to the contract or who say there isn't a contract.  It's

21   almost always the interested parties that are the witnesses.

22           I think I've gotten a lot of off track, but I can — I

23   can get myself back on.  So give me a minute, I will tell Mr.

24   Aigen what slide to go to.

25           Okay, why don't we go to 12.  And if we come across

*Plaintiff's Motion for Partial Summary Judgment*                    142

1    things I've already covered, I will go really quickly over them.

2              So I mean I'm not going to read all of these to you,

3    but, Your Honor, in the briefs you will see — and I don't think

4    that the debtor seriously disputes that at least Mr. Dondero and

5    Nancy Dondero testified as to the existence of the agreement.

6    And we'll send you the PowerPoint and you'll have the — the aid

7    memoirs on where that is.

8              And if you go on to 13 and 14, these were — there are

9    here the parallel declaration testimony for Nancy.  And if you

10   go to — I think that's on 13, 14 have the declaration testimony.

11   And if we go on to 15, okay, the debtor made a fuss and said,

12   'Oh, there are some that they said that Mr. Dondero didn't

13   really know about the notes.'  And — but you have to look at

14   what the question really was.  He says, he asked, "I'm asking" —

15   this is Mr. Morris asking Mr. Dondero — "I'm asking if during

16   your discussions with the Dugaboy trustee you ever disclosed the

17   name of the maker of any of the notes that were subject to the

18   agreements."

19             And Mr. Dondero answers, "She knew that the notes due

20   to — that she knew they were notes due to Highland from various

21   entities, so I don't know what your question is, but identify

22   specifically that there were notes due to Highland?  I guess the

23   answer to that is yes, but I don't know what you're asking me."

24             It's clear in that little snippet that in the briefing

25   the debtor tries to make much of it's clear he got confused by

1    the word maker.  He didn't — you know, maker, payee, he wasn't —

2    and then Mr. Morris never made the question-clear, so it went

3    nowhere, and now the debtor says, 'Ah, he didn't even know who

4    was on what side of the notes.  That's just clearly not true.

5         And I have to tell you, even myself, you know, when

6    someone says mortgagor and mortgagee to me, it takes me a

7    minute, I have to — or maker, I have to think for a minute which

8    one is that.  I'm not a real estate lawyers, I don't use those

9    words all along.  And we shouldn't be deciding things as

10   important as this based on — on kind of gotcha — gotcha

11   deposition questioning.  If anything, what it shows is Mr.

12   Morris wasn't listening to the — to the answer to the question.

13        So if we go on to 16 now.

14        Another tactic that the debtor takes is tries to

15   create a summary judgment issue by saying Nancy and Jim disagree

16   about the notes are subject to the agreements, that the

17   deposition testimony doesn't show that, and then Mr. Dondero

18   specifically says in his declaration that he did discuss and

19   identify the notes that were subject to the agreement to Nancy.

20   So that's also not — not a reason to grant summary judgment.

21        We go on to 17.

22        Okay.  Another thing that — that the plaintiff does is

23   it makes a big deal about the fact that Mr. Dondero couldn't

24   list which note was on which date for how much, to suggest that

25   the agreements must not have taken place.  But that's clearly an

*Plaintiff's Motion for Partial Summary Judgment*                    144

1    attack on Jim's credibility, which is improper at this point.

2    And that takes us back to that Alsud case that you looked at

3    before, Your Honor.  And it's important to look at what it

4    actually say is, which is to determine whether a genuine dispute

5    exists such that the case must be submitted to a jury, courts

6    must, not might or maybe, courts must consider all of the

7    evidence in the light most favorable to the nonmoving party,

8    that is, Mr. Dondero and the companies, draw all reasonable

9    inferences in light of the nonmoving party, refuse to make

10   credibility determinations, or weigh the relative strength of

11   the evidence.  And that's — think about how many times you heard

12   Mr. Morris say something wasn't credible or that the plaintiff's

13   evidence was stronger or more voluminous than the defendants'.

14           The plaintiff is asking you to do the very thing the

15   courts say that the law prevents you from doing.  You can't —

16   you can't say, ew, I find — I find the plaintiff's arguments

17   more credible here, I find Mr. Klos' declaration as more

18   credible than Mr. Dondero's testimony.  That's not the purpose

19   of the Court on a motion for summary judgment, and that's true

20   whether this is a bankruptcy court or a district court.  The

21   plaintiff, the debtor here is trying to lead you astray and I

22   just ask that you not be dragged along this road —

23           THE COURT:  Let me ask you —

24           MS. DEITSCH-PEREZ:  — and —

25           THE COURT:  — to address head on I think a more

*Plaintiff's Motion for Partial Summary Judgment*                           145

1    nuanced argument that Mr. Morris is making.  He says, 'I'm not

2    asking the Court to make a credibility assessment,' that he is

3    saying this, quoting Fifth Circuit law, he says I'm supposed to

4    focus on is there a dispute about a genuine material fact,

5    stressing the word "genuine material fact."  And he cites Fifth

6    Circuit law that says if a reasonable jury could not possibly

7    return a verdict in favor of the nonmoving party, then that's

8    not a genuine dispute of material fact.  What is your response

9    to that?

10           MS. DEITSCH-PEREZ:  The response is that can't mean

11   that the — that the movant can say, 'Well, look at all of this

12   evidence and look at all of that evidence, and this evidence is

13   more credible than that evidence.'  That's what Mr. Morris did.

14   He may put that law up on a slide, but what he actually did was

15   he pointed out various situations and said, 'Boy, someone

16   looking at that would think Mr. Dondero's going to have a hard

17   time explaining it.'  That is the epitome of saying it's not

18   credible, that one side is more credible than the other.  And

19   just by saying, 'Boy, this is hard to explain,' doesn't make it

20   not genuine.

21           There's a little bit of word play here.  I mean the

22   debtor is still asking you to make a credibility determination,

23   that you should look at all of this evidence and say, 'Hmm, do

24   you think it happened or didn't you think it happened,' in the

25   face of testimony that it happened.  There are two parties in

*Plaintiff's Motion for Partial Summary Judgment*                    146

1    the conversation about this agreement and both of them say it

2    happened.  You don't really have a choice but to say this has to

3    go to a fact-finder.

4              THE COURT:  All right.  Well, I may —

5              MS. DEITSCH-PEREZ:  Because Your Honor is not the fact

6    finder —

7              THE COURT:  — I may — I'm going to ask you another

8    question.  I'm going to ask you another question.  There's also

9    plenty of case authority that says if — if the only thing that

10   seems to create a material fact dispute are affidavits with

11   conclusory, self-serving statements, then that's not enough,

12   okay.  So —

13             MS. DEITSCH-PEREZ:  But that's not what —

14             THE COURT:  I think what I hear you saying is —

15             MS. DEITSCH-PEREZ:  — that's not what this is.

16             THE COURT:  — when — you know, when I've got any

17   testimony, I've got put it to a jury.  But yet there is a nuance

18   there that courts sometimes recognize, right?

19             MS. DEITSCH-PEREZ:  I think those cases are ones where

20   you have bet — where all you have a declaration that is after

21   the fact.  It's not where you have deposition testimony that

22   establishes the disputed issue.  Sometimes you'll have an

23   instance where parties will — will not give testimony on

24   whatever the issue is.  And then afterwards, when it's pointed

25   out in a motion, they will either contradict themselves or they

*Plaintiff's Motion for Partial Summary Judgment*                    147

1   will say something that's never said before in a declaration,

2   and that's where you have those cases.

3           It's not — it's not where you have deposition

4   testimony that is — that does — that puts — that creates a live

5   issue.  I mean this Court is just not entitled to sit here and

6   say, 'I just — I don't believe Jim Dondero and I don't believe

7   Nancy Dondero.'  And — and that would be wrong.  That would be

8   taking something on which they have — there is a right to a jury

9   trial away from them.  I don't know how to say it.

10          And, not only that, it's not like that is the only

11  evidence, because there is the evidence of the — of the expert

12  that indicates that Mr. Dondero was under compensated.  There is

13  the evidence of the tax expert who explains that if you want to

14  have tax-efficient compensation, you would have a bonafide note

15  and you would have to make it subject to a condition subsequent,

16  because otherwise Mr. Morris is right.  If it had been a

17  different kind of agreement, if it was searched, that the note

18  was going to be forgiven, then there would be taxes owed on it

19  right away.

20          So if you look at those things, it's not just Mr.

21  Dondero's testimony and Nancy Dondero's testimony, it's

22  extraneous factors that also allow you to — allow not you —

23  allow a fact finder to find that, yes, that is how he was — how

24  he wanted to structure his compensation and that Highland, which

25  — you know for most of the time period, he was the largest

*Plaintiff's Motion for Partial Summary Judgment*                          148

1    shareholder and he was its CEO.  He had ever reason to ask them

2    and Highland had every reason to agree to let him structure his

3    compensation thus, because otherwise he just would have taken

4    out more money.

5            I mean there are a lot of private equity funds where

6    the owners take all the money out at the end of the year and

7    they basically start fresh the next year.  That's not what —

8    what Highland did.  He was building, you know, what Your Honor

9    has called this giant web, but he was building this big empire,

10   and that required leaving some money in there to be able to do

11   things with.  And so he didn't take out every last penny that he

12   could take out.  But he shouldn't be punished now for that.

13           He should be allowed to put it to a jury and have them

14   say, yeah, we believe you did this, or, no, we don't.  But,

15   seriously, given what everybody has said about — about Mr.

16   Dondero and about how he wanted to make money, is there really

17   any doubt that he would — he would construct a plan by which he

18   had the chance to have these loans forgiven?  I mean seriously,

19   nobody really thinks that he made these loans thinking there was

20   no chance that they wouldn't have to be paid back.  Of course he

21   said up a plan where he would have the potential for

22   tax-efficient compensation.  I mean to think that — I mean I

23   don't believe Mr. Morris thinks, I don't think the debtor

24   thinks, I don't think Your Honor thinks that he was making — he

25   was taking these loans that he thought for sure weren't going to

*Plaintiff's Motion for Partial Summary Judgment*                    149

1   have to be paid back.  He was doing something where he thought

2   he would have the ability to turn them — or to have be turned

3   into compensation if — if Highland succeeded in the way that he

4   hoped it would.

5           THE COURT:  Anyway, —

6           MS. DEITSCH-PEREZ:  And I ask you to think about that

7   when you think about whether it's credible —

8           THE COURT:  We're — I am thinking about it.  We have

9   16 notes that were talking about in this litigation.

10          MS. DEITSCH-PEREZ:  Um-hum.

11          THE COURT:  It's roughly $70 million worth of notes.

12          MS. DEITSCH-PEREZ:  Um-hum.

13          THE COURT:  And it all — well, let's see.  There was

14  one November 2013 note, but with that one exception, they are

15  all within two and a half years of the bankruptcy, 2017, 2018,

16  2009 [sic], so $70 million of notes, mostly in the two and a

17  half years before Highland is in bankruptcy.  And, again, you

18  know, context matters, Highland's hurdling towards bankruptcy or

19  the zone of insolvency at some point — well, anyway, I don't

20  know if that's in summary judgment evidence, —

21          MS. DEITSCH-PEREZ:  I — it's not, right —

22          THE COURT:  — evidence —

23          MS. DEITSCH-PEREZ:  It's not, Your Honor, exactly —

24          THE COURT:  — in this case.  But the point is $70

25  million of notes, all —

*Plaintiff's Motion for Partial Summary Judgment*                    150

1          MS. DEITSCH-PEREZ:  Your Honor, that's —

2          THE COURT:  Let me complete my thought.

3          MS. DEITSCH-PEREZ:  I know.

4          THE COURT:  It's taking me a lot to get it out —

5          MS. DEITSCH-PEREZ:  Well, I apologize.

6          THE COURT:  But 70 million of notes, 16 notes, all but

7   one is within two and a half years before the bankruptcy is

8   filed.  And the defense is, the defense that requires this to go

9   to a jury in — in your client's estimation is there was

10  basically a secret oral agreement between Dondero and his

11  sister, who had no management role at all with any of these

12  entities, but was the trustee of his family trust, which is the

13  majority owner of Highland, there was a secret, oral agreement

14  that these don't have to be repaid.  And never was this

15  agreement — never was this agreement disclosed to the other

16  officers of Highland or these makers.  And, in fact, they never

17  showed up, the oral agreement never showed up in a footnote or

18  anywhere on — on audited financial statements or bankruptcy

19  schedules that are signed under penalty of perjury, or monthly

20  operating reports that are filed under penalty of perjury, nor

21  in any objection to the disclosure statement or plan when

22  objections were made about feasibility.

23          So that — I mean, again, I'm just trying to assess

24  does this need to go to a jury.  That's what Judge Starr is

25  going to want to know.  Did I correctly encapsulate your —

*Plaintiff's Motion for Partial Summary Judgment*                    151

1          MS. DEITSCH-PEREZ:  And —

2          THE COURT:  — your defense?

3          No.  Okay, what —

4          MS. DEITSCH-PEREZ:  No, because — no.  And the reason

5    the answer is no, because you — there was an important sort of

6    assumption buried in there.  You said that these notes would be

7    forgiven.  And the — and the fact is it was not the — the

8    agreement was not that the notes would be forgiven, —

9          THE COURT:  They might be, they might be.

10         MS. DEITSCH-PEREZ:  — they would only — exactly.

11   Exactly.  And so, for better or worse, they didn't think it — I

12   mean Mr. Dondero testified he didn't — for that reason didn't

13   think it was material because they might be, they might not be

14   until the condition was triggered.  They were just — they were

15   just notes.  And so could he have been wrong in that assessment?

16   Yeah, I mean maybe a cons- — a more conservative person would

17   have said, 'Ew, you know, this could be forgiven.'  But he

18   didn't.  But that doesn't mean summary judgment should be

19   granted against him.  It means that's a fact that the fact

20   finder is going to consider in whether or not they think this

21   happened.  You have to balance that against do you really think

22   he didn't make a plan where he had the potential for more

23   compensation?  That doesn't sound very much like Mr. Dondero.

24   So it's not quite as cut and dry as Your Honor posited.

25         It's also not true that it was secret, because while

1    it was not a fulsome disclosure, Mr. Dondero, before this all

2    became an issue, did tell Mr. Waterhouse that, 'Wait a minute,

3    these might end up being compensation.'  Now did he sit down and

4    tell him chapter and verse?  No, but it's undisputed, nobody's

5    challenged the fact that he did tell that to Mr. Waterhouse.

6    And that is evidence of the agreement and that he also told —

7            THE COURT:  So that where is that — where is that

8    evidence?  Where is that evidence?  When —

9            MS. DEITSCH-PEREZ:  It — it —

10           THE COURT:  And how did he tell Mr. Waterhouse?

11           MS. DEITSCH-PEREZ:  There — there — he — there is

12   testimony from Mr. Dondero, and in our next break I'll find the

13   page and line number and the appendix.  There is testimony from

14   Mr. Dondero that he told Mr. Waterhouse that the agreements were

15   potential compensation, you know.  And — and you heard Mr.

16   Morris concede that during his opening, but we'll get you the

17   actual page and line.  And then Mr. Waterhouse —

18           THE COURT:  But it's just testimony.  It's just

19   testimony from Mr. Dondero.

20           MS. DEITSCH-PEREZ:  And then you also have Mr.

21   Waterhouse saying that, yes, Jim said something to him in the

22   context of when they were discussing putting up a competing

23   plan, that he shouldn't be counting the notes as money that was

24   due to Highland because they were potentially going to be

25   compensation and they should take that into account in doing the

*Plaintiff's Motion for Partial Summary Judgment*                    153

pot plan.

So that's something before we were in this litigation fight that indicates there was some kind — something out there that might have converted these notes into something less than straightforward, plain vanilla pay your money notes.

And then on top of that, and I will concede this is after litigation started, but really before anybody started digging in to investigate the lawsuits and to find out all the facts. When the debtor said something overt about counting on the money, Judge Lynn wrote to — I think Pomerantz, not Mr. Morris, Mr. Pomerantz and said, 'Wait a minute. Those are potentially compensation, so don't go selling those notes without telling somebody.'

So it's not true that these were completely secret. It is the disclosure what —

THE COURT: Uh-oh. We're frozen. We're frozen. Can anyone hear me?

(Off the record from 2:47 to 2:52 p.m.)

THE COURT: Okay, is everyone back on, Mr. Morris, Mr. Rukavina?

MR. RUKAVINA: Yes, Your Honor. It's —

MR. MORRIS: Yes, Your Honor.

MR. RUKAVINA: We all — we all can hear each other perfectly. Sometimes the Court, we can't hear you perfectly. So I suggest that the problem is on the Court's end.

*Plaintiff's Motion for Partial Summary Judgment*                    154

1              THE COURT:  Okay, okay.  We've got the IT guy coming

2      back up here.  I'm going to have him just sit through the rest

3      of this, but for now, Ms. Perez, you can continue.

4              Just a minute.

5              Harold, can you stay, because they're saying it's at

6      our end because when we freeze, they can all hear each other but

7      not us.

8              Okay, so we got an IT guy.

9              Ms. Perez, you can continue.  Let's see, where were

10     you.

11             MS. DEITSCH-PEREZ:  I think actually we — we were

12     talking about the fact that the agreement wasn't really secret,

13     that there had been some heads-up to Mr. Waterhouse and from

14     Judge Lynn to Jeff Pomerantz.  And, in fact, you had asked what

15     — where was the testimony about telling Mr. Waterhouse.

16             And, Mike, if you go to slide 18, I think we quote —

17     we quote at least Jim's there.  So there was a little bit of it

18     there.  And we can also get you the Waterhouse page and line

19     numbers also.

20             So I'm going to jump ahead because in the course of

21     answering your questions, I did cover some of this, so we can go

22     past 18.  And then 19, this is the letter from — that I just

23     talked about.  And let's go on to 20.

24             THE COURT:  Okay.  I'm not seeing the slides, so the

25     same thing —

*Plaintiff's Motion for Partial Summary Judgment*                    155

1          MS. DEITSCH-PEREZ:  You're not seeing the slides?

2          THE COURT:  — same thing happened earlier today when

3   we had to reconnect.

4          MS. DEITSCH-PEREZ:  Mike, would you stop sharing and

5   then reshare?

6          THE COURT:  Okay, got it.

7          MR. AIGEN:  We're okay.

8          MS. DEITSCH-PEREZ:  Okay.  And so, you know, another

9   thing that the debtor points out is, gee, there was a time

10  period when a little bit of MGM stock was sold and Mr. Dondero

11  did not immediately jump up and down and say, 'Okay, you better

12  forgive my loans,' and therefore the fact that he didn't do that

13  must mean there was no agreement, there were no agreements.  No,

14  all it meant was that Mr. Dondero was trying to maximize the

15  prospects for reorganization.  And, as Mr. Morris is found of

16  saying, no good deed goes unpunished because now it's being

17  raised as a defense or a counter to — to the defendants'

18  defense.

19          So if we go on to slide 21, again there's some fuss

20  about whether Nancy looked at the notes at the time she was

21  entering into the agreement.  You know, that's the kind of thing

22  that maybe Mr. Morris could fool a jury that that's meaningful.

23  But that would actually be a good reason for a motion in limine,

24  not summary judgment to — to knock it out.

25          The same thing about the focus on the fact that it's a

*Plaintiff's Motion for Partial Summary Judgment*                    156

1   verbal agreement.  I mean maybe that ought to be limined out of

2   a jury trial or at least the amount of argument on it limited

3   because lawyers tend to play on the prejudices of nonlawyers

4   that contracts must be in writing or that certain formalities,

5   like showing her the notes, must be met when they're not

6   requirements at all.

7              So let's go on to slide 22.

8              Again here are some extrinsic evidence that tends to

9   support the notion that there was an agreement.  The debtor

10  says, well, there's no history of forgiving loans as

11  compensation, but in fact that's not true.  Mr. Seery admitted

12  that they had found some.  Now it wasn't widespread, it wasn't

13  all the time, but there is evidence that other executives had

14  loan — had regular straight-up, bonafide loans that were

15  subsequently made forgivable based on — based on how they did.

16  And here is a little bit of the testimony of Mr. Dondero

17  battered (phonetic) and in his deposition.  There's more.

18             So not only plaintiff is wrong that there was no prior

19  practice, even if there wasn't one, that wouldn't be summary

20  judgment evidence that this agreement didn't take place, but the

21  fact that there were other people who got such agreements is

22  evidence, so again summary judgment.  It supports the existence

23  — it supports the existence of an agreement.

24             And this also takes us back to what I was talking to

25  you about earlier that doesn't it seem more likely to you than

*Plaintiff's Motion for Partial Summary Judgment*                    157

1  not that Mr. Dondero would — would take the advice of someone

2  like Professor McGovern (phonetic) on how to have compensation

3  that was tax efficient, which is you borrow some money and then

4  you could either later take more money as part of your

5  compensation or you make the loan forgivable if you succeeded in

6  something.  And the latter is tax efficient.  Taking, just

7  taking the money is not tax efficient.  Is there anyone here who

8  would doubt that Mr. Dondero would take the tax-efficient way?

9           Let's go to the next slide.

10          MR. RUKAVINA:  Hey, Ms. Deitsch-Perez, I must

11  interrupt you, —

12          MS. DEITSCH-PEREZ:  Yeah.

13          MR. RUKAVINA:  —, please.  I need to take over.  And

14  if I have any time left over, I will yield it, but you've had 70

15  minutes by my clock.

