```
 1                    WATERHOUSE - 10-19-21

 2    collectively as the retail funds; is that okay?

 3         A.    Okay.

 4         Q.    Each of the retail funds is governed

 5    by a board; correct?

 6         A.    Yes.

 7         Q.    And do you know the people who serve

 8    on the boards of the retail funds?

 9               MS. DANDENEAU:  Objection to form.

10         A.    I don't know all of them.

11         Q.    Do you know whether the same people

12    serve on the board of each of the retail funds

13    as we've defined that term?

14         A.    Which -- so when you say "retail

15    funds" -- again, I want to be -- what retail

16    funds are you referring to, because there are

17    -- there are several distinctions?

18               What retail funds are you using when

19    you refer to them?

20         Q.    That is why -- that is why I tried

21    to define the terms.  So let me do it again.

22               Retail funds for the purposes of

23    this deposition means any retail fund to which

24    either of the advisors provides advisory

25    services.  Okay?
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Okay.

 3        Q.    Okay.  So do you know whether the

 4   same people serve on the board of each of the

 5   retail funds?

 6        A.    I don't know.

 7        Q.    Were you ever employed by any of the

 8   retail funds?

 9        A.    No.

10        Q.    No?

11        A.    No.

12        Q.    Okay.  Do you have any title with

13   respect to any of the retail funds?

14        A.    Yes.

15        Q.    What titles do you hold --

16   withdrawn.

17              Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20              MS. DANDENEAU:  Objection to form.

21        Q.    Withdrawn.

22              Do you have the same title with

23   respect to each of the retail funds?

24        A.    No.

25        Q.    Tell me which title you have with
```

```
 1                    WATERHOUSE - 10-19-21

 2     respect to each retail fund.

 3                    Actually, let's do it a different

 4     way.  I withdraw the question.

 5                    Can you give me one title you have

 6     in relation to any retail fund?

 7          A.    Yes.

 8          Q.    What title -- what title can you

 9     give me?

10          A.    Principal executive officer.

11          Q.    Do you serve as principal executive

12     officer for each of the retail funds?

13          A.    No.

14          Q.    Can you identify for me the retail

15     funds in which you serve as the principal

16     executive officer?

17          A.    Yes.  Highland Funds 1, Highland

18     Funds 2, Highland Income Fund, Highland Global

19     Allocation Fund.

20          Q.    I'm sorry, you said "Global

21     Allocation Fund"?

22          A.    Yes.

23                    VIDEOGRAPHER:  Excuse me,

24          Mr. Morris.  This is the videographer.  I'm

25          concerned about the lighting in the
```

```
 1                    WATERHOUSE - 10-19-21

 2       witness' camera.

 3              Do you want to go off the record and

 4       make some adjustments?

 5              MR. MORRIS:  Sure, but just for this

 6       purpose.  I don't want to take a break.  We

 7       just started.

 8              MS. DANDENEAU:  Yeah, that is fine.

 9       That is fine.  We're going to put you on

10       mute.

11              MR. MORRIS:  All right.

12              MS. DANDENEAU:  I'm going to try to

13       open up some of the shades.

14              VIDEOGRAPHER:  We're going off the

15       record at 10:08 a.m.

16       (Recess taken 10:08 a.m. to 10:11 a.m.)

17              VIDEOGRAPHER:  We are back on the

18       record at 10:11 a.m.

19       Q.    Mr. Waterhouse, when did you become

20   the principal executive officer of the four

21   retail funds that you just identified?

22       A.    I don't recall.

23       Q.    Do you recall the approximate year

24   that you became the principal executive officer

25   of the four funds?
```

1                     WATERHOUSE - 10-19-21

2          A.    2021.

3          Q.    Did you ever hold any title with

4     respect to any of the four funds you have just

5     identified other than principal executive

6     officer?

7          A.    I don't recall.

8          Q.    Is it possible that you held a

9     position or a title with the four funds you

10    just identified prior to 2021?

11         A.    Yes.

12         Q.    But you don't recall if you did or

13    not; do I have that right?

14         A.    No.  You -- I thought you asked, did

15    I hold other titles.

16         Q.    Did you hold any title at the four

17    retail funds for which you now serve as

18    principal executive officer at any time prior

19    to 2021?

20         A.    Yes.

21         Q.    What titles did you hold?

22         A.    I don't recall all the titles.

23         Q.    Do you recall any of the titles?

24         A.    Yes.

25         Q.    What titles do you recall holding at

```
 1                    WATERHOUSE - 10-19-21

 2    those four retail funds before 2021?

 3         A.    Principal executive officer.

 4         Q.    Were you the principal executive

 5    officer of the four retail funds that you have

 6    identified?

 7         A.    Sorry, could you repeat the

 8    question?

 9         Q.    Were you the principal executive

10    officer for each of the four retail funds that

11    you have identified?

12         A.    Yes.

13         Q.    When did you become the principal

14    executive -- withdrawn.

15               Can you give me the approximate year

16    that you became the principal executive officer

17    for each of the four retail funds you've

18    identified?

19         A.    I don't recall.

20         Q.    What are your duties and

21    responsibilities as the principal executive

22    officer of these four retail funds?

23         A.    It is to manage the finance and

24    accounting positions.

25         Q.    So at the same time you serve as the
```

```
 1                 WATERHOUSE - 10-19-21

 2    treasurer of the advisors, you also serve as

 3    the principal executive officer of these four

 4    retail funds; correct?

 5         A.    Yes.

 6         Q.    Did you ever hold any title with

 7    respect to any other retail fund?

 8         A.    Not that I recall.

 9         Q.    During the period that you served as

10    Highland's CFO, from time to time Highland

11    loaned money to certain of its officers and

12    employees; correct?

13         A.    Yes.

14         Q.    During the period that you served as

15    Highland's CFO, from time to time Highland

16    loaned money to certain --

17         A.    Let me -- let me retract that,

18    sorry, that -- you asked during the time I was

19    CFO, Highland loaned moneys to employees.  I

20    don't -- I don't recall that during my tenure

21    of CFO.

22         Q.    You have no recollection during the

23    time that you were the CFO of Highland of

24    Highland ever loaning any money to any officer

25    or director of Highland?
```

```
1              WATERHOUSE - 10-19-21

2         A.    I don't recall during my tenure of

3    Highland or my -- as CFO of Highland -- yeah,

4    if there are any loans as CFO of Highland.

5         Q.    I'm just talking about officers and

6    employees right now.  You have no recollection

7    of Highland ever making a loan to any of its

8    officers or employees during the time that you

9    served as CFO.  Do I have that right?

10             MS. DANDENEAU:  Objection to form.

11        A.    So I thought you were saying

12   officers and employees as CFO, right, so there

13   were -- I mean, okay, yes.

14        Q.    I would ask you to listen carefully

15   to my question.  If I -- if I'm not clear, let

16   me know, but I'm really trying to be as clear

17   as I can.

18        A.    I'm listening as carefully as I can,

19   and you are asking very specific questions in a

20   timeline.  And I'm trying to answer your

21   questions as specifically as I can, and I

22   apologize if -- if I'm going back.  I am -- you

23   are asking very specific questions.  Thank you.

24        Q.    During the period that you served as

25   Highland's CFO, from time to time Highland
```

```
 1                    WATERHOUSE - 10-19-21

 2    loaned money to certain corporate affiliates;

 3    correct?

 4              MS. DANDENEAU:  Objection to form.

 5         A.    What are corporate affiliates?

 6         Q.    How about the ones that are in

 7    Highland's audited financial statements under

 8    the section entitled Loans to Affiliates.  Why

 9    don't we start with those.  Do you have any

10    understanding of what the phrase "affiliates"

11    means?

12              MS. DANDENEAU:  Objection to form.

13         A.    I understand what affiliates are,

14    yet affiliates can have different meanings in

15    different contexts, so...

16         Q.    Why don't you -- why don't you tell

17    me what your understanding of the term

18    "affiliate" is in relation to Highland Capital

19    Management, L.P.

20         A.    Is that a -- it depends on the

21    context.

22         Q.    How about the context of making

23    loans?

24              MS. DANDENEAU:  Objection to form.

25         A.    I didn't make the determination of
```

```
 1                    WATERHOUSE - 10-19-21

 2     who an affiliate was or is at the time those --

 3     I didn't -- that wasn't my job to make a

 4     determination of who an affiliate is.

 5          Q.    All right.  So as the CFO of

 6     Highland, do you have any ability right now to

 7     tell me which companies that were directly or

 8     indirectly owned and/or controlled by

 9     Mr. Dondero in whole or in part received loans

10     from Highland Capital Management, L.P.?

11               MS. DANDENEAU:  Objection to form.

12               MS. DEITSCH-PEREZ:  Objection, form.

13          A.    Yes.

14          Q.    Okay.  Identify every entity that

15     you can think of that was directly or

16     indirectly owned and/or controlled by

17     Mr. Dondero in whole or in part that received a

18     loan from Highland Capital Management, L.P.

19               MR. RUKAVINA:  Objection, legal

20          conclusion.

21          A.    NexPoint Advisors, Highland Capital

22     Management Fund Advisors, HCM Services,

23     Dugaboy.  Sorry, I don't think -- Dugaboy

24     doesn't fit that definition.  You said owned

25     and controlled.  I don't think that that
```

1              WATERHOUSE - 10-19-21

2    definition --

3         Q.    I said owned and/or controlled.

4         A.    I don't -- again, I'm not -- I'm not

5    the legal expert.  I don't think it controls --

6    he controls Dugaboy, so again, I'm not the

7    legal person.

8         Q.    I'm not asking you for a legal

9    conclusion, sir.  I'm asking you for your

10   knowledge, okay, as the CFO -- the former CFO

11   of Highland Capital Management, other than

12   NexPoint, HCMFA, and HCMF -- HCMS, can you

13   think of any other entities that were owned

14   and/or controlled directly or indirectly in

15   whole or in part by Jim Dondero who received a

16   loan from Highland Capital Management, L.P.?

17             MS. DANDENEAU:  Objection to form.

18        A.    HCRE.

19        Q.    Any others?

20        A.    That is -- that is all I can think

21   of.

22        Q.    And you're aware that from time to

23   time while you were the CFO, Highland loaned

24   money to Jim Dondero; correct?

25        A.    Yes.

1          WATERHOUSE - 10-19-21

2      Q.    Okay.  Can we refer to the four

3  entities that you just named and Mr. Dondero as

4  the affiliates?

5      A.    So that would be Jim Dondero,

6  NexPoint Advisors, Highland Capital Management

7  Fund Advisors, and HCRE.

8      Q.    And HCMS?

9      A.    And HCMS, okay.

10      Q.    And can we refer to the loans that

11  were given to each of those affiliates as the

12  affiliate loans?

13      A.    Yes.

14      Q.    And is it fair to say that each of

15  the affiliates were the borrowers under the

16  affiliate loans as we're defining the term?

17          MR. RUKAVINA:  Objection, legal

18      conclusion.

19      A.    The borrowers are whoever were on

20  the notes.  I don't -- I don't know.  I'm not

21  the legal person.

22      Q.    But you --

23      A.    I don't know.

24      Q.    You do know, as Highland's former

25  CFO, that each of the affiliates that you have

```
1                    WATERHOUSE - 10-19-21

2    identified tendered notes to Highland; correct?

3                    MR. RUKAVINA:  Hey, John, will you

4         just give me a running objection to legal

5         conclusion to HCM --

6                    MR. MORRIS:  No.  No, if you want to

7         object --

8                    MR. RUKAVINA:  I will object every

9         time.  Object to legal conclusion.

10                   MR. MORRIS:  That is fine.

11   A.      Sorry, can you repeat the question?

12   Q.      Are you aware that each of the --

13   that each of the affiliates, as we have defined

14   the term, gave to Highland a promissory note in

15   exchange for the loans?

16                   MR. RUKAVINA:  Objection to the

17        extent that calls for a legal conclusion.

18   A.     I don't.

19   Q.     No, you don't know that?

20   A.     No, they didn't -- you said they

21   exchanged a promissory note for a loan.  I

22   don't -- I don't understand that question, so I

23   said no.

24   Q.     At the time of the bankruptcy

25   filing, did Highland have in its possession
```

1                    WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4         A.    Yes.

5         Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10             MR. RUKAVINA:  Objection, that calls

11        for a legal conclusion.

12             MS. DEITSCH-PEREZ:  I also couldn't

13        hear you, John, because there was some

14        garbling on -- on the -- on the call.

15             MR. MORRIS:  Folks, I've got to tell

16        you this is not going well, and I'm

17        reserving my right --

18             MS. DANDENEAU:  John, it was just

19        the end of that question.  It was just the

20        end of that question.  I couldn't hear it

21        either.  Sorry, if you could repeat it,

22        please.

23             MR. MORRIS:  That is less than an

24        hour into this, but folks are trying to run

25        out the clock, and so I'm just going to

```
 1                    WATERHOUSE - 10-19-21

 2           state that now.

 3                    MS. DANDENEAU:  You know, and,

 4           Mr. Morris, I really object to that.  I

 5           mean --

 6                    MR. MORRIS:  Okay.

 7                    MS. DANDENEAU:  -- Mr. Waterhouse

 8           just told you he's trying to listen to your

 9           questions and answer them carefully, and

10           you have no basis for saying that.

11                    MR. MORRIS:  Okay.

12                    MS. DANDENEAU:  This does not --

13           this is not an experienced witness, so he's

14           trying to do the best he can.

15           Q.    Mr. Waterhouse, during the time that

16     you served as Highland's CFO, did Highland

17     disclose to its outside auditors all of the

18     loans that it made to each of the affiliates

19     that you have identified?

20                    MR. RUKAVINA:  Objection, legal

21           conclusion.

22           A.    Yes.

23           Q.    To the best of your knowledge, while

24     you were Highland's CFO, were all of the

25     affiliate loans described in Highland's audited
```

```
 1                    WATERHOUSE - 10-19-21
 2    financial statements?
 3              MR. RUKAVINA:  Objection, legal
 4         conclusion.
 5         A.    When an audit was performed, any
 6    loans that were made by Highland to the
 7    affiliates were disclosed to auditors.
 8         Q.    Are you aware of any loan that was
 9    made to any affiliate that was not disclosed to
10    the auditors?
11         A.    I'm not aware.
12         Q.    To the best of your knowledge, did
13    each of the affiliates who were --
14    (inaudible) -- loaned from Highland execute a
15    promissory note in connection with that loan?
16              MR. RUKAVINA:  Objection, legal
17         conclusion.
18         A.    Sorry, you -- halfway through the
19    question it got muffled.
20              Can you repeat that again?
21         Q.    To the best of your knowledge, did
22    every affiliate execute a promissory note in
23    connection with each loan that it obtained from
24    Highland?
25              MR. RUKAVINA:  Objection, legal
```

Page 49

```
 1              WATERHOUSE - 10-19-21
 2       conclusion.
 3       A.    Yes.
 4       Q.    You are not aware of any loan that
 5  any affiliate ever obtained from Highland where
 6  the affiliate did not give a promissory note in
 7  return; is that fair?
 8       A.    Yes, I'm not aware.
 9       Q.    And to the best of your knowledge,
10  did Highland loan to each affiliate an amount
11  of money equal to the principal amount of each
12  promissory note?
13            MR. RUKAVINA:  Objection, legal
14       conclusion.
15       A.    Yes.
16       Q.    During the time that you served as
17  CFO, did Highland ever loan money to
18  Mark Okada?
19       A.    I -- I don't recall.
20       Q.    Did you ever see any promissory
21  notes executed by Mark Okada?
22       A.    I don't recall.
23       Q.    Do you know if Highland ever forgave
24  any loan that it ever made to Mr. Okada?
25       A.    I don't recall.
```

```
 1                 WATERHOUSE - 10-19-21
 2      Q.    Do you recall if Mr. Okada paid back
 3  all principal and interest due and owing under
 4  any loan he obtained from Highland?
 5            MS. DEITSCH-PEREZ:  Objection to
 6      form.
 7            MS. DANDENEAU:  Objection to form.
 8      A.    I don't recall.
 9      Q.    Do you recall whether -- during your
10  time as CFO, whether Highland ever loaned money
11  to Jim Dondero?
12      A.    Yes.
13      Q.    To the best of your knowledge, did
14  Mr. Dondero sign and deliver to Highland a
15  promissory note in connection with each loan
16  that he obtained from Highland?
17      A.    If you are referring to the
18  promissory notes that, you know, part of
19  Highland's records, yes.
20      Q.    Okay.  You're not aware of any loan
21  that Mr. Dondero took from Highland that wasn't
22  backed up by -- by a promissory note with a
23  face -- with a principal amount equal to the
24  amount of the loan; correct?
25      A.    Am I aware that Jim Dondero took a
```

```
 1                   WATERHOUSE - 10-19-21

 2    loan?

 3         Q.    Without giving a -- let me ask a

 4    better question.  I'm sorry, Mr. Waterhouse.

 5              Are you aware of any loan that

 6    Mr. Dondero obtained from Highland where he

 7    didn't give a promissory note in return?

 8         A.    I'm not aware.

 9         Q.    During the time that you served as

10    Highland's CFO, did Highland ever forgive any

11    loans, in whole or in part, that it made to

12    Mr. Dondero?

13         A.    Not that I'm aware.

14         Q.    At the time that you served as

15    Highland's CFO, did Highland ever forgive any

16    loan, in whole or in part, that it made to any

17    affiliate as we've defined the term today?

18         A.    Not that I'm aware.

19         Q.    During the time that you served as

20    Highland's CFO, did Highland ever forgive, in

21    whole or in part, any loan that it ever made to

22    any officer or employee?

23         A.    Highland forgave loans to officers

24    and employees.  It may not have been at the

25    time when my title was CFO.
```

```
1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And so I appreciate the

3  distinction.

4              Is it fair to say that, to the best

5  of your knowledge, Highland did not forgive a

6  loan that it made to an officer or employee

7  after 2013?

8              MS. DANDENEAU:  Objection to form.

9        A.    I don't recall.

10        Q.    To the best of your knowledge, did

11  Highland disclose to its auditors every

12  instance where it forgave, in whole or in part,

13  a loan that it had made to one of its officers

14  or employees?

15        A.    No.

16        Q.    Can you think of -- can you -- can

17  you identify any loan to an officer or employee

18  that was forgiven by Highland, in whole or in

19  part, that was not disclosed to Highland's

20  outside auditors?

21        A.    Look, I don't recall all of the

22  loans and the loan forgiveness.  I just know as

23  part of the audit process there is a

24  materiality concept.

25              So if there were loans to employees
```

1               WATERHOUSE - 10-19-21

2   that were of -- you know, that were deemed

3   immaterial, those items may not have been

4   disclosed by the team to the auditors.

5       Q.    I appreciate that.

6            Do you have an understanding as to

7   what the level of materiality was?

8       A.    I don't recall.

9       Q.    As the CFO of Highland, to the best

10  of your knowledge, did Highland disclose to its

11  outside auditors every loan that was forgiven,

12  in whole or in part, that was material as that

13  term was defined by the outside auditors?

14      A.    Yes.

15      Q.    And do you recall where -- do you

16  recall where the definition of materiality can

17  be found for -- for this particular purpose?

18           MS. DANDENEAU:  Objection to form.

19      A.    No.  You -- I don't determine

20  materiality.

21      Q.    Okay.  I'm just asking you if you

22  can help me understand where it is, but I think

23  we will find it in a few minutes.

24           You are aware that Highland has

25  commenced lawsuits against each of the

```
1                    WATERHOUSE - 10-19-21

2    affiliates, as we've defined the term, to

3    collect under certain promissory notes; is that

4    right?

5        A.    Yes.

6        Q.    And are you familiar with the notes

7    that are issue -- at issue in the lawsuits?

8             MS. DANDENEAU:  Objection to form.

9        A.    Generally familiar.

10       Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13       A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15       Q.    And Mr. Dondero?

16       A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19       Q.    I just --

20       A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23       Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and
```

```
1              WATERHOUSE - 10-19-21

2    Mr. Dondero we will call Mr. Dondero.  Okay?

3         A.    Okay.  Thank you.  As you can see,

4    Mr. Morris, there is a lot of entities -- a lot

5    here.  I just want to be clear.

6         Q.    Okay.  Now, the affiliates of

7    Mr. Dondero signed promissory notes that are

8    not subject to the lawsuit.

9              Do you understand that?

10             MS. DANDENEAU:  Objection to form.

11        A.    The affiliates and Mr. Dondero

12   signed --

13        Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15             From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20             MR. RUKAVINA:  Objection to the

21        extent that calls for a legal conclusion.

22        A.    Yes.

23        Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that
```

1                    WATERHOUSE - 10-19-21

2    were given by the affiliates and Mr. Dondero?

3         A.    Yes.

4         Q.    Can you describe the process for me?

5         A.    The process, payment should be

6    applied as laid out in the -- in the promissory

7    note.

8         Q.    From time to time were payments made

9    that were not required under the promissory

10   notes?

11              MS. DANDENEAU:  Objection to form.

12        A.    Yes.

13        Q.    Who was responsible for deciding

14   when and how much the payments would be made

15   with respect to each of the notes that were

16   issued by the affiliates and Mr. Dondero?

17        A.    Who was responsible for deciding how

18   much was paid prior to the due date?

19        Q.    Yes.

20        A.    I don't know.

21        Q.    Did you approve of each payment that

22   was made against principal and interest on the

23   notes that were given by the affiliates and

24   Mr. Dondero?

25              MS. DANDENEAU:  Objection to form.

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Did I approve the payments?  I

 3   approve -- I approve -- if there was cash -- if

 4   there was cash being repaid on a note payment,

 5   yes, I approved in the general sense of being

 6   made aware of the payment and the amount.

 7         Q.    And are you the person who

 8   authorized Highland's employees to effectuate

 9   those payments?

10         A.    Yes.

11         Q.    When you gave the instruction to

12   effectuate the payment, did you obtain

13   Mr. Dondero's prior approval?

14         A.    I mean, it -- I mean, it -- it

15   depends.

16         Q.    Can you think of any instance where

17   you directed Highland's employees to make a

18   payment of principal or interest against any

19   note that was tendered by an affiliate or

20   Mr. Dondero that Mr. Dondero did not approve of

21   in advance?

22         A.    I can't recall specifically.

23         Q.    Can you identify -- withdrawn.

24               Did Mr. Dondero ever tell you that a

25   payment that was made against principal and
```

```
 1                    WATERHOUSE - 10-19-21
 2      interest due under one of the notes that was
 3      tendered by an affiliate or himself should not
 4      have been made?
 5           A.    Yes.
 6           Q.    Can you identify the payment for me?
 7           A.    It would be for -- for NexPoint
 8      Advisors.
 9           Q.    Okay.  And when did Mr. Dondero tell
10      you that a payment that you had initiated on
11      behalf of NexPoint should not have been made?
12           A.    I wasn't initiating payment.  It was
13      in the context of the -- I think you used this
14      term, "the advisors," so NexPoint Advisors and
15      Highland Capital Management Fund Advisors had
16      overpaid on certain agreements with Highland
17      Capital Management, L.P.  And as a part of that
18      process, the advisors -- what I was told at the
19      time were in talks and negotiations and
20      discussions with Highland Capital Management,
21      L.P., on offsets in relation to those
22      overpayments.
23           Q.    When did this conversation take
24      place?
25                MS. DANDENEAU:  Objection to form.
```

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall specifically.

3        Q.    Do you recall what year it was?

4        A.    Yes.

5        Q.    What year did the conversation with

6   Mr. Dondero take place that you just described?

7        A.    2020.

8        Q.    Okay.  Do you remember if it was

9   December 2020?

10        A.    It -- it -- I don't -- I don't

11   recall what month specifically, but it would

12   have been November or December.

13        Q.    And we're talking here about a

14   payment of principal and/or interest that was

15   due -- withdrawn.

16            We're talking here about a payment

17   of principal and interest that was applied

18   against NexPoint's note; correct?

19            MS. DANDENEAU:  Objection to form.

20        A.    I don't recall what that payment

21   consisted of.

22        Q.    Is it possible that the payment you

23   have in mind related to the shared services

24   agreement?

25            MS. DANDENEAU:  Objection to form.

Case 21-03000-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 21:31:57 Desc
Case 3:21-cv-00881-X   Document 178-18   Filed 09/09/24   Page 28 of 200   PageID 54550
Exhibit 18   Page 29 of 446

Page 60

```
 1                    WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Are you certain that the payment --

 4   that the payment that you have in mind related

 5   to the promissory note that NexPoint issued in

 6   favor of Highland?

