1                    WATERHOUSE - 10-19-21

2    don't know because, again, I wasn't reviewing

3    them.  I hadn't reviewed a close package for --

4    for a long time.  But I believe the standard

5    practice that was still being carried out.

6         Q.    Did you ever have any discussions

7    with the debtor's independent board concerning

8    any promissory notes that were issued by any of

9    the affiliates or Mr. Dondero?

10        A.    I can't -- I can't -- I can't recall

11   specifically.

12        Q.    Did you speak with the independent

13   board from time to time?

14        A.    Yes, from -- from -- from time to

15   time I had discussions with the independent

16   board members, you know, either -- either, you

17   know, by themselves or wholly, you know, as --

18   as a -- as a combined work.

19        Q.    Okay.  Before we talk about

20   Mr. Seery, do you recall ever having a

21   conversation with Mr. Nelms or Mr. Dubel

22   concerning any promissory note that was

23   rendered by one of the affiliates or

24   Mr. Dondero to Highland?

25        A.    I don't recall any conversations

Case 23-03007-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:15:57 Desc
Case 3:21-cv-00881-X Document 179-19 Filed 03/09/24 Page 2 of 192 PageID 54724

Page 234

1                WATERHOUSE - 10-19-21

2  specifically.

3       Q.    Do you know if the topic was ever

4  discussed, even if you don't remember it

5  specifically?

6            MS. DANDENEAU:  Objection to form.

7       A.    It -- it -- it may have.  I don't

8  know.  I don't recall.

9       Q.    Do you recall ever discussing any

10 promissory note issued by any of the affiliates

11 or Mr. Dondero with James Seery?

12      A.    I don't -- I don't recall

13 specifically.

14      Q.    Do you recall generally ever

15 discussing the topic of promissory notes issued

16 by any of the affiliates or Mr. Dondero to

17 Highland with Mr. Seery?

18      A.    Nothing -- nothing is really jumping

19 out at me.

20      Q.    Do you recall if you ever told

21 Mr. Seery that any of the affiliates or

22 Mr. Dondero didn't have an obligation to pay

23 all amounts due and owing under their notes?

24      A.    I don't recall having that

25 conversation.

Case 3:03-cv-00817-Doc 8 Document 10-20/1/29 Entered 10/20/21 29 21:21:57 Page 23 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 09/446 Page 3 of 192 PageID 54725

Page 235

```
 1                   WATERHOUSE - 10-19-21

 2          Q.    Did you ever tell Mr. Seery that you

 3    had any reason to believe that the amounts

 4    reflected in the notes issued by the affiliates

 5    and Mr. Dondero were invalid for any reason?

 6          A.    I don't -- I don't recall.

 7          Q.    Did you tell Mr. Dondero -- did you

 8    tell Mr. Seery that you thought the promissory

 9    notes issued by the advisors and Mr. Dondero

10    that were outstanding as of the petition date

11    were assets of the estate?

12          A.    I don't recall having a specific

13    conversation about those -- you know, those

14    notes outstanding as -- as of the petition date

15    being assets on the estate.  I mean, we put

16    together -- you know, they're in the books and

17    records of the financial statements.  I don't

18    recall having a specific conversation.

19          Q.    Did you ever prepare any documents

20    that were delivered to Mr. Seery that concerned

21    the promissory notes issued by any of the

22    affiliates or Mr. Dondero?

23                MS. DANDENEAU:  Objection to form.

24          A.    Did I produce any that concerned --

25    you mean did I just -- did I give Mr. Seery
```

```
 1                   WATERHOUSE - 10-19-21

 2   anything that -- that said I have concerns over

 3   these notes?

 4        Q.    No.  Let me try again.  Maybe it was

 5   my question.

 6             Did you ever give Mr. Seery any

 7   information concerning any of the notes that

 8   were issued by any of the affiliates or

 9   Mr. Dondero?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15             MR. MORRIS:  Can we put up the

16        document that has been premarked as Exhibit

17        39?

18             MS. DANDENEAU:  John, that is this

19        document, isn't it?

20             MR. MORRIS:  Oh, yeah, it might be,

21        as a matter of fact.  Let's go to Number

22        40.

23             (Exhibit 40 marked.)

24        Q.    During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that
```

```
 1                    WATERHOUSE - 10-19-21

 2    were filed with the bankruptcy court?

 3         A.   I didn't -- I didn't prepare them

 4    personally.

 5         Q.   Did people prepare them under your

 6    direction?

 7         A.   Yes.  There were members of the team

 8    that prepared them, and they worked in -- you

 9    know, there were members of DSI that were

10    involved in the process as well.

11         Q.   To the best of your knowledge, did

12    DSI rely on the employees of Highland for the

13    information that they used to prepare the

14    bankruptcy filings?

15         A.   Yes.  The books and records were

16    with the Highland personnel.

17         Q.   Okay.  And do you see on the screen

18    here, there is a document that we have marked

19    as Exhibit 40 that is -- that is titled Summary

20    of Assets and Liabilities?

21         A.   Uh-huh.

22         Q.   Okay.  And do you recall reviewing

23    any summary of assets and liabilities before it

24    was filed with the bankruptcy court?

25         A.   Yes, I recall reviewing this at a
```

Case 3:21-cv-00881-X Doc Filed 10/30/2129 Entered 10/20/21 02:28:51 Page 238 Desc 397
Case 3:21-cv-00881-X Document 1519-19 Filed 01/09/246 Page 6 of 192 PageID 54728

Page 238

 1

 2   high level.

 3        Q.    And did you believe that it was

 4   accurate at the time it was filed?

 5        A.    I didn't have any other reason to

 6   believe otherwise.

 7        Q.    Okay.  Do you see that the total

 8   value of all properties listed in Part 1 is

 9   approximately $410 million?

10           MS. DEITSCH-PEREZ:  Objection to

11      form.

12        A.    Yes, it is in 1c.

13        Q.    Yes.

14        A.    Yes, I see that.

15        Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22           Do you see that?

23        A.    I do.

24        Q.    And that was a reference to the

25   notes receivable from the affiliates and

1                 WATERHOUSE - 10-19-21

2   Mr. Dondero, among others; is that right?

3          MS. DANDENEAU:  Objection to form.

4     A.   Yes.  The affiliate notes and the

5   Dondero notes were in this amount, but they

6   weren't -- again, like you said, and among

7   others.

8     Q.   Okay.  We will look at the

9   specificity because I'm not playing gaming

10  here, but do you know if the $150 million of

11  notes receivable was included within the

12  $410 million of total value of the debtor's

13  assets?

14         MS. DANDENEAU:  Objection to form.

15    A.   I -- I -- I believe so.

16    Q.   Right.  And so is it fair to say

17  that as of the date this document was prepared,

18  the notes receivable were more than one-third

19  of the value of the debtor's assets?

20         MS. DEITSCH-PEREZ:  Object to the

21     form.

22         MS. DANDENEAU:  Object to the form.

23    A.   Again, if you are just taking the

24  math, 150 divided by whatever the $400 million

25  number is above, then yes, you get there.

1            WATERHOUSE - 10-19-21

2        Q.     Okay.

3        A.     You know, but as of the time of this

4    filing, that is what was put in this filing,

5    right, but, you know, I mean, numbers --

6    numbers change, facts and circumstances change.

7        Q.     But as the CFO of Highland, the

8    debtor in bankruptcy, did you believe that this

9    number accurately reflected the total amount

10   due under the notes receivable?

11       A.     That is what we had in our books and

12   records.

13       Q.     Okay.  And did you believe as the

14   CFO that the books and records accurately

15   reported the then value of the debtor's assets?

16            MS. DANDENEAU:  Objection to form.

17       A.     We didn't -- as part of this filing,

18   there was no fair value measurement or

19   anything.  These were just accounting entries

20   for the promissory notes.  There is no analysis

21   for impairment or fair market value adjustments

22   or anything of that nature.  This is purely

23   taking numbers and putting them in our form.

24       Q.     Did you do any impairment analysis

25   at any time while you were employed by

Case 3:00-05807-Sgj-Doc 8 Doc Filed 10/20/21 0/29/21 Entered 10/20/21 0/29/21 21:53:57 24 Desc 397
Case 3:21-cv-00881-X Document 170-19 Filed 09/09/44 20 Doc Filed 09/446 Page 9 of 192 PageID 54731

Page 241

```
 1                    WATERHOUSE - 10-19-21

 2   Highland?

 3        A.    Yes, we did do impairment analysis

 4   on -- on assets.

 5        Q.    Okay.  Did you ever do an impairment

 6   analysis on any of the promissory notes that

 7   were given to Highland by any of the affiliates

 8   or Mr. Dondero?

 9        A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19              As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?
```

Case 23-03007-sgj Doc 88 Filed 10/20/21 Entered 10/20/21 22:31:57 Page 24 of 397
Case 3:21-cv-00881-X Document 178-19 Filed 09/09/24 Page 10 of 192 PageID 54732

Page 242

```
1              WATERHOUSE - 10-19-21

2        A.     The audited financials -- yes,

3   audited financial statements are prepared in

4   accordance with GAAP.

5        Q.     Do you recall whether any of

6   Highland or HCMFA or NexPoint ever made a fair

7   market value adjustment to any of the notes

8   issued by any of the affiliates or Mr. Dondero

9   to Highland?

10       A.     I do not recall that happening, but

11  the -- it is because under -- under GAAP,

12  the -- the treatment of liabilities is

13  different than assets.

14       Q.     Okay.  So then let's just focus on

15  Highland's audited financial statements.

16              The last audited financial

17  statements were for the period ending December

18  31st, 2018; correct?

19       A.     That is my understanding.

20       Q.     And you had -- you had an obligation

21  to disclose anything to PricewaterhouseCoopers

22  concerning any subsequent events between the

23  end of 2018 and June 3rd, 2019; correct?

24              MS. DANDENEAU:  Objection to form.

25              MS. DEITSCH-PEREZ:  Form.
```

1              WATERHOUSE - 10-19-21

2       A.     Correct.

3       Q.     Okay.  To the best of your

4    knowledge, as Highland's CFO, did Highland ever

5    make any fair market value adjustments to any

6    of the promissory notes that were carried on

7    its balance sheet and that were issued by any

8    of the affiliates or Mr. Dondero?

9       A.     I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14      Q.     Okay.

15             MR. MORRIS:  Can we go to the next

16      page.

17      Q.     Do you see this is a note a list of

18   notes receivable?  Do you see that?

19      A.     Yes, I do.

20      Q.     And do you see that this ties into

21   the page that we were just looking?

22      A.     I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.

1                    WATERHOUSE - 10-19-21

2         Q.    Okay.  So now let's look at that

3    schedule.  So this was the face amount of all

4    of the promissory notes that Highland held at

5    the time this document was filed with the

6    bankruptcy court; right?

7         A.    Yes.

8         Q.    There is a footnote there that says,

9    doubtful or uncollectible accounts are

10   evaluated at year-end.

11              Do you see that?

12        A.    I do.

13        Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18        A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21        Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24        A.    Yes.

25        Q.    Why did Highland -- were you

```
1                    WATERHOUSE - 10-19-21

2    involved in the decision to reserve the Hunter

3    Mountain Investment Trust note?

4         A.    I was not.

5         Q.    Do you know why Highland decided to

6    reserve for the Hunter Mountain Investment

7    Trust note?

8         A.    I don't know yet decision was made.

9    I believe it was made by someone at DSI.

10        Q.    Okay.  I'm just asking if you know

11   why.

12              Did you ever ask anyone why they

13   reserved for that particular note?

14        A.    I don't recall.

15        Q.    Do you know whether the debtor

16   reserved for any other note on this list during

17   the bankruptcy?

18        A.    Again, I don't recall.  I wasn't

19   part of any process of -- again, like any fair

20   value adjustments or anything to that degree.

21   Like I said, a lot of that was done by DSI and

22   it was kind of out of our court.

23        Q.    Okay.  Do you know if any note

24   receivable on this list was ever deemed by the

25   debtor to be doubtful or uncollectible?
```

```
 1                      WATERHOUSE - 10-19-21

 2          A.    I don't -- I don't have a

 3    recollection of every filing, so I don't know.

 4          Q.    Did you ever have a discussion with

 5    anybody at any time about whether any of the

 6    notes receivable on this list should be deemed

 7    to be doubtful or uncollectible?

 8          A.    No.  As I previously stated, we were

 9    told we didn't have to keep GAAP financials.

10    We weren't having -- you know, there is no

11    underlying audits being performed, so I mean,

12    it wasn't something I worried about.

13                MR. MORRIS:  I move to strike.

14          Q.    Did you ever have a conversation

15    with anybody about any of the notes receivable

16    and whether they should be deemed to be

17    doubtful or uncollectible?  Did you have the

18    conversation, yes or no?

19                MS. DANDENEAU:  Objection to form.

20          A.    I don't recall.

21          Q.    Do you recall ever telling anybody

22    that you believed any of the notes receivable

23    on this list should be doubtful -- should be

24    deemed to be doubtful or uncollectible?

25                MS. DANDENEAU:  Objection to form.
```

Case 3:10-05087-bjc Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:55 Desc 24 Test 397
Case 3:21-cv-00881-X Document 108-19 Filed 09/06/24 Page 15 of 192 PageID 54737

Page 247

```
 1                   WATERHOUSE - 10-19-21
 2        A.     I don't recall.  I mean, it may have
 3   happened, you know, again, when we initially
 4   getting DSI up to speed and going through
 5   financials, it may have happened, but I don't
 6   recall specifically.
 7        Q.     While you were the CFO of Highland
 8   during the time that the company was in
 9   bankruptcy, did you have any reason to believe
10   that any of the notes receivable on this list
11   other than Hunter Mountain Investment Trust
12   should have been characterized as doubtful or
13   uncollectible?
14             MS. DANDENEAU:  Objection to form.
15             MS. DEITSCH-PEREZ:  Form.
16        A.     I didn't know.  I didn't form an
17   opinion.  Bankruptcy was new to me.  It still
18   is new to me, even after going through this.
19   So I really didn't know what to expect nor
20   really -- you know, I didn't know.
21             MR. MORRIS:  I move to strike.
22        Q.     During the period of Highland's
23   bankruptcy when you were serving as CFO, did
24   you have any reason to believe any of the notes
25   on this list were doubtful or uncollectible?
```

```
 1              WATERHOUSE - 10-19-21

 2         MS. DEITSCH-PEREZ:  This is like the

 3    fifth time you've asked it.  Object to the

 4    form.

 5         MR. MORRIS:  I'm moving to strike,

 6    if you haven't noticed, because he's not

 7    answering the question.

 8         MS. DEITSCH-PEREZ:  He was answering

 9    the question, you just didn't like it, like

10    the answer.

11         MR. MORRIS:  Good Lord.

12    Q.    Go ahead, Mr. Waterhouse.

13    A.    Again, I don't -- we brought up a

14  myriad of issues at the start of the bankruptcy

15  case.  I don't recall if this was one of them,

16  but, again, there are a lot of things we

17  couldn't change.  Even, you know, I was told

18  status quo, blah, blah, blah, right, there is a

19  stay, you can't -- you know, I don't recall

20  specifically, but that doesn't mean it didn't

21  happen.

22         MR. MORRIS:  I move to strike.

23    Q.    During the time that Highland was in

24  bankruptcy and you served as CFO, did you have

25  any reason to believe that any of the notes
```

```
1                    WATERHOUSE - 10-19-21

2     receivable on this list were doubtful or

3     uncollectible?

4              MS. DEITSCH-PEREZ:  Object to the

5              form.

6         A.    Potentially.

7         Q.    Did you ever tell anybody that?

8         A.    As I just stated like five times,

9     yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15        Q.    I don't want to know -- I don't want

16    to know what was --

17             MS. DEITSCH-PEREZ:  Wait, wait.

18             Excuse me.  Mr. Morris, you did not let him

19             finish his answer.

20        A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not
```

Case 3:21-cv-00881-X Document 178-9 Filed 01/10/29 Entered 01/10/29 21:31:57 Page 250 of 397
Case 3:21-cv-00881-X Document 178-9 Exhibit 9 Filed 01/10/24 Page 18 of 192 PageID 54740
Page 250

```
 1              WATERHOUSE - 10-19-21

 2   once, twice, three, four times with -- you

 3   know, I mean, we -- I don't -- I don't remember

 4   the sum culmination of all these discussions.

 5   They all kind of blend together.

 6              MR. MORRIS:  Okay.  I move to strike

 7        and I will try one more time.

 8        Q.    Did you ever tell anybody at DSI

 9   that you believed any of the notes receivable

10   on this list were doubtful or uncollectible?

11              MS. DANDENEAU:  Object to form.

12        A.    Potentially.

13        Q.    Potentially you told them or

14   potentially they were doubtful or

15   uncollectible?

16        A.    Potentially I told them that we

17   needed to look at the value of these -- of

18   these assets.

19        Q.    Okay.  Did you -- okay.  It is

20   potential that you told them and it is

21   potentially that you didn't; right?

22              MS. DANDENEAU:  Objection to form.

23        A.    I've gone through that.  I don't

24   recall specifically.

25        Q.    So you should just -- I don't want
```

```
1              WATERHOUSE - 10-19-21

2     to tell what you to do.  Do you have --

3              MS. DANDENEAU:  Good.

4         Q.    Other than -- other than telling

5     them that they should look at the values, do

6     you have any recollection whatsoever of ever

7     having told anybody at DSI that any of the

8     notes receivable on this page were doubtful or

9     uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14    about everything on our balance sheet which

15    would have included these -- these notes

16    receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19    those discussions delved into.

20        Q.    Do you recall any discussion at all

21    on the topic of whether any of these notes on

22    this list were doubtful or uncollectible?

23              MR. AIGEN:  Mr. Morris, how on earth

24         is that question different from the

25         question that you just asked for the last
```

1            WATERHOUSE - 10-19-21

2  five times?  I mean, really I thought you

3  were -- (overspeak.)

4       MR. MORRIS:  Because he never

5  answered it.

6       MS. DEITSCH-PEREZ:  Are you

7  listening to him?

8       MR. MORRIS:  You know --

9       MS. DEITSCH-PEREZ:  He basically

10  said that he had a conversation with DSI

11  that went over all of this stuff and that

12  conversation could have included the notes

13  but he doesn't recall specifically.

14       What more do you want him -- to ask

15  of him?

16       MR. MORRIS:  I want him -- I would

17  love him to say -- I would like him to

18  testify to the truth, and that is he has no

19  recollection.

20       MS. DEITSCH-PEREZ:  Well, the truth

21  as you would like to see it, but -- but he

22  is testifying truthfully.  And I -- and, by

23  the way, I move to strike that comment --

24       MR. MORRIS:  Okay.

25       MS. DEITSCH-PEREZ:  -- because it

Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 21 of 192 PageID 54743
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 21 of 192 PageID 54743

Page 253

```
 1                    WATERHOUSE - 10-19-21

 2          suggests that he has not testified

 3          truthfully.

 4                MR. MORRIS:  I will ask my question

 5          again.  And if at any time you want to

 6          direct him not to answer, that is your

 7          prerogative.

 8          Q.    Mr. Waterhouse, do you have any

 9    recollection at all of ever telling anybody

10    from DSI that any of these notes were doubtful

11    or uncollectible?

12                MS. DANDENEAU:  Object to form.

13          A.    I don't remember specifically.

14          Q.    Do you remember generally that

15    specific topic?

16          A.    We generally talked about assets,

17    values.  If -- we had discussions of that and

18    collectability in nature.  I mean, of Highland,

19    the funds, the CLOs, the entire complex.  We

20    had discussions like that, which is, you know,

21    as you look at a billion dollar consolidated

22    balance sheet.

23                So I generally remember -- this is

24    billions of dollars, including these assets --

25    having discussions of this -- of this type.
```

1                    WATERHOUSE - 10-19-21

2          Q.    Do you believe that an affiliate

3    loan on this list was doubtful or

4    uncollectible?  Would you have told that to

5    DSI?

6                    MS. DANDENEAU:  Objection to form.

7                    MS. DEITSCH-PEREZ:  Object to form.

8          A.    If we had, like -- again, if we --

9    if -- if we weren't preparing financial

10   statements in accordance with GAAP, and -- you

11   know, if DSI at that point -- they were --

12   again, I was new to bankruptcy.

13                   The CRO is -- we are delegating

14   everything to the CRO.  All the decisionmaking.

15   Remember -- remember when you and I went into

16   Delaware Court and we were saying DSI basically

17   does everything, remember this, Mr. Morris?

18                   You were my counsel at the time, and

19   basically we're running everything through DSI.

20   That was what this was like in the early part.

21                   Everything was communicated through

22   DSI.  So DSI says this.  DSI says that.  That

23   is what we're doing, and we're pointing out

24   things to them.

25                   Now, they decide what direction this

```
 1                    WATERHOUSE - 10-19-21

 2    goes.

 3          Q.    Did you point out that any of

 4    these --

 5          A.    I don't recall specifically.

 6          Q.    Okay.  At any time that you served

 7    as Highland's CFO, did you ever point out to

 8    DSI that any of these loans were doubtful or

 9    uncollectible?

10                MS. DEITSCH-PEREZ:  Object to the

11          form.

12                MS. DANDENEAU:  Objection.

13          A.    If you're asking me if I had a

14    conversation with DSI, if any of these loans

15    were doubtful or uncollectible, I don't recall

16    specifically.

17          Q.    Do you recall that the debtor filed

18    on the docket monthly operating reports?

19          A.    Yes.

20          Q.    You prepared those personally,

21    didn't you?

22                MS. DEITSCH-PEREZ:  Objection to

23          form.

24          A.    I didn't personally prepare them,

25    the team did with DSI.
```

1                    WATERHOUSE - 10-19-21

2        Q.     But you signed them; correct?

3        A.     My signature is on the MORs.

4        Q.     And you signed them as the preparer

5   of the document; correct?

6        A.     Yes, I did this pursuant to DSI's

7   instructions.

8        Q.     Okay.  You wouldn't have signed the

9   document if you didn't believe it to be

10  accurate; correct?

11       A.     If I had reason to believe it

12  wasn't, presumably I wouldn't have signed it.

13       Q.     Okay.  And do you have any reason to

14  believe right now that any monthly operating

15  report that has your signature on it was

16  inaccurate in any way?

17              MS. DEITSCH-PEREZ:  Object to the

18       form.

19       A.     My understanding of the monthly

20  operating reports is we were filing them in

21  accordance with the standards set by the Court.

22  It wasn't -- you know, again, I don't -- you

23  know, it wasn't GAAP.  It wasn't these other

24  standards, so I testified I didn't have

25  experience in this.  The CRO was running the

Case 3:05-sdj-00897-Dgc 8D8cFiled 107/B0/210/29/i2aredEnte20/210/29213:851-5a57 257est397
Case 3:21-cv-00881-X   Document 170-19   Exhibit 18   Filed 06/02/44606 Page 25 of 192   PageID 54747

Page 257

```
 1                  WATERHOUSE - 10-19-21

 2    show.  I followed their advice.

 3         Q.    But you assured yourself that

 4    everything in the report was accurate before

 5    you signed them; correct?

 6              MS. DANDENEAU:  Objection to form.

 7         A.    I trusted the guidance from the CRO

 8    and their team and their experience and their

 9    guidance for doing this for many, many, many

10    years to -- to -- to categorize and put things

11    in ways on the form.

12              You know, my team had -- had not

13    filled out these forms before and needed all of

14    this guidance.  I'm not an expert in this.  I

15    have oversight of it.  I signed the form.  DSI

16    told me to.

17         Q.    And you and your team are the source

18    of the information that DSI used to create the

19    reports; correct?

20              MS. DANDENEAU:  Objection to form.

21         A.    The books and records reside with

22    the -- with -- with the corporate accounting

23    team.

24         Q.    Okay.  And the corporate accounting

25    team was the corporate accounting team that was
```

Case 3:10-05027-hdh Doc 8 Filed 10/20/21 Entered 10/20/21 12:31:57 Desc 397
Case 3:21-cv-00881-X   Document 109-9   Filed 07/00/246   Page 26 of 192   PageID 54748

Page 258

1                    WATERHOUSE - 10-19-21

2    under your direction; correct?

