PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



DECLARATION OF JOHN A. MORRIS IN SUPPORT OF HIGHLAND'S OBJECTION
TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P.
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a) and under penalty of perjury, declare as

follows:

1.       I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel

to the above-referenced Reorganized Debtor, and I submit this Declaration in support of

*Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure*

*and Discovery Deadlines* (the "Objection") being filed concurrently with this Declaration.   I

submit this Declaration based on my personal knowledge and review of the documents listed

below.

2.       Attached as **Exhibit 1** is a true and correct copy of a 30-year term note on behalf

of NexPoint Advisors, L.P. and in favor of Highland Capital Management, L.P. for an original

principal amount of $30,746,812.33, dated May 31, 2017.

3.    Attached as **<mark>Exhibit 2</mark>** is a true and correct copy of a Demand Letter dated January

7, 2021.

4.    Attached as **<mark>Exhibit 3</mark>** is a true and correct copy of the October 19, 2021 deposition

transcript of Frank Waterhouse.

5.     Attached as **<mark>Exhibit 4</mark>** is a true and correct copy of the October 29, 2021 deposition

transcript of James Dondero.


Dated: December 1, 2021.                              */s/ John A. Morris*
                                                      John A. Morris

# EXHIBIT 1

# PROMISSORY NOTE

**$30,746,812.33**                                                    **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in Exhibit A hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below.  All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

   1.    Interest Rate.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

   2.    Payment of Principal and Interest. Principal and interest under this Note shall be payable as follows:

      2.1    Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

      2.2    Final Payment Date.       The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

   3.    Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

   4.    Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    <u>Limitation on Agreements</u>.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    <u>Governing Law</u>.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    <u>Prior Notes</u>.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

# EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | **$27,675,000** | | **$30,746,812.33** |

# EXHIBIT 2

<p align="center">**HIGHLAND CAPITAL MANAGEMENT, L.P.**</p>

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

   Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due underlined immediately.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
         James Romey
         Jeffrey Pomerantz
         Ira Kharasch
         Gregory Demo
         DC Sauter

**Appendix A**

ABA #:              322070381
Bank Name:          East West Bank
Account Name:  Highland Capital Management, LP
Account #:          5500014686

# EXHIBIT 3

1            WATERHOUSE - 10-19-21

2        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
     -----------------------------
4   IN RE:

5                    Chapter 11
     HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,      CASE NO.
                    19-34054-SGI11
7
          Debtor.
8    -----------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10  vs.                    Adversary
                    Proceeding No.
11  HIGHLAND CAPITAL MANAGEMENT     21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12  ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13  STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14  CLO HOLDCO, LTD.,

15            Defendants.
     -----------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18            FRANK WATERHOUSE

19            October 19, 2021

20

21

22

23

24  Reported by: Susan S. Klinger, RMR-CRR, CSR

25  Job No: 201195

Page 2

```
 1          WATERHOUSE - 10-19-21
 2
 3
 4          October 19, 2021
 5          9:30 a.m.
 6
 7
 8
 9     Remote Deposition of FRANK WATERHOUSE,
10  held before Susan S. Klinger, a Registered
11  Merit Reporter and Certified Realtime Reporter
12  of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          WATERHOUSE - 10-19-21
 2  A P P E A R A N C E S :
 3  (All appearances via Zoom.)
 4  Attorneys for the Reorganized Highland Capital
 5  Management:
 6     John Morris, Esq.
 7     Hayley Winograd, Esq.
 8     PACHULSKI STANG ZIEHL & JONES
 9     780 Third Avenue
10     New York, New York  10017
11  Attorneys for the Witness:
12     Debra Dandeneau, Esq.
13     Michelle Hartmann, Esq.
14     BAKER McKENZIE
15     1900 North Pearl Street
16     Dallas, Texas  75201
17  Attorneys for NexPoint Advisors, LP and
18  Highland Capital Management Fund Advisors,
19  L.P.:
20     Davor Rukavina, Esq.
21     An Nguyen, Esq.
22     MUNSCH HARDT KOPF & HARDD
23     500 North Akard Street
24     Dallas, Texas  75201-6659
25
```

Page 4

```
 1          WATERHOUSE - 10-19-21
 2  Attorneys for Jim Dondero, Nancy Dondero, HCRA,
 3  and HCMS:
 4     Deborah Deitsch-Perez, Esq.
 5     Michael Aigen, Esq.
 6     STINSON
 7     3102 Oak Lawn Avenue
 8     Dallas, Texas  75219
 9
10  Attorneys for Dugaboy Investment Trust:
11     Warren Horn, Esq.
12     HELLER, DRAPER & HORN
13     650 Poydras Street
14     New Orleans, Louisiana 70130
15
16  Attorneys for Marc Kirschner as the trustee for
17  the litigation SunTrust:
18     Deborah Newman, Esq.
19     QUINN EMANUEL URQUHART & SULLIVAN
20     51 Madison Avenue
21     New York, New York  10010
22
23  Also Present:
24     Ms. La Asia Canty
25
```

Page 5

```
 1          WATERHOUSE - 10-19-21
 2            I N D E X
 3
 4  WITNESS                    PAGE
 5  FRANK WATERHOUSE
 6  EXAMINATION BY MR. MORRIS        10
 7  EXAMINATION BY MR. RUKAVINA      256
 8  EXAMINATION BY MS. DEITSCH-PEREZ  352
 9  EXAMINATION BY MR. MORRIS        377
10  EXAMINATION BY MR. RUKAVINA      387
11  EXAMINATION BY MS. DEITSCH-PEREZ  393
12
13            E X H I B I T S
14  No.                       Page
15  Exhibit 2  NPA et al Amended Complaint   142
16  Exhibit 33 6/3/19 Management       91
17        Representation
18  Exhibit 34 HCMLP Consolidated Financial   94
19        Statements
20  Exhibit 35 HCMFA Incumbency Certificate  151
21  Exhibit 36 Email string re 15(c)     170
22  Exhibit 39 HCMLP Operating Results 2/18  226
23  Exhibit 40 Summary of Assets and      236
24        Liabilities
25  Exhibit 41 12/19 Monthly Operating Report  258
```

Page 6

1        WATERHOUSE - 10-19-21
2  Exhibit 45 HCMFA Consolidated Financial    135
3        Statements
4  Exhibit 46 NexPoint 2019 Audited        218
5        Financials
6
7  Exhibit A1 Emails 11/25        328
8  Exhibit A2 Emails 12/31        338
9  Exhibit A6 Emails 1/12        341
10  Exhibit A7 Promissory Notes        297
11  Exhibit A9 Email, 8/31        307
12  Exhibit A10 Acknowledgment from HCMLP    302
13  Exhibit A11 HCMLP Schedule 71A        309
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1        WATERHOUSE - 10-19-21
2        P R O C E E D I N G S
3        VIDEOGRAPHER:  Good morning,
4  Counselors.  My name is Scott Hatch.  I'm a
5  certified legal videographer in association
6  with TSG Reporting, Inc.
7        Due to the severity of COVID-19 and
8  following the practice of social
9  distancing, I will not be in the same room
10  with the witness.  Instead, I will record
11  this videotaped deposition remotely.  The
12  reporter, Susan Klinger, also will not be
13  in the same room and will swear the witness
14  remotely.
15        Do all parties stipulate to the
16  validity of this video recording and remote
17  swearing, and that it will be admissible in
18  the courtroom as if it had been taken
19  following Rule 30 of the Federal Rules of
20  Civil Procedures and the state's rules
21  where this case is pending?
22        MR. HORN:  Yes.
23        MS. DANDENEAU:  Yes.
24        MR. MORRIS:  Yes.  John Morris.  I
25  would just try to do a negative notice

Page 8

1        WATERHOUSE - 10-19-21
2  here, as we did yesterday.  If anybody has
3  a problem with what was just stated, can
4  you state your objection now?
5        Okay.  No response, so everybody
6  accepts the stipulation and the instruction
7  that was just given.
8        VIDEOGRAPHER:  Thank you.  This is
9  the start of media labeled Number 1 of the
10  video recorded deposition of Frank
11  Waterhouse In Re: Highland Capital
12  Management, L.P., in the United States
13  Bankruptcy Court for the Northern District
14  of Texas, Dallas Division, Case Number
15  21-03000-SGI.
16        This deposition is being held via
17  video conference with participants
18  appearing remotely due to COVID-19
19  restrictions on Tuesday, October 19th, 2021
20  at approximately 9:32 a.m.  My name is
21  Scott Hatch, legal video specialist with
22  TSG Reporting, Inc. headquartered at 228
23  East 45th Street, New York, New York.  The
24  court reporter is Susan Klinger in
25  association with TSG Reporting.

Page 9

1        WATERHOUSE - 10-19-21
2        Counsel, please introduce
3  yourselves.
4        MR. MORRIS:  John Morris, Pachulski
5  Stang Ziehl & Jones for the reorganized
6  Highland Capital Management, L.P., the
7  plaintiff in these actions.
8        MS. DANDENEAU:  Deborah Dandeneau
9  from Baker McKenzie.  My partner, Michelle
10  Hartmann, is also in the room with me,
11  representing Frank Waterhouse individually.
12        MS. DEITSCH-PEREZ:  Deborah
13  Deitsch-Perez from Stinson, LLP,
14  representing Jim Dondero, Nancy Dondero,
15  HCRA, and HCMS.
16        MR. HORN:  Warren Horn with Heller,
17  Draper & Horn in New Orleans representing
18  Dugaboy Investment Trust.
19        MR. RUKAVINA:  Davor Rukavina with
20  Munsch Hardt Kopf & Harr in Dallas
21  representing NexPoint Advisors, LP and
22  Highland Capital Management Fund Advisors,
23  L.P.
24        MR. AIGEN:  Michael Aigen from
25  Stinson, and I represent the same parties

Page 10

WATERHOUSE - 10-19-21

1  as Deborah Deitsch-Perez.
2      MS. NEWMAN:  This is Deborah Newman
3  from Quinn Emanuel.  We represent the
4  litigation -- Marc Kirschner as the trustee
5  for the litigation SunTrust.
6      MR. MORRIS:  I think that is
7  everybody.
8      VIDEOGRAPHER:  Thank you.  Will the
9  court reporter please swear in the witness.
10     FRANK WATERHOUSE,
11 having been first duly sworn, testified as
12 follows:
13         EXAMINATION
14 BY MR. MORRIS:
15     Q.   Please state your name for the
16 record.
17     A.   My name is Frank Waterhouse.
18     Q.   Good morning, Mr. Waterhouse.  I'm
19 John Morris, as you know, from Pachulski Stang
20 Ziehl & Jones.  You understand that my firm and
21 I represent Highland Capital Management, L.P.;
22 is that right?
23     A.   Yes.
24     Q.   Okay.  And do you understand that

Page 11

WATERHOUSE - 10-19-21

1  we're here today for your deposition in your
2  individual capacity?
3      A.   Yes.
4      Q.   Did you review and -- did you
5  receive and review a subpoena that Highland
6  Capital Management, L.P., served upon you?
7      A.   Yes.
8      Q.   You have been deposed before; right?
9      A.   Yes.
10     Q.   How many times have you been
11 deposed?
12     A.   About three or four times.
13     Q.   Okay.  And I defended you in one
14 deposition; isn't that right?
15     A.   That is correct.
16     Q.   So the general ground rules for this
17 deposition are largely the same as the
18 depositions you have given before.  And that is
19 I will ask you a series of questions, and it is
20 important that you allow me to finish my
21 question before you begin your answer; is that
22 fair?
23     A.   Yes.
24     Q.   And it is important that I allow you

Page 12

WATERHOUSE - 10-19-21

1  to finish your answers before I begin a
2  question, but if I fail to do that, will you
3  let me know?
4      A.   I can certainly do that.
5      Q.   Okay.  Do you understand that this
6  deposition is being videotaped?
7      A.   Yes.
8      Q.   You understand that I may seek to
9  use portions of the videotape in a court of
10 law?
11     A.   I did not know that, until you just
12 said that.
13     Q.   Okay.  And you are aware of that now
14 before the deposition begins substantively; is
15 that right?
16     A.   Yes.
17     Q.   So unlike I think the other
18 depositions that you have given, this one is
19 being given remotely.  So that presents some
20 unique challenges, at least as compared to a
21 deposition that is taken in-person.
22         From time to time we're going to put
23 documents up on the screen, Mr. Waterhouse.
24 And it is important that I give you the

Page 13

WATERHOUSE - 10-19-21

1  opportunity to review any portion of the
2  document that you think you need in order to
3  fully and completely answer the question.
4          So I would ask you to let me know if
5  there is a portion of a document that you need
6  to see in order to fully and completely answer
7  the question.  Can you do that for me?
8      A.   Yes.
9          MS. DANDENEAU:  Mr. Morris, I would
10 just note that we do have hard copies of
11 the documents that you sent, so if you can
12 just refer to the exhibit number as
13 reflected in the documents that you sent,
14 Mr. Waterhouse will be able to look at the
15 hard copies of those documents.
16         MR. MORRIS:  I appreciate that,
17 and -- and I will encourage him to do so.
18 There will be other documents that we did
19 not send to you that we'll be using today
20 though.
21     Q.   Okay.  With that as background, if
22 there is anything that I ask you, sir, that you
23 don't understand, will you let me know?
24     A.   Yes.

Page 14

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Are you currently employed?
3    A.   Yes.
4    Q.   By whom?
5    A.   The Skyview Group.
6    Q.   When did you become employed by the
7    Skyview Group?
8    A.   I believe March 1st of 2021.
9    Q.   Do you have a title at Skyview?
10   A.   Yes.
11   Q.   What is your title?
12   A.   My title is chief financial officer.
13   Q.   Do you report to anybody in your
14   role as CFO?
15   A.   I don't, no.
16   Q.   No.  Is there a president or a CEO
17   of Skyview?
18   A.   Yes.
19   Q.   Who is that?
20   A.   That is Scott Ellington.
21   Q.   But you don't report to
22   Mr. Ellington; is that right?
23   A.   I don't think so.
24   Q.   Does Skyview Group --
25        MS. DANDENEAU:  Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

1
2    A.   I -- I -- I might.  I just -- I
3    don't recall.
4    Q.   Okay.  Does Skyview Group provide
5    any services to any entity directly or
6    indirectly owned or controlled by Jim Dondero?
7    A.   Yes.
8    Q.   Can you name -- is that pursuant to
9    written contracts?
10   A.   Yes.
11   Q.   And do you know how many contracts
12   exist?
13   A.   Approximately six or so.
14   Q.   And is the Skyview Group made up of
15   individuals who were formerly employees of
16   Highland Capital Management, L.P.?
17   A.   No.
18   Q.   Do you know how many -- how many --
19   how many employees does Skyview have?
20   A.   Approximately 35.
21   Q.   And can you tell me how many of
22   those 35 are former officers, directors, or
23   employees of Highland Capital Management, L.P.?
24   A.   I don't know the exact number.
25   Q.   Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   Is it more than 30?
4    A.   I don't know.
5    Q.   Can you tell me what portion of
6    Skyview -- Skyview's revenue is derived from
7    entities that are directly or indirectly owned
8    or controlled by Jim Dondero?
9        MS. DANDENEAU:  Mr. Morris, I mean,
10   you called Mr. Waterhouse here individually
11   for purposes of his testimony in connection
12   with the noticed litigation.  I have given
13   you some leeway to ask him some background
14   information about Skyview Group, but this
15   is not a substitute for a deposition in
16   connection with any other pending disputes
17   that exist.  And -- and we agreed to accept
18   the subpoena on the basis of he -- this is
19   testimony that he is giving in connection
20   with the noticed litigation.
21       I really think that you are now
22   going a little bit far afield from the
23   purpose of this deposition.
24       MR. MORRIS:  Okay.  It is -- I'm not
25   intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

1
2    these questions for any purpose other than
3    this litigation.  I think you understand
4    fully why I'm asking the questions, and I
5    just have a couple more, if you will bear
6    with me.
7        MS. DANDENEAU:  Okay.
8        MS. DEITSCH-PEREZ:  Can we have an
9    agreement that an objection by one is an
10   objection for any other party here?
11       MR. MORRIS:  Sure.  I would -- I
12   would encourage that, sure.
13       MS. DEITSCH-PEREZ:  Thank you.
14       MR. MORRIS:  It can't be sustained
15   or overruled more than one time, so...
16   Q.   Mr. Waterhouse, can you answer my
17   question, please.
18       MS. DANDENEAU:  Do you want to
19   repeat it, Mr. Morris, for his benefit?
20       MR. MORRIS:  Sure.
21   Q.   Can you -- can you tell me the
22   approximate portion of Skyview's revenue that
23   is derived from entities that are directly or
24   indirectly owned or controlled by Mr. Dondero?
25   A.   I don't know the exact number.

Page 18

WATERHOUSE - 10-19-21
1
2   Q.  Is it more than 75 percent?
3   A.  Yes.
4   Q.  Is it more than 90 percent?
5   A.  I don't know.
6   Q.  Okay.  Can I refer to Highland
7   Capital Management, L.P., as Highland?
8   A.  Yes.
9   Q.  All right.  And you previously
10  served as Highland's CFO; correct?
11  A.  Yes.
12  Q.  When did you join Highland?
13  A.  I don't recall the exact date.
14  Q.  Can you tell me what year?
15  A.  2006.
16  Q.  When did you -- in what year did you
17  become Highland's CFO?
18  A.  I don't recall the exact date.
19  Q.  I'm not asking you for the exact
20  date.  I'm asking you if you recall the year in
21  which you were appointed CFO.
22  A.  I don't recall the exact year.
23  Q.  Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?

Page 19

WATERHOUSE - 10-19-21
1
2   A.  2011 or 2012.
3   Q.  Did you serve as Highland's CFO on a
4   continuous basis from in or around 2011 or 2012
5   until early 2021?
6   A.  Yes.
7   Q.  During that entire time you reported
8   directly to Jim Dondero; correct?
9   A.  I -- I don't know.
10  Q.  Is there anybody else you reported
11  to -- withdrawn.
12      Did you report to Mr. Dondero for
13  some portion of the time that you served as
14  CFO?
15  A.  Yes.
16  Q.  Is there a portion of time that you
17  don't recall who you reported to?
18  A.  Yes.
19  Q.  What portion of time do you have in
20  your mind when you can't recall who you
21  reported to?
22  A.  From the 2011 to -- for
23  approximately a year or two.
24  Q.  Okay.  So is it fair to say that you
25  reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21
1
2   from at least 2014 until the time you left
3   Highland?
4       MS. DANDENEAU:  Objection to form.
5   A.  I don't want to speculate the exact
6   or what year that changed or -- so I would like
7   to stick with my testimony.
8   Q.  Can you recall when you began
9   reporting to Mr. Dondero?
10  A.  I don't recall.
11  Q.  Can you -- can you give me an
12  estimate of what year you think you might have
13  began reporting to Mr. Dondero?
14  A.  I will go back to my prior
15  testimony.
16  Q.  Okay.  There is no -- you have no
17  ability to tell me when you began reporting to
18  Mr. Dondero.
19      Do I have that right?
20      MS. DANDENEAU:  Objection to form.
21  A.  I don't recall.
22  Q.  Okay.  Do you recall who you might
23  have reported to before you began reporting to
24  Mr. Dondero?
25  A.  Yes.

Page 21

WATERHOUSE - 10-19-21
1
2   Q.  Who might you have reported to in
3   your capacity as CFO before you started
4   reporting to Mr. Dondero?
5   A.  That would have been Patrick Boyce.
6   Q.  Are you aware that Highland filed
7   for bankruptcy on October 19th, 2019?
8   A.  Yes.
9   Q.  And we refer to that as the petition
10  date?
11  A.  Yes.
12  Q.  Okay.  Do you hold any professional
13  licenses, sir?
14  A.  Yes.
15  Q.  Can you tell me what professional
16  licenses you hold?
17  A.  I'm a certified public accountant.
18  Q.  Okay.  Anything else?
19  A.  No.
20  Q.  Do you have any other professional
21  licenses or certificates?
22  A.  When you say "professional license,"
23  that is not education?
24  Q.  Tell me -- sure.  Anything other
25  than a driver's license.

**Page 22**

```
1              WATERHOUSE - 10-19-21
2         Do you have any other license or
3  certificate or certification?
4      A.  Are you asking, like, where I went
5  to school and the --
6      Q.  I am not. I am not. I didn't say
7  education. I didn't ask about degrees.
8         Do you know what a license is?
9      A.  Well, yeah, I mean, a license is
10 something you get after you receive a certain
11 level of proficiency.
12     Q.  Do you have any licenses or
13 certifications other than your CPA?
14        MS. DANDENEAU:  Objection, form.
15        I assume you mean professional
16 licenses, Mr. Morris; correct?
17     Q.  Can you answer my question, sir?
18     A.  Mr. Morris, I'm thinking. I
19 don't -- I don't think I have any others.
20     Q.  Are you familiar with an entity
21 called Highland Capital Management Fund
22 Advisors?
23     A.  Yes.
24     Q.  Were you ever -- can we refer to
25 that entity as HCMFA?
```

**Page 23**

```
1              WATERHOUSE - 10-19-21
2      A.  Yes.
3      Q.  Were you ever employed by HCMFA?
4      A.  Not that I recall.
5      Q.  Were you ever -- did you ever hold
6  the title of an officer or director of HCMFA?
7      A.  Yes.
8      Q.  What title did you hold?
9      A.  Treasurer.
10     Q.  When did you become the treasurer of
11 HCMFA?
12     A.  I don't recall.
13     Q.  Can you tell me the year?
14     A.  I don't -- I don't know the year.
15     Q.  Can you approximate the year in
16 which you became the treasurer of HCMFA?
17     A.  I don't know.
18     Q.  Can you tell me if it was before or
19 after 2016?
20     A.  I don't recall.
21     Q.  Are you still the -- do you know if
22 you're still the treasurer of HCMFA today?
23     A.  Today, I am the acting treasurer for
24 HCMFA.
25     Q.  Is there a distinction between
```

**Page 24**

```
1              WATERHOUSE - 10-19-21
2  treasurer and acting treasurer?
3      A.  I said "acting treasurer" as I am an
4  employee of Skyview, as you previously
5  stated -- or asked.
6      Q.  But you are the treasurer of HCMFA
7  today; correct?
8      A.  I am -- I am the acting treasurer
9  for HCMFA.
10     Q.  How did you become the treasurer of
11 HCMFA?
12     A.  Are you asking how I became the
13 treasurer of HCMFA today?
14     Q.  How did you become appointed to
15 serve as the treasurer of HCMFA?
16     A.  Well, in -- in -- in what time
17 capacity?
18     Q.  The first time that you were
19 appointed.
20     A.  First time. I believe I was asked
21 to serve as treasurer for HCMFA the first time.
22     Q.  By who? Who asked you to do that?
23     A.  I don't recall.
24     Q.  Is there anything that would refresh
25 your recollection as to who appointed you as
```

**Page 25**

```
1              WATERHOUSE - 10-19-21
2  the treasurer of CF- -- HCMFA for the first
3  time?
4      A.  I don't -- I mean, there would be
5  some documents, some legal documents. I don't
6  know where those are.
7      Q.  How many times have you been
8  appointed the treasurer of HCMFA?
9      A.  I don't know.
10     Q.  Was it more than once?
11     A.  I don't know.
12     Q.  Can you tell me any period of time
13 since 2016 that you did not hold the title of
14 treasurer of HCMFA?
15        MS. DANDENEAU:  Objection to form.
16     A.  I don't recall.
17     Q.  What are your duties and
18 responsibilities as the treasurer of HCMFA?
19     A.  My duties are to do the best job
20 that I can as the -- as an accountant and
21 finance guy.
22     Q.  What specific duties and
23 responsibilities do you have as the treasurer
24 of HCMFA?
25     A.  My duties are to do the best job
```

Page 26

WATERHOUSE - 10-19-21

2 that I can as the accounting and finance person
3 for HCMFA.
4    Q.   As the accounting and finance person
5 for HCMFA, do you have any particular areas of
6 responsibility?
7    A.   Yeah, it is to manage the accounting
8 and finance function for HCMFA.
9    Q.   Would that include -- do you have
10 responsibility for overseeing HCMFA's annual
11 audit?
12    A.   Can I please elaborate on my prior
13 question?
14    Q.   Of course.  You -- you are giving
15 answers.  I'm asking questions.
16    A.   Okay.  Yes, so the -- it -- like I
17 said, it is to manage the accounting finance
18 aspect, but I am, as we discussed, the
19 treasurer.  That is -- being treasurer is what
20 gives me that -- that management function.
21    Q.   Does anybody report to you in your
22 capacity as treasurer of HCMFA?
23    A.   I don't believe so.
24    Q.   Does HCMFA have a chief financial
25 officer?

Page 27

WATERHOUSE - 10-19-21

2    A.   I don't -- I don't know.
3    Q.   You don't know?
4       You're the treasurer of HCMFA but
5 you don't know if HCMFA has a chief financial
6 officer.
7       Do I have that right?
8    A.   That's right.
9    Q.   Okay.  Have you heard of a company
10 called NexPoint Advisors?
11    A.   Yes.
12    Q.   We will refer to that as NexPoint.
13 Okay?
14    A.   Okay.
15    Q.   Were you ever employed by NexPoint?
16    A.   I don't recall.
17    Q.   Did you ever hold any title with
18 respect to the entity known as NexPoint?
19    A.   Yes.
20    Q.   What titles have you held in
21 relation to NexPoint?
22    A.   Treasurer.  I think it was only
23 treasurer.
24    Q.   Can you tell me the approximate year
25 you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

2    A.   I don't know.
3    Q.   Are you still the treasurer of
4 NexPoint today?
5    A.   I am the acting treasurer for
6 NexPoint.
7    Q.   When did your title change from
8 treasurer to acting treasurer?
9    A.   I don't know.
10    Q.   Did your duties and responsibilities
11 change at all when your title was changed from
12 treasurer to acting treasurer?
13    A.   I don't -- I don't believe so.
14    Q.   Why did --
15    A.   I still manage the finance and
16 accounting function for NexPoint.
17    Q.   Why did your title change from
18 treasurer to acting treasurer?
19    A.   I don't -- I'm using the term
20 "acting treasurer" as I'm a Skyview employee.
21 I don't -- I don't know -- again, I am a -- as
22 I am the Skyview employee.
23    Q.   Okay.
24    A.   And we -- we provide officer
25 services.

Page 29

WATERHOUSE - 10-19-21

2    Q.   And you serve as an officer of
3 HCMFA; correct?
4    A.   I think we went over that with my
5 testimony.  Yes, I'm the acting treasurer for
6 HCMFA.
7    Q.   And you are an officer of NexPoint;
8 correct?
9    A.   I think -- I am the acting treasurer
10 for NexPoint Advisors.
11    Q.   And -- and who appointed you acting
12 treasurer of NexPoint Advisors?
13    A.   I don't recall specifically.
14    Q.   Do you have any recollection of who
15 might have appointed you the treasurer of
16 NexPoint?
17    A.   I mean, it -- it -- I don't recall
18 exactly who it was.
19    Q.   Who were the possibilities?
20       MS. DEITSCH-PEREZ:  Object to the
21 form.
22    Q.   You can answer.
23    A.   Someone in the legal group for
24 NexPoint.  The other officers as well.
25    Q.   Have you heard of a company called

Page 30

WATERHOUSE - 10-19-21

1   Highland Capital Management Services, Inc.?
2   A.   Yes.
3   Q.   We will refer to that as HCMS.
4   Okay?
5   A.   HCMS.  Okay.
6   Q.   Were you ever employed by HCMS?
7   A.   No.
8   Q.   Have you ever held any titles in
9   relation to HCMF -- I apologize -- HCMS?
10  A.   Yes.
11  Q.   What titles have you held in
12  relation to HCMS?
13  A.   Treasurer and acting treasurer.
14  Q.   When did you first become treasurer
15  or acting treasurer of HCMS?
16  A.   I don't recall the exact dates.
17  Q.   Can you recall -- can you
18  approximate the year that you became the
19  treasurer of HCMS?
20  A.   I don't -- I don't know.
21  Q.   Are you still the treasurer of HCMS
22  today?
23  A.   I am the acting treasurer for HCMS.
24  Q.   And are your duties and


Page 30

WATERHOUSE - 10-19-21

1   Highland Capital Management Services, Inc.?
2   A.   Yes.
3   Q.   We will refer to that as HCMS.
4   Okay?
5   A.   HCMS.  Okay.
6   Q.   Were you ever employed by HCMS?
7   A.   No.
8   Q.   Have you ever held any titles in
9   relation to HCMF -- I apologize -- HCMS?
10  A.   Yes.
11  Q.   What titles have you held in
12  relation to HCMS?
13  A.   Treasurer and acting treasurer.
14  Q.   When did you first become treasurer
15  or acting treasurer of HCMS?
16  A.   I don't recall the exact dates.
17  Q.   Can you recall -- can you
18  approximate the year that you became the
19  treasurer of HCMS?
20  A.   I don't -- I don't know.
21  Q.   Are you still the treasurer of HCMS
22  today?
23  A.   I am the acting treasurer for HCMS.
24  Q.   And are your duties and

Page 31

WATERHOUSE - 10-19-21

1   responsibilities as the acting treasurer for
2   HCMS and the acting treasurer for NexPoint the
3   same as your duties and responsibilities in
4   your role as the acting treasurer of HCMFA?
5   A.   More or less.
6   Q.   Have you ever heard of a company
7   called HCRE Partners, LLC?
8   A.   Yes.
9   Q.   And do you understand that that
10  entity is now known today as NexPoint Real
11  Estate Partners?
12  A.   I did not know that.
13  Q.   All right.  Can we refer to HCRE
14  Partners as HCRE?
15      MS. DANDENEAU:  Objection to form.
16      Did you mean NexPoint Real Estate
17  Partners, Mr. Morris?
18      MR. MORRIS:  No.
19      MS. DANDENEAU:  Oh.
20      MR. MORRIS:  He said he wasn't
21  familiar that it was succeeded by that
22  entity.  So --
23      MS. DANDENEAU:  Okay.
24      MR. MORRIS:  -- let's go with what

Page 32

WATERHOUSE - 10-19-21

1   the witness knows.
2   Q.   You're familiar with an entity
3   called HCRE Partners, LLC; correct?
4   A.   Yes.
5   Q.   Okay.  So that is the entity that we
6   will refer to as HCRE.  If you're aware of any
7   successor, that is great.  If not, let's just
8   define it as such.
9       Have you ever been employed by HCRE
10  or any entity that you know to have succeeded
11  HCRE?
12  A.   No.
13  Q.   Did you ever serve as an officer or
14  director of HCRE or any successor?
15  A.   Not that I recall.
16  Q.   Okay.  Can we refer to NexPoint and
17  HCMFA as the advisors?
18  A.   Yes.
19  Q.   In general, the advisors provided
20  investment advisory services to certain retail
21  funds; correct?
22  A.   Yes.
23  Q.   And we will refer to the retail
24  funds that are served by the advisors

Page 33

WATERHOUSE - 10-19-21

1   collectively as the retail funds; is that okay?
2   A.   Okay.
3   Q.   Each of the retail funds is governed
4   by a board; correct?
5   A.   Yes.
6   Q.   And do you know the people who serve
7   on the boards of the retail funds?
8       MS. DANDENEAU:  Objection to form.
9   A.   I don't know all of them.
10  Q.   Do you know whether the same people
11  serve on the board of each of the retail funds
12  as we've defined that term?
13  A.   Which -- so when you say "retail
14  funds" -- again, I want to be -- what retail
15  funds are you referring to, because there are
16  -- there are several distinctions?
17      What retail funds are you using when
18  you refer to them?
19  Q.   That is why -- that is why I tried
20  to define the terms.  So let me do it again.
21      Retail funds for the purposes of
22  this deposition means any retail fund to which
23  either of the advisors provides advisory
24  services.  Okay?

Page 34

WATERHOUSE - 10-19-21

1
2    A.   Okay.
3    Q.   Okay.  So do you know whether the
4  same people serve on the board of each of the
5  retail funds?
6    A.   I don't know.
7    Q.   Were you ever employed by any of the
8  retail funds?
9    A.   No.
10    Q.   No?
11    A.   No.
12    Q.   Okay.  Do you have any title with
13  respect to any of the retail funds?
14    A.   Yes.
15    Q.   What titles do you hold --
16  withdrawn.
17        Do you have the same titles with
18  respect to all of the retail funds or do
19  they -- or just something else?
20        MS. DANDENEAU:  Objection to form.
21    Q.   Withdrawn.
22        Do you have the same title with
23  respect to each of the retail funds?
24    A.   No.
25    Q.   Tell me which title you have with

Page 35

WATERHOUSE - 10-19-21

1
2  respect to each retail fund.
3        Actually, let's do it a different
4  way.  I withdraw the question.
5        Can you give me one title you have
6  in relation to any retail fund?
7    A.   Yes.
8    Q.   What title -- what title can you
9  give me?
10    A.   Principal executive officer.
11    Q.   Do you serve as principal executive
12  officer for each of the retail funds?
13    A.   No.
14    Q.   Can you identify for me the retail
15  funds in which you serve as the principal
16  executive officer?
17    A.   Yes.  Highland Funds 1, Highland
18  Funds 2, Highland Income Fund, Highland Global
19  Allocation Fund.
20    Q.   I'm sorry, you said "Global
21  Allocation Fund"?
22    A.   Yes.
23        VIDEOGRAPHER:  Excuse me,
24  Mr. Morris.  This is the videographer.  I'm
25  concerned about the lighting in the

Page 36

WATERHOUSE - 10-19-21

1
2  witness' camera.
3        Do you want to go off the record and
4  make some adjustments?
5        MR. MORRIS:  Sure, but just for this
6  purpose.  I don't want to take a break.  We
7  just started.
8        MS. DANDENEAU:  Yeah, that is fine.
9  That is fine.  We're going to put you on
10  mute.
11        MR. MORRIS:  All right.
12        MS. DANDENEAU:  I'm going to try to
13  open up some of the shades.
14        VIDEOGRAPHER:  We're going off the
15  record at 10:08 a.m.
16        (Recess taken 10:08 a.m. to 10:11 a.m.)
17        VIDEOGRAPHER:  We are back on the
18  record at 10:11 a.m.
19    Q.   Mr. Waterhouse, when did you become
20  the principal executive officer of the four
21  retail funds that you just identified?
22    A.   I don't recall.
23    Q.   Do you recall the approximate year
24  that you became the principal executive officer
25  of the four funds?

Page 37

WATERHOUSE - 10-19-21

1
2    A.   2021.
3    Q.   Did you ever hold any title with
4  respect to any of the four funds you have just
5  identified other than principal executive
6  officer?
7    A.   I don't recall.
8    Q.   Is it possible that you held a
9  position or a title with the four funds you
10  just identified prior to 2021?
11    A.   Yes.
12    Q.   But you don't recall if you did or
13  not; do I have that right?
14    A.   No.  You -- I thought you asked, did
15  I hold other titles.
16    Q.   Did you hold any title at the four
17  retail funds for which you now serve as
18  principal executive officer at any time prior
19  to 2021?
20    A.   Yes.
21    Q.   What titles did you hold?
22    A.   I don't recall all the titles.
23    Q.   Do you recall any of the titles?
24    A.   Yes.
25    Q.   What titles do you recall holding at

Page 38

```
1          WATERHOUSE - 10-19-21
2  those four retail funds before 2021?
3      A.   Principal executive officer.
4      Q.   Were you the principal executive
5  officer of the four retail funds that you have
6  identified?
7      A.   Sorry, could you repeat the
8  question?
9      Q.   Were you the principal executive
10 officer for each of the four retail funds that
11 you have identified?
12     A.   Yes.
13     Q.   When did you become the principal
14 executive -- withdrawn.
15          Can you give me the approximate year
16 that you became the principal executive officer
17 for each of the four retail funds you've
18 identified?
19     A.   I don't recall.
20     Q.   What are your duties and
21 responsibilities as the principal executive
22 officer of these four retail funds?
23     A.   It is to manage the finance and
24 accounting positions.
25     Q.   So at the same time you serve as the
```

Page 39

```
1          WATERHOUSE - 10-19-21
2  treasurer of the advisors, you also serve as
3  the principal executive officer of these four
4  retail funds; correct?
5      A.   Yes.
6      Q.   Did you ever hold any title with
7  respect to any other retail fund?
8      A.   Not that I recall.
9      Q.   During the period that you served as
10 Highland's CFO, from time to time Highland
11 loaned money to certain of its officers and
12 employees; correct?
13     A.   Yes.
14     Q.   During the period that you served as
15 Highland's CFO, from time to time Highland
16 loaned money to certain --
17     A.   Let me -- let me retract that,
18 sorry, that -- you asked during the time I was
19 CFO, Highland loaned moneys to employees. I
20 don't -- I don't recall that during my tenure
21 of CFO.
22     Q.   You have no recollection during the
23 time that you were the CFO of Highland of
24 Highland ever loaning any money to any officer
25 or director of Highland?
```

Page 40

```
1          WATERHOUSE - 10-19-21
2      A.   I don't recall during my tenure of
3  Highland or my -- as CFO of Highland -- yeah,
4  if there are any loans as CFO of Highland.
5      Q.   I'm just talking about officers and
6  employees right now.  You have no recollection
7  of Highland ever making a loan to any of its
8  officers or employees during the time that you
9  served as CFO.  Do I have that right?
10         MS. DANDENEAU:  Objection to form.
11     A.   So I thought you were saying
12 officers and employees as CFO, right, so there
13 were -- I mean, okay, yes.
14     Q.   I would ask you to listen carefully
15 to my question.  If I -- if I'm not clear, let
16 me know, but I'm really trying to be as clear
17 as I can.
18     A.   I'm listening as carefully as I can,
19 and you are asking very specific questions in a
20 timeline.  And I'm trying to answer your
21 questions as specifically as I can, and I
22 apologize if -- if I'm going back.  I am -- you
23 are asking very specific questions.  Thank you.
24     Q.   During the period that you served as
25 Highland's CFO, from time to time Highland
```

Page 41

```
1          WATERHOUSE - 10-19-21
2  loaned money to certain corporate affiliates;
3  correct?
4          MS. DANDENEAU:  Objection to form.
5      A.   What are corporate affiliates?
6      Q.   How about the ones that are in
7  Highland's audited financial statements under
8  the section entitled Loans to Affiliates.  Why
9  don't we start with those.  Do you have any
10 understanding of what the phrase "affiliates"
11 means?
12         MS. DANDENEAU:  Objection to form.
13     A.   I understand what affiliates are,
14 yet affiliates can have different meanings in
15 different contexts, so...
16     Q.   Why don't you -- why don't you tell
17 me what your understanding of the term
18 "affiliate" is in relation to Highland Capital
19 Management, L.P.
20     A.   Is that a -- it depends on the
21 context.
22     Q.   How about the context of making
23 loans?
24         MS. DANDENEAU:  Objection to form.
25     A.   I didn't make the determination of
```

Page 42

WATERHOUSE - 10-19-21

1
2 who an affiliate was or is at the time those --
3 I didn't -- that wasn't my job to make a
4 determination of who an affiliate is.
5    Q.   All right.  So as the CFO of
6 Highland, do you have any ability right now to
7 tell me which companies that were directly or
8 indirectly owned and/or controlled by
9 Mr. Dondero in whole or in part received loans
10 from Highland Capital Management, L.P.?
11       MS. DANDENEAU:  Objection to form.
12       MS. DEITSCH-PEREZ:  Objection, form.
13    A.   Yes.
14    Q.   Okay.  Identify every entity that
15 you can think of that was directly or
16 indirectly owned and/or controlled by
17 Mr. Dondero in whole or in part that received a
18 loan from Highland Capital Management, L.P.
19       MR. RUKAVINA:  Objection, legal
20    conclusion.
21    A.   NexPoint Advisors, Highland Capital
22 Management Fund Advisors, HCM Services,
23 Dugaboy.  Sorry, I don't think -- Dugaboy
24 doesn't fit that definition.  You said owned
25 and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1
2 definition --
3    Q.   I said owned and/or controlled.
4    A.   I don't -- again, I'm not -- I'm not
5 the legal expert.  I don't think it controls --
6 he controls Dugaboy, so again, I'm not the
7 legal person.
8    Q.   I'm not asking you for a legal
9 conclusion, sir.  I'm asking you for your
10 knowledge, okay, as the CFO -- the former CFO
11 of Highland Capital Management, other than
12 NexPoint, HCMFA, and HCMF -- HCMS, can you
13 think of any other entities that were owned
14 and/or controlled directly or indirectly in
15 whole or in part by Jim Dondero who received a
16 loan from Highland Capital Management, L.P.?
17       MS. DANDENEAU:  Objection to form.
18    A.   HCRE.
19    Q.   Any others?
20    A.   That is -- that is all I can think
21 of.
22    Q.   And you're aware that from time to
23 time while you were the CFO, Highland loaned
24 money to Jim Dondero; correct?
25    A.   Yes.

Page 44

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Can we refer to the four
3 entities that you just named and Mr. Dondero as
4 the affiliates?
5    A.   So that would be Jim Dondero,
6 NexPoint Advisors, Highland Capital Management
7 Fund Advisors, and HCRE.
8    Q.   And HCMS?
9    A.   And HCMS, okay.
10    Q.   And can we refer to the loans that
11 were given to each of those affiliates as the
12 affiliate loans?
13    A.   Yes.
14    Q.   And is it fair to say that each of
15 the affiliates were the borrowers under the
16 affiliate loans as we're defining the term?
17       MR. RUKAVINA:  Objection, legal
18    conclusion.
19    A.   The borrowers are whoever were on
20 the notes.  I don't -- I don't know.  I'm not
21 the legal person.
22    Q.   But you --
23    A.   I don't know.
24    Q.   You do know, as Highland's former
25 CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1
2 identified tendered notes to Highland; correct?
3       MR. RUKAVINA:  Hey, John, will you
4    just give me a running objection to legal
5    conclusion to HCM --
6       MR. MORRIS:  No.  No, if you want to
7    object --
8       MR. RUKAVINA:  I will object every
9    time.  Object to legal conclusion.
10       MR. MORRIS:  That is fine.
11    Q.   Sorry, can you repeat the question?
12    Q.   Are you aware that each of the --
13 that each of the affiliates, as we have defined
14 the term, gave to Highland a promissory note in
15 exchange for the loans?
16       MR. RUKAVINA:  Objection to the
17    extent that calls for a legal conclusion.
18    A.   I don't.
19    Q.   No, you don't know that?
20    A.   No, they didn't -- you said they
21 exchanged a promissory note for a loan.  I
22 don't -- I don't understand that question, so I
23 said no.
24    Q.   At the time of the bankruptcy
25 filing, did Highland have in its possession

Page 46

WATERHOUSE - 10-19-21
1
2  promissory notes that were signed by each of
3  the affiliates?
4      A.  Yes.
5      Q.  To the best of your knowledge,
6  during the time that you served as Highland's
7  CFO, did Highland disclose to its outside
8  auditors all of the loans that were made to
9  affiliates?
10     MR. RUKAVINA:  Objection, that calls
11  for a legal conclusion.
12     MS. DEITSCH-PEREZ:  I also couldn't
13  hear you, John, because there was some
14  garbling on -- on the -- on the call.
15     MR. MORRIS:  Folks, I've got to tell
16  you this is not going well, and I'm
17  reserving my right --
18     MS. DANDENEAU:  John, it was just
19  the end of that question.  It was just the
20  end of that question.  I couldn't hear it
21  either.  Sorry, if you could repeat it,
22  please.
23     MR. MORRIS:  That is less than an
24  hour into this, but folks are trying to run
25  out the clock, and so I'm just going to

Page 47

WATERHOUSE - 10-19-21
1
2  state that now.
3      MS. DANDENEAU:  You know, and,
4  Mr. Morris, I really object to that.  I
5  mean --
6      MR. MORRIS:  Okay.
7      MS. DANDENEAU:  -- Mr. Waterhouse
8  just told you he's trying to listen to your
9  questions and answer them carefully, and
10  you have no basis for saying that.
11     MR. MORRIS:  Okay.
12     MS. DANDENEAU:  This does not --
13  this is not an experienced witness, so he's
14  trying to do the best he can.
15     Q.  Mr. Waterhouse, during the time that
16  you served as Highland's CFO, did Highland
17  disclose to its outside auditors all of the
18  loans that it made to each of the affiliates
19  that you have identified?
20     MR. RUKAVINA:  Objection, legal
21  conclusion.
22     A.  Yes.
23     Q.  To the best of your knowledge, while
24  you were Highland's CFO, were all of the
25  affiliate loans described in Highland's audited

Page 48

WATERHOUSE - 10-19-21
1
2  financial statements?
3      MR. RUKAVINA:  Objection, legal
4  conclusion.
5      A.  When an audit was performed, any
6  loans that were made by Highland to the
7  affiliates were disclosed to auditors.
8      Q.  Are you aware of any loan that was
9  made to any affiliate that was not disclosed to
10  the auditors?
11     A.  I'm not aware.
12     Q.  To the best of your knowledge, did
13  each of the affiliates who were --
14  (inaudible) -- loaned from Highland execute a
15  promissory note in connection with that loan?
16     MR. RUKAVINA:  Objection, legal
17  conclusion.
18     A.  Sorry, you -- halfway through the
19  question it got muffled.
20  Can you repeat that again?
21     Q.  To the best of your knowledge, did
22  every affiliate execute a promissory note in
23  connection with each loan that it obtained from
24  Highland?
25     MR. RUKAVINA:  Objection, legal

Page 49

WATERHOUSE - 10-19-21
1
2  conclusion.
3      A.  Yes.
4      Q.  You are not aware of any loan that
5  any affiliate ever obtained from Highland where
6  the affiliate did not give a promissory note in
7  return; is that fair?
8      A.  Yes, I'm not aware.
9      Q.  And to the best of your knowledge,
10  did Highland loan to each affiliate an amount
11  of money equal to the principal amount of each
12  promissory note?
13     MR. RUKAVINA:  Objection, legal
14  conclusion.
15     A.  Yes.
16     Q.  During the time that you served as
17  CFO, did Highland ever loan money to
18  Mark Okada?
19     A.  I -- I don't recall.
20     Q.  Did you ever see any promissory
21  notes executed by Mark Okada?
22     A.  I don't recall.
23     Q.  Do you know if Highland ever forgave
24  any loan that it ever made to Mr. Okada?
25     A.  I don't recall.

Page 50

WATERHOUSE - 10-19-21

1
2  Q.  Do you recall if Mr. Okada paid back
3  all principal and interest due and owing under
4  any loan he obtained from Highland?
5      MS. DEITSCH-PEREZ:  Objection to
6  form.
7      MS. DANDENEAU:  Objection to form.
8  A.  I don't recall.
9  Q.  Do you recall whether -- during your
10 time as CFO, whether Highland ever loaned money
11 to Jim Dondero?
12 A.  Yes.
13 Q.  To the best of your knowledge, did
14 Mr. Dondero sign and deliver to Highland a
15 promissory note in connection with each loan
16 that he obtained from Highland?
17 A.  If you are referring to the
18 promissory notes that, you know, part of
19 Highland's records, yes.
20 Q.  Okay.  You're not aware of any loan
21 that Mr. Dondero took from Highland that wasn't
22 backed up by -- by a promissory note with a
23 face -- with a principal amount equal to the
24 amount of the loan; correct?
25 A.  Am I aware that Jim Dondero took a

Page 51

WATERHOUSE - 10-19-21

1
2  loan?
3      Q.  Without giving a -- let me ask a
4  better question.  I'm sorry, Mr. Waterhouse.
5          Are you aware of any loan that
6  Mr. Dondero obtained from Highland where he
7  didn't give a promissory note in return?
8      A.  I'm not aware.
9      Q.  During the time that you served as
10 Highland's CFO, did Highland ever forgive any
11 loans, in whole or in part, that it made to
12 Mr. Dondero?
13 A.  Not that I'm aware.
14 Q.  At the time that you served as
15 Highland's CFO, did Highland ever forgive any
16 loan, in whole or in part, that it made to any
17 affiliate as we've defined the term today?
18 A.  Not that I'm aware.
19 Q.  During the time that you served as
20 Highland's CFO, did Highland ever forgive, in
21 whole or in part, any loan that it ever made to
22 any officer or employee?
23 A.  Highland forgave loans to officers
24 and employees.  It may not have been at the
25 time when my title was CFO.

Page 52

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  And so I appreciate the
3  distinction.
4          Is it fair to say that, to the best
5  of your knowledge, Highland did not forgive a
6  loan that it made to an officer or employee
7  after 2013?
8      MS. DANDENEAU:  Objection to form.
9  A.  I don't recall.
10 Q.  To the best of your knowledge, did
11 Highland disclose to its auditors every
12 instance where it forgave, in whole or in part,
13 a loan that it had made to one of its officers
14 or employees?
15 A.  No.
16 Q.  Can you think of -- can you --
17 you identify any loan to an officer or employee
18 that was forgiven by Highland, in whole or in
19 part, that was not disclosed to Highland's
20 outside auditors?
21 A.  Look, I don't recall all of the
22 loans and the loan forgiveness.  I just know as
23 part of the audit process there is a
24 materiality concept.
25          So if there were loans to employees

Page 53

WATERHOUSE - 10-19-21

1
2  that were of -- you know, that were deemed
3  immaterial, those items may not have been
4  disclosed by the team to the auditors.
5      Q.  I appreciate that.
6          Do you have an understanding as to
7  what the level of materiality was?
8      A.  I don't recall.
9      Q.  As the CFO of Highland, to the best
10 of your knowledge, did Highland disclose to its
11 outside auditors every loan that was forgiven,
12 in whole or in part, that was material as that
13 term was defined by the outside auditors?
14 A.  Yes.
15 Q.  And do you recall where -- do you
16 recall where the definition of materiality can
17 be found for -- for this particular purpose?
18      MS. DANDENEAU:  Objection to form.
19 A.  No.  You -- I don't determine
20 materiality.
21 Q.  Okay.  I'm just asking you if you
22 can help me understand where it is, but I think
23 we will find it in a few minutes.
24          You are aware that Highland has
25 commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1
2  affiliates, as we've defined the term, to
3  collect under certain promissory notes; is that
4  right?
5      A.  Yes.
6      Q.  And are you familiar with the notes
7  that is issue -- at issue in the lawsuits?
8          MS. DANDENEAU:  Objection to form.
9      A.  Generally familiar.
10     Q.  Can we refer to the lawsuits that
11 Highland has commenced against the affiliates
12 collectively as the lawsuits?
13     A.  Yes.  And, again, the affiliates are
14 NexPoint, HCMFA, HCMS, and HCRE.
15     Q.  And Mr. Dondero?
16     A.  Okay.  See, that is a new -- and now
17 Mr. Dondero is included in your affiliate
18 definition.
19     Q.  I just --
20     A.  I thought affiliates -- I thought
21 affiliates were just the four prior entities,
22 so I just want to be clear.
23     Q.  I appreciate that.  So let's --
24 let's keep them separate and let's refer to the
25 four corporate entities as the affiliates, and

Page 55

WATERHOUSE - 10-19-21

1
2  Mr. Dondero we will call Mr. Dondero.  Okay?
3      A.  Okay.  Thank you.  As you can see,
4  Mr. Morris, there is a lot of entities -- a lot
5  here.  I just want to be clear.
6      Q.  Okay.  Now, the affiliates of
7  Mr. Dondero signed promissory notes that are
8  not subject to the lawsuit.
9          Do you understand that?
10         MS. DANDENEAU:  Objection to form.
11     A.  The affiliates and Mr. Dondero
12 signed --
13     Q.  You know what?  I will skip it.
14 That is okay.  Okay.
15         From time to time while you were
16 Highland's CFO, payments were applied against
17 principal and interests that were due under the
18 notes that were tendered by the affiliates and
19 Mr. Dondero; correct?
20         MR. RUKAVINA:  Objection to the
21     extent that calls for a legal conclusion.
22     A.  Yes.
23     Q.  Did Highland have a process where --
24 whereby payments would be applied against
25 principal and interest against the notes that

Page 56

WATERHOUSE - 10-19-21

1
2  were given by the affiliates and Mr. Dondero?
3      A.  Yes.
4      Q.  Can you describe the process for me?
5      A.  The process, payment should be
6  applied as laid out in the -- in the promissory
7  note.
8      Q.  From time to time were payments made
9  that were not required under the promissory
10 notes?
11         MS. DANDENEAU:  Objection to form.
12     A.  Yes.
13     Q.  Who was responsible for deciding
14 when and how much the payments would be made
15 with respect to each of the notes that were
16 issued by the affiliates and Mr. Dondero?
17     A.  Who was responsible for deciding how
18 much was paid prior to the due date?
19     Q.  Yes.
20     A.  I don't know.
21     Q.  Did you approve of each payment that
22 was made against principal and interest on the
23 notes that were given by the affiliates and
24 Mr. Dondero?
25         MS. DANDENEAU:  Objection to form.

Page 57

WATERHOUSE - 10-19-21

1
2      A.  Did I approve the payments?  I
3  approve -- I approve -- if there was cash -- if
4  there was cash being repaid on a note payment,
5  yes, I approved in the general sense of being
6  made aware of the payment and the amount.
7      Q.  And are you the person who
8  authorized Highland's employees to effectuate
9  those payments?
10     A.  Yes.
11     Q.  When you gave the instruction to
12 effectuate the payment, did you obtain
13 Mr. Dondero's prior approval?
14     A.  I mean, it -- I mean, it -- it
15 depends.
16     Q.  Can you think of any instance where
17 you directed Highland's employees to make a
18 payment of principal or interest against any
19 note that was tendered by an affiliate or
20 Mr. Dondero that Mr. Dondero did not approve of
21 in advance?
22     A.  I can't recall specifically.
23     Q.  Can you identify -- withdrawn.
24         Did Mr. Dondero ever tell you that a
25 payment that was made against principal and

Page 58

WATERHOUSE - 10-19-21

1  interest due under one of the notes that was
2  tendered by an affiliate or himself should not
3  have been made?
4      A.  Yes.
5      Q.  Can you identify the payment for me?
6      A.  It would be for -- NexPoint
7  Advisors.
8      Q.  Okay.  And when did Mr. Dondero tell
9  you that a payment that you had initiated on
10 behalf of NexPoint should not have been made?
11     A.  I wasn't initiating payment.  It was
12 in the context of the -- I think you used this
13 term, "the advisors," so NexPoint Advisors and
14 Highland Capital Management Fund Advisors had
15 overpaid on certain agreements with Highland
16 Capital Management, L.P. And as a part of that
17 process, the advisors -- what I was told at the
18 time were in talks and negotiations and
19 discussions with Highland Capital Management,
20 L.P., on offsets in relation to those
21 overpayments.
22     Q.  When did this conversation take
23 place?
24     MS. DANDENEAU:  Objection to form.
25

Page 59

WATERHOUSE - 10-19-21

1      A.  I don't recall specifically.
2      Q.  Do you recall what year it was?
3      A.  Yes.
4      Q.  What year did the conversation with
5  Mr. Dondero take place that you just described?
6      A.  2020.
7      Q.  Okay.  Do you remember if it was
8  December 2020?
9      A.  It -- it -- I don't -- I don't
10 recall what month specifically, but it would
11 have been November or December.
12     Q.  And we're talking here about a
13 payment of principal and/or interest that was
14 due -- withdrawn.
15     We're talking here about a payment
16 of principal and interest that was applied
17 against NexPoint's note; correct?
18     MS. DANDENEAU:  Objection to form.
19     A.  I don't recall what that payment
20 consisted of.
21     Q.  Is it possible that the payment you
22 have in mind related to the shared services
23 agreement?
24     MS. DANDENEAU:  Objection to form.
25

Page 60

WATERHOUSE - 10-19-21

1      A.  No.
2      Q.  Are you certain that the payment --
3  that the payment that you have in mind related
4  to the promissory note that NexPoint issued in
5  favor of Highland?
6      MS. DANDENEAU:  Objection to form.
7      A.  Yes.
8      Q.  Okay.  Other than that one payment,
9  can you identify any other instance where
10 Mr. Dondero told you that a payment should not
11 have been applied against principal and
12 interest under any promissory note tendered by
13 any affiliate or Mr. Dondero?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Objection to
16 form.
17     A.  Not that I recall.
18     Q.  Thank you very much.
19     Do you know if Mr. Dondero approved
20 in advance of each loan made to each affiliate
21 and himself during the time that you were the
22 CFO?
23     MS. DEITSCH-PEREZ:  Object to the
24 form.
25

Page 61

WATERHOUSE - 10-19-21

1      A.  Yes, generally.
2      Q.  Can you identify any loan that was
3  ever made to an affiliate or to Mr. Dondero
4  that Mr. Dondero did not approve of in advance?
5      A.  Other than the ones that are in
6  dispute, I'm not aware.
7      Q.  Do you believe that Mr. Dondero did
8  not approve of each of the loans that are in
9  dispute in advance of the time that the loan
10 was made?
11     MS. DANDENEAU:  Objection to form.
12     A.  Given what is in the dispute, you
13 know, and -- and -- and the way things might --
14 yeah, I mean...
15     Q.  I am not asking about the dispute,
16 and it was probably my mistake to follow you
17 there.
18     Were you aware of every loan made by
19 Highland to each of its affiliates and
20 Mr. Dondero while you were the CFO at the time
21 each loan was made?
22     A.  Was I aware of every loan, yes.
23     Q.  Okay.  And if you put yourself back
24 in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21

1
2 that were made to one of the affiliates or
3 Mr. Dondero during the time that you were the
4 CFO was made without Mr. Dondero's prior
5 knowledge and approval?
6     A.   Not that I recall.
7     Q.   Thank you.  In fact, do you -- as
8 the CFO, would you have allowed Highland to
9 loan money to an affiliate or to Mr. Dondero
10 without obtaining Mr. Dondero's prior approval?
11        MS. DANDENEAU:  Objection to form.
12     A.   I can't -- there was so many times
13 over the years, I can't speak for every single
14 one, but generally, yes, I -- I spoke to him.
15     Q.   You -- you never -- you never --
16 withdrawn.  I will just take that.
17        Can you recall any payment that was
18 ever made against principal and interest on a
19 note that was issued in favor of Highland by an
20 affiliate or Mr. Dondero that you personally
21 did not know about in advance?
22     A.   There are so many through the years,
23 I don't -- I don't -- I don't recall every
24 single one.
25     Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21

1
2 that was made against principal and interest on
3 any note tendered by any affiliate or
4 Mr. Dondero that you didn't know about in
5 advance?
6     A.   I don't recall.
7     Q.   Other than Mr. Dondero -- withdrawn.
8        Did anybody at Highland have the
9 authority to make a payment against principal
10 and interest due under a loan given to the
11 affiliates and Mr. Dondero without your
12 knowledge and approval?
13        MS. DANDENEAU:  Objection to form.
14     A.   Sorry, there was -- to make a
15 payment on an affiliate loan, what you are
16 saying would it require my knowledge and
17 approval, yes.
18     Q.   Okay.  I appreciate that.  Thank
19 you.
20        Did anybody at Highland have the
21 authority, to the best of your knowledge, to
22 effectuate a loan to an affiliate without
23 Mr. Dondero's prior knowledge and approval?
24        MS. DANDENEAU:  Objection to form.
25     A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21

1
2 generally, yes.
3     Q.   Did you personally communicate with
4 Mr. Dondero to let him know each time a payment
5 of principal or interest was being made against
6 any note that was tendered by an affiliate or
7 Mr. Dondero to Highland?
8     A.   I don't -- are you saying, did I let
9 Mr. Dondero know if a payment was made on any
10 affiliate or loan to Mr. Dondero?  I mean,
11 not -- not every -- no.
12     Q.   Let me ask it this way:  Did you
13 have a practice of informing Mr. Dondero when
14 payments were made against principal and
15 interest on any note that was tendered by an
16 affiliate or Mr. Dondero?
17        MS. DEITSCH-PEREZ:  Objection to
18 form.
19        MS. DANDENEAU:  Objection to form.
20     A.   No, I did not.
21     Q.   Did Mr. Dondero ever tell you that a
22 payment of principal or interest had been made
23 against a note that was tendered by an
24 affiliate or himself that he had been unaware
25 of?

Page 65

WATERHOUSE - 10-19-21

1
2     A.   Not that I recall.
3     Q.   Are you aware that Mr. Dondero and
4 the affiliates -- withdrawn.
5        Are you aware that Mr. Dondero
6 NexPoint, HCRE, and HCMS all contend that they
7 do not have to pay on any of the notes they
8 issued because they are subject to an oral
9 agreement between Mr. Dondero and Nancy
10 Dondero, in her capacity as the trustee of the
11 Dugaboy Investment Trust?
12        MS. DANDENEAU:  Objection to form.
13     A.   I didn't -- I didn't -- I didn't
14 know that it was all notes.
15     Q.   Okay.  Are you -- did you ever learn
16 that there was an oral agreement between Jim
17 Dondero and Nancy Dondero pertaining to any
18 notes issued by any affiliate or Mr. Dondero?
19        MS. DEITSCH-PEREZ:  Object to the
20 form.
21     A.   Yes.
22     Q.   Do you have any understanding as to
23 the terms of that agreement?
24     A.   Yes.
25     Q.   What is your understanding of the

Page 66

WATERHOUSE - 10-19-21

1
2  terms of the agreement?
3      A.   That there were certain milestones
4  that had to be reached.
5      Q.   Do you have any understanding of the
6  terms of the agreement between Mr. Dondero and
7  Nancy Dondero concerning any of the notes
8  issued by the affiliates or Mr. Dondero other
9  than that there have to be milestones reached?
10         MS. DEITSCH-PEREZ:  Object to the
11     form.
12     A.   There are milestones, I found out
13  yesterday, or there was some --
14         MS. DANDENEAU:  Okay.  I'm just
15     going to object to the extent that you
16     learned anything in conversations with
17     counsel, please don't reveal -- that is
18     privileged, and don't reveal any privileged
19     communications.
20         THE WITNESS:  Okay.
21     A.   So I'm not aware of anything else.
22     Q.   Do you know what the milestones
23  were?
24         MS. DANDENEAU:  Objection to form.
25     A.   I don't.

Page 67

WATERHOUSE - 10-19-21

1
2      Q.   Do you know anything about -- do you
3  know what promissory notes the agreement
4  covered?
5      A.   I don't.
6      Q.   Do you know if -- if Jim and Nancy
7  Dondero entered into one agreement or more than
8  one agreement?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   I don't know.
12     Q.   Do you know if the agreement is in
13  writing?
14     A.   I don't know.
15     Q.   How did you learn of the existence
16  of the agreement?
17         MS. DANDENEAU:  Objection to form.
18         Again --
19     A.   I don't -- I don't recall who told
20     me.
21     Q.   You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24         MS. DEITSCH-PEREZ:  Object to the
25     form.

Page 68

WATERHOUSE - 10-19-21

1
2      A.   I don't recall.
3      Q.   Do you recall how you learned of the
4  agreement?
5          Was it in a meeting?  Was it in a
6  phone call?  Was it in an email?
7      A.   I don't recall.
8      Q.   Do you recall when you learned of
9  the agreement?
10     A.   Not specifically.
11     Q.   Do you recall what year you learned
12  of the agreement?
13     A.   In -- look, I mean, there are so
14  many notes.  I may be getting -- I believe it
15  was 2020.
16     Q.   All right.  I'm not asking about
17  notes, sir.  I'm asking about the agreement
18  that you testified you knew about between Jim
19  and Don- -- Nancy Dondero.  Okay.
20         Do you understand my question now?
21  Should I ask my question again?
22     A.   Yeah, sure.  Go ahead.
23     Q.   I'm going to use the word
24  "agreement" to refer to the agreement that
25  Mr. Dondero and Nancy Dondero entered into

Page 69

WATERHOUSE - 10-19-21

1
2  where you understood that certain milestones
3  had to be reached.  Okay?
4      A.   Uh-huh.
5          MS. DANDENEAU:  Objection.
6          MS. DEITSCH-PEREZ:  Object to the
7      form.
8          MR. MORRIS:  Just defining a term,
9      what is the objection.
10         MS. DEITSCH-PEREZ:  The objection --
11         MR. MORRIS:  I will move on.  I will
12     move on.
13         MS. DEITSCH-PEREZ:  John --
14     Q.   Sir, are you okay with that
15  definition of agreement?
16     A.   Okay.
17     Q.   Okay.  So you don't recall who --
18  who informed you of the existence of the
19  agreement; is that right?
20     A.   I don't recall.
21     Q.   You don't recall who told you the
22  terms of the agreement.
23         Do I have that right?
24     A.   Correct.
25     Q.   And you don't recall if you learned

Page 70

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  about the agreement in a meeting, through an
3  email, or through a phone call.
4       Do I have that right?
5  A.  I don't recall.
6  Q.  Can you tell me when you learned of
7  the agreement?
8  A.  I don't -- I don't -- I don't
9  remember specifically.
10  Q.  Can you tell me if you learned of
11  the agreement before or after the petition
12  date?
13  A.  It would have been -- it would have
14  been after.
15  Q.  Can you tell me if you learned of
16  the agreement before or after January 9th,
17  2020?
18  A.  It would have been after.
19  Q.  Can you tell me if you learned of
20  the agreement before or after you left Highland
21  Capital Management in February of 2021?
22  A.  I don't -- I don't -- I don't know.
23  Q.  It is possible that you learned of
24  it while you were a Highland employee.
25       Do I have that right?

Page 71

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  A.  I don't remember the -- I mean, it
3  was sometime in 2021.  I don't remember when.
4  Q.  All right.  So to the best of your
5  recollection, it was in 2021 but you don't
6  recall if it was before or after you ceased to
7  be a Highland employee.
8       Do I have that right?
9  A.  Yeah, I mean, it was -- it was
10  likely after I was -- after I left Highland
11  because, if I put myself back into the last
12  days of -- of 2021, it was -- you know, the
13  communications with Mr. Dondero were -- were --
14  were -- there weren't as many communications
15  because of the circumstances.
16  Q.  And so based on that you believe
17  that it is most likely that you learned of this
18  agreement sometime after you left Highland
19  employment?
20  A.  I wouldn't use the term "most
21  likely."  I don't recall specifically.  I don't
22  recall.
23  Q.  Do you recall ever telling Jim Seery
24  about this agreement?
25  A.  No, I don't -- I didn't tell

Page 72

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  Jim Seery.
3  Q.  Did you tell anybody at DSI about
4  this agreement?
5  A.  No.
6  Q.  Did you tell any of Highland's
7  independent directors about this agreement?
8  A.  No.
9  Q.  Did you tell anybody at Pachulski
10  Stang Ziehl & Jones about this agreement?
11  A.  No.
12  Q.  Did you tell any employee of
13  Highland about this agreement?
14  A.  No.
15       MS. DANDENEAU:  Mr. Morris, it has
16  been an hour and a half.  Is this a good
17  time for a break?
18       MR. MORRIS:  Sure.
19  Q.  Mr. Waterhouse, I will just remind
20  you that during the break please don't speak
21  with anybody about the deposition, the
22  substance of your testimony or anything else
23  concerning the deposition.  Okay?
24  A.  Yes.
25       MR. MORRIS:  So it is 11:02.  We're

Page 73

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  at 11:02 your time.  Let's come back, I
3  guess, at 15 -- at 11:15 your time.
4       VIDEOGRAPHER:  We're going off the
5  record at 11:02 a.m.
6  (Recess taken 11:02 a.m. to 11:20 a.m.)
7       VIDEOGRAPHER:  We are back on the
8  record at 11:20 a.m.
9  Q.  Mr. Waterhouse, did you speak with
10  anybody during the break about this deposition?
11  A.  No.
12       MS. DANDENEAU:  Other than -- other
13  than his counsel.
14  Q.  Did you speak to your counsel about
15  the substance of your deposition today?
16  A.  No, I didn't bring it up.
17  Q.  I didn't ask you if you brought it
18  up.  I asked you if you had any conversation
19  with your lawyer about the substance of your
20  deposition.
21       MS. DANDENEAU:  Yes, he did.
22  Q.  Can you tell me what the -- you
23  discussed?
24       MS. DANDENEAU:  No, I object to
25  that.  He's not going to answer.  That is a

Page 74

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   privileged conversation.
3       MR. MORRIS: So I just want to make
4   sure that I understand. During the break
5   you spoke with your client about the
6   substance of this deposition; is that
7   right?
8       MS. DANDENEAU: Yes, John.
9       MR. MORRIS: And you refuse -- you
10  refuse to let your client tell me what was
11  discussed; is that right?
12      MS. DANDENEAU: That's correct.
13      MR. MORRIS: You know, I had given
14  the instruction prior to the break not to
15  speak with counsel. I would have
16  appreciated --
17      MS. DANDENEAU: No, you didn't --
18  actually, that is not true, Mr. Morris.
19  You said not to speak with anyone. We
20  never have interpreted that to mean
21  conversations with counsel. That's never
22  been -- I have never, ever heard that
23  instruction.
24      MR. MORRIS: Okay. We will -- we
25  will -- we will deal with it when and if we

Page 75

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   have to.
3       Q. Mr. Waterhouse, after learning about
4   the agreement, did you ask anybody if the
5   agreement was reflected in a writing?
6       MS. DANDENEAU: Objection to form.
7       A. No.
8       Q. Did you ask anybody if the terms of
9   the agreement were memorialized anywhere?
10      MS. DANDENEAU: Objection to form.
11      MR. MORRIS: What is the --
12      A. No.
13      MS. DANDENEAU: Well, because you
14  keep talking about this agreement and I --
15  I -- I think, Mr. Morris, that is really
16  not clear what you mean by "the agreement."
17  And maybe you can just go back and restate
18  what that is.
19      MR. MORRIS: Okay. Your client has
20  agreed with me twice on the definition, but
21  I will try one more time.
22      Q. Mr. Waterhouse, do you understand
23  that when I use the term "agreement," I'm
24  referring to the agreement between Jim and
25  Nancy Dondero concerning certain promissory

Page 76

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   notes where you learned that one of the terms
3   of the agreement was milestones reached?
4       A. Okay.
5       Q. And did you understand that that was
6   the -- the agreement that we were referring to
7   every time we used the word "agreement" in this
8   deposition?
9       A. I don't know anything about this
10  agreement. So, look, I do -- it -- I don't
11  know whether --
12      Q. Let's -- let's try this again.
13      A. Yeah. Look, I don't know what this
14  agreement relates.
15      MS. DEITSCH-PEREZ: John, John --
16      Q. Let me try --
17      MS. DEITSCH-PEREZ: John, please let
18  the witness finish.
19      MR. MORRIS: Please stop. Please
20  stop. Please stop talking.
21      MS. DEITSCH-PEREZ: No, you stop.
22  Let the witness --
23      MR. MORRIS: Stop talking.
24      MS. DEITSCH-PEREZ: -- finish -- you
25  interrupted him.

Page 77

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2       MR. MORRIS: You know what, you
3   guys, this is really wrong. It is really,
4   really wrong. Okay?
5       I had the witness agree not once,
6   but twice to the definition of agreement.
7   Okay? I'm going to try and do it a third
8   time.
9       MS. DANDENEAU: No, but, please,
10  John, really --
11      MR. MORRIS: No, please stop
12  talking. Please. It is my deposition.
13  Object to questions.
14      MS. DANDENEAU: No, but also you
15  instructed him that -- that if you were
16  going -- if you were interrupting him, that
17  he should remind you that you're
18  interrupting him and -- and --
19      MR. MORRIS: Let him do that. Let
20  him do that.
21      MS. DANDENEAU: Okay. Well, you --
22      MR. MORRIS: Please stop talking.
23      A. Okay. I don't know any of the
24  details of these agreements. I don't know
25  anything about them. I heard -- someone -- I

Page 78

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  don't know who, I don't know when, as you
3  asked, sometime in '21, someone told me about
4  this -- or I don't honestly know -- I don't
5  even recall exactly how I was made aware of
6  this, but I was. I don't know -- I don't know
7  any of these details, and I'm getting -- again,
8  there is, you know, I -- I -- I had a passing
9  conversation with -- with Jim at some point
10  on -- on some -- on the executive comp, and I'm
11  getting confused of what is what, because
12  again, I don't know any of these details.
13  Q.  Okay. Let me try again,
14  Mr. Waterhouse, and I apologize.
15  Are you aware of any agreement
16  between Jim Dondero and Nancy Dondero
17  concerning any promissory note that was given
18  to Highland by any affiliate or Mr. Dondero?
19  MS. DEITSCH-PEREZ: Object to the
20  form.
21  A.  I've heard of an agreement. That
22  is -- that is -- I mean, if you are using aware
23  as heard, sure.
24  Q.  And you understand that one of the
25  terms of the agreement is that it was based on

Page 79

WATERHOUSE - 10-19-21

1  milestones that had to be reached; is that
2  right?
3  MS. DANDENEAU: Objection to form.
4  A.  That was one of the words that was
5  used when I heard about it, yes.
6  Q.  And when you heard about this
7  agreement that had a term in it concerning
8  milestones reached, did you ask the person who
9  was telling you about the agreement whether or
10  not it was in writing?
11  A.  I did not.
12  Q.  Did you ask any questions at all?
13  MS. DANDENEAU: Objection to form.
14  A.  Not that I recall.
15  Q.  But do you understand that going
16  forward, we're going to refer to the agreement
17  as the agreement that you just described that
18  you were --
19  MS. DANDENEAU: Object to the form.
20  A.  Yes.
21  Q.  Okay. You don't have any personal
22  knowledge concerning the terms of the
23  agreement; correct?
24  MS. DEITSCH-PEREZ: Object to the

Page 80

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  form.
3  Q.  You can answer.
4  A.  I don't -- I heard about the
5  agreement. I don't know anything -- I heard
6  there was an agreement. That is -- again, as I
7  testified before -- I said before, heard about
8  it, don't know the details. I believe it was
9  sometime this year.
10  Q.  Do you have any personal knowledge
11  about the terms of the agreement, sir?
12  MS. DANDENEAU: Objection to form.
13  A.  Other than what I have previously
14  discussed, I don't -- I don't know.
15  Q.  Did -- did Mr. Dondero tell you
16  about the existence of the agreement?
17  A.  I don't recall.
18  Q.  Do you recall the source of your
19  information when you learned about the
20  agreement?
21  A.  No, I don't -- I don't recall. I
22  don't remember. I just -- I heard about it
23  generally. I don't remember -- I don't
24  remember who, how, if, how. I don't remember.
25  Q.  You know, Mr. Waterhouse, I just

Page 81

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  want to be clear that I never would have asked
3  you to appear at this deposition if your name
4  hadn't been included in responses to discovery
5  as to somebody with knowledge about the -- who
6  was told about the existence of the agreement.
7  That is what prompted me do this,
8  and I really do feel compelled to tell you that
9  I otherwise would never have called you as a
10  witness. So I regret that you're being put
11  through this today. I had no intention of
12  burdening you or taking your time, but that is
13  the reason that we issued the subpoena is
14  because certain of the defendants identified
15  you as somebody --
16  MS. DEITSCH-PEREZ: Mr. Morris, you
17  are here to ask questions, not to have --
18  MR. MORRIS: I feel badly for the
19  guy. I really do.
20  MS. DEITSCH-PEREZ: I'm sure you do.
21  MR. MORRIS: I do. Stop.
22  MS. DEITSCH-PEREZ: You stop.
23  MR. MORRIS: I'm allowed.
24  MS. DEITSCH-PEREZ: No, you're not
25  allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1
2   Q.   Okay.  Well, I hope that you
3   appreciate what I'm saying here,
4   Mr. Waterhouse.
5        MS. DANDENEAU:  All right.  Let's go
6   ahead and ask questions, and again, you're
7   entitled to probe his -- his knowledge
8   of -- whatever knowledge he has about
9   this -- this agreement and --
10       MR. MORRIS:  That is what I'm doing.
11       MS. DANDENEAU:  -- he will answer
12   the questions to the best that he can.
13       MR. MORRIS:  That is what I'm doing.
14   Q.   Mr. Waterhouse, I take it you do not
15   know which promissory notes issued by which
16   affiliates or Mr. Dondero are the subject of
17   this agreement; do I have that right?
18   A.   Yes, I don't -- I don't know.
19   Q.   Do you know of any way to determine
20   which promissory notes issued by the affiliates
21   and Mr. Dondero are the subject of this
22   agreement other than asking Jim or Nancy
23   Dondero?
24       MS. DANDENEAU:  Objection to form.
25   A.   I don't know.

Page 83

WATERHOUSE - 10-19-21

1
2   Q.   Did you ever make --
3   A.   I don't know anything about these
4   agreements.
5   Q.   Did you ever make any effort to
6   determine which promissory notes are subject to
7   this agreement?
8   A.   No.
9   Q.   Did you ever ask anybody which
10   promissory notes are subject to this agreement?
11   A.   No.
12   Q.   Do you know if there is a list
13   anywhere of the promissory notes that are
14   subject to this agreement?
15   A.   I'm not aware.
16   Q.   Have you ever seen the terms of the
17   agreement written down anywhere?
18   A.   No.
19   Q.   Have you ever asked anybody whether
20   the terms of the agreement were written down
21   anywhere?
22   A.   I have not.
23   Q.   Did learning about the agreement
24   cause you to do anything in response?
25       MS. DANDENEAU:  Objection to form.

Page 84

WATERHOUSE - 10-19-21

1
2   A.   No.
3   Q.   Did anybody ever describe to you the
4   nature of the milestones that you referred to
5   earlier?
6   A.   No, I don't -- I don't have any
7   details of this.
8   Q.   That is fine.
9        PricewaterhouseCoopers served as
10   Highland's outside auditors prior to the
11   petition date; correct?
12   A.   Yes.
13   Q.   You refer to PricewaterhouseCoopers
14   as PwC?
15   A.   Yes.
16   Q.   PricewaterhouseCoopers audited
17   Highland's financial statements on an annual
18   basis; correct?
19   A.   During my -- during my time as -- as
20   CFO, yes, PricewaterhouseCoopers was the
21   auditor.
22   Q.   Do you know why Highland had its
23   annual financial statements audited each year?
24   A.   Generally.
25   Q.   Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1
2   as to the reason why Highland had its annual
3   financial statements audited each year.
4   A.   From -- from time to time, they were
5   used -- or asked for, as part of diligence or
6   transactions or -- or things of that nature.
7   Q.   And were they given to third parties
8   for purposes of diligence or transactions from
9   time to time?
10   A.   As far as I'm aware, yes.
11   Q.   And was it your understanding as the
12   CFO that the third parties who received the
13   financial statements in diligence or
14   transactions was going to rely on those?
15       MS. DANDENEAU:  Objection to form.
16   A.   I don't know -- I don't know gen --
17   I don't know specifically what they were going
18   to rely on.  You know, we would get requests
19   for audited financial statements.  I don't know
20   what they were relying on.
21   Q.   And --
22   A.   You would have to ask them.
23   Q.   Did you personally play a role in
24   PwC's annual audit and the conduct of the
25   audit?

Page 86

WATERHOUSE - 10-19-21
1
2        MS. DANDENEAU:  Objection to form.
3     A.   During my tenure as CFO, I played a
4  very minimal role.
5     Q.   What was the minimal role that you
6  played?
7     A.   You know, again, it was -- it was to
8  check in with the team, to make sure that, you
9  know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages.  I mean, this is -- but I -- I --
17  I played a minimal role towards the end.
18        Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21     Q.   Okay.  Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25     A.   Yeah.  I mean, there was -- there

Page 87

WATERHOUSE - 10-19-21
1
2  was a -- there was a point -- it varies.  It
3  varies by year, in function, in time and, you
4  know, depending on the request, but yes, I
5  mean, there is -- there is -- there is
6  generally a point person of communication.
7     Q.   And who was the point person from
8  2016 until the time you left Highland?
9     A.   I don't -- I don't know
10  specifically, but it would have been, you
11  know -- you know, someone on the corporate
12  accounting team.
13     Q.   And was there a head of the
14  corporate accounting team?
15     A.   Yes, so -- yes.
16     Q.   Who was the head of corporate
17  accounting for the five years prior to the time
18  you left Highland?
19     A.   I don't -- if you're asking from
20  2016 on, I don't -- it was Dave Klos, but,
21  again, there was -- there was changes to the
22  team and the reporting structure.  I don't
23  remember exactly when that happened during --
24  you know, over the last -- since 2016.
25     Q.   Did the folks who participated and

Page 88

WATERHOUSE - 10-19-21
1
2  ran the audit all report to you, directly or
3  indirectly?
4     A.   Yes.
5     Q.   And did you have any responsibility
6  for making sure that the audit report was
7  accurate before it was finalized?
8     A.   Yeah.  I mean, you know, that --
9  that is -- my responsibility to the auditors
10  was -- again, is -- and the CFO is to -- we are
11  providing accurate financial statements; right?
12        And -- and -- and as part of any
13  audit, we disclose all relevant information as
14  part of any audit.
15     Q.   Okay.  And as the CFO, did you take
16  steps to make sure that the audit report was
17  accurate?
18     A.   I mean, I would say in a general
19  sense, yes.  But, again, I mean, I had a
20  very -- I had a very capable and competent
21  team.  I wasn't managing them.
22        You know, part of what I do is I let
23  the team -- I want managers to grow.  I want
24  managers to have rope.  And that is -- you
25  know, I'm not a stand-behind-you type of guy.

Page 89

WATERHOUSE - 10-19-21
1
2  If you -- if you talk to my team members, I'm
3  not micromanaging people.  I want people to
4  learn and grow in their function so they can go
5  on and do bigger and better things with their
6  careers.
7        And so, yes, generally I was
8  responsible for it, but I wanted the team to
9  learn and grow and be responsible for the bulk
10  of the audit.
11     Q.   Did you personally review each audit
12  report before it was finalized to satisfy
13  yourself that it was accurate?
14     A.   I don't -- I don't recall, you know,
15  for every single -- we're talking 2016, there
16  would have been three years, 2016 to '17, '18.
17  I don't -- we're -- we're going back
18  five years-plus.  I don't -- you know, I don't
19  recall.
20     Q.   Did you have a practice that you
21  employed to make sure that you were satisfied
22  that Highland's audit reports were true and
23  accurate to the best of your knowledge?
24     A.   I mean, our -- the practice was set
25  up with our -- the -- the practice to put

Page 90

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  together accurate audited or accurate financial
3  statements is to your control environment.
4          So, you know, the -- so the practice
5  was to maintain a stable control environment
6  which then the output is -- is accurate
7  financial statements.
8          So -- so, you know, if I was
9  comfortable that the control environment was
10  operating, then, you know, that would dictate
11  how I would -- you know, what I might or might
12  not do in a given year.
13    Q.   Okay. Do you recall ever being
14  uncomfortable with the control environment
15  during the period that you served as CFO?
16    A.   Yeah. I mean, look, yes, there are
17  times -- you know, nothing is perfect. So
18  there were -- there were times when, yes, you
19  know -- there are times I learned I was
20  uncomfortable with the control environment, and
21  that is part of the management of the process
22  and having, you know -- and -- and working
23  through whatever obstacles present themselves.
24    Q.   Okay. Were you ever uncomfortable
25  with the control process as it related to

Page 91

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  reporting and disclosures of loans to
3  affiliates and Mr. Dondero?
4          MS. DANDENEAU:  Objection to form.
5    A.   I don't -- I don't recall --
6    Q.   So you don't recall --
7    A.   -- the --
8          MS. DANDENEAU:  Mr. Morris --
9    A.   I don't recall being uncomfortable.
10  But, again, we're going back several years. I
11  don't -- you know, the practice in an audit is
12  to disclose all information to the auditors.
13  And I don't -- I don't recall.
14    Q.   As part of the process of the audit,
15  did you sign what is sometimes referred to as a
16  management representation letter?
17    A.   Yes.
18          MR. MORRIS:  Can we put up on the
19  screen a document that we have premarked as
20  Exhibit 33.
21          (Exhibit 33 marked.)
22          MS. DANDENEAU:  Mr. Morris, that is
23  not in the binder; correct?
24          MR. MORRIS:  Correct.
25    Q.   So you will see, Mr. Waterhouse,

Page 92

1          WATERHOUSE - 10-19-21
2  this is a letter dated June 3rd. And if we
3  could go to the signature page.
4          And do you see that you and
5  Mr. Dondero signed this document?
6    A.   Yes.
7    Q.   That is your signature; right?
8    A.   Yes.
9          MR. MORRIS:  Okay. Can you go back
10  to the top.
11          MS. DANDENEAU:  Mr. Morris, can you
12  have somebody post this in the chat so that
13  we have can have a copy of this, please.
14          MR. MORRIS:  Yeah, sure. Asia, can
15  you do that, please.
16    Q.   Okay. Do you see at the bottom of
17  the second paragraph there is a reference to
18  materiality?
19    A.   Yes.
20    Q.   Okay. It says, Materiality used for
21  purposes of these representations is
22  $1.7 million.
23          Do you see that?
24    A.   I do.
25    Q.   And did PwC set that level of

Page 93

1          WATERHOUSE - 10-19-21
2  materiality?
3    A.   Yes.
4    Q.   And for purposes of the audit, did
5  PwC set the level of materiality each year?
6    A.   Yes.
7    Q.   Did that number change over time?
8    A.   I'm not aware of what materiality is
9  every single year, so -- but, you know, this
10  number would likely fluctuate.
11    Q.   Okay. I'm going to go back to a
12  question I asked you earlier today. And that
13  is in connection -- this letter is issued in
14  connection with the audit for the period ending
15  12/31/2018; correct?
16    A.   Yes.
17    Q.   Okay. And is it fair to say that if
18  any -- actually, withdrawn. I'm going to take
19  it outside of this.
20          If Highland ever forgave the loan to
21  any affiliate or any of its officers or
22  employees, in whole or in part, to the best of
23  your knowledge, would that forgiveness have
24  been disclosed in the audited financial
25  statements if it exceeded the level of

Page 94

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  materiality that PwC established?
3      MS. DANDENEAU:  Objection to form.
4      A.  So, again, during my tenure as CFO,
5  and -- Highland -- it was -- it is required to
6  disclose any affiliate loans that are in excess
7  of materiality.
8      Now, the forgiveness of those loans
9  may or may not -- I mean, since materiality
10  fluctuates every year, a -- you know, if a loan
11  was forgiven, it may or may not, you know --
12  and, look, I would want to consult the guidance
13  around this.
14      It is not something we do -- you
15  know, it is not -- you know, GAAP can be and
16  disclosures can be very specialized so, again,
17  we want to consult the guidance.  But we would
18  see if and what would need to be disclosed if
19  it were deemed immaterial.
20      Q.  Did you and Mr. Dondero sign
21  management representation letters of this type
22  in each year in which you served as Highland's
23  CFO?
24      A.  I -- I -- I will speak for myself.
25  I signed them.  There may have been others that

Page 95

1      WATERHOUSE - 10-19-21
2  signed as well.  I don't -- I don't recall.
3      Q.  But to the best of your knowledge,
4  you, personally, signed a management
5  representation letter in connection with
6  Highland's audit each year that you served as
7  the CFO; correct?
8      A.  I would say generally speaking,
9  Mr. Morris.  I don't recall for every single
10  year, you know, generally, but I would want to
11  refer to all the rep letters and see who signed
12  them.
13      Q.  Do you recall Highland having its
14  financial statements audited in any year during
15  the period that you were a CFO where you didn't
16  sign the management representation letter?
17      A.  I don't recall.  But, John, we're
18  going back five, six, seven, eight, nine,
19  decade.  I don't -- I don't remember.
20      Q.  I don't want to go back that many
21  decades, but I'm just asking you if you recall
22  that there was you didn't sign it?
23      A.  I -- I -- I don't, but my memory
24  is -- again, I -- I -- I can't tell you what I
25  did in 2012.  I mean, I think generally, yes,

Page 96

1      WATERHOUSE - 10-19-21
2  but I don't -- I don't know for sure, and I
3  would want to rely on the document.
4      Q.  Let me ask the question a little bit
5  differently then.
6      Do you have any reason to believe
7  that Highland had its annual financial audit
8  and you did not sign a management
9  representation letter in connection with that
10  audit?
11      MS. DANDENEAU:  Objection to form.
12      A.  I don't believe it would, but,
13  again, I would want to -- I don't recall and I
14  would want to confirm it to -- to make, you
15  know, an affirmative -- to give an affirmative
16  answer.
17      Q.  Do you know whether PwC required
18  management to sign management representation
19  letters?
20      MS. DANDENEAU:  Objection to form.
21      A.  Yes.  I mean, it -- management
22  representation letters are signed by
23  management.
24      Q.  Okay.  And do you know -- do you
25  have any understanding as to why PwC requires

Page 97

1      WATERHOUSE - 10-19-21
2  management to sign management representation
3  letters?
4      MS. DEITSCH-PEREZ:  Object to the
5  form.
6      A.  I don't know why PwC's -- what PwC's
7  specific practice is.  I know generally what
8  management representation letters are.
9      Q.  Okay.  Do you personally -- I'm not
10  asking about PwC.  I'm asking for you -- I'm
11  asking about you, do you have an understanding
12  as to why the auditor asks for management
13  representation letters?
14      A.  Okay.  So you're asking me in my
15  personal capacity, yes, I have a general
16  understanding of why.
17      Q.  Can you give me the general
18  understanding that you have as to why
19  management representation letters are required?
20      A.  They are -- they are required to --
21  they are -- they are one of the items required
22  in an audit to help verify completeness.
23      Q.  Do you have any -- any other
24  understanding as to why management
25  representation letters are required?

Page 98

WATERHOUSE - 10-19-21

1    A.   That is -- that is -- other than
2  what I said, it is -- it is -- it is required
3  so -- to ensure that the -- you know, there
4  is -- there is completeness in what is being
5  audited.
6    Q.   Did you -- did you have a practice
7  whereby you and Mr. Dondero conferred about the
8  management representation letters before you
9  signed them?
10    A.   No.
11    Q.   Did you have a practice --
12  withdrawn.
13    Do you see just the next sentence
14  after the materiality, there is a sentence that
15  states: We confirm, to the best of our
16  knowledge and belief, as of June 3rd, 2019, the
17  date of your report, the following
18  representations made to you during your audit.
19    Do you see that sentence?
20    A.   Yes.
21    Q.   Okay.  Did you understand when you
22  signed this letter that you were confirming the
23  representations that followed?
24    A.   When I signed this management

Page 99

WATERHOUSE - 10-19-21

1  letter -- representation letter, yes.
2    Q.   Okay.  Did you discuss this letter
3  with Mr. Dondero before you signed it?
4    A.   I don't recall.
5    Q.   Do you recall if Mr. Dondero asked
6  you any questions before he signed the letter?
7    A.   I don't recall.
8    Q.   Do you recall if you asked
9  Mr. Dondero any questions before you signed
10  this letter?
11    A.   I don't recall.
12    Q.   Is it fair to say that Mr. Dondero
13  did not disclose to you the existence of the
14  agreement that we have -- as we've defined that
15  term prior to the time you signed this letter?
16    MS. DANDENEAU:  Objection to form.
17    I don't think I understand the
18  question.  So, again, you are saying, did
19  Mr. Dondero not disclose to me the existence of
20  this letter?
21    Q.   No, I apologize.
22    Did Mr. Dondero disclose to you the
23  existence of the agreement prior to the time
24  you signed this letter on June 3rd, 2019?

Page 100

WATERHOUSE - 10-19-21

1    A.   The agreement -- the agreement that
2  we talked about earlier?
3    Q.   Correct.
4    A.   Look, as I said earlier, the first
5  time I heard of this agreement was sometime
6  this year.
7    Q.   Okay.  Can we turn -- let's just
8  look at a couple of items on the list.  If we
9  can go to page 33416.  Do you see in Number 35
10  it talks about the proper recording or
11  disclosure in the financial statements of ND
12  relationships and transactions with related
13  parties.
14    Do you see that?
15    A.   I do.
16    Q.   As the CFO, do you have any
17  understanding as to whether Dugaboy is a
18  related party?
19    A.   I don't recall.
20    Q.   Do you know whether any of the
21  affiliates are related parties?
22    A.   If -- if it was NexPoint, HCMFA,
23  HCMS, HCRE, yeah, if -- if that is the
24  affiliate definition, and there.  In ASC 850 --

Page 101

WATERHOUSE - 10-19-21

1  again, I mean, I haven't looked at ASC 850 in
2  quite some time, but, you know, if -- if there
3  is a control language, you know, ASC 850, would
4  that -- that section in GAAP would -- would
5  pick up and define what are related parties.
6    So, you know, like I said, if -- one
7  of the four entities I just described, if -- if
8  they are in that control definition of ASC 850,
9  they would be picked up in 35D.
10    Q.   Do you -- do you have any reason to
11  believe that they would be picked up in that
12  definition, based on your knowledge and
13  experience?
14    A.   I -- I believe that entities
15  controlled under GAAP are -- are affiliates.
16    Q.   Okay.  Would Mr. Dondero also
17  qualify as a related party for purposes of
18  Section 35D, to the best of your knowledge?
19    A.   Yeah, I don't -- I don't know.  I
20  would think -- I would have to read the code
21  section to see if someone personally -- is it
22  talking about related parties.  So, look, if
23  your own in control, yeah, I mean, I would have
24  to read the section.

Page 102

WATERHOUSE - 10-19-21

2    Q.   To the best of your knowledge, was
3  the existence of the agreement ever disclosed
4  to PwC?
5    A.   I'm not -- I'm not aware.
6    Q.   Do you recall if the agreement was
7  ever disclosed in Highland's audited financial
8  statements?
9    A.   I don't -- I don't remember if it
10  was in every Highland's audited financial
11  statements during my tenure.  We would have to
12  read the financial statements to see what was
13  disclosed, but I'm not -- I mean, as I sit here
14  today, I'm not aware.
15    Q.   That is all I'm asking for.
16    A.   I'm not aware.
17    Q.   Can we go to the next page, please,
18  and look at 36.  36 says, we have disclosed to
19  you the identity of the partnership's related
20  party relationships and all the related party
21  relationships and transactions of which we are
22  aware.
23      Do you see that?
24    A.   Yes.
25    Q.   To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

2  June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6    A.   I mean, I can speak for myself as
7  signer of this representation letter.  I
8  disclosed what -- what, you know, what --
9  what -- what I knew.  Sorry, look, yes, so I --
10  I disclosed what I knew.
11    Q.   Okay.  Can we go to page 419.  Do
12  you see at the end there is a reference to
13  events that occurred since the end of the
14  fiscal year and the date of the letter?
15    A.   Yes.
16    Q.   And were you aware of that -- of
17  that provision of the management representation
18  letter before you signed the document?
19    A.   Yes.
20    Q.   Do you have an understanding as to
21  why PwC asked for that confirmation of that
22  particular part of the management
23  representation letter?
24    A.   It is -- it is -- it is just -- it
25  is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

2    Q.   And do you understand -- do you have
3  an understanding that PwC wanted to know that
4  as of the date of the audit whether any
5  material changes had occurred since the end of
6  the fiscal year, using the definition of
7  materiality that is in this particular
8  management representation letter?
9    A.   It -- it is -- it is -- it is a --
10  it is as described.  It is just a poorly worded
11  question, so it is hard for me to say yes.
12    Q.   If I asked you this, I apologize,
13  but did you ever learn when the agreement was
14  entered into?
15    A.   I don't -- I don't -- like I said
16  before, I don't know or have any details of the
17  agreement.
18    Q.   Okay.  Did you ever ask anybody when
19  the agreement was entered into?
20    A.   I did not.
21    Q.   Let's look at the audited financial
22  statements.  We will put up on the screen a
23  document that has been premarked as Exhibit 34.
24      (Exhibit 34 marked.)
25      MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

2  Canty could please put that in the chat
3  room, that would be great.
4      MR. MORRIS:  I will assure you we
5  will put every document in the chat room.
6    Q.   Now, I'm just going to ask you
7  questions that are related to the provisions of
8  this report that concern the affiliate loans,
9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14    A.   Yes.
15    Q.   Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20    A.   Yes.
21    Q.   If we can go to -- I think it is the
22  next one, looking for PwC's signature line.
23      MS. CANTY:  I'm sorry, John, did you
24  say something?
25      MR. MORRIS:  Yes, can we turn the

Page 106

WATERHOUSE - 10-19-21

1  page. I think it is 215. Yes, stop right
2  there, just above -- I'm sorry, I want to
3  see just the date of the report.
4      Q.  Okay. Do you see at the bottom of
5  that page there, Mr. Waterhouse,
6  PricewaterhouseCoopers has signed this audit
7  report?
8      A.  Yes, I see their signature.
9      Q.  Okay. And it is the dated same day
10 as your management representation letter; is
11 that right?
12     A.  It is -- yes, it is the same day.
13     Q.  Was that the practice to sign the
14 management representation letter on the same
15 day that the audit report was signed?
16     A.  Yes, that is typical in every audit.
17     Q.  Can we just scroll down to the
18 balance sheet on the next page.
19         Do you see that there is a line
20 there that says, Notes and Other Amounts Due
21 from Affiliates?
22     A.  Yes.
23     Q.  Does that line, to the best of your
24 knowledge, include the amounts that were due

Page 107

WATERHOUSE - 10-19-21

1  under the affiliate under the notes signed by
2  the affiliates and Mr. Dondero?
3      MR. RUKAVINA:  Objection to the
4  extent that calls for a legal question.
5      A.  I mean, I would want to see the
6  detail and the build to this $173,398,000, but,
7  yes, I mean, if -- if -- given what we
8  discussed before, you know, it -- it should
9  capture that.
10     Q.  And -- and while you were the CFO of
11 Highland, were all notes held by Highland that
12 were issued by an affiliate or Mr. Dondero
13 carried as assets on Highland's balance sheets?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Object to form.
16     A.  I don't -- I don't know how else
17 they would be carried.
18     Q.  Okay. Can you think of any -- are
19 you aware of any promissory note issued by an
20 affiliate or Mr. Dondero that was not carried
21 on Highland's audited financial balance sheets?
22     A.  I'm -- I'm -- I'm not aware.
23     Q.  Okay. Are you aware of any category
24 of asset on Highland's balance sheet in which

Page 108

WATERHOUSE - 10-19-21

1  any of the promissory notes issued by an
2  affiliate or Mr. Dondero would have been
3  included?
4      MS. DANDENEAU:  Objection to form.
5      A.  Sorry, am I aware of any asset of an
6  affiliate being included --
7      Q.  That -- let me -- let me try again.
8         Do you see there is a number of
9  different assets that are described on this
10 balance sheet?
11     A.  Yes.
12     Q.  One of the assets that is described
13 is Notes and Other Amounts Due from Affiliates;
14 right?
15     A.  Yes.
16     Q.  And it is reasonable to conclude
17 that the notes from the affiliates and
18 Mr. Dondero are included in that line item;
19 right?
20     A.  Yes, based on this description.
21 Again, I would want to see a build of this to
22 100 percent confirm, but based on the
23 description, the asset description, it is -- it
24 is likely.

Page 109

WATERHOUSE - 10-19-21

1         Now, does that mean absolute?  I
2  don't know.
3      Q.  Do you have any reason to believe
4  that the promissory notes would have been
5  carried on the balance sheet in a category
6  other than Notes and Other Amounts Due from
7  Affiliates?
8      A.  If they were deemed -- no. If they
9  were deemed an affiliate, you know, under GAAP,
10 they should be carried in that line.
11 Otherwise, it would go into another line.
12     Q.  Okay. And do you see the total
13 asset base as of December 31st, 2018, was
14 approximately $1.04 billion?
15     A.  Yes.
16     Q.  Is my math correct that the Notes
17 and Other Amounts Due from Affiliates
18 constituted approximately 17 percent of
19 Highland's assets as of the end of 2018?
20     A.  Well, so how are you defining
21 Highland?
22     Q.  Highland Capital Management, L.P.,
23 the entity that this audit is subject to -- or
24 the subject of.

Page 110

WATERHOUSE - 10-19-21

1
2    A.   On a consolidated or unconsolidated
3  basis?
4    Q.   I'm looking at the balance sheet.
5  It is a consolidated balance sheet.  Okay?
6       Does the Notes and Other Amounts Due
7  from Affiliates constitute approximately
8  17 percent of the total assets of Highland
9  Capital Management, L.P., on a consolidated
10  basis?
11      MS. DANDENEAU:  Objection to form.
12    A.   I don't have a calculator in front
13  of me but I will take your math, if you are
14  taking the 173 divided by the billion.
15    Q.   Okay.
16    A.   If that is accurate, yes.  But,
17  again, on a consolidated basis.
18    Q.   And on an unconsolidated basis the
19  percentage would be higher; correct?
20    A.   I -- no.  I don't know.
21    Q.   Well, okay.  That is fair.
22      MR. MORRIS:  Can we turn to
23  page 241, please.
24    Q.   Do you see that this is a section of
25  the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

1
2  Other Amounts Due from Affiliates?
3    A.   Sorry, I can't see the -- the --
4    Q.   It is at the top.
5    A.   Notes and Other Amounts Due from
6  Affiliates, yes, I see that.  I don't -- I
7  don't have a page number, but I'm on a page
8  that says at the top:  Notes and Other Amounts
9  Due from Affiliates.
10    Q.   Okay.  And that is the same title of
11  the line item on the balance sheet that we just
12  looked at; right?  Notes and Other Amounts Due
13  from Affiliates?
14    A.   Yes.
15    Q.   And is it your understanding, based
16  on your experience and knowledge as the CFO,
17  that this is the section of the narrative that
18  ties into the line item that we just looked at?
19    A.   Yes.
20    Q.   And is this section of the audit
21  report intended to describe and disclose all of
22  the material facts concerning the Notes and
23  Other Amounts Due from Affiliates?
24      MS. DANDENEAU:  Objection, form.
25    A.   This -- these notes -- these notes

Page 112

WATERHOUSE - 10-19-21

1
2  of the financial statements are -- the purpose
3  is to disclose any material items in relation
4  to that balance sheet line item.
5    Q.   Okay.  And all of the information,
6  to the best of your knowledge, that is set
7  forth in this section of the audit report was
8  provided by Highland; correct?
9    A.   Yes, it would have been provided by
10  the corporate accounting team.
11    Q.   Okay.  And the corporate accounting
12  team, did that team report to you in the
13  organizational structure?
14    A.   Yes.
15    Q.   And did you have any concerns about
16  the controls that were in place to make sure
17  that the information provided with respect to
18  Notes and Other Amounts Due from Affiliates was
19  accurate and complete?
20      MS. DANDENEAU:  Objection to form.
21    A.   Not that I recall.
22    Q.   Okay.  Do you recall ever being
23  concerned that any portion of the Notes and
24  Other Amounts Due from Affiliates in any audit
25  report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

1
2  reliable?
3    A.   I didn't -- I had concerns about,
4  you know, like I talked about before, of there
5  were -- there were potentially issues in the
6  control environment.  But as far as it relates
7  to the audited financial statements, any -- the
8  team would work with the auditors to disclose
9  all -- all notes in Highland's possession.
10      And any -- any notes that were
11  deemed material by the auditor, right, these
12  were disclosed in these -- in this section, you
13  know, in -- in the notes to the consolidated
14  financial statements as you presented.
15    Q.   Do you recall ever having a
16  conversation with anybody at any time
17  concerning the accuracy of the section of audit
18  reports that relates to Notes and Other Amounts
19  Due from Affiliates?
20      MS. DANDENEAU:  Objection to form.
21    A.   You know, as -- as -- I didn't have
22  direct conversations with
23  PricewaterhouseCoopers as I had, you know --
24  I -- I had the team that managed this.
25      Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   being the point person of this audit.  And I
3   can't recall, you know, when -- you know, I
4   don't even know if I was ever the point person
5   during my tenure as CFO.
6        I don't know if PwC had any concerns
7   when they were performing those audit
8   procedures.  They may have and they may have --
9   and it may not have been communicated to me.  I
10  don't know.
11       MR. MORRIS:  All right.  I move to
12  strike.
13   Q.  And I'm going to ask you to listen
14  carefully to my question.
15       Did you -- do you recall ever having
16  a conversation with anybody at any time
17  concerning the accuracy of the reporting
18  provided in the audited financial statement on
19  the topic of Notes and Other Amounts Due?
20       MS. DANDENEAU:  Objection to form.
21   A.  I don't recall for this, but that
22  doesn't mean that it didn't exist.
23   Q.  Okay.  But you have no reason to
24  believe, as you sit here right now, that you
25  ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   accuracy of the section of the audit reports
3   called Notes and Other Amounts Due from
4   Affiliates; correct?
5        MS. DANDENEAU:  Object to the form.
6        MS. DEITSCH-PEREZ:  Objection to
7   form.
8    A.  I don't recall having any
9   conversations.  But, again, I mean, this is --
10  this is two years ago.
11   Q.  I'm just asking for your
12  recollection, sir.
13   A.  Yes.
14   Q.  If you don't recall, this will --
15   A.  Yeah.
16   Q.  (Overspeak) -- if you don't
17  recall --
18   A.  Yeah, I don't -- I don't recall.
19   Q.  Do you know who was responsible for
20  drafting the audit report?
21   A.  Are you asking the actual Highland
22  employee responsible?  I mean, it was
23  Highland's responsibility, so, I mean, that
24  is --
25   Q.  Right.

Page 116

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2    A.  -- Highland's responsibility.
3   Highland's responsibility.
4    Q.  Who, at Highland, was responsible
5   for drafting this section of the audit report?
6    A.  I -- I don't know the answer to
7   that.  Again, there was a team who worked on
8   this.  And I don't know, you know, whether it
9   was the staff or the manager.
10       Again, this is where I let the teams
11  manage.  And, you know, there may be a
12  corporate accountant who worked on this.  I
13  just -- you know, I wasn't part of that process
14  to give that person experience.  I don't know.
15   Q.  Do you recall having any
16  communications with anybody at any time
17  concerning this section of the report?
18   A.  Yeah, I don't recall.
19   Q.  Do you recall whether you ever told
20  anybody at any time that any aspect of this
21  section of the report was inaccurate or
22  incomplete?
23   A.  I don't recall.
24   Q.  As you sit here today, do you have
25  any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   audit report is incomplete or inaccurate in any
3   way?
4        And I'm happy to give you a moment
5   to -- to look at it, if you would like.
6        MS. DANDENEAU:  Objection to form.
7        MS. DEITSCH-PEREZ:  Same.
8    A.  I mean, I would have to look at -- I
9   would have to look at the bill to the note
10  schedule to make sure I know you presented me
11  with materiality, but again, there might be a
12  note as of 12/31/18 that somehow was -- was
13  under materiality not disclosed.  I don't -- I
14  don't know.  I would need more information.
15   Q.  Okay.  But without more information,
16  you have no reason to believe anything this
17  section is inaccurate; correct?
18       MS. DANDENEAU:  Objection to form.
19   A.  I don't.  I mean, you know, this was
20  part of the audit.
21   Q.  Thank you.  Now, you will see if we
22  could scroll just a little bit more that each
23  of the first five paragraphs concerns
24  specifically the four affiliates that we've
25  been discussing and Mr. Dondero.

Page 118

```
1           WATERHOUSE - 10-19-21
2       MR. MORRIS:  If we could go the
3   other way, La Asia.  We don't need Okada.
4   We're going to have to thread the needle.
5   Okay.  Good, perfect.
6       Q.  Do you see those five paragraphs
7   certain the four affiliates and Mr. Dondero as
8   we've been referring to today?
9       A.  Yes.
10      Q.  Okay.  And do you see at the end of
11  every paragraph it states, quote:  A fair value
12  of a partnership's outstanding notes receivable
13  approximates the carrying value of the notes
14  receivable?
15      A.  Yes, I see that.
16      Q.  Do you have an understanding of what
17  that means?
18      A.  Yes.
19      Q.  What is your understanding of that
20  sentence?
21      A.  It is the -- again, the -- the fair
22  value, right, which is -- which is what the --
23  what Highland could sell that asset for.  This
24  statement is comparing the fair value of the
25  notes to the carrying value, so the carrying
```

Page 119

```
1           WATERHOUSE - 10-19-21
2   value is the line item that you showed me
3   earlier that is in Notes and Other Amounts Due
4   from Affiliates.
5       Q.  Is another way to say this is
6   that the fair market value of the notes equals
7   the principal amount and -- withdrawn.
8       Is the fair way to interpret this
9   that the fair market value of the notes equals
10  all remaining unpaid principal and interest due
11  under the notes?
12      MS. DANDENEAU:  Object to the form.
13      MS. DEITSCH-PEREZ:  Objection, form.
14      A.  I don't know the answer to that,
15  because I don't recall where -- where any --
16  where -- in what line item was the interest
17  component reported.
18      Q.  All right.  Well, if we look in this
19  audit report, you will see in the middle of the
20  first paragraph, for example, it states that as
21  of December 31st, 2018, total interest and
22  principal due on outstanding promissory notes
23  was approximately $5.3 million.
24      Do you see that?
25      A.  I do.
```

Page 120

```
1           WATERHOUSE - 10-19-21
2       Q.  Is that the carrying value or the
3   fair value?
4       A.  That would be the carrying value --
5       Q.  And is the last --
6       A.  -- in my opinion.
7       Q.  Okay.  And it is in your opinion as
8   the chief financial officer of Highland during
9   the period of time that you described; right?
10  It is an educated opinion?
11      A.  I'm reading this at face value.  I'm
12  taking that as that is carrying value.
13      Q.  Okay.  And does the last sentence
14  say that the carrying value is roughly
15  approximate to the fair market value?
16      MS. DANDENEAU:  Objection to form.
17      MS. DEITSCH-PEREZ:  Objection, form.
18      A.  Again, this note to the financial
19  statement is specific to notes and other
20  amounts due from affiliates.
21      Q.  Correct.
22      A.  If the interest component is
23  reported elsewhere on the balance sheet, you
24  know, it -- it -- it could be off.  Again, I
25  don't have the detail.  I don't know, but yes,
```

Page 121

```
1           WATERHOUSE - 10-19-21
2   look, I mean, if you -- I mean, if you are
3   saying the 5.3 million is in the notes and
4   other amounts due from affiliates, then the
5   last statement is saying the fair value
6   approximates 5.3 million.  That is what that
7   last sentence is saying.
8       Q.  Do you see in the middle of the
9   first paragraph -- not in the middle, the next
10  to last sentence there is a statement that the
11  partnership will not demand payment on amounts
12  that exceed HCMFA's excess cash availability
13  prior to May 31st, 2021.
14      Do you see that?
15      A.  I do.
16      Q.  Do you know when Highland agreed not
17  to demand payment as described in that
18  sentence?
19      A.  I don't know specifically.
20      Q.  Do you know why Highland agreed not
21  to demand payment on HCMFA's notes until May
22  2021?
23      A.  Yes.
24      Q.  Why was that decision made?
25      A.  You know, well, it -- it -- that
```

Page 122

WATERHOUSE - 10-19-21

1
2  decision was made as to not put HCMFA into a
3  position where it didn't have sufficient assets
4  to pay for the demand note.
5      Q.   And at the time the agreement was
6  entered into, pursuant to which the partnership
7  wouldn't demand payment, did HCMFA have
8  insufficient assets to satisfy the notes if a
9  demand had been made?
10      MS. DANDENEAU:  Objection to form.
11      A.   I don't have HCMFA's financial
12  statements in front of me as of 12/31/18.
13      Q.   Was there a concern that HCMFA would
14  be unable to satisfy its demands under the
15  notes if demand was made?
16      MS. DANDENEAU:  Objection to form.
17      A.   Well, there is -- I don't recall --
18  I mean, there is something, right, in place to
19  basically not demand payment until May 31, 2021
20  as detailed here.
21      Q.   And who made the decision to enter
22  into -- who made the decision on behalf of
23  Highland not to demand payment until May 31st,
24  2021?
25      A.   I'm trying to remember.  I don't

Page 123

WATERHOUSE - 10-19-21

1
2  remember exactly -- I don't remember if it was
3  myself or -- or Jim Dondero who -- who -- there
4  was -- there was something signed, from what I
5  recall, that -- that -- that backed up this
6  line item in the -- in the notes I'm -- look,
7  I'm, I'm --
8      Q.   We will get to that.
9      A.   You --
10      Q.   I'm just --
11      A.   You have -- I mean --
12      Q.   We're going to give that to you.
13  I'm going to give that to you.
14      A.   You -- you -- you have all the
15  documents.  I don't have the documents, and
16  that is what makes it so hard.  I don't have
17  any documents to prepare for this deposition;
18  right?  You have all -- I don't -- I don't -- I
19  don't remember, but, you know, again, it would
20  probably be myself or Jim.
21      Q.   Do you know if Highland received
22  anything in return for its agreement not to
23  make a demand for two years?
24      A.   I don't -- I don't think it referred
25  anything.

Page 124

WATERHOUSE - 10-19-21

1
2      Q.   And did you and Mr. Dondero discuss
3  HCMFA's ability to satisfy the notes if a
4  demand was made at the time this agreement was
5  entered into?
6      MS. DANDENEAU:  Objection to form.
7      A.   I don't -- I don't -- I don't recall
8  having a specific conversation, if I did, or --
9  or David Klos.
10      Q.   Okay.  I'm just asking if you recall
11  any conversations that you had.
12      A.   I don't recall.
13      Q.   Okay.  Do you know why Highland
14  loaned the money to HCMFA that is the subject
15  of the notes described in this paragraph?
16      A.   I don't remember specifically why
17  5.3 million was loaned.  I mean, I -- it would
18  have to be put in the context.
19      Q.   Do you have any recollection at all
20  as to why Highland ever loaned any money to
21  HCMFA?
22      A.   Yes.
23      MS. DANDENEAU:  Objection to form.
24      Q.   What do you remember about that?
25      A.   There was a Highland Global

Page 125

WATERHOUSE - 10-19-21

1
2  Allocation Fund, which was a -- a fund managed
3  by Highland Capital Management Fund Advisors.
4  There was a -- we -- I'm just telling you,
5  there was -- there was -- there was a -- a
6  ultimately a NAV error found in this fund while
7  it was an open-ended fund and, you know, there
8  were amounts owed by the advisor in -- in
9  relation to that NAV error.
10      There were also, for the same fund,
11  that same fund was ongoing an
12  open-end-to-close-end conversion, and as part
13  of that proposal, shareholders who voted for
14  the conversion received compensation from the
15  advisor.
16      Q.   All right.  Now, the events that
17  you're describing occurred in the spring of
18  2019; right?
19      A.   These started back -- I think, I
20  mean --
21      Q.   I apologize.
22      A.   -- that -- I mean, the answer to
23  that is no.
24      Q.   I apologize, the loans that were
25  made in connection with the events that you're

Page 126

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   describing occurred in May 2019; right?
3       MR. RUKAVINA: Objection to the
4   extent that calls for a legal conclusion.
5       A.  I don't recall specifically what
6   amounts of money were moved when, for what
7   purpose.
8       Q.  Okay. Fair enough. Going to the
9   next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13      A.  This is for NexPoint Advisors?
14      Q.  Yes.
15      A.  I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18      Q.  Do you know why?
19      A.  But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21      Q.  Okay. That is fair. Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24      A.  Yes.
25      Q.  Why did High -- why do you recall --

Page 127

1       WATERHOUSE - 10-19-21
2   what is the reason you recall Highland lending
3   money to NexPoint?
4       A.  I mean, I was just -- I just -- I
5   just recall. I mean, I just -- I don't
6   remember why.
7       Q.  I understand. And I'm asking you if
8   you recall --
9       A.  Oh, why -- I thought you say --
10  NexPoint Advisors was launching a fund which
11  is -- I believe that the legal name is NexPoint
12  Capital, Inc. And it -- it provided a
13  co-invest into that fund.
14      And, from what I remember, the --
15  the -- that NexPoint borrowed money from
16  Highland at the time to make that co-invest.
17      Q.  So this was an investment that
18  NexPoint was required to make; is that right?
19      MS. DANDENEAU: Objection to form.
20      A.  I don't know if it was required to
21  make, I don't recall that, or if it just made
22  it.
23      Q.  Okay. But your recollection is that
24  NexPoint made an investment and they borrowed
25  money from Highland to finance the investment.

Page 128

1       WATERHOUSE - 10-19-21
2       Do I have that right?
3       A.  Yes.
4       Q.  How about HCRE? Do you know why
5   HCRE borrowed money from Highland?
6       A.  I don't remember specifically.
7       Q.  Do you remember generally?
8       A.  Generally, yeah -- I mean, yes.
9       Q.  Can you tell me your general
10  recollection as to why Highland loaned money to
11  HCRE?
12      A.  For -- for -- for investment
13  purposes.
14      Q.  So HCRE made the investment and it
15  obtained a loan, or loans, from Highland in
16  order to finance that investment or those
17  investments.
18      Do I have that right?
19      A.  I mean, I -- you know, generally.
20      Q.  Okay. How about Highland Management
21  Services, Inc.?
22      Do you have any recollection as to
23  why HCMS borrowed money from Highland?
24      A.  Generally.
25      Q.  What is your general recollection as

Page 129

1       WATERHOUSE - 10-19-21
2   to why HCMS borrowed money from Highland?
3       A.  For -- for investment purposes.
4       Q.  So it is the same thing, HCMS wanted
5   to make investments and it borrowed money from
6   Highland in order to finance those investments;
7   is that right?
8       A.  I mean, yes, generally. I mean, I
9   can't -- I don't -- on the services, there --
10  there are several loans in these schedules.
11  You know, I can't remember why every single one
12  of these were made, but I would say, yeah, I
13  mean, generally.
14      Q.  Okay. I appreciate that.
15      MR. MORRIS: Let's go to the page
16  with Bates No. 251. La Asia, are you
17  there?
18      MS. CANTY: Sorry, John. It went
19  out for a minute. Can you say that again.
20  I don't know what is going on.
21      MR. MORRIS: The page with Bates
22  No. 251, can we go to that.
23      MS. CANTY: Yes, sorry.
24      MR. MORRIS: Keep going to the
25  bottom. Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2       Q.  Do you see, Mr. Waterhouse, that
3   there is a section there called Subsequent
4   Events?
5       A.  I do.
6       Q.  And does this relate to the last
7   sentence above the signature line on the
8   management representation letter that we talked
9   about earlier where you made the representation
10  that you disclosed subsequent events?
11      A.  I mean, it relates to it, but not in
12  its entirety.
13      Q.  Okay.
14          MR. MORRIS:  If we can scroll up to
15  capture the entirety of this section right
16  here.
17      Q.  And what do you mean by that, sir?
18          MR. MORRIS:  Yeah, right there.
19  Perfect.
20      A.  There are -- there are different
21  subsequent events in -- under GAAP.  So there
22  are -- and -- and -- so what we see in the
23  notes to the financial statements are one type
24  of subevent.
25      Q.  Okay.  And -- and would the type of

Page 131

1       WATERHOUSE - 10-19-21
2   subsequent event relating to affiliate loans be
3   captured in this section if they were -- if
4   they were made after the end of the fiscal year
5   and prior to the issuance of the audit report?
6       A.  Yes, if they were deemed material or
7   disclosable.
8       Q.  Okay.  I appreciate that.
9           Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14      A.  Yes.
15      Q.  And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19      A.  I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22      Q.  Yes.
23      A.  I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically

Page 132

1       WATERHOUSE - 10-19-21
2   if -- you know, what -- if that 7.4 million was
3   solely attributable to the NAV error.
4       Q.  Okay.  But there is no question that
5   Highland told PricewaterhouseCoopers that over
6   the course of 2019 HCMFA issued promissory
7   notes to the partnership in the aggregate
8   amount of $7.4 million; correct?
9       A.  In the course of the audit, we would
10  have produced all promissory notes in our
11  possession, including the ones that are
12  detailed here.
13      Q.  Do you recall that you signed the
14  two promissory notes that are referenced in
15  that provision?
16          MS. DANDENEAU:  Objection to form.
17      A.  I didn't recall initially but I've
18  been reminded.
19      Q.  Okay.  And -- and do you recall that
20  those notes are dated May 2nd and May 3rd,
21  2019?
22      A.  Yes.
23      Q.  So that was just a month before the
24  audit was completed; correct?
25      A.  Yes.  I think we had a June 3rd

Page 133

1       WATERHOUSE - 10-19-21
2   date, right, if -- if my memory serves me
3   right.
4       Q.  Yes, I will represent to you that
5   your memory is accurate in that regard.
6           Did anybody ever instruct you as the
7   CFO to correct this statement that we're
8   looking at in subsequent events?
9       A.  So let me understand.  You're saying
10  when I was CFO at Highland Capital did anyone
11  ever ask me to correct the -- over the course
12  of 2019 through the report date HCMFA issued
13  promissory notes, this statement?
14      Q.  Right.
15      A.  Not that I'm aware.
16      Q.  While you were the CFO of Highland,
17  did anybody ever tell you that that sentence
18  was wrong?
19      A.  Not that I'm aware.
20      Q.  Highland -- withdrawn.
21          HCMFA disclosed these notes in its
22  own audited financial statements; right?
23          MR. RUKAVINA:  Objection, form.
24      A.  I assume that these would be
25  material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  statements, yes, they -- they -- they should be
3  and they were likely disclosed.
4      Q.   Now, there is no statement
5  concerning the 2019 notes about the forbearance
6  that we looked at in the affiliated note
7  section of the report; right?
8          MS. DANDENEAU:  Objection to form.
9      Q.   I'll withdraw.  That was bad.
10         Do you recall when we were looking
11  at the paragraph concerning HCMFA earlier it
12  had that disclosure about the agreement whereby
13  Highland wouldn't ask for demand on the -- on
14  the HCMFA notes?
15     A.   Yes.
16     Q.   That forbearance disclosure is not
17  made with respect to the 2019 notes; right?
18     A.   Not -- look, not that I can recall,
19  unless -- unless it was done at a subsequent
20  day.
21     Q.   Right.  And it is not in the
22  subsequent event section that we're looking at
23  right now where the 2019 notes are described;
24  right?
25     A.   Right.  But this is through

Page 135

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  June 3rd.  It could have been done on June 4th.
3  I don't -- I don't -- I don't recall.
4      Q.   Okay.
5          MR. MORRIS:  Can we put up on the
6  screen the HCMFA audit report.  And while
7  we're --
8          MS. DANDENEAU:  What exhibit is
9  this?
10         MR. MORRIS:  La Asia, what number is
11  that?
12         MS. CANTY:  45.
13         MR. MORRIS:  So this will be marked
14  as Exhibit 45.
15         (Exhibit 45 marked.)
16         MS. CANTY:  Yeah, and I will put it
17  in the chat.
18         MS. DANDENEAU:  Thank you.
19     Q.   Okay.  All right.  Do you see that
20  this is the consolidated financial statements
21  for HCMFA for the period ending 12/31/18?
22     A.   Yes.
23     Q.   As the treasurer of HCMFA at the
24  time, did you have to sign a management
25  representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  we looked at earlier for Highland?
3      A.   I would imagine I would have been
4  asked to.  I don't recall if I did.
5      Q.   Do you recall ever being asked by an
6  auditor to sign a management representation
7  letter and then not doing it?
8      A.   No.
9          MR. MORRIS:  Can we just scroll down
10  again.  I just want to see the date of the
11  document.
12     A.   I mean, let me -- you know, there
13  are different versions to management
14  representation letters I will qualify.
15         Yes, there are certain -- from time
16  to time auditors can make representations
17  that -- in the rep letter that is being
18  proposed that are inaccurate or out of scope or
19  things like that and they've asked for
20  signature.
21         In that context, yes.  I mean, you
22  know -- I mean, if I have been asked to sign
23  and make those representations and those
24  representations are invalid, yes, I would not,
25  I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2      Q.   Okay.  PricewaterhouseCoopers served
3  as HCMFA's outside auditors as well; correct?
4      A.   Yes.
5      Q.   Do you see that this audit report is
6  signed on June 3rd, 2019, just like the
7  Highland audit report?
8      A.   That is correct.
9      Q.   And did the process of -- of
10  preparing HCMFA's audit report, was that the
11  same process that Highland followed when it did
12  its audit report at this time?
13     A.   I mean, it is a different entity.
14  There are different assets.  You know, it --
15  it -- it is -- as you saw, Highland's
16  financials are on a consolidated basis.  This
17  is different, so it is under the same control
18  environment and team.
19     Q.   Okay.  I appreciate that.  So the
20  same control environment and team participated
21  in the preparation of the audit for Highland
22  and for HCMFA at around the same time; correct?
23     A.   Yes.
24         MR. MORRIS:  Can we go to page 17 of
25  the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

2  Q.  Okay. Do you see that just like
3  Highland's audited financial report, HCMFA's
4  audited financial report also has a section
5  related to subsequent events?
6  A.  Yes.
7  Q.  And am I reading this correctly that
8  just as Highland had done, HCMFA disclosed in
9  its audited financial report a subsequent event
10  that related to the issuance of promissory
11  notes to Highland in the aggregate amount of
12  $7.4 million in 2019?
13  A.  That is what I see in the report.
14  Q.  And you were the treasurer of HCMFA
15  at the time; right?
16  A.  Yes, to the best of my knowledge.
17  Q.  And did anybody ever tell you prior
18  to the time of the issuance of this audit
19  report that that sentence relating to HCMFA's
20  2019 notes was inaccurate or wrong in any way?
21  A.  Not that I recall.
22  Q.  As you sit here right now, has
23  anybody ever told you that that sentence is
24  inaccurate or wrong in any way?
25  A.  Not that I recall.

Page 139

WATERHOUSE - 10-19-21

2  Q.  I apologize if I asked you this
3  already, but has anybody ever told you at any
4  time that you are not authorized to sign the
5  promissory notes that are the subject of the
6  sentence we're looking at?
7  A.  Not that I recall.
8  Q.  Did anybody ever tell you at any
9  time that you had made a mistake when you
10  signed the promissory notes that are the
11  subject of this sentence?
12  A.  Say that again. Did anyone ever say
13  that I made a mistake?
14  Q.  Let me ask the question again.
15  Did anybody ever tell you at any
16  time that you made a mistake when you signed
17  the two promissory notes in Highland's favor on
18  behalf of HCMFA in 2019?
19  A.  Not that I recall.
20  MR. MORRIS:  Let's just look at the
21  promissory notes quickly. Can we please
22  put up Document Number 1, and so this is in
23  the pile that y'all have. We'll just go
24  for a few more minutes and we can take our
25  lunch break.

Page 140

WATERHOUSE - 10-19-21

2  Q.  All right. So I don't know if you
3  have seen this before, sir. Do you see that
4  this is a complaint against HCMFA?
5  A.  Yes, I am looking at it on the
6  screen.
7  Q.  Okay. And have you ever seen this
8  document before?
9  A.  I went through some of these
10  documents with my counsel here yesterday.
11  MR. MORRIS:  All right. Can we go
12  to Exhibit 1 of this document.
13  Q.  Do you see Exhibit 1 is a
14  $2.4 million promissory note back in 2019?
15  A.  Yeah, I found it in the book. Yes,
16  I have it here in front of me.
17  Q.  And this is a demand note, right, if
18  you look at Paragraph 2?
19  A.  I mean, it -- if -- if -- if there
20  Q.  And this is a note where the maker
21  is HCMFA, and Highland is the payee; right?
22  A.  Yes.
23  MR. MORRIS:  And if we can scroll
24  down, can we just see Mr. Waterhouse's
25  signature.

Page 141

WATERHOUSE - 10-19-21

2  Q.  Is that your signature, sir?
3  A.  Yes, it is.
4  Q.  And did you sign this document on or
5  around May 2nd, 2019?
6  A.  I don't recall specifically signing
7  this, but this is my signature.
8  Q.  Okay. And do you recall that
9  Highland transferred $2.4 million to HCMFA at
10  or around the time you signed this document?
11  A.  I don't recall specifically. I
12  would want to, as I sit here today, go back and
13  confirm that, but again, presumably that --
14  that -- that did happen.
15  Q.  You wouldn't have signed this
16  document if you didn't believe that HCMFA
17  either received or was going to receive
18  $2.4 million from Highland; is that fair?
19  A.  I mean, it -- if -- if -- if there
20  wasn't a transfer of value, yeah, I mean, you
21  know, I would have no reason to -- to sign a
22  note.
23  Q.  And -- and Highland wouldn't have
24  given this note to PricewaterhouseCoopers if --
25  withdrawn.

Page 142

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2        HCMFA wouldn't have given this note
3  to PricewaterhouseCoopers if it hadn't received
4  the principal value of -- of the note in the
5  form of a loan; correct?
6            MR. RUKAVINA: Objection, legal
7     conclusion, speculation and form.
8        A.  Again, we -- what we provided to PwC
9  were, as part of the audit, any promissory
10  notes executed and outstanding. You know, as a
11  part of the audit, they, you know, they -- they
12  have copies of all the bank statements,
13  things -- things of that sort.
14            MR. MORRIS: Okay. Can we go to
15     Exhibit 2.
16        (Exhibit 2 marked.)
17        Q.  Do you see that this is a promissory
18  note dated May 3rd, 2019 in the amount of
19  $5 million?
20        A.  Yes.
21        Q.  Do you believe this is also a demand
22  note if you look at Paragraph 2?
23        A.  Yes.
24        Q.  And do you see that HCMFA is the
25  maker, and Highland is the payee?

Page 143

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2        A.  Yes.
3        Q.  And if we go to the bottom, can we
4  just confirm that that is your signature?
5        A.  Yes.
6        Q.  And together these notes are the
7  notes that are referred to both in Highland and
8  HCMFA's audited financial reports in the
9  subsequent event sections; correct?
10            MS. DANDENEAU: Objection to form.
11        A.  They -- they -- they totaled
12  $7.4 million, so presumably, yes.
13        Q.  Okay. And you were authorized to
14  sign these two notes; correct?
15            MR. RUKAVINA: Objection, legal
16     conclusion.
17        A.  Yeah. I mean, I'm -- I was the
18  officer of -- of HCMFA. You know, I -- I'm not
19  the legal expert on -- on what that -- what
20  that confers to me or what it doesn't. I mean,
21  that is my signature on the notes.
22        Q.  And you believed you were authorized
23  to sign the notes; is that fair?
24        A.  I signed a lot of documents in my
25  capacity, just because it is operational in

Page 144

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  nature. So, you know, to me this was just
3  another document, to be perfectly honest.
4        Q.  Sir, would you have signed
5  promissory notes with the principal amount of
6  $7.4 million if you didn't believe you were
7  authorized to do so?
8            MS. DANDENEAU: Objection to form.
9        Q.  Are you frozen?
10        A.  No. I'm just -- you know, it is --
11  you know, again, I typically don't sign
12  promissory notes, and I don't recall why I
13  signed these, but -- you know, but I did.
14        Q.  All right. So listen carefully to
15  my question. Would you have signed
16  promissory notes with a face amount of
17  $7.4 million without believing that you were
18  authorized to do so?
19        A.  No. I mean, I'm -- I'm putting my
20  signature on there, so no.
21        Q.  Okay. And would you have signed two
22  promissory notes obligating HCMFA to pay
23  Highland $7.4 million without Mr. Dondero's
24  prior knowledge and approval?
25            MS. DEITSCH-PEREZ: Object to the

Page 145

WATERHOUSE - 10-19-21

1            WATERHOUSE - 10-19-21
2  form.
3        A.  You know, from -- from what I recall
4  around these notes, you know, I don't recall
5  specifically Mr. -- Mr. Dondero saying to -- to
6  make this a loan.
7        So my conversation with Mr. Dondero
8  around the culmination of the NAV error as
9  related to TerreStar which was a -- a -- I
10  think it was a year and a half process. I
11  don't know, it was a multi-month process, very
12  laborious, very difficult.
13        When we got to the end, I had a
14  conversation with Mr. Dondero on where to, you
15  know, basically get the funds to reimburse the
16  fund, and I recall him saying, get the money
17  from Highland.
18        Q.  And so he told you to get the money
19  from Highland; is that right?
20        A.  That is what I recall -- in my
21  conversation with him, that is -- that is what
22  I can recall.
23        Q.  Do you know who drafted these notes?
24        A.  I don't.
25        Q.  Did you ask somebody to draft the

Page 146

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    notes?
3        A.    I didn't ask -- I don't specifically
4    ask people to draft notes really. I mean,
5    again, you know, the legal group at Highland is
6    responsible and has always been responsible for
7    drafting promissory notes.
8        Q.    So based on your -- based on the
9    practice, you believe that somebody from the
10   Highland's legal department would have drafted
11   these notes. Do I have that right?
12       MS. DEITSCH-PEREZ: Object to the
13       form. John, I also asked you for the Word
14       versions of these notes so we could look at
15       the properties, and you have not provided
16       them. Are you intending to?
17       MR. MORRIS: No.
18       Q.    Can you answer my question, sir?
19       A.    Again, I --
20       MS. DANDENEAU: Do you want him to
21       repeat it?
22       A.    Yeah, why don't you repeat it?
23       Q.    Sure. Mr. Waterhouse, based on the
24   practice that you have described in your
25   understanding, do you believe that these notes

Page 147

1    WATERHOUSE - 10-19-21
2    would have been drafted by somebody in the
3    legal department?
4        MS. DEITSCH-PEREZ: Object to the
5        form.
6        A.    Yes.
7        Q.    Okay. And do you know who would
8    have instructed -- do you have any knowledge as
9    to who would have instructed the legal
10   department to draft these notes?
11       MS. DEITSCH-PEREZ: Object to the
12       form.
13       A.    It was whoever was working -- I
14   mean, it was likely someone on the team. I
15   mean, I don't remember exactly on every note or
16   every document, but, again, a lot of these
17   things of this nature -- they're operational in
18   nature -- were handled by the team.
19       The team knows to -- I mean, we
20   don't draft documents. We're not lawyers.
21   We're not attorneys. It is not what I do or
22   accountants do.
23       So they are always instructed to go
24   and -- and go to the legal team to get
25   documents like this drafted. Also, when you go

Page 148

1    WATERHOUSE - 10-19-21
2    to the legal team, the -- you know, we always
3    loop in compliance. And compliance -- when you
4    go to the legal team, compliance is part of
5    legal team. They're made aware of -- of -- of
6    these types of transactions.
7        Q.    And do you believe that you had
8    the -- withdrawn.
9        Did you ever tell Mr. Dondero --
10   (inaudible) -- did you see those?
11       A.    Sorry.
12       MS. DEITSCH-PEREZ: I did not hear
13       the end of that question.
14       Q.    Did you ever tell Mr. Dondero that
15   you signed these two notes?
16       A.    I don't recall ever -- no, I don't
17   recall having a conversation with him.
18       Q.    Did you ever discuss these two notes
19   with him at any time?
20       A.    The conversation, I recall, was what
21   I described earlier. And that is the only time
22   I recall ever discussing this.
23       Q.    Okay. But the corporate accounting
24   group had a copy of this -- of these two notes.
25   And pursuant to the audit process, the

Page 149

1    WATERHOUSE - 10-19-21
2    corporate accounting group gave the two notes
3    to PricewaterhouseCoopers in connection with
4    the audit; correct?
5        MS. DANDENEAU: Objection to form.
6        A.    Yes. I mean, that is -- yeah, I
7    mean, they -- unless the legal team can also
8    retain copies of items like this. I mean, I
9    don't know everything that they would retain as
10   well.
11       The legal team would also, if they
12   had documents as part of audits, turn that over
13   to the auditors as well. So it could have been
14   the corporate accounting team. It could be
15   someone on the legal team.
16       Q.    All right. So you didn't -- you
17   didn't draft this note; right?
18       A.    I -- I -- I did not.
19       Q.    But somebody at Highland did; is
20   that fair?
21       MS. DEITSCH-PEREZ: Object to the
22       form.
23       A.    I don't know. I mean, we can go to
24   the legal team. I don't -- I'm not sitting
25   behind someone in legal. Maybe they went to

Page 150

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  outside counsel. I have no idea.
3    Q.   Did you have any reason to believe
4  you weren't authorized to sign this note,
5  either of these two notes?
6    A.   I think I have already answered that
7  question.
8    Q.   Okay. You didn't give these notes
9  to PricewaterhouseCoopers; correct?
10    MS. DANDENEAU: Objection to form.
11    A.   I don't recall giving these to
12  PricewaterhouseCoopers.
13    Q.   And in the practice that you have
14  described, somebody in the corporate accounting
15  group would have given these two notes to
16  PricewaterhouseCoopers; correct?
17    MS. DANDENEAU: Objection to form.
18    A.   I think I've answered that. I said
19  either the corporate accounting team or maybe
20  the legal team.
21    MR. MORRIS: Okay. Why don't we
22  take our lunch break here.
23    VIDEOGRAPHER: We're going off the
24  record at 1:04 p.m.
25    (Recess taken 1:04 p.m. to 1:49 p.m.)

Page 151

1    WATERHOUSE - 10-19-21
2    VIDEOGRAPHER: We are back on the
3  record at 1:49 p.m.
4    Q.   Mr. Waterhouse, did you speak with
5  anybody during the break about the substance of
6  this deposition?
7    A.   I spoke to -- to Deb and Michelle.
8    Q.   About the substance of the
9  deposition?
10    A.   Yes.
11    Q.   Can you tell me what you talked
12  about?
13    MS. DANDENEAU: No. We object on
14  the basis of privilege.
15    Q.   Okay. You are going to follow your
16  counsel's objection here?
17    A.   Yes.
18    Q.   Okay.
19    MR. MORRIS: Can we put up on the
20  screen Exhibit 35.
21    (Exhibit 35 marked.)
22    Q.   Are you able to see that document,
23  sir?
24    A.   Yes.
25    Q.   Have you ever seen an incumbency

Page 152

1    WATERHOUSE - 10-19-21
2  certificate before?
3    A.   I have.
4    Q.   Do you have a general understanding
5  of what an incumbency certificate is?
6    A.   I have a general understanding.
7    Q.   What is your general understanding?
8    A.   You know, those -- my general
9  understanding is that the incumbency
10  certificate basically lists folks that can --
11  are like authorized signers.
12    Q.   Okay. And do you see that this is
13  an incumbency certificate for Highland Capital
14  Management Fund Advisors, L.P.?
15    A.   Yes.
16    Q.   Okay. And if we could scroll down
17  just a little bit, do you see that it's dated
18  effective as of April 11th, 2019?
19    A.   Yes, I see that.
20    Q.   Okay. And is that your signature in
21  the middle of the signature block?
22    A.   Yes, it is.
23    Q.   And by signing it, did you accept
24  appointment as the treasurer of HCMFA effective
25  as of April 11th, 2019?

Page 153

1    WATERHOUSE - 10-19-21
2    A.   Again, I'm not the legal -- I don't
3  know if this makes me the treasurer or the
4  appointment. I don't know -- I don't know
5  that, so I don't -- I don't know if that
6  document -- again, I think -- again, I'm not
7  the legal expert. I think isn't there --
8  aren't there other legal documents that detail
9  who the officers are that could be incorporated
10  or things like that? Again, I don't want to
11  play armchair attorney here.
12    Q.   I'm not asking you for a legal
13  conclusion. I'm asking you for your knowledge
14  and understanding. When you signed this
15  document, did you understand that you were
16  accepting an appointment as the treasurer of
17  HCMFA?
18    MS. DANDENEAU: Objection to form.
19    MS. DEITSCH-PEREZ: Objection, form.
20    A.   Again, I don't think this -- that
21  wasn't my understanding. I don't think this
22  makes -- this document makes me the treasurer.
23    Q.   What do you think this document --
24  why did you sign this document?
25    MS. DEITSCH-PEREZ: Objection to

Page 154

WATERHOUSE - 10-19-21

1    form.
2        MR. MORRIS: You're objecting to the
3    form of the question when I asked him why
4    did you sign the document? What is the
5    basis for the objection?
6        MS. DEITSCH-PEREZ: Because, John, I
7    think that it does call for a legal
8    conclusion other than -- with him saying
9    because somebody told me to sign this
10   document. But if you want to go there,
11   that is fine.
12       MR. MORRIS: Okay.
13       MS. DANDENEAU: I don't think --
14   he's already said he's not a lawyer.
15       MR. MORRIS: I'll allow the witness
16   to answer this question.
17   Q.   Why did you sign this document, sir?
18   A.   I mean, our -- our legal group would
19   bring by these incumbency certificates from
20   time to time. I have no idea why they're being
21   updated, and I was asked to sign.
22   Q.   Did you ask anybody, what is this
23   document?
24   A.   No.

Page 155

WATERHOUSE - 10-19-21

1    Q.   Did anybody tell you why they needed
2    you to sign the document?
3    A.   Not that I can recall.
4    Q.   You testified earlier that you
5    understood that you served as the acting
6    treasurer for HCMFA; correct?
7    A.   Yes.
8    Q.   How did you become the acting
9    treasurer of HCMFA?
10       MS. DANDENEAU: Objection to form.
11   A.   I don't -- I don't know the legal --
12   I don't know the legal mechanic of how I became
13   the acting treasurer.
14   Q.   I'm not asking for the legal
15   mechanic. I'm asking you as the person who
16   is --
17       MS. DANDENEAU: John, you said --
18       MR. MORRIS: Stop.
19       MS. DANDENEAU: -- how did you
20   become the treasurer. That is --
21       MR. MORRIS: Please stop.
22       MS. DANDENEAU: That is a legal
23   question.
24       MR. MORRIS: I am not asking any

Page 156

WATERHOUSE - 10-19-21

1    legal questions, to be clear. I'm asking
2    for this witness' understanding as to how
3    he became the acting treasurer of HCMFA.
4    If he doesn't know, he can say he doesn't
5    know, but this legal stuff is nonsense, and
6    I really object to it.
7    Q.   Sir, I'm asking you a very simple
8    question.
9        MS. DANDENEAU: Argumentative.
10   Q.   You testified -- you testified that
11   you became the acting treasurer of HCM --
12   HCMFA; correct?
13   A.   Yes.
14   Q.   How did that happen?
15       MS. DANDENEAU: Again, object to
16   form.
17       MR. MORRIS: I can't wait to do this
18   in a courtroom. Good God.
19   Q.   Go ahead, sir.
20   A.   I don't know the exact process of
21   how that happened.
22   Q.   Do you have any idea whether signing
23   this document was part of the process?
24       MR. MORRIS: You know what --

Page 157

WATERHOUSE - 10-19-21

1        MS. DANDENEAU: Objection.
2        MR. MORRIS: -- withdrawn. You guys
3    want to do this, I can't wait. I can't
4    wait. This is the craziest stuff ever.
5        MS. DANDENEAU: John, he said he's
6    not a lawyer, and you are asking him for a
7    legal conclusion, and he says he doesn't
8    know, and you persist.
9        MR. MORRIS: Okay.
10       MS. DANDENEAU: So you can ask these
11   questions --
12       MR. MORRIS: Did anyone -- please
13   stop talking.
14       MS. DANDENEAU: -- at another
15   point -- no, no, no, I'm entitled to talk,
16   too; right? If you're going to make these
17   accusations as if we're trying to stonewall
18   you, this is not the witness to ask that
19   question.
20       MR. MORRIS: I can't -- I can't
21   wait -- I can't wait to do this in a
22   courtroom. I will just leave it at that.
23       MS. DANDENEAU: That's right, I'm
24   sure you can't.

Page 158

WATERHOUSE - 10-19-21
1
2    Q.  Did anyone ever tell you, sir, that
3  even though you were the acting treasurer of
4  HCMFA, that you were not authorized to sign the
5  two promissory notes that we looked at before
6  lunch?
7    A.  I'm not sure I understand the
8  question.  I wasn't -- I mean, I'm -- I'm the
9  current acting treasurer.
10    Q.  Did anybody ever tell you at any
11  time that even though you were the acting
12  treasurer of HCMFA, that you were not
13  authorized to sign the two promissory notes
14  that we looked at before lunch?
15        MS. DANDENEAU:  Objection to form.
16    A.  Not that I recall.
17    Q.  Did anybody ever tell you at any
18  time that you were not authorized to sign the
19  two promissory notes that we looked at before
20  lunch?
21    A.  Not that I recall.
22    Q.  Did anybody ever tell you at any
23  time that you should not have signed the two
24  promissory notes that we looked at before
25  lunch?

Page 159

WATERHOUSE - 10-19-21
1
2    A.  Not that I recall.
3    Q.  Did you ever tell anybody at any
4  time that you weren't authorized to sign the
5  two promissory notes that we looked at before
6  lunch?
7    A.  Not that I recall.
8    Q.  Did you ever tell anybody at any
9  time that you made a mistake when you signed
10  the two promissory notes that we looked at
11  before lunch?
12    A.  Not that I recall.
13    Q.  As you sit here right now, do you
14  have any reason to believe that you were not
15  authorized to sign the two documents that we
16  looked at before lunch?
17        MS. DANDENEAU:  Objection to form.
18    A.  If -- if this is the -- the valid
19  incumbency certificate, I mean, this does --
20  this does detail who the signers are.
21    Q.  Okay.  And looking at that document,
22  does that give you comfort that you were
23  authorized to sign the two promissory notes
24  that we looked at before lunch?
25        MS. DEITSCH-PEREZ:  Object to the

Page 160

WATERHOUSE - 10-19-21
1
2  form.
3        MS. DANDENEAU:  Objection, form.
4    A.  Yes.
5    Q.  As of October 20th -- withdrawn.
6        I'm trying to take your mind back to
7  a year ago, October 2020.  Do you recall at
8  that time that the boards of the retail funds
9  were making inquiries about obligations that
10  were owed by the advisors to Highland in
11  connection with their 15(c) review?
12        MS. DANDENEAU:  Objection to form.
13    A.  I don't -- I don't recall.
14    Q.  As of October 2020, you had no
15  reason to believe you weren't authorized to
16  sign the two promissory notes that we just
17  looked at; correct?
18        MS. DANDENEAU:  Objection, form.
19        MS. DEITSCH-PEREZ:  Objection to
20  form.
21    A.  I didn't think about it in October
22  of 2020, but I mean I --
23    Q.  Did you have any reason to believe
24  at that time that you weren't authorized to
25  sign the two notes that we just looked at?

Page 161

WATERHOUSE - 10-19-21
1
2    A.  Not that I'm aware, no.
3    Q.  Did you have any reason to believe a
4  year ago that you made a mistake when you
5  signed those two notes?
6    A.  Not that I'm aware.
7    Q.  A year ago you believed that HCMFA
8  owed Highland the unpaid principal amounts that
9  were due under those two notes; correct?
10    A.  They're -- they're promissory notes
11  that were -- as you presented, that were --
12  that were executed.  Whether they're valid or
13  if there's other reasons, I didn't -- I don't
14  know.
15    Q.  I'm not asking you whether they're
16  valid or not.  I'm asking you for your state of
17  mind.  A year ago you believed that HCMFA
18  was -- was obligated to pay the unpaid
19  principal amount under the two notes that you
20  signed; correct?
21    A.  Yeah, I'm -- I'm -- yes.
22    Q.  Thank you.  Are you aware -- you're
23  aware that -- that in 2017, NexPoint issued a
24  note in favor of Highland in the approximate
25  amount of $30 million; correct?

Page 162

```
1              WATERHOUSE - 10-19-21
2    A.   I'm -- I'm -- I'm generally aware.
3    Q.   Okay.  And are you generally aware
4  that from time to time, after the note was
5  issued by NexPoint, that moneys were applied to
6  principal and interest that were due under the
7  NexPoint note?
8    A.   Yes, I'm generally aware.
9    Q.   Okay.  And did anybody ever tell you
10  that the payments that were made against the
11  NexPoint notes were made by mistake?
12   A.   Yes.
13   Q.   And is it the one payment that we
14  talked about earlier today?
15   A.   We talked about a lot of things
16  today.  What payment are we talking about?
17   Q.   Okay.  Who told you that any payment
18  made against the NexPoint note was made by
19  mistake?
20   A.   D.C. Sauter.
21   Q.   When did Mr. Sauter tell you that?
22   A.   I don't -- I don't remember
23  specifically.
24   Q.   Do you remember what payments --
25   A.   Sometime -- sometime this year.
```

Page 163

```
1              WATERHOUSE - 10-19-21
2    Q.   Sometime in 2021?
3    A.   Yes.
4    Q.   Do you remember what payment he was
5  referring to?
6    A.   It was the -- the payment made in
7  January of 2021 or -- yeah, January of -- of
8  this -- January of 2021.
9    Q.   Okay.  So did anybody ever tell you
10  at any time that any payment that was made
11  against principal --
12   A.   And -- and -- and -- hold on, and it
13  may have been other -- again, it may have been
14  that payment or -- or there may have been what
15  he was explaining, a misapplication of prior
16  payments as well.
17   Q.   Can you -- can you give me any
18  specificity -- withdrawn.
19        Withdrawn.  Can you tell me
20  everything that Mr. Sauter told you about --
21  about errors in relation to payments made
22  against principal and interest due under the
23  NexPoint note?
24        MS. DANDENEAU:  Can I just --
25        MR. RUKAVINA:  Hold on.  Hold on.
```

Page 164

```
1              WATERHOUSE - 10-19-21
2  I'm going to object here, and I'm going to
3  instruct the witness not to answer
4  depending on the discussion that you had --
5  Mr. Waterhouse, I'm the lawyer for
6  NexPoint, and as everyone here knows, D.C.
7  Sauter is in-house counsel.
8        So if you and Mr. Sauter were having
9  a factual discussion and him preparing his
10  affidavit, et cetera, then go ahead and
11  answer that.  But if you were having a
12  discussion as to our legal strategy in this
13  lawsuit, or anything having to do with
14  that, then do not answer that.
15        And if you need to talk to either
16  your counsel or me about that, then we need
17  to have that discussion now.
18   A.   Okay.  Yeah, I don't -- I don't
19  really know how to make that distinction, so
20  maybe I need to talk to counsel before I
21  answer, or if I can answer.
22   Q.   Let me just ask you this question:
23  Did -- did you have any conversation with
24  Mr. Sauter about any payment of principal and
25  interest prior to the time that you left
```

Page 165

```
1              WATERHOUSE - 10-19-21
2  Highland's employment, or did it happen after
3  you left Highland's employment?
4    A.   I don't -- I don't recall if -- I
5  don't recall.  I mean, it was sometime in 2021.
6  I don't remember if it was before or after I
7  was let go from Highland.
8    Q.   Okay.  So -- so nobody told you
9  prior to 2021 that any error or mistake was
10  made in the application of payments against
11  principal and interest due on the NexPoint
12  note.  Do I have that right?
13   A.   Yeah, I don't -- I don't recall this
14  being in 2020.
15   Q.   Okay.  And it didn't happen in 2019;
16  correct?
17   A.   I don't recall that happened.
18   Q.   And it didn't happen in 2018;
19  correct?
20   A.   I don't -- I don't recall that
21  happening.
22   Q.   And it didn't happen in 2017;
23  correct?
24   A.   I don't recall.
25   Q.   But -- but you believe the
```

Page 166

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  conversation took place in 2021. You just
3  don't remember if it was before or after you
4  left Highland's employment. Do I have that
5  right?
6      A.  It was sometime this year. I
7  don't -- I don't remember.
8      Q.  Okay. Did you report this
9  conversation to Mr. Seery at any point?
10      A.  I don't believe so.
11      Q.  Did you report this conversation to
12  anybody at DSI at any time?
13      A.  I don't recall.
14      Q.  Do you have -- you don't have a
15  recollection of ever doing that; correct?
16      A.  Yeah, that's right. I don't recall
17  doing that.
18      Q.  Do you recall telling anybody at
19  Pachulski Stang about the conversation you
20  recall with Mr. Sauter?
21      A.  No, I don't -- I don't recall.
22      Q.  Did you tell any of the independent
23  board members about your conversation with
24  Mr. Sauter?
25      A.  I don't recall.

Page 167

1          WATERHOUSE - 10-19-21
2      Q.  Did you tell any of the employees at
3  Highland before you left Highland's employment
4  about this call that you had with Mr. Sauter?
5      MS. DANDENEAU: Objection to form.
6      A.  No, I don't -- no, I don't recall.
7      Q.  NexPoint -- to the best of your
8  knowledge, did NexPoint ever file a proof of
9  claim against Highland to try to recover moneys
10  that were mistakenly paid against the principal
11  and interest due under the note?
12      A.  Okay. Hold on. You are saying did
13  NexPoint Advisors file a proof of claim to
14  Highland for errors related to payments under
15  the NexPoint note to Highland?
16      Q.  Correct.
17      A.  I'm -- I'm -- I'm not -- I'm not
18  aware.
19      Q.  Are you aware --
20      A.  I'm not the legal person here, I
21  don't know.
22      Q.  I'm just asking for your knowledge,
23  sir.
24      A.  Yeah, I don't know. I'm not aware.
25      Q.  Are you aware of any claim of any

Page 168

1          WATERHOUSE - 10-19-21
2  kind that NexPoint has ever made to try to
3  recover the amounts that it contends were -- or
4  that Mr. Sauter contend were mistakenly applied
5  against principal and interest due under the
6  NexPoint note?
7      A.  I'm not aware.
8      MS. DANDENEAU: Objection to form.
9      Q.  Okay. The advisors' agreements with
10  the retail funds are subject to annual renewal;
11  correct?
12      A.  Yes.
13      Q.  And do you participate in the
14  renewal process each year?
15      A.  Yes.
16      Q.  What role do you play in the renewal
17  process?
18      A.  I'm -- I'm asked by the retail board
19  to walk-through the advisors financials.
20      Q.  And do you do that in the context of
21  a board meeting?
22      A.  Yes, it is -- yes, it is typically
23  done in a board meeting.
24      Q.  And do you recall the time --
25  does -- does the renewal process happen around

Page 169

1          WATERHOUSE - 10-19-21
2  the same time each year?
3      A.  Yes, it is -- it is around the same
4  time every year.
5      Q.  And what -- what time period of the
6  year does the renewal process occur?
7      A.  Approximately the September
8  timeframe.
9      Q.  During that process, in your
10  experience, does the board typically conduct
11  its own diligence and ask for information?
12      A.  Does the board ask for lots of -- I
13  mean, just -- I mean, lots of information as a
14  part of that -- that -- as part of that board
15  meeting and that process.
16      Q.  Okay. And do you recall that the
17  process in 2020 spilled into October?
18      A.  Yes. Yes.
19      Q.  Okay. And as part of the process in
20  2020, the retail board asked -- asked what are
21  referred to as 15(c) questions; right?
22      A.  I guess I don't want to be -- they
23  asked 15(c) -- are you saying they asked 15(c)
24  questions and this is why it went into October
25  or --

Page 170

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2    Q.   No, I apologize.
3         Do you have an understanding of
4    what -- of what 15(c) refers to in the context
5    of the annual renewal process?
6    A.   Yes, generally.
7    Q.   All right.  What is your general
8    understanding of the term "15(c)" in the
9    context of the annual renewal process?
10   A.   I -- I think 15(c) is the section
11   that -- that -- you know, that -- that the
12   board has to evaluate every year, the retail
13   board.  They have to, you know, go through,
14   evaluate, and go through that approval process
15   on a yearly basis.
16   Q.   Okay.
17        MR. MORRIS:  Can we put up on the
18   screen Exhibit 36, please.
19        (Exhibit 36 marked.)
20        MR. MORRIS:  I guess let's just
21   start at the bottom so Mr. Waterhouse can
22   see what is here.
23   Q.   You see this begins with an email
24   from Blank Rome to a number of people.
25        MR. MORRIS:  And if we can scroll

Page 171

WATERHOUSE - 10-19-21

1    up -- keep going just a little bit.
2    Q.   You will see that there is an email
3    from Lauren Thedford to Thomas Surgent and
4    others where she reports that she was attaching
5    and reproducing below additional 15(c)
6    follow-up questions from the board.
7         Do you see that?
8    A.   Yes.
9    Q.   And do you see Question No. 2 asks
10   whether there are any material outstanding
11   amounts currently payable or due in the future
12   (e.g., notes) to HCMLP by HCMFA or NexPoint
13   Advisors or any other affiliate that provides
14   services to the funds?
15        Do you see that?
16   A.   Yes.
17   Q.   And -- and did you -- do you recall
18   that in -- in October of 2020 the retail boards
19   were asking for that information?
20   A.   I don't recall it, but there --
21   they're obviously asking in this email.
22   Q.   Okay.
23        MR. MORRIS:  Can we scroll up a
24   little bit, please.

Page 172

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2    Q.   And then do you see that
3    Ms. Thedford includes you on the email string
4    on Tuesday, October 6th, at 5:52?
5    A.   Yes.
6    Q.   And she asks you and Dave Klos and
7    Kristin Hendrix for advice on that particular
8    Request No. 2 that I have just read; right?
9    A.   Yes.
10   Q.   Okay.  Can you tell me who
11   Ms. Thedford is?
12   A.   She was an attorney that was in the
13   legal group.
14   Q.   At Highland Capital Management,
15   L.P.?
16   A.   I'm -- I'm -- I'm -- I don't
17   remember if she was an employee of Highland or
18   any of the advisors.
19   Q.   Okay.  Do you know if she served as
20   the corporate secretary for both HCMFA and
21   NexPoint?
22   A.   Yes.
23   Q.   And -- okay.
24        Do you know whether Ms. Thedford
25   held any positions in relation to the retail

Page 173

WATERHOUSE - 10-19-21

1         WATERHOUSE - 10-19-21
2    funds as we defined that term?
3    A.   Yes.
4    Q.   What is your understanding of the
5    positions that Ms. Thedford held at the retail
6    funds?
7    A.   I -- I recall her being an officer.
8    I don't recall her title.
9    Q.   Okay.  Is she still an officer at
10   any of the retail funds today?
11   A.   No.
12   Q.   Do you know when she ceased to be an
13   officer of the retail funds?
14   A.   Approximately.
15   Q.   And when did she approximately cease
16   to be an officer of the retail funds?
17   A.   It was in -- it was in early of
18   2021.
19   Q.   Okay.  Do you know when she became
20   an officer of the retail funds?
21   A.   I don't recall.
22   Q.   To the best of your recollection,
23   was she an officer of the retail funds in
24   October of 2020?
25   A.   I believe so.

Page 174

```
1            WATERHOUSE - 10-19-21
2    Q.  Okay.  Do you know what title she
3  held in her capacity as an officer, if any?
4    A.  I told you I don't remember.
5    Q.  Okay.  So she sends this email to
6  you at 5:52 p.m. on October 6th.
7         And if we can scroll up to the
8  response, you responded a minute later with a
9  one-word answer: Yes.
10        Do you see that?
11   A.  Yes.
12   Q.  And -- and yes is -- yes was in
13 response to the retail board's Question No. 2,
14 right, whether there are any material
15 outstanding amounts currently payable or due in
16 the future?
17   A.  Yes.
18      MR. MORRIS:  And can we scroll up to
19   see what happened next.
20   Q.  So Ms. Thedford writes back to you a
21 few minutes later and she asks whether you
22 could provide the amounts.
23        Do you see that?
24   A.  Yes.
25   Q.  And then you respond further and you
```

Page 175

```
1            WATERHOUSE - 10-19-21
2  refer her to the balance sheet that was
3  provided to the board as part of the 15(c)
4  materials.
5         Do you see that?
6    A.  Yes.
7    Q.  And -- and did the advisors provide
8  to the board certain balance sheets in 2020 in
9  connection with the 15(c) review?
10   A.  Yes, they did.
11   Q.  Okay.  And were the amounts that
12 were outstanding or that were to be due in the
13 future by the advisors to Highland included in
14 the liability section of the balance sheet that
15 was given to the retail board?
16   A.  Yes.  Notes would be reflected as
17 liabilities.
18   Q.  Okay.  And --
19   A.  If I'm understanding your question
20 correctly.
21   Q.  You are.  And -- and -- and those
22 liabilities you -- you were -- you believed
23 were responsive to the retail board's question;
24 correct?
25   A.  Yes.
```

Page 176

```
1            WATERHOUSE - 10-19-21
2    Q.  Okay.  And then if we can scroll up,
3  you see Ms. Thedford responds to you
4  nine minutes later with a draft response.
5         Do you see that?
6    A.  Yes.
7    Q.  And she says that she is taking from
8  the 6/30 financials certain information about
9  amounts that were due to HCMLP and affiliates
10 as of June 30th, 2020.
11        Do you see that?
12   A.  I do.
13   Q.  Okay.  And did you believe, as the
14 treasurer of NexPoint and HCMFA and as the CFO
15 of Highland, that the information that
16 Ms. Thedford obtained from the 6/30 financials
17 was accurate and responsive in relation to the
18 retail fund board's question?
19   A.  I just want to make sure I
20 understand the question.
21        Are you saying that the financial
22 information provided to the retail board as
23 part of the 15(c) process, which included
24 financial statements as of June 30th of 2021,
25 did I feel like those were responsive to their
```

Page 177

```
1            WATERHOUSE - 10-19-21
2  questions?
3    Q.  Yes.
4    A.  Yes.
5    Q.  Thank you.
6       MS. DEITSCH-PEREZ:  John, it is not
7    in the chat yet.  Can you just make sure it
8    gets put in there.
9       MR. MORRIS:  Sure.
10      MS. CANTY:  I put it in there.  I
11   think maybe I just sent it directly, so let
12   me make sure it says to everyone.  But I
13   did put it in there.  I will try again.
14      MR. MORRIS:  Thank you, La Asia.
15      MS. DANDENEAU:  What number is it.
16      MR. MORRIS:  What, the Bates number?
17      MS. DEITSCH-PEREZ:  No, the --
18   this -- yeah, 36 is not in the chat.
19      MR. MORRIS:  Okay.  We'll get it.
20      MS. DANDENEAU:  I think that
21   Ms. Canty just sent it to me originally.
22   Sorry.
23      MR. MORRIS:  Okay.  We will get it
24   there.
25      MS. CANTY:  Okay.  It is there now
```

Page 178

WATERHOUSE - 10-19-21

1  for everyone.
2      MS. DEITSCH-PEREZ:  Got it.  Thank
3  you.
4      Q.  Do you recall if the proposed
5  response that Ms. Thedford crafted was
6  delivered to the retail board with the -- with
7  the yellow dates having been completed?
8      A.  I don't know.
9      MR. MORRIS:  Davor, I'm going to ask
10  that the advisors and -- the advisors of
11  both HCMFA and NexPoint produce to me any
12  report that was given to the retail board
13  concerning the promissory notes at issue,
14  including the obligations under the notes.
15      Q.  Do you know -- do you know if
16  ultimately NexPoint informed the retail board
17  in response to its question that NexPoint owed
18  Highland approximately 23 or $24 million?
19      MS. DANDENEAU:  Objection to the
20  form.
21      A.  Sorry, are you asking, did NexPoint
22  tell the retail board that it owed Highland?
23      Q.  Let me ask a better question,
24  Mr. Waterhouse.

Page 179

WATERHOUSE - 10-19-21

1      Did -- do you know if anybody ever
2  answered the retail board's question that was
3  Number 2?
4      A.  I don't -- I can't say for sure.
5      Q.  Okay.  Do you recall -- I think you
6  testified earlier that you walked through the
7  advisors' financials with the retail board;
8  correct?
9      A.  Yes.
10      Q.  And as part of that process, did you
11  disclose to the retail board the obligations
12  that NexPoint and HCMFA had to Highland under
13  promissory notes?
14      A.  The retail board, as I stated
15  earlier, receives financial information,
16  balance sheet, income statement information
17  from the advisors.  That information is
18  provided to the retail board in connection with
19  the 15(c) process.
20      So any notes between the advisors
21  and the Highland would be -- anything would be
22  detailed in those financial statements.
23      Q.  Do you recall in 2020 ever speaking
24  with the retail board about the advisors'

Page 180

WATERHOUSE - 10-19-21

1  obligations under the notes to Highland?
2      MS. DANDENEAU:  Objection to form.
3      MS. DEITSCH-PEREZ:  Object to the
4  form.
5      A.  I don't recall specifically.
6      Q.  Do you have any general recollection
7  of discussing with the retail board the
8  advisors' obligations to Highland under the
9  notes that they issued?
10      MS. DANDENEAU:  Object to the form.
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13      A.  I just recall generally just -- it
14  is just -- I present the financial statements,
15  and if they have questions, I answer their
16  questions and walk them through.
17      I don't recall what they asked.  I
18  don't recall where the discussion went.  I
19  don't recall anything of that nature.
20      Q.  Okay.  Do you know if anybody on
21  behalf of HCMF -- HCMFA ever told the retail
22  board that HCMFA had no obligations under the
23  two 2019 notes that you signed?  Withdrawn.
24      Do you know whether anybody on

Page 181

WATERHOUSE - 10-19-21

1  behalf of HCMFA ever told the retail boards
2  that you weren't authorized to sign either of
3  the two 2019 notes?
4      MS. DANDENEAU:  Objection to form.
5      A.  I'm not aware.
6      Q.  Are you aware of anybody on behalf
7  of HCMFA ever telling the retail boards that
8  your execution of the two 2019 notes was a
9  mistake?
10      MS. DANDENEAU:  Objection to form.
11      A.  I'm not aware.
12      Q.  Are you aware of anybody on behalf
13  of HCMFA ever telling the retail boards that
14  HCMFA did not have to pay the amounts reflected
15  in the two notes that you signed in 2019?
16      A.  I'm not aware.
17      Q.  Do you know whether anybody ever
18  told the retail boards -- withdrawn.
19      Do you know whether anybody ever
20  told the retail boards that Highland has
21  commenced a lawsuit to recover on the two notes
22  that you signed in 2019?
23      A.  I'm not aware.
24      Q.  Are you aware of anybody informing

Page 182

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    the retail boards that Highland has sued to
3    recover on the NexPoint note?
4        A.   I'm not aware.
5        Q.   Do you know whether anybody ever
6    told the retail board that Highland had
7    declared a default with respect to the two
8    HCMFA notes that you signed in 2019?
9        A.   I'm not aware.
10       Q.   Are you aware of anybody ever
11   informing the retail boards that Highland had
12   declared a default under the NexPoint note?
13       A.   I'm not aware.
14       Q.   Are you aware of anybody telling the
15   retail board that Highland made a demand for
16   payment under the 2019 notes that you signed on
17   behalf of HCMFA?
18       A.   I'm not aware.
19       Q.   Let's -- let's see if there is a
20   response to Ms. Thedford's email, if we can
21   scroll up.
22           Do you see you responded to
23   Ms. Thedford five minutes after she provided
24   the draft response to you?
25       A.   Yes.

Page 183

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        Q.   Okay.  And do you see that Dustin
3    Norris is copied on this email?
4        A.   Yes, he is.
5        Q.   Great.  Do you know whether
6    Mr. Norris held any positions at either of the
7    advisors as of October 6, 2020?
8        A.   I will go back to -- I'm not the
9    legal expert of what appoints you or how or
10   why, but you did see Dustin's name on the
11   incumbency certificate that you produced
12   earlier.
13       Q.   Do you know what his title was in
14   October of 2020?
15           MS. DANDENEAU:  Objection to form.
16       A.   I don't -- I don't recall.
17       Q.   Was he -- did he have a title with
18   each of the advisors, to the best of your
19   recollection?
20       A.   I don't recall.
21       Q.   Do you know why he is included on
22   this email string?
23       A.   I didn't add Dustin.  It looks like
24   Lauren did.  I don't know why she added him or
25   not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        Q.   Does Mr. Norris play a role in
3    formulating the advisors' responses to the
4    questions asked by the retail board in
5    connection with the 15(c) annual review?
6            MS. DANDENEAU:  Objection to form.
7        A.   He -- Dustin Norris is there in the
8    board meetings.  But -- so he has a role, yes.
9        Q.   Okay.  And does Mr. Norris hold any
10   positions, to the best of your knowledge, in
11   relation to any of the retail funds?
12       A.   I don't -- I don't believe he does.
13       Q.   How about Mr. Post, do you know
14   whether Mr. Post holds any position in either
15   of the advisors?
16       A.   I mean, he -- he -- yes.
17       Q.   What is your understanding of the
18   positions that Mr. Post holds in relation to
19   the advisors?
20           MS. DANDENEAU:  Objection to form.
21       A.   He is an employee of NexPoint
22   Advisors.  He is also the chief compliance
23   officer for -- for NexPoint.
24       Q.   Who is the chief compliance officer
25   for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2            MS. DANDENEAU:  Objection to form.
3        A.   That would be Jason as well.
4        Q.   Okay.  Now, looking at your
5    response, you noted initially that nothing was
6    owed under shared services.  Do I have that
7    right in substance?
8        A.   Yeah.  I think I'm being responsive
9    to Lauren's question here, whether any of the
10   shared service invoices are outstanding.
11       Q.   Right.
12       A.   Yes.
13       Q.   And that is because -- and that is
14   because the retail the retail board has asked
15   for the disclosure of all material obligations
16   that were owed to HCMLP either then or in the
17   future; isn't that right?
18           MS. DANDENEAU:  Objection to form.
19       Q.   We can go back down and look.
20       A.   Look, I don't know if that's a
21   material item, I mean, again, but sure.
22       Q.   Okay.  But there were no shared
23   services outstanding; correct?
24           MS. DANDENEAU:  Objection to form.
25       A.   That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1    indicate.
2    Q.   And you wouldn't have written it if
3    you didn't believe it to be true at the time;
4    correct?
5    A.   Correct.
6    Q.   And when you referred to shared
7    services outstanding, what you meant there was
8    that neither NexPoint nor HCMFA owed Highland
9    any money under the shared services agreements
10   that they had with Highland as of October 6th,
11   2020; right?
12   A.   I don't know if it is as of October
13   6, 2020 or if it was from -- like through the
14   financials -- through the date of the
15   financials as of June 30.
16   Q.   Okay.  And then you noted that
17   HCMA -- the HCMFA note is a demand note; right?
18   A.   Yes.
19   Q.   And then you referred Ms. Thedford
20   to Kristin Hendrix for the term of the NexPoint
21   note.  Do I have that right?
22   A.   Yes.
23   Q.   And then you refer to that agreement
24   that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1    financials about Highland's agreement not to
2    make demand upon HCMFA until May 2021; correct?
3    A.   Correct.
4    Q.   And then -- and then the next thing
5    you write is that the attorneys think that BK
6    doesn't change that, but don't know for sure at
7    the end of the day.
8    Do you see that sentence?
9    A.   Yes.
10   Q.   Which attorneys were you referring
11   to?
12   A.   I don't remember.
13   Q.   Did you have a conversation with
14   attorneys concerning whether the bankruptcy
15   would change or alter in any way the agreement
16   not to make a demand under the HCMFA note?
17   A.   Look, yeah, I mean, I don't
18   specifically remember, but generally, I mean,
19   it is in this email.  I don't -- I don't -- I
20   don't -- I don't remember who I talked to or,
21   you know, was it inside counsel, outside
22   counsel, but obviously I talked to somebody.
23   Q.   Do you have any recollection --
24   A.   Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1    actually, it may not even have been me.  I say
2    the attorneys in, you know, a lot of -- like I
3    talked about the team.
4    It could have been someone on the
5    team, like, hey, we need to run this down, and
6    maybe they talked to attorneys again and
7    relayed that information to me.
8    So I really don't know if I spoke to
9    someone else did or -- or, I mean, and maybe it
10   wasn't even from corporate accounting.  Maybe
11   it was, you know, other -- I'm kind of
12   summarizing, you know, again, so I don't really
13   know -- I can't really say for sure.  I don't
14   remember how I came about of this knowledge.
15   Q.   I appreciate your efforts,
16   Mr. Waterhouse, but I will just tell you that
17   if I ask a question and you don't know the
18   answer or you don't recall, I'm happy to accept
19   that.  I don't -- I don't want you to
20   speculate, so I want to be clear about that.
21   So I appreciate it.
22   Let me just ask you simply:  Do you
23   know what attorneys -- can you identify any of
24   the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1    process didn't change the agreement?
2    A.   I don't recall.
3    Q.   Okay.  Perfect.
4    And then let's look at the last
5    sentence.  It says, quote:  The response should
6    include, as I covered in the board meeting,
7    that both entities have the full faith and
8    backing from Jim Dondero, and to my knowledge
9    that hasn't changed.
10   Do you see that?
11   A.   Yes.
12   Q.   Okay.  Prior to October 6th, 2020,
13   had you told the retail board that HCMFA and
14   NexPoint have the full faith and backing from
15   Jim Dondero?
16   A.   Yes.
17   Q.   Do you remember in the context in
18   which you told the retail board that?
19   A.   I mean, generally, yes.
20   Q.   Tell me what you recall.
21   A.   So we were walking through the
22   financials from the advisors; right?  So as I
23   described to you, you have got HCMFA and NPA.
24   And these -- the financials, you know, show

Page 190

WATERHOUSE - 10-19-21

2 they have liabilities on them that exceed
3 assets.
4      So the retail board has asked, okay,
5 you know, how -- you know, if -- if these
6 liabilities come due or they're payable, you
7 know, how does that come about?
8      And, you know, the response is,
9 well, the advisors have the -- the full faith
10 and backing from -- from Jim Dondero.
11      Q.   And how did you know that the
12 advisors had the full faith and backing from
13 Jim Dondero?  What was the basis for that
14 statement that you made to the retail board?
15      A.   I talked to Jim about it at some
16 point in the past.
17      Q.   And did you tell Mr. Dondero that
18 you were going to inform the retail board that
19 the advisors had his full faith and backing
20 before you actually told that to the retail
21 board?
22      A.   I don't recall having that
23 conversation.
24      Q.   Do you recall if you ever informed
25 Mr. Dondero that you had disclosed or told the

Page 191

WATERHOUSE - 10-19-21

2 retail board that the advisors had the full
3 faith and backing of Mr. -- Mr. Dondero?
4      MS. DEITSCH-PEREZ:  Object to the
5 form.
6      A.   I don't recall discussing that with
7 him at the time.
8      Q.   When you told this to the board, was
9 Mr. Dondero participating in the discussion?
10      A.   Not that I recall.
11      Q.   Withdrawn.  Was it not -- withdrawn.
12      Do you recall whether -- when you
13 covered this issue with the board, was that in
14 a -- a Zoom call or a Webex call?  Was it a
15 telephone call?  Was it in-person?  Like where
16 were you physically in relation to the board?
17      A.   I believe I was at home.
18      Q.   Okay.  Can you identify every person
19 that you recall who was present for this
20 disclosure other than -- other than the board
21 members themselves?
22      MS. DEITSCH-PEREZ:  Object to the
23 form.
24      A.   I don't recall everyone on the call.
25      Q.   Can you identify anybody who was on

Page 192

WATERHOUSE - 10-19-21

2 the call?
3      A.   Other than the board members?
4      Q.   Yes.
5      A.   Lauren Thedford.  I mean, there
6 are -- there are many -- my section is just one
7 of many sections that are just -- you know, as
8 you can appreciate, this is a long board
9 meeting.
10      I can't recall specifically, really
11 even generally, or who was on when this was
12 discussed.  But Lauren was typically on for the
13 entire time.
14      Q.   I apologize if I asked you this, but
15 do either of Mr. Norris or Mr. Post hold any
16 positions relative to the retail funds?
17      A.   I think you asked me this already,
18 John.
19      Q.   Okay.  I just don't recall.  Can you
20 just refresh my recollection if I did, in fact,
21 ask you the question?
22      A.   I don't believe -- if we can go
23 back.  I don't believe Mr. Norris has a title
24 at the retail funds.  Mr. -- and Mr. Post is
25 the CCO of the advisor, the advisors.

Page 193

WATERHOUSE - 10-19-21

2      Q.   Okay.  Do you know if either of them
3 have a position with the retail board -- with
4 the retail funds?
5      A.   I don't believe Mr. Norris has a
6 position with the retail funds.
7      Q.   All right.  What about Mr. Post?
8      A.   Mr. Post is the CCO of the advisors.
9      Q.   Okay.  Does he hold any position --
10      A.   I don't believe so.
11      Q.   -- with the retail funds?
12      A.   I don't believe so.
13      Q.   Okay.
14      A.   I don't know if being the CCO for
15 the advisor conveys something for the retail
16 funds.  Again, I am not -- that is the legal
17 compliance part of it.  I don't know.
18      Q.   Why did you tell the retail board
19 that the advisors have the full faith and
20 backing from Mr. Dondero?
21      MS. DANDENEAU:  Objection to form.
22      A.   It is -- it is -- it is what has
23 been discussed with them prior.
24      Q.   And were you -- were you trying to
25 give them comfort that even though the

Page 194

```
1            WATERHOUSE - 10-19-21
2   liabilities exceeded the assets that the
3   advisors would still be able to meet their
4   obligations as they become due?
5            MS. DANDENEAU: Objection to form.
6            MS. DEITSCH-PEREZ: Object form.
7       A.   I -- I can't -- I don't remember
8   specifically the conversation, but generally --
9   you know, generally, yes. And that is why --
10  but, you know, again, in this email saying, you
11  know, I am sure I qualified it with the retail
12  board, you know, as I said I like -- you know,
13  to my knowledge, that hasn't changed. But,
14  again, generally -- generally that is what I
15  remember.
16      Q.   Okay. Do you recall if in the
17  advisors' response to the retail board's
18  question if the response included any statement
19  concerning Mr. Dondero and -- and the full
20  faith and backing that he was giving to the
21  advisors?
22           MS. DEITSCH-PEREZ: Object to the
23  form.
24      A.   I don't -- I don't remember
25  specifically what was provided.
```

Page 195

```
1            WATERHOUSE - 10-19-21
2       Q.   Okay.
3       A.   And I don't really -- I don't really
4   remember generally either.
5       Q.   Okay.
6            MR. MORRIS: So -- so, again, I'm
7   just going to ask Mr. Rukavina if your
8   clients can produce as soon as possible the
9   15(c) response, the written response that
10  the advisors made, if any, to the board's
11  Question No. 2.
12           I'm not looking for the whole
13  response, but I certainly want the response
14  to Question No. 2.
15      Q.   Do you have a general understanding
16  as to the amount by which -- withdrawn.
17           Did -- did the assets of --
18  withdrawn.
19           Did the liabilities of HCMFA exceed
20  its assets in 2020?
21           MS. DANDENEAU: Objection to form.
22           MS. DEITSCH-PEREZ: Objection, form.
23      A.   I believe I have already answered
24  that question earlier, I think. I believe I
25  said yes.
```

Page 196

```
1            WATERHOUSE - 10-19-21
2       Q.   Okay. And did the liabilities of
3   NexPoint exceed its assets in 2020?
4            MS. DEITSCH-PEREZ: Objection to
5   form.
6       A.   I don't believe so.
7       Q.   Okay. So -- so it was only one of
8   the two advisors who had liabilities that
9   exceeded the value of the assets.
10           Do I have that right?
11           MS. DEITSCH-PEREZ: Objection to
12  form.
13           MS. DANDENEAU: Form.
14      A.   Yes.
15      Q.   And do you know, ballpark, the
16  amount by which the value of HCMFA's
17  liabilities exceeded their assets in 2020?
18           MS. DANDENEAU: Objection to form.
19      A.   I don't -- I don't recall.
20           MR. MORRIS: I had specifically
21  requested in discovery the audited
22  financial reports for both advisors and
23  NexPoint. I think I may have gotten one
24  for NexPoint but I'm still waiting for the
25  balance. And I'm going to renew my request
```

Page 197

```
1            WATERHOUSE - 10-19-21
2   for those documents too.
3       Q.   Let's go to the next exhibit, which
4   is Number 10. So I think it is in your stack,
5   Mr. Waterhouse.
6            MR. MORRIS: And we can take the one
7   down from the screen and put up Number 10
8   for everybody.
9            (Exhibit 10 marked.)
10      Q.   And I don't know if you have ever
11  seen this before, but I'm really putting it up
12  on the screen for purposes of turning to the
13  very last page of the document.
14           So this is a document that we have
15  been -- that we premarked as Exhibit 10. And
16  we're turning to the last page of the document,
17  which is a document that was filed in the
18  adversary proceeding 21-3004. And -- no, I
19  apologize, I think we -- right there. Perfect.
20           And it is page 31 of 31.
21           MR. MORRIS: I think there may have
22  been some something erroneously stapled to
23  the hard copy that I gave you folks, but
24  I'm looking for page 31 of 31 in the
25  document that begins with the first page of
```

Page 198

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    Exhibit 10.
3       Q.   Do you have that, Mr. Waterhouse?
4       A.   I don't have it yet. I'm looking.
5       Q.   All right. If you look at the top
6    right-hand corner, you will see it says page
7    hopefully something of 31?
8       A.   Yes, I've got it now.
9       Q.   Okay. You have got 31 of 31. You
10   can take a moment to read that, if you would
11   like.
12      A.   (Reviewing document.) Okay.
13      Q.   Have you ever seen this before?
14      A.   I don't know if I have seen this
15   specific document, but, you know, I've --
16   I'm -- I'm aware of it.
17      Q.   And is this the document that you
18   had in mind when you sent that email to
19   Ms. Thedford that we just looked at where you
20   said that Highland had agreed not to make a
21   demand upon HCMFA until May 2021?
22      A.   Honestly, I don't -- it wasn't this
23   document. I mean, it's something like this,
24   yes. I mean, yes.
25      Q.   Well --

Page 199

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2       A.   It is something like this, but I
3    don't think it was this specific document.
4       Q.   Well, but this document does say in
5    the last sentence that Highland agreed not to
6    seek -- not to demand payment from HCMFA prior
7    to May 31, 2021; right?
8       A.   Yes.
9       Q.   And are you aware of any other
10   document that was ever created pursuant to
11   which Highland agreed not to demand payment on
12   amounts owed by HCMFA before May 31, 2021?
13      A.   Hold on. Are you asking, am I aware
14   of a document that by HCMFA that basically says
15   otherwise?
16      Q.   No. Let me try again.
17           Are you aware of any other document
18   pursuant to which -- pursuant to which Highland
19   agreed not to make a demand on HCMFA until May
20   31st, 2021?
21      A.   I'm -- I think there was something
22   in connection with -- with the -- with the
23   audit that basically says the same thing.
24      Q.   Okay. And do you think that the
25   audit is referring to this particular document?

Page 200

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2       A.   I don't know.
3       Q.   All right. This document is dated
4    April 15, 2019. Do you see that?
5       A.   I do.
6       Q.   And do you remember that the audit
7    was completed on June 3rd, 2019?
8       A.   Yes.
9       Q.   And do you recall that the audited
10   financials -- and I'm happy to pull them up if
11   you would like, but do you recall that the
12   audited financials included a reference to the
13   agreement pursuant to which Highland agreed not
14   to make a demand until May 31st, 2021?
15      A.   Yes, I remember.
16      Q.   And as part of the process, would
17   you have expected the corporate accounting team
18   to have provided a copy of this document to
19   PwC?
20           MS. DANDENEAU: Objection to form.
21      A.   Yes, I would have expected something
22   like this, or again, you know, some document
23   that basically states -- states the deferral
24   till May 31 of 2020.
25      Q.   Okay.

Page 201

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2       A.   May 31 of 2021, excuse me.
3       Q.   And this document states the
4    deferral that you just described; correct?
5       A.   It does.
6       Q.   And this document states the
7    deferral that was described in the audited
8    financial statements that we looked at before;
9    correct?
10      A.   It does.
11           MR. MORRIS: Okay. Can we scroll
12      down just a little bit to see who signed on
13      behalf of the acknowledgment there.
14      Q.   Okay. So Mr. Dondero signed this
15   document on behalf of both HCMFA and Highland;
16   do you see that?
17      A.   I do.
18      Q.   Okay. Did you discuss this document
19   or the -- withdrawn.
20           Did you discuss the concept of the
21   deferral with Mr. Dondero in the spring of
22   2019?
23      A.   I think I testified I don't recall.
24      Q.   Okay. Do you know whose idea it was
25   to issue the acknowledgment in this form?

Page 202

```
WATERHOUSE - 10-19-21
1
2   A.  I don't recall.
3       MR. MORRIS:  Can we scroll back up
4   to the document, please.
5   Q.   Do you see in the beginning it says,
6   reference is made to certain outstanding
7   amounts loaned from Highland to HCMFA for
8   funding ongoing operations.
9       Do you see that?
10  A.   Yes.
11  Q.   And were you aware as the CFO of
12  Highland and as the treasurer of HCMFA that as
13  of April 15, 2019, Highland had made certain
14  loans to HCMFA to fund HCMFA's ongoing
15  operations?
16  A.   Yes.
17  Q.   And were you aware that those loans
18  were payable on demand and remained outstanding
19  as of December 31st, 2018?
20  A.   Yes.
21  Q.   And were you aware that those
22  amounts were payable on demand, and they
23  remained outstanding as of April 15, 2019?
24      MS. DEITSCH-PEREZ:  Object to the
25  form.
```

Page 203

```
WATERHOUSE - 10-19-21
1
2   A.  Well, this -- this document dated
3   April 15, 2019 says they have been deferred to
4   May 31, 2021.
5   Q.   Right.  But I'm just sticking to the
6   first paragraph where they refer to the
7   outstanding amounts.  And in the end it says
8   the -- it remained outstanding on December
9   31st, 2018, and I think you told me that you
10  understood that, and then I'm just trying to
11  capture the last piece of it.
12      Did you understand that there were
13  amounts outstanding from the loan that Highland
14  made to HCMFA to fund ongoing operations as of
15  April 15th, 2019?
16  A.   Yes.
17  Q.   Thank you.  Let's look at the next
18  sentence.  HCMFA expects that it may be unable
19  to repay such amounts should they become due
20  for the period commencing today and continuing
21  through May 31st, 2021.
22      Do you see that?
23      MS. DANDENEAU:  Objection to form.
24  A.   I do.
25  Q.   As the CFO -- withdrawn.
```

Page 204

```
WATERHOUSE - 10-19-21
1
2       As the treasurer of HCMFA, did you
3   believe that -- do you believe that statement
4   was true and accurate at the time it was
5   rendered?
6   A.   I mean, it -- it -- the answer to
7   that is I really didn't have any -- I didn't
8   have an opinion really.
9   Q.   Did you do anything to educate
10  yourself in April of 2019 on the issue of
11  whether HCMFA could repay the amounts that it
12  owed to Highland should they become due?
13  A.   I don't believe so.
14  Q.   Did you at any time form any
15  opinions as to HCMFA's ability to repay all
16  amounts due to Highland should they become due?
17  A.   Not really.  I guess I don't...
18  Q.   Well, you told the retail board that
19  HCMFA's liabilities exceeded their assets in
20  2020; correct?
21  A.   Yes.
22  Q.   Based on the work that you did to
23  prepare for the retail board, did you form any
24  view as to whether HCMFA would be unable to
25  repay the amounts that it owed to Highland
```

Page 205

```
WATERHOUSE - 10-19-21
1
2   should they become due?
3       MS. DANDENEAU:  Objection to form.
4   A.   I mean, I -- when you look at that,
5   to answer you, completely, you know, again,
6   if -- the response I gave the retail board was,
7   you know, the -- the advice -- HCMFA advisors
8   have the -- have the full faith and backing of
9   Jim Dondero.  So I didn't form an opinion of
10  whether the advisor could pay it or not.
11  Q.   Did you form any view as to whether
12  the advisors could repay the amounts that it
13  owed to Highland should they become due without
14  the full faith and backing of Mr. Dondero?
15      MS. DANDENEAU:  Objection to form.
16      MS. DEITSCH-PEREZ:  Form.
17  A.   I mean, if you -- if you -- if you
18  take that last statement out, I mean, it would
19  be difficult for HCMFA to pay back demand notes
20  at that time.
21  Q.   And it was precisely for that reason
22  that you told the retail board that -- that the
23  retail -- that the advisors had the full faith
24  and backing of Mr. Dondero; correct?
25      MS. DANDENEAU:  Objection to form.
```

Page 206

```
1              WATERHOUSE - 10-19-21
2    A.   I mean, yes, as the mouthpiece, I
3  was relaying information.
4    Q.   Okay.  And you relayed that
5  information with the knowledge and approval of
6  Mr. Dondero; correct?
7       MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   As I stated in the email, I don't
10 believe, and I think I testified I don't
11 believe I had conversations with Mr. Dondero at
12 the time of that board meeting.
13   Q.   Did you tell the retail board that
14 the advisors had the full faith and backing of
15 Mr. Dondero without Mr. Dondero's prior
16 approval?
17   A.   Yeah, I -- I -- yes, I'm -- like I
18 said, I think I testified earlier, I'm sure I
19 qualified it as well.
20   Q.   What do you mean by that?
21      MS. DANDENEAU:  Objection to form.
22   A.   Again -- again, like I said in the
23 email, it has the full faith and backing of Jim
24 Dondero unless that has changed.
25   Q.   Actually that is not what you said,
```

Page 207

```
1              WATERHOUSE - 10-19-21
2  so let's put the email back up.
3    A.   It is -- it is -- it is in the
4  email.
5    Q.   Let's put the email back up.  You
6  didn't say unless it has changed.  You said you
7  believe it hasn't changed; right?
8    A.   Okay.  And to my knowledge that
9  hasn't changed, that is what it says.
10   Q.   That's right.
11   A.   But, again, I mean, that is -- I
12 don't know everything.  And I'm not in every
13 conversation.  I'm not -- to presume that I am,
14 is -- and you have to put myself -- as you
15 started this out, Mr. Morris, I was at home in
16 October of 2020 with COVID -- or, you know,
17 under these COVID times that we described is
18 very difficult.
19      We have all been working at home for
20 really the first time ever, undergoing
21 processes, procedures, control environments
22 that have been untested, and there is poor
23 communication.
24      So I am relaying, as I'm telling you
25 now, what is in the email.  And unless
```

Page 208

```
1              WATERHOUSE - 10-19-21
2  something has changed -- to my knowledge, it
3  hasn't changed, but it could have changed.
4    Q.   When you say that the advisors have
5  the full faith and backing from Mr. Dondero,
6  did you intend to convey that, to the extent
7  the advisors were unable to satisfy their
8  obligations as they become due, Mr. Dondero
9  would do it for them?
10      MS. DANDENEAU:  Object to the form.
11      MS. DEITSCH-PEREZ:  Object to the
12   form.
13      And, John, we have given you a lot
14 of leeway here but this does not seem
15 relevant to this case.  You seem sort of
16 taking a complete sort of diversion into
17 the allegations and the complaint just
18 filed on Friday, and so I would ask you to
19 move on because --
20      MR. MORRIS:  And I will tell you --
21 I will tell you that I have never read that
22 complaint cover-to-cover.  I have nothing
23 to do with the prosecution of those claims.
24 And this issue that we're talking about
25 right now is related solely to the
```

Page 209

```
1              WATERHOUSE - 10-19-21
2  promissory notes that your clients refuse
3  to pay.
4       So I'm going to continue to ask my
5  questions, and I would ask the court
6  reporter to read back my last question.
7       (Record read.)
8       MS. DEITSCH-PEREZ:  And then I
9  believe there were objections to form.
10   Q.   You can answer the question.
11   A.   Yes.
12   Q.   Thank you very much, sir.
13      MR. MORRIS:  Can we go back to the
14 other document, please?
15   Q.   Mr. Waterhouse, do you know if this
16 document was ever shared with the retail board?
17   A.   I don't recall.
18   Q.   Did you ever share it with the
19 retail board?
20   A.   I don't recall.
21   Q.   Did you ever tell the retail board
22 about the substance of this document?
23   A.   I don't recall.
24   Q.   Did you ever tell the retail board
25 that Highland had agreed not to make a demand
```

Page 210

1          WATERHOUSE - 10-19-21
2  against HCMFA until May 2021?
3      A.  I don't recall.
4      Q.  Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9      A.  I don't recall.
10     Q.  Did you instruct Ms. Thedford or
11  anybody else responding to the retail board's
12  15(c) inquiry to disclose this document?
13     A.  Did I instruct Ms. Thedford or
14  anyone else to -- to -- to produce this, to
15  disclose this document?  Is that what you -- I
16  just want to make sure.
17     Q.  Uh-huh.
18     A.  Yeah, I don't -- I don't recall.
19     Q.  Did you instruct anybody to inform
20  the retail board, in response to their question
21  as part of the 15(c) process, to -- to tell the
22  retail board about Highland's agreement not to
23  make a demand until 2021?
24         MS. DANDENEAU:  Objection to form.
25     A.  I don't recall.

Page 211

1          WATERHOUSE - 10-19-21
2      Q.  Did you ever inform PwC that HCMFA's
3  liabilities exceeded its assets?
4         MS. DANDENEAU:  Object to the form.
5      A.  I don't -- I don't think I told
6  them.  I mean, they -- they audited the
7  financial statements.
8      Q.  Did -- do you know if anybody on
9  behalf of Highland ever informed
10  PricewaterhouseCoopers that HCMFA may be unable
11  to repay amounts owing to Highland, should they
12  become due?
13         MS. DANDENEAU:  Objection to form.
14     A.  Yes.  Again, I think I testified
15  earlier that -- that this was communicated to
16  the auditors.
17     Q.  Ideally --
18     A.  I don't know who exactly did that.
19  I don't recall doing it, but, yeah, it was --
20  it was communicated.  And that is why -- I
21  mean, there is a disclosure in the financial
22  statements; right?
23     Q.  There is, and that disclosure
24  relates to the last sentence of this document;
25  correct?

Page 212

1          WATERHOUSE - 10-19-21
2      A.  Yes.
3      Q.  Do you recall looking in the
4  document and seeing anything that was disclosed
5  with respect to the sentence above that?
6      A.  No.
7      Q.  Do you know whether anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA expects that
10  it may be unable to repay amounts due and owing
11  to Highland should they become due?
12         MS. DEITSCH-PEREZ:  Object to the
13     form.  I think that is the third time.
14     A.  I don't recall.  Again, as I said,
15  we -- all of this was given to the auditors.
16     Q.  Do you know if Highland received
17  anything of value in exchange for its agreement
18  not to demand payment on amounts owed by HCMFA
19  prior to May 31st, 2021?
20         MS. DEITSCH-PEREZ:  Object to the
21     form.  That is the second time.
22         MS. DANDENEAU:  Object to the form.
23     A.  I have answered this question.
24         MR. RUKAVINA:  Hold on.  Object to
25     legal conclusion.  Go ahead.

Page 213

1          WATERHOUSE - 10-19-21
2      A.  I have answered this question
3  before.
4      Q.  And the answer was no?
5      A.  I'm not aware.
6      Q.  Now, this acknowledgment can't
7  possibly apply to the two notes that you signed
8  on behalf of HCMFA because those notes were
9  signed on May 2nd and May 3rd, 2019; is that
10  right?
11         MS. DANDENEAU:  Objection to form.
12     A.  Unless there is a drafting error.
13     Q.  Okay.  Are you aware of a drafting
14  error?
15     A.  I'm not aware.  I didn't -- I wasn't
16  part of -- I didn't sign this note or this
17  acknowledgment.  I didn't draft it.
18     Q.  But you do see it is dated April 15,
19  2019; right?
20     A.  Yes.
21     Q.  And this was a document that was
22  actually included by the advisors in a pleading
23  they filed with the Court; right?
24         MR. RUKAVINA:  Well, I don't know
25     that so I object to form.

Page 214

```
1            WATERHOUSE - 10-19-21
2     Q.  Okay.  Let's go to the first page of
3  the document and just confirm that.
4          MR. AIGEN:  Mr. Morris, I just note
5     that you already said there was some error
6     with the document that is listed as
7     exhibit --
8          MR. MORRIS:  No.  No, no, no.
9          MS. DEITSCH-PEREZ:  Oh, okay.
10         MR. MORRIS:  What I said is that
11    there is a few pages that were mistakenly
12    stapled to the end of the document.
13         MS. DEITSCH-PEREZ:  Okay.
14         MR. MORRIS:  There is no problem
15    with this document.
16         MS. DEITSCH-PEREZ:  And just so
17    we're clear that the document -- the pages
18    that start with defendant's amended answer
19    are not intended to be part of this
20    document?
21         MR. MORRIS:  That's correct.
22         MS. DEITSCH-PEREZ:  And that the --
23    but it is your representation that the rest
24    of the document is -- is -- is correct
25    because we don't -- we don't have any way
```

Page 215

```
1  of verifying that, we're just --
2          MR. MORRIS:  You do, actually.  You
3     could just go to Docket No. 21-3004.
4          MS. DEITSCH-PEREZ:  If you want to
5     stop this deposition so we can go and pull
6     that document up, we're happy to do it.  So
7     I am just asking you for your
8     representation.
9          MR. MORRIS:  Sure.  I gave that.
10         MS. DEITSCH-PEREZ:  Okay.
11    Q.  So do you see that this is a
12  document that was actually filed with the Court
13  by Highland Capital Management Fund Advisors?
14    A.  No.  I get with the first page in
15  the section.  Maybe I'm looking at the wrong
16  thing.  It says, Highland Capital Management.
17    Q.  Don't worry about it.  Don't worry
18  about it.
19    A.  Maybe I went back -- okay.
20         MR. MORRIS:  All right.  Can we put
21    up on the screen Exhibit 2.
22         (Exhibit 2 marked.)
23         MR. MORRIS:  I think it is
24    Exhibit 1.
```

Page 216

```
1            WATERHOUSE - 10-19-21
2          MS. DANDENEAU:  I'm sorry, John, did
3     you say Exhibit 2 or Exhibit 1?
4          MR. MORRIS:  It is Exhibit 2 in the
5     binders so it is premarked Exhibit 2.  And
6     now I'm asking -- right there -- going to
7     Exhibit 1 to the document that was marked
8     as Exhibit 2.
9          MS. DANDENEAU:  Got it.  In the
10    binder there is no --
11         MS. DEITSCH-PEREZ:  There is no
12    Exhibit 1.
13         MR. MORRIS:  All right.  So look at
14    the one on the screen.
15    Q.  Do you see, Mr. Waterhouse, that
16  this is a promissory note dated May 31st, 2017,
17  in the approximate amount of $30.7 million?
18    A.  Yes.
19    Q.  And do you see that the maker of the
20  note is NexPoint?
21    A.  Yes.
22    Q.  And that Highland is the payee; is
23  that right?
24    A.  Yes.
25    Q.  Okay.  And do you see in Paragraph 2
```

Page 217

```
1            WATERHOUSE - 10-19-21
2  this is an annual installment note?
3    A.  Can you scroll down.
4    Q.  Sure.
5          MR. MORRIS:  Can we scroll down --
6     yeah, there you go.
7    A.  Right there, yeah.  Yes.
8          MR. MORRIS:  And can we scroll down
9     to the signature line.
10    Q.  And do you recognize that as
11  Mr. Dondero's signature?
12    A.  Yes.
13    Q.  And is this the promissory note that
14  we talked about earlier where NexPoint had made
15  certain payments in the aggregate amount of
16  about 6 to $7 million against principal and
17  interest?
18    A.  I don't recall discussing the
19  aggregate principal amounts of 6 to $7 million,
20  but -- so I don't -- I don't recall that prior
21  discussion with those amounts.
22    Q.  All right.  Let's take a look.
23  NexPoint always included this promissory note
24  as a liability on its audited financial
25  statements; right?
```

Page 218

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2    A.  Yes.
3    Q.  And NexPoint had its financial
4  statements audited; isn't that correct?
5    A.  Yes.
6    Q.  And was the process of NexPoint's
7  audit similar to the process you described
8  earlier for Highland and HCMFA?
9    A.  Yes, it is similar.
10   Q.  Okay.
11       MR. MORRIS:  Can we put up
12   NexPoint's audited financials and let
13   everybody know what exhibit number it is,
14   La Asia?
15       MS. CANTY:  It is going to be
16   Exhibit 46.
17       (Exhibit 46 marked.)
18   Q.  And do you see, sir, that we've put
19  up NexPoint Advisors' consolidated financial
20  statements and supplemental information for the
21  period ending December 31st, 2019?
22   A.  Yes.
23   Q.  Did you participate in the process
24  whereby these audited financial statements were
25  issued?

Page 219

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2    A.  I didn't participate directly, as
3  I've described before, about the -- the team
4  performing the audit.
5    Q.  Do you recall when the audit of
6  NexPoint's financial statements for the period
7  ending December 31st, 2019 was completed?
8    A.  Yes.
9    Q.  And when do you recall it being
10  completed?
11   A.  In January of 2021.
12   Q.  Do you know why the 2019 audit
13  report wasn't completed until January of 2021?
14   A.  Yes.
15   Q.  Why was the NexPoint audit report
16  for the period ending 12/31/19 not completed
17  until January 2021?
18   A.  Because we had to deal with working
19  from home from -- with COVID, and on top of all
20  of our daily responsibilities and job duties
21  at -- at providing -- at Highland providing
22  services to NexPoint, we had to do all of this
23  extra work for a bankruptcy that was filed in
24  October of 2019.
25       MR. MORRIS:  Can we go to the

Page 220

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  balance sheet on page 3?  Okay.  Stop right
3  there.
4    Q.  Do you see under the liabilities
5  section, the last item is note payable to
6  affiliate?
7    A.  Yes.
8    Q.  And is that the note that we just
9  looked at?
10       MS. DANDENEAU:  Objection to form.
11   Q.  Withdrawn.
12       Is that the approximately
13   $30 million note that we just looked at that
14   was dated from 2017?
15       MS. DANDENEAU:  Objection to form.
16   A.  I believe no.
17   Q.  Okay.  You're not aware of any other
18  note that was outstanding from NexPoint to
19  Highland as of the end of the year 2019, other
20  than that one $30 million note; right?
21   A.  I don't recall.
22   Q.  And as of the end of 2019, the
23  principal amount that was due on the note was
24  approximately $23 million; right?
25       MS. DEITSCH-PEREZ:  Object to the

Page 221

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  form.
3    A.  Approximately.
4    Q.  And does that refresh your
5  recollection that between the time the note was
6  executed and the end of 2019, that NexPoint had
7  paid down approximately $7 million?
8    A.  Yes.  If we are just doing the math,
9  yes.
10   Q.  Okay.  Did NexPoint complete its
11  audit from 2020?
12   A.  Sorry, you kind of broke up.  Do
13  NexPoint complete?
14   Q.  The audit of its financial
15  statements for the period ending December 31st,
16  2020?
17   A.  No.
18   Q.  No, it's not complete?
19   A.  No, it is not complete.
20   Q.  Did HCMFA complete its audit for the
21  year ending December 31st, 2020?
22   A.  No.
23       MR. MORRIS:  Can we go to page 15,
24   please, the paragraph at the bottom.
25   Q.  Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2  included under notes payable to Highland a
3  reference to the amounts that were outstanding
4  as of the year-end 2019 under the note that we
5  looked at just a moment ago?
6      A.   Yes.  Are you talking about the
7  second paragraph?
8      Q.   I'm actually talking about first
9  paragraph.  Do you understand that the first
10  paragraph is a reference to the 2017 note, and
11  the amounts that were -- the principal amount
12  that was outstanding as of the end of 2019?
13         MS. DANDENEAU:  Objection to form.
14  John, do you mean the first paragraph of
15  that page?
16         MR. MORRIS:  No, the first paragraph
17  under notes payable to Highland.
18      A.   Yeah, I see the paragraph, and
19  again, this is what I answered earlier.  I
20  believe so, just because I don't -- again, this
21  is a number in a balance sheet, and without
22  matching it up and seeing the detail with the
23  schedule like I kind of talked about for
24  Highland's financial statements, it is a little
25  bit more difficult to tie everything in

Page 223

1  perfectly together.
2      Q.   Okay.  But you're not aware of any
3  note that was outstanding at the end of 2019
4  from NexPoint to Highland other than whatever
5  principal was still due and owing under the
6  $30 million note issued in 2017; correct?
7      A.   Well, it -- I don't -- there is
8  reference in the second paragraph.  I don't --
9  I don't -- I don't recall what that is
10  referring to, so I don't -- I don't know.
11      Q.   Well, if you listen carefully to my
12  question, right, I'm asking about notes that
13  were outstanding at the end of 2019, and if we
14  look at the paragraph you just referred to, it
15  says that during the year there were new notes
16  issued totaling $1.5 million, but by the end of
17  the year, no principal or interest was
18  outstanding on the notes.
19         Do you see that?
20      A.   Oh, I do, yes.
21      Q.   So does that refresh your
22  recollection that there were no notes
23  outstanding from NexPoint to Highland other
24  than the principal remaining under the original

Page 224

1           WATERHOUSE - 10-19-21
2  $30 million 2017 note that we looked at a
3  moment ago?
4      A.   Well, we're at the bottom of the
5  page.  Is there anything on page 16?
6      Q.   That is a fair question, sure.  That
7  is it.
8      A.   Okay.  So it appears that that is
9  the only note that is detailed in the notes in
10  the financial statement.
11      Q.   And you don't have any memory of any
12  other note other than the 2017 note, right,
13  being outstanding as of the end of the year?
14      A.   I deal with thousands of
15  transactions every year.  I don't really have a
16  very specific memory for what exactly was
17  outstanding.
18         MR. MORRIS:  Why don't we take a
19  break now.  We've been going for a little
20  while.  It's 3:26.  Let's come back at
21  3:40.
22         VIDEOGRAPHER:  We're going off the
23  record at 3:26 a.m.
24  (Recess taken 3:26 p.m. to 3:39 p.m.)
25         VIDEOGRAPHER:  We are going back on

Page 225

1      the record at 3:39 p.m.
2      Q.   All right.  Mr. Waterhouse, we -- I
3  don't think we have a lot more here.
4         To the best of your knowledge and
5  recollection, were all affiliate loans and all
6  loans made to Mr. Dondero recorded on
7  Highland's books and records as assets of
8  Highland?
9      A.   Well, we're at the
10         MS. DANDENEAU:  Object to the form,
11      asked and answered.
12      A.   To my knowledge, yes.
13      Q.   Okay.  Can you recall any loan to
14  any affiliate or Mr. Dondero that was not
15  recorded on Highland's books and records as an
16  asset?
17      A.   Like during my time as CFO?  I don't
18  recall.
19      Q.   How about after the time that you
20  were CFO?  Did you recall that there was a loan
21  by Highland to an affiliate or to Mr. Dondero
22  that hadn't been previously recorded on
23  Highland's books as an asset?
24         MS. DANDENEAU:  Objection to form.
25      A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1    question. I left Highland as of -- I'm not
2    aware of -- I left Highland in February --
3    probably the last day of February of 2021.
4        Q.   Okay.
5        A.   I'm not -- I'm not aware of any --
6    I'm not aware of anything past that date.
7        Q.   Okay. While you were the CFO at
8    Highland, did Highland prepare in the ordinary
9    course of business a document that reported
10   operating results on a monthly basis?
11       A.   Yes.
12       Q.   And are you generally familiar with
13   the monthly operating reports?
14       A.   Yeah. You are referring to the
15   reports that we filed to the Court every month?
16       Q.   I apologize, I'm not. I'm taking
17   you back to the pre-petition period. There was
18   a report that I have seen that I'm going to
19   show you, but I'm just asking for your
20   knowledge.
21           MR. MORRIS: Let's put it up on the
22   screen, Exhibit 39.
23           (Exhibit 39 marked.)
24       Q.   Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1    is called operating results?
2        A.   Yeah, that's the title of it.
3        Q.   Okay. And was a report of operating
4    results prepared by Highland on a monthly basis
5    during the time that you served as CFO?
6        A.   No.
7        Q.   Are you familiar with a document of
8    this type? And we can certainly look at the
9    next page or two to refresh your recollection.
10       A.   I'm just looking at the title. I
11   don't really -- again, as I discussed before, I
12   don't have any records or documents or emails
13   or appointments or anything that I was able to
14   use prior to -- prior to this deposition, so
15   I'm doing the best I can.
16       Q.   Okay. You don't need to apologize.
17   I'm just asking you if you are familiar with
18   the document called Operating Results that was
19   prepared on a monthly basis at Highland?
20           MS. DEITSCH-PEREZ: Object to the
21   form.
22       Q.   If you're not, you're not.
23       A.   I don't believe this was prepared on
24   a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1        Q.   Okay. Do you see that this one
2    is -- is dated February 2018?
3        A.   Yes.
4        Q.   Do you have -- do you believe --
5    have you ever seen a document that was
6    purporting to report operating results for
7    Highland?
8            MS. DANDENEAU: Objection to form.
9        A.   Yes.
10       Q.   Okay. And when you say that you
11   don't believe it was produced on a monthly
12   basis, was it produced on any periodic bases to
13   the best of your recollection?
14       A.   I believe it was -- it was prepared
15   on an annual basis.
16       Q.   Okay.
17           MR. MORRIS: Can we look at the next
18   page.
19       Q.   Do you see that there is a statement
20   here called: Significant items impacting
21   HCMLP's balance sheet?
22           And it is dated February 2018.
23       A.   Yes.
24       Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1    report that Highland prepared that identified
2    significant items impacting the balance sheet?
3        A.   A report that was prepared.
4        Q.   Let me ask a better question: Did
5    Highland prepare reports to the best of your
6    recollection that identified significant items
7    that impacted its balance sheet?
8        A.   Well, so Highland prepared a -- a
9    monthly close package. And maybe I'm
10   getting -- and -- and maybe change names at one
11   time or maybe I'm just -- again, just
12   misremembering -- but in that, yes, there is a
13   page that would detail just changes in -- you
14   know, just changes month over month on the
15   balance sheet.
16       Q.   Okay. And maybe it is my fault.
17   Maybe I didn't know the proper name for it.
18   But let's use the phrase "monthly close
19   package."
20           Did Highland prepare a monthly close
21   package in the ordinary course of business
22   during the time that you served as CFO?
23           MS. DANDENEAU: Objection to form.
24       A.   Yes.

Page 230

1          WATERHOUSE - 10-19-21
2    Q.   And did the monthly close package
3    that Highland prepared include information
4    concerning significant items that impacted
5    Highland's balance sheet?
6    A.   Yes, it had a page like that is --
7    that is on the screen that detailed items
8    like -- of that nature.
9    Q.   And do you know who -- was there
10   anybody at Highland who was responsible for
11   overseeing the preparation of the monthly
12   reporting package?
13   A.   That would have been -- again, it
14   varies over time during my tenure as CFO.
15   It -- it varied over -- over time, but -- but
16   typically a -- a corporate accounting manager.
17   Q.   And who were the corporate
18   accounting managers during your tenure as CFO?
19   A.   It would have been Dave Klos and
20   Kristin Hendrix.
21   Q.   And did the corporate accounting
22   manager deliver to you drafts of the monthly
23   close package before it was finalized?
24   A.   Sometimes.
25   Q.   Was that the practice even if there

Page 231

1    were exceptions to the practice?
2    A.   The practice meaning that they
3    sometimes lured them to me?
4    Q.   That that was the expectation even
5    if circumstances prevented that from happening
6    from time to time.
7          MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   I -- I would say it started out that
10   way but over the years it -- it was not
11   enforced.
12   Q.   Okay.  So you were -- you reviewed
13   and approved monthly -- monthly reporting
14   packages for a certain period of time and then
15   over time you stopped doing that.
16   Do I have that right?
17        MS. DANDENEAU:  Objection to form.
18   A.   Yes, I mean, if you're talking about
19   a formal meeting where we sit down and go
20   through and approve it.  I would say that was
21   standard practice a decade -- you know, early
22   on.  And as time went on that -- that -- that
23   practice wasn't followed.
24   Q.   Okay.

Page 232

1          WATERHOUSE - 10-19-21
2    A.   And, quite frankly, I don't even
3    know if these were -- these were sent to me
4    even in any capacity.
5    Q.   What was the purpose of preparing
6    the monthly reporting package -- withdrawn.
7    What was the purpose of preparing
8    the monthly close package?
9          MS. DEITSCH-PEREZ:  Object to the
10   form.
11   A.   The -- the original purpose was so
12   that it would just -- it would be a report that
13   was reviewed monthly with senior management.
14   Q.   Who was included in the idea of
15   senior management?
16   A.   You know, I think originally when
17   this was conceived that would have been like
18   Jim Dondero and Mark Okada.
19   Q.   Were monthly reporting -- withdrawn.
20        Were monthly close packages prepared
21   to the best of your knowledge until the time
22   you left Highland?
23   A.   To my knowledge -- I don't know,
24   actually.  I mean, to my knowledge, I believe
25   it was being -- that still being done.  I

Page 233

1          WATERHOUSE - 10-19-21
2    don't know because, again, I wasn't reviewing
3    them.  I hadn't reviewed a close package for --
4    for a long time.  But I believe the standard
5    practice that was still being carried out.
6    Q.   Did you ever have any discussions
7    with the debtor's independent board concerning
8    any promissory notes that were issued by any of
9    the affiliates or Mr. Dondero?
10   A.   I can't -- I can't -- I can't recall
11   specifically.
12   Q.   Did you speak with the independent
13   board from time to time?
14   A.   Yes, from -- from -- from time to
15   time I had discussions with the independent
16   board members, you know, either -- either, you
17   know, by themselves or wholly, you know, as --
18   as a -- as a combined work.
19   Q.   Okay.  Before we talk about
20   Mr. Seery, do you recall ever having a
21   conversation with Mr. Nelms or Mr. Dubel
22   concerning any promissory note that was
23   rendered by one of the affiliates or
24   Mr. Dondero to Highland?
25   A.   I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1    specifically.
2    Q.   Do you know if the topic was ever
3    discussed, even if you don't remember it
4    specifically?
5         MS. DANDENEAU:  Objection to form.
6    A.   It -- it -- it may have.  I don't
7    know.  I don't recall.
8    Q.   Do you ever recall discussing any
9    promissory note issued by any of the affiliates
10   or Mr. Dondero with James Seery?
11   A.   I don't -- I don't recall
12   specifically.
13   Q.   Do you recall generally ever
14   discussing the topic of promissory notes issued
15   by any of the affiliates or Mr. Dondero to
16   Highland with Mr. Seery?
17   A.   Nothing -- nothing is really jumping
18   out at me.
19   Q.   Do you recall if you ever told
20   Mr. Seery that any of the affiliates or
21   Mr. Dondero didn't have an obligation to pay
22   all amounts due and owing under their notes?
23   A.   I don't recall having that
24   conversation.

Page 235

WATERHOUSE - 10-19-21

1    Q.   Did you ever tell Mr. Seery that you
2    had any reason to believe that the amounts
3    reflected in the notes issued by the affiliates
4    and Mr. Dondero were invalid for any reason?
5    A.   I don't -- I don't recall.
6    Q.   Did you tell Mr. Dondero -- did you
7    tell Mr. Seery that you thought the promissory
8    notes issued by the advisors and Highland
9    that were outstanding as of the petition date
10   were assets of the estate?
11   A.   I don't recall having a specific
12   conversation about those -- you know, those
13   notes outstanding as -- as of the petition date
14   being assets on the estate.  I mean, we put
15   together -- you know, they're in the books and
16   records of the financial statements.  I don't
17   recall having a specific conversation.
18   Q.   Did you ever prepare any documents
19   that were delivered to Mr. Seery that concerned
20   the promissory notes issued by any of the
21   affiliates or Mr. Dondero?
22        MS. DANDENEAU:  Objection to form.
23   A.   Did I produce any that concerned --
24   you mean did I just -- did I give Mr. Seery

Page 236

WATERHOUSE - 10-19-21

1    anything that -- that said I have concerns over
2    these notes?
3    Q.   No.  Let me try again.  Maybe it was
4    my question.
5         Did you ever give Mr. Seery any
6    information concerning any of the notes that
7    were issued by any of the affiliates or
8    Mr. Dondero?
9         MS. DANDENEAU:  Objection to form.
10   A.   I don't recall if I did or not.  I
11   don't -- I don't remember.  I mean, you have my
12   emails.  You may have asked.  Again, I don't --
13   I don't know.
14        MR. MORRIS:  Can we put up the
15        document that has been premarked as Exhibit
16        39?
17        MS. DANDENEAU:  John, that is this
18        document, isn't it?
19        MR. MORRIS:  Oh, yeah, it might be,
20        as a matter of fact.  Let's go to Number
21        40.
22        (Exhibit 40 marked.)
23   Q.   During the bankruptcy,
24   Mr. Waterhouse, did you prepare documents that

Page 237

WATERHOUSE - 10-19-21

1    were filed with the bankruptcy court?
2    A.   I didn't -- I didn't prepare them
3    personally.
4    Q.   Did people prepare them under your
5    direction?
6    A.   Yes.  There were members of the team
7    that prepared them, and they worked in -- you
8    know, there were members of DSI that were
9    involved in the process as well.
10   Q.   To the best of your knowledge, did
11   DSI rely on the employees of Highland for the
12   information that they used to prepare the
13   bankruptcy filings?
14   A.   Yes.  The books and records were
15   with the Highland personnel.
16   Q.   Okay.  And do you see on the screen
17   here, there is a document that we have marked
18   as Exhibit 40 that is -- that is titled Summary
19   of Assets and Liabilities?
20   A.   Uh-huh.
21   Q.   Okay.  And do you recall reviewing
22   any summary of assets and liabilities before it
23   was filed with the bankruptcy court?
24   A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1  high level.
2  Q.  And did you believe that it was
3  accurate at the time it was filed?
4  A.  I didn't have any other reason to
5  believe otherwise.
6  Q.  Okay.  Do you see that the total
7  value of all properties listed in Part 1 is
8  approximately $410 million?
9      MS. DEITSCH-PEREZ:  Objection to
10  form.
11  A.  Yes, it is in 1c.
12  Q.  Yes.
13  A.  Yes, I see that.
14  Q.  Okay.  If we go to the second page,
15  now I think I may just have excerpts here, just
16  so everybody is clear, but if we scroll down to
17  the second page, you will see that there is
18  a -- a little further.  There you go.  You will
19  see there is a reference to Item 71, notes
20  receivable.
21      Do you see that?
22  A.  I do.
23  Q.  And that was a reference to the
24  notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1  Mr. Dondero, among others; is that right?
2      MS. DANDENEAU:  Objection to form.
3  A.  Yes.  The affiliate notes and the
4  Dondero notes were in this amount, but they
5  weren't -- again, like you said, and among
6  others.
7  Q.  Okay.  We will look at the
8  specificity because I'm not playing gaming
9  here, but do you know if the $150 million of
10  notes receivable was included within the
11  $410 million of total value of the debtor's
12  assets?
13      MS. DANDENEAU:  Objection to form.
14  A.  I -- I -- I believe so.
15  Q.  Right.  And so is it fair to say
16  that as of the date this document was prepared,
17  the notes receivable were more than one-third
18  of the value of the debtor's assets?
19      MS. DEITSCH-PEREZ:  Object to the
20  form.
21      MS. DANDENEAU:  Object to the form.
22  A.  Again, if you are just taking the
23  math, 150 divided by whatever the $400 million
24  number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1  Q.  Okay.
2  A.  You know, but as of the time of this
3  filing, that is what was put in this filing,
4  right, but, you know, I mean, numbers --
5  numbers change, facts and circumstances change.
6  Q.  But as the CFO of Highland, the
7  debtor in bankruptcy, did you believe that this
8  number accurately reflected the total amount
9  due under the notes receivable?
10  A.  That is what we had in our books and
11  records.
12  Q.  Okay.  And did you believe as the
13  CFO that the books and records accurately
14  reported the then value of the debtor's assets?
15      MS. DANDENEAU:  Objection to form.
16  A.  We didn't -- as part of this filing,
17  there was no fair value measurement or
18  anything.  These were just accounting entries
19  for the promissory notes.  There is no analysis
20  for impairment or fair market value adjustments
21  or anything of that nature.  This is purely
22  taking numbers and putting them in our form.
23  Q.  Did you do any impairment analysis
24  at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1  Highland?
2  A.  Yes, we did do impairment analysis
3  on -- on assets.
4  Q.  Okay.  Did you ever do an impairment
5  analysis on any of the promissory notes that
6  were given to Highland by any of the affiliates
7  or Mr. Dondero?
8  A.  Not that I recall.
9  Q.  Under what circumstances do you
10  prepare impairment analyses?
11  A.  As -- as -- if you're preparing
12  financials in accordance with GAAP, generally
13  accepted accounting principles, if you're
14  preparing full GAAP financials, you should be
15  preparing -- you should be undergoing on a
16  periodic basis any fair market value
17  adjustments to assets.
18      As I was instructed at the time of
19  the petition date, we weren't producing GAAP
20  financials.  So this wasn't something I was
21  worried about nor concerned about.
22  Q.  Okay.  Were NexPoint and HCMFA and
23  Highland's audited financial statements
24  prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.   The audited financials -- yes,
3  audited financial statements are prepared in
4  accordance with GAAP.
5     Q.   Do you recall whether any of
6  Highland or HCMFA or NexPoint ever made a fair
7  market value adjustment to any of the notes
8  issued by any of the affiliates or Mr. Dondero
9  to Highland?
10    A.   I do not recall that happening, but
11 the -- it is because under -- under GAAP,
12 the -- the treatment of liabilities is
13 different than assets.
14    Q.   Okay. So then let's just focus on
15 Highland's audited financial statements.
16         The last audited financial
17 statements were for the period ending December
18 31st, 2018; correct?
19    A.   That is my understanding.
20    Q.   And you had -- you had an obligation
21 to disclose anything to PricewaterhouseCoopers
22 concerning any subsequent events between the
23 end of 2018 and June 3rd, 2019; correct?
24         MS. DANDENEAU:  Objection to form.
25         MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.   Correct.
3     Q.   Okay. To the best of your
4  knowledge, as Highland's CFO, did Highland ever
5  make any fair market value adjustments to any
6  of the promissory notes that were carried on
7  its balance sheet and that were issued by any
8  of the affiliates or Mr. Dondero?
9     A.   I think I answered that question
10 earlier. I don't recall doing that for any of
11 the -- those -- those notes. So it would have
12 included the audit for the -- for the 2018
13 period.
14    Q.   Okay.
15         MR. MORRIS:  Can we go to the next
16 page.
17    Q.   Do you see this is a note a list of
18 notes receivable? Do you see that?
19    A.   Yes, I do.
20    Q.   And do you see that this ties into
21 the page that we were just looking?
22    A.   I'm sorry, can we go back to the
23 prior page? I mean, it was at 150,331,222. It
24 was on the prior page. Next page. Yes, it
25 agrees.

Page 244

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     Q.   Okay. So now let's look at that
3  schedule. So this was the face amount of all
4  of the promissory notes that Highland held at
5  the time this document was filed with the
6  bankruptcy court; right?
7     A.   Yes.
8     Q.   There is a footnote there that says,
9  doubtful or uncollectible accounts are
10 evaluated at year-end.
11         Do you see that?
12    A.   I do.
13    Q.   Okay. And is it fair to say that as
14 of the year-end 2018, the year before this,
15 that to the extent any of these notes were
16 outstanding at that time, they weren't deemed
17 to be doubtful or uncollectible?
18    A.   Yeah. For the 2018 audit, there
19 weren't any -- there weren't any adjustments to
20 fair value.
21    Q.   Okay. And during the bankruptcy, do
22 you recall that Highland subsequently reserved
23 for the Hunter Mountain Investment Trust note?
24    A.   Yes.
25    Q.   Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  involved in the decision to reserve the Hunter
3  Mountain Investment Trust note?
4     A.   I was not.
5     Q.   Do you know why Highland decided to
6  reserve for the Hunter Mountain Investment
7  Trust note?
8     A.   I don't know yet decision was made.
9  I believe it was made by someone at DSI.
10    Q.   Okay. I'm just asking if you know
11 why.
12         Did you ever ask anyone why they
13 reserved for that particular note?
14    A.   I don't recall.
15    Q.   Do you know whether the debtor
16 reserved for any other note on this list during
17 the bankruptcy?
18    A.   Again, I don't recall. I wasn't
19 part of any process of -- again, like any fair
20 value adjustments or anything to that degree.
21 Like I said, a lot of that was done by DSI and
22 it was kind of out of our court.
23    Q.   Okay. Do you know if any note
24 receivable on this list was ever deemed by the
25 debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1
2    A.  I don't -- I don't have a
3    recollection of every filing, so I don't know.
4    Q.  Did you ever have a discussion with
5    anybody at any time about whether any of the
6    notes receivable on this list should be deemed
7    to be doubtful or uncollectible?
8    A.  No.  As I previously stated, we were
9    told we didn't have to keep GAAP financials.
10   We weren't having -- you know, there is no
11   underlying audits being performed, so I mean,
12   it wasn't something I worried about.
13       MR. MORRIS: I move to strike.
14   Q.  Did you ever have a conversation
15   with anybody about any of the notes receivable
16   and whether they should be deemed to be
17   doubtful or uncollectible?  Did you have the
18   conversation, yes or no?
19       MS. DANDENEAU:  Objection to form.
20   A.  I don't recall.
21   Q.  Do you recall ever telling anybody
22   that you believed any of the notes receivable
23   on this list should be doubtful -- should be
24   deemed to be doubtful or uncollectible?
25       MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1
2    A.  I don't recall.  I mean, it may have
3    happened, you know, again, when we initially
4    getting DSI up to speed and going through
5    financials, it may have happened, but I don't
6    recall specifically.
7    Q.  While you were the CFO of Highland
8    during the time that the company was in
9    bankruptcy, did you have any reason to believe
10   that any of the notes receivable on this list
11   other than Hunter Mountain Investment Trust
12   should have been characterized as doubtful or
13   uncollectible?
14       MS. DANDENEAU:  Objection to form.
15       MS. DEITSCH-PEREZ:  Form.
16   A.  I didn't know.  I didn't form an
17   opinion.  Bankruptcy was new to me.  It still
18   is new to me, even after going through this.
19   So I really didn't know what to expect nor
20   really -- you know, I didn't know.
21       MR. MORRIS: I move to strike.
22   Q.  During the period of Highland's
23   bankruptcy when you were serving as CFO, did
24   you have any reason to believe any of the notes
25   on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1
2       MS. DEITSCH-PEREZ:  This is like the
3    fifth time you've asked it.  Object to the
4    form.
5       MR. MORRIS:  I'm moving to strike,
6    if you haven't noticed, because he's not
7    answering the question.
8       MS. DEITSCH-PEREZ:  He was answering
9    the question, you just didn't like it, like
10   the answer.
11      MR. MORRIS:  Good Lord.
12   Q.  Go ahead, Mr. Waterhouse.
13   A.  Again, I don't -- we brought up a
14   myriad of issues at the start of the bankruptcy
15   case.  I don't recall if this was one of them,
16   but, again, there are a lot of things we
17   couldn't change.  Even, you know, I was told
18   status quo, blah, blah, blah, right, there is a
19   stay, you can't -- you know, I don't recall
20   specifically, but that doesn't mean it didn't
21   happen.
22      MR. MORRIS: I move to strike.
23   Q.  During the time that Highland was in
24   bankruptcy and you served as CFO, did you have
25   any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1
2    receivable on this list were doubtful or
3    uncollectible?
4       MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.  Potentially.
7    Q.  Did you ever tell anybody that?
8    A.  As I just stated like five times,
9    yes, we -- at the beginning after filing and we
10   were getting DSI and others up to speed, you
11   know, we had a myriad of discussions of a lot
12   of things and this was likely one of them.  I
13   don't -- but I don't recall specifically we
14   talked --
15   Q.  I don't want to know -- I don't want
16   to know what was --
17      MS. DEITSCH-PEREZ:  Wait, wait.
18   Excuse me.  Mr. Morris, you did not let him
19   finish his answer.
20   A.  I spoke -- we had -- we were
21   bringing Fred Karesa and Brad Sharp (phonetic)
22   up to speed on all of these items, contracts,
23   and investments and going through -- we had
24   hours and hours and hours of discussion.  And
25   then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1   once, twice, three, four times with -- you
2   know, I mean, we -- I don't -- I don't remember
3   the sum culmination of all these discussions.
4   They all kind of blend together.
5       MR. MORRIS: Okay. I move to strike
6   and I will try one more time.
7       Q.   Did you ever tell anybody at DSI
8   that you believed any of the notes receivable
9   on this list were doubtful or uncollectible?
10       MS. DANDENEAU: Object to form.
11       A.   Potentially.
12       Q.   Potentially you told them or
13   potentially they were doubtful or
14   uncollectible?
15       A.   Potentially I told them that we
16   needed to look at the value of these -- of
17   these assets.
18       Q.   Okay. Did you -- okay. It is
19   potential that you told them and it is
20   potentially that you didn't; right?
21       MS. DANDENEAU: Objection to form.
22       A.   I've gone through that. I don't
23   recall specifically.
24       Q.   So you should just -- I don't want
25

Page 251

WATERHOUSE - 10-19-21

1   to tell what you to do. Do you have --
2       MS. DANDENEAU: Good.
3       Q.   Other than -- other than telling
4   them that they should look at the values, do
5   you have any recollection whatsoever of ever
6   having told anybody at DSI that any of the
7   notes receivable on this page were doubtful or
8   uncollectible?
9       MS. DEITSCH-PEREZ: Object to the
10   form.
11       MS. DANDENEAU: Objection.
12       A.   I recall having general discussions
13   about everything on our balance sheet which
14   would have included these -- these notes
15   receivable.
16       Q.   Okay.
17       A.   I don't recall specifically where
18   those discussions delved into.
19       Q.   Do you recall any discussion at all
20   on the topic of whether any of these notes on
21   this list were doubtful or uncollectible?
22       MR. AIGEN: Mr. Morris, how on earth
23   is that question different from the
24   question that you just asked for the last
25

Page 252

WATERHOUSE - 10-19-21

1   five times? I mean, really I thought you
2   were -- (overspeak.)
3       MR. MORRIS: Because he never
4   answered it.
5       MS. DEITSCH-PEREZ: Are you
6   listening to him?
7       MR. MORRIS: You know --
8       MS. DEITSCH-PEREZ: He basically
9   said that he had a conversation with DSI
10   that went over all of this stuff and that
11   conversation could have included the notes
12   but he doesn't recall specifically.
13       What more do you want him -- to ask
14   of him?
15       MR. MORRIS: I want him -- I would
16   love him to say -- I would like him to
17   testify to the truth, and that is he has no
18   recollection.
19       MS. DEITSCH-PEREZ: Well, the truth
20   as you would like to see it, but -- but he
21   is testifying truthfully. And I -- and, by
22   the way, I move to strike that comment --
23       MR. MORRIS: Okay.
24       MS. DEITSCH-PEREZ: -- because it
25

Page 253

WATERHOUSE - 10-19-21

1   suggests that he has not testified
2   truthfully.
3       MR. MORRIS: I will ask my question
4   again. And if at any time you want to
5   direct him not to answer, that is your
6   prerogative.
7       Q.   Mr. Waterhouse, do you have any
8   recollection at all of ever telling anybody
9   from DSI that any of these notes were doubtful
10   or uncollectible?
11       MS. DANDENEAU: Object to form.
12       A.   I don't remember specifically.
13       Q.   Do you remember generally that
14   specific topic?
15       A.   We generally talked about assets,
16   values. If -- we had discussions of that and
17   collectability in nature. I mean, of Highland,
18   the funds, the CLOs, the entire complex. We
19   had discussions like that, which is, you know,
20   as you look at a billion dollar consolidated
21   balance sheet.
22       So I generally remember -- this is
23   billions of dollars, including these assets --
24   having discussions of this -- of this type.
25

Page 254

```
1           WATERHOUSE - 10-19-21
2    Q.  Do you believe that an affiliate
3  loan on this list was doubtful or
4  uncollectible? Would you have told that to
5  DSI?
6        MS. DANDENEAU: Objection to form.
7        MS. DEITSCH-PEREZ: Object to form.
8    A.  If we had, like -- again, if we --
9  if -- if we weren't preparing financial
10 statements in accordance with GAAP, and -- you
11 know, if DSI at that point -- they were --
12 again, I was new to bankruptcy.
13       The CRO is -- we are delegating
14 everything to the CRO. All the decisionmaking.
15 Remember -- remember when you and I went into
16 Delaware Court and we were saying DSI basically
17 does everything, remember this, Mr. Morris?
18       You were my counsel at the time, and
19 basically we're running everything through DSI.
20 That was what this was like in the early part.
21       Everything was communicated through
22 DSI. So DSI says this. DSI says that. That
23 is what we're doing, and we're pointing out
24 things to them.
25       Now, they decide what direction this
```

Page 255

```
1  goes.
2    Q.  Did you point out that any of
3  these --
4    A.  I don't recall specifically.
5    Q.  Okay. At any time that you served
6  as Highland's CFO, did you ever point out to
7  DSI that any of these loans were doubtful or
8  uncollectible?
9        MS. DEITSCH-PEREZ: Object to the
10       form.
11       MS. DANDENEAU: Objection.
12   A.  If you're asking me if I had a
13 conversation with DSI, if any of these loans
14 were doubtful or uncollectible, I don't recall
15 specifically.
16   Q.  Do you recall that the debtor filed
17 on the docket monthly operating reports?
18   A.  Yes.
19   Q.  You prepared those personally,
20 didn't you?
21       MS. DEITSCH-PEREZ: Objection to
22       form.
23   A.  I didn't personally prepare them,
24 the team did with DSI.
```

Page 256

```
1           WATERHOUSE - 10-19-21
2    Q.  But you signed them; correct?
3    A.  My signature is on the MORs.
4    Q.  And you signed them as the preparer
5  of the document; correct?
6    A.  Yes, I did this pursuant to DSI's
7  instructions.
8    Q.  Okay. You wouldn't have signed the
9  document if you didn't believe it to be
10 accurate; correct?
11   A.  If I had reason to believe it
12 wasn't, presumably I wouldn't have signed it.
13   Q.  Okay. And do you have any reason to
14 believe right now that any monthly operating
15 report that has your signature on it was
16 inaccurate in any way?
17       MS. DEITSCH-PEREZ: Object to the
18       form.
19   A.  My understanding of the monthly
20 operating reports is we were filing them in
21 accordance with the standards set by the Court.
22 It wasn't -- you know, again, I don't -- you
23 know, it wasn't GAAP. It wasn't these other
24 standards, so I testified I didn't have
25 experience in this. The CRO was running the
```

Page 257

```
1           WATERHOUSE - 10-19-21
2  show. I followed their advice.
3    Q.  But you assured yourself that
4  everything in the report was accurate before
5  you signed them; correct?
6        MS. DANDENEAU: Objection to form.
7    A.  I trusted the guidance from the CRO
8  and their team and their experience and their
9  guidance for doing this for many, many, many
10 years to -- to -- to categorize and put things
11 in ways on the form.
12       You know, my team had -- had not
13 filled out these forms before and needed all of
14 this guidance. I'm not an expert in this. I
15 have oversight of it. I signed the form. DSI
16 told me to.
17   Q.  And you and your team are the source
18 of the information that DSI used to create the
19 reports; correct?
20       MS. DANDENEAU: Objection to form.
21   A.  The books and records reside with
22 the -- with -- with the corporate accounting
23 team.
24   Q.  Okay. And the corporate accounting
25 team was the corporate accounting team that was
```

Page 258

WATERHOUSE - 10-19-21

2  under your direction; correct?
3     A.  Yes.
4     Q.  So -- so your team was responsible
5  for maintaining Highland's books and records;
6  correct?
7     A.  I'm sorry, my team was responsible?
8     Q.  Correct.
9     A.  Yes.  They -- they -- they were
10  the -- the -- the general ledger of Highland,
11  that responsibility was with the corporate
12  accounting team.
13     Q.  The corporate accounting group
14  reported to you; correct?
15     A.  Yes.
16       MR. MORRIS:  Can we put up 41,
17  please.
18       (Exhibit 41 marked.)
19     Q.  All right.  You will see that this
20  is a report that is dated January 31st, 2020,
21  but it is for the month ending December 2019.
22       Do you see that?
23     A.  I do.
24     Q.  And you signed this report in your
25  capacity as the chief financial officer of

Page 259

WATERHOUSE - 10-19-21

2  Highland; correct?
3     A.  Yes.
4     Q.  And you're the preparer -- you're
5  identified as the preparer of the report;
6  correct?
7     A.  That is correct.
8     Q.  Do you recall participating in the
9  preparation of monthly operating reports?
10     A.  As I testified earlier, it was put
11  together, you know, with the team.  The team
12  worked with DSI to put these monthly operating
13  reports together.  We had no experience at this
14  time of the monthly operating reports or things
15  of this nature.
16       MR. MORRIS:  Can you turn to the
17  next page, please.
18     Q.  Do you see a line item under assets
19  due from affiliates?
20     A.  Yes, I do.
21     Q.  Okay.  And to the best of your
22  knowledge and understanding, as the person who
23  is identified as the preparer of this report,
24  does that line item include the affiliate loans
25  that we've been talking about?

Page 260

WATERHOUSE - 10-19-21

2     A.  Again, I would have to see, just
3  like we did with the financial statements of
4  Highland and NexPoint, I would have to see a
5  detailed build, but, you know, if you look at
6  the other line items, you know, the only other
7  place it could be would be in -- in other
8  assets.
9     Q.  Okay.  And as a matter of
10  arithmetic, is it fair to say that is the value
11  of the assets due from affiliates was more than
12  25 percent of the value of Highland's total
13  assets as of 12/31/2019?
14       MS. DANDENEAU:  Objection to form.
15     A.  I'm really not doing the mental math
16  right now, so I've been going at this depo for
17  hours, so I'm really not -- you know --
18     Q.  All right.  No problem.
19     A.  -- these are millions of dollars.
20     Q.  Let's look at the Footnote 1,
21  please.  Do you see there is a reference to the
22  Hunter Mountain note?
23     A.  Yes, I see that in Footnote 1.
24     Q.  Okay.  And that's the reserve that
25  was taken against that note?

Page 261

WATERHOUSE - 10-19-21

2     A.  Yes, that is what this indicates.
3     Q.  Okay.  And were you aware that the
4  reserve was being taken on that it was?
5     A.  I was -- I was aware, yeah, at some
6  point, yes.
7     Q.  Okay.  And are you aware of any
8  reserve being taken with respect to any other
9  note that was issued in favor of Highland?
10     A.  Again, as I testified, we didn't go
11  through an analysis on -- on -- on the other
12  notes.
13     Q.  Can we turn --
14     A.  I believe -- I believe it says that
15  in Footnote 1, fair value has not been
16  determined with respect to any of the notes.
17       So this footnote -- footnotes, look,
18  there has been no determination.
19     Q.  Okay.  The determination was made in
20  the audited financial statements just six
21  months earlier; right?  We saw that earlier?
22     A.  That was as of 12/31/18.  I mean,
23  things -- circumstances -- there's a bank --
24  circumstances change, things change -- things
25  change over time, you know, facts and

Page 262

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    circumstances change. Again, you have to do an
3    analysis.
4        Q.    Okay. And you do recall that in
5    Highland's 2018 financial statement, all of the
6    notes issued by affiliates and Mr. Dondero that
7    were due at year-end had a fair value equal to
8    the carrying value; correct? We looked at
9    that?
10       A.    Yes. That was in the -- in the
11   disclosure for the -- for the affiliate notes,
12   yes.
13       Q.    And -- and you were obligated to
14   share with PwC any subsequent events between
15   the end of 2018 and the date that you signed
16   your management representation letter on June
17   3rd, 2019; correct?
18       MS. DEITSCH-PEREZ:  Object to the
19   form.
20       A.    Yes. I -- I -- I signed the
21   management, you know, my signature is in the
22   management representation letter -- I hope I'm
23   answering your question -- that is dated in
24   June with the representations made in that
25   management representation letter.

Page 263

1    WATERHOUSE - 10-19-21
2        Q.    Okay. And there was nothing that
3    caused PricewaterhouseCoopers to include in
4    subsequent events any adjustment to the
5    conclusion that the fair value of the affiliate
6    notes and the notes issued by Mr. Dondero
7    equaled the carrying value; correct?
8        MS. DANDENEAU:  Objection to the
9    form.
10       A.    That is correct. That is what was
11   in the -- in the -- in the footnotes.
12       Q.    Okay. So are you aware of anything
13   that occurred between June 3rd, 2019 and
14   December 31st, 2019 that would have caused the
15   fair value of the notes to differ from the
16   carrying value?
17       A.    Yeah. Highland filed for
18   bankruptcy, things changed -- I mean, there was
19   a bankruptcy filed in October of -- of -- of
20   2019, right, the petition date that we've
21   described earlier.
22       I mean, I had a -- I guess looking
23   back naively, I thought we were going to get an
24   audit from PwC for year-ended 2019, and when we
25   had discussions with PwC, they were like, are

Page 264

1    WATERHOUSE - 10-19-21
2    you crazy, we're not auditing this. Values
3    change, all these things change, bankruptcy
4    changes the entire scenario. I mean -- and
5    they're like, we're not -- we're not touching
6    this.
7        And so, you know, I was like, okay,
8    sorry, I get it, okay, no an audit.
9        I mean, it is -- you know, and --
10   you know, and we weren't preparing GAAP
11   financial statements.
12       Again, I didn't know what we were
13   doing in relation to our financial statements,
14   but these were the discussions I was having at
15   the time. And yeah, I mean, filing bankruptcy
16   from what I got from outside auditors and
17   others involved changed things dramatically.
18       Q.    Okay. Highland wasn't the obligor
19   under any of the notes that we're talking
20   about; correct?
21       A.    No.
22       Q.    So --
23       A.    That's right.
24       Q.    So can you identify any fact that
25   would cause the fair value to deviate from the

Page 265

1    WATERHOUSE - 10-19-21
2    carrying value during the seven-month period
3    between June 3rd and the end of the year, 2019?
4        MS. DANDENEAU:  Objection to form.
5        A.    No. I mean, I'm putting myself back
6    at that time, right. Hindsight is 2020, but we
7    didn't do an analysis, but we would have done a
8    fulsome analysis and looked at all of the facts
9    and circumstances at the time, but asset values
10   change. You know, there could have been a
11   market crash in hindsight in 2020, which --
12   which affected entities' abilities.
13       There could have been all of these
14   things, right, that -- that happen. It is --
15   it is easy to look back in hindsight, but when
16   you are looking at this in -- in realtime, the
17   analysis is different, and again, we didn't do
18   an analysis.
19       Q.    Okay. You didn't do an analysis.
20       Do I have that right?
21       A.    I don't -- I don't recall doing one
22   or maybe -- you know, I don't recall doing one.
23       MR. MORRIS:  Okay. I'm going to
24   take a break. I may be done, so the time
25   now is -- is 4:30 your time. Let's just

Page 266

WATERHOUSE - 10-19-21
2  take a short break until 4:40 your time.
3      MS. DANDENEAU:  Okay.
4      VIDEOGRAPHER:  We're going off the
5  record, 4:31 p.m.
6  (Recess taken 4:31 p.m. to 4:43 p.m.)
7      VIDEOGRAPHER:  We are back on the
8  record at 4:43 p.m.
9      MR. MORRIS:  I have no further
10  questions.
11     MR. RUKAVINA:  Okay.
12  Mr. Waterhouse, I will go next.
13         EXAMINATION
14  BY MR. RUKAVINA:
15     Q.  Sir, my name is Davor Rukavina.  I'm
16  the lawyer for --
17     MR. MORRIS:  Hey, Davor, just before
18  you begin, I just want to put on the record
19  Highland's objection to documents that were
20  produced to me 10 minutes before the
21  deposition began.
22     MR. RUKAVINA:  What the basis of
23  your objection?
24     MR. MORRIS:  That they were due
25  quite some time ago, and the fact that you

Page 267

WATERHOUSE - 10-19-21
2  had -- I just think it's appropriate to --
3  to dump documents on somebody 10 minutes
4  before the deposition.  I just think
5  that's --
6      MR. RUKAVINA:  Well, these are
7  documents Highland produced.  I'm not aware
8  of any rule I have to give you advance
9  documents when I know for the record that
10  other than the exhibits that you sent to us
11  last week, most of the exhibits you used
12  today you did not provide to me prior to
13  this deposition.
14     MR. MORRIS:  No, but the documents
15  were produced by me in -- in litigation,
16  right?
17     MR. RUKAVINA:  I'm going to use
18  primarily, John, the documents that you
19  produced to me today, but you may.
20     MR. MORRIS:  Primarily.  I've got --
21  I've got my objection.  You have got your
22  response.  Proceed.
23     Q.  Mr. Waterhouse, again, I represent
24  the advisors, HCMFA and NexPoint Advisors.
25     Do you understand that?

Page 268

WATERHOUSE - 10-19-21
2  A.  Yes.
3  Q.  You and I have never met or talked
4  before today, have we?
5  A.  No, I have -- I have heard your
6  voice on calls before.
7  Q.  Okay.
8      MR. RUKAVINA:  Madam Court Reporter,
9  I will use a few exhibits today.  My
10  associate, Mr. Nguyen, will find some way
11  to get them to you.  I don't know how to do
12  that, but it looks like you guys do.
13     I am going to use numbers as well.
14  But to differentiate them from Mr. Morris
15  we're going to mark mine with the prefix A
16  for advisors.
17     Do you understand?
18     COURT REPORTER:  Yes.
19     MR. RUKAVINA:  Okay.  Perfect.
20  Q.  Okay.  So, Mr. Waterhouse, let's
21  start with those two HCMFA notes that you were
22  asked about, one for 5 million and one for
23  2.4 million.
24     Do you recall those notes?
25  A.  Yes.

Page 269

WATERHOUSE - 10-19-21
2  Q.  Were you ever the CFO of HCMFA?
3  A.  I don't recall.
4  Q.  So to the best of your recollection,
5  you were still an officer of HCMFA in 2019,
6  just that your title was treasurer?
7      MR. MORRIS:  Object to the form of
8  the question.  There is no leading here.
9  He works for your client.
10     MS. DANDENEAU:  That is not -- that
11  is not true.
12     MR. MORRIS:  He's the treasurer --
13  he is the treasurer of your client.  I
14  don't -- I'm going to object every time you
15  try to lead, so...
16     MR. RUKAVINA:  Totally fine to
17  object.
18     MR. MORRIS:  Okay.
19     Q.  Please answer my question,
20  Mr. Waterhouse.
21  A.  I'm sorry, could you repeat?  There
22  was...
23  Q.  Yes.  You were -- you testified
24  earlier that in 2019 you were an officer of
25  HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.    Yes, I testified that I was the
3  treasurer and I didn't know if that incumbency
4  certificate, you know, was one that appointed
5  me as a treasurer, but yes.
6     Q.    I'm just trying to confirm that
7  sitting here today, to the best of your
8  recollection, at that time you were -- your
9  title was treasurer.  It was not chief
10 financial officer.
11    A.    I don't recall that being my title.
12    Q.    Okay.  And in May of 2019, however,
13 I think you testified you were the chief
14 financial officer of the debtor; correct?
15          MR. MORRIS:  Objection to the form
16    of the question.
17    A.    Yes, I was -- yes.
18    Q.    Okay.  As such, in May of 2019, did
19 you have the authority, to your understanding,
20 to unilaterally loan $5 million or $2.4 million
21 to anyone on behalf of the debtor?
22          MR. MORRIS:  Objection to the form
23    of the question.
24    A.    Sorry, can you repeat that?
25    Q.    Yes.  So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  chief financial officer of the debtor, Highland
3  Capital Management, L.P., in May of 2019, did
4  you believe that you unilaterally, just Frank
5  Waterhouse, had the authority to loan on behalf
6  of the debtor to anyone $5 million and
7  $2.4 million?
8          MR. MORRIS:  Objection to the form
9    of the question.
10    A.    No.
11    Q.    Is it because loans of that amount
12 would have had to be approved by someone else?
13    A.    Yes.
14    Q.    Who in '20 -- in May of 2019, if
15 Highland wanted to loan 5 million or
16 $2.4 million to someone, what would have been
17 the internal approval procedure?
18          MR. MORRIS:  Objection to the form
19    of the question.
20    A.    If -- if we had loans of that nature
21 that needed to be made due to their size, we
22 would have gotten approval from the -- the
23 president of Highland.
24    Q.    And who that was individual?
25    A.    It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     Q.    Okay.  Now, I'm going to ask you a
3  similar question but for a different entity.
4          In May of 2019, as the treasurer of
5  HCMFA, did you believe that you unilaterally
6  had the ability to cause HCMFA to become the
7  borrower of a $5 million loan and a
8  $2.4 million loan?
9          MR. MORRIS:  Objection to the form
10    of the question.
11    A.    No.
12    Q.    What would -- what would the
13 approval have taken place -- strike that.
14          What would the approval process have
15 been like in May of 2019 at HCMFA for HCMFA to
16 take out a $7.4 million loan?
17          MR. MORRIS:  Objection to the form
18    of the question.
19    A.    The process would have been similar
20 to what we just discussed on -- for Highland to
21 make a loan to others.  So, again, you know,
22 we -- we would have -- either myself or someone
23 on the team would have discussed this with
24 the -- the president and owner of -- of HCMFA.
25    Q.    And who was that individual?

Page 273

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     A.    That was James -- Jim Dondero.
3     Q.    So do I understand that in May of
4  2019, on behalf of both the lender, Highland,
5  and the borrower, HCMFA, Mr. Dondero would have
6  had to approve $7.4 million in loans?
7          MR. MORRIS:  Objection to the form
8    of the question.
9     A.    Yes.
10    Q.    You mentioned when Mr. Morris was
11 asking you the NAV error, N-A-V error, with
12 respect to TerreStar, without writing us a
13 novel, unless you feel like you have to, can
14 you summarize what that NAV error was?  What
15 happened?
16    A.    There was a -- in the Highland
17 Global Allocation Fund, it owned at the time an
18 equity interest in a company called TerreStar.
19 And TerreStar is -- at the time was a private
20 company, and it may still be today.  Again, I'm
21 putting myself back then as a private company.
22          We had -- sorry, I don't mean we --
23 the fund and the advisor used Houlihan Lokey
24 to -- to value that investment.  And during
25 that time there was some trades that were

Page 274

1        WATERHOUSE - 10-19-21
2    executed at market levels that were much lower
3    than the Houlihan Lokey model.
4        And based on information and
5    discussions with the portfolio managers and,
6    you know, principals that were very familiar
7    with TerreStar, it was determined that those
8    trades were non-orderly and they were not
9    considered in the valuation as consulted with
10   Houlihan Lokey and PricewaterhouseCoopers at
11   the time.
12       Subsequent to a -- I can't remember
13   the exact circumstances of why the SEC got
14   involved. I think it was due to this -- this
15   investment became a material position in the
16   fund. It triggered an SEC, kind of, inquiry.
17   And as part of that inquiry, they questioned
18   the valuation methodology. "They" meaning the
19   SEC.
20       And at the culmination of that
21   process -- this is all summarized -- the value
22   that was -- that ultimately had to be used in
23   the fund's NAV was different than -- materially
24   different than what the original valuation at
25   Houlihan Lokey provided.

Page 275

1        WATERHOUSE - 10-19-21
2        And given that there was this fund
3    was, as we discussed -- I don't know if we
4    discussed it, but it was an open-ended fund
5    that was going -- that was converting to a
6    close-end fund.
7        Due to the fact that it was an
8    open-ended fund, you had to recalculate NAV and
9    see what the impact was on people -- on
10   investors coming in and out of the fund and if
11   there is a detrimental impact and to calculate
12   what that -- what that impact was and if there
13   was any amounts owed to the fund pursuant to
14   the error.
15   Q.   Were you personally involved
16   internally at either Highland or HCMFA with
17   these investigations and discussions with the
18   SEC?
19   A.   I was.
20   Q.   Which other key people or senior
21   people at Highland were involved, to your
22   recollection?
23   A.   Myself, Thomas Surgent, David Klos,
24   Lauren Thedford, Jason Post.
25   Q.   Mr. Dondero, was he --

Page 276

1        WATERHOUSE - 10-19-21
2    A.   I believe Cliff Stoops. I'm trying
3    to think. And maybe that is -- that is -- that
4    is -- that is all kind I can recall at the
5    moment.
6    Q.   Do you recall whether it was
7    determined that the fund suffered losses as a
8    result of this error?
9    A.   The -- the fund -- the -- the --
10   because the open-ended nature of the fund,
11   there were losses that were attributable to
12   investors. Meaning they -- they would have
13   redeemed and got a less money or -- or they
14   subscribed in and maybe because they didn't get
15   enough shares and then they later sold and then
16   they were harmed in that fashion.
17       And there is -- there is is -- there
18   were very -- there were very detailed
19   calculations and, you know, all these different
20   scenarios that we had to -- I'm sorry, I keep
21   saying "we" -- that the individuals involved
22   had to calculate and quantify.
23   Q.   Well, do you recall whether HCMFA
24   admitted certain fault and liability for this
25   error?

Page 277

1        WATERHOUSE - 10-19-21
2    A.   I don't recall specifically.
3    Q.   Do you recall whether HCMFA caused
4    any funds to be paid to the investors and the
5    fund the subject of the NAV error?
6    A.   Yes.
7    Q.   Do you recall the approximate amount
8    of funds, moneys paid to the investors and the
9    fund?
10   A.   It was -- it was approximately
11   $7 million.
12   Q.   If I was to suggest 7.8 million,
13   would that ring more true or are you sticking
14   with your original answer?
15   A.   It was -- it was approximately 7 --
16   7 to $8 million. Again, I don't remember the
17   exact number, but it was in that ballpark.
18   Q.   So regardless of whether HCMFA
19   accepted fault or liability, it caused some
20   $7 million or more to be paid out to affected
21   investors in the fund?
22       MR. MORRIS: Objection to the form
23   of the question.
24   A.   And I want to make sure I'm
25   understanding your question because there is a

Page 278

WATERHOUSE - 10-19-21

1    lot of different entities that are going on to
2    my head.
3         I think what you are saying is based
4    on this error, shareholders were harmed by this
5    approximately $7.8 million -- by approximately
6    $7.8 million.  Is that what you are asking?
7         Q.   Yes, sir.
8         A.   Yes, that was -- again, I don't have
9    the exact numbers.  If I take -- it was -- it
10   was in that ballpark, and there is a detail
11   calculation and write-up that could, that --
12   that exists someplace.
13        Q.   Now, at that time, at the time that
14   the NAV error occurred, was there a contract in
15   place between HCMFA and the debtor pursuant to
16   which the debtor was providing services to
17   HCMFA?
18        MR. MORRIS:  Objection to the form
19   of the question.
20        A.   Yes.
21        Q.   Was that contract generally called a
22   shared services agreement?
23        A.   It was generally called that, but
24   there were -- there were -- I mean, it -- it --

Page 279

WATERHOUSE - 10-19-21

1    it depends on who you talk to, but yes,
2    generally, there were -- there are multiple
3    agreements.
4         Q.   Pursuant to one or more of those
5    agreements, was the debtor providing certain
6    services to HCMFA?
7         MR. MORRIS:  Objection to the form
8    of the question.
9         A.   Yes.
10        Q.   And can you at a very high level
11   summarize in 2018 and 2019 what those services
12   were?
13        A.   Yes, there was a -- yes.
14        Q.   Okay.  Please -- please go -- go
15   through a short summary.
16        A.   There was a -- a cost reimbursement
17   agreement between Highland Capital Management
18   Fund Advisors and Highland Capital Management,
19   L.P.  That agreement was for what we referred
20   to as front office services, so investment
21   management, things of that nature.
22        There was I think what most people
23   refer to as the shared services agreement that
24   was -- that agreement was between Highland

Page 280

WATERHOUSE - 10-19-21

1    Capital Management Fund Advisors and Highland
2    Capital Management for back office services.
3         Q.   And can you summarize what you mean
4    by back office services?
5         A.   Those services were for accounting,
6    finance, tax, valuation, HR, IT, you know,
7    legal compliance, things of -- things of those
8    nature -- or things of that nature, excuse me.
9         Q.   So in the spring of 2019, do you
10   recall whether HCMFA took the position that it
11   was actually Highland that caused the NAV error
12   to occur pursuant to the valuation services
13   that Highland was providing?
14        MR. MORRIS:  Objection to the form
15   of the question.
16        A.   I do not recall.
17        Q.   Did you ever have any discussions
18   with anyone, Jim Dondero or anyone in the first
19   half of 2019 as to whether Highland, the
20   debtor, that is, had any liability to HCMFA
21   related to the NAV error?
22        MR. MORRIS:  Objection to the form
23   of the question.
24        A.   I do not recall.

Page 281

WATERHOUSE - 10-19-21

1         Q.   And then you mentioned that the fund
2    was being closed and some compensation related
3    to that.  Can you -- can you elaborate?  What
4    were you referring to?
5         A.   Right.  So the advisor, pursuant to
6    board approval, put a proposal in front of the
7    shareholders of the Highland Global Allocation
8    Fund to convert it from an open-ended fund to a
9    closed-end fund.
10        So an open-ended fund, when
11   shareholders subscribe to the fund or redeem
12   into the fund, they do it at NAV.
13        When it is -- when you have a
14   closed-end fund, closed-end funds are -- are
15   publicly-traded, like on the New York Stock
16   Exchange, exchanges like that, and -- and
17   shareholders or investors, they're not --
18   they're -- they're not subscribing and
19   redeeming with the fund.  They are like shares
20   of Apple.
21        Those shares of the Highland Global
22   Allocation Fund trade on an exchange, and that
23   is how you, you know, that is how, you know,
24   you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1    sell your shares and you are no longer an
2    equity owner.
3
4        As part of that proposal, the
5    advisor told shareholders if you -- if you vote
6    for this proposal to -- to convert it from an
7    open-ended fund to a closed-end fund, we will
8    pay you some amounts of money. I forgot -- a
9    certain number of points. I think it was
10   like -- it was like two to three points or
11   something -- something like that.
12       Q.   Okay. You mentioned when Mr. Morris
13   was asking you, going back to those two
14   promissory notes, you will recall the 5 million
15   and 2.4 million, you mentioned something to the
16   effect that Mr. Dondero told -- told you to pay
17   some moneys out of Highland. Do you remember
18   that discussion with Mr. Morris?
19       A.   I do.
20       Q.   So, to the best of your
21   recollection, did you have a discussion with
22   Mr. Dondero about making some payments in May
23   of 2019 out of Highland?
24       A.   I recall, as I testified earlier,
25   that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1    for -- for these amounts attributable to -- it
2    was either the error -- you know, the error,
3    and in that conversation he said, go get the
4    money from Highland. I believe that is what I
5    testified earlier, and that -- that is my
6    recollection.
7        Q.   Do you recall if that was an
8    in-person meeting or some other mode for the
9    meeting?
10       A.   I -- I -- I recall that being
11   in-person.
12       Q.   Do you recall if anyone else was
13   present, or was it just you and Mr. Dondero?
14       A.   I recall just he and I.
15       Q.   And the moneys that he told you to
16   find from -- or get from Highland, was that in
17   the amount of $5 million and $2.4 million?
18       MR. MORRIS: Objection to the form
19   of the question.
20       A.   I believe so, but I would have to go
21   back and look and see when those moneys were
22   actually paid into the -- into the fund and,
23   you know, when those transfers were done. If
24   they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1    yes, I would say it was -- it was all related
2    to that.
3        Q.   Did Mr. Dondero tell you that those
4    funds would be a loan from Highland to HCMFA?
5        A.   I don't recall.
6        MR. MORRIS: Objection to the form
7    of the question.
8        Q.   Now, and forgive me, I'm probably
9    the only non-American born here, but I speak
10   reasonably well in English. I don't recall,
11   does that mean you don't remember or does that
12   mean it didn't happen?
13       MR. MORRIS: Objection to the form
14   of the question.
15       A.   It -- it means I don't -- I don't
16   remember.
17       Q.   Did Mr. Dondero tell you to have
18   those two promissory notes prepared?
19       A.   I don't recall.
20       Q.   When you -- again, when you say, I
21   don't recall today, that means that sitting
22   here today, you just don't remember one way or
23   the other. Is that accurate?
24       A.   Yes.

Page 285

WATERHOUSE - 10-19-21

1        Q.   Is it possible that you, having
2    heard what Mr. Dondero said and seeing funds
3    being transferred, assumed that that would be a
4    loan without him actually telling you that
5    would be a loan?
6        MR. MORRIS: Objection to the form
7    of the question.
8        A.   Sorry, I want to make sure -- did I
9    ask the amounts that were transferred that I --
10   that -- that I assumed that that was a loan?
11       Q.   Well, let me -- let me take -- let
12   me try again.
13       So you have established already that
14   there were quite a number of promissory notes
15   back and forth -- I'm sorry, quite a number of
16   promissory notes with affiliated companies and
17   individuals owing Highland money; right?
18       A.   Yes.
19       Q.   And you have established that there
20   were many transactions and transfers going back
21   and forth over the years; right?
22       MS. DANDENEAU: Objection to form.
23       A.   In -- yes, in my capacity as CFO and
24   my employment, yes, that is -- yes.

Page 286

1          WATERHOUSE - 10-19-21
2     Q.   And that's part of the reason why
3   you just can't remember some of the details
4   today because this -- this happened years ago,
5   and there were a number of transactions.  Is
6   that accurate?
7          MS. DANDENEAU:  Objection to the
8     form.
9          MR. MORRIS:  Objection to the form
10    of the question.
11    A.   I mean, I deal with thousands of --
12   of -- of -- of transactions, you know, whether
13   it has -- the processing of transactions, you
14   know, if it has got, you know, more -- more
15   zeros, you know, behind it than others.
16          When you look at thousands of
17   transactions over the years for funds and
18   advisors and -- and, you know, financial
19   statements, I mean, it is -- it is very hard
20   going back in -- in -- in my -- you know,
21   14-ish year career at -- at Highland to
22   remember a lot of those details, especially
23   when I don't have any records or books or
24   anything like that, and -- and going back many
25   years.

Page 287

1          WATERHOUSE - 10-19-21
2     Q.   And that is fine.  That -- that --
3   that is why I asked the question.
4          Is it possible in May of 2019 when
5   Mr. Dondero told you to transfer the funds from
6   Highland, you just assumed on your own that
7   those would be loans without him actually
8   telling you that those would be loans?
9          MR. MORRIS:  Objection to the form
10    of the question.
11    A.   I don't know.
12    Q.   I'm sorry, you --
13    A.   I said I don't know.
14    Q.   Okay.  Well, as the -- as the CFO
15   for Highland, if you saw $7.4 million going
16   out, you would feel some responsibility to
17   account for that, wouldn't you?
18          MR. MORRIS:  Objection to the form
19    of the question.
20    A.   Yes.
21    Q.   Is it fair to say that those would
22   be in the range large enough to rise up to your
23   level?
24          MR. MORRIS:  Objection to the form
25    of the question.

Page 288

1          WATERHOUSE - 10-19-21
2     A.   If -- I don't know if I understand
3   your question.  Those amounts would arise to my
4   level where I would be involved or...
5     Q.   You would want to know what a
6   transfer for that amount, $7.4 million, was all
7   about, as the CFO of Highland, wouldn't you?
8          MR. MORRIS:  Objection to the form
9    of the question.
10    A.   Yes, I make it -- I mean, I -- I
11   review all sorts of payments, I mean, even
12   smaller dollar payments on a periodic basis,
13   you know, to -- to -- to understand and to make
14   sure that we are paying things in a -- you
15   know, in -- in -- in an informed way.  And, you
16   know -- and we're -- and we're paying things
17   pursuant to vendor contracts and things like
18   that.
19    Q.   So as part of that, is it possible
20   that seeing $7.4 million go out you would have
21   promissory notes made in order to keep a paper
22   trail, assuming that those were loans, when
23   perhaps they were never intended to be loans by
24   Mr. Dondero?
25          MR. MORRIS:  Objection to the form

Page 289

1          WATERHOUSE - 10-19-21
2    of the question.
3     A.   I don't know.  As I testified
4   earlier, I had conversations with Mr. Dondero
5   about -- about the -- the -- the moneys that
6   were needed for the NAV error.  And I recall
7   him saying go get it from Highland -- or get it
8   from Highland.
9     Q.   Well, why did you sign those
10   promissory notes and why didn't you have him
11   sign them?
12          MR. MORRIS:  Objection to the form
13    of the question.
14    A.   I don't know.  I don't know.
15    Q.   You mentioned earlier that you
16   typically don't sign promissory notes.  Am I
17   remembering your testimony correctly?
18          I mean, promissory notes on behalf
19   of the entities.  Not yourself, obviously.
20    A.   Yes, that is what I said earlier.
21    Q.   Do you recall any other promissory
22   notes in the million-plus range that you had
23   ever signed before on behalf of any entity?
24    A.   There is -- there has been a lot of
25   transactions over the years.  I don't -- I

Page 290

WATERHOUSE - 10-19-21

1    don't -- I don't recall generally. I don't --
2    I don't recall.
3    Q. So -- but to the best of your
4    recollection, it was on your initiative,
5    following your discussion with Mr. Dondero,
6    that you had someone draft those two promissory
7    notes; is that correct?
8        MR. MORRIS: Objection to the form
9    of the question.
10   A. Yes, we would have -- the team, as I
11   stated earlier, we don't draft promissory
12   notes. "The team" meaning the accounting and
13   finance team.
14       So the team would have worked with
15   the legal group at Highland to draft any notes.
16   Q. Do you believe or do you have any
17   recollection as to whether you would have done
18   that pursuant to an email or telephone call or
19   in-person meeting?
20       MR. MORRIS: Objection to the form
21   of the question.
22   A. Are you asking if I would have -- if
23   those notes would have been drafted pursuant to
24   an email or phone call?

Page 291

WATERHOUSE - 10-19-21

1    Q. Strike that.
2        Do you recall whether you sent an
3    email to anyone asking them to draft those two
4    promissory notes?
5    A. I don't recall because, again,
6    once -- I would have instructed -- likely
7    instructed the team to -- to work with the
8    legal group to draft these documents.
9        I -- I -- I -- yeah, I didn't -- I
10   mean, that is more an operational-type
11   procedure. So, you know, a manager or a
12   controller or working with legal. You know,
13   they -- they can certainly handle that task to
14   get that -- you know, to request that from
15   legal.
16   Q. And who on your team do you think
17   you would have asked to do that?
18       MR. MORRIS: Objection --
19   Q. Who would have been the logical
20   person or people, if you don't remember their
21   name today?
22       MR. MORRIS: Objection to the form
23   of the question.
24   A. It -- it -- there is only two

Page 292

WATERHOUSE - 10-19-21

1    managers of the group. That would have been
2    Dave Klos or Kristin Hendrix.
3        Dave was the -- one of his duties
4    was managing the valuation team, and so he was
5    intimately involved with this process. So, you
6    know...
7    Q. Okay.
8    A. I don't recall specifically but, I
9    mean, my general -- you know, I -- I -- I
10   likely would have talked to Dave first about it
11   versus someone like Kristin who hadn't been
12   intimately involved.
13   Q. And -- and do you have a view as to
14   whether it is most likely that you would have
15   done that by email or in-person or how would
16   you believe you would have communicated that to
17   Mr. Klos?
18       MR. MORRIS: Objection to the form
19   of the question.
20   A. I likely would have done that in
21   person. Again, if things of this nature
22   that -- again, you have to put ourselves back
23   to, we have been working on this very stressful
24   project for many, many months. And once the

Page 293

WATERHOUSE - 10-19-21

1    go-ahead was to -- you know, we see the light
2    at the end of the tunnel with wrapping this up
3    and making shareholders whole -- sorry to say
4    "we" -- you know, the -- so the folks that are
5    involved in it.
6        I like to talk to people
7    face-to-face and -- and -- and go to -- and go
8    to their desk, because that shows if I'm going
9    to their desk that -- that is something that I
10   want done, you know.
11   Q. And do you remember, Mr. Waterhouse,
12   getting those two promissory notes in paper
13   format or by email before they were executed?
14       MR. MORRIS: Objection to the form
15   of the question.
16   A. I don't recall.
17   Q. For whatever was the ordinary course
18   back then in May 2019, would you expect to have
19   received them only on paper or would you have
20   expected to have received them in Word document
21   or PDF document by email?
22       MR. MORRIS: Objection to the form
23   of the question.
24   A. I -- I didn't sign -- I signed very

Page 294

WATERHOUSE - 10-19-21
1
2 few documents via email. I can't say that it
3 never happened, but people either stopped by my
4 office and physically walked in documents for
5 signature that we discussed face-to-face.
6        Or documents were -- if -- if --
7 if -- if -- let's say I wasn't there or I
8 wasn't available, documents were dropped off.
9 I had -- I had some in- and outboxes in front
10 of my -- my office there at the Crescent.
11       Documents would be dropped off for
12 signature. There would be a cover sheet that
13 would be -- have been applied to those
14 documents detailing, you know, who dropped it
15 off, the purpose, why, what time.
16       And then, you know, as I stated, I
17 don't draft documents and I always go to the
18 legal group and the compliance group to make
19 sure that they're in the loop. And there is
20 a -- a box or section that says, Has legal
21 reviewed or approved, or something to that
22 nature.
23       Again, I don't -- I don't have
24 access to that cover sheet anymore, but it
25 was -- it was something to that effect.

Page 295

WATERHOUSE - 10-19-21
1
2        And my assistant, you know, if she
3 was there, she would review that -- you know,
4 whatever was being dropped off. And if that
5 has legal, you know, reviewed or -- reviewed or
6 approved it, if that wasn't -- if that stuff
7 hadn't been done, it was like she would just
8 tell them like, go -- go -- go to the legal
9 group, because --
10    Q.   Let me -- let me pause --
11       MS. DANDENEAU: Let him finish.
12       MR. MORRIS: Thank you. Go ahead.
13    A.   I take -- go to the legal group
14 because that -- that was my -- you know, I
15 didn't -- I didn't review anything that -- that
16 they weren't -- you know, or there wasn't some
17 representation made to me that they had
18 reviewed, approved in some capacity.
19       Again, my -- my -- my goal, as CFO,
20 is to provide transparency and make sure that
21 groups like compliance and other things -- and
22 the other group in legal are -- are in -- you
23 know, their -- they're made aware of
24 transactions of -- you know, that are crossing
25 my desk.

Page 296

WATERHOUSE - 10-19-21
1
2        Because I'm not in every
3 conversation. They're not in every
4 conversation -- meaning legal compliance -- and
5 I just want to make sure that -- that everyone
6 is in sync to, you know, to -- to the extent
7 possible.
8    Q.   So if we summarize, you don't
9 specifically remember signing these two notes,
10 but most likely it would have been that they
11 would have presented -- been presented to you
12 physically on paper?
13       MR. MORRIS: Objection to the form
14 of the question.
15    A.   They would -- they would have been
16 presented physically on paper most likely or
17 someone would have left it. But, I mean,
18 again, I don't -- I don't recall.
19    Q.   I understand. Understand.
20       When you signed -- when you signed
21 documents, when you personally signed
22 documents, did you typically use a ink pen or
23 did you use a stamp?
24    A.   No, I -- I -- I use a -- an -- an
25 ink pen.

Page 297

WATERHOUSE - 10-19-21
1
2    Q.   Do you know -- was there a file at
3 Highland kept anywhere with ink-signed
4 originals of a promissory notes in general or
5 these two promissory notes specifically?
6       MR. MORRIS: Objection to the form
7 of the question.
8    A.   Sorry, I just want to make sure I
9 understand your question. Are you saying is
10 there a file somewhere that has ink-signed
11 originals of these two promissory notes?
12    Q.   Yes.
13    A.   I would -- I would assume they're
14 some place. I mean --
15    Q.   Well, was there a -- was there a
16 place where Highland generally kept originals
17 of promissory notes owed to it?
18    A.   I wouldn't -- no.
19       MR. RUKAVINA: Mr. Nguyen, would you
20 please pull up my A7, alpha 7.
21    Q.   These are the two promissory notes,
22 Mr. Waterhouse.
23       (Exhibit A7 marked.)
24    Q.   And please -- Mr. Waterhouse, please
25 command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

1
2  to, but I want you to take a very close look at
3  your two signatures here and tell me whether
4  you believe, in fact, that you ink signed them
5  or whether you --
6        MS. DANDENEAU:  Mr. Rukavina,
7  Mr. Waterhouse has the copies.
8        MR. RUKAVINA:  Perfect.  Then you
9  can take this down, Mr. Nguyen.
10       A.  These -- these -- these signatures
11  are identical, now that I stare at them, and I
12  mean, they are so close -- I mean, they're
13  identical that, I mean, even with my chicken
14  scratch signature, I don't know if I can -- you
15  know, I do this 100 times, could I do that
16  as -- as precisely as I see between the two
17  notes.
18       Q.  Well, that is why I ask.
19  Mr. Waterhouse, now that you have examined
20  them, does it seem like it is more likely that
21  you actually electronically signed these?
22       MR. MORRIS:  Objection to the form
23  of the question.
24       A.  Is -- I don't -- I don't recall
25  specifically.  As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1
2  did have a -- an electronic signature, and that
3  was used from time to time.  It wasn't as
4  common practice back in 2019.  It definitely
5  was more common practice when we had to work
6  from home and remotely for COVID because it
7  that made it almost impossible to, right,
8  provide wet signatures since we're all working
9  from home remotely.
10       Q.  Well, going just for these two
11  promissory notes, Mr. Waterhouse, in light of
12  your inability to remember any details, are you
13  sure you actually signed either or both of
14  those notes?
15       MS. DANDENEAU:  Objection to form.
16       A.  I don't recall specifically
17  signing -- actually physically signing these
18  notes.  As I said before, I don't recall doing
19  that.  This -- this looks like my signature,
20  but yet these two signatures are identical.
21       Q.  So you don't recall physically
22  signing them, and I take it you don't recall
23  electronically signing them either?
24       A.  I don't recall.  You know, Highland
25  has all my emails.  If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1
2  you know, I don't have any of these records is
3  what I'm saying.  I don't have any of those
4  records.
5        Q.  That is why I'm asking you these
6  questions in great detail because I don't have
7  those emails.  I'm trying to -- I'm hoping that
8  you will give me some names or some details so
9  I can go look for more emails, but again, you
10  don't remember any -- any individual, other
11  than Mr. Dondero that we've discussed, you
12  don't remember any individual with whom you
13  discussed these promissory notes prior to their
14  execution?
15       MR. MORRIS:  Objection to the form
16  of the question.
17       A.  I don't recall discussing it with
18  anybody else.
19       Q.  Okay.
20       A.  I mean, prior --
21       Q.  I understand.
22       A.  You know, there was no one else --
23  there was no one else in that meeting that I
24  recall with Mr. Dondero.
25       Q.  Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1
2  May of 2019 --
3        A.  And -- and from what I recall, and
4  the reason why I was by myself is -- is, you
5  know, I don't -- I don't want to speculate, I'm
6  sorry.
7        Q.  Okay.  We have established that by
8  May of 2019, in your view, the liabilities of
9  HCMFA exceeded its assets; correct?
10       A.  Yeah.  I mean, again, I don't have
11  financial statements in front of me, but I
12  think, if I recall, we'd have to go through the
13  testimony with Mr. Morris, I believe that was
14  the case.
15       Q.  In fact, you will recall that in
16  April of 2019, Mr. Dondero signed a document
17  that extended the demand feature of two prior
18  notes to May 31, 2019.  Do you recall that?
19       MS. DEITSCH-PEREZ:  I think you
20  might -- maybe have the court reporter read
21  that back.  You might have misspoke.
22       (Record read.)
23       MR. RUKAVINA:  And I did misspeak.
24       Q.  I meant to say to May 31, 2021.  Do
25  you recall that, sir?

Page 302

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          MR. MORRIS: Objection to the form
3   of the question.
4      A.  Yes.
5          MR. MORRIS: And, Mr. Nguyen, just
6   so that the record is clear, will you please
7   pull up my Exhibit Alpha 10, A10.
8          (Exhibit A10 marked.)
9      Q.  You don't have this one in front of
10  you, Mr. Waterhouse?  This is the one that
11  Mr. Morris used earlier.  Do you see that
12  document, sir?
13     A.  Yes, I do.
14     Q.  And this is what you were testifying
15  about before when Mr. Morris was asking you.
16  Do you remember that?
17     A.  Yes.
18     Q.  So here is my question for you,
19  Mr. Waterhouse: As the chief financial officer
20  of Highland, was it prudent for Highland less
21  than three weeks later to be lending
22  $7.2 million to an insolvent entity that
23  couldn't even then pay its debts back to
24  Highland?
25         MS. DANDENEAU: Objection to form.

Page 303

1          WATERHOUSE - 10-19-21
2          MR. MORRIS: Objection to the form
3   of the question.
4      A.  Sorry, I just want to make sure --
5   are you asking me, did you say, was it prudent
6   for Highland to loan $7.4 million to HCMFA a
7   few weeks after this document was executed?
8      Q.  Yes, and at a time when HCMFA's
9   liabilities exceeded its assets.
10         MR. MORRIS: Objection to the form
11  of the question.
12     A.  I don't -- it is odd.  I don't know.
13         MR. RUKAVINA: You can take this
14  exhibit down, Mr. Nguyen.
15     Q.  Do you recall asking anyone,
16  Mr. Dondero or -- or anyone outside as to
17  whether Highland ought to be lending
18  $7.4 million to HCMF regarding HCMF's
19  creditworthiness?
20         MR. MORRIS: Objection to the form
21  of the question.
22     A.  I don't recall.
23     Q.  Did you receive personally any of
24  that $7.4 million?
25     A.  No.

Page 304

1          WATERHOUSE - 10-19-21
2      Q.  Did you even --
3          MR. MORRIS: I didn't hear that
4   question, sir.
5          MR. RUKAVINA: The one that he
6   answered, John, or my new one?
7          MR. MORRIS: No, no, your question,
8   Davor.
9          MR. RUKAVINA: I had asked him
10  whether he received any of the
11  $7.4 million.  He said no.
12         MR. MORRIS: Yeah.  I thought there
13  was a question after that.  Maybe I was
14  mistaken.  I apologize.
15         MR. RUKAVINA: I had started a new
16  question, so here, let me start the new
17  question again.
18     Q.  Did you personally receive any
19  direct benefit from those two notes for
20  $7.4 million?
21     A.  No.
22     Q.  Did you ever personally consider
23  yourself obligated to repay either or both of
24  those notes?
25     A.  No.

Page 305

1          WATERHOUSE - 10-19-21
2          MR. RUKAVINA: Pull up those notes
3   again, Mr. Nguyen.
4      Q.  You can have them in front of you,
5   Exhibit 7, Mr. Waterhouse, whatever is easier
6   for you.  If you go to your signature page, my
7   question to you is, why did you not include
8   your title as treasurer by your name, Frank
9   Waterhouse?
10         MS. DANDENEAU: Objection to form.
11     A.  I didn't -- I didn't draft this
12  document.
13     Q.  So you relied on whoever drafted it
14  to draft it correctly?
15     A.  Yes.
16     Q.  Okay.  But back then when you signed
17  this, did it ever cross your mind that you were
18  the maker on these notes?
19     A.  No.
20     Q.  Back then when you signed this
21  document, did it ever cross your mind that you
22  could be a co-obligor on these notes?
23     A.  No.  I didn't receive $7.4 million,
24  I mean...
25     Q.  But can you say that HCMFA received

Page 306

WATERHOUSE - 10-19-21

1  $7.4 million?
2      A.  I would have to go back and look and
3  check in, you know, the -- the financial
4  records and the bank statements.
5          MR. RUKAVINA:  You can take this
6  exhibit down, Mr. Nguyen.
7      Q.  Mr. Waterhouse, I'm not trying to be
8  a smart-ass, but if the law says that because
9  of the way that you signed this promissory
10  note, if that is what the law says, that that
11  made you personally -- personally liable, then
12  you would agree with me that that was never
13  your intent?
14          MR. MORRIS:  Objection to the form
15  of the question.
16      A.  That was never -- I wouldn't sign a
17  note and not get consideration in return.
18      Q.  So putting all other issues aside,
19  if the law -- if the law says that you were
20  liable for those notes because of how you
21  signed them, then would you agree with me that
22  these notes are a mistake?
23          MR. MORRIS:  Objection to the form
24  of the question.

Page 307

WATERHOUSE - 10-19-21

1          MS. DANDENEAU:  Objection to the
2  form.
3      A.  Yes.
4      Q.  So do you agree with me that it's
5  odd -- I think that is the word you used --
6  that Highland would be loaning $7.4 million a
7  few weeks after that extension to an entity
8  whose liabilities exceeded its assets, and you
9  would agree with me that it was never your
10  intention to be in any way liable for these two
11  promissory notes; correct?
12          MR. MORRIS:  Objection to the form
13  of the question.
14      A.  Sorry, you -- you asked a lot there.
15          MR. RUKAVINA:  I will strike it and
16  I will move on.
17          Let's go to -- pull up Exhibit 9,
18  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19  9, A9.
20          (Exhibit A9 marked.)
21      Q.  Sir, take a moment to look at this,
22  but this is an email, and you will see attached
23  July 31, 2020 affiliate notes.
24          Do you see that attachment?

Page 308

WATERHOUSE - 10-19-21

1      A.  Yes.
2      Q.  Okay.  And do you see an entry for
3  Highland Capital Management Fund Advisors?
4          MR. MORRIS:  I'm sorry, hold on.
5  Where are you looking?
6          MR. RUKAVINA:  Last page, John.
7          MR. MORRIS:  Is it the page on the
8  screen?
9          MR. RUKAVINA:  Oh, I'm sorry.
10  Mr. Nguyen just did it.  Yes, the last page
11  there.
12          MR. MORRIS:  Thank you.
13      Q.  Do you see an entry there for HCMFA?
14      A.  Yes.
15      Q.  About $10.5 million.
16          Do you see that?
17      A.  I do.
18      Q.  And, now, do you have any
19  explanation for why if HCMFA owed $7.4 million,
20  plus the 5.3 million that had been extended,
21  why that amount was only 10.5 million?
22      A.  I don't know.  Okay.
23          MR. RUKAVINA:  Close this one and
24  pull up, Mr. Nguyen, the schedules,

Page 309

WATERHOUSE - 10-19-21

1  schedule of assets.  What exhibit is this
2  of ours, Mr. Nguyen?
3          MR. NGUYEN:  This is A11.
4          MR. RUKAVINA:  Oh, this will be A11.
5          (Exhibit A11 marked.)
6      Q.  You don't have this in front of you,
7  Mr. Waterhouse?
8      A.  Okay.
9      Q.  This is what Mr. Morris used
10  earlier.  Do you remember looking at this with
11  Mr. Morris?
12      A.  Yes.
13          MR. RUKAVINA:  You might have to
14  zoom in a little.  Okay.
15      Q.  Now, I see Affiliate Note A, B, and
16  C.
17          Do you have any recollection as to
18  why the names of the affiliates are omitted?
19      A.  I don't.  I testified earlier that,
20  you know, the team worked with DSI in providing
21  these.  I -- I don't -- I don't know.
22      Q.  Can we deduce -- is it logical to
23  deduce that Affiliate Note A would be NexPoint
24  given its size of $24.5 million?

Page 310

WATERHOUSE - 10-19-21

1    MR. MORRIS: Objection to the form
2  of the question.
3    A.   I mean, it -- it is a -- it is -- it
4  is approximate.
5    Q.   Well, can we -- can we deduce -- or,
6  I'm sorry, strike that.
7        Can you, sitting here today,
8  logically conclude that Affiliate Note B or C
9  represents HCMFA?
10    MR. MORRIS: Objection to the form
11  of the question.
12    A.   I don't know. I don't know. I
13  can't.
14    Q.   Okay. As of the petition date, we
15  have established that HCMFA, under promissory
16  notes, owed $7.4 million and $5.3 million to
17  the debtor; correct?
18    MR. MORRIS: Objection to the form
19  of the question.
20    A.   Yes.
21    Q.   Okay. And by my reckoning, that
22  would be somewhere approaching $13 million.
23    MR. MORRIS: Objection to the form
24  of the question.
25

Page 311

WATERHOUSE - 10-19-21

1    Q.   It would be $12.7 million. Is that
2  generally correct?
3    A.   Sorry, the amounts were 7.4, 5.3.
4    Q.   Yes.
5    A.   Okay. Yeah, that -- that -- I can
6  do that math, yes.
7    Q.   Do you have any explanation or any
8  understanding of why there is no similar entry
9  listed here on the schedule of assets filed
10  with the bankruptcy court?
11    MR. MORRIS: Objection to the form
12  of the question.
13    A.   I don't know. We have to look at
14  the supporting schedules, like I talked about
15  other -- presumably there is -- there is a
16  build to the schedule that would provide the
17  detail.
18    Q.   Well, that was going to be my next
19  question. You anticipated it.
20    MR. RUKAVINA: You can -- you can
21  take this down, Mr. Nguyen.
22    Q.   Do you believe that whenever you and
23  your team provided the underlying data to the
24  financial advisor that the actual names of the
25

Page 312

WATERHOUSE - 10-19-21

1  affiliates for Affiliate Note A, B, and C would
2  have been listed there?
3    A.   Are you asking we provided the names
4  to the financial advisor? I don't -- I don't
5  understand who the financial advisor is.
6    Q.   I'm sorry, DSI.
7        Let me ask the question this way,
8  Mr. Waterhouse.
9        Whenever you provided information
10  about the affiliate notes to DSI, do you
11  believe that you would have included the actual
12  names of the affiliates, you or your team, or
13  that you would have done the Affiliate Note A,
14  Note B, Note C?
15    MR. MORRIS: Objection to the form
16  of the question.
17    MS. DANDENEAU: Objection to the
18  form.
19    A.   We -- like I testified earlier, when
20  we were -- we gave everything to -- to DSI. We
21  were giving all of our records, all of our
22  files, everything to DSI. We weren't redacting
23  information or saying, hey, here is a note,
24  here is Affiliate Note A or B.

Page 313

WATERHOUSE - 10-19-21

1        I mean, it was -- our job and our
2  focus -- and I testified in court back in 2019;
3  right -- was -- was to be transparent and, you
4  know, get DSI up to speed on -- on the matters
5  at Highland. So I can't see us redacting at
6  that point.
7    MR. RUKAVINA: Mr. Nguyen, will you
8  please pull up Mr. Morris' Exhibit 36.
9        Just the very first page, the very top
10  email. You might zoom in a little bit.
11    Q.   Now, you recall being asked about
12  this by Mr. Morris?
13    A.   Yes, I do.
14    Q.   And you wrote: The HCMFA note is a
15  demand note.
16        You wrote that; right?
17    A.   Yes.
18    Q.   And, in fact, weren't there by that
19  point in time several notes?
20    A.   Yes, there were. Again, I don't --
21  I don't remember everything specifically. I
22  mean --
23    Q.   I understand. I understand.
24        So this is an example where -- where

Page 314

WATERHOUSE - 10-19-21

1  you might have made a mistake by referring to a
2  singular instead of a plural; right?
3    A.  Yes.
4    Q.  Okay.  And you -- you wrote -- a
5  couple of sentences later, you wrote:  There
6  was an agreement between HCMLP and HCMFA the
7  earliest they could demand is May 2021.
8        You wrote that; right?
9    A.  Yes.
10   Q.  But I think you -- you agreed with
11  Mr. Morris that that can't possibly apply to
12  the May 2019 notes, can it?
13       MR. MORRIS:  Objection to the form
14   of the question.  That is not what he
15   testified to.
16   Q.  Let me ask -- let me ask a different
17  question.
18       Sitting here today -- or if you can
19  answer me from your memory on October 6,
20  2020 -- did the April acknowledgment that
21  extended the maturity date apply to the
22  May 2019 notes also?
23   A.  I don't recall specifically.
24   Q.  Well, you recall that the notes that

Page 315

WATERHOUSE - 10-19-21

1  you signed were demand notes; right?
2    A.  Yes.
3    Q.  Do you find it logical, based on
4  your experience, that had they intended to have
5  a different or a set maturity date, you would
6  have instructed that that set maturity date be
7  included instead of a demand feature?
8        MR. MORRIS:  Objection to the form
9   of the question.
10   A.  Sorry, just want to make sure I
11  understand.  You are saying that -- that the
12  $5 million note, the $2.4 million note, if
13  those were supposed to be a term note, that I
14  would have made sure that those were a term
15  note?
16   Q.  I'm saying -- I'm saying,
17  Mr. Waterhouse, that on May the 2nd and May the
18  3rd, 2019, if you intended that those two
19  promissory notes could not be called until May
20  2021, would you have included such language in
21  those two promissory notes?
22       MR. MORRIS:  Objection to the form
23   of the question.
24   A.  I guess -- I'm sorry, I don't recall

Page 316

WATERHOUSE - 10-19-21

1  putting language in those May notes.  I don't
2  remember what language you are referring to.
3    Q.  Well, let's read this again.
4        There was an agreement between HCMLP
5  and HCMFA the earliest they could demand is May
6  2021.
7        Do you recall that agreement?
8    A.  Yes, that was the agreement we
9  looked at earlier; correct?
10   Q.  Okay.  Yes.
11       Do you -- do you understand now that
12  that agreement that we looked at earlier also
13  applied to the May 2019 notes that you signed?
14   A.  I don't -- I don't know.
15   Q.  But as of October 6, 2020, you're
16  writing that there is one demand note and
17  you're categorizing that demand note as not
18  being demandable on May 2021; correct?
19   A.  Yes.
20   Q.  And you know now that you made at
21  least one mistake in this email; correct?
22       MR. MORRIS:  Objection to the form
23   of the question.
24   A.  Yes.

Page 317

WATERHOUSE - 10-19-21

1        MR. RUKAVINA:  You can pull this
2   down, Mr. Nguyen.
3    Q.  So, Mr. Waterhouse, you don't
4  remember Mr. Dondero telling you to make these
5  loans or not.  HCMLP was loaning $7.4 million
6  to someone that their assets were less than
7  their liabilities.
8        We don't see on the July list of
9  notes, where there is $12.7 million of notes,
10  we don't see that on the bankruptcy schedules,
11  and we have this Exhibit 36 where you are
12  confused.
13       Are you prepared to tell me, sir,
14  today that you might have made a mistake in
15  executing those two promissory notes?
16       MR. MORRIS:  Objection to the form
17   of the question.
18   A.  I -- I don't know.
19   Q.  And if it turns out that you're
20  personally liable for those promissory notes,
21  it would certainly be a mistake, wouldn't it?
22       MS. DANDENEAU:  Objection to the
23   form.
24       MR. MORRIS:  Join.

Page 318

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   If Mr. Dondero testifies that he
4 never told you to make these loans, would you
5 disagree with his testimony?
6        MR. MORRIS:  Objection to the form
7 of the question.
8    A.   Like I testified earlier with my
9 conversation with Mr. Dondero, all I recall is
10 he said, get the money from Highland.
11   Q.   And if Mr. Dondero testifies that
12 he, in consultation with other senior personnel
13 at Highland, decided that Highland needed to
14 pay HCMFA $7.4 million as compensation for the
15 NAV error and not a loan, would you have any
16 reason to disagree with Mr. Dondero?
17       MR. MORRIS:  Objection to the form
18 of the question.
19   A.   If that was -- if that was his
20 intent, yes, it would -- I would --
21   Q.   Do you have any reason to disagree
22 with him?
23       MR. MORRIS:  Objection to the form
24 of the question.
25   A.   If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1 know.  I don't know how I disagree with that.
2    Q.   And just to confirm, you don't
3 remember ever asking Mr. Dondero whether you
4 should have two promissory notes prepared?
5    A.   No.
6    Q.   And you don't remember discussing
7 with Mr. Dondero what the terms of those two
8 promissory notes should be?
9    A.   I don't recall -- I testified all I
10 recall is he said, get the money from Highland.
11 I don't -- the -- the terms of the note, I
12 don't recall ever having a discussion around
13 the terms of the note, but since I don't draft
14 the notes, that -- there could have been a
15 conversation with other people later.
16   Q.   Do you have any memory of whether
17 after the notes were drafted, but before you
18 signed them, that you communicated with
19 Mr. Dondero in any way to just confirm or -- or
20 get his blessing or ratification to signing
21 those notes?
22       MR. MORRIS:  Objection to the form
23 of the question.
24   A.   I don't recall.
25

Page 320

WATERHOUSE - 10-19-21

1
2    Q.   Again, the only thing you remember,
3 sitting here today, was Mr. Dondero said, get
4 the money from Highland, and that is it, that
5 is all you remember?
6        MR. MORRIS:  Objection to the form
7 of the question.
8    A.   I testified to that several times.
9 This was over two years ago.  A lot has
10 happened.  That is all I recall.
11   Q.   And help me here.  I'm not very
12 technologically astute.  When you -- and I -- I
13 recognize that you do it rarely, but when you
14 sign a document electronically, do you believe
15 that there is an electronic record of you
16 having authorized or signed a document
17 electronically?
18       MR. MORRIS:  Objection to the form
19 of the question.
20   A.   I -- I don't know the tech answer to
21 that, but, you know, since I don't have -- I
22 don't ever attach my signature block
23 electronically, my assistant would have done
24 that, and if that is done over email like we
25 did several times -- you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1
2 multiple times over COVID, she would attach my
3 signature block and then email it out to
4 whatever party.
5    Q.   What was your assistant's name in
6 May 2019?
7    A.   It was Naomi Chisum.
8    Q.   Is she the only one?  I'm sorry, was
9 she your only assistant that would have maybe
10 facilitated logistically something like you
11 just described?
12   A.   You know, she was out on maternity
13 leave at some point.  I don't -- I don't recall
14 those dates where she was out for maternity
15 leave.  There was -- there were folks backing
16 her up.  I don't recall specifically who
17 those -- who those, you know, administrative
18 assistants were, and I don't recall
19 specifically if she was out during this time on
20 maternity leave.
21       I do know that that she was out for
22 a period of time, or who knows, or she could
23 have been on vacation that day or, you know, I
24 don't know.
25   Q.   Switching gears now, the two

Page 322

WATERHOUSE - 10-19-21
2 complaints that have been filed that is against
3 HCMFA and NexPoint, did you see any drafts of
4 those complaints before they were filed?
5      MR. MORRIS: Objection to the form
6 of the question, and to the extent that you
7 had any communications with counsel or you
8 were shown drafts of the complaints by
9 counsel while you were employed by
10 Highland, I direct you not to answer.
11  A.  I -- I reviewed documents yesterday
12 with counsel here. I believe that is the first
13 time I have ever seen those.
14  Q.  Okay. Did you ever discuss with
15 Mr. Seery these two lawsuits before or after
16 they were filed?
17  A.  I don't recall.
18  Q.  Were you ever interviewed by legal
19 counsel, to your knowledge, about these
20 promissory notes before the complaints were
21 filed? Without going into what was said, were
22 you ever interviewed by legal counsel?
23      MR. MORRIS: Objection to the form
24 of the question.
25  A.  I don't recall.

Page 323

WATERHOUSE - 10-19-21
2  Q.  Obviously with COVID, it changed,
3 but -- but before COVID, did you used to meet
4 with Mr. Seery from time to time in-person?
5  A.  Yeah, I mean, so before COVID -- so
6 we're talking kind of late March, early April,
7 right, there was about -- I don't remember the
8 specific date when the board for Highland was
9 appointed. I believe it was around February of
10 2020, so maybe there was a month-and-a-half,
11 two-month window where we were meeting
12 in-person or, you know, like we were actually
13 in the office, excuse me, we were in the
14 office.
15      And, you know, when they were first
16 appointed, the board members and Mr. Seery
17 were -- were definitely down here more
18 in-person.
19  Q.  Did you ever see Mr. Seery taking
20 written notes of -- of his meetings with you or
21 others?
22  A.  I don't recall.
23  Q.  Do you recall on any Zoom or video
24 conference with Mr. Seery, seeing him take
25 notes, written notes?

Page 324

WATERHOUSE - 10-19-21
2  A.  The Zoom calls we had, I don't
3 recall having seen video or, you know, or if it
4 was on Zoom, I just remember it being -- well,
5 no, you know what, there were some -- you know,
6 I take that back.
7      So there were -- there were some
8 times that I did remember seeing Mr. Seery
9 on -- on some of the Zoom calls.
10  Q.  Well, let me --
11  A.  I don't -- sorry, I'm thinking. I'm
12 thinking -- I'm going back. I'm trying to
13 process this.
14  Q.  I can make it much quicker,
15 Mr. Waterhouse. I have heard -- I have heard
16 that Mr. Seery is a copious note taker.
17      Do you have any knowledge about
18 that?
19  A.  No.
20  Q.  Okay. Switching gears yet again,
21 and this will be last theme. Do you need a
22 restroom break, or are you good to go for
23 another half an hour?
24      MS. DEITSCH-PEREZ: I need a
25 restroom break.

Page 325

WATERHOUSE - 10-19-21
2      MR. RUKAVINA: Can we make it five
3 minutes?
4      THE WITNESS: Five minutes would be
5 great.
6      VIDEOGRAPHER: We're going off the
7 record at 5:53 p.m.
8 (Recess taken 5:53 p.m. to 5:59 p.m.)
9      VIDEOGRAPHER: We are back on the
10 record at 5:59 p.m.
11  Q.  Mr. Waterhouse, I had asked you
12 earlier about contracts between HCMFA and the
13 debtor, and now I'm going to talk about
14 contracts between the debtor and NexPoint
15 Advisors. Okay?
16  A.  Okay.
17  Q.  Now, were there contracts similar to
18 the ones with HCMFA that NexPoint had in the
19 nature of employee reimbursement and shared
20 services?
21  A.  Yes, they -- NexPoint Advisors and
22 Highland Capital Management Fund Advisors had
23 cost reimbursement and shared services
24 agreements with Highland Capital Management,
25 L.P.

Page 326

WATERHOUSE - 10-19-21

1
2  Q.  And was that shared services
3  agreement, to the best of your understanding,
4  in place as of December 31, 2020?
5  A.  It was -- it was terminated at some
6  point, and I remember the contracts had
7  different termination dates, but I think the --
8  the date of termination was January 31st of
9  2021, after the termination was put in.
10      So yeah, it would be in place at the
11  end of the year of December -- it would be in
12  place at December 31st, 2020.
13  Q.  And pursuant to that agreement as of
14  December 31st, 2020, was the debtor providing
15  what you would describe as back office services
16  to NexPoint?
17  A.  Yes.
18  Q.  Would those have included accounting
19  services?
20  A.  Yes.
21  Q.  And as part of those accounting
22  services, would the debtor have assisted
23  NexPoint with paying its bills?
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 327

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  So let's break that up.  You were a
4  treasurer of NexPoint as well in December of
5  2020?
6      MR. MORRIS:  Objection to the form
7  of the question.
8  A.  Yes.
9  Q.  Okay.  And in December of 2020, did
10  NexPoint have its own bank accounts?
11  A.  Yes.
12  Q.  And did it use those bank accounts
13  to pay various of its obligations?
14  A.  Yes.
15  Q.  Did employees of the debtor have the
16  ability to cause transfers to be made from
17  those bank accounts on behalf of NexPoint?
18  A.  Yes.
19  Q.  And is that one of services that the
20  debtor provided NexPoint, basically ensuring
21  that accounts payable and other obligations
22  would be paid?
23  A.  Yes.
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 328

WATERHOUSE - 10-19-21

1
2  Q.  You answered yes?
3  A.  Yes.
4  Q.  And the payments, though, whose
5  funds would they be made from?
6  A.  From the bank account of NexPoint
7  Advisors.  If they were NexPoint advisor
8  obligations, it would be made from NexPoint
9  Advisors' bank account.
10  Q.  So let's pull up Exhibit Alpha 1.
11  You should have that -- it is my Tab 1 or my
12  Exhibit 1.
13      (Exhibit A1 marked.)
14  Q.  So this is a -- this is a series of
15  emails, Mr. Waterhouse.  Let's look at the
16  first page here, November 25, 2020, between
17  Kristin Hendrix and yourself.
18      Do you see that, sir?
19  A.  I do.
20  Q.  And do you see where Ms. Hendrix
21  writes:  NPA.
22      Do you know what NPA stood for?
23  A.  Yes.
24  Q.  And what does it stand for?
25  A.  NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1
2  Q.  And was that how you-all internally
3  at Highland refer to NexPoint Advisors, L.P.?
4  A.  I mean, yes, amongst other things.
5  Q.  And she writes at the bottom of her
6  email:  Okay to release?
7      Do you see that?
8  A.  Yes, I do.
9  Q.  So what --
10      MR. MORRIS:  Hold on one second.
11      Okay.  Go ahead.
12      MR. RUKAVINA:  Yeah.
13  Q.  So what is -- what is Ms. Hendrix
14  here on November 25 asking of you?
15  A.  She is asking you -- so she -- these
16  are -- these are payments -- typically we would
17  do an accounts payable run every week at the
18  end of every Friday.  But looking at this date,
19  it is Wednesday, November 25th, which means, to
20  me, it is likely Thanksgiving weekend.
21      So this is the day before
22  Thanksgiving, so this is the last kind of --
23  kind of day before the holidays and vacation
24  and things of that nature.  So it is
25  effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1       So she is -- she is putting in all
2   the payments for the week because we batch
3   payments weekly. And these are the payments
4   that go out that week, and she is informing me
5   of the payments and -- you know, again, at the
6   bottom of the email, she is asking for my okay
7   to -- to release these payments in the wire
8   system.
9       Q.   So these would be accounts payable
10  of NexPoint?
11      A.   I mean, it would be accounts payable
12  for all of these entities listed on this email.
13      Q.   And who was Ms. Hendrix employed by
14  in November and December of 2020?
15      A.   Highland Capital Management.
16      Q.   Okay. So -- so part of the services
17  that NexPoint had contracted with was for
18  Highland to ensure that NexPoint timely paid
19  its accounts payable; is that accurate?
20      MR. MORRIS: Objection to the form
21  of the question. You have got to be
22  kidding me.
23      Q.   Is that accurate?
24      A.   Yes.

Page 331

WATERHOUSE - 10-19-21

1       Q.   And did NexPoint rely on employees
2   of the debtor to ensure that NexPoint's
3   accounts payable were timely paid?
4       MR. MORRIS: Objection to the form
5   of the question.
6       A.   Yes.
7       MR. RUKAVINA: Let's flip to the
8   next page, Mr. Nguyen, if you will please
9   scroll to the next page.
10      Q.   So this is an email similar to the
11  prior one, November 30th.
12      Do you see where it says, NPA HCMFA,
13  USD $325,000 one-day loan?
14      Do you see that, sir?
15      A.   I do.
16      Q.   Do you have any memory of what that
17  was?
18      A.   I don't recall what that -- what
19  that payment was for.
20      Q.   Did it sometimes occur that one
21  advisor would, on very short-terms, make loans
22  to another advisor?
23      A.   Yes. This -- this -- this occurred
24  from -- from -- from time to time. It actually

Page 332

WATERHOUSE - 10-19-21

1   looking at -- I'm -- I'm looking at the date of
2   this email. It is November 30th. It is the
3   last day of the month.
4       HCMFA has obligations it needs to
5   pay to its broker-dealer, which is HCFD. And
6   it likely was short funds to make those
7   obligations under that -- under its agreement,
8   and so it provided a one-day loan because on
9   the next business day on 12/1 -- or the next
10  business day in December, it would receive
11  management fees from the underlying funds that
12  it managed and it would be able to pay back
13  that loan to NexPoint Advisors.
14      Q.   So -- so here Ms. Hendrix was
15  seeking your approval to transfer $325,000 from
16  NexPoint to HCMFA for a one-day loan; is that
17  correct?
18      A.   That is correct.
19      Q.   Let's flip to the next page, sir.
20      MR. RUKAVINA: And, Mr. Nguyen, if
21  you will please scroll down.
22      Q.   Now we have as an entry for
23  $325,000, 11/30 loan payment.
24      Do you see that, sir?

Page 333

WATERHOUSE - 10-19-21

1       A.   Yes.
2       Q.   And that is probably the loan that
3   was approved on the prior page?
4       A.   Yes, most likely.
5       Q.   So is it also true, sir, that in
6   addition to accounts payable debtor employees
7   would be assisting NexPoint with respect to
8   paying back its debt?
9       MR. MORRIS: Objection to the form
10  of the question.
11      A.   I mean, yes, for loans of this
12  nature, yes.
13      Q.   Well, what about long term loans?
14  Was it reasonable for NexPoint to expect debtor
15  employees to ensure that NexPoint timely paid
16  its obligations under long-term notes?
17      MR. MORRIS: Objection to the form
18  of the question.
19      MS. DANDENEAU: Objection to form.
20      A.   I mean, that is one of the things
21  that the Highland personnel did provide to the
22  advisors. Yes, we would -- we would -- over
23  the years, yes, we -- we -- we -- we did do
24  that generally. Again, I don't remember

Page 334

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  specifically but, yes, generally we -- you
3  know, we did do that.
4      Q.   So do you recall -- and we can pull
5  it up, if need be -- that under the NexPoint
6  note that Mr. Morris asked you about earlier,
7  the one for more than $30 million, that
8  NexPoint was obligated to make an annual
9  payment of principal and interest?
10         MR. MORRIS:  Objection to the form
11     of the question.
12     A.   Yes, it was -- yes, it -- it was an
13  amortizing note.  It was -- you know, from what
14  we reviewed earlier, it was payable by
15  December 31st of each year.  So -- but are --
16  are you asking me --
17     Q.   I'm just asking you, sir, if you
18  recall the note.
19     A.   Yes, the $30 million note, yes, we
20  reviewed it earlier, yes.
21     Q.   And do you recall Mr. Morris had you
22  go through the fact that NexPoint had made
23  payments in years prior to 2020 on that note?
24     A.   I do.
25     Q.   And do you believe that employees of

Page 335

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  the debtor would have played any role in
3  NexPoint having made those prior payments?
4         MR. MORRIS:  Objection to the form
5     of the question.
6     A.   Yes.
7     Q.   And what role in years prior to 2020
8  would employees of the debtor have had with
9  respect to NexPoint making that annual payment?
10     A.   We -- we -- we would have -- I keep
11  saying "we."  The team would have calculated
12  any amounts due under that loan and other
13  loans, as -- as standard course.
14         We would -- since we provided
15  treasury services to the advisors, we would
16  inform the -- the -- the -- we informed
17  Mr. Dondero of any cash obligations that are
18  forthcoming, whether we do cash projections.
19         If, you know, any of these payments
20  would have -- or, you know, the sum total of
21  all of these payments, including any note
22  payments, if there were any cash shortfalls, we
23  would have informed Mr. Dondero of any cash
24  shortfalls.  We could adequately plan, you
25  know, in instances like that.

Page 336

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2         Or, sorry, we -- I say "we" -- I
3  keep saying "we" -- I keep wearing my -- again,
4  my -- my treasurer hat.
5         But, yes, it is to -- it is to
6  inform Mr. Dondero of the obligations of the
7  advisors in terms of cash and obligations that
8  are -- are upcoming and that -- and that are --
9  are scheduled to be paid.
10     Q.   And would those obligations that are
11  upcoming and scheduled to be paid prior to 2020
12  have incurred the annual payment on that
13  NexPoint $30 million note?
14         MS. DANDENEAU:  Objection to form.
15         MS. DEITSCH-PEREZ:  Davor, I think
16     you misspoke.  You might want to just
17     repeat the question.
18     Q.   Okay.  Let me repeat the question,
19  sir.
20         Prior to 2020, those services that
21  you just described, would that -- on behalf of
22  the debtor, would that have included NexPoint's
23  payments on the $30 million note?
24     A.   Yes.
25     Q.   So someone at the debtor in treasury

Page 337

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  or accounting would have sent some schedule or
3  a reminder that a payment would be coming due
4  in the future.  Is that generally the practice?
5     A.   Yes, we would -- you know, again, I
6  didn't -- I didn't micromanage the teams, but
7  we had a -- a corporate accounting calendar
8  that we use as kind of a tickler file to keep
9  track of payments.
10         I actually, you know, don't know how
11  actively they're using that in -- in prior to
12  2020, but it was actively used at some point.
13         We did look at NexPoint cash
14  periodically and cash for the other advisors as
15  well and payments.  You know, we -- payments
16  like this would have appeared in our cash
17  projections, in the advisor's cash projections.
18         And, again, as like I said earlier,
19  they would have appeared there, so there would
20  be time to plan for making any of these
21  payments.
22     Q.   And based on your experience, would
23  it have been reasonable for NexPoint to rely on
24  the debtors' employees to inform NexPoint of an
25  upcoming payment due on the $30 million

Page 338

WATERHOUSE - 10-19-21
1
2  promissory note?
3      MR. MORRIS: Objection to form of
4  the question.
5      MS. DANDENEAU: Objection to form.
6  A.  Yes. Yes, they did. I mean, but I
7  mean, but I don't think these -- these notes
8  were any secret to anybody.
9  Q.  I understand, and I'm not suggesting
10  otherwise.
11      MR. RUKAVINA: Please pull up Alpha
12  2, Mr. Nguyen.
13      (Exhibit A2 marked.)
14  Q.  Now, this document is similar to the
15  ones we've seen before as of December 31, 2020,
16  and I don't see under NTA anything there for
17  paying the promissory note to Highland.
18      Do you see anything like that?
19  A.  I do not.
20      MR. RUKAVINA: You can pull that --
21  that exhibit down, Mr. Nguyen.
22  Q.  You are aware, of course, by now
23  that, in fact, NexPoint failed to make the
24  payment due December 31, 2020, are you not?
25  A.  I am aware, and yes, I do understand

Page 339

WATERHOUSE - 10-19-21
1
2  it.
3  Q.  Were you aware that Highland
4  accelerated that $30 million promissory note?
5  A.  I am aware.
6  Q.  Were you aware of that acceleration
7  at the time that it occurred?
8  A.  I don't remember specifically.
9  Q.  Do you recall whether anyone asked
10  you -- prior to the acceleration, anyone asked
11  you at Highland, what Highland should do with
12  respect to the missed payment?
13  A.  Did anyone ask me what Highland
14  should do about the missed payment?
15  Q.  Yes, before acceleration.
16      MR. MORRIS: Objection to the form
17  of the question.
18  A.  I mean, what -- what I recall is
19  there was the -- sorry, are you asking me --
20      MS. DANDENEAU: Why don't you just
21  repeat the question, Mr. Rukavina.
22  Q.  Let me try again, Mr. Waterhouse,
23  let me try again.
24      I am saying you're the CFO of
25  someone, in this case, Highland, and the

Page 340

WATERHOUSE - 10-19-21
1
2  borrower failed to make the required payment.
3  Are you with me so far?
4  A.  I am.
5  Q.  Did anyone then ask you, what should
6  we do with respect to our rights against the
7  borrower that missed the payment?
8  A.  Not that I recall.
9  Q.  Did you play a role in the decision
10  to accelerate that $30 million promissory note?
11  A.  I did not.
12  Q.  Do you recall whether Mr. Seery ever
13  asked you before the acceleration as to whether
14  he should accelerate the note?
15  A.  I don't recall.
16  Q.  And you don't recall when you
17  learned of the acceleration itself?
18      MR. MORRIS: Objection to the form
19  of that question.
20  A.  It was -- it was sometime in
21  early -- in early 2021. I don't remember
22  specifically.
23  Q.  But do you recall whether it was
24  after the acceleration had already been
25  transmitted?

Page 341

WATERHOUSE - 10-19-21
1
2      MS. DANDENEAU: Objection to the
3  form of the question.
4  A.  I don't recall.
5  Q.  Do you recall in early to mid
6  January of 2021, after the default, discussing
7  the default with Mr. Dondero?
8  A.  I do recall discussing with
9  Mr. Dondero after December 31, 2020?
10  Q.  Yes, the fact of the default.
11  A.  I don't recall.
12      MR. RUKAVINA: Let's pull up my
13  Exhibit 6, Alpha 6.
14      (Exhibit A6 marked.)
15      MR. RUKAVINA: And, Mr. Nguyen, if
16  you will please scroll down.
17  Q.  This email chain begins with you
18  writing to Ms. Hendrix on January the 12th:
19  NexPoint note to HCMLP.
20      Do you see that, sir?
21  A.  I do.
22  Q.  Were you discussing this same
23  $30 million note we're talking about right now
24  with Ms. Hendrix?
25  A.  Yes.

Page 342

WATERHOUSE - 10-19-21

1
2   Q.   Okay.  Do you recall what prompted
3   you to send that email to her?
4   A.   Yes, I had -- I had a conversation
5   with Jim.
6   Q.   Okay.  And what -- what did you
7   discuss with Jim that led to this email chain?
8   A.   He -- he called me and he said he
9   wanted to make payment on the NexPoint note,
10  and I didn't -- I didn't know the -- the amount
11  offhand, so I reached out to Kristin and got
12  the details and relayed that to him.
13  Q.   And you see you sent that email to
14  her at 11:15 a.m.  Does that help you remember
15  when you had this discussion with Mr. Dondero?
16  In other words, was it that morning or the day
17  before, or can you -- can you --
18  A.   No, it was -- it was that morning.
19  Q.   And do you recall how you had that
20  conversation with him?
21      MR. MORRIS:  Objection to the form
22  of the question.
23  Q.   By telephone, by email, in-person?
24  A.   Yeah, he -- he called me.  I was at
25  home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1
2   December of 2020.  He called me from home.  He
3   said he was in court.  He wanted to -- he asked
4   about, you know, making payment on the note and
5   the amount, and so I didn't have those numbers
6   in front of me, so I said I would get back to
7   him.  I wanted all the details, so here is
8   this -- so I reached out to Kristin.
9   Q.   And then she gave you that
10  $1,406,000 figure?
11      MR. RUKAVINA:  Mr. Nguyen, if you
12  will scroll up, please.
13  A.   Yes.  Yeah, she -- the $1,406,112.
14  Q.   And do you recall whether you
15  conveyed that amount to Mr. Dondero?
16  A.   Yes.  I -- I called him back and
17  gave him -- gave him this amount.
18  Q.   Are you aware of whether NexPoint
19  in fact, then made that 1 million 406 and
20  change payment?
21  A.   Yes, they did.
22  Q.   Did you discuss with Mr. Dondero at
23  that time, either the first conference or the
24  second conference that day -- strike that.
25      When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1
2   Mr. Dondero, was -- was it also on January
3   12th?
4   A.   Sorry, when I conveyed the
5   $1.4 million number?
6   Q.   Yes.
7   A.   Yes, yes, it was that -- it was --
8   Q.   So you had --
9   A.   It was that point.
10  Q.   Well, to the best of your
11  recollection, you had a conference with
12  Mr. Dondero by the telephone in the morning,
13  and then another conference with him by
14  telephone after 11:40 a.m. that morning?
15  A.   Yeah, I can't remember -- yeah, it
16  was either that morning or it could have been,
17  you know, early afternoon, but again, I
18  remember calling him back, relaying this
19  information to him, and he said, okay, pay --
20  you know, make -- make this payment.
21  Q.   And during either of those two
22  calls, did you tell Mr. Dondero anything to the
23  effect that making those -- I'm sorry, making
24  that payment would not de-accelerate the
25  promissory note?

Page 345

WATERHOUSE - 10-19-21

1
2   A.   No.
3   Q.   Did you tell him anything to the
4   effect that making that payment would not cure
5   the default?
6   A.   No.
7   Q.   Did you discuss that in any way with
8   him?
9   A.   No, I did not.
10  Q.   Did he say why he wanted to have
11  that $1.4 million payment made?
12      MR. MORRIS:  Objection to the form
13  of the question.
14  A.   He -- he -- he didn't go into
15  specifics.
16  Q.   Did he say anything to you to the
17  effect that if NexPoint makes that payment,
18  then the note will be de-accelerated?
19      MR. MORRIS:  Objection to the form
20  of the question.
21  A.   I don't recall.
22      MR. RUKAVINA:  You can put this one
23  down, Mr. Nguyen.
24  And, again, when you say you don't
25  recall, you mean you don't remember right now

Page 346

WATERHOUSE - 10-19-21

1    either way; correct?

2    A.   Yeah, I don't remember. I don't

3    remember us discussing that.

4    Q.   Now -- and we're almost done, I

5    promise. I'm just going to -- I don't know how

6    to ask this question, so I'm just going to try

7    to do my best.

8        Prior to the default on December 31,

9    2020, did Mr. Seery ever tell you any words to

10   the effect that you or someone at Highland

11   should ensure that NexPoint doesn't make its

12   payment?

13   A.   No.

14   Q.   Did you have any hint or any belief

15   that anyone at NexPoint -- I'm sorry, strike

16   that.

17       Did you have any reason to believe

18   that anyone with Highland was actively trying

19   to get NexPoint to make that default by not

20   paying on December 31?

21       MR. MORRIS: Objection to the form

22   of the question.

23   A.   Are you asking, did any Highland

24   employees actively work to make -- to

Page 347

WATERHOUSE - 10-19-21

1    somehow --

2    Q.   Yes. Let me take a step back. Let

3    me take a step back.

4        So you are aware now that as a

5    result of that default, what was still some

6    25-year note was accelerated and became

7    immediately due. You are aware of that now;

8    right?

9    A.   Yes.

10   Q.   And can you see how someone at

11   Highland might actually have been pleased with

12   that development?

13       MR. MORRIS: Objection to the form.

14   Q.   Not that they were --- not that they

15   were pleased, but you can see how someone at

16   Highland might have been pleased with that

17   development?

18       MR. MORRIS: Objection to the form

19   of the question.

20       MS. DANDENEAU: Object to form.

21   A.   I don't know how they would have

22   reacted to that.

23   Q.   Okay. But you're not -- you're not

24   aware of any instructions or any actions being

Page 348

WATERHOUSE - 10-19-21

1    given or taken at Highland by Mr. Seery, the

2    independent board, DSI, that -- that would have

3    basically led Highland to ensure that NexPoint

4    would fail to make that payment?

5    A.   I'm not aware.

6    Q.   In other words, there wasn't a trick

7    or a settlement; right?

8        MS. DEITSCH-PEREZ: Objection to

9    form.

10       MS. DANDENEAU: Object to form.

11       MR. MORRIS: Object to form.

12   A.   I'm not aware.

13       Look, I'm not aware. I'm not in

14   every conversation. I mean, and I'm just --

15   again, I'm sitting at home. It is the end of

16   the year. Again, I'm not aware.

17   Q.   That is a perfectly legitimate

18   answer. I don't know why -- why you think

19   otherwise.

20       Okay. Just give me one second to

21   compose my thoughts.

22       MS. DEITSCH-PEREZ: While you're

23   taking your one second, why don't we take

24   three minutes. I will be right back.

Page 349

WATERHOUSE - 10-19-21

1        VIDEOGRAPHER: Do we want to go off

2    the record?

3        MR. RUKAVINA: Yes.

4        VIDEOGRAPHER: All right. We're

5    going off the record at 6:27 p.m.

6    (Recess taken 6:27 p.m. to 6:30 p.m.)

7        VIDEOGRAPHER: We are back on the

8    record at 6:30 p.m.

9        MR. HORN: Is Deb back?

10       MS. DANDENEAU: Are you asking about

11   me? I'm here.

12       MR. HORN: Oh, okay. I don't see

13   you, sorry.

14   Q.   Actually, yeah, Mr. Waterhouse, so

15   when you had --

16       MS. DANDENEAU: Are you asking about

17   Deb Dandeneau or Deborah? I mean, there

18   are a lot -- as we talked about, a lot of

19   Debs. I'm here.

20       MS. DEITSCH-PEREZ: I'm here.

21       MR. HORN: Yes, I was asking about

22   DDP.

23       MS. DEITSCH-PEREZ: Oh, DDP is here.

24       MR. HORN: Okay. Here we go. I'm

Page 350

1          WATERHOUSE - 10-19-21
2    going back on mute.
3          MS. DANDENEAU: Get the right
4    nomenclature.
5    Q.   Mr. Waterhouse, on January 12th,
6    2021, when you had those talks with Mr. Dondero
7    about the $1.4 million payment, did you have a
8    communication or a conversation with Mr. Seery
9    about that payment after January 12th, 2021?
10   A.   I don't recall.
11   Q.   Well, in response to Mr. Dondero
12   reaching out to you, do you recall on that day,
13   January 12th, talking to Mr. Seery or anyone at
14   Highland other than the email chain we just saw
15   about Mr. Dondero's call with you?
16   A.   Did I talk to -- I spoke with
17   Kristin -- I don't know if I spoke to her. I
18   likely spoke to Kristin Hendrix because we had
19   to get the wire on NexPoint's behalf to make
20   the payment to Highland.
21   Q.   So it is true, then, that -- that
22   employees of the debtor did actually cause that
23   payment to be made when it was made after
24   January 12th?
25   A.   Yes, I mean, we -- we -- as I

Page 351

1          WATERHOUSE - 10-19-21
2    testified earlier, we provided that accounting
3    finance treasury function as -- under the
4    shared services agreement. And so once I
5    got the -- I talked to Jim, got the approval to
6    make this payment, we have to then make the
7    payment, or the team does, and so the payment
8    was made.
9    Q.   Okay. But -- okay. And -- and
10   sitting here right now, after Jim called you,
11   you don't remember talking to anyone other than
12   the -- the couple of people you mentioned,
13   talking to anyone about something to the effect
14   that, hey, Jim wants to make this payment now?
15         MR. MORRIS: Objection to the form
16   of the question.
17   A.   I don't -- I don't recall.
18   Q.   And does that include legal counsel?
19         Without going into any detail, on
20   January 12th or before that payment was made,
21   did you consult with legal counsel about
22   anything having to do with the $1.4 million
23   payment?
24   A.   I don't recall.
25   Q.   Okay. Thank you, sir, for your

Page 352

1          WATERHOUSE - 10-19-21
2    time.
3          MR. RUKAVINA: Pass the witness.
4          MR. MORRIS: I just have a few
5    questions, if I may.
6          MS. DEITSCH-PEREZ: Don't you go at
7    the end?
8          MR. MORRIS: Oh, I apologize. He is
9    your witness. I'm surprised you want to
10   ask him questions, but go right ahead.
11         MS. DEITSCH-PEREZ: Just have a
12   couple of things.
13         MR. RUKAVINA: And I will just
14   object to that, that he's our witness.
15   That's not --
16         MR. MORRIS: I'm not talking to you.
17   I'm not talking to you.
18         MS. DANDENEAU: Also, Mr. Morris, it
19   is -- it is --
20         MS. DEITSCH-PEREZ: He is not my
21   witness. He's been subpoenaed by you.
22   Okay?
23         That is no offense, Mr. Waterhouse,
24   I'm -- I'm not -- okay. Anyway.
25         EXAMINATION

Page 353

1          WATERHOUSE - 10-19-21
2    BY MS. DEITSCH-PEREZ:
3    Q.   Good evening. I'm very sorry to be
4    going last and I know you have had a long and
5    taxing day, so I thank you for indulging me.
6          The kinds of services that you
7    describe that the -- that Highland provided for
8    NexPoint, did Highland also provide similar
9    services to that to HCRE and HCMS?
10   A.   Yes.
11         MR. MORRIS: Objection to the form
12   of the question.
13   Q.   What kind of services did Highland
14   provide to HCRE and HCMS?
15         MR. MORRIS: Objection to the form
16   of the question.
17         MS. DEITSCH-PEREZ: What is your
18   objection, John?
19         MR. MORRIS: It is vague and
20   ambiguous. Unlike the advisors and
21   NexPoint, they actually had shared services
22   agreements.
23         MS. DEITSCH-PEREZ: I got -- I
24   understand your objection. That is fine.
25   Q.   Let's take them one at a time.

Page 354

1          WATERHOUSE - 10-19-21
2          What kinds of services did Highland
3    provide to HCRE?
4          MR. MORRIS:  Objection to the form
5    of the question.
6          A.  HCMS, Highland employees provided
7    accounting services, treasury management
8    services, potentially legal services.  I
9    don't -- but I wouldn't have been directly
10   involved in that.  But as far as the teams that
11   I manage, it was accounting, treasury, things
12   of that nature.
13         Q.  Okay.  And that was for HCM, LLP --
14         A.  And -- and, sorry, it would also be
15   any asset valuation if needed as well.
16         Q.  Okay.  We went back and forth on
17   each other and I apologize, so just to clarify.
18         You were talking about the services
19   that Highland Capital Management provided to
20   HCMS; is that right?
21         A.  HCMS.  So, again, yes.  And
22   accounting, treasury, valuation, and also tax
23   services too.
24         Q.  Okay.
25         A.  Tax services.  Look, I'm expanding

Page 355

1          WATERHOUSE - 10-19-21
2    this, their HR services as well.
3          Q.  Okay.  And did that include bill
4    paying?
5          MR. MORRIS:  Objection to the form
6    of the question.
7          Q.  Did the services that HCM provided
8    to HCMS include bill paying?
9          MR. MORRIS:  Objection to the form
10   of the question.
11         A.  Yes.
12         Q.  And did the services that HCMLP
13   provided to HCMS include scheduling upcoming
14   bills?
15         MR. MORRIS:  Objection to the form
16   of the question.
17         A.  Yes.
18         Q.  And did HCMLP regularly pay -- cause
19   to be paid the payments on loans HCMS had from
20   HCMLP?
21         MR. MORRIS:  Objection to the form
22   of the question.
23         A.  Yes.
24         Q.  Typically -- if there is a
25   typically, how far in advance of due dates did

Page 356

1          WATERHOUSE - 10-19-21
2    HCMLP cause HCMS to pay its bills?
3          MR. MORRIS:  Objection to the form
4    of the question.
5          A.  I mean, it -- it -- it depend -- it
6    depended on the nature of the payment and the
7    vendor, but, you know, if there were -- if
8    there were larger scheduled payments, you know,
9    I would like to give at least 30 days notice.
10         And that is -- that is kind of my
11   rule of thumb so no one is surprised.
12         Q.  Okay.  And was it generally HCMLP's
13   practice to timely pay HCMS' bills?
14         MR. MORRIS:  Objection to the form
15   of the question.
16         A.  It -- it -- it -- that depended on
17   the nature of the payment.
18         Q.  Okay.  And can you explain what you
19   mean by that?
20         A.  Yeah, I mean if -- if it was -- I
21   mean -- if there was some professional fees
22   that weren't -- you know, they were due but
23   they weren't urgent, those fees may not be paid
24   as timely as others that have a due date or --
25   or things like that.

Page 357

1          WATERHOUSE - 10-19-21
2          Q.  Okay.  Are loan payments the kinds
3    of thing that HCMLP would pay on time because
4    of potential consequences of not paying on
5    time?
6          MR. MORRIS:  Objection to the form
7    of the question.
8          A.  Yes.  As I testified earlier, we
9    would want to give, you know, notice on -- on
10   -- on larger payments and -- and things of that
11   nature so we didn't miss due dates.
12         Q.  Okay.  And over the course of time,
13   did HCMLP generally pay HCMS' loan payments in
14   a timely fashion?
15         MR. MORRIS:  Objection to the form
16   of the question.
17         A.  I can't remember specifically, but
18   generally, yes.
19         Q.  Okay.  Now, did HCMLP provide
20   similar services to HCRE that you have
21   described it provided to HCMS?
22         MR. MORRIS:  Objection to the form
23   of the question.
24         A.  Yes, but I don't think it -- it
25   provided -- I don't think it provided HR

Page 358

1         WATERHOUSE - 10-19-21
2    services.
3         Q.   Can you describe the accounting and
4    treasury services that HCMLP provided for HCRE?
5         A.   Yeah, it -- it would provide
6    bookkeeping services on a -- on a periodic
7    basis.  It would make payments, you know, as
8    needed.
9         Q.   Okay.  So did it provide --
10        A.   And -- and I believe it -- it -- it
11   provided tax services as well.
12        Q.   Okay.  And so did it provide the
13   same kind of bill -- did HCMLP provide the same
14   kind of bill-paying services for HCRE that it
15   provided for HCMS and NexPoint?
16             MR. MORRIS:  Objection to the form
17        of the question.
18        A.   Yes.
19        Q.   And over the course of time, did
20   HCMLP generally cause to be made the loan
21   payments that HCRE owed to HCMLP?
22             MR. MORRIS:  Objection to the form
23        of the question.
24        A.   Yes.
25        Q.   Did HCMLP make loan payment -- the

Page 359

1         WATERHOUSE - 10-19-21
2    loan payment that was due from HCMS to HCMLP in
3    December of 2020?
4             MR. MORRIS:  Objection to the form
5        of the question.
6        A.   I don't believe that payment --
7    payment was made.
8        Q.   Okay.  And when HCMLP caused HCMS in
9    the past to make loan payments, whose money did
10   it use to make those payments?
11             MR. MORRIS:  Objection to the form
12        of the question.
13        A.   It was the -- the money in HCMS's
14   operating account would be made to that --
15   those moneys would be used to make payment to
16   Highland Capital Management.
17        Q.   Okay.  And Highland -- is it correct
18   that Highland Capital Management personnel had
19   the access to HCMS's accounts to be able to
20   cause such payments to be made?
21        A.   Yes, Highland personnel had access
22   to those accounts.
23        Q.   Okay.  And so now for HCRE, whose
24   money was used when HCMLP caused HCRE
25   payments -- loan payments to Highland to be

Page 360

1         WATERHOUSE - 10-19-21
2    made?
3             MR. MORRIS:  Objection to the form
4        of the question.
5        A.   It was -- it was cash in HCRE's bank
6    account that would be used to make payments to
7    Highland Capital Management.
8        Q.   Okay.  And so did Highland Capital
9    Management have access to HCRE's funds in order
10   to be able to make such payments?
11             MR. MORRIS:  Objection to the form
12        of the question.
13        A.   Personnel at Highland Capital
14   Management had access to HCRE's bank account to
15   effectuate the payments.
16        Q.   Okay.  And was the payment due from
17   HCRE to HCMLP due in December of 2020 made?
18        A.   It --
19        Q.   In December of 2020.
20        A.   It was not.
21        Q.   Okay.  And was there money in HCRE's
22   account that would have enabled the payment to
23   be made had HCM personnel attempted to make the
24   payment?
25             MR. MORRIS:  Objection to the form

Page 361

1         WATERHOUSE - 10-19-21
2        of the question.
3        A.   I -- I don't recall.
4        Q.   Do you have any reason to believe
5    that either HCRE or HCMS simply didn't have the
6    funds on hand to make the December 2020
7    payments?
8        A.   I don't know.
9        Q.   I guess I'm asking, do you have any
10   reason to believe that they didn't have the
11   funds?
12        A.   We managed cash for so many
13   different entities and funds, and I don't
14   recall, you know, where the cash position was
15   for HCRE and HCMS at 12/31/2020.
16        Q.   Okay.
17        A.   I just don't recall, and I don't --
18   and I don't remember what the loan payment
19   obligations were from HCRE to Highland, and
20   from HCMS to Highland.  I don't recall.  I
21   don't recall, I mean...
22        Q.   Let me come at it a different way.
23   Were the -- were the payments that would
24   otherwise have been due in December of 2020
25   made in January of 2021 for HCMS and HCRE?

Page 362

1        WATERHOUSE - 10-19-21
2    A.  I believe the HCRE payment was made
3  in January of 2021. I don't recall any
4  payments being made from HCMS to Highland.
5    Q.  If it -- how is it the HCRE payment
6  came to be made?  Why did you make it -- why
7  did HCM make the payment in January of 2021?
8    A.  Jim -- Jim called me and instructed
9  me to -- to make the payment on behalf of HCRE,
10  Jim Dondero -- Jim Dondero.
11    Q.  Did he seem upset that -- that the
12  payment had not been made?
13    A.  Yeah.  On the note that was, you
14  know, that was the term note, yes, he -- he was
15  displeased that the -- that the payment had not
16  been made by year-end.
17    Q.  Okay.  And did you make the -- cause
18  the payment to be made as -- as requested?
19    A.  Yes.
20    Q.  And did anyone else from HCM
21  participate with you in causing the payment to
22  be made to -- on the HCRE loan?
23    A.  Yes.  It would have been Kristin
24  Hendrix.  I -- again, I don't -- as I testified
25  earlier, I'm not an officer of HCRE.  I don't

Page 363

1        WATERHOUSE - 10-19-21
2  believe I'm an authorized signer.  So I
3  can't -- other personnel have to make payment
4  from HCRE to -- to -- to -- to Highland.
5    Q.  Okay.  And in the conversation
6  that -- that you had with Mr. Dondero when he
7  requested the payment to be made, did you say
8  to him words to the effect, Jim, this loan is
9  going to stay in default, what are you making
10  the payment for, anything like that?
11    A.  No.
12    Q.  In fact, did you have the impression
13  from him that he thought that the loan would
14  be -- the default would be cured by making the
15  payment?
16      MR. MORRIS:  Objection to the form
17    of the question.
18    A.  Did I get the impression from Jim
19  Dondero that the loan would be cured if the
20  payment from HCRE --
21    Q.  Yeah, if that is what he thought.
22      MR. MORRIS:  Objection to the form
23    of the question.
24    A.  I didn't get any impression from him
25  on that at the time.

Page 364

1        WATERHOUSE - 10-19-21
2    Q.  Do you know whether there was an
3  HCMS term loan that had a payment due in
4  December of 2020?
5    A.  I don't recall.
6    Q.  Okay.  And so the reason you don't
7  recall whether or not there was a payment in
8  January of 2021 is because you just don't
9  remember whether there was such a loan at all?
10      MR. MORRIS:  Objection to the form
11    of the question.
12    A.  I don't remember.  There is -- there
13  is so many notes, and I mean, demands, and I
14  don't -- I don't remember.  It's a lot to keep
15  track in your head.
16    Q.  I understand, and -- and I hear your
17  frustration when you have explained that the
18  debtor has your documents and you don't, and so
19  I fully appreciate it, and this is no knock on
20  you.  It's a knock on somebody else on this
21  call.
22      MR. MORRIS:  I move to strike.  That
23    was pretty obnoxious, but go ahead.
24    Q.  Okay.  But so, Mr. Waterhouse, if --
25  if a payment on the HCMS loan was made in

Page 365

1        WATERHOUSE - 10-19-21
2  January of 2021, do you think it was part of
3  the same conversation where Jim Dondero said,
4  hey, why didn't that get paid, please make
5  that -- get that payment done?
6      MR. MORRIS:  I object to the form of
7    the question.
8    A.  Yes.  Likely it would have been -- I
9  mean, again, I don't recall a payment being
10  made, but, you know, again, I don't remember
11  everything.
12    Q.  Okay.  Did -- at the time you were
13  communicating with Kristin Hendrix about the
14  payment being made, whichever payments were
15  made in January, did she say anything to you
16  about the payments not curing the loan
17  defaults?
18    A.  No.
19    Q.  Okay.  All right.  So I'm going to
20  take you back to very early in the deposition
21  when Mr. Morris was asking you about the --
22  the -- the -- the agreement with respect to
23  the -- the forgiveness element of the loans, so
24  that is just to orient you.
25      Do you remember that there was a

Page 366

```
1            WATERHOUSE - 10-19-21
2   time that you and Mr. Dondero were
3   communicating about potential means of
4   resolving the Highland bankruptcy by what was
5   colloquially referred to as a pot plan?
6       A.   Yes.
7       Q.   Okay.  And can you tell me generally
8   when that was?
9       A.   Like mid -- mid 2020, sometime in
10  2020, mid 2020.
11      Q.   Okay.  And did the process of trying
12  to figure out what the numbers should be
13  involve looking at what one should pay for the
14  Highland assets?
15           MR. MORRIS:  Objection to the form
16  of the question.
17      A.   Yes.
18      Q.   Okay.  And did there come a time
19  when you were proposing some potential numbers
20  and Mr. Dondero said something to you like,
21  well, why are you including payment for the
22  related party notes, those, you know, were
23  likely to be forgiven as part of my deferred
24  executive compensation?
25           MR. MORRIS:  Objection to the form
```

Page 367

```
1   of the question.
2       A.   Yes, we did have that conversation.
3       Q.   Okay.  Was that conversation in
4   connection with trying to figure out the right
5   numbers for a pot plan?
6       A.   Yeah.  I mean, it was -- it was -- I
7   mean, Jim -- Jim would ask for, you know,
8   most -- most recent asset values, you know, for
9   Highland, and -- and myself and the team
10  provided those to him, so it was in that
11  context.
12      Q.   Okay.  And does that refresh your
13  recollection that these communications were in
14  2020 rather than 2021?
15           MR. MORRIS:  Objection to the form
16  of the question.
17      A.   The -- the -- the executive
18  compensation discussions were definitely in
19  2020.
20      Q.   Okay.  Now, did you ever make
21  proposals that took into account Jim's comment
22  that the notes were likely to end up forgiven
23  as part of his compensation?
24           MR. MORRIS:  Objection to the form
```

Page 368

```
1            WATERHOUSE - 10-19-21
2   of the question.
3       A.   Yes, we -- the team and myself put
4   together, you know, asset summaries of Highland
5   at various times for all the assets of
6   Highland, and not including the notes.
7       Q.   Okay.  And were those presentations
8   communicated to -- Mr. Seery?
9       A.   No.  Well, look, I didn't tell -- I
10  didn't tell Mr. Seery.  I don't know what
11  Mr. Dondero did with the information.
12      Q.   Okay.
13      A.   I did not have conversations with
14  Mr. Seery.
15      Q.   Okay.  Do you know who saw the
16  presentations that you put together that didn't
17  include the value of the related party notes?
18      A.   We're talking presentations -- these
19  are -- these are Excel spreadsheets?
20      Q.   Uh-huh.
21      A.   I don't know who -- these were given
22  to -- to Jim Dondero.  I don't know what was
23  done with them after that.
24      Q.   Okay.  You also mentioned earlier
25  that sometime during your tenure at Highland
```

Page 369

```
1            WATERHOUSE - 10-19-21
2   you knew of the practice of giving forgivable
3   loans to executives.
4            MR. MORRIS:  Objection to the form
5   of the question.
6       Q.   Can you -- can you tell me what you
7   recall about that practice?
8            MR. MORRIS:  Objection to the form
9   of the question.
10      A.   Yes, so there were -- there were --
11  during my tenure at Highland, there were loans
12  or -- given to employees that were later
13  forgiven at a future date and time.
14      Q.   Okay.  And when the loans were
15  given, did the notes, to your recollection, say
16  anything about the potential forgiveness term?
17           MR. MORRIS:  Objection to the form
18  of the question.
19      A.   When you say "did the notes," did
20  the promissory notes detail the forgiveness?
21      Q.   Yes.
22      A.   Not that I recall.
23      Q.   And until such time as whatever was
24  to trigger the forgiveness occurred, were the
25  notes bona fide notes as far as you were
```

Page 370

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    concerned?
3          MR. MORRIS: Objection to the form
4    of the question.
5    A.    Yes, similar to -- yes.
6    Q.    Okay. You were going to say similar
7    to what?
8    A.    Mr. Morris earlier today showed
9    notes of the financial statements about various
10   affiliate loans. I -- I -- I do recall these
11   notes because I -- at that time personally
12   worked on the -- the financial statements of
13   Highland. That was, you know, in my role as a
14   corporate accountant.
15         And there were -- those loans
16   were -- to the partners were detailed in the
17   notes to the financial statements, similar to
18   what we went through earlier today in the prior
19   testimony about what we saw with Highland
20   and -- and -- and the -- and HCMFA.
21   Q.    Is it fair to say that on Highland's
22   balance sheet there were any number of assets
23   that the value of which could be affected by
24   subsequent events?
25         MR. MORRIS: Objection to the form

Page 371

WATERHOUSE - 10-19-21

1    of the question.
2    A.    Yes. I mean, yes, that -- there
3    are. And that is -- yes.
4    Q.    Okay. And is it typical accounting
5    practice that until there is some certainty
6    about those potential future events, that asset
7    value listed on -- on the books doesn't take
8    into account those potential future events?
9          MR. MORRIS: Objection to the form
10   of the question.
11   A.    Yeah, if those -- yes. If -- if
12   those future events, you know, at the time of
13   issuance are not known or knowable, like I
14   discussed earlier with, like, market practice,
15   asset dislocation, or, you know, I mean, things
16   like that, you -- I mean, it -- it could affect
17   its fair value --
18   Q.    Okay.
19   A.    -- in the future.
20   Q.    And am I correct you wouldn't feel
21   compelled to footnote in every possible change
22   in -- in an asset when those possibilities are
23   still remote?
24         MR. MORRIS: Objection to the form

Page 372

WATERHOUSE - 10-19-21

1    of the question.
2    A.    The accounting standard is you have
3    to estimate to the best -- you know, to -- to
4    the best of your ability, the fair value of an
5    asset as of the balance sheet date under --
6    under GAAP.
7    Q.    Did -- strike that.
8          Okay. Give me a minute. I'm
9    close -- I'm close to done. Let me just go off
10   and look at my notes for a second. So take two
11   minutes.
12         VIDEOGRAPHER: We're going off the
13   record at 7:02 p.m.
14   (Recess taken 7:02 p.m. to 7:03 p.m.)
15         VIDEOGRAPHER: We are back on the
16   record at 7:03 p.m.
17   Q.    Mr. Waterhouse, is it generally your
18   understanding that people you work with now
19   have been asking the debtor for full and
20   unfettered access to their own former files?
21         MR. MORRIS: Objection to the form
22   of the question.
23   A.    Yes, I am -- I am generally aware.
24   Q.    Okay. And do you think you could

Page 373

WATERHOUSE - 10-19-21

1    have been better prepared for this deposition
2    if the debtor had complied with those requests?
3          MR. MORRIS: Objection to the form
4    of the question.
5    A.    I -- I -- I most certainly -- yes.
6    I mean, again, these are multiple years,
7    multiple years ago, lots and lots of
8    transactions.
9          You know, we asked about NAV errors
10   and, you know, things like that and these
11   are -- it would make this process a lot more --
12   a lot easier and if we had -- if we had access
13   to that.
14   Q.    Okay. And has the debtor -- is the
15   debtor suing you right now?
16   A.    Yes.
17   Q.    And is the debtor trying to renege
18   on deals that it had previously made with you?
19         MR. MORRIS: Objection to the form
20   of the question.
21   A.    Sorry, I need to -- it is my
22   understanding that the litigation trust is
23   suing me. And not being a lawyer, I don't
24   know -- is that the debtor?

Page 374

WATERHOUSE - 10-19-21

1
2        Is that -- I don't know the
3    relationship. So, again, I'm not the lawyers.
4    I've said many times. But my understanding is
5    the litigation trust is suing me. I could be
6    wrong there. I don't know.
7       Q.   Okay. I understand.
8        Someone with some connection to the
9    Highland debtor has brought a claim against
10   you; is that fair?
11       MR. MORRIS: Objection to the form
12   of the question.
13       A.   Yes.
14       Q.   Okay. And is there also some motion
15   practice in the bankruptcy where the debtor or
16   someone associated with the debtor is
17   attempting to undo something that was
18   previously resolved with you?
19       A.   Yes.
20       Q.   And so in one action somebody is
21   associated with the debtors trying to --
22   threatening you with trying to take money from
23   you, and then in the other -- and trying to --
24   and in the other they are threatening not to
25   pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

1
2    is that correct?
3       MR. MORRIS: Objection to the form
4    of the question.
5       A.   I want to be -- yes, I -- there
6    is -- I'm being sued, again, on -- on something
7    that was agreed to with Mr. Seery and myself.
8    I don't -- I don't -- I don't own that claim.
9       Q.   Okay.
10       A.   To be transparent, I don't own that
11   claim. So it is not my personal property.
12       Q.   Okay.
13       A.   And -- and being the nonlawyer, I
14   don't know how I can get sued for something
15   that I don't owe or, like, I don't own
16   anything. I'm not the lawyer. But, I mean, if
17   that is -- if I'm understanding the facts
18   correctly.
19       Q.   Okay. And the lawsuit that was
20   filed that names you, that was just filed
21   this -- this past week; is that right?
22       MS. DANDENEAU: Ms. Deitsch-Perez, I
23   do want to interrupt at this point because
24   just as I told Mr. Morris, that this is a
25   deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

1
2        I really don't want to go -- go
3    afield --
4       MS. DEITSCH-PEREZ: Yeah.
5       MS. DANDENEAU: -- and open up a
6    whole new line of inquiry about the lawsuit
7    or the -- the motion and the bankruptcy
8    court. We will be here all night.
9       MS. DEITSCH-PEREZ: And I
10   understand.
11       Q.   My -- my point is: Do you feel
12   like -- like there is some effort by these
13   parties related to the debtor to intimidate
14   you -- not that you -- I'm not saying you are
15   or you aren't.
16        But do you feel like there is some
17   effort to intimidate you and maybe an effort to
18   deter you from being as prepared as you might
19   be in this deposition?
20       MR. MORRIS: Objection to the form
21   of the question.
22       A.   I was -- I was surprised by the
23   lawsuit, by me being named, because, again, I
24   don't own the asset and things like that.
25   Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

1
2    life at Skyview.
3       MS. DEITSCH-PEREZ: Thank you.
4       THE WITNESS: Thank you.
5       FURTHER EXAMINATION
6    BY MR. MORRIS:
7       Q.   If I may, I just have a few
8    questions.
9        Mr. Waterhouse, we saw a number of
10   documents that Mr. Rukavina put up on the
11   screen where Ms. Hendrix would send you a
12   schedule of payments that were due on behalf of
13   certain Highland affiliates.
14        Do you remember that?
15       A.   Yes.
16       Q.   And in each instance she asked for
17   your approval to make the payments; is that
18   right?
19       A.   Yes, she did.
20       Q.   And was that the -- was that the
21   practice in the second half of 2020 whereby
22   Ms. Hendrix would prepare a list of payments
23   that were due on behalf of Highland associates
24   and ask for approval?
25       A.   Yes.

Page 378

WATERHOUSE - 10-19-21
2  Q.  And I think you said that there was
3  a -- a --
4     A.  It was -- I think I testified to
5  this earlier when we talked about procedures
6  and policy, you know, again, I want to be
7  informed of -- of -- of -- of -- of any
8  payments that are going out.  I want to be made
9  aware of these payments, and that was just a
10  general policy, not just for 2020.
11    Q.  Okay.  So it went beyond 2020?
12    A.  Yes.
13    Q.  Is that right?
14    A.  Yes.
15    Q.  Okay.  And the corporate accounting
16  group would prepare a calendar that would set
17  forth all of the payments that were anticipated
18  in the -- in the three weeks ahead; is that
19  right?
20    A.  I -- like I testified earlier, we
21  had a corporate calendar that was set up, you
22  know, to -- to provide reminders or, you know,
23  of anything of any nature, whether it is
24  payments or -- or financial statements or, you
25  know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21
2  deadlines.
3     I don't know how, as I testified
4  earlier, how much they were using that
5  calendar.
6     Q.  Okay.  But -- but you did get notice
7  and a request to approve the payments that were
8  coming due on behalf of Highland's affiliates.
9  Do I have that right?
10    MS. DANDENEAU:  Objection to form.
11    A.  I mean, generally, yes.  I mean, you
12  know, as we saw with these emails, generally, I
13  mean, did that encompass everything, no.
14    Q.  Okay.  Do you know why the
15  payment -- do you know why there was no payment
16  made by NexPoint at the end of 2020?
17    A.  Yes.  There was -- there was -- we
18  talked about these agreements between the
19  advisors and Highland, the shared services and
20  the cost reimbursement agreement.
21     And in late 2020, there were
22  overpayments, large overpayments that had been
23  made over the years on these agreements, and it
24  was my understanding that the advisors were --
25  were talking with -- like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21
2  to offset any obligations that the advisors
3  owed to Highland as offset to the overpayments
4  on these agreements.
5     Q.  Okay.  Did you participate in any of
6  those conversations?
7     A.  I did not.
8     Q.  Okay.  Do you know -- do you recall
9  that the -- at the end of November, the debtor
10  did notice to the advisors of their intent to
11  terminate the shared services agreements?
12    A.  Like I testified earlier, there
13  was -- the agreements weren't identical, from
14  what I recall, and there is one that had a
15  longer notice period, which I think had a
16  60-day notice period.  I don't recall which one
17  that was, so not all of them were -- notice
18  hadn't been given as of November 30th, for all
19  of the agreements.
20    Q.  Upon the receipt of the -- the
21  termination notices that you recall, do you
22  know if the advisors decided at that point not
23  to make any further payments of any kind to
24  Highland?
25    MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21
2     A.  No.  The advisors -- the advisors
3  had stopped making payments prior to that
4  notice.
5     Q.  Okay.  And how do you know that the
6  advisors stopped making -- making payments
7  prior to that notice?
8     A.  I had -- I had a conversation
9  with -- with Jim Dondero.
10    Q.  And did Mr. Dondero tell you that
11  the advisors would no longer make payments to
12  Highland?
13    MS. DEITSCH-PEREZ:  Object to the
14  form.
15    A.  Yes, he -- he -- again, he said
16  they -- they -- the advisors have overpaid on
17  these agreements, to not make any future
18  payments, and that there needs to be offsets,
19  and they're working on getting offsets to these
20  overpayment.
21    Q.  Do you know if anybody ever
22  instructed Highland's employees to make the
23  payment that was due by NexPoint at the end of
24  the year?
25    A.  Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    employees to make that payment?
3    Q.    Correct.
4    A.    Anyone -- not that I'm aware.
5    Q.    Were any of Highland's employees
6    authorized to make the payments on behalf of
7    its affiliates -- withdrawn.
8         Was any of Highland's employees
9    authorized to effectuate the payment on behalf
10   of NexPoint that was due at the end of the year
11   without getting approval from either you or
12   Mr. Dondero?
13   A.    They had the -- they had the ability
14   to make the payment, but they didn't -- you
15   know, that -- that payment needed to be
16   approved.
17   Q.    Okay.  And it needed to be approved
18   by you or Mr. Dondero; is that right?
19   A.    I mean, I'm not going to make the
20   unilateral decision.
21   Q.    Is that a decision that you
22   understood had to be made by Mr. Dondero?
23   A.    Yes.  Sitting back in December of
24   2020, the -- that -- there was this off --
25   offset negotiation that -- that was happening,

Page 383

WATERHOUSE - 10-19-21

1    so I mean, until those negotiations were
2    resolved, you know, there wasn't any
3    payments -- there weren't any payments.
4    Q.    And -- and there were no payments
5    until the negotiations were resolved because
6    that was the directive that you received from
7    Mr. Dondero; correct?
8    A.    I don't think he said -- I mean, I
9    think -- yeah, I mean -- I'm trying to recall
10   the conversation.  It was -- you know, there
11   is -- there is these negotiations.  There's --
12   there needs to be these offsets.  They're
13   talking with the debtor.  So, you know, until
14   this is resolved, right, I mean, depending on
15   how, whatever that resolution was, were we to
16   take any action.
17   Q.    Okay.  How about with respect to
18   HCMS, did HCMS have a term payment due at the
19   end of the year?
20   A.    Again, I don't -- I don't recall.
21   Q.    Okay.  You discussed briefly two
22   payments that were made in January of 2021, one
23   on behalf of NexPoint, and one on behalf of
24   HCMS.  Do I have that right?

Page 384

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    A.    No.  The two payments I recall were
3    NexPoint and HCRE.
4    Q.    Okay.  And those two payments --
5    thank you for the correction.  And those two
6    payments were made because Mr. Dondero
7    authorized those payments to be made; correct?
8    A.    Yes.
9    Q.    And they hadn't been made before
10   that because Mr. Dondero had not authorized
11   them to be made?
12        MS. DEITSCH-PEREZ:  Object to the
13   form.
14   A.    Yes, because of these negotiations.
15   Q.    Okay.  Just a couple of more
16   questions.
17        Did anybody, to the best of your
18   knowledge, on behalf of HCMFA, ever tell the
19   SEC that HCMLP was responsible for the mistakes
20   that were made on the TerreStar valuation?
21   A.    Did anyone from Highland on HCMFA's
22   behalf tell the SEC that Highland -- that
23   Highland was responsible for there -- I just
24   want to make sure --
25   Q.    It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

1    let me try again.
2    A.    These are very long questions, John.
3    I'm not trying to be --
4    Q.    That is good.  Do you know whether
5    anybody -- do you know whether anybody on
6    behalf of HCMS -- HCMFA ever told the SEC that
7    Highland was the responsible party for the
8    TerreStar valuation error?
9    A.    Not that I'm aware.
10   Q.    Okay.  Did anybody on behalf of
11   the -- on behalf of HCMFA ever tell the retail
12   board that Highland was responsible for the
13   TerreStar valuation error?
14   A.    Not that I'm aware.
15   Q.    Do you know if HCMFA made an
16   insurance claim with respect to the damages
17   that were incurred in relation to the TerreStar
18   valuation error?
19   A.    Yes.
20   Q.    And do you know why they made that
21   insurance claim?
22   A.    Because there was an error.  I
23   mean --
24   Q.    Was the insured's claim made -- was

Page 386

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2 the insurance claim made under HCMFA's policy?
3    A.  Yes.
4    Q.  Did HCMFA at any time prior to the
5 petition date -- withdrawn.
6       You were asked a couple of questions
7 where -- where you said that Mr. Dondero told
8 you that he was ascribing zero value to the
9 notes as part of a pot plan because he believed
10 that the notes were part of executive
11 compensation.
12      Do I have that right?
13     MS. DEITSCH-PEREZ: Object to the
14   form.
15    A.  Yes.
16    Q.  Okay. Have you ever heard that
17 before the time that Mr. Dondero told you that
18 in the conversation about the pot plan?
19    A.  Had I heard that prior to my
20 conversation with Mr. Dondero?
21    Q.  Yes.
22    A.  No, I had not heard that prior.
23    Q.  Okay. And that was in the context
24 of his formulation of the settlement proposal;
25 is that right?

Page 387

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    A.  I mean, generally, yes. You know,
3 we were asked to provide asset values, right,
4 and he was having settlement discussions.
5 Again, I don't know who those went to
6 ultimately. I don't recall.
7     MR. MORRIS: I have no further
8   questions. Thank you very much for your
9   patience. I apologize for the late hour.
10     MS. DEITSCH-PEREZ: John, you stay
11   on about your email when --
12     MR. RUKAVINA: Hold on, I'm not
13   done.
14     MS. DEITSCH-PEREZ: Oh, okay. Davor
15   still has questions. Sorry. I was going
16   to say both John and Davor, could you stay
17   on afterwards just to talk about the
18   requests.
19      FURTHER EXAMINATION
20 BY MR. RUKAVINA:
21    Q.  Mr. Waterhouse, you were just now
22 testifying about a discussion you had with
23 Mr. Dondero where he said something like no
24 more payments.
25     Do you remember that testimony?

Page 388

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2    A.  Yes.
3    Q.  Okay. And was that late November or
4 early December of 2020?
5    A.  It was, I would say, first or second
6 week of November.
7    Q.  Okay. Do you recall whether --
8 whenever you had that discussion, whether
9 Mr. Dondero had already been fired by the
10 debtor?
11    A.  Yes, I -- I believe he was not an
12 employee of the debtor anymore at that time.
13    Q.  And when you were discussing this
14 with Mr. Dondero and he said no more payments,
15 you were discussing the two shared services
16 agreements and employee reimbursement
17 agreements we testified -- you testified about
18 before; is that correct?
19     MR. MORRIS: Objection to the form
20   of the question.
21    A.  That is correct.
22    Q.  And had your office or you -- and we
23 will talk at a future deposition about the
24 administrative claim.
25     But had -- by that time that you

Page 389

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2 talked to Mr. Dondero, had your office or you
3 done any estimate of what the alleged
4 overpayments were?
5     MR. MORRIS: Objection to the form
6   of the question.
7    A.  Yes, we had -- there was a -- there
8 was a detailed analysis that was put together
9 by David Klos at the time.
10    Q.  And do you recall just generally
11 what the total amount for both advisors of the
12 overpayments was?
13    A.  It was in excess of $10 million.
14    Q.  Was it in excess of $14 million?
15     MR. MORRIS: Objection to the form
16   of the question.
17    A.  I -- I remember it was an
18 eight-figure number. I don't remember
19 specifically.
20    Q.  Okay. And did you convey that
21 number to Mr. Dondero when you had that
22 conversation?
23    A.  Yes.
24    Q.  What was his reaction?
25    A.  I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

1
2  Q.  Is it fair to say he was upset?
3  A.  Yes.
4  Q.  Did Mr. Dondero ever expressly tell
5  you to not have NexPoint make the required
6  December 31, 2020, payment?
7  A.  Yes, I recall him saying don't make
8  the payment because it was being negotiated, as
9  I discussed with Mr. Morris, this offset
10  concept.  So there were obligations due by the
11  advisors to Highland, they should be offset
12  that -- you know, those obligations should be
13  offset by this -- by this overpayment.
14  Q.  And when did he tell you that?
15  A.  I would say -- I would say around --
16  probably December -- December-ish.
17  Q.  Early December, late December?
18  A.  I don't recall with as much
19  specificity as -- as -- as -- as stopping the
20  shared services payments, because we had
21  actually made one shared services payment in
22  November.  So that is why I need to remember
23  that one more clearly.  I don't remember where
24  exactly in December that conversation occurred.
25  Q.  Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

1
2  word "NexPoint" when he was saying don't make
3  these payments?
4  MR. MORRIS:  Objection to the form
5  of the question, asked and answered.
6  A.  Yeah, we were -- we were discussing
7  advisor obligations.  So it was -- you know, it
8  was just obligations from the advisors.
9  And -- and he specifically talked
10  about the NexPoint payment as well.
11  Q.  Okay.  And it is your testimony that
12  he expressly told you not to make that NexPoint
13  December 31 payment?
14  MR. MORRIS:  Objection, asked and
15  answered twice.
16  A.  Yes, he -- he did, during that
17  conversation.
18  Q.  And did you ever follow up with him
19  after that about whether NexPoint should or
20  shouldn't make that payment?
21  A.  I did not.
22  Q.  Did you ever, on or about
23  December 31, 2020, remind him and say, hey,
24  this payment is due, what shall I -- what
25  should I do?

Page 392

WATERHOUSE - 10-19-21

1
2  A.  I did not.
3  Q.  So sitting here today, you -- you
4  remember distinctly that Dondero in December of
5  2020 expressly told you not to have NexPoint
6  make that payment?
7  MR. MORRIS:  Objection, asked and
8  answered three times.
9  A.  Yes.
10  Q.  Can you say categorically it wasn't
11  just some general discussion where he told you
12  not to make payments?
13  MR. MORRIS:  Objection, asked and
14  answer four times.
15  MR. HORN:  Four times now.  Go for
16  five.
17  A.  Yes.
18  Q.  Did you tell Mr. Seery that?
19  A.  I don't believe I did.  I don't
20  recall.
21  Q.  And was this an in-person discussion
22  or telephone or email?  Do you remember?
23  A.  This was a phone -- a phone
24  conversation.
25  Q.  Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

1
2  on your cell phone of when that conversation
3  might have taken place?
4  I'm sorry, strike that.
5  Was that by cell phone?
6  A.  I believe -- yes, because we -- I
7  was at home.  I mean, I don't have a landline.
8  All I have is my cell phone.
9  Q.  Do you know whether your cell phone
10  still has records of conversations from
11  December 2020 on it?
12  A.  My call log doesn't go back that
13  far.
14  Q.  Okay.  Thank you.
15  MR. RUKAVINA:  I will pass the
16  witness.
17  MS. DEITSCH-PEREZ:  Just a couple
18  quick questions.
19  FURTHER EXAMINATION
20  BY MS. DEITSCH-PEREZ:
21  Q.  With respect to HCRE and HCMS, am I
22  correct there was -- there was no direction not
23  to pay those loan payments?
24  MR. MORRIS:  Objection to the form
25  of the question.

Page 394

WATERHOUSE - 10-19-21

1
2    A.    Yes, I don't recall having
3    conversations about, you know, those -- those
4    entities.
5    Q.    And, in fact, what was the tone that
6    Mr. Dondero had when he talked to you about the
7    fact that HCRE and HCMS payments hadn't been
8    made when he found out that they hadn't been
9    paid?
10    MS. DANDENEAU:  Objection to form.
11    MR. MORRIS:  Objection to form.
12    Q.    What was the tone he took with you?
13    A.    Oh, it was -- it was -- it was -- it
14    was very negative.  I mean, I think he cursed
15    at me and he doesn't usually curse.
16    Q.    Okay.  And in your mind, is that
17    consistent with the fact that he was surprised
18    that those payments hadn't been made?
19    MR. MORRIS:  Objection to the form
20    of the question.
21    A.    Yes.
22    Q.    Okay.  Thank you.
23    MR. MORRIS:  I have nothing further.
24    Thank you so much, Mr. Waterhouse.
25    MR. HORN:  I have no questions.

Page 395

WATERHOUSE - 10-19-21

1
2    Thank you, Mr. Waterhouse.  We appreciate
3    your time.  I am logging off the discussion
4    and I will talk to y'all tomorrow.
5    MR. MORRIS:  Super.
6    VIDEOGRAPHER:  If there are no
7    further questions, this ends the
8    deposition -- excuse me.  This ends the
9    deposition, and we are going off the record
10    at 7:30 p.m.
11    (Deposition concluded at 7:30 p.m.)
12
13    _____
14    FRANK WATERHOUSE
15
16    Subscribed and sworn to before me
17    this    day of        2021.
18
19    --------------------------------
20
21
22
23
24
25

Page 396

WATERHOUSE - 10-19-21

1
2    C E R T I F I C A T E
3
4    I, SUSAN S. KLINGER, a certified shorthand
5    reporter within and for the State of Texas, do
6    hereby certify:
7    That FRANK WATERHOUSE, the witness whose
8    deposition is hereinbefore set forth, was duly
9    sworn by me and that such deposition is a true
10    record of the testimony given by such witness.
11    I further certify that I am not related to
12    any of the parties to this action by blood or
13    marriage; and that I am in no way interested in
14    the outcome of this matter.
15    IN WITNESS WHEREOF, I have hereunto set my
16    hand this 19th of October, 2021.
17
18    _____
19    Susan S. Klinger, RMR-CRR, CSR
20    Texas CSR# 6531
21
22
23
24
25

Page 397

WATERHOUSE - 10-19-21

1
2    NAME OF CASE:  In re:  Highland Capital
3    DATE OF DEPOSITION:  October 19, 2021
4    NAME OF WITNESS:  Frank Waterhouse
5    Reason Codes:
6    1. To clarify the record.
7    2. To conform to the facts.
8    3. To correct transcription errors.
9    Page____Line____Reason_____
10    From_____to_____
11    Page____Line____Reason_____
12    From_____to_____
13    Page____Line____Reason_____
14    From_____to_____
15    Page____Line____Reason_____
16    From_____to_____
17    Page____Line____Reason_____
18    From_____to_____
19    Page____Line____Reason_____
20    From_____to_____
21    Page____Line____Reason_____
22    From_____to_____
23    Page____Line____Reason_____
24    From_____to_____
25

Case 21-03007-sgj  Doc 106-3  Filed 12/01/21  Entered 12/01/21 14:55:44  Desc
Case 3:21-cv-00881-X  Document 78-30  Exhibit 30  Page 102 of 131  Page 113 of 213  PageID 55027

Index: $1,406,000..2

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11 350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18 270:20 271:7,16 272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20 223:7 224:2 334:7,19 336:13,23 337:25 339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14 332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20 271:6 272:7 283:18 315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7 277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8 138:12 143:12 144:6, 17,23 272:16 273:6

287:15 288:6,20 303:6,18,24 304:11, 20 305:23 306:2 307:7 308:20 310:17 317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

**1**

**1** 8:9 35:17 139:22 140:12,13 215:25 216:3,7,12 238:8 260:20,23 261:15 328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15 198:2 266:20 267:3 302:7

**10-19-21** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1

129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1

297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12 122:12 135:21 261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3 350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13, 23 203:3 210:6 213:18 221:23

**15(c)** 5:21 160:11 169:21,23 170:4,8,10 171:6 175:3,9 176:23 179:20 184:5 195:9 210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19 110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

**2**

**2** 5:15 35:18 140:18 142:15,16,22 171:10

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-20    Exhibit 20    Page 103 of 131    Page 114 of 213    PageID 55028

Index: 2.4..780

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

**34** 5:18 104:23,24

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 73-20   Exhibit 20   Page 104 of 211   Page 115 of 213   PageID 55029

Index: 7:02..agreement

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18
73:5,6,8 342:14
344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6
124:3 204:15 272:6
327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10,
14

**accelerated** 339:4
347:7

**acceleration** 339:6,
10,15 340:13,17,24

**accept** 16:17 152:23
188:19

**accepted** 241:14
277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24
359:19,21 360:9,14
372:21 373:13

**accordance** 241:13,
25 242:4 254:10
256:21

**account** 287:17
328:6,9 359:14
360:6,14,22 367:22
371:9

**accountant** 21:17
25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4,
7,17 28:16 38:24
87:12,14,17 112:10,
11 148:23 149:2,14
150:14,19 188:11
200:17 230:16,18,21
240:19 241:14
257:22,24,25 258:12,
13 280:6 290:13
326:18,21 337:2,7
351:2 354:7,11,22
358:3 371:5 372:3
378:15

**accounts** 244:9
327:10,12,17,21
329:17 330:10,12,20
331:4 333:7 359:19,
22

**accuracy** 113:17
114:17 115:2

**accurate** 88:7,11,17
89:13,23 90:2,6
110:16 112:19 133:5
176:17 204:4 238:4
256:10 257:4 284:24
286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25
213:6,17 314:21

**acting** 23:23 24:2,3,8
28:5,8,12,18,20 29:5,
9,11 30:14,16,24
31:2,3,5 155:6,9,14
156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12
346:19,25

**actual** 115:21 311:25
312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7
263:4

**adjustments** 36:4
240:21 241:18 243:5
244:19 245:20

**administrative**
321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21
61:5,10 62:21 63:5
267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7
257:2

**advisor** 125:8,15
192:25 193:15
205:10 273:23 281:6
282:5 311:25 312:5,6
328:7 331:22,23
391:7

**advisor's** 337:17

**advisors** 3:17,18
9:21,22 22:22 27:10
29:10,12 32:18,20,25
33:24 39:2 42:21,22
44:6,7 58:8,14,15,18

125:3 126:10,13,16
127:10 152:14
160:10 167:13
168:19 171:14
172:18 175:7,13
178:11 179:18,21
183:7,18 184:15,19,
22 189:23 190:9,12,
19 191:2 192:25
193:8,19 194:3,21
195:10 196:8,22
205:7,12,23 206:14
208:4,7 210:5 213:22
215:14 235:9 267:24
268:16 279:19 280:2
286:18 308:4 325:15,
21,22 328:7,25 329:3
332:14 333:23
335:15 336:7 337:14
353:20 379:19,24
380:2,10,22 381:2,6,
11,16 389:11 390:11
391:8

**advisors'** 168:9
179:8,25 180:9 184:3
194:17 218:19 328:9

**advisory** 32:21
33:24

**affect** 371:17

**affected** 265:12
277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4
44:12,16 47:25 48:9,
22 49:5,6,10 51:17
54:17 57:19 58:3
60:14,21 61:4 62:9,
20 63:3,15,22 64:6,
10,16,24 65:18 78:18
93:21 94:6 100:25
105:8 107:2,13,21
108:3,7 109:10 131:2
171:14 220:6 225:6,
14,21 239:4 254:2
259:24 262:11 263:5
307:24 309:16,24
310:9 312:2,11,14,25
370:10

**affiliated** 134:6
285:17

**affiliates** 41:2,5,8,10,
13,14 44:4,11,15,25

45:13 46:3,9 47:18
48:7,13 54:2,11,13,
20,21,25 55:6,11,18
56:2,16,23 61:20
62:2 63:11 65:4 66:8
82:16,20 91:3 100:22
101:16 106:22 107:3
108:14,18 109:8,18
110:7 111:2,6,9,13,
23 112:18,24 113:19
115:4 117:24 118:7
119:4 120:20 121:4
176:9 233:9,23
234:10,16,21 235:4,
22 236:8 238:25
241:7 242:8 243:8
259:19 260:11 262:6
309:19 312:2,13
377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13
132:7 138:11 217:15,
19

**agree** 77:5 306:13,22
307:5,10

**agreed** 16:17 75:20
121:16,20 198:20
199:5,11,19 200:13
209:25 210:6 314:11
374:25 375:7

**agreement** 17:9
59:24 65:9,16,23
66:2,6 67:3,7,8,12,
16,22 68:4,9,12,17,
24 69:15,19,22 70:2,
7,11,16,20 71:18,24
72:4,7,10,13 75:4,5,
9,14,16,23,24 76:3,6,
7,10,14 77:6 78:15,
21,25 79:8,10,17,18,
24 80:5,6,11,16,20
81:6 82:9,17,22 83:7,
10,14,17,20,23
99:15,24 100:2,6
102:3,6 104:13,17,19
122:5 123:22 124:4
134:12 186:24 187:2,
16 189:2 200:13
210:22 212:17
278:23 279:18,20,24,

Index: agreements..audited

25 314:7 316:5,8,9,
13 326:3,13 332:8
351:4 365:22 379:20

**agreements** 58:16
77:24 83:4 168:9
186:10 279:4,6
325:24 353:22
379:18,23 380:4,11,
13,19 381:17 388:16,
17

**agrees** 243:25

**ahead** 68:22 82:6
156:20 164:10
212:25 248:12
295:12 329:11
352:10 364:23
378:18

**Aigen** 4:5 9:24 214:4
251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21
125:2 273:17 281:8,
23

**allowed** 62:8 81:23,
25

**alpha** 297:20 302:7
307:19 328:10
338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15
214:18

**amortizing** 334:13

**amount** 49:10,11
50:23,24 57:6 119:7
131:13 132:8 138:11
142:18 144:5,16
161:19,25 195:16
196:16 216:17
217:15 220:23
222:11 239:5 240:9
244:3 271:11 277:7
283:18 288:6 308:22
342:10 343:5,15,17
389:11

**amounts** 106:21,25
108:14 109:7,18
110:6 111:2,5,8,12,
23 112:18,24 113:18
114:19 115:3 119:3
120:20 121:4,11
125:8 126:6 161:8
168:3 171:12 174:15,
22 175:11 176:9
181:15 199:12 202:7,
22 203:7,13,19
204:11,16,25 205:12
211:11 212:10,18
217:19,21 222:3,11
234:23 235:3 275:13
282:8 283:2 285:10
288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24
241:3,6 261:11 262:3
265:7,8,17,18,19
389:8

**and/or** 42:8,16 43:3,
14 59:14

**annual** 26:10 84:17,
23 85:2,24 96:7
168:10 170:5,9 184:5
217:2 228:16 334:8
335:9 336:12

**answering** 248:7,8
262:23

**answers** 12:2 16:25
26:15

**anticipated** 311:20
378:17

**anymore** 294:24
388:12

**apologize** 30:10
40:22 78:14 99:22
104:12 125:21,24
139:2 170:2 192:14
197:19 226:17
227:17 304:14 352:8
354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24
56:6 59:17 60:12
162:5 168:4 294:13
316:14

**apply** 213:7 314:12,
22

**appointed** 18:21,24
24:14,19,25 25:8
29:11,15 270:4
323:9,16

**appointment** 152:24
153:4,16

**appointments**
227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5,
10 63:12,17,23
144:24 170:14 206:5,
16 271:17,22 272:13,
14 281:7 332:16
351:5 377:17,24
382:11

**approve** 56:21 57:2,
3,20 61:5,9 231:21
273:6 379:7

**approved** 57:5 60:20
231:14 271:12
294:21 295:6,18
333:4 382:16,17

**approximate** 17:22
23:15 27:24 30:19
36:23 38:15 120:15
161:24 216:17 277:7
310:5

**approximately** 8:20
15:13,20 19:23
109:15,19 110:7
119:23 126:12 169:7
173:14,15 178:19
220:12,24 221:3,7
238:9 277:10,15
278:6

**approximates**
118:13 121:6

**April** 152:18,25 200:4
202:13,23 203:3,15
204:10 210:6 213:18
301:16 314:21 323:6

**areas** 26:5

**Argumentative**
156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4,
9

**ascribing** 386:8

**Asia** 4:24 92:14
118:3 129:16 135:10
177:14 218:14

**asks** 97:12 171:10
172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6,
24 109:14 118:23
225:16,23 265:9
354:15 367:9 368:4
371:7,16,23 372:6
376:24 387:3

**assets** 5:23 107:14
108:10,13 109:20
110:8 122:3,8 137:14
190:3 194:2 195:17,
20 196:3,9,17 204:19
211:3 225:8 235:11,
15 237:20,23 239:13,
19 240:15 241:4,18
242:13 250:18
253:16,24 259:18
260:8,11,13 301:9
303:9 307:9 309:2
311:10 317:7 366:14
368:5 370:22

**assistant** 295:2
298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10
297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15
133:24 297:13

**assumed** 285:4,11
287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11
172:12

**attorneys** 3:4,11,17
4:2,10,16 147:21
187:6,11,15 188:3,7,
24,25

**attributable** 132:3
276:11 283:2

**audit** 26:11 48:5
52:23 85:24,25 86:9,
23 88:2,6,13,14,16
89:10,11,22 91:11,14
93:4,14 95:6 96:7,10
97:22 98:19 103:25
104:4 106:7,16,17
109:24 110:25
111:20 112:7,24
113:17 114:2,7
115:2,20 116:5
117:2,20 119:19
131:5 132:9,24 135:6
137:5,7,10,12,21
138:18 142:9,11
148:25 149:4 199:23,
25 200:6 218:7
219:4,5,12,15
221:11,14,20 243:12
244:18 263:24 264:8

**audited** 6:4 41:7
47:25 84:16,23 85:3,
19 90:2 93:24 95:14

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-20   Exhibit 20   Page 106 of 131   Page 117 of 213   PageID 55031

Index: auditing..briefly

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 75-20   Filed 01/09/24   Page 118 of 213   PageID 55032
Exhibit 20   Page 117 of 131

Index: bring..company

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

---

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

**caused** (continued column)

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

**308:24 372:10**

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,20
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 73-30   Page 108 of 231   Page 119 of 213   PageID 55033
Exhibit 30   Page 108 of 231

Index: compared..COVID

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:11

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

Index: COVID-19..Deitsch-perez

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness** 303:19

**Crescent** 294:10

**CRO** 254:13,14 256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8 250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14

---

**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8 8:14 9:20

**damages** 385:17

**Dandeneau** 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

**dated** 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

**dates** 30:17 178:8 321:14 326:7 355:25 357:11

**Dave** 87:20 172:6 230:19 292:3,4,11

**David** 124:9 275:23 389:9

**Davor** 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

**day** 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate** 344:24

**de-accelerated** 345:18

**deadlines** 86:9 379:2

**deal** 74:25 219:18 224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8, 12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

**debtor's** 233:7 239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

**December-ish** 390:16

**decide** 254:25

**decided** 245:5 318:13 380:22

**deciding** 56:13,17

**decision** 121:24 122:2,21,22 245:2,8 340:9 382:20,21

**decisionmaking** 254:14

**declared** 182:7,12

**deduce** 309:23,24 310:6

**deemed** 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

**default** 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23 201:4,7,21

**deferred** 203:3 366:23

**define** 32:9 33:21 101:6

**defined** 33:13 45:13 51:17 53:13 54:2 99:15 173:2

**defining** 44:16 69:8 109:21

**definition** 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 73-30    Exhibit 30    Page 110 of 131    Page 121 of 213    PageID 55035

Index: Delaware..Dondero

159:25 160:19 177:6,
17 178:3 180:4,12
191:4,22 194:6,22
195:22 196:4,11
202:24 205:16 206:7
208:11 209:8 212:12,
20 214:9,13,16,22
215:5,11 216:11
220:25 227:21 231:8
232:9 238:10 239:20
242:25 247:15 248:2,
8 249:4,17 251:10
252:6,9,20,25 254:7
255:10,22 256:17
262:18 301:19
324:24 336:15 348:9,
23 349:21,24 352:6,
11,20 353:2,17,23
375:22 376:4,9 377:3
381:13 384:12
386:13 387:10,14
393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7
235:20

**delved** 251:19

**demand** 121:11,17,
21 122:4,7,9,15,19,
23 123:23 124:4
134:13 140:17
142:21 182:15
186:18 187:3,17
198:21 199:6,11,19
200:14 202:18,22
205:19 209:25 210:7,
23 212:18 301:17
313:16 314:8 315:2,8
316:6,17,18

**demandable** 316:19

**demands** 122:14
364:13

**department** 146:10
147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4
164:4 383:15

**depends** 41:20
57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11
8:10,16 11:2,15,18
12:7,15,22 16:15,23
33:23 72:21,23
73:10,15,20 74:6
76:8 77:12 81:3
123:17 151:6,9 215:6
227:15 266:21 267:4,
13 365:20 373:2
375:25 376:19
388:23 395:8,9,11

**depositions** 11:19
12:19

**derived** 16:6 17:23

**describe** 56:4 84:3
111:21 326:15 353:7
358:3

**describing** 125:17
126:2

**description** 108:21,
24

**desk** 293:9,10 295:25

**detail** 107:7 120:25
153:8 159:20 222:22
229:14 278:11 300:6
311:18 351:19
369:20

**detailed** 122:20
132:12 179:23 224:9
230:7 260:5 276:18
370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12
80:8 84:7 104:16
131:25 286:3,22
299:12 300:8 342:12
343:7

**deter** 376:18

**determination**
41:25 42:4 261:18,19

**determine** 53:19
82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development**
347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12
205:19 207:18
222:25

**diligence** 85:5,8,13
169:11

**direct** 113:22 253:6
304:19 322:10

**directed** 57:17

**direction** 237:6
254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7
17:23 19:8 42:7,15
43:14 88:2 177:11
219:2 354:9

**director** 23:6 32:15
39:25

**directors** 15:22 72:7

**disagree** 318:5,16,
21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17
52:11 53:10 88:13
91:12 94:6 99:14,20,
23 103:2 111:21
112:3 113:8 179:12
210:12,15 242:21

**disclosed** 48:7,9
52:19 53:4 93:24
94:18 102:3,7,13,18
103:8,10 113:12
117:13 130:10
133:21 134:3 138:8
190:25 212:4

**disclosure** 100:12
134:12,16 185:15

191:20 211:21,23
262:11

**disclosures** 91:2
94:16

**discovery** 81:4
196:21

**discuss** 99:3 124:2
148:18 201:18,20
322:14 342:7 343:22
345:7

**discussed** 26:18
73:23 74:11 80:14
107:9 114:25 192:12
193:23 227:12 234:4
272:20,23 275:3,4
294:5 300:11,13
371:15 383:22 390:9

**discussing** 117:25
148:22 180:8 191:6
217:18 234:9,15
300:17 319:7 341:6,
8,22 346:4 388:13,15
391:6

**discussion** 164:4,9,
12,17 180:19 191:9
217:21 246:4 249:24
251:20 282:18,21
290:6 319:13 342:15
387:22 388:8 392:11,
21 395:3

**discussions** 58:20
233:6,15 249:11
250:4 251:13,19
253:17,20,25 263:25
264:14 274:5 275:17
280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13,
16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25
52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14
239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6
91:19 92:5 96:3
103:18 104:23 105:5,
10,16 136:11 139:22
140:8,12 141:4,10,16
144:3 147:16 151:22
153:6,15,22,23,24
154:5,11,18,24 155:3
156:24 159:21
197:13,14,16,17,25
198:12,15,17,23
199:3,4,10,14,17,25
200:3,18,22 201:3,6,
15,18 202:4 203:2
209:14,16,22 210:12,
15 211:24 212:4
213:21 214:3,6,12,
15,17,20,24 215:7,13
216:7 226:10,25
227:8,19 228:6
236:16,19 237:18
239:17 244:5 256:5,9
293:21,22 301:16
302:12 303:7 305:12,
21 320:14,16 338:14

**documents** 12:24
13:12,14,16,19 25:5
123:15,17 126:19
140:10 143:24
147:20,25 149:12
153:8 159:15 197:2
227:13 235:19
236:25 266:19 267:3,
7,9,14,18 291:9
294:2,4,6,8,11,14,17
296:21,22 322:11
364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24
260:19

**Don-** 68:19

**Dondero** 4:2 9:14
15:6 16:8 17:24 19:8,
12,25 20:9,13,18,24
21:4 42:9,17 43:15,
24 44:3,5 50:11,14,

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-20    Page 110 of 131    Page 122 of 213    PageID 55036

Index: Dondero's..ensure

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

---

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:23
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 313:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 257:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

Index: ensuring..filed

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25
104:14,19 122:6
124:5

**entire** 19:7 192:13
253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23
43:13 44:3 54:21,25
55:4 101:8,15 189:8
278:2 289:19 330:13
361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7
110:25 157:16

**entity** 15:5 22:20,25
27:18 31:11,23 32:3,
6,11 42:14 109:24
137:13 272:3 289:23
302:22 307:8

**entries** 240:19

**entry** 131:10 308:3,
14 311:9 332:23

**environment** 90:3,5,
9,14,20 113:6
137:18,20

**environments**
207:21

**equal** 49:11 50:23
262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25
282:3

**erroneously** 197:22

**error** 125:6,9 131:17,
24 132:3 145:8 165:9
213:12,14 214:5
273:11,14 275:14
276:8,25 277:5
278:5,15 280:12,22
283:3 289:6 318:15
385:9,14,19,23

**errors** 163:21 167:14
373:10

**Esq** 3:6,7,12,13,20,
21 4:4,5,11,18

**established** 94:2
285:14,20 300:25
301:7 310:16

**estate** 31:12,17
235:11,15

**estimate** 20:12 372:4
389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22
138:9 143:9

**events** 103:13
125:16,25 130:4,10,
21 133:8 138:5
242:22 262:14 263:4
370:24 371:7,9,13

**exact** 15:24 17:25
18:13,18,19,22 20:5
30:17 131:20 156:21
274:13 277:17
278:10

**EXAMINATION** 5:6,
7,8,9,10,11 10:14
266:13 352:25 377:5
387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2
195:19 196:3

**exceeded** 93:25
194:2 196:9,17
204:19 211:3 301:9
303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12
389:13,14

**exchange** 45:15
212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23
201:2 249:18 280:9
323:13 395:8

**execute** 48:14,22

**executed** 49:21
142:10 161:12 221:6
274:2 293:14 303:7

**executing** 317:16

**execution** 181:9
300:14

**executive** 35:10,11,
16 36:20,24 37:5,18
38:3,4,9,14,16,21
39:3 78:10 366:24
367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18,
20,21,22,23,25 6:2,4,
7,8,9,10,11,12,13
13:13 91:20,21
104:23,24 135:8,14,
15 140:12,13 142:15,
16 151:20,21 170:18,
19 197:3,9,15 198:2
214:7 215:22,23,25
216:3,4,5,7,8,12
218:13,16,17 226:23,
24 236:16,23 237:19
258:18 297:23 302:7,
8 303:14 305:5 306:7
307:18,21 309:2,6
313:9 317:12 328:10,
12,13 338:13,21
341:13,14

**exhibits** 267:10,11
268:9

**exist** 15:12 16:17
114:22

**existence** 67:15
69:18 80:16 81:6
99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19
293:19 333:15

**exchanged** 45:21

**expectation** 231:5

**expected** 200:17,21
293:21

**expects** 203:18
212:9

**experience** 101:14
111:16 116:14
169:10 256:25 257:8
259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19
153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20
311:8

**expressly** 390:4,25
391:12 392:5

**extended** 301:17
308:21 314:22

**extension** 307:8

**extent** 45:17 55:21
66:15 107:5 126:4
208:6 244:15 296:6
322:6

**extra** 219:23

---

**F**

**face** 50:23 120:11
144:16 244:3

**face-to-face** 293:8
294:5

**facilitated** 321:10

**fact** 62:7 192:20
236:21 264:24
266:25 275:7 298:4
301:15 313:19
334:22 338:23
341:10 343:19
363:12 394:5,7,17

**facts** 111:22 240:6
261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14
49:7 52:4 93:17
99:13 110:21 118:11,
21,24 119:6,8,9
120:3,15 121:5
126:8,21 141:18
143:23 149:20 224:6
239:16 240:18,21
241:17 242:6 243:5
244:13,20 245:19
260:10 261:15 262:7
263:5,15 264:25
287:21 370:21
371:18 372:5 374:10
390:2

**faith** 189:8,15 190:9,
12,19 191:3 193:19
194:20 205:8,14,23
206:14,23 208:5

**familiar** 22:20 31:22
32:3 54:6,9 226:13
227:8,18 274:6

**fashion** 86:11 276:16
357:14

**fault** 229:17 276:24
277:19

**favor** 60:6 62:19
139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21
226:3,4 228:3,23
323:9

**Federal** 7:19

**feel** 81:8,18 176:25
273:13 287:16
371:21 376:11,16

**fees** 332:12 356:21,
23

**fide** 369:25

**figure** 343:10 366:12
367:5

**file** 167:8,13 297:2,10
337:8

**filed** 21:6 197:17
208:18 213:23
215:13 219:23

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 75-20    Page 11 of 21    Page 124 of 213    PageID 55038

Exhibit 20                              Page 1139 of 1141

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:3 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:19
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-20   Page 11 of 21   Page 125 of 213   PageID 55039
Exhibit 20   Page 114 of 141

Index: future..held

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

### G

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

---

### H

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

---

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

Index: indulging..L.P.

276:21 285:18

**indulging** 353:5

**inform** 190:18
210:19 211:2 335:16
336:6 337:24

**information** 16:14
80:19 86:10 88:13
91:12 112:5,17
117:14,15 169:11,13
171:20 176:8,15,22
179:16,17,18 188:8
206:3,5 218:20 230:3
236:7 237:13 257:18
274:4 312:10,24
344:19 368:11

**informed** 69:18
178:17 190:24 210:5
211:9 212:8 288:15
335:16,23 378:7

**informing** 64:13
181:25 182:11 330:5

**initially** 132:17 185:5
247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12
274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16
60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3
210:10,13,19 381:25

**instructed** 77:15
147:8,9,23 241:19
291:7,8 315:7 362:8
381:22

**instruction** 8:6
57:11 74:14,23

**instructions** 256:7
347:25

**insufficient** 122:8

**insurance** 385:17,22
386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21
214:19 288:23 315:5,
19

**intending** 16:25
146:16

**intent** 306:14 318:20,
25 380:10

**intention** 81:11
307:11

**interest** 50:3 55:25
56:22 57:18 58:2
59:14,17 60:13 62:18
63:2,10 64:5,15,22
119:10,16,21 120:22
162:6 163:22 164:25
165:11 167:11 168:5
217:17 223:18
273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16
329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16,
18

**interviewed** 322:18,
22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations**
275:17

**investment** 4:10
9:18 32:21 65:11
127:17,24,25 128:12,
14,16 129:3 244:23
245:3,6 247:11
273:24 274:15
279:21

**investments** 128:17
129:5,6 249:23

**investors** 275:10
276:12 277:4,8,21
281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10
245:2 264:17 274:14
275:15,21 276:21
288:4 292:6,13 293:6
354:10

**issuance** 131:5
138:10,18 371:14

**issue** 54:7 178:14
191:13 201:25
204:10 208:24

**issued** 56:16 60:5
62:19 65:8,18 66:8
81:13 82:15,20 93:13
107:13,20 108:2
131:11 132:6 133:12
161:23 162:5 180:10
218:25 223:7,17
233:8 234:10,15
235:4,9,21 236:8
242:8 243:7 261:9
262:6 263:6

**issues** 113:5 248:14
306:19

**item** 108:19 111:11,
18 112:4 119:2,16
123:6 185:21 220:5
238:20 259:18,24

**items** 53:3 97:21
100:9 112:3 131:21
149:8 228:21 229:3,7
230:4,7 249:22 260:6

J

**James** 234:11
271:25 273:2

**January** 70:16
163:7,8 219:11,13,17
258:20 326:8 341:6,
18 344:2 350:5,9,13,
24 351:20 361:25
362:3,7 364:8 365:2,
15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6
16:8 19:8 43:15,24
44:5 50:11,25 65:16
67:6,22 68:18 71:23
72:7 75:24 78:9,16
82:22 123:3,20
189:9,16 190:10,13,
15 205:9 206:23
232:18 273:2 280:19
342:5,7 351:5,10,14
362:8,10 363:8,18
365:3 367:8 368:22
379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3
219:20 313:2

**John** 3:6 7:24 9:4
10:20 45:3 46:13,18
69:13 74:8 76:15,17
77:10 95:17 105:23
129:18 146:13 154:7
155:18 157:6 177:6
192:18 208:13 216:2
222:14 236:18
267:18 304:6 308:7
353:18 385:3 387:10,
16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21
72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17
99:25 103:2 132:25
135:2 137:6 176:10,
24 186:16 200:7
242:23 262:16,24
263:13 265:3

K

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12
221:12 222:23
245:22 250:5 274:16
276:4 323:6 329:22,
23 337:8 353:13
356:10 358:13,14
380:23

**kinds** 353:6 354:2
357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9
172:6 230:19 275:23
292:3,18 389:9

**knew** 68:18 103:9,10
369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10
46:5 47:23 48:12,21
49:9 50:13 52:5,10
53:10 62:5 63:12,16,
21,23 79:23 80:10
81:5 82:7,8 89:23
93:23 95:3 98:17
101:13,19 102:2,25
106:25 111:16 112:6
138:16 144:24 147:8
153:13 167:8,22
184:10 188:15 189:9
194:13 206:5 207:8
208:2 225:5,12
226:21 232:21,23,24
237:11 243:4 259:22
322:19 324:17
384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21
230:20 292:3,12
328:17 342:11 343:8
350:17,18 362:23
365:13

L

**L.P.** 3:19 8:12 9:6,23
10:22 11:7 15:16,23

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 79-20    Filed 01/09/24    Page 128 of 213    PageID 55042
Exhibit 20    Page 11 of 21

Index: La..made

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5:7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 321:10

**Lokey** 323:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

## M

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:13,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-30   Exhibit 30   Page 131 of 131   Page 130 of 213   PageID 55044

Index: mistakes..North

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4
198:10 222:5 224:3
276:5 307:22

**money** 39:11,16,24
41:2 43:24 49:11,17
50:10 62:9 124:14,20
126:6,23 127:3,15,25
128:5,10,23 129:2,5
145:16,18 186:10
276:13 282:8 283:5
285:18 318:10
319:11 320:4 359:9,
13,24 360:21 374:22

**moneys** 39:19 162:5
167:9 277:8 282:17
283:16,22 289:5
359:15

**month** 59:11 132:23
226:16 229:15
258:21 332:4

**month-and-a-half**
323:10

**monthly** 5:25
226:11,14 227:5,20,
25 228:12 229:10,19,
21 230:2,11,22
231:14 232:6,8,13,
19,20 255:18 256:14,
19 259:9,12,14

**months** 261:21
292:25

**morning** 7:3 10:19
342:16,18 344:12,14,
16

**Morris** 3:6 5:6,9 7:24
9:4 10:7,15,20 13:10,
17 16:9,24 17:11,14,
19,20 22:16,18
31:18,19,21,25 35:24
36:5,11 45:6,10
46:15,23 47:4,6,11
55:4 69:8,11 72:15,
18,25 74:3,9,13,18,
24 75:11,15,19
76:19,23 77:2,11,19,
22 81:16,18,21,23

82:10,13 91:8,18,22,
24 92:9,11,14 95:9
105:4,25 110:22
114:11 118:2 129:15,
21,24 130:14,18
135:5,10,13 136:9
137:24 139:20
140:11,23 142:14
146:17 150:21
151:19 154:3,13,16
155:19,22,25 156:18,
25 157:3,10,13,21
170:17,20,25 171:24
174:18 177:9,14,16,
19,23 178:10 195:6
196:20 197:6,21
201:11 202:3 207:15
208:20 209:13 214:4,
8,10,14,21 215:3,10,
21,24 216:4,13
217:5,8 218:11
219:25 221:23
222:16 224:18
226:22 228:18
236:15,20 243:15
246:13 247:21 248:5,
11,22 249:18 250:6
251:23 252:4,8,16,24
253:4 254:17 258:16
259:16 265:23 266:9,
17,24 267:14,20
268:14 269:7,12,18
270:15,22 271:8,18
272:9,17 273:7,10
277:22 278:19 279:8
280:15,23 282:12,18
283:19 284:7,14
285:7 286:9 287:9,
18,24 288:8,25
289:12 290:9,21
291:19,23 292:19
293:15,23 295:12
296:13 297:6 298:22
300:15 301:13 302:2,
11,15 303:2,10,20
304:3,7,12 306:15,24
307:13 308:5,8,13
309:10,12 310:2,11,
19,24 311:12 312:16
313:13 314:12,14
315:9,23 316:23
317:17,25 318:6,17,
23 319:23 320:6,18
322:5,23 326:24
327:6,24 329:10
330:21 331:5 333:10,

18 334:6,10,21 335:4
338:3 339:16 340:18
342:21 345:12,19
346:22 347:14,19
348:12 351:15 352:4,
8,16,18 353:11,15,19
354:4 355:5,9,15,21
356:3,14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10,22 365:6,
21 366:15,25 367:16,
25 369:4,8,17 370:3,
8,25 371:10,25
372:22 373:4,20
374:11 375:3,24
376:20 377:6 387:7
388:19 389:5,15
390:9 391:4,14
392:7,13 393:24
394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23
245:3,6 247:11
260:22

**mouthpiece** 206:2

**move** 69:11,12
114:11 208:19
246:13 247:21
248:22 250:6 252:23
307:17 364:22
376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3
320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14
249:11

---

**N**

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8
309:19 311:25 312:4,
13 375:20

**Nancy** 4:2 9:14 65:9,
17 66:7 67:6,22
68:19,25 75:25 78:16
82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6
144:2 147:17,18
180:20 230:8 240:22
253:18 259:15
271:20 276:10
279:22 280:9 292:22
294:22 325:19
329:24 333:13
354:12 356:6,17
357:11 378:23

**NAV** 125:6,9 131:17,
24 132:3 145:8
273:11,14 274:23
275:8 277:5 278:15
280:12,22 281:13
289:6 318:15 373:10

**needed** 155:2 250:17
257:13 271:21 289:6
318:13 354:15 358:8
382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19
383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4
9:21 27:10,12,15,18,
21,25 28:4,6,16 29:7,
10,12,16,24 31:3,11,
17 32:17 42:21 43:12
44:6 54:14 58:7,11,
14 60:5 65:6 100:23
126:9,13,16,23
127:3,10,11,15,18,24

161:23 162:5,7,11,18
163:23 164:6 165:11
167:7,8,13,15 168:2,
6 171:13 172:21
176:14 178:12,17,18,
22 179:13 182:3,12
184:21,23 186:9,21
189:15 196:3,23,24
216:20 217:14,23
218:3,19 219:15,22
220:18 221:6,10,13,
25 223:5,24 241:23
242:6 260:4 267:24
309:24 322:3 325:14,
18,21 326:16,23
327:4,10,17,20
328:6,7,8,25 329:3
330:11,18,19 331:2
332:14,17 333:8,15,
16 334:5,8,22 335:3,
9 336:13 337:13,23,
24 338:23 341:19
342:9 343:18 345:17
346:12,16,20 348:4
353:8,21 358:15
379:16 381:23
382:10 383:24 384:3
390:5 391:2,10,12,19
392:5

**Nexpoint's** 59:18
218:6,12 219:6 331:3
336:22 350:19

**Nguyen** 3:21 268:10
297:19 298:9 302:5
303:14 305:3 306:7
307:19 308:11,25
309:3,4 311:22 313:8
317:3 331:9 332:21
338:12,21 341:15
343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american**
284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2,
7,9 192:15,23 193:5

**North** 3:15,23

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-30    Filed 01/09/24    Page 131 of 213    PageID 55045
Exhibit 30    Page 130 of 211

Index: Northern..obligations

**Northern** 8:13

**note** 13:11 45:14,21 48:15,22 49:6,12 50:15,22 51:7 56:7 57:4,19 59:18 60:5, 13 62:19 63:3 64:6, 15,23 78:17 107:20 117:9,12 120:18 122:4 126:12 134:6 140:14,17,20 141:22, 24 142:2,4,18,22 147:15 149:17 150:4 161:24 162:4,7,18 163:23 165:12 167:11,15 168:6 182:3,12 186:18,22 187:17 213:16 214:4 216:16,20 217:2,13, 23 220:5,8,13,18,20, 23 221:5 222:4,10 223:4,7 224:2,9,12 233:22 234:10 243:17 244:23 245:3, 7,13,16,23 260:22,25 261:9 306:11,18 309:16,24 310:9 312:2,14,15,24,25 313:15,16 315:13,14, 16 316:17,18 319:12, 14 324:16 334:6,13, 18,19,23 335:21 336:13,23 338:2,17 339:4 340:10,14 341:19,23 342:9 343:4 344:25 345:18 347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20 45:2 46:2 49:21 50:18 54:3,6 55:7,18, 25 56:10,15,23 58:2 65:7,14,18 66:7 67:3 68:14,17 76:2 82:15, 20 83:6,10,13 106:21 107:2,12 108:2,14,18 109:5,7,17 110:6,25 111:5,8,12,22,25 112:18,23 113:9,10, 13,18 114:19 115:3 118:12,13,25 119:3, 6,9,11,22 120:19 121:3,21 122:8,15 123:6 124:3,15 130:23 131:12,16

132:7,10,14,20 133:13,21 134:5,14, 17,23 138:11,20 139:5,10,17,21 142:10 143:6,7,14, 21,23 144:5,12,16,22 145:4,23 146:2,4,7, 11,14,25 147:10 148:15,18,24 149:2 150:5,8,15 158:5,13, 19,24 159:5,10,23 160:16,25 161:5,9, 10,19 162:11 171:13 175:16 178:14,15 179:14,21 180:2,10, 24 181:4,9,16,22 182:8,16 205:19 209:2 210:8 213:7,8 222:2,17 223:13,16, 19,23 224:9 233:8 234:15,23 235:4,9, 14,21 236:3,7 238:20,25 239:4,5, 11,18 240:10,20 241:6 242:7 243:6, 11,18 244:4,15 246:6,15,22 247:10, 24 248:25 250:9 251:8,15,21 252:12 253:10 261:12,16 262:6,11 263:6,15 264:19 268:21,24 282:14 284:19 285:15,17 288:21 289:10,16,18,22 290:8,13,16,24 291:5 293:13 296:9 297:4, 5,11,17,21 298:17 299:11,14,18 300:13 301:18 304:19,24 305:2,18,22 306:21, 23 307:12,24 310:17 312:11 313:20 314:13,23,25 315:2, 20,22 316:2,14 317:10,16,21 319:5, 9,15,18,22 322:20 323:20,25 333:17 338:7 364:13 366:22 367:23 368:6,17 369:15,19,20,25 370:9,11,17 372:11 386:9,10

**notice** 7:25 356:9 357:9 379:6 380:10, 15,16,17 381:4,7

**noticed** 16:12,20 248:6 375:25

**notices** 380:21

**November** 59:12 328:16 329:14,19 330:15 331:12 332:3 380:9,18 388:3,6 390:22

**NPA** 5:15 189:24 328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13 15:24 17:25 93:7,10 100:10 108:9 111:7 126:10 135:10 137:25 139:22 170:24 177:15,16 179:4 197:4,7 218:13 222:21 236:21 239:25 240:9 277:17 282:9 285:15,16 286:5 343:25 344:5 370:22 377:9 389:18, 21

**numbers** 240:5,6,23 268:13 278:10 343:5 366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9 47:4 60:24 65:19 66:10,15 67:9,24 69:6 73:24 77:13 78:19 79:20,25 97:4 107:16 115:5 119:12 144:25 146:12 147:4, 11 149:21 151:13 156:7,16 159:25 164:2 180:4,11,12 191:4,22 194:6,22 202:24 206:7 208:10, 11 211:4 212:12,20, 22,24 213:25 220:25 225:10 227:21 231:8 232:9 239:20,22 248:3 249:4 250:11 251:10 253:12 254:7 255:10 256:17 262:18 269:7,14,17 347:21 348:11,12

352:14 365:6 381:13 384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9, 10 20:4,20 22:14 25:15 31:16 33:9 34:20 40:10 41:4,12, 24 42:11,12,19 43:17 44:17 45:4,16 46:10 47:20 48:3,16,25 49:13 50:5,7 52:8 53:18 54:8 55:10,20 56:11,25 58:25 59:19,25 60:7,15,16 61:12 62:11 63:13,24 64:17,19 65:12 66:24 67:17 69:5,9,10 75:6, 10 79:4,14 80:12 82:24 83:25 85:15 86:2 91:4 94:3 96:11, 20 99:17 107:4,15 108:5 110:11 111:24 112:20 113:20 114:20 115:6 117:6, 18 119:13 120:16,17 122:10,16 124:6,23 126:3 127:19 132:16 133:23 134:8 142:6 143:10,15 144:8 149:5 150:10,17 151:16 153:18,19,25 154:6 155:11 157:2 158:15 159:17 160:3, 12,18,19 167:5 168:8 178:20 180:3 181:5, 11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21,22 196:4,11,18 200:20 203:23 205:3,15,25 206:21 210:24 211:13 213:11 220:10,15 222:13 225:24 228:9 229:24 231:18 234:6 235:23 236:10 238:10 239:3, 14 240:16 242:24 246:19,25 247:14 250:22 251:12 254:6 255:12,22 257:6,20 260:14 263:8 265:4 266:19,23 267:21 270:15,22 271:8,18 272:9,17 273:7 277:22 278:19 279:8

280:15,23 283:19 284:7,14 285:7,23 286:7,9 287:9,18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2, 25 303:2,10,20 305:10 306:15,24 307:2,13 310:2,11, 19,24 311:12 312:16, 18 314:14 315:9,23 316:23 317:17,23 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:2 342:21 345:12,19 346:22 347:14,19 348:9 351:15 353:11, 15,18,24 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 388:19 389:5,15 391:4,14 392:7,13 393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18 262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22 242:20

**obligations** 160:9 178:15 179:12 180:2, 9,23 185:15 194:4 208:8 327:13,21 328:8 332:5,8 333:17 335:17 336:6,7,10 361:19 380:2 390:10, 12 391:7,8

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 75-20   Page 120 of 211 Page 132 of 213   PageID 55046

Index: obligor..payable

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5
50:4,16 51:6 126:10
128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13
331:21

**occurred** 103:13
104:5 125:17 126:2
263:13 278:15
299:25 331:24 339:7
369:24 390:24

**October** 8:19 21:7
160:5,7,14,21
169:17,24 171:19
172:4 173:24 174:6
183:7,14 186:11,13
189:13 207:16
219:24 263:19
314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5
294:4,10 323:13,14
326:15 388:22 389:2

**officer** 14:12 23:6
26:25 27:6 28:24
29:2,7 32:14 35:10,
12,16 36:20,24 37:6,
18 38:3,5,10,16,22
39:3,24 51:22 52:6,
17 120:8 143:18
173:7,9,13,16,20,23
174:3 184:23,24
258:25 269:5,24
270:10,14 271:2
302:19 362:25

**officers** 15:22 29:24
39:11 40:5,8,12
51:23 52:13 93:21
153:9

**offset** 380:2,3 382:25
390:9,11,13

**offsets** 58:21 381:18,
19 383:13

**Okada** 49:18,21,24
50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14
332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11
202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-
end** 125:12

**open-ended** 125:7
275:4,8 276:10
281:9,11 282:7

**operating** 5:22,25
90:10 226:11,14
227:2,4,19 228:7
255:18 256:14,20
259:9,12,14 359:14

**operational** 143:25
147:17

**operational-type**
291:11

**operations** 202:8,15
203:14

**opinion** 120:6,7,10
204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11
128:16 129:6 288:21
360:9

**ordinary** 226:9
229:22 293:18

**organizational**
112:13

**orient** 365:24

**original** 223:25
232:11 274:24
277:14

**originally** 177:21
232:16

**originals** 297:4,11,
16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12
119:22 142:10
171:11 174:15
175:12 185:10,23
186:8 202:6,18,23
203:7,8,13 220:18
222:3,12 223:4,14,
19,24 224:13,17
235:10,14 244:16

**overpaid** 58:16
381:16

**overpayment**
381:20 390:13

**overpayments**
58:22 379:22 380:3
389:4,12

**overruled** 17:15

**overseeing** 26:10
86:22 230:11

**oversight** 257:15

**overspeak** 115:16
252:3

**owe** 375:15

**owed** 125:8 160:10
161:8 178:18,23
185:6,16 186:9
199:12 204:12,25
205:13 212:18
275:13 297:17
308:20 310:17
358:21 380:3

**owing** 50:3 211:11
212:10 223:6 234:23
285:18

**owned** 15:6 16:7
17:24 42:8,16,24
43:3,13 273:17

**owner** 272:24 281:25
282:3

**P**

**p.m.** 150:24,25 151:3
174:6 224:23,24
225:2 266:5,6,8
325:7,8,10 349:6,7,9
372:14,15,17 395:10,
11

**Pachulski** 3:8 9:4
10:20 72:9 166:19

**package** 229:10,20,
22 230:2,12,23
232:6,8 233:3

**packages** 231:15
232:20

**pages** 214:11,17

**paid** 50:2 56:18
167:10 221:7 277:4,
8,20 283:23 327:22
330:19 331:4 333:16
336:9,11 355:19
356:23 365:4 394:9

**paper** 288:21 293:13,
20 296:12,16

**paragraph** 92:17
118:11 119:20 121:9
124:15 126:9 134:11
140:18 142:22 203:6
216:25 221:24 222:7,
9,10,14,16,18 223:9,
15

**paragraphs** 117:23
118:6

**part** 42:9,17 43:15
50:18 51:11,16,21
52:12,19,23 53:12
58:17 85:5 88:12,14,
22 90:21 91:14 93:22
103:22 105:9 116:13
117:20 125:12 142:9,
11 148:4 149:12
156:24 169:14,19
175:3 176:23 179:11
193:17 200:16
210:21 213:16
214:19 238:8 240:17
245:19 254:20
274:17 282:4 286:2
288:19 326:21
330:17 365:2 366:23

367:24 386:9,10

**participants** 8:17

**participate** 168:13
218:23 219:2 362:21
380:5

**participated** 87:25
137:20

**participating** 191:9
259:8

**participation** 86:23

**parties** 7:15 9:25
85:7,12 100:14,22
101:6,23 103:4
376:13

**partner** 9:9

**partners** 31:8,12,15,
18 32:4 370:16

**partnership** 121:11
122:6 131:12 132:7

**partnership's**
102:19 103:3 118:12

**party** 17:10 100:19
101:18 102:20 103:4
321:4 366:22 368:17
385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7
359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4
144:22 161:18
181:15 205:10,19
209:3 234:22 282:8,
16 302:23 318:14
327:13 332:6,13
344:19 355:18 356:2,
13 357:3,13 366:13
374:25 393:23

**payable** 171:12
174:15 190:6 202:18,
22 220:5 222:2,17
327:21 329:17
330:10,12,20 331:4

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 170-23   Exhibit 23   Filed 12/29/21   Page 133 of 213   PageID 55047

Index: payee..president

333:7 334:14

**payee** 140:21 142:25 216:22

**paying** 288:14,16 326:23 333:9 338:17 346:21 355:4,8 357:4

**payment** 56:5,21 57:4,6,12,18,25 58:6, 10,12 59:14,16,20,22 60:3,4,9,11 62:17,25 63:9,15 64:4,9,22 121:11,17,21 122:7, 19,23 162:13,16,17 163:4,6,10,14 164:24 182:16 199:6,11 212:18 331:20 332:24 334:9 335:9 336:12 337:3,25 338:24 339:12,14 340:2,7 342:9 343:4, 20 344:20,24 345:4, 11,17 346:13 348:5 350:7,9,20,23 351:6, 7,14,20,23 356:6,17 358:25 359:2,6,7,15 360:16,22,24 361:18 362:2,5,7,9,12,15,18, 21 363:3,7,10,15,20 364:3,7,25 365:5,9, 14 366:21 379:15 381:23 382:2,9,14,15 383:19 390:6,8,21 391:10,13,20,24 392:6

**payments** 55:16,24 56:8,14 57:2,9 64:14 162:10,24 163:16,21 165:10 167:14 217:15 282:22 288:11,12 328:4 329:16 330:3,4,6,8 334:23 335:3,19,21, 22 336:23 337:9,15, 21 355:19 356:8 357:2,10,13 358:7,21 359:9,10,20,25 360:6,10,15 361:7,23 362:4 365:14,16 377:12,17,22 378:8, 9,17,24 379:7 380:23 381:3,6,11,18 382:6 383:4,5,23 384:2,4,6, 7 387:24 388:14 390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4 89:3 146:4 170:24 237:5 275:9,20,21 279:23 291:21 293:7 294:3 319:16 351:12 372:19

**percent** 18:2,4 86:15 108:23 109:19 110:8 260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5 130:19 189:4 197:19 268:19 298:8

**perfectly** 144:3 223:2 348:18

**performed** 48:5 246:11

**performing** 114:7 219:4

**period** 25:12 39:9,14 40:24 90:15 93:14 95:15 105:18 120:9 135:21 169:5 203:20 218:21 219:6,16 221:15 226:18 231:15 242:17 243:13 247:22 265:2 321:22 380:15,16

**periodic** 228:13 241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7 44:21 57:7 79:9 86:21 87:6,7 114:2,4 116:14 155:16 167:20 191:18 259:22 291:21 292:22

**personal** 79:22 80:10 97:15 375:11

**personally** 62:20 64:3 85:23 89:11 95:4 97:9 101:22 237:4 255:20,24 275:15 296:21 303:23 304:18,22 306:12 317:21 370:11

**personnel** 237:16 318:12 333:22 359:18,21 360:13,23 363:3

**pertaining** 65:17

**petition** 21:9 70:11 84:11 235:10,14 241:20 263:20 310:15 386:5

**phone** 68:6 70:3 290:25 392:23 393:2, 5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16 294:4 296:12,16 299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6 112:16 122:18 166:2 260:7 272:13 278:16 297:14,16 326:4,10, 12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20 366:5 367:6 386:9,18

**play** 85:23 153:11 168:16 184:2 340:9

**played** 86:3,6,17 335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16, 17

**plural** 314:3

**point** 78:9 87:2,6,7 114:2,4 157:16 166:9 190:16 254:11 255:3, 7 261:6 313:7,20 321:13 326:6 337:12 344:9 375:23 376:11 380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10 386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5 17:22 19:13,16,19 112:23

**portions** 12:10

**position** 37:9 122:3 184:14 193:3,6,9 274:15 280:11 361:14

**positions** 38:24 172:25 173:5 183:6 184:10,18 192:16

**possession** 45:25 113:9 132:11

**possibilities** 29:19 371:23

**possibly** 213:7 314:12

**post** 92:12 184:13, 14,18 192:15,24 193:7,8 275:24

**pot** 366:5 367:6 386:9,18

**potential** 250:20 357:4 366:3,19 369:16 371:7,9

**potentially** 113:5 249:6 250:12,13,14, 16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13 89:20,24,25 90:4

91:11 97:7 98:7,12 106:14 146:9,24 150:13 230:25 231:2, 3,22,24 233:5 299:4, 5 337:4 356:13 369:2,7 371:6,15 374:15 377:21

**pre-petition** 226:18

**precisely** 205:21 298:16

**prefix** 268:15

**premarked** 91:19 104:23 197:15 216:5 236:16

**preparation** 137:21 230:11 259:9

**prepare** 123:17 204:23 226:9 229:6, 21 235:19 236:25 237:3,5,13 241:11 255:24 377:22 378:16

**prepared** 227:5,20, 24 228:15 229:2,4,9 230:3 232:20 237:8 239:17 241:25 242:3 255:20 284:19 317:14 319:5 373:2 376:18

**preparer** 256:4 259:4,5,23

**preparing** 137:10 164:9 232:5,7 241:12,15,16 254:9 264:10

**prerogative** 253:7

**present** 4:23 90:23 180:15 191:19 283:14

**presentations** 368:7,16,18

**presented** 86:10 113:14 117:10 161:1 296:11,16

**presents** 12:20

**president** 14:16 271:23 272:24

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-20    Filed 12/23/21    Page 134 of 213    PageID 55048
Exhibit 20    Page 123 of 131

Index: presume..question

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhouseco opers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

**83**:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

**175**:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

**226**:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

**Q**

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 79-23   Exhibit 23   Filed 01/09/24   Page 135 of 213   PageID 55049

Index: questioned..refer

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

### R

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 173-20    Exhibit 20    Page 125 of 213    Page 136 of 213    PageID 55050

Index: reference..responsibility

31:14 32:7,17,24
33:19 44:2,10 54:10,
24 68:24 79:17 84:13
95:11 175:2 186:24
203:6 279:24 329:3

**reference** 92:17
103:12 200:12 202:6
222:3,10 223:9
238:20,24 260:21

**referenced** 132:14
186:25

**referred** 84:4 91:15
123:24 143:7 169:21
186:7,20 223:15
279:20 366:5

**referring** 33:16
50:17 75:24 76:6
118:8 163:5 187:11
199:25 223:11
226:15 281:5 314:2
316:3

**refers** 170:4

**reflected** 13:14 75:5
175:16 181:15 235:4
240:9

**refresh** 24:24 105:12
131:15 192:20 221:4
223:22 227:10
367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement**
279:17 325:19,23
379:20 388:16

**relate** 130:6

**related** 59:23 60:4
90:25 100:13,19,22
101:6,18,23 102:19,
20 103:3,4 105:7
131:17 138:5,10
145:9 167:14 208:25
280:22 281:3 284:2
366:22 368:17
376:13

**relates** 76:14 113:6,
18 130:11 211:24

**relating** 131:2
138:19

**relation** 27:21 30:10,
13 35:6 41:18 58:21
112:3 125:9 163:21
172:25 176:17
184:11,18 191:16
264:13 385:18

**relationship** 374:3

**relationships**
100:13 102:20,21
103:4

**relative** 192:16

**relayed** 188:8 206:4
342:12

**relaying** 206:3
207:24 344:18

**release** 329:6 330:8

**relevant** 88:13
208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3
237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23
203:8

**remaining** 119:10
223:25

**remember** 59:8 70:9
71:2,3 80:22,23,24
87:23 95:19 102:9
122:25 123:2,19
124:16,24 127:6,14
128:6,7 129:11
131:19 147:15
162:22,24 163:4
165:6 166:3,7 172:17
174:4 187:13,19,21
188:15 189:18 194:7,
15,24 195:4 200:6,15
234:4 236:12 250:3
253:13,14,23 254:15,
17 274:12 277:16
282:17 284:12,17,23
286:3,22 291:21

293:12 296:9 299:12
300:10,12 302:16
309:11 313:22 316:3
317:5 319:4,7 320:2,
5 323:7 324:4,8
326:6 333:25 339:8
340:21 342:14
344:15,18 345:25
346:3,4 351:11
357:17 361:18 364:9,
12,14 365:10,25
377:14 387:25
389:17,18 390:22,23
392:4,22

**remembering**
289:17

**remind** 72:19 77:17
391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14
8:18 12:20 299:6,9

**rendered** 204:5
233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14,
16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11,
15,25 205:12 211:11
212:10 304:23

**repeat** 17:19 38:7
45:11 46:21 48:20
146:21,22 249:25
269:21 270:24
336:17,18 339:21

**report** 5:25 14:13,21
19:12 26:21 88:2,6,
16 89:12 98:18 105:8
106:4,8,16 110:25
111:21 112:7,12,25
115:20 116:5,17,21

117:2 119:19 131:5,
11 133:12 134:7
135:6 137:5,7,10,12,
25 138:3,4,9,13,19
166:8,11 178:13
219:13,15 226:19
227:4 228:7 229:2,4
232:12 256:15 257:4
258:20,24 259:5,23

**reported** 19:7,10,17,
21,25 20:23 21:2
119:17 120:23
226:10 240:15
258:14

**reporter** 7:12 8:24
10:10 209:6 268:8,18
301:20

**reporting** 7:6 8:22,
25 20:9,13,17,23
21:4 87:22 91:2
114:17 230:12
231:14 232:6,19

**reports** 89:22 113:18
115:2 143:8 171:5
196:22 226:14,16
229:6 255:18 256:20
257:19 259:9,13,14

**represent** 9:25 10:4,
22 133:4 267:23

**representation** 5:17
91:16 94:21 95:5,16
96:9,18,22 97:2,8,13,
19,25 98:9 99:2
103:7,17,23 104:8
106:11,15 130:8,9
135:25 136:6,14
214:23 215:9 262:16,
22,25 295:17

**representations**
92:21 98:19,24
136:16,23,24 262:24

**representing** 9:11,
14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25
172:8 196:25 291:15
379:7

**requested** 196:21
362:18 363:7

**requests** 85:18
373:3 387:18

**require** 63:16

**required** 56:9 94:5
96:17 97:19,20,21,25
98:3 127:18,20 340:2
390:5

**requires** 96:25

**reserve** 245:2,6
260:24 261:4,8

**reserved** 244:22
245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18
383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13,
18,23 35:2 37:4 39:7
56:15 112:17 134:17
182:7 212:5 261:8,16
273:12 333:8 335:9
339:12 340:6 365:22
383:18 385:17
393:21

**respond** 174:25

**responded** 174:8
182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24
174:8,13 176:4
178:6,18 182:20,24
185:5 189:6 190:8
194:17,18 195:9,13
205:6 210:20 267:22
350:11

**responses** 81:4
184:3

**responsibilities**
25:18,23 28:10 31:2,
4 38:21 219:20

**responsibility** 26:6,
10 88:5,9 115:23
116:2,3 258:11

Case 21-03007-sgj Doc 106-3 Filed 12/01/21 Entered 12/01/21 14:55:44 Desc
Case 3:21-cv-00881-X Document 73-30 Page 126 of 243 Page 137 of 213 PageID 55051

Index: responsible..Sharp

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,17 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

**S**

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 353:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-30    Exhibit 30    Page 170 of 431    Page 138 of 213    PageID 55052

Index: sheet..stipulate

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 213:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

116:24 138:22 141:12 159:13 231:20

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:19 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

268:21 304:16

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 70-20   Exhibit 20   Page 129 of 131   Page 139 of 213   PageID 55053

Index: stipulation..thing

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23
77:11,22 81:21,22
106:2 155:19,22
157:14 215:6 220:2

**stopped** 231:16
294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13
8:23

**stressful** 292:24

**strike** 114:12 246:13
247:21 248:5,22
250:6 252:23 272:13
291:2 307:16 310:7
343:24 346:16
364:22 372:8 393:4

**string** 5:21 172:3
183:22

**structure** 87:22
112:13

**stuff** 156:6 157:5
252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8
82:16,21 83:6,10,14
109:24,25 124:14
139:5,11 168:10
277:5

**subpoena** 11:6
16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14
395:16

**subscribing** 281:19

**subsequent** 130:3,
10,21 131:2 133:8
134:19,22 138:5,9

143:9 242:22 262:14
263:4 274:12 370:24

**subsequently**
244:22

**substance** 72:22
73:15,19 74:6 151:5,
8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22
32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24
374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14
279:12 280:4 296:8

**summarized** 274:21

**summarizing**
188:13

**summary** 5:23
237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental**
218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4
275:23

**surprised** 352:9
356:11 376:22
394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25
324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

———————

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14
120:12 176:7 208:16
226:17 239:23
240:23 323:19
348:24

**talk** 89:2 157:16
164:15,20 233:19
279:2 293:7 325:13
350:16 387:17
388:23 395:4

**talked** 100:3 113:4
130:8 151:11 162:14,
15 187:21,23 188:4,7
190:15 217:14
222:23 249:14
253:16 268:3 292:11
311:15 349:19 351:5
378:5 379:18 389:2
391:9 394:6

**talking** 40:5 59:13,16
75:14 76:20,23
77:12,22 89:15
101:23 157:14
162:16 208:24 222:6,
8 231:19 259:25
264:19 323:6 341:23
350:13 351:11,13
352:16,17 354:18
368:18 379:25
383:14

**talks** 58:19 100:11
350:6

**task** 291:14

**tax** 280:7 354:22,25
358:11

**taxing** 353:5

**team** 53:4 86:8,12
87:12,14,22 88:21,23
89:2,8 112:10,12
113:8,24 116:7
137:18,20 147:14,18,
19,24 148:2,4,5
149:7,11,14,15,24
150:19,20 188:4,6
200:17 219:3 237:7
255:25 257:8,12,17,
23,25 258:4,7,12
259:11 272:23
290:11,13,14,15
291:8,17 292:5
309:21 311:24
312:13 335:11 351:7
367:10 368:3

**teams** 116:10 337:6
354:10

**tech** 320:20

**technologically**
320:12

**telephone** 191:15
290:19 342:23
344:12,14 392:22

**telling** 71:23 79:10
125:4 166:18 181:8,
14 182:14 207:24
246:21 251:4 253:9
285:5 287:8 317:5

**tendered** 45:2 55:18
57:19 58:3 60:13
63:3 64:6,15,23

**tenure** 39:20 40:2
86:3 94:4 102:11
114:5 230:14,18
368:25 369:11

**term** 28:19 33:13
41:17 44:16 45:14
51:17 53:13 54:2
58:14 69:8 71:20
75:23 79:8 99:16
170:8 173:2 186:21
315:14,15 333:14
362:14 364:3 369:16
383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8,
9 380:21

**terms** 33:21 65:23
66:2,6 69:22 75:8
76:2 78:25 79:23
80:11 83:16,20
319:8,12,14 336:7

**Terrestar** 145:9
273:12,18,19 274:7
384:20 385:9,14,18

**testified** 10:12 68:18
80:7 155:5 156:11
179:7 201:23 206:10,
18 211:14 253:2
256:24 259:10
261:10 269:23 270:2,
13 282:24 283:6
289:3 309:20 312:20
313:3 314:16 318:8
319:10 320:8 351:2
357:8 362:24 378:4,
20 379:3 380:12
388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22
302:14 387:22

**testimony** 16:11,19
20:7,15 29:5 72:22
289:17 301:13 318:5
370:19 387:25
391:11

**Texas** 3:16,24 4:8
8:14

**Thanksgiving**
329:20,22

**Thedford** 171:4
172:3,11,24 173:5
174:20 176:3,16
178:6 182:23 186:20
192:5 198:19 210:10,
13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5
199:23 215:17 320:2
357:3

Case 21-03007-sgj   Doc 106-3   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 170-30   Exhibit 30   Page 129 of 131   Page 140 of 213   PageID 55054

Index: things..unable

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

**U**

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

Index: unaware..Wednesday

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

Case 21-03007-sgj    Doc 106-3    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-20    Page 130 of 431    Page 142 of 213    PageID 55056

Index: week..zoom

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

## Y

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16 91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

## Z

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

# EXHIBIT 4

Page 283

1            DONDERO - 10/29/21

2        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION
      ------------------------------
4    IN RE:

5                    Chapter 11
     HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                 19-34054-SGI11
7
         Debtor.
8    ------------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
         Plaintiff,
10   vs.                    Adversary
                         Proceeding No.
11   JAMES D. DONDERO,          21-03003-sgi

12           Defendant.
     ------------------------------
13

14        REMOTE VIDEOTAPED DEPOSITION OF

15         JAMES DONDERO - VOLUME 2

16           October 29, 2021

17

18

19

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No. 201874

Page 284

```
1              DONDERO - 10/29/21
2
3
4          October 29, 2021
5          10:21 a.m.
6
7
8
9       Remote Deposition of JAMES DONDERO, held
10   before Susan S. Klinger, a Registered Merit
11   Reporter and Certified Realtime Reporter of the
12   State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 285

```
1              DONDERO - 10/29/21
2   A P P E A R A N C E S:
3   (All appearances via Zoom.)
4   Attorneys for the Reorganized Highland Capital
5   Management:
6       John Morris, Esq.
7       Hayley Winograd, Esq.
8       Gregory Demo, Esq.
9       PACHULSKI STANG ZIEHL & JONES
10      780 Third Avenue
11      New York, New York 10017
12
13   Attorneys for NexPoint Advisors, LP and
14   Highland Capital Management Fund Advisors,
15   L.P.:
16      Davor Rukavina, Esq.
17      Thomas Berghman, Esq.
18      MUNSCH HARDT KOPF & HARR
19      500 North Akard Street
20      Dallas, Texas 75201
21
22
23
24
25
```

Page 286

```
1              DONDERO - 10/29/21
2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3   and HCMS:
4       Deborah Deitsch-Perez, Esq.
5       Michael Aigen, Esq.
6       STINSON
7       3102 Oak Lawn Avenue
8       Dallas, Texas 75219
9
10   Attorneys for Dugaboy Investment Trust:
11      Douglas Draper, Esq.
12      Michael Landis, Esq.
13      HELLER, DRAPER & HORN
14      650 Poydras Street
15      New Orleans, Louisiana 70130
16   Attorneys for Marc Kirschner as the trustee for
17   the litigation SunTrust:
18      Deborah Newman, Esq.
19      QUINN EMANUEL URQUHART & SULLIVAN
20      51 Madison Avenue
21      New York, New York 10010
22   Also Present:
23      Dan Elms
24      Aaron Lawrence
25      Patricia Jeffries, Pachulski Stang
```

Page 287

```
1              DONDERO - 10/29/21
2              I N D E X
3   WITNESS                      PAGE
4   JAMES DONDERO
5   EXAMINATION BY MR. MORRIS            289
6              E X H I B I T S
7   No.                          Page
8   Exhibit 1  Original Complaint        466
9   Exhibit 2  NexPoint Complaint        408
10  Exhibit 3  HCMS Complaint            433
11  Exhibit 4  Letter, 12/3/20           464
12  Exhibit 6  Term note                 446
13  Exhibit 15 NexPoint Advisors Answer  380
14  Exhibit 16 HCMS's Answer             362
15  Exhibit 17 HCRE's Answer             377
16  Exhibit 31 Answer to Complaint       354
17  Exhibit 35 Incumbency Certificate    309
18  Exhibit 37 Incumbency Certificate    323
19  Exhibit 47 NexPoint 30(b)(6) notice  345
20  Exhibit 48 HCMS 30(b)(6) notice      353
21  Exhibit 49 HCRE 30(b)(6) notice      354
22
23
24
25
```

Page 288

DONDERO - 10/29/21

1          PROCEEDINGS
2       P R O C E E D I N G S
3          VIDEOGRAPHER:  This marks the
4  beginning of Video 1 in Volume 2 of the
5  deposition of James Dondero in the matter
6  In Re: Highland Capital Management, L.P.
7  Today's date is October 29, 2021.  The time
8  on the video monitor is 10:21 a.m.
9          Will the court reporter please swear
10  in the witness.
11          JAMES DONDERO,
12  having been first duly sworn, testified as
13  follows:
14          MR. MORRIS:  Deborah, would you like
15  to make a statement?
16          MS. DEITSCH-PEREZ:  I didn't know if
17  you wanted appearances first.  Sure.  This
18  is Deborah Deitsch-Perez from Stinson.  I'm
19  counsel for Mr. Dondero, Nancy Dondero,
20  HCRE and HCMS in this deposition.
21          I want to apologize for everybody
22  that we're starting late.  Mr. Dondero was
23  under the weather.  It is -- he has taken
24  something, so he should not have to leave
25  the deposition, but if at any point he

Page 289

DONDERO - 10/29/21

1  looks green to me, I will ask that we stop
2  and reconvene when he is not feeling
3  nauseous.
4          MR. MORRIS:  All right.  I would
5  like to just begin here.  We have counsel
6  on the line for all of the defendants, we
7  have counsel for the plaintiff, and we have
8  counsel for the Highland Litigation Trust,
9  and I think that that is everybody who
10  is -- supposed to be here, so I would
11  like to just begin.
12          EXAMINATION
13  BY MR. MORRIS:
14     Q.  Mr. Dondero, can you hear me okay?
15     A.  Yes.
16     Q.  Okay.  And are you feeling well
17  enough to begin today's deposition?
18     A.  Yes.
19     Q.  Okay.  I understand that you are not
20  feeling well.  And I want you to know that I do
21  not want to proceed with this deposition unless
22  you believe that you are physically and
23  mentally able to participate to the best of
24  your ability.  Okay?  Do you understand that?
25

Page 290

DONDERO - 10/29/21

1     A.  Yes.
2     Q.  So if at any time you don't feel
3  like you can continue, I would rather adjourn
4  to one day next week to complete the deposition
5  rather than forcing you to do something that
6  you don't believe you're capable of doing.
7  Okay?
8     A.  Yes.  Yes.  I did throw up twice
9  last night.
10     Q.  Okay.
11     A.  I imagine we could go for -- let's
12  shoot for four hours today, you know, maybe --
13  maybe five, I don't know, but if we don't
14  finish --
15     Q.  I don't want to --
16     A.  -- we will do the rest next week.
17     Q.  Okay.  I don't want to put an
18  arbitrary time on it.  Let me tell you if you are
19  unable to continue.  Okay?  Is that fair?
20     A.  Yes.  That is my estimate at this
21  point.
22     Q.  Okay.  You founded Highland Capital
23  Management, L.P.; correct?
24     A.  Yes.

Page 291

DONDERO - 10/29/21

1     Q.  And we are going to refer to that
2  entity and that entity only today as Highland;
3  is that okay?
4     A.  Yes.
5     Q.  When did you found -- when did you
6  create Highland?
7     A.  '94.
8     Q.  And did you serve as Highland's
9  president from 1994 until on or around January
10  9th, 2020?
11     A.  Yes.
12     Q.  Did -- can you describe in your own
13  words what the business of Highland was while
14  you were president?
15     A.  We were largely below investment
16  grade, credit strap, and we diversified over
17  the years to become more of an alternative
18  asset manager in a variety of formats.
19     Q.  And --
20          MS. DEITSCH-PEREZ:  I'm sorry, John,
21  one sec.  This was set up by someone a lot
22  shorter than Mr. Dondero.  Let me just take
23  one minute to adjust it.
24          MR. MORRIS:  May I proceed, Deborah?
25

Page 292

1           DONDERO - 10/29/21
2        MS. DEITSCH-PEREZ: (Nods head.)
3     Q.  Okay. Mr. Dondero, at its peak,
4  what is the -- the largest value of assets that
5  Highland had under management while you were
6  president?
7     A.  35 billion.
8     Q.  And do you recall what year that
9  was?
10    A.  Not exactly.
11    Q.  Was it before the 2008 financial
12 crisis?
13    A.  Yes.
14    Q.  Okay. So you were the president of
15 Highland for about 25 years; is that right?
16    A.  Yes, 25, 26, whatever.
17    Q.  And do you consider yourself to be
18 expert in the area of money management?
19    A.  Yeah, on the things that we focus
20 on.
21    Q.  You are a sophisticated investor;
22 right?
23    A.  Yes. I would believe I'm
24 categorized as such.
25    Q.  And you are a sophisticated money

Page 293

1           DONDERO - 10/29/21
2  manager; is that fair?
3     A.  Yes.
4     Q.  And you manage money on behalf of
5  thousands of people; isn't that right?
6     A.  Yes.
7     Q.  And as a general matter, you know
8  how to read and understand balance sheets,
9  don't you?
10    A.  Yes.
11    Q.  You have signed promissory --
12 promissory notes before, haven't you?
13    A.  Yes.
14    Q.  Is it fair to say you have signed
15 hundreds of promissory notes during the 25-year
16 period that you were the president of Highland?
17    A.  No.
18    Q.  Is it fair to say that you signed
19 dozens of promissory notes during the time that
20 you were president of Highland?
21    A.  Yeah, dozens is probably fair.
22    Q.  Okay. And is it fair to say that
23 the aggregate principal amount of the
24 promissory notes that you signed while you were
25 president of Highland likely exceeded

Page 294

1           DONDERO - 10/29/21
2  $200 million?
3        MS. DEITSCH-PEREZ: Objection to the
4     form.
5     A.  I don't have a basis for knowing
6  that.
7     Q.  You do know that it is more than
8  $100 million, don't you?
9     A.  No.
10    Q.  Do you owe today Highland Capital
11 Management Services more than $75 million?
12    A.  I don't know what the amount is. I
13 don't believe it is that much.
14    Q.  Are the obligations to Highland
15 Capital --
16       MS. DEITSCH-PEREZ: Hold on. Hold
17    on. My connection just disappeared.
18       MR. MORRIS: Okay.
19    MS. DEITSCH-PEREZ: Okay, I'm back.
20    Q.  Okay. Did the -- did the
21 obligations that you have to Highland Capital
22 Management Services, are they reflected in
23 promissory notes?
24       MS. DEITSCH-PEREZ: Could you repeat
25    that question?

Page 295

1           DONDERO - 10/29/21
2        MR. MORRIS: Sure.
3     Q.  Mr. Dondero, you borrowed money from
4  Highland Capital Management Services; correct?
5     A.  I'm sorry, it sounds like at first
6  you were asking me, did Highland Capital
7  Services borrow money from Highland. Now
8  you're asking me if I borrowed money from
9  Services?
10    Q.  Yeah, let me -- let me rephrase the
11 question, sir, because if it is not clear, that
12 is my fault, and I apologize.
13       Did you -- have you borrowed money
14 from Highland Capital Management Services?
15    A.  I believe so.
16    Q.  Okay. Do you know the aggregate
17 principal amount that is outstanding today,
18 ballpark?
19    A.  No.
20    Q.  Are the obligations that you have to
21 Highland Capital Management Services reflected
22 in promissory notes where you're the maker and
23 Highland Capital Management Services is the
24 payee?
25    A.  Please repeat that question.

Page 296

DONDERO - 10/29/21

1    Q.   Are you the maker on promissory
2    notes in favor of Highland Capital Management
3    Services, Inc.?
4    A.   I don't know.  I believe -- I
5    believe so, or I believe I have in the past,
6    but I don't know.
7    Q.   Do you have any -- any estimate as
8    to how much money you owe Highland Capital
9    Management Services, Inc. today?
10        MS. DEITSCH-PEREZ:  Asked and
11        answered.
12   A.   No.
13   Q.   Can you say if it is more or less
14   than $50 million?
15   A.   I don't know.
16   Q.   Can you say if it is more or less
17   than $25 million?
18   A.   I don't know.
19   Q.   As a general matter, is it fair to
20   say that you know how to read and understand
21   promissory notes?
22        MS. DEITSCH-PEREZ:  Object to the
23        form.
24   A.   In general, yes.

Page 297

DONDERO - 10/29/21

1    Q.   Okay.  When you were in control of
2    Highland, you personally decided who was hired
3    at that company; is that fair?
4    A.   Sometimes, in senior positions.
5    Q.   Okay.  Did your duties as president
6    of Highland include being familiar with the
7    debts and obligations that were owed to
8    Highland?
9         MS. DEITSCH-PEREZ:  Object to the
10        form.
11   A.   I mean, generally.
12   Q.   Okay.  Did you ever do anything to
13   familiarize yourself with the debts and
14   obligations that were owed to Highland?
15   A.   Are you referring to the affiliated
16   notes or --
17   Q.   Sure.
18   A.   -- or what -- what are --
19   Q.   I was -- I was asking -- I
20   apologize.  I don't mean to step on your words.
21   A.   No, you just -- because I don't
22   think Highland had a lot of other obligations
23   due from other parties, and the affiliated
24   notes in aggregate were always de minimis to

Page 298

DONDERO - 10/29/21

1    Highland than now, at any time.
2    Q.   It is your -- it is your position
3    that the affiliate notes to Highland were de
4    minimis in amount?
5    A.   Yes.
6    Q.   And how do you define de minimus for
7    that purpose?
8    A.   I believe the balance sheet of
9    Highland today for the last three years, four
10   years, five years has been between 5 and
11   $600 million.  I believe the notes have never
12   been more than 8 or 10 or 12 percent of that
13   number.
14   Q.   And you believe that 8 or 10 or
15   12 percent of Highland's asset base you
16   would -- you would define as de minimis?
17   A.   Yes.
18   Q.   Okay.  As -- as president of
19   Highland, did you ever do anything to
20   familiarize yourself with the number and amount
21   of affiliate loans that Highland carried on its
22   books and records?
23   A.   Not that I can recall.
24   Q.   Was there anybody at Highland who

Page 299

DONDERO - 10/29/21

1    was charged with the responsibility of knowing
2    the number and amount of affiliate loans that
3    Highland carried on its balance sheet?
4    A.   Sure.
5    Q.   Can you identify the people who were
6    responsible for that?
7    A.   The people in accounting responsible
8    for tracking assets and liabilities in
9    preparing all the audited financial statements
10   every year and the quarterly unaudited
11   financial statements that were prepared and the
12   monthly operating reports.
13   Q.   Can you -- can you name any names of
14   the people who had the responsibilities that
15   you just described?
16   A.   I think it changed regularly, but it
17   would have been people in Frank's group in
18   accounting.
19   Q.   Did Frank have any responsibility
20   for knowing and understanding the affiliate
21   loans that Highland carried on its balance
22   sheet?
23   A.   Sure.  I -- as CFO he had to sign
24   off on the audited financials and rep letters

Page 300

DONDERO - 10/29/21

2 and -- yes.
3    Q.    And can you -- can you identify the
4 name of any person in the accounting group in,
5 let's say, the three years prior to the
6 bankruptcy who had responsibility for knowing
7 and understanding the scope of affiliate loans
8 that Highland carried on its balance sheet?
9    A.    No, I would just be speculating but
10 it would be -- the senior people in Frank's
11 group would be responsible for the financial
12 statements.
13    Q.    Are you able to name the people, the
14 senior people in Frank's group in the couple of
15 years prior to the bankruptcy?
16    A.    Yes, but I don't know -- like
17 David Klos was a senior person, Cliff Stoops
18 was a senior person.  There were a couple
19 up-and-comers below them, but who did the
20 financials -- how Frank assigned the work in
21 his group, I have no idea.
22    Q.    Did you ever ask?
23    A.    No.
24    Q.    Do you have any knowledge as you sit
25 here today who within Frank's group had

Page 301

DONDERO - 10/29/21

2 responsibility for knowing and understanding
3 the affiliate loans that Highland carried on
4 its balance sheets?
5    A.    No.
6    Q.    And to the best of your knowledge as
7 you sit here today, you never personally did
8 anything to know and understand the extent and
9 scope of the affiliate loans that Highland
10 carried on its balance sheet; is that right?
11    A.    Correct.
12    Q.    Okay.  You appointed Mr. Waterhouse
13 as Highland's CFO; is that right?
14    A.    I think it was appointed and
15 recommended by Patrick Boyce, but I agreed with
16 the selection.
17    Q.    And you --
18    A.    That -- (speaking simultaneously.)
19    Q.    I apologize, are you done?
20    A.    I'm just saying that was a long time
21 ago, and I don't remember the details exactly.
22    Q.    But you had the authority and you
23 used that authority to appoint Frank as CFO;
24 correct?
25        MS. DEITSCH-PEREZ:  There's a lag in

Page 302

DONDERO - 10/29/21

2 the video.  I don't know if it matters, but
3 for a while Jim was frozen.  And I know
4 because -- since there was voice and no --
5 his mouth wasn't moving.  So let's just --
6 if the videographer sees there is a
7 problem, please let us know.
8    Q.    I --
9    A.    Yes.  I'm sorry, could you just
10 repeat the question regarding Frank, please?
11    Q.    Sure.
12        As the president of Highland, did
13 you have the authority and did you exercise
14 that authority to appoint him as Highland's
15 CFO?
16    A.    Yes.
17    Q.    Okay.  Do you recall when you
18 appointed Mr. Waterhouse CFO of Highland?
19    A.    No.
20    Q.    Was it more than five years prior to
21 the bankruptcy?
22    A.    Yes.
23    Q.    As the president -- during the time
24 that you served as president of Highland, did
25 you believe that Mr. Waterhouse fulfilled his

Page 303

DONDERO - 10/29/21

2 duties as chief financial officer?
3    A.    Yes.
4    Q.    Can you recall anything that
5 Mr. Waterhouse did in his capacity as
6 Highland's CFO that did not comport with your
7 expectations?
8    A.    I think we will talk about some of
9 those today.
10    Q.    Okay.  Do you have any reason to
11 believe that Mr. Waterhouse ever breached his
12 duties to Highland during the time that you
13 served as president?
14        COURT REPORTER:  We can't hear you
15 speaking.
16    Q.    We haven't heard any portion of your
17 answer, Mr. Dondero.
18        MR. MORRIS:  I don't know if people
19 can -- can hear, but I cannot hear
20 Mr. Dondero.
21        COURT REPORTER:  I can't either.
22        MR. MORRIS:  Yeah, Deborah, can you
23 speak, please.
24        COURT REPORTER:  They're on the same
25 speaker.

Page 304

DONDERO - 10/29/21

1
2   VIDEOGRAPHER: Do we want to go off
3   the record?
4   MR. MORRIS: Yes, please.
5   VIDEOGRAPHER: Off the record,
6   10:41.
7   (Recess taken 10:41 a.m. to 10:47 a.m.)
8   VIDEOGRAPHER: Back on the record,
9   10:47.
10   Q.   Okay.  Let me just ask the question
11   again so the record is clean, Mr. Dondero.
12        Do you have any reason to believe as
13   you sit here right now that Mr. Waterhouse ever
14   breached his duties to Highland during the time
15   that you served as president?
16        MS. DEITSCH-PEREZ:  Asked and
17   answered.
18   A.   Yeah, I think I did ask and answer
19   that.  Again, not intentionally, not
20   maliciously.  I am -- I guess things we're
21   going to talk about today are for periods of
22   time after I was president, so...
23   Q.   Right.  That is going to be the next
24   question that I ask.  But to be clear -- I just
25   want to have a clear record -- during the time

Page 305

DONDERO - 10/29/21

1
2   that you were president, do you have any reason
3   to believe that Mr. Waterhouse breached his
4   duties to Highland?
5        MS. DEITSCH-PEREZ:  Asked and
6   answered.  This is the third time.
7   A.   No.
8        MR. MORRIS:  It is actually not.
9   Q.   But thank you, Mr. Dondero.  I
10   appreciate that.
11        After you ceased to be president of
12   Highland, do you have any reason to believe
13   that Mr. Waterhouse breached his duties to
14   Highland?
15   A.   Breached his duties to -- I don't --
16   I don't know if it is -- I don't want to -- I
17   don't want to make a judgment overall.  When we
18   talk about the notes we can make conclusions
19   then.
20   Q.   All right.  But you're not able to
21   tell me in response to my question whether you
22   believe today that Mr. Waterhouse breached his
23   duties to Highland after the time that you
24   served as president?
25        MS. DEITSCH-PEREZ:  Object to the

Page 306

DONDERO - 10/29/21

1
2   form of the question.
3   A.   I don't want to comment off the top
4   of my head, but I've highlighted that we will
5   discuss it around the note issue.
6   Q.   Okay.  You are familiar with an
7   entity called Highland Capital Management Fund
8   Advisors, L.P.; is that correct?
9   A.   Yes.
10   Q.   And we're going to refer to that
11   entity as HCMFA.  Is that okay?
12   A.   Yes.
13   Q.   Do you know who owns HCMFA?
14   A.   I believe it is myself and
15   Mark Okada.
16   Q.   Okay.  And do you have an
17   understanding as to -- as to the percentage of
18   each of your interests, ownership interests in
19   HCMFA?
20   A.   No, and I don't know the entities.
21   I don't know if I own it directly or through
22   Dugaboy.  And I do believe Okada tends to use
23   his trusts, but I don't know the percentages
24   either.
25   Q.   Do you own a -- do you own a

Page 307

DONDERO - 10/29/21

1
2   major- -- withdrawn.
3        Do you directly or indirectly own a
4   majority of the ownership interests in HCMFA?
5   A.   I believe so.
6   Q.   Okay.  And do you control HCMFA?
7   A.   Yes.
8   Q.   And do you know when HCMFA was
9   created?
10   A.   No, I do not.
11   Q.   Do you know if it was before or
12   after 2010?
13   A.   I don't know.
14   Q.   Have you controlled HCMFA since the
15   time it was created?
16   A.   I believe so, but I don't know for
17   sure.
18   Q.   Can you think of any period of time
19   when you didn't control HCMFA?
20   A.   I don't know.  I don't remember the
21   ownership structure prior and I don't remember
22   when it started, so I don't know.
23   Q.   Okay.  I'm asking about control and
24   not ownership.
25        Can you think of any period of time

Page 308

DONDERO - 10/29/21

1
2  when you did not control HCMFA?
3      A.  I don't know.
4      Q.  Okay.  Can you tell me what the
5  nature of HCMFA's business is?
6      A.  It largely housed our mutual funds.
7      Q.  What does it mean to house mutual
8  funds?
9      A.  It managed -- it managed the mutual
10  funds from a portfolio asset side and captured
11  the management fees as the advisor or sub
12  advisor -- I can't remember the structure.  I
13  can't remember if it was the advisor and
14  Highland was the sub advisor or vice versa, but
15  in general, a good portion, or most of the
16  portfolio team that managed the mutual funds
17  was employed at HCMFA.
18      Q.  Do you have a title with HCMFA
19  today?
20      A.  I don't know.
21      Q.  Do you know who the president of
22  HCMFA is?
23      A.  I would believe -- I would -- I
24  would think I am, but I don't know.
25      Q.  Do you know of any title that you

Page 309

DONDERO - 10/29/21

1
2  have at HCMFA today?
3      A.  I know I'm the portfolio manager on
4  a bunch of the funds, one of usually two or
5  three portfolio managers, and I believe I'm the
6  president, but I don't know beyond that.
7      Q.  Okay.  Did Frank Waterhouse serve as
8  treasurer of HCMFA at any point in time?
9      A.  I don't know.  I don't know.  I
10  just -- I don't know.  I don't remember.
11          MR. MORRIS:  Can I ask my -- my
12      colleague to please put up a document that
13      was premarked as Exhibit 35 to see if I can
14      refresh your recollection.
15          MS. DEITSCH-PEREZ:  Is that in the
16      book that you sent over?
17          MR. MORRIS:  No.  She will post it
18      and she will put it in the chat room.
19      Q.  Are you able to see that,
20  Mr. Dondero?
21      A.  Yes.
22      Q.  Can you see that this is an
23  incumbency certificate?
24      A.  Yes.
25      Q.  Do you know what an incumbency

Page 310

DONDERO - 10/29/21

1
2  certificate is?
3      A.  I'm reading it here for a second.  I
4  guess it is an officer statement or signature
5  authority, or some combination thereof.
6      Q.  Is that your signature at the bottom
7  of this document?
8      A.  Yes.
9      Q.  And do you see that this is an
10  incumbency certificate for HCMFA that you
11  signed effective as of April 11th, 2019?
12      A.  Yes.
13      Q.  Do you see that Frank Waterhouse is
14  identified as the treasurer of HCMFA as of that
15  date?
16      A.  Yes.
17      Q.  Does that refresh your recollection
18  that Mr. Waterhouse served as the treasurer of
19  HCMFA?
20      A.  It seems to be an authoritative
21  document, but I didn't have a recollection.
22      Q.  Do you know of anybody else who has
23  ever served as the treasurer of HCMFA other
24  than Mr. Waterhouse?
25      A.  I don't recall.

Page 311

DONDERO - 10/29/21

1
2      Q.  Did you, in your capacity as the
3  person who was in control of HCMFA, appoint
4  Mr. Waterhouse as the treasurer of that entity?
5          MS. DEITSCH-PEREZ:  Object to the
6      form.
7      A.  It appears to me that that's what
8  this incumbency certificate does, but...
9      Q.  Is it fair to say that you knew for
10  at least a few years prior to the petition date
11  that Mr. Waterhouse was simultaneously serving
12  as Highland's CFO and HCMFA's treasurer?
13      A.  No.  I mean, like I said, I don't
14  remember, and a lot of the officers had
15  multiple roles and multiple entities.  I mean,
16  it is not surprising, but I didn't have any
17  recollection.
18      Q.  Are you aware that Mr. Waterhouse
19  served in any capacity in the Highland universe
20  of companies other than as CFO of Highland
21  Capital Management, L.P.?
22      A.  I would -- I would assume he would
23  have a position like this in multiple other
24  entities, but I don't know which ones or what
25  titles he would have off the top of my head.

Page 312

DONDERO - 10/29/21

1    Q.  Is it fair to say, though, that he
2    wouldn't have obtained any of those titles
3    without your knowledge and approval?
4    A.  It is -- it is fair to say he was --
5    he had -- the lawyers or whoever worked on
6    general corporate structuring, Frank was a
7    senior officer in good standing, so they would
8    have used him as appropriate in different
9    things.
10        So to that extent, I guess I approve
11   it, but I sign hundreds of things like this.
12   Would -- you know, would I have been
13   specifically aware or remember -- remember it
14   is a very low likelihood.
15   Q.  Is there any position that
16   Mr. Waterhouse has ever held that you learned
17   about and you objected to on the grounds that
18   you hadn't approved it?
19   A.  No, not that I recall.
20   Q.  Okay.  Do you know if Mr. Waterhouse
21   held any positions with any of the retail
22   funds?
23   A.  I don't know.
24   Q.  He may have, you just don't recall;

Page 313

DONDERO - 10/29/21

1    is that right?
2    A.  That is correct.
3    Q.  And you can't identify any title
4    that Mr. Waterhouse held during the time that
5    you served as Highland's president other than
6    CFO of Highland.  Do I have that right?
7    A.  No, I don't think that is fair.
8    Q.  Okay.
9    A.  I mean -- I mean, he was CFO, but he
10   was other things before he was CFO.  And as we
11   were just saying, he's -- he's treasurer on
12   this incumbency certificate, but I think he
13   might have been on other incumbency
14   certificates, so I think your -- your summary
15   was too narrow.
16   Q.  Okay.  Can you identify any position
17   that Mr. Waterhouse held at the same time that
18   he is CFO of Highland other than treasurer of
19   HCMFA as reflected on this document?
20   A.  I can't recall, but I imagine there
21   to be others.
22   Q.  And to the extent there are others,
23   is it fair to say that you knew at the time
24   that Mr. Waterhouse was serving in more than

Page 314

DONDERO - 10/29/21

1    one role?
2    A.  Yes.
3    Q.  Okay.  And in his capacity as CFO of
4    Highland, did he report directly to you?
5    A.  Yes.
6    Q.  In his capacity as treasurer of
7    HCMFA, did he report directly to you?
8    A.  Yeah, it appears that, yes, that is
9    how it was structured.
10   Q.  Can you think of any position that
11   Mr. Waterhouse ever held in the Highland family
12   of companies where he didn't report directly to
13   you?
14   A.  I can't -- I can't think of any.
15   Q.  Is Mr. Waterhouse the treasurer of
16   HCMFA today?
17   A.  I don't know.  I'm not aware of any
18   changes, nor did I orchestrate any changes, but
19   I don't know for sure.
20   Q.  Can you identify any position that
21   Mr. Waterhouse holds with any former affiliated
22   company of Highland today?
23   A.  Again, I'm not aware of any changes,
24   nor did I orchestrate or precipitate any

Page 315

DONDERO - 10/29/21

1    changes.  With the formation of Skyview, I
2    don't know if there was changes.  I'm not
3    aware.
4    Q.  Have you considered firing
5    Mr. Waterhouse from any of the positions that
6    he holds with any of the companies that were
7    formerly affiliated with Highland?
8    A.  No.
9    Q.  As the president of HCMFA --
10   withdrawn.
11       As the person who was in control of
12   HCMFA, did you have any responsibility for
13   being familiar with HCMFA's debts and
14   obligations?
15   MS. DEITSCH-PEREZ:  Object to the
16   form.
17   A.  I don't know.
18   Q.  Did you ever do anything in your
19   capacity as the person in control of HCMFA to
20   familiarize yourself with HCMFA's debts and
21   obligations?
22   A.  Not during -- I mean, not prior to
23   bankruptcy.
24   Q.  So before the bankruptcy, you didn't

Page 316

DONDERO - 10/29/21

1
2  take any steps to familiarize yourself with
3  HCMFA's debts and obligations. Do I have that
4  right?
5      A.  Correct, not specifically.
6      Q.  Okay. Who was responsible for
7  knowing and understanding the scope and extent
8  of HCMFA's debts and obligations?
9      A.  That would have fallen on Frank and
10  his group.
11      Q.  Okay. Do you have an understanding
12  as to who was authorized to incur obligations
13  on behalf of HCMFA?
14      A.  I mean, beyond -- beyond due course,
15  I struggle to see why it would be anybody other
16  than me, but I don't know.
17      Q.  Do you know if Mr. Waterhouse was
18  authorized as the treasurer of HCMFA to incur
19  obligations on its behalf?
20      A.  He wasn't the senior operating or
21  executive positions there. So the answer is
22  no, beyond, you know -- beyond the normal
23  course of operating expenses or whatever, but
24  it would -- he would never be the person on
25  anything of significance.

Page 317

DONDERO - 10/29/21

1
2      Q.  How do you define "significance"?
3      A.  Like waiving fees on a mutual fund,
4  purchasing another mutual fund, yeah, things
5  like that.
6      Q.  Was there any document or policy
7  that you are aware of that specifically
8  identifies the scope of Mr. Waterhouse's
9  authority as the treasurer of HCMFA?
10      A.  No.
11      Q.  Is there anything that you are aware
12  of that specifically limits Mr. Waterhouse's
13  authority other than what might be in your
14  head?
15      A.  No, I would -- I would say what is
16  in my head is -- would be typical industry
17  practice. You wouldn't -- you wouldn't have
18  executive vice presidents or ownership defined
19  if you were going to delegate everything to an
20  employee three levels down, you know.
21      MS. DEITSCH-PEREZ:  Okay. John,
22  I've had a request from Davor to take a
23  quick restroom break, so --
24      MR. MORRIS:  You know, I really --
25  Davor, I'm happy to accommodate, but at

Page 318

DONDERO - 10/29/21

1
2  some point we have got to be able to get
3  more than 10 minutes of testimony in a row.
4  So let's take a short break.
5      MS. DEITSCH-PEREZ:  Thank you.
6      VIDEOGRAPHER:  Going off the record.
7  The time is 11:08.
8      (Recess taken 11:08 a.m. to 11:16 a.m.)
9      VIDEOGRAPHER:  Back on the record,
10  11:16.
11      Q.  Mr. Dondero, did you communicate
12  with anybody on the break about the substance
13  of your testimony?
14      A.  No.
15      Q.  As treasurer of HCMFA, did
16  Mr. Waterhouse's responsibilities include being
17  familiar with HCMFA's debts and obligations?
18      A.  Yes.
19      Q.  Do you have any reason to believe as
20  you sit here today that Mr. Waterhouse failed
21  to fulfill his responsibilities as treasurer of
22  HCMFA and familiarize himself with their debts
23  and responsibilities?
24      MS. DEITSCH-PEREZ:  Object to the
25  form.

Page 319

DONDERO - 10/29/21

1
2      A.  I don't know.
3      Q.  I appreciate that you don't know,
4  but do you have any reason as you sit here
5  today to believe that he failed to fulfill that
6  particular responsibility?
7      A.  I don't know.
8      Q.  Okay. Are you an authorized
9  signatory on HCMFA's bank accounts?
10      A.  I don't know.
11      Q.  Do you know who the authorized
12  signatories are on HCMFA's bank accounts?
13      A.  No.
14      Q.  Do you know whether anybody now
15  employed or previously employed by Highland was
16  an authorized signatory with respect to any of
17  HCMFA's bank accounts?
18      A.  I don't know.
19      Q.  Do you know whether Mr. Waterhouse
20  was an authorized signatory on any of HCMFA's
21  bank accounts?
22      A.  I don't know how he had -- had it
23  set up. There would have been, I imagine,
24  checks and balances. We run, as far as I know,
25  a compliant accounting group, you know, with

Page 320

DONDERO - 10/29/21

1  the right audit controls, et cetera. So I
2  would imagine there would have been somebody
3  preparing it and multiple signatures or
4  multiple sign-offs on wires, but I have no
5  awareness of this. I mean, I would believe
6  that it was done compliantly and correctly, but
7  I don't have any specific awareness.
8  Q.  Okay. Do you know Lauren Thedford?
9  A.  Yes.
10  Q.  And was Ms. Thedford an employee of
11  Highland at one time?
12  A.  Yes.
13  Q.  Do you recall what position she held
14  at any particular point in time?
15  A.  I believe she held several different
16  positions over the years, but I remember most
17  as a corporate attorney working on document --
18  documents when we -- we do new funds or amend
19  old funds.
20  Q.  Okay. Do you recall whether she
21  served as an officer of HCMFA?
22  A.  Wasn't her name on the incumbency
23  certificate we had up earlier?
24  Q.  It was. We can put it back up if

Page 321

DONDERO - 10/29/21

1  you want to look at that.
2  A.  No, but I think that is -- that is
3  the answer, but that is my only awareness.
4  Q.  Okay. Do you have -- do you have --
5  do you know whether she was ever appointed to
6  any position within the Highland corporate
7  family other than as an attorney with Highland
8  and as the secretary of HCMFA?
9  A.  I don't know.
10  Q.  Other than Ms. Waterhouse --
11  withdrawn.
12  Other than Mr. Waterhouse and
13  Ms. Thedford, can you identify any current or
14  former employee of Highland that ever served as
15  an officer of HCMFA?
16  A.  I don't know.
17  Q.  Okay. Can you identify any current
18  or former employee of Highland who was
19  simultaneously also an employee of HCMFA?
20  MS. DEITSCH-PEREZ: Object to the
21  form.
22  A.  You mean somebody who was a dual
23  employee?
24  Q.  Yeah, who was actually -- yeah, to

Page 322

DONDERO - 10/29/21

1  be clear, who was actually employed by both,
2  who received, you know, income from both.
3  A.  I don't know regarding income, but
4  some of that historic portfolio managers like
5  Michael Gregory or Jonathan Lamensdorf, they
6  did work for HCMFA primarily, but they also did
7  other things for Highland. I don't know how
8  their compensation or their bonuses were split.
9  I just -- I wouldn't have awareness of that.
10  Q.  Let's move on to NexPoint. You're
11  familiar with an entity called NexPoint
12  Advisors, L.P.; correct?
13  A.  Yes.
14  Q.  We will refer to that as NexPoint,
15  okay?
16  A.  Sure.
17  Q.  Do you know who owns NexPoint?
18  A.  Directly or indirectly, I believe I
19  do.
20  Q.  Okay. And do you control NexPoint?
21  A.  Yes.
22  Q.  And do you know when NexPoint was
23  created?
24  A.  More than five years ago, but I

Page 323

DONDERO - 10/29/21

1  don't remember when.
2  Q.  Can you tell me generally the nature
3  of NexPoint's business?
4  A.  It is generally real estate related.
5  Q.  Have you controlled NexPoint
6  throughout its corporate existence, to the best
7  of your knowledge?
8  A.  Yes.
9  Q.  Do you have a title with NexPoint
10  today?
11  A.  I believe I'm president, but I don't
12  know for sure.
13  Q.  Did you appoint Mr. Waterhouse to
14  serve as treasurer of NexPoint?
15  A.  I don't know.
16  MR. MORRIS: Please put up Exhibit
17  37.
18  Q.  This is another incumbency
19  certificate, sir?
20  A.  Yes.
21  Q.  And do you see, is that your
22  signature at the bottom?
23  A.  Looks like it, yes.
24  Q.  And does that refresh your

Page 324

DONDERO - 10/29/21

1
2  recollection that you personally identified
3  Mr. Waterhouse as the treasurer of NexPoint
4  Advisors, L.P. effective as of April 11th,
5  2019?
6      A.   No, I mean, not -- no.
7      Q.   Do you have any reason to doubt that
8  Mr. Waterhouse served as the treasurer of
9  NexPoint Advisors prior to the petition date?
10     A.   No, I don't have a reason to
11 disagree with it.  I just didn't have an
12 awareness.  And when you asked me earlier, the
13 thing that was running through my mind is that
14 it could have been, you know, Brian Mitts who
15 has a strong accounting background at NexPoint.
16 I just wasn't -- I didn't know, based on
17 recollection, who was treasurer.
18     Q.   Okay.  Were you aware that -- but
19 you were aware, were you not, that
20 Mr. Waterhouse wore multiple hats?
21     MS. DEITSCH-PEREZ:  Objection to
22 form.
23     Q.   Withdrawn.
24          You were aware, were you not, sir,
25 that during the time that you served as

Page 325

DONDERO - 10/29/21

1
2  president of Highland, that Mr. Waterhouse
3  served in capacities with respect to affiliated
4  companies?
5      A.   I was aware that multiple senior
6  executives had multiple titles at multiple
7  different entities, but I didn't have specific
8  awareness whatsoever on entities that Frank was
9  or was not involved in.
10     Q.   Okay.  But to the extent that he
11 held a title with one of the affiliated
12 companies, those affiliated companies would
13 have been managed or controlled by you;
14 correct?
15     A.   Generally.
16     Q.   You can't think of any title that he
17 held with an affiliated company that wasn't
18 managed by you, can you?
19     A.   No, not off the top of my head.
20     Q.   And you knew and intended prior to
21 the petition date to have Mr. Waterhouse serve
22 in multiple roles; is that fair?
23     A.   Yes.
24     Q.   Have you ever considered firing
25 Mr. Waterhouse from his position as treasurer

Page 326

DONDERO - 10/29/21

1
2  of NexPoint Advisors?
3      A.   No.
4      Q.   Okay.  As the president of NexPoint
5  Advisors, do you believe that you had a
6  responsibility to familiarize yourself with
7  NexPoint's debts and obligations?
8      MS. DEITSCH-PEREZ:  Object to the
9  form.
10     A.   Just generally.
11     Q.   Okay.  Did you do anything to
12 generally inform yourself of NexPoint's debts
13 and obligations?
14     A.   Not -- not specifically that I can
15 recall.
16     Q.   Can you recall doing anything to
17 familiarize yourself with NexPoint's debts and
18 obligations at any time?
19     MS. DEITSCH-PEREZ:  Object to the
20 form.
21     A.   Not that I recall.
22     Q.   Did you ever look at NexPoint's
23 balance sheet?
24     A.   Not -- not that I -- not that I
25 recall.

Page 327

DONDERO - 10/29/21

1
2      Q.   Do you know whether NexPoint's
3  balance sheet reflected obligations that it
4  carried as liabilities that were due and owing
5  to Highland?
6      A.   I was aware generally of the notes,
7  but I didn't study the NexPoint balance sheet.
8      Q.   Do you believe that Mr. Waterhouse
9  had any responsibility as NexPoint's treasurer
10 to familiarize himself with NexPoint's debts
11 and obligations?
12     A.   Yeah.  I mean, the role is different
13 and the burden is different, and Frank and his
14 team orchestrated all the audits and compliance
15 statements and regulatory stuff for all of the
16 funds managed by NexPoint.
17     Q.   Well, you personally were
18 responsible for Highland's audited financial
19 statements, weren't you?
20     MS. DEITSCH-PEREZ:  Objection, form.
21     A.   No.  I mean, "responsible" is not
22 the right word.  I mean, we -- I have to -- as
23 the senior most executive, I have to -- to
24 sign -- sign statements regarding completeness
25 and no known frauds and those kinds of things,

Page 328

DONDERO - 10/29/21

1 but I am in no way involved in the preparation.
2    Q.    We will talk about that in a bit.
3        Do you have any reason to believe
4 today that Mr. Waterhouse failed to fulfill his
5 responsibilities as treasurer of NexPoint to
6 familiarize himself with NexPoint's debts and
7 obligations?
8    A.    I don't know.
9    Q.    You can't identify any particular
10 reason that you might have for concluding that
11 Mr. Waterhouse failed to fulfill his duties as
12 treasurer of NexPoint to familiarize himself
13 with NexPoint's duties and respons -- duties
14 and obligations; correct?
15    A.    Yes, I don't know.
16    Q.    Okay. Do you know who the
17 authorized signatories are on NexPoint's bank
18 accounts?
19    A.    No.
20    Q.    Do you know if you're an authorized
21 signatory on NexPoint's bank accounts?
22    A.    I don't know.
23    Q.    Do you know if Mr. Waterhouse is an
24 authorized signatory on NexPoint's bank

Page 329

DONDERO - 10/29/21

1 accounts?
2    A.    I don't know.
3    Q.    Do you know whether there is any
4 current or former employee of Highland who did
5 not hold an officer position at NexPoint who
6 would have been an authorized signatory on
7 NexPoint's bank accounts?
8        MS. DEITSCH-PEREZ:  Object to the
9        form.
10    A.    I don't know.
11    Q.    Can you identify any current or
12 former employee of Highland who served as an
13 officer of NexPoint at any time other than
14 Ms. Thedford and Mr. Waterhouse?
15    A.    I don't know.
16    Q.    Okay. Let's go to HCMS. Are you
17 familiar with an entity called Highland Capital
18 Management Services, Inc.?
19    A.    Generally, yes.
20    Q.    And can we refer to that as HCMS?
21    A.    Yes.
22    Q.    Do you have a direct or indirect
23 ownership interest in HCMS?
24    A.    I believe so.

Page 330

DONDERO - 10/29/21

1    Q.    And do you own a majority of the
2 interest directly or indirectly in HCMS?
3    A.    I believe so.
4    Q.    Do you control HCMS?
5    A.    I believe so.
6    Q.    Have you -- has there ever been a
7 period of time in HCMS's corporate existence
8 where you did not control that entity?
9    A.    Not that I'm aware of.
10    Q.    Do you recall when HCMS was created?
11    A.    More than five years ago, but I
12 don't remember when.
13    Q.    Do you have an understanding of the
14 nature of HCMS's business?
15    A.    It manages some assets, and it was
16 trying to create track records that then could
17 be marketed.
18    Q.    What does it mean to create a track
19 record that could be marketed?
20    A.    You execute investments and
21 investment strategy that you can refine and
22 articulate and show good results to potential
23 third-party investors as -- as evidence that
24 you can do it. And then that track record is

Page 331

DONDERO - 10/29/21

1 something the investors are willing to take a
2 chance on and then you separate account
3 money along those lines.
4    Q.    Do you have a title with HCMS today?
5    A.    I don't know.
6    Q.    But you do control the entity; is
7 that fair?
8        MS. DEITSCH-PEREZ:  Object to the
9        form, asked and answered.
10    A.    I believe so.
11    Q.    Okay. Do you know whether
12 Mr. Waterhouse has ever served as an officer of
13 HCMS?
14    A.    I have no idea.
15    Q.    Can you identify any person in the
16 world who has ever served as an officer of
17 HCMS?
18    A.    I don't know what the incumbency
19 certificate would look like for services, but
20 I'm willing to be refreshed.
21    Q.    Do you know if anybody ever served
22 as the chief -- withdrawn.
23        Did HCMF ever have anybody serve in
24 the capacity of chief financial officer?

Page 332

DONDERO - 10/29/21

1
2    A.   The subject of that question was
3    HCMF.  Is that what you meant to say, or did
4    you mean Services?
5    Q.   No, I apologize.  Thank you for the
6    clarification.  I did mean HCMS, so let me try
7    again.
8         Has anybody ever served in the
9    capacity of chief financial officer of HCMS?
10    A.   HCMF.
11        MS. DEITSCH-PEREZ:  S.
12    A.   Not --
13    Q.   S.
14    A.   Not of Services -- not that --
15    again, I don't know.  I'm willing to be
16    refreshed, but I -- I have no awareness.
17    Q.   Okay.  As president -- as the person
18    in control of HCMS, do you believe you had any
19    responsibility to familiarize yourself with
20    that entity's debts and obligations?
21    A.   Again, just generally, to the extent
22    that they were material or an issue or
23    whatever, but no more than generally.
24    Q.   Can you describe anything you ever
25    did to generally familiarize yourself with

Page 333

DONDERO - 10/29/21

1
2    HCMS's debts and obligations?
3    A.   I guess my answer, which would apply
4    to all of these entities, is awareness to know
5    that the amounts were de minimis relative to
6    the value of the entity, and the debt service
7    costs or issues were very de minimis relative
8    to the entities, but beyond that, I didn't
9    study them.
10    Q.   Well, did -- did HCMFA have
11    obligations to HCMLP that you would
12    characterize as di minimis from HCMFA's
13    perspective?
14    A.   Yeah, or just -- it never had
15    obligations that were more than de minimis.
16    Q.   As -- as the person in control of
17    HCMFA, did you have any concern that HCMFA
18    would not be able to satisfy its obligations to
19    HCMLP if -- if a demand was made?
20    A.   No.
21    Q.   Okay.  Was anybody charged with the
22    responsibility of familiarizing themselves with
23    HCMS's debts and obligations?
24    A.   Again, to differentiate or separate
25    myself from the treasury function or from what

Page 334

DONDERO - 10/29/21

1
2    Frank and his group were doing.
3         From my perspective, I had to be
4    aware about it -- aware of any obligations or
5    notes or debt service costs, et cetera, but to
6    the extent that I was aware and knew that it
7    was de minimis, I didn't spend any time
8    focusing on it, studying it, calculating it
9    exactly, or anything like that.
10        Having said that, we are highly
11    compliant.  We do -- we did audits every year
12    with reputable accounting firms that were
13    complete and in depth.  And any obligations
14    and/or assets, de minimis or not, in my view,
15    would nonetheless have to be reflected or
16    captured accurately and prepared for the
17    auditors in supplying, you know, detail or
18    source documents or whatever, whatever they do
19    in accounting as part of the audit function.
20        And all that would have done -- been
21    done exactly and expertly, as far as I know,
22    and it would have been done by Frank and his
23    group.
24    Q.   Okay.
25    A.   That is -- I'm trying to give a

Page 335

DONDERO - 10/29/21

1
2    complete answer regarding a myriad of ways
3    you've asked me kind of the same structural
4    questions.
5    Q.   I am, and just to be clear, I'm
6    asking kind of the same structural questions
7    with respect to each of the entities at issue.
8    I think you picked up on that.  I hope you
9    don't think I'm being repetitive.
10        You mentioned Frank and his group in
11    the context of HCMS.  Did I hear that
12    correctly?
13    A.   Yes.
14    Q.   Okay.  HCMS did not have a shared
15    services agreement with Highland; correct?
16        MS. DEITSCH-PEREZ:  You mean a
17    written shared services agreement, John?
18    Q.   Do you understand the question, sir?
19    A.   Yeah.  My answer would be the
20    advisors like NexPoint and HFAM that had to
21    have by law and regulatory statute have to have
22    formal sub advisors and shared services
23    agreements had formal shared services
24    agreement.
25        Entities that didn't need to have

Page 336

DONDERO - 10/29/21

1 formal written shared services agreements were
2 often serviced similarly or -- or exactly the
3 same as those entities, but without a written
4 agreement, but with a verbal shared services
5 agreement providing, again, all the same
6 similar services.
7 And the entities that didn't have a
8 written shared services agreement weren't
9 getting shared services or support from any
10 other entities other than Highland doing the
11 same thing for them that it did for the mutual
12 funds.
13 Q. Okay. Can you tell me who entered
14 into an oral shared services agreement between
15 Highland and HCMS?
16 A. Boy, I can imagine way back in the
17 day it would have been myself and Frank, but he
18 and his group understood and knew that they
19 were doing it for all the new entities that
20 came along, and I can't imagine it was even
21 talked about much over the years.
22 Q. Did -- did HCMFA and NexPoint pay
23 money to Highland under the shared services
24 agreement until let's just say late 2020?

Page 337

DONDERO - 10/29/21

1 A. Yeah, yes, and early into '21, I
2 believe also.
3 Q. Okay. As -- as part of the oral
4 agreement that you referenced, was there -- was
5 there ever an agreement that HCMS would pay any
6 money to Highland in exchange for the services
7 that Highland provided to it?
8 A. I do not believe there was a
9 financial remuneration aspect of it.
10 Q. Okay. And do you recall during your
11 time as president of Highland whether Highland
12 ever received payment from HCMS for services
13 rendered?
14 MS. DEITSCH-PEREZ: And are we just
15 talking about money?
16 MR. MORRIS: Correct.
17 A. Yeah, I don't -- I don't recall
18 moneys being -- well, you know what, let me --
19 let me clarify that a little bit.
20 If there were any direct costs that
21 Highland would have incurred like getting the
22 audits done, you know, like if Price Waterhouse
23 said, okay, give us the details on, you know,
24 all the different entities that roll up into

Page 338

DONDERO - 10/29/21

1 the Highland entity.
2 And then -- and they prepared
3 statements or did work for services, Frank and
4 his group would have passed through those costs
5 and expected services and/or Dugaboy or any of
6 the other entities to pay for direct
7 out-of-pocket costs. But it wouldn't have paid
8 a supplemental fee or profit or anything to
9 Highland.
10 Q. Okay. To the best of your
11 recollection, during the time that you were
12 president of Highland, did Highland ever
13 receive anything of value from HCMS on account
14 of services other than the reimbursement of
15 out-of-pocket expenses?
16 A. Yeah, I'm going to go back to my
17 comment in terms of building track record. And
18 I would use -- yeah, we had done it several
19 times in the past and it had worked
20 effectively. And that is -- you know, yeah, I
21 mean, the -- the track record in CLO paper was
22 what was used to track -- (inaudible) -- as an
23 investor.
24 And so, you know, to the extent that

Page 339

DONDERO - 10/29/21

1 the DAF wasn't paying a fee, along the way, to
2 Highland for shared services, Highland got the
3 benefit of the track record that was being
4 built at the DAF to then market to third
5 parties, which then created a revenue stream
6 for Highland down the road.
7 And I would say that was the same
8 intent on Services.
9 Q. Is there anything -- anything else
10 of value that you believe HCMS provided to
11 Highland in exchange for the services that
12 Highland rendered?
13 A. That would be primarily it. I would
14 say there is probably times where Services
15 provided liquidity for Highland or helped on
16 investments that Highland was involved in, but
17 I would have to refresh myself on exactly what.
18 Q. Is it fair to say that HCMF -- HCMS
19 never provided a revenue stream to Highland
20 similar to the revenue stream that was provided
21 by HCMFA and NexPoint under the shared services
22 agreements?
23 A. That is correct.
24 Q. Okay. Did anybody at HCMF --

Page 340

DONDERO - 10/29/21

1  withdrawn.
2       Did anybody at HCMS ever have the
3  responsibility for familiarizing themselves
4  with HCMS' debts and obligations?
5       MS. DEITSCH-PEREZ:  Object to the
6  form.
7  A.  Frank and his team, as part of
8  preparing the audited financials for all the
9  entities, would have definitively been aware of
10  all of them.  Who else on the services
11  incumbency certificate or -- would be aware or
12  have knowledge, I don't know.
13  Q.  Okay.  And when you refer to "Frank
14  and his team," are any of them acting as an
15  officer or employee of HCMS in what you are
16  thinking about?
17  A.  I -- I don't know.  I don't know.
18  Did -- we haven't -- have we looked at the
19  incumbency certificate for services?
20  Q.  No.
21  A.  I don't know.  I don't know off the
22  top of my head.
23  Q.  Okay.  Let's just finish this up.
24       Can you identify any current or
25

Page 341

DONDERO - 10/29/21

1  former Highland employee who served as an
2  officer of HCMS at any time?
3  A.  No, I would need to be refreshed.
4  Q.  Okay.  Can you identify --
5  withdrawn.  Let's go to the last one, HCRE.
6       Are you familiar with an entity
7  called HCRE Partners, LLC?
8  A.  Yes.
9  Q.  And is that entity now known as
10  NexPoint Real Estate Partners, LLC?
11  A.  You know what, I do believe it had a
12  name change.  I don't know if that is the name
13  change, but that would make sense.
14  Q.  Okay.  Can we just refer to that
15  entity as HCRE?
16  A.  That is fine.
17  Q.  Okay.  Do you have any direct or
18  indirect ownership interest in HCRE?
19  A.  Yes.
20  Q.  And is it a majority interest to the
21  best of your knowledge?
22  A.  Yes.
23  Q.  Do you control HCRE?
24  A.  Yes.
25

Page 342

DONDERO - 10/29/21

1  Q.  Have you controlled HCRE throughout
2  its corporate existence?
3  A.  Yes.
4  Q.  Can you tell me what the nature of
5  HCRE's business is?
6  A.  It makes real estate investments.
7  Q.  Do you have a title with that
8  entity?
9  A.  I don't know, but I'm willing to be
10  refreshed.  And I assume its incumbency
11  certificate looks similar to the ones that you
12  have put up.
13  Q.  Can you identify for me today
14  anybody who has ever served as an officer of
15  HCRE at any time?
16  A.  I would rather be refreshed.  I
17  would imagine myself and Matt McGraner are two
18  of those people, but I don't know for sure.
19  Q.  Okay.  Without the incumbency
20  certificates or other documentation, you are
21  not able to give me any names other than Mr. --
22  other than you and Mr. McGraner; is that fair?
23  A.  That's correct.
24  Q.  Okay.  Do you know whether anybody

Page 343

DONDERO - 10/29/21

1  has ever been given the responsibility --
2  withdrawn.
3       Do you know whether anybody has ever
4  had the responsibility for familiarizing
5  themselves with the debts and obligations of
6  HCRE?
7  A.  It would be the same answer as given
8  on the other entities.  It would be the
9  treasurer, which is probably Frank.  And if not
10  the treasurer it would be Frank in his role and
11  his team of putting together the complete and
12  accurate financials of HCRE.
13  Q.  Other than putting together the
14  complete and accurate financials of HCRE, did
15  Frank and his team have any other
16  responsibility with respect to understanding
17  the debts and obligations of HCRE?
18  MS. DEITSCH-PEREZ:  Objection, form.
19  A.  Again, just the general overlay
20  being that they were de minimis and -- de
21  minimus, and the service obligations were de
22  minimus relative to the value or operating
23  income of the enterprise.
24       In other words, had they been more

Page 344

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2  material or material, they would have had more
3  focus. But they didn't deserve more focus.
4     Q.   And so is it fair to say that you
5  didn't do anything to familiarize yourself with
6  HCRE's debts and obligations?
7          MS. DEITSCH-PEREZ:  Object to the
8  form.
9     A.   Not on a regular detailed basis, you
10  know, just a general awareness.
11    Q.   Did you ever take any steps to
12  review the affiliate loans and obligations that
13  were due between and among Highland and its
14  affiliated companies?
15    A.   Again, just generally.
16    Q.   What did you do?
17    A.   Like I said, I had a general
18  awareness of them.
19    Q.   And did you receive from time to
20  time lists or information that specifically
21  described the amounts that were due and owing
22  from the affiliates to Highland?
23    A.   Yeah, from time to time the amounts,
24  yes.
25    Q.   Let's just quickly go to the

Page 345

1          DONDERO - 10/29/21
2  30(b)(6) notices if we can.
3          MR. MORRIS:  Can we put up a
4     document that has been marked as
5     Exhibit 47.
6          (Exhibit 47 marked.)
7     Q.   Do you understand, Mr. Dondero, that
8  you are here today in your individual capacity
9  and in your capacity as what is called a
10  30(b)(6) witness for certain entities?
11    A.   Yes, a little bit to my chagrin.
12  And I don't think you will see me again as a
13  30(b)(6) witness, but yes.
14    Q.   All right. Well, it wasn't my
15  choice, so let's just go through it quickly.
16          Have you seen this document before,
17  sir?
18    A.   Yes.
19    Q.   And do you understand that you are
20  here today in your capacity as NexPoint's
21  corporate representative?
22    A.   Yes.
23    Q.   And do you understand that your
24  answers today in your capacity as NexPoint's
25  corporate representative will be binding on

Page 346

1          DONDERO - 10/29/21
2  NexPoint?
3          MS. DEITSCH-PEREZ:  As qualified by
4     the objections that we made.
5          MR. MORRIS:  Sure.
6     A.   I will do the best I can.
7     Q.   Thank you so much.
8          MR. MORRIS:  Can we go to the next
9     page, please. The last page. The topics.
10    Q.   Okay. Have you seen these topics
11  before, sir?
12    A.   Yes.
13    Q.   Okay. Do you see that we asked for
14  somebody to testify as to NexPoint's answer?
15    A.   Yes.
16    Q.   Okay. Are you aware that
17  NexPoint -- are you aware that NexPoint filed
18  an answer to Highland's amended complaint?
19    A.   Yes.
20    Q.   And did you review NexPoint's answer
21  at any time before today's deposition?
22    A.   It was in the binder, I believe,
23  that you guys sent over.
24    Q.   I think that's right. Are you
25  prepared to answer questions today about

Page 347

1          DONDERO - 10/29/21
2  NexPoint's answer?
3          MS. DEITSCH-PEREZ:  Again, subject
4     to our objection, but...
5     A.   Yeah, to the best I can.
6     Q.   Okay. The next topic concerns
7  affirmative defenses.
8          Do you see that?
9     A.   Yes.
10    Q.   Do you have an understanding of what
11  an affirmative defense is?
12    A.   Yes.
13    Q.   What is your understanding of an
14  affirmative defense?
15    A.   I think it is those -- phrase that
16  you see in most of our answers, the
17  justification, estoppel, waiver, and then --
18  and then there is some specific answers beyond
19  that, I guess.
20    Q.   Okay. Are you prepared --
21          MS. DEITSCH-PEREZ:  John, I take it
22     you will show him. He doesn't have to have
23     them memorized.
24          MR. MORRIS:  No, of course not.
25          MS. DEITSCH-PEREZ:  So if you are

Page 348

DONDERO - 10/29/21

1   going to ask him, you will put it in front
2   of him?
3       MR. MORRIS: Of course.
4       MS. DEITSCH-PEREZ: Thank you.
5   Q.  Are you prepared to testify today to
6   the circumstances, communications, documents,
7   and facts concerning NexPoint's affirmative
8   defenses?
9   A.  Yeah, to the best that I can.
10  Q.  Okay.  Do you see Topic 3 concerns
11  the demand notes?
12  A.  Yes.
13  Q.  Okay.  Are you prepared to testify
14  about the demand notes, including with respect
15  to the specific issues identified in that
16  topic?
17      MS. DEITSCH-PEREZ: Again, subject
18  to the objections, particularly I think
19  with respect to use of the proceeds.
20      We will get to that.
21      Are you prepared to testify?
22  A.  I hope so.
23  Q.  And -- and I know that there is an
24  objection there, but just a simple yes or no,

Page 349

DONDERO - 10/29/21

1   are you -- do you have knowledge of the -- of
2   NexPoint's use of the proceeds of the note?
3   A.  Not specifically.
4   Q.  All right.  Maybe I will refresh
5   your recollection later.
6       And then the last topic is discovery
7   requests.
8       Do you see that?
9   A.  Yes.
10  Q.  Are you prepared to testify today on
11  NexPoint's behalf concerning Highland's
12  discovery requests?
13  A.  To the best of my knowledge.
14  Q.  Okay.  Did you do anything to
15  prepare for today's deposition?
16  A.  I met with Deborah.
17  Q.  When did you do that?
18  A.  A couple of days ago for a couple of
19  hours, and a few days before that for a couple
20  of hours.
21  Q.  How many times --
22      MS. DEITSCH-PEREZ: Are you also
23  asking about calls?
24      MR. MORRIS: I appreciate that.

Page 350

DONDERO - 10/29/21

1   A.  Yeah.  There were a couple of phone
2   calls too.
3   Q.  How many times did you communicate
4   with Deborah in preparation for today's
5   deposition?
6   A.  A half dozen, maybe, you know.
7   Q.  How many times --
8   A.  You know, in-person and phone calls,
9   but...
10  Q.  How many times did you meet with her
11  in-person?
12  A.  Two, maybe three.
13  Q.  And can you just tell me an estimate
14  of the total time spent preparing for this
15  deposition, inclusive of both the meetings and
16  the phone calls?
17  A.  I don't know.  Does it matter?  I
18  mean, I don't know.  I don't know, four hours,
19  four hours.
20  Q.  Okay.  Did anybody participate in
21  these meetings or phone calls other than your
22  lawyers?
23  A.  No.
24  Q.  Did any lawyers participate in any

Page 351

DONDERO - 10/29/21

1   of these meetings or phone calls who didn't
2   represent you in your individual capacity?
3   A.  No.  It was just -- it was just
4   Deborah and I.
5   Q.  Okay.  Have you had a chance to
6   review the transcript of Mr. Waterhouse's
7   deposition?
8   A.  No.  I haven't seen it yet.
9   Q.  You haven't seen any portion of that
10  deposition?
11  A.  No.
12  Q.  Are you aware of anything that
13  Mr. Waterhouse testified to in his deposition?
14  A.  No.
15  Q.  You have no knowledge of anything
16  that Mr. Waterhouse said last week in his
17  deposition; do I have that right?
18  A.  That's correct.
19  Q.  Okay.  Do you have any knowledge as
20  to anything your sister said in her deposition?
21  A.  No, other than she is glad it is
22  over.
23  Q.  I hope -- I hope -- I hope she
24  thinks at least I was respectful.

Page 352

DONDERO - 10/29/21

1    Did -- did you ever see her
2 transcript -- the transcript from her
3 deposition?
4    A.  No.
5    Q.  How about Mr. Seery, did you see the
6 transcript from Mr. Seery's deposition?
7    A.  I didn't even know that Seery was
8 deposed, so the answer is no.
9    Q.  Okay.  Are you aware that Dave Klos
10 was deposed?
11    A.  You know what, I think I had
12 awareness of that, but I haven't seen that
13 deposition.
14    Q.  Do you know anything about anything
15 that he testified to the other day?
16    A.  Nope.
17    Q.  How about Kristin -- Kristin
18 Hendrix, are you aware that she was deposed?
19    A.  I think I heard that she was also.
20    Q.  Do you know anything about anything
21 that she testified to?
22    A.  No.
23    Q.  Did you look at any documents to
24 refresh your recollection in advance of this

Page 353

DONDERO - 10/29/21

1 deposition other than the stack that I provided
2 and the deposition notices?
3    A.  I mean just -- no, just a listing of
4 the notes, but that is it.
5    Q.  Did you see any emails at all in
6 connection with your preparation for today's
7 deposition?
8    A.  No, not a single email.
9    MR. MORRIS:  Okay.  Let's put up
10 Exhibit 48, please.
11    (Exhibit 48 marked.)
12    Q.  And I think you will see that this
13 is the 30(b)(6) notice for HCMS.  If we can go
14 to the next page.  And it is really the same --
15 I will represent to you that the topics for
16 HCMS are the same as the topics for NexPoint.
17    Have you seen HCMS's 30(b)(6) notice
18 that is up on the screen right now?
19    A.  Yes.
20    Q.  And if we took the time -- if I took
21 the time to ask you the same questions about
22 your ability to answer on behalf of HCMS --
23 HCMS with respect to the topics identified
24 there and subject to your counsel's objections,

Page 354

DONDERO - 10/29/21

1 would you be able to do so?
2    A.  Yes.
3    MR. MORRIS:  Let's put up Exhibit
4 49, please.
5    (Exhibit 49 marked.)
6    Q.  And this is the 30(b)(6) notice for
7 HCRE.  You're here today to testify on behalf
8 of HCRE as its corporate representative.  Do
9 you understand that?
10    A.  Yes.
11    Q.  And did you review the list of
12 topics that we included in our 30(b)(6) notice
13 for HCRE?
14    A.  Yes.
15    Q.  And subject to your counsel's
16 objections, are you prepared to testify to the
17 topics that are listed on the page that is up
18 on the screen?
19    A.  Yes.
20    MR. MORRIS:  Okay.  Can we please
21 put up Exhibit 31.
22    (Exhibit 31 marked.)
23    Q.  Mr. Dondero, we're putting up on the
24 screen now your answer to the -- to Highland's

Page 355

DONDERO - 10/29/21

1 amended complaint.
2    MS. DEITSCH-PEREZ:  Is that in the
3 notebook?
4    MR. MORRIS:  No, no.  This is one
5 that we had -- we had --
6    MS. DEITSCH-PEREZ:  All right.  Hang
7 on.
8    MR. MORRIS:  That's okay.  That is
9 why we're putting it up on the screen, and
10 we will put it in the chat room.  It is
11 already in there, actually.
12    MS. DEITSCH-PEREZ:  Yeah, I think we
13 have it here.  Hold on.  I think Nancy
14 walked off with the duplicate of this, so
15 if you need it, I will hand it to you.
16    Q.  Mr. Dondero, while we wait to see if
17 your counsel has a hard copy, do you recall
18 reviewing your answer to the plaintiff's
19 amended complaint before it was filed?
20    A.  I don't know if I was involved at
21 that juncture.
22    Q.  All right.  So just to refresh your
23 recollection, this is a document that was filed
24 with the Court at the beginning of September.

Page 356

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2  If you recall, Highland filed an original
3  complaint, and after you amended your answer
4  late in August pursuant to an agreement,
5  Highland filed amended complaints against
6  certain of the obligors in the notes
7  litigation.
8         Does that refresh your recollection
9  that this document was prepared in early
10 September?
11    A.   Okay.
12    Q.   Okay.
13    A.   I don't have specific memory.
14    Q.   Okay.  So as always, Mr. Dondero, we
15 have done this many times before, if there is
16 anything in the document that you think that
17 you need to see because it is a little bit of a
18 lengthy document, will you let me know that?
19    A.   Sure.
20    MS. DEITSCH-PEREZ:  Yeah.  And we
21    have a copy if you need to stop and take a
22    look.  We did get a hard copy.  We have a
23    hard copy here.
24    Q.   Okay.
25    A.   All right.

Page 357

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2    Q.   So -- let me ask the question
3  again then:  Do you recall, with that
4  background, having reviewed and approved the
5  filing of this document at the beginning of
6  September 2021?
7    A.   Generally.
8    Q.   Okay.  As you sit here today, are
9  you aware of anything in this document that is
10 inaccurate?
11    A.   Not that I'm aware of.
12    Q.   Okay.  Are you aware of anything in
13 the document that you believe should be
14 modified or amended to make it more complete or
15 more accurate?
16    A.   Not as of this moment.
17    Q.   Okay.  Can we please go to Paragraph
18 83.  Okay.  Right there.
19         So do you see that on -- on page 13
20 of the exhibit, we have in Paragraphs 82
21 through 91 what are called your affirmative
22 defenses?
23    A.   Yes.
24    Q.   All right.  I'm going to skip the
25 one in 82 for the moment, but focusing on 83.

Page 358

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2  Can you just read that to yourself and tell me
3  when you have done that?
4    A.   Yes.
5    Q.   Are you aware of any facts that
6  concern this particular affirmative defense?
7    A.   Which notes are these again?
8    Q.   These would be your personal notes.
9    A.   The -- personal notes.  I'm trying
10 to remember.  No, I -- well, if you read the
11 question one more time.
12    Q.   Sure.  Just so -- so to make sure
13 that you understand, because I'm not here to
14 trick you, this is your answer to Highland's
15 complaint against you where Highland is trying
16 to recover on the notes that you signed.
17         Do you understand that?
18    A.   Right.
19    Q.   Okay.  So in Paragraph 83 you have
20 asserted an affirmative defense that the
21 plaintiff's claims are barred in whole or in
22 part due to waiver.
23         Do you see that?
24    A.   Yes.
25    Q.   Do you have any facts that you can

Page 359

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2  share with me that concern that particular
3  affirmative defense?
4    MS. DEITSCH-PEREZ:  And, again, just
5    in this particular answer.
6    MR. MORRIS:  That is all I'm asking
7    about.
8    Q.   We're going to go through the answer
9  for each one of them.  So just one at a time.
10 We're only talking about your -- your notes.
11    A.   No, not the moment.
12    Q.   Let's go to Paragraph 84.
13         Do you see Paragraph 84 states,
14 among other things, that plaintiff's claims are
15 barred, in whole or in part, due to estoppel?
16    A.   Yes.
17    Q.   Can you share with me any facts that
18 you are aware of that concern that particular
19 affirmative defense?
20    A.   No.
21    Q.   Okay.  I'm going to skip over 85
22 because I've gotten that answer elsewhere.  If
23 we can go to 86, do you see that Paragraph 86
24 asserts as an affirmative defense, among other
25 things, that, quote:  Plaintiff's claims may be

Page 360

DONDERO - 10/29/21

1 barred, in whole or in part, due to failure of
2 consideration, closed quote?
3 A. Right, I see that.
4 Q. Do you -- do you -- do you
5 acknowledge that Highland transferred to you an
6 amount of money equal to the principal amount
7 on each of the notes that are at issue?
8 A. I believe -- yes.
9 Q. Okay. I appreciate that.
10 Do you have any facts that would
11 support the affirmative defense that is set
12 forth in Paragraph 86?
13 A. No.
14 Q. Okay. And then, finally,
15 Paragraph 88 asserts, among other things, that
16 the fraudulent transfer claim should be barred,
17 in whole or in part, because the alleged
18 fraudulent transfer -- and I'm summarizing
19 here -- was taken in good faith and for
20 reasonably equivalent value.
21 Do you see that?
22 A. Yes.
23 Q. Okay. Do you have any facts that
24 concern that particular affirmative defense?
25

Page 361

DONDERO - 10/29/21

1 A. Let me read that one more time.
2 Q. Take your time.
3 A. I think that one is -- I'm trying --
4 I'm trying to remember if that one -- if the
5 partner defense is on alternative comp that
6 could have been taken or forgiveness that was
7 in lieu of other comp -- I'm trying to remember
8 if that falls under this category. I think it
9 does.
10 Q. Okay. Is there anything else that
11 you can -- any other facts that you can think
12 of that concern the affirmative defense in
13 Paragraph 88?
14 A. I mean, the -- yes. Okay. To the
15 extent that the -- in lieu of additional comp
16 falls under there, so does the incentives to --
17 the incentive to me to help monetize illiquid
18 investments better faster.
19 Q. And does that relate to the three
20 portfolio companies that are the subject of the
21 oral agreement between you and your sister or
22 to something else?
23 A. It is --
24 MS. DEITSCH-PEREZ: Objection, form.
25

Page 362

DONDERO - 10/29/21

1 A. -- regarding that, yeah.
2 Q. It is the same thing. Do I have
3 that right?
4 A. Yes.
5 Q. Okay. Thank you very much.
6 Is there anything else you can share
7 with me about the facts that concern the
8 affirmative defense in Paragraph 88?
9 A. I think that is -- that is -- that
10 is it.
11 Q. Okay. Can we change now to
12 Exhibit 16, which you should have in your pile,
13 which is the answer that was filed by the HCMS
14 to Highland's amended complaint.
15 (Exhibit 16 marked.)
16 A. Which number is this?
17 Q. It is number 16.
18 A. 16 in the binder?
19 Q. It should be, yeah.
20 A. Yes. Okay. I got it.
21 Q. Okay. And is the first page titled
22 Defendant, Highland Capital Management
23 Services, Inc.'s Answer to Amended Complaint?
24 A. Yes.
25

Page 363

DONDERO - 10/29/21

1 Q. Okay. So these questions I'm asking
2 in your capacity as HCMS' 30(b)(6) witness.
3 Okay?
4 A. Okay.
5 Q. And you recall that one of the
6 topics under the deposition notice was HCMS'
7 answer; right?
8 Are you prepared to answer questions
9 about this document?
10 A. Yep, to the best I can.
11 Q. Okay. Have you seen it before?
12 A. Yes.
13 Q. And do you know whether HCMS
14 authorized this Stinson firm to file this
15 document on its behalf at the beginning of
16 2021?
17 A. Yes.
18 Q. Did you personally have any role in
19 reviewing and preparing this document?
20 A. I mean, just generally that the
21 transition of former Judge Lynn passing and
22 Bonds Ellis not being able to handle
23 complexity -- maybe I shouldn't say it like
24 that -- or handle this aspect of the case
25

Page 364

DONDERO - 10/29/21

1 and/or -- I think it was -- yeah, just
2 whatever. He moved to Stinson from -- I think
3 maybe it started at Bonds Ellis and then maybe
4 it went to Wick Phillips and then it went to
5 Stinson, but, you know, there was a migration
6 of these notes in general.
7    Q.   Was there a particular person who
8 was charged with the responsibility of
9 approving and authorizing the filing of this
10 document on behalf of HCMS?
11    A.   Like I said, I think generally that
12 was myself.
13    Q.   Okay. Are you aware of anything in
14 this document today that is inaccurate in any
15 way?
16    A.   Not specifically.
17    Q.   Are you aware of anything generally
18 in this document that is inaccurate in any way?
19    A.   Not at the moment.
20    Q.   Are you aware of anything in this
21 document that you believe should be modified or
22 amended to make it more complete or more
23 accurate?
24    A.   Not yet.

Page 365

DONDERO - 10/29/21

1    Q.   Let's go to Paragraph 40 -- 94,
2 please.
3        MS. DEITSCH-PEREZ:  We may be
4 imperfect creatures as lawyers.
5    A.   Yes.
6    Q.   Okay.
7    A.   Yes.
8    Q.   Okay. I was just going to say, do
9 you see from Paragraphs 94 through 102 HCMS has
10 set forth its affirmative defenses?
11    A.   Yes.
12    Q.   Okay. Let's -- let's start with the
13 first one.
14        Do you see in Paragraph 94 HCMS
15 asserts that, quote:  Plaintiff's claims are
16 barred, in whole or in part, by the doctrine of
17 justification and/or repudiation?
18    A.   Yes.
19    Q.   Are you aware of any facts that
20 concern that particular defense?
21    A.   I believe this -- they were material
22 prepayments of the loan. I believe that is --
23 those are the -- they were material and
24 numerous prepayments of the loan, which I think

Page 366

DONDERO - 10/29/21

1 was -- that is incorporated into that defense.
2    Q.   Okay. We will talk about the --
3 details of that in a moment, but are there any
4 other kind of broad statements that you can
5 give me that identify facts related to this
6 particular affirmative defense?
7        MS. DEITSCH-PEREZ:  Object to the
8 form.
9    A.   That is all I have at the moment.
10    Q.   Okay. Do you know whether any
11 document that HCMS ever filed with the
12 bankruptcy court ever asserted, as in a
13 defense, that they didn't have to pay because
14 they had prepaid any obligations that were due
15 and owing?
16        MS. DEITSCH-PEREZ:  Object to the
17 form.
18    A.   I don't have awareness.
19    Q.   And this document doesn't -- doesn't
20 use the word "prepayment" anywhere, does it?
21        MS. DEITSCH-PEREZ:  Object to the
22 form.
23    A.   I don't know.
24    Q.   Do you know of anything that HCMS

Page 367

DONDERO - 10/29/21

1 ever did before this week to put Highland on
2 notice that it contended that it didn't have to
3 pay its obligations under the notes because of
4 a prepayment defense?
5        MS. DEITSCH-PEREZ:  Object to the
6 form.
7    A.   We have no records. I'm not sure we
8 would have ever been in a position to -- to do
9 that. The -- you know, we were relying on
10 shared services from Highland, and Highland had
11 all the records regarding the amounts and
12 prepayments, et cetera.
13    Q.   When did you learn that HCMS had
14 made a prepayment to Highland?
15    A.   I don't know, but I -- I imagine --
16 I imagine it was -- if you are asking why it
17 wasn't mentioned earlier but then mentioned
18 later, it is because somewhere in that time
19 period we became aware.
20    Q.   So you didn't -- you didn't have
21 knowledge of the prepayment until the debtor
22 produced documents. Do I have that right?
23        Withdrawn.
24        How did you learn that HCMS made a

Page 368

DONDERO - 10/29/21

1
2  prepayment?
3    A.  I don't know.  I just know that we
4  became aware of that being a material fact
5  somewhere along the line.
6    Q.  Do you remember when you learned
7  that material fact?
8    A.  No.
9    Q.  Do you have any facts that you can
10  share with me concerning the prepayment?
11    A.  Eventually there was a spreadsheet
12  that summarized it, but I don't -- I don't
13  know -- I don't know when that occurred.
14    Q.  Does -- does this defense of
15  prepayment apply to demand notes or a term
16  note?
17    A.  I would -- I would -- I would say,
18  you know, primarily a term note, but -- yeah, I
19  think primarily the term note because I think
20  that was the one that was declared to be in
21  default of share, you know, whatever, so I
22  think it was regarding the term note.
23    Q.  Do you recall -- do you have any
24  knowledge as to when the prepayment was made?
25    A.  I believe there were numerous and

Page 369

DONDERO - 10/29/21

1
2  material prepayments, but I don't know exactly
3  when they were made.
4    Q.  Do you know what year they were
5  made?
6    A.  No, but -- no, but -- no, I don't.
7      MS. DEITSCH-PEREZ:  If you want,
8    John, if you would like for him to give you
9    dates, he could probably dig up the
10    spreadsheet and give you dates, but you
11    have it also.
12      MR. MORRIS:  Thank you.  Okay.  I
13    think we're doing just fine here.
14    Q.  Do you know if there were any
15  prepayments made by HCMS in 2018?
16    A.  I don't know the specifics off the
17  top of my head.
18    Q.  Do you know if HCMS made any
19  prepayments in 2019?
20    A.  I don't know the specifics off the
21  top of my head.
22    Q.  Are you aware that under the term
23  note, HCMS was required to pay annual
24  installment payments at the end of each year?
25      MS. DEITSCH-PEREZ:  Object to the

Page 370

DONDERO - 10/29/21

1
2  form.
3    A.  I wouldn't say it like that.
4    Q.  We will look -- we will look at the
5  documents in a few minutes.
6      Are you aware of any facts that
7  support the justification or repudiation
8  defense in Paragraph 94 other than what you
9  have testified to so far?
10    A.  I think it is largely the prepayment
11  aspect of it that is captured there.
12    Q.  Okay.  And -- and -- all right.  I
13  will leave it at that.
14      Let's go to Paragraph 95.  Do you
15  see the affirmative defense in 95 is that,
16  quote, plaintiff's claims are barred in whole
17  or in part by the doctrine of estoppel.
18      Do you see that?
19    A.  Yes.
20    Q.  Do you have any facts as the
21  30(b)(6) witness of HCMS that concern that
22  particular affirmative defense?
23    A.  You know, I think for both 95 and
24  96, the way I understand it is that was
25  reliance on Highland's and Highland's screw-up,

Page 371

DONDERO - 10/29/21

1
2  to the extent that there was a screw-up, on the
3  term loans.
4    Q.  What screw-up are you referring to?
5    A.  Well, we didn't have accountants or
6  employees at Services, you know, and Services
7  was relying on Highland and shared services to
8  stay in compliance or to -- on the various
9  loans.
10    Q.  Did you ever personally instruct
11  anybody in December of 2020 to make a payment
12  on behalf of HCMS under the term note?
13    A.  To make -- I'm sorry, is this --
14  what was the timeframe again?
15    Q.  December 2020 -- let's just say
16  anytime in 2020.  Did you, in your capacity as
17  the person in control of HCMS, ever direct or
18  authorize any person in the world to make a
19  payment from HCMS to Highland in satisfaction
20  of the obligation that was due under the term
21  note at the end of the year?
22    A.  Not that -- not that I recall.
23    Q.  Okay.  Do you know whether anybody
24  acting on behalf of HCMS ever instructed or
25  authorized Highland to make a payment on

Page 372

DONDERO - 10/29/21

1
2 account of HCMS's term note to Highland?
3     A.   Well, again, and maybe I didn't say
4 it clearly enough.  I think there was a
5 reliance in the due course aspect, especially
6 on small amounts, and it would have been done
7 by Highland personnel on behalf of Services.
8         MR. MORRIS:  Okay.  Move to strike.
9     Q.   And I'm going to ask you,
10 Mr. Dondero, to be patient with me and to
11 listen carefully to my question.
12         Are you aware of anybody acting on
13 behalf of HCMS, whoever instructed Highland to
14 make a payment in satisfaction of any payment
15 that was due at the year-end of 2020 under the
16 term note?
17     A.   Not specifically, but I'm saying I
18 don't think it needed to be made specifically.
19     Q.   Okay.  So you are not aware of any
20 instruction that was ever given to Highland by
21 HCMS to make the payment; is that fair?  You
22 relied on the course of dealing?
23     A.   Right.  I relied on ordinary course.
24 I don't believe there was a specific -- I'm not
25 aware of a specific request.

Page 373

DONDERO - 10/29/21

1
2     Q.   Okay.  And you were aware that the
3 payment was due at the end of the year; isn't
4 that right?
5         MS. DEITSCH-PEREZ:  Object to the
6     form.
7     A.   Not -- not specifically.  There
8 is -- to be bona fide notes, there is -- I know
9 there is -- there is tax structuring and things
10 that the auditors want to see in terms of -- of
11 regular payment that everything just doesn't
12 accrue indefinitely, but what those roles are
13 and when and if it needs to be paid and whether
14 it was by the end of the year or not.
15         I'm generally not specifically
16 knowledgeable of or involved in, and nor do I
17 have an awareness that was it or could it have
18 been satisfied by other payments throughout the
19 year.  I'm not -- I'm not the person for that
20 knowledge.
21     Q.   Now, do you recall in December of
22 2020 there was some tension between you and
23 Mr. Seery?
24     A.   Tension between me and Mr. Seery.  I
25 would say there was tension between Mr. Seery

Page 374

DONDERO - 10/29/21

1
2 and everybody.  He was trying to steal the
3 estate, you know, so yes.
4         MR. MORRIS:  I move to strike.
5     Q.   You were asked to resign from
6 Highland in late September of 2020; correct?
7     A.   Yes.
8     Q.   And you did resign as of October
9 9th, 2020; correct?
10     A.   Yes.
11     Q.   And do you recall that in early
12 December, Highland sought a temporary
13 restraining order against you?
14     A.   Yes.
15     Q.   And do you recall that Highland
16 obtained a temporary restraining order against
17 you in early December?
18     A.   Yes.
19     Q.   Okay.  Do you recall that the
20 advisors that you controlled filed a motion
21 against the debtor in mid December 2020?
22     A.   Yes.
23     Q.   Okay.  And do you recall that that
24 motion was curved by the Court in the middle of
25 December?

Page 375

DONDERO - 10/29/21

1
2     A.   Yes, roughly.
3     Q.   And do you recall that at the end of
4 November, Highland had given notice of
5 termination of the shared services agreements
6 with the advisors?
7     A.   I believe they did that multiple
8 times or extended it multiple times.  I can't
9 remember if that was -- if it was done then or
10 not.
11     Q.   Okay.  And it is your testimony that
12 notwithstanding those facts and circumstances,
13 you relied on Highland to make the payment that
14 HCMS owed at the end of the year?
15     A.   Yes, absolutely.  We were still
16 deluded in terms of thinking that Seery was
17 working to resolve the estate, not to steal the
18 estate.
19         MR. MORRIS:  I move to strike.
20     Q.   Do you have any other facts and
21 circumstances that relate to the affirmative
22 defenses in Paragraphs 95 and 96?
23     A.   I mean, not at the moment, not that
24 I want to volunteer.  When you ask more
25 questions about the specifics, I guess we will

Page 376

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  get to some of it.
3      Q.  Well, I'm asking you questions now.
4  You are the 30(b)(6) witness.  This is one of
5  the topics that you were supposed to have
6  prepared to answer questions about, and I would
7  just like to know everything that you have in
8  your head as to facts that relate to these two
9  affirmative defenses.
10     MS. DEITSCH-PEREZ:  Object to the
11  form.
12     Q.  Because if I don't ask the right
13  question later, you know, we can't do that;
14  right?
15     So do you have any other facts that
16  you are aware of that relate to these two
17  particular affirmative defenses?
18     MS. DEITSCH-PEREZ:  John, the fact
19  that it's a 30(b)(6) deposition doesn't
20  absolve you of the necessity to ask
21  questions.
22     MR. MORRIS:  I asked the question.
23     Q.  Can I please have an answer?
24     A.  Again, the notes in general are de
25  minimis relative to asset values of Highland or

Page 377

1  the counterparties.  So the annual obligations
2  are even more de minimis or a million bucks or
3  less than a million bucks.
4      There was never an intent, nor would
5  there be a logical intent to -- from my
6  perspective or any of the entities that had
7  notice to Highland to be in default.  And it is
8  not logical that they would do that for any
9  purpose.
10     And the facts around the curing
11  quickly of the notes and getting the curing
12  amounts from Highland and making the payments
13  and Highland accepting them as they're defining
14  what it took to cure it, I think, are all, you
15  know, the key facts that make any, you know,
16  acceleration argument, you know, ridiculous.
17     Q.  Okay.  Anything else?
18     A.  That's it at this point.
19     MR. MORRIS:  Okay.  Let's go to
20  Exhibit 17, please.
21     (Exhibit 17 marked.)
22     Q.  This is HCRE's answer.  Do you see
23  that, sir?
24     A.  Yes.

Page 378

1  DONDERO - 10/29/21
2      Q.  And I'm going to ask these questions
3  in your capacity as the 30(b)(6) representative
4  of HCRE.  Do you understand that?
5      A.  Yes.
6      Q.  Have you seen this document before?
7      A.  Yes.
8      Q.  Are you aware of anything in this
9  document that is inaccurate today?
10     A.  I mean, I think 96 we put in there
11  similar to the other affirmative defenses in
12  case there was a prepayment.  But, again, we
13  have been so blocked from getting information
14  and detail we didn't know it at the time
15  regarding, you know, prepayments.
16     So I don't think the prepayment
17  defense works for 96.  So that would be my
18  clarification of an inaccuracy.
19     Q.  Why do you believe that the
20  prepayment defense doesn't work in Paragraph 96
21  for HCRE?
22     A.  Because I don't think there were any
23  prepayments.
24     Q.  All right.  I appreciate that.
25     A.  We didn't -- we didn't know it at

Page 379

1  DONDERO - 10/29/21
2  the time --
3      Q.  Okay.
4      A.  -- we put this together.
5      Q.  Is there any other aspect of this
6  document that you believe is inaccurate today?
7      A.  Not as far as I know.
8      Q.  Is there anything in this document
9  that you believe should be modified or amended
10  to make it more accurate or more complete?
11     MS. DEITSCH-PEREZ:  Object to the
12  form.
13     A.  Not yet.
14     Q.  Okay.  Looking at Paragraph 96, I
15  believe you just testified that,
16  notwithstanding the assertion of the defense
17  therein, you are not aware of any facts
18  concerning the prepayment defense that you
19  described earlier for HCMS.
20     Do I have that right?
21     A.  Yes.
22     Q.  Okay.  Do you have any facts at all
23  that relate to the affirmative defense in
24  Paragraph 96?
25     A.  I don't believe so at this moment.

Page 380

DONDERO - 10/29/21

1     Q.  Okay. How about Paragraphs 97 and
2  98? Do you have any facts that relate to those
3  affirmative defenses?
4     A.  It would be the same answer as on
5  the last one.
6     Q.  Okay. I appreciate that. And so --
7  but we don't have to go over it again. I will
8  just leave it at that.
9        Let's go to Exhibit 15, please.
10       (Exhibit 15 marked.)
11       MR. MORRIS:  This is the next --
12       MS. DEITSCH-PEREZ:  Hey, John.
13  John, can we take a -- like a very quick
14  restroom break?
15       MR. MORRIS:  You know, if we could
16  just get through this document, which
17  shouldn't take long, then perhaps we can
18  take a short half-hour lunch break.
19       MS. DEITSCH-PEREZ:  Well, we can
20  take a short half-hour lunch break after we
21  get through this, but I just need to run to
22  the restroom.
23       MR. MORRIS:  Okay.
24       MS. DEITSCH-PEREZ:  So you can leave

Page 381

DONDERO - 10/29/21

1  the screen on if you want so that we can
2  get back fast.
3     MR. MORRIS:  My pleasure, Deborah.
4  No problem.
5     MS. DEITSCH-PEREZ:  Thank you.
6     VIDEOGRAPHER:  Off the record,
7  12:40.
8     (Recess taken 12:40 p.m. to 12:51 p.m.)
9     Q.  Before we go on to this document,
10  sir, did HCRE have a shared services agreement
11  with Highland?
12     VIDEOGRAPHER:  We're back on the
13  record.
14     MR. MORRIS:  Oh, do I need to read
15  the question again?
16     COURT REPORTER:  No, I've got it.
17     A.  I -- I don't believe it is a formal
18  written one. I think it is just a verbal one.
19     Q.  And who is the verbal agreement
20  between?
21     A.  It was between Highland and HCRE.
22  Now it is between NexPoint and HCRE.
23     Q.  And who entered into the agreement
24  between Highland and HCRE?

Page 382

DONDERO - 10/29/21

1     A.  I would give the same answer I gave
2  before where it was just -- it was just
3  understood that we supported all the related
4  entities or entrepreneurial efforts and it was,
5  you know, modest amounts of work.
6        There wasn't specific financial
7  remuneration, but -- and NexPoint is a good
8  example, too. There was a significant track
9  record gulf that was able to be used to raise
10  other money.
11     Q.  I'm just asking you who entered into
12  the agreement between Highland and -- and HCRE
13  for the provision of services by Highland?
14     MS. DEITSCH-PEREZ:  Asked and
15  answered.
16     A.  Yeah, again, same answer as before.
17  I don't think anybody specifically, formally
18  did it.
19     Q.  Okay. Is it -- are the terms of the
20  agreement written down anywhere?
21     A.  No, like I said, it is just
22  understood the accounting department and tax
23  department would handle the accounting and tax
24  for all entities.

Page 383

DONDERO - 10/29/21

1     Q.  Did the legal department also
2  provide services to HCRE?
3     A.  It would depend on the specific
4  entity. In the case of HCRE I think they used
5  the -- the two lawyers that worked at NexPoint.
6        I don't think they used the legal
7  staff per se. I think they -- the shared
8  services that they relied on were accounting
9  and tax primarily.
10     Q.  Did Mark Patrick do work for HCRE
11  while he was employed by Highland?
12     A.  Boy, I don't know. I imagine
13  probably tax-related stuff.
14     Q.  Did HCRE ever pay Highland anything
15  for the services that it received?
16     MS. DEITSCH-PEREZ:  Are you talking
17  about cash or --
18     MR. MORRIS:  Please, please, please.
19  -- I'm trying to be really patient,
20  Deborah, but please no speaking objections.
21  Mr. Dondero is a very sophisticated man.
22        We have done this many times
23  together. He will ask me if he doesn't
24  understand the question. And if you would

Page 384

DONDERO - 10/29/21

1    like to object, by all means.  I don't have
2    a problem with that.  I don't.
3        MS. DEITSCH-PEREZ:  But I asked --
4    (speaking simultaneously.)
5        Q.   Mr. Dondero -- Mr. Dondero --
6    Mr. Dondero, did HCRE ever pay anything to
7    Highland for services rendered?
8        MS. DEITSCH-PEREZ:  Asked and
9    answered.
10       A.   Yeah, that is what I was going to
11   say.  Same answer.  You know, not -- not a
12   formal cash remuneration, but, you know, a --
13   which wouldn't have been much anyway.  But --
14   but more in terms of track record and presence
15   in the market that then Highland or NexPoint
16   could use to further its business.
17       Q.   Are you saying that -- that all of
18   the entities were working kind of as a unified
19   unit and got synergistic benefits from the work
20   that it did?
21       MS. DEITSCH-PEREZ:  Object to the
22   form.
23       A.   I don't want to over generalize and
24   say yes to that, but -- but there were
25

Page 385

DONDERO - 10/29/21

1    definitely -- you know, when I use the DAF
2    example, you know, we would have never got the
3    Harvard vest as an investor if it wasn't for
4    the track record that the DAF had in CLO
5    equity.
6        I think there is business that
7    NexPoint got in the real estate space
8    benefiting from the HCRE performance.  So I do
9    believe there was specific definable benefit
10   gained for the modest amount of cost of
11   services provided.
12       Q.   And you --
13       A.   There wasn't specific remuneration.
14       Q.   And you controlled all of these
15   entities; right?
16       MS. DEITSCH-PEREZ:  Object to the
17   form.
18       A.   Well, the DAF is independent and
19   separate, but the -- HCRE-type entity, yes.
20       Q.   And did you decide that HCRE and
21   HCMS and the DAF wouldn't be required to pay
22   for services rendered to Highland?
23       MS. DEITSCH-PEREZ:  Object to the
24   form.
25

Page 386

DONDERO - 10/29/21

1        A.   My recollection on the services and
2    the HCRE is that the dollar value of the
3    services provided was -- was small and nominal.
4        With regard to the DAF, it was more
5    complicated.  There is rules -- there is
6    charging rules in terms of fees and then there
7    is also -- I wasn't the one that decided that.
8    And there are other issues there other than
9    just the value for services argument.
10       And so I don't -- the short answer
11   is, I don't know and I'm not involved in that,
12   and I don't understand why sometimes there is
13   one and sometimes there isn't one.  Even to
14   this day I don't know the answer to that.
15       Q.   Did -- did -- did you decide on
16   behalf of Highland that Highland would provide
17   services to DAF without receiving a stream of
18   income in return?
19       MS. DEITSCH-PEREZ:  John, I think
20   we're really far outside of either any of
21   the 30(b)(6)s or the permissible topics for
22   Mr. Dondero's personal deposition.
23       So could you move on?
24       MR. MORRIS:  Okay.  I will after I

Page 387

DONDERO - 10/29/21

1    get an answer to this question.
2        A.   Can you repeat the question?
3        Q.   Sure.
4        Did you make the decision on behalf
5    of Highland to provide services to the DAF
6    without receiving a stream of income in return?
7        MS. DEITSCH-PEREZ:  Same objection.
8        A.   Yeah, I think I answered it with my
9    rambling a few minutes ago, but the short
10   answer is no.
11       Q.   Who made that decision?  Who made
12   that decision?
13       MS. DEITSCH-PEREZ:  Was that Mike's
14   dog or yours?
15       MR. MORRIS:  That was my dog.  I
16   apologize.
17       MS. DEITSCH-PEREZ:  Okay.
18       Q.   Who made that decision, sir?
19       A.   I wasn't sure --
20       MS. DEITSCH-PEREZ:  Again -- again,
21   John, this is well beyond the scope of the
22   30(b)(6)s or even anything permissible for
23   Mr. Dondero's personal.  And, in fact, you
24   said last time that is it, that was my last
25

Page 388

1    question. So...
2        MR. MORRIS: That is -- that is
3    because I thought that he would say as the
4    control person at the enterprise that he
5    made the decision, but he said that he
6    didn't.
7        So I'm just asking one follow-up
8    question. I just want to know -- Deborah,
9    please.
10    Q.    I just want to know who made the
11    decision on behalf of Highland to render
12    services to the DAF without receiving a stream
13    of income in return.
14        MS. DEITSCH-PEREZ: Object to the
15    form of the question for all of the reasons
16    I stated before.
17    A.    And I don't know the answer.
18    Q.    Okay. So looking back at the
19    document on the screen, we're going to ask --
20    I'm going to ask these questions in your
21    capacity as NexPoint's 30(b)(6) representative,
22    okay?
23    A.    Sure.
24    Q.    And do you understand that the

Page 389

1    document on the screen is NexPoint's answer to
2    Highland's amended complaint?
3    A.    Yes.
4    Q.    Did you review this document before?
5    A.    Just generally.
6    Q.    And did you authorize the filing of
7    this document on behalf of NexPoint?
8    A.    Yes, yes.
9    Q.    Are you aware of anything in this
10    document today that you believe to be
11    inaccurate?
12    A.    I think the -- on the affirmative
13    defenses on the -- do you remember on the prior
14    one we had the -- I think it was called
15    justification as the first one, but there
16    wasn't a prepay in that one?
17    Q.    Correct.
18    A.    I think this one there were prepays,
19    but the justification defense is missing from
20    the front here. And I think that is -- I think
21    if that were to continue -- I think that is
22    partly due to different law firms and what was
23    known at the time, et cetera, but I would say
24    that is -- that is the -- that is the one thing

Page 390

1    that jumps out at me between the two.
2        MR. MORRIS: Okay. Can we go to
3    Paragraph 80, and let's see if we can see
4    what Mr. Dondero is talking about.
5    Q.    Okay. So I'm just going to focus on
6    the first three paragraphs, 80, 81, and 82, and
7    ask you whether -- whether you are aware of any
8    facts that concern the affirmative defenses set
9    forth in those paragraphs. And I think they're
10    related, and that is why I'm asking you to do
11    it all together, but we can do it one at a
12    time, whatever you are comfortable with.
13        MS. DEITSCH-PEREZ: Object to the
14    form. I mean, other than the facts in
15    those paragraphs?
16        MR. MORRIS: You are doing it again,
17    Deborah.
18        MS. DEITSCH-PEREZ: It --
19        MR. MORRIS: Please, please.
20        MS. DEITSCH-PEREZ: John, when you
21    ask questions -- I understand Mr. Dondero
22    is sophisticated, but he's also not a
23    lawyer, and when you ask questions that are
24    misleading, I'm going to interject

Page 391

1    something.
2        MR. MORRIS: It is completely
3    improper. He doesn't need to be a lawyer.
4    He's a 30(b)(6) witness, and I'm asking
5    such a simple question, what facts do you
6    have that support the affirmative defense.
7    A.    Okay. Is it okay if I repeat some
8    of them from the prior one?
9    Q.    Sure. Whatever you are comfortable
10    with.
11    A.    The -- to the extent that -- to the
12    extent that the notes were prepaid -- prepaid
13    significantly, it is a real question on whether
14    or not there could have been a breach at the
15    end of the year, even if there wasn't a payment
16    at the end of the year.
17        There is no logical reason, nor
18    would I have ever authorized or suggested no
19    payment to put us on -- in default due to a de
20    minimis amount of money, like a few hundred
21    thousand dollars, even if I was highly annoyed
22    with Seery, even if we knew that Seery and
23    Highland had overcharged NexPoint by whatever
24    it was, 14, 16 million bucks, I would not have

Page 392

DONDERO - 10/29/21

1 let a small amount cause a -- cause a breach.
2      You know, the -- how would I -- how
3 would I add to that now. The overpayment on
4 the $14 million, holding back additional shared
5 services amount, made an inordinate amount of
6 sense.
7      There was supposed to be at that
8 time -- there was another netting from Seery in
9 terms of wanting to be fair and reasonable, you
10 know, with employees and with the transition of
11 the estate, et cetera, and everything was going
12 to get trued up.
13      So I do believe there was an
14 expectation of a netting, et cetera, but
15 overall, Highland should have paid it. It
16 shouldn't have let it breach the cause, but at
17 least when I found out about it and they knew I
18 was annoyed. And I told them I didn't want it
19 to be in default, they gave me the numbers and
20 the amounts to cure it in their mind, and they
21 accepted it.
22      Now, I think they should have gone
23 back and incorporated prepays and said that no
24 amounts were due because of the prepays, et

Page 393

DONDERO - 10/29/21

1 cetera, but the calculation that they came up
2 to get it in compliance in good standing was a
3 million 4. And just like we relied on them to
4 pay it and keep us out of default, we relied on
5 them to set the amount to cure.
6      But I guess I would make the
7 argument that it shouldn't have been, but
8 again, I didn't want to mince -- I didn't want
9 to on small dollars make an argument that could
10 get us in bigger trouble -- bigger trouble. So
11 it was easier to -- to pay the million bucks
12 than it was to argue that it wasn't due.
13      Q.   Did you at any time in your capacity
14 as the person in control of NexPoint instruct
15 anybody at Highland to make the payment that
16 was due at the end of 2020?
17      A.   Not specifically to pay it or not
18 specifically not to pay it. It was something,
19 again, small and de minimis that I expected to
20 be done in due course.
21      MR. MORRIS: I move to strike.
22      Q.   It's a very simple question.
23      Did you personally take any steps to
24 ensure that NexPoint made the payment that was

Page 394

DONDERO - 10/29/21

1 due at the end of 2020?
2      Q.   Okay. I'm going to say the word
3      MS. DEITSCH-PEREZ: Asked and
4      answered.
5      A.   Yes, I would like to repeat my same
6 answer.
7      Q.   Did you tell anybody to make the
8 payment on behalf of NexPoint at the end of
9 2020?
10      MS. DEITSCH-PEREZ: Asked and
11      answered.
12      A.   I would like to give the same answer
13 that you -- you -- you struck.
14      Q.   Can you just say yes or no, sir, did
15 you tell anybody to make the payment at the end
16 of 2020 on behalf of NexPoint?
17      MS. DEITSCH-PEREZ: Asked and
18      answered.
19      A.   I don't want to give anything beyond
20 the answer that I gave.
21      Q.   Okay.
22      A.   I get myself in trouble because I
23 paraphrase. I don't want to answer yes -- I
24 don't think yes or no would be an appropriate
25 answer. I want to stay with the answer that I

Page 395

DONDERO - 10/29/21

1
2 gave.
3      Q.   Okay. I'm going to say the word
4 "Yankees," and every time I say the word
5 "Yankees" today, everybody should know that
6 that is the question that I'm going to bring to
7 the Court on a motion to compel, okay?
8      It's a very simple question. It's a
9 very simple question. I will ask one more
10 time, and if you don't want to answer, that is
11 fine.
12      MS. DEITSCH-PEREZ: What --
13      Q.   Mr. Dondero -- Mr. Dondero, in
14 December of 2020, did you give anybody any
15 instructions at Highland to make sure that
16 NexPoint made the payment that was due at the
17 end of the year?
18      MS. DEITSCH-PEREZ: Asked and
19      answered.
20      A.   I think that means I'm supposed to
21 stick with the answer that I gave.
22      MS. DEITSCH-PEREZ: You're on mute,
23 John. John, you're on mute. John, you're
24 on mute. John, we can't hear you.
25      THE WITNESS: I do like it better

Page 396

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2    when he yells at me on mute.
3        MS. DEITSCH-PEREZ: John, we can't
4    hear you.
5        COURT REPORTER: We can't hear you,
6    John.
7        MR. MORRIS: You can't hear me?
8        COURT REPORTER: Now we can.
9        MS. DEITSCH-PEREZ: Now we can hear
10   you, but we couldn't hear you. It looks
11   like you were yelling, but we couldn't hear
12   you.
13   A.    I do like it better when you yell at
14   me on mute.
15   Q.    I try not to yell at you, and I hope
16   that you haven't perceived this -- we do have a
17   videotape this time. So to the extent that
18   anybody perceives your comment as suggesting
19   that I have yelled at you, I would invite them
20   to look at the video.
21       MS. DEITSCH-PEREZ: Well, we said we
22   couldn't hear you, but your animation
23   looked like that.
24   Q.    Sir, can you identify any person in
25   the world acting on behalf of NexPoint who

Page 397

DONDERO - 10/29/21

1    instructed Highland to make the payment that
2    was due on the NexPoint term note in December
3    of 2020?
4        MS. DEITSCH-PEREZ: John, that is
5    the fifth or sixth time.
6        MR. MORRIS: It is a completely
7    different question. Please.
8        MS. DEITSCH-PEREZ: Could you read
9    it back, if I was mistaken. So read it
10   back.
11       (Record read.)
12   A.    NexPoint did not have the accounting
13   staff or the systems or the records or the
14   knowledge to have any person in the world at
15   NexPoint to give that instruction.
16       So the long answer -- the short
17   answer is no, but the long answer is we had
18   been kept away from our books and records. I
19   think we largely still don't have them, and
20   there would -- I was aware of anybody who --
21   anybody in the world at NexPoint who made that
22   request.
23   Q.    Frank Waterhouse was the treasurer
24   of NexPoint in December of 2020; is that

Page 398

DONDERO - 10/29/21

1    correct?
2    A.    I think he was very much viewing his
3    responsibilities as Highland related and as an
4    employee of Highland. But yes, based on that
5    incumbency certificate, but that is your --
6    your question to ask Frank if he was taking
7    that seriously, but NexPoint was relying on
8    Highland.
9    Q.    Do you have any other facts that you
10   are aware of that relate to the affirmative
11   defenses set forth in Paragraphs 81 through 82?
12   A.    I think I -- I think I've said them
13   all.
14       MR. MORRIS: Okay. It is 2:13
15   Eastern time. Let's just take a short
16   half-hour lunch break, and let's return at
17   2:45, or 1:45 Central.
18       VIDEOGRAPHER: Off the record, 1:13.
19   (Recess taken 1:13 p.m. to 1:48 p.m.)
20       VIDEOGRAPHER: Back on the record,
21   1:48.
22   Q.    Mr. Dondero, are you comfortable?
23   A.    Yes.
24   Q.    And are you able to proceed?

Page 399

DONDERO - 10/29/21

1    A.    Yes.
2    Q.    Okay. Did you speak with anybody
3    during the break about the substance of this
4    deposition?
5    A.    No.
6    Q.    You entered into certain oral
7    agreements with your sister concerning some of
8    the notes at issue in these lawsuits.
9        Do I have that right?
10       MS. DEITSCH-PEREZ: Object to the
11   form.
12   A.    Can you rephrase or repeat, please?
13   Q.    Sure.
14       You entered into certain oral
15   agreements with your sister concerning certain
16   of the notes at issue in these lawsuits.
17       Do I have that right?
18       MS. DEITSCH-PEREZ: Object --
19   A.    Yes.
20       MS. DEITSCH-PEREZ: Object to the
21   form. And I'm going to object -- object
22   every time because it just -- just so it is
23   on the record because you are saying "your
24   sister" without giving her -- her capacity.

Page 400

DONDERO - 10/29/21

1
2    A.    Okay.
3        MS. DEITSCH-PEREZ:  But I don't want
4    to disrupt the deposition, so I'm just
5    telling you why I'm doing it and he can
6    continue to answer thereafter.  That is why
7    I'm doing it.
8    Q.    Okay.  Can we -- can we agree,
9    Mr. Dondero, when I refer to your sister in the
10   context of oral agreements that she was
11   entering into those agreements with you as a
12   representative of Dugaboy -- as Dugaboy
13   trustee, as representative for a majority of
14   the class A interest holders of Highland?
15   A.    Yeah.  How about just to make it
16   simple let's just call it the Dugaboy trustee,
17   and everybody will know that it is my sister
18   and everybody will know that it is the majority
19   of the class A unit holders.
20   Q.    Okay.  Okay.  I appreciate that and
21   I will do just that.
22        You entered into certain oral
23   agreements with the Dugaboy trustee concerning
24   certain of the notes at issue in these
25   lawsuits; is that right?

Page 401

DONDERO - 10/29/21

1
2    A.    Yes.
3    Q.    Okay.  Let's discuss the purpose of
4    those oral agreements.
5        MR. MORRIS:  Can we put back up on
6    the screen Mr. Dondero's answer.
7    Q.    And while we're doing that,
8    Mr. Dondero, can you confirm that your sister
9    is the only trustee of the Dugaboy Investment
10   Trust?
11        MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.    For what period of time are we
14   talking about?
15   Q.    During the period of time at which
16   you entered into the oral agreements with the
17   Dugaboy trustee.
18        MS. DEITSCH-PEREZ:  Object to the
19   form.
20   A.    Yeah, I believe she has been the
21   trustee since 2015 and remains so today.  I
22   don't have an awareness of -- I don't have an
23   awareness of another functional trustee.
24        So some of these -- sometimes
25   complex trusts have other layers that are

Page 402

DONDERO - 10/29/21

1
2    called trustees but they're not trustees per
3    se.  But I think I'm over thinking it.  But I'm
4    not aware of anybody I've interacted with,
5    other than her, as trustee with regard to the
6    notes.
7    Q.    Okay.  So up on the screen we
8    have -- no, that is the wrong document.
9        MR. MORRIS:  We need Exhibit 31,
10   please.
11        Yeah, there you go.  That one.
12   Perfect.  Okay.
13        MS. DEITSCH-PEREZ:  31 is not -- oh,
14   is that the '03 answer?
15        MR. MORRIS:  Correct, that is
16   Mr. Dondero's answer.
17   Q.    Do you see that, sir, on the screen?
18        MS. DEITSCH-PEREZ:  Hang on.  I'm
19   going to get it again.
20        Okay.  If you want a hard copy, I
21   have one here but he's got it up.
22   Q.    Do you see on the screen,
23   Mr. Dondero, marked as Exhibit 31 is your
24   answer to Highland's amended complaint?
25   A.    Yes.

Page 403

DONDERO - 10/29/21

1
2    Q.    Okay.
3        MR. MORRIS:  Can we go to
4    Paragraph 82, please.
5    Q.    Is it your understanding that
6    Paragraph 82 describes, among other things, in
7    general terms your oral agreements with --
8    between you and the Dugaboy trustee?
9    A.    Yes.
10   Q.    Is it your position that the oral
11   agreements that you entered into with your
12   sister -- withdrawn.
13        Is it your contention that the oral
14   agreements you entered into with the Dugaboy
15   trustee applied to each of the notes that were
16   executed by NexPoint and that are the subject
17   of Highland's lawsuit against NexPoint?
18   A.    Yes.
19   Q.    Is it your contention that the oral
20   agreements that were entered into with the
21   Dugaboy trustee apply to the notes executed by
22   HCMS that are the subject of Highland's lawsuit
23   against HCMS?
24   A.    Yes.
25   Q.    Is it your contention that the oral

Page 404

DONDERO - 10/29/21

1
2 agreements between you and the Dugaboy trustee
3 apply to the notes that were executed by HCRE
4 that are the subject of the lawsuit that
5 Highland has commenced against HCRE?
6     A.  Yes.
7     Q.  Okay.  Do I understand correctly
8 that your oral agreements with your sister do
9 not apply to the notes that were executed on
10 behalf of HCMFA that are the subject of the
11 lawsuit that Highland commenced against HCMFA?
12     A.  Correct.
13     Q.  Okay.  I appreciate that.
14        Do you see in this paragraph towards
15 the middle it says, quote:  The purpose of this
16 agreement was to provide compensation to
17 defendant, James Dondero, who was otherwise
18 underpaid, compared to reasonable compensation
19 levels in the industry through the use of
20 forgivable loans, a practice that was standard
21 at HCMLP in the industry.
22        Have I read that correctly?
23     A.  Yes.
24     Q.  Is that the purpose of the agreement
25 that you entered into with your sister --

Page 405

DONDERO - 10/29/21

1 withdrawn.
2
3        Is that the purpose of the agreement
4 that you entered into with the Dugaboy trustee
5 concerning the notes at issue in the lawsuits
6 that were commenced against you personally?
7        Withdrawn.  That was a bad question.
8        Does that purpose apply only to the
9 notes that you executed or does it apply to the
10 corporate notes as well?
11        MS. DEITSCH-PEREZ:  Object to the
12 form.
13        Other than HCMFA?
14        MR. MORRIS:  Correct.  I think we've
15 established the scope of the agreements.
16     A.  To give a complete answer, from my
17 perspective it is about 50 million of notes
18 between -- current balance between NexPoint,
19 Services, myself, and HCRE.
20     Q.  And HCMS; right?
21     A.  Yes, Services, Highland Capital
22 Management, yes.
23     Q.  Okay.  So I just want to know, that
24 sentence there concerning the purpose was
25 omitted from the answers of NexPoint, HCMS,

Page 406

DONDERO - 10/29/21

1 HCRE.
2
3        And I'm happy to walk you through to
4 show you.  And I just want to know in your
5 capacity as a 30(b)(6) witness for those
6 entities, if you know why that statement of
7 purpose was omitted.
8     A.  Well, we talked about it earlier.  I
9 think there is some cleanup.  There has been
10 multiple lawyers involved.  We didn't know
11 which loans were prepaid, which loans weren't.
12 But, you know, I don't know why it was omitted
13 but it applies to all of them.
14        MS. DEITSCH-PEREZ:  I think that is
15 the first time that I've noticed that.  So,
16 John, I'm going to take a mea culpa.  I
17 think that is a cut-and-paste error.
18        MR. MORRIS:  All right.  Well, I
19 will -- I will just point out that the
20 affirmative defense concerning the oral
21 agreements is the exact same in all four
22 answers, except for the omission of the
23 statement of purpose for the three
24 corporate entities.
25     Q.  And so, Mr. Dondero, is it fair to

Page 407

DONDERO - 10/29/21

1 say that you don't know why that statement of
2 purpose was omitted from the corporate
3 entities' answers?
4     A.  Yeah, I don't know why it is omitted
5 or why the complaints aren't consistent with
6 that regard.
7     Q.  Okay.  But it is your -- it is your
8 position as the purpose -- as one of the people
9 who entered into this oral agreement that the
10 purpose for the -- for the condition subsequent
11 agreement is the same as for the corporate
12 entities as it is for you, as stated in this
13 paragraph; is that right?
14     A.  Yes.
15     Q.  Okay.  We talked a little bit about
16 the NexPoint term note.
17        Do you remember that?
18     A.  Yes.
19     Q.  And do you recall that in its
20 original form the NexPoint term note was for a
21 principal amount of approximately $30 million?
22     A.  Yes.
23     Q.  And do you recall that the NexPoint
24 term note was a rollup of the outstanding

Page 408

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2  principal and interest then due on certain
3  promissory notes that had previously been given
4  by NexPoint to Highland?
5      A.   Yes.
6      Q.   Okay.
7          MR. MORRIS:  Can we put up, please,
8      Exhibit Number 2, which I believe is the
9      complaint against NexPoint.
10         (Exhibit 2 marked.)
11         MR. MORRIS:  And if we can go to
12     Exhibit Number 1 of Deposition Exhibit
13     Number 2.
14     Q.   Okay.  And do you see -- I'm sorry,
15  sir, do you see that Exhibit Number 1 to the
16  complaint is a promissory note dated May 31st,
17  2017 in the approximate amount of
18  $30.75 million?
19     A.   Yes.
20     Q.   Okay.  And is that your signature on
21  page 2?
22     A.   Looks like it.
23     Q.   Okay.  And did you sign this note on
24  behalf of NexPoint on or around May 31st, 2017?
25     A.   I assume so.

Page 409

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2      Q.   Do you know if you read the note
3  before you signed it?
4      A.   Not likely.
5      Q.   Do you recall whether there was
6  anything about the note that you didn't
7  understand before you signed it on behalf of
8  NexPoint?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   Yeah, I'm not -- I doubt I read it,
12  so I don't remember objecting to anything.
13     Q.   Okay.  Looking at Paragraph 2.1, am
14  I characterizing that section fairly when I say
15  that the borrower was required to make an
16  annual installment payment at the end of each
17  calendar year?
18         MS. DEITSCH-PEREZ:  Object to the
19     form.
20     A.   I see that paragraph, yes.
21     Q.   Okay.  And did you understand when
22  you signed it that an annual installment
23  payment would be due at the end of each year by
24  NexPoint?
25         MS. DEITSCH-PEREZ:  Object to the

Page 410

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2      form.
3      A.   I never read it that closely.
4      Q.   So as the control person of
5  NexPoint, is it fair to say then that you don't
6  recall having an understanding when you signed
7  this note that NexPoint would be required to
8  make annual payments at the end of each year?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   I didn't have knowledge of the
12  specifics, and again, I would describe those
13  specifics as de minimis.
14     Q.   Okay.  Do you see -- do you have any
15  idea who drafted this note?
16     A.   It would have come from accounting.
17  I think they have boilerplate -- I don't know
18  if they work with legal at all.  I have no
19  idea, but it would have come through
20  accounting.
21     Q.   Do you recall that all three of the
22  term notes at issue were signed on the same
23  day, May 31st, 2017?
24     A.   That doesn't surprise me.  I think
25  there was an accounting reason, if I remember

Page 411

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2  correctly.  I think it had something to do with
3  either the audit or the financials or if we had
4  a credit facility at the time.  I think that is
5  probably why, but I don't remember exactly.
6      Q.   Do you have any other recollection
7  as to why all three notes were executed at the
8  end of May 2017?
9      A.   Again, I believe they're -- the --
10  aggregating or solidifying them into one
11  defined note I think was required by the
12  auditors or the -- the accounting department as
13  best practices.  I don't think -- it wasn't a
14  regulatory reason and it wasn't a compliance
15  reason.  I believe it was just an accounting or
16  an audit reason.
17     Q.   Did you ever make sure on behalf of
18  NexPoint that the terms of the promissory note
19  were fair and reasonable?
20         MS. DEITSCH-PEREZ:  Object to the
21     form.
22     A.   Yeah, I don't remember ever
23  negotiating or reading it that closely.  And
24  again, I think the view from all concerned is
25  that it was relatively de minimis from the

Page 412

DONDERO - 10/29/21

1  balance sheet at Highland then or now and/or de
2  minimis relevant to NexPoint's value.
3      Q.   It is a $30 million note.  Do I have
4  that right?
5      A.   Yes.
6      Q.   Okay.  And it was material enough to
7  be included in Highland's financial statements;
8  is that correct?
9      A.   Anything material or not as part of
10  doing proper audited financials needs to be
11  properly included.
12      Q.   Okay.  And you know, because you
13  signed the management representation letter,
14  that this note was specifically disclosed to
15  PwC and included in both Highland's and
16  NexPoint's audited financial statements;
17  correct?
18      A.   I would -- I would have been shocked
19  if it wasn't, if it is an asset and a liability
20  respectively of the companies.
21      Q.   Okay.  Do you see the section on
22  acceleration upon default, Paragraph 4?
23      A.   Yes.
24      Q.   Have you ever seen that section

Page 413

DONDERO - 10/29/21

1  before?
2      A.   No.
3      Q.   Do you think a prudent executive
4  signing a $30 million note should take the time
5  to read the terms and conditions of the note?
6      A.   Not necessarily.
7      Q.   Under what circumstances do you
8  think that an executive shouldn't take the time
9  to read the terms and conditions of a
10  $30 million promissory note?
11      A.   When it is between affiliates,
12  between friendly affiliates with no even
13  inkling that bankruptcy or the parties could be
14  at odds create a note, when it is a soft note
15  with limited collateral and limited other
16  protections.  And then the servicing or value
17  of the note is de minimis relative to the
18  balance sheets of each entity I think is a good
19  reason or logical reason for the executives on
20  both sides not to spend much time focusing on
21  it.
22      Q.   All right.  So you thought it was
23  reasonable not to read this particular note for
24  the reasons you just gave.

Page 414

DONDERO - 10/29/21

1  Do I have that right?
2      A.   Right.
3      MR. MORRIS:  Okay.  Can we go to the
4  next page, please.
5      Q.   Do you see Paragraph 5?  There is a
6  paragraph entitled Waiver.
7      A.   Yes.
8      Q.   And I will read it out loud:  Maker
9  hereby waives grace, demand, presentment for
10  payment, notice of non-payment, protest, notice
11  of protest, notice of intent to accelerate,
12  notice of acceleration, and all other notices
13  of any kind hereunder.
14      Have I read that correctly?
15      A.   Yes.
16      Q.   Do you know that that paragraph is
17  included in every single note that you signed
18  that is part of the litigation that we're here
19  to talk about today?
20      A.   You have to -- you have to define
21  when.  You know, like today I know that it
22  is -- it is in those notes.
23      At the end of '20, Seery and DSI
24  were withholding all notes, all information,

Page 415

DONDERO - 10/29/21

1  anything regarding the company from any of the
2  other subsidiaries, and Frank was administering
3  the notes on behalf of both the related parties
4  and Highland.
5      So at the time -- at the time I
6  would have -- I would have never known that at
7  the end of 2020.  And it is crazy to think I
8  would have remembered a clause in a soft note
9  from three years earlier.
10      Q.   Okay.  Is it fair to say that -- do
11  you understand today that that provision is
12  included in every note that you signed?
13      MS. DEITSCH-PEREZ:  Object to the
14  form.
15      A.   You're saying it, so I believe you.
16  I'm not asking you to go show me all the other
17  notes, but --
18      Q.   Thank you.
19      A.   -- I'm assuming it is in all the
20  other notes.  I will take your word for it.
21      Q.   And is it fair to say that at the
22  time you signed these notes you didn't take the
23  time to read that particular provision?
24      MS. DEITSCH-PEREZ:  Object to the

Page 416

DONDERO - 10/29/21

1   form.
2   A.   That is correct. A lot of it is
3   boilerplate. And, again, treasury or
4   accounting would have put in what was necessary
5   for regulatory, tax, audit purposes. Maybe the
6   auditors put that in. I have no idea.
7       But the content and the bullet
8   points here, the nine paragraphs on a soft note
9   would have been put in by other people and
10  administered by other people other than me.
11  Q.   What is a soft note?
12  A.   You know, like a secured -- I mean,
13  a note that isn't a hard note, like a note that
14  isn't secured, deed in lieu, UCC filed,
15  guaranteed, you know, performance and bad boy
16  clauses and all of that other stuff.
17      A soft note is an unsecured loan
18  that has basic terms to it, but it is likely
19  subject to renegotiation over time.
20  Q.   Were any of the notes that you
21  signed subject to negotiation?
22  A.   Well, I'm saying by definition that
23  is what a soft note is.
24  Q.   One that -- that is not subject to

Page 417

DONDERO - 10/29/21

1   the negotiation -- to negotiations?
2   A.   No, one that is over time subject to
3   negotiation or modification.
4   Q.   Okay.
5   A.   Because there is -- there is
6   limited -- there is limited, team collateral,
7   guarantee, bad boy features in -- in a soft
8   note.
9   Q.   Okay. Perhaps my question wasn't
10  clear.
11      Did the notes that you signed -- did
12  you negotiate them with anybody, the terms of
13  each note?
14  A.   No.
15  Q.   Okay. Did you personally decide on
16  the terms of each note?
17  A.   No. Again, they were two highly
18  solvent, highly well-capitalized subsidiaries,
19  and the amount of the notes was de minimis and
20  friendly, and they were soft notes administered
21  by a centralized treasury shared services
22  department.
23
24      They were the ones deciding what it

Page 418

DONDERO - 10/29/21

1   took to be compliant from an accounting
2   regulatory-wise standpoint, but wasn't -- they
3   were trying to come up with a balance note,
4   which I think this is, such that it wouldn't
5   have to be negotiated or haggled by any of the
6   parties.
7       And there is no evidence of any of
8   the notes ever being haggled or ever being
9   negotiated.
10  Q.   Okay. I appreciate that.
11      At the time you signed each of the
12  notes on behalf of the obligors, did the
13  obligors have an intention at the time you put
14  your signature on the page of repaying the
15  notes in accordance with their terms?
16  A.   Yes. They're all -- soft note
17  doesn't mean it's not a bona fide note. They
18  were all intended to be bona fide notes, and
19  they all are bona fide notes that were intended
20  to be paid and for the -- virtually most part,
21  were always paid or prepaid and, you know, paid
22  in accordance.
23  Q.   Do you see to the right there is a
24  list of prior notes?

Page 419

DONDERO - 10/29/21

1   A.   Yes.
2   Q.   And is it your understanding that
3   this note substituted and superseded the
4   promissory notes that are listed on Exhibit A
5   on the page there?
6   A.   Yeah. I mean, effectively pay those
7   off and reestablish an aggregate note.
8   Q.   Right. And Exhibit A actually set
9   forth the outstanding principal and interest
10  that NexPoint owed Highland under the prior
11  notes as defined there as of May 31st, 2017;
12  right?
13  A.   Yeah, that is what it looks like.
14  Q.   Okay. And -- and so the initial
15  principal amount of the prior notes was what is
16  stated there, approximately $27.675 million?
17  A.   Right.
18  Q.   Okay. You wouldn't have signed this
19  note on behalf of NexPoint if you didn't
20  believe at the time you signed it that NexPoint
21  owed Highland that amount of money; correct?
22  A.   Yeah, it is a bona fide note,
23  consistent with my testimony.
24  Q.   Okay. Do you know why NexPoint

Page 420

DONDERO - 10/29/21

1
2  borrowed the money from Highland at the times
3  and in the amounts listed on Exhibit A?
4     A.   No.
5     Q.   Did you authorize NexPoint to borrow
6  the money that is reflected in the prior note
7  set forth on Exhibit A?
8     A.   I don't know.  Probably some of
9  them, yes.
10    Q.   Okay.  And you have no recollection
11 at all as to why NexPoint borrowed over
12 $27 million from Highland in the 12-month
13 period from August 2014 to July 2015?
14    A.   Not without being refreshed.
15    Q.   Okay.  Do you have any knowledge as
16 to what NexPoint did with the proceeds from
17 these loans?
18    A.   Not without being refreshed.
19    Q.   Okay.  And you contend that this
20 note is subject to -- subject to one of your
21 oral agreements with the Dugaboy trustee;
22 correct?
23    A.   Yes.
24    Q.   Who decided to include this
25 particular note in your agreement with the

Page 421

DONDERO - 10/29/21

1
2  Dugaboy trustee?
3     A.   Me, myself.
4     Q.   Okay.  What was the purpose of
5  including this note in your agreement with the
6  Dugaboy trustee?
7          Was it to provide you with a
8  compensation?
9     A.   Yeah.  I mean, in fact, I think it
10 was articulated in that big paragraph
11 reasonably well that my cash compensation, I
12 believe through any lens, people would look at
13 it as de minimis from the standpoint of
14 Highland as asset manager.
15         I don't think it was more than a
16 couple million bucks in a year and it went
17 down, I think, in the '15 through '20 period.
18         So I think it is common in private
19 companies to loan money that is bona fide debt
20 and then forgive it at different times to
21 manage compensation and incentives to managers
22 of private companies.
23         This is a -- we're in -- we each
24 have experts talking about it, but I think this
25 is, you know, typical.

Page 422

DONDERO - 10/29/21

1
2     Q.   Can you identify any moment in the
3  25 or 26 year history that you were president
4  of Highland where Highland forgave an
5  intercompany loan for the purpose of providing
6  compensation to you or any other employee
7  except for the agreements that are described in
8  Paragraph 82 of your answer?
9     A.   Boy, I know we have masked it.  I
10 don't know if we -- it sounds like we may not
11 have sent it to you, but we have done it for a
12 dozen employees over the years in -- in fairly
13 significant amount --
14    Q.   I'm going to interrupt you, sir,
15 because it's not responsive to my question.  I
16 apologize for that.  I'm just focusing on
17 intercompany loans.
18         Can you identify any loan in the 25
19 or 26 years that you were president, an
20 intercompany loan where -- where Highland was
21 the payee that was forgiven for purposes of
22 giving you or any employee compensation, other
23 than -- other than the agreements that you
24 struck with the Dugaboy trustee?
25    A.   It is an odd question because I'm

Page 423

DONDERO - 10/29/21

1
2  the only one at the compensation level with the
3  interrelated entities who could possibly get
4  intercompany loans forgiven as part of the
5  comp, but it --
6     Q.   Okay.  So let me ask a cleaner --
7  let me ask a cleaner question.  I appreciate
8  that clarification.
9          Other than the agreements described
10 in Paragraph 82, can you think of any other
11 intercompany loan that was ever forgiven while
12 you were president of Highland for the purpose
13 of giving you compensation?
14    A.   I don't -- I don't know.
15    Q.   This is not an important issue; right?
16 The notion of a prior practice.  It is your
17 contention that there was a prior practice at
18 Highland -- hold on one second.  I apologize.
19         Sorry about that.  Somebody almost
20 dropped an air conditioner out the window.
21         MS. DEITSCH-PEREZ:  That would not
22 be good.
23         MR. MORRIS:  No.
24    Q.   All right.  Apologies.
25         MR. MORRIS:  May I have the last

Page 424

DONDERO - 10/29/21

1    question read back?
2        (Record read.)
3    Q.   I'm going to start all over here.
4        Mr. Dondero, do you contend that
5    there was a practice at Highland of forgiving
6    loans; is that correct?
7    A.   Yes.
8    Q.   And do you recall that we talked
9    about that issue back in May?
10   A.   Yes.
11   Q.   Okay.  And since -- since that time
12   have you made any effort to gather any
13   information that would demonstrate that there
14   was a prior practice at Highland of forgiving
15   loans?
16   A.   Yes.
17   Q.   And what efforts have you made?
18   A.   Like I said, we amassed a list, and
19   not insignificant list and not insignificant
20   amounts, proportionate to the people's
21   compensation where it was a practice.
22       You know, for some people for
23   relocation, for some people for bonuses, for
24   house purposes, for senior executives, senior

Page 425

DONDERO - 10/29/21

1    executives at the bank and board members at the
2    bank in the seven-figure kind of numbers that
3    were then subsequently forgiven.
4        It is -- I know we amassed more than
5    a dozen examples that were significant and
6    material.
7        MR. MORRIS:  Deborah, I apologize.
8    It is certainly possible I missed it, but I
9    don't recall seeing any list or any
10   documents of any kind that Mr. Dondero has
11   described.
12       Have they been produced?
13       MS. DEITSCH-PEREZ:  I think so.  I
14   will double-check, but I believe that
15   they're listed --
16       MR. MORRIS:  I know there is a list
17   of -- I apologize.  I know there is a list
18   of names in one of the discovery responses.
19   But other than the list of names in the
20   discovery response, I don't recall
21   receiving any documents at all.
22       MS. DEITSCH-PEREZ:  No.  And I think
23   we asked you for the documents because we
24   don't have access to the documents on

Page 426

DONDERO - 10/29/21

1    Highland's server.  The only thing I can
2    think of that we might owe you is there
3    might be a few additional names to list in
4    the interrogatory, and I will check whether
5    that has been done.
6        MR. MORRIS:  Okay.
7    Q.   Mr. Dondero, you sign management
8    representation letters in connection with
9    Highland's audit each year; is that right?
10   A.   Yes.
11   Q.   Do you understand that you have an
12   obligation when you sign the management
13   representation to disclose to the auditor all
14   agreements with affiliated entities and people
15   that are deemed to be material?
16       MS. DEITSCH-PEREZ:  Object to the
17   form.
18   A.   Generally, yes.
19   Q.   Okay.  And is it your understanding
20   that at least since 2008 Highland has disclosed
21   to its auditors all agreements with affiliates
22   that are material, as defined in the management
23   representation letter?
24   A.   Yes.

Page 427

DONDERO - 10/29/21

1    Q.   And would that include any
2    agreements to forgive loans that were deemed to
3    be material amounts?
4    A.   No, because it is contingent in long
5    term and speculative.
6    Q.   But at some point if it is forgiven
7    would that be -- would that be an event that
8    would be disclosed to the auditor?
9    A.   Sure.
10   Q.   Okay.  So is it fair to say that all
11   loans that were deemed to be material to the
12   extent they were forgiven were disclosed to the
13   auditors?
14   A.   Yes.
15   Q.   Okay.
16   A.   But, yeah, the only caveat I would
17   put on it is we have such limited information
18   regarding Cornerstone and Trust Life, which is
19   part of my agreement with the Dugaboy trustee
20   or with the majority of class A holders.
21       They could have been sold in
22   secrecy, without disclosure to us, such that
23   the notes are all forgiven at this point, but
24   we -- we -- we may never know.

Page 428

DONDERO - 10/29/21

1
2    Q.   So you can't rely on anything that
3    you don't know; is that fair?
4    A.   Yeah.
5    MS. DEITSCH-PEREZ:  Objection to
6    form.
7    A.   Yeah, we can't rely on things we
8    don't know and we can't rely on the debtor to
9    be honorable.
10   Q.   Well, the debtor has produced to
11   you, sir, every single audited financial
12   statement without redaction since 2008.  Are
13   you aware of that?
14   A.   That is actually news to me because
15   we were asking for them a couple of months ago.
16   That must be -- that must be a new production.
17   Q.   No.  Actually, it was produced to
18   you way back in July.  You are not aware of
19   that?
20   A.   No, I'm looking --
21   MS. DEITSCH-PEREZ:  Hang on.
22   A.   I'm looking at Deborah.  She'll --
23   MS. DEITSCH-PEREZ:  I will get the
24   date.
25   A.   Yeah.  I would love to see them.

Page 429

DONDERO - 10/29/21

1
2    Q.   So then -- so then it -- so is it
3    fair to say, sir, that when you are describing
4    this practice of forgiveness of loans, you are
5    doing so without having reviewed any of the
6    audited financial statements that Highland
7    provided to your attorneys going back to 2008?
8    MS. DEITSCH-PEREZ:  Object to the
9    form.
10   A.   What I'm saying, I guess, is that we
11   haven't treated the loans as forgiven yet
12   because if the condition precedent has been
13   satisfied, we're not aware of it yet.
14   Now, if there is something in those
15   financial statements that will show that the
16   condition precedent is satisfied, then we have
17   a decision to make about the -- or figure out
18   what the mechanism is for forgiving the loans.
19   Q.   Are you saying that there are loans
20   out there subject to forgiveness where the
21   maker is somebody other than you or an entity
22   that you control?
23   A.   No, I'm just -- I'm talking about
24   the 50 million of loans that we've been talking
25   about.

Page 430

DONDERO - 10/29/21

1
2    Q.   Okay.  So -- so I just want to go
3    back and focus on your assertion that there was
4    this practice of loan forgiveness.  I think you
5    have agreed with me that any loan that was
6    forgiven in a material amount would be
7    contained within the Highland audited financial
8    statements; right?
9    A.   I believe they -- material or not,
10   they were all included in the Highland
11   financials.  Now, they might not have been
12   specifically footnoted, you know.
13   Like in other words, if we gave
14   somebody half a million bucks to relocate and
15   then forgave the loan, it might just be mixed
16   with all other compensation in the line item.
17   It might not have been listed separately
18   because it would have been small relative to
19   the overall financial statement.
20   Q.   But you're just speculating right
21   now because, in fact, you haven't read the
22   audited financial statements for the purpose of
23   seeing whether or not there were loan -- loans
24   that were forgiven and disclosed; right?
25   MS. DEITSCH-PEREZ:  Object to the

Page 431

DONDERO - 10/29/21

1    form.
2    A.   Well, what I'm saying, just to be
3    clear, is I haven't looked at the presentation
4    of forgiven loans in the historic financials
5    because I was unaware that we had gotten
6    historic financials, but I am testifying that
7    we had amassed at least a dozen, 15 material
8    examples of material loan forgiveness amounts
9    to different executives.
10   Q.   All right.  Do you have any
11   documentation to support your assertion of the
12   practice of forgiving loans at Highland?
13   A.   Again, we have very, very little
14   access to anything, and we didn't take anything
15   with us that we weren't supposed to take, so we
16   don't have any of that documentation.
17   At NexBank, one of the sister
18   companies that we still have full control over
19   our records, we could show seven-figure-plus
20   loans to senior management and the entire board
21   of directors and forgiveness thereof as an
22   example, but that -- that is the only
23   documentation that we would be able to present
24   without having access to the records that you

Page 432

DONDERO - 10/29/21

1  guys are keeping from us.
2      MR. MORRIS: I move to strike the
3  last comment, and I take offense to it,
4  sir. We're not withholding anything, okay.
5      Q.   Would the NexBank audited financial
6  statements include a disclosure of the loans
7  that you are describing?
8      A.   Yes.
9      Q.   Okay. So is it fair to say that if
10  Highland forgave loans, it would be disclosed
11  in its audited financial statements?
12      MS. DEITSCH-PEREZ: Object, asked
13  and answered.
14      A.   Well, just to be clear, these loans
15  like the one up on the sheet, those were
16  included in Highland's financials, those loans,
17  just like the NexBank loans, when they were
18  made to senior executives were included. But
19  there wasn't a -- at NexBank there wasn't any
20  kind of disclosure that said, these might be
21  forgiven, or these are the terms that they
22  would be forgiven under, just like there was no
23  disclosure in the Highland financials that
24  these are the terms that it might be forgiven


Page 432

DONDERO - 10/29/21

1  guys are keeping from us.
2      MR. MORRIS: I move to strike the
3  last comment, and I take offense to it,
4  sir. We're not withholding anything, okay.
5      Q.   Would the NexBank audited financial
6  statements include a disclosure of the loans
7  that you are describing?
8      A.   Yes.
9      Q.   Okay. So is it fair to say that if
10  Highland forgave loans, it would be disclosed
11  in its audited financial statements?
12      MS. DEITSCH-PEREZ: Object, asked
13  and answered.
14      A.   Well, just to be clear, these loans
15  like the one up on the sheet, those were
16  included in Highland's financials, those loans,
17  just like the NexBank loans, when they were
18  made to senior executives were included. But
19  there wasn't a -- at NexBank there wasn't any
20  kind of disclosure that said, these might be
21  forgiven, or these are the terms that they
22  would be forgiven under, just like there was no
23  disclosure in the Highland financials that
24  these are the terms that it might be forgiven

Page 433

DONDERO - 10/29/21

1  under, et cetera, et cetera.
2      Q.   It's certainly disclosed in the
3  financials when it was forgiven. Will you --
4  will you concede that point?
5      A.   Yes, sure.
6      Q.   Okay. Let's move on.
7          Let's go to HCMS. Are you familiar
8  with the notes at issue in the lawsuit that was
9  commenced by Highland against HCMS?
10      MS. DEITSCH-PEREZ: S or --
11      A.   S as in Services. Yes.
12      MR. MORRIS: Okay. Can we please
13  put up Exhibit 3.
14      (Exhibit 3 marked.)
15      MS. DEITSCH-PEREZ: Is that in the
16  binder that you sent?
17      MR. MORRIS: Yes, as Exhibit 3.
18      MS. DEITSCH-PEREZ: Okay.
19      MR. MORRIS: And if we could go to
20  the Exhibits 1 through 4, okay.
21      Q.   Sir, we've put up on the screen
22  Exhibit 1 to Exhibit 3, which is the complaint
23  against HCMS. Do you see Exhibit 1 up on your
24  screen?

Page 434

DONDERO - 10/29/21

1      A.   Yeah. This is the $150,000
2  promissory note; is that that is?
3      Q.   Yes, sir.
4      A.   Okay. As long as I can see it on
5  the screen, I don't need to find it in hard
6  copy, do I?
7      MS. DEITSCH-PEREZ: Yeah.
8      MR. MORRIS: Can you scroll to the
9  second page, P.J.
10      Q.   Is that your signature, sir?
11      A.   Close.
12      Q.   Are you aware that your signature is
13  affixed to a $150,000 promissory note that was
14  made by HCMS to Highland Capital Management?
15      A.   Like I said --
16      MS. DEITSCH-PEREZ: Objection, form.
17      A.   Like I said, it's close. I don't
18  know if that is mine, but it's close.
19      Q.   Do you have any reason to believe
20  that either you or somebody you authorized
21  didn't sign this particular promissory note?
22      A.   Not specifically.
23      MR. MORRIS: Okay. Can we go to the
24  first page, please.

Page 435

DONDERO - 10/29/21

1      Q.   Did HCMS receive a loan from
2  Highland in the amount of $150,000 on March
3  28th, 2018?
4      A.   I assume so.
5      Q.   Okay. You wouldn't have either
6  signed or allowed your signature to be affixed
7  to this document if you didn't understand that
8  HCMS had received from Highland $150,000;
9  correct?
10      A.   This is one of the many things I
11  would have signed on a given day.
12      Q.   Okay. And -- are you aware that
13  this note was given to Highland's auditors?
14      A.   It could. I'm not aware
15  specifically, but it should be.
16      Q.   Okay. Do you have any recollection
17  as to why HCMS obtained this loan from
18  Highland?
19      A.   Unless it says it on these two
20  pages, I have no idea.
21      Q.   Okay. Do you have any recollection
22  as to what HCMS did with the proceeds of this
23  loan?
24      A.   No.

Page 436

DONDERO - 10/29/21

1
2    Q.   Okay.  Let's just flip through the
3    Exhibits 2, 3, and 4, if we could.
4        Looking at Exhibit 2, is that your
5    signature on Exhibit 2, sir?
6    A.   Again, it is close.
7    Q.   Okay.  And do you have any reason to
8    believe that that is either not your signature
9    or that you did not authorize somebody to sign
10   this on behalf of HCMS in June of 2018?
11   A.   No.
12   Q.   Okay.
13       MR. MORRIS:  Can we go to Exhibit 3,
14   please, and if we can go to the signature
15   line.
16   Q.   Do you see that that is Frank
17   Waterhouse?
18   A.   Yes.
19       MR. MORRIS:  Okay.  And can we go to
20   the page before that, the first page.
21   Q.   Frank Waterhouse was the treasurer
22   of HCMS in May 2019; correct?
23   A.   That is what it said right on that
24   thing we saw earlier; right?
25   Q.   Incumbency certificate.

Page 437

DONDERO - 10/29/21

1
2    A.   Yes.
3    Q.   Do you recall that HCMS borrowed
4    $400,000 from Highland in or around May 2019?
5    A.   Not specifically.
6    Q.   Do you have any reason to believe
7    that it didn't?
8    A.   I have no knowledge -- I have no
9    knowledge of what it was used for and whether
10   it did or didn't.
11       MR. MORRIS:  Okay.  Let's go to the
12   next exhibit, please.
13   Q.   Do you see Frank Waterhouse signed
14   here on behalf of the maker, HCMS Services?
15   A.   Yes.
16   Q.   Okay.  Are you aware that HCMS
17   borrowed $150,000 from Highland in June 2019?
18   A.   No.
19   Q.   Okay.  Do you have --
20   A.   I'm not aware and --
21   Q.   Do you have --
22   A.   I didn't -- I'm sorry, go ahead.  I
23   was just saying, looking at Frank's signature,
24   you know, we're switching from me signing to
25   Frank signing.  And I guess we're saying Frank

Page 438

DONDERO - 10/29/21

1
2    is an authorized signatory, although if you
3    look at Frank's, it looks like an automated
4    signature versus, you know, an actual
5    signature, but I assume you went over this with
6    him, but I don't have specific knowledge of
7    these at all.
8    Q.   And do you know that Mr. Waterhouse
9    from time to time used an electronic signature?
10       MS. DEITSCH-PEREZ:  Object to the
11   form.
12   A.   I believe he did.
13   Q.   And you saw -- you have seen his
14   electronic signature on other documents; is
15   that right?
16   A.   Yes.
17   Q.   So it doesn't surprise you to see
18   his electronic signature on a note; correct?
19   A.   Yeah.  Yeah, yeah.  Yeah, I don't
20   know.  But whether or not he did it or somebody
21   else did it or -- we're just getting a little
22   far afoot from me signing it; right?  That is
23   all.
24   Q.   Right.
25   A.   To -- Frank -- Frank may have signed

Page 439

DONDERO - 10/29/21

1
2    it.  He may have done it electronically or
3    somebody may have done it electronically for
4    him.  Those are just different answers than me
5    signing it; right?
6    Q.   Okay.  And -- and that is fair.
7        Are you aware that on December 3rd,
8    2020, Highland made a demand upon HCMS for
9    payment under these four notes that we have
10   just looked at?
11   A.   I knew there was a demand on the
12   NexPoint one.  Can you refresh me on this one?
13   Q.   Sure.
14       MR. MORRIS:  Can we go to the next
15   exhibit in Exhibit 3.  Exhibit 5.
16   Q.   You will see that there is a letter
17   dated December 3rd, 2020, from Mr. Seery to
18   HCMS?
19   A.   Yep.
20   Q.   And do you see that it was sent to
21   the attention of Mr. Waterhouse?
22       Do you see that, sir?
23   A.   Yes, yep.
24   Q.   And, again, Mr. Waterhouse at that
25   time was the treasurer of HCMS to the best of

Page 440

DONDERO - 10/29/21

1
2  your recollection; correct?
3     A. He primarily was the CFO of
4  Highland. But, yes, I mean, I do see that.
5     Q. Okay. And did you learn on or
6  around December 3rd that Highland had made
7  demand upon HCMS for payment of all outstanding
8  principal and interest due under the four
9  demand notes that are listed on the page there?
10    A. Yes, yep.
11    Q. So you knew that at the time; right?
12    A. Well, more importantly I knew they
13 were all subject to the same forgiveness
14 provisions as the other note.
15    Q. Okay. So I move to strike.
16       You knew in December 3rd, 2020, that
17 Highland made demand; correct?
18    A. Yes.
19    Q. Okay. And do you see that Highland
20 gave HCMS an eight-day grace period or until
21 December 11th, 2020, to make payment?
22    A. Yes.
23    Q. Under the demand note do you have
24 any understanding that Highland was required to
25 give any grace period at all?

Page 441

DONDERO - 10/29/21

1
2     A. I don't know.
3        MS. DEITSCH-PEREZ: Object to the
4     form.
5     Q. Do you know whether HCMS ever
6  responded to this demand letter prior to the
7  commencement of litigation?
8     A. I don't know.
9     Q. Prior to the commencement of
10 litigation, did you discuss with anyone whether
11 HCMS should respond to Highland's demand
12 letter?
13    A. Did I discuss with anyone? No, I
14 don't remember -- I don't remember talking
15 about this with Frank at all where --
16       MS. DEITSCH-PEREZ: And I'm just
17 going to stop you to make sure you don't
18 blurt out any privileged communications, if
19 there are any.
20       We object to the disclosure. But
21 with that caveat, go ahead.
22    A. I'm sorry, repeat the question
23 again. Let me try and keep it simple here.
24    Q. Sure. It may be my fault.
25       Mr. Dondero, you testified that you

Page 442

DONDERO - 10/29/21

1
2  were aware that Highland made a demand for
3  payment on these four notes; correct?
4     A. Yes.
5     Q. Okay. Did you have any
6  non-privileged communications at any time after
7  Highland sent this letter about whether and how
8  HCMS should respond?
9     A. You know, let me just -- let me
10 adjust the prior answer for a second.
11       I'm aware that this letter was sent.
12 I'm not sure I knew contemporaneously or when I
13 knew the letter was sent. I can't -- I have no
14 recollection of receiving it at the time.
15       And to answer your question, I can't
16 recollect talking to Frank or anybody else
17 about it at the time. I'm not sure I knew
18 about it at the time. But I have -- I don't
19 have any recollection of discussing it with
20 anybody at or around the time.
21    Q. Did you ever instruct anybody at any
22 time to respond to this letter, whenever it is
23 you learned about it?
24    A. No.
25    Q. Do you know if anyone acting on

Page 443

DONDERO - 10/29/21

1
2  behalf of HCMS ever informed Highland of HCMS'
3  defenses to the -- to the demand letter prior
4  to the commencement of litigation?
5     A. Yeah, Frank would be the person to
6  ask there. I don't know.
7     Q. I'm just asking you. Prior to the
8  commencement of litigation, did you ever
9  instruct anyone to inform Highland that the
10 HCMS notes were subject to oral agreements with
11 the Dugaboy trustee?
12    A. I believe former Judge Lynn sent a
13 letter in that regard. But other than that, I
14 don't remember talking to anybody -- I don't
15 remember talking to the debtor about it per se.
16    Q. It is your recollection that
17 Judge Lynn sent a letter to Highland before the
18 commencement of litigation, putting Highland on
19 notice that the HCMS notes were the subject of
20 oral agreements between you and the Dugaboy
21 trust.
22       Do I have that right?
23    A. Yeah, that they were part of
24 forgiveness or compensation or something. He
25 sent a letter in that regard.

Page 444

DONDERO - 10/29/21

1
2    Q.    And was this part of a settlement
3    discussion or was this in response to this
4    demand letter?
5        A.    I don't know.
6        Q.    Have you produced that letter in
7    discovery?
8        MS. DEITSCH-PEREZ:  I'm aware that
9    you have the letter.  I don't know if it
10   was attached to something, but I know you
11   have it.
12       MR. MORRIS:  Because you produced it
13   in discovery or because Mr. Dondero is
14   testifying that his recollection was that
15   Mr. Dondero sent this letter to the debtor?
16       MS. DEITSCH-PEREZ:  The -- the
17   letter has either been produced or was
18   attached to something or was used in a
19   deposition, but I am aware that you have
20   it.  If you need it to be Bates stamped, we
21   could do that.
22       MR. MORRIS:  I definitely need it to
23   be Bates stamped, I do, because I'm not
24   aware of this particular letter.  But I
25   appreciate that.

Page 445

DONDERO - 10/29/21

1
2        MR. RUKAVINA:  This is Davor.
3    Couple things, John -- and I apologize for
4    interjecting.  I have not made an
5    appearance yet today.  Deborah has been
6    objecting for everyone.
7        Thomas Berghman will take over
8    around 3:00 o'clock.  Is that okay with
9    you, John?
10       He is probably just going to sit
11   here and not object.
12       MR. MORRIS:  I will miss you and I
13   hope you have safe travels.
14       MR. RUKAVINA:  Okay.  Thank you very
15   much.
16       And, second, I think that the letter
17   that is being referred to is the email
18   letter, so I have produced it to you.
19       With that, thank you everyone.
20       MR. MORRIS:  Okay.  Take care.
21       Q.    Did anyone -- did you ever instruct
22   anyone in December 2020 to make the payments
23   that Highland demanded under the HCMS notes?
24       MS. DEITSCH-PEREZ:  The demand notes
25   that are listed here on the Exhibit 5?

Page 446

DONDERO - 10/29/21

1
2        MR. MORRIS:  Yes.
3        A.    Yes, not that I recall.
4        Q.    Did you ever instruct anyone in
5    December 2020 not to make the payments that
6    Highland demanded that are listed in this
7    exhibit?
8        A.    No.
9        Q.    Do you know why HCMS did not make
10   the payments that Highland demanded under the
11   notes?
12       A.    Again, beyond compensation
13   forgiveness argument, no.
14       MR. MORRIS:  Okay.  Let's go to the
15   next exhibit, 6.
16       (Exhibit 6 marked.)
17       Q.    And this is another one of the term
18   notes; right?
19       A.    Yes.
20       MR. MORRIS:  And can we just go to
21   the signature line, please.
22       Q.    Is that your signature, sir?
23       A.    That looks more like it.
24       Q.    And do you -- are you willing to
25   agree that you signed this promissory note in

Page 447

DONDERO - 10/29/21

1
2    favor of Highland on May 31st, 2017?
3        A.    Yes.
4        Q.    And is it fair to say you didn't
5    read this note before you signed it?
6        A.    Correct.  No reason to, really.
7        Q.    Okay.  So it is fair to say that
8    there is not a provision of this note that you
9    didn't understand before you signed it;
10   correct?
11       MS. DEITSCH-PEREZ:  Object to the
12   form.
13       A.    That I didn't review it, so
14   therefore I didn't have a opinion one way or
15   the other.
16       Q.    Okay.  This note substituted and
17   superseded for the promissory notes that are
18   set forth on Exhibit A to this document;
19   correct?
20       A.    Yes.
21       Q.    So just like NexPoint and HCMS, HCRE
22   also consolidated their outstanding demand
23   notes into one term notes at the end of
24   May 2017; right?
25       A.    Yep.

Page 448

DONDERO - 10/29/21

1      Q.   Okay.  Let's go to HCRE, if we can
2  take this down and put up Exhibit 4.
3      Q.   Okay.  Let's go to HCRE, if we can
4      Actually, before we go to that, do
5  you have any recollection as to why HCRE
6  borrowed money from Highland in the amounts
7  equal to the prior notes as set forth to the
8  exhibit to the term note?
9      A.   Nope.
10     Q.   Do you have any recollection at all
11  as to what HCRE did with the proceeds of the
12  loans that it obtained from Highland?
13     A.   No.
14     Q.   This is Exhibit 4, so this is the
15  complaint -- this is actually the complaint
16  against HCRE.
17         MR. MORRIS:  Can we go to Exhibit 6,
18  please.
19         MS. DEITSCH-PEREZ:  Exhibit 6 of
20  Exhibit 4?
21         MR. MORRIS:  No, I apologize.  That
22  was my mistake.  Yes, Exhibit 6 to Exhibit
23  4.
24         MS. DEITSCH-PEREZ:  Okay.  If you
25  want the hard copy, it is in a booklet.

Page 449

DONDERO - 10/29/21

1      Otherwise, she is pulling it up.
2      Q.   So this is the last of the three
3  term notes.  Do you see that?
4      A.   Yes.
5      Q.   Also signed on May 31st, 2017;
6  correct?
7      A.   Yes.
8      Q.   And if we could look at the
9  signature line, is that your signature, sir?
10     A.   Yes.
11     Q.   And did you sign this note on behalf
12  of HCRE on or about May 31st, 2017?
13     A.   Yes.
14     Q.   Did you read this note before you
15  signed it?
16     A.   No.
17     Q.   And since you didn't read it, is it
18  fair to say that there wasn't a provision of
19  this agreement that you didn't understand at
20  the time that you signed it?
21         MS. DEITSCH-PEREZ:  Object to the
22  form.
23     A.   There is -- there wasn't a
24  provisions I did or didn't understand because I

Page 450

DONDERO - 10/29/21

1  didn't review it.
2      Q.   Okay.  This note substituted and
3  superseded for the promissory notes that are
4  listed on Exhibit A on the right side of the
5  page; correct?
6      A.   Yes.
7      Q.   And Exhibit A set forth the
8  outstanding principal and interest that HCRE
9  owed to Highland under the prior notes as of
10  May 31st, 2017; correct?
11     A.   Uh-huh.
12     Q.   That is a yes, sir; correct?
13     A.   Yes.
14     Q.   Okay.  Do you know why HCRE borrowed
15  the money from Highland at the times and -- and
16  in the amounts set forth on Exhibit A to the
17  promissory note?
18     A.   No.
19     Q.   Do you have any recollection as to
20  what HCRE did with the proceeds of the loans
21  that they had obtained from Highland between
22  January 2014 and April 2015?
23     A.   No.
24     Q.   Can we call the three term notes

Page 451

DONDERO - 10/29/21

1      that were signed by NexPoint, HCRE, and HCMS on
2  May 31st, 2017 collectively as the term notes?
3      A.   Yes.
4      Q.   Okay.  You had the authority to sign
5  each of the term notes on behalf of each of the
6  respective makers; correct?
7      A.   Yes.
8      Q.   Each of the term notes was for a
9  30-year term; correct?
10     A.   I believe so.
11     Q.   Okay.  Who decided to give each note
12  a 30-year term, if you know?
13     A.   The auditors, the accountants, not
14  me.
15     Q.   But you knew that each of the notes
16  was for a 30-year term; is that fair?
17     A.   Yes, I guess, yes.
18     Q.   Notes were unsecured; right?
19     A.   Yes.
20     Q.   And the notes were not the product
21  of any negotiations; correct?
22     A.   Correct.
23     Q.   Is it fair to say that none of the
24  makers of the term notes ever sought financing

Page 452

DONDERO - 10/29/21

1
2 from a third party as an alternative to the
3 Highland notes?
4     A.   That's correct.
5     Q.   Okay.  You don't have any reason to
6 believe that an unrelated third party would
7 have loaned money to NexPoint, HCRE, and HCMS
8 on the terms set forth in each of the term
9 notes, do you?
10        MS. DEITSCH-PEREZ:  Object to the
11    form.
12    A.   I -- it is not fair to draw that
13 conclusion.  You know, particularly NexPoint
14 has borrowed a lot of money at much lower rates
15 at or around 2017 and later, and to this day.
16    Q.   So then why --
17    A.   The same thing with HCRE.
18    Q.   So then why would HCRE and NexPoint
19 enter into these loans rather than obtaining
20 loans at lower interest rates if they were
21 available?
22    A.   These are soft loans, again, so
23 they're -- especially affiliate soft loans to
24 other creditors are viewed almost as equity or
25 subordinated to senior secured mortgages or

Page 453

DONDERO - 10/29/21

1
2 other financings that NexPoint and HCRE did.
3 So I would say that is -- that is the reason.
4     Q.   Are you saying that Highland today
5 really has equity interests in NexPoint, HCRE,
6 and HCMS?
7         MS. DEITSCH-PEREZ:  Object to the
8     form.
9     A.   Yeah, no, I didn't say that.  I'm
10 saying it has subordinated debt interest, but
11 they are soft notes, so they're viewed as
12 deeply subordinated equity-ish, so to speak, as
13 far as the senior secured debtholders are
14 concerned.
15    Q.   Well, that would be true of any
16 senior secured debt relative to unsecured debt;
17 isn't that right?
18    A.   Yes, but again, these are
19 particularly soft notes, you know.
20    Q.   Okay.  At the time you signed these
21 notes, were you aware that each of the term
22 notes required payment of an annual installment
23 on December 31st of each year?
24        MS. DEITSCH-PEREZ:  Object to the
25    form.

Page 454

DONDERO - 10/29/21

1
2     A.   I knew there was more required
3 periodic payments than historically, and that
4 was part of -- partly driven by the -- the
5 auditors, I believe.
6         THE WITNESS:  You know what, can
7     we -- can we take a break for five or
8     10 minutes, and then, you know, at most --
9     at most I've got another hour in me today,
10    and then so we could just work on when it
11    fits on everybody else's calendar if we
12    can't wrap up in an hour; okay?
13        MR. MORRIS:  No problem,
14    Mr. Dondero.  So the time now is what --
15    what time do we have?
16        VIDEOGRAPHER:  Off the record, 2:56.
17    (Recess taken 2:56 p.m. to 3:19 p.m.)
18        VIDEOGRAPHER:  Back on the record,
19    3:19.
20    Q.   Are you ready to proceed, sir?
21    A.   Yes.
22    Q.   Okay.  Did you speak with anybody
23 during the break about the substance of this
24 deposition?
25    A.   No.

Page 455

DONDERO - 10/29/21

1
2     Q.   So we were just looking at the third
3 in the series of term notes, and if we can go
4 to the -- I apologize, the first page of this
5 one, just to refresh your recollection after
6 the break that this is the term note that was
7 executed by you on behalf of HCRE Partners on
8 May 31st, 2017.
9         Do you see that?
10    A.   Yes.
11    Q.   Okay.  And I looked at Paragraph 5
12 before, but I just want to make sure, you're
13 telling me that you didn't read this before you
14 signed it, do I have that right, Paragraph 5?
15    A.   Yes.
16    Q.   And so you are unaware -- when did
17 you first -- when did you first become aware of
18 the provision that is set forth in Paragraph 5?
19        MS. DEITSCH-PEREZ:  Object to the
20    form.
21    A.   I don't know.
22    Q.   Okay.  Was it before or after the
23 commencement of the litigation?
24    A.   I don't know.
25    Q.   Okay.  NexPoint didn't make the

Page 456

DONDERO - 10/29/21

1
2  installment payment that was due at the end of
3  2020; correct?
4       MS. DEITSCH-PEREZ: Object to -- are
5  you still talking -- have you left HCRE?
6       MR. MORRIS: No. I said what I
7  meant to. So we can take down the exhibit
8  if that's the part that is confusing you.
9  I appreciate that.
10       MS. DEITSCH-PEREZ: Okay.
11       Q. Okay. NexPoint didn't make the
12  installment payment that was due at the end of
13  2020; correct?
14       MS. DEITSCH-PEREZ: Object to the
15  form.
16       A. Yeah. I mean, I think maybe the
17  right way to describe it is Highland or --
18  yeah, Highland or Frank Waterhouse on behalf of
19  NexPoint didn't make the payment.
20       Q. Okay. And HCRE didn't make the
21  installment payment that was due at the end of
22  2020; correct?
23       A. I don't -- I guess -- okay, if they
24  missed it too, I -- I did not have specific
25  awareness to that, I guess, but if you are

Page 457

DONDERO - 10/29/21

1
2  suing under it, I guess they did.
3       Q. Right. And HCMS didn't make the
4  payment that was due at the end of the year, to
5  the best of your knowledge; correct?
6       MS. DEITSCH-PEREZ: Object to the
7  form.
8       A. Yeah. I mean, what I'd just
9  separate in my notes here is the HCMFA was just
10  not -- it wasn't a bona fide note, I guess,
11  is -- that is -- which I guess is a
12  different -- a different conversation.
13       Q. Yeah. Do you understand that the
14  question was about HCMS? Let me restate the
15  question.
16       MS. DEITSCH-PEREZ: Yes.
17       Q. HCMS --
18       A. Oh, I'm sorry.
19       MS. DEITSCH-PEREZ: John, I'm sorry,
20  it is really hard on the video to
21  distinguish between HCMF and HCMS, so if
22  you could just --
23       A. How about just say Services for
24  Highland Capital Management Services, just
25  say -- instead of S, just say Services.

Page 458

DONDERO - 10/29/21

1
2       Q. Sure. All right. So from now on, I
3  will try and use the word "Services" and you
4  will know that that means Highland Management
5  Services, Inc.; is that fair?
6       A. Yes, okay.
7       Q. Okay. So Services didn't make the
8  installment payment that was due at year-end;
9  correct?
10       A. Yes.
11       Q. Okay. And I just want to make sure
12  that I have this right. Is it -- is it the
13  corporate obligors' -- those three corporate
14  obligors' contention that one of the reasons
15  they didn't make the payments at the end of the
16  year is that they were relying on Highland to
17  make the payment for them?
18       A. Absolutely.
19       Q. Okay.
20       A. It was due course de minimis, and
21  those entities didn't have a single employee or
22  capable financial person other than the people
23  at Highland that were doing the shared services
24  for them.
25       Q. NexPoint didn't have any employees

Page 459

DONDERO - 10/29/21

1
2  in December 2020. Is that your testimony?
3       A. I was thinking about HCRE and
4  Services had zero employees. NexPoint had
5  employees but none that were involved in basic
6  accounting functions.
7       Q. Okay. And -- and there are people,
8  including yourself, who were officers or
9  employees of NexPoint in December 2020;
10  correct?
11       A. Yes.
12       Q. And HCRE had officers in December
13  2020, including you; correct?
14       A. Yes. Officers, yes.
15       Q. And Services had officers in
16  December 2020, including you; correct?
17       A. Yes.
18       Q. Okay. I think in summary form, to
19  be fair, I think we have identified one of the
20  defenses for these three corporate obligors.
21       Two of them have the defense of
22  prepayment; right?
23       A. Yes.
24       Q. And one of them is NexPoint,
25  NexPoint has the defense of prepayment.

Page 460

DONDERO - 10/29/21

1 
2 Do you have that -- do I have that
3 right?
4 A. Yes.
5 Q. Which of the other two, remind me?
6 A. Services.
7 Q. Okay. So NexPoint and Services have
8 the defense of prepayment. Are there any other
9 reasons that you know of that these three
10 corporate obligors didn't make the annual
11 installment payment that was due at the end of
12 the year?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 A. Again, they -- they should have been
16 in regular course. Those payments -- using the
17 word "payment" is almost like an overstatement
18 of the significance or the amount. If the
19 amounts were small in all cases, they should
20 have been made or they should have been paid,
21 even in the context of contention and even in
22 the context of the larger amounts of money that
23 Highland owed us.
24 Q. I'm just -- I'm just asking a pretty
25 simple question, sir. I don't mean to be

Page 461

DONDERO - 10/29/21

1 contentious with you. We have identified one
2 defense that these corporate obligors contends
3 exists; and that is, Highland was supposed to
4 make the payment. Fair?
5 A. Yes.
6 Q. And then we have identified a second
7 defense for NexPoint and HCMS, and that is
8 their defense that they prepaid.
9 Do I have that generally right?
10 A. Yes.
11 Q. Can you describe for me any other
12 defenses that these three corporate obligors
13 have for not making the payment that was due at
14 the end of the year?
15 MS. DEITSCH-PEREZ: Object to the
16 form.
17 A. I'm thinking. Not at the moment.
18 Q. Okay. Did you instruct anyone in
19 December of 2020 to make the installment
20 payments that were due on December 31st under
21 these three term notes?
22 MS. DEITSCH-PEREZ: Object to the
23 form, asked and answered.
24 A. No.

Page 462

DONDERO - 10/29/21

1 
2 Q. Okay. Did you take any steps to
3 confirm that Highland would make the payments
4 that were due under these three term notes at
5 the end of the year?
6 MS. DEITSCH-PEREZ: Object to the
7 form.
8 A. No. I testified already the first I
9 heard about it was a week or two later. And I
10 called up Frank and confirmed with him to make
11 sure they got paid and make sure they were back
12 in compliance.
13 Q. Okay.
14 MR. MORRIS: I move to strike
15 everything after the word "no."
16 Q. Do you know whether anybody on
17 behalf of any of the three corporate obligors
18 under the term notes ever directed Highland to
19 make the payments under them at the end of the
20 year?
21 MS. DEITSCH-PEREZ: Object to the
22 form.
23 A. Not before the end of the year, no.
24 Q. Okay. And do you know whether
25 anybody acting on behalf of any of the three

Page 463

DONDERO - 10/29/21

1 corporate obligors under the term notes ever
2 took any steps in December 2020 to make sure
3 that Highland would, in fact, make the payments
4 that were due at year-end?
5 MS. DEITSCH-PEREZ: Object to the
6 form.
7 A. No, there was a reliance on
8 Highland.
9 Q. Okay. Is it your testimony that
10 Highland was authorized to make the payments
11 under the notes at year-end without being
12 directed by a representative of the three
13 corporate obligors?
14 A. Yes. It is my contention that that
15 is how it worked in prior years also.
16 Q. And so you believe that nobody on
17 behalf of any of the corporate obligors ever
18 authorized or directed Highland to make the
19 payments but that Highland did it without --
20 without direction?
21 MS. DEITSCH-PEREZ: Object to the
22 form.
23 A. Yes, typically. And in 2017 or
24 2018, 2019, for sure.

Page 464

DONDERO - 10/29/21

1
2    Q.   Okay.  We have looked at one -- at
3    one December 3rd letter.  I mean, do you
4    remember that you also received a number of
5    letters on December 3rd demanding payment on
6    certain promissory notes?
7    A.   No.
8    Q.   All right.
9        MR. MORRIS:  Can we call up
10   Exhibit 2, please.  No, I apologize.  Not
11   Exhibit 2, Exhibit 4.
12       (Exhibit 4 marked.)
13       MS. DEITSCH-PEREZ:  Exhibit 4 in the
14   notebook?
15       MR. MORRIS:  Yes, ma'am.
16       Okay.  And now let's -- let's go to
17   the exhibits.  Exhibit 2, Exhibit 3,
18   Exhibit 4, Exhibit 5.
19   Q.   Do you see, sir, that this is a
20   letter addressed to you on behalf of HCRE
21   Partners that is also dated December 3rd, 2020?
22   A.   Yes.
23   Q.   Does that refresh your recollection
24   that you also received notices, demand notices
25   on or around December 3rd, 2020, with respect

Page 465

DONDERO - 10/29/21

1
2    to notes that were held by Highland?
3    A.   No.
4    Q.   Do you recall this letter at all?
5    A.   No, if I -- if I had, I would have
6    made the forgiveness argument or I would have
7    told someone to make the forgiveness argument,
8    but I don't remember this at all.
9    Q.   Okay.  Is it fair to say that
10   neither you nor anyone acting on behalf of
11   yourself, HCMS, or HCRE ever responded to any
12   of the demand letters at the beginning of
13   December 2020?
14       MS. DEITSCH-PEREZ:  Object to the
15   form.
16   A.   Yes, I don't -- I don't know.
17   Q.   You don't have any knowledge of
18   that; is that fair?
19       MS. DEITSCH-PEREZ:  Object to the
20   form.
21   A.   I don't know.
22   Q.   And you don't have any knowledge of
23   anybody responding to any demand letter that
24   was sent to HCMFA; correct?
25       MS. DEITSCH-PEREZ:  Object to the

Page 466

DONDERO - 10/29/21

1
2    form.
3    A.   HCMFA or Services?
4    Q.   HCMFA?
5    A.   I -- I don't know.  I don't have any
6    knowledge.
7        MR. MORRIS:  Can we put up
8    Exhibit 1, please.
9        (Exhibit 1 marked.)
10       MR. MORRIS:  We probably want to go
11   to Exhibit 3 of that document.
12   Q.   This one was sent to Mr. Waterhouse.
13       Do you see that?
14   A.   Yes.
15   Q.   Okay.  And did you become aware on
16   or around December 3rd, 2020, that Highland
17   made demand under the two notes listed in this
18   letter?
19   A.   Yes.  Why would this one go to
20   Frank Waterhouse?
21   Q.   Was he the treasurer -- was he the
22   treasurer of Highland Capital Management Fund
23   Advisors at the time?
24   A.   Right.
25   Q.   So does it make sense that the payee

Page 467

DONDERO - 10/29/21

1
2    on a note might send a demand letter to the
3    treasurer of the maker of the note?
4        MS. DEITSCH-PEREZ:  Object to form.
5    A.   I'm just saying they could have sent
6    the NexPoint letter or the Services letter to
7    him also; right?
8    Q.   I don't -- I think the NexPoint is
9    only a term note; right?  So there is no demand
10   letter.
11   A.   No, I know that.  But whatever --
12   whatever the other one we were just looking at,
13   the Services one could have gone to him, too.
14       Anyway, whatever.  It doesn't
15   matter.  But, no, I don't have a specific
16   recollection of this, if that was your
17   question.
18   Q.   You don't have -- you don't have any
19   recollection of Highland making demand under
20   promissory notes that were issued by you and
21   certain of your affiliates in early December
22   2020.  You don't remember that at all?
23   A.   There was a lot going on then.  And,
24   again, it wasn't something that we either
25   thought was legitimate based on forgiveness or

Page 468

DONDERO - 10/29/21

1 other issues or it wasn't things that we
2 thought were legitimate as part of the overall
3 settlement.
4 You've got to remember we didn't
5 realize Seery betrayed the estate at this
6 point. We thought we were moving towards, you
7 know, resolution or a pot plan.
8 Q. Okay.
9 MR. MORRIS: I move to strike.
10 Q. And please listen carefully to my
11 question.
12 Did you have any knowledge in early
13 December 2020 that Highland made demand for
14 payment under demand notes that were issued by
15 you and certain of your affiliates?
16 A. Same answer.
17 Q. Were you aware or you were not
18 aware?
19 A. Well, no specific knowledge for the
20 reasons articulated in the answer that you --
21 you moved to strike.
22 Q. Okay. So -- so you had -- you had
23 no particularized knowledge of the demands in
24 December 2020; correct?
25

Page 469

DONDERO - 10/29/21

1 A. Right.
2 Q. Okay. And so it is fair to say that
3 you never directed anybody to respond to these
4 demands because you didn't have knowledge of
5 them; correct?
6 A. Right.
7 Q. Okay. Do you know whether anybody
8 responded on behalf -- on your behalf or any of
9 the corporate obligors' behalf to any of the
10 demand letters that were -- that you now know
11 were sent in early December 2020?
12 A. Well, yes. I mean, I know
13 eventually. I don't know when, but I don't
14 think anybody believes these -- these HVIN
15 notes are legitimate notes.
16 I know the response was more around
17 it being payments for the TerreStar regulatory
18 obligations for all the things that Highland
19 had mucked up in the TerreStar situation.
20 Q. While you were president of that
21 entity; right?
22 A. Yes.
23 Q. Okay. And -- and
24 PricewaterhouseCoopers certainly doesn't think
25

Page 470

DONDERO - 10/29/21

1 these are frivolous obligations, does it?
2 MS. DEITSCH-PEREZ: Object to the
3 form.
4 A. PricewaterhouseCoopers doesn't --
5 Q. PricewaterhouseCoopers specifically
6 included a disclosure of all of these
7 promissory notes in the audited financial
8 statements; correct?
9 MS. DEITSCH-PEREZ: Object to the
10 form.
11 A. I mean, as they should have with the
12 information they had at the time, but I think
13 what has come out since then is that they -- it
14 was moneys that moved from Highland to HFAM for
15 things that were caused by Highland and people,
16 not me, not even Frank, I think, but other
17 people assumed it was a note and made notes out
18 of it. And that is what PricewaterhouseCoopers
19 put into the financials, but I think what
20 everybody acknowledges is that they were
21 never -- they were never notes.
22 Q. Is there a document that you have
23 ever seen in your life that supports what you
24 just said?
25

Page 471

DONDERO - 10/29/21

1 MS. DEITSCH-PEREZ: Object to the
2 form.
3 A. Yes.
4 Q. Can you identify that document for
5 me?
6 A. Yeah. It is a -- it is a settlement
7 with the SEC in terms of what they said the
8 breaches were, and why they were finding HFAM,
9 the rationale that they had in the regulatory
10 breaches and in the settlement, and all of the
11 breaches in the settlement were things that
12 Highland did, not that HFAM did.
13 It was all valuation, it was all --
14 it was all services that HFAM had contracted
15 with Highland that were performed deficiently
16 in the eyes of the SEC.
17 Q. Okay. We will -- we will get to
18 that in more detail, but I just would like to
19 know if you believe that any correspondence to
20 the SEC specifically stated that Highland
21 Capital Management, L.P. and not Highland
22 Capital Management Fund Advisors, L.P. was
23 responsible for the TerreStar valuation error.
24 A. The SEC would not have parsed
25

**Page 472**

DONDERO - 10/29/21

1     DONDERO - 10/29/21
2 between the different players in the entities.
3 They would have said what they thought the
4 breaches were overall in their letter, and what
5 would govern the split is the shared services
6 agreement and where were the employees that
7 performed the activities that they cited.
8     Q.  Okay.  We will get to that at a
9 later time.
10     All right.  Let's go back to the
11 oral agreements that you entered into with the
12 Dugaboy trustee.
13     MR. MORRIS:  And let's start by
14 putting back up Exhibit 31, Paragraph 82.
15     MS. JEFFRIES:  I'm sorry, can you
16 repeat that?
17     MR. MORRIS:  Yes.  Exhibit 31,
18 Paragraph 82, yes.
19     Q.  And, again, Mr. Dondero, I think you
20 have testified already that you believe
21 Paragraph 82 generally describes the oral
22 agreement that you entered into with the
23 Dugaboy trustee with respect to the promissory
24 notes that we've described; right?
25     A.  Yes.

**Page 473**

1     DONDERO - 10/29/21
2     Q.  And -- and it is -- and that
3 includes the promissory notes that you signed
4 that Highland is suing on as well as the
5 promissory notes that HCRE, HCMS, and NexPoint
6 signed that Highland is suing on; correct?
7     A.  Yes.
8     Q.  Okay.  Do you contend that the oral
9 agreements that you entered into with the
10 Dugaboy trustee modified the parties' rights
11 under the original promissory notes?
12     MS. DEITSCH-PEREZ:  Object to the
13 form.
14     A.  Modify, boy, sounds like a legal
15 term.  It said conditions by which they could
16 be forgiven.
17     Q.  And there were no such conditions in
18 the original notes; right?
19     A.  That is correct.
20     Q.  Okay.  So I'm just asking you from
21 your perspective whether the oral agreements
22 that you entered into with the Dugaboy trustee
23 were intended to modify the parties' rights and
24 obligations under the original promissory
25 notes.

**Page 474**

1     DONDERO - 10/29/21
2     MS. DEITSCH-PEREZ:  Object to the
3 form.
4     A.  It was meant to condition the
5 forgiveness.
6     Q.  Did it change --
7     A.  I would like to use those words
8 versus modified the agreement.
9     Q.  Did it -- did it alter the parties'
10 rights and obligations?
11     MS. DEITSCH-PEREZ:  Object to the
12 form.
13     Q.  I'm not trying to play a game with
14 you.  I just --
15     MS. DEITSCH-PEREZ:  That is exactly
16 what you are doing.  Why don't you just ask
17 him --
18     MR. MORRIS:  Please stop talking.
19 Please stop talking.
20     Q.  Mr. Dondero, is it fair to say that
21 the promissory notes that are the subject of
22 your oral agreements with the Dugaboy --
23 Dugaboy trustee set forth the parties' rights
24 and obligations thereunder, both the maker and
25 the payee?

**Page 475**

1     DONDERO - 10/29/21
2     MS. DEITSCH-PEREZ:  Can you read
3 that back again.
4     Q.  Is it fair to say that the original
5 promissory notes that are the subject of the
6 oral agreements between you and the Dugaboy --
7 withdrawn.
8     Is it fair to say that the original
9 promissory notes that Highland is suing under
10 set forth the maker and the payees' rights and
11 obligations under those notes?
12     MS. DEITSCH-PEREZ:  Object to the
13 form.  Object to the form.
14     A.  Yeah, I -- again, I want to -- I
15 want to avoid using the term "modification" or
16 implying modification because, again, the notes
17 are soft, and they really just talk about a
18 rate and/or payment or amortizations, but
19 they're soft notes.  Something in the agreement
20 that lays out the conditions for forgiveness
21 aren't necessarily a modification of the note,
22 and I'd like that to be --
23     Q.  Let me --
24     A.  -- my testimony.
25     Q.  Let me ask it this way:  Under each

Page 476

DONDERO - 10/29/21

1      of the demand notes, Highland as the payee had
2      the unfetterred right to demand payment at any
3      time; correct? Did you understand that?
4          MS. DEITSCH-PEREZ: At the time that
5      the notes were first signed?
6          MR. MORRIS: Yes, ma'am.
7      A.   Yeah. I mean, at the -- at the time
8      that they were first put in place, but by the
9      time the demand was made, they had already been
10     subject to the conditions present or the
11     conditions for forgiveness.
12     Q.   Okay. So this is exactly what I'm
13     trying to get at. At the time the notes were
14     signed, Highland had the right to make demand
15     for payment at any time; correct?
16     A.   Yes.
17     Q.   And when you entered into the oral
18     agreements with the Dugaboy trustee, Highland's
19     right to make a demand -- pick your word,
20     modified, altered, amended, changed -- it
21     was -- your oral agreement had an impact on
22     Highland's rights under the promissory notes;
23     correct?
24         MS. DEITSCH-PEREZ: Object to form
25

Page 477

DONDERO - 10/29/21

1      of the question.
2      Q.   You can answer.
3      A.   The conditions subsequent -- the
4      condition precedent -- precedence for
5      forgiveness changed the ability for the demand
6      notes to be demanded.
7      Q.   Okay. And -- and each of the oral
8      agreements that you entered into with the
9      Dugaboy trustee was related to the loans that
10     were reflected in the promissory notes;
11     correct?
12     A.   Well, it was related to the
13     promissory notes themselves.
14     Q.   Correct. And the promissory notes
15     reflect notes that were made from the payee to
16     the maker; correct?
17     A.   Yeah. Most of them were roll-ups
18     from prior.
19     Q.   No. Those are the term notes. I'm
20     only talking about the demand notes.
21     A.   Okay.
22     Q.   Okay. So with respect to the demand
23     notes, the oral agreements that you entered
24     into with the Dugaboy trustee related to the
25

Page 478

DONDERO - 10/29/21

1      loans that were the subject of the promissory
2      notes; correct?
3      A.   Yeah, I -- I -- I am just not
4      understanding the nuance enough to answer that
5      question.
6      Q.   Did the oral agreements relate to
7      the loans that were the subject of the
8      promissory notes?
9      A.   The oral agreements affected the
10     term loans and the demand notes.
11     Q.   Okay.
12     A.   Does that answer your question?
13     Q.   And so -- and so is it fair to say
14     that the oral agreements related to -- to
15     the -- to the -- to the loans that were the
16     subject of the notes?
17     A.   I don't know.
18     Q.   Okay.
19     A.   I'm not -- I'm not sure what you are
20     asking, but I don't know the answer.
21     Q.   Okay. It is your --
22         MS. DEITSCH-PEREZ: John, just
23     how -- I just think the witness is lagging
24     a little. So how much longer do you think
25

Page 479

DONDERO - 10/29/21

1      you have?
2          MR. MORRIS: Oh, I've got probably
3      four hours, so I don't expect to finish
4      today. If Mr. Dondero -- if Mr. Dondero
5      wants to stop --
6      Q.   Are you unable to continue right
7      now, Mr. Dondero?
8      A.   Well, if we have four more hours, I
9      would rather do it a day next -- next week, one
10     afternoon.
11         MR. MORRIS: Okay. Can we check our
12     calendars before we go off the record?
13         We have a deposition on Tuesday.
14     I'm not available on Monday. I can make
15     myself free on Wednesday, Thursday, or
16     Friday. And I think that we should expect,
17     you know, a substantial period of time,
18     perhaps as long as a full day.
19         I mean, with all due respect --
20         MS. DEITSCH-PEREZ: How do you have
21     a full day? You have already gone -- you
22     have already gone more than half a day.
23         MR. MORRIS: Yeah. And just -- just
24     to be clear -- and I'm happy, you know,
25

Page 480

DONDERO - 10/29/21

1
2  to -- to discuss this with you offline, but
3  I didn't decide that Mr. Dondero would
4  appear in his personal capacity and on
5  behalf of three separate 30(b)(6)
6  witnesses.
7      If you had given me a different
8  witness for each, I would have a total of
9  28 hours. I don't expect to use anything
10 remotely close to that time, but I am
11 examining four witnesses here and I
12 would -- I would appreciate --
13     MS. DEITSCH-PEREZ: But we also --
14     MR. MORRIS: I would appreciate it.
15 And, look, you can stop me at any time. If
16 I haven't finished asking the questions
17 that I believe I'm entitled to, I will, you
18 know, take it to the judge. I'm just
19 putting you on notice. I have -- I'm on
20 page 27 of a 57-page outline, so...
21     MS. DEITSCH-PEREZ: Oh, geez.
22     MR. MORRIS: Yeah, so I do have a
23 fair amount more to cover. Okay?
24     MS. DEITSCH-PEREZ: All right.
25     MR. MORRIS: So Wednesday, Thursday,

Page 481

DONDERO - 10/29/21

1
2  or Friday, Mr. Dondero, I will make myself
3  available at your convenience.
4      THE WITNESS: I have all day board
5  meetings on Wednesday.
6      MR. MORRIS: Okay.
7      THE WITNESS: I could do Thursday
8  afternoon or I can do Friday afternoon.
9  Hold on.
10     MS. DEITSCH-PEREZ: Let me put this
11 on mute and we will look at our calendars.
12     MR. MORRIS: Thank you.
13     VIDEOGRAPHER: Do you want to stay
14 on the record?
15     MR. MORRIS: Yes, please.
16     THE WITNESS: Hello. All right. I
17 can do Thursday afternoon for four hours.
18 And if we need more time than that we can
19 either do Friday afternoon or sometime
20 the -- the week after that, but I have -- I
21 have got --
22     MR. MORRIS: Thank you very much.
23 What time on Thursday works for you,
24 sir?
25     THE WITNESS: How about 1:00 o'clock

Page 482

DONDERO - 10/29/21

1
2  my time?
3      MR. MORRIS: Okay. I appreciate it.
4  Thank you very much. 1:00 o'clock Central,
5  it is, next Thursday for the continuation
6  of this.
7      And hopefully I will finish that
8  day, you know, if we can go without a lot
9  of breaks and the rest of it. Hopefully I
10 can finish that day. My intention is to do
11 that. Okay?
12     THE WITNESS: Perfect. Thank you.
13     MS. DEITSCH-PEREZ: Can -- can I get
14 the rough?
15     COURT REPORTER: Yes. Yes.
16     MR. MORRIS: All right. We can go
17 off the record.
18     MS. DEITSCH-PEREZ: Thank you.
19     COURT REPORTER: Thank you.
20     VIDEOGRAPHER: Off the record, 3:53.
21 (Deposition adjourned at 3:53 p.m.)
22
23
24
25

Page 483

DONDERO - 10/29/21

1
2  _____
3      JAMES DONDERO
4
5  Subscribed and sworn to before me
6  this    day of    2021.
7
8  --------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 484

| | |
|---|---|
| 1 | DONDERO - 10/29/21 |
| 2 | C E R T I F I C A T E |
| 3 | |
| 4 | I, SUSAN S. KLINGER, a certified shorthand |
| 5 | reporter within and for the State of Texas, do |
| 6 | hereby certify: |
| 7 | That JAMES DONDERO, the witness whose |
| 8 | deposition is hereinbefore set forth, was duly |
| 9 | sworn by me and that such deposition is a true |
| 10 | record of the testimony given by such witness. |
| 11 | I further certify that I am not related to |
| 12 | any of the parties to this action by blood or |
| 13 | marriage; and that I am in no way interested in |
| 14 | the outcome of this matter. |
| 15 | IN WITNESS WHEREOF, I have hereunto set my |
| 16 | hand this 29th of October, 2021. |
| 17 | |
| 18 | _____ |
| 19 | Susan S. Klinger, RMR-CRR, CSR |
| 20 | Texas CSR# 6531 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 485

1  DONDERO - 10/29/21
2  NAME OF CASE:  In re: Highland Capital
3  DATE OF DEPOSITION:  October 29, 2021
4  NAME OF WITNESS:  James Dondero
5  Reason Codes:
6    1. To clarify the record.
7    2. To conform to the facts.
8    3. To correct transcription errors.
9  Page____Line_____Reason_____
10 From_____Line_____to_____
11 Page____Line_____Reason_____
12 From_____Line_____to_____
13 Page____Line_____Reason_____
14 From_____Line_____to_____
15 Page____Line_____Reason_____
16 From_____Line_____to_____
17 Page____Line_____Reason_____
18 From_____Line_____to_____
19 Page____Line_____Reason_____
20 From_____Line_____to_____
21 Page____Line_____Reason_____
22 From_____Line_____to_____
23 Page____Line_____Reason_____
24 From_____Line_____to_____
25

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 180-24    Filed 05/09/24    Page 196 of 213    PageID 55110

Index: $100..84

**$**

**$100** 294:8

**$14** 392:5

**$150,000** 434:2,11 435:3,9 437:17

**$200** 294:2

**$25** 296:18

**$27** 420:12

**$27.675** 419:17

**$30** 407:22 412:4 413:5,11

**$30.75** 408:18

**$400,000** 437:4

**$50** 296:15

**$600** 298:12

**$75** 294:11

**0**

**03** 402:14

**1**

**1** 288:4 408:12,15 433:21,23,24 466:8,9

**10** 298:13,15 318:3 454:8

**10/29/21** 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1 425:1 426:1 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1 442:1 443:1 444:1 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1 464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1 473:1 474:1 475:1 476:1 477:1 478:1 479:1 480:1 481:1 482:1

**102** 365:10

**10:21** 288:8

**10:41** 304:6,7

**10:47** 304:7,9

**11:08** 318:7,8

**11:16** 318:8,10

**11th** 310:11 324:4 440:21

**12** 298:13,16

**12-month** 420:12

**12:40** 381:8,9

**12:51** 381:9

**13** 357:19

**14** 391:25

**15** 380:10,11 421:17 431:8

**16** 362:13,16,18,19 391:25

**17** 377:21,22

**1994** 291:10

**1:00** 481:25 482:4

**1:13** 398:19,20

**1:45** 398:18

**1:48** 398:20,22

**2**

**2** 288:4 408:8,10,13, 21 436:3,4,5 464:10, 11,17

**2.1** 409:13

**20** 414:24 421:17

**2008** 292:11 426:21 428:12 429:7

**2010** 307:12

**2014** 420:13 450:23

**2015** 401:21 420:13 450:23

**2017** 408:17,24 410:23 411:8 419:12 447:2,24 449:6,13 450:11 451:3 452:15 455:8 463:24

**2018** 369:15 435:4 436:10 463:25

**2019** 310:11 324:5 369:19 436:22 437:4, 17 463:25

**2020** 291:11 336:25 371:11,15,16 372:15 373:22 374:6,9,21 393:17 394:2,9,16 395:14 397:4,25 415:8 439:8,17 440:16,21 445:22 446:5 456:3,13,22 459:2,9,13,16 461:20 463:3 464:21,25 465:13 466:16 467:22 468:14,25 469:12

**2021** 288:7 357:6 363:17

**21** 337:2

**25** 292:15,16 422:3, 18

**25-year** 293:15

**26** 292:16 422:3,19

**27** 480:20

**28** 480:9

**28th** 435:4

**29** 288:7

**2:13** 398:15

**2:45** 398:18

**2:56** 454:16,17

**3**

**3** 348:11 433:14,15, 18,23 436:3,13 439:15 464:17 466:11

**30(b)(6)** 345:2,10,13 353:14,18 354:7,13 363:3 370:21 376:4, 19 378:3 388:22 391:5 406:5 480:5

**30(b)(6)s** 386:22 387:23

**30-year** 451:10,13,17

**31** 354:22,23 402:9, 13,23 472:14,17

**31st** 408:16,24 410:23 419:12 447:2

**449:6,13 450:11 451:3 453:23 455:8 461:21

**35** 292:7 309:13

**37** 323:18

**3:00** 445:8

**3:19** 454:17,19

**3:53** 482:20,21

**3rd** 439:7,17 440:6,16 464:3,5,21,25 466:16

**4**

**4** 393:4 412:23 433:21 436:3 448:3,14,20,23 464:11,12,13,18

**40** 365:2

**47** 345:5,6

**48** 353:11,12

**49** 354:5,6

**5**

**5** 298:11 414:6 439:15 445:25 455:11,14,18 464:18

**50** 405:17 429:24

**57-page** 480:20

**6**

**6** 446:15,16 448:17, 19,22

**8**

**8** 298:13,15

**80** 390:4,7

**81** 390:7 398:12

**82** 357:20,25 390:7 398:12 403:4,6 422:8 423:10 472:14,18,21

**83** 357:18,25 358:19

**84** 359:12,13

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-14    Filed 05/09/24    Page 197 of 213    PageID 55111

Index: 85..aspect

**85** 359:21

**86** 359:23 360:13

**88** 360:16 361:14 362:9

**9**

**91** 357:21

**94** 291:8 365:2,10,15 370:8

**95** 370:14,15,23 375:22

**96** 370:24 375:22 378:10,17,20 379:14, 24

**97** 380:2

**98** 380:3

**9th** 291:11 374:9

**A**

**a.m.** 288:8 304:7 318:8

**ability** 289:25 353:23 477:6

**absolutely** 375:15 458:18

**absolve** 376:20

**accelerate** 414:12

**acceleration** 377:17 412:23 414:13

**accepted** 392:22

**accepting** 377:14

**access** 425:25 431:15,25

**accommodate** 317:25

**accordance** 418:16, 23

**account** 331:3 338:14 372:2

**accountants** 371:5 451:14

**accounting** 299:8, 19 300:4 319:25 324:15 334:12,19 382:23,24 383:9 397:13 410:16,20,25 411:12,15 416:5 418:2 459:6

**accounts** 319:9,12, 17,21 328:19,22 329:2,8

**accrue** 373:12

**accurate** 343:13,15 357:15 364:24 379:10

**accurately** 334:16

**acknowledge** 360:6

**acknowledges** 470:21

**acting** 340:15 371:24 372:12 396:25 442:25 462:25 465:10

**activities** 472:7

**actual** 438:4

**add** 392:4

**additional** 361:16 392:5 426:4

**addressed** 464:20

**adjourn** 290:4

**adjourned** 482:21

**adjust** 291:24 442:10

**administered** 416:11 417:21

**administering** 415:3

**advance** 352:25

**advisor** 308:11,12, 13,14

**advisors** 306:8 322:13 324:4,9 326:2,5 335:20,22 374:20 375:6 466:23 471:23

**affected** 478:10

**affiliate** 298:4,22

299:3,21 300:7 301:3,9 344:12 452:23

**affiliated** 297:16,24 314:22 315:8 325:3, 11,12,17 344:14 426:15

**affiliates** 344:22 413:12,13 426:22 467:21 468:16

**affirmative** 347:7,11, 14 348:8 357:21 358:6,20 359:3,19,24 360:12,25 361:13 362:9 365:11 366:7 370:15,22 375:21 376:9,17 378:11 379:23 380:4 389:13 390:9 391:7 398:11 406:20

**affixed** 434:14 435:7

**afoot** 438:22

**afternoon** 479:11 481:8,17,19

**aggregate** 293:23 295:16 297:25 419:8

**aggregating** 411:10

**agree** 400:8 446:25

**agreed** 301:15 430:5

**agreement** 335:15, 17,24 336:5,6,9,15, 25 337:5,6 356:4 361:22 381:11,20,24 382:13,21 404:16,24 405:3 407:10,12 420:25 421:5 427:20 449:20 472:6,22 474:8 475:19 476:22

**agreements** 335:23 336:2 339:23 375:5 399:8,16 400:10,11, 23 401:4,16 403:7, 11,14,20 404:2,8 405:15 406:21 420:21 422:7,23 423:9 426:15,22 427:3 443:10,20 472:11 473:9,21 474:22 475:6 476:19 477:9,24 478:7,10,15

**ahead** 437:22 441:21

**air** 423:20

**alleged** 360:18

**allowed** 435:7

**alter** 474:9

**altered** 476:21

**alternative** 291:18 361:6 452:2

**amassed** 424:19 425:5 431:8

**amend** 320:19

**amended** 346:18 355:2,20 356:3,5 357:14 362:15,24 364:23 379:9 389:3 402:24 476:21

**amortizations** 475:18

**amount** 293:23 294:12 295:17 298:5, 21 299:3 360:7 385:11 391:21 392:2, 6 393:6 407:22 408:17 417:20 419:16,22 422:13 430:6 435:3 460:18 480:23

**amounts** 333:5 344:21,23 367:12 372:6 377:13 382:6 392:21,25 420:3 424:21 427:4 431:9 448:6 450:17 460:19, 22

**and/or** 334:14 338:6 364:2 365:18 412:2 475:18

**animation** 396:22

**annoyed** 391:22 392:19

**annual** 369:23 377:2 409:16,22 410:8 453:22 460:10

**answers** 345:24 347:16,18 405:25 406:22 407:4 439:4

**anytime** 371:16

**Apologies** 423:24

**apologize** 288:21 295:12 297:21 301:19 332:5 387:17 422:16 423:18 425:8, 18 445:3 448:21 455:4 464:10

**appearance** 445:5

**appearances** 288:17

**appears** 311:7 314:9

**applied** 403:15

**applies** 406:13

**apply** 333:3 368:15 403:21 404:3,9 405:8,9

**appoint** 301:23 302:14 311:3 323:14

**appointed** 301:12,14 302:18 321:6

**approval** 312:4

**approve** 312:11

**approved** 312:19 357:4

**approving** 364:10

**approximate** 408:17

**approximately** 407:22 419:17

**April** 310:11 324:4 450:23

**arbitrary** 290:19

**area** 292:18

**argue** 393:13

**argument** 377:17 386:10 393:8,10 446:13 465:6,7

**articulate** 330:23

**articulated** 421:10 468:21

**aspect** 337:10 363:25 370:11 372:5 379:5

Index: asserted..capacity

**asserted** 358:20 366:13

**assertion** 379:16 430:3 431:12

**asserts** 359:24 360:16 365:16

**asset** 291:19 298:16 308:10 376:25 412:20 421:14

**assets** 292:4 299:9 330:16 334:14

**assigned** 300:20

**assume** 311:22 342:11 408:25 435:5 438:5

**assumed** 470:18

**assuming** 415:20

**attached** 444:10,18

**attention** 439:21

**attorney** 320:18 321:8

**attorneys** 429:7

**audit** 320:2 334:19 411:3,16 416:6 426:10

**audited** 299:10,25 327:18 340:9 412:11, 17 428:11 429:6 430:7,22 432:6,12 470:8

**auditor** 426:14 427:9

**auditors** 334:17 373:10 411:12 416:7 426:22 427:14 435:14 451:14 454:5

**audits** 327:14 334:11 337:23

**August** 356:4 420:13

**authoritative** 310:20

**authority** 301:22,23 302:13,14 310:5 317:9,13 451:5

**authorize** 371:18 389:7 420:5 436:9

**authorized** 316:12, 18 319:8,11,16,20 328:18,21,25 329:7 363:15 371:25 391:19 434:21 438:2 463:11,19

**authorizing** 364:10

**automated** 438:3

**avoid** 475:15

**aware** 311:18 312:14 314:18,24 315:4 317:7,11 324:18,19, 24 325:5 327:6 330:10 334:4,6 340:10,12 346:16,17 351:13 352:10,19 357:9,11,12 358:5 359:18 364:14,18,21 365:20 367:20 368:4 369:22 370:6 372:12, 19,25 373:2 376:16 378:8 379:17 389:10 390:8 397:21 398:11 402:4 428:13,18 429:13 434:13 435:13,15 437:16,20 439:7 442:2,11 444:8,19,24 453:21 455:17 466:15 468:18,19

**awareness** 320:6,8 321:4 322:10 324:12 325:8 332:16 333:4 344:10,18 352:13 366:19 373:17 401:22,23 456:25

**B**

**back** 294:19 304:8 318:9 320:25 336:17 338:17 381:3,13 388:19 392:5,24 397:10,11 398:21 401:5 424:2,10 428:18 429:7 430:3 454:18 462:11 472:10,14 475:3

**background** 324:15 357:4

**bad** 405:7 416:16 417:8

**balance** 293:8 298:9 299:4,22 300:8 301:4,10 326:23 327:3,7 405:18 412:2 413:19 418:4

**balances** 319:24

**ballpark** 295:18

**bank** 319:9,12,17,21 328:18,22,25 329:8 425:2,3

**bankruptcy** 300:6, 15 302:21 315:24,25 366:13 413:14

**barred** 358:21 359:15 360:2,17 365:17 370:16

**base** 298:16

**based** 324:16 398:5 467:25

**basic** 416:19 459:5

**basis** 294:5 344:9

**Bates** 444:20,23

**begin** 289:6,12,18

**beginning** 288:4 355:25 357:5 363:16 465:12

**behalf** 293:4 316:13, 19 349:12 353:23 354:8 363:16 364:11 371:12,24 372:7,13 386:17 387:5 388:12 389:8 394:8,16 396:25 404:10 408:24 409:7 411:17 415:4 418:13 419:20 436:10 437:14 443:2 449:12 451:6 455:7 456:18 462:17,25 463:18 464:20 465:10 469:9,10 480:5

**believes** 469:15

**benefit** 339:4 385:10

**benefiting** 385:9

**benefits** 384:20

**Berghman** 445:7

**betrayed** 468:6

**big** 421:10

**bigger** 393:11

**billion** 292:7

**binder** 346:22 362:19 433:17

**binding** 345:25

**bit** 328:3 337:20 345:11 356:17 407:16

**blocked** 378:13

**blurt** 441:18

**board** 425:2 431:21 481:4

**boilerplate** 410:17 416:4

**bona** 373:8 418:18, 19,20 419:23 421:19 457:10

**Bonds** 363:23 364:4

**bonuses** 322:9 424:24

**book** 309:16

**booklet** 448:25

**books** 298:23 397:19

**borrow** 295:7 420:5

**borrowed** 295:3,8,13 420:2,11 437:3,17 448:6 450:15 452:14

**borrower** 409:15

**bottom** 310:6 323:23

**boy** 336:17 383:13 416:16 417:8 422:9 473:14

**Boyce** 301:15

**breach** 391:15 392:2, 17

**breached** 303:11 304:14 305:3,13,15, 22

**breaches** 471:9,11, 12 472:4

**break** 317:23 318:4, 12 380:15,19,21 398:17 399:4 454:7, 23 455:6

**breaks** 482:9

**Brian** 324:14

**bring** 395:6

**broad** 366:5

**bucks** 377:3,4 391:25 393:12 421:16 430:14

**building** 338:18

**built** 339:5

**bullet** 416:8

**bunch** 309:4

**burden** 327:13

**business** 291:14 308:5 323:4 330:15 342:6 384:17 385:7

**C**

**calculating** 334:8

**calculation** 393:2

**calendar** 409:17 454:11

**calendars** 479:13 481:11

**call** 400:16 450:25 464:9

**called** 306:7 322:12 329:18 341:8 345:9 357:21 389:15 402:2 462:10

**calls** 349:24 350:3,9, 17,22 351:2

**capable** 290:7 458:22

**capacities** 325:3

**capacity** 303:5 311:2,19 314:4,7 315:20 331:25 332:9 345:8,9,20,24 351:3 363:3 371:16 378:3 388:22 393:14

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-24    Filed 05/09/24    Page 199 of 213    PageID 55113
Exhibit 24    Page 570 of 741

Index: Capital..copy

399:25 406:5 480:4

**Capital** 288:6 290:23 294:10,15,21 295:4, 6,14,21,23 296:3,9 306:7 311:21 329:18 362:23 405:21 434:15 457:24 466:22 471:22,23

**captured** 308:10 334:16 370:11

**care** 445:20

**carefully** 372:11 468:11

**carried** 298:22 299:4,22 300:8 301:3,10 327:4

**case** 363:25 378:12 383:5

**cases** 460:19

**cash** 383:18 384:13 421:11

**categorized** 292:24

**category** 361:9

**caused** 470:16

**caveat** 427:17 441:21

**ceased** 305:11

**Central** 398:18 482:4

**centralized** 417:22

**certificate** 309:23 310:2,10 311:8 313:13 320:24 323:20 331:20 340:12,20 342:12 398:6 436:25

**certificates** 313:15 342:21

**cetera** 320:2 334:5 367:13 389:24 392:12,15 393:2 433:2

**CFO** 299:24 301:13, 23 302:15,18 303:6 311:12,20 313:7,10, 11,19 314:4 440:3

**chagrin** 345:11

**chance** 331:3 351:6

**change** 341:13,14 362:12 474:6

**changed** 299:17 476:21 477:6

**characterize** 333:12

**characterizing** 409:14

**charged** 299:2 333:21 364:9

**charging** 386:7

**chat** 309:18 355:11

**check** 426:5 479:12

**checks** 319:24

**chief** 303:2 331:23, 25 332:9

**choice** 345:15

**circumstances** 348:7 375:12,21 413:8

**cited** 472:7

**claim** 360:17

**claims** 358:21 359:14,25 365:16 370:16

**clarification** 332:6 378:18 423:8

**clarify** 337:20

**class** 400:14,19 427:21

**clause** 415:9

**clauses** 416:17

**clean** 304:11

**cleaner** 423:6,7

**cleanup** 406:9

**clear** 295:11 304:24, 25 322:2 335:5 417:11 431:4 432:15 479:25

**Cliff** 300:17

**CLO** 338:22 385:5

**close** 434:12,18,19 436:6 480:10

**closed** 360:3

**closely** 410:3 411:23

**collateral** 413:16 417:7

**colleague** 309:12

**collectively** 451:3

**combination** 310:5

**comfortable** 390:13 391:10 398:23

**commenced** 404:5, 11 405:6 433:10

**commencement** 441:7,9 443:4,8,11 455:23

**comment** 306:3 338:18 396:18 432:4

**common** 421:18

**communicate** 318:11 350:4

**communications** 348:7 441:18 442:6

**comp** 361:6,8,16 423:5

**companies** 311:20 314:13 315:7 325:4, 12 344:14 361:21 412:21 421:19,22 431:19

**company** 297:4 314:23 325:17 415:2

**compared** 404:18

**compel** 395:7

**compensation** 322:9 404:16,18 421:8,11,21 422:6,22 423:2,13 424:22 430:16 443:24 446:12

**complaint** 346:18 355:2,20 356:3 358:15 362:15,24 389:3 402:24 408:9,

16 433:23 448:15

**complaints** 356:5 407:6

**complete** 290:5 334:13 335:2 343:12, 15 357:14 364:23 379:10 405:16

**completely** 391:3 397:7

**completeness** 327:24

**complex** 401:25

**complexity** 363:24

**compliance** 327:14 371:8 393:3 411:14 462:12

**compliant** 319:25 334:11 418:2

**compliantly** 320:7

**complicated** 386:6

**comport** 303:6

**concede** 433:5

**concern** 333:17 358:6 359:2,18 360:25 361:13 362:8 365:21 370:21 390:9

**concerned** 411:24 453:14

**concerns** 347:6 348:11

**concluding** 328:11

**conclusion** 452:13

**conclusions** 305:18

**condition** 407:11 429:12,16 474:4 477:5

**conditioner** 423:20

**conditions** 413:6,10 473:15,17 475:20 476:11,12 477:4

**confirm** 401:8 462:3

**confirmed** 462:10

**confusing** 456:8

**connection** 294:17 353:7 426:9

**consideration** 360:3

**considered** 315:5 325:24

**consistent** 407:6 419:24

**consolidated** 447:22

**contained** 430:7

**contemporaneousl y** 442:12

**contend** 420:19 424:5 473:8

**contended** 367:3

**contends** 461:3

**content** 416:8

**contention** 403:13, 19,25 423:17 458:14 460:21 463:15

**contentious** 461:2

**context** 335:11 400:10 460:21,22

**contingent** 427:5

**continuation** 482:5

**continue** 290:4,20 389:22 400:6 479:7

**contracted** 471:15

**control** 297:2 307:6, 19,23 308:2 311:3 315:12,20 322:21 330:5,9 331:7 332:18 333:16 341:24 371:17 388:5 393:15 410:4 429:22 431:19

**controlled** 307:14 323:6 325:13 342:2 374:20 385:15

**controls** 320:2

**convenience** 481:3

**conversation** 457:12

**copy** 355:18 356:21, 22,23 402:20 434:7

Case 21-03007-sgj   Doc 106-4   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-14   Filed 05/09/24   Page 200 of 213   PageID 55114
Exhibit 14   Page 589 of 741

Index: Cornerstone..demands

448:25

**Cornerstone** 427:19

**corporate** 312:7
320:18 321:7 323:7
330:8 342:3 345:21,
25 354:9 405:10
406:24 407:3,12
458:13 459:20
460:10 461:3,13
462:17 463:2,14,18
469:10

**correct** 290:24 295:4
301:11,24 306:8
313:3 316:5 322:13
325:14 328:15
335:15 337:17
339:24 342:24
351:19 374:6,9
389:18 398:2 402:15
404:12 405:14 412:9,
18 416:3 419:22
420:22 424:7 435:10
436:22 438:18 440:2,
17 442:3 447:6,10,19
449:7 450:6,11,13
451:7,10,22,23 452:4
456:3,13,22 457:5
458:9 459:10,13,16
465:24 468:25 469:6
470:9 473:6,19
476:4,16,24 477:12,
15,17 478:3

**correctly** 320:7
335:12 404:7,22
411:2 414:15

**correspondence**
471:20

**cost** 385:11

**costs** 333:7 334:5
337:21 338:5,8

**counsel** 288:19
289:6,8,9 355:18

**counsel's** 353:25
354:16

**counterparties**
377:2

**couple** 300:14,18
349:19,20 350:2
421:16 428:15 445:3

**court** 288:9 303:14,
21,24 355:25 366:13
374:24 381:17 395:7
396:5,8 482:15,19

**cover** 480:23

**crazy** 415:8

**create** 291:7 330:17,
19 413:15

**created** 307:9,15
322:24 330:11 339:6

**creatures** 365:5

**credit** 291:17 411:4

**creditors** 452:24

**crisis** 292:12

**culpa** 406:16

**cure** 377:15 392:21
393:6

**curing** 377:11,12

**current** 321:14,18
329:5,12 340:25
405:18

**curved** 374:24

**cut-and-paste**
406:17

―――――

**D**

**DAF** 339:2,5 385:2,5,
19,22 386:5,18 387:6
388:13

**date** 288:7 310:15
311:10 324:9 325:21
428:24

**dated** 408:16 439:17
464:21

**dates** 369:9,10

**Dave** 352:10

**David** 300:17

**Davor** 317:22,25
445:2

**day** 290:5 336:18
352:16 386:15
410:23 435:12
452:15 479:10,19,22,

23 481:4 482:8,10

**days** 349:19,20

**de** 297:25 298:4,7,17
333:5,7,15 334:7,14
343:21,22 376:24
377:3 391:20 393:20
410:13 411:25 412:2
413:18 417:20
421:13 458:20

**dealing** 372:22

**Deborah** 288:14,18
291:25 303:22
349:17 350:5 351:5
381:4 383:21 388:9
390:18 425:8 428:22
445:5

**debt** 333:6 334:5
421:19 453:10,16

**debtholders** 453:13

**debtor** 367:22
374:21 428:8,10
443:15 444:15

**debts** 297:8,14
315:14,21 316:3,8
318:17,22 326:7,12,
17 327:10 328:7
332:20 333:2,23
340:5 343:6,18 344:6

**December** 371:11,
15 373:21 374:12,17,
21,25 395:14 397:3,
25 439:7,17 440:6,
16,21 445:22 446:5
453:23 459:2,9,12,16
461:20,21 463:3
464:3,5,21,25 465:13
466:16 467:21
468:14,25 469:12

**decide** 385:21
386:16 417:16 480:3

**decided** 297:3 386:8
420:24 451:12

**deciding** 417:25

**decision** 387:5,12,
13,19 388:6,12
429:17

**declared** 368:20

**deed** 416:15

**deemed** 426:16
427:3,12

**deeply** 453:12

**default** 368:21 377:8
391:20 392:20 393:5
412:23

**defendant** 362:23
404:17

**defendants** 289:7

**defense** 347:11,14
358:6,20 359:3,19,24
360:12,25 361:6,13
362:9 365:21 366:2,
7,14 367:5 368:14
370:8,15,22 378:17,
20 379:16,18,23
389:20 391:7 406:20
459:21,25 460:8
461:3,8,9

**defenses** 347:7
348:9 357:22 365:11
375:22 376:9,17
378:11 380:4 389:14
390:9 398:12 443:3
459:20 461:13

**deficiently** 471:16

**definable** 385:10

**define** 298:7,17
317:2 414:21

**defined** 317:18
411:11 419:12
426:23

**defining** 377:14

**definition** 416:23

**definitively** 340:10

**Deitsch-perez**
288:16,18 291:21
292:2 294:3,16,19,24
296:11,23 297:10
301:25 304:16 305:5,
25 309:15 311:5
315:16 317:21 318:5,
24 321:21 324:21
326:8,19 327:20
329:9 331:9 332:11
335:16 337:15 340:6
343:19 344:7 346:3
347:3,21,25 348:5,18
349:23 355:3,7,13

**delegate** 317:19

**deluded** 375:16

**demand** 333:19
348:12,15 368:15
414:10 439:8,11
440:7,9,17,23 441:6,
11 442:2 443:3 444:4
445:24 447:22
464:24 465:12,23
466:17 467:2,9,19
468:14,15 469:11
476:2,3,10,15,20
477:6,21,23 478:11

**demanded** 445:23
446:6,10 477:7

**demanding** 464:5

**demands** 468:24
469:5

**deemed** 426:16

356:20 359:4 361:25
365:4 366:8,17,22
367:6 369:7,25 373:5
376:10,18 379:11
380:13,20,25 381:6
382:15 383:17 384:4,
9,22 385:17,24
386:20 387:8,14,18,
21 388:15 390:14,19,
21 394:3,10,17
395:12,18,22 396:3,
9,21 397:5,9 399:11,
19,21 400:3 401:11,
18 402:13,18 405:11
406:14 409:9,18,25
410:9 411:20 415:14,
25 423:21 425:14,23
426:17 428:5,21,23
429:8 430:25 432:13
433:11,16,19 434:8,
17 438:10 441:3,16
444:8,16 445:24
447:11 448:19,24
449:22 452:10 453:7,
24 455:19 456:4,10,
14 457:6,16,19
460:13 461:16,23
462:6,21 463:6,22
464:13 465:14,19,25
467:4 470:3,10 471:2
473:12 474:2,11,15
475:2,12 476:5,25
478:23 479:21
480:13,21,24 481:10
482:13,18

demonstrate 424:14

department 382:23, 24 383:2 411:12 417:23

depend 383:4

deposed 352:9,11, 19

deposition 288:5,20, 25 289:18,22 290:5 346:21 349:16 350:6, 16 351:8,11,14,18,21 352:4,7,14 353:2,3,8 363:7 376:19 386:23 399:5 400:4 408:12 444:19 454:24 479:14 482:21

depth 334:13

describe 291:13 332:24 410:12 456:17 461:12

describes 403:6 472:21

describing 429:3 432:8

deserve 344:3

detail 334:17 378:14 471:19

detailed 344:9

details 301:21 337:24 366:4

di 333:12

differentiate 333:24

dig 369:9

direct 329:23 337:21 338:7 341:18 371:17

directed 462:18 463:13,19 469:4

direction 463:21

directly 306:21 307:3 314:5,8,13 322:19 330:3

directors 431:22

disagree 324:11

disappeared 294:17

disclose 426:14

disclosed 412:15 426:21 427:9,13 430:24 432:11 433:3

disclosure 427:23 432:7,21,24 441:20 470:7

discovery 349:7,13 425:19,21 444:7,13

discuss 306:5 401:3 441:10,13 480:2

discussing 442:19

discussion 444:3

disrupt 400:4

distinguish 457:21

diversified 291:17

doctrine 365:17 370:17

document 309:12 310:7,21 313:20 317:6 320:18 345:4, 16 355:24 356:9,16, 18 357:5,9,13 363:10,16,20 364:11, 15,19,22 366:12,20 378:6,9 379:6,8 380:17 381:10 388:20 389:2,5,8,11 402:8 435:8 447:18 466:11 470:23 471:5

documentation 342:21 431:12,17,24

documents 320:19 334:18 348:7 352:24 367:23 370:5 425:11, 22,24,25 438:14

dog 387:15,16

dollar 386:3

dollars 391:22 393:10

Dondero 288:1,5,11, 19,22 289:1,15 290:1 291:1,23 292:1,3 293:1 294:1 295:1,3 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1,17,20

304:1,11 305:1,9 306:1 307:1 308:1 309:1,20 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,11 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1,7 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1,24 355:1,17 356:1,14 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,10 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1,22 384:1,6,7 385:1 386:1 387:1 388:1 389:1 390:1,5, 22 391:1 392:1 393:1 394:1 395:1,13 396:1 397:1 398:1,23 399:1 400:1,9 401:1,8 402:1,23 403:1 404:1,17 405:1 406:1,25 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1,5 425:1,11 426:1,8 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1,25 442:1 443:1 444:1,13,15 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1,14 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1

464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1,19 473:1 474:1,20 475:1 476:1 477:1 478:1 479:1,5,8 480:1,3 481:1,2 482:1

Dondero's 386:23 387:24 401:6 402:16

double-check 425:15

doubt 324:7 409:11

dozen 350:7 422:12 425:6 431:8

dozens 293:19,21

drafted 410:15

draw 452:12

driven 454:4

dropped 423:20

DSI 414:24

dual 321:23

due 297:24 316:14 327:4 344:13,21 358:22 359:15 360:2 366:15 371:20 372:5, 15 373:3 389:23 391:20 392:25 393:13,17,21 394:2 395:16 397:3 408:2 409:23 440:8 456:2, 12,21 457:4 458:8,20 460:11 461:14,21 462:4 463:5 479:20

Dugaboy 306:22 338:6 400:12,16,23 401:9,17 403:8,14,21 404:2 405:4 420:21 421:2,6 422:24 427:20 443:11,20 472:12,23 473:10,22 474:22,23 475:6 476:19 477:10,25

duly 288:12

duplicate 355:15

duties 297:6 303:2, 12 304:14 305:4,13, 15,23 328:12,14

E

earlier 320:24 324:12 367:18 379:19 406:8 415:10 436:24

early 337:2 356:9 374:11,17 467:21 468:13 469:12

easier 393:12

Eastern 398:16

effective 310:11 324:4

effectively 338:21 419:7

effort 424:13

efforts 382:5 424:18

eight-day 440:20

electronic 438:9,14, 18

electronically 439:2,3

Ellis 363:23 364:4

else's 454:11

email 353:9 445:17

emails 353:6

employed 308:17 319:15 322:2 383:12

employee 317:20 320:11 321:15,19,20, 24 329:5,13 340:16 341:2 398:5 422:6,22 458:21

employees 371:6 392:11 422:12 458:25 459:4,5,9 472:6

end 369:24 371:21 373:3,14 375:3,14 391:16,17 393:17 394:2,8,15 395:17 409:16,23 410:8 411:8 414:24 415:8 447:23 456:2,12,21 457:4 458:15 460:11 461:15 462:5,19,23

Case 21-03007-sgj   Doc 106-4   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-24   Filed 06/09/21   Page 202 of 213   PageID 55116

Index: ensure..forgiven

**ensure** 393:25

**enter** 452:19

**entered** 336:14 381:24 382:12 399:7, 15 400:22 401:16 403:11,14,20 404:25 405:4 407:10 472:11, 22 473:9,22 476:18 477:9,24

**entering** 400:11

**enterprise** 343:24 388:5

**entire** 431:21

**entities** 306:20 311:15,24 325:7,8 333:4,8 335:7,25 336:4,8,11,20 337:25 338:7 340:10 343:9 345:10 377:7 382:5, 25 384:19 385:16 406:6,24 407:13 423:3 426:15 458:21 472:2

**entities'** 407:4

**entitled** 414:7 480:17

**entity** 291:3 306:7,11 311:4 322:12 329:18 330:9 331:7 333:6 338:2 341:7,10,16 342:9 383:5 385:20 413:19 429:21 469:22

**entity's** 332:20

**entrepreneurial** 382:5

**equal** 360:7 448:7

**equity** 385:6 452:24 453:5

**equity-ish** 453:12

**equivalent** 360:21

**error** 406:17 471:24

**established** 405:15

**estate** 323:5 341:11 342:7 374:3 375:17, 18 385:8 392:12 468:6

**estimate** 290:21 296:8 350:14

**estoppel** 347:17 359:15 370:17

**event** 427:8

**eventually** 368:11 469:14

**evidence** 330:24 418:8

**exact** 406:21

**EXAMINATION** 289:13

**examining** 480:11

**examples** 425:6 431:9

**exceeded** 293:25

**exchange** 337:7 339:12

**execute** 330:21

**executed** 403:16,21 404:3,9 405:9 411:7 455:7

**executive** 316:21 317:18 327:23 413:4, 9

**executives** 325:6 413:20 424:25 425:2 431:10 432:19

**exercise** 302:13

**exhibit** 309:13 323:17 345:5,6 353:11,12 354:4,6, 22,23 357:20 362:13, 16 377:21,22 380:10, 11 402:9,23 408:8, 10,12,15 419:5,9 420:3,7 433:14,15, 18,23,24 436:4,5,13 437:12 439:15 445:25 446:7,15,16 447:18 448:3,8,14, 17,19,20,22 450:5,8, 17 456:7 464:10,11, 12,13,17,18 466:8,9, 11 472:14,17

**exhibits** 433:21 436:3 464:17

**existence** 323:7 330:8 342:3

**exists** 461:4

**expect** 479:4,17 480:9

**expectation** 392:15

**expectations** 303:7

**expected** 338:6 393:20

**expenses** 316:23 338:16

**expert** 292:18

**expertly** 334:21

**experts** 421:24

**extended** 375:8

**extent** 301:8 312:11 313:23 316:7 325:10 332:21 334:6 338:25 361:16 371:2 391:12, 13 396:17 427:13

**eyes** 471:17

---

**F**

**facility** 411:4

**fact** 368:4,7 376:18 387:24 421:9 430:21 463:4

**facts** 348:8 358:5,25 359:17 360:11,24 361:12 362:8 365:20 366:6 368:9 370:6,20 375:12,20 376:8,15 377:11,16 379:17,22 380:3 390:9,15 391:6 398:10

**failed** 318:20 319:5 328:5,12

**failure** 360:2

**fair** 290:20 293:2,14, 18,21,22 296:20 297:4 311:9 312:2,5 313:8,24 325:22 331:8 339:19 342:23 344:4 372:21 392:10 406:25 410:5 411:19

**415**:11,22 427:11 428:3 429:3 432:10 439:6 447:4,7 449:19 451:17,24 452:12 458:5 459:19 461:5 465:9,18 469:3 474:20 475:4,8 478:14 480:23

**fairly** 409:14 422:12

**faith** 360:20

**fallen** 316:9

**falls** 361:9,17

**familiar** 297:7 306:6 315:14 318:17 322:12 329:18 341:7 433:8

**familiarize** 297:14 298:21 315:21 316:2 318:22 326:6,17 327:10 328:7,13 332:19,25 344:5

**familiarizing** 333:22 340:4 343:5

**family** 314:12 321:8

**fast** 381:3

**faster** 361:19

**fault** 295:12 441:24

**favor** 296:3 447:2

**features** 417:8

**fee** 338:9 339:2

**feel** 290:3

**feeling** 289:3,17,21

**fees** 308:11 317:3 386:7

**fide** 373:8 418:18,19, 20 419:23 421:19 457:10

**figure** 429:17

**file** 363:15

**filed** 346:17 355:20, 24 356:2,5 362:14 366:12 374:20 416:15

**filing** 357:5 364:10

**389**:7

**finally** 360:15

**financial** 292:11 299:10,12 300:11 303:2 327:18 331:25 332:9 337:10 382:7 412:8,17 428:11 429:6,15 430:7,19,22 432:6,12 458:22 470:8

**financials** 299:25 300:20 340:9 343:13, 15 411:3 412:11 430:11 431:5,7 432:17,24 433:4 470:20

**financing** 451:25

**financings** 453:2

**find** 434:6

**finding** 471:9

**fine** 341:17 369:13 395:11

**finish** 290:15 340:24 479:4 482:7,10

**finished** 480:16

**firing** 315:5 325:24

**firm** 363:15

**firms** 334:12 389:23

**fits** 454:11

**flip** 436:2

**focus** 292:19 344:3 390:6 430:3

**focusing** 334:8 357:25 413:21 422:16

**follow-up** 388:8

**footnoted** 430:12

**forcing** 290:6

**forgave** 422:4 430:15 432:11

**forgivable** 404:20

**forgive** 421:20 427:3

**forgiven** 422:21

Case 21-03007-sgj   Doc 106-4   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-14   Filed 01/09/24   Page 203 of 213   PageID 55117
Exhibit 14   Page 609 of 741

Index: forgiveness..hear

423:4,11 425:4
427:7,13,24 429:11
430:6,24 431:5
432:22,23,25 433:4
473:16

**forgiveness** 361:7
429:4,20 430:4
431:9,22 440:13
443:24 446:13 465:6,
7 467:25 474:5
475:20 476:12 477:6

**forgiving** 424:6,15
429:18 431:13

**form** 294:4 296:24
297:11 306:2 311:6
315:17 318:25
321:22 324:22 326:9,
20 327:20 329:10
331:10 340:7 343:19
344:8 361:25 366:9,
18,23 367:7 370:2
373:6 376:11 379:12
384:23 385:18,25
388:16 390:15
399:12,22 401:12,19
405:12 407:21
409:10,19 410:2,10
411:21 415:15 416:2
426:18 428:6 429:9
431:2 434:17 438:11
441:4 447:12 449:23
452:11 453:8,25
455:20 456:15 457:7
459:18 460:14
461:17,24 462:7,22
463:7,23 465:15,20
466:2 467:4 470:4,11
471:3 473:13 474:3,
12 475:13 476:25

**formal** 335:22,23
336:2 381:18 384:13

**formally** 382:18

**formation** 315:2

**formats** 291:19

**found** 291:6 392:18

**founded** 290:23

**Frank** 299:20 300:20
301:23 302:10 309:7
310:13 312:7 316:9
325:8 327:13 334:2,
22 335:10 336:18

338:4 340:8,14
343:10,11,16 397:24
398:7 415:3 436:16,
21 437:13,25 438:25
441:15 442:16 443:5
456:18 462:10
466:20 470:17

**Frank's** 299:18
300:10,14,25 437:23
438:3

**frauds** 327:25

**fraudulent** 360:17,
19

**free** 479:16

**Friday** 479:17 481:2,
8,19

**friendly** 413:13
417:21

**frivolous** 470:2

**front** 348:2 389:21

**frozen** 302:3

**fulfill** 318:21 319:5
328:5,12

**fulfilled** 302:25

**full** 431:19 479:19,22

**function** 333:25
334:19

**functional** 401:23

**functions** 459:6

**fund** 306:7 317:3,4
466:22 471:23

**funds** 308:6,8,10,16
309:4 312:23 320:19,
20 327:16 336:13

### G

**gained** 385:11

**game** 474:13

**gather** 424:13

**gave** 382:2 392:20
394:20 395:2,21
413:25 430:13
440:20

**geez** 480:21

**general** 293:7
296:20,25 308:15
312:7 343:20 344:10,
17 364:7 376:24
403:7

**generalize** 384:24

**generally** 297:12
323:3,5 325:15
326:10,12 327:6
329:20 332:21,23,25
344:15 357:7 363:21
364:12,18 373:15
389:6 426:19 461:10
472:21

**give** 331:3 334:25
337:24 342:22 366:6
369:8,10 382:2
394:12,19 395:14
397:16 405:16
440:25 451:12

**giving** 399:25 422:22
423:13

**glad** 351:22

**good** 308:15 312:8
330:23 360:20 382:8
393:3 413:19 423:22

**govern** 472:5

**grace** 414:10 440:20,
25

**grade** 291:17

**green** 289:2

**Gregory** 322:6

**grounds** 312:18

**group** 299:18 300:4,
11,14,21,25 316:10
319:25 334:2,23
335:10 336:19 338:5

**guarantee** 417:8

**guaranteed** 416:16

**guess** 304:20 310:4
312:11 333:3 347:19
375:25 393:7 429:10
437:25 451:18
456:23,25 457:2,10,
11

**gulf** 382:10

**guys** 346:23 432:2

### H

**haggled** 418:6,9

**half** 350:7 430:14
479:23

**half-hour** 380:19,21
398:17

**hand** 355:16

**handle** 363:23,25
382:24

**Hang** 355:7 402:18
428:21

**happy** 317:25 406:3
479:25

**hard** 355:18 356:22,
23 402:20 416:14
434:6 448:25 457:20

**Harvard** 385:4

**hats** 324:20

**HCMF** 331:24 332:3,
10 339:19,25 457:21

**HCMFA** 306:11,13,
19 307:4,6,8,14,19
308:2,17,18,22
309:2,8 310:10,14,
19,23 311:3 313:20
314:8,17 315:10,13,
20 316:13,18 317:9
318:15,22 320:22
321:9,16,20 322:7
333:10,17 336:23
339:22 404:10,11
405:13 457:9 465:24
466:3,4

**HCMFA's** 308:5
311:12 315:14,21
316:3,8 318:17
319:9,12,17,20
333:12

**HCMLP** 333:11,19
404:21

**HCMS** 288:20
329:17,21,24 330:3,
5,11 331:5,14,18

332:6,9,18 335:11,14
336:16 337:6,13
338:14 339:11,19
340:3,16 341:3
353:14,17,23,24
362:14 363:14
364:11 365:10,15
366:12,25 367:14,25
369:15,18,23 370:21
371:12,17,19,24
372:13,21 375:14
379:19 385:22
403:22,23 405:20,25
433:8,10,24 434:15
435:2,9,18,23
436:10,22 437:3,14,
16 439:8,18,25
440:7,20 441:5,11
442:8 443:2,10,19
445:23 446:9 447:21
451:2 452:7 453:6
457:3,14,17,21 461:8
465:11 473:5

**HCMS'** 340:5 363:3,7
443:2

**HCMS's** 330:8,15
333:2,23 353:18
372:2

**HCRE** 288:20 341:6,
8,16,19,24 342:2,16
343:7,13,15,18
354:8,9,14 378:4,21
381:11,22,23,25
382:13 383:3,5,11,15
384:7 385:9,21 386:3
404:3,5 405:19 406:2
447:21 448:2,5,11,16
449:13 450:9,15,21
451:2 452:7,17,18
453:2,5 455:7 456:5,
20 459:3,12 464:20
465:11 473:5

**HCRE's** 342:6 344:6
377:23

**HCRE-TYPE** 385:20

**head** 292:2 306:4
311:25 317:14,16
325:19 340:23
369:17,21 376:8

**hear** 289:15 303:14,
19 335:11 395:24
396:4,5,7,9,10,11,22

Case 21-03007-sgj   Doc 106-4   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 78-14   Filed 02/02/24   Page 204 of 213   PageID 55118

Index: heard..investor

**heard** 303:16 352:20 462:9

**held** 312:17,22 313:5, 18 314:12 320:14,16 325:11,17 465:2

**helped** 339:16

**Hendrix** 352:19

**hereunder** 414:14

**Hey** 380:13

**HFAM** 335:20 470:15 471:9,13,15

**Highland** 288:6 289:9 290:23 291:3, 7,14 292:5,15 293:16,20,25 294:10, 14,21 295:4,6,7,14, 21,23 296:3,9 297:3, 7,9,15,23 298:2,4,10, 20,22,25 299:4,22 300:8 301:3,9 302:12,18,24 303:12 304:14 305:4,12,14, 23 306:7 308:14 311:19,20 313:7,19 314:5,12,23 315:8 319:15 320:12 321:7, 8,15,19 322:8 325:2 327:5 329:5,13,18 335:15 336:11,16,24 337:7,8,12,22 338:2, 10,13 339:3,7,12,13, 16,17,20 341:2 344:13,22 356:2,5 358:15 360:6 362:23 367:2,11,15 371:7, 19,25 372:2,7,13,20 374:6,12,15 375:4,13 376:25 377:8,13,14 381:12,22,25 382:13, 14 383:12,15 384:8, 16 385:23 386:17 387:6 388:12 391:24 392:16 393:16 395:15 397:2 398:4, 5,9 400:14 404:5,11 405:21 408:4 412:2 415:5 419:11,22 420:2,12 421:14 422:4,20 423:12,18 424:6,15 426:21 429:6 430:7,10 431:13 432:11,24

433:10 434:15 435:3, 9,19 437:4,17 439:8 440:4,6,17,19,24 442:2,7 443:2,9,17, 18 445:23 446:6,10 447:2 448:6,12 450:10,16,22 452:3 453:4 456:17,18 457:24 458:4,16,23 460:23 461:4 462:3, 18 463:4,9,11,19,20 465:2 466:16,22 467:19 468:14 469:19 470:15,16 471:13,16,21,22 473:4,6 475:9 476:2, 15

**Highland's** 291:9 298:16 301:13 302:14 303:6 311:12 313:6 327:18 346:18 349:12 354:25 358:14 362:15 370:25 389:3 402:24 403:17,22 412:8,16 426:2,10 432:17 435:14 441:11 476:19,23

**highlighted** 306:4

**highly** 334:10 391:22 417:18,19

**hired** 297:3

**historic** 322:5 431:5, 7

**historically** 454:3

**history** 422:3

**hold** 294:16 329:6 355:14 423:18 481:9

**holders** 400:14,19 427:21

**holding** 392:5

**holds** 314:22 315:7

**honorable** 428:9

**hope** 335:8 348:23 351:24 396:15 445:13

**hour** 454:9,12

**hours** 290:13 349:20,

21 350:19,20 479:4,9 480:9 481:17

**house** 308:7 424:25

**housed** 308:6

**hundred** 391:21

**hundreds** 293:15 312:12

**HVIN** 469:15

**I**

**idea** 300:21 331:15 410:15,19 416:7 435:21

**identified** 310:14 324:2 348:16 353:24 459:19 461:2,7

**identifies** 317:8

**identify** 299:6 300:3 313:4,17 314:21 321:14,18 328:10 329:12 331:16 340:25 341:5 342:14 366:6 396:24 422:2, 18 471:5

**illiquid** 361:18

**imagine** 290:12 313:21 319:23 320:3 336:17,21 342:18 367:16,17 383:13

**impact** 476:22

**imperfect** 365:5

**implying** 475:16

**important** 423:15

**importantly** 440:12

**improper** 391:4

**in-person** 350:9,12

**inaccuracy** 378:18

**inaccurate** 357:10 364:15,19 378:9 379:6 389:12

**inaudible** 338:23

**Inc.'s** 362:24

**incentive** 361:18

**incentives** 361:17 421:21

**include** 297:7 318:16 420:24 427:2 432:7

**included** 354:13 412:8,12,16 414:18 415:13 430:10 432:17,19 470:7

**includes** 473:3

**including** 348:15 421:5 459:8,13,16

**inclusive** 350:16

**income** 322:3,4 343:24 386:19 387:7 388:14

**incorporated** 366:2 392:24

**incumbency** 309:23,25 310:10 311:8 313:13,14 320:23 323:19 331:19 340:12,20 342:11,20 398:6 436:25

**incur** 316:12,18

**incurred** 337:22

**indefinitely** 373:12

**independent** 385:19

**indirect** 329:23 341:19

**indirectly** 307:3 322:19 330:3

**individual** 345:8 351:3

**industry** 317:16 404:19,21

**inform** 326:12 443:9

**information** 344:20 378:13 414:25 424:14 427:18 470:13

**informed** 443:2

**initial** 419:15

**inkling** 413:14

**inordinate** 392:6

**insignificant** 424:20

**installment** 369:24 409:16,22 453:22 456:2,12,21 458:8 460:11 461:20

**instruct** 371:10 393:15 442:21 443:9 445:21 446:4 461:19

**instructed** 371:24 372:13 397:2

**instruction** 372:20 397:16

**instructions** 395:15

**intended** 325:20 418:19,20 473:23

**intent** 339:9 377:5,6 414:12

**intention** 418:14 482:10

**intentionally** 304:19

**interacted** 402:4

**intercompany** 422:5,17,20 423:4,11

**interest** 329:24 330:3 341:19,21 400:14 408:2 419:10 440:8 450:9 452:20 453:10

**interests** 306:18 307:4 453:5

**interject** 390:25

**interjecting** 445:4

**interrelated** 423:3

**interrogatory** 426:5

**interrupt** 422:14

**investment** 291:16 330:22 401:9

**investments** 330:21 339:17 342:7 361:19

**investor** 292:21 338:24 385:4

**investors** 330:24 331:2

**invite** 396:19

**involved** 325:9 328:2 339:17 355:21 373:16 386:12 406:10 459:5

**issue** 306:5 332:22 335:7 360:8 399:9,17 400:24 405:5 410:22 423:15 424:10 433:9

**issued** 467:20 468:15

**issues** 333:7 348:16 386:9 468:2

**item** 430:16

---

**J**

**James** 288:5,11 404:17

**January** 291:10 450:23

**JEFFRIES** 472:15

**Jim** 302:3

**John** 291:21 317:21 335:17 347:21 369:8 376:18 380:13,14 386:20 387:22 390:21 395:23,24 396:3,6 397:5 406:16 445:3,9 457:19 478:23

**Jonathan** 322:6

**judge** 363:22 443:12, 17 480:18

**judgment** 305:17

**July** 420:13 428:18

**jumps** 390:2

**juncture** 355:22

**June** 436:10 437:17

**justification** 347:17 365:18 370:7 389:16, 20

---

**K**

**keeping** 432:2

**key** 377:16

**kind** 335:3,6 366:5 384:19 414:14 425:3, 11 432:21

**kinds** 327:25

**Klos** 300:17 352:10

**knew** 311:9 313:24 325:20 334:6 336:19 391:23 392:18 439:11 440:11,12,16 442:12,13,17 451:16 454:2

**knowing** 294:5 299:2,21 300:6 301:2 316:7

**knowledge** 300:24 301:6 312:4 323:8 340:13 341:22 349:2, 14 351:16,20 367:22 368:24 373:20 397:15 410:11 420:15 437:8,9 438:6 457:5 465:17,22 466:6 468:13,20,24 469:5

**knowledgeable** 373:16

**Kristin** 352:18

---

**L**

**L.P.** 288:6 290:24 306:8 311:21 322:13 324:4 471:22,23

**lag** 301:25

**lagging** 478:24

**Lamensdorf** 322:6

**largely** 291:16 308:6 370:10 397:20

**larger** 460:22

**largest** 292:4

**late** 288:22 336:25 356:4 374:6

**Lauren** 320:9

**law** 335:21 389:23

**lawsuit** 403:17,22 404:4,11 433:9

**lawsuits** 399:9,17 400:25 405:5

**lawyer** 390:24 391:4

**lawyers** 312:6 350:23,25 365:5 383:6 406:10

**layers** 401:25

**lays** 475:20

**learn** 367:14,25 440:5

**learned** 312:17 368:6 442:23

**leave** 288:24 370:13 380:9,25

**left** 456:5

**legal** 383:2,7 410:18 473:14

**legitimate** 467:25 468:3 469:16

**lengthy** 356:18

**lens** 421:12

**letter** 412:14 426:24 439:16 441:6,12 442:7,11,13,22 443:3,13,17,25 444:4,6,9,15,17,24 445:16,18 464:3,20 465:4,23 466:18 467:2,6,10 472:4

**letters** 299:25 426:9 464:5 465:12 469:11

**level** 423:2

**levels** 317:20 404:19

**liabilities** 299:9 327:4

**liability** 412:20

**lieu** 361:8,16 416:15

**life** 427:19 470:24

**likelihood** 312:15

**Lauren** — (continued)

**limited** 413:16 417:7 427:18

**limits** 317:12

**lines** 331:4

**liquidity** 339:16

**list** 354:12 418:25 424:19,20 425:10,17, 18,20 426:4

**listed** 354:18 419:5 420:3 425:16 430:17 440:9 445:25 446:6 450:5 466:17

**listen** 372:11 468:11

**listing** 353:4

**lists** 344:20

**litigation** 289:9 356:7 414:19 441:7, 10 443:4,8,18 455:23

**LLC** 341:8,11

**loan** 365:23,25 416:18 421:19 422:5, 18,20 423:11 430:4, 5,15,23 431:9 435:2, 18,24

**loaned** 452:7

**loans** 298:22 299:3, 22 300:7 301:3,9 344:12 371:3,9 404:20 406:11 420:17 422:17 423:4 424:7,16 427:3,12 429:4,11,18,19,24 430:23 431:5,13,21 432:7,11,15,17,18 448:12 450:21 452:19,20,22,23 477:10 478:2,8,11,16

**logical** 377:6,9 391:18 413:20

**long** 301:20 380:18 397:17,18 427:5 434:5 479:19

**longer** 478:25

**looked** 340:19 396:23 431:4 439:10 455:11 464:2

**lot** 291:22 297:23 311:14 416:3 452:14 467:23 482:8

**loud** 414:9

**love** 428:25

**low** 312:15

**lower** 452:14,20

**lunch** 380:19,21 398:17

**Lynn** 363:22 443:12, 17

---

**M**

**made** 333:19 346:4 367:15,25 368:24 369:3,5,15,18 372:18 387:12,19 388:6,11 392:6 393:25 395:16 397:22 424:13,18 432:19 434:15 439:8 440:6,17 442:2 445:4 460:20 465:6 466:17 468:14 470:18 476:10 477:16

**major-** 307:2

**majority** 307:4 330:2 341:21 400:13,18 427:21

**make** 288:15 305:17, 18 341:14 357:14 358:12 364:23 371:11,13,18,25 372:14,21 375:13 377:16 379:10 387:5 393:7,10,16 394:7,15 395:15 397:2 400:15 409:15 410:8 411:17 429:17 440:21 441:17 445:22 446:5, 9 455:12,25 456:11, 19,20 457:3 458:7, 11,15,17 460:10 461:5,20 462:3,10, 11,19 463:3,4,11,19 465:7 466:25 476:15, 20 479:15 481:2

**maker** 295:22 296:2 414:9 429:21 437:14 467:3 474:24 475:10

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 180-24    Filed 06/09/24    Page 206 of 213    PageID 55120

Index: makers..Nexpoint

477:17

**makers** 451:7,25

**makes** 342:7

**making** 377:13
461:14 467:19

**maliciously** 304:20

**man** 383:22

**manage** 293:4
421:21

**managed** 308:9,16
325:13,18 327:16

**management** 288:6
290:24 292:5,18
294:11,22 295:4,14,
21,23 296:3,10 306:7
308:11 311:21
329:19 362:23
405:22 412:14 426:8,
13,23 431:21 434:15
457:24 458:4 466:22
471:22,23

**manager** 291:19
293:2 309:3 421:14

**managers** 309:5
322:5 421:21

**manages** 330:16

**March** 435:3

**Mark** 306:15 383:11

**marked** 345:4,6
353:12 354:6,23
362:16 377:22
380:11 402:23
408:10 433:15
446:16 464:12 466:9

**market** 339:5 384:16

**marketed** 330:18,20

**marks** 288:3

**masked** 422:9

**material** 332:22
344:2 365:22,24
368:4,7 369:2 412:7,
10 425:7 426:16,23
427:4,12 430:6,9
431:8,9

**Matt** 342:18

**matter** 288:5 293:7
296:20 350:18
467:15

**matters** 302:2

**Mcgraner** 342:18,23

**mea** 406:16

**means** 384:2 395:20
458:4

**meant** 332:3 456:7
474:4

**mechanism** 429:18

**meet** 350:11

**meetings** 350:16,22
351:2 481:5

**members** 425:2

**memorized** 347:23

**memory** 356:13

**mentally** 289:24

**mentioned** 335:10
367:18

**met** 349:17

**Michael** 322:6

**mid** 374:21

**middle** 374:24
404:15

**migration** 364:6

**Mike's** 387:14

**million** 294:2,8,11
296:15,18 298:12
377:3,4 391:25 392:5
393:4,12 405:17
407:22 408:18 412:4
413:5,11 419:17
420:12 421:16
429:24 430:14

**mince** 393:9

**mind** 324:13 392:21

**mine** 434:19

**minimis** 297:25
298:5,17 333:5,7,12,
15 334:7,14 343:21
376:25 377:3 391:21
393:20 410:13

411:25 412:3 413:18
417:20 421:13
458:20

**minimus** 298:7
343:22,23

**minute** 291:24

**minutes** 318:3 370:5
387:10 454:8

**misleading** 390:25

**missed** 425:9 456:24

**missing** 389:20

**mistake** 448:22

**mistaken** 397:10

**Mitts** 324:14

**mixed** 430:15

**modest** 382:6 385:11

**modification** 417:4
475:15,16,21

**modified** 357:14
364:22 379:9 473:10
474:8 476:21

**modify** 473:14,23

**moment** 357:16,25
359:11 364:20 366:4,
10 375:23 379:25
422:2 461:18

**Monday** 479:15

**monetize** 361:18

**money** 292:18,25
293:4 295:3,7,8,13
296:9 331:4 336:24
337:7,16 360:7
382:11 391:21
419:22 420:2,6
421:19 448:6 450:16
452:7,14 460:22

**moneys** 337:19
470:15

**monitor** 288:8

**monthly** 299:13

**months** 428:15

**MORRIS** 288:14
289:5,14 291:25
294:18 295:2 303:18,

22 304:4 305:8
309:11,17 317:24
323:17 337:17 345:3
346:5,8 347:24 348:4
349:25 353:10 354:4,
21 355:5,9 359:6
369:12 372:8 374:4
375:19 376:22
377:20 380:12,16,24
381:4,15 383:19
386:25 387:16 388:3
390:3,17,20 391:3
393:22 396:7 397:7
398:15 401:5 402:9,
15 403:3 405:14
406:18 408:7,11
414:4 423:23,25
425:8,17 426:7 432:3
433:13,18,20 434:9,
24 436:13,19 437:11
439:14 444:12,22
445:12,20 446:2,14,
20 448:17,21 454:13
456:6 462:14 464:9,
15 466:7,10 468:10
472:13,17 474:18
476:7 479:3,12,24
480:14,22,25 481:6,
12,15,22 482:3,16

**mortgages** 452:25

**motion** 374:20,24
395:7

**mouth** 302:5

**move** 322:11 372:8
374:4 375:19 386:24
393:22 432:3 433:7
440:15 462:14
468:10

**moved** 364:3 468:22
470:15

**moving** 302:5 468:7

**mucked** 469:20

**multiple** 311:15,23
320:4,5 324:20
325:5,6,22 375:7,8
406:10

**mute** 395:22,23,24
396:2,14 481:11

**mutual** 308:6,7,9,16
317:3,4 336:12

**myriad** 335:2

**N**

**names** 299:14
342:22 425:19,20
426:4

**Nancy** 288:19 355:14

**narrow** 313:16

**nature** 308:5 323:3
330:15 342:5

**nauseous** 289:4

**necessarily** 413:7
475:21

**necessity** 376:20

**needed** 372:18

**negotiate** 417:13

**negotiated** 418:6,10

**negotiating** 411:23

**negotiation** 416:22
417:2,4

**negotiations** 417:2
451:22

**netting** 392:9,15

**news** 428:14

**Nexbank** 431:18
432:6,18,20

**Nexpoint** 322:11,12,
15,18,21,23 323:6,
10,15 324:3,9,15
326:2,4 327:7,16
328:6,13 329:6,14
335:20 336:23
339:22 341:11 346:2,
17 353:17 381:23
382:8 383:6 384:16
385:8 389:8 391:24
393:15,25 394:8,16
395:16 396:25 397:3,
13,16,22,25 398:8
403:16,17 405:18,25
407:17,21,24 408:4,
9,24 409:8,24 410:5,
7 411:18 419:11,20,
21,25 420:5,11,16
439:12 447:21 451:2
452:7,13,18 453:2,5

455:25 456:11,19 458:25 459:4,9,24,25 460:7 461:8 467:6,8 473:5

**Nexpoint's** 323:4 326:7,12,17,22 327:2,9,10 328:7,14, 18,22,25 329:8 345:20,24 346:14,20 347:2 348:8 349:3,12 388:22 389:2 412:3, 17

**night** 290:10

**nods** 292:2

**nominal** 386:4

**non-payment** 414:11

**non-privileged** 442:6

**nonetheless** 334:15

**normal** 316:22

**note** 306:5 349:3 368:16,18,19,22 369:23 371:12,21 372:2,16 397:3 407:17,21,25 408:16, 23 409:2,6 410:7,15 411:11,18 412:4,15 413:5,6,11,15,18,24 414:18 415:9,13 416:9,12,14,18,24 417:9,14,17 418:4, 17,18 419:4,8,20,23 420:6,20,25 421:5 434:3,14,22 435:14 438:18 440:14,23 446:25 447:5,8,16 448:8 449:12,15 450:3,18 451:12 455:6 457:10 467:2, 3,9 470:18 475:21

**notebook** 355:4 464:14

**notes** 293:12,15,19, 24 294:23 295:22 296:3,22 297:17,25 298:4,12 305:18 327:6 334:5 348:12, 15 353:5 356:6 358:7,8,9,16 359:10

360:8 364:7 367:4 368:15 373:8 376:24 377:12 391:13 399:9, 17 400:24 402:6 403:15,21 404:3,9 405:5,9,10,17 408:3 410:22 411:7 414:23, 25 415:4,18,21,23 416:21 417:12,20,21 418:9,13,16,19,20,25 419:5,12,16 427:24 433:9 439:9 440:9 442:3 443:10,19 445:23,24 446:11,18 447:17,23 448:7 449:4 450:4,10,25 451:3,6,9,16,19,21, 25 452:3,9 453:11, 19,21,22 455:3 457:9 461:22 462:4,18 463:2,12 464:6 465:2 466:17 467:20 468:15 469:16 470:8, 18,22 472:24 473:3, 5,11,18,25 474:21 475:5,9,11,16,19 476:2,6,14,23 477:7, 11,14,15,16,20,21,24 478:3,9,11,17

**notice** 353:14,18 354:7,13 363:7 367:3 375:4 377:8 414:11, 12,13 443:19 480:19

**noticed** 406:15

**notices** 345:2 353:3 414:13 464:24

**notion** 423:16

**notwithstanding** 375:12 379:16

**November** 375:4

**nuance** 478:5

**number** 298:14,21 299:3 362:17,18 408:8,12,13,15 464:4

**numbers** 392:20 425:3

**numerous** 365:25 368:25

---

**O**

**object** 296:23 297:10 305:25 311:5 315:16 318:24 321:21 326:8, 19 329:9 331:9 340:6 344:7 366:8,17,22 367:6 369:25 373:5 376:10 379:11 384:2, 22 385:17,24 388:15 390:14 399:11,19,21, 22 401:11,18 405:11 409:9,18,25 410:9 411:20 415:14,25 426:17 429:8 430:25 432:13 438:10 441:3, 20 445:11 447:11 449:22 452:10 453:7, 24 455:19 456:4,14 457:6 460:13 461:16, 23 462:6,21 463:6,22 465:14,19,25 467:4 470:3,10 471:2 473:12 474:2,11 475:12,13 476:25

**objected** 312:18

**objecting** 409:12 445:6

**objection** 294:3 324:21 327:20 343:19 347:4 348:25 361:25 387:8 428:5 434:17

**objections** 346:4 348:19 353:25 354:17 383:21

**obligation** 371:20 426:13

**obligations** 294:14, 21 295:20 297:8,15, 23 315:15,22 316:3, 8,12,19 318:17 326:7,13,18 327:3,11 328:8,15 332:20 333:2,11,15,18,23 334:4,13 340:5 343:6,18,22 344:6,12 366:15 367:4 377:2 469:19 470:2 473:24 474:10,24 475:11

**obligors** 356:6

**obligors'** 458:13,14 469:10

**obtained** 312:3 374:16 435:18 448:12 450:22

**obtaining** 452:19

**occurred** 368:13

**October** 288:7 374:8

**odd** 422:25

**odds** 413:15

**offense** 432:4

**officer** 303:2 310:4 312:8 320:22 321:16 329:6,14 331:13,17, 25 332:9 340:16 341:3 342:15

**officers** 311:14 459:8,12,14,15

**offline** 480:2

**Okada** 306:15,22

**omission** 406:22

**omitted** 405:25 406:7,12 407:3,5

**operating** 299:13 316:20,23 343:23

**opinion** 447:14

**oral** 336:15 337:4 361:22 399:7,15 400:10,22 401:4,16 403:7,10,13,19,25 404:8 406:20 407:10 420:21 443:10,20 472:11,21 473:8,21 474:22 475:6 476:18, 22 477:8,24 478:7, 10,15

**orchestrate** 314:19, 25

**orchestrated** 327:14

**order** 374:13,16

**ordinary** 372:23

418:13,14 459:20 460:10 461:3,13 462:17 463:2,14,18

**original** 356:2 407:21 473:11,18,24 475:4,8

**out-of-pocket** 338:8,16

**outline** 480:20

**outstanding** 295:17 407:25 419:10 440:7 447:22 450:9

**overcharged** 391:24

**overlay** 343:20

**overpayment** 392:4

**overstatement** 460:17

**owe** 294:10 296:9 426:3

**owed** 297:8,15 375:14 419:11,22 450:10 460:23

**owing** 327:4 344:21 366:16

**ownership** 306:18 307:4,21,24 317:18 329:24 341:19

**owns** 306:13 322:18

---

**P**

**p.m.** 381:9 398:20 454:17 482:21

**pages** 435:21

**paid** 338:8 373:13 392:16 418:21,22 460:20 462:11

**paper** 338:22

**paragraph** 357:17 358:19 359:12,13,23 360:13,16 361:14 362:9 365:2,15 370:8,14 378:20 379:14,24 390:4 403:4,6 404:14 407:14 409:13,20 412:23 414:6,7,17 421:10 422:8 423:10 455:11,14,18 472:14, 18,21

Index: paragraphs..private

**paragraphs** 357:20 365:10 375:22 380:2 390:7,10,16 398:12 416:9

**paraphrase** 394:23

**parsed** 471:25

**part** 334:19 337:4 340:8 358:22 359:15 360:2,18 365:17 370:17 412:10 414:19 418:21 423:4 427:20 443:23 444:2 454:4 456:8 468:3

**participate** 289:24 350:21,25

**particularized** 468:24

**parties** 297:24 339:6 413:14 415:4 418:7

**parties'** 473:10,23 474:9,23

**partly** 389:23 454:4

**partner** 361:6

**Partners** 341:8,11 455:7 464:21

**party** 452:2,6

**passed** 338:5

**passing** 363:22

**past** 296:6 338:20

**patient** 372:10 383:20

**Patrick** 301:15 383:11

**pay** 336:23 337:6 338:7 366:14 367:4 369:23 383:15 384:7 385:22 393:5,12,18, 19 419:7

**payee** 295:24 422:21 466:25 474:25 476:2 477:16

**payees'** 475:10

**paying** 339:2

**payment** 337:13 371:11,19,25 372:14,

21 373:3,11 375:13 391:16,20 393:16,25 394:8,15 395:16 397:2 409:16,23 414:11 439:9 440:7, 21 442:3 453:22 456:2,12,19,21 457:4 458:8,17 460:11,17 461:5,14 464:5 468:15 475:18 476:3, 16

**payments** 369:24 373:18 377:13 410:8 445:22 446:5,10 454:3 458:15 460:16 461:21 462:3,19 463:4,11,20 469:18

**peak** 292:3

**people** 293:5 299:6, 8,15,18 300:10,13,14 303:18 342:19 407:9 416:10,11 421:12 424:23,24 426:15 458:22 459:7 470:16, 18

**people's** 424:21

**perceived** 396:16

**perceives** 396:18

**percent** 298:13,16

**percentage** 306:17

**percentages** 306:23

**Perfect** 402:12 482:12

**performance** 385:9 416:16

**performed** 471:16 472:7

**period** 293:16 307:18,25 330:8 367:20 401:13,15 420:13 421:17 440:20,25 479:18

**periodic** 454:3

**periods** 304:21

**permissible** 386:22 387:23

**person** 300:4,17,18

311:3 315:12,20 316:24 331:16 332:17 333:16 364:8 371:17,18 373:19 388:5 393:15 396:24 397:15 410:4 443:5 458:22

**personal** 358:8,9 386:23 387:24 480:4

**personally** 297:3 301:7 324:2 327:17 363:19 371:10 393:24 405:6 417:16

**personnel** 372:7

**perspective** 333:13 334:3 377:7 405:17 473:21

**petition** 311:10 324:9 325:21

**Phillips** 364:5

**phone** 350:2,9,17,22 351:2

**phrase** 347:15

**physically** 289:23

**pick** 476:20

**picked** 335:8

**pile** 362:13

**PJ** 434:10

**place** 476:9

**plaintiff** 289:8

**plaintiff's** 355:19 358:21 359:14,25 365:16 370:16

**plan** 468:8

**play** 474:13

**players** 472:2

**pleasure** 381:4

**point** 288:25 290:22 309:8 318:2 320:15 377:19 406:19 427:7, 24 433:5 468:7

**points** 416:9

**policy** 317:6

**portfolio** 308:10,16 309:3,5 322:5 361:21

**portion** 303:16 308:15 351:10

**position** 298:3 311:23 312:16 313:17 314:11,21 320:14 321:7 325:25 329:6 367:9 403:10 407:9

**positions** 297:5 312:22 315:6 316:21 320:17

**possibly** 423:3

**post** 309:17

**pot** 468:8

**potential** 330:23

**practice** 317:17 404:20 423:16,17 424:6,15,22 429:4 430:4 431:13

**practices** 411:13

**precedence** 477:5

**precedent** 429:12,16 477:5

**precipitate** 314:25

**premarked** 309:13

**prepaid** 366:15 391:13 406:11 418:22 461:9

**preparation** 328:2 350:5 353:7

**prepare** 349:16

**prepared** 299:12 334:16 338:3 346:25 347:20 348:6,14,22 349:11 354:17 356:9 363:9 376:6

**preparing** 299:10 320:4 340:9 350:15 363:20

**prepay** 389:17

**prepayment** 366:21 367:5,15,22 368:2, 10,15,24 370:10 378:12,16,20 379:18

459:22,25 460:8

**prepayments** 365:23,25 367:13 369:2,5,19 378:15, 23

**prepays** 389:19 392:24,25

**presence** 384:15

**present** 431:24 476:11

**presentation** 431:4

**presentment** 414:10

**president** 291:10,15 292:6,14 293:16,20, 25 297:6 298:19 302:12,23,24 303:13 304:15,22 305:2,11, 24 308:21 309:6 313:6 315:10 323:12 325:2 326:4 332:17 337:12 338:13 422:3, 19 423:12 469:21

**presidents** 317:18

**pretty** 460:24

**previously** 319:15 408:3

**Price** 337:23

**Pricewaterhouseco opers** 469:25 470:5, 6,19

**primarily** 322:7 339:14 368:18,19 383:10 440:3

**principal** 293:23 295:17 360:7 407:22 408:2 419:10,16 440:8 450:9

**prior** 300:5,15 302:20 307:21 311:10 315:23 324:9 325:20 389:14 391:9 418:25 419:11,16 420:16 423:16,17 424:15 441:6,9 442:10 443:3,7 448:7 450:10 463:16 477:19

**private** 421:18,22

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-14    Filed 06/09/21    Page 209 of 213    PageID 55123
Exhibit 14    Page 670 of 741

Index: privileged..relative

**privileged** 441:18

**problem** 302:7 381:5
384:3 454:13

**proceed** 289:22
291:25 398:25
454:20

**proceeds** 348:20
349:3 420:16 435:23
448:11 450:21

**produced** 367:23
425:13 428:10,17
444:6,12,17 445:18

**product** 451:21

**production** 428:16

**profit** 338:9

**promissory** 293:11,
12,15,19,24 294:23
295:22 296:2,22
408:3,16 411:18
413:11 419:5 434:3,
14,22 446:25 447:17
450:4,18 464:6
467:20 470:8 472:23
473:3,5,11,24 474:21
475:5,9 476:23
477:11,14,15 478:2,9

**proper** 412:11

**properly** 412:12

**proportionate**
424:21

**protections** 413:17

**protest** 414:11,12

**provide** 383:3
386:17 387:6 404:16
421:7

**provided** 337:8
339:11,16,20,21
353:2 385:12 386:4
429:7

**providing** 336:6
422:5

**provision** 382:14
415:12,24 447:8
449:19 455:18

**provisions** 440:14
449:25

**prudent** 413:4

**pulling** 449:2

**purchasing** 317:4

**purpose** 298:8
377:10 401:3 404:15,
24 405:3,8,24 406:7,
23 407:3,9,11 421:4
422:5 423:12 430:22

**purposes** 416:6
422:21 424:25

**pursuant** 356:4

**put** 290:18 309:12,18
320:25 323:17
342:13 345:3 348:2
353:10 354:4,22
355:11 367:2 378:10
379:4 391:20 401:5
408:7 416:5,7,10
418:14 427:18
433:14,22 448:3
466:7 470:20 476:9
481:10

**putting** 343:12,14
354:24 355:10
443:18 472:14
480:19

**Pwc** 412:16

_____

**Q**

**qualified** 346:3

**quarterly** 299:11

**question** 294:25
295:11,25 302:10
304:10,24 305:21
306:2 332:2 335:18
357:2 358:11 372:11
376:13,22 381:16
383:25 387:2,3
388:2,9,16 391:6,14
393:23 395:6,8,9
397:8 398:7 405:7
417:10 422:15,25
423:7 424:2 441:22
442:15 457:14,15
460:25 467:17
468:12 477:2 478:6,
13

**questions** 335:4,6

346:25 353:22 363:2,
9 375:25 376:3,6,21
378:2 388:21 390:22,
24 480:16

**quick** 317:23 380:14

**quickly** 344:25
345:15 377:12

**quote** 359:25 360:3
365:16 370:16
404:15

_____

**R**

**raise** 382:10

**rambling** 387:10

**rate** 475:18

**rates** 452:14,20

**rationale** 471:10

**read** 293:8 296:21
358:2,10 361:2
381:15 397:9,10,12
404:22 409:2,11
410:3 413:6,10,24
414:9,15 415:24
424:2,3 430:21 447:5
449:15,18 455:13
475:2

**reading** 310:3
411:23

**ready** 454:20

**real** 323:5 341:11
342:7 385:8 391:14

**realize** 468:6

**reason** 303:10
304:12 305:2,12
318:19 319:4 324:7,
10 328:4,11 391:18
410:25 411:14,15,16
413:20 434:20 436:7
437:6 447:6 452:5
453:3

**reasonable** 392:10
404:18 411:19
413:24

**reasons** 388:16
413:25 458:14 460:9
468:21

**recall** 292:8 298:24
302:17 303:4 310:25
312:20,25 313:21
320:14,21 326:15,16,
21,25 330:11 337:11,
18 355:18 356:2
357:3 363:6 368:23
371:22 373:21
374:11,15,19,23
375:3 407:20,24
409:5 410:6,21 424:9
425:10,21 437:3
446:3 465:4

**receive** 338:14
344:19 435:2

**received** 322:3
337:13 383:16 435:9
464:4,24

**receiving** 386:18
387:7 388:13 425:22
442:14

**recess** 304:7 318:8
381:9 398:20 454:17

**recollect** 442:16

**recollection** 309:14
310:17,21 311:17
324:2,17 338:12
349:6 352:25 355:24
356:8 386:2 411:6
420:10 435:17,22
440:2 442:14,19
443:16 444:14 448:5,
10 450:20 455:5
464:23 467:16,19

**recommended**
301:15

**reconvene** 289:3

**record** 304:3,5,8,11,
25 318:6,9 330:20,25
338:18,22 339:4
381:7,14 382:10
384:15 385:5 397:12
398:19,21 399:24
424:3 454:16,18
479:13 481:14
482:17,20

**records** 298:23
330:17 367:8,12
397:14,19 431:20,25

**recover** 358:16

**redaction** 428:12

**reestablish** 419:8

**refer** 291:2 306:10
322:15 329:21
340:14 341:15 400:9

**referenced** 337:5

**referred** 445:17

**referring** 297:16
371:4

**refine** 330:22

**reflect** 477:16

**reflected** 294:22
295:21 313:20 327:3
334:15 420:6 477:11

**refresh** 309:14
310:17 323:25
339:18 349:5 352:25
355:23 356:8 439:12
455:5 464:23

**refreshed** 331:21
332:16 341:4 342:11,
17 420:14,18

**regard** 386:5 402:5
407:7 443:13,25

**regular** 344:9 373:11
460:16

**regularly** 299:17

**regulatory** 327:15
335:21 411:14 416:6
469:18 471:10

**regulatory-wise**
418:3

**reimbursement**
338:15

**relate** 361:20 375:21
376:8,16 379:23
380:3 398:11 478:7

**related** 323:5 366:6
382:4 390:11 398:4
415:4 477:10,13,25
478:15

**relative** 333:5,7
343:23 376:25
413:18 430:18
453:16

Case 21-03007-sgj   Doc 106-4   Filed 12/01/21   Entered 12/01/21 14:55:44   Desc
Case 3:21-cv-00881-X   Document 20804  FPaged 62.89 of 241   Page 210 of 213   PageID 55124

Index: relevant..services

**relevant** 412:3

**reliance** 370:25
372:5 463:8

**relied** 372:22,23
375:13 383:9 393:4,5

**relocate** 430:14

**relocation** 424:24

**rely** 428:2,7,8

**relying** 367:10 371:7
398:8 458:16

**remains** 401:21

**remember** 301:21
307:20,21 308:12,13
309:10 311:14
312:14 320:17 323:2
330:13 358:10 361:5,
8 368:6 375:9 389:14
407:18 409:12
410:25 411:5,22
441:14 443:14,15
464:4 465:8 467:22
468:5

**remembered** 415:9

**remind** 460:5

**remotely** 480:10

**remuneration**
337:10 382:8 384:13
385:14

**render** 388:12

**rendered** 337:14
339:13 384:8 385:23

**renegotiation**
416:20

**rep** 299:25

**repaying** 418:15

**repeat** 294:24 295:25
302:10 387:3 391:8
394:5 399:13 441:22
472:16

**repetitive** 335:9

**rephrase** 295:10
399:13

**report** 314:5,8,13

**reporter** 288:9

**303**:14,21,24 381:17
396:5,8 482:15,19

**reports** 299:13

**represent** 351:3
353:16

**representation**
412:14 426:9,14,24

**representative**
345:21,25 354:9
378:3 388:22 400:12,
13 463:13

**repudiation** 365:18
370:7

**reputable** 334:12

**request** 317:22
372:25 397:23

**requests** 349:8,13

**required** 369:23
385:22 409:15 410:7
411:11 440:24
453:22 454:2

**resign** 374:5,8

**resolution** 468:8

**resolve** 375:17

**respect** 319:16 325:3
335:7 343:17 348:15,
20 353:24 464:25
472:23 477:23
479:20

**respectful** 351:25

**respective** 451:7

**respond** 441:11
442:8,22 469:4

**responded** 441:6
465:11 469:9

**responding** 465:23

**respons** 328:14

**response** 305:21
425:21 444:3 469:17

**responses** 425:19

**responsibilities**
299:15 318:16,21,23
328:6 398:4

**responsibility**
299:2,20 300:6 301:2
315:13 319:6 326:6
327:9 332:19 333:22
340:4 343:2,5,17
364:9

**responsible** 299:7,8
300:11 316:6 327:18,
21 471:24

**responsive** 422:15

**rest** 290:17 482:9

**restate** 457:14

**restraining** 374:13,
16

**restroom** 317:23
380:15,23

**results** 330:23

**retail** 312:22

**return** 386:19 387:7
388:14 398:17

**revenue** 339:6,20,21

**review** 344:12
346:20 351:7 354:12
389:5 447:13 450:2

**reviewed** 357:4
429:5

**reviewing** 355:19
363:20

**ridiculous** 377:17

**rights** 473:10,23
474:10,23 475:10
476:23

**road** 339:7

**role** 314:2 327:12
343:11 363:19

**roles** 311:15 325:22
373:12

**roll** 337:25

**roll-ups** 477:18

**rollup** 407:25

**room** 309:18 355:11

**rough** 482:14

**roughly** 375:2

**row** 318:3

**RUKAVINA** 445:2,14

**rules** 386:6,7

**run** 319:24 380:22

**running** 324:13

⎯⎯⎯⎯⎯ S ⎯⎯⎯⎯⎯

**safe** 445:13

**satisfaction** 371:19
372:14

**satisfied** 373:18
429:13,16

**satisfy** 333:18

**scope** 300:7 301:9
316:7 317:8 387:22
405:15

**screen** 353:19
354:19,25 355:10
381:2 388:20 389:2
401:6 402:7,17,22
433:22,25 434:6

**screw-up** 370:25
371:2,4

**scroll** 434:9

**sec** 291:22 471:8,17,
21,25

**secrecy** 427:23

**secretary** 321:9

**section** 409:14
412:22,25

**secured** 416:13,15
452:25 453:13,16

**Seery** 352:6,8
373:23,24,25 375:16
391:23 392:9 414:24
439:17 468:6

**Seery's** 352:7

**sees** 302:6

**selection** 301:16

**send** 467:2

**senior** 297:5 300:10,
14,17,18 312:8
316:20 325:5 327:23

**424**:25 431:21
432:19 452:25
453:13,16

**sense** 341:14 392:7
466:25

**sentence** 405:24

**separate** 331:3
333:24 385:20 457:9
480:5

**separately** 430:17

**September** 355:25
356:10 357:6 374:6

**series** 455:3

**serve** 291:9 309:7
323:15 325:21
331:24

**served** 302:24
303:13 304:15
305:24 310:18,23
311:19 313:6 320:22
321:15 324:8,25
325:3 329:13 331:13,
17,22 332:8 341:2
342:15

**server** 426:2

**service** 333:6 334:5
343:22

**serviced** 336:3

**services** 294:11,22
295:4,7,9,14,21,23
296:4,10 329:19
331:20 332:4,14
335:15,17,22,23
336:2,5,17,22,23
337:7,13 338:4,6,15
339:3,9,12,15,22
340:11,20 362:24
367:11 371:6,7 372:7
375:5 381:11 382:14
383:3,9,16 384:8
385:12,23 386:2,4,
10,18 387:6 388:13
392:6 405:19,21
417:22 433:12
437:14 457:23,24,25
458:3,5,7,23 459:4,
15 460:6,7 466:3
467:6,13 471:15
472:5

Index: servicing..subject

**servicing** 413:17

**serving** 311:11
313:25

**set** 291:22 319:23
360:12 365:11 390:9
393:6 398:12 419:9
420:7 447:18 448:7
450:8,17 452:8
455:18 474:23
475:10

**settlement** 444:2
468:4 471:7,11,12

**seven-figure** 425:3

**seven-figure-plus**
431:20

**share** 359:2,17 362:7
368:10,21

**shared** 335:14,17,22,
23 336:2,5,9,10,15,
24 339:3,22 367:11
371:7 375:5 381:11
383:8 392:5 417:22
458:23 472:5

**She'll** 428:22

**sheet** 298:9 299:4,23
300:8 301:10 326:23
327:3,7 412:2 432:16

**sheets** 293:8 301:4
413:19

**shocked** 412:19

**shoot** 290:13

**short** 318:4 380:19,
21 386:11 387:10
397:17 398:16

**shorter** 291:23

**show** 330:23 347:22
406:4 415:17 429:15
431:20

**side** 308:10 450:5

**sides** 413:21

**sign** 299:24 312:12
327:24 408:23 426:8,
13 434:22 436:9
449:12 451:5

**sign-offs** 320:5

**signatories** 319:12
328:18

**signatory** 319:9,16,
20 328:22,25 329:7
438:2

**signature** 310:4,6
323:23 408:20
418:15 434:11,13
435:7 436:5,8,14
437:23 438:4,5,9,14,
18 446:21,22 449:10

**signatures** 320:4

**signed** 293:11,14,18,
24 310:11 358:16
409:3,7,22 410:6,22
412:14 414:18
415:13,23 416:22
417:12 418:12
419:19,21 435:7,12
437:13 438:25
446:25 447:5,9
449:6,16,21 451:2
453:20 455:14 473:3,
6 476:6,15

**significance** 316:25
317:2 460:18

**significant** 382:9
422:13 425:6

**significantly** 391:14

**signing** 413:5
437:24,25 438:22
439:5

**similar** 336:7 339:21
342:12 378:11

**similarly** 336:3

**simple** 348:25 391:6
393:23 395:8,9
400:16 441:23
460:25

**simultaneously**
301:18 311:11
321:20 384:5

**single** 353:9 414:18
428:11 458:21

**sir** 295:11 323:20
324:24 335:18
345:17 346:11
377:24 381:11
387:19 394:14

**396:24 402:17
408:15 422:14
428:11 429:3 432:5
433:22 434:4,11
436:5 439:22 446:22
449:10 450:13
454:20 460:25
464:19 481:24

**sister** 351:21 361:22
399:8,16,25 400:9,17
401:8 403:12 404:8,
25 431:18

**sit** 300:24 301:7
304:13 318:20 319:4
357:8 445:10

**situation** 469:20

**sixth** 397:6

**skip** 357:24 359:21

**Skyview** 315:2

**small** 372:6 386:4
392:2 393:10,20
430:18 460:19

**soft** 413:15 415:9
416:9,12,18,24
417:8,21 418:17
452:22,23 453:11,19
475:17,19

**sold** 427:22

**solidifying** 411:10

**solvent** 417:19

**sophisticated**
292:21,25 383:22
390:23

**sought** 374:12
451:25

**sounds** 295:5 422:10
473:14

**source** 334:18

**space** 385:8

**speak** 303:23 399:3
453:12 454:22

**speaker** 303:25

**speaking** 301:18
303:15 383:21 384:5

**specific** 320:8 325:7
347:18 348:16

**356:13 372:24,25
382:7 383:4 385:10,
14 438:6 456:24
467:15 468:20

**specifically** 312:14
316:5 317:7,12
326:14 344:20 349:4
364:17 372:17,18
373:7,15 382:18
393:18,19 412:15
430:12 434:23
435:16 437:5 470:6
471:21

**specifics** 369:16,20
375:25 410:12,13

**speculating** 300:9
430:20

**speculative** 427:6

**spend** 334:7 413:21

**spent** 350:15

**split** 322:9 472:5

**spreadsheet** 368:11
369:10

**stack** 353:2

**staff** 383:8 397:14

**stamped** 444:20,23

**standard** 404:20

**standing** 312:8
393:3

**standpoint** 418:3
421:13

**start** 365:13 424:4
472:13

**started** 307:22 364:4

**starting** 288:22

**stated** 388:17 407:13
419:17 471:21

**statement** 288:15
310:4 406:6,23 407:2
428:12 430:19

**statements** 299:10,
12 300:12 327:15,19,
24 338:4 366:5
412:8,17 429:6,15
430:8,22 432:7,12
470:9

**states** 359:13

**statute** 335:21

**stay** 371:8 394:25
481:13

**steal** 374:2 375:17

**step** 297:21

**steps** 316:2 344:11
393:24 462:2 463:3

**stick** 395:21

**Stinson** 288:18
363:15 364:3,6

**Stoops** 300:17

**stop** 289:2 356:21
441:17 474:18,19
479:6 480:15

**strap** 291:17

**strategy** 330:22

**stream** 339:6,20,21
386:18 387:7 388:13

**strike** 372:8 374:4
375:19 393:22 432:3
440:15 462:14
468:10,22

**strong** 324:15

**struck** 394:13 422:24

**structural** 335:3,6

**structure** 307:21
308:12

**structured** 314:10

**structuring** 312:7
373:9

**struggle** 316:15

**study** 327:7 333:9

**studying** 334:8

**stuff** 327:15 383:14
416:17

**subject** 332:2 347:3
348:18 353:25
354:16 361:21
403:16,22 404:4,10
416:20,22,25 417:3
420:20 429:20
440:13 443:10,19

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-14    Filed 07/09/21    Page 212 of 213    PageID 55126
Exhibit 14    Page 170 of 171

Index: subordinated..trust

474:21 475:5 476:11
478:2,8,17

**subordinated**
452:25 453:10,12

**subsequent** 407:11
477:4

**subsequently** 425:4

**subsidiaries** 415:3
417:19

**substance** 318:12
399:4 454:23

**substantial** 479:18

**substituted** 419:4
447:16 450:3

**suggested** 391:19

**suggesting** 396:18

**suing** 457:2 473:4,6
475:9

**summarized** 368:12

**summarizing**
360:19

**summary** 313:15
459:18

**superseded** 419:4
447:17 450:4

**supplemental** 338:9

**supplying** 334:17

**support** 336:10
360:12 370:7 391:7
431:12

**supported** 382:4

**supports** 470:24

**supposed** 289:11
376:5 392:8 395:20
431:16 461:4

**surprise** 410:24
438:17

**surprising** 311:16

**swear** 288:9

**switching** 437:24

**sworn** 288:12

**synergistic** 384:20

**systems** 397:14

---

**T**

**taking** 398:7

**talk** 303:8 304:21
305:18 328:3 366:3
414:20 475:17

**talked** 336:22 406:8
407:16 424:9

**talking** 337:16
359:10 383:17 390:5
401:14 421:24
429:23,24 441:14
442:16 443:14,15
456:5 474:18,19
477:21

**tax** 373:9 382:23,24
383:10 416:6

**tax-related** 383:14

**team** 308:16 327:14
340:8,15 343:12,16
417:7

**telling** 400:5 455:13

**temporary** 374:12,
16

**tension** 373:22,24,25

**term** 368:15,18,19,22
369:22 371:3,12,20
372:2,16 397:3
407:17,21,25 410:22
427:6 446:17 447:23
448:8 449:4 450:25
451:3,6,9,10,13,17,
25 452:8 453:21
455:3,6 461:22
462:4,18 463:2 467:9
473:15 475:15
477:20 478:11

**termination** 375:5

**terms** 338:18 373:10
375:16 382:20
384:15 386:7 392:10
403:7 411:18 413:6,
10 416:19 417:13,17
418:16 432:22,25
452:8 471:8

**Terrestar** 469:18,20

**testified** 288:12
351:14 352:16,22
370:9 379:15 441:25
462:8 472:20

**testify** 346:14 348:6,
14,22 349:11 354:8,
17

**testifying** 431:7
444:14

**testimony** 318:3,13
375:11 419:24 459:2
463:10 475:24

**Thedford** 320:9,11
321:14 329:15

**thereof** 310:5 431:22

**thereunder** 474:24

**thing** 324:13 336:12
362:3 389:25 426:2
436:24 452:17

**things** 292:19 304:20
312:10,12 313:11
317:4 322:8 327:25
359:14,25 360:16
373:9 403:6 428:7
435:11 445:3 468:2
469:19 470:16
471:12

**thinking** 340:17
375:16 402:3 459:3
461:18

**thinks** 351:25

**third-party** 330:24

**Thomas** 445:7

**thought** 388:4
413:23 467:25 468:3,
7 472:3

**thousand** 391:22

**thousands** 293:5

**throw** 290:9

**Thursday** 479:16
480:25 481:7,17,23
482:5

**time** 288:7 290:3,19
293:19 298:2 301:20
302:23 303:12

471:24

**testified** 288:12
351:14 352:16,22
370:9 379:15 441:25
462:8 472:20

304:14,22,25 305:6,
23 307:15,18,25
309:8 313:5,18,24
318:7 320:12,15
324:25 326:18
329:14 330:8 334:7
337:12 338:12 341:3
342:16 344:19,20,23
346:21 350:15
353:21,22 358:11
359:9 361:2,3 367:19
378:14 379:2 387:25
389:24 390:13 392:9
393:14 395:4,10
396:17 397:6 398:16
399:23 401:13,15
406:15 411:4 413:5,
9,21 415:6,23,24
416:20 417:3 418:12,
14 419:21 424:12
438:9 439:25 440:11
442:6,14,17,18,20,22
449:21 453:20
454:14,15 466:23
470:13 472:9 476:4,
5,8,10,14,16 479:18
480:10,15 481:18,23
482:2

**timeframe** 371:14

**times** 338:20 339:15
349:22 350:4,8,11
356:15 375:8 383:23
420:2 421:20 450:16

**title** 308:18,25 313:4
323:10 325:11,16
331:5 342:8

**titled** 362:22

**titles** 311:25 312:3
325:6

**today** 290:13 291:3
294:10 295:17
296:10 298:10
300:25 301:7 303:9
304:21 305:22
308:19 309:2 314:17,
23 318:20 319:5
323:11 328:5 331:5
342:14 345:8,20,24
346:25 348:6 349:11
354:8 357:8 364:15
378:9 379:6 389:11
395:5 401:21 414:20,
22 415:12 445:5

453:4 454:9 479:5

**today's** 288:7 289:18
346:21 349:16 350:5
353:7

**told** 392:19 465:7

**top** 306:3 311:25
325:19 340:23
369:17,21

**topic** 347:6 348:11,
17 349:7

**topics** 346:9,10
353:16,17,24 354:13,
18 363:7 376:5
386:22

**total** 350:15 480:8

**track** 330:17,19,25
338:18,22,23 339:4
382:9 384:15 385:5

**tracking** 299:9

**transcript** 351:7
352:3,7

**transfer** 360:17,19

**transferred** 360:6

**transition** 363:22
392:11

**travels** 445:13

**treasurer** 309:8
310:14,18,23 311:4,
12 313:12,19 314:7,
16 316:18 317:9
318:15,21 323:15
324:3,8,17 325:25
327:9 328:6,13
343:10,11 397:24
436:21 439:25
466:21,22 467:3

**treasury** 333:25
416:4 417:22

**treated** 429:11

**trick** 358:14

**trouble** 393:11
394:22

**true** 453:15

**trued** 392:13

**trust** 289:9 401:10

Case 21-03007-sgj    Doc 106-4    Filed 12/01/21    Entered 12/01/21 14:55:44    Desc
Case 3:21-cv-00881-X    Document 78-24    Filed 07/09/21    Page 213 of 213    PageID 55127

Index: trustee..yells

427:19 443:21

**trustee** 400:13,16,23
401:9,17,21,23 402:5
403:8,15,21 404:2
405:4 420:21 421:2,6
422:24 427:20
443:11 472:12,23
473:10,22 474:23
476:19 477:10,25

**trustees** 402:2

**trusts** 306:23 401:25

**Tuesday** 479:14

**typical** 317:16
421:25

**typically** 463:24

_____

**U**

**UCC** 416:15

**Uh-huh** 450:12

**unable** 290:20 479:7

**unaudited** 299:11

**unaware** 431:6
455:16

**underpaid** 404:18

**understand** 289:20,
25 293:8 296:21
301:8 335:18 345:7,
19,23 354:10 358:13,
17 370:24 378:4
383:25 386:13
388:25 390:22 404:7
409:7,21 415:12
426:12 435:8 447:9
449:20,25 457:13
476:4

**understanding**
299:21 300:7 301:2
306:17 316:7,11
330:14 343:17
347:10,13 403:5
410:6 419:3 426:20
440:24 478:5

**understood** 336:19
382:4,23

**unfettered** 476:3

**unified** 384:19

**unit** 384:20 400:19

**universe** 311:19

**unrelated** 452:6

**unsecured** 416:18
451:19 453:16

**up-and-comers**
300:19

_____

**V**

**valuation** 471:14,24

**values** 376:25

**variety** 291:19

**verbal** 336:5 381:19,
20

**versa** 308:14

**versus** 438:4 474:8

**vest** 385:4

**vice** 308:14 317:18

**video** 288:4,8 302:2
396:20 457:20

**videotape** 396:17

**view** 334:14 411:24

**viewed** 452:24
453:11

**viewing** 398:3

**virtually** 418:21

**voice** 302:4

**Volume** 288:4

**volunteer** 375:24

_____

**W**

**wait** 355:17

**waiver** 347:17
358:22 414:7

**waives** 414:10

**waiving** 317:3

**walk** 406:3

**walked** 355:15

**wanted** 288:17

**wanting** 392:10

**Waterhouse** 301:12
302:18,25 303:5,11
304:13 305:3,13,22
309:7 310:13,18,24
311:4,11,18 312:17,
21 313:5,18,25
314:12,16,22 315:6
316:17 318:20
319:19 321:11,13
323:14 324:3,8,20
325:2,21,25 327:8
328:5,12,24 329:15
331:13 337:23
351:14,17 397:24
436:17,21 437:13
438:8 439:21,24
456:18 466:12,20

**Waterhouse's**
317:8,12 318:16
351:7

**ways** 335:2

**weather** 288:23

**Wednesday** 479:16
480:25 481:5

**week** 290:5,17
351:17 367:2 462:9
479:10 481:20

**well-capitalized**
417:19

**whatsoever** 325:8

**Wick** 364:5

**window** 423:20

**wires** 320:5

**withdrawn** 307:2
315:11 321:12
324:23 331:23 340:2
341:6 343:3 367:24
403:12 405:2,7 475:7

**withholding** 414:25
432:5

**witnesses** 480:6,11

**word** 327:22 366:21
395:3,4 415:21 458:3
460:17 462:15

476:20

**words** 291:14 297:21
343:25 430:13 474:7

**wore** 324:20

**work** 300:20 322:7
338:4 378:20 382:6
383:11 384:20
410:18 454:10

**worked** 312:6 338:20
383:6 463:16

**working** 320:18
375:17 384:19

**works** 378:17 481:23

**world** 331:17 371:18
396:25 397:15,22

**wrap** 454:12

**written** 335:17 336:2,
4,9 381:19 382:21

**wrong** 402:8

_____

**Y**

**Yankees** 395:4,5

**year** 292:8 299:11
334:11 369:4,24
371:21 373:3,14,19
375:14 391:16,17
395:17 409:17,23
410:8 421:16 422:3
426:10 453:23 457:4
458:16 460:12
461:15 462:5,20,23

**year-end** 372:15
458:8 463:5,12

**years** 291:18 292:15
298:10,11 300:5,15
302:20 311:10
320:17 322:25
330:12 336:22
415:10 422:12,19
463:16

**yell** 396:13,15

**yelled** 396:19

**yelling** 396:11

**yells** 396:2