ALAN JOHNSON

1
2  A.  I don't believe so.
3  Q.  Do you have any information at all to
4  support the statement that throughout this period,
5  Mr. Dondero received loans in lieu of additional
6  current compensation other than what Mr. Dondero
7  specifically told you?
8  A.  For him specifically, it's relying on
9  what Mr. Dondero said.
10  Q.  Okay.
11  You haven't seen any documents that
12  support that statement, do you -- did you?
13  A.  I have not -- I have not seen any
14  documents, no.
15  Q.  Would your opinions change if you
16  learned that for at least the 11 years prior to
17  the bankruptcy filing, Mr. Dondero never received
18  a single loan in lieu of compensation?
19  A.  I'm -- I didn't understand the
20  question.  I'm sorry.
21  Q.  This is the first paragraph of your
22  expert report that we're looking at, right?
23  What if I told you that the sentence
24  "Throughout this period, he received loans in lieu
25  of additional current compensation" was false at

ALAN JOHNSON

1
2  least going back as far as 2008, would you want to
3  amend your report in any way?
4  A.  Well, then the sentence wouldn't be
5  true if the loans weren't a form of deferred
6  compensation.
7  So if the facts changed, then the
8  report would need to be changed.
9  Q.  So let me state it a different way.
10  Would your opinions change if you
11  assume that in the 11 years prior to the
12  bankruptcy filing Highland never forgave any loan
13  in whole or in part that it had extended to
14  Mr. Dondero.
15  MR. AIGEN:  Objection, form.
16  A.  No, I don't -- I don't think that -- I
17  don't think that sentence would change that, no.
18  Q.  Okay.
19  I'm not talking about the sentence
20  itself, but if I could prove to you today that
21  there's no written record of Highland ever
22  forgiving a loan to Mr. Dondero, would that have
23  an impact at all on your opinions?
24  A.  I don't think the written record would
25  change my opinion.  I think he -- he had stated to

ALAN JOHNSON

1
2  me that the -- the -- that a lot of these loans
3  were made as a form of deferred compensation with
4  the intent to be forgiven at some point in the
5  future.
6  Q.  All right.  I'm going to ask you to
7  assume the following facts:  For the 11 years
8  prior to the petition date, other than the three
9  loans that were outstanding as of the petition
10  date, Mr. Dondero received three loans from
11  Highland.  Okay?
12  So that's assumption No. 1, that
13  between 2008 and 2019, Mr. Dondero received three
14  loans from Highland.
15  Assumption No. 2, that Mr. Dondero
16  paid Highland all principal and interest due under
17  all three loans.
18  Assumption No. 3:  The last of those
19  three loans was taken out in January 2018 and was
20  paid back in full plus interest in December 2019.
21  The next assumption:  Mr. Dondero has
22  testified that any loan that Highland actually
23  forgave would be described in Highland's audited
24  financial statements and that in those financial
25  statements going back to 2008, there's no

ALAN JOHNSON

1
2  description of any loan ever being given to
3  Mr. Dondero that was forgiven in whole or in part.
4  Do you remember all those assumptions?
5  A.  I believe so.
6  Q.  Okay.
7  If you assume that each of those
8  assumptions is, in fact, true, would you have any
9  basis at all to conclude that Mr. Dondero received
10  loans in lieu of additional compensation in the
11  decade before Highland filed for bankruptcy?
12  MR. AIGEN:  Objection, form.
13  A.  Well, in trying to answer the
14  question, the -- I think a lot of the loans here,
15  as I recall, were for different entities and
16  different, you know, amounts and situations.
17  So if -- if the -- either hypothetical
18  or the assumptions we're making here, that the
19  loans eventually were not forgiven, I think now
20  if the -- they were intended to be forgiven and
21  just weren't or we're talking about other loans
22  that are outside the three that you -- that you
23  mentioned.
24  Q.  Is it fair to say that neither
25  Mr. Dondero nor the Stinson firm ever shared with

**Page 110**

ALAN JOHNSON

1
2 you the fact that Mr. Dondero had received three
3 loans that are not the subject of this litigation?
4    A.   I was aware that I believe there were
5 loans that were not subject to litigation that had
6 been paid off or other types of things.  I was
7 aware of that.
8    Q.   How did you learn that?
9    A.   I think I've seen materials that
10 listed loans that showed principals paid off and
11 so forth, but I think I've been -- I know they
12 were loans -- I believe I recall that they were
13 loans outside of what's being disputed.
14    Q.   I'm sorry.
15    A.   No, I was done.  I'm sorry.
16    Q.   Did you ever discuss that with
17 Mr. Dondero?
18    A.   I did not.
19    Q.   Do you have any knowledge as to why he
20 paid back some loans and others were supposed to
21 be treated as compensation?
22    A.   I do not know.
23    Q.   Is there any reason you didn't
24 disclose in your report that Mr. Dondero had
25 received loans that he had paid back?

**Page 111**

ALAN JOHNSON

1
2    A.   I didn't think it was relevant.
3    Q.   Did you ever ask Mr. Dondero how he
4 reconciled the payment of principal and interest
5 due on the notes prior to the petition date but
6 his treatment of the notes pursuant to the
7 agreement that's been described to you?
8    A.   I did not.
9    Q.   Are you curious at all as to why he
10 paid off some of the notes but not others?
11       MR. AIGEN:  Objection, form.
12    A.   Yeah, I'm probably curious.  It's
13 convoluted enough, I'm a curious person, so yeah,
14 I'd probably be curious to understand all the ins
15 and outs.
16    Q.   Did it cause you any discomfort that
17 Mr. Dondero paid certain loans off in full but the
18 only loans that he didn't pay off in full were the
19 loans that existed as of the petition date?
20       MR. AIGEN:  Objection, form.
21    A.   Well, isn't that by definition true?
22 If they've already been paid off, they couldn't
23 exist as of the petition date, right?
24       Isn't that just -- am I missing
25 something?

**Page 112**

ALAN JOHNSON

1
2    Q.   Well, you told me that, from the
3 review of the documents, you understood that there
4 were loans that Mr. Dondero had taken out that had
5 been paid off in full.  Is that right?
6    A.   Yes, I recall that I was aware that
7 there were loans that had been paid off.  I was
8 aware of that.
9    Q.   And so paying back the loans is
10 certainly not -- would you agree with me that if
11 he -- that if he was paying back the loans, then
12 he didn't receive the loans in lieu of additional
13 current compensation?
14    A.   Yeah, when I wrote the report, maybe I
15 should have parsed out that, but I think I was
16 focusing on that there were loans that were
17 deferred compensation.
18       I guess what we're saying is there may
19 have been other loans that were not deferred
20 compensation.  They were more run-of-the-mill
21 obligations, so if that's the point we're making,
22 but I think what I was trying to address here,
23 that there were loans made that were intended to
24 be deferred compensation.
25    Q.   And the only basis that you have for

**Page 113**

ALAN JOHNSON

1
2 that statement is what Mr. Dondero told you,
3 correct?
4    A.   For himself, that is true, and then
5 the other four executives provided a little bit of
6 history on the use of such loans within the
7 company.
8    Q.   And it didn't concern you at all that
9 certain loans were paid back and that certain
10 loans, according to Mr. Dondero, are subject to
11 this agreement that he entered into with the
12 company?
13    A.   I think that would be something that
14 if -- certainly, I would have asked him about, but
15 that certainly would be something to -- to discuss
16 with him, yes.
17    Q.   But you haven't done that as of today,
18 correct?
19    A.   I have not.
20    Q.   And nobody has explained to you why he
21 paid back certain loans but certain other loans
22 were supposed to be provided in lieu of additional
23 current compensation, right?
24    A.   That's right.
25    Q.   Okay.

Page 114

ALAN JOHNSON

1
2      The next sentence in this paragraph
3  says -- and I just want to make sure that I'm
4  quoting this correctly -- "Consistent with company
5  practice, the loans were considered a form of
6  deferred compensation that could be realized over
7  time as the loans were forgiven and the income
8  recognized by the individuals."
9      Have I read that correctly?
10     A.   Yes.
11     Q.   Why did you include that sentence in
12  your report?
13     A.   Well, from talking to the four former
14  executives and himself, he described a company
15  practice of having using loans as deferred
16  compensation.  In his words, it was called
17  "delayed gratification."
18         So you had these loans that were
19  intended to provide capital to invest in the
20  business, and they would eventually be forgiven
21  and then the income would be recognized by the
22  individual.
23         So the four of them and himself had
24  described a company practice of using these loans
25  to -- you know, as a form of deferred

Page 115

ALAN JOHNSON

1
2  compensation.
3      Q.   And that practice is very important to
4  your opinions, right?
5      A.   Well, it -- it -- as I said earlier,
6  my opinion is about the use of loans in private
7  financial services companies and what his market
8  value, his compensation, would be.
9      Q.   But actually, the practice that was
10  described to you by Mr. Dondero and these four
11  former employees, you relied upon to determine
12  that Highland had a practice and that the
13  forgiveness of the loans in this instance would be
14  consistent with that practice.  Is that right?
15     A.   That's right.
16         MR. MORRIS:  Let's turn to page 16 of
17  the report.
18     Q.   This is your conclusion, right?
19     A.   Yes.
20     Q.   And in the middle, it says,
21  "Additionally, it is my opinion that the loans
22  provided to Mr. Dondero should be considered
23  potential deferred compensation as they were
24  similar to loans given to other professionals at
25  the firm."

Page 116

ALAN JOHNSON

1
2      Have I read that correctly?
3      A.   Yes.
4      Q.   And is the information that supports
5  your opinion in that sentence based solely on what
6  was told to you by Mr. Dondero and the four
7  individuals?
8      A.   Yes.
9      Q.   You have no documents that support
10  that sentence.  Is that correct?
11     A.   That's correct.
12     Q.   And I assume, as a dutiful expert, you
13  asked for any documentation that might concern or
14  relate to the prior practice.  Is that right?
15     A.   That's right.
16     Q.   Just looking at the sentence itself,
17  what do you mean by the loans being "similar to
18  loans given to other professionals at the firm"?
19     A.   Just that they would be forgiven.  I
20  mean that deferred compensation at some point
21  would be -- would be forgiven.
22     Q.   They're certainly not similar in
23  amount.  Is that fair?
24     A.   No.  They're much larger.
25     Q.   In fact, I think you testified that

Page 117

ALAN JOHNSON

1
2  the largest loan you have been informed has ever
3  been forgiven was $500,000 or thereabouts.
4      Do I have that right?
5      A.   That's what I'm aware of, yes.
6      Q.   And Mr. Dondero has told you that
7  there's 40 to $50 million in loans that he
8  contends are the subject of an agreement?
9      A.   I don't know if he told me the 40 to
10  50 million, but I think I've seen that in various
11  spreadsheets or numbers.  That's the number I
12  believe -- at least that I recall that's in
13  dispute.
14     Q.   So is it fair to say that the
15  aggregate value of the loans that are the subject
16  to the agreement that Mr. Dondero described for
17  you concern loans that are 80 to 100 times larger
18  than the largest loan you have been told has ever
19  been forgiven by Highland?
20     A.   It is much -- it is much large than
21  any loan I'm familiar with, yes.
22     Q.   Did anybody ever tell you that
23  Highland had ever forgiven a loan made to a
24  corporate affiliate?
25     A.   That, I'm not aware of, no.

Page 118

```
1              ALAN JOHNSON
2      Q.   So there's nothing similar about the
3  loans that were given to the corporate affiliates
4  as compared to the loans that were forgiven for
5  the four individuals you spoke with.  Is that
6  correct?
7          MR. AIGEN:  Objection, form.
8          MR. MORRIS:  Withdrawn.  That's a fair
9  objection.
10     Q.   The four individuals that you spoke
11 with, they described for you loans that had been
12 given to individuals.  Is that right?
13     A.   Yes.
14     Q.   But the loan documents that you saw
15 that had those schedules of loans that were being
16 rolled up, all of those loans related to corporate
17 entities.  Isn't that right?
18     A.   No.  I think I mentioned before, I
19 didn't really focus on that.  I looked at the
20 loans themselves.  So I did not actually focus on
21 the corporate entities in my perusal of those
22 documents.
23     Q.   Would there be any difference in your
24 expert opinion as to whether or not the loan was
25 given to an individual or given to a corporate
```

Page 119

```
1              ALAN JOHNSON
2  entity?
3      A.   Usually it would, but in these closely
4  held corporations, often they're synonymous, so it
5  really would depend on the circumstances.
6      Q.   Let's -- let's spend some time looking
7  at the documentation that we have that's been
8  produced in this case concerning this company
9  practice.
10         MR. MORRIS:  And so I'd like to put up
11 on the screen what's been marked as --
12 premarked as Exhibit 63, which is Highland's
13 2008 audited financial statements.
14         (Exhibit 63, Highland's 2008 audited
15     financial statements, was marked for
16     identification at this time.)
17 BY MR. MORRIS:
18     Q.   And I'd like you, as we go through
19 this exercise, Mr. Johnson, to take notes of all
20 of the loans that we're going to discuss.  There
21 won't be many, but do you have a pen and a piece
22 of paper with you?
23     A.   I do.
24     Q.   Yeah, can I trouble you to just write
25 down, you know, "2008 financial statements," and
```

Page 120

```
1              ALAN JOHNSON
2  we're just going to do this for every year through
3  2018, so you can have a full understanding of the
4  loans that Highland included in its audited
5  financial statements.
6          I assume that you did not rely on this
7  document for your opinions because you didn't have
8  it at the time that you prepared your report;
9  correct?
10     A.   That's right.
11     Q.   Okay.
12         MR. MORRIS:  And if we could turn to
13 page 38, please.
14         I'm sorry, not PDF 38.  I'm referring
15 to the document, No. 38.  It shouldn't be
16 too far.
17         This is going to be a little painful
18 on the Zoom, Mr. Johnson.  I ask for your
19 patience.
20         All right.  Stop right there.
21     Q.   Do you see that this portion of the
22 Highland's 2008 audited financial statements has a
23 section called "Notes to Affiliates"?
24     A.   Yes.
25     Q.   Okay.
```

Page 121

```
1              ALAN JOHNSON
2          And in paragraph 1, it says that the
3  partnership issued a promissory note of $400,000
4  to an employee.
5          Do you see that?
6      A.   Yes.
7      Q.   And at the end of the paragraph, it
8  says that that promissory note was forgiven.
9          Do you see that?
10     A.   Yes.
11     Q.   So we can write down that in 2008,
12 Highland forgave a promissory note to an employee
13 in the amount of $400,000.
14     A.   Okay.
15     Q.   The next paragraph, there's a
16 reference to an August 1 promissory note in the
17 amount of $500,000.
18         Do you see that?
19     A.   Yes.
20     Q.   And at the end of the year, that
21 promissory note was still outstanding.
22         Do you see that?
23     A.   Okay.
24     Q.   So No. 1 is 7/31/06, $400,000
25 forgiven.
```

Page 122

ALAN JOHNSON

1
2      No. 2 is 8/1/08, $500,000 outstanding,
3    right?
4      No. 3, do you see there's a reference
5    to two loans that were made in 2 — on May 21,
6    2007, in the amount of a million dollars each?
7      A.   Okay.
8      Q.   And if you read further, it says that
9    during 2008, 30 percent of the outstanding
10   principal was owed – was forgiven, leaving
11   $700,000 due and paying.
12      So there's two loans that were
13   forgiven in the amount of $300,000 each.
14      Do I have that right?
15      A.   Okay.
16      Q.   Then, in the next paragraph, we've got
17   August 20th, 2008, and there's $330,000 loan which
18   is all outstanding at year end.
19      Do I have that right?
20      A.   Okay.
21      Q.   And the next paragraph, August 1
22   there's a $500,000 loan that was given to an
23   employee that was all outstanding at year end.
24      Do I have that right?
25      A.   Okay.

Page 123

ALAN JOHNSON

1
2      Q.   And then on October 15th, there's
3    another $500,000 loan made to another employee
4    that was outstanding at year end.
5      Do I have that right?
6      A.   Okay.
7      Q.   So would you agree with me that in
8    fiscal year 2008, Highland forgave one loan to an
9    employee in the amount of $400,000 and forgave in
10   part loans to two other employees in the amount of
11   $300,000 each?
12      A.   Okay.
13      Q.   Okay.
14      MR. MORRIS:  Let's go to Exhibit
15   No. 64.
16      (Exhibit 64, Highland's audited
17      financial statements for December 31, 2009,
18      was marked for identification at this time.)
19   BY MR. MORRIS:
20      Q.   And do you see that this is Highland's
21   audited financial statements for December 31,
22   2009?
23      A.   Yes.
24      Q.   Okay.
25      MR. MORRIS:  Can we go to page 33 of

Page 124

ALAN JOHNSON

1
2    the document?
3      There you go.  All right.
4      Q.   The first one that's described is an
5    August 20th, 2008 loan in the amount of $300,000,
6    and that seems to correspond with the fourth loan
7    that we looked at in 2008 because it's also a loan
8    dated August 20, 2008 in the amount of $330,000.
9      Do you see that?
10      A.   I'm sorry, I lost my train.
11      Where is it now?
12      Q.   So in the very first paragraph, under
13   "Affiliated Transactions"?
14      A.   Yeah, okay, I see it now.  I'm sorry.
15      Q.   Okay.
16      This loan, is it fair, if you take a
17   look at your notes, this loan corresponds with
18   the – with the loan that was described in the
19   2008 financials.
20      Do you have that as the fourth item on
21   your list, if you look at your list?
22      A.   My list is going to be incomplete here
23   in terms of going through this, but I'm trying to
24   take notes here, but I believe what you say is
25   true.

Page 125

ALAN JOHNSON

1
2      Q.   Okay.
3      And you can see that the principal
4    amount of the note had been reduced by year end.
5      Do you see that?
6      A.   Yes.
7      Q.   Okay.
8      So there's no evidence that this
9    particular note was forgiven in whole or in part
10   in 2009, correct?
11      A.   That's right.
12      Q.   And if we look at the next paragraph,
13   there's a reference to an August 1, 2008 note in
14   the amount of $500,000.
15      Do you see that?
16      A.   Yes.
17      Q.   And that entire amount of principal
18   was still outstanding at the end of the year.
19      Do you see that?
20      A.   Yes.
21      Q.   So there's no evidence that this note
22   was forgiven in whole or in part in 2009, correct?
23      A.   Yes.
24      Q.   And there's no other – we can go
25   through the rest of the section, but there's no

**Appx. 01989**

Page 126

ALAN JOHNSON

1  ALAN JOHNSON
2  other notes of any kind that are referred to in --
3  in this section of the audited financials.
4  If we can just scroll down to the end
5  of the affiliated transaction sections, I mean, I
6  will tell you that they put the employees up top.
7  So is it fair to say based on just
8  what I've shown you that you don't see any
9  evidence that Highland forgave any notes to any
10  employees in 2009?
11  A.  I think that's right.
12  Q.  Okay.
13  MR. MORRIS:  Let's go to 2010,
14  Exhibit 65, please.
15  (Exhibit 65, Highland's audited
16  financial statements for December 31, 2010,
17  was marked for identification at this time.)
18  MR. MORRIS:  And if we can turn to
19  page 33.
20  BY MR. MORRIS:
21  Q.  So if we look at the first paragraph,
22  do you see there's still a reference to the
23  $330,000 note?
24  A.  Yep.
25  Q.  Okay.

Page 127

1  ALAN JOHNSON
2  It's interesting, in the
3  next-to-the-last sentence -- let's see if I'm
4  reading this correctly -- it says, "The note has
5  specific forgiveness provisions of principal and
6  interest prior to maturity if certain milestones'
7  dates are obtained."
8  Do you see that?
9  A.  Yes.
10  Q.  So based on that, would you conclude
11  in your experience that the note actually had
12  specific provisions concerning forgiveness?
13  A.  Yes, that's what that implies.
14  Q.  And based on your experience, would
15  you understand that this note was really a form of
16  retention note whereby it would be forgiven if the
17  person were still employed at the time of the
18  note's -- at the end of the note's term?
19  A.  It's hard to tell.  Milestones could
20  be performance or it -- it could go either way,
21  but there's certain provisions that have been
22  documented that it will be forgiven either through
23  time or performance.
24  Q.  Well, it doesn't refer to milestones.
25  Instead, it refers to milestone dates.

Page 128

1  ALAN JOHNSON
2  Do you see that?
3  A.  I -- I think you're right, just I've
4  never seen the word "milestone dates" used, so I'm
5  not quite sure what they were trying to say, but I
6  think you're probably right.
7  Q.  Okay.
8  But in any event, you would agree with
9  me that there's nothing in this paragraph that
10  suggests that Highland forgave that loan in whole
11  or in part in 2010, correct?
12  A.  That's right.
13  Q.  And if we scroll down through the rest
14  of this section, I think -- I hope you'll agree
15  with me that there's no other reference to any
16  other loans given to any employee in 2010?
17  A.  I think that's right.
18  MR. MORRIS:  Okay.  Let's go to
19  Exhibit 66 --
20  Q.  Oh, I'm going to tell you, I'm
21  skipping, actually, because there's only so much
22  pain I'm willing to endure.
23  We're going to skip 2011, '12, and
24  '13, and I'm going to represent to you that
25  there's absolutely nothing in any of those audited

Page 129

1  ALAN JOHNSON
2  financial statements that pertains or concerns any
3  loans given to any employee.
4  And you can -- you can -- not accept
5  my representation, but take that as an assumption
6  you should make, that there's no reference to any
7  loan to any employee in those years.
8  MR. MORRIS:  Can we go to Exhibit 66
9  please.
10  MS. CANTY:  It's 69, 2014.
11  MR. MORRIS:  Okay.  Yep, it's up on
12  the screen.
13  (Exhibit 69, Highland's audited
14  financial statements for December 31, 2014,
15  was marked for identification at this time.)
16  BY MR. MORRIS:
17  Q.  So do you see that this is the 2014
18  audited financial reports for Highland Capital
19  Management?
20  A.  Yes.
21  Q.  And you may or may not have seen this
22  report.  Is that right?
23  A.  I think I got it.
24  Q.  When you reviewed the audited
25  financial statements that you were given, did you

**Appx. 01990**

Page 130

ALAN JOHNSON

1
2 review them to try to learn any more information
3 about the practice that was described to you
4 whereby Highland would forgive loans to employees
5 in whole or in part?
6     A.   I had just received these.  I didn't
7 have time to go through it.
8         MR. MORRIS:  Let's go to page 27,
9 please.
10     Q.   Okay.  Do you see that there's a
11 section called "Affiliated Transactions" again
12 that begins at the bottom of page 27?
13     A.   Okay.
14     Q.   And do you see that the first
15 paragraph describes a loan between Highland and
16 Highland Capital Management Fund Advisors?
17     A.   Yes.
18     Q.   And does it appear to you that the
19 loan that was granted in 2014 was fully
20 outstanding at year end?
21     A.   Yes.
22     Q.   And there's no reference in that
23 paragraph to any portion of the loan having been
24 forgiven, correct?
25     A.   That's right.

Page 131

ALAN JOHNSON

1
2     Q.   And then the next paragraph refers to
3 another loan between the same parties.
4         Do I have that right?
5     A.   Yes.
6     Q.   And there's nothing in that paragraph
7 that suggests that that loan was forgiven in whole
8 or in part at any time in 2014, correct?
9     A.   That's right.
10        MR. MORRIS:  And let's go to the next
11 page, please.
12     Q.   Do you see that there's a reference to
13 a note in the first paragraph between Highland and
14 NexPoint that was issued in 2014?
15     A.   Yes.
16     Q.   And there's nothing in that paragraph
17 that suggests the note was forgiven in whole or in
18 part at any time in 2014, correct?
19     A.   Yes.
20     Q.   In fact, the entirety of the principal
21 amount plus interest was still due at year end,
22 correct?
23     A.   Yes.
24     Q.   The next paragraph, do you see it
25 refers to a note between Highland and an entity

Page 132

ALAN JOHNSON

1
2 called "HCRE"?
3     A.   Yes.
4     Q.   And there's nothing in that paragraph
5 that suggests that the note or the loan was
6 forgiven in whole or in part at any time in 2014,
7 correct?
8     A.   That's right.
9     Q.   There was a modest payment made of
10 principal during the year.
11        Do I have that right?  Is my
12 interpretation a fair interpretation?
13     A.   That's right.
14     Q.   And then the last section of this, the
15 last paragraph of this section refers to a note
16 between Highland and an entity called "Highland
17 Capital Management Services, Inc."
18        Do you see that?
19     A.   Yes.
20     Q.   And there's nothing in that paragraph
21 that suggests that any portion of that loan was
22 forgiven in whole or in part in 2014, correct?
23     A.   That's right.
24     Q.   And, in fact, the entire principal
25 balance plus interest was due at year end.  Is

Page 133

ALAN JOHNSON

1
2 that fair?
3     A.   Yes.
4         MR. MORRIS:  Okay.  Let's go to 2015,
5 please.
6         What exhibit are we on?
7         MS. CANTY:  70 is 2015.
8         MR. MORRIS:  I see what we did.  Okay.
9         (Exhibit 70, Highland's audited
10 financial statements for December 31, 2015,
11 was marked for identification at this time.)
12        MR. MORRIS:  If we can just go to the
13 first page, please.
14 BY MR. MORRIS:
15     Q.   Do you see that this is the first page
16 of the audited financial statements for the year
17 ending 2015 for Highland?
18     A.   Yes.
19     Q.   And you're not relying on this
20 document for any of your opinions, correct?
21     A.   That's right.
22        MR. MORRIS:  Can we turn to page 27,
23 please -- I messed this up, sorry.
24        Keep going down.  Keep going.  Keep
25 going.

Page 134

ALAN JOHNSON

1  
2   Okay. Stop right there.
3       Can we just scroll down so we can see
4   what page number we're on?
5   Q. All right. Do you see we're on
6   page 29, Mr. Johnson?
7   A. Yes.
8       MR. MORRIS: Can we go to the top of
9   the affiliates transaction.
10   Q. Do you see that there's a reference to
11   Highland Capital Management Fund Advisors?
12   A. Yes.
13   Q. Okay.
14       And do you see there's a reference to
15   $6.1 million principal and interest being due at
16   the year end?
17   A. Yes.
18   Q. And then there's a sentence that says,
19   "The partnership will not demand payment on
20   amounts owed prior to May 31, 2017."
21       Do you see that?
22   A. Yes.
23   Q. Were you aware that Highland had
24   agreed with its affiliate not to make a demand on
25   the payments for a period of time?

Page 135

ALAN JOHNSON

1  
2   A. I wasn't aware of that.
3   Q. Do you see the last paragraph -- the
4   last sentence of the paragraph says, "A fair value
5   of the partnership's outstanding notes receivable
6   approximates the carrying value of the notes
7   receivable"?
8   A. Yes.
9   Q. Do you understand that to mean that
10   the fair value of the notes equals to the
11   principal face amount of the notes?
12   A. The carrying value would include the
13   face amount probably and any unpaid interest, but
14   yes, it would be the book -- the book value, yes.
15   Q. And the book value in this case equals
16   the unpaid principal and interest due on the note,
17   correct?
18   A. Yes.
19   Q. And so as of this time anyway, the
20   fair value of the notes equaled the unpaid
21   principal and interest due on the note, correct?
22       MR. AIGEN: Objection, form.
23   A. Yes. Yes, I think that's right.
24   Q. There's nothing in that first
25   paragraph that says or suggests that any of the

Page 136

ALAN JOHNSON

1  
2   loans with HCMFA were forgiven in whole or in part
3   in 2015, correct?
4   A. Right.
5   Q. And the next paragraph relates to
6   loans with NexPoint Advisors.
7       Do you see that?
8   A. Yes.
9   Q. Okay.
10       Take your time, but my question is
11   whether there's anything in that paragraph that
12   states or suggests that any portion of the loans
13   between Highland and NexPoint were forgiven in
14   whole or in part in 2015?
15   A. I think that's right, yes.
16   Q. Do you see there was also a statement
17   regarding Highland's not demanding payment on the
18   notes for a couple of years?
19   A. Yes.
20   Q. In your experience and based on your
21   expertise, can you think of a reason why Highland
22   would agree not to make a demand on promissory
23   notes?
24   A. It could be the financial condition of
25   the borrower that was part of the negotiation

Page 137

ALAN JOHNSON

1  
2   putting the loans together. It would -- it
3   generally have something to do with the financial
4   condition of the borrower and the terms.
5   Q. Let's look at the next paragraph.
6       Do you see it relates to HCRE?
7   A. Yes.
8   Q. And do you see how during 2014 and
9   '15, HCRE issued promissory notes to Highland in
10   the aggregate amount of $13 million and that
11   principal amount plus interest was due at the end
12   of the year?
13   A. Sorry, it just says it's payable on
14   demand, right?
15   Q. Right.
16       And the amount is -- that was loaned
17   was $13 million, but at year end 2015, the unpaid
18   principal and interest actually equaled
19   $13.3 million.
20       Have I read that correctly?
21   A. Yes.
22   Q. Is there anything in this paragraph
23   that says or suggests that Highland forgave in
24   whole or in part any loans that were made to HCRE
25   in the year 2014 or '15?

Page 138

ALAN JOHNSON

1
2   A.   No.
3       MR. MORRIS:  Let's go to the next
4   paragraph.
5   Q.   Do you see there's a reference to
6   loans or promissory notes that were issued to
7   Highland by HCMSI?
8   A.   Yes.
9   Q.   Okay.
10      And do you see that the aggregate
11  amount of the notes was $23 million?
12  A.   Yes.
13  Q.   And do you see that during the years
14  ended 2014, Highland Capital Management Services,
15  Inc. repaid $8.1 million in principal?
16  A.   Yes.
17  Q.   Is it customary in the industry to
18  make principal payments or interest payments
19  against loans that are the subject to agreements
20  of forgiveness?
21  A.   It really would depend on the
22  likelihood of it being forgiven.  If I had a loan
23  that I thought wouldn't be forgiven, I might pay
24  it early because I just don't think the
25  probability of being forgiven is likely.  If I

Page 139

ALAN JOHNSON

1
2   think it's likely or highly likely, I would try to
3   avoid paying down the balance and wait for it to
4   be forgiven.
5   Q.   And is that the advice you would give
6   to the maker of a note who owed money that was
7   subject to a forgiveness agreement?
8   A.   Maker of the loan, I would tell them
9   if – if things are looking like you're going to
10  forgive it, they probably won't want to pay down
11  the principal and the interest if they can avoid
12  it, and if the – it's unlikely it will be
13  forgiven due to the terms, then they're more
14  likely to pay the principal and interest sooner.
15  Q.   Is there anything in this paragraph
16  that says or suggests that Highland had agreed to
17  forgive in whole or in part any loan that it had
18  extended to Highland Capital Management Services?
19  A.   I don't believe so, no.
20      MR. MORRIS:  Okay.  Let's go to the
21  2016 financials.
22  Q.   Do you see that this is the audited
23  financial statements for Highland Capital
24  Management, L.P. for the period ending December
25  31, 2016?

Page 140

ALAN JOHNSON

1
2   A.   Yes.
3   Q.   Okay.  And you're not relying on this
4   report for any of your opinions, correct?
5   A.   That's correct.
6   Q.   Okay.
7       MR. MORRIS:  Can we go to page 31,
8   please.
9   Q.   Okay.  Do you see notes and other
10  amounts due from affiliates?
11  A.   Yes.
12  Q.   The first paragraph relates to loans
13  between Highland and its affiliate HCMFA.
14      Do you see that?
15  A.   Yes.
16  Q.   Is there anything in this paragraph
17  that states or suggests that Highland has forgiven
18  in whole or in part any portion of any loan that
19  it made to HCMFA?
20  A.   No.
21  Q.   Looking at the next paragraph, do you
22  see that concerns loans between Highland and
23  NexPoint Advisors?
24  A.   Yes.
25  Q.   Is there anything in that paragraph

Page 141

ALAN JOHNSON

1
2   that states or suggests that Highland forgave in
3   whole or in part any portion of any loan that it
4   gave to NexPoint?
5   A.   No.
6   Q.   Looking at the next paragraph, do you
7   see there's a reference to loans between Highland
8   and HCRE Partners, LLC?
9   A.   Yes.
10  Q.   Is there any statement or suggestions
11  in that paragraph that Highland forgave in whole
12  or in part any loan it made to HCRE Partners, LLC?
13  A.   No.
14  Q.   Looking at the next paragraph, do you
15  see there's a reference to loans between Highland
16  and HCMSI?
17  A.   Yes.
18  Q.   Is there anything in that paragraph
19  that states or suggests that Highland forgave in
20  whole or in part any loan that it made to HCMSI?
21  A.   No.
22      MR. MORRIS:  Okay.  Can we go to the
23  next paragraph.
24  Q.   Do you see there's a reference to
25  promissory notes that James Dondero issued to

ALAN JOHNSON

1
2 Highland in the aggregate amount of $14.8 million
3 in 2016?
4     A.  Yes.
5     Q.  Okay.
6         So this is the first time we're seeing
7 a loan to Mr. Dondero that's reported in the
8 financial statements that we've looked at.  Is
9 that fair?
10    A.  I think that's right, yes.
11    Q.  Okay.
12        And according to this audited
13 financial statement, Highland loaned Mr. Dondero
14 $14.8 million in 2016.
15        Do I have that right?
16    A.  Yes.
17    Q.  And at the end of the year, he
18 actually owed principal and interest in the amount
19 of $14.9 million, correct?
20    A.  Yes.
21    Q.  And there's no statement or suggestion
22 in this paragraph that Highland had forgiven in
23 whole or in part any portion of the loans that it
24 had extended to Mr. Dondero.
25        Do I have that right?

ALAN JOHNSON

1
2     A.  Yes.
3     Q.  Okay.
4         Do you see the next paragraph relates
5 to a gentleman named Mark Okada?
6     A.  Yes.
7     Q.  Do you have any understanding as to
8 who Mr. Okada is?
9     A.  He was the other major shareholder in
10 Highland.
11    Q.  And do you understand him to be one of
12 the -- to be a co-founder with Mr. Dondero of
13 Highland?
14    A.  I believe that's right, yes.
15    Q.  Did you make any inquiry as to whether
16 or not Mr. Okada had ever obtained any loans from
17 Highland?
18    A.  I don't -- I don't believe I did.
19    Q.  Do you know if Highland ever forgave
20 any loan in whole or in part that it extended to
21 Mr. Okada?
22    A.  I don't know.
23    Q.  Are you aware that Mr. Okada paid back
24 the loan referenced in this paragraph in full plus
25 interest?

ALAN JOHNSON

1
2     A.  I was not aware of that.
3         MR. MORRIS:  Let's just go to the next
4 page to see if there's anything else here.
5     Q.  There's a reference to Dugaboy.
6         Do you see that?
7     A.  Yes.
8     Q.  You don't know what Dugaboy is, do
9 you?
10    A.  I do not.
11    Q.  Nobody has ever told you about
12 Dugaboy.
13        Do I have that right?
14    A.  That's right.
15    Q.  So you weren't aware that Highland
16 loaned $23.4 million to Dugaboy in 2016?
17    A.  Well, that's not -- it says they
18 purchased a promissory note due from Dugaboy.
19    Q.  Okay.
20        So now Dugaboy owes the partnership
21 $23.4 million, correct?
22    A.  That's not -- at least my reading of
23 it is they purchased a note from Dugaboy.
24    Q.  Why don't we assume that what they
25 meant by that was that Dugaboy provided a note to

ALAN JOHNSON

1
2 Highland in the amount of $23.4 million.
3         Okay?  Can we make that assumption?
4     A.  We can assume that.  That's not what
5 it says.
6     Q.  Okay.  I'm going to ask you to
7 assume --
8     A.  Okay.
9     Q.  -- that in 2016, Dugaboy incurred an
10 obligation to Highland in the amount of
11 $23.6 million.
12        I'm going to ask you to further assume
13 that the Dugaboy Investment Trust is a trust
14 created by Jim Dondero.
15        I'm going to ask you to further assume
16 that the purpose of the trust is to provide living
17 expenses to the beneficiaries.
18        I'm going to ask you to further assume
19 that Mr. Dondero is the beneficiary of that trust
20 for his lifetime.
21        And I'm going to ask you to further
22 assume that his sister Nancy is the trustee.
23        If Highland loaned money to Dugaboy,
24 is that a fact that would have been relevant to
25 your analysis?

Page 146

ALAN JOHNSON

1
2     A.    It could have been. It could have
3  been.
4     Q.    And why could it have been relevant to
5  your analysis?
6     A.    Well, if it's in effect a loan to him,
7  then I would probably consider it similar to the
8  other loans, but maybe if I had time to think
9  about it, it – I might have considered
10  differently.
11         But if I came to the conclusion that
12  loaning to that – the investment trust or to him
13  personally is essentially the same thing, then I
14  probably would have considered, you know, an
15  equal – on an equal basis.
16     Q.    Now, neither Mr. Dondero nor Stinson
17  shared with you any information about any loan
18  that Highland ever extended to Dugaboy, if any.
19  Is that correct?
20     A.    It may have been in the listing of
21  loans – the listing, but I had no separate
22  conversation about Dugaboy, no.
23     Q.    There's nothing in this paragraph that
24  suggests that any loan between Dugaboy and
25  Highland was forgiven in whole or in part in 2016,

Page 147

ALAN JOHNSON

1
2  correct?
3     A.    That's right.
4     Q.    So if you look at your notes and
5  refresh your recollection as to what we've been
6  through just now, is it fair to say that there's
7  no evidence of Highland forgiving any loan to
8  anybody in the world in whole or in part at any
9  time since 2008?
10         MR. AIGEN:  Objection, form.
11     A.    The ones we've looked through, I think
12  you're right. I think there was forgiveness in
13  2008. I think that's correct.
14     Q.    And given the amounts of the loans
15  that we looked at in 2008 – and if you want to
16  refer to your cheat sheet to refresh your
17  recollection – does it seem that the loans that
18  were described in the 2008 audited financial
19  statements might, in fact, be the very loans that
20  were described for you by the four individuals you
21  interviewed?
22     A.    They could – they certainly could
23  have been, yes.
24     Q.    They're consistent with the amount of
25  the loans that were forgiven as was told by you,

Page 148

ALAN JOHNSON

1
2  right?
3     A.    That is correct, yes.
4         MR. MORRIS:  Let's go to 2017.
5         Can we go to page 30 –
6     Q.    Oh, I apologize, before we do that,
7  did you see that first page, sir?
8         Do you understand that we're looking
9  at Highland's audited financial statements for the
10  period ending December 31, 2017?
11     A.    Yes.
12     Q.    Okay.
13         And this is not a document you're
14  relying on, correct?
15     A.    That is correct.
16     Q.    Okay.
17         So now we're at page 30 of the audited
18  financial statements, and we're again in the
19  section relating to notes and other amounts due
20  from affiliates.
21         And do you see the first paragraph
22  relates to notes that Highland Capital Management
23  Fund Advisors has issued to Highland?
24     A.    Yes.
25     Q.    And this paragraph, like all of the

Page 149

ALAN JOHNSON

1
2  paragraphs, continues to say, quote, at the end,
3  that fair value of the partnership's outstanding
4  notes receivable approximates the carrying value
5  of the notes receivable.
6         Do you see that?
7     A.    Yes.
8     Q.    Okay.
9         And that sentence is at the end of
10  every paragraph in this section.
11         Do I have that right, if we continue
12  to scroll there?
13     A.    Yes.
14     Q.    Okay.
15         So looking at the first paragraph
16  relating to HCMFA, there's nothing in that
17  paragraph that states or suggests that Highland
18  agreed to forgive in whole or in part any loan it
19  had extended to HCMFA, correct?
20     A.    Yes.
21     Q.    And looking at the second paragraph,
22  do you see that it states that Highland combined
23  its outstanding promissory and revolving notes
24  from NexPoint to a single note with a 30-year
25  amortization schedule?

Page 150

ALAN JOHNSON

1
2    I'm summarizing.
3    A.   Yes.
4    Q.   And is it fair to assume that that's
5    probably one of the notes that recently saw?
6         MR. AIGEN:  Objection, form.
7    A.   Yes.  Yes.
8    Q.   Yes?
9    A.   Yes, that's correct.
10   Q.   And the reason it's correct is because
11   it comports with your recollection that there was
12   a roll-up of previously outstanding notes that
13   were combined in one into a 30-year term note,
14   right?
15   A.   That is correct.
16   Q.   Okay.
17        Is there anything in this paragraph
18   that states or suggests that Highland agreed to
19   forgive in whole or in part any aspect of any loan
20   it ever gave to NexPoint?
21   A.   No, there's not.
22   Q.   Looking at the next paragraph for
23   HCRE, do you see that there's a description of the
24   promissory note that HCRE issued to Highland in
25   exchange for a loan in December -- in 2017?

Page 151

ALAN JOHNSON

1
2    A.   Yes.
3    Q.   Is there anything in that paragraph
4    that suggests or states that Highland has agreed
5    to forgive in whole or in part any portion of any
6    loan it ever extended to HCRE?
7    A.   No.
8    Q.   The next paragraph refers to loans
9    that Highland has extended to Highland Capital
10   Management Services, Inc.
11        Do you see that?
12   A.   Yes.
13   Q.   Is there anything in that paragraph
14   that states or suggests that Highland has agreed
15   to forgive in whole or in part any portion of any
16   loan it ever extended to HCMSI?
17   A.   No.
18        MR. MORRIS:  Can we go to the next
19        paragraph, please.
20   Q.   Okay.  These two paragraphs relate to
21   Mr. Dondero and Mr. Okada.
22        Did you see that?
23   A.   Yes.
24   Q.   And it wasn't up on the screen before,
25   so I just want to make it clear that each of those

Page 152

ALAN JOHNSON

1
2    paragraph ends with the same sentence concerning
3    the fair value of the notes approximating the
4    carrying value the notes receivable.
5         Do I have that right?
6    A.   Yes.
7    Q.   Okay.
8         Now, remember we saw in the 2016
9    financials that Mr. Dondero had $14.9 million
10   outstanding at year end.
11        Do you recall that?
12   A.   I don't specifically recall that,
13   but -- I don't specifically recall that, no.
14   Q.   I'll represent to you that the 2016
15   audited financial statements showed that the
16   outstanding principal and interest due by
17   Mr. Dondero under the note that he issued to
18   Highland was $14.9 million.  Okay?
19   A.   Okay.
20   Q.   With that representation, do you see
21   that the amount has been reduced by $400,000 at
22   the end of 2017?
23   A.   Yes.
24   Q.   Okay.
25        And so is it fair -- is it a fair

Page 153

ALAN JOHNSON

1
2    conclusion to reach that at some point in 2017,
3    Mr. Dondero made payments against his obligations
4    to Highland that reduced the amount owing from
5    14.9 million to 14.5 million at the end of 2017,
6    again, assuming that I'm right about 2016?
7    A.   That would be right.  That would be
8    correct, yes.
9    Q.   And there's nothing in this paragraph
10   that states or suggests that Highland has agreed
11   to forgive in whole or in part any loan it has
12   ever extended to Mr. Dondero, correct?
13   A.   That's correct.
14   Q.   Okay.  So I would like you to note
15   down, because it's hard to flip back -- this is
16   the dilemma of virtual depositions -- but can you
17   write down that Mr. Dondero owed Highland
18   principal and interest of $14-and-a-half million
19   at the end of 2017?
20   A.   Okay.
21   Q.   And the next paragraph relates to
22   Mr. Okada.
23        There's nothing in there that states
24   or suggests that Highland has agreed to forgive in
25   whole or in part any loan Highland had ever

Page 154

ALAN JOHNSON

2 extended to Mr. Okada, correct?
3    A.   That's correct.
4        MR. MORRIS:  Okay.  Can we continue on
5 to the next page.
6    Q.   And do you see the first paragraph
7 relates to Dugaboy again?
8    A.   Yes.
9    Q.   And it specifically says that during
10 the year ending December 31, 2017, Dugaboy did not
11 issue any new notes to the partnership.
12        Do you see that?
13    A.   Yes.
14    Q.   And then it states that all
15 outstanding notes accrue interest at the rate of
16 2.75 percent.
17        Do you see that?
18    A.   Yes.
19    Q.   And then it says that at year end, the
20 total unpaid principal and interest due was
21 approximately $22.8 million and was payable on
22 demand?
23        Have I read that correctly?
24    A.   Yes.
25    Q.   Okay.

Page 155

ALAN JOHNSON

2        Is there anything in this paragraph
3 that states or suggests that Highland ever agreed
4 to forgive in whole or in part any loan it ever
5 extended to Dugaboy?
6    A.   No.
7    Q.   The next paragraph refers to a
8 contribution agreement.
9        Do you see that?
10    A.   Yes.
11    Q.   Have any idea what a contribution
12 agreement is in this context?
13    A.   Not in this context, no.
14    Q.   Is that something you might – you
15 might have asked about had you been told – had
16 you been given these financial statements, let's
17 say, back in July?
18    A.   I – I might have asked about this,
19 yes.
20    Q.   I mean, in fact, this is in the
21 section of the audited financial statements that
22 is entitled –
23        MR. MORRIS:  If would can go back to
24 the top – no – I'm sorry – the top of
25 that section, page – yeah.

Page 156

ALAN JOHNSON

2    Q.   That section is specifically called
3 "Notes and Other Amounts Due From Affiliates,"
4 right?
5    A.   Yes.
6    Q.   If you wanted to assess whether or not
7 Mr. Dondero was reasonably compensated, wouldn't
8 you want to know about all of the notes that
9 Highland held on behalf of the affiliates that
10 were owned and controlled by Mr. Dondero?
11        MR. AIGEN:  Objection, form.
12    A.   I – I would have – if I had had the
13 financials, I would have certainly looked through
14 these things, yes.
15    Q.   And if you had been given this
16 information, wouldn't you want to know the full
17 extent – I mean – withdrawn.
18        I think we – I think at the beginning
19 of the day – I know we've been going at this for
20 a while – you specifically told me that you would
21 advise a decision maker to know and understand the
22 full scope of all loans that were given to or for
23 the benefit of the executive before entering into
24 a forgiveness agreement, right?
25    A.   Yes.

Page 157

ALAN JOHNSON

2    Q.   Okay.
3        And the information that's contained
4 in this section of the audited financial
5 statements specifically pertains to loans to
6 affiliates.  Isn't that right?
7    A.   Yes, among other things, but yes.
8    Q.   Okay.
9        In order to know if Mr. Dondero had
10 been compensated in a way equal to his peers
11 wouldn't you want to know the full extent of
12 amounts loaned to entities he owned and
13 controlled?
14        MR. AIGEN:  Objection to form.
15    A.   Well, a straight loan to someone is
16 not generally compensation.  If the loan is going
17 to be forgiven at some point in the future, yes,
18 that would have been a relevant – you know,
19 relevant factor, but just a straight loan wouldn't
20 generally be considered compensation.
21    Q.   If Highland – let's say
22 hypothetically Highland – withdrawn.
23        You see NexPoint Advisors on the page,
24 the second box?
25    A.   Yes.

**Appx. 01997**

Page 158

ALAN JOHNSON

1
2    Q.   Highland – let's assume that James
3    Dondero owns and controls NexPoint.  Okay?
4    A.   Yes.
5    Q.   As of May 31, 2017, according to
6    Highland's audited financial statements, it loaned
7    NexPoint $30.7 million.
8         Do you see that?
9    A.   Well, I think it's saying it combined
10   all these notes together and a new note of 30.7,
11   right.
12   Q.   I appreciate that – that precision.
13   So let me restate the question.
14        According to the audited financial
15   statements, Highland had loaned in the aggregate
16   $30.7 million to NexPoint, correct?
17   A.   Yes.
18   Q.   Okay.
19        And what if I told you that NexPoint
20   took that money and they invested it and they
21   turned that money into $100 million, would that be
22   a benefit to Mr. Dondero if you assume that he
23   owned and controlled the entity?
24   A.   Well, it's certainly – he made a wise
25   investment with his $30 million loan for sure.

Page 159

ALAN JOHNSON

1
2    Q.   And would you agree that Highland
3    enabled him to make that wise investment by giving
4    him the loan?
5    A.   They facilitated it, but it depends
6    what the terms of the loan are and – so, yes, he
7    would have benefited from his wise investment, and
8    they would have facilitated him doing that by
9    loaning the $30 million.
10   Q.   And NexPoint didn't go into the
11   marketplace to negotiate for a loan with a third
12   party, right?
13   A.   That, I don't know.
14   Q.   Well, they took the loan from
15   Highland, correct?
16   A.   It already had loans, right, from
17   Highland, yes.
18   Q.   And you understood that Mr. Dondero
19   controlled both NexPoint and Highland at the time,
20   correct?
21   A.   Yes.
22   Q.   Okay.
23        And so is it fair to say based on your
24   experience and expertise that Highland used –
25   withdrawn.

Page 160

ALAN JOHNSON

1
2         Is it based – is it fair based on
3    your knowledge and expertise that Mr. Dondero used
4    Highland to increase the value of its affiliated
5    companies by providing it with capital?
6         MR. AIGEN:  Objection to form.
7    A.   Yeah, I don't – I guess I would be
8    uncomfortable – I'm not sure I understand the
9    question.  I'm sorry.
10   Q.   Okay.
11        You did not – your report and your
12   opinions – withdrawn.  Let me take this simply.
13        Your conclusion in your report is that
14   Mr. Dondero had earnings from Highland of
15   approximately $3 million for the 7 years prior to
16   the petition date; correct?
17   A.   That's right, from the – from the –
18   yes, from the various entities, yes.
19   Q.   And based on your analysis of
20   comparable executives, you believe he should have
21   been earning $6 million for each of those seven
22   years, correct?
23   A.   Yes, that is correct.
24   Q.   And the difference between the two
25   equals $3 million for seven years, or $21 million.

Page 161

ALAN JOHNSON

1
2         Do I have that right?
3    A.   Yes.
4    Q.   And you calculated that based solely
5    on certain W-2 income, correct?
6    A.   W-2s and I think, also, with the
7    1040s, I believe, but yeah, it was the W-2s.
8    Q.   So you did not take into account, for
9    example, any benefit that Mr. Dondero received by
10   using Highland's capital to support his affiliated
11   companies, correct?
12        MR. AIGEN:  Objection, form.
13   A.   We did not take into account any
14   ownership – using the ownership capital either
15   for him or for anybody else, that's correct.
16   Q.   And you didn't try to quantify the
17   benefit to Mr. Dondero from using Highland's
18   capital to support his affiliated companies,
19   correct?
20   A.   We made no attempt to – to do it for
21   him or for anybody else we might have thought of
22   as comparable executives, that's correct.
23   Q.   Would you – would you agree with me
24   that it was a benefit to Mr. Dondero to have
25   access to Highland's capital for the purpose of

**Appx. 01998**

Page 162

ALAN JOHNSON

1 supporting his affiliated companies?
2     MR. AIGEN:  Objection, form.
3     A.   He – he benefited from having
4 significant capital – he certainly benefited as
5 an owner from something significant capital,
6 absolutely.
7     Q.   Okay.
8         And how would you – how would you
9 describe that benefit?
10     A.   Well, he would get returns on the
11 capital.  Either through loans or direct
12 investments as the owner of both Highland and
13 NexPoint, he would benefit from their successes
14 and, of course, lose from their failures.
15     Q.   Are you aware of any failures?
16     A.   In getting these financials, there
17 were a couple of years that were terrible.  There
18 were some outstanding years, so it varied during
19 this period.
20         So there were certainly a couple of
21 years with very disappointing results.
22     Q.   And which entity are you referring to
23 that had those disappointing results?  Was that
24 Highland?

Page 163

ALAN JOHNSON

1     A.   I believe – I believe – I believe it
2 was Highland as well, yes.
3     Q.   And do you think that when a company
4 fails, that that's a factor that a decision maker
5 should take into account when deciding whether or
6 not to forgive loans?
7         Is that part of the financial
8 condition that we described earlier?
9     A.   Absolutely, the condition of the
10 company, it's both income, capital, and the
11 importance of achieving those goals as part of
12 forgiving absolutely should be considered.
13     MR. MORRIS:  I've forgotten if I've
14 gone through 2017 yet.
15         Does anybody recall?
16         All right.  We'll do it again.
17     MS. CANTY:  This is 2017 on the
18 screen.
19     MR. MORRIS:  Right.  But I have – all
20 right.  I'll just do it again then.
21         Michael starts objecting as asked and
22 answered, I'll get the hint.
23     Q.   Mr. Johnson, take a look at the first
24 paragraph.

Page 164

ALAN JOHNSON

1         Do you see that that – under the
2 section "Notes and Other Amounts Due From
3 Affiliates," describes loans between Highland and
4 HCMFA in 2017?
5     A.   Yes.
6     Q.   Is there anything in that paragraph
7 that states or suggests that Highland agreed to
8 forgive in whole or in part any loan it ever
9 extended to HCMFA?
10     A.   No.
11     Q.   Looking at the next paragraph, next
12 point, do you see that the next paragraph concerns
13 loans that Highland extended to NexPoint?
14     A.   Yes.
15     Q.   Is there anything in that paragraph
16 that states or suggests that Highland has agreed
17 to forgive in whole or in part any note that it
18 ever – any loan it ever extended to NexPoint?
19     A.   No.
20     Q.   All right.
21         Looking at the next paragraph, do you
22 see the next paragraph describes loans between
23 Highland and HCRE Partners, LLC?
24     A.   Yes.

Page 165

ALAN JOHNSON

1     Q.   Is there anything in that paragraph
2 that states or suggests that Highland has agreed
3 to forgive in whole or in part any loan it ever
4 extended to HCRE Partners, LLC?
5     A.   No.
6     Q.   The next paragraph relates to loans
7 between Highland and Highland Capital Management
8 Services, Inc.
9         Do you see that?
10     A.   Yes.
11     Q.   Is there anything in that paragraph
12 that states or suggests that Highland has agreed
13 to forgive in whole or in part any loan it ever
14 extended to Highland Capital Management Services,
15 Inc.?
16     A.   No.
17     Q.   The next paragraph relates to
18 Mr. Dondero.
19         Do you see that?
20     A.   Yes.
21     Q.   And do you see that it states that
22 Mr. Dondero didn't obtain any new loans from
23 Highland in 2017?
24     A.   Yes.

Page 166

ALAN JOHNSON

1
2    Q.   And do you see that –
3         MR. MORRIS:  Michael, I'm boring you,
4    because you should be asking as asked and
5    answered because there's that $14.5 million
6    number that I know Mr. Johnson wrote down,
7    right?  So we have done this before.  Okay?
8         Let's go to the 2018 audited
9    financials.
10        MS. CANTY:  This is Exhibit 34.
11        MR. MORRIS:  Thank you very much.
12        (Exhibit 34, Highland's audited
13    financial statements for December 31, 2018,
14    was marked for identification at this time.)
15        MR. MORRIS:  And if we can go to the
16    first page.
17   BY MR. MORRIS:
18        Q.   Do you see that this is a – the first
19   page of Highland's audited financial statements
20   for the period ending December 31, 2018?
21        A.   Yes.
22        MR. MORRIS:  Before we go to – before
23   we go to the affiliate loans, can we just
24   turn to the – I think it's the first
25   substantive page, the balance sheet.

Page 167

ALAN JOHNSON

1
2         Yes, stop right there.
3         Q.   Do you see – do you see the balance
4    sheet, sir?
5         A.   Yes.
6         Q.   Do you see that near the bottom
7    there's a line item showing notes and other
8    amounts due from affiliates?
9         A.   Oh, yeah – I'm sorry – yes.
10        Q.   And do you see that Highland has
11   carried on its balance sheet $173.4 million in
12   notes and other amounts due from affiliates?
13        A.   Yes.
14        Q.   Do you understand that the affiliates
15   are owned and controlled by Mr. Dondero?
16        A.   Owned and controlled?  I think
17   Mr. Okada owned some of – he certainly controlled
18   them.  I don't know if he had 100 percent
19   ownership of all of them.  He certainly controlled
20   the affiliates we're talking about.
21        Q.   At the time that you prepared your
22   report, did you know that Highland's affiliates
23   owed it $174 million as of the end of 2018?
24        A.   I don't think I was aware of that, no.
25        Q.   Is that a fact that you would have

Page 168

ALAN JOHNSON

1
2    wanted to be aware of before you prepared your
3    report?
4         A.   I'm not sure.  I'm not sure.
5         Q.   Well, I think you testified that if
6    you were advising a decision maker, you would
7    advise them to try to obtain as much information
8    as they could concerning any loans that had been
9    extended by the employer to or for the benefit of
10   the executive, correct?
11        A.   That is correct.
12        Q.   And is there any reason for you to
13   believe that this $173.4 million didn't relate to
14   loans that were made by the employer to or for the
15   benefit of the executive and Mr. Okada?
16        MR. AIGEN:  Objection, form.
17        A.   Yeah, I don't – at least that
18   174 million would say they're notes from
19   affiliates, but the affiliates is also the
20   businesses.
21        So I'm not – I certainly would want
22   to be aware of that.  Whether it would have
23   changed my report, I'd have to – I'd have to
24   think about.
25        Q.   Okay.

Page 169

ALAN JOHNSON

1
2         But you weren't told about the
3    totality of the loans, correct?
4         A.   I did not know the totality, no.
5         Q.   Did you know that more than 15 percent
6    of Highland's assets were tied up in notes and
7    other amounts due from affiliates?
8         MR. AIGEN:  Objection, form.
9         A.   I did not know that.
10        Q.   Is that a fact that you would have
11   liked to have known about before you issued your
12   report?
13        A.   As I answered before, I'm not sure.
14   I'm not sure.
15        Q.   Do you think this is a fact that the
16   decision maker should have known about before he
17   or she entered into the forgiveness agreement?
18        A.   I think – as I testified before, I
19   think the decision makers certainly understand the
20   totality of the loans that are potentially being
21   forgiven, absolutely.
22        Q.   Do you think the decision maker could
23   have done his or her job without knowing that the
24   employer had extended over $173 million to the
25   executive before entering into the agreement?

**Appx. 02000**

Page 170

ALAN JOHNSON

1          ALAN JOHNSON
2          MR. AIGEN:  Objection, form.
3     A.   Well, I think -- at least I
4  understand, the way it's stated here in the
5  financials, those are to the businesses.
6          So I think the -- a decision maker
7  should know, you know, the totality of the loans
8  being forgiven and the decision maker probably
9  should have some idea of the various -- as I
10  testified earlier, about the financial condition
11  of the company, which would include these notes
12  from affiliates.
13          MR. MORRIS:  Let's -- can we scroll
14     down a page or two?
15          Okay.  Stop right -- a little
16     further -- no, go to the top of this page.
17     Q.   Do you see that this page is the
18  consolidated income statement?
19     A.   Yes.
20     Q.   And you're familiar with income
21  statements.  Is that right?
22     A.   Yes.
23          MR. MORRIS:  Okay.  Can we go to the
24     bottom, please?
25     Q.   Do you see that in the year before

Page 171

ALAN JOHNSON

1  bankruptcy, the net loss attributable to Highland
2  was more than $73 million, at the bottom of the
3  page?
4     A.   Yes.
5     Q.   Is that a fact that you knew of at the
6  time that you prepared your report?
7     A.   I did not.
8     Q.   Is that a fact that you would have
9  liked to have known about before you prepared your
10  report?
11     A.   I would have liked to have seen all of
12  these financial statements before I prepared my
13  report, absolutely.
14     Q.   Is the fact that Highland lost
15  $73 million in 2018 relevant to your analysis at
16  all?
17     A.   I'd have to think about it, but I
18  certainly would have wanted to know about it.
19     Q.   And you were told by Mr. Dondero that
20  the forgiveness agreement was entered into in
21  either December of 2018 or January or February of
22  2019, correct?
23     A.   It's in my report.  I can't remember
24  if it was late '17 or '18 or late '18 and '19.

Page 172

ALAN JOHNSON

1  Sitting here, I don't recall which, but it was
2  told a time frame.  It was either late one year or
3  early the next.  I don't recall the --
4     Q.   We're not going to put it back up on
5  the screen, but I'll just try to refresh your
6  recollection that on page 6 of your report, you
7  had stated, "I understand from Mr. Dondero that
8  the 2018 loans that are the subject of this suit
9  were modified by an agreement in late 2018 or
10  early 2019."
11          Does that refresh your recollection as
12  to the timing of the purported agreement that was
13  described to you?
14     A.   Yes, I think that's right, yep.
15     Q.   And do you understand that this
16  $74 million loss relates to the period ending in
17  December 2018?
18     A.   Yes.
19     Q.   And do you think the decision maker
20  should have known about the financial condition of
21  the company when he or she entered into the
22  agreement on behalf of Highland in late 2018 or
23  early 2019?
24     A.   The decision maker should have had an

Page 173

ALAN JOHNSON

1  idea about the condition of the company,
2  absolutely.
3     Q.   Do you have any reason to believe that
4  the decision maker had any information about the
5  financial condition of the company before agreeing
6  on behalf of Highland to enter into a forgiveness
7  of loans with the potential value of 40 to
8  $50 million?
9     A.   I have no information about that.
10          MR. MORRIS:  Can we go back to the
11     balance sheet for a second?
12     Q.   Do you see how the assets exceed the
13  liabilities and there's partners' capital of about
14  $371 million?
15     A.   Yes.
16     Q.   That partners' capital assumes that
17  the value of the notes and other amounts due and
18  affiliates equals $173.4 million, correct?
19     A.   That's one of the assumptions, right,
20  yes.
21     Q.   And there's nothing on the balance
22  sheet that discloses potential litigation
23  liability, correct?
24     A.   No, there's nothing on here, on the

ALAN JOHNSON

1
2 balance sheet, no.
3       Q.    Did anybody ever give you any
4 information about potential litigation risk that
5 Highland faced in 2018 and '19?
6       A.    I think in preparing my report, I was
7 aware of litigation around this company.  I think
8 there had been an arbitration award that was
9 outstanding, so I was aware of any significant
10 litigation risk and litigation expenses ongoing.
11 I was aware of that.
12      Q.    Okay.
13            So is it fair to say that the
14 statement of partners' capital on this page, to
15 the best of your knowledge, assumes the recovery
16 in full -- assumes, among other things, the
17 recovery in full of the notes and other amounts
18 due from affiliates in the amount of
19 $173.4 million?
20      A.    That's one of the assumptions that
21 goes into this balance sheet, yes.
22      Q.    And is it fair to say that the
23 statement of partners' capital doesn't take into
24 account at all litigation risk?
25            MR. AIGEN:  Objection, form.

ALAN JOHNSON

1
2       A.    That, I don't know.  I don't know what
3 PwC would have done with the litigation risk.
4            But if we're just looking at the line
5 items here, I don't see a reserve for litigation,
6 but that might be in the footnotes or so forth.
7 But as written here, the balance sheet seems to
8 suggest that there is no -- there's nothing on
9 here for litigation risk.
10      Q.    Okay.
11            MR. MORRIS:  Can we go to page -- I
12 think it's 28.
13      Q.    Amount -- you see, "Notes and Other
14 Amounts Due From Affiliates"?
15      A.    Yes.
16      Q.    There's notes from HCMFA.
17            Do you see that?
18      A.    Yes.
19      Q.    We'll just do it the same way.
20            Can you take a look at that paragraph
21 and let me know if you see anything in there that
22 states or suggests that Highland agreed to forgive
23 in whole or in part any loan it ever extended to
24 HCMFA?
25      A.    I don't see that, no.

ALAN JOHNSON

1
2       Q.    Okay.
3            Same question for the next paragraph,
4 can you tell me if you see anything in the second
5 paragraph that states or suggests that Highland
6 has agreed to forgive in whole or in part any loan
7 it ever extended to NexPoint?
8       A.    I don't -- I don't see that there
9 either.
10      Q.    Next paragraph, is there anything in
11 the next paragraph that states or suggests that
12 Highland has agreed to forgive in whole or in part
13 any loan it ever extended to HCRE Partners?
14      A.    No, I don't see that.
15      Q.    The next paragraph, is there anything
16 in the next paragraph that states or suggests that
17 Highland has agreed to forgive in whole or in part
18 any note it ever extended to Highland Capital
19 Management Services, Inc.?
20      A.    No, I don't see that.
21      Q.    And do you see that with respect to
22 these four paragraphs, each of them still contains
23 as its last sentence the statement that the fair
24 value of the partnership's outstanding notes
25 receivable approximates the carrying value the

ALAN JOHNSON

1
2 notes receivable?
3       A.    Yes.
4       Q.    So this is as late as -- for the
5 financial statements that are dated as of -- I'm
6 sorry.
7            This is -- these statements refer --
8 withdrawn.
9            These statements concern Highland's
10 audited financial statements for the period ending
11 December 31, 2018, correct?
12      A.    Yes.
13      Q.    Okay.  Let's continue to scroll down.
14            Do you see there's a reference to Jim
15 Dondero having issued new promissory notes for
16 $14.9 million in 2018?
17      A.    Yes.
18      Q.    Okay.  So if you add the 14.9 with the
19 14.5 that was due -- if you could write this
20 down -- at the end of 2018, that would be a total
21 of $29.4 million.
22            Do I have that right?
23      A.    I believe that's right, yes.
24      Q.    Okay.
25            But at the end of the year, he

Page 178

ALAN JOHNSON

1    actually owed just a hair less than that,
2    $29.2 million.
3        Do you see that?
4    A.   Yes.
5    Q.   Okay.
6        Is it fair to conclude that at some
7    point in 2018, Mr. Dondero made a modest payment
8    of principal and interest against the loans that
9    were outstanding to Highland?
10       MR. AIGEN:  Objection, form.
11   A.   That -- that appears what's going on,
12   yes.
13   Q.   And there's certainly nothing in this
14   paragraph that states or suggests that Highland
15   agreed to forgive in whole or in part any loan it
16   ever extended to Mr. Dondero, correct?
17   A.   That's right.
18   Q.   And the next paragraph again relates
19   to Mr. Okada.
20       Do you see that?
21   A.   Yes.
22   Q.   And there's nothing in that paragraph
23   that states or suggests that Mr. Okada had -- had
24   reached an agreement with Highland on the

Page 179

ALAN JOHNSON

1    forgiveness of any loan extended to him in whole
2    or in part?
3    A.   That's correct.
4        MR. MORRIS:  Okay.  Can we go down to
5    the next page, please.
6    Q.   Okay.  And then you have the same
7    statement about Dugaboy and the contribution
8    agreement.
9        Do you see that?
10   A.   Yes, I see it.
11   Q.   Is there anything in either paragraph
12   that states or suggests that Highland has agreed
13   to forgive in whole or in part any loan it ever
14   extended to Dugaboy or pursuant to -- in
15   connection with the contribution agreement?
16   A.   No.
17   Q.   Okay.
18       Are you familiar with the concept of
19   subsequent events?
20   A.   Sure.
21   Q.   And what's your understanding of the
22   concept of subsequent events for purposes of
23   audited financial statements?
24   A.   In the footnotes, often they'll talk

Page 180

ALAN JOHNSON

1    about events that happen shortly after the end of
2    the fiscal year and before the reports or things,
3    and usually, they'll appear in the footnotes and
4    talk about events that a shareholder should be
5    aware of that have happened following the
6    financial year end and the issues of the
7    financials.
8    Q.   It's not just the shareholders, it's
9    anybody who uses or relies on the financial
10   statements should have that information.  Is that
11   fair?
12       MR. AIGEN:  Objection.
13   A.   Anybody who -- yeah, well said, anyone
14   who relies on it, the subsequent event is
15   material -- is material enough that you should
16   be -- you she take into account and be aware of.
17   Q.   Now, if Mr. Dondero had entered into
18   the forgiveness agreement in late 2018, would you
19   have expected it to have been described in the
20   section that we just looked at?
21       MR. AIGEN:  Objection, form.
22   A.   I would hope it would show up in the
23   reported financials.  I would hope that would
24   happen, yes.

Page 181

ALAN JOHNSON

1    Q.   Why is it your hope that it would
2    happen?
3    A.   Well, as I testified earlier, I
4    recommend to clients, and sometimes they follow,
5    to document things in writing, and if it's in
6    writing, it would usually or hopefully would show
7    up in the audited financial statements.
8    Q.   Would you always recommend your client
9    to inform its auditors of any agreement relating
10   to the forgiveness of loans made to executives?
11       MR. AIGEN:  Objection, form.
12   A.   I would certainly recommend -- if it
13   was an issue, I would certainly recommend to
14   clients that they report to the finance team,
15   which would then talk to the auditors, about how
16   to disclose material loans to executives and if
17   they were going to be forgiven.
18       MR. MORRIS:  Okay.  Can we scroll
19   down -- I apologize, I don't know the page
20   number, but there's a section of this report
21   concerning subsequent events.
22       Okay.  Right there.
23   Q.   Do you see on page 38 of Highland's
24   2018 audited financials there's Section 15

Page 182

1           ALAN JOHNSON
2   entitled, "Subsequent Events"?
3       A.   Yes.
4           MR. MORRIS:  Okay.  If we could just
5   show Mr. Johnson that portion and continue
6   on to page 39.
7       Q.   Okay.  And do you see -- now that
8   you've got the whole section on the screen, do you
9   see in the next-to-the-last paragraph there's a
10  reference to HCMFA having issued promissory notes
11  to the partnership in the aggregate amount of
12  $7.4 million during the course of 2019 through the
13  date of the report?
14      A.   Yeah, yes.  Yes, I see that.
15      Q.   Is it your understanding with 30 years
16  in the industry that the auditors would require
17  the disclosure of material transactions that occur
18  after the date of the report but prior to its
19  issuance?
20          MR. AIGEN:  Objection, form.
21      A.   I'm not familiar with the exact
22  accounting rules of what qualifies as subsequent
23  event, but my expectation would be that material
24  events that occurred after the end of the year
25  would be disclosed in a section like this before

Page 183

1           ALAN JOHNSON
2   the financials came out.
3       Q.   If Mr. Dondero had entered into his
4   forgiveness agreement in early 2019, would you
5   have expected that agreement to have been
6   disclosed in the subsequent event section of the
7   audited financial report?
8           MR. AIGEN:  Objection, form.
9       A.   As I said earlier, I would hope it
10  would be -- I would hope that it would be
11  documented and I would hope that if it was -- in
12  this case, was significant, that it would have
13  been informed and probably shown up in a section
14  like this.
15      Q.   But you don't see it show up in a
16  section like this, do you, sir?
17      A.   I don't see it here, no.
18          MR. MORRIS:  Can we go to the, I
19  think, second or third page of the document?
20          Yeah, the signature page, yeah.
21      Q.   Do you see that that's
22  PricewaterhouseCoopers' signature on the audited
23  financial report for the period ending
24  December 31, 2018?
25      A.   You mean, '19 -- nor '18 -- I'm

Page 184

1           ALAN JOHNSON
2   sorry -- yes, I see PwC.
3       Q.   Right.
4           And do you see it's dated June 3,
5   2019?
6       A.   Yes.
7       Q.   And is it your understanding that the
8   subsequent event section covers the period
9   January 1, 2019 until June 3, 2019?
10      A.   I'm not -- again, I'm not an expert on
11  exactly the timing of the subsequent events, but
12  it -- it would have -- it covers some of the
13  period -- some or all the period before they
14  issued.  I don't know when they have a cutoff, but
15  it covers certainly at period after the end of the
16  year before these are finalized.
17      Q.   Okay.  So just to shift gears -- you
18  can take this down, please.
19          Just a few more questions and we will
20  have a short break for lunch, and I hope I won't
21  have a lot more after that, just to give you a
22  sense of where we are.
23          We just saw, based on the 2018 audited
24  financials, that as of the end of that year,
25  Mr. Dondero had loans outstanding of approximately

Page 185

1           ALAN JOHNSON
2   $29.4 million, at least according to the audited
3   financial statements, right?
4       A.   I think that's true from Highland.  I
5   don't know if that included the different
6   affiliates, but I think that's an accurate figure
7   from Highland.
8       Q.   And do you understand that Mr. Dondero
9   has borrowed money from other affiliates as well?
10      A.   I believe that's true, yes.
11      Q.   Do you have any understanding of the
12  magnitude of his borrowing from those affiliates?
13      A.   I believe in this case there's, I
14  believe, something like 40 to $50 million at
15  stake, but I don't know the interplay of the
16  different -- the different amounts.
17      Q.   Just maybe I'm confused, but are you
18  talking about the money loaned from Highland to
19  affiliates or are you talking about money loaned
20  from affiliates to Mr. Dondero?
21      A.   I -- Mr. Dondero owes -- that he owes,
22  if I'm phrasing it correctly.
23      Q.   All right.  Look, I don't want to
24  confuse this, so let's try and keep this simple.
25          We just saw in the 2018 audit report

**Appx. 02004**

Page 186

ALAN JOHNSON

2 that as of the end of the year, he personally had
3 obligations to Highland of $29.4 million, right?
4    A.   Yes.
5    Q.   Okay.
6         And there was nothing in the audited
7 financial statements that suggested that any
8 portion of that was subject to forgiveness,
9 correct?
10    A.   That's correct.
11    Q.   Okay.
12         And you're aware that Highland was a
13 debtor in bankruptcy.  Is that right?
14    A.   It went into bankruptcy.  I don't
15 recall the date of the filing, but it certainly
16 went into bankruptcy.
17    Q.   Did you – did you – do you know –
18 are you aware that it filed for bankruptcy in
19 October of 2019.
20    A.   That's the time frame.  That's what I
21 believed, yes.
22    Q.   Just a few months after
23 PricewaterhouseCoopers signed off on the 2018
24 audit, right?
25    A.   Yes.

Page 187

ALAN JOHNSON

2    Q.   Do you know if Mr. Dondero or anyone
3 acting on his behalf ever informed the bankruptcy
4 court that some or all of the loans were subject
5 to forgiveness?
6    A.   That, I don't know.
7    Q.   Did you – did you ask anybody?
8    A.   No.
9    Q.   If you were advising a client – if
10 you were advising a debtor in bankruptcy – no –
11 withdrawn.
12         If you were advising the maker of
13 certain notes that were held by a debtor in
14 bankruptcy, would you advise that client to tell
15 the Court of any agreements that existed that –
16 pursuant to which the notes might be forgiven?
17         MR. AIGEN:  Objection, form.
18    A.   I would certainly – if it wasn't
19 obvious already, I would have certainly advised
20 the client to inform whoever if there are terms
21 that would be favorable to them, absolutely.
22    Q.   And why would you do that?
23    A.   Well, if I was an executive or an
24 entity that had forgiveness provisions that might
25 benefit me and someone else who's not a banker or

Page 188

ALAN JOHNSON

1 bankruptcy judge wasn't aware of it, I would
2 suggest that they inform them rapidly that these
3 favorable provisions were in place.
4    Q.   Can you think of any reason why the
5 executive wouldn't disclose the favorable
6 provisions that were in place?
7         MR. AIGEN:  Objection, form.
8    A.   Having seen some bankruptcies, I think
9 people forget, people make bad decisions.  In the
10 chaotic situations that happen, people often
11 ignore things.  But I – the most logical one
12 would be the confusion or chaos.
13    Q.   Let me give you a hypothetical:
14 There's an executive who owes a bankrupt entity
15 $30 million in its individual capacity, and the
16 debtor discloses in its disclosure statement and
17 its plan of reorganization its intention to
18 collect that $30 million as part of its plan of
19 reorganization.
20         If the executive doesn't stand up and
21 say, Hold your horses, I've got an agreement
22 pursuant to which those notes might be forgiven,
23 and only makes that disclosure after litigation is
24 commenced, in your experience as an executive

Page 189

ALAN JOHNSON

1 compensation consultant, would you question
2 whether there was really an agreement in the first
3 place?
4         MR. AIGEN:  Objection, form.
5    A.   Of course I would question it, and I
6 often question clients about decisions that I
7 wished they hadn't made, but yeah, certainly, I
8 would question it.
9    Q.   And what if you knew in the
10 hypothetical that the individual was represented
11 by multiple law firms, would that cause you to
12 question it even further?
13         MR. AIGEN:  Objection, form.
14    A.   No, I would expect in a situation like
15 that, he would be represented by a bunch of law
16 firms, but I would certainly question that.  It
17 seems convenient.  That doesn't mean it's not
18 true, though, which I often find clients that make
19 very unfortunate decisions, so – but I would
20 certainly question it.
21    Q.   Okay.  Just a few more questions
22 before we break.
23         So we spent a lot of time, and I
24 really appreciate your patience, Mr. Johnson,

**Appx. 02005**

Page 190

ALAN JOHNSON

1  
2  going through many of Highland's audited financial  
3  statements, but I just want to know, with the  
4  caveat that you're relying on only what I showed  
5  you, with that caveat, would you agree with me  
6  that based on our review Highland has not forgiven  
7  a loan to anyone in the world since around 2009?  
8      A.  Yeah, that's what it appeared from the  
9  financials, I guess.  
10         The only thing that makes me pause is  
11  I'd want to look at the – again, the similar  
12  documents for the affiliates and see if there's  
13  stuff in there as well.  But in the documents that  
14  you showed, that appeared to be, you know, what is  
15  recorded in these financials.  
16      Q.  And Highland – the – Highland  
17  capital Management, L.P. is the only payee on the  
18  notes that you're aware of, correct?  
19      A.  I believe so.  I believe that's right.  
20      Q.  And Highland Capital Management, L.P.  
21  was the only entity that was in bankruptcy.  Is  
22  that right?  
23      A.  I believe that's right.  
24         MR. AIGEN:  Objection to form.  
25      Q.  And you're not aware that Highland has  

Page 191

ALAN JOHNSON

1  
2  an ownership interest in any of the makers under  
3  any of the notes at issue here, correct?  
4      A.  That, you're getting – I'm not sure I  
5  understand – ownership – that, I don't know.  
6      Q.  Okay.  Okay.  
7         But we can agree that, based at least  
8  on Highland's audited financial statements, you're  
9  comfortable concluding that Highland hasn't  
10  forgiven a loan to anybody or any entity since  
11  2009, correct?  
12      A.  That's the only thing, and the things  
13  you showed me have been disclosed, that's right.  
14      Q.  And based on what I showed you, you're  
15  comfortable in concluding that the largest loan  
16  that Highland ever forgave was $500,000.  Is that  
17  fair?  
18      A.  That's what it appears, that's right.  
19      Q.  Okay.  
20         And based on what I showed you, you're  
21  comfortable excluding that Highland has never  
22  forgiven a loan to Mr. Dondero, correct, or at  
23  least through 2008?  
24      A.  And as reported in the financials,  
25  that appears to be correct, yes.  

Page 192

ALAN JOHNSON

1  
2      Q.  And based on the information that I've  
3  given you and the financials that we looked at,  
4  you're comfortable concluding that at no time  
5  since at least 2008 has Highland ever forgiven in  
6  whole or in part any loan that it ever extended to  
7  any affiliate, right?  
8         MR. AIGEN:  Objection to form.  
9      A.  That's – that's what's in the  
10  financials, yes.  
11         MR. MORRIS:  Okay.  So it's 1 o'clock.  
12  Let's break until 1:30.  And I hope, you  
13  know, I have another 60 or 90 minutes.  
14         Thank you very much.  
15         (Luncheon recess taken from 1:02 p.m.  
16  until 1:32 p.m.)  
17  
18  
19  
20  
21  
22  
23  
24  
25  

Page 193

ALAN JOHNSON

1  
2  A F T E R N O O N   S E S S I O N  
3         (Time noted:  1:32 p.m.)  
4  BY MR. MORRIS:  
5      Q.  Good afternoon, Mr. Johnson.  
6      A.  Hello.  
7      Q.  Did you speak with anybody during the  
8  break about the substance of your testimony today?  
9      A.  No.  
10         MR. MORRIS:  Okay.  I'd like to put up  
11  on the screen a document that has been  
12  premarked as Exhibit 70 – you know what, I  
13  apologize, not 70, 73.  
14         (Exhibit 73 Exhibit 73, Demonstrative,  
15  was marked for identification at this time.)  
16  BY MR. MORRIS:  
17      Q.  Mr. Johnson, are you able to view the  
18  document that's been premarked as Exhibit 33  
19  that's up on the screen?  
20      A.  Yes.  Yes, I can.  
21      Q.  So I'm going to represent to you that  
22  this is a – this is what we call a "demonstrative  
23  exhibit," right?  
24         This isn't a document that was  
25  prepared in the ordinary course of business.  It's  

**Appx. 02006**

ALAN JOHNSON

1 a summary of other information that we've produced
2 in this litigation, and I will represent to you
3 that we have produced in this litigation, among
4 other things, bank statements that show the
5 transfer of money on behalf of Mr. Dondero against
6 a couple of outstanding notes.
7        And, you know, Mr. Dondero's counsel
8 can, you know, take the documents that were
9 produced with this to make sure that it's
10 accurate, but I believe it to be accurate, and I
11 just want to ask you some questions about this --
12 about the information that's contained in this
13 document.
14        I assume you've never seen this
15 before, right?
16    A.   I don't -- I may have seen something
17 similar.  I don't believe I've seen this exact
18 thing, no.
19    Q.   Were you -- do you remember before we
20 looked back and there was that $14.9 million loan
21 that was reflected in the -- in the financials?
22    A.   Yes.
23    Q.   And I'll represent to you that's
24 what's the restructured note in Column C and D.

ALAN JOHNSON

1        Do you see that?
2    A.   Yes.
3    Q.   Okay.
4        And do you recall from the financials
5 that in 2018, Mr. Dondero had borrowed an
6 additional $14 million and change?
7    A.   Yes.
8    Q.   Okay.
9        I'll represent to you that the
10 January 18, 2018 note in the principal amount of
11 $7.9 million was among the new loans that he
12 obtained in 2018.
13        Were you ever informed that in 2017,
14 '18, and '19, Mr. Dondero was making payments of
15 principal and interest due on loans that he had
16 obtained from Highland?
17    A.   I don't think I discussed that with
18 anybody.  I think I had noticed that -- these loan
19 amounts changing around, that something was going
20 on in terms of payment, but I don't think I
21 discussed that with anybody.
22    Q.   Before completing your report, would
23 you have liked to have known about Mr. Dondero's
24 payment history, if any?

ALAN JOHNSON

1    A.   Yeah, that would have been something I
2 would have liked to have known, yes.
3    Q.   Because that would relate to the whole
4 concept of whether or not there was a prior course
5 of forgiveness.  Is that right?
6    A.   I would -- yeah, that would have
7 been -- that would have been helpful to know.
8    Q.   I mean, it's -- you wouldn't dispute
9 that if, in fact, this chart is correct and
10 Mr. Dondero was making payments in 2017, '18, and
11 '19 against those notes, that those notes were not
12 likely to be subject to any forgiveness agreement,
13 correct?
14        MR. AIGEN:  Objection, form.
15    A.   As I testified before, you could have
16 a loan forgiveness that you would make payments
17 on.  It really would depend on the circumstances
18 and what you thought the probability of the
19 forgiveness happening, but answering your
20 question, yes, I would have liked to have known
21 about this.
22    Q.   According to this chart, if you just
23 focus -- you see the Column G, "Total Received in
24 Respect of Retired Notes"?

ALAN JOHNSON

1    A.   Yes.
2    Q.   Okay.
3        And do you see the total is
4 approximately $23.7 million?
5    A.   Yes.
6    Q.   If you exclude the first three
7 payments that were made in 2017 and '18, they
8 total about $3.3 million or $3.4 million.
9        Is my math roughly correct?
10    A.   Yes, it looks that way.
11    Q.   Okay.
12        So is it fair then to just -- if you
13 deduct that from the total, to say that
14 Mr. Dondero made principal and interest payments
15 against those two notes in 2019 in excess of
16 $20 million?
17    A.   That looks correct, yes.
18    Q.   Okay.
19        Now, do you see the last payment was
20 made, if you look at the Row 16, on December 23,
21 2019?
22    A.   Yes.
23    Q.   Okay.
24        And do you understand that that's

Page 198

ALAN JOHNSON

2  after the petition date?
3      A.   Yes, that would be.
4      Q.   And according to this chart anyway, in
5  Column B, the payment that was made on that date
6  was approximately $783,000?
7      A.   Yes.
8      Q.   And that money was applied to
9  outstanding principal and interest that was due
10  under the January 18, 2018 note.
11         Do you see that?
12      A.   Yes.
13      Q.   Okay.
14         And do you see how the principal
15  balance of $7.9 million was paid exactly as of
16  December 23, 2019?
17      A.   I'm sorry, I don't understand.  The
18  7.9 was --
19      Q.   Was the principal amount of the note,
20  right?
21         And I'll represent to you that the
22  January '18 note was given by Mr. Dondero to
23  Highland in exchange for 17. -- for a $7.9 million
24  loan on the same day.  Okay?
25      A.   Okay.

Page 199

ALAN JOHNSON

2      Q.   And do you see in Column G, it shows
3  that once the portion of the payment was applied
4  to the January 2018 note, the total that was
5  applied was about 319,000 and change?
6      A.   Yes.  Okay.
7      Q.   And then there's an asterisk in
8  Column H next to that total received on that date.
9         Do you see that?
10      A.   Yes.
11      Q.   Okay.
12         And if you look at the footnote, it
13  says the difference between the total paid on
14  December 23, 2019 and the amount applied to the
15  January 18, 2018 note was applied in three
16  different ways.
17         Do you see that?
18      A.   Yes.
19      Q.   And do you see that it was applied
20  against principal and interest due on three other
21  notes that Mr. Dondero took in 2018?
22      A.   Yes.
23      Q.   Were you aware, until I showed you
24  this, that Mr. Dondero had made payments of
25  principal and interest against the notes that he

Page 200

ALAN JOHNSON

2  contends are subject to the forgiveness agreement?
3      A.   I don't think I was aware of that.
4      Q.   Is that a fact that you would have
5  liked to have known before you completed your
6  report?
7      A.   I would have probably liked to have
8  known that, yes.
9      Q.   And why is that?
10      A.   The statement I made in the report
11  around the practice of the company to forgive
12  loans, I would have had to perhaps rethought that.
13  This would have been -- this would have been
14  information that I would have liked to have known,
15  yes.
16      Q.   In fact, this page shows that, you
17  know, if we exclude the payment made in late 2017,
18  from December 2018 to December 2019, Mr. Dondero
19  paid approximately $23-and-a-half million again
20  principal and interest due on 5 different notes.
21         Have I characterized that fairly based
22  on this chart?
23      A.   I think you may have double counted in
24  your arithmetic, but the point is he made
25  significant payments against principal and

Page 201

ALAN JOHNSON

2  interest.
3      Q.   Okay.  I don't want to double count.
4  Let me try and do it again.
5         Do you see the total Dondero payment
6  amount in Column B is $24.143 million.
7      A.   Yes.
8      Q.   If we simply deduct from that
9  $677,000, do you come out to roughly
10  $23-and-a-half million?
11      A.   Yes, that's right.  That's right.
12      Q.   And that $23-and-a-half million was
13  paid in the 370-day period between December 18,
14  2018 and December 23, 2019, correct?
15      A.   I don't want to be a stickler here,
16  but if you look to the payment amount of
17  24 million, I think you were trying to say that
18  the end of '18-'19, so you'd subtract those first
19  three payments in that Column B, I think, which
20  gets you to about $20 million.
21         So it looks like in '19 -- it's north
22  of $20 million.
23      Q.   Okay.
24         And if we add the payments that were
25  made on December 18, 2018 and December 19, 2018,

**Appx. 02008**

Page 202

ALAN JOHNSON

1
2  you come up with about 23 to $23-and-a-half
3  million, right?
4      A.   Something like that, that's right.
5      Q.   And that's about a one-year period
6  that straddles the petition date, to the best of
7  your knowledge, right?
8      A.   Yes.  Yes, it does.
9      Q.   And so those payments, according to
10  this chart – and, again, I'm asking you to assume
11  the accuracy of this chart – according to this
12  chart, for the approximately one-year period from
13  December 2018 to December 2019, Mr. Dondero made
14  principal and interest payments of approximately
15  23 to $23-and-a-half million against 5 different
16  promissory notes that were held by Highland,
17  correct?
18      A.   Yes, I believe that's true.
19      Q.   And is it fair to say that that
20  information conflicts with the concept of Highland
21  having a practice of forgiving loans?
22          MR. AIGEN:  Objection, form.
23      A.   Well, as I said earlier, it doesn't
24  mean that the loans weren't forgivable.  It means
25  he made payments against loans that may have been

Page 203

ALAN JOHNSON

1
2  subject to a – you know, a forgiveness agreement,
3  which, as I testified earlier, you know, could
4  happen, but it would certainly be a fact you'd
5  want to – you know, you'd want to consider.
6      Q.   And tell me the understanding – your
7  opinion as to the circumstances under which you
8  think a maker under notes would rationally make a
9  payment of principal and interest against notes
10  that were the subject of a forgiveness agreement?
11          MR. AIGEN:  Objection, form.
12      A.   Well, I think, as I testified earlier,
13  I think someone would think to themselves, what is
14  the likelihood of those notes being forgiven?
15          If they believe they're not likely to
16  be forgiven, and if they're a senior executive of
17  the company and the company perhaps needs the
18  money, they might make those payments.  A rational
19  executive or borrower could make those payments
20  believing that, perhaps, the likelihood of the
21  things being forgiven is not high and/or the
22  company needs the money.
23      Q.   Did – did anybody give you any
24  explanation as to why Mr. Dondero made
25  approximately $23-and-a-half million of payments

Page 204

ALAN JOHNSON

1
2  against premium – against principal and interest
3  due on these 5 notes?
4      A.   No, they did not.
5      Q.   To the best of your knowledge and
6  understanding was Mr. Dondero in control of
7  Highland throughout that period December 2018
8  until the end of 2019?
9      A.   I'm not – I'm not sure about what
10  happened in bankruptcy, but certainly from the
11  period up until the filing of the bankruptcy, he
12  was in control.
13      Q.   Okay.
14          Do you know – if you look at the
15  restructure note, the January 18, 2018 note, and
16  the notes that are referred to in Rows 21, 22, and
17  23, are you able to identify which of them, if
18  any, are subject to the modification agreement
19  described if your report?
20      A.   I cannot identify them, no.
21      Q.   So you don't know which, if any, were
22  the subject – were subject to the agreement.
23          Do I have that right?
24      A.   I can't identify them, no.
25          MR. MORRIS:  Okay.  Can we go back to

Page 205

ALAN JOHNSON

1
2  Mr. Johnson's report, Exhibit 62?
3          And if we can go to page 3, please.
4      Q.   This is the introduction of your
5  report, right?
6      A.   Yes.
7      Q.   And now that we've done the work we
8  have so far today, I'm going to point you to the
9  sentence towards the end of the first paragraph
10  that says, "Throughout this period, he received
11  loans in lieu of additional current compensation."
12          Do you see that?
13      A.   Yes.
14      Q.   And the "he" there refers to
15  Mr. Dondero, correct?
16      A.   Yes.
17      Q.   Knowing what you know now, do you
18  stand by that statement?
19          MR. AIGEN:  Objection, form.
20          MR. MORRIS:  Withdrawn.
21      Q.   Knowing what you know now, do you
22  believe that statement is accurate?
23      A.   I'd have to rethink about it.  I
24  haven't heard anything that would say what he told
25  me was not true.

ALAN JOHNSON

1
2     Q.    Have you seen any evidence that
3  Mr. Dondero ever received a loan in lieu of
4  additional current compensation?
5     A.    Besides his -- his assertions to me,
6  I've seen no written documentation, no.
7     Q.    And, in fact, the audited financial
8  statements that we looked at did, in fact,
9  disclose the loans that were forgiven to the
10  individuals that you spoke with, correct?
11       MR. AIGEN:  Objection, form.
12     A.    Yes.
13     Q.    There was nothing in any of the
14  audited financial statements that we saw that
15  showed that any loan was ever given to Mr. Dondero
16  that was forgiven, correct?
17     A.    In the Highland financials we looked
18  at -- and I guess when that was asked before, I
19  had the caveat around the affiliated companies,
20  but in the Highland financials that we went
21  through, there was nothing disclosed of that.
22     Q.    Highland -- does the practice of other
23  entities in terms -- is that -- withdrawn.
24        When you described the practice, are
25  you describing the practice of firms or entities

ALAN JOHNSON

1  or affiliates other than Highland?
2     A.    Well, I -- in this case, everything is
3  kind of inter -- intertwined here, so when I talk
4  about loans, the loan could have potentially come
5  from an affiliate or some other organization since
6  these all were co-owned.
7        So we went through the Highland thing,
8  so the loans to Mr. Dondero could have been made
9  by -- potentially could have been made by an
10  affiliate or some other entity.
11     Q.    Do you have knowledge of any affiliate
12  ever forgiving any loan to Mr. Dondero?
13     A.    I do not.
14     Q.    Do you have knowledge of any affiliate
15  ever forgiving in whole or in part any loan to
16  anyone in the world?
17       MR. AIGEN:  Objection, form.
18     A.    I -- I don't have any knowledge of
19  that either.
20     Q.    And your report does not depend in any
21  way, sir, on whether or not affiliates forgave
22  loans to any of its employees, correct?
23       MR. AIGEN:  Objection to form.
24     A.    That's correct.
25

ALAN JOHNSON

1
2     Q.    Looking at the last sentence, there's
3  a reference to company practice.
4        Do you see that?
5     A.    Yes.
6     Q.    That company practice would not
7  include the forgiveness of any loans from the year
8  2009 until the end of 2018, correct?
9     A.    None -- none of those would have
10  been -- none of those were disclosed in the
11  financials we looked at.
12       MR. MORRIS:  Can we go to page 6,
13  please?
14     Q.    Yeah, I'm looking at the first
15  sentence of the second bullet point:  I understand
16  from Mr. Dondero that the 2018 loans that are the
17  subject of the suit were modified by an agreement
18  in late 2018 or early 2019 under which the loans
19  would be forgiven upon the sale and over cost of
20  substantially of any of three portfolio companies.
21        Have I generally categorized that
22  statement correctly?
23     A.    Yes.
24     Q.    Based on everything that we've talked
25  about and looked at today, are you confident that

ALAN JOHNSON

1  that sentence is accurate?
2     A.    Yes.
3        Withdrawn.
4        Based on everything we've talked about
5  and looked at today, are you confident that
6  Mr. Dondero accurately disclosed to you the
7  subject of this agreement?
8       MR. AIGEN:  Objection, form.
9     A.    I'm sorry, could you repeat that?
10     Q.    Sure.
11        Mr. Dondero told you that the 2018
12  loans were the subject of a modification
13  agreement, correct?
14     A.    Yes.
15     Q.    Would you stake your professional
16  reputation on the accuracy of what he told you?
17       MR. AIGEN:  Objection, form.
18     A.    I -- I heard him clearly.  I can't
19  vouch for his word, but he told me -- what is
20  written there is what -- is what he told me
21  happened.  And I asked that question.
22     Q.    I appreciate that.
23        So --
24     A.    I wasn't finished.  I'm sorry.
25     Q.    I apologize.

Page 210

ALAN JOHNSON

1
2    A.   So I asked that question, you know,
3  pretty specifically, so that -- I understood that
4  that's what he said.
5        And I'm sorry to interrupt you.  I'm
6  sorry.  Go ahead.
7    Q.   That's okay.
8        So what you've reported in this
9  sentence is what you were told.  Is that fair?
10    A.   Yes, I was told by Mr. Dondero about
11  the modification of the loans.
12    Q.   And you don't have any information or
13  evidence to support that statement other than what
14  he told you, correct?
15    A.   I've seen no other document, no.
16    Q.   Does the absence of documentation
17  cause you to question the reliability of what
18  Mr. Dondero told you as described in that
19  sentence?
20    A.   Well, as I testified before, I think
21  it certainly would bring it into question, but as
22  I testified before, I have other clients that
23  don't document important things as well.  So it
24  would certainly -- not the lack of documentation
25  would bring it into question, but that doesn't

Page 211

ALAN JOHNSON

1
2  mean it's not -- it's not true.
3    Q.   Would the lack of disclosure to the
4  bankruptcy also call it into question --
5        MR. AIGEN:  Objection to form.
6    Q.   -- in your opinion?
7    A.   Certainly, as I testified before,
8  people often in chaotic situations don't do the
9  things that are even to their advantage.
10        So certainly that raised -- that
11  raises questions about, again, did he disclose
12  things that may have been even to his advantage in
13  a bankruptcy situation.
14    Q.   Would the existence of the agreement
15  be called into question if you assumed that the
16  decision maker never told anybody in the world
17  that he or she had entered into the agreement on
18  behalf of the company?
19        MR. AIGEN:  Objection, form.
20    A.   Certainly.  The lack of disclosure is
21  a reasonable question to ask, Why didn't you
22  disclose?
23        But as I've said a couple times now,
24  that I've got private clients that over time have
25  not disclosed things, and as I testified earlier,

Page 212

ALAN JOHNSON

1
2  I admonish them to write things down and disclose
3  them, and they often don't.
4    Q.   Looking back at the document on the
5  screen, the next-to-the-last sentence of that
6  paragraph says, "Based on interviews from prior
7  employees, the use of forgivable loans was a known
8  business practice at Highland, and there was a
9  clear expectation similar loans would be
10  forgiven."
11        Do you see that?
12    A.   Yes.
13    Q.   Okay.
14        The prior employees are the four
15  people we talked about before, right?
16    A.   Yes.
17    Q.   And they told you about the four loans
18  that they had that were forgiven in whole or in
19  part, correct?
20    A.   And I would answer that, yes, they
21  said it, and Mr. Dondero mentioned it as well.
22    Q.   And they told that there was a use of
23  forgivable loans as a nonbusiness practice at
24  Highland, right?
25    A.   Yes.

Page 213

ALAN JOHNSON

1
2    Q.   They didn't mention any other entity,
3  correct?
4    A.   That, I don't remember.  I don't
5  believe so.
6    Q.   You wrote Highland, right?
7    A.   Yes.
8    Q.   And you haven't seen any documents
9  that support the known business practice that they
10  described for you, correct?
11    A.   I have seen no written documentation,
12  no.
13    Q.   When you referred to a "clear
14  expectation," whose expectation are you referring
15  to?
16    A.   The recipient of the loan, that's what
17  I was referring to.
18    Q.   And when you used the phrase "similar
19  loans," do you mean similar to the ones that were
20  forgiven by the four employees -- the four former
21  employees that you interviewed?
22    A.   I meant just that there was a loan of
23  a significant period of time and it would be
24  forgiven over time.  That's what I would be trying to
25  get at there.

ALAN JOHNSON

1
2     Q.   Now that you have seen -- withdrawn.
3          Now that I have shown you the
4     demonstrative exhibit that reflects payments by
5     Mr. Dondero against 5 different promissory notes
6     in the 12-month period between December '18 and
7     December '19, do you believe that he had a clear
8     expectation that his loans would be forgiven?
9          MR. AIGEN:  Objection, form.
10        A.   I -- I don't -- I don't -- he hasn't
11    told me what his expectation -- I don't -- I would
12    just be speculating about what his expectations
13    were.
14        Q.   Well, paying -- paying more than
15    $23 million in a 12-month period is inconsistent
16    with any expectation that the loans would be
17    forgiven.
18        Would you give me that?
19        MR. AIGEN:  Objection, form.
20        A.   Well, I think I testified before that
21    you could forgive -- you could make payments
22    against the loan if you thought the probability of
23    achieving the goals were not highly likely and/or
24    the company needed the money.
25        So on a private situation, such as

ALAN JOHNSON

1
2     this, Mr. Dondero rationally could have said to
3     himself, I'll repay the loans because the company
4     needs the money and/or the odds of selling one of
5     these three assets in a reasonably timely manner
6     may be unlikely, but I'm just speculating on what
7     he -- he may have thought.
8         Q.   Okay.
9         MR. MORRIS:  Can we go to page 16,
10    please?
11        Q.   Just to finish this up, in the middle,
12    it says, "It is my opinion that the loans provided
13    to Mr. Dondero should be considered potential
14    deferred compensation as they were similar to
15    loans given to other professionals at the firm."
16        Have I read that correctly?
17        A.   Yes.
18        Q.   After our questions today and looking
19    at the documents is that still your opinion?
20        A.   Well, I think it goes back to what
21    Mr. Dondero told me.  If what Mr. Dondero told me
22    is accurate, it -- his statement continues to be
23    true, that these loans were intended to be
24    forgiven, and that that would have been similar to
25    the other four executives that I interviewed.

ALAN JOHNSON

1
2     Q.   So that sentence and your opinion is
3     dependent 100 percent on the accuracy of what
4     Mr. Dondero told you, correct?
5         A.   If Mr. Dondero, you know, was
6     inaccurate, then that sentence will be inaccurate
7     as well.
8         Q.   And is there anything that we looked
9     at today, like the financial statements or the
10    payment history for the 12-month period from
11    December 2018 to December 2019, that calls you to
12    question the accuracy of what he told you?
13        A.   I don't -- I don't -- I believe it
14    still could very well be true, so I don't -- I
15    don't -- I don't believe that -- I don't believe I
16    would have changed that sentence based on what
17    I've heard today.
18        Q.   Your report refers in several places
19    to a founder's premium.
20        Do I have that phrased right?
21        A.   Yes.  Yes, it does.
22        Q.   What's a founder's premium?
23        A.   In many or most financial services
24    companies, founders get paid more than comparable
25    executives elsewhere.  They're the face of the

ALAN JOHNSON

1
2     firm.  They have an unusual stature in the
3     industry and so forth.
4         So when you look at large or outsized
5     pay packages, they're often delivered to founders
6     of similar financial firms.
7         Q.   Have you done any analysis to
8     determine what the founder's premium would be in
9     this case?
10        A.   I have not.
11        Q.   You're not offering any opinion as to
12    what the founder's premium should be, correct?
13        A.   I have not done that work, no.
14        Q.   You haven't attempted to quantify what
15    the founder's premium is, correct?
16        A.   Again, I haven't done that work.
17        Q.   Is there a particular reason why you
18    didn't attempt to quantify or analyze the
19    founder's premium that you referred to in your
20    report?
21        A.   Well, when I wrote the report in May,
22    I didn't have available some of the things we've
23    talked about today, I just didn't feel that that
24    was appropriate.
25        So I took what I thought was a

Page 218

ALAN JOHNSON

1 conservative view of what the market rate with him
2 would be, and then it could obviously be
3 supplemented at some future point with additional
4 information or facts.
5     Q.    But as you sit here today, you haven't
6 done any analysis to try to update your report to
7 quantify a founder's premium, correct?
8     A.    I have not.
9         MR. MORRIS:  Can we go to page 19 of
10 Mr. Johnson's report.
11    Q.    Right there at the top, you've got
12 Exhibit C.  That's Mr. Dondero's actual
13 compensation for the period 2013 to 2019.
14        Do I have that right?
15    A.    Yes.
16    Q.    Why did you use that seven-year
17 period?
18    A.    It was after the financial crisis.  It
19 seemed more stability in the business.  It seemed
20 like a reasonable period to look at.
21    Q.    Is there any – is the decision to use
22 the seven-year period from 2018 to 2019 a
23 subjective decision that you made on your own?
24    A.    To be – I don't remember.

Page 219

ALAN JOHNSON

1     Q.    Is it fair to say that somebody else
2 might differ with you and apply either a 4-year
3 period, for example, or a 10-year period?
4     A.    Reasonable people might have a
5 different point of view, yes.
6     Q.    Did you rely on any particular
7 methodology or industry study in reaching your
8 decision to use a seven-year period?
9     A.    No.
10    Q.    Is there any article that you're aware
11 of or any presentation anybody has ever made
12 whereby they – they suggested that when doing an
13 analysis of this type, one ought to the use a
14 seven-year look-back period?
15    A.    I – I don't – I'm not aware of
16 any – any study like that.
17    Q.    And the reason that the timeline is
18 important, of course, is it because you're just
19 multiplying the difference between Mr. Dondero's
20 compensation as reflected in this chart –
21 withdrawn.
22        The reason why the time period is
23 important, because you're taking the average of
24 Mr. Dondero's annual compensation during the

Page 220

ALAN JOHNSON

1 seven-year period and comparing it with the
2 average for your comps and multiplying it by
3 seven, correct?
4     A.    Well, I'm looking at his average pay
5 over the period.  I wanted a long enough period to
6 be representative and looking at what the market
7 rate would have been over that period, so yes, you
8 arithmetically will come up with a difference over
9 that period.
10    Q.    And your difference is $21 million,
11 right?
12    A.    Yes.
13    Q.    And your difference is $21 million
14 because you compared Mr. Dondero's average of
15 $3 million with what you determined to be the
16 industry average of $6 million, you took the
17 difference of 3 and multiplied it by the 7 years
18 and you got to $21 million, correct?
19    A.    In simple fashion, that's right.
20    Q.    Is there any other fashion in which my
21 description of what you did is incorrect?
22    A.    No.  I think that's accurate, but the
23 point was that he had been underpaid from a W-2
24 perspective during this period and, you know,

Page 221

ALAN JOHNSON

1 the – anyway, that was the point.
2     Q.    And if a reasonable mind decided that,
3 you know, the look-back period should be a bit
4 shorter, only 5 years, then the delta would only
5 be $15 million, right?
6     A.    Assuming the same facts, the 3 million
7 and the 6 million, that's right.
8     Q.    And if somebody thought it ought to be
9 10 years, then the delta would be $30 million,
10 right?
11    A.    It could be, but I don't know what his
12 pay was prior to 2013.  Maybe that wouldn't be
13 accurate.  But yes, assuming the facts are the
14 same, that would be – that would be accurate.
15    Q.    Okay.  But one of the three factors –
16 so there are 3 factors in the $21 million.  It's
17 Mr. Dondero's average compensation during the
18 7-year period, correct?
19    A.    Yes.
20    Q.    And it's the industry average as
21 you've determined for the seven-year period,
22 correct?
23    A.    Well, just to be picky, it's not the
24 industry average.  It's what I think the market

Page 222

ALAN JOHNSON

1         ALAN JOHNSON
2  was for his particular role, which was 6 million,
3  but yes, it's 3 million and 6 million.
4     Q.   Thank you.  Thank you for the
5  clarification.
6         And then the third factor in reaching
7  the $21 million is multiplying the difference
8  between those first two numbers by 7, correct?
9     A.   Exactly.
10     Q.   And you determined to use 7, correct?
11     A.   Yes.
12     Q.   And you made that determination based
13  on your subjective judgment, correct?
14     A.   Yes.
15     Q.   And you're not aware of any -- any
16  guideline, any analysis, any peer-reviewed
17  article, any presentation, anything in the world
18  that caused you to select 7 years.  You just based
19  that on your own experience.  Is that fair?
20     A.   That's fair.
21     Q.   Okay.
22         So if you look at the chart, you've
23  got three different line items.  The first is
24  "Highland Capital Management W-2 Income," correct?
25     A.   Yes.

Page 223

1         ALAN JOHNSON
2     Q.   Okay.
3         And why did you decide that this
4  analysis should incorporate Mr. Dondero's Highland
5  Capital Management W-2 income?
6     A.   That is his reported employee
7  compensation.
8     Q.   The next line relates to NexPoint
9  Residential Trust W-2 income.
10         Do you see that?
11     A.   Yes.
12     Q.   You've only included income for 2018.
13         Do I have that right?
14     A.   That's right.
15     Q.   Why did you decide that it was
16  appropriate to include NexPoint Residential Trust
17  W-2 income in your analysis?
18     A.   It was a W-2.  I think he was paid as
19  an employee, and that should be recognized here.
20     Q.   And how come you only disclosed the
21  income for 2018?
22     A.   That's the only one we have W-2 for.
23     Q.   Okay.
24         How about NexPoint Advisors' W-2
25  income, why did you decide to include that in this

Page 224

1         ALAN JOHNSON
2  analysis?
3     A.   Again, it was employee income.
4         These businesses are so intertwined
5  that I included his pay for, you now, his
6  activities at NexPoint.
7     Q.   Okay.
8         And did you not go back prior to 2016
9  because you didn't have any W-2 income for that
10  entity?
11     A.   Didn't have a W-2 income.
12     Q.   Do you know if Mr. Dondero received
13  any other W-2 income from any other
14  Highland-related affiliate?
15     A.   We were not -- I was not aware that
16  there was any others.
17     Q.   If you were aware of other W-2 income
18  that Mr. Dondero received from a Highland
19  affiliate, would you have included it in this
20  analysis?
21     A.   I would have included it, yes.
22         MR. MORRIS:  Okay.  Let's go down to
23  page 21, and if we can go to the bottom of
24  the page.
25     Q.   All right.  So correct me if I'm wrong

Page 225

1         ALAN JOHNSON
2  here, but what I think you did is you went and did
3  some research and you tried to identify executives
4  who had similar responsibilities to Mr. Dondero --
5  Mr. Dondero and you reviewed what information was
6  in the public domain to try to ascertain what
7  their total compensation was for each of the years
8  2013 through 2019.
9         Is that generally correct?
10     A.   Yes, that's generally correct.
11     Q.   And looking at this chart, this chart
12  at the bottom of page 21 only relates to 2019.
13         Do I have that right?
14     A.   Yes.
15     Q.   And you have one, two, three, four,
16  five, six, seven comps.
17         Do I have that right?
18     A.   Yes.
19     Q.   And the first portion of the analysis
20  shows the total base salary cash bonus for the
21  total amount of total cash that was paid to each
22  executive by their employer in 2019.  Is that
23  right?
24     A.   That's right.
25     Q.   Now, Mr. Dondero received

Page 226

ALAN JOHNSON

1  substantially more cash than any of these
2  executives in 2019, correct?
3     A.   I don't recall his actual cash in
4  2019.  That, I don't know, sitting here.
5     Q.   And then the next part of the analysis
6  relates to stock options and restricted shares.
7  Let's take them one at a time.
8        What are stock options for purposes of
9  your analysis?
10    A.   It's the value of a – of an award
11 made, and this is their disclosed value of the
12 ability to exercise a – a – an option to
13 purchase the company's stock at a fixed price.  So
14 if on the day of grant the company is trading at
15 $25, you're granted options to purchase the stock
16 at $25.
17       You don't have to exercise.  The stock
18 increases in value at some point within a 10-year
19 period, you can exercise those options and realize
20 a gain.
21       The numbers shown here reflect their
22 disclosed value in their proxy statement, so use
23 Black-Scholes or some other method to value the
24 prospective value of these options.

Page 227

ALAN JOHNSON

1     Q.   In your expert opinion, is it
2  appropriate to include the value of the stock
3  options when trying to assess the total
4  compensation of an executive comparable to
5  Mr. Dondero?
6     A.   Yes, it would be.
7     Q.   Did you ask Mr. Dondero or anybody
8  acting on his behalf whether he ever received any
9  stock options of any kind?
10    A.   I did not.
11    Q.   So is it fair to say that your
12 analysis does not take into account the value of
13 any stock options that Mr. Dondero may have
14 received?
15    A.   I was not aware that he received any,
16 so it would not have included it, no.
17    Q.   And nobody told you that he received
18 any, correct?
19    A.   No.
20    Q.   And you didn't ask, correct?
21    A.   I don't recall whether I asked or not,
22 but I didn't see it anyway.
23    Q.   The next column relates to restricted
24 shares.

Page 228

ALAN JOHNSON

1     Do you see that?
2     A.   Yes.
3     Q.   What are restricted shares?
4     A.   It's the grant of shares with time
5  vesting.  So you receive $100,000 worth of stock
6  in the company, and then that vests over, say, a
7  3- or 4-year period.  So it's a fixed number of
8  shares that vest on the passage of time.
9     Q.   And in your professional and expert
10 opinion, do you believe that the value of
11 restricted shares should be considered when
12 assessing the total compensation received by
13 executives comparable to Mr. Dondero?
14    A.   Yes.
15    Q.   Did you ask Mr. Dondero or anybody
16 acting on his behalf whether he had ever received
17 restricted shares during the 7-year period you
18 were analyzing?
19    A.   I don't recall asking that, no.
20    Q.   Did Mr. Dondero or anybody on his
21 behalf ever disclose to you any restricted shares
22 that Mr. Dondero may have received?
23    A.   I'm not aware that he received any.
24 No one told me anything about it.

Page 229

ALAN JOHNSON

1     Q.   So is it fair to say that your
2  analysis does not take into account any restricted
3  shares that Mr. Dondero may have received during
4  the 7-year period of your – of your analysis?
5     A.   Well, he would have if either options
6  were the restricted shares.  If they had turned
7  into actual shares, they would have shown up in
8  his W-2.
9        So if there were things that didn't
10 show up in his W-2, then yes, I would have been
11 unaware of it.
12    Q.   Okay.
13       And is the total long term just the
14 addition really of the stock options and the
15 restricted shares?
16    A.   Yes.
17    Q.   Okay.
18       All right.  So let's look at a few
19 more documents.  I'm almost done here.
20       MR. MORRIS:  Can we go back up to the
21 page with Mr. Dondero's chart, 19.
22       Yeah, there we go.
23    Q.   Okay.  So you included the NexPoint
24 Residential Trust W-2 income, correct?

Page 230

1          ALAN JOHNSON
2      A.   Yes.
3      Q.   And the only reason that you limited
4  yourself to 2018 is because you hadn't found any
5  W-2 income related to that entity during your
6  diligence, right?
7      A.   That's right.
8          MR. MORRIS:  Can we please put up
9  what's been marked as Exhibit 67.
10         (Exhibit 67, 2019 W-2 , was marked for
11         identification at this time.)
12  BY MR. MORRIS:
13     Q.   Do you see that this is a 2019 W-2
14  made out to Mr. Dondero from NexPoint Residential
15  Trust, Inc.?
16     A.   Yes, yes.
17     Q.   Okay.  And if we go to the bottom of
18  the page, do you see it says, "Expert No. 1"?
19     A.   Yes, I see that.
20     Q.   This is, in fact, a document that was
21  provided to you before you completed your report,
22  right?
23     A.   I believe that that appears to be
24  right.
25         MR. MORRIS:  Okay.  Let's go back to

Page 231

1          ALAN JOHNSON
2  the top of the document.
3      Q.   Do you see that Mr. Dondero had W-2
4  income in 2019 of approximately $1.5 million?
5      A.   Yes, I believe that's right.
6      Q.   Okay.
7          So for consistency, your report should
8  be amended -- the chart on paragraph 19 should be
9  amended to include the number that's in box 1 of
10  the W-2 under W-2 income from NexPoint Residential
11  Trust in 2019; correct?
12     A.   If I've missed it, then it should be
13  included, yes.
14         MR. MORRIS:  Can we go -- can we put
15  up Exhibit 67-2?
16         (Exhibit 67-2, 2017 W-2 , was marked
17         for identification at this time.)
18  BY MR. MORRIS:
19     Q.   Do you see that this is a 2017 W-2
20  issued by NexPoint Residential Trust, Inc. to
21  Mr. Dondero?
22     A.   Yes.
23         MR. MORRIS:  Can we go to the bottom
24  of the page?
25         Can we just see the Bates number?

Page 232

1          ALAN JOHNSON
2          Oh, hold on, I know what I have to do.
3          Yeah, there you go.
4      Q.   Do you see that it's Bates stamped
5  page 937?
6      A.   Yes, I see that.
7      Q.   Does that indicate that that document
8  was provided to you before you completed your
9  report?
10     A.   I don't know what the Bates number
11  means, but I see the 937.
12     Q.   Well, I'll represent to you, sir, that
13  if we went to page 25 of your report, this
14  document would be listed among those that you were
15  given before you completed your report.
16         MR. MORRIS:  Can we go back up to the
17         top of the document?
18     Q.   Do you see in Box No. 1, it discloses
19  wages of approximately $625,000?
20     A.   Yes, I see that.
21     Q.   And that's the corrected information,
22  right?
23     A.   Yes.
24     Q.   Okay.
25         So looking at this now, in order to be

Page 233

1          ALAN JOHNSON
2  consistent, that $625,000 should have been
3  included in your report in the chart on page 19,
4  correct?
5      A.   I believe that's right.
6      Q.   Okay.
7          So those two entries alone are
8  approximately $2.5 million, or more than
9  10 percent of the $21 million difference that you
10  calculated, correct?
11     A.   Yes, I believe that's right.
12     Q.   Okay.
13         MR. MORRIS:  Can we please put up
14  Exhibit No. 68?
15         (Exhibit 68, compensation and benefit
16         statement for 2016, was marked for
17         identification at this time.)
18  BY MR. MORRIS:
19     Q.   Okay.  So what's on the screen, sir,
20  is a compensation and benefit statement that I
21  will represent to you was prepared by Highland in
22  the ordinary course of its business for years for
23  every employee -- I think for every employee in
24  the organization.
25         And if we go down to the bottom, you

Page 234

ALAN JOHNSON

1   can see that this document was produced to
2   Mr. Dondero's lawyers previously.
3        And if we can scroll back up, do you
4   see that there's reference in the middle to a 2016
5   deferred compensation award?
6        MR. AIGEN:  Hey, John, I think you
7   tried to scroll down to show the Bates
8   label, but I don't think it went far enough.
9        I just want to write down what the
10  Bates label was so I can have it for my
11  records.
12       MR. MORRIS:  Sure.
13       MR. AIGEN:  Or if you can read it into
14  the record, that will work, too.
15       MR. MORRIS:  Sure.
16       It's D-CNL003585.
17       MR. AIGEN:  Thank you.
18   Q.   And do you see that he's got total
19  compensation listed there of $2.3 million?
20   A.   Yes, I see that.
21   Q.   Okay.
22        Do you see that there's a reference to
23  a deferred compensation award?
24   A.   Yes.

Page 235

ALAN JOHNSON

1   Q.   And that award of $1.2 million relates
2   to 50,000 restricted stock units of NXRT.
3        Do you see that?
4   A.   Yes.
5   Q.   And you testified earlier that
6   restricted stock is something that should be taken
7   into account when assessing the total compensation
8   of an executive, correct?
9   A.   Yes.
10  Q.   And NXRT, do you know what that symbol
11  represents?
12  A.   I don't think I've seen that symbol.
13  Q.   Okay.  If I represented to you that it
14  is the symbol for the NexPoint Residential Trust
15  that we were just looking at -- the W-2s that we
16  were just looking at, do you think that this
17  $1.2 million should be taken into account in
18  Mr. Dondero's 2016 total compensation since it is
19  restricted stock units that were given to him in
20  that year?
21  A.   I'd certainly have to consider that,
22  yes.
23  Q.   Okay.
24       But you weren't given this

Page 236

ALAN JOHNSON

1   information, correct?
2   A.   I don't think I've seen this.
3   Q.   Okay.
4        MR. MORRIS:  Can we please go to
5   Exhibit 50, 5-0.
6        (Exhibit 50, compensation and benefit
7        statement for 2017, was marked for
8        identification at this time.)
9   BY MR. MORRIS:
10  Q.   I'll represent to you that this is
11  Mr. Dondero's compensation and benefit statement
12  for 2017.
13       Do you see there's another reference
14  to approximately $1.55 million in restricted stock
15  units that were granted to him for the 2017
16  performance year?
17  A.   Yes, I see that.
18  Q.   And nobody told you that Mr. Dondero
19  had received any stock options prior to today,
20  correct -- withdrawn.
21       Nobody told you that Mr. Dondero had
22  received restricted stock units of NXRT before
23  today, correct?
24  A.   I was not aware of this when I wrote

Page 237

ALAN JOHNSON

1   my report, no.
2   Q.   You would have -- this number --
3   withdrawn.
4        MR. MORRIS:  Can we go to the bottom
5   of the page, please?
6        Just for the record, this is document
7   with Bates No. D-CNL003587.
8        And if you can scroll back up.
9   Q.   If Mr. Dondero received restricted
10  stock units of NexPoint Residential Trust in 2017
11  for the performance -- for his performance during
12  that year in an amount of $1.55 million that's --
13  that's compensation that you would have included
14  in your report had you known about it at the time,
15  correct?
16  A.   Probably would have, yes.
17       MR. MORRIS:  Okay.  Can we go to
18  Exhibit 51, please.
19       (Exhibit 51, compensation and benefit
20       statement for 2018, was marked for
21       identification at this time.)
22       MR. MORRIS:  Okay.  This is
23  Mr. Dondero's compensation and benefits
24  statement for 2018.

Page 238

ALAN JOHNSON

1
2     If we can go to the bottom.
3     And it has Bates No. D-CNL003588.
4     And if we can scroll back up, please.
5   BY MR. MORRIS:
6     Q.   According to this compensation and
7   benefits statement, Mr. Dondero received almost
8   $1.7 million in restricted stock units of NXRT for
9   the 2018 performance year.
10     Do you see that?
11   A.   Yes, I do.
12     Q.   Were you told that Mr. Dondero
13   received restricted stock units of NXRT for the
14   2018 performance year?
15   A.   I was not aware of that.
16     Q.   Had you known that prior to issuing
17   your report, would you have included that in your
18   assessment of Mr. Dondero's total compensation for
19   the year 2018?
20   A.   I would have looked at those awards,
21   yes.
22     MR. MORRIS:  Let's go to Exhibit 52,
23   please.
24     (Exhibit 52, compensation and benefits
25   statement for 2019, was marked for

Page 239

ALAN JOHNSON

1
2   identification at this time.)
3   BY MR. MORRIS:
4     Q.   And when you say you would have looked
5   at the awards, if you assume that they are
6   restricted stock units of NexPoint Residential
7   Trust, is there any basis on which you would not
8   have included those restricted – the value those
9   restricted stock units in an analysis of
10   Mr. Dondero's total compensation, just as you did
11   for the other executives that are your comps?
12   A.   I want to know what the terms of the
13   awards were.  I don't know how NXRT was valued, so
14   I would want to – more information about – this
15   is as employee statement, so I don't know how
16   accurate it would be, but I would certainly – if
17   I'd have been aware of this, would certainly want
18   to consider what those awards were worth, you
19   know, what a comparable like-to-like comparison
20   would be.
21     Q.   Okay.
22     The next document that we have on the
23   screen is Exhibit 52, which is Mr. Dondero's
24   compensation and benefits statement for 2019.
25     And if we go to the bottom, we will

Page 240

ALAN JOHNSON

1
2   see it has Bates No. D-CNL003589.
3     Do you see that, sir?
4   A.   Yes.
5     Q.   And if we scroll back up, you'll see
6   that Mr. Dondero received in 2019 a deferred
7   compensation award of approximately $5.6 million
8   in the form of various grants of what appear to be
9   stock?
10   A.   Yes, the number on the page is 5
11   million 6, yes.
12     Q.   And you weren't told that Mr. Dondero
13   had received any grants of stock as part of a
14   deferred compensation award in 2019, correct?
15   A.   I was not aware of that, no.
16     Q.   But had you – had you known about the
17   deferred compensation award, you certainly would
18   have asked the questions, right?
19   A.   I would have asked questions, yes.
20     Q.   And is it fair to say as you sit here
21   right now that just as you included the restricted
22   stock and the stock options in your comps, you
23   would have included this $5.6 million in your
24   analysis of Mr. Dondero's 2019 compensation?
25     MR. AIGEN:  Objection, form.

Page 241

ALAN JOHNSON

1
2   A.   I – I don't know what amount of the 5
3   million 6.  I think, as I said before, I'd want to
4   know more about these entities and what – what –
5   you know, how they were valued and so forth, but
6   I'd certainly want to be aware of it in coming up
7   with an aggregated figure for its compensation.
8     Q.   As you sit here right now, based on
9   the documents we've looked at so far, your
10   $21 million is subject to some questions.  Is that
11   fair?
12   A.   It's fair.  Certainly, the cash
13   amounts that he was paid should be added back, and
14   then we have these series of deferred comp awards
15   that I'd have to consider how do we include some
16   or all of it value.
17     Q.   But you weren't told about any of
18   these awards before you prepared your report,
19   correct?
20   A.   I was not aware of them.
21     Q.   And you don't have any information as
22   you sit here today that you're aware of that
23   relates to any of these awards except what I'm
24   showing you, right?
25   A.   I'm not aware of the terms of these

**Appx. 02018**

Page 242

ALAN JOHNSON

1     awards, no.
2          MR. MORRIS:  Okay.  Let's go to
3     Exhibit 67-3, which is Mr. Dondero's 2013
4     Form 1040.
5          (Exhibit 67-3, 2013 Form 1040, was
6     marked for identification at this time.)
7          MR. MORRIS:  And if we can go to PDF
8     page 279 of 335.
9     BY MR. MORRIS:
10         Q.   Do you see you received Mr. Dondero's
11    Forms 1040 for the period 2013 through I think
12    either 2019 or 2020, right?
13         A.   Yes, I believe so.
14         Q.   Did you take the time to look at the
15    statements supporting his 1040s that relate to
16    wages received?
17         A.   I went through it, yes.
18         Q.   Do you see on statement 12 there's a
19    reference to Highland Capital Management PTE LTD?
20         A.   I'm sorry, where are we on the page?
21         Q.   We're looking at the top.  It's
22    statement 12.
23         A.   Okay.
24         Q.   Okay.

Page 243

ALAN JOHNSON

1          And do you see there's a reference to
2     Highland Capital Management PTE LTD?
3          A.   I see that, yes.
4          Q.   Do you have any idea what that entity
5     is?
6          A.   I don't -- I don't know.
7          Q.   Have you ever heard of it before?
8          A.   I don't believe so.
9          Q.   In your review of Mr. Dondero's tax
10    returns, did you ever notice that he had received
11    W-2 income from that firm?
12         A.   If I looked at it, I don't recall.
13         Q.   Based on the name of the entity by
14    itself, is it fair to conclude in the absence of
15    contrary information that any W-2 income he
16    received from an entity called Highland Capital
17    Management PTE LTD should have been included in
18    your report?
19         MR. AIGEN:  Objection, form.
20         A.   That -- that, I don't know.  That, I
21    don't know.
22         Q.   All right.  Mr. Johnson, I'm going to,
23    you know, save us all the pain and tell you that
24    if we looked at Mr. Dondero's Forms 1040 for the

Page 244

ALAN JOHNSON

1     period from 2013 to 2019, Mr. Dondero reported
2     receiving W-2 income from Highland Capital
3     Management PTE LTD in every single year.
4          And I will also represent to you that
5     the aggregate amount of those payments were
6     approximately a half a million dollars, and that
7     if we added up the value of the payment -- the W-2
8     payments from Highland Capital Management PTE LTD,
9     along with the NexPoint Residential Trust W-2
10    income that we looked at, along with the value of
11    the stock options, that we would come up with a
12    number in excess of $13 million, with that
13    representation, how comfortable are you that your
14    $21 million accurately states the difference
15    between what Mr. Dondero received in the 7-year
16    period from 2013 through 2019 and what he would
17    have received if he had received the comparable
18    market compensation for similarly situated
19    executives?
20         MR. AIGEN:  Objection, form.
21         A.   I think you pointed out some
22    adjustments that would need to be made.  I think,
23    as I testified before, I would need to go back and
24    look at the value of those awards.

Page 245

ALAN JOHNSON

1          I think of the $8 million you referred
2     to, I think about 5 or 6 million was made in the
3     year of bankruptcy, which I would certainly put
4     probably, in the work we do, put a question mark
5     next to, but you certainly pointed out some
6     omissions that should be included.
7          So the $21 million analysis would
8     certainly look like it would get somewhat smaller,
9     but I would -- sitting here, the 8 million you
10    mentioned, that looks like about 4 or 5 million
11    was a deferred comp award made in the year of
12    bankruptcy, which I'd probably put a question mark
13    around.
14         But it does look like, to some degree,
15    the $21 million difference that I've calculated
16    would be reduced.
17         Q.   Have you done any analysis to
18    determine whether or not Mr. Dondero passed
19    through any personal expenses through the
20    business?
21         A.   That, I don't know.
22         Q.   Is that something that you would
23    consider if you had the information available, you
24    know, whether or not he passed personal expenses

Page 246

ALAN JOHNSON

1
2 on through the business?
3     A.   Well, it should be -- it should be
4 disclosed in his W-2, if he's -- if he's filling
5 out a W-2 or other income, but if it wasn't
6 reported on his taxes or there's a W-2, I wouldn't
7 know about it.
8     Q.   I appreciate that you wouldn't know
9 about it.
10         I'm just asking you if you were trying
11 to assess the value that Mr. Dondero received from
12 serving as Highland's CEO, would you take into
13 account, if you had the information available and
14 you could quantify it, the value of any personal
15 expenses that -- that he ran through the business?
16     A.   I would be reluctant to do that just
17 because many private business owners do a similar
18 thing, so it would not be fair to Mr. Dondero or
19 any other executive in his position to only do one
20 side of that trade.
21         So if I said $6 million was the
22 appropriate level that many private business
23 owners do similar things, so if there's something
24 particularly unusual, I might want to be aware of
25 it, but if it was the normal course of what

Page 247

ALAN JOHNSON

1
2 business owners often do, I probably wouldn't
3 include it.
4     Q.   Your comparable individuals in 2019,
5 are those CEOs of public companies?
6     A.   The real comparison here, the
7 $6 million figure, is primarily not CEOs of public
8 companies.  The small asset management companies
9 that we list are not -- neither paid that high in
10 the roles, as we say in the report, are
11 meaningfully different.
12         I think the real reference point is
13 people who manage similar assets mostly in the
14 private domain.  So I think many of those CEOs,
15 founders, owners, would -- the issue we're talking
16 about, would pass on allegedly personal expenses
17 through the business.
18     Q.   How about -- we talked about this a
19 little bit earlier.
20         You're aware that Highland doesn't
21 have an ownership interest in HCRE or Highland
22 Capital Management Fund Advisors or NexPoint or
23 Highland Capital Management Service, right?
24     A.   I'm sorry, are you saying Highland
25 doesn't have an ownership interest?

Page 248

ALAN JOHNSON

1
2         Is that what you're saying?  I just
3 want to make sure I heard correctly.
4     Q.   Yes.
5     A.   I believe that's true yes.
6     Q.   And you're also aware that Mr. Dondero
7 directly or indirectly owns at least the majority
8 interest in each of these four entities, right?
9     A.   I'm aware of the NexPoint and
10 Advisors.  The real estate, I'm not sure I've ever
11 heard about the ownership, but certainly, at least
12 several of those, he's the controlling or sole
13 owner.
14     Q.   Are you aware that -- that Highland
15 Capital Management -- withdrawn.
16         Are you aware that Highland provided
17 services to Highland Capital Fund Advisor as
18 NexPoint pursuant to certain shared services
19 agreements?
20     A.   I was aware of that.
21     Q.   And are you aware that until sometime
22 in late 2020, HCMFA and NexPoint made payments to
23 Highland in exchange for those services?
24     A.   I think I was aware of that, yes.
25     Q.   Are you aware that when Mr. Dondero

Page 249

ALAN JOHNSON

1
2 was in control, Highland also provided services to
3 Highland Capital Management Services, Inc. as well
4 as HCRE Partners, LLC?
5     A.   I think I was aware of that as well.
6     Q.   And were you aware that neither of
7 those entities had any shared services agreement
8 with Highland?
9     A.   That, I'm not sure I was aware of.
10     Q.   Are you aware that neither of those
11 entities ever provided any cash payment to
12 Highland for services rendered?
13     A.   I have no knowledge of that.
14     Q.   Is it fair to say that your analysis
15 doesn't take into account the value that HCRE and
16 HCMS received by getting services from Highland
17 without paying for them?
18         MR. AIGEN:  Objection, form.
19     A.   I am not familiar with what services
20 they received, so I don't -- I don't know how to
21 handle that.
22     Q.   Let's assume that HCMS and HCRE
23 received back-office services similar to what
24 HCMFA and NexPoint contracted and paid for.  Okay?
25         Can we -- can we make that assumption?

Page 250

ALAN JOHNSON

1
2    A.   Okay.
3    Q.   Okay.
4         And let's assume that neither of those
5    entities, HCRE or HCMS, ever paid any money to
6    Highland in exchange for those services.  Okay?
7    A.   Okay.
8    Q.   As the person in control of those
9    entities, do you think it would be appropriate to
10   try to quantify the benefit that Mr. Dondero
11   received through his ownership of HCRE and HCMS as
12   a result of Highland's providing services to those
13   entities without compensation?
14        MR. AIGEN:  Objection, form.
15   A.   At a high level, I think if Highland
16   was providing meaningful services that had value
17   to those entities and Highland wasn't getting
18   something back in return, you would want to try to
19   understand how big that was.
20   Q.   Okay.
21        But that's not an issue that you
22   analyzed, correct?
23   A.   It is not.
24   Q.   And your $21 million delta doesn't
25   take into account that issue at all, correct?

Page 251

ALAN JOHNSON

1
2    A.   It does not take that into account,
3    no.
4    Q.   And you didn't do any diligence to try
5    to determine whether or not Highland had provided
6    services without receiving payment in return with
7    respect to HCMS and HCRE, correct?
8    A.   I did no such analysis.
9    Q.   Okay.
10        MR. MORRIS:  Can we take -- it's 2:45.
11   Let's take a 5-minute break, a short break.
12   I may be done.
13        (Recess taken from 2:45 p.m. until
14   2:50 p.m.)
15        MR. MORRIS:  I have no further
16   questions of this witness at this time.
17        Thank you very much, Mr. Johnson, for
18   your time and your patience.
19        THE WITNESS:  Thank you, and also say
20   hi to Laura Johnson for me.
21        MR. MORRIS:  I sure will.  I'm sure
22   I'll be speaking to her this afternoon.
23        MR. AIGEN:  Alan, you're not
24   completely done yet.  I have one or two
25   questions I wanted to ask you, just to clear

Page 252

ALAN JOHNSON

1
2    something up.
3         THE WITNESS:  Okay.
4    EXAMINATION
5    BY MR. AIGEN:
6    Q.   You talked about the founder's premium
7    earlier.
8         Can you just again explain what that
9    means?
10   A.   Founder's premium in a private firm
11   like this is the amount that a founder typically
12   gets paid in excess of what a non-founder or
13   ordinary executive gets paid.
14   Q.   And I know you don't have a specific
15   number but do you have an opinion on what the
16   general founder's premium would be in this
17   marketplace?
18        MR. MORRIS:  Objection to the form of
19   the question.
20   A.   A premium could be very significant.
21   It could be two or even three times what the --
22   what a typical executive might get paid.
23   Q.   And what's that based on?
24   A.   Just working with these
25   founder-dominated firms, they often get paid an

Page 253

ALAN JOHNSON

1
2    awful lot for -- for the role they play.
3         MR. AIGEN:  That's all I have.
4         MR. MORRIS:  Just a couple of
5    questions, Mr. Johnson.
6    EXAMINATION (CONTINUED)
7    BY MR. MORRIS:
8    Q.   You didn't make any disclosure
9    concerning a founder's premium, correct?
10   A.   No, I have not done that work.
11   Q.   You did not conduct any analysis
12   concerning a founder's premium, correct?
13   A.   I have not.
14        MR. AIGEN:  Object to form.
15   Q.   And your report contains no opinion as
16   to what you believe the founder's premium should
17   be in this case, correct?
18   A.   That is correct.
19        MR. MORRIS:  Okay.  No further
20   questions.  Thank you very much.
21        THE WITNESS:  Thank you.
22        MR. MORRIS:  Have a good day.  Take
23   care all.
24        (Whereupon the proceedings were
25   concluded at 2:53 p.m.)

Appx. 02021

Page 254

```
1
2                      oOo
3          I, ALAN JOHNSON, the witness herein,
4    do hereby certify that the foregoing
5    testimony of the pages of this deposition to
6    be a true and correct transcript, subject to
7    the corrections, if any, shown on the
8    attached page.
9          _____
10               ALAN JOHNSON
11   Subscribed and sworn to before me this
12   _____day of _____,_____.
13
14   _____
15
16
17
18
19
20
21
22
23
24
25
```

Page 255

```
1
2                  CERTIFICATE
3          I, AMY A. RIVERA, a Certified Shorthand
4    Reporter, Registered Professional Reporter,
5    Certified LiveNote Reporter, and Notary Public of
6    the State of New York, do hereby certify that prior
7    to the commencement of the examination ALAN JOHNSON,
8    was duly sworn by me to testify the truth, the whole
9    truth and nothing but the truth.
10         I DO FURTHER CERTIFY that the foregoing is
11   a true and accurate transcript of the testimony as
12   taken stenographically by and before me at the time,
13   place and on the date hereinbefore set forth.
14         I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.
20   _____
21         Notary Public of the State of New York
22         My commission expires December 6, 2021
23         License No. XI00939
24   Dated:  November 2, 2021
25
```

Page 256

```
1
2                    INDEX
3    WITNESS                        PAGE
4    ALAN JOHNSON
5    By Mr. Morris              6, 253
6    By Mr. Aigen               252
7
8
9              EXHIBITS
10   NUMBER         DESCRIPTION      PAGE
11   Exhibit 34     Highland's audited    166
12               financial statements
13               for December 31, 2018
14   Exhibit 50     Compensation and      236
15               benefit statement for
16               2017
17   Exhibit 51     Compensation and      237
18               benefit statement for
19               2018
20   Exhibit 52     Compensation and      239
21               benefits statement for
22               2019
23   Exhibit 62     Expert report      76
24
25
```

Page 257

```
1
2              EXHIBITS (Continued)
3    NUMBER          DESCRIPTION       PAGE
4    Exhibit 63     Highland's 2008 audited  119
5               financial statements
6    Exhibit 64     Highland's audited    123
7               financial statements
8               for December 31, 2009
9    Exhibit 65     Highland's audited    126
10               financial statements
11               for December 31, 2010
12   Exhibit 67     2019 W-2          230
13   Exhibit 67-2   2017 W-2          231
14   Exhibit 67-3   2013 Form 1040    242
15   Exhibit 68     Compensation and      233
16               benefit statement for
17               2016
18   Exhibit 69     Highland's audited    129
19               financial statements
20               for December 31, 2014
21   Exhibit 70     Highland's audited    133
22               financial statements
23               for December 31, 2015
24   Exhibit 73     Demonstrative      193
25
```

Appx. 02022

Page 258

1

2  ERRATA SHEET FOR THE TRANSCRIPT OF:

3  Case Name:  In Re:  HIGHLAND CAPITAL MANAGEMENT,

4          L.P.

5  Dep. Date:  November 2, 2021

6  Deponent:   Alan Johnson

7  Reason codes:

8      1. To clarify the record.

       2. To conform to the facts.

9      3. To correct transcription errors.

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20

21              _____

22              ALAN JOHNSON

23      Subscribed and sworn to before me

24      this    day of            2021.

25      _____

## $

**$1.2** 235:2,18
**$1.5** 231:4
**$1.55** 236:15 237:13
**$1.7** 238:8
**$100** 46:10,14 158:21
**$100,000** 228:6
**$13** 137:10,17 244:13
**$13.3** 137:19
**$14** 195:7
**$14-and-a-half** 153:18
**$14.5** 166:5
**$14.8** 142:2,14
**$14.9** 142:19 152:9, 18 177:16 194:21
**$15** 221:6
**$173** 169:24
**$173.4** 167:11 168:13 173:19 174:19
**$174** 167:23
**$2.3** 234:20
**$2.5** 233:8
**$20** 197:17 201:20,22
**$21** 160:25 220:11, 14,19 221:10 222:7 233:9 241:10 244:15 245:8,16 250:24
**$22.8** 154:21
**$23** 138:11 214:15
**$23-and-a-half** 200:19 201:10,12 202:2,15 203:25
**$23.4** 144:16,21 145:2
**$23.6** 145:11
**$23.7** 197:5
**$24.143** 201:6
**$25** 226:16,17

**$29.2** 178:3
**$29.4** 177:21 185:2 186:3
**$3** 160:15,25 220:16
**$3.3** 197:9
**$3.4** 197:9
**$30** 158:25 159:9 188:16,19 221:10
**$30.7** 158:7,16
**$300,000** 122:13 123:11 124:5
**$330,000** 122:17 124:8 126:23
**$371** 173:15
**$400,000** 121:3,13, 24 123:9 152:21
**$5** 46:10
**$5.6** 240:7,23
**$50** 17:3,8 50:12,19, 24 51:24 117:7 173:9 185:14
**$500,000** 97:2,5 117:3 121:17 122:2, 22 123:3 125:14 191:16
**$6** 50:6,9 160:21 220:17 246:21 247:7
**$6.1** 134:15
**$625,000** 232:19 233:2
**$677,000** 201:9
**$7.4** 182:12
**$7.9** 195:12 198:15, 23
**$700,000** 122:11
**$73** 171:3,16
**$74** 172:17
**$783,000** 198:6
**$8** 245:2
**$8.1** 138:15

## 1

**1** 108:12 121:2,16,24 122:21 125:13 184:9 192:11 230:18 231:9 232:18
**10** 83:20 97:11,15 221:10 233:9
**10-minute** 73:21
**10-year** 219:4 226:19
**100** 117:17 167:18 216:3
**1040** 242:5,6,12 243:25
**1040s** 161:7 242:16
**10:27** 74:3
**10:40** 73:22 74:4
**11** 83:20 106:16 107:11 108:7
**12** 83:20 128:23 242:19,23
**12-month** 214:6,15 216:10
**13** 83:20 128:24
**13-minute** 73:23
**14** 80:6
**14.5** 153:5 177:19
**14.9** 153:5 177:18
**143** 87:23
**15** 80:6 82:25 137:9, 25 169:5 181:25
**15th** 123:2
**16** 77:2 115:16 197:21 215:9
**17** 171:25 198:23
**174** 168:18
**18** 16:16 171:25 183:25 195:11,15 196:11 197:8 198:10, 22 199:15 201:13,25 204:15 214:6
**18-'19** 201:18

**19** 7:12 16:16 80:7 171:25 174:5 183:25 195:15 196:12 201:21,25 214:7 218:10 229:22 231:8 233:3
**1:02** 192:15
**1:30** 192:12
**1:32** 192:16 193:3

## 2

**2** 108:15 122:2,5
**2.75** 154:16
**20** 11:20,21,25 46:11 124:8
**2007** 122:6
**2008** 83:19 107:2 108:13,25 119:13,14, 25 120:22 121:11 122:9,17 123:8 124:5,7,8,19 125:13 147:9,13,15,18 191:23 192:5
**2009** 123:17,22 125:10,22 126:10 190:7 191:11 208:8
**2010** 126:13,16 128:11,16
**2011** 128:23
**2013** 7:20 218:14 221:13 225:8 242:4, 6,12 244:2,17
**2014** 80:5 82:25 129:10,14,17 130:19 131:8,14,18 132:6,22 137:8,25 138:14
**2015** 133:4,7,10,17 136:3,14 137:17
**2016** 139:21,25 142:3,14 144:16 145:9 146:25 152:8, 14 153:6 224:8 233:16 234:5 235:19
**2017** 134:20 148:4,10 150:25 152:22 153:2, 5,19 154:10 158:5

163:15,18 164:5 165:24 195:14 196:11 197:8 200:17 231:16,19 236:8,13, 16 237:11
**2018** 7:12 15:9,11 27:9 42:10 92:14 98:23 103:2 108:19 120:3 166:8,13,20 167:23 171:16,22 172:9,10,18,23 174:5 177:11,16,20 178:8 180:19 181:25 183:24 184:23 185:25 186:23 195:6, 11,13 198:10 199:4, 15,21 200:18 201:14, 25 202:13 204:7,15 208:8,16,18 209:11 216:11 218:23 223:12,21 230:4 237:21,25 238:9,14, 19
**2019** 7:20 15:11 27:9 82:25 92:15 98:24 103:2 108:13,20 171:23 172:11,24 182:12 183:4 184:5,9 186:19 197:16,22 198:16 199:14 200:18 201:14 202:13 204:8 208:18 216:11 218:14,23 225:8,12,22 226:3,5 230:10,13 231:4,11 238:25 239:24 240:6, 14,24 242:13 244:2, 17 247:4
**2020** 242:13 248:22
**2021** 77:8 79:14,20 83:14 88:10 89:17
**20th** 122:17 124:5
**21** 122:5 204:16 224:23 225:12
**22** 204:16
**23** 197:21 198:16 199:14 201:14 202:2, 15 204:17
**24** 201:17
**25** 77:19 232:13

**27** 130:8,12 133:22

**279** 242:9

**28** 77:8 83:14 88:10 89:17 175:12

**28th** 79:9,14,20

**29** 134:6

**2:45** 251:10,13

**2:50** 251:14

**3**

**3** 103:17 108:18 122:4 184:4,9 205:3 220:18 221:7,17 222:3

**3-** 228:8

**30** 5:17 18:22 68:17 122:9 148:5,17 182:15

**30-year** 18:23,24 59:17,25 149:24 150:13

**30.7** 158:10

**31** 123:17,21 126:16 129:14 133:10 134:20 139:25 140:7 148:10 154:10 158:5 166:13,20 177:11 183:24

**319,000** 199:5

**33** 123:25 126:19 193:18

**335** 242:9

**34** 166:10,12

**370-day** 201:13

**38** 120:13,14,15 181:24

**39** 182:6

**4**

**4** 245:11

**4-year** 219:3 228:8

**40** 17:3,8 117:7,9 173:8 185:14

**5**

**5** 89:19 200:20 202:15 204:3 214:5 221:5 240:10 241:2 245:3, 11

**5-0** 236:6

**5-minute** 251:11

**50** 11:22,25 12:2 117:10 236:6,7

**50,000** 235:3

**51** 237:19,20

**52** 238:22,24 239:23

**6**

**6** 172:7 208:12 221:8 222:2,3 240:11 241:3 245:3

**60** 192:13

**62** 76:20,24 205:2

**63** 119:12,14

**64** 123:15,16

**65** 126:14,15

**66** 128:19 129:8

**67** 230:9,10

**67-2** 231:15,16

**67-3** 242:4,6

**68** 233:14,15

**69** 129:10,13

**7**

**7** 50:10 160:15 220:18 222:8,10,18

**7-year** 221:19 228:18 229:5 244:16

**7.9** 198:18

**7/31/06** 121:24

**70** 133:7,9 193:12,13

**73** 193:13,14

**8**

**8** 97:11,15 245:10

**8/1/08** 122:2

**80** 117:17

**9**

**9** 83:20

**90** 91:19 192:13

**90s** 10:19

**937** 232:5,11

**A**

**a.m.** 74:3,4

**ability** 25:11 38:20 47:10 226:13

**absence** 210:16 243:15

**absolutely** 14:5,8,12 42:7 51:14 70:15 128:25 162:7 163:10, 13 169:21 171:14 173:3 187:21

**acceleration** 7:14

**accept** 129:4

**access** 53:20 65:22 161:25

**accomplishment** 31:16

**accomplishments** 31:24 43:11,16

**accord** 82:16

**account** 161:8,13 163:6 174:24 180:17 227:13 229:3 235:8, 18 246:13 249:15 250:25 251:2

**accounting** 182:22

**accrue** 154:15

**accumulated** 7:17

**accuracy** 202:11

209:16 216:3,12

**accurate** 78:19 185:6 194:11 205:22 209:2 215:22 220:23 221:14,15 239:16

**accurately** 209:6 244:15

**achieve** 60:4

**achieved** 24:6 64:15

**achievement** 62:11, 18

**achieving** 44:23 163:12 214:23

**acknowledged** 81:19

**act** 29:14

**acted** 93:4

**acting** 29:10 83:7 187:3 227:9 228:17

**activities** 224:6

**actual** 23:8 218:13 226:4 229:8

**actualized** 23:4

**actualizing** 23:22

**add** 177:18 201:24

**added** 241:13 244:8

**addition** 101:5 229:15

**additional** 22:18 88:12 104:3 105:5, 17,25 106:5,25 109:10 112:12 113:22 195:7 205:11 206:4 218:4

**Additionally** 115:21

**address** 112:22

**adequate** 30:20

**adjustments** 244:23

**Adkins** 95:2,20,21 96:5,7

**admissible** 5:15

**admonish** 212:2

**advantage** 13:13 211:9,12

**advice** 11:16 12:5,14 13:3 28:9,13 29:5 30:9,14,24 34:17 40:17,20 54:23 58:6 61:5 69:23 70:7 71:8, 19 139:5

**advise** 30:17 34:22 35:4 38:11 39:4,11 41:24 43:3,20 44:4 47:16 51:15 52:19 53:23 54:10 55:11,14 57:19 58:5,23 60:25 62:5,21 63:16 64:8 65:12 66:3,22 68:9, 13 69:11,18 70:2,4 156:21 168:7 187:14

**advised** 11:2,6 55:4, 9 70:23 187:19

**advising** 69:8 71:6 168:6 187:9,10,12

**Advisor** 248:17

**Advisors** 78:6 130:16 134:11 136:6 140:23 148:23 157:23 247:22 248:10

**Advisors'** 223:24

**affiliate** 19:11,25 90:5 94:21 95:14 117:24 134:24 140:13 166:23 192:7 207:6,11,12,15 224:14,19

**affiliated** 56:12 124:13 126:5 130:11 160:4 161:10,18 162:2 206:19

**affiliates** 22:3 75:16 118:3 120:23 134:9 140:10 148:20 156:3, 9 157:6 164:4 167:8, 12,14,20,22 168:19 169:7 170:12 173:19 174:18 175:14 185:6, 9,12,19,20 190:12 207:2,22

**afternoon** 193:5 251:22

**aggregate** 16:23
17:17 60:19 65:13
117:15 137:10
138:10 142:2 158:15
182:11 244:6

**aggregated** 241:7

**agree** 29:15 33:18
36:13,23 41:4,24
60:8,18 67:10 69:4
112:10 123:7 128:8,
14 136:22 159:2
161:23 190:5 191:7

**agreed** 134:24
139:16 149:18
150:18 151:4,14
153:10,24 155:3
164:8,17 165:3,13
175:22 176:6,12,17
178:16 179:13

**agreeing** 34:15 36:2
40:14 42:25 46:13
49:16 59:2 68:5
173:6

**agreement** 15:10,22,
23 16:2,4,9,14,21,24
17:21 19:6,10,14,20,
24 20:5,10,15,17,19,
21,23 21:4,7,13,25
22:7,13 23:19 24:5,
12 25:2,8 26:12 27:8,
14 28:3 31:5,7,10,13
32:11 39:14 42:9
44:8,12,14 45:8 46:2,
9,11 47:25 50:17
53:25 55:8,22 56:7,
10 57:10 61:13,19,24
62:6 63:24 65:11
66:10,24 68:11 69:12
70:9,12,17,24 71:5
73:9 83:9 92:14
93:17,25 94:2 98:23
99:7,20 100:2
101:14,21 102:25
103:14 111:7 113:11
117:8,16 139:7
155:8,12 156:24
169:17,25 171:21
172:10,13,23 178:25
179:9,16 180:19
181:10 183:4,5
188:22 189:3 196:13
200:2 203:2,10
204:18,22 208:17

209:7,13 211:14,17
249:7

**agreements** 17:12
69:17,19,24 70:21
72:7 78:6,15 138:19
187:15 248:19

**agrees** 32:21

**ahead** 210:6

**Aigen** 5:24 28:7
67:17,25 107:15
109:12 111:11,20
118:7 135:22 147:10
150:6 156:11 157:14
160:6 161:12 162:3
168:16 169:8 170:2
174:25 178:11
180:13,22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
234:7,14,18 240:25
243:20 244:21
249:18 250:14
251:23

**Alan** 5:1 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1 100:1
101:1 102:1 103:1

104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1,23

**alleged** 22:7,13
103:14

**allegedly** 247:16

**altered** 18:8

**alternative** 11:7

**amend** 80:9 89:11
107:3

**amended** 18:6 77:10
231:8,9

**amortization** 149:25

**amount** 31:22 33:6
43:9 48:18 52:13,15,
17 55:14 56:3,4 59:6
61:2 73:13 81:12
92:7 97:2 116:23
121:13,17 122:6,13
123:9,10 124:5,8
125:4,14,17 131:21
135:11,13 137:10,11,
16 138:11 142:2,18
145:2,10 147:24
152:21 153:4 174:18
175:13 182:11
195:11 198:19
199:14 201:6,16
225:21 237:13 241:2
244:6

**amounts** 17:25 44:3
55:25 58:21 60:23
96:19,21 97:4 109:16
134:20 140:10
147:14 148:19 156:3
157:12 164:3 167:8,
12 169:7 173:18
174:17 175:14
185:16 195:20
241:13

**Amy** 5:4

**analysis** 16:19 17:18
145:25 146:5 160:19
171:16 217:7 218:7
219:14 222:16 223:4,
17 224:2,20 225:19
226:6,10 227:13
229:3,5 239:9 240:24
245:8,18 249:14
251:8

**analyze** 217:18

**analyzed** 250:22

**analyzing** 228:19

**and/or** 203:21 214:23
215:4

**annual** 219:25

**alternative** 11:7

**answering** 196:20

**apologize** 26:10
31:8 74:15 82:7 96:2,
6 148:6 181:20
193:13 209:25

**appeared** 190:8,14

**appears** 178:12
191:18,25 230:23

**applied** 43:18
105:11,19 198:8
199:3,5,14,15,19

**applies** 56:10

**apply** 219:3

**approximately**
91:14 154:21 160:15
184:25 197:5 198:6
200:19 202:12,14
203:25 231:4 232:19
233:8 236:15 240:7
244:7

**approximates** 135:6
149:4 176:25

**approximating**
152:3

**April** 75:2

**arbitration** 174:8

**area** 9:3 14:4 28:18
66:21

**areas** 12:15 30:25

**arithmetic** 200:24

**arithmetically** 220:9

**arm's** 10:10

**article** 219:11 222:17

**ascertain** 225:6

**aspect** 79:15 98:7
150:19

**assertion** 100:3

**assertions** 206:5

**assess** 45:4 62:19
63:5,14,25 64:5,6,9,
21 100:21,23 101:9
156:6 227:4 246:11

**assessing** 228:13
235:8

**assessment** 43:4 44:16 45:19 47:3 48:12 102:13 238:18

**asset** 11:2 46:16 247:8

**assets** 28:2 42:11,21 43:22 44:7,10 46:8,9, 10,24 47:20 48:8 93:18 94:3 169:6 173:13 215:5 247:13

**assignment** 100:18, 22,25 101:4,7

**association** 5:5

**assume** 53:15,17,19 66:13 67:21 107:11 108:7 109:7 116:12 120:6 144:24 145:4, 7,12,15,18,22 150:4 158:2,22 194:15 202:10 239:5 249:22 250:4

**assumed** 211:15

**assumes** 173:17 174:15,16

**assuming** 55:13 153:6 221:7,14

**assumption** 108:12, 15,18,21 129:5 145:3 249:25

**assumptions** 109:4, 8,18 173:20 174:20

**asterisk** 199:7

**attached** 28:24 31:17

**attempt** 51:16 161:20 217:18

**attempted** 217:14

**attempting** 39:6 52:22

**attention** 18:17

**attorney** 6:17

**attorneys** 21:4 52:8 99:16

**attributable** 171:2

**audit** 40:4 185:25 186:24

**audited** 83:19 108:23 119:13,14 120:4,22 123:16,21 126:3,15 128:25 129:13,18,24 133:9,16 139:22 142:12 147:18 148:9, 17 152:15 155:21 157:4 158:6,14 166:8,12,19 177:10 179:24 181:8,25 183:7,22 184:23 185:2 186:6 190:2 191:8 206:7,14

**auditors** 84:3 181:10,16 182:16

**August** 121:16 122:17,21 124:5,8 125:13

**authored** 84:7

**average** 50:6 219:24 220:3,5,15,17 221:18,21,25

**avoid** 51:5 139:3,11

**award** 174:8 226:11 234:6,24 235:2 240:7,14,17 245:12

**awards** 238:20 239:5,13,18 241:14, 18,23 242:2 244:25

**aware** 15:23 18:12 32:17 33:10,15,24 71:22 79:3,6 83:25 84:5,8 99:18 110:4,7 112:6,8 117:5,25 134:23 135:2 143:23 144:2,15 162:16 167:24 168:2,22 174:7,9,11 180:6,17 186:12,18 188:2 190:18,25 199:23 200:3 219:11,16 222:15 224:15,17 227:16 228:24 236:25 238:15 239:17 240:15 241:6, 20,22,25 246:24 247:20 248:6,9,14, 16,20,21,24,25 249:5,6,9,10

**aways** 25:24

---

### B

**back** 10:14 25:9,21, 24 65:19 71:4 73:22 83:6 92:5 107:2 108:20,25 110:20,25 112:9,11 113:9,21 143:23 153:15 155:17,23 172:5 173:11 194:21 204:25 212:4 215:20 224:8 229:21 230:25 232:16 234:4 237:9 238:4 240:5 241:13 244:24 250:18

**back-office** 249:23

**bad** 188:10

**balance** 40:4 42:3 61:16 62:13,15 132:25 139:3 166:25 167:3,11 173:12,22 174:2,21 175:7 198:15

**bank** 83:11 90:16,17 194:5

**banker** 187:25

**bankrupt** 188:15

**bankruptcies** 188:9

**bankruptcy** 106:17 107:12 109:11 171:2 186:13,14,16,18 187:3,10,14 188:2 190:21 204:10,11 211:4,13 245:4,13

**base** 225:20

**based** 10:14 22:18 29:15 45:8 47:6 67:11 116:5 126:7 127:10,14 136:20 159:23 160:2,19 161:4 184:23 190:6 191:7,14,20 192:2 200:21 208:24 209:4 212:6 216:16 222:12, 18 241:8 243:14

**basic** 31:18 40:16,23 41:5 43:6 44:9 58:3 60:15

**basis** 109:9 112:25 146:15 239:7

**Bates** 231:25 232:4, 10 234:8,11,17 237:8 238:3 240:2

**beginning** 156:18

**begins** 130:12

**behalf** 6:6 21:10,11 29:10,14,17 30:4 83:7 85:2 93:4 103:15 156:9 172:23 173:7 187:3 194:6 211:18 227:9 228:17, 22

**behaviors** 33:4,8

**believed** 16:4 186:21

**believes** 66:8

**believing** 203:20

**beneficiaries** 145:17

**beneficiary** 55:8,22 145:19

**benefit** 156:23 158:22 161:9,17,24 162:10,14 168:9,15 187:25 233:15,20 236:7,12 237:20 250:10

**benefited** 159:7 162:4,5

**benefits** 237:24 238:7,24 239:24

**bet** 9:9

**big** 13:20 250:19

**bit** 15:4 39:24 72:24 79:12 113:5 221:4 247:19

**Black-scholes** 226:24

**blue** 52:12

**board** 11:16,21 12:4 13:9 29:20,23

**boards** 12:7,11,12

**body** 30:3

**basis** (see basis above)

**bonus** 225:20

**book** 135:14,15

**books** 44:11 72:8

**boring** 166:3

**borrowed** 46:5 185:9 195:6

**borrower** 136:25 137:4 203:19

**borrowing** 185:12

**bottom** 77:4 130:12 167:6 170:24 171:3 224:23 225:12 230:17 231:23 233:25 237:5 238:2 239:25

**box** 157:24 231:9 232:18

**break** 73:21,23 74:7, 12 184:20 189:23 192:12 193:8 251:11

**bring** 210:21,25

**broad** 52:25 58:2 92:11,12

**broke** 88:13

**bullet** 208:15

**bunch** 17:12 189:16

**business** 12:17 24:14,17,24 25:12,23 33:11 36:18 37:6 38:19 39:22 40:25 41:12 46:19,22 48:10 54:8 114:20 193:25 212:8 213:9 218:20 233:22 245:21 246:2, 15,17,22 247:2,17

**businesses** 168:20 170:5 224:4

---

### C

**calculated** 161:4 233:10 245:16

**calculus** 44:23

**call** 42:15,20 90:24 91:12 193:22 211:4

**called** 114:16 120:23 130:11 132:2,16 156:2 211:15 243:17

**calling** 22:19

**calls** 90:25 91:2,8 216:11

**candid** 93:10

**CANTY** 76:18 129:10 133:7 163:18 166:10

**capacity** 188:16

**capital** 5:21 6:18 75:15 78:5 79:24 85:11 114:19 129:18 130:16 132:17 134:11 138:14 139:18,23 148:22 151:9 160:5 161:10, 14,18,25 162:5,6,12 163:11 165:8,15 173:14,17 174:14,23 176:18 190:17,20 222:24 223:5 242:20 243:3,17 244:3,9 247:22,23 248:15,17 249:3

**career** 10:16 73:2

**carried** 167:11

**carrying** 135:6,12 149:4 152:4 176:25

**case** 5:19 43:19 73:16 74:17,25 75:12,16,20 76:3 84:6,15,22 85:18,21 90:14 100:7 119:8 135:15 183:12 185:13 207:3 217:9

**cash** 40:5 225:20,21 226:2,4 241:12 249:11

**catalog** 70:14

**catch** 79:11

**categories** 80:14 92:12

**categorized** 208:21

**caused** 222:18

**caveat** 52:24,25 55:24 73:13 78:19

**Civil** 5:18

**clarification** 222:5

**clarity** 37:20

**clear** 6:14 8:9 26:11 37:5,11 38:7 41:21 151:25 212:9 213:13 214:7 251:25

**client** 14:23 39:8,11 44:4 55:4,9,11,14 58:23 60:25 68:9 181:9 187:9,14,20

**clients** 11:11 13:4,25 14:16 28:19 33:25 37:14 47:21 68:13 69:18 70:5 181:5,15 189:7,19 210:22 211:24

**closely** 119:3

**closer** 47:8

**co-founder** 143:12

**co-owned** 207:7

**codifying** 92:25

**colleague** 91:11 95:9

**collect** 188:19

**column** 194:25 196:24 198:5 199:2,8 201:6,19 227:24

**combined** 149:22 150:13 158:9

**comfortable** 10:7 13:25 191:9,15,21 192:4 244:14

**commenced** 72:15 73:5 188:25

**comment** 25:9

**comments** 26:8 95:25 105:13

**committee** 12:4 13:9 29:19,20,24

**committees** 12:12

**common** 69:4,7

**commonly** 45:3

**communicate** 74:10

**communicated** 90:13

**communication** 90:22

**comp** 29:20 45:3 241:14 245:12

**companies** 12:19 15:13 56:12 72:5 115:7 160:5 161:11, 18 162:2 206:19 208:20 216:24 247:5, 8

**company** 29:15,17 32:14 36:6,10 44:3 53:19 61:11,17,20, 23,25 62:4,13 63:13, 21,23 66:12 67:16 68:6 92:22 93:4 102:2 105:9 113:7,12 114:4,14,24 119:8 163:4,11 170:11 172:22 173:2,6 174:7 200:11 203:17,22 208:3,6 211:18 214:24 215:3 226:15 228:7

**company's** 33:13 38:3 53:20 226:14

**comparable** 48:13, 19 49:10,15 51:11,17 52:4,20 64:25 65:23 68:23 102:13 160:20 161:22 216:24 227:5 228:14 239:19 244:18 247:4

**compared** 118:4 220:15

**comparing** 220:2

**comparison** 239:19 247:6

**compensated** 49:10,16 51:11 156:7 157:10

**compensation** 7:19 9:4 10:16,19,23 11:4, 8,17 12:4,15 13:5,9 13:5,9 14:4,15 22:18 23:3,5,8,9,12,13 24:15,19 27:19,25

28:15 29:24 30:5,16 32:10 33:19,20 34:6, 15,24 35:5,7 36:14 38:2,12,22 39:15 40:23 41:5,25 43:2 48:13,19,22 50:20 61:9 62:23 66:16,22 69:11 70:23 72:19 88:9,12,14 94:12 101:6 104:3,12 105:5,18,25 106:6, 18,25 107:6 108:3 109:10 110:21 112:13,17,20,24 113:23 114:6,16 115:2,8,23 116:20 157:16,20 189:2 205:11 206:4 215:14 218:14 219:21,25 221:18 223:7 225:7 227:5 228:13 233:15, 20 234:6,20,24 235:8,19 236:7,12 237:14,20,24 238:6, 18,24 239:10,24 240:7,14,17,24 241:7 244:19 250:13

**competition** 52:23

**complaints** 75:12

**completed** 200:5 230:21 232:8,15

**completely** 93:9 251:24

**completing** 195:23

**complicated** 34:2 69:17

**comports** 150:11

**comps** 220:3 225:16 239:11 240:22

**concept** 14:19 179:19,23 196:5 202:20

**concern** 79:14,20 113:8 116:13 117:17 177:9

**concerns** 129:2 140:22 164:13

**conclude** 109:9 127:10 178:7 243:15

**CEO** 29:25 53:11,24 54:12 65:20 66:20,24 67:24 71:5,9 246:12

**CEOS** 247:5,7,14

**certainty** 44:21

**certified** 5:5

**change** 89:6,10 106:15 107:10,17,25 195:7 199:5

**changed** 23:10 107:7,8 168:23 216:16

**changing** 195:20

**chaos** 188:13

**chaotic** 37:2 41:10 54:19 55:18 188:11 211:8

**characteristic** 23:7

**characteristics** 23:11

**characterization** 22:23

**characterize** 78:2 81:6

**characterized** 20:21 200:21

**chart** 196:10,23 198:4 200:22 202:10, 11,12 219:21 222:22 225:11 229:22 231:8 233:3

**cheat** 147:16

**chief** 85:12

**child** 10:9

**circumstance** 36:11 37:23 41:2,15 47:23 54:17 60:6,17

**circumstances** 26:6,7 30:21 33:16 34:5,10 45:6 47:14 48:3 54:11,16 63:12 102:3 119:5 196:18 203:7

**cell** 10:3

190:4,5 206:19

**concluding** 191:9, 15 192:4

**conclusion** 115:18 146:11 153:2 160:13

**conclusions** 18:8

**condition** 35:10,12, 15,20,25 36:5,9,15, 18,25 37:6,7,12,14 38:4,14,17,19,24 39:2,7,9,13,22 40:24 41:6,11 43:5 44:16 63:8,12,21 66:17 68:21 136:24 137:4 163:9,10 170:10 172:21 173:2,6

**conditions** 22:20 43:22 56:9

**conducted** 95:13 102:24

**confident** 208:25 209:5

**conflicts** 202:20

**confuse** 185:24

**confused** 185:17

**confusion** 188:13

**conjure** 55:20 67:12

**connection** 179:16

**conservative** 218:2

**consideration** 58:8, 25 59:16

**considered** 54:13 89:23 90:3 91:4 114:5 115:22 146:9, 14 157:20 163:13 215:13 228:12

**consistency** 231:7

**consistent** 102:8 105:13 114:4 115:14 147:24 233:2

**consolidated** 7:13 16:15 170:18

**constituted** 56:4

**constructing** 87:18

**consultant** 10:16 189:2

**consultants** 13:16

**consulting** 10:19,23 13:2

**contained** 157:3 194:13

**contemplate** 58:14

**contemplating** 69:9

**contends** 117:8 200:2

**context** 15:18 32:14, 23 33:11 49:2 65:7 155:12,13

**contingency** 42:16

**contingent** 42:16 64:11

**continue** 149:11 154:4 177:13 182:5

**continues** 149:2 215:22

**contracted** 249:24

**contrary** 243:16

**contribution** 155:8, 11 179:8,16

**control** 204:6,12 249:2 250:8

**controlled** 56:23 156:10 157:13 158:23 159:19 167:15,16,17,19

**controlling** 248:12

**controls** 56:13 158:3

**convenient** 189:18

**conversation** 56:17 83:10,12 146:22

**conversations** 56:18

**convoluted** 111:13

**copies** 57:20

**copy** 86:17

**corporate** 19:11,24 117:24 118:3,16,21, 25

**corporations** 119:4

**correct** 10:15,17,24 11:8 27:11,16 28:5 30:11 40:18 61:4 62:23 63:9 65:15 77:16,17 80:10 83:9 85:3 94:6 97:23 101:22 102:4 103:2, 6,15 113:3,18 116:10,11 118:6 120:9 125:10,22 128:11 130:24 131:8, 18,22 132:7,22 133:20 135:17,21 136:3 140:4,5 142:19 144:21 146:19 147:2, 13 148:3,14,15 149:19 150:9,10,15 153:8,12,13 154:2,3 158:16 159:15,20 160:16,22,23 161:5, 11,15,19,22 168:10, 11 169:3 171:23 173:19,24 177:11 178:17 179:4 186:9, 10 190:18 191:3,11, 22,25 196:10,14 197:10,18 201:14 202:17 205:15 206:10,16 207:23,25 208:8 209:13 210:14 212:19 213:3,10 216:4 217:12,15 218:8 220:4,19 221:19,23 222:8,10, 13,24 224:25 225:9, 10 226:3 227:19,21 229:25 231:11 233:4, 10 235:9 236:2,21,24 237:16 240:14 241:19 250:22,25 251:7

**corrected** 232:21

**correctly** 6:22 8:6 11:11 104:6 114:4,9 116:2 127:4 137:20 154:23 185:22 208:22 215:16 248:3

**correspond** 124:6

**corresponds** 124:17

**cost** 15:12 28:3 42:12,21 43:21 46:8, 10,11 47:3,19 208:19

**Cote** 95:2 96:9

**counsel** 5:3 194:8

**count** 201:3

**counted** 200:23

**couple** 16:18 19:2 136:18 162:18,21 194:7 211:23

**court** 5:2,5 187:4,15

**courtroom** 5:16

**cover** 56:21

**covering** 19:6,10,14

**covers** 184:8,12,15

**COVID-19** 5:7

**created** 23:11 145:14

**crisis** 37:3 218:19

**criss-crossed** 8:16

**curious** 111:9,12,13, 14

**current** 14:10 24:18 92:5 104:3 105:5,17, 25 106:6,25 112:13 113:23 205:11 206:4

**customarily** 72:6

**customary** 138:17

**cutoff** 184:14

**cycles** 13:24

**D**

**D-CNL003585** 234:17

**D-CNL003587** 237:8

**D-CNL003588** 238:3

**D-CNL003589** 240:2

**Daniel** 6:5

**data** 13:18 39:18 89:23 91:4

**date** 44:7 46:8,11 75:7 81:13 82:10 84:6 85:13 89:16 108:8,10 111:5,19,23 160:16 182:13,18

**dated** 124:8 177:5 184:4

**dates** 127:7,25 128:4

**day** 156:19 198:24 226:15

**days** 95:18

**deal** 45:13 61:15,16 66:7

**dealing** 13:21 29:25

**Deborah** 6:2

**debtor** 186:13 187:10,13 188:17

**decade** 109:11

**December** 108:20 123:17,21 126:16 129:14 133:10 139:24 148:10 150:25 154:10 166:13,20 171:22 172:18 177:11 183:24 197:21 198:16 199:14 200:18 201:13,14,25 202:13 204:7 214:6,7 216:11

**decide** 67:7 223:3, 15,25

**decided** 221:3

**decides** 29:21

**deciding** 163:6

**decision** 12:13 29:7, 9,11,12,16 30:2,4,9, 14,18,23,25 31:10 32:8,12,18 33:17 34:13,22 35:4,12,24 36:12,23 37:9,16,24 38:11,18,21 39:4 40:11,18 41:3,16,24 43:3,20 44:5,13 45:7 46:13 47:17,24 48:20 49:14 50:11,13 51:4, 6,16 52:3,5,19 53:23 54:8,10,21,25 55:21 57:2,6,8,11,14,19,21 58:4,5,9,15,20 59:14 60:7,17,21 61:7,12,

18,21 62:3,4,6,21
63:8,10,16 64:8,23
65:12 66:3,14,23
67:4,10,13,21,22
68:10,15,18 69:8,11
70:2,23 72:12 73:2,8
93:3,17 98:22
100:14,17 102:24
103:10,13 156:21
163:5 168:6 169:16,
19,22 170:6,8
172:20,25 173:5
211:16 218:22,24
219:9

**decisions** 41:12,14
65:7 188:10 189:7,20

**deduct** 197:14 201:8

**deferred** 23:8 105:10
107:5 108:3 112:17,
19,24 114:6,15,25
115:23 116:20
215:14 234:6,24
240:6,14,17 241:14
245:12

**define** 56:16

**defined** 28:25

**definition** 30:10
80:21 111:21

**degree** 245:15

**Deitsch-perez** 6:3

**delayed** 24:16 27:23
114:17

**delaying** 25:22

**delivered** 217:5

**delta** 221:5,10
250:24

**demand** 18:19 19:3
59:16 60:2 134:19,24
136:22 137:14
154:22

**demanding** 136:17

**demonstrative**
193:14,22 214:4

**department** 52:10
71:22

**depend** 54:16 119:5
138:21 196:18

207:21

**dependent** 216:3

**depending** 47:13

**depends** 66:5 159:5

**deposed** 8:20 100:7

**deposition** 5:11 6:19
18:5 29:7 81:20
82:19 84:6,10,25
85:17,22,24 86:4,12,
13 88:7 89:9 100:10

**depositions** 9:11
153:16

**describe** 13:8 17:10
19:19,23 20:4 28:17
48:14 83:8 92:13
105:18 162:10

**describes** 130:15
164:4,23

**describing** 105:20
206:25

**description** 27:3
109:2 150:23 220:22

**design** 45:2 59:22

**detail** 7:24

**determination**
48:20 222:12

**determine** 65:8,10
115:11 217:8 245:19
251:5

**determined** 220:16
221:22 222:10

**differ** 219:3

**difference** 118:23
160:24 199:13
219:20 220:9,11,14,
18 222:7 233:9
244:15 245:16

**differently** 8:16
146:10

**difficult** 13:21,23,25
37:4 41:11 43:7
44:24 45:19

**difficulty** 32:4 45:4,
17,23 64:14

**dilemma** 153:16

**diligence** 102:24
103:5 230:6 251:4

**direct** 87:2 162:12

**directed** 86:21,24
87:16

**directly** 56:13,22
90:13 248:7

**director** 53:12,16,18,
19 54:2 65:20,25
66:8,14 68:2,6 71:6,
7,12

**directors** 11:16,21
12:4,8,11,12 29:23
71:14

**disappointing**
162:22,24

**disclose** 110:24
181:17 188:6 206:9
211:11,22 212:2
228:22

**disclosed** 79:4
182:25 183:6 191:13
206:21 208:10 209:6
211:25 223:20
226:12,23 246:4

**discloses** 173:23
188:17 232:18

**disclosure** 182:17
188:17,24 211:3,20

**discomfort** 111:16

**discuss** 14:19
110:16 113:15
119:20

**discussed** 16:3
195:18,22

**discussions** 53:10

**dispute** 37:6 39:3
117:13 196:9

**disputed** 110:13

**disputes** 72:20

**distancing** 5:9

**document** 9:16
17:10 40:8 78:12,22
81:10,14 120:7,15
124:2 133:20 148:13
181:6 183:19 193:11,

18,24 194:14 210:15,
23 212:4 230:20
231:2 232:7,14,17
234:2 237:7 239:22

**documentary** 20:9

**documentation**
17:24 18:3,13 21:16,
18,20 79:23 116:13
119:7 206:6 210:16,
24 213:11

**documented** 72:20
127:22 183:11

**documents** 9:13,21
17:6 18:9 19:18,22
20:3,12 21:11 77:22,
25 78:3 79:3,9,13,17,
19 80:8,14,16,19
81:5,17,20,24,25
82:4,5,9,15,17,19,21
83:7,14 88:5,19
89:15 90:4 98:7,10,
13,15 106:11,14
112:3 116:9 118:14,
22 190:12,13 194:9
213:8 215:19 229:20
241:9

**dollar** 60:23 61:2

**dollars** 46:5,7 122:6
244:7

**domain** 225:6 247:14

**Dondero** 6:6 7:10
14:23 15:9,24 16:3
18:15 19:7,20 20:15
21:3,10 22:3,8,13,17
23:21 24:4,13,23
25:3,6,16,25 26:9,20,
24 27:3,7 28:3 56:11,
12,14 75:19 83:6,10
85:20,23 90:5,9 91:2,
9,15 94:9,18 98:23
99:3,6,13,20,23
100:2 101:15 102:7
103:2 104:10,17
105:4,7,12,16,23
106:5,6,9,17 107:14,
22 108:10,13,15,21
109:3,9,25 110:2,17,
24 111:3,17 112:4
113:2,10 115:10,22
116:6 117:6,16
141:25 142:7,13,24
143:12 145:14,19

146:16 151:21 152:9,
17 153:3,12,17
156:7,10 157:9
158:3,22 159:18
160:3,14 161:9,17,24
165:19,23 167:15
171:20 172:8 177:15
178:8,17 180:18
183:3 184:25 185:8,
20,21 187:2 191:22
194:6 195:6,15
196:11 197:15
198:22 199:21,24
200:18 201:5 202:13
203:24 204:6 205:15
206:3,15 207:9,13
208:16 209:6,11
210:10,18 212:21
214:5 215:2,13,21
216:4,5 224:12,18
225:4,5,25 227:6,8,
14 228:14,16,21,23
229:4 230:14 231:3,
21 236:19,22 237:10
238:7,12 240:6,12
244:2,16 245:19
246:11,18 248:6,25
250:10

**Dondero's** 87:17
88:7,9,20 89:9 194:8
195:24 218:13
219:20,25 220:15
221:18 223:4 229:22
234:3 235:19 236:12
237:24 238:18
239:10,23 240:24
242:4,11 243:10,25

**double** 200:23 201:3

**dozen** 70:10,13,18

**dozens** 12:9

**drill** 39:23

**due** 5:7 82:23 108:16
111:5 122:11 131:21
132:25 134:15
135:16,21 137:11
139:13 140:10
144:18 148:19
152:16 154:20 156:3
164:3 167:8,12 169:7
173:18 174:18
175:14 177:19
195:16 198:9 199:20
200:20 204:3

**Dugaboy** 84:17,19, 21 85:2 99:8,23 101:15 144:5,8,12, 16,18,20,23,25 145:9,13,23 146:18, 22,24 154:7,10 155:5 179:8,15

**duly** 6:8

**duties** 54:3 67:15 92:3,6 94:16

**dutiful** 116:12

**duty** 61:10 67:23

---

**E**

**earlier** 27:21 35:16 38:15 41:8 42:5,24 48:23 55:25 60:12 62:9,20 64:16 70:20 90:15 115:5 163:9 170:10 181:4 183:9 202:23 203:3,12 211:25 235:6 247:19

**early** 10:19 15:11 27:9 90:10 92:15 95:5 98:24 103:2 138:24 172:4,11,24 183:4 208:18

**earn** 102:14

**earning** 160:21

**earnings** 160:14

**eastern** 73:22

**effect** 146:6

**elements** 38:22 88:14,25

**Elms** 6:5

**embarrassed** 77:24

**employed** 127:17

**employee** 46:5 55:7 73:4 97:15 121:4,12 122:23 123:3,9 128:16 129:3,7 223:6,19 224:3 233:23 239:15

**employees** 26:14 30:2 34:6 52:23 90:6 94:22 95:14 105:15

115:11 123:10 126:6, 10 130:4 207:23 212:7,14 213:20,21

**employer** 29:10 30:4 40:13 41:7,18 46:6 63:9 168:9,14 169:24 225:22

**employer's** 36:24 63:18 68:20

**employment** 68:20

**enabled** 159:3

**enabling** 44:15

**encompassed** 70:9

**end** 13:19 103:24 121:7,20 122:18,23 123:4 125:4,18 126:4 127:18 130:20 131:21 132:25 134:16 137:11,17 142:17 149:2,9 152:10,22 153:5,19 154:19 167:23 177:20,25 180:2,7 182:24 184:15,24 186:2 201:18 204:8 205:9 208:8

**ended** 138:14

**ending** 133:17 139:24 148:10 154:10 166:20 172:17 177:10 183:23

**ends** 152:2

**endure** 128:22

**engaged** 6:23 74:16, 17,21,24 75:7

**engagement** 75:3,6, 16

**enter** 31:3,10 37:25 38:11 39:5,19 40:14 41:16 45:8 46:2 47:25 48:21 49:16 52:20 55:5 58:15 63:15 66:23 68:10 70:17,24 72:5,12 102:2 173:7

**entered** 21:13 23:18 27:9 46:9 62:7 73:3

92:14 93:17 98:22 99:6,19,25 101:15 102:8 103:14 113:11 169:17 171:21 172:22 180:18 183:3 211:17

**entering** 32:10 35:13 39:13 50:17 51:18 53:25 54:14 55:22 57:4 61:8,20 63:6 64:2,4,7,22 65:11 67:23 68:18,24 69:9 102:25 156:23 169:25

**enters** 67:14

**entire** 10:15 86:17 125:17 132:24

**entirety** 131:20

**entities** 8:16 56:22 89:2 109:15 118:17, 21 157:12 160:18 206:23,25 241:4 248:8 249:7,11 250:5,9,13,17

**entitled** 81:10 155:22 182:2

**entity** 19:16 20:6 119:2 131:25 132:16 158:23 162:23 187:24 188:15 190:21 191:10 207:11 213:2 224:10 230:5 243:5,14,17

**entity's** 35:9,11,25 36:15 38:13,24 39:2, 13 42:2 66:17,18

**entries** 233:7

**entry** 73:9

**equal** 97:2 146:15 157:10

**equaled** 135:20 137:18

**equals** 135:10,15 160:25 173:19

**equity** 12:18

**essentially** 146:13

**estate** 248:10

**event** 27:15 42:17, 19,20 45:9,11 47:4 128:8 180:15 182:23 183:6 184:8

**events** 31:20 32:6 33:12 35:17,21 64:10,15 179:20,23 180:2,5 181:22 182:2,24 184:11

**eventually** 109:19 114:20

**evidence** 20:9 125:8, 21 126:9 147:7 206:2 210:13

**exact** 59:7 97:4 182:21 194:18

**EXAMINATION** 6:11

**exceed** 173:13

**excel** 88:11,13,18,23 89:5,14

**exception** 69:22

**excerpt** 86:18,19,22, 24 87:4,6,11,15 88:7, 20 89:10

**excess** 197:16 244:13

**exchange** 150:25 198:23 248:23 250:6

**exclude** 197:7 200:17

**excluding** 191:21

**exclusively** 105:6

**executed** 89:17

**executive** 9:4 10:16, 18 11:4,7,17 12:15 14:4 28:14 30:5,16 32:23 35:5 36:13 38:2,12 39:14 41:4, 25 48:22 49:17 50:8, 21 51:25 55:7 61:9 65:24 66:4,22 69:10 70:22 72:12 156:23 168:10,15 169:25 187:23 188:6,15,21, 25 203:16,19 225:22 227:5 235:9 246:19

**executive's** 32:9,20

33:19,20 34:14,24 35:7 62:23 66:15 68:20

**executives** 21:14,15 25:19 28:21 33:23 48:13,19 49:10,15 50:2,5 51:11,17 52:4, 20 64:25 65:23 68:23 102:13 104:19,21 113:5 114:14 160:20 161:22 181:11,17 215:25 216:25 225:3 226:3 228:14 239:11 244:20

**exercise** 119:19 226:13,18,20

**exhibit** 76:20,24 81:11 119:12,14 123:14,16 126:14,15 128:19 129:8,13 133:6,9 166:10,12 193:12,14,18,23 205:2 214:4 218:13 230:9,10 231:15,16 233:14,15 236:6,7 237:19,20 238:22,24 239:23 242:4,6

**exist** 37:8 111:23

**existed** 21:20 22:22 102:4 111:19 187:15

**existence** 19:19,23 20:4 21:12 71:10 72:14 83:8,15 211:14

**existing** 81:6

**exists** 16:9 21:25 100:11 101:21

**expect** 189:15

**expectation** 182:23 212:9 213:14 214:8, 11,16

**expectations** 214:12

**expected** 180:20 183:5

**expenses** 145:17 174:10 245:20,25 246:15 247:16

**experience** 13:11,24 28:9,18 49:9 53:16

66:20 67:11 68:17
72:4 103:9,13
127:11,14 136:20
159:24 188:25
222:19

**experienced** 9:12

**experiences** 13:14
95:24

**expert** 6:23 7:3 8:23
9:3 30:24 35:23
70:22 74:21 76:15,20
83:16 89:17 106:22
116:12 118:24
184:10 227:2 228:10
230:18

**expertise** 14:4,7,9
29:16 49:9 66:21
67:12 136:21 159:24
160:3

**experts** 13:17

**explain** 7:23

**explained** 113:20

**explanation** 203:24

**extended** 19:7,11,15
22:3 107:13 139:18
142:24 143:20
146:18 149:19 151:6,
9,16 153:12 154:2
155:5 164:10,14,19
165:5,15 168:9
169:24 175:23 176:7,
13,18 178:17 179:2,
15 192:6

**extent** 58:7,24 62:21
63:7,17 156:17
157:11

**extremist** 54:20
55:17

---

**F**

**face** 66:6 67:8 68:7
135:11,13 216:25

**faced** 174:5

**facets** 72:19

**facilitated** 159:5,8

**fact** 9:2 21:19 27:13

49:4 109:8 110:2
116:25 131:20
132:24 145:24
147:19 155:20
167:25 169:10,15
171:6,9,15 196:10
200:4,16 203:4
206:7,8 230:20

**factor** 157:19 163:5
222:6

**factors** 32:16 51:13
61:16 221:16,17

**facts** 69:6 89:22 91:4
102:3 107:7 108:7
218:5 221:7,14

**fails** 163:5

**failures** 162:15,16

**fair** 10:12 11:24 14:3,
6 20:8 22:20,23
23:14 27:20 29:18
30:6 31:14 32:5
38:10 41:23 42:15
47:2,6 48:14 49:13
51:5,8,10,12,19
52:18 61:13,17,19,
22,24 62:4,7,16
63:18 64:12 65:2
66:7,9,11 67:8 68:3,
5,7 78:2 84:9,13,20,
24 92:6 94:4 100:6,9
101:17 102:14
103:10 109:24
116:23 117:14 118:8
124:16 126:7 132:12
133:2 135:4,10,20
142:9 147:6 149:3
150:4 152:3,25
159:23 160:2 174:13,
22 176:23 178:7
180:12 191:17
197:13 202:19 210:9
219:2 222:19,20
227:12 229:2 240:20
241:11,12 243:15
246:18 249:14

**fairly** 62:18 200:21

**fairness** 62:20 63:5,
14,25 64:6,22 65:8,
10 100:23

**fallible** 69:18

**false** 106:25

**familiar** 14:10 25:21
40:7 57:9,22 65:21
80:13,23,25 117:21
170:20 179:19
182:21 249:19

**familiarity** 38:6
57:25 75:14,18

**fashion** 220:20,21

**fast** 96:2

**fathom** 36:21

**favorable** 187:21
188:4,6

**feasible** 34:19

**features** 7:14 58:3

**February** 171:22

**Federal** 5:18

**feel** 43:14 217:23

**feeling** 45:17 47:6,9

**felt** 62:16

**fiduciary** 54:3

**figure** 41:11 185:6
241:7 247:7

**file** 88:11,13,18,24
89:5,14

**filed** 109:11 186:18

**filing** 106:17 107:12
186:15 204:11

**filling** 246:4

**final** 30:23

**finalized** 184:16

**finance** 71:22 181:15

**financial** 10:23 11:12
12:22 13:4,12,22
35:10,12,15,20,25
36:5,9,15,25 37:3,5,
12,14 38:3,14,24
39:2,7,13,24 40:2,12,
16,24 41:6,18 42:2
49:11 53:17,20 63:8,
18,21,23 65:22
66:17,18 68:21,22
71:23 72:2,7 78:4,14
79:24 80:4 82:9,24

83:19 85:12 88:6,19
101:9 108:24 115:7
119:13,15,25 120:5,
22 123:17,21 126:16
129:2,14,18,25
133:10,16 136:24
137:3 139:23 142:8,
13 147:18 148:9,18
152:15 155:16,21
157:4 158:6,14 163:8
166:13,19 170:10
171:13 172:21 173:6
177:5,10 179:24
180:7,10 181:8
183:7,23 185:3 186:7
190:2 191:8 206:7,14
216:9,23 217:6
218:19

**financials** 124:19
126:3 139:21 152:9
156:13 162:17 166:9
170:5 180:8,24
181:25 183:2 184:24
190:9,15 191:24
192:3,10 194:22
195:5 206:17,20
208:11

**find** 34:18 93:12
189:19

**finish** 215:11

**finished** 209:24

**firm** 9:3 10:19,22
12:18 46:25 74:17,22
75:23 76:3,5 82:2,4,
12 83:18 86:25 87:2,
12 91:11,21 92:6
109:25 115:25
116:18 215:15 217:2
243:12

**firm's** 11:11

**firms** 11:3,7 12:22
13:2 72:10 101:9
189:12,17 206:25
217:6

**fiscal** 123:8 180:3

**five-plus** 85:12

**fixed** 226:14 228:8

**flip** 153:15

**flow** 40:5

**focus** 15:7,21
118:19,20 196:24

**focused** 86:19

**focusing** 112:16

**follow** 181:5

**footnote** 199:12

**footnotes** 175:6
179:25 180:4

**forecast** 43:7

**forgave** 97:18
107:12 108:23
121:12 123:8,9 126:9
128:10 137:23 141:2,
11,19 143:19 191:16
207:22

**forget** 188:10

**forgivable** 14:19
28:9,14 38:11 39:21
40:22 43:2,9 70:25
87:18 101:8 202:24
212:7,23

**forgive** 29:12,17
30:5,15 32:5,21
33:18 34:15,23 35:2,
5 36:2,13,23 39:14
41:4,24 45:8 46:7,14
50:11 52:14 59:2
60:8,18 61:2 70:9
130:4 139:10,17
149:18 150:19 151:5,
15 153:11,24 155:4
163:7 164:9,18
165:4,14 175:22
176:6,12,17 178:16
179:14 200:11
214:21

**forgiven** 15:12 21:20
27:15 31:11 42:11
43:10 56:8 57:7
60:10,20,24 65:5,15
92:24 93:18 94:3
96:14,17,22,25
97:10,14,22 98:4
104:23 108:4 109:3,
19,20 114:7,20
116:19,21 117:3,19,
23 118:4 121:8,25
122:10,13 125:9,22
127:16,22 130:24
131:7,17 132:6,22

136:2,13 138:22,23,
25 139:4,13 140:17
142:22 146:25
147:25 157:17
169:21 170:8 181:18
187:16 188:23 190:6
191:10,22 192:5
203:14,16,21 206:9,
16 208:19 212:10,18
213:20,24 214:8,17
215:24

**forgiveness** 15:24
19:6,10,14,19,23
20:4,10 21:12 22:2,9,
14 23:20 24:11 25:2,
8 26:12 27:8 31:3,6,
22 32:11 33:3 35:14
36:4 37:25 39:5
40:14 41:17 42:16
47:25 48:21 49:17
51:18 52:21 53:11
54:14 55:5,23 57:5,
10 58:8,16,25 61:8
62:17 64:11 65:11
66:2 67:14,24 68:19,
25 69:10,24 70:18
71:10 72:5,13,17,22
73:3,10 83:9,11,15
92:15 98:24 101:16
102:2,7 115:13
127:5,12 138:20
139:7 147:12 156:24
169:17 171:21 173:7
179:2 180:19 181:11
183:4 186:8 187:5,24
196:6,13,17,20 200:2
203:2,10 208:7

**forgiving** 37:10
58:11,13 60:14
107:22 147:7 163:13
202:21 207:13,16

**forgot** 76:15

**forgotten** 163:14

**form** 27:25 28:7
48:19 67:17,25 90:22
105:9 107:5,15 108:3
109:12 111:11,20
114:5,25 118:7
127:15 135:22
147:10 150:6 156:11
157:14 160:6 161:12
162:3 168:16 169:8
170:2 174:25 178:11

180:22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
240:8,25 242:5,6
243:20 244:21
249:18 250:14

**formed** 94:11

**Forms** 242:12 243:25

**formulating** 94:19

**found** 54:24 230:4

**founder's** 216:19,22
217:8,12,15,19 218:8

**founders** 216:24
217:5 247:15

**founding** 50:5

**fourth** 124:6,20

**frame** 172:3 186:20

**frames** 39:18

**Frank** 85:5

**front** 9:21

**frustrating** 45:21

**fulfill** 67:23

**fulfilled** 67:15

**full** 108:20 111:17,18
112:5 120:3 143:24
156:16,22 157:11
174:16,17

**fully** 130:19

**fund** 12:18 78:5
130:16 134:11
148:23 247:22
248:17

**funds** 11:6 24:16

**future** 24:6 27:10,15
33:14 42:17,19 45:9,
10 46:25 47:4 56:8
64:10 108:5 157:17
218:4

**G**

**gain** 39:6 51:17
226:21

**gave** 56:20 81:25
82:4,20 84:5 97:22
141:4 150:20

**gears** 184:17

**general** 7:2,6 25:10,
20 32:13 34:11 39:20
48:25 57:12,25 58:20
59:5,9 60:22 63:22
105:18,21

**generally** 12:8,13
34:17 45:15 53:5
57:22 80:24 87:10
137:3 157:6,20
208:21 225:9,10

**gentleman** 143:5

**give** 7:23 11:19 12:14
25:11 30:14 40:18,20
64:2 69:23 71:19
82:15 83:18 98:6,10
105:2 139:5 174:3
184:21 188:14
203:23 214:18

**giving** 13:8,25 28:9
29:5 30:24 159:3

**goals** 62:11,18
163:12 214:23

**good** 5:2 6:12 13:16
14:2,14 33:8 34:11
38:6 41:19 47:14
48:4,6 193:5

**grant** 226:15 228:5

**granted** 130:19
226:16 236:16

**grants** 240:8,13

**gratification** 24:16
27:23 28:4 114:17

**great** 45:13 82:7

**Greenberg** 6:5

**guess** 23:4,22 55:16
112:18 160:7 190:9
206:18

**guideline** 222:16

**gut** 45:16 47:6,8 93:8

**H**

**hair** 178:2

**half** 73:19 91:18
244:7

**handle** 249:21

**happen** 31:25 33:12
44:20 180:2,25 181:3
188:11 203:4

**happened** 34:3
180:6 204:10 209:21

**happening** 31:24
43:12,17 45:5,18,24
64:20 196:20

**happy** 15:7

**hard** 47:8,9 127:19
153:15

**HCM** 82:24

**HCMFA** 78:15 136:2
140:13,19 149:16,19
164:5,10 175:16,24
182:10 248:22
249:24

**HCMS** 249:16,22
250:5,11 251:7

**HCMSI** 138:7 141:16,
20 151:16

**HCRE** 132:2 137:6,9,
24 141:8,12 150:23,
24 151:6 164:24
165:5 176:13 247:21
249:4,15,22 250:5,11
251:7

**head** 55:20

**hear** 6:13

**heard** 68:15,18,23
72:11 73:2 84:17
85:5 99:13,15 205:24
209:18 216:17 243:8
248:3,11

**hearing** 93:6

**hedge** 11:6 12:18

**guideline** column continues

**held** 15:14 119:4
156:9 187:13 202:16

**helpful** 196:8

**Hey** 234:7

**high** 7:5,7 43:13
58:22 203:21 247:9
250:15

**Highland** 5:21 6:18
8:7,12 15:14,24 19:7,
11,15,20,24 20:5,10
21:13,15 22:2,8,13
22:25 25:19 56:20,22
75:15 78:5 79:24
80:4 85:11 88:10
89:15 90:5 94:21
95:14 96:13,22,25
97:14,18,22 98:3
99:25 102:18 103:15
104:18,21,23 107:12,
21 108:11,14,16,22
109:11 115:12
117:19,23 120:4
121:12 123:8 126:9
128:10 129:18 130:4,
15,16 131:13,25
132:16 133:17
134:11,23 136:13,21
137:9,23 138:7,14
139:16,18,23 140:13,
17,22 141:2,7,11,15,
19 142:2,13,22
143:10,13,17,19
144:15 145:2,10,23
146:18,25 147:7
148:22,23 149:17,22
150:18,24 151:4,9,14
152:18 153:4,10,17,
24,25 155:3 156:9
157:21,22 158:2,15
159:2,15,17,19,24
160:4,14 162:13,25
163:3 164:4,8,14,17,
24 165:3,8,13,15,24
167:10 171:2,15
172:23 173:7 174:5
175:22 176:5,12,17,
18 178:10,15,25
179:13 185:4,7,18
186:3,12 190:6,16,
20,25 191:9,16,21
192:5 195:17 198:23
202:16,20 204:7
206:17,20,22 207:2,8
212:8,24 213:6

222:24 223:4 224:18
233:21 242:20 243:3,
17 244:3,9 247:20,
21,23,24 248:14,16,
17,23 249:2,3,8,12,
16 250:6,15,17 251:5

**Highland's** 83:19
84:2 99:9 108:23
119:12,14 120:22
123:16,20 126:15
129:13 133:9 136:17
148:9 158:6 161:10,
17,25 166:12,19
167:22 169:6 177:9
181:24 190:2 191:8
246:12 250:12

**Highland-related**
224:14

**highly** 31:25 139:2
214:23

**hint** 163:23

**hire** 13:10 52:6,7

**histories** 34:7

**history** 32:10,13,20
33:2,11,21,24,25
34:12,15,24 35:7
49:2,20 62:23 63:3
66:16 68:20 113:6
195:25 216:10

**hold** 188:22 232:2

**holder** 99:24

**holds** 99:9

**home** 9:19

**home-field** 13:13

**hope** 68:11 128:14
180:23,24 181:2
183:9,10,11 184:20
192:12

**horses** 188:22

**hour** 73:19 91:17,18

**hours** 91:17

**how's** 10:11

**HR** 52:9

**human** 56:21

**hundred** 46:5,7

**hundreds** 96:23

**Hurley** 95:2 96:9

**hypothetical** 38:25
44:5 46:16,18 47:17
50:24 51:24 53:22
54:2,12 55:3 65:19,
24 66:13 67:3 70:8
71:4 109:17 188:14
189:11

**hypothetically**
45:25 46:4 50:4,10
52:2 53:9 59:15
157:22

**hypotheticals** 54:18

___

**I**

**idea** 25:22 31:23
37:11 44:20 46:23
50:25 52:16 59:6,23
60:4 63:2 65:4
155:11 170:9 173:2
243:5

**ideal** 34:2 36:17,20
37:13,17,18 57:17

**identification** 76:21
119:16 123:18
126:17 129:15
133:11 166:14
193:15 230:11
231:17 233:17 236:9
237:22 239:2 242:7

**identify** 12:13 18:14
78:11,22 93:3 98:3
204:17,20,24 225:3

**identity** 70:11

**ignore** 188:12

**immediately** 51:21

**imminently** 68:3

**impact** 33:7 48:9
107:23

**impacted** 94:13

**implies** 127:13

**importance** 45:4
49:22 57:18 59:12
60:12 64:19 163:12

**important** 33:12
49:25 59:8,13 115:3
210:23 219:19,24

**impossible** 37:4
44:21,25

**impression** 45:17
64:14,17,18 97:4

**inaccurate** 216:6

**incent** 28:20 60:3

**incenting** 31:20

**incentivize** 27:10

**include** 11:11 72:6
104:8 114:11 135:12
170:11 208:7 223:16,
25 227:3 231:9
241:15 247:3

**included** 78:10
120:4 185:5 223:12
224:5,19,21 227:17
229:24 231:13 233:3
237:14 238:17 239:8
240:21,23 243:18
245:7

**including** 42:3 81:12

**income** 114:7,21
161:5 163:11 170:18,
20 222:24 223:5,9,
12,17,21,25 224:3,9,
11,13,17 229:25
230:5 231:4,10
243:12,16 244:3,11
246:5

**incomplete** 124:22

**inconsistent** 214:15

**incorporate** 223:4

**incorrect** 220:22

**increase** 160:4

**increases** 226:19

**incurred** 145:9

**independent** 54:6,
23

**indirectly** 56:13,23
248:7

**individual** 26:5
32:14 33:5 36:6
56:20 114:22 118:25

188:16 189:11

**individual's** 32:25
49:20 63:2

**individually** 95:17,
18

**individuals** 95:4
98:2,6 114:8 116:7
118:5,10,12 147:20
206:10 247:4

**industry** 10:24 13:15
49:11,21 50:2,5,21
51:12 52:4,14 53:7,
17 65:6,21 66:21
67:12 69:5 100:19
102:8,14,17 138:17
182:16 217:3 219:8
220:17 221:21,25

**influenced** 94:12

**inform** 97:13 181:10
187:20 188:3

**information** 13:18
24:25 25:5,15 26:19,
23 30:17,20 31:12
32:7 34:14 35:6 38:3
39:10,12 43:21 44:6,
15 46:12 47:3,7,14,
18 48:2 53:24 54:13
55:6 56:3 62:22 64:9,
24 65:23 66:15 78:4,
14 88:8 98:11 99:11
102:23 103:8 104:14
105:3,6 106:3 116:4
130:2 146:17 156:16
157:3 168:7 173:5,10
174:4 180:11 192:2
194:2,13 200:14
202:20 210:12 218:5
225:5 232:21 236:2
239:14 241:21
243:16 245:24
246:13

**informed** 16:8 22:16
30:19,22 31:2 67:4,7,
9 71:13,17 117:2
183:13 187:3 195:14

**inquiry** 143:15

**ins** 59:11 111:14

**instance** 72:25
115:13

**institutions** 11:13

**intended** 22:17 24:5
27:18 92:24 93:14
109:20 112:23
114:19 215:23

**intent** 23:18 25:2
26:3,7 92:25 108:4

**intention** 188:18

**inter** 207:4

**interest** 18:2 28:23
58:2 59:6,10 61:25
81:12 82:22 108:16,
20 111:4 127:6
131:21 132:25
134:15 135:13,16,21
137:11,18 138:18
139:11,14 142:18
143:25 152:16
153:18 154:15,20
178:9 191:2 195:16
197:15 198:9 199:20,
25 200:20 201:2
202:14 203:9 204:2
247:21,25 248:8

**interesting** 127:2

**interests** 99:10,25

**interplay** 185:15

**interpretation**
132:12

**interrupt** 210:5

**intertwined** 207:4
224:4

**interview** 90:9 91:21
92:2 94:18,22 95:3
98:12

**interviewed** 25:18
94:23 99:3 104:17
105:12 147:21
213:21 215:25

**interviewing** 91:3

**interviews** 90:4
95:7,10,13,22 97:9
212:6

**introduction** 103:19
205:4

**invest** 24:14 114:19

**invested** 24:17 158:20

**investment** 11:3 84:18,22 85:3 99:8, 24 101:16 145:13 146:12 158:25 159:3, 7

**investments** 23:23 92:21 162:13

**involve** 12:21

**involved** 7:17 12:16, 25 28:22 53:10 92:5

**involves** 7:9

**issuance** 182:19

**issue** 47:20 49:22,24 50:8 73:15 154:11 181:14 191:3 247:15 250:21,25

**issued** 121:3 131:14 137:9 138:6 141:25 148:23 150:24 152:17 169:11 177:15 182:10 184:14 231:20

**issues** 11:3,7 47:19 71:24 180:7

**issuing** 238:16

**item** 124:20 167:7

**items** 175:5 222:23

---

**J**

**James** 14:23 75:19 141:25 158:2

**January** 108:19 171:22 184:9 195:11 198:10,22 199:4,15 204:15

**Jersey** 9:19

**Jim** 49:24 145:14 177:14

**job** 50:14 169:23

**John** 5:20 6:16 76:18 234:7

**Johnson** 5:1 6:1,12 7:1 8:1 9:1 10:1 11:1

12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1,6 75:1 76:1,23 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1,19 120:1,18 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1,6 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1,24 164:1 165:1 166:1,6 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1,5 183:1 184:1 185:1 186:1 187:1 188:1 189:1,25 190:1 191:1 192:1 193:1,5,17 194:1 195:1 196:1 197:1 198:1 199:1

200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1,23 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1,17,20

**Johnson's** 205:2 218:11

**Jones** 5:21 6:17

**judge** 188:2

**judgment** 45:13 222:13

**July** 155:17

**June** 184:4,9

---

**K**

**kind** 31:13 42:15 50:15 126:2 207:4 227:10

**kinds** 72:20

**knew** 68:10 100:8 171:6 189:10

**knowing** 14:7,9 60:18 61:2 169:23 205:17,21

**knowledge** 13:13 23:17 35:2 40:24 41:6 49:9 52:3,19 57:3 65:17 67:11 68:19,22 78:21 84:14,21,23 97:21,24 98:5 110:19 160:3 174:15 202:7 204:5 207:12,15,19 249:13

**knowledgeable** 32:9,19

**Kornfeld** 9:6

---

**L**

**L.P.** 5:22 75:15 82:24 139:24 190:17,20

**L.p.'s** 85:11

**label** 234:9,11

**lack** 210:24 211:3,20

**laid** 69:6

**large** 13:13 52:15 117:20 217:4

**larger** 53:4 116:24 117:17

**largest** 117:2,18 191:15

**late** 7:12 15:11 16:16 27:9 92:14 98:23 103:2 171:25 172:3, 10,23 177:4 180:19 200:17 208:18 248:22

**Laura** 251:20

**law** 82:2,3,12 86:25 87:2,12 91:11 189:12,16

**Lawlor** 95:2 96:7

**lawsuit** 26:13,19 27:2

**lawyers** 234:3

**lead** 33:8

**leaders** 12:21

**learn** 97:8 110:8 130:2

**learned** 106:16

**leaving** 122:10

**legal** 81:2 89:2

**letter** 75:3,6

**level** 7:5,7 24:6 43:14 58:22 71:21 246:22 250:15

**liabilities** 173:14

**liability** 173:24

**lieu** 104:2,11 105:5, 17,25 106:5,18,24 109:10 112:12 113:22 205:11 206:3

**lifetime** 145:20

**like-to-like** 239:19

**likelihood** 43:4,16 44:16 45:10,23 47:15 64:10,14,19 138:22 203:14,20

**limited** 230:3

**lines** 87:7

**liquidity** 46:22

**list** 77:21 81:21 124:21,22 247:9

**listed** 81:11 110:10 232:14 234:20

**listen** 13:17

**listing** 82:22 146:20, 21

**litigation** 7:3,8,9,16 8:8,13 72:15 73:5 110:3,5 173:23 174:4,7,10,24 175:3, 5,9 188:24 194:3,4

**living** 145:16

**LLC** 141:8,12 164:24 165:5 249:4

**loan** 8:2,4 17:12 18:13,23 20:9 25:13 26:8 27:18 29:12 30:5 31:9,22 32:5 33:4 35:13 37:25 38:12 39:5 40:14 41:16 46:14 47:25 49:17 51:18 52:21 54:7 55:5,23 58:10 59:7,11 61:8 62:17 63:24 65:5,9 66:2 67:24 68:19,24 69:9 71:10 72:5,13,17,21 73:3 79:23 80:15,19 81:5,20 82:8,21 83:8, 11,15 88:5,19 96:25 97:18,21 98:3 102:2, 7 106:18 107:12,22 108:22 109:2 117:2, 18,21,23 118:14,24 122:17,22 123:3,8

124:5,6,7,16,17,18
128:10 129:7 130:15,
19,23 131:3,7 132:5,
21 138:22 139:8,17
140:18 141:3,12,20
142:7 143:20,24
146:6,17,24 147:7
149:18 150:19,25
151:6,16 153:11,25
155:4 157:15,16,19
158:25 159:4,6,11,14
164:9,19 165:4,14
175:23 176:6,13
178:16 179:2,14
190:7 191:10,15,22
192:6 194:21 195:19
196:17 198:24 206:3,
15 207:5,13,16
213:16,22 214:22

**loaned** 137:16
142:13 144:16
145:23 157:12 158:6,
15 185:18,19

**loaning** 146:12 159:9

**loans** 7:9,12,17,18,
22 8:5,7,12,15 14:20
15:9,11,25 16:13,20,
24 17:2,7,17,20,24,
25 18:15,19,20,25
19:3,6,10,14 21:16,
18 22:2,9,14,21,24
23:2,6,13 24:11,13,
21 25:7,11 26:3,6,11,
14,18,25 27:4,14,22,
25 28:10,14,20,22
29:3,18 30:16 31:11,
17,19 32:11,21 33:18
34:16,23 35:2,5 36:2,
4,8,13,23 37:10
38:21 39:14,21 40:22
41:4,24 42:10 43:2,9,
15 45:2,8 50:12 53:2,
3,5,11 56:8,11,12,15,
20,21,25 57:4,9,12,
15,22,25 58:7,13,16,
18,21,25 59:2,3,15,
16,24 60:5,8,10,11,
15,18,19,23 61:2,3
62:8,10,17 65:14
70:9,10,11,14,15,18,
25 72:3 73:10,15
79:23 81:6,11 82:23
87:13,15,18 90:17
92:9,10,16,22,23,25

93:14,18 94:2 95:24
96:13 97:9,14,25
98:25 100:19,21
101:8,17 102:16
104:2,10,12,22
105:4,9,17,25 106:5,
24 107:5 108:2,9,10,
14,17,19 109:10,14,
19,21 110:3,5,10,12,
13,20,25 111:17,18,
19 112:4,7,9,11,12,
16,19,23 113:6,9,10,
21 114:5,7,15,18,24
115:6,13,21,24
116:17,18 117:7,15,
17 118:3,4,11,15,16,
20 119:20 120:4
122:5,12 123:10
128:16 129:3 130:4
136:2,6,12 137:2,24
138:6,19 140:12,22
141:7,15 142:23
143:16 146:8,21
147:14,17,19,25
151:8 156:22 157:5
159:16 162:12 163:7
164:4,14,23 165:7,23
166:23 168:8,14
169:3,20 170:7 172:9
173:8 178:9 181:11,
17 184:25 187:4
195:12,16 200:12
202:21,24,25 205:11
206:9 207:5,9,23
208:7,16,18 209:12
210:11 212:7,9,17,23
213:19 214:8,16
215:3,12,15,23

**logical** 188:12

**long** 18:22 25:21
87:6 220:6 229:14

**look-back** 219:15
221:4

**looked** 77:25 86:22
118:19 124:7 142:8
147:11,15 156:13
180:21 192:3 194:21
206:8,17 208:11,25
209:5 216:8 238:20
239:4 241:9 243:13,
25 244:11

**lose** 162:15

**loss** 42:3 171:2
172:17

**lost** 67:19 124:10
171:15

**lot** 7:16 11:23 12:20
13:11,24 16:17 47:8
59:3 108:2 109:14
184:21 189:24

**lucky** 68:3,6,12,14

**lunch** 184:20

**luncheon** 192:15

---

**M**

**made** 8:3,7,12 26:6
30:22 56:22 63:24
104:13 108:3 112:23
117:23 122:5 123:3
132:9 137:24 140:19
141:12,20 153:3
158:24 161:20
168:14 178:8 181:11
189:8 197:8,15,21
198:5 199:24 200:10,
17,24 201:25 202:13,
25 203:24 207:9,10
218:24 219:12
222:12 226:12
230:14 244:23 245:3,
12 248:22

**magnitude** 28:22
31:16,19 43:8,15
50:19,25 52:17 54:4
57:7 60:13 62:10
65:4 185:12

**magnitudes** 29:3
58:2

**major** 11:2 13:2
143:9

**majority** 99:9,24
248:7

**make** 29:11,16 31:4
37:9,16 38:21 39:21
41:12,14 42:25 43:4
44:15 49:6 51:7
54:20,25 61:19 62:6
65:25 67:4 69:12
71:8,18,21 74:19
104:15 114:3 129:6
134:24 136:22

**loss** 42:3 171:2

138:18 143:15 145:3
151:25 159:3 188:10
189:19 194:10
196:17 203:8,18,19
214:21 248:3 249:25

**maker** 29:7,9 30:3,25
32:9,12,19 33:17
34:14,22 35:4,12,24
36:12,23 37:24
38:11,18 39:5 40:12,
18 41:3,16,24 43:3,
20 44:5,14 45:7
46:13 47:17,24 49:14
50:11,13 51:4,6 52:3,
5,19 53:23 54:11
55:21 57:3,6,8,11,14,
19,21 58:4,6,9,15,20
59:14 60:7,17,22
61:7,12,19,22 62:6,
21 63:8,10,16 64:8,
24 65:12 66:3,14,23
67:13,21,22 68:10,
16,18 69:8,11 70:2,
24 72:12 73:2,8 93:3,
17 98:22 100:14,17
102:24 103:10,14
139:6,8 156:21 163:5
168:6 169:16,22
170:6,8 172:20,25
173:5 187:12 203:8
211:16

**maker's** 48:20

**makers** 12:14 30:10,
15 51:16 169:19
191:2

**makes** 188:24
190:10

**making** 30:4,18
40:22 62:2 65:3
69:23 102:13 103:7
109:18 112:21
195:15 196:11

**manage** 247:13

**management** 5:22
6:18 11:2 75:15 78:5
79:25 85:11 129:19
130:16 132:17
134:11 138:14
139:18,24 148:22
151:10 165:8,15
176:19 190:17,20
222:24 223:5 242:20

243:3,18 244:4,9
247:8,22,23 248:15
249:3

**manner** 215:5

**March** 75:2

**mark** 23:24 143:5
245:5,13

**marked** 44:10 76:20
119:11,15 123:18
126:17 129:15
133:11 166:14
193:15 230:9,10
231:16 233:16 236:8
237:21 238:25 242:7

**market** 7:19 27:24
101:6 115:7 218:2
220:7 221:25 244:19

**marketplace** 14:7,
11 159:11

**Mary** 49:24

**material** 180:16
181:17 182:17,23

**materials** 17:13
110:9

**math** 197:10

**matter** 6:24 75:8
79:10 89:16

**maturity** 127:6

**meaning** 81:2

**meaningful** 56:2
70:13 250:16

**meaningfully**
247:11

**means** 51:8 202:24
232:11

**meant** 144:25 213:22

**measures** 12:9

**meet** 76:10 90:21

**memory** 69:18 85:15

**mention** 213:2

**mentioned** 7:22
20:25 27:21 35:16
55:24 59:25 79:22
80:15 81:4 90:15

102:16 109:23
118:18 212:21
245:11

**messed** 133:23

**method** 226:24

**methodology** 219:8

**Michael** 5:24 163:22
166:3

**middle** 115:20
215:11 234:5

**milestone** 127:25
128:4

**milestones** 127:19,
24

**milestones'** 127:6

**million** 17:3,8 50:6,9,
12,19,24 51:24 97:5
117:7,10 122:6
134:15 137:10,17,19
138:11,15 142:2,14,
19 144:16,21 145:2,
11 152:9,18 153:5,18
154:21 158:7,16,21,
25 159:9 160:15,21,
25 166:5 167:11,23
168:13,18 169:24
171:3,16 172:17
173:9,15,19 174:19
177:16,21 178:3
182:12 185:2,14
186:3 188:16,19
194:21 195:7,12
197:5,9,17 198:15,23
200:19 201:6,10,12,
17,20,22 202:3,15
203:25 214:15
220:11,14,16,17,19
221:6,7,8,10,17
222:2,3,7 231:4
233:8,9 234:20
235:2,18 236:15
237:13 238:8 240:7,
11,23 241:3,10
244:7,13,15 245:2,3,
8,10,11,16 246:21
247:7 250:24

**mind** 80:20 221:3

**minutes** 91:19
192:13

**missed** 231:12

**missing** 111:24

**misunderstanding**
71:25

**misunderstandings**
69:16,20

**mixed** 72:9

**modest** 132:9 178:8

**modification** 22:17
23:19 27:14 42:9
56:7 77:14 204:18
209:12 210:11

**modified** 7:13 15:10
22:24 23:6 172:10
208:17

**modify** 80:9 89:10

**moment** 39:3

**money** 50:15 51:2
55:14 96:17 139:6
145:23 158:20,21
185:9,18,19 194:6
198:8 203:18,22
214:24 215:4 250:5

**months** 186:22

**morning** 5:2 6:12

**Morris** 5:20 6:10,16
9:6,9 73:18,25 74:5
76:19,22 77:2,19
89:19 103:17 115:16
118:8 119:10,17
120:12 123:14,19,25
126:13,18,20 128:18
129:8,11,16 130:8
131:10 133:4,8,12,
14,22 134:8 138:3
139:20 140:7 141:22
144:3 148:4 151:18
154:4 155:23 163:14,
20 166:3,11,15,17,22
170:13,23 173:11
175:11 179:5 181:19
182:4 183:18 192:11
193:4,10,16 204:25
205:20 208:12 215:9
218:10 224:22
229:21 230:8,12,25
231:14,18,23 232:16
233:13,18 234:13,16
236:5,10 237:5,18,23

238:5,22 239:3
242:3,8,10 251:10,
15,21

**motivate** 28:21 33:4
35:18 44:19

**multiple** 189:12

**multiplied** 220:18

**multiplying** 219:20
220:3 222:7

**murky** 33:25 34:6

**N**

**named** 143:5

**names** 94:24 96:10

**Nancy** 6:6 99:7,13,23
145:22

**narrow** 49:22

**nature** 7:3 58:6,24

**necessarily** 57:23
61:14

**needed** 73:14 214:24

**negotiate** 61:10
66:3,7,10 67:8
159:11

**negotiation** 66:25
67:2 136:25

**net** 171:2

**news** 13:25

**Nexpoint** 78:5,14
131:14 136:6,13
140:23 141:4 149:24
150:20 157:23 158:3,
7,16,19 159:10,19
162:14 164:14,19
176:7 223:8,16,24
224:6 229:24 230:14
231:10,20 235:15
237:11 239:6 244:10
247:22 248:9,18,22
249:24

**next-to-the-last**
127:3 182:9 212:5

**nice** 76:10

**nonbusiness**

212:23

**normal** 246:25

**north** 201:21

**Notary** 6:9

**note** 60:2 80:22 81:3
121:3,8,12,16,21
125:4,9,13,21 126:23
127:4,11,15,16
131:13,17,25 132:5,
15 135:16,21 139:6
144:18,23,25 149:24
150:13,24 152:17
153:14 158:10
164:18 176:18
194:25 195:11
198:10,19,22 199:4,
15 204:15

**note's** 127:18

**noted** 193:3

**notes** 57:20,24 59:17
80:20,23,25 95:6,10
111:5,6,10 119:19
120:23 124:17,24
126:2,9 135:5,6,10,
11,20 136:18,23
137:9 138:6,11 140:9
141:25 147:4 148:19,
22 149:4,5,23 150:5,
12 152:3,4 154:11,15
156:3,8 158:10 164:3
167:7,12 168:18
169:6 170:11 173:18
174:17 175:13,16
176:24 177:2,15
182:10 187:13,16
188:23 190:18 191:3
194:7 196:12,25
197:16 199:21,25
200:20 202:16 203:8,
9,14 204:3,13,16 214:5

**notice** 243:11

**noticed** 195:19

**nuances** 13:14

**number** 9:13 11:19
12:8 16:20 60:9,11
61:16 76:16 88:3
117:11 134:4 166:6
181:21 228:8 231:9,
25 232:10 237:3
240:10 244:13

**numbers** 87:21
117:11 222:8 226:22

**NXRT** 235:3,11
236:23 238:8,13
239:13

**O**

**objecting** 163:22

**objection** 28:7
67:17,25 107:15
109:12 111:11,20
118:7,9 135:22
147:10 150:6 156:11
157:14 160:6 161:12
162:3 168:16 169:8
170:2 174:25 178:11
180:13,22 181:12
182:20 183:8 187:17
188:8 189:5,14
190:24 192:8 196:15
202:22 203:11
205:19 206:11
207:18,24 209:8,17
211:5,19 214:9,19
240:25 243:20
244:21 249:18
250:14

**objective** 47:9

**obligation** 61:14
145:10

**obligations** 112:21
153:3 186:3

**obligor** 18:14

**obligors** 7:21,23
24:21 26:25

**obtain** 30:17 39:12
41:22 43:20 44:6
47:18 57:20 58:6
62:22 63:17 64:8,24
165:23 168:7

**obtained** 55:6 57:16
66:18 96:13 127:7
143:16 195:13,17

**obvious** 187:19

**occasion** 76:8

**occur** 24:2 32:6 43:5
44:17 45:11 47:5
182:17

**occurred** 7:15 23:24 182:24

**occurrence** 56:9

**occurs** 27:15

**October** 88:16,17 123:2 186:19

**odds** 215:4

**offer** 67:8

**offered** 7:4

**offering** 21:24 22:6, 11 101:13,20,24 102:6,20 103:4,12 217:11

**officer** 85:12 97:15

**oftentimes** 47:15

**Okada** 143:5,8,16,21, 23 151:21 153:22 154:2 167:17 168:15 178:20,24

**omissions** 245:7

**one-year** 202:5,12

**ongoing** 174:10

**operate** 93:15

**operational** 71:21, 24

**operationalize** 72:3

**operations** 40:5

**opining** 7:19

**opinion** 20:23 21:24 22:6 32:8 35:11,24 40:11 48:18 67:22 73:15 94:11 101:13 102:6,20 103:4,7,12 107:25 115:6,21 116:5 118:24 203:7 211:6 215:12,19 216:2 217:11 227:2 228:11

**opinionated** 13:23

**opinions** 22:11 37:16 77:15 80:9 89:6,11 94:8,19 101:20,24 106:15 107:10,23 115:4 120:7 133:20 140:4

160:12

**option** 226:13

**options** 226:7,9,16, 20,25 227:4,10,14 229:6,15 236:20 240:22 244:12

**oral** 20:17,19,21 70:24

**order** 62:19 63:5,14, 25 64:4,6,21 65:8,10 104:15 157:9 232:25

**ordinary** 193:25 233:22

**organization** 36:7 71:9 207:6 233:24

**originally** 16:16 57:16

**outs** 59:11 111:15

**outsized** 217:4

**outstanding** 60:5 81:13 108:9 121:21 122:2,9,18,23 123:4 125:18 130:20 135:5 149:3,23 150:12 152:10,16 154:15 162:19 174:9 176:24 178:10 184:25 194:7 198:9

**overpay** 51:7

**overpaying** 51:5

**overwhelming** 33:7

**owed** 122:10 134:20 139:6 142:18 153:17 167:23 178:2

**owes** 144:20 185:21 188:15

**owing** 153:4

**owned** 56:23 156:10 157:12 158:23 167:15,16,17

**owner** 162:6,13 248:13

**owners** 12:17 246:17,23 247:2,15

**ownership** 161:14 167:19 191:2,5

247:21,25 248:11 250:11

**owns** 56:13 158:3 248:7

---

**P**

**P&I** 40:5

**p.m.** 192:15,16 193:3 251:13,14

**Pachulski** 5:20 6:17

**package** 40:4 41:5

**packages** 217:5

**pages** 87:7,8,20

**paid** 24:18 27:23 32:24 48:13,19 49:24 50:3,6,22 51:18,25 52:4,20 59:10 64:25 108:16,20 110:6,10, 20,25 111:10,17,22 112:5,7 113:9,21 143:23 198:15 199:13 200:19 201:13 216:24 223:18 225:21 241:13 247:9 249:24 250:5

**pain** 128:22 243:24

**painful** 120:17

**paper** 119:22

**paragraph** 103:25 106:21 114:2 121:2, 7,15 122:16,21 124:12 125:12 126:21 128:9 130:15, 23 131:2,6,13,16,24 132:4,15,20 135:3,4, 25 136:5,11 137:5,22 138:4 139:15 140:12, 16,21,25 141:6,11, 14,18,23 142:22 143:4,24 146:23 148:21,25 149:10,15, 17,21 150:17,22 151:3,8,13,19 152:2 153:9,21 154:6 155:2,7 163:25 164:7,12,13,16,22,23 165:2,7,12,18 175:20 176:3,5,10,11,15,16

178:15,19,23 179:12 182:9 205:9 212:6 231:8

**paragraphs** 149:2 151:20 176:22

**parse** 17:7

**parsed** 112:15

**part** 13:15 14:6,9 26:13 28:14 30:5,16 33:18 35:5 36:13 37:25 38:12 39:14 40:22 41:4,25 44:22 48:22 61:9 63:19,21 65:3 69:10 74:22 94:14 96:14 97:23 102:15 104:23 107:13 109:3 123:10 125:9,22 128:11 130:5 131:8,18 132:6,22 136:2,14,25 137:24 139:17 140:18 141:3,12,20 142:23 143:20 146:25 147:8 149:18 150:19 151:5,15 153:11,25 155:4 163:8,12 164:9,18 165:4,14 175:23 176:6,12,17 178:16 179:3,14 188:19 192:6 207:16 212:19 226:6 240:13

**participate** 91:8

**parties** 5:13 23:18 61:23 78:7,16 131:3

**Partners** 141:8,12 164:24 165:5 176:13 249:4

**partners'** 173:14,17 174:14,23

**partnership** 121:3 134:19 144:20 154:11 182:11

**partnership's** 135:5 149:3 176:24

**party** 58:5 93:19 94:4 159:12

**pass** 247:16

**passage** 228:9

**passed** 245:19,25

**past** 26:16 27:25 32:24 49:24 92:23

**patience** 73:20 120:19 189:25 251:18

**pause** 190:10

**pay** 18:16 32:13,20 33:2,11,24,25 34:11 48:25 49:20 53:6 63:2 65:6 88:25 105:10 111:18 138:23 139:10,14 217:5 220:5 221:13 224:5

**payable** 137:13 154:21

**payee** 190:17

**paying** 24:15 104:11 112:9,11 122:11 139:3 214:14 249:17

**payment** 111:4 132:9 134:19 136:17 178:8 195:21,25 197:20 198:5 199:3 200:17 201:5,16 203:9 216:10 244:8 249:11 251:6

**payments** 71:23 134:25 138:18 153:3 195:15 196:11,17 197:8,15 199:24 200:25 201:19,24 202:9,14,25 203:18, 19,25 214:4,21 244:6,9 248:22

**payout** 44:25

**pays** 52:23

**PDF** 120:14 242:8

**peer-reviewed** 222:16

**peers** 157:10

**pen** 119:21

**pending** 5:19 7:7 26:18

**people** 13:21,22 34:6 37:15 49:21 50:14,21

51:25 53:9 65:6
71:13,15,17 72:9,10
188:10,11 211:8
212:15 219:5 247:13

**people's** 69:17

**percent** 122:9
154:16 167:18 169:5
216:3 233:9

**perform** 27:10

**performance** 23:6
24:6 28:24 127:20,23
236:17 237:12 238:9,
14

**period** 7:11,18,20
17:25 18:22 37:22
104:2 105:4,24
106:4,24 134:25
139:24 148:10
162:20 166:20
172:17 177:10
183:23 184:8,13,15
201:13 202:5,12
204:7,11 205:10
213:23 214:6,15
216:10 218:14,18,21,
23 219:4,9,15,23
220:2,6,8,10,25
221:4,19,22 226:20
228:8,18 229:5
242:12 244:2,17

**permit** 46:3

**Perniciaro** 91:12

**person** 19:15 20:5
29:10,21 30:3 90:21,
23 99:19,25 103:6
111:13 127:17 250:8

**personal** 10:7
245:20,25 246:14
247:16

**personally** 11:15
146:13 186:2

**perspective** 32:25
220:25

**pertaining** 15:23
21:25

**pertains** 129:2 157:5

**perusal** 118:21

**petition** 85:13 108:8,

9 111:5,19,23 160:16
198:2 202:6

**philosophy** 92:9

**phone** 10:3,8 90:21,
24,25

**phrase** 29:6,8 30:2
40:2 213:18

**phrased** 216:20

**phrasing** 185:22

**picky** 221:24

**piece** 119:21

**pitch** 13:8,15,19

**place** 7:13 23:13 68:4
86:13,14 188:4,7
189:4

**places** 216:18

**plan** 59:23 188:18,19

**plans** 14:15

**platform** 15:14

**pleading** 99:6

**pleadings** 75:12
78:17

**plural** 8:5

**point** 108:4 112:21
116:20 153:2 157:17
164:13 178:8 200:24
205:8 208:15 218:4
219:6 220:24 221:2
226:19 247:12

**pointed** 244:22
245:6

**poorly** 32:24

**portfolio** 12:19 15:13
23:23 92:21 208:20

**portion** 48:15 87:3
120:21 130:23
132:21 136:12
140:18 141:3 142:23
151:5,15 182:5 186:8
199:3 225:19

**position** 62:2 63:23
246:19

**potential** 115:23
173:8,23 174:4

215:13

**potentially** 169:20
207:5,10

**practical** 59:4

**practicalities** 39:18

**practice** 5:8 25:10,
20 72:9 100:19 101:7
104:11 105:8,19,21
114:5,15,24 115:3,9,
12,14 116:14 119:9
130:3 200:11 202:21
206:22,24,25 208:3,6
212:8,23 213:9

**practices** 7:18 53:6

**precision** 158:12

**preliminarily** 9:12

**premarked** 76:16,24
119:12 193:12,18

**premium** 204:2
216:19,22 217:8,12,
15,19 218:8

**preparation** 78:13,
23

**prepared** 10:14
91:16 120:8 167:21
168:2 171:7,10,13
193:25 233:21
241:18

**preparing** 71:23
90:3 174:6

**presentation** 219:12
222:17

**pretty** 210:3

**previously** 27:19
150:12 234:3

**price** 23:24 47:11
226:14

**Pricewaterhouseco
opers** 84:2,15 186:23

**Pricewaterhouseco
opers'** 84:10 183:22

**primarily** 247:7

**principal** 81:12
82:22 108:16 111:4
122:10 125:3,17

127:5 131:20 132:10,
24 134:15 135:11,16,
21 137:11,18 138:15,
18 139:11,14 142:18
152:16 153:18
154:20 178:9 195:11,
16 197:15 198:9,14,
19 199:20,25 200:20,
25 202:14 203:9
204:2

**principals** 110:10

**prior** 18:4 25:9 26:14
52:3 75:16,19 76:3
78:12,23 81:20 82:5,
17 85:13 90:18 91:5
102:25 104:18,20
106:16 107:11 108:8
111:5 116:14 127:6
134:20 160:15
182:18 196:5 212:6,
14 221:13 224:8
236:20 238:16

**private** 12:18 72:10
115:6 211:24 214:25
246:17,22 247:14

**probabilities** 62:14

**probability** 31:24
43:11 138:25 196:19
214:22

**Procedures** 5:18

**proceeds** 24:22,24
27:2 43:25 46:20

**produced** 88:9 89:16
119:8 194:2,4,10
234:2

**professional** 209:15
228:10

**professionals** 28:21
115:24 116:18
215:15

**profit** 42:3

**program** 12:23 35:14
37:25 38:12 39:5
40:14 41:17 45:3
48:21 49:17,18 51:19
52:21 54:14 55:5,23
57:5 61:9 67:15,24
68:19,25 69:10 71:11
72:13,15,17,22 73:3
83:11,15 102:3,7

**programs** 12:24
72:6

**project** 12:20

**promissory** 57:20,
24 80:20,22,23 81:2
121:3,8,12,16,21
136:22 137:9 138:6
141:25 144:18
149:23 150:24
177:15 182:10
202:16 214:5

**proportionality**
31:21 32:3

**proposal** 66:2 68:3,7

**proposed** 54:7 66:6,
9,24

**prospective** 226:25

**prove** 107:20

**provide** 6:23 9:3
11:16 12:5 13:3
22:17 27:18 42:25
48:12 98:13 114:19
145:16

**provided** 78:23 79:8,
13 83:22 86:16 87:11
90:4 98:12 113:5,22
115:22 144:25
215:12 230:21 232:8
248:16 249:2,11
251:5

**providing** 46:22
160:5 250:12,16

**provisions** 59:7
127:5,12,21 187:24
188:4,7

**proxy** 226:23

**PTE** 242:20 243:3,18
244:4,9

**public** 6:9 225:6
247:5,7

**purchase** 226:14,16

**purchased** 144:18,
23

**purely** 47:5

**purported** 172:13

**purportedly** 99:9

**purpose** 24:10 25:6 26:17,20 27:4,8 91:3 92:9,22 145:16 161:25

**purposes** 76:25 179:23 226:9

**pursuant** 31:10 56:7 111:6 179:15 187:16 188:23 248:18

**put** 7:13 9:14 10:10, 11 15:6 68:4 69:19 70:2,6,21 71:25 76:14 119:10 126:6 172:5 193:10 230:8 231:14 233:13 245:4, 5,13

**putting** 101:18 137:2

**Pwc** 84:4,5 175:3 184:2

**Q**

**qualifies** 182:22

**quantifiable** 45:16

**quantify** 161:16 217:14,18 218:8 246:14 250:10

**quarter** 97:5

**question** 31:4 49:7 52:17 67:19 72:23 79:17 82:7 97:19 106:20 109:14 136:10 158:13 160:9 176:3 189:2,6,7,9,13, 17,21 196:21 209:21 210:2,17,21,25 211:4,15,21 216:12 245:5,13

**questioning** 93:12

**questions** 80:13 93:7,13 184:19 189:22 194:12 211:11 215:18 240:18,19 241:10 251:16,25

**quote** 149:2

**quoting** 114:4

**R**

**raised** 211:10

**raises** 211:11

**ran** 92:6 246:15

**range** 17:3

**ranged** 97:4

**rapid** 54:20

**rapidly** 188:3

**rate** 59:10 154:15 218:2 220:8

**rates** 18:2 28:23 58:3 59:6

**rational** 203:18

**rationally** 203:8 215:2

**reach** 10:10 153:2

**reached** 178:25

**reaching** 219:8 222:6

**read** 11:10 15:5 17:4, 5 57:23 87:25 104:6, 16 114:9 116:2 122:8 137:20 154:23 215:16 234:14

**reading** 127:4 144:22

**reads** 103:25

**ready** 82:19

**real** 32:22 247:6,12 248:10

**realize** 226:20

**realized** 114:6

**reason** 37:21 88:2 110:23 136:21 150:10 168:12 173:4 188:5 217:17 219:18, 23 230:3

**reasonable** 54:8 61:13 211:21 218:21 219:5 221:3

**reasonableness** 22:12 100:23 101:10, 11,14

**reasons** 10:7

**recall** 16:18 17:9,13 18:19,21,24 19:2,4 20:24 21:2,5,8 69:2 72:17,25 73:6 74:14, 24 75:13 78:12,18 79:19,25 80:5 81:19, 22 82:3 86:5,6 87:10, 21 88:3,11,22,23 90:24,25 91:20,25 93:6,20,24 94:24 95:20 96:21 97:16,17 109:15 110:12 112:6 117:12 152:11,12,13 163:16 172:2,4 186:15 195:5 226:4 227:22 228:20 243:13

**receivable** 135:5,7 149:4,5 152:4 176:25 177:2

**receive** 88:15,17 89:15 112:12 228:6

**received** 24:22 50:9 79:4,17 82:10,12 86:18,20 88:4,8 104:2,22 105:4,17,24 106:5,17,24 108:10, 13 109:9 110:2,25 130:6 161:9 196:24 199:8 205:10 206:3 224:12,18 225:25 227:9,15,16,18 228:13,17,23,24 229:4 236:20,23 237:10 238:7,13 240:6,13 242:11,17 243:11,17 244:16,18 246:11 249:16,20,23 250:11

**receiving** 79:20 244:3 251:6

**recently** 18:10 82:6 86:14 150:5

**recess** 74:3 192:15 251:13

**recipient** 213:16

**recognized** 114:8,21 223:19

**recollection** 82:24 85:9 147:5,17 150:11 172:7,12

**recollections** 97:7

**recommend** 34:13 35:8 43:19 51:15 52:5 63:7 64:23 70:10,14,20 71:16 73:7,12 181:5,9,13, 14

**reconciled** 111:4

**record** 5:10 70:11,19 76:12 95:13 104:16 107:21,24 234:15 237:7

**recorded** 190:15

**recording** 5:14

**records** 72:8 234:12

**recovery** 174:15,17

**reduced** 125:4 152:21 153:4 245:17

**refer** 30:3 82:5 127:24 147:16 177:7

**reference** 72:6 121:16 122:4 125:13 126:22 128:15 129:6 130:22 131:12 134:10,14 138:5 141:7,15,24 144:5 177:14 182:10 208:3 234:5,23 236:14 242:20 243:2 247:12

**referenced** 81:5 143:24

**referred** 16:25 83:16 126:2 204:16 213:13 217:19 245:2

**referring** 17:11 120:14 162:23 213:14,17

**refers** 127:25 131:2, 25 132:15 151:8 155:7 205:14 216:18

**reflect** 21:12 75:7 83:14 226:22

**reflected** 194:22 219:21

**reflects** 214:4

**refresh** 85:8 147:5, 16 172:6,12

**refreshed** 85:14

**reinvest** 25:11

**reinvested** 24:24

**reinvesting** 25:22

**relate** 51:24 79:9,15 116:14 151:20 168:13 196:4 242:16

**related** 118:16 230:5

**relates** 136:5 137:6 140:12 143:4 148:22 153:21 154:7 165:7, 18 172:17 178:19 223:8 225:12 226:7 227:24 235:2 241:23

**relating** 35:7 38:3 84:25 92:15 98:7 148:19 149:16 181:10

**relative** 52:17

**relevant** 16:19 17:17 33:2 35:12,16 48:20 111:2 145:24 146:4 157:18,19 171:16

**reliability** 210:17

**relied** 94:19 104:15 115:11

**relies** 180:10,15

**reluctant** 246:16

**rely** 54:12 55:21 94:8 120:6 219:7

**relying** 106:8 133:19 140:3 148:14 190:4

**remember** 15:15 18:18 20:20 21:6 80:3 84:4 87:14 89:4 109:4 152:8 171:24 194:20 213:4 218:25

**remote** 5:14 9:10

**remotely** 5:11,12

**rendered** 27:20 249:12

**reorganization** 188:18,20

**repaid** 138:15

**repay** 215:3

**repeat** 67:18 209:9

**report** 10:13,14 11:10 15:5,8 16:25 17:22,23 18:6 40:4 42:10 48:12,15 76:15,20,23 77:10,15 78:13,24 79:10,15,21 82:6,11,18 83:5,16 84:7 89:7,12,17,20 90:3,18 91:5,16 93:21 94:14 98:8 101:6 103:18,21 104:9 106:22 107:3,8 110:24 112:14 114:12 115:17 120:8 129:22 140:4 160:11, 13 167:22 168:3,23 169:12 171:7,11,14, 24 172:7 174:6 181:15,21 182:13,18 183:7,23 185:25 195:23 200:6,10 204:19 205:2,5 207:21 216:18 217:20,21 218:7,11 230:21 231:7 232:9, 13,15 233:3 237:2,15 238:17 241:18 243:19 247:10

**reported** 142:7 180:24 191:24 210:8 223:6 244:2 246:6

**reporter** 5:2,5

**Reporting** 5:6

**reports** 129:18 180:3

**represent** 6:18 15:2 99:5 128:24 152:14 193:21 194:3,24 195:10 198:21 232:12 233:21 236:11 244:5

**representation** 129:5 152:20 244:14

**representative** 220:7

**represented** 189:11, 16 235:14

**representing** 62:3 99:16

**represents** 235:12

**reputation** 209:16

**request** 82:21

**require** 182:16

**required** 53:4

**research** 52:9 54:24 225:3

**reserve** 175:5

**Residential** 223:9, 16 229:25 230:14 231:10,20 235:15 237:11 239:6 244:10

**respect** 26:17 69:23 98:24 176:21 196:25 251:7

**response** 82:20

**responsibilities** 92:4 94:17 225:4

**responsibility** 61:22

**rest** 125:25 128:13

**restate** 158:13

**restricted** 226:7 227:24 228:4,12,18, 22 229:3,7,16 235:3, 7,20 236:15,23 237:10 238:8,13 239:6,8,9 240:21

**restructure** 204:15

**restructured** 194:25

**result** 250:12

**results** 162:22,24

**retained** 9:2 11:15 12:3,14 14:25 75:19, 23 76:5

**retention** 127:16

**rethink** 205:23

**rethought** 200:12

**Retired** 196:25

**return** 250:18 251:6

**returns** 162:11 243:11

**review** 40:12 75:11 87:16 112:3 130:2 190:6 243:10

**reviewed** 66:18 77:22 78:3 79:22 129:24 225:5

**reviewing** 78:12 80:8

**revolved** 87:13

**revolving** 149:23

**reward** 23:21,25 24:5 35:22 44:19,23 92:20

**rewarded** 62:18

**rewarding** 31:20

**rings** 10:8

**risk** 33:9 68:5 174:4, 10,24 175:3,9

**Rivera** 5:4

**role** 93:14 94:10,11, 13,16 95:23 222:2

**roles** 247:10

**roll-up** 81:6 150:12

**rolled** 118:16

**room** 5:9

**rough** 11:19 60:13 62:9

**roughly** 197:10 201:9

**Row** 197:21

**Rows** 204:16

**Rule** 5:17

**rules** 5:17,18,19 182:22

**run-of-the-mill** 112:20

─────────────

**S**

**salary** 225:20

**sale** 15:12 42:11,21 208:19

**sales** 13:8,15,19

**satisfaction** 22:19

**save** 243:24

**scans** 13:20

**scenario** 36:22 43:3 67:13 69:25 70:16

**schedule** 81:9,11 82:22 149:25

**schedules** 81:15,18 118:15

**scope** 58:17 156:22

**screen** 9:14 15:6 76:15,24 89:21 119:11 129:12 151:24 163:19 172:6 182:8 193:11,19 212:5 233:19 239:23

**scroll** 126:4 128:13 134:3 149:12 170:13 177:13 181:19 234:4, 8 237:9 238:4 240:5

**section** 120:23 125:25 126:3 128:14 130:11 132:14,15 148:19 149:10 155:21,25 156:2 157:4 164:3 180:21 181:21,25 182:8,25 183:6,13,16 184:8

**sections** 126:5

**seek** 34:14 64:24

**select** 222:18

**sell** 13:7 46:7 47:10 49:4,5,8

**selling** 46:18 49:7 215:4

**sends** 9:6

**senior** 12:21 28:21 50:5 203:16

**sense** 184:22

**sentence** 15:7,20 90:2 91:4 103:25 104:8 106:23 107:4, 17,19 114:2,11

**116:5,10,16 127:3 134:18 135:4 149:9 152:2 176:23 205:9 208:2,15 209:2 210:9,19 212:5 216:2,6,16**

**separate** 12:7 146:21

**series** 80:13 241:14

**serve** 14:16

**served** 8:23 85:11

**Service** 247:23

**services** 9:3 10:23 12:22 13:4,12,23 27:19 49:11 53:17 101:9 115:7 132:17 138:14 139:18 151:10 165:9,15 176:19 216:23 248:17,18,23 249:2, 3,7,12,16,19,23 250:6,12,16 251:6

**serving** 246:12

**set** 77:15 89:6,11 103:9,13

**seven-year** 37:22 218:17,23 219:9,15 220:2 221:22

**severity** 5:7

**shared** 109:25 146:17 248:18 249:7

**shareholder** 143:9 180:5

**shareholders** 61:23 180:9

**shares** 226:7 227:25 228:4,5,9,12,18,22 229:4,7,8,16

**sheet** 40:4 42:4 147:16 166:25 167:4, 11 173:12,23 174:2, 21 175:7

**shift** 184:17

**short** 184:20 251:11

**shorter** 221:5

**shortly** 180:2

**show** 180:23 181:7
182:5 183:15 194:5
229:11 234:8

**showed** 110:10
152:15 190:4,14
191:13,14,20 199:23
206:15

**showing** 167:7
241:24

**shown** 126:8 183:13
214:3 226:22 229:8

**shows** 199:2 200:16
225:20

**side** 246:20

**sign** 77:7

**signature** 77:5
183:20,22

**signed** 83:5 186:23

**significance** 35:17,
21 43:10,15,25 48:7

**significant** 11:12
33:4,13 36:5,6,9
44:2,24 46:18,21
53:2 55:13 62:12
162:5,6 174:9 183:12
200:25 213:23

**similar** 95:23,25
115:24 116:17,22
118:2 146:7 190:11
194:18 212:9 213:18,
19 215:14,24 217:6
225:4 246:17,23
247:13 249:23

**similarly** 244:19

**simple** 185:24
220:20

**simply** 92:24 160:12
201:8

**single** 16:4 106:18
149:24 244:4

**sir** 73:20 77:5 148:7
167:4 183:16 207:22
232:12 233:19 240:3

**sister** 99:7 145:22

**sit** 8:12 97:20 218:6
240:20 241:8,22

**sitting** 9:18 72:16,21
73:6 172:2 226:5
245:10

**situated** 244:19

**situation** 32:15 37:3
49:2 54:19,20 55:18
58:14 69:2 72:11
189:15 211:13
214:25

**situations** 37:9
38:16 54:22 55:19
109:16 188:11 211:8

**Sixty-two** 76:18

**sizing** 29:2

**sketchy** 97:3

**skill** 103:9,13

**skip** 128:23

**skipping** 128:21

**small** 52:15 53:3
55:25 73:13,16 247:8

**smaller** 245:9

**social** 5:8

**sold** 28:3 46:24 48:8
93:19 94:4

**sole** 25:15 248:12

**solely** 54:12 55:21
116:5 161:4

**somebody's** 34:11

**sooner** 139:14

**sophisticated** 58:5

**source** 24:25 25:5,15
26:19,23 53:23 54:13
55:6

**sources** 52:10

**space** 13:12

**speak** 74:6 90:20
91:22 95:16,17
100:13,17 193:7

**speaking** 91:15
251:22

**special** 29:24

**specializes** 10:22

**specific** 7:14 101:3,
10 127:5,12

**specifically** 39:24
93:24 105:16 106:7,8
152:12,13 154:9
156:2,20 157:5 210:3

**speculating** 23:15
214:12 215:6

**speculation** 23:16
27:22

**spend** 119:6

**spent** 10:15 91:15
92:6 189:24

**spoke** 118:5,10
206:10

**spoken** 66:19

**spouse** 10:9

**spreadsheets**
117:11

**stability** 218:20

**stack** 50:20 52:14
65:5

**stake** 59:9 185:15
209:15

**stamped** 232:4

**stand** 188:21 205:18

**standards** 102:9

**standpoint** 66:11

**Stang** 5:21 6:17

**starts** 163:22

**state** 107:9

**state's** 5:19

**stated** 91:3 107:25
170:4 172:8

**statement** 40:5
104:15 105:3 106:4,
12 113:2 136:16
141:10 142:13,21
170:18 174:14,23
176:23 179:8 188:17
200:10 205:18,22
208:22 210:13
215:22 226:23
233:16,20 236:8,12

237:21,25 238:7,25
239:15,24 242:19,23

**statements** 39:25
40:3,6,13,16 41:18
42:2 53:21 63:18
65:22 66:19 68:22
71:24 72:2,7 78:4,14
79:24 80:4 82:9,24
83:19 88:6,20
108:24,25 119:13,15,
25 120:5,22 123:17,
21 126:16 129:2,14,
25 133:10,16 139:23
142:8 147:19 148:9,
18 152:15 155:16,21
157:5 158:6,15
166:13,19 170:21
171:13 177:5,7,9,10
179:24 180:11 181:8
185:3 186:7 190:3
191:8 194:5 206:8,14
216:9 242:16

**states** 136:12 140:17
141:2,19 149:17,22
150:18 151:4,14
153:10,23 154:14
155:3 164:8,17
165:3,13,22 175:22
176:5,11,16 178:15,
24 179:13 244:15

**stature** 217:2

**steps** 51:5

**stickler** 201:15

**Stinson** 5:25 14:25
75:23 76:2 82:2,3
83:18 86:25 87:2,12
91:11,21 109:25
146:16

**stipulate** 5:13,23
6:4,7

**stock** 226:7,9,14,16,
18 227:3,10,14 228:6
229:15 235:3,7,20
236:15,20,23 237:11
238:8,13 239:6,9
240:9,13,22 244:12

**stop** 71:23 120:20
134:2 167:2 170:15

**straddles** 202:6

**straight** 157:15,19

**straightforward**
93:11

**strike** 61:15

**strive** 41:13

**structure** 14:14
28:14 58:7,12,17
60:10,15,19,23 61:3
65:14 92:19

**structured** 8:18
92:25

**structuring** 31:6

**study** 219:8,17

**stuff** 190:13

**subject** 8:8,13 15:10
16:14,20,24 17:21
24:11 25:7 26:12,18,
25 28:2 39:2 43:22
57:10 70:12 79:10
94:2 110:3,5 113:10
117:8,15 138:19
139:7 172:9 186:8
187:4 196:13 200:2
203:2,10 204:18,22
208:17 209:7,12
241:10

**subjective** 45:19,22
47:5,9,12 64:17
218:24 222:13

**subjectivity** 45:14

**subsequent** 17:23
22:20 42:20 43:5,23
44:17 56:9 64:10
179:20,23 180:15
181:22 182:2,22
183:6 184:8,11

**subsequently** 96:14

**substance** 87:14
95:21,22 193:8

**substantially** 15:13
208:20 226:2

**substantiate** 98:11,
15

**substantive** 103:20
166:25

**subtract** 201:18

**success** 31:22 62:12

**successes** 162:14

**successful** 92:20

**sufficient** 103:6

**suggest** 34:18,21,25 39:8 71:16 91:21 175:8 188:3

**suggested** 91:23 186:7 219:13

**suggestion** 142:21

**suggestions** 141:10

**suggests** 128:10 131:7,17 132:5,21 135:25 136:12 137:23 139:16 140:17 141:2,19 146:24 149:17 150:18 151:4,14 153:10,24 155:3 164:8,17 165:3,13 175:22 176:5,11,16 178:15,24 179:13

**suit** 15:10 172:9 208:17

**summarizing** 150:2

**summary** 194:2

**supplement** 41:20

**supplemented** 218:4

**support** 105:3 106:4, 12 116:9 161:10,18 210:13 213:9

**supporting** 162:2 242:16

**supports** 116:4

**supposed** 24:3 110:20 113:22

**swear** 5:11

**swearing** 5:15

**sworn** 6:8

**symbol** 235:11,13,15

**synonymous** 119:4

**T**

**taking** 219:24

**talk** 15:3 32:7 35:9 39:24 52:8,9 100:18 101:7 179:25 180:5 181:16 207:4

**talked** 21:14,16,23 90:15,17 91:5 92:3,8 96:18 104:18 208:24 209:4 212:15 217:23 247:18

**talking** 26:11,14,16 31:5,8,9 62:8 70:15 91:23 92:7 107:19 109:21 114:13 167:20 185:18,19 247:15

**tax** 243:10

**tax-related** 78:4,13

**taxes** 246:6

**team** 181:15

**telephone** 9:24 91:8

**telling** 93:25

**term** 18:20,23,25 59:6,17,25 66:8 127:18 150:13 229:14

**terms** 19:19,23 20:4 21:12 22:7,12 28:23 29:3 36:9 46:21 57:9, 12 58:2,11,21 61:10, 13 62:10 66:5,9 69:21 71:10 72:14 83:8,14 93:25 124:23 137:4 139:13 159:6 187:20 195:21 206:23 239:12 241:25

**terrible** 162:18

**testified** 6:9 62:20 82:10 84:15,22 85:21 86:3 98:21 108:22 116:25 168:5 169:18 170:10 181:4 196:16 203:3,12 210:20,22 211:7,25 214:20 235:6 244:24

**testimony** 6:23 7:4 74:7,11 85:2,17,23, 25 87:17 105:12 193:8

**testing** 83:21

**thereabouts** 117:3

**thesis** 39:20

**thing** 94:12 146:13 190:10 191:12 194:19 207:8 246:18

**things** 14:18 34:20 45:5,13,18,20,23 46:23 48:11,24 49:5, 8 59:20 62:14 63:3 64:19 70:6 72:19 73:12 78:9 88:12 100:20,24 110:6 139:9 156:14 157:7 174:16 180:3 181:6 188:12 191:12 194:5 203:21 210:23 211:9, 12,25 212:2 217:22 229:10 246:23

**thinking** 40:3

**thought** 48:4 67:19 93:10,11 138:23 161:21 196:19 214:22 215:7 217:25 221:9

**thoughts** 43:19

**thousands** 96:23

**tied** 169:6

**time** 12:16,17,25 18:22 21:21 25:21 28:19 39:3,18 44:11, 14 63:13 76:21 83:5 90:12 91:15 92:5,7 95:16,19 102:4 114:7 119:6,16 120:8 123:18 126:17 127:17,23 129:15 130:7 131:8,18 132:6 133:11 134:25 135:19 136:10 142:6 146:8 147:9 159:19 166:14 167:21 171:7 172:3 186:20 189:24 192:4 193:3,15 211:24 213:23,24 219:23 226:8 228:5,9

230:11 231:17 233:17 236:9 237:15, 22 239:2 242:7,15 251:16,18

**timeline** 219:18

**timely** 215:5

**times** 11:18 13:23 46:11 76:9 90:19 91:6 117:17 211:23

**timing** 172:13 184:11

**today** 6:19 8:12 9:14 14:19 74:8,11 79:9, 14 107:20 113:17 193:8 205:8 208:25 209:5 215:18 216:9, 17 217:23 218:6 236:20,24 241:22

**today's** 81:20

**told** 25:3 73:4 91:25 93:8 94:9,18 95:21 98:15,17 99:18,22 104:20 106:7,23 112:2 113:2 116:6 117:6,9,18 144:11 147:25 155:15 156:20 158:19 169:2 171:20 172:3 205:24 209:11,16,19,20 210:9,10,14,18 211:16 212:17,22 214:11 215:21 216:4, 12 227:18 228:25 236:19,22 238:12 240:12 241:17

**top** 126:6 134:8 155:24 170:16 218:12 231:2 232:17 242:22

**topic** 23:19 25:16

**total** 17:2 91:15 154:20 177:20 196:24 197:4,9,14 199:4,8,13 201:5 225:7,20,21 227:4 228:13 229:14 234:19 235:8,19 238:18 239:10

**totaled** 17:8

**totality** 25:13 169:3, 4,20 170:7

**trade** 246:20

**trading** 226:15

**traditional** 40:3

**train** 67:19 124:10

**transaction** 23:24 63:6,15 64:2,5,7,22 92:20 101:11 126:5 134:9

**transactions** 7:15 24:2 43:25 124:13 130:11 182:17

**transcript** 84:11,25 85:17 86:7,8,9,10,17, 20 87:3 88:21 89:10 100:10

**transfer** 194:6

**Traurig** 6:6

**treated** 110:21

**treatment** 111:6

**trends** 14:10

**trivial** 33:6 36:7 73:13,16

**trouble** 10:4 119:24

**true** 100:3 107:5 109:8 111:21 113:4 124:25 185:4,10 188:19 202:18 205:25 211:2 215:23 216:14 248:5

**trust** 84:18,22 85:3 99:8,24 101:16 145:13,16,19 146:12 223:9,16 229:25 230:15 231:11,20 235:15 237:11 239:7 244:10

**trustee** 99:8,23 145:22

**TSG** 5:6

**turn** 10:4 115:16 120:12 126:18 133:22 166:24

**turned** 23:7 158:21 229:7

**turning** 46:21

**type** 40:7 78:11
219:14

**types** 46:23 110:6

**typical** 54:22

_____

**U**

**unaware** 229:12

**uncertain** 37:15

**uncomfortable**
160:8

**underlying** 31:9

**underpaid** 220:24

**understand** 6:20,22
7:16 8:15 14:21 15:8,
19,25 20:16 29:9
31:4,15 32:23 38:18,
23,25 39:9 40:12
43:24 46:15 47:22
49:6 50:12 52:22
58:24 63:8,11,17
106:19 111:14
127:15 135:9 143:11
148:8 156:21 160:8
167:14 169:19 170:4
172:8,16 185:8 191:5
197:25 198:17
208:15 250:19

**understanding** 7:2,
7 8:11 14:14 24:4
27:7,13 31:18 32:3,4,
13 33:20 34:11,23
35:25 36:14,24 37:5
38:13 39:6,22 40:16
41:13,20,21 42:2,6
43:7,14 44:2,9 45:10,
21 46:17 48:4,6,25
49:15 51:10,17,22,23
52:13 53:6 54:4,9
56:6,10,14,24 57:3,
12,15 58:10,12,17,21
59:8 60:9,22 63:20,
22 65:13 66:17 68:21
120:3 143:7 179:22
182:15 184:7 185:11
203:6 204:6

**understands** 69:20

**understood** 22:21
112:3 159:18 210:3

**unfortunate** 189:20

**units** 12:24 235:3,20
236:16,23 237:11
238:8,13 239:6,9

**unpaid** 135:13,16,20
137:17 154:20

**unusual** 54:15 217:2
246:24

**update** 218:7

**upside** 10:11

**urgency** 59:23 60:5

**urgent** 60:2

**utilize** 53:23

_____

**V**

**validity** 5:14

**valued** 239:13 241:5

**varied** 162:19

**vehicle** 28:20

**verbal** 20:25

**verification** 54:6

**vest** 228:9

**vesting** 228:6

**vests** 228:7

**view** 193:17 218:2
219:6

**virtual** 153:16

**vouch** 209:19

_____

**W**

**W-2** 161:5 220:24
222:24 223:5,9,17,
18,22,24 224:9,11,
13,17 229:9,11,25
230:5,10,13 231:3,
10,16,19 243:12,16
244:3,8,10 246:4,5,6

**W-2S** 161:6,7 235:16

**wage** 27:24

**wages** 232:19 242:17

**wait** 139:3

**wanted** 50:11 156:6
168:2 171:19 220:6
251:25

**Waterhouse** 85:6,
10,18

**ways** 51:9 199:16

**week** 18:4 82:13 86:2
90:16

**wise** 158:24 159:3,7

**wished** 189:8

**withdrawn** 8:3 37:22
46:3 56:5 64:5 65:9
68:16 74:15 81:24
88:4 96:11 97:12
99:21 102:21 118:8
156:17 157:22
159:25 160:12 177:8
187:11 205:20
206:23 209:3 214:2
219:22 236:21 237:4
248:15

**word** 8:5,6 29:8
37:17 45:16 128:4
209:19

**words** 27:23 114:16

**work** 12:20 13:3 29:4
76:2 205:7 217:13,16
234:15 245:5

**worked** 20:23 53:18
76:11

**working** 12:21 21:9,
10

**world** 19:16 20:6,11
32:22 38:25 73:4
147:8 190:7 207:17
211:16 222:17

**world's** 11:12

**worth** 46:10 228:6
239:18

**write** 119:24 121:11
153:17 177:19 212:2
234:10

**writing** 69:12,19,24
70:3,6,21 71:3 73:12
74:11 82:6,18 96:2
181:6,7

**written** 17:22 19:5,9,
13 20:25 21:4 70:11,
19 95:12 107:21,24
175:7 206:6 209:20
213:11

**wrong** 224:25

**wrote** 90:2 112:14
166:6 213:6 217:21
236:25

_____

**Y**

**year** 50:6,9 75:2
90:11 95:5 120:2
121:20 122:18,23
123:4,8 125:4,18
130:20 131:21
132:10,25 133:16
134:16 137:12,17,25
142:17 152:10
154:10,19 170:25
172:3 177:25 180:3,7
182:24 184:16,24
186:2 208:7 235:21
236:17 237:13 238:9,
14,19 244:4 245:4,12

**years** 7:11,18 18:22
50:10 80:3 85:12
97:11,15 106:16
107:11 108:7 129:7
136:18 138:13
160:15,22,25 162:18,
19,22 182:15 220:18
221:5,10 222:18
225:7 233:22

**years'** 68:17

_____

**Z**

**Ziehl** 5:21 6:17

**Zoom** 90:24 91:2,8
120:18

_____

# EXHIBIT 102

# INTENTIONALLY

# OMITTED

**EXHIBIT 103**

# INTENTIONALLY

# OMITTED

# EXHIBIT 104

# INTENTIONALLY

# OMITTED

# EXHIBIT 105

Appx. 02048

1            WATERHOUSE - 10-19-21

2      IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
3               DALLAS DIVISION
    -----------------------------
4   IN RE:

5                    Chapter 11
    HIGHLAND CAPITAL
6   MANAGEMENT, L.P.,        CASE NO.
                    19-34054-SGI11
7
          Debtor.
8   -----------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10  vs.                     Adversary
                          Proceeding No.
11  HIGHLAND CAPITAL MANAGEMENT      21-03000-SGI
    FUND ADVISORS, L.P.; NEXPOINT
12  ADVISORS, L.P.; HIGHLAND
    INCOME FUND; NEXPOINT
13  STRATEGIC OPPORTUNITIES FUND;
    NEXPOINT CAPITAL, INC.; and
14  CLO HOLDCO, LTD.,

15          Defendants.
    -----------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18            FRANK WATERHOUSE

19            October 19, 2021

20

21

22

23

24  Reported by:  Susan S. Klinger, RMR-CRR, CSR

25  Job No: 201195

Page 2

```
1              WATERHOUSE - 10-19-21
2
3
4            October 19, 2021
5            9:30 a.m.
6
7
8
9      Remote Deposition of FRANK WATERHOUSE,
10  held before Susan S. Klinger, a Registered
11  Merit Reporter and Certified Realtime Reporter
12  of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              WATERHOUSE - 10-19-21
2   A P P E A R A N C E S :
3   (All appearances via Zoom.)
4   Attorneys for the Reorganized Highland Capital
5   Management:
6       John Morris, Esq.
7       Hayley Winograd, Esq.
8       PACHULSKI STANG ZIEHL & JONES
9       780 Third Avenue
10      New York, New York  10017
11  Attorneys for the Witness:
12      Debra Dandeneau, Esq.
13      Michelle Hartmann, Esq.
14      BAKER McKENZIE
15      1900 North Pearl Street
16      Dallas, Texas  75201
17  Attorneys for NexPoint Advisors, LP and
18  Highland Capital Management Fund Advisors,
19  L.P.:
20      Davor Rukavina, Esq.
21      An Nguyen, Esq.
22      MUNSCH HARDT KOPF & HARDD
23      500 North Akard Street
24      Dallas, Texas  75201-6659
25
```

Page 4

```
1              WATERHOUSE - 10-19-21
2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3   and HCMS:
4       Deborah Deitsch-Perez, Esq.
5       Michael Aigen, Esq.
6       STINSON
7       3102 Oak Lawn Avenue
8       Dallas, Texas  75219
9
10  Attorneys for Dugaboy Investment Trust:
11      Warren Horn, Esq.
12      HELLER, DRAPER & HORN
13      650 Poydras Street
14      New Orleans, Louisiana 70130
15
16  Attorneys for Marc Kirschner as the trustee for
17  the litigation SunTrust:
18      Deborah Newman, Esq.
19      QUINN EMANUEL URQUHART & SULLIVAN
20      51 Madison Avenue
21      New York, New York  10010
22
23  Also Present:
24      Ms. La Asia Canty
25
```

Page 5

```
1              WATERHOUSE - 10-19-21
2                I N D E X
3
4   WITNESS                          PAGE
5   FRANK WATERHOUSE
6   EXAMINATION BY MR. MORRIS            10
7   EXAMINATION BY MR. RUKAVINA          256
8   EXAMINATION BY MS. DEITSCH-PEREZ     352
9   EXAMINATION BY MR. MORRIS            377
10  EXAMINATION BY MR. RUKAVINA          387
11  EXAMINATION BY MS. DEITSCH-PEREZ     393
12
13             E X H I B I T S
14  No.                        Page
15  Exhibit 2  NPA et al Amended Complaint    142
16  Exhibit 33 6/3/19 Management        91
17         Representation
18  Exhibit 34 HCMLP Consolidated Financial    94
19         Statements
20  Exhibit 35 HCMFA Incumbency Certificate    151
21  Exhibit 36 Email string re 15(c)      170
22  Exhibit 39 HCMLP Operating Results 2/18    226
23  Exhibit 40 Summary of Assets and       236
24         Liabilities
25  Exhibit 41 12/19 Monthly Operating Report  258
```

Page 6

WATERHOUSE - 10-19-21

1
2 Exhibit 45 HCMFA Consolidated Financial     135
3     Statements
4 Exhibit 46 NexPoint 2019 Audited         218
5     Financials
6
7 Exhibit A1 Emails 11/25                 328
8 Exhibit A2 Emails 12/31                 338
9 Exhibit A6 Emails 1/12                  341
10 Exhibit A7 Promissory Notes            297
11 Exhibit A9 Email, 8/31                 307
12 Exhibit A10 Acknowledgment from HCMLP        302
13 Exhibit A11 HCMLP Schedule 71A            309
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

WATERHOUSE - 10-19-21

1
2     P R O C E E D I N G S
3     VIDEOGRAPHER:  Good morning,
4 Counselors.  My name is Scott Hatch.  I'm a
5 certified legal videographer in association
6 with TSG Reporting, Inc.
7     Due to the severity of COVID-19 and
8 following the practice of social
9 distancing, I will not be in the same room
10 with the witness.  Instead, I will record
11 this videotaped deposition remotely.  The
12 reporter, Susan Klinger, also will not be
13 in the same room and will swear the witness
14 remotely.
15     Do all parties stipulate to the
16 validity of this video recording and remote
17 swearing, and that it will be admissible in
18 the courtroom as if it had been taken
19 following Rule 30 of the Federal Rules of
20 Civil Procedures and the state's rules
21 where this case is pending?
22     MR. HORN:  Yes.
23     MS. DANDENEAU:  Yes.
24     MR. MORRIS:  Yes.  John Morris.  I
25 would just try to do a negative notice

Page 8

WATERHOUSE - 10-19-21

1
2 here, as we did yesterday.  If anybody has
3 a problem with what was just stated, can
4 you state your objection now?
5     Okay.  No response, so everybody
6 accepts the stipulation and the instruction
7 that was just given.
8     VIDEOGRAPHER:  Thank you.  This is
9 the start of media labeled Number 1 of the
10 video recorded deposition of Frank
11 Waterhouse In Re: Highland Capital
12 Management, L.P., in the United States
13 Bankruptcy Court for the Northern District
14 of Texas, Dallas Division, Case Number
15 21-03000-SGI.
16     This deposition is being held via
17 video conference with participants
18 appearing remotely due to COVID-19
19 restrictions on Tuesday, October 19th, 2021
20 at approximately 9:32 a.m.  My name is
21 Scott Hatch, legal video specialist with
22 TSG Reporting, Inc. headquartered at 228
23 East 45th Street, New York, New York.  The
24 court reporter is Susan Klinger in
25 association with TSG Reporting.

Page 9

WATERHOUSE - 10-19-21

1
2 Counsel, please introduce
3 yourselves.
4     MR. MORRIS:  John Morris, Pachulski
5 Stang Ziehl & Jones for the reorganized
6 Highland Capital Management, L.P., the
7 plaintiff in these actions.
8     MS. DANDENEAU:  Deborah Dandeneau
9 from Baker McKenzie.  My partner, Michelle
10 Hartmann, is also in the room with me,
11 representing Frank Waterhouse individually.
12     MS. DEITSCH-PEREZ:  Deborah
13 Deitsch-Perez from Stinson, LLP,
14 representing Jim Dondero, Nancy Dondero,
15 HCRA, and HCMS.
16     MR. HORN:  Warren Horn with Heller,
17 Draper & Horn in New Orleans representing
18 Dugaboy Investment Trust.
19     MR. RUKAVINA:  Davor Rukavina with
20 Munsch Hardt Kopf & Harr in Dallas
21 representing NexPoint Advisors, LP and
22 Highland Capital Management Fund Advisors,
23 L.P.
24     MR. AIGEN:  Michael Aigen from
25 Stinson, and I represent the same parties

**Appx. 02051**

Page 10

1        WATERHOUSE - 10-19-21
2   as Deborah Deitsch-Perez.
3        MS. NEWMAN:  This is Deborah Newman
4   from Quinn Emanuel.  We represent the
5   litigation – Marc Kirschner as the trustee
6   for the litigation SunTrust.
7        MR. MORRIS:  I think that is
8   everybody.
9        VIDEOGRAPHER:  Thank you.  Will the
10   court reporter please swear in the witness.
11        FRANK WATERHOUSE,
12   having been first duly sworn, testified as
13   follows:
14        EXAMINATION
15   BY MR. MORRIS:
16   Q.   Please state your name for the
17   record.
18   A.   My name is Frank Waterhouse.
19   Q.   Good morning, Mr. Waterhouse.  I'm
20   John Morris, as you know, from Pachulski Stang
21   Ziehl & Jones.  You understand that my firm and
22   I represent Highland Capital Management, L.P.;
23   is that right?
24   A.   Yes.
25   Q.   Okay.  And do you understand that

Page 11

1        WATERHOUSE - 10-19-21
2   we're here today for your deposition in your
3   individual capacity?
4   A.   Yes.
5   Q.   Did you review and – did you
6   receive and review a subpoena that Highland
7   Capital Management, L.P., served upon you?
8   A.   Yes.
9   Q.   You have been deposed before; right?
10   A.   Yes.
11   Q.   How many times have you been
12   deposed?
13   A.   About three or four times.
14   Q.   Okay.  And I defended you in one
15   deposition; isn't that correct?
16   A.   That is correct.
17   Q.   So the general ground rules for this
18   deposition are largely the same as the
19   depositions you have given before.  And that is
20   I will ask you a series of questions, and it is
21   important that you allow me to finish my
22   question before you begin your answer; is that
23   fair?
24   A.   Yes.
25   Q.   And it is important that I allow you

Page 12

1   to finish your answers before I begin a
2   question, but if I fail to do that, will you
3   let me know?
4   A.   I can certainly do that.
5   Q.   Okay.  Do you understand that this
6   deposition is being videotaped?
7   A.   Yes.
8   Q.   You understand that I may seek to
9   use portions of the videotape in a court of
10   law?
11   A.   I did not know that, until you just
12   said that.
13   Q.   Okay.  And you are aware of that now
14   before the deposition begins substantively; is
15   that right?
16   A.   Yes.
17   Q.   So unlike I think the other
18   depositions that you have given, this one is
19   being given remotely.  So that presents some
20   unique challenges, at least as compared to a
21   deposition that is taken in-person.
22        From time to time we're going to put
23   documents up on the screen, Mr. Waterhouse.
24   And it is important that I give you the

Page 13

1        WATERHOUSE - 10-19-21
2   opportunity to review any portion of the
3   document that you think you need in order to
4   fully and completely answer the question.
5        So I would ask you to let me know if
6   there is a portion of a document that you need
7   to see in order to fully and completely answer
8   the question.  Can you do that for me?
9   A.   Yes.
10        MS. DANDENEAU:  Mr. Morris, I would
11   just note that we do have hard copies of
12   the documents that you sent, so if you can
13   just refer to the exhibit number as
14   reflected in the documents that you sent,
15   Mr. Waterhouse will be able to look at the
16   hard copies of those documents.
17        MR. MORRIS:  I appreciate that,
18   and – and I will encourage him to do so.
19   There will be other documents that we did
20   not send to you that we'll be using today
21   though.
22   Q.   Okay.  With that as background, if
23   there is anything that I ask you, sir, that you
24   don't understand, will you let me know?
25   A.   Yes.

**Appx. 02052**

Page 14

WATERHOUSE - 10-19-21

1
2  Q.  Okay.  Are you currently employed?
3  A.  Yes.
4  Q.  By whom?
5  A.  The Skyview Group.
6  Q.  When did you become employed by the
7  Skyview Group?
8  A.  I believe March 1st of 2021.
9  Q.  Do you have a title at Skyview?
10  A.  Yes.
11  Q.  What is your title?
12  A.  My title is chief financial officer.
13  Q.  Do you report to anybody in your
14  role as CFO?
15  A.  I don't, no.
16  Q.  No.  Is there a president or a CEO
17  of Skyview?
18  A.  Yes.
19  Q.  Who is that?
20  A.  That is Scott Ellington.
21  Q.  But you don't report to
22  Mr. Ellington; is that right?
23  A.  I don't think so.
24  Q.  Does Skyview Group –
25      MS. DANDENEAU:  Excuse me, we –

Page 15

WATERHOUSE - 10-19-21

1
2  A.  I – I – I might.  I just – I
3  don't recall.
4  Q.  Okay.  Does Skyview Group provide
5  any services to any entity directly or
6  indirectly owned or controlled by Jim Dondero?
7  A.  Yes.
8  Q.  Can you name – is that pursuant to
9  written contracts?
10  A.  Yes.
11  Q.  And do you know how many contracts
12  exist?
13  A.  Approximately six or so.
14  Q.  And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17  A.  No.
18  Q.  Do you know how many – how many –
19  how many employees does Skyview have?
20  A.  Approximately 35.
21  Q.  And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24  A.  I don't know the exact number.
25  Q.  Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2  A.  Yes.
3  Q.  Is it more than 30?
4  A.  I don't know.
5  Q.  Can you tell me what portion of
6  Skyview – Skyview's revenue is derived from
7  entities that are directly or indirectly owned
8  or controlled by Jim Dondero?
9      MS. DANDENEAU:  Mr. Morris, I mean,
10  you called Mr. Waterhouse here individually
11  for purposes of his testimony in connection
12  with the noticed litigation.  I have given
13  you some leeway to ask him some background
14  information about Skyview Group, but this
15  is not a substitute for a deposition in
16  connection with any other pending disputes
17  that exist.  And – and we agreed to accept
18  the subpoena on the basis of he – this is
19  testimony that he is giving in connection
20  with the noticed litigation.
21      I really think that you are now
22  going a little bit far afield from the
23  purpose of this deposition.
24      MR. MORRIS:  Okay.  It is – I'm not
25  intending to use these – the answers to

Page 17

WATERHOUSE - 10-19-21

1
2  these questions for any purpose other than
3  this litigation.  I think you understand
4  fully why I'm asking the questions, and I
5  just have a couple more, if you will bear
6  with me.
7      MS. DANDENEAU:  Okay.
8      MS. DEITSCH-PEREZ:  Can we have an
9  agreement that an objection by one is an
10  objection for any other party here?
11      MR. MORRIS:  Sure.  I would – I
12  would encourage that, sure.
13      MS. DEITSCH-PEREZ:  Thank you.
14      MR. MORRIS:  It can't be sustained
15  or overruled more than one time, so...
16  Q.  Mr. Waterhouse, can you answer my
17  question, please.
18      MS. DANDENEAU:  Do you want to
19  repeat it, Mr. Morris, for his benefit?
20      MR. MORRIS:  Sure.
21  Q.  Can you – can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25  A.  I don't know the exact number.

**Appx. 02053**

Page 18

```
1              WATERHOUSE - 10-19-21
2    Q.   Is it more than 75 percent?
3    A.   Yes.
4    Q.   Is it more than 90 percent?
5    A.   I don't know.
6    Q.   Okay.  Can I refer to Highland
7    Capital Management, L.P., as Highland?
8    A.   Yes.
9    Q.   All right.  And you previously
10   served as Highland's CFO; correct?
11   A.   Yes.
12   Q.   When did you join Highland?
13   A.   I don't recall the exact date.
14   Q.   Can you tell me what year?
15   A.   2006.
16   Q.   When did you -- in what year did you
17   become Highland's CFO?
18   A.   I don't recall the exact date.
19   Q.   I'm not asking you for the exact
20   date.  I'm asking you if you recall the year in
21   which you were appointed CFO.
22   A.   I don't recall the exact year.
23   Q.   Can you tell me which years it is
24   possible that you were appointed to CFO of
25   Highland?
```

Page 19

```
1              WATERHOUSE - 10-19-21
2    A.   2011 or 2012.
3    Q.   Did you serve as Highland's CFO on a
4    continuous basis from in or around 2011 or 2012
5    until early 2021?
6    A.   Yes.
7    Q.   During that entire time you reported
8    directly to Jim Dondero; correct?
9    A.   I -- I don't know.
10   Q.   Is there anybody else you reported
11   to -- withdrawn.
12        Did you report to Mr. Dondero for
13   some portion of the time that you served as
14   CFO?
15   A.   Yes.
16   Q.   Is there a portion of time that you
17   don't recall who you reported to?
18   A.   Yes.
19   Q.   What portion of time do you have in
20   your mind when you can't recall who you
21   reported to?
22   A.   From the 2011 to -- for
23   approximately a year or two.
24   Q.   Okay.  So is it fair to say that you
25   reported to Mr. Dondero in your capacity as CFO
```

Page 20

```
1    from at least 2014 until the time you left
2    Highland?
3         MS. DANDENEAU:  Objection to form.
4    A.   I don't want to speculate the exact
5    or what year that changed or -- so I would like
6    to stick with my testimony.
7    Q.   Can you recall when you began
8    reporting to Mr. Dondero?
9    A.   I don't recall.
10   Q.   Can you -- can you give me an
11   estimate of what year you think you might have
12   began reporting to Mr. Dondero?
13   A.   I will go back to my prior
14   testimony.
15   Q.   Okay.  There is no -- you have no
16   ability to tell me when you began reporting to
17   Mr. Dondero.
18        Do I have that right?
19        MS. DANDENEAU:  Objection to form.
20   A.   I don't recall.
21   Q.   Okay.  Do you recall who you might
22   have reported to before you began reporting to
23   Mr. Dondero?
24   A.   Yes.
```

Page 21

```
1              WATERHOUSE - 10-19-21
2    Q.   Who might you have reported to in
3    your capacity as CFO before you started
4    reporting to Mr. Dondero?
5    A.   That would have been Patrick Boyce.
6    Q.   Are you aware that Highland filed
7    for bankruptcy on October 19th, 2019?
8    A.   Yes.
9    Q.   And we refer to that as the petition
10   date?
11   A.   Yes.
12   Q.   Okay.  Do you hold any professional
13   licenses, sir?
14   A.   Yes.
15   Q.   Can you tell me what professional
16   licenses you hold?
17   A.   I'm a certified public accountant.
18   Q.   Okay.  Anything else?
19   A.   No.
20   Q.   Do you have any other professional
21   licenses or certificates?
22   A.   When you say "professional license,"
23   that is not education?
24   Q.   Tell me -- sure.  Anything other
25   than a driver's license.
```

Page 22

WATERHOUSE - 10-19-21

1
2     Do you have any other license or
3 certificate or certification?
4     A.   Are you asking, like, where I went
5 to school and the –
6     Q.   I am not.  I am not.  I didn't say
7 education.  I didn't ask about degrees.
8     Do you know what a license is?
9     A.   Well, yeah, I mean, a license is
10 something you get after you receive a certain
11 level of proficiency.
12     Q.   Do you have any licenses or
13 certifications other than your CPA?
14     MS. DANDENEAU:  Objection, form.
15     I assume you mean professional
16 licenses, Mr. Morris; correct?
17     Q.   Can you answer my question, sir?
18     A.   Mr. Morris, I'm thinking.  I
19 don't – I don't think I have any others.
20     Q.   Are you familiar with an entity
21 called Highland Capital Management Fund
22 Advisors?
23     A.   Yes.
24     Q.   Were you ever – can we refer to
25 that entity as HCMFA?

Page 23

WATERHOUSE - 10-19-21

1
2     A.   Yes.
3     Q.   Were you ever employed by HCMFA?
4     A.   Not that I recall.
5     Q.   Were you ever – did you ever hold
6 the title of an officer or director of HCMFA?
7     A.   Yes.
8     Q.   What title did you hold?
9     A.   Treasurer.
10     Q.   When did you become the treasurer of
11 HCMFA?
12     A.   I don't recall.
13     Q.   Can you tell me the year?
14     A.   I don't – I don't know the year.
15     Q.   Can you approximate the year in
16 which you became the treasurer of HCMFA?
17     A.   I don't know.
18     Q.   Can you tell me if it was before or
19 after 2016?
20     A.   I don't recall.
21     Q.   Are you still the – do you know if
22 you're still the treasurer of HCMFA today?
23     A.   Today, I am the acting treasurer for
24 HCMFA.
25     Q.   Is there a distinction between

Page 24

WATERHOUSE - 10-19-21

1
2 treasurer and acting treasurer?
3     A.   I said "acting treasurer" as I am an
4 employee of Skyview, as you previously
5 stated – or asked.
6     Q.   But you are the treasurer of HCMFA
7 today; correct?
8     A.   I am – I am the acting treasurer
9 for HCMFA.
10     Q.   How did you become the treasurer of
11 HCMFA?
12     A.   Are you asking how I became the
13 treasurer of HCMFA today?
14     Q.   How did you become appointed to
15 serve as the treasurer of HCMFA?
16     A.   Well, in – in – in what time
17 capacity?
18     Q.   The first time that you were
19 appointed.
20     A.   First time.  I believe I was asked
21 to serve as treasurer for HCMFA the first time.
22     Q.   By who?  Who asked you to do that?
23     A.   I don't recall.
24     Q.   Is there anything that would refresh
25 your recollection as to who appointed you as

Page 25

WATERHOUSE - 10-19-21

1
2 the treasurer of CF- – HCMFA for the first
3 time?
4     A.   I don't – I mean, there would be
5 some documents, some legal documents.  I don't
6 know where those are.
7     Q.   How many times have you been
8 appointed the treasurer of HCMFA?
9     A.   I don't know.
10     Q.   Was it more than once?
11     A.   I don't know.
12     Q.   Can you tell me any period of time
13 since 2016 that you did not hold the title of
14 treasurer of HCMFA?
15     MS. DANDENEAU:  Objection to form.
16     A.   I don't recall.
17     Q.   What are your duties and
18 responsibilities as the treasurer of HCMFA?
19     A.   My duties are to do the best job
20 that I can as the – as an accountant and
21 finance guy.
22     Q.   What specific duties and
23 responsibilities do you have as the treasurer
24 of HCMFA?
25     A.   My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1
2  that I can as the accounting and finance person
3  for HCMFA.
4      Q.   As the accounting and finance person
5  for HCMFA, do you have any particular areas of
6  responsibility?
7      A.   Yeah, it is to manage the accounting
8  and finance function for HCMFA.
9      Q.   Would that include -- do you have
10  responsibility for overseeing HCMFA's annual
11  audit?
12      A.   Can I please elaborate on my prior
13  question?
14      Q.   Of course.  You -- you are giving
15  answers.  I'm asking questions.
16      A.   Okay.  Yes, so the -- it -- like I
17  said, it is to manage the accounting finance
18  aspect, but I am, as we discussed, the
19  treasurer.  That is -- being treasurer is what
20  gives me that -- that management function.
21      Q.   Does anybody report to you in your
22  capacity as treasurer of HCMFA?
23      A.   I don't believe so.
24      Q.   Does HCMFA have a chief financial
25  officer?

Page 27

WATERHOUSE - 10-19-21

1
2      A.   I don't -- I don't know.
3      Q.   You don't know?
4           You're the treasurer of HCMFA but
5  you don't know if HCMFA has a chief financial
6  officer.
7           Do I have that right?
8      A.   That's right.
9      Q.   Okay.  Have you heard of a company
10  called NexPoint Advisors?
11      A.   Yes.
12      Q.   We will refer to that as NexPoint.
13  Okay?
14      A.   Okay.
15      Q.   Were you ever employed by NexPoint?
16      A.   I don't recall.
17      Q.   Did you ever hold any title with
18  respect to the entity known as NexPoint?
19      A.   Yes.
20      Q.   What titles have you held in
21  relation to NexPoint?
22      A.   Treasurer.  I think it was only
23  treasurer.
24      Q.   Can you tell me the approximate year
25  you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

1
2      A.   I don't know.
3      Q.   Are you still the treasurer of
4  NexPoint today?
5      A.   I am the acting treasurer for
6  NexPoint.
7      Q.   When did your title change from
8  treasurer to acting treasurer?
9      A.   I don't know.
10      Q.   Did your duties and responsibilities
11  change at all when your title was changed from
12  treasurer to acting treasurer?
13      A.   I don't -- I don't believe so.
14      Q.   Why did --
15      A.   I still manage the finance and
16  accounting function for NexPoint.
17      Q.   Why did your title change from
18  treasurer to acting treasurer?
19      A.   I don't -- I'm using the term
20  "acting treasurer" as I'm a Skyview employee.
21  I don't -- I don't know -- again, I am a -- as
22  I am the Skyview employee.
23      Q.   Okay.
24      A.   And we -- we provide officer
25  services.

Page 29

WATERHOUSE - 10-19-21

1
2      Q.   And you serve as an officer of
3  HCMFA; correct?
4      A.   I think we went over that with my
5  testimony.  Yes, I'm the acting treasurer for
6  HCMFA.
7      Q.   And you are an officer of NexPoint;
8  correct?
9      A.   I think -- I am the acting treasurer
10  for NexPoint Advisors.
11      Q.   And -- and who appointed you acting
12  treasurer of NexPoint Advisors?
13      A.   I don't recall specifically.
14      Q.   Do you have any recollection of who
15  might have appointed you the treasurer of
16  NexPoint?
17      A.   I mean, it -- it -- I don't recall
18  exactly who it was.
19      Q.   Who were the possibilities?
20      MS. DEITSCH-PEREZ:  Object to the
21  form.
22      Q.   You can answer.
23      A.   Someone in the legal group for
24  NexPoint.  The other officers as well.
25      Q.   Have you heard of a company called

**Appx. 02056**

WATERHOUSE - 10-19-21

1
2 Highland Capital Management Services, Inc.?
3    A.   Yes.
4    Q.   We will refer to that as HCMS.
5 Okay?
6    A.   HCMS.  Okay.
7    Q.   Were you ever employed by HCMS?
8    A.   No.
9    Q.   Have you ever held any titles in
10 relation to HCMF -- I apologize -- HCMS?
11    A.   Yes.
12    Q.   What titles have you held in
13 relation to HCMS?
14    A.   Treasurer and acting treasurer.
15    Q.   When did you first become treasurer
16 or acting treasurer of HCMS?
17    A.   I don't recall the exact dates.
18    Q.   Can you recall -- can you
19 approximate the year that you became the
20 treasurer of HCMS?
21    A.   I don't -- I don't know.
22    Q.   Are you still the treasurer of HCMS
23 today?
24    A.   I am the acting treasurer for HCMS.
25    Q.   And are your duties and

WATERHOUSE - 10-19-21

1
2 responsibilities as the acting treasurer for
3 HCMS and the acting treasurer for NexPoint the
4 same as your duties and responsibilities in
5 your role as the acting treasurer of HCMFA?
6    A.   More or less.
7    Q.   Have you ever heard of a company
8 called HCRE Partners, LLC?
9    A.   Yes.
10    Q.   And do you understand that that
11 entity is now known today as NexPoint Real
12 Estate Partners?
13    A.   I did not know that.
14    Q.   All right.  Can we refer to HCRE
15 Partners as HCRE?
16    MS. DANDENEAU:  Objection to form.
17    Did you mean NexPoint Real Estate
18 Partners, Mr. Morris?
19    MR. MORRIS:  No.
20    MS. DANDENEAU:  Oh.
21    MR. MORRIS:  He said he wasn't
22 familiar that it was succeeded by that
23 entity.  So --
24    MS. DANDENEAU:  Okay.
25    MR. MORRIS:  -- let's go with what

WATERHOUSE - 10-19-21

1
2    the witness knows.
3    Q.   You're familiar with an entity
4 called HCRE Partners, LLC; correct?
5    A.   Yes.
6    Q.   Okay.  So that is the entity that we
7 will refer to as HCRE.  If you're aware of any
8 successor, that is great.  If not, let's just
9 define it as such.
10    Have you ever been employed by HCRE
11 or any entity that you know to have succeeded
12 HCRE?
13    A.   No.
14    Q.   Did you ever serve as an officer or
15 director of HCRE or any successor?
16    A.   Not that I recall.
17    Q.   Okay.  Can we refer to NexPoint and
18 HCMFA as the advisors?
19    A.   Yes.
20    Q.   In general, the advisors provided
21 investment advisory services to certain retail
22 funds; correct?
23    A.   Yes.
24    Q.   And we will refer to the retail
25 funds that are served by the advisors

WATERHOUSE - 10-19-21

1
2 collectively as the retail funds; is that okay?
3    A.   Okay.
4    Q.   Each of the retail funds is governed
5 by a board; correct?
6    A.   Yes.
7    Q.   And do you know the people who serve
8 on the boards of the retail funds?
9    MS. DANDENEAU:  Objection to form.
10    A.   I don't know all of them.
11    Q.   Do you know whether the same people
12 serve on the board of each of the retail funds
13 as we've defined that term?
14    A.   Which -- so when you say "retail
15 funds" -- again, I want to be -- what retail
16 funds are you referring to, because there are
17 -- there are several distinctions?
18    What retail funds are you using when
19 you refer to them?
20    Q.   That is why -- that is why I tried
21 to define the terms.  So let me do it again.
22    Retail funds for the purposes of
23 this deposition means any retail fund to which
24 either of the advisors provides advisory
25 services.  Okay?

Page 34

WATERHOUSE - 10-19-21

1   A.   Okay.
2   Q.   Okay.  So do you know whether the
3   same people serve on the board of each of the
4   retail funds?
5   A.   I don't know.
6   Q.   Were you ever employed by any of the
7   retail funds?
8   A.   No.
9   Q.   No?
10  A.   No.
11  Q.   Okay.  Do you have any title with
12  respect to any of the retail funds?
13  A.   Yes.
14  Q.   What titles do you hold --
15  withdrawn.
16      Do you have the same titles with
17  respect to all of the retail funds or do
18  they -- or just something else?
19      MS. DANDENEAU:  Objection to form.
20  Q.   Withdrawn.
21      Do you have the same title with
22  respect to each of the retail funds?
23  A.   No.
24  Q.   Tell me which title you have with

Page 35

WATERHOUSE - 10-19-21

1   respect to each retail fund.
2       Actually, let's do it a different
3   way.  I withdraw the question.
4       Can you give me one title you have
5   in relation to any retail fund?
6   A.   Yes.
7   Q.   What title -- what title can you
8   give me?
9   A.   Principal executive officer.
10  Q.   Do you serve as principal executive
11  officer for each of the retail funds?
12  A.   No.
13  Q.   Can you identify for me the retail
14  funds in which you serve as the principal
15  executive officer?
16  A.   Yes.  Highland Funds 1, Highland
17  Funds 2, Highland Income Fund, Highland Global
18  Allocation Fund.
19  Q.   I'm sorry, you said "Global
20  Allocation Fund"?
21  A.   Yes.
22      VIDEOGRAPHER:  Excuse me,
23  Mr. Morris.  This is the videographer.  I'm
24  concerned about the lighting in the

Page 36

WATERHOUSE - 10-19-21

1   witness' camera.
2       Do you want to go off the record and
3   make some adjustments?
4       MR. MORRIS:  Sure, but just for this
5   purpose.  I don't want to take a break.  We
6   just started.
7       MS. DANDENEAU:  Yeah, that is fine.
8   That is fine.  We're going to put you on
9   mute.
10      MR. MORRIS:  All right.
11      MS. DANDENEAU:  I'm going to try to
12  open up some of the shades.
13      VIDEOGRAPHER:  We're going off the
14  record at 10:08 a.m.
15      (Recess taken 10:08 a.m. to 10:11 a.m.)
16      VIDEOGRAPHER:  We are back on the
17  record at 10:11 a.m.
18  Q.   Mr. Waterhouse, when did you become
19  the principal executive officer of the four
20  retail funds that you just identified?
21  A.   I don't recall.
22  Q.   Do you recall the approximate year
23  that you became the principal executive officer
24  of the four funds?

Page 37

WATERHOUSE - 10-19-21

1   A.   2021.
2   Q.   Did you ever hold any title with
3   respect to any of the four funds you have just
4   identified other than principal executive
5   officer?
6   A.   I don't recall.
7   Q.   Is it possible that you held a
8   position or a title with the four funds you
9   just identified prior to 2021?
10  A.   Yes.
11  Q.   But you don't recall if you did or
12  not; do I have that right?
13  A.   No.  You -- I thought you asked, did
14  I hold other titles.
15  Q.   Did you hold any title at the four
16  retail funds for which you now serve as
17  principal executive officer at any time prior
18  to 2021?
19  A.   Yes.
20  Q.   What titles did you hold?
21  A.   I don't recall all the titles.
22  Q.   Do you recall any of the titles?
23  A.   Yes.
24  Q.   What titles do you recall holding at

Appx. 02058

Page 38

1       WATERHOUSE - 10-19-21
2   those four retail funds before 2021?
3       A.   Principal executive officer.
4       Q.   Were you the principal executive
5   officer of the four retail funds that you have
6   identified?
7       A.   Sorry, could you repeat the
8   question?
9       Q.   Were you the principal executive
10  officer for each of the four retail funds that
11  you have identified?
12      A.   Yes.
13      Q.   When did you become the principal
14  executive -- withdrawn.
15           Can you give me the approximate year
16  that you became the principal executive officer
17  for each of the four retail funds you've
18  identified?
19      A.   I don't recall.
20      Q.   What are your duties and
21  responsibilities as the principal executive
22  officer of these four retail funds?
23      A.   It is to manage the finance and
24  accounting positions.
25      Q.   So at the same time you serve as the

Page 39

1       WATERHOUSE - 10-19-21
2   treasurer of the advisors, you also serve as
3   the principal executive officer of these four
4   retail funds; correct?
5       A.   Yes.
6       Q.   Did you ever hold any title with
7   respect to any other retail fund?
8       A.   Not that I recall.
9       Q.   During the period that you served as
10  Highland's CFO, from time to time Highland
11  loaned money to certain of its officers and
12  employees; correct?
13      A.   Yes.
14      Q.   During the period that you served as
15  Highland's CFO, from time to time Highland
16  loaned money to certain --
17      A.   Let me -- let me retract that,
18  sorry, that -- you asked during the time I was
19  CFO, Highland loaned moneys to employees.  I
20  don't -- I don't recall that during my tenure
21  of CFO.
22      Q.   You have no recollection during the
23  time that you were the CFO of Highland of
24  Highland ever loaning any money to any officer
25  or director of Highland?

Page 40

1       WATERHOUSE - 10-19-21
2       A.   I don't recall during my tenure of
3   Highland or my -- as CFO of Highland -- yeah,
4   if there are any loans as CFO of Highland.
5       Q.   I'm just talking about officers and
6   employees right now.  You have no recollection
7   of Highland ever making a loan to any of its
8   officers or employees during the time that you
9   served as CFO.  Do I have that right?
10          MS. DANDENEAU:  Objection to form.
11      A.   So I thought you were saying
12  officers and employees as CFO, right, so there
13  were -- I mean, okay, yes.
14      Q.   I would ask you to listen carefully
15  to my question.  If I -- if I'm not clear, let
16  me know, but I'm really trying to be as clear
17  as I can.
18      A.   I'm listening as carefully as I can,
19  and you are asking very specific questions in a
20  timeline.  And I'm trying to answer your
21  questions as specifically as I can, and I
22  apologize if -- if I'm going back.  I am -- you
23  are asking very specific questions.  Thank you.
24      Q.   During the period that you served as
25  Highland's CFO, from time to time Highland

Page 41

1       WATERHOUSE - 10-19-21
2   loaned money to certain corporate affiliates;
3   correct?
4           MS. DANDENEAU:  Objection to form.
5       A.   What are corporate affiliates?
6       Q.   How about the ones that are in
7   Highland's audited financial statements under
8   the section entitled Loans to Affiliates.  Why
9   don't we start with those.  Do you have any
10  understanding of what the phrase "affiliates"
11  means?
12          MS. DANDENEAU:  Objection to form.
13      A.   I understand what affiliates are,
14  yet affiliates can have different meanings in
15  different contexts, so...
16      Q.   Why don't you -- why don't you tell
17  me what your understanding of the term
18  "affiliate" is in relation to Highland Capital
19  Management, L.P.
20      A.   Is that a -- it depends on the
21  context.
22      Q.   How about the context of making
23  loans?
24          MS. DANDENEAU:  Objection to form.
25      A.   I didn't make the determination of

Appx. 02059

Page 42

WATERHOUSE - 10-19-21

1  who an affiliate was or is at the time those –
2  I didn't – that wasn't my job to make a
3  determination of who an affiliate is.
4      Q.   All right.  So as the CFO of
5  Highland, do you have any ability right now to
6  tell me which companies that were directly or
7  indirectly owned and/or controlled by
8  Mr. Dondero in whole or in part received loans
9  from Highland Capital Management, L.P.?
10         MS. DANDENEAU:  Objection to form.
11         MS. DEITSCH-PEREZ:  Objection, form.
12     A.   Yes.
13     Q.   Okay.  Identify every entity that
14 you can think of that was directly or
15 indirectly owned and/or controlled by
16 Mr. Dondero in whole or in part that received a
17 loan from Highland Capital Management, L.P.
18         MR. RUKAVINA:  Objection, legal
19         conclusion.
20     A.   NexPoint Advisors, Highland Capital
21 Management Fund Advisors, HCM Services,
22 Dugaboy.  Sorry, I don't think – Dugaboy
23 doesn't fit that definition.  You said owned
24 and controlled.  I don't think that that

Page 43

WATERHOUSE - 10-19-21

1  definition –
2      Q.   I said owned and/or controlled.
3      A.   I don't – again, I don't – I'm not
4  the legal expert.  I don't think it controls –
5  he controls Dugaboy, so again, I'm not the
6  legal person.
7      Q.   I'm not asking you for a legal
8  conclusion, sir.  I'm asking you for your
9  knowledge, okay, as the CFO – the former CFO
10 of Highland Capital Management, other than
11 NexPoint, HCMFA, and HCMF – HCMS, can you
12 think of any other entities that were owned
13 and/or controlled directly or indirectly in
14 whole or in part by Jim Dondero who received a
15 loan from Highland Capital Management, L.P.?
16         MS. DANDENEAU:  Objection to form.
17     A.   HCRE.
18     Q.   Any others?
19     A.   That is – that is all I can think
20 of.
21     Q.   And you're aware that from time to
22 time while you were the CFO, Highland loaned
23 money to Jim Dondero; correct?
24     A.   Yes.

Page 44

WATERHOUSE - 10-19-21

1      Q.   Okay.  Can we refer to the four
2  entities that you just named and Mr. Dondero as
3  the affiliates?
4      A.   So that would be Jim Dondero,
5  NexPoint Advisors, Highland Capital Management
6  Fund Advisors, and HCRE.
7      Q.   And HCMS?
8      A.   And HCMS, okay.
9      Q.   And can we refer to the loans that
10 were given to each of those affiliates as the
11 affiliate loans?
12     A.   Yes.
13     Q.   And is it fair to say that each of
14 the affiliates were the borrowers under the
15 affiliate loans as we're defining the term?
16         MR. RUKAVINA:  Objection, legal
17         conclusion.
18     A.   The borrowers are whoever were on
19 the notes.  I don't – I don't know.  I'm not
20 the legal person.
21     Q.   But you –
22     A.   I don't know.
23     Q.   You do know, as Highland's former
24 CFO, that each of the affiliates that you have

Page 45

WATERHOUSE - 10-19-21

1  identified tendered notes to Highland; correct?
2      A.   Yes.
3          MR. RUKAVINA:  Hey, John, will you
4          just give me a running objection to legal
5          conclusion to HCM –
6          MR. MORRIS:  No.  No, if you want to
7          object –
8          MR. RUKAVINA:  I will object every
9          time.  Object to legal conclusion.
10         MR. MORRIS:  That is fine.
11     A.   Sorry, can you repeat the question?
12     Q.   Are you aware that each of the –
13 that each of the affiliates, as we have defined
14 the term, gave to Highland a promissory note in
15 exchange for the loans?
16         MR. RUKAVINA:  Objection to the
17         extent that calls for a legal conclusion.
18     A.   I don't.
19     Q.   No, you don't know that?
20     A.   No, they didn't – you said they
21 exchanged a promissory note for a loan.  I
22 don't – I don't understand that question, so I
23 said no.
24     Q.   At the time of the bankruptcy
25 filing, did Highland have in its possession

WATERHOUSE - 10-19-21

1    promissory notes that were signed by each of
2    the affiliates?
3        A.   Yes.
4        Q.   To the best of your knowledge,
5    during the time that you served as Highland's
6    CFO, did Highland disclose to its outside
7    auditors all of the loans that were made to
8    affiliates?
9        MR. RUKAVINA:  Objection, that calls
10   for a legal conclusion.
11       MS. DEITSCH-PEREZ:  I also couldn't
12   hear you, John, because there was some
13   garbling on -- on the -- on the call.
14       MR. MORRIS:  Folks, I've got to tell
15   you this is not going well, and I'm
16   reserving my right --
17       MS. DANDENEAU:  John, it was just
18   the end of that question.  It was just the
19   end of that question.  I couldn't hear it
20   either.  Sorry, if you could repeat it,
21   please.
22       MR. MORRIS:  That is less than an
23   hour into this, but folks are trying to run
24   out the clock, and so I'm just going to

WATERHOUSE - 10-19-21

1    state that now.
2        MS. DANDENEAU:  You know, and,
3    Mr. Morris, I really object to that.  I
4    mean --
5        MR. MORRIS:  Okay.
6        MS. DANDENEAU:  -- Mr. Waterhouse
7    just told you he's trying to listen to your
8    questions and answer them carefully, and
9    you have no basis for saying that.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  This does not --
12   this is not an experienced witness, so he's
13   trying to do the best he can.
14       Q.   Mr. Waterhouse, during the time that
15   you served as Highland's CFO, did Highland
16   disclose to its outside auditors all of the
17   loans that it made to each of the affiliates
18   that you have identified?
19       MR. RUKAVINA:  Objection, legal
20   conclusion.
21       A.   Yes.
22       Q.   To the best of your knowledge, while
23   you were Highland's CFO, were all of the
24   affiliate loans described in Highland's audited

WATERHOUSE - 10-19-21

1    financial statements?
2        MR. RUKAVINA:  Objection, legal
3    conclusion.
4        A.   When an audit was performed, any
5    loans that were made by Highland to the
6    affiliates were disclosed to auditors.
7        Q.   Are you aware of any loan that was
8    made to any affiliate that was not disclosed to
9    the auditors?
10       A.   I'm not aware.
11       Q.   To the best of your knowledge, did
12   each of the affiliates who were --
13   (inaudible) -- loaned from Highland execute a
14   promissory note in connection with that loan?
15       MR. RUKAVINA:  Objection, legal
16   conclusion.
17       A.   Sorry, you -- halfway through the
18   question it got muffled.
19       Can you repeat that again?
20       Q.   To the best of your knowledge, did
21   every affiliate execute a promissory note in
22   connection with each loan that it obtained from
23   Highland?
24       MR. RUKAVINA:  Objection, legal

WATERHOUSE - 10-19-21

1    conclusion.
2        A.   Yes.
3        Q.   You are not aware of any loan that
4    any affiliate ever obtained from Highland where
5    the affiliate did not give a promissory note in
6    return; is that fair?
7        A.   Yes, I'm not aware.
8        Q.   And to the best of your knowledge,
9    did Highland loan to each affiliate an amount
10   of money equal to the principal amount of each
11   promissory note?
12       MR. RUKAVINA:  Objection, legal
13   conclusion.
14       A.   Yes.
15       Q.   During the time that you served as
16   CFO, did Highland ever loan money to
17   Mark Okada?
18       A.   I -- I don't recall.
19       Q.   Did you ever see any promissory
20   notes executed by Mark Okada?
21       A.   I don't recall.
22       Q.   Do you know if Highland ever forgave
23   any loan that it ever made to Mr. Okada?
24       A.   I don't recall.

Appx. 02061

1          WATERHOUSE - 10-19-21
2     Q.    Do you recall if Mr. Okada paid back
3  all principal and interest due and owing under
4  any loan he obtained from Highland?
5          MS. DEITSCH-PEREZ:  Objection to
6  form.
7          MS. DANDENEAU:  Objection to form.
8     A.    I don't recall.
9     Q.    Do you recall whether -- during your
10  time as CFO, whether Highland ever loaned money
11  to Jim Dondero?
12     A.    Yes.
13     Q.    To the best of your knowledge, did
14  Mr. Dondero sign and deliver to Highland a
15  promissory note in connection with each loan
16  that he obtained from Highland?
17     A.    If you are referring to the
18  promissory notes that, you know, part of
19  Highland's records, yes.
20     Q.    Okay.  You're not aware of any loan
21  that Mr. Dondero took from Highland that wasn't
22  backed up by -- by a promissory note with a
23  face -- with a principal amount equal to the
24  amount of the loan; correct?
25     A.    Am I aware that Jim Dondero took a

1          WATERHOUSE - 10-19-21
2  loan?
3     Q.    Without giving a -- let me ask a
4  better question.  I'm sorry, Mr. Waterhouse.
5          Are you aware of any loan that
6  Mr. Dondero obtained from Highland where he
7  didn't give a promissory note in return?
8     A.    I'm not aware.
9     Q.    During the time that you served as
10  Highland's CFO, did Highland ever forgive any
11  loans, in whole or in part, that it made to
12  Mr. Dondero?
13     A.    Not that I'm aware.
14     Q.    At the time that you served as
15  Highland's CFO, did Highland ever forgive any
16  loan, in whole or in part, that it made to any
17  affiliate as we've defined the term today?
18     A.    Not that I'm aware.
19     Q.    During the time that you served as
20  Highland's CFO, did Highland ever forgive, in
21  whole or in part, any loan that it ever made to
22  any officer or employee?
23     A.    Highland forgave loans to officers
24  and employees.  It may not have been at the
25  time when my title was CFO.

1          WATERHOUSE - 10-19-21
2     Q.    Okay.  And so I appreciate the
3  distinction.
4          Is it fair to say that, to the best
5  of your knowledge, Highland did not forgive a
6  loan that it made to an officer or employee
7  after 2013?
8          MS. DANDENEAU:  Objection to form.
9     A.    I don't recall.
10     Q.    To the best of your knowledge, did
11  Highland disclose to its auditors every
12  instance where it forgave, in whole or in part,
13  a loan that it had made to one of its officers
14  or employees?
15     A.    No.
16     Q.    Can you think of -- can you -- can
17  you identify any loan to an officer or employee
18  that was forgiven by Highland, in whole or in
19  part, that was not disclosed to Highland's
20  outside auditors?
21     A.    Look, I don't recall all of the
22  loans and the loan forgiveness.  I just know as
23  part of the audit process there is a
24  materiality concept.
25          So if there were loans to employees

1          WATERHOUSE - 10-19-21
2  that were of -- you know, that were deemed
3  immaterial, those items may not have been
4  disclosed by the team to the auditors.
5     Q.    I appreciate that.
6          Do you have an understanding as to
7  what the level of materiality was?
8     A.    I don't recall.
9     Q.    As the CFO of Highland, to the best
10  of your knowledge, did Highland disclose to its
11  outside auditors every loan that was forgiven,
12  in whole or in part, that was material as that
13  term was defined by the outside auditors?
14     A.    Yes.
15     Q.    And do you recall where -- do you
16  recall where the definition of materiality can
17  be found for -- for this particular purpose?
18          MS. DANDENEAU:  Objection to form.
19     A.    No.  You -- I don't determine
20  materiality.
21     Q.    Okay.  I'm just asking you if you
22  can help me understand where it is, but I think
23  we will find it in a few minutes.
24          You are aware that Highland has
25  commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  affiliates, as we've defined the term, to
3  collect under certain promissory notes; is that
4  right?
5     A.  Yes.
6     Q.  And are you familiar with the notes
7  that are issue -- at issue in the lawsuits?
8        MS. DANDENEAU:  Objection to form.
9     A.  Generally familiar.
10    Q.  Can we refer to the lawsuits that
11  Highland has commenced against the affiliates
12  collectively as the lawsuits?
13    A.  Yes.  And, again, the affiliates are
14  NexPoint, HCMFA, HCMS, and HCRE.
15    Q.  And Mr. Dondero?
16    A.  Okay.  See, that is a new -- and now
17  Mr. Dondero is included in your affiliate
18  definition.
19    Q.  I just --
20    A.  I thought affiliates -- I thought
21  affiliates were just the four prior entities,
22  so I just want to be clear.
23    Q.  I appreciate that.  So let's --
24  let's keep them separate and let's refer to the
25  four corporate entities as the affiliates, and

Page 55

1        WATERHOUSE - 10-19-21
2  Mr. Dondero we will call Mr. Dondero.  Okay?
3    A.  Okay.  Thank you.  As you can see,
4  Mr. Morris, there is a lot of entities -- a lot
5  here.  I just want to be clear.
6    Q.  Okay.  Now, the affiliates of
7  Mr. Dondero signed promissory notes that are
8  not subject to the lawsuit.
9     Do you understand that?
10      MS. DANDENEAU:  Objection to form.
11    A.  The affiliates and Mr. Dondero
12  signed --
13    Q.  You know what?  I will skip it.
14  That is okay.  Okay.
15     From time to time while you were
16  Highland's CFO, payments were applied against
17  principal and interests that were due under the
18  notes that were tendered by the affiliates and
19  Mr. Dondero; correct?
20      MR. RUKAVINA:  Objection to the
21    extent that calls for a legal conclusion.
22    A.  Yes.
23    Q.  Did Highland have a process where --
24  whereby payments would be applied against
25  principal and interest against the notes that

Page 56

1        WATERHOUSE - 10-19-21
2  were given by the affiliates and Mr. Dondero?
3    A.  Yes.
4    Q.  Can you describe the process for me?
5    A.  The process, payment should be
6  applied as laid out in the -- in the promissory
7  note.
8    Q.  From time to time were payments made
9  that were not required under the promissory
10  notes?
11      MS. DANDENEAU:  Objection to form.
12    A.  Yes.
13    Q.  Who was responsible for deciding
14  when and how much the payments would be made
15  with respect to each of the notes that were
16  issued by the affiliates and Mr. Dondero?
17    A.  Who was responsible for deciding how
18  much was paid prior to the due date?
19    Q.  Yes.
20    A.  I don't know.
21    Q.  Did you approve of each payment that
22  was made against principal and interest on the
23  notes that were given by the affiliates and
24  Mr. Dondero?
25      MS. DANDENEAU:  Objection to form.

Page 57

1        WATERHOUSE - 10-19-21
2    A.  Did I approve the payments?  I
3  approve -- I approve -- if there was cash -- if
4  there was cash being repaid on a note payment,
5  yes, I approved in the general sense of being
6  made aware of the payment and the amount.
7    Q.  And are you the person who
8  authorized Highland's employees to effectuate
9  those payments?
10    A.  Yes.
11    Q.  When you gave the instruction to
12  effectuate the payment, did you obtain
13  Mr. Dondero's prior approval?
14    A.  I mean, it -- I mean, it -- it
15  depends.
16    Q.  Can you think of any instance where
17  you directed Highland's employees to make a
18  payment of principal or interest against any
19  note that was tendered by an affiliate or
20  Mr. Dondero that Mr. Dondero did not approve of
21  in advance?
22    A.  I can't recall specifically.
23    Q.  Can you identify -- withdrawn.
24     Did Mr. Dondero ever tell you that a
25  payment that was made against principal and

**Appx. 02063**

Page 58

WATERHOUSE - 10-19-21

1
2    interest due under one of the notes that was
3    tendered by an affiliate or himself should not
4    have been made?
5        A.   Yes.
6        Q.   Can you identify the payment for me?
7        A.   It would be for -- for NexPoint
8    Advisors.
9        Q.   Okay.  And when did Mr. Dondero tell
10   you that a payment that you had initiated on
11   behalf of NexPoint should not have been made?
12       A.   I wasn't initiating payment.  It was
13   in the context of the -- I think you used this
14   term, "the advisors," so NexPoint Advisors and
15   Highland Capital Management Fund Advisors had
16   overpaid on certain agreements with Highland
17   Capital Management, L.P.  And as a part of that
18   process, the advisors -- what I was told at the
19   time were in talks and negotiations and
20   discussions with Highland Capital Management,
21   L.P., on offsets in relation to those
22   overpayments.
23       Q.   When did this conversation take
24   place?
25       MS. DANDENEAU:  Objection to form.

Page 59

WATERHOUSE - 10-19-21

1
2        A.   I don't recall specifically.
3        Q.   Do you recall what year it was?
4        A.   Yes.
5        Q.   What year did the conversation with
6    Mr. Dondero take place that you just described?
7        A.   2020.
8        Q.   Okay.  Do you remember if it was
9    December 2020?
10       A.   It -- it -- I don't -- I don't
11   recall what month specifically, but it would
12   have been November or December.
13       Q.   And we're talking here about a
14   payment of principal and/or interest that was
15   due -- withdrawn.
16           We're talking here about a payment
17   of principal and interest that was applied
18   against NexPoint's note; correct?
19       MS. DANDENEAU:  Objection to form.
20       A.   I don't recall what that payment
21   consisted of.
22       Q.   Is it possible that the payment you
23   have in mind related to the shared services
24   agreement?
25       MS. DANDENEAU:  Objection to form.

Page 60

WATERHOUSE - 10-19-21

1
2        A.   No.
3        Q.   Are you certain that the payment --
4    that the payment that you have in mind related
5    to the promissory note that NexPoint issued in
6    favor of Highland?
7        MS. DANDENEAU:  Objection to form.
8        A.   Yes.
9        Q.   Okay.  Other than that one payment,
10   can you identify any other instance where
11   Mr. Dondero told you that a payment should not
12   have been applied against principal and
13   interest under any promissory note tendered by
14   any affiliate or Mr. Dondero?
15       MS. DANDENEAU:  Objection to form.
16       MS. DEITSCH-PEREZ:  Objection to
17   form.
18       A.   Not that I recall.
19       Q.   Thank you very much.
20           Do you know if Mr. Dondero approved
21   in advance of each loan made to each affiliate
22   and himself during the time that you were the
23   CFO?
24       MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 61

WATERHOUSE - 10-19-21

1
2        A.   Yes, generally.
3        Q.   Can you identify any loan that was
4    ever made to an affiliate or to Mr. Dondero
5    that Mr. Dondero did not approve of in advance?
6        A.   Other than the ones that are in
7    dispute, I'm not aware.
8        Q.   Do you believe that Mr. Dondero did
9    not approve of each of the loans that are in
10   dispute in advance of the time that the loan
11   was made?
12       MS. DANDENEAU:  Objection to form.
13       A.   Given what is in the dispute, you
14   know, and -- and -- and the way things might --
15   yeah, I mean...
16       Q.   I am not asking about the dispute,
17   and it was probably my mistake to follow you
18   there.
19           Were you aware of every loan made by
20   Highland to each of its affiliates and
21   Mr. Dondero while you were the CFO at the time
22   each loan was made?
23       A.   Was I aware of every loan, yes.
24       Q.   Okay.  And if you put yourself back
25   in time, do you recall that any of the loans

**Appx. 02064**

Page 62

WATERHOUSE - 10-19-21

1   that were made to one of the affiliates or
2   Mr. Dondero during the time that you were the
3   CFO was made without Mr. Dondero's prior
4   knowledge and approval?
5       A.   Not that I recall.
6       Q.   Thank you.  In fact, do you -- as
7   the CFO, would you have allowed Highland to
8   loan money to an affiliate or to Mr. Dondero
9   without obtaining Mr. Dondero's prior approval?
10          MS. DANDENEAU:  Objection to form.
11      A.   I can't -- there was so many times
12  over the years, I can't speak for every single
13  one, but generally, yes, I -- I spoke to him.
14      Q.   You -- you never -- you never --
15  withdrawn.  I will just take that.
16          Can you recall any payment that was
17  ever made against principal and interest on a
18  note that was issued in favor of Highland by an
19  affiliate or Mr. Dondero that you personally
20  did not know about in advance?
21      A.   There are so many through the years,
22  I don't -- I don't -- I don't recall every
23  single one.
24      Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21

1   that was made against principal and interest on
2   any note tendered by any affiliate or
3   Mr. Dondero that you didn't know about in
4   advance?
5       A.   I don't recall.
6       Q.   Other than Mr. Dondero -- withdrawn.
7          Did anybody at Highland have the
8   authority to make a payment against principal
9   and interest due under a loan given to the
10  affiliates and Mr. Dondero without your
11  knowledge and approval?
12          MS. DANDENEAU:  Objection to form.
13      A.   Sorry, there was -- to make a
14  payment on an affiliate loan, what you are
15  saying would it require my knowledge and
16  approval, yes.
17      Q.   Okay.  I appreciate that.  Thank
18  you.
19          Did anybody at Highland have the
20  authority, to the best of your knowledge, to
21  effectuate a loan to an affiliate without
22  Mr. Dondero's prior knowledge and approval?
23          MS. DANDENEAU:  Objection to form.
24      A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21

1   generally, yes.
2       Q.   Did you personally communicate with
3   Mr. Dondero to let him know each time a payment
4   of principal or interest was being made against
5   any note that was tendered by an affiliate or
6   Mr. Dondero to Highland?
7       A.   I don't -- are you saying, did I let
8   Mr. Dondero know if a payment was made on any
9   affiliate or loan to Mr. Dondero?  I mean,
10  not -- not every -- no.
11      Q.   Let me ask it this way:  Did you
12  have a practice of informing Mr. Dondero when
13  payments were made against principal and
14  interest on any note that was tendered by an
15  affiliate or Mr. Dondero?
16          MS. DEITSCH-PEREZ:  Objection to
17  form.
18          MS. DANDENEAU:  Objection to form.
19      A.   No, I did not.
20      Q.   Did Mr. Dondero ever tell you that a
21  payment of principal or interest had been made
22  against a note that was tendered by an
23  affiliate or himself that he had been unaware
24  of?

Page 65

WATERHOUSE - 10-19-21

1       A.   Not that I recall.
2       Q.   Are you aware that Mr. Dondero and
3   the affiliates -- withdrawn.
4          Are you aware that Mr. Dondero
5   NexPoint, HCRE, and HCMS all contend that they
6   do not have to pay on any of the notes they
7   issued because they are subject to an oral
8   agreement between Mr. Dondero and Nancy
9   Dondero, in her capacity as the trustee of the
10  Dugaboy Investment Trust?
11          MS. DANDENEAU:  Objection to form.
12      A.   I didn't -- I didn't -- I didn't
13  know that it was all notes.
14      Q.   Okay.  Are you -- did you ever learn
15  that there was an oral agreement between Jim
16  Dondero and Nancy Dondero pertaining to any
17  notes issued by any affiliate or Mr. Dondero?
18          MS. DEITSCH-PEREZ:  Object to the
19  form.
20      A.   Yes.
21      Q.   Do you have any understanding as to
22  the terms of that agreement?
23      A.   Yes.
24      Q.   What is your understanding of the

Page 66

WATERHOUSE - 10-19-21

1  terms of the agreement?
2      A.   That there were certain milestones
3  that had to be reached.
4      Q.   Do you have any understanding of the
5  terms of the agreement between Mr. Dondero and
6  Nancy Dondero concerning any of the notes
7  issued by the affiliates or Mr. Dondero other
8  than that there have to be milestones reached?
9          MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   There are milestones, I found out
12  yesterday, or there was some --
13         MS. DANDENEAU:  Okay.  I'm just
14     going to object to the extent that you
15     learned anything in conversations with
16     counsel, please don't reveal -- that is
17     privileged, and don't reveal any privileged
18     communications.
19     THE WITNESS:  Okay.
20     A.   So I'm not aware of anything else.
21     Q.   Do you know what the milestones
22  were?
23         MS. DANDENEAU:  Objection to form.
24     A.   I don't.

Page 67

WATERHOUSE - 10-19-21

1      Q.   Do you know anything about -- do you
2  know what promissory notes the agreement
3  covered?
4      A.   I don't.
5      Q.   Do you know if -- if Jim and Nancy
6  Dondero entered into one agreement or more than
7  one agreement?
8          MS. DEITSCH-PEREZ:  Object to the
9      form.
10     A.   I don't know.
11     Q.   Do you know if the agreement is in
12  writing?
13     A.   I don't know.
14     Q.   How did you learn the existence
15  of the agreement?
16         MS. DANDENEAU:  Objection to form.
17     Again --
18     A.   I don't -- I don't recall who told
19  me.
20     Q.   You have no recollection of who told
21  you about this agreement between Jim and Nancy
22  Dondero?
23         MS. DEITSCH-PEREZ:  Object to the
24     form.

Page 68

WATERHOUSE - 10-19-21

1      A.   I don't recall.
2      Q.   Do you recall how you learned of the
3  agreement?
4          Was it in a meeting?  Was it in a
5  phone call?  Was it in an email?
6      A.   I don't recall.
7      Q.   Do you recall when you learned of
8  the agreement?
9      A.   Not specifically.
10     Q.   Do you recall what year you learned
11  of the agreement?
12     A.   In -- look, I mean, there are so
13  many notes.  I may be getting -- I believe it
14  was 2020.
15     Q.   All right.  I'm not asking about
16  notes, sir.  I'm asking about the agreement
17  that you testified you knew about between Jim
18  and Don- -- Nancy Dondero.  Okay.
19         Do you understand my question now?
20  Should I ask my question again?
21     A.   Yeah, sure.  Go ahead.
22     Q.   I'm going to use the word
23  "agreement" to refer to the agreement that
24  Mr. Dondero and Nancy Dondero entered into

Page 69

WATERHOUSE - 10-19-21

1  where you understood that certain milestones
2  had to be reached.  Okay?
3      A.   Uh-huh.
4          MS. DANDENEAU:  Objection.
5          MS. DEITSCH-PEREZ:  Object to the
6      form.
7      MR. MORRIS:  Just defining a term,
8      what is the objection.
9          MS. DEITSCH-PEREZ:  The objection --
10         MR. MORRIS:  I will move on.  I will
11     move on.
12         MS. DEITSCH-PEREZ:  John --
13     Q.   Sir, are you okay with that
14  definition of agreement?
15     A.   Okay.
16     Q.   Okay.  So you don't recall who --
17  who informed you of the existence of the
18  agreement; is that right?
19     A.   I don't recall.
20     Q.   You don't recall who told you the
21  terms of the agreement.
22         Do I have that right?
23     A.   Correct.
24     Q.   And you don't recall if you learned

Page 70

WATERHOUSE - 10-19-21

1  about the agreement in a meeting, through an
2  email, or through a phone call.
3      Do I have that right?
4      A.   I don't recall.
5      Q.   Can you tell me when you learned of
6  the agreement?
7      A.   I don't -- I don't -- I don't
8  remember specifically.
9      Q.   Can you tell me if you learned of
10  the agreement before or after the petition
11  date?
12      A.   It would have been -- it would have
13  been after.
14      Q.   Can you tell me if you learned of
15  the agreement before or after January 9th,
16  2020?
17      A.   It would have been after.
18      Q.   Can you tell me if you learned of
19  the agreement before or after you left Highland
20  Capital Management in February of 2021?
21      A.   I don't -- I don't -- I don't know.
22      Q.   It is possible that you learned of
23  it while you were a Highland employee.
24      Do I have that right?
25

Page 71

WATERHOUSE - 10-19-21

1      A.   I don't remember the -- I mean, it
2  was sometime in 2021.  I don't remember when.
3      Q.   All right.  So to the best of your
4  recollection, it was in 2021 but you don't
5  recall if it was before or after you ceased to
6  be a Highland employee.
7      Do I have that right?
8      A.   Yeah, I mean, it was -- it was
9  likely after I was -- after I left Highland
10  because, if I put myself back into the last
11  days of -- of 2021, it was -- you know, the
12  communications with Mr. Dondero were -- were --
13  were -- there weren't as many communications
14  because of the circumstances.
15      Q.   And so based on that you believe
16  that it is most likely that you learned of this
17  agreement sometime after you left Highland
18  employment?
19      A.   I wouldn't use the term "most
20  likely."  I don't recall specifically.  I don't
21  recall.
22      Q.   Do you recall ever telling Jim Seery
23  about this agreement?
24      A.   No, I don't -- I didn't tell
25

Page 72

WATERHOUSE - 10-19-21

1  Jim Seery.
2      Q.   Did you tell anybody at DSI about
3  this agreement?
4      A.   No.
5      Q.   Did you tell any of Highland's
6  independent directors about this agreement?
7      A.   No.
8      Q.   Did you tell anybody at Pachulski
9  Stang Ziehl & Jones about this agreement?
10      A.   No.
11      Q.   Did you tell any employee of
12  Highland about this agreement?
13      A.   No.
14      MS. DANDENEAU:  Mr. Morris, it has
15  been an hour and a half.  Is this a good
16  time for a break?
17      MR. MORRIS:  Sure.
18      Q.   Mr. Waterhouse, I will just remind
19  you that during the break please don't speak
20  with anybody about the deposition, the
21  substance of your testimony or anything else
22  concerning the deposition.  Okay?
23      A.   Yes.
24      MR. MORRIS:  So it is 11:02.  We're
25

Page 73

WATERHOUSE - 10-19-21

1  at 11:02 your time.  Let's come back, I
2  guess, at 15 -- at 11:15 your time.
3      VIDEOGRAPHER:  We're going off the
4  record at 11:02 a.m.
5  (Recess taken 11:02 a.m. to 11:20 a.m.)
6      VIDEOGRAPHER:  We are back on the
7  record at 11:20 a.m.
8      Q.   Mr. Waterhouse, did you speak with
9  anybody during the break about this deposition?
10      A.   No.
11      MS. DANDENEAU:  Other than -- other
12  than his counsel.
13      Q.   Did you speak to your counsel about
14  the substance of your deposition today?
15      A.   No, I didn't bring it up.
16      Q.   I didn't ask you if you brought it
17  up.  I asked you if you had any conversation
18  with your lawyer about the substance of your
19  deposition.
20      MS. DANDENEAU:  Yes, he did.
21      Q.   Can you tell me what the -- you
22  discussed?
23      MS. DANDENEAU:  No, I object to
24  that.  He's not going to answer.  That is a
25

Appx. 02067

WATERHOUSE - 10-19-21

1   privileged conversation.
2   MR. MORRIS: So I just want to make
3   sure that I understand. During the break
4   you spoke with your client about the
5   substance of this deposition; is that
6   right?
7   MS. DANDENEAU: Yes, John.
8   MR. MORRIS: And you refuse – you
9   refuse to let your client tell me what was
10  discussed; is that right?
11  MS. DANDENEAU: That's correct.
12  MR. MORRIS: You know, I had given
13  the instruction prior to the break not to
14  speak with counsel. I would have
15  appreciated –
16  MS. DANDENEAU: No, you didn't –
17  actually, that is not true, Mr. Morris.
18  You said not to speak with anyone. We
19  never have interpreted that to mean
20  conversations with counsel. That's never
21  been – I have never, ever heard that
22  instruction.
23  MR. MORRIS: Okay. We will – we
24  will – we will deal with it when and if we

WATERHOUSE - 10-19-21

1   have to.
2   Q.   Mr. Waterhouse, after learning about
3   the agreement, did you ask anybody if the
4   agreement was reflected in a writing?
5   MS. DANDENEAU: Objection to form.
6   A.   No.
7   Q.   Did you ask anybody if the terms of
8   the agreement were memorialized anywhere?
9   MS. DANDENEAU: Objection to form.
10  MR. MORRIS: What is the –
11  A.   No.
12  MS. DANDENEAU: Well, because you
13  keep talking about this agreement and I –
14  I – I think, Mr. Morris, that is really
15  not clear what you mean by "the agreement."
16  And maybe you can just go back and restate
17  what that is.
18  MR. MORRIS: Okay. Your client has
19  agreed with me twice on the definition, but
20  I will try one more time.
21  Q.   Mr. Waterhouse, do you understand
22  that when I use the term "agreement," I'm
23  referring to the agreement between Jim and
24  Nancy Dondero concerning certain promissory

WATERHOUSE - 10-19-21

1   notes where you learned that one of the terms
2   of the agreement was milestones reached?
3   A.   Okay.
4   Q.   And did you understand that that was
5   the – the agreement that we were referring to
6   every time we used the word "agreement" in this
7   deposition?
8   A.   I don't know anything about this
9   agreement. So, look, I do – it – I don't
10  know whether –
11  Q.   Let's – let's try this again.
12  A.   Yeah. Look, I don't know what this
13  agreement relates.
14  MS. DEITSCH-PEREZ: John, John –
15  Q.   Let me try –
16  MS. DEITSCH-PEREZ: John, please let
17  the witness finish.
18  MR. MORRIS: Please stop. Please
19  stop. Please stop talking.
20  MS. DEITSCH-PEREZ: No, you stop.
21  Let the witness –
22  MR. MORRIS: Stop talking.
23  MS. DEITSCH-PEREZ: – finish – you
24  interrupted him.

WATERHOUSE - 10-19-21

1   MR. MORRIS: You know what, you
2   guys, this is really wrong. It is really,
3   really wrong. I had the witness agree not once,
4   but twice to the definition of agreement.
5   Okay? I'm going to try and do it a third
6   time.
7   MS. DANDENEAU: No, but, please,
8   John, really –
9   MR. MORRIS: No, please stop
10  talking. Please. It is my deposition.
11  Object to questions.
12  MS. DANDENEAU: No, but also you
13  instructed him that – that if you were
14  going – if you were interrupting him, that
15  he should remind you that you're
16  interrupting him and – and –
17  MR. MORRIS: Let him do that. Let
18  him do that.
19  MS. DANDENEAU: Okay. Well, you –
20  MR. MORRIS: Please stop talking.
21  A.   Okay. I don't know any of the
22  details of these agreements. I don't know
23  anything about them. I heard – someone – I

Page 78

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    don't know who, I don't know when, as you
3    asked, sometime in '21, someone told me about
4    this -- or I don't honestly know -- I don't
5    even recall exactly how I was made aware of
6    this, but I was. I don't know -- I don't know
7    any of these details, and I'm getting -- again,
8    there is, you know, I -- I -- I had a passing
9    conversation with -- with Jim at some point
10   on -- on some -- on the executive comp, and I'm
11   getting confused of what is what, because
12   again, I don't know any of these details.
13       Q.   Okay. Let me try again,
14   Mr. Waterhouse, and I apologize.
15           Are you aware of any agreement
16   between Jim Dondero and Nancy Dondero
17   concerning any promissory note that was given
18   to Highland by any affiliate or Mr. Dondero?
19           MS. DEITSCH-PEREZ:  Object to the
20   form.
21       A.   I've heard of an agreement. That
22   is -- that is -- I mean, if you are using aware
23   as heard, sure.
24       Q.   And you understand that one of the
25   terms of the agreement is that it was based on

Page 79

1    WATERHOUSE - 10-19-21
2    milestones that had to be reached; is that
3    right?
4           MS. DANDENEAU:  Objection to form.
5       A.   That was one of the words that was
6    used when I heard about it, yes.
7       Q.   And when you heard about this
8    agreement that had a term in it concerning
9    milestones reached, did you ask the person who
10   was telling you about the agreement whether or
11   not it was in writing?
12       A.   I did not.
13       Q.   Did you ask any questions at all?
14           MS. DANDENEAU:  Objection to form.
15       A.   Not that I recall.
16       Q.   But do you understand that going
17   forward, we're going to refer to the agreement
18   as the agreement that you just described that
19   you were --
20           MS. DANDENEAU:  Object to the form.
21       A.   Yes.
22       Q.   Okay. You don't have any personal
23   knowledge concerning the terms of the
24   agreement; correct?
25           MS. DEITSCH-PEREZ:  Object to the

Page 80

1    WATERHOUSE - 10-19-21
2    form.
3       Q.   You can answer.
4       A.   I don't -- I heard about the
5    agreement. I don't know anything -- I heard
6    there was an agreement. That is -- again, as I
7    testified before -- I said before, heard about
8    it, don't know the details. I believe it was
9    sometime this year.
10       Q.   Do you have any personal knowledge
11   about the terms of the agreement, sir?
12           MS. DANDENEAU:  Objection to form.
13       A.   Other than what I have previously
14   discussed, I don't -- I don't know.
15       Q.   Did -- did Mr. Dondero tell you
16   about the existence of the agreement?
17       A.   I don't recall.
18       Q.   Do you recall the source of your
19   information when you learned about the
20   agreement?
21       A.   No, I don't -- I don't recall. I
22   don't remember. I just -- I heard about it
23   generally. I don't remember -- I don't
24   remember who, how, if, how. I don't remember.
25       Q.   You know, Mr. Waterhouse, I just

Page 81

1    WATERHOUSE - 10-19-21
2    want to be clear that I never would have asked
3    you to appear at this deposition if your name
4    hadn't been included in responses to discovery
5    as somebody with knowledge about the -- who
6    was told about the existence of the agreement.
7           That is what prompted me do this,
8    and I really do feel compelled to tell you that
9    I otherwise would never have called you as a
10   witness. So I regret that you're being put
11   through this today. I had no intention of
12   burdening you or taking your time, but that is
13   the reason that we issued the subpoena is
14   because certain of the defendants identified
15   you as somebody --
16           MS. DEITSCH-PEREZ:  Mr. Morris, you
17   are here to ask questions, not to have --
18           MR. MORRIS:  I feel badly for the
19   guy. I really do.
20           MS. DEITSCH-PEREZ:  I'm sure you do.
21           MR. MORRIS:  I do. Stop.
22           MS. DEITSCH-PEREZ:  You stop.
23           MR. MORRIS:  I'm allowed.
24           MS. DEITSCH-PEREZ:  No, you're not
25   allowed to have a chat with the witness.

**Appx. 02069**

Page 82

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2   Q.   Okay. Well, I hope that you
3 appreciate what I'm saying here,
4 Mr. Waterhouse.
5      MS. DANDENEAU: All right. Let's go
6 ahead and ask questions, and again, you're
7 entitled to probe his -- his knowledge
8 of -- whatever knowledge he has about
9 this -- this agreement and --
10      MR. MORRIS: That is what I'm doing.
11      MS. DANDENEAU: -- he will answer
12 the questions to the best that he can.
13      MR. MORRIS: That is what I'm doing.
14   Q.   Mr. Waterhouse, I take it you do not
15 know which promissory notes issued by which
16 affiliates or Mr. Dondero are the subject of
17 this agreement; do I have that right?
18   A.   Yes, I don't -- I don't know.
19   Q.   Do you know of any way to determine
20 which promissory notes issued by the affiliates
21 and Mr. Dondero are the subject of this
22 agreement other than asking Jim or Nancy
23 Dondero?
24      MS. DANDENEAU: Objection to form.
25   A.   I don't know.

Page 83

1          WATERHOUSE - 10-19-21
2   Q.   Did you ever make --
3   A.   I don't know anything about these
4 agreements.
5   Q.   Did you ever make any effort to
6 determine which promissory notes are subject to
7 this agreement?
8   A.   No.
9   Q.   Did you ever ask anybody which
10 promissory notes are subject to this agreement?
11   A.   No.
12   Q.   Do you know if there is a list
13 anywhere of the promissory notes that are
14 subject to this agreement?
15   A.   I'm not aware.
16   Q.   Have you ever seen the terms of the
17 agreement written down anywhere?
18   A.   No.
19   Q.   Have you ever asked anybody whether
20 the terms of the agreement were written down
21 anywhere?
22   A.   I have not.
23   Q.   Did learning about the agreement
24 cause you to do anything in response?
25      MS. DANDENEAU: Objection to form.

Page 84

1          WATERHOUSE - 10-19-21
2   A.   No.
3   Q.   Did anybody ever describe to you the
4 nature of the milestones that you referred to
5 earlier?
6   A.   No, I don't -- I don't have any
7 details of this.
8   Q.   That is fine.
9      PricewaterhouseCoopers served as
10 Highland's outside auditors prior to the
11 petition date; correct?
12   A.   Yes.
13   Q.   You refer to PricewaterhouseCoopers
14 as PwC?
15   A.   Yes.
16   Q.   PricewaterhouseCoopers audited
17 Highland's financial statements on an annual
18 basis; correct?
19   A.   During my -- during my time as -- as
20 CFO, yes, PricewaterhouseCoopers was the
21 auditor.
22   Q.   Do you know why Highland had its
23 annual financial statements audited each year?
24   A.   Generally.
25   Q.   Tell me your general understanding

Page 85

1          WATERHOUSE - 10-19-21
2 as to the reason why Highland had its annual
3 financial statements audited each year.
4   A.   From -- from time to time, they were
5 used -- or asked for, as part of diligence or
6 transactions or -- or things of that nature.
7   Q.   And were they given to third parties
8 for purposes of diligence or transactions from
9 time to time?
10   A.   As far as I'm aware, yes.
11   Q.   And was it your understanding as the
12 CFO that the third parties who received the
13 financial statements in diligence or
14 transactions was going to rely on those?
15      MS. DANDENEAU: Objection to form.
16   A.   I don't know -- I don't know gen --
17 I don't know specifically what they were going
18 to rely on. You know, we would get requests
19 for audited financial statements. I don't know
20 what they were relying on.
21   Q.   And --
22   A.   You would have to ask them.
23   Q.   Did you personally play a role in
24 PwC's annual audit and the conduct of the
25 audit?

**Appx. 02070**

Page 86

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          MS. DANDENEAU:  Objection to form.
3      A.   During my tenure as CFO, I played a
4  very minimal role.
5      Q.   What was the minimal role that you
6  played?
7      A.   You know, again, it was -- it was to
8  check in with the team, to make sure that, you
9  know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages.  I mean, this is -- but I -- I
17  I played a minimal role towards the end.
18          Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21      Q.   Okay.  Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25      A.   Yeah.  I mean, there was -- there

Page 87

WATERHOUSE - 10-19-21

1  was a -- there was a point -- it varies.  It
2  varies by year, in function, in time and, you
3  know, depending on the request, but yes, I
4  mean, there is -- there is -- there is
5  generally a point person of communication.
6      Q.   And who was the point person from
7  2016 until the time you left Highland?
8      A.   I don't -- I don't know
9  specifically, but it would have been, you
10  know -- you know, someone on the corporate
11  accounting team.
12      Q.   And was there a head of the
13  corporate accounting team?
14      A.   Yes, so -- yes.
15      Q.   Who was the head of corporate
16  accounting for the five years prior to the time
17  you left Highland?
18      A.   I don't -- if you're asking from
19  2016 on, I don't -- it was Dave Klos, but,
20  again, there was -- there was changes to the
21  team and the reporting structure.  I don't
22  remember exactly when that happened during --
23  you know, over the last -- since 2016.
24      Q.   Did the folks who participated and

Page 88

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  ran the audit all report to you, directly or
3  indirectly?
4      A.   Yes.
5      Q.   And did you have any responsibility
6  for making sure that the audit report was
7  accurate before it was finalized?
8      A.   Yeah.  I mean, you know, that --
9  that is -- my responsibility to the auditors
10  was -- again, is -- and the CFO is to -- we are
11  providing accurate financial statements; right?
12          And -- and -- and as part of any
13  audit, we disclose all relevant information as
14  part of any audit.
15      Q.   Okay.  And as the CFO, did you take
16  steps to make sure that the audit report was
17  accurate?
18      A.   I mean, I would say in a general
19  sense, yes.  But, again, I mean, I had a
20  very -- I had a very capable and competent
21  team.  I wasn't managing them.
22          You know, part of what I do is I let
23  the team -- I want managers to grow.  I want
24  managers to have rope.  And that is -- you
25  know, I'm not a stand-behind-you type of guy.

Page 89

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2  If you -- if you talk to my team members, I'm
3  not micromanaging people.  I want people to
4  learn and grow in their function so they can go
5  on and do bigger and better things with their
6  careers.
7          And so, yes, generally I was
8  responsible for it, but I wanted the team to
9  learn and grow and be responsible for the bulk
10  of the audit.
11      Q.   Did you personally review each audit
12  report before it was finalized to satisfy
13  yourself that it was accurate?
14      A.   I don't -- I don't recall, you know,
15  for every single -- we're talking 2016, there
16  would have been three years, 2016 to '17, '18.
17  I don't -- we're -- we're going back
18  five years-plus.  I don't -- you know, I don't
19  recall.
20      Q.   Did you have a practice that you
21  employed to make sure that you were satisfied
22  that Highland's audit reports were true and
23  accurate to the best of your knowledge?
24      A.   I mean, our -- the practice was set
25  up with our -- the -- the practice to put

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  together accurate audited or accurate financial
3  statements is to your control environment.
4      So, you know, the – so the practice
5  was to maintain a stable control environment
6  which then the output is – is accurate
7  financial statements.
8      So – so, you know, if I was
9  comfortable that the control environment was
10  operating, then, you know, that would dictate
11  how I would – you know, what I might or might
12  not do in a given year.
13      Q.   Okay.  Do you recall ever being
14  uncomfortable with the control environment
15  during the period that you served as CFO?
16      A.   Yeah.  I mean, look, yes, there are
17  times – you know, nothing is perfect.  So
18  there were – there were times when, yes, you
19  know – there are times I learned I was
20  uncomfortable with the control environment, and
21  that is part of the management of the process
22  and having, you know – and – and working
23  through whatever obstacles present themselves.
24      Q.   Okay.  Were you ever uncomfortable
25  with the control process as it related to

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  reporting and disclosures of loans to
3  affiliates and Mr. Dondero?
4      MS. DANDENEAU:  Objection to form.
5      A.   I don't – I don't recall –
6      Q.   So you don't recall –
7      A.   – the –
8      MS. DANDENEAU:  Mr. Morris –
9      A.   I don't recall being uncomfortable.
10  But, again, we're going back several years.  I
11  don't – you know, the practice in an audit is
12  to disclose all information to the auditors.
13  And I don't – I don't recall.
14      Q.   As part of the process of the audit,
15  did you sign what is sometimes referred to as a
16  management representation letter?
17      A.   Yes.
18      MR. MORRIS:  Can we put up on the
19  screen a document that we have premarked as
20  Exhibit 33.
21      (Exhibit 33 marked.)
22      MS. DANDENEAU:  Mr. Morris, that is
23  not in the binder; correct?
24      MR. MORRIS:  Correct.
25      Q.   So you will see, Mr. Waterhouse,

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  this is a letter dated June 3rd.  And if we
3  could go to the signature page.
4      And do you see that you and
5  Mr. Dondero signed this document?
6      A.   Yes.
7      Q.   That is your signature; right?
8      A.   Yes.
9      MR. MORRIS:  Okay.  Can you go back
10  to the top.
11      MS. DANDENEAU:  Mr. Morris, can you
12  have somebody post this in the chat so that
13  we have can have a copy of this, please.
14      MR. MORRIS:  Yeah, sure.  Asia, can
15  you do that, please.
16      Q.   Okay.  Do you see at the bottom of
17  the second paragraph there is a reference to
18  materiality?
19      A.   Yes.
20      Q.   Okay.  It says, Materiality used for
21  purposes of these representations is
22  $1.7 million.
23      Do you see that?
24      A.   I do.
25      Q.   And did PwC set that level of

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2  materiality?
3      A.   Yes.
4      Q.   And for purposes of the audit, did
5  PwC set the level of materiality each year?
6      A.   Yes.
7      Q.   Did that number change over time?
8      A.   I'm not aware of what materiality is
9  every single year, so – but, you know, this
10  number would likely fluctuate.
11      Q.   Okay.  I'm going to go back to a
12  question I asked you earlier today.  And that
13  is in connection – this letter is issued in
14  connection with the audit for the period ending
15  12/31/2018; correct?
16      A.   Yes.
17      Q.   Okay.  And is it fair to say that if
18  any – actually, withdrawn.  I'm going to take
19  it outside of this.
20      If Highland ever forgave the loan to
21  any affiliate or any of its officers or
22  employees, in whole or in part, to the best of
23  your knowledge, would that forgiveness have
24  been disclosed in the audited financial
25  statements if it exceeded the level of

Page 94

WATERHOUSE - 10-19-21

1      WATERHOUSE - 10-19-21
2  materiality that PwC established?
3         MS. DANDENEAU:  Objection to form.
4      A.   So, again, during my tenure as CFO,
5  and -- Highland -- it was -- it is required to
6  disclose any affiliate loans that are in excess
7  of materiality.
8         Now, the forgiveness of those loans
9  may or may not -- I mean, since materiality
10 fluctuates every year, a -- you know, if a loan
11 was forgiven, it may or may not, you know --
12 and, look, I may want to consult the guidance
13 around this.
14        It is not something we do -- you
15 know, it is not -- you know, GAAP can be and
16 disclosures can be very specialized so, again,
17 we want to consult the guidance.  But we would
18 see if and what would need to be disclosed if
19 it were deemed immaterial.
20     Q.   Did you and Mr. Dondero sign
21 management representation letters of this type
22 in each year in which you served as Highland's
23 CFO?
24     A.   I -- I -- I will speak for myself.
25 I signed them.  There may have been others that

Page 95

1      WATERHOUSE - 10-19-21
2  signed as well.  I don't -- I don't recall.
3      Q.   But to the best of your knowledge,
4  you, personally, signed a management
5  representation letter in connection with
6  Highland's audit each year that you served as
7  the CFO; correct?
8      A.   I would say generally speaking,
9  Mr. Morris.  I don't recall for every single
10 year, you know, generally, but I would want to
11 refer to all the rep letters and see who signed
12 them.
13     Q.   Do you recall Highland having its
14 financial statements audited in any year during
15 the period that you were a CFO where you didn't
16 sign the management representation letter?
17     A.   I don't recall.  But, John, we're
18 going back five, six, seven, eight, nine,
19 decade.  I don't -- I don't remember.
20     Q.   I don't want to go back that many
21 decades, but I'm just asking you if you recall
22 that there was you didn't sign it?
23     A.   I -- I -- I don't, but my memory
24 is -- again, I -- I -- I can't tell you what I
25 did in 2012.  I mean, I think generally, yes,

Page 96

1      WATERHOUSE - 10-19-21
2  but I don't -- I don't know for sure, and I
3  would want to rely on the document.
4      Q.   Let me ask the question a little bit
5  differently then.
6         Do you have any reason to believe
7  that Highland had its annual financial audit
8  and you did not sign a management
9  representation letter in connection with that
10 audit?
11        MS. DANDENEAU:  Objection to form.
12     A.   I don't believe it would, but,
13 again, I would want to -- I don't recall and I
14 would want to confirm it to -- to make, you
15 know, an affirmative -- to give an affirmative
16 answer.
17     Q.   Do you know whether PwC required
18 management to sign management representation
19 letters?
20        MS. DANDENEAU:  Objection to form.
21     A.   Yes.  I mean, it -- management
22 representation letters are signed by
23 management.
24     Q.   Okay.  And do you know -- do you
25 have any understanding as to why PwC requires

Page 97

1      WATERHOUSE - 10-19-21
2  management to sign management representation
3  letters?
4         MS. DEITSCH-PEREZ:  Object to the
5  form.
6      A.   I don't know why PwC's -- what PwC's
7  specific practice is.  I know generally what
8  management representation letters are.
9      Q.   Okay.  Do you personally -- I'm not
10 asking about PwC.  I'm asking for you -- I'm
11 asking about you, do you have an understanding
12 as to why the auditor asks for management
13 representation letters?
14     A.   Okay.  So you're asking me in my
15 personal capacity, yes, I have a general
16 understanding of why.
17     Q.   Can you give me the general
18 understanding that you have as to why
19 management representation letters are required?
20     A.   They are -- they are required to --
21 they are -- they are one of the items required
22 in an audit to help verify completeness.
23     Q.   Do you have any -- any other
24 understanding as to why management
25 representation letters are required?

**Appx. 02073**

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       A.   That is – that is – other than
3   what I said, it is – it is – it is required
4   so – to ensure that the – you know, there
5   is – there is completeness in what is being
6   audited.
7       Q.   Did you – did you have a practice
8   whereby you and Mr. Dondero conferred about the
9   management representation letters before you
10  signed them?
11      A.   No.
12      Q.   Did you have a practice –
13  withdrawn.
14          Do you see just the next sentence
15  after the materiality, there is a sentence that
16  states:  We confirm, to the best of our
17  knowledge and belief, as of June 3rd, 2019, the
18  date of your report, the following
19  representations made to you during your audit.
20          Do you see that sentence?
21      A.   Yes.
22      Q.   Okay.  Did you understand when you
23  signed this letter that you were confirming the
24  representations that followed?
25      A.   When I signed this management

1   WATERHOUSE - 10-19-21
2   letter – representation letter, yes.
3       Q.   Okay.  Did you discuss this letter
4   with Mr. Dondero before you signed it?
5       A.   I don't recall.
6       Q.   Do you recall if Mr. Dondero asked
7   you any questions before he signed the letter?
8       A.   I don't recall.
9       Q.   Do you recall if you asked
10  Mr. Dondero any questions before you signed
11  this letter?
12      A.   I don't recall.
13      Q.   Is it fair to say that Mr. Dondero
14  did not disclose to you the existence of the
15  agreement that we have – as we've defined that
16  term prior to the time you signed this letter?
17          MS. DANDENEAU:  Objection to form.
18      A.   I don't think I understand the
19  question.  So, again, you are saying, did
20  Mr. Dondero not disclose to me the existence of
21  this letter?
22      Q.   No, I apologize.
23          Did Mr. Dondero disclose to you the
24  existence of the agreement prior to the time
25  you signed this letter on June 3rd, 2019?

1   WATERHOUSE - 10-19-21
2       A.   The agreement – the agreement that
3   we talked about earlier?
4       Q.   Correct.
5       A.   Look, as I said earlier, the first
6   time I heard of this agreement was sometime
7   this year.
8       Q.   Okay.  Can we turn – let's just
9   look at a couple of items on the list.  If we
10  can go to page 33416.  Do you see in Number 35
11  it talks about the proper recording or
12  disclosure in the financial statements of ND
13  relationships and transactions with related
14  parties.
15          Do you see that?
16      A.   I do.
17      Q.   As the CFO, do you have any
18  understanding as to whether Dugaboy is a
19  related party?
20      A.   I don't recall.
21      Q.   Do you know whether any of the
22  affiliates are related parties?
23      A.   If – if it was NexPoint, HCMFA,
24  HCMS, HCRE, yeah, if – if that is the
25  affiliate definition, and there.  In ASC 850 –

1   WATERHOUSE - 10-19-21
2   again, I mean, I haven't looked at ASC 850 in
3   quite some time, but, you know, if – if there
4   is a control language, you know, ASC 850, would
5   that – that section in GAAP would – would
6   pick up and define what are related parties.
7          So, you know, like I said, if – one
8   of the four entities I just described, if – if
9   they are in that control definition of ASC 850,
10  they would be picked up in 35D.
11      Q.   Do you – do you have any reason to
12  believe that they would be picked up in that
13  definition, based on your knowledge and
14  experience?
15      A.   I – I believe that entities
16  controlled under GAAP are – are affiliates.
17      Q.   Okay.  Would Mr. Dondero also
18  qualify as a related party for purposes of
19  Section 35D, to the best of your knowledge?
20      A.   Yeah, I don't – I don't know.  I
21  would think – I would have to read the code
22  section to see if someone personally – is it
23  talking about related parties.  So, look, if
24  your own in control, yeah, I mean, I would have
25  to read the section.

Page 102

WATERHOUSE - 10-19-21

1
2  Q.   To the best of your knowledge, was
3  the existence of the agreement ever disclosed
4  to PwC?
5  A.   I'm not – I'm not aware.
6  Q.   Do you recall if the agreement was
7  ever disclosed in Highland's audited financial
8  statements?
9  A.   I don't – I don't remember if it
10  was in every Highland's audited financial
11  statements during my tenure.  We would have to
12  read the financial statements to see what was
13  disclosed, but I'm not – I mean, as I sit here
14  today, I'm not aware.
15  Q.   That is all I'm asking for.
16  A.   I'm not aware.
17  Q.   Can we go to the next page, please,
18  and look at 36.  36 says, we have disclosed to
19  you the identity of the partnership's related
20  party relationships and all the related party
21  relationships and transactions of which we are
22  aware.
23       Do you see that?
24  A.   Yes.
25  Q.   To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

1
2  June 3rd, 2019, did Highland disclose to PwC
3  the identity of the partnership's related
4  parties and all the related party relationships
5  and transactions of which it was aware?
6  A.   I mean, I can speak for myself as
7  signer of this representation letter.  I
8  disclosed what – what, you know, what –
9  what – what I knew.  Sorry, look, yes, so I –
10  I disclosed what I knew.
11  Q.   Okay.  Can we go to page 419.  Do
12  you see at the end there is a reference to
13  events that occurred since the end of the
14  fiscal year and the date of the letter?
15  A.   Yes.
16  Q.   And were you aware of that – of
17  that provision of the management representation
18  letter before you signed the document?
19  A.   Yes.
20  Q.   Do you have an understanding as to
21  why PwC asked for that confirmation of that
22  particular part of the management
23  representation letter?
24  A.   It is – it is – it is just – it
25  is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

1
2  Q.   And do you understand – do you have
3  an understanding that PwC wanted to know that
4  as of the date of the audit whether any
5  material changes had occurred since the end of
6  the fiscal year, using the definition of
7  materiality that is in this particular
8  management representation letter?
9  A.   It – it is – it is – it is a –
10  it is as described.  It is just a poorly worded
11  question, so it is hard for me to say yes.
12  Q.   If I asked you this, I apologize,
13  but did you ever learn when the agreement was
14  entered into?
15  A.   I don't – I don't – like I said
16  before, I don't know or have any details of the
17  agreement.
18  Q.   Okay.  Did you ever ask anybody when
19  the agreement was entered into?
20  A.   I did not.
21  Q.   Let's look at the audited financial
22  statements.  We will put up on the screen a
23  document that has been premarked as Exhibit 34.
24       (Exhibit 34 marked.)
25  MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

1
2  Canty could please put that in the chat
3  room, that would be great.
4  MR. MORRIS:  I will assure you we
5  will put every document in the chat room.
6  Q.   Now, I'm just going to ask you
7  questions that are related to the provisions of
8  this report that concern the affiliate loans,
9  but again, Mr. Waterhouse, if there is any part
10  of the document that you need to see or that
11  you think you might need to see in order to
12  refresh your recollection to answer any of my
13  questions, will you let me know that?
14  A.   Yes.
15  Q.   Because this is a pretty lengthy
16  document, but do you see that the cover page
17  here is the Highland consolidated financial
18  statements for the period ending December 31st,
19  2018?
20  A.   Yes.
21  Q.   If we can go to – I think it is the
22  next one, looking for PwC's signature line.
23  MS. CANTY:  I'm sorry, John, did you
24  say something?
25  MR. MORRIS:  Yes, can we turn the

**Appx. 02075**

Page 106

WATERHOUSE - 10-19-21

1            page. I think it is 215. Yes, stop right
2    there, just above -- I'm sorry, I want to
3    see just the date of the report.
4      Q.   Okay. Do you see at the bottom of
5    that page there, Mr. Waterhouse,
6    PricewaterhouseCoopers has signed this audit
7    report?
8      A.   Yes, I see their signature.
9      Q.   Okay. And it is the dated same day
10   as your management representation letter; is
11   that right?
12     A.   It is -- yes, it is the same day.
13     Q.   Was that the practice to sign the
14   management representation letter on the same
15   day that the audit report was signed?
16     A.   Yes, that is typical in every audit.
17     Q.   Can we just scroll down to the
18   balance sheet on the next page.
19       Do you see that there is a line
20   there that says, Notes and Other Amounts Due
21   from Affiliates?
22     A.   Yes.
23     Q.   Does that line, to the best of your
24   knowledge, include the amounts that were due

Page 107

WATERHOUSE - 10-19-21

1   under the affiliate under the notes signed by
2   the affiliates and Mr. Dondero?
3       MR. RUKAVINA: Objection to the
4    extent that calls for a legal conclusion.
5     A.   I mean, I would want to see the
6   detail and the build to this $173,398,000, but,
7   yes, I mean, if -- if -- given what we
8   discussed before, you know, it -- it should
9   capture that.
10     Q.   And -- and while you were the CFO of
11   Highland, were all notes held by Highland that
12   were issued by an affiliate or Mr. Dondero
13   carried as assets on Highland's balance sheets?
14       MS. DANDENEAU: Objection to form.
15       MS. DEITSCH-PEREZ: Object to form.
16     A.   I don't -- I don't know how else
17   they would be carried.
18     Q.   Okay. Can you think of any -- are
19   you aware of any promissory note issued by an
20   affiliate or Mr. Dondero that was not carried
21   on Highland's audited financial balance sheets?
22     A.   I'm -- I'm -- I'm not aware.
23     Q.   Okay. Are you aware of any category
24   of asset on Highland's balance sheet in which

Page 108

WATERHOUSE - 10-19-21

1   any of the promissory notes issued by an
2   affiliate or Mr. Dondero would have been
3   included?
4       MS. DANDENEAU: Objection to form.
5     A.   Sorry, am I aware of any asset of an
6   affiliate being included --
7     Q.   That -- let me -- let me try again.
8       Do you see there is a number of
9   different assets that are described on this
10   balance sheet?
11     A.   Yes.
12     Q.   One of the assets that is described
13   is Notes and Other Amounts Due from Affiliates;
14   right?
15     A.   Yes.
16     Q.   And it is reasonable to conclude
17   that the notes from the affiliates and
18   Mr. Dondero are included in that line item;
19   right?
20     A.   Yes, based on this description.
21   Again, I would want to see a build of this to
22   100 percent confirm, but based on the
23   description, the asset description, it is -- it
24   is likely.

Page 109

WATERHOUSE - 10-19-21

1       Now, does that mean absolute? I
2   don't know.
3     Q.   Do you have any reason to believe
4   that the promissory notes would have been
5   carried on the balance sheet in a category
6   other than Notes and Other Amounts Due from
7   Affiliates?
8     A.   If they were deemed -- no. If they
9   were deemed an affiliate, you know, under GAAP,
10   they should be carried in that line.
11   Otherwise, it would go into another line.
12     Q.   Okay. And do you see the total
13   asset base as of December 31st, 2018, was
14   approximately $1.04 billion?
15     A.   Yes.
16     Q.   Is my math correct that the Notes
17   and Other Amounts Due from Affiliates
18   constituted approximately 17 percent of
19   Highland's assets as of the end of 2018?
20     A.   Well, so how are you defining
21   Highland?
22     Q.   Highland Capital Management, L.P.,
23   the entity that this audit is subject to -- or
24   the subject of.

Page 110

WATERHOUSE - 10-19-21

1
2    A.   On a consolidated or unconsolidated
3    basis?
4    Q.   I'm looking at the balance sheet.
5    It is a consolidated balance sheet.  Okay?
6         Does the Notes and Other Amounts Due
7    from Affiliates constitute approximately
8    17 percent of the total assets of Highland
9    Capital Management, L.P., on a consolidated
10   basis?
11        MS. DANDENEAU:  Objection to form.
12   A.   I don't have a calculator in front
13   of me but I will take your math, if you are
14   taking the 173 divided by the billion.
15   Q.   Okay.
16   A.   If that is accurate, yes.  But,
17   again, on a consolidated basis.
18   Q.   And on an unconsolidated basis the
19   percentage would be higher; correct?
20   A.   I – no.  I don't know.
21   Q.   Well, okay.  That is fair.
22        MR. MORRIS:  Can we turn to
23   page 241, please.
24   Q.   Do you see that this is a section of
25   the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

1
2    Other Amounts Due from Affiliates?
3    A.   Sorry, I can't see the – the –
4    Q.   It is at the top.
5    A.   Notes and Other Amounts Due from
6    Affiliates, yes, I see that.  I don't – I
7    don't have a page number, but I'm on a page
8    that says at the top:  Notes and Other Amounts
9    Due from Affiliates.
10   Q.   Okay.  And that is the same title of
11   the line item on the balance sheet that we just
12   looked at; right?  Notes and Other Amounts Due
13   from Affiliates?
14   A.   Yes.
15   Q.   And is it your understanding, based
16   on your experience and knowledge as the CFO,
17   that this is the section of the narrative that
18   ties into the line item that we just looked at?
19   A.   Yes.
20   Q.   And is this section of the audit
21   report intended to describe and disclose all of
22   the material facts concerning the Notes and
23   Other Amounts Due from Affiliates?
24        MS. DANDENEAU:  Objection, form.
25   A.   This – these notes – these notes

Page 112

WATERHOUSE - 10-19-21

1
2    of the financial statements are – the purpose
3    is to disclose any material items in relation
4    to that balance sheet line item.
5    Q.   Okay.  And all of the information,
6    to the best of your knowledge, that is set
7    forth in this section of the audit report was
8    provided by Highland; correct?
9    A.   Yes, it would have been provided by
10   the corporate accounting team.
11   Q.   Okay.  And the corporate accounting
12   team, did that team report to you in the
13   organizational structure?
14   A.   Yes.
15   Q.   And did you have any concerns about
16   the controls that were in place to make sure
17   that the information provided with respect to
18   Notes and Other Amounts Due from Affiliates was
19   accurate and complete?
20        MS. DANDENEAU:  Objection to form.
21   A.   Not that I recall.
22   Q.   Okay.  Do you recall ever being
23   concerned that any portion of the Notes and
24   Other Amounts Due from Affiliates in any audit
25   report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

1
2    reliable?
3    A.   I didn't – I had concerns about,
4    you know, like I talked about before, of there
5    were – there were potentially issues in the
6    control environment.  But as far as it relates
7    to the audited financial statements, any – the
8    team would work with the auditors to disclose
9    all – all notes in Highland's possession.
10        And any – any notes that were
11   deemed material by the auditor, right, these
12   were disclosed in these – in this section, you
13   know, in – in the notes to the consolidated
14   financial statements as you presented.
15   Q.   Do you recall ever having a
16   conversation with anybody at any time
17   concerning the accuracy of the section of audit
18   reports that relates to Notes and Other Amounts
19   Due from Affiliates?
20        MS. DANDENEAU:  Objection to form.
21   A.   You know, as – as – I didn't have
22   direct conversations with
23   PricewaterhouseCoopers as I had, you know –
24   I – I had the team that managed this.
25        Again, I wasn't anywhere chose to

**Appx. 02077**

Page 114

WATERHOUSE - 10-19-21

1
2 being the point person of this audit.  And I
3 can't recall, you know, when -- you know, I
4 don't even know if I was ever the point person
5 during my tenure as CFO.
6       I don't know if PwC had any concerns
7 when they were performing those audit
8 procedures.  They may have and they may have --
9 and it may not have been communicated to me.  I
10 don't know.
11      MR. MORRIS:  All right.  I move to
12 strike.
13      Q.   And I'm going to ask you to listen
14 carefully to my question.
15           Did you -- do you recall ever having
16 a conversation with anybody at any time
17 concerning the accuracy of the reporting
18 provided in the audited financial statement on
19 the topic of Notes and Other Amounts Due?
20      MS. DANDENEAU:  Objection to form.
21      A.   I don't recall for this, but that
22 doesn't mean that it didn't exist.
23      Q.   Okay.  But you have no reason to
24 believe, as you sit here right now, that you
25 ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21

1
2 accuracy of the section of the audit reports
3 called Notes and Other Amounts Due from
4 Affiliates; correct?
5      MS. DANDENEAU:  Object to the form.
6      MS. DEITSCH-PEREZ:  Objection to
7 form.
8      A.   I don't recall having any
9 conversations.  But, again, I mean, this is --
10 this is two years ago.
11      Q.   I'm just asking for your
12 recollection, sir.
13      A.   Yes.
14      Q.   If you don't recall, this will --
15      A.   Yeah.
16      Q.   (Overspeak) -- if you don't
17 recall --
18      A.   Yeah, I don't -- I don't recall.
19      Q.   Do you know who was responsible for
20 drafting the audit report?
21      A.   Are you asking the actual Highland
22 employee responsible?  I mean, it was
23 Highland's responsibility, so, I mean, that
24 is --
25      Q.   Right.

Page 116

WATERHOUSE - 10-19-21

1
2      A.   -- Highland's responsibility.
3 Highland's responsibility.
4      Q.   Who, at Highland, was responsible
5 for drafting this section of the audit report?
6      A.   I -- I don't know the answer to
7 that.  Again, there was a team who worked on
8 this.  And I don't know, you know, whether it
9 was the staff or the manager.
10          Again, this is where I let the teams
11 manage.  And, you know, there may be a
12 corporate accountant who worked on this.  I
13 just -- you know, I wasn't part of that process
14 to give that person experience.  I don't know.
15      Q.   Do you recall having any
16 communications with anybody at any time
17 concerning this section of the report?
18      A.   Yeah, I don't recall.
19      Q.   Do you recall whether you ever told
20 anybody at any time that any aspect of this
21 section of the report was inaccurate or
22 incomplete?
23      A.   I don't recall.
24      Q.   As you sit here today, do you have
25 any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21

1
2 audit report is incomplete or inaccurate in any
3 way?
4           And I'm happy to give you a moment
5 to -- to look at it, if you would like.
6      MS. DANDENEAU:  Objection to form.
7      MS. DEITSCH-PEREZ:  Same.
8      A.   I mean, I would have to look at -- I
9 would have to look at the bill to the note
10 schedule to make sure I know you presented me
11 with materiality, but again, there might be a
12 note as of 12/31/18 that somehow was -- was
13 under materiality not disclosed.  I don't -- I
14 don't know.  I would need more information.
15      Q.   Okay.  But without more information,
16 you have no reason to believe anything this
17 section is inaccurate; correct?
18      MS. DANDENEAU:  Objection to form.
19      A.   I don't.  I mean, you know, this was
20 part of the audit.
21      Q.   Thank you.  Now, you will see if we
22 could scroll just a little bit more that each
23 of the first five paragraphs concerns
24 specifically the four affiliates that we've
25 been discussing and Mr. Dondero.

Page 118

WATERHOUSE - 10-19-21

1     MR. MORRIS:  If we could go the
2   other way, La Asia.  We don't need Okada.
3   We're going to have to thread the needle.
4   Okay.  Good, perfect.
5       Q.   Do you see those five paragraphs
6   certain the four affiliates and Mr. Dondero as
7   we've been referring to today?
8       A.   Yes.
9       Q.   Okay.  And do you see at the end of
10   every paragraph it states, quote:  A fair value
11   of a partnership's outstanding notes receivable
12   approximates the carrying value of the notes
13   receivable?
14      A.   Yes, I see that.
15      Q.   Do you have an understanding of what
16   that means?
17      A.   Yes.
18      Q.   What is your understanding of that
19   sentence?
20      A.   It is the -- again, the -- the fair
21   value, right, which is -- which is what the --
22   what Highland could sell that asset for.  This
23   statement is comparing the fair value of the
24   notes to the carrying value, so the carrying

Page 119

WATERHOUSE - 10-19-21

1   value is the line item that you showed me
2   earlier that is in Notes and Other Amounts Due
3   from Affiliates.
4       Q.   Okay.  Is another way to say this is
5   that the fair market value of the notes equals
6   the principal amount and -- withdrawn.
7       Is the fair way to interpret this
8   that the fair market value of the notes equals
9   all remaining unpaid principal and interest due
10   under the notes?
11          MS. DANDENEAU:  Object to the form.
12          MS. DEITSCH-PEREZ:  Objection, form.
13      A.   I don't know the answer to that,
14   because I don't recall where -- where any --
15   where -- in what line item was the interest
16   component reported.
17      Q.   All right.  Well, if we look in this
18   audit report, you will see in the middle of the
19   first paragraph, for example, it states that as
20   of December 31st, 2018, total interest and
21   principal due on outstanding promissory notes
22   was approximately $5.3 million.
23      Do you see that?
24      A.   I do.

Page 120

WATERHOUSE - 10-19-21

1       Q.   Is that the carrying value or the
2   fair value?
3       A.   That would be the carrying value --
4       Q.   And is the last --
5       A.   -- in my opinion.
6       Q.   Okay.  And it is in your opinion as
7   the chief financial officer of Highland during
8   the period of time that you described; right?
9   It is an educated opinion?
10      A.   I'm reading this at face value.  I'm
11   taking that as that is carrying value.
12      Q.   Okay.  And does the last sentence
13   say that the carrying value is roughly
14   approximate to the fair market value?
15          MS. DANDENEAU:  Objection to form.
16          MS. DEITSCH-PEREZ:  Objection, form.
17      A.   Again, this note to the financial
18   statement is specific to notes and other
19   amounts due from affiliates.
20      Q.   Correct.
21      A.   If the interest component is
22   reported elsewhere on the balance sheet, you
23   know, it -- it -- it could be off.  Again, I
24   don't have the detail.  I don't know, but yes,

Page 121

WATERHOUSE - 10-19-21

1   look, I mean, if you -- I mean, if you are
2   saying the 5.3 million is in the notes and
3   other amounts due from affiliates, then the
4   last statement is saying the fair value
5   approximates 5.3 million.  That is what that
6   last sentence is saying.
7       Q.   Do you see in the middle of the
8   first paragraph -- not in the middle, the next
9   to last sentence there is a statement that the
10   partnership will not demand payment on amounts
11   that exceed HCMFA's excess cash availability
12   prior to May 31st, 2021.
13      Do you see that?
14      A.   I do.
15      Q.   Do you know when Highland agreed not
16   to demand payment as described in that
17   sentence?
18      A.   I don't know specifically.
19      Q.   Do you know why Highland agreed not
20   to demand payment on HCMFA's notes until May
21   2021?
22      A.   Yes.
23      Q.   Why was that decision made?
24      A.   You know, well, it -- it -- that

Page 122

WATERHOUSE - 10-19-21

1      decision was made as to not put HCMFA into a
2      position where it didn't have sufficient assets
3      to pay for the demand note.
4          Q.   And at the time the agreement was
5      entered into, pursuant to which the partnership
6      wouldn't demand payment, did HCMFA have
7      insufficient assets to satisfy the notes if a
8      demand had been made?
9          MS. DANDENEAU:  Objection to form.
10         A.   I don't have HCMFA's financial
11     statements in front of me as of 12/31/18.
12         Q.   Was there a concern that HCMFA would
13     be unable to satisfy its demands under the
14     notes if demand was made?
15         MS. DANDENEAU:  Objection to form.
16         A.   Well, there is – I don't recall –
17     I mean, there is something, right, in place to
18     basically not demand payment until May 31, 2021
19     as detailed here.
20         Q.   And who made the decision to enter
21     into – who made the decision on behalf of
22     Highland not to demand payment until May 31st,
23     2021?
24         A.   I'm trying to remember.  I don't
25

Page 123

WATERHOUSE - 10-19-21

1      remember exactly – I don't remember if it was
2      myself or – or Jim Dondero who – who – there
3      was – there was something signed, from what I
4      recall, that – that – that backed up this
5      line item in the – in the notes I'm – look,
6      I'm, I'm –
7          Q.   We will get to that.
8          A.   You –
9          Q.   I'm just –
10         A.   You have – I mean –
11         Q.   We're going to give that to you.
12     I'm going to give that to you.
13         A.   You – you – you have all the
14     documents.  I don't have the documents, and
15     that is what makes it so hard.  I don't have
16     any documents to prepare for this deposition;
17     right?  You have all – I don't – I don't – I
18     don't remember, but, you know, again, it would
19     probably be myself or Jim.
20         Q.   Do you know if Highland received
21     anything in return for its agreement not to
22     make a demand for two years?
23         A.   I don't – I don't think it referred
24     anything.
25

Page 124

WATERHOUSE - 10-19-21

1          Q.   And did you and Mr. Dondero discuss
2      HCMFA's ability to satisfy the notes if a
3      demand was made at the time this agreement was
4      entered into?
5          MS. DANDENEAU:  Objection to form.
6          A.   I don't – I don't – I don't recall
7      having a specific conversation, if I did, or –
8      or David Klos.
9          Q.   Okay.  I'm just asking if you recall
10     any conversations that you had.
11         A.   I don't recall.
12         Q.   Okay.  Do you know why Highland
13     loaned the money to HCMFA that is the subject
14     of the notes described in this paragraph?
15         A.   I don't remember specifically why
16     5.3 million was loaned.  I mean, I – it would
17     have to be put in the context.
18         Q.   Do you have any recollection at all
19     as to why Highland ever loaned any money to
20     HCMFA?
21         A.   Yes.
22         MS. DANDENEAU:  Objection to form.
23         Q.   What do you remember about that?
24         A.   There was a Highland Global
25

Page 125

WATERHOUSE - 10-19-21

1      Allocation Fund, which was a – a fund managed
2      by Highland Capital Management Fund Advisors.
3      There was a – we – I'm just telling you,
4      there was – there was – there was a – a
5      ultimately a NAV error found in this fund while
6      it was an open-ended fund and, you know, there
7      were amounts owed by the advisor in – in
8      relation to that NAV error.
9              There were also, for the same fund,
10     that same fund was ongoing an
11     open-end-to-close-end conversion, and as part
12     of this proposal, shareholders who voted for
13     the conversion received compensation from the
14     advisor.
15         Q.   All right.  Now, the events that
16     you're describing occurred in the spring of
17     2019; right?
18         A.   These started back – I think, I
19     mean –
20         Q.   I apologize.
21         A.   – that – I mean, the answer to
22     that is no.
23         Q.   I apologize, the loans that were
24     made in connection with the events that you're
25

Page 126

```
1           WATERHOUSE - 10-19-21
2   describing occurred in May 2019; right?
3           MR. RUKAVINA:  Objection to the
4       extent that calls for a legal conclusion.
5       A.   I don't recall specifically what
6   amounts of money were moved when, for what
7   purpose.
8       Q.   Okay.  Fair enough.  Going to the
9   next paragraph, do you recall that NexPoint
10  Advisors had obtained a number of loans from
11  Highland, and they rolled up those loans into
12  one note in approximately 2017?
13      A.   This is for NexPoint Advisors?
14      Q.   Yes.
15      A.   I -- I mean, I don't -- I don't
16  recall the NexPoint Advisors loan being a
17  roll-up loan, but --
18      Q.   Do you know why?
19      A.   But, look, if you have documents
20  that show -- I mean, look, I just don't recall.
21      Q.   Okay.  That is fair.  Do you know
22  why -- do you have any recollection as to why
23  Highland loaned money to NexPoint?
24      A.   Yes.
25      Q.   Why did High -- why do you recall --
```

Page 127

```
1           WATERHOUSE - 10-19-21
2   what is the reason you recall Highland lending
3   money to NexPoint?
4       A.   I mean, I was just -- I just -- I
5   just recall.  I mean, I just -- I don't
6   remember why.
7       Q.   I understand.  And I'm asking you if
8   you recall --
9       A.   Oh, why -- I thought you say --
10  NexPoint Advisors was launching a fund which
11  is -- I believe that the legal name is NexPoint
12  Capital, Inc.  And it -- it provided a
13  co-invest into that fund.
14          And, from what I remember, the --
15  the -- that NexPoint borrowed money from
16  Highland at the time to make that co-invest.
17      Q.   So this was an investment that
18  NexPoint was required to make; is that right?
19          MS. DANDENEAU:  Objection to form.
20      A.   I don't know if it was required to
21  make, I don't recall that, or if it just made
22  it.
23      Q.   Okay.  But your recollection is that
24  NexPoint made an investment and they borrowed
25  money from Highland to finance the investment.
```

Page 128

```
1           WATERHOUSE - 10-19-21
2           Do I have that right?
3       A.   Yes.
4       Q.   How about HCRE?  Do you know why
5   HCRE borrowed money from Highland?
6       A.   I don't remember specifically.
7       Q.   Do you remember generally?
8       A.   Generally, yeah -- I mean, yes.
9       Q.   Can you tell me your general
10  recollection as to why Highland loaned money to
11  HCRE?
12      A.   For -- for -- for investment
13  purposes.
14      Q.   So HCRE made the investment and it
15  obtained a loan, or loans, from Highland in
16  order to finance that investment or those
17  investments.
18          Do I have that right?
19      A.   I mean, I -- you know, generally.
20      Q.   Okay.  How about Highland Management
21  Services, Inc.?
22          Do you have any recollection as to
23  why HCMS borrowed money from Highland?
24      A.   Generally.
25      Q.   What is your general recollection as
```

Page 129

```
1           WATERHOUSE - 10-19-21
2   to why HCMS borrowed money from Highland?
3       A.   For -- for investment purposes.
4       Q.   So it is the same thing, HCMS wanted
5   to make investments and it borrowed money from
6   Highland in order to finance those investments;
7   is that right?
8       A.   I mean, yes, generally.  I mean, I
9   can't -- I don't -- on the services, there --
10  there are several loans in these schedules.
11  You know, I can't remember why every single one
12  of these were made, but I would say, yeah, I
13  mean, generally.
14      Q.   Okay.  I appreciate that.
15          MR. MORRIS:  Let's go to the page
16  with Bates No. 251.  La Asia, are you
17  there?
18          MS. CANTY:  Sorry, John.  It went
19  out for a minute.  Can you say that again.
20  I don't know what is going on.
21          MR. MORRIS:  The page with Bates
22  No. 251, can we go to that.
23          MS. CANTY:  Yes, sorry.
24          MR. MORRIS:  Keep going to the
25  bottom.  Yeah, there you go.
```

**Appx. 02081**

Page 130

WATERHOUSE - 10-19-21

1
2    Q.   Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5    A.   I do.
6    Q.   And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10  that you disclosed subsequent events?
11    A.   I mean, it relates to it, but not in
12  its entirety.
13    Q.   Okay.
14        MR. MORRIS:  If we can scroll up to
15  capture the entirety of this section right
16  here.
17    Q.   And what do you mean by that, sir?
18        MR. MORRIS:  Yeah, right there.
19  Perfect.
20    A.   There are -- there are different
21  subsequent events in -- under GAAP.  So there
22  are -- and -- and -- so what we see in the
23  notes to the financial statements are one type
24  of subevent.
25    Q.   Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

1
2  subsequent event relating to affiliate loans be
3  captured in this section if they were -- if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6    A.   Yes, if they were deemed material or
7  disclosable.
8    Q.   Okay.  I appreciate that.
9        Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14    A.   Yes.
15    Q.   And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19    A.   I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22    Q.   Yes.
23    A.   I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1
2  if -- you know, what -- if that 7.4 million was
3  solely attributable to the NAV error.
4    Q.   Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9    A.   In the course of the audit, we would
10  have produced all promissory notes in our
11  possession, including the ones that are
12  detailed here.
13    Q.   Do you recall that you signed the
14  two promissory notes that are referenced in
15  that provision?
16        MS. DANDENEAU:  Objection to form.
17    A.   I didn't recall initially but I've
18  been reminded.
19    Q.   Okay.  And -- and do you recall that
20  those notes are dated May 2nd and May 3rd,
21  2019?
22    A.   Yes.
23    Q.   So that was just a month before the
24  audit was completed; correct?
25    A.   Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1
2  date, right, if -- if my memory serves me
3  right.
4    Q.   Yes, I will represent to you that
5  your memory is accurate in that regard.
6        Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9    A.   So let me understand.  You're saying
10  when I was CFO at Highland Capital did anyone
11  ever ask me to correct the -- over the course
12  of 2019 through the report date HCMFA issued
13  promissory notes, this statement?
14    Q.   Right.
15    A.   Not that I'm aware.
16    Q.   While you were the CFO of Highland,
17  did anybody ever tell you that sentence
18  was wrong?
19    A.   Not that I'm aware.
20    Q.   Highland -- withdrawn.
21        HCMFA disclosed these notes in its
22  own audited financial statements; right?
23        MR. RUKAVINA:  Objection, form.
24    A.   I assume that these would be
25  material -- if these are material financial

WATERHOUSE - 10-19-21

2  statements, yes, they -- they -- they should be

3  and they were likely disclosed.

4      Q.   Now, there is no statement

5  concerning the 2019 notes about the forbearance

6  that we looked at in the affiliated note

7  section of the report; right?

8      MS. DANDENEAU:  Objection to form.

9      Q.   I'll withdraw.  That was bad.

10         Do you recall when we were looking

11  at the paragraph concerning HCMFA earlier it

12  had that disclosure about the agreement whereby

13  Highland wouldn't ask for demand on the -- on

14  the HCMFA notes?

15     A.   Yes.

16     Q.   That forbearance disclosure is not

17  made with respect to the 2019 notes; right?

18     A.   Not -- look, not that I can recall,

19  unless -- unless it was done at a subsequent

20  day.

21     Q.   Right.  And it is not in the

22  subsequent event section that we're looking at

23  right now where the 2019 notes are described;

24  right?

25     A.   Right.  But this is through

WATERHOUSE - 10-19-21

2  June 3rd.  It could have been done on June 4th.

3  I don't -- I don't -- I don't recall.

4      Q.   Okay.

5      MR. MORRIS:  Can we put up on the

6  screen the HCMFA audit report.  And while

7  we're --

8      MS. DANDENEAU:  What exhibit is

9  this?

10     MR. MORRIS:  La Asia, what number is

11  that?

12     MS. CANTY:  45.

13     MR. MORRIS:  So this will be marked

14  as Exhibit 45.

15     (Exhibit 45 marked.)

16     MS. CANTY:  Yeah, and I will put it

17  in the chat.

18     MS. DANDENEAU:  Thank you.

19     Q.   Okay.  All right.  Do you see that

20  this is the consolidated financial statements

21  for HCMFA for the period ending 12/31/18?

22     A.   Yes.

23     Q.   As the treasurer of HCMFA at the

24  time, did you have to sign a management

25  representation letter similar to the one that

WATERHOUSE - 10-19-21

2  we looked at earlier for Highland?

3      A.   I would imagine I would have been

4  asked to.  I don't recall if I did.

5      Q.   Do you recall ever being asked by an

6  auditor to sign a management representation

7  letter and then not doing it?

8      A.   No.

9      MR. MORRIS:  Can we just scroll down

10  again.  I just want to see the date of the

11  document.

12     A.   I mean, let me -- you know, there

13  are different versions to management

14  representation letters I will qualify.

15     Yes, there are certain -- from time

16  to time auditors can make representations

17  that -- in the rep letter that is being

18  proposed that are inaccurate or out of scope or

19  things like that and they've asked for

20  signature.

21     In that context, yes.  I mean, you

22  know -- I mean, if I have been asked to sign

23  and make those representations and those

24  representations are invalid, yes, I would not,

25  I mean, I -- I wouldn't sign that.

WATERHOUSE - 10-19-21

2      Q.   Okay.  PricewaterhouseCoopers served

3  as HCMFA's outside auditors as well; correct?

4      A.   Yes.

5      Q.   Do you see that this audit report is

6  signed on June 3rd, 2019, just like the

7  Highland audit report?

8      A.   That is correct.

9      Q.   And did the process of -- of

10  preparing HCMFA's audit report, was that the

11  same process that Highland followed when it did

12  its audit report at this time?

13     A.   I mean, it is a different entity.

14  There are different assets.  You know, it --

15  it -- it is -- as you saw, Highland's

16  financials are on a consolidated basis.  This

17  is different, so it is under the same control

18  environment and team.

19     Q.   Okay.  I appreciate that.  So the

20  same control environment and team participated

21  in the preparation of the audit for Highland

22  and for HCMFA at around the same time; correct?

23     A.   Yes.

24     MR. MORRIS:  Can we go to page 17 of

25  the report.  I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   Q.  Okay.  Do you see that just like
3  Highland's audited financial report, HCMFA's
4  audited financial report also has a section
5  related to subsequent events?
6   A.  Yes.
7   Q.  And am I reading this correctly that
8  just as Highland had done, HCMFA disclosed in
9  its audited financial report a subsequent event
10  that related to the issuance of promissory
11  notes to Highland in the aggregate amount of
12  $7.4 million in 2019?
13   A.  That is what I see in the report.
14   Q.  And you were the treasurer of HCMFA
15  at the time; right?
16   A.  Yes, to the best of my knowledge.
17   Q.  And did anybody ever tell you prior
18  to the time of the issuance of this audit
19  report that that sentence relating to HCMFA's
20  2019 notes was inaccurate or wrong in any way?
21   A.  Not that I recall.
22   Q.  As you sit here right now, has
23  anybody ever told you that that sentence is
24  inaccurate or wrong in any way?
25   A.  Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   Q.  I apologize if I asked you this
3  already, but has anybody ever told you at any
4  time that you are not authorized to sign the
5  promissory notes that are the subject of the
6  sentence we're looking at?
7   A.  Not that I recall.
8   Q.  Did anybody ever tell you at any
9  time that you had made a mistake when you
10  signed the promissory notes that are the
11  subject of this sentence?
12   A.  Say that again.  Did anyone ever say
13  that I made a mistake?
14   Q.  Let me ask the question again.
15     Did anybody ever tell you at any
16  time that you made a mistake when you signed
17  the two promissory notes in Highland's favor on
18  behalf of HCMFA in 2019?
19   A.  Not that I recall.
20     MR. MORRIS:  Let's just look at the
21  promissory notes quickly.  Can we please
22  put up Document Number 1, and so this is in
23  the pile that y'all have.  We'll just go
24  for a few more minutes and we can take our
25  lunch break.

Page 140

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   Q.  All right.  So I don't know if you
3  have seen this before, sir.  Do you see that
4  this is a complaint against HCMFA?
5   A.  Yes, I am looking at it on the
6  screen.
7   Q.  Okay.  And have you ever seen this
8  document before?
9   A.  I went through some of these
10  documents with my counsel here yesterday.
11     MR. MORRIS:  All right.  Can we go
12  to Exhibit 1 of this document.
13   Q.  Do you see Exhibit 1 is a
14  $2.4 million promissory note back in 2019?
15   A.  Yeah, I found it in the book.  Yes,
16  I have it here in front of me.
17   Q.  And this is a demand note, right, if
18  you look at Paragraph 2?
19   A.  Yes.
20   Q.  And this is a note where the maker
21  is HCMFA, and Highland is the payee; right?
22   A.  Yes.
23     MR. MORRIS:  And if we can scroll
24  down, can we just see Mr. Waterhouse's
25  signature.

Page 141

WATERHOUSE - 10-19-21

1        WATERHOUSE - 10-19-21
2   Q.  Is that your signature, sir?
3   A.  Yes, it is.
4   Q.  And did you sign this document on or
5  around May 2nd, 2019?
6   A.  I don't recall specifically signing
7  this, but this is my signature.
8   Q.  Okay.  And do you recall that
9  Highland transferred $2.4 million to HCMFA at
10  or around the time you signed this document?
11   A.  I don't recall specifically.  I
12  would want to, as I sit here today, go back and
13  confirm that, but again, presumably that --
14  that -- that did happen.
15   Q.  You wouldn't have signed this
16  document if you didn't believe that HCMFA
17  either received or was going to receive
18  $2.4 million from Highland; is that fair?
19   A.  I mean, it -- if -- if -- if there
20  wasn't a transfer of value, yeah, I mean, you
21  know, I would have no reason to -- to sign a
22  note.
23   Q.  And -- and Highland wouldn't have
24  given this note to PricewaterhouseCoopers if --
25  withdrawn.

**Appx. 02084**

Page 142

1       WATERHOUSE - 10-19-21
2       HCMFA wouldn't have given this note
3   to PricewaterhouseCoopers if it hadn't received
4   the principal value of – of the note in the
5   form of a loan; correct?
6       MR. RUKAVINA:  Objection, legal
7       conclusion, speculation and form.
8       A.   Again, we – what we provided to PwC
9   were, as part of the audit, any promissory
10  notes executed and outstanding.  You know, as a
11  part of the audit, they, you know, they – they
12  have copies of all the bank statements,
13  things – things of that sort.
14      MR. MORRIS:  Okay.  Can we go to
15      Exhibit 2.
16      (Exhibit 2 marked.)
17      Q.   Do you see that this is a promissory
18  note dated May 3rd, 2019 in the amount of
19  $5 million?
20      A.   Yes.
21      Q.   Do you believe this is also a demand
22  note if you look at Paragraph 2?
23      A.   Yes.
24      Q.   And do you see that HCMFA is the
25  maker, and Highland is the payee?

Page 143

1       WATERHOUSE - 10-19-21
2       A.   Yes.
3       Q.   And if we go to the bottom, can we
4   just confirm that that is your signature?
5       A.   Yes.
6       Q.   And together these notes are the
7   notes that are referred to both in Highland and
8   HCMFA's audited financial reports in the
9   subsequent event sections; correct?
10      MS. DANDENEAU:  Objection to form.
11      A.   They – they – they totaled
12  $7.4 million, so presumably, yes.
13      Q.   Okay.  And you were authorized to
14  sign these two notes; correct?
15      MR. RUKAVINA:  Objection, legal
16      conclusion.
17      A.   Yeah.  I mean, I'm – I was the
18  officer of – of HCMFA.  You know, I – I'm not
19  the legal expert on – on what that – what
20  that confers to me or what it doesn't.  I mean,
21  that is my signature on the notes.
22      Q.   And you believed you were authorized
23  to sign the notes; is that fair?
24      A.   I signed a lot of documents in my
25  capacity, just because it is operational in

Page 144

1       WATERHOUSE - 10-19-21
2   nature.  So, you know, to me this was just
3   another document, to be perfectly honest.
4       Q.   Sir, would you have signed
5   promissory notes with the principal amount of
6   $7.4 million if you didn't believe you were
7   authorized to do so?
8       MS. DANDENEAU:  Objection to form.
9       Q.   Are you frozen?
10      A.   No.  I'm just – you know, it is –
11  you know, again, I typically don't sign
12  promissory notes, and I don't recall why I
13  signed these, but – you know, but I did.
14      Q.   All right.  So listen carefully to
15  my question.  Would you have ever signed
16  promissory notes with a face amount of
17  $7.4 million without believing that you were
18  authorized to do so?
19      A.   No.  I mean, I'm – I'm putting my
20  signature on there, so no.
21      Q.   Okay.  And would you have signed two
22  promissory notes obligating HCMFA to pay
23  Highland $7.4 million without Mr. Dondero's
24  prior knowledge and approval?
25      MS. DEITSCH-PEREZ:  Object to the

Page 145

1       WATERHOUSE - 10-19-21
2   form.
3       A.   You know, from – from what I recall
4   around these notes, you know, I don't recall
5   specifically Mr. – Mr. Dondero saying to – to
6   make this a loan.
7       So my conversation with Mr. Dondero
8   around the culmination of the NAV error as
9   related to TerreStar which was a – a – I
10  think it was a year and a half process.  I
11  don't know, it was a multi-month process, very
12  laborious, very difficult.
13      When we got to the end, I had a
14  conversation with Mr. Dondero on where to, you
15  know, basically get the funds to reimburse the
16  fund, and I recall him saying, get the money
17  from Highland.
18      Q.   And so he told you to get the money
19  from Highland; is that right?
20      A.   That is what I recall – in my
21  conversation with him, that is – that is what
22  I can recall.
23      Q.   Do you know who drafted these notes?
24      A.   I don't.
25      Q.   Did you ask somebody to draft the

Page 146

WATERHOUSE - 10-19-21

1 notes?

2 notes?

3    A. I didn't ask – I don't specifically

4 ask people to draft notes really. I mean,

5 again, you know, the legal group at Highland is

6 responsible and has always been responsible for

7 drafting promissory notes.

8    Q. So based on your – based on the

9 practice, you believe that somebody from the

10 Highland's legal department would have drafted

11 these notes. Do I have that right?

12    MS. DEITSCH-PEREZ: Object to the

13    form. John, I also asked you for the Word

14    versions of these notes so we could look at

15    the properties, and you have not provided

16    them. Are you intending to?

17    MR. MORRIS: No.

18    Q. Can you answer my question, sir?

19    A. Again, I –

20    MS. DANDENEAU: Do you want him to

21    repeat it?

22    A. Yeah, why don't you repeat it?

23    Q. Sure. Mr. Waterhouse, based on the

24 practice that you have described in your

25 understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

1

2 would have been drafted by somebody in the

3 legal department?

4    MS. DEITSCH-PEREZ: Object to the

5    form.

6    A. Yes.

7    Q. Okay. And do you know who would

8 have instructed – do you have any knowledge as

9 to who would have instructed the legal

10 department to draft these notes?

11    MS. DEITSCH-PEREZ: Object to the

12    form.

13    A. It was whoever was working – I

14 mean, it was likely someone on the team. I

15 mean, I don't remember exactly on every note or

16 every document, but, again, a lot of these

17 things of this nature – they're operational in

18 nature – were handled by the team.

19    The team knows to – I mean, we

20 don't draft documents. We're not lawyers.

21 We're not attorneys. It is not what I do or

22 accountants do.

23    So they are always instructed to go

24 and – and go to the legal team to get

25 documents like this drafted. Also, when you go

Page 148

WATERHOUSE - 10-19-21

1

2 to the legal team, the – you know, we always

3 loop in compliance. And compliance – when you

4 go to the legal team, compliance is part of

5 legal team. They're made aware of – of – of

6 these types of transactions.

7    Q. And do you believe that you had

8 the – withdrawn.

9    Did you ever tell Mr. Dondero –

10 (inaudible) – did you see those?

11    A. Sorry.

12    MS. DEITSCH-PEREZ: I did not hear

13    the end of that question.

14    Q. Did you ever tell Mr. Dondero that

15 you signed these two notes?

16    A. I don't recall ever – no, I don't

17 recall having a conversation with him.

18    Q. Did you ever discuss these two notes

19 with him at any time?

20    A. The conversation, I recall, was what

21 I described earlier. And that is the only time

22 I recall ever discussing this.

23    Q. Okay. But the corporate accounting

24 group had a copy of this – of these two notes.

25 And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

1

2 corporate accounting group gave the two notes

3 to PricewaterhouseCoopers in connection with

4 the audit; correct?

5    MS. DANDENEAU: Objection to form.

6    A. Yes. I mean, that is – yeah, I

7 mean, they – unless the legal team can also

8 retain copies of items like this. I mean, I

9 don't know everything that they would retain as

10 well.

11    The legal team would also, if they

12 had documents as part of audits, turn that over

13 to the auditors as well. So it could have been

14 the corporate accounting team. It could be

15 someone on the legal team.

16    Q. All right. So you didn't – you

17 didn't draft this note; right?

18    A. I – I – I did not.

19    Q. But somebody at Highland did; is

20 that fair?

21    MS. DEITSCH-PEREZ: Object to the

22    form.

23    A. I don't know. I mean, we can go to

24 the legal team. I don't – I'm not sitting

25 behind someone in legal. Maybe they went to

Page 150

```
1            WATERHOUSE - 10-19-21
2   outside counsel. I have no idea.
3       Q.   Did you have any reason to believe
4   you weren't authorized to sign this note,
5   either of these two notes?
6       A.   I think I have already answered that
7   question.
8       Q.   Okay. You didn't give these notes
9   to PricewaterhouseCoopers; correct?
10           MS. DANDENEAU: Objection to form.
11      A.   I don't recall giving these to
12  PricewaterhouseCoopers.
13      Q.   And in the practice that you have
14  described, somebody in the corporate accounting
15  group would have given these two notes to
16  PricewaterhouseCoopers; correct?
17           MS. DANDENEAU: Objection to form.
18      A.   I think I've answered that. I said
19  either the corporate accounting team or maybe
20  the legal team.
21           MR. MORRIS: Okay. Why don't we
22  take our lunch break here.
23           VIDEOGRAPHER: We're going off the
24  record at 1:04 p.m.
25      (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Page 151

```
1            WATERHOUSE - 10-19-21
2            VIDEOGRAPHER: We are back on the
3   record at 1:49 p.m.
4       Q.   Mr. Waterhouse, did you speak with
5   anybody during the break about the substance of
6   this deposition?
7       A.   I spoke to -- to Deb and Michelle.
8       Q.   About the substance of the
9   deposition?
10      A.   Yes.
11      Q.   Can you tell me what you talked
12  about?
13           MS. DANDENEAU: No. We object on
14  the basis of privilege.
15      Q.   Okay. You are going to follow your
16  counsel's objection here?
17      A.   Yes.
18      Q.   Okay.
19           MR. MORRIS: Can we put up on the
20  screen Exhibit 35.
21      (Exhibit 35 marked.)
22      Q.   Are you able to see that document,
23  sir?
24      A.   Yes.
25      Q.   Have you ever seen an incumbency
```

Page 152

```
1            WATERHOUSE - 10-19-21
2   certificate before?
3       A.   I have.
4       Q.   Do you have a general understanding
5   of what an incumbency certificate is?
6       A.   I have a general understanding.
7       Q.   What is your general understanding?
8       A.   You know, those -- my general
9   understanding is that the incumbency
10  certificate basically lists folks that can --
11  are like authorized signers.
12      Q.   Okay. And do you see that this is
13  an incumbency certificate for Highland Capital
14  Management Fund Advisors, L.P.?
15      A.   Yes.
16      Q.   Okay. And if we could scroll down
17  just a little bit, do you see that it's dated
18  effective as of April 11th, 2019?
19      A.   Yes, I see that.
20      Q.   Okay. And is that your signature in
21  the middle of the signature block?
22      A.   Yes, it is.
23      Q.   And by signing it, did you accept
24  appointment as the treasurer of HCMFA effective
25  as of April 11th, 2019?
```

Page 153

```
1            WATERHOUSE - 10-19-21
2       A.   Again, I'm not the legal -- I don't
3   know if this makes me the treasurer or the
4   appointment. I don't know -- I don't know
5   that, so I don't -- I don't know if that
6   document -- again, I think -- again, I'm not
7   the legal expert. I think isn't there --
8   aren't there other legal documents that detail
9   who the officers are that could be incorporated
10  or things like that? Again, I don't want to
11  play armchair attorney here.
12      Q.   I'm not asking you for a legal
13  conclusion. I'm asking you for your knowledge
14  and understanding. When you signed this
15  document, did you understand that you were
16  accepting an appointment as the treasurer of
17  HCMFA?
18           MS. DANDENEAU: Objection to form.
19           MS. DEITSCH-PEREZ: Objection, form.
20      A.   Again, I don't think this -- that
21  wasn't my understanding. I don't think this
22  makes -- this document makes me the treasurer.
23      Q.   What do you think this document --
24  why did you sign this document?
25           MS. DEITSCH-PEREZ: Objection to
```

Page 154

WATERHOUSE - 10-19-21

1        form.
2        MR. MORRIS:  You're objecting to the
3    form of the question when I asked him why
4    did you sign the document?  What is the
5    basis for the objection?
6        MS. DEITSCH-PEREZ:  Because, John, I
7    think that it does call for a legal
8    conclusion other than -- with him saying
9    because somebody told me to sign this
10   document.  But if you want to go there,
11   that is fine.
12       MR. MORRIS:  Okay.
13       MS. DANDENEAU:  I don't think --
14   he's already said he's not a lawyer.
15       MR. MORRIS:  I'll allow the witness
16   to answer this question.
17   Q.    Why did you sign this document, sir?
18   A.    I mean, our -- our legal group would
19   bring by these incumbency certificates from
20   time to time.  I have no idea why they're being
21   updated, and I was asked to sign.
22   Q.    Did you ask anybody, what is this
23   document?
24   A.    No.

Page 155

WATERHOUSE - 10-19-21

1    Q.    Did anybody tell you why they needed
2    you to sign the document?
3    A.    Not that I can recall.
4    Q.    You testified earlier that you
5    understood that you served as the acting
6    treasurer for HCMFA; correct?
7    A.    Yes.
8    Q.    How did you become the acting
9    treasurer of HCMFA?
10       MS. DANDENEAU:  Objection to form.
11   A.    I don't -- I don't know the legal --
12   I don't know the legal mechanic of how I became
13   the acting treasurer.
14   Q.    I'm not asking for the legal
15   mechanic.  I'm asking you as the person who
16   is --
17       MS. DANDENEAU:  John, you said --
18       MR. MORRIS:  Stop.
19       MS. DANDENEAU:  -- how did you
20   become the treasurer.  That is --
21       MR. MORRIS:  Please stop.
22       MS. DANDENEAU:  That is a legal
23   question.
24       MR. MORRIS:  I am not asking any

Page 156

WATERHOUSE - 10-19-21

1    legal questions, to be clear.  I'm asking
2    for this witness' understanding as to how
3    he became the acting treasurer of HCMFA.
4    If he doesn't know, he can say he doesn't
5    know, but this legal stuff is nonsense, and
6    I really object to it.
7    Q.    Sir, I'm asking you a very simple
8    question.
9        MS. DANDENEAU:  Argumentative.
10   Q.    You testified -- you testified that
11   you became the acting treasurer of HCM --
12   HCMFA; correct?
13   A.    Yes.
14   Q.    How did that happen?
15       MS. DANDENEAU:  Again, object to
16   form.
17       MR. MORRIS:  I can't wait to do this
18   in a courtroom.  Good God.
19   Q.    Go ahead, sir.
20   A.    I don't know the exact process of
21   how that happened.
22   Q.    Do you have any idea whether signing
23   this document was part of the process?
24       MR. MORRIS:  You know what --

Page 157

WATERHOUSE - 10-19-21

1        MS. DANDENEAU:  Objection.
2        MR. MORRIS:  -- withdrawn.  You guys
3    want to do this, I can't wait.  I can't
4    wait.  This is the craziest stuff ever.
5        MS. DANDENEAU:  John, he said he's
6    not a lawyer, and you are asking him for a
7    legal conclusion, and he says he doesn't
8    know, and you persist.
9        MR. MORRIS:  Okay.
10       MS. DANDENEAU:  So you can ask these
11   questions --
12       MR. MORRIS:  Did anyone -- please
13   stop talking.
14       MS. DANDENEAU:  -- at another
15   point -- no, no, no, I'm entitled to talk,
16   too; right?  If you're going to make these
17   accusations as if we're trying to stonewall
18   you, this is not the witness to ask that
19   question.
20       MR. MORRIS:  I can't -- I can't
21   wait -- I can't wait to do this in a
22   courtroom.  I will just leave it at that.
23       MS. DANDENEAU:  That's right, I'm
24   sure you can't.

WATERHOUSE - 10-19-21

1
2    Q.   Did anyone ever tell you, sir, that
3    even though you were the acting treasurer of
4    HCMFA, that you were not authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7    A.   I'm not sure I understand the
8    question.  I wasn't -- I mean, I'm -- I'm the
9    current acting treasurer.
10   Q.   Did anybody ever tell you at any
11   time that even though you were the acting
12   treasurer of HCMFA, that you were not
13   authorized to sign the two promissory notes
14   that we looked at before lunch?
15        MS. DANDENEAU:  Objection to form.
16   A.   Not that I recall.
17   Q.   Did anybody ever tell you at any
18   time that you were not authorized to sign the
19   two promissory notes that we looked at before
20   lunch?
21   A.   Not that I recall.
22   Q.   Did anybody ever tell you at any
23   time that you should not have signed the two
24   promissory notes that we looked at before
25   lunch?

WATERHOUSE - 10-19-21

1
2    A.   Not that I recall.
3    Q.   Did you ever tell anybody at any
4    time that you weren't authorized to sign the
5    two promissory notes that we looked at before
6    lunch?
7    A.   Not that I recall.
8    Q.   Did you ever tell anybody at any
9    time that you made a mistake when you signed
10   the two promissory notes that we looked at
11   before lunch?
12   A.   Not that I recall.
13   Q.   As you sit here right now, do you
14   have any reason to believe that you were not
15   authorized to sign the two documents that we
16   looked at before lunch?
17        MS. DANDENEAU:  Objection to form.
18   A.   If -- if this is the -- the valid
19   incumbency certificate, I mean, this does --
20   this does detail who the signers are.
21   Q.   Okay.  And looking at that document,
22   does that give you comfort that you were
23   authorized to sign the two promissory notes
24   that we looked at before lunch?
25        MS. DEITSCH-PEREZ:  Object to the

WATERHOUSE - 10-19-21

1
2    form.
3        MS. DANDENEAU:  Objection, form.
4    A.   Yes.
5    Q.   As of October 20th -- withdrawn.
6        I'm trying to take your mind back to
7    a year ago, October 2020.  Do you recall at
8    that time that the boards of the retail funds
9    were making inquiries about obligations that
10   were owed by the advisors to Highland in
11   connection with their 15(c) review?
12        MS. DANDENEAU:  Objection to form.
13   A.   I don't -- I don't recall.
14   Q.   As of October 2020, you had no
15   reason to believe you weren't authorized to
16   sign the two promissory notes that we just
17   looked at; correct?
18        MS. DANDENEAU:  Objection, form.
19        MS. DEITSCH-PEREZ:  Objection to
20   form.
21   A.   I didn't think about it in October
22   of 2020, but I mean --
23   Q.   Did you have any reason to believe
24   at that time that you weren't authorized to
25   sign the two notes that we just looked at?

WATERHOUSE - 10-19-21

1
2    A.   Not that I'm aware, no.
3    Q.   Did you have any reason to believe a
4    year ago that you made a mistake when you
5    signed those two notes?
6    A.   Not that I'm aware.
7    Q.   A year ago you believed that HCMFA
8    owed Highland the unpaid principal amounts that
9    were due under those two notes; correct?
10   A.   They're -- they're promissory notes
11   that were -- as you presented, that were --
12   that were executed.  Whether they're valid or
13   if there's other reasons, I didn't -- I don't
14   know.
15   Q.   I'm not asking you whether they're
16   valid or not.  I'm asking you for your state of
17   mind.  A year ago you believed that HCMFA
18   was -- was obligated to pay the unpaid
19   principal amount under the two notes that you
20   signed; correct?
21   A.   Yeah, I'm -- I'm -- yes.
22   Q.   Thank you.  Are you aware -- you're
23   aware that -- that in 2017, NexPoint issued a
24   note in favor of Highland in the approximate
25   amount of $30 million; correct?

WATERHOUSE - 10-19-21

2    A.   I'm – I'm – I'm generally aware.

3    Q.   Okay.  And are you generally aware

4  that from time to time, after the note was

5  issued by NexPoint, that moneys were applied to

6  principal and interest that were due under the

7  NexPoint note?

8    A.   Yes, I'm generally aware.

9    Q.   Okay.  And did anybody ever tell you

10  that the payments that were made against the

11  NexPoint notes were made by mistake?

12    A.   Yes.

13    Q.   And is it the one payment that we

14  talked about earlier today?

15    A.   We talked about a lot of things

16  today.  What payment are we talking about?

17    Q.   Okay.  Who told you that any payment

18  made against the NexPoint note was made by

19  mistake?

20    A.   D.C. Sauter.

21    Q.   When did Mr. Sauter tell you that?

22    A.   I don't – I don't remember

23  specifically.

24    Q.   Do you remember what payments –

25    A.   Sometime – sometime this year.

WATERHOUSE - 10-19-21

2    Q.   Sometime in 2021?

3    A.   Yes.

4    Q.   Do you remember what payment he was

5  referring to?

6    A.   It was the – the payment made in

7  January of 2021 or – yeah, January of – of

8  this – January of 2021.

9    Q.   Okay.  So did anybody ever tell you

10  at any time that any payment that was made

11  against principal –

12    A.   And – and – and – hold on, and it

13  may have been other – again, it may have been

14  that payment or – or there may have been what

15  he was explaining, a misapplication of prior

16  payments as well.

17    Q.   Can you – can you give me any

18  specificity – withdrawn.

19        Withdrawn.  Can you tell me

20  everything that Mr. Sauter told you about –

21  about errors in relation to payments made

22  against principal and interest due under the

23  NexPoint note?

24        MS. DANDENEAU:  Can I just –

25        MR. RUKAVINA:  Hold on.  Hold on.

WATERHOUSE - 10-19-21

2  I'm going to object here, and I'm going to

3  instruct the witness not to answer

4  depending on the discussion that you had –

5  Mr. Waterhouse, I'm the lawyer for

6  NexPoint, and as everyone here knows, D.C.

7  Sauter is in-house counsel.

8        So if you and Mr. Sauter were having

9  a factual discussion and him preparing his

10  affidavit, et cetera, then go ahead and

11  answer that.  But if you were having a

12  discussion as to our legal strategy in this

13  lawsuit, or anything having to do with

14  that, then do not answer that.

15        And if you need to talk to either

16  your counsel or me about that, then we need

17  to have that discussion now.

18    A.   Okay.  Yeah, I don't – I don't

19  really know how to make that distinction, so

20  maybe I need to talk to counsel before I

21  answer, or if I can answer.

22    Q.   Let me just ask you this question:

23  Did – did you have any conversation with

24  Mr. Sauter about any payment of principal and

25  interest prior to the time that you left

WATERHOUSE - 10-19-21

2  Highland's employment, or did it happen after

3  you left Highland's employment?

4    A.   I don't – I don't recall if – I

5  don't recall.  I mean, it was sometime in 2021.

6  I don't remember if it was before or after I

7  was let go from Highland.

8    Q.   Okay.  So – so nobody told you

9  prior to 2021 that any error or mistake was

10  made in the application of payments against

11  principal and interest due on the NexPoint

12  note.  Do I have that right?

13    A.   Yeah, I don't – I don't recall this

14  being in 2020.

15    Q.   Okay.  And it didn't happen in 2019;

16  correct?

17    A.   I don't recall that happened.

18    Q.   And it didn't happen in 2018;

19  correct?

20    A.   I don't – I don't recall that

21  happening.

22    Q.   And it didn't happen in 2017;

23  correct?

24    A.   I don't recall.

25    Q.   But – but you believe the

Page 166

WATERHOUSE - 10-19-21

1  conversation took place in 2021.  You just
2  don't remember if it was before or after you
3  left Highland's employment.  Do I have that
4  right?
5      A.   It was sometime this year.  I
6  don't – I don't remember.
7      Q.   Okay.  Did you report this
8  conversation to Mr. Seery at any point?
9      A.   I don't believe so.
10     Q.   Did you report this conversation to
11 anybody at DSI at any time?
12     A.   I don't recall.
13     Q.   Do you have – you don't have a
14 recollection of ever doing that; correct?
15     A.   Yeah, that's right.  I don't recall
16 doing that.
17     Q.   Do you recall telling anybody at
18 Pachulski Stang about the conversation you
19 recall with Mr. Sauter?
20     A.   No, I don't – I don't recall.
21     Q.   Did you tell any of the independent
22 board members about your conversation with
23 Mr. Sauter?
24     A.   I don't recall.

Page 167

WATERHOUSE - 10-19-21

1      Q.   Did you tell any of the employees at
2  Highland before you left Highland's employment
3  about this call that you had with Mr. Sauter?
4      MS. DANDENEAU:  Objection to form.
5      A.   No, I don't – no, I don't recall.
6      Q.   NexPoint – to the best of your
7  knowledge, did NexPoint ever file a proof of
8  claim against Highland to try to recover moneys
9  that were mistakenly paid against the principal
10 and interest due under the note?
11     A.   Okay.  Hold on.  You are saying did
12 NexPoint Advisors file a proof of claim to
13 Highland for errors related to payments under
14 the NexPoint note to Highland?
15     Q.   Correct.
16     A.   I'm – I'm – I'm not – I'm not
17 aware.
18     Q.   Are you aware –
19     A.   I'm not the legal person here, I
20 don't know.
21     Q.   I'm just asking for your knowledge,
22 sir.
23     A.   Yeah, I don't know.  I'm not aware.
24     Q.   Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1  kind that NexPoint has ever made to try to
2  recover the amounts that it contends were – or
3  that Mr. Sauter contend were mistakenly applied
4  against principal and interest due under the
5  NexPoint note?
6      A.   I'm not aware.
7      MS. DANDENEAU:  Objection to form.
8      Q.   Okay.  The advisors' agreements with
9  the retail funds are subject to annual renewal;
10 correct?
11     A.   Yes.
12     Q.   And do you participate in the
13 renewal process each year?
14     A.   Yes.
15     Q.   What role do you play in the renewal
16 process?
17     A.   I'm – I'm asked by the retail board
18 to walk-through the advisors financials.
19     Q.   And do you do that in the context of
20 a board meeting?
21     A.   Yes, it is – yes, it is typically
22 done in a board meeting.
23     Q.   And do you recall the time –
24 does – does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1  the same time each year?
2      A.   Yes, it is – it is around the same
3  time every year.
4      Q.   And what – what time period of the
5  year does the renewal process occur?
6      A.   Approximately the September
7  timeframe.
8      Q.   During that process, in your
9  experience, does the board typically conduct
10 its own diligence and ask for information?
11     A.   Does the board ask for lots of – I
12 mean, just – I mean, lots of information as a
13 part of that – that – as part of that board
14 meeting and that process.
15     Q.   Okay.  And do you recall that the
16 process in 2020 spilled into October?
17     A.   Yes.  Yes.
18     Q.   Okay.  And as part of the process in
19 2020, the retail board asked – asked what are
20 referred to as 15(c) questions; right?
21     A.   I guess I don't want to be – they
22 asked 15(c) – are you saying they asked 15(c)
23 questions and this is why it went into October
24 or –

Appx. 02091

Page 170

```
 1          WATERHOUSE - 10-19-21
 2    Q.  No, I apologize.
 3         Do you have an understanding of
 4    what -- of what 15(c) refers to in the context
 5    of the annual renewal process?
 6    A.  Yes, generally.
 7    Q.  All right.  What is your general
 8    understanding of the term "15(c)" in the
 9    context of the annual renewal process?
10    A.  I -- I think 15(c) is the section
11    that -- that -- you know, that -- that the
12    board has to evaluate every year, the retail
13    board.  They have to, you know, go through,
14    evaluate, and go through that approval process
15    on a yearly basis.
16    Q.  Okay.
17         MR. MORRIS:  Can we put up on the
18    screen Exhibit 36, please.
19         (Exhibit 36 marked.)
20         MR. MORRIS:  I guess let's just
21    start at the bottom so Mr. Waterhouse can
22    see what is here.
23    Q.  You see this begins with an email
24    from Blank Rome to a number of people.
25         MR. MORRIS:  And if we can scroll
```

Page 171

```
 1          WATERHOUSE - 10-19-21
 2    up -- keep going just a little bit.
 3    Q.  You will see that there is an email
 4    from Lauren Thedford to Thomas Surgent and
 5    others where she reports that she was attaching
 6    and reproducing below additional 15(c)
 7    follow-up questions from the board.
 8         Do you see that?
 9    A.  Yes.
10    Q.  And do you see Question No. 2 asks
11    whether there are any material outstanding
12    amounts currently payable or due in the future
13    (e.g., notes) to HCMLP by HCMFA or NexPoint
14    Advisors or any other affiliate that provides
15    services to the funds?
16         Do you see that?
17    A.  Yes.
18    Q.  And -- and did you -- do you recall
19    that in -- in October of 2020 the retail boards
20    were asking for that information?
21    A.  I don't recall it, but there --
22    they're obviously asking in this email.
23    Q.  Okay.
24         MR. MORRIS:  Can we scroll up a
25    little bit, please.
```

Page 172

```
 1          WATERHOUSE - 10-19-21
 2    Q.  And then do you see that
 3    Ms. Thedford includes you on the email string
 4    on Tuesday, October 6th, at 5:52?
 5    A.  Yes.
 6    Q.  And she asks you and Dave Klos and
 7    Kristin Hendrix for advice on that particular
 8    Request No. 2 that I have just read; right?
 9    A.  Yes.
10    Q.  Okay.  Can you tell me who
11    Ms. Thedford is?
12    A.  She was an attorney that was in the
13    legal group.
14    Q.  At Highland Capital Management,
15    L.P.?
16    A.  I'm -- I'm -- I'm -- I don't
17    remember if she was an employee of Highland or
18    any of the advisors.
19    Q.  Okay.  Do you know if she served as
20    the corporate secretary for both HCMFA and
21    NexPoint?
22    A.  Yes.
23    Q.  And -- okay.
24         Do you know whether Ms. Thedford
25    held any positions in relation to the retail
```

Page 173

```
 1          WATERHOUSE - 10-19-21
 2    funds as we defined that term?
 3    A.  Yes.
 4    Q.  What is your understanding of the
 5    positions that Ms. Thedford held at the retail
 6    funds?
 7    A.  I -- I recall her being an officer.
 8    I don't recall her title.
 9    Q.  Okay.  Is still an officer at
10    any of the retail funds today?
11    A.  No.
12    Q.  Do you know when she ceased to be an
13    officer of the retail funds?
14    A.  Approximately.
15    Q.  And when did she approximately cease
16    to be an officer of the retail funds?
17    A.  It was in -- it was in early of
18    2021.
19    Q.  Okay.  Do you know when she became
20    an officer of the retail funds?
21    A.  I don't recall.
22    Q.  To the best of your recollection,
23    was she an officer of the retail funds in
24    October of 2020?
25    A.  I believe so.
```

Page 174

```
1           WATERHOUSE - 10-19-21
2     Q.   Okay.  Do you know what title she
3  held in her capacity as an officer, if any?
4     A.   I told you I don't remember.
5     Q.   Okay.  So she sends this email to
6  you at 5:52 p.m. on October 6th.
7           And if we can scroll up to the
8  response, you responded a minute later with a
9  one-word answer:  Yes.
10          Do you see that?
11    A.   Yes.
12    Q.   And – and yes is – yes was in
13 response to the retail board's Question No. 2,
14 right, whether there are any material
15 outstanding amounts currently payable or due in
16 the future?
17    A.   Yes.
18          MR. MORRIS:  And can we scroll up to
19 see what happened next.
20    Q.   So Ms. Thedford writes back to you a
21 few minutes later and she asks whether you
22 could provide the amounts.
23          Do you see that?
24    A.   Yes.
25    Q.   And then you respond further and you
```

Page 175

```
1           WATERHOUSE - 10-19-21
2  refer her to the balance sheet that was
3  provided to the board as part of the 15(c)
4  materials.
5           Do you see that?
6     A.   Yes.
7     Q.   And – and did the advisors provide
8  to the board certain balance sheets in 2020 in
9  connection with the 15(c) review?
10    A.   Yes, they did.
11    Q.   Okay.  And were the amounts that
12 were outstanding or that were to be due in the
13 future by the advisors to Highland included in
14 the liability section of the balance sheet that
15 was given to the retail board?
16    A.   Yes.  Notes would be reflected as
17 liabilities.
18    Q.   Okay.  And –
19    A.   If I'm understanding your question
20 correctly.
21    Q.   You are.  And – and – and those
22 liabilities you – you were – you believed
23 were responsive to the retail board's question;
24 correct?
25    A.   Yes.
```

Page 176

```
1           WATERHOUSE - 10-19-21
2     Q.   Okay.  And then if we can scroll up,
3  you see Ms. Thedford responds to you
4  nine minutes later with a draft response.
5           Do you see that?
6     A.   Yes.
7     Q.   And she says that she is taking from
8  the 6/30 financials certain information about
9  amounts that were due to HCMLP and affiliates
10 as of June 30th, 2020.
11          Do you see that?
12    A.   I do.
13    Q.   Okay.  And did you believe, as the
14 treasurer of NexPoint and HCMFA and as the CFO
15 of Highland, that the information that
16 Ms. Thedford obtained from the 6/30 financials
17 was accurate and responsive in relation to the
18 retail fund board's question?
19    A.   I just want to make sure I
20 understand the question.
21          Are you saying that the financial
22 information provided to the retail board as
23 part of the 15(c) process, which included
24 financial statements as of June 30th of 2021,
25 did I feel like those were responsive to their
```

Page 177

```
1           WATERHOUSE - 10-19-21
2  questions?
3     Q.   Yes.
4     A.   Yes.
5     Q.   Thank you.
6           MS. DEITSCH-PEREZ:  John, it is not
7  in the chat yet.  Can you just make sure it
8  gets put in there.
9           MR. MORRIS:  Sure.
10          MS. CANTY:  I put it in there.  I
11 think maybe I just sent it directly, so let
12 me make sure it says to everyone.  But I
13 did put it in there.  I will try again.
14          MR. MORRIS:  Thank you, La Asia.
15          MS. DANDENEAU:  What number is it.
16          MR. MORRIS:  What, the Bates number?
17          MS. DEITSCH-PEREZ:  No, the –
18 this – yeah, 36 is not in the chat.
19          MR. MORRIS:  Okay.  We'll get it.
20          MS. DANDENEAU:  I think that
21 Ms. Canty just sent it to me originally.
22 Sorry.
23          MR. MORRIS:  Okay.  We will get it
24 there.
25          MS. CANTY:  Okay.  It is there now
```

Appx. 02093

Page 178

WATERHOUSE - 10-19-21

1  for everyone.
2      MS. DEITSCH-PEREZ:  Got it.  Thank
3  you.
4      Q.   Do you recall if the proposed
5  response that Ms. Thedford crafted was
6  delivered to the retail board with the -- with
7  the yellow dates having been completed?
8      A.   I don't know.
9      MR. MORRIS:  Davor, I'm going to ask
10     that the advisors and -- the advisors of
11     both HCMFA and NexPoint produce to me any
12     report that was given to the retail board
13     concerning the promissory notes at issue,
14     including the obligations under the notes.
15     Q.   Do you know -- do you know if
16  ultimately NexPoint informed the retail board
17  in response to its question that NexPoint owed
18  Highland approximately 23 or $24 million?
19     MS. DANDENEAU:  Objection to the
20     form.
21     A.   Sorry, are you asking, did NexPoint
22  tell the retail board that it owed Highland?
23     Q.   Let me ask a better question,
24  Mr. Waterhouse.

Page 179

WATERHOUSE - 10-19-21

1      Did -- do you know if anybody ever
2  answered the retail board's question that was
3  Number 2?
4      A.   I don't -- I can't say for sure.
5      Q.   Okay.  Do you recall -- I think you
6  testified earlier that you walked through the
7  advisors' financials with the retail board;
8  correct?
9      A.   Yes.
10     Q.   And as part of that process, did you
11  disclose to the retail board the obligations
12  that NexPoint and HCMFA had to Highland under
13  promissory notes?
14     A.   The retail board, as I stated
15  earlier, receives financial information,
16  balance sheet, income statement information
17  from the advisors.  That information is
18  provided to the retail board in connection with
19  the 15(c) process.
20     So any notes between the advisors
21  and the Highland would be -- anything would be
22  detailed in those financial statements.
23     Q.   Do you recall in 2020 ever speaking
24  with the retail board about the advisors'

Page 180

WATERHOUSE - 10-19-21

1  obligations under the notes to Highland?
2      MS. DANDENEAU:  Objection to form.
3      MS. DEITSCH-PEREZ:  Object to the
4  form.
5      A.   I don't recall specifically.
6      Q.   Do you have any general recollection
7  of discussing with the retail board the
8  advisors' obligations to Highland under the
9  notes that they issued?
10     MS. DANDENEAU:  Object to the form.
11     MS. DEITSCH-PEREZ:  Object to the
12  form.
13     A.   I just recall generally just -- it
14  is just -- I present the financial statements,
15  and if they have questions, I answer their
16  questions and walk them through.
17     I don't recall what they asked.  I
18  don't recall where the discussion went.  I
19  don't recall anything of that nature.
20     Q.   Okay.  Do you know if anybody on
21  behalf of HCMF -- HCMFA ever told the retail
22  board that HCMFA had no obligations under the
23  two 2019 notes that you signed?  Withdrawn.
24     Do you know whether anybody on

Page 181

WATERHOUSE - 10-19-21

1  behalf of HCMFA ever told the retail boards
2  that you weren't authorized to sign either of
3  the two 2019 notes?
4      MS. DANDENEAU:  Objection to form.
5      A.   I'm not aware.
6      Q.   Are you aware of anybody on behalf
7  of HCMFA ever telling the retail boards that
8  your execution of the two 2019 notes was a
9  mistake?
10     MS. DANDENEAU:  Objection to form.
11     A.   I'm not aware.
12     Q.   Are you aware of anybody on behalf
13  of HCMFA ever telling the retail boards that
14  HCMFA did not have to pay the amounts reflected
15  in the two notes that you signed in 2019?
16     A.   I'm not aware.
17     Q.   Do you know whether anybody ever
18  told the retail boards -- withdrawn.
19     Do you know whether anybody ever
20  told the retail boards that Highland has
21  commenced a lawsuit to recover on the two notes
22  that you signed in 2019?
23     A.   I'm not aware.
24     Q.   Are you aware of anybody informing

Page 182

WATERHOUSE - 10-19-21

1  the retail boards that Highland has sued to
2  recover on the NexPoint note?
3  A.  I'm not aware.
4  Q.  Do you know whether anybody ever
5  told the retail board that Highland had
6  declared a default with respect to the two
7  HCMFA notes that you signed in 2019?
8  A.  I'm not aware.
9  Q.  Are you aware of anybody ever
10  informing the retail boards that Highland had
11  declared a default under the NexPoint note?
12  A.  I'm not aware.
13  Q.  Are you aware of anybody telling the
14  retail board that Highland made a demand for
15  payment under the 2019 notes that you signed on
16  behalf of HCMFA?
17  A.  I'm not aware.
18  Q.  Let's -- let's see if there is a
19  response to Ms. Thedford's email, if we can
20  scroll up.
21  Do you see you responded to
22  Ms. Thedford five minutes after she provided
23  the draft response to you?
24  A.  Yes.
25

Page 183

WATERHOUSE - 10-19-21

1  Q.  Okay.  And do you see that Dustin
2  Norris is copied on this email?
3  A.  Yes, he is.
4  Q.  Great.  Do you know whether
5  Mr. Norris held any positions at either of the
6  advisors as of October 6, 2020?
7  A.  I will go back to -- I'm not the
8  legal expert of what appoints you or how or
9  why, but you did see Dustin's name on the
10  incumbency certificate that you produced
11  earlier.
12  Q.  Do you know what his title was in
13  October of 2020?
14  MS. DANDENEAU:  Objection to form.
15  A.  I don't -- I don't recall.
16  Q.  Was he -- did he have a title with
17  each of the advisors, to the best of your
18  recollection?
19  A.  I don't recall.
20  Q.  Do you know why he is included on
21  this email string?
22  A.  I didn't add Dustin.  It looks like
23  Lauren did.  I don't know why she added him or
24  not.  You would have to ask her.
25

Page 184

WATERHOUSE - 10-19-21

1  Q.  Does Mr. Norris play a role in
2  formulating the advisors' responses to the
3  questions asked by the retail board in
4  connection with the 15(c) annual review?
5  MS. DANDENEAU:  Objection to form.
6  A.  He -- Dustin Norris is there in the
7  board meetings.  But -- so he has a role, yes.
8  Q.  Okay.  And does Mr. Norris hold any
9  positions, to the best of your knowledge, in
10  relation to any of the retail funds?
11  A.  I don't -- I don't believe he does.
12  Q.  How about Mr. Post, do you know
13  whether Mr. Post holds any position in either
14  of the advisors?
15  A.  I mean, he -- he -- yes.
16  Q.  What is your understanding of the
17  positions that Mr. Post holds in relation to
18  the advisors?
19  MS. DANDENEAU:  Objection to form.
20  A.  He is an employee of NexPoint
21  Advisors.  He is also the chief compliance
22  officer for -- for NexPoint.
23  Q.  Who is the chief compliance officer
24  for HCMFA, if you know?
25

Page 185

WATERHOUSE - 10-19-21

1  MS. DANDENEAU:  Objection to form.
2  A.  That would be Jason as well.
3  Q.  Okay.  Now, looking at your
4  response, you noted initially that nothing was
5  owed under shared services.  Do I have that
6  right in substance?
7  A.  Yeah.  I think I'm being responsive
8  to Lauren's question here, whether any of the
9  shared service invoices are outstanding.
10  Q.  Right.
11  A.  Yes.
12  Q.  And that is because -- and that is
13  because the retail the retail board has asked
14  for the disclosure of all material obligations
15  that were owed to HCMLP either then or in the
16  future; isn't that right?
17  MS. DANDENEAU:  Objection to form.
18  Q.  We can go back down and look.
19  A.  Look, I don't know if that's a
20  material item, I mean, again, but sure.
21  Q.  Okay.  But there were no shared
22  services outstanding; correct?
23  MS. DANDENEAU:  Objection to form.
24  A.  That is what this email seems to
25

WATERHOUSE - 10-19-21

1  indicate.
2      Q.   And you wouldn't have written it if
3  you didn't believe it to be true at the time;
4  correct?
5      A.   Correct.
6      Q.   And when you referred to shared
7  services outstanding, what you meant there was
8  that neither NexPoint nor HCMFA owed Highland
9  any money under the shared services agreements
10  that they had with Highland as of October 6th,
11  2020; right?
12     A.   I don't know if it is as of October
13  6, 2020 or if it was from -- like through the
14  financials -- through the date of the
15  financials as of June 30.
16     Q.   Okay.  And then you noted that
17  HCMA -- the HCMFA note is a demand note; right?
18     A.   Yes.
19     Q.   And then you referred Ms. Thedford
20  to Kristin Hendrix for the term of the NexPoint
21  note.  Do I have that right?
22     A.   Yes.
23     Q.   And then you refer to that agreement
24  that is referenced in the 2018 audited

WATERHOUSE - 10-19-21

1  financials about Highland's agreement not to
2  make demand upon HCMFA until May 2021; correct?
3      A.   Correct.
4      Q.   And then -- and then the next thing
5  you write is that the attorneys think that BK
6  doesn't change that, but don't know for sure at
7  the end of the day.
8          Do you see that sentence?
9      A.   Yes.
10     Q.   Which attorneys were you referring
11  to?
12     A.   I don't remember.
13     Q.   Did you have a conversation with
14  attorneys concerning whether the bankruptcy
15  would change or alter in any way the agreement
16  not to make a demand under the HCMFA note?
17     A.   Look, yeah, I mean, I don't
18  specifically remember, but generally, I mean,
19  it is in this email.  I don't -- I don't -- I
20  don't -- I don't remember who I talked to or,
21  you know, was it inside counsel, outside
22  counsel, but obviously I talked to somebody.
23     Q.   Do you have any recollection --
24     A.   Well, I don't even know if it's --

WATERHOUSE - 10-19-21

1  actually, it may not even have been me.  I say
2  the attorneys in, you know, a lot of -- like I
3  talked about the team.
4          It could have been someone on the
5  team, like, hey, we need to run this down, and
6  maybe they talked to attorneys again and
7  relayed that information to me.
8          So I really don't know if I spoke or
9  someone else did or -- or, I mean, and maybe it
10  wasn't even from corporate accounting.  Maybe
11  it was, you know, other -- I'm kind of
12  summarizing, you know, again, so I don't really
13  know -- I can't really say for sure.  I don't
14  remember how I came about of this knowledge.
15     Q.   I appreciate your efforts,
16  Mr. Waterhouse, but I will just tell you that
17  if I ask a question and you don't know the
18  answer or you don't recall, I'm happy to accept
19  that.  I don't -- I don't want you to
20  speculate, so I want to be clear about that.
21  So I appreciate it.
22          Let me just ask you simply:  Do you
23  know what attorneys -- can you identify any of
24  the attorneys who thought that the bankruptcy

WATERHOUSE - 10-19-21

1  process didn't change the agreement?
2      A.   I don't recall.
3      Q.   Okay.  Perfect.
4          And then let's look at the last
5  sentence.  It says, quote:  The response should
6  include, as I covered in the board meeting,
7  that both entities have the full faith and
8  backing from Jim Dondero, and to my knowledge
9  that hasn't changed.
10         Do you see that?
11     A.   Yes.
12     Q.   Okay.  Prior to October 6th, 2020,
13  had you told the retail board that HCMFA and
14  NexPoint have the full faith and backing from
15  Jim Dondero?
16     A.   Yes.
17     Q.   Do you remember in the context in
18  which you told the retail board that?
19     A.   I mean, generally, yes.
20     Q.   Tell me what you recall.
21     A.   So we were walking through the
22  financials from the advisors; right?  So as I
23  described to you, you have got HCMFA and NPA.
24  And these -- the financials, you know, show

WATERHOUSE - 10-19-21

1
2 they have liabilities on them that exceed
3 assets.
4       So the retail board has asked, okay,
5 you know, how -- you know, if -- if these
6 liabilities come due or they're payable, you
7 know, how does that come about?
8       And, you know, the response is,
9 well, the advisors have the -- full faith
10 and backing from -- from Jim Dondero.
11     Q.   And how did you know that the
12 advisors had the full faith and backing from
13 Jim Dondero?  What was the basis for that
14 statement that you made to the retail board?
15     A.   I talked to Jim about it at some
16 point in the past.
17     Q.   And did you tell Mr. Dondero that
18 you were going to inform the retail board that
19 the advisors had his full faith and backing
20 before you actually told that to the retail
21 board?
22     A.   I don't recall having that
23 conversation.
24     Q.   Do you recall if you ever informed
25 Mr. Dondero that you had disclosed or told the

WATERHOUSE - 10-19-21

1
2 retail board that the advisors had the full
3 faith and backing of Mr. -- Mr. Dondero?
4       MS. DEITSCH-PEREZ:  Object to the
5 form.
6     A.   I don't recall discussing that with
7 him at the time.
8     Q.   When you told this to the board, was
9 Mr. Dondero participating in the discussion?
10     A.   Not that I recall.
11     Q.   Withdrawn.  Was it not -- withdrawn.
12       Do you recall whether -- when you
13 covered this issue with the board, was that in
14 a -- a Zoom call or a Webex call?  Was it a
15 telephone call?  Was it in-person?  Like where
16 were you physically in relation to the board?
17     A.   I believe I was at home.
18     Q.   Okay.  Can you identify every person
19 that you recall who was present for this
20 disclosure other than -- other than the board
21 members themselves?
22       MS. DEITSCH-PEREZ:  Object to the
23 form.
24     A.   I don't recall everyone on the call.
25     Q.   Can you identify anybody who was on

WATERHOUSE - 10-19-21

1
2 the call?
3     A.   Other than the board members?
4     Q.   Yes.
5     A.   Lauren Thedford.  I mean, there
6 are -- there are many -- my section is just one
7 of many sections that are just -- you know, as
8 you can appreciate, this is a long board
9 meeting.
10       I can't recall specifically, really
11 even generally, or who was on when this was
12 discussed.  But Lauren was typically on for the
13 entire time.
14     Q.   I apologize if I asked you this, but
15 do either of Mr. Norris or Mr. Post hold any
16 positions relative to the retail funds?
17     A.   I think you asked me this already,
18 John.
19     Q.   Okay.  I just don't recall.  Can you
20 just refresh my recollection if I did, in fact,
21 ask you the question?
22     A.   I don't believe -- if we can go
23 back.  I don't believe Mr. Norris has a title
24 at the retail funds.  Mr. -- and Mr. Post is
25 the CCO of the advisor, the advisors.

WATERHOUSE - 10-19-21

1
2     Q.   Okay.  Do you know if either of them
3 have a position with the retail board -- with
4 the retail funds?
5     A.   I don't believe Mr. Norris has a
6 position with the retail funds.
7     Q.   All right.  What about Mr. Post?
8     A.   Mr. Post is the CCO of the advisors.
9     Q.   Okay.  Does he hold any position --
10     A.   I don't believe so.
11     Q.    -- with the retail funds?
12     A.   I don't believe so.
13     Q.   Okay.
14     A.   I don't know if being the CCO for
15 the advisor conveys something for the retail
16 funds.  Again, I am not -- that is the legal
17 compliance part of it.  I don't know.
18     Q.   Why did you tell the retail board
19 that the advisors have the full faith and
20 backing from Mr. Dondero?
21       MS. DANDENEAU:  Objection to form.
22     A.   It is -- it is -- it is what has
23 been discussed with them prior.
24     Q.   And were you -- were you trying to
25 give them comfort that even though the

Page 194

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2   liabilities exceeded the assets that the
3   advisors would still be able to meet their
4   obligations as they become due?
5           MS. DANDENEAU:  Objection to form.
6           MS. DEITSCH-PEREZ:  Object form.
7       A.   I -- I can't -- I don't remember
8   specifically the conversation, but generally --
9   you know, generally, yes.  And that is why --
10  but, you know, again, in this email saying, you
11  know, I am sure I qualified it with the retail
12  board, you know, as I said I like -- you know,
13  to my knowledge, that hasn't changed.  But,
14  again, generally -- generally that is what I
15  remember.
16      Q.   Okay.  Do you recall if in the
17  advisors' response to the retail board's
18  question if the response included any statement
19  concerning Mr. Dondero and -- and the full
20  faith and backing that he was giving to the
21  advisors?
22          MS. DEITSCH-PEREZ:  Object to the
23  form.
24      A.   I don't -- I don't remember
25  specifically what was provided.

Page 195

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2       Q.   Okay.
3       A.   And I don't really -- I don't really
4   remember generally either.
5       Q.   Okay.
6           MR. MORRIS:  So -- so, again, I'm
7   just going to ask Mr. Rukavina if your
8   clients can produce as soon as possible the
9   15(c) response, the written response that
10  the advisors made, if any, to the board's
11  Question No. 2.
12          I'm not looking for the whole
13  response, but I certainly want the response
14  to Question No. 2.
15      Q.   Do you have a general understanding
16  as to the amount by which -- withdrawn.
17          Did -- did the assets of --
18  withdrawn.
19          Did the liabilities of HCMFA exceed
20  its assets in 2020?
21          MS. DANDENEAU:  Objection to form.
22          MS. DEITSCH-PEREZ:  Objection, form.
23      A.   I believe I have already answered
24  that question earlier, I think.  I believe I
25  said yes.

Page 196

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2       Q.   Okay.  And did the liabilities of
3   NexPoint exceed its assets in 2020?
4           MS. DEITSCH-PEREZ:  Objection to
5   form.
6       A.   I don't believe so.
7       Q.   Okay.  So -- so it was only one of
8   the two advisors who had liabilities that
9   exceeded the value of the assets.
10          Do I have that right?
11          MS. DEITSCH-PEREZ:  Objection to
12  form.
13          MS. DANDENEAU:  Form.
14      A.   Yes.
15      Q.   And do you know, ballpark, the
16  amount by which the value of HCMFA's
17  liabilities exceeded their assets in 2020?
18          MS. DANDENEAU:  Objection to form.
19      A.   I don't -- I don't recall.
20          MR. MORRIS:  I had specifically
21  requested in discovery the audited
22  financial reports for both advisors and
23  NexPoint.  I think I may have gotten one
24  for NexPoint but I'm still waiting for the
25  balance.  And I'm going to renew my request

Page 197

WATERHOUSE - 10-19-21

1           WATERHOUSE - 10-19-21
2   for those documents too.
3       Q.   Let's go to the next exhibit, which
4   is Number 10.  So I think it is in your stack,
5   Mr. Waterhouse.
6           MR. MORRIS:  And we can take the one
7   down from the screen and put up Number 10
8   for everybody.
9           (Exhibit 10 marked.)
10      Q.   And I don't know if you have ever
11  seen this before, but I'm really putting it up
12  on the screen for purposes of turning to the
13  very last page of the document.
14          So this is a document that we have
15  been -- that we premarked as Exhibit 10.  And
16  we're turning to the last page of the document,
17  which is a document that was filed in the
18  adversary proceeding 21-3004.  And -- no, I
19  apologize, I think we -- right there.  Perfect.
20          And it is page 31 of 31.
21          MR. MORRIS:  I think there may have
22  been some something erroneously stapled to
23  the hard copy that I gave you folks, but
24  I'm looking for page 31 of 31 in the
25  document that begins with the first page of

**Appx. 02098**

Page 198

WATERHOUSE - 10-19-21

1    Exhibit 10.
2    Q.   Do you have that, Mr. Waterhouse?
3    A.   I don't have it yet.  I'm looking.
4    Q.   All right.  If you look at the top
5    right-hand corner, you will see it says page
6    hopefully something of 31?
7    A.   Yes, I've got it now.
8    Q.   Okay.  You have got 31 of 31.  You
9    can take a moment to read that, if you would
10   like.
11   A.   (Reviewing document.)  Okay.
12   Q.   Have you ever seen this before?
13   A.   I don't know if I have seen this
14   specific document, but, you know, I've --
15   I'm -- I'm aware of it.
16   Q.   And is this the document that you
17   had in mind when you sent that email to
18   Ms. Thedford that we just looked at where you
19   said that Highland had agreed not to make a
20   demand upon HCMFA until May 2021?
21   A.   Honestly, I don't -- it wasn't this
22   document.  I mean, it's something like this,
23   yes.  I mean, yes.
24   Q.   Well --

Page 199

WATERHOUSE - 10-19-21

1    A.   It is something like this, but I
2    don't think it was this specific document.
3    Q.   Well, but this document does say in
4    the last sentence that Highland agreed not to
5    seek -- not to demand payment from HCMFA prior
6    to May 31, 2021; right?
7    A.   Yes.
8    Q.   And are you aware of any other
9    document that was ever created pursuant to
10   which Highland agreed not to demand payment on
11   amounts owed by HCMFA before May 31, 2021?
12   A.   Hold on.  Are you asking, am I aware
13   of a document that by HCMFA that basically says
14   otherwise?
15   Q.   No.  Let me try again.
16   Are you aware of any other document
17   pursuant to which -- pursuant to which Highland
18   agreed not to make a demand on HCMFA until May
19   31st, 2021?
20   A.   I'm -- I think there was something
21   in connection with -- with the -- with the
22   audit that basically says the same thing.
23   Q.   Okay.  And do you think that the
24   audit is referring to this particular document?

Page 200

WATERHOUSE - 10-19-21

1    A.   I don't know.
2    Q.   All right.  This document is dated
3    April 15, 2019.  Do you see that?
4    A.   I do.
5    Q.   And do you remember that the audit
6    was completed on June 3rd, 2019?
7    A.   Yes.
8    Q.   And do you recall that the audited
9    financials -- and I'm happy to pull them up if
10   you would like, but do you recall that the
11   audited financials included a reference to the
12   agreement pursuant to which Highland agreed not
13   to make a demand until May 31st, 2021?
14   A.   Yes, I remember.
15   Q.   And as part of the process, would
16   you have expected the corporate accounting team
17   to have provided a copy of this document to
18   PwC?
19   MS. DANDENEAU:  Objection to form.
20   A.   Yes, I would have expected something
21   like this, or again, you know, some document
22   that basically states -- states the deferral
23   till May 31 of 2020.
24   Q.   Okay.

Page 201

WATERHOUSE - 10-19-21

1    A.   May 31 of 2021, excuse me.
2    Q.   And this document states the
3    deferral that you just described; correct?
4    A.   It does.
5    Q.   And this document states the
6    deferral that was described in the audited
7    financial statements that we looked at before;
8    correct?
9    A.   It does.
10   MR. MORRIS:  Okay.  Can we scroll
11   down just a little bit to see who signed on
12   behalf of the acknowledgment there.
13   Q.   Okay.  So Mr. Dondero signed this
14   document on behalf of both HCMFA and Highland;
15   do you see that?
16   A.   I do.
17   Q.   Okay.  Did you discuss this document
18   or the -- withdrawn.
19   Did you discuss the concept of the
20   deferral with Mr. Dondero in the spring of
21   2019?
22   A.   I think I testified I don't recall.
23   Q.   Okay.  Do you know whose idea it was
24   to issue the acknowledgment in this form?

Page 202

1          WATERHOUSE - 10-19-21
2    A.   I don't recall.
3         MR. MORRIS:  Can we scroll back up
4    to the document, please.
5    Q.   Do you see in the beginning it says,
6    reference is made to certain outstanding
7    amounts loaned from Highland to HCMFA for
8    funding ongoing operations.
9         Do you see that?
10   A.   Yes.
11   Q.   And were you aware as the CFO of
12   Highland and as the treasurer of HCMFA that as
13   of April 15, 2019, Highland had made certain
14   loans to HCMFA to fund HCMFA's ongoing
15   operations?
16   A.   Yes.
17   Q.   And were you aware that those loans
18   were payable on demand and remained outstanding
19   as of December 31st, 2018?
20   A.   Yes.
21   Q.   And were you aware that those
22   amounts were payable on demand, and they
23   remained outstanding as of April 15, 2019?
24        MS. DEITSCH-PEREZ:  Object to the
25   form.

Page 203

1          WATERHOUSE - 10-19-21
2    A.   Well, this -- this document dated
3    April 15, 2019 says they have been deferred to
4    May 31, 2021.
5    Q.   Right.  But I'm just sticking to the
6    first paragraph where they refer to the
7    outstanding amounts.  And in the end it says
8    the -- it remained outstanding on December
9    31st, 2018, and I think you told me that you
10   understood that, and then I'm just trying to
11   capture the last piece of it.
12        Did you understand that there were
13   amounts outstanding from the loan that Highland
14   made to HCMFA to fund ongoing operations as of
15   April 15th, 2019?
16   A.   Yes.
17   Q.   Thank you.  Let's look at the next
18   sentence.  HCMFA expects that it may be unable
19   to repay such amounts should they become due
20   for the period commencing today and continuing
21   through May 31st, 2021.
22        Do you see that?
23        MS. DANDENEAU:  Objection to form.
24   A.   I do.
25   Q.   As the CFO -- withdrawn.

Page 204

1          WATERHOUSE - 10-19-21
2         As the treasurer of HCMFA, did you
3    believe that -- do you believe that statement
4    was true and accurate at the time it was
5    rendered?
6    A.   I mean, it -- it -- the answer to
7    that is I really didn't have any -- I didn't
8    have an opinion really.
9    Q.   Did you do anything to educate
10   yourself in April of 2019 on the issue of
11   whether HCMFA could repay the amounts that it
12   owed to Highland should they become due?
13   A.   I don't believe so.
14   Q.   Did you at any time form any
15   opinions as to HCMFA's ability to repay all
16   amounts due to Highland should they become due?
17   A.   Not really.  I guess I don't...
18   Q.   Well, you told the retail board that
19   HCMFA's liabilities exceeded their assets in
20   2020; correct?
21   A.   Yes.
22   Q.   Based on the work that you did to
23   prepare for the retail board, did you form any
24   view as to whether HCMFA would be unable to
25   repay the amounts that it owed to Highland

Page 205

1          WATERHOUSE - 10-19-21
2    should they become due?
3         MS. DANDENEAU:  Objection to form.
4    A.   I mean, I -- when you look at that,
5    to answer you, completely, you know, again,
6    if -- the response I gave the retail board was,
7    you know, the -- the advice -- HCMFA advisors
8    have the -- have the full faith and backing of
9    Jim Dondero.  So I didn't form an opinion of
10   whether the advisor could pay it or not.
11   Q.   Did you form any view as to whether
12   the advisors could repay the amounts that it
13   owed to Highland should they become due without
14   the full faith and backing of Mr. Dondero?
15        MS. DANDENEAU:  Objection to form.
16        MS. DEITSCH-PEREZ:  Form.
17   A.   I mean, if you -- if you -- if you
18   take that last statement out, I mean, it would
19   be difficult for HCMFA to pay back demand notes
20   at that time.
21   Q.   And it was precisely for that reason
22   that you told the retail board that -- that the
23   retail -- that the advisors had the full faith
24   and backing of Mr. Dondero; correct?
25        MS. DANDENEAU:  Objection to form.

Page 206

WATERHOUSE - 10-19-21

1
2     A.   I mean, yes, as the mouthpiece, I
3 was relaying information.
4     Q.   Okay.  And you relayed that
5 information with the knowledge and approval of
6 Mr. Dondero; correct?
7        MS. DEITSCH-PEREZ:  Object to the
8 form.
9     A.   As I stated in the email, I don't
10 believe, and I think I testified I don't
11 believe I had conversations with Mr. Dondero at
12 the time of that board meeting.
13    Q.   Did you tell the retail board that
14 the advisors had the full faith and backing of
15 Mr. Dondero without Mr. Dondero's prior
16 approval?
17    A.   Yeah, I -- I -- yes, I'm -- like I
18 said, I think I testified earlier, I'm sure I
19 qualified it as well.
20    Q.   What do you mean by that?
21       MS. DANDENEAU:  Objection to form.
22    A.   Again -- again, like I said in the
23 email, it has the full faith and backing of Jim
24 Dondero unless that has changed.
25    Q.   Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

1 so let's put the email back up.
2    A.   It is -- it is -- it is in the
3 email.
4    Q.   Let's put the email back up.  You
5 didn't say unless it has changed.  You said you
6 believe it hasn't changed; right?
7    A.   Okay.  And to my knowledge that
8 hasn't changed, that is what it says.
9
10    Q.   That's right.
11    A.   But, again, I mean, that is -- I
12 don't know everything.  And I'm not in every
13 conversation.  I'm not -- to presume that I am,
14 is -- and you have to put myself -- as you
15 started this out, Mr. Morris, I was at home in
16 October of 2020 with COVID -- or, you know,
17 under these COVID times that we described is
18 very difficult.
19       We have all been working at home for
20 really the first time ever, undergoing
21 processes, procedures, control environments
22 that have been untested, and there is poor
23 communication.
24       So I am relaying, as I'm telling you
25 now, what is in the email.  And unless

Page 208

WATERHOUSE - 10-19-21

1
2 something has changed -- to my knowledge, it
3 hasn't changed, but it could have changed.
4    Q.   When you say that the advisors have
5 the full faith and backing from Mr. Dondero,
6 did you intend to convey that, to the extent
7 the advisors were unable to satisfy their
8 obligations as they become due, Mr. Dondero
9 would do it for them?
10       MS. DANDENEAU:  Object to the form.
11       MS. DEITSCH-PEREZ:  Object to the
12 form.
13       And, John, we have given you a lot
14 of leeway here but this does not seem
15 relevant to this case.  You seem sort of
16 taking a complete sort of diversion into
17 the allegations and the complaint just
18 filed on Friday, and so I would ask you to
19 move on because --
20       MR. MORRIS:  And I will tell you --
21 I will tell you that I have never read that
22 complaint cover-to-cover.  I have nothing
23 to do with the prosecution of those claims.
24 And this issue that we're talking about
25 right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

1
2 promissory notes that your clients refuse
3 to pay.
4       So I'm going to continue to ask my
5 questions, and I would ask the court
6 reporter to read back my last question.
7       (Record read.)
8       MS. DEITSCH-PEREZ:  And then I
9 believe there were objections to form.
10    Q.   You can answer the question.
11    A.   Yes.
12    Q.   Thank you very much, sir.
13       MR. MORRIS:  Can we go back to the
14 other document, please?
15    Q.   Mr. Waterhouse, do you know if this
16 document was ever shared with the retail board?
17    A.   I don't recall.
18    Q.   Did you ever share it with the
19 retail board?
20    A.   I don't recall.
21    Q.   Did you ever tell the retail board
22 about the substance of this document?
23    A.   I don't recall.
24    Q.   Did you ever tell the retail board
25 that Highland had agreed not to make a demand

Appx. 02101

Page 210

WATERHOUSE - 10-19-21

1    against HCMFA until May 2021?
2        Q.   Did you ever inform PwC that HCMFA's
3        A.   I don't recall.
4        Q.   Do you know whether anybody on
5    behalf of the advisors ever informed the retail
6    board that Highland had agreed on April 15,
7    2019, not to make a demand against HCMFA under
8    the promissory notes?
9        A.   I don't recall.
10       Q.   Did you instruct Ms. Thedford or
11   anybody else responding to the retail board's
12   15(c) inquiry to disclose this document?
13       A.   Did I instruct Ms. Thedford or
14   anyone else to -- to -- to produce this, to
15   disclose this document?  Is that what you -- I
16   just want to make sure.
17       Q.   Uh-huh.
18       A.   Yeah, I don't -- I don't recall.
19       Q.   Did you instruct anybody to inform
20   the retail board, in response to their question
21   as part of the 15(c) process, to -- to tell the
22   retail board about Highland's agreement not to
23   make a demand until 2021?
24       MS. DANDENEAU:  Objection to form.
25       A.   I don't recall.

Page 211

WATERHOUSE - 10-19-21

1        Q.   Did you ever inform PwC that HCMFA's
2    liabilities exceeded its assets?
3        MS. DANDENEAU:  Object to the form.
4        A.   I don't -- I don't think I told
5    them.  I mean, they -- they audited the
6    financial statements.
7        Q.   Did -- do you know if anybody on
8    behalf of Highland ever informed
9    PricewaterhouseCoopers that HCMFA may be unable
10   to repay amounts owing to Highland, should they
11   become due?
12       MS. DANDENEAU:  Objection to form.
13       A.   Yes.  Again, I think I testified
14   earlier that -- that this was communicated to
15   the auditors.
16       Q.   Ideally --
17       A.   I don't know who exactly did that.
18   I don't recall doing it, but, yeah, it was --
19   it was communicated.  And that is why -- I
20   mean, there is a disclosure in the financial
21   statements; right?
22       Q.   There is, and that disclosure
23   relates to the last sentence of this document;
24   correct?

Page 212

WATERHOUSE - 10-19-21

1        A.   Yes.
2        Q.   Do you recall looking in the
3    document and seeing anything that was disclosed
4    with respect to the sentence above that?
5        A.   No.
6        Q.   Do you know whether anybody on
7    behalf of Highland ever informed
8    PricewaterhouseCoopers that HCMFA expects that
9    it may be unable to repay amounts due and owing
10   to Highland should they become due?
11       MS. DEITSCH-PEREZ:  Object to the
12       form.  I think that is the third time.
13       A.   I don't recall.  Again, as I said,
14   we -- all of this was given to the auditors.
15       Q.   Do you know if Highland received
16   anything of value in exchange for its agreement
17   not to demand payment on amounts owed by HCMFA
18   prior to May 31st, 2021?
19       MS. DEITSCH-PEREZ:  Object to the
20       form.  That is the second time.
21       MS. DANDENEAU:  Object to the form.
22       A.   I have answered this question.
23       MR. RUKAVINA:  Hold on.  Object to
24       legal conclusion.  Go ahead.

Page 213

WATERHOUSE - 10-19-21

1        A.   I have answered this question
2    before.
3        Q.   And the answer was no?
4        A.   I'm not aware.
5        Q.   Now, this acknowledgment can't
6    possibly apply to the two notes that you signed
7    on behalf of HCMFA because those notes were
8    signed on May 2nd and May 3rd, 2019; is that
9    right?
10       MS. DANDENEAU:  Objection to form.
11       A.   Unless there is a drafting error.
12       Q.   Okay.  Are you aware of a drafting
13   error?
14       A.   I'm not aware.  I didn't -- I wasn't
15   part of -- I didn't sign this note or this
16   acknowledgment.  I didn't draft it.
17       Q.   But you do see it is dated April 15,
18   2019; right?
19       A.   Yes.
20       Q.   And this was a document that was
21   actually included by the advisors in a pleading
22   they filed with the Court; right?
23       MR. RUKAVINA:  Well, I don't know
24       that so I object to form.

```
1            WATERHOUSE - 10-19-21
2     Q.   Okay.  Let's go to the first page of
3  the document and just confirm that.
4         MR. AIGEN:  Mr. Morris, I just note
5  that you already said there was some error
6  with the document that is listed as
7  exhibit –
8         MR. MORRIS:  No.  No, no, no.
9         MS. DEITSCH-PEREZ:  Oh, okay.
10        MR. MORRIS:  What I said is that
11  there is a few pages that were mistakenly
12  stapled to the end of the document.
13        MS. DEITSCH-PEREZ:  Okay.
14        MR. MORRIS:  There is no problem
15  with this document.
16        MS. DEITSCH-PEREZ:  And just so
17  we're clear that the document – the pages
18  that start with defendant's amended answer
19  are not intended to be part of this
20  document?
21        MR. MORRIS:  That's correct.
22        MS. DEITSCH-PEREZ:  And that the –
23  but it is your representation that the rest
24  of the document is – is – is correct
25  because we don't – we don't have any way
```

```
1            WATERHOUSE - 10-19-21
2  of verifying that, we're just –
3         MR. MORRIS:  You do, actually.  You
4  could just go to Docket No. 21-3004.
5         MS. DEITSCH-PEREZ:  If you want to
6  stop this deposition so we can go and pull
7  that document up, we're happy to do it.  So
8  I am just asking you for your
9  representation.
10        MR. MORRIS:  Sure.  I gave that.
11        MS. DEITSCH-PEREZ:  Okay.
12     Q.   So do you see that this is a
13  document that was actually filed with the Court
14  by Highland Capital Management Fund Advisors?
15     A.   No.  I get with the first page in
16  the section.  Maybe I'm looking at the wrong
17  thing.  It says, Highland Capital Management.
18     Q.   Don't worry about it.  Don't worry
19  about it.
20     A.   Maybe I went back – okay.
21        MR. MORRIS:  All right.  Can we put
22  up on the screen Exhibit 2.
23        (Exhibit 2 marked.)
24        MR. MORRIS:  I think it is
25  Exhibit 1.
```

```
1            WATERHOUSE - 10-19-21
2         MS. DANDENEAU:  I'm sorry, John, did
3  you say Exhibit 2 or Exhibit 1?
4         MR. MORRIS:  It is Exhibit 2 in the
5  binders so it is premarked Exhibit 2.  And
6  now I'm asking – right there – going to
7  Exhibit 1 to the document that was marked
8  as Exhibit 2.
9         MS. DANDENEAU:  Got it.  In the
10  binder there is no –
11        MS. DEITSCH-PEREZ:  There is no
12  Exhibit 1.
13        MR. MORRIS:  All right.  So look at
14  the one on the screen.
15     Q.   Do you see, Mr. Waterhouse, that
16  this is a promissory note dated May 31st, 2017,
17  in the approximate amount of $30.7 million?
18     A.   Yes.
19     Q.   And do you see that the maker of the
20  note is NexPoint?
21     A.   Yes.
22     Q.   And that Highland is the payee; is
23  that right?
24     A.   Yes.
25     Q.   Okay.  And do you see in Paragraph 2
```

```
1            WATERHOUSE - 10-19-21
2  this is an annual installment note?
3     A.   Can you scroll down.
4     Q.   Sure.
5         MR. MORRIS:  Can we scroll down –
6  yeah, there you go.
7     A.   Right there, yeah.  Yes.
8         MR. MORRIS:  And can we scroll down
9  to the signature line.
10     Q.   And do you recognize that as
11  Mr. Dondero's signature?
12     A.   Yes.
13     Q.   And is this the promissory note that
14  we talked about earlier where NexPoint had made
15  certain payments in the aggregate amount of
16  about 6 to $7 million against principal and
17  interest?
18     A.   I don't recall discussing the
19  aggregate principal amounts of 6 to $7 million,
20  but – so I don't – I don't recall that prior
21  discussion with those amounts.
22     Q.   All right.  Let's take a look.
23  NexPoint always included this promissory note
24  as a liability on its audited financial
25  statements; right?
```

Page 218

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3    Q.   And NexPoint had its financial
4    statements audited; isn't that correct?
5    A.   Yes.
6    Q.   And was the process of NexPoint's
7    audit similar to the process you described
8    earlier for Highland and HCMFA?
9    A.   Yes, it is similar.
10   Q.   Okay.
11        MR. MORRIS:  Can we put up
12   NexPoint's audited financials and let
13   everybody know what exhibit number it is,
14   La Asia?
15        MS. CANTY:  It is going to be
16   Exhibit 46.
17        (Exhibit 46 marked.)
18   Q.   And do you see, sir, that we've put
19   up NexPoint Advisors' consolidated financial
20   statements and supplemental information for the
21   period ending December 31st, 2019?
22   A.   Yes.
23   Q.   Did you participate in the process
24   whereby these audited financial statements were
25   issued?

Page 219

WATERHOUSE - 10-19-21

1
2    A.   I didn't participate directly, as
3    I've described before, about the – the team
4    performing the audit.
5    Q.   Do you recall when the audit of
6    NexPoint's financial statements for the period
7    ending December 31st, 2019 was completed?
8    A.   Yes.
9    Q.   And when do you recall it being
10   completed?
11   A.   In January of 2021.
12   Q.   Do you know why the 2019 audit
13   report wasn't completed until January of 2021?
14   A.   Yes.
15   Q.   Why was the NexPoint audit report
16   for the period ending 12/31/19 not completed
17   until January 2021?
18   A.   Because we had to deal with working
19   from home from – with COVID, and on top of all
20   of our daily responsibilities and job duties
21   at – at providing – at Highland providing
22   services to NexPoint, we had to do all of this
23   extra work for a bankruptcy that was filed in
24   October of 2019.
25        MR. MORRIS:  Can we go to the

Page 220

WATERHOUSE - 10-19-21

1
2    balance sheet on page 3?  Okay.  Stop right
3    there.
4    Q.   Do you see under the liabilities
5    section, the last item is note payable to
6    affiliate?
7    A.   Yes.
8    Q.   And is that the note that we just
9    looked at?
10        MS. DANDENEAU:  Objection to form.
11   Q.   Withdrawn.
12        Is that the approximately
13   $30 million note that we just looked at that
14   was dated from 2017?
15        MS. DANDENEAU:  Objection to form.
16   A.   I believe no.
17   Q.   Okay.  You're not aware of any other
18   note that was outstanding from NexPoint to
19   Highland as of the end of the year 2019, other
20   than that one $30 million note; right?
21   A.   I don't recall.
22   Q.   And as of the end of 2019, the
23   principal amount that was due on the note was
24   approximately $23 million; right?
25        MS. DEITSCH-PEREZ:  Object to the

Page 221

WATERHOUSE - 10-19-21

1
2    form.
3    A.   Approximately.
4    Q.   And does that refresh your
5    recollection that between the time the note was
6    executed and the end of 2019, that NexPoint had
7    paid down approximately $7 million?
8    A.   Yes.  If we are just doing the math,
9    yes.
10   Q.   Okay.  Did NexPoint complete its
11   audit from 2020?
12   A.   Sorry, you kind of broke up.  Do
13   NexPoint complete?
14   Q.   The audit of its financial
15   statements for the period ending December 31st,
16   2020?
17   A.   No.
18   Q.   No, it's not complete?
19   A.   No, it is not complete.
20   Q.   Did HCMFA complete its audit for the
21   year ending December 31st, 2020?
22   A.   No.
23        MR. MORRIS:  Can we go to page 15,
24   please, the paragraph at the bottom.
25   Q.   Do you see that NexPoint has

Appx. 02104

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2   included under notes payable to Highland a
3   reference to the amounts that were outstanding
4   as of the year-end 2019 under the note that we
5   looked at just a moment ago?
6       A.   Yes.  Are you talking about the
7   second paragraph?
8       Q.   I'm actually talking about first
9   paragraph.  Do you understand that the first
10  paragraph is a reference to the 2017 note, and
11  the amounts that were -- the principal amount
12  that was outstanding as of the end of 2019?
13      MS. DANDENEAU:  Objection to form.
14  John, do you mean the first paragraph of
15  that page?
16      MR. MORRIS:  No, the first paragraph
17  under notes payable to Highland.
18      A.   Yeah, I see the paragraph, and
19  again, this is what I answered earlier.  I
20  believe so, just because I don't -- again, this
21  is a number in a balance sheet, and without
22  matching it up and seeing the detail with the
23  schedule like I kind of talked about for
24  Highland's financial statements, it is a little
25  bit more difficult to tie everything in

1       WATERHOUSE - 10-19-21
2   perfectly together.
3       Q.   Okay.  But you're not aware of any
4   note that was outstanding at the end of 2019
5   from NexPoint to Highland other than whatever
6   principal was still due and owing under the
7   $30 million note issued in 2017; correct?
8       A.   Well, it -- there is
9   reference in the second paragraph.  I don't --
10  I don't -- I don't recall what that is
11  referring to, so I don't -- I don't know.
12      Q.   Well, if you listen carefully to my
13  question, right, I'm asking about notes that
14  were outstanding at the end of 2019, and if we
15  look at the paragraph you just referred to, it
16  says that during the year there were new notes
17  issued totaling $1.5 million, but by the end of
18  the year, no principal or interest was
19  outstanding on the notes.
20      Do you see that?
21      A.   Oh, I do, yes.
22      Q.   So does that refresh your
23  recollection that there were no notes
24  outstanding from NexPoint to Highland other
25  than the principal remaining under the original

1       WATERHOUSE - 10-19-21
2   $30 million 2017 note that we looked at a
3   moment ago?
4       A.   Well, we're at the bottom of the
5   page.  Is there anything on page 16?
6       Q.   That is a fair question, sure.  That
7   is it.
8       A.   Okay.  So it appears that that is
9   the only note that is detailed in the notes in
10  the financial statement.
11      Q.   And you don't have any memory of any
12  other note other than the 2017 note, right,
13  being outstanding as of the end of the year?
14      A.   I deal with thousands of
15  transactions every year.  I don't really have a
16  very specific memory for what exactly was
17  outstanding.
18      MR. MORRIS:  Why don't we take a
19  break now.  We've been going for a little
20  while.  It's 3:26.  Let's come back at
21  3:40.
22      VIDEOGRAPHER:  We're going off the
23  record at 3:26 p.m.
24      (Recess taken 3:26 p.m. to 3:39 p.m.)
25      VIDEOGRAPHER:  We are going back on

1       WATERHOUSE - 10-19-21
2   the record at 3:39 p.m.
3       Q.   All right.  Mr. Waterhouse, we -- I
4   don't think we have a lot more here.
5       To the best of your knowledge and
6   recollection, were all affiliate loans and all
7   loans made to Mr. Dondero recorded on
8   Highland's books and records as assets of
9   Highland?
10      MS. DANDENEAU:  Object to the form,
11  asked and answered.
12      A.   To my knowledge, yes.
13      Q.   Okay.  Can you recall any loan to
14  any affiliate or Mr. Dondero that was not
15  recorded on Highland's books and records as an
16  asset?
17      A.   Like during my time as CFO?  I don't
18  recall.
19      Q.   How about after the time that you
20  were CFO?  Did you recall that there was a loan
21  by Highland to an affiliate or to Mr. Dondero
22  that hadn't been previously recorded on
23  Highland's books as an asset?
24      MS. DANDENEAU:  Objection to form.
25      A.   I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1  question. I left Highland as of – I'm not
2  aware of – I left Highland in February –
3  probably the last day of February of 2021.
4  Q.   Okay.
5  A.   I'm not – I'm not aware of any –
6  I'm not aware of anything past that date.
7  Q.   Okay. While you were the CFO at
8  Highland, did Highland prepare in the ordinary
9  course of business a document that reported
10  operating results on a monthly basis?
11  A.   Yes.
12  Q.   And are you generally familiar with
13  the monthly operating reports?
14  A.   Yeah. You are referring to the
15  reports that we filed to the Court every month?
16  Q.   I apologize, I'm not. I'm taking
17  you back to the pre-petition period. There was
18  a report that I have seen that I'm going to
19  show you, but I'm just asking for your
20  knowledge.
21       MR. MORRIS:  Let's put it up on the
22  screen, Exhibit 39.
23       (Exhibit 39 marked.)
24  Q.   Do you see this is a document that


1       WATERHOUSE - 10-19-21
2  question. I left Highland as of – I'm not
3  aware of – I left Highland in February –
4  probably the last day of February of 2021.
5  Q.   Okay.
6  A.   I'm not – I'm not aware of any –
7  I'm not aware of anything past that date.
8  Q.   Okay. While you were the CFO at
9  Highland, did Highland prepare in the ordinary
10  course of business a document that reported
11  operating results on a monthly basis?
12  A.   Yes.
13  Q.   And are you generally familiar with
14  the monthly operating reports?
15  A.   Yeah. You are referring to the
16  reports that we filed to the Court every month?
17  Q.   I apologize, I'm not. I'm taking
18  you back to the pre-petition period. There was
19  a report that I have seen that I'm going to
20  show you, but I'm just asking for your
21  knowledge.
22       MR. MORRIS:  Let's put it up on the
23  screen, Exhibit 39.
24       (Exhibit 39 marked.)
25  Q.   Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  is called operating results?
3  A.   Yeah, that's the title of it.
4  Q.   Okay. And was a report of operating
5  results prepared by Highland on a monthly basis
6  during the time that you served as CFO?
7  A.   No.
8  Q.   Are you familiar with a document of
9  this type? And we can certainly look at the
10  next page or two to refresh your recollection.
11  A.   I'm just looking at the title. I
12  don't really – again, as I discussed before, I
13  don't have any records or documents or emails
14  or appointments or anything that I was able to
15  use prior to – prior to this deposition, so
16  I'm doing the best I can.
17  Q.   Okay. You don't need to apologize.
18  I'm just asking you if you are familiar with
19  the document called Operating Results that was
20  prepared on a monthly basis at Highland?
21       MS. DEITSCH-PEREZ:  Object to the
22  form.
23  Q.   If you're not, you're not.
24  A.   I don't believe this was prepared on
25  a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  Q.   Okay. Do you see that this one
3  is – is dated February 2018?
4  A.   Yes.
5  Q.   Do you have – do you believe –
6  have you ever seen a document that was
7  purporting to report operating results for
8  Highland?
9       MS. DANDENEAU:  Objection to form.
10  A.   Yes.
11  Q.   Okay. And when you say that you
12  don't believe it was produced on a monthly
13  basis, was it produced on any periodic bases to
14  the best of your recollection?
15  A.   I believe it was – it was prepared
16  on an annual basis.
17  Q.   Okay.
18       MR. MORRIS:  Can we look at the next
19  page.
20  Q.   Do you see that there is a statement
21  here called:  Significant items impacting
22  HCMLP's balance sheet?
23       And it is dated February 2018.
24  A.   Yes.
25  Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1       WATERHOUSE - 10-19-21
2  report that Highland prepared that identified
3  significant items impacting the balance sheet?
4  A.   A report that was prepared.
5  Q.   Let me ask a better question:  Did
6  Highland prepare reports to the best of your
7  recollection that identified significant items
8  that impacted its balance sheet?
9  A.   Well, so Highland prepared a – a
10  monthly close package. And maybe I'm
11  getting – and – and maybe change names at one
12  time or maybe I'm just – again, just
13  misremembering – but in that, yes, there is a
14  page that would detail just changes in – you
15  know, just changes month over month on the
16  balance sheet.
17  Q.   Okay. And maybe it is my fault.
18  Maybe I didn't know the proper name for it.
19  But let's use the phrase "monthly close
20  package."
21       Did Highland prepare a monthly close
22  package in the ordinary course of business
23  during the time that you served as CFO?
24       MS. DANDENEAU:  Objection to form.
25  A.   Yes.

Appx. 02106

Page 230

1      WATERHOUSE - 10-19-21
2      Q.   And did the monthly close package
3   that Highland prepared include information
4   concerning significant items that impacted
5   Highland's balance sheet?
6      A.   Yes, it had a page like that is –
7   that is on the screen that detailed items
8   like – of that nature.
9      Q.   And do you know who – was there
10  anybody at Highland who was responsible for
11  overseeing the preparation of the monthly
12  reporting package?
13     A.   That would have been – again, it
14  varies over time during my tenure as CFO.
15  It – it varied over – over time, but – but
16  typically a – a corporate accounting manager.
17     Q.   And who were the corporate
18  accounting managers during your tenure as CFO?
19     A.   It would have been Dave Klos and
20  Kristin Hendrix.
21     Q.   And did the corporate accounting
22  manager deliver to you drafts of the monthly
23  close package before it was finalized?
24     A.   Sometimes.
25     Q.   Was that the practice even if there

Page 231

1   were exceptions to the practice?
2      A.   The practice meaning that they
3   sometimes lured them to me?
4      Q.   That that was the expectation even
5   if circumstances prevented that from happening
6   from time to time.
7      MS. DEITSCH-PEREZ:  Object to the
8      form.
9      A.   I – I would say it started out that
10  way but over the years it – it was not
11  enforced.
12     Q.   Okay.  So you were – you reviewed
13  and approved monthly – monthly reporting
14  packages for a certain period of time and then
15  over time you stopped doing that.
16     Do I have that right?
17     MS. DANDENEAU:  Objection to form.
18     A.   Yes, I mean, if you're talking about
19  a formal meeting where we sit down and go
20  through and approve it.  I would say that was
21  standard practice a decade – you know, early
22  on.  And as time went on that – that – that
23  practice wasn't followed.
24     Q.   Okay.

Page 232

1      WATERHOUSE - 10-19-21
2      A.   And, quite frankly, I don't even
3   know if these were – these were sent to me
4   even in any capacity.
5      Q.   What was the purpose of preparing
6   the monthly reporting package – withdrawn.
7      What was the purpose of preparing
8   the monthly close package?
9      MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   The – the original purpose was so
12  that it would just – it would be a report that
13  was reviewed monthly with senior management.
14     Q.   Who was included in the idea of
15  senior management?
16     A.   You know, I think originally when
17  this was conceived that would have been like
18  Jim Dondero and Mark Okada.
19     Q.   Were monthly reporting – withdrawn.
20     Were monthly close packages prepared
21  to the best of your knowledge until the time
22  you left Highland?
23     A.   To my knowledge – I don't know,
24  actually.  I mean, to my knowledge, I believe
25  it was being – that was still being done.  I

Page 233

1      WATERHOUSE - 10-19-21
2   don't know because, again, I wasn't reviewing
3   them.  I hadn't reviewed a close package for –
4   for a long time.  But I believe the standard
5   practice that was still being carried out.
6      Q.   Did you ever have any discussions
7   with the debtor's independent board concerning
8   any promissory notes that were issued by any of
9   the affiliates or Mr. Dondero?
10     A.   I can't – I can't – I can't recall
11  specifically.
12     Q.   Did you speak with the independent
13  board from time to time?
14     A.   Yes, from – from – from time to
15  time I had discussions with the independent
16  board members, you know, either – either, you
17  know, by themselves or wholly, you know, as –
18  as a – as a combined work.
19     Q.   Okay.  Before we talk about
20  Mr. Seery, do you recall ever having a
21  conversation with Mr. Nelms or Mr. Dubel
22  concerning any promissory note that was
23  rendered by one of the affiliates or
24  Mr. Dondero to Highland?
25     A.   I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1 specifically.
2    Q.   Do you know if the topic was ever
3 discussed, even if you don't remember it
4 specifically?
5       MS. DANDENEAU:  Objection to form.
6    A.   It – it – it may have.  I don't
7 know.  I don't recall.
8    Q.   Do you recall ever discussing any
9 promissory note issued by any of the affiliates
10 or Mr. Dondero with James Seery?
11   A.   I don't – I don't recall
12 specifically.
13   Q.   Do you recall generally ever
14 discussing the topic of promissory notes issued
15 by any of the affiliates or Mr. Dondero to
16 Highland with Mr. Seery?
17   A.   Nothing – nothing is really jumping
18 out at me.
19   Q.   Do you recall if you ever told
20 Mr. Seery that any of the affiliates or
21 Mr. Dondero didn't have an obligation to pay
22 all amounts due and owing under their notes?
23   A.   I don't recall having that
24 conversation.

Page 235

WATERHOUSE - 10-19-21

1    Q.   Did you ever tell Mr. Seery that you
2 had any reason to believe that the amounts
3 reflected in the notes issued by the affiliates
4 and Mr. Dondero were invalid for any reason?
5    A.   I don't – I don't recall.
6    Q.   Did you tell Mr. Dondero – did you
7 tell Mr. Seery that you thought the promissory
8 notes issued by the advisors and Mr. Dondero
9 that were outstanding as of the petition date
10 were assets of the estate?
11   A.   I don't recall having a specific
12 conversation about those – you know, those
13 notes outstanding as -- as of the petition date
14 being assets on the estate.  I mean, we put
15 together – you know, they're in the books and
16 records of the financial statements.  I don't
17 recall having a specific conversation.
18   Q.   Did you ever prepare any documents
19 that were delivered to Mr. Seery that concerned
20 the promissory notes issued by any of the
21 affiliates or Mr. Dondero?
22      MS. DANDENEAU:  Objection to form.
23   A.   Did I produce any that concerned –
24 you mean did I just – did I give Mr. Seery

Page 236

WATERHOUSE - 10-19-21

1 anything that – that said I have concerns over
2 these notes?
3    Q.   No.  Let me try again.  Maybe it was
4 my question.
5       Did you ever give Mr. Seery any
6 information concerning any of the notes that
7 were issued by any of the affiliates or
8 Mr. Dondero?
9       MS. DANDENEAU:  Objection to form.
10   A.   I don't recall if I did or not.  I
11 don't – I don't remember.  I mean, you have my
12 emails.  You may have asked.  Again, I don't –
13 I don't know.
14      MR. MORRIS:  Can we put up the
15 document that has been premarked as Exhibit
16 39?
17      MS. DANDENEAU:  John, that is this
18 document, isn't it?
19      MR. MORRIS:  Oh, yeah, it might be,
20 as a matter of fact.  Let's go to Number
21 40.
22      (Exhibit 40 marked.)
23   Q.   During the bankruptcy,
24 Mr. Waterhouse, did you prepare documents that

Page 237

WATERHOUSE - 10-19-21

1 were filed with the bankruptcy court?
2    A.   I didn't – I didn't prepare them
3 personally.
4    Q.   Did people prepare them under your
5 direction?
6    A.   Yes.  There were members of the team
7 that prepared them, and they worked in – you
8 know, there were members of DSI that were
9 involved in the process as well.
10   Q.   To the best of your knowledge, did
11 DSI rely on the employees of Highland for the
12 information that they used to prepare the
13 bankruptcy filings?
14   A.   Yes.  The books and records were
15 with the Highland personnel.
16   Q.   Okay.  And do you see on the screen
17 here, there is a document that we have marked
18 as Exhibit 40 that is – that is titled Summary
19 of Assets and Liabilities?
20   A.   Uh-huh.
21   Q.   Okay.  And do you recall reviewing
22 any summary of assets and liabilities before it
23 was filed with the bankruptcy court?
24   A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1  high level.

2  Q.   And did you believe that it was

3  accurate at the time it was filed?

4  A.   I didn't have any other reason to

5  believe otherwise.

6  Q.   Okay.  Do you see that the total

7  value of all properties listed in Part 1 is

8  approximately $410 million?

9       MS. DEITSCH-PEREZ:  Objection to

10  form.

11  A.   Yes, it is in 1c.

12  Q.   Yes.

13  A.   Yes, I see that.

14  Q.   Okay.  If we go to the second page,

15  now I think I may just have excerpts here, just

16  so everybody is clear, but if we scroll down to

17  the second page, you will see that there is

18  a – a little further.  There you go.  You will

19  see there is a reference to Item 71, notes

20  receivable.

21       Do you see that?

22  A.   I do.

23  Q.   And that was a reference to the

24  notes receivable from the affiliates and

Page 239

WATERHOUSE - 10-19-21

1  Mr. Dondero, among others; is that right?

2       MS. DANDENEAU:  Objection to form.

3  A.   Yes.  The affiliate notes and the

4  Dondero notes were in this amount, but they

5  weren't – again, like you said, and among

6  others.

7  Q.   Okay.  We will look at the

8  specificity because I'm not playing gaming

9  here, but do you know if the $150 million of

10  notes receivable was included within the

11  $410 million of total value of the debtor's

12  assets?

13       MS. DANDENEAU:  Objection to form.

14  A.   I – I – I believe so.

15  Q.   Right.  And so is it fair to say

16  that as of the date this document was prepared,

17  the notes receivable were more than one-third

18  of the value of the debtor's assets?

19       MS. DEITSCH-PEREZ:  Object to the

20  form.

21       MS. DANDENEAU:  Object to the form.

22  A.   Again, if you are just taking the

23  math, 150 divided by whatever the $400 million

24  number is above, then yes, you get there.

Page 240

WATERHOUSE - 10-19-21

1  Q.   Okay.

2  A.   You know, but as of the time of this

3  filing, that is what was put in this filing,

4  right, but, you know, I mean, numbers --

5  numbers change, facts and circumstances change.

6  Q.   But as the CFO of Highland, the

7  debtor in bankruptcy, did you believe that this

8  number accurately reflected the total amount

9  due under the notes receivable?

10  A.   That is what we had in our books and

11  records.

12  Q.   Okay.  And did you believe as the

13  CFO that the books and records accurately

14  reported the then value of the debtor's assets?

15       MS. DANDENEAU:  Objection to form.

16  A.   We didn't -- as part of this filing,

17  there was no fair value measurement or

18  anything.  These were just accounting entries

19  for the promissory notes.  There is no analysis

20  for impairment or fair market value adjustments

21  or anything of that nature.  This is purely

22  taking numbers and putting them in our form.

23  Q.   Did you do any impairment analysis

24  at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1  Highland?

2  A.   Yes, we did do impairment analysis

3  on – on assets.

4  Q.   Okay.  Did you ever do an impairment

5  analysis on any of the promissory notes that

6  were given to Highland by any of the affiliates

7  or Mr. Dondero?

8  A.   Not that I recall.

9  Q.   Under what circumstances do you

10  prepare impairment analyses?

11  A.   As – as – if you're preparing

12  financials in accordance with GAAP, generally

13  accepted accounting principles, if you're

14  preparing full GAAP financials, you should be

15  preparing – you should be undergoing on a

16  periodic basis any fair market value

17  adjustments to assets.

18       As I was instructed at the time of

19  the petition date, we weren't producing GAAP

20  financials.  So this wasn't something I was

21  worried about nor concerned about.

22  Q.   Okay.  Were NexPoint and HCMFA and

23  Highland's audited financial statements

24  prepared in accordance with GAAP?

Page 242

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2     A.   The audited financials -- yes,
3   audited financial statements are prepared in
4   accordance with GAAP.
5     Q.   Do you recall whether any of
6   Highland or HCMFA or NexPoint ever made a fair
7   market value adjustment to any of the notes
8   issued by any of the affiliates or Mr. Dondero
9   to Highland?
10    A.   I do not recall that happening, but
11  the -- it is because under -- under GAAP,
12  the -- the treatment of liabilities is
13  different than assets.
14    Q.   Okay.  So then let's just focus on
15  Highland's audited financial statements.
16         The last audited financial
17  statements were for the period ending December
18  31st, 2018; correct?
19    A.   That is my understanding.
20    Q.   And you had -- you had an obligation
21  to disclose anything to PricewaterhouseCoopers
22  concerning any subsequent events between the
23  end of 2018 and June 3rd, 2019; correct?
24         MS. DANDENEAU:  Objection to form.
25         MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2     A.   Correct.
3     Q.   Okay.  To the best of your
4   knowledge, as Highland's CFO, did Highland ever
5   make any fair market value adjustments to any
6   of the promissory notes that were carried on
7   its balance sheet and that were issued by any
8   of the affiliates or Mr. Dondero?
9     A.   I think I answered that question
10  earlier.  I don't recall doing that for any of
11  the -- those -- those notes.  So it would have
12  included the audit for the -- for the 2018
13  period.
14    Q.   Okay.
15         MR. MORRIS:  Can we go to the next
16  page.
17    Q.   Do you see this is a note a list of
18  notes receivable?  Do you see that?
19    A.   Yes, I do.
20    Q.   And do you see that this ties into
21  the page that we were just looking?
22    A.   I'm sorry, can we go back to the
23  prior page?  I mean, it was at 150,331,222.  It
24  was on the prior page.  Next page.  Yes, it
25  agrees.

Page 244

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2     Q.   Okay.  So now let's look at that
3   schedule.  So this was the face amount of all
4   of the promissory notes that Highland held at
5   the time this document was filed with the
6   bankruptcy court; right?
7     A.   Yes.
8     Q.   There is a footnote there that says,
9   doubtful or uncollectible accounts are
10  evaluated at year-end.
11         Do you see that?
12    A.   I do.
13    Q.   Okay.  And is it fair to say that as
14  of the year-end 2018, the year before this,
15  that to the extent any of these notes were
16  outstanding at that time, they weren't deemed
17  to be doubtful or uncollectible?
18    A.   Yeah.  For the 2018 audit, there
19  weren't any -- there weren't any adjustments to
20  fair value.
21    Q.   Okay.  And during the bankruptcy, do
22  you recall that Highland subsequently reserved
23  for the Hunter Mountain Investment Trust note?
24    A.   Yes.
25    Q.   Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1     WATERHOUSE - 10-19-21
2   involved in the decision to reserve the Hunter
3   Mountain Investment Trust note?
4     A.   I was not.
5     Q.   Do you know why Highland decided to
6   reserve for the Hunter Mountain Investment
7   Trust note?
8     A.   I don't know yet decision was made.
9   I believe it was made by someone at DSI.
10    Q.   Okay.  I'm just asking if you know
11  why.
12         Did you ever ask anyone why they
13  reserved for that particular note?
14    A.   I don't recall.
15    Q.   Do you know whether the debtor
16  reserved for any other note on this list during
17  the bankruptcy?
18    A.   Again, I don't recall.  I wasn't
19  part of any process of -- again, like any fair
20  value adjustments or anything to that degree.
21  Like I said, a lot of that was done by DSI and
22  it was kind of out of our court.
23    Q.   Okay.  Do you know if any note
24  receivable on this list was ever deemed by the
25  debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1
2     A.   I don't -- I don't have a
3  recollection of every filing, so I don't know.
4     Q.   Did you ever have a discussion with
5  anybody at any time about whether any of the
6  notes receivable on this list should be deemed
7  to be doubtful or uncollectible?
8     A.   No.  As I previously stated, we were
9  told we didn't have to keep GAAP financials.
10  We weren't having -- you know, there is no
11  underlying audits being performed, so I mean,
12  it wasn't something I worried about.
13     MR. MORRIS:  I move to strike.
14     Q.   Did you ever have a conversation
15  with anybody about any of the notes receivable
16  and whether they should be deemed to be
17  doubtful or uncollectible?  Did you have the
18  conversation, yes or no?
19     MS. DANDENEAU:  Objection to form.
20     A.   I don't recall.
21     Q.   Do you recall ever telling anybody
22  that you believed any of the notes receivable
23  on this list should be doubtful -- should be
24  deemed to be doubtful or uncollectible?
25     MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1
2     A.   I don't recall.  I mean, it may have
3  happened, you know, again, when we initially
4  getting DSI up to speed and going through
5  financials, it may have happened, but I don't
6  recall specifically.
7     Q.   While you were the CFO of Highland
8  during the time that the company was in
9  bankruptcy, did you have any reason to believe
10  that any of the notes receivable on this list
11  other than Hunter Mountain Investment Trust
12  should have been characterized as doubtful or
13  uncollectible?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Form.
16     A.   I didn't know.  I didn't form an
17  opinion.  Bankruptcy was new to me.  It still
18  is new to me, even after going through this.
19  So I really didn't know what to expect nor
20  really -- you know, I didn't know.
21     MR. MORRIS:  I move to strike.
22     Q.   During the period of Highland's
23  bankruptcy when you were serving as CFO, did
24  you have any reason to believe any of the notes
25  on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1
2     MS. DEITSCH-PEREZ:  This is like the
3  fifth time you've asked it.  Object to the
4  form.
5     MR. MORRIS:  I'm moving to strike,
6  if you haven't noticed, because he's not
7  answering the question.
8     MS. DEITSCH-PEREZ:  He was answering
9  the question, you just didn't like it, like
10  the answer.
11     MR. MORRIS:  Good Lord.
12     Q.   Go ahead, Mr. Waterhouse.
13     A.   Again, I don't -- we brought up a
14  myriad of issues at the start of the bankruptcy
15  case.  I don't recall if this was one of them,
16  but, again, there are a lot of things we
17  couldn't change.  Even, you know, I was told
18  status quo, blah, blah, blah, right, there is a
19  stay, you can't -- you know, I don't recall
20  specifically, but that doesn't mean it didn't
21  happen.
22     MR. MORRIS:  I move to strike.
23     Q.   During the time that Highland was in
24  bankruptcy and you served as CFO, did you have
25  any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1
2  receivable on this list were doubtful or
3  uncollectible?
4     MS. DEITSCH-PEREZ:  Object to the
5  form.
6     A.   Potentially.
7     Q.   Did you ever tell anybody that?
8     A.   As I just stated like five times,
9  yes, we -- at the beginning after filing and we
10  were getting DSI and others up to speed, you
11  know, we had a myriad of discussions of a lot
12  of things and this was likely one of them.  I
13  don't -- but I don't recall specifically we
14  talked --
15     Q.   I don't want to know -- I don't want
16  to know what was --
17     MS. DEITSCH-PEREZ:  Wait, wait.
18  Excuse me.  Mr. Morris, you did not let him
19  finish his answer.
20     A.   I spoke -- we had -- we were
21  bringing Fred Karesa and Brad Sharp (phonetic)
22  up to speed on all of these items, contracts,
23  and investments and going through -- we had
24  hours and hours and hours of discussion.  And
25  then not only do I have to repeat this not

**Appx. 02111**

Page 250

```
1          WATERHOUSE - 10-19-21
2   once, twice, three, four times with -- you
3   know, I mean, we -- I don't -- I don't remember
4   the sum culmination of all these discussions.
5   They all kind of blend together.
6          MR. MORRIS:  Okay.  I move to strike
7       and I will try one more time.
8       Q.   Did you ever tell anybody at DSI
9   that you believed any of the notes receivable
10  on this list were doubtful or uncollectible?
11         MS. DANDENEAU:  Object to form.
12      A.   Potentially.
13      Q.   Potentially you told them or
14  potentially they were doubtful or
15  uncollectible?
16      A.   Potentially I told them that we
17  needed to look at the value of these -- of
18  these assets.
19      Q.   Okay.  Did you -- okay.  It is
20  potential that you told them and it is
21  potentially that you didn't; right?
22         MS. DANDENEAU:  Objection to form.
23      A.   I've gone through that.  I don't
24  recall specifically.
25      Q.   So you should just -- I don't want
```

Page 251

```
1          WATERHOUSE - 10-19-21
2   to tell what you to do.  Do you have --
3          MS. DANDENEAU:  Good.
4       Q.   Other than -- other than telling
5   them that they should look at the values, do
6   you have any recollection whatsoever of ever
7   having told anybody at DSI that any of the
8   notes receivable on this page were doubtful or
9   uncollectible?
10         MS. DEITSCH-PEREZ:  Object to the
11      form.
12         MS. DANDENEAU:  Objection.
13      A.   I recall having general discussions
14  about everything on our balance sheet which
15  would have included these -- these notes
16  receivable.
17      Q.   Okay.
18      A.   I don't recall specifically where
19  those discussions delved into.
20      Q.   Do you recall any discussion at all
21  on the topic of whether any of these notes on
22  this list were doubtful or uncollectible?
23         MR. AIGEN:  Mr. Morris, how on earth
24      is that question different from the
25      question that you just asked for the last
```

Page 252

```
1          WATERHOUSE - 10-19-21
2   five times?  I mean, really I thought you
3   were -- (overspeak.)
4          MR. MORRIS:  Because he never
5   answered it.
6          MS. DEITSCH-PEREZ:  Are you
7       listening to him?
8          MR. MORRIS:  You know --
9          MS. DEITSCH-PEREZ:  He basically
10  said that he had a conversation with DSI
11  that went over all of this stuff and that
12  conversation could have included the notes
13  but he doesn't recall specifically.
14         What more do you want him -- to ask
15  of him?
16         MR. MORRIS:  I want him -- I would
17  love him to say -- I would like him to
18  testify to the truth, and that is he has no
19  recollection.
20         MS. DEITSCH-PEREZ:  Well, the truth
21  as you would like to see it, but -- but he
22  is testifying truthfully.  And I -- and, by
23  the way, I move to strike that comment --
24         MR. MORRIS:  Okay.
25         MS. DEITSCH-PEREZ:  -- because it
```

Page 253

```
1          WATERHOUSE - 10-19-21
2   suggests that he has not testified
3   truthfully.
4          MR. MORRIS:  I will ask my question
5       again.  And if at any time you want to
6       direct him not to answer, that is your
7       prerogative.
8       Q.   Mr. Waterhouse, do you have any
9   recollection at all of ever telling anybody
10  from DSI that any of these notes were doubtful
11  or uncollectible?
12         MS. DANDENEAU:  Object to form.
13      A.   I don't remember specifically.
14      Q.   Do you remember generally that
15  specific topic?
16      A.   We generally talked about assets,
17  values.  If -- we had discussions of that and
18  collectability in nature.  I mean, of Highland,
19  the funds, the CLOs, the entire complex.  We
20  had discussions like that, which is, you know,
21  as you look at a billion dollar consolidated
22  balance sheet.
23         So I generally remember -- this is
24  billions of dollars, including these assets --
25  having discussions of this -- of this type.
```

Page 254

WATERHOUSE - 10-19-21

1
2    Q.   Do you believe that an affiliate
3    loan on this list was doubtful or
4    uncollectible?  Would you have told that to
5    DSI?
6         MS. DANDENEAU:  Objection to form.
7         MS. DEITSCH-PEREZ:  Object to form.
8    A.   If we had, like -- again, if we --
9    if -- if we weren't preparing financial
10   statements in accordance with GAAP, and -- you
11   know, if DSI at that point -- they were --
12   again, I was new to bankruptcy.
13        The CRO is -- we are delegating
14   everything to the CRO.  All the decisionmaking.
15   Remember -- remember when you and I went into
16   Delaware Court and we were saying DSI basically
17   does everything, remember this, Mr. Morris?
18        You were my counsel at the time, and
19   basically we're running everything through DSI.
20   That was what this was like in the early part.
21        Everything was communicated through
22   DSI.  So DSI says this.  DSI says that.  That
23   is what we're doing, and we're pointing out
24   things to them.
25        Now, they decide what direction this

Page 255

WATERHOUSE - 10-19-21

1
2    goes.
3         Q.   Did you point out that any of
4    these --
5         A.   I don't recall specifically.
6         Q.   Okay.  At any time that you served
7    as Highland's CFO, did you ever point out to
8    DSI that any of these loans were doubtful or
9    uncollectible?
10        MS. DEITSCH-PEREZ:  Object to the
11   form.
12        MS. DANDENEAU:  Objection.
13        A.   If you're asking me if I had a
14   conversation with DSI, if any of these loans
15   were doubtful or uncollectible, I don't recall
16   specifically.
17        Q.   Do you recall that the debtor filed
18   on the docket monthly operating reports?
19        A.   Yes.
20        Q.   You prepared those personally,
21   didn't you?
22        MS. DEITSCH-PEREZ:  Objection to
23   form.
24        A.   I didn't personally prepare them,
25   the team did with DSI.

Page 256

WATERHOUSE - 10-19-21

1
2    Q.   But you signed them; correct?
3    A.   My signature is on the MORs.
4    Q.   And you signed them as the preparer
5    of the document; correct?
6    A.   Yes, I did this pursuant to DSI's
7    instructions.
8    Q.   Okay.  You wouldn't have signed the
9    document if you didn't believe it to be
10   accurate; correct?
11   A.   If I had reason to believe it
12   wasn't, presumably I wouldn't have signed it.
13   Q.   Okay.  And do you have any reason to
14   believe right now that any monthly operating
15   report that has your signature on it was
16   inaccurate in any way?
17        MS. DEITSCH-PEREZ:  Object to the
18   form.
19   A.   My understanding of the monthly
20   operating reports is we were filing them in
21   accordance with the standards set by the Court.
22   It wasn't -- you know, again, I don't -- you
23   know, it wasn't GAAP.  It wasn't these other
24   standards, so I testified I didn't have
25   experience in this.  The CRO was running the

Page 257

WATERHOUSE - 10-19-21

1
2    show.  I followed their advice.
3    Q.   But you assured yourself that
4    everything in the report was accurate before
5    you signed them; correct?
6         MS. DANDENEAU:  Objection to form.
7    A.   I trusted the guidance from the CRO
8    and their team and their experience and their
9    guidance for doing this for many, many, many
10   years to -- to -- to categorize and put things
11   in ways on the form.
12        You know, my team had -- had not
13   filled out these forms before and needed all of
14   this guidance.  I'm not an expert in this.  I
15   have oversight of it.  I signed the form.  DSI
16   told me to.
17   Q.   And you and your team are the source
18   of the information that DSI used to create the
19   reports; correct?
20        MS. DANDENEAU:  Objection to form.
21   A.   The books and records reside with
22   the -- with -- with the corporate accounting
23   team.
24   Q.   Okay.  And the corporate accounting
25   team was the corporate accounting team that was

Page 258

WATERHOUSE - 10-19-21

1
2  under your direction; correct?
3      A.   Yes.
4      Q.   So -- so your team was responsible
5  for maintaining Highland's books and records;
6  correct?
7      A.   I'm sorry, my team was responsible?
8      Q.   Correct.
9      A.   Yes.  They -- they -- they were
10  the -- the -- the general ledger of Highland,
11  that responsibility was with the corporate
12  accounting team.
13      Q.   The corporate accounting group
14  reported to you; correct?
15      A.   Yes.
16         MR. MORRIS:  Can we put up 41,
17      please.
18         (Exhibit 41 marked.)
19      Q.   All right.  You will see that this
20  is a report that is dated January 31st, 2020,
21  but it is for the month ending December 2019.
22         Do you see that?
23      A.   I do.
24      Q.   And you signed this report in your
25  capacity as the chief financial officer of

Page 259

WATERHOUSE - 10-19-21

1
2  Highland; correct?
3      A.   Yes.
4      Q.   And you're the preparer -- you're
5  identified as the preparer of the report;
6  correct?
7      A.   That is correct.
8      Q.   Do you recall participating in the
9  preparation of monthly operating reports?
10      A.   As I testified earlier, it was put
11  together, you know, with the team.  The team
12  worked with DSI to put these monthly operating
13  reports together.  We had no experience at this
14  time of the monthly operating reports or things
15  of this nature.
16         MR. MORRIS:  Can you turn to the
17      next page, please.
18      Q.   Do you see a line item under assets
19  due from affiliates?
20      A.   Yes, I do.
21      Q.   Okay.  And to the best of your
22  knowledge and understanding, as the person who
23  is identified as the preparer of this report,
24  does that line item include the affiliate loans
25  that we've been talking about?

Page 260

WATERHOUSE - 10-19-21

1
2      A.   Again, I would have to see, just
3  like we did with the financial statements of
4  Highland and NexPoint, I would have to see a
5  detailed build, but, you know, if you look at
6  the other line items, you know, the only other
7  place it could be would be in -- in other
8  assets.
9      Q.   Okay.  And as a matter of
10  arithmetic, is it fair to say that is the value
11  of the assets due from affiliates was more than
12  25 percent of the value of Highland's total
13  assets as of 12/31/2019?
14         MS. DANDENEAU:  Objection to form.
15      A.   I'm really not doing the mental math
16  right now, so I've been going at this depo for
17  hours, so I'm really not -- you know --
18      Q.   All right.  No problem.
19      A.   -- these are millions of dollars.
20      Q.   Let's look at the Footnote 1,
21  please.  Do you see there is a reference to the
22  Hunter Mountain note?
23      A.   Yes, I see that in Footnote 1.
24      Q.   Okay.  And that's the reserve that
25  was taken against that note?

Page 261

WATERHOUSE - 10-19-21

1
2      A.   Yes, that is what this indicates.
3      Q.   Okay.  And were you aware that the
4  reserve was being taken on that it was?
5      A.   I was -- I was aware, yeah, at some
6  point, yes.
7      Q.   Okay.  And are you aware of any
8  reserve being taken with respect to any other
9  note that was issued in favor of Highland?
10      A.   Again, as I testified, we didn't go
11  through an analysis on -- on -- on the other
12  notes.
13      Q.   Can we turn --
14      A.   I believe -- I believe it says that
15  in Footnote 1, fair value has not been
16  determined with respect to any of the notes.
17         So this footnote -- footnotes, look,
18  there has been no determination.
19      Q.   Okay.  The determination was made in
20  the audited financial statements just six
21  months earlier; right?  We saw that earlier?
22      A.   That was as of 12/31/18.  I mean,
23  things -- circumstances -- there's a bank --
24  circumstances change, things change -- things
25  change over time, you know, facts and

**Appx. 02114**

Page 262

WATERHOUSE - 10-19-21

1  circumstances change.  Again, you have to do an
2  analysis.
3
4     Q.   Okay.  And you do recall that in
5  Highland's 2018 financial statement, all of the
6  notes issued by affiliates and Mr. Dondero that
7  were due at year-end had a fair value equal to
8  the carrying value; correct?  We looked at
9  that?
10    A.   Yes.  That was in the -- in the
11 disclosure for the -- for the affiliate notes,
12 yes.
13    Q.   And -- and you were obligated to
14 share with PwC any subsequent events between
15 the end of 2018 and the date that you signed
16 your management representation letter on June
17 3rd, 2019; correct?
18       MS. DEITSCH-PEREZ:  Object to the
19 form.
20    A.   Yes.  I -- I -- I signed the
21 management, you know, my signature is in the
22 management representation letter -- I hope I'm
23 answering your question -- that is dated in
24 June with the representations made in that
25 management representation letter.

Page 263

WATERHOUSE - 10-19-21

1
2     Q.   Okay.  And there was nothing that
3  caused PricewaterhouseCoopers to include in
4  subsequent events any adjustment to the
5  conclusion that the fair value of the affiliate
6  notes and the notes issued by Mr. Dondero
7  equaled the carrying value; correct?
8        MS. DANDENEAU:  Objection to the
9  form.
10    A.   That is correct.  That is what was
11 in the -- in the -- in the footnotes.
12    Q.   Okay.  So are you aware of anything
13 that occurred between June 3rd, 2019 and
14 December 31st, 2019 that would have caused the
15 fair value of the notes to differ from the
16 carrying value?
17    A.   Yeah.  Highland filed for
18 bankruptcy, things changed -- I mean, there was
19 a bankruptcy filed in October of -- of -- of
20 2019, right, the petition date that we've
21 described earlier.
22       I mean, I had a -- I guess looking
23 back naively, I thought we were going to get an
24 audit from PwC for year-ended 2019, and when we
25 had discussions with PwC, they were like, are

Page 264

WATERHOUSE - 10-19-21

1  you crazy, we're not auditing this.  Values
2  change, all these things change, bankruptcy
3  changes the entire scenario.  I mean -- and
4  they're like, we're not -- we're not touching
5  this.
6        And so, you know, I was like, okay,
7  sorry, I get it, okay, no an audit.
8        I mean, it is -- you know, and --
9  you know, and we weren't preparing GAAP
10 financial statements.
11       Again, I didn't know what we were
12 doing in relation to our financial statements,
13 but these were the discussions I was having at
14 the time.  And yeah, I mean, filing bankruptcy
15 from what I got from outside auditors and
16 others involved changed things dramatically.
17    Q.   Okay.  Highland wasn't the obligor
18 under any of the notes that we're talking
19 about; correct?
20    A.   No.
21    Q.   So --
22    A.   That's right.
23    Q.   So can you identify any fact that
24 would cause the fair value to deviate from the

Page 265

WATERHOUSE - 10-19-21

1  carrying value during the seven-month period
2  between June 3rd and the end of the year, 2019?
3        MS. DANDENEAU:  Objection to form.
4     A.   No.  I mean, I'm putting myself back
5  at that time, right.  Hindsight is 2020, but we
6  didn't do an analysis, but we would have done a
7  fulsome analysis and looked at all of the facts
8  and circumstances at the time, but asset values
9  change.  You know, there could have been a
10 market crash in hindsight in 2020, which --
11 which affected entities' abilities.
12       There could have been all of these
13 things, right, that -- that happen.  It is --
14 it is easy to look back in hindsight, but when
15 you are looking at this in -- in realtime, the
16 analysis is different, and again, we didn't do
17 an analysis.
18    Q.   Okay.  You didn't do an analysis.
19       Do I have that right?
20    A.   I don't -- I don't recall doing one
21 or maybe -- you know, I don't recall doing one.
22       MR. MORRIS:  Okay.  I'm going to
23 take a break.  I may be done, so the time
24 now is -- is 4:30 your time.  Let's just

Page 266

WATERHOUSE - 10-19-21

1 take a short break until 4:40 your time.
2 MS. DANDENEAU: Okay.
3 VIDEOGRAPHER: We're going off the
4 record, 4:31 p.m.
5 (Recess taken 4:31 p.m. to 4:43 p.m.)
6 VIDEOGRAPHER: We are back on the
7 record at 4:43 p.m.
8 MR. MORRIS: I have no further
9 questions.
10 MR. RUKAVINA: Okay.
11 Mr. Waterhouse, I will go next.
12 EXAMINATION
13 BY MR. RUKAVINA:
14 Q. Sir, my name is Davor Rukavina. I'm
15 the lawyer for --
16 MR. MORRIS: Hey, Davor, just before
17 you begin, I just want to put on the record
18 Highland's objection to documents that were
19 produced to me 10 minutes before the
20 deposition began.
21 MR. RUKAVINA: What the basis of
22 your objection?
23 MR. MORRIS: That they were due
24 quite some time ago, and the fact that you

Page 267

WATERHOUSE - 10-19-21

1 had -- I just think it's appropriate to --
2 to dump documents on somebody 10 minutes
3 before the deposition. I just think
4 that's --
5 MR. RUKAVINA: Well, these are
6 documents Highland produced. I'm not aware
7 of any rule I have to give you advance
8 documents when I know for the record that
9 other than the exhibits that you sent to us
10 last week, most of the exhibits you used
11 today you did not provide to me prior to
12 this deposition.
13 MR. MORRIS: No, but the documents
14 were produced by me in -- in litigation,
15 right?
16 MR. RUKAVINA: I'm going to use
17 primarily, John, the documents that you
18 produced to me today, but you may.
19 MR. MORRIS: Primarily. I've got --
20 I've got my objection. You have got your
21 response. Proceed.
22 Q. Mr. Waterhouse, again, I represent
23 the advisors, HCMFA and NexPoint Advisors.
24 Do you understand that?

Page 268

WATERHOUSE - 10-19-21

1 A. Yes.
2 Q. You and I have never met or talked
3 before today, have we?
4 A. No, I have -- I have heard your
5 voice on calls before.
6 Q. Okay.
7 MR. RUKAVINA: Madam Court Reporter,
8 I will use a few exhibits today. My
9 associate, Mr. Nguyen, will find some way
10 to get them to you. I don't know how to do
11 that, but it looks like you guys do.
12 I am going to use numbers as well.
13 But to differentiate them from Mr. Morris
14 we're going to mark mine with the prefix A
15 for advisors.
16 Do you understand?
17 COURT REPORTER: Yes.
18 MR. RUKAVINA: Okay. Perfect.
19 Q. Okay. So, Mr. Waterhouse, let's
20 start with those two HCMFA notes that you were
21 asked about, one for 5 million and one for
22 2.4 million.
23 Do you recall those notes?
24 A. Yes.

Page 269

WATERHOUSE - 10-19-21

1 Q. Were you ever the CFO of HCMFA?
2 A. I don't recall.
3 Q. So to the best of your recollection,
4 you were still an officer of HCMFA in 2019,
5 just that your title was treasurer?
6 MR. MORRIS: Object to the form of
7 the question. There is no leading here.
8 He works for your client.
9 MS. DANDENEAU: That is not -- that
10 is not true.
11 MR. MORRIS: He's the treasurer --
12 he is the treasurer of your client. I
13 don't -- I'm going to object every time you
14 try to lead, so...
15 MR. RUKAVINA: Totally fine to
16 object.
17 MR. MORRIS: Okay.
18 Q. Please answer my question,
19 Mr. Waterhouse.
20 A. I'm sorry, could you repeat? There
21 was...
22 Q. Yes. You were -- you testified
23 earlier that in 2019 you were an officer of
24 HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

1    A.   Yes, I testified that I was the
2    treasurer and I didn't know if that incumbency
3    certificate, you know, was one that appointed
4    me as a treasurer, but yes.
5    Q.   I'm just trying to confirm that
6    sitting here today, to the best of your
7    recollection, at that time you were – your
8    title was treasurer.  It was not chief
9    financial officer.
10   A.   I don't recall that being my title.
11   Q.   Okay.  And in May of 2019, however,
12   I think you testified you were the chief
13   financial officer of the debtor; correct?
14       MR. MORRIS:  Objection to the form
15   of the question.
16   A.   Yes, I was – yes.
17   Q.   Okay.  As such, in May of 2019, did
18   you have the authority, to your understanding,
19   to unilaterally loan $5 million or $2.4 million
20   to anyone on behalf of the debtor?
21       MR. MORRIS:  Objection to the form
22   of the question.
23   A.   Sorry, can you repeat that?
24   Q.   Yes.  So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

1    chief financial officer of the debtor, Highland
2    Capital Management, L.P., in May of 2019, did
3    you believe that you unilaterally, just Frank
4    Waterhouse, had the authority to loan on behalf
5    of the debtor to anyone $5 million and
6    $2.4 million?
7        MR. MORRIS:  Objection to the form
8    of the question.
9    A.   No.
10   Q.   Is it because loans of that amount
11   would have had to be approved by someone else?
12   A.   Yes.
13   Q.   Who in '20 – in May of 2019, if
14   Highland wanted to loan 5 million or
15   $2.4 million to someone, what would have been
16   the internal approval procedure?
17       MR. MORRIS:  Objection to the form
18   of the question.
19   A.   If – if we had loans of that nature
20   that needed to be made due to their size, we
21   would have gotten approval from the – the
22   president of Highland.
23   Q.   And who that was individual?
24   A.   It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

1    Q.   Okay.  Now, I'm going to ask you a
2    similar question but for a different entity.
3        In May of 2019, as the treasurer of
4    HCMFA, did you believe that you unilaterally
5    had the ability to cause HCMFA to become the
6    borrower of a $5 million loan and a
7    $2.4 million loan?
8        MR. MORRIS:  Objection to the form
9    of the question.
10   A.   No.
11   Q.   What would – what would the
12   approval have taken place – strike that.
13       What would the approval process have
14   been like in May of 2019 at HCMFA for HCMFA to
15   take out a $7.4 million loan?
16       MR. MORRIS:  Objection to the form
17   of the question.
18   A.   The process would have been similar
19   to what we just discussed on – for Highland to
20   make a loan to others.  So, again, you know,
21   we – we would have – either myself or someone
22   on the team would have discussed this with
23   the – the president and owner of – of HCMFA.
24   Q.   And who was that individual?

Page 273

WATERHOUSE - 10-19-21

1    A.   That was James – Jim Dondero.
2    Q.   So do I understand that in May of
3    2019, on behalf of both the lender, Highland,
4    and the borrower, HCMFA, Mr. Dondero would have
5    had to approve $7.4 million in loans?
6        MR. MORRIS:  Objection to the form
7    of the question.
8    A.   Yes.
9    Q.   You mentioned when Mr. Morris was
10   asking you the NAV error, N-A-V error, with
11   respect to TerreStar, without writing us a
12   novel, unless you feel like you have to, can
13   you summarize what that NAV error was?  What
14   happened?
15   A.   There was a – in the Highland
16   Global Allocation Fund, it owned at the time an
17   equity interest in a company called TerreStar.
18   And TerreStar is – at the time was a private
19   company, and it may still be today.  Again, I'm
20   putting myself back then as a private company.
21       We had – sorry, I don't mean we –
22   the fund and the advisor Houlihan Lokey
23   to – to value that investment.  And during
24   that time there was some trades that were

Page 274

WATERHOUSE - 10-19-21

1
2 executed at market levels that were much lower
3 than the Houlihan Lokey model.
4        And based on information and
5 discussions with the portfolio managers and,
6 you know, principals that were very familiar
7 with TerreStar, it was determined that those
8 trades were non-orderly and they were not
9 considered in the valuation as consulted with
10 Houlihan Lokey and PricewaterhouseCoopers at
11 the time.
12        Subsequent to a -- I can't remember
13 the exact circumstances of why the SEC got
14 involved. I think it was due to this -- this
15 investment became a material position in the
16 fund. It triggered an SEC, kind of, inquiry.
17 And as part of that inquiry, they questioned
18 the valuation methodology. "They" meaning the
19 SEC.
20        And at the culmination of that
21 process -- this is all summarized -- the value
22 that was -- that ultimately had to be used in
23 the fund's NAV was different than -- materially
24 different than what the original valuation at
25 Houlihan Lokey provided.

Page 275

WATERHOUSE - 10-19-21

1
2        And given that there was this fund
3 was, as we discussed -- I don't know if we
4 discussed it, but it was an open-ended fund
5 that was going -- that was converting to a
6 close-end fund.
7        Due to the fact that it was an
8 open-ended fund, you had to recalculate NAV and
9 see what the impact was on people -- on
10 investors coming in and out of the fund and if
11 there is a detrimental impact and to calculate
12 what that -- what that impact was and if there
13 was any amounts owed to the fund pursuant to
14 the error.
15    Q.  Were you personally involved
16 internally at either Highland or HCMFA with
17 these investigations and discussions with the
18 SEC?
19    A.  I was.
20    Q.  Which other key people or senior
21 people at Highland were involved, to your
22 recollection?
23    A.  Myself, Thomas Surgent, David Klos,
24 Lauren Thedford, Jason Post.
25    Q.  Mr. Dondero, was he --

Page 276

WATERHOUSE - 10-19-21

1
2    A.  I believe Cliff Stoops. I'm trying
3 to think. And maybe that is -- that is -- that
4 is -- that is all kind I can recall at the
5 moment.
6    Q.  Do you recall whether it was
7 determined that the fund suffered losses as a
8 result of this error?
9    A.  The -- the fund -- the -- the --
10 because the open-ended nature of the fund,
11 there were losses that were attributable to
12 investors. Meaning they -- they would have
13 redeemed and got a less money or -- or they
14 subscribed in and maybe because they didn't get
15 enough shares and then they later sold and then
16 they were harmed in that fashion.
17        And there is -- there is -- there
18 were very -- there were very detailed
19 calculations, and, you know, all these different
20 scenarios that we had to -- I'm sorry, I keep
21 saying "we" -- that the individuals involved
22 had to calculate and quantify.
23    Q.  Well, do you recall whether HCMFA
24 admitted certain fault and liability for this
25 error?

Page 277

WATERHOUSE - 10-19-21

1
2    A.  I don't recall specifically.
3    Q.  Do you recall whether HCMFA caused
4 any funds to be paid to the investors and the
5 fund the subject of the NAV error?
6    A.  Yes.
7    Q.  Do you recall the approximate amount
8 of funds, moneys paid to the investors and the
9 fund?
10    A.  It was -- it was approximately
11 $7 million.
12    Q.  If I was to suggest 7.8 million,
13 would that ring more true or are you sticking
14 with your original answer?
15    A.  It was -- it was approximately 7 --
16 7 to $8 million. Again, I don't remember the
17 exact number, but it was in that ballpark.
18    Q.  So regardless of whether HCMFA
19 accepted fault or liability, it caused some
20 $7 million or more to be paid out to affected
21 investors in the fund?
22        MR. MORRIS: Objection to the form
23 of the question.
24    A.  And I want to make sure I'm
25 understanding your question because there is a

Page 278

WATERHOUSE - 10-19-21

1
2  lot of different entities that are going on to
3  my head.
4        I think what you are saying is based
5  on this error, shareholders were harmed by this
6  approximately $7.8 million -- by approximately
7  $7.8 million.  Is that what you are asking?
8        Q.   Yes, sir.
9        A.   Yes, that was -- again, I don't have
10  the exact numbers.  If I take -- it was -- it
11  was in that ballpark, and there is a detail
12  calculation and write-up that could, that --
13  that exists someplace.
14       Q.   Now, at that time, at the time that
15  the NAV error occurred, was there a contract in
16  place between HCMFA and the debtor pursuant to
17  which the debtor was providing services to
18  HCMFA?
19            MR. MORRIS:  Objection to the form
20  of the question.
21       A.   Yes.
22       Q.   Was that contract generally called a
23  shared services agreement?
24       A.   It was generally called that, but
25  there were -- there were -- I mean, it -- it --

Page 279

WATERHOUSE - 10-19-21

1
2  it depends on who you talk to, but yes,
3  generally, there were -- there are multiple
4  agreements.
5        Q.   Pursuant to one or more of those
6  agreements, was the debtor providing certain
7  services to HCMFA?
8            MR. MORRIS:  Objection to the form
9  of the question.
10       A.   Yes.
11       Q.   And can you at a very high level
12  summarize in 2018 and 2019 what those services
13  were?
14       A.   Yes, there was a -- yes.
15       Q.   Okay.  Please -- please go -- go
16  through a short summary.
17       A.   There was a -- a cost reimbursement
18  agreement between Highland Capital Management
19  Fund Advisors and Highland Capital Management,
20  L.P.  That agreement was for what we referred
21  to as front office services, so investment
22  management, things of that nature.
23            There was I think what most people
24  refer to as the shared services agreement that
25  was -- that agreement was between Highland

Page 280

WATERHOUSE - 10-19-21

1
2  Capital Management Fund Advisors and Highland
3  Capital Management for back office services.
4        Q.   And can you summarize what you mean
5  by back office services?
6        A.   Those services were for accounting,
7  finance, tax, valuation, HR, IT, you know,
8  legal compliance, things of -- things of those
9  nature -- or things of that nature, excuse me.
10       Q.   So in the spring of 2019, do you
11  recall whether HCMFA took the position that it
12  was actually Highland that caused the NAV error
13  to occur pursuant to the valuation services
14  that Highland was providing?
15            MR. MORRIS:  Objection to the form
16  of the question.
17       A.   I do not recall.
18       Q.   Did you ever have any discussions
19  with anyone, Jim Dondero or anyone in the first
20  half of 2019 as to whether Highland, the
21  debtor, that is, had any liability to HCMFA
22  related to the NAV error?
23            MR. MORRIS:  Objection to the form
24  of the question.
25       A.   I do not recall.

Page 281

WATERHOUSE - 10-19-21

1
2        Q.   And then you mentioned that the fund
3  was being closed and some compensation related
4  to that.  Can you -- can you elaborate?  What
5  were you referring to?
6        A.   Right.  So the advisor, pursuant to
7  board approval, put a proposal in front of the
8  shareholders of the Highland Global Allocation
9  Fund to convert it from an open-ended fund to a
10  closed-end fund.
11            So an open-ended fund, when
12  shareholders subscribe to the fund or redeem
13  into the fund, they do it at NAV.
14            When it is -- when you have a
15  closed-end fund, closed-end funds are -- are
16  publicly-traded, like on the New York Stock
17  Exchange, exchanges like that, and -- and
18  shareholders or investors, they're not --
19  they're -- they're not subscribing and
20  redeeming with the fund.  They are like shares
21  of Apple.
22            Those shares of the Highland Global
23  Allocation Fund trade on an exchange, and that
24  is how you, you know, that is how you, you know,
25  you become an equity owner in the fund or you

**Appx. 02119**

Page 282

WATERHOUSE - 10-19-21

1  sell your shares and you are no longer an
2  equity owner.
3
4        As part of that proposal, the
5  advisor told shareholders if you -- if you vote
6  for this proposal to -- to convert it from an
7  open-ended fund to a closed-end fund, we will
8  pay you some amounts of money.  I forgot -- a
9  certain number of points.  I think it was
10  like -- it was like two to three points or
11  something -- something like that.
12      Q.   Okay.  You mentioned when Mr. Morris
13  was asking you, going back to those two
14  promissory notes, you will recall the 5 million
15  and 2.4 million, you mentioned something to the
16  effect that Mr. Dondero told -- told you to pay
17  some moneys out of Highland.  Do you remember
18  that discussion with Mr. Morris?
19      A.   I do.
20      Q.   So, to the best of your
21  recollection, did you have a discussion with
22  Mr. Dondero about making some payments in May
23  of 2019 out of Highland?
24      A.   I recall, as I testified earlier,
25  that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1  for -- for these amounts attributable to -- it
2  was either the error -- you know, the error,
3  and in that conversation he said, go get the
4  money from Highland.  I believe that is what I
5  testified earlier, and that -- that is my
6  recollection.
7      Q.   Do you recall if that was an
8  in-person meeting or some other mode for the
9  meeting?
10      A.   I -- I -- I recall that being
11  in-person.
12      Q.   Do you recall if anyone else was
13  present, or was it just you and Mr. Dondero?
14      A.   I recall just he and I.
15      Q.   And the moneys that he told you to
16  find from -- or get from Highland, was that in
17  the amount of $5 million and $2.4 million?
18      MR. MORRIS:  Objection to the form
19  of the question.
20      A.   I believe so, but I would have to go
21  back and look and see when those moneys were
22  actually paid into the -- into the fund and,
23  you know, when those transfers were done.  If
24  they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1  yes, I would say it was -- it was all related
2  to that.
3      Q.   Did Mr. Dondero tell you that those
4  funds would be a loan from Highland to HCMFA?
5      A.   I don't recall.
6      MR. MORRIS:  Objection to the form
7  of the question.
8      Q.   Now, and forgive me, I'm probably
9  the only non-American born here, but I speak
10  reasonably well in English.  I don't recall,
11  does that mean you don't remember or does that
12  mean it didn't happen?
13      MR. MORRIS:  Objection to the form
14  of the question.
15      A.   It -- it means I don't -- I don't
16  remember.
17      Q.   Did Mr. Dondero tell you to have
18  those two promissory notes prepared?
19      A.   I don't recall.
20      Q.   When you -- again, when you say, I
21  don't recall today, that means that sitting
22  here today, you just don't remember one way or
23  the other.  Is that accurate?
24      A.   Yes.

Page 285

WATERHOUSE - 10-19-21

1      Q.   Is it possible that you, having
2  heard what Mr. Dondero said and seeing funds
3  being transferred, assumed that that would be a
4  loan without him actually telling you that
5  would be a loan?
6      MR. MORRIS:  Objection to the form
7  of the question.
8      A.   Sorry, I want to make sure -- did I
9  ask the amounts that were transferred that I --
10  that I assumed that that was a loan?
11      Q.   Well, let me -- let me take -- let
12  me try again.
13      So you have established already that
14  there were quite a number of promissory notes
15  back and forth -- I'm sorry, quite a number of
16  promissory notes with affiliated companies and
17  individuals owing Highland money; right?
18      A.   Yes.
19      Q.   And you have established that there
20  were many transactions and transfers going back
21  and forth over the years; right?
22      MS. DANDENEAU:  Objection to form.
23      A.   In -- yes, in my capacity as CFO and
24  my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

2    Q.   And that's part of the reason why
3  you just can't remember some of the details
4  today because this -- this happened years ago,
5  and there were a number of transactions.  Is
6  that accurate?
7        MS. DANDENEAU:  Objection to the
8    form.
9        MR. MORRIS:  Objection to the form
10    of the question.
11    A.   I mean, I deal with thousands of --
12  of -- of -- of transactions, you know, whether
13  it has -- the processing of transactions, you
14  know, if it has got, you know, more -- more
15  zeros, you know, behind it than others.
16        When you look at thousands of
17  transactions over the years for funds and
18  advisors and -- and, you know, financial
19  statements, I mean, it is -- it is very hard
20  going back in -- in -- in my -- you know,
21  14-ish year career at -- at Highland to
22  remember a lot of those details, especially
23  when I don't have any records or books or
24  anything like that, and -- and going back many
25  years.

Page 287

WATERHOUSE - 10-19-21

2    Q.   And that is fine.  That -- that --
3  that is why I asked the question.
4        Is it possible in May of 2019 when
5  Mr. Dondero told you to transfer the funds from
6  Highland, you just assumed on your own that
7  those would be loans without him actually
8  telling you that those would be loans?
9        MR. MORRIS:  Objection to the form
10    of the question.
11    A.   I don't know.
12    Q.   I'm sorry, you --
13    A.   I said I don't know.
14    Q.   Okay.  Well, as the -- as the CFO
15  for Highland, if you saw $7.4 million going
16  out, you would feel some responsibility to
17  account for that, wouldn't you?
18        MR. MORRIS:  Objection to the form
19    of the question.
20    A.   Yes.
21    Q.   Is it fair to say that those would
22  be in the range large enough to rise up to your
23  level?
24        MR. MORRIS:  Objection to the form
25    of the question.

Page 288

WATERHOUSE - 10-19-21

2    A.   If -- I don't know if I understand
3  your question.  Those amounts would arise to my
4  level where I would be involved or...
5    Q.   You would want to know what a
6  transfer for that amount, $7.4 million, was all
7  about, as the CFO of Highland, wouldn't you?
8        MR. MORRIS:  Objection to the form
9    of the question.
10    A.   Yes, I make it -- I mean, I -- I
11  review all sorts of payments, I mean, even
12  smaller dollar payments on a periodic basis,
13  you know, to -- to -- to understand and to make
14  sure that we are paying things in a -- you
15  know, in -- in -- in an informed way.  And, you
16  know -- and we're -- and we're paying things
17  pursuant to vendor contracts and things like
18  that.
19    Q.   So as part of that, is it possible
20  that seeing $7.4 million go out you would have
21  promissory notes made in order to keep a paper
22  trail, assuming that those were loans, when
23  perhaps they were never intended to be loans by
24  Mr. Dondero?
25        MR. MORRIS:  Objection to the form

Page 289

WATERHOUSE - 10-19-21

2    of the question.
3    A.   I don't know.  As I testified
4  earlier, I had conversations with Mr. Dondero
5  about -- about the -- the -- the moneys that
6  were needed for the NAV error.  And I recall
7  him saying go get it from Highland -- or get it
8  from Highland.
9    Q.   Well, why did you sign those
10  promissory notes and why didn't you have him
11  sign them?
12        MR. MORRIS:  Objection to the form
13    of the question.
14    A.   I don't know.  I don't know.
15    Q.   You mentioned earlier that you
16  typically don't sign promissory notes.  Am I
17  remembering your testimony correctly?
18        I mean, promissory notes on behalf
19  of the entities.  Not yourself, obviously.
20    A.   Yes, that is what I said earlier.
21    Q.   Do you recall any other promissory
22  notes in the million-plus range that you had
23  ever signed before on behalf of any entity?
24    A.   There is -- there has been a lot of
25  transactions over the years.  I don't -- I

Page 290

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  don't – I don't recall generally.  I don't –
3  I don't recall.
4      Q.   So – but to the best of your
5  recollection, it was on your initiative,
6  following your discussion with Mr. Dondero,
7  that you had someone draft those two promissory
8  notes; is that correct?
9           MR. MORRIS:  Objection to the form
10     of the question.
11     A.   Yes, we would have – the team, as I
12  stated earlier, we don't draft promissory
13  notes.  "The team" meaning the accounting and
14  finance team.
15          So the team would have worked with
16  the legal group at Highland to draft any notes.
17     Q.   Do you believe or do you have any
18  recollection as to whether you would have done
19  that pursuant to an email or telephone call or
20  in-person meeting?
21          MR. MORRIS:  Objection to the form
22     of the question.
23     A.   Are you asking if I would have – if
24  those notes would have been drafted pursuant to
25  an email or phone call?

Page 291

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2      Q.   Strike that.
3          Do you recall whether you sent an
4  email to anyone asking them to draft those two
5  promissory notes?
6      A.   I don't recall because, again,
7  once – I would have instructed – likely
8  instructed the team to – to work with the
9  legal group to draft these documents.
10          I – I – I – yeah, I didn't – I
11  mean, that is more an operational-type
12  procedure.  So, you know, a manager or a
13  controller or working with legal.  You know,
14  they – they can certainly handle that task to
15  get that – you know, to request that from
16  legal.
17     Q.   And who on your team do you think
18  you would have asked to do that?
19          MR. MORRIS:  Objection –
20     Q.   Who would have been the logical
21  person or people, if you don't remember their
22  name today?
23          MR. MORRIS:  Objection to the form
24     of the question.
25     A.   It – it – there is only two

Page 292

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  managers of the group.  That would have been
3  Dave Klos or Kristin Hendrix.
4          Dave was the – one of his duties
5  was managing the valuation team, and so he was
6  intimately involved with this process.  So, you
7  know...
8      Q.   Okay.
9      A.   I don't recall specifically but, I
10  mean, my general – you know, I – I – I
11  likely would have talked to Dave first about it
12  versus someone like Kristin who hadn't been
13  intimately involved.
14     Q.   And – and do you have a view as to
15  whether it is most likely that you would have
16  done that by email or in-person or how would
17  you believe you would have communicated that to
18  Mr. Klos?
19          MR. MORRIS:  Objection to the form
20     of the question.
21     A.   I likely would have done that in
22  person.  Again, if things of that nature
23  that – again, you have to put ourselves back
24  to, we have been working on this very stressful
25  project for many, many months.  And once the

Page 293

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2  go-ahead was to – you know, we see the light
3  at the end of the tunnel with wrapping this up
4  and making shareholders whole – sorry to say
5  "we" – you know, the – so the folks that are
6  involved in it.
7          I like to talk to people
8  face-to-face and – and – and go to – and go
9  to their desk, because that shows if I'm going
10  to their desk that – that is something that I
11  want done, you know.
12     Q.   And do you remember, Mr. Waterhouse,
13  getting those two promissory notes in paper
14  format or by email before they were executed?
15          MR. MORRIS:  Objection to the form
16     of the question.
17     A.   I don't recall.
18     Q.   For whatever was the ordinary course
19  back then in May 2019, would you expect to have
20  received them only on paper or would you have
21  expected to have received them in Word document
22  or PDF document by email?
23          MR. MORRIS:  Objection to the form
24     of the question.
25     A.   I – I didn't sign – I signed very

Appx. 02122

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  few documents via email. I can't say that it
3  never happened, but people either stopped by my
4  office and physically walked in documents for
5  signature that we discussed face-to-face.
6          Or documents were -- if -- if --
7  if -- if -- let's say I wasn't there or I
8  wasn't available, documents were dropped off.
9  I had -- I had some in- and outboxes in front
10 of my -- my office there at the Crescent.
11         Documents would be dropped off for
12 signature. There would be a cover sheet that
13 would be -- have been applied to those
14 documents detailing, you know, who dropped it
15 off, the purpose, why, what time.
16         And then, you know, as I stated, I
17 don't draft documents and I always go to the
18 legal group and the compliance group to make
19 sure that they're in the loop. And there is
20 a -- a box or section that says, Has legal
21 reviewed or approved, or something to that
22 nature.
23         Again, I don't -- I don't have
24 access to that cover sheet anymore, but it
25 was -- it was something to that effect.

1  WATERHOUSE - 10-19-21
2          And my assistant, you know, if she
3  was there, she would review that -- you know,
4  whatever was being dropped off. And if that
5  has legal, you know, reviewed or -- reviewed or
6  approved it, if that wasn't -- if that stuff
7  hadn't been done, it was like she would just
8  tell them like, go -- go -- go to the legal
9  group, because --
10     Q.   Let me -- let me pause --
11         MS. DANDENEAU:  Let him finish.
12         MR. MORRIS:  Thank you. Go ahead.
13     A.   I take -- go to the legal group
14 because that -- that was my -- you know, I
15 didn't -- I didn't review anything that -- that
16 they weren't -- you know, or there wasn't some
17 representation made to me that they had
18 reviewed, approved in some capacity.
19         Again, my -- my -- my goal, as CFO,
20 is to provide transparency and make sure that
21 groups like compliance and other things -- and
22 the other group in legal are -- are in -- you
23 know, their -- they're made aware of
24 transactions of -- you know, that are crossing
25 my desk.

1  WATERHOUSE - 10-19-21
2          Because I'm not in every
3  conversation. They're not in every
4  conversation -- meaning legal compliance -- and
5  I just want to make sure that -- that everyone
6  is in sync to, you know, to -- to the extent
7  possible.
8      Q.   So if we summarize, you don't
9  specifically remember signing these two notes,
10 but most likely it would have been that they
11 would have presented -- been presented to you
12 physically on paper?
13         MR. MORRIS:  Objection to the form
14 of the question.
15     A.   They would -- they would have been
16 presented physically on paper most likely or
17 someone would have left it. But, I mean,
18 again, I don't -- I don't recall.
19     Q.   I understand. Understand.
20         When you signed -- when you signed
21 documents, when you personally signed
22 documents, did you typically use a ink pen or
23 did you use a stamp?
24     A.   No, I -- I -- I use a -- an -- an
25 ink pen.

1  WATERHOUSE - 10-19-21
2      Q.   Do you know -- was there a file at
3  Highland kept anywhere with ink-signed
4  originals of a promissory notes in general or
5  these two promissory notes specifically?
6          MR. MORRIS:  Objection to the form
7  of the question.
8      A.   Sorry, I just want to make sure I
9  understand your question. Are you saying is
10 there a file somewhere that has ink-signed
11 originals of these two promissory notes?
12     Q.   Yes.
13     A.   I would -- I would assume they're
14 some place. I mean --
15     Q.   Well, was there a -- was there a
16 place where Highland generally kept originals
17 of promissory notes owed to it?
18     A.   I wouldn't -- no.
19         MR. RUKAVINA:  Mr. Nguyen, would you
20 please pull up my A7, alpha 7.
21     Q.   These are the two promissory notes,
22 Mr. Waterhouse.
23         (Exhibit A7 marked.)
24     Q.   And please -- Mr. Waterhouse, please
25 command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

1    to, but I want you to take a very close look at
2    your two signatures here and tell me whether
3    you believe, in fact, that you ink signed them
4    or whether you --
5        MS. DANDENEAU:  Mr. Rukavina,
6        Mr. Waterhouse has the copies.
7        MR. RUKAVINA:  Perfect.  Then you
8        can take this down, Mr. Nguyen.
9        A.   These -- these -- these signatures
10   are identical, now that I stare at them, and I
11   mean, they are so close -- I mean, they're
12   identical that, I mean, even with my chicken
13   scratch signature, I don't know if I can -- you
14   know, I do this 100 times, could I do that
15   as -- as precisely as I see between the two
16   notes.
17       Q.   Well, that is why I ask.
18   Mr. Waterhouse, now that you have examined
19   them, does it seem like it is more likely that
20   you actually electronically signed these?
21       MR. MORRIS:  Objection to the form
22       of the question.
23       A.   Is -- I don't -- I don't recall
24   specifically.  As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1    did have a -- an electronic signature, and that
2    was used from time to time.  It wasn't as
3    common practice back in 2019.  It definitely
4    was more common practice when we had to work
5    from home and remotely for COVID because it
6    that made it almost impossible to, right,
7    provide wet signatures since we're all working
8    from home remotely.
9        Q.   Well, going just for these two
10   promissory notes, Mr. Waterhouse, in light of
11   your inability to remember any details, are you
12   sure you actually signed either or both of
13   those notes?
14       MS. DANDENEAU:  Objection to form.
15       A.   I don't recall specifically
16   signing -- actually physically signing these
17   notes.  As I said before, I don't recall doing
18   that.  This -- this looks like my signature,
19   but yet these two signatures are identical.
20       Q.   So you don't recall physically
21   signing them, and I take it you don't recall
22   electronically signing them either?
23       A.   I don't recall.  You know, Highland
24   has all my emails.  If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1    you know, I don't have any of these records is
2    what I'm saying.  I don't have any of those
3    records.
4        Q.   That is why I'm asking you these
5    questions in great detail because I don't have
6    those emails.  I'm trying to -- I'm hoping that
7    you will give me some names or some details so
8    I can go look for more emails, but again, you
9    don't remember any -- any individual, other
10   than Mr. Dondero that we've discussed, you
11   don't remember any individual with whom you
12   discussed these promissory notes prior to their
13   execution?
14       MR. MORRIS:  Objection to the form
15       of the question.
16       A.   I don't recall discussing it with
17   anybody else.
18       Q.   Okay.
19       A.   I mean, prior --
20       Q.   I understand.
21       A.   You know, there was no one else --
22   there was no one else in that meeting that I
23   recall with Mr. Dondero.
24       Q.   Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1    May of 2019 --
2        A.   And -- and from what I recall, and
3    the reason why I was by myself is -- is, you
4    know, I don't -- I don't want to speculate, I'm
5    sorry.
6        Q.   Okay.  We have established that by
7    May of 2019, in your view, the liabilities of
8    HCMFA exceeded its assets; correct?
9        A.   Yeah.  I mean, again, I don't have
10   financial statements in front of me, but I
11   think, if I recall, we'd have to go through the
12   testimony with Mr. Morris, I believe that was
13   the case.
14       Q.   In fact, you will recall that in
15   April of 2019, Mr. Dondero signed a document
16   that extended the demand feature of two prior
17   notes to May 31, 2019.  Do you recall that?
18       MS. DEITSCH-PEREZ:  I think you
19       might -- maybe have the court reporter read
20       that back.  You might have misspoke.
21       (Record read.)
22       MR. RUKAVINA:  And I did misspeak.
23       Q.   I meant to say to May 31, 2021.  Do
24   you recall that, sir?

Page 302

```
1        WATERHOUSE - 10-19-21
2        MR. MORRIS:  Objection to the form
3    of the question.
4        A.   Yes.
5        MR. RUKAVINA:  And, Mr. Nguyen, just
6    so that the record is clear, will you please
7    pull up my Exhibit Alpha 10, A10.
8        (Exhibit A10 marked.)
9        Q.   You don't have this one in front of
10   you, Mr. Waterhouse?  This is the one that
11   Mr. Morris used earlier.  Do you see that
12   document, sir?
13       A.   Yes, I do.
14       Q.   And this is what you were testifying
15   about before when Mr. Morris was asking you.
16   Do you remember that?
17       A.   Yes.
18       Q.   So here is my question for you,
19   Mr. Waterhouse:  As the chief financial officer
20   of Highland, was it prudent for Highland less
21   than three weeks later to be lending
22   $7.2 million to an insolvent entity that
23   couldn't even then pay its debts back to
24   Highland?
25       MS. DANDENEAU:  Objection to form.
```

Page 303

```
1        WATERHOUSE - 10-19-21
2        MR. MORRIS:  Objection to the form
3    of the question.
4        A.   Sorry, I just want to make sure --
5    are you asking me, did you say, was it prudent
6    for Highland to loan $7.4 million to HCMFA a
7    few weeks after this document was executed?
8        Q.   Yes, and at a time when HCMFA's
9    liabilities exceeded its assets.
10       MR. MORRIS:  Objection to the form
11   of the question.
12       A.   I don't -- it is odd.  I don't know.
13       MR. RUKAVINA:  You can take this
14   exhibit down, Mr. Nguyen.
15       Q.   Do you recall asking anyone,
16   Mr. Dondero or -- or anyone outside as to
17   whether Highland ought to be lending
18   $7.4 million to HCMF regarding HCMF's
19   creditworthiness?
20       MR. MORRIS:  Objection to the form
21   of the question.
22       A.   I don't recall.
23       Q.   Did you receive personally any of
24   that $7.4 million?
25       A.   No.
```

Page 304

```
1        WATERHOUSE - 10-19-21
2        Q.   Did you even --
3        MR. MORRIS:  I didn't hear that
4    question, sir.
5        MR. RUKAVINA:  The one that he
6    answered, John, or my new one?
7        MR. MORRIS:  No, no, your question,
8    Davor.
9        MR. RUKAVINA:  I had asked him
10   whether he received any of the
11   $7.4 million.  He said no.
12       MR. MORRIS:  Yeah.  I thought there
13   was a question after that.  Maybe I was
14   mistaken.  I apologize.
15       MR. RUKAVINA:  I had started a new
16   question, so here, let me start the new
17   question again.
18       Q.   Did you personally receive any
19   direct benefit from those two notes for
20   $7.4 million?
21       A.   No.
22       Q.   Did you ever personally consider
23   yourself obligated to repay either or both of
24   those notes?
25       A.   No.
```

Page 305

```
1        WATERHOUSE - 10-19-21
2        MR. RUKAVINA:  Pull up those notes
3    again, Mr. Nguyen.
4        Q.   You can have them in front of you,
5    Exhibit 7, Mr. Waterhouse, whatever is easier
6    for you.  If you go to your signature page, my
7    question to you is, why did you not include
8    your title as treasurer by your name, Frank
9    Waterhouse?
10       MS. DANDENEAU:  Objection to form.
11       A.   I didn't -- I didn't draft this
12   document.
13       Q.   So you relied on whoever drafted it
14   to draft it correctly?
15       A.   Yes.
16       Q.   Okay.  But back then when you signed
17   this, did it ever cross your mind that you were
18   the maker on these notes?
19       A.   No.
20       Q.   Back then when you signed this
21   document, did it ever cross your mind that you
22   could be a co-obligor on these notes?
23       A.   No.  I didn't receive $7.4 million,
24   I mean...
25       Q.   But can you say that HCMFA received
```

WATERHOUSE - 10-19-21

1   $7.4 million?
2      A.   I would have to go back and look and
3   check in, you know, the -- the financial
4   records and the bank statements.
5        MR. RUKAVINA:  You can take this
6   exhibit down, Mr. Nguyen.
7      Q.   Mr. Waterhouse, I'm not trying to be
8   a smart-ass, but if the law says that because
9   of the way that you signed this promissory
10  note, if that is what the law says, that that
11  made you personally -- personally liable, then
12  you would agree with me that that was never
13  your intent?
14       MR. MORRIS:  Objection to the form
15    of the question.
16     A.   That was never -- I wouldn't sign a
17  note and not get consideration in return.
18     Q.   So putting all other issues aside,
19  if the law -- if the law says that you were
20  liable for those notes because of how you
21  signed them, then would you agree with me that
22  these notes are a mistake?
23       MR. MORRIS:  Objection to the form
24    of the question.

WATERHOUSE - 10-19-21

1        MS. DANDENEAU:  Objection to the
2     form.
3      A.   Yes.
4      Q.   So do you agree with me that it's
5   odd -- I think that is the word you used --
6   that Highland would be loaning $7.4 million a
7   few weeks after that extension to an entity
8   whose liabilities exceeded its assets, and you
9   would agree with me that it was never your
10  intention to be in any way liable for these two
11  promissory notes; correct?
12       MR. MORRIS:  Objection to the form
13    of the question.
14     A.   Sorry, you -- you asked a lot there.
15       MR. RUKAVINA:  I will strike it and
16  I will move on.
17       Let's go to -- pull up Exhibit 9,
18  please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19  9, A9.
20       (Exhibit A9 marked.)
21     Q.   Sir, take a moment to look at this,
22  but this is an email, and you will see attached
23  July 31, 2020 affiliate notes.
24       Do you see that attachment?

WATERHOUSE - 10-19-21

1      A.   Yes.
2      Q.   Okay.  And do you see an entry for
3   Highland Capital Management Fund Advisors?
4        MR. MORRIS:  I'm sorry, hold on.
5   Where are you looking?
6        MR. RUKAVINA:  Last page, John.
7        MR. MORRIS:  Is it the page on the
8   screen?
9        MR. RUKAVINA:  Oh, I'm sorry.
10  Mr. Nguyen just did it.  Yes, the last page
11  there.
12       MR. MORRIS:  Thank you.
13     Q.   Do you see an entry there for HCMFA?
14     A.   Yes.
15     Q.   About $10.5 million.
16       Do you see that?
17     A.   I do.
18     Q.   And, now, do you have any
19  explanation for why if HCMFA owed $7.4 million,
20  plus the 5.3 million that had been extended,
21  why that amount was only 10.5 million?
22     A.   I don't know.  Okay.
23       MR. RUKAVINA:  Close this one and
24  pull up, Mr. Nguyen, the schedules,

WATERHOUSE - 10-19-21

1   schedule of assets.  What exhibit is this
2   of ours, Mr. Nguyen?
3        MR. NGUYEN:  This is A11.
4        MR. RUKAVINA:  Oh, this will be A11.
5        (Exhibit A11 marked.)
6      Q.   You don't have this in front of you,
7   Mr. Waterhouse?
8      A.   Okay.
9      Q.   This is what Mr. Morris used
10  earlier.  Do you remember looking at this with
11  Mr. Morris?
12     A.   Yes.
13       MR. RUKAVINA:  You might have to
14  zoom in a little.  Okay.
15     Q.   Now, I see Affiliate Note A, B, and
16  C.
17       Do you have any recollection as to
18  why the names of the affiliates are omitted?
19     A.   I don't.  I testified earlier that,
20  you know, the team worked with DSI in providing
21  these.  I -- I don't -- I don't know.
22     Q.   Can we deduce -- is it logical to
23  deduce that Affiliate Note A would be NexPoint
24  given its size of $24.5 million?

Page 310

```
1          WATERHOUSE - 10-19-21
2          MR. MORRIS:  Objection to the form
3    of the question.
4      A.   I mean, it -- it is a -- it is -- it
5    is approximate.
6      Q.   Well, can we -- can we deduce -- or,
7    I'm sorry, strike that.
8          Can you, sitting here today,
9    logically conclude that Affiliate Note B or C
10   represents HCMFA?
11         MR. MORRIS:  Objection to the form
12   of the question.
13     A.   I don't know.  I don't know.  I
14   can't.
15     Q.   Okay.  As of the petition date, we
16   have established that HCMFA, under promissory
17   notes, owed $7.4 million and $5.3 million to
18   the debtor; correct?
19         MR. MORRIS:  Objection to the form
20   of the question.
21     A.   Yes.
22     Q.   Okay.  And by my reckoning, that
23   would be somewhere approaching $13 million.
24         MR. MORRIS:  Objection to the form
25   of the question.
```

Page 311

```
1          WATERHOUSE - 10-19-21
2      Q.   It would be $12.7 million.  Is that
3    generally correct?
4      A.   Sorry, the amounts were 7.4, 5.3.
5      Q.   Yes.
6      A.   Okay.  Yeah, that -- that -- I can
7    do that math, yes.
8      Q.   Do you have any explanation or any
9    understanding of why there is no similar entry
10   listed here on the schedule of assets filed
11   with the bankruptcy court?
12         MR. MORRIS:  Objection to the form
13   of the question.
14     A.   I don't know.  We have to look at
15   the supporting schedules, like I talked about
16   other -- presumably there is -- there is a
17   build to the schedule that would provide the
18   detail.
19     Q.   Well, that was going to be my next
20   question.  You anticipated it.
21         MR. RUKAVINA:  You can -- you can
22   take this down, Mr. Nguyen.
23     Q.   Do you believe that whenever you and
24   your team provided the underlying data to the
25   financial advisor that the actual names of the
```

Page 312

```
1          WATERHOUSE - 10-19-21
2    affiliates for Affiliate Note A, B, and C would
3    have been listed there?
4      A.   Are you asking we provided the names
5    to the financial advisor?  I don't -- I don't
6    understand who the financial advisor is.
7      Q.   I'm sorry, DSI.
8          Let me ask the question this way,
9    Mr. Waterhouse.
10         Whenever you provided information
11   about the affiliate notes to DSI, do you
12   believe that you would have included the actual
13   names of the affiliates, you or your team, or
14   that you would have done the Affiliate Note A,
15   Note B, Note C?
16         MR. MORRIS:  Objection to the form
17   of the question.
18         MS. DANDENEAU:  Objection to the
19   form.
20     A.   We -- like I testified earlier, when
21   we were -- we gave everything to -- to DSI.  We
22   were giving all of our records, all of our
23   files, everything to DSI.  We weren't redacting
24   information or saying, hey, here is a note,
25   here is Affiliate Note A or B.
```

Page 313

```
1          WATERHOUSE - 10-19-21
2          I mean, it was -- our job and our
3    focus -- and I testified in court back in 2019;
4    right -- was -- was to be transparent and, you
5    know, get DSI up to speed on -- on the matters
6    at Highland.  So I can't see us redacting for
7    that point.
8          MR. RUKAVINA:  Mr. Nguyen, will you
9    please pull up Mr. Morris' Exhibit 36.
10         Just the very first page, the very top
11   email.  You might zoom in a little bit.
12     Q.   Now, you recall being asked about
13   this by Mr. Morris?
14     A.   Yes, I do.
15     Q.   And you wrote:  The HCMFA note is a
16   demand note.
17         You wrote that; right?
18     A.   Yes.
19     Q.   And, in fact, weren't there by that
20   point in time several notes?
21     A.   Yes, there were.  Again, I don't --
22   I don't remember everything specifically.  I
23   mean --
24     Q.   I understand.  I understand.
25         So this is an example where -- where
```

**Appx. 02127**

Page 314

WATERHOUSE - 10-19-21

1 you might have made a mistake by referring to a
2 singular instead of a plural; right?
3     A.   Yes.
4     Q.   Okay.  And you -- you wrote -- a
5 couple of sentences later, you wrote:  There
6 was an agreement between HCMLP and HCMFA the
7 earliest they could demand is May 2021.
8         You wrote that; right?
9     A.   Yes.
10    Q.   But I think you -- you agreed with
11 Mr. Morris that that can't possibly apply to
12 the May 2019 notes, can it?
13        MR. MORRIS:  Objection to the form
14    of the question.  That is not what he
15    testified to.
16    Q.   Let me ask -- let me ask a different
17 question.
18        Sitting here today -- or if you can
19 answer me from your memory on October 6,
20 2020 -- did the April acknowledgment that
21 extended the maturity date apply to the
22 May 2019 notes also?
23    A.   I don't recall specifically.
24    Q.   Well, you recall that the notes that

Page 315

WATERHOUSE - 10-19-21

1 you signed were demand notes; right?
2     A.   Yes.
3     Q.   Do you find it logical, based on
4 your experience, that had they intended to have
5 a different or a set maturity date, you would
6 have instructed that that set maturity date be
7 included instead of a demand feature?
8         MR. MORRIS:  Objection to the form
9     of the question.
10    A.   Sorry, just want to make sure I
11 understand.  You are saying that -- that the
12 $5 million note, the $2.4 million note, if
13 those were supposed to be a term note, that I
14 would have made sure that those were a term
15 note?
16    Q.   I'm saying -- I'm saying,
17 Mr. Waterhouse, that on May the 2nd and May the
18 3rd, 2019, if you intended that those two
19 promissory notes could not be called until May
20 2021, would you have included such language in
21 those two promissory notes?
22        MR. MORRIS:  Objection to the form
23    of the question.
24    A.   I guess -- I'm sorry, I don't recall

Page 316

WATERHOUSE - 10-19-21

1 putting language in those May notes.  I don't
2 remember what language you are referring to.
3     Q.   Well, let's read this again.
4         There was an agreement between HCMLP
5 and HCMFA the earliest they could demand is May
6 2021.
7         Do you recall that agreement?
8     A.   Yes, that was the agreement we
9 looked at earlier; correct?
10    Q.   Okay.  Yes.
11        Do you -- do you understand now that
12 that agreement that we looked at earlier also
13 applied to the May 2019 notes that you signed?
14    A.   I don't -- I don't know.
15    Q.   But as of October 6, 2020, you're
16 writing that there is one demand note and
17 you're categorizing that demand note as not
18 being demandable on May 2021; correct?
19    A.   Yes.
20    Q.   And you know now that you made at
21 least one mistake in this email; correct?
22        MR. MORRIS:  Objection to the form
23    of the question.
24    A.   Yes.

Page 317

WATERHOUSE - 10-19-21

1         MR. RUKAVINA:  You can pull this
2     down, Mr. Nguyen.
3     Q.   So, Mr. Waterhouse, you don't
4 remember Mr. Dondero telling you to make these
5 loans or not.  HCMLP was loaning $7.4 million
6 to someone that their assets were less than
7 their liabilities.
8         We don't see on the July list of
9 notes, where there is $12.7 million of notes,
10 we don't see that on the bankruptcy schedules,
11 and we have this Exhibit 36 where you are
12 confused.
13        Are you prepared to tell me, sir,
14 today that you might have made a mistake in
15 executing those two promissory notes?
16        MR. MORRIS:  Objection to the form
17    of the question.
18    A.   I -- I don't know.
19    Q.   And if it turns out that you're
20 personally liable for those promissory notes,
21 it would certainly be a mistake, wouldn't it?
22        MS. DANDENEAU:  Objection to the
23    form.
24        MR. MORRIS:  Join.

Page 318

```
1          WATERHOUSE - 10-19-21
2     A.   Yes.
3     Q.   If Mr. Dondero testifies that he
4  never told you to make these loans, would you
5  disagree with his testimony?
6          MR. MORRIS:  Objection to the form
7     of the question.
8     A.   Like I testified earlier with my
9  conversation with Mr. Dondero, all I recall is
10 he said, get the money from Highland.
11    Q.   And if Mr. Dondero testifies that
12 he, in consultation with other senior personnel
13 at Highland, decided that Highland needed to
14 pay HCMFA $7.4 million as compensation for the
15 NAV error and not a loan, would you have any
16 reason to disagree with Mr. Dondero?
17         MR. MORRIS:  Objection to the form
18    of the question.
19    A.   If that was -- if that was his
20 intent, yes, it would -- I would --
21    Q.   Do you have any reason to disagree
22 with him?
23         MR. MORRIS:  Objection to the form
24    of the question.
25    A.   If that was his intent, I don't
```

Page 319

```
1          WATERHOUSE - 10-19-21
2  know.  I don't know how I disagree with that.
3     Q.   And just to confirm, you don't
4  remember ever asking Mr. Dondero whether you
5  should have two promissory notes prepared?
6     A.   No.
7     Q.   And you don't remember discussing
8  with Mr. Dondero what the terms of those two
9  promissory notes should be?
10    A.   I don't recall -- I testified all I
11 recall is he said, get the money from Highland.
12 I don't -- the -- the terms of the note, I
13 don't recall ever having a discussion around
14 the terms of the note, but since I don't draft
15 the notes, that -- there could have been a
16 conversation with other people later.
17    Q.   Do you have any memory of whether
18 after the notes were drafted, but before you
19 signed them, that you communicated with
20 Mr. Dondero in any way to just confirm or -- or
21 get his blessing or ratification to signing
22 those notes?
23         MR. MORRIS:  Objection to the form
24    of the question.
25    A.   I don't recall.
```

Page 320

```
1          WATERHOUSE - 10-19-21
2     Q.   Again, the only thing you remember,
3  sitting here today, was Mr. Dondero said, get
4  the money from Highland, and that is it, that
5  is all you remember?
6          MR. MORRIS:  Objection to the form
7     of the question.
8     A.   I testified to that several times.
9  This was over two years ago.  A lot has
10 happened.  That is all I recall.
11    Q.   And help me here.  I'm not very
12 technologically astute.  When you -- and I -- I
13 recognize that you do it rarely, but when you
14 sign a document electronically, do you believe
15 that there is an electronic record of you
16 having authorized or signed a document
17 electronically?
18         MR. MORRIS:  Objection to the form
19    of the question.
20    A.   I -- I don't know the tech answer to
21 that, but, you know, since I don't have -- I
22 don't ever attach my signature block would have done
23 electronically, my assistant would have done
24 that, and if that is done over email like we
25 did several times -- you know, multiple,
```

Page 321

```
1          WATERHOUSE - 10-19-21
2  multiple times over COVID, she would attach my
3  signature block and then email it out to
4  whatever party.
5     Q.   What was your assistant's name in
6  May 2019?
7     A.   It was Naomi Chisum.
8     Q.   Is she the only one?  I'm sorry, was
9  she your only assistant that would have maybe
10 facilitated logistically something like you
11 just described?
12    A.   You know, she was out on maternity
13 leave at some point.  I don't -- I don't recall
14 those dates where she was out for maternity
15 leave.  There was -- there were folks backing
16 her up.  I don't recall specifically who
17 those -- who those, you know, administrative
18 assistants were, and I don't recall
19 specifically if she was out during this time on
20 maternity leave.
21         I do know that that she was out for
22 a period of time, or who knows, or she could
23 have been on vacation that day or, you know, I
24 don't know.
25    Q.   Switching gears now, the two
```

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2   complaints that have been filed that is against
3   HCMFA and NexPoint, did you see any drafts of
4   those complaints before they were filed?
5        MR. MORRIS:  Objection to the form
6        of the question, and to the extent that you
7        had any communications with counsel or you
8        were shown drafts of the complaints by
9        counsel while you were employed by
10       Highland, I direct you not to answer.
11       A.   I – I reviewed documents yesterday
12   with counsel here.  I believe that is the first
13   time I have ever seen those.
14       Q.   Okay.  Did you ever discuss with
15   Mr. Seery these two lawsuits before or after
16   they were filed?
17       A.   I don't recall.
18       Q.   Were you ever interviewed by legal
19   counsel, to your knowledge, about these
20   promissory notes before the complaints were
21   filed?  Without going into what was said, were
22   you ever interviewed by legal counsel?
23       MR. MORRIS:  Objection to the form
24       of the question.
25       A.   I don't recall.

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       Q.   Obviously with COVID, it changed,
3   but – but before COVID, did you used to meet
4   with Mr. Seery from time to time in-person?
5       A.   Yeah, I mean, so before COVID – so
6   we're talking kind of late March, early April,
7   right, there was about – I don't remember the
8   specific date when the board for Highland was
9   appointed.  I believe it was around February of
10  2020, so maybe there was a month-and-a-half,
11  two-month window where we were meeting
12  in-person or, you know, like we were actually
13  in the office, excuse me, we were in the
14  office.
15       And, you know, when they were first
16  appointed, the board members and Mr. Seery
17  were – were definitely down here more
18  in-person.
19       Q.   Did you ever see Mr. Seery taking
20  written notes of – of his meetings with you or
21  others?
22       A.   I don't recall.
23       Q.   Do you recall on any Zoom or video
24  conference with Mr. Seery, seeing him take
25  notes, written notes?

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       A.   The Zoom calls we had, I don't
3   recall having seen video or, you know, or if it
4   was on Zoom, I just remember it being – well,
5   no, you know what, there were some – you know,
6   I take that back.
7       So there were – there were some
8   times that I did remember seeing Mr. Seery
9   on – on some of the Zoom calls.
10       Q.   Well, let me –
11       A.   I don't – sorry, I'm thinking.  I'm
12  thinking – I'm going back.  I'm trying to
13  process this.
14       Q.   I can make it much quicker,
15  Mr. Waterhouse.  I have heard – I have heard
16  that Mr. Seery is a copious note taker.
17       Do you have any knowledge about
18  that?
19       A.   No.
20       Q.   Okay.  Switching gears yet again,
21  and this will be last theme.  Do you need a
22  restroom break, or are you good to go for
23  another half an hour?
24       MS. DEITSCH-PEREZ:  I need a
25       restroom break.

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       MR. RUKAVINA:  Can we make it five
3   minutes?
4       THE WITNESS:  Five minutes would be
5   great.
6       VIDEOGRAPHER:  We're going off the
7   record at 5:53 p.m.
8   (Recess taken 5:53 p.m. to 5:59 p.m.)
9       VIDEOGRAPHER:  We are back on the
10  record at 5:59 p.m.
11       Q.   Mr. Waterhouse, I had asked you
12  earlier about contracts between HCMFA and the
13  debtor, and now I'm going to talk about
14  contracts between the debtor and NexPoint
15  Advisors.  Okay?
16       A.   Okay.
17       Q.   Now, were there contracts similar to
18  the ones with HCMFA that NexPoint had in the
19  nature of employee reimbursement and shared
20  services?
21       A.   Yes, they – NexPoint Advisors and
22  Highland Capital Management Fund Advisors had
23  cost reimbursement and shared services
24  agreements with Highland Capital Management,
25  L.P.

Page 326

WATERHOUSE - 10-19-21

1
2    Q.   And was that shared services
3    agreement, to the best of your understanding,
4    in place as of December 31, 2020?
5        A.   It was – it was terminated at some
6    point, and I remember the contracts had
7    different termination dates, but I think the –
8    the date of termination was January 31st of
9    2021, after the termination was put in.
10       So yeah, it would be in place at the
11   end of the year of December – it would be in
12   place at December 31st, 2020.
13       Q.   And pursuant to that agreement as of
14   December 31st, 2020, was the debtor providing
15   what you would describe as back office services
16   to NexPoint?
17       A.   Yes.
18       Q.   Would those have included accounting
19   services?
20       A.   Yes.
21       Q.   And as part of those accounting
22   services, would the debtor have assisted
23   NexPoint with paying its bills?
24       MR. MORRIS:  Objection to the form
25   of the question.

Page 327

WATERHOUSE - 10-19-21

1
2    A.   Yes.
3        Q.   So let's break that up.  You were a
4    treasurer of NexPoint as well in December of
5    2020?
6        MR. MORRIS:  Objection to the form
7    of the question.
8        A.   Yes.
9        Q.   Okay.  And in December of 2020, did
10   NexPoint have its own bank accounts?
11       A.   Yes.
12       Q.   And did it use those bank accounts
13   to pay various of its obligations?
14       A.   Yes.
15       Q.   Did employees of the debtor have the
16   ability to cause transfers to be made from
17   those bank accounts on behalf of NexPoint?
18       A.   Yes.
19       Q.   And is that one of services that the
20   debtor provided NexPoint, basically ensuring
21   that accounts payable and other obligations
22   would be paid?
23       A.   Yes.
24       MR. MORRIS:  Objection to the form
25   of the question.

Page 328

WATERHOUSE - 10-19-21

1
2    Q.   You answered yes?
3        A.   Yes.
4        Q.   And the payments, though, whose
5    funds would they be made from?
6        A.   From the bank account of NexPoint
7    Advisors.  If they were NexPoint advisor
8    obligations, it would be made from NexPoint
9    Advisors' bank account.
10       Q.   So let's pull up Exhibit Alpha 1.
11   You should have that – it is my Tab 1 or my
12   Exhibit 1.
13       (Exhibit A1 marked.)
14       Q.   So this is a – this is a series of
15   emails, Mr. Waterhouse.  Let's look at the
16   first page here, November 25, 2020, between
17   Kristin Hendrix and yourself.
18       Do you see that, sir?
19       A.   I do.
20       Q.   And do you see where Ms. Hendrix
21   writes:  NPA.
22       Do you know what NPA stood for?
23       A.   Yes.
24       Q.   And what does it stand for?
25       A.   NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1
2    Q.   And was that how you-all internally
3    at Highland refer to NexPoint Advisors, L.P.?
4        A.   I mean, yes, amongst other things.
5        Q.   And she writes at the bottom of her
6    email:  Okay to release?
7        Do you see that?
8        A.   Yes, I do.
9        Q.   So what –
10       MR. MORRIS:  Hold on one second.
11       Okay.  Go ahead.
12       MR. RUKAVINA:  Yeah.
13       Q.   So what is – what is Ms. Hendrix
14   here on November 25 asking of you?
15       A.   She is asking me – so she – these
16   are – these are payments – typically we would
17   do an accounts payable run every week at the
18   end of every Friday.  But looking at this date,
19   it is Wednesday, November 25th, which means, to
20   me, it is likely Thanksgiving weekend.
21       So this is the day before
22   Thanksgiving, so this is the last kind of –
23   kind of day before the holidays and vacation
24   and things of that nature.  So it is
25   effectively the Friday of that week.

**Appx. 02131**

Page 330

```
1        WATERHOUSE - 10-19-21
2        So she is – she is putting in all
3   the payments for the week because we batch
4   payments weekly.  And these are the payments
5   that go out that week, and she is informing me
6   of the payments and – you know, again, at the
7   bottom of the email, she is asking for my okay
8   to – to release these payments in the wire
9   system.
10       Q.   So these would be accounts payable
11  of NexPoint?
12       A.   I mean, it would be accounts payable
13  for all of these entities listed on this email.
14       Q.   And who was Ms. Hendrix employed by
15  in November and December of 2020?
16       A.   Highland Capital Management.
17       Q.   Okay.  So – so part of the services
18  that NexPoint had contracted with was for
19  Highland to ensure that NexPoint timely paid
20  its accounts payable; is that accurate?
21       MR. MORRIS:  Objection to the form
22  of the question.  You have got to be
23  kidding me.
24       Q.   Is that accurate?
25       A.   Yes.
```

Page 331

```
1        WATERHOUSE - 10-19-21
2        Q.   And did NexPoint rely on employees
3   of the debtor to ensure that NexPoint's
4   accounts payable were timely paid?
5        MR. MORRIS:  Objection to the form
6   of the question.
7        A.   Yes.
8        MR. RUKAVINA:  Let's flip to the
9   next page, Mr. Nguyen, if you will please
10  scroll to the next page.
11       Q.   So this is an email similar to the
12  prior one, November 30th.
13       Do you see where it says, NPA HCMFA,
14  USD $325,000 one-day loan?
15       Do you see that, sir?
16       A.   I do.
17       Q.   Do you have any memory of what that
18  was?
19       A.   I don't recall what that – what
20  that payment was for.
21       Q.   Did it sometimes occur that one
22  advisor would, on very short-terms, make loans
23  to another advisor?
24       A.   Yes.  This – this – this occurred
25  from – from – from time to time.  It actually
```

Page 332

```
1        WATERHOUSE - 10-19-21
2   looking at – I'm – I'm looking at the date of
3   this email.  It is November 30th.  It is the
4   last day of the month.
5        HCMFA has obligations it needs to
6   pay to its broker-dealer, which is HCFD.  And
7   it likely was short funds to make those
8   obligations under that – under its agreement,
9   and so it provided a one-day loan because on
10  the next business day on 12/1 – or the next
11  business day in December, it would receive
12  management fees from the underlying funds that
13  it managed and it would be able to pay back
14  that loan to NexPoint Advisors.
15       Q.   So – so here Ms. Hendrix was
16  seeking your approval to transfer $325,000 from
17  NexPoint to HCMFA for a one-day loan; is that
18  correct?
19       A.   That is correct.
20       Q.   Let's flip to the next page, sir.
21       MR. RUKAVINA:  And, Mr. Nguyen, if
22  you will please scroll down.
23       Q.   Now we have an entry for
24  $325,000, 11/30 loan payment.
25       Do you see that, sir?
```

Page 333

```
1        WATERHOUSE - 10-19-21
2        A.   Yes.
3        Q.   And that is probably the loan that
4   was approved on the prior page?
5        A.   Yes, most likely.
6        Q.   So is it also true, sir, that in
7   addition to accounts payable debtor employees
8   would be assisting NexPoint with respect to
9   paying back its debt?
10       MR. MORRIS:  Objection to the form
11  of the question.
12       A.   I mean, yes, for loans of this
13  nature, yes.
14       Q.   Well, what about long term loans?
15  Was it reasonable for NexPoint to expect debtor
16  employees to ensure that NexPoint timely paid
17  its obligations under long-term notes?
18       MR. MORRIS:  Objection to the form
19  of the question.
20       MS. DANDENEAU:  Objection to form.
21       A.   I mean, that is one of the things
22  that the Highland personnel did provide to the
23  advisors.  Yes, we would – we would – over
24  the years, yes, we – we – we – we did do
25  that generally.  Again, I don't remember
```

Page 334

WATERHOUSE - 10-19-21

1  specifically but, yes, generally we -- you
2  know, we did do that.
3      Q.   So do you recall -- and we can pull
4  it up, if need be -- that under the NexPoint
5  note that Mr. Morris asked you about earlier,
6  the one for more than $30 million, that
7  NexPoint was obligated to make an annual
8  payment of principal and interest?
9          MR. MORRIS:  Objection to the form
10     of the question.
11     A.   Yes, it was -- yes, it -- it was an
12  amortizing note.  It was -- you know, from what
13  we reviewed earlier, it was payable by
14  December 31st of each year.  So -- but are --
15  are you asking me --
16     Q.   I'm just asking you, sir, if you
17  recall the note.
18     A.   Yes, the $30 million note, yes, we
19  reviewed it earlier, yes.
20     Q.   And do you recall Mr. Morris had you
21  go through the fact that NexPoint had made
22  payments in years prior to 2020 on that note?
23     A.   I do.
24     Q.   And do you believe that employees of

Page 335

WATERHOUSE - 10-19-21

1  the debtor would have played any role in
2  NexPoint having made those prior payments?
3          MR. MORRIS:  Objection to the form
4      of the question.
5      A.   Yes.
6      Q.   And what role in years prior to 2020
7  would employees of the debtor have had with
8  respect to NexPoint making that annual payment?
9      A.   We -- we -- we would have -- I keep
10  saying "we".  The team would have calculated
11  any amounts due under that loan and other
12  loans, as -- as standard course.
13         We would -- since we provided
14  treasury services to the advisors, we would
15  inform the -- the -- the -- we informed
16  Mr. Dondero of any cash obligations that are
17  forthcoming, whether we do cash projections.
18         If, you know, any of these payments
19  would have -- or, you know, the sum total of
20  all of these payments, including any note
21  payments, if there were any cash shortfalls, we
22  would have informed Mr. Dondero of any cash
23  shortfalls.  We could adequately plan, you
24  know, in instances like that.

Page 336

WATERHOUSE - 10-19-21

1      Or, sorry, we -- I say "we" -- I
2  keep saying "we" -- I keep wearing my -- again,
3  my -- my treasurer hat.
4          But, yes, it is to -- it is to
5  inform Mr. Dondero of the obligations of the
6  advisors in terms of cash and obligations that
7  are -- are upcoming and that -- and that are --
8  are scheduled to be paid.
9      Q.   And would those obligations that are
10  upcoming and scheduled to be paid prior to 2020
11  have incurred the annual payment on that
12  NexPoint $30 million note?
13         MS. DANDENEAU:  Objection to form.
14         MS. DEITSCH-PEREZ:  Davor, I think
15     you misspoke.  You might want to just
16     repeat the question.
17     Q.   Okay.  Let me repeat the question,
18  sir.
19         Prior to 2020, those services that
20  you just described, would that -- on behalf of
21  the debtor, would that have included NexPoint's
22  payments on the $30 million note?
23     A.   Yes.
24     Q.   So someone at the debtor in treasury

Page 337

WATERHOUSE - 10-19-21

1  or accounting would have sent some schedule or
2  a reminder that a payment would be coming due
3  in the future.  Is that generally the practice?
4      A.   Yes, we would -- you know, again, I
5  didn't -- I didn't micromanage the teams, but
6  we had a -- a corporate accounting calendar
7  that we use as kind of a tickler file to keep
8  track of payments.
9          I actually, you know, don't know how
10  actively they're using that in -- in prior to
11  2020, but it was actively used at some point.
12         We did look at NexPoint cash
13  periodically and cash for the other advisors as
14  well and payments.  You know, we -- payments
15  like this would have appeared in our cash
16  projections, in the advisor's cash projections.
17         And, again, as like I said earlier,
18  they would have appeared there, so there would
19  be time to plan for making any of these
20  payments.
21     Q.   And based on your experience, would
22  it have been reasonable for NexPoint to rely on
23  the debtors' employees to inform NexPoint of an
24  upcoming payment due on the $30 million

**Appx. 02133**

WATERHOUSE - 10-19-21

1
2  promissory note?
3      MR. MORRIS:  Objection to form of
4  the question.
5      MS. DANDENEAU:  Objection to form.
6      A.  Yes.  Yes, they did.  I mean, but I
7  mean, but I don't think these -- these notes
8  were any secret to anybody.
9      Q.  I understand, and I'm not suggesting
10  otherwise.
11      MR. RUKAVINA:  Please pull up Alpha
12  2, Mr. Nguyen.
13      (Exhibit A2 marked.)
14      Q.  Now, this document is similar to the
15  ones we've seen before as of December 31, 2020,
16  and I don't see under NTA anything there for
17  paying the promissory note to Highland.
18      Do you see anything like that?
19      A.  I do not.
20      MR. RUKAVINA:  You can pull that --
21  that exhibit down, Mr. Nguyen.
22      Q.  You are aware, of course, by now
23  that, in fact, NexPoint failed to make the
24  payment due December 31, 2020, are you not?
25      A.  I am aware, and yes, I do understand

WATERHOUSE - 10-19-21

1
2  it.
3      Q.  Were you aware that Highland
4  accelerated that $30 million promissory note?
5      A.  I am aware.
6      Q.  Were you aware of that acceleration
7  at the time that it occurred?
8      A.  I don't remember specifically.
9      Q.  Do you recall whether anyone asked
10  you -- prior to the acceleration, anyone asked
11  you at Highland, what Highland should do with
12  respect to the missed payment?
13      A.  Did anyone ask me what Highland
14  should do about the missed payment?
15      Q.  Yes, before acceleration.
16      MR. MORRIS:  Objection to the form
17  of the question.
18      A.  I mean, what -- what I recall is
19  there was the -- sorry, are you asking me --
20      MS. DANDENEAU:  Why don't you just
21  repeat the question, Mr. Rukavina.
22      Q.  Let me try again, Mr. Waterhouse,
23  let me try again.
24      I am saying you're the CFO of
25  someone, in this case, Highland, and the

WATERHOUSE - 10-19-21

1
2  borrower failed to make the required payment.
3  Are you with me so far?
4      A.  I am.
5      Q.  Did anyone then ask you, what should
6  we do with respect to our rights against the
7  borrower that missed the payment?
8      A.  Not that I recall.
9      Q.  Did you play a role in the decision
10  to accelerate that $30 million promissory note?
11      A.  I did not.
12      Q.  Do you recall whether Mr. Seery ever
13  asked you before the acceleration as to whether
14  he should accelerate the note?
15      A.  I don't recall.
16      Q.  And you don't recall when you
17  learned of the acceleration itself?
18      MR. MORRIS:  Objection to the form
19  of that question.
20      A.  It was -- it was sometime in
21  early -- early 2021.  I don't remember
22  specifically.
23      Q.  But do you recall whether it was
24  after the acceleration had already been
25  transmitted?

WATERHOUSE - 10-19-21

1
2      MS. DANDENEAU:  Objection to the
3  form of the question.
4      A.  I don't recall.
5      Q.  Do you recall in early to mid
6  January of 2021, after the default, discussing
7  the default with Mr. Dondero?
8      A.  I do recall discussing with
9  Mr. Dondero after December 31, 2020?
10      Q.  Yes, the fact of the default.
11      A.  I don't recall.
12      MR. RUKAVINA:  Let's pull up my
13  Exhibit 6, Alpha 6.
14      (Exhibit A6 marked.)
15      MR. RUKAVINA:  And, Mr. Nguyen, if
16  you will please scroll down.
17      Q.  This email chain begins with you
18  writing to Ms. Hendrix on January the 12th:
19  NexPoint note to HCMLP.
20      Do you see that, sir?
21      A.  I do.
22      Q.  Were you discussing this same
23  $30 million note we're talking about right now
24  with Ms. Hendrix?
25      A.  Yes.

Page 342

WATERHOUSE - 10-19-21

1
2    Q.   Okay.  Do you recall what prompted
3    you to send that email to her?
4    A.   Yes, I had -- I had a conversation
5    with Jim.
6    Q.   Okay.  And what -- what did you
7    discuss with Jim that led to this email chain?
8    A.   He -- he called me and he said he
9    wanted to make payment on the NexPoint note,
10   and I didn't -- I didn't know the -- the amount
11   offhand, so I reached out to Kristin and got
12   the details and relayed that to him.
13   Q.   And you see you sent that email to
14   her at 11:15 a.m.  Does that help you remember
15   when you had this discussion with Mr. Dondero?
16   In other words, was it that morning or the day
17   before, or can you -- can you --
18   A.   No, it was -- it was that morning.
19   Q.   And do you recall how you had that
20   conversation with him?
21       MR. MORRIS:  Objection to the form
22   of the question.
23   Q.   By telephone, by email, in-person?
24   A.   Yeah, he -- he called me.  I was at
25   home.  We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1
2    December of 2020.  He called me from home.  He
3    said he was in court.  He wanted to -- he asked
4    about, you know, making payment on the note and
5    the amount, and so I didn't have those numbers
6    in front of me, so I said I would get back to
7    him.  I wanted all the details, so here is
8    this -- so I reached out to Kristin.
9    Q.   And then she gave you that
10   $1,406,000 figure?
11       MR. RUKAVINA:  Mr. Nguyen, if you
12   will scroll up, please.
13   A.   Yes.  Yeah, she -- the $1,406,112.
14   Q.   And do you recall whether you
15   conveyed that amount to Mr. Dondero?
16   A.   Yes.  I -- I called him back and
17   gave him -- gave him this amount.
18   Q.   Are you aware of whether NexPoint,
19   in fact, then made that 1 million 406 and
20   change payment?
21   A.   Yes, they did.
22   Q.   Did you discuss with Mr. Dondero at
23   that time, either the first conference or the
24   second conference that day -- strike that.
25       When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1
2    Mr. Dondero, was -- was it also on January
3    12th?
4    A.   Sorry, when I conveyed the
5    $1.4 million number?
6    Q.   Yes.
7    A.   Yes, yes, it was that -- it was --
8    Q.   So you had --
9    A.   It was that point.
10   Q.   Well, to the best of your
11   recollection, you had a conference with
12   Mr. Dondero by the telephone in the morning,
13   and then another conference with him by
14   telephone after 11:40 a.m. that morning?
15   A.   Yeah, I can't remember -- yeah, it
16   was either that morning or it could have been,
17   you know, early afternoon, but again, I
18   remember calling him back, relaying this
19   information to him, and he said, okay, pay --
20   you know, make -- make this payment.
21   Q.   And during either of those two
22   calls, did you tell Mr. Dondero anything to the
23   effect that making those -- I'm sorry, making
24   that payment would not de-accelerate the
25   promissory note?

Page 345

WATERHOUSE - 10-19-21

1
2    A.   No.
3    Q.   Did you tell him anything to the
4    effect that making that payment would not cure
5    the default?
6    A.   No.
7    Q.   Did you discuss that in any way with
8    him?
9    A.   No, I did not.
10   Q.   Did he say why he wanted to have
11   that $1.4 million payment made?
12       MR. MORRIS:  Objection to the form
13   of the question.
14   A.   He -- he -- he didn't go into
15   specifics.
16   Q.   Did he say anything to you to the
17   effect that if NexPoint makes that payment,
18   then the note will be de-accelerated?
19       MR. MORRIS:  Objection to the form
20   of the question.
21   A.   I don't recall.
22       MR. RUKAVINA:  You can put this one
23   down, Mr. Nguyen.
24   Q.   And, again, when you say you don't
25   recall, you mean you don't remember right now

Page 346

WATERHOUSE - 10-19-21

1    either way; correct?
2    A.   Yeah, I don't remember.  I don't
3    remember us discussing that.
4    Q.   Now -- and we're almost done, I
5    promise.  I'm just going to -- I don't know how
6    to ask this question, so I'm just going to try
7    to do my best.
8    Prior to the default on December 31,
9    2020, did Mr. Seery ever tell you any words to
10   the effect that you or someone at Highland
11   should ensure that NexPoint doesn't make its
12   payment?
13   A.   No.
14   Q.   Did you have any hint or any belief
15   that anyone at NexPoint -- I'm sorry, strike
16   that.
17   Did you have any reason to believe
18   that anyone with Highland was actively trying
19   to get NexPoint to make that default by not
20   paying on December 31?
21   MR. MORRIS:  Objection to the form
22   of the question.
23   A.   Are you asking, did any Highland
24   employees actively work to make -- to
25

Page 347

WATERHOUSE - 10-19-21

1    somehow --
2    Q.   Yes.  Let me take a step back.  Let
3    me take a step back.
4    So you are aware now that as a
5    result of that default, what was still some
6    25-year note was accelerated and became
7    immediately due.  You are aware of that now;
8    right?
9    A.   Yes.
10   Q.   And can you see how someone at
11   Highland might actually have been pleased with
12   that development?
13   MR. MORRIS:  Objection to the form.
14   Q.   Not that they were -- not that they
15   were pleased, but you can see how someone at
16   Highland might have been pleased with that
17   development?
18   MR. MORRIS:  Objection to the form
19   of the question.
20   MS. DANDENEAU:  Object to form.
21   A.   I don't know how they would have
22   reacted to that.
23   Q.   Okay.  But you're not -- you're not
24   aware of any instructions or any actions being
25

Page 348

WATERHOUSE - 10-19-21

1    given or taken at Highland by Mr. Seery, the
2    independent board, DSI, that -- that would have
3    basically led Highland to ensure that NexPoint
4    would fail to make that payment?
5    A.   I'm not aware.
6    Q.   In other words, there wasn't a trick
7    or a settlement; right?
8    MS. DEITSCH-PEREZ:  Objection to
9    form.
10   MS. DANDENEAU:  Object to form.
11   MR. MORRIS:  Object to form.
12   A.   I'm not aware.
13   Look, I'm not aware.  I'm not in
14   every conversation.  I mean, and I'm just --
15   again, I'm sitting at home.  It is the end of
16   the year.  Again, I'm not aware.
17   Q.   That is a perfectly legitimate
18   answer.  I don't know why -- why you think
19   otherwise.
20   Okay.  Just give me one second to
21   compose my thoughts.
22   MS. DEITSCH-PEREZ:  While you're
23   taking your one second, why don't we take
24   three minutes.  I will be right back.
25

Page 349

WATERHOUSE - 10-19-21

1    VIDEOGRAPHER:  Do we want to go off
2    the record?
3    MR. RUKAVINA:  Yes.
4    VIDEOGRAPHER:  All right.  We're
5    going off the record at 6:27 p.m.
6    (Recess taken 6:27 p.m. to 6:30 p.m.)
7    VIDEOGRAPHER:  We are back on the
8    record at 6:30 p.m.
9    MR. HORN:  Is Deb back?
10   MS. DANDENEAU:  Are you asking about
11   me?  I'm here.
12   MR. HORN:  Oh, okay.  I don't see
13   you, sorry.
14   Q.   Actually, yeah, Mr. Waterhouse, so
15   when you had --
16   MS. DANDENEAU:  Are you asking about
17   Deb Dandeneau or Deborah?  I mean, there
18   are a lot -- as we talked about, a lot of
19   Debs.  I'm here.
20   MS. DEITSCH-PEREZ:  I'm here.
21   MR. HORN:  Yes, I was asking about
22   DDP.
23   MS. DEITSCH-PEREZ:  Oh, DDP is here.
24   MR. HORN:  Okay.  Here we go.  I'm
25

Page 350

WATERHOUSE - 10-19-21

1  going back on mute.
2  MS. DANDENEAU: Get the right
3  nomenclature.
4  Q.  Mr. Waterhouse, on January 12th,
5  2021, when you had those talks with Mr. Dondero
6  about the $1.4 million payment, did you have a
7  communication or a conversation with Mr. Seery
8  about that payment after January 12th, 2021?
9  A.  I don't recall.
10  Q.  Well, in response to Mr. Dondero
11  reaching out to you, do you recall on that day,
12  January 12th, talking to Mr. Seery or anyone at
13  Highland other than the email chain we just saw
14  about Mr. Dondero's call with you?
15  A.  Did I talk to -- I spoke with
16  Kristin -- I don't know if I spoke to her.  I
17  likely spoke to Kristin Hendrix because we had
18  to get the wire on NexPoint's behalf to make
19  the payment to Highland.
20  Q.  So it is true, then, that -- that
21  employees of the debtor did actually cause that
22  payment to be made when it was made after
23  January 12th?
24  A.  Yes, I mean, we -- we -- as I

Page 351

WATERHOUSE - 10-19-21

1  testified earlier, we provided that accounting
2  finance treasury function as -- under the
3  shared services agreement.  And so once I
4  got the -- I talked to Jim, got the approval to
5  make this payment, we have to then make the
6  payment, or the team does, and so the payment
7  was made.
8  Q.  Okay.  But -- okay.  And -- and
9  sitting here right now, after Jim called you,
10  you don't remember talking to anyone other than
11  the -- the couple of people you mentioned,
12  talking to anyone about something to the effect
13  that, hey, Jim wants to make this payment now?
14  MR. MORRIS: Objection to the form
15  of the question.
16  A.  I don't -- I don't recall.
17  Q.  And does that include legal counsel?
18  Without going into any detail, on
19  January 12th or before that payment was made,
20  did you consult with legal counsel about
21  anything having to do with the $1.4 million
22  payment?
23  A.  I don't recall.
24  Q.  Okay.  Thank you, sir, for your

Page 352

WATERHOUSE - 10-19-21

1  time.
2  MR. RUKAVINA: Pass the witness.
3  MR. MORRIS: I just have a few
4  questions, if I may.
5  MS. DEITSCH-PEREZ: Don't you go at
6  the end?
7  MR. MORRIS: Oh, I apologize.  He is
8  your witness.  I'm surprised you want to
9  ask him questions, but go right ahead.
10  MS. DEITSCH-PEREZ: Just have a
11  couple of things.
12  MR. RUKAVINA: And I will just
13  object to that, that he's our witness.
14  That's not --
15  MR. MORRIS: I'm not talking to you.
16  I'm not talking to you.
17  MS. DANDENEAU: Also, Mr. Morris, it
18  is -- it is --
19  MS. DEITSCH-PEREZ: He is not my
20  witness.  He's been subpoenaed by you.
21  Okay?
22  That is no offense, Mr. Waterhouse,
23  I'm -- I'm not -- okay.  Anyway.
24  EXAMINATION

Page 353

WATERHOUSE - 10-19-21

1  BY MS. DEITSCH-PEREZ:
2  Q.  Good evening.  I'm very sorry to be
3  going last and I know you have had a long and
4  taxing day, so I thank you for indulging me.
5  The kinds of services that you
6  describe that the -- that Highland provided for
7  NexPoint, did Highland also provide similar
8  services to that to HCRE and HCMS?
9  A.  Yes.
10  MR. MORRIS: Objection to the form
11  of the question.
12  Q.  What kind of services did Highland
13  provide to HCRE and HCMS?
14  MR. MORRIS: Objection to the form
15  of the question.
16  MS. DEITSCH-PEREZ: What is your
17  objection, John?
18  MR. MORRIS: It is vague and
19  ambiguous.  Unlike the advisors and
20  NexPoint, they actually had shared services
21  agreements.
22  MS. DEITSCH-PEREZ: I got -- I
23  understand your objection.  That is fine.
24  Q.  Let's take them one at a time.

Page 354

WATERHOUSE - 10-19-21

1   WATERHOUSE - 10-19-21
2       What kinds of services did Highland
3   provide to HCRE?
4           MR. MORRIS:  Objection to the form
5   of the question.
6       A.   HCMS, Highland employees provided
7   accounting services, treasury management
8   services, potentially legal services.  I
9   don't – but I wouldn't have been directly
10  involved in that.  But as far as the teams that
11  I manage, it was accounting, treasury, things
12  of that nature.
13      Q.   Okay.  And that was for HCM, LLP –
14      A.   And – and, sorry, it would also be
15  any asset valuation if needed as well.
16      Q.   Okay.  We went back and forth on
17  each other and I apologize, so just to clarify.
18          You were talking about the services
19  that Highland Capital Management provided to
20  HCMS; is that right?
21      A.   HCMS.  So, again, yes.  And
22  accounting, treasury, valuation, and also tax
23  services too.
24      Q.   Okay.
25      A.   Tax services.  Look, I'm expanding

Page 355

1   WATERHOUSE - 10-19-21
2   this, their HR services as well.
3       Q.   Okay.  And did that include bill
4   paying?
5           MR. MORRIS:  Objection to the form
6   of the question.
7       Q.   Did the services that HCM provided
8   to HCMS include bill paying?
9           MR. MORRIS:  Objection to the form
10  of the question.
11      A.   Yes.
12      Q.   And did the services that HCMLP
13  provided to HCMS include scheduling upcoming
14  bills?
15          MR. MORRIS:  Objection to the form
16  of the question.
17      A.   Yes.
18      Q.   And did HCMLP regularly pay – cause
19  to be paid the payments on loans HCMS had from
20  HCMLP?
21          MR. MORRIS:  Objection to the form
22  of the question.
23      A.   Yes.
24      Q.   Typically – if there is a
25  typically, how far in advance of due dates did

Page 356

1   WATERHOUSE - 10-19-21
2   HCMLP cause HCMS to pay its bills?
3           MR. MORRIS:  Objection to the form
4   of the question.
5       A.   I mean, it – it – it depend – it
6   depended on the nature of the payment and the
7   vendor, but, you know, if there were – if
8   there were larger scheduled payments, you know,
9   I would like to give at least 30 days notice.
10          And that is – that is kind of my
11  rule of thumb so no one is surprised.
12      Q.   Okay.  And was it generally HCMLP's
13  practice to timely pay HCMS' bills?
14          MR. MORRIS:  Objection to the form
15  of the question.
16      A.   It – it – it – that depended on
17  the nature of the payment.
18      Q.   Okay.  And can you explain what you
19  mean by that?
20      A.   Yeah, I mean if – if it was – I
21  mean – if there was some professional fees
22  that weren't – you know, they were due but
23  they weren't urgent, those fees may not be paid
24  as timely as others that have a due date or –
25  or things like that.

Page 357

1   WATERHOUSE - 10-19-21
2       Q.   Okay.  Are loan payments the kinds
3   of thing that HCMLP would pay on time because
4   of potential consequences of not paying on
5   time?
6           MR. MORRIS:  Objection to the form
7   of the question.
8       A.   Yes.  As I testified earlier, we
9   would want to give, you know, notice on – on
10  – on larger payments and – and things of that
11  nature so we didn't miss due dates.
12      Q.   Okay.  And over the course of time,
13  did HCMLP generally pay HCMS' loan payments in
14  a timely fashion?
15          MR. MORRIS:  Objection to the form
16  of the question.
17      A.   I can't remember specifically, but
18  generally, yes.
19      Q.   Okay.  Now, did HCMLP provide
20  similar services to HCRE that you have
21  described it provided to HCMS?
22          MR. MORRIS:  Objection to the form
23  of the question.
24      A.   Yes, but I don't think it – it
25  provided – I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1 services.

2    Q.   Can you describe the accounting and

3 treasury services that HCMLP provided for HCRE?

4    A.   Yeah, it -- it would provide

5 bookkeeping services on a -- on a periodic

6 basis.  It would make payments, you know, as

7 needed.

8    Q.   Okay.  So did it provide --

9    A.   And -- and I believe it -- it -- it

10 provided tax services as well.

11    Q.   Okay.  And so did it provide the

12 same kind of bill -- did HCMLP provide the same

13 kind of bill-paying services for HCRE that it

14 provided for HCMS and NexPoint?

15         MR. MORRIS:  Objection to the form

16 of the question.

17    A.   Yes.

18    Q.   And over the course of time, did

19 HCMLP generally cause to be made the loan

20 payments that HCRE owed to HCMLP?

21         MR. MORRIS:  Objection to the form

22 of the question.

23    A.   Yes.

24    Q.   Did HCMLP make loan payment -- the

25

Page 359

WATERHOUSE - 10-19-21

1 loan payment that was due from HCMS to HCMLP in

2 December of 2020?

3         MR. MORRIS:  Objection to the form

4 of the question.

5    A.   I don't believe that payment --

6 payment was made.

7    Q.   Okay.  And when HCMLP caused HCMS in

8 the past to make loan payments, whose money did

9 it use to make those payments?

10         MR. MORRIS:  Objection to the form

11 of the question.

12    A.   It was the -- the money in HCMS's

13 operating account would be made to that --

14 those moneys would be used to make payment to

15 Highland Capital Management.

16    Q.   Okay.  And Highland -- is it correct

17 that Highland Capital Management personnel had

18 the access to HCMS's accounts to be able to

19 cause such payments to be made?

20    A.   Yes, Highland personnel had access

21 to those accounts.

22    Q.   Okay.  And so now for HCRE, whose

23 money was used when HCMLP caused HCRE

24 payments -- loan payments to Highland to be

25

Page 360

WATERHOUSE - 10-19-21

1 made?

2         MR. MORRIS:  Objection to the form

3 of the question.

4    A.   It was -- it was cash in HCRE's bank

5 account that would be used to make payments to

6 Highland Capital Management.

7    Q.   Okay.  And so did Highland Capital

8 Management have access to HCRE's funds in order

9 to be able to make such payments?

10         MR. MORRIS:  Objection to the form

11 of the question.

12    A.   Personnel at Highland Capital

13 Management had access to HCRE's bank account to

14 effectuate the payments.

15    Q.   Okay.  And was the payment due from

16 HCRE to HCMLP due in December of 2020 made?

17    A.   It --

18    Q.   In December of 2020.

19    A.   It was not.

20    Q.   Okay.  And was there money in HCRE's

21 account that would have enabled the payment to

22 be made had HCM personnel attempted to make the

23 payment?

24         MR. MORRIS:  Objection to the form

25

Page 361

WATERHOUSE - 10-19-21

1 of the question.

2    A.   I -- I don't recall.

3    Q.   Do you have any reason to believe

4 that either HCRE or HCMS simply didn't have the

5 funds on hand to make the December 2020

6 payments?

7    A.   I don't know.

8    Q.   I guess I'm asking, do you have any

9 reason to believe that they didn't have the

10 funds?

11    A.   We managed cash for so many

12 different entities and funds, and I don't

13 recall, you know, where the cash position was

14 for HCRE and HCMS at 12/31/2020.

15    Q.   Okay.

16    A.   I just don't recall, and I don't --

17 and I don't remember what the loan payment

18 obligations were from HCRE to Highland, and

19 from HCMS to Highland.  I don't recall.  I

20 don't recall, I mean...

21    Q.   Let me come at it a different way.

22 Were the -- were the payments that would

23 otherwise have been due in December of 2020

24 made in January of 2021 for HCMS and HCRE?

25

Page 362

WATERHOUSE - 10-19-21

1
2    A.   I believe the HCRE payment was made
3  in January of 2021.  I don't recall any
4  payments being made from HCMS to Highland.
5    Q.   If it -- how is it the HCRE payment
6  came to be made?  Why did you make it -- why
7  did HCM make the payment in January of 2021?
8    A.   Jim -- Jim called me and instructed
9  me to -- to make the payment on behalf of HCRE,
10  Jim Dondero -- Jim Dondero.
11    Q.   Did he seem upset that -- that the
12  payment had not been made?
13    A.   Yeah.  On the note that was, you
14  know, that was the term note, yes, he -- he was
15  displeased that the -- that the payment had not
16  been made by year-end.
17    Q.   Okay.  And did you make the -- cause
18  the payment to be made as -- as requested?
19    A.   Yes.
20    Q.   And did anyone else from HCM
21  participate with you in causing the payment to
22  be made to -- on the HCRE loan?
23    A.   Yes.  It would have been Kristin
24  Hendrix.  I -- again, I don't -- as I testified
25  earlier, I'm not an officer of HCRE.  I don't

Page 363

WATERHOUSE - 10-19-21

1
2  believe I'm an authorized signer.  So I
3  can't -- other personnel have to make payment
4  from HCRE to -- to -- to -- to Highland.
5    Q.   Okay.  And in the conversation
6  that -- that you had with Mr. Dondero when he
7  requested the payment to be made, did you say
8  to him words to the effect, Jim, this loan is
9  going to stay in default, what are you making
10  the payment for, anything like that?
11    A.   No.
12    Q.   In fact, did you have the impression
13  from him that he thought that the loan would
14  be -- the default would be cured by making the
15  payment?
16        MR. MORRIS:  Objection to the form
17    of the question.
18    A.   Did I get the impression from Jim
19  Dondero that the loan would be cured if the
20  payment from HCRE --
21    Q.   Yeah, if that is what he thought.
22        MR. MORRIS:  Objection to the form
23    of the question.
24    A.   I didn't get any impression from him
25  on that at the time.

Page 364

WATERHOUSE - 10-19-21

1
2    Q.   Do you know whether there was an
3  HCMS term loan that had a payment due in
4  December of 2020?
5    A.   I don't recall.
6    Q.   Okay.  And so the reason you don't
7  recall whether or not there was a payment in
8  January of 2021 is because you just don't
9  remember whether there was such a loan at all?
10        MR. MORRIS:  Objection to the form
11    of the question.
12    A.   I don't remember.  There is -- there
13  is so many notes, and I mean, demands, and I
14  don't -- I don't remember.  It's a lot to keep
15  track in your head.
16    Q.   I understand, and -- and I hear your
17  frustration when you have explained that the
18  debtor has your documents and you don't, and so
19  I fully appreciate it, and this is no knock on
20  you.  It's a knock on somebody else on this
21  call.
22        MR. MORRIS:  I move to strike.  That
23    was pretty obnoxious, but go ahead.
24    Q.   Okay.  But so, Mr. Waterhouse, if --
25  if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1
2  January of 2021, do you think it was part of
3  the same conversation where Jim Dondero said,
4  hey, why didn't that get paid, please make
5  that -- get that payment done?
6        MR. MORRIS:  I object to the form of
7    the question.
8    A.   Yes.  Likely it would have been -- I
9  mean, again, I don't recall a payment being
10  made, but, you know, again, I don't remember
11  everything.
12    Q.   Okay.  Did -- at the time you were
13  communicating with Kristin Hendrix about the
14  payment being made, whichever payments were
15  made in January, did you say anything to you
16  about the payments not curing the loan
17  defaults?
18    A.   No.
19    Q.   Okay.  All right.  So I'm going to
20  take you back to very early in the deposition
21  when Mr. Morris was asking you about the --
22  the -- the -- the agreement with respect to
23  the -- the forgiveness element of the loans, so
24  that is just to orient you.
25        Do you remember that there was a

**Appx. 02140**

Page 366

WATERHOUSE - 10-19-21

1    time that you and Mr. Dondero were
2    communicating about potential means of
3    resolving the Highland bankruptcy by what was
4    colloquially referred to as a pot plan?
5        A.   Yes.
6        Q.   Okay.  And can you tell me generally
7    when that was?
8        A.   Like mid -- mid 2020, sometime in
9    2020, mid 2020.
10       Q.   Okay.  And did the process of trying
11   to figure out what the numbers should be
12   involve looking at what one should pay for the
13   Highland assets?
14       MR. MORRIS:  Objection to the form
15   of the question.
16       A.   Yes.
17       Q.   Okay.  And did there come a time
18   when you were proposing some potential numbers
19   and Mr. Dondero said something to you like,
20   well, why are you including payment for the
21   related party notes, those, you know, were
22   likely to be forgiven as part of my deferred
23   executive compensation?
24       MR. MORRIS:  Objection to the form

Page 367

WATERHOUSE - 10-19-21

1    of the question.
2        A.   Yes, we did have that conversation.
3        Q.   Okay.  Was that conversation in
4    connection with trying to figure out the right
5    numbers for a pot plan?
6        A.   Yeah.  I mean, it was -- it was -- I
7    mean, Jim -- Jim would ask for, you know,
8    most -- most recent asset values, you know, for
9    Highland, and -- and myself and the team
10   provided those to him, so it was in that
11   context.
12       Q.   Okay.  And does that refresh your
13   recollection that these communications were in
14   2020 rather than 2021?
15       MR. MORRIS:  Objection to the form
16   of the question.
17       A.   The -- the -- the executive
18   compensation discussions were definitely in
19   2020.
20       Q.   Okay.  Now, did you ever make
21   proposals that took into account Jim's comment
22   that the notes were likely to end up forgiven
23   as part of his compensation?
24       MR. MORRIS:  Objection to the form

Page 368

WATERHOUSE - 10-19-21

1    of the question.
2        A.   Yes, we -- the team and myself put
3    together, you know, asset summaries of Highland
4    at various times for all the assets of
5    Highland, and not including the notes.
6        Q.   Okay.  And were those presentations
7    communicated to -- to Mr. Seery?
8        A.   No.  Well, look, I didn't tell -- I
9    didn't tell Mr. Seery.  I don't know what
10   Mr. Dondero did with the information.
11       Q.   Okay.
12       A.   I did not have conversations with
13   Mr. Seery.
14       Q.   Okay.  Do you know who saw the
15   presentations that you put together that didn't
16   include the value of the related party notes?
17       A.   We're talking presentations -- these
18   are -- these are Excel spreadsheets?
19       Q.   Uh-huh.
20       A.   I don't know who -- these were given
21   to -- to Jim Dondero.  I don't know what was
22   done with them after that.
23       Q.   Okay.  You also mentioned earlier
24   that sometime during your tenure at Highland

Page 369

WATERHOUSE - 10-19-21

1    you knew of the practice of giving forgivable
2    loans to executives.
3        MR. MORRIS:  Objection to the form
4    of the question.
5        Q.   Can you -- can you tell me what you
6    recall about that practice?
7        MR. MORRIS:  Objection to the form
8    of the question.
9        A.   Yes, so there were -- there were --
10   during my tenure at Highland, there were loans
11   or -- given to employees that were later
12   forgiven at a future date and time.
13       Q.   Okay.  And when the loans were
14   given, did the notes, to your recollection, say
15   anything about the potential forgiveness term?
16       MR. MORRIS:  Objection to the form
17   of the question.
18       A.   When you say "did the notes," did
19   the promissory notes detail the forgiveness?
20       Q.   Yes.
21       A.   Not that I recall.
22       Q.   And until such time as whatever was
23   to trigger the forgiveness occurred, were the
24   notes bona fide notes as far as you were

Appx. 02141

Page 370

WATERHOUSE - 10-19-21

1 concerned?

2

3      MR. MORRIS:  Objection to the form

4   of the question.

5      A.   Yes, similar to – yes.

6      Q.   Okay.  You were going to say similar

7   to what?

8      A.   Mr. Morris earlier today showed

9   notes of the financial statements about various

10  affiliate loans.  I – I – I do recall these

11  notes because I – at that time personally

12  worked on the – the financial statements of

13  Highland.  That was, you know, in my role as a

14  corporate accountant.

15      And there were – those loans

16  were – to the partners were detailed in the

17  notes to the financial statements, similar to

18  what we went through earlier today in the prior

19  testimony about what we saw with Highland

20  and – and – and the – and HCMFA.

21      Q.   Is it fair to say that on Highland's

22  balance sheet there were any number of assets

23  that the value of which could be affected by

24  subsequent events?

25      MR. MORRIS:  Objection to the form

Page 371

WATERHOUSE - 10-19-21

1 of the question.

2

3      A.   Yes.  I mean, yes, that – there

4   are.  And that is – yes.

5      Q.   Okay.  And is it typical accounting

6   practice that until there is some certainty

7   about those potential future events, that asset

8   value listed on – on the books doesn't take

9   into account those potential future events?

10      MR. MORRIS:  Objection to the form

11  of the question.

12      A.   Yeah, if those – yes.  If – if

13  those future events, you know, at the time of

14  issuance are not known or knowable, like I

15  discussed earlier with, like, market practice,

16  asset dislocation, or, you know, I mean, things

17  like that, you – I mean, it – it could affect

18  its fair value –

19      Q.   Okay.

20      A.   – in the future.

21      Q.   And am I correct you wouldn't feel

22  compelled to footnote in every possible change

23  in – in an asset when those possibilities are

24  still remote?

25      MR. MORRIS:  Objection to the form

Page 372

WATERHOUSE - 10-19-21

1 of the question.

2

3      A.   The accounting standard is you have

4   to estimate to the best – you know, to – to

5   the best of your ability, the fair value of an

6   asset as of the balance sheet date under –

7   under GAAP.

8      Q.   Did – strike that.

9      Okay.  Give me a minute.  I'm

10  close – I'm close to done.  Let me just go off

11  and look at my notes for a second.  So take two

12  minutes.

13      VIDEOGRAPHER:  We're going off the

14  record at 7:02 p.m.

15      (Recess taken 7:02 p.m. to 7:03 p.m.)

16      VIDEOGRAPHER:  We are back on the

17  record at 7:03 p.m.

18      Q.   Mr. Waterhouse, is it generally your

19  understanding that people you work with now

20  have been asking the debtor for full and

21  unfetterred access to their own former files?

22      MR. MORRIS:  Objection to the form

23  of the question.

24      A.   Yes, I am – I am generally aware.

25      Q.   Okay.  And do you think you could

Page 373

WATERHOUSE - 10-19-21

1 have been better prepared for this deposition

2 if the debtor had complied with those requests?

3      MR. MORRIS:  Objection to the form

4   of the question.

5      A.   I – I – I most certainly – yes.

6   I mean, again, these are multiple years,

7   multiple years ago, lots and lots of

8   transactions.

9      You know, we asked about NAV errors

10  and, you know, things like that and these

11  are – it would make this process a lot more –

12  a lot easier and if we had – if we had access

13  to that.

14      Q.   Okay.  And has the debtor – is the

15  debtor suing you right now?

16      A.   Yes.

17      Q.   And is the debtor trying to renege

18  on deals that it had previously made with you?

19      MR. MORRIS:  Objection to the form

20  of the question.

21      A.   Sorry, I need to – it is my

22  understanding that the litigation trust is

23  suing me.  And not being a lawyer, I don't

24  know – is that the debtor?

Page 374

WATERHOUSE - 10-19-21

1  
2       Is that -- I don't know the
3  relationship.  So, again, I'm not the lawyers.
4  I've said many times.  But my understanding is
5  the litigation trust is suing me.  I could be
6  wrong there.  I don't know.
7       Q.   Okay.  I understand.
8            Someone with some connection to the
9  Highland debtor has brought a claim against
10 you; is that fair?
11           MR. MORRIS:  Objection to the form
12      of the question.
13      A.   Yes.
14      Q.   Okay.  And is there also some motion
15 practice in the bankruptcy where the debtor or
16 someone associated with the debtor is
17 attempting to undo something that was
18 previously resolved with you?
19      A.   Yes.
20      Q.   And so in one action somebody is
21 associated with the debtors trying to --
22 threatening you with trying to take money from
23 you, and then in the other -- and trying to --
24 and in the other they are threatening not to
25 pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

1  
2  is that correct?
3            MR. MORRIS:  Objection to the form
4       of the question.
5       A.   I want to be -- yes, I -- there
6  is -- I'm being sued, again, on -- on something
7  that was agreed to with Mr. Seery and myself.
8  I don't -- I don't -- I don't own that claim.
9       Q.   Okay.
10      A.   To be transparent, I don't own that
11 claim.  So it is not my personal property.
12      Q.   Okay.
13      A.   And -- and being the nonlawyer, I
14 don't know how I can get sued for something
15 that I don't owe or, like, I don't own
16 anything.  I'm not the lawyer.  But, I mean, if
17 that is -- if I'm understanding the facts
18 correctly.
19      Q.   Okay.  And the lawsuit that was
20 filed that names you, that was just filed
21 this -- this past week; is that right?
22           MS. DANDENEAU:  Ms. Deitsch-Perez, I
23      do want to interrupt at this point because
24      just as I told Mr. Morris, that this is a
25      deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

1  
2       I really don't want to go -- go
3  afield --
4            MS. DEITSCH-PEREZ:  Yeah.
5            MS. DANDENEAU:  -- and open up a
6       whole new line of inquiry about the lawsuit
7       or the -- the motion and the bankruptcy
8       court.  We will be here all night.
9            MS. DEITSCH-PEREZ:  And I
10      understand.
11      Q.   My -- my point is:  Do you feel
12 like -- like there is some effort by these
13 parties related to the debtor to intimidate
14 you -- not that you -- I'm not saying you are
15 or you aren't.
16           But do you feel like there is some
17 effort to intimidate you and maybe an effort to
18 deter you from being as prepared as you might
19 be in this deposition?
20           MR. MORRIS:  Objection to the form
21      of the question.
22      A.   I was -- I was surprised by the
23 lawsuit, by me being named, because, again, I
24 don't own the asset and things like that.
25 Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

1  
2  life at Skyview.
3            MS. DEITSCH-PEREZ:  Thank you.
4            THE WITNESS:  Thank you.
5            FURTHER EXAMINATION
6  BY MR. MORRIS:
7       Q.   If I may, I just have a few
8  questions.
9            Mr. Waterhouse, we saw a number of
10 documents that Mr. Rukavina put up on the
11 screen where Ms. Hendrix would send you a
12 schedule of payments that were due on behalf of
13 certain Highland affiliates.
14           Do you remember that?
15      A.   Yes.
16      Q.   And in each instance she asked for
17 your approval to make the payments; is that
18 right?
19      A.   Yes, she did.
20      Q.   And was that the -- was that the
21 practice in the second half of 2020 whereby
22 Ms. Hendrix would prepare a list of payments
23 that were due on behalf of Highland associates
24 and ask for approval?
25      A.   Yes.

Page 378

WATERHOUSE - 10-19-21

1
2    Q.   And I think you said that there was
3    a -- a --
4    A.   It was -- I think I testified to
5    this earlier when we talked about procedures
6    and policy, you know, again, I want to be
7    informed of -- of -- of -- of -- of any
8    payments that are going out.  I want to be made
9    aware of these payments, and that was just a
10   general policy, not just for 2020.
11   Q.   Okay.  So it went beyond 2020?
12   A.   Yes.
13   Q.   Is that right?
14   A.   Yes.
15   Q.   Okay.  And the corporate accounting
16   group would prepare a calendar that would set
17   forth all of the payments that were anticipated
18   in the -- in the three weeks ahead; is that
19   right?
20   A.   I -- like I testified earlier, we
21   had a corporate calendar that was set up, you
22   know, to -- to provide reminders or, you know,
23   of anything of any nature, whether it is
24   payments or -- or financial statements or, you
25   know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2    deadlines.
3         I don't know how, as I testified
4    earlier, how much they were using that
5    calendar.
6    Q.   Okay.  But -- but you did get notice
7    and a request to approve the payments that were
8    coming due on behalf of Highland's affiliates.
9    Do I have that right?
10        MS. DANDENEAU:  Objection to form.
11   A.   I mean, generally, yes.  I mean, you
12   know, as we saw with these emails, generally, I
13   mean, did that encompass everything, no.
14   Q.   Okay.  Do you know why the
15   payment -- do you know why there was no payment
16   made by NexPoint at the end of 2020?
17   A.   Yes.  There was -- there was -- we
18   talked about these agreements between the
19   advisors and Highland, the shared services and
20   the cost reimbursement agreement.
21        And in late 2020, there were
22   overpayments, large overpayments that had been
23   made over the years on these agreements, and it
24   was my understanding that the advisors were --
25   were talking with -- like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2    to offset any obligations that the advisors
3    owed to Highland as offset to the overpayments
4    on these agreements.
5    Q.   Okay.  Did you participate in any of
6    those conversations?
7    A.   I did not.
8    Q.   Okay.  Do you know -- do you recall
9    that the -- at the end of November, the debtor
10   did notice to the advisors of their intent to
11   terminate the shared services agreements?
12   A.   Like I testified earlier, there
13   was -- the agreements weren't identical, from
14   what I recall, and there is one that had a
15   longer notice period, which I think had a
16   60-day notice period.  I don't recall which one
17   that was, so not all of them were -- notice
18   hadn't been given as of November 30th, for all
19   of the agreements.
20   Q.   Upon the receipt of the -- the
21   termination notices that you recall, do you
22   know if the advisors decided at that point not
23   to make any further payments of any kind to
24   Highland?
25        MR. RUKAVINA:  Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2    A.   No.  The advisors -- the advisors
3    had stopped making payments prior to that
4    notice.
5    Q.   Okay.  And how do you know that the
6    advisors stopped making -- making payments
7    prior to the notice?
8    A.   I had -- I had a conversation
9    with -- with Jim Dondero.
10   Q.   And did Mr. Dondero tell you that
11   the advisors would no longer make payments to
12   Highland?
13        MS. DEITSCH-PEREZ:  Object to the
14   form.
15   A.   Yes, he -- he -- again, he said
16   they -- they -- the advisors have overpaid on
17   these agreements, to not make any future
18   payments, and that there needs to be offsets,
19   and they're working on getting offsets to these
20   overpayment.
21   Q.   Do you know if anybody ever
22   instructed Highland's employees to make the
23   payment that was due by NexPoint at the end of
24   the year?
25   A.   Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

1 employees to make that payment?
2      Q.   Correct.
3      A.   Anyone -- not that I'm aware.
4      Q.   Were any of Highland's employees
5 authorized to make the payments on behalf of
6 its affiliates -- withdrawn.
7           Was any of Highland's employees
8 authorized to effectuate the payment on behalf
9 of NexPoint that was due at the end of the year
10 without getting approval from either you or
11 Mr. Dondero?
12     A.   They had the -- they had the ability
13 to make the payment, but they didn't -- you
14 know, that -- that payment needed to be
15 approved.
16     Q.   Okay.  And it needed to be approved
17 by you or Mr. Dondero; is that right?
18     A.   I mean, I'm not going to make the
19 unilateral decision.
20     Q.   Is that a decision that you
21 understood had to be made by Mr. Dondero?
22     A.   Yes.  Sitting back in December of
23 2020, the -- that -- there was this off --
24 offset negotiation that -- that was happening,

Page 383

WATERHOUSE - 10-19-21

1 so I mean, until those negotiations were
2 resolved, you know, there wasn't any
3 payments -- there weren't any payments.
4      Q.   And -- and there were no payments
5 until the negotiations were resolved because
6 that was the directive that you received from
7 Mr. Dondero; correct?
8      A.   I don't think he said -- I mean, I
9 think -- yeah, I mean -- I'm trying to recall
10 the conversation.  It was -- you know, there
11 is -- there is these negotiations.  There's --
12 there needs to be these offsets.  They're
13 talking with the debtor.  So, you know, until
14 this is resolved, right, I mean, depending on
15 how, whatever that resolution was, were we to
16 take any action.
17     Q.   Okay.  How about with respect to
18 HCMS, did HCMS have a term payment due at the
19 end of the year?
20     A.   Again, I don't -- I don't recall.
21     Q.   You discussed briefly two
22 payments that were made in January of 2021, one
23 on behalf of NexPoint, and one on behalf of
24 HCMS.  Do I have that right?

Page 384

WATERHOUSE - 10-19-21

1      A.   No.  The two payments I recall were
2 NexPoint and HCRE.
3      Q.   Okay.  And those two payments --
4 thank you for the correction.  And those two
5 payments were made because Mr. Dondero
6 authorized those payments to be made; correct?
7      A.   Yes.
8      Q.   And they hadn't been made before
9 that because Mr. Dondero had not authorized
10 them to be made?
11          MS. DEITSCH-PEREZ:  Object to the
12 form.
13     A.   Yes, because of these negotiations.
14     Q.   Okay.  Just a couple of more
15 questions.
16          Did anybody, to the best of your
17 knowledge, on behalf of HCMFA, ever tell the
18 SEC that HCMLP was responsible for the mistakes
19 that were made on the TerreStar valuation?
20     A.   Did anyone from Highland on HCMFA's
21 behalf tell the SEC that Highland -- that
22 Highland was responsible for there -- I just
23 want to make sure --
24     Q.   It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

1 let me try again.
2      A.   These are very long questions, John.
3 I'm not trying to be --
4      Q.   That is good.  Do you know whether
5 anybody -- do you know whether anybody on
6 behalf of HCMS -- HCMFA ever told the SEC that
7 Highland was the responsible party for the
8 TerreStar valuation error?
9      A.   Not that I'm aware.
10     Q.   Okay.  Did anybody on behalf of
11 the -- on behalf of HCMFA ever tell the retail
12 board that Highland was responsible for the
13 TerreStar valuation error?
14     A.   Not that I'm aware.
15     Q.   Do you know if HCMFA made an
16 insurance claim with respect to the damages
17 that were incurred in relation to the TerreStar
18 valuation error?
19     A.   Yes.
20     Q.   And do you know why they made that
21 insurance claim?
22     A.   Because there was an error.  I
23 mean --
24     Q.   Was the insured's claim made -- was

Page 386

WATERHOUSE - 10-19-21

1     the insurance claim made under HCMFA's policy?
2     A.   Yes.
3     Q.   Did HCMFA at any time prior to the
4     petition date -- withdrawn.
5         You were asked a couple of questions
6     where -- where you said that Mr. Dondero told
7     you that he was ascribing zero value to the
8     notes as part of a pot plan because he believed
9     that the notes were part of executive
10    compensation.
11        Do I have that right?
12        MS. DEITSCH-PEREZ:  Object to the
13    form.
14    A.   Yes.
15    Q.   Okay.  Have you ever heard that
16    before the time that Mr. Dondero told you that
17    in the conversation about the pot plan?
18    A.   Had I heard that prior to my
19    conversation with Mr. Dondero?
20    Q.   Yes.
21    A.   No, I had not heard that prior.
22    Q.   Okay.  And that was in the context
23    of his formulation of the settlement proposal;
24    is that right?
25

Page 387

WATERHOUSE - 10-19-21

1     A.   I mean, generally, yes.  You know,
2     we were asked to provide asset values, right,
3     and he was having settlement discussions.
4     Again, I don't know who those went to
5     ultimately.  I don't recall.
6         MR. MORRIS:  I have no further
7     questions.  Thank you very much for your
8     patience.  I apologize for the late hour.
9         MS. DEITSCH-PEREZ:  John, you stay
10    on your email when --
11        MR. RUKAVINA:  Hold on, I'm not
12    done.
13        MS. DEITSCH-PEREZ:  Oh, okay.  Davor
14    still has questions.  Sorry.  I was going
15    to say both John and Davor, could you stay
16    on afterwards just to talk about the
17    requests.
18        FURTHER EXAMINATION
19    BY MR. RUKAVINA:
20    Q.   Mr. Waterhouse, you were just now
21    testifying about a discussion you had with
22    Mr. Dondero where he said something like no
23    more payments.
24        Do you remember that testimony?
25

Page 388

WATERHOUSE - 10-19-21

1     A.   Yes.
2     Q.   Okay.  And was that late November or
3     early December of 2020?
4     A.   It was, I would say, first or second
5     week of November.
6     Q.   Okay.  Do you recall whether --
7     whenever you had that discussion, whether
8     Mr. Dondero had already been fired by the
9     debtor?
10    A.   Yes, I -- I believe he was not an
11    employee of the debtor anymore at that time.
12    Q.   And when you were discussing this
13    with Mr. Dondero and he said no more payments,
14    you were discussing the two shared services
15    agreements and employee reimbursement
16    agreements we testified -- you testified about
17    before; is that correct?
18        MR. MORRIS:  Objection to the form
19    of the question.
20    A.   That is correct.
21    Q.   And had your office or you -- and we
22    will talk at a future deposition about the
23    administrative claim.
24        But had -- by that time that you

Page 389

WATERHOUSE - 10-19-21

1     talked to Mr. Dondero, had your office or you
2     done any estimate of what the alleged
3     overpayments were?
4         MR. MORRIS:  Objection to the form
5     of the question.
6     A.   Yes, we had -- there was a -- there
7     was a detailed analysis that was put together
8     by David Klos at the time.
9     Q.   And do you recall just generally
10    what the total amount for both advisors of the
11    overpayments was?
12    A.   It was in excess of $10 million.
13    Q.   Was it in excess of $14 million?
14        MR. MORRIS:  Objection to the form
15    of the question.
16    A.   I -- I remember it was an
17    eight-figure number.  I don't remember
18    specifically.
19    Q.   Okay.  And did you convey that
20    number to Mr. Dondero when you had that
21    conversation?
22    A.   Yes.
23    Q.   What was his reaction?
24    A.   I mean, he wasn't happy.
25

Page 390

WATERHOUSE - 10-19-21

1
2    Q.   Is it fair to say he was upset?
3    A.   Yes.
4    Q.   Did Mr. Dondero ever expressly tell
5    you to not have NexPoint make the required
6    December 31, 2020, payment?
7    A.   Yes, I recall him saying don't make
8    the payment because it was being negotiated, as
9    I discussed with Mr. Morris, this offset
10   concept.  So there were obligations due by the
11   advisors to Highland, they should be offset
12   that -- you know, those obligations should be
13   offset by this -- by this overpayment.
14   Q.   And when did he tell you that?
15   A.   I would say -- I would say around --
16   probably December -- December-ish.
17   Q.   Early December, late December?
18   A.   I don't recall with as much
19   specificity as -- as -- as stopping the
20   shared services payments, because we had
21   actually made one shared services payment in
22   November.  So that is why I need to remember
23   that one more clearly.  I don't remember where
24   exactly in December that conversation occurred.
25   Q.   Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

1
2    word "NexPoint" when he was saying don't make
3    these payments?
4        MR. MORRIS:  Objection to the form
5        of the question, asked and answered.
6    A.   Yeah, we were -- we were discussing
7    advisor obligations.  So it was -- you know, it
8    was just obligations from the advisors.
9        And -- and he specifically talked
10   about the NexPoint payment as well.
11   Q.   Okay.  And it is your testimony that
12   he expressly told you not to make that NexPoint
13   December 31 payment?
14       MR. MORRIS:  Objection, asked and
15       answered twice.
16   A.   Yes, he -- he did, during that
17   conversation.
18   Q.   And did you ever follow up with him
19   after that about whether NexPoint should or
20   shouldn't make that payment?
21   A.   I did not.
22   Q.   Did you ever, on or about
23   December 31, 2020, remind him and say, hey,
24   this payment is due, what shall I -- what
25   should I do?

Page 392

WATERHOUSE - 10-19-21

1
2    A.   I did not.
3    Q.   So sitting here today, you -- you
4    remember distinctly that Dondero in December of
5    2020 expressly told you not to have NexPoint
6    make that payment?
7        MR. MORRIS:  Objection, asked and
8        answered three times.
9    A.   Yes.
10   Q.   Can you say categorically it wasn't
11   just some general discussion where he told you
12   not to make payments?
13       MR. MORRIS:  Objection, asked and
14       answer four times.
15       MR. HORN:  Four times now.  Go for
16       five.
17   A.   Yes.
18   Q.   Did you tell Mr. Seery that?
19   A.   I don't believe I did.  I don't
20   recall.
21   Q.   And was this an in-person discussion
22   or telephone or email?  Do you remember?
23   A.   This was a phone -- a phone
24   conversation.
25   Q.   Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

1
2    on your cell phone of when that conversation
3    might have taken place?
4        I'm sorry, strike that.
5        Was that by cell phone?
6    A.   I believe -- yes, because we -- I
7    was at home.  I mean, I don't have a landline.
8    All I have is my cell phone.
9    Q.   Do you know whether your cell phone
10   still has records of conversations from
11   December 2020 on it?
12   A.   My call log doesn't go back that
13   far.
14   Q.   Okay.  Thank you.
15       MR. RUKAVINA:  I will pass the
16   witness.
17       MS. DEITSCH-PEREZ:  Just a couple
18   quick questions.
19       FURTHER EXAMINATION
20   BY MS. DEITSCH-PEREZ:
21   Q.   With respect to HCRE and HCMS, am I
22   correct there was -- there was no direction not
23   to pay those loan payments?
24       MR. MORRIS:  Objection to the form
25       of the question.

Page 394

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2      A.   Yes, I don't recall having
3   conversations about, you know, those -- those
4   entities.
5      Q.   And, in fact, what was the tone that
6   Mr. Dondero had when he talked to you about the
7   fact that HCRE and HCMS payments hadn't been
8   made when he found out that they hadn't been
9   paid?
10        MS. DANDENEAU:  Objection to form.
11        MR. MORRIS:  Objection to form.
12      Q.   What was the tone he took with you?
13      A.   Oh, it was -- it was -- it was -- it
14   was very negative.  I mean, I think he cursed
15   at me and he doesn't usually curse.
16      Q.   Okay.  And in your mind, is that
17   consistent with the fact that he was surprised
18   that those payments hadn't been made?
19        MR. MORRIS:  Objection to the form
20   of the question.
21      A.   Yes.
22      Q.   Okay.  Thank you.
23        MR. MORRIS:  I have nothing further.
24   Thank you so much, Mr. Waterhouse.
25        MR. HORN:  I have no questions.

Page 395

1          WATERHOUSE - 10-19-21
2   Thank you, Mr. Waterhouse.  We appreciate
3   your time.  I am logging off the discussion
4   and I will talk to y'all tomorrow.
5        MR. MORRIS:  Super.
6        VIDEOGRAPHER:  If there are no
7   further questions, this ends the
8   deposition -- excuse me.  This ends the
9   deposition, and we are going off the record
10   at 7:30 p.m.
11      (Deposition concluded at 7:30 p.m.)
12
13        _____
14          FRANK WATERHOUSE
15
16   Subscribed and sworn to before me
17   this     day of        2021.
18
19   _____
20
21
22
23
24
25

Page 396

1          WATERHOUSE - 10-19-21
2      C E R T I F I C A T E
3
4      I, SUSAN S. KLINGER, a certified shorthand
5   reporter within and for the State of Texas, do
6   hereby certify:
7      That FRANK WATERHOUSE, the witness whose
8   deposition is hereinbefore set forth, was duly
9   sworn by me and that such deposition is a true
10   record of the testimony given by such witness.
11      I further certify that I am not related to
12   any of the parties to this action by blood or
13   marriage; and that I am in no way interested in
14   the outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set my
16   hand this 19th of October, 2021.
17
18      _____
19        Susan S. Klinger, RMR-CRR, CSR
20        Texas CSR# 6531
21
22
23
24
25

Page 397

1          WATERHOUSE - 10-19-21
2   NAME OF CASE:  In re:  Highland Capital
3   DATE OF DEPOSITION:  October 19, 2021
4   NAME OF WITNESS:  Frank Waterhouse
5   Reason Codes:
6      1.  To clarify the record.
7      2.  To conform to the facts.
8      3.  To correct transcription errors.
9   Page____Line_____Reason_____
10  From_____to_____
11  Page____Line_____Reason_____
12  From_____to_____
13  Page____Line_____Reason_____
14  From_____to_____
15  Page____Line_____Reason_____
16  From_____to_____
17  Page____Line_____Reason_____
18  From_____to_____
19  Page____Line_____Reason_____
20  From_____to_____
21  Page____Line_____Reason_____
22  From_____to_____
23  Page____Line_____Reason_____
24  From_____to_____
25

**$**

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11
350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18
270:20 271:7,16
272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20
223:7 224:2 334:7,19
336:13,23 337:25
339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14
332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20
271:6 272:7 283:18
315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7
277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8
138:12 143:12 144:6,
17,23 272:16 273:6

287:15 288:6,20
303:6,18,24 304:11,
20 305:23 306:2
307:7 308:20 310:17
317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

**1**

**1** 8:9 35:17 139:22
140:12,13 215:25
216:3,7,12 238:8
260:20,23 261:15
328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15
198:2 266:20 267:3
302:7

**10-19-21** 3:1 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1

129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1

297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1 353:1
354:1 355:1 356:1
357:1 358:1 359:1
360:1 361:1 362:1
363:1 364:1 365:1
366:1 367:1 368:1
369:1 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1
378:1 379:1 380:1
381:1 382:1 383:1
384:1 385:1 386:1
387:1 388:1 389:1
390:1 391:1 392:1
393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12
122:12 135:21
261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3
350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13,
23 203:3 210:6
213:18 221:23

**15(c)** 5:21 160:11
169:21,23 170:4,8,10
171:6 175:3,9 176:23
179:20 184:5 195:9
210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19
110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

**2**

**2** 5:15 35:18 140:18
142:15,16,22 171:10

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

---

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18 73:5,6,8 342:14 344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6 124:3 204:15 272:6 327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10, 14

**accelerated** 339:4 347:7

**acceleration** 339:6, 10,15 340:13,17,24

**accept** 16:17 152:23 188:19

**accepted** 241:14 277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24 359:19,21 360:9,14 372:21 373:13

**accordance** 241:13, 25 242:4 254:10 256:21

**account** 287:17 328:6,9 359:14 360:6,14,22 367:22 371:9

**accountant** 21:17 25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4, 7,17 28:16 38:24 87:12,14,17 112:10, 11 148:23 149:2,14 150:14,19 188:11 200:17 230:16,18,21 240:19 241:14 257:22,24,25 258:12, 13 280:6 290:13 326:18,21 337:2,7 351:2 354:7,11,22 358:3 371:5 372:3 378:15

**accounts** 244:9 327:10,12,17,21 329:17 330:10,12,20 331:4 333:7 359:19, 22

**accuracy** 113:17 114:17 115:2

**accurate** 88:7,11,17 89:13,23 90:2,6 110:16 112:19 133:5 176:17 204:4 238:4 256:10 257:4 284:24 286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25 213:6,17 314:21

**acting** 23:23 24:2,3,8 28:5,8,12,18,20 29:5, 9,11 30:14,16,24 31:2,3,5 155:6,9,14 156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12 346:19,25

**actual** 115:21 311:25 312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7 263:4

**adjustments** 36:4 240:21 241:18 243:5 244:19 245:20

**administrative** 321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21 61:5,10 62:21 63:5 267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7 257:2

**advisor** 125:8,15 192:25 193:15 205:10 273:23 281:6 282:5 311:25 312:5,6 328:7 331:22,23 391:7

**advisor's** 337:17

**advisors** 3:17,18 9:21,22 22:22 27:10 29:10,12 32:18,20,25 33:24 39:2 42:21,22 44:6,7 58:8,14,15,18

125:3 126:10,13,16 127:10 152:14 160:10 167:13 168:19 171:14 172:18 175:7,13 178:11 179:18,21 183:7,18 184:15,19, 22 189:23 190:9,12, 19 191:2 192:25 193:8,19 194:3,21 195:10 196:8,22 205:7,12,23 206:14 208:4,7 210:5 213:22 215:14 235:9 267:24 268:16 279:19 280:2 286:18 308:4 325:15, 21,22 328:7,25 329:3 332:14 333:23 335:15 336:7 337:14 353:20 379:19,24 380:2,10,22 381:2,6, 11,16 389:11 390:11 391:8

**advisors'** 168:9 179:8,25 180:9 184:3 194:17 218:19 328:9

**advisory** 32:21 33:24

**affect** 371:17

**affected** 265:12 277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4 44:12,16 47:25 48:9, 22 49:5,6,10 51:17 54:17 57:19 58:3 60:14,21 61:4 62:9, 20 63:3,15,22 64:6, 10,16,24 65:18 78:18 93:21 94:6 100:25 105:8 107:2,13,21 108:3,7 109:10 131:2 171:14 220:6 225:6, 14,21 239:4 254:2 259:24 262:11 263:5 307:24 309:16,24 310:9 312:2,11,14,25 370:10

**affiliated** 134:6 285:17

**affiliates** 41:2,5,8,10, 13,14 44:4,11,15,25

45:13 46:3,9 47:18 48:7,13 54:2,11,13, 20,21,25 55:6,11,18 56:2,16,23 61:20 62:2 63:11 65:4 66:8 82:16,20 91:3 100:22 101:16 106:22 107:3 108:14,18 109:8,18 110:7 111:2,6,9,13, 23 112:18,24 113:19 115:4 117:24 118:7 119:4 120:20 121:4 176:9 233:9,23 234:10,16,21 235:4, 22 236:8 238:25 241:7 242:8 243:8 259:19 260:11 262:6 309:19 312:2,13 377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13 132:7 138:11 217:15, 19

**agree** 77:5 306:13,22 307:5,10

**agreed** 16:17 75:20 121:16,20 198:20 199:5,11,19 200:13 209:25 210:6 314:11 374:25 375:7

**agreement** 17:9 59:24 65:19,6,23 66:2,6 67:3,7,8,12, 16,22 68:4,9,12,17, 24 69:15,19,22 70:2, 7,11,16,20 71:18,24 72:4,7,10,13 75:4,5, 9,14,16,23,24 76:3,6, 7,10,14 77:6 78:15, 21,25 79:8,10,17,18, 24 80:5,6,11,16,20 81:6 82:9,17,22 83:7, 10,14,17,20,23 99:15,24 100:2,6 102:3,6 104:13,17,19 122:5 123:22 124:4 134:12 186:24 187:2, 16 189:2 200:13 210:22 212:17 278:23 279:18,20,24,

25 314:7 316:5,8,9, 13 326:3,13 332:8 351:4 365:22 379:20

**agreements** 58:16 77:24 83:4 168:9 186:10 279:4,6 325:24 353:22 379:18,23 380:4,11, 13,19 381:17 388:16, 17

**agrees** 243:25

**ahead** 68:22 82:6 156:20 164:10 212:25 248:12 295:12 329:11 352:10 364:23 378:18

**Aigen** 4:5 9:24 214:4 251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21 125:2 273:17 281:8, 23

**allowed** 62:8 81:23, 25

**alpha** 297:20 302:7 307:19 328:10 338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15 214:18

**amortizing** 334:13

**amount** 49:10,11 50:23,24 57:6 119:7 131:13 132:8 138:11 142:18 144:5,16 161:19,25 195:16 196:16 216:17 217:15 220:23 222:11 239:5 240:9 244:3 271:11 277:7 283:18 288:6 308:22 342:10 343:5,15,17 389:11

**amounts** 106:21,25 108:14 109:7,18 110:6 111:2,5,8,12, 23 112:18,24 113:18 114:19 115:3 119:3 120:20 121:4,11 125:8 126:6 161:8 168:3 171:12 174:15, 22 175:11 176:9 181:15 199:12 202:7, 22 203:7,13,19 204:11,16,25 205:12 211:11 212:10,18 217:19,21 222:3,11 234:23 235:3 275:13 282:8 283:2 285:10 288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24 241:3,6 261:11 262:3 265:7,8,17,18,19 389:8

**and/or** 42:8,16 43:3, 14 59:14

**annual** 26:10 84:17, 23 85:2,24 96:7 168:10 170:5,9 184:5 217:2 228:16 334:8 335:9 336:12

**answering** 248:7,8 262:23

**answers** 12:2 16:25 26:15

**anticipated** 311:20 378:17

**anymore** 294:24 388:12

**apologize** 30:10 40:22 78:14 99:22 104:12 125:21,24 139:2 170:2 192:14 197:19 226:17 227:17 304:14 352:8 354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24 56:6 59:17 60:12 162:5 168:4 294:13 316:14

**apply** 213:7 314:12, 22

**appointed** 18:21,24 24:14,19,25 25:8 29:11,15 270:4 323:9,16

**appointment** 152:24 153:4,16

**appointments** 227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5, 10 63:12,17,23 144:24 170:14 206:5, 16 271:17,22 272:13, 14 281:7 332:16 351:5 377:17,24 382:11

**approve** 56:21 57:2, 3,20 61:5,9 231:21 273:6 379:7

**approved** 57:5 60:20 231:14 271:12 294:21 295:6,18 333:4 382:16,17

**approximate** 17:22 23:15 27:24 30:19 36:23 38:15 120:15 161:24 216:17 277:7 310:5

**approximately** 8:20 15:13,20 19:23 109:15,19 110:7 119:23 126:12 169:7 173:14,15 178:19 220:12,24 221:3,7 238:9 277:10,15 278:6

**approximates** 118:13 121:6

**April** 152:18,25 200:4 202:13,23 203:3,15 204:10 210:6 213:18 301:16 314:21 323:6

**areas** 26:5

**Argumentative** 156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4, 9

**ascribing** 386:8

**Asia** 4:24 92:14 118:3 129:16 135:10 177:14 218:14

**asks** 97:12 171:10 172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6, 24 109:14 118:23 225:16,23 265:9 354:15 367:9 368:4 371:7,16,23 372:6 376:24 387:3

**assets** 5:23 107:14 108:10,13 109:20 110:8 122:3,8 137:14 190:3 194:2 195:17, 20 196:3,9,17 204:19 211:3 225:8 235:11, 15 237:20,23 239:13, 19 240:15 241:4,18 242:13 250:18 253:16,24 259:18 260:8,11,13 301:9 303:9 307:9 309:2 311:10 317:7 366:14 368:5 370:22

**assistant** 295:2 298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10 297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15 133:24 297:13

**assumed** 285:4,11 287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11 172:12

**attorneys** 3:4,11,17 4:2,10,16 147:21 187:6,11,15 188:3,7, 24,25

**attributable** 132:3 276:11 283:2

**audit** 26:11 48:5 52:23 85:24,25 86:9, 23 88:2,6,13,14,16 89:10,11,22 91:11,14 93:4,14 95:6 96:7,10 97:22 98:19 103:25 104:4 106:7,16,17 109:24 110:25 111:20 112:7,24 113:17 114:2,7 115:2,20 116:5 117:2,20 119:19 131:5 132:9,24 135:6 137:5,7,10,12,21 138:18 142:9,11 148:25 149:4 199:23, 25 200:6 218:7 219:4,5,12,15 221:11,14,20 243:12 244:18 263:24 264:8

**audited** 6:4 41:7 47:25 84:16,23 85:3, 19 90:2 93:24 95:14

Index: auditing..briefly

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

---

## B

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

---

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,20
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

323:2,3,5

**COVID-19** 7:7 8:18

**CPA** 22:13

**crafted** 178:6

**crash** 265:11

**craziest** 157:5

**crazy** 264:2

**create** 257:18

**created** 199:10

**creditworthiness** 303:19

**Crescent** 294:10

**CRO** 254:13,14 256:25 257:7

**cross** 305:17,21

**crossing** 295:24

**culmination** 145:8 250:4 274:20

**cure** 345:4

**cured** 363:14,19

**curing** 365:16

**current** 86:13 158:9

**curse** 394:15

**cursed** 394:14


**D**

**D.C.** 162:20 164:6

**daily** 219:20

**Dallas** 3:16,24 4:8 8:14 9:20

**damages** 385:17

**Dandeneau** 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

**data** 311:24

**date** 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

**dated** 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

**dates** 30:17 178:8 321:14 326:7 355:25 357:11

**Dave** 87:20 172:6 230:19 292:3,4,11

**David** 124:9 275:23 389:9

**Davor** 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

**day** 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

**days** 71:12 356:9

**DDP** 349:23,24

**de-accelerate** 344:24

**de-accelerated** 345:18

**deadlines** 86:9 379:2

**deal** 74:25 219:18 224:14 286:11

**deals** 373:19

**Deb** 151:7 349:10,18

**Deborah** 4:4,18 9:8, 12 10:2,3 349:18

**Debra** 3:12

**Debs** 349:20

**debt** 333:9

**debtor** 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

**debtor's** 233:7 239:12,19 240:15

**debtors** 374:21

**debtors'** 337:24

**debts** 302:23

**decade** 95:19 231:22

**decades** 95:21

**December** 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

**December-ish** 390:16

**decide** 254:25

**decided** 245:5 318:13 380:22

**deciding** 56:13,17

**decision** 121:24 122:2,21,22 245:2,8 340:9 382:20,21

**decisionmaking** 254:14

**declared** 182:7,12

**deduce** 309:23,24 310:6

**deemed** 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

**default** 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

**defaults** 365:17

**defendant's** 214:18

**defendants** 81:14

**defended** 11:14

**deferral** 200:23 201:4,7,21

**deferred** 203:3 366:23

**define** 32:9 33:21 101:6

**defined** 33:13 45:13 51:17 53:13 54:2 99:15 173:2

**defining** 44:16 69:8 109:21

**definition** 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

**degree** 245:20

**degrees** 22:7

**Deitsch-perez** 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

159:25 160:19 177:6,
17 178:3 180:4,12
191:4,22 194:6,22
195:22 196:4,11
202:24 205:16 206:7
208:11 209:8 212:12,
20 214:9,13,16,22
215:5,11 216:11
220:25 227:21 231:8
232:9 238:10 239:20
242:25 247:15 248:2,
8 249:4,17 251:10
252:6,9,20,25 254:7
255:10,22 256:17
262:18 301:19
324:24 336:15 348:9,
23 349:21,24 352:6,
11,20 353:2,17,23
375:22 376:4,9 377:3
381:13 384:12
386:13 387:10,14
393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7
235:20

**delved** 251:19

**demand** 121:11,17,
21 122:4,7,9,15,19,
23 123:23 124:4
134:13 140:17
142:21 182:15
186:18 187:3,17
198:21 199:6,11,19
200:14 202:18,22
205:19 209:25 210:7,
23 212:18 301:17
313:16 314:8 315:2,8
316:6,17,18

**demandable** 316:19

**demands** 122:14
364:13

**department** 146:10
147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4
164:4 383:15

**depends** 41:20
57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11
8:10,16 11:2,15,18
12:7,15,22 16:15,23
33:23 72:21,23
73:10,15,20 74:6
76:8 77:12 81:3
123:17 151:6,9 215:6
227:15 266:21 267:4,
13 365:20 373:2
375:25 376:19
388:23 395:8,9,11

**depositions** 11:19
12:19

**derived** 16:6 17:23

**describe** 56:4 84:3
111:21 326:15 353:7
358:3

**describing** 125:17
126:2

**description** 108:21,
24

**desk** 293:9,10 295:25

**detail** 107:7 120:25
153:8 159:20 222:22
229:14 278:11 300:6
311:18 351:19
369:20

**detailed** 122:20
132:12 179:23 224:9
230:7 260:5 276:18
370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12
80:8 84:7 104:16
131:25 286:3,22
299:12 300:8 342:12
343:7

**deter** 376:18

**determination**
41:25 42:4 261:18,19

**determine** 53:19
82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development**
347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12
205:19 207:18
222:25

**diligence** 85:5,8,13
169:11

**direct** 113:22 253:6
304:19 322:10

**directed** 57:17

**direction** 237:6
254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7
17:23 19:8 42:7,15
43:14 88:2 177:11
219:2 354:9

**director** 23:6 32:15
39:25

**directors** 15:22 72:7

**disagree** 318:5,16,
21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17
52:11 53:10 88:13
91:12 94:6 99:14,20,
23 103:2 111:21
112:3 113:8 179:12
210:12,15 242:21

**disclosed** 48:7,9
52:19 53:4 93:24
94:18 102:3,7,13,18
103:8,10 113:12
117:13 130:10
133:21 134:3 138:8
190:25 212:4

**disclosure** 100:12
134:12,16 185:15

191:20 211:21,23
262:11

**disclosures** 91:2
94:16

**discovery** 81:4
196:21

**discuss** 99:3 124:2
148:18 201:18,20
322:14 342:7 343:22
345:7

**discussed** 26:18
73:23 74:11 80:14
107:9 114:25 192:12
193:23 227:12 234:4
272:20,23 275:3,4
294:5 300:11,13
371:15 383:22 390:9

**discussing** 117:25
148:22 180:8 191:6
217:18 234:9,15
300:17 319:7 341:6,
8,22 346:4 388:13,15
391:6

**discussion** 164:4,9,
12,17 180:19 191:9
217:21 246:4 249:24
251:20 282:18,21
290:6 319:13 342:15
387:22 388:8 392:11,
21 395:3

**discussions** 58:20
233:6,15 249:11
250:4 251:13,19
253:17,20,25 263:25
264:14 274:5 275:17
280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13,
16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25
52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14
239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6
91:19 92:5 96:3
103:18 104:23 105:5,
10,16 136:11 139:22
140:8,12 141:4,10,16
144:3 147:16 151:22
153:6,15,22,23,24
154:5,11,18,24 155:3
156:24 159:21
197:13,14,16,17,25
198:12,15,17,23
199:3,4,10,14,17,25
200:3,18,22 201:3,6,
15,18 202:4 203:2
209:14,16,22 210:12,
15 211:24 212:4
213:21 214:3,6,12,
15,17,20,24 215:7,13
216:7 226:10,25
227:8,19 228:6
236:16,19 237:18
239:17 244:5 256:5,9
293:21,22 301:16
302:12 303:7 305:12,
21 320:14,16 338:14

**documents** 12:24
13:12,14,16,19 25:5
123:15,17 126:19
140:10 143:24
147:20,25 149:12
153:8 159:15 197:2
227:13 235:19
236:25 266:19 267:3,
7,9,14,18 291:9
294:2,4,6,8,11,14,17
296:21,22 322:11
364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24
260:19

**Don-** 68:19

**Dondero** 4:2 9:14
15:6 16:8 17:24 19:8,
12,25 20:9,13,18,24
21:4 42:9,17 43:15,
24 44:3,5 50:11,14,

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

──────────

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:23
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 311:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 118:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

**ensuring** 327:20

**enter** 122:21

**entered** 67:7 68:25 104:14,19 122:6 124:5

**entire** 19:7 192:13 253:19 264:4

**entirety** 130:12,15

**entities** 16:7 17:23 43:13 44:3 54:21,25 55:4 101:8,15 189:8 278:2 289:19 330:13 361:13 394:4

**entities'** 265:12

**entitled** 41:8 82:7 110:25 157:16

**entity** 15:5 22:20,25 27:18 31:11,23 32:3, 6,11 42:14 109:24 137:13 272:3 289:23 302:22 307:8

**entries** 240:19

**entry** 131:10 308:3, 14 311:9 332:23

**environment** 90:3,5, 9,14,20 113:6 137:18,20

**environments** 207:21

**equal** 49:11 50:23 262:7

**equaled** 263:7

**equals** 119:6,9

**equity** 273:18 281:25 282:3

**erroneously** 197:22

**error** 125:6,9 131:17, 24 132:3 145:8 165:9 213:12,14 214:5 273:11,14 275:14 276:8,25 277:5 278:5,15 280:12,22 283:3 289:6 318:15 385:9,14,19,23

**errors** 163:21 167:14 373:10

**Esq** 3:6,7,12,13,20, 21 4:4,5,11,18

**established** 94:2 285:14,20 300:25 301:7 310:16

**estate** 31:12,17 235:11,15

**estimate** 20:12 372:4 389:3

**et al** 5:15

**evaluate** 170:12,14

**evaluated** 244:10

**evening** 353:3

**event** 131:2 134:22 138:9 143:9

**events** 103:13 125:16,25 130:4,10, 21 133:8 138:5 242:22 262:14 263:4 370:24 371:7,9,13

**exact** 15:24 17:25 18:13,18,19,22 20:5 30:17 131:20 156:21 274:13 277:17 278:10

**EXAMINATION** 5:6, 7,8,9,10,11 10:14 266:13 352:25 377:5 387:19 393:19

**examined** 298:19

**exceed** 121:12 190:2 195:19 196:3

**exceeded** 93:25 194:2 196:9,17 204:19 211:3 301:9 303:9 307:9

**Excel** 368:19

**exceptions** 231:2

**excerpts** 238:16

**excess** 94:6 121:12 389:13,14

**exchange** 45:15 212:17 281:17,23

**exchanged** 45:21

**exchanges** 281:17

**excuse** 14:25 35:23 201:2 249:18 280:9 323:13 395:8

**execute** 48:14,22

**executed** 49:21 142:10 161:12 221:6 274:2 293:14 303:7

**executing** 317:16

**execution** 181:9 300:14

**executive** 35:10,11, 16 36:20,24 37:5,18 38:3,4,9,14,16,21 39:3 78:10 366:24 367:18 386:10

**executives** 369:3

**exhibit** 5:15,16,18, 20,21,22,23,25 6:2,4, 7,8,9,10,11,12,13 13:13 91:20,21 104:23,24 135:8,14, 15 140:12,13 142:15, 16 151:20,21 170:18, 19 197:3,9,15 198:2 214:7 215:22,23,25 216:3,4,5,7,8,12 218:13,16,17 226:23, 24 236:16,23 237:19 258:18 297:23 302:7, 8 303:14 305:5 306:7 307:18,21 309:2,6 313:9 317:12 328:10, 12,13 338:13,21 341:13,14

**exhibits** 267:10,11 268:9

**exist** 15:12 16:17 114:22

**existence** 67:15 69:18 80:16 81:6 99:14,20,24 102:3

**exists** 278:13

**expanding** 354:25

**expect** 247:19 293:19 333:15

**expectation** 231:5

**expected** 200:17,21 293:21

**expects** 203:18 212:9

**experience** 101:14 111:16 116:14 169:10 256:25 257:8 259:13 315:5 337:22

**experienced** 47:13

**expert** 43:5 143:19 153:7 183:9 257:14

**explain** 356:18

**explained** 364:17

**explaining** 163:15

**explanation** 308:20 311:8

**expressly** 390:4,25 391:12 392:5

**extended** 301:17 308:21 314:22

**extension** 307:8

**extent** 45:17 55:21 66:15 107:5 126:4 208:6 244:15 296:6 322:6

**extra** 219:23

---

**F**

**face** 50:23 120:11 144:16 244:3

**face-to-face** 293:8 294:5

**facilitated** 321:10

**fact** 62:7 192:20 236:21 264:24 266:25 275:7 298:4 301:15 313:19 334:22 338:23 341:10 343:19 363:12 394:5,7,17

**facts** 111:22 240:6 261:25 265:8 375:17

**factual** 164:9

**fail** 12:3 348:5

**failed** 338:23 340:2

**fair** 11:23 19:24 44:14 49:7 52:4 93:17 99:13 110:21 118:11, 21,24 119:6,8,9 120:3,15 121:5 126:8,21 141:18 143:23 149:20 224:6 239:16 240:18,21 241:17 242:6 243:5 244:13,20 245:19 260:10 261:15 262:7 263:5,15 264:25 287:21 370:21 371:18 372:5 374:10 390:2

**faith** 189:8,15 190:9, 12,19 191:3 193:19 194:20 205:8,14,23 206:14,23 208:5

**familiar** 22:20 31:22 32:3 54:6,9 226:13 227:8,18 274:6

**fashion** 86:11 276:16 357:14

**fault** 229:17 276:24 277:19

**favor** 60:6 62:19 139:17 161:24 261:9

**feature** 301:17 315:8

**February** 70:21 226:3,4 228:3,23 323:9

**Federal** 7:19

**feel** 81:8,18 176:25 273:13 287:16 371:21 376:11,16

**fees** 332:12 356:21, 23

**fide** 369:25

**figure** 343:10 366:12 367:5

**file** 167:8,13 297:2,10 337:8

**filed** 21:6 197:17 208:18 213:23 215:13 219:23

226:16 237:2,24
238:4 244:5 255:17
263:17,19 311:10
322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17
246:3 249:9 256:20
264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12
230:23

**finance** 25:21 26:2,4,
8,17 28:15 38:23
127:25 128:16 129:6
280:7 290:14 351:3

**financial** 5:18 6:2
14:12 26:24 27:5
41:7 48:2 84:17,23
85:3,13,19 88:11
90:2,7 93:24 95:14
96:7 100:12 102:7,
10,12 104:21 105:17
107:22 112:2 113:7,
14 114:18 120:8,18
122:11 130:23
133:22,25 135:20
138:3,4,9 143:8
176:21,24 179:16,23
180:15 196:22 201:8
211:7,21 217:24
218:3,19,24 219:6
221:14 222:24
224:10 235:17
241:24 242:3,15,16
254:9 258:25 260:3
261:20 262:5 264:11,
13 270:10,14 271:2
286:18 301:11
302:19 306:4 311:25
312:5,6 370:9,12,17
378:24

**financials** 6:5
137:16 168:19 176:8,
16 179:8 186:15,16
187:2 189:23,25
200:10,12 218:12
241:13,15,21 242:2
246:9 247:5

**find** 53:23 268:10
283:17 315:4

**fine** 36:8,9 45:10 84:8
154:12 269:16 287:2
353:24

**finish** 11:21 12:2
76:18,24 249:19
295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6
131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25
152:10 197:23 293:5
321:15

**follow** 61:17 151:15
391:18

**follow-up** 171:7

**footnote** 244:8
260:20,23 261:15,17
371:22

**footnotes** 261:17
263:11

**forbearance** 134:5,
16

**forgave** 49:23 51:23
52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20
52:5 284:9

**forgiven** 52:18 53:11
94:11 366:23 367:23
369:13

**forgiveness** 52:22
93:23 94:8 365:23
369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14
25:15 29:21 31:16
33:9 34:20 40:10
41:4,12,24 42:11,12

43:17 50:6,7 52:8
53:18 54:8 55:10
56:11,25 58:25
59:19,25 60:7,15,17,
25 61:12 62:11
63:13,24 64:18,19
65:12,20 66:11,24
67:10,17,25 69:7
75:6,10 78:20 79:4,
14,20 80:2,12 82:24
83:25 85:15 86:2
91:4 94:3 96:11,20
97:5 99:17 107:15,16
108:5 110:11 111:24
112:20 113:20
114:20 115:5,7
117:6,18 119:12,13
120:16,17 122:10,16
124:6,23 127:19
132:16 133:23 134:8
142:5,7 143:10 144:8
145:2 146:13 147:5,
12 149:5,22 150:10,
17 153:18,19 154:2,4
155:11 156:17
158:15 159:17 160:2,
3,12,18,20 167:5
168:8 178:21 180:3,
5,11,13 181:5,11
183:15 184:6,20
185:2,18,24 191:5,23
193:21 194:5,6,23
195:21,22 196:5,12,
13,18 200:20 201:25
202:25 203:23
204:14,23 205:3,9,
11,15,16,25 206:8,21
208:10,12 209:9
210:24 211:4,13
212:13,21,22 213:11,
25 220:10,15 221:2
222:13 225:10,24
227:22 228:9 229:24
231:9,18 232:10
234:6 235:23 236:10
238:11 239:3,14,21,
22 240:16,23 242:24,
25 246:19,25 247:14,
15,16 248:4 249:5
250:11,22 251:11
253:12 254:6,7
255:11,23 256:18
257:6,11,15,20
260:14 262:19 263:9
265:4 269:7 270:15,
22 271:8,18 272:9,17

273:7 277:22 278:19
279:8 280:15,23
283:19 284:7,14
285:7,23 286:8,9
287:9,18,24 288:8,25
289:12 290:9,21
291:23 292:19
293:15,23 296:13
297:6 298:22 299:15
300:15 302:2,25
303:2,10,20 305:10
306:15,24 307:3,13
310:2,11,19,24
311:12 312:16,19
314:14 315:9,23
316:23 317:17,24
318:6,17,23 319:23
320:6,18 322:5,23
326:24 327:6,24
330:21 331:5 333:10,
18,20 334:10 335:4
336:14 338:3,5
339:16 340:18 341:3
342:21 345:12,19
346:22 347:14,19,21
348:10,11,12 351:15
353:11,15 354:4
355:5,9,15,21 356:3,
14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10 365:6
366:15,25 367:16,25
369:4,8,17 370:3,25
371:10,25 372:22
373:4,20 374:11
375:3 376:20 379:10
380:25 381:14
384:13 386:14
388:19 389:5,15
391:4 393:24 394:10,
11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17
376:25

**found** 53:17 66:12
125:6 140:15 394:8

**Frank** 5:5 8:10 9:11
10:11,18 271:4 305:8
395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18
329:18,25

**front** 110:12 122:12
140:16 279:21 281:7
294:9 301:11 302:9
305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9,
12,19 191:2 193:19
194:19 205:8,14,23
206:14,23 208:5
241:15 372:20

**fully** 13:4,7 17:4
364:19

**fulsome** 265:8

**function** 26:8,20
28:16 87:3 89:4
351:3

**fund** 3:18 9:22 22:21
33:23 35:2,6,18,19,
21 39:7 42:22 44:7
58:15 125:2,3,6,7,10,
11 127:10,13 145:16
152:14 176:18
202:14 203:14
215:14 273:17,23
274:16 275:2,4,6,8,
10,13 276:7,9,10
277:5,9,21 279:19
280:2 281:2,9,10,11,
12,13,15,20,23,25
282:7 283:23 308:4
325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2,
4,8,12,15,16,18,22
34:5,8,13,18,23
35:12,15,17,18
36:21,25 37:4,9,17
38:2,5,10,17,22 39:4
145:15 160:8 168:10
171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

---

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

379:11,12 387:2
389:10

268:12

---

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

---

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18
210:19 211:2 335:16
336:6 337:24

**information** 16:14
80:19 86:10 88:13
91:12 112:5,17
117:14,15 169:11,13
171:20 176:8,15,22
179:16,17,18 188:8
206:3,5 218:20 230:3
236:7 237:13 257:18
274:4 312:10,24
344:19 368:11

**informed** 69:18
178:17 190:24 210:5
211:9 212:8 288:15
335:16,23 378:7

**informing** 64:13
181:25 182:11 330:5

**initially** 132:17 185:5
247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12
274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16
60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3
210:10,13,19 381:25

**instructed** 77:15
147:8,9,23 241:19
291:7,8 315:7 362:8
381:22

**instruction** 8:6
57:11 74:14,23

**instructions** 256:7
347:25

**insufficient** 122:8

**insurance** 385:17,22
386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21
214:19 288:23 315:5,
19

**intending** 16:25
146:16

**intent** 306:14 318:20,
25 380:10

**intention** 81:11
307:11

**interest** 50:3 55:25
56:22 57:18 58:2
59:14,17 60:13 62:18
63:2,10 64:5,15,22
119:10,16,21 120:22
162:6 163:22 164:25
165:11 167:11 168:5
217:17 223:18
273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16
329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16,
18

**interviewed** 322:18,
22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations**
275:17

**investment** 4:10
9:18 32:21 65:11
127:17,24,25 128:12,
14,16 129:3 244:23
245:3,6 247:11
273:24 274:15
279:21

**investments** 128:17
129:5,6 249:23

**investors** 275:10
276:12 277:4,8,21
281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10
245:2 264:17 274:14
275:15,21 276:21
288:4 292:6,13 293:6
354:10

**issuance** 131:5
138:10,18 371:14

**issue** 54:7 178:14
191:13 201:25
204:10 208:24

**issued** 56:16 60:5
62:19 65:8,18 66:8
81:13 82:15,20 93:13
107:13,20 108:2
131:11 132:6 133:12
161:23 162:5 180:10
218:25 223:7,17
233:8 234:10,15
235:4,9,21 236:8
242:8 243:7 261:9
262:6 263:6

**issues** 113:5 248:14
306:19

**item** 108:19 111:11,
18 112:4 119:2,16
123:6 185:21 220:5
238:20 259:18,24

**items** 53:3 97:21
100:9 112:3 131:21
149:8 228:21 229:3,7
230:4,7 249:22 260:6

**J**

**James** 234:11
271:25 273:2

**investment** 4:10

**January** 70:16
163:7,8 219:11,13,17
258:20 326:8 341:6,
18 344:2 350:5,9,13,
24 351:20 361:25
362:3,7 364:8 365:2,
15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6
16:8 19:8 43:15,24
44:5 50:11,25 65:16
67:6,22 68:18 71:23
72:7 75:24 78:9,16
82:22 123:3,20
189:9,16 190:10,13,
15 205:9 206:23
232:18 273:2 280:19
342:5,7 351:5,10,14
362:8,10 363:8,18
365:3 367:8 368:22
379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3
219:20 313:2

**John** 3:6 7:24 9:4
10:20 45:3 46:13,18
69:13 74:8 76:15,17
77:10 95:17 105:23
129:18 146:13 154:7
155:18 157:6 177:6
192:18 208:13 216:2
222:14 236:18
267:18 304:6 308:7
353:18 385:3 387:10,
16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21
72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17
99:25 103:2 132:25
135:2 137:6 176:10,
24 186:16 200:7
242:23 262:16,24
263:13 265:3

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12
221:12 222:23
245:22 250:5 274:16
276:4 323:6 329:22,
23 337:8 353:13
356:10 358:13,14
380:23

**kinds** 353:6 354:2
357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9
172:6 230:19 275:23
292:3,18 389:9

**knew** 68:18 103:9,10
369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10
46:5 47:23 48:12,21
49:9 50:13 52:5,10
53:10 62:5 63:12,16,
21,23 79:23 80:10
81:5 82:7,8 89:23
93:23 95:3 98:17
101:13,19 102:2,25
106:25 111:16 112:6
138:16 144:24 147:8
153:13 167:8,22
184:10 188:15 189:9
194:13 206:5 207:8
208:2 225:5,12
226:21 232:21,23,24
237:11 243:4 259:22
322:19 324:17
384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21
230:20 292:3,12
328:17 342:11 343:8
350:17,18 362:23
365:13

**L**

**L.P.** 3:19 8:12 9:6,23
10:22 11:7 15:16,23

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 331:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

**M**

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:13,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4
198:10 222:5 224:3
276:5 307:22

**money** 39:11,16,24
41:2 43:24 49:11,17
50:10 62:9 124:14,20
126:6,23 127:3,15,25
128:5,10,23 129:2,5
145:16,18 186:10
276:13 282:8 283:5
285:18 318:10
319:11 320:4 359:9,
13,24 360:21 374:22

**moneys** 39:19 162:5
167:9 277:8 282:17
283:16,22 289:5
359:15

**month** 59:11 132:23
226:16 229:15
258:21 332:4

**month-and-a-half**
323:10

**monthly** 5:25
226:11,14 227:5,20,
25 228:12 229:10,19,
21 230:2,11,22
231:14 232:6,8,13,
19,20 255:18 256:14,
19 259:9,12,14

**months** 261:21
292:25

**morning** 7:3 10:19
342:16,18 344:12,14,
16

**Morris** 3:6 5:6,9 7:24
9:4 10:7,15,20 13:10,
17 16:9,24 17:11,14,
19,20 22:16,18
31:18,19,21,25 35:24
36:5,11 45:6,10
46:15,23 47:4,6,11
55:4 69:8,11 72:15,
18,25 74:3,9,13,18,
24 75:11,15,19
76:19,23 77:2,11,19,
22 81:16,18,21,23

82:10,13 91:8,18,22,
24 92:9,11,14 95:9
105:4,25 110:22
114:11 118:2 129:15,
21,24 130:14,18
135:5,10,13 136:9
137:24 139:20
140:11,23 142:14
146:17 150:21
151:19 154:3,13,16
155:19,22,25 156:18,
25 157:3,10,13,21
170:17,20,25 171:24
174:18 177:9,14,16,
19,23 178:10 195:6
196:20 197:6,21
201:11 202:3 207:15
208:20 209:13 214:4,
8,10,14,21 215:3,10,
21,24 216:4,13
217:5,8 218:11
219:25 221:23
222:16 224:18
226:22 228:18
236:15,20 243:15
246:13 247:21 248:5,
11,22 249:18 250:6
251:23 252:4,8,16,24
253:4 254:17 258:16
259:16 265:23 266:9,
17,24 267:14,20
268:14 269:7,12,18
270:15,22 271:8,18
272:9,17 273:7,10
277:22 278:19 279:8
280:15,23 282:12,18
283:19 284:7,14
285:7 286:9 287:9,
18,24 288:8,25
289:12 290:9,21
291:19,23 292:19
293:15,23 295:12
296:13 297:6 298:22
300:15 301:13 302:2,
11,15 303:2,10,20
304:3,7,12 306:15,24
307:13 308:5,8,13
309:10,12 310:2,11,
19,24 311:12 312:16
313:13 314:12,14
315:9,23 316:23
317:17,25 318:6,17,
23 319:23 320:6,18
322:5,23 326:24
327:6,24 329:10
330:21 331:5 333:10,

18 334:6,10,21 335:4
338:3 339:16 340:18
342:21 345:12,19
346:22 347:14,19
348:12 351:15 352:4,
8,16,18 353:11,15,19
354:4 355:5,9,15,21
356:3,14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10,22 365:6,
21 366:15,25 367:16,
25 369:4,8,17 370:3,
8,25 371:10,25
372:22 373:4,20
374:11 375:3,24
376:20 377:6 387:7
388:19 389:5,15
390:9 391:4,14
392:7,13 393:24
394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23
245:3,6 247:11
260:22

**mouthpiece** 206:2

**move** 69:11,12
114:11 208:19
246:13 247:21
248:22 250:6 252:23
307:17 364:22
376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3
320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14
249:11

---

### N

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8
309:19 311:25 312:4,
13 375:20

**Nancy** 4:2 9:14 65:9,
17 66:7 67:6,22
68:19,25 75:25 78:16
82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6
144:2 147:17,18
180:20 230:8 240:22
253:18 259:15
271:20 276:10
279:22 280:9 292:22
294:22 325:19
329:24 333:13
354:12 356:6,17
357:11 378:23

**NAV** 125:6,9 131:17,
24 132:3 145:8
273:11,14 274:23
275:8 277:5 278:15
280:12,22 281:13
289:6 318:15 373:10

**needed** 155:2 250:17
257:13 271:21 289:6
318:13 354:15 358:8
382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19
383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4
9:21 27:10,12,15,18,
21,25 28:4,6,16 29:7,
10,12,16,24 31:3,11,
17 32:17 42:21 43:12
44:6 54:14 58:7,11,
14 60:5 65:6 100:23
126:9,13,16,23
127:3,10,11,15,18,24

161:23 162:5,7,11,18
163:23 164:6 165:11
167:7,8,13,15 168:2,
6 171:13 172:21
176:14 178:12,17,18,
22 179:13 182:3,12
184:21,23 186:9,21
189:15 196:3,23,24
216:20 217:14,23
218:3,19 219:15,22
220:18 221:6,10,13,
25 223:5,24 241:23
242:6 260:4 267:24
309:24 322:3 325:14,
18,21 326:16,23
327:4,10,17,20
328:6,7,8,25 329:3
330:11,18,19 331:2
332:14,17 333:8,15,
16 334:5,8,22 335:3,
9 336:13 337:13,23,
24 338:23 341:19
342:9 343:18 345:17
346:12,16,20 348:4
353:8,21 358:15
379:16 381:23
382:10 383:24 384:3
390:5 391:2,10,12,19
392:5

**Nexpoint's** 59:18
218:6,12 219:6 331:3
336:22 350:19

**Nguyen** 3:21 268:10
297:19 298:9 302:5
303:14 305:3 306:7
307:19 308:11,25
309:3,4 311:22 313:8
317:3 331:9 332:21
338:12,21 341:15
343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american**
284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2,
7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21 48:15,22 49:6,12 50:15,22 51:7 56:7 57:4,19 59:18 60:5, 13 62:19 63:3 64:6, 15,23 78:17 107:20 117:9,12 120:18 122:4 126:12 134:6 140:14,17,20 141:22, 24 142:2,4,18,22 147:15 149:17 150:4 161:24 162:4,7,18 163:23 165:12 167:11,15 168:6 182:3,12 186:18,22 187:17 213:16 214:4 216:16,20 217:2,13, 23 220:5,8,13,18,20, 23 221:5 222:4,10 223:4,7 224:2,9,12 233:22 234:10 243:17 244:23 245:3, 7,13,16,23 260:22,25 261:9 306:11,18 309:16,24 310:9 312:2,14,15,24,25 313:15,16 315:13,14, 16 316:17,18 319:12, 14 324:16 334:6,13, 18,19,23 335:21 336:13,23 338:2,17 339:4 340:10,14 341:19,23 342:9 343:4 344:25 345:18 347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20 45:2 46:2 49:21 50:18 54:3,6 55:7,18, 25 56:10,15,23 58:2 65:7,14,18 66:7 67:3 68:14,17 76:2 82:15, 20 83:6,10,13 106:21 107:2,12 108:2,14,18 109:5,7,17 110:6,25 111:5,8,12,22,25 112:18,23 113:9,10, 13,18 114:19 115:3 118:12,13,25 119:3, 6,9,11,22 120:19 121:3,21 122:8,15 123:6 124:3,15 130:23 131:12,16

132:7,10,14,20 133:13,21 134:5,14, 17,23 138:11,20 139:5,10,17,21 142:10 143:6,7,14, 21,23 144:5,12,16,22 145:4,23 146:2,4,7, 11,14,25 147:10 148:15,18,24 149:2 150:5,8,15 158:5,13, 19,24 159:5,10,23 160:16,25 161:5,9, 10,19 162:11 171:13 175:16 178:14,15 179:14,21 180:2,10, 24 181:4,9,16,22 182:8,16 205:19 209:2 210:8 213:7,8 222:2,17 223:13,16, 19,23 224:9 233:8 234:15,23 235:4,9, 14,21 236:3,7 238:20,25 239:4,5, 11,18 240:10,20 241:6 242:7 243:6, 11,18 244:4,15 246:6,15,22 247:10, 24 248:25 250:9 251:8,15,21 252:12 253:10 261:12,16 262:6,11 263:6,15 264:19 268:21,24 282:14 284:19 285:15,17 288:21 289:10,16,18,22 290:8,13,16,24 291:5 293:13 296:9 297:4, 5,11,17,21 298:17 299:11,14,18 300:13 301:18 304:19,24 305:2,18,22 306:21, 23 307:12,24 310:17 312:11 313:20 314:13,23,25 315:2, 20,22 316:2,14 317:10,16,21 319:5, 9,15,18,22 322:20 323:20,25 333:17 338:7 364:13 366:22 367:23 368:6,17 369:15,19,20,25 370:9,11,17 372:11 386:9,10

**notice** 7:25 356:9 357:9 379:6 380:10, 15,16,17 381:4,7

**noticed** 16:12,20 248:6 375:25

**notices** 380:21

**November** 59:12 328:16 329:14,19 330:15 331:12 332:3 380:9,18 388:3,6 390:22

**NPA** 5:15 189:24 328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13 15:24 17:25 93:7,10 100:10 108:9 111:7 126:10 135:10 137:25 139:22 170:24 177:15,16 179:4 197:4,7 218:13 222:21 236:21 239:25 240:9 277:17 282:9 285:15,16 286:5 343:25 344:5 370:22 377:9 389:18, 21

**numbers** 240:5,6,23 268:13 278:10 343:5 366:12,19 367:6

---

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9 47:4 60:24 65:19 66:10,15 67:9,24 69:6 73:24 77:13 78:19 79:20,25 97:4 107:16 115:5 119:12 144:25 146:12 147:4, 11 149:21 151:13 156:7,16 159:25 164:2 180:4,11,12 191:4,22 194:6,22 202:24 206:7 208:10, 11 211:4 212:12,20, 22,24 213:25 220:25 225:10 227:21 231:8 232:9 239:20,22 248:3 249:4 250:11 251:10 253:12 254:7 255:10 256:17 262:18 269:7,14,17 347:21 348:11,12

352:14 365:6 381:13 384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9, 10 20:4,20 22:14 25:15 31:16 33:9 34:20 40:10 41:4,12, 24 42:11,12,19 43:17 44:17 45:4,16 46:10 47:20 48:3,16,25 49:13 50:5,7 52:8 53:18 54:8 55:10,20 56:11,25 58:25 59:19,25 60:7,15,16 61:12 62:11 63:13,24 64:17,19 65:12 66:24 67:17 69:5,9,10 75:6, 10 79:4,14 80:12 82:24 83:25 85:15 86:2 91:4 94:3 96:11, 20 99:17 107:4,15 108:5 110:11 111:24 112:20 113:20 114:20 115:6 117:6, 18 119:13 120:16,17 122:10,16 124:6,23 126:3 127:19 132:16 133:23 134:8 142:6 143:10,15 144:8 149:5 150:10,17 151:16 153:18,19,25 154:6 155:11 157:2 158:15 159:17 160:3, 12,18,19 167:5 168:8 178:20 180:3 181:5, 11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21,22 196:4,11,18 200:20 203:23 205:3,15,25 206:21 210:24 211:13 213:11 220:10,15 222:13 225:24 228:9 229:24 231:18 234:6 235:23 236:10 238:10 239:3, 14 240:16 242:24 246:19,25 247:14 250:22 251:12 254:6 255:12,22 257:6,20 260:14 263:8 265:4 266:19,23 267:21 270:15,22 271:8,18 272:9,17 273:7 277:22 278:19 279:8

280:15,23 283:19 284:7,14 285:7,23 286:7,9 287:9,18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2, 25 303:2,10,20 305:10 306:15,24 307:2,13 310:2,11, 19,24 311:12 312:16, 18 314:14 315:9,23 316:23 317:17,23 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:2 342:21 345:12,19 346:22 347:14,19 348:9 351:15 353:11, 15,18,24 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 388:19 389:5,15 391:4,14 392:7,13 393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18 262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22 242:20

**obligations** 160:9 178:15 179:12 180:2, 9,23 185:15 194:4 208:8 327:13,21 328:8 332:5,8 333:17 335:17 336:6,7,10 361:19 380:2 390:10, 12 391:7,8

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5
50:4,16 51:6 126:10
128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13
331:21

**occurred** 103:13
104:5 125:17 126:2
263:13 278:15
299:25 331:24 339:7
369:24 390:24

**October** 8:19 21:7
160:5,7,14,21
169:17,24 171:19
172:4 173:24 174:6
183:7,14 186:11,13
189:13 207:16
219:24 263:19
314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5
294:4,10 323:13,14
326:15 388:22 389:2

**officer** 14:12 23:6
26:25 27:6 28:24
29:2,7 32:14 35:10,
12,16 36:20,24 37:6,
18 38:3,5,10,16,22
39:3,24 51:22 52:6,
17 120:8 143:18
173:7,9,13,16,20,23
174:3 184:23,24
258:25 269:5,24
270:10,14 271:2
302:19 362:25

**officers** 15:22 29:24
39:11 40:5,8,12
51:23 52:13 93:21
153:9

**offset** 380:2,3 382:25
390:9,11,13

**offsets** 58:21 381:18,
19 383:13

**Okada** 49:18,21,24
50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14
332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11
202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-
end** 125:12

**open-ended** 125:7
275:4,8 276:10
281:9,11 282:7

**operating** 5:22,25
90:10 226:11,14
227:2,4,19 228:7
255:18 256:14,20
259:9,12,14 359:14

**operational** 143:25
147:17

**operational-type**
291:11

**operations** 202:8,15
203:14

**opinion** 120:6,7,10
204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11
128:16 129:6 288:21
360:9

**ordinary** 226:9
229:22 293:18

**organizational**
112:13

**orient** 365:24

**original** 223:25
232:11 274:24
277:14

**originally** 177:21
232:16

**originals** 297:4,11,
16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12
119:22 142:10
171:11 174:15
175:12 185:10,23
186:8 202:6,18,23
203:7,8,13 220:18
222:3,12 223:4,14,
19,24 224:13,17
235:10,14 244:16

**overpaid** 58:16
381:16

**overpayment**
381:20 390:13

**overpayments**
58:22 379:22 380:3
389:4,12

**overruled** 17:15

**overseeing** 26:10
86:22 230:11

**oversight** 257:15

**overspeak** 115:16
252:3

**owe** 375:15

**owed** 125:8 160:10
161:8 178:18,23
185:6,16 186:9
199:12 204:12,25
205:13 212:18
275:13 297:17
308:20 310:17
358:21 380:3

**owing** 50:3 211:11
212:10 223:6 234:23
285:18

**owned** 15:6 16:7
17:24 42:8,16,24
43:3,13 273:17

**owner** 272:24 281:25
282:3

## P

**p.m.** 150:24,25 151:3
174:6 224:23,24
225:2 266:5,6,8
325:7,8,10 349:6,7,9
372:14,15,17 395:10,
11

**Pachulski** 3:8 9:4
10:20 72:9 166:19

**package** 229:10,20,
22 230:2,12,23
232:6,8 233:3

**packages** 231:15
232:20

**pages** 214:11,17

**paid** 50:2 56:18
167:10 221:7 277:4,
8,20 283:23 327:22
330:19 331:4 333:16
336:9,11 355:19
356:23 365:4 394:9

**paper** 288:21 293:13,
20 296:12,16

**paragraph** 92:17
118:11 119:20 121:9
124:15 126:9 134:11
140:18 142:22 203:6
216:25 221:24 222:7,
9,10,14,16,18 223:9,
15

**paragraphs** 117:23
118:6

**part** 42:9,17 43:15
50:18 51:11,16,21
52:12,19,23 53:12
58:17 85:5 88:12,14,
22 90:21 91:14 93:22
103:22 105:9 116:13
117:20 125:12 142:9,
11 148:4 149:12
156:24 169:14,19
175:3 176:23 179:11
193:17 200:16
210:21 213:16
214:19 238:8 240:17
245:19 254:20
274:17 282:4 286:2
288:19 326:21
330:17 365:2 366:23

**367:24 386:9,10**

**participants** 8:17

**participate** 168:13
218:23 219:2 362:21
380:5

**participated** 87:25
137:20

**participating** 191:9
259:8

**participation** 86:23

**parties** 7:15 9:25
85:7,12 100:14,22
101:6,23 103:4
376:13

**partner** 9:9

**partners** 31:8,12,15,
18 32:4 370:16

**partnership** 121:11
122:6 131:12 132:7

**partnership's**
102:19 103:3 118:12

**party** 17:10 100:19
101:18 102:20 103:4
321:4 366:22 368:17
385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7
359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4
144:22 161:18
181:15 205:10,19
209:3 234:22 282:8,
16 302:23 318:14
327:13 332:6,13
344:19 355:18 356:2,
13 357:3,13 366:13
374:25 393:23

**payable** 171:12
174:15 190:6 202:18,
22 220:5 222:2,17
327:21 329:17
330:10,12,20 331:4

333:7 334:14

**payee** 140:21 142:25
216:22

**paying** 288:14,16
326:23 333:9 338:17
346:21 355:4,8 357:4

**payment** 56:5,21
57:4,6,12,18,25 58:6,
10,12 59:14,16,20,22
60:3,4,9,11 62:17,25
63:9,15 64:4,9,22
121:11,17,21 122:7,
19,23 162:13,16,17
163:4,6,10,14 164:24
182:16 199:6,11
212:18 331:20
332:24 334:9 335:9
336:12 337:3,25
338:24 339:12,14
340:2,7 342:9 343:4,
20 344:20,24 345:4,
11,17 346:13 348:5
350:7,9,20,23 351:6,
7,14,20,23 356:6,17
358:25 359:2,6,7,15
360:16,22,24 361:18
362:2,5,7,9,12,15,18,
21 363:3,7,10,15,20
364:3,7,25 365:5,9,
14 366:21 379:15
381:23 382:2,9,14,15
383:19 390:6,8,21
391:10,13,20,24
392:6

**payments** 55:16,24
56:8,14 57:2,9 64:14
162:10,24 163:16,21
165:10 167:14
217:15 282:22
288:11,12 328:4
329:16 330:3,4,6,8
334:23 335:3,19,21,
22 336:23 337:9,15,
21 355:19 356:8
357:2,10,13 358:7,21
359:9,10,20,25
360:6,10,15 361:7,23
362:4 365:14,16
377:12,17,22 378:8,
9,17,24 379:7 380:23
381:3,6,11,18 382:6
383:4,5,23 384:2,4,6,
7 387:24 388:14
390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4
89:3 146:4 170:24
237:5 275:9,20,21
279:23 291:21 293:7
294:3 319:16 351:12
372:19

**percent** 18:2,4 86:15
108:23 109:19 110:8
260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5
130:19 189:4 197:19
268:19 298:8

**perfectly** 144:3
223:2 348:18

**performed** 48:5
246:11

**performing** 114:7
219:4

**period** 25:12 39:9,14
40:24 90:15 93:14
95:15 105:18 120:9
135:21 169:5 203:20
218:21 219:6,16
221:15 226:18
231:15 242:17
243:13 247:22 265:2
321:22 380:15,16

**periodic** 228:13
241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7
44:21 57:7 79:9
86:21 87:6,7 114:2,4
116:14 155:16
167:20 191:18
259:22 291:21
292:22

**personal** 79:22
80:10 97:15 375:11

**personally** 62:20
64:3 85:23 89:11
95:4 97:9 101:22
237:4 255:20,24
275:15 296:21
303:23 304:18,22
306:12 317:21
370:11

**personnel** 237:16
318:12 333:22
359:18,21 360:13,23
363:3

**pertaining** 65:17

**petition** 21:9 70:11
84:11 235:10,14
241:20 263:20
310:15 386:5

**phone** 68:6 70:3
290:25 392:23 393:2,
5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16
294:4 296:12,16
299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6
112:16 122:18 166:2
260:7 272:13 278:16
297:14,16 326:4,10,
12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20
366:5 367:6 386:9,18

**play** 85:23 153:11
168:16 184:2 340:9

**played** 86:3,6,17
335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16,
17

**plural** 314:3

**point** 78:9 87:2,6,7
114:2,4 157:16 166:9
190:16 254:11 255:3,
7 261:6 313:7,20
321:13 326:6 337:12
344:9 375:23 376:11
380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10
386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5
17:22 19:13,16,19
112:23

**portions** 12:10

**position** 37:9 122:3
184:14 193:3,6,9
274:15 280:11
361:14

**positions** 38:24
172:25 173:5 183:6
184:10,18 192:16

**possession** 45:25
113:9 132:11

**possibilities** 29:19
371:23

**possibly** 213:7
314:12

**post** 92:12 184:13,
14,18 192:15,24
193:7,8 275:24

**pot** 366:5 367:6
386:9,18

**potential** 250:20
357:4 366:3,19
369:16 371:7,9

**potentially** 113:5
249:6 250:12,13,14,
16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13
89:20,24,25 90:4

**plural** (see above)

91:11 97:7 98:7,12
106:14 146:9,24
150:13 230:25 231:2,
3,22,24 233:5 299:4,
5 337:4 356:13
369:2,7 371:6,15
374:15 377:21

**pre-petition** 226:18

**precisely** 205:21
298:16

**prefix** 268:15

**premarked** 91:19
104:23 197:15 216:5
236:16

**preparation** 137:21
230:11 259:9

**prepare** 123:17
204:23 226:9 229:6,
21 235:19 236:25
237:3,5,13 241:11
255:24 377:22
378:16

**prepared** 227:5,20,
24 228:15 229:2,4,9
230:3 232:20 237:8
239:17 241:25 242:3
255:20 284:19
317:14 319:5 373:2
376:18

**preparer** 256:4
259:4,5,23

**preparing** 137:10
164:9 232:5,7
241:12,15,16 254:9
264:10

**prerogative** 253:7

**present** 4:23 90:23
180:15 191:19
283:14

**presentations**
368:7,16,18

**presented** 86:10
113:14 117:10
161:11 296:11,16

**presents** 12:20

**president** 14:16
271:23 272:24

**presume** 207:13

**pretty** 105:15 364:23

**prevented** 231:6

**previously** 18:9 24:4 80:13 225:22 246:8 373:19 374:18,25

**Pricewaterhouseco opers** 84:9,13,16,20 106:7 113:23 132:5 137:2 141:24 142:3 149:3 150:9,12,16 211:10 212:9 242:21 263:3 274:10

**primarily** 267:18,20

**principal** 35:10,11, 15 36:20,24 37:5,18 38:3,4,9,13,16,21 39:3 49:11 50:3,23 55:17,25 56:22 57:18,25 59:14,17 60:12 62:18 63:2,9 64:5,14,22 119:7,10, 22 142:4 144:5 161:8,19 162:6 163:11,22 164:24 165:11 167:10 168:5 217:16,19 220:23 222:11 223:6,18,25 334:9

**principals** 274:6

**principles** 241:14

**prior** 20:14 26:12 37:10,18 54:21 56:18 57:13 62:4,10 63:23 74:14 84:10 87:17 99:16,24 121:13 131:5 138:17 144:24 163:15 164:25 165:9 189:13 193:23 199:6 206:15 212:19 217:20 227:15 243:23,24 267:12 300:13,20 301:17 331:12 333:4 334:23 335:3,7 336:11,20 337:11 339:10 346:9 370:18 381:3,7 386:4,19,22

**private** 273:19,21

**privilege** 151:14

**privileged** 66:18 74:2

**probe** 82:7

**problem** 8:3 214:14 260:18

**procedure** 271:17 291:12

**procedures** 7:20 114:8 207:21 378:5

**Proceed** 267:22

**proceeding** 197:18

**process** 52:23 55:23 56:4,5 58:18 90:21, 25 91:14 116:13 131:24 137:9,11 145:10,11 148:25 156:21,24 168:14,17, 25 169:6,9,15,17,19 170:5,9,14 176:23 179:11,20 189:2 200:16 210:21 218:6, 7,23 237:10 245:19 272:14,19 274:21 292:6 324:13 366:11 373:12

**processes** 207:21

**processing** 286:13

**produce** 178:12 195:8 210:14 235:24

**produced** 132:10 183:11 228:12,13 266:20 267:7,15,19

**producing** 241:20

**professional** 21:12, 15,20,22 22:15 356:21

**proficiency** 22:11

**project** 292:25

**projections** 335:18 337:17

**promise** 346:6

**promissory** 6:10 45:14,21 46:2 48:15, 22 49:6,12,20 50:15, 18,22 51:7 54:3 55:7 56:6,9 60:5,13 67:3 75:25 78:17 82:15,20

83:6,10,13 107:20 108:2 109:5 119:22 131:12 132:6,10,14 133:13 138:10 139:5, 10,17,21 140:14 142:9,17 144:5,12, 16,22 146:7 158:5, 13,19,24 159:5,10,23 160:16 161:10 178:14 179:14 209:2 210:8 216:16 217:13, 23 233:8,22 234:10, 15 235:8,21 240:20 241:6 243:6 244:4 282:14 284:19 285:15,17 288:21 289:10,16,18,21 290:7,12 291:5 293:13 297:4,5,11, 17,21 299:11 300:13 306:10 307:12 310:16 315:20,22 317:16,21 319:5,9 322:20 338:2,17 339:4 340:10 344:25 369:20

**prompted** 81:7 342:2

**proof** 167:8,13

**proper** 100:11 229:18

**properties** 146:15 238:8

**property** 375:11

**proposal** 125:13 281:7 282:4,6 386:24

**proposals** 367:22

**proposed** 136:18 178:5

**proposing** 366:19

**prosecution** 208:23

**provide** 15:4 28:24 174:22 175:7 267:12 295:20 299:8 311:17 333:22 353:8,14 354:3 357:19 358:5, 9,12,13 378:22 387:3

**provided** 32:20 112:8,9,17 114:18 127:12 142:8 146:15

175:3 176:22 179:19 182:23 194:25 200:18 274:25 311:24 312:4,10 327:20 332:9 335:14 351:2 353:7 354:6,19 355:7,13 357:21,25 358:4,11,15 367:11

**providing** 88:11 219:21 278:17 279:6 280:14 309:21 326:14

**provision** 103:17 132:15

**provisions** 105:7

**prudent** 302:20 303:5

**public** 21:17

**publicly-traded** 281:16

**pull** 200:10 215:6 297:20 302:7 305:2 307:18 308:25 313:9 317:2 328:10 334:4 338:11,20 341:12

**purely** 240:22

**purporting** 228:7

**purpose** 16:23 17:2 36:6 53:17 112:2 126:7 232:5,7,11 294:15

**purposes** 16:11 33:22 85:8 92:21 93:4 101:18 128:13 129:3 197:12

**pursuant** 15:8 122:6 148:25 199:10,18 200:13 256:6 275:13 278:16 279:5 280:13 281:6 288:17 290:19, 24 326:13

**put** 12:23 36:9 61:24 71:11 81:10 89:25 91:18 104:22 105:2,5 122:2 124:18 135:5, 16 139:22 151:19 170:17 177:8,10,13 197:7 207:2,5,14 215:21 218:11,18

226:22 235:15 236:15 240:4 257:10 258:16 259:10,12 266:18 281:7 292:23 326:9 345:22 368:3, 16 377:10 389:8

**putting** 144:19 197:11 240:23 265:5 273:21 306:19 316:2 330:2

**Pwc** 84:14 92:25 93:5 94:2 96:17,25 97:10 102:4 103:2,21 104:3 114:6 142:8 200:19 211:2 262:14 263:24, 25

**Pwc's** 85:24 86:23 97:6 105:22

---

**Q**

**qualified** 194:11 206:19

**qualify** 101:18 136:14

**quantify** 276:22

**question** 11:22 12:3 13:4,8 17:17 22:17 26:13 35:4 38:8 40:15 45:11,22 46:19,20 48:19 51:4 68:20,21 93:12 96:4 99:19 104:11 114:14 132:4 139:14 144:15 146:18 148:13 150:7 154:4,17 155:24 156:9 157:20 158:8 164:22 171:10 174:13 175:19,23 176:18,20 178:18,24 179:3 185:9 188:18 192:21 194:18 195:11,14,24 209:6, 10 210:20 212:23 213:2 223:13 224:6 226:2 229:5 236:5 243:9 248:7,9 251:24,25 253:4 262:23 269:8,19 270:16,23 271:9,19 272:3,10,18 273:8 277:23,25 278:20

279:9 280:16,24 283:20 284:8,15 285:8 286:10 287:3, 10,19,25 288:3,9 289:2,13 290:10,22 291:24 292:20 293:16,24 296:14 297:7,9 298:23 300:16 302:3,18 303:3,11,21 304:4,7, 13,16,17 305:7 306:16,25 307:14 310:3,12,20,25 311:13,20 312:8,17 314:15,18 315:10,24 316:24 317:18 318:7, 18,24 319:24 320:7, 19 322:6,24 326:25 327:7,25 330:22 331:6 333:11,19 334:11 335:5 336:17, 18 338:4 339:17,21 340:19 341:3 342:22 345:13,20 346:7,23 347:20 351:16 353:12,16 354:5 355:6,10,16,22 356:4,15 357:7,16,23 358:17,23 359:5,12 360:4,12 361:2 363:17,23 364:11 365:7 366:16 367:2, 17 368:2 369:5,9,18 370:4 371:2,11 372:2,23 373:5,21 374:12 375:4 376:21 388:20 389:6,16 391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20 17:2,4 26:15 40:19, 21,23 47:9 77:13 79:13 81:17 82:6,12 99:7,10 105:7,13 156:2 157:12 169:21, 24 171:7 177:2 180:16,17 184:4 209:5 266:10 300:6 352:5,10 377:8 384:16 385:3 386:6 387:8,15 393:18 394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

**R**

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3 76:3 79:2,9 342:11 343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25 102:12 172:8 198:10 208:21 209:6,7 301:20,22 316:4

**reading** 120:11 138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2 96:6 101:11 109:4 114:23 116:25 117:16 127:2 141:21 150:3 159:14 160:15, 23 161:3 205:21 235:3,5 238:5 247:9, 24 248:25 256:11,13 286:2 301:4 318:16, 21 346:18 361:4,10 364:6

**reasonable** 108:17 333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18, 20,22 19:17,20 20:8, 10,21,22 23:4,12,20 24:23 25:16 27:16

29:13,17 30:17,18 32:16 36:22,23 37:7, 12,22,23,25 38:19 39:8,20 40:2 49:19, 22,25 50:2,8,9 52:9, 21 53:8,15,16 57:22 59:2,3,11,20 60:18 61:25 62:6,17,23 63:6 65:2 67:19 68:2, 3,7,8,11 69:17,20,21, 25 70:5 71:6,21,22, 23 78:5 79:15 80:17, 18,21 89:14,19 90:13 91:5,6,9,13 95:2,9, 13,17,21 96:13 99:5, 6,8,9,12 100:20 102:6 112:21,22 113:15 114:3,15,21 115:8,14,17,18 116:15,18,19,23 119:15 122:17 123:5 124:7,10,12 126:5,9, 16,20,25 127:2,5,8, 21 131:25 132:13,17, 19 134:10,18 135:3 136:4,5 138:21,25 139:7,19 141:6,8,11 144:12 145:3,4,16, 20,22 148:16,17,20, 22 150:11 155:4 158:16,21 159:2,7,12 160:7,13 165:4,5,13, 17,20,24 166:13,16, 18,20,21,25 167:6 168:24 169:16 171:18,21 173:7,8,21 178:5 179:6,24 180:6,14,18,19,20 183:16,20 188:19 189:3,21 190:22,24 191:6,10,12,19,24 192:10,19 194:16 196:19 200:9,11 201:23 202:2 209:17, 20,23 210:3,9,18,25 211:19 212:3,14 217:18,20 219:5,9 220:21 223:10 225:13,18,20 228:25 233:10,20,25 234:8, 9,12,14,20,24 235:6, 12,18 236:11 237:22, 25 241:9 242:5,10 243:10 244:22 245:14,18 246:20,21 247:2,6 248:15,19

249:13 250:24 251:13,18,20 252:13 255:5,15,17 259:8 262:4 265:21,22 268:24 269:3 270:11 276:4,6,23 277:2,3,7 280:11,17,25 282:14, 24 283:8,11,13,15 284:6,11,20,22 289:6,21 290:2,3 291:3,6 292:9 293:17 296:18 298:24 299:16,18,21,22,24 300:17,24 301:3,12, 15,18,25 303:15,22 313:12 314:24,25 315:25 316:8 318:9 319:10,11,13,25 320:10 321:13,16,18 322:17,25 323:22,23 324:3 331:19 334:4, 18,21 339:9,18 340:8,12,15,16,23 341:4,5,8,11 342:2, 19 343:14 345:21,25 350:10,12 351:17,24 361:3,14,17,20,21 362:3 364:5,7 365:9 369:7,22 370:10 380:8,14,16,21 383:10,21 384:2 387:6 388:7 389:10 390:7,18 392:20 394:2

**receipt** 380:20

**receivable** 118:12, 14 238:21,25 239:11, 18 240:10 243:18 245:24 246:6,15,22 247:10 249:2 250:9 251:8,16

**receive** 11:6 22:10 141:17 303:23 304:18 305:23 332:11

**received** 42:9,17 43:15 85:12 123:21 125:14 141:17 142:3 212:16 293:20,21 304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6 150:25 224:24 266:6 325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10 320:13

**recollection** 24:25 29:14 39:22 40:6 67:21 71:5 105:12 115:12 124:19 126:22 127:23 128:10,22,25 131:16 166:15 173:22 180:7 183:19 187:24 192:20 221:5 223:23 225:6 227:10 228:14 229:7 246:3 251:6 252:19 253:9 269:4 270:8 275:22 282:21 283:7 290:5,18 309:18 344:11 367:14 369:15

**record** 7:10 10:17 36:3,15,18 73:5,8 150:24 151:3 209:7 224:23 225:2 266:5, 8,18 267:9 301:22 302:6 320:15 325:7, 10 349:3,6,9 372:14, 17 392:25 395:9

**recorded** 8:10 225:7, 15,22

**recording** 7:16 100:11

**records** 50:19 225:8, 15 227:13 235:17 237:15 240:12,14 257:21 258:5 286:23 300:2,4 306:5 312:22 393:10

**recover** 167:9 168:3 181:22 182:3

**redacting** 312:23 313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9 22:24 27:12 30:4

31:14 32:7,17,24
33:19 44:2,10 54:10,
24 68:24 79:17 84:13
95:11 175:2 186:24
203:6 279:24 329:3

**reference** 92:17
103:12 200:12 202:6
222:3,10 223:9
238:20,24 260:21

**referenced** 132:14
186:25

**referred** 84:4 91:15
123:24 143:7 169:21
186:7,20 223:15
279:20 366:5

**referring** 33:16
50:17 75:24 76:6
118:8 163:5 187:11
199:25 223:11
226:15 281:5 314:2
316:3

**refers** 170:4

**reflected** 13:14 75:5
175:16 181:15 235:4
240:9

**refresh** 24:24 105:12
131:15 192:20 221:4
223:22 227:10
367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement**
279:17 325:19,23
379:20 388:16

**relate** 130:6

**related** 59:23 60:4
90:25 100:13,19,22
101:6,18,23 102:19,
20 103:3,4 105:7
131:17 138:5,10
145:9 167:14 208:25
280:22 281:3 284:2
366:22 368:17
376:13

**relates** 76:14 113:6,
18 130:11 211:24

**relating** 131:2
138:19

**relation** 27:21 30:10,
13 35:6 41:18 58:21
112:3 125:9 163:21
172:25 176:17
184:11,18 191:16
264:13 385:18

**relationship** 374:3

**relationships**
100:13 102:20,21
103:4

**relative** 192:16

**relayed** 188:8 206:4
342:12

**relaying** 206:3
207:24 344:18

**release** 329:6 330:8

**relevant** 88:13
208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3
237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23
203:8

**remaining** 119:10
223:25

**remember** 59:8 70:9
71:2,3 80:22,23,24
87:23 95:19 102:9
122:25 123:2,19
124:16,24 127:6,14
128:6,7 129:11
131:19 147:15
162:22,24 163:4
165:6 166:3,7 172:17
174:4 187:13,19,21
188:15 189:18 194:7,
15,24 195:4 200:6,15
234:4 236:12 250:3
253:13,14,23 254:15,
17 274:12 277:16
282:17 284:12,17,23
286:3,22 291:21

293:12 296:9 299:12
300:10,12 302:16
309:11 313:22 316:3
317:5 319:4,7 320:2,
5 323:7 324:4,8
326:6 333:25 339:8
340:21 342:14
344:15,18 345:25
346:3,4 351:11
357:17 361:18 364:9,
12,14 365:10,25
377:14 387:25
389:17,18 390:22,23
392:4,22

**remembering**
289:17

**remind** 72:19 77:17
391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14
8:18 12:20 299:6,9

**rendered** 204:5
233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14,
16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11,
15,25 205:12 211:11
212:10 304:23

**repeat** 17:19 38:7
45:11 46:21 48:20
146:21,22 249:25
269:21 270:24
336:17,18 339:21

**report** 5:25 14:13,21
19:12 26:21 88:2,6,
16 89:12 98:18 105:8
106:4,8,16 110:25
111:21 112:7,12,25
115:20 116:5,17,21

117:2 119:19 131:5,
11 133:12 134:7
135:6 137:5,7,10,12,
25 138:3,4,9,13,19
166:8,11 178:13
219:13,15 226:19
227:4 228:7 229:2,4
232:12 256:15 257:4
258:20,24 259:5,23

**reported** 19:7,10,17,
21,25 20:23 21:2
119:17 120:23
226:10 240:15
258:14

**reporter** 7:12 8:24
10:10 209:6 268:8,18
301:20

**reporting** 7:6 8:22,
25 20:9,13,17,23
21:4 87:22 91:2
114:17 230:12
231:14 232:6,19

**reports** 89:22 113:18
115:2 143:8 171:5
196:22 226:14,16
229:6 255:18 256:20
257:19 259:9,13,14

**represent** 9:25 10:4,
22 133:4 267:23

**representation** 5:17
91:16 94:21 95:5,16
96:9,18,22 97:2,8,13,
19,25 98:9 99:2
103:7,17,23 104:8
106:11,15 130:8,9
135:25 136:6,14
214:23 215:9 262:16,
22,25 295:17

**representations**
92:21 98:19,24
136:16,23,24 262:24

**representing** 9:11,
14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25
172:8 196:25 291:15
379:7

**requested** 196:21
362:18 363:7

**requests** 85:18
373:3 387:18

**require** 63:16

**required** 56:9 94:5
96:17 97:19,20,21,25
98:3 127:18,20 340:2
390:5

**requires** 96:25

**reserve** 245:2,6
260:24 261:4,8

**reserved** 244:22
245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18
383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13,
18,23 35:2 37:4 39:7
56:15 112:17 134:17
182:7 212:5 261:8,16
273:12 333:8 335:9
339:12 340:6 365:22
383:18 385:17
393:21

**respond** 174:25

**responded** 174:8
182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24
174:8,13 176:4
178:6,18 182:20,24
185:5 189:6 190:8
194:17,18 195:9,13
205:6 210:20 267:22
350:11

**responses** 81:4
184:3

**responsibilities**
25:18,23 28:10 31:2,
4 38:21 219:20

**responsibility** 26:6,
10 88:5,9 115:23
116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

---

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

---

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

**S**

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:11 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

---

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

---

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

**sheet** 106:19 107:25
108:11 109:6 110:4,5
111:11 112:4 120:23
175:2,14 179:17
220:2 222:21 228:22
229:3,8,16 230:5
243:7 251:14 253:22
294:12,24 370:22
372:6

**sheets** 107:14,22
175:8

**short** 266:2 279:16
332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25
226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15
94:20 95:16,22 96:8,
18 97:2 106:14
135:24 136:6,22,25
139:4 141:4,21
143:14,23 144:11
150:4 153:24 154:5,
10,18,22 155:3
158:4,13,18 159:4,
15,23 160:16,25
181:3 213:16 289:9,
11,16 293:25 306:17
320:14

**signature** 92:3,7
105:22 106:9 130:7
136:20 140:25 141:2,
7 143:4,21 144:20
152:20,21 217:9,11
256:3,15 262:21
294:5,12 298:14
299:2,19 305:6
320:22 321:3

**signatures** 298:3,10
299:8,20

**signed** 46:2 55:7,12
92:5 94:25 95:2,4,11
96:22 98:10,23,25
99:4,7,10,16,25
103:18 106:7,16
107:2 123:4 132:13

**sheet** 137:6 139:10,16
141:10,15 143:24
144:4,13,15,21
148:15 153:14
158:23 159:9 161:5,
20 180:24 181:16,23
182:8,16 201:12,14
213:7,9 256:2,4,8,12
257:5,15 258:24
262:15,20 289:23
293:25 296:20,21
298:4,21 299:13
301:16 305:16,20
306:10,22 315:2
316:14 319:19
320:16

**signer** 103:7 363:2

**signers** 152:11
159:20

**significant** 228:21
229:3,7 230:4

**signing** 141:6 152:23
156:23 296:9 299:17,
22,23 319:21

**similar** 135:25 218:7,
9 272:3,19 311:9
325:17 331:11
338:14 353:8 357:20
370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24
89:15 93:9 95:9
129:11

**singular** 314:3

**sir** 13:23 21:13 22:17
43:9 68:17 69:14
80:11 115:12 130:17
140:3 141:2 144:4
146:18 151:23
154:18 156:8,20
158:2 167:23 209:12
218:18 266:15 278:8
301:25 302:12 304:4
307:22 317:14
328:18 331:15
332:20,25 333:6
334:17 336:19
341:20 351:25

**sit** 102:13 114:24

116:24 138:22
141:12 159:13
231:20

**sitting** 149:24 270:7
284:22 310:8 314:19
320:3 348:16 351:10
382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17,
24 15:4,14,19 16:6,
14 24:4 28:20,22
377:2

**Skyview's** 16:6
17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15,
16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25
72:20 73:9,14 74:15,
19 94:24 103:6 151:4
233:12 284:10

**speaking** 95:8
179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19,
23 97:7 120:19 124:8
198:15 199:3 224:16
235:12,18 253:15
323:8

**specifically** 29:13
40:21 57:22 59:2,11
68:10 70:9 71:21
85:17 87:10 117:24
121:19 124:16 126:5
128:6 131:25 141:6,
11 145:5 146:3
162:23 180:6 187:19

192:10 194:8,25
196:20 233:11 234:2,
5,13 247:6 248:20
249:13 250:24
251:18 252:13
253:13 255:5,16
277:2 292:9 296:9
297:5 298:25 299:16
313:22 314:24
321:16,19 334:2
339:8 340:22 357:17
389:19 391:9

**specificity** 163:18
239:9 390:19

**specifics** 345:15

**speculate** 20:5
188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10,
22 313:5

**spilled** 169:17

**spoke** 62:14 74:5
151:7 188:9 249:20
350:16,17,18

**spreadsheets**
368:19

**spring** 125:17 201:21
280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you**
88:25

**standard** 231:22
233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20
72:10 166:19

**stapled** 197:22
214:12

**stare** 298:11

**start** 8:9 41:9 170:21
214:18 248:14

268:21 304:16

**started** 21:3 36:7
125:19 207:15
231:10 304:15

**state** 8:4 10:16 47:2
161:16

**state's** 7:20

**stated** 8:3 24:5
179:15 206:9 246:8
249:8 290:12 294:16

**statement** 114:18
118:24 120:19 121:5,
10 133:7,13 134:4
179:17 190:14
194:18 204:3 205:18
224:10 228:20 262:5

**statements** 5:19 6:3
41:7 48:2 84:17,23
85:3,13,19 88:11
90:3,7 93:25 95:14
100:12 102:8,11,12
104:22 105:18 112:2
113:7,14 122:12
130:23 133:22 134:2
135:20 142:12
176:24 179:23
180:15 201:8 211:7,
22 217:25 218:4,20,
24 219:6 221:15
222:24 235:17
241:24 242:3,15,17
254:10 260:3 261:20
264:11,13 286:19
301:11 306:5 370:9,
12,17 378:24

**states** 8:12 98:16
118:11 119:20
200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9
387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5
277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23
77:11,22 81:21,22
106:2 155:19,22
157:14 215:6 220:2

**stopped** 231:16
294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13
8:23

**stressful** 292:24

**strike** 114:12 246:13
247:21 248:5,22
250:6 252:23 272:13
291:2 307:16 310:7
343:24 346:16
364:22 372:8 393:4

**string** 5:21 172:3
183:22

**structure** 87:22
112:13

**stuff** 156:6 157:5
252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8
82:16,21 83:6,10,14
109:24,25 124:14
139:5,11 168:10
277:5

**subpoena** 11:6
16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14
395:16

**subscribing** 281:19

**subsequent** 130:3,
10,21 131:2 133:8
134:19,22 138:5,9

143:9 242:22 262:14
263:4 274:12 370:24

**subsequently**
244:22

**substance** 72:22
73:15,19 74:6 151:5,
8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22
32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24
374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14
279:12 280:4 296:8

**summarized** 274:21

**summarizing**
188:13

**summary** 5:23
237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental**
218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4
275:23

**surprised** 352:9
356:11 376:22
394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25
324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

———————

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14
120:12 176:7 208:16
226:17 239:23
240:23 323:19
348:24

**talk** 89:2 157:16
164:15,20 233:19
279:2 293:7 325:13
350:16 387:17
388:23 395:4

**talked** 100:3 113:4
130:8 151:11 162:14,
15 187:21,23 188:4,7
190:15 217:14
222:23 249:14
253:16 268:3 292:11
311:15 349:19 351:5
378:5 379:18 389:2
391:9 394:6

**talking** 40:5 59:13,16
75:14 76:20,23
77:12,22 89:15
101:23 157:14
162:16 208:24 222:6,
8 231:19 259:25
264:19 323:6 341:23
350:13 351:11,13
352:16,17 354:18
368:18 379:25
383:14

**talks** 58:19 100:11
350:6

**task** 291:14

**tax** 280:7 354:22,25
358:11

**taxing** 353:5

**team** 53:4 86:8,12
87:12,14,22 88:21,23
89:2,8 112:10,12
113:8,24 116:7
137:18,20 147:14,18,
19,24 148:2,4,5
149:7,11,14,15,24
150:19,20 188:4,6
200:17 219:3 237:7
255:25 257:8,12,17,
23,25 258:4,7,12
259:11 272:23
290:11,13,14,15
291:8,17 292:5
309:21 311:24
312:13 335:11 351:7
367:10 368:3

**teams** 116:10 337:6
354:10

**tech** 320:20

**technologically**
320:12

**telephone** 191:15
290:19 342:23
344:12,14 392:22

**telling** 71:23 79:10
125:4 166:18 181:8,
14 182:14 207:24
246:21 251:4 253:9
285:5 287:8 317:5

**tendered** 45:2 55:18
57:19 58:3 60:13
63:3 64:6,15,23

**tenure** 39:20 40:2
86:3 94:4 102:11
114:5 230:14,18
368:25 369:11

**term** 28:19 33:13
41:17 44:16 45:14
51:17 53:13 54:2
58:14 69:8 71:20
75:23 79:8 99:16
170:8 173:2 186:21
315:14,15 333:14
362:14 364:3 369:16
383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8,
9 380:21

**terms** 33:21 65:23
66:2,6 69:22 75:8
76:2 78:25 79:23
80:11 83:16,20
319:8,12,14 336:7

**Terrestar** 145:9
273:12,18,19 274:7
384:20 385:9,14,18

**testified** 16:12 68:18
80:7 155:5 156:11
179:7 201:23 206:10,
18 211:14 253:2
256:24 259:10
261:10 269:23 270:2,
13 282:24 283:6
289:3 309:20 312:20
313:3 314:16 318:8
319:10 320:8 351:2
357:8 362:24 378:4,
20 379:3 380:12
388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22
302:14 387:22

**testimony** 16:11,19
20:7,15 29:5 72:22
289:17 301:13 318:5
370:19 387:25
391:11

**Texas** 3:16,24 4:8
8:14

**Thanksgiving**
329:20,22

**Thedford** 171:4
172:3,11,24 173:5
174:20 176:3,16
178:6 182:23 186:20
192:5 198:19 210:10,
13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5
199:23 215:17 320:2
357:3

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

## U

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

### V

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

### W

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1,25 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

**Y**

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16

91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

**Z**

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

**EXHIBIT 106**



2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
972 934.4700
www.NexBank.com





```
                                    Date 12/29/17          Page    1
                                    Primary Account        ████
                                    Enclosures
```

```
            Highland Capital Management LP
            300 Crescent Court Suite 700
            Dallas TX 75201
```

```
        NexBank's Privacy Notice, which has not changed, is available on our website
        at www.NexBank.com/files/privacynotice.pdf.  If you would like a copy of our
        Privacy Notice mailed to you, please call us at 972-934-4700.
```

Checking Account/s

        Account Type:  Highland Capital Management LP

Analysis Checking w/ Interest
Account Number                          Statement Dates  12/01/17 thru 12/31/17



--------------------------------------------------------------------------------

Deposits and Additions
Date     Description                              Amount



12/08    INCOMING WIRE                            677,500.75
         JAMES D DONDERO

---

MEMBER FDIC                    NOTICE: SEE LAST PAGE FOR IMPORTANT INFORMATION
              Payments received at the address indicated on this statement by 3:00 pm. Central Standard Time
              each banking day will be credited as of that date.



2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
972 934 4700
www.NexBank.com





Date 12/29/17          Page     2
Primary Account
Enclosures

Analysis Checking w/ Interest          ▮▮▮▮    (Continued)



----------------------------------------------------------------------------

Checks and Withdrawals



MEMBER FDIC                    NOTICE: SEE LAST PAGE FOR IMPORTANT INFORMATION
Payments received at the address indicated on this statement by 3:00 pm. Central Standard Time
each banking day will be credited as of that date.

HIGHLY CONFIDENTIAL                                        D-CNL003543

Appx. 02181



2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
972 934 4700
www.NexBank.com





```
                                    Date 12/29/17        Page    3
                                    Primary Account
                                    Enclosures
```

```
    Analysis Checking w/ Interest          ████        (Continued)

    -------------------------------------------------------------------------------
```



```
    -------------------------------------------------------------------------------
```

```
    End of Statement
```

MEMBER FDIC                    NOTICE: SEE LAST PAGE FOR IMPORTANT INFORMATION
                    Payments received at the address indicated on this statement by 3:00 pm. Central Standard Time
                    each banking day will be credited as of that date.

HIGHLY CONFIDENTIAL

| OUTSTANDING CHECKS | RECONCILIATION INSTRUCTIONS |
|---|---|

**Reconciliation of Account**

Date _____

| CHECKS WRITTEN BUT NOT PAID | |
|---|---|
| NUMBER | AMOUNT |

Please examine this statement and items at once and refer any excep ions immediately.

Sort your checks numerically or by date issued.

Mark off in your checkbook each of your checks paid by the bank and list the numbers and amounts of those not paid in the space provided at the left. Include any checks still not paid from previous statements.

Subtract from your checkbook balance any SERVICE CHARGE (S.C.) or bank charge appearing on this statement.

Reconcile your statement in the space provided below.

| | Enter bank balance from statement | |
|---|---|---|
| | Add deposits not credited by bank (if any) | |
| | TOTAL | |
| Total of Checks not paid | Subtract total of checks not paid | |

**THIS AMOUNT SHOULD EQUAL YOUR CHECKBOOK BALANCE->**

---

**Any Charge for Imprinted Checks Includes State Sales Tax Computed at the Current Rate, When Applicable**
**Notice: The Annual Percentage Rate and Daily Periodic Rate may vary.**

---

**EXPLANATION OF BALANCE ON WHICH THE INTEREST CHARGE IS COMPUTED**

We figure the interest charge on your account by applying the periodic rate to the "daily balance" of your account for each day in the billing cycle. To get the "daily balance" we take the beginning balance of your account each day, add any new advances/fees, and subtract any unpaid interest or other finance charges and any payments or credits. This gives us the daily balance.

---

**WHAT TO DO IF YOU THINK YOU FIND A MISTAKE ON YOUR STATEMENT**

If you think  here is an error on your statement, write to us at:
**NexBank**
2515 McKinney Avenue, 11th Floor
Dallas, Texas 75201
You may also contact us on the Web: www.nexbank.com
In your letter, give us the following information:
- Account Information: Your name and account number.
- Dollar Amount: The dollar amount of the suspected error.
- Description of Problem: If you think  here is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors in writing or electronically. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.
While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on  hat amount.
- The charge in question may remain on your statement, and we can inue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for  he remainder of your balance.
- We can apply any unpaid amount against your credit limit.

---

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS**

In Case of Errors or Questions About Your Electronic Transfers, Telephone us at 972.934.4700 or Write us at NexBank, 2515 McKinney Avenue, 11th Floor, Dallas, Texas 75201 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on  he statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account number (if any).
(2) Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us  he dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

HIGHLY CONFIDENTIAL

# EXHIBIT 107