Committee by any member (as the case may be) will be liable to any Partner or the Partnership for any action taken, or omitted to be taken, in good faith on behalf of the Advisory Committee (as the case may be) with respect to the Partnership and in accordance with the provisions of this Agreement.

(c)    If any Limited Partner obtains a final judgment in a court of competent jurisdiction against the General Partner for matters relating to the Partnership, the General Partner shall pursue against its members the remedies (if any) that it has against such member relating to such claim.

Section 5.11    <u>Indemnification of General Partner, the Manager and Advisory Committee.</u> (a) The Partnership will indemnify (A) the Principals, the General Partner, the Manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates against any losses, liabilities, damages or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such persons may become subject in connection with such person's activities on behalf of the Partnership or in connection with any involvement with a Portfolio Company (including serving as an officer, director, consultant or employee of any Portfolio Company) directly or indirectly on behalf of the Partnership and (B) the members of the Advisory Committee, any Affiliate or employer of any such members and any Limited Partner represented on the Advisory Committee by any member, in connection with any involvement with the Advisory Committee, respectively, but, in the case of members of the Advisory Committee or their Affiliates and employers or any Limited Partner represented on the Advisory Committee by any member, only to the extent that such person acted in good faith and, in the case of the Principals, the General Partner, the manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates, only to the extent that such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership or the Portfolio Company (as the case may be), (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of <u>nolo contendere</u> (including as part of a settlement) by a court of competent jurisdiction. Any person described in clause (A) of this <u>Section 5.11(a)</u> entitled to seek indemnification hereunder shall first use reasonable efforts to seek indemnification from other available sources, if any, prior to obtaining indemnification hereunder; <u>provided</u> that any such person may seek and obtain indemnification hereunder if at any time such person reasonably believes that such person will not receive timely indemnification on terms reasonably acceptable to such person from such other sources; and <u>provided</u>, <u>further</u>, that such person shall continue to use reasonable efforts to seek such indemnification from such other sources and, to the extent any such indemnification is obtained, reimburse the Partnership for any such recovery. The Partnership may, in the sole judgment of the General Partner, pay the expenses of any person indemnifiable under this <u>Section 5.11</u> in advance of the final disposition of any proceeding, so long as (w) with respect to any derivative action brought by any Limited Partner, the person receiving the advance is not the subject of such derivative action, (x) the proceeding is not instituted by a Majority in Interest of the Limited Partners against the General Partner or the Manager, (y) General Partner has a good faith belief such expenses are indemnifiable, and (z) the General Partner receives a written undertaking by such person for the benefit of the Partnership

-34-

to repay the full amount advanced if (A) there is a final determination that such person did not satisfy the standards set forth in underline clauses (i) through (v) immediately above, (B) with respect to any criminal action, such person is finally determined to be or admits to being guilty or enters a plea of nolo contendere (including as part of a settlement) by a court of competent jurisdiction, or (C) such person is not otherwise entitled to indemnification as provided herein. Notwithstanding the foregoing, no person will be exculpated or exonerated from liability or indemnified against loss for violations of federal or state securities laws, or for any other intentional or criminal wrongdoing. No person shall be indemnifiable under this Section 5.11 in respect of losses, liabilities, damages or expenses to which any such person may become subject in connection with (x) such person's activities with any Portfolio Company if such losses arise after the Partnership's final disposition of such Portfolio Company or (y) a dispute among the General Partner, the Manager, their respective members and employees, and the Principals.

(b)     No Limited Partner shall have any obligation or liability, including any obligation to make a Capital Contribution to the Partnership, in respect of an indemnity obligation arising from a Portfolio Investment with respect to which such Limited Partner is not a Participating Partner.

(c)     The General Partner will use reasonable efforts to cause each Portfolio Company for which any Affiliate of the General Partner serves as an officer or director to adopt organizational documents which provide mandatory indemnification to directors, officers, and managers to the fullest extent permitted by applicable law.

Section 5.12 Formation of New Fund or Business Endeavor. (a) Subject to the other provisions of this Article V, each Partner's interest in the business endeavors of the other Partners is limited to his, her or its interest in the Partnership and no Partner's future business activities are restricted. Notwithstanding the foregoing, unless consented to by Two-Thirds in Interest of the Limited Partners or approved by a majority vote of the Advisory Committee, neither the General Partner, nor the Manager or any of their Affiliates will close and make investments, or act as general partner, managing member, advisor, employee, agent, or the primary source of transactions on behalf of another private equity investment vehicle or pooled investment vehicle (other than Crusader, a Parallel Vehicle or Separate Investment Entity) that has primary investment objectives substantially similar to those of the Partnership (a "Successor Fund") until the earlier of (i) the date on which at least 75% of the Commitments have been invested or committed for investment in Portfolio Companies or otherwise set aside for Follow-on Investments, Partnership Expenses or Management Fees, and (ii) the end of the Commitment Period; provided, however, that this Section 5.12 shall not prohibit the formation of one or more Co-investment Funds, and Co-investment Funds shall not be considered Successor Funds. If a Successor Fund is organized prior to the termination of the Commitment Period of the Partnership, as permitted under the previous sentence, the Successor Fund may only coinvest in investments made by the Partnership alongside the Partnership, on the same terms and conditions in all material respects, with amounts for investment allocated between the Partnership and the Successor Fund, subject to available capital or other investment limitations on the Partnership and the Successor Fund, as determined by the General Partner. Any Successor Fund will dispose of securities of a Portfolio Company that are of the same class as those purchased by the Partnership at the same time as the Partnership, and on the same economic and other terms.

-35-

Appx. 03986

Section 5.13  Interest as a Limited Partner. To the extent that the General Partner acquires the interest of a Defaulting Partner or any other Limited Partner, the General Partner will (subject to Section 2.5) be deemed to be a Limited Partner with respect to such interest for all purposes of this Agreement.

Section 5.14  Parallel Vehicles. The General Partner has organized the Main Fund as a Parallel Vehicle, and may organize additional Parallel Vehicles (or series of related Parallel Vehicles), for purposes of facilitating investments in Portfolio Companies by non-U.S. investors and certain accredited investors that are not qualified purchasers (as defined in the Investment Company Act) in the Fund Group. If any Parallel Vehicles are organized, then the Partnership and each Parallel Vehicle (a) will invest in each Portfolio Company in direct proportion to their respective available capital commitments so that the Partnership will invest in each Portfolio Company an amount equal to the total investment by the Partnership and any Parallel Vehicle multiplied by a fraction, the numerator of which is the aggregate Commitments, and the denominator of which is the sum of the aggregate Commitments plus the aggregate capital commitments by investors in the Parallel Vehicles, provided that such proportion may be modified by the General Partner with the prior approval of the Advisory Committee or a Majority in Interest of the Limited Partners in order to reflect the available commitments and any tax, regulatory or other legal aspects of any Parallel Vehicle and its investors and (b) invest in and dispose of Portfolio Company at the same time and on effectively the same economic terms and conditions. Any item of income, fees, reimbursement or expense that relates to a Portfolio Company in which the Partnership and one or more Parallel Vehicles are investors or to a potential investment that is considered on behalf of the Partnership and any Parallel Vehicles by the General Partner, the Manager or the general partners or managers of any Parallel Vehicles shall, to the extent that any such item is not directly attributable to the Partnership or a Parallel Vehicle, be pro rated among the Partnership and the Parallel Vehicles based on their respective investments in such Portfolio Company or the portions of such potential investment that would have been made available to the Partnership in accordance with the preceding sentence, as applicable. Organizational Expenses shall be borne by the Partnership and each Parallel Vehicle in proportion to their respective aggregate capital commitments, except the Partnership and each Parallel Vehicle shall separately bear the Organizational Expenses that are directly attributed to each such entity. Each Parallel Vehicle shall reimburse the Partnership for such Parallel Vehicle's share of Organizational Expenses that were paid by the Partnership. Investments in Parallel Vehicles by investors shall be on substantially the same terms and conditions as investments in the Partnership by Limited Partners. For the avoidance of doubt, all references to Portfolio Investments shall include investments made by the Partnership, all Parallel Vehicles and all Separate Investment Entities. To the extent that this Agreement provides that the Limited Partners shall vote together with the investors of any Parallel Vehicle, the General Partner agrees (i) that the relevant documentation of any such Parallel Vehicle shall contain comparable voting provisions to the extent applicable, (ii) that any combined vote of the Limited Partners and the investors in any Parallel Vehicle on any such matter for the purposes of this Agreement shall constitute a combined vote on the matter for the purposes of the Parallel Vehicles, and (iii) each such matter shall, if approved by such vote, be equally applicable to the Partnership and all Parallel Vehicles.

Section 5.15  Separate Investment Entities. If the General Partner determines for legal, tax, regulatory or other reasons, in its sole discretion that it is in the best interests of the Partners

to invest in one or more Portfolio Companies through an entity other than the Partnership, such investment or investments shall not be made by the Partnership but shall instead be made, either in lieu of or in conjunction with, the Partnership, by one or more limited partnerships, limited liability companies, corporations or similar entities (each a "Separate Investment Entity") owned in the aggregate by all of the Partners and managed by the General Partner or an Affiliate thereof controlled by the Principals. Each Separate Investment Entity shall receive an opinion of counsel for the benefit of the Limited Partners (x) regarding its classification for United States Federal income tax purposes and the limited liability of the Separate Investment Entity and (y) to the effect that no Limited Partner shall be personally liable for any debts or losses of the Separate Investment Entity in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The Partnership and each Separate Investment Entity will invest in and dispose of Portfolio Investments at the same time and on effectively the same economic terms and conditions. To the extent that Benefit Plan Investors participate in a Separate Investment Entity, such Separate Investment Entity shall be (i) structured so that it will not be deemed to hold Plan Assets and shall provide the same ERISA protections to those Benefit Plan Investors that are provided under this Agreement, and (ii) established on substantially the same terms and conditions in all material respects as Partners are required to make Capital Contributions to the Partnership, and such capital contributions shall be deemed to reduce the Unfunded Commitment of each Partner to the same extent that it would be reduced if made to the Partnership. The provisions and economic terms of each such Separate Investment Entity shall be substantially the same in all material respects as those of the Partnership, except to the extent such terms are required to differ from the economic and other material arrangements reflected in the terms of this Agreement in order to accomplish the purposes of such Separate Investment Entity (including, for example, different economic treatment of different Partners resulting solely from the consequences of a structure created to minimize the amount of UBTI recognized by a Tax Exempt Partner). The gains and losses of any such Separate Investment Entity shall be treated as having been realized by the Partnership for all economic calculations under this Agreement, and there will be no duplication of the management fees. The Partners having interests in the Separate Investment Entity (including the General Partner and its Affiliates with respect to their Commitments as Partners) shall contribute to each Separate Investment Entity the amounts required to fund such Separate Investment Entity, with each such Partner contributing its pro rata portion of such amounts (based on the relative Unfunded Commitments of the Partners as of the date of such contributions) up to such Partner's remaining Unfunded Commitment and such amounts will reduce such Partner's Unfunded Commitment. Each Limited Partner hereby agrees and consents to the formation of each Separate Investment Entity and hereby covenants and agrees that it will execute and deliver any agreements, documents and certificates as reasonably necessary for, or incidental to, the formation and continuation of each such Separate Investment Entity and its participation as a limited partner, member or participant in each such Separate Investment Entity established in accordance with this Section 5.15.

Section 5.16  Media Company Investments.

(a)      In the event and for so long as, and only during periods from time to time in which, the Partnership shall directly or indirectly hold (or otherwise have attributed to it) an ownership or other interest in a Media Company that is "attributed" to the Partnership under the rules and regulations of the FCC relating to the particular FCC service in which the Media Company operates, no Limited Partner (an "Insulated Partner"), or any person that is a director,

Appx. 03988

officer, equivalent non-corporate official, partner, member or 5% or greater shareholder or other direct or indirect owner of an Insulated Partner such that the ownership interests of the Insulated Partner, are "attributed" to such owner, director, officer, equivalent non-corporate officer, partner or member (an "Insulated Partner Affiliate"), to the extent reasonably determined by the General Partner (with the advice of GP's Counsel) to be necessary to have such ownership or interest not be attributable to the Limited Partners for purposes of the FCC Attribution Rules and the Ownership Rules, shall do any of the following:

(i)     act as an employee of the Partnership or any Media Company if such Insulated Partner's or Insulated Partner Affiliate's functions, directly or indirectly, relate to the media or common carrier enterprises of the Partnership or any Media Company;

(ii)     serve, in any material capacity, as an independent contractor or agent of the Partnership or any Media Company with respect to the media or common carrier enterprises of the Partnership or any such Media Company;

(iii)     communicate with the General Partner or any Portfolio Company on matters pertaining to the day-to-day operations of any Media Company;

(iv)     to the extent Partners have the power under this Agreement to admit additional General Partners, vote to admit any additional General Partner to the Partnership unless such addition is subject to the veto of the General Partner;

(v)     to the extent Partners have the power under this Agreement, except as permitted under Sections 5.9 and 8.2, vote on the removal of the General Partner;

(vi)     perform any services for the Partnership or any Media Company materially relating to the media or common carrier enterprises of the Partnership or such Media Company, with the exception of making loans to, or acting as a surety for, such Media Company or the Partnership to the extent consistent with the "equity or debt plus" component of the FCC Attribution Rules; or

(vii)     become actively involved in the management or operation of any Media Company.

(viii)     serve as a member or otherwise participate in the activities of the Advisory Committee if, in the determination of the Insulated Partner, such membership or participation would cause the Insulated Partner to lose its insulated status under the Attribution Rules.

(b)     An Insulated Partner may, upon five Business Days' prior written notice to the General Partner, relinquish its status as an Insulated Partner, in which case the provisions of this Section 5.16 shall no longer apply to such Limited Partner; provided, that such relinquishment shall not be effective until the General Partner has received an opinion of special counsel to the Partnership on FCC matters stating that such relinquishment will not (1) cause the Partnership or any of its Affiliates to violate any law, regulation, rule or policy applicable to matters currently subject to FCC jurisdiction or (2) in any way limit or restrict the activities of the Partnership or any of its Affiliates.  To the extent that issuance of such an opinion requires the filing of any notices with the FCC or the issuance of any approvals by the FCC, the General Partner and the

Appx. 03989

Insulated Partner seeking to relinquish its insulated status shall reasonably cooperate in making any such filing or obtaining any such approval, and the General Partner shall seek the opinion of special counsel to the Partnership on FCC matters with respect to the making of any such filing or the obtaining of any such approval.

(c)     Nothing in this Section 5.16 shall be interpreted to restrict the activities of (A) the Limited Partners or (B) the beneficial interest holders of any Limited Partner during the period that it is an Insulated Partner so long as such Limited Partner's partnership or other governing agreement contains language reasonably designed to insulate such Limited Partner's unaffiliated limited partners or beneficial interest holders, as the case may be, from having the Partnership's interest in any Media Company being attributed under the FCC attribution rules to such beneficial owners, as necessary pursuant to the FCC attribution rules.

(d)     Upon written request by an Insulated Partner, the General Partner shall, prior to the Partnership consummating an investment in a Media Company, cause the legal counsel to the Partnership to deliver an opinion reasonably acceptable to such Insulated Partner to the effect that such investment shall not be "attributed" to the Insulated Partner under the rules and regulations of the FCC relating to the particular FCC service in which such Media Company operates.

Section 5.17   Co-investment Funds.

(a)     Where possible and appropriate, the General Partner may, in its discretion, provide co-investment opportunities to invest in a Portfolio Company (each a "Co-Investment Opportunity") to one or more Limited Partners, strategic investors, lenders, or members, investors, Affiliates or employees of the General Partner and Manager or, other accounts managed by Highland (each a "Co-Investor"). Notwithstanding the foregoing, investment opportunities allocated to Affiliates of the Manager or the General Partner or client accounts managed by the Manager, in accordance with the Highland Investment Allocation Policy, shall not be deemed Co-Investment Opportunities. The General Partner, the Manager, and their respective Affiliates will not receive any carried interest in any Co-Investment Opportunity provided to Limited Partners or receive management fees from Limited Partners in respect of Co-Investment Opportunities provided to Limited Partners. The General Partner intends to not provide Co-Investment Opportunities to Benefit Plan Investors to the extent necessary to prevent such Co-Investment Opportunity from being deemed to be Plan Assets of the related Benefit Plan Investor.

(b)     The General Partner may, as a condition to any Co-Investment Opportunity, (i) require any or all Co-Investors to execute a confidentiality agreement relating to such Co-Investment Opportunity in form and substance acceptable to the General Partner, and (ii) require Co-Investors electing to participate in a Co-Investment Opportunity to coinvest through a Co-Investment Fund, which may have investors other than Limited Partners.

(c)     Each Limited Partner shall treat the information provided to it pursuant to this Section 5.17 as confidential, shall use such information solely for the purpose of considering the offer made pursuant to this Section, shall, upon the request of the General Partner, promptly return to the General Partner any written information provided it pursuant to this Section, and

Appx. 03990

shall not disclose the identity of the securities or issuer to any person other than (i) its employees, counsel or advisors, solely on a need to know and confidential basis, (ii) any governmental authority or regulatory authority which regulates such Limited Partner's ability to engage in any of its businesses under U.S. or foreign law to the extent such information is required by such governmental authority or regulatory authority, as the case may be, and (iii) to the extent such Limited Partner is required by law or regulation to disclose such information.

(d)     If Co-Investment Funds or Co-Investors purchase securities of a Portfolio Company that are of the same class as securities of a Portfolio Company purchased by the Partnership, the Co-Investment Funds or Co-Investors shall purchase such securities on terms that are no less advantageous than the terms on which the Partnership purchases such securities. Each Co-Investment Fund and Co-Investor will dispose of securities of a Portfolio Company that are of the same class as securities of a Portfolio Company purchased by the Partnership at the same time and on substantially the same terms (including price) as the Partnership.

Section 5.18  Bridge Leveraging.  (a)  The Partnership is authorized to enter into one or more credit facilities (each, a "Bridge Leveraging/Credit Support Facility") in order to (i) borrow money for the purpose of (A) Bridge Leveraging, and (B) paying Partnership Expenses; and/or (ii) provide Credit Support for the obligations of Portfolio Companies or their subsidiaries as described in Section 5.4(c); provided, however, that in no event shall the aggregate amount of Bridge Leveraging outstanding at any time under any Bridge Leveraging/Credit Support Facility exceed the aggregate amount of Unfunded Commitments as of such date and provided, further, that in no event shall the maturity date of an individual borrowing under any Bridge Leveraging/Credit Support Facility be later than the 45th day following the incurrence of such debt under a Bridge Leveraging/Credit Support Facility.  A Bridge Leveraging/Credit Support Facility may be secured by (x) a pledge by the Partnership of all or a portion of the aggregate Unfunded Commitments of the Partners, and (y) a pledge and assignment by the General Partner of the rights of the General Partner contained herein, including, without limitation, the right to deliver Capital Call Notices and enforce all remedies against Partners that fail to fund their respective Unfunded Commitments pursuant thereto and in accordance with the terms hereof. The Partnership and any Parallel Vehicles may be co-borrowers under any Bridge Leveraging/Credit Support Facility, in which event the Partnership and the Parallel Vehicles may be jointly and severally liable for all obligations under such Bridge Leveraging/Credit Support Facility.  In the event such a Bridge Leveraging/Credit Support Facility is so secured by Commitments, and to the extent funds are advanced against the Commitment of a particular Partner or partner of a Parallel Vehicle because such Person is late in funding or defaults on a Capital Call Notice delivered hereunder or by the Parallel Vehicle, each Limited Partner understands, acknowledges and agrees that (i) it may be required to make a Capital Contribution in respect of its pro rata share of such late or defaulted contribution amount, provided, however, that in no event shall any Partner be required to make Capital Contributions in excess of its Unfunded Commitment, and (ii) as a result of such default or late payment, the allocation between the Partnership and each Parallel Vehicle of a Portfolio Investment (together with any item of income, fees, reimbursement or expense that relates to such Portfolio Investment) with respect to which there has occurred a shortfall in contributions made by the Partners or the partners in a Parallel Vehicle shall be made by the General Partner based on the total amount of Capital Contributions of the Partners and the partners in each Parallel Vehicle actually funded to acquire such Portfolio Investment.  In addition to the rights and remedies of the General Partner

17475053                                              -40-

in respect of a Defaulting Partner pursuant to Section 6.11, any Partner that is late in funding or defaults on a Capital Call Notice shall be responsible for any interest or other expenses incurred in connection with such advance. Any such expenses shall be withheld from distributions otherwise to be made to such Defaulting Partner, and, to the extent such expenses exceed such distributions, such Defaulting Partner shall pay the amount of such excess to the Partnership in the manner and at the time or times required by the General Partner. Any such excess shall not be credited to such Defaulting Partner's Capital Account. For purposes of this Agreement, any amount withheld from a Defaulting Partner and paid to a lender shall be paid to the lender on behalf of such Defaulting Partner and shall be treated as if distributed to such Defaulting Partner.

(b)    Each Limited Partner understands, acknowledges and agrees, in connection with any such Bridge Leveraging/Credit Support Facility and for the benefit of any lender thereunder, as follows: (i) that the General Partner may from time to time request a certificate confirming (x) the remaining amount of such Limited Partner's Unfunded Commitment or (y) that the Limited Partner has not and will not pledge, collaterally assign, encumber or otherwise grant a security interest in its limited partnership interest in the Partnership, and (ii) that the General Partner may from time to time request such other information as may be reasonably required by the lender(s) under the terms of the Bridge Leveraging/Credit Support Facility. Each Limited Partner agrees to comply with such requests to the extent they are reasonable.

(c)    To induce any such lender to enter into a Bridge Leveraging/Credit Support Facility with the Partnership, each Limited Partner hereby: (i) acknowledges that the Partnership has informed such Limited Partner that the Partnership may pledge to a lender the right to call all Unfunded Commitments to secure all obligations made under the Bridge Leveraging/Credit Support Facility (collectively, the "Obligations"), the terms of which are in accordance with this Agreement, and, in connection therewith, grant to such lender the right to issue Capital Call Notices pursuant to the terms of this Agreement when an event of default under such Bridge Leveraging/Credit Support Facility exists, including an event of default resulting from the failure of a partner of a Parallel Vehicle to fund any capital contributions when required, which each Limited Partner shall fund, in accordance with the terms hereof and its rights and obligations hereunder; and (ii) acknowledges that the Partnership has informed such Limited Partner that for so long as the Bridge Leveraging/Credit Support Facility is in place, the General Partner and the Partnership may agree with the lender not to amend, modify, supplement, cancel, terminate, reduce (other than with respect to Funded Commitments) or suspend any of such Limited Partner's obligations to fund its Unfunded Commitment pursuant hereto, subject to excuse provisions set forth herein, without the lender's prior written consent.


## ARTICLE VI

## LIMITED PARTNERS

Section 6.1    Limited Liability. The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation (including with respect to a deficit balance in their Capital Account) to make contributions to the Partnership in excess of their respective Commitments specified in Schedule 1 attached hereto in accordance with this

17475053                                    -41-

Agreement, except to the extent set forth in Section 6.7 or the ELP Law.  The Limited Partners will take no part in the conduct of the business, to include, without limitation, the control, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

Section 6.2   Transfer of Limited Partnership Interests.

(a)    A Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Partnership unless the General Partner has consented to such transfer or assignment in writing; provided, that with regard to an assignment by a Limited Partner to an Affiliate of such Limited Partner, such consent shall not be unreasonably withheld.  Any transfer shall be effected in accordance with the provisions of this Agreement, by execution of an assignment in writing and by entry of the name of the new limited partner in the register of limited partners.

(b)    A Limited Partner which is a trust under an employee benefit plan may, upon prior written notice to the General Partner, assign a beneficial interest in all or a portion of its interest in the Partnership to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor (provided that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the U.S. Internal Revenue Service).  Such assignment to another trust under such employee benefit plan or to any other employee benefit plan having the same sponsor will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore will not require the General Partner's consent pursuant to Section 6.2(a)).  In addition, a change in any trustee or fiduciary of a Limited Partner will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore not require the General Partner's consent pursuant to Section 6.2(e)), so long as any such replacement trustee or fiduciary is also a fiduciary as defined under applicable law, that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the Internal Revenue Service, and the General Partner receives prior written notice of such change in trustee or fiduciary.  In connection with any assignment of interest or change in trustee or fiduciary under this Section 6.2(b), the Limited Partner shall provide such documentation as the General Partner shall reasonably request.

(c)    The voting rights of any Limited Partner's interest shall automatically terminate upon any transfer of such interest to a trust, heir, beneficiary, executor, personal representative, guardian or conservator or upon any other transfer if the transferor no longer retains control over such voting rights and the General Partner has not consented pursuant to Section 6.2(e) to such transferee becoming a substitute Limited Partner.  No consent of any other Limited Partner will be required as a condition precedent to any such transfer or substitution.

(d)    As a condition to any transfer of a Limited Partner's interest pursuant to Section 6.2(a), the transferor and the transferee shall provide such legal opinions and documentation as the General Partner shall reasonably request; provided that if the transfer is to be made from a Limited Partner to a co-trustee or trustee as contemplated above or to an Affiliate pursuant to Section 6.2(a), an officer's certificate in form reasonably satisfactory to the

Appx. 03993

General Partner may be delivered by the Limited Partner in lieu of such legal opinions and other documentation.

(e)     Notwithstanding anything to the contrary contained in this Section 6.2 or 6.11, a transferee or assignee will not become a substitute Limited Partner (i.e., a transfer other than as described in Section 6.2(b)) without the consent of the General Partner, which consent may be granted or withheld in its sole and absolute discretion (except for a disposition by a Limited Partner to an Affiliate permitted by Section 6.2(a), for which such consent shall not be unreasonably withheld), and without executing (i) a copy of this Agreement or amendment hereto, and (ii) a Subscription Agreement in form and substance satisfactory to the General Partner in its sole discretion. Any substitute Limited Partner admitted to the Partnership with the consent of the General Partner will succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the interest to which such Limited Partner was substituted, but any transferee or assignee that does not become a substitute Limited Partner shall have the right to receive allocations pursuant to Section 2.3 and distributions pursuant to Article III and Article VIII, but shall have no other rights under this Agreement.

(f)     The transferor and transferee of any Limited Partner's interest shall be jointly and severally obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) of any transfer or proposed transfer of a Limited Partner's interest, whether or not consummated.

(g)     The transferee of any Limited Partner's interest shall be treated as having made all of the Capital Contributions made by, and received all of the distributions received by, the transferor of such interest.

(h)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would be subject to the registration or reporting requirements of the Investment Company Act or in the General Partner's good faith determination, such transfer would cause the assets of the Partnership to be deemed Plan Assets. Each transferee that is or will be a Benefit Plan Investor as of the transfer effective date shall so notify the General Partner in writing prior to the transfer effective date. Any transferee that has not so indicated in writing its status as a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

Section 6.3   No Withdrawal. Subject to the provisions of Sections 6.2, 6.6 and 6.11, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner be required to withdraw, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.

Appx. 03994

Section 6.4  <u>No Termination</u>.  The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

Section 6.5  <u>Subsequent Limited Partners</u>.

(a)      The General Partner may accept additional Limited Partners ("<u>Additional Limited Partners</u>") subsequent to the First Closing of the Partnership up to and including the date fourteen months after the First Closing.  Any Additional Limited Partners will be treated as having been a party to this Agreement and have made its Commitment as of the date hereof for all purposes, and such Additional Limited Partners will be required to bear a portion of the Management Fee, Organizational Expenses and Partnership Expenses equivalent to that which would have been borne by such Additional Limited Partner had such Limited Partner been a Limited Partner from the date of the First Closing.

(b)      Such Additional Limited Partners shall contribute to the Partnership, on the date of their admission to the Partnership, an amount of their Commitments equal to their portion (based on the Commitments of all Partners) determined pursuant to this <u>Section 6.5(b)</u>.  The initial drawdown for each Limited Partner will include such Limited Partner's proportionate share of (i) Management Fees retroactive to the First Closing; (ii) Placement Fees, if any, retroactive to the First Closing, (iii) Organizational Expenses (to the extent provided in <u>Section 4.2</u>) and Partnership Expenses attributable to the Partnership; and (iv) Capital Contributions made at or prior to such drawdown to fund any Portfolio Investment, other than Capital Contributions that have been returned prior to such drawdown to the Partners who made such Capital Contributions.  In addition, Additional Limited Partners will be required to pay to the Partnership, with respect to the period from the date of the applicable Capital Contributions made by the Partners who were admitted pursuant to the First Closing to the date of their admission to the Partnership:  (A) interest at the rate of 10% on their proportionate share of Management Fees retroactive to the First Closing; (B) interest at the rate of 10% on their proportionate share of Organizational Expenses (to the extent provided in <u>Section 4.2</u>), Placement Fees and Partnership Expenses attributable to the Partnership; and (C) interest at the rate of 10% on their proportionate share of the Capital Contributions made prior to such drawdown (other than Capital Contributions that have been returned prior to such drawdown to the Partners who make such Capital Contributions), to fund any Portfolio Investment; <u>provided</u>, <u>however</u>, that interest payable pursuant to <u>sub-clauses (B)</u> and <u>(C)</u> above shall be reduced, but not below zero, by each Additional Limited Partner's <u>pro rata</u> portion (based on Commitments of all Partners) of all distributions made prior to the date of such drawdown to all Partners pursuant to <u>Sections 3.3(a)(i)</u>, <u>3.3(a)(ii)(B)</u> and <u>3.3(a)(iii)(A)</u> of the Master Partnership Agreement, to the extent such distributions exceed the aggregate amount of Capital Contributions to make Portfolio Investments that have been Disposed of prior to the date of such drawdown.  Any amounts paid to the Partnership under <u>clause (i)</u> and <u>subclause (A)</u> above will be paid to the Manager (and to the extent the General Partner has waived all or part of such Management Fees, such Waived Fee Amount shall not be paid to the Manager or the General Partner but will instead increase the Unapplied Waived Fee Amounts).  Any amounts paid to the Partnership under <u>clause (ii)</u> above shall be paid to the applicable placement agency if applicable to such Limited Partner.  Any amounts paid to the Partnership under <u>clauses (iii)</u> and <u>(iv)</u> above, and <u>subclauses (B)</u> and <u>(C)</u>

Appx. 03995

above shall be distributed to the Partners that participated in the earlier Capital Contributions based upon their relative shares of each earlier Capital Contribution, and any such returned Capital Contributions (but not amounts referred to in subclauses (B) and (C) above) may be recalled by the General Partner pursuant to Section 2.2(a) above as if such returned Capital Contributions had not previously been called; provided, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the contribution of such amounts to the Partnership, the General Partner may, in its discretion, retain such amounts and reduce the Capital Call with respect to such other Partners (in which event the Funded Commitments of such other Partners shall be increased by their pro rata share of that portion of such amounts referred to in subclauses (B) and (C) above). For purposes of this Section 6.5, a Limited Partner that increases its Commitment shall be treated as an Additional Limited Partner with respect to the amount by which its Commitment increased.

(c)    Each Additional Limited Partner admitted to the Partnership pursuant to this Section 6.5 shall be treated as purchasing a pro rata share of the interests in the Partnership of the Partners to whom amounts are distributed pursuant to this Section 6.5 ("Existing Partners"), and a portion of the Capital Account of each Existing Partner shall be allocated to such Additional Limited Partner so that after such allocation the Capital Accounts and Capital Contributions of such Additional Limited Partner and Existing Partners attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses are as equal as practicable to what their Capital Accounts and Capital Contributions attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses would have been if such Additional Limited Partner had been admitted to the Partnership at the First Closing.

Section 6.6   Regulatory Matters.

(a)    Each Limited Partner acknowledges that the assets of the Partnership are not intended to constitute plan assets of such Limited Partner for purposes of any applicable non-U.S., state or local law governing the investment and management of the assets of that Limited Partner, and that, as a result, none of the Partnership, the General Partner, the Manager or any of their Affiliates intend to be acting as a fiduciary within the meaning of any applicable non-U.S., state or local law relating to governmental plans or foreign plans with respect to such Limited Partner or the Partnership assets; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the ELP Law.

(b)    In the event that the General Partner determines in good faith that (i) the investment in the Partnership by a Limited Partner which is a governmental plan, foreign plan or other regulated entity (each, a "Regulated Investor") is reasonably likely to result in (A) any violation of any provision of law applicable to such Regulated Investor, (B) the treatment of the assets of the Partnership as assets of such Regulated Investor or (C) the treatment of the Partnership, the General Partner or the Manager as a fiduciary under such provisions of law applicable to such Regulated Investor and (ii) if, in the reasonable judgment of the General Partner, any of the foregoing conditions result in or are reasonably likely to result in any material adverse consequences to the Partnership or the General Partner (both of (i) and (ii), a "Regulatory Issue"), then the General Partner shall use its reasonable best efforts to work with the Regulated Investor to cure the Regulatory Issue. The General Partner, in its sole discretion,

Appx. 03996

may require that such Regulated Investor provide (at such Regulated Investor's expense) an opinion of counsel, reasonably acceptable to the General Partner in form and substance, that no Regulatory Issue exists or, in the event such an opinion is not delivered within a reasonable time after being requested, may cause the Partnership to redeem such Regulated Investor's interest in the Partnership, in whole or in part.

(c)     Effective upon the date specified by the General Partner in the notice sent to a Limited Partner, notifying such Limited Partner of the General Partner's determination to completely or partially redeem such Limited Partner's interest in the Partnership pursuant to Section 5.6(e) or Section 6.6(b) (the "Redemption Effective Date"), such Limited Partner (the "Redeemed Limited Partner") shall cease to be a Partner of the Partnership for purposes of the withdrawn portion of its interest only and, in addition to its right to receive payment for its withdrawn interest in the Partnership as provided in Section 6.6(d), shall continue to be entitled, with respect to its remaining interest only, if any, to the rights of a Partner under this Agreement (including, without limitation, the right to have any allocations made to its Capital Account (as such may be adjusted) pursuant to Article II, the right to receive distributions pursuant to Article III and upon dissolution of the Partnership pursuant to Article VIII and the right to vote on matters as provided in this Agreement).

(d)     The Redemption Value shall be paid by the Partnership to such Redeemed Limited Partner in cash by paying to such Limited Partner a "pro rata portion" of each distribution payable to the Redeemed Limited Partners until the Redemption Value has been fully paid; provided, that the General Partner shall be under no obligation to sell, finance or refinance any Partnership property or assets or to take any other action to effect such redemption which, in the judgment of the General Partner, may affect adversely the Partnership (taking into account the liquidity needs of the Partnership) or any Partner. For purposes of the preceding sentence, a Redeemed Limited Partner's "pro rata portion" of a distribution shall be an amount equal to the amount such Redeemed Limited Partner would have received in respect of the redeemed interest had such interest not been redeemed.

Section 6.7   Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback.

(a)     If the Partnership is obligated to pay any amount to a governmental agency or to any other person (or otherwise makes a payment) in respect of any tax because of a Partner's status or otherwise specifically attributable to a Partner (including, without limitation, federal withholding taxes with respect to foreign partners, state personal property taxes, state unincorporated business taxes, etc.), then such Partner (the "Indemnifying Partner") shall indemnify the Partnership in full for the entire amount paid (including, without limitation, any interest, and any penalties and expenses associated with such payment to the extent such penalties and expenses are attributable to such Partner's actions or failure to act). At the option of the General Partner, the amount to be indemnified may be charged against the Capital Account of the Indemnifying Partner, and, at the option of the General Partner, either:

(i)     promptly upon notification of an obligation to indemnify the Partnership, the Indemnifying Partner shall make a cash payment to the Partnership equal to the full amount

Appx. 03997

to be indemnified (and the amount paid shall be added to the Indemnifying Partner's Capital Account but shall not be deemed a Capital Contribution hereunder), or

    (ii)  the Partnership shall reduce subsequent distributions which would otherwise be made to the Indemnifying Partner until the Partnership has recovered the amount to be indemnified (provided, that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Indemnifying Partner's Capital Account). If the General Partner reasonably expects that subsequent distributions to such Partner will be sufficient to satisfy such Partner's obligation to pay such amount, the General Partner shall not seek a payment pursuant to clause (i) above, until the General Partner reasonably believes such distributions will not be sufficient.

    (b)  A Partner's obligation to make contributions to the Partnership under this Section 6.7 shall, subject to the limitations set forth in Section 6.7(c), survive the termination, dissolution, liquidation and winding up of the Partnership until the third (3rd) anniversary of the date of the final distribution made in connection with the complete liquidation of the assets of the Partnership and, for purposes of this Section 6.7, the Partnership shall be treated as continuing in existence. The General Partner may pursue and enforce all rights and remedies the Partnership may have against each Partner under this Section 6.7, including instituting a lawsuit to collect such contribution with interest equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

    (c)  At any time and from time to time prior to the third (3rd) anniversary of the date of receipt thereof, the General Partner may require each Partner to return distributions (including distributions made in connection with the complete liquidation of the assets of the Partnership) to the Partnership in an amount sufficient to satisfy all or any portion of (i) such Partner's indemnification obligations pursuant to Section 6.7(a), or (ii) any liability which the Partnership would be required by this Agreement or otherwise to pay if it had adequate funds, including but not limited to (A) the expenses of investigating, defending or handling any pending or threatened litigation or claim arising out of the Partnership's activities, investments or business, (B) the amount of any judgment or settlement arising out of such litigation or claim, and (C) the Partnership's obligation to indemnify any Partner or other Person pursuant to Section 5.11 (a "Liability"), whether such obligations arise before or after the last day of the Partnership or, with respect to any Partner, before or after such Partner's withdrawal from the Partnership; provided, that (x) each Partner will return distributions in respect of its share of any such indemnification payment in proportion to the aggregate amount of distributions received by such Partner that have not previously been returned to the Partnership by such Partner pursuant to this Section 6.7(c); and (y) Partner's maximum liability under this Section 6.7 is limited to an amount equal to the lesser of (1) $33^{1/3}\%$ of such Partner's Commitment, and (2) 50% of the aggregate amount of distributions received by such Partner as of such date. Any distributions returned pursuant to this Section 6.7(c) shall not be treated as Capital Contributions, but shall be treated as returns of distributions in making subsequent distributions pursuant to Section 3.3 and in determining the amount that the General Partner is required to contribute to the Partnership pursuant to Section 8.3(c) of the Master Partnership Agreement. Nothing in this Section 6.7(c), express or implied, is intended or shall be construed to give any person other than the Partnership or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 6.7(c) or any

Appx. 03998

provision contained herein.  If a Limited Partner returns an amount to the Partnership under Section 6.7(c)(ii) after the final distribution of the assets of the Partnership, the amount the General Partner is required to contribute to the Partnership with respect to such Limited Partner pursuant to Section 8.3(c) of the Master Partnership Agreement shall be re-determined, taking into account the return of such amount to the Partnership.  The provisions of Section 8.3(c) of the Master Partnership Agreement shall apply, and the payments required thereby shall be made, in the same manner as if the return of such amount to the Partnership had occurred prior to the final distribution of the assets of the Partnership.

Section 6.8   Section 754 Election.  Upon the written request of a Majority in Interest of the Limited Partners, that an election provided for in Section 754 of the Code be made, the General Partner shall, if then permitted by applicable law, make such election.

Section 6.9   BHCA Partners.

(a)      Any Limited Partner may, upon notice to the General Partner, elect to hold all or any fraction of such Limited Partner's interest in the Partnership as a Non-Voting Interest, in which case such Limited Partner shall not be entitled to vote or otherwise participate in any consent of the Limited Partners with respect to the portion of its interest which is held as a Non-Voting Interest (and such Non-Voting Interest shall not be counted in determining the giving or withholding of any such consent or whether the requisite percentage of the Limited Partners or Partners, as the case may be, have consented to, approved, adopted or taken any other action hereunder).  Except as provided in this Section 6.9, an interest held as a Non-Voting Interest shall be identical in all regards to all other interests held by Limited Partners.  Any such election shall be irrevocable and shall bind the assignees of such Limited Partner's interest.

(b)      Any interest in the Partnership held for its own account by a BHCA Partner, that is determined at the time of admission of such BHCA Partner, the complete or partial withdrawal of another Limited Partner or any other adjustment of the interests of the Partners pursuant to this Agreement to be in excess of 4.99% (or such other amount as may be permitted by applicable regulation to be held by a BHCA Partner as voting securities, but not including Section 4(k) of the BHC Act or any successor provision thereto) of the interests of the Limited Partners, excluding for purposes of calculating this percentage portions of any other interests that are Non-Voting Interests pursuant to this Section 6.9 and any other Section of this Agreement (collectively the "Non-Voting Partnership Interests"), shall be a Non-Voting Partnership Interest (whether or not subsequently transferred in whole or in part to any other person) and shall not be included in determining whether the requisite percentage of the Partners have consented to, approved, adopted or taken any action hereunder; provided, that such Non-Voting Partnership Interest shall be permitted to vote on any proposal to continue the business of the Partnership under Section 8.2(a) but not on the selection of a General Partner pursuant to Section 8.2(a).  Each BHCA Partner hereby further irrevocably waives its corresponding right to vote for a successor general partner with respect to any Non-Voting Partnership Interest, which waiver shall be binding upon such BHCA Partner and any entity which succeeds to its interest.  Upon the occurrence of a subsequent closing or any event specified in the second preceding sentence, a recalculation of the interest held by all BHC Partners shall be made, and only that portion of the total interest held by each BHC Partner that is determined as of the date of such recalculation to

be in excess of 4.99% (or such other amount) of the interests of the Limited Partners, excluding Non-Voting Partnership Interests as of such date, shall be a Non-Voting Partnership Interest.

Section 6.10 <u>Excused Investments</u>. In the event that (a) the Partnership makes or proposes to make a Portfolio Investment which the General Partner reasonably determines could result in a material violation by any Limited Partner (or any of its Affiliates) of any law, order, decree or judgment of any court or governmental agency applicable to such Limited Partner (or any of its Affiliates), or (b) the General Partner reasonably determines that a Limited Partner's participation in a proposed Portfolio Investment of the Partnership could have a material adverse effect on the Partnership, the entity in which such investment is to be made, such Limited Partner, or the General Partner and its Affiliates, the General Partner may, in its sole discretion, and subject to <u>Section 5.6(a)</u>, (x) reduce or eliminate the interest of such Limited Partner with respect to such Portfolio Investment and the distributions with respect thereto (provided that any Capital Contributions made by such Limited Partner with respect to such Portfolio Investment shall be promptly returned to such Limited Partner) and correspondingly increase the interest of the other Limited Partners with respect to such Portfolio Investment and/or (y) increase the interest of such Limited Partner in future Portfolio Investments of the Partnership and such Limited Partner's interest in the distributions with respect thereto and correspondingly decrease the interests of the other Limited Partners in such Portfolio Investments. All determinations necessary to reflect the operation of this <u>Section 6.10</u> and not otherwise explicitly provided for in this <u>Section 6.10</u> shall be made on an equitable basis as determined by the General Partner in good faith, whose decision thereon shall be final and binding on all Limited Partners. Determinations by the General Partner pursuant to <u>clauses (a)</u> and <u>(b)</u> above may be made on its own initiative or after considering the request of any Limited Partner, including any supporting legal analysis or other documentation submitted by such Limited Partner.

Section 6.11 <u>Limited Partner's Default on Commitment</u>.

(a)   If any Limited Partner fails to make full payment of any portion of its Commitment when due (a "<u>Defaulting Partner</u>") and such failure is not cured within five Business Days after receipt by such Limited Partner of written notice from the General Partner with respect to such failure to pay, the General Partner may in its discretion and subject to <u>Section 5.6(a)</u>, undertake any one or more of the following steps:

(i)   The General Partner may assist the Defaulting Partner in finding a buyer for the Defaulting Partner's Partnership interest (<u>provided</u>, that the General Partner will have no obligation to contact any particular Limited Partner or other person with regard to such sale).

(ii)   The Partnership may pursue and enforce all rights and remedies the Partnership may have against such Defaulting Partner with respect thereto, including a lawsuit to collect the overdue portion of the Commitment and any other amounts due the Partnership or General Partner hereunder, with interest at a rate equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points (but not in excess of the highest rate per annum permitted by law).

(iii)   The General Partner may offer the Defaulting Partner's interest to the Partners and the partners in the Parallel Vehicles (other than any Defaulting Partners) <u>pro rata</u> in

Appx. 04000

accordance with their Commitments and their capital commitments to Parallel Vehicles on the terms set forth below.  If any Partner or partner in a Parallel Vehicle does not elect to purchase the entire interest offered to it, the remaining interest allocable to the Partners and the partners in the Parallel Vehicles will be reoffered pro rata to the Partners and the partners in Parallel Vehicles who have purchased the entire interest offered to them until either all of such interest is acquired or no Partner or partner in a Parallel Vehicle wishes to make a further investment.  At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall (A) deliver a non-interest bearing, non-recourse (except to the extent of the Partnership interest purchased and the proceeds therefrom) ten-year promissory note (in a form approved by the General Partner) payable to the Defaulting Partner in an amount equal to the portion of the Defaulting Partner's Capital Account being purchased by such Partner, (B) assume the portion of the Defaulting Partner's obligation to make both defaulted and further Capital Contributions pursuant to its Commitment which is equal to the portion of the Defaulting Partner's interest being purchased by such Partner, and (C) be entitled to have his name entered in the register of limited partners held by the Partnership.  In the case of a purchase of a portion of a Defaulted Partner's Capital Account by one or more partners in a Parallel Vehicle, such Parallel Vehicle shall deliver a note in the same form as the note described above to the Partnership for the aggregate portion of the Defaulted Partner's Capital Account being purchased by the limited partners in such Parallel Vehicle, the Partnership shall make the adjustments described in Section 6.5 of the Master Partnership Agreement with respect to such purchase and the Partnership shall distribute such note to the Defaulting Partner.  If a Partner purchases a portion of the interest of a defaulting partner of a Parallel Vehicle, the Partner purchasing such interest shall increase its Commitments as described above with respect to purchases of an interest of a Defaulting Partner, and shall guarantee the note delivered to the Parallel Vehicle, and the Partnership shall make such other adjustments as are required by Section 6.5 of the Master Partnership Agreement.  The General Partner will handle the mechanics of making the offers set forth herein and will in its discretion impose time limits for acceptance.

(iv)    If the entire Defaulting Partner's interest is not purchased in the manner set forth in (iii) above, the General Partner in its sole discretion may offer the remaining interest either (A) to a third party or parties on the same terms as originally offered to the Partners pursuant to (iii) above (in which case such third party or parties will, as a condition of purchasing such interest, become a party to this Agreement), or (B) to the Partners and the partners in Parallel Vehicles in the manner provided in (iii) above, but with no requirement to assume the Defaulting Partner's obligation to make further capital contributions pursuant to its Commitment, in which case the Defaulting Partner's Commitment shall be deemed reduced (effective on the date of the default) to the amount actually paid in and the aggregate Commitments of the Partnership shall be reduced by the amount of such Defaulting Partner's remaining contributions to be made pursuant to its Commitment.

(v)    In addition to, or instead of, the other remedies and undertakings available to the General Partner pursuant to this Section 6.11(a), the General Partner may, in its sole discretion, reduce (effective on the date of the default, after giving effect to the 5-day cure period) any portion of such Defaulting Partner's Commitment (which has not been assumed by another Partner) to the amount of the Capital Contributions (which have not been purchased by another Partner) made by such Defaulting Partner (net of distributions pursuant to Section 6.5(b)) and the aggregate Commitments of the Partnership shall be commensurately reduced.

Appx. 04001

(vi)     Notwithstanding anything contained herein to the contrary, from and after any date on which a Defaulting Partner's Commitment is reduced pursuant to subparagraph (v) above, (A) such Defaulting Partner will have no right to receive any distributions, except for distributions made upon the Partnership's liquidation, (B) such Defaulting Partner's Capital Account will not be credited with any Investment Income and Gain or Short-Term Investment Income which shall instead be allocated to the Partners (other than any Defaulting Partners) in accordance with Section 2.3(b) and (c), as appropriate (and as adjusted to treat the Defaulting Partner's Capital Contribution as equal to zero), (C) until such Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Capital Account shall continue to be debited in accordance with Sections 2.3(c), (d), (f), and (g) for such Defaulting Partner's share of Investment Loss, Organizational Expenses, Placement Fees and Uncapitalized Partnership Expenses as if there had been no reduction in such Defaulting Partner's Commitment or Capital Contributions and (2) the Management Fee payable by the Defaulting Partner shall be calculated as if there had been no reduction in such Defaulting Partner's Commitment, and (D) once such Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Commitment shall be reduced to zero for all purposes of the Agreement, including the calculation of the Partnership's aggregate Commitments and determination of the Management Fee and (2) such Defaulting Partner (and not the Partnership or any other Limited Partner) shall be liable each quarterly period to the General Partner for an amount equal to its portion of the Management Fee for such period as if there had been no reduction in such Defaulting Partner's Commitment.

(vii)     No consent of any Limited Partner shall be required as a condition precedent to any transfer, assignment or other disposition of a Defaulting Partner's interest pursuant to this Section 6.11.

(b)     Additionally, the Defaulting Partner shall indemnify and hold harmless the General Partner and the Partnership against any losses, damages and expenses (including attorneys' fees) incurred by the General Partner and the Partnership in enforcing or attempting to enforce the provisions of this Section 6.11 or resulting from the Partnership failing to meet its obligations with respect to any Portfolio Investment by reason of any such default.

Section 6.12  Investment Company Act Limitations.  Notwithstanding anything to the contrary contained in this Agreement, (i) no person shall be admitted to the Partnership as Limited Partner, an Additional Limited Partner or a substitute Limited Partner unless such person is a Qualified Purchaser, and (ii) no sale, assignment, transfer, pledge, mortgage or other disposition of any or all of a Limited Partner's interest in the Partnership shall be effective unless the assignee of any beneficial interest in the Partnership is a Qualified Purchaser.

## ARTICLE VII

## ADVISORY COMMITTEE

Section 7.1  Advisory Committee.  (a) A committee (an "Advisory Committee") of not fewer than three individuals and not more than seven individuals who are affiliated with or

Appx. 04002

officers, employees, representatives or designees of Limited Partners or limited partners of Parallel Vehicles (but are not affiliated with the General Partner, the Manager, the Principals or any Affiliates thereof) will be appointed by the General Partner. The General Partner will not appoint to the Advisory Committee any individual who is an officer, employee or representative of a BHC Partner whose Partner Interest in the Partnership is over 4.99%. The Advisory Committee will meet at least semi-annually with the Manager and will perform such duties as is contemplated by this Agreement and provide such advice and counsel, including advice and counsel as to general economic and financial trends, portfolio investments and valuations, as is requested by the General Partner in connection with the investments of the Partnership, the Parallel Vehicles and the Separate Investment Entities, and other matters related thereto; provided, that the General Partner will retain ultimate responsibility for all decisions relating to the operation and management of the Partnership, including all investment decisions. The Advisory Committee will be consulted on potential conflicts involving the Partnership and will perform the duties contemplated by this Agreement and all transactions between the Partnership and the General Partner, the Manager and their Affiliates not specifically contemplated by this Agreement must be approved by the Advisory Committee. Notwithstanding the foregoing, the Advisory Committee will not consult with the General Partner on allocations of investment opportunities to Affiliates of the Manager or client accounts managed by the Manager if such allocations are made in accordance with the Highland Investment Allocation Policy. The Manager shall be entitled to remove a member of the Advisory Committee selected by the Manager from among the Limited Partners (or their representatives) upon at least 15 days prior written notice to the Limited Partners, provided, however, that the Manager may not remove a member of the Advisory Committee designated by a Limited Partner without the consent of 75% of the other members of the Advisory Committee. The Limited Partner that had the right to designate the removed member of the Advisory Committee shall have the right to designate a replacement. The Partnership will reimburse each member of the Advisory Committee for such member's reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee. Such reimbursements shall be Partnership Expenses. The Advisory Committee shall act by affirmative vote or written consent of a majority of its members.

(b)     Neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Limited Partner in respect of the activities of the Advisory Committee, other than the duty to act in good faith.

## ARTICLE VIII

## DURATION AND TERMINATION

Section 8.1  Duration. The General Partner shall cause the Partnership to be dissolved and the Partnership will terminate on the tenth anniversary of the Final Closing and the General Partner will take all necessary steps pursuant to the ELP Law to dissolve the Partnership, except that the term of the Partnership may be extended by the General Partner, with the approval of the Advisory Committee, for up to two consecutive one-year extensions.

Appx. 04003

Section 8.2 <u>Early Termination</u>.

(a)    Subject to the ELP Law, the Partnership shall terminate on:

(i)    the bankruptcy of the General Partner or on the happening of any other event that would cause a dissolution of the Partnership under the ELP Law, <u>unless</u>, within 90 days after the occurrence of such event, the Limited Partners and limited partners of all Parallel Vehicles unanimously elect a new general partner pursuant to the ELP Law and resolve to continue the business of the Partnership;

(ii)    a good faith determination upon receipt of written legal advice of counsel by the General Partner that dissolution of the Partnership is necessary or desirable (A) as a result of a Plan Asset Event or (B) to avoid any material adverse consequences to the Partnership or the General Partner as a result of any law applicable to a Regulated Investor;

(iii)    the removal of the General Partner pursuant to <u>Section 5.9</u> unless all of the Limited Partners and limited partners of all Parallel Vehicles elect a new General Partner and resolve to continue the business of the Partnership; or

(iv)    at any time after the second anniversary of the Final Closing upon the consent of Seventy-Five Percent in Interest of the Limited Partners and the filing of a notice of dissolution by the General Partner.

(b)    As promptly as possible following the election by the Limited Partners of a successor General Partner pursuant to <u>Section 8.2(a)(i)</u>, there shall be distributed to the former General Partner, in full payment and satisfaction of its interest in the Partnership, a Limited Partnership Interest in the Partnership.  The Limited Partnership Interest of the former General Partner shall entitle the former General Partner to the same distributions and allocations in respect of Portfolio Investments made prior to the termination of the former General Partner it would have received had it remained the General Partner, subject to the obligations set forth in Section 8.3(c) of the Master Partnership Agreement, and to the rights of a Limited Partner hereunder with a Commitment equal to the Commitment of the former General Partner, but shall not entitle it to any other rights to participate in the management of the Partnership.  After its withdrawal as General Partner, a former General Partner shall only be liable under this Agreement for actions taken and investments in Portfolio Companies made prior to the date of such withdrawal.  If the Limited Partners elect to continue the Partnership's business pursuant to <u>Section 8.2(a)(i)</u>, an appropriate amendment to this Agreement and to the Registration shall be made within 90 days after the event giving rise to such election.

Section 8.3 <u>Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back</u>.

(a)    <u>Liquidation</u>.  Upon dissolution, the Partnership will be dissolved and wound up in accordance with the ELP Law.

(b)    <u>Final Allocation and Distribution</u>.  Upon termination of the Partnership (whether or not an early termination), the General Partner shall approve a plan of dissolution in

Appx. 04004

accordance with the ELP Law and take all steps necessary to appoint a liquidator and otherwise to dissolve and wind up the Partnership in accordance with the ELP Law.


# ARTICLE IX

## VALUATION OF PARTNERSHIP ASSETS

Section 9.1 <u>Normal Valuation</u>. For purposes of this Agreement, the value of any security as of any date (or in the event such date is a holiday or other day which is not a Business Day, as of the next preceding Business Day) will be determined as follows:

(a)     a Marketable Security which is listed on a recognized securities exchange or the NMS will be valued at the average of the last sales prices (or, if no sale occurred on such date, at the last "bid" price thereon) for the five consecutive trading days before such date and the five consecutive trading days after such date;

(b)     a Marketable Security which is traded over-the-counter (other than on the NMS) will be valued at the average of the last "bid" prices for the five consecutive trading days before such date and the five consecutive trading days after such date;

(c)     subject to <u>Section 9.3</u>, all Non-Marketable Securities will be valued on such date by the General Partner at fair market value in such manner as it may determine; and

(d)     a Marketable Security which meets <u>clause (ii)</u>, but not <u>clause (i)</u> of the definition of "Marketable Securities" will be valued as if it had been converted, exchanged or exercised as of such date.

Section 9.2 <u>Restrictions on Transfer or Blockage</u>. Any security which is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Partnership's holdings compared to the trading volume would affect its marketability, will, subject to the provisions of <u>Section 9.3</u>, be valued at such discount from the value determined under <u>Section 9.1</u> above as the General Partner deems necessary to reflect properly the marketability of such security.

Section 9.3 <u>Objection to Valuation</u>. Prior to acting upon its final valuation of any security pursuant to <u>Sections 9.1</u> or <u>9.2</u> or its determination of written down value pursuant to <u>Section 9.4</u>, the General Partner shall provide the members of the Advisory Committee with notice and backup support of the General Partner's valuation of such security. If within 30 days after delivery of such notice a majority of the members of the Advisory Committee delivers written notice to the General Partner objecting to the valuation of such security and if, within 15 days from the date on which the General Partner receives such notice from a majority of the Advisory Committee, the General Partner and the Advisory Committee cannot agree on the valuation of such security, then the General Partner will (at the Partnership's expense) cause an independent securities expert mutually acceptable to the General Partner and the Advisory

-54-

Appx. 04005

Committee to review such valuation, and such expert's determination will be binding on the parties.

Section 9.4  Write-down to Value.  Any Portfolio Investment that has permanently declined in value as determined by the General Partner will be written down to its value (or, if applicable, written off) pursuant to the provisions of this Article IX, including the valuation provisions of Section 9.3, as of the date of such determination.  The General Partner shall provide the Advisory Committee at least annually with the then current valuation of all Portfolio Investments.

## ARTICLE X

## BOOKS OF ACCOUNTS; MEETINGS

Section 10.1  Books.  The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, which books will be open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours.

Section 10.2  Fiscal Year.  The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

Section 10.3  Reports.  The General Partner will furnish the Limited Partners:

(a)  within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under Section 10.3(c), (i) unaudited quarterly financial statements (including balance sheet and income statement (including additions, dispositions and write-offs)) showing each Partner's Capital Account prepared in accordance with GAAP, applied on a consistent basis (except that, in accordance with GAAP, such quarterly financial reports may omit footnotes and year-end adjustments, accruals and reserves), and (ii) a schedule of investments including the Partnership's cost and the value of such investments prepared in accordance with Article IX;

(b)  within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under Section 10.3(c), unaudited quarterly descriptive investment information for each Portfolio Company and narrative summary financial information for each Portfolio Company, including revenues, EBITDA and net debt; and

(c)  within 90 days after the end of each fiscal year beginning with fiscal year 2008, (i) financial statements for such year prepared, in accordance with GAAP, applied on a consistent basis (certified by a firm of independent certified public accountants of recognized national standing selected by the General Partner), (ii) valuations of the Partnership's investments as of the end of such year (including a statement of each Partner's closing Capital Account) prepared in accordance with Article IX, and (iii) the certification to Benefit Plan

Appx. 04006

Investors confirming that the Partnership continues to qualify for an exception from Plan Assets described in the last sentence of Section 5.6(a) and a certification regarding the Partnership's compliance in all material respects with Article III hereof.

Section 10.4  Certain Tax Elections.  The Partnership shall file an election effective as of the date of its formation pursuant to U.S. Treasury Regulation §301.7701-3(c) to be treated as an association taxable as a corporation.

Section 10.5  Annual Meeting.  The General Partner will hold annual general informational meetings for the Limited Partners until such time, after the termination of the Commitment Period, that substantially all of the Portfolio Investments have been Disposed.

## ARTICLE XI

### MAINTENANCE OF REGISTRATION OF LIMITED PARTNERSHIP; POWER OF ATTORNEY

Section 11.1  Maintenance of Registration of Limited Partnership.  The General Partner has caused to be filed, recorded and published such statements, notices, certificates or other instruments required by any provision of any applicable law which governs the formation of the Partnership or the conduct of its business from time to time (collectively, the "Registration").

Section 11.2  Power of Attorney.  Each of the undersigned does hereby constitute and appoint each member of the General Partner and each person who hereafter becomes a member of the General Partner with full power to act without the others, as his, her or its true and lawful representative and attorney-in-fact, in her, his or its name, place and stead, to make, execute, sign, acknowledge and deliver or file (a) the Registration, (b) any amendment to or cancellation of the Registration or any amendment to, or waiver of, this Agreement effected in accordance with Section 12.1, (c) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (d) all instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Partnership, and (e) in the case of a Defaulting Partner any bills of sale or other appropriate transfer documents necessary to effectuate transfers of such Defaulting Partner's interest pursuant to Section 6.11 above.  The powers of attorney granted herein are intended to secure an interest in property and the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable and will survive the death, incompetency, disability or dissolution of a Limited Partner.  Without limiting the foregoing, the powers of attorney granted herein will not be deemed to constitute the written consent of any Limited Partner for purposes of Section 12.1.  Each Limited Partner hereby agrees not to revoke this power of attorney and further agrees that this power of attorney shall survive and shall not be affected by its dissolution, bankruptcy or legal disability and shall extend to its successors and assigns whomsoever.  Any attempted revocation by a Limited Partner of any power of attorney granted herein shall constitute a breach of this Agreement by such Limited Partner.  Further, each Limited Partner agrees that at any time, upon request by the General Partner, it will confirm in writing that the power of attorney granted herein has not been revoked.  Notwithstanding the

Appx. 04007

foregoing or anything contained in this Agreement to the contrary, the foregoing power of attorney may not be exercised by the General Partner after the occurrence of an event specified in Section 8.2 or the removal of the General Partner pursuant to Section 5.9.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1  Amendments.

(a)    This Agreement may be amended only by the written consent of the General Partner and, except as otherwise provided in this Section 12.1, a Majority in Interest of the Limited Partners.

(b)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which (i) increases or decreases such Limited Partner's Commitment without the written consent of such Limited Partner or (ii) amends the provisions of this Section 12.1(b).

(c)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which alters (i) the provisions of Sections 2.3, 3.3, 4.1, 6.1 or the provisions of this Section 12.1(c), (ii) the provisions of Section 6.7(c) in a manner that increases a Limited Partner's potential obligations, or (iii) any other provision of this Agreement, in a manner adverse to such Limited Partner, without the written consent of such Limited Partner; provided, however, that with respect to clause (iii), if such Limited Partner is not treated differently in any material respect from any other Limited Partner then such amendment will be valid with only the written consent of the General Partner and the Limited Partners representing at least a Majority in Interest of the Limited Partners.

(d)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters the provisions of Sections 1.3, 5.4, 5.10, 5.11, 12.1 or any provision which requires the consent or vote of at least Two-Thirds in Interest of the Limited Partners without the written consent of the General Partner and at least Two-Thirds in Interest of the Limited Partners.

(e)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment which would alter the provisions of Sections 5.5, 6.6 and the provisions of this Section 12.1(e), or, with respect to Benefit Plan Investors, Sections 5.6, 12.1(e), and the provisions in Section 5.15 relating to Benefit Plan Investors or the definitions of Benefit Plan Investor or Redemption Value, will be valid without the written consent of at least a Majority in Interest of the Limited Partners that are materially and adversely affected by such amendment (including Limited Partners whose direct or indirect beneficial owners would be so affected).

(f)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters any provision which requires the consent or vote of at least Seventy-Five Percent in Interest of the Limited

Appx. 04008

Partners or the provisions of this Section 12.1(f) without the written consent of the General Partner and at least Seventy-Five Percent in Interest of the Limited Partners.

(g)    Notwithstanding anything in this Section 12.1 to the contrary, no amendment shall be made which would amend the provisions hereof relating to the rights of BHCA Partners without the consent of each BHCA Partner affected thereby.

(h)    Notwithstanding anything in this Section 12.1 to the contrary, the General Partner may amend any provisions of this Agreement solely as it relates to a Limited Partner pursuant to one or more side letters with such Limited Partner without the consent of the Limited Partners not party to such side letters.

(i)    Subject to Section 12.1 of the Master Partnership Agreement, no amendment or waiver of the provisions of the Master Partnership Agreement shall be made without the written consent of a Majority in Interest of the Limited Partners.

(j)    In addition to any amendments or waivers otherwise authorized hereby, this Agreement may be amended from time to time by the General Partner without the consent of any of the Limited Partners (i) to add to the representations, duties or obligations of the General Partner or surrender any right or power (but not responsibilities) granted to the General Partner herein; (ii) to cure any ambiguity or correct any provisions hereof which may be inconsistent with any other provisions hereof, or correct any printing, stenographic or clerical errors or omissions; (iii) to admit one or more Additional Limited Partners, or withdraw one or more Limited Partners, in accordance with the terms of this Agreement, and (iv) with the consent of the Advisory Committee, to take such actions contemplated in Section 5.6(e) or avoid any material adverse consequences to the Partnership or the General Partner as a result of any change in law or interpretation of law applicable to a Regulated Investor.  The General Partner shall promptly send each Limited Partner a copy of any amendment adopted pursuant to Section 12.1.

Section 12.2  Successors.  Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and assigns.

Section 12.3  Governing Law; Severability.  This Agreement will be construed in accordance with the laws of the Cayman Islands and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the ELP Law.  If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 12.4  Notices.  All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given when personally delivered, sent by telecopy (with hard copy to follow by reputable overnight courier) or sent by reputable overnight courier service (charges prepaid) or mailed by first class mail (with a copy sent by telecopy) to the addresses or telecopy numbers set forth in Schedule 1 hereto or to such other address or telecopy number as has been indicated to all Partners.

Appx. 04009

Section 12.5 <u>Legal Counsel</u>.  Each Partner hereby agrees and acknowledges that:

(a)     The law firm retained by the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity (the "<u>GP's Counsel</u>") in connection with the formation of the Partnership, the offering of Limited Partner interests and the management and operation of the Partnership does not and will not represent the Limited Partners in connection with any such matter or in connection with any dispute which may arise between the Limited Partners on one hand and the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity on the other (the "<u>Partnership Legal Matters</u>").

(b)     Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect to each of the foregoing matters described in <u>Section 12.5(a)</u>.

(c)     Each Limited Partner hereby agrees that the GP's Counsel may represent (i) the General Partner and the Partnership and any Parallel Vehicle or Separate Investment Entity in connection with any and all Partnership Legal Matters (including any dispute between the General Partner and one or more Limited Partners, but excluding a Limited Partner's derivative action brought against the General Partner).

Section 12.6 <u>Miscellaneous</u>.  This document and the schedules, exhibits and side letter agreements between the Partnership and certain of the Limited Partners in connection herewith and the Subscription Agreements contain the entire Agreement among the parties and supersede all prior arrangements or understanding with respect thereto.  Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement.  This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together will constitute one agreement.

Appx. 04010

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

Executed as a Deed by:

**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL PARTNERS GP, LLC

By: _____

Name: James Dondero
Title:   President

In the presence of:

_____
Witness

_Meredith etheredge_
Name

_18455 Noel Road, STE 800, Dallas, TX 75240_
Address

_Notary_
Occupation

MEREDITH ETHEREDGE
Notary Public, State of Texas
My Commission Expires
May 20, 2009

_Highland Restoration Capital Partners Offshore, L.P. – Second
Amended and Restated Agreement of Limited Partnership_

17475053

**Appx. 04011**

Executed as a Deed by:

**LIMITED PARTNER:**

1397225 ONTARIO LIMITED

By: _____

    Name:   _A̲S̲O̲_

    Title:

In the presence of:

_____
Witness

_____
Name   CYNTHIA TUCCIARONE

_____
Address   5650 Yonge Street, Toronto, M2N4H5 Canada

_____
Occupation   Senior Law Clerk - Investments + Contracts

17475053

*Highland Restoration Capital Partners Offshore, L.P. – Second*
*Amended and Restated Agreement of Limited Partnership*

Appx. 04012

# LIMITED PARTNERS

*Highland Restoration Capital Partners Offshore, L.P. – Second Amended and Restated Agreement of Limited Partnership*

Appx. 04013

Executed as a Deed on behalf of each of the parties
named above

By:  HIGHLAND RESTORATION CAPITAL
     PARTNERS GP, LLC as Attorney-in-Fact
     pursuant to Section 14 of each of the
     Subscription Agreements, dated April 18,
     2008, between each of the above named
     parties and Highland Restoration Capital
     Partners GP, LLC as General Partner of
     Highland Restoration Capital Partners
     Offshore, L.P.

By:  _____
     Name: James Dondero
     Title:   President


In the presence of:

_____
Witness

_____
Name

_____
Address

_____
Occupation

MEREDITH ETHEREDGE
Notary Public, State of Texas
My Commission Expires
May 20, 2009

17475053

*Highland Restoration Capital Partners Offshore, L.P. – Second*
*Amended and Restated Agreement of Limited Partnership*

AGREEMENT OF LIMITED PARTNERSHIP

OF

HIGHLAND RESTORATION CAPITAL PARTNERS, L.P.

17461908

Appx. 04015

## TABLE OF CONTENTS

**Page**

ARTICLE I      GENERAL PROVISIONS ................................................................... 1

    Section 1.1      Formation.......................................................................... 1

    Section 1.2      Name .................................................................................. 1

    Section 1.3      Purpose............................................................................... 1

    Section 1.4      Place of Business ............................................................ 1

ARTICLE II      DEFINITIONS; DETERMINATIONS; CAPITAL
    CONTRIBUTIONS; CAPITAL ACCOUNTS............................. 2

    Section 2.1      Definitions; Determinations............................................ 2

    Section 2.2      Capital Contribution Commitment; Key Person Provision .............. 18

    Section 2.3      Capital Accounts ............................................................ 21

    Section 2.4      Distributions in Kind....................................................... 22

    Section 2.5      Determination of Voting Thresholds ............................. 23

ARTICLE III      DISTRIBUTIONS ......................................................................... 24

    Section 3.1      Distribution Policy.......................................................... 24

    Section 3.2      Distribution of Short-Term Investment Income ............... 24

    Section 3.3      Distributions of Current Cash Income and Proceeds From
    Dispositions of or Partial Realizations with Respect to
    Investments and In Kind Distributions ................................ 24

    Section 3.4      Foreign Taxes.................................................................. 26

ARTICLE IV      MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES ............... 27

    Section 4.1      Management Fee.............................................................. 27

    Section 4.2      Organizational and Partnership Expenses........................ 29

    Section 4.3      Ordinary Operating Expenses ......................................... 29

ARTICLE V      GENERAL PARTNER...................................................................... 29

    Section 5.1      Investment Opportunities; Devotion of Time; Management
    Authority.......................................................................... 29

    Section 5.2      Use of Affiliates.............................................................. 30

    Section 5.3      Indebtedness.................................................................... 30

    Section 5.4      Limitation on Investments .............................................. 31

    Section 5.5      UBTI; USRPI.................................................................. 32

Appx. 04016

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 5.6 | ERISA Matters | 32 |
| Section 5.7 | Conflicts of Interest | 33 |
| Section 5.8 | Transfer of General Partnership Interest; No Withdrawal or Loans | 35 |
| Section 5.9 | Removal of the General Partner | 35 |
| Section 5.10 | No Liability to Limited Partners | 36 |
| Section 5.11 | Indemnification of General Partner, the Manager and Advisory Committee | 36 |
| Section 5.12 | Formation of New Fund or Business Endeavor | 37 |
| Section 5.13 | Interest as a Limited Partner | 38 |
| Section 5.14 | Parallel Vehicles | 38 |
| Section 5.15 | Separate Investment Entities | 39 |
| Section 5.16 | Media Company Investments | 40 |
| Section 5.17 | Co-investment Funds | 41 |
| Section 5.18 | Bridge Leveraging | 42 |
| ARTICLE VI | LIMITED PARTNERS | 44 |
| Section 6.1 | Limited Liability | 44 |
| Section 6.2 | Transfer of Limited Partnership Interests | 44 |
| Section 6.3 | No Withdrawal | 46 |
| Section 6.4 | No Termination | 46 |
| Section 6.5 | Subsequent Limited Partners | 46 |
| Section 6.6 | Regulatory Matters | 48 |
| Section 6.7 | Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback | 49 |
| Section 6.8 | Section 754 Election | 51 |
| Section 6.9 | BHCA Partners | 51 |
| Section 6.10 | Excused Investments | 52 |
| Section 6.11 | Limited Partner's Default on Commitment | 52 |
| Section 6.12 | Investment Company Act Limitations | 54 |
| ARTICLE VII | ADVISORY COMMITTEE | 55 |
| Section 7.1 | Advisory Committee | 55 |

Appx. 04017

## TABLE OF CONTENTS
(continued)

Page

ARTICLE VIII    DURATION AND TERMINATION ............................................................... 56

    Section 8.1    Duration ........................................................................... 56

    Section 8.2    Early Termination ............................................................ 56

    Section 8.3    Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back .................... 57

ARTICLE IX    VALUATION OF PARTNERSHIP ASSETS ............................................... 58

    Section 9.1    Normal Valuation .......................................................... 58

    Section 9.2    Restrictions on Transfer or Blockage ............................. 59

    Section 9.3    Objection to Valuation .................................................. 59

    Section 9.4    Write-down to Value ..................................................... 59

ARTICLE X    BOOKS OF ACCOUNTS; MEETINGS ..................................................... 59

    Section 10.1    Books ............................................................................ 59

    Section 10.2    Fiscal Year ................................................................... 59

    Section 10.3    Reports ......................................................................... 59

    Section 10.4    Tax Allocation ............................................................. 60

    Section 10.5    Tax Controversies ........................................................ 61

    Section 10.6    Certain Tax Elections ................................................... 61

    Section 10.7    Code Section 83 Safe Harbor Election. ........................ 61

    Section 10.8    Tax Basis Elections ...................................................... 62

    Section 10.9    Annual Meeting ........................................................... 63

ARTICLE XI    CERTIFICATE OF LIMITED PARTNERSHIP; POWER OF ATTORNEY ............................................................................................. 63

    Section 11.1    Certificate of Partnership ............................................. 63

    Section 11.2    Power of Attorney ........................................................ 63

ARTICLE XII    MISCELLANEOUS .................................................................................... 64

    Section 12.1    Amendments ................................................................ 64

    Section 12.2    Successors .................................................................... 65

    Section 12.3    Governing Law; Severability ........................................ 65

    Section 12.4    Notices ......................................................................... 65

    Section 12.5    Legal Counsel .............................................................. 65

17461908

-iii-

## TABLE OF CONTENTS
(continued)

|  |  | Page |
| --- | --- | --- |
| Section 12.6 | Miscellaneous ................................................................................ | 66 |

17461908

-iv-

Appx. 04019

Schedule 1    Limited Partners/Commitments/Notice Information
Exhibit A     Form of Guaranty Agreement

17461908

Appx. 04020

# AGREEMENT OF LIMITED PARTNERSHIP
## OF
## HIGHLAND RESTORATION CAPITAL PARTNERS, L.P.

THIS AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is dated effective as of April 18, 2008 between Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company (in its capacity as general partner of the Partnership, the "General Partner"), and the limited partners listed in Schedule 1 attached hereto (in their capacities as limited partners of the Partnership, the "Limited Partners") (the General Partner and the Limited Partners being herein collectively called the "Partners"). Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in Section 2.1(a).

## ARTICLE I

## GENERAL PROVISIONS

Section 1.1  Formation. The Partners hereby agree to form a limited partnership (the "Partnership") pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (the "Delaware Partnership Act").

Section 1.2  Name. The name of the Partnership will be "Highland Restoration Capital Partners, L.P." or such other name or names as the General Partner may from time to time designate. The General Partner will notify Limited Partners in writing of any change to the name of the Partnership.

Section 1.3  Purpose. Subject to the express limitations set forth herein, the Partnership is organized for the object and purpose of (i) investing in senior secured bank loans, debt obligations, trade claims and equity securities of middle market Distressed Companies primarily based in the United States generally consistent with the investment strategy described in the Partnership's Confidential Private Placement Memorandum, including, without limitation, privately placed or publicly traded debt securities and other debt obligations, senior and subordinated debt obligations, secured and unsecured debt obligations, privately placed or publicly traded equity securities including common stock, preferred stock and warrants, and (ii) managing and monitoring such investments and engaging in such activities incidental or ancillary thereto and otherwise permitted by the Delaware Partnership Act as the General Partner deems necessary or advisable.

Section 1.4  Place of Business. The Partnership will maintain offices and places of business at Two Galleria Tower, 13455 Noel Road, Dallas, TX 75240, or at such other place or places in the United States as the General Partner may from time to time designate; provided, however, that if the General Partner designates different places of business, it shall promptly notify the Limited Partners in writing.

## ARTICLE II

## DEFINITIONS; DETERMINATIONS;
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 2.1  Definitions; Determinations.

(a)      For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"Additional Limited Partners" has the meaning set forth in Section 6.5(a).

"Advisory Committee" has the meaning set forth in Section 7.1(a).

"Affiliate" has the meaning set forth in Rule 405 promulgated under the Securities Act.

"Agent" has the meaning set forth in Section 2.4(b).

"Agreement" has the meaning set forth in the introduction.

"Allocated Expenses" means, for any Partner as of any date with respect to any Portfolio Investment, such Partner's Capital Contributions applied to pay Management Fees, Organizational Expenses and Uncapitalized Partnership Expenses that have been allocated pursuant to Section 3.3(c) to such Portfolio Investment as of such date.

"Available Profits" means, with respect to a Waived Fee Amount, the cumulative amount of items of Partnership income and gain (such items being "Partnership Profits") realized after the Waived Fee Notice giving rise to such Waived Fee Amount.  The amount of Partnership Profits realized after a Waived Fee Notice for the purpose of this Available Profits definition shall equal the amount of Partnership income and gain realized after the Waived Fee Notice for purposes of maintaining Capital Accounts; provided, however, the amount of Partnership gain realized after a Waived Fee Notice that is attributable to any Portfolio Investment held by the Partnership at the time of such Waived Fee Notice that is taken into account in calculating Partnership Profits shall equal the excess, if any, of (1) the amount the Partnership realizes on the sale, transfer, or other disposition of such Portfolio Investment or its assets over (2) the fair market value (as determined by the General Partner) of such Portfolio Investment or its assets, as applicable, on the date of such Waived Fee Notice.  Notwithstanding the two preceding sentences, the aggregate amount of all items of Partnership Profits for any taxable year included in Available Profits shall not exceed the total amount of the Partnership's net income and gain for such taxable year as determined for federal income tax purposes, except that gain attributable to a Portfolio Investment shall be determined as described in the proviso to the preceding sentence.  Notwithstanding the three preceding sentences, to the extent of the amount by which the Special Profit Interest with respect to a Portfolio Investment exceeds the Deemed Contribution with respect to such Portfolio Investment, Available Profits includes an allocable share of all items of income or gain realized by the Partnership with respect to such Portfolio Investment.

17461908                                        -2-

Appx. 04022

"Basis" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to Section 9.4 and as further adjusted by the General Partner in its reasonable discretion to reverse the effects of any exchange of securities that would result in an increase in tax basis pursuant to the Code.

"Benefit Plan Investor" means any Partner that is a "benefit plan investor" as defined in Section 3(42) of ERISA and any regulations promulgated thereunder.

"BHC Act" means the Bank Holding Company Act of 1956, as amended.

"BHCA Partner" means a Limited Partner that is a bank holding company, as defined in Section 2(a) of the BHC Act, or a non-bank subsidiary of such bank holding company, provided, that such Limited Partner shall not be a BHC Partner if (i) it is a financial holding company, as defined in Section 2(p) of the BHC Act, or a non-bank subsidiary thereof and is acting pursuant to Section 4(k)(4)(h) or Section 4(k)(4)(i) of the BHC Act as set forth in a notice to such effect to the General Partner; or (ii) it is a small business investment company licensed as such under the Small Business Investment Act of 1958, as amended.

"Bridge Financing" means, with respect to the Partnership's investment in a Portfolio Company, that portion of the investment that the Partnership provides as interim financing (including guarantees of debt financing) in anticipation of, or to support, a permanent investment by the Partnership in such Portfolio Company and that the Partnership intends to cause the Portfolio Company to repay or refinance within 18 months after the date of such investment in the Portfolio Company and which the General Partner designates in the Capital Call Notice therefor. During the first 18 months following a Bridge Financing, such Bridge Financing shall be treated as a Short-Term Investment. A Bridge Financing that is outstanding 18 months following the making of such Bridge Financing, shall be treated by the Partnership as a permanent investment in a Portfolio Company.

"Bridge Leveraging" means indebtedness incurred by the Partnership to fund the acquisition of a Portfolio Investment pending receipt of Capital Contributions (including as a result of any default by any Limited Partner or limited partner of a Parallel Vehicle in the making of Capital Contributions) pursuant to a Capital Call Notice that the Partnership anticipates issuing pursuant to Section 2.2(a), provided that the Capital Contributions made with respect to such Capital Call Notice are applied by the Partnership upon receipt thereof to repay such indebtedness.

"Built-In Tax Amount" means, with respect to any distribution of securities in-kind received by the General Partner, an amount equal to the taxes that would be payable by the General Partner (and its direct and indirect members), assuming (i) such securities were sold in a taxable transaction immediately after their receipt by the General Partner for an amount equal to their value and (ii) any gains were taxed at the highest marginal rates applicable to any of the General Partner's members or former members, applying the assumptions set forth in Section 3.3(b) in the same manner as if such securities had been sold by the Partnership immediately before such distribution.

Appx. 04023

"Business Day" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks located in New York City generally are closed for business.

"Capital Account" has the meaning set forth in Section 2.3.

"Capital Call" has the meaning set forth in Section 2.2(a).

"Capital Call Notice" has the meaning set forth in Section 2.2(a).

"Capital Contribution" of any Partner means the amount received by the Partnership from such Partner as an actual contribution.

"Capitalized Partnership Expenses" means Partnership Expenses that are reflected in the Basis of Portfolio Investments.

"Carried Interest" means the General Partner's 20% interest in the Partnership's distributions specified in Section 3.3(a)(ii)(A) and Section 3.3(a)(iii)(B).

"Certificate" has the meaning set forth in Section 11.1.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Co-Investment Opportunity" has the meaning set forth in Section 5.17(a).

"Co-Investment Fund" means any partnership, limited liability company or other entity that is an Affiliate of the General Partner or the Manager, is not a Parallel Vehicle or a Separate Investment Entity, and is organized to invest in Portfolio Investments pursuant to a Co-Investment Opportunity.

"Co-Investor" has the meaning set forth in Section 5.17(a).

"Commitment" with respect to each Partner means the aggregate amount of cash agreed to be contributed as capital to the Partnership by such Partner (as determined with respect to the General Partner without regard to Section 2.2(a)(ii)) as specified in Schedule 1 attached hereto as the same may be modified from time to time under the terms of this Agreement.

"Commitment Period" has the meaning set forth in Section 2.2(b).

"Continuity Period" has the meaning set forth in Section 2.2(d).

"Credit Support" has the meaning set forth in Section 5.3.

"Crusader" means Highland Crusader Fund, L.P., and its successors.

"Current Cash Income" means all Current Income paid in cash or cash equivalents.

"Current Income" means all interest and dividend income (including from original issue discount, purchases or investments at a market discount, and payment of in-kind income and other non-cash current income) from a Portfolio Company.

Appx. 04024

"Deemed Contribution" means, as of any date, for any Portfolio Investment or the payment of expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, the Gross-up Percentage multiplied by the product of (i) the amount by which the Capital Contributions required from the General Partner are reduced pursuant to Section 2.2(a)(ii) with respect to such Portfolio Investment or the payment of related expenses, multiplied by (ii) (1) with respect to the General Partner, the quotient determined by dividing (x) the aggregate Commitments of all Partners (including the General Partner) other than Limited Partners as to whom no Management Fee is payable pursuant to Section 4.1(b) by (y) the aggregate Commitments of all Partners, and (2) with respect to each Limited Partner as to whom no Management Fee is payable pursuant to Section 4.1(b), the quotient determined by dividing (x) the Commitment of such Limited Partner by (y) the aggregate Commitments of all Partners.

"Defaulting Partner" has the meaning set forth in Section 6.11(a).

"Delaware Partnership Act" has the meaning set forth in Section 1.1.

"Determination Date" has the meaning set forth in Section 8.3(c).

"Director Fees" means directors, consulting, monitoring or similar fees in respect of a Portfolio Company, including options, warrants or other non-cash compensation received by a director or officer of a Portfolio Company which shall be valued at the earlier of (v) the time of exercise of such instrument, (w) three years after the underlying security of such instrument becomes a Marketable Security, (x) the dissolution of the Partnership, (y) the date the Partnership disposes of the Portfolio Investment that gave rise to such fee or (z) the date such option, warrant or other non-cash compensation was disposed of by the General Partner, the Manager, the Principals or their Affiliates and thereafter credited against Management Fees pursuant to Section 4.1(c), in each such case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates in respect of Portfolio Investments; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Disposition" or "Disposed of" means, with respect to all or a portion of a Portfolio Investment, (i) except as provided in the next sentence, the sale, exchange or other disposition by the Partnership of all or a portion of the securities or other interests constituting that Portfolio Investment for cash, securities or other property, (ii) the receipt by the Partnership of a distribution of the proceeds of the sale of all or substantially all of the assets of the Portfolio Company in complete liquidation of the Partnership's entire interest in the Portfolio Investment and (iii) an in-kind distribution of all or part of a Portfolio Investment that has not previously been deemed to have been Disposed of, as of the date of and to the extent of such distribution. A "Disposition" does not include (i) a recapitalization that consists of an exchange of a Portfolio

Appx. 04025

Investment for other securities of or claims against the issuing Portfolio Company, (ii) a business combination that consists of an exchange of substantially all of the Partnership's remaining interest in a Portfolio Investment for securities issued by an acquiring entity, (iii) a business combination that consists of the exchange of all or substantially all of the assets of a Portfolio Company or one or more divisions or operating units of a Portfolio Company for securities issued by an acquiring entity or (iv) a sale, exchange or other disposition that does not constitute a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment.

"Distressed Companies" shall mean persons that, in the opinion of the General Partner, (a) are or have been in financial or other stress; (b) are restructuring, are considered likely to be restructured, or have been restructured in an out-of-court process or in a proceeding under the Federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; (c) are being, are considered likely to be or have been reorganized within or outside of a proceeding under federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; or (d) are engaged, are considered likely to engage or have been engaged in other extraordinary transactions, such as debt restructurings, reorganizations and liquidations outside of bankruptcy.

"ECI" means income that is effectively connected with a United States trade or business within the meaning of Section 864(c) of the Code and the Treasury Regulations promulgated thereunder, but not including any income or gain attributable to the disposition of a "United States real property interest" as defined for purposes of Section 897(c) of the Code.

"Electing Limited Partner" has the meaning set forth in Section 2.4(b).

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"Excess Partial Realization Proceeds" means, for any Partner and as of any date, the sum of the positive amounts determined with respect to each Portfolio Investment (or portion thereof) that has not been Disposed of as of such date and as to which there have been proceeds from a Partial Realization as of such date, equal to the excess of (a) such Partner's Partner Share of aggregate proceeds that have been distributed as of such date of all Partial Realizations with respect to such Portfolio Investment or portion thereof over (b) the sum of (i) such Partner's Capital Contributions applied to make such Portfolio Investment or portion thereof, including Capitalized Partnership Expenses attributed to such Portfolio Investment or portion thereof and any Allocated Expenses with respect to such Portfolio Investment as of such date, plus (ii) an amount that would be equal to such Partner's Preferred Amount if such Partner's Preference Base were only the amounts described in clause (i).

"Existing Partners" has the meaning set forth in Section 6.5(c).

"FCC" shall mean the U.S. Federal Communications Commission.

"FCC Attribution Rules" shall mean the ownership attribution rules of the FCC, including, but not limited to, 47 C.F.R. §§ 21.912, Note 1; 24-709; 24.720; 26.101(b), (c);

73.3555, Note 2; 76.501, Note 2; 76.503, Note 2; 76-504, Note 1; Attribution Reconsideration Order, 58 Radio Regulation 2nd 604 (1985); Further Attribution Reconsideration Order, 1 FCC Rcd 802 (1986); Report and Order, 14 FCC Rcd 12559 (1999); Report and Order, 14 FCC Rcd 19014 (1999); Memorandum Opinion and Second Order in Reconsideration, FCC 00-431 (released Jan. 19, 2001); and Memorandum and Opinion and Order on Reconsideration, FCC-00-438 (released Jan. 19, 2001), all as the same may be amended or supplemented from time to time.

"Final Closing" means the final closing of subscriptions by Limited Partners pursuant to Subscription Agreements, which, in any event, shall take place no later than the fourteen month anniversary of the First Closing.

"First Closing" means the first closing of subscriptions by Limited Partners pursuant to Subscription Agreements.

"Follow-on Investment" means investments made after the termination of the Commitment Period in securities of an existing Portfolio Company that are appropriate or necessary in the opinion of the General Partner to preserve, protect or enhance the investment in such Portfolio Company that was made by the Partnership during the Commitment Period.

"Fund Group" means the Partnership, Parallel Vehicles, Separate Investment Entities and their respective Portfolio Investments.

"Funded Commitment" means as to any Partner as of any date, that portion of a Partner's Commitment that has been contributed (or "deemed contributed") to the Partnership to meet a Capital Call (including any amounts contributed pursuant to Section 6.5(b)), reduced by (a) any amounts which are distributed (or "deemed distributed") to such Partner in respect of a proposed Portfolio Investment (or portion thereof) that was not consummated, (b) any amounts which are distributed (or "deemed distributed") to such Partner in respect of a Bridge Financing (or portion thereof) that was sold, refinanced, redeemed or otherwise disposed of within 18 months from the Investment Date of such Portfolio Investment in an amount not to exceed the Partner's portion of Funded Commitments used to acquire such Bridge Financing, (c) any amounts paid by such Partner pursuant to subclauses (A), (B) and (C) of the third sentence of Section 6.5(b), (d) any amounts distributed (or "deemed distributed") to such Partner pursuant to Section 6.5 (other than amounts attributable to payments by an Additional Limited Partner pursuant to subclauses (A), (B) and (C) of the third sentence of Section 6.5(b)), and (e) in the sole discretion of the General Partner, any amounts distributed (or "deemed distributed") to such Partner with respect to a Portfolio Investment that was sold, refinanced, redeemed or otherwise disposed of within 48 months after the Investment Date for such Portfolio Investment in an amount not to exceed the portion of such Partner's Funded Commitments used to acquire such Portfolio Investment, all as determined in good faith by the General Partner. For the purposes of this definition, those proceeds otherwise distributable to a Partner that are retained for reinvestment or application to a Capital Call in accordance with the proviso to Section 3.1(b) or the proviso to the second to last sentence in Section 6.5(b), shall be "deemed distributed" to such Partner by the Partnership and "deemed contributed" by such Partner to the Partnership. The General Partner, in its discretion, may reduce the 48 month period referenced above at any time during the Commitment Period.

Appx. 04027

"GAAP" means U.S. generally accepted accounting principles as in effect from time to time.

"General Partner" has the meaning set forth in the introduction to this Agreement and includes any successor general partner of the Partnership appointed in accordance with this Agreement.

"GP's Counsel" has the meaning set forth in Section 12.5.

"Gross-up Percentage" means the percentage determined by dividing (i) the aggregate Commitments of all Partners by (ii) the aggregate Commitments of all Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b).

"Guaranty Agreement" shall mean the Guaranty Agreement, dated as of the date hereof, by and among the Partnership, the General Partner and the guarantors party thereto, substantially in the form of the agreement set forth in Exhibit A hereto, as amended from time to time in accordance with its terms.

"Highland" shall mean Highland Capital Management, L.P., a Delaware limited partnership.

"Highland Accounts" means collectively funds, accounts and vehicles managed by Highland from time to time.

"Highland Investment Allocation Policy" shall mean the investment allocation policy of Highland described in the Partnership's Confidential Private Placement Memorandum and as in effect or modified from time to time.

"Highland Portfolio Company" means each portfolio company (and each of their subsidiaries) as to which Highland and/or the Principals and/or their respective Affiliates have completed, or are in the process of completing, an investment or acquisition or receipt of a debt or equity ownership position therein, including, without limitation through Crusader and other Highland Accounts, at the time of the First Closing, together with follow-on or other additional investments and acquisitions from time to time after the First Closing in or by such companies so long as such investments and acquisitions are reasonably determined by the Principals to be primarily within the general lines or areas of business of such companies as of the First Closing or incidental or related thereto.

"Indemnifying Partner" has the meaning set forth in Section 6.7(a).

"Initial Fee Period" means the period starting on the First Closing and ending on the earlier of (i) the termination of the Commitment Period, and (ii) the date on which the Manager, the General Partner or an Affiliate thereof closes subscriptions of capital commitments by investors of a Successor Fund.

"Insulated Partner" has the meaning set forth in Section 5.16(a).

"Insulated Partner Affiliate" has the meaning set forth in Section 5.16(a).

Appx. 04028

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Date" means, with respect to any Portfolio Investment, the date such Portfolio Investment was acquired by the Partnership.

"Investment Income and Gain" means, with respect to a Portfolio Investment, (i) the excess, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income over the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.3, the excess, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners over the Basis of such portion of such Portfolio Investment, and (iii) Current Income attributable to such Portfolio Investment.

"Investment Loss" means, with respect to a Portfolio Investment, (i) the deficiency, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income as compared to the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.4, the deficiency, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners as compared to the Basis of such portion of such Portfolio Investment, and (iii) the amount, as reasonably determined by the General Partner in accordance with Section 9.4, by which such Portfolio Investment has permanently declined in value below the Basis of such Portfolio Investment immediately prior to such determination.

"Keyman Group" means James Dondero, Pat Daugherty and John Honis; provided, that the Keyman Group will include replacements chosen pursuant to Section 2.2(d) if a Triggering Event occurs pursuant to clauses (ii) or (iii) therein; provided, further, that, if any one of the members of the Keyman Group ceases to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner, the Keyman Group will include such replacement person that is proposed by the General Partner to the Advisory Committee and who is approved to serve as a member of the Keyman Group by the consent of a majority of the members of the Advisory Committee.

"Limited Partners" means the persons listed in Schedule 1 hereto in their capacity as limited partners of the Partnership (including each person admitted to the Partnership in accordance with Section 6.5) and each person who is admitted to the Partnership as a substitute limited partner pursuant to Section 6.2 or 6.5, so long as each such person continues to be a limited partner of the Partnership hereunder.

"Majority in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than 50% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

Appx. 04029

"Management Fee" has the meaning set forth in Section 4.1(a).

"Management Fee Period" has the meaning set forth in Section 4.1(a).

"Manager" means Highland Capital Management, L.P., a Delaware limited partnership, or other entity controlled by James Dondero and Mark Okada, and appointed as Manager by the General Partner on behalf of the Partnership from time to time.

"Marketable Securities" means securities that (A) (i) are (x) listed on a national securities exchange in the United States, (y) quoted on the NMS or (z) listed on a securities exchange or quoted on an established quotation system within or without the United States that in the opinion of the General Partner after consultation with the Advisory Committee supports sufficient trading activity and volume to allow for the orderly disposition of such securities by the Partners following a distribution thereof in accordance with Sections 2.4 and 3.3, and (ii) are not subject to restrictions on transfer as a result of applicable contract provisions, the provisions of the Securities Act or regulations thereunder (other than the volume, manner-of-sale and notice restrictions of Rule 144 promulgated thereunder or any successor rule thereto; provided, that if such securities are subject to volume limitations under Rule 144 and distributed in kind to Limited Partners, each Limited Partner would be able to sell such securities promptly after the distribution thereof in accordance with Sections 2.4 and 3.3 (notwithstanding volume limitations)), or other applicable law, or (B) are immediately convertible, exchangeable or exercisable by the holder thereof into securities that meet the requirements of the foregoing clause (A).

"Media Company" shall mean any entity in which the Partnership has or acquires an investment and that directly or indirectly owns, controls or operates any: (i) broadcast radio or television station licensed by the FCC; (ii) U.S. cable television system; (iii) daily newspaper (as such term is defined in Section 73.3555 of the Ownership Rules); (iv) multipoint multichannel distribution system licensed by the FCC; (v) other communications facility the ownership or operation of which is subject to regulation by the FCC under (x) the Communications Act of 1934, as amended, (y) the FCC Attribution Rules, or (z) the FCC Ownership Rules; and (vi) other business or activity that is subject to ownership restrictions imposed by the FCC from time to time.

"Net Funded Commitment" means, in respect of any Partner and as of the first day of any Management Fee Period, such Partner's Funded Commitment as of such date less (i) such Partner's Capital Contributions (or portion thereof, in the case of a partial Disposition) applied by the Partnership to make all Portfolio Investments that have been Disposed of on or prior to such date and applied to pay Capitalized Partnership Expenses relating to such Portfolio Investments and Allocated Expenses with respect to such Portfolio Investment as of such date, (ii) all write downs pursuant to Section 9.4 in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date multiplied by such Partner's Partner Interest in each such Portfolio Investment, and (iii) such Partner's Capital Contributions in respect of Management Fees and Partnership Expenses allocable to Portfolio Investments that have not been Disposed of on or prior to such date.

Appx. 04030

"NMS" means the National Market System of the National Association of Securities Dealers, Inc.

"Non-Marketable Securities" means all securities which are not Marketable Securities.

"Non-U.S. Partner" means with respect to any determination hereunder, (i) any Limited Partner that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code, or (ii) any Limited Partner that has a direct or indirect beneficial owner that (x) is not a "United States person" within the meaning of Section 7701(a)(30) of the Code and (y) is required to report on a United States federal income tax return or report any taxable income allocated to such Limited Partner pursuant to Section 10.4, to the extent of such beneficial owner's pro rata share of such income, but in each case, only if such Limited Partner has notified the General Partner of such status at any time prior to such determination, by providing the General Partner an IRS Form W-8BEN or by some other method satisfactory to the General Partner.

"Non-Voting Interest" means any interest of a Limited Partner in the Partnership, and if applicable, any interest of a limited partner in a Parallel Vehicle (or portion thereof) with respect to which a Limited Partner or limited partner in a Parallel Vehicle has, or elects to have, no or limited voting rights pursuant to Section 6.9 or a similar provision in the agreement of limited partnership of the Parallel Vehicles, as the case may be.

"Non-Voting Partnership Interests" has the meaning set forth in Section 6.9(b).

"Operating Company" means an "operating company" within the meaning of the Plan Asset Regulation, including a "venture capital operating company."

"Opinion of the Partnership's Counsel" means an opinion of Mayer Brown LLP or other counsel selected by the General Partner and reasonably acceptable (by reason of experience in the area of law involved) to the Limited Partner affected by such opinion or, if more than one Limited Partner is affected by such opinion, a Majority in Interest of the Limited Partners so affected.

"Organizational Expenses" means the reasonable out-of-pocket expenses (including, without limitation, travel, printing, legal and accounting fees and other expenses) of the General Partner, the Manager, the Principals and their respective Affiliates (but not including any Placement Fees) incurred in the formation of the Partnership, any Parallel Vehicle or any Separate Investment Entity or incurred in connection with the organization and funding of the Partnership, any Parallel Vehicle, Separate Investment Entity and the General Partner.

"Other Permitted Investment Activities" means the continuing involvement of the Principals, subject to compliance with the devotion of time covenant in Section 5.1(a), (i) in the full range of their activities in connection with their duties and responsibilities as members, owners, partners, directors, officers, employees, shareholders, or consultants of the Manager and Highland Accounts, including Crusader, (ii) in acquisitions and follow-on investments by Highland Portfolio Companies reasonably determined by the Principals to be primarily within the general area of business of a Highland Portfolio Company or incidental or related thereto, (iii) as passive owners, stockholders, debtholders and investors in professionally managed hedge

Appx. 04031

funds, fund of funds and other private investment entities and vehicles, (iv) in investments which do not otherwise meet the investment objectives of the Partnership, and (v) in a Successor Fund organized in accordance with Section 5.12; provided, that none of the activities described in clauses (i) through (v) above shall unreasonably affect the ability of the Principals to fulfill their duties to the Limited Partners and to be actively involved in the business of the Fund Group.

"Ownership Rules" means the multiple and cross-ownership rules of the FCC including, but not limited to, 47 C.F.R. §§ 21.912; 24-709; 24.720; 26.101(a); 73.3555; 74.931(h); 76.501; 76.503; 76.504, and other regulations or written policies of the FCC which limit or restrict ownership in Media Companies, all as the same may be amended or supplemented from time to time.

"Parallel Vehicle" means any entity that is organized pursuant to Section 5.14 and designated a Parallel Vehicle by the General Partner, including Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnership, but solely for purposes of this Agreement, the Partnership is not a Parallel Vehicle.

"Partial Realization" means, with respect to any Portfolio Investment, the realization by the Partnership of Current Income or of proceeds from a recapitalization, extraordinary dividend, sale, redemption or other disposition of less than all of such Portfolio Investment (other than a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment) or any other similar event that does not constitute a Disposition of such Portfolio Investment.

"Participating Partner" means, with respect to any Portfolio Investment, any Limited Partner who made a Capital Contribution (other than solely a Waiver Contribution) that was applied to such Portfolio Investment.

"Partner Interest" means for any Partner that is a Participating Partner with respect to any Portfolio Investment (i) for each Partner as to which there is a Deemed Contribution, the proportion that the sum of such Partner's Capital Contributions and allocable share of Deemed Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment, and (ii) for any Partner other than Partners described in clause (i), the proportion that such Partner's Capital Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment.

"Partner Share" means, for any Partner, and for any period, the amount of Investment Income and Gain, Investment Loss, Current Cash Income, proceeds from the Disposition of or Partial Realization with respect to a Portfolio Investment for such period or Portfolio Investments distributed in kind, as the case may be, or items of Partnership income or expense (other than Management Fees or Placement Fees, if any), in each case for such period multiplied by such Partner's Partner Interest in the Portfolio Investments giving rise to such items or to which such items are allocable pursuant to Section 3.3(c).

"Partners" means the General Partner and the Limited Partners, collectively.

Appx. 04032

"Partnership" has the meaning set forth in Section 1.1.

"Partnership Expenses" means all reasonable costs and expenses relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company or proposed Portfolio Company), including, but not limited to, (i) all costs and out-of-pocket fees and expenses attributable to acquiring, investing, holding, monitoring and disposing of the Partnership's investments, (ii) all other out-of-pocket costs and out-of-pocket fees and expenses attributable to unconsummated transactions or investment strategies (but excluding marketing strategies) that do not lead to consummated acquisitions, (iii) legal, accounting, auditing, administrative, consulting and other fees and expenses (including, but not limited to, fees of the administrator of the Partnership and insurance and other out-of-pocket expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and forms K-1), (iv) expenses of the Advisory Committee incurred in accordance with Article VII, (v) extraordinary expenses, liabilities, indemnities and other obligations of the Partnership (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements (including, but not limited to, costs and expenses payable under Section 5.11)), and (vi) all debt service obligations, including interest, premium, if any, fees, expenses and other amounts payable in respect of indebtedness of the Partnership incurred in accordance with Section 5.3, but in each case, not including Organizational Expenses in excess of $1,250,000, Management Fees, Placement Fees and those expenses borne by the Manager pursuant to Section 4.3.

"Partnership Legal Matters" has the meaning set forth in Section 12.5.

"Permitted GP Transferee" means, as to any membership or other ownership interest in the General Partner, of or held by any Principal or other member or investor in the General Partner (a) any family member of such person provided the transferor retains all voting control with respect to the interest, (b) any other partner or investor in the General Partner who was a partner or investor in the General Partner as of the Final Closing, and (c) any trust, partnership, foundation corporation or other entity that is either controlled by such person or is primarily for the benefit of such person and/or their family members.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency or political subdivision thereof).

"Placement Fees" means the fees and expenses and any interest on any deferred fees and expenses charged by or paid to any placement agency designated by the Partnership or the General Partner for the marketing and sale of interests in the Partnership and the Parallel Vehicles. The Partnership's pro rata share of any Placement Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the aggregate Commitments of the Limited Partners giving rise to such fees, and the denominator of which is the sum of the aggregate Commitments of the Limited Partners and the aggregate capital commitments of all limited partners in all Parallel Vehicles giving rise to such fees.

"Plan Assets" means "plan assets" as defined in the Plan Asset Regulation.

"Plan Asset Event" has the meaning set forth in Section 5.6(e).

"Plan Asset Regulation" means the U.S. Department of Labor regulation located at 29 C.F.R. Section 2510.3-101, or any successor regulation thereto, as in effect at the time of reference, as modified by Section 3(42) of ERISA.

"Portfolio Company" means any corporation, partnership, limited liability, company or other entity in which the Partnership has made an investment, other than Short-Term Investments.

"Portfolio Investments" means any investments held by the Partnership, other than Short-Term Investments. If the Partnership holds multiple classes of securities or other interests that were issued by a Portfolio Company in a single closing or series of related closings, all of such securities or interests in the aggregate shall constitute one Portfolio Investment.

"Preference Base" means for any Partner and as of any date (a) with respect to any distribution of the proceeds of a Disposition, the sum of (i) such Partner's Capital Contributions applied to make Portfolio Investments that have been Disposed of on or prior to such date or applied to pay Capitalized Partnership Expenses with respect to such Portfolio Investments, (ii) such Partner's Partner Share of all writedowns (including write-offs) pursuant to Section 9.4 in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date and (iii) such Partner's Capital Contributions applied to pay Allocated Expenses with respect to Portfolio Investments that have been Disposed of, written down or written off on or prior to such date, and (b) with respect to any distribution of proceeds of a Partial Realization, the amounts determined pursuant to clause (a), plus such Partner's Capital Contributions applied to make the Portfolio Investment to which such proceeds are attributable, including Capitalized Partnership Expenses attributable to such Portfolio Investment and Allocated Expenses with respect to such Portfolio Investment as of such date. For purposes of determining a Partner's Preferred Amount, a Partner's Preference Base shall not include any Capital Contributions returned to such Partner pursuant to Section 2.2(c).

"Preferred Amount" means, for any Partner and as of any date, the amount, if any, that would be required to be distributed on such date so that the aggregate distributions pursuant to Section 3.3 (including distributions pursuant to Sections 8.3(b) and (c)), to such Partner in excess of such Partner's Preference Base provide a return of 8% per annum (compounded annually) on such Partner's Preference Base. For purposes of determining a Partner's Preferred Amount with respect to a Disposition of a Portfolio Investment, no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date. A Partner's Preferred Amount shall be calculated on the basis of the actual number of days elapsed from and including the date on which each Capital Contribution is invested in a Portfolio Company or is contributed to the Partnership for the purpose of paying Management Fees, Organizational Expenses and Partnership Expenses, as applicable, to, but not including, the date that distributions constituting a return of such Capital Contributions were made by the Partnership to the Partners pursuant to Section 3.3(a)(i).

Appx. 04034

"<u>Principals</u>" means the following senior investment professionals who are partners or members of the General Partner or are employed by the Manager, for so long as such persons have not voluntarily resigned from, or been terminated by, the General Partner or Manager, and any other senior investment professionals from time to time who are designated as such by the General Partner: James Dondero, Mark Okada, Patrick Daugherty and John Honis.

"<u>Qualified Purchaser</u>" has the meaning set forth in Section 2(a)(51) of the Investment Company Act and the regulations promulgated thereunder.

"<u>Redeemed Limited Partner</u>" has the meaning set forth in <u>Section 6.6(c)</u>.

"<u>Redemption Effective Date</u>" has the meaning set forth in <u>Section 6.6(c)</u>.

"<u>Redemption Value</u>" means, with respect to any interest in the Partnership, or such portion thereof in the case of a partial withdrawal, being redeemed because of a Plan Asset Event or Regulatory Issue, the fair market value of such interest as of the applicable Redemption Effective Date, as determined in good faith by the General Partner; <u>provided</u> that, if the Plan Asset Event or the Regulatory Issue is a result of a breach of a representation, warranty or covenant made by the Redeemed Limited Partner, the Redemption Value shall be (in each case as determined in good faith by the General Partner) the lesser of (i) the fair market value of such Redeemed Limited Partner's interest in the Partnership on the applicable Redemption Effective Date and (ii) the fair market value of the applicable portion of the Redeemed Limited Partner's interest in the Partnership being redeemed on the date on which cash is allocated to make redemption payments.  In making such determination of fair market value, the General Partner shall assume that all of the assets of the Partnership will be sold on the applicable date in a commercially reasonable manner and the proceeds of such sale, net of estimated closing costs, as reasonably determined by the General Partner, and all obligations of the Partnership (other than the redemption of the interest or interests in the Partnership being redeemed as of such date), will be distributed to the Partners pursuant to this Agreement.  With respect to a Plan Asset Event or Regulatory Issue that is not a result of a breach of a representation or warranty made by the Redeemed Limited Partner, if the majority of such Redeemed Limited Partners disagree with the General Partner's determination of the Redemption Value of the applicable interests in the Partnership, such Redeemed Limited Partners shall negotiate in good faith to resolve such disagreement, and if such Redeemed Limited Partners continue to disagree after negotiations are held, either side may request that an independent evaluator (who must be reasonably acceptable to the other party) be retained, whose valuation shall be final and binding on the Partnership and all of the Partners.  The Partnership will bear the cost of the independent evaluator.

"<u>Regulated Investor</u>" has the meaning set forth in <u>Section 6.6(b)</u>.

"<u>Regulatory Issue</u>" has the meaning set forth in <u>Section 6.6(b)</u>.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Separate Investment Entity</u>" has the meaning set forth in <u>Section 5.15</u>.

"<u>Seventy-Five Percent in Interest of the Limited Partners</u>" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel

Vehicles totaling 75% of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"Short-Term Investment Income" means the income earned on Short-Term Investments including in any event any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means investments in (a) cash, (b) obligations of, or fully guaranteed as to timely payment of principal and interest by, the United States of America and with a maturity date not in excess of 12 months from the date of purchase by the Partnership, (c) interest-bearing accounts and/or certificates of deposit of any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, (d) reverse repurchase agreements using U.S. Treasury securities and entered into with any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, and (e) money market mutual funds with assets of not less than $500 million, substantially all of which assets are reasonably believed by the General Partner to consist of items described in one or more of the foregoing clauses (b), (c) and (d).

"Special Profit Interest" means (i) the General Partner's right to receive distributions pursuant to the first two sentences of Section 3.3(a), but only to the extent such distributions exceed the distributions that would have been made to the General Partner pursuant to the first two sentences of Section 3.3(a) if such distributions had been made pro rata according to each Partner's Capital Contributions to the Partnership, and (ii) the General Partner's right to receive distributions pursuant to Section 3.3(e).

"Subscription Agreement" means the Subscription Agreements (including a Subscriber Information Form) executed and delivered by Partners investing in the Partnership substantially in the form of the Subscription Agreement, dated as of the date hereof.

"Successor Fund" has the meaning set forth in Section 5.12.

"Tax Distributions" means the aggregate amount of distributions that would be made to the General Partner if the General Partner received no distributions other than those required pursuant to Section 3.3(b).

"Tax Exempt Partner" means (i) a Limited Partner that is exempt from tax under Section 501 of the Code or (ii) a Limited Partner that has a direct or indirect beneficial owner that (x) is exempt from tax under Section 501 of the Code and (y) is required to report on a United States federal income tax return or report any taxable income allocated to such Limited Partner pursuant to Section 10.4, to the extent of such beneficial owner's pro rata share of such income,

Appx. 04036

but only in each case if such Limited Partner has notified the General Partner in writing regarding the status of such direct or indirect beneficial owner.

"Topping and Break-up Fees" means topping, break-up or similar fees in connection with prospective Portfolio Investments that are not completed, in each case to the extent actually paid by a prospective Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Transaction and Monitoring Fees" means commitment, transaction, closing, merger and acquisition, divestiture, financing, monitoring and similar advisory fees in respect of a Portfolio Company, in each case to the extent actually paid by a Portfolio Company and received by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates; provided, however, that (A) such fees shall not include, in each case, any such amounts that are applied to cover amounts paid by the General Partner, the Manager, the Principals, employees of the Manager or their Affiliates that constitute unreimbursed (i) out-of-pocket expenses of such persons incurred in generating such fees, and (ii) Partnership Expenses incurred in generating such fees, and (B) to the extent that the General Partner, the Manager, the Principals or their Affiliates were actually reimbursed by the Partnership for any Partnership Expenses incurred in generating such fees, such fees will first be applied to repay the Partnership for such Partnership Expenses.

"Triggering Event" has the meaning set forth in Section 2.2(d).

"Two-Thirds in Interest of the Limited Partners" means Limited Partners with Commitments and limited partners in Parallel Vehicles with capital commitments to Parallel Vehicles totaling more than $66^{2/3}\%$ of the aggregate Commitments of all Limited Partners and capital commitments of limited partners in Parallel Vehicles.

"UBTI" means unrelated business taxable income and unrelated debt financed taxable income, as defined in Sections 512 and 514 of the Code, respectively.

"Unapplied Waived Fee Amounts" means, as of the date of determination, the excess, if any, of (i) the sum of (A) the aggregate Waived Fee Amount for all Management Fee Periods, beginning on or before the date of determination (B) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" relating to the aggregate Capital Contributions previously returned to the Partners pursuant to Section 2.2(c) (including, without limitation, in respect of Bridge Financings) and (C) amounts added to the Unapplied Waived Fee Amounts pursuant to Section 6.5(b) over (ii) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" as of such date.

Appx. 04037

"Uncapitalized Partnership Expenses" means Partnership Expenses that are not Capitalized Partnership Expenses.

"Unfunded Commitment" means that portion of a Partner's Commitment that is not a Funded Commitment.

"Waived Fee Amount" has the meaning set forth in Section 4.1(d).

"Waived Fee Notice" has the meaning set forth in Section 4.1(d).

"Waiver Contribution" has the meaning set forth in Section 2.2(a)(ii).

Section 2.2  Capital Contribution Commitment; Key Person Provision.  Subject to Section 5.6(b):

(a)      (i)   Each Partner agrees to make contributions in cash to the capital of the Partnership pro rata based upon such Partner's respective Unfunded Commitment in an aggregate amount up to its Unfunded Commitment when and as called by the General Partner ("Capital Call") upon at least ten Business Days written notice (the "Capital Call Notice"); provided, however, that the General Partner shall not be obligated to make Capital Contributions to be used to pay the Management Fee or Placement Fees, and Capital Contributions to pay the Management Fee will be made by each Limited Partner based on the amount of each payment of the Management Fee that is borne by such Limited Partner pursuant to Section 4.1(b). Any Capital Contributions made by the Limited Partners to pay the Partnership's pro rata share of any Placement Fees shall be made by the Limited Partners whose Commitments gave rise to such fees, pro rata in accordance with their respective Commitments. The aggregate Commitments and capital commitments to all Parallel Vehicles of the General Partner, the Principals, Highland and their Affiliates, shall be pro rata and shall equal the lesser of 5.0% of aggregate Commitments and capital commitments to all Parallel Vehicles and $50 million. In the event of the election described in Section 2.2(a)(ii), each Limited Partner required to make a Waiver Contribution pursuant to Section 2.2(a)(ii) shall make the Waiver Contribution specified in the Capital Call Notice. Each Capital Contribution shall be made by Partners in cash either by delivery to the Partnership of a certified check or wire transfer of immediately available funds to an account designated by the General Partner, provided, however, that the Capital Contributions of the General Partner may be made by cash contributions or by Deemed Contributions as set forth in Section 2.2(a)(ii).

A Capital Call Notice shall: (i) specify the purpose for which the Capital Contributions are required to be made (including a breakdown of the amounts called in respect of Portfolio Investments, Partnership Expenses, Organizational Expenses, Management Fees or Placement Fees); (ii) in the case of a Capital Call Notice with respect to the anticipated making of a Portfolio Investment, include: (A) a brief description of the identity, nature and business of such Portfolio Investment; (B) a statement as to whether the Portfolio Investment might be structured through a Separate Investment Entity; (C) a designation as such of any Bridge Financing to be made as part of such Portfolio Investment, and (D) a statement as to whether the Portfolio Investment is an investment in a Media Company or could, in the reasonable judgment of the General Partner, cause a Limited Partner to recognize UBTI; and (iii) specify a Limited Partner's

Appx. 04038

pro rata share of the Capital Contributions required to be made by such Limited Partner, the portion of the Capital Contribution to be applied towards the payment of Management Fees, and the amount of a Limited Partner's Unfunded Commitment remaining following the funding of such Capital Contribution.

(ii)      Notwithstanding Section 2.2(a)(i) above, at such time as the General Partner delivers any Capital Call Notice, the General Partner's required Capital Contributions in respect of anticipated or actual Portfolio Investment and/or expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, at the General Partner's election, shall be reduced by an amount up to the lesser of (A) the amount of Capital Contributions otherwise required to be made by the General Partner pursuant to Section 2.2(a)(i), or (B) the amount of any existing Unapplied Waived Fee Amounts, and such amount shall instead be funded by the Participating Partners with respect to whom the Management Fee is payable pursuant to Section 4.1(b), pro rata according to their respective Commitments (for any Partner, a "Waiver Contribution"). If, as of any date, the aggregate amounts described in clause (i) of the definition of "Deemed Contribution" exceed the sum of the amounts described in clause (i) of the definition of "Unapplied Waived Fee Amounts," the General Partner shall, within ten Business Days after such date, make a Capital Contribution equal to the amount of such excess. Such amount shall be distributed to the Partners as a return of their Capital Contributions, in proportion to their respective Waiver Contributions. Corresponding adjustments shall be made to the Special Profits Interest.

(b)      Each Partner's Commitment will commence on the date of the First Closing and will expire on the earlier of (i) five years from the Final Closing, (ii) the date after the second anniversary of the Final Closing on which the Commitment Period is terminated with the consent of Seventy-Five Percent in Interest of the Limited Partners, (iii) the date on which the General Partner determines that 90% of the aggregate Commitments of the Partners have been funded or are needed for purposes described in clauses (i) through (iii) of the next sentence below, or (iv) the date that the Commitment Period is terminated pursuant to Section 2.2(d), (such period being referred to as the "Commitment Period"). Notwithstanding the expiration or the termination of the Commitment Period, the Partners will remain obligated to make cash contributions throughout the duration of the Partnership pursuant to their respective Unfunded Commitments to the extent needed (i) to make Follow-on Investments; provided, however, that the aggregate of all Follow-on Investments made after the termination of the Commitment Period shall not exceed 15% of the aggregate Commitments, (ii) to make investments that were the subject of written agreements in process or under active consideration prior to or on the date of termination of the Commitment Period and which are consummated within 120 days of the date of termination of the Commitment Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals, and (iii) to pay Partnership Expenses and the Management Fee. The General Partner shall notify the Limited Partners within 30 days of the termination of the Commitment Period as to all in process investments that were the subject of written agreements in process and investments under active consideration to the extent the General Partner is not bound by confidentiality obligations related thereto.

(c)      The General Partner shall cause the Partnership to return to the Partners all or any portion of any Capital Contribution to the Partnership which is not invested in a Portfolio Investment or used to pay Partnership Expenses, Management Fees, Placement Fees or

Appx. 04039

Organizational Expenses or which has been contributed in order to fund a Bridge Financing which is refinanced. Each such return of Capital Contributions shall be made pro rata among all Partners in the same proportion as the Partners made such Capital Contributions and shall be made on or before the sixtieth (60th) day following the date such Capital Contributions were due (as set forth in the Capital Call Notice pursuant to which such Capital Contributions were made by the Partners to the Partnership), provided, however, that such Capital Contributions may be retained and applied with respect to another outstanding Capital Call Notice and may also be retained if the General Partner determines in good faith that there will be a Capital Call within thirty (30) days after the date that such Capital Contributions would otherwise be required to be returned, and if not so applied and retained, may be called again by the General Partner according to the provisions of this Section 2.2 as if such returned Capital Contributions had not been previously called.

(d)    If:

(i)    James Dondero and Mark Okada both cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(ii)    the Keyman Group, together with the Principals as of the Final Closing and Permitted GP Transferees thereof, are no longer entitled to receive, directly or indirectly, in the aggregate at least 50% of the Carried Interest (as defined in the Master Partnership Agreement) payable to the General Partner, or

(iii)    any two or more of the members of the Keyman Group cease to be actively involved, including in a supervisory role, on an ongoing basis with respect to the business, operations or investment decisions of Highland, the Manager and General Partner,

(the circumstances specified in each of clauses (i), (ii), and (iii), above being referred to herein as a "Triggering Event"), then the Partnership shall automatically enter into a 120 day period (subject to extension for an additional 120 day period as described below) in which the Commitment Period will be suspended (a "Continuity Period").

The Partnership shall not make any new investments during the Continuity Period, except to the extent such investments (a) were the subject of written agreements, (b) were in process or (c) under active consideration prior to the commencement of the Continuity Period, and in each such case, are consummated within 120 days of the commencement of the Continuity Period, subject to extension, if necessary, in order to obtain requisite regulatory approvals for such investments. The pursuit of Other Permitted Investment Activities by the Principals and the members of the Keyman Group will not give rise to a Triggering Event. The General Partner will promptly notify the Limited Partners of the occurrence of a Triggering Event.

During a Continuity Period, if a Triggering Event described in clause (i) above has occurred, the General Partner, after consultation with the Advisory Committee, will prepare for and provide to the Limited Partners within 60 days of the Triggering Event a program recommended by the General Partner for resumption by the Partnership of its full range of activities at the end of such Continuity Period. Prior to the end of the Continuity Period, but

within a reasonable time period following the delivery of a program recommended by the General Partner, the General Partner will arrange for a vote of all Limited Partners. By consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early termination of the Commitment Period, such termination to commence on the date such Continuity Period expires. If a Continuity Period expires without the occurrence of an effective consent of the requisite Limited Partners to terminate the Commitment Period, the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities.

During a Continuity Period, if a Triggering Event described in clauses (ii) or (iii) above has occurred, within 90 days of the Triggering Event the General Partner may propose to the Advisory Committee one or more replacements to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve of such replacement or replacements, such replacement person or persons shall thereafter be members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities. If the Advisory Committee does not approve of such replacement person or persons within 30 days following the delivery of the General Partner proposal to the Advisory Committee, the Continuity Period shall be extended for an additional 120 day period. The General Partner may propose to the Advisory Committee, within 90 days after the rejection by the Advisory Committee of the initial replacement person or persons, a different replacement or replacements than originally proposed to serve as members of the Keyman Group for purposes of this Section 2.2(d); if a majority of the members of the Advisory Committee approve of such replacement or replacements within 30 days following delivery of the new General Partner proposal, such replacement person or persons shall thereafter be members of the Keyman Group and the Partnership, and the General Partner on its behalf, shall be authorized and entitled to resume the Partnership's full range of activities. If the Advisory Committee does not approve of such replacement person or persons within such thirty day period, the General Partner will arrange for a vote of all Limited Partners. By consent of Two-Thirds in Interest of the Limited Partners, the Limited Partners may cause an early termination of the Commitment Period, such termination to commence on the date the Continuity Period expires.

Section 2.3   Capital Accounts. A capital account ("Capital Account") will be established for each Partner on the books of the Partnership and will be adjusted as follows:

(a)      Capital Contributions and Allocations. A Partner's Capital Contribution will be credited to its Capital Account when received by the Partnership.

(b)      Short-Term Investment Income. Short-Term Investment Income earned in each quarterly period with respect to Capital Contributions that have not yet been invested in Portfolio Investments or used to pay fees and expenses of the Partnership will be credited to the Capital Accounts of the Partners pro rata according to their respective Partner Capital Contributions to which such Short-Term Investment Income is attributable. Short-Term Investment Income on undistributed proceeds from Portfolio Investments shall be credited to the Capital Accounts of the Partners ratably in proportion to their respective shares of such undistributed amounts.

Appx. 04041

(c) <u>Investment Income and Gain and Investment Loss</u>. Taking into account <u>Section 6.6(d)</u> and except as otherwise provided in this <u>Section 2.3(c)</u>, Investment Income and Gain or Investment Loss shall be allocated among the Partners for each taxable period in such a manner that, as of the end of such taxable period, and to the extent possible, the Capital Account of each Partner shall be equal to the net amount, positive or negative, which would be distributed to each Partner or for which such Partner would be liable to the Partnership under this Agreement (including <u>Sections 8.3(c)</u> and <u>(e)</u>), determined as if the Partnership were to liquidate the assets of the Partnership for an amount equal to their Basis, reduced, but not below zero, by the amount of nonrecourse debt, if any, to which such Partnership assets are subject, and distribute the proceeds in liquidation after the payment of all liabilities (other than nonrecourse liabilities) in accordance with <u>Sections 3.2</u> and <u>3.3</u>. For purposes of the foregoing determination, no amount shall be treated as distributable pursuant to <u>subclause (z)</u> of <u>clause (A)</u> of <u>Section 3.3(a)(i)</u> by virtue of <u>clause (a)(ii)</u> of the definition of Preference Base or <u>clause (B)</u> of <u>Section 3.3(a)(i)</u> with respect to any Portfolio Investment or portion thereof solely because of the deemed liquidation of such Portfolio Investment; provided, however, that any increase in the Basis of a Portfolio Investment shall be taken into account for this purpose in the same manner as proceeds of a Partial Realization. Investment Income and Gain or Investment Loss attributable to Portfolio Investments retained by the Partnership pursuant to <u>Section 3.3(e)(ii)</u> shall be allocated 100% to the General Partner.

(d) <u>Organizational Expenses, Management Fee</u>. Organizational Expenses that are borne by the Partnership will be apportioned to the Partners <u>pro rata</u> according to their respective Capital Contributions to pay Organizational Expenses. Organizational Expenses that are described in Section 705(a)(2)(B) of the Code will be debited against the Capital Accounts of the Partners in the fiscal period in which they are incurred, and Organizational Expenses that are described in Section 709(b) of the Code will be debited against the Capital Accounts of the Partners over a 180-month period. The Management Fee for any Management Fee Period shall be debited against the Capital Account of each Limited Partner in the amount that is borne by such Limited Partner pursuant to <u>Section 4.1(b)</u> for such Management Fee Period.

(e) <u>Distributions</u>. Any amounts distributed to the Partners will be debited against their Capital Accounts.

(f) <u>Partnership Expenses</u>. Uncapitalized Partnership Expenses shall be debited against the Capital Accounts of the Partners in proportion to their respective Commitments.

(g) <u>Placement Fees</u>. Placement Fees, shall be debited against the Capital Accounts of the Limited Partners whose Commitments gave rise to such fees, in proportion to their respective Commitments.

Section 2.4 <u>Distributions in Kind</u>.

(a) If any securities are to be distributed in kind to the Partners as provided in <u>Article III</u>, such securities will first be written up or down to their value (as determined pursuant to <u>Article IX</u> as of the date of such distribution), thus creating Investment Income or Gain or Investment Loss, which shall be allocated in accordance with <u>Section 2.3</u> to the Capital Accounts of the Partners, and upon the distribution (or deemed distribution pursuant to <u>Section 2.4(b)</u>) of

such securities to the Partners, the value of such securities shall be debited, in accordance with Section 2.3(e), against the Capital Accounts of the Partners.

(b)     The General Partner shall give at least ten Business Days prior notice to the Limited Partners of any proposed distribution of securities pursuant to this Section 2.4 and the date of such proposed distribution.  In connection with any distribution of securities in kind, the General Partner shall offer each Limited Partner the right to elect to receive a distribution of securities or to have the Partnership dispose of all or any portion of such securities for the account of such Limited Partner.  At the election of a Limited Partner (an "Electing Limited Partner"), all distributions of securities that otherwise would be made to the Electing Limited Partner by the Partnership shall be made, as determined by the General Partner, to the General Partner or an independent escrow agent or custodian as agent for the Limited Partner (the "Agent") and, unless otherwise specified in writing, an Electing Limited Partner shall be deemed to have chosen to have the Partnership sell its share of securities in full.  An Electing Limited Partner shall bear all expenses (including, without limitation, underwriting costs and brokerage commissions) relating to the sale by the Partnership of such securities.  The General Partner may require the Electing Limited Partner to make any representations, warranties and covenants as the General Partner shall reasonably determine are necessary or desirable in order to dispose of the securities.  For all purposes of this Agreement, the Limited Partner shall be deemed to have received such distribution of securities on the date that such securities are delivered to the Agent.  Immediately following a distribution to the Agent pursuant to this Section 2.4(b), the General Partner shall notify the Limited Partner of the type and quantity of securities distributed.  The Agent shall thereafter hold such securities for a period of 10 Business Days following which the Agent shall use its reasonable efforts to promptly sell such securities and deliver the net proceeds therefrom to the Limited Partner; provided, however, that the Agent shall not sell such securities and shall instead promptly deliver such securities to the Limited Partner following the conclusion of such 10 Business Day period if, prior to the conclusion of such period, the Limited Partner notifies the Agent that the receipt of such securities would not violate any law, regulation or governmental order applicable to the Limited Partner.  The Agent shall use good faith efforts in selling such securities at the highest available price, but shall not be liable to an Electing Limited Partner in any manner in connection with such sale in the absence of gross negligence or willful misconduct, including for any claim that the Agent was unable to effect any such sale (for any reason) or failed to obtain the highest possible sale price for such securities.

(c)     An Electing Limited Partner's election pursuant to Section 2.4(b) may be revoked by the Electing Limited Partner at any time upon notice to the General Partner; provided, however, that an election may not be revoked with respect to securities if the Agent has entered into a binding commitment to sell securities on behalf of the Electing Limited Partner.

Section 2.5  Determination of Voting Thresholds.  Any vote, approval or consent that is to be based upon a specified proportion of the interests in the Partnership held by the limited partners shall be based upon the Limited Partners' Commitments and the capital commitments of limited partners in Parallel Vehicles, excluding (i) except as specifically provided in Section 6.9, that portion of each Limited Partner's Commitment and the capital commitment of each limited partner in a Parallel Vehicle that represents a Non-Voting Interest, (ii) except as otherwise set forth in Section 12.I(b), limited partner interests in the Partnership or in any Parallel Vehicle held by a Defaulting Partner or a defaulting partner of a Parallel Vehicle, (iii) limited partner

Appx. 04043

interests in the Partnership or in any Parallel Vehicle held, directly or indirectly, by the General Partner, Highland, the Principals or any of their respective Affiliates prior to any removal of the General Partner pursuant to Section 5.9, and (iv) in the case of any particular matter that affects or pertains only to the Partners and not to any partner of a Parallel Vehicle, limited partner interests in such Parallel Vehicle held, directly or indirectly, by the General Partner or by any limited partner of such Parallel Vehicle.

## ARTICLE III

## DISTRIBUTIONS

Section 3.1   Distribution Policy.

(a)   The General Partner may in its sole discretion make distributions of cash or Marketable Securities at any time and from time to time subject to the remaining provisions of this Section 3.1; provided, however, that no securities will be distributed in kind to the Partners that are not Marketable Securities until the final distribution of the assets of the Partnership to the Partners pursuant to Section 8.3(b).

(b)   The General Partner will cause the Partnership to distribute (i) Current Cash Income at least semi-annually unless reinvested as described in this Section 3.1(b), (ii) Short-Term Investment Income at least quarterly, and (iii) the net cash proceeds received from Dispositions of or Partial Realizations with respect to Portfolio Investments within 60 days of the receipt thereof unless reinvested as described in this Section 3.1(b), after, in each case, the setting aside by the General Partner, in its discretion, of reasonable reserves for anticipated obligations and commitments of the Partnership as well as any required tax withholdings; provided, however, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the date that an amount that would otherwise be distributed that would be described in clauses (a), (b) and (d) of the definition of Funded Commitment, or if there is an outstanding Capital Call Notice the General Partner may, in its discretion, retain such amount and reduce the amount required to be contributed with respect to such Capital Call.

Section 3.2   Distribution of Short-Term Investment Income.   Short-Term Investment Income will be distributed among the Partners in the same proportions as Short-Term Investment Income was credited to the Partners' Capital Accounts.

Section 3.3   Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions.

(a)   Distributions not attributable to a Portfolio Investment shall be distributed to the Partners in proportion to their Funded Commitments as of the date of such distribution.  All distributions of Current Cash Income and all distributions out of net proceeds from Dispositions of or Partial Realizations with respect to Portfolio Investments (in each case, net of Partnership Expenses) and all distributions of Portfolio Investments shall be apportioned in proportion to their respective Partner Interests among the General Partner and the Participating Partners with respect to the Portfolio Investment that gave rise to such Current Cash Income or net proceeds or

Appx. 04044

that is being distributed in kind. The General Partner's Partner Share of such distributions shall be distributed 100% to the General Partner. Each Participating Partner's Partner Share shall be distributed to such Participating Partner and the General Partner as follows:

(i)      First, 100% to such Participating Partner until (A) the aggregate amount distributed to such Participating Partner in accordance with this Section 3.3(a) equals such Participating Partner's Preference Base as of the date of such distribution and (B) the aggregate amount distributed to such Participating Partner in accordance with this Section 3.3(a) (other than clause (A) of this paragraph) equals such Participating Partner's Preferred Amount as of such date. Solely for purposes of determining how proceeds of a Disposition of a Portfolio Investment are to be distributed pursuant to this Section 3.3(a) no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date.

(ii)      Second, (A) 50% to the General Partner and (B) 50% to such Participating Partner until the aggregate distributions to the General Partner with respect to such Participating Partner pursuant to this paragraph (ii) and paragraph (iii), reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to Section 8.3(c), equal 20% of the aggregate distributions of such Participating Partner's Partner Share of such amounts to the General Partner, reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to Section 8.3(c), and to such Participating Partner pursuant to this paragraph (ii) and paragraph (iii), and clause (B) of the immediately preceding paragraph.

(iii)      Third, (A) 80% to such Participating Partner and (B) 20% to the General Partner.

For purposes of this Section 3.3(a), amounts distributed to a Participating Partner pursuant to Section 8.3(c) shall be treated as having been distributed pursuant to this Section 3.3(a).

(b)      Anything contained herein to the contrary notwithstanding, the General Partner shall be entitled to receive cash distributions from the Partnership (after taking into account any other distributions received by the General Partner in such fiscal year pursuant to Sections 3.3(a)(ii)(A) and 3.3(a)(iii)(B)) in amounts sufficient to enable the General Partner and the individual members of the General Partner to discharge any federal, state and local tax liability (excluding penalties) arising as a result of the allocation of Investment Income and Gain pursuant to Section 2.3(c) attributable to the General Partner's Carried Interest in the Partnership, determined by assuming the applicability of the highest combined effective marginal federal, state and local income tax rates applicable to an individual resident in New York, New York. The amount of such tax liability shall be calculated taking into account (i) the deductibility (to the extent allowed) of state and local income taxes for United States Federal income tax purposes, (ii) the amount of net cumulative tax loss previously allocated to the General Partner in prior fiscal years with respect to the Carried Interest and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this subsection (b) and (iii) the character of any income or gain and the income tax rates applicable thereto. The calculation shall be made on the assumption that taxable income or tax loss from the Partnership with

Appx. 04045

respect to the Carried Interest is the General Partner's only taxable income or tax loss. Such distributions shall be debited to the General Partner's Capital Account, as provided in Section 2.3(e). Any amounts distributed pursuant to this subsection (b) shall be considered an advance against the next distribution of Carried Interest distributable to the General Partner, and shall offset such distributions.

(c)    A Partner's Capital Contributions used to pay Organizational Expenses, Management Fees, Placement Fees and Uncapitalized Partnership Expenses that are to be allocated to a Portfolio Investment shall be determined on the date such Portfolio Investment is Disposed of, and shall equal the product of (i) such Capital Contributions not theretofore allocated to Portfolio Investments that have been Disposed of multiplied by (ii) a fraction, the numerator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and the denominator of which shall equal such Partner's Capital Contributions in respect of such Portfolio Investment and all Portfolio Investments that have not been Disposed of on or prior to the date such allocation is effected. For purposes of the determinations described in clause (b)(i) of the definition of Excess Partial Realization Proceeds, such Capital Contributions shall be tentatively allocated to the Portfolio Investment giving rise to such Partial Realization proceeds as though such Portfolio Investment had been Disposed of on the date such proceeds were realized.

(d)    In the event of a partial Disposition of a Portfolio Investment, the unreturned Capital Contributions and remaining Preferred Amount with respect to such Portfolio Investment shall be allocated between the Disposed portion and retained portion of such Portfolio Investment, pro rata, based on the relative amounts that are Disposed of and retained, respectively, of that portion of such Portfolio Investment held by the Partnership immediately prior to such Disposition.

(e)    (i)    Notwithstanding anything in this Agreement to the contrary, the General Partner may at any time elect not to receive all or any portion of any distribution that otherwise would be made to it with respect to its Carried Interest.

(ii)    Any amount of cash which is not distributed to the General Partner pursuant to Section 3.3(e)(i) shall, in the General Partner's sole discretion, either be retained by the Partnership or distributed to the Partners (other than to the General Partner) in accordance with Section 3.3(a). Any amount of securities not distributed in-kind to the General Partner pursuant to Section 3.3(e)(i) shall be retained by the Partnership.

(iii)    If the General Partner elects to distribute cash to the other Partners pursuant to Section 3.3(e)(ii), 100% of any or all subsequent cash distributions by the Partnership shall be distributed to the General Partner until the General Partner has received the same aggregate amount of cash distributions it would have received had it not waived receipt of certain distributions pursuant to Section 3.3(e)(i) (without regard to the distribution of any Short-Term Investment Income earned on such retained amounts).

(iv)    All Current Cash Income attributable to, and distributions out of net proceeds from the Disposition or Partial Realization of, Portfolio Investments retained by the Partnership pursuant to Section 3.3(e)(ii) and all cash retained by the Partnership pursuant to

Appx. 04046

Section 3.3(e)(ii) shall be distributed to the General Partner as of the date determined by the General Partner in its sole discretion. The General Partner shall not be entitled to any additional distributions in respect of such retained amounts, other than Short-Term Investment Income earned on such retained amounts.

(f)     Notwithstanding anything to the contrary in this Agreement, if at the expiration of the Commitment Period, there are Unapplied Waived Fee Amounts, the General Partner shall, in its sole discretion, prior to any other distribution pursuant to this Article III, be entitled to a distribution of cash equal to the Unapplied Waived Fee Amount.

Section 3.4  Foreign Taxes. The amount of any foreign taxes paid by the Partnership (or by an entity in which the Partnership holds an interest, either directly or indirectly through one or more such entities, that is treated as a partnership or is disregarded for federal income tax purposes) or withheld from receipts of the Partnership or such entity from a Portfolio Investment shall be allocated among the Partners as reasonably determined by the General Partner (taking into account any allocation of taxes under Section 6.7) and, for purposes of Sections 3.3(a)(i) – (iii), shall be deemed to have been distributed to each Partner as Current Cash Income or proceeds from the Disposition of a Portfolio Investment to the extent that the payment or withholding of such foreign taxes reduced Current Cash Income or the proceeds from the Disposition of a Portfolio Investment, as the case may be, otherwise distributable to such Partner as provided herein (for this purpose taking into account with respect to each Partner any reduction in such foreign taxes that occurs by reason of such Partner's status); provided that the General Partner may deem foreign taxes paid by or withheld from receipts of the Partnership and allocable to a Tax Exempt Partner to have been distributed to such Tax Exempt Partner as described above only to the extent that such Tax Exempt Partner incurs and is subject to tax on UBTI relating to such Tax Exempt Partner's Interest in the Partnership, as determined by the General Partner.


# ARTICLE IV

## MANAGEMENT FEE AND ORGANIZATIONAL EXPENSES

Section 4.1  Management Fee.

(a)     During each quarterly period beginning on each January 1, April 1, July 1 and October 1 from and after the First Closing (each such quarterly period, a "Management Fee Period") until the termination of the Partnership, the Partnership will pay the Manager a quarterly fee as calculated below (the "Management Fee"), in advance on each January 1, April 1, July 1 and October 1, as compensation for managing the affairs of the Partnership, provided, however, that the initial payment of the Management Fee shall be for the period from the First Closing to December 31, 2007.

(b)     The Management Fee payable by the Partnership shall be the sum of the amounts determined for each Limited Partner pursuant to this Section 4.1. No Management Fee shall be payable with respect to the General Partner and their Affiliates. Subject to Sections 4.1(c) and 4.1(d), the quarterly Management Fee payable with respect to a Limited Partner during the Initial

Appx. 04047

Fee Period shall be 0.4375% of the Commitments of such Limited Partner resulting in an aggregate annual Management Fee of 1.75%. Following the expiration of the Initial Fee Period, the quarterly Management Fee payable with respect to a Limited Partner shall be 0.4375% of the aggregate Net Funded Commitment of such Limited Partner as reduced by any writedowns or writeoffs pursuant to Section 9.4 in respect of Portfolio Investments that have not been Disposed of on or prior to such date (resulting in an aggregate annual Management Fee of 1.75%). The Management Fee in any partial quarterly period will be pro rated on a daily basis according to the actual number of days in such period.

(c)   The Management Fee payable with respect to any Management Fee Period and with respect to a Limited Partner will be reduced (but not below zero) by such Limited Partner's Partner Share of eighty-five percent (85%) of the Partnership's pro rata share of all Topping and Break-up Fees, Transaction and Monitoring Fees, and Director Fees. The Management Fee shall also be reduced, but not below zero, by such Limited Partner's Capital Contributions used pursuant to Section 2.2(a)(i) to pay (x) any Placement Fees and (y) any Organizational Expenses in excess of $1,250,000, paid or payable by the Partnership. To the extent that such Limited Partner's share of the Management Fee in any Management Fee Period is reduced to zero as a result of the reduction for Placement Fees, Organizational Expenses in excess of $1,250,000, Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees, the excess shall be carried forward to the next Management Fee Period (and, if necessary, to one or more subsequent Management Fee Periods) and applied as a reduction of the Management Fee, but not below zero, for such succeeding Management Fee Period (or a subsequent Management Fee Period). To the extent that Director Fees, Topping and Break Up Fees and Transaction and Monitoring Fees exceed or cannot be applied as a reduction of Management Fees for succeeding Management Fee Periods, then such excess will first be applied to reimburse the Partnership for any previously unreimbursed Management Fees paid by the Partnership for prior Management Fee Periods (with such amounts being treated for purposes of Section 3.3(a) as distributions in return of the Capital Contributions made to pay such Management Fees), and the remainder of such excess will be paid or contributed to the Partnership and will be distributed pursuant to Section 3.3(a) as if net proceeds from the Disposition of a Portfolio Investment; provided, however, that in the event that any Partner desires not to receive any such excess fee offsets upon the termination of the Partnership, such Partner may elect in writing at any time prior to the termination of the Partnership to waive receipt of any such fee offsets, in which case the amount of fee offsets that would otherwise have been allocated and distributed to such Partner shall instead be allocated and distributed to the other non-waiving Partners on a pro rata basis in accordance with their respective Commitments. The Partnership's pro rata share of all Topping and Break-up Fees, Transaction and Monitoring Fees and Director Fees shall be the amount of such fees multiplied by a fraction, the numerator of which is the Partnership's investment in the Portfolio Investment (or proposed investment in the proposed Portfolio Investment) giving rise to such fee and the denominator of which is the aggregate investment or proposed investment in such Portfolio Investment or proposed Portfolio Investment by the Partnership, all Parallel Vehicles, all Separate Investment Entities, all Co-investment Funds and all other co-investment arrangements arranged by the Manager with respect to such Portfolio Investment or proposed Portfolio Investment (provided, that for the avoidance of doubt, any such Co-Investment Funds or other co-investment arrangements will not receive any amount of fee offsets).

Appx. 04048

(d)      After taking into account any reduction in the Management Fee payable for any Management Fee Period with respect to a Limited Partner pursuant to Section 4.1(c), the Management Fee payable for any Management Fee Period with respect to such Limited Partner shall be further reduced by an amount (the "Waived Fee Amount") equal to the lesser of (i) the amount of the Management Fee to which the Manager would otherwise be entitled pursuant to this Section 4.1 that the Manager has irrevocably elected to waive in a written notice (a "Waived Fee Notice") delivered to the Partnership with respect to each Management Fee Period, at least 15 days prior to the end of the calendar year immediately preceding the calendar year in which such Management Fee Period begins, and with respect to each Management Fee Period in the first calendar year of the term of the Partnership, such Waived Fee Notice delivered on or prior to the delivery of the first Capital Call Notice in respect of Management Fees and (ii) the amount that would be payable to the Manager on such Management Fee Period pursuant to this Section 4.1 in the absence of this Section 4.1(d).  A Limited Partner's share of the Waived Fee Amount for any Management Fee Period is equal to the Waived Fee Amount for such Management Fee Period multiplied by the quotient determined by dividing (i) the Management Fee that would be payable for such Management Fee Period with respect to such Limited Partner in the absence of this Section 4.1(d) by (ii) the total Management Fee that would be payable for such Management Fee Period in the absence of this Section 4.1(d).  If the Manager delivers a Waived Fee Notice with respect to any Management Fee Period that begins before the date of the Final Closing, (i) if such Waived Fee Notice specifies that a percentage of the Management Fee otherwise payable for such Management Fee Period be waived, the Manager shall be deemed to have waived a proportionate amount of the Management Fee otherwise payable for such Management Fee Period by all Additional Limited Partners whose subscriptions are accepted after the date of such Waived Fee Notice and (ii) if such Waived Fee Notice specifies that a fixed dollar amount of such Management Fee otherwise payable for such Management Fee Period be waived, the reduction in the Management Fee for such Management Fee Period shall be allocated to all Limited Partners in the same proportion as the Management Fee is borne by the Limited Partners for such Management Fee Period.

(e)      For purposes of Section 4.1(c), a Limited Partner's share of Director Fees and Transaction and Monitoring Fees is equal to the amount of the Partnership's pro rata share of such fees multiplied by the Limited Partner's Partner Interest in the Portfolio Investment to which such Director Fees and Transaction and Monitoring Fees are attributable, and a Limited Partner's share of Topping and Break-up Fees is equal to the amount of such fees multiplied by the proportion of such Limited Partner's Commitment to the Commitments of all Partners on the first day of the Management Fee Period in which such Topping and Break-up Fees are paid.

Section 4.2  Organizational and Partnership Expenses.  The Partnership will reimburse the General Partner or the Manager for all Organizational Expenses incurred by the General Partner or the Manager on behalf of the Partnership.  The Partnership will pay all Partnership Expenses.

Section 4.3  Ordinary Operating Expenses.  The Manager shall pay all ordinary overhead expenses of the Partnership, the General Partner, the Manager, the Separate Investment Entities and the Parallel Vehicles (including salaries, rent, overhead, travel expenses and similar expenses), other than Partnership Expenses, Organizational Expenses and Placement Fees.

Appx. 04049

## ARTICLE V

## GENERAL PARTNER

Section 5.1   <u>Investment Opportunities; Devotion of Time; Management Authority</u>.

(a)      The Principals shall each be actively involved in the business of the Fund Group and shall devote such amount of their business time and attention in order to fulfill their fiduciary duties to the Limited Partners in accordance with the Delaware Partnership Act; <u>provided, however</u>, that the Principals may engage and be involved in Other Permitted Investment Activities.  Subject to the foregoing and to <u>Section 5.12(a)</u> and the Highland Investment Allocation Policy, during the Commitment Period, the General Partner, the Manager and the Principals will present all investment opportunities to the Partnership which they believe in good faith are suitable for the Partnership and fit the investment objective of the Partnership.  However, the Principals and the Manager will not be restricted from pursuing, engaging in and completing acquisitions and investments in, through or by Highland Portfolio Companies in connection with Other Permitted Investment Activities and other investments through other Highland Accounts, in each such case, in accordance with the Highland Investment Allocation Policy.

(b)      Subject to the retention of the Manager, the General Partner will have full control over the business and affairs of the Partnership consistent with its fiduciary duties arising under the Delaware Partnership Act.  The General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, are necessary or advisable or incidental thereto, including the power to acquire or dispose of any security (including Marketable Securities).  Notwithstanding the foregoing, the management of the Partnership will vest in the Manager which will provide the Partnership with portfolio management and administrative services, including investigating, analyzing, structuring and negotiating potential investments, monitoring the performance of Portfolio Companies and advising as to disposition opportunities.  In no event shall the Manager, which has been engaged by the Partnership, be treated as an agent or partner of the General Partner.

(c)      Except to the extent otherwise provided in this Agreement, all matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Investment Income and Gain, Investment Loss, Partnership Expenses, Organizational Expenses, Carried Interest, and the distribution of net proceeds and the return of capital among the Partners, including the taxes thereon, (ii) accounting procedures and determinations (including the determination of the Preferred Amount), estimates of the amount of Management Fees or Placement Fees payable by any Defaulting Partner, (iii) the calculation of the Management Fee (including Director Fees, Topping and Break-up Fees and Transaction and Monitoring Fees ), and (iv) the reinvestment of any amounts distributed in respect of a Bridge Financing (or portion thereof) that was sold, refinanced or otherwise disposed of within eighteen (18) months from the Investment Date of such Bridge Financing, shall be determined by the General Partner in accordance with its reasonable interpretation of the provisions of this Agreement made in good faith.

Appx. 04050

Section 5.2  <u>Use of Affiliates</u>.  The General Partner shall retain the services of the Manager and any officers, directors or Affiliates thereof in connection with the operation of the Partnership, and the compensation of the Manager and such persons shall be as provided in <u>Section 4.1</u> hereof; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 5.2</u> shall be construed to relieve the General Partner of its responsibilities under this Agreement or the duties and limitations set forth in this <u>Article V</u>.

Section 5.3  <u>Indebtedness</u>.  Subject to <u>Section 5.5</u> and <u>Section 5.4</u>, the Partnership may incur indebtedness consisting of Bridge Leveraging or the issuance of credit support of the obligations of Portfolio Companies or their subsidiaries, which may be in the form of guarantees, letters of credit or pledges of a portion of the Commitments ("<u>Credit Support</u>").  Any such indebtedness will not be considered as Capital Contributions by the Partners unless, until and to the extent the General Partner calls for Capital Contributions in connection therewith pursuant to a Capital Call Notice pursuant to this Agreement.

Section 5.4  <u>Limitation on Investments</u>.

(a)  The Partnership will not invest (including through Credit Support) more than twenty five percent (25%) of the aggregate Commitments in any single Portfolio Company together with any of its Affiliates (valued at original cost).  A Bridge Financing, when added to the amount of permanent investment by the Partnership in the Portfolio Investment that is the subject of the Bridge Financing, may not exceed twenty five percent (25%) of the aggregate Commitments.

(b)  The aggregate amount of Bridge Financings outstanding at any one time shall not exceed fifteen percent (15%) of the aggregate Commitments.

(c)  Subject to <u>Section 5.5</u>, the Partnership may issue Credit Support, which does not at any one time exceed Unfunded Commitments.

(d)  The Partnership shall invest cash in Short-Term Investments.

(e)  The aggregate investments (valued at cost) by the Partnership in Portfolio Companies organized and with principal executive offices outside the United States shall not exceed thirty percent (30%) of the aggregate Commitments.  The Partnership will not invest in Portfolio Companies that are organized or with principal executive offices in countries that are not within the Organization for Economic Cooperation and Development as of the date of the First Closing.

(f)  The Partnership will not invest as a partner or member in any pooled investment fund or "fund of funds" in which an investment adviser or manager of such fund (other than the Partnership) receives management fees or the right to carried interest distributions on the Partnership's investment or interest therein unless the amount of any such management fee is considered part of the Capital Contribution relating to such Portfolio Investment and the amounts distributable to the General Partner under <u>Sections 3.3(a)(ii)</u> and <u>3.3(a)(iii)</u> are reduced by the amount of any carried interest payable to such sponsor or investment manager.

Appx. 04051

(g)    In connection with a Portfolio Investment in any non-U.S. jurisdiction, the General Partner shall obtain an opinion of counsel with respect to such jurisdiction to the effect that (i) no Limited Partner, solely as a result of the Partnership making such investments, will be required either (x) to file an income tax return in such jurisdiction (other than in connection with an application for a refund of withholding or similar taxes) or (y) to pay income tax in such jurisdiction with respect to income not derived from the Partnership, and (ii) no Limited Partner shall be personally liable for any debts or losses of the Partnership in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The General Partner shall use commercially reasonable efforts to ensure that any opinion obtained pursuant to this Section 5.4(i) will permit the Limited Partners to rely thereon. The General Partner shall ask local counsel to confirm and/or update periodically as it deems necessary any opinion it obtains pursuant to this Section 5.4(i). The Partnership will use commercially reasonable efforts to prepare all tax rebate, reduction or reclaim forms or other filings or elections that are required to obtain any available exemption from, reduction in, or refund of, any withholding or other taxes required in any taxing jurisdiction on behalf of each Limited Partner, for signature by such Limited Partner, and to assist each Limited Partner, at such Limited Partner's expense, to obtain refunds for taxes withheld or paid with respect to such Limited Partner as to which a refund is obtainable. Each Partner agrees that it will cooperate with the General Partner in making any such filings or elections to the extent the General Partner determines that such cooperation is necessary or desirable.

(h)    The Partnership will not invest (including through Credit Support) more than twenty percent (20%) of the aggregate Commitments in Persons that are not Distressed Companies; provided that the General Partner in its good faith discretion believes that an investment in such Persons is consistent with the Partnership's investment objective.

Section 5.5  UBTI; USRPI. The General Partner shall use commercially reasonable efforts not to (i) structure the Fund's Portfolio Investments in a manner that would result in the realization by a Tax Exempt Partner of a substantial amount of UBTI or (ii) cause the Partnership to acquire a Portfolio Investment that the General Partner reasonably believes at the time of such acquisition is or is likely to become a "United States real property interest" ("USRPI") within the meaning of Section 897(c) of the Code. In addition, if the Partnership makes an investment in a pass-through entity that could give rise to UBTI or income effectively connected with a U.S. trade or business, the Partnership may make available a "blocker" structure through which Tax-Exempt and non-U.S. Partners can invest. However, the use of Bridge Leveraging and the use of Director Fees, Topping and Break-up Fees, Transaction and Monitoring Fees and Placement Fees to offset the Management Fee, as described in Section 4.1(c), will not be deemed a violation of this Section 5.5.

Section 5.6  ERISA Matters.

(a)    The General Partner will use reasonable efforts to conduct the affairs and operations of the Partnership in such a manner that the Partnership will qualify as an Operating Company or for another exception from being deemed to hold Plan Assets of any Benefit Plan Investor. As of the initial Capital Contribution date, the General Partner shall deliver to each Benefit Plan Investor either (i) an opinion from the General Partner's counsel to the effect that the Partnership should qualify as an Operating Company as of the initial Capital Contribution

Appx. 04052

date or (ii) a certificate, based on consultation with the General Partner's counsel, to the effect that the Partnership should qualify for another exemption from being deemed to hold Plan Assets of any Benefit Plan Investor as of the initial Capital Contribution date. Annually thereafter, the General Partner will provide a certificate to Benefit Plan Investors confirming that the Partnership continues to qualify for an exception from being deemed to hold Plan Assets of any Benefit Plan Investor and specifying which exception from Plan Assets is available to the Partnership as of the date of the certificate.

(b)     Notwithstanding Section 2.2, until such time as the General Partner delivers to each Benefit Plan Investor (and the escrow agent, if any) either the opinion or the certificate described above in Section 5.6(a), the initial Capital Contribution required to be made to the Partnership by a Benefit Plan Investor shall, at the request of the General Partner, instead be deposited directly by such Benefit Plan Investor into an escrow account that is intended to comply with Department of Labor Advisory Opinion 95-04A.

(c)     Each Partner that is or will be a Benefit Plan Investor on the Closing Date when it is admitted to the Partnership shall so notify the General Partner in writing prior to such Closing Date. Any Limited Partner which has not indicated in its Subscription Agreement that it is a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

(d)     It is intended that none of the Partnership, the General Partner, the Manager or any of their Affiliates will act as or be deemed to be a fiduciary under ERISA with respect to any Benefit Plan Investor or the assets of the Partnership; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the Delaware Partnership Act. Notwithstanding any other provision of this Agreement, the General Partner is authorized to take any action or refrain from taking any action which in its judgment is necessary or desirable in order to prevent any Partnership assets from being deemed to constitute Plan Assets of any Benefit Plan Investor.

(e)     Should the General Partner reasonably determine that the continued participation of a Benefit Plan Investor would result in the assets of the Partnership being deemed Plan Assets of such Benefit Plan Investor (a "Plan Asset Event"), the General Partner shall so notify, each of the Benefit Plan Investors in writing within 30 days of such determination. Thereafter, the General Partner shall take reasonable steps to correct or cure the Plan Asset Event and, if the General Partner determines that it is not reasonably likely that the Partnership's Plan Asset Event can be reasonably corrected or cured, taking into account the overall interest of the Partnership, the General Partner shall terminate the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3. In connection with the foregoing obligation, in addition to any other powers the General Partner may have, the General Partner shall have the authority to take any of the following actions, in its sole discretion: (i) any action necessary or desirable, in the General Partner's reasonable judgment, to cure the Partnership's failure to qualify as an Operating Company, if applicable; (ii) in accordance with the provisions of Section 12.1, amend this Agreement to cure any illegality or other material adverse consequences to the Partnership; (iii) amend, terminate or restructure any then existing or contemplated arrangements with third parties to cure any illegality or other adverse consequences to the Partnership so long as such

17461908                                          -33-

action would not have a material adverse effect on the Limited Partners; (iv) redeem any Limited Partner's interest in the Partnership, in whole or in part, in a manner consistent with the procedures in Section 6.6(d); (v) force the sale of all or any portion of any Benefit Plan Investor's interest in the Partnership to one or more Limited Partners at the Redemption Value or (vi) terminate the Partnership and wind up its affairs in accordance with Sections 8.2 and 8.3.

Section 5.7   Conflicts of Interest.

(a)     The Limited Partners hereby acknowledge and agree that the General Partner and its Affiliates currently manage and may in the future manage Highland Accounts that invest in securities that may be eligible for purchase by the Partnership, which presents the potential for conflicts of interest. While the General Partner and the Manager intend to manage potential conflicts of interest, as Highland has in the past, by following certain guidelines, and to avoid where practicable situations involving conflicts of interest in a portfolio company or otherwise, each Limited Partner acknowledges that there may be situations in which the interests of the Partnership in a portfolio company or otherwise may conflict with the interests of other Highland Accounts, the General Partner, the Manager, the Principals or their respective Affiliates. On any matter involving a conflict of interest not otherwise provided for in this Agreement, the General Partner shall be guided by its good faith judgment as to the best interests of the Partnership and shall take such actions as are determined by the General Partner and Highland to be appropriate and in compliance with the Highland Investment Allocation Policy. Each Limited Partner agrees that the activities of any other Highland Account, the General Partner, the Manager, the Principals and their Affiliates, including Other Permitted Investment Activities, authorized by this Agreement or conducted consistently with this Agreement and the Highland Investment Allocation Policy may be engaged in by such other Highland Accounts, the General Partner, the Manager, the Principals and their Affiliates, as the case may be, and will not, in any case or in the aggregate, be deemed a breach of this Agreement or any duty that might be owed by any such person to the Partnership or to any Partner.

(b)     Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, none of the General Partner, the Manager, the Principals, or any of their respective Affiliates will invest in any securities of any company in which the Partnership either is actively considering making a Portfolio Investment or has an investment; provided, that (x) the foregoing will not apply to Other Permitted Investment Activities or investments made in accordance with the Highland Investment Allocation Policy, (y) each such person will be permitted to hold securities which such person received in a distribution by the Partnership and (z) any Parallel Vehicles or Separate Investment Entities will be permitted to invest in Portfolio Companies in accordance with this Agreement.

(c)     Except as permitted by Sections 5.12(a) and 5.17(a), without the prior approval of either (i) a majority of the members of the Advisory Committee or (ii) a Majority in Interest of the Limited Partners, the Partnership will not invest in any securities issued by, acquire investments from, sell investments to, or enter into any transaction with an entity in which the General Partner, the Manager, the Principals, or their respective Affiliates has a material financial interest in respect of such entity; provided that the foregoing will not apply to (w) Other Permitted Investment Activities, (x) investments by the Partnership in Portfolio Companies in

Appx. 04054

which the Parallel Vehicles, Separate Investment Entities or Co-Investment Funds invest in accordance with this Agreement; (y) investments by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material interest that have been made in accordance with the Highland Investment Allocation Policy, or (z) investments by the Partnership in publicly traded securities of Portfolio Companies in which a Highland Account has a material financial interest that are made on arms length terms at prevailing market prices; provided, further, that the Partnership will not be precluded from investing in securities of a company in which the General Partner, the Manager, the Principals, or their respective Affiliates either (A) in the case of public companies, owns securities issued by such company representing one percent (1%) or less of the outstanding equity securities, or (B) own only securities which such Persons received in a distribution by the Partnership.

(d)     The General Partner will furnish to the Advisory Committee annually at the time annual financial statements of the Partnership are furnished pursuant to Section 10.3(b) a report of each acquisition or investment by the Partnership in Portfolio Companies in which the General Partner, the Manager, the Principals or their respective Affiliates have a material financial interest that have been made in accordance with the Highland Investment Allocation Policy.

Section 5.8   Transfer of General Partnership Interest; No Withdrawal or Loans.  The General Partner generally may not sell, assign, pledge, mortgage or otherwise dispose of its General Partner interest in the Partnership; provided, however, that the General Partner may transfer its General Partner interest in the Partnership (or consent to the transfer of an interest in the General Partner) in a derivative transaction if the transferor maintains the economic attributes of the interest and voting control of the interest.  The General Partner will not borrow or withdraw any amount from the Partnership or voluntarily withdraw from the Partnership.

Section 5.9   Removal of the General Partner.  By consent of Two-Thirds in Interest of the Limited Partners, the General Partner may be removed in the event of (a) the General Partner's or any member of the Keyman Group's conviction of (or plea of nolo contendere to), a material violation of federal or state securities law or a felony criminal violation, (b) the General Partner's adjudication in a final judgment by a court of competent jurisdiction as having committed in respect of the Partnership an act or omission of a material nature involving gross negligence, bad faith, willful misconduct or fraud, or (c) the General Partner's violation of this Agreement which has a material and adverse effect on the Partnership and which remains uncured for 30 days. Notwithstanding the foregoing, if an event described in clause (a) above has occurred and the event relates to a violation or act of a member of the Keyman Group, the Limited Partners may remove the General Partner only if such violation or act (i) relates to the Partnership or a Portfolio Company, (ii) has a material adverse effect on the Partnership, (iii) such member of the Keyman Group is not terminated as a member of the General Partner and the Manager within 45 days, and (iv) such member of the Keyman Group does not cease to own any interest in the future carried interest or voting interests in the General Partner following termination.  The General Partner will provide the Limited Partners with written notice of the occurrence of any event described in clauses (a), (b) or (c) above.  Concurrently with the removal of the General Partner, the Manager shall be removed as manager of the Partnership unless re-appointed by the successor general partner of the Partnership.  Upon removal of the General Partner, the Limited Partners may elect to continue the Partnership and appoint a new duly authorized general partner of the Partnership and all Parallel Vehicles with the consent of all of the Limited Partners of the

Appx. 04055

Partnership and each Parallel Vehicle and such election shall be deemed to have occurred as of the date of the removal of the former General Partner.  In such an event, the former General Partner shall be entitled to receive distributions equal to any amounts it would have been entitled to had the Partnership been dissolved and wound up in accordance with Sections 8.3(a) and (b) and distributed in kind all Partnership assets as of the date of the election of the Limited Partners to continue the Partnership.  The Partnership shall issue an unsecured non-interest bearing promissory note to the former General Partner in the face amount of the liquidating distribution determined in accordance with this Section 5.9, such note to be payable upon the final liquidation of the Partnership.  All such distributions shall be subject to the obligations set forth in Section 8.3(c) and (d); provided, however, that the General Partner's obligation, if any, to fund Commitments in respect of its obligations in Section 8.3(c) relating to such liquidating distribution shall be satisfied by a reduction to the principal amount of the unsecured non-interest bearing promissory note described in this Section 5.9 in the amount of such obligation.  For purposes of determining allocation and distributions pursuant to the preceding sentence, securities and other property held by the Partnership shall be valued pursuant to the procedures set forth in Article IX.

Section 5.10  No Liability to Limited Partners.

(a)  None of the General Partner, the Manager, the Principals or their Affiliates, officers, directors, members, partners, shareholders, employees or agents will be liable to any Limited Partner or to the Partnership for any action taken, or omitted to be taken, as General Partner with respect to the Partnership, or for any action taken, or omitted to be taken, by any member, partner, director, officer, employee or agent of the General Partner or Manager in connection with its activities for or on behalf of the Partnership so long as such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership, (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to being guilty or enter a plea of nolo contendere (including as part of a settlement) by a court of competent jurisdiction.

(b)  No member of the Advisory Committee, or any Affiliate or employer of any member of the Advisory Committee or any Limited Partner represented on the Advisory Committee by any member (as the case may be) will be liable to any Partner or the Partnership for any action taken, or omitted to be taken, in good faith on behalf of the Advisory Committee (as the case may be) with respect to the Partnership and in accordance with the provisions of this Agreement.

(c)  If any Limited Partner obtains a final judgment in a court of competent jurisdiction against the General Partner for matters relating to the Partnership, the General Partner shall pursue against its members the remedies (if any) that it has against such member relating to such claim.

Section 5.11  Indemnification of General Partner, the Manager and Advisory Committee. (a) The Partnership will indemnify (A) the Principals, the General Partner, the Manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and

Appx. 04056

Affiliates against any losses, liabilities, damages or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such persons may become subject in connection with such person's activities on behalf of the Partnership or in connection with any involvement with a Portfolio Company (including serving as an officer, director, consultant or employee of any Portfolio Company) directly or indirectly on behalf of the Partnership and (B) the members of the Advisory Committee, any Affiliate or employer of any such members and any Limited Partner represented on the Advisory Committee by any member, in connection with any involvement with the Advisory Committee, respectively, but, in the case of members of the Advisory Committee or their Affiliates and employers or any Limited Partner represented on the Advisory Committee by any member, only to the extent that such person acted in good faith and, in the case of the Principals, the General Partner, the manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates, only to the extent that such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership or the Portfolio Company (as the case may be), (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to being guilty or enter a plea of <u>nolo contendere</u> (including as part of a settlement) by a court of competent jurisdiction.  Any person described in clause (A) of this <u>Section 5.11(a)</u> entitled to seek indemnification hereunder shall first use reasonable efforts to seek indemnification from other available sources, if any, prior to obtaining indemnification hereunder; <u>provided</u> that any such person may seek and obtain indemnification hereunder if at any time such person reasonably believes that such person will not receive timely indemnification on terms reasonably acceptable to such person from such other sources; and <u>provided</u>, <u>further</u>, that such person shall continue to use reasonable efforts to seek such indemnification from such other sources and, to the extent any such indemnification is obtained, reimburse the Partnership for any such recovery.  The Partnership may, in the sole judgment of the General Partner, pay the expenses of any person indemnifiable under this <u>Section 5.11</u> in advance of the final disposition of any proceeding, so long as (w) with respect to any derivative action brought by any Limited Partner, the person receiving the advance is not the subject of such derivative action, (x) the proceeding is not instituted by a Majority in Interest of the Limited Partners against the General Partner or the Manager, (y) General Partner has a good faith belief such expenses are indemnifiable, and (z) the General Partner receives a written undertaking by such person for the benefit of the Partnership to repay the full amount advanced if (A) there is a final determination that such person did not satisfy the standards set forth in <u>clauses (i)</u> through <u>(v)</u> immediately above, (B) with respect to any criminal action, such person is finally determined to be or admits to being guilty or enters a plea of <u>nolo contendere</u> (including as part of a settlement) by a court of competent jurisdiction, or (C) such person is not otherwise entitled to indemnification as provided herein.  Notwithstanding the foregoing, no person will be exculpated or exonerated from liability or indemnified against loss for violations of federal or state securities laws, or for any other intentional or criminal wrongdoing.  No person shall be indemnifiable under this <u>Section 5.11</u> in respect of losses, liabilities, damages or expenses to which any such person may become subject in connection with (x) such person's activities with any Portfolio Company if such losses arise after the Partnership's final disposition of such Portfolio Company or (y) a dispute among the General Partner, the Manager, their respective members and employees, and the Principals.

17461908                                                -37-

(b)     No Limited Partner shall have any obligation or liability, including any obligation to make a Capital Contribution to the Partnership, in respect of an indemnity obligation arising from a Portfolio Investment with respect to which such Limited Partner is not a Participating Partner.

(c)     The General Partner will use reasonable efforts to cause each Portfolio Company for which any Affiliate of the General Partner serves as an officer or director to adopt organizational documents which provide mandatory indemnification to directors, officers, and managers to the fullest extent permitted by applicable law.

Section 5.12   <u>Formation of New Fund or Business Endeavor</u>.  (a)  Subject to the other provisions of this <u>Article V</u>, each Partner's interest in the business endeavors of the other Partners is limited to his, her or its interest in the Partnership and no Partner's future business activities are restricted.  Notwithstanding the foregoing, unless consented to by Two-Thirds in Interest of the Limited Partners or approved by a majority vote of the Advisory Committee, neither the General Partner, nor the Manager or any of their Affiliates will close and make investments, or act as general partner, managing member, advisor, employee, agent, or the primary source of transactions on behalf of another private equity investment vehicle or pooled investment vehicle (other than Crusader, a Parallel Vehicle or Separate Investment Entity) that has primary investment objectives substantially similar to those of the Partnership (a "<u>Successor Fund</u>") until the earlier of (i) the date on which at least 75% of the Commitments have been invested or committed for investment in Portfolio Companies or otherwise set aside for Follow-on Investments, Partnership Expenses or Management Fees, and (ii) the end of the Commitment Period; <u>provided, however</u>, that this <u>Section 5.12</u> shall not prohibit the formation of one or more Co-investment Funds, and Co-investment Funds shall not be considered Successor Funds.  If a Successor Fund is organized prior to the termination of the Commitment Period of the Partnership, as permitted under the previous sentence, the Successor Fund may only coinvest in investments made by the Partnership alongside the Partnership, on the same terms and conditions in all material respects, with amounts for investment allocated between the Partnership and the Successor Fund, subject to available capital or other investment limitations on the Partnership and the Successor Fund, as determined by the General Partner.  Any Successor Fund will dispose of securities of a Portfolio Company that are of the same class as those purchased by the Partnership at the same time as the Partnership, and on the same economic and other terms.

Section 5.13   <u>Interest as a Limited Partner</u>.  To the extent that the General Partner acquires the interest of a Defaulting Partner or any other Limited Partner, the General Partner will (subject to <u>Section 2.5</u>) be deemed to be a Limited Partner with respect to such interest for all purposes of this Agreement.

Section 5.14   <u>Parallel Vehicles</u>.  The General Partner and the Manager may organize and capitalize Parallel Vehicles for purposes of facilitating investments in Portfolio Companies for non-U.S. investors and certain accredited investors that are not qualified purchasers (as defined in the Investment Company Act) in the Fund Group.  If any Parallel Vehicles are organized, then the Partnership and each Parallel Vehicle (a) will invest in each Portfolio Company in direct proportion to their respective available capital commitments so that the Partnership will invest in each Portfolio Company an amount equal to the total investment by the Partnership and any Parallel Vehicle multiplied by a fraction, the numerator of which is the aggregate Commitments,

Appx. 04058

and the denominator of which is the sum of the aggregate Commitments plus the aggregate capital commitments by investors in the Parallel Vehicles, provided that such proportion may be modified by the General Partner with the prior approval of the Advisory Committee or a Majority in Interest of the Limited Partners in order to reflect the available commitments and any tax, regulatory or other legal aspects of any Parallel Vehicle and its investors and (b) invest in and dispose of Portfolio Company at the same time and on effectively the same economic terms and conditions. Any item of income, fees, reimbursement or expense that relates to a Portfolio Company in which the Partnership and one or more Parallel Vehicles are investors or to a potential investment that is considered on behalf of the Partnership and any Parallel Vehicles by the General Partner, the Manager or the general partners or managers of any Parallel Vehicles shall, to the extent that any such item is not directly attributable to the Partnership or a Parallel Vehicle, be pro rated among the Partnership and the Parallel Vehicles based on their respective investments in such Portfolio Company or the portions of such potential investment that would have been made available to the Partnership in accordance with the preceding sentence, as applicable. Organizational Expenses shall be borne by the Partnership and each Parallel Vehicle in proportion to their respective aggregate capital commitments, except the Partnership and each Parallel Vehicle shall separately bear the Organizational Expenses that are directly attributed to each such entity. Each Parallel Vehicle shall reimburse the Partnership for such Parallel Vehicle's share of Organizational Expenses that were paid by the Partnership. Investments in Parallel Vehicles by investors shall be on substantially the same terms and conditions as investments in the Partnership by Limited Partners. For the avoidance of doubt, all references to Portfolio Investments shall include investments made by the Partnership, all Parallel Vehicles and all Separate Investment Entities. To the extent that this Agreement provides that the Limited Partners shall vote together with the investors of any Parallel Vehicle, the General Partner agrees (i) that the relevant documentation of any such Parallel Vehicle shall contain comparable voting provisions to the extent applicable, (ii) that any combined vote of the Limited Partners and the investors in any Parallel Vehicle on any such matter for the purposes of this Agreement shall constitute a combined vote on the matter for the purposes of the Parallel Vehicles, and (iii) each such matter shall, if approved by such vote, be equally applicable to the Partnership and all Parallel Vehicles.

Section 5.15 <u>Separate Investment Entities</u>. If the General Partner determines for legal, tax, regulatory or other reasons, in its sole discretion that it is in the best interests of the Partners to invest in one or more Portfolio Companies through an entity other than the Partnership, such investment or investments shall not be made by the Partnership but shall instead be made, either in lieu of or in conjunction with, the Partnership, by one or more limited partnerships, limited liability companies, corporations or similar entities (each a "<u>Separate Investment Entity</u>") owned in the aggregate by all of the Partners and managed by the General Partner or an Affiliate thereof controlled by the Principals. Each Separate Investment Entity shall receive an opinion of counsel for the benefit of the Limited Partners (x) regarding its classification for United States Federal income tax purposes and the limited liability of the Separate Investment Entity and (y) to the effect that no Limited Partner shall be personally liable for any debts or losses of the Separate Investment Entity in such jurisdiction in excess of such Limited Partner's Unfunded Commitment. The Partnership and each Separate Investment Entity will invest in and dispose of Portfolio Investments at the same time and on effectively the same economic terms and conditions. To the extent that Benefit Plan Investors participate in a Separate Investment Entity, such Separate Investment Entity shall be (i) structured so that it will not be deemed to hold Plan

Appx. 04059

Assets and shall provide the same ERISA protections to those Benefit Plan Investors that are provided under this Agreement, and (ii) established on substantially the same terms and conditions in all material respects as Partners are required to make Capital Contributions to the Partnership, and such capital contributions shall be deemed to reduce the Unfunded Commitment of each Partner to the same extent that it would be reduced if made to the Partnership. The provisions and economic terms of each such Separate Investment Entity shall be substantially the same in all material respects as those of the Partnership, except to the extent such terms are required to differ from the economic and other material arrangements reflected in the terms of this Agreement in order to accomplish the purposes of such Separate Investment Entity (including, for example, different economic treatment of different Partners resulting solely from the consequences of a structure created to minimize the amount of UBTI recognized by a Tax Exempt Partner). The gains and losses of any such Separate Investment Entity shall be treated as having been realized by the Partnership for all economic calculations under this Agreement (including, without limitation, the calculation of the General Partner give back obligation pursuant to Section 8.3(c)), and there will be no duplication of management fees or Carried Interest. The Partners having interests in the Separate Investment Entity (including the General Partner and its Affiliates with respect to their Commitments as Partners) shall contribute to each Separate Investment Entity the amounts required to fund such Separate Investment Entity, with each such Partner contributing its pro rata portion of such amounts (based on the relative Unfunded Commitments of the Partners as of the date of such contributions) up to such Partner's remaining Unfunded Commitment and such amounts will reduce such Partner's Unfunded Commitment. Each Limited Partner hereby agrees and consents to the formation of each Separate Investment Entity and hereby covenants and agrees that it will execute and deliver any agreements, documents and certificates as reasonably necessary for, or incidental to, the formation and continuation of each such Separate Investment Entity and its participation as a limited partner, member or participant in each such Separate Investment Entity established in accordance with this Section 5.15.

Section 5.16  Media Company Investments.

(a)     In the event and for so long as, and only during periods from time to time in which, the Partnership shall directly or indirectly hold (or otherwise have attributed to it) an ownership or other interest in a Media Company that is "attributed" to the Partnership under the rules and regulations of the FCC relating to the particular FCC service in which the Media Company operates, no Limited Partner (an "Insulated Partner"), or any person that is a director, officer, equivalent non-corporate official, partner, member or 5% or greater shareholder or other direct or indirect owner of an Insulated Partner such that the ownership interests of the Insulated Partner, are "attributed" to such owner, director, officer, equivalent non-corporate partner, partner or member (an "Insulated Partner Affiliate"), to the extent reasonably determined by the General Partner (with the advice of GP's Counsel) to be necessary to have such ownership or interest not be attributable to the Limited Partners for purposes of the FCC Attribution Rules and the Ownership Rules, shall do any of the following:

(i)     act as an employee of the Partnership or any Media Company if such Insulated Partner's or Insulated Partner Affiliate's functions, directly or indirectly, relate to the media or common carrier enterprises of the Partnership or any Media Company;

Appx. 04060

(ii)     serve, in any material capacity, as an independent contractor or agent of the Partnership or any Media Company with respect to the media or common carrier enterprises of the Partnership or any such Media Company;

(iii)    communicate with the General Partner or any Portfolio Company on matters pertaining to the day-to-day operations of any Media Company;

(iv)    to the extent Partners have the power under this Agreement to admit additional General Partners, vote to admit any additional General Partner to the Partnership unless such addition is subject to the veto of the General Partner;

(v)     to the extent Partners have the power under this Agreement, except as permitted under Sections 5.9 and 8.2, vote on the removal of the General Partner;

(vi)    perform any services for the Partnership or any Media Company materially relating to the media or common carrier enterprises of the Partnership or such Media Company, with the exception of making loans to, or acting as a surety for, such Media Company or the Partnership to the extent consistent with the "equity or debt plus" component of the FCC Attribution Rules; or

(vii)   become actively involved in the management or operation of any Media Company.

(viii)  serve as a member or otherwise participate in the activities of the Advisory Committee if, in the determination of the Insulated Partner, such membership or participation would cause the Insulated Partner to lose its insulated status under the Attribution Rules.

(b)     An Insulated Partner may, upon five Business Days' prior written notice to the General Partner, relinquish its status as an Insulated Partner, in which case the provisions of this Section 5.16 shall no longer apply to such Limited Partner; provided, that such relinquishment shall not be effective until the General Partner has received an opinion of special counsel to the Partnership on FCC matters stating that such relinquishment will not (1) cause the Partnership or any of its Affiliates to violate any law, regulation, rule or policy applicable to matters currently subject to FCC jurisdiction or (2) in any way limit or restrict the activities of the Partnership or any of its Affiliates.  To the extent that issuance of such an opinion requires the filing of any notices with the FCC or the issuance of any approvals by the FCC, the General Partner and the Insulated Partner seeking to relinquish its insulated status shall reasonably cooperate in making any such filing or obtaining any such approval, and the General Partner shall seek the opinion of special counsel to the Partnership on FCC matters with respect to the making of any such filing or the obtaining of any such approval.

(c)     Nothing in this Section 5.16 shall be interpreted to restrict the activities of (A) the Limited Partners or (B) the beneficial interest holders of any Limited Partner during the period that it is an Insulated Partner so long as such Limited Partner's partnership or other governing agreement contains language reasonably designed to insulate such Limited Partner's unaffiliated limited partners or beneficial interest holders, as the case may be, from having the Partnership's interest in any Media Company being attributed under the FCC attribution rules to such beneficial owners, as necessary pursuant to the FCC attribution rules.

17461908                                                     -41-

(d)      Upon written request by an Insulated Partner, the General Partner shall, prior to the Partnership consummating an investment in a Media Company, cause the legal counsel to the Partnership to deliver an opinion reasonably acceptable to such Insulated Partner to the effect that such investment shall not be "attributed" to the Insulated Partner under the rules and regulations of the FCC relating to the particular FCC service in which such Media Company operates.

Section 5.17   Co-investment Funds.

(a)      Where possible and appropriate, the General Partner may, in its discretion, provide co-investment opportunities to invest in a Portfolio Company (each a "Co-Investment Opportunity") to one or more Limited Partners, strategic investors, lenders, or members, investors, Affiliates or employees of the General Partner and Manager or, other accounts managed by Highland (each a "Co-Investor"). Notwithstanding the foregoing, investment opportunities allocated to Affiliates of the Manager or the General Partner or client accounts managed by the Manager, in accordance with the Highland Investment Allocation Policy, shall not be deemed Co-Investment Opportunities. The General Partner, the Manager, and their respective Affiliates will not receive any carried interest in any Co-Investment Opportunity provided to Limited Partners or receive management fees from Limited Partners in respect of Co-Investment Opportunities provided to Limited Partners. The General Partner intends to not provide Co-Investment Opportunities to Benefit Plan Investors to the extent necessary to prevent such Co-Investment Opportunity from being deemed to be Plan Assets of the related Benefit Plan Investor.

(b)      The General Partner may, as a condition to any Co-Investment Opportunity, (i) require any or all Co-Investors to execute a confidentiality agreement relating to such Co-Investment Opportunity in form and substance acceptable to the General Partner, and (ii) require Co-Investors electing to participate in a Co-Investment Opportunity to coinvest through a Co-Investment Fund, which may have investors other than Limited Partners.

(c)      Each Limited Partner shall treat the information provided to it pursuant to this Section 5.17 as confidential, shall use such information solely for the purpose of considering the offer made pursuant to this Section, shall, upon the request of the General Partner, promptly return to the General Partner any written information provided it pursuant to this Section, and shall not disclose the identity of the securities or issuer to any person other than (i) its employees, counsel or advisors, solely on a need to know and confidential basis, (ii) any governmental authority or regulatory authority which regulates such Limited Partner's ability to engage in any of its businesses under U.S. or foreign law to the extent such information is required by such governmental authority or regulatory authority, as the case may be, and (iii) to the extent such Limited Partner is required by law or regulation to disclose such information.

(d)      If Co-Investment Funds or Co-Investors purchase securities of a Portfolio Company that are of the same class as securities of a Portfolio Company purchased by the Partnership, the Co-Investment Funds or Co-Investors shall purchase such securities on terms that are no less advantageous than the terms on which the Partnership purchases such securities. Each Co-Investment Fund and Co-Investor will dispose of securities of a Portfolio Company that

Appx. 04062

are of the same class as securities of a Portfolio Company purchased by the Partnership at the same time and on substantially the same terms (including price) as the Partnership.

Section 5.18 Bridge Leveraging. (a) The Partnership is authorized to enter into one or more credit facilities (each, a "Bridge Leveraging/Credit Support Facility") in order to (i) borrow money for the purpose of (A) Bridge Leveraging; and (B) paying Partnership Expenses; and/or (ii) provide Credit Support for the obligations of Portfolio Companies or their subsidiaries as described in Section 5.4(c); provided, however, that in no event shall the aggregate amount of Bridge Leveraging outstanding at any time under any Bridge Leveraging/Credit Support Facility exceed the aggregate amount of Unfunded Commitments as of such date and provided, further, that in no event shall the maturity date of an individual borrowing under any Bridge Leveraging/Credit Support Facility be later than the 45th day following the incurrence of such debt under a Bridge Leveraging/Credit Support Facility. A Bridge Leveraging/Credit Support Facility may be secured by (x) a pledge by the Partnership of all or a portion of the aggregate Unfunded Commitments of the Partners, and (y) a pledge and assignment by the General Partner of the rights of the General Partner contained herein, including, without limitation, the right to deliver Capital Call Notices and enforce all remedies against Partners that fail to fund their respective Unfunded Commitments pursuant thereto and in accordance with the terms hereof. The Partnership and any Parallel Vehicles may be co-borrowers under any Bridge Leveraging/Credit Support Facility, in which event the Partnership and the Parallel Vehicles may be jointly and severally liable for all obligations under such Bridge Leveraging/Credit Support Facility. In the event such a Bridge Leveraging/Credit Support Facility is so secured by Commitments, and to the extent funds are advanced against the Commitment of a particular Partner or partner of a Parallel Vehicle because such Person is late in funding or defaults on a Capital Call Notice delivered hereunder or by the Parallel Vehicle, each Limited Partner understands, acknowledges and agrees that (i) it may be required to make a Capital Contribution in respect of its pro rata share of such late or defaulted contribution amount, provided, however, that in no event shall any Partner be required to make Capital Contributions in excess of its Unfunded Commitment, and (ii) as a result of such default or late payment, the allocation between the Partnership and each Parallel Vehicle of a Portfolio Investment (together with any item of income, fees, reimbursement or expense that relates to such Portfolio Investment) with respect to which there has occurred a shortfall in contributions made by the Partners or the partners in a Parallel Vehicle shall be made by the General Partner based on the total amount of Capital Contributions of the Partners and the partners in each Parallel Vehicle actually funded to acquire such Portfolio Investment. In addition to the rights and remedies of the General Partner in respect of a Defaulting Partner pursuant to Section 6.11, any Partner that is late in funding or defaults on a Capital Call Notice shall be responsible for any interest or other expenses incurred in connection with such advance. Any such expenses shall be withheld from distributions otherwise to be made to such Defaulting Partner, and, to the extent such expenses exceed such distributions, such Defaulting Partner shall pay the amount of such excess to the Partnership in the manner and at the time or times required by the General Partner. Any such excess shall not be credited to such Defaulting Partner's Capital Account. For purposes of this Agreement, any amount withheld from a Defaulting Partner and paid to a lender shall be paid to the lender on behalf of such Defaulting Partner and shall be treated as if distributed to such Defaulting Partner.

(b)     Each Limited Partner understands, acknowledges and agrees, in connection with any such Bridge Leveraging/Credit Support Facility and for the benefit of any lender thereunder,

Appx. 04063

as follows: (i) that the General Partner may from time to time request a certificate confirming (x) the remaining amount of such Limited Partner's Unfunded Commitment or (y) that the Limited Partner has not and will not pledge, collaterally assign, encumber or otherwise grant a security interest in its limited partnership interest in the Partnership, and (ii) that the General Partner may from time to time request such other information as may be reasonably required by the lender(s) under the terms of the Bridge Leveraging/Credit Support Facility.  Each Limited Partner agrees to comply with such requests to the extent they are reasonable.

(c)     To induce any such lender to enter into a Bridge Leveraging/Credit Support Facility with the Partnership, each Limited Partner hereby: (i) acknowledges that the Partnership has informed such Limited Partner that the Partnership may pledge to a lender the right to call all Unfunded Commitments to secure all obligations made under the Bridge Leveraging/Credit Support Facility (collectively, the "Obligations") the terms of which are in accordance with this Agreement, and, in connection therewith, grant to such lender the right to issue Capital Call Notices pursuant to the terms of this Agreement when an event of default under such Bridge Leveraging/Credit Support Facility exists, including an event of default resulting from the failure of a partner of a Parallel Vehicle to fund any capital contributions when required, which each Limited Partner shall fund, in accordance with the terms hereof and its rights and obligations hereunder; and (ii) acknowledges that the Partnership has informed such Limited Partner that for so long as the Bridge Leveraging/Credit Support Facility is in place, the General Partner and the Partnership may agree with the lender not to amend, modify, supplement, cancel, terminate, reduce (other than with respect to Funded Commitments) or suspend any of such Limited Partner's obligations to fund its Unfunded Commitment pursuant hereto, subject to excuse provisions set forth herein, without the lender's prior written consent.


# ARTICLE VI

# LIMITED PARTNERS

Section 6.1  Limited Liability.  The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation (including with respect to a deficit balance in their Capital Account) to make contributions to the Partnership in excess of their respective Commitments specified in Schedule 1 attached hereto in accordance with this Agreement, except to the extent set forth in Section 6.7 or the Delaware Partnership Act.  The Limited Partners will take no part in the control, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

Section 6.2  Transfer of Limited Partnership Interests.

(a)     A Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Partnership unless the General Partner has consented to such transfer or assignment in writing; provided, that with regard to an assignment by a Limited Partner to an Affiliate of such Limited Partner, such consent shall not be unreasonably withheld.

(b)     A Limited Partner which is a trust under an employee benefit plan may, upon prior written notice to the General Partner, assign a beneficial interest in all or a portion of its

Appx. 04064

interest in the Partnership to any other trust under such employee benefit plan or to any other employee benefit plan having the same sponsor (provided that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the Internal Revenue Service). Such assignment to another trust under such employee benefit plan or to any other employee benefit plan having the same sponsor will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore will not require the General Partner's consent pursuant to Section 6.2(a)). In addition, a change in any trustee or fiduciary of a Limited Partner will not be deemed to be an assignment or transfer of a limited partnership interest pursuant to this Agreement (and therefore not require the General Partner's consent pursuant to Section 6.2(e)), so long as any such replacement trustee or fiduciary is also a fiduciary as defined under applicable law, that income and loss allocable to the Limited Partner of the Partnership will continue to be included in the same filings under the same employer identification number with the Internal Revenue Service, and the General Partner receives prior written notice of such change in trustee or fiduciary. In connection with any assignment of interest or change in trustee or fiduciary under this Section 6.2(b), the Limited Partner shall provide such documentation as the General Partner shall reasonably request.

(c)     The voting rights of any Limited Partner's interest shall automatically terminate upon any transfer of such interest to a trust, heir, beneficiary, executor, personal representative, guardian or conservator or upon any other transfer if the transferor no longer retains control over such voting rights and the General Partner has not consented pursuant to Section 6.2(e) to such transferee becoming a substitute Limited Partner. No consent of any other Limited Partner will be required as a condition precedent to any such transfer or substitution.

(d)     As a condition to any transfer of a Limited Partner's interest pursuant to Section 6.2(a), the transferor and the transferee shall provide such legal opinions and documentation as the General Partner shall reasonably request; provided that if the transfer is to be made from a Limited Partner to a co-trustee or trustee as contemplated above or to an Affiliate pursuant to Section 6.2(a), an officer's certificate in form reasonably satisfactory to the General Partner may be delivered by the Limited Partner in lieu of such legal opinions and other documentation.

(e)     Notwithstanding anything to the contrary contained in this Section 6.2 or 6.11, a transferee or assignee will not become a substitute Limited Partner (i.e., a transfer other than as described in Section 6.2(b)) without the consent of the General Partner, which consent may be granted or withheld in its sole and absolute discretion (except for a disposition by a Limited Partner to an Affiliate permitted by Section 6.2(a), for which such consent shall not be unreasonably withheld), and without executing (i) a copy of this Agreement or amendment hereto, and (ii) a Subscription Agreement in form and substance satisfactory to the General Partner in its sole discretion. Any substitute Limited Partner admitted to the Partnership with the consent of the General Partner will succeed to all rights and be subject to all the obligations of the transferring or assigning Limited Partner with respect to the interest to which such Limited Partner was substituted, but any transferee or assignee that does not become a substitute Limited Partner shall have the right to receive allocations pursuant to Section 2.3 and distributions pursuant to Article III and Article VIII, but shall have no other rights under this Agreement.

17461908                                                        -45-

Appx. 04065

(f)     The transferor and transferee of any Limited Partner's interest shall be jointly and severally obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) of any transfer or proposed transfer of a Limited Partner's interest, whether or not consummated.

(g)     The transferee of any Limited Partner's interest shall be treated as having made all of the Capital Contributions made by, and received all of the distributions received by, the transferor of such interest.

(h)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would have more than one hundred (100) Partners, unless the General Partner determines in its sole discretion that the Partnership will meet the requirements set forth in Treasury Regulation § 1.7704-1(j)(1) for the taxable year of such transfer and all subsequent taxable years.  In determining whether the Partnership will have more than one hundred (100) Partners for purposes of this Section 6.2(h), each person indirectly owning an interest in the Partnership through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a "flow-through entity") shall be treated as a Partner unless the General Partner determines in its sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Partnership.

(i)     Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would be subject to the registration or reporting requirements of the Investment Company Act or in the General Partner's good faith determination, such transfer would cause the assets of the Partnership to be deemed Plan Assets.  Each transferee that is or will be a Benefit Plan Investor as of the transfer effective date shall so notify the General Partner in writing prior to the transfer effective date.  Any transferee that has not so indicated in writing its status as a Benefit Plan Investor hereby represents, warrants and covenants that it is not, it is not acting on behalf of and, so long as it holds an interest in the Partnership, it will not be and will not be acting on behalf of a Benefit Plan Investor.

Section 6.3   No Withdrawal.  Subject to the provisions of Sections 6.2, 6.6 and 6.11, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner be required to withdraw, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.

17461908                                    -46-

Appx. 04066

Section 6.4 <u>No Termination</u>. The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

Section 6.5 <u>Subsequent Limited Partners</u>.

(a)    The General Partner may accept additional Limited Partners ("<u>Additional Limited Partners</u>") subsequent to the First Closing of the Partnership up to and including the date fourteen months after the First Closing. Any Additional Limited Partners will be treated as having been a party to this Agreement and have made its Commitment as of the date hereof for all purposes, and such Additional Limited Partners will be required to bear a portion of the Management Fee, Organizational Expenses and Partnership Expenses equivalent to that which would have been borne by such Additional Limited Partner had such Limited Partner been a Limited Partner from the date of the First Closing.

(b)    Such Additional Limited Partners shall contribute to the Partnership, on the date of their admission to the Partnership, an amount of their Commitments equal to their portion (based on the Commitments of all Partners) determined pursuant to this <u>Section 6.5(b)</u>. The initial drawdown for each Limited Partner will include such Limited Partner's proportionate share of (i) Management Fees retroactive to the First Closing; (ii) Placement Fees, if any, retroactive to the First Closing, (iii) Organizational Expenses (to the extent provided in <u>Section 4.2</u>) and Partnership Expenses attributable to the Partnership; and (iv) Capital Contributions made at or prior to such drawdown to fund any Portfolio Investment, other than Capital Contributions that have been returned prior to such drawdown to the Partners who made such Capital Contributions. In addition, Additional Limited Partners will be required to pay to the Partnership, with respect to the period from the date of the applicable Capital Contributions made by the Partners who were admitted pursuant to the First Closing to the date of their admission to the Partnership:  (A) interest at the rate of 10% on their proportionate share of Management Fees retroactive to the First Closing; (B) interest at the rate of 10% on their proportionate share of Organizational Expenses (to the extent provided in <u>Section 4.2</u>), Placement Fees and Partnership Expenses attributable to the Partnership; and (C) interest at the rate of 10% on their proportionate share of the Capital Contributions made prior to such drawdown (other than Capital Contributions that have been returned prior to such drawdown to the Partners who make such Capital Contributions), to fund any Portfolio Investment; <u>provided</u>, <u>however</u>, that interest payable pursuant to <u>sub-clauses (B)</u> and <u>(C)</u> above shall be reduced, but not below zero, by each Additional Limited Partner's <u>pro rata</u> portion (based on Commitments of all Partners) of all distributions made prior to the date of such drawdown to all Partners pursuant to <u>Sections 3.3(a)(i)</u>, <u>3.3(a)(ii)(B)</u> and <u>3.3(a)(iii)(A)</u>, to the extent such distributions exceed the aggregate amount of Capital Contributions to make Portfolio Investments that have been Disposed of prior to the date of such drawdown. Any amounts paid to the Partnership under <u>clause (i)</u> and <u>subclause (A)</u> above will be paid to the Manager (and to the extent the General Partner has waived all or part of such Management Fees, such Waived Fee Amount shall not be paid to the Manager or the General Partner but will instead increase the Unapplied Waived Fee Amounts). Any amounts paid to the Partnership under <u>clause (ii)</u> above shall be paid to the applicable placement agency if applicable to such Limited Partner. Any amounts paid to the Partnership under <u>clauses (iii)</u> and <u>(iv)</u> above, and <u>subclauses (B)</u> and <u>(C)</u> above shall be

Appx. 04067

distributed to the Partners that participated in the earlier Capital Contributions based upon their relative shares of each earlier Capital Contribution, and any such returned Capital Contributions (but not amounts referred to in subclauses (B) and (C) above) may be recalled by the General Partner pursuant to Section 2.2(a) above as if such returned Capital Contributions had not previously been called; provided, that if the General Partner determines in good faith that there will be a Capital Call within 30 days after the contribution of such amounts to the Partnership, the General Partner may, in its discretion, retain such amounts and reduce the Capital Call with respect to such other Partners (in which event the Funded Commitments of such other Partners shall be increased by their pro rata share of that portion of such amounts referred to in subclauses (B) and (C) above).  For purposes of this Section 6.5, a Limited Partner that increases its Commitment shall be treated as an Additional Limited Partner with respect to the amount by which its Commitment increased.

(c)     Each Additional Limited Partner admitted to the Partnership pursuant to this Section 6.5 shall be treated as purchasing a pro rata share of the interests in the Partnership of the Partners to whom amounts are distributed pursuant to this Section 6.5 ("Existing Partners"), and a portion of the Capital Account of each Existing Partner shall be allocated to such Additional Limited Partner so that after such allocation the Capital Accounts and Capital Contributions of such Additional Limited Partner and Existing Partners attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses are as equal as practicable to what their Capital Accounts and Capital Contributions attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses would have been if such Additional Limited Partner had been admitted to the Partnership at the First Closing.

(d)     If the admission of Additional Limited Partners to the Partnership or of investors in Parallel Vehicles or the purchase by a limited partner in a Parallel Vehicle of a portion of the interest of a Defaulting Partner pursuant to Section 6.11 would result in the Partnership and the Parallel Vehicles not having reimbursed the General Partner and its Affiliates for Organizational Expenses in the proportions contemplated by Section 4.2 hereof or would result in the Partnership and the Parallel Vehicles not owning investments in Portfolio Companies in the proportions contemplated by Sections 5.14 or 5.15 hereof, the General Partner shall have the authority:

(i)     to effect transfers of funds and of Portfolio Company to Parallel Vehicles and to effect transfers of funds and portfolio investments of Parallel Vehicles to the Partnership for the purpose of reallocating the ownership of investments in Portfolio Companies and the reimbursements of Organizational Expenses by the Partnership and the Parallel Vehicles, and

(ii)     to make allocations to, or to reallocate, the Capital Accounts and Capital Contributions attributable to each Portfolio Investment and to the payment of Organizational Expenses, Management Fees, Placement Fees and Partnership Expenses of the Existing Partners and the Additional Limited Partners in the manner contemplated by the previous provisions of this Section 6.5.

Appx. 04068

in each case to achieve allocations and distributions as close as practicable to those that would have obtained had such Additional Limited Partners or investors been admitted to the Partnership or to Parallel Vehicles, respectively, at the First Closing or had such purchased interest of a Defaulting Partner been issued to the purchaser at the First Closing. Any distribution of cash made by the Partnership in connection with a reallocation under this Section 6.5(d) representing a return of Capital Contributions may be recalled by the General Partner pursuant to Section 2.2(a) as if such returned Capital Contributions had not previously been called.

Section 6.6  Regulatory Matters.

(a)     Each Limited Partner acknowledges that the assets of the Partnership are not intended to constitute plan assets of such Limited Partner for purposes of any applicable non-U.S., state or local law governing the investment and management of the assets of that Limited Partner, and that, as a result, none of the Partnership, the General Partner, the Manager or any of their Affiliates intend to be acting as a fiduciary within the meaning of any applicable non-U.S., state or local law relating to governmental plans or foreign plans with respect to such Limited Partner or the Partnership assets; provided, however, that this provision is not intended to negate the fiduciary duties imposed upon a general partner under the Delaware Partnership Act.

(b)     In the event that the General Partner determines in good faith that (i) the investment in the Partnership by a Limited Partner which is a governmental plan, foreign plan or other regulated entity (each, a "Regulated Investor") is reasonably likely to result in (A) any violation of any provision of law applicable to such Regulated Investor, (B) the treatment of the assets of the Partnership as assets of such Regulated Investor or (C) the treatment of the Partnership, the General Partner or the Manager as a fiduciary under such provisions of law applicable to such Regulated Investor and (ii) if, in the reasonable judgment of the General Partner, any of the foregoing conditions result in or are reasonably likely to result in any material adverse consequences to the Partnership or the General Partner (both of (i) and (ii), a "Regulatory Issue"), then the General Partner shall use its reasonable best efforts to work with the Regulated Investor to cure the Regulatory Issue. The General Partner, in its sole discretion, may require that such Regulated Investor provide (at such Regulated Investor's expense) an opinion of counsel, reasonably acceptable to the General Partner in form and substance, that no Regulatory Issue exists or, in the event such an opinion is not delivered within a reasonable time after being requested, may cause the Partnership to redeem such Regulated Investor's interest in the Partnership, in whole or in part.

(c)     Effective upon the date specified by the General Partner in the notice sent to a Limited Partner, notifying such Limited Partner of the General Partner's determination to completely or partially redeem such Limited Partner's interest in the Partnership pursuant to Section 5.6(e) or Section 6.6(b) (the "Redemption Effective Date"), such Limited Partner (the "Redeemed Limited Partner") shall cease to be a Partner of the Partnership for purposes of the withdrawn portion of its interest only and, in addition to its right to receive payment for its withdrawn interest in the Partnership as provided in Section 6.6(d), shall continue to be entitled, with respect to its remaining interest only, if any, to the rights of a Partner under this Agreement (including, without limitation, the right to have any allocations made to its Capital Account (as such may be adjusted) pursuant to Article II, the right to receive distributions pursuant to Article

Appx. 04069

III and upon dissolution of the Partnership pursuant to Article VIII and the right to vote on matters as provided in this Agreement).

(d)    The Redemption Value shall be paid by the Partnership to such Redeemed Limited Partner in cash by paying to such Limited Partner a "pro rata portion" of each distribution payable to the Redeemed Limited Partners until the Redemption Value has been fully paid; provided, that the General Partner shall be under no obligation to sell, finance or refinance any Partnership property or assets or to take any other action to effect such redemption which, in the judgment of the General Partner, may affect adversely the Partnership (taking into account the liquidity needs of the Partnership) or any Partner.  For purposes of the preceding sentence, a Redeemed Limited Partner's "pro rata portion" of a distribution shall be an amount equal to the amount such Redeemed Limited Partner would have received in respect of the redeemed interest had such interest not been redeemed.

Section 6.7   Indemnification and Reimbursement for Payments on Behalf of a Partner/Partner Clawback.

(a)    If the Partnership is obligated to pay any amount to a governmental agency or to any other person (or otherwise makes a payment) in respect of any tax because of a Partner's status or otherwise specifically attributable to a Partner (including, without limitation, federal withholding taxes with respect to foreign partners, state personal property taxes, state unincorporated business taxes, etc.), then such Partner (the "Indemnifying Partner") shall indemnify the Partnership in full for the entire amount paid (including, without limitation, any interest, and any penalties and expenses associated with such payment to the extent such penalties and expenses are attributable to such Partner's actions or failure to act).  At the option of the General Partner, the amount to be indemnified may be charged against the Capital Account of the Indemnifying Partner, and, at the option of the General Partner, either:

(i)    promptly upon notification of an obligation to indemnify the Partnership, the Indemnifying Partner shall make a cash payment to the Partnership equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Partner's Capital Account but shall not be deemed a Capital Contribution hereunder), or

(ii)    the Partnership shall reduce subsequent distributions which would otherwise be made to the Indemnifying Partner until the Partnership has recovered the amount to be indemnified (provided, that the amount of such reduction shall be deemed to have been distributed for all purposes of this Agreement, but such deemed distribution shall not further reduce the Indemnifying Partner's Capital Account).  If the General Partner reasonably expects that subsequent distributions to such Partner will be sufficient to satisfy such Partner's obligation to pay such amount, the General Partner shall not seek a payment pursuant to clause (i) above, until the General Partner reasonably believes such distributions will not be sufficient.

(b)    A Partner's obligation to make contributions to the Partnership under this Section 6.7 shall, subject to the limitations set forth in Section 6.7(c), survive the termination, dissolution, liquidation and winding up of the Partnership until the third (3rd) anniversary of the date of the final distribution made in connection with the complete liquidation of the assets of the Partnership and, for purposes of this Section 6.7, the Partnership shall be treated as continuing in

Appx. 04070

existence. The Partnership may pursue and enforce all rights and remedies it may have against each Partner under this Section 6.7, including instituting a lawsuit to collect such contribution with interest equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points per annum (but not in excess of the highest rate per annum permitted by law).

(c)   At any time and from time to time prior to the third (3rd) anniversary of the date of receipt thereof, the General Partner may require each Partner to return distributions (including distributions made in connection with the complete liquidation of the assets of the Partnership) to the Partnership in an amount sufficient to satisfy all or any portion of (i) such Partner's indemnification obligations pursuant to Section 6.7(a), or (ii) any liability which the Partnership would be required by this Agreement or otherwise to pay if it had adequate funds, including but not limited to (A) the expenses of investigating, defending or handling any pending or threatened litigation or claim arising out of the Partnership's activities, investments or business, (B) the amount of any judgment or settlement arising out of such litigation or claim, and (C) the Partnership's obligation to indemnify any Partner or other Person pursuant to Section 5.11 (a "Liability"), whether such obligations arise before or after the last day of the Partnership or, with respect to any Partner, before or after such Partner's withdrawal from the Partnership; provided, that (x) each Partner will return distributions in respect of its share of any such indemnification payment in proportion to the aggregate amount of distributions received by such Partner that have not previously been returned to the Partnership by such Partner pursuant to this Section 6.7(c); and (y) Partner's maximum liability under this Section 6.7 is limited to an amount equal to the lesser of (1) $33^{1/3}\%$ of such Partner's Commitment, and (2) 50% of the aggregate amount of distributions received by such Partner as of such date. Any distributions returned pursuant to this Section 6.7(c) shall not be treated as Capital Contributions, but shall be treated as returns of distributions in making subsequent distributions pursuant to Section 3.3 and in determining the amount that the General Partner is required to contribute to the Partnership pursuant to Section 8.3(c) (other than for purposes of computing a Partner's Preferred Amount, which shall be computed based on actual Capital Contributions made and distributions received). Nothing in this Section 6.7(c), express or implied, is intended or shall be construed to give any person other than the Partnership or the Partners any legal or equitable right, remedy or claim under or in respect of this Section 6.7(c) or any provision contained herein. If a Limited Partner returns an amount to the Partnership under Section 6.7(c)(ii) after the final distribution of the assets of the Partnership, the amount the General Partner is required to contribute to the Partnership with respect to such Limited Partner pursuant to Section 8.3(c) shall be re-determined, taking into account the return of such amount to the Partnership. The provisions of Section 8.3(c) shall apply, and the payments required thereby shall be made, in the same manner as if the return of such amount to the Partnership had occurred prior to the final distribution of the assets of the Partnership.

Section 6.8   Section 754 Election. Upon the written request of a Majority in Interest of the Limited Partners, that an election provided for in Section 754 of the Code be made, the General Partner shall, if then permitted by applicable law, make such election.

Appx. 04071

Section 6.9   BHCA Partners.

(a)   Any Limited Partner may, upon notice to the General Partner, elect to hold all or any fraction of such Limited Partner's interest in the Partnership as a Non-Voting Interest, in which case such Limited Partner shall not be entitled to vote or otherwise participate in any consent of the Limited Partners with respect to the portion of its interest which is held as a Non-Voting Interest (and such Non-Voting Interest shall not be counted in determining the giving or withholding of any such consent or whether the requisite percentage of the Limited Partners or Partners, as the case may be, have consented to, approved, adopted or taken any other action hereunder).  Except as provided in this Section 6.9, an interest held as a Non-Voting Interest shall be identical in all regards to all other interests held by Limited Partners.  Any such election shall be irrevocable and shall bind the assignees of such Limited Partner's interest.

(b)   Any interest in the Partnership held for its own account by a BHCA Partner, that is determined at the time of admission of such BHCA Partner, the complete or partial withdrawal of another Limited Partner or any other adjustment of the interests of the Partners pursuant to this Agreement to be in excess of 4.99% (or such other amount as may be permitted by applicable regulation to be held by a BHCA Partner as voting securities, but not including Section 4(k) of the BHC Act or any successor provision thereto) of the interests of the Limited Partners, excluding for purposes of calculating this percentage portions of any other interests that are Non-Voting Interests pursuant to this Section 6.9 and any other Section of this Agreement (collectively the "Non-Voting Partnership Interests"), shall be a Non-Voting Partnership Interest (whether or not subsequently transferred in whole or in part to any other person) and shall not be included in determining whether the requisite percentage of the Partners have consented to, approved, adopted or taken any action hereunder; provided, that such Non-Voting Partnership Interest shall be permitted to vote on any proposal to continue the business of the Partnership under Section 8.2(a) but not on the selection of a General Partner pursuant to Section 8.2(a).  Each BHCA Partner hereby further irrevocably waives its corresponding right to vote for a successor general partner under Section 17-801 of the Delaware Partnership Act with respect to any Non-Voting Partnership Interest, which waiver shall be binding upon such BHCA Partner and any entity which succeeds to its interest.  Upon the occurrence of a subsequent closing or any event specified in the second preceding sentence, a recalculation of the interest held by all BHC Partners shall be made, and only that portion of the total interest held by each BHC Partner that is determined as of the date of such recalculation to be in excess of 4.99% (or such other amount) of the interests of the Limited Partners, excluding Non-Voting Partnership Interests as of such date, shall be a Non-Voting Partnership Interest.

Section 6.10   Excused Investments.  In the event that (a) the Partnership makes or proposes to make a Portfolio Investment which the General Partner reasonably determines could result in a material violation by any Limited Partner (or any of its Affiliates) of any law, order, decree or judgment of any court or governmental agency applicable to such Limited Partner (or any of its Affiliates), or (b) the General Partner reasonably determines that a Limited Partner's participation in a proposed Portfolio Investment of the Partnership could have a material adverse effect on the Partnership, the entity in which such investment is to be made, such Limited Partner, or the General Partner and its Affiliates, the General Partner may, in its sole discretion, and subject to Section 5.6(a), (x) reduce or eliminate the interest of the such Limited Partner with respect to such Portfolio Investment and the distributions with respect thereto (provided that any

Appx. 04072

Capital Contributions made by such Limited Partner with respect to such Portfolio Investment shall be promptly returned to such Limited Partner) and correspondingly increase the interest of the other Limited Partners with respect to such Portfolio Investment and/or (y) increase the interest of such Limited Partner in future Portfolio Investments of the Partnership and such Limited Partner's interest in the distributions with respect thereto and correspondingly decrease the interests of the other Limited Partners in such Portfolio Investments.  All determinations necessary to reflect the operation of this <u>Section 6.10</u> and not otherwise explicitly provided for in this <u>Section 6.10</u> shall be made on an equitable basis as determined by the General Partner in good faith, whose decision thereon shall be final and binding on all Limited Partners. Determinations by the General Partner pursuant to <u>clauses (a)</u> and <u>(b)</u> above may be made on its own initiative or after considering the request of any Limited Partner, including any supporting legal analysis or other documentation submitted by such Limited Partner.

Section 6.11   <u>Limited Partner's Default on Commitment</u>.

(a)   If any Limited Partner fails to make full payment of any portion of its Commitment when due (a "<u>Defaulting Partner</u>") and such failure is not cured within five Business Days after receipt by such Limited Partner of written notice from the General Partner with respect to such failure to pay, the General Partner may in its discretion and subject to <u>Section 5.6(a)</u>, undertake any one or more of the following steps:

(i)   The General Partner may assist the Defaulting Partner in finding a buyer for the Defaulting Partner's Partnership interest (<u>provided</u>, that the General Partner will have no obligation to contact any particular Limited Partner or other person with regard to such sale).

(ii)   The Partnership may pursue and enforce all rights and remedies the Partnership may have against such Defaulting Partner with respect thereto, including a lawsuit to collect the overdue portion of the Commitment and any other amounts due the Partnership or General Partner hereunder, with interest at a rate equal to the prime or base rate then in effect (as announced by Citibank, N.A., New York, New York) plus six percentage points (but not in excess of the highest rate per annum permitted by law).

(iii)   The General Partner may offer the Defaulting Partner's interest to the Partners and the partners in the Parallel Vehicles (other than any Defaulting Partners) <u>pro rata</u> in accordance with their Commitments and their capital commitments to Parallel Vehicles on the terms set forth below.  If any Partner or partner in a Parallel Vehicle does not elect to purchase the entire interest offered to it, the remaining interest allocable to the Partners and the partners in the Parallel Vehicles will be reoffered <u>pro rata</u> to the Partners and the partners in Parallel Vehicles who have purchased the entire interest offered to them until either all of such interest is acquired or no Partner or partner in a Parallel Vehicle wishes to make a further investment.  At the closing of such purchase (on a date and at a place designated by the General Partner), each purchasing Partner shall (A) deliver a <u>non-interest bearing</u>, <u>non-recourse</u> (except to the extent of the Partnership interest purchased and the proceeds therefrom) <u>ten-year promissory note</u> (in a form approved by the General Partner) payable to the Defaulting Partner in an amount equal to the portion of the Defaulting Partner's Capital Account being purchased by such Partner, and (B) assume the portion of the Defaulting Partner's obligation to make both defaulted and further Capital Contributions pursuant to its Commitment which is equal to the portion of the Defaulting

Appx. 04073

Partner's interest being purchased by such Partner.  In the case of a purchase of a portion of a Defaulted Partner's Capital Account by one or more partners in a Parallel Vehicle, such Parallel Vehicle shall deliver a note in the same form as the note described above to the Partnership for the aggregate portion of the Defaulted Partner's Capital Account being purchased by the limited partners in such Parallel Vehicle, the Partnership shall make the adjustments described in Section 6.5(d) with respect to such purchase and the Partnership shall distribute such note to the Defaulting Partner.  If a Partner purchases a portion of the interest of a defaulting partner of a Parallel Vehicle, the Partner purchasing such interest shall increase its Commitments as described above with respect to purchases of an interest of a Defaulting Partner, and shall guarantee the note delivered to the Parallel Vehicle, and the Partnership shall make such other adjustments as are required by Section 6.5(d).  The General Partner will handle the mechanics of making the offers set forth herein and will in its discretion impose time limits for acceptance.

(iv)    If the entire Defaulting Partner's interest is not purchased in the manner set forth in (iii) above, the General Partner in its sole discretion may offer the remaining interest either (A) to a third party or parties on the same terms as originally offered to the Partners pursuant to (iii) above (in which case such third party or parties will, as a condition of purchasing such interest, become a party to this Agreement), or (B) to the Partners and the partners in Parallel Vehicles in the manner provided in (iii) above, but with no requirement to assume the Defaulting Partner's obligation to make further capital contributions pursuant to its Commitment, in which case the Defaulting Partner's Commitment shall be deemed reduced (effective on the date of the default) to the amount actually paid in and the aggregate Commitments of the Partnership shall be reduced by the amount of such Defaulting Partner's remaining contributions to be made pursuant to its Commitment.

(v)    In addition to, or instead of, the other remedies and undertakings available to the General Partner pursuant to this Section 6.11(a), the General Partner may, in its sole discretion, reduce (effective on the date of the default, after giving effect to the 5-day cure period) any portion of such Defaulting Partner's Commitment (which has not been assumed by another Partner) to the amount of the Capital Contributions (which have not been purchased by another Partner) made by such Defaulting Partner (net of distributions pursuant to Section 6.5(b)) and the aggregate Commitments of the Partnership shall be commensurately reduced.

(vi)    Notwithstanding anything contained herein to the contrary, from and after any date on which a Defaulting Partner's Commitment is reduced pursuant to subparagraph (v) above, (A) such Defaulting Partner will have no right to receive any distributions, except for distributions made upon the Partnership's liquidation, (B) such Defaulting Partner's Capital Account will not be credited with any Investment Income and Gain or Short-Term Investment Income which shall instead be allocated to the Partners (other than any Defaulting Partners) in accordance with Section 2.3(b) and (c), as appropriate (and as adjusted to treat the Defaulting Partner's Capital Contribution as equal to zero), (C) until such Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Capital Account shall continue to be debited in accordance with Sections 2.3(c), (d), (f), and (g) for such Defaulting Partner's share of Investment Loss, Organizational Expenses, Placement Fees and Uncapitalized Partnership Expenses as if there had been no reduction in such Defaulting Partner's Commitment or Capital Contributions and (2) the Management Fee payable by the Defaulting Partner shall be calculated as if there had been no reduction in such Defaulting Partner's Commitment, and (D) once such

Defaulting Partner's Capital Account is reduced to zero, (1) such Defaulting Partner's Commitment shall be reduced to zero for all purposes of the Agreement, including the calculation of the Partnership's aggregate Commitments and determination of the Management Fee and (2) such Defaulting Partner (and not the Partnership or any other Limited Partner) shall be liable each quarterly period to the General Partner for an amount equal to its portion of the Management Fee for such period as if there had been no reduction in such Defaulting Partner's Commitment.

(vii)   No consent of any Limited Partner shall be required as a condition precedent to any transfer, assignment or other disposition of a Defaulting Partner's interest pursuant to this <u>Section 6.11</u>.

(b)   Additionally, the Defaulting Partner shall indemnify and hold harmless the General Partner and the Partnership against any losses, damages and expenses (including attorneys' fees) incurred by the General Partner and the Partnership in enforcing or attempting to enforce the provisions of this <u>Section 6.11</u> or resulting from the Partnership failing to meet its obligations with respect to any Portfolio Investment by reason of any such default.

Section 6.12   <u>Investment Company Act Limitations</u>.   Notwithstanding anything to the contrary contained in this Agreement, (i) no person shall be admitted to the Partnership as Limited Partner, an Additional Limited Partner or a substitute Limited Partner unless such person is a Qualified Purchaser, and (ii) no sale, assignment, transfer, pledge, mortgage or other disposition of any or all of a Limited Partner's interest in the Partnership shall be effective unless the assignee of any beneficial interest in the Partnership is a Qualified Purchaser.

**ARTICLE VII**

**ADVISORY COMMITTEE**

Section 7.1   <u>Advisory Committee</u>.   (a) A committee (an "<u>Advisory Committee</u>") of not fewer than three individuals and not more than seven individuals who are affiliated with or officers, employees, representatives or designees of Limited Partners or limited partners of Parallel Vehicles (but are not affiliated with the General Partner, the Manager, the Principals or any Affiliates thereof) will be appointed by the General Partner.   The General Partner will not appoint to the Advisory Committee any individual who is an officer, employee or representative of a BHC Partner whose Partner Interest in the Partnership is over 4.99%.   The Advisory Committee will meet at least semi-annually with the Manager and will perform such duties as is contemplated by this Agreement and provide such advice and counsel, including advice and counsel as to general economic and financial trends, portfolio investments and valuations, as is requested by the General Partner in connection with the investments of the Partnership, the Parallel Vehicles and the Separate Investment Entities, and other matters related thereto; <u>provided</u>, that the General Partner will retain ultimate responsibility for all decisions relating to the operation and management of the Partnership, including all investment decisions.   The Advisory Committee will be consulted on potential conflicts involving the Partnership and will perform the duties contemplated by this Agreement and all transactions between the Partnership

Appx. 04075

and the General Partner, the Manager and their Affiliates not specifically contemplated by this Agreement must be approved by the Advisory Committee. Notwithstanding the foregoing, the Advisory Committee will not consult with the General Partner on allocations of investment opportunities to Affiliates of the Manager or client accounts managed by the Manager if such allocations are made in accordance with the Highland Investment Allocation Policy. The Manager shall be entitled to remove a member of the Advisory Committee selected by the Manager from among the Limited Partners (or their representatives) upon at least 15 days prior written notice to the Limited Partners, provided, however, that the Manager may not remove a member of the Advisory Committee designated by a Limited Partner without the consent of 75% of the other members of the Advisory Committee. The Limited Partner that had the right to designate the removed member of the Advisory Committee shall have the right to designate a replacement. The Partnership will reimburse each member of the Advisory Committee for such member's reasonable out-of-pocket expenses incurred in attending meetings of the Advisory Committee. Such reimbursements shall be Partnership Expenses. The Advisory Committee shall act by affirmative vote or written consent of a majority of its members.

(b)      Neither the members of the Advisory Committee, nor the Limited Partners on behalf of whom such members act as representatives, shall owe any duties (fiduciary or otherwise) to the Partnership or any other Limited Partner in respect of the activities of the Advisory Committee, other than the duty to act in good faith.


### ARTICLE VIII

### DURATION AND TERMINATION

Section 8.1  Duration.  The Partnership will terminate on the tenth anniversary of the Final Closing, except that the term of the Partnership may be extended by the General Partner, with the approval of the Advisory Committee, for up to two consecutive one-year extensions.

Section 8.2  Early Termination.

(a)      The Partnership shall terminate on:

(i)      the bankruptcy of the General Partner or on the happening of any other event that would cause a dissolution of the Partnership under the Delaware Partnership Act unless, within 90 days after notice is given to the Limited Partners of the occurrence of such event, the Limited Partners and limited partners of all Parallel Vehicles unanimously select a new general partner and resolve to continue the business of the Partnership;

(ii)      a good faith determination upon receipt of written legal advice of counsel by the General Partner that dissolution of the Partnership is necessary or desirable (A) as a result of a Plan Asset Event or (B) to avoid any material adverse consequences to the Partnership or the General Partner as a result of any law applicable to a Regulated Investor;

Appx. 04076

(iii)     the removal of the General Partner pursuant to Section 5.9 unless all of the Limited Partners and all limited partners of Parallel Vehicles select a successor general partner and resolve to continue the business of the Partnership pursuant to Section 5.9; or

(iv)     at any time after the second anniversary of the Final Closing upon the consent of Seventy-Five Percent in Interest of the Limited Partners.

(b)     As promptly as possible following the election by the Limited Partners of a successor General Partner pursuant to Section 8.2(a)(i), there shall be distributed to the former General Partner, in full payment and satisfaction of its interest in the Partnership, a Limited Partnership Interest in the Partnership. The Limited Partnership Interest of the former General Partner shall entitle the former General Partner to the same distributions and allocations in respect of Portfolio Investments made prior to the termination of the former General Partner it would have received had it remained the General Partner, subject to the obligations set forth in Section 8.3(c), and to the rights of a Limited Partner hereunder with a Commitment equal to the Commitment of the former General Partner, but shall not entitle it to any other rights to participate in the management of the Partnership. After its withdrawal as General Partner, a former General Partner shall only be liable under this Agreement for actions taken and investments in Portfolio Companies made prior to the date of such withdrawal. If the Limited Partners elect to continue the Partnership's business pursuant to Section 8.2(a)(i), an appropriate amendment to this Agreement and to the Certificate shall be made within 90 days after the event giving rise to such election.

Section 8.3  Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back.

(a)     Liquidation.  Upon termination, the Partnership will be liquidated in an orderly manner. The General Partner (or, in the absence, bankruptcy or removal under Section 5.9, of the General Partner, the party selected by a Majority in Interest of the Limited Partners) will be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.

(b)     Final Allocation and Distribution.  Upon termination of the Partnership (whether or not an early termination), the General Partner will make a final allocation of all kinds of income, loss and expense in accordance with Article II hereof and the Partnership's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Partners. After payment or provision for payment of all debts of the Partnership, the remaining assets, if any, will be distributed among the Partners as provided in Sections 3.2 and 3.3.

(c)     General Partner Give Back.  Within 90 days after the termination of the Commitment Period and after the final distribution of the assets of the Partnership among the Partners as provided in Sections 3.2 and 3.3 (each of the termination of the Commitment Period and the final distribution of the assets of the Partnership, a "Determination Date"), the General Partner will make a Capital Contribution to the Partnership with respect to each Limited Partner (and such amount will be distributed to the Limited Partners in proportion to the amounts determined with respect to each Limited Partner pursuant to this Section 8.3(c)), equal to the greater of:

-57-

Appx. 04077

(i)     the amount by which (A) (x) the aggregate distributions to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) (including amounts initially distributed pursuant to Section 3.3(b)) with respect to such Limited Partner's Partner Share of distributions pursuant to Section 3.3(a) as of the applicable Determination Date less (y) all amounts previously contributed by the General Partner pursuant to this Section 8.3(c) with respect to such Limited Partner, exceed (B) 20% of the excess of (x) such Limited Partner's Partner Share of all distributions pursuant to Section 3.3(a) from the Partnership as of the applicable Determination Date (including amounts distributed to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii), but reduced by any amounts previously contributed by the General Partner pursuant to this Section 8.3(c)) over (y) the aggregate Capital Contributions made by such Limited Partner to the Partnership as of the applicable Determination Date; and

(ii)    the amount by which all distributions received by such Limited Partner as of the applicable Determination Date are less than the sum of such Limited Partner's Capital Contributions as of the applicable Determination Date, plus such Limited Partner's aggregate Preferred Amount as of the applicable Determination Date; provided, however, that the aggregate General Partner Capital Contributions pursuant to this Section 8.3(c) will not exceed the excess, if any, of (x) an amount equal to 100% of the net amount distributed to the General Partner with respect to such Limited Partner over the entire term of the Partnership (other than Tax Distributions) pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) over (y) the Built-In Tax Amount with respect to any distribution of securities in-kind received by the General Partner with respect to such Limited Partner.

(d)     The General Partner hereby covenants and agrees that each of the members of the General Partner entitled to receive Carried Interest distributions from the General Partner has guaranteed and will guaranty severally, but not jointly, the payment of his, her or its pro rata share of the payments required by Section 8.3(c) to the extent and on the terms set forth in the Guaranty Agreement.

(e)     Special Profit Interest Give Back.  After the final distribution of the assets of the Partnership among the Partners as provided in this Section 8.3 (and Article III hereof), but prior to the application of Section 8.3(c), the General Partner shall be obligated to make aggregate Capital Contributions to the Partnership, within 30 days after the date of such final distribution, in an amount equal to the sum of the excess, if any, of (i) the distributions received by the General Partner on account of the Special Profit Interest attributable to each Waived Fee Amount over (ii) the Available Profits with respect to such Waived Fee Amount.  The distributions described in clause (i) of the preceding sentence with respect to a Waived Fee Amount are the Special Profit Interest distributions attributable to the Portfolio Company with respect to which the General Partner applied such Waived Fee Amount pursuant to Section 2.2(a)(ii), treating the Waived Fee Amounts as having been applied on a "first-in, first-out" basis.  Amounts distributed to the General Partner pursuant to Section 3.3(f) shall be treated for this purpose as proceeds from Portfolio Company made on the date of each Waived Fee Notice giving rise to Waived Fee Amounts that are not applied to Portfolio Company pursuant to Section 2.2(a)(ii).  For purposes of applying the first sentence of this Section 8.3(e), Partnership Profits shall not be treated as Available Profits with respect to more than one Waived Fee Amount.  All such amounts returned to the Partnership shall be distributed to the Partners (other than a Defaulting Partner or the General Partner) in accordance with the provisions of Section 3.3.  All determinations and

Appx. 04078

calculations pursuant to this Section 8.3(e) shall be made by the General Partner in its sole discretion.

## ARTICLE IX

## VALUATION OF PARTNERSHIP ASSETS

Section 9.1  Normal Valuation.  For purposes of this Agreement, the value of any security as of any date (or in the event such date is a holiday or other day which is not a Business Day, as of the next preceding Business Day) will be determined as follows:

(a)  a Marketable Security which is listed on a recognized securities exchange or the NMS will be valued at the average of the last sales prices (or, if no sale occurred on such date, at the last "bid" price thereon) for the five consecutive trading days before such date and the five consecutive trading days after such date;

(b)  a Marketable Security which is traded over-the-counter (other than on the NMS) will be valued at the average of the last "bid" prices for the five consecutive trading days before such date and the five consecutive trading days after such date;

(c)  subject to Section 9.3, all Non-Marketable Securities will be valued on such date by the General Partner at fair market value in such manner as it may determine; and

(d)  a Marketable Security which meets clause (ii), but not clause (i) of the definition of "Marketable Securities" will be valued as if it had been converted, exchanged or exercised as of such date.

Section 9.2  Restrictions on Transfer or Blockage.  Any security which is held under a representation that it has been acquired for investment and not with a view to public sale or distribution, or which is held subject to any other restriction, or where the size of the Partnership's holdings compared to the trading volume would affect its marketability, will, subject to the provisions of Section 9.3, be valued at such discount from the value determined under Section 9.1 above as the General Partner deems necessary to reflect properly the marketability of such security.

Section 9.3  Objection to Valuation.  Prior to acting upon its final valuation of any security pursuant to Sections 9.1 or 9.2 or its determination of written down value pursuant to Section 9.4, the General Partner shall provide the members of the Advisory Committee with notice and backup support of the General Partner's valuation of such security.  If within 30 days after delivery of such notice a majority of the members of the Advisory Committee delivers written notice to the General Partner objecting to the valuation of such security and if, within 15 days from the date on which the General Partner receives such notice from a majority of the Advisory Committee, the General Partner and the Advisory Committee cannot agree on the valuation of such security, then the General Partner will (at the Partnership's expense) cause an independent securities expert mutually acceptable to the General Partner and the Advisory

17461908                                    -59-

Committee to review such valuation, and such expert's determination will be binding on the parties.

Section 9.4  Write-down to Value.  Any Portfolio Investment that has permanently declined in value as determined by the General Partner will be written down to its value (or, if applicable, written off) pursuant to the provisions of this Article IX, including the valuation provisions of Section 9.3, as of the date of such determination.  The General Partner shall provide the Advisory Committee at least annually with the then current valuation of all Portfolio Investments.

# ARTICLE X

# BOOKS OF ACCOUNTS; MEETINGS

Section 10.1  Books.  The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, which books will be open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours.

Section 10.2  Fiscal Year.  The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

Section 10.3  Reports.  The General Partner will furnish the Limited Partners:

(a)  within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under Section 10.3(c), (i) unaudited quarterly financial statements (including balance sheet and income statement (including additions, dispositions and write-offs)) showing each Partner's Capital Account prepared in accordance with GAAP, applied on a consistent basis (except that, in accordance with GAAP, such quarterly financial reports may omit footnotes and year-end adjustments, accruals and reserves), and (ii) a schedule of investments including the Partnership's cost and the value of such investments prepared in accordance with Article IX;

(b)  within 60 days after the end of each of the first three quarters of each fiscal year beginning with fiscal year 2008, and with respect to the fourth quarter in each fiscal year at the time of delivery of the annual financial statements under Section 10.3(c), unaudited quarterly descriptive investment information for each Portfolio Company and narrative summary financial information for each Portfolio Company, including revenues, EBITDA and net debt;

(c)  within 90 days after the end of each fiscal year beginning with fiscal year 2008, (i) financial statements for such year prepared in accordance with GAAP, applied on a consistent basis (certified by a firm of independent certified public accountants of recognized national standing selected by the General Partner), (ii) valuations of the Partnership's investments as of the end of such year (including a statement of each Partner's closing Capital Account) prepared in accordance with Article IX, and (iii) the certification to Benefit Plan Investors confirming that

the Partnership continues to qualify for an exception from Plan Assets described in the last sentence of Section 5.6(a) and a certification regarding the Partnership's compliance in all material respects with Article III hereof; and

(d)      within 90 days after the end of each fiscal year beginning with fiscal year 2008, (subject to reasonable delays in the event of late receipt of any necessary financial statements or other information necessary to prepare tax returns in respect of any Portfolio Investment), the Partnership's tax return and the Limited Partners' respective forms K-1.

Section 10.4   Tax Allocation.

(a)      Except as otherwise set forth in this Section 10.4(a), the income, gains, losses, deductions and credits of the Partnership will be allocated, for federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, deductions and credits among the Partners for computing their Capital Accounts, except that if any such allocation is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.  Notwithstanding the preceding sentence, in the event the Basis of any asset of the Partnership differs from its adjusted tax basis for federal income tax purposes, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Basis in the same manner as under Section 704(c) of the Code and the Regulations thereunder.

(b)      If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of his, her or its Partnership interest (whether under Section 83 of the Code or any similar provisions of any law, rule or regulation or any other applicable law, rule, regulation or doctrine) and the Partnership is entitled to any offsetting deduction, the Partnership's deduction will be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Partner and, as a result of such adjustment, the Partnership is entitled to a deduction for federal income tax purposes in excess of any gain recognized by the Partnership, such excess deduction shall be allocated to such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership and, as a result of such adjustment, any Partner is entitled to a deduction for federal income tax purposes in excess of any gain recognized by such Partner, the additional Partnership taxable income shall be allocated to such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership disallowing deductions for any of the fees paid or payable to the General Partner, then additional Partnership taxable income allocable to the Partners as a result of such disallowance shall be reallocated to the General Partner.

(c)      Notwithstanding any other provision of this Agreement, if a Partner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii) (d)(4), (5) or (6) which gives rise to a negative Capital Account (or which would give rise to a negative Capital Account when added to expected adjustments, allocations or distributions of the same type), such Partner will be allocated items of income and gain in an

amount and manner sufficient to eliminate such deficit balance as quickly as possible; provided that the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to achieve as nearly as possible the results that would have been achieved if this Section 10.4(c) had not been in this Agreement, except that no such allocation shall be made which would violate the provisions or purposes of Treasury Regulation § 1.704-1(b).

Section 10.5   Tax Controversies.  The General Partner is hereby designated the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's business and affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Limited Partner agrees to cooperate with the General Partner and to do or refrain from doing any or all things reasonably requested by the General Partner with respect to the conduct of such proceedings.  The General Partner shall provide the Limited Partners with all notices required to be provided to them by law in connection with such proceedings, and shall otherwise keep the Limited Partners reasonably informed of the progress thereof.

Section 10.6   Certain Tax Elections.  The Partnership shall not, without the consent of all Partners, file an election (i) pursuant to Section 761 of the Code not to be treated as a partnership, or (ii) pursuant to Treasury Regulation §301.7701-3(c) to be treated as an association taxable as a corporation.

Section 10.7   Code Section 83 Safe Harbor Election.

(a)      Notice 2005-43.  By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "Notice") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with section 3.03(1) of the Notice.  The Partnership and each Partner hereby agrees to comply with all requirements of the Safe Harbor described in the Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each "Safe Harbor Partnership Interest" (as described in Section 3.02 of the Notice) issued by the Partnership in a manner consistent with the requirements of the Notice.

(b)      Amendment.  Each Partner authorizes the General Partner to amend Section 10.7(a) to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in section 4 of the Notice (e.g., to reflect changes from the rules set forth in the Notice in subsequent Internal Revenue Service guidance), provided that such amendment is not materially adverse to any Partner (as compared with the after-tax

Appx. 04082

consequences that would result if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

Section 10.8   Tax Basis Elections.  Each Limited Partner hereby agrees and covenants that, with respect to such Partner's interest in the Partnership, it shall not make an election under Section 732(d) of the Code without the prior written consent of the General Partner.  Each Limited Partner hereby acknowledges and agrees that the Partnership may, but shall not be obligated to, elect to be treated as an electing investment Partnership under Section 743(e) of the Code in the event the Partnership qualifies to do so.  In such event, each transferring Limited Partner hereby agrees to provide the Partnership and its transferee with the timely notice required in IRS Notice 2005-32, or any successor guidance or interpretations(s), including such information as is necessary to enable such transferee to compute the amount of losses disallowed under Section 743(e) of the Code.  Alternatively, in the event that the Partnership elects or is required to adjust the basis of the Partnership property under Section 743 of the Code, each Limited Partner hereby agrees to promptly provide the General Partner with any information reasonably requested by the General Partner in connection with such adjustment to the basis of Partnership property.  In addition, to the extent that the transfer to a Limited Partner (or the transfer of interests in a Limited Partner) results in the Partnership adjusting the basis of Partnership property, each Limited Partner that received an interest in the Partnership by reason of such transfer (or, in the case of the transfer of interest in a Limited Partner, such Limited Partner) hereby agrees to reimburse the Partnership and/or the General Partner within 10 Business Days for any expenses (including without limitation accounting fees) reasonably incurred by the Partnership and/or the General Partner (and their respective affiliates) in connection with effecting such adjustments to the basis of Partnership property as it relates to such transfer.  The General Partner is hereby authorized by each Limited Partner, with respect to any distribution to which such Limited Partner might otherwise be entitled, to defer making such distribution to such Limited Partner, if at the time such distribution would otherwise be effected, such Limited Partner has not satisfied its obligation to make the reimbursements provided for in the preceding sentence within the period specified therein.

Section 10.9   Annual Meeting.  The General Partner will hold annual general informational meetings for the Limited Partners until such time, after the termination of the Commitment Period, that substantially all of the Portfolio Investments have been Disposed..

## ARTICLE XI

## CERTIFICATE OF LIMITED PARTNERSHIP;
## POWER OF ATTORNEY

Section 11.1   Certificate of Partnership.  A certificate of Limited Partnership within the meaning of the Delaware Partnership Act (the "Certificate") will be prepared upon the execution and delivery of this Agreement.  The General Partner will cause the Certificate to be filed and recorded in the office of the Secretary of State of the State of Delaware and, to the extent required by local law, in the appropriate place in each state in which the Partnership may

Appx. 04083

hereafter establish a place of business; provided, however, that the Partnership will not be obligated to provide the Limited Partners with a copy of any amendment to or restatement of the Certificate other than any amendment or restatement required to be filed in connection with an amendment of this Agreement pursuant to Section 12.1. The General Partner will also cause to be filed, recorded and published such statements, notices, certificates or other instruments required by any provision of any applicable law which governs the formation of the Partnership or the conduct of its business from time to time.

Section 11.2  Power of Attorney. Each of the undersigned does hereby constitute and appoint each member of the General Partner and each person who hereafter becomes a member of the General Partner with full power to act without the others, as his, her or its true and lawful representative and attorney-in-fact, in her, his or its name, place and stead, to make, execute, sign, acknowledge and deliver or file (a) the Certificate, (b) any amendment to or cancellation of the Certificate or any amendment to, or waiver of, this Agreement effected in accordance with Section 12.1, (c) all instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Partnership, (d) all instruments, documents and certificates which may be required to effectuate the dissolution and termination of the Partnership, and (e) in the case of a Defaulting Partner any bills of sale or other appropriate transfer documents necessary to effectuate transfers of such Defaulting Partner's interest pursuant to Section 6.11 above. The powers of attorney granted herein will be deemed to be coupled with an interest, will be irrevocable and will survive the death, incompetency, disability or dissolution of a Limited Partner. Without limiting the foregoing, the powers of attorney granted herein will not be deemed to constitute the written consent of any Limited Partner for purposes of Section 12.1. Notwithstanding the foregoing or anything contained in this Agreement to the contrary, the foregoing power of attorney may not be exercised by the General Partner after the occurrence of an event specified in Section 8.2 or the removal of the General Partner pursuant to Section 5.9.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1  Amendments.

(a)  This Agreement may be amended only by the written consent of the General Partner and, except as otherwise provided in this Section 12.1, a Majority in Interest of the Limited Partners.

(b)  Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which (i) increases or decreases such Limited Partner's Commitment without the written consent of such Limited Partner or (ii) amends the provisions of this Section 12.1(b).

(c)  Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner) which alters (i) the provisions of Sections 2.3, 3.3, 4.1, 6.1, 8.3(c) or the provisions of this Section 12.1(c), (ii) the provisions of

Appx. 04084

Section 6.7(c) in a manner that increases a Limited Partner's potential obligations, or (iii) any other provision of this Agreement, in a manner adverse to such Limited Partner, without the written consent of such Limited Partner; provided, however, that with respect to clause (iii), if such Limited Partner is not treated differently in any material respect from any other Limited Partner then such amendment will be valid with only the written consent of the General Partner and the Limited Partners representing at least a Majority in Interest of the Limited Partners.

(d)   Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters the provisions of Sections 1.3, 5.4, 5.10, 5.11, 12.1 or any provision which requires the consent or vote of at least Two-Thirds in Interest of the Limited Partners without the written consent of the General Partner and at least Two-Thirds in Interest of the Limited Partners.

(e)   Notwithstanding anything in this Section 12.1 to the contrary, no amendment which would alter the provisions of Sections 5.5, 6.6 and the provisions of this Section 12.1(e), or, with respect to Benefit Plan Investors, Sections 5.6, 12.1(e), and the provisions in Section 5.15 relating to Benefit Plan Investors or the definitions of Benefit Plan Investor or Redemption Value, will be valid without the written consent of at least a Majority in Interest of the Limited Partners that are materially and adversely affected by such amendment (including Limited Partners whose direct or indirect beneficial owners would be so affected).

(f)   Notwithstanding anything in this Section 12.1 to the contrary, no amendment will be valid as to any Limited Partner (including a Defaulting Partner), which alters any provision which requires the consent or vote of at least Seventy-Five Percent in Interest of the Limited Partners or the provisions of this Section 12.1(f) without the written consent of the General Partner and at least Seventy-Five Percent in Interest of the Limited Partners.

(g)   Notwithstanding anything in this Section 12.1 to the contrary, no amendment shall be made which would amend the provisions hereof relating to the rights of BHCA Partners without the consent of each BHCA Partner affected thereby.

(h)   Notwithstanding anything in this Section 12.1 to the contrary, the General Partner may amend any provisions of this Agreement solely as it relates to a Limited Partner pursuant to one or more side letters with such Limited Partner without the consent of the Limited Partners not party to such side letters.

(i)   In addition to any amendments or waivers otherwise authorized hereby, this Agreement may be amended from time to time by the General Partner without the consent of any of the Limited Partners (i) to add to the representations, duties or obligations of the General Partner or surrender any right or power (but not responsibilities) granted to the General Partner herein; (ii) to cure any ambiguity or correct any provisions hereof which may be inconsistent with any other provisions hereof, or correct any printing, stenographic or clerical errors or omissions; (iii) to admit one or more Additional Limited Partners, or withdraw one or more Limited Partners, in accordance with the terms of this Agreement, and (iv) with the consent of the Advisory Committee, to take such actions contemplated in Section 5.6(e) or avoid any material adverse consequences to the Partnership or the General Partner as a result of any change

Appx. 04085

in law or interpretation of law applicable to a Regulated Investor. The General Partner shall promptly send each Limited Partner a copy of any amendment adopted pursuant to <u>Section 12.1</u>.

Section 12.2 <u>Successors</u>. Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and assigns.

Section 12.3 <u>Governing Law; Severability</u>. This Agreement will be construed in accordance with the laws of the State of Delaware and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Partnership Act. If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 12.4 <u>Notices</u>. All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given when personally delivered, sent by telecopy (with hard copy to follow by reputable overnight courier) or sent by reputable overnight courier service (charges prepaid) or mailed by first class mail (with a copy sent by telecopy) to the addresses or telecopy numbers set forth in <u>Schedule 1</u> hereto or to such other address or telecopy number as has been indicated to all Partners.

Section 12.5 <u>Legal Counsel</u>. Each Partner hereby agrees and acknowledges that:

(a)     The law firm retained by the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity (the "<u>GP's Counsel</u>") in connection with the formation of the Partnership, the offering of Limited Partner interests and the management and operation of the Partnership does not and will not represent the Limited Partners in connection with any such matter or in connection with any dispute which may arise between the Limited Partners on one hand and the General Partner, the Partnership and any Parallel Vehicle or Separate Investment Entity on the other (the "<u>Partnership Legal Matters</u>").

(b)     Each Limited Partner will, if it wishes counsel on a Partnership Legal Matter, retain its own independent counsel with respect to each of the foregoing matters described in <u>Section 12.5(a)</u>.

(c)     Each Limited Partner hereby agrees that the GP's Counsel may represent (i) the General Partner and the Partnership and any Parallel Vehicle or Separate Investment Entity in connection with any and all Partnership Legal Matters (including any dispute between the General Partner and one or more Limited Partners, but excluding a Limited Partner's derivative action brought against the General Partner).

Section 12.6 <u>Miscellaneous</u>. This document and the schedules, exhibits and side letter agreements between the Partnership and certain of the Limited Partners in connection herewith and the Subscription Agreements contain the entire Agreement among the parties and supersede all prior arrangements or understanding with respect thereto. Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement. This Agreement may be executed in any number of counterparts, any one of

17461908                                          -66-

which need not contain the signatures of more than one party, but all of such counterparts together will constitute one agreement.

**[Remainder of page intentionally left blank]**

Appx. 04087

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL
PARTNERS GP, LLC

By: _____
    Name:  James Dondero
    Title:   President

17461908

*Highland Restoration Capital Partners, L.P. –*
*Agreement of Limited Partnership*

**LIMITED PARTNERS**

*Highland Restoration Capital Partners, L.P. –*
*Agreement of Limited Partnership*

Appx. 04089

On behalf of each of the parties named above

By:  HIGHLAND RESTORATION CAPITAL
     PARTNERS GP, LLC as Attorney-in-Fact
     pursuant to Section 14 of each of the
     Subscription Agreements, dated April 18,
     2008, between each of the above named
     parties and Highland Restoration Capital
     Partners GP, LLC as General Partner of
     Highland Restoration Capital Partners, L.P.

By:  _____
     Name:  James Dondero
     Title:  President

*Highland Restoration Capital Partners, L.P. –*
*Agreement of Limited Partnership*

**Appx. 04090**

AMENDED AND RESTATED

AGREEMENT OF LIMITED PARTNERSHIP

OF

HIGHLAND RESTORATION CAPITAL PARTNERS MASTER, L.P.

17475136

Appx. 04091

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS | 1 |
| Section 1.1 | Formation | 1 |
| Section 1.2 | Name | 1 |
| Section 1.3 | Purpose | 1 |
| Section 1.4 | Place of Business | 1 |
| ARTICLE II | DEFINITIONS; DETERMINATIONS; CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS | 2 |
| Section 2.1 | Definitions; Determinations | 2 |
| Section 2.2 | Capital Contribution Commitment | 9 |
| Section 2.3 | Capital Accounts | 9 |
| Section 2.4 | Distributions in Kind | 11 |
| ARTICLE III | DISTRIBUTIONS | 11 |
| Section 3.1 | Distribution Policy | 11 |
| Section 3.2 | Distribution of Short-Term Investment Income | 11 |
| Section 3.3 | Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions | 12 |
| Section 3.4 | Foreign Taxes | 14 |
| ARTICLE IV | PARTNERSHIP EXPENSES | 14 |
| Section 4.1 | Partnership Expenses | 14 |
| ARTICLE V | GENERAL PARTNER | 14 |
| Section 5.1 | Management Authority | 14 |
| Section 5.2 | Use of Affiliates | 15 |
| Section 5.3 | Transfer of General Partnership Interest; No Withdrawal or Loans | 15 |
| Section 5.4 | Removal of the General Partner | 15 |
| Section 5.5 | No Liability to Limited Partners | 16 |
| Section 5.6 | Indemnification | 16 |
| ARTICLE VI | LIMITED PARTNERS | 17 |
| Section 6.1 | Limited Liability | 17 |

Appx. 04092

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 6.2 | Transfer of Limited Partnership Interests | 17 |
| Section 6.3 | No Withdrawal | 18 |
| Section 6.4 | No Termination | 18 |
| Section 6.5 | Additional Investors | 18 |
| Section 6.6 | Section 754 Election | 19 |
| ARTICLE VII | [RESERVED] | 19 |
| ARTICLE VIII | DURATION AND TERMINATION | 19 |
| Section 8.1 | Duration | 19 |
| Section 8.2 | Early Termination | 19 |
| Section 8.3 | Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back | 20 |
| ARTICLE IX | [RESERVED] | 21 |
| ARTICLE X | BOOKS OF ACCOUNTS; MEETINGS | 21 |
| Section 10.1 | Books | 21 |
| Section 10.2 | Fiscal Year | 22 |
| Section 10.3 | Tax Allocation | 22 |
| Section 10.4 | Tax Controversies | 23 |
| Section 10.5 | Certain Tax Elections | 23 |
| Section 10.6 | Code Section 83 Safe Harbor Election. | 23 |
| ARTICLE XI | REGISTRATION OF LIMITED PARTNERSHIP | 24 |
| Section 11.1 | Registration of Limited Partnership | 24 |
| ARTICLE XII | MISCELLANEOUS | 24 |
| Section 12.1 | Amendments | 24 |
| Section 12.2 | Successors | 24 |
| Section 12.3 | Governing Law; Severability | 24 |
| Section 12.4 | Notices | 24 |
| Section 12.5 | Miscellaneous | 24 |

Schedule 1   Limited Partners/Partnership Percentage Interest/Notice Information

# AMENDED AND RESTATED
## AGREEMENT OF LIMITED PARTNERSHIP
### OF
## HIGHLAND RESTORATION CAPITAL PARTNERS MASTER, L.P.

THIS AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") is dated effective as of April 18, 2008 between Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company (in its capacity as general partner of the Partnership, the "General Partner"), and the limited partners listed in Schedule 1 attached hereto (in their capacities as limited partners of the Partnership, the "Limited Partners") (the General Partner and the Limited Partners being herein collectively called the "Partners"). Capitalized terms not otherwise defined shall have the meanings ascribed to such terms in Section 2.1(a).

The General Partner and certain of the Limited Partners entered into an Agreement of Limited Partnership, dated as of November 15, 2007 (the "Original Agreement"). The parties hereto wish to amend and restate the Original Agreement in the manner set forth herein.

# ARTICLE I

## GENERAL PROVISIONS

Section 1.1  Formation.  The Partners hereby agree to form a limited partnership (the "Partnership") pursuant to and in accordance with the Delaware Revised Uniform Limited Partnership Act (the "Delaware Partnership Act").

Section 1.2  Name.  The name of the Partnership will be "Highland Restoration Capital Partners Master, L.P." or such other name or names as the General Partner may from time to time designate.  The General Partner will notify Limited Partners in writing of any change to the name of the Partnership.

Section 1.3  Purpose.  Subject to the express limitations set forth herein and in the Offshore Fund Agreement, the Partnership is organized for the object and purpose of (i) investing in senior secured bank loans, debt obligations, trade claims and equity securities of middle market Distressed Companies primarily based in the United States generally consistent with the investment strategy described in the Partnership's Confidential Private Placement Memorandum, including, without limitation, privately placed or publicly traded debt securities and other debt obligations, senior and subordinated debt obligations, secured and unsecured debt obligations, privately placed or publicly traded equity securities including common stock, preferred stock and warrants, (ii) managing and monitoring such investments and (iii) engaging in such activities incidental or ancillary thereto and otherwise permitted by the Delaware Partnership Act as the General Partner deems necessary or advisable.

Section 1.4  Place of Business.  The Partnership will maintain offices and places of business at Two Galleria Tower, 13455 Noel Road, Dallas, TX 75240, or at such other place or places in the United States as the General Partner may from time to time designate; provided,

17475136

however, that if the General Partner designates different places of business, it shall promptly notify the Limited Partners in writing.

## ARTICLE II

### DEFINITIONS; DETERMINATIONS;
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 2.1   Definitions; Determinations.

(a)      For purposes of this Agreement the following capitalized terms shall have the meanings set forth below:

"Affiliate" has the meaning set forth in the Offshore Fund Agreement.

"Agreement" has the meaning set forth in the introduction.

"Allocated Expenses" has the meaning set forth in the Offshore Fund Agreement.

"Available Profits" means, with respect to a Waived Fee Amount, the cumulative amount of items of Partnership income and gain (such items being "Partnership Profits") realized after the Waived Fee Notice giving rise to such Waived Fee Amount.  The amount of Partnership Profits realized after a Waived Fee Notice for the purpose of this Available Profits definition shall equal the amount of Partnership income and gain realized after the Waived Fee Notice for purposes of maintaining Capital Accounts; provided, however, the amount of Partnership gain realized after a Waived Fee Notice that is attributable to any Portfolio Investment held by the Partnership at the time of such Waived Fee Notice that is taken into account in calculating Partnership Profits shall equal the excess, if any, of (1) the amount the Partnership realizes on the sale, transfer, or other disposition of such Portfolio Investment or its assets over (2) the fair market value (as determined by the General Partner) of such Portfolio Investment or its assets, as applicable, on the date of such Waived Fee Notice.  Notwithstanding the two preceding sentences, the aggregate amount of all items of Partnership Profits for any taxable year included in Available Profits shall not exceed the total amount of the Partnership's net income and gain for such taxable year as determined for federal income tax purposes, except that gain attributable to a Portfolio Investment shall be determined as described in the proviso to the preceding sentence.  Notwithstanding the three preceding sentences, to the extent of the amount by which the Special Profit Interest with respect to a Portfolio Investment exceeds the Deemed Contribution with respect to such Portfolio Investment, Available Profits includes an allocable share of all items of income or gain realized by the Partnership with respect to such Portfolio Investment.

"Basis" of any security means the basis of such security as determined in accordance with the Code less the amount of any write-down pursuant to Section 9.4 of the Offshore Fund Agreement and as further adjusted by the General Partner in its reasonable discretion to reverse the effects of any exchange of securities that would result in an increase in tax basis pursuant to the Code.

17475136

-2-

"Bridge Financing" has the meaning set forth in the Offshore Fund Agreement.

"Built-In Tax Amount" means, with respect to any distribution of securities in-kind received by the General Partner, an amount equal to the taxes that would be payable by the General Partner (and its direct and indirect members), assuming (i) such securities were sold in a taxable transaction immediately after their receipt by the General Partner for an amount equal to their value and (ii) any gains were taxed at the highest marginal rates applicable to any of the General Partner's members or former members, applying the assumptions set forth in Section 3.3(b) in the same manner as if such securities had been sold by the Partnership immediately before such distribution.

"Business Day" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks located in New York City generally are closed for business.

"Capital Account" has the meaning set forth in Section 2.3.

"Capital Contribution" of any Partner means the amount received by the Partnership from such Partner as an actual contribution.

"Capitalized Partnership Expenses" means Partnership Expenses that are reflected in the Basis of Portfolio Investments.

"Carried Interest" means the General Partner's 20% interest in the Partnership's distributions specified in Section 3.3(a)(ii)(A) and Section 3.3(a)(iii)(B).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Commitment" has the meaning set forth in the Offshore Fund Agreement.

"Commitment Period" has the meaning set forth in the Offshore Fund Agreement.

"Current Cash Income" means all Current Income paid in cash or cash equivalents.

"Current Income" means all interest and dividend income (including from original issue discount, purchases or investments at a market discount, and payment of in-kind income and other non-cash current income) from a Portfolio Company.

"Deemed Contribution" means, as of any date, for any Portfolio Investment or the payment of expenses incurred directly in connection with the making, maintaining or disposing of such Portfolio Investment, the Gross-up Percentage multiplied by the product of (i) the amount by which the Capital Contributions required from the General Partner pursuant to the Offshore Fund Agreement are reduced pursuant to Section 2.2(a)(ii) of the Offshore Fund Agreement with respect to such Portfolio Investment or the payment of related expenses, multiplied by (ii) (1) with respect to the General Partner, the quotient determined by dividing (x) the aggregate Commitments of all Partners in the Offshore Fund (including the General Partner) other than Limited Partners as to whom no Management Fee is payable pursuant to Section 4.1(b) by (y) the aggregate Commitments of all Partners in the Offshore Fund, and (2) with respect to each Limited Partner as to whom no Management Fee is payable pursuant to Section

Appx. 04096

4.1(b), the quotient determined by dividing (x) the Commitment of such Limited Partner by (y) the aggregate Commitments of all Partners.

"Delaware Partnership Act" has the meaning set forth in Section 1.1.

"Determination Date" has the meaning set forth in Section 8.3(c).

"Disposition" or "Disposed of" means, with respect to all or a portion of a Portfolio Investment, (i) except as provided in the next sentence, the sale, exchange or other disposition by the Partnership of all or a portion of the securities or other interests constituting that Portfolio Investment for cash, securities or other property, (ii) the receipt by the Partnership of a distribution of the proceeds of the sale of all or substantially all of the assets of the Portfolio Company in complete liquidation of the Partnership's entire interest in the Portfolio Investment and (iii) an in-kind distribution of all or part of a Portfolio Investment that has not previously been deemed to have been Disposed of, as of the date of and to the extent of such distribution. A "Disposition" does not include (i) a recapitalization that consists of an exchange of a Portfolio Investment for other securities of or claims against the issuing Portfolio Company, (ii) a business combination that consists of an exchange of substantially all of the Partnership's remaining interest in a Portfolio Investment for securities issued by an acquiring entity, (iii) a business combination that consists of the exchange of all or substantially all of the assets of a Portfolio Company or one or more divisions or operating units of a Portfolio Company for securities issued by an acquiring entity or (iv) a sale, exchange or other disposition that does not constitute a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment.

"Distressed Companies" shall mean persons that, in the opinion of the General Partner, (a) are or have been in financial or other stress; (b) are restructuring, are considered likely to be restructured, or have been restructured in an out-of-court process or in a proceeding under the Federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; (c) are being, are considered likely to be or have been reorganized within or outside of a proceeding under federal bankruptcy laws or state insolvency laws or similar laws in or outside of the United States; or (d) are engaged, are considered likely to engage or have been engaged in other extraordinary transactions, such as debt restructurings, reorganizations and liquidations outside of bankruptcy.

"Excess Partial Realization Proceeds" means, for any Partner and as of any date, the sum of the positive amounts determined with respect to each Portfolio Investment (or portion thereof) that has not been Disposed of as of such date and as to which there have been proceeds from a Partial Realization as of such date, equal to the excess of (a) such Partner's Partner Share of aggregate proceeds that have been distributed as of such date of all Partial Realizations with respect to such Portfolio Investment or portion thereof over (b) the sum of (i) such Partner's Capital Contributions applied to make such Portfolio Investment or portion thereof, including Capitalized Partnership Expenses attributed to such Portfolio Investment or portion thereof and any Allocated Expenses with respect to such Portfolio Investment as of such date, plus (ii) an amount that would be equal to such Partner's Preferred Amount if such Partner's Preference Base were only the amounts described in clause (i).

17475136                                          -4-

Appx. 04097

"Final Closing" has the meaning set forth in the Offshore Fund Agreement.

"First Closing" has the meaning set forth in the Offshore Fund Agreement.

"General Partner" has the meaning set forth in the introduction to this Agreement and includes any successor general partner of the Partnership appointed in accordance with this Agreement.

"Guaranty Agreement" shall mean the Guaranty Agreement, dated as of the date hereof, by and among the Partnership, the General Partner and the guarantors party thereto, substantially in the form of the agreement set forth in Exhibit A to the Offshore Fund Agreement, as amended from time to time in accordance with its terms.

"Initial Limited Partner" has the meaning set forth in the introduction.

"Interest" means a partnership interest in the Partnership.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Investment Date" means, with respect to any Portfolio Investment, the date such Portfolio Investment was acquired by the Partnership.

"Investment Income and Gain" means, with respect to a Portfolio Investment, (i) the excess, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income over the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.3, the excess, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners over the Basis of such portion of such Portfolio Investment, and (iii) Current Income attributable to such Portfolio Investment.

"Investment Loss" means, with respect to a Portfolio Investment, (i) the deficiency, if any, of the proceeds from the Disposition of such Portfolio Investment or portion thereof or Partial Realization with respect to such Portfolio Investment or portion thereof that does not give rise to Current Income as compared to the Basis of such Portfolio Investment or portion thereof, (ii) to the extent all or any portion of such Portfolio Investment is distributed to the Partners in kind as contemplated by Section 2.4, the deficiency, if any, of the value (as determined pursuant to Article IX) of the portion of such Portfolio Investment distributed to the Partners as compared to the Basis of such portion of such Portfolio Investment, and (iii) the amount, as reasonably determined by the General Partner in accordance with Section 9.4 of the Offshore Fund Agreement, by which such Portfolio Investment has permanently declined in value below the Basis of such Portfolio Investment immediately prior to such determination.

"Limited Partners" means the persons listed in Schedule 1 hereto in their capacity as limited partners of the Partnership and each person who is admitted to the Partnership as a substitute limited partner pursuant to Section 6.2, so long as each such person continues to be a limited partner of the Partnership hereunder.

"Majority in Interest of the Offshore Fund Limited Partners" means limited partners of the Offshore Fund with aggregate percentage interests in the Offshore Fund in excess of 50%.

"Manager" has the meaning set forth in the Offshore Fund Agreement.

"Marketable Securities" has the meaning set forth in the Offshore Fund Agreement.

"Notice" has the meaning set forth in Section 10.6(a).

"Offshore Fund" means Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnership.

"Offshore Fund Agreement" means Amended and Restated Agreement of Limited Partnership of the Offshore Fund, dated as of November 15, 2007, as amended from time to time in accordance with its terms.

"Parallel Vehicle" has the meaning set forth in the Offshore Fund Agreement.

"Partial Realization" means, with respect to any Portfolio Investment, the realization by the Partnership of Current Income or of proceeds from a recapitalization, extraordinary dividend, sale, redemption or other disposition of less than all of such Portfolio Investment (other than a pro rata disposition of a portion of each class of securities or other interests constituting such Portfolio Investment) or any other similar event that does not constitute a Disposition of such Portfolio Investment.

"Participating Partner" means, with respect to any Portfolio Investment, any Limited Partner who made a Capital Contribution (other than solely a Waiver Contribution) that was applied to such Portfolio Investment.

"Partner Interest" means, for any Partner that is a Participating Partner with respect to any Portfolio Investment (i) for each Partner as to which there is a Deemed Contribution, the proportion that the sum of such Partner's Capital Contributions and allocable share of Deemed Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment, and (ii) for any Partner other than Partners described in clause(i), the proportion that such Partner's Capital Contributions that were applied to such Portfolio Investment bears to the aggregate Capital Contributions and Deemed Contributions of all Partners that were applied to such Portfolio Investment.

"Partner Share" means, for any Partner, and for any period, the amount of Investment Income and Gain, Investment Loss, Current Cash Income, proceeds from the Disposition of or Partial Realization with respect to such Portfolio Investment for such period or distribution in kind with respect to such Portfolio Investment, as the case may be, or items of Partnership income or expense generated by such Portfolio Investment or allocable to such Portfolio Investment pursuant to Section 3.3(b) of the Offshore Fund Agreement, in each case for such period multiplied by such Partner's Partner Interest in such Portfolio Investment.

"Partners" means the General Partner and the Limited Partners, collectively.

Appx. 04099

"Partnership" has the meaning set forth in Section 1.1.

"Partnership Expenses" means all reasonable costs and expenses relating to the Partnership's activities, investments and business (to the extent not borne or reimbursed by a Portfolio Company or proposed Portfolio Company), including, but not limited to, (i) all costs and out-of-pocket fees and expenses attributable to acquiring, investing, holding, monitoring and disposing of the Partnership's investments, (ii) all other out-of-pocket costs and out-of-pocket fees and expenses attributable to unconsummated transactions or investment strategies (but excluding marketing strategies) that do not lead to consummated acquisitions, (iii)  legal, accounting, auditing, administrative, consulting and other fees and expenses (including, but not limited to, fees of the administrator of the Partnership and insurance and other out-of-pocket expenses associated with negotiating, consummating, monitoring and disposing of the Partnership's investments and the preparation of Partnership financial statements, tax returns and forms K-1), (iv) extraordinary expenses, liabilities, indemnities and other obligations of the Partnership (including, but not limited to, litigation and indemnification costs and expenses, judgments and settlements (including, but not limited to, costs and expenses payable under Section 5.6)), and (v) all debt service obligations, including interest, premium, if any, fees, expenses and other amounts payable in respect of indebtedness of the Partnership.

"Partnership Percentage Interest" shall mean in respect of each Partner, the percentage designated as such Partner's Partnership Percentage Interest in Schedule 1 attached hereto, as the same shall be amended from time to time in order to reflect transfers of Interests.  The General Partner's Partnership Percentage Interest shall be the percentage determined by dividing the General Partner's Commitment as of the date of determination by the aggregate Commitments of all partners in the Offshore Fund (including the General Partner) as of such date.

"Person" means an individual, a partnership, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency or political subdivision thereof).

"Portfolio Company" means any corporation, partnership, limited liability, company or other entity in which the Partnership has made an investment, other than Short-Term Investments.

"Portfolio Investments" means any investments held by the Partnership, other than Short-Term Investments.  If the Partnership holds multiple classes of securities or other interests that were issued by a Portfolio Company in a single closing or series of related closings, all of such securities or interests in the aggregate shall constitute one Portfolio Investment.

"Preference Base" means for any Partner and, as of any date, (a) with respect to any distribution of the proceeds of a Disposition, the sum of (i) the Limited Partners' aggregate Capital Contributions applied to make Portfolio Investments that have been Disposed of on or prior to such date or applied to pay Capitalized Partnership Expenses with respect to such Portfolio Investments, (ii) the Limited Partners' aggregate Partner Share of all writedowns (including write-offs) pursuant to Section 9.4 of the Offshore Fund Agreement in respect of Portfolio Investments that have not been Disposed of by the Partnership on or prior to such date and (iii) the Limited Partners' aggregate Capital Contributions applied to pay Allocated

17475136                                    -7-

Expenses with respect to Portfolio Investments that have been Disposed of, written down or written off on or prior to such date, and (b) with respect to any distribution of proceeds of a Partial Realization, the amounts determined pursuant to clause (a), plus the Limited Partners' aggregate Capital Contributions applied to make the Portfolio Investment to which such proceeds are attributable, including Capitalized Partnership Expenses attributable to such Portfolio Investment and Allocated Expenses with respect to such Portfolio Investment as of such date. For purposes of determining a Partner's Preferred Amount, a Partner's Preference Base shall not include any Capital Contributions returned to such Partner pursuant to Section 2.2(c).

"Preferred Amount" means, for any Partner and as of any date, the amount, if any, that would be required to be distributed on such date so that the aggregate distributions pursuant to Section 3.3 (including distributions pursuant to Sections 8.3(b) and (c)), to such Partner in excess of such Partner's Preference Base provide a return of 8% per annum (compounded annually) on such Partner's Preference Base. For purposes of determining a Partner's Preferred Amount with respect to a Disposition of a Portfolio Investment, no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date. A Partner's Preferred Amount shall be calculated on the basis of the actual number of days elapsed from and including the date on which each Capital Contribution is invested in a Portfolio Company or contributions are made to the Offshore Fund for the purpose of paying Management Fees, Organizational Expenses and Partnership Expenses (as such terms are defined in the Offshore Fund Agreement), as applicable, to, but not including, the date that distributions constituting a return of such Capital Contributions were made by the Offshore Fund to the Partners thereof pursuant to Section 3.3(a)(i).

"Principals" has the meaning set forth in the Offshore Fund Agreement.

"Short-Term Investment Income" means the income earned on Short-Term Investments including in any event any gains and net of any losses from dispositions of Short-Term Investments and also net of any costs and expenses directly attributable thereto.

"Short-Term Investments" means investments in (a) cash, (b) obligations of, or fully guaranteed as to timely payment of principal and interest by, the United States of America and with a maturity date not in excess of 12 months from the date of purchase by the Partnership, (c) interest-bearing accounts and/or certificates of deposit of any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, (d) reverse repurchase agreements using U.S. Treasury securities and entered into with any U.S. bank with capital and surplus in excess of $500 million and whose short-term debt securities are rated not lower than P-1 by Moody's Investor Services, Inc. and A-1+ by Standard & Poor's Corporation and whose long term unsecured debt securities, or the long term unsecured debt securities of its affiliated holding company, are rated no lower than A1 by Moody's Investor Services, Inc. and A+ by Standard & Poor's Corporation, and (e) money market mutual funds with assets of not less than $500 million, substantially all of

which assets are reasonably believed by the General Partner to consist of items described in one or more of the foregoing clauses (b), (c) and (d).

"Special Profit Interest" means (i) the General Partner's right to receive distributions pursuant to the first two sentences of Section 3.3(a), but only to the extent such distributions exceed the distributions that would have been made to the General Partner pursuant to the first two sentences of Section 3.3(a) if such distributions had been made pro rata according to each Partner's Capital Contributions to the Partnership, and (ii) the General Partner's right to receive distributions pursuant to Section 3.3(e).

"Tax Distributions" means the aggregate amount of distributions that would be made to the General Partner if the General Partner received no distributions other than those required pursuant to Section 3.3(b).

"Unapplied Waived Fee Amounts" means, as of the date of determination, the excess, if any, of (i) the sum of (A) the aggregate Waived Fee Amount for all Management Fee Periods (as defined in the Offshore Fund Agreement), beginning on or before the date of determination (B) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" relating to the aggregate Waiver Contributions previously returned to the limited partners of the Offshore Fund pursuant to Section 2.2(c) of the Offshore Fund Agreement (including, without limitation, in respect of Bridge Financings) and (C) amounts added to the Unapplied Waived Fee Amounts pursuant to Section 6.5(b) of the Offshore Fund Agreement over (ii) the aggregate amount described in clause (i) of the definition of "Deemed Contribution" as of such date.

"Uncapitalized Partnership Expenses" means Partnership Expenses that are not Capitalized Partnership Expenses.

"Unfunded Commitment" has the meaning set forth in the Offshore Fund Agreement.

"Waived Fee Amount" has the meaning set forth in the Offshore Fund Agreement.

"Waived Fee Notice" has the meaning set forth in the Offshore Fund Agreement.

"Waiver Contribution" has the meaning set forth in the Offshore Fund Agreement.

Section 2.2   Capital Contribution Commitment.  The General Partner shall make Capital Contributions to the Partnership as provided in Section 2.2(a)(i) of the Offshore Fund Agreement, taking into account any reduction in such Capital Contributions as provided in Section 2.2(a)(ii) of the Offshore Fund Agreement.  The remaining capital requirements of the Partnership shall be funded through Capital Contributions by the Limited Partners pro rata in accordance with their respective Partnership Percentage Interests.  Each Capital Contribution shall be made by the Partners in cash either by delivery to the Partnership of a certified check or wire transfer of immediately available funds to an account designated by the General Partner.

Section 2.3   Capital Accounts.  A capital account ("Capital Account") will be established for each Partner on the books of the Partnership and will be adjusted as follows:

Appx. 04102

(a)   <u>Capital Contributions and Allocations</u>.  A Partner's Capital Contribution will be credited to its Capital Account when received by the Partnership.

(b)   <u>Short-Term Investment Income</u>.  Short-Term Investment Income earned in each quarterly period with respect to Capital Contributions that have not yet been invested in Portfolio Investments or used to pay fees and expenses of the Partnership will be credited to the Capital Accounts of the Partners <u>pro rata</u> according to their respective Partner Capital Contributions to which such Short-Term Investment Income is attributable.  Short-Term Investment Income on undistributed proceeds from Portfolio Investments shall be credited to the Capital Accounts of the Partners ratably in proportion to their respective shares of such undistributed amounts.

(c)   <u>Investment Income and Gain and Investment Loss</u>.  Except as otherwise provided in this <u>Section 2.3(c)</u>, Investment Income and Gain or Investment Loss shall be allocated among the Partners for each taxable period in such a manner that, as of the end of such taxable period, and to the extent possible, the Capital Account of each Partner shall be equal to the net amount, positive or negative, which would be distributed to each Partner or for which such Partner would be liable to the Partnership under this Agreement (including <u>Sections 8.3(c)</u> and <u>(e)</u>), determined as if the Partnership were to liquidate the assets of the Partnership for an amount equal to their Basis, reduced, but not below zero, by the amount of nonrecourse debt, if any, to which such Partnership assets are subject, and distribute the proceeds in liquidation after the payment of all liabilities (other than nonrecourse liabilities) in accordance with <u>Sections 3.2</u> and <u>3.3</u>.  For purposes of the foregoing determination, no amount shall be treated as distributable pursuant to <u>clause (A)</u> of <u>Section 3.3(a)(i)</u> by virtue of <u>clause (a)(iii)</u> of the definition of Preference Base or <u>clause (B)</u> of <u>Section 3.3(a)(i)</u> with respect to any Portfolio Investment or portion thereof solely because of the deemed liquidation of such Portfolio Investment; <u>provided</u>, <u>however</u>, that any increase in the Basis of a Portfolio Investment shall be taken into account for this purpose in the same manner as proceeds of a Partial Realization.  Investment Income and Gain or Investment Loss attributable to Portfolio Investments retained by the Partnership pursuant to <u>Section 3.3(e)(ii)</u> shall be allocated 100% to the General Partner.

(d)   <u>Distributions</u>.  Any amounts distributed to the Partners will be debited against their Capital Accounts.

(e)   <u>Partnership Expenses</u>.  Uncapitalized Partnership Expenses shall be debited against the Capital Accounts of the Partners in proportion to their respective Commitments.

Appx. 04103

Section 2.4  Distributions in Kind.

(a)    If any securities are to be distributed in kind to the Partners as provided in Article III, such securities will first be written up or down to their value (as determined pursuant to Article IX of the Offshore Fund Agreement as of the date of such distribution), thus creating Investment Income or Gain or Investment Loss, which shall be allocated in accordance with Section 2.3 to the Capital Accounts of the Partners, and upon the distribution of such securities to the Partners, the value of such securities shall be debited, in accordance with Section 2.3(e), against the Capital Accounts of the Partners.

## ARTICLE III

## DISTRIBUTIONS

Section 3.1  Distribution Policy.

(a)    The General Partner may in its sole discretion make distributions of cash, property and securities.

(b)    The General Partner will cause the Partnership to distribute (i) Current Cash Income at least semi-annually unless reinvested as described in this Section 3.1(b), (ii) Short-Term Investment Income at least quarterly, and (iii) the net cash proceeds received from Dispositions of or Partial Realizations with respect to Portfolio Investments within 60 days of the receipt thereof unless reinvested as described in this Section 3.1(b), after, in each case, the setting aside by the General Partner, in its discretion, of appropriate reserves for anticipated obligations and commitments of the Partnership as well as any required tax withholdings; provided, however, that if the General Partner determines in good faith that the Partnership will require additional capital within 30 days after the date that an amount that would otherwise be distributed that would be described in clauses (a), (b) and (d) of the definition of "Funded Commitment" in the Offshore Fund Agreement, the General Partner may, in its discretion, retain such amount and reduce the amount required to be contributed by the applicable Partners.

(c)    If any Marketable Security is distributed in kind, such Marketable Security shall be valued pursuant to Section 9.1 of the Offshore Fund Agreement as of the date of such distribution and shall be distributed in accordance with Section 3.3.

(d)    The General Partner may, immediately prior to the Disposition of any Portfolio Investment, cause such Portfolio Investment to be distributed in accordance with Section 3.3 based on the value of the Portfolio Investment at such time, as determined by the consideration to be received in connection with such Disposition.

Section 3.2  Distribution of Short-Term Investment Income.  Short-Term Investment Income will be distributed among the Partners in the same proportions as Short-Term Investment Income was credited to the Partners' Capital Accounts.

Appx. 04104

Section 3.3   <u>Distributions of Current Cash Income and Proceeds From Dispositions of or Partial Realizations with Respect to Investments and In Kind Distributions</u>.

(a)   All distributions of Current Cash Income and all distributions out of net proceeds from Dispositions of or Partial Realizations with respect to Portfolio Investments (in each case, net of Partnership Expenses) and all distributions of Portfolio Investments shall be apportioned in proportion to their respective Partner Interests among the General Partner and the Participating Partners with respect to the Portfolio Investment that gave rise to such Current Cash Income or net proceeds or that is being distributed in kind. The General Partner's Partner Share of such distributions shall be distributed 100% to the General Partner. Each Participating Partner's Partner Share shall be distributed to such Participating Partner and the General Partner as follows:

(i)   <u>First</u>, 100% to such Participating Partner until (A) the aggregate amount distributed to such Participating Partner in accordance with this <u>Section 3.3(a)</u> equals such Participating Partner's Preference Base as of the date of such distribution and (B) the aggregate amount distributed to such Participating Partner in accordance with this <u>Section 3.3(a)</u> (other than <u>clause (A)</u> of this paragraph) equals such Participating Partner's Preferred Amount as of such date. Solely for purposes of determining how proceeds of a Disposition of a Portfolio Investment are to be distributed pursuant to this <u>Section 3.3(a)</u> no proceeds of Partial Realizations with respect to Portfolio Investments or portions thereof that have not been Disposed of as of such date shall be taken into account, other than Excess Partial Realization Proceeds realized as of such date.

(ii)   <u>Second</u>, (A) 50% to the General Partner and (B) 50% to such Participating Partner until the aggregate distributions to the General Partner with respect to such Participating Partner pursuant to this <u>paragraph (ii)</u> and <u>paragraph (iii)</u>, reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to <u>Section 8.3(c)</u>, equal 20% of the aggregate distributions of such Participating Partner's Partner Share of such amounts to the General Partner, reduced by any amounts contributed to the Partnership by the General Partner with respect to such Participating Partner pursuant to <u>Section 8.3(c)</u>, and to such Participating Partner pursuant to this <u>paragraph (ii)</u> and <u>paragraph (iii)</u>, and <u>clause (B)</u> of the immediately preceding paragraph.

(iii)   <u>Third</u>, (A) 80% to such Participating Partner and (B) 20% to the General Partner.

For purposes of this <u>Section 3.3(a)</u>, amounts distributed to a Participating Partner pursuant to <u>Section 8.3(c)</u> shall be treated as having been distributed pursuant to this <u>Section 3.3(a)</u>.

(b)   Anything contained herein to the contrary notwithstanding, the General Partner shall be entitled to receive cash distributions from the Partnership (after taking into account any other distributions received by the General Partner in such fiscal year pursuant to <u>Sections 3.3(a)(ii)(A)</u> and <u>3.3(a)(iii)(B)</u>) in amounts sufficient to enable the General Partner and the individual members of the General Partner to discharge any federal, state and local tax liability (excluding penalties) arising as a result of the allocation of Investment Income and Gain pursuant to <u>Section 2.3(c)</u> attributable to the General Partner's Carried Interest in the Partnership,

Appx. 04105

determined by assuming the applicability of the highest combined effective marginal federal, state and local income tax rates applicable to an individual resident in New York, New York. The amount of such tax liability shall be calculated taking into account (i) the deductibility (to the extent allowed) of state and local income taxes for United States Federal income tax purposes, (ii) the amount of net cumulative tax loss previously allocated to the General Partner in prior fiscal years with respect to the Carried Interest and not used in prior fiscal years to reduce taxable income for the purpose of making distributions under this subsection (b) and (iii) the character of any income or gain and the income tax rates applicable thereto. The calculation shall be made on the assumption that taxable income or tax loss from the Partnership with respect to the Carried Interest is the General Partner's only taxable income or tax loss. Such distributions shall be debited to the General Partner's Capital Account, as provided in Section 2.3(e). Any amounts distributed pursuant to this subsection (b) shall be considered an advance against the next distribution of Carried Interest distributable to the General Partner, and shall offset such distributions.

(c)     In the event of a partial Disposition of a Portfolio Investment, the unreturned Capital Contributions and remaining Preferred Amount with respect to such Portfolio Investment shall be allocated between the Disposed portion and retained portion of such Portfolio Investment, pro rata, based on the relative amounts that are Disposed of and retained, respectively, of that portion of such Portfolio Investment held by the Partnership immediately prior to such Disposition.

(d)     (i)     Notwithstanding anything in this Agreement to the contrary, the General Partner may at any time elect not to receive all or any portion of any distribution that otherwise would be made to it with respect to its Carried Interest.

(ii)     Any amount of cash which is not distributed to the General Partner pursuant to Section 3.3(d)(i) shall, in the General Partner's sole discretion, either be retained by the Partnership or distributed to the Partners (other than to the General Partner) in accordance with Section 3.3(a). Any amount of securities not distributed in-kind to the General Partner pursuant to Section 3.3(d)(i) shall be retained by the Partnership.

(iii)     If the General Partner elects to distribute cash to the other Partners pursuant to Section 3.3(d)(ii), 100% of any or all subsequent cash distributions by the Partnership shall be distributed to the General Partner until the General Partner has received the same aggregate amount of cash distributions it would have received had it not waived receipt of certain distributions pursuant to Section 3.3(d)(i) (without regard to the distribution of any Short-Term Investment Income earned on such retained amounts).

(iv)     All Current Cash Income attributable to, and distributions out of net proceeds from the Disposition or Partial Realization of, Portfolio Investments retained by the Partnership pursuant to Section 3.3(d)(ii) and all cash retained by the Partnership pursuant to Section 3.3(d)(ii) shall be distributed to the General Partner as of the date determined by the General Partner in its sole discretion. The General Partner shall not be entitled to any additional distributions in respect of such retained amounts, other than Short-Term Investment Income earned on such retained amounts.

Appx. 04106

(e)      Notwithstanding anything to the contrary in this Agreement, if at the expiration of the Commitment Period, there are Unapplied Waived Fee Amounts, the General Partner shall, in its sole discretion, prior to any other distribution pursuant to this Article III, be entitled to a distribution of cash equal to the Unapplied Waived Fee Amount.

Section 3.4  Foreign Taxes.  The amount of any foreign taxes paid by the Partnership (or by an entity in which the Partnership holds an interest, either directly or indirectly through one or more such entities, that is treated as a partnership or is disregarded for federal income tax purposes) or withheld from receipts of the Partnership or such entity from a Portfolio Investment shall be allocated among the Partners as reasonably determined by the General Partner and, for purposes of Sections 3.3(a)(i) – (iii), shall be deemed to have been distributed to each Partner as Current Cash Income or proceeds from the Disposition of a Portfolio Investment to the extent that the payment or withholding of such foreign taxes reduced Current Cash Income or the proceeds from the Disposition of a Portfolio Investment, as the case may be, otherwise distributable to such Partner as provided herein (for this purpose taking into account with respect to each Partner any reduction in such foreign taxes that occurs by reason of such Partner's status).


# ARTICLE IV

# PARTNERSHIP EXPENSES

Section 4.1  Partnership Expenses.  The Partnership will pay all Partnership Expenses.


# ARTICLE V

# GENERAL PARTNER

Section 5.1  Management Authority.

(a)      Subject to the retention of the Manager, the General Partner will have full control over the business and affairs of the Partnership consistent with its duties arising under the Delaware Partnership Act.  The General Partner will have the power on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings which, in its sole discretion, are necessary or advisable or incidental thereto, including the power to acquire or dispose of any security.  Notwithstanding the foregoing, the management of the Partnership will vest in the Manager which will provide the Partnership with portfolio management and administrative services, including investigating, analyzing, structuring and negotiating potential investments, monitoring the performance of Portfolio Companies and advising as to disposition opportunities.  In no event shall the Manager, which has been engaged by the Partnership, be treated as an agent or partner of the General Partner.

Appx. 04107

(b)     Except to the extent otherwise provided in this Agreement, all matters concerning (i) the allocation of Short-Term Investment Income, Current Income, Investment Income and Gain, Investment Loss, Partnership Expenses, and the distribution of net proceeds and the return of capital among the Partners, including the taxes thereon, (ii) accounting procedures and determinations (including the determination of the Preferred Amount and (iii) other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the General Partner in accordance with its reasonable interpretation of the provisions of this Agreement made in good faith.

(c)     The General Partner shall have the authority to admit additional Limited Partners in connection with making a Portfolio Investment.

Section 5.2  Use of Affiliates.  The General Partner shall retain the services of the Manager and any officers, directors or Affiliates thereof in connection with the operation of the Partnership, and the compensation of the Manager and such persons shall be as provided in Section 4.1 of the Offshore Fund Agreement.

Section 5.3  Transfer of General Partnership Interest; No Withdrawal or Loans.  The General Partner generally may not sell, assign, pledge, mortgage or otherwise dispose of its General Partner interest in the Partnership; provided, however, that the General Partner may transfer its General Partner interest in the Partnership (or consent to the transfer of an interest in the General Partner) in a derivative transaction if the transferor maintains the economic attributes of the interest and voting control of the interest.  The General Partner will not borrow or withdraw any amount from the Partnership or voluntarily withdraw from the Partnership.

Section 5.4  Removal of the General Partner.  In the event that the General Partner is removed as general partner of the Offshore Fund pursuant to Section 5.9 of the Offshore Fund Agreement, the General Partner shall also be removed as general partner of the Partnership.  If the Offshore Fund has appointed another Person to act as general partner of the Offshore Fund and the limited partners of the Offshore Fund have consented to continue the Offshore Fund pursuant to Section 5.9 of the Offshore Fund Agreement, such Person shall also be appointed to act as General Partner of the Partnership and the Partnership shall also be continued.  In such an event, the former General Partner shall be entitled to receive distributions equal to any amounts it would have been entitled to had the Partnership been dissolved and wound up in accordance with Sections 8.3(a) and (b) and distributed in kind all Partnership assets as of the date of the election of the Limited Partners to continue the Partnership.  The Partnership shall issue an unsecured non-interest bearing promissory note to the former General Partner in the face amount of the liquidating distribution determined in accordance with this Section 5.4, such note to be payable upon the final liquidation of the Partnership.  All such distributions shall be subject to the obligations set forth in Section 8.3(c) and (d); provided, however, that the General Partner's obligation, if any, to fund Commitments in respect of its obligations in Section 8.3(c) relating to such liquidating distribution shall be satisfied by a reduction to the principal amount of the unsecured non-interest bearing promissory note described in this Section 5.4 in the amount of such obligation.  For purposes of determining allocation and distributions pursuant to the preceding sentence, securities and other property held by the Partnership shall be valued pursuant to the procedures set forth in Article IX.

Appx. 04108

Section 5.5  <u>No Liability to Limited Partners</u>.

(a)     None of the General Partner, the Manager, the Principals or their Affiliates, officers, directors, members, partners, shareholders, employees or agents will be liable to any Limited Partner or to the Partnership for any action taken, or omitted to be taken, as General Partner with respect to the Partnership, or for any action taken, or omitted to be taken, by any member, partner, director, officer, employee or agent of the General Partner or Manager in connection with its activities for or on behalf of the Partnership so long as such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership, (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of <u>nolo</u> <u>contendre</u> (including as part of a settlement) by a court of competent jurisdiction.

(b)     If any Limited Partner obtains a final judgment in a court of competent jurisdiction against the General Partner for matters relating to the Partnership, the General Partner shall pursue against its members the remedies (if any) that it has against such member relating to such claim.

Section 5.6  <u>Indemnification</u>.  The Partnership will indemnify the Principals, the General Partner, the Manager and each of their respective members, partners, shareholders, directors, officers, employees, agents and Affiliates against any losses, liabilities, damages or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding) to which any of such persons may become subject in connection with such person's activities on behalf of the Partnership or in connection with any involvement with a Portfolio Company (including serving as an officer, director, consultant or employee of any Portfolio Company) directly or indirectly on behalf of the Partnership, but only to the extent that such person (i) acted in good faith, (ii) acted in a manner reasonably believed to be in the best interests of the Partnership or the Portfolio Company (as the case may be), (iii) was neither grossly negligent nor engaged in willful malfeasance, fraud or reckless disregard of fiduciary duties, (iv) did not materially breach this Agreement, and (v) with respect to any criminal action, such person is not finally determined to be and does not admit to be guilty or enter a plea of <u>nolo</u> <u>contendre</u> (including as part of a settlement) by a court of competent jurisdiction.  Any person described in this <u>Section 5.6</u> entitled to seek indemnification hereunder shall first use reasonable efforts to seek indemnification from other available sources, if any, prior to obtaining indemnification hereunder; <u>provided</u> that any such person may seek and obtain indemnification hereunder if at any time such person reasonably believes that such person will not receive timely indemnification on terms reasonably acceptable to such person from such other sources; and <u>provided</u>, <u>further</u>, that such person shall continue to use reasonable efforts to seek such indemnification from such other sources and, to the extent any such indemnification is obtained, reimburse the Partnership for any such recovery.  The Partnership may, in the sole judgment of the General Partner, pay the expenses of any person indemnifiable under this <u>Section 5.6</u> in advance of the final disposition of any proceeding, so long as (w) with respect to any derivative action brought by any Limited Partner, the person receiving the advance is not the subject of such derivative action, (x) the proceeding is not instituted by a Majority in Interest of the

Offshore Fund Limited Partners against the General Partner or the Manager, (y) General Partner has a good faith belief such expenses are indemnifiable, and (z) the General Partner receives a written undertaking by such person for the benefit of the Partnership to repay the full amount advanced if (A) there is a final determination that such person did not satisfy the standards set forth in clauses (i) through (v) immediately above, (B) with respect to any criminal action, such person is finally determined to be or admits to being guilty or enters a plea of nolo contendere (including as part of a settlement) by a court of competent jurisdiction, or (C) such person is not otherwise entitled to indemnification as provided herein.  Notwithstanding the foregoing, no person will be exculpated or exonerated from liability or indemnified against loss for violations of federal or state securities laws, or for any other intentional or criminal wrongdoing.  No person shall be indemnifiable under this Section 5.6 in respect of losses, liabilities, damages or expenses to which any such person may become subject in connection with (x) such person's activities with any Portfolio Company if such losses arise after the Partnership's final disposition of such Portfolio Company or (y) a dispute among the General Partner, the Manager, their respective members and employees, and the Principals.

## ARTICLE VI

## LIMITED PARTNERS

Section 6.1  Limited Liability.  The Limited Partners will not be personally liable for any obligations of the Partnership and will have no obligation (including with respect to a deficit balance in their Capital Account) to make contributions to the Partnership in excess of their respective capital commitments to the Partnership, except to the extent set forth under the Delaware Partnership Act.  The Limited Partners will take no part in the control, direction or operation of the affairs of the Partnership and will have no power to bind the Partnership.

Section 6.2  Transfer of Limited Partnership Interests.

(a)  A Limited Partner may not sell, assign, transfer, pledge, mortgage or otherwise dispose of all or any of its interest in the Partnership unless the General Partner has consented to such transfer or assignment in writing.  Any transfer shall be effected in accordance with the provisions of this Agreement, by execution of an assignment in writing and by entry of the name of the new limited partner in the register of limited partners.  A transferee or assignee will not become a substitute Limited Partner without the consent of the General Partner in writing, and without executing a copy of this Agreement or amendment hereto.

(b)  Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would have more than one hundred (100) Partners, unless the General Partner determines in its sole discretion that the Partnership will meet the requirements set forth in Treasury Regulation

Appx. 04110

§ 1.7704-1(j)(1) for the taxable year of such transfer and all subsequent taxable years. In determining whether the Partnership will have more than one hundred (100) Partners for purposes of this Section 6.2(b), each person indirectly owning an interest in the Partnership through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a "flow-through entity") shall be treated as a Partner unless the General Partner determines in its sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Partnership.

(c)    Anything in this Agreement to the contrary notwithstanding, no admission (or purported admission) of a Partner, and no transfer (or purported transfer) of all or any part of a Partner's interest in the Partnership (or any economic interest therein) whether to another Partner or to a person who is not a Partner, shall be effective, and any such admission or transfer (or purported admission or transfer) shall be void ab initio, and no person shall otherwise become a Partner if after such admission or transfer (or purported admission or transfer) the Partnership would be subject to the registration or reporting requirements of the Investment Company Act.

Section 6.3  No Withdrawal.  Subject to the provisions of Section 6.2, no Limited Partner may withdraw as a Partner of the Partnership, nor may a Limited Partner be required to withdraw, nor may a Limited Partner borrow or withdraw any portion of its Capital Account from the Partnership.

Section 6.4  No Termination.  The substitution, death, insanity, dissolution (whether voluntary or involuntary) or bankruptcy of a Limited Partner will not affect the existence of the Partnership, and the Partnership will continue for the term of this Agreement until its existence is terminated as provided herein.

Section 6.5  Additional Investors.  If the admission of investors in Parallel Vehicles or the purchase by a limited partner in a Parallel Vehicle of a portion of the interest of a Defaulting Partner (as defined in the Offshore Fund Agreement) pursuant to Section 6.11 of the Offshore Fund Agreement would result in the Partnership, the Offshore Fund and the Parallel Vehicles not having reimbursed the General Partner and its Affiliates for Organizational Expenses (as defined in the Offshore Fund Agreement) in the proportions contemplated by Section 4.2 of the Offshore Fund Agreement or would result in the Partnership, the Offshore Fund and the Parallel Vehicles not owning investments in Portfolio Companies in the proportions contemplated by Sections 5.14 or 5.15 of the Offshore Fund Agreement, the General Partner shall have the authority to effect transfers of funds and of Portfolio Investments to Parallel Vehicles and to effect transfers of funds and portfolio investments of Parallel Vehicles to the Partnership for the purpose of reallocating the ownership of investments in Portfolio Companies and the reimbursements of Organizational Expenses (as defined in the Offshore Fund Agreement) by the Partnership, the Offshore Fund and the Parallel Vehicles, to achieve allocations and distributions as close as practicable to those that would have obtained had such investors been admitted to the Partnership, the Offshore Fund or to Parallel Vehicles, respectively, at the First Closing or had such purchased interest of a Defaulting Partner (as defined in the Offshore Fund Agreement) been issued to the purchaser at the First Closing.

Appx. 04111

Section 6.6  Section 754 Election.  Upon the written request of a Majority in Interest of the Limited Partners, that an election provided for in Section 754 of the Code be made, the General Partner shall, if then permitted by applicable law, make such election.

## ARTICLE VII

## [RESERVED]

## ARTICLE VIII

## DURATION AND TERMINATION

Section 8.1  Duration.  The Partnership will terminate on the tenth anniversary of the Final Closing, except that in the event that the term of the Offshore Fund is extended pursuant to Section 8.1 of the Offshore Fund Agreement, the term of the Partnership shall be extended for the same period.

Section 8.2  Early Termination.

(a)  The Partnership shall terminate on:

(i)  the bankruptcy of the General Partner or on the happening of any other event that would cause a dissolution of the Partnership under the Delaware Partnership Act (other than removal of the General Partner for Cause pursuant to Section 5.4), unless, within 90 days after notice is given to the Offshore Fund Limited Partners of the occurrence of such event, the Offshore Fund Limited Partners and limited partners of all Parallel Vehicles unanimously select a new general partner and resolve to continue the business of the Partnership;

(ii)  the removal of the General Partner pursuant to Section 5.4 unless all of the Limited Partners and all limited partners of Parallel Vehicles select a successor general partner and resolve to continue the business of the Partnership pursuant to Section 5.4; or

(iii)  the date that the Offshore Fund is terminated.

(b)  As promptly as possible following the election by the Limited Partners of a successor General Partner pursuant to Section 8.2(a)(i), there shall be distributed to the former General Partner, in full payment and satisfaction of its interest in the Partnership, a Limited Partnership Interest in the Partnership.  The Limited Partnership Interest of the former General Partner shall entitle the former General Partner to the same distributions and allocations in respect of Portfolio Investments made prior to the termination of the former General Partner it would have received had it remained the General Partner, subject to the obligations set forth in Section 8.3(c), and to the rights of a Limited Partner hereunder with a Commitment equal to the Commitment of the former General Partner, but shall not entitle it to any other rights to participate in the management of the Partnership.  After its withdrawal as General Partner, a

17475136                                         -19-

Appx. 04112

former General Partner shall only be liable under this Agreement for actions taken and investments in Portfolio Companies made prior to the date of such withdrawal. If the Limited Partners elect to continue the Partnership's business pursuant to Section 8.2(a)(i), an appropriate amendment to this Agreement and to the Certificate shall be made within 90 days after the event giving rise to such election.

Section 8.3   Termination and Liquidation of Partnership Interests; Annual Determination of General Partner Give Back.

(a)   Liquidation.  Upon termination, the Partnership will be liquidated in an orderly manner.  The General Partner (or, in the absence, bankruptcy or removal under Section 5.4, of the General Partner, the party selected by a Majority in Interest of the Offshore Fund Limited Partners) will be the liquidator to wind up the affairs of the Partnership pursuant to this Agreement.

(b)   Final Allocation and Distribution.  Upon termination of the Partnership (whether or not an early termination), the General Partner will make a final allocation of all kinds of income, loss and expense in accordance with Article II hereof and the Partnership's liabilities and obligations to its creditors shall be paid or adequately provided for prior to any distributions to the Partners.  After payment or provision for payment of all debts of the Partnership, the remaining assets, if any, will be distributed among the Partners as provided in Sections 3.2 and 3.3.

(c)   General Partner Give Back.  Within 90 days after the termination of the Commitment Period and after the final distribution of the assets of the Partnership among the Partners as provided in Sections 3.2 and 3.3 (each of the termination of the Commitment Period and the final distribution of the assets of the Partnership, a "Determination Date"), the General Partner will make a Capital Contribution to the Partnership (and such amount will be distributed to the Offshore Fund), equal to the greater of:

(i)   the amount by which (A) (x) the aggregate distributions to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) (including amounts initially distributed pursuant to Section 3.3(b)) with respect to such Limited Partner's Partner Share of distributions pursuant to Section 3.3(a) as of the applicable Determination Date less (y) all amounts previously contributed by the General Partner pursuant to this Section 8.3(c) with respect to such Limited Partner, exceed (B) 20% of the excess of (x) such Limited Partner's Partner Share of all distributions pursuant to Section 3.3(a) from the Partnership as of the applicable Determination Date (including amounts distributed to the General Partner pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii), but reduced by any amounts previously contributed by the General Partner pursuant to this Section 8.3(c)) over (y) the aggregate Capital Contributions made by such Limited Partner to the Partnership as of the applicable Determination Date; and

(ii)   the amount by which all distributions received by such Limited Partner as of the applicable Determination Date are less than the sum of such Limited Partner's Capital Contributions as of the applicable Determination Date, plus such Limited Partner's aggregate Preferred Amount as of the applicable Determination Date; provided, however, that the aggregate General Partner Capital Contributions pursuant to this Section 8.3(c) will not exceed

the excess, if any, of (x) an amount equal to 100% of the net amount distributed to the General Partner with respect to such Limited Partner over the entire term of the Partnership (other than Tax Distributions) pursuant to Sections 3.3(a)(ii) and 3.3(a)(iii) over (y) the Built-In Tax Amount with respect to any distribution of securities in-kind received by the General Partner with respect to such Limited Partner.

(d)     The General Partner hereby covenants and agrees that each of the members of the General Partner entitled to receive Carried Interest distributions from the General Partner has guaranteed and will guaranty severally, but not jointly, the payment of his, her or its pro rata share of the payments required by Section 8.3(c) to the extent and on the terms set forth in the Guaranty Agreement.

(e)     Special Profit Interest Give Back.  After the final distribution of the assets of the Partnership among the Partners as provided in this Section 8.3 (and Article III hereof), but prior to the application of Section 8.3(c), the General Partner shall be obligated to make aggregate Capital Contributions to the Partnership, within 30 days after the date of such final distribution, in an amount equal to the sum of the excess, if any, of (i) the distributions received by the General Partner on account of the Special Profit Interest attributable to each Waived Fee Amount over (ii) the Available Profits with respect to such Waived Fee Amount.  The distributions described in clause (i) of the preceding sentence with respect to a Waived Fee Amount are the Special Profit Interest distributions attributable to the Portfolio Company with respect to which the General Partner applied such Waived Fee Amount pursuant to Section 2.2(a)(ii) of the Offshore Fund Agreement, treating the Waived Fee Amounts as having been applied on a "first-in, first-out" basis.  Amounts distributed to the General Partner pursuant to Section 3.3(f) shall be treated for this purpose as proceeds from Portfolio Company made on the date of each Waived Fee Notice giving rise to Waived Fee Amounts that are not applied to Portfolio Company pursuant to Section 2.2(a)(ii) of the Offshore Fund Agreement.  For purposes of applying the first sentence of this Section 8.3(e), Partnership Profits shall not be treated as Available Profits with respect to more than one Waived Fee Amount.  All such amounts returned to the Partnership shall be distributed to the Partners (other than the General Partner) in accordance with the provisions of Section 3.3.  All determinations and calculations pursuant to this Section 8.3(e) shall be made by the General Partner in its sole discretion.


# ARTICLE IX

# [RESERVED]


# ARTICLE X

# BOOKS OF ACCOUNTS; MEETINGS

Section 10.1  Books.  The Partnership will maintain complete and accurate books of account of the Partnership's affairs at the Partnership's principal office, which books will be

Appx. 04114

open to inspection by any Partner (or its authorized representative) at any time during ordinary business hours.

Section 10.2  <u>Fiscal Year</u>.  The fiscal year of the Partnership will be the calendar year, unless otherwise determined by the General Partner.

Section 10.3  <u>Tax Allocation</u>.

(a)    Except as otherwise set forth in this <u>Section 10.3(a)</u>, the income, gains, losses, deductions and credits of the Partnership will be allocated, for federal, state and local income tax purposes, among the Partners in accordance with the allocation of such income, gains, losses, deductions and credits among the Partners for computing their Capital Accounts, <u>except that</u> if any such allocation is not permitted by the Code or other applicable law, the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.  Notwithstanding the preceding sentence, in the event the Basis of any asset of the Partnership differs from its adjusted tax basis for federal income tax purposes, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Basis in the same manner as under Section 704(c) of the Code and the Regulations thereunder.

(b)    If any Partner is treated for income tax purposes as realizing ordinary income because of receipt of his, her or its Partnership interest (whether under Section 83 of the Code or any similar provisions of any law, rule or regulation or any other applicable law, rule, regulation or doctrine) and the Partnership is entitled to any offsetting deduction, the Partnership's deduction will be allocated among the Partners in such manner as to, as nearly as possible, offset such ordinary income realized by such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Partner and, as a result of such adjustment, the Partnership is entitled to a deduction for federal income tax purposes in excess of any gain recognized by the Partnership, such excess deduction shall be allocated to such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership and, as a result of such adjustment, any Partner is entitled to a deduction for federal income tax purposes in excess of any gain recognized by such Partner, the additional Partnership taxable income shall be allocated to such Partner.  If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Partnership disallowing deductions for any of the fees paid or payable to the General Partner, then additional Partnership taxable income allocable to the Partners as a result of such disallowance shall be reallocated to the General Partner.

(c)    Notwithstanding any other provision of this Agreement, if a Partner unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation § 1.704-1(b)(2)(ii) (d)(4), (5) or (6) which gives rise to a negative Capital Account (or which would give rise to a negative Capital Account when added to expected adjustments, allocations or distributions of the same type), such Partner will be allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance as quickly as possible; <u>provided</u> that the Partnership's subsequent income, gains, losses, deductions and credits will be allocated among the Partners so as to achieve as nearly as possible the results that would have been

17475136

-22-

achieved if this Section 10.3(c) had not been in this Agreement, except that no such allocation shall be made which would violate the provisions or purposes of Treasury Regulation § 1.704-1(b).

Section 10.4  Tax Controversies.  The General Partner is hereby designated the "Tax Matters Partner" (as defined in Section 6231 of the Code), and is authorized and required to represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's business and affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith.  Each Limited Partner agrees to cooperate with the General Partner and to do or refrain from doing any or all things reasonably requested by the General Partner with respect to the conduct of such proceedings.  The General Partner shall provide the Limited Partners with all notices required to be provided to them by law in connection with such proceedings, and shall otherwise keep the Limited Partners reasonably informed of the progress thereof.

Section 10.5  Certain Tax Elections.  The Partnership shall not, without the consent of all Partners, file an election (i) pursuant to Section 761 of the Code not to be treated as a partnership, or (ii) pursuant to Treasury Regulation §301.7701-3(c) to be treated as an association taxable as a corporation.

Section 10.6  Code Section 83 Safe Harbor Election.

(a)     Notice 2005-43.  By executing this Agreement, each Partner authorizes and directs the Partnership to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "Notice") apply to any interest in the Partnership transferred to a service provider by the Partnership on or after the effective date of such Revenue Procedure in connection with services provided to the Partnership.  For purposes of making such Safe Harbor election, the General Partner is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Partnership and, accordingly, execution of such Safe Harbor election by the General Partner constitutes execution of a "Safe Harbor Election" in accordance with section 3.03(1) of the Notice.  The Partnership and each Partner hereby agrees to comply with all requirements of the Safe Harbor described in the Notice, including, without limitation, the requirement that each Partner shall prepare and file all federal income tax returns reporting the income tax effects of each "Safe Harbor Partnership Interest" (as described in Section 3.02 of the Notice) issued by the Partnership in a manner consistent with the requirements of the Notice.

(b)     Amendment.  Each Partner authorizes the General Partner to amend Section 10.6(a) to the extent necessary to achieve substantially the same tax treatment with respect to any interest in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership as set forth in section 4 of the Notice (e.g., to reflect changes from the rules set forth in the Notice in subsequent Internal Revenue Service guidance), provided that such amendment is not materially adverse to any Partner (as compared with the after-tax consequences that would result if the provisions of the Notice applied to all interests in the Partnership transferred to a service provider by the Partnership in connection with services provided to the Partnership).

17475136

-23-

## ARTICLE XI

## REGISTRATION OF LIMITED PARTNERSHIP

Section 11.1 <u>Registration of Limited Partnership</u>. The General Partner will cause to be filed, recorded and published such statements, notices, certificates or other instruments required by any provision of any applicable law which governs the formation of the Partnership or the conduct of its business from time to time.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1 <u>Amendments</u>. This Agreement may be amended, and waivers hereunder may be given, only by the written consent of the General Partner and a Majority in Interest of the Offshore Fund Limited Partners, provided, however, that notwithstanding the foregoing, the provisions of this Agreement may be amended or waived from time to time by the General Partner without the consent of a Majority in Interest of the Offshore Fund Limited Partners (i) to add to the representations, duties or obligations of the General Partner or surrender any right or power (but not responsibilities) granted to the General Partner herein; (ii) to cure any ambiguity or correct any provisions hereof which may be inconsistent with any other provisions hereof, or correct any printing, stenographic or clerical errors or omissions; and (iii) to admit one or more additional Limited Partners, or withdraw one or more Limited Partners, in accordance with the terms of this Agreement.

Section 12.2 <u>Successors</u>. Except as otherwise provided herein, this Agreement will inure to the benefit of and be binding upon the Partners and their legal representatives, heirs, successors and assigns.

Section 12.3 <u>Governing Law; Severability</u>. This Agreement will be construed in accordance with the laws of the State of Delaware and, to the maximum extent possible, in such manner as to comply with all the terms and conditions of the Delaware Partnership Act. If it is determined by a court of competent jurisdiction that any provision of this Agreement is invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

Section 12.4 <u>Notices</u>. All notices, demands and other communications to be given and delivered under or by reason of provisions under this Agreement will be in writing and will be deemed to have been given when personally delivered, sent by telecopy (with hard copy to follow by reputable overnight courier) or sent by reputable overnight courier service (charges prepaid) or mailed by first class mail (with a copy sent by telecopy) to the addresses or telecopy numbers set forth in <u>Schedule 1</u> hereto or to such other address or telecopy number as has been indicated to all Partners.

Section 12.5 <u>Miscellaneous</u>. This document and its schedules and exhibits contain the entire Agreement among the parties and supersede all prior arrangements or understanding with

Appx. 04117

respect thereto.  Descriptive headings are for convenience only and will not control or affect the meaning or construction of any provision of this Agreement.  This Agreement may be executed in any number of counterparts, any one of which need not contain the signatures of more than one party, but all of such counterparts together will constitute one agreement.

[*Remainder of page intentionally left blank*]

Appx. 04118

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first above written.

**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL PARTNERS GP, LLC

By: _____
    Name: James Dondero
    Title:  President

**LIMITED PARTNER:**

HIGHLAND RESTORATION CAPITAL PARTNERS OFFSHORE, L.P.

By: Highland Restoration Capital Partners GP,
    LLC, its general partner

By: _____
    Name: James Dondero
    Title:  President

17475136

*Highland Restoration Capital Partners Master, L.P. –*
*Amended and Restated Agreement of Limited Partnership*

<u>**SCHEDULE 1**</u>

**Limited Partners/ Partnership Percentage Interest/Notice Information**

| Limited Partner | Partnership Percentage Interest | Notice Information |
| --- | --- | --- |

17475136

Appx. 04120

# MANAGEMENT AGREEMENT

This Management Agreement (this "Agreement") is made as of November 15, 2007, between Highland Restoration Capital Partners, L.P., a Delaware limited partnership (the "Partnership"), Highland Restoration Capital Partners Offshore, L.P., a Cayman exempted limited partnerships (the "Offshore Partnership"), Highland Restoration Capital Partners Master, L.P., a Delaware limited partnership (the "Master Partnership"), each Parallel Vehicle that may be formed from time to time (the "Parallel Vehicles", and, together with the Partnership, the Offshore Partnership, and the Master Partnership, the "Highland Partnerships"), Highland Restoration Capital Partners GP, LLC, a Delaware limited liability company, the general partner of each of the Highland Partnerships (the "General Partner"), and Highland Capital Management, L.P., a Delaware limited partnership (the "Manager").

W I T N E S S E T H:

WHEREAS, the General Partner desires to engage the Manager on behalf of each of the Highland Partnerships to advise the General Partner and each of the Highland Partnerships with respect to the Highland Partnerships' investments as hereinafter set forth;

WHEREAS, the Manager is willing to render such advice on the terms and conditions hereinafter set forth; and

WHEREAS, capitalized terms used herein and not defined herein have the meanings set forth in the Agreement of Limited Partnership of each of the Highland Partnerships, as amended from time to time (the "Partnership Agreements").

NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.      Services to be Rendered by the Manager.  Each of the Highland Partnerships and the General Partner hereby appoint the Manager, and the Manager hereby accepts such appointment, as the Manager for each of the Highland Partnerships on the terms and conditions set forth herein.  To the extent requested and determined by the General Partner to be necessary or appropriate, the Manager shall advise and consult with the General Partner concerning the general and day-to-day operations of the Highland Partnerships and the acquisition and disposal of, and dealings with, investments by or for the account of the Highland Partnerships.  The provisions of this Agreement shall not, however, confer any power or authority on the Manager to enter into any transaction on behalf of or in any way bind the Highland Partnerships except as expressly conferred upon the Manager by the General Partner and only in accordance with the terms and provisions of the Partnership Agreements.  In performing its duties hereunder, the Manager shall act in accordance with the Partnership Agreements.  In no event shall the Manager, which has been engaged on behalf of the Highland Partnerships, be treated as an agent or partner of the General Partner.

2.      Manager's Fees.  As compensation for services to be rendered hereunder, each of the Highland Partnerships shall pay, or cause to be paid, to the Manager the Management Fee (as

17457439

defined in Section 4.1 of the Partnership Agreements) on the terms, and subject to the conditions, set forth in Section 4.1 and the other provisions of the Partnership Agreements.

3.    <u>Expenses</u>. The Manager shall pay all expenses that the Manager is required to pay under the Partnership Agreements out of the Management Fee received by the Manager. The Highland Partnerships shall bear and pay Partnership Expenses and Organizational Expenses during the term of this Agreement in accordance with the Partnership Agreements.

4.    <u>Use of Affiliates.</u>  The parties hereto agree that any member, director, officer, employee or agent of the Manager may be a partner, director, officer, employee or agent of the Highland Partnerships or a member, director, officer, employee or agent of the General Partner.

5.    <u>Indemnification and Exculpation.</u>

(a)    The Manager and any delegate of the Manager shall not be liable and shall be exculpated and indemnified by the Highland Partnerships for any liabilities incurred by the Manager to the full extent provided in Sections 5.10 and 5.11 of the Partnership Agreements.

(b)    The term "liability," as used in this <u>Section 5</u>, shall include any losses, liabilities, claims, damages of any kind or expenses (including amounts paid for attorneys' fees, judgments and settlements in connection with any threatened, pending or completed action, suit or proceeding and other reasonable costs and expenses incurred by the Manager or its delegate(s) in the course of defending itself) or other liabilities arising for any reason under this Agreement.

6.    <u>Amendments; Termination</u>. No provision of this Agreement may be amended, altered or modified unless in a writing executed by the parties hereto and a Majority in Interest of the Limited Partners. This Agreement shall become effective with respect to each Highland Partnership commencing as of the date set forth on its respective signature page hereto and shall continue until the earlier of (a) the date that such Highland Partnership is finally terminated and its liquidation completed under the applicable Partnership Agreement, (b) the effective date of the removal of the General Partner under the applicable Partnership Agreement, or (c) the effective date of termination of this Agreement by the General Partner, in its sole discretion; provided, however, that the provisions of <u>Section 5</u> will survive the termination of this Agreement with respect to any actions taken by the Manager prior to any such date.

7.    <u>Notice</u>. Any notice under this Agreement shall be given in writing, addressed and delivered by first class mail, postage paid, and shall be deemed to be effective upon receipt, if to the Highland Partnerships, or the Manager:

(i)    if to the General Partner or any of the Highland Partnerships:

Highland Restoration Capital Partners GP, LLC
c/o Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road
Dallas, Texas 75240

or to such other address specified for this purpose in the Partnership Agreements;

17457439

      (ii)    if to the Manager:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road
Dallas, Texas 75240

or at such other address as such party shall have specified in writing to the other parties hereto.

      8.    <u>Assignment</u>.  This Agreement may not be assigned by any of the parties hereto, unless agreed to by all other parties, <u>provided</u>, that the Manager may assign this Agreement to an affiliate of the Manager to the extent permitted by the Partnership Agreements.

      9.    <u>Governing Law</u>.  This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, without reference to principles of conflicts of law.

      10.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

      11.    <u>Entire Agreement</u>.  There are no oral agreements or understandings with respect to or affecting this Agreement, and this Agreement and the Partnership Agreements constitute the entire agreement between the parties hereto with regard to the subject hereof.

      12.    <u>Partnership Agreements</u>.  This Agreement will be subject to the terms and provisions of the Partnership Agreements, and in the event of any conflict between this Agreement and the Partnership Agreements, the Partnership Agreements will supersede and control such conflict.

*[Remainder of page intentionally left blank]*

17457439

IN WITNESS WHEREOF, the parties hereto have caused this Management Agreement to be duly executed as of the date first above written.

MANAGER:

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:   Strand Advisors, Inc., its general partner

By:_____
    Name:  James Dondero
    Title:   President


**GENERAL PARTNER:**

HIGHLAND RESTORATION CAPITAL
PARTNERS GP, LLC

By:_____
    Name:  James Dondero
    Title:   President


**PARTNERSHIP:**

HIGHLAND RESTORATION CAPITAL
PARTNERS, L.P.

By:   Highland Restoration Capital Partners GP,
      LLC, its general partner

By:_____
    Name:  James Dondero
    Title:   President


17457439                                        *Management Agreement*

Appx. 04124

**OFFSHORE PARTNERSHIP:**

HIGHLAND RESTORATION CAPITAL
PARTNERS OFFSHORE, L.P.

By:   Highland Restoration Capital Partners GP,
      LLC, its general partner

By:_____

Name:  James Dondero
Title:   President

**MASTER PARTNERSHIP:**

HIGHLAND RESTORATION CAPITAL
PARTNERS MASTER, L.P.

By:   Highland Restoration Capital Partners GP,
      LLC, its general partner

By:_____

Name:  James Dondero
Title:   President

17457439

*Management Agreement*

**Appx. 04125**

# EXHIBIT 202

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
|  | ) |  |
| Debtor. | ) |  |
|  | ) | **Docket Ref. No. 474** |
|  | ) |  |

### OBJECTION OF THE OFFICIAL
### COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF THE
### DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING,
### THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"

The official committee of unsecured creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor"), hereby submits this objection (this "Objection") to the *Motion of the Debtor for Entry of an Order Authorizing, But Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No.474] (the "Distribution Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

1.     The Committee's objection focuses on a very limited portion of the transaction currently proposed by the Debtor – namely, proposed distributions of approximately $8.6 million (the "Proposed Insider Distributions") to several insiders who not only owe money to the Debtor but also may be the target of avoidance and other litigation brought by the Committee on behalf

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Distribution Motion.

of the Debtor's estate - Mark Okada and two entities owned and/or controlled by James Dondero and/or Mark Okada (such entities, together with Messrs. Dondero and Okada, the "Insider Parties"). As this Court is aware, Messrs. Dondero and Okada owned and controlled the Debtor for most of the past 30 years. During that time, the Debtor repeatedly breached fiduciary duties and contractual obligations, leading to hundreds of millions of dollars in judgments against the Debtor and certain affiliates. The Committee is currently investigating a variety of significant potential estate claims against the Insider Parties. For example, certain of the interests held by the Insider Parties, which form the basis for a portion of the Proposed Insider Distributions, were once owned by the Debtor – the Committee is investigating, among other things, the propriety of the transfers of these interests from the Debtor to the Insider Parties. In addition, Messrs. Dondero and Okada currently owe the Debtor over $10.6 million in demand notes and another Insider Party owes the Debtor nearly $7.5 million in notes receivable, some of which also are demand notes. In light of these and other potential claims, which are only now the subject of review by a party other than the Debtor, the Committee believes the Proposed Insider Distributions to the Insider Parties should be reserved in segregated accounts pending resolution of the issues under investigation by the Committee and repayment of all amounts owed to the Debtor by the Insider Parties.

      2.     This Court's order granting the relief requested by the Committee would shield the Debtor from any purported legal risks associated with withholding the Proposed Insider Distributions. Similarly, the Debtor and Independent Board would not breach their fiduciary duties by complying with this Court's order to withhold the Proposed Insider Distributions.[3]

---

[3] Even absent court order, the Committee is highly skeptical of the legal merit of any such legal claims by Messrs. Dondero and Okada and related damages for any alleged breach of contract and/or fiduciary duty by the Debtor.

Appx. 04128

3.      Temporarily withholding and segregating the proposed distributions would greatly facilitate the Debtor's interests while causing little harm to the Insider Parties.  It would facilitate repayment of over $18 million in notes payable to the Debtor by the Insider Parties.  Moreover, delay in the distribution will allow the Committee an adequate opportunity to investigate potential estate claims against the Insider Parties, including claims arising from the very transactions pursuant to which the Debtor transferred certain of the interests at issue to such parties.

4.      While the Debtor and Independent Board have taken the position that they cannot affirmatively seek this relief, clearly both should be supportive of this outcome which preserves claims of the Debtor's estate and a ready source of recovery for the outstanding demand notes. Moreover, the Proposed Insider Distributions will be temporarily placed in segregated, interest bearing accounts, compensating the Insider Parties for any material injury from the mere passage of time.  To the extent Messrs. Dondero and Okada believe they would incur additional harm of which the Committee is not aware, they – not the Debtor – should bring those concerns directly to this Court.

**OBJECTION**

5.      Through the Distribution Motion, the Debtor seeks authority to make redemption payments and other distributions to investors in certain funds managed by the Debtor.  Specifically, as part of the Debtor's plan to distribute (i) approximately $123.25 million to investors of RCP, (ii) $21.8 million to investors of AROF in connection with the wind up of such fund, and (iii) $34.8 million to investors in Dynamic in connection with the wind up of such fund – the Debtor seeks authority for some of the foregoing distributions to be made to the Insider Parties.  Of the almost $180 million in distributions, the Committee only objects to the distribution of a total of $8.6 million to be distributed to three Insider Parties.  Specifically, the Committee objects to the request

3

to make distributions to Mark Okada, Highland Capital Management Services, Inc. ("HCM Services," owned by James Dondero, and Mark Okada), and CLO Holdco Ltd. ("CLOH").[4]  To be clear, the Committee does not object to the Debtor's orderly liquidation of Dynamic or AROF, or to the distributions from AROF, Dynamic, and RCP to any third-party, non-affiliated investors. However, in light of the significant amounts of money owed to the Debtor by Mr. Okada, Mr. Dondero and HCM Services, the Committee's ongoing investigation of the Debtor's insiders and related entities (including with respect to the propriety of how the Insider Parties obtained the interests which form the basis of the Proposed Insider Distributions (such interests, the "Insider Interests")), and the well-documented fraudulent and improper activities engaged in by the Debtor's insiders, the Committee requests that the Court order the Debtor to hold the Proposed Insider Distributions in a reserve for a limited period of time.

I.    **The Proposed Insider Distributions Should Be Reserved Pending the Repayment of Insiders Parties' Obligations Owed to the Debtor and the Committee Investigation**

6.    Through the Distribution Motion, the Debtor seeks to make the following Proposed Insider Distributions:

| Investor | Distribution Amount | Fund |
|---|---|---|
| CLO HoldCo, Ltd. | $872,000 | AROF |
| CLO HoldCo, Ltd. | $1,521,000 | Dynamic |
| Mark Okada | $4,185,000 | Dynamic |
| Highland Capital Management Services, Inc. | $2,085,000 | RCP |
| **Total** | **$8,663,000** | |

These Proposed Insider Distributions are a small portion of the $180 million to be distributed from Dynamic, AROF and RCP.

---

[4] The Distribution Motion also seeks authority to make distributions to Highland Dynamic Income Fund GP, LLC. The Committee does not object to such distribution.

*The Insider Parties Owe the Debtor Money*

7.　　It is undisputed that James Dondero, Mark Okada, and HCM Services owe the Debtor significant amounts of money.  The Debtor's schedule of assets and liabilities [Docket No. 247] discloses that, as of the Petition Date, the Debtor holds notes receivable from (i) James Dondero, in the principle amount of $9,334,012 (the "Dondero Note")[5]; (ii) HCM Services in the aggregate principle amount of $7,482,480.88 (the "HCM Services Notes"), and (iii) Mark Okada, in the principle amount of $1,336,287.84 (the "Okada Note", and with the Dondero Note and the HCM Services Notes, the "Notes").  The Dondero Note, the Okada Note, and four of the five HCM Services Notes are demand notes, payable upon the request of the Debtor.  These Notes should be repaid before the Debtor makes any distributions to these insiders.

*The Insider Parties Have Engaged in a Pattern of Fraudulent Activities to the Detriment of Creditors*

8.　　Further, as this Court is well-aware, the Debtor has a documented history of engaging in misconduct, breaches of fiduciary duty and fraudulent transactions in multiple settings, which ultimately led to the commencement of this bankruptcy case.  At all relevant times, Mr. Dondero and Mr. Okada, as co-founders and executive officers, managed and controlled the Debtor and were ultimately responsible for the Debtor's pattern of misconduct, breaches of fiduciary duty and fraudulent activities.

9.　　As examples of the extensive misconduct, in 2014, the Securities and Exchange Commission ("SEC") determined (i) that the Debtor knowingly engaged in multiple transactions with its client advisory accounts without disclosing that the Debtor was acting as principal, or obtaining client consent, before the trades were completed, and (ii) that the debtor failed to

---

[5] The Dondero Note is in addition to $18.3 million owed to the Debtor under a demand note made by The Dugaboy Investment Trust, of which Mr. Dondero is a beneficiary.

maintain sufficient documentation with respect to certain transactions. *See* SEC Order ¶¶ 6-7, *In the Matter of Highland Capital Mgmt., L.P.*, File No. 3-16169 [Docket No. 130. Ex. A]. As established in the Redeemer Committee litigation, the Debtor, under the control of Mr. Dondero and Mr. Okada, was found to have covertly and improperly taken $32.3 million in cash out of the a fund for which the Debtor acted as investment manager (the "Crusader Fund"), and was found to have made decisions with the "willful intent" to benefit itself and not the parties to whom the Debtor owed fiduciary duties. An arbitration panel unanimously found that the Debtor, Mr. Dondero, and Highland's in-house lawyers violated their fiduciary duties to the Crusader Fund, engaged in willful misconduct, self-dealing, and secrecy, and made multiple misrepresentations to the Crusader Fund's investors as well as the Debtor's auditors.

10.     In the Acis Capital Management bankruptcy case, this Court found that there was a "legitimate prospect" that the Debtor "would continue dismantling [Acis], to the detriment of [Acis] creditors." *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 147, 149 (Bankr. N.D. Tex. 2018). Following an arbitration award against Acis, Mr. Dondero and other members of the Debtor's management transferred tens of millions of dollars in assets out of Acis into newly-formed Cayman Islands-based Highland affiliates. *Id.* at 127-130. This Court ultimately concluded that the "record contain[ed] substantial evidence of both intentional and constructive fraudulent transfers," and "[t]he numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear[ed] more likely than not to have been made to deprive the Debtor-Acis of value and with the actual intent to hinder, delay, or defraud the Debtors' creditors." *See In re Acis Capital Mgmt., L.P.*, No. 18-30264, 2019 WL 417149, at *11 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd* 604 B.R. 484 (N.D. Tex. 2019). In both the Acis bankruptcy case and the Crusader Fund arbitration, the Debtor's management were found to have manufactured dishonest and

illegitimate defenses and provided unreliable and incredible testimony regarding the Debtor's actions.

11.     Each of the Insider Parties are closely affiliated with Mr. Dondero and/or the fraudulent actions that led the Debtor to bankruptcy:

- *Mark Okada*:  Mr. Okada is the co-founder of the Debtor, and was the Chief Investment Officer until shortly before the commencement of this chapter 11 case. As Chief Investment Officer, Mr. Okada was responsible for overseeing the Debtor's investment activities across all investment platforms.  Mr. Okada was an executive officer of the Debtor (i) when the Debtor was found by the SEC to have engaged in wrongful transactions without disclosing important information to clients, (ii) when the Debtor stripped Acis of its assets – CLO portfolio management contracts – and transferred to them a newly formed Cayman entity, and (iii) when the Debtor engaged in misconduct and breached fiduciary duties with respect to the Crusader Fund.  Mr. Okada was the beneficial owner of 25% of Acis Capital Management, L.P. when Mr. Dondero and the Debtor transferred assets away from Acis, and this Court found that Mr. Dondero and Mr. Okada were the individuals making decisions for Highland CLO Funding Ltd. ("HCLOF Guernsey") in connection with the events leading to the Acis bankruptcy litigation.[6]

- *HCM Services* – As the Debtor disclosed, HCM Services is owned 75% by Mr. Dondero and 25% by Mr. Okada.  HCM Services appears to have received its interests in RCP from the Debtor, but the circumstances of such transaction have yet to be fully investigated by the Committee.  HCM Services owes the Debtor $7,482,481, of which $900,000 is payable on demand.  The Committee understands that Mr. Dondero remains in complete control of HCM Services.

- *CLOH* – CLOH is an entity owned by Charitable DAF Fund, LP (the "DAF"), which was seeded with contributions from the Debtor; the consideration for such contributions has yet to be fully investigated by the Committee.  The DAF is managed and advised by the Debtor, and its trustee is a long-time friend of Mr. Dondero.[7]  The trustee for the DAF has also served as trustee for The Get Good Trust, The Dugaboy Investment Trust, and the SLHC Trust, of which Mr. Dondero

---

[6] *In re Acis Capital Management, L.P.*, 2019 WL 417149, at *7, *9 (Bankr. N.D. Tex. January 31, 2019) (observing (i) that Mr. Okada owed 25% of Acis until the day after Mr. Terry obtained his arbitration judgement against Acis, at which point Mr. Okada conveyed his interests in Acis to Neutra, Ltd. for no consideration, and that (ii) Mr. Dondero, Mr. Okada, and another Highland employee made decisions for HCLOF Guernsey regarding the optional redemptions of the Acis CLOs).

[7] *See In re Acis Capital Management, L.P.*, 2019 WL 417149, at *6 (Bankr. N.D. Tex. January 31, 2019) (noting that one of the three equity owners of HCLOF Guernsey was the DAF, which was "seeded with contributions from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero**" (emphasis in original)).

is a beneficiary.  The Distribution Motion discloses that the interests in Dynamic currently held by CLOH were originally held by the Debtor, and were transferred to The Get Good Nonexempt Trust, in exchange for Get Good's interest in a promissory note made by The Dugaboy Investment Trust, and then from Get Good to Mr. Dondero's Highland Dallas Foundation, Inc. and then to CLOH.  The Distribution Motion does not disclose how or when CLOH obtained its interests in AROF.  The Committee is investigating CLOH's relationship to and transactions with Mr. Dondero and other entities controlled by or otherwise benefitting Mr. Dondero.

*The Committee is Investigating Claims Against the Insider Parties, Including Transfers the Transfers of the Insider Interest*

12.     Pursuant to the Term Sheet outlining the agreement between the Debtor and the Committee, the Committee has standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor and the Debtor's related entities (which include the DAF and CLOH), "including any promissory notes held by any of the foregoing." [Docket No. 354] This part of the settlement with the Debtor was a critical component of the Committee's agreement to the governance structure in lieu of seeking appointment of a chapter 11 trustee.  The Committee has begun its investigation and served document production requests to the Debtor.  Among other claims and causes of action, the Committee is investigating potential preferential transfers, fraudulent transfers, breaches of fiduciary duties, usurpation of corporate opportunities, misappropriation of assets, and abuses of the corporate form.  The Committee's investigation includes fully exploring the circumstances and transactions through which HCM Services, CLOH and Mr. Okada obtained the Insider Interests.

13.     The Debtor's history of self-dealing and improper or fraudulent activities suggests that the Committee's investigation is likely to uncover similar inappropriate activities with respect to the Debtor's assets, including the Insider Interests.  The Debtor's statements of financial affairs [Docket No. 248] disclosed that the Debtor made significant payments to affiliates through purported intercompany funding and affiliate loans in the 90 days prior to the filing date, along

8

with significant other insider transfers in the one year before the filing date (including very large expense reimbursement payments to Mr. Dondero).  The Committee must have the opportunity to fully investigate the insider and affiliate transactions, including those that gave rise to the Insider Interests, that may be the subject of valuable estate causes of action before transactions distributing funds to those same insiders and affiliates can be consummated.

14.     This is all the more true because the evidence is that, even during this bankruptcy case, Mr. Dondero continues to engage in secretive and potentially improper transactions.  The Distribution Motion fails to highlight that the MGM Sale was negotiated by Mr. Dondero without the knowledge or approval of Debtor's counsel or the Debtor's financial advisors.  Specifically, at the very same time that the Debtor's counsel and financial advisors were attempting to persuade the Committee to approve certain transactions with respect to RCP, Mr. Dondero, unbeknownst to any Debtor professional, committed the Debtor to executing the MGM Sale.  The Independent Directors, the Debtor's counsel and the Debtor's CRO and financial advisors were not made aware of the MGM Sale until *two months* after Mr. Dondero allegedly committed to the transaction on behalf of the Debtor.  While the Committee has decided not to object to the MGM Sale itself (based, in significant part, on feedback from the Independent Board regarding its concern about the alleged binding nature of Mr. Dondero's secretive agreement with MGM), the circumstances surrounding Mr. Dondero's negotiation of and entry into the transaction are alarming at best, and the Committee has not waived any rights to fully investigate that transaction and any related potential causes of action against Mr. Dondero or others.

15.     In addition to its concern that some or all of the Proposed Insider Distributions may be on account of otherwise avoidable transactions, based upon the Interested Parties' long history of transferring assets and taking other actions to hinder, delay, and defraud creditors, the

9

Committee is also seriously concerned that the Insider Parties will swiftly place these distributions out of reach of the Debtor's estate while refusing to satisfy their obligations to the Debtor. Such actions would jeopardize the estate's ability to recover amounts owed to it and any future judgments against the Insider Parties, and would waste estate resources by forcing the Debtor to incur additional litigation costs to recover such debts and judgments.

## II.     The Court Has Authority to Direct the Debtor to Withhold the Proposed Insider Distributions

16.     The Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). "Courts interpret Section 105 liberally." *King Louie Mining, LLC v. Comu (In re Comu)*, Nos. 09-38820-SGJ-7, 10-03269-SGJ, 2014 Bankr. LEXIS 2969, at \*264 (Bankr. N.D. Tex. July 8, 2014) (citing *Momentum Mfg. Corp. v. Employee Creditors Committee (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994)). While the Supreme Court has found that section 105(a) does not give the bankruptcy court the ability to take any actions explicitly prohibited by another provision of the Bankruptcy Code, it does grant "extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties." *Caesars Entm't Operating Co. v. BOKF, N.A. (In re Caesars Entm't Operating Co.)*, 808 F.3d 1186, 1188 (7th Cir. 2015) (citing *Law v. Siegel*, 571 U.S. 415, 420 (2014). Section 105 has been the source of authority for courts to, among other things, enjoin third parties, substantively consolidate non-debtors, and extend the automatic stay. *See e.g., Celotex Corp. v. Edwards*, 514 U.S. 300, 303 (1995) (holding that an injunction issued under § 105 was an appropriate use of the court's powers); *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 769 (9th Cir. 2000) (holding that the court's power to substantively consolidate non-debtors was found in § 105); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1230

(6th Cir. 1985) (holding that a preliminary injunction issued to bar distributions from a non-debtor to third parties was an appropriate use of the court's equitable power under § 105).

17.    Temporarily withholding the Proposed Insider Distributions and placing the corresponding funds in segregated accounts is well within the authority of this Court under section 105 of the Bankruptcy Code.  The Insider Parties are current and former affiliates and/or insiders of the Debtor and creditors of the Debtor.  The order requested by the Committee will allow full investigation of the claims and causes of action against the Insider Parties that was integral to the settlement approved by this Court in connection with approval of the Term Sheet. Furthermore, the Committee submits (and the Debtor has not asserted otherwise) that the relief sought by the Committee would not violate any explicit or implicit requirements of the Bankruptcy Code. Therefore, the Court need only consider the equitable nature of the relief that the Committee seeks, and its appropriateness in the context of furthering the goals of this bankruptcy.  *See In re Caesars Entm't Operating Co.*, 808 F.3d at 1188.

18.    The equitable argument for temporarily withholding the Proposed Insider Distributions and segregating such funds is straightforward.  These actions merely maintain the status quo.  The Committee is not requesting that the Debtor effectuate a set-off or take possession of the Proposed Insider Distribution.  No party has asserted that any economic harm (much less any significant harm) will be done to the Insider Parties by holding the Proposed Insider Distributions in segregated interest bearing accounts pending further order of this Court.  On the other hand, the withholding of the Proposed Insider Distributions (and the resulting leverage that creates against the Insider Parties) may be the only chance for the Debtor to receive any value for the amounts it is owed (or potentially owed) by the Insider Parties or obtaining redress for fraudulent or improper transactions involving those parties, including with respect to the Insider

Interest.  As set forth above, the Insider Parties and the persons controlling them have repeatedly engaged in schemes and other behavior designed to evade creditors.  It should not surprise this Court to learn that, after making demand for payment on the demand note from Mr. Okada as of February 13th at the urging of the Committee, the Debtor still has yet to receive any payment from Mr. Okada.  Absent approval of the Committee's request, the Debtor's efforts to collect from the Insider Parties may be extremely cost intensive and time-consuming.  It is fair and equitable for this Court to temporarily prevent money from flowing to the Insider Parties in order to facilitate the Debtor's efforts to recover amounts owed to it.  Furthermore, the Committee should be given the opportunity to investigate the propriety of the Debtor's transfers of its interests in the underlying funds to the Insider Parties, including the Insider Interests.  Maintaining the status quo until the Committee has investigated those transfers is fair and equitable and falls well within this Court's authority under section 105.

19.    Moreover, the relief sought by the Committee would further the goals of this bankruptcy case and would allow the Debtor to fulfill its duties to creditors by maximizing the value of the estate.  The Debtor contends, and the Committee does not disagree, that the Debtor has certain contractual and fiduciary duties to the investors in the funds that it manages.  The Debtor asserts that those duties compelled the Debtor to file the Distribution Motion.  *Distribution Motion* ¶ 7.  The Debtor also has duties to its creditors, however, and the Committee, for the reasons set forth above, asserts that such duties require the Debtor to avoid making the Proposed Insider Distributions at this time.  Filing the Distribution Motion should fulfill any duties the Debtor may have to the Insider Parties in respect of the Proposed Insider Distributions.  An order from this Court providing that the Proposed Insider Distributions should be temporarily withheld

and segregated fully addresses any conflict of duties the Debtor otherwise may have, and would allow the Debtor to more effectively carry out its duty to maximize the value of the estate.

20.      Accordingly, the Committee believes that the Court should order the Debtor to withhold and segregate the Proposed Insider Distributions until (i) the Insider Parties repay the Notes that are currently due and payable and (ii) the Committee has an opportunity to fully investigate estate causes of action against such Insider Parties.  The Committee does not propose that the Debtor effectuate a setoff or take possession of the Proposed Insider Distributions; rather the Committee requests that the Court order the Debtor to segregate and hold the Proposed Insider Distributions in reserve for a limited period of time in order to avoid the significant prejudice to the estate in allowing cash distributions to be paid to Insider Parties and beneficiaries that owe the Debtor money, and then forcing the estate to spend resources recovering assets from these parties.

*[Remainder of Page Intentionally Left Blank]*

Appx. 04139

WHEREFORE, the Committee respectfully requests that the Court deny the Distribution Motion and direct the Debtor to hold the Proposed Insider Distributions in segregated interest bearing accounts pending further order of the Court.

Dated: March 2, 2020          SIDLEY AUSTIN LLP
       Dallas, Texas         /s/ *Juliana Hoffman*
                              Penny P. Reid
                              Paige Holden Montgomery
                              Juliana L. Hoffman
                              2021 McKinney Avenue
                              Suite 2000
                              Dallas, Texas 74201
                              Telephone: (214) 981-3300
                              Facsimile: (214) 981-3400

                              -and-

                              Bojan Guzina (admitted *pro hac vice*)
                              Matthew A. Clemente (admitted *pro hac vice*)
                              Dennis M. Twomey (admitted *pro hac vice*)
                              Alyssa Russell (admitted *pro hac vice*)
                              One South Dearborn Street
                              Chicago, Illinois 60603
                              Telephone:  (312) 853-7000
                              Facsimile:  (312) 853-7036

                              COUNSEL FOR THE OFFICIAL COMMITTEE OF
                              UNSECURED CREDITORS

14

# EXHIBIT 203

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone:  (214) 745-5400
Facsimile:   (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
achiarello@winstead.com

Brian P. Shaw – State Bar No. 24053473
**ROGGE DUNN GROUP, PC**
500 N. Akard Street, Suite 1900
Dallas, Texas 75201
Telephone: (214) 888-5000
Facsimile:   (214) 220-3833
shaw@roggedunngroup.com

**COUNSEL FOR ACIS CAPITAL MANAGEMENT,
L.P AND ACIS CAPITAL MANAGEMENT GP,
LLC**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| | § | |
| **DEBTOR.** | § | **Chapter 11** |

### JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME

Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," together with Acis LP, "Acis") file this joinder (this "Joinder") to the Committee's objection (the "Objection") to the *Motion of the Debtor for an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No. 474] (the "Distribution Motion") and comment to the Distribution Motion, and respectfully state as follows:[1]

---

[1] Any capitalized term not otherwise defined in this Joinder shall have the meaning ascribed to such term in the Objection.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SA**

1934054200302000000000004

## I.   INTRODUCTION

1.     Acis wants the Court to know the whole story.  After the Debtor filed for bankruptcy—and after the Debtor filed its initial motion to approve protocols for certain "ordinary course" transactions—James Dondero purportedly entered into a *rogue oral trade* of $123.25 million in thinly-traded stock of MGM, a private company of which Dondero is on the board of directors, and thus privy to unique information. Upon information and belief, Dondero did so unbeknownst to Debtor's bankruptcy counsel or the newly-installed chief restructuring officer and his staff; however, there is a question whether Debtor's in-house legal team was aware of Dondero's actions.  Like so many prior transactions, Dondero was on both sides of the deal. To make things worse, after the purported oral trade, MGM's stock price appreciated significantly in value.  Moreover, other Dondero-controlled entities have not sold their pro-rata positions in MGM, calling into question why doing so for this Debtor-controlled fund was in the various stakeholders' best interests, and consequently in the estate's best interests.

2.     While the Committee did not ultimately object to the underlying transaction, Acis objected in the strongest terms.  This was not an "ordinary course" transaction, and much is to be learned about the circumstances surrounding Dondero's purported $123.25 million oral trade. Even if the trade really happened and was proper, it does not reflect sound business judgment for the Debtor to allow millions of dollars go out the door to insiders when those same insiders will likely owe much, much more to the estate.  Rather than authorizing the Debtor to reward Dondero and other insiders for his misfeasance, the Court should sustain the Committee's Objection.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**                    **Page 2 of 9**

**Appx. 04143**

## II.   RELEVANT FACTS

3.      On October 16, 2019, the Debtor filed the above-captioned bankruptcy case (this "Bankruptcy Case").

4.      On October 24, 2019, the Debtor filed its *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76] (the "Initial Protocols Motion"), whereby the Debtor requested that the Court approve certain protocols with respect to "ordinary course" services and intercompany transactions.

5.      Also on October 24, 2019, the U.S. Trustee appointed the Committee, of which Acis is a member. *See* Docket No. 64.

6.      In November 2019, as described in the Distribution Motion, prior to the appointment of the Independent Board, "the Debtor requested the Committee's authorization to proceed first with the larger transactions and then solely the MGM Sale, but the Committee rejected both of these transactions." Distribution Motion ¶ 30.

7.      Sometime in late November 2019, *after* the Committee rejected the proposed MGM Sale, and without approval of the Debtor's counsel or financial advisors (or their knowledge), Dondero purportedly orally entered into the clandestine, rogue trade of 1.7 million shares of MGM stock for $123.25 million, or for $72.50 per share. *See id.* ¶ 29. While Dondero was still controlling the Debtor, he was also on the board of directors of MGM. Upon information and belief, Dondero engaged in this purported trade just after MGM reported earnings, and most likely before the market absorbed the reported earnings.[2] These

---

[2] Also disturbing, just prior to the purported trade, the Debtor's CRO, Bradley Sharp, was deposed and testified that, under his engagement letter, Dondero was required to obtain his approval for such related-party transactions.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**                                     **Page 3 of 9**

circumstances reflect the continuation of Dondero's pattern of flouting his duties in connection with the Debtor or this Bankruptcy Case.

8.      As explained by the Committee in its Objection, the Independent Board, Debtor's counsel, and the Debtor's CRO and financial advisors were not made aware of the MGM Sale until over two months after Dondero purportedly committed to the transaction on behalf of the Debtor. Likewise, the MGM Sale was not disclosed to the Committee until February 7, 2020. *Id*.

9.      On January 14, 2020, the Debtor filed its *Notice of Final Term Sheet* [Docket No. 354] (the "Term Sheet"), which set out proposed terms of a settlement between the Debtor and the Committee related to the Debtor's corporate governance and operating protocols.  The next day, on January 15, 2020, the Debtor withdrew the Initial Protocols Motion. *See* Docket No. 360.

10.      On February 21, 2020, the Debtor filed its *Notice of Debtor's Amended Operating Protocols* [Docket No. 466] (the "Protocols"). Under the Protocols (amended slightly from the Term Sheet), the operating requirements for "Ordinary Course Transactions" (which do not require Court approval) differ significantly from "Related Entity Transactions," which likely do require Court approval if the Committee objects. *See* Protocols Ex. A at 2-6.  Under the Protocols, MGM Holdings, Inc. is specifically defined as a "Related Entity." *Id*. at 1.

### III.    JOINDER AND COMMENT

11.    Acis expressly joins the Committee's Objection and hereby incorporates the Objection as if set forth in full and for all purposes herein.

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**                    **Page 4 of 9**

**Appx. 04145**

A.      **The Court should not allow Dondero and other Insider Parties to benefit from the rogue MGM Sale by allowing the Debtor to make the Proposed Insider Distributions.**

12.      The MGM Sale is just a continuation of Dondero's self-dealing—even during this Bankruptcy Case—to enrich himself (or other entities he controls), at the expense of the estate. Now the Debtor seeks "authority" to approve Dondero's misfeasance.  At a minimum, it is only proper for this Court to sustain the Committee's Objection and prevent distribution of any of the Proposed Insider Distributions.

13.      The MGM Sale continues a familiar pattern.  Like many prior transactions, Dondero was on both sides of the MGM Sale. While acting as a director on MGM's board, he was also acting on behalf of the Debtor.  Further, even though this transaction required CRO oversight under the proposed protocols (which were contemplated at the time of or soon after the bankruptcy filing), Dondero engaged in the purported rogue MGM Sale without knowledge of the Debtor's counsel or the CRO.

14.      Since Dondero entered into this clandestine, rogue trade at $72.50 a share, on information and belief, MGM shares have recently traded in the $90s. Moreover, other Dondero-controlled entities have not sold their pro-rata positions in MGM, which calls into question whether this transaction was in the best interest of the Debtor and the various stakeholders in this Debtor-controlled fund.

15.      After the Committee learned of the transaction, Acis strenuously objected to its approval. The Committee nevertheless voted to approve it.  Still, by its Objection, the Committee requests that the Court direct the Debtor to withhold any Proposed Insider Distributions until the Insider Parties repay Notes that are currently due and payable to the

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME                   Page 5 of 9**

Appx. 04146

Debtor and the Committee can fully investigate causes of action against the Insider Parties. Acis joins in this request.

**B.     The MGM Sale was not in the ordinary course and distributing its proceeds to the Insider Parties is not in the Debtors' sound business judgment.**

16.     The Debtor first asserts that the Distributions, including those from the MGM Sale, are in the ordinary course pursuant to section 363(c)(1) of the Bankruptcy Code. The Protocols themselves belie this assertion. The Protocols specifically carve out "Related Entity" Transactions," such as the MGM Sale, from "Ordinary Course Transactions," which do not require Court approval.  Now arguing that these Related Entity Transactions should simply be rubber stamped because they are ordinary course under section 363(c) defeats the purpose of Court approval and undermines the Protocols.

17.     Alternatively, the Debtor argues that if the Distributions are not ordinary course, they are within the exercise of the Debtor's sound business judgment, and therefore allowed under section 363(b)(1) of the Bankruptcy Code. *See* Distribution Motion ¶ 56-57.

18.     When exercising its business judgment pursuant to section 363(b), the trustee or debtor in possession has a duty to maximize value for the estate and its creditors.  *See Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 326-27 (5th Cir. 2019) (noting that, under section 363(b), a "'trustee as a duty to maximize the value of the estate'") (*quoting Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)); *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (affirming the bankruptcy court's finding that the "proposed reimbursement of expenses was designed to maximize the value of [the] estate, and was fair, reasonable, and appropriate").

19.     Accordingly, when the Debtor uses property of the estate, which here are the Debtor's contract rights in connection with making the Distributions, outside of the ordinary

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME            Page 6 of 9**

**Appx. 04147**

course, the Debtor has a duty maximize value for the estate. As expressed by the Committee in its Objection, it does not reflect sound business judgment for the Debtor to pay millions of dollars in cash distributions to insiders when those same insiders likely owe much more to the estate.

20.    As a court of equity, and pursuant to sections 105 and 363 of the Bankruptcy Code, at a minimum this Court should prevent the Debtor from making any Proposed Insider Distributions, as set forth in the Objection, until the Committee has the opportunity to fully investigate estate causes of action against Dondero and other Insider Parties.

### IV.    PRAYER

Acis respectfully requests that this Court sustain the Committee's Objection and grant Acis such other and further relief to which it may show itself to be justly entitled.

**DATED:  March 2, 2020.**

*[Remainder of Page Intentionally Left Blank]*

JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME                    Page 7 of 9

Respectfully submitted,


By: */s/ Rakhee V. Patel*
    Rakhee V. Patel
    State Bar No. 00797213
    Phillip Lamberson
    State Bar No. 00794134
    Annmarie Chiarello
    State Bar No. 24097496
    **WINSTEAD PC**
    500 Winstead Building
    2728 N. Harwood Street
    Dallas, Texas 75201
    Telephone:  (214) 745-5400
    Facsimile:  (214) 745-5390
    rpatel@winstead.com
    plamberson@winstead.com
    achiarello@winstead.com

    -and-

    Brian P. Shaw
    State Bar No. 24053473
    **ROGGE DUNN GROUP, PC**
    500 N. Akard Street, Suite 1900
    Dallas, Texas 75201
    Telephone: (214) 888-5000
    Facsimile:  (214) 220-3833
    shaw@roggedunngroup.com

    **COUNSEL FOR ACIS CAPITAL
    MANAGEMENT, L.P. AND ACIS
    CAPITAL MANAGEMENT GP, LLC**

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC
TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN
ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO
CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME    Page 8 of 9**

Appx. 04149

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2020, notice of this document will be electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Filing Procedures in this District.


*/s/ Rakhee V. Patel*
One of Counsel

**JOINDER OF ACIS CAPITAL MANAGEMENT, L.P. AND ACIS CAPITAL MANAGEMENT GP, LLC TO THE COMMITTEE'S OBJECTION TO THE MOTION TO THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES," AND COMMENT TO THE SAME**            **Page 9 of 9**
4846-1397-8038v.2

Appx. 04150

# EXHIBIT 204

Docket #0499  Date Filed: 03/04/2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**DEBTOR'S REPLY IN SUPPORT OF MOTION OF THE DEBTOR FOR ENTRY OF
AN ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE
DISTRIBUTIONS TO CERTAIN
"RELATED ENTITIES"**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



¶1934054200304000000000001

**Appx. 04152**

The above-captioned debtor and debtor-in-possession (the "Debtor") files this reply (the "Reply") in support of the *Motion of the Debtor for Entry of an Order Authorizing but Not Directing the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No. 474] (the "Motion").[2]

In further support of the Motion, the Debtor respectfully states as follows:

**Preliminary Statement**

1.      In the Motion, the Debtor disclosed that certain "Related Entities" (the "Related Entity Investors") had invested in three funds – Dynamic, AROF, and RCP (collectively, the "Funds") – and that the Debtor was seeking authority from this Court to distribute funds owned by the Funds – not the Debtor – to the Related Entity Investors that they are contractually entitled to receive under the Funds' governing documents.  The Committee objected to the relief sought in the Motion,[3] and Acis Capital Management, L.P., and Acis Capital Management GP, LLC (collectively, "Acis," and together with the Committee, the "Objecting Parties") filed a joinder to the Committee Objection.[4]  In their objections, the Objecting Parties – citing only to Section 105(a) of the Bankruptcy Code as authority – requested that this Court order the Debtor to "withhold and segregate" the proceeds due to the Related Entity Investors.  (Committee Objection, § 20.)  That relief amounts to a request for a preliminary injunction and a prejudgment attachment without filing any underlying action or otherwise complying with the procedural and substantive requirements to obtain a prejudgment attachment under applicable law.  As set forth below, the

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

[3] *Objection of the Official Committee of Unsecured Creditors to the Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities."* [Docket No. 487] (the "Committee Objection").

[4] *Joinder of Acis Capital Management, L.P., and Acis Capital Management GP, LLC to the Committee's Objection to the Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities," and Comment to the Same* [Docket No. 489] (the "Joinder").

existence of potential claims against the Related Parties are not, in and of themselves, sufficient to justify such extraordinary relief.

2.      As the Debtor disclosed in the Motion it, or in the case of AROF, one of its subsidiaries manage the Funds and that the Debtor's Independent Board (after consultation with outside counsel) believes that, as a registered investment adviser, the Debtor has certain duties to the funds that it manages, including the Funds.  Those duties exist regardless of whether the investors in those funds are Related Entities or otherwise and are based on contract and on the laws of the United States, Delaware, and the Cayman Islands.  Importantly, applicable law prohibits the Debtor from asserting its own interest ahead of those of investors.  In the Motion, the Debtor further disclosed that it did not have the contractual or legal authority to withhold or cause the Funds to withhold distributions from the Related Entity Investors or to treat the Related Entity Investors differently than non-Related Entity Investors.

3.      Because of those duties – duties which both the Debtor and the Independent Board take seriously – the Debtor sought the relief requested in the Motion.  Although the Committee and Acis objected to that relief, notably, neither the Committee nor Acis have alleged that any of the Debtor, the Funds, or any other entity can without violating their contractual and fiduciary obligations elect *not* to distribute to the Related Entity Investors their allocable portion of the distributions being made to the investors in the Funds.  Nor has any party alleged that any of the Funds' assets are property of the Debtor's estate or that any of the Funds have claims against their Related Entity Investors.  Instead, the Objecting Parties have asked this Court to use its equitable powers under Section 105(a) of the Bankruptcy Code to cause the Debtor to withhold distributions to the Related Entity Investors because of certain alleged bad acts and potential claims that may exist against those Related Entities.

3

4.    The Independent Board respects the Committee's intention to investigate claims against the Related Entity Investors and insiders as contemplated by the Term Sheet, approved by this Court on January 9, 2020, which led to the installation of the Independent Board. The Independent Board intends to cooperate with the Committee in its efforts.  At the same time, the Independent Board was installed to revamp the Debtor's prior culture, including to ensure obligations to the investors in the funds managed by the Debtor are being appropriately honored. The Independent Board believes this is essential to rebuilding the Debtor's reputation in the marketplace and the investor community, and to prospectively protect the Debtor from liability. However, neither Section 105(a) nor any other provision of the Bankruptcy Code allows this Court to grant the relief that the Objecting Parties are actually requesting – an injunction and prejudgment attachment against third parties not currently before the Court.

### Reply

5.    The Debtor, or with respect to AROF, its subsidiary, is the investment adviser to each of the Funds.  As the investment adviser, the Debtor has contractual discretion over the selection and disposition of the Funds' investments, but does not serve in a governance role. Rather, the governing body of each Fund is either a board of directors or a general partner.  And the terms of each of the Funds is governed by its applicable governing documents, which each investor was furnished and relied upon when subscribing for an interest in the Fund.  The Dynamic Fund Documents govern Dynamic; the AROF Fund Documents govern AROF; and the RCP Fund Documents govern RCP (the Dynamic Fund Documents, the AROF Fund Documents, and the RCP Fund Documents, collectively, the "Fund Documents").  Each of the Fund Documents is in turn governed, as applicable, by U.S. and Delaware or Cayman law.

6.      As discussed at length in the Motion, each of the Funds is its own separate legal entity which owns its own assets, and none of the Fund Documents allow the Debtor to treat the Related Entity Investors – regardless of who such investors happen to be or by whom they are owned – differently than non-Related Entity Investors.  (Motion, ¶¶ 42-47.)  Importantly, neither the Committee nor Acis has stated or alleged that:  (a) any of the Funds is a debtor in the Bankruptcy Case or subject to this Court's jurisdiction; (b) the assets held by the Funds are property of the Debtor's estate; (c) the Debtor does *not* have contractual and fiduciary obligations to the Funds; or (d) any provision in any of the Fund Documents allows the Debtor to treat the Related Entity Investors in the Funds differently than the non-Related Entity Investors in the manner being requested.

7.      Instead, the Objecting Parties rely on alleged bad acts by the Debtor and certain of the Debtor's employees and principals[5] and the Committee's potential, but inchoate, causes of action against such parties to seek what amounts to an injunction from this Court under Section 105(a) and a prejudgment attachment against the proceeds that the Related Entity Investors in the Funds are contractually entitled to receive – not from the Debtor – but from the Funds.  However, those alleged bad acts – regardless of whether they occurred pre- or postpetition – and

---

[5] The Debtor does not believe that the provenance of the $123.25 million in proceeds from the MGM Sale or Mr. Dondero's role in the MGM Sale is relevant to the Motion.  What the Debtor does believe is relevant is that (a) RCP is currently in liquidation and is required to liquidate its assets in an orderly manner and (b) RCP's investors, such as the California Public Employees' Retirement System ("CalPERS"), have requested that the Debtor disburse the proceeds of the MGM Sale as quickly as possible in the manner required by the RCP Fund Documents.  *See, e.g., Response by CalPERS to Motion by the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities"* [Docket No. 486].

Whether or not Mr. Mr. Dondero had the authority to bind RCP to sell the MGM common stock is not relevant to the Motion.  When the Independent Board and the Debtor's professionals found out that Mr. Dondero had agreed to the MGM Sale, they reviewed the MGM Sale and independently determined that it was in the best interests of the Debtor's estate to close that sale.  The Independent Board disclosed their reasoning to the Committee, and the Committee did not object to the MGM Sale.  (Committee Objection, § 14.)  Consequently, the MGM Sale closed on February 24, 2020.  To the extent the Committee seeks to investigate further the circumstances surrounding the MGM Sale, the Independent Board will ensure that the Debtor cooperates with such investigation.  However, that issue is not relevant to the relief the Debtor is seeking here.

DOCS_NY:40258.9 36027/002

potential causes of action are *not* the subject of the Motion.  And if either the Committee or Acis believe that such claims exist, the Committee, at least, has been granted standing to pursue those claims (and Acis has shown itself more than capable of standing up for its rights).  Further, the Committee's and Acis's request is procedurally and substantively improper.  To obtain a pre-judgment writ or attachment, they are required to commence an action and seek such remedy in accordance with due process and to prove the substantive elements that support such relief.  The Objecting Parties have done neither.

8.     First, assuming, *arguendo*, that Texas state law applies to the Related Entity Investors (although the law of other States and the Cayman Islands may also apply), the burden associated with seeking a prejudgment attachment is a significant one, and it is placed on the moving party – in this case the Objecting Parties.  *See S.R.S. World Wheels v. Enlow*, 946 S.W.2d 574, 575 (Tex. Civ. App. - Ft. Worth 1997) ("[a]ttachment is a harsh, oppressive remedy; therefore, attachment is not available unless statutory safeguards are strictly observed.").  To get a prejudgment attachment, the Objecting Parties would first be required to commence an action articulating the nature and extent of the claims supporting such attachment.  Next, the Committee would be required to file and serve a request for a prejudgment attachment with appropriate notice to the defendant.  Finally, to obtain that relief under Texas law, the Committee would have to prove the following elements:  (a) defendant is justly indebted to the plaintiff; (b) attachment is not sought for purposes of harassment or injury; (c) plaintiff will probably lose his debt if there is no attachment; and (d) specific grounds for the attachment exist.[6]  Tex. Civ. Prac. & Rem. Code.

---

[6] Specific grounds for attachment under Texas law exist if:  (a) the defendant is not a resident of this state or is a foreign corporation or is acting as such; (b) the defendant is about to move from this state permanently and has refused to pay or secure the debt due the plaintiff; (c) the defendant is in hiding so that ordinary process of law cannot be served on him; (d) the defendant has hidden or is about to hide his property for the purpose of defrauding his creditors; (e) the defendant is about to remove his property from this state without leaving an amount sufficient to pay his debts; (f) the defendant is about to remove all or part of his property from the county in which the suit is brought with the intent to defraud his creditors; (g) the defendant has disposed of or is about to dispose of all or part of his property

§ 61.001. Neither Objecting Party has pled any of the foregoing statutory elements let alone carried its burden.

9.      Second, Section 105(a) of the Bankruptcy Code – which is the only provision cited by the Objecting Parties to justify their position – does not allow this Court to grant the Objecting Parties' request.  As a general matter, Section 105(a) does not create a "roving commission" for a court "to do equity."  *See, e.g., United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986); *see also New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2nd Cir. 2003).  Rather, relief under Section 105(a) must be tethered to some provision of the Bankruptcy Code.  *See, e.g., Law v. Siegel*, 571 U.S. 415, 421 (2014) ("We have long held that 'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code.") (citing cases); *New England Dairies*, 351 F.3d at 91-92 ("[S]ection 105(a) [confers] the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code. . . This language 'suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.'") (citations omitted) (emphasis in original).  Here, the Committee has not cited to any provision under the Bankruptcy Code justifying its request besides the general powers available under Section 105(a).

10.     Instead, the Committee has requested that this Court cause the "[temporary] withholding" of distributions to Related Entity Investors in Dynamic, AROF, and RCP. (Committee Objection, ¶¶ 16-20.)  As such, the Committee and Acis, through the Joinder, are asking this Court for an injunction only under Section 105(a) ordering "the Debtor to withhold and

---

with the intent to defraud his creditors; (h) the defendant is about to convert all or part of his property into money for the purpose of placing it beyond the reach of his creditors; or (i) the defendant owes the plaintiff for property obtained by the defendant under false pretenses.  *See* Tex. Civ. Prac. & Rem. Code. § 61.002.  There is no factual record before the Court to support any of these required findings.

segregate the Proposed Insider Distributions." (*Id.*, ¶ 20.)  However, because the Related Entity Investors in the Funds have a contractual right to their distributions from the Funds – not from the Debtor – any order from this Court enjoining the "Proposed Insider Distributions" would also, by necessity, be an order from this Court enjoining such Related Entity Investors from asserting their contractual rights against the Funds and enjoining the Funds from making distributions to the Related Entity Investors.[7]  Such injunction would therefore be an order enjoining third party action and require the Committee to satisfy the standards for a preliminary injunction.  *Feld v. Zale Corp. (in Re Zale Corp.)*, 62 F.3d 746, 765 (5th Cir. 1995) (citing *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855, 858 (6th Cir. 1992) ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions issued pursuant to Federal Rule of Civil Procedure 65.").

11.     Here, however, the Objecting Parties have not followed the procedural or substantive requirements to obtain a pre-judgment remedy: a proper complaint providing the Related Parties with the opportunity to respond as well as a separate application for prejudgment attachment is required.  Only then would the Court be in a position to evaluate whether the Committee can establish: (a) substantial likelihood of success on the merits; (b) substantial threat of irreparable injury; (c) the threatened injury outweighs the harm of the injunction; and (d) the injunction will not disserve the public interest.  *Id.*  The Committee has not carried its burden.  Section 105(a) does not allow the Objecting Parties to bootstrap their objections into a prejudgment

---

[7] CLOH is invested in the AROF Cayman feeder fund.  The AROF Cayman feeder fund is managed by an independent board of Cayman-based directors.  The Debtor, as a matter of Cayman law, has no ability to compel those independent directors to "withhold and segregate the Proposed Insider Distributions," and while the Cayman directors may have some ability to treat certain investors differently than others, the Debtor has no right to direct the Cayman directors. Consequently, any order from this Court seeking to require the Debtor to withhold distributions made to CLOH by the AROF Cayman feeder fund will be an order with which the Debtor simply cannot comply.  As such, any order enjoining payments on account of CLOH's interest in the AROF Cayman feeder fund will need to be an order compelling the Cayman directors to take or not to take action; however, for such an order to be binding in the Cayman Islands, it must first be recognized by a Cayman court of competent jurisdiction.

attachment against assets that are not property of the Debtor's estate and that contractually are owed to parties not currently before this Court, i.e., Mr. Okada, CLOH, and HCM Services.  If the Objecting Parties desire such relief, they should bring a procedurally appropriate motion instead of seeking an ex parte injunction and prejudgment attachment.[8]

12.    In sum, it is uncontroverted that (a) the Funds are not debtors in this Bankruptcy Case; (b) the Funds' assets are not property of the Debtor; (c) the Fund Documents do not allow the Debtor to cause the Funds to *not* make certain distributions that they would otherwise be required to make to their Related Entity Investors; and (d) there are no provisions in the Fund Documents – or applicable law – that would allow the Debtor to do what the Objecting Parties are demanding.  It is also uncontroverted that the Independent Board determined that (i), after seeking advice from U.S. and Cayman-based fund and regulatory counsel, as the parties in control of a registered investment advisor, they have obligations to the Debtor's managed funds and, by extension, the investors in such funds and (ii) those obligations required the Independent Board to file and prosecute the Motion.

*[Remainder of Page Intentionally Blank]*

---

[8] The Committee cannot argue it was unaware of the procedural deficiencies in the Committee Objection as one of the cases cited by the Committee – *In re DeLorean Motors Co.* – lays out the appropriate way to use Section 105(a).  755 F.2d 1223 (6th Cir. 1985).  In *DeLorean*, the unsecured creditors committee (and later the trustee) believed certain assets were property of the debtor's estate.  To secure those assets, the committee filed an adversary proceeding seeking a declaration that the assets were estate property and could not be removed from the estate.  In reviewing the case, the Sixth Circuit first noted that committee was not seeking an attachment.  "The preliminary injunction in the present case is similarly not for the purpose of securing satisfaction of the judgment ultimately to be entered in the action.  The trustee does not seek to attach. . . assets in order to satisfy a possible damage award.  The relief sought is merely a declaration that the assets are a part of the bankruptcy estate.").  *DeLorean*, 755 F.3d at 1227.  Because the moving party was not seeking attachment, but rather a preliminary injunction, the Sixth Circuit found that Rule 64 of the Federal Rules of Civil Procedure did not apply but that to get an injunction that the moving party had to satisfy Rule 65 and its traditional four part test.  *Id.*

Consequently, *DeLorean* highlights the appropriate way to use Section 105(a).  Section 105(a) is to be paired with another section of the Bankruptcy Code (in *DeLorean*, Section 541), and if an injunction and attachment is sought, (a) an adversary proceeding should be filed, (b) the appropriate parties noticed, and (c) the requirements of Rules 64 and 65 of the Federal Rules of Civil Procedure satisfied.  The Committee, however, has failed to abide by any of the procedural or statutory requirements laid out in *DeLorean*.

WHEREFORE, for the reasons set forth above and in the Motion, the Committee

Objection and the Acis Objection should be overruled in all respects and the relief requested in the

Motion should be granted.

Dated:  March 4, 2020                    PACHULSKI STANG ZIEHL & JONES LLP
                                         Jeffrey N. Pomerantz (CA Bar No.143717)
                                         (*admitted pro hac vice*)
                                         Ira D. Kharasch (CA Bar No. 109084)
                                         (*admitted pro hac vice*)
                                         Maxim B. Litvak (Texas Bar No. 24002482)
                                         Gregory V. Demo (NY Bar No. 5371992)
                                         (*admitted pro hac vice*)
                                         10100 Santa Monica Blvd., 13th Floor
                                         Los Angeles, CA 90067
                                         Telephone: (310) 277-6910
                                         Facsimile: (310) 201-0760
                                         E-mail:     jpomerantz@pszjlaw.com
                                                     ikharasch@pcszjlaw.com
                                                     mlitvak@pszjlaw.com
                                                     gdemo@pszjlaw.com

                                         -and-

                                         */s/  Melissa S. Hayward.*
                                         HAYWARD & ASSOCIATES PLLC
                                         Melissa S. Hayward
                                         Texas Bar No. 24044908
                                         MHayward@HaywardFirm.com
                                         Zachery Z. Annable
                                         Texas Bar No. 24053075
                                         ZAnnable@HaywardFirm.com
                                         10501 N. Central Expy, Ste. 106
                                         Dallas, Texas 75231
                                         Tel: (972) 755-7100
                                         Fax: (972) 755-7110

                                         *Counsel for the Debtor and*
                                         *Debtor-in-Possession*

10

**Appx. 04161**

# EXHIBIT 205

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

### R E C I T A L S

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

### ARTICLE I

### DEFINITIONS

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

Exhibit A

Appx. 04163

Case 21-03006-sgj Doc 843-32 Filed 02/17/21   Entered 02/17/21 03:49:49   Page 3 of 20

"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person.   The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

Appx. 04164

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02   Interpretation.  The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01   General Authority.  Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02   Provision of Services.  Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)     *Back- and Middle-Office:* Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

3

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)    *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)    *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)    *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)    *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)    *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)    *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)    *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

(i)      *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

(j)      *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

(k)      *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

(l)      *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03   Shared Employees.

(a)      The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider. Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company. To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder. The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

Appx. 04167

(b)    Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)    To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person" of, or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)    Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)    Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)    The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)    The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.   To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)    The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

Appx. 04168

(i)      The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)      The Staff and Services Provider shall require that each Shared Employee:

(i)      certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)      be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)      to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)      Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf of or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

7

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06    Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement.  The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party.  Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time.  The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07    Third Parties.

(a)    The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)    In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08    Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09    Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

Appx. 04170

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments). Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01  Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02  Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03  Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01  Representations. Each of the Parties hereto represents and warrants that:

(a)  It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)  this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)  no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)  neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

### ARTICLE V

### COVENANTS

Section 5.01    Compliance: Advisory Restrictions.

(a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

(b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records: Confidentiality.

The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

10

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01  Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder.  No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account.  Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02   Exculpation.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "Disabling Conduct") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   Indemnification by the Management Company.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("Claims"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04   Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

Appx. 04175

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

## ARTICLE VII

## TERMINATION

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

14

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03   Non-Recourse; Non-Petition.

(a)      The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)      Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)      Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)      The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)      The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

15

Section 8.04   <u>Governing Law</u>.

(a)      This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

(b)      The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05   <u>WAIVER OF JURY TRIAL</u>.   EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06   <u>Severability</u>.   The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07   <u>No Waiver</u>.   The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08   <u>Counterparts</u>.   This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

Section 8.09    Third Party Beneficiaries.  This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10    No Partnership or Joint Venture.  Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.  Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11    Independent Contractor.  Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12    Written Disclosure Statement.  The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13    Headings.  The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14    Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15    Notices.  Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

 (a) If to the Management Company:

   NexPoint Advisors, L.P.
   200 Crescent Court
   Suite 700
   Dallas, TX 75201

Appx. 04179

(b)     If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

18

Appx. 04180

   IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By:  NexPoint Advisors GP, LLC, its
General Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL
MANAGEMENT, L.P.**

By:  Strand Advisors, Inc., its General
Partner

By: _____
Name: Frank Waterhouse
Title: Treasurer

# EXHIBIT 206

```
                      IN THE UNITED STATES BANKRUPTCY COURT
 1                     FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION
 2
                                     )    Case No. 19-34054-sgj-11
 3   In Re:                          )    Chapter 11
                                     )
 4   HIGHLAND CAPITAL                 )    Dallas, Texas
     MANAGEMENT, L.P.,                )    Tuesday, February 2, 2021
 5                                    )    9:30 a.m. Docket
                                     )
 6           Debtor.                  )
                                     )    CONFIRMATION HEARING [1808]
                                     )    AGREED MOTION TO ASSUME [1624]
 7   _____)

 8                         TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 9                    UNITED STATES BANKRUPTCY JUDGE.

10   WEBEX APPEARANCES:

11   For the Debtor:              Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
12                                10100 Santa Monica Blvd.,
                                    13th Floor
13                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
14
     For the Debtor:              John A. Morris
15                                Gregory V. Demo
                                  PACHULSKI STANG ZIEHL & JONES, LLP
16                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
17                                (212) 561-7700

18   For the Debtor:              Ira D. Kharasch
                                  PACHULSKI STANG ZIEHL & JONES, LLP
19                                10100 Santa Monica Blvd.,
                                    13th Floor
20                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
21
     For the Official Committee   Matthew A. Clemente
22   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
23                                Chicago, IL  60603
                                  (312) 853-7539
24

25
```

Appx. 04183

2

```
1   APPEARANCES, cont'd.:

2   For Redeemer Committee of     Terri L. Mascherin
    the Highland Crusader         JENNER & BLOCK, LLP
3   Fund:                         353 N. Clark Street
                                  Chicago, IL  60654-3456
4                                 (312) 923-2799

5   For Acis Capital              Rakhee V. Patel
    Management GP, LLC:           WINSTEAD, P.C.
6                                 2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
7                                 (214) 745-5250

8   For UBS Securities, LLC:      Andrew Clubok
                                  LATHAM & WATKINS, LLP
9                                 555 Eleventh Street, NW,
                                    Suite 1000
10                                Washington, DC  20004
                                  (202) 637-2200
11
    For Patrick Daugherty:        Jason Patrick Kathman
12                                PRONSKE & KATHMAN, P.C.
                                  2701 Dallas Parkway, Suite 590
13                                Plano, TX  75093
                                  (214) 658-6500
14
    For HarbourVest, et al.:      Erica S. Weisgerber
15                                DEBEVOISE & PLIMPTON, LLP
                                  919 Third Avenue
16                                New York, NY  10022
                                  (212) 909-6000
17
    For James Dondero:            Clay M. Taylor
18                                John Y. Bonds, III
                                  D. Michael Lynn
19                                Bryan C. Assink
                                  BONDS ELLIS EPPICH SCHAFER
20                                  JONES, LLP
                                  420 Throckmorton Street,
21                                  Suite 1000
                                  Fort Worth, TX  76102
22                                (817) 405-6900

23  For Get Good Trust and        Douglas S. Draper
    Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
24                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
25                                (504) 299-3300
```