PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:   jpomerantz@pszjlaw.com
         rfeinstein@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:   MHayward@HaywardFirm.com
         ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Adv. Proc. No. 21-03003-sgj |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § | Case No. 3:21-cv-01010-E |
| Defendants. | § § § | |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-3004 |
| § | |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-00881-X |
| § | |
| HIGHLAND CAPITAL MANAGEMENT FUND § | |
| ADVISORS, L.P., § | |
| § | |
| § | |
| Defendant. § | |
| § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-3005 |
| § | |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-00880-C |
| NEXPOINT ADVISORS, L.P., JAMES § | |
| DONDERO, NANCY DONDERO, AND § | |
| THE DUGABOY INVESTMENT TRUST, § | |
| § | |
| § | |
| Defendants. § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-3006 |
| § | |
| § | |
| vs. § | |
| § | |
| HIGHLAND CAPITAL MANAGEMENT § | Case No. 3:21-cv-01378-N |
| SERVICES, INC., JAMES DONDERO, § | |
| NANCY DONDERO, AND THE DUGABOY § | |
| INVESTMENT TRUST, § | |
| § | |
| Defendants. § | |
| § | |

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., § | |
| § | |
| § | |
| Plaintiff, § | Adv. Proc. No. 21-3007 |
| § | |
| vs. § | |
| § | Case No. 3:21-cv-01379-X |
| HCRE PARTNERS, LLC (n/k/a NexPoint § | |
| Real Estate Partners, LLC), JAMES § | |
| DONDERO, NANCY DONDERO, AND § | |
| THE DUGABOY INVESTMENT TRUST, § | |
| § | |
| § | |
| Defendants. § | |

## TABLE OF CONTENTS

**Page**

I.       PRELIMINARY STATEMENT ...................................................................1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................2

     A.     BACKGROUND .................................................................. 2

          1.    The Bankruptcy Case ........................................... 2

          2.    Procedural History ............................................... 3

               i.     Commencement of the Adversary Proceedings.............................. 3

               ii.    Defendants' Motions to Withdraw the Reference ......................... 4

               iii.   The Adversary Proceedings are Consolidated for Pretrial Purposes .................................................. 4

               iv.   Plaintiff Files the Amended Complaints........................................ 5

     B.     HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT ....................................... 5

          1.    The Demand Notes .............................................. 5

                i.     James Dondero.............................................. 6

               ii.    HCMFA .......................................................... 6

               iii.   HCMS ........................................................... 6

               iv.   HCRE............................................................. 7

          2.    The Term Notes ................................................. 9

     C.     THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING ........................ 12

          1.    Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet ..................................... 13

          2.    In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes ............ 17

          3.    Without Exception, the Notes were Disclosed in Highland's Books and Records Carried as Assets without Discount ..................................... 19

          4.    Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections ......................................................... 21

     D.     THE OBLIGORS' AFFIRMATIVE DEFENSES............................................. 23

i

|   |   | 1. | The Alleged Agreement Defense .................................................................. 23 |
|   |   |   | i. | The Allegations Materially Changed Over Time......................... 24 |
|   |   |   | ii. | The Final Version of the "Alleged Agreement" Defense ............. 26 |
|   |   |   | iii. | No Reasonable Trier of Fact Can Find that the Alleged Agreement Existed.................................................................................... 26 |
|   |   | 2. | HCMFA's "Mutual Mistake" Defense ..................................................... 32 |
|   |   | 3. | Waiver and Estoppel [NexPoint, HCMS, HCRE] .................................... 37 |
|   |   | 4. | Other Defenses ......................................................................................... 38 |
| III. | ARGUMENT ..............................................................................................................38 |
|   | A. | Legal Standard ...................................................................................................... 38 |
|   |   | 1. | Summary Judgment Standard .................................................................. 38 |
|   |   | 2. | Summary Judgment Standard for Promissory Notes ................................ 40 |
|   | B. | Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes ..................................................................................................................... 40 |
|   | C. | Defendants Fail to Rebut Highland's Prima Facie Case...................................... 43 |
|   |   | 1. | No Reasonable Jury Could Find that the "Alleged Agreement" Exists .......................................................................................................... 43 |
|   |   | 2. | No Reasonable Jury Could Find the HCMFA Note Was a "Mistake" ................................................................................................. 46 |
|   |   | 3. | No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence ................................................................................................. 48 |
|   |   | 4. | No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note.......................................................................................... 49 |
| CONCLUSION ...........................................................................................................................49 |

EXHIBIT A - Parties, Witnesses, and Definitions

DOCS_NY:44673.9 36027/003

## TABLE OF AUTHORITIES

**CASES**

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*,
    MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021)................................ 46, 48

*Alton v. Texas A&M University*,
    168 F.3d 196 (5th Cir. 1999) ........................................................................................ 39, 40

*Armstrong v. City of Dallas*,
    997 F.2d 62 (5th Cir.1993) ................................................................................................. 40

*Crisalli v. ARX Holding Corp.*,
    177 F. App'x 417 (5th Cir. 2006) ....................................................................................... 46

*FDIC v. Cardinal Oil Well Servicing Co.*,
    837 F.2d 1369 (5th Cir.1988) ............................................................................................ 40

*Hall v. Branch Banking*,
    No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014)............................................ 39

*Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*,
    CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007).......................................... 47

*In re Heritage Org., L.L.C.*,
    354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006)............................................................... 45, 46

*In re Magna Cum Latte, Inc.*,
    07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007) ................................ 39, 40, 44

*Latimer v. Smithkline & French Laboratories*,
    919 F.2d 301 (5th Cir.1990) .............................................................................................. 39

*Looney v. Irvine Sensors Corp.*,
    CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) ................ 40, 43, 46, 48

*Melanson v. Navistar, Inc.*,
    3:13-CV-2018-D, 2014 WL 4375715 (N.D. Tex. Sept. 4, 2014).......................................... 45

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
    40 F.3d 698 (5th Cir. 1994) ............................................................................................. 39

*Resolution Tr. Corp. v. Starkey*,
    41 F.3d 1018 (5th Cir. 1995) ........................................................................................ 40, 43

*Scott v. Wollney*,
    No. 3:20-CV-2825-M-BH, 2021 WL 4202169 (N.D. Tex Aug. 28, 2021)............................ 45

*Turner v. Baylor Richardson Med. Ctr.*,
    476 F.3d 337 (5th Cir. 2007) ............................................................................................ 39

*Warfield v. Byron*,
    436 F.3d 551 (5th Cir. 2006) ............................................................................................ 38

DOCS_NY:44673.9 36027/003

*Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*,
    No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007) ...................................... 46, 47, 48

**RULES**

FED. R. CIV. P. 56(c) .................................................................................................................... 36

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S AMENDED MEMORANDUM OF
LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Highland Capital Management, L.P., the reorganized debtor and the plaintiff in the above-
captioned adversary proceedings ("Highland" or "Plaintiff"), hereby files this amended
memorandum of law in support of its *Motion for Partial Summary Judgment* (the "Motion") on its
First and Second Causes of Action.[1]  In support of its Motion, Highland states as follows:

## I.   PRELIMINARY STATEMENT[2]

1.      In accordance with its Plan and the clear and unambiguous terms of the
Notes, Plaintiff seeks to collect on over $50 million of promissory notes issued by Mr. Dondero
and certain entities controlled by him.  The Notes were tendered in exchange for hard dollars at a
time when Mr. Dondero controlled both the borrower and the lender.  Now, Mr. Dondero refuses
to make good on his promises to repay the money he borrowed.

2.      Plaintiff makes out its prima facie case for summary judgment for
Defendants' breach of the Notes.  The uncontroverted documentary evidence shows that the Notes
are (i) valid, (ii) executed by Defendants and in favor of Highland, and (iii) there is a balance due
and owing under the Notes.  Defendants fail to rebut Plaintiff's prima facie case because
Defendants fail to create a genuine issue of material fact regarding their breach.   There is a
complete absence of evidence to support each of Defendants' affirmative defenses.

3.      Nevertheless, Defendants are certain to contest every single fact and erect
countless strawmen regardless of the record in support of their own fabricated stories.  But in the
end, there will be no evidence to corroborate the Defendants' contentions other than their own

---

[1] Concurrently herewith, Highland is filing the *Appendix of Exhibits in Support of Highland Capital Management,
L.P.'s Motion for Partial Summary Judgment* (the "Appendix"). Citations to the Appendix are notated as follows: Ex.
#, Appx. #

[2] Capitalized terms in this Preliminary Statement shall have the meanings ascribed to them below.

1

self-serving, conclusory, and unsubstantiated assertions.  There will be no documents or written communications that credibly support Defendants' story.  By contrast, Plaintiffs claims are both simple and buttressed by a mountain of undisputed evidence including contemporaneous written communications, audited financial statements, statements to third parties, books and records, and the plain words of the Defendants and their officers.

4.      Plaintiff does not have to prove its case beyond a reasonable doubt or by clear and convincing evidence nor does Plaintiff have the burden of proving that *no* facts are in dispute.  Instead, Plaintiff need only show that there is no "genuine" dispute of material fact.

5.      Viewed fairly, Plaintiff's evidence is so overwhelming, and Defendants' stories are so weak, that the Court must grant the Motion.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

## A.   BACKGROUND[3]

### 1.   The Bankruptcy Case

6.      On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

7.      On December 4, 2019, the Delaware Court entered an order transferring venue of Highland's bankruptcy case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") [Bankr. Docket No. 186].[4]

---

[3] Attached hereto as **Exhibit A** is a list of *Parties, Witnesses, and Definitions*.

[4] "Bankr. Docket No. __" refers to the docket maintained by the Bankruptcy Court in case no. 19-34054.

DOCS_NY:44673.9 36027/003

8.      On January 22, 2021, Highland filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Bankr. Docket No. 1808] (the "Plan").

9.      On February 22, 2021, the Bankruptcy Court entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Bankr. Docket No. 1943] (the "Confirmation Order") which confirmed Highland's Plan.[5]

10.     On August 11, 2021, the Plan became Effective (as defined in the Plan), and Highland became the Reorganized Debtor (as defined in the Plan).  *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 2700].

    2.      **Procedural History**

        i.      **Commencement of the Adversary Proceedings**

11.     On January 22, 2021, Plaintiff commenced the Adversary Proceedings by filing a *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* (the "Original Complaints") against each of the Defendants.[6]

12.     In its Original Complaints, Plaintiff asserted claims against each Defendant for (i) breach of contract for the Defendant's breach of its respective obligations under the Notes and (ii) turnover by each Defendant for all accrued and unpaid principal and interest due under the

---

[5] The confirmed Plan included certain amendments filed on February 1, 2021.  *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Bankr. Docket No. 1875].

[6] *See* Adv. Pro. No. 21-03003 (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004 (the "HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005 (the "NexPoint Action"), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006 (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Pro. No. 21-03007 (the "HCRE Action"), Docket No. 1 (the "HCRE Original Complaint").  The forgoing are collectively referred to as the "Original Complaints."

Notes until the date of payment, plus Plaintiff's cost of collection and reasonable attorney's fees (as expressly provided for under each of the Notes).

### ii.    Defendants' Motions to Withdraw the Reference

13.    Between April and June 2021, the Obligors each filed a similar motion to withdraw the reference (the "Motions to Withdraw") in which the Obligors sought to withdraw the Adversary Proceedings from the Bankruptcy Court to the District Court.

14.    In July 2021, the Bankruptcy Court issued Reports and Recommendations (the "R&Rs") to the District Court recommending that the Motions to Withdraw be granted, but that the Bankruptcy Court retain the cases for all pre-trial matters, including the consideration (but not determination) of any dispositive motions.

15.    The applicable District Court subsequently adopted the Bankruptcy Court's R&Rs in the NexPoint, HCMS, HCRE, and HCMFA Actions, but the decision on the R&R in the Dondero Action remains pending.

### iii.    The Adversary Proceedings are Consolidated for Pretrial Purposes

16.    The Parties subsequently agreed to, among other things, consolidate discovery for all purposes and coordinate the timing of the service of pleadings (i.e., Plaintiff's amended complaints adding the New Claims against the Duty Defendants and the Defendants' responses thereto).    That agreement was memorialized in a *Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* dated August 17, 2021, approved by the Bankruptcy Court on September 6, 2021, and entered in each respective Adversary Proceeding (collectively, the "Discovery Stipulations").

17.    In furtherance of the intent reflected in the Discovery Stipulations, and consistent with the related Orders granting Plaintiff's unopposed motions for leave to amend its pleadings, Plaintiff was "deemed to have served the Amended Complaint on the [applicable]

4

[D]efendant on July 13, 2021," even though the Amended Complaints were not actually filed on the dockets until August 27, 2021.

<b>iv.    Plaintiff Files the Amended Complaints</b>

18.    On August 27, 2021, Highland filed its Amended Complaints against Mr. Dondero (Ex. 32, Appx. 658-728), NexPoint (Ex. 2, Appx. 22-95), HCMS (Ex. 3, Appx. 96-179), and HCRE (Ex. 4, Appx. 180-263).[7]  In the Amended Complaints, Highland added the new claims against new defendants.  Specifically, Plaintiff (a) added as defendants (i) Ms. Dondero; (ii) Dugaboy; and (iii) Mr. Dondero, in his capacity as an "aider and abetter" to Dugaboy (collectively, the "Duty Defendants") and (b) asserted claims against the Duty Defendants for (i) declaratory relief; (ii) breach of fiduciary duty; and (iii) aiding and abetting a breach of fiduciary duty, arising from the Duty Defendants' unlawful entry into the Alleged Agreements.[8]

<b>B.    HIGHLAND EXTENDS LOANS TO THE OBLIGORS IN EXCHANGE FOR THE NOTES BUT THE OBLIGORS DEFAULT</b>

19.    The Obligors are the makers under a series of promissory notes tendered to Highland in exchange for contemporaneous loans and other consideration.  These Notes were executed between 2013 and 2019 and are described below.

<b>1.    The Demand Notes</b>

20.    As the documentary evidence specifically identified below establishes, Mr. Dondero, HCMFA, HCMS, and HCRE each executed certain demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") in exchange for contemporaneous loans as follows:

---

[7] All of the amendments related to the belated assertion of the Alleged Agreement defense.  Plaintiff did not amend its complaint against HCMFA because that entity did not assert the Alleged Agreement defense.

[8] Plaintiff also added claims for actual fraudulent transfer against Mr. Dondero, NexPoint, HCRE, and HCMS because their respective Notes were purportedly all subject to the Alleged Agreement.

5

i.     **James Dondero**

- a Demand Note in the original principal amount of $3,825,000, executed on February 2, 2018, in favor of Highland (the "First Dondero Note"); (Klos Dec.[9] ¶ 18 at Ex. D); Ex. 125 at 9, Appx. 2357; Ex. 188, Appx. 3001-3002; Ex. 189, Appx. 3003-3004; Ex. 74, Appx. 1338-1340; Ex. 81 (Responses to RFAs 1-3), Appx. 1387; *see also* Ex. 32 ¶ 20, Appx. 664; Ex. 31 ¶ 20, Appx. 647)

- a Demand Note in the original principal amount of $2,500,000, executed on August 1, 2018, favor of Highland (the "Second Dondero Note"); (Klos Dec. ¶ 19 at Ex. E); Ex. 126 at 2, Appx. 2366; Ex. 190, Appx. 3005-3006; Ex. 76, Appx. 1354-1356; Ex. 81 (Responses to RFAs 5-7), Appx. 1387-1388; *see also* Ex. 32 ¶ 21, Appx. 664; Ex. 31 ¶ 21, Appx. 647); and

- a Demand Note in the original principal amount of $2,500,000, executed on August 13, 2018, in favor of Highland (the "Third Dondero Note," collectively with the First Dondero Note and the Second Dondero Note, the "Dondero Notes") (Klos Dec. ¶ 20 at Ex. F); Ex. 126 at 2, Appx. 2366; Ex. 77, Appx. 1357-1359; Ex. 81 (Responses to RFAs 9-11), Appx. 1388; *see also* Ex. 32 ¶ 22, Appx. 664; Ex. 31 ¶ 22, Appx. 647).

ii.     **HCMFA**

- a Demand Note in the original principal amount of $2,400,000, executed on May 2, 2019, in favor of Highland (the "First HCMFA Note") (Klos Dec. ¶ 21 at Ex. G); Ex. 147 at 7, Appx. 2526; Ex. 54, Appx. 870-873; Ex. 55, Appx. 874-875; Ex. 1 (Exhibit 1) Appx. 9-11; Ex. 53, Appx. 866-869); and

- a Demand Note in the original principal amount of $5,000,000, executed on May 3, 2019, in favor of Highland (the "Second HCMFA Note," together with the First HCMFA Note, the "HCMFA Notes") (Klos Dec. ¶ 22 at Ex. H); Ex. 147 at 7, Appx. 2526; Ex. 56, Appx. 876-877; Ex. 1 (Exhibit 2), Appx. 12-15; Ex. 57, Appx. 878-880).

iii.     **HCMS**

- a Demand Note in the original principal amount of $150,000, executed on March 28, 2018, in favor of Highland (the "First HCMS Demand Note") (Klos Dec. ¶ 23 at Ex. I); Ex. 143, Appx. 2487-2490; Ex. 3 (Exhibit 1), Appx. 117-119);

---

[9] Refers to the *Declaration of David Klos in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, being filed concurrently herewith.

DOCS_NY:44673.9 36027/003

- a Demand Note in the original principal amount of $200,000, executed on June 25, 2018, in favor of Highland (the "Second HCMS Demand Note") (Klos Dec. ¶ 24 at Ex. J); Ex. 144, Appx. 2491-2494; Ex. 3 (Exhibit 2), Appx. 120-122);

- a Demand Note in the original principal amount of $400,000, executed on May 29, 2019, in favor of Highland (the "Third HCMS Demand Note") (Klos Dec. ¶ 25 at Ex. K); Ex. 145 at 11, Appx. 2506; Ex. 3 (Exhibit 3), Appx. 123-125); and

- a Demand Note in the original principal amount of $150,000, executed on June 26, 2019, in favor of Highland (the "Fourth HCMS Demand Note," collectively with the First HCMS Demand Note, the Second HCMS Demand Note, and the Third HCMS Demand Note, the "HCMS Demand Notes") (Klos Dec. ¶ 26 at Ex. L); Ex. 146 at 7, Appx. 2516; Ex. 3 (Exhibit 4), Appx. 126-128).

### iv.   **HCRE**

- a Demand Note in the original principal amount of $100,000, executed on November 27, 2013, in favor of Highland (the "First HCRE Demand Note") (Klos Dec. ¶ 27 at Ex. M); Ex. 148, Appx. 2533-2536; Ex. 4 (Exhibit 1), Appx. 201-203);

- a Demand Note in the original principal amount of $2,500,000, executed on October 12, 2017, in favor of Highland (the "Second HCRE Demand Note") (Klos Dec. ¶ 28 at Ex. N); Ex. 154 at 7, Appx. 2575; Ex. 4 (Exhibit 2), Appx. 204-206);

- a Demand Note in the original principal amount of $750,000, executed on October 15, 2018, in favor of Highland (the "Third HCRE Demand Note") (Klos Dec. ¶ 29 at Ex. O); (Ex. 155 at 5, Appx. 2585; Ex. 4 (Exhibit 3), Appx. 207-209); and

- a Demand Note in the original principal amount of $900,000, executed on September 25, 2019, in favor of Highland (the "Fourth HCRE Demand Note," collectively with the First HCRE Demand Note, the Second HCRE Demand Note, and the Third HCRE Demand Note, the "HCRE Demand Notes") (Klos Dec. ¶ 30 at Ex. P); Ex. 156 at 6, Appx. 2596; Ex. 4 (Exhibit 4), Appx. 210-212).

21.     Except for the date, the amount, the maker, and the interest rate, each of the

Demand Notes is identical and includes the following provisions, among others:

2.      Payment of Principal and Interest.  The accrued interest and principal of this Note shall be ***due and payable on demand of the Payee***.

5.      Acceleration Upon Default.  ***Failure to pay this Note or any installment hereunder as it becomes due shall***, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.***  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

6.      Waiver.  Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

7.      Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

Ex. 74, Appx. 1338-1340; Ex. 76, Appx. 1354-1356; Ex. 77, Appx. 1357-1359; Ex. 1 (Exhibits 1-2), Appx. 9-15; Ex. 3 (Exhibits 1-4), Appx. 117-128; and Ex. 4 (Exhibits 1-4), Appx. 201-212 (emphases added).

22.      On December 3, 2020, Highland made separate demands on Mr. Dondero, HCMFA, HCMS, and HCRE, respectively, for payment of all accrued principal and interest due under the Demand Notes by December 11, 2020.  The Demand Letters also included a demand for all costs of collection, including attorneys' fees, as provided in the Notes.  Ex. 79, Appx. 1370-1373; Ex. 1 (Exhibit 3), Appx. 16-19; Ex. 3 (Exhibit 5), Appx. 129-132; and Ex. 4 (Exhibit 5), Appx. 213-216 (collectively, the "Demand Letters").

23.    Neither Mr. Dondero, nor HCMFA, nor HCMS, nor HCRE made any payments to Highland on account of Notes or otherwise responded to the Demand Letters prior to the commencement of the Adversary Proceedings.

24.    Consequently, Mr. Dondero, HCMFA, HCMS, and HCRE breached Section 2 of each Demand Note, and each such Obligor is in default.

25.    As of December 11, 2020, the unpaid principal and accrued interest due under the Dondero Notes was $9,004,013.07, and (b) as of December 17, 2021, the unpaid principal and accrued interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

26.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMFA Notes was $7,687,653.06, and (b) December 17, 2020, the unpaid principal and accrued interest due under the HCMFA Demand Notes was $7,874,436.09. (Klos Dec. ¶ 40).

27.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81. (Klos Dec. ¶ 45).

28.    As of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23. (Klos Dec. ¶ 50).

## 2.    <u>The Term Notes</u>

29.    As the documentary evidence specifically identified below establishes, on May 31, 2017, Mr. Dondero executed a 30-year term note on behalf of NexPoint (the "<u>NexPoint Term Note</u>"), HCMS (the "<u>HCMS Term Note</u>"), and HCRE (the "<u>HCRE Term Note</u>"),

respectively, each as a maker, in favor of Highland (collectively, the "<u>Term Notes</u>"). (Klos Dec. ¶¶ 27-29).

30.    Each of the Term Notes "rolled up" the respective maker's obligations under certain then-outstanding demand notes that were identified as the "Prior Notes" in each Term Note.[10]

31.    The following Term Notes are at issue:

- a Term Note signed on NexPoint's behalf in the original principal amount of $30,746,812.23 (the "<u>NexPoint Term Note</u>") (Klos Dec. ¶ 31 at Ex. A); Ex. 2 (Exhibit 1), Appx. 41-44; Ex. 2 ¶ 21, Appx. 28; Ex. 15 ¶ 21, Appx. 428);

- a Term Note signed on HCMS's behalf in the original principal amount of $20,247,628.02 (the "<u>HCMS Term Note</u>" and together with the HCMS Demand Notes, the "<u>HCMS Notes</u>") (Klos Dec. ¶ 32 at Ex. R); Ex. 3 (Exhibit 6), Appx. 133-136); and

- a Term Note signed on HCRE's behalf in the original principal amount of $6,059,831.51 (the "<u>HCRE Term Note</u>" and together with the HCRE Demand Notes, the "<u>HCRE Notes</u>") (Klos Dec. ¶ 33 at Ex. S); Ex. 4 (Exhibit 6), Appx. 217-220).

32.    According to Mr. Waterhouse, Highland loaned money to NexPoint, HCMS, and HCRE to enable those entities to make investments. Ex. 105 at 126:21-129:3, Appx. 2081.[11]

---

[10] Proof of the loans underlying the Prior Notes (as defined in each Term Note) can be found at Exs. 127-141, Appx. 2368-2481 (HCMS); Exs. 149-153, Appx. 2537-2567 (HCRE); Exs. 157-161, Appx. 2599-2636 (NexPoint (the July 22, 2015 Prior Note appears to have been backdated because the underlying loans were effectuated between July 2015 and May 2017 (*see* Ex. 161))).

[11] Highland sought to inquire as to the use of the loan proceeds by NexPoint, HCMS, and HCRE (Exs. 47-49, Appx. 842-859 (Rule 30(b)(6) Topic 3(e))), but (a) those Obligors objected on relevance grounds (Ex. 191, Appx. 3007-3012; Ex. 98 at 348:18-20, Appx. 1758), and (b) Mr. Dondero claimed to have no personal knowledge of the purpose of the loans or the borrowers' use of the loan proceeds.  Ex. 98 at 420:10-18, Appx. 1776, 435:17-25, Appx. 1779, 448:4-13, Appx. 1783, and 450:3-24, Appx. 1783.

33.    Except for the date, the amount, the maker, the interest rate, and the identity of the Prior Notes (as that term is defined in each Term Note), each of the Term Notes is identical and includes the following provisions, among others:

2.1    <u>Annual Payment Dates</u>.    During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**<u>Annual Installment</u>**") until the Note is paid in full. ***Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

4.    <u>Acceleration Upon Default</u>.  *Failure to pay this Note or any installment hereunder as it becomes due shall*, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof***. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    <u>Waiver</u>.  Maker hereby ***waives*** grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    <u>Attorneys' Fees</u>.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, ***the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection***, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

34.    NexPoint, HCMS, and HCRE each failed to make the Annual Installment payment due on December 31, 2020.

35.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and (b) December 17, 2021, the unpaid

principal and accrued interest due under the NexPoint Term Note was $24,383,877.27.[12] (Klos Dec. ¶ 51).

36.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31.[13] (Klos Dec. ¶ 52).

37.    As of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[14] (Klos Dec. ¶ 53).

## C.    THE EVIDENCE OF THE EXISTENCE, VALIDITY AND ENFORCEABILITY OF THE NOTES IS OVERWHELMING

38.    As described in more detail below, the existence, validity, and enforceability of the Notes is corroborated by the following undisputed facts:

- Plaintiff's audited financial statements (prepared based on management representation letters signed by Mr. Dondero and Mr. Waterhouse) showed that each of the Notes (including the HCMFA Notes) (a) was carried as an asset on Plaintiff's balance sheet, (b) had a value equal to the unpaid principal and interest then due, and (c) was disclosed without reference to the Alleged Agreement, HCMFA's Mistake Defense, or any other defense;

- HCMFA and NexPoint jointly reported to the Retail Board in October 2020 that they were obligated to pay Highland the amounts due under the HCMFA Notes and the NexPoint Notes, respectively, each without any setoff or reservation;

---

[12] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[13] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[14] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

- Without exception, Plaintiff's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Plaintiff;

- Without exception, throughout Plaintiff's bankruptcy (including during the period from the Petition Date through January 9, 2020, when Mr. Dondero solely controlled Plaintiff), Plaintiff's bankruptcy filings (most of which were prepared or signed by Mr. Waterhouse) reported the Notes (including the HCMFA Notes) as being assets of the Debtor's estate, each without any setoff or reservation;

- The Notes (including the HCMFA Notes) were identified as substantial assets and sources of recovery under Plaintiff's proposed Plan, yet none of the Obligors informed the Court, Plaintiff, or any creditors of any of their purported defenses even though (a) each of them filed a Plan Objection, and (b) the Adversary Proceedings had already been commenced when the confirmation hearing on the Plaintiff's Plan was conducted.

1.    **Highland Disclosed The Notes In its Audited Financial Statements and Carried them as Assets on its Balance Sheet**

39.    The undisputed evidence cited below establishes, among other things, that (a) all of the Notes executed through early May 2019 were provided to PwC, Highland's long-time outside auditors, and were described in Highland's audited financial statements; (b) all of the Notes were carried as assets on Highland's balance sheet and were valued in amounts equal to the accrued and unpaid principal and interest without any offset or reservation whatsoever;[15] and (c) neither Highland nor Mr. Dondero disclosed the Alleged Agreement, HCMFA's Mistake Defense, or any other defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principals ("GAAP").

---

[15] As discussed below, the HCMFA Notes were executed in May 2019, and were fully described in the "Subsequent Events" section of Highland's audited financial statements for the period ending December 31, 2018. Ex. 34 at 39, Appx. 782. Because the HCMFA Notes were executed after the end of the fiscal year, they were **not** included as "assets" for 2018, and Highland never completed its 2019 audit. Nevertheless, the undisputed evidence also shows that HCMFA (a) disclosed the existence of the HCMFA Notes in the "Subsequent Events" section of its *own* 2018 audited financial statements and (b) carried the HCMFA Notes as liabilities on its *own* balance sheet. Ex. 45 at 17; Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029.

40.     PwC's audit process was extensive and took months to complete.  Ex. 94 at 9:24-12:14, Appx. 1554-1555.

41.     As part of the process, Highland was responsible for drafting the financial statements and accompanying notes and "management" provided the information that PwC needed to conduct its audits.  *Id*. at 14:8-15:14, Appx. 1556; *see also id*. at 49:11-50:22, Appx. 1564-1565. All of Highland's employees who worked on the audit reported to Mr. Waterhouse, and Mr. Waterhouse was ultimately responsible for making sure the audit was accurate before it was finalized.  Ex. 105 at 87:25-89:10, Appx. 2071.

42.     Before signing off on its audit, PwC required Highland to deliver "management representation letters" that included specific representations that PwC relied upon. Ex. 94 at 16:18-17:20, Appx. 1556, 23:4-9, Appx. 1558.  *See also* Ex. 105 at 96:24-98:6, Appx. 2073-2074 (according to Mr. Waterhouse, management representation letters are "required in an audit to help verify completeness.").

43.     For at least the fiscal years 2017 and 2018, Mr. Dondero and Mr. Waterhouse signed Highland's management representation letters; their representations were applicable through the date of the audit's completion so that all "material" subsequent events could be included and disclosed.  Ex. 33, Appx. 729-740, Ex. 86, Appx. 1420-1431, Ex. 94 at 17:21-25, Appx. 1556, 19:2-22:6, Appx. 1557-1558; *see also* Ex. 105 at 92:4-8, Appx. 2072, 94:20-95:12, Appx. 2073.

44.     On June 3, 2019, in connection with PwC's audit of Highland's financial statements for the period ending December 31, 2018, Mr. Dondero and Mr. Waterhouse made the following representations to PwC:

- The Affiliated Party Notes represented bona fide claims against the makers, and all Affiliated Party Notes were current as of June 3, 2019 (Ex. 33 ¶11, Appx. 732; Ex. 94 at 24:6-25:5, Appx. 1558);[16]

- If there were any errors in Highland's financial statements, they were not "material" (Ex. 33 ¶32, Appx. 735; Ex. 94 at 25:6-26:13, Appx. 1558-1559);

- There were no "material" transactions or agreements that were not recorded in the financial statements (Ex. 33 ¶34, Appx. 735; Ex. 94 at 26:14-27:11, Appx. 1559);

- All relationships and transactions with, and amounts receivable or payable to or from, related parties were properly reported and disclosed in the consolidated financial statements (Ex. 33 ¶35(d), Appx. 735; Ex. 94 at 27:12-28:11, Appx. 1559);

- All related party relationships and transactions known to Mr. Dondero and Mr. Waterhouse were disclosed (Ex. 33 ¶36, Appx. 736; Ex. 94 at 28:12-29:5, Appx. 1559); and

- All subsequent events were disclosed (Ex. 33 (signature page), Appx. 738; Ex. 94 at 29:6-30:2, Appx. 1559-1560).

45.     Under GAAP, Highland was required to disclose to PwC (a) all "material" related party transactions and (b) any circumstances that would call into question the collectability of any of the Notes.  Ex. 94 at 34:17-35:2, Appx. 1561, 51:17-52:5, Appx. 1565, 70:20-71:3, Appx. 1570.[17]

46.     Neither Mr. Dondero nor Highland ever disclosed to PwC (a) the existence or terms of the Alleged Agreement; (b) the existence of any oral or written amendment to any of the Affiliate Notes listed in PwC's 2018 work papers; or (c) that any of the Notes might be

---

[16] "Affiliated Party Notes" is the term used by PwC to refer to notes tendered to Highland by officers, employees, or affiliates of Highland.  *See generally* Ex. 33, Appx. 729-740; Ex. 94, Appx. 1551-1585.

[17] For purposes of the 2017 audit, the "materiality" threshold was $2 million.  Ex. 86 at 1, Appx. 1421.  For purposes of the 2018 audit, the "materiality" threshold was $1.7 million or more.  Ex. 33 at 1, Appx. 730; Ex. 94 at 22:11-23:3, Appx. 1558.  *See also* Ex. 105 at 91:14-93:6, Appx. 2072.

forgiven.  Ex. 24 (Responses to RFAs 1-2), Appx. 521; Ex. 94 at 67:16-70:19, Appx. 1569-1570,

71:4-74-8, Appx. 1570-1571, 92:19-93:12, Appx. 1575; Ex. 105 at 102:2-5, Appx. 2075.

       47.     If PwC had learned before June 3, 2019, that any of the Notes (a) might not

be collectible, or (b) might be forgiven, or (c) was amended, or (d) would be extinguished based

on the fulfillment of certain conditions subsequent, it would have required that fact to be disclosed.

Ex. 94 at 74:19-76:12, Appx. 1571.

       48.     For purposes of PwC's audit, "affiliate notes" were considered receivables

of Highland and were carried as assets on Highland's balance sheet under "Notes and other

amounts due from affiliates."  Ex. 34 at 2, Appx. 745; Ex. 72 at 2, Appx. 1291; Ex. 94 at 23:10-

22, Appx. 1558, 31:11-33:20, Appx. 1560; Ex. 105 at 106:20-109:12, Appx. 2076.

       49.     For the 2017 fiscal year, Highland valued "Notes and other amounts due

from affiliates" in the aggregate amount of approximately $163.4 million, which then constituted

more than 10% of Highland's total assets; for the 2018 fiscal year, Highland valued "Notes and

other amounts due from affiliates" in the aggregate amount of approximately $173.4 million,

which then constituted more than 15% of Highland's total assets.  Ex. 72 at 2, Appx. 1291; Ex. 34

at 2, Appx. 745; Ex. 94 at 33:21-34:2, Appx. 1560-1561, 51:2-16, Appx. 1565.

       50.     The notes to the financial statements described the "Affiliate Notes" that

were carried on Highland's balance sheet; management calculated the amounts due and owing to

Highland from each Affiliate.  Ex. 72 at 30-31; Ex. 34 at 28-29; Ex. 94 at 34:17-36:25; 51:17-

53:12, Appx. 1565; Ex. 105 at 110:22-112:21, Appx. 2077.

       51.     The "fair value" of the Affiliate Notes was "equal to the principal and

interest due under the notes."  Ex. 72 at 30-31, Appx. 1319-1320; Ex. 34 at 28-29, Appx. 771-772;

Ex. 94 at 37:11-39:12, Appx. 1561-1562; 53:19-25, Appx. 1565.

16

52.     At the time PwC completed its 2017 and 2018 audits, PwC had no reason to discount the value of any of the Affiliate Notes.  Ex. 94 at 39:17-21, Appx. 1562; 54:2-8, Appx. 1566.

53.     Moreover, as reflected in PwC's work papers, and based on the information provided by Highland and PwC's own independent analysis, PwC concluded that the obligors under each of the Affiliate Notes had the ability to pay all amounts outstanding.  Ex. 92, Appx. 1514-1530; Ex. 93, Appx. 1531-1550; Ex. 94 at 41:2-45:6, Appx. 1562-1563, 55:17-60:22, Appx. 1566-1567, 68:20-25, Appx. 1569.

54.     Note 15 to Highland's 2018 audited financial statements disclosed as a "subsequent event" (*i.e.*, an event occurring after the December 31, 2018 end of the fiscal year and on or before June 3, 2019, the date Mr. Dondero and Mr. Waterhouse signed the management representation letters and PwC completed its audit) the following:

> Over the course of 2019, through the report date, HCMFA issued promissory notes to [Highland] in the aggregate amount of $7.4 million.  The notes accrue interest at a rate of 2.39%.