16          MS. DEITSCH-PEREZ:  I do apologize and part of that

17  was in answering questions.  If you give me just one minute, I

18  will look to see if there is anything that absolutely must be

19  said and then —

20          MR. RUKAVINA:  Thank you.

21          MS. DEITSCH-PEREZ:  — I will yield the field.

22          Yeah, I do want to go quickly to slide 27, okay.

23  Maybe it's 28.  Okay.

24          There was confusion in Mr. Morris' argument about

25  consideration.  We are not arguing that the sole consideration

*Plaintiff's Motion for Partial Summary Judgment*                              158

1    was that Mr. Dondero work harder.  He could have and would have

2    taken more compensation, which he was entitled to do, because if

3    you look back at the LPA, even — you know, he could have taken

4    $5 million a year or even more if there was no NAM (phonetic)

5    trigger, and the debtor does claim there was a NAM trigger

6    period.  He could have taken much more compensation if he had

7    not gotten this agreement, so there is no lack-of-consideration

8    argument.

9          And I will — I would urge you, we'll send you these

10   slides, just look at what we have to say about competence.

11   There is no serious argument that Nancy was not competent to

12   enter into an agreement.  Lack of competence means something

13   like you were drunk or you were mentally ill or otherwise

14   incapable of entering into the agreement.

15         And I mean if a client tasked me with — with

16   negotiating an agreement on — you know, that involved particle

17   physics and to get all the components that are needed to build

18   some equipment, and I did a crappy job at it because I knew

19   nothing about the subject matter, no one would seriously argue

20   that you could not enforce the contract because the party tasked

21   with negotiating, you know, wasn't the ideal person to do it.

22   That's not what lack of competent — competence means.

23         And I will now leave for Mr. Rukavina to please cover

24   the issues with respect to Highland should have been taking care

25   of the payments and the prepayment arguments.  And if I have

*Plaintiff's Motion for Partial Summary Judgment*                    159

1   more time later, I will take it.  Thank you very much, Your

2   Honor.

3            THE COURT:  All right.  Thank you.

4            Mr. Rukavina.

5            MR. RUKAVINA:  Thank you, Your Honor.

6            I think first the Court is under the assumption that

7   these were all notes for $70 million in the couple of years

8   before bankruptcy.  That is not correct.

9            So, Mr. Vasek, please pull up the NexPoint note and go

10  to the last page.

11           So this is the NexPoint note, Your Honor, almost half

12  of the amount.  And you will see this is from 2014 and 2015.

13  This is our old note.

14           Go to the very top, Mr. Vasek.

15           And at the very top it says that this note is in

16  substitution for and supersedes the prior note.  So the monies

17  were extended in 2014 and 2015.  HCMS likewise goes back to

18  2015.  I don't have it to share right now.  And HCRE goes back

19  to 2014.  I don't have that to share right now either.

20           You can remove that, Mr. Vasek.

21           But I think everyone here knows that in 2014 and 2015

22  Highland was doing very, very well, certainly much better than

23  in 2019.  So I just wanted to correct the Court's review that

24  the monies were actually transferred from Highland in 2019 or

25  so, and 2018.  HCMFA, that is true, but it is not for the other

*Plaintiff's Motion for Partial Summary Judgment*                    160

1   notes.

2          Mr. Vasek, if you will please pull up my deck.

3          So — so, first, Your Honor, let me address the

4   prepayment affirmative defense, and this is an affirmative

5   defense.  And I want to focus on NexPoint, which is my client.

6   But I think Ms. Deitsch-Perez's clients have identical issues.

7          So first we have to look at the language of the note.

8   And it clearly says that the maker may prepay in whole or in

9   part the unpaid principal — everyone knows what that means — and

10  then it says, "or accrued interest of this note."  I don't

11  understand how one prepays accrued interest.  Accrued interest

12  means that it's already happened and you're paying it, but the

13  note says accrued — prepay accrued interest.  The Court must

14  construe the instrument to give that meaning.

15         And here you see I have a quote from Mr. Seery when I

16  asked him this at his deposition.  He says:  Interest accrues on

17  this note.  How you prepay it is you send the money before the

18  accrual date.

19         So that makes sense.  So you want to prepay future

20  interest, basically.  That's what prepaying accrued interest

21  means.

22         But look at the second sentence of this provision.  It

23  says:  Any payment on this note shall be applied first to unpaid

24  accrued interest and then to unpaid principal hereof.  So we

25  have here immediately an ambiguity.  So I'm allowed to prepay

*Plaintiff's Motion for Partial Summary Judgment*                    161

1   future interest, but the second sentence says that any payment

2   first goes to accrued interest, meaning present, historical

3   interest, and into unpaid principal.  So how can a prepayment

4   ever go towards future interest?  So again we submit that there

5   is an ambiguity in this provision.

6            Go to the next slide.

7            But clearly what my client had done before, was it did

8   prepay future interest.  This is the actual course of conduct

9   between the parties.  This is the ledger that is in the debtor's

10  appendix.  I can certainly give you the citation.  And we — Ms.

11  Hendrix at her deposition walked us through it.  So this is

12  NexPoint right now.

13           So you see on the left there is a column that says,

14  "Interest accrual," that's how much interest is accrued at any

15  given point in time.  "Interest paid" and "Accrued interest."

16  So I want to take Your Honor to near the bottom, May 9th, 2018.

17  On May 9th, 2018, NexPoint made a $879,000 and change payment.

18  And look at how the debtor applied that.  Even though there was

19  only $39,000 of accrued interest pending, the balance did not go

20  to the principal.  The balance went to future interest.  You see

21  that there is a negative entry of $835,000 interest.  And then

22  as time goes on, — I don't have the rest of it right now, I can

23  certainly pull it up — as time goes on, if Your Honor looks at

24  this, you will see that basically the prepayment of that future

25  interest basically took care of many months of future interest.

*Plaintiff's Motion for Partial Summary Judgment*                    162

1          This also happened on December 5th, 2017, when there

2     was a prepayment of future interest of $127,000, and on December

3     18th, when there was a prepayment of future interest of $60,000

4     and more.  So — and obviously we know that the Court can look at

5     the parties' course of conduct whether the contract is ambiguous

6     or not.  The contract does have to be ambiguous for the Court to

7     look at the course of conduct to understand how the parties

8     understood and applied this change.

9          Again, all this is more fully set forth in our brief.

10    And if the Court needs me to pull up the full payment ledger, I

11    certainly can.  But the only point of this exercise is to show

12    you that the debtor and NexPoint historically understood the

13    note to allow the prepayment of future interest, not just

14    principal and not just accrued interest.

15         Next slide, please.

16         So what we have is between March and August of 2019,

17    NexPoint made $6.38 million on its note, and the other

18    defendants — again, what I'm saying, Your Honor, goes for the

19    other defendants.  I'm using NexPoint because, well, it's my

20    client and it's — one example is better than more [sic].

21         But that $6.38 million were not due.  Rather, after

22    using it, a portion of that to pay for future interest and

23    principal, a credit, if you will — I'm going to call it a credit

24    — of $4.1 million remained.  Now when — when NexPoint was making

25    these payments in 2019, Mr. Dondero very clearly testified that

Case 21-03006-sgj   Doc 211   Filed 05/03/22   Entered 05/03/22 13:14:27   Desc Main
Case 3:21-cv-00881-X   Document 170   Filed 06/09/22   Page 58 of 162   PageID 53067

*Plaintiff's Motion for Partial Summary Judgment*                            163

1  these were intended to be prepayments.  So as happened, and as

2  you will see, Ms. Hendrix confirms, as did everyone else, as

3  what happened, as Highland needed liquidity, as Highland needed

4  cash, some of these term defendants would prepay.  Mr.

5  Waterhouse would call Mr. Dondero and say, 'We need cash,' and

6  Mr. Dondero would say, 'Okay, how much,' and then it would be

7  and it should have been recorded as a prepayment.  So Mr.

8  Dondero clearly talks about how when NexPoint made these

9  payments, and this is in his declaration, Your Honor, and it's

10  in his deposition, he expected that these were prepayments.

11         Next slide, please.

12         Now the Court may not necessarily believe that Mr.

13  Dondero is the most credible person.  I would disagree with

14  that.  And of course we're not here today on credibility

15  determinations.  But this is Ms. Hendrix.  Ms. Hendrix is still

16  with the debtor.  She was at that time the debtor's senior

17  accountant and she is now the debtor's controller.  She

18  certainly is going to be credible and she certainly has no

19  reason to try to wriggle out of any promissory note.

20         So I ask her does she have any understanding as to why

21  in 2019 NexPoint was making these large payments.  And he she

22  goes on to testify that, without looking at all the emails,

23  Highland would have needed cash, so this was one way to get the

24  cash to the debtor.

25         I ask, "So this is kind of like what we discussed in

*Plaintiff's Motion for Partial Summary Judgment*                    164

1    the beginning, that Mr. Dondero on a cash-needed basis would

2    just transfer money between entities?

3              "Yes.

4              "Do you have any memory in the first half of 2019

5    whether Highland had any particular need for cash money?"

6              She says, "We always had a need."

7              Then I ask her, "If NexPoint — if NexPoint was

8    transferring money back to Highland on this note, because

9    Highland needed the money, wouldn't those have been recorded as

10   prepayments by the debtor?"

11             Mr. Morris objects to form.  "You can discuss that."

12             But she says, "Yes."  So she confirms that if NexPoint

13   was making large unscheduled payments on its promissory note,

14   they would have been recorded as prepayments.

15             Now why is that important?

16             Next slide, please.

17             So recall, Your Honor, that at the end of 2019,

18   NexPoint, there was what I call a credit of $4.1 million.

19   NexPoint had prepaid $4.1 million.  Our argument is that that

20   was enough to prepay all of the accrued and unpaid interest and

21   principal due in the year 2020.  So recall the issue is that

22   NexPoint did not make the 2020 payment on or before December 31,

23   as the debtor alleges is required.

24             NexPoint did make payments.  And NexPoint had an

25   unallocated, unapplied $4.1 million — again what I call —

*Plaintiff's Motion for Partial Summary Judgment*                165

1    credit, which Mr. Dondero and Ms. Hendrix both state should have

2    been a prepayment.  Very importantly, these notes do not have

3    language that say that a prepayment does not relieve the maker

4    of any scheduled payments.  Most notes that we have, that we

5    have seen, at least in bankruptcy, where there is the ability to

6    prepay, the note also says that making a prepayment does not

7    relieve you of scheduled payments.

8          So we believe that it is equitable, appropriate, and

9    fair, in compliance with Texas law, and the intent of the

10   parties that those 2019 overpayments, credits, prepayments are

11   left there for future application against future obligations.

12   We know that all reasonable inferences must be drawn in the

13   nonmovant's favor.  And we know from Texas case law, we quote

14   this and we discuss this, that when neither party clearly

15   applies a prepayment against an obligation, so Mr. Dondero knew

16   that there were prepayments, but he did not say those better

17   relieve me of my December 31, 2020 payment, and Ms. Hendrix knew

18   that they were prepayments, but she didn't say those are going

19   to or those are not going to relieve your debt.  So when we have

20   something like this, where neither party clearly applies the

21   prepayment to any obligation, then it is up to the law and the

22   equities of the case to make a proper application of that

23   payment.

24         And, importantly, under Texas law, Texas Supreme Court

25   law, that such a presumed legal equitable application should be

*Plaintiff's Motion for Partial Summary Judgment*                    166

1   done in the manner that would be most beneficial to the debtor.

2   So it's just logic.  It's not — there's nothing magical about

3   it.  My client overpaid by $4.1 million in 2019.  That was

4   intended to be a prepayment.  The debtor asked for that money

5   because the debtor needed that money.  The debtor got the

6   benefit of that money.  And the most logical, best, most

7   equitable way to apply that is against the next scheduled

8   payments.  That's what happened before.  There is no language

9   that says you have to make scheduled payments.

10          Now we believe there are no real disputes of fact on

11  anything I've just shown you.  Yes, perhaps the trier of fact

12  can apply the prepayments differently.  The trier of fact can

13  say, 'Well, we're going to apply them to principal.'  But the

14  law clearly allows the trier of fact to decide, based on the

15  equities, where the prepayments should be applied.  And because

16  that is a question of fact, Your Honor, it is outside the scope

17  of summary judgment.  The Court should, therefore, deny summary

18  judgment on the prepayment defense, allow these facts to be

19  presented to a jury.  And the jury, based on all the facts that

20  it hears, will decide whether the default Texas law that the

21  payments should be applied as most beneficial to NexPoint should

22  be followed or, for some other reason, it shouldn't.

23          Next slide, please.

24          The next defense, which is probably an affirmative

25  defense, concerns the fact that we contracted with Highland to

*Plaintiff's Motion for Partial Summary Judgment*                    167

1    monitor and take care of our payables for us.  So you heard Mr.

2    Morris talk about the shared services agreement.  You heard him

3    talk about Section 2.  I heard him say something that I don't —

4    I don't know if I heard him right, which he said something like

5    'We're just pulling this out of thin air,' but the NexPoint

6    shared services agreement clearly says that NexPoint shall

7    provide assistance and advice, not just assistance, Your Honor,

8    but advice, with respect to back-office and middle-office

9    functions, which clearly contemplates payables, and then it

10   says, "including but not limited to payments, accounts

11   payables," and other things, like cash management, finance,

12   bookkeeping.

13          Then it says, "assistance and advice on all things

14   ancillary or incidental," incidental "to the foregoing."  And

15   then it also says "other assistance and advice relating to such

16   other back- and middle-office services in connection with the

17   day-to-day businesses," et cetera.

18          So NexPoint — and, again, Ms. — Ms. Deitsch-Perez

19   might talk about a couple of the other ones that didn't have

20   written service agreements, but NexPoint had a written service

21   agreement where we contracted with the debtor to monitor and

22   take care of and advise us with our payment responsibilities —

23   next slide — that's black and white in the contract, Your Honor.

24          But we asked Mr. Waterhouse whether these services

25   would have included making sure that NexPoint would pay under

*Plaintiff's Motion for Partial Summary Judgment*                    168

1    long-term obligation notes.  I asked, "Was it reasonable for

2    NexPoint to expect debtor employees to ensure that NexPoint

3    timely paid its obligations?"  There's a couple of objections to

4    form.

5         But Mr. Waterhouse says, "Yes, we did that.  We did

6    that generally.  Again, I don't remember specifically.  But,

7    generally, yes, you know, we did that."

8         And then I says, "Roles — what role in years prior to

9    2020 would employees of the debtor have had with respect to

10   NexPoint making that annual payment?"

11        Now he answers without objection, "We would.  Since we

12   provided treasury services to the advisors, we would inform" —

13   blah-blah-blah — "we informed Mr. Dondero of any cash

14   obligations that are forthcoming.  We do cash projections.  But,

15   yes, it is to inform Mr. Dondero of the obligations of the

16   advisors in terms of cash and obligations that are — are

17   upcoming and that are — are scheduled to be paid."

18        Next slide.

19        Then I ask and, again without objection, he answers.

20   "I asked prior to the 2020 would those services have included

21   NexPoint's payments on the $30 million loan?"  He says, "Yes."

22        And then I ask, "And based on your experience, would

23   it have been reasonable for NexPoint to rely on the debtor's

24   employees to inform NexPoint of an upcoming payment due on the

25   $30 million promissory note."  That's the December 31, 2020

*Plaintiff's Motion for Partial Summary Judgment*                    169

1    payment.

2          Again there's a couple form objections that I don't

3    understand the basis for it.  This is the debtor's CFO.  This is

4    my treasurer.  This is a man that worked in shared services

5    certainly knew what would have been reasonable, and he says,

6    "Yes.  Yes, they did."  But then of course he adds, "Those notes

7    weren't a secret to anyone."

8          Let me also correct something that Mr. Morris

9    mentioned.  Mr. Morris said at that no one Social Security any

10   provision that Highland is supposed to pay these notes.  It's a

11   play on words, Your Honor.  Of course Highland doesn't pay on

12   our notes.  As the summary judgment record shows, as Mr.

13   Waterhouse, as Mr. Klos, as Ms. Hendrix all testified, it's in

14   their depositions, it's in my brief, Highland would pay advisor

15   bills from advisor funds.  Highland had access and control over

16   advisor accounts and Highland would make those payments.

17         Mr. Morris also referenced those emails where Ms.

18   Hendrix would ask Mr. Waterhouse for approval to make payables.

19   That's exactly what happened.  That happened on at least a

20   weekly basis.  But Mr. Waterhouse was wearing his CFO of

21   Highland hat when the a happened.  Ms. Hendrix was not an

22   advisor  employee.  Ms. Hendrix, pursuant to shared services,

23   was asking Mr. Waterhouse, pursuant to shared services, whether

24   the following bills and obligations of the advisor should be

25   paid.  So let's be clear on that.   we are not arguing that

*Plaintiff's Motion for Partial Summary Judgment*                    170

1    somehow Highland had to use its money to pay our obligation, not

2    at all.  Just that Highland had to assist and advise us.

3            Next slide, please.

4            Now we come to the question of fact.  The underlying —

5    well, I apologize.  Who is it — Julian, I see, viewing "Julian

6    Vasek" right over my title.  What is this?  Who is testifying

7    right here?

8            THE COURT:  Hendrix.

9            MR. RUKAVINA:  Is this — is this Hendrix?  Hendrix.

10   Thank you.

11           MS. DEITSCH-PEREZ:  Hendrix.

12           MR. RUKAVINA:  And I apologize, Your Honor.  I just —

13   I don't know why I can't read it.

14           Just to round out the discussion, not only — if the

15   Court questions Mr. Waterhouse's sincerity, again, you can't

16   question Ms. Hendrix's sincerity.

17           Ms. Hendrix, again I ask her there at the bottom, "As

18   part of that in December 2020, would it have been employees of

19   the debtor that would have scheduled potential payment subject

20   to approval by NexPoint, NexPoint's future obligations as they

21   were coming due, she says, "Yes, only with approval."

22           And then I ask, "And would that have included

23   NexPoint's obligations on the promissory note to Highland."  And

24   she says, "Yes," again without objection.

25           So we're on the next slide.

*Plaintiff's Motion for Partial Summary Judgment*                    171

1        And Mr. Dondero confirms the same, but you can go to

2   the next slide.  So we have again Mr. Dondero, Mr. Waterhouse,

3   and Ms. Hendrix all discussing how the advisors would rely on

4   Highland to schedule and advise with these payments, and how

5   that was one of the services contracted out to Highland.

6        Now here is the dispute of fact, one that the Court

7   obviously cannot resolve.  In late November or early December

8   2020, Mr. Dondero learns of alleged overpayments under shared

9   services, and he tells Mr. Waterhouse stop payments.  Mr.

10  Dondero said, testified, he said stop payments just on shared

11  services and payroll reimbursement.  Mr. Waterhouse testifies,

12  no, no, Mr. Waterhouse said — Mr. Dondero said stop all

13  payments.

14       So if the jury believes Mr. Dondero, that he did not

15  say stop payments on the notes, then Highland's fault is

16  obvious.  Likewise, if the jury believed Mr. Waterhouse, then

17  Highland's fault is still obvious because, as Mr. Waterhouse

18  confirmed, after he got that instruction from Dondero, he did

19  nothing.  He did nothing.  He literally put his head in the sand

20  and did nothing.

21       Well, I'm sorry, but the CFO and treasurer, someone

22  who that is contracted out to provide these services, needed to

23  take some action, such as ensure if he understood Mr. Dondero

24  correctly, try to advise Mr. Dondero of the consequences, and

25  try to convince Mr. Dondero otherwise.  Would Mr. Dondero and

*Plaintiff's Motion for Partial Summary Judgment*                    172

1    NexPoint really for a million dollars, especially because it had

2    been prepaid, wanted to default on what was at that time — I

3    forget how much — a 23,-, $24 million note?  Of c- — Your Honor

4    mentioned it this morning.  When the Court denied our Rule 16

5    motion to extend the expert deadline for Pully, the Court found

6    that expert testimony was not needed to decide this standard of

7    care.  A reasonable jury can conclude that Highland was at

8    fault, whether it's Waterhouse's or Dondero's testimony.  And

9    here is why.

10          Next slide, please.

11          The shared services agreement, Your Honor, there it is

12   in the middle, standard of care, it expressly provides that

13   Highland will fulfill its duties with the care, skill, prudence,

14   and diligence under the circumstances then prevailing that a

15   prudent person acting in like capacity, et cetera, et cetera, we

16   discussed this at the Rule 16 hearing.

17          So we know that the Court cannot — first of all, we

18   know that there is language in the shared services agreements

19   requiring Highland to assist and advise NexPoint with its

20   payment obligations.  We know that Dondero, Waterhouse, and

21   Hendrix all testified that that included ensuring that NexPoint

22   was advised of its upcoming note payment.

23          We don't know whether Dondero or Waterhouse, which one

24   the jury will before, we can't — the can't decide that.  And the

25   Court also can't decide whether this black-and-white standard of

1   care was satisfied.  But the Court did rule that that does not

2   require expert testimony, that that is within the average

3   juror's ability to decide.  And although I am seeking a

4   reconsideration of that order, I don't have that

5   reconsideration, so right now this Court's order stands that I

6   do not need expert testimony to prove up that that standard of

7   care was violated.

8          And we know from the United States Supreme Court that

9   on summary judgment the Court cannot decide whether a standard

10  of care was violated or not.  But, again, there is a standard of

11  care and there is a service contracted for.