 7              MS. DANDENEAU:  Objection to form.

 8        A.    Yes.

 9        Q.    Okay.  Other than that one payment,

10   can you identify any other instance where

11   Mr. Dondero told you that a payment should not

12   have been applied against principal and

13   interest under any promissory note tendered by

14   any affiliate or Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Objection to

17         form.

18        A.    Not that I recall.

19        Q.    Thank you very much.

20              Do you know if Mr. Dondero approved

21   in advance of each loan made to each affiliate

22   and himself during the time that you were the

23   CFO?

24              MS. DEITSCH-PEREZ:  Object to the

25         form.
```

```
 1                   WATERHOUSE - 10-19-21

 2        A.    Yes, generally.

 3        Q.    Can you identify any loan that was

 4   ever made to an affiliate or to Mr. Dondero

 5   that Mr. Dondero did not approve of in advance?

 6        A.    Other than the ones that are in

 7   dispute, I'm not aware.

 8        Q.    Do you believe that Mr. Dondero did

 9   not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12             MS. DANDENEAU:  Objection to form.

13        A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16        Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19             Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23        A.    Was I aware of every loan, yes.

24        Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans
```

1    WATERHOUSE - 10-19-21

2  that were made to one of the affiliates or

3  Mr. Dondero during the time that you were the

4  CFO was made without Mr. Dondero's prior

5  knowledge and approval?

6        A.    Not that I recall.

7        Q.    Thank you.  In fact, do you -- as

8  the CFO, would you have allowed Highland to

9  loan money to an affiliate or to Mr. Dondero

10 without obtaining Mr. Dondero's prior approval?

11            MS. DANDENEAU:  Objection to form.

12       A.    I can't -- there was so many times

13 over the years, I can't speak for every single

14 one, but generally, yes, I -- I spoke to him.

15       Q.    You -- you never -- you never --

16 withdrawn.  I will just take that.

17            Can you recall any payment that was

18 ever made against principal and interest on a

19 note that was issued in favor of Highland by an

20 affiliate or Mr. Dondero that you personally

21 did not know about in advance?

22       A.    There are so many through the years,

23 I don't -- I don't -- I don't recall every

24 single one.

25       Q.    Okay.  Can you identify any payment

```
 1                    WATERHOUSE - 10-19-21
 2     that was made against principal and interest on
 3     any note tendered by any affiliate or
 4     Mr. Dondero that you didn't know about in
 5     advance?
 6          A.    I don't recall.
 7          Q.    Other than Mr. Dondero -- withdrawn.
 8                Did anybody at Highland have the
 9     authority to make a payment against principal
10     and interest due under a loan given to the
11     affiliates and Mr. Dondero without your
12     knowledge and approval?
13                MS. DANDENEAU:  Objection to form.
14          A.    Sorry, there was -- to make a
15     payment on an affiliate loan, what you are
16     saying would it require my knowledge and
17     approval, yes.
18          Q.    Okay.  I appreciate that.  Thank
19     you.
20                Did anybody at Highland have the
21     authority, to the best of your knowledge, to
22     effectuate a loan to an affiliate without
23     Mr. Dondero's prior knowledge and approval?
24                MS. DANDENEAU:  Objection to form.
25          A.    I can't speak for all, but
```

WATERHOUSE - 10-19-21

1    generally, yes.

2         Q.    Did you personally communicate with

3    Mr. Dondero to let him know each time a payment

4    of principal or interest was being made against

5    any note that was tendered by an affiliate or

6    Mr. Dondero to Highland?

7         A.    I don't -- are you saying, did I let

8    Mr. Dondero know if a payment was made on any

9    affiliate or loan to Mr. Dondero?  I mean,

10   not -- not every -- no.

11        Q.    Let me ask it this way:  Did you

12   have a practice of informing Mr. Dondero when

13   payments were made against principal and

14   interest on any note that was tendered by an

15   affiliate or Mr. Dondero?

16             MS. DEITSCH-PEREZ:  Objection to

17        form.

18             MS. DANDENEAU:  Objection to form.

19        A.    No, I did not.

20        Q.    Did Mr. Dondero ever tell you that a

21   payment of principal or interest had been made

22   against a note that was tendered by an

23   affiliate or himself that he had been unaware

24   of?

```
 1              WATERHOUSE - 10-19-21

 2      A.    Not that I recall.

 3      Q.    Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5            Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12            MS. DANDENEAU:  Objection to form.

13      A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15      Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19            MS. DEITSCH-PEREZ:  Object to the

20      form.

21      A.    Yes.

22      Q.    Do you have any understanding as to

23   the terms of that agreement?

24      A.    Yes.

25      Q.    What is your understanding of the
```

```
 1              WATERHOUSE - 10-19-21

 2    terms of the agreement?

 3        A.    That there were certain milestones

 4    that had to be reached.

 5        Q.    Do you have any understanding of the

 6    terms of the agreement between Mr. Dondero and

 7    Nancy Dondero concerning any of the notes

 8    issued by the affiliates or Mr. Dondero other

 9    than that there have to be milestones reached?

10             MS. DEITSCH-PEREZ:  Object to the

11        form.

12        A.    There are milestones, I found out

13    yesterday, or there was some --

14             MS. DANDENEAU:  Okay.  I'm just

15        going to object to the extent that you

16        learned anything in conversations with

17        counsel, please don't reveal -- that is

18        privileged, and don't reveal any privileged

19        communications.

20             THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23    were?

24             MS. DANDENEAU:  Objection to form.

25        A.    I don't.
```

1               WATERHOUSE - 10-19-21

2        Q.    Do you know anything about -- do you

3   know what promissory notes the agreement

4   covered?

5        A.    I don't.

6        Q.    Do you know if -- if Jim and Nancy

7   Dondero entered into one agreement or more than

8   one agreement?

9               MS. DEITSCH-PEREZ:  Object to the

10       form.

11       A.    I don't know.

12       Q.    Do you know if the agreement is in

13  writing?

14       A.    I don't know.

15       Q.    How did you learn of the existence

16  of the agreement?

17              MS. DANDENEAU:  Objection to form.

18       Again --

19       A.    I don't -- I don't recall who told

20  me.

21       Q.    You have no recollection of who told

22  you about this agreement between Jim and Nancy

23  Dondero?

24              MS. DEITSCH-PEREZ:  Object to the

25       form.

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I don't recall.

 3        Q.    Do you recall how you learned of the

 4   agreement?

 5              Was it in a meeting?  Was it in a

 6   phone call?  Was it in an email?

 7        A.    I don't recall.

 8        Q.    Do you recall when you learned of

 9   the agreement?

10        A.    Not specifically.

11        Q.    Do you recall what year you learned

12   of the agreement?

13        A.    In -- look, I mean, there are so

14   many notes.  I may be getting -- I believe it

15   was 2020.

16        Q.    All right.  I'm not asking about

17   notes, sir.  I'm asking about the agreement

18   that you testified you knew about between Jim

19   and Don- -- Nancy Dondero.  Okay.

20              Do you understand my question now?

21   Should I ask my question again?

22        A.    Yeah, sure.  Go ahead.

23        Q.    I'm going to use the word

24   "agreement" to refer to the agreement that

25   Mr. Dondero and Nancy Dondero entered into
```

```
 1                    WATERHOUSE - 10-19-21

 2     where you understood that certain milestones

 3     had to be reached.  Okay?

 4          A.    Uh-huh.

 5               MS. DANDENEAU:  Objection.

 6               MS. DEITSCH-PEREZ:  Object to the

 7          form.

 8               MR. MORRIS:  Just defining a term,

 9          what is the objection.

10               MS. DEITSCH-PEREZ:  The objection --

11               MR. MORRIS:  I will move on.  I will

12          move on.

13               MS. DEITSCH-PEREZ:  John --

14          Q.    Sir, are you okay with that

15     definition of agreement?

16          A.    Okay.

17          Q.    Okay.  So you don't recall who --

18     who informed you of the existence of the

19     agreement; is that right?

20          A.    I don't recall.

21          Q.    You don't recall who told you the

22     terms of the agreement.

23               Do I have that right?

24          A.    Correct.

25          Q.    And you don't recall if you learned
```

1                    WATERHOUSE - 10-19-21

2    about the agreement in a meeting, through an

3    email, or through a phone call.

4            Do I have that right?

5        A.    I don't recall.

6        Q.    Can you tell me when you learned of

7    the agreement?

8        A.    I don't -- I don't -- I don't

9    remember specifically.

10       Q.    Can you tell me if you learned of

11   the agreement before or after the petition

12   date?

13       A.    It would have been -- it would have

14   been after.

15       Q.    Can you tell me if you learned of

16   the agreement before or after January 9th,

17   2020?

18       A.    It would have been after.

19       Q.    Can you tell me if you learned of

20   the agreement before or after you left Highland

21   Capital Management in February of 2021?

22       A.    I don't -- I don't -- I don't know.

23       Q.    It is possible that you learned of

24   it while you were a Highland employee.

25            Do I have that right?

1          WATERHOUSE - 10-19-21

2          A.    I don't remember the -- I mean, it

3     was sometime in 2021.  I don't remember when.

4          Q.    All right.  So to the best of your

5     recollection, it was in 2021 but you don't

6     recall if it was before or after you ceased to

7     be a Highland employee.

8                Do I have that right?

9          A.    Yeah, I mean, it was -- it was

10    likely after I was -- after I left Highland

11    because, if I put myself back into the last

12    days of -- of 2021, it was -- you know, the

13    communications with Mr. Dondero were -- were --

14    were -- there weren't as many communications

15    because of the circumstances.

16         Q.    And so based on that you believe

17    that it is most likely that you learned of this

18    agreement sometime after you left Highland

19    employment?

20         A.    I wouldn't use the term "most

21    likely."  I don't recall specifically.  I don't

22    recall.

23         Q.    Do you recall ever telling Jim Seery

24    about this agreement?

25         A.    No, I don't -- I didn't tell

```
 1                WATERHOUSE - 10-19-21
 2   Jim Seery.
 3        Q.    Did you tell anybody at DSI about
 4   this agreement?
 5        A.    No.
 6        Q.    Did you tell any of Highland's
 7   independent directors about this agreement?
 8        A.    No.
 9        Q.    Did you tell anybody at Pachulski
10   Stang Ziehl & Jones about this agreement?
11        A.    No.
12        Q.    Did you tell any employee of
13   Highland about this agreement?
14        A.    No.
15              MS. DANDENEAU:  Mr. Morris, it has
16         been an hour and a half.  Is this a good
17         time for a break?
18              MR. MORRIS:  Sure.
19        Q.    Mr. Waterhouse, I will just remind
20   you that during the break please don't speak
21   with anybody about the deposition, the
22   substance of your testimony or anything else
23   concerning the deposition.  Okay?
24        A.    Yes.
25              MR. MORRIS:  So it is 11:02.  We're
```

```
 1                    WATERHOUSE - 10-19-21

 2         at 11:02 your time.  Let's come back, I

 3         guess, at 15 -- at 11:15 your time.

 4                 VIDEOGRAPHER:  We're going off the

 5         record at 11:02 a.m.

 6         (Recess taken 11:02 a.m. to 11:20 a.m.)

 7                 VIDEOGRAPHER:  We are back on the

 8         record at 11:20 a.m.

 9         Q.    Mr. Waterhouse, did you speak with

10    anybody during the break about this deposition?

11         A.    No.

12                 MS. DANDENEAU:  Other than -- other

13         than his counsel.

14         Q.    Did you speak to your counsel about

15    the substance of your deposition today?

16         A.    No, I didn't bring it up.

17         Q.    I didn't ask you if you brought it

18    up.  I asked you if you had any conversation

19    with your lawyer about the substance of your

20    deposition.

21                 MS. DANDENEAU:  Yes, he did.

22         Q.    Can you tell me what the -- you

23    discussed?

24                 MS. DANDENEAU:  No, I object to

25         that.  He's not going to answer.  That is a
```

```
 1                WATERHOUSE - 10-19-21

 2    privileged conversation.

 3            MR. MORRIS:  So I just want to make

 4    sure that I understand.  During the break

 5    you spoke with your client about the

 6    substance of this deposition; is that

 7    right?

 8            MS. DANDENEAU:  Yes, John.

 9            MR. MORRIS:  And you refuse -- you

10    refuse to let your client tell me what was

11    discussed; is that right?

12            MS. DANDENEAU:  That's correct.

13            MR. MORRIS:  You know, I had given

14    the instruction prior to the break not to

15    speak with counsel.  I would have

16    appreciated --

17            MS. DANDENEAU:  No, you didn't --

18    actually, that is not true, Mr. Morris.

19    You said not to speak with anyone.  We

20    never have interpreted that to mean

21    conversations with counsel.  That's never

22    been -- I have never, ever heard that

23    instruction.

24            MR. MORRIS:  Okay.  We will -- we

25    will -- we will deal with it when and if we
```

```
 1              WATERHOUSE - 10-19-21

 2        have to.

 3        Q.    Mr. Waterhouse, after learning about

 4   the agreement, did you ask anybody if the

 5   agreement was reflected in a writing?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    No.

 8        Q.    Did you ask anybody if the terms of

 9   the agreement were memorialized anywhere?

10              MS. DANDENEAU:  Objection to form.

11              MR. MORRIS:  What is the --

12        A.    No.

13              MS. DANDENEAU:  Well, because you

14         keep talking about this agreement and I --

15         I -- I think, Mr. Morris, that is really

16         not clear what you mean by "the agreement."

17         And maybe you can just go back and restate

18         what that is.

19              MR. MORRIS:  Okay.  Your client has

20         agreed with me twice on the definition, but

21         I will try one more time.

22        Q.    Mr. Waterhouse, do you understand

23   that when I use the term "agreement," I'm

24   referring to the agreement between Jim and

25   Nancy Dondero concerning certain promissory
```

1                    WATERHOUSE - 10-19-21

2    notes where you learned that one of the terms

3    of the agreement was milestones reached?

4         A.    Okay.

5         Q.    And did you understand that that was

6    the -- the agreement that we were referring to

7    every time we used the word "agreement" in this

8    deposition?

9         A.    I don't know anything about this

10   agreement.  So, look, I do -- it -- I don't

11   know whether --

12        Q.    Let's -- let's try this again.

13        A.    Yeah.  Look, I don't know what this

14   agreement relates.

15              MS. DEITSCH-PEREZ:  John, John --

16        Q.    Let me try --

17              MS. DEITSCH-PEREZ:  John, please let

18        the witness finish.

19              MR. MORRIS:  Please stop.  Please

20        stop.  Please stop talking.

21              MS. DEITSCH-PEREZ:  No, you stop.

22        Let the witness --

23              MR. MORRIS:  Stop talking.

24              MS. DEITSCH-PEREZ:  -- finish -- you

25        interrupted him.

```
 1                    WATERHOUSE - 10-19-21

 2              MR. MORRIS:  You know what, you

 3         guys, this is really wrong.  It is really,

 4         really wrong.  Okay?

 5              I had the witness agree not once,

 6         but twice to the definition of agreement.

 7         Okay?  I'm going to try and do it a third

 8         time.

 9              MS. DANDENEAU:  No, but, please,

10         John, really --

11              MR. MORRIS:  No, please stop

12         talking.  Please.  It is my deposition.

13         Object to questions.

14              MS. DANDENEAU:  No, but also you

15         instructed him that -- that if you were

16         going -- if you were interrupting him, that

17         he should remind you that you're

18         interrupting him and -- and --

19              MR. MORRIS:  Let him do that.  Let

20         him do that.

21              MS. DANDENEAU:  Okay.  Well, you --

22              MR. MORRIS:  Please stop talking.

23         A.   Okay.  I don't know any of the

24    details of these agreements.  I don't know

25    anything about them.  I heard -- someone -- I
```

```
 1                WATERHOUSE - 10-19-21

 2   don't know who, I don't know when, as you

 3   asked, sometime in '21, someone told me about

 4   this -- or I don't honestly know -- I don't

 5   even recall exactly how I was made aware of

 6   this, but I was.  I don't know -- I don't know

 7   any of these details, and I'm getting -- again,

 8   there is, you know, I -- I -- I had a passing

 9   conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15              Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19              MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on
```

```
 1                    WATERHOUSE - 10-19-21

 2    milestones that had to be reached; is that

 3    right?

 4               MS. DANDENEAU:  Objection to form.

 5         A.    That was one of the words that was

 6    used when I heard about it, yes.

 7         Q.    And when you heard about this

 8    agreement that had a term in it concerning

 9    milestones reached, did you ask the person who

10    was telling you about the agreement whether or

11    not it was in writing?

12         A.    I did not.

13         Q.    Did you ask any questions at all?

14               MS. DANDENEAU:  Objection to form.

15         A.    Not that I recall.

16         Q.    But do you understand that going

17    forward, we're going to refer to the agreement

18    as the agreement that you just described that

19    you were --

20               MS. DANDENEAU:  Object to the form.

21         A.    Yes.

22         Q.    Okay.  You don't have any personal

23    knowledge concerning the terms of the

24    agreement; correct?

25               MS. DEITSCH-PEREZ:  Object to the
```

1                WATERHOUSE - 10-19-21

2        form.

3        Q.    You can answer.

4        A.    I don't -- I heard about the

5    agreement.  I don't know anything -- I heard

6    there was an agreement.  That is -- again, as I

7    testified before -- I said before, heard about

8    it, don't know the details.  I believe it was

9    sometime this year.

10       Q.    Do you have any personal knowledge

11   about the terms of the agreement, sir?

12             MS. DANDENEAU:  Objection to form.

13       A.    Other than what I have previously

14   discussed, I don't -- I don't know.

15       Q.    Did -- did Mr. Dondero tell you

16   about the existence of the agreement?

17       A.    I don't recall.

18       Q.    Do you recall the source of your

19   information when you learned about the

20   agreement?

21       A.    No, I don't -- I don't recall.  I

22   don't remember.  I just -- I heard about it

23   generally.  I don't remember -- I don't

24   remember who, how, if, how.  I don't remember.

25       Q.    You know, Mr. Waterhouse, I just

```
 1                    WATERHOUSE - 10-19-21

 2    want to be clear that I never would have asked

 3    you to appear at this deposition if your name

 4    hadn't been included in responses to discovery

 5    as to somebody with knowledge about the -- who

 6    was told about the existence of the agreement.

 7               That is what prompted me do this,

 8    and I really do feel compelled to tell you that

 9    I otherwise would never have called you as a

10    witness.  So I regret that you're being put

11    through this today.  I had no intention of

12    burdening you or taking your time, but that is

13    the reason that we issued the subpoena is

14    because certain of the defendants identified

15    you as somebody --

16               MS. DEITSCH-PEREZ:  Mr. Morris, you

17         are here to ask questions, not to have --

18               MR. MORRIS:  I feel badly for the

19         guy.  I really do.

20               MS. DEITSCH-PEREZ:  I'm sure you do.

21               MR. MORRIS:  I do.  Stop.

22               MS. DEITSCH-PEREZ:  You stop.

23               MR. MORRIS:  I'm allowed.

24               MS. DEITSCH-PEREZ:  No, you're not

25         allowed to have a chat with the witness.
```

Case 23-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 21:31:57 Page 82 of 397
Case 3:21-cv-00881-X Document 178-48 Filed 03/10/24 Page 50 of 200 PageID 54572

Page 82

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    Okay.  Well, I hope that you

 3  appreciate what I'm saying here,

 4  Mr. Waterhouse.

 5            MS. DANDENEAU:  All right.  Let's go

 6       ahead and ask questions, and again, you're

 7       entitled to probe his -- his knowledge

 8       of -- whatever knowledge he has about

 9       this -- this agreement and --

10            MR. MORRIS:  That is what I'm doing.

11            MS. DANDENEAU:  -- he will answer

12       the questions to the best that he can.

13            MR. MORRIS:  That is what I'm doing.

14       Q.    Mr. Waterhouse, I take it you do not

15  know which promissory notes issued by which

16  affiliates or Mr. Dondero are the subject of

17  this agreement; do I have that right?

18       A.    Yes, I don't -- I don't know.

19       Q.    Do you know of any way to determine

20  which promissory notes issued by the affiliates

21  and Mr. Dondero are the subject of this

22  agreement other than asking Jim or Nancy

23  Dondero?

24            MS. DANDENEAU:  Objection to form.

25       A.    I don't know.
```

WATERHOUSE - 10-19-21

1

2     Q.    Did you ever make --

3     A.    I don't know anything about these

4  agreements.

5     Q.    Did you ever make any effort to

6  determine which promissory notes are subject to

7  this agreement?

8     A.    No.

9     Q.    Did you ever ask anybody which

10 promissory notes are subject to this agreement?

11    A.    No.

12    Q.    Do you know if there is a list

13 anywhere of the promissory notes that are

14 subject to this agreement?

15    A.    I'm not aware.

16    Q.    Have you ever seen the terms of the

17 agreement written down anywhere?

18    A.    No.

19    Q.    Have you ever asked anybody whether

20 the terms of the agreement were written down

21 anywhere?

22    A.    I have not.

23    Q.    Did learning about the agreement

24 cause you to do anything in response?

25          MS. DANDENEAU:  Objection to form.

```
 1                    WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Did anybody ever describe to you the

 4   nature of the milestones that you referred to

 5   earlier?

 6        A.    No, I don't -- I don't have any

 7   details of this.

 8        Q.    That is fine.

 9              PricewaterhouseCoopers served as

10   Highland's outside auditors prior to the

11   petition date; correct?

12        A.    Yes.

13        Q.    You refer to PricewaterhouseCoopers

14   as PwC?

15        A.    Yes.

16        Q.    PricewaterhouseCoopers audited

17   Highland's financial statements on an annual

18   basis; correct?

19        A.    During my -- during my time as -- as

20   CFO, yes, PricewaterhouseCoopers was the

21   auditor.

22        Q.    Do you know why Highland had its

23   annual financial statements audited each year?

24        A.    Generally.

25        Q.    Tell me your general understanding
```

```
 1                    WATERHOUSE - 10-19-21

 2   as to the reason why Highland had its annual

 3   financial statements audited each year.

 4        A.     From -- from time to time, they were

 5   used -- or asked for, as part of diligence or

 6   transactions or -- or things of that nature.

 7        Q.     And were they given to third parties

 8   for purposes of diligence or transactions from

 9   time to time?

10        A.     As far as I'm aware, yes.

11        Q.     And was it your understanding as the

12   CFO that the third parties who received the

13   financial statements in diligence or

14   transactions was going to rely on those?

15             MS. DANDENEAU:  Objection to form.

16        A.     I don't know -- I don't know gen --

17   I don't know specifically what they were going

18   to rely on.  You know, we would get requests

19   for audited financial statements.  I don't know

20   what they were relying on.

21        Q.     And --

22        A.     You would have to ask them.

23        Q.     Did you personally play a role in

24   PwC's annual audit and the conduct of the

25   audit?
```

```
1                    WATERHOUSE - 10-19-21

2                    MS. DANDENEAU:  Objection to form.

3         A.    During my tenure as CFO, I played a

4    very minimal role.

5         Q.    What was the minimal role that you

6    played?

7         A.    You know, again, it was -- it was to

8    check in with the team, to make sure that, you

9    know, audit -- the deadlines were being hit,

10   information was being presented to the auditors

11   in a -- in a timely fashion, but, you know,

12   other than that, it was a very capable team

13   that are still current employees of Highland

14   and, you know, they -- they conducted 99

15   percent of -- look, I don't want to give

16   percentages.  I mean, this is -- but I -- I --

17   I played a minimal role towards the end.

18              Before during my earlier years as

19   CFO, I did more, and then as time went on, I

20   did less in it.

21        Q.    Okay.  Was there a person at

22   Highland who was responsible for overseeing

23   Highland's participation in PwC's audit during

24   the time that you were the CFO?