3         A.    Yes.

4         Q.    So -- so your team was responsible

5    for maintaining Highland's books and records;

6    correct?

7         A.    I'm sorry, my team was responsible?

8         Q.    Correct.

9         A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13        Q.    The corporate accounting group

14   reported to you; correct?

15        A.    Yes.

16              MR. MORRIS:  Can we put up 41,

17        please.

18              (Exhibit 41 marked.)

19        Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22              Do you see that?

23        A.    I do.

24        Q.    And you signed this report in your

25   capacity as the chief financial officer of

Case 3:21-cv-00881-X Document 179-19 Filed 10/20/21 Entered 10/20/21 22:33:57 Page 259 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 10/20/21 Page 27 of 192 PageID 54749
Page 259

1                     WATERHOUSE - 10-19-21

2     Highland; correct?

3         A.    Yes.

4         Q.    And you're the preparer -- you're

5     identified as the preparer of the report;

6     correct?

7         A.    That is correct.

8         Q.    Do you recall participating in the

9     preparation of monthly operating reports?

10        A.    As I testified earlier, it was put

11    together, you know, with the team.  The team

12    worked with DSI to put these monthly operating

13    reports together.  We had no experience at this

14    time of the monthly operating reports or things

15    of this nature.

16              MR. MORRIS:  Can you turn to the

17        next page, please.

18        Q.    Do you see a line item under assets

19    due from affiliates?

20        A.    Yes, I do.

21        Q.    Okay.  And to the best of your

22    knowledge and understanding, as the person who

23    is identified as the preparer of this report,

24    does that line item include the affiliate loans

25    that we've been talking about?

1                    WATERHOUSE - 10-19-21

2          A.    Again, I would have to see, just

3    like we did with the financial statements of

4    Highland and NexPoint, I would have to see a

5    detailed build, but, you know, if you look at

6    the other line items, you know, the only other

7    place it could be would be in -- in other

8    assets.

9          Q.    Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14               MS. DANDENEAU:  Objection to form.

15         A.    I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18         Q.    All right.  No problem.

19         A.    -- these are millions of dollars.

20         Q.    Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23         A.    Yes, I see that in Footnote 1.

24         Q.    Okay.  And that's the reserve that

25   was taken against that note?

WATERHOUSE - 10-19-21

1

2    A.    Yes, that is what this indicates.

3    Q.    Okay.  And were you aware that the

4 reserve was being taken on that it was?

5    A.    I was -- I was aware, yeah, at some

6 point, yes.

7    Q.    Okay.  And are you aware of any

8 reserve being taken with respect to any other

9 note that was issued in favor of Highland?

10    A.    Again, as I testified, we didn't go

11 through an analysis on -- on -- on the other

12 notes.

13    Q.    Can we turn --

14    A.    I believe -- I believe it says that

15 in Footnote 1, fair value has not been

16 determined with respect to any of the notes.

17        So this footnote -- footnotes, look,

18 there has been no determination.

19    Q.    Okay.  The determination was made in

20 the audited financial statements just six

21 months earlier; right?  We saw that earlier?

22    A.    That was as of 12/31/18.  I mean,

23 things -- circumstances -- there's a bank --

24 circumstances change, things change -- things

25 change over time, you know, facts and

1             WATERHOUSE - 10-19-21

2    circumstances change.  Again, you have to do an

3    analysis.

4        Q.    Okay.  And you do recall that in

5    Highland's 2018 financial statement, all of the

6    notes issued by affiliates and Mr. Dondero that

7    were due at year-end had a fair value equal to

8    the carrying value; correct?  We looked at

9    that?

10       A.    Yes.  That was in the -- in the

11   disclosure for the -- for the affiliate notes,

12   yes.

13       Q.    And -- and you were obligated to

14   share with PwC any subsequent events between

15   the end of 2018 and the date that you signed

16   your management representation letter on June

17   3rd, 2019; correct?

18          MS. DEITSCH-PEREZ:  Object to the

19       form.

20       A.    Yes.  I -- I -- I signed the

21   management, you know, my signature is in the

22   management representation letter -- I hope I'm

23   answering your question -- that is dated in

24   June with the representations made in that

25   management representation letter.

```
 1                   WATERHOUSE - 10-19-21

 2       Q.    Okay.  And there was nothing that

 3   caused PricewaterhouseCoopers to include in

 4   subsequent events any adjustment to the

 5   conclusion that the fair value of the affiliate

 6   notes and the notes issued by Mr. Dondero

 7   equaled the carrying value; correct?

 8             MS. DANDENEAU:  Objection to the

 9       form.

10       A.    That is correct.  That is what was

11   in the -- in the -- in the footnotes.

12       Q.    Okay.  So are you aware of anything

13   that occurred between June 3rd, 2019 and

14   December 31st, 2019 that would have caused the

15   fair value of the notes to differ from the

16   carrying value?

17       A.    Yeah.  Highland filed for

18   bankruptcy, things changed -- I mean, there was

19   a bankruptcy filed in October of -- of -- of

20   2019, right, the petition date that we've

21   described earlier.

22             I mean, I had a -- I guess looking

23   back naively, I thought we were going to get an

24   audit from PwC for year-ended 2019, and when we

25   had discussions with PwC, they were like, are
```

Case 3:00-5000j-9oj-8 Doc-File 107/20/210/29/212red E10620/210/292132 1:52ct 264est 397
Case 3:21-cv-00881-X Document 100-19 Filed 01/20/246 Page 32 of 192 PageID 54754

Page 264

1                    WATERHOUSE - 10-19-21

2    you crazy, we're not auditing this.  Values

3    change, all these things change, bankruptcy

4    changes the entire scenario.  I mean -- and

5    they're like, we're not -- we're not touching

6    this.

7                    And so, you know, I was like, okay,

8    sorry, I get it, okay, no an audit.

9                    I mean, it is -- you know, and --

10   you know, and we weren't preparing GAAP

11   financial statements.

12                   Again, I didn't know what we were

13   doing in relation to our financial statements,

14   but these were the discussions I was having at

15   the time.  And yeah, I mean, filing bankruptcy

16   from what I got from outside auditors and

17   others involved changed things dramatically.

18        Q.    Okay.  Highland wasn't the obligor

19   under any of the notes that we're talking

20   about; correct?

21        A.    No.

22        Q.    So --

23        A.    That's right.

24        Q.    So can you identify any fact that

25   would cause the fair value to deviate from the

 1                    WATERHOUSE - 10-19-21

 2     carrying value during the seven-month period

 3     between June 3rd and the end of the year, 2019?

 4                    MS. DANDENEAU:  Objection to form.

 5          A.    No.  I mean, I'm putting myself back

 6     at that time, right.  Hindsight is 2020, but we

 7     didn't do an analysis, but we would have done a

 8     fulsome analysis and looked at all of the facts

 9     and circumstances at the time, but asset values

10     change.  You know, there could have been a

11     market crash in hindsight in 2020, which --

12     which affected entities' abilities.

13                    There could have been all of these

14     things, right, that -- that happen.  It is --

15     it is easy to look back in hindsight, but when

16     you are looking at this in -- in realtime, the

17     analysis is different, and again, we didn't do

18     an analysis.

19          Q.    Okay.  You didn't do an analysis.

20                    Do I have that right?

21          A.    I don't -- I don't recall doing one

22     or maybe -- you know, I don't recall doing one.

23                    MR. MORRIS:  Okay.  I'm going to

24            take a break.  I may be done, so the time

25            now is -- is 4:30 your time.  Let's just

```
 1                    WATERHOUSE - 10-19-21

 2          take a short break until 4:40 your time.

 3                 MS. DANDENEAU:  Okay.

 4                 VIDEOGRAPHER:  We're going off the

 5          record, 4:31 p.m.

 6          (Recess taken 4:31 p.m. to 4:43 p.m.)

 7                 VIDEOGRAPHER:  We are back on the

 8          record at 4:43 p.m.

 9                 MR. MORRIS:  I have no further

10          questions.

11                 MR. RUKAVINA:  Okay.

12          Mr. Waterhouse, I will go next.

13                          EXAMINATION

14     BY MR. RUKAVINA:

15          Q.    Sir, my name is Davor Rukavina.  I'm

16     the lawyer for --

17                 MR. MORRIS:  Hey, Davor, just before

18          you begin, I just want to put on the record

19          Highland's objection to documents that were

20          produced to me 10 minutes before the

21          deposition began.

22                 MR. RUKAVINA:  What the basis of

23          your objection?

24                 MR. MORRIS:  That they were due

25          quite some time ago, and the fact that you
```

|   |   |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | had -- I just think it's appropriate to -- |
| 3 | to dump documents on somebody 10 minutes |
| 4 | before the deposition.  I just think |
| 5 | that's -- |
| 6 | MR. RUKAVINA:  Well, these are |
| 7 | documents Highland produced.  I'm not aware |
| 8 | of any rule I have to give you advance |
| 9 | documents when I know for the record that |
| 10 | other than the exhibits that you sent to us |
| 11 | last week, most of the exhibits you used |
| 12 | today you did not provide to me prior to |
| 13 | this deposition. |
| 14 | MR. MORRIS:  No, but the documents |
| 15 | were produced by me in -- in litigation, |
| 16 | right? |
| 17 | MR. RUKAVINA:  I'm going to use |
| 18 | primarily, John, the documents that you |
| 19 | produced to me today, but you may. |
| 20 | MR. MORRIS:  Primarily.  I've got -- |
| 21 | I've got my objection.  You have got your |
| 22 | response.  Proceed. |
| 23 | Q.    Mr. Waterhouse, again, I represent |
| 24 | the advisors, HCMFA and NexPoint Advisors. |
| 25 | Do you understand that? |

1                    WATERHOUSE - 10-19-21

2         A.    Yes.

3         Q.    You and I have never met or talked

4    before today, have we?

5         A.    No, I have -- I have heard your

6    voice on calls before.

7         Q.    Okay.

8               MR. RUKAVINA:  Madam Court Reporter,

9         I will use a few exhibits today.  My

10        associate, Mr. Nguyen, will find some way

11        to get them to you.  I don't know how to do

12        that, but it looks like you guys do.

13              I am going to use numbers as well.

14        But to differentiate them from Mr. Morris

15        we're going to mark mine with the prefix A

16        for advisors.

17              Do you understand?

18              COURT REPORTER:  Yes.

19              MR. RUKAVINA:  Okay.  Perfect.

20        Q.    Okay.  So, Mr. Waterhouse, let's

21    start with those two HCMFA notes that you were

22    asked about, one for 5 million and one for

23    2.4 million.

24              Do you recall those notes?

25        A.    Yes.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Were you ever the CFO of HCMFA?

 3        A.    I don't recall.

 4        Q.    So to the best of your recollection,

 5   you were still an officer of HCMFA in 2019,

 6   just that your title was treasurer?

 7             MR. MORRIS:  Object to the form of

 8        the question.  There is no leading here.

 9        He works for your client.

10             MS. DANDENEAU:  That is not -- that

11        is not true.

12             MR. MORRIS:  He's the treasurer --

13        he is the treasurer of your client.  I

14        don't -- I'm going to object every time you

15        try to lead, so...

16             MR. RUKAVINA:  Totally fine to

17        object.

18             MR. MORRIS:  Okay.

19        Q.    Please answer my question,

20   Mr. Waterhouse.

21        A.    I'm sorry, could you repeat?  There

22   was...

23        Q.    Yes.  You were -- you testified

24   earlier that in 2019 you were an officer of

25   HCMFA; correct?
```

 1                WATERHOUSE - 10-19-21

 2        A.    Yes, I testified that I was the

 3   treasurer and I didn't know if that incumbency

 4   certificate, you know, was one that appointed

 5   me as a treasurer, but yes.

 6        Q.    I'm just trying to confirm that

 7   sitting here today, to the best of your

 8   recollection, at that time you were -- your

 9   title was treasurer.  It was not chief

10   financial officer.

11        A.    I don't recall that being my title.

12        Q.    Okay.  And in May of 2019, however,

13   I think you testified you were the chief

14   financial officer of the debtor; correct?

15            MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes, I was -- yes.

18        Q.    Okay.  As such, in May of 2019, did

19   you have the authority, to your understanding,

20   to unilaterally loan $5 million or $2.4 million

21   to anyone on behalf of the debtor?

22            MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Sorry, can you repeat that?

25        Q.    Yes.  So in your capacity as the

WATERHOUSE - 10-19-21

1
2    chief financial officer of the debtor, Highland
3    Capital Management, L.P., in May of 2019, did
4    you believe that you unilaterally, just Frank
5    Waterhouse, had the authority to loan on behalf
6    of the debtor to anyone $5 million and
7    $2.4 million?
8              MR. MORRIS:  Objection to the form
9         of the question.
10   A.    No.
11   Q.    Is it because loans of that amount
12   would have had to be approved by someone else?
13   A.    Yes.
14   Q.    Who in '20 -- in May of 2019, if
15   Highland wanted to loan 5 million or
16   $2.4 million to someone, what would have been
17   the internal approval procedure?
18             MR. MORRIS:  Objection to the form
19        of the question.
20   A.    If -- if we had loans of that nature
21   that needed to be made due to their size, we
22   would have gotten approval from the -- the
23   president of Highland.
24   Q.    And who that was individual?
25   A.    It was James Dondero.

1                    WATERHOUSE - 10-19-21

2         Q.    Okay.  Now, I'm going to ask you a

3    similar question but for a different entity.

4              In May of 2019, as the treasurer of

5    HCMFA, did you believe that you unilaterally

6    had the ability to cause HCMFA to become the

7    borrower of a $5 million loan and a

8    $2.4 million loan?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    No.

12        Q.    What would -- what would the

13   approval have taken place -- strike that.

14             What would the approval process have

15   been like in May of 2019 at HCMFA for HCMFA to

16   take out a $7.4 million loan?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    The process would have been similar

20   to what we just discussed on -- for Highland to

21   make a loan to others.  So, again, you know,

22   we -- we would have -- either myself or someone

23   on the team would have discussed this with

24   the -- the president and owner of -- of HCMFA.

25        Q.    And who was that individual?

```
 1                   WATERHOUSE - 10-19-21

 2        A.    That was James -- Jim Dondero.

 3        Q.    So do I understand that in May of

 4   2019, on behalf of both the lender, Highland,

 5   and the borrower, HCMFA, Mr. Dondero would have

 6   had to approve $7.4 million in loans?

 7             MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.    Yes.

10        Q.    You mentioned when Mr. Morris was

11   asking you the NAV error, N-A-V error, with

12   respect to TerreStar, without writing us a

13   novel, unless you feel like you have to, can

14   you summarize what that NAV error was?  What

15   happened?

16        A.    There was a -- in the Highland

17   Global Allocation Fund, it owned at the time an

18   equity interest in a company called TerreStar.

19   And TerreStar is -- at the time was a private

20   company, and it may still be today.  Again, I'm

21   putting myself back then as a private company.

22             We had -- sorry, I don't mean we --

23   the fund and the advisor used Houlihan Lokey

24   to -- to value that investment.  And during

25   that time there was some trades that were
```

Case 3:00500007-Dgc 8D-cfiled 107/20/210/29/2tredEn0/20/210/292/131:53a57 27Aest397
Case 3:21-cv-00881-X  DocumentExth109-A9  Filed 322of246 Page 42 of 192  PageID 54764

Page 274

```
 1                WATERHOUSE - 10-19-21

 2    executed at market levels that were much lower

 3    than the Houlihan Lokey model.

 4              And based on information and

 5    discussions with the portfolio managers and,

 6    you know, principals that were very familiar

 7    with TerreStar, it was determined that those

 8    trades were non-orderly and they were not

 9    considered in the valuation as consulted with

10    Houlihan Lokey and PricewaterhouseCoopers at

11    the time.

12              Subsequent to a -- I can't remember

13    the exact circumstances of why the SEC got

14    involved.  I think it was due to this -- this

15    investment became a material position in the

16    fund.  It triggered an SEC, kind of, inquiry.

17    And as part of that inquiry, they questioned

18    the valuation methodology.  "They" meaning the

19    SEC.

20              And at the culmination of that

21    process -- this is all summarized -- the value

22    that was -- that ultimately had to be used in

23    the fund's NAV was different than -- materially

24    different than what the original valuation at

25    Houlihan Lokey provided.
```

```
 1                WATERHOUSE - 10-19-21

 2                And given that there was this fund

 3    was, as we discussed -- I don't know if we

 4    discussed it, but it was an open-ended fund

 5    that was going -- that was converting to a

 6    close-end fund.

 7                Due to the fact that it was an

 8    open-ended fund, you had to recalculate NAV and

 9    see what the impact was on people -- on

10    investors coming in and out of the fund and if

11    there is a detrimental impact and to calculate

12    what that -- what that impact was and if there

13    was any amounts owed to the fund pursuant to

14    the error.

15        Q.    Were you personally involved

16    internally at either Highland or HCMFA with

17    these investigations and discussions with the

18    SEC?

19        A.    I was.

20        Q.    Which other key people or senior

21    people at Highland were involved, to your

22    recollection?

23        A.    Myself, Thomas Surgent, David Klos,

24    Lauren Thedford, Jason Post.

25        Q.    Mr. Dondero, was he --
```

```
 1                    WATERHOUSE - 10-19-21

 2         A.    I believe Cliff Stoops.  I'm trying

 3    to think.  And maybe that is -- that is -- that

 4    is -- that is all kind I can recall at the

 5    moment.

 6         Q.    Do you recall whether it was

 7    determined that the fund suffered losses as a

 8    result of this error?

 9         A.    The -- the fund -- the -- the --

10    because the open-ended nature of the fund,

11    there were losses that were attributable to

12    investors.  Meaning they -- they would have

13    redeemed and got a less money or -- or they

14    subscribed in and maybe because they didn't get

15    enough shares and then they later sold and then

16    they were harmed in that fashion.

17               And there is -- there is -- there

18    were very -- there were very detailed

19    calculations and, you know, all these different

20    scenarios that we had to -- I'm sorry, I keep

21    saying "we" -- that the individuals involved

22    had to calculate and quantify.

23         Q.    Well, do you recall whether HCMFA

24    admitted certain fault and liability for this

25    error?
```

Case 3:21-cv-00881-X Document 179-9 Filed 01/09/24 Entered 01/09/24 21:31:57 Page 27 of 397
Case 3:21-cv-00881-X Document 179-9 Filed 01/09/24 Page 45 of 192 PageID 54767

Page 277

```
 1                    WATERHOUSE - 10-19-21

 2        A.     I don't recall specifically.

 3        Q.     Do you recall whether HCMFA caused

 4   any funds to be paid to the investors and the

 5   fund the subject of the NAV error?

 6        A.     Yes.

 7        Q.     Do you recall the approximate amount

 8   of funds, moneys paid to the investors and the

 9   fund?

10        A.     It was -- it was approximately

11   $7 million.

12        Q.     If I was to suggest 7.8 million,

13   would that ring more true or are you sticking

14   with your original answer?

15        A.     It was -- it was approximately 7 --

16   7 to $8 million.  Again, I don't remember the

17   exact number, but it was in that ballpark.

18        Q.     So regardless of whether HCMFA

19   accepted fault or liability, it caused some

20   $7 million or more to be paid out to affected

21   investors in the fund?

22               MR. MORRIS:  Objection to the form

23        of the question.

24        A.     And I want to make sure I'm

25   understanding your question because there is a
```

1          WATERHOUSE - 10-19-21

2     lot of different entities that are going on to

3     my head.

4               I think what you are saying is based

5     on this error, shareholders were harmed by this

6     approximately $7.8 million -- by approximately

7     $7.8 million.  Is that what you are asking?

8          Q.    Yes, sir.

9          A.    Yes, that was -- again, I don't have

10    the exact numbers.  If I take -- it was -- it

11    was in that ballpark, and there is a detail

12    calculation and write-up that could, that --

13    that exists someplace.

14         Q.    Now, at that time, at the time that

15    the NAV error occurred, was there a contract in

16    place between HCMFA and the debtor pursuant to

17    which the debtor was providing services to

18    HCMFA?

19               MR. MORRIS:  Objection to the form

20         of the question.

21         A.    Yes.

22         Q.    Was that contract generally called a

23    shared services agreement?

24         A.    It was generally called that, but

25    there were -- there were -- I mean, it -- it --

```
 1                    WATERHOUSE - 10-19-21

 2   it depends on who you talk to, but yes,

 3   generally, there were -- there are multiple

 4   agreements.

 5        Q.    Pursuant to one or more of those

 6   agreements, was the debtor providing certain

 7   services to HCMFA?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10        A.    Yes.

11        Q.    And can you at a very high level

12   summarize in 2018 and 2019 what those services

13   were?

14        A.    Yes, there was a -- yes.

15        Q.    Okay.  Please -- please go -- go

16   through a short summary.

17        A.    There was a -- a cost reimbursement

18   agreement between Highland Capital Management

19   Fund Advisors and Highland Capital Management,

20   L.P.  That agreement was for what we referred

21   to as front office services, so investment

22   management, things of that nature.

23              There was I think what most people

24   refer to as the shared services agreement that

25   was -- that agreement was between Highland
```

Case 23-03056-sgj Doc 80-4 Filed 07/20/21 Entered 07/20/21 21:31:57 Page 280 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 48 of 192 PageID 54770

Page 280

1          WATERHOUSE - 10-19-21

2     Capital Management Fund Advisors and Highland

3     Capital Management for back office services.

4          Q.     And can you summarize what you mean

5     by back office services?

6          A.     Those services were for accounting,

7     finance, tax, valuation, HR, IT, you know,

8     legal compliance, things of -- things of those

9     nature -- or things of that nature, excuse me.

10          Q.     So in the spring of 2019, do you

11     recall whether HCMFA took the position that it

12     was actually Highland that caused the NAV error

13     to occur pursuant to the valuation services

14     that Highland was providing?

15          MR. MORRIS:  Objection to the form

16     of the question.

17          A.     I do not recall.

18          Q.     Did you ever have any discussions

19     with anyone, Jim Dondero or anyone in the first

20     half of 2019 as to whether Highland, the

21     debtor, that is, had any liability to HCMFA

22     related to the NAV error?

23          MR. MORRIS:  Objection to the form

24     of the question.

25          A.     I do not recall.

```
 1                 WATERHOUSE - 10-19-21

 2        Q.     And then you mentioned that the fund

 3   was being closed and some compensation related

 4   to that.  Can you -- can you elaborate?  What

 5   were you referring to?

 6        A.     Right.  So the advisor, pursuant to

 7   board approval, put a proposal in front of the

 8   shareholders of the Highland Global Allocation

 9   Fund to convert it from an open-ended fund to a

10   closed-end fund.

11              So an open-ended fund, when

12   shareholders subscribe to the fund or redeem

13   into the fund, they do it at NAV.