Ex. 34 at 39, Appx. 782.  *See also* Ex. 94 at 54:9-55:7, Appx. 1566.

55.     There will be no evidence that HCMFA issued any notes to Highland in 2019 other than the HCMFA Notes.

**2.      In October 2020, HCMFA and NexPoint Jointly Informed The Retail Board of their Obligations under Their Respective Notes**

56.     The Advisors have contracts to manage certain funds (the "Fund Agreements").  The Fund Agreements are among the most important contracts the Advisors have; HCMFA's Rule 30(b)(6) witness acknowledged that its contracts with the Funds are largely the reason for HCMFA's existence.  Ex. 192 at 66:3-67:6, Appx. 3031.

17

57.     The Funds are purportedly managed by a board (the "Retail Board").  In the fall of each year, the Retail Board must determine whether to renew the Fund Agreements with the Advisors, a process referred to as a "15(c) Review."  As part of the 15(c) Review process, the Retail Board requests information from the Advisors.  Ex. 99 at 129:17-130:3, Appx. 1844-1845, Ex. 105 at 32:17-33:6, Appx. 2057, 168:9-12, Appx. 2091, 169:9-170:16, Appx. 2091-2092.

58.     Mr. Waterhouse, the Advisors' Treasurer, and Mr. Norris, HCMFA's Executive Vice President, participated in the annual 15(c) Review process with the Retail Board. Ex. 192 at 67:7-68:19, Appx. 3031; Ex. 105 at 168:13-169:8, Appx. 2091.

59.     In October 2020, as part of its 15(c) Review, the Retail Board asked the Advisors to provide certain information including the following:

> Are there any outstanding amounts currently payable or due in the future (e.g., notes) to HCMLP by HCMFA or NexPoint Advisors or any other affiliate that provides services to the Funds?

Ex. 36 at 3, Appx. 793.

60.     Ms. Thedford, the Secretary of the Advisors and an employee of Highland, followed up on this particular question, and Mr. Waterhouse directed her to "the balance sheet that was provided to the [Retail Board] as part of the" 15(c) Review.  *Id.* at 2, Appx. 792.

61.     As directed by Mr. Waterhouse, Ms. Thedford (a) obtained the relevant information from the Advisors' June 30, 2020 financial statements and (b) drafted a response that she shared with, among others, Mr. Waterhouse, Mr. Norris (the Advisors' Executive Vice President), and Mr. Post (the Advisors' Chief Compliance Officer).  Ex. 35, Appx. 788-789; Ex. 37, Appx. 795-796.

62.     Based on HCMFA's June 30, 2020 financial statements, Ms. Thedford sent her draft response to Mr. Waterhouse, Mr. Norris, Mr. Post, and others and reported that "$12,286,000 remains outstanding to HCMLP from HCMFA."  Ex. 36 at 1, Appx. 791.

63.    This amount necessarily included the amounts due under the HCMFA Notes because, as HCMFA has admitted, HCMFA carried the HCMFA Notes as liabilities on its balance sheet and the balance sheet was Ms. Thedford's source of information.  Ex. 192 at 54:6-9, 54:22-55:8, 55:23-56:3, Appx. 3028, 56:20-59:3, Appx. 3028-3029; Ex. 194 at 117:16-122:15, Appx. 3156-3157; Ex. 195 at 120:23-122:13, Appx. 3211-3212.

64.    On October 23, 2020, the Advisors provided their final, formal responses to the questions posed by the Retail Board.  As to the issue of outstanding amounts currently payable or due to Highland or its affiliates, the Advisors reported as follows:

> As of June 30, 2020, $23,683,000 remains outstanding to HCMLP and its affiliates from NexPoint and $12,286,000 remains outstanding to HCMLP from HCMFA.  The Note between HCMLP and NexPoint comes due on December 31, 2047.  The earliest the Note between HCMLP and HCMFA could come due is in May 2021.  All amounts owed by each of NexPoint and HCMFA pursuant to the shared services arrangement with HCMLP have been paid as of the date of this letter.  The Advisor notes that both entities have the full faith and support of James Dondero.

Ex. 59 at 2, Appx. 885.

65.    Based on the foregoing, there is no dispute that the Advisors -- with the full knowledge of each of their officers and based on HCMFA's own balance sheet -- informed the Retail Board in October 2020 of their unmitigated obligations under the NexPoint Note the HCMFA Notes.

### 3.    Without Exception, the Notes were Disclosed in Highland's Books and Records and Were Consistently Carried as Assets without Discount

66.    In addition to its audited financial statements, and without exception, Highland's contemporaneous books and records – before the Petition Date and after -- recorded the Notes as valid debts due and owing by each of the Obligors to Plaintiff.

67.    For example, in the Debtor's February 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the transfer to Mr. Dondero on February 2, 2018 was contemporaneously identified as "($3.8M) partner loan." Ex. 39 at 1, Appx. 801. *See also* Ex. 78 at 2, Appx. 1362 (in the Debtor's August 2018 internal monthly reporting package, under the heading "Significant Items Impacting HCMLP's Balance Sheet," the August 2018 transfers to Mr. Dondero were together contemporaneously identified as "($5.0M) partner loan.").

68.    After the Petition Date, but while Mr. Dondero was still in control of Highland, the Debtor filed its *Schedules of Assets and Liabilities* [Bankr. Docket No. 247] (the "Debtor's Schedules").  The Debtor's Schedules included the Notes among the Debtor's assets. Ex. 40, Appx. 812-815 (excerpts of the Debtor's Schedules showing that Highland (i) disclosed as assets of the estate "Notes Receivable" in the approximate amount of $150 million (Item 71), and (ii) provided a description of the Notes (Exhibit D)).

69.    In every one of the Debtor's *Monthly Operating Reports* (the "MORs") filed with the Court (while Mr. Dondero was in control of Highland and after), the Debtor included as assets of the estate amounts "Due from affiliates" that included the Notes.  *See, e.g.,* Ex. 41, Appx. 816-825; Ex. 42, Appx. 826-835; Ex. 88, Appx. 1475-1486; Ex. 89, Appx. 1487-1496.[18]

70.    Highland's "back-up" to the amounts "Due from affiliates" set forth in the MORs identified the Obligors under the Notes and included all unpaid principal and accrued

---

[18] *See also* Bankr. Docket No. 405 (October 2019); Bankr. Docket No. 289 (November 2019); Bankr. Docket No. 418 (December 2019); Bankr. Docket No. 497 (January 2020); Bankr. Docket No. 558 (February 2020); Bankr. Docket No. 634 (March 2020); Bankr. Docket No. 686 (April 2020); Bankr. Docket No. 800 (May 2020), as amended in Bankr. Docket No. 905; Bankr. Docket No. 913 (June 2020); Bankr. Docket No. 1014 (July 2020); Bankr. Docket No. 1115 (August 2020); Bankr. Docket No. 1329 (September 2020); Bankr. Docket No. 1493 (October 2020); Bankr. Docket No. 1710 (November 2020); Bankr. Docket No. 1949 (December 2020); and Bankr. Docket No. 2030 (January 2021).

interest.  *See, e.g.,* Exs. 196-198, Appx. 3239-3244 (the back-up to the "Due from Affiliates" amounts set forth in the MORs for December, September 2020, and January 2021).

71.     Relatedly, Highland's accounting group has a regular practice of creating, maintaining and updating on a monthly basis "loan summaries" in the ordinary course of business (the "Loan Summaries").  The Loan Summaries identify amounts owed to Highland under affiliate notes and are created by updating underlying schedules for activity and reconciling with Highland's general ledger.  Ex. 199, Appx. 3245-3246 is an example of a Loan Summary.  The Loan Summaries identify each Obligor by reference to the "GL" number used in the general ledger. *See* Ex. 199, Appx. 3246 (HCMS ("GL 14530"), HCMFA ("GL 14531"), NexPoint ("GL 14532"), HCRE ("GL 14533"), and Mr. Dondero ("GL 14565")).

72.     The Loan Summaries were used in connection with the PwC audits and to support accounting entries and year-end balances in the ordinary course of Highland's business. For example, Ex. 199, Appx. 3246 ties exactly into Ex. 198, Appx. 3243-3244, the "back up" to the "Due from affiliates" entry in the January 2021 MOR.  Bankr. Docket No. 2020.  Klos Dec. ¶¶15-16.[19]

### 4.     Recovery on the Notes Was A Significant Component of the Plan Yet the Obligors Remained Silent On the Point Despite Lodging Objections

73.     On November 24, 2020, Highland filed its *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Bankr. Docket No. 1473].  Included therein were the Debtor's Liquidation Analysis/Financial Projections (the

---

[19] Colloquially, the Loan Summaries are the "back up" to the "back up."  To illustrate, and working backwards, the January 2021 MOR reported that $152,538,000 was "Due from affiliates."  Bankr. Docket No. 2030 (balance sheet). Ex. 198, Appx. 3243-3244 is the "back up" to the January 2021 MOR and it shows that $152,537,622 was the "Total Due from Affiliates" (the January 2021 MOR rounded up to the nearest thousand).  Ex. 199, Appx. 3245-3246, the Loan Summary, is the "back up" to the "back up," and is reconciled with Highland's general ledger.  As can be seen, the Loan Summary specifies the outstanding principal amounts due under each Note.  *See* Klos Dec. ¶¶15-16.

"Projections"). Ex. 90, Appx. 1497-1505. Among the assumptions supporting the Projections was

that "[a]ll demand notes are collected in the year 2021." *Id.* at 173 of 178, Appx. 1500

(Assumption C).

74. Thus, even though Highland had not yet called the Demand Notes, the

Obligors and all parties in interest were put on notice on November 24, 2020, that the Debtor's

Projections assumed all Demand Notes would be collected the following year.

75. By early February 2021, Highland had already commenced the Adversary

Proceedings to collect on all of the Notes. Consequently, it amended the Projections [Bankr.

Docket No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand

notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on

default provisions; payment estimated in 2021." Ex. 91 at 2, Appx. 1508 (Assumption C) (the

"Assumption").

76. Thus, as of February 1, 2021, on the eve of confirmation, the Obligors and

all parties in interest knew the Debtor's Projections, as amended, assumed that all amounts due

under the Notes would be collected as part of the Plan.

77. At the confirmation hearing, James P. Seery, Jr., Highland's Chief

Executive Officer, testified as to (a) why the Debtor believed the Assumption was reasonable, and

(b) how the commencement of the Adversary Proceedings impacted the Projections.

Mr. Dondero's counsel asked limited questions on cross-examination concerning the Notes.

Ex. 206 at 123:23-124:23, Appx. 4305-4306, 128:23-129:21, Appx. 4310-4311, 185:8-15, Appx.

4367.

78. In his closing argument, Mr. Dondero's counsel discussed the Notes and (a)

vaguely suggested that there may be "arguments" against the Debtor's assertion that the Term

Notes are due and payable and (b) observed that the Notes were not discounted for "collectability

issues," but made no mention of the Alleged Agreement, HCMFA's Mutual Mistake defense, or

any other defense:

> First, there's the notes; and second, there's the assets. The notes are
> either long-term or demand notes. Those long-term notes,
> Mr. Seery will tell you some have been validly accelerated and
> therefore are now due and payable. I think there's arguments to the
> contrary. But those long-term notes probably have some both time
> value of money and collection costs. And then, of course, you have
> to discount them by collectability issues, too.
>
> I don't believe any analysis went into it, or at least the Court was not
> provided any data or analysis as to what discounts were applied to
> those notes. And, therefore, I don't think that this Court can make
> any determination that the best interests of the creditors have been
> met.

Ex. 207 at 223:22-224:14, Appx. 4701-4702.

## D.    THE OBLIGORS' AFFIRMATIVE DEFENSES

79.    The Obligors have asserted various defenses to Plaintiff's claims

concerning Counts One and Two and those are addressed below.

### 1.    The Alleged Agreement Defense

80.    Over the course of several months, Mr. Dondero cobbled together an

affirmative defense premised on an alleged oral agreement pursuant to which all of the Notes

would be forgiven based on certain "conditions subsequent" or if certain assets were sold by a

third party. After Mr. Dondero settled on that defense, all of the Obligors (except HCMFA)

amended their pleadings to adopt the same affirmative defense.

DOCS_NY:44673.9 36027/003

i.        **The Allegations Materially Changed Over Time**

81.      In due course, each of the Defendants filed its respective Original Answer.[20]
In his Original Answer, Mr. Dondero asserted as his first affirmative defense that "Plaintiff's
claims should be barred because it was previously agreed that Plaintiff would not collect on the
Notes."  Ex. 80 ¶40, Appx. 1380 (the "Alleged Agreement").  None of the Corporate Obligors
asserted the Alleged Agreement or any similar defense in its respective Original Answer.

82.      In late March, Highland asked Mr. Dondero to admit, among other things,
that he did not pay taxes on the amounts loaned to him but that Plaintiff allegedly agreed not to
collect.  Ex. 81 (Responses to RFAs 4, 8, and 12), Appx. 1387-1388.  Having been alerted to a
fatal flaw in his defense, Mr. Dondero modified his affirmative defense based on the Alleged
Agreement to state that: "Plaintiff's claims should be barred because it was previously agreed that
Plaintiff would not collect on the Notes *upon fulfillment of conditions subsequent*."   Ex. 83
("Amended Answer") ¶40, Appx. 1403.

83.      On April 15, 2021, about ten days after serving his Amended Answer, Mr.
Dondero served his *Rule 26 Initial Disclosures.*  Ex. 184, Appx. 2982-2990 (the "Rule 26
Disclosures").   In his Rule 26 Disclosures, Mr. Dondero specifically identified fifteen (15)
"individuals likely to have discoverable information," but his sister, Ms. Dondero, was not among
them.  *Id.* at 2-5, Appx. 2984-2987.

84.      On April 26, 2021, Mr. Dondero served his sworn *Objections and Answers
to Highland Capital Management L.P.'s First Set of Interrogatories*.  Ex. 82, Appx. 1390-1396.

---

[20] Dondero Action, Docket No. 6 (the "Dondero Original Answer"); HCFMA Action, Docket No. 6 (the "HCMFA
Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6
(the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

85.     In response to an interrogatory that required Mr. Dondero to identify, with respect to each Note, "the person who entered into each [Alleged] Agreement on behalf of the Debtor," Mr. Dondero answered that "[t]he [Alleged] Agreements were entered into on behalf of the Debtor *by James Dondero* subsequent to the time each note was executed." *Id*. at 4, Appx. 1394 (Answer to Interrogatory No. 1) (emphasis added).

86.     In response to an interrogatory that required Mr. Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Mr. Dondero identified five (5) individuals, including himself, but – like the Rule 26 Disclosures – Mr. Dondero's sister was not among them. *Id.*, Appx. 1394 (Answer to Interrogatory No. 2).

87.     It was not until later in discovery that Mr. Dondero identified his sister – someone he failed to include as a person likely to have discoverable information or someone he believed had actual knowledge of each Alleged Agreement – as the person who allegedly bound Plaintiff to the Alleged Agreement, rather than himself.[21]

88.     In the weeks that followed, each of the Obligors (except for HCMFA) sought leave from the Court to amend its respective answer to adopt Mr. Dondero's Alleged Agreement defense, contending that it is not liable under any of the Notes because Plaintiff (bound by Ms. Dondero, acting as the Dugaboy Trustee) previously entered into an oral agreement pursuant to which it promised not to collect on the Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[22]

---

[21] Ms. Dondero was allegedly acting in her capacity as the Trustee of Dugaboy, a family trust in which Mr. Dondero is the sole beneficiary during his lifetime and that purportedly held a majority of certain of the limited partner interests in Highland.  *See* Ex. 31 ¶82, Appx. 655.

[22] *See* Ex. 11, Appx. 384-393 (NexPoint's Motion for Leave to Amend); Ex. 14 (NexPoint's First Amended Answer) ¶42, Appx. 421-422; Ex. 8, Appx. 292-312 (HCMS's Motion for Leave to Amend); Ex. 12 (HCMS's First Amended Answer) ¶56, Appx. 402; Ex. 9 (HCRE's Motion for Leave to Amend), Appx. 313-333; Ex. 17 (HCRE's Amended Answer) ¶99, Appx. 468.

ii.   **The Final Version of the "Alleged Agreement" Defense**

89.   After months of maneuvering, Mr. Dondero, HCMS, HCRE, and NexPoint

finally settled on the following affirmative defense based on the Alleged Agreement:

> Plaintiff's claims are barred … because prior to the demands for
> payment Plaintiff agreed that it would not collect the Notes upon
> fulfillment of conditions subsequent.   Specifically, sometime
> between December of the year in which each note was made and
> February of the following year, [] Nancy Dondero, as representative
> for a majority of the Class A shareholders of Plaintiff agreed that
> Plaintiff would forgive the Notes if certain portfolio companies were
> sold for greater than cost or on a basis outside of James Dondero's
> control.   The purpose of this agreement was to provide
> compensation to Defendant James Dondero, who was otherwise
> underpaid compared to reasonable compensation levels in the
> industry, through the use of forgivable loans, a practice that was
> standard at HCMLP and in the industry.   This agreement setting
> forth the conditions subsequent to demands for payment on the
> Notes was an oral agreement; however, Defendant [ ] believes there
> may be testimony or email correspondence that discusses the
> existence of this agreement that may be uncovered through
> discovery in this Adversary Proceeding.

Ex. 31 ¶ 82, Appx. 655 ("Dondero's Answer").[23]

iii.   **No Reasonable Trier of Fact Can Find that the Alleged Agreement
Existed**

90.   For the reasons set forth below, no reasonable trier of fact can find that the

Alleged Agreement ever existed.

91.   Mr. Dondero could not identify a material term of the Alleged Agreements.

Mr. Dondero could not describe a material terms of the Alleged Agreements without relying on a

document prepared by counsel.   Specifically, without a list prepared by counsel, Mr. Dondero

could not identify any of the Notes subject to the Alleged Agreements nor could he recall (i) the

number of Notes subject to each Alleged Agreement, (ii) the maker of each Note subject to each

---

[23] *See also* Ex. 15 ¶83, Appx. 435-436 ("NexPoint's Answer"); Ex. 16 ¶97, Appx. 451-452 ("HCMS's Answer"); and
Ex. 17 ¶99, Appx. 468 ("HCRE's Answer").

Alleged Agreement, (iii) the date of each Note subject to each Alleged Agreement, or (iv) the principal amount of any Note subject to the Alleged Agreements.  Ex. 99 at 13:4-28:22, Appx. 1815-1819.

92.     Mr. Dondero's inability to identify the notes subject to the Alleged Agreement is significant because he and HCMFA had other notes outstanding at the same time. *See, e.g.,* Ex. 43, Appx. 836-838 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million); Adv. Pro. 21-03082, Docket No. 1 (Exhibit 1, February 26, 2014 note executed by HCMFA in the principal amount of $4 million) (Exhibit 2, a February 26, 2016 note executed by HCMFA in the principal amount of $2.3 million).

93.     <u>Mr. and Ms. Dondero dispute a key aspect of the Alleged Agreements</u>.  Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope.  Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement.  Mr. Dondero, on the other hand, disagrees.  *Compare* Ex. 100 at 180:8-183:20, Appx. 1919-1920 *with* Ex. 99 at 79:6-81:23, Appx. 1832.

94.     <u>Mr. Dondero personally caused MGM stock to be sold in November 2019 and failed to declare the Notes forgiven</u>.  According to Mr. and Ms. Dondero, all of the Notes would be forgiven if Mr. Dondero sold one of three portfolio companies -- Trussway, Cornerstone, or MGM -- above cost.  *See* Ex. 31 ¶82, Appx. 655.

95.     In November 2019, Mr. Dondero caused the sale of a substantial interest in MGM for $123.25 million, a portion of which was for the Debtor's interest in a fund, but failed to declare all of the Notes forgiven, and remained silent about the Alleged Agreement altogether.  *See* Ex. 201 ¶29-30, Appx. 3270-3271; Ex. 202 ¶14, Appx. 4135; Ex. 203 ¶1, Appx. 4143; Ex. 204 at 5 n. 5, Appx. 4156.

96. <u>Ms. Dondero was not competent to enter into the Alleged Agreements</u>.

Under the circumstances, Ms. Dondero was not competent to enter into the Alleged Agreements, and she made no effort to educate herself before purportedly binding Highland. Ms. Dondero:

- had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) Mr. Dondero's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry" (Ex. 100 at 42:22-43:8, Appx. 1885, 48:7-61:9, Appx. 1886-1889; 211:8-216:21, Appx. 1927-1928);[24]

- never reviewed Highland's financial statements (including balance sheets, bank statements, profit and loss statements and statements of operations), never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (*Id*. at 61:25-63:13, Appx. 1889-1890);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Ms. Dondero did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (*Id*. at 63:18-80-22, Appx. 1890-1894; 208:24-210:13, Appx. 1926-1927);

- never saw a promissory note signed by James Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (*Id*. at 83:14-84:8, Appx. 1895; 95:3-16, Appx. 1898; 99:20-100:10, Appx. 1899; 115:11-116:4, Appx. 1903; 127:13-128:4, Appx. 1906; 140:15-141:22, Appx. 1909, 180:18-23, Appx. 1919);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans, but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (*Id*. 84:9-92:3, Appx. 1895-1897, 100:11-103:8, Appx. 1899-1900);

---

[24] The only information Ms. Dondero had concerning Mr. Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." Ex. 100 at 51:11-22, Appx. 1887. This information was false. Ex. 68, Appx. 1129-1130 (2016 base salary of $1,062,500 with total earnings and awards of $2,287,175); Ex. 50, Appx. 860-861 (2017 base salary of $2,500,024 with total earnings and awards of $4,075,324); Ex. 51, Appx. 862-863 (2018 base salary of $2,500,000 with total earnings and awards of $4,194,925); and Ex. 52, Appx. 864-865 (2019 base salary of $2,500,000 with total earnings and awards of $8,134,500).

- had no knowledge of NexPoint, HCMS, or HCRE (the Corporate Obligors whose Notes are purportedly subject to the Alleged Agreement), including (a) the nature of their businesses, (b) their relationships with Highland, including whether they provided any services to Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (*Id.* at 103:19-115:10, Appx. 1900-1903, 119:5-127:7, Appx. 1904-1906, 129:5-140:14, Appx. 1906-1909).

- had no authority under the HCMLP partnership agreement to negotiate and enter into binding agreements on behalf of HCMLP Ex. 2 (Exhibit4), Appx. 57-93.

97. Mr. Dondero retained Alan Johnson as an executive compensation expert. Mr. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions. Based on his expertise, Mr. Johnson would very likely concur that Ms. Dondero was not competent to enter into the Alleged Agreements on behalf of Highland. Ex. 101 at 12:3-73:17, Appx. 1961-1976.

98. <u>The Alleged Agreements were kept secret and were never disclosed.</u> The Alleged Agreements were never disclosed by Mr. Dondero or Ms. Dondero:

- Other than Mr. and Ms. Dondero, no one participated in the discussions that led to each Alleged Agreement. Ex. 100 at 190:16-191:17, Appx. 1922;

- Ms. Dondero and Dugaboy have admitted that (1) neither ever disclosed the existence or terms of the Alleged Agreements to *anyone*, including PwC, Mr. Waterhouse, or Mr. Okada, and (2) neither ever caused Highland to disclose the existence or terms of the Alleged Agreements to the Bankruptcy Court. Ex. 25 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 538-542; Ex. 26 (Responses to RFAs 1-6, 9-16, responses to Interrogatories 1-2, Appx. 554-558); and

- Mr. Dondero has admitted that he (1) never disclosed the existence or terms of the Alleged Agreements to PwC, Mr. Okada, or the Bankruptcy Court; and (2) never caused Highland to disclose the existence or terms

of the Alleged Agreement to the Bankruptcy Court.  Ex. 24 (Responses to RFAs 1-2, 5-7, 11-17, Appx. 521-524).[25]

99.    <u>No Document Exists that Reflects the Existence or Terms of the Alleged Agreements</u>.  No document was created prior to the Petition Date that memorializes or reflects the existence or terms of the Alleged Agreement:

- Neither Dugaboy nor Ms. Dondero (a) ever made a list of the promissory notes that are the subject of the Alleged Agreement; or (b) is otherwise aware of anything in writing that identifies the promissory notes that are the subject of each Alleged Agreement.  Ex. 100 at 178:25-180:7, 180:24-181:6, Appx. 1919.

- The terms of the Alleged Agreement were never reduced to writing.  Ex. 25 (Responses to RFAs 7-8, Appx. 539, Responses to Interrogatories 3-4, Appx. 542); Ex. 26 (Responses to RFAs 7-8, Appx. 555, Responses to Interrogatories 3-4, Appx. 558); Ex. 100 at 217:2-17, Appx. 1928.

- Mr. Dondero has admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreement; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identifies the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that reflects or memorializes the terms of the Alleged Agreements.  Ex. 24, Appx. 522 (Response to RFA 7); Ex. 99 at 28:24-29:12, Appx. 1819.

100.    <u>Even if the Alleged Agreements existed, they are unenforceable for lack of consideration</u>.  Mr. Dondero is the founder of Highland and Highland was the platform he used to support his other businesses, including the Advisors, HCRE, and HCMS.  No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Mr. Dondero or (b) that Highland received anything of value in exchange for agreeing to forgive over $50 million in valid promissory notes if either (i) Mr. Dondero sold one of the three

---

[25] Mr. Dondero asserts that he informed Mr. Waterhouse about the Alleged Agreement. Ex. 24, Appx. 521 (Responses to RFAs 3 and 4).  But Mr. Waterhouse testified that he did not learn of the Alleged Agreement until 2021 and even now only knows that it was subject to "milestones" that he cannot identify.  Ex. 105 at 65:5-72:14, Appx. 2065-2067, 82:19-84:7, Appx. 2070.

portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party.

Yet, according to Ms. Dondero, "motivating" Mr. Dondero is all Highland received.  *See, e.g.,*

Ex. 100 at 221:2-225:7, Appx. 1929-1930.

        101.    Indeed, Ms. Dondero admitted that she did not know, and had no reason to

expect, that Highland would benefit from the sale of the portfolio companies by a third party.  She

also acknowledged that (a) Highland would not benefit from the Alleged Agreements if a third

party sold the portfolio companies at less than cost and (b) the Notes would all be forgiven even if

a third party sold the portfolio companies at a price "substantially below cost."  Ex. 100 at 201:24-

203:11, Appx. 1924-1925; 227:17-229:14, Appx. 1931.

        102.    <u>Mr. Dondero fixed the terms of the Alleged Agreements without</u>

<u>negotiation</u>.  No aspect of the Alleged Agreement was the subject of negotiation and Ms. Dondero

made no counterproposal of any kind.  Indeed, the undisputed facts show that Ms. Dondero never

(i) made a counterproposal; (ii) negotiated any aspect of the Alleged Agreements; (iii) asked Mr.

Dondero how he selected the portfolio companies; (iv) inquired as to whether Mr. Dondero already

had a duty to maximize value; (v) rejected any aspect of Mr. Dondero's proposal; or (vi) rejected

or pushed back on Mr. Dondero's proposal that all of the Notes would be forgiven if any of the

portfolio companies were sold by a third party.  Ex. 100 at 194:16-19, Appx. 1923, 195:14-199:15,

Appx. 1923-1924.

        103.    <u>There is No History of Loans Being Forgiven at Highland</u>.  Mr. Dondero,

NexPoint, HCMS, and HCRE contend that the use of "forgivable loans" was a "practice that was

standard at Highland."  *See, e.g.,* Ex. 31 ¶82, Appx. 655.  This is demonstrably false.

        104.    Mr. Dondero has admitted that Highland disclosed to its auditors all loans

of a material amount that Highland ever forgave.  Ex. 98 at 426:8-427:15, Appx. 1777.  During his

deposition, Mr. Johnson, Mr. Dondero's executive compensation expert, reviewed Highland's audited financial statements for each year from 2008 through 2018 (Ex. 101 at 119:14-189:21, Appx. 1988-2005) and concluded that (a) Highland has not forgiven a loan to anyone in the world since 2009, (b) the largest loan Highland has forgiven since 2008 was $500,000, (c) Highland has not forgiven any loan to Mr. Dondero since at least 2008, and (d) since at least 2008, Highland has never forgiven in whole or in part any loan that it extended to any affiliate. *Id.* at 189:24-192:10, Appx. 2005-2006. *See also* Ex. 98 at 422:18-428:14, Appx. 1776-1778.

## 2.     HCMFA's "Mutual Mistake" Defense

105.    HCMFA's primary affirmative defense is that the HCMFA Notes are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from Defendant to Waterhouse to executive the same for Defendant."  Ex. 13 ¶ 47, Appx. 412.

106.    In support of its defense, HCMFA asserts that Mr. Waterhouse signed the HCMFA Notes by mistake and without authority ("HCMFA's Mistake Defense"), and that Highland's transfer of $7.4 million on May 2 and May 3, 2019 should have been treated "as compensation by the Plaintiff to the Defendant." Ex. 13 ¶ 45, Appx. 412.

107.    HCMFA specifically contends that, in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of certain securities Highland Global Allocation Fund ("HGAF") held in Terrestar (the "NAV Error").  HCMFA maintains that after the NAV Error was discovered in early 2019:

> The Securities and Exchange Commission opened an investigation, and various employees and representatives of the Plaintiff, the Defendant, and HGAF worked with the SEC to correct the error and to compensate HGAF and the various investors in HGAF harmed by the NAV Error. Ultimately, and working with the SEC, the Plaintiff determined that the losses from the NAV Error to HGAF and its shareholders amounted to $7.5 million: (i) $6.1 million for the NAV Error itself, as well as rebating related advisor fees and processing costs; and (ii) $1.4 million of losses to the shareholders of HGAF.

32

> The Defendant accepted responsibility for the NAV Error and paid out $5,186,496 on February 15, 2019 and $2,398,842 on May 21, 2019. In turn, the Plaintiff accepted responsibility to the Defendant for having caused the NAV Error, and the Plaintiff ultimately, whether through insurance or its own funds, compensated the Defendant for the above payments by paying, or causing to be paid, approximately $7.5 million to the Defendant directly or indirectly to HGAF and its investors.

Ex. 13 ¶¶ 41-42, Appx. 411.

108.    On May 28, 2019, HCMFA sent a memorandum to the Board of Trustees of HGAF to describe the "Resolution of the Fund's" NAV Error, HCMFA did not mention Highland but reported:

> The Adviser and Houlihan Lokey, an independent third party expert valuation consultant approved by the Board, initially determined that the March Transactions were "non-orderly" and should be given "zero weighting" for purposes of determining fair value.  As reflected in the consultation, the Adviser ultimately determined that both March Transactions should be classified as "orderly."  The fair valuation methodology adopted, as addressed in the consultation, weights inputs and does not reflect last sales transaction pricing exclusively in determining fair value.  The "orderly determination and adoption of the weighted fair valuation methodology resulted in NAV errors in the Fund (the "<u>NAV Error</u>").

Ex. 182, Appx. 2978-2980.

109.    HCMFA will not offer into evidence any document to establish that (a) it ever told Securities and Exchange Commission that Highland, and not HCMFA, was responsible for the NAV Error; (b) it ever told the HGAF Board that anyone other than HCMFA and Houlihan Lokey were responsible for the NAV Error; or that (c) Highland ever agreed to "compensate" HCMFA for any mistake it may have made with respect to the NAV error.  *See* Ex. 192 at 140:7-11, Appx. 3049.[26]

---

[26] While no document exists that corroborates HCMFA's contention that Highland agreed to pay HCMFA $7.4 million as compensation for the NAV Error, HCMFA has identified Mr. Dondero as the person who allegedly agreed to make that payment on behalf of Highland.  *Id.* Ex. 192 at 138:15-19, Appx. 3049.

110. <u>HCMFA Recovers Approximately $5 million Through Insurance to Compensate HGAF for the NAV Error</u>. HCMFA reported to the HGAF Board that the "Estimated Net Loss" from the NAV Error was $7,442,123. Ex. 182 at 2, Appx. 2980. HCMFA admits that it received almost $5 million in the form of insurance proceeds to fund the loss and had to pay approximately $2.4 million out-of-pocket to fully cover the estimated loss.[27] Despite having received approximately $5 million in insurance proceeds (representing more than two-third of the total loss), HCMFA insists that (a) Highland's subsequent payment of $7.4 million was "compensation" for its negligence and (b) HCMFA was entitled to receive **both** and $5 million in insurance proceeds $7.4 million in "compensation" from Highland even though the total loss was only $7.4 million. HCMFA never told its insurance carrier that Highland was at fault or that Highland paid HCMFA $7.4 million as compensation for the same loss the carrier covered. Ex. 192 at 133:14-150:22, Appx. 3047-3052.

111. After HCMFA filed its claim with ICI Mutual, HCMFA received the $7.4 million from Highland in connection with the Notes. Ex. 192 at 146:20-25, Appx. 3051.

112. Thus, according to HCMFA, "it received $7.4 million from Highland as compensation, and approximately $5 million from the insurance carrier as compensation for the total receipts of $12.4 million in connection with the [NAV Error]." Ex. 192 at 147:4-11, Appx. 3051.

113. HCMFA is not aware of (a) anyone on behalf of HCMFA ever informing ICI mutual that it received $7.4 million from Highland on account of the NAV Error, Ex. 192 at 150:3-6, Appx. 3052, or (b) anyone on behalf of HCMFA ever informing ICI Mutual that HCMFA

---

[27] Specifically, HCMFA reported that it (a) received $4,939,520 as insurance proceeds, (b) paid a deductible of $246,976, and (c) after accounting for other sources of capital and expenses, needed an additional payment of $2,398,842 to fully fund the loss. Ex. 182 at 2, Appx. 2980.

believed Highland was the cause of the NAV Error, Ex. 192 at 150:19-22, Appx. 3052. In other

words, HCMFA admits that it never told ICI Mutual that Highland made HCMFA "whole" or

otherwise compensated HCMFA approximately $5 million dollars in connection with the NAV

Error—the same amount HCMFA recovered from ICI Mutual in connection with the NAV Error.

114.    <u>Mr. Waterhouse Knew the HCMFA Notes Were Treated as Intercompany</u>

<u>Loans</u>. Highland maintained an e-mail group called "Corporate Accounting" that included Mr.

Waterhouse, among others. *See, e.g.,* Ex. 194 at 111:6-112:7, Appx. 3154.

115.    On May 2, 2019, David Klos, Highland's Controller, sent an e-mail to the

Corporate Accounting group entitled "HCMLP to HCMFA loan" that said:

> Blair, Please send $2,400,000 from HCMLP to HCMFA. This is a
> new interco loan. Kristin, can you or Hayley please prep a note for
> execution. I'll have further instructions later today, but please
> process this payment as soon as possible.

Ex. 54, Appx. 870-873.

116.    Thus, on May 2, 2019, Mr. Waterhouse was informed that (a) HCMLP was

transferring $2.4 million to HCMFA, and (b) Ms. Hendrix and another HCMLP employee were

asked to prepare a promissory note.

117.    The next day, on May 3, 2019, Ms. Hendrix sent an e-mail to the Corporate

Accounting group that said:

> Blair, Please set up a wire from HCMLP to HCMFA for $5M as a
> new loan ($4.4M should be coming in from Jim soon).
>
> Hayley, please add this to your loan tracker. I will paper the loan.

Ex. 56, Appx. 876-877.

118.    Thus, on May 3, 2019, Mr. Waterhouse was informed that (a) HCMLP was

going to make a "new loan" to HCMFA in the amount of $5 million, and (b) Ms. Hendrix was

going to "paper the loan." And that's exactly what happened.