12         Next slide, please.

13         And that means that under Texas law, Your Honor, that

14  one whose negligence caused a delay in performance of a

15  contract, that delay is excused.  We have cited case after can

16  for that proposition.  I'm not going to read them to you, but

17  it's also common sense.

18         If I contract with someone to do something for me and

19  they mess up, they fail, they can't then take advantage of my

20  resulting delay, when I have been paying them and relying on

21  them to make sure that I do it right.  That, Your Honor, is the

22  Highland fault affirmative defense.

23         Next slide.

24         And, again, that defense is factually intensive.

25  There are disputed facts, but it is a valid defense under Texas

*Plaintiff's Motion for Partial Summary Judgment* 174

1    law.

2    The final one, and I will be very brief on this, Your

3    Honor, the record is clear, a couple of weeks after the default,

4    the defendants, NexPoint, we actually made the payments.  What

5    happened was Dondero called Waterhouse, Waterhouse said, 'Well,

6    you didn't make the payments.'  Dondero said, 'Make the

7    payments.'  So now we have — we have questions of fact.

8    Mr. Dondero has given sworn testimony that when he

9    made those payments, it was his understanding that they would

10   cure the prior defaults.  Now at this time Mr. Waterhouse was

11   still the CFO of the debtor.  He certainly had the ability to

12   speak at least with apparent authority for the debtor.  At this

13   time — so go to the next slide, please — at this time Mr.

14   Waterhouse did not advise Mr. Dondero that the payments would

15   not cure.

16   Now in truth and in fairness, Mr. Waterhouse — no one

17   remembers whether Mr. Waterhouse said the payments will cure.  I

18   don't have any evidence of that.  I'm not arguing that Mr.

19   Waterhouse told Dondero, 'Make these payments and your defaults

20   are cured and the notes unaccelerated.'  The point is, going

21   back to the standard of care, Your Honor, under shared services,

22   Mr. Waterhouse did not advise Mr. Dondero that making these

23   payments will not or might not or Mr. Seery might decide not

24   cure your defaults.  That is exactly what the CFO and treasurer,

25   a Highland employee, under contract to provide us with advice

*Plaintiff's Motion for Partial Summary Judgment*                    175

1    regarding our payments should have said.  That is an omission by

2    him.  So he basically induced Mr. Dondero to have these payments

3    made.  Mr. Dondero believed that they would cure the — the

4    defaults.  And Highland kept the money.  That's again common

5    sense.

6            Would Mr. Dondero have really said, 'Make millions of

7    dollars of payments,' after we had been defaulted and

8    accelerated if he did not believe that it would not cure and

9    unaccelerate the notes?  But that is a question of fact.

10   Whether Mr. Dondero's expectation was reasonable is a question

11   of fact.  Whether Mr. Dondero is telling the truth is a question

12   of fact.  Whether Mr. Waterhouse is telling the truth, it's a

13   question of fact.  And that's all that matters for purposes of

14   summary judgment.

15           Is that the last slide, Julian?

16           So those — that rounds off, Your Honor, our discussion

17   — you can close this, Julian — that rounds off our discussion

18   the note, the terminal defendants.  Now let's move to HCMFA.

19   And I want to try to be brief on this one because I understand

20   that I'm not going to permitted to argue the signature issue,

21   which would have otherwise consumed a lot of time.

22           Please pull up the HCMFA one, Julian.

23           MR. VASEK:  Just a moment.

24           MR. RUKAVINA:  So go to the next slide, please.

25           So the defense here, Your Honor, is mutual mistake.

*Plaintiff's Motion for Partial Summary Judgment*                    176

1    We have two promissory notes, May 2nd of $2.4 million, May 3rd

2    of $5 million.  And — and the core of the mistake is that these

3    — these were transfers that happened from Highland to HCMFA, but

4    that they were never intended or authorized to be loans, were

5    instead compensation.  And we're going to go through that in

6    quite some detail.

7              Next slide, please.

8              So this is back to that time line I shared with you

9    earlier.  The bottom half now really won't matter.  It related

10   to the signature issue that has been precluded.

11             So we have the shared services agreement from 2013.

12   It's a little bit different than the NexPoint one I just

13   discussed.  This is a separate HCMFA one, but we'll get to that.

14   And in 2018, there is a valuation error regarding an asset

15   called TerreStar.  And it's all in the record.  Your Honor has

16   the post error memo, Your Honor has the memo to the SEC.  There

17   was a mistake made that caused millions of dollars in damages to

18   one or more funds.

19             HCMFA contracted valuation services to Highland,

20   pursuant to the shared services agreement.  That's one of those

21   middle-office things you've heard about.  So ultimately what

22   happened was that HCMFA, pursuant to a compromise that involved

23   the SEC and the insurance carrier, paid just over — or just

24   under $5.2 million as compensation to the funds.  And then on

25   May 2nd, it paid an additional just under $2.4 million.  There

Case 21-03006-sgj   Doc 211   Filed 05/03/22   Entered 05/03/22 13:14:27   Desc Main
Case 3:21-cv-00881-X   Document 170   Filed 07/09/22   Page 72 of 162   PageID 53081

*Plaintiff's Motion for Partial Summary Judgment*                        177

1    is a contradictory evidence, which again the Court can't

2    resolve.  Mr. Dondero, Mr. Waterhouse believed that $2.4 million

3    to be compensation.  And that's also in the post-error memo that

4    we have that we can walk through.  Whereas, Mr. Klos and Ms.

5    Hendrix remembered that $2.4 million to be a consent fee, a fee

6    payable to the holders of various funds to convert them from

7    open to closed funds — or maybe I'm inverting that.

8            So now we have the two promissory notes, we have the

9    two payments on account of the NAV (phonetic) error.  Then

10   Highland calls the notes.  These were demand notes.  Highland

11   files the complaint.  We first answer with no affirmative

12   defenses.  After filing a motion for leave, we assert the

13   affirmative defense of mutual mistake.  And, very importantly, I

14   walked you through it this morning, I can well, you through it

15   again, we assert in multiple places that we did not execute the

16   notes and that Mr. Waterhouse did not have authority on behalf

17   of NexPoint to execute the notes —

18       (Very brief garbled audio.)

19           MR. RUKAVINA:  — signature.  I'm not talking about the

20   signature now.  I'm talking about that NexPoint did not execute

21   the notes and that Mr. Waterhouse wasn't authorized.

22           Next slide, please.

23           So this is — this is a new record.  Mr. Dondero

24   testified and gave an affidavit, and it's always been

25   consistent, that he was very angry about these mistakes.  They

*Plaintiff's Motion for Partial Summary Judgment*                    178

1  cost a lot of money.  Yes, the insurance paid for five point

2  something, but it was very embarrassing.  It caused a huge

3  amount of internal problems.  Everyone in the complex knew about

4  this because you don't make errors like this, no.  So Mr.

5  Waterhouse — I'm sorry — Mr. Dondero said in his own mind that

6  Highland needs to compensate HCMFA, because it HCMFA that was on

7  the hook.  So that's in the record.

8         Now by itself, the Court might not find that credible,

9  although the Court can't make that determination.  I'll give you

10 other indicia of credibility.  What — what both Dondero and

11 Waterhouse testified to clearly and unambiguously is that only

12 Mr. Dondero could authorize Highland or HCMFA to make or take

13 loans on that size at that time.  Only Mr. Dondero.

14         Mr. Morris talked about apparent authority because Mr.

15 Waterhouse is the treasurer of HCMFA.  Normally he'd be right,

16 that a CFO or treasurer can go out there and presume to have

17 authority to enter into loans of this size.  That does not apply

18 when he wears both hats.  When an agent is common to two

19 principles, the agent's knowledge is imputed to both.  Both

20 principals know what the agent knows.  If the agent knows that

21 he can't authorize this on the one, that applies on the other

22 one as well.

23         And we have briefed this at length.  There is no point

24 in my hammering on that.  But the fact that Mr. Waterhouse was

25 an agent for both means he can't have no apparent authority.

*Plaintiff's Motion for Partial Summary Judgment*                    179

1    Apparent authority is, again, what someone outside reasonably

2    assumes you'd have.  All that he could have was actual authority

3    and he could not have actual authority on his own to take or

4    make loans of this size.

5            So what happens, what both Dondero and Waterhouse

6    testified to is Dondero tells Waterhouse to transfer $7.4

7    million from Highland to HCMFA.  Dondero did not say these are

8    loans.  Dondero did not tell Waterhouse why these transfers were

9    happening, except that they were related to TerreStar.

10           Waterhouse did not ask if they were loans, and he does

11   not recall being told that they were loans.  What he remembers

12   is Dondero saying, 'Go get the money from Highland.'  But, again

13   importantly, to bolster the credibility of Mr. Dondero, not that

14   it needs credibility, what Mr. Waterhouse remembers is that

15   these transfers were related to the NAV error.  Were.  Nothing

16   at all about a liquidity need on the part of HCMFA.  No

17   evidence, no one has said nothing in the record that, wait,

18   HCMFA needs liquidity, so let's transfer funds to HCMFA by way

19   of a loan.

20           All of them remember, Waterhouse, Klos, and Hendrix,

21   that it was related to the NAV error.  Again, the NAV error,

22   where Highland caused this liability for HCMFA.  That bolsters

23   Mr. Dondero's subjective intent that this transfer be

24   compensation for the harm that Highland caused.

25           Now as Mr. Waterhouse testified at length, these notes

*Plaintiff's Motion for Partial Summary Judgment*                    180

1    should have gone through the Legal Department.  They did not.

2    Instead Waterhouse tells Mr. Klos, at that time the controller,

3    to transfer the funds.  That's all he tells him, 'Transfer the

4    funds.'  Mr. Klos, and he testified at length about this,

5    testifies about how based on prior practice he, a prudent

6    accountant, a prudent controller, would paper up intercompany

7    transfers as loans or payments on loans — well, not he, but that

8    would be the practice.

9            Mr. Klos doesn't ask, 'Are these loans therefore,' he

10   assumes that they're loans because that's the prior practice.

11   He then instructs Ms. Hendrix, the senior accountant, to go

12   paper them up, and his role is done.  Now it is true that on one

13   of those two emails instructing that the loans — that the

14   transfers be papered up, he does copy Mr. Waterhouse.  He does.

15   And the debtor argues, well, Mr. Waterhouse should have hit the

16   panic button and said these are not loans.  Well, that's some

17   evidence of something.  That's some evidence that perhaps Mr.

18   Waterhouse thought that they were loans.  But it's just evidence

19   of that.  It is not — it is not the magic bullet here.  The

20   point again is Mr. Klos testified very clearly that he assumed,

21   based on prior practice, that these were loans.  And then Ms.

22   Hendrix likewise testified very clearly that based on prior

23   practice and Mr. Klos' instructions these were loans, and she

24   papered them up as loans.  It didn't go through Legal, she

25   papered them up as loans.  She never showed the notes to Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    181

1   Waterhouse, she never brought the end notes to Mr. Waterhouse.

2   That was it.  Mr. Waterhouse told Klos to transfer it.  Klos

3   told Hendrix to paper it up as loans.  And that was it.

4          Next slide, please.

5          Now there is a lot of other circumstantial evidence

6   here that I think a jury should and will consider.  And I agree

7   completely with Ms. Deitsch-Perez, Mr. Morris' argument is the

8   best evidence of why the Court cannot grant summary judgment

9   because it kept talking about jury and reasonable jury, and he

10  was making opening arguments.  But look at the other

11  circumstantial evidence.

12         There is two notes, two transfers, and two payments by

13  HCMFA for the harm caused.  If there is a need for liquidity,

14  why have two notes and two transfers?  Highland was bleeding

15  cash at that time.  Mr. Dondero — this is in the record —

16  personally put in money into Highland so that Highland could

17  make these transfers to HCMFA.  Why would he have done that

18  unless it was for compensation.  If HCMFA needed funding for

19  some reason, why wouldn't he have just put money into HCMFA?

20  Why have Highland do it?

21         The promissory notes are in amounts very, very similar

22  to the actual payouts because of the error, 5 million versus 5.2

23  million, 2.4 million versus just under that.  In fact, the 2.4

24  million is done on the very same day as the note.  Again

25  Waterhouse remembers that this was related to the NAV error.

*Plaintiff's Motion for Partial Summary Judgment*                    182

1   There is no mention by anyone in their depositions, the debtor

2   hasn't presented any because there is none, that there was a

3   need at HCMFA at that time to transfer money such that this

4   would be a loan.  Again, Ms. Hendrix remembers that this was

5   related to the NAV error and the consent fee, so there is a

6   question of fact there.  The — the shared services provides for

7   the valuation.  Again, this was logical when I put in here it

8   passes the smell test.

9           If Mr. Morris asking the Court to conclude that no

10  reasonable juror could conclude that this is true, I — not only

11  do I respectfully disagree, I utterly disagree.  The Court might

12  not find it credible.  Mr. Morris might find it incredible, but

13  all that we need to defeat summary judgment are genuine issues

14  of dispute fact.  These are all genuine issues.

15          No one is arguing that some space alien came down here

16  and fabricated these promissory notes.  That would not be a

17  genuine issue.  And, again, nothing went through Legal, nothing

18  was papered up through Legal, nothing was shown to Waterhouse

19  afterwards.

20          Now the big counter argument is, well, how could Mr.

21  Waterhouse carry these on the books for months and months, how

22  do he file MORs.  This is all just a lie, Judge.  This is an ex

23  poste facto lie.  Again, questions of fact.  But let's look at

24  Mr. Waterhouse's understanding after the fact.

25          The email, Julian.  So — slow down a little bit more.

*Plaintiff's Motion for Partial Summary Judgment*          183

1         So — so Your Honor has this, we've addressed it.  What

2    is being discussed here is the retail boards are asking of the

3    advisor, HCMFA, amongst other things, are any amounts currently

4    payable or due to the debtor by HCMFA.  What you see then from

5    Lauren Fedtherd (phonetic), and she's copying various people

6    whose names you've gotten to know, she talks about HCMFA, due to

7    HCMLP of June 30th, 2022, 12 million and change, per the top.

8         Look at how Mr. Waterhouse responds.  The man who

9    signed these notes allegedly a little over a year earlier, he's

10   going off memory here, he says the HCMFA note is a demand note.

11   There was an agreement between HCMLP the earliest they could

12   demand is May 2021.  That's completely wrong.  And why is it

13   wrong?  Because there are four HCMFA notes, Your Honor.  There

14   were two prior notes — we have briefed this.  We have given you

15   copies.  The debtor has sued HCMFA for these two prior notes —

16   where the maturity was extended to May 2021, which is the why

17   the debtor only filed suit on those notes after that maturity

18   passed.

19        So again here is the CFO, who Mr. Morris has told you,

20   and the Court, I heard the Court say should have known better,

21   calling the HCMFA note a note instead of promissory notes, and

22   saying that the earliest it could be demanded is May 2021.

23        Close this and pull up the Rule 15(c), Julian.

24        We're going to look at just the top of this Rule

25   15(c), Your Honor, because it contains highly confidential,

*Plaintiff's Motion for Partial Summary Judgment*                                    184

1    proprietary information, but this is the report that Mr. Morris

2    told you that HCMFA sent to the retail boards where they concede

3    and admit that they owed this money.

4            Scroll down, Julian.  Keep scrolling.  Keep scrolling,

5    please.  Okay.

6            So there are any material amounts currently payable or

7    due.  So here again, now this is the whole Legal and Accounting

8    Department at Highland, Ms. Fedtherd, Mr. Klos, Ms. Hendrix, Mr.

9    Waterhouse.  You saw them all on that email.  None of them

10   remembered, oh, wait, oh, wait, these notes have not been

11   extended to May 2021; oh, wait, there's more than one note.

12   Again, it talks about the note between HCMLP and HCMFA and it

13   talks about coming due in May 2021.  Again, that's not correct.

14           And the debtor has never explained why the numbers

15   don't add up.  Why does it say that HCMLP — I'm sorry, where is

16   it here — the twelve million two hundred and eighty-six

17   thousand, Your Honor.  So there were the two notes are the

18   question here for 7.4 million and there were two other notes

19   which — it's in my brief, I forget right now, but the total

20   amount is quite a bit higher than $12.286 million.

21           No one has ever tried to explain to Your Honor why

22   these professional people, if they believe and know of the

23   existence of four notes, can't do simple math and add up four

24   principal amounts owing — you can close this.  The point of me

25   saying that, Your Honor, is it's very easy in hindsight for Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    185

1   Morris to argue and for, frankly, the Court to assume that Mr.

2   Waterhouse and his team did know about these notes, that they

3   were always reported in the bankruptcy and that this is just us

4   trying to weasel out of a lawful debt after the fact.  That is

5   not correct, Your Honor.  That is not correct because, as I've

6   shown you, that's just a small sampling of our evidence.

7           These two notes are different.  These two notes are

8   different and they're different because the amounts are very

9   similar to the prior HCMFA notes.  These two notes are different

10  because there were two prior HCMFA notes.  Everyone knew that

11  there were two prior HCMFA notes.  Everyone would have recalled

12  that and they would have put it in financials.  They would have

13  put it on Rule 15(c)s.  They would have put it on the bankruptcy

14  schedules.  That does not mean that they knew about these two

15  notes, that they knew that there were in fact four notes.

16  People were confused.  They were confused for many reasons

17  because this had to do with TerreStar, it had to do with the

18  same numbers as was paid out to TerreStar.

19          And the jury, a reasonable jury can conclude that all

20  these people that are now telling you that Mr. Waterhouse should

21  have been perfect and Ms. Hendrix should have been perfect and

22  Mr. Klos should have been perfect and Ms. Fedtherd should have

23  been perfect, that they made a simple mistake.  And that mistake

24  was that these promissory notes were never intended to be debt.

25  Mr. Waterhouse didn't register them as such in his mind.  And

*Plaintiff's Motion for Partial Summary Judgment*                    186

1    that's why you see mistake after mistake of how they're carried.

2                And, finally, yes, there are repeated instances of the

3    debt from HCMFA being recorded, but it's also all debtor

4    employees.  Of course Ms. Hendrix, who prepared the notes,

5    assuming that they were loans, would have recorded that.  Of

6    course Mr. Klos, who told her to do that, assuming that they

7    were loans, would have recorded that.  That's evidence of

8    nothing.  That's not evidence that there was a mutual mistake.

9    That's evidence that the people who caused the mistake did so in

10   good faith and didn't defraud anyone.

11               And the final point is the debtor makes a big deal

12   about how my client received $5.1 million from the insurance

13   company to pay part of the liability for this error.  We have

14   briefed out in some detail the collateral source rule in Texas.

15   That rule allows you to have a double recovery.  That rules says

16   you can recover from an insurance company and from the

17   tortfeasor without any kind of problem.  And it exists and it's

18   existed for over a hundred years because people can go out there

19   and pay for insurance and are responsible, not insurance pays,

20   that should not be relieving the tortfeasor of its liability.

21   So that's a red herring.

22               And, really, if Highland believes that we did

23   something wrong with the insurance carrier, then it can go and

24   talk to the insurance carrier.

25               Fact, Your Honor, there was a NAV error.  Fact, it

*Plaintiff's Motion for Partial Summary Judgment*                    187

1    caused my client to pay over $7.4 million in damages.  Fact,

2    there is two transfers of about that amount.  Arguable fact, Mr.

3    Dondero instructed that this be compensation.  Arguable fact,

4    Mr. Waterhouse knew about it.

5             Now pull up my PowerPoint, Your Honor — Julian.

6             My final point, Your Honor, my time is almost up.

7    This is now the authority.  This is a very important point.

8             Go down, please.

9             Okay.  So — so let's talk about the authority now.  We

10   — I mentioned earlier the UCC.  Here, Your Honor, I have quoted

11   the relevant portion.  It's the Texas version, 3.308(a):  In an

12   action with respect to an instrument, the authenticity and

13   authority to make — that's clear — and authority to make each

14   signature on the instrument are admitted unless specifically

15   denied in the pleadings.

16            If the validity of a signature is denied in the

17   pleadings, the burden of establishing validity is on the person

18   claiming validity.

19            I'm not talking about the Waterhouse signature, Your

20   Honor, now.  I'm talking about just the authority.  In our first

21   amended answer, as I walked you through before, we expressly

22   denied, specifically denied that Waterhouse had the authority to

23   make the promissory note on behalf of HCMFA.  Because that's

24   denied in the pleadings, the burden of establishing validity is

25   on the person claiming validity, HCMFA.  There is zero evidence

*Plaintiff's Motion for Partial Summary Judgment*                    188

1    before Your Honor from the debtor that Mr. Waterhouse was

2    authorized by the debtor or by HCMFA to execute these notes.

3    Certainly Klos and Hendrix weren't.  Those were lower-level

4    employees, those were not officers.  There's no argument that

5    they were.

6           The burden is on Highland to prove that Waterhouse had

7    actual and/or apparent authority to sign these notes.  There is

8    nothing in the record to prove that, Your Honor, because again

9    the mere fact that this being an officer doesn't matter.  And

10   both Dondero and Waterhouse testified that Waterhouse did not

11   have that authority.  So for that reason, if no other reason,

12   Your Honor, the Court cannot recommend granting summary judgment

13   because there is a fatal flaw of evidence on the part of the

14   debtor.

15          Again the debtor assumes, 'Well, he is the officer, he

16   can do it.'  Uh-uh, because he's wearing both hats.  Thank you,

17   Your Honor.

18          THE COURT:  All right.  Thank you.

19          All right.

20          MR. MORRIS:  Your Honor, may I — may I request just a

21   very brief break before I give my rebuttal, which I don't expect

22   to last the whole 55 minutes that I have?