25        A.    Yeah.  I mean, there was -- there
```

```
 1                    WATERHOUSE - 10-19-21
 2   was a -- there was a point -- it varies.  It
 3   varies by year, in function, in time and, you
 4   know, depending on the request, but yes, I
 5   mean, there is -- there is -- there is
 6   generally a point person of communication.
 7        Q.   And who was the point person from
 8   2016 until the time you left Highland?
 9        A.   I don't -- I don't know
10   specifically, but it would have been, you
11   know -- you know, someone on the corporate
12   accounting team.
13        Q.   And was there a head of the
14   corporate accounting team?
15        A.   Yes, so -- yes.
16        Q.   Who was the head of corporate
17   accounting for the five years prior to the time
18   you left Highland?
19        A.   I don't -- if you're asking from
20   2016 on, I don't -- it was Dave Klos, but,
21   again, there was -- there was changes to the
22   team and the reporting structure.  I don't
23   remember exactly when that happened during --
24   you know, over the last -- since 2016.
25        Q.   Did the folks who participated and
```

WATERHOUSE - 10-19-21

1      ran the audit all report to you, directly or

2      indirectly?

3           A.    Yes.

4           Q.    And did you have any responsibility

5      for making sure that the audit report was

6      accurate before it was finalized?

7           A.    Yeah.  I mean, you know, that --

8      that is -- my responsibility to the auditors

9      was -- again, is -- and the CFO is to -- we are

10     providing accurate financial statements; right?

11               And -- and -- and as part of any

12     audit, we disclose all relevant information as

13     part of any audit.

14          Q.    Okay.  And as the CFO, did you take

15     steps to make sure that the audit report was

16     accurate?

17          A.    I mean, I would say in a general

18     sense, yes.  But, again, I mean, I had a

19     very -- I had a very capable and competent

20     team.  I wasn't managing them.

21               You know, part of what I do is I let

22     the team -- I want managers to grow.  I want

23     managers to have rope.  And that is -- you

24     know, I'm not a stand-behind-you type of guy.

WATERHOUSE - 10-19-21

1    If you -- if you talk to my team members, I'm

2    not micromanaging people.  I want people to

3    learn and grow in their function so they can go

4    on and do bigger and better things with their

5    careers.

6              And so, yes, generally I was

7    responsible for it, but I wanted the team to

8    learn and grow and be responsible for the bulk

9    of the audit.

10   Q.    Did you personally review each audit

11   report before it was finalized to satisfy

12   yourself that it was accurate?

13   A.    I don't -- I don't recall, you know,

14   for every single -- we're talking 2016, there

15   would have been three years, 2016 to '17, '18.

16   I don't -- we're -- we're going back

17   five years-plus.  I don't -- you know, I don't

18   recall.

19   Q.    Did you have a practice that you

20   employed to make sure that you were satisfied

21   that Highland's audit reports were true and

22   accurate to the best of your knowledge?

23   A.    I mean, our -- the practice was set

24   up with our -- the -- the practice to put

1                    WATERHOUSE - 10-19-21

2    together accurate audited or accurate financial

3    statements is to your control environment.

4              So, you know, the -- so the practice

5    was to maintain a stable control environment

6    which then the output is -- is accurate

7    financial statements.

8              So -- so, you know, if I was

9    comfortable that the control environment was

10   operating, then, you know, that would dictate

11   how I would -- you know, what I might or might

12   not do in a given year.

13        Q.   Okay.  Do you recall ever being

14   uncomfortable with the control environment

15   during the period that you served as CFO?

16        A.   Yeah.  I mean, look, yes, there are

17   times -- you know, nothing is perfect.  So

18   there were -- there were times when, yes, you

19   know -- there are times I learned I was

20   uncomfortable with the control environment, and

21   that is part of the management of the process

22   and having, you know -- and -- and working

23   through whatever obstacles present themselves.

24        Q.   Okay.  Were you ever uncomfortable

25   with the control process as it related to

```
 1                  WATERHOUSE - 10-19-21

 2   reporting and disclosures of loans to

 3   affiliates and Mr. Dondero?

 4             MS. DANDENEAU:  Objection to form.

 5       A.    I don't -- I don't recall --

 6       Q.    So you don't recall --

 7       A.    -- the --

 8             MS. DANDENEAU:  Mr. Morris --

 9       A.    I don't recall being uncomfortable.

10   But, again, we're going back several years.  I

11   don't -- you know, the practice in an audit is

12   to disclose all information to the auditors.

13   And I don't -- I don't recall.

14       Q.    As part of the process of the audit,

15   did you sign what is sometimes referred to as a

16   management representation letter?

17       A.    Yes.

18             MR. MORRIS:  Can we put up on the

19        screen a document that we have premarked as

20        Exhibit 33.

21             (Exhibit 33 marked.)

22             MS. DANDENEAU:  Mr. Morris, that is

23        not in the binder; correct?

24             MR. MORRIS:  Correct.

25       Q.    So you will see, Mr. Waterhouse,
```

```
 1                WATERHOUSE - 10-19-21

 2    this is a letter dated June 3rd.  And if we

 3    could go to the signature page.

 4              And do you see that you and

 5    Mr. Dondero signed this document?

 6       A.    Yes.

 7       Q.    That is your signature; right?

 8       A.    Yes.

 9              MR. MORRIS:  Okay.  Can you go back

10       to the top.

11              MS. DANDENEAU:  Mr. Morris, can you

12       have somebody post this in the chat so that

13       we have can have a copy of this, please.

14              MR. MORRIS:  Yeah, sure.  Asia, can

15       you do that, please.

16       Q.    Okay.  Do you see at the bottom of

17    the second paragraph there is a reference to

18    materiality?

19       A.    Yes.

20       Q.    Okay.  It says, Materiality used for

21    purposes of these representations is

22    $1.7 million.

23              Do you see that?

24       A.    I do.

25       Q.    And did PwC set that level of
```

1              WATERHOUSE - 10-19-21

2    materiality?

3         A.    Yes.

4         Q.    And for purposes of the audit, did

5    PwC set the level of materiality each year?

6         A.    Yes.

7         Q.    Did that number change over time?

8         A.    I'm not aware of what materiality is

9    every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20              If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of

Page 94

```
 1                  WATERHOUSE - 10-19-21
 2    materiality that PwC established?
 3                  MS. DANDENEAU:  Objection to form.
 4         A.    So, again, during my tenure as CFO,
 5    and -- Highland -- it was -- it is required to
 6    disclose any affiliate loans that are in excess
 7    of materiality.
 8                  Now, the forgiveness of those loans
 9    may or may not -- I mean, since materiality
10    fluctuates every year, a -- you know, if a loan
11    was forgiven, it may or may not, you know --
12    and, look, I would want to consult the guidance
13    around this.
14                  It is not something we do -- you
15    know, it is not -- you know, GAAP can be and
16    disclosures can be very specialized so, again,
17    we want to consult the guidance.  But we would
18    see if and what would need to be disclosed if
19    it were deemed immaterial.
20         Q.    Did you and Mr. Dondero sign
21    management representation letters of this type
22    in each year in which you served as Highland's
23    CFO?
24         A.    I -- I -- I will speak for myself.
25    I signed them.  There may have been others that
```

1      WATERHOUSE - 10-19-21

2    signed as well.  I don't -- I don't recall.

3        Q.    But to the best of your knowledge,

4    you, personally, signed a management

5    representation letter in connection with

6    Highland's audit each year that you served as

7    the CFO; correct?

8        A.    I would say generally speaking,

9    Mr. Morris.  I don't recall for every single

10   year, you know, generally, but I would want to

11   refer to all the rep letters and see who signed

12   them.

13       Q.    Do you recall Highland having its

14   financial statements audited in any year during

15   the period that you were a CFO where you didn't

16   sign the management representation letter?

17       A.    I don't recall.  But, John, we're

18   going back five, six, seven, eight, nine,

19   decade.  I don't -- I don't remember.

20       Q.    I don't want to go back that many

21   decades, but I'm just asking you if you recall

22   that there was you didn't sign it?

23       A.    I -- I -- I don't, but my memory

24   is -- again, I -- I -- I can't tell you what I

25   did in 2012.  I mean, I think generally, yes,

Case 3:23-cv-00967-Doc 86-4 Filed 10/29/21 Entered 10/29/21 21:31:57 Page 9 Desc
Case 3:21-cv-00881-X Document 109-A8 Filed 04/06/24 Page 64 of 200 PageID 54586

Page 96

                    WATERHOUSE - 10-19-21

1

2    but I don't -- I don't know for sure, and I

3    would want to rely on the document.

4         Q.    Let me ask the question a little bit

5    differently then.

6               Do you have any reason to believe

7    that Highland had its annual financial audit

8    and you did not sign a management

9    representation letter in connection with that

10   audit?

11              MS. DANDENEAU:  Objection to form.

12        A.    I don't believe it would, but,

13   again, I would want to -- I don't recall and I

14   would want to confirm it to -- to make, you

15   know, an affirmative -- to give an affirmative

16   answer.

17        Q.    Do you know whether PwC required

18   management to sign management representation

19   letters?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes.  I mean, it -- management

22   representation letters are signed by

23   management.

24        Q.    Okay.  And do you know -- do you

25   have any understanding as to why PwC requires

Page 97

```
 1                 WATERHOUSE - 10-19-21

 2    management to sign management representation

 3    letters?

 4                 MS. DEITSCH-PEREZ:  Object to the

 5          form.

 6          A.    I don't know why PwC's -- what PwC's

 7    specific practice is.  I know generally what

 8    management representation letters are.

 9          Q.    Okay.  Do you personally -- I'm not

10    asking about PwC.  I'm asking for you -- I'm

11    asking about you, do you have an understanding

12    as to why the auditor asks for management

13    representation letters?

14          A.    Okay.  So you're asking me in my

15    personal capacity, yes, I have a general

16    understanding of why.

17          Q.    Can you give me the general

18    understanding that you have as to why

19    management representation letters are required?

20          A.    They are -- they are required to --

21    they are -- they are one of the items required

22    in an audit to help verify completeness.

23          Q.    Do you have any -- any other

24    understanding as to why management

25    representation letters are required?
```

```
 1                    WATERHOUSE - 10-19-21

 2          A.     That is -- that is -- other than

 3    what I said, it is -- it is -- it is required

 4    so -- to ensure that the -- you know, there

 5    is -- there is completeness in what is being

 6    audited.

 7          Q.     Did you -- did you have a practice

 8    whereby you and Mr. Dondero conferred about the

 9    management representation letters before you

10    signed them?

11          A.     No.

12          Q.     Did you have a practice --

13    withdrawn.

14               Do you see just the next sentence

15    after the materiality, there is a sentence that

16    states:  We confirm, to the best of our

17    knowledge and belief, as of June 3rd, 2019, the

18    date of your report, the following

19    representations made to you during your audit.

20               Do you see that sentence?

21          A.     Yes.

22          Q.     Okay.  Did you understand when you

23    signed this letter that you were confirming the

24    representations that followed?

25          A.     When I signed this management
```

1     letter -- representation letter, yes.

2         Q.   Okay.  Did you discuss this letter

3     with Mr. Dondero before you signed it?

4         A.   I don't recall.

5         Q.   Do you recall if Mr. Dondero asked

6     you any questions before he signed the letter?

7         A.   I don't recall.

8         Q.   Do you recall if you asked

9    Mr. Dondero any questions before you signed

10   this letter?

11        A.   I don't recall.

12       Q.   Is it fair to say that Mr. Dondero

13   did not disclose to you the existence of the

14   agreement that we have -- as we've defined that

15   term prior to the time you signed this letter?

16        MS. DANDENEAU:  Objection to form.

17       A.   I don't think I understand the

18   question.  So, again, you are saying, did

19   Mr. Dondero not disclose to me the existence of

20   this letter?

21       Q.   No, I apologize.

22        Did Mr. Dondero disclose to you the

23   existence of the agreement prior to the time

24   you signed this letter on June 3rd, 2019?

1                    WATERHOUSE - 10-19-21

2          A.     The agreement -- the agreement that

3    we talked about earlier?

4          Q.     Correct.

5          A.     Look, as I said earlier, the first

6    time I heard of this agreement was sometime

7    this year.

8          Q.     Okay.  Can we turn -- let's just

9    look at a couple of items on the list.  If we

10   can go to page 33416.  Do you see in Number 35

11   it talks about the proper recording or

12   disclosure in the financial statements of ND

13   relationships and transactions with related

14   parties.

15              Do you see that?

16         A.     I do.

17         Q.     As the CFO, do you have any

18   understanding as to whether Dugaboy is a

19   related party?

20         A.     I don't recall.

21         Q.     Do you know whether any of the

22   affiliates are related parties?

23         A.     If -- if it was NexPoint, HCMFA,

24   HCMS, HCRE, yeah, if -- if that is the

25   affiliate definition, and there.  In ASC 850 --

1                    WATERHOUSE - 10-19-21

2    again, I mean, I haven't looked at ASC 850 in

3    quite some time, but, you know, if -- if there

4    is a control language, you know, ASC 850, would

5    that -- that section in GAAP would -- would

6    pick up and define what are related parties.

7              So, you know, like I said, if -- one

8    of the four entities I just described, if -- if

9    they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11        Q.    Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15        A.    I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17        Q.    Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20        A.    Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.

1                 WATERHOUSE - 10-19-21

2      Q.    To the best of your knowledge, was

3  the existence of the agreement ever disclosed

4  to PwC?

5      A.    I'm not -- I'm not aware.

6      Q.    Do you recall if the agreement was

7  ever disclosed in Highland's audited financial

8  statements?

9      A.    I don't -- I don't remember if it

10  was in every Highland's audited financial

11  statements during my tenure.  We would have to

12  read the financial statements to see what was

13  disclosed, but I'm not -- I mean, as I sit here

14  today, I'm not aware.

15      Q.    That is all I'm asking for.

16      A.    I'm not aware.

17      Q.    Can we go to the next page, please,

18  and look at 36.  36 says, we have disclosed to

19  you the identity of the partnership's related

20  party relationships and all the related party

21  relationships and transactions of which we are

22  aware.

23           Do you see that?

24      A.    Yes.

25      Q.    To the best of your knowledge, as of

```
 1                WATERHOUSE - 10-19-21
 2   June 3rd, 2019, did Highland disclose to PwC
 3   the identity of the partnership's related
 4   parties and all the related party relationships
 5   and transactions of which it was aware?
 6        A.    I mean, I can speak for myself as
 7   signer of this representation letter.  I
 8   disclosed what -- what, you know, what --
 9   what -- what I knew.  Sorry, look, yes, so I --
10   I disclosed what I knew.
11        Q.    Okay.  Can we go to page 419.  Do
12   you see at the end there is a reference to
13   events that occurred since the end of the
14   fiscal year and the date of the letter?
15        A.    Yes.
16        Q.    And were you aware of that -- of
17   that provision of the management representation
18   letter before you signed the document?
19        A.    Yes.
20        Q.    Do you have an understanding as to
21   why PwC asked for that confirmation of that
22   particular part of the management
23   representation letter?
24        A.    It is -- it is -- it is just -- it
25   is a typical audit request.
```

1                  WATERHOUSE - 10-19-21

2           Q.     And do you understand -- do you have

3      an understanding that PwC wanted to know that

4      as of the date of the audit whether any

5      material changes had occurred since the end of

6      the fiscal year, using the definition of

7      materiality that is in this particular

8      management representation letter?

9           A.     It -- it is -- it is -- it is a --

10     it is as described.  It is just a poorly worded

11     question, so it is hard for me to say yes.

12          Q.     If I asked you this, I apologize,

13     but did you ever learn when the agreement was

14     entered into?

15          A.     I don't -- I don't -- like I said

16     before, I don't know or have any details of the

17     agreement.

18          Q.     Okay.  Did you ever ask anybody when

19     the agreement was entered into?

20          A.     I did not.

21          Q.     Let's look at the audited financial

22     statements.  We will put up on the screen a

23     document that has been premarked as Exhibit 34.

24                 (Exhibit 34 marked.)

25                 MS. DANDENEAU:  And again, if Ms. La

Case 3:21-cv-00087-bjc Doc Filed 10/20/21 Entered 10/20/21 13:57 Set 397
Case 3:21-cv-00881-X   Document 170-18   Filed 05/06/24   Page 73 of 200   PageID 54595

Page 105

```
 1                  WATERHOUSE - 10-19-21

 2         Canty could please put that in the chat

 3         room, that would be great.

 4              MR. MORRIS:  I will assure you we

 5         will put every document in the chat room.

 6         Q.    Now, I'm just going to ask you

 7    questions that are related to the provisions of

 8    this report that concern the affiliate loans,

 9    but again, Mr. Waterhouse, if there is any part

10    of the document that you need to see or that

11    you think you might need to see in order to

12    refresh your recollection to answer any of my

13    questions, will you let me know that?

14         A.    Yes.

15         Q.    Because this is a pretty lengthy

16    document, but do you see that the cover page

17    here is the Highland consolidated financial

18    statements for the period ending December 31st,

19    2018?

20         A.    Yes.

21         Q.    If we can go to -- I think it is the

22    next one, looking for PwC's signature line.

23              MS. CANTY:  I'm sorry, John, did you

24    say something?

25              MR. MORRIS:  Yes, can we turn the
```

1              WATERHOUSE - 10-19-21

2         page.  I think it is 215.  Yes, stop right

3         there, just above -- I'm sorry, I want to

4         see just the date of the report.

5         Q.    Okay.  Do you see at the bottom of

6    that page there, Mr. Waterhouse,

7    PricewaterhouseCoopers has signed this audit

8    report?

9         A.    Yes, I see their signature.

10        Q.    Okay.  And it is the dated same day

11   as your management representation letter; is

12   that right?

13        A.    It is -- yes, it is the same day.

14        Q.    Was that the practice to sign the

15   management representation letter on the same

16   day that the audit report was signed?

17        A.    Yes, that is typical in every audit.

18        Q.    Can we just scroll down to the

19   balance sheet on the next page.

20             Do you see that there is a line

21   there that says, Notes and Other Amounts Due

22   from Affiliates?

23        A.    Yes.

24        Q.    Does that line, to the best of your

25   knowledge, include the amounts that were due

```
 1                    WATERHOUSE - 10-19-21

 2    under the affiliate under the notes signed by

 3    the affiliates and Mr. Dondero?

 4              MR. RUKAVINA:  Objection to the

 5         extent that calls for a legal conclusion.

 6         A.    I mean, I would want to see the

 7    detail and the build to this $173,398,000, but,

 8    yes, I mean, if -- if -- given what we

 9    discussed before, you know, it -- it should

10    capture that.

11         Q.    And -- and while you were the CFO of

12    Highland, were all notes held by Highland that

13    were issued by an affiliate or Mr. Dondero

14    carried as assets on Highland's balance sheets?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Object to form.

17         A.    I don't -- I don't know how else

18    they would be carried.

19         Q.    Okay.  Can you think of any -- are

20    you aware of any promissory note issued by an

21    affiliate or Mr. Dondero that was not carried

22    on Highland's audited financial balance sheets?

23         A.    I'm -- I'm -- I'm not aware.

24         Q.    Okay.  Are you aware of any category

25    of asset on Highland's balance sheet in which
```

1                    WATERHOUSE - 10-19-21

2      any of the promissory notes issued by an

3      affiliate or Mr. Dondero would have been

4      included?

5                    MS. DANDENEAU:  Objection to form.

6          A.     Sorry, am I aware of any asset of an

7      affiliate being included --

8          Q.     That -- let me -- let me try again.

9                    Do you see there is a number of

10     different assets that are described on this

11     balance sheet?

12         A.     Yes.

13         Q.     One of the assets that is described

14     is Notes and Other Amounts Due from Affiliates;

15     right?

16         A.     Yes.

17         Q.     And it is reasonable to conclude

18     that the notes from the affiliates and

19     Mr. Dondero are included in that line item;

20     right?

21         A.     Yes, based on this description.

22     Again, I would want to see a build of this to

23     100 percent confirm, but based on the

24     description, the asset description, it is -- it

25     is likely.

Case 23-03007-sgj Doc 80 Filed 10/20/21 Entered 10/20/21 21:51:57 Page 109 of 397
Case 3:21-cv-00881-X Document 179-18 Filed 05/06/24 Page 77 of 200 PageID 54599

Page 109

WATERHOUSE - 10-19-21

1

2          Now, does that mean absolute?  I

3   don't know.

4          Q.    Do you have any reason to believe

5   that the promissory notes would have been

6   carried on the balance sheet in a category

7   other than Notes and Other Amounts Due from

8   Affiliates?

9          A.    If they were deemed -- no.  If they

10  were deemed an affiliate, you know, under GAAP,

11  they should be carried in that line.

12  Otherwise, it would go into another line.

13         Q.    Okay.  And do you see the total

14  asset base as of December 31st, 2018, was

15  approximately $1.04 billion?

16         A.    Yes.

17         Q.    Is my math correct that the Notes

18  and Other Amounts Due from Affiliates

19  constituted approximately 17 percent of

20  Highland's assets as of the end of 2018?

21         A.    Well, so how are you defining

22  Highland?

23         Q.    Highland Capital Management, L.P.,

24  the entity that this audit is subject to -- or

25  the subject of.

```
 1                 WATERHOUSE - 10-19-21

 2        A.    On a consolidated or unconsolidated

 3   basis?

 4        Q.    I'm looking at the balance sheet.

 5   It is a consolidated balance sheet.  Okay?

 6             Does the Notes and Other Amounts Due

 7   from Affiliates constitute approximately

 8   17 percent of the total assets of Highland

 9   Capital Management, L.P., on a consolidated

10   basis?

11             MS. DANDENEAU:  Objection to form.

12        A.    I don't have a calculator in front

13   of me but I will take your math, if you are

14   taking the 173 divided by the billion.

15        Q.    Okay.

16        A.    If that is accurate, yes.  But,

17   again, on a consolidated basis.

18        Q.    And on an unconsolidated basis the

19   percentage would be higher; correct?

20        A.    I -- no.  I don't know.

21        Q.    Well, okay.  That is fair.

22             MR. MORRIS:  Can we turn to

23        page 241, please.

24        Q.    Do you see that this is a section of

25   the audit report that is entitled Notes and
```

1                 WATERHOUSE - 10-19-21

2   Other Amounts Due from Affiliates?

3        A.    Sorry, I can't see the -- the --

4        Q.    It is at the top.

5        A.    Notes and Other Amounts Due from

6   Affiliates, yes, I see that.  I don't -- I

7   don't have a page number, but I'm on a page

8   that says at the top:  Notes and Other Amounts

9   Due from Affiliates.

10       Q.    Okay.  And that is the same title of

11  the line item on the balance sheet that we just

12  looked at; right?  Notes and Other Amounts Due

13  from Affiliates?

14       A.    Yes.

15       Q.    And is it your understanding, based

16  on your experience and knowledge as the CFO,

17  that this is the section of the narrative that

18  ties into the line item that we just looked at?

19       A.    Yes.

20       Q.    And is this section of the audit

21  report intended to describe and disclose all of

22  the material facts concerning the Notes and

23  Other Amounts Due from Affiliates?

24             MS. DANDENEAU:  Objection, form.

25       A.    This -- these notes -- these notes

WATERHOUSE - 10-19-21

 1

 2    of the financial statements are -- the purpose

 3    is to disclose any material items in relation

 4    to that balance sheet line item.

 5         Q.   Okay.  And all of the information,

 6    to the best of your knowledge, that is set

 7    forth in this section of the audit report was

 8    provided by Highland; correct?

 9         A.   Yes, it would have been provided by

10    the corporate accounting team.

11         Q.   Okay.  And the corporate accounting

12    team, did that team report to you in the

13    organizational structure?

14         A.   Yes.

15         Q.   And did you have any concerns about

16    the controls that were in place to make sure

17    that the information provided with respect to

18    Notes and Other Amounts Due from Affiliates was

19    accurate and complete?

20              MS. DANDENEAU:  Objection to form.

21         A.   Not that I recall.

22         Q.   Okay.  Do you recall ever being

23    concerned that any portion of the Notes and

24    Other Amounts Due from Affiliates in any audit

25    report was inaccurate, incomplete, or not

```
1                 WATERHOUSE - 10-19-21

2    reliable?