14              When it is -- when you have a

15   closed-end fund, closed-end funds are -- are

16   publicly-traded, like on the New York Stock

17   Exchange, exchanges like that, and -- and

18   shareholders or investors, they're not --

19   they're -- they're not subscribing and

20   redeeming with the fund.  They are like shares

21   of Apple.

22              Those shares of the Highland Global

23   Allocation Fund trade on an exchange, and that

24   is how you, you know, that is how, you know,

25   you become an equity owner in the fund or you
```

1              WATERHOUSE - 10-19-21

2   sell your shares and you are no longer an

3   equity owner.

4              As part of that proposal, the

5   advisor told shareholders if you -- if you vote

6   for this proposal to -- to convert it from an

7   open-ended fund to a closed-end fund, we will

8   pay you some amounts of money.  I forgot -- a

9   certain number of points.  I think it was

10  like -- it was like two to three points or

11  something -- something like that.

12       Q.    Okay.  You mentioned when Mr. Morris

13  was asking you, going back to those two

14  promissory notes, you will recall the 5 million

15  and 2.4 million, you mentioned something to the

16  effect that Mr. Dondero told -- told you to pay

17  some moneys out of Highland.  Do you remember

18  that discussion with Mr. Morris?

19       A.    I do.

20       Q.    So, to the best of your

21  recollection, did you have a discussion with

22  Mr. Dondero about making some payments in May

23  of 2019 out of Highland?

24       A.    I recall, as I testified earlier,

25  that I had a conversation with Mr. Dondero

Case 23-03050-sgj Doc 8 Filed 07/20/21 Entered 07/20/21 21:31:58 Page 28 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 03/20/24 Page 51 of 192 PageID 54773
Page 283

WATERHOUSE - 10-19-21

1

2   for -- for these amounts attributable to -- it

3   was either the error -- you know, the error,

4   and in that conversation he said, go get the

5   money from Highland. I believe that is what I

6   testified earlier, and that -- that is my

7   recollection.

8       Q. Do you recall if that was an

9   in-person meeting or some other mode for the

10   meeting?

11       A. I -- I -- I recall that being

12   in-person.

13       Q. Do you recall if anyone else was

14   present, or was it just you and Mr. Dondero?

15       A. I recall just he and I.

16       Q. And the moneys that he told you to

17   find from -- or get from Highland, was that in

18   the amount of $5 million and $2.4 million?

19       MR. MORRIS: Objection to the form

20       of the question.

21       A. I believe so, but I would have to go

22   back and look and see when those moneys were

23   actually paid into the -- into the fund and,

24   you know, when those transfers were done. If

25   they were all done around that same time, then

Case 3:21-cv-00887-Boc Doc 84-9 Filed 10/30/21 Entered 10/30/21 02:21:55 Page 285 of 397
Case 3:21-cv-00881-X Document 178-19 Filed 03/30/24 Page 52 of 192 PageID 54774

Page 284

```
 1                    WATERHOUSE - 10-19-21

 2      yes, I would say it was -- it was all related

 3      to that.

 4           Q.    Did Mr. Dondero tell you that those

 5      funds would be a loan from Highland to HCMFA?

 6           A.    I don't recall.

 7                 MR. MORRIS:  Objection to the form

 8           of the question.

 9           Q.    Now, and forgive me, I'm probably

10      the only non-American born here, but I speak

11      reasonably well in English.  I don't recall,

12      does that mean you don't remember or does that

13      mean it didn't happen?

14                 MR. MORRIS:  Objection to the form

15           of the question.

16           A.    It -- it means I don't -- I don't

17      remember.

18           Q.    Did Mr. Dondero tell you to have

19      those two promissory notes prepared?

20           A.    I don't recall.

21           Q.    When you -- again, when you say, I

22      don't recall today, that means that sitting

23      here today, you just don't remember one way or

24      the other.  Is that accurate?

25           A.    Yes.
```

```
 1                    WATERHOUSE - 10-19-21

 2         Q.     Is it possible that you, having

 3    heard what Mr. Dondero said and seeing funds

 4    being transferred, assumed that that would be a

 5    loan without him actually telling you that

 6    would be a loan?

 7                 MR. MORRIS:  Objection to the form

 8         of the question.

 9         A.     Sorry, I want to make sure -- did I

10    ask the amounts that were transferred that I --

11    that -- that I assumed that that was a loan?

12         Q.     Well, let me -- let me take -- let

13    me try again.

14                 So you have established already that

15    there were quite a number of promissory notes

16    back and forth -- I'm sorry, quite a number of

17    promissory notes with affiliated companies and

18    individuals owing Highland money; right?

19         A.     Yes.

20         Q.     And you have established that there

21    were many transactions and transfers going back

22    and forth over the years; right?

23                 MS. DANDENEAU:  Objection to form.

24         A.     In -- yes, in my capacity as CFO and

25    my employment, yes, that is -- yes.
```

1                WATERHOUSE - 10-19-21

2       Q.     And that's part of the reason why

3 you just can't remember some of the details

4 today because this -- this happened years ago,

5 and there were a number of transactions.  Is

6 that accurate?

7            MS. DANDENEAU:  Objection to the

8       form.

9            MR. MORRIS:  Objection to the form

10       of the question.

11       A.     I mean, I deal with thousands of --

12 of -- of -- of transactions, you know, whether

13 it has -- the processing of transactions, you

14 know, if it has got, you know, more -- more

15 zeros, you know, behind it than others.

16         When you look at thousands of

17 transactions over the years for funds and

18 advisors and -- and, you know, financial

19 statements, I mean, it is -- it is very hard

20 going back in -- in -- in my -- you know,

21 14-ish year career at -- at Highland to

22 remember a lot of those details, especially

23 when I don't have any records or books or

24 anything like that, and -- and going back many

25 years.

1                    WATERHOUSE - 10-19-21

2          Q.    And that is fine.  That -- that --

3    that is why I asked the question.

4                Is it possible in May of 2019 when

5    Mr. Dondero told you to transfer the funds from

6    Highland, you just assumed on your own that

7    those would be loans without him actually

8    telling you that those would be loans?

9                MR. MORRIS:  Objection to the form

10        of the question.

11         A.    I don't know.

12         Q.    I'm sorry, you --

13         A.    I said I don't know.

14         Q.    Okay.  Well, as the -- as the CFO

15   for Highland, if you saw $7.4 million going

16   out, you would feel some responsibility to

17   account for that, wouldn't you?

18               MR. MORRIS:  Objection to the form

19        of the question.

20         A.    Yes.

21         Q.    Is it fair to say that those would

22   be in the range large enough to rise up to your

23   level?

24               MR. MORRIS:  Objection to the form

25        of the question.

Case 23-03007-sgj Doc 8 Filed 10/20/23 Entered 10/20/23 21:51:57 Desc Desc 397
Case 3:21-cv-00881-X Document 179-19 Filed 03/70/746 Page 56 of 192 PageID 54778

Page 288

```
 1                     WATERHOUSE - 10-19-21

 2          A.    If -- I don't know if I understand

 3     your question.  Those amounts would arise to my

 4     level where I would be involved or...

 5          Q.    You would want to know what a

 6     transfer for that amount, $7.4 million, was all

 7     about, as the CFO of Highland, wouldn't you?

 8                MR. MORRIS:  Objection to the form

 9          of the question.

10          A.    Yes, I make it -- I mean, I -- I

11     review all sorts of payments, I mean, even

12     smaller dollar payments on a periodic basis,

13     you know, to -- to -- to understand and to make

14     sure that we are paying things in a -- you

15     know, in -- in -- in an informed way.  And, you

16     know -- and we're -- and we're paying things

17     pursuant to vendor contracts and things like

18     that.

19          Q.    So as part of that, is it possible

20     that seeing $7.4 million go out you would have

21     promissory notes made in order to keep a paper

22     trail, assuming that those were loans, when

23     perhaps they were never intended to be loans by

24     Mr. Dondero?

25                MR. MORRIS:  Objection to the form
```

Case 23-03007-sgj Doc 80-4 Filed 07/20/21 Entered 07/20/21 21:31:53 Desc
Case 3:21-cv-00881-X Document 178-19 Filed 03/00/246 Page 57 of 192 PageID 54779

Page 289

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21

2         of the question.

3         A.    I don't know.  As I testified

4    earlier, I had conversations with Mr. Dondero

5    about -- about the -- the -- the moneys that

6    were needed for the NAV error.  And I recall

7    him saying go get it from Highland -- or get it

8    from Highland.

9         Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18              I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I

Case 23-03005-sgj Doc 8 Filed 07/10/21 Entered 07/10/21 22:13:57 Desc of 397
Case 3:21-cv-00881-X Document 179-19 Filed 03/09/24 Page 58 of 192 PageID 54780

Page 290

1                    WATERHOUSE - 10-19-21

2    don't -- I don't recall generally.  I don't --

3    I don't recall.

4         Q.    So -- but to the best of your

5    recollection, it was on your initiative,

6    following your discussion with Mr. Dondero,

7    that you had someone draft those two promissory

8    notes; is that correct?

9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes, we would have -- the team, as I

12   stated earlier, we don't draft promissory

13   notes.  "The team" meaning the accounting and

14   finance team.

15              So the team would have worked with

16   the legal group at Highland to draft any notes.

17        Q.    Do you believe or do you have any

18   recollection as to whether you would have done

19   that pursuant to an email or telephone call or

20   in-person meeting?

21              MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Are you asking if I would have -- if

24   those notes would have been drafted pursuant to

25   an email or phone call?

1              WATERHOUSE - 10-19-21

2     Q.    Strike that.

3          Do you recall whether you sent an

4  email to anyone asking them to draft those two

5  promissory notes?

6     A.   I don't recall because, again,

7  once -- I would have instructed -- likely

8  instructed the team to -- to work with the

9  legal group to draft these documents.

10         I -- I -- I -- yeah, I didn't -- I

11  mean, that is more an operational-type

12  procedure.  So, you know, a manager or a

13  controller or working with legal.  You know,

14  they -- they can certainly handle that task to

15  get that -- you know, to request that from

16  legal.

17     Q.   And who on your team do you think

18  you would have asked to do that?

19         MR. MORRIS:  Objection --

20     Q.   Who would have been the logical

21  person or people, if you don't remember their

22  name today?

23         MR. MORRIS:  Objection to the form

24     of the question.

25     A.   It -- it -- there is only two

```
 1                    WATERHOUSE - 10-19-21

 2     managers of the group.  That would have been

 3     Dave Klos or Kristin Hendrix.

 4               Dave was the -- one of his duties

 5     was managing the valuation team, and so he was

 6     intimately involved with this process.  So, you

 7     know...

 8        Q.    Okay.

 9        A.    I don't recall specifically but, I

10     mean, my general -- you know, I -- I -- I

11     likely would have talked to Dave first about it

12     versus someone like Kristin who hadn't been

13     intimately involved.

14        Q.    And -- and do you have a view as to

15     whether it is most likely that you would have

16     done that by email or in-person or how would

17     you believe you would have communicated that to

18     Mr. Klos?

19               MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I likely would have done that in

22     person.  Again, if things of this nature

23     that -- again, you have to put ourselves back

24     to, we have been working on this very stressful

25     project for many, many months.  And once the
```

1                    WATERHOUSE - 10-19-21

2     go-ahead was to -- you know, we see the light

3     at the end of the tunnel with wrapping this up

4     and making shareholders whole -- sorry to say

5     "we" -- you know, the -- so the folks that are

6     involved in it.

7                    I like to talk to people

8     face-to-face and -- and -- and go to -- and go

9     to their desk, because that shows if I'm going

10    to their desk that -- that is something that I

11    want done, you know.

12          Q.    And do you remember, Mr. Waterhouse,

13    getting those two promissory notes in paper

14    format or by email before they were executed?

15                MR. MORRIS:  Objection to the form

16          of the question.

17          A.    I don't recall.

18          Q.    For whatever was the ordinary course

19    back then in May 2019, would you expect to have

20    received them only on paper or would you have

21    expected to have received them in Word document

22    or PDF document by email?

23                MR. MORRIS:  Objection to the form

24          of the question.

25          A.    I -- I didn't sign -- I signed very

                    WATERHOUSE - 10-19-21

 1

 2    few documents via email.  I can't say that it

 3    never happened, but people either stopped by my

 4    office and physically walked in documents for

 5    signature that we discussed face-to-face.

 6              Or documents were -- if -- if --

 7    if -- if -- let's say I wasn't there or I

 8    wasn't available, documents were dropped off.

 9    I had -- I had some in- and outboxes in front

10    of my -- my office there at the Crescent.

11              Documents would be dropped off for

12    signature.  There would be a cover sheet that

13    would be -- have been applied to those

14    documents detailing, you know, who dropped it

15    off, the purpose, why, what time.

16              And then, you know, as I stated, I

17    don't draft documents and I always go to the

18    legal group and the compliance group to make

19    sure that they're in the loop.  And there is

20    a -- a box or section that says, Has legal

21    reviewed or approved, or something to that

22    nature.

23              Again, I don't -- I don't have

24    access to that cover sheet anymore, but it

25    was -- it was something to that effect.

```
 1                    WATERHOUSE - 10-19-21

 2                    And my assistant, you know, if she

 3       was there, she would review that -- you know,

 4       whatever was being dropped off.  And if that

 5       has legal, you know, reviewed or -- reviewed or

 6       approved it, if that wasn't -- if that stuff

 7       hadn't been done, it was like she would just

 8       tell them like, go -- go -- go to the legal

 9       group, because --

10            Q.    Let me -- let me pause --

11                    MS. DANDENEAU:  Let him finish.

12                    MR. MORRIS:  Thank you.  Go ahead.

13            A.    I take -- go to the legal group

14       because that -- that was my -- you know, I

15       didn't -- I didn't review anything that -- that

16       they weren't -- you know, or there wasn't some

17       representation made to me that they had

18       reviewed, approved in some capacity.

19                    Again, my -- my -- my goal, as CFO,

20       is to provide transparency and make sure that

21       groups like compliance and other things -- and

22       the other group in legal are -- are in -- you

23       know, their -- they're made aware of

24       transactions of -- you know, that are crossing

25       my desk.
```

1                    WATERHOUSE - 10-19-21

2              Because I'm not in every

3    conversation.  They're not in every

4    conversation -- meaning legal compliance -- and

5    I just want to make sure that -- that everyone

6    is in sync to, you know, to -- to the extent

7    possible.

8        Q.    So if we summarize, you don't

9    specifically remember signing these two notes,

10   but most likely it would have been that they

11   would have presented -- been presented to you

12   physically on paper?

13             MR. MORRIS:  Objection to the form

14       of the question.

15       A.    They would -- they would have been

16   presented physically on paper most likely or

17   someone would have left it.  But, I mean,

18   again, I don't -- I don't recall.

19       Q.    I understand.  Understand.

20             When you signed -- when you signed

21   documents, when you personally signed

22   documents, did you typically use a ink pen or

23   did you use a stamp?

24       A.    No, I -- I -- I use a -- an -- an

25   ink pen.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Do you know -- was there a file at

 3   Highland kept anywhere with ink-signed

 4   originals of a promissory notes in general or

 5   these two promissory notes specifically?

 6              MR. MORRIS:  Objection to the form

 7        of the question.

 8        A.    Sorry, I just want to make sure I

 9   understand your question.  Are you saying is

10   there a file somewhere that has ink-signed

11   originals of these two promissory notes?

12        Q.    Yes.

13        A.    I would -- I would assume they're

14   some place.  I mean --

15        Q.    Well, was there a -- was there a

16   place where Highland generally kept originals

17   of promissory notes owed to it?

18        A.    I wouldn't -- no.

19              MR. RUKAVINA:  Mr. Nguyen, would you

20   please pull up my A7, alpha 7.

21        Q.    These are the two promissory notes,

22   Mr. Waterhouse.

23              (Exhibit A7 marked.)

24        Q.    And please -- Mr. Waterhouse, please

25   command my associate to scroll down as you need
```

Case 3:00-05607-cv-Doc 8 Doc Filed 10/20/21 Entered 10/20/21 21:57:57 Desc 397
Case 3:21-cv-00881-X Document 172-19 Filed 04/06/24 Page 66 of 192 PageID 54788

Page 298

1              WATERHOUSE - 10-19-21

2    to, but I want you to take a very close look at

3    your two signatures here and tell me whether

4    you believe, in fact, that you ink signed them

5    or whether you --

6              MS. DANDENEAU:  Mr. Rukavina,

7         Mr. Waterhouse has the copies.

8              MR. RUKAVINA:  Perfect.  Then you

9         can take this down, Mr. Nguyen.

10        A.    These -- these -- these signatures

11   are identical, now that I stare at them, and I

12   mean, they are so close -- I mean, they're

13   identical that, I mean, even with my chicken

14   scratch signature, I don't know if I can -- you

15   know, I do this 100 times, could I do that

16   as -- as precisely as I see between the two

17   notes.

18        Q.    Well, that is why I ask.

19   Mr. Waterhouse, now that you have examined

20   them, does it seem like it is more likely that

21   you actually electronically signed these?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Is -- I don't -- I don't recall

25   specifically.  As I said before, my assistant

1            WATERHOUSE - 10-19-21

2   did have a -- an electronic signature, and that

3   was used from time to time.  It wasn't as

4   common practice back in 2019.  It definitely

5   was more common practice when we had to work

6   from home and remotely for COVID because it

7   that made it almost impossible to, right,

8   provide wet signatures since we're all working

9   from home remotely.

10       Q.    Well, going just for these two

11  promissory notes, Mr. Waterhouse, in light of

12  your inability to remember any details, are you

13  sure you actually signed either or both of

14  those notes?

15            MS. DANDENEAU:  Objection to form.

16       A.    I don't recall specifically

17  signing -- actually physically signing these

18  notes.  As I said before, I don't recall doing

19  that.  This -- this looks like my signature,

20  but yet these two signatures are identical.

21       Q.    So you don't recall physically

22  signing them, and I take it you don't recall

23  electronically signing them either?

24       A.    I don't recall.  You know, Highland

25  has all my emails.  If that occurred, you know,

```
 1                 WATERHOUSE - 10-19-21

 2   you know, I don't have any of these records is

 3   what I'm saying.  I don't have any of those

 4   records.

 5        Q.    That is why I'm asking you these

 6   questions in great detail because I don't have

 7   those emails.  I'm trying to -- I'm hoping that

 8   you will give me some names or some details so

 9   I can go look for more emails, but again, you

10   don't remember any -- any individual, other

11   than Mr. Dondero that we've discussed, you

12   don't remember any individual with whom you

13   discussed these promissory notes prior to their

14   execution?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall discussing it with

18   anybody else.

19        Q.    Okay.

20        A.    I mean, prior --

21        Q.    I understand.

22        A.    You know, there was no one else --

23   there was no one else in that meeting that I

24   recall with Mr. Dondero.

25        Q.    Now, when you established that by
```

Case 3:21-cv-00881-X  Doc 8  Filed 10/20/21  Entered 10/20/21 21:31:57  Page 30 of 397
Case 3:21-cv-00881-X  Document 170-19  Filed 05/06/24  Page 69 of 192  PageID 54791

Page 301

 1                 WATERHOUSE - 10-19-21

 2    May of 2019 --

 3         A.    And -- and from what I recall, and

 4    the reason why I was by myself is -- is, you

 5    know, I don't -- I don't want to speculate, I'm

 6    sorry.

 7         Q.    Okay.  We have established that by

 8    May of 2019, in your view, the liabilities of

 9    HCMFA exceeded its assets; correct?

10         A.    Yeah.  I mean, again, I don't have

11    financial statements in front of me, but I

12    think, if I recall, we'd have to go through the

13    testimony with Mr. Morris, I believe that was

14    the case.

15         Q.    In fact, you will recall that in

16    April of 2019, Mr. Dondero signed a document

17    that extended the demand feature of two prior

18    notes to May 31, 2019.  Do you recall that?

19              MS. DEITSCH-PEREZ:  I think you

20         might -- maybe have the court reporter read

21         that back.  You might have misspoke.

22              (Record read.)

23              MR. RUKAVINA:  And I did misspeak.

24         Q.    I meant to say to May 31, 2021.  Do

25    you recall that, sir?

```
 1                  WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3       of the question.

 4       A.    Yes.

 5              MR. RUKAVINA:  And, Mr. Nguyen, just

 6       so that the record is clear, will you please

 7       pull up my Exhibit Alpha 10, A10.

 8              (Exhibit A10 marked.)

 9       Q.    You don't have this one in front of

10       you, Mr. Waterhouse?  This is the one that

11       Mr. Morris used earlier.  Do you see that

12       document, sir?

13       A.    Yes, I do.

14       Q.    And this is what you were testifying

15       about before when Mr. Morris was asking you.

16       Do you remember that?

17       A.    Yes.

18       Q.    So here is my question for you,

19       Mr. Waterhouse:  As the chief financial officer

20       of Highland, was it prudent for Highland less

21       than three weeks later to be lending

22       $7.2 million to an insolvent entity that

23       couldn't even then pay its debts back to

24       Highland?

25              MS. DANDENEAU:  Objection to form.
```

Case 3:10-cv-00830-L Doc 8 Doc. Filed 10/20/21 Entered 10/20/21 21:31:57 Page 30 Desc 397
Case 3:21-cv-00881-X Document 179-19 Exhibit 179-A9 Filed 05/06/24 Page 71 of 192 PageID 54793

Page 303

1                    WATERHOUSE - 10-19-21

2              MR. MORRIS:  Objection to the form

3        of the question.

4        A.    Sorry, I just want to make sure --

5    are you asking me, did you say, was it prudent

6    for Highland to loan $7.4 million to HCMFA a

7    few weeks after this document was executed?

8        Q.    Yes, and at a time when HCMFA's

9    liabilities exceeded its assets.

10             MR. MORRIS:  Objection to the form

11       of the question.

12       A.    I don't -- it is odd.  I don't know.

13             MR. RUKAVINA:  You can take this

14   exhibit down, Mr. Nguyen.

15       Q.    Do you recall asking anyone,

16   Mr. Dondero or -- or anyone outside as to

17   whether Highland ought to be lending

18   $7.4 million to HCMF regarding HCMF's

19   creditworthiness?

20             MR. MORRIS:  Objection to the form

21       of the question.

22       A.    I don't recall.

23       Q.    Did you receive personally any of

24   that $7.4 million?

25       A.    No.

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Did you even --

 3             MR. MORRIS:  I didn't hear that

 4        question, sir.

 5             MR. RUKAVINA:  The one that he

 6        answered, John, or my new one?

 7             MR. MORRIS:  No, no, your question,

 8        Davor.

 9             MR. RUKAVINA:  I had asked him

10        whether he received any of the

11        $7.4 million.  He said no.

12             MR. MORRIS:  Yeah.  I thought there

13        was a question after that.  Maybe I was

14        mistaken.  I apologize.

15             MR. RUKAVINA:  I had started a new

16        question, so here, let me start the new

17        question again.

18        Q.    Did you personally receive any

19   direct benefit from those two notes for

20   $7.4 million?

21        A.    No.

22        Q.    Did you ever personally consider

23   yourself obligated to repay either or both of

24   those notes?