119.     <u>HCMFA Represented to Third Parties that the HCMFA Notes Were</u>
<u>Liabilities</u>.  As discussed above, HCMFA represented to the Retail Board in October 2020 as part
of the 15(c) Review that as of June 30, 2020, the HCMFA Notes were liabilities of HCMFA.  *See*
Ex. 59 at 2, Appx. 885.  Before filing its Original Answer, HCMFA never told anyone that was
there was an error in the letter to the Retail Board.  Ex. 192 at 125:18-127:2, Appx. 3045-3046.

120.     <u>The HCMFA Notes Are Carried as Liabilities on HCMFA's Balance Sheet</u>
<u>and Included in its Audited Financial Statements</u>.  HCMFA (a) disclosed the existence of the
HCMFA Notes in the "Subsequent Events" section of its 2018 audited financial statements and (b)
carried the HCMFA Notes as liabilities on its balance sheet.  Ex. 45 at 17; Ex. 192 at 49:19-50:2,
54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59-3, Appx. 3026-3029.

121.     <u>Nothing in HCMFA's Books and Records Corroborates HCMFA's Mistake</u>
<u>Defense</u>.  There is nothing in HCMFA's books and records that corroborates HCMFA's contention
that the payments from Highland to HCMFA in exchange for the HCMFA Notes were intended to
be compensation and not a loan. Ex. 192 at 59:8-63:20, Appx. 3029-3030.

122.     <u>Highland's Bankruptcy Court Filings Contradict HCMFA's Mistake</u>
<u>Defense</u>.  As discussed *supra*, Highland's contemporaneous books and records – before the
Petition Date and after -- recorded the HCMFA Notes as valid debts due and owing by each of the
Obligors to Plaintiff.  Thus, regardless of what HCMFA may think, there is no evidence that any
purported mistake is "mutual."  Moreover, if Mr. Waterhouse "made a mistake" in preparing and
executing the HCMFA Notes, then he compounded the mistake at least twenty (20) times when he
(i) signed off on Highland's and HCMFA's audited financial statements, (ii) included the HCMFA
Notes as liabilities on HCMFA's own balance sheet, and (iii) prepared each of the Debtor's MORs
and other court filings.

36

3.    <u>**Waiver and Estoppel [NexPoint, HCMS, HCRE]**</u>

123.    There is no dispute that Highland was never directed or instructed to make the Annual Installment payments due on December 31, 2020.  Ex. 98 at 462:16-463:9, Appx. 1786; Ex. 105 at 381:21-382:16, Appx. 2144-2145.  Nevertheless, NexPoint, HCMS, and HCRE assert that any default under the Notes was the "result of Plaintiff's own negligence, misconduct, breach of contract" under the Shared Services Agreement. Ex. 15 ¶ 80, Appx. 435; Ex. 12 ¶¶ 54-55, Appx. 402; Ex. 17 ¶¶ 97-98, Appx. 467.

124.    NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "<u>SSA</u>").  Ex. 205, Appx. 4162-4181.

125.    Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.  In fact, Article II of the SSA expressly provided that "for the avoidance of doubt   . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  Ex. 205 at § 2.02, Appx. 4165-4167 (emphasis added).

126.    To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 <u>Authority</u>.  [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement.  [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which NexPoint is a party***. . . . [Highland] shall not

have any duties or obligations to [NexPoint] unless those duties and
obligations are specifically provided for in this Agreement (or in any
amendment, modification or novation hereto or hereof to which
[NexPoint] is a party.

*Id*. § 2.06, Appx. 4170 (emphasis added).

### 4.   Other Defenses

127.   Mr. Dondero could not identify any facts to support his affirmative
defenses of waiver, estoppel, or lack of consideration. Ex. 98 at 357:24-360:14, Appx. 1760-1761.

128.   NexPoint and HCMS assert that they did not default by failing to make the
December 31, 2020 Annual Installment payment because they "prepaid." Ex. 98 at 362:12-366:10,
Appx. 1761-1762, 370:6-11, Appx. 1763, 389:10, Appx. 1768. The facts relevant to this defense
are described above and in the Klos Declaration. (Klos Dec. ¶¶ 3-14). Further, while NexPoint
and HCMS now contend that they "pre-paid," both chose to pay Highland in January 2021 after
receiving notice of default (in a transparent but futile attempt to "cure," for which they had no right
rather than assert the "prepayment" defense. *See* Ex. 2 (Exhibit 3), Appx. 49-56.

## III.   ARGUMENT

### A.   Legal Standard

#### 1.   Summary Judgment Standard

129.   "The court shall grant summary judgment if the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law." FED. R. CIV. P. 56(c); *see also Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir.
2006) ("[S]ummary judgment is proper when the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter
of law.") (quoting Fed. R. Civ. P. 56(c)). "A dispute about a material fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party."

*Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999). The moving party meets its

initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of

evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French

Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814,

2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment

may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the

absence of a genuine issue of material fact.").

130.    "If the moving party carries [their] initial burden, the burden then falls upon

the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919

F.3d at 303; *see also Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,

40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary

judgment, the nonmoving party must come forward with evidence to support the essential elements

of its claim on which it bears the burden of proof at trial."). "This showing requires more than

some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations

omitted); *see also Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex.

Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to

create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor

Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be

satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.")

(internal quotations omitted).

131.    Thus, "[w]here critical evidence is so weak or tenuous on an essential fact

that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming

39

that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199; *see also Armstrong v. City of Dallas*, 997 F.2d 62, 66 n 12 (5th Cir.1993) ("We no longer ask whether literally little evidence, *i.e.*, a scintilla or less, exists but, whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury.").

### 2.   Summary Judgment Standard for Promissory Notes

132.   "Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *see also Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment.").  To prevail on summary judgment for breach of a promissory note under Texas law, the movant need not prove all essential elements of a breach of contract, but only must establish (i) the note in question, (ii) that the non-movant signed the note, (iii) that the movant was the legal owner and holder thereof, and (iv) that a certain balance was due and owing on the note. *See Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

### B.   Highland is Entitled to Summary Judgment for Defendants' Breach of the Notes

133.   Highland has made its *prima facie* case that it is entitled to summary judgment on Defendants' breach of the Notes.

134.   The Dondero Demand Notes are: (i) valid, (ii) signed by Mr. Dondero, and in Highland's favor, (Klos Dec. ¶¶ 18-20, Exs. D, E, F), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was

$9,004,013.07, and as of (b) December 17, 2021, the total outstanding principal and accrued but unpaid interest due under the Dondero Notes was $9,263,365.05. (Klos Dec. ¶ 37).

135.    The HCMFA Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 21-22, Exs. G, H), and (iii) as of (a) December 11, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,687,653.06, and as of (b) December 17, 2020, the total outstanding principal and accrued but unpaid interest due under the HCMFA Notes was $7,874,436.09, (Klos Dec. ¶ 40).

136.    The HCMS Demand Notes are: (i) valid, (ii) signed by HCMFA, and in Highland's favor, (Klos Dec. ¶¶ 23-26, Exs. I, J, K, L), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCMS Demand Notes was $947,519.43, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Demand Notes was $972,762.81, (Klos Dec. ¶ 45).

137.    The HCRE Demand Notes are: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶¶ 27-30, Exs. M, N, O, P), and (iii) as of (a) December 11, 2020, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,012,170.96, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Demand Notes was $5,330,378.23, (Klos Dec. ¶ 50).

138.    The NexPoint Term Note is: (i) valid, (ii) signed by NexPoint, and in Highland's favor, (Klos Dec. ¶ 31, Ex. A), and (iii) as (a) January 8, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,471,804.98, and as of (b)

December 17, 2021, the unpaid principal and accrued interest due under the NexPoint Term Note was $24,383,877.27,[28] (Klos Dec. ¶ 51).

139.    The HCMS Term Note is: (i) valid, (ii) signed by HCMS, and in Highland's favor, (Klos Dec. ¶ 32, Ex. R), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,758,507.81, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCMS Term Note was $6,748,456.31,[29] (Klos Dec. ¶ 52).

140.    The HCRE Term Note is: (i) valid, (ii) signed by HCRE, and in Highland's favor, (Klos Dec. ¶ 33, Ex. S), and (iii) as of (a) January 8, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $6,145,466.84, and as of (b) December 17, 2021, the unpaid principal and accrued interest due under the HCRE Term Note was $5,899,962.22.[30] (Klos Dec. ¶ 53).

141.    Each of the Obligors under the Demand Notes breached their obligations by failing to pay Highland all amounts due and owing upon Highland's demand.

142.    Each of the Obligors under the Term Notes breached their obligations by failing to make the Annual Installment payment due on December 31, 2020.

---

[28] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $1,406,111.92 made January 14, 2021, which reduced the total principal and interest then-outstanding.

[29] Total unpaid outstanding principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $181,226.83 made January 21, 2021, which reduced the total principal and interest then-outstanding.

[30] Total unpaid principal and interest due actually decreased from January 8, 2021 to December 17, 2021 because a payment of $665,811.09 made January 21, 2021, which reduced the total principal and interest then-outstanding.

42

143.    Highland has been damaged by the Obligors' breaches in amounts that are set forth above but which (a) continued to increase daily, and (b) which do not include a calculation of collection costs and attorneys' fees.[31]

144.    Accordingly, Highland has made out its prima facie case for summary judgment that Defendants have breached the Notes. *See Resolution*, 41 F.3d at 1023 (holding that where affidavit "describes the date of execution, maker, payee, principal amount, balance due, amount of accrued interest owed, and the date of default for each of the two promissory notes," movant "presented a prima facie case of default on the notes."); *Looney*, 2010 WL 532431, at *2-3 (where movant "has attached a copy of the note … to a sworn affidavit in which he states that the photocopy is a true and correct copy of the note, that he is the owner and holder of the note, and that there is a balance due on the note … [movant] has made a prima facie case that he is entitled to summary judgment on the note.").[32]

## C.    Defendants Fail to Rebut Highland's Prima Facie Case

145.    Defendants fail cannot rebut Highland's prima facie case for breach of the Notes because there is no substantive or credible evidence to support any of their affirmative defenses and there is substantial evidence to contradict them.

### 1.    No Reasonable Jury Could Find that the "Alleged Agreement" Exists

146.    Mr. Dondero, NexPoint, HCRE, and HCMS fail to show there is any genuine issue of material fact to support their "Alleged Agreement" defense.  There is a complete absence of evidence in support of this defense and there is substantial evidence to contradict them.

---

[31] Plaintiff seeks to add to its damages accrued and unpaid interest, and Plaintiff's costs of collection, including reasonable attorney's fees. Ex. 162-180, Appx. 2637-2945.  Plaintiff respectfully requests an opportunity to conduct a final damage calculation if the Court fully grants the Motion.

[32] In the event the Motion is granted, Highland requests that the Court hold a hearing on damages, as interest under the Notes and attorney's fees continue to accrue.

DOCS_NY:44673.9 36027/003

147.    As discussed above, (i) Mr. Dondero cannot identify materials terms of the Alleged Agreement, such as (a) which Notes are subject to the Alleged Agreement, (b) the number of Notes subject to the Alleged Agreement, (c) the maker of each Note subject to the Alleged Agreement; (d) the date of each Note subject to the Alleged Agreement, or (e) the principal amount of any Note subject to the Alleged Agreement, (*see supra* ¶¶ 91-92); (ii) Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each Alleged Agreement, (*see supra* ¶¶ 93); (iii) Mr. Dondero sold MGM stock in November 2019—an alleged "condition subsequent" under the Alleged Agreement—but failed to declare the Notes forgiven, and otherwise remained silent about the Alleged Agreement, (*see supra* ¶¶ 94-95); (iv) Ms. Dondero, the counter-party to the Alleged Agreement, never saw a Note signed by Mr. Dondero or any affiliate of Highland and was not competent to enter into the Alleged Agreements (*see supra* ¶¶ 96); (v) the existence or terms of the Alleged Agreement was never disclosed by Mr. Dondero or Ms. Dondero to anyone, including PwC, Mr. Waterhouse, Mr. Okada or the Bankruptcy Court, (*see supra* ¶¶ 98); (vi) no document exists memorializing or otherwise reflecting the existence of terms of the Alleged Agreement, (*see supra* ¶ 99); and (vii) there is no history of loans being forgiven at Highland, (*see supra* ¶¶ 103-104).   Accordingly, there is an absence of evidence showing the Alleged Agreement exists.  *See Magna*, 2007 WL 3231633, at *16 (granting summary judgment with respect to breach of promissory note where defendants assert that they are discharged from debt obligations after terms of lease were altered, finding "[t]here is no evidence that any agreement was altered. At best, the summary judgment evidence supports a theory that the terms of the leases were not what the [] Defendants expected them to be.")

148.    The Alleged Agreement would also be unenforceable as a matter of law for lack of (a) consideration, (b) definiteness, and (c) a meeting of the minds.   In order to be legally

enforceable, a contract "must address all of its essential and material terms with a reasonable degree of certainty and definiteness." *Scott v. Wollney*, No. 3:20-CV-2825-M-BH, 2021 WL 4202169, at * 7 (N.D. Tex Aug. 28, 2021); *In re Heritage Org., L.L.C.*, 354 B.R. 407, 431–32 (Bankr. N.D. Tex. 2006) (in order to prove existence of a valid and binding subsequent oral agreement binding upon parties, party must prove that there was "(1) a meeting of the minds" and "(2) consideration to support such a subsequent oral agreement.") "Whether a contract contains all of the essential terms for it to be enforceable is a question of law." *Id.* (internal quotations omitted). "A contract must also be based on valid consideration." *Id.* "In determining the existence of an oral contract, courts look at the communications between the parties and the acts and circumstances surrounding those communications." *Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014).

149.    Based on the evidence cited above, no reasonable trier of fact could find that there was a meeting of the minds between Ms. Dondero and Mr. Dondero regarding the material terms of the oral Alleged Agreement or that such oral Agreement was exchanged for consideration. *See Melanson v. Navistar, Inc.*, 3:13-CV-2018-D, 2014 WL 4375715, at *5 (N.D. Tex. Sept. 4, 2014) (finding that a reasonable trier of fact could not find that based on the oral conversation between the plaintiff and the defendant that there was an offer, an acceptance, and a meeting of the minds because the conversation did not contain all essential terms); *Wollney*, 2021 WL 4202169, at *8 (finding that "[w]hen, as here, 'an alleged agreement is so indefinite as to make it impossible for a court to 'fix' the legal obligations and liabilities of the parties, a court will not find an enforceable contract,'" finding that party "has not identified evidence of record that would allow a reasonable trier of fact to find that there was an offer, an acceptance, and a meeting of the minds between Plaintiff and Defendant.") (quoting *Crisalli v. ARX Holding Corp.*, 177 F. App'x

417, 419 (5th Cir. 2006)) (citation omitted);  *Heritage*, 354 B.R. at 431–32 (finding a "subsequent

oral amendment" defense fails where the summary judgment record does not support the existence

of a subsequent agreement").

150.     Accordingly, there is no genuine issue of material fact regarding the Alleged

Agreement defense, and Highland is, therefore, entitled to summary judgment on Mr. Dondero's,

NexPoint's, HCMS's, and HCRE's breach of their respective Notes.

### 2.     No Reasonable Jury Could Find the HCMFA Note Was a "Mistake"

151.     HCMFA's Mistake Defense also fails as a matter of law because there is no

evidence to show that HCMFA and Highland were acting under a shared factual mistake when

executing the HCMFA Notes.

152.     "For mutual mistake to nullify a promissory note, the evidence must show

that both parties were acting under the same misunderstanding of the same material fact." *Looney*,

2010 WL 532431, at *5 (internal quotations omitted) (citing Texas law).  "[A] party must show

that there exists (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects

the agreed upon exchange. *Whitney Nat. Bank v. Medical Plaza Surgical Center L.L.P.*, No. H-06-

1492, 2007 WL 3145798, at *6 (S.D.Tex. Oct. 27. 2007) (citing Texas law).  In other words,

"[m]utual mistake of fact occurs where the parties to an agreement have a common intention, but

the written instrument does not reflect the intention of the parties due to a mutual mistake." *Id.*

(internal quotations omitted).  "In determining the intent of the parties to a written contract, a court

may consider the conduct of the parties and the information available to them at the time of signing

in addition to the written agreement itself." *Id.*  "When mutual mistake is alleged, the party seeking

relief must show what the parties' true agreement was and that the instrument incorrectly reflects

that agreement because of a mutual mistake."  *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co.,*

*Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) (internal quotations

omitted).  "The question of mutual mistake is determined not by self-serving subjective statements of the parties' intent … but rather solely by objective circumstances surrounding execution of the [contract.]" *Hitachi Capital Am. Corp. v. Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at *6 (S.D. Tex. Sept. 20, 2007) (internal quotations omitted).  "The purpose of the mutual mistake doctrine is not to allow parties to avoid the results of an unhappy bargain." *Whitney*, 2007 WL 3145798, at *7.

153.    Here, the HCMFA Notes were apparently hiding in plain sight for almost two years.  The undisputed documentary and testimonial evidence overwhelmingly establishes that both HCMFA and Highland intended the HCMFA Notes to be loans.  As discussed above: (i) Mr. Waterhouse, HCMFA's treasurer, knew the money Highland transferred to HCMFA was being treated as an "intercompany loan" (*supra*, ¶¶ 114-118); (ii) the HCMFA Notes have always been recorded as liabilities in HCMFA's audited financial statements and balance sheets (*supra* ¶ 120); (iii) the HCMFA Demand Notes were reflected as assets in Highland's Bankruptcy filings, (see *supra* ¶ 122), and (iv) the HCMFA Demand Notes were represented as "liabilities" to third parties at all relevant times, (*supra*, ¶¶ 119).

154.    There is no evidence in support of HCMFA's contention that there existed a mistake of fact held by both Highland and HCMFA when entering into this agreement.  The purported "mistake" was never disclosed to critical (or any) third parties, such as: (i) the Retail Board or (ii) ICI Mutual. (*See supra*, ¶¶ 110-115; 119).  The purported "mistake" is also not reflected in HCMFA's books and records or audited financials. (*See supra*, ¶¶ 120).

155.    HCMFA's Mistake Defense, therefore, fails as a matter of law.  *See Hitachi*, 2007 WL 2752692, at *6 (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that

[defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense.) (emphasis in original); *Whitney*, 2007 WL 3145798, at *6 (finding defendants' assertion of mutual mistake "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note."); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").

156.    Accordingly, there is no genuine issue of material fact regarding HCMFA's Mistake Defense, and Highland is entitled to summary judgment for HCMFA's breach of the HCMFA Demand Notes.

### 3.    No Reasonable Jury Could Find that NexPoint's, HCRE's, and HCMS's Defaults under the Notes Were the Result of Highland's Negligence

157.    No reasonable jury could find that NexPoint's default under its Note was the result of Highland's negligence under the SSA.[33]    As discussed above, the SSA, by its clear

---

[33] Highland did not enter into shared services agreements with HCRE and HCMS so those Obligors' affirmative defenses fail as a matter of law.

terms, does not impose a duty on Highland to make payments under the Term Notes, on behalf of

NexPoint, HCRE, and HCMS, without the express authorization of those entities or an agent of

those entities. *See supra* ¶¶ 120-125.   It is undisputed that Highland was never directed to make

the payments under the Term Notes. *See supra* ¶ 123.

158.    Accordingly, there is no genuine issue of material fact regarding

NexPoint's, HCRE's, and HCMS's breach under the Term Notes, and Highland is entitled to

summary judgment on its claims for breach of the Term Notes.

### 4.    No Reasonable Jury Could Find that NexPoint "Prepaid" on the NexPoint Note

159.    NexPoint's and HCMS's assertion that they did not default by failing to

make the December 31, 2020 Annual Installment payment because they "prepaid" is contradicted

by undisputed documentary evidence.  (*See* Klos Dec. ¶¶ 3-14).

160.    Accordingly, there can be no genuine dispute of material fact regarding

NexPoint's and HCMS's failure to pay amounts due and owing under the NexPoint and HCMS

Term Notes.

### CONCLUSION

WHEREFORE, Highland respectfully requests that the Court (i) grant its Motion, (ii) hold

Defendants liable for (a) breach of contract and (b) turnover for all amounts due under the Notes,

including the costs of collection and reasonable attorneys' fees in an amount to be determined and

(iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of Page Intentionally Blank]*

Dated:  December 20, 2021      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email:  jpomerantz@pszjlaw.com
       jmorris@pszjlaw.com
       gdemo@pszjlaw.com
       hwinograd@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email:  MHayward@HaywardFirm.com
       ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT A

DOCS_NY:44673.9 36027/003

Case 21-03007-sgj    Doc 128    Filed 12/20/21    Entered 12/20/21 13:25:13    Desc Main

## PARTIES, WITNESSES, AND DEFINITIONS

1.      "Advisors" refers to HCMFA and NexPoint, together.  The Advisors provide investment advisors services to certain retail funds and are effectively owned or controlled by Mr. Dondero. Ex. 96 at 228:11-19; Ex. 105 at 32:17-23.[34]

2.      "Corporate Obligors" refers to HCMFA, NexPoint, HCMS, and HCRE in their capacities as makers under their respective Notes.

3.      "Dugaboy" refers to The Dugaboy Investment Trust, a trust formed in 2010 to purportedly provide for the living maintenance, education, health, and lifestyle of its beneficiaries. Mr. Dondero is the sole beneficiary of Dugaboy during his lifetime; his children and subsequent generations shall become the beneficiaries following his demise.

4.      "HCMFA" refers to Highland Capital Management Advisors, L.P.  HCMFA is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23. HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:11-15.

5.      "NexPoint" refers to NexPoint Advisors, L.P.  NexPoint is an entity that provides investment advisory services to certain retail funds. Ex. 105 at 32:17-23.  HCMFA is directly or indirectly owned and controlled by Mr. Dondero. Ex. 96 at 228:16-19.

6.      "HCRE" refers to HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC), and is an entity that is directly or indirectly owned by Mr. Dondero. Ex. 96 at 228:20-23.

7.      "HCMS" refers to Highland Capital Management Services, Inc., and is an entity that is directly or indirectly owned or controlled by Mr. Dondero. Ex. 96 at 228:24-229:4.

---

[34] All citations herein to "Appx." refer to the *Appendix of Exhibits in Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*.

DOCS_NY:44673.9 36027/003

8.      "Klos Dec." refers to the *Declaration of David Klos In Support of Highland Capital Management, L.P.'s Motion for Partial Summary Judgment*, filed simultaneously with the Motion.

9.      "Mr. Dondero" refers to an individual named James Dondero.  Mr. Dondero is the founder and former president and Chief Executive Officer of Highland.  Ex. 96 at 248:3-6.  Mr. Dondero served as Highland's president from 1994 until January 9, 2020. Ex. 98 at 291:6-292:16. At all relevant times, Mr. Dondero also served as President of HCMFA and directly or indirectly owned or controlled each of the Corporate Obligors. Ex. 37; Ex. 96 at 228:6-229.

10.     "Ms. Dondero" refers to an individual named Nancy Dondero.  Ms. Dondero is Mr. Dondero's sister.  At Mr. Dondero's request, Ms. Dondero became the sole Trustee of Dugaboy in October 2015 and has served in that capacity since that time.  Ex. 96 at 174:21-25; Ex. 100 at 166:19-169:5.

11.     "Mr. Norris" refers to an individual named Dustin Norris.  Mr. Norris has been an officer of HCMFA since 2012, and currently serves as the Executive Vice President of HCMFA. Ex. 35; Ex. 192 at 18:11-25.

12.     "Mr. Post" refers to an individual named Jason Post. Mr. Post was employed by Highland in 2018 and 2019, and then became an employee of HCMFA and served as the Chief Compliance Officer for each of the Advisors. Ex. 105 at 184:13-185:3; Ex. 192 at 32:6-33:25.

13.     "Mr. Sauter" refers to an individual named Dennis C. Sauter.  Mr. Sauter served as Highland's general counsel of real estate from approximately February 2020 until April 2021, and has served as the general counsel of NexPoint from April 2021 to the present. Ex. 193 at: 7:16-9:12.

14.     "Ms. Thedford" refers to an individual named Lauren Thedford.  Ms. Thedford is an attorney who was previously employed by Highland while simultaneously serving as an officer

of HCMFA and NexPoint, holding the title of Secretary.  Ms. Thedford also served as an officer

of the retail funds managed by the Advisors until early 2021.  Ex. 35; Ex. 37; Ex. 105 at 172:10-

173:25.

      15.    "<u>Mr. Waterhouse</u>" refers to an individual named Frank Waterhouse.  Mr.

Waterhouse is a Certified Public Accountant who joined Highland Capital Management, L.P. in

2006 and served as Highland's Chief Financial Officer ("<u>CFO</u>") on a continuous basis from

approximately 2011 or 2012 until early 2021.  While serving as Highland's CFO, Mr. Waterhouse

simultaneously served as (1) an officer of HCMFA, NexPoint, and HCMS, holding the title of

Treasurer and (2) Principal Executive Officer of certain retail funds managed by the Advisors.  As

Treasurer and Principal Executive Officer of these entities, Mr. Waterhouse was responsible for

managing the Advisor's accounting and finance functions.  Ex. 35; Ex. 37; Ex. 105 at 18:6-15,

18:23-19:6, 21:15-17, 23:5-20, 25:17-26:8, 27:17-28:16, 29:2-10, 30:9-31:6, 34:12-35:19, 38:20-

39:5.

      16.    "<u>Notes</u>" refers to the Demand Notes and the Term Notes, as those terms are defined

below.

      17.    "<u>Obligors</u>" refers to Mr. Dondero and the Corporate Obligors in their capacities as

makers under the Notes.

      18.    "<u>PwC</u>" refers to Pricewaterhouse Coopers, firm that served as Highland's outside

auditors from 2003 through at least June 3, 2019.  Ex. 34; Exs. 63-66; Exs. 69-72; Ex. 87 at 9 (Item

26b.1).



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 21, 2021**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | §  Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | §  Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | §  Adversary Proceeding No. |
| | § |
| vs. | §  21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES | § |
| DONDERO, NANCY DONDERO AND THE | § |
| DUGABOY INVESTMENT TRUST, | § |
| | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | §  Adversary Proceeding No. |
| | § |
| vs. | §  21-03006-sgj |
| | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | §<br>§<br>§<br>§<br>§ |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | §<br>§ |
| Plaintiff, | §  Adversary Proceeding No.<br>§ |
| vs. | §  21-03007-sgj<br>§ |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | §<br>§<br>§<br>§<br>§ |
| Defendants. | § |

## ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

This matter having come before the Court on the (a) *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 86] (the "NexPoint Motion") filed by NexPoint Advisors, L.P. ("NexPoint"); (b) *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 91] (the "HCMS Motion") filed by Highland Capital Management Services, Inc. ("HCMS"); and (c) *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3007, Docket No. 86] (the "HCRE Motion," and collectively with the NexPoint Motion and the HCMS Motion, the "Motions") filed by HCRE Partners, LLC ("HCRE," and collectively with NexPoint and HCMS, "Defendants"); and this Court having considered (i) the Motions; (ii) *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 104; Adv. Proc. 21-3006, Docket No. 109; Adv. Proc. 21-3007, Docket No. 104] (the "Objection") filed by Highland Capital Management, L.P. ("Highland"); (iii) the (a) *Reply of*

*Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 115] (the "NexPoint Reply") filed by NexPoint; and (b) *Highland Capital Management Services, Inc. and HCRE partners, LLC's Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 120, and Adv. Proc. 21-3007, Docket No. 115] (the "HCRE and HCMS Replies," and together with the NexPoint Reply, the "Replies") filed by HCRE and HCMS; and (iv) the arguments made during the hearing held on December 13, 2021 (the "Hearing"); and this Court having found that Defendants have not established "good cause" under Rule 16(b) of the Federal Rules of Civil Procedure for the relief requested in the Motions; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motions in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court, and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth during the Hearing on these Motions, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motions are **DENIED**.

2.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendants Highland Capital Management Services, Inc.*
*and HCRE Partners, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03006-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC., JAMES DONDERO,** | § | |
| **NANCY DONDERO, AND THE** | § | |
| **DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03007-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NEXPOINT** | § | |
| **REAL ESTATE PARTNERS, LLC), JAMES** | § | |
| **DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

## NOTICE OF ==OBJECTION== OF HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND HCRE PARTNERS, LLC TO ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

PLEASE TAKE NOTICE that, on January 5, 2022, Highland Capital Management Services, Inc. ("HCMS") and HCRE Partners, LLC ("HCRE"), filed their *Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines* in the United States District Court for the Northern District of Texas, under Case Nos. 3:21-cv-01378-X (==Dkt. 26==) and 3:21-cv-01379-X (==Dkt. 23==), a copy of which is attached hereto.

Dated:  January 5, 2022

Respectfully submitted,

**STINSON LLP**

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Telecopier: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND HCRE PARTNERS, LLC**

CORE/3522697.0002/171985140.1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties registered to receive electronic notices in this case.

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez

Deborah Deitsch-Perez
Michael P. Aigen
**STINSON LLP**
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Facsimile: (214) 560-2203

*Counsel for Defendants Highland Capital Management Services, Inc.*
*and HCRE Partners, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03006-sgj |
| | § | |
| vs. | § | Case No. 3:21-cv-01378-X |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03007-sgj |
| | § | |
| vs. | § | Case No. 3:21-cv-01379-X |
| | § | |
| HCRE PARTNERS, LLC (n/k/a NEXPOINT | § | |
| REAL ESTATE PARTNERS, LLC), JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANTS HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND HCRE
PARTNERS, LLC'S OBJECTION TO ORDER DENYING MOTIONS TO EXTEND
EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

COME NOW, Highland Capital Management Services, Inc. ("HCMS") and HCRE
Partners, LLC ("HCRE"), Defendants in the above styled and numbered proceeding initiated by
Highland Capital Management, L.P. as Plaintiff (the "Debtor"), and file this *Objection to Order
Denying Motions to Extend Expert Disclosure and Discovery Deadlines* (the "Objection"). HCMS
and HCRE respectfully show as follows:

## I.   RELIEF REQUESTED

1.   On January 5, 2022, NexPoint Advisors, L.P. ("NexPoint") filed its *Brief in Support
of Objection to Order Denying Motions to Extend Expert Disclosure and Discovery Deadline* and
accompanying appendix in Case No. 19-34054-sgj11, Civ. Act. No. 3:21-cv-00880-X (the
"NexPoint Objection").[1] HCRE and HCMS incorporate the context of the NexPoint Objection as
if fully set forth herein.

2.   As described in the NexPoint Objection, NexPoint seeks the District Court's review
of the Bankruptcy Court's *Order Denying Motions to Extend Expert Disclosure and Discovery
Deadlines* (the "Order"). NexPoint submits that, in denying NexPoint leave to extend the expert
disclosure and discovery deadlines, the Order is clearly erroneous and contrary to law and should,
therefore, be reconsidered and reversed by the District Court.

3.   For generally the same reasons set forth in the NexPoint Objection, HCMS and
HCRE request this Court grant them the same relief requested by NexPoint.

---

[1] *Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery
Deadlines*, Case No. 21-00880-X [Doc 21]; *Brief in Support of Objection of NexPoint Advisors, L.P. to Order Denying
Motions to Extend Expert Disclosure and Discovery Deadlines*, Case No. 21-00880-X [Doc 22]; *Appendix in Support
of Objection of NexPoint Advisors, L.P. to Order Denying Motions to Extend Expert Disclosure and Discovery
Deadlines*, Case No. 21-00880-X [Doc 23].

CORE/3522697.0002/171977604.1

## II.    PRAYER

WHEREFORE, PREMISES CONSIDERED, HCMS and HCRE respectfully request the District Court reverse the Order and grant the Motions modifying the Scheduling Order to (i) extend the deadline to designate experts and serve expert reports; (ii) modify the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and (iii) extend expert discovery. HCMS and HCRE also respectfully request such other and further relief as may be proper.

Dated:  January 5, 2022                              Respectfully submitted,

**STINSON LLP**

/s/ *Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas State Bar No. 24036072
Michael P. Aigen
Texas State Bar No. 24012196
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219-4259
Telephone: (214) 560-2201
Telecopier: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**ATTORNEYS FOR DEFENDANTS HIGHLAND CAPITAL MANAGEMENT SERVICES, INC. AND HCRE PARTNERS, LLC**

3

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on all parties registered to receive electronic notices in this case.

                                          /s/ *Deborah Deitsch-Perez*
                                          Deborah Deitsch-Perez

CORE/3522697.0002/171977604.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § § | |
| Plaintiff, | § | |
| vs. | § § | Adv. Proc. No. 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | Case No. 3:21-cv-00880 |
| Defendants. | § § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03004-sgj |
| vs. | § § | Case No. 3:21-cv-00881 |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., | § § § § | |
| Defendant. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § § | Adv. Proc. No. 21-03003-sgj |
| vs. | § § | Case No. 3:21-cv-01010 |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § § | |
| Plaintiff, | § § | Adv. Proc. No. 21-03006-sgj |
| vs. | § § | Case No. 3:21-cv-01378 |
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, | § § | |

1

|                                         |   |                              |
|-----------------------------------------|---|------------------------------|
| NANCY DONDERO, AND THE                  | § |                              |
| DUGABOY INVESTMENT TRUST,               | § |                              |
|                                         | § |                              |
|     Defendants.     | § |                              |
|                                         | § |                              |

|                                         |   |                              |
|-----------------------------------------|---|------------------------------|
| HIGHLAND CAPITAL MANAGEMENT, L.P.,      | § |                              |
|                                         | § | Adv. Proc. No. 21-03007-sgj  |
|     Plaintiff,      | § |                              |
| vs.                                     | § | Case No. 3:21-cv-01379       |
|                                         | § |                              |
| HCRE PARTNERS, LLC (n/k/a NexPoint      | § |                              |
| Real Estate Partners, LLC), JAMES       | § |                              |
| DONDERO, NANCY DONDERO, AND             | § |                              |
| THE DUGABOY INVESTMENT TRUST,           | § |                              |
|                                         | § |                              |
|     Defendants.     | § |                              |

## ORDER GRANTING
## DEFENDANT'S MOTION TO CONSOLIDATE THE NOTE CASES

Before this Court is Defendant's Motion to Consolidate the Note Cases [Doc. No. 16] (the

"Motion"). Having considered the Motion the Court finds that consolidation of the Note Cases is

warranted under Rule 42(a) of the Federal Rules of Civil Procedure and that the interests of judicial

efficiency are best served by consolidation of the Note Cases under Case No. 3:21-cv-881.

Consolidating the cases under 3:21-cv-881 best services judicial efficiency because (a) Case No.

3:21-cv-881 is the lowest-numbered case in the Dallas Division,[1] and (b) because the undersigned

was originally assigned two of the five Note Cases captioned above (before transfer of the three

others to the undersigned), as well as other cases arising out of the Highland Bankruptcy.[2]  The

Court therefore **GRANTS** defendant's motion to consolidate.

---

[1] The typical procedure in consolidation actions is to consolidate under the lowest-numbered case, which here is 3:21-cv-880, previously assigned to Judge Sam Cummings.  However, the Court finds that judicial efficiency is best served by consolidating under 3:21-cv-881 because 3:21-cv-880 and 3:21-cv-881 were filed in district court on the same day and several other factors (explained above the line) are served by consolidation under 881 as opposed to 880.

[2] In 3:21-cv-1010, the plaintiffs moved to consolidate under that case.  [Doc. No. 10.]  That request is denied.  Importantly, plaintiffs agree that consolidation of all five note cases is warranted and promotes judicial efficiency.

**IT IS HEREBY ORDERED THAT**:

1.  The Note Cases are consolidated under the lead case, No. 3:21-cv-00881 for all purposes other than that Case No. 3:21-cv-00881-X may be tried separately (or that the determination of whether such case shall be tried separately is deferred until after all summary judgement motions are heard and decided), to be heard by the Honorable Judge Starr.