23          THE COURT:  I need a break as well —

24          MR. RUKAVINA:  May we make it 10 minutes, Your Honor?

25          THE COURT:  We'll make it 10 minutes right.

*Plaintiff's Motion for Partial Summary Judgment*                    189

1              COURT SECURITY OFFICER:  All rise.

2              MR. MORRIS:  So we'll come back at the top of the

3    hour?

4              THE COURT:  We'll — yeah, it's 3:48, let's just make

5    it four o'clock we'll come back.

6         (Recess taken.)

7              COURT SECURITY OFFICER:  All rise.

8              THE COURT:  All right.  Please be seated.

9              We are back on the record in the Highland note

10   adversaries.

11             Mr. Morris, do we have you?

12             Looks like I'm on mute.  Am I on mute?

13             All right.  Hello.  I was muted apparently.  We're

14   back on the record in the Highland note adversaries.

15             Mr. Morris, are you ready for your rebuttal?

16             MR. MORRIS:  I think so.

17             Ms. Canty, are you all set?

18             MS. CANTY:  I am.

19             MR. MORRIS:  Okay.  So good afternoon, Your Honor.

20   John Morris, Pachulski, Stang, Ziehl and Jones, for Highland

21   Capital Management, L.P.  I understand I have 55 minutes for my

22   rebuttal.  I'm hopeful not to take so long.

23             I want to begin my rebuttal where I began with my

24   opening argument since I guess I was accused several times of

25   not citing to the law, so I thought I'd cite to the law again.

*Plaintiff's Motion for Partial Summary Judgment*                    190

1           We're entitled to summary judgment if there is no

2     genuine dispute of a material fact.  A dispute about a material

3     fact is genuine only if the evidence is such that a reasonable

4     jury could return a verdict in favor of the nonmoving party.

5     And that's why I referred to the jury, not because I was making

6     a closing argument, but because that is merely what the legal

7     standard is.

8           We can meet our burden by demonstrating either an

9     absence of evidence to support the nonmoving party's claims, or

10    in this case defenses, or by showing that there is an absence of

11    genuine issues of material fact.

12          The defendants here have to do more than create some

13    metaphysical doubt as to material facts.  They can't satisfy

14    their burden by relying on conclusory allegations,

15    unsubstantiated assertions, or a scintilla of evidence.

16    Critical — where critical evidence is so weak or tenuous on an

17    essential fact that it couldn't support a judgment in favor of

18    the nonmovants or where it is so overwhelming that it mandates

19    judgment in favor of the movant, summary judgment is

20    appropriate.  We believe that we easily meet that standard,

21    notwithstanding all the moles that I'm going to try and whack

22    now, as this is what I do for a living now.  I whack moles.  So

23    I'm just going to begin with some of the assertions that were

24    made by the first lawyer who spoke.

25          So it's not in any particular order because it's kind

*Plaintiff's Motion for Partial Summary Judgment*                    191

1   of hard to do that on a 10-minute break.  But you know they make

2   the assertion again that there was a practice of forgiving

3   loans.  Your Honor, it's actually not a material point.  I don't

4   believe that whether or not it was a practice is material to

5   this analysis, but they put it into their answer, and that is

6   why we have pursued it.

7           I think the documentary evidence speaks for itself.

8   Mr. Dondero as well as somebody else, I forget, testified that

9   if a loan was forgiven, it should be recorded in the financial

10  statements.  We have put forth I think the 10 or 11 years of

11  financial statements that existed prior to the bankruptcy

12  filing, and what they show is that no loan was forgiven for at

13  least seven or eight years.  We're not saying that no loan was

14  ever forgiven in the history of the world, but what we're saying

15  is when you don't do something for seven or eight years, kind of

16  hard to call it a practice.

17          And what makes it even more interesting, Your Honor,

18  not to spend too much time on a point that I don't even think is

19  material, but I just — I've got to whack the mole, no loan was

20  ever forgiven for Mr. Dondero than $500,000.

21          And I'd like to put up on the screen, Ms. Canty, I

22  think Exhibit 24, because it's important, because this is where

23  credibility starts to come in.

24          And I'm not talking about the credibility of the

25  witnesses, I'm talking about the credibility of the lawyers.

*Plaintiff's Motion for Partial Summary Judgment*                    192

1    Because in their reply they said Highland conceded that Mr.

2    Dondero had a loan forgiven.  And they reach that conclusion

3    because we carefully wrote in our moving papers that Mr.

4    Johnson, Mr. Dondero's expert, testified that he was not aware

5    of any loan prior to 2008, because we only put the financial

6    statements up to 2008, we didn't put any earlier statements, so

7    when we write, there's no evidence that Mr. Dondero received a

8    forgivable loan prior to 2008, we're just trying to be careful

9    and show what the evidence is.  And they turn that around and

10   they say, see, Highland has conceded that Mr. Dondero received a

11   forgivable loan prior to 2008.

12          Let's see what Mr. Dondero said in response to these

13   interrogatories.  If we could go — keep going, because I think

14   this is — this is so important.  It goes to the credibility of

15   the presentation here.  This is called whack a mole.  So keep

16   going.  Cross my fingers and hope it's 24.  Keep going.  It's 24

17   — I'm sorry.  It's Request for Admission Number 15.  It's page

18   11.  Keep going.  No, it's right there.

19          So they say Highland conceded that Mr. Dondero

20   received a forgivable loan.  It's interesting, when we asked Mr.

21   Dondero to admit that Highland never gave him a loan that was

22   actually forgiven, he admitted it.

23          We asked him did Highland ever give — to admit that

24   Highland never gave Mr. Okada a loan that was ever forgiven, he

25   admitted it.  We asked him "to admit that Highland never gave a

1    loan to any entity, directly or indirectly, owned or controlled

2    by you that was actually forgiven," he admitted it.

3          Okay.  So those are the undisputed facts, to the

4    extent the Court is at all interested about the so-called

5    practice, Your Honor can decide whether or not it constitutes a

6    practice.  The facts are the facts.  The facts are no loan was

7    ever given to Mr. Dondero that was forgiven.  The fact is that

8    no loan was ever given to one of his entities that was ever

9    forgiven.  The fact is that no loan was ever given to anybody

10   that was ever forgiven since probably 2010.

11         Nancy Dondero's competence, I really didn't want to

12   address the issue because I thought we had — you can take that

13   down — we had covered it pretty extensively in our briefing, and

14   I had no interest in embarrassing Ms. Dondero, but I hope and

15   assume that Your Honor has read the transcript.  I'm not talking

16   — Highland is not saying that she was drunk.  Highland is not

17   saying that she is not mentally capable of living, right.  We're

18   not using Competency with a big C, we're using competency as a

19   small c because they're going to have to put her in front of a

20   jury.  And, again, the standard is, is there any way a

21   reasonable jury is really going to buy the story?

22         The evidence speaks for itself, her testimony speaks

23   for itself.  I may be a mediocre litigator, but of this somebody

24   asked me to create a tax structure for the maximization or the

25   minimization of taxes, I would not be competent to do that.  I

*Plaintiff's Motion for Partial Summary Judgment*                            194

1    may be a mediocre litigator, but I wouldn't be competent to do

2    that.

3           I don't believe, based on the testimony, again not a

4    credibility finding, based on facts, on the facts that she asked

5    no questions, on the fact that she didn't negotiate, on the fact

6    that she never saw the notes, on the fact that she couldn't

7    identify the makers of the notes, on the fact that she asked no

8    questions about the very terms of the agreement.  The agreement

9    was he would get the bonus if the assets were above cost.  She

10   asked no questions.

11          Had she asked questions she would have learned they're

12   already in the money, substantially above.  That's what we mean

13   by competence.   and it's just something that the Court should

14   consider as to whether or not a reasonable jury could ever

15   credit that testimony.

16          You know, Ms. Deitsch-Perez spent a lot of time

17   telling Your Honor how benevolent Mr. Dondero is.  Absolutely no

18   evidence in the record to support that.  She spent a lot of time

19   telling you how much he could have taken in compensation but he

20   didn't because — he took $70 million in the three years before

21   the bankruptcy.  He took it in the form of a loan, but he took

22   $70 million and he doesn't want to pay it back.  That is the

23   undisputed fact.  He took it and the entities that he owns and

24   controls took it.  They took the money and they don't want to

25   give it back.

*Plaintiff's Motion for Partial Summary Judgment*                    195

1          And the only reason he took it in the form of a loan,

2    — she said it — tax maximization, because he didn't want to pay

3    income taxes on it.  He took the money and he thought he would

4    never have to pay it back, because that's Jim Dondero.  Not a

5    benevolent man.  He took $70 million.

6          I went through that whole slide where I said there

7    were seven or eight opportunities for him to act in his own

8    self-interest, and the only rebuttal I got was:  Mr. Dondero put

9    the company ahead of his own self-interest.  It actually would

10   have been in the company's interest as well as his own if he had

11   disclosed the agreements to anybody when they were entered into.

12   If he had disclosed them to the auditors, if he had disclosed

13   them to this Court, if he had disclosed them to the creditors,

14   if he had disclosed them at confirmation, if he had disclosed

15   them in response to the projections, if he had disclosed them in

16   response to the demand letters.  His failure to do that isn't

17   some magnanimous act of — of, you know, benevolence, acting out

18   of self-interest.  That was literally the rebuttal, that it was

19   a sacrifice and he — he — that he didn't disclose it.  I don't

20   get it.  No reasonable jury, right, you're going to put this to

21   a jury?  Didn't act in his own interest and didn't act in

22   Highland's interest.

23          Highland's creditors would have been much better off

24   if Mr. Dondero had actually disclosed, if he was compliant, if

25   he was a compliant officer, if he was part of a compliant

1  company, he wouldn't have allowed monthly operating reports to

2  be filed that, according to him, falsely claimed that Highland

3  actually had notes of the value that they were disclosed at.

4          The sausage-making.  Undisputed facts.  Undisputed

5  facts how it developed.  Yes, I agree with Ms. Deitsch-Perez,

6  everybody overlooks things.  I do.  It's why we didn't produce

7  that — that thing, because nobody followed up and we didn't

8  think about it and you do a million things, and those things do

9  happen, but how can you possibly explain that you sat down to

10  create a list of people who have knowledge and information about

11  this case and you come up with 15 people and you forget your

12  sister who is the principal witness in the case?  How do you

13  respond to an interrogatory that says, "Please identify all the

14  people who have knowledge about the alleged agreement," and you

15  forget your sister?  That's not an oversight.

16          I think the two excuses that we got were they were too

17  busy doing things and there were too many cooks in the room.

18  Does a jury really need to consider that?  Okay, take it — take

19  the totality, take this in totality.

20          You asked Ms. Deitsch-Perez, and I — just to go back

21  to the law, you're right, what I did, Your Honor, is because I'm

22  confident that the Court is very familiar with the standards for

23  summary judgment, I highlighted the standards because I think

24  it's important to put in context the argument that we're making

25  here today, what I didn't do is go through cases because there's

*Plaintiff's Motion for Partial Summary Judgment*                    197

1    no case like this, and Ms. Deitsch-Perez effectively not only

2    agreed with that, but you asked her a much broader question, are

3    you aware of any case where a court allowed a maker to rely on

4    an oral agreement to get out of from under an unambiguous

5    promissory note, and she bobbed and she weaved, but I didn't

6    hear an answer, Your Honor.  Maybe you did, I did not hear an

7    answer.

8            Certainly no case that I'm aware of where parties to

9    an oral agreement are siblings, where they've got just the

10   mountain evidence, right, that's — that's part of what the Fifth

11   Circuit says look to, is there a mountain of evidence.  The

12   mountain of evidence that no agreement exists is just absolutely

13   overwhelming.  There is not one scintilla of evidence, frankly,

14   other than the words out of Jim and Nancy's mouth that supports

15   this theory.

16           I want to talk for a second about — about PWC.  The

17   assertion was made again to minimize the undisputed fact.  The

18   undisputed fact is that Mr. Dondero did not disclose the

19   agreement to PWC.  The undisputed fact is that paragraph 36 of

20   the representations required Mr. Dondero to disclose whether

21   material or not as decided by PWC that the agreements existed

22   because they were related-party agreements.  And what Your Honor

23   was told was, ah, maybe it's a bad judgment call not to disclose

24   it.  Maybe in hindsight, he should have done it.

25           He's a CPA.  These are management representation

1    letters.  The representation was unambiguous.  Mr. Dondero

2    breached his representation and the audited financial statements

3    are false and misleading as a result, okay.  It's not a question

4    of bad judgment.  What it goes to is it shows no agreement

5    existed because if an agreement existed, it wouldn't have been

6    good judgment to tell PWC.  It would have been required.  And a

7    compliant executive and a compliant company would have disclosed

8    it to their auditors.

9          The Jim and Nancy show on — on this agreement, again

10   not a scintilla of evidence other than what that case said,

11   self-serving conclusory allegations.  You know, the fact of the

12   matter is Jim Dondero couldn't identify the notes if he tried.

13         And I do want to take this opportunity, Your Honor, we

14   haven't discussed this, maybe I should wait for this, but

15   Exhibit 3C, I've — I've got a few objections to their exhibits,

16   just three actually, and then one proposal.  But one of them

17   goes to this list of the promissory notes.  And if Your Honor

18   read Mr. Dondero's testimony from his deposition, he couldn't

19   identify the notes that were subject to the agreement without

20   this cheat sheet, which is Defendants' Exhibit 3C, and it was

21   prepared by lawyers for litigation.  And it should absolutely

22   not be admitted into evidence.

23         He couldn't identify the notes that were the subject

24   of the — of the alleged agreements.  And this is critical,

25   because it is an absolute critical term of the agreement, to

1    identify what notes do they apply to.  And the reason that it's

2    critical, Your Honor, is because there were a whole host of

3    other notes that aren't part of this litigation.  We know there

4    were two other HCMFA notes, because we're suing on them.  And we

5    know that there were other notes of Jim Dondero that he paid off

6    in the interim, right.  And that's why they're not part of this

7    litigation, but the evidence is well in the record.

8              And so it's not a situation where you could say, look,

9    we had 10 notes, you sued on 10 notes, so of course the 10 notes

10   are the subject of the litigation and it's the subject of the

11   agreements, because those are the only notes.  You can't do that

12   here.  There's lots of other notes.  So if he can't specifically

13   identify, because they didn't write it down, it's all undisputed

14   facts, didn't write anything down, didn't create a list of

15   notes, nothing.  I think he's missing a critical term in the

16   agreement and I think that's another reason why this thing

17   shouldn't — you shouldn't burden a jury with this fraud — with

18   this story.

19             Again, nothing corroborates their story.  Ms.

20   Deitsch-Perez referred to her experts.  Respectfully, the tax

21   law expert is irrelevant.  I would stipulate you don't pay taxes

22   until you have income.  That's what he says.  It's not — it's

23   not terribly sophisticated, it's not at all — contested at all,

24   frankly.

25             The important one is Mr. Johnson, and why is Mr.

1   Johnson so very critical to this case?  Because it blows

2   everything Ms. Deitsch-Perez said away.  And how does it do

3   that?  Because by Mr. Johnson's calculation going back seven

4   years, Mr. Dondero was only under — only under compensated,

5   taking his analysis in full, by $20 million.  It was by $1.7

6   million for the three years prior to the petition date, but he

7   went back seven years, and it's in the record.  I asked him how

8   did you come up with seven years, is that subjective.  Yes.

9   Could have been five years, then the number would have been

10  smaller.  Could have been 10 years, then the number could have

11  been bigger.

12          But just take his analysis at face value.  There is no

13  rhyme or reason why he picked seven years, but take seven years.

14  Mr. Dondero was under compensated by $20 million.  Why is he

15  entering into agreements for $70 million?  Benevolent?  I don't

16  think so.  He helps our case.  And the fact is the evidence is

17  undisputed.  If you look at Mr. Johnson's deposition, Mr.

18  Dondero failed to disclose to Mr. Johnson tens of millions of

19  dollars that he got in additional deferred compensation.  No

20  dispute about it.

21          So if you took Mr. Johnson's $20 million and you took

22  into account the compensation that Mr. Dondero failed to share

23  with his expert, that number comes closer to 10,-, maybe even

24  less.  Over seven years, based on Mr. Johnson's analysis, that's

25  what he was under compensated for.

*Plaintiff's Motion for Partial Summary Judgment*                    201

1          This may be my favorite of all.  They attempt to

2     dispute our assertion that Mr. — that, you know, there was never

3     any disclosure of the agreement, and they point to two examples.

4     I'm just going to read for a moment, Your Honor, it's page 11

5     from our reply brief that was filed in Adversary Proceeding

6     21-03003, at Docket 159, and we address this very briefly.  With

7     two irrelevant exceptions, defendants do not dispute that

8     neither Mr. Dondero nor his sister ever told anybody about the

9     existence or terms of the alleged agreements.  And I have a

10    citation here:  Compare our motion at paragraph 28 with the

11    opposition at a couple of places.

12          And I'm going to address now the two exceptions that

13    Ms. Deitsch-Perez focused on.  The two exceptions are irrelevant

14    because they are vague, self-serving statements insufficient to

15    create a genuine dispute of material fact.  The first one I cite

16    to is Mike Lynn's (phonetic) letter that she referred to.  We

17    also object to that exhibit only to the extent that it's being

18    offered for the truth of the matter asserted.  But with that, we

19    would encourage the Court to read that letter.  That's a letter

20    that was sent after we commenced the lawsuit.  It doesn't use

21    the word — it doesn't use the word agreement, forgiveness,

22    contingency, condition subsequent, Nancy, or Dugaboy.  It merely

23    expressed Mr. Dondero's, quote, views that the notes were

24    compensation.

25          And then there's Mr. Waterhouse.  Even accepting Mr.

*Plaintiff's Motion for Partial Summary Judgment*                    202

1    Dondero's statements as true, Mr. Dondero's spoke to Mr.

2    Waterhouse only in the context of settlement discussions, and he

3    failed again to say the words agreement, forgiveness,

4    contingency, condition subsequent, Nancy, or Dugaboy.  Given Mr.

5    Dondero's own words, his assertion that he, quote, did not

6    discuss every detail of the agreements with Mr. Waterhouse is to

7    be quite charitable.  An extraordinary under statements.  He

8    admittedly did not discuss any detail of the alleged agreement

9    with him, and we cite to the record there.  So that can be found

10   on page 11 of our reply brief.  That is the entirety of the

11   disclosures that they're relying upon.

12           Mr. Rukavina, he first addressed the issue of prepays.

13   We don't dispute that there were prepayments.  He kept citing

14   Ms. Hendrix and Mr. Klos' admission that there were prepayments.

15   I don't dispute that there's prepayments.  The question becomes

16   what is the agreement of the parties and what did they actually

17   do.  I mean I think at the end of the day the agreement of the

18   parties carries it, but let's look at both, okay.

19           We encourage you, we urge you, Your Honor, because I

20   can't — I can't whack, I can't do every single thing right here,

21   but please look carefully at the language Mr. Rukavina suggested

22   that there is an ambiguity.  This is the first I've ever heard

23   of that.  The fact of the matter is the provision in the term

24   notes couldn't be clearer:  The parties could renegotiate and

25   the — and the maker could repay.  And it says very clearly:  If

*Plaintiff's Motion for Partial Summary Judgment*                    203

1    you prepay — may have said repay — I meant prepay — if you

2    prepay, the parties' agreement says exactly how that is going to

3    be treated.  You prepay and then the money gets applied to

4    outstanding, accrued but unpaid interest, and then the balance

5    goes to principal.  It's really like any other loan that I know

6    of, but I'm not here to testify.

7            So think about that, Your Honor:  Interest accrues

8    every single day.  The amortization schedule shows that interest

9    is charged every single month, for whatever reason, and I don't

10   think the Court needs to weigh why did they prepay.  Who needed

11   the money?  Did Mr. Dondero do this, did somebody else do this?

12           Just look at the plain and unambiguous terms of the

13   agreement, and then look at the amortization schedules.  I think

14   Mr. Klos' declaration will be particularly helpful because he

15   rebuts everything that Mr. Rukavina tried to argue in order to

16   attempt to create an addition — a genuine issue of disputed

17   fact.

18           But I would ask Ms. Canty to put up on the screen the

19   entirety of the NexPoint amortization schedule, because Mr.

20   Rukavina focused on the very first point and then conveniently

21   said, 'I don't want to go through the rest of it,' and there is

22   a reason for that, because if you read Mr. Klos' declaration

23   he's going to tell you that in May 2018, they did exactly what

24   they're contending to now, right?  So you can see in May 2018,

25   they make a very large payment, and the payment is, in fact,

*Plaintiff's Motion for Partial Summary Judgment*                    204

1   interest continues to accrue.  That's the interest-accrual line,

2   right?

3           Then if you just scroll down very slowly, please.

4           Okay.  You will see — you will see that at the end of

5   the year, if you add up the $149,000 plus the $84,000, you know,

6   they paid — they paid $200,000, and it got applied to

7   outstanding — here's a prepay of 13 days.  So that at the end of

8   the year, you get to zero.

9           Keep going.

10          So notwithstanding the fact that they've paid millions

11  and millions of dollars during 2018, exactly what the agreement

12  says, they apply it — except for that May 18 application, Mr.