3         A.    I didn't -- I had concerns about,

4    you know, like I talked about before, of there

5    were -- there were potentially issues in the

6    control environment.  But as far as it relates

7    to the audited financial statements, any -- the

8    team would work with the auditors to disclose

9    all -- all notes in Highland's possession.

10              And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15        Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20              MS. DANDENEAU:  Objection to form.

21        A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25              Again, I wasn't anywhere chose to
```

```
 1              WATERHOUSE - 10-19-21

 2   being the point person of this audit.  And I

 3   can't recall, you know, when -- you know, I

 4   don't even know if I was ever the point person

 5   during my tenure as CFO.

 6              I don't know if PwC had any concerns

 7   when they were performing those audit

 8   procedures.  They may have and they may have --

 9   and it may not have been communicated to me.  I

10   don't know.

11              MR. MORRIS:  All right.  I move to

12        strike.

13        Q.    And I'm going to ask you to listen

14   carefully to my question.

15              Did you -- do you recall ever having

16   a conversation with anybody at any time

17   concerning the accuracy of the reporting

18   provided in the audited financial statement on

19   the topic of Notes and Other Amounts Due?

20              MS. DANDENEAU:  Objection to form.

21        A.    I don't recall for this, but that

22   doesn't mean that it didn't exist.

23        Q.    Okay.  But you have no reason to

24   believe, as you sit here right now, that you

25   ever discussed with anybody concerns over the
```

```
1                 WATERHOUSE - 10-19-21

2    accuracy of the section of the audit reports

3    called Notes and Other Amounts Due from

4    Affiliates; correct?

5              MS. DANDENEAU:  Object to the form.

6              MS. DEITSCH-PEREZ:  Objection to

7         form.

8         A.    I don't recall having any

9    conversations.  But, again, I mean, this is --

10   this is two years ago.

11        Q.    I'm just asking for your

12   recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17   recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20   drafting the audit report?

21        A.    Are you asking the actual Highland

22   employee responsible?  I mean, it was

23   Highland's responsibility, so, I mean, that

24   is --

25        Q.    Right.
```

```
 1              WATERHOUSE - 10-19-21
 2        A.     -- Highland's responsibility.
 3   Highland's responsibility.
 4        Q.     Who, at Highland, was responsible
 5   for drafting this section of the audit report?
 6        A.     I -- I don't know the answer to
 7   that.  Again, there was a team who worked on
 8   this.  And I don't know, you know, whether it
 9   was the staff or the manager.
10              Again, this is where I let the teams
11   manage.  And, you know, there may be a
12   corporate accountant who worked on this.  I
13   just -- you know, I wasn't part of that process
14   to give that person experience.  I don't know.
15        Q.     Do you recall having any
16   communications with anybody at any time
17   concerning this section of the report?
18        A.     Yeah, I don't recall.
19        Q.     Do you recall whether you ever told
20   anybody at any time that any aspect of this
21   section of the report was inaccurate or
22   incomplete?
23        A.     I don't recall.
24        Q.     As you sit here today, do you have
25   any reason to believe that this section of the
```

1                    WATERHOUSE - 10-19-21

2    audit report is incomplete or inaccurate in any

3    way?

4                    And I'm happy to give you a moment

5    to -- to look at it, if you would like.

6                    MS. DANDENEAU:  Objection to form.

7                    MS. DEITSCH-PEREZ:  Same.

8         A.    I mean, I would have to look at -- I

9    would have to look at the bill to the note

10   schedule to make sure I know you presented me

11   with materiality, but again, there might be a

12   note as of 12/31/18 that somehow was -- was

13   under materiality not disclosed.  I don't -- I

14   don't know.  I would need more information.

15        Q.    Okay.  But without more information,

16   you have no reason to believe anything this

17   section is inaccurate; correct?

18                   MS. DANDENEAU:  Objection to form.

19        A.    I don't.  I mean, you know, this was

20   part of the audit.

21        Q.    Thank you.  Now, you will see if we

22   could scroll just a little bit more that each

23   of the first five paragraphs concerns

24   specifically the four affiliates that we've

25   been discussing and Mr. Dondero.

```
 1                    WATERHOUSE - 10-19-21

 2               MR. MORRIS:  If we could go the

 3          other way, La Asia.  We don't need Okada.

 4          We're going to have to thread the needle.

 5          Okay.  Good, perfect.

 6          Q.    Do you see those five paragraphs

 7     certain the four affiliates and Mr. Dondero as

 8     we've been referring to today?

 9          A.    Yes.

10          Q.    Okay.  And do you see at the end of

11     every paragraph it states, quote:  A fair value

12     of a partnership's outstanding notes receivable

13     approximates the carrying value of the notes

14     receivable?

15          A.    Yes, I see that.

16          Q.    Do you have an understanding of what

17     that means?

18          A.    Yes.

19          Q.    What is your understanding of that

20     sentence?

21          A.    It is the -- again, the -- the fair

22     value, right, which is -- which is what the --

23     what Highland could sell that asset for.  This

24     statement is comparing the fair value of the

25     notes to the carrying value, so the carrying
```

WATERHOUSE - 10-19-21

1
2  value is the line item that you showed me

3  earlier that is in Notes and Other Amounts Due

4  from Affiliates.

5      Q.   Okay.  Is another way to say this is

6  that the fair market value of the notes equals

7  the principal amount and -- withdrawn.

8          Is the fair way to interpret this

9  that the fair market value of the notes equals

10 all remaining unpaid principal and interest due

11 under the notes?

12         MS. DANDENEAU:  Object to the form.

13         MS. DEITSCH-PEREZ:  Objection, form.

14     A.   I don't know the answer to that,

15 because I don't recall where -- where any --

16 where -- in what line item was the interest

17 component reported.

18     Q.   All right.  Well, if we look in this

19 audit report, you will see in the middle of the

20 first paragraph, for example, it states that as

21 of December 31st, 2018, total interest and

22 principal due on outstanding promissory notes

23 was approximately $5.3 million.

24         Do you see that?

25     A.   I do.

                    WATERHOUSE - 10-19-21

1

2        Q.    Is that the carrying value or the

3    fair value?

4        A.    That would be the carrying value --

5        Q.    And is the last --

6        A.    -- in my opinion.

7        Q.    Okay.  And it is in your opinion as

8    the chief financial officer of Highland during

9    the period of time that you described; right?

10   It is an educated opinion?

11       A.    I'm reading this at face value.  I'm

12   taking that as that is carrying value.

13       Q.    Okay.  And does the last sentence

14   say that the carrying value is roughly

15   approximate to the fair market value?

16             MS. DANDENEAU:  Objection to form.

17             MS. DEITSCH-PEREZ:  Objection, form.

18       A.    Again, this note to the financial

19   statement is specific to notes and other

20   amounts due from affiliates.

21       Q.    Correct.

22       A.    If the interest component is

23   reported elsewhere on the balance sheet, you

24   know, it -- it -- it could be off.  Again, I

25   don't have the detail.  I don't know, but yes,

WATERHOUSE - 10-19-21

1  look, I mean, if you -- I mean, if you are

2  saying the 5.3 million is in the notes and

3  other amounts due from affiliates, then the

4  last statement is saying the fair value

5  approximates 5.3 million.  That is what that

6  last sentence is saying.

7  Q.    Do you see in the middle of the

8  first paragraph -- not in the middle, the next

9  to last sentence there is a statement that the

10  partnership will not demand payment on amounts

11  that exceed HCMFA's excess cash availability

12  prior to May 31st, 2021.

13           Do you see that?

14  A.    I do.

15  Q.    Do you know when Highland agreed not

16  to demand payment as described in that

17  sentence?

18  A.    I don't know specifically.

19  Q.    Do you know why Highland agreed not

20  to demand payment on HCMFA's notes until May

21  2021?

22  A.    Yes.

23  Q.    Why was that decision made?

24  A.    You know, well, it -- it -- that

Case 3:10-cv-00691-N Doc 864 Filed 10/20/21 Entered 10/20/21 21:31:55 Desc
Case 3:21-cv-00881-X Document 179-18 Filed 07/06/24 Page 90 of 200 PageID 54612

Page 122

1                          WATERHOUSE - 10-19-21

2    decision was made as to not put HCMFA into a

3    position where it didn't have sufficient assets

4    to pay for the demand note.

5          Q.    And at the time the agreement was

6    entered into, pursuant to which the partnership

7    wouldn't demand payment, did HCMFA have

8    insufficient assets to satisfy the notes if a

9    demand had been made?

10              MS. DANDENEAU:  Objection to form.

11         A.    I don't have HCMFA's financial

12   statements in front of me as of 12/31/18.

13         Q.    Was there a concern that HCMFA would

14   be unable to satisfy its demands under the

15   notes if demand was made?

16              MS. DANDENEAU:  Objection to form.

17         A.    Well, there is -- I don't recall --

18   I mean, there is something, right, in place to

19   basically not demand payment until May 31, 2021

20   as detailed here.

21         Q.    And who made the decision to enter

22   into -- who made the decision on behalf of

23   Highland not to demand payment until May 31st,

24   2021?

25         A.    I'm trying to remember.  I don't

Case 23-03007-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 12 Desc
Case 3:21-cv-00881-X Document 179-18 Exhibit 18 Filed 07/20/24 Page 91 of 200 PageID 54613

Page 123

1                    WATERHOUSE - 10-19-21

2    remember exactly -- I don't remember if it was

3    myself or -- or Jim Dondero who -- who -- there

4    was -- there was something signed, from what I

5    recall, that -- that -- that backed up this

6    line item in the -- in the notes I'm -- look,

7    I'm, I'm --

8         Q.    We will get to that.

9         A.    You --

10        Q.    I'm just --

11        A.    You have -- I mean --

12        Q.    We're going to give that to you.

13   I'm going to give that to you.

14        A.    You -- you -- you have all the

15   documents.  I don't have the documents, and

16   that is what makes it so hard.  I don't have

17   any documents to prepare for this deposition;

18   right?  You have all -- I don't -- I don't -- I

19   don't remember, but, you know, again, it would

20   probably be myself or Jim.

21        Q.    Do you know if Highland received

22   anything in return for its agreement not to

23   make a demand for two years?

24        A.    I don't -- I don't think it referred

25   anything.

Case 3:10-0500gj-sgj 8c-cFiile1 1070/210/291ared E10e20/210/292 1381:5Ba5c7 12es397
Case 3:21-cv-00881-X   Documentit109-A8   FiPled 07300/2446   Page 92 of 200   PageID 54614

Page 124

WATERHOUSE - 10-19-21

1

2      Q.    And did you and Mr. Dondero discuss

3   HCMFA's ability to satisfy the notes if a

4   demand was made at the time this agreement was

5   entered into?

6           MS. DANDENEAU:  Objection to form.

7      A.    I don't -- I don't -- I don't recall

8   having a specific conversation, if I did, or --

9   or David Klos.

10      Q.    Okay.  I'm just asking if you recall

11   any conversations that you had.

12      A.    I don't recall.

13      Q.    Okay.  Do you know why Highland

14   loaned the money to HCMFA that is the subject

15   of the notes described in this paragraph?

16      A.    I don't remember specifically why

17   5.3 million was loaned.  I mean, I -- it would

18   have to be put in the context.

19      Q.    Do you have any recollection at all

20   as to why Highland ever loaned any money to

21   HCMFA?

22      A.    Yes.

23           MS. DANDENEAU:  Objection to form.

24      Q.    What do you remember about that?

25      A.    There was a Highland Global

```
 1                    WATERHOUSE - 10-19-21

 2   Allocation Fund, which was a -- a fund managed

 3   by Highland Capital Management Fund Advisors.

 4   There was a -- we -- I'm just telling you,

 5   there was -- there was -- there was a -- a

 6   ultimately a NAV error found in this fund while

 7   it was an open-ended fund and, you know, there

 8   were amounts owed by the advisor in -- in

 9   relation to that NAV error.

10              There were also, for the same fund,

11   that same fund was ongoing an

12   open-end-to-close-end conversion, and as part

13   of that proposal, shareholders who voted for

14   the conversion received compensation from the

15   advisor.

16       Q.    All right.  Now, the events that

17   you're describing occurred in the spring of

18   2019; right?

19       A.    These started back -- I think, I

20   mean --

21       Q.    I apologize.

22       A.    -- that -- I mean, the answer to

23   that is no.

24       Q.    I apologize, the loans that were

25   made in connection with the events that you're
```

1                    WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3               MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5         A.    I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8         Q.    Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13        A.    This is for NexPoint Advisors?

14        Q.    Yes.

15        A.    I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18        Q.    Do you know why?

19        A.    But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21        Q.    Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24        A.    Yes.

25        Q.    Why did High -- why do you recall --

```
 1                    WATERHOUSE - 10-19-21

 2    what is the reason you recall Highland lending

 3    money to NexPoint?

 4         A.    I mean, I was just -- I just -- I

 5    just recall.  I mean, I just -- I don't

 6    remember why.

 7         Q.    I understand.  And I'm asking you if

 8    you recall --

 9         A.    Oh, why -- I thought you say --

10    NexPoint Advisors was launching a fund which

11    is -- I believe that the legal name is NexPoint

12    Capital, Inc.  And it -- it provided a

13    co-invest into that fund.

14               And, from what I remember, the --

15    the -- that NexPoint borrowed money from

16    Highland at the time to make that co-invest.

17         Q.    So this was an investment that

18    NexPoint was required to make; is that right?

19               MS. DANDENEAU:  Objection to form.

20         A.    I don't know if it was required to

21    make, I don't recall that, or if it just made

22    it.

23         Q.    Okay.  But your recollection is that

24    NexPoint made an investment and they borrowed

25    money from Highland to finance the investment.
```

Case 3:10-5037-cv 8 Doc Filed 10/20/21/21 and for En0/20/21/29/2131 577 Page 128 of 397
Case 3:21-cv-00881-X   Document 179-18   Filed 07/06/246   Page 96 of 200   PageID 54618

Page 128

                        WATERHOUSE - 10-19-21

1

2                    Do I have that right?

3          A.     Yes.

4          Q.     How about HCRE?  Do you know why

5     HCRE borrowed money from Highland?

6          A.     I don't remember specifically.

7          Q.     Do you remember generally?

8          A.     Generally, yeah -- I mean, yes.

9          Q.     Can you tell me your general

10    recollection as to why Highland loaned money to

11    HCRE?

12         A.     For -- for -- for investment

13    purposes.

14         Q.     So HCRE made the investment and it

15    obtained a loan, or loans, from Highland in

16    order to finance that investment or those

17    investments.

18                    Do I have that right?

19         A.     I mean, I -- you know, generally.

20         Q.     Okay.  How about Highland Management

21    Services, Inc.?

22                    Do you have any recollection as to

23    why HCMS borrowed money from Highland?

24         A.     Generally.

25         Q.     What is your general recollection as

```
1                  WATERHOUSE - 10-19-21

2    to why HCMS borrowed money from Highland?

3         A.    For -- for investment purposes.

4         Q.    So it is the same thing, HCMS wanted

5    to make investments and it borrowed money from

6    Highland in order to finance those investments;

7    is that right?

8         A.    I mean, yes, generally.  I mean, I

9    can't -- I don't -- on the services, there --

10   there are several loans in these schedules.

11   You know, I can't remember why every single one

12   of these were made, but I would say, yeah, I

13   mean, generally.

14        Q.    Okay.  I appreciate that.

15             MR. MORRIS:  Let's go to the page

16        with Bates No. 251.  La Asia, are you

17        there?

18             MS. CANTY:  Sorry, John.  It went

19        out for a minute.  Can you say that again.

20        I don't know what is going on.

21             MR. MORRIS:  The page with Bates

22        No. 251, can we go to that.

23             MS. CANTY:  Yes, sorry.

24             MR. MORRIS:  Keep going to the

25        bottom.  Yeah, there you go.
```

1                 WATERHOUSE - 10-19-21

2       Q.    Do you see, Mr. Waterhouse, that

3    there is a section there called Subsequent

4    Events?

5       A.    I do.

6       Q.    And does this relate to the last

7    sentence above the signature line on the

8    management representation letter that we talked

9    about earlier where you made the representation

10   that you disclosed subsequent events?

11      A.    I mean, it relates to it, but not in

12   its entirety.

13      Q.    Okay.

14            MR. MORRIS:  If we can scroll up to

15       capture the entirety of this section right

16       here.

17      Q.    And what do you mean by that, sir?

18            MR. MORRIS:  Yeah, right there.

19       Perfect.

20      A.    There are -- there are different

21   subsequent events in -- under GAAP.  So there

22   are -- and -- and -- so what we see in the

23   notes to the financial statements are one type

24   of subevent.

25      Q.    Okay.  And -- and would the type of

1                    WATERHOUSE - 10-19-21

2    subsequent event relating to affiliate loans be

3    captured in this section if they were -- if

4    they were made after the end of the fiscal year

5    and prior to the issuance of the audit report?

6         A.    Yes, if they were deemed material or

7    disclosable.

8         Q.    Okay.  I appreciate that.

9              Do you see the next to the last

10   entry there?  It says, Over the course of 2019

11   through the report date, HCMFA issued

12   promissory notes to the partnership in the

13   aggregate amount of $7.4 million?

14        A.    Yes.

15        Q.    And does that refresh your

16   recollection that those are the notes that

17   related to the NAV error that you mentioned

18   earlier?

19        A.    I don't -- I don't remember the

20   exact.  Again, there are -- I mentioned two

21   line items; right?

22        Q.    Yes.

23        A.    I mean, it was the GAAP conversion

24   process plus the -- the NAV error.  I don't

25   have the details.  I don't recall specifically

Case 3:21-cv-00881-X Doc File 1 07/20/210/29/21red Ent0e20/210/292231:5Page 132est 397
Case 3:21-cv-00881-X Document 1791-8 Exh7541-8 Page 0309/2446Page 100 of 200 PageID 54622

Page 132

```
1                    WATERHOUSE - 10-19-21

2    if -- you know, what -- if that 7.4 million was

3    solely attributable to the NAV error.

4         Q.    Okay.  But there is no question that

5    Highland told PricewaterhouseCoopers that over

6    the course of 2019 HCMFA issued promissory

7    notes to the partnership in the aggregate

8    amount of $7.4 million; correct?

9         A.    In the course of the audit, we would

10   have produced all promissory notes in our

11   possession, including the ones that are

12   detailed here.

13        Q.    Do you recall that you signed the

14   two promissory notes that are referenced in

15   that provision?

16             MS. DANDENEAU:  Objection to form.

17        A.    I didn't recall initially but I've

18   been reminded.

19        Q.    Okay.  And -- and do you recall that

20   those notes are dated May 2nd and May 3rd,

21   2019?

22        A.    Yes.

23        Q.    So that was just a month before the

24   audit was completed; correct?

25        A.    Yes.  I think we had a June 3rd
```

                     WATERHOUSE - 10-19-21

1

2   date, right, if -- if my memory serves me

3   right.

4        Q.    Yes, I will represent to you that

5   your memory is accurate in that regard.

6              Did anybody ever instruct you as the

7   CFO to correct this statement that we're

8   looking at in subsequent events?

9        A.    So let me understand.  You're saying

10  when I was CFO at Highland Capital did anyone

11  ever ask me to correct the -- over the course

12  of 2019 through the report date HCMFA issued

13  promissory notes, this statement?

14       Q.    Right.

15       A.    Not that I'm aware.

16       Q.    While you were the CFO of Highland,

17  did anybody ever tell you that that sentence

18  was wrong?

19       A.    Not that I'm aware.

20       Q.    Highland -- withdrawn.

21             HCMFA disclosed these notes in its

22  own audited financial statements; right?

23             MR. RUKAVINA:  Objection, form.

24       A.    I assume that these would be

25  material -- if these are material financial

```
1              WATERHOUSE - 10-19-21

2    statements, yes, they -- they -- they should be

3    and they were likely disclosed.

4         Q.    Now, there is no statement

5    concerning the 2019 notes about the forbearance

6    that we looked at in the affiliated note

7    section of the report; right?

8              MS. DANDENEAU:  Objection to form.

9         Q.    I'll withdraw.  That was bad.

10             Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15        A.    Yes.

16        Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18        A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21        Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25        A.    Right.  But this is through
```

Case 3:05-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 135 of 397
Case 3:21-cv-00881-X Document 179-18 Page 103 of 446 Page 103 of 200 PageID 54625

Page 135

```
 1                    WATERHOUSE - 10-19-21

 2   June 3rd.  It could have been done on June 4th.

 3   I don't -- I don't -- I don't recall.

 4        Q.    Okay.

 5              MR. MORRIS:  Can we put up on the

 6        screen the HCMFA audit report.  And while

 7        we're --

 8              MS. DANDENEAU:  What exhibit is

 9        this?

10              MR. MORRIS:  La Asia, what number is

11        that?

12              MS. CANTY:  45.

13              MR. MORRIS:  So this will be marked

14        as Exhibit 45.

15              (Exhibit 45 marked.)

16              MS. CANTY:  Yeah, and I will put it

17        in the chat.

18              MS. DANDENEAU:  Thank you.

19        Q.    Okay.  All right.  Do you see that

20   this is the consolidated financial statements

21   for HCMFA for the period ending 12/31/18?

22        A.    Yes.

23        Q.    As the treasurer of HCMFA at the

24   time, did you have to sign a management

25   representation letter similar to the one that
```

Case 3:21-cv-00881-X Document 185-1 Filed 10/20/21 Entered 10/20/21 22:31:57 Page 136 of 397
Case 3:21-cv-00881-X Document 179-13 Page 01599/2446 Page 104 of 200 PageID 54626

Page 136

```
 1                    WATERHOUSE - 10-19-21

 2    we looked at earlier for Highland?

 3        A.    I would imagine I would have been

 4    asked to.  I don't recall if I did.

 5        Q.    Do you recall ever being asked by an

 6    auditor to sign a management representation

 7    letter and then not doing it?

 8        A.    No.

 9              MR. MORRIS:  Can we just scroll down

10         again.  I just want to see the date of the

11         document.

12        A.    I mean, let me -- you know, there

13    are different versions to management

14    representation letters I will qualify.

15              Yes, there are certain -- from time

16    to time auditors can make representations

17    that -- in the rep letter that is being

18    proposed that are inaccurate or out of scope or

19    things like that and they've asked for

20    signature.