25        A.    No.
```

1                    WATERHOUSE - 10-19-21

2                    MR. RUKAVINA:  Pull up those notes

3       again, Mr. Nguyen.

4           Q.    You can have them in front of you,

5       Exhibit 7, Mr. Waterhouse, whatever is easier

6       for you.  If you go to your signature page, my

7       question to you is, why did you not include

8       your title as treasurer by your name, Frank

9       Waterhouse?

10                   MS. DANDENEAU:  Objection to form.

11          A.    I didn't -- I didn't draft this

12      document.

13          Q.    So you relied on whoever drafted it

14      to draft it correctly?

15          A.    Yes.

16          Q.    Okay.  But back then when you signed

17      this, did it ever cross your mind that you were

18      the maker on these notes?

19          A.    No.

20          Q.    Back then when you signed this

21      document, did it ever cross your mind that you

22      could be a co-obligor on these notes?

23          A.    No.  I didn't receive $7.4 million,

24      I mean...

25          Q.    But can you say that HCMFA received

```
1                    WATERHOUSE - 10-19-21

2     $7.4 million?

3          A.    I would have to go back and look and

4     check in, you know, the -- the financial

5     records and the bank statements.

6               MR. RUKAVINA:  You can take this

7     exhibit down, Mr. Nguyen.

8          Q.    Mr. Waterhouse, I'm not trying to be

9     a smart-ass, but if the law says that because

10    of the way that you signed this promissory

11    note, if that is what the law says, that that

12    made you personally -- personally liable, then

13    you would agree with me that that was never

14    your intent?

15              MR. MORRIS:  Objection to the form

16        of the question.

17         A.    That was never -- I wouldn't sign a

18    note and not get consideration in return.

19         Q.    So putting all other issues aside,

20    if the law -- if the law says that you were

21    liable for those notes because of how you

22    signed them, then would you agree with me that

23    these notes are a mistake?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Case 3:21-cv-00881-X   Doc 8   Filed 10/20/21   Entered 10/20/21 21:31:57   Page 307 of 397
Case 3:21-cv-00881-X   Document 179-9   Filed 05/09/24   Page 75 of 192   PageID 54797

Page 307

```
 1                   WATERHOUSE - 10-19-21

 2                   MS. DANDENEAU:  Objection to the

 3        form.

 4        A.    Yes.

 5        Q.    So do you agree with me that it's

 6   odd -- I think that is the word you used --

 7   that Highland would be loaning $7.4 million a

 8   few weeks after that extension to an entity

 9   whose liabilities exceeded its assets, and you

10   would agree with me that it was never your

11   intention to be in any way liable for these two

12   promissory notes; correct?

13                   MR. MORRIS:  Objection to the form

14        of the question.

15        A.    Sorry, you -- you asked a lot there.

16                   MR. RUKAVINA:  I will strike it and

17   I will move on.

18                   Let's go to -- pull up Exhibit 9,

19   please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20   9, A9.

21                   (Exhibit A9 marked.)

22        Q.    Sir, take a moment to look at this,

23   but this is an email, and you will see attached

24   July 31, 2020 affiliate notes.

25                   Do you see that attachment?
```

1               WATERHOUSE - 10-19-21

2     A.    Yes.

3     Q.    Okay.  And do you see an entry for

4  Highland Capital Management Fund Advisors?

5         MR. MORRIS:  I'm sorry, hold on.

6     Where are you looking?

7         MR. RUKAVINA:  Last page, John.

8         MR. MORRIS:  Is it the page on the

9     screen?

10        MR. RUKAVINA:  Oh, I'm sorry.

11    Mr. Nguyen just did it.  Yes, the last page

12    there.

13        MR. MORRIS:  Thank you.

14    Q.    Do you see an entry there for HCMFA?

15    A.    Yes.

16    Q.    About $10.5 million.

17        Do you see that?

18    A.    I do.

19    Q.    And, now, do you have any

20  explanation for why if HCMFA owed $7.4 million,

21  plus the 5.3 million that had been extended,

22  why that amount was only 10.5 million?

23    A.    I don't know.  Okay.

24        MR. RUKAVINA:  Close this one and

25    pull up, Mr. Nguyen, the schedules,

Case 3:10-05-00:07-9-1: Doc 8-Document 170-A9 e 10/20/21 Page 1 Enter 10/20/210/29 2331:55 07 309 c 397
Case 3:21-cv-00881-X Document 170-A9 Filed 05/20/24 Page 77 of 192 PageID 54799
Page 309

1              WATERHOUSE - 10-19-21

2         schedule of assets.  What exhibit is this

3         of ours, Mr. Nguyen?

4              MR. NGUYEN:  This is A11.

5              MR. RUKAVINA:  Oh, this will be A11.

6              (Exhibit A11 marked.)

7         Q.    You don't have this in front of you,

8    Mr. Waterhouse?

9         A.    Okay.

10        Q.    This is what Mr. Morris used

11   earlier.  Do you remember looking at this with

12   Mr. Morris?

13        A.    Yes.

14              MR. RUKAVINA:  You might have to

15        zoom in a little.  Okay.

16        Q.    Now, I see Affiliate Note A, B, and

17   C.

18              Do you have any recollection as to

19   why the names of the affiliates are omitted?

20        A.    I don't.  I testified earlier that,

21   you know, the team worked with DSI in providing

22   these.  I -- I don't -- I don't know.

23        Q.    Can we deduce -- is it logical to

24   deduce that Affiliate Note A would be NexPoint

25   given its size of $24.5 million?

```
 1                   WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3       of the question.

 4       A.    I mean, it -- it is a -- it is -- it

 5  is approximate.

 6       Q.    Well, can we -- can we deduce -- or,

 7  I'm sorry, strike that.

 8              Can you, sitting here today,

 9  logically conclude that Affiliate Note B or C

10  represents HCMFA?

11              MR. MORRIS:  Objection to the form

12       of the question.

13       A.    I don't know.  I don't know.  I

14  can't.

15       Q.    Okay.  As of the petition date, we

16  have established that HCMFA, under promissory

17  notes, owed $7.4 million and $5.3 million to

18  the debtor; correct?

19              MR. MORRIS:  Objection to the form

20       of the question.

21       A.    Yes.

22       Q.    Okay.  And by my reckoning, that

23  would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25       of the question.
```

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    It would be $12.7 million.  Is that

 3  generally correct?

 4        A.    Sorry, the amounts were 7.4, 5.3.

 5        Q.    Yes.

 6        A.    Okay.  Yeah, that -- that -- I can

 7  do that math, yes.

 8        Q.    Do you have any explanation or any

 9  understanding of why there is no similar entry

10  listed here on the schedule of assets filed

11  with the bankruptcy court?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  We have to look at

15  the supporting schedules, like I talked about

16  other -- presumably there is -- there is a

17  build to the schedule that would provide the

18  detail.

19        Q.    Well, that was going to be my next

20  question.  You anticipated it.

21              MR. RUKAVINA:  You can -- you can

22        take this down, Mr. Nguyen.

23        Q.    Do you believe that whenever you and

24  your team provided the underlying data to the

25  financial advisor that the actual names of the
```

```
 1                  WATERHOUSE - 10-19-21

 2    affiliates for Affiliate Note A, B, and C would

 3    have been listed there?

 4         A.    Are you asking we provided the names

 5    to the financial advisor?  I don't -- I don't

 6    understand who the financial advisor is.

 7         Q.    I'm sorry, DSI.

 8               Let me ask the question this way,

 9    Mr. Waterhouse.

10               Whenever you provided information

11    about the affiliate notes to DSI, do you

12    believe that you would have included the actual

13    names of the affiliates, you or your team, or

14    that you would have done the Affiliate Note A,

15    Note B, Note C?

16               MR. MORRIS:  Objection to the form

17         of the question.

18               MS. DANDENEAU:  Objection to the

19         form.

20         A.    We -- like I testified earlier, when

21    we were -- we gave everything to -- to DSI.  We

22    were giving all of our records, all of our

23    files, everything to DSI.  We weren't redacting

24    information or saying, hey, here is a note,

25    here is Affiliate Note A or B.
```

Case 3:05-cv-00037-Doc 8 Document 10780-10 Filed 10/20/21 Entered 10/20/21 21:38:57 Page 3 Desc
Case 3:21-cv-00881-X Document 170-19 Filed 06/20/24 Page 81 of 192 PageID 54803

Page 313

```
 1                  WATERHOUSE - 10-19-21

 2             I mean, it was -- our job and our

 3    focus -- and I testified in court back in 2019;

 4    right -- was -- was to be transparent and, you

 5    know, get DSI up to speed on -- on the matters

 6    at Highland.  So I can't see us redacting at

 7    that point.

 8             MR. RUKAVINA:  Mr. Nguyen, will you

 9        please pull up Mr. Morris' Exhibit 36.

10        Just the very first page, the very top

11        email.  You might zoom in a little bit.

12        Q.    Now, you recall being asked about

13    this by Mr. Morris?

14        A.    Yes, I do.

15        Q.    And you wrote:  The HCMFA note is a

16    demand note.

17             You wrote that; right?

18        A.    Yes.

19        Q.    And, in fact, weren't there by that

20    point in time several notes?

21        A.    Yes, there were.  Again, I don't --

22    I don't remember everything specifically.  I

23    mean --

24        Q.    I understand.  I understand.

25             So this is an example where -- where
```

Case 3:21-cv-00881-X   Document 179-9   Filed 10/20/21   Entered 10/20/21 21:31:57   Page 314 of 397
Case 3:21-cv-00881-X   Document 179-9   Filed 08/20/24   Page 82 of 192   PageID 54804

Page 314

                        WATERHOUSE - 10-19-21

1     you might have made a mistake by referring to a

2     singular instead of a plural; right?

3

4          A.    Yes.

5          Q.    Okay.  And you -- you wrote -- a

6     couple of sentences later, you wrote:   There

7     was an agreement between HCMLP and HCMFA the

8     earliest they could demand is May 2021.

9               You wrote that; right?

10         A.    Yes.

11         Q.    But I think you -- you agreed with

12    Mr. Morris that that can't possibly apply to

13    the May 2019 notes, can it?

14              MR. MORRIS:  Objection to the form

15         of the question.  That is not what he

16         testified to.

17         Q.    Let me ask -- let me ask a different

18    question.

19              Sitting here today -- or if you can

20    answer me from your memory on October 6,

21    2020 -- did the April acknowledgment that

22    extended the maturity date apply to the

23    May 2019 notes also?

24         A.    I don't recall specifically.

25         Q.    Well, you recall that the notes that

```
1                  WATERHOUSE - 10-19-21

2   you signed were demand notes; right?

3        A.    Yes.

4        Q.    Do you find it logical, based on

5   your experience, that had they intended to have

6   a different or a set maturity date, you would

7   have instructed that that set maturity date be

8   included instead of a demand feature?

9              MR. MORRIS:  Objection to the form

10       of the question.

11       A.    Sorry, just want to make sure I

12  understand.  You are saying that -- that the

13  $5 million note, the $2.4 million note, if

14  those were supposed to be a term note, that I

15  would have made sure that those were a term

16  note?

17       Q.    I'm saying -- I'm saying,

18  Mr. Waterhouse, that on May the 2nd and May the

19  3rd, 2019, if you intended that those two

20  promissory notes could not be called until May

21  2021, would you have included such language in

22  those two promissory notes?

23             MR. MORRIS:  Objection to the form

24       of the question.

25       A.    I guess -- I'm sorry, I don't recall
```

1               WATERHOUSE - 10-19-21

2    putting language in those May notes.  I don't

3    remember what language you are referring to.

4          Q.    Well, let's read this again.

5                There was an agreement between HCMLP

6    and HCMFA the earliest they could demand is May

7    2021.

8                Do you recall that agreement?

9          A.    Yes, that was the agreement we

10   looked at earlier; correct?

11         Q.    Okay.  Yes.

12               Do you -- do you understand now that

13   that agreement that we looked at earlier also

14   applied to the May 2019 notes that you signed?

15         A.    I don't -- I don't know.

16         Q.    But as of October 6, 2020, you're

17   writing that there is one demand note and

18   you're categorizing that demand note as not

19   being demandable on May 2021; correct?

20         A.    Yes.

21         Q.    And you know now that you made at

22   least one mistake in this email; correct?

23               MR. MORRIS:  Objection to the form

24         of the question.

25         A.    Yes.

Page 317

1              WATERHOUSE - 10-19-21

2              MR. RUKAVINA:  You can pull this

3         down, Mr. Nguyen.

4         Q.    So, Mr. Waterhouse, you don't

5    remember Mr. Dondero telling you to make these

6    loans or not.  HCMLP was loaning $7.4 million

7    to someone that their assets were less than

8    their liabilities.

9              We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14             Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    I -- I don't know.

20        Q.    And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23             MS. DANDENEAU:  Objection to the

24        form.

25             MR. MORRIS:  Join.

Case 23-03007-sgj Doc 80-4 Filed 10/20/21 Entered 10/20/21 21:31:57 Desc
Case 3:21-cv-00881-X Document 169-19 Filed 06/07/24 Page 86 of 192 PageID 54808

Page 318

```
 1                    WATERHOUSE - 10-19-21

 2      A.    Yes.

 3      Q.    If Mr. Dondero testifies that he

 4  never told you to make these loans, would you

 5  disagree with his testimony?

 6            MR. MORRIS:  Objection to the form

 7      of the question.

 8      A.    Like I testified earlier with my

 9  conversation with Mr. Dondero, all I recall is

10  he said, get the money from Highland.

11      Q.    And if Mr. Dondero testifies that

12  he, in consultation with other senior personnel

13  at Highland, decided that Highland needed to

14  pay HCMFA $7.4 million as compensation for the

15  NAV error and not a loan, would you have any

16  reason to disagree with Mr. Dondero?

17            MR. MORRIS:  Objection to the form

18      of the question.

19      A.    If that was -- if that was his

20  intent, yes, it would -- I would --

21      Q.    Do you have any reason to disagree

22  with him?

23            MR. MORRIS:  Objection to the form

24      of the question.

25      A.    If that was his intent, I don't
```

Case 3:21-cv-00881-X  Document 179-9  Filed 01/09/24  Entered 01/09/24 21:31:57  Page 319 of 397
Case 3:21-cv-00881-X  Document 179-9  Exhibit 69  Page 86 of 246  Page 87 of 192  PageID 54809

Page 319

```
 1                  WATERHOUSE - 10-19-21

 2     know.  I don't know how I disagree with that.

 3          Q.    And just to confirm, you don't

 4     remember ever asking Mr. Dondero whether you

 5     should have two promissory notes prepared?

 6          A.    No.

 7          Q.    And you don't remember discussing

 8     with Mr. Dondero what the terms of those two

 9     promissory notes should be?

10          A.    I don't recall -- I testified all I

11     recall is he said, get the money from Highland.

12     I don't -- the -- the terms of the note, I

13     don't recall ever having a discussion around

14     the terms of the note, but since I don't draft

15     the notes, that -- there could have been a

16     conversation with other people later.

17          Q.    Do you have any memory of whether

18     after the notes were drafted, but before you

19     signed them, that you communicated with

20     Mr. Dondero in any way to just confirm or -- or

21     get his blessing or ratification to signing

22     those notes?

23                MR. MORRIS:  Objection to the form

24          of the question.

25          A.    I don't recall.
```

WATERHOUSE - 10-19-21

1

2      Q.    Again, the only thing you remember,

3   sitting here today, was Mr. Dondero said, get

4   the money from Highland, and that is it, that

5   is all you remember?

6           MR. MORRIS:  Objection to the form

7      of the question.

8      A.    I testified to that several times.

9   This was over two years ago.  A lot has

10  happened.  That is all I recall.

11     Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18          MR. MORRIS:  Objection to the form

19     of the question.

20     A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,

```
 1                  WATERHOUSE - 10-19-21

 2    multiple times over COVID, she would attach my

 3    signature block and then email it out to

 4    whatever party.

 5         Q.    What was your assistant's name in

 6    May 2019?

 7         A.    It was Naomi Chisum.

 8         Q.    Is she the only one?  I'm sorry, was

 9    she your only assistant that would have maybe

10    facilitated logistically something like you

11    just described?

12         A.    You know, she was out on maternity

13    leave at some point.  I don't -- I don't recall

14    those dates where she was out for maternity

15    leave.  There was -- there were folks backing

16    her up.  I don't recall specifically who

17    those -- who those, you know, administrative

18    assistants were, and I don't recall

19    specifically if she was out during this time on

20    maternity leave.

21              I do know that that she was out for

22    a period of time, or who knows, or she could

23    have been on vacation that day or, you know, I

24    don't know.

25         Q.    Switching gears now, the two
```

1              WATERHOUSE - 10-19-21

2    complaints that have been filed that is against

3    HCMFA and NexPoint, did you see any drafts of

4    those complaints before they were filed?

5              MR. MORRIS:  Objection to the form

6         of the question, and to the extent that you

7         had any communications with counsel or you

8         were shown drafts of the complaints by

9         counsel while you were employed by

10        Highland, I direct you not to answer.

11   A.    I -- I reviewed documents yesterday

12   with counsel here.  I believe that is the first

13   time I have ever seen those.

14   Q.    Okay.  Did you ever discuss with

15   Mr. Seery these two lawsuits before or after

16   they were filed?

17   A.    I don't recall.

18   Q.    Were you ever interviewed by legal

19   counsel, to your knowledge, about these

20   promissory notes before the complaints were

21   filed?  Without going into what was said, were

22   you ever interviewed by legal counsel?

23              MR. MORRIS:  Objection to the form

24        of the question.

25   A.    I don't recall.

```
1                  WATERHOUSE - 10-19-21

2          Q.     Obviously with COVID, it changed,

3    but -- but before COVID, did you used to meet

4    with Mr. Seery from time to time in-person?

5          A.     Yeah, I mean, so before COVID -- so

6    we're talking kind of late March, early April,

7    right, there was about -- I don't remember the

8    specific date when the board for Highland was

9    appointed.  I believe it was around February of

10   2020, so maybe there was a month-and-a-half,

11   two-month window where we were meeting

12   in-person or, you know, like we were actually

13   in the office, excuse me, we were in the

14   office.

15               And, you know, when they were first

16   appointed, the board members and Mr. Seery

17   were -- were definitely down here more

18   in-person.

19         Q.     Did you ever see Mr. Seery taking

20   written notes of -- of his meetings with you or

21   others?

22         A.     I don't recall.

23         Q.     Do you recall on any Zoom or video

24   conference with Mr. Seery, seeing him take

25   notes, written notes?
```

1          WATERHOUSE - 10-19-21

2          A.     The Zoom calls we had, I don't

3    recall having seen video or, you know, or if it

4    was on Zoom, I just remember it being -- well,

5    no, you know what, there were some -- you know,

6    I take that back.

7               So there were -- there were some

8    times that I did remember seeing Mr. Seery

9    on -- on some of the Zoom calls.

10         Q.     Well, let me --

11         A.     I don't -- sorry, I'm thinking.  I'm

12   thinking -- I'm going back.  I'm trying to

13   process this.

14         Q.     I can make it much quicker,

15   Mr. Waterhouse.  I have heard -- I have heard

16   that Mr. Seery is a copious note taker.

17              Do you have any knowledge about

18   that?

19         A.     No.

20         Q.     Okay.  Switching gears yet again,

21   and this will be last theme.  Do you need a

22   restroom break, or are you good to go for

23   another half an hour?

24              MS. DEITSCH-PEREZ:  I need a

25         restroom break.

Case 23-05005-sgj Doc 86-4 Filed 10/20/21 Entered 10/20/21 22:31:53 Desc 325 of 397
Case 3:21-cv-00881-X Document 178-19 Filed 07/09/24 Page 93 of 192 PageID 54815

Page 325

```
 1                    WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Can we make it five

 3       minutes?

 4              THE WITNESS:  Five minutes would be

 5       great.

 6              VIDEOGRAPHER:  We're going off the

 7       record at 5:53 p.m.

 8       (Recess taken 5:53 p.m. to 5:59 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10       record at 5:59 p.m.

11       Q.    Mr. Waterhouse, I had asked you

12  earlier about contracts between HCMFA and the

13  debtor, and now I'm going to talk about

14  contracts between the debtor and NexPoint

15  Advisors.  Okay?

16       A.    Okay.

17       Q.    Now, were there contracts similar to

18  the ones with HCMFA that NexPoint had in the

19  nature of employee reimbursement and shared

20  services?

21       A.    Yes, they -- NexPoint Advisors and

22  Highland Capital Management Fund Advisors had

23  cost reimbursement and shared services

24  agreements with Highland Capital Management,

25  L.P.
```

```
1                    WATERHOUSE - 10-19-21

2         Q.    And was that shared services

3    agreement, to the best of your understanding,

4    in place as of December 31, 2020?

5         A.    It was -- it was terminated at some

6    point, and I remember the contracts had

7    different termination dates, but I think the --

8    the date of termination was January 31st of

9    2021, after the termination was put in.

10              So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13        Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17        A.    Yes.

18        Q.    Would those have included accounting

19   services?

20        A.    Yes.

21        Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Case 3:21-cv-00881-X   Document 179-9   Filed 07/20/21   Entered 07/20/21 21:31:51   Page 327 of 397
Case 3:21-cv-00881-X   Document 179-9   Exhibit 9   Filed 07/06/24   Page 95 of 192   PageID 54817

Page 327

```
1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    So let's break that up.  You were a

4   treasurer of NexPoint as well in December of

5   2020?

6              MR. MORRIS:  Objection to the form

7        of the question.

8        A.    Yes.

9        Q.    Okay.  And in December of 2020, did

10  NexPoint have its own bank accounts?

11       A.    Yes.

12       Q.    And did it use those bank accounts

13  to pay various of its obligations?

14       A.    Yes.

15       Q.    Did employees of the debtor have the

16  ability to cause transfers to be made from

17  those bank accounts on behalf of NexPoint?

18       A.    Yes.

19       Q.    And is that one of services that the

20  debtor provided NexPoint, basically ensuring

21  that accounts payable and other obligations

22  would be paid?

23       A.    Yes.

24             MR. MORRIS:  Objection to the form

25       of the question.
```

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    You answered yes?

 3        A.    Yes.

 4        Q.    And the payments, though, whose

 5   funds would they be made from?

 6        A.    From the bank account of NexPoint

 7   Advisors.  If they were NexPoint advisor

 8   obligations, it would be made from NexPoint

 9   Advisors' bank account.

10        Q.    So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13              (Exhibit A1 marked.)

14        Q.    So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18              Do you see that, sir?

19        A.    I do.

20        Q.    And do you see where Ms. Hendrix

21   writes:  NPA.

22              Do you know what NPA stood for?

23        A.    Yes.

24        Q.    And what does it stand for?

25        A.    NexPoint Advisors.
```

1                    WATERHOUSE - 10-19-21

2        Q.    And was that how you-all internally

3   at Highland refer to NexPoint Advisors, L.P.?

4        A.    I mean, yes, amongst other things.

5        Q.    And she writes at the bottom of her

6   email:  Okay to release?

7              Do you see that?

8        A.    Yes, I do.

9        Q.    So what --

10             MR. MORRIS:  Hold on one second.

11             Okay.  Go ahead.

12             MR. RUKAVINA:  Yeah.

13        Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15        A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21             So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.

```
 1                   WATERHOUSE - 10-19-21

 2              So she is -- she is putting in all

 3    the payments for the week because we batch

 4    payments weekly.  And these are the payments

 5    that go out that week, and she is informing me

 6    of the payments and -- you know, again, at the

 7    bottom of the email, she is asking for my okay

 8    to -- to release these payments in the wire

 9    system.

10        Q.    So these would be accounts payable

11    of NexPoint?

12        A.    I mean, it would be accounts payable

13    for all of these entities listed on this email.

14        Q.    And who was Ms. Hendrix employed by

15    in November and December of 2020?

16        A.    Highland Capital Management.

17        Q.    Okay.  So -- so part of the services

18    that NexPoint had contracted with was for

19    Highland to ensure that NexPoint timely paid

20    its accounts payable; is that accurate?