2.  The cases consolidated under No. 3:21-cv-881 are:

    -   No. 3:21-cv-00880

    -   No. 3:21-cv-01010

    -   No. 3:21-cv-01378

    -   No. 3:21-cv-01379

3.  All future filings related to all five cases shall be filed on the docket for No. 3:21-cv-881.

**IT IS SO ORDERED** this 6th day of January, 2022.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com
**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
**Attorneys for James Dondero, Nancy Dondero, Highland Capital Management Services, Inc. and NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03005-sgj** |
| **vs.** | § § | |
| **NEXPOINT ADVISORS, L.P., JAMES DONDERO, AND NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § § | |
| **Plaintiff,** | § § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § § | |
| **vs.** | § § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,** | § § § § § | |
| **Defendants.** | § § | |

## **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW, Defendants James Dondero, NexPoint Advisors, L.P., Highland Capital Management Services, Inc., and HCRE Partners, LLC, the Defendants in the above-captioned and related adversary proceedings, and hereby submit this *Opposition to Highland Capital Management, L.P.'s Motion for Partial Summary Judgment* (the "Opposition"). Defendants fully incorporate by reference their brief in response filed contemporaneously with this Opposition and would show the Court as follows:

1

## RELIEF REQUESTED

1.      By this Opposition, Defendants respectfully request that the Court enter an order denying Plaintiff's Motion for Partial Summary Judgment.

2.      Pursuant to Rule 7056(d) of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas and Rule 56.4(b) of the Local Rules of the Northern District of Texas, a separate memorandum of law is being filed contemporaneously with this Opposition that will state why Defendants oppose the Motion for Partial Summary Judgment and is incorporated by reference.

## PRAYER

WHEREFORE, Defendants respectfully request that the Court deny the relief requested in Plaintiff's Motion for Partial Summary Judgment and grant Defendants such further and other relief to which they are entitled.

2

Dated: January 20, 2022                    Respectfully submitted,

                                           */s/Deborah Deitsch-Perez*
                                           Deborah Deitsch-Perez
                                           State Bar No. 24036072
                                           Michael P. Aigen
                                           State Bar No. 24012196
                                           STINSON LLP
                                           3102 Oak Lawn Avenue, Suite 777
                                           Dallas, Texas 75219
                                           (214) 560-2201 telephone
                                           (214) 560-2203 facsimile
                                           Email: deborah.deitschperez@stinson.com
                                           Email: michael.aigen@stinson.com
                                           **ATTORNEYS FOR JAMES DONDERO, NANCY
                                           DONDERO, HIGHLAND CAPITAL MANAGEMENT
                                           SERVICES, INC. AND NEXPOINT REAL ESTATE
                                           PARTNERS, LLC**

                                           */s/Clay M. Taylor*
                                           Clay M. Taylor
                                           State Bar No. 24033261
                                           Bryan C. Assink
                                           State Bar No. 24089009
                                           BONDS ELLIS EPPICH SCHAFER JONES LLP
                                           420 Throckmorton Street, Suite 1000
                                           Fort Worth, Texas 76102
                                           (817) 405-6900 telephone
                                           (817) 405-6902 facsimile
                                           Email: clay.taylor@bondsellis.com
                                           Email: bryan.assink@bondsellis.com
                                           **ATTORNEYS FOR JAMES DONDERO**

                                           */s/Davor Rukavina*
                                           Davor Rukavina
                                           Julian P. Vasek
                                           MUNSCH HARDT KOPF & HARR, P.C.
                                           500 N. Akard Street, Suite 3800
                                           Dallas, Texas 75202-2790
                                           (214) 855-7500 telephone
                                           (214) 978-4375 facsimile
                                           Email:  drukavina@munsch.com

                                           **ATTORNEYS FOR NEXPOINT ADVISORS, L.P.  AND
                                           HIGHLAND CAPITAL MANAGEMENT FUND
                                           ADVISORS, L.P.**

CORE/3522697.0002/172202497.1

## <u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

                                          */s/Deborah Deitsch-Perez*

                                          Deborah Deitsch-Perez

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | § | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Adv. Proc. No. 21-03005-sgj** |
| | § | |
| **NEXPOINT ADVISORS, L.P., JAMES** | § | |
| **DONDERO, AND NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Adv. Proc. No. 21-03006-sgj** |
| **vs.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT** | § | |
| **SERVICES, INC., JAMES DONDERO,** | § | |
| **NANCY DONDERO, AND THE DUGABOY** | § | |
| **INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § | |
| **vs.** | § | |
| | § | |
| **HCRE PARTNERS, LLC (n/k/a NexPoint Real** | § | |
| **Estate Partners, LLC), JAMES DONDERO,** | § | |
| **NANCY DONDERO, AND THE DUGABOY** | § | |
| **INVESTMENT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANTS'[1] MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

---

[1] Defendants Jim Dondero, HCMS, HCRE, and NexPoint, are collectively referred to as the "Defendants" throughout this Memorandum of Law unless otherwise expressly named.

## TABLE OF CONTENTS

**Page**

I.    Preliminary Statement ..................................................................................... 1

II.    Statement of Facts .......................................................................................... 1

   A.    Procedural Background ................................................................................ 1

   B.    The Promissory Notes ................................................................................. 2

   C.    Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent ........... 2

      1.    Forgivable Loans as Compensation Are Not Uncommon. ........................ 2

      2.    The Agreements to Forgive the Notes ..................................................... 3

      3.    The Agreements Were Never Kept "Secret" from Anyone .......................... 5

      4.    Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified. ................................................................................. 7

      5.    Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements ........................................................................ 9

   D.    Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE ........................................................ 11

      1.    The NexPoint Shared Services Agreement ................................................ 11

      2.    The HCMS and HCRE Shared Services Agreements ................................. 13

   E.    Prepayment on the Term Notes .................................................................... 15

      1.    NexPoint's Prepayments .......................................................................... 15

      2.    HCMS' Prepayments ................................................................................ 16

III.    Argument and Authorities ............................................................................... 17

   A.    Legal Standard .......................................................................................... 17

   B.    Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses ................................................................ 18

      1.    The Agreements to Forgive the Notes ....................................................... 18

         a.    The Evidence Shows that the Agreements Exist ..................................... 18

            (i)  The Evidence Shows That Jim Dondero Identifies Material Terms of the Agreements ......................................................................................... 19

            (ii) The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements ....................... 20

            (iii)Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist .................................... 20

            (iv)Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence. ............................................................................................. 21

(v) Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence. ............................................................................................... 21

(vi)The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence. ...................................................................... 22

(vii)  Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation. ..................................... 22

b.  Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence. ........................................................... 22

c.  The Evidence Shows the Agreements Were Supported by Consideration ................ 25

d.  The Evidence Shows the Agreements Were Definite ................................. 28

e.  The Evidence Shows the Agreements Were Supported by a Meeting of the Minds ................................................................................... 29

f.  Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements. ............................................................................... 31

(i) Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements. ............................................... 32

(ii) Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements. ................................................ 32

(iii)Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements. ....................................... 34

(iv)Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements. ...................................................................... 35

2.  The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements ................... 36

a.  The Affirmative Defense ............................................................. 36

b.  The Law ............................................................................. 36

c.  The NexPoint SSA and the Debtor's Duties Thereunder ................................. 37

3.  The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation ................ 42

4.  Debtor's Negligence and Fault In Creating Alleged Default .............................. 44

(i)  If Dondero Did Not Issue the Non-Payment Instruction ............................. 44

(ii) If Dondero Issued the Non-Payment Instruction: Offer of Proof ..................... 45

5.  The HCMS and HCRE SSAs. ................................................................. 47

6.  Prepayments by NexPoint and HCMS ....................................................... 47

a.  NexPoint Prepayments .............................................................. 47

b.  HCMS Prepayments .................................................................. 52

IV.  Conclusion ............................................................................ 55

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*,
   584 S.W.3d 53 (Tex. App. 2018) ............................................................26

*271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*,
   03-07-00498-CV, 2008 WL 2387630 (Tex. App.—Austin
   June 11, 2008, no pet.) .............................................................................24

*Al-Saud v. Youtoo Media, L.P.*,
   3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. Mar. 15, 2017) ..............18, 20

*Alexander v. Good Marble & Tile Co.*,
   4 S.W.2d 636 (Tex. Civ. App. 1928) ....................................................37, 38

*Anderson Bros. Corp. v. O'Meara*,
   306 F.3d 672 (5th Cir. 1962) ...................................................................35

*Anderson v. Liberty Lobby Inc.*,
   477 U.S. 242 (1986) ................................................................................44

*Armstrong v. Assocs. Int'l Holding Corp.*,
   No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043
   (N.D. Tex. Sept. 20, 2006) .......................................................................34

*Bacher v. Maddux*,
   550 S.W.2d 405 (Tex. Civ. App. 1977) ......................................................48

*Brown v. Jackson*,
   40 S.W. 162 (Tex. Civ. App. 1897) ...........................................................26

*Buxani v. Nussbaum*,
   940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ) ............................23

*In re Capco Energy, Inc.*,
   669 F.3d 274 (5th Cir. 2012) ...................................................................30

*Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*,
   297 S.W.3d 248 (Tex. 2009) .....................................................................47

*City of Keller v. Wilson*,
   168 S.W.3d 802 (Tex. 2005) .....................................................................18

*Collier v. Robinson*,
   129 S.W. 389, 61 Tex. Civ. App. 164 (Tex. Civ. App. 1910) .........................36

iii

*Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*,
    No. 3:21-CV-01748-N, 2021 LEXIS 247218 (N.D. Tex., Dec. 29, 2021)............................35

*Craig Sessions M.D., P.A. v. TH Healthcare Ltd.*
    412 S.W.3d 738 (Tex. App. – Texarkana 2013).......................................................38, 48

*Critchfield v. Smith*,
    151 S.W.3d 225 (Tex. App.—Tyler 2004, pet. denied)...........................................22

*Curry v. O'Daniel*,
    102 S.W.2d 481 (Tex. Civ. App. 1937) ....................................................................48

*Del Bosque v. AT&T Adver., L.P.*,
    441 Fed. Appx. 258 (5th Cir. Sept. 16, 2011).........................................................36

*DeWitt County Elec. Coop. Inc. v. Parks*,
    1 S.W.3d 96 (Tex. 1999)...........................................................................................48

*Diamond v. Hodges*,
    58 S.W.2d 187 (Tex. Civ. App. 1933) ......................................................................54

*Dorsett v. Hispanic Hous. & Educ. Corp.*,
    389 S.W.3d 609 (Tex. App.—Houston [14th Dist.] 2012, no pet.).........................18

*Envtl. Conservation Org. v. City of Dallas, Tex.*,
    529 F.3d 519 (5th Cir. 2008) ...................................................................................18

*First Com. Bank v. Palmer*,
    226 S.W.3d 396 (Tex. 2007).....................................................................................26

*First Nat'l Bank v. Whirlpool Corp.*,
    517 S.W.2d 262 (Tex. 1974).....................................................................................51

*Fischer v. CTMI, LLC*,
    479 S.W.3d 231 (Tex. 2016).....................................................................................29

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.*,
    3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015) .....................23, 24

*Floyd v. Hefner*,
    556 F. Supp. 2d 617 (S.D. Tex. 2008) .....................................................................45

*Franklin v. Regions Bank*,
    CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) ....................................24

*Garcia v. Lumacorp, Inc.*,
    No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635 (N.D. Tex. July 27, 2004),
    aff'd, 429 F.3d 549 (5th Cir. 2005) .........................................................................28

CORE/3522697.0002/171927721.9

*Getto v. Gray*,
  627 S.W.2d 437 (Tex. App. 1981) ................................................................48

*Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*,
  600 S.W.2d 856 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) ......................34

*Hallmark v. Hand*,
  885 S.W.2d 471 (Tex. App.—El Paso 1994, writ denied) ........................................30

*Haverda v. Hays County*,
  723 F.3d 586 (5th Cir. 2013) ..............................................................18

*Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*,
  480 S.W.2d 607 (Tex. 1972) ...............................................................23

*Hoard v. McFarland*,
  229 S.W. 687 (Tex. Civ. App. 1921) .......................................................26

*Honore v. Douglas*,
  833 F.2d 565 (5th Cir.1987) ..............................................................25

*Ibarra v. Texas Employment Commission*,
  823 F.2d 873 (5th Cir. 1987) .............................................................34

*Katy Int'l, Inc. v. Jinchun Jiang*,
  451 S.W.3d 74 (Tex. App. 2014) ...........................................................26

*Katz v. Intel Pharma*,
  CV H-18-1347, 2019 WL 13037048 (S.D. Tex. Apr. 19, 2019) ................................29

*Looney v. Irvine Sensors Corp*,
  CIV.A.309-CV-0840-G, 2010 WL 532431 (N.D. Tex. Feb. 15, 2010) .........................17

*Mack v. John L. Wortham & Son, L.P.*,
  541 Fed. Appx. 348 (5th Cir. 2013) .......................................................30

*Mandell & Wright v. Thomas*,
  441 S.W.2d 841 (Tex. 1969) ...............................................................35

*Martinez v. Pilgrim's Pride Corp.*,
  3:16-CV-3043-D, 2017 WL 6372385 (N.D. Tex Dec. 13, 2017) ..............................30

*Marx v. FDP, LP*,
  474 S.W.3d 368 (Tex. App. 2015) .........................................................26

*Nat'l Union Fire Ins. Co. v. CBI Indus.*,
  907 S.W.2d 517 (Tex. 1995) ..............................................................48

v

*O'Connor v. United States*,
   479 U.S. 27 (1986)...................................................................................48

*In re Palms at Water's Edge, L.P.*,
   334 B.R. 853 (Bankr. W.D. Tex. 2005)..................................................23

*Parrish v. Haynes*,
   62 F.2d 105 (5th Cir. 1932) ...................................................................51

*PGP Gas Products, Inc. v. Reserve Equip., Inc.*,
   667 S.W.2d 604 (Tex. App.—Austin 1984, writ ref'd n.r.e.)................24

*Phillips v. Herdon*,
   78 Tex. 378 (Tex. 1890) .........................................................................52

*Roark v. Stallworth Oil and Gas, Inc.*,
   813 S.W.2d 492 (Tex. 1991)...................................................................28

*Runnells v. Firestone*,
   746 S.W.2d 845 (Tex. App.—Houston [14th Dist.] 1988, writ denied)................23

*Samuel v. Holmes*,
   138 F.3d 173 (5th Cir.1998) ...................................................................18

*In re Schooler*,
   725 F.3d 498 (5th Cir. 2013) ..................................................................45

*Sinclair Oil Corp. v. Heights Energy Corp.*,
   4:05-CV-825-Y, 2007 WL 9718223 (N.D. Tex. Nov. 13, 2007) ...........30

*Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*,
   No. 05-17-01176-CV, 2018 WL 3454801 (Tex. App. July 18, 2018) ....26

*Szanto v. Pagel*,
   47 S.W.2d 632 (Tex. Civ. App. – Austin 1932) .....................................37

*T.O. Stanley Boot Co., Inc. v. Bank of El Paso*,
   847 S.W.2d 218 (Tex. 1992)...................................................................29

*Texas Co. v. Schram*,
   93 S.W.2d 544 (Tex. Civ. App. – Austin 1936) .....................................52

*Vaughan v. Crown Plumbing & Sewer Serv., Inc.*,
   523 S.W.2d 72 (Tex. Civ. App. 1975).....................................................54

*W.E. Grace Mfg. Co. v. Levin*,
   506 S.W.2d 580 (Tex. 1974)...................................................................51

CORE/3522697.0002/171927721.9

*WCW Int'l, Inc. v. Broussard*,
    No. 14–12–00940–CV, 2014 WL 2700892 (Tex.App.-Houston [14th Dist.]
    Mar. 4, 2014, pet. filed) ..........................................................................26

*Williams v. Cambridge Cos.*,
    615 S.W.2d 172 (Tex. 1981)......................................................................48

*Yaquinto v. Segerstrom (In re Segerstrom)*,
    247 F.3d 218 (5th Cir.2001) .....................................................................18

## Other Authorities

Restatement (Second) of Contracts § 12(2) (1981) ....................................36

Restatement (Second) of Contracts § 33 comment A .................................29

14 Tex. Jur. 3d Contracts § 157 ..................................................................26

3 Williston on Contracts § 7:44 (4th ed.)....................................................26

CORE/3522697.0002/171927721.9

Defendants file this Memorandum of Law in Response to Highland Capital Management, L.P.'s ("Highland Capital" or "Plaintiff") *Motion for Partial Summary Judgment* (the "Motion").

## I.    Preliminary Statement

1.    Plaintiff's central argument is that it does not believe – and therefore, this Court should not believe – Defendants' "story," a set of facts that is supported by sworn declarations and uncontroverted deposition testimony.  Plaintiff's assertion that "there is a complete absence of evidence to support each of Defendants' affirmative defenses" is demonstrably false and misleading.  Indeed, the very fact that Plaintiff's principal argument is that the "Defendants' stories are so weak that the Court must grant [Plaintiff's] Motion" is a concession that the case turns on disputed genuine issues of material fact, regardless of how loudly or snidely Plaintiff avows disbelief. Plaintiff's disdain for Defendants' defenses does not equate to an absence of evidence. Defendants' affirmative defenses are supported by facts and evidence in their Appendix, and the Court – when viewing the evidence in the light most favorable to the Defendants – must deny Plaintiff's Motion.  Plaintiff's Motion is essentially a closing argument at trial – arguing that Plaintiff's version of the facts should be accepted over Defendants' version – rather than a motion for summary judgment, as it is based almost entirely on the credibility of disputed facts and lacks authorities addressing the legal sufficiency of Defendants' evidence.  In this Response, Defendants direct the Court to summary judgment evidence supporting their defenses that create genuine issues of material fact requiring the Court to deny Plaintiff's Motion.

## II.    Statement of Facts

### A.    Procedural Background

2.    Defendants generally agree with Plaintiff's recitation of procedural background recited in ¶¶ 6-18 of its Motion; however, the procedural history and the description of claims on which Plaintiff is not moving are not relevant to this Motion.

### B.    The Promissory Notes

3.      Plaintiff issued three demand promissory notes (collectively, the "<u>Dondero Demand Notes</u>") to Jim Dondero in 2018.[2]  Defendant Jim Dondero does not dispute the amounts or the existence of the Dondero Demand Notes as Plaintiff has recited and referenced them.[3]

4.      Plaintiff issued four demand promissory notes to Highland Capital Management Services, Inc. ("<u>HCMS</u>") in 2019 (collectively, the "<u>HCMS Demand Notes</u>").[4]  Defendant HCMS does not dispute the initial amount loaned or the existence of the HCMS Demand Notes.[5]

5.      Plaintiff issued one promissory term note payable on a term schedule with NexPoint Advisors, L.P. ("<u>NexPoint</u>"), on May 31, 2017 (the "<u>NexPoint Term Note</u>").[6]  Defendant NexPoint does not dispute the initial amount loaned or the existence of the NexPoint Term Note.[7]

6.      Plaintiff issued five promissory notes payable on demand and one promissory note payable on a term schedule with HCRE Partners, LLC ("<u>HCRE</u>"),  between November of 2013 and October of 2018 (the "<u>HCRE Demand Notes</u>" and the "<u>HCRE Term Note</u>").[8]  Defendant HCRE does not dispute the initial amounts loaned or the existence of either the HCRE Demand Notes or the HCRE Term Note.[9]

### C.    Plaintiff Agreed to Forgive the Notes Upon Fulfilment of Conditions Subsequent

#### 1.    Forgivable Loans as Compensation Are Not Uncommon.

7.      Contrary to Plaintiff's assertion that "There is No History of Loans Being Forgiven [by Plaintiff]," it was not an uncommon practice for Plaintiff to provide executives with forgivable

---

[2] Def. Ex. 1, Declaration of James Dondero ("J Dondero Dec."), ¶¶ 5-7, Def. Appx. 5.
[3] Motion, ¶ 20(i).
[4] Def. Ex. 1, J Dondero Dec., ¶¶ 14-18, Def. Appx. 9-11.
[5] Motion, ¶ 20(iii).
[6] Def. Ex. 1, J Dondero Dec., ¶ 8, Def. Appx. 6-7.
[7] Motion, ¶ 20(iii).
[8] Def. Ex. 1, J Dondero Dec., ¶¶ 9-13, Def. Appx. 7-9.
[9] Motion, ¶¶ 29-31.

loans as compensation.[10]  Along with Jim Dondero, several of Plaintiff's executives received loans

that were forgiven, including Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins,

Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery.[11]  Plaintiff's corporate representative,

James Seery, confirmed that several of the above-named individuals received loans that were

forgiven in the past.[12]  Further, Plaintiff's own Motion contradicts itself by claiming there is no

history of loans being forgiven, but in the very next paragraph concedes that "[Plaintiff] has not

forgiven any loan to Mr. Dondero since at least 2008," recognizing that, in fact, Plaintiff has

forgiven loans to Jim Dondero in the past.[13]  Using forgivable loans to compensate Jim Dondero

made sense for Plaintiff, as Jim Dondero was undercompensated in his position compared to other

similarly-situated contemporaries at comparable investment firms.[14]

## 2.    The Agreements to Forgive the Notes

8.    The Highland Capital Limited Partnership Agreement (the "LPA") authorized the

Dugaboy Family Trust ("Dugaboy") to approve compensation for the General Partner and

Affiliates of the General Partner.  Specifically, the LPA provides, in pertinent part:

(a)    Compensation.  The General Partner and any Affiliate of the General
Partner shall receive no compensation from the Partnership for services
rendered pursuant to this Agreement or any other agreements *unless
approved by a Majority Interest.*"[15]

The LPA defines the relevant actors in the Compensation provision as follows:

---

[10] Motion, ¶ 103; Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 98, Jim Dondero 10/29/21 Tr.  424:4-8, Pl. Appx. 01777.
[11] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 24, Jim Dondero's Objections and Responses to Plaintiff's Requests for Admission, Interrogatories, and Requests for Production, Pl. Appx. 00526; Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 109:7-22, Pl. Appx. 03154; Pl. Ex. 195, David Klos 10/27/21 Tr. 106:6-22, Pl. Appx. 03208; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 212:4-25, Pl. Appx. 02011.
[12] Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982; Def. Ex. 3-A, Deposition of James P. Seery, Jr. (177:19-178:5), Def. Appx. 141-142.
[13] Motion, ¶ 104.
[14] Def. Ex. 1, J Dondero Dec., ¶ 23, Def. Appx. 13; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 160:10-161:3; 218:12-222:14, Pl. Appx. 02013-02014; Def. Ex. 3-B, Deposition of Bruce McGovern Tr. 24:7-25:4, Def. Appx. 193 (providing expert testimony that the Agreements did not create taxable income for Jim Dondero).
[15] Pl. Ex. 30, 4th LPA, § 3.10(a) (emphasis added), Pl. Appx. 00622.

"'***Majority Interest***' means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[16]

"'***Class A Limited Partners***' means those Partners holding a Class A Limited Partnership Interest, as shown on Exhibit A."[17]

**Exhibit A** reflects "The Dugaboy Investment Trust" as a Class A Limited Partner owning 74.4426% of the Class A Limited Partnership Interests.[18]

Nancy Dondero is the Dugaboy Trustee and was therefore the individual entitled to approve compensation under the pertinent LPA provisions above.[19]

9.      In December of 2017 or January of 2018, Nancy Dondero – on behalf of Plaintiff and as representative for a majority of Class A shareholders – entered into an oral agreement with Jim Dondero that Plaintiff would forgive the Notes issued in 2017 upon the fulfilment of certain conditions subsequent.[20]  Specifically, if certain portfolio companies were sold at or above cost – Trussway, Cornerstone, or MGM – the Notes would be forgiven.[21]  Jim and Nancy Dondero entered into identical Agreements subsequent to each Note at issue in this litigation in 2018, 2019, and 2020, respectively (referred to collectively as the "Agreements").[22]  Notably, nowhere in Plaintiff's Motion does it dispute that Jim Dondero and Nancy Dondero had the authority to enter into these Agreements or that the Agreements would be legally binding on Plaintiff.

10.     The Agreements themselves served as an incentive for Jim Dondero to work particularly diligently on the sale of the portfolio companies and to make sure they were

---

[16] *Id.*, § 2.1, Pl. Appx. 00612.
[17] *Id.*, § 2.1, Pl. Appx. 00610.
[18] *Id.*, Exhibit A, line 5, Pl. Appx. 00639.
[19] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 22:13-15, Pl. Appx. 01880; Pl. Ex. 98, James Dondero 10/29/21 Tr. 400:8-19, Pl. Appx. 01771; Def. Ex. 1, J Dondero Dec., ¶ 21, Def. Appx. 13; Def. Ex. 2, N Dondero Dec., ¶ 3, Def. Appx. 80; Def. Ex. 2-A, Nancy Dondero Acceptance of Appointment of [Dugaboy] Family Trustee, Def. Appx. 89.
[20] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.
[21] *Id.*
[22] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 7-8, Def. Appx. 81-83

4

successful.[23]   This incentive benefitted Plaintiff by maintaining its profitability and reputation

across the industry for successful performance as a private equity firm.[24]   The Agreements acted

to motivate and retain Jim Dondero as Plaintiff's employee.[25]   Further, Jim Dondero forwent

opting to increase his own salary with cash compensation in accordance with § 3.10 of the LPA,

as he would have been allowed to do.   Instead, Jim Dondero elected to make his potential

compensation conditional upon his own successful performance, and Plaintiff benefitted from the

Agreements by not paying Jim Dondero higher base compensation, something Jim Dondero

thought was "great for the [Plaintiff] at the time," and "reduces other compensation [that he would

have otherwise taken]. [26]   Therefore, Plaintiff benefited from the Agreements on two fronts: (i)

receiving more focused and dedicated work from Jim Dondero in his efforts to make the portfolio

companies more profitable, and (ii) not paying Jim Dondero a higher base compensation.

### 3.    The Agreements Were Never Kept "Secret" from Anyone

11.    Plaintiff's assertion that the Agreements were "kept secret" and "never disclosed

by Mr. Dondero" is not only irrelevant to the Motion, but also inaccurate.[27]   Jim Dondero indicated

to both Frank Waterhouse and Plaintiff's counsel that the Notes were forgivable.   Well before

these proceedings, Jim Dondero told Frank Waterhouse, the Debtor's Chief Financial Officer, that

there were "mechanisms in place for forgiving the Notes, or for having them considered as

compensation and not being an asset to the Debtor's estate."[28]   Further, on February 1, 2021,

counsel for Jim Dondero – the late Judge Michael Lynn – informed opposing counsel that "[a]s

you are aware, in addition to other defenses, Mr. Dondero views the notes in question as *having*

---

[23] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[24] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[25] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14; Def. Ex. 2, N Dondero Dec., ¶ 10, Def. Appx. 83-84.
[26] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-18, Pl. Appx. 01660; Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[27] Motion ¶ 98.
[28] Pl. Ex. 99, James Dondero 11/4/21 Tr. 167:10-16, Pl. Appx. 01854; Def. Ex. 1, J Dondero Dec., ¶ 28, Def. Appx. 15.

been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero."[29]
Although that correspondence did not detail every facet of the Agreements, it alerted Debtor to
Defendants' position that the Notes were potentially forgivable, which Debtor did not question.

12.     Jim Dondero did not disclose the Agreements to the financial auditors at Highland
Capital because such disclosure was unnecessary.[30]  In light of Highland Capital's sizable financial
assets, potential Note forgiveness under the Agreements was *de minimis.*[31]  Thus, such a disclosure
was not considered material, and would have been unwarranted.[32]  And, of course, whether the
Agreements were disclosed to the financial auditors – or anyone else for that matter – has no
bearing on whether the Agreements are legally enforceable.

13.     Plaintiff's claim in ¶ 47 of its Motion that: "[i]f PwC had learned before June 3,
2019, at any of the Notes (a) might not be collectible, or (b) might be forgiven, or (c) was amended,
or (d) would be extinguished based on the fulfillment of certain conditions subsequent, it would
have required that fact to be disclosed," is demonstrably untrue, as cross-examination testimony
from Peet Burger of PwC – the testimonial basis for Plaintiff's position – concedes.[33]  On cross
examination, Burger confirmed that disclosure of the Agreements would only have been required
when the Notes were *actually forgiven*, not that they *might* be forgivable.[34]  Thus, Peet Burger

---

[29] Def. Ex. 1-D, Letter to Pachulski Stang Ziehl & Jones, LLP, Def. Appx. 74 (emphasis added).
[30] Def. Ex. 1, J Dondero Dec., ¶ 27, Def. Appx. 15.
[31] *Id.*
[32] *Id.*
[33] Motion, ¶ 47, citing the Deposition of Peet Burger (74:19-76:12), Pl. Appx. 1571.
[34] Pl. Ex. 94 Peet Burger 7/30/21 Tr. 78:11-79:13, Pl. Appx. 01572:

Q:    And I want to focus on this.  I know these are [Plaintiff's counsel's] questions, so it may not have been your
      language, but you were asked if it [the loans] might be forgiven.  What does that mean to you?  Are we
      talking about is there a difference for you if there was a 1 percent chance that something would be forgiven
      or a 90 percent chance of it being forgiven?
A:    If we learned about something, let's say, we learned [it] might be forgiven, that would have resulted in
      additional audit work.  *The question I understood to be and the answer I gave was if something happened
      where there was an event that actually occurred before or on June 3rd, we would have required disclosure.*
Q:    Got it.  So is it fair to say that in response to all of [Plaintiff's counsel's] questions about what would have
      been required to be disclosed, in your mind he was referring those events or items have *actually occurred*
      and the notes being *actually forgiven* at that point in time; is that correct?

very quickly changed his position and conceded that he misunderstood Plaintiff's counsel's question when he gave the quote that forms the basis of Plaintiff's Motion, ¶ 47. Plaintiff is fully aware of the recantation, making its use of a demonstrably false statement in its Motion a concession of the Motion's lack of merit.

### 4. Jim and Nancy Dondero Do Not Disagree About Whether the Notes Were Specifically Identified.

14.    Plaintiff's assertion that Jim and Nancy Dondero disagree as to whether or not Jim Dondero identified which notes were subject to the Agreements is a mischaracterization of the deposition testimony.[35] Nancy Dondero testified that she understood which Notes were subject to the Agreements:

"Q:    At the time that you entered into the agreements, did you have any understanding that the agreements would cover all notes executed by your brother, NexPoint, HCRE and HCMS?

A:    Yes."[36]

            . . . .

"Q:    Was it your understanding that when you entered into each of these agreements, that the agreements would cover every promissory note that was executed by your brother, by NexPoint, by HCMS, and by HCRE, irrespective of whether it wound up being part of the lawsuit?

A:    My understanding for the agreement I had with Jim is just for these 13 notes."[37]

            . . . .

"Q:    Why don't you tell me what the conversations were that led to each of the agreements to best that you can recall.

A:    The conversations with my brother that took place towards the end of each of the years that we're discussing, they started as general conversations about business, about work. And Jim would bring up the loans that were done earlier in the year. He had stated in the conversation that he thought he was undercompensated for the work that he does and the time that he

---

Q:    I didn't hear your answer.
A:    Correct.

[35] Motion, ¶ 93 ("Mr. and Ms. Dondero disagree on perhaps the most important aspect of the Alleged Agreements; namely, its scope. Ms. Dondero insists that Mr. Dondero identified the notes that are the subject of each Alleged Agreement. Mr. Dondero, on the other hand, disagrees.").
[36] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 186:7-12, Pl. Appx. 01921.
[37] *Id.* at (186:25-187-10), Pl. Appx. 01921.

puts in.  And he wanted those loans to be forgiven if any of the three portfolio companies that we talked about monetized at a higher value.

Q:    And you agreed with that?

A:    Well, it was – yes, I did agree with that proposal.  I thought it was a win-win for everybody. [38]

Nancy Dondero reaffirms in her declaration: "During our conversations in which we made the Agreements, I understood which Notes were subject to the Agreements."[39]

15.    Jim Dondero did not "disagree" with Nancy Dondero that he identified the Notes subject to the Agreements.  Rather, Plaintiff cites a portion of Jim Dondero's deposition in which, in response to unclear questioning,[40] Jim Dondero indicated that he communicated to Nancy Dondero that the Notes were made by different entities:

"Q:    No.  I'm just asking if during your discussions with the Dugaboy trustee, you ever disclosed the name of the maker of any of the Notes that were subject to the agreements?

A:    She – she knew they were Notes due to Highland from various entities. So I don't know what your question is.  Did I identify specifically that they were Notes due to Highland?  I guess the answer to that is yes, *but I don't know what you're asking me*."[41]
. . . .

"A:    She was aware that they were notes due to Highland from a variety of entities."[42]

Jim Dondero reiterates in his declaration: "when entering into the Agreements . . . I specifically remember discussing and identifying the Notes to Nancy Dondero."[43]  Thus, Plaintiff's argument

---

[38] *Id.* at (193:19-194:15), Pl. Appx. 01923.

[39] Def. Ex. 2, N Dondero Dec., ¶ 8, Def. Appx. 81-83.

[40] Motion, ¶ 93, citing Ex. 99 at 79:6-81:23, Appx. 1832.

[41] Pl. Ex. 99, James Dondero 11/4/21 Tr. 79:20-80:5, Pl. Appx. 01832 (emphasis added).

[42] *Id.* at (80:16-17), Pl. Appx. 01832. Moreover, Mr. Dondero's additional testimony is even clearer. Pl. Ex. 99, James Dondero 11/4/21 Tr. 28:6-21, Pl. Appx. 01819; Declaration of Jim Dondero, ¶ 24-26; James Dondero 10/29/21 Tr. 403:10-404:12, Pl. Appx. 01771-01771; Pl. Ex. 96, James Dondero 5/28/21 Tr. 153:5-154:6, 180:5-9, 214:16-24, Pl. Appx. 01653, 01660, 01668.

[43] Def. Ex. 1, J Dondero Dec., ¶¶ 25-26, Def. Appx. 14-15.

that there is some discrepancy between Jim Dondero and Nancy Dondero's testimony that supports its summary judgment motion is without foundation.

> **5.**    **Jim and Nancy Dondero Provide Sworn Deposition Testimony and Declarations Evidencing the Agreements**

16.    Throughout this litigation, Plaintiff has taken the position that the Agreements are fabricated and lack any evidence of their existence.[44]   However, Jim and Nancy Dondero have consistently testified under oath that the Agreements took place, exist, and are valid.[45]   Further, both Jim and Nancy Dondero have provided this Court with declarations swearing to the Agreements' factual existence:

> 24.  At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred.  [The Declaration of James Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[46]

> 6.  In either December of 2017 or January of 2018, I caused Dugaboy (solely in my capacity as Dugaboy's Family Trustee) to cause Highland Capital to enter into the first of a series of verbal agreements with Jim Dondero that provided that the repayment obligation on the notes made in 2017 involved in this litigation would be forgiven if Highland Capital sold any of Trussway, Cornerstone, or MGM for a price greater than its cost, or if any of those portfolio companies were sold in a circumstance that was outside of Jim Dondero's control. [The Declaration of Nancy Dondero goes on to also describe the Agreements for the Notes issued in years 2018 and 2019].[47]

17.    Plaintiff also suggests that because Jim Dondero would have preferred to use a list of the Notes to refresh his recollection regarding the Agreements during his deposition, no reasonable trier of fact could find the Agreements existed.[48]   While whether an agreement was

---

[44] Motion, ¶ 90.

[45] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 162:22-163:8, Pl. Appx. 01915; Pl. Ex. 96, James Dondero 5/28/21 Tr. 176:20-177:5, Pl. Appx. 01659; Def. Ex. 1, J Dondero Dec., ¶ 24-26, Def. Appx. 14-15; Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81-83.