13  Rukavina is right to point that out, but he's wrong to ignore

14  the rest of it.  So — too fast, go back to the top — and you can

15  see every single time, Your Honor, if you add up the 275,- that

16  was the interest that was due on 2/28, plus the 135,-, the

17  interest that was accrued at the end of March, if you add those

18  two together, it will equal the 411,-.  And if you add the

19  411,-, and then the balance is paid to principal.  That's Your

20  $750,000.  Interest continues to accrue for the balance of

21  March.  And then you get to April.

22          I'm not going to debate about why the payment was made

23  or what was intended.  What we know is that they paid $1.3

24  million.  What did they do?  They applied that to the

25  outstanding interest, $9,000 plus $73,000 equals $83,000, and

*Plaintiff's Motion for Partial Summary Judgment*                205

1   the balance went to principal, period, full stop.  Interest

2   continues to accrue.  They continue to do the same thing.  They

3   continue to do the same thing.

4          I need not go through every one of these , Your Honor,

5   but here you are, you have now in 2019, you've paid seven

6   fifty-one three two one, so that's, what, about four four,

7   that's about $6 million.  And, lo and behold, notwithstanding

8   the payment of all of that, right on August 13th, they make

9   their last prepayment of the year, interest continues to accrue

10  such that at the end of the year, on November 30th there was

11  $412,000, on — in December there was another $113,000, so they

12  pay the 530,-, and again there's one day of interest.  I guess

13  this is their gotcha moment.  They prepaid, see they prepaid one

14  day.  They got them to the end of the year to zero.  Every

15  single time in 2019, they do exactly what the contract says,

16  they receive a prepayment, they apply it to outstanding

17  interest.  Outstanding, accrued but unpaid.  Mr. Rukavina didn't

18  seem to understand how there could possibly be accrued but

19  unpaid interest on prepayment because you're paying the interest

20  that exists as of the date of the payment.  It's really not

21  complicated.

22         2020, made another payment, applied in exactly the

23  same way.  I don't know why he's doing this.  It doesn't really

24  matter.  It's applied exactly as the unambiguous terms of the

25  term notes provide:  412,000 plus the 113,-, right, it leaves

*Plaintiff's Motion for Partial Summary Judgment*                    206

1    you with 530,-.  Again, it took you to the end of the year.

2         And it goes on.  And the same thing is true.  You

3    know, nobody's made the argument, nobody's put up the — the

4    amortization schedule for HCMS, but the same thing is true.  You

5    know, at the end of 2019, notwithstanding the payment of all the

6    millions of dollars, they still had to pay the interest that was

7    due.  That's the same interest that was due at the end of 2020.

8    It's the exact same thing.  The terms of the term notes are

9    clear and unambiguous as to what happens when there is a

10   prepayment, the parties could do something different, as Mr.

11   Klos testified in his deposition — in his declaration, there was

12   the one instance where they did something different, but they

13   didn't do anything different at any other time.  And all of

14   these payments, were on the 13-week forecast.  So that takes

15   care of prepayment, I believe.  The language is unambiguous and

16   the practice was also pretty darn clear.

17        I heard a lot of references to equity.  I don't get

18   it.  The parties' contract governs here.  This is — I understand

19   that the bankruptcy court is considered a court of equity here,

20   but there is no equity here.  The equity is making sure that

21   Highland recovers the assets that under Jim Dondero's watch were

22   reported to its creditors as being valid assets of the estate.

23   That's the equitable piece that the Court should take into

24   account if it's considered equity at all.

25        Let's go to the next.  The next argument was the

*Plaintiff's Motion for Partial Summary Judgment*                              207

1    shared services agreement.  You can take that down.

2          You know, God bless him.  He put up — he put up the

3    shared services agreement.  The shared services agreement, he

4    focused on assistance and advice, and said it even includes

5    accounts payable.  We don't dispute, we don't dispute that

6    Highland's accounting department effectuated payments.  The one

7    thing that Mr. Rukavina didn't do that they've never done, that

8    they will never be able to do is show you where in the agreement

9    Highland had not just the authority but the actual obligation to

10   make these payments.  It doesn't say it.  And I think that is

11   the end of the inquiry.  I believe that the Court can rule as a

12   matter of law that this —

13         (Voices on audio.)

14             THE COURT:  Who was that?

15             THE REPORTER:  That's someone calling in, Judge.

16             THE COURT:  You don't know who the caller —

17             MS. DEITSCH-PEREZ:  Somebody is unmuted and there's

18   noise in the background.

19             THE COURT:  Okay.

20             THE REPORTER:  It's a number, I've muted them.

21             THE COURT:  It's a — we've muted them.  It's a number,

22   we don't know who that was.

23         All right.  Go ahead, Mr. Morris.  I'm sorry.

24             MR. MORRIS:  So — so you can rule as a matter of law,

25   Your Honor, I believe very quickly and very easily that there is

*Plaintiff's Motion for Partial Summary Judgment*                    208

1    no obligation, right, that Highland wasn't authorized, let alone

2    obligated to make these payments on behalf of third parties.

3           To the extent the Court needs it, the — I will

4    stipulate that Highland assisted in effectuating payments that

5    were approved by Jim Dondero or Frank Waterhouse.  Again,

6    Exhibits 3D and 3F — 3D and 3E are a litany of December 2020

7    emails from Kristen Hendrix to Frank Waterhouse that says:

8    Please, sir, do you approve these payments before I make them.

9           So there's no question from the documentary evidence

10   that Kristen Hendrix always believed that she needed Frank's

11   approval to effectuate these payments.  And of course there's

12   the 13-week forecast, so nobody — right, you've heard so much

13   testimony about 13-week forecasts, there's no dispute that

14   13-week forecasts were prepared.  There's no dispute.  It's, you

15   know, in our papers, it's in Mr. Klos' declaration that these

16   forecasts fully disclosed the interest payments that were due at

17   year-end.  You know it is what it is.

18          You know what, can we put up Exhibit 3E, just to

19   emphasize the point for just a moment, because Mr. Rukavina, I

20   think, suggested, oh, you know, Mr. Waterhouse was wearing his

21   Highland hat when he got these emails.  I don't know — it's

22   argument, right, and the Court needs to distinguish argument

23   from facts.

24          Here is the fact.  Here is December 31st.  Jim Seery

25   is the one who approved payments on behalf of Highland.  Jim

Case 21-03006-sgj    Doc 211    Filed 05/03/22    Entered 05/03/22 13:14:27    Desc Main
Case 3:21-cv-00881-X    Document 79-10    Filed 12/09/22    Page 104 of 162    PageID 53113

*Plaintiff's Motion for Partial Summary Judgment*                                   209

1    Seery did not approve payments on behalf of the advisors or

2    HCMFA or HCRE.  That was Frank Waterhouse's responsibility.  Not

3    in his capacity as Highland's CEO, because if that was true you

4    wouldn't need Jim Seery, right?  Approved by Seery.  Mr. Seery

5    is approving everything.  So final nail in that coffin.

6              Cure, — you can take that down now — cure, I heard

7    argument, you know, cure that now somehow Mr. Waterhouse, who

8    can't do anything for the advisors is somehow going to be the

9    person to bind Highland to a cure.  Again, Your Honor, I would

10   just urge the Court to look at the four corners of the parties'

11   agreement as reflected in the term note.  There is no right to

12   cure, right.  There just isn't, period, full stop.

13             I think — I think the record is clear, Mr. Dondero

14   heard on the 14th that Highland was going to seek to collect

15   these notes, and he panicked.  And he called up and he screamed

16   at Frank Waterhouse, in the record, he said make the damn

17   payments, and he did.  Pardon my language.  And he did.  There's

18   no evidence of cure.  There's nothing in their answer that ever

19   suggested that.  It's not a defense.

20             You would have heard about that at confirmation,

21   because these payments are made in mid-January.  If he had cured

22   this, right, remember the undisputed facts are that:  We amended

23   our projections to say we're going to collect on the term notes

24   in 2021, because we had just commenced these lawsuits.  These

25   lawsuits were commenced on January 21st.  If Mr. Dondero

*Plaintiff's Motion for Partial Summary Judgment*                    210

1   actually believed at the time that Frank Waterhouse somehow

2   bound the debtor to this cure, what better time to raise that

3   than at confirmation.  His silence, what reasonable jury is

4   going to buy that.  What reasonable jury is going to believe

5   that he believed that he cured, and he just forgot to tell you,

6   Your Honor, at confirmation about that.  I don't think any

7   reasonable jury will do that.

8           Let's be clear, let's move on to HCMFA.  It's kind of

9   cute.  But, you know, the notion that Mr. Dondero authorized the

10  transfers as — with compensation is an issue that came up for

11  the very first time in opposition to the motion for summary

12  judgment.  If you review Mr. Dondero's transcript, if you review

13  Mr. Waterhouse's transcript, and if you look at our motion for

14  summary judgment which summarizes that — those facts, you will

15  see that the undisputed evidence until we got Mr. Dondero's

16  declaration in opposition to summary judgment, Mr. Dondero told,

17  and this is how I started the day, Mr. Dondero told Mr.

18  Waterhouse to make the transfer.  He didn't tell it should be a

19  loan, but he didn't tell them it should be compensation.

20          And, you know, don't take my word for it, Your Honor.

21  Go back and read HCMFA's motion, their second motion for leave

22  to amend, and look at Step 1 of Mr. Rukavina's parade of

23  horribles, how assumptions came to be snowballed, I think he

24  used the word.  Look at Step 1.  Mr. Rukavina, when he wrote

25  back, didn't say anything about Mr. Dondero giving an

*Plaintiff's Motion for Partial Summary Judgment*                211

1   instruction to make the transfer as compensation.  He simply

2   says:  Mr. Dondero didn't say to make it a loan, he said make it

3   a transfer.

4         And so, again, in opposition to summary judgment,

5   violating the cardinal rule, throwing out unsupported,

6   uncorroborated, conclusory statements.  Not permissible.  He

7   didn't have the authority, like by what?  By what?  Is there —

8   is there a document that clipped his wings?  Because that's not

9   what Mr. — that's not what Mr. Waterhouse told Mr. Sauter during

10  the interview.  He didn't say, 'I don't know.  I don't know

11  where that came from.  I never would have authorized that,'

12  right?  This is the changing story whack a mole that I've been

13  dealing with for 15 months now.

14        You should — you should take seriously what Mr.

15  Waterhouse told Mr. Sauter in the spring of 2021.  That is

16  probably the most credible piece of evidence that exists as to

17  Frank Waterhouse's views on all of this.  I encourage the Court

18  to read carefully my examination of Mr. Norris, who was the

19  30(b)(6) witness, I believe, and then — and then the examination

20  of Mr. Sauter at the motion, because the one thing that's

21  crystal clear is Frank Waterhouse knew exactly what these notes

22  were, he knew exactly when they were created, and he knew

23  exactly why they were created.  All of this stuff about the he

24  said/she said, the rest of it, he's the person whose name

25  appears on the notes.  He's the officer.  He's the fiduciary.

*Plaintiff's Motion for Partial Summary Judgment*                     212

1    And, you know what, he's still there.  So Frank Waterhouse, who

2    consistently engages in the parade of horribles, that his

3    employer alleges, right?  That — I mean you're the ones who keep

4    coming after Frank, right?  Frank signed this or his signatures

5    appear without authority.  They're the ones who keep coming

6    after Frank.  And yet he's still employed.  Another kind of

7    interesting issue.

8            The NAV error, Your Honor, I understand that they

9    think they're entitled to windfall, but I just want to read from

10   Exhibit 182, which is the contemporaneous memo that the advisor

11   sent to their client relating to the NAV error to make sure that

12   it's clear, and you can read this.  It's Exhibit 182.  All about

13   the NAV error.

14           "The advisor and Houlihan Lokey, an independent,

15   third-party expert valuation consultant, approved by the board"

16   — that would be the retail board — "initially determined that

17   the March transaction were, quote, nonorderly, close quote, and

18   should be given, quote, zero weight, and close quote, for

19   purposes of determining fair value."

20           That's who made the determination, the advisor and

21   Houlihan Lokey.  It doesn't say anything about Highland.

22           "As reflected in the consultation, the advisor" —

23   meaning HCMFA — "ultimately determined that both March

24   transactions should be classified as orderly."  So they're

25   changing it from nonorderly to orderly.  "The fair" — and then

*Plaintiff's Motion for Partial Summary Judgment*                    213

1   it continues, quote:  The fair valuation methodology adopted, as

2   addressed in the consultation, weights inputs and doesn't

3   reflect last-sales transaction pricing exclusively in

4   determining fair value.  The orderly determination, — in other

5   words, the determination made by the advisor and adoption of the

6   fair-weighted — the weighted fair valuation methodology resulted

7   in NAV errors in the fund.  And that's what's the fund, is the

8   NAV error.

9           So this is — this is contemporaneous, documentary,

10  undisputed evidence that the advisors told their client that it

11  made a mistake.  There is not — they talk about the letter to

12  the SEC.  They just say stuff.  This is whack a mole.  They

13  didn't present a single document to you, a single

14  contemporaneous document that says Highland made the mistake.

15  They tell the SEC, they tell their client, they tell their

16  insurance carrier that they made the mistake.

17          Undisputed facts.

18          I don't really have much more, Your Honor.  I would

19  just ask the Court to seriously consider the evidence, to

20  seriously consider the legal standard, and to do justice in

21  preparing its report and recommendations.  If Your Honor has no

22  questions, I've completed my presentation.

23          THE COURT:  All right.  Thank you.

24          Let me ask a couple of things.  First, we don't have

25  anything else under advisement in Highland right now.  I know we

*Plaintiff's Motion for Partial Summary Judgment*          214

1    have closing arguments next week in the —

2          MR. MORRIS:  I'm sorry.  The question is whether the

3    Court has any other matters that are under advisement right now?

4          THE COURT:  Yeah.  I don't think we do.  I mean we — I

5    mean we've done all our reports and recommendations that have

6    been on our —

7          MR. MORRIS:  Yeah.

8          THE COURT:  — list.  And I've got closing arguments

9    next week one day, I forget which date, maybe Wednesday,

10   Wednesday of next week in the —

11         MR. MORRIS:  It is Wednesday.

12         THE COURT:  — in the big —

13         MR. MORRIS:  Um-hum.

14         THE COURT:  — in the big adversary.

15         So — so let me think through this.  Are there any —

16   are there any looming deadlines, deadlines of any sort in these

17   note adversary proceedings?  You know, obviously you're not —

18   you don't have a trial date out in the future in Judge Starr's

19   court, because I'll certify when it's trial ready if it needs to

20   go to trial.  Anything, any deadlines?

21         MR. MORRIS:  Nothing that I'm aware of, Your Honor.  I

22   think that's exactly right, that we're here finishing summary

23   judgment, and I think the next thing to happen is for you to

24   enter the orders on the two motions that were argued earlier

25   today where Your Honor issued bench rulings and to get the

*Plaintiff's Motion for Partial Summary Judgment*                    215

1    report and recommendation on summary judgment to Judge Starr and

2    then we'll take it from there.

3              THE COURT:  Okay.  And —

4              MS. DEITSCH-PEREZ:  And, Your Honor, were you asking

5    just about the note cases?  I just —

6              THE COURT:  Well, —

7              MS. DEITSCH-PEREZ:  These note — the note cases that

8    are the subject of this motion or about all matters in

9    bankruptcy —

10             THE COURT:  I was — I was thinking of all matters.

11   I'm just trying to think about —

12             MS. DEITSCH-PEREZ:  There are —

13             THE COURT:  — how quickly I'm going to get you — get a

14   report and recommendation out.  And I just, number one, wanted

15   to know if I did have anything else in my queue ahead of this,

16   and the answer is I don't in all of the Highland matters.

17             But then the second thing I was getting at was

18   deadlines.  For example, okay, if — let's say hypothetically I

19   were to deny motion for summary judgment, then you've got a

20   whole — you've got at that point a very complex set of adversary

21   proceedings, right, because you've got avoidance actions and all

22   kinds of alternative theories, plaintiff, that you would be

23   arguing, correct?

24             MR. MORRIS:  I think —

25             MS. DEITSCH-PEREZ:  Those are all —

*Plaintiff's Motion for Partial Summary Judgment*                    216

1      MR. MORRIS:  — procedurally, Your Honor, right, you

2  don't — I think we all agree, you don't decide this motion.  You

3  give a report and recommendation to the judge, to Judge Starr.

4  And Judge Starr — I'll be honest with you, I don't know if we

5  have an opportunity to object or not, but let's assume we do.

6      THE COURT:  Well, —

7      MR. MORRIS:  At some point Judge Starr will decide

8  whether or not to grant the motion —

9      THE COURT:  No, —

10     MR. MORRIS:  — and if — and if he denies the motion,

11 then we'll proceed to a jury trial on all claims.

12     THE COURT:  That's what — I'm getting at the other

13 claims.  You know, it —

14     MS. DEITSCH-PEREZ:  The other — to other claims, Your

15 Honor, —

16     THE COURT:  Let's — just a minute, just a minute, just

17 a minute.

18     I'm just thinking through this.  If summary judgment

19 were to be denied on these Counts 1 and 2 by Judge Starr, and he

20 said, no, this needs to go to a jury, then there are a bunch of

21 other claims that basically —

22     MR. MORRIS:  Correct.

23     THE COURT:  — plaintiff — plaintiff fallback claims,

24 right?  Avoidance actions and whatnot, right?

25     MR. MORRIS:  And breach of —

*Plaintiff's Motion for Partial Summary Judgment*                    217

1          MS. DEITSCH-PEREZ:  That's what —

2          MR. MORRIS:  — fiduciary duty, that's correct, Your

3    Honor.

4          MS. DEITSCH-PEREZ:  Except, Your Honor, —

5          THE COURT:  Um-hum.

6          MS. DEITSCH-PEREZ:  — and if I could please clarify

7    the record because Mr. Morris is incorrect that those are just

8    sitting there, those — the motion to dismiss those claims and

9    the motion to compel arbitration of those claims is currently

10   sitting before Judge Starr, and he — and the parties agreed

11   that those would be stayed until Your Honor had made the report

12   and recommendation, and Judge Starr had ruled upon it.

13         THE COURT:  Okay.

14         MS. DEITSCH-PEREZ:  So that's other claims are not

15   simply sitting in the bankruptcy court, if you want to think of

16   them as placed somewhere.  They are currently up at the district

17   court.

18         THE COURT:  No, I didn't think they were at the

19   bankruptcy court.  I just couldn't remember —

20         MS. DEITSCH-PEREZ:  Okay.

21         THE COURT:  I guess what I'm getting at, you know,

22   have you all held up on doing discovery on those other claims,

23   waiting to get a ruling on Counts 1 or 2, or anything like that?

24         MR. MORRIS:  I'll be honest with you, I don't remember

25   off the top of my head, Your Honor.

*Plaintiff's Motion for Partial Summary Judgment*                    218

1        THE COURT:  Okay.  All right.

2        MR. MORRIS:  I don't think so.  I don't think so.

3        THE COURT:  All right.

4        MR. MORRIS:  I don't think — I don't think for these

5   purposes — well, I'll just leave it at that.  I don't know the

6   answer off the top of my head, and I don't want to commit myself

7   to something if I'm not certain.

8        THE COURT:  Okay.  All right.  Well, don't read

9   anything into my questions.  I'm just — I'm wanting to get a

10  report and recommendation to Judge Starr as soon as possible and

11  I was just kind of wanting to know what all hangs —

12       MR. MORRIS:  Sure.

13       THE COURT:  — in the balance if, you know, I were to

14  take a few weeks to get this out.  It sets in motion maybe a

15  chain of events.  Here's what I'm going to do, in a normal case

16  I would say these things with the hopes that maybe it might

17  encourage settlement.  Forgive me for saying in a normal case.

18  This is not normal.  There's been nothing about Highland that's

19  been normal.  But I'm going to do — I'm going to say right now

20  what I would say in any other case.

21       I am likely to grant summary judgment here against all

22  the note defendants expect I'm not sure about HCMFA.  I need to

23  drill down a little bit more on what the summary judgment

24  evidence is, but you know here's what I've got in front of me.

25  I've got, with the exception of HCMFA, I've got all the other

*Plaintiff's Motion for Partial Summary Judgment*                    219

1   defendants admitting to the debtor's prima facie case, okay.

2   But what I have is essentially a defense of an oral agreement.

3   Yes, I know that under Texas law oral agreements are sometimes

4   enforceable, but I think context matters.  And in the context of

5   promissory notes where all of the essential elements have been

6   admitted to, there's a note on movant, sign the note.  Movant's

7   the legal owner or holder of it, and a balance is due.  When

8   you've got all of that, you know you better have something very,

9   very significant to create a fact issue for a jury.  And here,

10  again, I've got an oral agreement that has morphed from Highland

11  agreed it wouldn't collect on the notes to Highland agreed it

12  wouldn't collect on the notes if certain condition subsequent

13  happened.  It's morphed from it was an agreement that Dondero

14  made with himself to many months later it was presented as an

15  agreement between Mr. Dondero and his sister, who happened to

16  not be an officer or director or representative of any sort of

17  Highland or these note makers.  And all of this against many

18  months of Rule 26 disclosures that never mentioned Ms. Dondero

19  as a potential fact witness.  So we have four out of the five

20  defendants eventually adopting this argument.

21       So again I, as I probably hinted at during oral

22  arguments, I see there being a nuance here between saying it's a

23  credibility issue for a jury.  Credibility of the witness, a

24  jury is entitled to look at credibility questions.  There's a

25  nuance between that and a situation of defenses are put out that

*Plaintiff's Motion for Partial Summary Judgment*                    220

1    create fact issues, but the fact issues just don't seem genuine.