21              In that context, yes.  I mean, you

22    know -- I mean, if I have been asked to sign

23    and make those representations and those

24    representations are invalid, yes, I would not,

25    I mean, I -- I wouldn't sign that.
```

```
 1                    WATERHOUSE - 10-19-21
 2        Q.    Okay.  PricewaterhouseCoopers served
 3   as HCMFA's outside auditors as well; correct?
 4        A.    Yes.
 5        Q.    Do you see that this audit report is
 6   signed on June 3rd, 2019, just like the
 7   Highland audit report?
 8        A.    That is correct.
 9        Q.    And did the process of -- of
10   preparing HCMFA's audit report, was that the
11   same process that Highland followed when it did
12   its audit report at this time?
13        A.    I mean, it is a different entity.
14   There are different assets.  You know, it --
15   it -- it is -- as you saw, Highland's
16   financials are on a consolidated basis.  This
17   is different, so it is under the same control
18   environment and team.
19        Q.    Okay.  I appreciate that.  So the
20   same control environment and team participated
21   in the preparation of the audit for Highland
22   and for HCMFA at around the same time; correct?
23        A.    Yes.
24              MR. MORRIS:  Can we go to page 17 of
25         the report.  I don't have the Bates number.
```

WATERHOUSE - 10-19-21

1

2       Q.      Okay.  Do you see that just like

3   Highland's audited financial report, HCMFA's

4   audited financial report also has a section

5   related to subsequent events?

6       A.      Yes.

7       Q.      And am I reading this correctly that

8   just as Highland had done, HCMFA disclosed in

9   its audited financial report a subsequent event

10  that related to the issuance of promissory

11  notes to Highland in the aggregate amount of

12  $7.4 million in 2019?

13      A.      That is what I see in the report.

14      Q.      And you were the treasurer of HCMFA

15  at the time; right?

16      A.      Yes, to the best of my knowledge.

17      Q.      And did anybody ever tell you prior

18  to the time of the issuance of this audit

19  report that that sentence relating to HCMFA's

20  2019 notes was inaccurate or wrong in any way?

21      A.      Not that I recall.

22      Q.      As you sit here right now, has

23  anybody ever told you that that sentence is

24  inaccurate or wrong in any way?

25      A.      Not that I recall.

Case 3:21-cv-00881-X  Document 179-18  Filed 10/20/21  Entered 10/20/21 22:31:57  Page 139 of 397
Case 3:21-cv-00881-X  Document 179-18  Filed 10/20/21  Page 107 of 200  PageID 54629

Page 139

1                    WATERHOUSE - 10-19-21

2          Q.     I apologize if I asked you this

3     already, but has anybody ever told you at any

4     time that you are not authorized to sign the

5     promissory notes that are the subject of the

6     sentence we're looking at?

7          A.     Not that I recall.

8          Q.     Did anybody ever tell you at any

9     time that you had made a mistake when you

10    signed the promissory notes that are the

11    subject of this sentence?

12         A.     Say that again.  Did anyone ever say

13    that I made a mistake?

14         Q.     Let me ask the question again.

15              Did anybody ever tell you at any

16    time that you made a mistake when you signed

17    the two promissory notes in Highland's favor on

18    behalf of HCMFA in 2019?

19         A.     Not that I recall.

20              MR. MORRIS:  Let's just look at the

21         promissory notes quickly.  Can we please

22         put up Document Number 1, and so this is in

23         the pile that y'all have.  We'll just go

24         for a few more minutes and we can take our

25         lunch break.

Case 3:21-cv-00881-X Document 179-18 Filed 10/20/21 Entered 10/20/21 22:31:57 Page 140 of 397
Case 3:21-cv-00881-X Document 179-18 Page 109/2446 Page 108 of 200 PageID 54630

Page 140

WATERHOUSE - 10-19-21

1

2     Q.    All right.  So I don't know if you

3  have seen this before, sir.  Do you see that

4  this is a complaint against HCMFA?

5     A.    Yes, I am looking at it on the

6  screen.

7     Q.    Okay.  And have you ever seen this

8  document before?

9     A.    I went through some of these

10  documents with my counsel here yesterday.

11         MR. MORRIS:  All right.  Can we go

12     to Exhibit 1 of this document.

13     Q.    Do you see Exhibit 1 is a

14  $2.4 million promissory note back in 2019?

15     A.    Yeah, I found it in the book.  Yes,

16  I have it here in front of me.

17     Q.    And this is a demand note, right, if

18  you look at Paragraph 2?

19     A.    Yes.

20     Q.    And this is a note where the maker

21  is HCMFA, and Highland is the payee; right?

22     A.    Yes.

23         MR. MORRIS:  And if we can scroll

24     down, can we just see Mr. Waterhouse's

25     signature.

Case 21-03005-sgj Doc 86 Filed 10/20/21 Entered 10/20/21 22:21:57 Page 14 of 397
Case 3:21-cv-00881-X Document 178-48 Page 109/2446 Page 109 of 200 PageID 54631

Page 141

                        WATERHOUSE - 10-19-21

1

2        Q.      Is that your signature, sir?

3        A.      Yes, it is.

4        Q.      And did you sign this document on or

5    around May 2nd, 2019?

6        A.      I don't recall specifically signing

7    this, but this is my signature.

8        Q.      Okay.  And do you recall that

9    Highland transferred $2.4 million to HCMFA at

10   or around the time you signed this document?

11       A.      I don't recall specifically.  I

12   would want to, as I sit here today, go back and

13   confirm that, but again, presumably that --

14   that -- that did happen.

15       Q.      You wouldn't have signed this

16   document if you didn't believe that HCMFA

17   either received or was going to receive

18   $2.4 million from Highland; is that fair?

19       A.      I mean, it -- if -- if -- if there

20   wasn't a transfer of value, yeah, I mean, you

21   know, I would have no reason to -- to sign a

22   note.

23       Q.      And -- and Highland wouldn't have

24   given this note to PricewaterhouseCoopers if --

25   withdrawn.

Case 23-03007-sgj Doc 80-4 Filed 10/20/21 Entered 10/20/21 22:31:57 Page 142 Desc
Case 3:21-cv-00881-X Document 71-18 Page 0109/2446 Page 110 of 200 PageID 54632

Page 142

1          WATERHOUSE - 10-19-21

2          HCMFA wouldn't have given this note

3   to PricewaterhouseCoopers if it hadn't received

4   the principal value of -- of the note in the

5   form of a loan; correct?

6          MR. RUKAVINA:  Objection, legal

7      conclusion, speculation and form.

8      A.    Again, we -- what we provided to PwC

9   were, as part of the audit, any promissory

10  notes executed and outstanding.  You know, as a

11  part of the audit, they, you know, they -- they

12  have copies of all the bank statements,

13  things -- things of that sort.

14         MR. MORRIS:  Okay.  Can we go to

15     Exhibit 2.

16         (Exhibit 2 marked.)

17     Q.    Do you see that this is a promissory

18  note dated May 3rd, 2019 in the amount of

19  $5 million?

20     A.    Yes.

21     Q.    Do you believe this is also a demand

22  note if you look at Paragraph 2?

23     A.    Yes.

24     Q.    And do you see that HCMFA is the

25  maker, and Highland is the payee?

WATERHOUSE - 10-19-21

1

2      A.      Yes.

3      Q.      And if we go to the bottom, can we

4   just confirm that that is your signature?

5      A.      Yes.

6      Q.      And together these notes are the

7   notes that are referred to both in Highland and

8   HCMFA's audited financial reports in the

9   subsequent event sections; correct?

10          MS. DANDENEAU:  Objection to form.

11     A.      They -- they -- they totaled

12   $7.4 million, so presumably, yes.

13     Q.      Okay.  And you were authorized to

14   sign these two notes; correct?

15          MR. RUKAVINA:  Objection, legal

16      conclusion.

17     A.      Yeah.  I mean, I'm -- I was the

18   officer of -- of HCMFA.  You know, I -- I'm not

19   the legal expert on -- on what that -- what

20   that confers to me or what it doesn't.  I mean,

21   that is my signature on the notes.

22     Q.      And you believed you were authorized

23   to sign the notes; is that fair?

24     A.      I signed a lot of documents in my

25   capacity, just because it is operational in

1                    WATERHOUSE - 10-19-21

2    nature.  So, you know, to me this was just

3    another document, to be perfectly honest.

4         Q.    Sir, would you have signed

5    promissory notes with the principal amount of

6    $7.4 million if you didn't believe you were

7    authorized to do so?

8              MS. DANDENEAU:  Objection to form.

9         Q.    Are you frozen?

10        A.    No.  I'm just -- you know, it is --

11   you know, again, I typically don't sign

12   promissory notes, and I don't recall why I

13   signed these, but -- you know, but I did.

14        Q.    All right.  So listen carefully to

15   my question.  Would you have ever signed

16   promissory notes with a face amount of

17   $7.4 million without believing that you were

18   authorized to do so?

19        A.    No.  I mean, I'm -- I'm putting my

20   signature on there, so no.

21        Q.    Okay.  And would you have signed two

22   promissory notes obligating HCMFA to pay

23   Highland $7.4 million without Mr. Dondero's

24   prior knowledge and approval?

25              MS. DEITSCH-PEREZ:  Object to the

Case 23-03037-sgj Doc 80-1 Filed 10/20/21 Entered 10/20/21 21:31:57 Desc
Case 3:21-cv-00881-X Document 178-18 Page 104 of 446 Page 113 of 200 PageID 54635

Page 145

WATERHOUSE - 10-19-21

1          form.

3          A.    You know, from -- from what I recall

4   around these notes, you know, I don't recall

5   specifically Mr. -- Mr. Dondero saying to -- to

6   make this a loan.

7                So my conversation with Mr. Dondero

8   around the culmination of the NAV error as

9   related to TerreStar which was a -- a -- I

10  think it was a year and a half process.  I

11  don't know, it was a multi-month process, very

12  laborious, very difficult.

13               When we got to the end, I had a

14  conversation with Mr. Dondero on where to, you

15  know, basically get the funds to reimburse the

16  fund, and I recall him saying, get the money

17  from Highland.

18         Q.    And so he told you to get the money

19  from Highland; is that right?

20         A.    That is what I recall -- in my

21  conversation with him, that is -- that is what

22  I can recall.

23         Q.    Do you know who drafted these notes?

24         A.    I don't.

25         Q.    Did you ask somebody to draft the

                    WATERHOUSE - 10-19-21

1

2    notes?

3        A.    I didn't ask -- I don't specifically

4    ask people to draft notes really.  I mean,

5    again, you know, the legal group at Highland is

6    responsible and has always been responsible for

7    drafting promissory notes.

8        Q.    So based on your -- based on the

9    practice, you believe that somebody from the

10   Highland's legal department would have drafted

11   these notes.  Do I have that right?

12              MS. DEITSCH-PEREZ:  Object to the

13          form.  John, I also asked you for the Word

14          versions of these notes so we could look at

15          the properties, and you have not provided

16          them.  Are you intending to?

17              MR. MORRIS:  No.

18       Q.    Can you answer my question, sir?

19       A.    Again, I --

20              MS. DANDENEAU:  Do you want him to

21          repeat it?

22       A.    Yeah, why don't you repeat it?

23       Q.    Sure.  Mr. Waterhouse, based on the

24   practice that you have described in your

25   understanding, do you believe that these notes

Case 3:21-cv-00881-X   Document 8-1   Filed 10/20/21   Entered 10/20/21 21:31:57   Desc
Case 3:21-cv-00881-X   Document 179-18   Page 1909/2446   Page 115 of 200   PageID 54637

Page 147

```
 1                    WATERHOUSE - 10-19-21

 2    would have been drafted by somebody in the

 3    legal department?

 4            MS. DEITSCH-PEREZ:  Object to the

 5        form.

 6        A.    Yes.

 7        Q.    Okay.  And do you know who would

 8    have instructed -- do you have any knowledge as

 9    to who would have instructed the legal

10    department to draft these notes?

11            MS. DEITSCH-PEREZ:  Object to the

12        form.

13        A.    It was whoever was working -- I

14    mean, it was likely someone on the team.  I

15    mean, I don't remember exactly on every note or

16    every document, but, again, a lot of these

17    things of this nature -- they're operational in

18    nature -- were handled by the team.

19            The team knows to -- I mean, we

20    don't draft documents.  We're not lawyers.

21    We're not attorneys.  It is not what I do or

22    accountants do.

23            So they are always instructed to go

24    and -- and go to the legal team to get

25    documents like this drafted.  Also, when you go
```

```
 1                  WATERHOUSE - 10-19-21

 2    to the legal team, the -- you know, we always

 3    loop in compliance.  And compliance -- when you

 4    go to the legal team, compliance is part of

 5    legal team.  They're made aware of -- of -- of

 6    these types of transactions.

 7         Q.    And do you believe that you had

 8    the -- withdrawn.

 9              Did you ever tell Mr. Dondero --

10    (inaudible) -- did you see those?

11         A.    Sorry.

12              MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14         Q.    Did you ever tell Mr. Dondero that

15    you signed these two notes?

16         A.    I don't recall ever -- no, I don't

17    recall having a conversation with him.

18         Q.    Did you ever discuss these two notes

19    with him at any time?

20         A.    The conversation, I recall, was what

21    I described earlier.  And that is the only time

22    I recall ever discussing this.

23         Q.    Okay.  But the corporate accounting

24    group had a copy of this -- of these two notes.

25    And pursuant to the audit process, the
```

```
 1                    WATERHOUSE - 10-19-21

 2   corporate accounting group gave the two notes

 3   to PricewaterhouseCoopers in connection with

 4   the audit; correct?

 5             MS. DANDENEAU:  Objection to form.

 6        A.    Yes.  I mean, that is -- yeah, I

 7   mean, they -- unless the legal team can also

 8   retain copies of items like this.  I mean, I

 9   don't know everything that they would retain as

10   well.

11             The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16        Q.    All right.  So you didn't -- you

17   didn't draft this note; right?

18        A.    I -- I -- I did not.

19        Q.    But somebody at Highland did; is

20   that fair?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        A.    I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to
```

Page 150

```
 1                  WATERHOUSE - 10-19-21

 2   outside counsel.  I have no idea.

 3        Q.    Did you have any reason to believe

 4   you weren't authorized to sign this note,

 5   either of these two notes?

 6        A.    I think I have already answered that

 7   question.

 8        Q.    Okay.  You didn't give these notes

 9   to PricewaterhouseCoopers; correct?

10            MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12   PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14   described, somebody in the corporate accounting

15   group would have given these two notes to

16   PricewaterhouseCoopers; correct?

17            MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19   either the corporate accounting team or maybe

20   the legal team.

21            MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23            VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)
```

```
 1                 WATERHOUSE - 10-19-21

 2                 VIDEOGRAPHER:  We are back on the

 3        record at 1:49 p.m.

 4        Q.    Mr. Waterhouse, did you speak with

 5   anybody during the break about the substance of

 6   this deposition?

 7        A.    I spoke to -- to Deb and Michelle.

 8        Q.    About the substance of the

 9   deposition?

10        A.    Yes.

11        Q.    Can you tell me what you talked

12   about?

13                 MS. DANDENEAU:  No.  We object on

14        the basis of privilege.

15        Q.    Okay.  You are going to follow your

16   counsel's objection here?

17        A.    Yes.

18        Q.    Okay.

19                 MR. MORRIS:  Can we put up on the

20        screen Exhibit 35.

21                 (Exhibit 35 marked.)

22        Q.    Are you able to see that document,

23   sir?

24        A.    Yes.

25        Q.    Have you ever seen an incumbency
```

1          WATERHOUSE - 10-19-21

2    certificate before?

3          A.    I have.

4          Q.    Do you have a general understanding

5    of what an incumbency certificate is?

6          A.    I have a general understanding.

7          Q.    What is your general understanding?

8          A.    You know, those -- my general

9    understanding is that the incumbency

10   certificate basically lists folks that can --

11   are like authorized signers.

12         Q.    Okay.  And do you see that this is

13   an incumbency certificate for Highland Capital

14   Management Fund Advisors, L.P.?

15         A.    Yes.

16         Q.    Okay.  And if we could scroll down

17   just a little bit, do you see that it's dated

18   effective as of April 11th, 2019?

19         A.    Yes, I see that.

20         Q.    Okay.  And is that your signature in

21   the middle of the signature block?

22         A.    Yes, it is.

23         Q.    And by signing it, did you accept

24   appointment as the treasurer of HCMFA effective

25   as of April 11th, 2019?

1          WATERHOUSE - 10-19-21

2          A.    Again, I'm not the legal -- I don't

3    know if this makes me the treasurer or the

4    appointment.  I don't know -- I don't know

5    that, so I don't -- I don't know if that

6    document -- again, I think -- again, I'm not

7    the legal expert.  I think isn't there --

8    aren't there other legal documents that detail

9    who the officers are that could be incorporated

10   or things like that?  Again, I don't want to

11   play armchair attorney here.

12          Q.    I'm not asking you for a legal

13   conclusion.  I'm asking you for your knowledge

14   and understanding.  When you signed this

15   document, did you understand that you were

16   accepting an appointment as the treasurer of

17   HCMFA?

18                MS. DANDENEAU:  Objection to form.

19                MS. DEITSCH-PEREZ:  Objection, form.

20          A.    Again, I don't think this -- that

21   wasn't my understanding.  I don't think this

22   makes -- this document makes me the treasurer.

23          Q.    What do you think this document --

24   why did you sign this document?

25                MS. DEITSCH-PEREZ:  Objection to

Case 3:10-cv-00881-X  Document 8  Filed 10/20/21  Entered 10/20/21 21:31:57  Desc
Case 3:21-cv-00881-X   Document 179-18   Filed 12/09/24  Page 122 of 200   PageID 54644

Page 154

```
 1                    WATERHOUSE - 10-19-21

 2        form.

 3              MR. MORRIS:  You're objecting to the

 4        form of the question when I asked him why

 5        did you sign the document?  What is the

 6        basis for the objection?

 7              MS. DEITSCH-PEREZ:  Because, John, I

 8        think that it does call for a legal

 9        conclusion other than -- with him saying

10        because somebody told me to sign this

11        document.  But if you want to go there,

12        that is fine.

13              MR. MORRIS:  Okay.

14              MS. DANDENEAU:  I don't think --

15        he's already said he's not a lawyer.

16              MR. MORRIS:  I'll allow the witness

17        to answer this question.

18        Q.    Why did you sign this document, sir?

19        A.    I mean, our -- our legal group would

20   bring by these incumbency certificates from

21   time to time.  I have no idea why they're being

22   updated, and I was asked to sign.

23        Q.    Did you ask anybody, what is this

24   document?

25        A.    No.
```

Case 3:21-cv-00881-X Document 179-18 Filed 10/20/21 Entered 10/20/21 22:33:57 Page 155 of 397
Case 3:21-cv-00881-X Document 179-18 Page ID 2446 Page 123 of 200 PageID 54645

Page 155

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Did anybody tell you why they needed

 3   you to sign the document?

 4        A.    Not that I can recall.

 5        Q.    You testified earlier that you

 6   understood that you served as the acting

 7   treasurer for HCMFA; correct?

 8        A.    Yes.

 9        Q.    How did you become the acting

10   treasurer of HCMFA?

11             MS. DANDENEAU:  Objection to form.

12        A.    I don't -- I don't know the legal --

13   I don't know the legal mechanic of how I became

14   the acting treasurer.

15        Q.    I'm not asking for the legal

16   mechanic.  I'm asking you as the person who

17   is --

18             MS. DANDENEAU:  John, you said --

19             MR. MORRIS:  Stop.

20             MS. DANDENEAU:  -- how did you

21        become the treasurer.  That is --

22             MR. MORRIS:  Please stop.

23             MS. DANDENEAU:  That is a legal

24        question.

25             MR. MORRIS:  I am not asking any
```

```
 1                    WATERHOUSE - 10-19-21

 2            legal questions, to be clear.  I'm asking

 3            for this witness' understanding as to how

 4            he became the acting treasurer of HCMFA.

 5            If he doesn't know, he can say he doesn't

 6            know, but this legal stuff is nonsense, and

 7            I really object to it.

 8            Q.    Sir, I'm asking you a very simple

 9    question.

10                    MS. DANDENEAU:  Argumentative.

11            Q.    You testified -- you testified that

12    you became the acting treasurer of HCM --

13    HCMFA; correct?

14            A.    Yes.

15            Q.    How did that happen?

16                    MS. DANDENEAU:  Again, object to

17            form.

18                    MR. MORRIS:  I can't wait to do this

19            in a courtroom.  Good God.

20            Q.    Go ahead, sir.

21            A.    I don't know the exact process of

22    how that happened.

23            Q.    Do you have any idea whether signing

24    this document was part of the process?

25                    MR. MORRIS:  You know what --
```

```
1              WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection.

3          MR. MORRIS:  -- withdrawn.  You guys

4   want to do this, I can't wait.  I can't

5   wait.  This is the craziest stuff ever.

6          MS. DANDENEAU:  John, he said he's

7   not a lawyer, and you are asking him for a

8   legal conclusion, and he says he doesn't

9   know, and you persist.

10         MR. MORRIS:  Okay.

11         MS. DANDENEAU:  So you can ask these

12  questions --

13         MR. MORRIS:  Did anyone -- please

14  stop talking.

15         MS. DANDENEAU:  -- at another

16  point -- no, no, no, I'm entitled to talk,

17  too; right?  If you're going to make these

18  accusations as if we're trying to stonewall

19  you, this is not the witness to ask that

20  question.

21         MR. MORRIS:  I can't -- I can't

22  wait -- I can't wait to do this in a

23  courtroom.  I will just leave it at that.

24         MS. DANDENEAU:  That's right, I'm

25  sure you can't.
```

Page 158

WATERHOUSE - 10-19-21

1

2      Q.      Did anyone ever tell you, sir, that

3  even though you were the acting treasurer of

4  HCMFA, that you were not authorized to sign the

5  two promissory notes that we looked at before

6  lunch?

7      A.      I'm not sure I understand the

8  question.  I wasn't -- I mean, I'm -- I'm the

9  current acting treasurer.

10      Q.      Did anybody ever tell you at any

11  time that even though you were the acting

12  treasurer of HCMFA, that you were not

13  authorized to sign the two promissory notes

14  that we looked at before lunch?

15              MS. DANDENEAU:  Objection to form.

16      A.      Not that I recall.

17      Q.      Did anybody ever tell you at any

18  time that you were not authorized to sign the

19  two promissory notes that we looked at before

20  lunch?

21      A.      Not that I recall.

22      Q.      Did anybody ever tell you at any

23  time that you should not have signed the two

24  promissory notes that we looked at before

25  lunch?

1                    WATERHOUSE - 10-19-21

2          A.    Not that I recall.

3          Q.    Did you ever tell anybody at any

4    time that you weren't authorized to sign the

5    two promissory notes that we looked at before

6    lunch?

7          A.    Not that I recall.

8          Q.    Did you ever tell anybody at any

9    time that you made a mistake when you signed

10   the two promissory notes that we looked at

11   before lunch?

12         A.    Not that I recall.

13         Q.    As you sit here right now, do you

14   have any reason to believe that you were not

15   authorized to sign the two documents that we

16   looked at before lunch?

17               MS. DANDENEAU:  Objection to form.

18         A.    If -- if this is the -- the valid

19   incumbency certificate, I mean, this does --

20   this does detail who the signers are.

21         Q.    Okay.  And looking at that document,

22   does that give you comfort that you were

23   authorized to sign the two promissory notes

24   that we looked at before lunch?

25               MS. DEITSCH-PEREZ:  Object to the

Case 3:21-cv-00881-X Document 179-18 Filed 10/20/23 Entered 10/20/23 21:35:57 Desc
Case 3:21-cv-00881-X Document 179-18 Page 2099/2446 Page 128 of 200 PageID 54650

Page 160

                    WATERHOUSE - 10-19-21

1          form.

2                    MS. DANDENEAU:  Objection, form.

3          A.    Yes.

4          Q.    As of October 20th -- withdrawn.

5                    I'm trying to take your mind back to

6     a year ago, October 2020.  Do you recall at

7     that time that the boards of the retail funds

8     were making inquiries about obligations that

9     were owed by the advisors to Highland in

10    connection with their 15(c) review?

11                   MS. DANDENEAU:  Objection to form.

12         A.    I don't -- I don't recall.

13         Q.    As of October 2020, you had no

14    reason to believe you weren't authorized to

15    sign the two promissory notes that we just

16    looked at; correct?

17                   MS. DANDENEAU:  Objection, form.

18                   MS. DEITSCH-PEREZ:  Objection to

19         form.