21              MR. MORRIS:  Objection to the form

22        of the question.  You have got to be

23        kidding me.

24        Q.    Is that accurate?

25        A.    Yes.
```

1                    WATERHOUSE - 10-19-21

2          Q.    And did NexPoint rely on employees

3   of the debtor to ensure that NexPoint's

4   accounts payable were timely paid?

5               MR. MORRIS:  Objection to the form

6          of the question.

7          A.    Yes.

8               MR. RUKAVINA:  Let's flip to the

9          next page, Mr. Nguyen, if you will please

10         scroll to the next page.

11         Q.    So this is an email similar to the

12  prior one, November 30th.

13              Do you see where it says, NPA HCMFA,

14  USD $325,000 one-day loan?

15              Do you see that, sir?

16         A.    I do.

17         Q.    Do you have any memory of what that

18  was?

19         A.    I don't recall what that -- what

20  that payment was for.

21         Q.    Did it sometimes occur that one

22  advisor would, on very short-terms, make loans

23  to another advisor?

24         A.    Yes.  This -- this -- this occurred

25  from -- from -- from time to time.  It actually

1    WATERHOUSE - 10-19-21

2   looking at -- I'm -- I'm looking at the date of

3   this email.  It is November 30th.  It is the

4   last day of the month.

5           HCMFA has obligations it needs to

6   pay to its broker-dealer, which is HCFD.  And

7   it likely was short funds to make those

8   obligations under that -- under its agreement,

9   and so it provided a one-day loan because on

10  the next business day on 12/1 -- or the next

11  business day in December, it would receive

12  management fees from the underlying funds that

13  it managed and it would be able to pay back

14  that loan to NexPoint Advisors.

15      Q.    So -- so here Ms. Hendrix was

16  seeking your approval to transfer $325,000 from

17  NexPoint to HCMFA for a one-day loan; is that

18  correct?

19      A.    That is correct.

20      Q.    Let's flip to the next page, sir.

21          MR. RUKAVINA:  And, Mr. Nguyen, if

22      you will please scroll down.

23      Q.    Now we have as an entry for

24  $325,000, 11/30 loan payment.

25          Do you see that, sir?

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    And that is probably the loan that

 4   was approved on the prior page?

 5        A.    Yes, most likely.

 6        Q.    So is it also true, sir, that in

 7   addition to accounts payable debtor employees

 8   would be assisting NexPoint with respect to

 9   paying back its debt?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I mean, yes, for loans of this

13   nature, yes.

14        Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18             MR. MORRIS:  Objection to the form

19        of the question.

20             MS. DANDENEAU:  Objection to form.

21        A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember
```

Page 334

1                    WATERHOUSE - 10-19-21

2    specifically but, yes, generally we -- you

3    know, we did do that.

4          Q.    So do you recall -- and we can pull

5    it up, if need be -- that under the NexPoint

6    note that Mr. Morris asked you about earlier,

7    the one for more than $30 million, that

8    NexPoint was obligated to make an annual

9    payment of principal and interest?

10              MR. MORRIS:   Objection to the form

11         of the question.

12         A.    Yes, it was -- yes, it -- it was an

13   amortizing note.  It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.  So -- but are --

16   are you asking me --

17         Q.    I'm just asking you, sir, if you

18   recall the note.

19         A.    Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21         Q.    And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24         A.    I do.

25         Q.    And do you believe that employees of

```
 1                    WATERHOUSE - 10-19-21

 2     the debtor would have played any role in

 3     NexPoint having made those prior payments?

 4                    MR. MORRIS:  Objection to the form

 5          of the question.

 6          A.    Yes.

 7          Q.    And what role in years prior to 2020

 8     would employees of the debtor have had with

 9     respect to NexPoint making that annual payment?

10          A.    We -- we -- we would have -- I keep

11     saying "we."  The team would have calculated

12     any amounts due under that loan and other

13     loans, as -- as standard course.

14                    We would -- since we provided

15     treasury services to the advisors, we would

16     inform the -- the -- the -- we informed

17     Mr. Dondero of any cash obligations that are

18     forthcoming, whether we do cash projections.

19                    If, you know, any of these payments

20     would have -- or, you know, the sum total of

21     all of these payments, including any note

22     payments, if there were any cash shortfalls, we

23     would have informed Mr. Dondero of any cash

24     shortfalls.  We could adequately plan, you

25     know, in instances like that.
```

Case 3:21-cv-00881-X Document 180-47 Filed 10/20/21 Entered 10/20/21 21:58:57 Desc
Case 3:21-cv-00881-X Document 179-49 Page 359/2446 Page 104 of 192 PageID 54826

Page 336

```
1                    WATERHOUSE - 10-19-21

2              Or, sorry, we -- I say "we" -- I

3    keep saying "we" -- I keep wearing my -- again,

4    my -- my treasurer hat.

5              But, yes, it is to -- it is to

6    inform Mr. Dondero of the obligations of the

7    advisors in terms of cash and obligations that

8    are -- are upcoming and that -- and that are --

9    are scheduled to be paid.

10      Q.    And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14              MS. DANDENEAU:  Objection to form.

15              MS. DEITSCH-PEREZ:  Davor, I think

16         you misspoke.  You might want to just

17         repeat the question.

18      Q.    Okay.  Let me repeat the question,

19   sir.

20              Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24      A.    Yes.

25      Q.    So someone at the debtor in treasury
```

Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 57 of 397
Case 3:21-cv-00881-X Document 179-19 Page 105 of 192 PageID 54827

Page 337

1              WATERHOUSE - 10-19-21

2     or accounting would have sent some schedule or

3     a reminder that a payment would be coming due

4     in the future.  Is that generally the practice?

5          A.    Yes, we would -- you know, again, I

6     didn't -- I didn't micromanage the teams, but

7     we had a -- a corporate accounting calendar

8     that we use as kind of a tickler file to keep

9     track of payments.

10               I actually, you know, don't know how

11    actively they're using that in -- in prior to

12    2020, but it was actively used at some point.

13               We did look at NexPoint cash

14    periodically and cash for the other advisors as

15    well and payments.  You know, we -- payments

16    like this would have appeared in our cash

17    projections, in the advisor's cash projections.

18               And, again, as like I said earlier,

19    they would have appeared there, so there would

20    be time to plan for making any of these

21    payments.

22         Q.    And based on your experience, would

23    it have been reasonable for NexPoint to rely on

24    the debtors' employees to inform NexPoint of an

25    upcoming payment due on the $30 million

```
 1              WATERHOUSE - 10-19-21

 2   promissory note?

 3              MR. MORRIS:  Objection to form of

 4        the question.

 5              MS. DANDENEAU:  Objection to form.

 6        A.    Yes.  Yes, they did.  I mean, but I

 7   mean, but I don't think these -- these notes

 8   were any secret to anybody.

 9        Q.    I understand, and I'm not suggesting

10   otherwise.

11              MR. RUKAVINA:  Please pull up Alpha

12   2, Mr. Nguyen.

13              (Exhibit A2 marked.)

14        Q.    Now, this document is similar to the

15   ones we've seen before as of December 31, 2020,

16   and I don't see under NTA anything there for

17   paying the promissory note to Highland.

18              Do you see anything like that?

19        A.    I do not.

20              MR. RUKAVINA:  You can pull that --

21   that exhibit down, Mr. Nguyen.

22        Q.    You are aware, of course, by now

23   that, in fact, NexPoint failed to make the

24   payment due December 31, 2020, are you not?

25        A.    I am aware, and yes, I do understand
```

                    WATERHOUSE - 10-19-21

1   it.

2        Q.    Were you aware that Highland

3   accelerated that $30 million promissory note?

4        A.    I am aware.

5        Q.    Were you aware of that acceleration

6   at the time that it occurred?

7        A.    I don't remember specifically.

8        Q.    Do you recall whether anyone asked

9   you -- prior to the acceleration, anyone asked

10  you at Highland, what Highland should do with

11  respect to the missed payment?

12       A.    Did anyone ask me what Highland

13  should do about the missed payment?

14       Q.    Yes, before acceleration.

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I mean, what -- what I recall is

18  there was the -- sorry, are you asking me --

19            MS. DANDENEAU:  Why don't you just

20       repeat the question, Mr. Rukavina.

21       Q.    Let me try again, Mr. Waterhouse,

22  let me try again.

23            I am saying you're the CFO of

24  someone, in this case, Highland, and the

Case 3:21-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 21:51:57 Page 340 of 397
Case 3:21-cv-00881-X Document 179-19 Page 3899/2446 Page 108 of 192 PageID 54830

Page 340

1                    WATERHOUSE - 10-19-21

2    borrower failed to make the required payment.

3    Are you with me so far?

4         A.    I am.

5         Q.    Did anyone then ask you, what should

6    we do with respect to our rights against the

7    borrower that missed the payment?

8         A.    Not that I recall.

9         Q.    Did you play a role in the decision

10   to accelerate that $30 million promissory note?

11        A.    I did not.

12        Q.    Do you recall whether Mr. Seery ever

13   asked you before the acceleration as to whether

14   he should accelerate the note?

15        A.    I don't recall.

16        Q.    And you don't recall when you

17   learned of the acceleration itself?

18             MR. MORRIS:  Objection to the form

19        of that question.

20        A.    It was -- it was sometime in

21   early -- in early 2021.  I don't remember

22   specifically.

23        Q.    But do you recall whether it was

24   after the acceleration had already been

25   transmitted?

```
1                 WATERHOUSE - 10-19-21

2                 MS. DANDENEAU:  Objection to the

3        form of the question.

4        A.    I don't recall.

5        Q.    Do you recall in early to mid

6   January of 2021, after the default, discussing

7   the default with Mr. Dondero?

8        A.    I do recall discussing with

9   Mr. Dondero after December 31, 2020?

10       Q.    Yes, the fact of the default.

11       A.    I don't recall.

12                 MR. RUKAVINA:  Let's pull up my

13  Exhibit 6, Alpha 6.

14                 (Exhibit A6 marked.)

15                 MR. RUKAVINA:  And, Mr. Nguyen, if

16       you will please scroll down.

17       Q.    This email chain begins with you

18  writing to Ms. Hendrix on January the 12th:

19  NexPoint note to HCMLP.

20                 Do you see that, sir?

21       A.    I do.

22       Q.    Were you discussing this same

23  $30 million note we're talking about right now

24  with Ms. Hendrix?

25       A.    Yes.
```

Page 342

```
                    WATERHOUSE - 10-19-21
 1
 2       Q.    Okay.  Do you recall what prompted

 3   you to send that email to her?

 4       A.    Yes, I had -- I had a conversation

 5   with Jim.

 6       Q.    Okay.  And what -- what did you

 7   discuss with Jim that led to this email chain?

 8       A.    He -- he called me and he said he

 9   wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13       Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18       A.    No, it was -- it was that morning.

19       Q.    And do you recall how you had that

20   conversation with him?

21            MR. MORRIS:  Objection to the form

22       of the question.

23       Q.    By telephone, by email, in-person?

24       A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in
```

Case 23-00537-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 13:57 34 Desc 397
Case 3:21-cv-00881-X Document 179-19 Page 329/2446 Page 111 of 192 PageID 54833

Page 343

                    WATERHOUSE - 10-19-21

1

2    December of 2020.  He called me from home.  He

3    said he was in court.  He wanted to -- he asked

4    about, you know, making payment on the note and

5    the amount, and so I didn't have those numbers

6    in front of me, so I said I would get back to

7    him.  I wanted all the details, so here is

8    this -- so I reached out to Kristin.

9         Q.    And then she gave you that

10   $1,406,000 figure?

11             MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25             When you conveyed the number to

Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Entered 01/09/24 21:31:57 Page 34 of 397
Case 3:21-cv-00881-X Document 179-19 Page 3999/2446 Page 112 of 192 PageID 54834

Page 344

WATERHOUSE - 10-19-21

1

2    Mr. Dondero, was -- was it also on January

3    12th?

4         A.    Sorry, when I conveyed the

5    $1.4 million number?

6         Q.    Yes.

7         A.    Yes, yes, it was that -- it was --

8         Q.    So you had --

9         A.    It was that point.

10        Q.    Well, to the best of your

11   recollection, you had a conference with

12   Mr. Dondero by the telephone in the morning,

13   and then another conference with him by

14   telephone after 11:40 a.m. that morning?

15        A.    Yeah, I can't remember -- yeah, it

16   was either that morning or it could have been,

17   you know, early afternoon, but again, I

18   remember calling him back, relaying this

19   information to him, and he said, okay, pay --

20   you know, make -- make this payment.

21        Q.    And during either of those two

22   calls, did you tell Mr. Dondero anything to the

23   effect that making those -- I'm sorry, making

24   that payment would not de-accelerate the

25   promissory note?

Case 3:21-cv-00881-X Document 179-19 Filed 10/20/21 Entered 10/20/21 21:51:57 Page 345 of 397
Case 3:21-cv-00881-X Document 179-19 Page 390 of 446 Page 113 of 192 PageID 54835

Page 345

```
1                WATERHOUSE - 10-19-21

2        A.     No.

3        Q.     Did you tell him anything to the

4   effect that making that payment would not cure

5   the default?

6        A.     No.

7        Q.     Did you discuss that in any way with

8   him?

9        A.     No, I did not.

10       Q.     Did he say why he wanted to have

11  that $1.4 million payment made?

12              MR. MORRIS:  Objection to the form

13       of the question.

14       A.     He -- he -- he didn't go into

15  specifics.

16       Q.     Did he say anything to you to the

17  effect that if NexPoint makes that payment,

18  then the note will be de-accelerated?

19              MR. MORRIS:  Objection to the form

20       of the question.

21       A.     I don't recall.

22              MR. RUKAVINA:  You can put this one

23       down, Mr. Nguyen.

24       Q.     And, again, when you say you don't

25  recall, you mean you don't remember right now
```

```
 1                    WATERHOUSE - 10-19-21

 2   either way; correct?

 3        A.    Yeah, I don't remember.  I don't

 4   remember us discussing that.

 5        Q.    Now -- and we're almost done, I

 6   promise.  I'm just going to -- I don't know how

 7   to ask this question, so I'm just going to try

 8   to do my best.

 9              Prior to the default on December 31,

10   2020, did Mr. Seery ever tell you any words to

11   the effect that you or someone at Highland

12   should ensure that NexPoint doesn't make its

13   payment?

14        A.    No.

15        Q.    Did you have any hint or any belief

16   that anyone at NexPoint -- I'm sorry, strike

17   that.

18              Did you have any reason to believe

19   that anyone with Highland was actively trying

20   to get NexPoint to make that default by not

21   paying on December 31?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Are you asking, did any Highland

25   employees actively work to make -- to
```

```
 1              WATERHOUSE - 10-19-21

 2   somehow --

 3        Q.    Yes.  Let me take a step back.  Let

 4   me take a step back.

 5              So you are aware now that as a

 6   result of that default, what was still some

 7   25-year note was accelerated and became

 8   immediately due.  You are aware of that now;

 9   right?

10        A.    Yes.

11        Q.    And can you see how someone at

12   Highland might actually have been pleased with

13   that development?

14              MR. MORRIS:  Objection to the form.

15        Q.    Not that they were --- not that they

16   were pleased, but you can see how someone at

17   Highland might have been pleased with that

18   development?

19              MR. MORRIS:  Objection to the form

20        of the question.

21              MS. DANDENEAU:  Object to form.

22        A.    I don't know how they would have

23   reacted to that.

24        Q.    Okay.  But you're not -- you're not

25   aware of any instructions or any actions being
```

```
                      WATERHOUSE - 10-19-21
 1
 2    given or taken at Highland by Mr. Seery, the
 3    independent board, DSI, that -- that would have
 4    basically led Highland to ensure that NexPoint
 5    would fail to make that payment?
 6          A.    I'm not aware.
 7          Q.    In other words, there wasn't a trick
 8    or a settlement; right?
 9                MS. DEITSCH-PEREZ:  Objection to
10          form.
11                MS. DANDENEAU:  Object to form.
12                MR. MORRIS:  Object to form.
13          A.    I'm not aware.
14                Look, I'm not aware.  I'm not in
15    every conversation.  I mean, and I'm just --
16    again, I'm sitting at home.  It is the end of
17    the year.  Again, I'm not aware.
18          Q.    That is a perfectly legitimate
19    answer.  I don't know why -- why you think
20    otherwise.
21                Okay.  Just give me one second to
22    compose my thoughts.
23                MS. DEITSCH-PEREZ:  While you're
24          taking your one second, why don't we take
25          three minutes.  I will be right back.
```

Case 3:21-cv-00881-X   Document 179-19   Filed 10/20/21   Page 57 of 397
Case 3:21-cv-00881-X   Document 179-19   Filed 10/20/21   Page 117 of 192   PageID 54839
Page 349

```
 1                    WATERHOUSE - 10-19-21

 2                    VIDEOGRAPHER:  Do we want to go off

 3          the record?

 4                    MR. RUKAVINA:  Yes.

 5                    VIDEOGRAPHER:  All right.  We're

 6          going off the record at 6:27 p.m.

 7          (Recess taken 6:27 p.m. to 6:30 p.m.)

 8                    VIDEOGRAPHER:  We are back on the

 9          record at 6:30 p.m.

10                    MR. HORN:  Is Deb back?

11                    MS. DANDENEAU:  Are you asking about

12          me?  I'm here.

13                    MR. HORN:  Oh, okay.  I don't see

14          you, sorry.

15          Q.   Actually, yeah, Mr. Waterhouse, so

16     when you had --

17                    MS. DANDENEAU:  Are you asking about

18          Deb Dandeneau or Deborah?  I mean, there

19          are a lot -- as we talked about, a lot of

20          Debs.  I'm here.

21                    MS. DEITSCH-PEREZ:  I'm here.

22                    MR. HORN:  Yes, I was asking about

23          DDP.

24                    MS. DEITSCH-PEREZ:  Oh, DDP is here.

25                    MR. HORN:  Okay.  Here we go.  I'm
```

Case 23-03037-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:53:57 Desc
Case 3:21-cv-00881-X Document 179-19 Filed 09/09/24 Page 118 of 192 PageID 54840

Page 350

```
1                 WATERHOUSE - 10-19-21

2        going back on mute.

3                 MS. DANDENEAU:  Get the right

4        nomenclature.

5        Q.    Mr. Waterhouse, on January 12th,

6   2021, when you had those talks with Mr. Dondero

7   about the $1.4 million payment, did you have a

8   communication or a conversation with Mr. Seery

9   about that payment after January 12th, 2021?

10       A.    I don't recall.

11       Q.    Well, in response to Mr. Dondero

12  reaching out to you, do you recall on that day,

13  January 12th, talking to Mr. Seery or anyone at

14  Highland other than the email chain we just saw

15  about Mr. Dondero's call with you?

16       A.    Did I talk to -- I spoke with

17  Kristin -- I don't know if I spoke to her.  I

18  likely spoke to Kristin Hendrix because we had

19  to get the wire on NexPoint's behalf to make

20  the payment to Highland.

21       Q.    So it is true, then, that -- that

22  employees of the debtor did actually cause that

23  payment to be made when it was made after

24  January 12th?

25       A.    Yes, I mean, we -- we -- as I
```

Case 3:21-cv-00881-X Document 1719 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 351 of 397
Case 3:21-cv-00881-X Document 179-19 Page 40 of 246 Page 119 of 192 PageID 54841

Page 351

WATERHOUSE - 10-19-21

1

2    testified earlier, we provided that accounting

3    finance treasury function as -- under the

4    shared services agreement.  And so once I

5    got the -- I talked to Jim, got the approval to

6    make this payment, we have to then make the

7    payment, or the team does, and so the payment

8    was made.

9        Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I don't -- I don't recall.

18       Q.    And does that include legal counsel?

19            Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24       A.    I don't recall.

25       Q.    Okay.  Thank you, sir, for your

1                    WATERHOUSE - 10-19-21

2     time.

3                    MR. RUKAVINA:  Pass the witness.

4                    MR. MORRIS:  I just have a few

5          questions, if I may.

6                    MS. DEITSCH-PEREZ:  Don't you go at

7          the end?

8                    MR. MORRIS:  Oh, I apologize.  He is

9          your witness.  I'm surprised you want to

10         ask him questions, but go right ahead.

11                   MS. DEITSCH-PEREZ:  Just have a

12         couple of things.

13                   MR. RUKAVINA:  And I will just

14         object to that, that he's our witness.

15         That's not --

16                   MR. MORRIS:  I'm not talking to you.

17         I'm not talking to you.

18                   MS. DANDENEAU:  Also, Mr. Morris, it

19         is -- it is --

20                   MS. DEITSCH-PEREZ:  He is not my

21         witness.  He's been subpoenaed by you.

22         Okay?

23                   That is no offense, Mr. Waterhouse,

24         I'm -- I'm not -- okay.  Anyway.

25                              EXAMINATION

```
 1              WATERHOUSE - 10-19-21

 2   BY MS. DEITSCH-PEREZ:

 3        Q.   Good evening.  I'm very sorry to be

 4   going last and I know you have had a long and

 5   taxing day, so I thank you for indulging me.

 6             The kinds of services that you

 7   describe that the -- that Highland provided for

 8   NexPoint, did Highland also provide similar

 9   services to that to HCRE and HCMS?

10        A.   Yes.

11             MR. MORRIS:  Objection to the form

12        of the question.

13        Q.   What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16        of the question.

17             MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19             MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.   Let's take them one at a time.
```

```
 1                    WATERHOUSE - 10-19-21

 2               What kinds of services did Highland

 3   provide to HCRE?

 4               MR. MORRIS:  Objection to the form

 5        of the question.

 6        A.    HCMS, Highland employees provided

 7   accounting services, treasury management

 8   services, potentially legal services.  I

 9   don't -- but I wouldn't have been directly

10   involved in that.  But as far as the teams that

11   I manage, it was accounting, treasury, things

12   of that nature.

13        Q.    Okay.  And that was for HCM, LLP --

14        A.    And -- and, sorry, it would also be

15   any asset valuation if needed as well.

16        Q.    Okay.  We went back and forth on

17   each other and I apologize, so just to clarify.

18               You were talking about the services

19   that Highland Capital Management provided to

20   HCMS; is that right?

21        A.    HCMS.  So, again, yes.  And

22   accounting, treasury, valuation, and also tax

23   services too.

24        Q.    Okay.

25        A.    Tax services.  Look, I'm expanding
```

Case 3:21-cv-00881-X Doc 8 Filed 10/20/21 Entered 10/20/21 21:31:57 Page 355 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 123 of 192 PageID 54845

Page 355

 1                   WATERHOUSE - 10-19-21

 2    this, their HR services as well.

 3         Q.    Okay.  And did that include bill

 4    paying?

 5              MR. MORRIS:  Objection to the form

 6         of the question.

 7         Q.    Did the services that HCM provided

 8    to HCMS include bill paying?

 9              MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Yes.

12         Q.    And did the services that HCMLP

13    provided to HCMS include scheduling upcoming

14    bills?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    And did HCMLP regularly pay -- cause

19    to be paid the payments on loans HCMS had from

20    HCMLP?

21              MR. MORRIS:  Objection to the form

22         of the question.