[46] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.

[47] Def. Ex. 2, N Dondero Dec., ¶ 6, Def. Appx. 81.

[48] Motion, ¶ 91.

actually made is potentially a proper issue for summary judgment in a he said she said situation (which does not exist here), whether or not a witness uses notes to refresh his recollection is not a basis for granting a summary judgment.  It would be a factor for a fact-finder to take into account in determining the credibility of a witness.  Here, the fuss Debtor makes about Jim Dondero's list of the Notes is much ado about nothing, as shown by the following:

> Q:      Thank you very much.  The agreements covered each of the notes that are the subject of the lawsuits that Highland commenced against you, HCRE Services, and NexPoint, is that right?
>
> A:      The – yes.[49]
>         . . . .
>
> Q:      Can you identify any Promissory Note that is the subject of any specific agreement that you ever entered into with the Dugaboy trustee without looking at the list?
>
> A:       I believe it covered virtually all of them.  So I don't remember [now] which ones specifically in each year.  Generally, it was, I believe, the ones incurred in that year, but I don't remember which entities.  But again, the ultimate result being that the term loans, the demand notes, the things incurred, the things outstanding were part of the agreement.[50]

A deposition, much less a 30(b)6(6) deposition, where witnesses frequently bring notebooks full of data to be able to testify to specific details is not a game of gotcha, entitling one party to force the other to testify about dozens of details without the aids a business person would typically use to keep track of such information.

18.      Defendants refer the Court to the declarations and deposition testimony of Jim Dondero and Nancy Dondero to demonstrate that the Agreements exist, and Plaintiff's assertion that "no reasonable trier of fact can find that the [] Agreement[] existed" is simply inconsistent with the summary judgment evidence.

---

[49] Pl. Ex. 99, James Dondero 11/4/21 Tr. 14:7-12, Pl. Appx. 01816.
[50] *Id.* at (28:6-21), Pl. Appx. 01819.

CORE/3522697.0002/171927721.9

### D.    Plaintiff was Responsible for Making Term Note Payments under a Shared Services Agreement with NexPoint, HCMS, and HCRE

19.    The Shared Services Agreements ("SSAs") between Highland Capital and NexPoint, HCMS, and HCRE provided that Highland Capital would manage "back and middle office" tasks, which included making debt payments for NexPoint, HCMS, and HCRE.[51]  SSAs are common in the private equity industry, and exist to consolidate function and manpower between large and small entities that share overlapping ownership structure.[52]

#### 1.    The NexPoint Shared Services Agreement

20.    NexPoint and Plaintiff entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, which resulted in Plaintiff providing almost the entire workforce for NexPoint's business.[53]  Specifically, Plaintiff was to provide back- and middle-office, legal compliance, administrative services, management of clients and accounts, and other services to NexPoint.[54]  These services included making debt payments on behalf of NexPoint. The NexPoint SSA outlined these responsibilities in Section 2.02:

> Section 2.02   Provision of Services. . . .[T]he Staff and Services Provider [Plaintiff] hereby agrees, from the date hereof, to provide the following back- and middle-offices services and administrative, infrastructure and other services to the Management Company [NexPoint].
>
> > (a)    *Back- and Middle-Office*:  Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, ***payments***, operations, book keeping, cash management . . . . ***accounts payable*** . . .[55]

Further, the NexPoint SSA provided the standard of care that Plaintiff was required to adhere to when it provided such services for NexPoint:

---

[51] *Id.* at ¶ 36.
[52] *Id.*
[53] Def. Ex. 1, J Dondero Dec., ¶ 32, Def. Appx. 16-17; Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04162.
[54] *Id.*
[55] *Id.* at 04165-04166 (emphasis added).

> Section 6.01 Standard of Care.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . .[56]

Thus, the NexPoint SSA itself clearly provided both the specific services that Plaintiff was to provide NexPoint – namely the back- and middle-office tasks of handling payments and accounts payable – and the standard of care under which Plaintiff was to provide those services.

21.    Further, Kristin Hendrix – who served as Plaintiff's assistant controller in 2020 and is currently employed by Plaintiff – stated that she knew about the upcoming NexPoint Annual Installment in 2020, but received a phone call from Frank Waterhouse instructing her not to make any payments from the Advisors (which includes NexPoint) to Plaintiff.[57]

22.    Therefore, Plaintiff decided on either November 30, 2020 or December 1, 2020 that it was not going to make the annual term payment on the NexPoint Note.  However, Plaintiff never reached out in writing to confirm this with Jim Dondero or anyone else at NexPoint, or to inquire about clarification or whether Frank Waterhouse's instruction was a mistake, given the significant consequences of nonpayment.  Plaintiff's inaction certainly ran afoul of the NexPoint SSA Section 6.01 "Standard of Care" provision.

23.    Plaintiff's characterization of the relationship between Highland and NexPoint under the NexPoint SSA is disputed and inaccurate.[58]  Plaintiff claims that "[n]one of the services [provided for under the NexPoint SSA] authorized Highland to…effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint."[59] However, Highland Capital made payments for NexPoint in December of 2017,

---

[56] *Id.* at 04173.
[57] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 71:3-20, Pl. Appx. 03144.
[58] Motion, ¶ 123-126.
[59] Motion, ¶ 125.

2018, and 2019 *without any specific authorization, direction, or permission* from either Jim Dondero or any other NexPoint executive.[60]

24.     This course of conduct would lead any reasonable person to believe that Plaintiff would continue to make the annual payments without explicit direction, *as they had done for three years prior.*  Defendant believed that Plaintiff would continue to make the NexPoint Term Note payments, and was surprised to learn that Plaintiff decided not to make the December 31, 2020 annual payment.[61]  Whether or not Plaintiff should have continued to make payments on the NexPoint Note is a genuine issue of material fact.  Moreover, Plaintiff failed to bring certain prepayments to NexPoint's attention, resulting in NexPoint believing that payment was due, when it was not, although Plaintiff now claims it was due, even though it failed to make that payment.

## 2.     The HCMS and HCRE Shared Services Agreements

25.     Similar to the NexPoint SSA, Plaintiff had similar SSAs with both HCMS (the "HCMS SSA") and HCRE (the "HCRE SSA"), which were both established by oral agreement and course of conduct.[62]  Plaintiff provided identical services to both HCMS and HCRE as it did to NexPoint, and made sure all their financial obligations were promptly paid on time.[63]  There was a lengthy history of Plaintiff providing such services to HCMS and HCRE.[64]  The need for these SSAs with HCMS and HCRE were predicated on the fact that both entities – like NexPoint – lacked the internal infrastructure to operate entirely independently.[65]  Both HCMS and HCRE heavily relied on Plaintiff to provide these services, as Plaintiff had for years prior.[66]  Plaintiff was

---

[60] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03248-03249; Def. Ex. 1, J Dondero Dec., ¶ 34, Def. Appx. 17.
[61] J Dondero Dec. at ¶ 35, Def. Appx. 17-18.
[62] *Id.* at ¶¶ 36-39, Def. Appx. 18-19.
[63] *Id*.
[64] *Id.* at ¶¶ 36, 38, Def. Appx. 18-19.
[65] Pl. Ex. 98, James Dondero 10/29/21 Tr. 335:14-337:3, Pl. Appx. 01754-01755; Def. Ex. 1, J Dondero Dec., ¶¶ 36, 38, Def. Appx. 18-19.
[66] *Id.*

required to act reasonably in the performance of its obligations to HCMS and HCRE, given the record of past practices and the precedent created by similar work done by Plaintiff for NexPoint.[67]

26.    Frank Waterhouse confirmed in his deposition that Plaintiff provided the same services to HCRE and HCMS as it did to NexPoint, including ". . . accounting services, treasury management services, [and] potentially legal services."[68]    He also specifically confirmed that loan payments were the "kinds of things that [Plaintiff] would pay on time because of potential consequences of not paying on time" for HCMS and HCRE.[69]

27.    Further, Kristin Hendrix testified that it was "fair to say that [she] [did not] remember any instructions telling [her] not to make any payments from HCMS or HCRE,"[70] and that the reason she never made the December 31, 2020 payments on the HCMS or HCRE Term Notes was because she "never got an affirmative instruction to actually make the payment."[71] However, Hendrix later confirmed that Plaintiff "make[s] payments all the time" without the specific instruction of Frank Waterhouse or Jim Dondero.[72]    Hendrix made no attempts to determine if Jim Dondero wanted the HCMS or HCRE annual installment payments to be made.[73]

28.    Plaintiff ultimately knew about but failed to make the December 31, 2020 payments on both the HCMS Term Note and the HCRE Term Note.[74]    No one at HCMS or HCRE – including Jim Dondero – directed any person to miss or skip the payments on these Notes.[75] Whether or not Plaintiff should have continued to make payments on the HCMS Term Note and

---

[67] Def. Ex. 3-F, Expert Report of Steven J. Pully ¶ 57, Def. Appx. 231.
[68] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 353:3-354:12, Pl. Appx. 02137-02138.
[69] *Id.* at (357:2-11), Pl. Appx. 02138.
[70] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 100:20-23, Pl. Appx. 03151.
[71] *Id.* at (101:13-16), Pl. Appx. 03152.
[72] *Id.* at (103:10-16), Pl. Appx. 03152.
[73] *Id.* at (102:10-13), Pl. Appx. 03152.
[74] Def. Ex. 1, J Dondero Dec., ¶¶ 37, 39, Def. Appx. 18-19.
[75] *Id.*

14

the HCRE Term Note pursuant to the respective oral SSAs are genuine issues of material fact.[76]

Moreover, as discussed in greater detail below, Plaintiff failed to remind HCMS of prepayments

that had been made that relieved it of the obligation to make any additional payment in 2020.

      **E.**    **Prepayment on the Term Notes**

        **1.**    **NexPoint's Prepayments**

29.     NexPoint asserts the affirmative defense of prepayment on the NexPoint Note,

which relieved NexPoint of any obligation to make any additional payment in 2020. Thus, the

NexPoint Note was not in default when no payment was made on December 31, 2020. NexPoint

demonstrates *infra* that there is evidence supporting this affirmative defense and summary

judgment denying this affirmative defense is inappropriate as a matter of law.

30.     There is no dispute of fact that, between March and August of 2019, the following

payments were made on the NexPoint Note (collectively, the "NexPoint Prepayments"): (i)

$750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June

4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi)

$1,300,000.00 on August 13, 2019.[77] These payments totaled $6,380,000.00 in 2019.[78] The

normal December, 2019 payment of principal and interest on the Note would have been

$2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

31.     None of the aforementioned payments were scheduled payments or payments on

arrears.[79] Rather, they were prepayments since the Plaintiff needed money and asked NexPoint to

transfer it funds for liquidity purposes, which NexPoint did.[80] These transfers were intended by

---

[76] Defendants' position is bolstered by the Expert Report of Steven J. Pully, ¶ 59 (Def. Ex. 3-F, Def. Appx. 232),
which was incorrectly not permitted to be included in the record by the Court. Defendants submit this proffer to
preserve their objection.
[77] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249.
[78] *Id.*
[79] *Id.*
[80] Def. Ex. 1, J Dondero Dec., ¶ 42, Def. Appx. 21.

both NexPoint and Plaintiff to be prepayments on the Note.[81]  This fact is confirmed by testimony from Plaintiff's personnel and its amortization schedule for the NexPoint Note.[82]  The only dispute here is how these NexPoint Prepayments should have been applied; more specifically, whether they should have been applied to the December 31, 2020 scheduled payment, rendering further payment at that time unnecessary.

### 2.  HCMS' Prepayments

32.    Plaintiff's Motion never directly addresses HCMS's prepayment defense. Rather, in its 50-page Motion, Plaintiff lists HCMS in several headings, but then never actually makes any arguments or raises any facts specific to HCMS.  Moreover, not once in paragraphs 3-14 Mr. Klos's Declaration addressing the NexPoint prepayment defense (or anywhere else), does Klos mention the HCMS Term Note.[83]  Therefore, it does not appear that Plaintiff actually is moving for summary judgment on HCMS' prepayment defense.  However, as with NexPoint, any such motion would have no merit.

33.    There is no factual dispute that between May of 2017 and December of 2020, the HCMS Term Note's principal amount was paid down by almost $14,000,000.00.[84]   Between May of 2017 and December of 2020, the following prepayments were made on the HCMS Note (collectively, the "HCMS Prepayments"): (i) $985,216.44 on June 23, 2017; (ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on

---

[81] *Id.*
[82] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 03249; Pl. Ex. 194, Kristen Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147 (objections omitted).
[83] Declaration of David Klos in Support of [Plaintiff's] Motion for Partial Summary Judgment in Note Actions, ¶¶ 3-14, Case 21-03003-sgj [Doc. 133].
[84] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.

CORE/3522697.0002/171927721.9

October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.[85]

34.     Again, none of the above payments were scheduled, nor were they ever made on December 31 of any given year.[86] Further, none of these payments were made on arrears.[87] Rather, these prepayments were intended by HCMS to be applied to the scheduled Annual Installment payments, and were obviously accepted as such, since Plaintiff never declared the note to be in default in 2017, 2018, or 2019.[88] Plaintiff presents no legal or factual argument to the contrary, so summary judgment for this defense must be denied.

## III.     Argument and Authorities

### A.     Legal Standard

35.     Plaintiff suggests that there is a separate or independent summary judgment standard for promissory notes.[89] The fact that the elements of breach of promissory note differ from breach of contract in no way lessens Plaintiff's burden of proving there are no genuine issues of material fact.[90] *Looney v. Irvine Sensors Corp*, CIV.A.309-CV-0840-G, 2010 WL 532431 at 2 (N.D. Tex. Feb. 15, 2010) (noting that, although the elements for breach of a promissory note differs from traditional breach of contract, "[s]ummary judgment is proper when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, what that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law").

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[89] Compare, Motion, III. A. 1: "Summary Judgment Standard" with III. A. 2: "Summary Judgment Standard for Promissory Notes."
[90] Motion, ¶ 132 (under the heading: "Summary Judgment Standard for Promissory Notes").

36.     Plaintiff's Motion is a "no-evidence" motion, arguing that "[t]here is a complete absence of evidence to support each of Defendants' affirmative defenses." Motion, ¶ 2. Therefore, the Court may only grant Plaintiff's Motion if: ". . . (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact."[91]

37.     When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant.[92] To determine whether a genuine dispute exists such that the case must be submitted to a jury, courts must consider all of the evidence in the light most favorable to the non-moving party, draw all reasonable inferences in favor of the non-moving party, refuse to make credibility determinations or weigh the relative strength of the evidence, and disregard all evidence favorable to the movant that the jury would not be required to believe.[93]

**B.     Plaintiff is Not Entitled to Summary Judgment because Defendants Raise Genuine Issues of Material Fact with their Defenses**

**1.     The Agreements to Forgive the Notes**

**a.     The Evidence Shows that the Agreements Exist**

38.     Plaintiff argues that "[t]here is a complete absence of evidence in support of this defense [the Agreements]," claiming that: (i) Jim Dondero could not "identify material terms" of the Agreements, (ii) "Mr. and Ms. Dondero cannot even agree whether Mr. Dondero identified the Notes subject to each. . .Agreement," (iii) Jim Dondero "failed to declare the Notes forgiven" when

---

[91] *Dorsett v. Hispanic Hous. & Educ. Corp.*, 389 S.W.3d 609, 613 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex. 2005)).

[92] *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008); *Yaquinto v. Segerstrom (In re Segerstrom),* 247 F.3d 218, 223 (5th Cir.2001); *Samuel v. Holmes,* 138 F.3d 173, 176 (5th Cir.1998).

[93] *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197, at 2 (N.D. Tex. Mar. 15, 2017) (citing *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013)).

MGM stock was sold in November 2019, (iv) "Ms. Dondero. . .never saw a Note signed by Mr.

Dondero. . .and was not competent to enter into the [] Agreements," (v) the Agreements were

"never disclosed to anyone," (vi) there is no written evidence of the Agreements, (vii) and "there

is no history of loans being forgiven [by Plaintiff]."[94]   These are simply closing arguments that

address credibility of evidence and are properly made at trial, not at summary judgment.

(i)      <b>The Evidence Shows That Jim Dondero Identified<br>Material Terms of the Agreements</b>

39.     Plaintiff argues that Jim Dondero was not able to identify the material terms of the

Agreements.[95]   However – as addressed in section C.4, *supra* – Jim Dondero identified that the

Notes that were subject to the Agreements and provided general details,[96] but was prevented by

the examiner from referencing his list of the Notes to give the specific details of each.[97] Mr.

Dondero was noticed for deposition in both his personal and 30(b)(6) capacities and therefore it

was appropriate for him to have a list to be able to give precise details for questions that might be

asked about the exact amounts, dates and terms of the Notes.   There is no surprise about which

loans the Agreements applied to since Jim Dondero has consistently stated that all the loans at

issue in this litigation were subject to the Agreements.[98]   Regardless, Jim Dondero provides the

Court with a sworn declaration evidencing his knowledge of the details of the Notes.[99]

40.     Plaintiff provides no legal authority supporting its claim that no jury could believe

the Agreements exist because Jim Dondero could not reference the specific terms without his

---

[94] Motion, ¶ 147.
[95] *Id.*
[96] Response, ¶ 15.
[97] *Id.*
[98] See note 42 *supra*.
[99] J Dondero Dec., ¶¶ 5-18 (itemizing the Notes subject to the Agreements, including their amounts and dates of each Note).

19

notes.  Plaintiff's argument is simply an attack on Mr. Dondero's credibility, which is improper at the summary judgment stage.  *See, Al-Saud* at 2.

> **(ii)    The Evidence Shows that Jim and Nancy Dondero Do Not Disagree About Whether Jim Dondero Identified the Notes Subject to the Agreements**

41.    As demonstrated in section C.4, *supra*, Jim and Nancy Dondero do not disagree about whether Jim Dondero identified the Notes subject to the Agreements.  Defendants have pointed this court to specific summary judgment evidence that there is no disagreement about which Notes Jim Dondero identified.[100]  Further, Plaintiff has no authority supporting its claim that no reasonable trier of fact could find that the Agreements exist in these circumstances.

> **(iii)    Jim Dondero Not "Declaring the Notes Forgiven" upon the Sale of the MGM Asset Has No Bearing on Whether the Agreements Exist**

42.    Regarding whether Jim Dondero failed to declare the Notes forgiven upon the alleged sale of some unspecified amount of HCM's interest in MGM, Plaintiff provides no legal authority (nor have Defendants located any) addressing the relevance of this point.  Even if all of Plaintiff's interest in MGM had been sold for more than it had cost (in which case Mr. Dondero would have raised the forgiveness of the Notes), there is no legal proposition in Texas requiring a party to a contract to declare that a contractual term has been completed in an effort to prove that contract's existence.  But, in fact, Plaintiff does not assert that HCM's interest in MGM was sufficiently liquidated to trigger forgiveness, and indeed only a tiny amount was sold.[101]

43.    More importantly, Plaintiff is estopped from making this argument because it is contradicted by its sworn interrogatory answers.  When Defendants requested Plaintiff "[i]dentify any sale or potential sale of any portfolio companies (or a portion of such portfolio companies)

---

[100] Response, ¶¶ 14-17.
[101] Def. Ex. 1, J Dondero Dec., ¶ 47, Def. Appx. 22.

20

CORE/3522697.0002/171927721.9

owned (wholly or partially) by the [Plaintiff], including, but not limited to, Trussway, MGM and Cornerstone…," Plaintiff responded that it "ha[d] not sold Trussway, MGM or Cornerstone…."[102]

### (iv)   Whether Nancy Dondero Ever Saw a Note is Irrelevant to the Agreements' Existence.

44.    Whether Nancy Dondero ever saw the Notes is completely irrelevant to whether a reasonable trier of fact could conclude the Agreements existed.  Again, Plaintiff cites no legal authority to support its position that this fact has any bearing on the existence of the Agreements. Similar to the MGM issue above, Plaintiff's point is irrelevant and must be disregarded.

### (v)   Whether the Agreements Were Disclosed is Irrelevant to the Agreements' Existence.

45.    Plaintiff argues – without any supporting legal authority – that since the Agreements were "never disclosed . . . to anyone," there is no evidence supporting their existence.[103]  However, Plaintiff overlooks the fact that Jim Dondero alerted Frank Waterhouse that there were mechanisms in place for forgiving the Notes,[104] and that Jim Dondero's counsel sent a letter to Plaintiff's counsel indicating that Jim Dondero planned on citing the Agreements as an affirmative defense.[105]  Moreover, Plaintiff cites no authority for its proposition that a failure to broadly disclose an agreement has any bearing on whether the agreement does or does not exist. Plaintiff's lack of authority is especially telling in a case that is not a "he said, she said" debate on whether an agreement was made: rather both side to the Agreements (Dugaboy for HCM and Jim Dondero) agree *that the Agreements were made*. Therefore, again, Plaintiff's argument does not support its motion for summary judgment.

---

[102] Def. Ex. 3-H, Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, Interrogatory 14, Def. Appx. 299.
[103] Motion, ¶¶ 145-147.
[104] Response, ¶ 11.
[105] *Id.*

(vi)   **The Lack of Written Documentation of the Oral Agreements is Irrelevant to the Agreements' Existence.**

46.   Plaintiff argues that, because there is no written documentation evidencing the oral Agreements, the existence of the oral Agreements cannot be believed.[106]   The fact that the oral Agreements between Jim and Nancy Dondero lack written documentation should not be surprising, as they were reached through verbal communication.   In Texas, oral contracts have the same validity and enforceability as written contracts.   "The elements of written and oral contracts are the same and must be present for a contract to be binding." *Critchfield v. Smith*, 151 S.W.3d 225, 233 (Tex. App.—Tyler 2004, pet. denied).   Plaintiff cites no authority to the contrary.

(vii)   **Defendant's Summary Judgment Evidence Shows that Plaintiff Does Have a History of Forgiving Loans as Compensation.**

47.   Plaintiff's argument that "there is no history of loans being forgiven" by Plaintiff is rebutted by the record.   As demonstrated *supra*, Defendants present evidence that Plaintiff has forgiven loans to several executives in the past.[107]   Further, Plaintiff has forgiven loans to Jim Dondero in the past, a fact conceded in its Motion and confirmed by its own witness.[108]

b.   **Both Sides to the Agreements Provide Summary Judgment Evidence Attesting to the Agreements' Existence.**

48.   Jim and Nancy Dondero's testimony alone is sufficient under Texas law to show that the Agreements exist.   Plaintiff's lack of legal authority supporting the proposition that when ***both sides*** to an agreement testify to that same agreement's existence, there is somehow still a material issue of fact regarding that agreement's existence, should not come as a surprise.   Only one side to an oral agreement is required to testify as to its existence to survive a motion for

---

[106] Motion, ¶ 147.
[107] Response, ¶ 7.
[108] *Id.*

CORE/3522697.0002/171927721.9

summary judgment. "Where there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact under Texas law."[109]   In other words, Defendants' summary judgment evidence is more than sufficient to provide proof that the Agreements exist and create a genuine issue of material fact, since they present testimony from ***both*** sides to the Agreements while Texas law only requires testimony from ***one***.

49.     Further, "whether the parties had a meeting of the minds or common understanding is better suited for the trier of fact and cannot be determined by the court at this [summary judgment] juncture."[110] In *Fisher*, the movant argued on summary judgment that no implied contract with the non-movant existed.   However, the court denied summary judgment on the existence of an implied contract where the non-movant produced evidence of a course of conduct that "raised a genuine dispute of material fact as to whether the parties had an implied contract…"[111]

50.     Of course, unlike the case cites above, here, ***both sides*** that made the Agreements attest the Agreements exist.    Jim and Nancy Dondero – the only two individuals who have firsthand knowledge of the Agreements – have testified numerous times that the Agreements occurred and do exist.  Nancy Dondero testified to the Agreements' existence at her deposition:

> Q:     Is it your testimony that you, as the trustee of The Dugaboy Investment Trust, entered into oral agreements with your brother between December and the year each note was made and February of the following year,

---

[109] *In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 857 (Bankr. W.D. Tex. 2005) (citing *Runnells v. Firestone*, 746 S.W.2d 845, 849 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (emphasis added); *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607, 610 (Tex. 1972); *Buxani v. Nussbaum*, 940 S.W.2d 350, 352 (Tex. App.—San Antonio 1997, no writ)).

[110] *Fisher v. Blue Cross and Blue Shield of Tex., Inc.*, 3:10-CV-2652-L, 2015 WL 5603711 at 10 (N.D. Tex. Sept. 23, 2015) (analogizing the *In re Palms* in a summary judgment context: "[s]imply alleging there was no meeting of the minds is not a legitimate basis for summary judgment because "[w]here there is no written contract in evidence, and ***one party*** attests to a contractual agreement while the other vigorously denies any meeting of the minds, determining the existence of a contract is a question of fact.").

[111] *Id*. at 10.

CORE/3522697.0002/171927721.9

pursuant to which plaintiff agreed that plaintiff would forgive the notes if certain portfolio companies were sold for greater than cost or on a basis outside of James Dondero's control?

A:   That is correct.[112]

Jim Dondero also testified to the Agreements' existence at his deposition:

Q:   Okay.  And in the first sentence to your answer in Interrogatory 1, you wrote, or somebody wrote on your behalf, quote: "The agreements were entered into on behalf of the debtor by James Dondero, subsequent to the time each note was executed."  Is that an accurate statement, or is it an inaccurate statement?"

A:   Again, it was between me and the Class A, the majority of the Class A members.  It was a Class A – the Class A members were representing Highland, never the debtor, because the debtor didn't exist yet.[113]

51.   Plaintiff ignores this testimony in its Motion.  Both Jim and Nancy Dondero also provide this Court with sworn Declarations explicitly asserting that the Agreements exist.  Based on the evidence above, Defendant Jim Dondero provides evidence that the Agreements exist, and creates a genuine issue of material fact.  *See, Fisher* at 10.

52.   Plaintiff seems to suggest that testimony from Jim and Nancy Dondero attesting to the Agreements' existence is insufficient to create an issue of material fact that the Agreements exist.  While this may be the case in one state with markedly different law than other states (*see Franklin v. Regions Bank*, CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021) (statutorily requiring corroborating evidence in addition to testimony from one party to prove an oral contract in excess of $500.00 in Louisiana)), this is not the case in Texas.  In Texas, "[t]he existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence."[114]  The circumstantial evidence supports the existence of the Agreements.  Plaintiff never demanded any

---

[112] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 164:13-23, Pl. Appx. 1915.
[113] Pl. Ex. 96, James Dondero 5/28/21 Tr. 165:8-20, Pl. Appx. 01656.
[114] *271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, 03-07-00498-CV, 2008 WL 2387630 at 4 (Tex. App.—Austin June 11, 2008, no pet.) (citing *PGP Gas Products, Inc. v. Reserve Equip., Inc.*, 667 S.W.2d 604, 607 (Tex. App.—Austin 1984, writ ref'd n.r.e.)).

of demand notes at issue in this case (nor did it declare any Term Notes to be in default) until James Seery assumed control of Plaintiff.  Actually, it was not until Plaintiff was in bankruptcy that Plaintiff decided to conspicuously call all the demand notes for payment.[115] Prior to the bankruptcy, Plaintiff made no attempt to demand the Notes.  Circumstantially, it appears that Plaintiff was operating from 2017 to 2020 as if the Agreements were valid and in effect.

53.    Plaintiff's argument that the evidence of the Agreements' existence is factually insufficient flies in the face of black letter law that the court cannot "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."[116] Because Jim and Nancy Dondero have sworn to the existence and validity of the Agreements, Plaintiff's arguments amount to nothing more than factual attacks that impermissibly require this Court to opine on the credibility of Defendants' evidence.  Thus, summary judgement must be denied.

> ### c.    The Evidence Shows the Agreements Were Supported by Consideration

54.    Plaintiff also argues that the Agreements are unenforceable due to a lack of consideration.[117]   Specifically, Plaintiff simply broadly asserts – without reference to any supporting facts – that ". . . no reasonable trier of fact could find that . . . such oral agreement was exchanged for consideration."[118]  Despite Plaintiff's lack of any relevant supporting facts besides a "laundry list" of grievances against the Donderos that have no applicability to Plaintiff's arguments – discussed in more detail *infra* – the Agreements were supported by adequate consideration independent from any pre-existing consideration supporting the Notes.

---

[115] Motion, ¶ 22 (referencing Plaintiff's demand on the Demand Notes); Pl. Ex. 2, Amended Complaint against NPA et al., ¶ 27, Pl. Appx. 00029; Pl. Ex. 3, Amended Complaint against HCMS, ¶ 43, Pl. Appx. 00189; Pl. Ex. 4, Amended Complaint against HCRE et al., ¶ 43, Pl. Appx. 00189.
[116] *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir.1987).
[117] Motion, ¶ 148.
[118] Motion, ¶ 149.

55.     Consideration is a present exchange bargained for in return for a promise that may consist of *some* right, interest, or profit, or benefit that accrues to one party or of *some* forbearance, loss, or responsibility that is undertaken or incurred by the other party.[119]  Consideration consists of *either* a benefit to the promisor *or* a detriment to the promisee and thus, there is valid consideration when "when a party gives up a pre-existing legal right."[120]

56.     Here, Jim Dondero's forbearance from increasing his own compensation—a legal right he possessed prior to entering into the Agreements—as well as his contribution to increasing the value of all of the portfolio companies in efforts to sell the companies above cost, is adequate consideration for the Agreements.  At the time the Agreements were formed, Jim Dondero was authorized as General Partner of the Plaintiff to set his own compensation subject to approval by the Majority Interest.[121] Therefore, Jim Dondero had a legal right to increase his own salary that existed before the Agreement was formed.[122]  Accordingly, his decision to set his compensation conditional upon his own performance instead of exercising his right under the LPA to increase the immediate cash component of his compensation provided adequate consideration in exchange

---

[119] *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74, 85 (Tex. App. 2014) (emphasis added) (citing *WCW Int'l, Inc. v. Broussard*, No. 14–12–00940–CV, 2014 WL 2700892, at *9 (Tex.App.-Houston [14th Dist.] Mar. 4, 2014, pet. filed) (sub. mem. op.).

[120] *See, e.g., 1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 65–66 (Tex. App. 2018); *Marx v. FDP, LP*, 474 S.W.3d 368, 378–79 (Tex. App. 2015) (cleaned up) (relinquishment of disputed claims against each other adequate consideration agreement granting purchaser option to purchase vendors' homestead); *First Com. Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex. 2007) (guaranties executed in connection with renewal of promissory note to prevent payee from accelerating debt supported by consideration consisting of the payee's forbearance on prior guaranties and agreement to renew and extend the original debt); *Southern Equip. Sales, Inc. v. Ready Mix Sols., LLC*, No. 05-17-01176-CV, 2018 WL 3454801, at *5 (Tex. App. July 18, 2018) (extending time for payment of note or debt suffices as consideration); *Hoard v. McFarland*, 229 S.W. 687 (Tex. Civ. App. 1921) (cancellation of vendor's lien note before expiration of limitations period was sufficient consideration for reconveyance), writ refused (June 7, 1922); *Brown v. Jackson*, 40 S.W. 162 (Tex. Civ. App. 1897) (agreement by execution debtor with agent of execution creditor not to bid at execution sale was sufficient consideration for agent's promise to allow the debtor to redeem). *See also* 3 Williston on Contracts § 7:44 (4th ed.) ("Just as a promisor may make an agreement for acts or promises to act, so too may it bargain for forbearances or promises to forbear."); 14 Tex. Jur. 3d Contracts § 157 ("Generally, forbearance from exercising a legal right, or the outright surrender of a legal right that one is not bound to surrender, is sufficient consideration for a contract or promise.").

[121] Pl. Ex. 30, 4th LPA, § 3.10(a), Pl. Appx. 00622.

[122] *Id.*

CORE/3522697.0002/171927721.9

for the Agreements. Jim Dondero's testimony was clear that the Agreements served to motivate his performance with heightened focus and reduce other compensation Plaintiff would have otherwise had to pay him through an increased salary.[123]

57.     Here, Jim Dondero was incentivized to work particularly hard on the profitability and sale of the three portfolio companies – MGM, Trussway, and Cornerstone – to ensure that Plaintiff maintained its profitability and reputation.[124]   Jim Dondero's increased efforts and workload to maximize these assets was also a right he gave up – and a benefit obtained by Plaintiff – in exchange for the potential for increased deferred compensation.

58.     At the time of the Agreements, Nancy Dondero believed that Jim Dondero was undercompensated for the work that he did for the Debtor and that he was also undercompensated in comparison to other asset managers in similar industry roles.[125]   Therefore, Nancy Dondero understood Jim Dondero's forbearance of pay increase as a fair exchange for the Agreements.

59.     In addition, Nancy Dondero agreed that Jim Dondero's efforts to increase the value of any of the portfolio companies would cause them to be sold for the highest value possible; if she did not believe that to be true, the Agreements would not have been made.[126] Plaintiff's Motion not only fails to cite to any authority to support failed or inadequate consideration, but also misconstrues Nancy Dondero's testimony. The Motion inaccurately states that Nancy Dondero "admitted that she did not know, and had no reason to expect, that Highland would benefit from the sale of the portfolio companies by a third party."[127] What she actually stated, however, was

---

[123] Pl. Ex. 96, James Dondero 5/28/21 Tr. 182:2-19, Pl. Appx. 01660.
[124] Def. Ex. 1, J Dondero Dec., ¶ 24, Def. Appx. 14.
[125] Pl. Ex. 100,  Nancy Dondero 10/18/21 Tr. 193:19-25-194:1-19, 206:17-25-207:1-17, 211:12-23, Pl. Appx. 01922-01923, 01926-01927;  Pl. Ex. 99, James Dondero 11/4/21 Tr. 51:8-13, 52:19-25-53:1-4, Pl. Appx. 01825-01826; Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:4-17, Pl. Appx. 01776; Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 94:21-96:22, Pl. Appx. 01982.
[126] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 194:20-25-195:1-10, 206:17-25-207:1-17, Pl. Appx. 01926.
[127] Motion, ¶¶ 98, 101.

that she entered into the Agreements and understood that if "any of the portfolio companies monetized higher [] the notes would be forgiven."[128]  Only when Plaintiff's counsel asked if she expected the Plaintiff to benefit if the portfolio companies were "sold on a basis outside of Mr. Dondero's control" did she answer that she did not know what to expect.[129] Nancy Dondero acknowledged that if the portfolio companies were sold for less than their value by a third party, then that would not be in Jim Dondero's control.[130]

60.    Furthermore, "[i]n order for the consideration to be deemed inadequate, it must be *so grossly inadequate as to shock the conscience*, being tantamount to fraud."[131] Even if this Court finds that the exchange was not made for equal value, Jim Dondero's conditional forbearance to increase his own pay and his specific dedication to increase his focus on the profitable sale of the portfolio companies is ***not so inadequate as to shock the conscience***, particularly given that it is common practice in private companies to forgive bona fide debt in order to manage compensation and provide incentives to managers.[132]  Simply because Plaintiff disagrees with Mr. Dondero's assessment does not make the consideration "grossly inadequate;" it is an issue of fact for a jury.[133]

### d.    The Evidence Shows the Agreements Were Definite

61.    Plaintiff argues, with very limited supportive facts and no legal authority, that the Agreements are not enforceable as a matter of law "for lack of. . .(b) definiteness."[134]  However, Plaintiff never specifically articulates how the Agreements fail for lack of definitiveness.[135]

---

[128] Pl. Ex. 100, Nancy Dondero 10/18/21 Tr. 205:14-21, Pl. Appx. 01925.

[129] *Id.* at (202:23-25-203:1-11), Pl. Appx. 01925.

[130] *Id.*

[131] *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426-, 2004 WL 1686635, at *11 (N.D. Tex. July 27, 2004), aff'd, 429 F.3d 549 (5th Cir. 2005) (emphasis added, citations omitted).