2    And, you know, as we've said, no reasonable — genuine means no —

3    if it's not genuine, that means no reasonable jury could adopt

4    the argument.  So I'm very disturbed at both the fact that we've

5    had a morphing defense.  And I know, I know it happens in

6    litigation as discovery is undertaken, but that's not what we've

7    had here.

8            And I'm very disturbed that we have had disclosure

9    after disclosure after disclosure after disclosure where these

10   notes were disclosed and nothing was said about, well, there's a

11   significant contingency so that they might not be collectable.

12   We went through those all today:  The audited financial

13   statements; the schedules in the bankruptcy; the MORs in the

14   bankruptcy; a disclosure statement; a plan that very

15   significantly had as a feature attempts to collect on these

16   notes; objections by some of the note defendants to the

17   feasibility of the plan without mentioning, oh, but the notes

18   aren't going to be collectable.

19           I have to find — Mr. Morris, you mentioned somewhere

20   in the record that there was a disclosure that the Hunter

21   Mountain note was uncollectible.  I've never followed exactly

22   where that was.  But I just don't understand, frankly, what's

23   going on here.  I mean these seem like very dangerous defenses

24   that have been forged here.

25           I guess no one's worried about materially misleading

*Plaintiff's Motion for Partial Summary Judgment*                221

1    audited financial statements.  I don't know who saw these

2    financial statements.  You know maybe they think that there's no

3    one who could complain about materially misleading financial

4    statements.  Maybe they aren't worried about documents signed

5    under penalty of perjury in the bankruptcy case, having been

6    erroneous or materially misleading.  But, anyway, I'm kind of

7    doing a soliloquy up here, I guess, but again, you know, in a

8    normal case I would be telling people this is how I'm inclined

9    to rule and people would either settle or not, motivated by what

10   might be coming down the pike.

11          I promise you I will give a very thorough report and

12   recommendation to Judge Starr so that he will understand the

13   basis for my ruling and he will either accept it or reject it.

14          And, again, I've told you with HCMFA, you know, we

15   sort have a unique situation out there with this compensation

16   argument, we may have some genuine issues of disputed facts on

17   that one, but I'm not sure.  I'm just letting you know that's

18   the one that I find most perplexing.

19          All right.  Is there anything further before we call

20   it quits today?

21       (The recording ends at 5:00 o'clock p.m.)

22                              —o0o—

23

24

25

State of California            )
                               )     SS.
County of Stanislaus           )

 

 

       I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

       I further certify that I am not a party to nor in any way interested in the outcome of this matter.

       I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services
P.O. Box 4082
Modesto, California   95352
(209) 915-3065

Dated April 29, 2022



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 19, 2022**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re: | Case No. 19-34054-sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | |
| Reorganized Debtor. | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |
| v. | Adversary No. 21-03004-sgj |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | Civ. Act. No. 3:21-cv-00881 |
| Defendant. | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |
| v. | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-00880 |
| Defendants. | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |

| | |
|---|---|
| v. | Adversary No. 21-03003-sgj |
| JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-01010 |
| Defendants. | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |
| v. | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-01378 |
| Defendants. | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | |
| Plaintiff. | |
| v. | Adversary No.: 21-03007-sgj |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | Civ. Act. No. 3:21-cv-01379 |
| Defendants. | **(Consolidated Under Civ. Act. No. 3:21-cv-00881)** |

## **REPORT AND RECOMMENDATION TO DISTRICT COURT: COURT SHOULD GRANT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST ALL FIVE NOTE MAKER DEFENDANTS[1] (WITH RESPECT TO ALL SIXTEEN PROMISSORY NOTES) IN THE ABOVE-REFERENCED CONSOLIDATED NOTE ACTIONS**

I.    **Introduction**

The five above-referenced civil actions, emanating from the Chapter 11 bankruptcy case

of Highland Capital Management, L.P. ("Highland," "Plaintiff," or, sometimes, the "Debtor"[2])

---

[1] The "Note Maker Defendants"—sometimes collectively referred to simply as the "Defendants"—are: James D. Dondero (Civ. Action No. 3:21-cv-01010); Highland Capital Management Fund Advisors, L.P. (Civ. Action No. 3:21-cv-00881); NexPoint Advisors, L.P. (Civ. Action No. 3:21-cv-00880); Highland Capital Management Services, Inc (Civ. Action No. 3:21-cv-01378); and HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC (Civ. Action No. 3:21-cv-01379).

[2] Highland is actually now a "Reorganized Debtor," having obtained confirmation of a Chapter 11 plan, which went "effective" in August 2021.

started out as what seemed like very simple lawsuits by a Chapter 11 debtor to collect on large promissory notes owed to it (collectively, the "Note Actions"). The Note Actions were initially filed in the bankruptcy court as adversary proceedings.

The Defendants soon filed motions to withdraw the reference in these Note Actions, arguing that the causes of action asserted against them are statutory non-core claims and the bankruptcy court also does not have constitutional authority to enter final judgments. The bankruptcy court agreed that the litigation presents non-core, related-to matters—since there are no proofs of claims of the Note Maker Defendants still pending, the resolution of which might be intertwined with the underlying promissory notes.[3] Additionally, the Note Maker Defendants did not consent to final judgments being issued by the bankruptcy court, and they also demanded jury trials.[4] The District Court accepted a report and recommendation of the bankruptcy court that the reference should be withdrawn when these Note Actions are trial-ready, with the bankruptcy court acting essentially as a magistrate judge for the District Court prior to trial, presiding over all pretrial matters. The Plaintiff's motion for partial summary judgment, now pending, is the type of pretrial matter contemplated to be handled by the bankruptcy court (with submission to the District Court of a Report and Recommendation required—to the extent final disposition of any claim is proposed).

By way of further background, the five Note Actions were originally brought on January 22, 2021, by Plaintiff (before confirmation of its Chapter 11 plan), again, as simple suits on promissory notes—that is, alleging breach of contract (nonpayment of notes) and seeking turnover of amounts allegedly due and owing from the various Defendants. Each of the Note Maker

---

[3] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

[4] 28 U.S.C. § 157(c) & (e).

Defendants are closely related to Highland's founder and former president, James Dondero ("Mr. Dondero), and collectively borrowed tens of millions of dollars from Highland prepetition.  The indebtedness was memorialized in a series of demand and term notes (i.e., sixteen notes altogether: thirteen demand notes and three term notes). The indebtedness represented by these notes remains unpaid.

The five Note Actions were subsequently consolidated into one action before District Judge Brantley Starr, in the interest of judicial economy, under Civ. Action No. 3:21-cv-881, since there are overlapping facts and defenses.[5]  As alluded to above, the consolidated litigation involves sixteen different promissory notes on which Highland is the payee.  More than $60 million of unpaid principal and interest was alleged to be due and owing on the notes as of the time that the five Note Actions were filed. The Note Maker Defendants and their notes are as follows: (i) Mr. Dondero is maker on three demand notes; (ii) Highland Capital Management Fund Advisors, L.P. ("HCMFA") is maker on two demand notes; (iii) NexPoint Advisors, L.P. ("NexPoint") is maker on one term note; (iv) Highland Capital Management Services, Inc ("HCMS") is maker on five notes (four demand notes and one term note); and (v) HCRE Partners, LLC, n/k/a NexPoint Real Estate Partners, LLC ("HCRE") is maker on five notes (four demand notes and one term note). Highland filed the five Note Actions—one against each of the Note Maker Defendants—to pursue payment on the notes to help fund distributions to creditors under its Chapter 11 plan. Mr. Dondero,

---

[5] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here would have been Civ. Action No. 3:21-cv-880, previously assigned to Judge Sam Cummings. However, Judge Starr determined that judicial efficiency would be best served by consolidating under Civ. Action No. 3:21-cv-881, because Civ. Action Nos. 3:21-cv-880 and 3:21-cv-881 were actually filed in district court on the same day and due to certain other factors explained in Judge Starr's Order Granting Defendant's Motion to Consolidate the Note Cases, dated January 6, 2022.

while a maker on three of the sixteen notes, was the signatory on a total of twelve of the sixteen notes.

The Note Actions morphed, so to speak, when **four** of the five Note Maker Defendants defended the Note Actions by alleging that an ***oral agreement*** existed between Highland and each of them—the substance of which was allegedly that Highland would not pursue collection on their underlying notes if certain conditions subsequent occurred.[6]

The "Oral Agreement" Defense Asserted by Four of the Five Note Defendants. To be clear, the "oral agreement" defense was asserted by each of the Note Maker Defendants **except** HCMFA. The four Defendants who assert the oral agreement defense are sometimes collectively referred to by the Plaintiff as the ***"Alleged Agreement Defendants"*** and they are:  Mr. Dondero; NexPoint; HCMS; and HCRE.  To be further clear, these Alleged Agreement Defendants represent that:

> Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at [Highland] and in the industry.  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant James Dondero believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this [Action].

Paragraph 82 in Amended Answer of Mr. Dondero [DE # 83 & DE # 16 ¶ 40 in Adv. Proc. No. 21-3003].  *See also* Paragraph 42 in Amended Answer of NexPoint [DE # 50 & DE # 64 ¶ 83 in

---

[6] These Note Maker Defendants also pleaded the affirmative defenses of justification and/or repudiation; estoppel; waiver; and ambiguity.

Adv. Proc. No. 21-3005]; Paragraph 56 in Amended Answer of HCMS [DE #34 & DE # 73 ¶ 97

in Adv. Proc. No. 21-3006]; Paragraph 58 in Amended Answer of HCRE [DE # 34 & DE # 68 ¶

99 in Adv. Proc. No. 21-3007].

Somewhat shockingly for a multi-billion-dollar enterprise with sophisticated officers and

directors—which was audited by one of the largest and most iconic public accounting firms in the

world (PwC)—the alleged "oral agreement" was supposedly made (unbeknownst to any of those

officer, directors, and PwC) between: (a) Mr. Dondero, acting on behalf of each of the Alleged

Agreement Defendants; and (b) **his sister, Nancy Dondero**, of Vero Beach, Florida ("Sister

Dondero"), acting on behalf of Highland.  Notably, Sister Dondero was never an officer, manager,

or held any role with Highland, but the position of the Alleged Agreement Defendants is that she

nevertheless had authority to act for Highland, in connection with agreeing not to collect on the

Notes, because she was/is the trustee of the Dugaboy Investment Trust ("Dugaboy"), which is a

family trust of Mr. Dondero, of which Mr. Dondero is sole beneficiary during his lifetime (with

his children as the future beneficiaries).[7] Here is the catch:  Dugaboy happens to own a majority

of the **limited partnership interests of Highland**—which, according to the Alleged Agreement

Defendants, means Dugaboy can exert control over Highland and do things like release millions

of dollars' worth of debt owed to Highland.[8]

When this "oral agreement" defense was articulated, the bankruptcy court granted

Highland's request for leave to amend its original complaints in each of the four applicable Note

---

[7] Mr. Dondero was himself the trustee of Dugaboy until his resignation as such on August 26, 2015. James Dondero Dec., DE # 155, ¶ 21 in Adv. Proc. No. 21-3003.

[8] *See id.* ¶ 20 (more specifically, the Defendants make a bizarre argument that a majority of equity holders in Highland could approve "compensation" set for Highland's general partner, Strand Advisors, Inc. ("Strand") and Strand's affiliates; the further argument is that Mr. Dondero is an affiliate of Strand, and, thus, Sister Dondero could release obligations on the Notes as a form of "compensation" to Mr. Dondero).

Actions to allege alternative theories of liability and add Mr. Dondero,[9] Dugaboy, and Sister Dondero as additional defendants on new counts—the theories being that, if such an "oral agreement" was made, it may have given rise to other causes of action on the part of the actors involved.  Highland amended its complaints in each of the four applicable Note Actions, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

The "Mutual Mistake" Defense of one sole Defendant:  HCMFA. Another way in which the simple Note Actions morphed was with regard to the "mutual mistake" defense that was alleged only with regard to the **two notes on which Defendant HCMFA was the maker**.

The "mutual mistake" defense was articulated as follows.  First, the signature on the two notes on which HCMFA was the maker—that of Frank Waterhouse, who was the Treasurer of HCMFA and also the former Chief Financial Officer ("CFO") of Highland until February 2021 (when he went to work for entities now controlled by Mr. Dondero)—was allegedly not authorized. More pointedly, it was alleged that the creation of the notes was entirely a **mistake** because (a) even though funds were frequently transferred between Highland and affiliates such as HCMFA, and (b) even though the Debtor's in-house accountants usually papered these transfers as loans, and (c) even though $7.4 million was undisputedly transferred from Highland to HCMFA at the time of the preparation and execution of the HCMFA Notes, the transfers of $7.4 million of funds to HCMFA was allegedly not supposed to be treated as a loan or loans in this instance.  The fund

---

[9] Mr. Dondero was, of course, already a Defendant in Adv. Proc. No. 21-3003, as he was a maker on three notes.

transfer was allegedly supposed to be treated as ***compensation*** to HCMFA from Highland, for certain harm Highland allegedly caused to HCMFA and its stakeholders through an error or negligence committed by Highland or its professionals.  The HCMFA notes were allegedly not what ***Mr. Dondero***—the person in charge of both Highland and HCMFA[10]—intended, and no one consulted with him before creating the HCMFA Notes.  *See* Paragraph 29, DE # 127, in Adv. Proc. No. 21-3004.

Manufacturing Chaos.  In the Plaintiff's motion for partial summary judgment now pending before the court—again, filed as to all five Note Maker Defendants and as to all sixteen notes— the Plaintiff contends that these are simple suits on promissory notes, and the Note Maker Defendants are essentially trying to manufacture chaos by attempting to create fact issues with bizarre (if not preposterous) defenses. The Plaintiff asserts that it is entitled to judgment as a matter of law on Counts I (breach of contract for nonpayment) and II (turnover of funds, pursuant to Bankruptcy Code Section 542(b)) in each of the five Note Actions.

The bankruptcy court agrees. The summary judgment evidence shows that the sixteen Notes: (i) are valid, (ii) were executed by the Note Maker Defendants and in favor of Highland; and (iii) there is a balance due and owing under each of the sixteen Notes.  The Note Maker Defendants failed to rebut Plaintiff's prima facie case because the Note Maker Defendants failed to create a ***genuine*** issue of material fact regarding their breaches. There was an absence of evidence to support each of Note Maker Defendants' affirmative defenses.  Interestingly, among other things, Mr. Dondero has referred to all of the Notes at issue here as "soft notes" that were "made between friendly affiliates," implying that this somehow makes them less collectible.[11]  For

---

[10] *See* James Dondero Dec. DE # 155, ¶¶ 3-4, in Adv. Proc. No. 21-3003.

[11] *Id*. ¶¶ 5-18.

the avoidance of doubt, a "soft note" is not a thing—not under the Bankruptcy Code, not in the

world of commercial finance, and not as described in any evidence submitted to the court.[12]  The

bankruptcy court hereby recommends that the District Court grant summary judgment in favor of

the Plaintiff/Reorganized Debtor on Counts I and II in all five consolidated Note Actions, for the

reasons set forth below.

## II.      Undisputed Facts Regarding Each of the Thirteen Demand Notes

Of the sixteen notes at issue in the Notes Actions (sometimes collectively referred to as the

"Notes"): (a) thirteen were demand notes; and (b) three were term notes.  These notes were

executed between 2013 and 2019 and are described below.  These are the undisputed facts

pertaining to the thirteen demand notes.

### A.  *The Three Demand Notes on Which Mr. Dondero is Maker*

On February 2, 2018, Mr. Dondero executed a promissory note in favor of Highland, as

payee, in the original principal amount of $3,825,000 ("Dondero's First Note").  Klos Dec. ¶ 18,

Ex. D;[13] Pl. Ex. 125 at p. 9, Appx. 2357; Pl. Ex. 188, Appx. 3001-3002; Pl. Ex. 189, Appx. 3003-

---

[12] For the sake of clarity, this court can take judicial notice that there are plenty of complex chapter 11 cases where there are intercompany loans among debtor-affiliates, and the intercompany loans are cancelled as part of a plan. However, this happens in ***very different circumstances from the Highland case***—i.e., when all affiliates file bankruptcy, and either a secured lender has liens on all the assets of all the affiliates and/or there is no benefit to the general creditor body of collecting on the intercompany loans.

[13] This refers to the Declaration of David Klos—the current Chief Financial Officer ("CFO") of the Reorganized Debtor—and the Exhibits attached thereto, filed concurrently with Highland's Motion for Partial Summary Judgment, found at DE # 133 in Adv. Proc No. 21-3003.  For convenience, the court will occasionally refer to the "Klos Declaration" at this same DE # 133 in Adv. Proc. No. 21-3003 even when referring herein to the ***other*** Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Declaration was filed in each of the Note Actions.

3004; Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Pl. Ex. 32 ¶ 20, Appx. 664; Pl. Ex. 31 ¶ 20, Appx. 647.[14]

On August 1, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note"). Klos Dec. ¶ 19, Ex. E; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 190, Appx. 3005-3006; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Pl. Ex. 32 ¶ 21, Appx. 664; Pl. Ex. 31 ¶ 21, Appx. 647.

On August 13, 2018, Mr. Dondero executed a promissory note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Dondero Notes").  Klos Dec. ¶ 20, Ex. F; Pl. Ex. 126 at p. 2, Appx. 2366; Pl. Ex. 77, Appx. 1357-1359; Pl. Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Pl. Ex. 32 ¶ 22, Appx. 664; Pl. Ex. 31 ¶ 22, Appx. 647.

B. *The Two Demand Notes on Which HCMFA is Maker*

On May 2, 2019, HCMFA executed[15] a promissory note in favor of Highland, as payee, in the original principal amount of $2,400,000 ("HCMFA's First Note"). Klos Dec. ¶ 21, Ex. G; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 54, Appx. 870-873; Pl. Ex. 55, Appx. 874-875; Pl. Ex. 1 at Ex. 1, Appx. 9-11; Pl. Ex. 53, Appx. 866-869.

---

[14] Concurrently with filing its Motions for Partial Summary Judgment, Highland filed an Appendix of Exhibits in Support (the "Appendix") at DE #135 in Adv. Proc No. 21-3003. Citations to the Appendix are notated as follows: Pl. Ex. #, Appx. # . For convenience, the court will occasionally refer to this Appendix at this same DE # 135 in Adv. Proc No. 21-3003 even when referring herein to the *other* Note Actions (i.e., the Note Actions involving the other Note Maker Defendants) since the very same Appendix was filed in each of the Note Actions.

[15] HCMFA disputes that the signature of HCMFA's Treasurer, Frank Waterhouse, on this document was genuine or authorized.  This allegation will be addressed later herein.

On May 3, 2019, HCMFA executed[16] a promissory note in favor of Highland, as payee, in the original principal amount of $5,000,000 ("HCMFA's Second Note," and together with HCMFA's First Note, the "HCMFA Notes"). Klos Dec. ¶ 22, Ex. H; Pl. Ex. 147 at p. 7, Appx. 2526; Pl. Ex. 56, Appx. 876-877; Pl. Ex. 1 at Ex. 2, Appx. 12-15; Pl. Ex. 57, Appx. 878-880.

*C. Four Demand Notes on Which Highland Capital Management Services, Inc. ("HCMS") is Maker*

On March 28, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $150,000 ("HCMS's First Demand Note"). Klos Dec. ¶ 23, Ex. I; Pl. Ex. 143, Appx. 2487-2490; Pl. Ex. 3 at Ex. 1, Appx. 117-119.

On June 25, 2018, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $200,000 ("HCMS's Second Demand Note"). Klos Dec. ¶ 24, Ex. J; Pl. Ex. 144, Appx. 2491-2494; Pl. Ex. 3 at Ex. 2, Appx. 120-122.

On May 29, 2019, HCMS executed a demand note in favor of Highland, as payee, in the original principal amount of $400,000 ("HCMS's Third Demand Note"). Klos Dec. ¶ 25, Ex. K; Pl. Ex. 145 at p. 11, Appx. 2506; Pl. Ex. 3 at Ex. 3, Appx. 123-125.

On June 26, 2019, HCMS executed a demand note in favor of the Debtor, as payee, in the original principal amount of $150,000 ("HCMS's Fourth Demand Note," and collectively, with HCMS's First Demand Note, HCMS's Second Demand Note, and HCMS's Third Demand Note, the "HCMS Demand Notes"). Klos Dec. ¶ 26, Ex. L; Pl. Ex. 146 at p. 7, Appx. 2516; Pl. Ex. 3 at Ex. 4, Appx. 126-128.

---

[16] HCMFA disputes that the signature of HCMFA's Treasurer on this document was genuine or authorized. This allegation will be addressed later herein.

*D. Four Demand Notes on Which HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) ("HCRE") is Maker*

On November 27, 2013, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $100,000 ("HCRE's First Demand Note"). Klos Dec. ¶ 27, Ex. M; Pl. Ex. 148, Appx. 2533-2536; Pl. Ex. 4 at Ex. 1, Appx. 201-203.

On October 12, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $2,500,000 ("HCRE's Second Demand Note"). Klos Dec. ¶ 28, Ex. N; Pl. Ex. 154 at p. 7, Appx. 2575; Pl. Ex. 4 at Ex. 2, Appx. 204-206.

On October 15, 2018, 2017, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $750,000 ("HCRE's Third Demand Note"). Klos Dec. ¶ 29, Ex. O; Pl. Ex. 155 at p. 5, Appx. 2585; Pl. Ex. 4 at Ex. 3, Appx. 207-209.