20         A.    I didn't think about it in October

21    of 2020, but I mean --

22         Q.    Did you have any reason to believe

23    at that time that you weren't authorized to

24    sign the two notes that we just looked at?

```
 1                  WATERHOUSE - 10-19-21

 2        A.     Not that I'm aware, no.

 3        Q.     Did you have any reason to believe a

 4   year ago that you made a mistake when you

 5   signed those two notes?

 6        A.     Not that I'm aware.

 7        Q.     A year ago you believed that HCMFA

 8   owed Highland the unpaid principal amounts that

 9   were due under those two notes; correct?

10        A.     They're -- they're promissory notes

11   that were -- as you presented, that were --

12   that were executed.  Whether they're valid or

13   if there's other reasons, I didn't -- I don't

14   know.

15        Q.     I'm not asking you whether they're

16   valid or not.  I'm asking you for your state of

17   mind.  A year ago you believed that HCMFA

18   was -- was obligated to pay the unpaid

19   principal amount under the two notes that you

20   signed; correct?

21        A.     Yeah, I'm -- I'm -- yes.

22        Q.     Thank you.  Are you aware -- you're

23   aware that -- that in 2017, NexPoint issued a

24   note in favor of Highland in the approximate

25   amount of $30 million; correct?
```

```
 1                    WATERHOUSE - 10-19-21

 2         A.    I'm -- I'm -- I'm generally aware.

 3         Q.    Okay.  And are you generally aware

 4   that from time to time, after the note was

 5   issued by NexPoint, that moneys were applied to

 6   principal and interest that were due under the

 7   NexPoint note?

 8         A.    Yes, I'm generally aware.

 9         Q.    Okay.  And did anybody ever tell you

10   that the payments that were made against the

11   NexPoint notes were made by mistake?

12         A.    Yes.

13         Q.    And is it the one payment that we

14   talked about earlier today?

15         A.    We talked about a lot of things

16   today.  What payment are we talking about?

17         Q.    Okay.  Who told you that any payment

18   made against the NexPoint note was made by

19   mistake?

20         A.    D.C. Sauter.

21         Q.    When did Mr. Sauter tell you that?

22         A.    I don't -- I don't remember

23   specifically.

24         Q.    Do you remember what payments --

25         A.    Sometime -- sometime this year.
```

Case 23-03007-sgj Doc 80-18 Filed 10/20/21 Entered 10/20/21 23:13:57 Desc 397
Case 3:21-cv-00881-X Document 179-18 Page 211/29/2446 Page 131 of 200 PageID 54653

Page 163

```
                         WATERHOUSE - 10-19-21
 1
 2        Q.      Sometime in 2021?
 3        A.      Yes.
 4        Q.      Do you remember what payment he was
 5   referring to?
 6        A.      It was the -- the payment made in
 7   January of 2021 or -- yeah, January of -- of
 8   this -- January of 2021.
 9        Q.      Okay.  So did anybody ever tell you
10   at any time that any payment that was made
11   against principal --
12        A.      And -- and -- and -- hold on, and it
13   may have been other -- again, it may have been
14   that payment or -- or there may have been what
15   he was explaining, a misapplication of prior
16   payments as well.
17        Q.      Can you -- can you give me any
18   specificity -- withdrawn.
19               Withdrawn.  Can you tell me
20   everything that Mr. Sauter told you about --
21   about errors in relation to payments made
22   against principal and interest due under the
23   NexPoint note?
24               MS. DANDENEAU:  Can I just --
25               MR. RUKAVINA:  Hold on.  Hold on.
```

Case 3:21-cv-00881-X   Document 178-18   Filed 10/20/21   Entered 10/20/21 21:31:57   Page 164 of 397
Case 3:21-cv-00881-X   Document 179-13   Page 21/89/2446   Page 132 of 200   PageID 54654
Page 164

```
 1                  WATERHOUSE - 10-19-21

 2          I'm going to object here, and I'm going to

 3          instruct the witness not to answer

 4          depending on the discussion that you had --

 5          Mr. Waterhouse, I'm the lawyer for

 6          NexPoint, and as everyone here knows, D.C.

 7          Sauter is in-house counsel.

 8                  So if you and Mr. Sauter were having

 9          a factual discussion and him preparing his

10          affidavit, et cetera, then go ahead and

11          answer that.  But if you were having a

12          discussion as to our legal strategy in this

13          lawsuit, or anything having to do with

14          that, then do not answer that.

15                  And if you need to talk to either

16          your counsel or me about that, then we need

17          to have that discussion now.

18     A.    Okay.  Yeah, I don't -- I don't

19   really know how to make that distinction, so

20   maybe I need to talk to counsel before I

21   answer, or if I can answer.

22     Q.    Let me just ask you this question:

23   Did -- did you have any conversation with

24   Mr. Sauter about any payment of principal and

25   interest prior to the time that you left
```

```
1                  WATERHOUSE - 10-19-21

2    Highland's employment, or did it happen after

3    you left Highland's employment?

4         A.    I don't -- I don't recall if -- I

5    don't recall.  I mean, it was sometime in 2021.

6    I don't remember if it was before or after I

7    was let go from Highland.

8         Q.    Okay.  So -- so nobody told you

9    prior to 2021 that any error or mistake was

10   made in the application of payments against

11   principal and interest due on the NexPoint

12   note.  Do I have that right?

13        A.    Yeah, I don't -- I don't recall this

14   being in 2020.

15        Q.    Okay.  And it didn't happen in 2019;

16   correct?

17        A.    I don't recall that happened.

18        Q.    And it didn't happen in 2018;

19   correct?

20        A.    I don't -- I don't recall that

21   happening.

22        Q.    And it didn't happen in 2017;

23   correct?

24        A.    I don't recall.

25        Q.    But -- but you believe the
```

Case 3:21-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 165 of 397
Case 3:21-cv-00881-X Document 179-13 Page 21/59/2446 Page 134 of 200 PageID 54656

Page 166

1        WATERHOUSE - 10-19-21

2   conversation took place in 2021.  You just

3   don't remember if it was before or after you

4   left Highland's employment.  Do I have that

5   right?

6        A.    It was sometime this year.  I

7   don't -- I don't remember.

8        Q.    Okay.  Did you report this

9   conversation to Mr. Seery at any point?

10       A.    I don't believe so.

11       Q.    Did you report this conversation to

12  anybody at DSI at any time?

13       A.    I don't recall.

14       Q.    Do you have -- you don't have a

15  recollection of ever doing that; correct?

16       A.    Yeah, that's right.  I don't recall

17  doing that.

18       Q.    Do you recall telling anybody at

19  Pachulski Stang about the conversation you

20  recall with Mr. Sauter?

21       A.    No, I don't -- I don't recall.

22       Q.    Did you tell any of the independent

23  board members about your conversation with

24  Mr. Sauter?

25       A.    I don't recall.

Case 3:21-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 21:31:57 Desc
Case 3:21-cv-00881-X Document 179-18 Page 21/09/2446 Page 135 of 200 PageID 54657

Page 167

                    WATERHOUSE - 10-19-21

1

2      Q.    Did you tell any of the employees at

3  Highland before you left Highland's employment

4  about this call that you had with Mr. Sauter?

5           MS. DANDENEAU:  Objection to form.

6      A.    No, I don't -- no, I don't recall.

7      Q.    NexPoint -- to the best of your

8  knowledge, did NexPoint ever file a proof of

9  claim against Highland to try to recover moneys

10 that were mistakenly paid against the principal

11 and interest due under the note?

12     A.    Okay.  Hold on.  You are saying did

13 NexPoint Advisors file a proof of claim to

14 Highland for errors related to payments under

15 the NexPoint note to Highland?

16     Q.    Correct.

17     A.    I'm -- I'm -- I'm not -- I'm not

18 aware.

19     Q.    Are you aware --

20     A.    I'm not the legal person here, I

21 don't know.

22     Q.    I'm just asking for your knowledge,

23 sir.

24     A.    Yeah, I don't know.  I'm not aware.

25     Q.    Are you aware of any claim of any

```
1                    WATERHOUSE - 10-19-21

2    kind that NexPoint has ever made to try to

3    recover the amounts that it contends were -- or

4    that Mr. Sauter contend were mistakenly applied

5    against principal and interest due under the

6    NexPoint note?

7         A.    I'm not aware.

8               MS. DANDENEAU:  Objection to form.

9         Q.    Okay.  The advisors' agreements with

10   the retail funds are subject to annual renewal;

11   correct?

12        A.    Yes.

13        Q.    And do you participate in the

14   renewal process each year?

15        A.    Yes.

16        Q.    What role do you play in the renewal

17   process?

18        A.    I'm -- I'm asked by the retail board

19   to walk-through the advisors financials.

20        Q.    And do you do that in the context of

21   a board meeting?

22        A.    Yes, it is -- yes, it is typically

23   done in a board meeting.

24        Q.    And do you recall the time --

25   does -- does the renewal process happen around
```

1                    WATERHOUSE - 10-19-21

2    the same time each year?

3         A.    Yes, it is -- it is around the same

4    time every year.

5         Q.    And what -- what time period of the

6    year does the renewal process occur?

7         A.    Approximately the September

8    timeframe.

9         Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

```
1                    WATERHOUSE - 10-19-21

2         Q.    No, I apologize.

3              Do you have an understanding of

4    what -- of what 15(c) refers to in the context

5    of the annual renewal process?

6         A.    Yes, generally.

7         Q.    All right.  What is your general

8    understanding of the term "15(c)" in the

9    context of the annual renewal process?

10        A.    I -- I think 15(c) is the section

11   that -- that -- you know, that -- that the

12   board has to evaluate every year, the retail

13   board.  They have to, you know, go through,

14   evaluate, and go through that approval process

15   on a yearly basis.

16        Q.    Okay.

17              MR. MORRIS:  Can we put up on the

18        screen Exhibit 36, please.

19              (Exhibit 36 marked.)

20              MR. MORRIS:  I guess let's just

21        start at the bottom so Mr. Waterhouse can

22        see what is here.

23        Q.    You see this begins with an email

24   from Blank Rome to a number of people.

25              MR. MORRIS:  And if we can scroll
```

Case 3:00-cv-00007-bjc-8 Doc Filed 10/20/21 /29/21 Entered 10/20/210/29/21 21:31:37 57 17 Desc 397
Case 3:21-cv-00881-X   Document 178-18   Page 220 9/2446 Page 139 of 200   PageID 54661

Page 171

1          WATERHOUSE - 10-19-21

2     up -- keep going just a little bit.

3     Q.    You will see that there is an email

4     from Lauren Thedford to Thomas Surgent and

5     others where she reports that she was attaching

6     and reproducing below additional 15(c)

7     follow-up questions from the board.

8              Do you see that?

9     A.    Yes.

10    Q.    And do you see Question No. 2 asks

11    whether there are any material outstanding

12    amounts currently payable or due in the future

13    (e.g., notes) to HCMLP by HCMFA or NexPoint

14    Advisors or any other affiliate that provides

15    services to the funds?

16             Do you see that?

17    A.    Yes.

18    Q.    And -- and did you -- do you recall

19    that in -- in October of 2020 the retail boards

20    were asking for that information?

21    A.    I don't recall it, but there --

22    they're obviously asking in this email.

23    Q.    Okay.

24             MR. MORRIS:  Can we scroll up a

25         little bit, please.

Case 3:21-cv-00881-X  Document 8-4  Filed 10/20/21  Entered 10/20/21 21:31:55  Page 172  Desc
Case 3:21-cv-00881-X  Document 179-18  Page 220 of 446  Page 140 of 200  PageID 54662

Page 172

1                    WATERHOUSE - 10-19-21

2          Q.     And then do you see that

3     Ms. Thedford includes you on the email string

4     on Tuesday, October 6th, at 5:52?

5          A.     Yes.

6          Q.     And she asks you and Dave Klos and

7     Kristin Hendrix for advice on that particular

8     Request No. 2 that I have just read; right?

9          A.     Yes.

10         Q.     Okay.  Can you tell me who

11    Ms. Thedford is?

12         A.     She was an attorney that was in the

13    legal group.

14         Q.     At Highland Capital Management,

15    L.P.?

16         A.     I'm -- I'm -- I'm -- I don't

17    remember if she was an employee of Highland or

18    any of the advisors.

19         Q.     Okay.  Do you know if she served as

20    the corporate secretary for both HCMFA and

21    NexPoint?

22         A.     Yes.

23         Q.     And -- okay.

24                Do you know whether Ms. Thedford

25    held any positions in relation to the retail

1                    WATERHOUSE - 10-19-21

2    funds as we defined that term?

3         A.    Yes.

4         Q.    What is your understanding of the

5    positions that Ms. Thedford held at the retail

6    funds?

7         A.    I -- I recall her being an officer.

8    I don't recall her title.

9         Q.    Okay.  Is she still an officer at

10   any of the retail funds today?

11        A.    No.

12        Q.    Do you know when she ceased to be an

13   officer of the retail funds?

14        A.    Approximately.

15        Q.    And when did she approximately cease

16   to be an officer of the retail funds?

17        A.    It was in -- it was in early of

18   2021.

19        Q.    Okay.  Do you know when she became

20   an officer of the retail funds?

21        A.    I don't recall.

22        Q.    To the best of your recollection,

23   was she an officer of the retail funds in

24   October of 2020?

25        A.    I believe so.

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  Do you know what title she

3   held in her capacity as an officer, if any?

4        A.    I told you I don't remember.

5        Q.    Okay.  So she sends this email to

6   you at 5:52 p.m. on October 6th.

7              And if we can scroll up to the

8   response, you responded a minute later with a

9   one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13  response to the retail board's Question No. 2,

14  right, whether there are any material

15  outstanding amounts currently payable or due in

16  the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19       see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21  few minutes later and she asks whether you

22  could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you

```
 1                  WATERHOUSE - 10-19-21

 2    refer her to the balance sheet that was

 3    provided to the board as part of the 15(c)

 4    materials.

 5                 Do you see that?

 6        A.    Yes.

 7        Q.    And -- and did the advisors provide

 8    to the board certain balance sheets in 2020 in

 9    connection with the 15(c) review?

10        A.    Yes, they did.

11        Q.    Okay.  And were the amounts that

12    were outstanding or that were to be due in the

13    future by the advisors to Highland included in

14    the liability section of the balance sheet that

15    was given to the retail board?

16        A.    Yes.  Notes would be reflected as

17    liabilities.

18        Q.    Okay.  And --

19        A.    If I'm understanding your question

20    correctly.

21        Q.    You are.  And -- and -- and those

22    liabilities you -- you were -- you believed

23    were responsive to the retail board's question;

24    correct?

25        A.    Yes.
```

Case 3:21-cv-00881-X Document 179-18 Filed 01/09/24 Entered 01/09/24 21:31:58 Page 176 of 397
Case 3:21-cv-00881-X Document 179-18 Page 2259/2446 Page 144 of 200 PageID 54666
Page 176

1                    WATERHOUSE - 10-19-21

2          Q.    Okay.  And then if we can scroll up,

3    you see Ms. Thedford responds to you

4    nine minutes later with a draft response.

5                Do you see that?

6          A.    Yes.

7          Q.    And she says that she is taking from

8    the 6/30 financials certain information about

9    amounts that were due to HCMLP and affiliates

10   as of June 30th, 2020.

11               Do you see that?

12         A.    I do.

13         Q.    Okay.  And did you believe, as the

14   treasurer of NexPoint and HCMFA and as the CFO

15   of Highland, that the information that

16   Ms. Thedford obtained from the 6/30 financials

17   was accurate and responsive in relation to the

18   retail fund board's question?

19         A.    I just want to make sure I

20   understand the question.

21               Are you saying that the financial

22   information provided to the retail board as

23   part of the 15(c) process, which included

24   financial statements as of June 30th of 2021,

25   did I feel like those were responsive to their

```
 1                WATERHOUSE - 10-19-21

 2    questions?

 3         Q.    Yes.

 4         A.    Yes.

 5         Q.    Thank you.

 6              MS. DEITSCH-PEREZ:  John, it is not

 7         in the chat yet.  Can you just make sure it

 8         gets put in there.

 9              MR. MORRIS:  Sure.

10              MS. CANTY:  I put it in there.  I

11         think maybe I just sent it directly, so let

12         me make sure it says to everyone.  But I

13         did put it in there.  I will try again.

14              MR. MORRIS:  Thank you, La Asia.

15              MS. DANDENEAU:  What number is it.

16              MR. MORRIS:  What, the Bates number?

17              MS. DEITSCH-PEREZ:  No, the --

18         this -- yeah, 36 is not in the chat.

19              MR. MORRIS:  Okay.  We'll get it.

20              MS. DANDENEAU:  I think that

21         Ms. Canty just sent it to me originally.

22         Sorry.

23              MR. MORRIS:  Okay.  We will get it

24         there.

25              MS. CANTY:  Okay.  It is there now
```

```
 1                  WATERHOUSE - 10-19-21

 2        for everyone.

 3             MS. DEITSCH-PEREZ:  Got it.  Thank

 4        you.

 5        Q.    Do you recall if the proposed

 6   response that Ms. Thedford crafted was

 7   delivered to the retail board with the -- with

 8   the yellow dates having been completed?

 9        A.    I don't know.

10             MR. MORRIS:  Davor, I'm going to ask

11        that the advisors and -- the advisors of

12        both HCMFA and NexPoint produce to me any

13        report that was given to the retail board

14        concerning the promissory notes at issue,

15        including the obligations under the notes.

16        Q.    Do you know -- do you know if

17   ultimately NexPoint informed the retail board

18   in response to its question that NexPoint owed

19   Highland approximately 23 or $24 million?

20             MS. DANDENEAU:  Objection to the

21        form.

22        A.    Sorry, are you asking, did NexPoint

23   tell the retail board that it owed Highland?

24        Q.    Let me ask a better question,

25   Mr. Waterhouse.
```

Case 23-00897-bjc 8 Doc Filed 10/10/20/29/21 red En10/20/21 02/23:21:57:57 17 9est 397
Case 3:21-cv-00881-X Document 179-18 Exh. 179-18 Page 22/9/2446 Page 147 of 200 PageID 54669

Page 179

```
 1                    WATERHOUSE - 10-19-21

 2              Did -- do you know if anybody ever

 3   answered the retail board's question that was

 4   Number 2?

 5       A.    I don't -- I can't say for sure.

 6       Q.    Okay.  Do you recall -- I think you

 7   testified earlier that you walked through the

 8   advisors' financials with the retail board;

 9   correct?

10       A.    Yes.

11       Q.    And as part of that process, did you

12   disclose to the retail board the obligations

13   that NexPoint and HCMFA had to Highland under

14   promissory notes?

15       A.    The retail board, as I stated

16   earlier, receives financial information,

17   balance sheet, income statement information

18   from the advisors.  That information is

19   provided to the retail board in connection with

20   the 15(c) process.

21              So any notes between the advisors

22   and the Highland would be -- anything would be

23   detailed in those financial statements.

24       Q.    Do you recall in 2020 ever speaking

25   with the retail board about the advisors'
```

Case 23-03005-sgj Doc 80 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 180 of 397
Case 3:21-cv-00881-X Document 179-18 Page 2299/2446 Page 148 of 200 PageID 54670

Page 180

```
 1                    WATERHOUSE - 10-19-21

 2   obligations under the notes to Highland?

 3                MS. DANDENEAU:  Objection to form.

 4                MS. DEITSCH-PEREZ:  Object to the

 5        form.

 6        A.    I don't recall specifically.

 7        Q.    Do you have any general recollection

 8   of discussing with the retail board the

 9   advisors' obligations to Highland under the

10   notes that they issued?

11                MS. DANDENEAU:  Object to the form.

12                MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    I just recall generally just -- it

15   is just -- I present the financial statements,

16   and if they have questions, I answer their

17   questions and walk them through.

18                I don't recall what they asked.  I

19   don't recall where the discussion went.  I

20   don't recall anything of that nature.

21        Q.    Okay.  Do you know if anybody on

22   behalf of HCMF -- HCMFA ever told the retail

23   board that HCMFA had no obligations under the

24   two 2019 notes that you signed?  Withdrawn.

25                Do you know whether anybody on
```

```
 1                    WATERHOUSE - 10-19-21

 2      behalf of HCMFA ever told the retail boards

 3      that you weren't authorized to sign either of

 4      the two 2019 notes?

 5                    MS. DANDENEAU:  Objection to form.

 6           A.    I'm not aware.

 7           Q.    Are you aware of anybody on behalf

 8      of HCMFA ever telling the retail boards that

 9      your execution of the two 2019 notes was a

10      mistake?

11                    MS. DANDENEAU:  Objection to form.

12           A.    I'm not aware.

13           Q.    Are you aware of anybody on behalf

14      of HCMFA ever telling the retail boards that

15      HCMFA did not have to pay the amounts reflected

16      in the two notes that you signed in 2019?

17           A.    I'm not aware.

18           Q.    Do you know whether anybody ever

19      told the retail boards -- withdrawn.

20                    Do you know whether anybody ever

21      told the retail boards that Highland has

22      commenced a lawsuit to recover on the two notes

23      that you signed in 2019?

24           A.    I'm not aware.

25           Q.    Are you aware of anybody informing
```

Page 182

                    WATERHOUSE - 10-19-21

1    the retail boards that Highland has sued to

2    recover on the NexPoint note?

3         A.    I'm not aware.

4         Q.    Do you know whether anybody ever

5    told the retail board that Highland had

6    declared a default with respect to the two

7    HCMFA notes that you signed in 2019?

8         A.    I'm not aware.

9         Q.    Are you aware of anybody ever

10   informing the retail boards that Highland had

11   declared a default under the NexPoint note?

12        A.    I'm not aware.

13        Q.    Are you aware of anybody telling the

14   retail board that Highland made a demand for

15   payment under the 2019 notes that you signed on

16   behalf of HCMFA?

17        A.    I'm not aware.

18        Q.    Let's -- let's see if there is a

19   response to Ms. Thedford's email, if we can

20   scroll up.

21              Do you see you responded to

22   Ms. Thedford five minutes after she provided

23   the draft response to you?

24        A.    Yes.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  And do you see that Dustin

 3   Norris is copied on this email?

 4        A.    Yes, he is.

 5        Q.    Great.  Do you know whether

 6   Mr. Norris held any positions at either of the

 7   advisors as of October 6, 2020?

 8        A.    I will go back to -- I'm not the

 9   legal expert of what appoints you or how or

10   why, but you did see Dustin's name on the

11   incumbency certificate that you produced

12   earlier.

13        Q.    Do you know what his title was in

14   October of 2020?

15              MS. DANDENEAU:  Objection to form.

16        A.    I don't -- I don't recall.

17        Q.    Was he -- did he have a title with

18   each of the advisors, to the best of your

19   recollection?

20        A.    I don't recall.

21        Q.    Do you know why he is included on

22   this email string?