23         A.    Yes.

24         Q.    Typically -- if there is a

25    typically, how far in advance of due dates did

```
1                WATERHOUSE - 10-19-21

2    HCMLP cause HCMS to pay its bills?

3              MR. MORRIS:  Objection to the form

4        of the question.

5        A.    I mean, it -- it -- it depend -- it

6    depended on the nature of the payment and the

7    vendor, but, you know, if there were -- if

8    there were larger scheduled payments, you know,

9    I would like to give at least 30 days notice.

10             And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12       Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14             MR. MORRIS:  Objection to the form

15       of the question.

16       A.    It -- it -- it -- that depended on

17   the nature of the payment.

18       Q.    Okay.  And can you explain what you

19   mean by that?

20       A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.
```

```
1                    WATERHOUSE - 10-19-21
2           Q.    Okay.  Are loan payments the kinds
3    of thing that HCMLP would pay on time because
4    of potential consequences of not paying on
5    time?
6                MR. MORRIS:  Objection to the form
7           of the question.
8           A.    Yes.  As I testified earlier, we
9    would want to give, you know, notice on -- on
10   -- on larger payments and -- and things of that
11   nature so we didn't miss due dates.
12          Q.    Okay.  And over the course of time,
13   did HCMLP generally pay HCMS' loan payments in
14   a timely fashion?
15               MR. MORRIS:  Objection to the form
16          of the question.
17          A.    I can't remember specifically, but
18   generally, yes.
19          Q.    Okay.  Now, did HCMLP provide
20   similar services to HCRE that you have
21   described it provided to HCMS?
22               MR. MORRIS:  Objection to the form
23          of the question.
24          A.    Yes, but I don't think it -- it
25   provided -- I don't think it provided HR
```

1                    WATERHOUSE - 10-19-21

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

Page 359

                    WATERHOUSE - 10-19-21

1

2    loan payment that was due from HCMS to HCMLP in

3    December of 2020?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I don't believe that payment --

7    payment was made.

8         Q.    Okay.  And when HCMLP caused HCMS in

9    the past to make loan payments, whose money did

10   it use to make those payments?

11             MR. MORRIS:  Objection to the form

12        of the question.

13        A.    It was the -- the money in HCMS's

14   operating account would be made to that --

15   those moneys would be used to make payment to

16   Highland Capital Management.

17        Q.    Okay.  And Highland -- is it correct

18   that Highland Capital Management personnel had

19   the access to HCMS's accounts to be able to

20   cause such payments to be made?

21        A.    Yes, Highland personnel had access

22   to those accounts.

23        Q.    Okay.  And so now for HCRE, whose

24   money was used when HCMLP caused HCRE

25   payments -- loan payments to Highland to be

Case 3:10-sj-00889-X Doc 8 Filed 10/20/10 Entered 10/20/10 22:31:57 Desc of 397
Case 3:21-cv-00881-X Document 179-19 Exhibit 19 Filed 04/09/24 Page 128 of 192 PageID 54850

Page 360

```
 1                  WATERHOUSE - 10-19-21

 2   made?

 3             MR. MORRIS:  Objection to the form

 4        of the question.

 5        A.    It was -- it was cash in HCRE's bank

 6   account that would be used to make payments to

 7   Highland Capital Management.

 8        Q.    Okay.  And so did Highland Capital

 9   Management have access to HCRE's funds in order

10   to be able to make such payments?

11             MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25             MR. MORRIS:  Objection to the form
```

Case 3:21-cv-00881-X Document 179-19 Filed 10/20/21 Declared Entered 10/20/21 22:23:57 Page 36 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 129 of 192 PageID 54851
Page 361

```
1                  WATERHOUSE - 10-19-21

2        of the question.

3        A.    I -- I don't recall.

4        Q.    Do you have any reason to believe

5   that either HCRE or HCMS simply didn't have the

6   funds on hand to make the December 2020

7   payments?

8        A.    I don't know.

9        Q.    I guess I'm asking, do you have any

10  reason to believe that they didn't have the

11  funds?

12       A.    We managed cash for so many

13  different entities and funds, and I don't

14  recall, you know, where the cash position was

15  for HCRE and HCMS at 12/31/2020.

16       Q.    Okay.

17       A.    I just don't recall, and I don't --

18  and I don't remember what the loan payment

19  obligations were from HCRE to Highland, and

20  from HCMS to Highland.  I don't recall.  I

21  don't recall, I mean...

22       Q.    Let me come at it a different way.

23  Were the -- were the payments that would

24  otherwise have been due in December of 2020

25  made in January of 2021 for HCMS and HCRE?
```

                            WATERHOUSE - 10-19-21

1

2         A.      I believe the HCRE payment was made

3   in January of 2021.  I don't recall any

4   payments being made from HCMS to Highland.

5         Q.      If it -- how is it the HCRE payment

6   came to be made?  Why did you make it -- why

7   did HCM make the payment in January of 2021?

8         A.      Jim -- Jim called me and instructed

9   me to -- to make the payment on behalf of HCRE,

10  Jim Dondero -- Jim Dondero.

11        Q.      Did he seem upset that -- that the

12  payment had not been made?

13        A.      Yeah.  On the note that was, you

14  know, that was the term note, yes, he -- he was

15  displeased that the -- that the payment had not

16  been made by year-end.

17        Q.      Okay.  And did you make the -- cause

18  the payment to be made as -- as requested?

19        A.      Yes.

20        Q.      And did anyone else from HCM

21  participate with you in causing the payment to

22  be made to -- on the HCRE loan?

23        A.      Yes.  It would have been Kristin

24  Hendrix.  I -- again, I don't -- as I testified

25  earlier, I'm not an officer of HCRE.  I don't

Page 363

```
 1                   WATERHOUSE - 10-19-21

 2    believe I'm an authorized signer.  So I

 3    can't -- other personnel have to make payment

 4    from HCRE to -- to -- to -- to Highland.

 5          Q.    Okay.  And in the conversation

 6    that -- that you had with Mr. Dondero when he

 7    requested the payment to be made, did you say

 8    to him words to the effect, Jim, this loan is

 9    going to stay in default, what are you making

10    the payment for, anything like that?

11          A.    No.

12          Q.    In fact, did you have the impression

13    from him that he thought that the loan would

14    be -- the default would be cured by making the

15    payment?

16                MR. MORRIS:  Objection to the form

17          of the question.

18          A.    Did I get the impression from Jim

19    Dondero that the loan would be cured if the

20    payment from HCRE --

21          Q.    Yeah, if that is what he thought.

22                MR. MORRIS:  Objection to the form

23          of the question.

24          A.    I didn't get any impression from him

25    on that at the time.
```

WATERHOUSE - 10-19-21

1

2    Q.   Do you know whether there was an

3    HCMS term loan that had a payment due in

4    December of 2020?

5    A.   I don't recall.

6    Q.   Okay.  And so the reason you don't

7    recall whether or not there was a payment in

8    January of 2021 is because you just don't

9    remember whether there was such a loan at all?

10        MR. MORRIS:  Objection to the form

11        of the question.

12   A.   I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16   Q.   I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22        MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24   Q.   Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in

Case 23-03005-sgj Doc 80-4 Filed 10/30/23 Entered 10/30/23 21:57:26 Desc
Case 3:21-cv-00881-X Document 179-19 Page 1 of 9446 Page 133 of 192 PageID 54855

Page 365

```
 1                   WATERHOUSE - 10-19-21
 2    January of 2021, do you think it was part of
 3    the same conversation where Jim Dondero said,
 4    hey, why didn't that get paid, please make
 5    that -- get that payment done?
 6              MR. MORRIS:  I object to the form of
 7         the question.
 8         A.    Yes.  Likely it would have been -- I
 9    mean, again, I don't recall a payment being
10    made, but, you know, again, I don't remember
11    everything.
12         Q.    Okay.  Did -- at the time you were
13    communicating with Kristin Hendrix about the
14    payment being made, whichever payments were
15    made in January, did she say anything to you
16    about the payments not curing the loan
17    defaults?
18         A.    No.
19         Q.    Okay.  All right.  So I'm going to
20    take you back to very early in the deposition
21    when Mr. Morris was asking you about the --
22    the -- the -- the agreement with respect to
23    the -- the forgiveness element of the loans, so
24    that is just to orient you.
25              Do you remember that there was a
```

```
 1                  WATERHOUSE - 10-19-21

 2    time that you and Mr. Dondero were

 3    communicating about potential means of

 4    resolving the Highland bankruptcy by what was

 5    colloquially referred to as a pot plan?

 6         A.    Yes.

 7         Q.    Okay.  And can you tell me generally

 8    when that was?

 9         A.    Like mid -- mid 2020, sometime in

10    2020, mid 2020.

11         Q.    Okay.  And did the process of trying

12    to figure out what the numbers should be

13    involve looking at what one should pay for the

14    Highland assets?

15              MR. MORRIS:  Objection to the form

16         of the question.

17         A.    Yes.

18         Q.    Okay.  And did there come a time

19    when you were proposing some potential numbers

20    and Mr. Dondero said something to you like,

21    well, why are you including payment for the

22    related party notes, those, you know, were

23    likely to be forgiven as part of my deferred

24    executive compensation?

25              MR. MORRIS:  Objection to the form
```

Case 3:21-cv-00881-X  Document 179-49  Filed 10/20/23  Entered 10/20/23 21:31:53  Page 367 of 397
Case 3:21-cv-00881-X  Document 179-49  Filed 01/09/24  Page 135 of 192  PageID 54857

Page 367

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we did have that conversation.

 4        Q.    Okay.  Was that conversation in

 5   connection with trying to figure out the right

 6   numbers for a pot plan?

 7        A.    Yeah.  I mean, it was -- it was -- I

 8   mean, Jim -- Jim would ask for, you know,

 9   most -- most recent asset values, you know, for

10   Highland, and -- and myself and the team

11   provided those to him, so it was in that

12   context.

13        Q.    Okay.  And does that refresh your

14   recollection that these communications were in

15   2020 rather than 2021?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    The -- the -- the executive

19   compensation discussions were definitely in

20   2020.

21        Q.    Okay.  Now, did you ever make

22   proposals that took into account Jim's comment

23   that the notes were likely to end up forgiven

24   as part of his compensation?

25             MR. MORRIS:  Objection to the form
```

1              WATERHOUSE - 10-19-21

2          of the question.

3          A.     Yes, we -- the team and myself put

4     together, you know, asset summaries of Highland

5     at various times for all the assets of

6     Highland, and not including the notes.

7          Q.     Okay.  And were those presentations

8     communicated to -- to Mr. Seery?

9          A.     No.  Well, look, I didn't tell -- I

10    didn't tell Mr. Seery.  I don't know what

11    Mr. Dondero did with the information.

12         Q.     Okay.

13         A.     I did not have conversations with

14    Mr. Seery.

15         Q.     Okay.  Do you know who saw the

16    presentations that you put together that didn't

17    include the value of the related party notes?

18         A.     We're talking presentations -- these

19    are -- these are Excel spreadsheets?

20         Q.     Uh-huh.

21         A.     I don't know who -- these were given

22    to -- to Jim Dondero.  I don't know what was

23    done with them after that.

24         Q.     Okay.  You also mentioned earlier

25    that sometime during your tenure at Highland

Case 3:21-cv-00881-X Document 180-1 Filed 10/20/23 Entered 10/20/23 21:58:57 Page 369 of 397
Case 3:21-cv-00881-X Document 179-19 Page 91/89/2446 Page 137 of 192 PageID 54859

Page 369

                       WATERHOUSE - 10-19-21

1    you knew of the practice of giving forgivable

2    loans to executives.

3         MR. MORRIS:  Objection to the form

4         of the question.

5         Q.   Can you -- can you tell me what you

6    recall about that practice?

7         MR. MORRIS:  Objection to the form

8         of the question.

9         A.   Yes, so there were -- there were --

10   during my tenure at Highland, there were loans

11   or -- given to employees that were later

12   forgiven at a future date and time.

13        Q.   Okay.  And when the loans were

14   given, did the notes, to your recollection, say

15   anything about the potential forgiveness term?

16        MR. MORRIS:  Objection to the form

17        of the question.

18        A.   When you say "did the notes," did

19   the promissory notes detail the forgiveness?

20        Q.   Yes.

21        A.   Not that I recall.

22        Q.   And until such time as whatever was

23   to trigger the forgiveness occurred, were the

24   notes bona fide notes as far as you were

Case 3:21-cv-00881-X Document 179-19 Filed 10/20/23 Entered 10/20/23 21:53:57 Page 370 of 397
Case 3:21-cv-00881-X Document 179-19 Page 00199/2446 Page 138 of 192 PageID 54860

Page 370

1                    WATERHOUSE - 10-19-21

2    concerned?

3                    MR. MORRIS:  Objection to the form

4         of the question.

5         A.    Yes, similar to -- yes.

6         Q.    Okay.  You were going to say similar

7    to what?

8         A.    Mr. Morris earlier today showed

9    notes of the financial statements about various

10   affiliate loans.  I -- I -- I do recall these

11   notes because I -- at that time personally

12   worked on the -- the financial statements of

13   Highland.  That was, you know, in my role as a

14   corporate accountant.

15                  And there were -- those loans

16   were -- to the partners were detailed in the

17   notes to the financial statements, similar to

18   what we went through earlier today in the prior

19   testimony about what we saw with Highland

20   and -- and -- and the -- and HCMFA.

21        Q.    Is it fair to say that on Highland's

22   balance sheet there were any number of assets

23   that the value of which could be affected by

24   subsequent events?

25                  MR. MORRIS:  Objection to the form

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes.  I mean, yes, that -- there

 4   are.  And that is -- yes.

 5        Q.    Okay.  And is it typical accounting

 6   practice that until there is some certainty

 7   about those potential future events, that asset

 8   value listed on -- on the books doesn't take

 9   into account those potential future events?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25             MR. MORRIS:  Objection to the form
```

```
 1                 WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    The accounting standard is you have

 4   to estimate to the best -- you know, to -- to

 5   the best of your ability, the fair value of an

 6   asset as of the balance sheet date under --

 7   under GAAP.

 8        Q.    Did -- strike that.

 9              Okay.  Give me a minute.  I'm

10   close -- I'm close to done.  Let me just go off

11   and look at my notes for a second.  So take two

12   minutes.

13              VIDEOGRAPHER:  We're going off the

14        record at 7:02 p.m.

15        (Recess taken 7:02 p.m. to 7:03 p.m.)

16              VIDEOGRAPHER:  We are back on the

17        record at 7:03 p.m.

18        Q.    Mr. Waterhouse, is it generally your

19   understanding that people you work with now

20   have been asking the debtor for full and

21   unfettered access to their own former files?

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes, I am -- I am generally aware.

25        Q.    Okay.  And do you think you could
```

1                    WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4              MR. MORRIS:  Objection to the form

5         of the question.

6         A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10             You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15        Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17        A.    Yes.

18        Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20             MR. MORRIS:  Objection to the form

21        of the question.

22        A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

```
 1                    WATERHOUSE - 10-19-21

 2               Is that -- I don't know the

 3    relationship.  So, again, I'm not the lawyers.

 4    I've said many times.  But my understanding is

 5    the litigation trust is suing me.  I could be

 6    wrong there.  I don't know.

 7          Q.   Okay.  I understand.

 8               Someone with some connection to the

 9    Highland debtor has brought a claim against

10    you; is that fair?

11               MR. MORRIS:  Objection to the form

12          of the question.

13          A.   Yes.

14          Q.   Okay.  And is there also some motion

15    practice in the bankruptcy where the debtor or

16    someone associated with the debtor is

17    attempting to undo something that was

18    previously resolved with you?

19          A.   Yes.

20          Q.   And so in one action somebody is

21    associated with the debtors trying to --

22    threatening you with trying to take money from

23    you, and then in the other -- and trying to --

24    and in the other they are threatening not to

25    pay you things that had previously been agreed;
```

Case 23-03007-sgj Doc 88 Filed 10/20/21 Entered 10/20/21 22:31:55 Page 375 Test 397
Case 3:21-cv-00881-X Document 179-19 Page 0209/2446 Page 143 of 192 PageID 54865

Page 375

                    WATERHOUSE - 10-19-21

1    is that correct?

2         MR. MORRIS:  Objection to the form

3         of the question.

4    A.    I want to be -- yes, I -- there

5    is -- I'm being sued, again, on -- on something

6    that was agreed to with Mr. Seery and myself.

7    I don't -- I don't -- I don't own that claim.

8         Q.    Okay.

9    A.    To be transparent, I don't own that

10   claim.  So it is not my personal property.

11        Q.    Okay.

12   A.    And -- and being the nonlawyer, I

13   don't know how I can get sued for something

14   that I don't owe or, like, I don't own

15   anything.  I'm not the lawyer.  But, I mean, if

16   that is -- if I'm understanding the facts

17   correctly.

18        Q.    Okay.  And the lawsuit that was

19   filed that names you, that was just filed

20   this -- this past week; is that right?

21        MS. DANDENEAU:  Ms. Deitsch-Perez, I

22        do want to interrupt at this point because

23        just as I told Mr. Morris, that this is a

24        deposition about the noticed litigation.

Case 3:21-cv-00881-X Document 179-49 Filed 01/09/24 Entered 01/09/24 21:38:57 Desc
Case 3:21-cv-00881-X Document 179-49 Page 425 of 446 Page 144 of 192 PageID 54866

Page 376

 1                 WATERHOUSE - 10-19-21

 2            I really don't want to go -- go

 3      afield --

 4            MS. DEITSCH-PEREZ:  Yeah.

 5            MS. DANDENEAU:  -- and open up a

 6      whole new line of inquiry about the lawsuit

 7      or the -- the motion and the bankruptcy

 8      court.  We will be here all night.

 9            MS. DEITSCH-PEREZ:  And I

10      understand.

11      Q.    My -- my point is:  Do you feel

12      like -- like there is some effort by these

13      parties related to the debtor to intimidate

14      you -- not that you -- I'm not saying you are

15      or you aren't.

16            But do you feel like there is some

17      effort to intimidate you and maybe an effort to

18      deter you from being as prepared as you might

19      be in this deposition?

20            MR. MORRIS:  Objection to the form

21      of the question.

22      A.    I was -- I was surprised by the

23      lawsuit, by me being named, because, again, I

24      don't own the asset and things like that.

25      Yeah, I just -- I want to move forward with my

Page 377

```
 1                  WATERHOUSE - 10-19-21

 2     life at Skyview.

 3                  MS. DEITSCH-PEREZ:  Thank you.

 4                  THE WITNESS:  Thank you.

 5                     FURTHER EXAMINATION

 6     BY MR. MORRIS:

 7          Q.   If I may, I just have a few

 8     questions.

 9                  Mr. Waterhouse, we saw a number of

10     documents that Mr. Rukavina put up on the

11     screen where Ms. Hendrix would send you a

12     schedule of payments that were due on behalf of

13     certain Highland affiliates.

14                  Do you remember that?

15          A.   Yes.

16          Q.   And in each instance she asked for

17     your approval to make the payments; is that

18     right?

19          A.   Yes, she did.

20          Q.   And was that the -- was that the

21     practice in the second half of 2020 whereby

22     Ms. Hendrix would prepare a list of payments

23     that were due on behalf of Highland associates

24     and ask for approval?

25          A.   Yes.
```

Page 378

 1                    WATERHOUSE - 10-19-21

 2         Q.    And I think you said that there was

 3    a -- a --

 4         A.    It was -- I think I testified to

 5    this earlier when we talked about procedures

 6    and policy, you know, again, I want to be

 7    informed of -- of -- of -- of -- of any

 8    payments that are going out.  I want to be made

 9    aware of these payments, and that was just a

10    general policy, not just for 2020.

11         Q.    Okay.  So it went beyond 2020?

12         A.    Yes.

13         Q.    Is that right?

14         A.    Yes.

15         Q.    Okay.  And the corporate accounting

16    group would prepare a calendar that would set

17    forth all of the payments that were anticipated

18    in the -- in the three weeks ahead; is that

19    right?

20         A.    I -- like I testified earlier, we

21    had a corporate calendar that was set up, you

22    know, to -- to provide reminders or, you know,

23    of anything of any nature, whether it is

24    payments or -- or financial statements or, you

25    know, whatever it is, you know, to meet

Case 23-03035-sgj Doc 80-4 Filed 10/20/21 Entered 10/20/21 21:31:53 Page 379 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 147 of 192 PageID 54869

Page 379

```
 1                WATERHOUSE - 10-19-21

 2    deadlines.

 3                I don't know how, as I testified

 4    earlier, how much they were using that

 5    calendar.

 6        Q.    Okay.  But -- but you did get notice

 7    and a request to approve the payments that were

 8    coming due on behalf of Highland's affiliates.

 9    Do I have that right?

10                MS. DANDENEAU:  Objection to form.

11        A.    I mean, generally, yes.  I mean, you

12    know, as we saw with these emails, generally, I

13    mean, did that encompass everything, no.

14        Q.    Okay.  Do you know why the

15    payment -- do you know why there was no payment

16    made by NexPoint at the end of 2020?

17        A.    Yes.  There was -- there was -- we

18    talked about these agreements between the

19    advisors and Highland, the shared services and

20    the cost reimbursement agreement.

21                And in late 2020, there were

22    overpayments, large overpayments that had been

23    made over the years on these agreements, and it

24    was my understanding that the advisors were --

25    were talking with -- like Jim Seery and others
```

Case 3:10-05327-sgj Doc 8 Filed 10/20/21 Entered 10/20/21 21:35:57 Page 380 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 148 of 192 PageID 54870
Page 380

```
1                  WATERHOUSE - 10-19-21

2    to offset any obligations that the advisors

3    owed to Highland as offset to the overpayments

4    on these agreements.

5         Q.    Okay.  Did you participate in any of

6    those conversations?

7         A.    I did not.

8         Q.    Okay.  Do you know -- do you recall

9    that the -- at the end of November, the debtor

10   did notice to the advisors of their intent to

11   terminate the shared services agreements?

12        A.    Like I testified earlier, there

13   was -- the agreements weren't identical, from

14   what I recall, and there is one that had a

15   longer notice period, which I think had a

16   60-day notice period.  I don't recall which one

17   that was, so not all of them were -- notice

18   hadn't been given as of November 30th, for all

19   of the agreements.

20        Q.    Upon the receipt of the -- the

21   termination notices that you recall, do you

22   know if the advisors decided at that point not

23   to make any further payments of any kind to

24   Highland?

25             MR. RUKAVINA:  Objection, form.
```

```
 1                  WATERHOUSE - 10-19-21

 2         A.    No.   The advisors -- the advisors

 3    had stopped making payments prior to that

 4    notice.

 5         Q.    Okay.   And how do you know that the

 6    advisors stopped making -- making payments

 7    prior to the notice?

 8         A.    I had -- I had a conversation

 9    with -- with Jim Dondero.

10         Q.    And did Mr. Dondero tell you that

11    the advisors would no longer make payments to

12    Highland?

13              MS. DEITSCH-PEREZ:   Object to the

14         form.

15         A.    Yes, he -- he -- again, he said

16    they -- they -- the advisors have overpaid on

17    these agreements, to not make any future

18    payments, and that there needs to be offsets,

19    and they're working on getting offsets to these

20    overpayment.

21         Q.    Do you know if anybody ever

22    instructed Highland's employees to make the

23    payment that was due by NexPoint at the end of

24    the year?

25         A.    Did anyone instruct Highland's
```

Case 3:00500187-sgj Doc 8 Doc Filed 10/20/210/29/21ared Entered 10/20/210/29/21 31:57 37 38 of 397
Case 3:21-cv-00881-X Document 179-19 Exhibit 19 Page 03/09/2446 Page 150 of 192 PageID 54872

Page 382

```
 1                   WATERHOUSE - 10-19-21

 2    employees to make that payment?

 3         Q.    Correct.

 4         A.    Anyone -- not that I'm aware.

 5         Q.    Were any of Highland's employees

 6    authorized to make the payments on behalf of

 7    its affiliates -- withdrawn.

 8               Was any of Highland's employees

 9    authorized to effectuate the payment on behalf

10    of NexPoint that was due at the end of the year

11    without getting approval from either you or

12    Mr. Dondero?

13         A.    They had the -- they had the ability

14    to make the payment, but they didn't -- you

15    know, that -- that payment needed to be

16    approved.

17         Q.    Okay.  And it needed to be approved

18    by you or Mr. Dondero; is that right?

19         A.    I mean, I'm not going to make the

20    unilateral decision.

21         Q.    Is that a decision that you

22    understood had to be made by Mr. Dondero?

23         A.    Yes.  Sitting back in December of

24    2020, the -- that -- there was this off --

25    offset negotiation that -- that was happening,
```

WATERHOUSE - 10-19-21

1
2   so I mean, until those negotiations were
3   resolved, you know, there wasn't any
4   payments -- there weren't any payments.
5       Q.    And -- and there were no payments
6   until the negotiations were resolved because
7   that was the directive that you received from
8   Mr. Dondero; correct?
9       A.    I don't think he said -- I mean, I
10  think -- yeah, I mean -- I'm trying to recall
11  the conversation.  It was -- you know, there
12  is -- there is these negotiations.  There's --
13  there needs to be these offsets.  They're
14  talking with the debtor.  So, you know, until
15  this is resolved, right, I mean, depending on
16  how, whatever that resolution was, were we to
17  take any action.
18      Q.    Okay.  How about with respect to
19  HCMS, did HCMS have a term payment due at the
20  end of the year?
21      A.    Again, I don't -- I don't recall.
22      Q.    Okay.  You discussed briefly two
23  payments that were made in January of 2021, one
24  on behalf of NexPoint, and one on behalf of
25  HCMS.  Do I have that right?