[132] It was common practice in private companies to loan money that is bona fide debt and then forgive it over time to manage compensation and as incentives to managers of private companies. Pl. Ex. 98, James Dondero 10/29/21 Tr. 421:18-25, Pl. Appx. 1776; Alan Johnson Expert Report p. 14-15.

[133]  *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (determining that adequacy of consideration is a question of fact for the jury).

[134] Motion, ¶ 148.

[135] *Id.*

62.     In Texas, "[i]n order to be legally binding, a [verbal] contract must be sufficiently definite in its terms so that a court can understand what a promisor understood."[136]  Further, "[t]he material terms of a contract are determined on a case-by-case basis."[137]  "[A] term that 'appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties," and "[t]erms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of an agreement to the contrary."[138]

63.     Here, there is certainly enough evidence for the Court to understand what the promisor (Nancy Dondero) understood.  Nancy Dondero understood that Jim Dondero was undercompensated, and that the Agreements created an "everybody wins" situation for both the Plaintiff and Jim Dondero.[139]  Further, Nancy Dondero and Jim Dondero articulated the terms of the Agreements in their depositions: that if any of the three portfolio companies were sold for above cost, the Notes would be forgiven.[140]  The Agreements were simple, and both the promisor and promisee understood their terms.[141]  The only individuals that entered into the Agreements were Nancy and Jim Dondero, and both have provided this Court with sworn declarations providing evidence of the Agreements' definitiveness.

e.      **The Evidence Shows the Agreements Were Supported by a Meeting of the Minds**

64.     Plaintiff's argument that the Agreements were not supported by a meeting of the minds fails because the summary judgment evidence shows that Jim Dondero and Nancy Dondero, on behalf of Plaintiff, objectively assented to the terms of the Agreement.[142]  Plaintiff does not

---

[136] *Katz v. Intel Pharma*, CV H-18-1347, 2019 WL 13037048 at 6 (S.D. Tex. Apr. 19, 2019) (quoting *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).
[137] *Intel Pharma* at 6 (quoting *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 237 (Tex. 2016)).
[138] *CTMI, LLC* at 239-240 (quoting the Restatement (Second) of Contracts § 33 comment A).
[139] Response, ¶ 14.
[140] Response, throughout.
[141] Response, ¶ 16.
[142] Response, ¶ throughout.

articulate how the evidence does not support a meeting of the minds.  Nor does Plaintiff articulate

specific facts that show there was no meeting of the minds between Jim Dondero and Nancy

Dondero, other than the "scope" issue, which Defendants have addressed in section C.4, *supra*.

Regardless, the contested issue of whether or not Jim Dondero and Nancy Dondero had a meeting

of the minds is an issue of fact that precludes summary judgment.

65.    In Texas, "[t]he determination of a meeting of the minds, and thus offer and

acceptance, is based on the objective standard of what the parties said and did and not their

subjective state of mind."[143]  "[A] meeting of the minds refers to a mutual understanding and assent

to the agreement regarding the subject matter and the essential terms of the contract."[144]  Further,

". . .the determination of whether the parties reached an agreement – whether there was a meeting

of the minds – is a question of fact, which precludes summary judgment."[145]

66.    Plaintiff does not identify what facts lend themselves to the argument that there was

no meeting of the minds other than its very brief "scope" argument: "Ms. Dondero insists that Mr.

Dondero identified the notes that are the subject of each Alleged Agreement.  Mr. Dondero, on the

other hand disagrees."  Motion, ¶ 93.  Nevertheless, Jim and Nancy Dondero provide evidence that

they objectively understood and agreed to the essential terms and scope of the Agreements.  Nancy

Dondero testified that she understood which Notes were subject to the Agreements, as well as the

Agreements' terms.[146]  These facts are also asserted in Nancy Dondero's declaration.[147]

---

[143] *Martinez v. Pilgrim's Pride Corp.*, 3:16-CV-3043-D, 2017 WL 6372385 at 4 (N.D. Tex Dec. 13, 2017) (quoting
*In re Capco Energy, Inc.*, 669 F.3d 274, 280 (5th Cir. 2012)).

[144] *Pilgrim's Pride* at 4 (quoting *Mack v. John L. Wortham & Son, L.P.*, 541 Fed. Appx. 348, 362 (5th Cir. 2013)).

[145] *Sinclair Oil Corp. v. Heights Energy Corp.*, 4:05-CV-825-Y, 2007 WL 9718223 at 3 (N.D. Tex. Nov. 13, 2007)
(Court agreeing with respondent that meeting of the minds is an issue of fact precluding summary judgment); *See
also: Hallmark v. Hand,* 885 S.W.2d 471, 476 (Tex. App.—El Paso 1994, writ denied) ("Where the element pertaining
as to whether or not there was a meeting of the minds is contested, determination of the existence of a contract is a
question of fact").

[146] Response, ¶ 14, quoting Nancy Dondero's deposition testimony.

[147] Def. Ex. 2, N Dondero Dec., ¶¶ 6-8, Def. Appx. 81.

67.    Plaintiff's assertion that Jim Dondero "disagrees" with Nancy Dondero that he identified the Notes subject to the Agreements misstates Jim Dondero's testimony.  Jim Dondero clarified that Nancy Dondero did know that the Notes were made by different entities.[148] These facts are also set forth in Jim Dondero's Declaration.[149]

68.    Ignoring Plaintiff's attempt to paraphrase Jim Dondero's testimony out of context – and in light of Nancy Dondero's testimony that Jim Dondero did identify the Notes – it is clear that Jim Dondero communicated to Nancy Dondero that the Notes were made on behalf of the various entities on behalf of which they were made, and Nancy Dondero understood this. Therefore, not only is the issue of whether there is a meeting of the minds a fact issue not susceptible of summary judgment, the evidence also shows the Donderos objectively understood the terms of the Agreements.  If anything, the evidence would support summary judgment *that there was a meeting of the minds*.

### f.    Nancy Dondero Was Competent to Cause Plaintiff to Enter into the Agreements.

69.    Plaintiff argues that Nancy Dondero was not "competent" to enter into the Agreements.[150]  The cited evidence has nothing to do with Nancy Dondero's competency to contract (as "competency" is normally understood under Texas law), but instead references various bits of information that Nancy Dondero allegedly lacked when she caused Plaintiff to enter into the Agreements.  Although mislabeled, the Debtor's argument appears to be that the Agreements are unenforceable because they were the product of a unilateral mistake by Nancy Dondero.

70.    This argument fails for several reasons.  First, Texas law provides that Nancy Dondero gets to determine the information she needed to decide whether to cause Plaintiff to enter

---

[148] Response, ¶ 15, quoting Jim Dondero's deposition testimony.
[149] *Id.*
[150] Motion ¶ 96.

into the Agreements, and the evidence confirms that she had what she needed.  Second, Plaintiff does not argue or submit any evidence suggesting that Plaintiff – the actual party to the Agreements – lacked any relevant information.  Third, a unilateral mistake can invalidate a contract only when it goes to a material term, when enforcement of the contract would be unreasonable, and when the mistake is made despite the exercise of due care.  Plaintiff does not even allege any of these elements, much less submit any evidence to support them.

**(i)      Nancy Dondero Lacking Certain Information Has No Bearing on her Competency to Enter into the Agreements.**

71.      The evidence shows that Nancy Dondero had the information she considered necessary and appropriate to cause Plaintiff to enter into the Agreements, and Texas law requires nothing more.  Plaintiff's assertion that Nancy Dondero should have had more and different information before entering into those Agreements has no legal effect on their validity or enforceability.

**(ii)     Nancy Dondero Had the Information She Needed to Cause Highland Capital to Enter into the Agreements.**

72.      Plaintiff's allegation that Nancy Dondero was ignorant of the facts and circumstances giving rise to the Agreements is not accurate.[151]  Specifically, at the time Nancy Dondero caused Plaintiff to enter into the Agreements, she knew Plaintiff was in the hedge fund business which included buying and selling portfolio companies, and she knew that it owned an interest in each of Cornerstone, MGM and Trussway, the portfolio companies involved in the Agreements.[152]  She knew that Jim Dondero's annual salary had historically been around $500,000 to $700,000 in the years preceding the Agreements, and she understood that Jim Dondero was

---

[151] Motion, ¶ 96; Plaintiff also ignores Nancy Dondero's business experience outlined in Def. Ex. 2, N Dondero Dec., ¶ 2, Def. Appx. 80.
[152] *Id.* at ¶ 9, Def. Appx. 83.

32

undercompensated as compared to other senior executives in the financial services industry.[153] She also knew that executives in the financial services industry tend to be paid on a bonus or incentive basis.[154] Nancy Dondero knew that potentially increasing Jim Dondero's compensation through contingent loan forgiveness would have less of an impact on Plaintiff's financial condition than requiring it to pay him additional cash in salary or bonus.[155]

73.     Nancy Dondero was aware that Plaintiff owned an interest in Cornerstone, MGM, and Trussway, the portfolio companies that were involved in the Agreements.[156] Nancy Dondero knew that Plaintiff's business included, among other things, buying and selling portfolio companies or interests in them for a profit.[157] Nancy Dondero also knew that Jim Dondero would the person most involved in, and responsible for, Plaintiff's marketing and eventual sale of Cornerstone, MGM, and Trussway.[158] And Nancy Dondero knew and believed that the Agreements would operate to further motivate and incentivize Jim Dondero to maximize Plaintiff's return on its investments in Cornerstone, MGM, and Trussway.[159] That Nancy Dondero may not have known every detail identified by the Plaintiff has no bearing on whether she had sufficient information to cause Plaintiff to enter into valid and binding Agreements.[160]

---

[153] *Id.* at ¶ 4, Def. Appx. 80-81.
[154] *Id.* at ¶ 9, Def. Appx. 83.
[155] *Id.* at ¶ 10, Def. Appx. 83-84.
[156] *Id.* at ¶ 9, Def. Appx. 83.
[157] *Id.*
[158] *Id.*
[159] *Id.* at ¶ 10, Def. Appx. 83-84.
[160] Plaintiff ignores the fact that Plaintiff was the actual party to the Agreements, and, even if Nancy Dondero lacked specific information, Plaintiff cannot credibly claim that it too lacked that information.

33

        **(iii)**      **Nancy Dondero's Personal Lack of Financial Details Has No Bearing on the Validity or Enforceability of the Agreements.**

74.     Under Texas law, the parties to a contract determine what they need to know before entering into the agreement.[161] The summary judgment evidence confirms that Nancy Dondero knew and understood the nature of the Agreements, and had all of the information she believed she needed to cause Plaintiff to enter into them.[162]  Nancy Dondero did not investigate the additional specifics identified by the Plaintiff because she did not believe she needed that information in order to make an informed and reasonable decision regarding the Agreements.[163]

75.     Nevertheless, Plaintiff seems to argue that the Agreements should be invalidated under the doctrine of unilateral mistake, arguing that Nancy Dondero was mistaken about, or unaware of, certain facts. Under Texas law, a unilateral mistake is generally not grounds for voiding a contract, and can do so only when (i) the mistake relates to a material term, (ii) the mistake makes enforcement of the contract unreasonable, and (iii) the mistake is made despite the exercise of due care.[164]  Plaintiff does not allege the existence of any (much less all) of these conditions, or offer any supporting evidence.

76.     Unsurprisingly, Texas law does not permit a party to avoid a contractual obligation when it could have conducted further investigation into the facts and circumstances underlying the contract, but chose not to do so.

---

[161] *Ginther-Davis Ctr., Ltd. v. Houston Nat. Bank*, 600 S.W.2d 856, 861 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e) (recognizing that it is presumed that a contracting party has sufficient information to enter into an agreement in Texas).

[162] *Id.* at ¶¶ 11, 12, Def. Appx. 84.

[163] *Id.* The Debtor's claim that Alan Johnson, Jim Dondero's executive compensation expert, would deem Nancy Dondero incompetent to enter into the Agreements is absurd. Mr. Johnson never said this or anything like it. Rather, he testified that he had no awareness of the Agreements and had never ever heard Nancy Dondero's name, other than that she was represented by legal counsel.  Pl. Ex. 101, Alan Johnson (Expert) 11/2/21 Tr. 99:5-100:5, Pl. Appx. 01983.

[164] *Armstrong v. Assocs. Int'l Holding Corp.*, No. 3:05-CV-02006-K, 2006 U.S. Dist. LEXIS 70043, **9-10 (N.D. Tex. Sept. 20, 2006) (*citing Ibarra v. Texas Employment Commission*, 823 F.2d 873, 879 (5th Cir. 1987)).

> It has been stated that 'though a court of equity will relieve against mistake, it will not assist a man whose condition is attributable to the want of due diligence which may be fairly expected from a reasonable person.' This is consistent with the general rule of equity that when a person does not avail himself of an opportunity to gain knowledge of the facts, he will not be relieved of the consequences of acting on supposition.

*Anderson Bros. Corp. v. O'Meara*, 306 F.3d 672, 677 (5ᵗʰ Cir. 1962) (internal citation omitted).

77.     Nancy Dondero had all of the information she considered necessary to decide whether to cause Plaintiff to enter into the Agreements.[165]  Plaintiff apparently disagrees, listing numerous details and specifics that it believes she should have investigated further.[166]  But Texas law does not permit a party to avoid a contract by claiming unilateral mistake when that party has conducted the due diligence it considered appropriate and necessary prior to entering into that contract. *Id.* This is exactly what happened here, and these facts cannot support a finding that the Agreements were – as a matter of law – the result of any "mistake" by Nancy Dondero.

### (iv)     Nancy Dondero Was Personally "Competent" to Cause Plaintiff to Enter into the Agreements.

78.     The only other possible construction of Plaintiff's "competency" argument is that Nancy Dondero lacked the personal capacity to cause Plaintiff to contract.  Texas law presumes that every party to a legal contract has sufficient capacity to understand the transaction involved, and the burden of proof to overcome this presumption is on the party challenging it.[167]  "A person has the mental capacity to contract under Texas law 'if she appreciated the effect of what she was doing and understood the nature and consequences of her acts.'"[168]

---

[165] Def. Ex. 2, N Dondero Dec., ¶ 11, Def. Appx. 84.
[166] Motion, ¶ 96.
[167] *Corsaro v. Columbia Hosp. at Med. City Dallas Subsidiary, LP*, No. 3:21-CV-01748-N, 2021 LEXIS 247218, 9 (N.D. Tex., Dec. 29, 2021).
[168] *Id*. (*quoting Mandell & Wright v. Thomas*, 441 S.W.2d 841, 845 (Tex. 1969)).

79.    A party lacks capacity to contract only when he or she is a minor, under a guardianship, mentally ill, or intoxicated.[169] The summary judgment evidence reflects that at the time she caused Highland Capital to enter into the Agreements, Nancy Dondero appreciated the effect of what she was doing and understood the nature and consequences of those acts.[170] Ms. Dondero was not mentally incompetent, under a legal guardianship, intoxicated, or under any other mental impairment at the time she caused Highland Capital to enter into the Agreements.[171]

### 2.    The Evidence Shows that Debtor was Responsible for Making Payments on the NexPoint, HCRE, and HCMS Notes under Shared Services Agreements

#### a.    The Affirmative Defense

80.    The Debtor declared a default under the NexPoint Note based on its allegation that NexPoint failed to make the December 2020 annual payment allegedly due under that note. Among other defenses, NexPoint pleads that Plaintiff caused the alleged default through its own negligence and fault.  Specifically, NexPoint had outsourced to Plaintiff the responsibility to ensure that NexPoint timely paid its payables, including under the NexPoint Note.  Plaintiff failed to properly discharge its responsibilities, causing the alleged default.  Accordingly, because Plaintiff caused the alleged default, plaintiff is estopped from seeking to capitalize on it.

#### b.    The Law

81.    Texas law recognizes that, when the plaintiff, through its negligence, has caused a delay in the defendant's performance of a contractual obligation, that delay is excused.[172]    As stated by one Texas appellate court:

---

[169] *Del Bosque v. AT&T Adver., L.P.*, 441 Fed. Appx. 258, 262 (5th Cir. Sept. 16, 2011) (*citing* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS § 12(2) (1981)).
[170] Def. Ex. 2, N Dondero Dec. at ¶ 12, Def. Appx. 84.
[171] *Id.*
[172] *Collier v. Robinson*, 129 S.W. 389, 61 Tex. Civ. App. 164, 166-67 (Tex. Civ. App. 1910) ("plaintiffs were excused from payment of the purchase price of the property within sixty days from the date of the contract, in the event only of a finding by the jury that they were prevented from so doing by the negligence of the defendants").

It is settled law that one may not take advantage of, nor recover damages for, delays for which he is himself responsible, and that the time for performance is excused and a corresponding extension of time given where the delay is occasioned by the act or default of the party claiming the damages.

*Szanto v. Pagel*, <mark>47 S.W.2d 632, 635</mark> (Tex. Civ. App. – Austin 1932).[173]

### c.   The NexPoint SSA and the Debtor's Duties Thereunder

82.     There is no question of fact that, at all times material to the Debtor's claims of default, NexPoint and the Debtor were parties to the SSA.[174]  Under the SSA, NexPoint outsourced various functions to the Debtor and the Debtor was obligated to provide various services to NexPoint.  The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

(a) Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, book keeping, cash management . . . accounts payable . . .

(k) Ancillary Services. Assistance and advice on all things ancillary or incidental to the foregoing.

(l) Other. Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.[175]

83.     The SSA itself expressly required the Debtor to provide "assistance" and "advice" with respect to, among other things, "payments" and "account payable," including" all things "ancillary" or "incidental" to the same.

84.     There should be no question of fact that the foregoing included providing NexPoint with assistance and advice in making payments allegedly required under the NexPoint Note.  At a

---

[173] *Accord Alexander v. Good Marble & Tile Co.*, <mark>4 S.W.2d</mark>  636, 639 (Tex. Civ. App. 1928), *writ ref'd* ("it is elementary that the owner is not entitled to recover damages brought about by his own wrong, regardless of whether the contract expressly so provided").

[174] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, Pl. Appx. 04163 ("This Amended and Restated Shared Services Agreement. . .is entered into by and between NexPoint Advisors, L.P. . . .and Highland Capital Management, L.P. . . .").

[175] *Id.* at § 2.02, Pl. Appx. 04165-04166 ("Provision of Services") (emphasis added).

minimum, there is a genuine issue of material fact regarding this question. In this respect, it is not parole evidence to consider the parties' past performance under a contract to determine their intention with respect to the same, so long as this is not offered to vary the express terms of a contract.[176] Here, the question is whether assistance and advice with respect to "payments" and "accounts payable," and all things "ancillary" or "incidental" to the same, included the Debtor assisting and advising NexPoint with respect to the alleged December 2020 annual payment. These phrases are not expressly defined in the SSA, so it is appropriate to consider the parties' prior course of dealing to understand the meanings of these terms.

85.    In this respect, Waterhouse, the CFO of the Debtor and an officer of NexPoint at the time, confirmed that the Debtor was responsible under the SSA to advise and assist NexPoint with respect to the alleged payment:

> Q.    <u>Well, what about long term loans? Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under longterm notes</u>?
>
> A.    <u>I mean, that is one of the things that the Highland personnel did provide to the advisors. Yes, we would -- we would – over the years, yes, we -- we -- we – we did do that generally. Again, I don't remember specifically but, yes, generally we – you know, we did do that</u>.
>
> . . . .
>
> Q.    And do you recall Mr. Morris had you go through the fact that NexPoint had made payments in years prior to 2020 on that note?
>
> A.    I do.
>
> . . . .
>
> Q.    And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?
>
> A.    We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the

---

[176] *See Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013). *Accord O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").

advisors,[177] we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections.  If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that.  Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat.  But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

. . . .

Q.    Prior to 2020, those services that you just described, would that -- on behalf of the debtor, would that have included NexPoint's payments on the $30 million note?

A.    Yes.

Q.    So someone at the debtor in treasury or accounting would have sent some schedule or a reminder that a payment would be coming due in the future. Is that generally the practice?

A.    Yes, we would -- you know, again, I didn't -- I didn't micromanage the teams, but we had a -- a corporate accounting calendar that we use as kind of a tickler file to keep track of payments.

I actually, you know, don't know how actively they're using that in -- in prior to 2020, but it was actively used at some point.

We did look at NexPoint cash periodically and cash for the other advisors as well and payments.  You know, we – payments like this would have appeared in our cash projections, in the advisor's cash projections.

And, again, as like I said earlier, they would have appeared there, so there would be time to plan for making any of these payments.

Q.    And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

A.    Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody.[178]

---

[177] The "advisors" include NexPoint.
[178] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 333:14-338:8, Pl. Appx. 02132-02134 (objections omitted) (emphasis added).

86.    Debtor was able to perform these services because it had access to and control over the bank accounts of the corporate Defendants, including NexPoint, HCMS and HCRE.[179]   In addition to the testimony of Waterhouse—who testified about the issues, roles, and duties of the parties under the SSA—Hendrix, a senior accountant for the Debtor at that time and still the Debtor's controller, confirmed the Debtor's "treasury" duties under the SSA to advise NexPoint of the alleged December, 2020 payment:

> Q.    You mentioned treasury management as of 2019, May. What do you mean by treasury management? What is that?
>
> A.    Generally speaking, we – it's not just me as one person. We have checks and balances.
> My team would be in charge of sending out payments, reconciling bank statements, making sure money is in the right accounts, creating cash forecasts and reporting on those every week with the CFO and oftentimes the CEO.
> Generally that's everything that fell under the umbrella.
>
> Q.    And would your description of treasury management be the same for the December 2020 period?
>
> A.    Yes.
>
>     . . . .
>
> Q.    We'll cut to the chase. In December of 2020, the debtor was providing services to various other entities affiliated with Mr. Dondero; correct?
>
> A.    Correct.
>
> Q.    That would have included NexPoint Advisors, LP?
>
> A.    Correct.
>
> Q.    And you're aware that NexPoint Advisors was the obligor on at least one promissory note to the debtor; correct?
>
> A.    Correct.
>
> Q.    And did the debtor in December 2020 provide so-called treasury management services to NexPoint Advisors?
>
> Q.    (BY MR. RUKAVINA) As part of that, in December 2020, would it have been employees of the debtor that would have scheduled for potential payment, subject to approval by NexPoint, NexPoint's future obligations as they were coming due?

---

[179] Frank Waterhouse 10/19/21 Tr. 327:9-328:9, 359:17-22, 360:8-15, Pl. Appx. 02131, 02139.

A.      Yes, we would have scheduled, only with approval.

Q.      And would that have included NexPoint's obligations on the promissory note to Highland?

A.      Yes.[180]

87.      Finally, Jim Dondero, in charge of NexPoint in December, 2020, and in charge of the Debtor in 2019 and prior years of the NexPoint Note, both the past practice and his understanding that the Debtor would advise him of any payments due under the NexPoint Note and his reliance on that advice, and that it did not occur in 2020:

Q.      Okay. And I just want to make sure that I have this right. Is it -- is it the corporate obligors' -- those three corporate obligors' contention that one of the reasons they didn't make the payments at the end of the year is that they were relying on Highland to make the payment for them?

A.      Absolutely.

Q.      Okay.

A.      It was due course de minimis, and those entities didn't have a single employee or capable financial person other than the people at Highland that were doing the shared services for them.

Q.      NexPoint didn't have any employees in December 2020. Is that your testimony?

A.      I was thinking about HCRE and Services had zero employees. NexPoint had employees but none that were involved in basic accounting functions.

         . . . .

Q.      I'm just – I'm just asking a pretty simple question, sir. I don't mean to be contentious with you. We have identified one defense that these corporate obligors contends exists; and that is, Highland was supposed to make the payment. Fair?

A.      Yes.

         . . . .

Q.      Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?

A.      No, there was a reliance on Highland.

---

[180] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 13:14-16:11, Pl. Appx. 03130 (objections omitted) (emphasis added).

> Q.   Okay.  Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?
>
> A.   Yes.  It is my contention that that is how it worked in prior years also.
>
> Q   And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?
>
> A.   Yes, typically. And in 2017 or 2018, 2019, for sure.[181]

88.   Accordingly, based on the plain language of the SSA and the above testimony, there is ample evidence—if not overwhelming and conclusive evidence—that the Debtor had duties under the SSA to at least remind NexPoint of any upcoming payment on the NexPoint Note and to advise NexPoint regarding the same, if not outright facilitating and making the payment: certainly to advise NexPoint of the upcoming payment and warn of the consequences of not making the payments.

### 3.   The Debtor Failed to Assist, Advise, or Facilitate Any Payment Obligation

89.   Notwithstanding its duties under the SSA and the parties' prior understanding of, and practice, under the SSA and those duties, the evidence demonstrates that the Debtor did nothing to assist NexPoint with, or advise NexPoint regarding, much less to facilitate, NexPoint's alleged payment in December, 2020 on the NexPoint Note.

90.   First, and despite the testimony of both Waterhouse and Hendrix that the Debtor would have, pursuant to the SSA and prior practice, identified and flagged any upcoming payment obligations on the Note and sought approval from NexPoint to make the same, the evidence is that the Debtor failed to do so.  In the record are several weekly runs of upcoming payment obligations of NexPoint, from late November and December, 2020, which fail to include any payment

---

[181] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786 (objections omitted) (emphasis added).

obligation on the Note, even though various other payment obligations—including upcoming loan payments—are listed and scheduled.[182]  Most relevant is the payment run from December 31, 2020 itself, which fails to list or schedule any payment on the NexPoint Note.[183]

91.    Second, Dondero's testimony confirms that the Debtor failed to advise or assist him and NexPoint with respect to the alleged payment, or to facilitate the same, cause the same to be made, or to seek his approval to make the same.

92.    Third, Waterhouse and his team at the Debtor failed to facilitate or to make the payment, despite Dondero's testimony that he relied on them to do so and that this is how the payments had been handed in 2017, 2019, and 2019.[184]  Here, there is a disagreement between Dondero and Waterhouse on the facts.  Namely, Waterhouse testified that, in late November or early December, 2020, he advised Dondero of the upcoming payment on the NexPoint Note and that Dondero expressly instructed him to not make the payment, as NexPoint had overpaid the Debtor millions of dollars on the SSA.[185]  Dondero testified that he only instructed Waterhouse to forbear from making any additional payments for shared services fees because they had been overpaid.[186]  Obviously, the Court cannot determine whose version of the events is correct and whose testimony the jury believe, but either way, Waterhouse's testimony confirms that the Debtor failed to assist with, advice, or facilitate the alleged payment, albeit due to an alleged instruction from Dondero.  Either way, the Debtor was negligent and at fault for the alleged default, as explained below.

---

[182] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 6:7-8 (referencing Exhibits A1 and A2, which were not included in Plaintiff's Appx), Pl. Appx. 02051; Def. Ex. 3-D, Email from F. Waterhouse to K. Hendrix, dated November 25, 2020, Def. Appx. 204-208; Def. Ex. 3-E, Email from F. Waterhouse to K. Hendrix, dated December 31, 2020, Def. Appx. 210.
[183] Id.
[184] Pl. Ex. 98, James Dondero 10/29/21 Tr. 458:11-463:25, Pl. Appx. 01785-01786.
[185] Pl. Ex. 105, Frank Waterhouse 10/19/21 Tr. 390:4-392:17, Pl. Appx. 02147.
[186] Pl. Ex. 99, James Dondero 11/4/21 Tr. 151:8-152:23, Pl. Appx. 01850.

### 4.    Debtor's Negligence and Fault In Creating an Alleged Default

93.    As demonstrated above, the Debtor failed to advise NexPoint of any upcoming payment on the NexPoint Note, much less to facilitate the same.  As such, there is ample evidence, at least to demonstrate a genuine issue of material fact, that it was the Debtor's own negligence and fault that caused the alleged default—all the more so since, on summary judgment, NexPoint's evidence is to be believed and reasonable inferences must be drawn in favor of NexPoint.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

94.    In this respect, the SSA sets forth the applicable standard of care by which the Debtor must discharge its duties under the SSA:

> "[T]he care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[187]

95.    Here, the analysis diverges depending on whether the jury will believe Waterhouse that he did in fact consult with Dondero regarding whether NexPoint should make the December, 2020 alleged payment and that Dondero instructed him not to make the payment, or whether the jury will believe Dondero that he gave no such instruction and was instead not consulted about the payment.  As noted throughout, the Court cannot make this determination on summary judgment.  *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### (i)    If Dondero Did Not Issue the Non-Payment Instruction

96.    If a jury found that Dondero did not instruct Waterhouse to not cause the December, 2020 payment to be made, then the Debtor clearly breached the standard of care under the SSA by doing *nothing* to assist and advise with respect to the payment, and no expert testimony is required

---

[187] Pl. Ex. 205, NexPoint's Amended and Restated Shared Services Agreement as of January 1, 2018, § 6.01, Pl. Appx. 04173.

on this issue because a layperson juror can reach this conclusion based on his or her own experience:

> under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken some form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013). *Accord Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008) ("an exception to the general rule is recognized where the [ ] lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge").

97.     Because the jury could well accept Dondero's testimony, and because the SSA sets forth a standard of care that would therefore have been breached by the Debtor by doing nothing to assist or advise NexPoint on the December 2020 payment, which conclusion the jury may reach without resort to expert testimony, and drawing all reasonable inferences in favor of NexPoint, the Court should deny summary judgment based on NexPoint's affirmative defense of the Debtor's own negligence and fault without any need to consider the alternative if the jury were to accept Waterhouse's testimony on Dondero's alleged instruction.

### (ii)     If Dondero Issued the Non-Payment Instruction: Offer of Proof

98.     Conversely, if a jury accepted Waterhouse's testimony that Dondero instructed him to not make the December 2020 alleged payment, expert testimony would be helpful to appreciate the consequences. In such an event, the Debtor would still be at fault and would have committed negligence in failing to take any additional steps after receiving the alleged instruction, including to: (i) double check, at a minimum, that Waterhouse correctly understood Dondero; (ii) advise

Dondero of the potential consequences of a missed payment; and (iii) try to dissuade Dondero from his alleged instruction.

99.     In this respect, NexPoint offers the expert opinion of its expert on this issue, Steven J. Pully.[188] The Bankruptcy Court denied NexPoint's motion for leave to extend the expert witness designation, report, and discovery deadlines, even though NexPoint filed its motion seeking such leave only ten (10) days after Waterhouse's deposition, when NexPoint first learned of Waterhouse's testimony regarding the alleged instruction, which first triggered the potential need for expert testimony regarding whether the Debtor properly discharged its duties under the SSA *if* Dondero gave the alleged instruction.  NexPoint has timely filed a motion with the District Court seeking its review of the Bankruptcy Court's denial of its motion for leave, and hereby incorporates, to the extent necessary, said motion.[189]

100.     Accordingly, under this offer of proof, there is a genuine issue of material fact regarding the Debtor's own negligence and fault in creating the alleged default, even if a jury could accept Waterhouse's testimony regarding Dondero's alleged instruction.

101.     At a minimum, there is admissible evidence to create a genuine issue of material fact that the Debtor was negligent and at fault for creating the alleged default, and the law confirms that, in such an event, timely performance under the NexPoint Note was excused as a result of such negligence and fault: (i) the SSA was in place at the time and, under the SSA, NexPoint outsourced payment, accounts payable, and treasury service functions to the Debtor; (ii) these included assisting and advising NexPoint with regard to payment obligations due under the Note, and to facilitate NexPoint's timey payment of such obligations; (iii) the Debtor utterly failed to

---

[188] Def. Ex. 3-F, Expert Report of Steven J. Pully, Def. Appx. 212-235.
[189] *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines,* Case 21-03005-sgj [Doc. 86]; *Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines*, Case 21-03005-sgj [Doc. 138].

take any steps to assist, advise, or facilitate the same or, if Dondero in fact instructed that the payment not be made, the Debtor utterly failed to take any steps thereafter consistent with its duties; and (iv) any resulting default in not making a timely payment under the NexPoint note is excused due to the Debtor's own negligence and fault.

### 5.    The HCMS and HCRE SSAs.

102.    For the reasons discussed in section D.2, *supra,* Plaintiff also owed the same services to HCMS and HCRE as it did NexPoint pursuant to its verbal SSAs with HCMS and HCRE.  Because the HCMS and HCRE SSAs carried with them the same obligations, rights, and duties as the NexPoint SSA, Plaintiff is also responsible for the skipped December 2020 annual payments for the same reasons outlined *supra*.  Therefore, there is sufficient summary judgment evidence creating a genuine issue of material fact that Plaintiff is responsible for these missed payments, and the Court must deny summary judgment.

### 6.    Prepayments by NexPoint and HCMS

#### a.    NexPoint Prepayments

103.    NexPoint presents evidence showing a course of conduct wherein prepayments on the NexPoint Term Note were accepted by the Plaintiff without default in prior years in contradiction to Plaintiff's claim that the term Notes required payment precisely on December 31 of each year.  This Court cannot resolve this issue at the summary judgment stage, as it raises a genuine issue of material fact regarding NexPoint's defense of prepayment.  Since the NexPoint Term Note is a contract, Texas law on contract interpretation and ambiguity must be applied.

104.    In Texas, it is clear that this Court's primary goal when interpreting the NexPoint Note is to "determine the parties' intent as reflected in the [Note's] terms."  *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.*, 297 S.W.3d 248, 252 (Tex. 2009).  As further summarized:

> When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law. A term is not ambiguous because of a simple lack of clarity. Nor does an ambiguity arise merely because parties to an agreement proffer different interpretations of a term. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning. Further, for an ambiguity to exist, both potential meanings must be reasonable.

*DeWitt County Elec. Coop. Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). However, when a contract contains an ambiguity, ". . . the courts [may] consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument."[190] Additionally, "[e]vidence of trade usage and ***course of conduct*** is admissible to explain, supplement, or qualify a term or an agreement, but it may not be used to contradict an express term."[191] And more importantly, Texas law requires a lender to apply prepayments to upcoming installments absent express, contrary instructions.[192]

105. Here, the NexPoint Term Note itself is ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal. Section 2.1 of the Note provides:

> 2.1 <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment"**) until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of

---

[190] *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995).
[191] *Craig Sessions M.D., P.A. v. TH Healthcare Ltd.* 412 S.W.3d 738, 745-46 (Tex. App. – Texarkana 2013) (emphasis added); s*ee also O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("the course of conduct of parties to any contract, is evidence of its meaning").
[192] *See Williams v. Cambridge Cos.*, 615 S.W.2d 172, 175 (Tex. 1981) ("Even in the absence of [instructions to apply a prepayment to the next installment], the prepayment was correctly applied to the installment first maturing."); *Getto v. Gray*, 627 S.W.2d 437, 440 (Tex. App. 1981) ("In the absence of an express stipulation to the contrary, prepayments on an indebtedness are to be applied to the installments first maturing."); *Bacher v. Maddux*, 550 S.W.2d 405, 405 (Tex. Civ. App. 1977) ("Where a party prepays note payments, these prepayments are applied to the installments first maturing."); *Curry v. O'Daniel*, 102 S.W.2d 481, 482 (Tex. Civ. App. 1937) ("Under these circumstances, the law will make the application according to the justice and equity of the case and this usually requires that such payment be applied according to priority of time—that is to the installments first maturing . . . .").

this Note, commencing on the first such date to occur after the date of execution of this Note.[193]

Section 3 of the Note further provides:

> 3. <u>Prepayment Allowed; Renegotiation Discretionary</u>. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[194]

106.     Clearly, the NexPoint Note does not require the annual payment on December 31 despite any prepayments.  In fact, the NexPoint Note contains **no** provision to the effect that a prepayment will not relieve the maker of any regularly scheduled payment.  James Seery – testifying for the Debtor – confirmed this at his deposition.[195]  Most importantly, NexPoint **never made the full annual payment** on December 31 in 2017, 2018, or 2019.[196]  For example, NexPoint paid $294,695.10 on December 18, 2018.[197]  NexPoint paid $530,112.36 on December 30, 2019.[198] Yet there were **no defaults** because, as explained below, NexPoint had prepaid the annual payment. Therefore, it is clear from the language of the Note, the parties' understanding of the NexPoint Note, and the parties' course of conduct that the annual installment payment can be prepaid, and was prepaid in the past.