On September 25, 2019, HCRE executed a demand note in favor of Highland, as payee, in the original principal amount of $900,000 ("HCRE's Fourth Demand Note," and collectively, with HCRE's First Demand Note, HCRE's Second Demand Note, and HCRE's Third Demand Note, the "HCRE Demand Notes"). Klos Dec. ¶ 30, Ex. P; Pl. Ex. 156 at p. 6, Appx. 2596; Pl. Ex. 4 at Ex. 4, Appx. 210-212.

*E. The Identical Provisions in Each of the Demand Notes.*

Except for the date, the amount, the maker, and the interest rate, each of the thirteen Demand Notes listed above is identical and includes the following provisions:

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be due and payable on demand of the Payee.

5.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of

this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

*See* Pl. Ex. 74, Appx. 1338-1340; Pl. Ex. 76, Appx. 1354-1356; Pl. Ex. 77, Appx. 1357-1359; Pl.

Ex. 1 at Exs.1-2, Appx. 9-15; Pl. Ex. 3 at Exs. 1-4, Appx. 117-128; and Pl. Ex. 4 at Exs. 1-4, Appx.

201-212.

    F.   *Demands by Plaintiff and Non-Payment*.

The undisputed evidence is that on December 3, 2020, during its bankruptcy case—with

its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of

dollars' of debt owed to creditors—Highland made separate demands on Mr. Dondero, HCMFA,

HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the

Demand Notes by December 11, 2020.  The demand letters also included a demand for all costs

of collection, including attorneys' fees, as provided in the above-referenced Demand Notes.  Pl.

Ex. 79, Appx. 1370-1373; Pl. Ex. 1 at Ex. 3, Appx. 16-19; Pl. Ex. 3 at Ex. 5, Appx. 129-132; and

Pl. Ex. 4 at Ex. 5, Appx. 213-216 (collectively, the "Demand Letters").

Furthermore, it is undisputed that none of these Note Maker Defendants made any

payments on the Demand Notes or otherwise replied to the Demand letters before Plaintiff

commenced these Note Actions.  Therefore, the Note Maker Defendants have breached Section 2 of the Demand Notes by their terms and are in default.

With regard to the three Dondero Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $9,263,365.05. Klos Dec. ¶ 37.

With regard to the two HCMFA Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under their terms was $7,874,436.09. Klos Dec. ¶ 40.

With regard to the four HCMS Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. Klos Dec. ¶ 45.

With regard to the four HCRE Demand Notes, as of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶ 50.

### III. Undisputed Facts Regarding Each of the Three Term Notes

Of the sixteen notes at issue in the Notes Actions, three were term notes (the "Term Notes"). These are the undisputed facts pertaining to the three Term Notes.

*A.  The Three Term Notes*

The Term Notes were each executed by Mr. Dondero on May 31, 2017. They were each for 30-year terms.  One was for NexPoint, one was for HCMS, and one was for HCRE. Klos Dec.

14

¶¶ 27-29. Each of these three Term Notes rolled up obligations of the makers under prior notes.[17]

Each Term Note is more fully described as follows:

A Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "NexPoint Term Note"). Klos Dec. ¶ 31, Ex. A; Pl. Ex. 2 at Ex. 1, Appx. 41-44; Pl. Ex. 2 ¶ 21, Appx. 28; Pl. Ex. 15 ¶ 21, Appx. 428.

A Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "HCMS Term Note" and together with the HCMS Demand Notes, the "HCMS Notes"). Klos Dec. ¶ 32, Ex. R; Pl. Ex. 3 at Ex. 6, Appx. 133-136.

A Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "HCRE Term Note" and together with the HCRE Demand Notes, the "HCRE Notes"). Klos Dec. ¶ 33, Ex. S; Pl. Ex. 4 at Ex. 6, Appx. 217-220.

According to Frank Waterhouse,[18] the former Highland CFO (who was also an officer of each of these three Note Maker Defendants), Highland loaned the money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Pl. Ex. 105 at 126:21-129:3, Appx. 2081. Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds. Pl. Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

> B.    *The Identical Provisions in Each of the Term Notes.*

---

[17] Proof of the loans underlying the prior notes (as defined in each of the Term Notes) is found at Pl. Exs. 127-141, Appx. 2368-2481 (HCMS); Pl. Exs. 149-153, Appx. 2537-2567 (HCRE); Pl. Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 prior note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (see Pl. Ex. 161))).

[18] Frank Waterhouse was CFO of Highland until he left Highland in February 2021. He now works for entities controlled by Mr. Dondero.

Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Notes), each of the Term Notes is identical and includes the following provisions:

> 2.1     Annual Payment Dates.  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "Annual Installment") until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

> 4.     Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

> 5.     Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

> 6.     Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

>      C.  *Non-Payment/Defaults Under the Term Notes*.

NexPoint, HCMS, and HCRE each failed to timely make their Annual Installment payments that were due on December 31, 2020. Belatedly, NexPoint made a payment of $1,406,111.92, on January 14, 2021, which reduced the total principal and interest then-outstanding. Also, belatedly, HCMS made a payment of $181,226.83, on January 21, 2021, which reduced the total principal and interest then-outstanding. Finally, belatedly HCRE made a payment

of $665,811.09, on January 21, 2021, which reduced the total principal and interest then-outstanding. However, as set forth in Section 4 above, the Term Notes allowed Highland to declare a default without notice when the annual installments were not timely paid on December 31, 2020.

As of December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.12.  Klos Dec. ¶ 51.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.13. Klos Dec. ¶ 52.

As of December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Loan was $5,899,962.22.14. Klos Dec. ¶ 53.

## IV.    Undisputed Corroborating Evidence Regarding the Sixteen Notes

### A.  The Notes Were All Disclosed on Highland's Financial Statements Audited by the Outside Accounting Firm PwC

The undisputed evidence establishes that (a) all of the Notes were provided to the accounting firm PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[19] and (c) neither Highland nor Mr. Dondero disclosed any potential defenses to PwC, despite having an affirmative obligation to do so under generally accepted accounting principles ("GAAP").

---

[19] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018.  Pl. Ex. 34 at p. 39, Appx. 782.  Because the HCMFA Notes were executed after the end of the fiscal year, they were not included as "assets" for 2018, and Highland never completed its 2019 audit.  Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its own 2018 audited financial statements, and (b) carried the HCMFA Notes as liabilities on its own balance sheet.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

As part of the PwC audit process[20] (as is typical), Highland was the one who actually drafted the financial statements and accompanying notes, and management provided the information that PwC needed to conduct its audits.  Pl. Ex. 94 at 14:8-15:14, Appx. 1556; *see also id.* at 49:11-50:22, Appx. 1564-1565.  All of Highland's employees who worked on the audit reported to Mr. Waterhouse (Highland's CFO), and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Pl. Ex. 105 at 87:25-89:10, Appx. 2071. As further part of the audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon.  Pl. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Pl. Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness."). For fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Pl. Ex. 33, Appx. 729-740, Pl. Ex. 86, Appx. 1420-1431, Pl. Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Pl. Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

Mr. Dondero and Mr. Waterhouse made the following representations to PwC, on June 3, 2019, in connection with PwC's audit of Highland financial statements for the period ending December 31, 2018:

> The Affiliated Party Notes[21] represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019. Pl. Ex. 33 ¶ 11, Appx. 732; Pl. Ex. 94 at 24:6-25:5, Appx. 1558.

---

[20] Pl. Ex. 94 at 9:24-12:14, Appx. 1554-1555.

[21] "Affiliated Party Notes" is the term used by PwC to refer to any and all notes payable to Highland and made by officers, employees, or affiliates of Highland.  *See generally* Pl. Ex. 33, Appx. 729-740; Pl. Ex. 94, Appx. 1551-1585.

If there were any errors in Highland's financial statements, they were not "material." Pl. Ex. 33 ¶ 32, Appx. 735; Pl. Ex. 94 at 25:6-26:13, Appx. 1558-1559.

There were no "material" transactions or agreements that were not recorded in the financial statements. Pl. Ex. 33 ¶ 34, Appx. 735; Pl. Ex. 94 at 26:14-27:11, Appx. 1559.

All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements. Pl. Ex. 33 ¶ 35(d), Appx. 735; Pl. Ex. 94 at 27:12-28:11, Appx. 1559.

All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed. Pl. Ex. 33 ¶ 36, Appx. 736; Pl. Ex. 94 at 28:12-29:5, Appx. 1559.

All subsequent events were disclosed. Pl. Ex. 33 (signature page), Appx. 738; Pl. Ex. 94 at 29:6-30:2, Appx. 1559-1560.

Under GAAP, Highland was required to disclose to PwC: (a) all "material" related party transactions; and (b) any circumstances that would call into question the collectability of any of the Notes. Pl. Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570. For purposes of the 2017 audit, the "materiality" threshold was $2 million. Pl. Ex. 86 at p. 1, Appx. 1421. For purposes of the 2018 audit, the "materiality" threshold was $1.7 million. Pl. Ex. 33 at p. 1, Appx. 730; Pl. Ex. 94 at p. 22:11-23:3, Appx. 1558. *See also* Pl. Ex. 105 at 91:14-93:6, Appx. 2072.

There is no evidence that Mr. Dondero nor anyone at Highland disclosed to PwC the existence of any defenses to the Notes (such as an "oral agreement or "mutual mistake"). Pl. Ex. 24 (Responses to RFAs 1-2), Appx. 521; Pl. Ex. 94 at 67:16-70:19, Appx. 1569-1570, 71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Pl. Ex. 105 at 102:2-5, Appx. 2075.

The Notes were carried on Highland's balance sheets as "Notes and other amounts due from affiliates." Pl. Ex. 34 at p. 2, Appx. 745; Pl. Ex. 72 at p. 2, Appx. 1291; Pl. Ex. 94 at 23:10-22, Appx. 1558, 31:11-33:20, Appx. 1560; Pl. Ex. 105 at 106:20-109:12, Appx. 2076.

19

The notes to the financial statements described the "Affiliate Notes" that were carried on Highland's balance sheet; management calculated the amounts due and owing to Highland from each Affiliate.  Pl. Ex. 72 at p. 30-31; Pl. Ex. 34 at p. 28-29; Pl. Ex. 94 at 34:17-36:25; 51:17-53:12, Appx. 1565; Pl. Ex. 105 at 110:22-112:21, Appx. 2077. The "fair value" of the Affiliate Notes was "equal to the principal and interest due under the notes."  Pl. Ex. 72 at p. 30-31, Appx. 1319-1320; Pl. Ex. 34 at p. 28-29, Appx. 771-772; Pl. Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565. No discounts were given to the Notes, and PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Pl. Ex. 92, Appx. 1514-1530; Pl. Ex. 93, Appx. 1531-1550; Pl. Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

Finally, with regard to the two HCMFA Notes in particular (i.e., the ones allegedly subject to a "mutual mistake" defense—as further described below), a note to Highland's audited financial statements for year 2018 disclosed, as a "subsequent event" (i.e., an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit), the following: "Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million. The notes accrue interest at a rate of 2.39%." Pl. Ex. 34 at p. 39, Appx. 782.  *See also* Pl. Ex. 94 at 54:9-55:7, Appx. 1566.

> B.  *More Corroborating Evidence:  During the Highland Bankruptcy Case (In Fact, Shortly Before the Note Actions Were Filed) HCMFA and NexPoint Informed Their Retail Board of their Obligations Under their Respective Notes*

HCMFA and NexPoint are engaged in the business of managing certain funds, for the benefit of various investors in those funds. In fact, HCMFA and NexPoint have contracts to

manage those funds (the "Fund Agreements"). Pl. Ex. 192 at 66:3-67:6, Appx. 3031. The funds

themselves, in turn, are overseen to an extent by a board known as the "Retail Board." The Retail

Board must determine on an annual basis whether to renew the Fund Agreements with HCMFA

and NexPoint, a process referred to as a "15(c) Review."  As part of the 15(c) Review, the Retail

Board requests information from HCMFA and NexPoint.  Pl. Ex. 99 at 129:17-130:3, Appx. 1844-

1845, Pl. Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-

2092.  Mr. Waterhouse, the Treasurer of HCMFA and NexPoint (along with various other officers

of HCMFA and NexPoint) participated in the annual 15(c) Review process with the Retail Board.

Pl. Ex. 192 at 67:7-68:19, Appx. 3031; Pl. Ex. 105 at 168:13-169:8, Appx. 2091.

The Retail Board, as part of the annual 15(c) Review, asked HCMFA and NexPoint, in

October 2020, to provide information regarding any outstanding amounts currently payable or due

in the future (e.g., notes) to Highland by HCMFA or NexPoint or to any other affiliate that provided

services to the Funds."  Pl. Ex. 36 at p. 3, Appx. 793.

On October 23, 2020, HCMFA and NexPoint provided their formal responses to the

questions posed by the Retail Board.  As to the issue of outstanding amounts currently payable or

due to Highland or its affiliates, HCMFA and NexPoint reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP [Highland] and
> its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP
> [Highland] from HCMFA.  The Note between HCMLP [Highland] and NexPoint
> comes due on December 31, 2047.  The earliest the Note between HCMLP
> [Highland] and HCMFA could come due is in May 2021.  All amounts owed by
> each of NexPoint and HCMFA pursuant to the shared services arrangement with
> HCMLP [Highland] have been paid as of the date of this letter.  The Advisor notes
> that both entities have the full faith and support of James Dondero.

Pl. Ex. 59 at p. 2, Appx. 885.

> C. More Corroborating Evidence:   Before and During the Highland
> Bankruptcy Case, the Notes Were Reflected on Highland's Books, Records,
> and Bankruptcy Paperwork as Assets Owed to Highland, without Discounts

In addition to its PwC-audited financial statements, Highland's contemporaneous books and records—before and after the Petition Date—recorded the Notes as valid debts due and owing by each of the Note Makers Defendants to Highland.

By way of example, the three Dondero Notes, reflecting personal loans to Mr. Dondero, show they were made on February 2, 2018; August 1, 2018; and August 13, 2018, respectively. A February 2018 internal monthly operating results of Highland, underneath a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," reflected a transfer to Mr. Dondero on February 2, 2018, as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. And in the Debtor's August 2018 internal monthly operating results, also under a heading "Significant Items Impacting HCMLP's [Highland's] Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan." *See also* Pl. Ex. 78 at p. 2, Appx. 1362.

Highland's accounting group had a regular practice of creating, maintaining, and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries"). The Loan Summaries identified amounts owed to Highland under affiliate notes and were created by updating underlying schedules for activity and reconciling with Highland's general ledger. Pl. Ex. 199, Appx. 3245-3246 is an example of a Loan Summary. The Loan Summaries identified each Note Maker Defendant by reference to the "GL" number used in the general ledger. *See* Pl. Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

The Debtor's Schedules of Assets and Liabilities [Bankr. DE # 247] (the "Debtor's Schedules"), filed during the Highland bankruptcy case at a time when Mr. Dondero was still under

control of Highland, included all of the Notes among the Debtor's assets.  Pl. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

Additionally, all of the Debtor's Monthly Operating Reports filed during the Highland bankruptcy case (including those filed while Mr. Dondero was still in control of the Debtor) included the Notes as assets of the Debtor. *See, e.g.*, Pl. Ex. 41, Appx. 816-825; Pl. Ex. 42, Appx. 826-835; Pl. Ex. 88, Appx. 1475-1486; Pl. Ex. 89, Appx. 1487-1496. *See also* Bankr. DE # 405 (October 2019); Bankr. DE # 289 (November 2019); Bankr. DE # 418 (December 2019); Bankr. DE # 497 (January 2020); Bankr. DE # 558 (February 2020); Bankr. DE # 634 (March 2020); Bankr. DE # 686 (April 2020); Bankr. DE # 800 (May 2020), as amended in Bankr. DE # 905; Bankr. DE # 913 (June 2020); Bankr. DE # 1014 (July 2020); Bankr. DE # 1115 (August 2020); Bankr. DE # 1329 (September 2020); Bankr. DE # 1493 (October 2020); Bankr. DE # 1710 (November 2020); Bankr. DE # 1949 (December 2020); and Bankr. DE # 2030 (January 2021).

## V.        The Note Maker Defenses

### A. The "Oral Agreement" Defense involving Mr. Dondero's Sister

As mentioned earlier, all Note Maker Defendants, besides HCMFA (sometimes referred to by Plaintiff as the "Alleged Agreement Defendants") have asserted as their primary defense to payment on their Notes that there was an alleged "oral agreement," pursuant to which all of the Notes would be forgiven based on certain "conditions subsequent," or if certain assets were sold by a third party.  Only Mr. Dondero originally asserted that defense (somewhat obliquely, in his original answer—merely stating that "it was previously agreed that Plaintiff would not collect the

Notes")[22] and thereafter all of the Note Maker Defendants (except HCMFA) amended their pleadings to adopt the same affirmative defense.  To be clear, the defense actually evolved over time. First, it was simply an alleged agreement by Highland not to collect on **Mr. Dondero's** Notes. Then, there were amended answers by each of the other Note Maker Defendants (except HCMFA) which obliquely referred to alleged agreements by Highland not to collect on the Notes upon fulfillment of undisclosed conditions subsequent.  Finally, the "oral agreement" defense was set up as follows:

> Plaintiff's claims are barred . . . because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control.  The purpose of this agreement was to provide compensation to James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP [Highland] and in the industry.[23]  This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

---

[22] Pl. Ex. 80, ¶ 40.

[23] This statement appears to have been false, according to Mr. Dondero's own executive compensation expert, Alan Johnson. During the deposition of Mr. Johnson, he testified that he reviewed Highland's audited financial statements for each year from 2008 through 2018 (Pl. Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland did not have a standard practice of forgiving loans and had not forgiven a loan to anyone in the world since 2009, (b) Highland had never forgiviven a loan of more than $500,000, (c) Highland had not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland had never forgiven in whole or in part any loan that it extended to any affiliate.  *Id.* at 189:24-192:10, Appx. 2005-2006.  *See also* Pl. Ex. 98 at 422:18-428:14, Appx. 1776-1778.

Pl. Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer"). *See also* Pl. Ex. 15 ¶ 83, Appx. 435-436

("NexPoint's Answer"); Pl. Ex. 16 ¶ 97, Appx. 451-452 ("HCMS's Answer"); and Pl. Ex. 17 ¶ 99,

Appx. 468 ("HCRE's Answer").

With regard to this "oral agreement" defense, certainly any trial judge should be inclined

to send a dispute to a jury when there is any genuine material fact issue raised upon which

reasonable minds might disagree. Nonetheless, ***there are numerous reasons why this court***

***believes no reasonable jury could find that there was truly an "oral agreement" to forgive these***

***loans to the Alleged Agreement Defendants***. The "oral agreement" defense does not pass the

"straight face" test for a myriad of reasons.

First, to be clear, ***no document was ever uncovered or produced in discovery to establish,***

***memorialize, or reflect the existence or terms of the alleged "oral agreement."***

Second, Mr. Dondero could not describe any material terms of the alleged "oral agreement"

without relying on a document prepared by counsel.   Specifically, without a list prepared by

counsel, Mr. Dondero could not identify any of the Notes subject to the alleged "oral agreement"

nor could he recall (i) the number of Notes subject to each alleged "oral agreement," (ii) the maker

of each Note subject to each alleged "oral agreement," (iii) the date of each Note subject to each

alleged "oral agreement," or (iv) the principal amount of any Note subject to the alleged "oral

agreement."  Pl. Ex. 99 at 13:4-28:22, Appx. 1815-1819.

Third, according to both Mr. Dondero and Sister Dondero, all of the Notes would be

forgiven if Mr. Dondero sold one of three portfolio companies—***Trussway, Cornerstone, or***

***MGM***—above cost.  *See* Pl. Ex. 31 ¶ 82, Appx. 655. Notably, in November 2019, Mr. Dondero

(while still in control of Highland) caused the sale of a substantial interest in ***MGM*** for $123.25

million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the
Notes forgiven, and remained silent about the alleged "oral agreement" altogether.  *See* Pl. Ex. 201
¶¶ 29-30, Appx. 3270-3271; Pl. Ex. 202 ¶ 14, Appx. 4135; Pl. Ex. 203 ¶ 1, Appx. 4143; Pl. Ex.
204 at p. 5 n.5, Appx. 4156.

Fourth, Mr. Dondero separately testified that Highland disclosed to its auditors all loans of
a material amount that Highland ever forgave.  Pl. Ex. 98 at 426:8-427:15, Appx. 1777.  As earlier
discussed, no forgiven loans are mentioned anywhere in Highland's audited financial statements.

Fifth, Sister Dondero was simply not capable of entering into any alleged "oral agreement"
on behalf of Highland.  For one thing, it is undisputed that Sister Dondero had no meaningful
knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry,
(c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was
"underpaid compared to reasonable compensation levels in the industry." Pl. Ex. 100 at 42:22-
43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928. Sister Dondero
resides in Vero Beach, Florida and represents that she owns a private investigations business.[24]
The only information Sister Dondero purported to have regarding Mr. Dondero's compensation
from Highland was that he had told her he "was not highly paid" and that, in recent years, "his
salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark."  Pl. Ex. 100
at 51:11-22, Appx. 1887.[25]  But this information was simply inaccurate. Pl. Ex. 68, Appx. 1129-
1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Pl. Ex. 50,
Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Pl.
Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of

---

[24] *See* Nancy Dondero Dec. DE # 155 in Adv. Proc. No. 21-3003.

[25] *See also id.*

$4,194,925); and Pl. Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

Additionally, Sister Dondero never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements, and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date. *Id.* at 61:25-63:13, Appx. 1889-1890. Sister Dondero did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Sister Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies. *Id.* at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927.