23        A.    I didn't add Dustin.  It looks like

24   Lauren did.  I don't know why she added him or

25   not.  You would have to ask her.
```

Case 3:21-cv-00881-X Document 180-18 Filed 10/20/21 Entered 10/20/21 21:31:57 Desc 397
Case 3:21-cv-00881-X Document 179-18 Page 23392446 Page 152 of 200 PageID 54674

Page 184

WATERHOUSE - 10-19-21

1

2    Q.    Does Mr. Norris play a role in

3 formulating the advisors' responses to the

4 questions asked by the retail board in

5 connection with the 15(c) annual review?

6          MS. DANDENEAU:  Objection to form.

7    A.    He -- Dustin Norris is there in the

8 board meetings.  But -- so he has a role, yes.

9    Q.    Okay.  And does Mr. Norris hold any

10 positions, to the best of your knowledge, in

11 relation to any of the retail funds?

12   A.    I don't -- I don't believe he does.

13   Q.    How about Mr. Post, do you know

14 whether Mr. Post holds any position in either

15 of the advisors?

16   A.    I mean, he -- he -- yes.

17   Q.    What is your understanding of the

18 positions that Mr. Post holds in relation to

19 the advisors?

20          MS. DANDENEAU:  Objection to form.

21   A.    He is an employee of NexPoint

22 Advisors.  He is also the chief compliance

23 officer for -- for NexPoint.

24   Q.    Who is the chief compliance officer

25 for HCMFA, if you know?

Case 3:05-cv-... Doc filed ... Page 185 of 397
Case 3:21-cv-00881-X   Document 178-18   Filed 03/09/24   Page 153 of 200   PageID 54675

Page 185

1                    WATERHOUSE - 10-19-21

2            MS. DANDENEAU:  Objection to form.

3       A.    That would be Jason as well.

4       Q.    Okay.  Now, looking at your

5  response, you noted initially that nothing was

6  owed under shared services.  Do I have that

7  right in substance?

8       A.    Yeah.  I think I'm being responsive

9  to Lauren's question here, whether any of the

10 shared service invoices are outstanding.

11      Q.    Right.

12      A.    Yes.

13      Q.    And that is because -- and that is

14 because the retail the retail board has asked

15 for the disclosure of all material obligations

16 that were owed to HCMLP either then or in the

17 future; isn't that right?

18           MS. DANDENEAU:  Objection to form.

19      Q.    We can go back down and look.

20      A.    Look, I don't know if that's a

21 material item, I mean, again, but sure.

22      Q.    Okay.  But there were no shared

23 services outstanding; correct?

24           MS. DANDENEAU:  Objection to form.

25      A.    That is what this email seems to

Case 3:21-cv-00881-X Document 179-18 Filed 01/09/24 Entered 01/09/24 21:58:57 Page 186 of 397
Case 3:21-cv-00881-X Document 179-18 Page 2359/2446 Page 154 of 200 PageID 54676

Page 186

                      WATERHOUSE - 10-19-21

1

2   indicate.

3        Q.    And you wouldn't have written it if

4   you didn't believe it to be true at the time;

5   correct?

6        A.    Correct.

7        Q.    And when you referred to shared

8   services outstanding, what you meant there was

9   that neither NexPoint nor HCMFA owed Highland

10  any money under the shared services agreements

11  that they had with Highland as of October 6th,

12  2020; right?

13       A.    I don't know if it is as of October

14  6, 2020 or if it was from -- like through the

15  financials -- through the date of the

16  financials as of June 30.

17       Q.    Okay.  And then you noted that

18  HCMA -- the HCMFA note is a demand note; right?

19       A.    Yes.

20       Q.    And then you referred Ms. Thedford

21  to Kristin Hendrix for the term of the NexPoint

22  note.  Do I have that right?

23       A.    Yes.

24       Q.    And then you refer to that agreement

25  that is referenced in the 2018 audited

Case 3:21-cv-00881-X  Document 8 Doc File 1 07/20/210/29/Filed En0/20/210/292381:58 57 18 Dest 397
Case 3:21-cv-00881-X  Document 179-18  Page 2309/2446 Page 155 of 200  PageID 54677

Page 187

                    WATERHOUSE - 10-19-21

 1

 2    financials about Highland's agreement not to

 3    make demand upon HCMFA until May 2021; correct?

 4         A.    Correct.

 5         Q.    And then -- and then the next thing

 6    you write is that the attorneys think that BK

 7    doesn't change that, but don't know for sure at

 8    the end of the day.

 9              Do you see that sentence?

10         A.    Yes.

11         Q.    Which attorneys were you referring

12    to?

13         A.    I don't remember.

14         Q.    Did you have a conversation with

15    attorneys concerning whether the bankruptcy

16    would change or alter in any way the agreement

17    not to make a demand under the HCMFA note?

18         A.    Look, yeah, I mean, I don't

19    specifically remember, but generally, I mean,

20    it is in this email.  I don't -- I don't -- I

21    don't -- I don't remember who I talked to or,

22    you know, was it inside counsel, outside

23    counsel, but obviously I talked to somebody.

24         Q.    Do you have any recollection --

25         A.    Well, I don't even know if it's --

Case 3:21-cv-00881-X Document 181 Filed 10/20/21 Entered 10/20/21 13:51:57 Page 156 of 397
Case 3:21-cv-00881-X Document 179-18 Page 23 of 446 Page 156 of 200 PageID 54678

Page 188

1              WATERHOUSE - 10-19-21

2   actually, it may not even have been me.  I say

3   the attorneys in, you know, a lot of -- like I

4   talked about the team.

5              It could have been someone on the

6   team, like, hey, we need to run this down, and

7   maybe they talked to attorneys again and

8   relayed that information to me.

9              So I really don't know if I spoke or

10  someone else did or -- or, I mean, and maybe it

11  wasn't even from corporate accounting.  Maybe

12  it was, you know, other -- I'm kind of

13  summarizing, you know, again, so I don't really

14  know -- I can't really say for sure.  I don't

15  remember how I came about of this knowledge.

16     Q.    I appreciate your efforts,

17  Mr. Waterhouse, but I will just tell you that

18  if I ask a question and you don't know the

19  answer or you don't recall, I'm happy to accept

20  that.  I don't -- I don't want you to

21  speculate, so I want to be clear about that.

22  So I appreciate it.

23              Let me just ask you simply:  Do you

24  know what attorneys -- can you identify any of

25  the attorneys who thought that the bankruptcy

1                    WATERHOUSE - 10-19-21

2     process didn't change the agreement?

3          A.    I don't recall.

4          Q.    Okay.  Perfect.

5               And then let's look at the last

6     sentence.  It says, quote:  The response should

7     include, as I covered in the board meeting,

8     that both entities have the full faith and

9     backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11              Do you see that?

12         A.    Yes.

13         Q.    Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.    Yes.

18         Q.    Do you remember in the context in

19    which you told the retail board that?

20         A.    I mean, generally, yes.

21         Q.    Tell me what you recall.

22         A.    So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show

Case 3:10-05817-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:51:57 Desc 190 of 397
Case 3:21-cv-00881-X Document 173-18 Page 2399/2446 Page 158 of 200 PageID 54680

Page 190

                        WATERHOUSE - 10-19-21

1

2    they have liabilities on them that exceed

3    assets.

4              So the retail board has asked, okay,

5    you know, how -- you know, if -- if these

6    liabilities come due or they're payable, you

7    know, how does that come about?

8              And, you know, the response is,

9    well, the advisors have the -- the full faith

10   and backing from -- from Jim Dondero.

11        Q.    And how did you know that the

12   advisors had the full faith and backing from

13   Jim Dondero?  What was the basis for that

14   statement that you made to the retail board?

15        A.    I talked to Jim about it at some

16   point in the past.

17        Q.    And did you tell Mr. Dondero that

18   you were going to inform the retail board that

19   the advisors had his full faith and backing

20   before you actually told that to the retail

21   board?

22        A.    I don't recall having that

23   conversation.

24        Q.    Do you recall if you ever informed

25   Mr. Dondero that you had disclosed or told the

Case 3:21-cv-00881-X  Document 8 Doc 8 Filed 10/20/21  Entered 10/20/21 21:31:57  Page 191 of 397
Case 3:21-cv-00881-X  Document 179-18  Page 24 of 446 Page 159 of 200  PageID 54681
Page 191

1                   WATERHOUSE - 10-19-21

2     retail board that the advisors had the full

3     faith and backing of Mr. -- Mr. Dondero?

4                   MS. DEITSCH-PEREZ:  Object to the

5            form.

6          A.    I don't recall discussing that with

7     him at the time.

8          Q.    When you told this to the board, was

9     Mr. Dondero participating in the discussion?

10         A.    Not that I recall.

11         Q.    Withdrawn.  Was it not -- withdrawn.

12               Do you recall whether -- when you

13    covered this issue with the board, was that in

14    a -- a Zoom call or a Webex call?  Was it a

15    telephone call?  Was it in-person?  Like where

16    were you physically in relation to the board?

17         A.    I believe I was at home.

18         Q.    Okay.  Can you identify every person

19    that you recall who was present for this

20    disclosure other than -- other than the board

21    members themselves?

22                   MS. DEITSCH-PEREZ:  Object to the

23            form.

24         A.    I don't recall everyone on the call.

25         Q.    Can you identify anybody who was on

Case 3:05-07-Sg 8Doc File 1 0720/210/29/Bred En0620/210/29z1281:F3a57 19De397
Case 3:21-cv-00881-X   Documen Ex0794 18   Page 0409/2446 Page 160 of 200   PageID 54682

Page 192

WATERHOUSE - 10-19-21

1          the call?

2          A.    Other than the board members?

3          Q.    Yes.

4          A.    Lauren Thedford.  I mean, there

5    are -- there are many -- my section is just one

6    of many sections that are just -- you know, as

7    you can appreciate, this is a long board

8    meeting.

9          I can't recall specifically, really

10   even generally, or who was on when this was

11   discussed.  But Lauren was typically on for the

12   entire time.

13         Q.    I apologize if I asked you this, but

14   do either of Mr. Norris or Mr. Post hold any

15   positions relative to the retail funds?

16         A.    I think you asked me this already,

17   John.

18         Q.    Okay.  I just don't recall.  Can you

19   just refresh my recollection if I did, in fact,

20   ask you the question?

21         A.    I don't believe -- if we can go

22   back.  I don't believe Mr. Norris has a title

23   at the retail funds.  Mr. -- and Mr. Post is

24   the CCO of the advisor, the advisors.

25

Case 3:21-cv-00881-X Document 179-18 Filed 10/20/21 Page 161 of 200 PageID 54683
Case 3:21-cv-00881-X Document 179-18 Filed 10/20/21 Page 161 of 200 PageID 54683

Page 193

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you know if either of them

 3   have a position with the retail board -- with

 4   the retail funds?

 5        A.    I don't believe Mr. Norris has a

 6   position with the retail funds.

 7        Q.    All right.  What about Mr. Post?

 8        A.    Mr. Post is the CCO of the advisors.

 9        Q.    Okay.  Does he hold any position --

10        A.    I don't believe so.

11        Q.    -- with the retail funds?

12        A.    I don't believe so.

13        Q.    Okay.

14        A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18        Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21              MS. DANDENEAU:  Objection to form.

22        A.    It is -- it is -- it is what has

23   been discussed with them prior.

24        Q.    And were you -- were you trying to

25   give them comfort that even though the
```

Case 23-03007-sgj Doc 86-1 Filed 10/20/21 Entered 10/20/21 22:31:57 Desc 397
Case 3:21-cv-00881-X Document 73-13 Page 24/39/2446 Page 162 of 200 PageID 54684

Page 194

```
 1              WATERHOUSE - 10-19-21

 2  liabilities exceeded the assets that the

 3  advisors would still be able to meet their

 4  obligations as they become due?

 5              MS. DANDENEAU:  Objection to form.

 6              MS. DEITSCH-PEREZ:  Object form.

 7      A.    I -- I can't -- I don't remember

 8  specifically the conversation, but generally --

 9  you know, generally, yes.  And that is why --

10  but, you know, again, in this email saying, you

11  know, I am sure I qualified it with the retail

12  board, you know, as I said I like -- you know,

13  to my knowledge, that hasn't changed.  But,

14  again, generally -- generally that is what I

15  remember.

16      Q.    Okay.  Do you recall if in the

17  advisors' response to the retail board's

18  question if the response included any statement

19  concerning Mr. Dondero and -- and the full

20  faith and backing that he was giving to the

21  advisors?

22              MS. DEITSCH-PEREZ:  Object to the

23        form.

24      A.    I don't -- I don't remember

25  specifically what was provided.
```

1                 WATERHOUSE - 10-19-21

2        Q.     Okay.

3        A.     And I don't really -- I don't really

4    remember generally either.

5        Q.     Okay.

6               MR. MORRIS:  So -- so, again, I'm

7               just going to ask Mr. Rukavina if your

8               clients can produce as soon as possible the

9               15(c) response, the written response that

10              the advisors made, if any, to the board's

11              Question No. 2.

12              I'm not looking for the whole

13              response, but I certainly want the response

14              to Question No. 2.

15       Q.     Do you have a general understanding

16   as to the amount by which -- withdrawn.

17              Did -- did the assets of --

18   withdrawn.

19              Did the liabilities of HCMFA exceed

20   its assets in 2020?

21              MS. DANDENEAU:  Objection to form.

22              MS. DEITSCH-PEREZ:  Objection, form.

23       A.     I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.  And did the liabilities of

 3    NexPoint exceed its assets in 2020?

 4              MS. DEITSCH-PEREZ:  Objection to

 5         form.

 6        A.    I don't believe so.

 7        Q.    Okay.  So -- so it was only one of

 8    the two advisors who had liabilities that

 9    exceeded the value of the assets.

10              Do I have that right?

11              MS. DEITSCH-PEREZ:  Objection to

12         form.

13              MS. DANDENEAU:  Form.

14        A.    Yes.

15        Q.    And do you know, ballpark, the

16    amount by which the value of HCMFA's

17    liabilities exceeded their assets in 2020?

18              MS. DANDENEAU:  Objection to form.

19        A.    I don't -- I don't recall.

20              MR. MORRIS:  I had specifically

21         requested in discovery the audited

22         financial reports for both advisors and

23         NexPoint.  I think I may have gotten one

24         for NexPoint but I'm still waiting for the

25         balance.  And I'm going to renew my request
```

for those documents too.

Q. Let's go to the next exhibit, which is Number 10. So I think it is in your stack, Mr. Waterhouse.

MR. MORRIS: And we can take the one down from the screen and put up Number 10 for everybody.

(Exhibit 10 marked.)

Q. And I don't know if you have ever seen this before, but I'm really putting it up on the screen for purposes of turning to the very last page of the document.

So this is a document that we have been -- that we premarked as Exhibit 10. And we're turning to the last page of the document, which is a document that was filed in the adversary proceeding 21-3004. And -- no, I apologize, I think we -- right there. Perfect.

And it is page 31 of 31.

MR. MORRIS: I think there may have been some something erroneously stapled to the hard copy that I gave you folks, but I'm looking for page 31 of 31 in the document that begins with the first page of

Case 3:20-cv-00852-G Doc 36-1 Filed 10/20/21 ... Entered 10/20/21 21:31:57 ... Page 198 Desc 397
Case 3:21-cv-00881-X   Document 173-18   Page 2470 of 2446   Page 166 of 200   PageID 54688

Page 198

1              WATERHOUSE - 10-19-21

2        Exhibit 10.

3        Q.    Do you have that, Mr. Waterhouse?

4        A.    I don't have it yet.  I'm looking.

5        Q.    All right.  If you look at the top

6   right-hand corner, you will see it says page

7   hopefully something of 31?

8        A.    Yes, I've got it now.

9        Q.    Okay.  You have got 31 of 31.  You

10  can take a moment to read that, if you would

11  like.

12       A.    (Reviewing document.)  Okay.

13       Q.    Have you ever seen this before?

14       A.    I don't know if I have seen this

15  specific document, but, you know, I've --

16  I'm -- I'm aware of it.

17       Q.    And is this the document that you

18  had in mind when you sent that email to

19  Ms. Thedford that we just looked at where you

20  said that Highland had agreed not to make a

21  demand upon HCMFA until May 2021?

22       A.    Honestly, I don't -- it wasn't this

23  document.  I mean, it's something like this,

24  yes.  I mean, yes.

25       Q.    Well --

```
 1                 WATERHOUSE - 10-19-21

 2        A.     It is something like this, but I

 3   don't think it was this specific document.

 4        Q.     Well, but this document does say in

 5   the last sentence that Highland agreed not to

 6   seek -- not to demand payment from HCMFA prior

 7   to May 31, 2021; right?

 8        A.     Yes.

 9        Q.     And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.     Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.     No.  Let me try again.

17               Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.     I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.     Okay.  And do you think that the

25   audit is referring to this particular document?
```

Case 23-00507-jpc Doc 8-1 Filed 10/20/21 Entered 10/20/21 22:38:57 Desc
Case 3:21-cv-00881-X Document 173-18 Page 199/2446 Page 168 of 200 PageID 54690

Page 200

                         WATERHOUSE - 10-19-21

1

2        A.    I don't know.

3        Q.    All right.  This document is dated

4   April 15, 2019.  Do you see that?

5        A.    I do.

6        Q.    And do you remember that the audit

7   was completed on June 3rd, 2019?

8        A.    Yes.

9        Q.    And do you recall that the audited

10  financials -- and I'm happy to pull them up if

11  you would like, but do you recall that the

12  audited financials included a reference to the

13  agreement pursuant to which Highland agreed not

14  to make a demand until May 31st, 2021?

15       A.    Yes, I remember.

16       Q.    And as part of the process, would

17  you have expected the corporate accounting team

18  to have provided a copy of this document to

19  PwC?

20             MS. DANDENEAU:  Objection to form.

21       A.    Yes, I would have expected something

22  like this, or again, you know, some document

23  that basically states -- states the deferral

24  till May 31 of 2020.

25       Q.    Okay.

Case 3:00-0507-bjc 8 Doc File 1 07/20/210/29/red Enter20/210/292131:5Page 201 of 397
Case 3:21-cv-00881-X   Document 179-18   Page 25709/2446 Page 169 of 200   PageID 54691

Page 201

1                    WATERHOUSE - 10-19-21

2          A.    May 31 of 2021, excuse me.

3          Q.    And this document states the

4    deferral that you just described; correct?

5          A.    It does.

6          Q.    And this document states the

7    deferral that was described in the audited

8    financial statements that we looked at before;

9    correct?

10         A.    It does.

11               MR. MORRIS:   Okay.  Can we scroll

12         down just a little bit to see who signed on

13         behalf of the acknowledgment there.

14         Q.    Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17         A.    I do.

18         Q.    Okay.  Did you discuss this document

19   or the -- withdrawn.

20               Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23         A.    I think I testified I don't recall.

24         Q.    Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?

Case 23-03007-sgj Doc 86 Filed 07/20/21 Entered 10/29/21 21:37:57 Desc
Case 3:21-cv-00881-X Document 79-18 Page 2509/2446 Page 170 of 200 PageID 54692

Page 202

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall.

3              MR. MORRIS:  Can we scroll back up

4        to the document, please.

5        Q.    Do you see in the beginning it says,

6    reference is made to certain outstanding

7    amounts loaned from Highland to HCMFA for

8    funding ongoing operations.

9              Do you see that?

10       A.    Yes.

11       Q.    And were you aware as the CFO of

12   Highland and as the treasurer of HCMFA that as

13   of April 15, 2019, Highland had made certain

14   loans to HCMFA to fund HCMFA's ongoing

15   operations?

16       A.    Yes.

17       Q.    And were you aware that those loans

18   were payable on demand and remained outstanding

19   as of December 31st, 2018?

20       A.    Yes.

21       Q.    And were you aware that those

22   amounts were payable on demand, and they

23   remained outstanding as of April 15, 2019?

24              MS. DEITSCH-PEREZ:  Object to the

25       form.

Case 3:00-cv-00001-X-Doc-File 1 07/20/21-09/29/21-Entered 10/20/21 09:29:23 13:57:23 Page 1 of 2-2 Doc 397
Case 3:21-cv-00881-X   Document 179-18   Filed 05/29/24   Page 171 of 200   PageID 54693

Page 203

1              WATERHOUSE - 10-19-21

2        A.    Well, this -- this document dated

3  April 15, 2019 says they have been deferred to

4  May 31, 2021.

5        Q.    Right.  But I'm just sticking to the

6  first paragraph where they refer to the

7  outstanding amounts.  And in the end it says

8  the -- it remained outstanding on December

9  31st, 2018, and I think you told me that you

10  understood that, and then I'm just trying to

11  capture the last piece of it.

12              Did you understand that there were

13  amounts outstanding from the loan that Highland

14  made to HCMFA to fund ongoing operations as of

15  April 15th, 2019?

16        A.    Yes.

17        Q.    Thank you.  Let's look at the next

18  sentence.  HCMFA expects that it may be unable

19  to repay such amounts should they become due

20  for the period commencing today and continuing

21  through May 31st, 2021.

22              Do you see that?

23              MS. DANDENEAU:  Objection to form.

24        A.    I do.

25        Q.    As the CFO -- withdrawn.

                        WATERHOUSE - 10-19-21

1

2                   As the treasurer of HCMFA, did you

3    believe that -- do you believe that statement

4    was true and accurate at the time it was

5    rendered?

6         A.    I mean, it -- it -- the answer to

7    that is I really didn't have any -- I didn't

8    have an opinion really.

9         Q.    Did you do anything to educate

10   yourself in April of 2019 on the issue of

11   whether HCMFA could repay the amounts that it

12   owed to Highland should they become due?

13        A.    I don't believe so.

14        Q.    Did you at any time form any

15   opinions as to HCMFA's ability to repay all

16   amounts due to Highland should they become due?

17        A.    Not really.  I guess I don't...

18        Q.    Well, you told the retail board that

19   HCMFA's liabilities exceeded their assets in

20   2020; correct?

21        A.    Yes.

22        Q.    Based on the work that you did to

23   prepare for the retail board, did you form any

24   view as to whether HCMFA would be unable to

25   repay the amounts that it owed to Highland

Case 23-03005-sgj Doc 80-4 Filed 10/20/21 Entered 10/20/21 22:31:58 Page 205 of 397
Case 3:21-cv-00881-X Document 178-43 Page 250 of 446 Page 173 of 200 PageID 54695

Page 205

                    WATERHOUSE - 10-19-21

 1

 2   should they become due?

 3             MS. DANDENEAU:  Objection to form.

 4        A.    I mean, I -- when you look at that,

 5   to answer you, completely, you know, again,

 6   if -- the response I gave the retail board was,

 7   you know, the -- the advice -- HCMFA advisors

 8   have the -- have the full faith and backing of

 9   Jim Dondero.  So I didn't form an opinion of

10   whether the advisor could pay it or not.

11        Q.    Did you form any view as to whether

12   the advisors could repay the amounts that it

13   owed to Highland should they become due without

14   the full faith and backing of Mr. Dondero?

15             MS. DANDENEAU:  Objection to form.

16             MS. DEITSCH-PEREZ:  Form.

17        A.    I mean, if you -- if you -- if you

18   take that last statement out, I mean, it would

19   be difficult for HCMFA to pay back demand notes

20   at that time.

21        Q.    And it was precisely for that reason

22   that you told the retail board that -- that the

23   retail -- that the advisors had the full faith

24   and backing of Mr. Dondero; correct?

25             MS. DANDENEAU:  Objection to form.

Case 21-03005-sgj Doc 86 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 206 of 397
Case 3:21-cv-00881-X Document 175-18 Page 2559/2446 Page 174 of 200 PageID 54696

Page 206

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I mean, yes, as the mouthpiece, I

 3   was relaying information.

 4        Q.    Okay.  And you relayed that

 5   information with the knowledge and approval of

 6   Mr. Dondero; correct?

 7              MS. DEITSCH-PEREZ:  Object to the

 8        form.

 9        A.    As I stated in the email, I don't

10   believe, and I think I testified I don't

11   believe I had conversations with Mr. Dondero at

12   the time of that board meeting.

13        Q.    Did you tell the retail board that

14   the advisors had the full faith and backing of

15   Mr. Dondero without Mr. Dondero's prior

16   approval?

17        A.    Yeah, I -- I -- yes, I'm -- like I

18   said, I think I testified earlier, I'm sure I

19   qualified it as well.

20        Q.    What do you mean by that?

21              MS. DANDENEAU:  Objection to form.

22        A.    Again -- again, like I said in the

23   email, it has the full faith and backing of Jim

24   Dondero unless that has changed.

25        Q.    Actually that is not what you said,
```

Case 3:00-5:05-c/-Sgic 8 Doc File 1 0/720/210/29/i2red En0e20/210/29/12331:F5a5e 207est397
Case 3:21-cv-00881-X  Document 79-18  Page 25609/2446Page 175 of 200  PageID 54697

Page 207

1                   WATERHOUSE - 10-19-21

2      so let's put the email back up.

3           A.    It is -- it is -- it is in the

4      email.

5           Q.    Let's put the email back up.  You

6      didn't say unless it has changed.  You said you

7      believe it hasn't changed; right?

8           A.    Okay.  And to my knowledge that

9      hasn't changed, that is what it says.

10          Q.    That's right.

11          A.    But, again, I mean, that is -- I

12     don't know everything.  And I'm not in every

13     conversation.  I'm not -- to presume that I am,

14     is -- and you have to put myself -- as you

15     started this out, Mr. Morris, I was at home in

16     October of 2020 with COVID -- or, you know,

17     under these COVID times that we described is

18     very difficult.

19                We have all been working at home for

20     really the first time ever, undergoing

21     processes, procedures, control environments

22     that have been untested, and there is poor

23     communication.