Case 3:21-cv-00881-X Doc File 10/20/21 Prepared En 10/20/21 09:21:57 Page 38 Desc 397
Case 3:21-cv-00881-X Document 179-19 Page 0339/2446 Page 152 of 192 PageID 54874

Page 384

```
 1                  WATERHOUSE - 10-19-21

 2        A.    No.   The two payments I recall were

 3   NexPoint and HCRE.

 4        Q.    Okay.  And those two payments --

 5   thank you for the correction.  And those two

 6   payments were made because Mr. Dondero

 7   authorized those payments to be made; correct?

 8        A.    Yes.

 9        Q.    And they hadn't been made before

10   that because Mr. Dondero had not authorized

11   them to be made?

12              MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    Yes, because of these negotiations.

15        Q.    Okay.  Just a couple of more

16   questions.

17              Did anybody, to the best of your

18   knowledge, on behalf of HCMFA, ever tell the

19   SEC that HCMLP was responsible for the mistakes

20   that were made on the TerreStar valuation?

21        A.    Did anyone from Highland on HCMFA's

22   behalf tell the SEC that Highland -- that

23   Highland was responsible for there -- I just

24   want to make sure --

25        Q.    It was a little bit different, so
```

```
 1                   WATERHOUSE - 10-19-21
 2    let me try again.
 3         A.     These are very long questions, John.
 4    I'm not trying to be --
 5         Q.     That is good.  Do you know whether
 6    anybody -- do you know whether anybody on
 7    behalf of HCMS -- HCMFA ever told the SEC that
 8    Highland was the responsible party for the
 9    TerreStar valuation error?
10         A.     Not that I'm aware.
11         Q.     Okay.  Did anybody on behalf of
12    the -- on behalf of HCMFA ever tell the retail
13    board that Highland was responsible for the
14    TerreStar valuation error?
15         A.     Not that I'm aware.
16         Q.     Do you know if HCMFA made an
17    insurance claim with respect to the damages
18    that were incurred in relation to the TerreStar
19    valuation error?
20         A.     Yes.
21         Q.     And do you know why they made that
22    insurance claim?
23         A.     Because there was an error.  I
24    mean --
25         Q.     Was the insured's claim made -- was
```

Case 23-03007-sgj Doc 84 Filed 10/20/21 Entered 10/20/21 22:31:57 Page 386 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 01/09/24 Page 154 of 192 PageID 54876

Page 386

1    WATERHOUSE - 10-19-21

2    the insurance claim made under HCMFA's policy?

3        A.    Yes.

4        Q.    Did HCMFA at any time prior to the

5    petition date -- withdrawn.

6              You were asked a couple of questions

7    where -- where you said that Mr. Dondero told

8    you that he was ascribing zero value to the

9    notes as part of a pot plan because he believed

10   that the notes were part of executive

11   compensation.

12             Do I have that right?

13             MS. DEITSCH-PEREZ:  Object to the

14        form.

15       A.    Yes.

16       Q.    Okay.  Have you ever heard that

17   before the time that Mr. Dondero told you that

18   in the conversation about the pot plan?

19       A.    Had I heard that prior to my

20   conversation with Mr. Dondero?

21       Q.    Yes.

22       A.    No, I had not heard that prior.

23       Q.    Okay.  And that was in the context

24   of his formulation of the settlement proposal;

25   is that right?

```
 1                    WATERHOUSE - 10-19-21

 2         A.    I mean, generally, yes.  You know,

 3    we were asked to provide asset values, right,

 4    and he was having settlement discussions.

 5    Again, I don't know who those went to

 6    ultimately.  I don't recall.

 7               MR. MORRIS:  I have no further

 8         questions.  Thank you very much for your

 9         patience.  I apologize for the late hour.

10               MS. DEITSCH-PEREZ:  John, you stay

11         on about your email when --

12               MR. RUKAVINA:  Hold on, I'm not

13         done.

14               MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15         still has questions.  Sorry.  I was going

16         to say both John and Davor, could you stay

17         on afterwards just to talk about the

18         requests.

19                    FURTHER EXAMINATION

20    BY MR. RUKAVINA:

21         Q.    Mr. Waterhouse, you were just now

22    testifying about a discussion you had with

23    Mr. Dondero where he said something like no

24    more payments.

25               Do you remember that testimony?
```

Case 21-03005-sgj Doc 80 Filed 10/20/21 Entered 10/20/21 21:15:57 Page 57 of 397
Case 3:21-cv-00881-X Document 179-19 Page 4379/2446 Page 156 of 192 PageID 54878
Page 388

```
 1                  WATERHOUSE - 10-19-21

 2        A.    Yes.

 3        Q.    Okay.  And was that late November or

 4   early December of 2020?

 5        A.    It was, I would say, first or second

 6   week of November.

 7        Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11        A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13        Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    That is correct.

22        Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25             But had -- by that time that you
```

```
1                    WATERHOUSE - 10-19-21

2    talked to Mr. Dondero, had your office or you

3    done any estimate of what the alleged

4    overpayments were?

5                    MR. MORRIS:  Objection to the form

6         of the question.

7         A.    Yes, we had -- there was a -- there

8    was a detailed analysis that was put together

9    by David Klos at the time.

10        Q.    And do you recall just generally

11   what the total amount for both advisors of the

12   overpayments was?

13        A.    It was in excess of $10 million.

14        Q.    Was it in excess of $14 million?

15                    MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I -- I remember it was an

18   eight-figure number.  I don't remember

19   specifically.

20        Q.    Okay.  And did you convey that

21   number to Mr. Dondero when you had that

22   conversation?

23        A.    Yes.

24        Q.    What was his reaction?

25        A.    I mean, he wasn't happy.
```

Case 3:21-cv-00881-X   Document 179   Filed 10/20/21   Entered 10/20/21 21:31:57   Page 390 of 397
Case 3:21-cv-00881-X   Document 179-19   Page 0399/2446   Page 158 of 192   PageID 54880

Page 390

                    WATERHOUSE - 10-19-21

1

2        Q.    Is it fair to say he was upset?

3        A.    Yes.

4        Q.    Did Mr. Dondero ever expressly tell

5   you to not have NexPoint make the required

6   December 31, 2020, payment?

7        A.    Yes, I recall him saying don't make

8   the payment because it was being negotiated, as

9   I discussed with Mr. Morris, this offset

10  concept.  So there were obligations due by the

11  advisors to Highland, they should be offset

12  that -- you know, those obligations should be

13  offset by this -- by this overpayment.

14       Q.    And when did he tell you that?

15       A.    I would say -- I would say around --

16  probably December -- December-ish.

17       Q.    Early December, late December?

18       A.    I don't recall with as much

19  specificity as -- as -- as -- as stopping the

20  shared services payments, because we had

21  actually made one shared services payment in

22  November.  So that is why I need to remember

23  that one more clearly.  I don't remember where

24  exactly in December that conversation occurred.

25       Q.    Did Mr. Dondero expressly use the

Case 3:21-cv-00881-X Document 8 Filed 10/20/21 Entered 10/20/21 21:58:57 Page 39 Desc
Case 3:21-cv-00881-X Document 179-19 Page 04/09/2446 Page 159 of 192 PageID 54881

Page 391

```
1                   WATERHOUSE - 10-19-21

2      word "NexPoint" when he was saying don't make

3      these payments?

4               MR. MORRIS:  Objection to the form

5           of the question, asked and answered.

6          A.    Yeah, we were -- we were discussing

7      advisor obligations.  So it was -- you know, it

8      was just obligations from the advisors.

9               And -- and he specifically talked

10     about the NexPoint payment as well.

11         Q.    Okay.  And it is your testimony that

12     he expressly told you not to make that NexPoint

13     December 31 payment?

14              MR. MORRIS:  Objection, asked and

15          answered twice.

16         A.    Yes, he -- he did, during that

17     conversation.

18         Q.    And did you ever follow up with him

19     after that about whether NexPoint should or

20     shouldn't make that payment?

21         A.    I did not.

22         Q.    Did you ever, on or about

23     December 31, 2020, remind him and say, hey,

24     this payment is due, what shall I -- what

25     should I do?
```

```
 1                WATERHOUSE - 10-19-21

 2        A.     I did not.

 3        Q.     So sitting here today, you -- you

 4   remember distinctly that Dondero in December of

 5   2020 expressly told you not to have NexPoint

 6   make that payment?

 7              MR. MORRIS:  Objection, asked and

 8         answered three times.

 9        A.     Yes.

10        Q.     Can you say categorically it wasn't

11   just some general discussion where he told you

12   not to make payments?

13              MR. MORRIS:  Objection, asked and

14         answer four times.

15              MR. HORN:  Four times now.  Go for

16         five.

17        A.     Yes.

18        Q.     Did you tell Mr. Seery that?

19        A.     I don't believe I did.  I don't

20   recall.

21        Q.     And was this an in-person discussion

22   or telephone or email?  Do you remember?

23        A.     This was a phone -- a phone

24   conversation.

25        Q.     Okay.  Would you have a record of --
```

 1                    WATERHOUSE - 10-19-21

 2    on your cell phone of when that conversation

 3    might have taken place?

 4                    I'm sorry, strike that.

 5                    Was that by cell phone?

 6         A.    I believe -- yes, because we -- I

 7    was at home.  I mean, I don't have a landline.

 8    All I have is my cell phone.

 9         Q.    Do you know whether your cell phone

10    still has records of conversations from

11    December 2020 on it?

12         A.    My call log doesn't go back that

13    far.

14         Q.    Okay.  Thank you.

15                    MR. RUKAVINA:  I will pass the

16    witness.

17                    MS. DEITSCH-PEREZ:  Just a couple

18         quick questions.

19                    FURTHER EXAMINATION

20    BY MS. DEITSCH-PEREZ:

21         Q.    With respect to HCRE and HCMS, am I

22    correct there was -- there was no direction not

23    to pay those loan payments?

24                    MR. MORRIS:  Objection to the form

25         of the question.

Case 3:21-cv-00881-X Doc 8 Doc Filed 10/20/21 Entered 10/20/21 22:31:57 Page 394 Desc 397
Case 3:21-cv-00881-X Document 79-19 Page 04/39/2446 Page 162 of 192 PageID 54884

Page 394

```
1              WATERHOUSE - 10-19-21

2        A.    Yes, I don't recall having

3   conversations about, you know, those -- those

4   entities.

5        Q.    And, in fact, what was the tone that

6   Mr. Dondero had when he talked to you about the

7   fact that HCRE and HCMS payments hadn't been

8   made when he found out that they hadn't been

9   paid?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  Objection to form.

12       Q.    What was the tone he took with you?

13       A.    Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16       Q.    Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19             MR. MORRIS:  Objection to the form

20       of the question.

21       A.    Yes.

22       Q.    Okay.  Thank you.

23             MR. MORRIS:  I have nothing further.

24       Thank you so much, Mr. Waterhouse.

25             MR. HORN:  I have no questions.
```

Case 3:21-cv-00881-X Doc 8 Doc Filed 10/20/21/29/21 red 10/20/21/29/21 81:57 Page 395 of 397
Case 3:21-cv-00881-X Document 179-19 Filed 04/09/24 Page 163 of 192 PageID 54885

Page 395

```
 1                    WATERHOUSE - 10-19-21

 2          Thank you, Mr. Waterhouse.  We appreciate

 3          your time.  I am logging off the discussion

 4          and I will talk to y'all tomorrow.

 5                    MR. MORRIS:  Super.

 6                    VIDEOGRAPHER:  If there are no

 7          further questions, this ends the

 8          deposition -- excuse me.  This ends the

 9          deposition, and we are going off the record

10          at 7:30 p.m.

11          (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                    FRANK WATERHOUSE

15

16     Subscribed and sworn to before me

17     this      day of             2021.

18

19     ---------------------------------

20

21

22

23

24

25
```

```
 1              WATERHOUSE - 10-19-21

 2              C E R T I F I C A T E

 3

 4        I, SUSAN S. KLINGER, a certified shorthand

 5   reporter within and for the State of Texas, do

 6   hereby certify:

 7        That FRANK WATERHOUSE, the witness whose

 8   deposition is hereinbefore set forth, was duly

 9   sworn by me and that such deposition is a true

10   record of the testimony given by such witness.

11        I further certify that I am not related to

12   any of the parties to this action by blood or

13   marriage; and that I am in no way interested in

14   the outcome of this matter.

15        IN WITNESS WHEREOF, I have hereunto set my

16   hand this 19th of October, 2021.

17

18        _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25
```

```
 1              WATERHOUSE - 10-19-21

 2   NAME OF CASE:  In re:  Highland Capital

 3   DATE OF DEPOSITION:  October 19, 2021

 4   NAME OF WITNESS:  Frank Waterhouse

 5   Reason Codes:

 6         1.  To clarify the record.

 7         2.  To conform to the facts.

 8         3.  To correct transcription errors.

 9   Page____Line_____Reason_____

10   From_____to_____

11   Page____Line_____Reason_____

12   From_____to_____

13   Page____Line_____Reason_____

14   From_____to_____

15   Page____Line_____Reason_____

16   From_____to_____

17   Page____Line_____Reason_____

18   From_____to_____

19   Page____Line_____Reason_____

20   From_____to_____

21   Page____Line_____Reason_____

22   From_____to_____

23   Page____Line_____Reason_____

24   From_____to_____

25
```

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |  |
| *Defendants.* | § |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § |  |
| *Plaintiff,* | § § | Adversary Proceeding No. |
| vs. | § § | 21-03007-sgj |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |  |
| *Defendants.* | § |  |

**HIGHLAND'S OBJECTION TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings. Highland fully incorporates by reference its contemporaneously filed brief (the "Brief")[3] in opposition to the Motions and would show unto the Court as follows:

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] Capitalized terms used but not defined herein shall take on the meaning scribed thereto in the Brief.

## RELIEF REQUESTED

1.      By this Objection, Highland respectfully requests that the Court enter an order denying the Motions seeking to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order.

2.      Pursuant to Rules 7.1(d) and (h) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), the Brief is being filed contemporaneously with this Objection and is incorporated by reference.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Highland respectfully requests that the Court enter an order (i) denying in whole the relief requested in the Motions, and (ii) granting Highland such further and additional relief as the Court deems just and proper.

Dated:  December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:      MHayward@HaywardFirm.com
             ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

4

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

HIGHLAND CAPITAL MANAGEMENT §
SERVICES, INC., JAMES DONDERO, NANCY §
DONDERO, AND THE DUGABOY §
INVESTMENT TRUST, §
                                         §
                                         §
                    Defendants.          §
HIGHLAND CAPITAL MANAGEMENT, L.P.,       §
                                         §
                    Plaintiff,           §    Adversary Proceeding No.
                                         §
vs.                                      §    21-03007-sgj
                                         §
HCRE PARTNERS, LLC (N/K/A NEXPOINT       §
REAL ESTATE PARTNERS, LLC), JAMES        §
DONDERO, NANCY DONDERO, AND THE          §
DUGABOY INVESTMENT TRUST,                §
                                         §
                    Defendants.          §

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................................... 4

    A.    The Note ......................................................................................................... 4

    B.    NexPoint Defaults under the Note and Highland Sues to Collect ....................................... 5

    C.    NexPoint Blames Highland for Its Default.......................................................... 6

    D.    The Court Enters the Scheduling Order ........................................................... 6

    E.    Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any
        Payments to Highland ............................................................................. 7

    F.    Highland's Obligations under the Shared Services Agreement Were Limited to
        Those "Specifically" Identified Therein .................................................... 8

    G.    The Instant Motion ....................................................................................... 9

III.  ARGUMENT.......................................................................................................... 9

    A.    NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law ................... 9

    B.    NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling
        Order.................................................................................................. 10

        1.    NexPoint's Explanation for Failing to Timely Designate an Expert Is
            Deficient ............................................................................... 12

        2.    NexPoint's Suggested "Expert" Testimony Is Irrelevant .......................... 13

        3.    Allowing the Testimony Would Prejudice Highland ................................. 15

    C.    HCRE's and HCMS's Joinders Have Even Less Merit than the Motion and Should
        Be Denied ........................................................................................... 17

CONCLUSION............................................................................................................... 17

DOCS_NY:44447.9 36027/003

## TABLE OF AUTHORITIES

**Cases**

*Askanase v. Fatjo*,
    130 F.3d 657 (5th Cir. 1997) .................................................. 10

*Binh Hoa Le v. Exeter Fin. Corp.*,
    3:15-CV-3839-L, 2019 WL 1436375 (N.D. Tex. Mar. 31, 2019) ......................... 12, 13, 17, 18

*Charalambopoulos v. Grammer*,
    3:14-CV-2424-D, 2017 WL 930819 (N.D. Tex. Mar. 8, 2017) ............................... 14

*Flax v. Quitman County Hosp.*,
    *LLC*, 2:09-CV-101-M-D, 2011 WL 3585870 (N.D. Miss. Aug. 16, 2011) ............................ 10

*Geiserman v. MacDonald*,
    893 F.2d 787 (5th Cir.1990) ..................................................... passim

*Grand Time Corp. v. Watch Factory, Inc.*,
    3:08-CV-1770-K, 2009 WL 10678210 (N.D. Tex. Nov. 18, 2009) .................................. 11, 12

*Hanspard v. Otis Elevator Co.*,
    CIV.A. 05-1292, 2007 WL 839994 (W.D. La. Jan. 12, 2007) ................................. 10

*Henderson v. Atmos Energy*,
    496 F. Supp. 3d 1011 (E.D. La. 2020) ...................................................... 16

*Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*,
    CV 12-1026, 2014 WL 12721924 (E.D. La. Nov. 7, 2014) ................................... 15

*Panhandle Advert., LLC v. United Rentals Realty*,
    *LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901 (N.D. Tex. Feb. 12, 2021) ........................ 9, 10

*Pipitone v. Biomatrix, Inc.*,
    288 F.3d 239 (5th Cir. 2002) .................................................. 14

*Reliance Ins. Co. v. Louisiana Land & Expl. Co.*,
    110 F.3d 253 (5th Cir. 1997) ............................................... 12, 13, 17

*Rolls-Royce Corp. v. Heros, Inc.*,
    CIV.A. 307-CV-0739-D, 2010 WL 184313 (N.D. Tex. Jan. 14, 2010) ................................. 15

*S&W Enters., L.L.C. v. SouthTrust Bank of Alabama, NA*,
    315 F.3d 533 (5th Cir. 2003) ............................................... 12, 17

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*,
    438 F. Supp. 2d 696 (E.D. Tex. 2006) ...................................................... 10

ii

**<u>Rules</u>**

Fed. R. Civ. P. 16(b)(4)................................................................................................................ 11

**HIGHLAND'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO
MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES**

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings.[3]  In support of its Objection, Highland respectfully states as follows:

## I.  PRELIMINARY STATEMENT[4]

1.    NexPoint's Motion to modify the Scheduling Order is without merit and should be denied.

2.    This Adversary Proceeding arises from NexPoint's default under its Note in the original principal amount of $30.7 million.  The Note required NexPoint to make Annual Installment payments to Highland on December 31 of each year.

3.    NexPoint blames Highland for its failure to timely make the Annual Installment payment.  Initially, NexPoint contended that Highland breached its obligations by negligently failing to make the payment on NexPoint's behalf.  Then, Frank Waterhouse, an officer of NexPoint, a current employee of Skyview (the entity that services numerous of Mr. Dondero's

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] *See Motion of Highland Capital Management Services, Inc. to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 91 in Adversary Proceeding 21-03006 ("HCMS's Joinder") (incorporating NexPoint's Motion), and *Motion of HCRE Partners, LLC to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 86 in Adversary Proceeding 21-03007 ("HCRE's Joinder", and together with HCMS's Joinder, the "Joinders," collectively with the Motion, the "Motions") (incorporating NexPoint's Motion).

[4] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed thereto below.

1

businesses), and Highland's former Chief Financial Officer, testified in his deposition that NexPoint failed to make the Annual Installment payment because Mr. Dondero instructed him in December 2020 not to make *any* payments to Highland from *any* of the entities that Mr. Dondero controlled.

4.      NexPoint contends that, in light of this testimony, an expert is necessary to testify regarding whether Highland violated an "affirmative duty or obligation" it owed to NexPoint under Section 6.01 of the Shared Services Agreement to effectuate the payment on behalf of NexPoint, despite Mr. Dondero's instructions to the contrary.   According to NexPoint:

> [T]he question becomes whether Waterhouse or the Debtor 'put their head in the sand' in violation of any affirmative duty or obligation they may have had regarding the matter, such as; to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint or the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision.

Motion ¶ 13.

5.      NexPoint's Motion to extend the expert disclosure and discovery deadlines in order to retain a testifying expert on Highland's duties of care under the Shared Services Agreement is without merit.

6.      NexPoint's suggested expert testimony is improper because it concerns "the standards and duties of care under the parties' Shared Services Agreement" and otherwise seeks to interpret that Agreement for the Court.   It is black-letter law that the determination of the existence and scope of contractual and other legal duties are improper subjects of expert opinion because they constitute legal conclusions that fall within the exclusive province of the Court.

7.      Even if that were not the case (and it is), NexPoint fails to satisfy its burden of demonstrating "good cause" to modify the Scheduling Order under Rule 16(b) for three independent reasons.   *First*, as set forth below, the Motion is untimely.   *Second*, the suggested expert testimony is irrelevant because it would not assist a factfinder in determining any technical

or complex issues in this case.  By its plain terms, the Shared Services Agreement does not impose an affirmative duty on—or even authorize—Highland to effectuate payments on behalf of NexPoint without authorization from a NexPoint Representative.  NexPoint's reliance on Section 6.01 as the source of Highland's alleged duties is thus misguided, as that provision applies only to duties specifically set forth under the Agreement.[5]  ***Finally***, allowance of the expert testimony at this late juncture would substantially prejudice Highland, with such prejudice being exacerbated (and not cured) by a continuance.  If the Motion is granted, Highland will be forced to expend significant resources addressing NexPoint's latest theories of its defense, including through additional discovery and motion practice.  It will also cause a further delay of the trial on the merits, thereby impeding Highland's ultimate recovery under the Note, all at the expense of Highland's creditors.