107.     The ambiguity in the NexPoint Note is fairly straightforward: can NexPoint prepay future interest?  The Note itself says that it can "prepay . . . accrued interest."[199]  Accrued interest is of course interest that has already accrued, but the Note expressly permits NexPoint to prepay this interest, in effect prepaying future interest.  Yet the Note also provides that "payments on this

---

[193] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.
[194] *Id.*
[195] Def. Ex. 3-A, Deposition of James P. Seery (65:20-66:2), Def. Appx. 113-114 ("It's -- it says on, but typically there's no issue about prepayment and that paragraph 3 says you can prepay").
[196] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[197] *Id.*
[198] *Id.*
[199] Pl. Ex. 2, Amended Complaint against NPA et al., Exhibit 1, Pl. Appx. 00042.

CORE/3522697.0002/171927721.9

Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof."[200]  This provision forecloses the ability to prepay future interest, since any prepayment can only be applied to accrued interest and then to principal.  This is the ambiguity in the Note itself: on the one hand, the Note permits NexPoint to prepay future interest, while on the other hand, such prepayment is impossible.

108.    There is no question that the parties – well before this litigation – understood that NexPoint was permitted to prepay future interest.  On May 9, 2018, NexPoint paid $879,927.65 on the Note.[201]  The ***entirety*** of this payment was applied as a prepayment towards future interest for the months of May through October, 2018, and ***none*** of it was applied to principal.[202]  Likewise, on December 5, 2017, NexPoint made a payment of which $127,030.67 was applied to future interest on the NexPoint Note, such that no payment was due – and no payment was made – on December 31, 2017.[203]  Similarly, on December 18, 2018, $60,727.60 of NexPoint's payment was applied to future interest.[204]   In addition to the parties' actual practice and conduct, Mr. Seery confirmed at his deposition that future interest can be prepaid under the NexPoint Note: "Interest accrues on this note.  How you prepay it is you send the money before the accrual date."[205]  Thus, NexPoint can prepay and has prepaid future interest under the Note, as evidenced by the parties' actual practice and Mr. Seery's testimony, regardless of Section 3's implication that prepaying future interest is impossible (since that provision provides that any prepayment is first applied to accrued interest and then to principal, leaving no room for any prepayment of future interest).

---

[200] *Id.*
[201] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] Def. Ex. 3-A, Deposition of James P. Seery (67:15-22), Def. Appx. 114.

109.    As noted, NexPoint prepaid the Note by $6,380,000.00 in 2019.  Plaintiff clearly concluded that the 2019 annual principal payment on the Note had been prepaid because there was no such payment made on December 31, 2019.[206]  But, the Debtor billed NexPoint for $530,112.36 for accrued interest on December 30, 2019, which NexPoint paid.[207]  This was the Plaintiff's error.  In fact – as consistent with prior payments – the large prepayments in 2019 should have prepaid *future* annual instalments as there is no provision in the Note that links any prepayment to simply the annual payment for the year in which the prepayment is made; *i.e.* nothing in the Note prevents a prepayment of annual instalments due in future years.   In sum, when NexPoint made $6,380,000.00 in 2019, those payments should have been applied to future annual installments in accordance with the parties' course of conduct and prior dealings.

110.    Fortunately, Texas law addresses the situation where a debt instrument fails to specify how a payment should be applied against the underlying obligation.  Generally, the debtor may direct the application of a payment in the absence of a written agreement providing otherwise.  *See Parrish v. Haynes*, 62 F.2d 105, 107 (5th Cir. 1932).  "When a debtor fails to properly exercise his power to direct the application of the payment, the creditor ordinarily may apply the payment to any valid and subsisting claim he has against the debtor."  *W.E. Grace Mfg. Co. v. Levin*, 506 S.W.2d 580, 585 (Tex. 1974).   However, the creditor may "not make an application that is inequitable and unjust to the debtor."  *First Nat'l Bank v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974) (emphasis added).  This is a "limitation on the general rule that in the absence of application of payments by the parties themselves the law applies them to the oldest items then due."  *Id.*

---

[206] Pl. Ex. 200, Amortization Schedule, Pl. Appx. 3247-3258.
[207] *Id.*

111.    However, if neither the debtor not creditor make a proper application of a payment, then "the law will make the application according to the justice of the case." *Phillips v. Herdon*, 78 Tex. 378, 384 (Tex. 1890). *Accord Texas Co. v. Schram*, 93 S.W.2d 544, 548 (Tex. Civ. App. – Austin 1936) ("the law makes the application which is in accord with the justice and equity of the particular case"). And, importantly:

> that the debtor has the absolute right to make the application if he sees proper to exercise it. If he omits to do so, and it is left to the law to make it for him, it ought, it would seem, to be made in accordance with the presumed intention of the debtor. And we think it must be presumed that the debtor intended to apply it to the debt that would be most beneficial to him.

*Phillips*, 78 Tex. at 385.

112.    The Court cannot resolve these ambiguities and course of conduct issues on summary judgment. NexPoint intended that the payments in 2019 be applied as prepayments on the Note in 2019. Plaintiff agreed and understood this to be the case as well.[208] The only question is what the prepayments should be applied to and, in particular, whether they should have been applied to the 2020 annual installment. NexPoint did not expressly direct such prepayment. And, the Plaintiff did not apply the prepayments to the 2020 annual installment. Although the Plaintiff's application is to be given weight, it should not result in a manner that is "inequitable and unjust" to NexPoint. And, the ultimate application of the payments must be made in equity and under the facts and equities of the case, with the presumption that NexPoint "intended to apply [the prepayments] to the debt that would be most beneficial to [it]." *Phillips*, 78 Tex. At 385.

#### b.    HCMS Prepayments

113.    Similarly-situated to NexPoint, HCMS also presents evidence showing a course of conduct wherein Plaintiff consistently accepted prepayments prior to December 31 of a given

---

[208] Pl. Ex. 194, Kristin Hendrix 10/27/21 Tr. 81:13-82:3, Pl. Appx. 03147.

calendar year for the HCMS Term Note, but never considered the Note to be in default when a payment was not made precisely on December 31.[209]   Further, the allocation of HCMS' prepayments on the Note between principal and interest raise the same defensive issue of ambiguity as the NexPoint Note discussed *supra*.

114.    The terms of the HCMS Term Note and the NexPoint Term Note are nearly identical, with both presenting the same ambiguity issues.  Section 2.1 of the HCMS Term Note provides:

> 2.1 Annual Payment Dates. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the **"Annual Installment")** until the Note is paid in full.  Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.[210]

Further, Section 3 of the HCMS Term Note provides:

> 3.  Prepayment Allowed; Renegotiation Discretionary. Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.[211]

115.    HCMS never made a single payment on December 31 of 2017, 2018, or 2019.[212] And, yet again, Plaintiff never called for payment or declared the HCMS Term Note to be in default in January – or any other month – of 2017, 2018, or 2019.[213]  However – like NexPoint – HCMS made large payments on the Note in 2017, 2018, and 2019 that it believed applied towards future scheduled payments on the HCMS Term Note.[214]  Specifically, HCMS paid $6,395,236.52 on the Note in 2017 ($5,395,319.15 more than the annual installment), $1,160,665.94 on the Note in 2018

---

[209] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[210] Pl. Ex. 3, Amended Complaint against HCMS, Exhibit 6, Pl. Appx. 00134.
[211] *Id.*
[212] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[213] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25; Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[214] *Id.*

($160,748.57 more than the annual installment), and $7,230,360.49 on the Note in 2019 ($6,230,443.12 more than the annual installment).[215]  Again, none of these payments were made on December 31, and at no time did Plaintiff declare the Note in default.[216]

116.    Applying the same Texas precedent raised *supra*, the Court should look to the pattern of conduct between the parties to the instrument to determine how a contractual ambiguity should be resolved.  Here – similarly to the NexPoint prepayments – the Plaintiff accepted enormous prepayments by HCMS in the past, and never once raised the issue of default when it did not receive the annual installment payment on December 31.[217]  Working off of this pattern of conduct, Plaintiff was not entitled to declare the Note in default. Again, however, the Court cannot resolve these ambiguities and course of conduct issues on summary judgment.

117.    Additionally, even if there were any missed payments, payments were made on the NexPoint, HCRE, and HCMS Term Notes to cure any defaults. "'An optional acceleration of maturity of a note can be waived by the acts and words of one who holds right of election.'"  *Vaughan v. Crown Plumbing & Sewer Serv., Inc.*, 523 S.W.2d 72, 75 (Tex. Civ. App. 1975) (quoting *Diamond v. Hodges*, 58 S.W.2d 187, 188 (Tex. Civ. App. 1933)).  As Defendants' evidence demonstrates, after learning about the alleged missed payments and talking with Frank Waterhouse, Plaintiff's CFO, Jim Dondero instructed him to make the payments and cure any default, and subsequently caused the payments to be made in January of 2021, payments that would not have been made if Mr. Waterhouse disagreed and told Jim Dondero that the payments would not cure and reinstate the loans.[218]  Therefore, to the extent there was a default, it was cured.

---

[215] Def. Ex. 1-A, HCMS Payment Ledger, Def. Appx. 25.
[216] Def. Ex. 1, J Dondero Dec., ¶ 46, Def. Appx. 22.
[217] *Id.*
[218] *Id.* at ¶ 40, Def. Appx. 19-20.

54

## IV.    Conclusion

118.    WHEREFORE, Defendants respectfully request this Court Deny Plaintiff's Motion for Partial Summary Judgment and grant such other and further relief as the Court deems just and proper.

Dated: January 20, 2022                                Respectfully submitted,

                                                       */s/Deborah Deitsch-Perez*
                                                       Deborah Deitsch-Perez
                                                       State Bar No. 24036072
                                                       Michael P. Aigen
                                                       State Bar No. 24012196
                                                       STINSON LLP
                                                       3102 Oak Lawn Avenue, Suite 777
                                                       Dallas, Texas 75219
                                                       (214) 560-2201 telephone
                                                       (214) 560-2203 facsimile
                                                       Email: deborah.deitschperez@stinson.com
                                                       Email: michael.aigen@stinson.com
                                                       **ATTORNEYS FOR JAMES DONDERO,
                                                       NANCY DONDERO, HIGHLAND CAPITAL
                                                       MANAGEMENT SERVICES, INC. AND
                                                       NEXPOINT REAL ESTATE PARTNERS, LLC**


                                                       */s/Clay M. Taylor*
                                                       Clay M. Taylor
                                                       State Bar No. 24033261
                                                       Bryan C. Assink
                                                       State Bar No. 24089009
                                                       BONDS ELLIS EPPICH SCHAFER JONES LLP
                                                       420 Throckmorton Street, Suite 1000
                                                       Fort Worth, Texas 76102
                                                       (817) 405-6900 telephone
                                                       (817) 405-6902 facsimile
                                                       Email: clay.taylor@bondsellis.com
                                                       Email: bryan.assink@bondsellis.com
                                                       **ATTORNEYS FOR JAMES DONDERO**

*/s/Davor Rukavina*
Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.  AND
HIGHLAND CAPITAL MANAGEMENT FUND
ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

CORE/3522697.0002/171927721.9

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
HCRE Partners, LLC**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 19-34054** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND** | § | |
| **THE DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
|---|---|---|
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **Adv. Proc. No. 21-03005-sgj** |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, AND NANCY DONDERO, AND | § | |
| THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| **Defendants.** | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| **Plaintiff,** | § | **Adv. Proc. No. 21-03006-sgj** |
| | § | |
| vs. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT | § | |
| SERVICES, INC., JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| **Defendants.** | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | **Adv. Proc. No. 21-03007-sgj** |
| **Plaintiff,** | § | |
| vs. | § | |
| | § | |
| HCRE PARTNERS, LLC (n/k/a NexPoint Real | § | |
| Estate Partners, LLC), JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| **Defendants.** | § | |

## APPENDIX IN SUPPORT OF DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants James Dondero, NexPoint Advisors, L.P., Highland Capital Management

Services, Inc., and HCRE Partners, LLC file this Appendix in Support of their Opposition to Plaintiff

Highland Capital Management, L.P.'s Motion for Partial Summary Judgment, and request the Court

take judicial notice of the documents contained herein.

1

| Exhibit | Document | Appendix Page(s) |
|---|---|---|
| 1 | **Declaration of James Dondero, dated January 20, 2022** | App. 1-23 |
| A | HCMS Payment Ledger | App. 24-25 |
| B | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 26-31 |
| C | Documents showing J. Dondero proof of service as Family Trustee for the Dugaboy Family Trust and subsequent resignation | App. 32-72 |
| D | Letter to J. Pomerantz from D. Lynn, dated February 1, 2021 | App. 73-74 |
| E | Termination of Amended and Restated Shared Services Agreement, among Highland Capital Management, L.P. and NexPoint Advisors, L.P., dated November 30, 2020 | App. 75-76 |
| 2 | **Declaration of Nancy M. Dondero, dated January 20, 2022** | App. 77-85 |
| A | Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015 | App. 86-91 |
| 3 | **Declaration of Michael Aigen, dated January 20, 2022** | App. 92-95 |
| A | Transcript of the Video Deposition of James P. Seery, Jr. on October 21, 2021, Adv. Proc. No. 21-03005 | App. 96-185 |
| B | Transcript of the Remote Deposition of Bruce McGovern on November 9, 2021, Adv. Proc. No 21-03003 | App. 186-200 |
| C | List of Promissory Notes | App. 201-202 |
| D | Email from F. Waterhouse to K. Hendrix, dated November 25, 2020 | App. 203-208 |
| E | Email from F. Waterhouse to K. Hendrix, dated December 31, 2020 | App. 209-210 |
| F | Expert Report of Steven J. Pully | App. 211-235 |
| G | Expert Report of Alan M. Johnson | App. 236-262 |
| H | Highland Capital Management, L.P.'s Responses and Objections to Defendants' Joint Discovery Requests, dated September 27, 2021 | App. 263-300 |

2

Dated: January 20, 2022                    Respectfully submitted,

                                           */s/Deborah Deitsch-Perez*
                                           Deborah Deitsch-Perez
                                           State Bar No. 24036072
                                           Michael P. Aigen
                                           State Bar No. 24012196
                                           STINSON LLP
                                           3102 Oak Lawn Avenue, Suite 777
                                           Dallas, Texas 75219
                                           (214) 560-2201 telephone
                                           (214) 560-2203 facsimile
                                           Email: deborah.deitschperez@stinson.com
                                           Email: michael.aigen@stinson.com
                                           **ATTORNEYS FOR JAMES DONDERO, NANCY
                                           DONDERO, HIGHLAND CAPITAL MANAGEMENT
                                           SERVICES, INC. AND NEXPOINT REAL ESTATE
                                           PARTNERS, LLC**

                                           */s/Clay M. Taylor*
                                           Clay M. Taylor
                                           State Bar No. 24033261
                                           Bryan C. Assink
                                           State Bar No. 24089009
                                           BONDS ELLIS EPPICH SCHAFER JONES LLP
                                           420 Throckmorton Street, Suite 1000
                                           Fort Worth, Texas 76102
                                           (817) 405-6900 telephone
                                           (817) 405-6902 facsimile
                                           Email: clay.taylor@bondsellis.com
                                           Email: bryan.assink@bondsellis.com
                                           **ATTORNEYS FOR JAMES DONDERO**

                                           */s/Davor Rukavina*
                                           Davor Rukavina
                                           Julian P. Vasek
                                           MUNSCH HARDT KOPF & HARR, P.C.
                                           500 N. Akard Street, Suite 3800
                                           Dallas, Texas 75202-2790
                                           (214) 855-7500 telephone
                                           (214) 978-4375 facsimile
                                           Email:  drukavina@munsch.com

                                           **ATTORNEYS FOR NEXPOINT ADVISORS, L.P.  AND
                                           HIGHLAND CAPITAL MANAGEMENT FUND
                                           ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on January 20, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system on counsel for Plaintiff Highland Capital Management, L.P. and on all other parties requesting or consenting to such service in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

4

# Exhibit 1

Clay M. Taylor
Bryan C. Assink
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: clay.taylor@bondsellis.com
Email: bryan.assink@bondsellis.com

**Attorneys for James Dondero**

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

**Attorneys for NexPoint Advisors, L.P. and
Highland Capital Management Fund Advisors, L.P.**

Deborah Deitsch-Perez
Michael P. Aigen
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

**Attorneys for James Dondero, Nancy Dondero,
Highland Capital Management Services, Inc. and
NexPoint Real Estate Partners, LLC**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff, | § | **Adv. Proc. No. 21-03003-sgj** |
| | § | |
| vs. | § | |
| | § | |
| **JAMES DONDERO, NANCY DONDERO, AND THE** | § | |
| **DUGABOY INVESTMENT TRUST,** | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,**<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03004-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03005-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03006-sgj** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Plaintiff,**<br>vs.<br><br>**HCRE PARTNERS, LLC (n/k/a NexPoint Real Estate Partners, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adv. Proc. No. 21-03007-sgj** |

<u>**DECLARATION OF JAMES DONDERO**</u>

I, James Dondero, hereby swear under oath and penalty of perjury pursuant to the laws of the United States of America that the following is true and correct to the best of my knowledge and belief:

1.     My name is James Dondero.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.  I have personal knowledge of the facts stated in this Declaration.

**A.     Background.**

2.     I am currently a named Defendant in Adversary Proceedings No. 21-03003-sgj, 21-03005-sgj, 21-03006-sgj, and 21-03007-sgj.  I have personal knowledge of the facts contained in this declaration, and if called as a witness to testify, I could and would do so competently.

3.     I co-founded Highland Capital Management, L.P. ("HCM") in the year 2000, and have been working in the financial services industry for over thirty (30) years.  I served as HCM's President and Chief Executive Officer until my resignation on January 9, 2020.

4.     Along with having served as CEO for HCM, I have also served as a high-level executive and controlling portfolio manager for NexPoint Advisors, L.P. ("NexPoint"), HCRE Partners, LLC ("HCRE"), Highland Capital Management Services, Inc. ("HCMS"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA").  I have spent years of service to these companies as a chief executive, and am familiar with each company's internal management and operational structures and procedures.

**B.     The Promissory Notes.**

**1.     HCM Issued Three (3) Notes to Me.**

CORE/3522697.0002/171867762.5

**App. 4**

5.      On February 2, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $3,825,000.00 (the "February 2018 Note").[1]  The February 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.66%, to be calculated at a daily rate equal to 1/365th per annum.  On its original terms, the February 2018 Note was a payable on demand by HCM, and was subject to an acceleration clause. This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note, and was made, as indicated in the promissory note, to help satisfy personal tax obligations.

6.      On August 1, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 1, 2018 Note").[2]  The August 1, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365th per annum.  On its original terms, the August 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note, which was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

7.      On August 13, 2018, I borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "August 13, 2018 Note").[3]  The August 13, 2018

---

[1] Pl. Appx. 00678-679.
[2] *Id.* at 00681-682.
[3] *Id.* at 00684-685.

**App. 5**

Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.95%, to be calculated at a daily rate equal to 1/365[th] per annum.  On its original terms, the August 2018 Note was payable upon demand by HCM and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.

### 2.    HCM Issued one (1) Term Note to NexPoint.

8.    On May 31, 2017, NexPoint borrowed money from HCM and entered into a promissory note with HCM in the amount of $30,746,812.33 (the "NexPoint Term Note").[4]  The NexPoint Term Note bore an interest rate of 6%, to be calculated at a daily rate equal to 1/365[th] per annum.  The NexPoint Term Note was due in thirty (30) equal annual payments, due by the 31st day of December of each calendar year, with the final payment being due on December 31, 2047.  This Term Note is paid current.  The NexPoint Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due.  The purpose of the NexPoint Term Note was in-part to consolidate several prior notes made between NexPoint Advisors, L.P. and HCM.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.  This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any

---

[4] *Id.* at 00042-43.

prepayment between accrued interest, future interest, and principal, and it did not contain any provision concerning what the impact of prepayments would be on future scheduled payments.

### 3.    HCM Issued Five (5) Notes to HCRE.

9.    On November 27, 2013, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $100,000 (the "November 27, 2013 Note").[5]  The November 27, 2013 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum.  On its original terms, the November 27, 2013 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

10.    On May 31, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $6,059,831.51 (the "HCRE Term Note").[6]  The HCRE Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum.  The HCRE Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047.  The HCRE Term Note allowed for prepayment, and was also subject to an acceleration clause upon failure to pay any installment as it became due.  The purpose of the HCRE Term Note was made in-part to consolidate several prior notes made between HCRE Partners, LLC, and HCM.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was

---

[5] *Id.* at 00202-203.
[6] *Id.* at 00218-219.

ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note. Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

11.    On October 12, 2017, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $2,500,000 (the "October 12, 2017 Note").[7]  The October 12, 2017 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum.  On its original terms, the October 12, 2017 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

12.    On October 15, 2018, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $750,000 (the "October 15, 2018 Note").[8]  The October 15, 2018 Note bore an interest rate of 8%, to be calculated at a daily rate equal to 1/365[th] per annum.  On its original terms, the October 15, 2018 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[7] *Id.* at 00205-206.
[8] *Id.* at 00208-209.

13.     On September 25, 2019, HCRE borrowed money from HCM and entered into a promissory note with HCM in the amount of $900,000 (the "September 25, 2019 Note").[9]  The September 25, 2019 Note bore an interest rate of 8%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the September 25, 2019 Note was payable on demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

**4.     HCM Issued five (5) Notes to HCMS.**

14.     On March 28, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "March 28, 2018 Note").[10]  The March 28, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.88%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the March 28, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[9] *Id.* at 00211-212.
[10] *Id.* at 00118-119.

**App. 9**

15.     On June 25, 2018, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $200,000.00 (the "June 25, 2018 Note").[11]  The June 25, 2018 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 3.05%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

16.     On May 29, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $400,000.00 (the "May 29, 2019 Note").[12]  The May 29, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.39%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 25, 2018 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

---

[11] *Id.* at 00121-122.
[12] *Id.* at 00124-125.

**App. 10**

17.    On June 26, 2019, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $150,000.00 (the "June 26, 2019 Note").[13]  The June 26, 2019 Note bore an interest rate equal to the long-term applicable federal interest rate at the time of 2.37%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  On its original terms, the June 26, 2019 Note was payable upon demand by HCM, and was subject to an acceleration clause.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.

18.    On May 31, 2017, HCMS borrowed money from HCM and entered into a promissory note with HCM in the amount of $20,247,628.02 (the "HCMS Term Note").[14]  The HCMS Term Note bore an interest rate of 8%, to be calculated at a daily rate equal to $1/365^{th}$ per annum.  The HCMS Term Note was due in thirty (30) equal annual payments, due the 31st day of December of each calendar year, with the final payment being due on December 31, 2047.  This Term Note has been paid current.  This promissory note, unlike typical promissory notes, was a soft note that was made between friendly affiliates, was subject to renegotiation per its own terms, was not collateralized, and was ambiguous, taken as whole, because it referred to other agreements that were not specified in the promissory note.  Additionally, unlike typical promissory notes of this nature, there was no personal guaranty supporting this promissory note.  This promissory note was also ambiguous with respect to the prepayment of future interest and the application of any prepayment between accrued interest, future interest, and principal, and it did not contain any

---

[13] *Id.* at 00127-128.
[14] *Id.* at 00134-135.

**App. 11**

provision concerning what the impact of prepayments would be on future scheduled payments. Attached to this Declaration as "Exhibit A" is an amortization table showing payments made on the HCMS Term Note, which was kept in the normal and ordinary course of business and made by someone with knowledge of the payments at the time it was created.

**C.      Dugaboy, as the "Majority Interest" Approved Compensation.**

19.     HCM was formed as a limited partnership under the laws of the State of Delaware, and was governed by a Limited Partnership Agreement ("LPA").[15]  The LPA was entered into on December 24, 2015, between Strand Advisors, Inc. (the General Partner), and the following Limited Partners:

(1)     The Dugaboy Investment Trust ("Dugaboy"),

(2)     The Mark and Pamela Okada Family Trust – Exempt Trust #1,

(3)     The Mark and Pamela Okada Family Trust – Exempt Trust #2, and

(4)     Mark Okada.[16]

20.     Pursuant to the LPA – specifically in Section 3.10(a) –HCM's "Majority Interest[-holder]" was entitled to approve the compensation of HCM's General Partner and any "Affiliate" of the General Partner.[17]  The LPA defines the Majority Interest as "the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners."[18]  The Dugaboy Family Trust ("Dugaboy") represented the Majority Interest of the Limited Partners, owning a 74.4426% interest of the Limited Partners Class A Interest.[19]

---

[15] *Id.* at 00606-641.
[16] *Id.* at 00636-638.
[17] *Id.* at 00622.
[18] *Id.* at 00612.
[19] *Id.* at 00639.

21.      My sister Nancy Dondero has served as the Dugaboy Family Trustee since her appointment in 2015.  Attached as "Exhibit B" is a copy of Nancy Dondero's Acceptance of Appointment of Family Trustee for the Dugaboy Family Trust effective October 14, 2015, a record which was kept in the ordinary course of business and made by someone with knowledge of the appointment.  Prior to Nancy Dondero's service, Grant Scott served as Dugaboy Family Trustee until October 12, 2015.  Grant Scott's resignation letter is contained within Exhibit B.  Prior to Grant Scott's service as Dugaboy Family Trustee, I personally served as Dugaboy Family Trustee until my resignation on August 26, 2015.  Attached as "Exhibit C" is  proof of my service as Family Trustee for the Dugaboy Family Trust and my subsequent resignation prior to Grant Scott's appointment, a record which was kept in the ordinary course of business and made by someone with knowledge of the document..  .

**D.      Dugaboy Agreed That HCM Would Not Collect on the Notes Upon Fulfillment of Conditions Subsequent, Making the Notes Potentially Deferred Compensation.**

22.      Based on my years of experience in working in Private Equity, I am familiar with the compensation structure of similarly situated Private Equity firms.  Based on this experience, I am also very familiar with the compensation structure of other similarly situated executives like myself.

23.      At HCM, as at other comparable capital investment firms, it was common practice to compensate executives with forgivable loans.  My compensation was no exception to this practice.   In fact, I was undercompensated in my position compared to similarly-situated contemporaries in my field.   I know that several other individuals may have received loans by HCM that were forgiven.  These individuals include Mike Hurley, Tim Lawler, Pat Daugherty, Jack Yang, Paul Adkins, Gibran Mahmud, Jean-Luc Eberlin, and Appu Mundassery and this was also a common practice and another company in which I have an interest, NexBank Capital, Inc.

**App. 13**

24.     At either the end of 2017 or the beginning of 2018, Dugaboy – through Nancy Dondero – entered into a verbal agreement (the "2017 Agreement") with myself that HCM would not collect on any of the aforementioned Notes issued in 2017 if certain events occurred. Specifically, if one of specific portfolio companies – either MGM, Cornerstone, or Trussway – were sold for above cost, or sold in a circumstance outside of my control, HCM agreed that the Notes would be forgiven.  In late 2013 or early 2014, the Dugaboy Family Trustee had made an identical agreement that applied to the November 27, 2013 Note.  The Agreement assured HCM that the monetization of these portfolio companies would have my utmost focus and attention, and served as an incentive for me to work particularly hard to make sure these assets were successful. Further, this agreement provided the additional benefit to HCM of not increasing my base salary, which I normally would have requested and obtained.  However, reaching this agreement made my compensation conditional on performance, and ensured that HCM would not immediately realize a change in its financial position through an increase in my salary, something I had the right to increase.

25.     At either the end of 2018 or the beginning of 2019, Dugaboy and I entered into another agreement that was identical to the Agreement made in the preceding year (the "2018 Agreement"). This 2018 Agreement covered all the Notes at issue in this litigation that were issued in 2018.  The 2018 Agreement provided the same benefits to the HCM as the 2017 Agreement.

26.     At either the end of 2019 or the beginning of 2020 (prior to January 9, 2020), Dugaboy and I entered into another agreement that was identical to the 2018 Agreement (the "2019 Agreement").  Again, the 2019 Agreement applied to all the Notes at issue in this litigation that were issued in 2019.  The 2019 Agreement provided the same benefits to HCM as the 2018 and 2017 Agreements.  Collectively, the 2017, 2018, and 2019 Agreements are referred to herein as

**App. 14**

the "Agreements."  I understand that Plaintiff claims in its Motion that Nancy Dondero and I do not agree about whether I identified the Notes subject to the Agreements. Despite unclear questioning at my deposition, I testified that I identified the Notes that were subject to the Agreements when entering into the Agreements (which is how Nancy Dondero was aware that they involved the different companies) and I specifically remember discussing and identifying the Notes to Nancy Dondero.

27.    In my years of experience in this industry, and experience working with financial auditors, although the Agreements were not disclosed to the financial auditors at HCM, such a disclosure was not necessary since it would not be considered material.  When compared to the considerable size of HCM's assets, the Agreement on such small comparative Notes was *de minimus* when viewed in light of such large assets.  Therefore, the Agreement was non-material and did not require disclosure.

28.    Prior to the commencement of any Adversary Proceedings concerning the Notes, I mentioned to Frank Waterhouse that there were mechanisms in place for forgiving the Notes, or for having them considered as compensation and not being an asset to the Debtor's estate.  This came up in the context of discussing what we called the "Pot Plan" discussion for resolving the bankruptcy. I did not discuss every detail of the Agreements, because the important point was that he was made aware that the Notes should be considered as part of my compensation in connection with a resolution of the bankruptcy.  By that time there was a great likelihood that some or all of the portfolio companies would be able to be sold for far more that their acquisition price.

29.    Further, opposing counsel was alerted on February 1, 2021 that one of the defenses in this litigation was that the Notes were subject to forgiveness as potential compensation.  In a letter from my one of my attorneys– to opposing counsel at Pachulski Stang Ziehl & Jones, LLP,

**App. 15**

the late retired Bankruptcy Judge Lynn, my lead counsel, made that disclosure.  A true and correct copy of this letter is attached to this Declaration as "Exhibit D."

**E.      The Agreements Were Made in Good Faith.**

30.      The Agreements made between myself and Dugaboy were all entered into in good faith.  At no point in time were any of these Agreements made with the intent to hinder or defraud HCM as payee.  Dugaboy had the right to approve my compensation under the LPA, and it was exercising that right when it agreed to make the Notes forgivable as compensation, provided that I performed successfully as a HCM executive and made sure that the aforementioned illiquid assets were sold for at-or-above cost.

**F.      HCM Waived Any Rights to Collect on the Notes When Dugaboy Made the Agreements.**

31.      When the Agreements were made, HCM waived any rights it had to demand repayment of the demand Notes until it became impossible for the condition subsequent to be met. However, I still intended to make periodic interest payments because I understood that until forgiveness actually occurred, the notes were still bona fide notes. Also, making periodic payments kept the Notes from becoming unreasonably large in the event the conditions for forgiveness did not come to pass.  The term loans had requirements for interest payments to be made until the conditions for forgiveness were met, which, as discussed below, were met.

**G.      Under its Shared Services Agreement with NexPoint, HCM was Responsible for the NexPoint Term Note Payments Being Made.**

32.      NexPoint and HCM entered into a written Shared Services Agreement (the "NexPoint SSA") on January 1, 2018, in which HCM provided a broad array of services to NexPoint, and essentially covered all functional areas of NexPoint's business other than executive

13

and investment functions.[20]   In my experience, these types of shared services agreements are common in my industry, and exist to help consolidate function and manpower between a large entity (like HCM) and smaller entities (like NexPoint) that share overlapping ownership structures.

33.    The NexPoint SSA outlined multiple areas in which HCM would provide services for NexPoint, which resulted in HCM providing virtually the entire workforce for NexPoint's business.  Among the areas of services provided under the NexPoint SSA, HCM provided services for NexPoint's back- and middle-office divisions, legal compliance and risk divisions, tax division, administrative services division, management of NexPoint's clients and accounts, and many other divisions.[21]   Again, this type of shared services agreement covering these types of services is common in the private equity market where ownership overlaps.

34.    The result of this shared services agreement was that HCM was responsible for making debt payments on behalf of NexPoint – considered a "back and middle office" task – which included making payments on the NexPoint Term Note.  In fact, HCM made the NexPoint Term Note payments – consistent with the SSA, which specifically provided that HCM would make payments to creditors – on December 31 of 2017, 2018, and 2019, without any specific authorization or permission from any of the makers.

35.    Although HCM sought to provide notice of termination of the NexPoint SSA in November of 2020, that termination date was subsequently extended and the SSA was still active and in full effect as of December 31, 2020, the date on which the 2020 annual installment payment was due.  The letters providing for the subsequent extension of the NexPoint SSA is attached to this Declaration as "Exhibit E"[22]   Because HCM was still responsible for making these types of

---

[20] *Id.* at 04163-04181.
[21] *Id.* at 04165-04167, NexPoint SSA, Section 2.02 "Provision of Services" (a-l).
[22] See attached Exhibit B, (Letters confirming Jim Dondero's resignation as Dugaboy Family Trustee, and the appointment of Nancy Dondero as Dugaboy Family Trustee)

**App. 17**

payments for NexPoint at that time under the active SSA, HCM was responsible for missing that payment. The fact that HCM did not make that payment – as it had done in previous years – was surprising to me, since I never at any point directed Frank Waterhouse to cease making term payments on any Note. In fact, I fully expected HCM's accounting staff to continue making scheduled payments on the NexPoint Note, since the SSA was still in place. The only thing I instructed Frank Waterhouse to do was to pause payment to HCM regarding the NexPoint SSA because it came to light that NexPoint was being substantially overcharged and had already substantially overpaid. I would not have instructed Frank Waterhouse to not make a $1.4 million installment payment on the NexPoint Term Note – which could result in a default – as the $1.4 million payment would be trivial compared to a note acceleration.

**H.    Under its Oral Shared Services Agreement with HCRE, HCM was also Responsible for the HCRE Term Note Payments Being Made.**

36.    HCRE had a similar shared services agreement (the "HCRE SSA") with HCM that was established by oral agreement. In my experience, shared services agreements are not always in written form, but established by oral agreement and patterns of conduct. HCM provided the same type of services to HCRE as it did to NexPoint, and orally agreed to do so. Similar to NexPoint, HCRE simply did not have the infrastructure or manpower to run its business without the HCRE SSA. As such, HCM provided a comprehensive array of services to HCRE that included back- and middle-office tasks like making sure HCRE's bills and loans were timely paid. This HCRE SSA was long-standing, as HCM had provided these comprehensive services to HCRE for years, and HCRE relied heavily on HCM to provide these services.

37.    HCM – despite having routinely paid on bills and notes for HCRE – did not make the December 31, 2020 payment on the HCRE Term Note. At no point prior to that missed payment did I ever direct any person to terminate the HCRE SSA. Further, at no point prior to

15

that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCRE

Term Note.  I fully expected HCM's accounting staff to continue providing these services and

making the scheduled payments on the HCRE Term Note.

**I.      Under its Oral Shared Services Agreement with HCMS, HCM was also Responsible for the HCMS Term Note Payments Being Made.**

38.      HCMS also had a similar shared services agreement (the "HCMS SSA") with

HCM that was established by oral agreement.  In my experience, shared services agreements are

not always in written form, but established by oral agreement and patterns of conduct.  HCM

provided the same type of services to HCMS as it did to NexPoint and HCRE, and orally agreed

to do so.  Similar to NexPoint and HCRE, HCMS simply did not have the infrastructure or

manpower to run its business without the HCMS SSA.  As such, HCM provided a comprehensive

array of services to HCMS that included back- and middle-office tasks like making sure HCMS's

bills and loans were timely paid.  This HCMS SSA was long-standing, as HCM had provided these

comprehensive services to HCMS for years, and HCMS relied heavily on HCM to provide these

services.