Still further, Sister Dondero never saw a promissory note signed by Mr. Dondero, nor any other officer or employee of Highland, nor any "affiliate" of Highland. *Id.* at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919. Sister Dondero purportedly learned from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement. *Id.* 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900.

And still further, Sister Dondero had no knowledge regarding any of the Alleged Agreement Defendants (i.e., NexPoint, HCMS, or HCRE), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland,

and their use of the proceeds. *Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909.

Finally, and perhaps most important, Sister Dondero (purportedly acting as trustee for Dugaboy—the family trust of which Mr. Dondero was beneficiary, and which was an indirect, majority ***limited*** partner of Highland) had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland. Pl. Ex. 2 at Ex. 4, Appx. 57-93.

If this were not all enough, the alleged "oral agreement" was never disclosed to anyone by Mr. Dondero or Sister Dondero. Other than Mr. Dondero and Sister Dondero, no one participated in the discussions that led to the alleged "oral agreement." Pl. Ex. 100 at 190:16-191:17, Appx. 1922. Sister Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the alleged "oral agreement" to anyone, including PwC, Mr. Waterhouse (again, Highland's CFO), or Highland's co-founder, Mark Okada,[26] and (2) neither ever caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 538-542); Pl. Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1 & 2, Appx. 554-558). Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the alleged "oral agreement" to PwC, Mr. Okada, or the bankruptcy court; and (2) never caused Highland to disclose the existence or terms of the alleged "oral agreement" to the bankruptcy court. Pl. Ex. 24 (Responses to RFAs 1, 2, 5-7, 11-17, Appx. 521-524). To be clear, Mr. Dondero represented that he did, indeed, inform Mr. Waterhouse about the alleged "oral agreement." Pl. Ex. 24, Appx. 521 (Responses to RFAs

---

[26] Mark Okada was not only the co-founder of Highland, but he and his family trusts owned all the limited partnership interests of Highland, other than those interests held by Dugaboy. *See* James Dondero Dec., DE # 155, ¶ 19 in Adv. Proc. No. 21-3003.

3 & 4).  However, Mr. Waterhouse—again, the CFO of Highland and an officer of each of the

Alleged Agreement Defendants—testified he did not learn of the alleged "oral agreement" until

recently and only believes that it was subject to "milestones" that he cannot identify.  Pl. Ex. 105

at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

### B.  The "Mutual Mistake" Defense of HCMFA

The "Mutual Mistake" defense—like the "oral agreement" defense asserted by the other

Note Maker Defendants—is farfetched, to say the least, especially in the context of a multi-billion

company with perhaps the world's most iconic and well-known public accounting firm serving as

its auditors.  As set forth below, this court does not believe any reasonable jury could reach a

verdict in favor of HCMFA on the "Mutual Mistake" defense.

To fully understand the defense, a reminder is in order regarding the many hats that Frank

Waterhouse wore.  Mr. Waterhouse is a Certified Public Accountant who joined Highland in 2006

and served as Highland's CFO on a continuous basis from approximately 2011 or 2012 until early

2021.  While serving as Highland's CFO, Mr. Waterhouse simultaneously served as (1) an officer

of HCMFA, NexPoint, and HCMS, holding the title of Treasurer; and (2) Principal Executive

Officer of certain retail funds managed by HCMFA and NexPoint.  As Treasurer and Principal

Executive Officer of these entities, Mr. Waterhouse was responsible for managing, among other

things, HCMFA's accounting and finance functions.  Pl. Ex. 35; Pl. Ex. 37; Pl. Ex. 105 at 18:6-

15, 18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19,

38:20-39:5.

With that in mind, the "Mutual Mistake" defense works as follows. HCMFA asserts that

the HCMFA Notes are void or unenforceable because they were signed by mistake or without

authority by Mr. Waterhouse, and Mr. Dondero (as the person in charge of both Highland and

HCMFA) **did not intend** for $7.4 million of funds that were transferred from the Debtor to

HCMFA in May 2019 to be loans—rather the money was intended to be **compensation to HCMFA**

**from Highland**, for a Highland error that allegedly cause HCMFA harm. Pl. Ex. 13 ¶¶ 45 & 47,

Appx. 412. HCMFA specifically contends that, in March 2019, Highland made a "mistake in

calculating" the net asset value ("NAV") of certain securities that Highland Global Allocation

Fund ("HGAF")—a fund managed by HCMFA—held in a portfolio company called Terrestar (the

"NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various
> employees and representatives of the Plaintiff, the Defendant, and HGAF worked
> with the SEC to correct the error and to compensate HGAF and the various
> investors in HGAF harmed by the NAV Error. Ultimately, and working with the
> SEC, the Plaintiff [i.e., Highland] determined that the losses from the NAV Error
> to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the
> NAV Error itself, as well as rebating related advisor fees and processing costs; and
> (ii) $1.4 million of losses to the shareholders of HGAF.
>
> The Defendant [HCMFA] accepted responsibility for the NAV Error and paid
> out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the
> Plaintiff [Highland] accepted responsibility to the Defendant [HCMFA] for having
> caused the NAV Error, and the Plaintiff [Highland] ultimately, whether through
> insurance or its own funds, compensated the Defendant [HCMFA] for the above
> payments by paying, or causing to be paid, approximately $7.5 million to the
> Defendant [HCMFA] directly or indirectly to HGAF and its investors.

Pl. Ex. 13 ¶¶ 41-42, Appx. 411.

While this is the theory of HCMFA's "Mutual Mistake" defense, there is an absence of

summary judgment evidence to support it.  In fact, to the contrary, on May 28, 2019, HCMFA sent

a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV

Error, and HCMFA **did not mention Highland**.  Pl. Ex. 182, Appx. 2978-2980. In fact, no

document was submitted to suggest: (a) HCMFA ever told the Securities and Exchange

Commission or HGAF Board that Highland, and not HCMFA, was responsible for the NAV Error;

or that (b) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV Error. *See* Pl. Ex. 192 at 140:7-11, Appx. 3049. While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland. *Id.* at 138:15-19, Appx. 3049.

HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Pl. Ex. 182 at p. 2, Appx. 2980. Notably, HCMFA admits that it filed a claim for and received almost $5 million in insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss. *Id.* at p. 2, Appx. 2980; Pl. Ex. 192 at 146:20-25, Appx. 3051. Yet, despite having received approximately $5 million in insurance proceeds, HCMFA now takes the position that (a) Highland's subsequent transfer of $7.4 million to HCMFA was "compensation" for Highland's negligence and (b) HCMFA was entitled to receive both and $5 million in insurance proceeds and $7.4 million in "compensation" from Highland, even though the total loss was only $7.4 million. It is undisputed that HCMFA never told its insurance carrier, ICI Mutual, that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Pl. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

In summary, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for a total receipt of $12.4 million in connection with the [NAV Error]." *Id.* at 147:4-11, Appx. 3051. There is no evidence that HCMFA ever told ICI Mutual that Highland made HCMFA "whole" or otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

To be clear, similar to all other Notes involved in this litigation, the HCMFA Notes were carried on its balance sheet and audited financial statements as liabilities.  Pl. Ex. 45 at p. 17; Pl. Ex. 192 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.   There is nothing in HCMFA's books and records that corroborates HCMFA's contention that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to be compensation and not a loan. Pl. Ex. 192 at 59:8-63:20, Appx. 3029-3030. And Highland's bankruptcy filings (most or all of which were signed by Mr. Waterhouse—both the CFO of Highland and the Treasurer of HCMFA) contradict HCMFA's "Mutual Mistake" defense. As discussed earlier, Highland's contemporaneous books and records—before the Petition Date and after—recorded the HCMFA Notes as valid debts due and owing by HCMFA to Highland.

In summary, there is no evidence that creates any genuine issue of "Mutual Mistake."  If one assumes that Mr. Waterhouse might have made a mistake in authorizing the preparation and execution of the HCMFA Notes,[27] then one must likewise assume that he compounded the mistake well over a dozen times when he (i) signed off on Highland's and HCMFA's audited financial

---

[27] There can be no genuine dispute regarding Mr. Waterhouse's authority to execute the Notes on behalf of HCMFA. "The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess."  *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992).  Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, Civ. Action No. 99-3040, 2000 WL 726880, at *5 (E.D. La. June 2, 2000).  The undisputed evidence establishes that Mr. Waterhouse had both actual and apparent authority to sign the Notes.  At the time Mr. Waterhouse executed the Notes on behalf of HCMFA, Mr. Waterhouse was the Treasurer of HCMFA. See Incumbency Certificate (Pl. Ex. 35, Appx. 789).  As Treasurer, he was authorized to, inter alia, "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the general partner of [HCMFA]." *Id.*  In this role, Mr. Waterhouse managed the accounting and finance for HCMFA. (Pl. Ex. 105 at 25:22-26:3, Appx. 2055-2056).  Mr. Waterhouse testified that he "signed a lot of documents in [his] capacity" as Treasurer, and believed he was authorized to sign the HCMFA Notes.  *Id.* at 143:24-25, Appx. 2085.  To Mr. Waterhouse, the Notes were "just another document." *Id.* at 144:2-3, Appx. 2085. No one at HCMFA ever told Mr. Waterhouse that, as the Treasurer of HCMFA, he did not possess such authority. *Id.* at 158:2-16, Appx. 2089.  At the time he signed the Notes on behalf of HCMFA, Mr. Waterhouse had no reason to believe he was not authorized to do so. *Id.* at 160:23-161:2, Appx. 2089.  In fact, Mr. Waterhouse would not have signed the Notes on behalf of HCMFA if he did not believe he possessed such authority. *Id.* at 144:4-20, Appx. 2085.  The Incumbency Certificate, which named Mr. Waterhouse as the Treasurer of HCMFA, gave Mr. Waterhouse "comfort" that he was authorized to sign the Notes. *Id.* at 159:13-160:4, Appx. 2089.

statements, (ii) included the HCMFA Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs and other court filings. No reasonable jury could go there—particularly when the defense is based on mostly self-serving conclusory statements of Mr. Dondero and not any tangible evidence.[28]

### C.  Miscellaneous Defenses

Mr. Dondero also raised the affirmative defenses of waiver, estoppel, or lack of consideration.  There is no summary judgment evidence in the record that supports his affirmative defenses of waiver, estoppel, or lack of consideration.  Pl. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

With regard to the term loans of NexPoint, HCRE, and HCMS, these Note Maker Defendants each also contend that they made prepayments on their Notes, such that they cannot be deemed to have defaulted, and also assert they did not default under those loans because of Annual Installment payments that they made.  First, the unrefuted summary judgment evidence of Plaintiff clearly dispels any argument that prepayments may have averted any defaults.  *See* Klos Dec. pp. 3-6; Pl. Ex. 198 (Loan Summaries).  Moreover, the Annual Installment payments were due on December 31, 2020, and these Note Maker Defendants did not make their Annual Installment payments to Highland until mid-January 2021, after receiving notices of default.  These Note Maker Defendants had no right to cure in the loan documents.  Thus, this defense fails as a matter of law.  *See* Pl. Ex. 2 at Ex. 3, Appx. 49-56; Pl. Ex. 98 at 362:12-366:10, Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768.

---

[28]    One disturbing aspect of both the "Mutual Mistake" defense and the "oral agreement" defense is that, if they are to be believed, it means the audited financial statements of Highland and the Note Maker Defendants were materially misleading for several years. What human being(s) would be held accountable for this? Mr. Dondero himself? *See* Pl. Ex. 33.

Finally, the "Alleged Agreement Defendants" pleaded defenses of "justification and/or repudiation; estoppel; waiver; and ambiguity."[29] No summary judgement evidence supported these affirmative defenses or any other defenses that were otherwise raised.[30]

## V.    Legal Standard

It is, of course, well settled that summary judgment is appropriate if a movant shows there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006) ("[S]ummary judgment is proper when the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") (quoting FED. R. CIV. P. 56(c)). A movant meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Lab'ys*, 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.,* Bankr. No. 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "If the moving party carries [its] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.2d at 303; *see also Nat'l Ass'n of Gov't*

---

[29] Mr. Dondero, who signed twelve of the sixteen Notes, testified that he did not read the Notes. Thus, he cannot rely on ambiguity as a defense. *See* Pl. Ex. 96 at 111:19-21; 125:13-20; 128:23-129:7.

[30] One stray defense alleged by HCMS, HCRE, and NexPoint, with regard to each of their Term Notes, is that they had "Shared Services Agreements" with Highland and, thus, Highland "made" them default by not directing them to make their Annual Installment payments timely in December 2021. First, as a technical matter, there was no admissible evidence that HCMS and HCRE had a shared service agreement with Highland. Second, while NexPoint did have a Shared Services Agreement with Highland, no provision authorized or obligated Highland to control NexPoint's bank accounts or to effectuate payments without instruction or direction from an authorized representative. *See* Pl. Ex. 205. Section 2.02 provided that "for the avoidance of doubt . . . [Highland] shall not provide any advice to [NexPoint] to perform any duties on behalf of [NexPoint], other than back- and middle-office services contemplated herein."

*Emps v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial.") "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.2d at 303 (internal quotations omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D. Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted). "Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ*, 168 F.3d 196, 199 (5th Cir. 1999); *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n.12 (5th Cir.1993) ("We no longer ask whether literally little evidence, i.e., a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

## VI.   Legal Analysis

### A.   The Context Here Matters:  Promissory Notes are at Issue

It has often been said that "suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir. 1988)); *see also Looney v. Irvine Sensors Corp.*, Civ. Action No. 3:09-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary

judgment."). To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

Highland has made its prima facie showing that it's entitled to summary judgment on each of the Note Maker Defendants' breach of their respective Notes.

With regard to the Dondero Demand Notes, the evidence was that they were valid, signed by Mr. Dondero in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. Klos Dec. ¶¶ 18-20, Exs. D, E, F; ¶ 37.

With regard to the HCMFA Demand Notes, the evidence was that they were valid, signed by HCMFA in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09. Klos Dec. ¶¶ 21-22, Exs. G, H; ¶ 40.

With regard to the HCMS Demand Notes, the evidence was that they were valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Notes was $972,762.81. Klos Dec. ¶¶ 23-26, Exs. I, J, K, L; ¶ 45.

With regard to the HCRE Demand Notes, the evidence was that they were valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and

accrued but unpaid interest due under the HCRE Demand Notes was $5,330,378.23. Klos Dec. ¶¶ 27-30, Exs. M, N, O, P; ¶ 50.

With regard to the NexPoint Term Note, the evidence was that it was valid, signed by NexPoint in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note was $24,383,877.27.[31] Klos Dec. ¶ 31, Ex. A; ¶ 51.

With regard to the HCMS Term Note, the evidence was that it was valid, signed by HCMS in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note was $6,748,456.31.[32] Klos Dec. ¶ 32, Ex. R; ¶ 52.

With regard to the HCRE Term Note, the evidence was that it was valid, signed by HCRE in Highland's favor and as of December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the HCRE Term Note was $5,899,962.22.[33] Klos Dec. ¶ 33, Ex. S; ¶ 53.

Each of the Note Maker Defendants under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand. Each of the Note Maker Defendants under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[31] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[32] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[33] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

The Reorganized Debtor, Highland, has been damaged by the Note Maker Defendants'
breaches in the amounts set forth above, plus the interest that has accrued under the Notes since
those calculations, plus collection costs and attorneys' fees—which amounts Highland should
separately submit to the court.

In summary, Highland has made its prima facie case for summary judgment for the Note
Makers Defendants' breach of the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where
affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of
accrued interest owed, and the date of default for each of the two promissory notes," movant
"presented a prima facie case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where
movant "has attached a copy of the note … to a sworn affidavit in which he states that the
photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and
that there is a balance due on the note … [movant] has made a prima facie case that he is entitled
to summary judgment on the note.").

The Note Maker Defendants failed to rebut Highland's prima facie case.

B.  *The Unsubstantiated "Oral Agreements"*

With regard to the alleged "oral agreement" defense, there was a complete lack of evidence
for it—it was only supported by conclusory statements of Mr. Dondero and, to a lesser extent,
Sister Dondero. Mr. Dondero could not identify any material terms of the alleged "oral agreement,"
such as (a) which Notes are subject to the alleged "oral agreement;" (b) the number of Notes
subject to the alleged "oral agreement;" (c) the maker of each Note subject to the alleged "oral
agreement;" (d) the date of each Note subject to the alleged "oral agreement;" or (e) the principal
amount of any Note subject to the alleged "oral agreement."  Mr. Dondero and Sister Dondero

cannot even agree whether Mr. Dondero identified the Notes subject to the alleged agreement.  Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the alleged agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the alleged agreement. Sister Dondero, the counter-party to the alleged agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not qualified to enter into the alleged agreement.  The existence or terms of the alleged agreement were never disclosed by Mr. Dondero or Sister Dondero to anyone, including PwC, Mr. Waterhouse, or the bankruptcy court. No document exists memorializing or otherwise reflecting the existence of terms of the alleged agreement.  There is no history of loans being forgiven at Highland in the past decade.

No genuine issue of material fact has been raised here such that a reasonable jury might find an alleged "oral agreement." Moreover, any alleged agreement would be unenforceable as a matter of law for lack of: (a) consideration, (b) definiteness, and (c) a meeting of the minds.   In order to be legally enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021) (internal quotations omitted); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (In order to prove existence of a valid and binding subsequent oral agreement binding upon parties, a party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted).  "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV- 2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014). *See also id.* at *6

(finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006) (citation omitted)); *Heritage*, 354 B.R. at 431–32 (finding a "subsequent oral amendment" defense fails where the summary judgment record does not support the existence of a subsequent agreement).

Accordingly, there is no genuine issue of material fact regarding the alleged "oral agreement" defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's, NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### C.  The Alleged "Mutual Mistake" Asserted by HCMFA is Unsubstantiated

Finally, the "Mutual Mistake" defense also fails as a matter of law because there is no evidence to show that Highland and HCMFA were acting under some shared factual mistake when the HCMFA Notes were prepared and executed. "For mutual mistake to nullify a promissory note, the evidence must show that both parties were acting under the same misunderstanding of the same material fact." *Looney*, 2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law). "[A] party must show that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange." *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. H-06 1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27, 2007) (alteration in

original) (citing Texas law).  In other words, "[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.* (internal quotations omitted).  "In determining the intent of the parties to a written contract, a court may consider the conduct of the parties and the information available to them at the time of signing in addition to the written agreement itself." *Id.* (internal quotations omitted). "When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,* MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations omitted). "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Cap. Am. Corp. v. Med. Plaza Surgical Ctr., L.L.P.*, Civ. Action No. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney,* 2007 WL 3145798, at *7 (internal quotations omitted).

The undisputed documentary and testimonial evidence overwhelmingly establish that both HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr. Waterhouse, HCMFA's Treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan"; (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets; (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times.

There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into HCMFA Notes.  The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) the insurance company ICI Mutual.  The purported "mistake" is also not reflected in HCMFA's books and records or audited financials.

In conclusion, HCMFA's "Mutual Mistake" defense fails as a matter of law. *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a mutual mistake was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.); *Whitney*, 2007 WL 3145798, at *6-7 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact" regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake [defense] is inapplicable [as a matter of law], because, even if [defendant's] assumption regarding the … contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake …").

There is no summary judgment evidence to support any remaining defenses of the Note Makers Defendants.

**VII.  Summary Judgment**.

Accordingly, summary judgment should be entered holding the Note Maker Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes, pursuant to Bankruptcy Code Section 542, including the costs of collection and reasonable attorneys' fees in an amount to be determined.  Specifically:

With regard to the Dondero Demand Notes, Mr. Dondero should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$9,263,365.05**, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMFA Demand Notes, HCMFA should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$7,874,436.09**, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Demand Notes, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$972,762.81**, the total outstanding principal and accrued but unpaid interest due under the HCMS Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCMS Term Note, HCMS should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$6,748,456.31**, the total outstanding principal and accrued but unpaid interest due under the HCMS Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Demand Notes, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$5,330,378.23**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the HCRE Term Note, HCRE should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$5,899,962.22**, the total outstanding principal and accrued but unpaid interest due under the HCRE Demand Notes as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

With regard to the NexPoint Term Note, NexPoint should be liable on a Judgment for breach of contract and turnover in the amount of:  (a) **$24,383,877.27**, the total outstanding principal and accrued but unpaid interest due under the NexPoint Term Note as of December 17, 2021; plus (b) interest accrued since December 17, 2021; plus (c) the costs of collection and reasonable attorneys' fees in an amount to be determined.

**<u>Submission of Judgment</u>.  The bankruptcy court directs Plaintiff to promptly submit a form of Judgment applicable to each Note Maker Defendant that calculates proper**

amounts due pursuant to this Report and Recommendation, including interest accrued to date (and continuing to accrue per diem), as well as costs and attorneys' fees incurred.  The costs and attorneys' fees calculation shall be separately filed as a Notice with backup documentation attached. The Note Maker Defendants shall have 21 days after the filing of such Notice to file an objection to the reasonableness of the attorneys' fees and costs.  The bankruptcy court will thereafter determine the reasonableness in Chambers (unless the bankruptcy court determines that a hearing is necessary) and will promptly submit the form Judgments, along with appropriate attorneys' fees and costs amounts inserted into the form Judgments, to the District Court, to consider along with this Report and Recommendation. This Report and Recommendation is immediately being sent to the District Court.

*### End of Report and Recommendation ###*