24                So I am relaying, as I'm telling you

25     now, what is in the email.  And unless

Case 3:21-cv-00881-X  Document 179-18  Filed 10/20/23  Entered 10/20/23 21:31:57  Page 208 of 397
Case 3:21-cv-00881-X  Document 179-18  Page 2509/2446  Page 176 of 200  PageID 54698

Page 208

```
1              WATERHOUSE - 10-19-21

2     something has changed -- to my knowledge, it

3     hasn't changed, but it could have changed.

4          Q.    When you say that the advisors have

5     the full faith and backing from Mr. Dondero,

6     did you intend to convey that, to the extent

7     the advisors were unable to satisfy their

8     obligations as they become due, Mr. Dondero

9     would do it for them?

10              MS. DANDENEAU:  Object to the form.

11              MS. DEITSCH-PEREZ:  Object to the

12         form.

13              And, John, we have given you a lot

14         of leeway here but this does not seem

15         relevant to this case.  You seem sort of

16         taking a complete sort of diversion into

17         the allegations and the complaint just

18         filed on Friday, and so I would ask you to

19         move on because --

20              MR. MORRIS:  And I will tell you --

21         I will tell you that I have never read that

22         complaint cover-to-cover.  I have nothing

23         to do with the prosecution of those claims.

24         And this issue that we're talking about

25         right now is related solely to the
```

Case 3:21-cv-00881-X   Document 178   Filed 10/20/21   Entered 10/20/21 21:31:57   Page 209 of 397
Case 3:21-cv-00881-X   Document 179-18   Page 2589/2446   Page 177 of 200   PageID 54699

Page 209

```
 1                    WATERHOUSE - 10-19-21

 2          promissory notes that your clients refuse

 3          to pay.

 4                    So I'm going to continue to ask my

 5          questions, and I would ask the court

 6          reporter to read back my last question.

 7                         (Record read.)

 8                    MS. DEITSCH-PEREZ:  And then I

 9          believe there were objections to form.

10          Q.     You can answer the question.

11          A.     Yes.

12          Q.     Thank you very much, sir.

13                    MR. MORRIS:  Can we go back to the

14          other document, please?

15          Q.     Mr. Waterhouse, do you know if this

16    document was ever shared with the retail board?

17          A.     I don't recall.

18          Q.     Did you ever share it with the

19    retail board?

20          A.     I don't recall.

21          Q.     Did you ever tell the retail board

22    about the substance of this document?

23          A.     I don't recall.

24          Q.     Did you ever tell the retail board

25    that Highland had agreed not to make a demand
```

1                    WATERHOUSE - 10-19-21

2    against HCMFA until May 2021?

3         A.    I don't recall.

4         Q.    Do you know whether anybody on

5    behalf of the advisors ever informed the retail

6    board that Highland had agreed on April 15,

7    2019, not to make a demand against HCMFA under

8    the promissory notes?

9         A.    I don't recall.

10        Q.    Did you instruct Ms. Thedford or

11   anybody else responding to the retail board's

12   15(c) inquiry to disclose this document?

13        A.    Did I instruct Ms. Thedford or

14   anyone else to -- to -- to produce this, to

15   disclose this document?  Is that what you -- I

16   just want to make sure.

17        Q.    Uh-huh.

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Did you instruct anybody to inform

20   the retail board, in response to their question

21   as part of the 15(c) process, to -- to tell the

22   retail board about Highland's agreement not to

23   make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25        A.    I don't recall.

Case 3:21-cv-00881-X   Document 179-18   Filed 10/20/23   Page 180 of 397   PageID 54701
Case 3:21-cv-00881-X   Document 179-18   Page 26 of 446   Page 179 of 200   PageID 54701

Page 211

1                WATERHOUSE - 10-19-21

2        Q.     Did you ever inform PwC that HCMFA's

3     liabilities exceeded its assets?

4              MS. DANDENEAU:  Object to the form.

5        A.     I don't -- I don't think I told

6     them.  I mean, they -- they audited the

7     financial statements.

8        Q.     Did -- do you know if anybody on

9     behalf of Highland ever informed

10    PricewaterhouseCoopers that HCMFA may be unable

11    to repay amounts owing to Highland, should they

12    become due?

13             MS. DANDENEAU:  Objection to form.

14       A.     Yes.  Again, I think I testified

15    earlier that -- that this was communicated to

16    the auditors.

17       Q.     Ideally --

18       A.     I don't know who exactly did that.

19    I don't recall doing it, but, yeah, it was --

20    it was communicated.  And that is why -- I

21    mean, there is a disclosure in the financial

22    statements; right?

23       Q.     There is, and that disclosure

24    relates to the last sentence of this document;

25    correct?

Case 3:10-05817-bjc Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:57 Desc Dec 397
Case 3:21-cv-00881-X Document 178-18 Page 260 of 446 Page 180 of 200 PageID 54702

Page 212

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Do you recall looking in the

 4   document and seeing anything that was disclosed

 5   with respect to the sentence above that?

 6        A.    No.

 7        Q.    Do you know whether anybody on

 8   behalf of Highland ever informed

 9   PricewaterhouseCoopers that HCMFA expects that

10   it may be unable to repay amounts due and owing

11   to Highland should they become due?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.  I think that is the third time.

14        A.    I don't recall.  Again, as I said,

15   we -- all of this was given to the auditors.

16        Q.    Do you know if Highland received

17   anything of value in exchange for its agreement

18   not to demand payment on amounts owed by HCMFA

19   prior to May 31st, 2021?

20             MS. DEITSCH-PEREZ:  Object to the

21        form.  That is the second time.

22             MS. DANDENEAU:  Object to the form.

23        A.    I have answered this question.

24             MR. RUKAVINA:  Hold on.  Object to

25        legal conclusion.  Go ahead.
```

Case 21-03005-sgj Doc 80-4 Filed 10/20/21 Entered 10/20/21 22:31:57 Desc Dist
Case 3:21-cv-00881-X Document 179-18 Page 26 of 446 Page 181 of 200 PageID 54703

Page 213

WATERHOUSE - 10-19-21

1

2    A.    I have answered this question

3  before.

4    Q.    And the answer was no?

5    A.    I'm not aware.

6    Q.    Now, this acknowledgment can't

7  possibly apply to the two notes that you signed

8  on behalf of HCMFA because those notes were

9  signed on May 2nd and May 3rd, 2019; is that

10  right?

11          MS. DANDENEAU:  Objection to form.

12    A.    Unless there is a drafting error.

13    Q.    Okay.  Are you aware of a drafting

14  error?

15    A.    I'm not aware.  I didn't -- I wasn't

16  part of -- I didn't sign this note or this

17  acknowledgment.  I didn't draft it.

18    Q.    But you do see it is dated April 15,

19  2019; right?

20    A.    Yes.

21    Q.    And this was a document that was

22  actually included by the advisors in a pleading

23  they filed with the Court; right?

24          MR. RUKAVINA:  Well, I don't know

25          that so I object to form.

```
 1                    WATERHOUSE - 10-19-21

 2         Q.    Okay.  Let's go to the first page of

 3    the document and just confirm that.

 4              MR. AIGEN:  Mr. Morris, I just note

 5         that you already said there was some error

 6         with the document that is listed as

 7         exhibit --

 8              MR. MORRIS:  No.  No, no, no.

 9              MS. DEITSCH-PEREZ:  Oh, okay.

10              MR. MORRIS:  What I said is that

11         there is a few pages that were mistakenly

12         stapled to the end of the document.

13              MS. DEITSCH-PEREZ:  Okay.

14              MR. MORRIS:  There is no problem

15         with this document.

16              MS. DEITSCH-PEREZ:  And just so

17         we're clear that the document -- the pages

18         that start with defendant's amended answer

19         are not intended to be part of this

20         document?

21              MR. MORRIS:  That's correct.

22              MS. DEITSCH-PEREZ:  And that the --

23         but it is your representation that the rest

24         of the document is -- is -- is correct

25         because we don't -- we don't have any way
```

```
 1                    WATERHOUSE - 10-19-21

 2            of verifying that, we're just --

 3                 MR. MORRIS:  You do, actually.  You

 4            could just go to Docket No. 21-3004.

 5                 MS. DEITSCH-PEREZ:  If you want to

 6            stop this deposition so we can go and pull

 7            that document up, we're happy to do it.  So

 8            I am just asking you for your

 9            representation.

10                 MR. MORRIS:  Sure.  I gave that.

11                 MS. DEITSCH-PEREZ:  Okay.

12            Q.    So do you see that this is a

13   document that was actually filed with the Court

14   by Highland Capital Management Fund Advisors?

15            A.    No.  I get with the first page in

16   the section.  Maybe I'm looking at the wrong

17   thing.  It says, Highland Capital Management.

18            Q.    Don't worry about it.  Don't worry

19   about it.

20            A.    Maybe I went back -- okay.

21                 MR. MORRIS:  All right.  Can we put

22            up on the screen Exhibit 2.

23                 (Exhibit 2 marked.)

24                 MR. MORRIS:  I think it is

25            Exhibit 1.
```

```
1                    WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  I'm sorry, John, did

3       you say Exhibit 2 or Exhibit 1?

4              MR. MORRIS:  It is Exhibit 2 in the

5       binders so it is premarked Exhibit 2.  And

6       now I'm asking -- right there -- going to

7       Exhibit 1 to the document that was marked

8       as Exhibit 2.

9              MS. DANDENEAU:  Got it.  In the

10      binder there is no --

11             MS. DEITSCH-PEREZ:  There is no

12      Exhibit 1.

13             MR. MORRIS:  All right.  So look at

14      the one on the screen.

15      Q.    Do you see, Mr. Waterhouse, that

16 this is a promissory note dated May 31st, 2017,

17 in the approximate amount of $30.7 million?

18      A.    Yes.

19      Q.    And do you see that the maker of the

20 note is NexPoint?

21      A.    Yes.

22      Q.    And that Highland is the payee; is

23 that right?

24      A.    Yes.

25      Q.    Okay.  And do you see in Paragraph 2
```

```
 1                  WATERHOUSE - 10-19-21

 2   this is an annual installment note?

 3        A.    Can you scroll down.

 4        Q.    Sure.

 5              MR. MORRIS:  Can we scroll down --

 6        yeah, there you go.

 7        A.    Right there, yeah.  Yes.

 8              MR. MORRIS:  And can we scroll down

 9        to the signature line.

10        Q.    And do you recognize that as

11   Mr. Dondero's signature?

12        A.    Yes.

13        Q.    And is this the promissory note that

14   we talked about earlier where NexPoint had made

15   certain payments in the aggregate amount of

16   about 6 to $7 million against principal and

17   interest?

18        A.    I don't recall discussing the

19   aggregate principal amounts of 6 to $7 million,

20   but -- so I don't -- I don't recall that prior

21   discussion with those amounts.

22        Q.    All right.  Let's take a look.

23   NexPoint always included this promissory note

24   as a liability on its audited financial

25   statements; right?
```

1                   WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    And NexPoint had its financial

4     statements audited; isn't that correct?

5          A.    Yes.

6          Q.    And was the process of NexPoint's

7     audit similar to the process you described

8     earlier for Highland and HCMFA?

9          A.    Yes, it is similar.

10         Q.    Okay.

11              MR. MORRIS:  Can we put up

12         NexPoint's audited financials and let

13         everybody know what exhibit number it is,

14         La Asia?

15              MS. CANTY:  It is going to be

16         Exhibit 46.

17              (Exhibit 46 marked.)

18         Q.    And do you see, sir, that we've put

19    up NexPoint Advisors' consolidated financial

20    statements and supplemental information for the

21    period ending December 31st, 2019?

22         A.    Yes.

23         Q.    Did you participate in the process

24    whereby these audited financial statements were

25    issued?

1                      WATERHOUSE - 10-19-21

2          A.    I didn't participate directly, as

3    I've described before, about the -- the team

4    performing the audit.

5          Q.    Do you recall when the audit of

6    NexPoint's financial statements for the period

7    ending December 31st, 2019 was completed?

8          A.    Yes.

9          Q.    And when do you recall it being

10   completed?

11         A.    In January of 2021.

12         Q.    Do you know why the 2019 audit

13   report wasn't completed until January of 2021?

14         A.    Yes.

15         Q.    Why was the NexPoint audit report

16   for the period ending 12/31/19 not completed

17   until January 2021?

18         A.    Because we had to deal with working

19   from home from -- with COVID, and on top of all

20   of our daily responsibilities and job duties

21   at -- at providing -- at Highland providing

22   services to NexPoint, we had to do all of this

23   extra work for a bankruptcy that was filed in

24   October of 2019.

25               MR. MORRIS:  Can we go to the

```
 1                WATERHOUSE - 10-19-21

 2        balance sheet on page 3?  Okay.  Stop right

 3        there.

 4        Q.    Do you see under the liabilities

 5   section, the last item is note payable to

 6   affiliate?

 7        A.    Yes.

 8        Q.    And is that the note that we just

 9   looked at?

10             MS. DANDENEAU:  Objection to form.

11        Q.    Withdrawn.

12             Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15             MS. DANDENEAU:  Objection to form.

16        A.    I believe no.

17        Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21        A.    I don't recall.

22        Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25             MS. DEITSCH-PEREZ:  Object to the
```

1                    WATERHOUSE - 10-19-21

2          form.

3          A.     Approximately.

4          Q.     And does that refresh your

5    recollection that between the time the note was

6    executed and the end of 2019, that NexPoint had

7    paid down approximately $7 million?

8          A.     Yes.  If we are just doing the math,

9    yes.

10         Q.     Okay.  Did NexPoint complete its

11   audit from 2020?

12         A.     Sorry, you kind of broke up.  Do

13   NexPoint complete?

14         Q.     The audit of its financial

15   statements for the period ending December 31st,

16   2020?

17         A.     No.

18         Q.     No, it's not complete?

19         A.     No, it is not complete.

20         Q.     Did HCMFA complete its audit for the

21   year ending December 31st, 2020?

22         A.     No.

23                MR. MORRIS:  Can we go to page 15,

24         please, the paragraph at the bottom.

25         Q.     Do you see that NexPoint has

1    WATERHOUSE - 10-19-21

2    included under notes payable to Highland a

3    reference to the amounts that were outstanding

4    as of the year-end 2019 under the note that we

5    looked at just a moment ago?

6        A.    Yes.  Are you talking about the

7    second paragraph?

8        Q.    I'm actually talking about first

9    paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13            MS. DANDENEAU:  Objection to form.

14       John, do you mean the first paragraph of

15       that page?

16            MR. MORRIS:  No, the first paragraph

17       under notes payable to Highland.

18       A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in

```
 1                   WATERHOUSE - 10-19-21
 2   perfectly together.
 3          Q.    Okay.  But you're not aware of any
 4   note that was outstanding at the end of 2019
 5   from NexPoint to Highland other than whatever
 6   principal was still due and owing under the
 7   $30 million note issued in 2017; correct?
 8          A.    Well, it -- I don't -- there is
 9   reference in the second paragraph.  I don't --
10   I don't -- I don't recall what that is
11   referring to, so I don't -- I don't know.
12          Q.    Well, if you listen carefully to my
13   question, right, I'm asking about notes that
14   were outstanding at the end of 2019, and if we
15   look at the paragraph you just referred to, it
16   says that during the year there were new notes
17   issued totaling $1.5 million, but by the end of
18   the year, no principal or interest was
19   outstanding on the notes.
20               Do you see that?
21          A.    Oh, I do, yes.
22          Q.    So does that refresh your
23   recollection that there were no notes
24   outstanding from NexPoint to Highland other
25   than the principal remaining under the original
```

1          WATERHOUSE - 10-19-21

2     $30 million 2017 note that we looked at a

3     moment ago?

4          A.    Well, we're at the bottom of the

5     page.  Is there anything on page 16?

6          Q.    That is a fair question, sure.  That

7     is it.

8          A.    Okay.  So it appears that that is

9     the only note that is detailed in the notes in

10    the financial statement.

11         Q.    And you don't have any memory of any

12    other note other than the 2017 note, right,

13    being outstanding as of the end of the year?

14         A.    I deal with thousands of

15    transactions every year.  I don't really have a

16    very specific memory for what exactly was

17    outstanding.

18              MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22              VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25              VIDEOGRAPHER:  We are going back on

Case 3:00-cv-00881-Doc 8 Doc File 10/20/21 Entered 10/20/21 21:31:57 Page 225 est 397
Case 3:21-cv-00881-X   Document 178-18   Page 2749/2446 Page 193 of 200   PageID 54715

Page 225

1                 WATERHOUSE - 10-19-21

2          the record at 3:39 p.m.

3          Q.    All right.  Mr. Waterhouse, we -- I

4    don't think we have a lot more here.

5                To the best of your knowledge and

6    recollection, were all affiliate loans and all

7    loans made to Mr. Dondero recorded on

8    Highland's books and records as assets of

9    Highland?

10               MS. DANDENEAU:  Object to the form,

11         asked and answered.

12         A.    To my knowledge, yes.

13         Q.    Okay.  Can you recall any loan to

14   any affiliate or Mr. Dondero that was not

15   recorded on Highland's books and records as an

16   asset?

17         A.    Like during my time as CFO?  I don't

18   recall.

19         Q.    How about after the time that you

20   were CFO?  Did you recall that there was a loan

21   by Highland to an affiliate or to Mr. Dondero

22   that hadn't been previously recorded on

23   Highland's books as an asset?

24               MS. DANDENEAU:  Objection to form.

25         A.    I guess I don't understand the

Case 3:21-cv-00881-X Doc 8 Doc Filed 10/20/21 Entered 10/20/21 13:15 Page 226 of 397
Case 3:21-cv-00881-X Document 179-18 Page 275 of 446 Page 194 of 200 PageID 54716

Page 226

```
 1                  WATERHOUSE - 10-19-21

 2    question.  I left Highland as of -- I'm not

 3    aware of -- I left Highland in February --

 4    probably the last day of February of 2021.

 5          Q.    Okay.

 6          A.    I'm not -- I'm not aware of any --

 7    I'm not aware of anything past that date.

 8          Q.    Okay.  While you were the CFO at

 9    Highland, did Highland prepare in the ordinary

10    course of business a document that reported

11    operating results on a monthly basis?

12          A.    Yes.

13          Q.    And are you generally familiar with

14    the monthly operating reports?

15          A.    Yeah.  You are referring to the

16    reports that we filed to the Court every month?

17          Q.    I apologize, I'm not.  I'm taking

18    you back to the pre-petition period.  There was

19    a report that I have seen that I'm going to

20    show you, but I'm just asking for your

21    knowledge.

22                MR. MORRIS:  Let's put it up on the

23          screen, Exhibit 39.

24                (Exhibit 39 marked.)

25          Q.    Do you see this is a document that
```

```
 1              WATERHOUSE - 10-19-21

 2   is called operating results?

 3        A.    Yeah, that's the title of it.

 4        Q.    Okay.  And was a report of operating

 5   results prepared by Highland on a monthly basis

 6   during the time that you served as CFO?

 7        A.    No.

 8        Q.    Are you familiar with a document of

 9   this type?  And we can certainly look at the

10   next page or two to refresh your recollection.

11        A.    I'm just looking at the title.  I

12   don't really -- again, as I discussed before, I

13   don't have any records or documents or emails

14   or appointments or anything that I was able to

15   use prior to -- prior to this deposition, so

16   I'm doing the best I can.

17        Q.    Okay.  You don't need to apologize.

18   I'm just asking you if you are familiar with

19   the document called Operating Results that was

20   prepared on a monthly basis at Highland?

21              MS. DEITSCH-PEREZ:  Object to the

22        form.

23        Q.    If you're not, you're not.

24        A.    I don't believe this was prepared on

25   a monthly basis.
```

Case 3:00-cv-00087-Doc 8 Doc Filed 10/20/21 Prepared Filed 10/20/21 22:38:57 Page 228 Dest 397
Case 3:21-cv-00881-X   Document 79-18   Page 207 of 446 Page 196 of 200   PageID 54718

Page 228

```
1                    WATERHOUSE - 10-19-21

2         Q.    Okay.  Do you see that this one

3    is -- is dated February 2018?

4         A.    Yes.

5         Q.    Do you have -- do you believe --

6    have you ever seen a document that was

7    purporting to report operating results for

8    Highland?

9              MS. DANDENEAU:  Objection to form.

10        A.    Yes.

11        Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15        A.    I believe it was -- it was prepared

16   on an annual basis.

17        Q.    Okay.

18              MR. MORRIS:  Can we look at the next

19        page.

20        Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23              And it is dated February 2018.

24        A.    Yes.

25        Q.    Do you recall that there was a
```

Case 3:21-cv-00881-X Document 8-4 Filed 10/20/21 Entered 10/20/21 21:31:53 Desc
Case 3:21-cv-00881-X Document 179-18 Page 2789/2446 Page 197 of 200 PageID 54719

Page 229

1                    WATERHOUSE - 10-19-21

2      report that Highland prepared that identified

3      significant items impacting the balance sheet?

4           A.    A report that was prepared.

5           Q.    Let me ask a better question:  Did

6      Highland prepare reports to the best of your

7      recollection that identified significant items

8      that impacted its balance sheet?

9           A.    Well, so Highland prepared a -- a

10     monthly close package.  And maybe I'm

11     getting -- and -- and maybe change names at one

12     time or maybe I'm just -- again, just

13     misremembering -- but in that, yes, there is a

14     page that would detail just changes in -- you

15     know, just changes month over month on the

16     balance sheet.

17          Q.    Okay.  And maybe it is my fault.

18     Maybe I didn't know the proper name for it.

19     But let's use the phrase "monthly close

20     package."

21               Did Highland prepare a monthly close

22     package in the ordinary course of business

23     during the time that you served as CFO?

24               MS. DANDENEAU:  Objection to form.

25          A.    Yes.

Case 3:21-cv-00881-X   Document 175-18   Filed 01/09/24   Entered 01/09/24 21:31:53   Page 230 of 397
Case 3:21-cv-00881-X   Document 175-18   Page 01799/2446   Page 198 of 200   PageID 54720

Page 230

                    WATERHOUSE - 10-19-21

1

2          Q.     And did the monthly close package

3    that Highland prepared include information

4    concerning significant items that impacted

5    Highland's balance sheet?

6          A.     Yes, it had a page like that is --

7    that is on the screen that detailed items

8    like -- of that nature.

9          Q.     And do you know who -- was there

10   anybody at Highland who was responsible for

11   overseeing the preparation of the monthly

12   reporting package?

13         A.     That would have been -- again, it

14   varies over time during my tenure as CFO.

15   It -- it varied over -- over time, but -- but

16   typically a -- a corporate accounting manager.

17         Q.     And who were the corporate

18   accounting managers during your tenure as CFO?

19         A.     It would have been Dave Klos and

20   Kristin Hendrix.

21         Q.     And did the corporate accounting

22   manager deliver to you drafts of the monthly

23   close package before it was finalized?

24         A.     Sometimes.

25         Q.     Was that the practice even if there

```
1                WATERHOUSE - 10-19-21

2    were exceptions to the practice?

3         A.    The practice meaning that they

4    sometimes lured them to me?

5         Q.    That that was the expectation even

6    if circumstances prevented that from happening

7    from time to time.

8              MS. DEITSCH-PEREZ:  Object to the

9         form.

10        A.    I -- I would say it started out that

11   way but over the years it -- it was not

12   enforced.

13        Q.    Okay.  So you were -- you reviewed

14   and approved monthly -- monthly reporting

15   packages for a certain period of time and then

16   over time you stopped doing that.

17             Do I have that right?

18             MS. DANDENEAU:  Objection to form.

19        A.    Yes, I mean, if you're talking about

20   a formal meeting where we sit down and go

21   through and approve it.  I would say that was

22   standard practice a decade -- you know, early

23   on.  And as time went on that -- that -- that

24   practice wasn't followed.

25        Q.    Okay.
```

Case 23-0053-3gj Doc 8 Dckt Filed 10/20/21 Entered 10/20/21 21:30:57 Desc
Case 3:21-cv-00881-X Document 179-18 Page 200 of 200 PageID 54722

Page 232

```
 1                    WATERHOUSE - 10-19-21

 2         A.    And, quite frankly, I don't even

 3    know if these were -- these were sent to me

 4    even in any capacity.

 5         Q.    What was the purpose of preparing

 6    the monthly reporting package -- withdrawn.

 7               What was the purpose of preparing

 8    the monthly close package?

 9               MS. DEITSCH-PEREZ:  Object to the

10         form.

11         A.    The -- the original purpose was so

12    that it would just -- it would be a report that

13    was reviewed monthly with senior management.

14         Q.    Who was included in the idea of

15    senior management?

16         A.    You know, I think originally when

17    this was conceived that would have been like

18    Jim Dondero and Mark Okada.

19         Q.    Were monthly reporting -- withdrawn.

20               Were monthly close packages prepared

21    to the best of your knowledge until the time

22    you left Highland?

23         A.    To my knowledge -- I don't know,

24    actually.  I mean, to my knowledge, I believe

25    it was being -- that was still being done.  I
```