8.      Separately, as ill-conceived as the Motion is, the Joinders raise considerable questions of good faith, because neither Highland Management Services, Inc. ("HCMS") nor HCRE Partners, LLC ("HCRE") even alleges that it is a party to a shared services agreement (let alone the Shared Services Agreement submitted with the Motion), nor can it.  The Motion seeks to "designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement," but the Joinders offer no explanation for why such expert testimony would have any relevance to them since they are not parties to ***any*** shared services agreement.

9.      For the reasons set forth herein, Highland respectfully requests that the Court deny the Motion in all respects.

---

[5] NexPoint offers no explanation for why Highland's alleged obligations under the Shared Services Agreement supersede Mr. Waterhouse's fiduciary duties to NexPoint.  If anyone had a duty to ask Mr. Dondero "Are you sure?" or "Do you know what you're doing" (an absurd concept on its own), it was surely Mr. Waterhouse—not in his capacity as a Highland employee—but in his capacity as an officer of, and a fiduciary to, NexPoint.

## II.    STATEMENT OF FACTS

### A.    The Note

10.    On May 31, 2017, James Dondero ("Mr. Dondero") signed a 30-year term note on behalf of NexPoint and in favor of Highland (the "Note").  Morris Dec.[6] Exhibit 1.

11.    The Note consolidated NexPoint's obligations under five Prior Notes (as that term is defined in the Note) and was for an original principal amount of $30,746,812.33.  *See* Morris Dec. Exhibit 1, Ex. A.  Highland received no consideration for consolidating the five demand notes into a single 30-year term note.

12.    NexPoint and Mr. Dondero knew that NexPoint was required to pay Highland in Annual Installments, because it was spelled out plainly in the Note:

> 2.1    Annual Payment Dates.  During the term of this Note, [NexPoint] shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each payment) in thirty (30) equal annual payments (the "Annual Installments") until the Note is paid in full.  ***[NexPoint] shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

Morris Dec. Exhibit 1 § 2.1 (emphasis added).

13.    NexPoint and Mr. Dondero also knew the consequences of failing to timely make the required Annual Installment payments, because they were also spelled out plainly in the Note:

> 4.    Acceleration Upon Default.  ***Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof [i.e., Highland]***, without notice, demand presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable*** and subject to those remedies of the holder hereof [i.e., Highland].

*Id*. § 4 (emphases added).

---

[6] References to "Morris Dec. __" are to the *Declaration of John Morris in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* being filed concurrently herewith.

14.     Finally, Mr. Dondero expressly agreed on behalf of NexPoint to waive any notice of default or acceleration:

> 5.    <u>Waiver</u>.  [NexPoint] hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and all other notices of any kind hereunder.

*Id*. § 5.

15.     Thus, based on the plain terms of the Note executed by Mr. Dondero on NexPoint's behalf at a time when Mr. Dondero indisputably controlled both entities, NexPoint agreed (a) to make Annual Installment payments to Highland on December 31 of each year; (b) that Highland would have the unilateral right upon a default to accelerate all unpaid principal and interest due under the Note without notice or demand; and (c) to waive, among other things, a grace period, notice of nonpayment, notice of intent to accelerate, and "all other notices of any kind hereunder."

**B.**    <u>**NexPoint Defaults under the Note and Highland Sues to Collect**</u>

16.     NexPoint does not dispute that it failed to make the Annual Installment payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

17.     By letter dated January 7, 2021, in an exercise of its unambiguous and unconditional rights under the Note, Highland demanded that NexPoint immediately pay all unpaid principal and interest then due under the Note (the "<u>Demand Letter</u>").  Morris Dec. Exhibit 2.  The Demand Letter stated:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.
>
> The Note is in default, and payment is due immediately.

*Id*.

18.     On January 22, 2021, after NexPoint failed to meet its obligations under the Note, Highland commenced this Adversary Proceeding.  [AP ==Docket No. 1==].

## C.     NexPoint Blames Highland for Its Default

19.     On March 1, 2021, NexPoint filed its *Original Answer* asserting, among other things, that "[p]ursuant to that certain Shared Services Agreement, [Highland] was responsible for making payments on behalf of [NexPoint] under the note" such that any "alleged default" was caused by Highland's own negligence and breach of contract (the "Original Defense"). *Defendant's Original Answer* [AP ==Docket No. 6==] (the "Original Answer") ¶¶ 39-41.

20.     On August 9, 2021, NexPoint filed its *First Amended Answer*, which did not substantively alter its Original Defense.  [AP ==Docket No. 50==] (the "Amended Answer") ¶¶ 39-41.

21.     On September 1, 2021, after Highland amended its Complaint, NexPoint filed its *Answer to Amended Complaint* [AP ==Docket No. 64==] (the "Final Answer").  The Final Answer did not substantively alter NexPoint's Original Defense.  *See id.* ¶¶ 80-82.

22.     Thus, at all times prior to filing the Motion, NexPoint contended that its failure to timely make the Annual Installment due on December 31, 2020 was caused by Highland's own alleged negligence and breach of the Shared Services Agreement.

## D.     The Court Enters the Scheduling Order

23.     On September 6, 2021, the Court entered the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [AP ==Docket No. 70==] (the "Scheduling Order").

24.     The Scheduling Order provides, in pertinent part, that "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021."  Scheduling Order ¶ 3.

E.  **Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any Payments to Highland**

25.     In December 2020, Frank Waterhouse ("Mr. Waterhouse") wore multiple hats that Mr. Dondero gave to him, including: (a) Chief Financial Officer of Highland; (b) Treasurer of NexPoint; (c) Treasurer of HCMS; (d) Treasurer of Highland Capital Management Fund Advisors, L.P. ("HCMFA", and together with NexPoint, the "Advisors"); and (e) Principal Executive Officer of certain funds managed by the Advisors.  *See* Morris Dec. Exhibit 3 at 24:2-25; 35:8-22; 120:7-12; 327:3-8.

26.     At a recent deposition, Mr. Waterhouse testified that NexPoint did not make the Annual Installment payment due on December 31, 2020 because Mr. Dondero had instructed him in December 2020 not to cause any payments to be made to Highland.  Mr. Waterhouse also testified that he never followed up with Mr. Dondero or reminded him that the payment was coming due at the end of the month.  *See* Morris Dec. Exhibit 3 at 390:4-392:17.

27.     Mr. Dondero testified that he was unaware of anyone ever instructing or authorizing Highland to make the Annual Installment payment due under the Note on NexPoint's behalf. Morris Dec. Exhibit 4 at 462:16-463:9.  Mr. Waterhouse concurred and confirmed that Highland's employees were not authorized to make the Annual Installment payment due at the end of the year without prior approval:

Q:  Do you know if anybody ever instructed Highland's employees to make the payment that was due by NexPoint at the end of the year?

A:  Did anyone instruct Highland's employees to make that payment?

Q:  Correct.

A:  Anyone – not that I'm aware.

Q:  . . . [Were] any of Highland's employees authorized to effectuate the payment on behalf of NexPoint that was due at the end of the year without getting approval from either you or Mr. Dondero?

A:  They had the – they had the ability to make the payment, but they didn't – you
know, that – that payment needed to be approved.

Morris Dec. Exhibit 3 at 381:21-382:16.

**F.**     **Highland's Obligations under the Shared Services Agreement Were
Limited to Those "Specifically" Identified Therein**

28.     NexPoint and Highland entered into that certain *Amended and Restated Shared
Services Agreement* effective as of January 1, 2018 (the "SSA").  Rukavina Dec., Exhibit A.[7]

29.     Article II of the SSA required Highland to provide "assistance and advice" with
respect to certain specified services.  Highland is unaware of any provision in the SSA—and
NexPoint cites to none—that authorized Highland to control NexPoint's bank accounts or required
Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction
from an authorized representative of NexPoint.

30.     In fact, Article II of the SSA expressly provided that "for the avoidance of doubt
. . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of
[NexPoint], other than the back- and middle office services contemplated herein, with respect to
(a) the general management of [NexPoint], its business or activities . . . ."  SSA at § 2.02 (emphasis
added).

31.     To emphasize the point further, the SSA expressly curtailed Highland's authority
to act on NexPoint's behalf:

> Section 2.06  Authority.  [Highland's] scope of assistance and advice hereunder is
> ***limited to the services specifically provided for in this Agreement.  [Highland]
> shall not assume or be deemed to assume any rights or obligations of [NexPoint]
> under any other document or agreement to which NexPoint is a party*** . . . .
> [Highland] shall not have any duties or obligations to [NexPoint] unless those
> duties and obligations are specifically provided for in this Agreement (or in any
> amendment, modification or novation hereto or hereof to which [NexPoint] is a
> party.

---

[7]  References to "Rukavina Dec. __" are to the *Declaration of Davor Rukavina* [AP Docket No. 86-1] attached to the
Motion.

*Id*. § 2.06 (emphasis added).

32.      There can be no credible dispute that (a) the Note is a "document or agreement to which NexPoint is a party," and that (b) the making of the Annual Installment payments were "obligations of" NexPoint under the Note.

**G.      The Instant Motion**

33.      Apparently stunned by Mr. Waterhouse's testimony, NexPoint now seeks to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order so it can obtain expert testimony regarding Highland's legal duties under Section 6.01 of the Shared Services Agreement.  Specifically, NexPoint proposes to retain an expert to testify "on the standards and duties of care under the parties' Shared Services Agreement . . . with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment." Motion ¶ 1.

## III.      ARGUMENT

**A.      NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law**

34.      NexPoint's suggested expert testimony is improper as a matter of law because it amounts to a legal conclusion.

35.      A party may not offer an expert opinion on the scope of a party's "legal duty" because such testimony amounts to a legal conclusion.  *See Panhandle Adver., LLC v. United Rentals Realty, LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901, at *5 (N.D. Tex. Feb. 12, 2021); *Flax v. Quitman County Hosp., LLC*, 2:09-CV-101-M-D, 2011 WL 3585870, at *5 (N.D. Miss. Aug. 16, 2011).

36.      NexPoint's suggested expert testimony relates to Highland's "duties of care under the parties' [SSA]" and, specifically, whether "Highland was responsible" under the SSA for

"ensuring that NexPoint made" its Annual Installment payment under its Note. Motion ¶¶ 1, 18. This is precisely the type of expert testimony that courts preclude because it constitutes a legal conclusion. *See Panhandle*, 2021 WL 1112901 at *5 (granting plaintiff's motion to exclude expert testimony "as to his opinions regarding the legal duties Defendant owed Plaintiff under the lease at issue" because "opinions on the duties owed by the defendants and whether they fulfilled those duties were legal conclusions and not the proper subject for expert testimony"); *Flax*, 2011 WL 3585870 at *5 (prohibiting expert testimony "on the issue of *law* of whether a duty of care was owed") (emphasis in original); *Hanspard v. Otis Elevator Co.*, CIV.A. 05-1292, 2007 WL 839994, at *2 (W.D. La. Jan. 12, 2007) (granting plaintiff's motion *in limine* to exclude expert testimony where "an opinion as to the scope of [party's] contractual duties" constitutes a legal conclusion); *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 706 (E.D. Tex. 2006) (finding expert testimony improper where it "opines as to the duties" owed by parties because "they amount to conclusions of law").

37.    The question of whether Highland owed or breached any legal duties is an issue for the trier of fact to decide. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (affirming lower court's preclusion of expert testimony regarding whether officers and directors "fulfilled their fiduciary duties to the Company … is a legal opinion and inadmissible. Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. It is not for [the expert] to tell the trier of fact what to decide").

38.    Accordingly, NexPoint's suggested expert testimony on Highland's duties under the SSA is improper as a matter of law, and the Motion should be denied on this basis alone.

**B.    <u>NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling Order</u>**

39.    NexPoint fails to satisfy its burden of demonstrating good cause to modify the Scheduling Order.

40.     Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order may be modified only for "good cause." FED. R. CIV. P. 16(b)(4). Courts consider four factors in determining whether "good cause" is shown: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir.1990). These are the same four factors used to determine whether to exclude expert testimony under Rule 37(c)(1) of the Federal Rules of Civil Procedure. *See Grand Time Corp. v. Watch Factory, Inc.*, 3:08-CV-1770-K, 2009 WL 10678210, at *2 (N.D. Tex. Nov. 18, 2009). Ultimately, "the good cause standard requires the 'party seeking relief to show that the deadlines [could not] reasonably [have been] met despite the diligence of the party needing the extension.'" *Binh Hoa Le v. Exeter Fin. Corp.*, 3:15-CV-3839-L, 2019 WL 1436375, at *14 (N.D. Tex. Mar. 31, 2019) (quoting *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)).

41.     "Under Rule 16(b), the movant has the burden of showing good cause to modify a scheduling order." *Grand Time*, 2009 WL 10678210 at *3. Whether to modify a scheduling order is within the court's broad discretion. *See Geiserman*, 893 F.2d at 790 ("[O]ur court gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order") (internal quotations omitted); *Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997). Moreover, "a trial court's decision to exclude evidence as a means of enforcing a pretrial order must not be disturbed absent a clear abuse of discretion." *Geiserman*, 893 F.2d at 790.

42.     Each of the four factors weighs in favor of denying modification of the Scheduling Order.

1.     **NexPoint's Explanation for Failing to Timely Designate an Expert Is Deficient**

43.     NexPoint's explanation for its failure to timely designate an expert is disingenuous. NexPoint contends that, *inter alia*, its failure to previously designate an expert was "due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony," and that expert testimony is now "necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint Motion." Motion ¶ 21.  NexPoint seeks to modify the Scheduling Order simply because the deposition of one of its witnesses did not go well.  This is plainly improper under Rule 16(b).  *See Reliance*, 110 F.3d at 257 (affirming lower court's denial of party's request to supplement expert report where "[movant] asked for an opportunity to avoid the deadline for its expert report merely because the deposition of its expert witness did not go well," noting that "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case").

44.     Moreover, NexPoint filed its Original Answer nine (9) months ago and its Original Defense was expressly based on the SSA.  [AP Docket No. 6 ¶¶ 39-41].  Given the testimony of Mr. Dondero (which could not have been unexpected) and Mr. Waterhouse that NexPoint never authorized or instructed Highland to make the Annual Installment payment due on December 31, 2020, *see* Section II.E, *supra*, NexPoint has always had the burden of proving that Highland owed a duty under the SSA, yet it never offered expert opinions on the topic.  If NexPoint wanted to offer "expert testimony" concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that.  *See Geiserman*, 893 F.2d at 792 (finding party failed to provide a "valid reason that would justify excusing him from the deadlines imposed by the lower court," noting "[t]he claimed importance of expert testimony underscores the need for [party] to have timely designated his expert witness," and "[t]he importance of such proposed testimony cannot singularly override the enforcement of local rules

and scheduling orders").   NexPoint's conclusory statements regarding the need for expert testimony are insufficient under Rule 16(b).  *See Binh Hoa*, 2019 WL 1436375 at *20 (finding "vague and conclusory statements regarding the need for additional information or facts do not adequately explain [party's] failure to meet the expert deadline in the Scheduling Order").

45.     Accordingly, the first factor strongly favors denial of the Motion.

**2.     NexPoint's Suggested "Expert" Testimony Is Irrelevant**

46.     The second factor—the importance of the suggested expert testimony— weighs heavily in favor of denying modification of the Scheduling Order.

47.     In addition to being improper, the suggested expert testimony is also irrelevant.  To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'"  *Charalambopoulos v. Grammer*, 3:14-CV-2424-D, 2017 WL 930819, at *9 (N.D. Tex. Mar. 8, 2017) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002)).

48.     NexPoint contends that its suggested expert testimony is "important because the duties of care as specified in the [SSA] are terms of art necessitating an expert analysis."  Motion ¶ 21.  NexPoint's reliance on Section 6.01 in support of its Motion is misplaced.

49.     By its express terms, Section 6.01 does not impose a duty on Highland to make or effectuate Annual Installment payments on NexPoint's behalf without authorization from a representative of NexPoint.  Rather, Section 6.01 sets forth a "standard of care" that applies ***only*** with respect to the discharge of "duties under this Agreement."[8]  In fact, to remove all doubt, the

---

[8] Notably, and notwithstanding the "standard of care" set forth in Section 6.01, the SSA provides Highland with considerable exculpation and indemnification protections that alone defeat NexPoint's Original Defense.  For example, NexPoint agreed not to hold Highland liable for any acts or omissions unless it is determined by a court of competent jurisdiction to "be the result of gross negligence or to constitute fraud or willful misconduct."  Rukavina Dec., Exhibit A § 6.02.  NexPoint also agreed to indemnify Highland "from and against any and all claims and causes of action" for, among other things, "negligence."  *Id.* § 6.03.

SSA emphasizes multiple times that Highland had **no** duties or obligations except with respect to those "specifically" identified therein. *See* Rukavina Dec., Exhibit A §§ 2.02, 2.06. NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative. *See* Original Answer ¶¶ 39-41 (no SSA provision cited); Amended Answer ¶¶ 39-41 (no SSA provision cited); Final Answer ¶¶ 80-82 (no SSA provision cited); Motion, generally (citing only to Section 6.01).

50.    Thus, based on the plain terms of the SSA and NexPoint's own pleadings, expert testimony regarding Highland's alleged "duties" is irrelevant. *See Geiserman*, 893 F.2d at 791 (affirming lower court's refusal to modify scheduling order, noting that expert testimony "is not critical" if the issue at hand is "obvious to a layperson or established as a matter of law"); *Rolls-Royce Corp. v. Heros, Inc.*, CIV.A. 307-CV-0739-D, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant [] when an expert offers a conclusion based on assumptions unsupported by the facts of the case").

51.    Moreover, the suggested expert testimony will not help the factfinder understand a complex fact in issue. Contrary to NexPoint's representations, this Adversary Proceeding does not involve complicated or technical issues. The issues in this Adversary proceeding are whether NexPoint defaulted on its Note and whether NexPoint can prove that Highland's alleged "negligence" or "breach of contract" caused such default. Final Answer ¶¶ 80-82. These issues are well within a fact-finder's understanding and are not the type which would necessitate an expert. *See Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*, CV 12-1026, 2014 WL 12721924, at *10 (E.D. La. Nov. 7, 2014), *on reconsideration,* CIV.A. 12-1026, 2014 WL 6090584 (E.D. La. Nov. 13, 2014) (excluding expert testimony where, "[d]espite Plaintiffs' arguments to the contrary, this case is not about the complicated inner workings of the insurance industry. It is about whether

an insurance agent misrepresented the type of coverage that Plaintiffs believed they were purchasing, and whether Defendants owed a heightened duty of care to Plaintiffs. Nothing in [expert's] report or proposed testimony will help the jury to understand a fact in issue that is not within the common understanding of a lay juror"); *Henderson v. Atmos Energy*, 496 F. Supp. 3d 1011, 1017 (E.D. La. 2020) (excluding expert testimony as irrelevant and unnecessary where "it is one based in common sense").

52.     At all relevant times, Mr. Waterhouse was an officer and a fiduciary of NexPoint, serving as its Treasurer.  If anyone had an obligation to ask Mr. Dondero if he wanted to reconsider his instructions, it was Mr. Waterhouse in the first instance—not in his capacity as an employee of Highland, but as an officer and fiduciary of the obligor, NexPoint.  Whether Mr. Dondero or Mr. Waterhouse is telling the truth is an interesting issue, but the Court need not resolve their dispute because it would only be relevant if the SSA imposed a duty on Highland to effectuate the Annual Installment payment without ever receiving any direction or instruction from a duly authorized representative of NexPoint.  And, as Mr. Waterhouse testified, the SSA imposes no such duty.

53.     Accordingly, the suggested expert testimony is irrelevant, and the Motion should be denied on this basis.

### 3.     <u>Allowing the Testimony Would Prejudice Highland</u>

54.     The third and fourth factors also weigh in favor of denying the Motion.

55.     Allowing the suggested expert testimony would prejudice Highland because Highland would need to expend additional resources responding to NexPoint's latest theory of its defense by way of: (i) retaining a rebuttal expert; (ii) deposing NexPoint's expert; or (iii) moving to strike the expert testimony.  *See Geiserman*, 893 F.2d at 791 (affirming lower court's striking of untimely witness designation and preclusion of expert testimony where delay of "a couple

weeks in designating the expert witness" would have "disrupted the court's discovery scheduling and the opponent's preparation," and resulted in "expense that would result from an extended discovery schedule for [movant's] failure to adhere to deadlines," noting that "the trial court has latitude to control discovery abuses and cure prejudice by excluding improperly designated evidence"); *Binh Hoa*, 2019 WL 1436375 at *20 ("It would [] be patently unfair to allow Plaintiff to supplement and amend his expert report this late in the case without: (1) allowing Defendants to amend their expert designations and provide an expert report to address the matters in Plaintiff's amended and supplemental expert reports, (2) giving Defendants an opportunity to depose Plaintiff's expert regarding his most recent opinion . . .").

56.    A continuance would not cure this prejudice because the trial on the merits of the underlying action would be unnecessarily delayed.  This would ultimately delay Highland's potential recovery under the Note and distributions to creditors under Highland's Plan.  *See S&W Enters.*, 315 F.3d at 537 (affirming lower court's denial of untimely submission of expert report where defendant would be forced to conduct additional discovery in response to movant's new materials, noting that "while a continuance could be granted for additional discovery . . . a continuance would unnecessarily delay the trial"); *Reliance*, 110 F.3d at 257-58 (affirming lower court's denial to modify scheduling order to add expert testimony where court found "[t]o allow plaintiff to add more material now and create essentially a new report would prejudice the defendants, who would then have to get an expert to address these last-minute conclusions, and thus disrupt the trial date in this case") (internal quotations omitted); *Geiserman*, 893 F.2d at 791 (finding that while attorney "could have conducted new discovery and redeposed witnesses under a continuance in response to the untimely designation, this would have resulted in additional delay and increased the expense of defending the lawsuit"); *Binh Hoa*, 2019 WL 1436375 at *20 ("Ordering another continuance would only serve to reward Plaintiff for his dilatory conduct and

failure to comply with court-ordered deadlines and this district's Local Civil Rules and result in additional delay and expense. Regardless, it is not incumbent on the court to award litigants for failing to develop their cases"). A simple collection action like the Adversary Proceeding should not be continually extended simply because the defendant is unsatisfied with its defenses and the evidence adduced in discovery.

57.     For these additional reasons, NexPoint fails to demonstrate good cause to excuse it from the deadlines set forth in the Scheduling Order. Accordingly, the Motion should be denied.

**C.     HCRE's and HCMS's Joinders Have Even Less Merit than the Motion and Should Be Denied**

58.     The Joinders are even more frivolous than the Motion. In addition to the reasons set forth above, neither HCMS nor HCRE was ever a party to any shared services agreement with Highland, let alone the SSA that is the foundation of the Motion. Accordingly, the Joinders are without merit and should be summarily denied by the Court.

## CONCLUSION

For the foregoing reasons, Highland respectfully requests that the Court (i) deny the Motions and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
                 jmorris@pszjlaw.com
                 gdemo@pszjlaw.com
                 hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:      MHayward@HaywardFirm.com
                 ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

18