39.      HCM – despite having routinely paid on bills and notes for HCMS – did not make

the December 31, 2020 payment on the HCMS Term Note.  At no point prior to that missed

payment did I ever direct any person to terminate the HCMS SSA.  Further, at no point prior to

that missed payment did I ever direct anyone at HCM to miss or skip any payment on the HCMS

Term Note.  I fully expected HCM's accounting staff to continue providing these services and

making the scheduled payments on the HCMS Term Note.

**J.      Payments Were Made on the NexPoint, HCRE, and HCMS Term Notes to Cure Any Defaults.**

40.      I did not know that the NexPoint, HCRE, and HCMS Term Notes were in default

until I called Frank Waterhouse from an in-person hearing in January 2021.  I was surprised,

**App. 19**

angered, and annoyed to learn that such *de minimis* amounts had not been paid on the Term Notes

to keep them current. After asking Frank Waterhouse what it would take to cure them and make

them current, he informed me of the amounts required, and I instructed him to make sure the

payments got made and that the Term Notes were cured. Much later I learned, discussed further

below, that the NexPoint and HCMS loans had been substantially prepaid so that no payment was

actually due in December 2021. HCM, which was responsible for keeping track of the status of

the loan, did not remind me of the prepayments in December of 2020 or January of 2021. So I

pressed Frank Waterhouse, who was HCM's CFO and had the ability and authority to speak on

behalf of and bind HCM, to make the payments HCM should have made if it believed that end of

year payments on the Term Notes were due in 2020, and he told me the amounts needed and

proceeded to make the payments. I would not have caused these payments to be made if Frank

Waterhouse disagreed and told me that the payments would not cure and reinstate the loans.

41. As a result of my conversation with Frank Waterhouse, I therefore believed that the

Term Notes would be cured by the payments I directed Frank Waterhouse to make. Surely if the

payments would not have cured the loans, he -- the lender's CFO -- would have told me that before

making the payments. I could not have been clearer that I was flabbergasted that the payments had

not been made and wanted the payment to be made as soon as possible to bring the loans current.

I specifically discussed with Frank Waterhouse – HCM's CFO at the time – that I wanted these

payments to act as cure payments for all three Term Notes. Waterhouse did not disagree with me

that the payments would cure the missed payments, and he agreed to make the cure payments.

However, HCM refused to accept the payments as cure for the defaults.

**K.    Prepayments by NexPoint and HCMS.**

17

42.     The HCMS and NexPoint Term Notes called for annual payments to be made by December 31 of every calendar year.  Not only did HCM make the required term payments, but I also instructed several prepayments to be made on these Notes throughout the years whenever HCM needed liquidity.  I understood that the prepayments I caused to be made on the Term Notes, when cash flow required, would be applied to the next scheduled annual payments if payments were not otherwise able to be made, and any reconciliations would be conducted by the HCM so that the borrowers would not be in default as a result of their voluntary prepayments for HCM's benefit.  I know that both NexPoint and HCMS made substantial prepayments on their term loans.

43.     Between March and August of 2019, the following prepayments were made on the NexPoint Term Note: (i) $750,000.00 on March 29, 2019; (ii) $1,300,000.00 on April 16, 2019; (iii) $300,000.00 on June 4, 2019; (iv) $2,100,000.00 on June 19, 2019; (v) $630,000.00 on July 9, 2019; and (vi) $1,300,000.00 on August 13, 2019.  These payments totaled $6,380,000.00 in 2019.  Setting aside all issues of prepayment, the normal December, 2019 payment of principal and interest on the NexPoint Term Note would have been $2,273,970.54, leaving $4,106,029.46 remaining to apply as prepayments on the Note.

44.     I know that none of the payments listed above were scheduled payments, but rather, they were payments made upon request from HCM because it needed the liquid funds.  Both NexPoint and HCM intended for these payments to count as prepayments on the NexPoint Note to be applied to the December 31, 2020 annual installment payment.

45.     Similar to NexPoint, HCMS made substantial prepayments towards the HCMS Term Note between May of 2017 and December of 2020.  In fact, the prepayments were so large that the HCMS Term Note's principal was paid down by almost $14,000,000.  In that timeframe, the following prepayments were made on the HCMS Term Note: (i) $985,216.44 on June 23, 2017;

(ii) $907,296.25 on July 6, 2017; (iii) $1,031,463.70 on July 18, 2017; (iv) $1,971,260.13 on August 25, 2017; (v) $1,500,000.00 on December 21, 2017; (vi) $160,665.94 on May 31, 2018; (vii) $1,000,000.00 on October 8, 2018; (viii) $1,015,000.00 on May 5, 2019; (ix) $550,000.00 on August 9, 2019; (x) $5,600,000.00 on August 21, 2019; and (xi) $65,360.49 on December 30, 2019.

46.      Similar to the NexPoint Term Note prepayments, none of these payments were made on December 31 of any given year, nor were any of these payments made on arrears.  Instead, these payments were intended by HCMS to be applied to the annual installment payments, and were believed to be accepted as such, since HCM never declared the HCMS Term Note to be in default in either 2017, 2018, or 2019.

**L.      Sale of Shares of MGM.**

47.      I understand that Plaintiff raises the issue of a sale of Plaintiff's interest in MGM in its Motion. This sale of a small portion of Plaintiff's interest in MGM would not have implicated the Agreements because it was for a *de minimis* amount of MGM stock and was only necessitated as a result of the UCC not being willing to cooperate in a transaction as part of the bankruptcy process that was agreed to by all of the other participants.

**App. 22**

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is

true and correct.

Dated: January 20, 2022

_____
JAMES DONDERO

CORE/3522697.0002/171867762.5

**App. 23**

# Exhibit A

**HCM Services**
**Exhibit A**

| | | |
|---|---|---|
| Closing Date | 5/31/2017 | |
| Total Commitment | $ | 20,247,628 |
| Rate | 2.750% | |

| Date | Interest Accrual | Interest Paid | Accrued Interest | Beg Prin Bal | Principal Paid | Ending Prin Bal |
|---|---|---|---|---|---|---|
| 5/31/2017 | | | | | | 20,247,628.02 |
| 5/31/2017 | - | | - | 20,247,628.02 | | 20,247,628.02 |
| 6/23/2017 | 35,086.64 | (35,086.64) | - | 20,247,628.02 | (950,129.80) | 19,297,498.22 |
| 6/30/2017 | 10,177.45 | | 10,177.45 | 19,297,498.22 | | 19,297,498.22 |
| 7/6/2017 | 8,723.53 | (18,900.97) | - | 19,297,498.22 | (888,395.28) | 18,409,102.95 |
| 7/18/2017 | 16,643.85 | (16,643.85) | 0.00 | 18,409,102.95 | (1,014,819.85) | 17,394,283.10 |
| 7/31/2017 | 17,036.87 | | 17,036.87 | 17,394,283.10 | | 17,394,283.10 |
| 8/25/2017 | 32,763.20 | (199,529.26) | (149,529.26) | 17,394,283.10 | (1,771,930.80) | 15,622,352.30 |
| 8/31/2017 | 7,062.16 | | (142,467.10) | 15,622,352.30 | | 15,622,352.30 |
| 9/30/2017 | 35,310.80 | | (107,156.30) | 15,622,352.30 | | 15,622,352.30 |
| 10/31/2017 | 36,487.82 | | (70,668.48) | 15,622,352.30 | | 15,622,352.30 |
| 11/30/2017 | 35,310.80 | | (35,357.68) | 15,622,352.30 | | 15,622,352.30 |
| 12/21/2017 | 24,717.56 | (10,640.13) | (10,640.13) | 15,622,352.30 | (1,500,000.00) | 14,122,352.30 |
| 12/31/2017 | 10,640.13 | | 0.00 | 14,122,352.30 | | 14,122,352.30 |
| 1/31/2018 | 32,984.40 | | 32,984.40 | 14,122,352.30 | | 14,122,352.30 |
| 2/28/2018 | 29,792.36 | | 62,776.76 | 14,122,352.30 | | 14,122,352.30 |
| 3/31/2018 | 32,984.40 | | 95,761.16 | 14,122,352.30 | | 14,122,352.30 |
| 4/30/2018 | 31,920.39 | | 127,681.54 | 14,122,352.30 | | 14,122,352.30 |
| 5/31/2018 | 32,984.40 | (160,665.94) | 0.00 | 14,122,352.30 | 160,665.94 | 14,283,018.24 |
| 6/30/2018 | 32,283.53 | | 32,283.54 | 14,283,018.24 | | 14,283,018.24 |
| 7/31/2018 | 33,359.65 | | 65,643.19 | 14,283,018.24 | | 14,283,018.24 |
| 8/31/2018 | 33,359.65 | | 99,002.84 | 14,283,018.24 | | 14,283,018.24 |
| 9/30/2018 | 32,283.53 | | 131,286.37 | 14,283,018.24 | | 14,283,018.24 |
| 10/8/2018 | 8,608.94 | (412,000.00) | (272,104.68) | 14,283,018.24 | (588,000.00) | 13,695,018.24 |
| 10/31/2018 | 23,731.78 | | (248,372.91) | 13,695,018.24 | | 13,695,018.24 |
| 11/30/2018 | 30,954.49 | | (217,418.41) | 13,695,018.24 | | 13,695,018.24 |
| 12/31/2018 | 31,986.31 | | (185,432.10) | 13,695,018.24 | | 13,695,018.24 |
| 1/31/2019 | 31,986.31 | | (153,445.79) | 13,695,018.24 | | 13,695,018.24 |
| 2/28/2019 | 28,890.86 | | (124,554.93) | 13,695,018.24 | | 13,695,018.24 |
| 3/5/2019 | 5,159.08 | (37,904.91) | (157,300.76) | 13,695,018.24 | (977,095.09) | 12,717,923.15 |
| 3/31/2019 | 24,913.19 | | (132,387.57) | 12,717,923.15 | | 12,717,923.15 |
| 4/30/2019 | 28,745.99 | | (103,641.58) | 12,717,923.15 | | 12,717,923.15 |
| 5/31/2019 | 29,704.19 | | (73,937.39) | 12,717,923.15 | | 12,717,923.15 |
| 6/30/2019 | 28,745.99 | | (45,191.40) | 12,717,923.15 | | 12,717,923.15 |
| 7/31/2019 | 29,704.19 | | (15,487.21) | 12,717,923.15 | | 12,717,923.15 |
| 8/9/2019 | 8,623.80 | | (6,863.41) | 12,717,923.15 | (550,000.00) | 12,167,923.15 |
| 8/21/2019 | 11,001.14 | (4,137.73) | (0.00) | 12,167,923.15 | (5,595,862.27) | 6,572,060.88 |
| 8/31/2019 | 4,951.55 | | 4,951.55 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2019 | 14,854.66 | | 19,806.21 | 6,572,060.88 | | 6,572,060.88 |
| 10/15/2019 | 7,427.33 | | 27,233.54 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2019 | 7,922.48 | | 35,156.02 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2019 | 14,854.66 | | 50,010.68 | 6,572,060.88 | | 6,572,060.88 |
| 12/30/2019 | 14,854.66 | (65,360.49) | (495.15) | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2019 | 495.16 | | 0.00 | 6,572,060.88 | | 6,572,060.88 |
| 1/31/2020 | 15,349.81 | | 15,349.82 | 6,572,060.88 | | 6,572,060.88 |
| 2/29/2020 | 14,359.50 | | 29,709.32 | 6,572,060.88 | | 6,572,060.88 |
| 3/31/2020 | 15,349.81 | | 45,059.13 | 6,572,060.88 | | 6,572,060.88 |
| 4/30/2020 | 14,854.66 | | 59,913.79 | 6,572,060.88 | | 6,572,060.88 |
| 5/31/2020 | 15,349.81 | | 75,263.60 | 6,572,060.88 | - | 6,572,060.88 |
| 6/30/2020 | 14,854.66 | | 90,118.26 | 6,572,060.88 | | 6,572,060.88 |
| 7/31/2020 | 15,349.81 | | 105,468.08 | 6,572,060.88 | | 6,572,060.88 |
| 8/31/2020 | 15,349.81 | | 120,817.89 | 6,572,060.88 | | 6,572,060.88 |
| 9/30/2020 | 14,854.66 | | 135,672.55 | 6,572,060.88 | | 6,572,060.88 |
| 10/31/2020 | 15,349.81 | | 151,022.36 | 6,572,060.88 | | 6,572,060.88 |
| 11/30/2020 | 14,854.66 | | 165,877.02 | 6,572,060.88 | | 6,572,060.88 |
| 12/31/2020 | 15,349.81 | | 181,226.83 | 6,572,060.88 | | 6,572,060.88 |
| 1/21/2021 | 10,398.26 | (181,226.83) | 10,398.26 | 6,572,060.88 | | 6,572,060.88 |

**App. 25**

# Exhibit B

THE DUGABOY INVESTMENT TRUST
James D. Dondero, Primary Beneficiary

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

Re:     The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on October 12, 2015, I received notice from Grant James Scott that he will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee from Grant James Scott, I appoint Nancy Marie Dondero as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.2 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with notice of my appointment of a successor Family Trustee.

Very truly yours,

James D. Dondero

DEFENDANT 000037

# THE DUGABOY INVESTMENT TRUST
## Grant James Scott, Family Trustee

October 12, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

       Re:    The Dugaboy Investment Trust

Dear Ms. Breault,

       I, Grant James Scott, am writing to inform you that as of October 12, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "**Trust**") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust pursuant to the attached Resignation of Family Trustee.

       This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

Grant James Scott

## RESIGNATION OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein NANCY MARIE DONDERO accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          10/12/2015
Family Trustee                    Date

STATE OF TEXAS          §
COUNTY OF DALLAS        §

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 14th day of October, 2015.

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

_____
Notary Public's Signature

[SEAL]

Expiration: January 15, 2019

**App. 29**

**DEFENDANT 000039**

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **NANCY MARIE DONDERO**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this ____13ᵗʰ____ day of October, 2015.

_Nancy Marie Dondero_
**NANCY MARIE DONDERO**
**Family Trustee**

STATE OF TEXAS          §
COUNTY OF DALLAS     §

Before me, a notary public, on this day personally appeared **NANCY MARIE DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __14ᵗʰ__ day of October, 2015.

_____
Notary Public's Signature

[SEAL]

**MICAELA SUE ALLEN**
Notary Public, State of Texas
My Commission Expires
**January 15, 2019**

Expiration: _January 15, 2019_

**App. 30**

**DEFENDANT 000040**

## ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family Trustee by NANCY MARIE DONDERO was delivered to and received by me on October __, 2015.

James D. Dondero

DEFENDANT 000041

# Exhibit C

TRUST AGREEMENT

Between

DANA SCOTT BREAULT,
Settlor

and

JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees

THE DUGABOY INVESTMENT TRUST

WINSTEAD PC
DALLAS, TEXAS

App. 33
DEFENDANT 000001

# THE DUGABOY INVESTMENT TRUST

## TABLE OF CONTENTS

PAGE

ARTICLE I  DEFINITIONS .................................................................................................1
    1.1    Settlor..............................................................................................................1
    1.2    Jim...................................................................................................................1
    1.3    Trustees..........................................................................................................1
    1.4    Children..........................................................................................................1
    1.5    Descendants ...................................................................................................1
    1.6    Code ...............................................................................................................1
    1.7    Per Stirpes ......................................................................................................1

ARTICLE II  FUNDING ......................................................................................................2

ARTICLE III  DISTRIBUTION OF PRINCIPAL AND INCOME ...................................2
    3.1    Trust for Jim...................................................................................................2
    3.2    Trust for Child................................................................................................5
    3.3    Trusts for Descendants..................................................................................6
    3.4    Contingent Distribution ................................................................................9
    3.5    General Power of Appointment for Certain Beneficiaries.............................9
    3.6    Postponement of Distribution ......................................................................10

ARTICLE IV  PROVISIONS AFFECTING DISTRIBUTION.........................................10
    4.1    Withdrawal Right..........................................................................................10
    4.2    Restriction Upon Alienation ........................................................................12
    4.3    Distributions Constitute Separate Property..................................................12
    4.4    Method of Payment.......................................................................................12
    4.5    Evidence of Need..........................................................................................12
    4.6    Termination of Small Trust...........................................................................12
    4.7    Generation-Skipping Transfer Taxes and Payment .....................................13

ARTICLE V  THE TRUSTEE .............................................................................................13
    5.1    Resignation of Trustee ..................................................................................13
    5.2    Appointment and Succession of Trustees.....................................................14
    5.3    Removal of Trustee.......................................................................................16
    5.4    Succession of Corporate Trustee ..................................................................16
    5.5    Trustee's Fees ...............................................................................................16
    5.6    Bond...............................................................................................................16
    5.7    Liability of Trustee. ......................................................................................16
    5.8    Predecessor Fiduciary ..................................................................................18
    5.9    Periodic Accounting.....................................................................................18
    5.10   Beneficiary under Disability ........................................................................19
    5.11   Incapacity of Individual Trustee ..................................................................19

ARTICLE VI  TRUST ADMINISTRATION ......................................................................19

App. 34

DEFENDANT 000002

<u>TABLE OF CONTENTS</u>
(Continued)

<u>PAGE</u>

| | | |
|---|---|---|
| 6.1 | General Powers | 19 |
| 6.2 | Division of Powers | 24 |
| 6.3 | Merger of Trusts | 25 |
| 6.4 | Certain Powers and Rights Limited | 25 |
| 6.5 | GST Inclusion Ratio | 25 |
| 6.6 | Out-of-State Properties | 25 |
| 6.7 | Management of Real Property | 26 |
| 6.8 | No Court Supervision | 26 |
| 6.9 | Division of Trusts | 26 |
| 6.10 | Limitation of Powers | 26 |
| 6.11 | Dealing with Fiduciaries | 27 |

**ARTICLE VII  IRREVOCABILITY** .......................................................... 27

**ARTICLE VIII  MISCELLANEOUS PROVISIONS** ................................ 28

| | | |
|---|---|---|
| 8.1 | Applicable Law | 28 |
| 8.2 | Perpetuities Provision | 28 |
| 8.3 | Gestation | 28 |
| 8.4 | Survivorship | 29 |
| 8.5 | Release of Powers and Interests | 29 |
| 8.6 | Powers of Appointment | 29 |
| 8.7 | Liability of Third Party | 30 |
| 8.8 | Use of Words | 30 |
| 8.9 | Unenforceable Provision | 30 |
| 8.10 | Titles, Headings, and Captions | 30 |
| 8.11 | Counterpart Signatures | 30 |
| 8.12 | Trust Name | 30 |

App. 35

**DEFENDANT 000003**

## THE DUGABOY INVESTMENT TRUST

AGREEMENT OF TRUST made and entered into at Dallas, Texas, this ____ day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

### ARTICLE I

### DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1    Settlor.  "Settlor" means DANA SCOTT BREAULT.

1.2    Jim.  "Jim" means JAMES D. DONDERO.

1.3    Trustees.    The initial Trustee of each trust created hereunder is JAMES D. DONDERO.  "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number.    "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c).  "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b). "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a).  The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4    Children.  "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement. "Child" means one of the Children.

1.5    Descendants.    "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6    Code.  "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7    Per Stirpes.  "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant.  The per

App. 36

DEFENDANT 000004

stirpital allocation shall commence with the most senior generation that has a living representative.

ARTICLE II

FUNDING

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

ARTICLE III

DISTRIBUTION OF PRINCIPAL AND INCOME

3.1   Trust for Jim.   The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a)   Distributions to Jim.   The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health. Undistributed income shall be accumulated and added to principal. In exercising its discretion, the Family Trustee shall take into account the following factors:

(i)   Jim is the primary beneficiary of the trust.

(ii)   The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii)   Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv)   Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v)   Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b)   Distributions by Independent Trustee.   The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable. It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

-2-

**App. 37**

**DEFENDANT 000005**

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c)     Inter Vivos Special Power of Appointment. During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate. Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d)     Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i)     If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

App. 38
DEFENDANT 000006

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii)    The scope and terms of the power shall be defined in the instrument. Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted. This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes. Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e)    <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death. Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i)    <u>Pursuant to General Testamentary Power of Appointment</u>. This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death. In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii)    <u>Special Testamentary Power of Appointment</u>. This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above. The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii)    <u>Alternative Disposition</u>. The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1)    If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living. The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof. The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

-4-

**App. 39**

**DEFENDANT 000007**

(2)    If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

3.2    <u>Trust for Child</u>.  All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

(a)    <u>Distributions to Child</u>.  The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education.   In exercising its discretion, the Trustee shall take into account the following factors:

(i)    The Child's standard of living at the creation of the trust.

(ii)    The Child is the primary beneficiary of the trust.

(iii)    The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

(iv)    Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

(v)    Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

(b)    <u>Distributions to Child's Descendants</u>.  The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education.  In exercising its discretion, the Trustee shall take into account the following factors:

(i)    The primary purpose of the trust.

(ii)    The respective needs of each Descendant.

(iii)    The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv)    Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

App. 40

DEFENDANT 000008

(v)   Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others.  Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)   Inter Vivos Special Power of Appointment.  The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement.  Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d)   Termination.  If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child.  Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it.  However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate.  The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof.  If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, Per Stirpes.  If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms.  If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3   Trusts for Descendants.  The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

App. 41

DEFENDANT 000009

Descendants, Per Stirpes.  The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

     (a)    Distributions.  The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education.  In exercising its discretion, the Trustee shall take into account the following factors:

          (i)    The Beneficiary's standard of living at the creation of the trust.

          (ii)    The Beneficiary is the primary beneficiary of the trust.

          (iii)    The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

          (iv)    Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

          (v)    Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

     (b)    Distributions to Beneficiary's Descendants.  The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education.  In exercising its discretion, the Trustee shall take into account the following factors:

          (i)    The primary purpose of the trust.

          (ii)    The respective needs of each Descendant.

          (iii)    The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

          (iv)    Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

          (v)    Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

App. 42

DEFENDANT 000010

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)    Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d)    Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

App. 43

DEFENDANT 000011

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4    <u>Contingent Distribution</u>. If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5    <u>General Power of Appointment for Certain Beneficiaries</u>.

(a)    Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees shall make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable. As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b)    If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

App. 44
DEFENDANT 000012

(c)    The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6    <u>Postponement of Distribution</u>.    Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property.    At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate.    During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education.    If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

ARTICLE IV

PROVISIONS AFFECTING DISTRIBUTION

4.1    <u>Withdrawal Right</u>.    Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer.    A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust.    If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes.    Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

(a)    <u>Amount That May Be Withdrawn</u>.    When a contribution is made, Jim may withdraw the lesser of the following amounts:

(i)    the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

(ii)    the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

App. 45
DEFENDANT 000013

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

        (iii)    the value of the contribution that is subject to the withdrawal right.

        (b)    <u>Withdrawal Period and Notice</u>.  Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right.  Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right.  During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf.  If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse.  For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate.  The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

        (c)    <u>Payment of Withdrawal Amount</u>.  If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor.  Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust.  Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose.  Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

        (d)    <u>Distributions During Withdrawal Period</u>.  If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

        (e)    <u>Lapse of Withdrawal Right</u>.  In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

**App. 46**

**DEFENDANT 000014**

4.2   <u>Restriction Upon Alienation</u>.  No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it.  Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts.  The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process.  The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3   <u>Distributions Constitute Separate Property</u>.  Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary.  Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary.  Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4   <u>Method of Payment</u>.  The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways:  directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability.  In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto.  The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5   <u>Evidence of Need</u>.  In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs.  The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6   <u>Termination of Small Trust</u>.  Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration.  In the event of termination, the Trustee shall distribute the trust to the income

App. 47

DEFENDANT 000015

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7    Generation-Skipping Transfer Taxes and Payment. It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1    Resignation of Trustee. The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

App. 48

DEFENDANT 000016

5.2     Appointment and Succession of Trustees.

    (a)     Generally.

        (i)     Family Trustee.   Jim is the initial Family Trustee of all trusts created hereunder.  If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising.  If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee.  If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee.  If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee.  If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (ii)     Independent Trustee.  GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee.  If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code.  If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee.  If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee.  If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (iii)     Administrative Trustee.   COMMONWEALTH TRUST COMPANY is the initial Administrative Trustee.   If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising.   If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising.   If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above.  The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

-14-

DEFENDANT 000017

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b)    Successor Trustee. If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act. If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c)    Manner of Appointment; Permissible Trustees. Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee. An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control. The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

App. 50
DEFENDANT 000018

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3   Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4   Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5   Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6   Bond. The Trustee shall not be required to furnish bond or other security.

5.7   Liability of Trustee.

(a)   Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b)   Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

-16-

**App. 51**

**DEFENDANT 000019**

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

-17-

App. 52

DEFENDANT 000020

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8     Predecessor Fiduciary.   No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9     Periodic Accounting.   The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

-18-

DEFENDANT 000021

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10    <u>Beneficiary under Disability</u>.  A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11    <u>Incapacity of Individual Trustee</u>.  In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

ARTICLE VI

<u>TRUST ADMINISTRATION</u>

6.1    <u>General Powers</u>.    Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a)    <u>Retain Property</u>.    To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b)    <u>Invest</u>.    To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c)    <u>Sell</u>.  By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

-19-

App. 54

DEFENDANT 000022

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper. To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d) <u>Lease</u>. To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e) <u>Real Estate</u>. To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f) <u>Borrow</u>. To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g) <u>Loans</u>. To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h) <u>Conserve Estate</u>. To take any action to conserve the trust estate.

(i) <u>Litigation</u>. To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j) <u>Claims</u>. To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k) <u>Abandon Property</u>. To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l) <u>Documents</u>. To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m) <u>Agents</u>. To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

App. 55

DEFENDANT 000023

(n)   <u>Securities</u>.   To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o)   <u>Nominee</u>.   To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p)   <u>Additional Property</u>.   To receive additional property from any source and add it to the trust estate.

(q)   <u>Insurance</u>.   To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs.  The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r)   <u>Business Powers</u>.

(i)   <u>In General</u>.   To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii)   <u>Closely Held Businesses</u>.   This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1)   <u>Exoneration from Liability</u>.   It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds.  Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2)   <u>Management Powers</u>.   The Family Trustee shall have the exclusive duty to deal with and manage the business.  In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A)   To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

-21-

(B)   To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C)   To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D)   To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E)   To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F)   To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G)   To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or  a fiduciary of this Trust; and

(3)   Exclusion from Powers.  Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s)   Income and Principal.  To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t)   Tax Elections.  To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others.  The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

App. 57

DEFENDANT 000025

(u)  <u>Reliance</u>.   To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution.   The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v)  <u>Commingling</u>.   To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w)  <u>Division and Distribution</u>.   To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x)  <u>Withholding of Distribution</u>.  To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y)  <u>Mineral Powers</u>.  To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z)  <u>Environmental Hazards</u>.  To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

-23-

**App. 58**

**DEFENDANT 000026**

(aa)    <u>Miscellaneous Powers</u>.  Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2    <u>Division of Powers</u>.  The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a)    <u>Administrative Trustee</u>.  The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i)    To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii)    To maintain storage of tangible personalty and evidence of intangible trust property.

(iii)    To maintain trust records.

(iv)    To maintain an office for Trustee meetings and other trust business.

(v)    To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi)    To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii)    To execute documents with respect to trust account transactions.

(viii)    To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b)    <u>Independent Trustee</u>.  The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement.  These powers may only be exercised by the Independent Trustee.

(c)    <u>Family Trustee</u>.  The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee.  Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate.  If there is no Family Trustee serving,

App. 59

DEFENDANT 000027

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3     Merger of Trusts.  If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement.  The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement.  If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen.  If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire.  Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4     Certain Powers and Rights Limited.  Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d).  All issues applicable to the trust shall be resolved accordingly.

6.5     GST Inclusion Ratio.  If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero.   If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6     Out-of-State Properties.  If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper.  The ancillary trustee shall be responsible to the Trustee for all property it administers.  The Trustee

App. 60

DEFENDANT 000028

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

    6.7    <u>Management of Real Property</u>. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

    6.8    <u>No Court Supervision</u>. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

    6.9    <u>Division of Trusts</u>. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

        (a)    <u>Division and Funding of Separate Trusts</u>. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

        (b)    <u>Administration of Separate Trusts</u>. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

        (c)    <u>Powers of Appointment</u>. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

    6.10    <u>Limitation of Powers</u>. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

-26-

**App. 61**

**DEFENDANT 000029**

(a)    Support Duty.  Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries.  When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b)    Adequacy of Consideration.  No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c)    Insurance.  The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d)    Borrow.  The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e)    Substitute Property.  The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f)    Vote.  A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11   Dealing with Fiduciaries.  The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement.  Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is:  a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

ARTICLE VII

IRREVOCABILITY

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

App. 62
DEFENDANT 000030

ARTICLE VIII

MISCELLANEOUS PROVISIONS

8.1 <u>Applicable Law</u>.  The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware.  However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state.  No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes. Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust.  Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2 <u>Perpetuities Provision</u>.  The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law.  If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property.  If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement.  Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution.  If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3 <u>Gestation</u>.  A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

-28-

App. 63

DEFENDANT 000031

8.4   <u>Survivorship</u>.  Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5   <u>Release of Powers and Interests</u>.   Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law.  Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6   <u>Powers of Appointment</u>.

(a)   <u>Capacity in Which Exercisable</u>.  Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b)   <u>Manner of Appointment</u>.   Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others.  Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c)   <u>Exercise of Inter Vivos Power</u>.   An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it.  If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d)   <u>Determination of the Exercise of a Testamentary Power</u>.  The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised.  If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

App. 64

DEFENDANT 000032

(e)   <u>Tax Consequences</u>.   The exercise of a power of appointment may have important tax consequences.  The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7   <u>Liability of Third Party</u>.  No person paying money or delivering property to the Trustee need see to the application of such money or property.  No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8   <u>Use of Words</u>.  As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9   <u>Unenforceable Provision</u>.   If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10   <u>Titles, Headings, and Captions</u>.  All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11   <u>Counterpart Signatures</u>.  This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12   <u>Trust Name</u>.  The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals.  The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement.  The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

App. 65

DEFENDANT 000033

_Dana Scott Breault_ 23 Oct 10

DANA SCOTT BREAULT, Settlor

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 23 day of October, 2010.

_____
Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013

-31-

**App. 66**

**DEFENDANT 000034**

_____

JAMES D. DONDERO, Family Trustee

STATE OF TEXAS            §
                          §
COUNTY OF DALLAS          §

     BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.



_____

Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

App. 67

DEFENDANT 000035

COMMONWEALTH TRUST COMPANY,
Administrative Trustee


By: _Cynthia D M Brown_

    Name:   Cynthia D. M. Brown

    Title:   President


STATE OF DELAWARE    §
                         §
COUNTY OF NEW CASTLE   §

    BEFORE ME, the undersigned authority on this day personally appeared _Cynthia D. M. Brown_, _President_, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed as the act of COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of ~~October~~ November, 2010.


Notary Public

5480300v.6 47609/1

App. 68

DEFENDANT 000036

### THE DUGABOY INVESTMENT TRUST
#### James D. Dondero, Family Trustee

August 26, 2015

Dana Scott Breault
5207 Scarborough Lane
Dallas, Texas 75287

Cynthia D. M. Brown, President
Commonwealth Trust Company
29 Bancroft Mills Road #2
Wilmington, Delaware 19806

> Re:   The Dugaboy Investment Trust

Dear Ms. Breault,

I, James D. Dondero, am writing to inform you that on August 26, 2015, I will cease to serve as Family Trustee of The Dugaboy Investment Trust (the "Trust") and shall stop performing all duties and responsibilities undertaken as Family Trustee of the Trust.

Pursuant to the attached Resignation of Family Trustee, I appoint Grant James Scott as the successor Family Trustee of the Trust.

This letter and the attached Resignation of Family Trustee shall satisfy my obligations under Section 5.1 of that Trust Agreement entered into on November 15, 2010 to provide you, Settlor, with written notice of my resignation.

Very truly yours,

James D. Dondero

**App. 69**

DEFENDANT 000042

## RESIGNATION OF FAMILY TRUSTEE

I, **JAMES D. DONDERO**, do hereby acknowledge that I voluntarily tender my resignation as Family Trustee of The Dugaboy Investment Trust pursuant to that Trust Agreement, dated November 15, 2010 by, between and among Dana Scott Breault, as Settlor, and Common Wealth Trust Company, as Administrative Trustee.

I appoint **GRANT JAMES SCOTT** as the successor Family Trustee. This resignation shall take effect immediately upon the execution hereof and delivery of a written acknowledged instrument wherein Grant James Scott accepts the trust and the position of Family Trustee.

**IN WITNESS WHEREOF**, I hereby sign my Resignation as Family Trustee of the above trust.

Signed, sealed and delivered in the presence of:

_____          8.26.15
Family Trustee                   Date

STATE OF TEXAS       §
COUNTY OF DALLAS     §

Before me, a notary public, on this day personally appeared **JAMES D. DONDERO** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26th_ day of August, 2015.

_____
Notary Public's Signature

[SEAL]

MICAELA SUE ALLEN
Notary Public, State of Texas
My Commission Expires
January 15, 2019

Expiration: _1-15-2019_

DEFENDANT 000043

## ACCEPTANCE OF APPOINTMENT OF FAMILY TRUSTEE

I, **GRANT JAMES SCOTT**, appointed as Family Trustee under Article V, Section 5.2(a)(i) of The Dugaboy Investment Trust, dated November 15, 2010 (the "**Trust**"), hereby acknowledge and accept the position of Family Trustee of the Trust and hereby agree to faithfully perform all the duties and adopt all of the obligations imposed.

Signed this _26 th_ day of August, 2015.

_____
GRANT JAMES SCOTT
**Family Trustee**

STATE OF ~~TEXAS~~ _NC_        §
COUNTY OF ~~DALLAS~~        §
_WAKE_

Before me, a notary public, on this day personally appeared **GRANT JAMES SCOTT** known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _26 th_ day of August, 2015.

[SEAL]

_____
Notary Public's Signature

MY COMMISSION EXPIRES MAY **17, 2018**
Expiration:_____

**App. 71**

**DEFENDANT 000044**

### ACKNOWLEDGEMENT OF DELIVERY

I, JAMES D. DONDERO, acknowledge that this Acceptance of Appointment of Family

Trustee was delivered to and received by me on August 26 2015.

James D. Dondero

DEFENDANT 000045

# Exhibit D

# BONDS ELLIS EPPICH SCHAFER JONES LLP

### ATTORNEYS & COUNSELORS

D. MICHAEL LYNN  |  D: 817.405.6915  |  MICHAEL.LYNN@BONDSELLIS.COM

February 1, 2021

***Via Email and First Class Mail:***
Jeffrey Pomerantz
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Email: jpomerantz@pszjlaw.com

**Re:    Highland Capital Management, L.P.: notes receivable from Dondero et al.**

Dear Jeff:

The Debtor recently commenced suit to collect on certain notes payable to it executed by Mr. Dondero and certain of his affiliates. As you are aware, in addition to other defenses, Mr. Dondero views the notes in question as having been given in exchange for loans by Highland made in lieu of compensation to Mr. Dondero.

Please ensure that any transferee of any of the notes is made aware of Mr. Dondero's position and that the Independent Board receives copies of this letter. I thank you in advance for your cooperation in this matter.

Sincerely,

D. Michael Lynn

Cc:    Jim Dondero
       John Bonds
       Douglas Draper
       Davor Rukavina
       Lee Hogewood
       John Kane
       Jason Rudd
       Lauren Drawhorn

**App. 74**

Confidential                                                                DEFENDANTS-0000435